**EXHIBIT 18 – Part 2**

June 16, 2008 Email from UBS to DTC, with attachments

(Attached)

Appendix IV





# Employees Retirement System of the Government of the Commonwealth of Puerto Rico (ERS):

# Covered Payroll Outlook

# (2008-2059)

**Submitted to: ERS**

**Prepared by: Global Insight, Inc.**

**May 28, 2008**

**Jim Diffley**
Managing Director, U.S. Regional Services

**Rafael Amiel**
Regional Managing Director, Latin America

**Ana Orozco**
Economist, Latin America

Global Insight, Inc.
800 Baldwin Tower
Eddystone, PA  19022

**(610) 490-2642**

Copyright © 2007 Global Insight Inc.

IV-1

Appendix IV

# Table of Contents

Page Number

Executive Summary..................................................................................... 2

Introduction................................................................................................. 4

Chapter 1. Macroeconomic Environment................................................. 4

Chapter 2. Econometric Model................................................................. 10

Chapter 3. Results...................................................................................... 14

Chapter 4. Alternative Forecasts.............................................................. 18

Appendix

IV-1

UBS-ERS_Ultra_Vires-0087926

## Executive Summary

Global Insight (GII) has developed a model to forecast the total payroll of those government employees that participate in the Employees Retirement System of the Government of the Commonwealth of Puerto Rico (ERS). This econometric model, coupled with our long term forecast of the Puerto Rico economy, has been used to project the total number of employees that will participate in the ERS as well as their average wage from fiscal year 2008 through fiscal year 2059. Our Baseline forecast indicates that in fiscal year 2059, the total covered payroll will amount to US$39.5 billion. Between fiscal years 2008 and 2059 the average annual growth rate of the covered payroll is projected to be 4.5%. We also present alternative forecasts that project higher and lower paths of the covered payroll. Under these, less likely, scenarios we forecast that by fiscal year 2059, the total covered payroll could be as low as US$32 billion, if the government undergoes a major downsizing, and as high as US$63.7 billion, in a scenario were an investment boom drives rapid economic growth.

Our model was constructed from widely accepted economic principles and Global Insight's long experience in building econometric forecasting models. After extensive analysis, we found the following Puerto Rico macroeconomic variables to be effective in building an empirical model of total employment and average wages in the ERS participating sector: total government employment, real GNP, labor productivity, and the unemployment rate. The projections and forecasts are based on future paths of these factors as predicted by GII's Macroeconomic Model of Puerto Rico, which in turn is fed by GII's U.S. Macroeconomic Model.

## Disclaimer

**The projections, forecasts and other forward looking information included in this report, including, but not limited to, those regarding future Government of Puerto Rico employment and wage levels, are estimates, which have been prepared on the basis of certain assumptions and hypotheses. No representation or warranty of any kind is or can be made with respect to the accuracy or completeness of, and no representation or warranty should be inferred from, these projections, forecasts and other forward looking information. The projections, forecasts and other forward looking information contained in this report are based upon assumptions as to future events and, accordingly, are subject to varying degrees of uncertainty. Some assumptions inevitably will not materialize and, additionally, unanticipated events and circumstances may occur. Therefore, for example, actual future Government of Puerto Rico payrolls inevitably will vary from the projections, forecasts and other forward looking information included in this report and the variations may be material and adverse.**

Confidential          UBS-ERS_Ultra_Vires-0087928

## Introduction

The goal of this research is to forecast the total payroll of those government employees that participate in the Employees Retirement System of the Government of the Commonwealth of Puerto Rico (ERS), over the next 51 years. In order to achieve this Global Insight has developed a model, which, coupled with our long-term forecast for the Puerto Rico economy, allows us to forecast the total number of ERS participating employees, as well as their average wage.

The ERS is the administrator of a cost-sharing, multiple-employer, retirement system established by the Commonwealth of Puerto Rico. The ERS was created under the Act 447, and became effective on January 1, 1952. The ERS covers all regular employees of the Commonwealth's central government, municipalities and certain public corporations not covered by their own retirement's systems.[1] On September 24, 1999, Act No. 447, was amended for the purpose of establishing a new pension program (System 2000), which is a hybrid defined contribution plan, also known as a cash balance plan. In fiscal year 2007, the ERS reported 176,837 active participants in all ERS plans.

This report is organized as follows: In Chapter 1, we discuss in detail our baseline forecast for the main macroeconomic factors that drive employment and wages in the government sector. Our baseline forecast assumes that there will be no major structural change in the Puerto Rican economy over the foreseeable future. We also assume that government policy continues as in the past, without significant government restructuring. Chapter 2 describes the econometric model used to project total employment and average wages in the ERS participating sector. The baseline forecast for total covered payroll is discussed and analyzed in relation to total government employment and wages in Chapter 3. Finally, in Chapter 4 we discuss alternative projections of the total covered payroll.

## Chapter 1

## Macroeconomic Environment

### Economic Growth

#### A. Context and Recent Developments

Puerto Rico is a self-governing commonwealth of the United States, yet its economic growth and development have traditionally been slower than that of the U.S. mainland. Although it does raise its own taxes, Puerto Rico has no independent monetary or trade policy. U.S. government transfers buoy local consumption, and U.S. demand influences tourism activity and manufacturing production on the island, as the majority of Puerto Rico's import-export trade is with the United States. As a result, economic performance in the Commonwealth is strongly influenced by the U.S. business cycle.

---

[1] For a detailed description of the Puerto Rico government's main retirement systems, as well as an overview of the government structure, please see the "Paper on Structure of Government of Puerto Rico and its Principal Retirement Systems" prepared by HCalero Consulting Group Inc.

Confidential                                                                                     UBS-ERS_Ultra_Vires-0087929

Robust U.S. demand and high levels of consumer and business confidence boosted Puerto Rico's annual average real growth rate to 3% in 1995-2001, from 2% in the preceding 15 years. From the second half of 2000 economic activity slowed, however, and in fiscal year 2002, the Commonwealth slipped into recession due in part to the terrorist attacks of September 11, 2001 and their effect on U.S. demand and tourism. Although the recession was relatively mild – real GNP contracted 0.3% – it has been followed by a period of sluggish growth. In 2001-07 average annual real growth was just 0.9%. Although historically, domestic factors have played a secondary role in the island's economic performance, over the last two years the island's ongoing fiscal crisis has been the main factor behind the economic slowdown.

**Economic Growth: Historical Trends**
(Percent change from a year earlier)



Real GNP        Real Per-capita GNP

Although in fiscal year (FY) 2004, thanks to stronger U.S. growth, the Puerto Rico economy seemed to be gaining momentum, high oil and food prices, an ongoing fiscal crisis, and a political impasse between the governor and the legislature have since had a negative impact on economic activity in the Commonwealth. In fiscal 2005, real GNP, which is most often used as a measure of growth in the local economy because, unlike GDP, it nets out the large flows of earnings accruing to non-Puerto Rico residents, i.e. U.S. corporations established on the island, expanded 1.9%, down from 2.7% in fiscal 2004. Real GDP was up 0.6%, down from 3.0% a year earlier.  In fiscal 2006 slow growth continued (real GNP inched up 0.5%) and turned into a recession in fiscal 2007 when real GNP contracted 1.8%, while real GDP dropped 1.6%.  High inflation, rising interest rates on the back of the U.S. Federal Reserve (Fed)'s monetary tightening, and high unemployment rates continued to impose constraints on the dynamics of real private consumption, which expanded only 1.7%, a similar rate to 2006 but down from 3.6% in fiscal 2005. Meanwhile, real fixed investment dropped for the third consecutive year, as worries about the fiscal retrenchment of the government and credit downgrades continued to weigh on business confidence. Government consumption, restricted by fiscal austerity measures needed to contain the widening deficit, was practically stagnant, growing 0.1% in real terms, while net trade continued to make a negative contribution to GNP, as exports of goods and services decreased 3.2%, while imports were up 0.4%, both in real terms.

**B. Current Trends Scenario (Baseline Forecast)**

In fiscal year 2008, Global Insight estimates that economic activity on the island remained in recession, with real GNP contracting by more than 2%. Through their effect on disposable income, elevated inflation levels, due to the gradual pass-through of high global oil prices to other goods and services, have continued to take a toll on private consumption. Private investment is also believed to have remained slow because of weak investor confidence and still-high interest rates at the beginning of the year. On the

Confidential

external front, the Commonwealth's export sector was undoubtedly hurt by the marked slowdown in the U.S. economy. In fiscal 2009, the slow improvement of public-sector finances, the fiscal stimulus from the U.S. Federal Government, and the continued easing of monetary policy in the United States will help reverse the economic contraction, marking the beginning of a gradual recovery. Still, private investment and household spending growth are expected to remain moderate as consumer and business confidence levels begin to recover but only slowly. Meanwhile, although the government will continue to fund some capital investment projects, such as the construction of new sports venues for the 2010 Central American and Caribbean Games, fiscal austerity measures needed to address the fiscal crisis will limit the public sector's ability to stimulate economic growth over the near term.

Over the medium-term, we estimate average real GNP growth around 3.0%, slowing to 2.0% by 2030. During the remainder of the forecast period growth will continue to decelerate due to unfavorable demographic trends, reaching 1.5% by 2059. This means that in the long-run economic growth in Puerto Rico will continue to lag behind that in the U.S. mainland. Puerto Rico will, however, continue to have one of the highest GDP per capita in Latin America.

Puerto Rico is one of the most open economies in the world, with free mobility of goods, services, capital, and labor to the vast U.S. market. The stability provided by this high degree of integration with the U.S., along with a highly skilled labor force and higher quality infrastructure than that of most emerging economies, create a relatively strong business environment that will support real economic growth in the long term.

Still, a number of structural issues will continue to prevent long-term real growth above 3%. Although Puerto Rico has a good record of educational development, the existence of a number of government transfer programs funded mainly by the U.S. federal government, and the fact that Puerto Rico is subject to U.S. minimum wage legislation, will continue to constrain labor force participation rates, while maintaining unemployment levels high, thus limiting the contribution of human capital to long-term growth. Moreover, the rate of capital accumulation in Puerto Rico has not been sufficiently fast to support vigorous medium- and long-term growth. The fixed investment-to-GDP ratio fell from close to 30% in the early 1970s to less than 15% recently, due mainly to declining private investment. This problem will be exacerbated by the recent elimination of the tax advantages under Section 936 of the U.S. Internal Revenue Code. Due to a weak domestic savings rate, investment in Puerto Rico has been largely financed by foreign sources, attracted by strong incentives under section 936 to reinvest earnings in the Commonwealth. With the cancellation of the section 936 provisions, the relaxation of U.S. trade barriers, and the emergence of many other tax havens around the world, some advantages Puerto Rico has had in the past thanks to its close association with the U.S. are fading. As a result, in order for Puerto Rico to improve its long-term growth outlook, it will have to find new ways to attract foreign investment to the island, as well as promoting the development of island-based businesses that can create new job opportunities. To this end, the government is trying to accelerate Puerto Rico's insertion into the knowledge economy by promoting research and development in the biotechnology, computing and information technology and aerospace industries in particular.

## Inflation

### A. Context and Recent Developments

Price changes in Puerto Rico as measured by the broadest price measure, the implicit GNP deflator, have roughly followed the trend in inflation levels in the United States, peeking in the early 1980s and accelerating recently on the back of high oil prices. Still, since the 1980s overall prices have consistently

Confidential

increased more rapidly in Puerto Rico than in the U.S. The inflation differential between Puerto Rico and the U.S. widened in the late 1990s, but has since started to converge back to its fifteen year average of 1.5%.

**Inflation: Historical Trends**
(GNP deflator, % change year-on-year)



The Puerto Rican Department of Labor recently completed the implementation of a new CPI for the island. The old CPI was often criticized because the basket of goods had not been revised since 1977, and the measure, therefore, normally overstated the real level of prices in the island. The newly released CPI has a base of December 2006. Monthly figures for the new index, which are published by the Puerto Rican Planning Board, are available only from December 2006 forward. As of April 2008 Puerto Rico's 12-month consumer price inflation stands at 8.1%, a much more reasonable rate than the 19.6% rate recorded by the old index in June 2007, and closer to the inflation rate as measured by the GNP deflator, which stood at 5.4% in fiscal 2007.

Despite the revisions, the fact remains that consumer prices have been consistently increasing more rapidly in Puerto Rico than in the United States. The main driver of consumer prices in the island has been the rise of global oil prices. Because the commonwealth is heavily dependent on oil imports to meet its domestic energy needs, particularly for electricity generation, any fluctuation in the price of oil has a significant effect on price levels in the island.

## B.  Current Trends Scenario (Baseline Forecast)

Inflation in Puerto Rico will remain high in the near term. The monetary easing by the U.S. Federal Reserve during the second half of 2007 and into 2008 will depress interest rates on the island, fueling stronger domestic demand, and in turn, pressuring inflation. Still, high global oil prices, which are expected to remain prone to significant upward spikes because of the still tight global supply/demand situation, will continue to present the biggest risk to the Commonwealth's inflationary picture in the near term.

Over the medium-term, we expect inflation levels in Puerto Rico will trend down gradually as global oil prices stabilize. In the long-term, we foresee Puerto Rico's inflation converging towards that observed in the United States, in a similar fashion as during the periods 1980-1989 and 1991-1993, before they started to diverge during the rest of the nineties. The high synchronization of Puerto Rico to the American economy, and the use of the same currency (low transaction costs, no exchange-rate risk, and the lack of independent monetary policy) support this view, which, however, requires the fulfillment of certain conditions. First of all, and contrary to the poor fiscal performance that affected domestic prices during the last couple of years, present and future governments would try to pursue a responsible fiscal

Confidential

management, keeping the growth of public debt in line with economic growth, and to avoid unnecessary borrowing that crowds out private investment. In addition, productivity gains observed in the United States would be equally transferred to Puerto Rico so that any price reduction coming from increasing productivity is replicated on the island. Moreover, increasing competition among producers and distributors on the island, and lower transportation costs would help to slowly reduce any mark-up charged in Puerto Rico with respect to U.S. prices.

## Demographics and the Labor Market

### A.   Context and Recent Developments

**Demographics**

Puerto Rico's population, 3.81 million according to the 2000 census, was estimated at 3.94 million in fiscal year 2007, making it one of the most populated islands in the world. Annual average population growth has slowed from 0.9% in the early 1990s to less than 0.5% recently due to declining birth rates and high emigration rates. It is estimated that some 2 million Puerto Rico residents have migrated to the United States. Although life expectancy rates in Puerto Rico (74.5 years for males and 82.5 years for females) have improved significantly in recent years, they remain lower than those in the U.S. mainland due to high rates of poverty on the island, especially in the rural areas.  Indeed, according to the 2000 Census, nearly 50% of all Puerto Rico residents live below the poverty line. In recent years, Puerto Rico's age structure has changed as the medical care system improved. As death rates decline, the proportion of the population over 65 years of age has increased; in fiscal 2007, it is estimated that people over 65 made up 13.2% of the population. However, the proportion of children under 16 has remained fairly constant at about 25%.

**Labor Markets**

Historically, the unemployment rate has been significantly higher in Puerto Rico than in the United States, and the labor force participation rate has been much lower. According to the Puerto Rico household survey, in fiscal 2007, the island's labor force amounted to 1.41 million, representing around 47% of the working-age population, well below the U.S. mainland's 65%. Even with these low labor force participation rates, Puerto Rico's average unemployment rate of 10.4% in fiscal 2007 was more than double the U.S. national average.

**Labor Market: Historical Trends**



As the economy has not been able to provide sufficient jobs in the private sector, the government is a primary source of employment, placing a heavy burden on the Commonwealth's financial accounts.

Confidential                                                                    UBS-ERS_Ultra_Vires-0087933

According to the United States' Bureau of Labor Statistics (BLS) Establishment Survey, in fiscal 2007, the Puerto Rico government employed 298,125 people, or 23.6% of the total employed population.

**B.  Current Trends Scenario (Baseline Forecast)**

Over the near term, unemployment levels in Puerto Rico will remain high.  Developments in the labor market are highly dependent on the macro-economy. Thus, the recession during fiscal 2007-2008 and the slow recovery during 2009, will likely constrain hiring, keeping the unemployment rate above 10%.

Beyond the near term, the labor force participation rate in Puerto Rico should trend up gradually. Estimates from the United Nations suggest that Puerto Rico's population will peak in 2044. This will take place very gradually, as the population growth rate—currently close to 0.5% per year—falls to zero over the next 40 years. The labor force, however, is currently growing significantly faster than the population, at roughly 2% per year. This is in part due to the age structure of Puerto Rico: although birth rates are declining, there are far more young people entering the workforce than there are older people retiring from the workforce. As a result, even after the population peaks, the labor force will continue to grow, albeit at a slower pace.

Still, important labor market rigidities will continue to constrain the labor force participation rate in Puerto Rico, keeping it below U.S. levels. Puerto Rico residents are eligible for the same income transfer programs as U.S. residents, such as the Nutrition Assistance Program (NAP, the food stamp program) and disability insurance, which are funded mainly by the U.S. federal government. Because average wages are much lower in Puerto Rico, the benefits these federal programs provide are much more attractive to residents of the island. Since these benefits are not tied to work incentives, they have discouraged participation in the labor force and will continue to do so in the foreseeable future unless they are reformed. Additionally, Puerto Rico is subject to U.S. minimum wage legislation, and as a result, the minimum wage on the island is relatively high when compared to the average wage. This discourages employment in low-productivity positions, while encouraging the informal sector, hindering Puerto Rico's ability to compete in labor-intensive manufacturing sectors.[2] Because we do not expect average wages to catch up to those in the mainland, this will continue to be problem in the future. Furthermore, an open border to the U.S. has encouraged the migration of Puerto Rico residents seeking higher wage employment in the mainland.

# Chapter 2

# Econometric Model

An econometric model is a set of mathematical equations which best statistically describes the available historical data. It can be applied, with assumptions on the projected path of independent explanatory variables, to predict the future path of the dependent variable being studied.  In this case, in order to forecast the payroll of those government employers that participate in the ERS, we are interested in

---

[2] Because the mandated minimum wage is relatively high when compared to the average wage in the island, it makes hiring low-skilled workers relatively costly for firms. This makes labor-intensive industries in Puerto Rico uncompetitive when compared to other low-wage countries, in both Latin America and Asia.

Confidential                                                                                  UBS-ERS_Ultra_Vires-0087934

predicting the future path of the total number of ERS participating employees, as well as their average wage.

After extensive analysis of available data measuring all of the factors which influence the Puerto Rico labor market, we found the following Puerto Rico macroeconomic variables to be effective in building an empirical model of the total employment and average wages in the ERS participating sector:

1) Total government employment,
2) Real GNP,
3) Labor productivity, and
4) Unemployment rate.

We used the tools of standard multivariate regression analysis to determine the nature of the economic relationship between these variables and total employment and average wages in the ERS participating sector. We then projected the total payroll in the ERS participating sector out to fiscal year 2059, using these relationships, along with Global Insight's (GII) Macroeconomic Model of Puerto Rico, which in turn is fed by GII's U.S. Macroeconomic Model. The latter consists of over 2000 simultaneous equations of which approximately one third are stochastic equations. Puerto Rico's model is a smaller one with approximately 100 equations, distributed between stochastic and identities in the same proportion as the US model.

## Total Employment in the ERS Participating Sector

Total employment in the ERS participating sector (EERS) was determined to be a function of total government employment (EG) and real national output (GNPR). The following equation was estimated over the period from 1989 to 2006.[3]

$$\log (EERS) = -0.711 + 0.499 * \log (EG) + 0.338 * \log (GNPR) [-1]$$

The model was estimated in logarithmic form, which is standard practice in the time series analysis of variables which grow over time. It also allows the direct computation of the responsiveness (or elasticity) of the dependent variable (total employment in the ERS) to changes in the various explanatory (or the right hand side) variables. The equation was adjusted using the Cochrane-Orcutt iterative method to correct for autocorrelation, a statistical relation that would otherwise bias coefficient estimates in this case.

This model has an R-square in excess of 0.82, meaning that it explains more than 82% of the variation in total employment in the ERS participating sector over the 1989 to 2006 period. In terms of explanatory power this indicates a strong model with a high level of statistical significance.

**Explanatory Variables**

*Total government employment*

---

[3]   Total headcount figures for the ERS participating sector are available for fiscal years 1989-2007. Real GNP figures are available for fiscal year 2006 only.

Confidential                                                                 UBS-ERS_Ultra_Vires-0087935

Data for total government employment in Puerto Rico are available from the U.S. Bureau of Labor Statistics' Establishment Survey at a monthly frequency since 1980. Total government employment represents nearly one-fourth of total employment in Puerto Rico, while employment in the ERS participating sector represents more than 50% of total government employment. Total government employment captures the essence of fiscal policy in Puerto Rico, which in turn will influence the path of total employment in the ERS participating sector.

The coefficient on EG in the regression equation measures the elasticity of total employment in the ERS sector with respect to total government employment. Specifically, every percent increase in total government employment has raised employment in the ERS sector by 0.499%. The estimated coefficient (0.499) is significantly different from zero at the 90% confidence level, which means there is significant explanatory power in total government employment to account for variations in total employment in the ERS sector.

*Real GNP*

Puerto Rico's real GNP is most often used as a measure of growth in the local economy because, unlike GDP, it nets out the large flows of earnings accruing to non-Puerto Rico residents, i.e., U.S. corporations established on the island. Data on real GNP are available at an annual frequency from the Puerto Rico Planning Board as far back as 1970. Over the long term real GNP growth in our Puerto Rico macroeconomic model is driven by labor productivity, demographic trends, fixed capital formation and growth in the U.S. economy, which is in turn determined by Global Insight's U.S. macroeconomic model.

As expected, the coefficient on GNPR in the regression equation indicates a positive correlation between employment in the ERS sector and economic growth. If the economy grows more quickly, it will require an increase in the supply of goods and services provided by the government, leading to an increase in government employment.

The econometric model states that every percent increase in real GNP in the previous year has raised employment in the ERS sector by 0.338%. Our model establishes a lag between changes in the level of economic activity and the supply of public goods and services, i.e., the increase in government employment is not immediate. Fiscal rigidities imposed by the budgetary process can delay the adjustment of government employment to changes in economic activity. Statistical results validate this specification. The estimated coefficient (0.338) is significantly different from zero at the 95% confidence level, which means there is a significant correlation between real GNP and employment and total employment in the ERS sector.

## Average Wage in the ERS Participating Sector

To forecast the average wage of ERS participating employees, we first derived the real average wage using the GNP deflator. Average real wages in the ERS participating sector (COMERSR) are then derived as a function of the unemployment rate (RU) and total labor productivity (LPE). The following equation was estimated over the period from 1989 to 2006.[4]

$$\log (COMERSR) = 6.214 + 1.089 * \log (LPE) [-1] - 0.011 * RU$$

---

[4] Average wage figures for the ERS participating sector are available for fiscal years 1989-2006.

IV-11

Once again, the model was estimated in logarithmic form, since that allows the easy computation of elasticity of the dependent variable (real wages in the ERS sector) to changes in the various explanatory variables. This model has an R-square in excess of 0.77, meaning that it explains more than 77% of the variation in average real wages in the ERS participating sector over the 1989 to 2006 period. In terms of explanatory power this indicates a strong model with a high level of statistical significance.

The nominal average wage is calculated from the real average wage using our inflation forecast as measured by the GNP price deflator, as follows:

$$\text{Nominal Average Wage} = \text{Real Average Rate} * \text{GNP deflator}$$

**Explanatory Variables**

*Labor Productivity*

Labor productivity is the measure of output per employee. We calculate labor productivity as real GNP divided by total employment, derived from annual data published by the Puerto Rico Planning Board. A rise in labor productivity lowers the cost of labor at a given level of wages and benefits, and as a result, firms will find it profitable to expand employment. As the new technological innovations that boost productivity occur, new industries arise, along with the creation of new jobs. The increased demand for labor will tend to boost wages, as firms compete to hire additional workers, and raise total employment.

In our model, a one percent increase in productivity in the previous year increases the real average wage in the ERS participating sector by 1.089%. The specification of the model defines a lag between changes in productivity and its effects on real wages. It is a common practice by the government and also by private corporations to revise wages and salaries once a year, based on recent past performance. Statistical results validate this specification. The estimated coefficient (1.089) is significantly different from zero at the 95% confidence level, which means there is a significant correlation between labor productivity and averages wages in the ERS sector.

*Unemployment Rate*

Puerto Rico's annual unemployment rate is reported by the Puerto Rico Planning Board dating back to 1973. Over the long-term, the number of unemployed and the unemployment rate are determined as identities from the employment and labor force projections of our Puerto Rico macroeconomic model, which are in turn a function of demographic trends and long-term labor productivity.

Standard labor market theory tells us that excess labor supply will exert downward pressure on wages. A rising unemployment rate indicates an excess in labor supply, we would thus expect the coefficient on RU to be negative. Indeed, our model indicates that a one percent increase in unemployment has lowered average wages in the ERS participating sector by 0.011%. The estimated coefficient (0.011) is significantly different from zero at the 80% confidence level.

# Chapter 3

IV-12

UBS-ERS_Ultra_Vires-0087937

## Results

After developing the two regression equations specified above, we used them to project the total employment and average wage in the ERS participating sector of the government for the period between fiscal years 2008 and 2059. The total covered payroll is then calculated as:

$$\text{Total Payroll} = \text{Total Number of Employees} * \text{Average Wage}$$

In using regression equations developed on the basis of historical data to project future values of the dependent variable, we must also assume that the underlying economic structure captured in the equation will remain essentially the same. While past performance is no guarantee of future patterns, it is still the best tool we have to make such projections.

### Total Employment in the ERS Participating Sector

The graph below displays the projected time trend of total headcount in the ERS participating sector over the next 51 years. Our baseline forecast indicates that total employment in the ERS sector will grow at an average annual rate of 1.0% between fiscal years 2008 and 2059.

**Employment in the ERS Participating Sector**



This forecast implies that, over the long-run, employment in the ERS participating sector as a percent of total government headcount will maintain the ongoing upward trend. Employment in the ERS sector as a percent of total government employment has been trending up from 46% in fiscal 1989, to almost 60% recently. By fiscal year 2059 we expect headcount in the participating sector will amount to more than 65% of total employment in the public sector.

IV-13

**Employment in ERS Sector as % of Total Government Employment**
(Percent)



**Average Wage in the ERS Participating Sector**

The graph below displays the projected time trend of average wages in the ERS participating sector over the next 51 years.  Our baseline forecast indicates that average wages in the ERS sector will grow at an average annual rate of 3.5% between fiscal years 2008 and 2059.  This results from a 1.2% average annual growth in real wages, and a 2.3% average inflation rate.

**Average Wage in the ERS Participating Sector**
(Thousands, U.S. dollars)



Over the forecast horizon wages in the ERS participating sector will continue to grow at fairly similar rates to those of average wages in the total government sector.

Confidential

UBS-ERS_Ultra_Vires-0087939

**Average Wage in ERS Sector as % of Average Government Wage**
(Percent)



## Total Covered Payroll

Using the forecasted employment and wage figures we calculated the total payroll in the ERS participating sector.  Our baseline forecast indicates that the total covered payroll will grow at an average annual rate of 4.5% between fiscal years 2008 and 2059, reaching US$39.5 billion in fiscal year 2059.

**Total Covered Payroll**
(Billions, U.S. dollars)



After averaging 34% over the 1989-2001 period, the covered payroll as a percent of total government spending on an National Income Accounts basis began to trend up in 2002, reaching a historical high of 41% in fiscal year 2005.  In the near term, we expect the normalization of this ratio, already evident in fiscal 2006 and 2007, will continue, bringing the covered payroll's share of government spending to less than 35% by fiscal 2010.  This is consistent with the ongoing government efforts to reduce the burden of the payroll on the fiscal accounts.  Over the medium and long-term the covered payroll as a percent of total government spending will gradually trend up to around 42%.

Confidential                                                                    UBS-ERS_Ultra_Vires-0087940





## Changes from Previous Forecast

In the January 2008 publication of this report, Global Insight projected the total covered payroll would amount to US$40.9 billion by fiscal year 2059, posting an average annual growth rate of 4.6%. The downward revision in our current payroll forecast is a result of the revision of the forecast for the four explanatory variables used in our model: total government employment, real GNP, labor productivity, and the unemployment rate.

Since our last forecast, the Puerto Rican Planning Board published real GNP figures for fiscal year 2007 and revised the data for fiscal 2005 and 2006 downward. The new figures reveal that in fiscal 2007 the economy contracted more than expected, with real GNP falling 1.8% (compared to 1.7% in our Baseline Forecast). Moreover, the outlook for the Puerto Rican economy over the near-term has deteriorated significantly, as the U.S. recession unfolds and oil prices continue trending higher. As described in Chapter 1, the Commonwealth is now expected to see yet another year of negative growth in fiscal 2008, pushing the expected recovery back to fiscal 2009. Still, in fiscal 2009, growth in both the U.S. and Puerto Rico is forecasted to be weaker than previously expected. With a lower growth path for economic activity, employment growth in the Commonwealth will be curtailed, resulting in higher unemployment levels over the medium term. Indeed, the unemployment rate is now expected to peak at 11.4% in fiscal year 2009 (compared to a peak of 11.0% in fiscal 2008 in our previous forecast).

The downward revision of the explanatory variables has resulted in a lower payroll forecast. Employment in the ERS participating sector is now expected to reach 285 thousand in 2059, down 0.2% from our previous forecast (286 thousand). Average wages in the ERS sector are now expected to reach US$138,664, down from US$143,282 in our previous baseline forecast.

## Chapter 4

## Alternative Forecasts

Confidential

Two sources of variance may appear in the forecast derived by our model. First, as detailed in the Explanatory Variables sections, there is some degree of forecast error in the parameters of the model. Second, the time paths of the explanatory variables may differ from our Baseline Forecast assumptions. In this chapter, we discuss three alternative forecasts and their effect on the total payroll in the ERS participating sector, in order to provide an interval forecast. The results of these scenarios are summarized in Table1 and displayed in the graph below.

**Take-off Scenario**

Under the "Take-off" scenario, a marked increase in investment results in higher labor productivity and an acceleration of real economic growth in Puerto Rico over the medium and long term. Thanks to vigorous investment by both the public and private sectors, under this scenario, Puerto Rico's investment-to-GDP ratio will reach 16.5% by 2011, and will accelerate further to a peak of 18.9% by 2037, declining only slightly to 18.5% by 2059. As a result, average real GNP growth reaches 5.0% by 2011 (compared to 3.6% in the "Current Trends" scenario) and peaks at 6.0% in 2017, then decelerating gradually to around 2.0% by 2059. This means that in the long-run, Puerto Rico will catch up to the U.S. mainland in terms of GDP per capita, which is consistent with the government's expectation of convergence.

The government sector will invest nearly US$8.8 billion over the period between 2008 and 2011, in accordance with the Capital Investment Program (Programa de Inversiones de Cuatro Años or PICA), which sets aside US$4.3 billion for social development and US$4.4 billion for economic development. Among planned investments are the completion of the Plan Vial for Puerto Rico, the expansion of the San Juan metro system (Tren Urbano), the development of the land around the old Roosevelt Rose Base in the municipality of Ceiba, and the construction of new plants by the Puerto Rico Electric Power Authority (PREPA). Meanwhile, private sector investment will be especially robust in the manufacturing, tourism and telecommunications sectors. Planned private investments include the expansion of the Amgen and Elli Lilly pharmaceutical plants, the construction of new hotels, and a multi-million dollar investment by the telecommunications company América Móvil following its acquisition of Verizon Communications' Puerto Rico operations. Additionally, the government, together with the private sector, will try to further promote and develop Puerto Rico's biotechnology, computing and information technology and aerospace industries.

Under this scenario, as government efficiency increases and the private sector grows, the government is able to undergo a significant restructuring, easing the burden on the island's fiscal accounts that has resulted from the elevated government payroll. Specifically, government employment is reduced by 4.9% over the next five years, and subsequently remains unchanged until fiscal year 2020. After this period, government employment grows at an average rate of 0.13% per year. As a result, total government employment as a percent of total employment, falls to 14.0% by 2059. However, because higher productivity will lead to faster wage growth in all sectors, the reduction in government employment is more than offset by higher government wages. Thus, the covered payroll reaches US$63.7 billion in fiscal year 2059.

**Low Inflation Scenario (Low Case 1)**

Under this scenario, inflation in Puerto Rico converges more rapidly to U.S. levels than expected. The inflation differential between the U.S. and Puerto Rico is completely eliminated over the next ten years. As a result, the covered payroll reaches only US$33.6 billion in fiscal year 2059.

Confidential

**Significant Government Downsizing (Low Case 2)**

As one alternative policy scenario, we assume that the Puerto Rico government will undergo a major restructuring. Employment in the public sector as a percentage of total employment in the Commonwealth has been trending down from more than 30% in the early eighties to around 24% recently.  In our baseline forecast, we assume this trend will continue into the future, so that by fiscal year 2059, government employment will represent 19.2% of total employment.  The elevated government payroll has placed a heavy burden on the Commonwealth's financial accounts, however, and fiscal pressures could prompt the government to implement a more rapid downsizing of the public sector.

Currently, on average, in the 50 U.S. states, government employment represents around 14% of total employment.  In this scenario, we assume that government employment in Puerto Rico, as a percent of total employment, will reach a level similar to that of the 50 U.S. states over the next ten years, falling from 24% in 2006 to 14.2% by 2018.  Over the following forty years, the share of government employment in Puerto Rico will follow the gradual downward trend expected on average for the 50 U.S. states. This scenario results in a covered payroll of US$32.0 billion in fiscal year 2059.

**Constant ERS Employment as a Share of Government Employment Scenario (Low Case 3)**

In our baseline forecast, over the long-run, employment in the ERS participating sector as a percent of total government headcount will maintain the ongoing upward trend, reaching 69% by fiscal year 2059. In this scenario, we assume that the share of ERS employment in total government employment will instead remain constant, at its 2006 level (58.4%).  This results in a total covered payroll amounting to US$33.1 billion in fiscal year 2059.

**Table 1. Alternative Forecast Summary**

|  | Total Covered Payroll in 2059 (billions US$) | Average Annual Increase in Payroll (%) | Average Annual Increase in Headcount (%) | Average Annual Increase in Wages (%) |
|---|---|---|---|---|
| Baseline | 39.5 | 4.5 | 1.0 | 3.5 |
| Take-off | 63.7 | 5.5 | 0.3 | 5.1 |
| Low Case 1 | 33.6 | 4.2 | 1.0 | 3.2 |
| Low Case 2 | 32.0 | 4.1 | 0.5 | 3.5 |
| Low Case 3 | 33.1 | 4.1 | 0.6 | 3.5 |

Confidential

**Appendix**

Confidential                                                     UBS-ERS_Ultra_Vires-0087944

**Table 1: Main Macroeconomic Concepts: Baseline Forecast**

| Fiscal Years | GNP Million Real 1954 US Dollars | % Change | Million US Dollars | % Change | Deflator | Inflation |
|---|---|---|---|---|---|---|
| 1989 | 4807.70 | 3.34 | 19954.20 | 7.57 | 415.05 | 3.50 |
| 1990 | 4929.80 | 2.54 | 21619.10 | 8.34 | 438.54 | 5.66 |
| 1991 | 4972.80 | 0.87 | 22609.00 | 5.50 | 458.68 | 4.59 |
| 1992 | 5011.50 | 0.78 | 23696.40 | 3.89 | 472.84 | 3.09 |
| 1993 | 5177.80 | 3.32 | 25132.90 | 6.06 | 485.40 | 2.66 |
| 1994 | 5308.90 | 2.53 | 26640.90 | 6.00 | 501.82 | 3.38 |
| 1995 | 5491.80 | 3.45 | 28452.30 | 6.80 | 518.09 | 3.24 |
| 1996 | 5671.23 | 3.27 | 30356.95 | 6.69 | 535.28 | 3.32 |
| 1997 | 5664.16 | 3.40 | 32342.71 | 6.54 | 551.53 | 3.04 |
| 1998 | 6054.70 | 3.25 | 35110.66 | 8.56 | 579.89 | 5.14 |
| 1999 | 6300.06 | 4.05 | 38281.15 | 9.03 | 607.63 | 4.78 |
| 2000 | 6487.10 | 2.97 | 41418.58 | 8.20 | 638.46 | 5.06 |
| 2001 | 6585.14 | 1.51 | 44045.56 | 6.34 | 668.88 | 4.76 |
| 2002 | 6562.55 | -0.34 | 45071.32 | 2.33 | 686.80 | 2.68 |
| 2003 | 6702.73 | 2.14 | 47479.42 | 5.34 | 708.36 | 3.14 |
| 2004 | 6886.20 | 2.74 | 50708.70 | 6.80 | 736.38 | 3.96 |
| 2005 | 7019.62 | 1.94 | 53752.39 | 6.00 | 765.74 | 3.99 |
| 2006 | 7057.56 | 0.54 | 56732.89 | 5.54 | 803.86 | 4.98 |
| 2007 | 6930.80 | 1.80 | 58712.37 | 3.49 | 847.12 | 5.38 |
| 2008 | 6767.87 | -2.35 | 60634.05 | 3.27 | 895.91 | 5.76 |
| 2009 | 6924.12 | 2.31 | 64053.92 | 5.64 | 925.08 | 3.25 |
| 2010 | 7176.15 | 3.64 | 68157.90 | 6.41 | 949.78 | 2.67 |
| 2011 | 7435.39 | 3.61 | 72268.03 | 6.03 | 971.95 | 2.33 |
| 2012 | 7706.55 | 3.65 | 76716.20 | 6.16 | 995.47 | 2.42 |
| 2013 | 7989.57 | 3.67 | 81463.39 | 6.19 | 1019.62 | 2.43 |
| 2014 | 8259.93 | 3.38 | 86408.31 | 6.07 | 1046.11 | 2.60 |
| 2015 | 8499.04 | 2.89 | 91406.47 | 5.78 | 1075.49 | 2.81 |
| 2016 | 8722.55 | 2.63 | 96551.62 | 5.63 | 1106.92 | 2.92 |
| 2017 | 8948.74 | 2.59 | 101665.05 | 5.52 | 1138.54 | 2.86 |
| 2018 | 9177.29 | 2.55 | 107443.94 | 5.46 | 1170.76 | 2.83 |
| 2019 | 9412.25 | 2.56 | 113266.51 | 5.42 | 1203.39 | 2.79 |
| 2020 | 9650.11 | 2.53 | 119331.21 | 5.35 | 1236.56 | 2.76 |
| 2021 | 9889.62 | 2.48 | 125608.82 | 5.26 | 1270.09 | 2.71 |
| 2022 | 10129.40 | 2.42 | 132087.80 | 5.16 | 1304.00 | 2.67 |
| 2023 | 10367.70 | 2.35 | 138735.61 | 5.03 | 1338.15 | 2.62 |
| 2024 | 10604.61 | 2.29 | 145548.63 | 4.91 | 1372.50 | 2.57 |
| 2025 | 10843.18 | 2.25 | 152561.51 | 4.82 | 1406.98 | 2.51 |
| 2026 | 11081.84 | 2.20 | 159786.14 | 4.74 | 1441.87 | 2.48 |
| 2027 | 11319.41 | 2.14 | 167212.11 | 4.65 | 1477.22 | 2.45 |
| 2028 | 11558.00 | 2.11 | 174829.38 | 4.56 | 1512.63 | 2.40 |
| 2029 | 11796.61 | 2.06 | 182628.13 | 4.46 | 1548.14 | 2.35 |
| 2030 | 12035.16 | 2.02 | 190623.78 | 4.38 | 1583.89 | 2.31 |
| 2031 | 12273.80 | 1.98 | 198790.54 | 4.28 | 1619.63 | 2.26 |
| 2032 | 12513.60 | 1.95 | 207126.92 | 4.19 | 1655.21 | 2.20 |
| 2033 | 12751.96 | 1.90 | 215619.08 | 4.10 | 1690.87 | 2.15 |
| 2034 | 12990.24 | 1.87 | 224248.22 | 4.00 | 1726.28 | 2.09 |
| 2035 | 13227.56 | 1.83 | 233015.30 | 3.91 | 1761.59 | 2.05 |
| 2036 | 13464.25 | 1.79 | 241885.58 | 3.81 | 1796.50 | 1.98 |
| 2037 | 13699.23 | 1.75 | 250868.83 | 3.71 | 1831.26 | 1.90 |
| 2038 | 13933.67 | 1.71 | 260010.86 | 3.64 | 1866.06 | 1.90 |
| 2039 | 14172.48 | 1.71 | 269602.47 | 3.69 | 1902.30 | 1.94 |
| 2040 | 14413.98 | 1.70 | 279493.18 | 3.67 | 1939.04 | 1.93 |
| 2041 | 14655.14 | 1.69 | 289639.30 | 3.65 | 1976.30 | 1.92 |
| 2042 | 14904.96 | 1.68 | 300199.07 | 3.63 | 2014.09 | 1.91 |
| 2043 | 15154.46 | 1.67 | 311028.26 | 3.61 | 2052.29 | 1.90 |
| 2044 | 15406.62 | 1.66 | 322186.29 | 3.59 | 2091.22 | 1.89 |
| 2045 | 15661.43 | 1.65 | 333676.91 | 3.57 | 2130.57 | 1.88 |
| 2046 | 15918.89 | 1.64 | 345510.82 | 3.55 | 2170.44 | 1.87 |
| 2047 | 16179.00 | 1.63 | 357694.85 | 3.53 | 2210.86 | 1.86 |
| 2048 | 16441.72 | 1.62 | 370233.91 | 3.51 | 2251.80 | 1.85 |
| 2049 | 16707.06 | 1.61 | 383137.83 | 3.49 | 2293.27 | 1.84 |
| 2050 | 16975.06 | 1.60 | 396413.49 | 3.46 | 2335.27 | 1.83 |
| 2051 | 17245.63 | 1.59 | 410069.73 | 3.44 | 2377.82 | 1.82 |
| 2052 | 17518.78 | 1.58 | 424112.28 | 3.42 | 2420.90 | 1.81 |
| 2053 | 17794.51 | 1.57 | 438543.80 | 3.40 | 2464.52 | 1.80 |
| 2054 | 18072.80 | 1.56 | 453388.05 | 3.38 | 2508.68 | 1.79 |
| 2055 | 18353.63 | 1.55 | 468635.96 | 3.36 | 2553.37 | 1.78 |
| 2056 | 18637.00 | 1.54 | 484302.35 | 3.34 | 2598.61 | 1.77 |
| 2057 | 18922.88 | 1.53 | 500395.17 | 3.32 | 2644.40 | 1.76 |
| 2058 | 19211.25 | 1.52 | 516919.25 | 3.30 | 2690.71 | 1.75 |
| 2059 | 19502.07 | 1.51 | 533878.91 | 3.28 | 2737.55 | 1.74 |

Confidential

UBS-ERS_Ultra_Vires-0087945

### Table 1: Main Macroeconomic Concepts: Baseline Forecast (Continued)

| Population | | Working Age Pop. (16 +) | | | Labor Force | | | Unemployment | | Employment | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Thousands | % Change | Thousands | % Change | % of Total Pop. | Thousands | % Change | % of Working Age Pop. | Thousands | Unemp. Rate | Thousands | % Change |
| 3479.00 | 0.93 | 2435.00 | 1.04 | 69.99 | 1108.00 | 2.50 | 45.50 | 160.00 | 14.44 | 948.00 | 4.29 |
| 3512.00 | 0.95 | 2473.00 | 1.56 | 70.42 | 1124.00 | 1.44 | 45.45 | 161.00 | 14.32 | 963.00 | 1.58 |
| 3539.00 | 0.77 | 2515.00 | 1.70 | 71.07 | 1152.00 | 2.49 | 45.81 | 175.00 | 15.19 | 977.00 | 1.45 |
| 3563.00 | 0.68 | 2536.00 | 0.83 | 71.18 | 1170.00 | 1.56 | 46.14 | 193.00 | 16.50 | 977.00 | 0.00 |
| 3588.00 | 0.70 | 2563.00 | 1.06 | 71.43 | 1201.00 | 2.65 | 46.86 | 202.00 | 16.82 | 999.00 | 2.25 |
| 3614.00 | 0.72 | 2608.00 | 1.76 | 72.16 | 1203.00 | 0.17 | 46.13 | 192.00 | 15.96 | 1011.00 | 1.20 |
| 3666.17 | 1.44 | 2654.00 | 1.76 | 72.39 | 1219.00 | 1.33 | 45.93 | 168.00 | 13.78 | 1051.00 | 3.96 |
| 3703.86 | 1.03 | 2685.00 | 1.17 | 72.49 | 1268.00 | 4.02 | 47.23 | 175.00 | 13.80 | 1093.00 | 4.00 |
| 3742.04 | 1.03 | 2708.00 | 0.78 | 72.31 | 1297.00 | 2.29 | 47.90 | 170.00 | 13.11 | 1127.00 | 3.11 |
| 3770.27 | 0.75 | 2743.00 | 1.37 | 72.75 | 1319.00 | 1.70 | 48.09 | 180.00 | 13.65 | 1139.00 | 1.06 |
| 3790.59 | 0.54 | 2774.00 | 1.13 | 73.18 | 1306.00 | -0.99 | 47.08 | 163.00 | 12.48 | 1143.00 | 0.35 |
| 3807.99 | 0.46 | 2797.00 | 0.83 | 73.45 | 1292.00 | -1.07 | 46.19 | 142.00 | 10.99 | 1150.00 | 0.61 |
| 3827.85 | 0.52 | 2816.00 | 0.68 | 73.57 | 1278.00 | -1.08 | 45.38 | 134.00 | 10.49 | 1144.00 | -0.52 |
| 3849.31 | 0.56 | 2861.00 | 1.60 | 74.33 | 1310.00 | 2.50 | 45.79 | 158.00 | 12.06 | 1152.00 | 0.70 |
| 3866.87 | 0.50 | 2902.00 | 1.43 | 75.01 | 1352.00 | 3.21 | 46.59 | 164.00 | 12.13 | 1188.00 | 3.13 |
| 3886.69 | 0.47 | 2929.00 | 0.93 | 75.36 | 1361.00 | 0.67 | 46.47 | 155.00 | 11.39 | 1206.00 | 1.52 |
| 3903.45 | 0.43 | 2945.00 | 0.55 | 75.45 | 1385.00 | 1.76 | 47.03 | 147.00 | 10.61 | 1238.00 | 2.65 |
| 3919.92 | 0.42 | 2972.00 | 0.92 | 75.82 | 1422.00 | 2.67 | 47.85 | 166.00 | 11.67 | 1256.00 | 1.45 |
| 3941.53 | 0.55 | 3002.02 | 1.01 | 76.18 | 1410.00 | -0.84 | 46.97 | 147.00 | 10.43 | 1263.00 | 0.56 |
| 3963.14 | 0.55 | 3031.85 | 0.99 | 76.50 | 1425.44 | 1.09 | 47.02 | 159.74 | 11.21 | 1265.70 | 0.21 |
| 3984.87 | 0.54 | 3061.35 | 0.96 | 76.82 | 1459.59 | 2.33 | 47.65 | 166.30 | 11.40 | 1292.30 | 2.10 |
| 4006.02 | 0.54 | 3089.23 | 0.92 | 77.11 | 1494.28 | 2.45 | 48.37 | 164.77 | 11.03 | 1329.50 | 2.88 |
| 4027.21 | 0.53 | 3116.35 | 0.88 | 77.38 | 1528.81 | 2.31 | 49.06 | 163.17 | 10.67 | 1365.64 | 2.72 |
| 4048.24 | 0.52 | 3142.42 | 0.84 | 77.62 | 1561.96 | 2.17 | 49.71 | 160.11 | 10.25 | 1401.85 | 2.65 |
| 4069.02 | 0.51 | 3167.12 | 0.79 | 77.83 | 1594.14 | 2.06 | 50.33 | 157.92 | 9.91 | 1436.22 | 2.45 |
| 4089.40 | 0.50 | 3190.11 | 0.73 | 78.01 | 1623.70 | 1.85 | 50.90 | 153.73 | 9.47 | 1469.97 | 2.35 |
| 4109.28 | 0.49 | 3211.21 | 0.66 | 78.15 | 1644.24 | 1.27 | 51.20 | 144.62 | 9.04 | 1495.63 | 1.75 |
| 4128.57 | 0.47 | 3230.24 | 0.59 | 78.24 | 1665.90 | 1.32 | 51.57 | 148.99 | 8.94 | 1516.91 | 1.42 |
| 4147.29 | 0.45 | 3247.38 | 0.53 | 78.30 | 1686.24 | 1.22 | 51.93 | 148.55 | 8.81 | 1537.69 | 1.37 |
| 4165.44 | 0.44 | 3263.08 | 0.48 | 78.34 | 1705.04 | 1.11 | 52.27 | 147.43 | 8.64 | 1558.11 | 1.33 |
| 4183.00 | 0.42 | 3278.02 | 0.46 | 78.37 | 1724.43 | 1.14 | 52.61 | 146.14 | 8.47 | 1578.26 | 1.30 |
| 4200.00 | 0.41 | 3292.68 | 0.45 | 78.40 | 1742.89 | 1.07 | 52.93 | 144.81 | 8.31 | 1598.08 | 1.25 |
| 4216.39 | 0.39 | 3307.25 | 0.44 | 78.44 | 1761.01 | 1.04 | 53.25 | 143.45 | 8.15 | 1617.56 | 1.22 |
| 4232.12 | 0.37 | 3321.64 | 0.44 | 78.49 | 1778.76 | 1.01 | 53.55 | 142.32 | 8.00 | 1636.44 | 1.17 |
| 4247.17 | 0.36 | 3335.85 | 0.43 | 78.54 | 1796.11 | 0.98 | 53.84 | 141.13 | 7.86 | 1654.98 | 1.13 |
| 4261.47 | 0.34 | 3349.84 | 0.42 | 78.61 | 1813.08 | 0.94 | 54.12 | 139.97 | 7.72 | 1673.10 | 1.10 |
| 4274.99 | 0.32 | 3363.53 | 0.41 | 78.68 | 1829.81 | 0.91 | 54.40 | 138.53 | 7.57 | 1691.07 | 1.07 |
| 4287.71 | 0.30 | 3376.99 | 0.40 | 78.76 | 1845.72 | 0.88 | 54.66 | 137.28 | 7.44 | 1708.44 | 1.03 |
| 4299.62 | 0.28 | 3390.25 | 0.39 | 78.85 | 1861.46 | 0.85 | 54.91 | 135.71 | 7.29 | 1725.74 | 1.01 |
| 4310.63 | 0.26 | 3403.23 | 0.38 | 78.95 | 1877.08 | 0.84 | 55.16 | 134.71 | 7.18 | 1742.37 | 0.96 |
| 4320.65 | 0.23 | 3415.77 | 0.37 | 79.06 | 1892.18 | 0.80 | 55.40 | 133.43 | 7.05 | 1758.75 | 0.94 |
| 4329.63 | 0.21 | 3427.81 | 0.35 | 79.17 | 1906.71 | 0.77 | 55.62 | 131.90 | 6.92 | 1774.81 | 0.91 |
| 4337.55 | 0.18 | 3439.29 | 0.33 | 79.29 | 1920.63 | 0.73 | 55.84 | 130.16 | 6.78 | 1790.47 | 0.88 |
| 4344.44 | 0.16 | 3450.22 | 0.32 | 79.42 | 1933.96 | 0.69 | 56.05 | 128.37 | 6.64 | 1805.59 | 0.84 |
| 4350.38 | 0.14 | 3460.61 | 0.30 | 79.55 | 1946.67 | 0.66 | 56.25 | 126.45 | 6.50 | 1820.22 | 0.81 |
| 4355.46 | 0.12 | 3470.46 | 0.28 | 79.68 | 1958.78 | 0.62 | 56.44 | 124.52 | 6.36 | 1834.26 | 0.77 |
| 4359.78 | 0.10 | 3479.78 | 0.27 | 79.82 | 1969.57 | 0.55 | 56.60 | 121.69 | 6.18 | 1847.88 | 0.74 |
| 4363.37 | 0.08 | 3488.55 | 0.25 | 79.95 | 1979.74 | 0.52 | 56.75 | 118.70 | 6.00 | 1861.04 | 0.71 |
| 4366.26 | 0.07 | 3496.73 | 0.23 | 80.09 | 1989.60 | 0.50 | 56.90 | 115.51 | 5.81 | 1874.09 | 0.70 |
| 4368.55 | 0.05 | 3504.33 | 0.22 | 80.22 | 1999.15 | 0.48 | 57.05 | 112.00 | 5.60 | 1887.14 | 0.70 |
| 4370.33 | 0.04 | 3511.31 | 0.20 | 80.34 | 2008.92 | 0.49 | 57.21 | 108.91 | 5.42 | 1900.01 | 0.68 |
| 4371.69 | 0.03 | 3517.66 | 0.18 | 80.46 | 2018.73 | 0.49 | 57.39 | 105.97 | 5.25 | 1912.76 | 0.67 |
| 4372.70 | 0.02 | 3523.38 | 0.16 | 80.58 | 2028.56 | 0.49 | 57.57 | 103.15 | 5.09 | 1925.41 | 0.66 |
| 4373.37 | 0.02 | 3528.38 | 0.14 | 80.69 | 2038.43 | 0.49 | 57.77 | 100.47 | 4.93 | 1937.95 | 0.65 |
| 4373.72 | 0.01 | 3532.71 | 0.12 | 80.77 | 2048.31 | 0.48 | 57.98 | 97.93 | 4.78 | 1950.37 | 0.64 |
| 4373.73 | 0.00 | 3536.31 | 0.10 | 80.85 | 2058.23 | 0.48 | 58.20 | 95.55 | 4.64 | 1962.69 | 0.63 |
| 4373.42 | -0.01 | 3538.19 | 0.08 | 80.93 | 2068.17 | 0.48 | 58.44 | 93.30 | 4.51 | 1974.88 | 0.62 |
| 4372.79 | -0.01 | 3541.30 | 0.06 | 80.98 | 2078.15 | 0.48 | 58.68 | 91.20 | 4.39 | 1986.95 | 0.61 |
| 4371.67 | -0.02 | 3542.62 | 0.04 | 81.03 | 2088.14 | 0.48 | 58.94 | 89.24 | 4.27 | 1998.90 | 0.60 |
| 4370.68 | -0.03 | 3543.13 | 0.01 | 81.07 | 2098.17 | 0.48 | 59.22 | 87.46 | 4.17 | 2010.71 | 0.59 |
| 4369.27 | -0.03 | 3542.81 | -0.01 | 81.08 | 2108.23 | 0.48 | 59.51 | 85.82 | 4.07 | 2022.41 | 0.58 |
| 4367.67 | -0.04 | 3541.61 | -0.03 | 81.09 | 2118.31 | 0.48 | 59.81 | 84.35 | 3.98 | 2033.96 | 0.57 |
| 4365.69 | -0.04 | 3542.54 | -0.03 | 81.14 | 2128.45 | 0.48 | 60.00 | 83.24 | 3.90 | 2045.37 | 0.56 |
| 4363.90 | -0.05 | 3542.07 | -0.01 | 81.17 | 2138.55 | 0.48 | 60.38 | 81.88 | 3.83 | 2056.66 | 0.55 |
| 4361.68 | -0.05 | 3541.33 | -0.02 | 81.19 | 2148.71 | 0.48 | 60.68 | 80.93 | 3.77 | 2067.78 | 0.54 |
| 4359.26 | -0.06 | 3540.47 | -0.02 | 81.22 | 2158.90 | 0.47 | 60.98 | 80.13 | 3.71 | 2078.77 | 0.53 |
| 4356.61 | -0.06 | 3539.42 | -0.03 | 81.24 | 2169.12 | 0.47 | 61.28 | 79.51 | 3.67 | 2089.60 | 0.52 |
| 4353.75 | -0.07 | 3538.19 | -0.03 | 81.27 | 2179.36 | 0.47 | 61.60 | 79.07 | 3.63 | 2100.29 | 0.51 |
| 4350.67 | -0.07 | 3536.80 | -0.04 | 81.29 | 2189.63 | 0.47 | 61.91 | 79.80 | 3.60 | 2110.82 | 0.50 |
| 4347.38 | -0.08 | 3535.22 | -0.04 | 81.32 | 2199.93 | 0.47 | 62.23 | 78.74 | 3.58 | 2121.18 | 0.49 |
| 4343.88 | -0.08 | 3533.46 | -0.05 | 81.34 | 2210.98 | 0.46 | 62.54 | 78.60 | 3.58 | 2131.38 | 0.48 |

IV-21

UBS-ERS_Ultra_Vires-0087946

## Table 2: Baseline Forecast

| | ERS Employers | | | Total ERS Covered Payroll | |
|---|---|---|---|---|---|
| Fiscal Years | Employment Thousands | Average Salary | % Change | Millions USD | % Change |
| 1989 | 137.16 | 10261.16 | | 1407.59 | |
| 1990 | 138.65 | 10789.61 | 5.15 | 1495.99 | 6.28 |
| 1991 | 139.47 | 11536.78 | 6.92 | 1609.00 | 7.55 |
| 1992 | 151.19 | 11059.08 | -4.14 | 1672.00 | 3.92 |
| 1993 | 154.24 | 12202.00 | 10.33 | 1882.00 | 12.56 |
| 1994 | 151.94 | 12288.15 | 0.71 | 1867.00 | -0.80 |
| 1995 | 153.70 | 13578.49 | 10.50 | 2087.00 | 11.78 |
| 1996 | 157.64 | 14101.93 | 3.85 | 2223.00 | 6.52 |
| 1997 | 159.60 | 14805.76 | 4.99 | 2363.00 | 6.30 |
| 1998 | 154.85 | 15279.70 | 3.20 | 2366.00 | 0.13 |
| 1999 | 149.69 | 17202.33 | 12.58 | 2575.00 | 8.83 |
| 2000 | 152.56 | 16147.41 | -6.13 | 2463.40 | -4.33 |
| 2001 | 155.66 | 16376.10 | 1.42 | 2549.50 | 3.50 |
| 2002 | 156.89 | 19289.78 | 17.79 | 3026.43 | 18.71 |
| 2003 | 158.83 | 21094.43 | 9.36 | 3350.49 | 10.71 |
| 2004 | 164.13 | 21637.99 | 2.58 | 3551.40 | 6.00 |
| 2005 | 175.50 | 23512.08 | 8.66 | 4126.46 | 16.19 |
| 2006 | 176.34 | 23374.32 | -0.59 | 4121.87 | -0.11 |
| 2007 | 176.84 | 22756.74 | -2.64 | 4024.23 | -2.37 |
| 2008 | 175.57 | 23180.02 | 1.86 | 4069.79 | 1.13 |
| 2009 | 174.83 | 23155.86 | -0.10 | 4048.34 | -0.53 |
| 2010 | 177.80 | 23941.68 | 3.39 | 4256.76 | 5.15 |
| 2011 | 181.46 | 24823.14 | 3.68 | 4504.52 | 5.82 |
| 2012 | 185.22 | 25820.18 | 4.02 | 4782.43 | 6.17 |
| 2013 | 188.96 | 26863.31 | 4.04 | 5078.08 | 6.14 |
| 2014 | 192.71 | 28100.23 | 4.60 | 5415.31 | 6.68 |
| 2015 | 195.84 | 29387.95 | 4.58 | 5755.31 | 6.28 |
| 2016 | 198.43 | 30684.87 | 4.41 | 6088.75 | 5.79 |
| 2017 | 200.86 | 32055.94 | 4.47 | 6438.67 | 5.75 |
| 2018 | 203.27 | 33498.07 | 4.50 | 6809.06 | 5.75 |
| 2019 | 205.67 | 34990.41 | 4.48 | 7198.97 | 5.70 |
| 2020 | 208.08 | 36559.03 | 4.47 | 7607.07 | 5.70 |
| 2021 | 210.47 | 38178.15 | 4.43 | 8035.52 | 5.63 |
| 2022 | 212.83 | 39839.97 | 4.35 | 8479.34 | 5.52 |
| 2023 | 215.17 | 41549.71 | 4.29 | 8940.06 | 5.43 |
| 2024 | 217.45 | 43288.30 | 4.18 | 9412.97 | 5.29 |
| 2025 | 219.70 | 45006.04 | 4.11 | 9901.13 | 5.19 |
| 2026 | 221.92 | 46885.45 | 4.04 | 10404.86 | 5.09 |
| 2027 | 224.13 | 48770.96 | 4.02 | 10930.87 | 5.06 |
| 2028 | 226.26 | 50660.05 | 3.87 | 11463.15 | 4.87 |
| 2029 | 228.41 | 52611.73 | 3.85 | 12016.97 | 4.83 |
| 2030 | 230.51 | 54610.70 | 3.80 | 12588.44 | 4.76 |
| 2031 | 232.56 | 56650.92 | 3.74 | 13178.13 | 4.67 |
| 2032 | 234.62 | 58725.66 | 3.66 | 13778.22 | 4.57 |
| 2033 | 236.63 | 60858.34 | 3.63 | 14400.67 | 4.52 |
| 2034 | 238.58 | 63018.67 | 3.55 | 15035.05 | 4.41 |
| 2035 | 240.50 | 65256.45 | 3.55 | 15594.46 | 4.39 |
| 2036 | 242.39 | 67525.38 | 3.48 | 16367.61 | 4.29 |
| 2037 | 244.26 | 69840.31 | 3.43 | 17059.23 | 4.23 |
| 2038 | 246.11 | 72193.56 | 3.37 | 17767.61 | 4.15 |
| 2039 | 247.94 | 74611.63 | 3.35 | 18499.46 | 4.12 |
| 2040 | 249.79 | 77109.25 | 3.35 | 19260.92 | 4.12 |
| 2041 | 251.64 | 79675.10 | 3.33 | 20049.10 | 4.09 |
| 2042 | 253.49 | 82309.15 | 3.31 | 20864.41 | 4.07 |
| 2043 | 255.34 | 85012.53 | 3.28 | 21708.99 | 4.04 |
| 2044 | 257.19 | 87787.29 | 3.26 | 22578.31 | 4.01 |
| 2045 | 259.05 | 90633.44 | 3.24 | 23478.75 | 3.99 |
| 2046 | 260.91 | 93552.89 | 3.22 | 24408.66 | 3.96 |
| 2047 | 262.77 | 96547.36 | 3.20 | 25369.47 | 3.94 |
| 2048 | 264.62 | 99615.12 | 3.18 | 26360.54 | 3.91 |
| 2049 | 266.48 | 102760.85 | 3.16 | 27384.14 | 3.88 |
| 2050 | 268.34 | 105983.16 | 3.14 | 28439.63 | 3.85 |
| 2051 | 270.20 | 109284.90 | 3.12 | 29528.68 | 3.83 |
| 2052 | 272.05 | 112666.70 | 3.09 | 30651.50 | 3.80 |
| 2053 | 273.91 | 116127.04 | 3.07 | 31808.47 | 3.77 |
| 2054 | 275.76 | 119671.21 | 3.05 | 33000.95 | 3.75 |
| 2055 | 277.61 | 123296.49 | 3.03 | 34228.60 | 3.72 |
| 2056 | 279.46 | 127006.20 | 3.01 | 35493.13 | 3.69 |
| 2057 | 281.31 | 130802.01 | 2.99 | 36795.47 | 3.67 |
| 2058 | 283.15 | 134680.38 | 2.97 | 38134.17 | 3.64 |
| 2059 | 284.97 | 138664.56 | 2.96 | 39515.65 | 3.62 |

IV-22

UBS-ERS_Ultra_Vires-0087947

### Table 3: Take-off Scenario

| Fiscal Years | Real GNP | | Total Government | | ERS Employers | | | |
|---|---|---|---|---|---|---|---|---|
| | Millions of USD | % Change | Employment Thousands | % Change | Employment Thousands | Average Salary | Total Payroll (Mill. USD) | % Change |
| 1989 | 4807.70 | 3.94 | 297.05 | 4.05 | 137.16 | 10261.16 | 1407.60 | |
| 1990 | 4929.80 | 2.54 | 294.74 | -0.78 | 138.65 | 10789.61 | 1495.99 | 6.28 |
| 1991 | 4972.80 | 0.87 | 291.53 | -1.09 | 139.47 | 11536.78 | 1609.00 | 7.55 |
| 1992 | 5011.50 | 0.78 | 293.26 | 0.59 | 151.19 | 11059.08 | 1672.00 | 3.92 |
| 1993 | 5177.80 | 3.32 | 292.46 | -0.27 | 154.24 | 12202.00 | 1882.00 | 12.56 |
| 1994 | 5308.90 | 2.53 | 292.33 | -0.05 | 151.94 | 12288.15 | 1867.00 | -0.80 |
| 1995 | 5491.80 | 3.45 | 303.56 | 3.84 | 153.70 | 13578.49 | 2087.00 | 11.78 |
| 1996 | 5671.23 | 3.27 | 307.53 | 1.31 | 157.64 | 14101.93 | 2223.00 | 6.52 |
| 1997 | 5864.16 | 3.40 | 318.89 | 3.69 | 159.60 | 14805.76 | 2363.00 | 6.30 |
| 1998 | 6054.70 | 3.25 | 309.48 | -2.95 | 154.85 | 15279.70 | 2366.00 | 0.13 |
| 1999 | 6300.06 | 4.05 | 302.18 | -2.36 | 149.69 | 17202.33 | 2575.00 | 8.83 |
| 2000 | 6487.10 | 2.97 | 286.13 | -5.31 | 152.56 | 16147.41 | 2463.40 | -4.33 |
| 2001 | 6585.14 | 1.51 | 282.73 | -1.19 | 155.68 | 16376.10 | 2549.50 | 3.50 |
| 2002 | 6562.55 | -0.34 | 288.68 | 2.10 | 156.89 | 19289.78 | 3026.43 | 18.71 |
| 2003 | 6702.73 | 2.14 | 297.72 | 3.13 | 158.83 | 21094.43 | 3350.49 | 10.71 |
| 2004 | 6886.20 | 2.74 | 303.41 | 1.91 | 164.13 | 21637.99 | 3551.40 | 6.00 |
| 2005 | 7019.62 | 1.94 | 307.83 | 1.46 | 175.50 | 23512.05 | 4126.46 | 16.19 |
| 2006 | 7057.56 | 0.54 | 302.49 | -1.73 | 176.34 | 23374.32 | 4121.87 | -0.11 |
| 2007 | 6984.11 | -1.04 | 286.13 | -1.44 | 176.84 | 22756.74 | 4024.25 | -2.37 |
| 2008 | 6801.56 | -1.86 | 295.02 | -1.04 | 174.24 | 23180.02 | 4038.85 | 0.36 |
| 2009 | 7102.86 | 4.43 | 292.59 | -0.82 | 170.84 | 23292.52 | 3979.31 | -1.47 |
| 2010 | 7444.81 | 4.81 | 290.16 | -0.83 | 168.88 | 24674.65 | 4167.13 | 4.72 |
| 2011 | 7813.74 | 4.96 | 287.73 | -0.84 | 167.75 | 25924.71 | 4348.75 | 4.36 |
| 2012 | 8181.12 | 4.70 | 285.30 | -0.84 | 166.57 | 27376.60 | 4560.06 | 4.86 |
| 2013 | 8619.77 | 5.36 | 282.87 | -0.85 | 165.52 | 28821.44 | 4770.56 | 4.62 |
| 2014 | 9099.63 | 5.57 | 282.87 | 0.00 | 165.99 | 30721.92 | 5099.41 | 6.89 |
| 2015 | 9627.29 | 5.80 | 282.87 | 0.00 | 166.80 | 32920.50 | 5491.14 | 7.68 |
| 2016 | 10198.28 | 5.93 | 282.87 | 0.00 | 167.63 | 35502.42 | 5951.11 | 8.38 |
| 2017 | 10806.66 | 5.97 | 282.87 | 0.00 | 168.34 | 38472.10 | 6476.48 | 8.83 |
| 2018 | 11420.10 | 5.68 | 282.87 | 0.00 | 169.07 | 41729.16 | 7055.00 | 8.93 |
| 2019 | 12067.10 | 5.67 | 282.87 | 0.00 | 169.79 | 45117.51 | 7660.47 | 8.58 |
| 2020 | 12748.71 | 5.65 | 282.87 | 0.00 | 170.54 | 48770.03 | 8317.23 | 8.57 |
| 2021 | 13473.24 | 5.68 | 283.24 | 0.13 | 171.52 | 52899.00 | 9038.74 | 8.67 |
| 2022 | 14236.39 | 5.66 | 283.61 | 0.13 | 172.51 | 56947.25 | 9823.76 | 8.69 |
| 2023 | 15028.10 | 5.56 | 283.98 | 0.13 | 173.49 | 61521.90 | 10673.35 | 8.65 |
| 2024 | 15843.94 | 5.43 | 284.35 | 0.13 | 174.46 | 66369.14 | 11578.50 | 8.48 |
| 2025 | 16686.11 | 5.32 | 284.71 | 0.13 | 175.40 | 71489.97 | 12539.26 | 8.30 |
| 2026 | 17547.96 | 5.17 | 285.08 | 0.13 | 176.36 | 76884.67 | 13559.30 | 8.13 |
| 2027 | 18413.36 | 4.93 | 285.45 | 0.13 | 177.30 | 82578.53 | 14640.91 | 7.98 |
| 2028 | 19275.74 | 4.68 | 285.82 | 0.13 | 178.24 | 88397.21 | 15755.99 | 7.62 |
| 2029 | 20126.72 | 4.41 | 286.18 | 0.13 | 179.18 | 94385.54 | 16911.99 | 7.34 |
| 2030 | 20960.37 | 4.14 | 286.55 | 0.13 | 180.11 | 100479.93 | 18097.87 | 7.01 |
| 2031 | 21770.36 | 3.86 | 286.92 | 0.13 | 181.05 | 106833.71 | 19305.73 | 6.67 |
| 2032 | 22550.69 | 3.59 | 287.29 | 0.13 | 181.98 | 112791.19 | 20526.24 | 6.32 |
| 2033 | 23251.69 | 3.29 | 287.66 | 0.13 | 182.93 | 118943.43 | 21758.50 | 6.00 |
| 2034 | 23988.71 | 2.99 | 288.03 | 0.13 | 183.88 | 124991.68 | 22983.83 | 5.63 |
| 2035 | 24632.75 | 2.68 | 288.40 | 0.13 | 184.83 | 130977.34 | 24209.06 | 5.33 |
| 2036 | 25217.44 | 2.37 | 288.77 | 0.13 | 185.78 | 136755.64 | 25406.81 | 4.95 |
| 2037 | 25734.22 | 2.05 | 289.14 | 0.13 | 186.72 | 142299.09 | 26569.15 | 4.58 |
| 2038 | 26259.20 | 2.04 | 289.51 | 0.13 | 187.63 | 147524.39 | 27680.02 | 4.18 |
| 2039 | 26793.89 | 2.04 | 289.88 | 0.13 | 188.53 | 152959.37 | 28837.62 | 4.18 |
| 2040 | 27338.45 | 2.03 | 290.26 | 0.13 | 189.44 | 158580.63 | 30041.91 | 4.18 |
| 2041 | 27893.04 | 2.03 | 290.63 | 0.13 | 190.35 | 164388.62 | 31292.03 | 4.16 |
| 2042 | 28457.82 | 2.02 | 291.00 | 0.13 | 191.27 | 170386.40 | 32589.66 | 4.14 |
| 2043 | 29032.66 | 2.02 | 291.38 | 0.13 | 192.18 | 176579.11 | 33935.33 | 4.13 |
| 2044 | 29618.63 | 2.02 | 291.75 | 0.13 | 193.10 | 182973.72 | 35331.95 | 4.12 |
| 2045 | 30214.95 | 2.01 | 292.13 | 0.13 | 194.01 | 189573.72 | 36780.12 | 4.10 |
| 2046 | 30822.20 | 2.01 | 292.50 | 0.13 | 194.94 | 196386.35 | 38282.77 | 4.09 |
| 2047 | 31440.46 | 2.01 | 292.88 | 0.13 | 195.86 | 203418.26 | 39840.93 | 4.07 |
| 2048 | 32069.93 | 2.00 | 293.25 | 0.13 | 196.78 | 210669.71 | 41456.14 | 4.05 |
| 2049 | 32710.79 | 2.00 | 293.63 | 0.13 | 197.71 | 218154.27 | 43130.82 | 4.04 |
| 2050 | 33363.22 | 1.99 | 294.01 | 0.13 | 198.64 | 225872.01 | 44866.72 | 4.02 |
| 2051 | 34027.40 | 1.99 | 294.38 | 0.13 | 199.57 | 233833.54 | 46666.10 | 4.01 |
| 2052 | 34703.53 | 1.99 | 294.76 | 0.13 | 200.50 | 242044.25 | 48530.76 | 4.00 |
| 2053 | 35393.63 | 1.99 | 295.14 | 0.13 | 201.44 | 250505.15 | 50461.63 | 3.98 |
| 2054 | 36096.34 | 1.99 | 295.52 | 0.13 | 202.38 | 259242.35 | 52465.38 | 3.97 |
| 2055 | 36813.55 | 1.99 | 295.90 | 0.13 | 203.32 | 268255.71 | 54542.87 | 3.96 |
| 2056 | 37545.06 | 1.99 | 296.28 | 0.13 | 204.27 | 277558.38 | 56696.97 | 3.95 |
| 2057 | 38291.08 | 1.99 | 296.66 | 0.13 | 205.22 | 287159.62 | 58930.45 | 3.94 |
| 2058 | 39051.92 | 1.99 | 297.04 | 0.13 | 206.17 | 297058.53 | 61245.47 | 3.93 |
| 2059 | 39827.88 | 1.99 | 297.42 | 0.13 | 207.14 | 307311.89 | 63655.75 | 3.94 |

Confidential

UBS-ERS_Ultra_Vires-0087948

## Table 4: Low Inflation Scenario

| Fiscal Years | Low Inflation Scenario (Low Case 1) | | | | | |
| | | | ERS Employers | | | |
| | GNP Deflator | Inflation | Employment Thousands | Average Salary | Total Payroll (Mill. USD) | % Change |
|---|---|---|---|---|---|---|
| 1989 | 415.05 | 3.50 | 137.18 | 10261.16 | 1407.59 | |
| 1990 | 438.54 | 5.66 | 138.65 | 10789.61 | 1495.99 | 6.26 |
| 1991 | 458.68 | 4.59 | 139.47 | 11536.78 | 1608.00 | 7.55 |
| 1992 | 472.84 | 3.09 | 151.19 | 11059.06 | 1672.00 | 3.92 |
| 1993 | 485.40 | 2.66 | 154.24 | 12202.00 | 1882.00 | 12.56 |
| 1994 | 501.82 | 3.38 | 151.94 | 12288.15 | 1867.00 | -0.80 |
| 1995 | 518.09 | 3.24 | 153.70 | 13578.40 | 2087.00 | 11.78 |
| 1996 | 535.28 | 3.32 | 157.64 | 14101.93 | 2223.00 | 6.52 |
| 1997 | 551.53 | 3.04 | 159.60 | 14805.76 | 2363.00 | 6.30 |
| 1998 | 579.69 | 5.14 | 154.85 | 15279.70 | 2366.00 | 0.13 |
| 1999 | 607.63 | 4.78 | 149.69 | 17202.33 | 2575.00 | 8.83 |
| 2000 | 638.48 | 5.08 | 152.56 | 16147.41 | 2463.40 | -4.33 |
| 2001 | 668.66 | 4.76 | 155.68 | 18376.10 | 2549.50 | 3.50 |
| 2002 | 686.80 | 2.68 | 156.69 | 19289.76 | 3026.43 | 18.71 |
| 2003 | 708.36 | 3.14 | 158.83 | 21094.43 | 3350.48 | 10.71 |
| 2004 | 736.38 | 3.96 | 164.13 | 21637.99 | 3551.40 | 6.00 |
| 2005 | 765.74 | 3.99 | 175.50 | 23512.08 | 4126.46 | 16.19 |
| 2006 | 803.86 | 4.98 | 176.34 | 23374.32 | 4121.87 | -0.11 |
| 2007 | 847.12 | 5.38 | 176.84 | 22758.74 | 4024.23 | -2.37 |
| 2008 | 887.13 | 4.72 | 175.57 | 22952.94 | 4029.92 | 0.14 |
| 2009 | 919.64 | 3.66 | 174.83 | 23019.60 | 4024.52 | -0.13 |
| 2010 | 948.77 | 3.17 | 177.80 | 23916.10 | 4252.23 | 5.66 |
| 2011 | 974.98 | 2.76 | 181.46 | 24900.55 | 4518.57 | 6.26 |
| 2012 | 1002.70 | 2.84 | 185.22 | 26007.70 | 4817.16 | 6.61 |
| 2013 | 1029.19 | 2.64 | 188.96 | 27115.26 | 5123.69 | 6.36 |
| 2014 | 1054.47 | 2.46 | 192.71 | 28324.81 | 5458.59 | 6.54 |
| 2015 | 1078.86 | 2.31 | 195.84 | 29480.08 | 5773.36 | 5.77 |
| 2016 | 1102.10 | 2.15 | 198.43 | 30551.37 | 6062.26 | 5.00 |
| 2017 | 1123.88 | 1.98 | 200.86 | 31643.10 | 6355.75 | 4.84 |
| 2018 | 1144.61 | 1.84 | 203.27 | 32749.75 | 6656.97 | 4.74 |
| 2019 | 1165.77 | 1.85 | 205.67 | 33899.24 | 6971.93 | 4.73 |
| 2020 | 1187.71 | 1.88 | 208.08 | 35114.33 | 7306.46 | 4.80 |
| 2021 | 1210.02 | 1.88 | 210.47 | 36372.43 | 7655.47 | 4.78 |
| 2022 | 1232.40 | 1.85 | 212.83 | 37652.35 | 8013.74 | 4.68 |
| 2023 | 1254.39 | 1.83 | 215.17 | 38967.61 | 8384.48 | 4.63 |
| 2024 | 1278.14 | 1.84 | 217.45 | 40312.04 | 8765.79 | 4.55 |
| 2025 | 1301.47 | 1.83 | 219.70 | 41686.50 | 9158.64 | 4.48 |
| 2026 | 1324.99 | 1.81 | 221.92 | 43084.70 | 9561.39 | 4.40 |
| 2027 | 1349.55 | 1.85 | 224.13 | 44555.66 | 9986.16 | 4.44 |
| 2028 | 1374.47 | 1.85 | 226.28 | 46032.86 | 10416.13 | 4.31 |
| 2029 | 1399.36 | 1.81 | 228.41 | 47555.45 | 10862.07 | 4.28 |
| 2030 | 1424.47 | 1.79 | 230.51 | 49114.05 | 11321.40 | 4.23 |
| 2031 | 1450.01 | 1.79 | 232.58 | 50717.84 | 11796.21 | 4.19 |
| 2032 | 1475.74 | 1.77 | 234.62 | 52358.18 | 12284.28 | 4.14 |
| 2033 | 1500.93 | 1.71 | 236.63 | 54022.02 | 12783.02 | 4.06 |
| 2034 | 1526.26 | 1.69 | 238.58 | 55716.73 | 13292.95 | 3.99 |
| 2035 | 1552.30 | 1.71 | 240.50 | 57503.53 | 13826.85 | 4.04 |
| 2036 | 1578.57 | 1.69 | 242.39 | 59333.94 | 14382.07 | 3.99 |
| 2037 | 1605.85 | 1.73 | 244.26 | 61243.65 | 14959.41 | 4.01 |
| 2038 | 1633.33 | 1.71 | 246.11 | 63189.82 | 15551.69 | 3.96 |
| 2039 | 1661.27 | 1.71 | 247.94 | 65158.02 | 16155.50 | 3.88 |
| 2040 | 1689.66 | 1.71 | 249.79 | 67192.19 | 16783.76 | 3.89 |
| 2041 | 1718.53 | 1.71 | 251.64 | 69282.65 | 17434.00 | 3.87 |
| 2042 | 1747.86 | 1.71 | 253.49 | 71429.45 | 18106.53 | 3.86 |
| 2043 | 1777.69 | 1.71 | 255.34 | 73634.11 | 18801.64 | 3.84 |
| 2044 | 1808.00 | 1.71 | 257.19 | 75898.08 | 19520.48 | 3.82 |
| 2045 | 1838.81 | 1.70 | 259.05 | 78222.47 | 20263.66 | 3.81 |
| 2046 | 1870.13 | 1.70 | 260.91 | 80608.56 | 21031.38 | 3.79 |
| 2047 | 1901.97 | 1.70 | 262.77 | 83058.25 | 21824.58 | 3.77 |
| 2048 | 1934.33 | 1.70 | 264.62 | 85570.87 | 22644.10 | 3.75 |
| 2049 | 1967.21 | 1.70 | 266.48 | 88150.80 | 23490.72 | 3.74 |
| 2050 | 2000.64 | 1.70 | 268.34 | 90796.49 | 24364.42 | 3.72 |
| 2051 | 2034.62 | 1.70 | 270.20 | 93511.33 | 25266.57 | 3.70 |
| 2052 | 2069.15 | 1.70 | 272.06 | 96296.52 | 26197.92 | 3.69 |
| 2053 | 2104.25 | 1.70 | 273.91 | 99151.35 | 27158.64 | 3.67 |
| 2054 | 2139.92 | 1.70 | 275.76 | 102080.49 | 28150.07 | 3.65 |
| 2055 | 2176.18 | 1.69 | 277.61 | 105082.67 | 29172.22 | 3.63 |
| 2056 | 2213.02 | 1.69 | 279.46 | 108160.97 | 30226.65 | 3.61 |
| 2057 | 2250.47 | 1.69 | 281.31 | 111317.04 | 31314.22 | 3.60 |
| 2058 | 2288.53 | 1.69 | 283.15 | 114549.89 | 32434.31 | 3.58 |
| 2059 | 2327.22 | 1.69 | 284.97 | 117860.06 | 33592.63 | 3.57 |

IV-24

UBS-ERS_Ultra_Vires-0087949

## Table 5: Significant Government Downsizing Scenario

| Fiscal Years | Gov. Employment | | ERS Employers | | | |
|---|---|---|---|---|---|---|
| | Thousands | % of Total Employment | Employment Thousands | Average Salary | Total Payroll (Mill. USD) | % Change |
| 1989 | 297.05 | 31.33 | 137.18 | 10261.16 | 1407.59 | |
| 1990 | 294.74 | 30.61 | 138.65 | 10789.61 | 1495.99 | 6.28 |
| 1991 | 291.53 | 29.84 | 139.47 | 11536.78 | 1609.00 | 7.55 |
| 1992 | 293.36 | 30.02 | 151.19 | 11059.08 | 1672.00 | 3.92 |
| 1993 | 292.46 | 29.28 | 154.24 | 12202.00 | 1882.00 | 12.56 |
| 1994 | 292.33 | 28.91 | 151.94 | 12288.15 | 1867.00 | -0.80 |
| 1995 | 303.56 | 28.88 | 153.70 | 13578.49 | 2087.00 | 11.78 |
| 1996 | 307.53 | 28.14 | 157.64 | 14101.93 | 2223.00 | 6.52 |
| 1997 | 318.89 | 28.30 | 159.60 | 14805.76 | 2363.00 | 6.30 |
| 1998 | 309.48 | 27.17 | 154.85 | 15279.70 | 2366.00 | 0.13 |
| 1999 | 302.18 | 26.44 | 149.69 | 17202.33 | 2575.00 | 8.83 |
| 2000 | 286.13 | 24.88 | 152.56 | 16147.41 | 2463.40 | -4.33 |
| 2001 | 282.73 | 24.71 | 155.88 | 16376.10 | 2549.50 | 3.50 |
| 2002 | 268.68 | 25.06 | 156.89 | 19289.78 | 3026.43 | 18.71 |
| 2003 | 297.72 | 25.06 | 158.83 | 21094.43 | 3350.49 | 10.71 |
| 2004 | 303.41 | 25.16 | 164.13 | 21637.99 | 3551.40 | 6.00 |
| 2005 | 307.83 | 24.86 | 175.50 | 23512.08 | 4126.46 | 16.19 |
| 2006 | 302.49 | 24.08 | 176.34 | 23374.32 | 4121.37 | -0.11 |
| 2007 | 298.13 | 23.60 | 178.84 | 22756.74 | 4024.23 | -2.37 |
| 2008 | 286.93 | 22.67 | 172.65 | 23180.02 | 4002.00 | -0.55 |
| 2009 | 280.87 | 21.73 | 169.81 | 23155.86 | 3927.56 | -1.86 |
| 2010 | 276.53 | 20.80 | 169.61 | 23941.68 | 4060.64 | 3.39 |
| 2011 | 271.28 | 19.66 | 173.31 | 24823.14 | 4220.34 | 3.93 |
| 2012 | 265.36 | 18.93 | 170.18 | 25820.18 | 4393.96 | 4.12 |
| 2013 | 258.44 | 17.99 | 170.00 | 26883.31 | 4566.84 | 3.93 |
| 2014 | 250.77 | 17.06 | 169.55 | 28100.23 | 4764.31 | 4.32 |
| 2015 | 241.16 | 16.12 | 168.23 | 29387.95 | 4943.91 | 3.77 |
| 2016 | 230.41 | 15.19 | 166.15 | 30684.67 | 5098.40 | 3.12 |
| 2017 | 219.19 | 14.25 | 163.84 | 32055.94 | 5245.49 | 2.88 |
| 2018 | 221.85 | 14.24 | 165.93 | 33498.07 | 5558.23 | 5.96 |
| 2019 | 224.71 | 14.24 | 168.29 | 34993.41 | 5888.99 | 5.95 |
| 2020 | 227.06 | 14.21 | 170.50 | 36559.03 | 6233.19 | 5.84 |
| 2021 | 229.07 | 14.16 | 172.59 | 38178.15 | 6589.14 | 5.71 |
| 2022 | 230.87 | 14.11 | 174.60 | 39839.97 | 6956.04 | 5.57 |
| 2023 | 232.56 | 14.05 | 176.58 | 41549.71 | 7335.86 | 5.46 |
| 2024 | 234.12 | 13.99 | 178.45 | 43288.30 | 7724.69 | 5.30 |
| 2025 | 235.67 | 13.94 | 180.32 | 45086.04 | 8126.12 | 5.20 |
| 2026 | 237.09 | 13.88 | 182.13 | 46885.45 | 8539.25 | 5.08 |
| 2027 | 238.46 | 13.82 | 183.92 | 48770.96 | 8969.74 | 5.04 |
| 2028 | 239.73 | 13.76 | 185.64 | 50660.05 | 9404.71 | 4.85 |
| 2029 | 240.88 | 13.70 | 187.32 | 52611.73 | 9855.44 | 4.79 |
| 2030 | 241.82 | 13.62 | 188.91 | 54610.70 | 10316.52 | 4.68 |
| 2031 | 242.52 | 13.54 | 190.40 | 56850.92 | 10786.13 | 4.55 |
| 2032 | 243.20 | 13.47 | 191.87 | 58725.66 | 11267.44 | 4.46 |
| 2033 | 243.83 | 13.40 | 193.34 | 60858.34 | 11766.43 | 4.43 |
| 2034 | 244.41 | 13.32 | 194.71 | 63018.67 | 12270.25 | 4.28 |
| 2035 | 245.00 | 13.26 | 196.10 | 65256.45 | 12798.94 | 4.29 |
| 2036 | 245.58 | 13.20 | 197.47 | 67525.38 | 13334.48 | 4.20 |
| 2037 | 246.01 | 13.13 | 198.78 | 69840.31 | 13882.66 | 4.11 |
| 2038 | 246.41 | 13.06 | 200.04 | 72193.56 | 14441.95 | 4.03 |
| 2039 | 247.52 | 13.03 | 201.58 | 74611.63 | 15040.05 | 4.14 |
| 2040 | 248.60 | 13.00 | 203.11 | 77109.25 | 15661.99 | 4.14 |
| 2041 | 249.67 | 12.97 | 204.65 | 79675.10 | 16305.22 | 4.11 |
| 2042 | 250.71 | 12.94 | 206.17 | 82309.15 | 16969.90 | 4.08 |
| 2043 | 251.74 | 12.91 | 207.70 | 85012.53 | 17656.71 | 4.05 |
| 2044 | 252.74 | 12.88 | 209.21 | 87787.29 | 18366.17 | 4.02 |
| 2045 | 253.71 | 12.85 | 210.72 | 90633.44 | 19098.55 | 3.99 |
| 2046 | 254.67 | 12.82 | 212.23 | 93552.89 | 19854.53 | 3.96 |
| 2047 | 255.60 | 12.79 | 213.73 | 96547.36 | 20634.75 | 3.93 |
| 2048 | 256.51 | 12.76 | 215.22 | 99615.12 | 21438.99 | 3.90 |
| 2049 | 257.39 | 12.73 | 216.70 | 102760.95 | 22265.65 | 3.87 |
| 2050 | 258.25 | 12.70 | 218.18 | 105983.16 | 23123.52 | 3.84 |
| 2051 | 259.09 | 12.67 | 219.65 | 109284.90 | 24004.54 | 3.81 |
| 2052 | 259.90 | 12.64 | 221.11 | 112666.70 | 24912.14 | 3.78 |
| 2053 | 260.69 | 12.61 | 222.57 | 116127.04 | 25846.08 | 3.75 |
| 2054 | 261.45 | 12.58 | 224.01 | 119671.21 | 26807.90 | 3.72 |
| 2055 | 262.18 | 12.55 | 225.45 | 123296.49 | 27797.13 | 3.69 |
| 2056 | 262.89 | 12.52 | 226.88 | 127006.20 | 28814.78 | 3.66 |
| 2057 | 263.58 | 12.49 | 228.30 | 130802.01 | 29861.49 | 3.63 |
| 2058 | 264.24 | 12.46 | 229.70 | 134680.38 | 30936.54 | 3.60 |
| 2059 | 264.87 | 12.43 | 231.10 | 138664.56 | 32045.47 | 3.58 |

IV-25

**Table 6: Constant ERS Employment as a Share of Government Employment Scenario**

| | | Constant Share in Gov. Employment (Low Case 3) | | | | |
| | | ERS Employers | | | | |
| Fiscal Years | Gov. Employment Thousands | Employment Thousands | % of Gov. Employment | Average Salary | Total Payroll (Mill. USD) | % Change |
|---|---|---|---|---|---|---|
| 1989 | 297.05 | 137.16 | 46.16 | 10261.18 | 1407.59 | |
| 1990 | 294.74 | 138.65 | 47.04 | 10789.61 | 1495.99 | 6.28 |
| 1991 | 291.53 | 139.47 | 47.84 | 11530.73 | 1609.00 | 7.55 |
| 1992 | 293.26 | 151.19 | 51.55 | 11059.08 | 1672.00 | 3.92 |
| 1993 | 292.46 | 154.24 | 52.74 | 12202.00 | 1882.00 | 12.56 |
| 1994 | 292.33 | 151.94 | 51.97 | 12288.15 | 1867.00 | -0.80 |
| 1995 | 303.55 | 153.70 | 50.63 | 13576.49 | 2087.00 | 11.78 |
| 1996 | 307.53 | 157.64 | 51.26 | 14101.93 | 2223.00 | 6.52 |
| 1997 | 318.89 | 159.60 | 50.05 | 14805.79 | 2363.00 | 6.30 |
| 1998 | 309.48 | 154.85 | 50.04 | 15279.70 | 2366.00 | 0.13 |
| 1999 | 302.18 | 149.69 | 49.54 | 17202.33 | 2575.00 | 8.83 |
| 2000 | 286.13 | 152.56 | 53.32 | 16147.41 | 2463.40 | -4.33 |
| 2001 | 262.73 | 155.68 | 55.07 | 16376.10 | 2549.50 | 3.50 |
| 2002 | 288.68 | 156.89 | 54.35 | 19289.78 | 3026.43 | 18.71 |
| 2003 | 297.72 | 158.83 | 53.35 | 21094.43 | 3350.49 | 10.71 |
| 2004 | 303.41 | 164.13 | 54.09 | 21637.99 | 3551.40 | 6.00 |
| 2005 | 307.83 | 175.50 | 57.01 | 23512.03 | 4128.46 | 16.19 |
| 2006 | 302.49 | 176.34 | 58.30 | 23374.32 | 4121.87 | -0.11 |
| 2007 | 298.13 | 176.84 | 59.32 | 22756.74 | 4024.23 | -2.37 |
| 2008 | 297.28 | 173.30 | 58.30 | 23180.02 | 4017.20 | -0.17 |
| 2009 | 299.42 | 174.55 | 58.30 | 23155.66 | 4041.94 | 0.62 |
| 2010 | 305.48 | 178.08 | 58.30 | 23941.68 | 4263.61 | 5.48 |
| 2011 | 311.27 | 181.46 | 58.30 | 24823.14 | 4504.33 | 5.65 |
| 2012 | 317.25 | 184.95 | 58.30 | 25820.18 | 4775.39 | 6.02 |
| 2013 | 322.93 | 188.26 | 58.30 | 26863.31 | 5057.19 | 5.90 |
| 2014 | 328.43 | 191.46 | 58.30 | 28100.23 | 5380.08 | 6.38 |
| 2015 | 332.12 | 193.62 | 58.30 | 29387.95 | 5689.98 | 5.76 |
| 2016 | 334.86 | 195.21 | 58.30 | 30684.87 | 5989.98 | 5.27 |
| 2017 | 337.51 | 196.76 | 58.30 | 32055.94 | 6307.25 | 5.30 |
| 2018 | 340.10 | 198.27 | 58.30 | 33498.07 | 6641.52 | 5.30 |
| 2019 | 342.65 | 199.75 | 58.30 | 34993.41 | 6993.75 | 5.25 |
| 2020 | 345.14 | 201.20 | 58.30 | 36550.03 | 7355.77 | 5.23 |
| 2021 | 347.58 | 202.63 | 58.30 | 38176.15 | 7735.88 | 5.17 |
| 2022 | 349.91 | 203.99 | 58.30 | 39839.97 | 8126.84 | 5.05 |
| 2023 | 352.20 | 205.32 | 58.30 | 41549.71 | 8530.99 | 4.97 |
| 2024 | 354.42 | 206.61 | 58.30 | 43288.30 | 8943.07 | 4.84 |
| 2025 | 356.63 | 207.90 | 58.30 | 45066.04 | 9369.37 | 4.76 |
| 2026 | 358.73 | 209.13 | 58.30 | 46685.45 | 9805.08 | 4.65 |
| 2027 | 360.85 | 210.36 | 58.30 | 48770.98 | 10259.47 | 4.63 |
| 2028 | 362.84 | 211.52 | 58.30 | 50660.05 | 10715.86 | 4.45 |
| 2029 | 364.81 | 212.67 | 58.30 | 52611.73 | 11189.06 | 4.42 |
| 2030 | 366.73 | 213.79 | 58.30 | 54610.70 | 11675.35 | 4.35 |
| 2031 | 368.60 | 214.88 | 58.30 | 56650.92 | 12173.07 | 4.26 |
| 2032 | 370.38 | 215.92 | 58.30 | 58725.66 | 12680.04 | 4.16 |
| 2033 | 372.09 | 216.92 | 58.30 | 60858.34 | 13201.17 | 4.11 |
| 2034 | 373.71 | 217.86 | 58.30 | 63018.67 | 13729.05 | 4.00 |
| 2035 | 375.28 | 218.76 | 58.30 | 65256.45 | 14275.75 | 3.98 |
| 2036 | 376.76 | 219.64 | 58.30 | 67525.38 | 14831.08 | 3.89 |
| 2037 | 378.25 | 220.50 | 58.30 | 69840.31 | 15400.13 | 3.84 |
| 2038 | 379.75 | 221.38 | 58.30 | 72193.56 | 15982.12 | 3.78 |
| 2039 | 381.23 | 222.25 | 58.30 | 74611.63 | 16582.17 | 3.75 |
| 2040 | 382.71 | 223.11 | 58.30 | 77109.25 | 17203.74 | 3.75 |
| 2041 | 384.18 | 223.97 | 58.30 | 79675.10 | 17844.89 | 3.73 |
| 2042 | 385.67 | 224.83 | 58.30 | 82309.15 | 18505.80 | 3.70 |
| 2043 | 387.13 | 225.68 | 58.30 | 85012.53 | 19185.95 | 3.68 |
| 2044 | 388.59 | 226.53 | 58.30 | 87787.29 | 19886.87 | 3.65 |
| 2045 | 390.05 | 227.39 | 58.30 | 90633.44 | 20608.75 | 3.63 |
| 2046 | 391.49 | 228.23 | 58.30 | 93552.89 | 21351.15 | 3.60 |
| 2047 | 392.93 | 229.07 | 58.30 | 96547.36 | 22115.64 | 3.58 |
| 2048 | 394.35 | 229.89 | 58.30 | 99615.12 | 22900.89 | 3.55 |
| 2049 | 395.77 | 230.72 | 58.30 | 102760.95 | 23709.24 | 3.53 |
| 2050 | 397.16 | 231.54 | 58.30 | 105983.16 | 24539.30 | 3.50 |
| 2051 | 398.57 | 232.35 | 58.30 | 109284.93 | 25392.50 | 3.48 |
| 2052 | 399.95 | 233.16 | 58.30 | 112666.70 | 26269.09 | 3.45 |
| 2053 | 401.32 | 233.96 | 58.30 | 116127.04 | 27168.86 | 3.43 |
| 2054 | 402.68 | 234.75 | 58.30 | 119671.21 | 28092.51 | 3.40 |
| 2055 | 404.01 | 235.53 | 58.30 | 123296.49 | 29039.46 | 3.37 |
| 2056 | 405.34 | 236.30 | 58.30 | 127006.20 | 30011.33 | 3.35 |
| 2057 | 406.65 | 237.07 | 58.30 | 130802.01 | 31008.60 | 3.32 |
| 2058 | 407.94 | 237.82 | 58.30 | 134680.38 | 32029.06 | 3.29 |
| 2059 | 409.19 | 238.54 | 58.30 | 138684.56 | 33077.33 | 3.27 |

IV-26

Confidential

**Appendix V**

EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT
OF THE COMMONWEALTH OF PUERTO RICO

————————————————————

PENSION FUNDING BOND RESOLUTION

————————————————————

Adopted on January 24, 2008

Confidential

# TABLE OF CONTENTS

**Page**

| | | | |
|---|---|---|---|
| ARTICLE I | STATUTORY AUTHORITY | | 5 |
| | SECTION 101. | Authority for this Resolution | 5 |
| | SECTION 102. | Resolution to Constitute Contract | 5 |
| ARTICLE II | AUTHORIZATION AND ISSUANCE OF BONDS | | 5 |
| | SECTION 201. | Authorization of Bonds | 5 |
| | SECTION 202. | General Provisions for Issuance of Bonds | 5 |
| | SECTION 203. | Special Provisions Concerning Capital Appreciation Bonds and Convertible Capital Appreciation Bonds | 7 |
| | SECTION 204. | Special Provisions for Refunding Bonds | 7 |
| | SECTION 205. | Delegation of Officers and Committees | 8 |
| | SECTION 206. | Credit and Liquidity Facilities; Rights of Credit Facility Providers | 8 |
| | SECTION 207. | Qualified Hedges | 8 |
| | SECTION 208. | Parity Obligations and Subordinate Obligations | 8 |
| ARTICLE III | GENERAL TERMS AND PROVISIONS OF BONDS | | 8 |
| | SECTION 301. | Medium of Payment; Form and Date | 8 |
| | SECTION 302. | Legends | 9 |
| | SECTION 303. | Execution and Authentication | 9 |
| | SECTION 304. | Negotiability, Transfer and Registry | 9 |
| | SECTION 305. | Registration of Transfer of Bonds | 9 |
| | SECTION 306. | Regulations with Respect to Exchanges and Registration of Transfers | 9 |
| | SECTION 307. | Bonds Mutilated, Destroyed, Stolen or Lost | 9 |
| | SECTION 308. | Preparation of Definitive Bonds; Temporary Bonds | 10 |
| | SECTION 309. | Tender of Option Bonds or Fixed Tender Bonds | 10 |
| | SECTION 310. | Book-Entry-Only System | 10 |
| ARTICLE IV | REDEMPTION OF BONDS | | 10 |
| | SECTION 401. | Privilege of Redemption and Redemption Price | 10 |
| | SECTION 402. | Redemption at the Election of the System | 10 |
| | SECTION 403. | Redemption in Satisfaction of Sinking Fund Installments | 10 |
| | SECTION 404. | Selection of Bonds to be Redeemed in Partial Redemption | 11 |
| | SECTION 405. | Notice of Redemption | 11 |
| | SECTION 406. | Payment of Redeemed Bonds | 11 |
| | SECTION 407 | . Cancellation and Disposition of Bonds | 11 |
| ARTICLE V | PLEDGE, ASSIGNMENT AND SECURITY INTEREST; ESTABLISHMENT AND MAINTENANCE OF FUNDS AND ACCOUNTS AND APPLICATION THEREOF | | 11 |
| | SECTION 501. | Pledge, Assignment and Security Interest | 11 |
| | SECTION 502. | Establishment of Fund and Accounts | 12 |
| | SECTION 503. | Capitalized Interest Account | 12 |
| | SECTION 504. | Revenue Account | 12 |
| | SECTION 505. | Debt Service Account | 13 |
| | SECTION 506. | Debt Service Reserve Account | 14 |
| | SECTION 507. | Satisfaction of Sinking Fund Installments | 15 |
| | SECTION 508. | Redemption Account; Amounts to be Deposited Therein | 15 |
| | SECTION 509. | General Reserve Account | 16 |
| ARTICLE VI | SECURITY FOR DEPOSITS AND INVESTMENT OF FUNDS | | 17 |
| | SECTION 601. | Security for Deposits | 17 |
| | SECTION 602. | Investment of Funds, Accounts and Subaccounts Held by the Fiscal Agent | 17 |
| | SECTION 603. | Valuation and Sale of Investments | 17 |
| ARTICLE VII | PARTICULAR COVENANTS OF THE SYSTEM | | 17 |
| | SECTION 701. | Payment of Obligations | 18 |
| | SECTION 702. | Extension of Payment of Bonds | 18 |
| | SECTION 703. | Offices for Servicing Bonds | 18 |
| | SECTION 704. | Further Assurance | 18 |
| | SECTION 705. | Power to Issue Bonds and Assign Funds and Accounts | 18 |
| | SECTION 706. | Creation of Liens | 18 |
| | SECTION 707. | Accounts and Reports | 18 |
| | SECTION 708. | Issuance of Additional Bonds | 18 |
| | SECTION 709. | General | 19 |

V-2

# TABLE OF CONTENTS

**Page**

ARTICLE VIII     CONCERNING THE FISCAL AGENT ......................................................................................... 19

    SECTION 801.     Fiscal Agent Appointment and Acceptance of Duties ................................................... 19
    SECTION 802.     Responsibilities of Fiscal Agent ................................................................................... 19
    SECTION 803.     Evidence on Which Fiscal Agent May Act ................................................................... 20
    SECTION 804.     Compensation and Indemnification ............................................................................. 20
    SECTION 805.     Certain Permitted Acts ................................................................................................. 20
    SECTION 806.     Resignation of Fiscal Agent ........................................................................................ 20
    SECTION 807.     Removal of Fiscal Agent .............................................................................................. 20
    SECTION 808.     Appointment of Successor Fiscal Agent ...................................................................... 21
    SECTION 809.     Transfer of Rights and Property to Successor Fiscal Agent ......................................... 21
    SECTION 810.     Merger or Consolidation .............................................................................................. 21
    SECTION 811.     Adoption of Authentication .......................................................................................... 21
    SECTION 812.     Accounting by Fiscal Agent; Nonpetition Covenant .................................................... 21
    SECTION 813.     Appointment of Co-Fiscal Agent 21

ARTICLE IX      SUPPLEMENTAL RESOLUTIONS ........................................................................................... 22

    SECTION 901.     Supplemental Resolutions Effective upon Filing with the Fiscal Agent ..................... 22
    SECTION 902.     Supplemental Resolutions Effective with Consent of Bondowners ............................ 23
    SECTION 903.     Reserved ....................................................................................................................... 23
    SECTION 904.     General Provisions ....................................................................................................... 23

ARTICLE X       AMENDMENTS .......................................................................................................................... 23

    SECTION 1001.    Mailing and Publication ............................................................................................... 23
    SECTION 1002.    Powers of Amendment .................................................................................................. 23
    SECTION 1003.    Consent of Bondowners ............................................................................................... 24
    SECTION 1004.    Modifications by Unanimous Consent .......................................................................... 24
    SECTION 1005.    Modification Before Bonds Outstanding ...................................................................... 24
    SECTION 1006.    Exclusion of Bonds ...................................................................................................... 24
    SECTION 1007.    Notation on Bonds ........................................................................................................ 24

ARTICLE XI      DEFAULTS AND REMEDIES ................................................................................................... 24

    SECTION 1101.    Events of Default .......................................................................................................... 24
    SECTION 1103.    Priority of Payments After Event of Default ................................................................ 25
    SECTION 1104.    Termination of Proceedings .......................................................................................... 26
    SECTION 1105.    Bondowners' Direction of Proceedings ........................................................................ 36
    SECTION 1106.    Limitation on Rights of Bondowners ........................................................................... 36
    SECTION 1107.    Possession of Bonds by Fiscal Agent Not Required .................................................... 26
    SECTION 1108.    Remedies Not Exclusive .............................................................................................. 26
    SECTION 1109.    No Waiver of Default .................................................................................................... 27
    SECTION 1110.    Notice of Event of Default ........................................................................................... 27

ARTICLE XII     SUBORDINATION PROVISIONS ............................................................................................. 27

    SECTION 1201.    Subordination ............................................................................................................... 27
    SECTION 1202.    Liability of Fiscal Agent and successor Fiscal Agent in respect of Subordination ...... 28
    SECTION 1203.    When Payment of Subordinated Bonds and Subordinate Obligations Allowed ........... 28
    SECTION 1204.    Subrogation of Owners of Subordinated Bonds and Subordinate Obligations ............ 28
    SECTION 1205.    Treatment of Ancillary Bond Facilities ....................................................................... 28
    SECTION 1206.    Amendments to Senior Bonds and Parity Obligations not Requiring Consent of Owners of Subordinated Bonds and
                Subordinate Obligations ............................................................................................... 29

ARTICLE XIII MISCELLANEOUS ...................................................................................................................... 29

    SECTION 1301.    Defeasance .................................................................................................................... 29
    SECTION 1302.    Evidence of Signatures of Bondowners and Owners of Bonds .................................... 30
    SECTION 1303.    Moneys Held for Particular Bonds ............................................................................... 30
    SECTION 1304.    Preservation and Inspection of Documents .................................................................. 30
    SECTION 1305.    Parties Interested Herein .............................................................................................. 30
    SECTION 1306.    No Personal Liability .................................................................................................... 30
    SECTION 1307.    Successors and Assigns ................................................................................................ 30
    SECTION 1308.    Severability of Invalid Provisions ................................................................................ 30
    SECTION 1309.    Headings ....................................................................................................................... 31
    SECTION 1310.    Conflict ......................................................................................................................... 31
    SECTION 1311.    Governing Law ............................................................................................................. 31

Confidential

UBS-ERS_Ultra_Vires-0087954

**TABLE OF CONTENTS**

**Page**

SECTION 1312.    Notices...................................................................................................................................31
SECTION 1313.    Jury Trial Waiver.....................................................................................................................31
SECTION 1314.    Effective Date..........................................................................................................................31

V-4

UBS-ERS_Ultra_Vires-0087955

## BOND RESOLUTION

**WHEREAS,** Employees Retirement System of the Government of the Commonwealth of Puerto Rico (the "System") is a trust created pursuant to Act 447 of May 15, 1951, as amended (the "Act"), to provide pension and other benefits to retired employees of the central government, municipalities and public corporations of the Commonwealth of Puerto Rico;

**WHEREAS,** by virtue of the Act, the System has, among others, the duties and powers

(i)       to incur debt secured by the assets of the System;

(ii)      to receive and collect Employers' Contributions;

(iii)     to make contracts and to execute all instruments necessary or convenient for the exercise of any of its powers; and

(iv)     to sue and be sued, complain and defend in all courts of justice and administrative bodies;

**WHEREAS,** as of June 30, 2005, the System had an unfunded liability of approximately $9.9 billion pursuant to the System's actuarial evaluation report;

**WHEREAS, the System's** statutory right to receive Employers' Contributions is an obligation of the Employers and a legal asset of the System;

**WHEREAS,** as a legal asset of the System, the Employers' Contributions may be pledged to secure the debt of the System; and

**WHEREAS,** in order to decrease the unfunded liability of the System, the System wishes to issue limited, non-recourse obligations in the form of Bonds, payable solely from the Pledged Property (as defined below), which includes the Employers' Contributions; now, therefore,

**BE IT RESOLVED** by the Board of Trustees of the System, as follows:

## ARTICLE I
## STATUTORY AUTHORITY

SECTION 101.       Authority for this Resolution. This Resolution is adopted pursuant to the provisions of the Act.

SECTION 102.       Resolution to Constitute Contract.  In consideration of the purchase and acceptance of any and all of the Bonds authorized to be issued hereunder by those Persons who shall hold the same from time to time, this Resolution shall be deemed to be and shall constitute a contract among the System, the Owners from time to time of the Bonds and the Ancillary Facility Providers; and the security interest created in this Resolution and the covenants and agreements therein set forth to be performed on behalf of the System shall be for the equal benefit, protection and security of the Owners of any and all of the Bonds and the Ancillary Facility Providers, all of which shall be of equal rank without preference, priority or distinction of any of the Bonds and Ancillary Facility Providers over any other thereof, except as expressly provided in or permitted by this Resolution.

## ARTICLE II
## AUTHORIZATION AND ISSUANCE OF BONDS

SECTION 201.       Authorization of Bonds.  The System may issue hereunder one or more series of Bonds of the System to be designated as "Pension Funding Bonds," which Bonds may be issued as hereinafter provided without limitation as to amount except as is or may hereafter be provided in this Resolution or in a Supplemental Resolution or as may be limited

by law.  There is hereby further created by this Resolution, in the manner and to the extent provided herein, a security interest and lien on the Pledged Property to secure the full and timely payment of the principal of and premium, if any, and interest on, all of the Bonds issued pursuant to this Resolution or any Supplemental Resolution.  The Bonds shall be special obligations of the System payable solely from the Pledged Property without recourse against other assets of the System.  The Commonwealth shall not be liable for the Bonds or any Ancillary Bond Facility.  Neither any Bond nor any Ancillary Bond Facility shall constitute a debt of the Commonwealth within the meaning of any constitutional provision, or a pledge of the good faith and credit of the Commonwealth or of the taxing power of the Commonwealth, and the Commonwealth shall not be liable to make any payments thereon, nor shall any Bond or any Ancillary Bond Facility be payable out of any funds or assets other than the Pledged Property, and the Bonds and each Ancillary Bond Facility shall contain a statement to the foregoing effect.

SECTION 202.  General Provisions for Issuance of Bonds.

1.       The Bonds may, if and when authorized by the System pursuant to one or more Supplemental Resolutions, be issued in one or more Series, as Senior Bonds or Subordinated Bonds, and the designation thereof, in addition to the name "Pension Funding Bonds," shall include such further appropriate particular designations added to or incorporated in such title for the Bonds of any particular Series as the System may determine, including designations of Classes.  Each Bond shall bear upon its face the designation so determined for the Series to which it belongs.  Except as may be limited by applicable law, Bonds of a Series may be issued in the form of Capital Appreciation Bonds, Convertible Capital Appreciation Bonds, Current Interest Bonds, Adjustable Rate Bonds, Option Bonds, Fixed Tender Bonds, or any combination of the foregoing, or any other type of Bond that may legally be issued by the System, which in each case may include Serial Bonds or Term Bonds, or any combination thereof.

2.       Each Supplemental Resolution authorizing or providing for the issuance of a Series of Bonds shall also specify, except as may be limited by applicable law:

(i)       the authorized principal amount and designation of such Series of Bonds;

(ii)      the purpose or purposes for which such Series of Bonds are being issued, which shall be one or more of the following, to the extent permitted by applicable law and the provisions of this Resolution:  (a) to provide sufficient funds to fund the System and decrease the unfunded liability of the System; (b) to refund or otherwise prepay any Bonds or other evidences of indebtedness issued by the System; (c) to pay or provide for the payment of Financing Costs, including but not limited to the costs of issuance; (d) to fund debt service reserves and other reserve accounts; and/or (e) for such other purposes as may be authorized by the Act, as the same may be amended and then in effect.

(iii)     the date or dates, maturity date or dates and amounts of each maturity of the Bonds of such Series;

(iv)     the interest rate or rates of the Bonds of such Series (which may include variable, convertible or other rates, and zero interest rate bonds), or the manner of determining such interest

UBS-ERS_Ultra_Vires-0087956

rate or rates, and the interest payment dates of the Bonds of such Series, and the date or dates on which and the methods by which any such rates shall be adjusted;

(v)      the type of Bonds to be issued, including, but not limited to, Capital Appreciation Bonds, Convertible Capital Appreciation Bonds, Current Interest Bonds, Adjustable Rate Bonds, Option Bonds, or Fixed Tender Bonds;

(vi)      the designation of Bonds of such Series as Senior Bonds or as Subordinated Bonds;

(vii)      the Record Date, if any, which shall be the 15th day of the month preceding the date of payment, whether or not a Business Day, if no other Record Date is specified;

(viii)      the denomination or denominations of, and the manner of dating, numbering and lettering, the Bonds of such Series;

(ix)      if so determined by the System, any Debt Service Reserve Requirement for the Bonds of such Series, and the method of calculating the same and funding thereof (which may be from Bond proceeds);

(x)      the place or places of payment of the principal of and premium, if any, and interest on the Bonds of such Series, or the method of determining the same;

(xi)      the Redemption Price or Prices, and the Currency in which such Prices are payable, if any, and, subject to the provisions of Article IV, the redemption terms, if any, for the Bonds of such Series (including but not limited to any notice of redemption period other than as provided in Section 406), *provided* that Bonds of any maturity for which Sinking Fund Installments shall be established pursuant to paragraph (xii) of this paragraph shall in any event be redeemable, or payable at maturity, by application of the Sinking Fund Installments for such Bonds on the due dates of such Sinking Fund Installments;

(xii)      the amount of each Sinking Fund Installment, or the method for determining such amount, and due date of each Sinking Fund Installment, if any, for Bonds of like maturity of such Series;

(xiii)      the amount, if any, or the method for determining such amount, to be credited to the Capitalized Interest Account, for capitalized interest with respect to such Series of Bonds and provisions for the application thereof to the payment of all or a portion of the interest on such Series of Bonds or any other Series of Bonds;

(xiv)      the amount, if any, or method of determining the costs of issuance to be delivered to GDB at Closing;

(xv)      if so determined by the System, provisions for the application of any moneys available therefor to the purchase or

redemption of Bonds of such Series and for the order of purchase or redemption of such Bonds;

(xvi)      if so determined by the System, provisions for the sale of the Bonds of such Series;

(xvii)      provisions for the execution and authentication of the Bonds of such Series;

(xviii)      the respective forms of the Bonds of such Series and of the Fiscal Agent's certificate of authentication;

(xix)      if Bonds of such Series are Adjustable Rate Bonds that are not the subject of a Qualified Hedge, the Maximum Interest Rate for such Bonds;

(xx)      if Bonds of such Series are Option Bonds or Fixed Tender Bonds, provisions regarding tender for purchase or redemption thereof and payment of the purchase or Redemption Price thereof, in the Currency in which the Bonds of such Series are payable;

(xxi)      if Bonds of such Series are Capital Appreciation Bonds or Convertible Capital Appreciation Bonds, provisions for including the principal and interest portions of the Accreted Amount in the calculation of accrued and unpaid and accruing interest or Principal Installments for purposes of the definition of Accrued Payment Obligation;

(xxii)      if Bonds of such Series are Adjustable Rate Bonds, Capital Appreciation Bonds, Convertible Capital Appreciation Bonds or Bonds hedged or to be hedged by a Qualified Hedge, or the Supplemental Resolution authorizes a Qualified Hedge on Bonds previously issued, provisions specifying the method of calculating the Accrued Payment Obligation with respect to such Adjustable Rate Bonds, Capital Appreciation Bonds, Convertible Capital Appreciation Bonds or the Bonds hedged or to be hedged by such Qualified Hedge, as the case may be, for purposes of the Debt Service Reserve Requirement and the additional Bonds tests of Sections 204 and 708;

(xxiii)      if so determined by the System, modifications to the definition of Revenues or Pledged Property applicable to the Bonds of such Series for the only purpose of adding resources to Revenues or Pledged Property for the benefit of the Bondowners;

(xxiv)      deposits into Funds, Accounts and Subaccounts as may be required or permitted by this Resolution and not otherwise provided for above;

(xxv)      if such Bonds are not payable in Dollars, the Foreign Currency or Currencies or Currency Unit in which the Bonds of such Series shall be denominated or in which payment of the principal of (and/or premium, if any) and/or interest on the Bonds of such Series may be made;

(xxvi)      if the amount of principal of (and premium, if any) or interest on the

V-6

Bonds of such Series may be determined with reference to an index, including, but not limited to, an index based on a Currency or Currencies other than that in which the Bonds of such Series are denominated or payable, or any other type of index, the manner in which such amounts shall be determined;

(xxvii)    the book-entry-only systems of registration to be chosen with respect to the Bonds of such Series, and the procedures regarding such registration and, if applicable, the rules and regulations of the book-entry-only system depository; and

(xxvii)    any other provisions deemed advisable by the System, not in conflict with the provisions of this Resolution or the Act as each is then in effect.

3.    Except in the case of the Series A Bonds being issued pursuant to the First Supplemental Resolution, each Series of Bonds issued by the System must satisfy the conditions contained in Section 708 in connection with the issuance of additional Bonds or in Section 204 in connection with the issuance of Refunding Bonds. Each Series of Bonds shall be executed by the System for issuance under this Resolution and delivered to the Fiscal Agent and thereupon shall be authenticated by the Fiscal Agent and delivered to the System and upon the receipt by the Fiscal Agent of:

(i)    a copy of this Resolution, certified by an Authorized Officer of the System;

(ii)    an Opinion of Counsel to the effect that (A) the System has the right and power under the Act, as amended to the date of such opinion, to adopt the Resolution and the Resolution has been duly and lawfully adopted by the System, is in full force and effect and is valid and binding upon the System and enforceable in accordance with its terms, and no other authorization for the Resolution is required; (B) the Resolution creates the valid security interest for the benefit of the Owners of the Bonds on the Pledged Property, subject only to the provisions of the Resolution permitting the application thereof to the purposes and on the terms and conditions set forth in the Resolution; and (C) the Bonds of such Series are valid and binding special, non-recourse obligations of the System enforceable in accordance with their terms and the terms of the Resolution (except insofar as the enforceability thereof may be limited by bankruptcy, moratorium, insolvency or other laws affecting creditors' rights or remedies theretofore or thereafter enacted and may be subject to general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law), or other customary exception), and entitled to the benefit of the Resolution and of the Act, as amended to the date of such opinion, and such Bonds have been duly and validly authorized, executed and issued in accordance with law, including the Act, as amended to the date of such opinion, and in accordance with the Resolution;

(iii)    a written order as to the authentication and delivery of the Bonds of such Series, signed by an Authorized Officer of the System;

(iv)    a copy of the Supplemental Resolution authorizing such Series,

certified by an Authorized Officer of the System;

(v)    a certificate of an Authorized Officer of the System stating that (A) the System is not in default in any material respect in the performance of any of the terms, provisions or covenants of this Resolution or any Supplemental Resolution to be complied with or performed by the System, and (B) the System has not violated the provisions of Article VII of this Resolution; and

(vi)    such further documents as are required by the provisions of this Section or Article IX or any Supplemental Resolution adopted pursuant to Article IX.

SECTION 203.    Special Provisions Concerning Capital Appreciation Bonds and Convertible Capital Appreciation Bonds.

Except as otherwise may be provided in a Supplemental Resolution:

1.    For purposes of clause (ii) within the definition of "Outstanding" in this Resolution, the principal amount of any Capital Appreciation Bond or Convertible Capital Appreciation Bond, in reference to the payment thereof at maturity, shall be deemed to equal its Maturity Amount.

2.    For purposes of the definition of "Redemption Price" in this Resolution, the principal amount of any Capital Appreciation Bond or Convertible Capital Appreciation Bond shall be deemed to equal its Accreted Amount as of the date of the intended redemption.

3.    For purposes of Sections 305, 307 and 308, the principal amount of any Capital Appreciation Bond or Convertible Capital Appreciation Bond shall be deemed to equal its Accreted Amount as of the date of the intended exchange or substitution.

4.    For purposes of Section 406, the principal amount of any Capital Appreciation Bond or Convertible Capital Appreciation Bond shall be deemed to equal its Accreted Amount.

5.    For purposes of Sections 501, 502, and 1103, and of all other provisions of this Resolution relating to security for the Bonds or application of assets which secure the Bonds, the principal amount of each Capital Appreciation Bond or Convertible Capital Appreciation Bond shall be deemed to equal its Accreted Amount as of the date of the intended application of the subject assets.

6.    For purposes of Sections 1002, 1003, 1101, 1102, 1105 and 1106 and of all other provisions of this Resolution relating to consents or directions given by, or requests of, Owners of the Bonds, the principal amount of each Capital Appreciation Bond or Convertible Capital Appreciation Bond shall be deemed to equal its Accreted Amount as of the most recent Accretion Date.

7.    For purposes of Section 1301, the principal amount of any Capital Appreciation Bond or Convertible Capital Appreciation Bond payable upon the maturity thereof shall be deemed to equal its Maturity Amount.

SECTION 204.    Special Provisions for Refunding

Confidential

UBS-ERS_Ultra_Vires-0087958

Bonds.

1.     Bonds of one or more Series may be authenticated and delivered upon original issuance, subject to the provisions and limitations of Section 202 and this Section, as Refunding Bonds, and only for the purposes of creating economic savings, restructuring debt service, modifying Resolution covenants, and providing for more favorable debt terms, or any of the foregoing or any other valid purpose of the System.  Each Supplemental Resolution authorizing a Series of Refunding Bonds shall set forth that the purposes for which such Series is issued include the payment or redemption of all or any part of the Bonds of any one or more Series then Outstanding.

2.     The Refunding Bonds of such Series shall be authenticated and delivered by the Fiscal Agent only upon receipt by the Fiscal Agent (in addition to the requirements of Section 202) of:

(i)     irrevocable instructions to the Fiscal Agent, in form reasonably satisfactory to it, to give due notice of the payment or redemption of all the Bonds so to be refunded on a payment or redemption date specified in such instructions and the payment or redemption dates, if any, upon which such Bonds are to be paid or redeemed;

(ii)     if the Bonds of a Series to be refunded are to be paid or redeemed subsequent to the forty-fifth day next succeeding the date of authentication of the Refunding Bonds, irrevocable instructions to the Fiscal Agent, to provide notice in the manner provided in Section 1301 with respect to the payment of such Bonds pursuant to such Section 1301;

(iii)     either (A) moneys or (B) Defeasance Securities as shall be necessary to comply with the provisions of paragraph 3 of Section 1301, which moneys and Defeasance Securities shall be held in trust and used only as provided in paragraph 3 of Section 1301; and

(iv)     a certificate of an independent certified public accountant certifying that (A) the amounts described in paragraph (iii) above are sufficient, without any reinvestment, to pay or redeem all of the Bonds to be refunded, and (B) the principal and interest payable with respect to the Refunding Bonds in each year while the Refunding Bonds are Outstanding is less than the principal and interest payable with the respect to the Bonds being refunded, provided that the certificate of the independent certified public accountant shall not be required to cover the matters described in this clause (B) if the Refunding Bonds are issued in compliance with the additional Bonds test set forth in Section 708.

3.     Refunding Bonds may be issued upon compliance with Section 708 in lieu of compliance with this Section.

SECTION 205.     Delegation of Officers and Committees.  A Supplemental Resolution authorizing Bonds may delegate to any Authorized Officer of the System the power to issue Bonds from time to time in compliance with the provisions of this Resolution and to fix the details of any such Bonds by a certificate of such Authorized Officer.  Any such action by an Authorized Officer of the System shall be in writing.  Each such action by an Authorized Officer of the System with respect to any

Bonds shall be deemed to be part of the Supplemental Resolution providing for such Bonds.

SECTION 206.     Credit and Liquidity Facilities; Rights of Credit Facility Providers.

1.     In connection with any Bonds, the System may obtain or cause to be obtained one or more Credit Facilities or Liquidity Facilities and agree with the Credit Facility Provider or Liquidity Facility Provider to reimburse such provider directly for amounts paid under the terms of such Credit Facility or Liquidity Facility, together with interest thereon; *provided*, *however*, that no obligation to reimburse a Credit Facility Provider or Liquidity Facility Provider shall be created, for purposes of this Resolution, until amounts are paid under such Credit Facility or Liquidity Facility.

2.     Any Supplemental Resolution may provide that (i) so long as a Credit Facility is in full force and effect, and payment on the Credit Facility is not in default, the Credit Facility Provider shall be deemed to be the sole Owner of the Outstanding Bonds the payment of which such Credit Facility secures when the approval, consent or action of the Owners of such Bonds is required or may be exercised under this Resolution, or, in the alternative, that the approval, consent or action of the Credit Facility Provider shall be required in addition to the approval, consent or action of the applicable percentage of the Owners of Outstanding Bonds required by Section 1002 and following an Event of Default, *provided* that no such approval, consent or action of a Credit Facility Provider may be made or taken without the approval, consent or action of the Owner of each Bond affected if such approval, consent or action of such Owner otherwise would be required by the second sentence of Section 1002, and (ii) in the event that the principal, Sinking Fund Installments, if any, and Redemption Price, if applicable, and interest due on any Outstanding Bonds shall be paid in the Currency in which the Bonds of such Series are payable under the provisions of a Credit Facility, all covenants, agreements and other obligations of the System to the Owners of such Bonds shall continue to exist and such Bonds shall be deemed to remain Outstanding, and such Credit Facility Provider shall be subrogated to the rights of such Owners in accordance with the terms of such Credit Facility.

SECTION 207.     Qualified Hedges.  The System may enter into one or more Qualified Hedges in connection with any Bonds (i) at the time of issuance of such Bonds, (ii) prior to the issuance of such Bonds, in anticipation of the issuance thereof, provided that payments by the System under the Qualified Hedges do not commence until the date any Bonds to which such Qualified Hedge of Qualified Hedges relate are expected to be issued, or (iii) after the issuance of such Bonds.

SECTION 208.     Parity     Obligations     and Subordinate Obligations.  For purposes of Articles V and XI, all Parity Obligations and Subordinate Obligations shall specify, to the extent applicable, the interest and principal components of such Parity Obligations and Subordinate Obligations; provided, however, that in the case of Qualified Hedges, scheduled payments thereunder shall constitute the interest components thereof and there shall be no principal components.

### ARTICLE III
### GENERAL TERMS AND PROVISIONS OF BONDS

*SECTION 301.*     *Medium of Payment; Form and Date.*

1.     The Bonds shall be payable, with respect to interest, principal and premium, if any, in Dollars or any Currency which at the time of payment is legal tender for the payment of public and private debts, as provided in the

Confidential

Supplemental Resolution authorizing the issuance thereof.

2.       The Bonds of each Series shall be issued only in the form of fully registered Bonds without coupons unless otherwise authorized by the Supplemental Resolution authorizing the issuance thereof.

3.       Each Bond shall be lettered and numbered as provided in the Supplemental Resolution authorizing the issuance thereof and so as to be distinguished from every other Bond.

4.       Bonds of each Series shall be dated as provided in the Supplemental Resolution authorizing the issuance thereof.

5.       If so provided by the Supplemental Resolution authorizing the issuance thereof, the Bonds of a Series authorized to be issued by such Supplemental Resolution may be issued in book entry form without definitive Bonds delivered to each beneficial owner thereof.

SECTION 302.       Legends.   The Bonds of each Series may contain or have endorsed thereon such provisions, specifications and descriptive words not inconsistent with the provisions of this Resolution as may be necessary or desirable to comply with custom or otherwise, as may be determined by the System prior to the authentication and delivery thereof.

SECTION 303.       Execution and Authentication.

1.       The Bonds shall be executed in the name of the System by the manual or facsimile signature of an Authorized Officer of the System and its seal (or a facsimile thereof) shall be thereunto affixed, imprinted, engraved or otherwise reproduced, and attested by the manual or facsimile signature of its Secretary or an Assistant Secretary. In case any one or more of the officers who shall have signed or sealed any of the Bonds shall cease to be such officer before the Bonds so signed and sealed shall have been authenticated and delivered by the Fiscal Agent, such Bonds may, nevertheless, be authenticated and delivered as herein provided, and may be issued as if the persons who signed or sealed such Bonds had not ceased to hold such offices. Any Bond of a Series may be signed and sealed on behalf of the System by such persons as at the time of the execution of such Bond shall be duly authorized or hold the proper office in the System, although at the date borne by the Bonds of such Series such persons may not have been so authorized or have held such office.

2.       The Bonds of each Series shall bear thereon a certificate of authentication, in the form set forth in the Supplemental Resolution authorizing such Bonds, executed manually by the Fiscal Agent. Only such Bonds as shall bear thereon such certificate of authentication shall be entitled to any right or benefit under this Resolution and no Bond shall be valid or obligatory for any purpose until such certificate of authentication shall have been duly executed by the Fiscal Agent. Such certificate of the Fiscal Agent upon any Bond executed on behalf of the System shall be conclusive evidence that the Bond so authenticated has been duly authenticated and delivered under this Resolution and that the Owner thereof is entitled to the benefits of this Resolution.

SECTION 304.       Negotiability, Transfer and Registry.   All Bonds issued under this Resolution shall be negotiable, subject to the provisions for registration and registration of transfer contained in this Resolution and in the Bonds. So long as any of the Bonds shall remain outstanding, the Fiscal Agent shall maintain and keep, at the Corporate Trust

Office, books for the registration and registration of transfer of Bonds; and, upon presentation thereof for such purpose at said office, the Fiscal Agent shall register or cause to be registered therein, under such reasonable regulations as it or the Fiscal Agent may prescribe, any Bond entitled to registration or registration of transfer. So long as any of the Bonds remain Outstanding, the Fiscal Agent shall also make all necessary provision to permit the exchange of Bonds at the Corporate Trust Office.

SECTION 305.       Registration of Transfer of Bonds.

1.       The transfer of each Bond shall be registrable only upon the books of the System, which shall be kept for that purpose at the Corporate Trust Office, by the Owner thereof in person or by his attorney duly authorized in writing, upon surrender thereof together with a written instrument of transfer duly executed by the Owner or his duly authorized attorney. Upon the registration of transfer of any such Bond, the System shall issue, and the Fiscal Agent shall authenticate, in the name of the transferee a new Bond or Bonds of the same aggregate principal amount, Series, maturity, and interest rate, as the surrendered Bond.

2.       The System and the Fiscal Agent may deem and treat the person in whose name any Bond shall be registered upon the books of the System as the absolute owner of such Bond whether such Bond shall be overdue or not, for the purpose of receiving payment of, or on account of, the principal or Redemption Price, if any, of and interest on such Bond and for all other purposes, and all such payments so made to any such Owner or upon his duly authorized written order shall be valid and effectual to satisfy and discharge the liability upon such Bond to the extent of the sum or sums so paid, and neither the System nor the Fiscal Agent shall be affected by any notice to the contrary. The System agrees to indemnify and save the Fiscal Agent harmless from and against any and all loss, cost, charge, expense, judgment or liability incurred by it, acting in good faith and without gross negligence under this Resolution, in so treating such Owner.

SECTION 306.       Regulations with Respect to Exchanges and Registration of Transfers.   In all cases in which the privilege of exchanging Bonds or registering transfers of Bonds is exercised, the System shall execute and the Fiscal Agent shall authenticate and deliver Bonds in accordance with the provisions of this Resolution. All Bonds surrendered in any such exchanges or registration of transfers shall forthwith be canceled by the Fiscal Agent. For every such exchange or registration of transfer of Bonds, whether temporary or definitive, the System or the Fiscal Agent may make a charge sufficient to reimburse it for any tax, fee or other governmental charge required to be paid with respect to such exchange or registration of transfer, and, except (i) with respect to the delivery of definitive Bonds in exchange for temporary Bonds, (ii) in the case of a Bond issued upon the first exchange or registration of transfer of a Bond or Bonds surrendered for such purpose within 60 days after the first authentication and delivery of any of the Bonds of the same Series, or (iii) as otherwise provided in this Resolution, may charge a sum sufficient to pay the cost of preparing each new Bond issued upon such exchange or registration of transfer, which sum or sums shall be paid by the person requesting such exchange or registration of transfer as a condition precedent to the exercise of the privilege of making such exchange or registration of transfer. Neither the System nor the Fiscal Agent shall be required to register the transfer of or exchange any Bonds called for redemption.

SECTION 307.       Bonds Mutilated, Destroyed, Stolen or Lost.   In case any Bond shall become mutilated or be destroyed, stolen or lost, the System shall execute, and thereupon the Fiscal Agent shall authenticate and deliver, a new Bond of like Series, maturity, and principal amount as the Bond so mutilated,

Confidential

UBS-ERS_Ultra_Vires-0087960

destroyed, stolen or lost or in exchange and substitution for such mutilated Bond, upon surrender and cancellation of such mutilated Bond or in lieu of and substitution for the Bond destroyed, stolen or lost, upon filing with the Fiscal Agent evidence satisfactory to the System and the Fiscal Agent that such Bond has been destroyed, stolen or lost and upon furnishing the System and the Fiscal Agent with indemnity satisfactory to it and complying with such other reasonable regulations as the System and the Fiscal Agent may prescribe and paying such expenses as the System and Fiscal Agent may incur.  All Bonds so surrendered to the Fiscal Agent shall be canceled by it.   Any such new Bonds issued pursuant to this Section in substitution for Bonds alleged to be destroyed, stolen or lost shall constitute original additional contractual obligations on the part of the System, whether or not the Bonds so alleged to be destroyed, stolen or lost be at any time enforceable by anyone, and shall be equally secured by and entitled to equal and proportionate benefits with all other Bonds issued under this Resolution, in any moneys or securities held by the System or the Fiscal Agent for the benefit of the Bondowners.

SECTION 308.        Preparation of Definitive Bonds; Temporary Bonds.

1.        Until the definitive Bonds of any Series are prepared, the System may execute, in the same manner as is provided in Section 303, and, upon the request of the System, the Fiscal Agent shall authenticate and deliver, in lieu of definitive Bonds, one or more temporary Bonds substantially of the tenor of the definitive Bonds in lieu of which such temporary Bond or Bonds are issued, in denominations or any multiples thereof authorized by the System, and with such omissions, insertions and variations as an Authorized Officer of the System may deem appropriate to temporary Bonds.  The System at its own expense shall prepare and execute and, upon the surrender of such temporary Bonds for exchange and the cancellation of such surrendered temporary Bonds, the Fiscal Agent shall authenticate and, without charge to the Owner thereof, deliver in exchange therefor definitive Bonds, of the same aggregate principal amount, Series and maturity if any, as the temporary Bonds surrendered. Until so exchanged, the temporary Bonds shall in all respects be entitled to the same benefits and security as definitive Bonds authenticated and issued pursuant to this Resolution.

2.        All temporary Bonds surrendered in exchange either for another temporary Bond or Bonds or for a definitive Bond or Bonds shall be forthwith canceled by the Fiscal Agent.

SECTION 309.        Tender of Option Bonds or Fixed Tender Bonds.  Option Bonds or Fixed Tender Bonds which are required to be delivered for redemption or purchase pursuant to the provisions hereof or of the Supplemental Resolution authorizing such Bonds shall be deemed surrendered for transfer even though such Bonds have not been actually delivered by the Owners thereof.

SECTION 310.        Book-Entry-Only        System. Notwithstanding any other provision of this Resolution, the System may employ one or more book-entry-only systems of registration with respect to any Bonds, and the procedures regarding such registration shall be set forth in a Supplemental Resolution and, if applicable, the rules and regulations of the book-entry-only system depository.  Any provisions of this Resolution inconsistent with book-entry-only Bonds, including but not limited to the manner in which Bonds may be paid, shall not be applicable to such book-entry-only Bonds.

**ARTICLE IV**
**REDEMPTION OF BONDS**

SECTION 401.        Privilege of Redemption and

Redemption Price.  Series of Bonds subject to redemption prior to maturity pursuant to the Supplemental Resolution authorizing such Series shall be redeemable, upon notice as provided in this Article IV, at such times, at such Redemption Prices, in such Currencies and upon such terms, in addition to and consistent with the terms contained in this Article IV, as may be specified in such Supplemental Resolution.

SECTION 402.        Redemption at the Election of the System.  In the case of any redemption of Bonds otherwise than as provided in Section 403, the System shall give written notice to the Fiscal Agent of its election to so redeem, of the redemption date, of the "CUSIP," "ISIN" or other similar numbers (provided, however, that the System and the Fiscal Agent shall not be liable for the correctness of such numbers as contained in such notice), of the Series, and of the aggregate principal amount (or Maturity Amount, if applicable) of the Bonds of each maturity and interest rate of such Series to be redeemed, which principal amount (or Maturity Amount, if applicable) shall be determined by the System in its sole discretion, subject to any limitations with respect thereto contained in any Supplemental Resolution.  Such notice shall be given at least forty (40) days prior to the redemption date or such shorter period as shall be acceptable to the Fiscal Agent.  In the event notice of redemption shall have been given as provided in Section 406, except to the extent such notice shall state that such redemption is conditioned upon the receipt by the Fiscal Agent of moneys sufficient to pay the Redemption Price, in the Currency in which the Bonds of such Series are payable, or upon the satisfaction of any other condition or the occurrence of any other event as shall be stated in such notice, the System shall, prior to the redemption date, pay or cause to be paid to the Fiscal Agent an amount in cash and/or a principal amount of Investment Obligations maturing or redeemable at the option of the holder thereof not later than the date fixed for redemption which, in addition to other moneys, if any, available therefor held by the Fiscal Agent, will be sufficient to redeem on the redemption date at the Redemption Price thereof, plus interest accrued and unpaid to the redemption date, and in the Currency in which the Bonds of such Series are payable, all of the Bonds (or portions thereof) to be redeemed.

SECTION 403.        Redemption in Satisfaction of Sinking Fund Installments.

1.        In addition to the redemption of Bonds pursuant to Sections 401 and 402 above, Term Bonds issued pursuant to this Resolution shall be subject to mandatory redemption by lot out of Sinking Fund Installments at a Redemption Price equal to the principal amount (or Accreted Amount, if applicable) thereof, in the Currency in which the Bonds of such Series are payable, on the dates and in the amounts set forth in the Supplemental Resolution pursuant to which such Bonds were issued.

2.        In the case of any redemption of Bonds out of Sinking Fund Installments, the System shall, in the case of each Sinking Fund Installment, give written notice to the Fiscal Agent of (i) the date of such Sinking Fund Installment, (ii) the unsatisfied balance of such Sinking Fund Installment (determined as provided in Section 507) and (iii) the particular Series and maturity of the Bonds then being redeemed out of such Sinking Fund Installment.  Such notice shall be given at least forty (40) days prior to the date of such redemption, or such shorter period as shall be acceptable to the Fiscal Agent.

3.        The System shall, and hereby covenants that it will, on or prior to 11:00 a.m. (New York City time) on the date of such redemption, pay to the Fiscal Agent an amount in cash which, in addition to other moneys, if any, available therefor held by the Fiscal Agent, will be sufficient to redeem at such redemption date, at the Redemption Price thereof, plus interest accrued and unpaid to the redemption date, in the

V-10

UBS-ERS_Ultra_Vires-0087961

Currency in which the Bonds of such Series are payable, all of the Bonds which are to be redeemed out of such Sinking Fund Installment.

SECTION 404.    Selection of Bonds to be Redeemed in Partial Redemption.

1.    In the event of redemption of less than all the Outstanding Bonds of a particular Series pursuant to Section 401 or 402 hereof, the System shall designate the maturities of the Bonds to be redeemed.

2.    If less than all of the Outstanding Bonds of a particular Series and maturity are to be redeemed, the Fiscal Agent shall select the Bonds or portions of Bonds to be redeemed in the appropriate authorized denominations by lot or by such other manner as it deems appropriate. For purposes of this Section 404, Bonds (or portions thereof) which have theretofore been selected by lot for redemption shall not be deemed to be Outstanding.

SECTION 405.    Notice of Redemption.

1.    When the Fiscal Agent shall receive notice from the System of its election to redeem Bonds pursuant to Section 402, or when Bonds are to be redeemed pursuant to Section 403, the Fiscal Agent shall give notice, in the name of the System, of the redemption of such Bonds, which notice shall specify the Series and maturities and interest rate of the Bonds to be redeemed, the redemption date and the place or places where amounts due upon such redemption will be payable and, if less than all of the Bonds of any like Series and maturity and interest rate are to be redeemed, the letters and numbers or other distinguishing marks of such Bonds so to be redeemed, and, in the case of Bonds to be redeemed in part only such notice shall also specify the respective portions of the principal amount thereof to be redeemed, and, if applicable, that such redemption is conditioned upon the satisfaction of the conditions specified as provided in 2 below. Such notice of redemption shall further state that on such redemption date there shall become due and payable upon each Bond (or portion thereof) to be redeemed the Redemption Price thereof, together with interest accrued to the redemption date in the Currency in which the Bonds of such Series are payable, and that from and after such date, sufficient moneys being held by the Fiscal Agent in trust for the payment of such Redemption Price, interest thereon shall cease to accrue and be payable on the Bonds (or portions thereof) to be redeemed, unless, in the case of any conditional notice, the requisite conditions are not satisfied, and it will further state that the notice will comply with the requirements of the Securities Exchange Act of 1934, as amended, Release No. 34-23856, dated December 3, 1986, as long as such Release shall be in effect. The Fiscal Agent shall mail a copy of such notice, postage prepaid, no less than thirty (30) days before the redemption date, or such other period for any particular Bonds as may be provided by the Supplemental Resolution authorizing such Bonds, to the Owners of Bonds or portions of Bonds which are to be redeemed, at their last address, if any, appearing upon the registry books. Failure to so mail any such notice to any particular Owner shall not affect the validity of the proceedings for the redemption of Bonds not owned by such Owner and failure of any Owner to receive such notice shall not affect the validity of the proposed redemption of Bonds.

2.    Any notice of optional redemption of Bonds given pursuant to this Section may be made conditional upon receipt by the Fiscal Agent of moneys sufficient to pay the Redemption Price of such Bonds in the Currency in which the Bonds of such Series are payable or upon the satisfaction of any other condition or the occurrence of any other event, which notice shall specify any such conditions or events. Any conditional notice so given may be rescinded at any time before payment of such Redemption Price if any such condition is not satisfied or if any such other event does not occur. Notice of such rescission shall be given by the Fiscal Agent to affected Owners of Bonds, in the same manner as the conditional notice of redemption was given, as promptly as practicable after the System shall have notified the Fiscal Agent of the failure of such condition or the occurrence of such other event.

SECTION 406.    Payment of Redeemed Bonds. Notice having been given in the manner provided in Section 405, the Bonds (or portions thereof) so called for redemption shall become due and payable on the redemption date so designated at the Redemption Price, plus interest accrued and unpaid to the redemption date in the Currency in which the Bonds of such Series are payable, and upon presentation and surrender thereof at the office specified in such notice, such Bonds (or portions thereof) shall be paid at the Redemption Price plus interest accrued and unpaid to the redemption date in the Currency in which the Bonds of such Series are payable, except to the extent the same shall not occur on account of a failure to comply with a condition or event stated in the notice to the Fiscal Agent pursuant to Section 402 and in the notice of redemption pursuant to Section 405. If there shall be called for redemption less than all of a Bond, the System shall execute and the Fiscal Agent shall authenticate and deliver, upon the surrender of such Bond, without charge to the Owner thereof, for the unredeemed balance of the principal amount of the Bond so surrendered, Bonds of like Series and maturity in any authorized denomination. If, on the redemption date, moneys for the redemption of all the Bonds (or portions thereof) of any like Series and maturity and interest rate to be redeemed, together with interest to the redemption date, shall be held by the Fiscal Agent so as to be available therefor on said date and if notice of redemption shall have been provided as aforesaid, and, with respect to any conditional notice of redemption, the conditions stated in the notice of redemption shall have been met and satisfied, then, from and after the redemption date, interest on the Bonds (or portions thereof) of such Series and maturity and interest rate so called for redemption shall cease to accrue and become payable. If said moneys shall not be so available on the redemption date, such Bonds (or portions thereof) shall continue to bear interest until paid at the same rate as they would have borne had they not been called for redemption.

SECTION 407.    Cancellation and Disposition of Bonds. All Bonds paid or redeemed, either at or before maturity, shall be delivered to the Fiscal Agent when such payment or redemption is made, and such Bonds shall thereupon be promptly canceled. Bonds so canceled shall be disposed of by the Fiscal Agent, in accordance with the Fiscal Agent's standard procedures, and, upon request from the System, the Fiscal Agent shall execute a certificate of disposition in duplicate by the signature of one of its Authorized Officers describing the Bonds so disposed of, and one executed certificate shall be delivered to the System and the other executed certificate shall be retained by the Fiscal Agent.

ARTICLE V
PLEDGE, ASSIGNMENT AND SECURITY INTEREST;
ESTABLISHMENT AND MAINTENANCE OF FUNDS AND
ACCOUNTS AND APPLICATION THEREOF

SECTION 501.    Pledge, Assignment and Security Interest.

1.    The pledge and assignment of, and the grant of a security interest in and over, the Pledged Property, subject to Section 804, in favor of the Fiscal Agent for the benefit of the Bondholders and for the payment and as security for the payment of the Principal Installments and Redemption Price of and interest on the Bonds and payments due under Credit Facilities, and payments due under Liquidity Facilities and Qualified Hedges is hereby authorized, created and granted in accordance with the terms and provisions of this Resolution and

Confidential

UBS-ERS_Ultra_Vires-0087962

subject to the provisions of this Resolution permitting the application of the Pledged Property for the purposes and on the terms and conditions set forth in this Resolution, and in each case subject to the provisions regarding priority of payment as between the Senior Bonds and the Subordinated Bonds. Nothing contained herein shall prevent a Credit Facility or Liquidity Facility from being provided with respect to any particular Bonds and not others. To further evidence such pledge, assignment and grant of security interest, the Fiscal Agent and the System shall execute the Security Agreement and the System shall cause the proper filing of the Security Agreement in accordance with the Uniform Commercial Code as in effect in Puerto Rico.

2.    To the fullest extent provided by the Act and other applicable law, the pledge, assignment and grant of security interest provided by this Section shall be valid and binding, and the Pledged Property shall immediately be subject to the lien of this pledge, assignment and security interest without any physical delivery thereof or further act, and the lien of this pledge, assignment and security interest shall be valid and binding as against all parties having claims of any kind in tort, contract or otherwise against the System, irrespective of whether such parties have notice thereof.

SECTION 502.    Establishment of Fund and Accounts.

1.    The "Project Fund" is hereby created and the following Accounts and Subaccounts are hereby created and established within the Project Fund, each of which shall have as a prefix "Employees Retirement System of the Government of the Commonwealth of Puerto Rico" and shall be held by the Fiscal Agent:

(1)    Capitalized Interest Account,

(2)    Revenue Account,

(3)    Debt Service Account, which, if there shall be any Subordinated Bonds Outstanding, shall be established for each Class of Bonds, and each of which shall contain therein a Principal Subaccount and an Interest Subaccount,

(4)    Debt Service Reserve Account, which, if there shall be any Subordinated Bonds Outstanding, shall be established for each Class of Bonds,

(5)    General Reserve Account, and

(6)    Redemption Account, which, if there shall be any Subordinated Bonds Outstanding, shall be established for each Class of Bonds.

2.    The System may establish and create such other Accounts in the Fund, or such other Subaccounts in any Account, as may be authorized pursuant to any Supplemental Resolution, including a Supplemental Resolution authorizing a Series of Bonds, and deposit therein such amounts as may from time to time be held for the credit of any Account or Subaccount.

3.    Amounts held by the System or by the Fiscal Agent at any time in the Fund or any Accounts and Subaccounts established pursuant to this Section, as the case may be, shall be held in trust in separate Accounts and Subaccounts and shall be applied only in accordance with the provisions of this Resolution and the Act.

SECTION 503.    Capitalized Interest Account.

1.    There shall be deposited in the Capitalized Interest Account amounts, if any, determined as set forth in a Supplemental Resolution as required by paragraph (xiii) of subsection 2 of Section 202 and authorizing the issuance of a Series of Bonds.

2.    Moneys in the Capitalized Interest Account or any Subaccount thereof shall be transferred to the corresponding Interest Subaccount in the Debt Service Account on or prior to the Business Day preceding each Interest Payment Date in accordance with the requirements of the applicable Supplemental Resolution.

3.    Any amounts on deposit in the Capitalized Interest Account or any Subaccount thereof and not set aside by the System, or set aside but determined by the System to be no longer required, to pay interest on a Series of Bonds, shall be withdrawn from such Account or Subaccount by the Fiscal Agent and deposited in the Revenue Account, as directed in writing by the System.

4.    In the event of the refunding of any Bonds, the System may withdraw from the Capitalized Interest Account related to the Bonds to be refunded all or any portion of amounts accumulated therein with respect to such Bonds and deposit such amounts as provided in a written direction of the System; *provided, however*, that such withdrawal shall not be made unless immediately thereafter the Bonds being refunded shall be deemed to have been paid pursuant to Section 1301.

SECTION 504.    Revenue Account.

1.    On the last Business Day of the month, the System will transfer the Employers' Contributions to the Fiscal Agent. Immediately thereafter, but in any case no later than the next Business Day following the transfer by the System of the Employers' Contributions, all Revenues shall be deposited into the Revenue Account except as provided by Section 602.3; *provided, however*, that the proceeds of any draw on or payment under any Credit Facility which is intended for the payment of a Bond may be applied directly to such payment or deposited directly to the Debt Service Account for such purpose. In addition, there shall be deposited in the Revenue Account all other amounts required by this Resolution to be so deposited. After payment to the Fiscal Agent of all amounts payable to the Fiscal Agent pursuant to Section 804, amounts on deposit from time to time in the Revenue Account shall be withdrawn and deposited as follows and in the following order of priority:

FIRST: to the Senior Bonds Debt Service Account, allocated between the Principal Subaccount and the Interest Subaccount, pro rata on the basis of the maximum amount required be held in each such Subaccount at the time of deposit, all amounts until the amount on deposit in the Senior Bonds Debt Service Account shall equal the Accrued Payment Obligation related to all Senior Bonds and Parity Obligations;

SECOND:    to the Senior Bonds Debt Service Reserve Account, the amount required to cause the amount on deposit therein to be equal to the Debt Service Reserve Requirement related to the Senior Bonds;

THIRD:    to the Subordinated Bonds Debt Service Account, allocated between the Principal Subaccount and the Interest Subaccount, pro rata on the basis of the maximum amount required be held in each such Subaccount at the time of deposit, all amounts until the amount on deposit in the Subordinated Bonds Debt Service Account shall equal the Accrued Payment Obligation related to all Subordinated Bonds and Parity Obligations;

FOURTH:    to the Subordinated Bonds Debt

Confidential

Service Reserve Account, the amount required to cause the amount on deposit therein to be equal to the Debt Service Reserve Requirement related to the Subordinated Bonds;

FIFTH: to the payment of Operating Expenses; and

SIXTH: to the General Reserve Account, subject to the requirements established in Section 509 below, the balance of the amount so withdrawn.

2.          Investment and interest earnings in each Fund, Account or Subaccount shall be applied to such Fund, Account or Subaccount pursuant to Section 602.

3.          In the event that amounts are required to be paid to providers of Qualified Hedges, Credit Facilities or Liquidity Facilities which do not represent scheduled payments or reimbursements in accordance with the terms of the related contracts, but represent costs, indemnities, termination payments or similar non-recurring amounts, or in the event such unscheduled amounts are due to such providers and there are insufficient funds held hereunder and available for the payment thereof, the System shall provide written notice thereof to the Fiscal Agent so that such amounts are paid from the General Reserve Account, subject to the provisions of Section 509 hereof.

4.          Operating Expenses shall be paid by the Fiscal Agent to the System pursuant to a requisition form signed by an Authorized Officer of the System and delivered to the Fiscal Agent detailing those expenses to be paid and that such expenses are permitted Operating Expenses payable under the Resolution.

SECTION 505.          Debt Service Account.

1.          There shall be transferred from the Revenue Account, and deposited into the Interest Subaccount and the Principal Subaccount of each Debt Service Account, the amounts required to be so transferred pursuant to paragraphs FIRST and THIRD of Section 504.1.

2.          There also shall be deposited into the Interest Subaccount of a Debt Service Account, if necessary, the following:

(i)          Such amount determined by the applicable Supplemental Resolution representing accrued interest received upon the sale of a Series of Bonds.

(ii)          Amounts transferred from the General Reserve Account pursuant to Section 509.2 for the payment of interest on the Bonds and the interest component of Parity Obligations.

(iii)          Amounts transferred from any Debt Service Reserve Account pursuant to Section 506.2 for the payment of interest on the Bonds and the interest component of Parity Obligations, to the extent other funds (including, but not limited to any amounts in the General Reserve Account) are not available to pay when due the interest on such Bonds and the interest component of Parity Obligations.

3.          There also shall be deposited into the Principal Account of a Debt Service Account, if necessary, the following:

(i)          Amounts transferred from the General Reserve Account pursuant to Section 509.2 for the payment of Principal Installments on the

Bonds and the principal component of Parity Obligations.

(ii)          Amounts transferred from the Debt Service Reserve Account pursuant to Section 506.2 for the payment of Principal Installments of the Bonds and the principal component of Parity Obligations, to the extent other funds (including, but not limited to any amounts in the General Reserve Account and the Redemption Account (see (ii) below)) are not available to pay when due the Principal Installments of such Bonds and the principal component of Parity Obligations.

(iii)          Amounts transferred from the Redemption Account pursuant to Section 508 for the payment of Principal Installments of any Bonds.

4.          The Fiscal Agent shall pay out of the Interest Account, to the Persons entitled thereto, in the Currency in which the Bonds of such Series are payable, (i) the interest on the Bonds as and when due and payable, and (ii) the interest component of Parity Obligations [at the times, in each case in the manner and on the other terms and conditions as determined by the System and set forth in written directions of an Authorized Officer of the System delivered to the Fiscal Agent]; *provided, however*, that amounts deposited to the Interest Account pursuant to clause (i) of paragraph 2 of this Section shall not be used to pay the interest component of Parity Obligations; and *provided further, however*, that if the amount available shall not be sufficient to pay in full all such interest due on the same date, then out of such available amount the Fiscal Agent shall make such payments under Bonds and Parity Obligations ratably, according to the amounts due on such date, without any discrimination or preference.

5.          The Fiscal Agent shall pay out of the Principal Account, to the Persons entitled thereto, in the Currency in which the Bonds of such Series are payable, (i) each Principal Installment for the Bonds (including the Redemption Price payable upon mandatory redemption out of Sinking Fund Installments) as and when due and payable, and (ii) the principal component of Parity Obligations, in each case described in this clause (ii) at the times, in the manner and on the other terms and conditions as determined by the System and set forth in written directions of an Authorized Officer of the System delivered to the Fiscal Agent; *provided, however*, that amounts deposited to the Principal Account pursuant to clause (ii) of paragraph 3 of this Section shall not be used to pay the principal component of Parity Obligations; and *provided further, however*, that if the amount available shall not be sufficient to pay in full all such Principal Installments and principal due on the same date, then out of such available amount the Fiscal Agent shall make such payments under Bonds and Parity Obligations ratably, according to the amounts due on such date, without any discrimination or preference.

6.          In the event of the refunding of any Bonds, the Fiscal Agent shall, upon the written direction of an Authorized Officer of the System delivered to the Fiscal Agent, withdraw from the Debt Service Account all or any portion of amounts accumulated therein with respect to the Bonds to be refunded and deposit such amounts as provided in such written direction; *provided, however*, that such withdrawal shall not be made unless immediately thereafter the Bonds being refunded shall be deemed to have been paid pursuant to Section 1301.

7.          If there is a deficiency in any Debt Service Account identified in connection with the valuation performed by the Fiscal Agent pursuant to Section 603, the Fiscal Agent shall immediately thereafter, and in any case no later than five Business Days prior to the date any payment obligation is due on the Bonds, notify the System of such deficiency. The System hereby instructs the Fiscal Agent to cover any such deficiency by transferring moneys first, from the General Reserve Account; and

V-13

if such moneys are not sufficient to cover such deficiency, second, from the Debt Service Reserve Account for such Class of Bonds. In the case of a deficiency in the Debt Service Account for the Senior Bonds, if moneys in the General Reserve Account or the Senior Bonds Debt Service Reserve Account are not sufficient to cover any deficiency, the System hereby instructs the Fiscal Agent to transfer moneys first, from the Subordinated Bonds Debt Service Account and second, from the Subordinated Bonds Debt Service Reserve Account.

SECTION 506.    Debt Service Reserve Account.

1.    At the time any Series of Bonds is delivered pursuant to this Resolution or any Supplemental Resolution, the System shall pay into the applicable Debt Service Reserve Account from the proceeds of such Bonds or other available funds, the amount, if any, necessary for the amount on deposit in such Debt Service Reserve Account to equal the Debt Service Reserve Requirement applicable to all Outstanding Bonds of such Class plus such additional Bonds being delivered, after giving effect to any Reserve Account Cash Equivalent, calculated immediately after the delivery of such Bonds.

2.    Except as otherwise provided by any Supplemental Resolution, amounts on deposit in a Debt Service Reserve Account shall be applied, to the extent other funds (including, but not limited to any amounts in the General Reserve Account) are not available therefor pursuant to this Resolution and the applicable Supplemental Resolution, to pay when due the Principal Installments and Redemption Price of and the interest on the Outstanding Bonds of the related Class and the principal and interest components of Parity Obligations, by transfer, in the Currency in which such Outstanding Bonds are payable, to the Debt Service Account or the Redemption Account, as applicable. To the extent other funds (including, but not limited to any amounts in the General Reserve Account) are not available therefor pursuant to this Resolution and the applicable Supplemental Resolution to pay when due the Principal Installments and Redemption Price of and the interest on the Outstanding Senior Bonds and the principal and interest components of Parity Obligations, the Fiscal Agent shall, and is hereby directed by the System to transfer, amounts on deposit in the Subordinated Bonds Debt Service Reserve Account and the Subordinated Bonds Debt Service Account to the Senior Bonds Debt Service Account, before being applied to the payment of the Principal Installments and Redemption Price of and the interest on the Outstanding Subordinated Bonds and the Subordinate Obligations.

3.    Whenever the amount in any Debt Service Reserve Account for a particular Class of Bonds exceeds the related Debt Service Reserve Requirement, after giving effect to any Reserve Account Cash Equivalent, the Fiscal Agent shall, and is hereby directed by the System to, withdraw from such Debt Service Reserve Account the amount of such excess and deposit the moneys so withdrawn into the Revenue Account.

4.    To the extent funds are not available in other funds or accounts, moneys may and, upon the written direction of an Authorized Officer of the System delivered to the Fiscal Agent, shall be withdrawn from the Debt Service Reserve Account by the Fiscal Agent and deposited in the Redemption Account for the purchase or redemption of Bonds at any time, provided that subsequent to such purchase or redemption the amount in the Debt Service Reserve Account, after giving effect to any Reserve Account Cash Equivalent, will not be less than the related Debt Service Reserve Requirement.  In the event of the refunding of any Bonds, the Fiscal Agent shall, upon the written direction of an Authorized Officer of the System, withdraw from the related Debt Service Reserve Account all or any portion of amounts accumulated therein with respect to the Bonds being

refunded and apply such amounts in accordance with such direction; provided, however, that such withdrawal shall not be made unless (i) immediately thereafter the Bonds being refunded shall be deemed to have been paid pursuant to Section 1301, and (ii) the amount remaining in the Debt Service Reserve Account, after giving effect to any Reserve Account Cash Equivalent, after such withdrawal shall not be less than the related Debt Service Reserve Requirement.

5.    If, as of the last Business Day of each calendar month, a deficiency exists in the Senior Bonds Debt Service Reserve Account, identified in connection with the valuation performed by the Fiscal Agent pursuant to Section 603 hereof, the Fiscal Agent shall transfer from the General Reserve Account to the Senior Bonds Debt Service Reserve Account the amount, if any, required to cause the balance in said Account to equal the Debt Service Reserve Requirement for the Senior Bonds after giving effect to any Reserve Account Cash Equivalent. Thereafter, if, as of the last Business Day of each calendar month, a deficiency exists in the Subordinated Bonds Debt Service Reserve Account, the Fiscal Agent shall transfer from the General Reserve Account to the Subordinated Bonds Debt Service Reserve Account, after all deposits required by paragraphs FIRST, SECOND, THIRD and FOURTH of Section 504.1 have been made, the amount, if any, required to cause the balance in said Account to equal the Debt Service Reserve Requirement for the Subordinated Bonds, after giving effect to any Reserve Account Cash Equivalent.

6.    Whenever the amount in all Debt Service Reserve Accounts, without giving effect to any Reserve Account Cash Equivalent, together with the amount in all Debt Service Accounts, is sufficient to pay in full all Outstanding Bonds in accordance with their terms (including the maximum amount of Principal Installments and interest which could become payable thereon) and all amounts due and owing to Credit Facility Providers, the funds on deposit in the Debt Service Reserve Accounts shall be transferred to the Debt Service Account established for the same Class, in accordance with the written direction of an Authorized Officer of the System delivered to the Fiscal Agent, and thereupon no further deposits shall be required to be made into the Debt Service Reserve Accounts.  Prior to said transfer, all investments held in the Debt Service Reserve Accounts shall be liquidated to the extent necessary in order to provide for the timely payment of the Principal Installments of and interest on Bonds, in accordance with the written direction of an Authorized Officer of the System delivered to the Fiscal Agent.

7.    Reserve   Account   Cash Equivalents may be deposited in a Debt Service Reserve Account as provided in this paragraph.  In lieu of any required transfers of moneys to the Debt Service Reserve Account, the System may cause to be deposited into the Debt Service Reserve Account a Reserve Account Cash Equivalent in an aggregate amount equal to the difference between the Debt Service Reserve Requirement and the sums of moneys or value of Investment Securities then on deposit in the Debt Service Reserve Account, if any.  In lieu of retaining all or any portion of the moneys theretofore on deposit in the Debt Service Reserve Account, the System may cause to be deposited into the Debt Service Reserve Account a Reserve Account Cash Equivalent in an aggregate amount equal to such moneys, subject to paragraph 3 of this Section.  Each Reserve Account Cash Equivalent shall be payable (upon the giving of notice as required thereunder) on any date on which moneys may be required to be withdrawn from the Debt Service Reserve Account.  If a disbursement is made pursuant to a Reserve Account Cash Equivalent, the System shall either (i) reinstate the maximum limits of such Reserve Account Cash Equivalent or (ii) deposit into the Debt Service Reserve Account moneys in the amount of the disbursement made under such Reserve Account Cash Equivalent, or a combination of such alternatives, at the times and in the amounts required by paragraph 5 of this Section.  In the event that

V-14

the rating attributable to any provider of any Reserve Account Cash Equivalent shall fall below that required in the definition thereof, such Reserve Account Cash Equivalent shall no longer be deemed to be a Reserve Account Cash Equivalent and the System shall either (i) replace such Reserve Account Cash Equivalent with a Reserve Account Cash Equivalent which shall meet the requirements therefor or (ii) deposit into the Debt Service Reserve Account sufficient moneys, or a combination of such alternatives, at the times and in the amounts required by paragraph 5 of this Section.

8.      Notwithstanding anything to the contrary contained in this Section, if amounts obtained under a Credit Facility or Reserve Account Cash Equivalent are to be used to pay the Principal Installments and Redemption Price of and interest on Bonds, then the providers of such Credit Facility or Reserve Account Cash Equivalent shall be subrogated to the rights of the relevant Bondholders, and amounts in the Debt Service Reserve Account which would otherwise have been used for such purposes may be applied, to the extent such amounts would have been used for such purpose in accordance with the priorities set forth herein, to reimburse the provider of such Credit Facility or Reserve Account Cash Equivalent for the amounts so obtained.

SECTION 507.      Satisfaction of Sinking Fund Installments.

1.      Any amount accumulated in the Debt Service Account up to the unsatisfied balance of each Sinking Fund Installment for Bonds may and, if so directed in writing by an Authorized Officer of the System, shall be applied (together with amounts accumulated in the Debt Service Account with respect to interest on the Bonds for which such Sinking Fund Installment was established) by the Fiscal Agent prior to the forty-fifth day preceding the due date of such Sinking Fund Installment as follows:

(i)      to the purchase of Bonds of the maturity and interest rate for which such Sinking Fund Installment was established, at prices (including any brokerage and other charges) not exceeding the principal amount (or Maturity Amount, if applicable) of such Bonds plus unpaid interest accrued to the date of purchase, such purchases to be made in such manner as the Fiscal Agent shall determine; or

(ii)      to the redemption of such Bonds if then redeemable by their terms at the price equal to the principal amount (or Maturity Amount, if applicable) of such Bonds plus unpaid interest accrued to the date of redemption.

2.      Upon the purchase or redemption of any Bond pursuant to paragraph 1 of this Section, an amount equal to the principal amount (or Maturity Amount, if applicable) of the Bonds so purchased or redeemed shall be credited toward the next Sinking Fund Installment thereafter to become due with respect to the Bonds of such maturity and interest rate and the amount of any excess of the amounts so credited over the amount of such Sinking Fund Installment shall be credited by the Fiscal Agent against future Sinking Fund Installments in direct chronological order, unless otherwise instructed in writing by an Authorized Officer of the System at the time of such purchase or redemption. Concurrently with the delivery of such Bonds, the System shall deliver to the Fiscal Agent a certificate of an Authorized Officer of the System specifying (i) the principal amount (or Maturity Amount, if applicable), Series, maturity, interest rate and numbers of the Bonds so delivered, (ii) the date of the Sinking Fund Installment in satisfaction of which such Bonds are so delivered, (iii) the aggregate principal amount (or Maturity Amount, if applicable) of the Bonds so delivered, and (iv) the

unsatisfied balance of such Sinking Fund Installment after giving effect to the delivery of such Bonds.

3.      In satisfaction, in whole or in part, of any Sinking Fund Installment, the System may deliver to the Fiscal Agent at least forty-five (45) days prior to the date of such Sinking Fund Installment, for cancellation, Bonds acquired by purchase of the Series and maturity and interest rate entitled to such Sinking Fund Installment. All Bonds so delivered to the Fiscal Agent in satisfaction of a Sinking Fund Installment shall reduce the amount of such Sinking Fund Installment by the aggregate principal amount (or Maturity Amount, if applicable) of such Bonds. Concurrently with such delivery of such Bonds the System shall deliver to the Fiscal Agent a certificate of an Authorized Officer of the System specifying (i) the principal amount (or Maturity Amount, if applicable), Series, maturity, interest rate and numbers of the Bonds so delivered, (ii) the date of the Sinking Fund Installment in satisfaction of which such Bonds are so delivered, (iii) the aggregate principal amount (or Accreted Amount, if applicable) of the Bonds so delivered, and (iv) the unsatisfied balance of each such Sinking Fund Installment after giving effect to the delivery of such Bonds.

4.      In the event that Bonds are redeemed prior to maturity pursuant to any Section hereof other than Section 403, the Fiscal Agent shall credit the principal amount (or Accreted Amount, if applicable) of the Bonds so redeemed against Sinking Fund Installments due hereunder; *provided, however*, that the System shall have delivered to the Fiscal Agent, at least forty-five (45) days prior to the date of such Sinking Fund Installment, a certificate of an Authorized Officer of the System specifying (i) the principal amount, Series, maturity, interest rate and number of each Bond so redeemed, (ii) the date of each Sinking Fund Installment in satisfaction of which such redeemed Bonds are credited, (iii) the aggregate principal amount (or Accreted Amount, if applicable) of the Bonds so redeemed, and (iv) the unsatisfied balance of each such Sinking Fund Installment after giving effect to the redemption of such Bonds.

5.      The Fiscal Agent shall, upon receipt of the notice specified by Section 403 and in the manner provided in Article IV, call for redemption on the date of each Sinking Fund Installment falling due prior to maturity such principal amount (or Accreted Amount, if applicable) of Bonds of the Series and maturity entitled to such Sinking Fund Installment as is required to exhaust the unsatisfied balance of such Sinking Fund Installment. The Fiscal Agent shall redeem such Bonds pursuant to Section 403.

SECTION 508.      Redemption Account; Amounts to be Deposited Therein.

1.      The following, upon receipt thereof, shall be deposited into the Redemption Account for the purpose of redeeming Outstanding Bonds at the option of the System:

(i)      amounts determined pursuant to paragraph 3 of Section 504; and

(ii)      amounts transferred from the Debt Service Reserve Accounts pursuant to Section 506 for the payment of the Redemption Price of Bonds.

2.      Subject to the limitations contained in paragraph 4 of this Section, if, on the last Business Day preceding any interest payment date for the Senior Bonds, Principal Installment due date for such Bonds, or due date of interest or principal components of Parity Obligations, the amount on deposit in the Senior Debt Service Account shall be less than

V-15

UBS-ERS_Ultra_Vires-0087966

the interest on such Bonds due on such interest payment date, the Principal Installment for such Bonds due on such Principal Installment due date, or the interest or principal components of Parity Obligations due on the due date thereof, and after taking into account transfers from the General Reserve Account, the Senior Bonds Debt Service Reserve Account, the Subordinated Bonds Debt Service Account and the Subordinated Bonds Debt Service Reserve Account, then the Fiscal Agent, shall, and is hereby instructed by the System to, transfer from the Senior Bonds Redemption Account to the Senior Bonds Debt Service Account an amount (or all of the moneys in the Senior Bonds Redemption Account if less than the amount required) which will be sufficient to make up such deficiency in the Senior Bonds Debt Service Account.

3.       Subject to the limitations contained in paragraph 4 of this Section, if, on the last Business Day preceding any interest payment date for the Subordinated Bonds, Principal Installment due date for such Bonds, or due date of interest or principal components of Subordinate Obligations, the amount on deposit in the Subordinated Debt Service Account shall be less than the interest on such Bonds due on such interest payment date, the Principal Installment for such Bonds due on such Principal Installment due date, or the interest or principal components of Subordinate Obligations due on the due date thereof, then the Fiscal Agent, shall, and is hereby instructed by the System to, transfer from the Subordinated Bonds Redemption Account to the Subordinated Bonds Debt Service Account an amount (or all of the moneys in the Subordinated Bonds Redemption Account if less than the amount required) which will be sufficient to make up such deficiency in the Subordinated Bonds Debt Service Account.

4.       To the extent not required to make up a deficiency as required in paragraph 2 of this Section, amounts in the Redemption Account shall be applied by the Fiscal Agent, as promptly as practicable after delivery to it of written instructions from an Authorized Officer of the System, to the purchase or redemption (including the payment of redemption premium, if any) of any particular Class of Bonds. Interest on Bonds so purchased or redeemed shall be paid from the Debt Service Account and all expenses in connection with such purchase or redemption shall be paid by the System from moneys held in the General Reserve Account.

5.       The transfers required by paragraph 2 of this Section shall be made from amounts in the Redemption Account only to the extent that such amounts are not then required to be applied to the redemption of Bonds for which notice of redemption shall have been given pursuant to Section 405, unless such notice is conditioned upon the availability of moneys on deposit in the Redemption Account.

SECTION 509.       General Reserve Account.

1.       There shall be transferred from the Revenue Account, after all deposits on deposit in the General Reserve Account pursuant to paragraphs FIRST through FIFTH of Section 504.1 have been made, all excess moneys into the General Reserve Account pursuant to paragraph SIXTH of Section 504.1.

2.       Except as otherwise provided by any Supplemental Resolution, amounts on deposit in the General Reserve Account shall be applied, to the extent funds are not available therefor in the Debt Service Account of any particular Class of Bonds, to pay when due the Principal Installments and Redemption Price of and the interest on the Outstanding Bonds of the related Class and the principal and interest components of Parity Obligations, by transfer, in the Currency in which such Outstanding Bonds are payable to such Debt Service Account or Redemption Account, as applicable.

3.       Any moneys remaining in the General Reserve Account at any time and not deposited, transferred or retained as set forth in Section 504.1, may be (i) transferred to the Revenue Account, (ii) transferred to the Redemption Account, or (iii) used for (I) the payment or reimbursement of Financing Costs, (II) the purchase of Bonds, or (III) any combination of the foregoing, in each case as directed in writing by an Authorized Officer of the System to the Fiscal Agent.

4.       Purchases of Bonds shall be made upon the written direction of an Authorized Officer of the System, with or without advertisement and with or without notice to other Owners of Bonds pursuant to the provisions of Section 507. Such purchases shall be made at such price or prices as determined by such written instructions. If Sinking Fund Installments have been established for the maturities of Bonds purchased by the System, then the Fiscal Agent, upon written instructions from an Authorized Officer of the System, shall credit the principal amount purchased against future Sinking Fund Installments in direct chronological order, unless otherwise instructed in writing by an Authorized Officer of the System at the time of such purchase.

5.       Whenever the amount in the General Reserve Account, together with the amount in all Debt Service Accounts, is sufficient to pay in full all Outstanding Bonds in accordance with their terms (including the maximum amount of Principal Installments and interest which could become payable thereon) and all amounts due and owing to Credit Facility Providers, the funds on deposit in the General Reserve Account shall be transferred, in the Currency in which such Bonds are payable, in accordance with the written direction of an Authorized Officer of the System delivered to the Fiscal Agent, to the Debt Service Account established for the same Class. Prior to said transfer, all investments held in the General Reserve Accounts shall be liquidated, in accordance with the written direction of an Authorized Officer of the System delivered to the Fiscal Agent, to the extent necessary in order to provide for the timely payment of the Principal Installments of and interest on Bonds.

6.       Except as provided in paragraph 509.7 below, as long as any Bonds are Outstanding, moneys held in the General Reserve Account may only be transferred to the System once per year as of the last Business Day of the Bond Year, if (i) during the Bond Year, there has been no withdrawal from a Debt Service Reserve Account to fund the Debt Service Account for any Class of Bonds; (ii) the balance in the Debt Service Account for each Class of Bonds is not less than the amount required to pay in full the next Accrued Payment Obligation due on each Class of Bonds; (iii) the balance in the Debt Service Reserve Account for each Class of Bonds is not less than the corresponding Debt Service Reserve Requirement; (iv) there are no outstanding amounts due to the Fiscal Agent under this Resolution or any Supplemental Resolution; and (v) the balance in the General Reserve Account is not less than ten percent (10%) of the next Bond Year's Accrued Payment Obligation for all Outstanding Bonds on the last Business Day of the Bond Year. If these conditions are met, the Fiscal Agent may withdraw from the General Reserve Account and transfer to the System the amount in excess of ten percent (10%) of such Accrued Payment Obligation.

7.       Notwithstanding the preceding paragraph, there may be no transfers from the General Reserve Account to the System during any period in which the Employers' Contribution Rate is below 9.275% of Covered Payroll. The System shall notify the Fiscal Agent of any reduction of the Employers' Contribution Rate.

8.       Assuming compliance with paragraph 5 and 6 above, should the balance to the credit of the General Reserve Account exceed (a) twenty-five percent (25%) or (b) if Subordinated Bonds are Outstanding, fifty percent (50%) of the next Bond Year's Accrued Payment Obligation for all Classes

Confidential       UBS-ERS_Ultra_Vires-0087967

of Bonds Outstanding, transfers may be made by the Fiscal Agent to the System at any time during a Bond Year upon written notice from the System to the Fiscal Agent and Government Development Bank for Puerto Rico. No such transfer may, however, reduce the General Reserve Account balance below (1) ten percent (10%) or (2) if Subordinated Bonds are Outstanding, twenty-five percent (25%) of the next Bond Year's Accrued Payment Obligation for all Classes of Bonds Outstanding.

## ARTICLE VI
## SECURITY FOR DEPOSITS AND INVESTMENT OF FUNDS

SECTION 601.     Security for Deposits.     All moneys held hereunder by the Fiscal Agent shall be continuously and fully secured, for the benefit of the System and the Owners of the Bonds and Parity Obligations in such manner as may then be required by applicable federal, Commonwealth or state laws and regulations regarding security, by Investment Obligations of a market value at least equal at all times to the amount of the deposit so held by the Fiscal Agent; provided, however, that it shall not be necessary, unless required by applicable law, for the Fiscal Agent to give security for the deposit of any moneys with them held in trust and set aside for the payment of the principal or Redemption Price of, or interest on, any Bonds, or for the Fiscal Agent to give security for any moneys which shall be represented by obligations purchased under the provisions of this Resolution as an investment of such moneys. The Fiscal Agent shall have no obligation for the payment of interest on moneys properly held by it uninvested hereunder.

SECTION 602.     Investment of Funds, Accounts and Subaccounts Held by the Fiscal Agent.

1.     Moneys in any Fund, Account or Subaccount held by the Fiscal Agent shall be continuously invested and reinvested or deposited and redeposited by the Fiscal Agent upon the written direction of an Authorized Officer of the System. The System shall direct the Fiscal Agent to invest and reinvest the moneys in any Fund, Account or Subaccount held by the Fiscal Agent in Investment Obligations so that the maturity date or date of redemption of such Investment Obligations shall coincide as nearly as practicable with the times at which moneys are anticipated to be needed to be expended hereunder, except that any Investment Obligation may be credited to more than one Fund, Account or Subaccount based upon the portions thereof purchased by or allocable to each such Fund, Account or Subaccount and need not be sold in order to provide for the transfer of amounts from one Fund, Account or Subaccount to another. The Investment Obligations purchased by the Fiscal Agent shall be held by it, or for its account as Fiscal Agent. The Fiscal Agent, at the written direction of the System as to specific investments, shall sell, or present for redemption, any Investment Obligations purchased by it as an investment hereunder whenever it shall be necessary in order to provide moneys to meet any payment from such Fund, Account or Subaccount. The Fiscal Agent shall have no obligation to invest, reinvest, deposit, redeposit or sell investments contemplated hereby except upon the written direction of an Authorized Officer of the System as to specific investments. The Fiscal Agent shall have no liability for interest on any money received by it hereunder (except as otherwise agreed in writing with the System and except that the Fiscal Agent shall invest such money as required pursuant to written direction of an Authorized Officer of the System) and no responsibility for any loss (after giving effect to any interest or other income thereon except to the extent theretofore paid to the System) incurred on the sale of such investments. The Fiscal Agent shall advise the System in writing on or before the twentieth (20th) day of each calendar month, of all investments held for the credit of each Fund, Account or Subaccount in its custody under the provisions of this Resolution as of the end of the preceding month.

2.     Investment Obligations purchased under the provisions of this Resolution as an investment of moneys in any Fund, Account or Subaccount shall be deemed at all times to be a part of such Fund, Account or Subaccount and, unless otherwise expressly provided in this Resolution or any Supplemental Resolution, the income or interest earned and gains realized in excess of losses suffered by any Fund, Account or Subaccount due to the investment thereof shall be deposited in such Fund, Account or Subaccount. The Fiscal Agent shall keep records of all such amounts deposited in any such Fund, Account or Subaccount to indicate the source of the income or earnings.

3.     The Fiscal Agent shall sell, or present for redemption or exchange, any Investment Obligation purchased by it pursuant to this Resolution or any Supplemental Resolution whenever it shall be requested in writing by an Authorized Officer of the System to do so or whenever it shall be necessary in order to provide moneys to meet any payment or transfer from the Fund, Account or Subaccount for which such investment was made, except that any Investment Obligation may be credited to more than one Fund, Account or Subaccount based upon the portions thereof purchased by or allocable to each such Fund, Account or Subaccount and need not be sold in order to provide for the transfer of amounts from one Fund, Account or Subaccount to another.

4.     Nothing in this Resolution shall prevent any Investment Obligations acquired hereunder from being held in book-entry form on the books of the Treasury of the United States or of any national securities depository.

5.     In the event that the Fiscal Agent has not, prior to 11:00 a.m. (Eastern time) on any Business Day, received investment instructions as provided herein as to any investment proceeds received hereunder, the Fiscal Agent shall invest the same in Investment Obligations having the shortest available maturity, in accordance with standing instructions received from an Authorized Officer of the System.

SECTION 603.     Valuation and Sale of Investments.

1.     In computing the amounts in any Fund, Account or Subaccount, obligations purchased as an investment of moneys therein shall be valued by the Fiscal Agent at Amortized Value on the last Business Day of each month. Accrued interest received upon the sale of any Investment Obligation shall be treated as income from such Investment Obligation for purposes of this Section, except to the extent that such accrued interest represents the repayment of accrued interest paid upon purchase of such Investment Obligations.

2.     Immediately after each such valuation performed pursuant to Section 603.1, any balance in any Debt Service Reserve Account in excess of the applicable Debt Service Reserve Fund Requirement, shall be transferred by the Fiscal Agent to the Revenue Account.

3.     The Fiscal Agent shall immediately notify the System in writing of any deficiency in the Debt Service Account or Debt Service Reserve Account that appears from the valuation performed by the Fiscal Agent pursuant to Section 603.1.

4.     The Fiscal Agent shall not be liable or responsible for the making of any investment authorized by the provisions of this Article, in the manner provided in this Article, or for any loss resulting from any such investment so made or disposed of in the manner provided in this Article.

## ARTICLE VII
## PARTICULAR COVENANTS OF THE SYSTEM

V-17

The System covenants and agrees with the Fiscal Agent and the Bondowners as follows:

SECTION 701.    Payment of Obligations.    The System shall duly and punctually pay or cause to be paid the principal of and premium, if any, on every Bond and the interest thereon, and all Parity Obligations and Subordinate Obligations, on the date(s), at the place(s) and in the manner mentioned in the Act, this Resolution, the applicable Supplemental Resolution, the Bonds, and applicable Credit Facilities, Liquidity Facilities, and Qualified Hedges according to the true intent and meaning thereof, and shall duly and punctually satisfy all Sinking Fund Installments which may be established for any Series, subject to the provisions of Section 201.  Furthermore, the System covenants to perform all acts and enforce all its powers under the Act in order to promptly collect and remit the Employers' Contributions to the Fiscal Agent. In addition, the System covenants to enter into a Memorandum of Understanding with Government Development Bank for Puerto Rico to establish inter-agency mechanisms in order to make sure that Employers are current in their payments to the System.

SECTION 702.    Extension of Payment of Bonds. The System shall not directly or indirectly extend or assent to the extension of the maturity of any of the Bonds or claims for interest by the purchase or funding of such Bonds or by any other arrangement.  Nothing herein shall be deemed to limit the right of the System (i) to issue Option Bonds or Refunding Bonds as provided in herein, and such issuance shall not be deemed to constitute an extension of maturity of Bonds, or (ii) to apply any amount in the Debt Service Account or the Redemption Account to the purchase or redemption of Bonds as provided in this Resolution.

SECTION 703.    Offices for Servicing Bonds. The Fiscal Agent shall at all times maintain one or more offices or agencies where notices, demands and other documents may be served upon the System in respect of the Bonds or of this Resolution.  The System hereby appoints the Fiscal Agent as its agent to receive such notices, demands and documents.

SECTION 704.    Further Assurance.  At any and all times the System shall, so far as it may be authorized by law, pass, make, do, execute, acknowledge and deliver, all and every such further resolutions, acts, deeds, conveyances, assignments, transfers and assurances and record the same in any office or register as may be necessary or desirable for the better assuring, conveying, granting, assigning and confirming all and singular the rights and other moneys, securities and funds hereby pledged or assigned, or intended so to be, or which the System may become bound to pledge or assign and, if required by law, to perfect the security interest created thereby.

SECTION 705.    Power to Issue Bonds and Assign Funds and Accounts. The System is duly authorized under the Act to create and issue the Bonds and to adopt this Resolution and to create a security interest on the Pledged Property in the manner and to the extent provided in this Resolution.  The Pledged Property is and will be free and clear of any pledge, lien, charge or encumbrance thereon or with respect thereto except as permitted by this Resolution, and all action on the part of the System to that end has been and will be duly and validly taken.  The Bonds are and will be the valid and legally binding special obligations of the System, enforceable in accordance with their terms and the terms of this Resolution.  The System shall at all times, to the extent permitted by law, defend, preserve and protect the assignment of the Pledged Property and all the rights of the Fiscal Agent, the Beneficiaries and the Bondowners under this Resolution against all claims and demands of all persons whomsoever.

SECTION 706.    Creation of Liens.  Until the security interest created in Section 501 of this Resolution shall be discharged and satisfied as provided in Section 1301, the System shall not (i) issue any bonds or other evidences of indebtedness, other than the Bonds, secured by the Pledged Property, nor create or cause to be created any lien or charge on the Pledged Property, other than as permitted by this Resolution, nor (ii) at any time when the System is in default in making any payment required to be made under this Resolution or maintaining the balance in any Fund, Account or Subaccount required to be maintained in the amount required therefor by this Resolution, set apart or appropriate and pay any amount from any Fund, Account or Subaccount, except as required by this Resolution.  The System may not issue Bonds with a payment priority or claim against the Pledged Property that is senior to that of the Senior Bonds.  The System, in its discretion, may determine to execute and deliver Subordinated Bonds or Subordinate Obligations, subject to compliance with Section 708 or 204 hereof.

SECTION 707.    Accounts and Reports.

1.    The System shall keep proper books of record and account (separate from all other records and accounts) in which complete and correct entries shall be made of its transactions relating to the Pledged Property and each Fund, Account and Subaccount established under this Resolution, and which, together with all books and papers of the System relating to the issuance of the Bonds, shall at all reasonable times during normal business hours be subject to the inspection of the Fiscal Agent (it being understood that the Fiscal Agent shall have no duty so to inspect).

2.    The System shall file with the Fiscal Agent and the Ancillary Facility Providers forthwith upon becoming aware of any Event of Default, or the occurrence of any event which with notice or lapse of time or both would be an Event of Default, in the performance by the System of any covenant, agreement or condition contained in this Resolution, a certificate signed by an Authorized Officer of the System specifying such Event of Default or other event as described in this paragraph, and if any such Event of Default or other such event shall so exist, specifying the nature and status of such Event of Default or other such event.

SECTION 708.    Issuance of Additional Bonds. The System may issue additional Bonds, from time to time, in one or more Series within any Class, on a parity with each such Series of Bonds within such Class, and secured by the Pledged Property, upon meeting the following requirements:

1.    There shall have been delivered to the Fiscal Agent the following documents:

(i)    a report (the "Consultant's Report") from a nationally recognized, independent, economic consultant, dated no earlier than 12 months before the date of issuance of the additional Bonds, identifying the projected Employers' Contributions for each Bond Year through the final Maturity of all outstanding Bonds proposed to be issued, and the assumptions used in such projections, it being agreed that the report, dated January 11, 2008, of Global Insight, Inc. delivered in connection with the issuance of the Series A Bonds (the "Global Insight Report") shall satisfy the obligations of the System under this paragraph (i) if delivered to the Fiscal Agent in connection with the delivery of any additional Bonds or Parity Obligations hereunder prior to January 1, 2009;

(ii)    a Supplemental Resolution adopted pursuant to requirements of Section 202; and

Confidential

UBS-ERS_Ultra_Vires-0087969

(iii)     a certificate of an Authorized Officer of the System setting forth for each Bond Year listed in the report in clause (i) above the Accrued Payment Obligation for the additional Bonds proposed to be issued and all Bonds and Parity Obligations to be Outstanding immediately after the issuance of said additional Bonds.  The certificate shall state that (a) the System has reviewed the Consultant's Report and believes that the assumptions used are reasonable (provided that this requirement should not apply to the Global Insight Report mentioned in paragraph (i) above prior to January 1, 2009 when used during 2008); and (b) (I) in the case of Senior Bonds, for each Bond Year, the projected Employers' Contributions for such year are equal to or greater than 140% of the corresponding Accrued Payment Obligation for the additional Senior Bonds proposed to be issued and the Senior Bonds and corresponding Parity Obligations outstanding immediately after the issuance of such additional Bonds; or (II) in the case of Subordinated Bonds, for each Bond Year, the projected Employers' Contributions for such year are equal to or greater than 125% of the corresponding Accrued Payment Obligation for the additional Subordinated Bonds proposed to be issued and the Senior Bonds, Subordinated Bonds and corresponding Parity Obligations outstanding immediately after the issuance of such additional Bonds.

2.       Refunding Bonds issued pursuant to Section 204 of this Resolution which generate savings in every Bond Year are exempt from complying with the coverage tests required by (iii) above.

SECTION 709.       General.

1.       The System shall do and perform or cause to be done and performed all acts and things required to be done or performed by or on behalf of the System under the provisions of the Act and this Resolution.  Specifically, the System shall do and perform or cause to be done and performed all acts and things required to be done or performed by or on behalf of the System with regards to the collection of the Employers' Contributions as provided in the Act.

2.       The System shall oppose any attempt by the Legislature of the Commonwealth to reduce the Employers' Contribution Rate or to make any other change in the Act or any other relevant legislation that would have a material adverse effect on Bondholders.  Such opposition shall include delivering written position papers to the Legislature of the Commonwealth, appearing before Legislative committees, and contacting individual legislators and other government officials to make legislators and other government officials aware that such reductions in the Employers' Contribution Rate or other changes may adversely affect the ability of the System to comply with its obligations and may ultimately have an adverse effect on the credit of the Commonwealth.

3.       Upon the date of authentication and delivery of any of the Bonds, all conditions, acts and things required by law and this Resolution to exist, to have happened and to have been performed precedent to and in the issuance of such Bonds shall exist, shall have happened and shall have been performed and the issue of such Bonds, together with all other indebtedness of the System, shall be within every debt and other limit prescribed by the laws of the Commonwealth.

**ARTICLE VIII**
**CONCERNING THE FISCAL AGENT**

SECTION 801.       Fiscal Agent Appointment and Acceptance of Duties.  The Bank of New York is hereby appointed as Fiscal Agent under this Resolution.  The Fiscal Agent shall signify its acceptance of the duties and obligations imposed upon it by this Resolution by executing the certificate of authentication endorsed upon the Bonds, and by executing such certificate upon any Bond the Fiscal Agent shall be deemed to have accepted such duties and obligations not only with respect to the Bond so authenticated, but with respect to all Bonds thereafter to be issued, but only, however, upon the terms and conditions set forth in this Resolution.

SECTION 802.       Responsibilities of Fiscal Agent.  The Fiscal Agent undertakes to perform such duties and only such duties as are specifically set forth in this Resolution, and no implied covenants or obligations shall be read into this Resolution against the Fiscal Agent.  The recitals of fact herein and in the Bonds contained shall be taken as the statements of the System and the Fiscal Agent assumes no responsibility for the correctness of the same.  The Fiscal Agent makes no representations as to the validity or sufficiency of this Resolution or any Supplemental Resolution or of any Bonds issued thereunder or as to the security afforded by this Resolution or any Supplemental Resolution, and the Fiscal Agent shall incur no liability in respect thereof.  The Fiscal Agent makes no representations as to the value, condition or sufficiency of any assets pledged or assigned as security for the Bonds, the right, title or interest of the System therein, or the security provided thereby or by this Resolution.  The Fiscal Agent shall, however, be responsible for its representation contained in its certificate of authentication on the Bonds.  The Fiscal Agent shall be under no responsibility or duty with respect to the authentication and delivery of the Bonds for value or the application of the proceeds thereof or the application of any moneys paid to the System.  The Fiscal Agent shall not be responsible for the validity, perfection, priority or enforceability of the pledge and security interest in the Pledged Property created or intended to be created by this Resolution, whether or not impaired by operation of law.  No provision of this Resolution shall be deemed to impose any duty or obligation on the Fiscal Agent to perform any act or acts, receive or obtain any interest in property or exercise any interest in property, or exercise any right, power, duty or obligation conferred or imposed on it in any jurisdiction in which it shall be illegal, or in which the Fiscal Agent shall be unqualified or incompetent in accordance with applicable law, to perform any such act or acts, to receive or obtain any such interest in property or to exercise any such right, power, duty or obligation.  The Fiscal Agent shall be under no obligation or duty to perform any act which would involve it in expense or liability or to institute or defend any suit in respect hereof, or to advance any of its own moneys, unless provided with security and indemnity satisfactory to it.  The Fiscal Agent shall be under no obligation to exercise any of the rights or powers vested in it by this Resolution at the request or direction of any of the Owners pursuant to this Resolution, unless such Owners shall have offered to the Fiscal Agent security or indemnity satisfactory to the Fiscal Agent against the costs, expenses and liabilities which might be incurred by it in compliance with such request or direction.  The permissive right of the Fiscal Agent to take actions enumerated in this Resolution shall not be construed as a duty.  The Fiscal Agent shall not be liable in connection with the performance of its duties under this Resolution except for its own gross negligence or willful misconduct.  The Fiscal Agent shall not be liable for any error of judgment made in good faith by an Authorized Officer of the Fiscal Agent, unless it shall be proved that the Fiscal Agent was grossly negligent in ascertaining the pertinent facts.  The Fiscal Agent shall not be liable with respect to any action taken or omitted to be taken by it in good faith in accordance with the direction of the *Owners of a*

V-19

majority in principal amount of the Outstanding Bonds relating to the time, method and place of conducting any proceeding for any remedy available to the Fiscal Agent or exercising any trust or power conferred upon the Fiscal Agent under this Resolution. The Fiscal Agent shall not be liable for any action taken, suffered, or omitted to be taken by it in good faith and believed by it to be authorized or within the discretion or rights or powers conferred upon it by this Resolution. Anything in this Resolution notwithstanding, in no event shall the Fiscal Agent be liable for special, indirect, punitive or consequential loss or damage of any kind whatsoever (including but not limited to loss of profit), even if the Fiscal Agent has been advised as to the likelihood of such loss or damage and regardless of the form of action. Whether or not therein expressly so provided, every provision of this Resolution relating to the conduct or affecting the liability of or affording protection to the Fiscal Agent shall be subject to the provisions of this Article VIII.

SECTION 803.        Evidence on Which Fiscal Agent May Act.

1.        The Fiscal Agent may conclusively rely and shall be fully protected in acting or refraining from acting upon any notice, resolution, request, consent, order, direction, certificate, report, opinion, bond, or other paper or document believed by it to be genuine, and to have been signed or presented by the proper party or parties. The Fiscal Agent may consult with counsel, who may or may not be of counsel to the System, and the opinion or advice of such counsel or any Opinion of Counsel shall be full and complete authorization and protection in respect of any action taken or omitted to be taken or suffered by it under this Resolution in good faith and in reliance thereon; *provided, however*, that such opinion or advice of counsel shall not relieve the Fiscal Agent from obtaining an Opinion of Counsel when and if required under this Resolution.

2.        Whenever the Fiscal Agent shall deem it necessary or desirable that a matter be proved or established prior to taking or omitting to take or suffering any action under this Resolution, such matter (unless other evidence in respect thereof be therein specifically prescribed) may be deemed to be conclusively proved and established by a certificate of an Authorized Officer of the System, and such certificate shall be full warrant and protection for any action taken or omitted to be taken or suffered, in the absence of bad faith, under the provisions of this Resolution in reliance thereon. The Fiscal Agent shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, bond, debenture, note, other evidence of indebtedness or other paper or document.

3.        Except as otherwise expressly provided in this Resolution, any request, order, notice or other direction required or permitted to be furnished pursuant to any provision thereof by the System to the Fiscal Agent shall be sufficiently evidenced if executed in the name of the System by an Authorized Officer of the System.

SECTION 804.        Compensation and Indemnification. The System shall pay to the Fiscal Agent from time to time reasonable compensation for all services rendered under this Resolution (which compensation shall not be limited by any provision of law in regard to the compensation of a fiscal agent or trustee of an express trust), and also all reasonable expenses, charges, counsel fees and other disbursements, including those of its attorneys, agents, and employees, incurred in and about the performance of their powers and duties under this Resolution. The System further agrees to indemnify and save the Fiscal Agent harmless against any loss, liability or expenses including taxes (other than taxes based upon, measured by or determined by the income of the Fiscal Agent), arising out of or in connection with the acceptance or administration of the trust or *trusts hereunder,*

including the costs and expenses of defending itself against any claim (whether asserted by the System or any Bondowner or any other Person) or liability in connection with the exercise or performance of any of its powers or duties hereunder, or in connection with enforcing the provisions of this Section 804, except to the extent that such loss, damage, claim, liability or expense is due to its own gross negligence or willful misconduct. In addition to, but without prejudice to its other rights under this Resolution, when the Fiscal Agent incurs expenses or renders services in connection with a bankruptcy or similar event, the expenses (including the reasonable charges and expenses of its counsel) and the compensation for the services are intended to constitute expenses of administration under any applicable federal or state bankruptcy, insolvency or other similar law. "Fiscal Agent" for purposes of this Section 804 shall include any predecessor Fiscal Agent; provided, however, that the negligence, willful misconduct or bad faith of any Fiscal Agent hereunder shall not affect the rights of any other Fiscal Agent hereunder. The obligations of the System and the lien provided for under this Section 804 shall survive the satisfaction and discharge of the Bonds, the termination for any reason of this Resolution or the earlier resignation or removal of the Fiscal Agent. The Fiscal Agent shall not be required to expend any of its own funds in the execution of its duties pursuant to the provisions of this Resolution. The Fiscal Agent shall have a lien prior to that of the Bondowners and other Beneficiaries therefor on any and all funds at any time held by it under this Resolution.

SECTION 805.        Certain Permitted Acts. The Fiscal Agent may become the owner of any Bonds, with the same rights it would have if it were not the Fiscal Agent. To the extent permitted by law, the Fiscal Agent may act as depositary for, and permit any of its officers or directors to act as a member of, or in any other capacity with respect to, any committee formed to protect the rights of Bondowners or to effect or aid in any reorganization growing out of the enforcement of the Bonds or this Resolution, whether or not any such committee shall represent the Owners of a majority in principal amount of the Bonds then Outstanding. The Fiscal Agent may execute any of the trusts or powers hereunder or perform any duties hereunder either directly or by or through agents or attorneys and the Fiscal Agent shall not be responsible for any misconduct or negligence on the part of any agent or attorney appointed with due care by it hereunder. The rights, privileges, protections, immunities and benefits given to the Fiscal Agent, including, without limitation, its right to be indemnified, are extended to, and shall be enforceable by, the Fiscal Agent in each of its capacities hereunder, and each agent, custodian and other Person employed to act hereunder.

SECTION 806.        Resignation of Fiscal Agent. The Fiscal Agent may at any time resign and be discharged of the duties and obligations created by this Resolution by giving not less than forty-five (45) days' written notice to the System (which shall give prompt written notice to each Beneficiary) and to the Bondowners (mailed, postage prepaid), specifying the date when such resignation shall take effect, and such resignation shall take effect upon the day specified in such notice unless (i) no successor shall have been appointed by such date in which case such resignation shall become effective upon the appointment of a successor, or (ii) previously a successor shall have been appointed by the System or the Bondowners as provided in Section 808, in which event such resignation shall take effect immediately on the appointment of such successor. The Fiscal Agent shall also mail a copy of the notice required to be given by this Section, postage prepaid, to the Owners of the Bonds, at their last addresses appearing on the registry books.

SECTION 807.        Removal of Fiscal Agent. The Fiscal Agent may be removed at any time, with or without cause, by an instrument or concurrent instruments in writing, delivered to the Fiscal Agent, and signed by the Owners of a majority in principal amount of the Bonds then Outstanding or their

Confidential

UBS-ERS_Ultra_Vires-0087971

attorneys-in-fact duly authorized, excluding any Bonds held by or for the account of the System, or, so long as no Event of Default or event which with the giving of notice or the passage of time would constitute an Event of Default has occurred and is continuing, by an instrument in writing delivered to the Fiscal Agent and signed by an Authorized Officer of the System; provided, however, that in each case that a successor Fiscal Agent shall be simultaneously appointed with the filing of such instrument.

SECTION 808.        Appointment of Successor Fiscal Agent.

1.        In case at any time the Fiscal Agent shall resign or shall be removed or shall become incapable of acting, or shall be adjudged bankrupt or insolvent, or if a receiver, liquidator or conservator of the Fiscal Agent, or of its property, shall be appointed, or if any public officer shall take charge or control of the Fiscal Agent, or of its property or affairs, a successor may be appointed by the Owners of a majority in principal amount of the Bonds then Outstanding, excluding any Bonds held by or for the account of the System, by an instrument or concurrent instruments in writing signed and acknowledged by such Bondowners or by their attorneys-in-fact duly authorized and delivered to such successor Fiscal Agent, notification thereof being given to the System and the predecessor Fiscal Agent; provided, nevertheless, that unless a successor Fiscal Agent shall have been appointed by the Bondowners as aforesaid, the System by a duly executed written instrument signed by an Authorized Officer of the System shall forthwith appoint a Fiscal Agent to fill such vacancy until a successor Fiscal Agent shall be appointed by the Bondowners as authorized in this Section. The Fiscal Agent shall mail a copy of the notice of any such appointment, postage prepaid, to the Owners of any Bonds, at their last addresses appearing on the registry books. Any successor Fiscal Agent appointed by the System shall, immediately and without further act, be superseded by a Fiscal Agent appointed by the Bondowners.

2.        If in a proper case no appointment of a successor Fiscal Agent shall be made pursuant to the foregoing provisions of this Section within thirty (30) days after the Fiscal Agent shall have given to the System written notice as provided in Section 806 or after a vacancy in the office of the Fiscal Agent shall have occurred by reason of its inability to act or its removal under Section 807, the Fiscal Agent or the Owner of any Bond may apply to any court of competent jurisdiction to appoint a successor Fiscal Agent. Said court may thereupon, after such notice, if any, as such court may deem proper, appoint a successor Fiscal Agent.

3.        Any Fiscal Agent appointed under the provisions of this Section in succession to the Fiscal Agent shall be a bank or trust company organized under the laws of a state of the United States of America or of the Commonwealth or a national banking association, and having a capital and surplus aggregating at least $50,000,000 (or whose obligations hereunder are guaranteed by a bank or trust company duly authorized to exercise corporate trust powers and subject to examination by federal or state authority, of good standing, and having at the time of the appointment of such Fiscal Agent, a combined capital and surplus of at least such amount), if there be such a bank or trust company or national banking association willing and able to accept the office on reasonable and customary terms and authorized by law to perform all the duties imposed upon it by this Resolution.

SECTION 809.        Transfer of Rights and Property to Successor Fiscal Agent. Any successor Fiscal Agent appointed under this Resolution shall execute, acknowledge and deliver to its predecessor Fiscal Agent, and also to the System, an instrument accepting such appointment, and thereupon such successor Fiscal Agent, without any further act, deed or conveyance, shall become fully vested with all moneys, estates, properties, rights, powers,

duties and obligations of such predecessor Fiscal Agent, with like effect as if originally named as Fiscal Agent; but the Fiscal Agent ceasing to act shall nevertheless, on the written request of the System, or of the successor Fiscal Agent, upon payment of its charges and all other amounts payable to it hereunder, execute, acknowledge and deliver such instruments of conveyance and further assurance and do such other things as may reasonably be required for more fully and certainly vesting and confirming in such successor Fiscal Agent all the right, title and interest of the predecessor Fiscal Agent in and to any property held by it under this Resolution, and shall pay over, assign and deliver to the successor Fiscal Agent any money or other property subject to the trusts and conditions herein set forth but subject to Section 804. Should any deed, conveyance or instrument in writing from the System be required by such successor Fiscal Agent for more fully and certainly vesting in and confirming to such successor Fiscal Agent any such estates, rights, powers and duties, any and all such deeds, conveyances and instruments in writing shall, on request, and so far as may be authorized by law, be executed, acknowledged and delivered by the System.

SECTION 810.        Merger or Consolidation. Any company into which the Fiscal Agent may be merged or converted or with which it may be consolidated or any company resulting from any merger, conversion or consolidation to which it shall be a party or any company to which the Fiscal Agent may sell or transfer all or substantially all of its corporate trust business, provided such company shall be a bank or trust company organized under the laws of any state of the United States or the Commonwealth or a national banking association, and shall be authorized by law to perform all the duties imposed upon it by this Resolution, shall be the successor to the Fiscal Agent without the execution or filing of any paper or the performance of any further act.

SECTION 811.        Adoption of Authentication. In case any of the Bonds contemplated to be issued under this Resolution shall have been authenticated but not delivered, any successor Fiscal Agent may adopt the certificate of authentication of any predecessor Fiscal Agent so authenticating such Bonds and deliver such Bonds so authenticated, and in case any of the said Bonds shall not have been authenticated, any successor Fiscal Agent may authenticate such Bonds in the name of the successor Fiscal Agent; and in all such cases such certificate shall have the full force which it is anywhere in said Bonds or in this Resolution provided that the certificate of authentication of the Fiscal Agent shall have.

SECTION 812.        Accounting by Fiscal Agent; Nonpetition Covenant. The Fiscal Agent shall, upon receipt of a written request therefor from the System, provide to the System an accounting of the amounts on deposit in all Funds, Accounts and Subaccounts maintained under this Resolution as of the date of such accounting. Notwithstanding any prior termination of this Resolution, the Fiscal Agent shall not, prior to the date which is one year and one day after the termination of this Resolution, acquiesce, petition or otherwise invoke or cause the System to invoke the process of any court or government authority for the purpose of commencing or sustaining a case against the System under any Federal or state bankruptcy, insolvency or similar law or appointing a receiver, liquidator, assignee, trustee, custodian, sequestrator or other similar official of the System or any substantial part of its property, or ordering the winding up or liquidation of the affairs of the System.

SECTION 813.        Appointment of Co-Fiscal Agent.
(a)        Notwithstanding any other provisions of this Resolution, at any time for the purpose of meeting any legal requirement of any jurisdiction (including any jurisdiction in which any part of the Pledged Property may at the time be located), the Fiscal Agent shall have the power and may execute and deliver all instruments necessary to appoint one or more Persons to act as a

Confidential

UBS-ERS_Ultra_Vires-0087972

co-fiscal agent or co-fiscal agents, or separate fiscal agent or separate fiscal agents (including with respect to all or any part of the Pledged Property), and to vest in such Person or Persons, in such capacity and for the benefit of the Bondowners, subject to the other provisions of this Section, such powers, duties, obligations, rights and trusts as the Fiscal Agent may consider necessary or desirable (including title to the Pledged Property or any part thereof). Each co-fiscal agent or separate fiscal agent hereunder shall be required to have a combined capital and surplus (computed in accordance with Section 310(a)(2) of the Trust Resolution Act of 1939, as amended) of at least $50,000,000 and the Fiscal Agent shall, at the expense of the System, provide prompt notice to holders of the appointment of any co-fiscal agent or separate fiscal agent.

(b)        Every separate fiscal agent and co-fiscal agent shall, to the extent permitted by law, be appointed and act subject to the following provisions and conditions:

(i)        all rights, powers, duties and obligations conferred or imposed upon the Fiscal Agent shall be conferred or imposed upon and exercised or performed by the Fiscal Agent and such separate fiscal agent or co-fiscal agent jointly (it being understood that such separate fiscal agent or co-fiscal agent is not authorized to act separately without the Fiscal Agent joining in such act), except to the extent that under any law of any jurisdiction in which any particular act or acts are to be performed the Fiscal Agent shall be incompetent or unqualified to perform such act or acts, in which event such rights, powers, duties and obligations (including the holding of the Pledged Property or any portion thereof in any such jurisdiction ) shall be exercised and performed singly by such separate trustee or co-trustee, but solely at the direction of the Fiscal Agent;

(ii)        no fiscal agent hereunder shall be personally liable by reason of any act or omission of any other fiscal agent hereunder; and

(iii)        the Fiscal Agent may at any time accept the resignation of or remove any separate fiscal agent or co-fiscal agent.

(c)        Any notice, request or other writing given to the Fiscal Agent shall be deemed to have been given to each of the then separate fiscal agent and co-fiscal agent, as effectively as if given to each of them. Every instrument appointing any separate fiscal agent or co-fiscal agent shall refer to this Resolution and the conditions of this Section 813. Each separate fiscal agent and co-fiscal agent, upon its acceptance of the trusts conferred, shall be vested with the estates or property specified in its instrument of appointment, either jointly with the Fiscal Agent or separately, as may be provided therein, subject to all the provisions of this Resolution, specifically including every provision of this Resolution relating to the conduct of, affecting the liability of, or affording protection or rights (including the right to compensation, reimbursement and indemnification hereunder) to, the Fiscal Agent. Every such instrument shall be filed with the Fiscal Agent.

(d)        Any separate fiscal agent or co-fiscal agent may at any time constitute the Fiscal Agent its agent or attorney-in-fact with full power and authority, to the extent not

prohibited by law, to do any lawful act under or in respect of this Resolution on its behalf and in its name. If any separate properties, rights, remedies and trusts shall vest in and be exercised by the Fiscal Agent, to the extent permitted by law, without appointment of a new or successor fiscal agent.

### ARTICLE IX
### SUPPLEMENTAL RESOLUTIONS

SECTION 901.        Supplemental        Resolutions Effective upon Filing with the Fiscal Agent. For any one or more of the following purposes and at any time or from time to time, the System may adopt a Supplemental Resolution, which, upon the filing with the Fiscal Agent of a copy thereof certified by an Authorized Officer of the System, and without the need to obtain the consent of any Bondholder, shall be fully effective in accordance with its terms:

(i)        to close this Resolution against, or provide limitations and restrictions in addition to the limitations and restrictions contained in this Resolution on, the authentication and delivery of the Bonds or the issuance of other evidences of indebtedness;

(ii)        to add to the covenants and agreements of the System in this Resolution, other covenants and agreements to be observed by the System which are not contrary to or inconsistent with this Resolution as theretofore in effect;

(iii)        to add to the limitations and restrictions in this Resolution, other limitations and restrictions to be observed by the System which are not contrary to or inconsistent with this Resolution as theretofore in effect;

(iv)        to surrender any right, power or privilege reserved to or conferred upon the System by this Resolution to the extent such surrender is for the benefit of the Owners of the Bonds;

(v)        to authorize Bonds of a Series and, in connection therewith, specify and determine the matters and things referred to in Section 202, and also any other matters and things relative to such Bonds which are not contrary to or inconsistent with this Resolution as theretofore in effect, or to amend, modify or rescind any such authorization, specification or determination at any time prior to the first authentication and delivery of such Bonds;

(vi)        to confirm, as further assurance, any pledge and assignment under, and the subjection to any lien, assignment or pledge created or to be created by, this Resolution, of the Pledged Property or of any other moneys, securities, funds or accounts;

(vii)        to modify any of the provisions of this Resolution as may be necessary or desirable to provide for the issuance of Bonds in book entry form pursuant to Section 301(5);

(viii)        to cure any ambiguity, defect or inconsistent provision in this Resolution;

(ix)        if such Supplemental Resolution authorizes Bonds of a Series that are Adjustable Rate Bonds, Capital Appreciation Bonds, Convertible Capital Appreciation Bonds or Bonds hedged or to be hedged by a Qualified Hedge, or authorizes a Qualified Hedge on Bonds previously issued, to add provisions specifying the method of calculating the Accrued Payment Obligation with respect to such Bonds, for purposes of the Debt Service Reserve Requirement and the additional Bonds

V-22

tests of Sections 204 and 708;

(x)     to provide such provisions with respect to Subordinated Bonds as are necessary and desirable, *provided*, that no such provisions shall adversely affect the payment priorities under this Resolution of any Bonds then Outstanding;

(xi)     to provide for a security interest on the Pledged Property for the payment and as security for Credit Facilities, Liquidity Facilities and Qualified Hedges as permitted by Section 501(1).

(xii)     as permitted by Section 1005;

(xiii)     to insert such provisions clarifying matters or questions arising under this Resolution as are necessary or desirable and are not contrary to or inconsistent with this Resolution as theretofore in effect; or

(xiv)     to modify any of the provisions of this Resolution or any previously adopted Supplemental Resolution in any respect whatsoever, *provided* that (i) such modification shall be, and be expressed to be, effective only after all Bonds of any Series Outstanding at the date of the adoption of such Supplemental Resolution shall cease to be Outstanding and (ii) such Supplemental Resolution shall be specifically referred to in the text of all Bonds of any Series authenticated and delivered after the date of the adoption of such Supplemental Resolution and of Bonds issued in exchange therefor or in place thereof.

SECTION 902.     Supplemental Resolutions Effective with Consent of Bondowners.  At any time or from time to time, the System may adopt a Supplemental Resolution subject to consent by Bondowners in accordance with and subject to the provisions of Article X, which Supplemental Resolution, upon the delivery to the Fiscal Agent of a copy thereof certified by an Authorized Officer of the System, and upon compliance with the provisions of Article X, shall become fully effective in accordance with its terms as provided in Article X.

SECTION 903.     Reserved.

SECTION 904.     General Provisions.

1.     This Resolution shall not be modified or amended in any respect except as provided in and in accordance with and subject to the provisions of this Article IX and Article X.  Nothing contained in this Article IX or Article X shall affect or limit the right or obligation of the System to adopt, make, execute, acknowledge or deliver any resolution, act or other instrument pursuant to the provisions of Section 704 or the right or obligation of the System to execute and deliver to the Fiscal Agent any instrument which elsewhere in this Resolution it is provided shall be delivered to the Fiscal Agent.

2.     Any Supplemental Resolution referred to and permitted or authorized by Section 901 may be adopted by the System without the consent of any of the Bondowners, but shall become effective only on the conditions, to the extent and at the time provided in said Section.  The copy of every Supplemental Resolution when delivered to the Fiscal Agent shall be accompanied by an Opinion of Counsel stating that such Supplemental Resolution has been duly and lawfully adopted in accordance with the provisions of this Resolution, is authorized or permitted by this Resolution, and is valid and binding upon the System and enforceable in accordance with its terms.  After any Supplemental Resolution becomes effective under this Article, the System shall mail to the Owners a notice briefly describing such Supplemental Resolution; *provided, however*, the failure to give

such notice, or any defect therein, shall not impair or affect the validity of such Supplemental Resolution under this Article.

3.     The Fiscal Agent is hereby authorized to accept the delivery of a certified copy of any Supplemental Resolution referred to and permitted or authorized by Sections 901 or 902 and to make all further agreements and stipulations which may be therein contained, and the Fiscal Agent, in taking such action in good faith, shall be fully protected in relying on an Opinion of Counsel that such Supplemental Resolution is authorized or permitted by the provisions of this Resolution.

4.     No Supplemental Resolution shall change or modify any of the rights or obligations of the Fiscal Agent without its written assent thereto.

ARTICLE X
AMENDMENTS

SECTION 1001.     Mailing and Publication.

1.     Any provision in this Article for the mailing of a notice or other paper to Bondowners shall be fully complied with if it is mailed postage prepaid only (i) to each Owner of Bonds then Outstanding at his address, if any, appearing upon the registry books of the System, and (ii) to the Fiscal Agent.

2.     In case by reason of the suspension of regular mail service or by reason of any other cause it shall be impracticable to give such notice by mail as required by this Resolution, then such notification as shall be made with the approval of the Fiscal Agent shall constitute a sufficient notification for every purpose hereunder.

SECTION 1002.     Powers of Amendment.  Any modification or amendment of this Resolution and of the rights and obligations of the System and of the Owners of the Bonds may be made by a Supplemental Resolution, with the written consent, given as provided in Section 1003, (i) of the Owners of at least a majority in principal amount of the Bonds Outstanding at the time such consent is given, and (ii) in case less than all of the several Series of Bonds then Outstanding are affected by the modification or amendment, of the Owners of at least a majority in principal amount of the Bonds of each Series so affected and Outstanding at the time such consent is given; provided, however, that if such modification or amendment will, by its terms, not take effect so long as any Bonds of any specified like Series and maturity remain Outstanding, the consent of the Owners of such Bonds shall not be required and such Bonds shall not be deemed to be Outstanding for the purpose of any calculation of Outstanding Bonds under this Section.  No such modification or amendment shall permit a change in the terms of redemption or maturity of the principal (or Accreted Amount, if applicable) of any Outstanding Bond or of any installment of interest thereon or a reduction in the principal amount (or Accreted Amount, if applicable) or the Redemption Price thereof or in the rate of interest thereon without the consent of each Bondowner affected thereby, or shall reduce the percentage of the aggregate principal amount (or Accreted Amount, if applicable) of Bonds or otherwise affect classes of Bonds the consent of the Owners of which is required to effect any such modification or amendment without the consent of all Bondowners, or shall change or modify any of the rights or obligations of the Fiscal Agent without its written assent thereto, or shall change or modify any of the rights of the providers of Qualified Hedges, Credit Facilities or Liquidity Facilities regarding source of and security for payments due to such Persons, or amount and timing of payments due, without the prior written consent of such Persons.  For the purposes of this Section, a Series shall be deemed to be affected by a modification or amendment of this Resolution if the same adversely affects or diminishes the

V-23

UBS-ERS_Ultra_Vires-0087974

rights of the Owners of Bonds of such Series. The Fiscal Agent may, but shall not be obligated to, determine whether or not in accordance with the foregoing powers of amendment, Bonds of any particular Series or maturity would be affected by any modification or amendment of this Resolution, and any such determination if reasonable and in good faith shall be binding and conclusive on the System and all Owners of Bonds.

SECTION 1003.    Consent of Bondowners.   The System may at any time adopt a Supplemental Resolution making a modification or amendment permitted by the provisions of Section 902, to take effect when and as provided in this Section. A copy of such Supplemental Resolution (or brief summary thereof or reference thereto in form approved by the Fiscal Agent) together with a request to Bondowners for their consent thereto in form satisfactory to the Fiscal Agent, shall be mailed by the System to all affected Bondowners. Such Supplemental Resolution shall not be effective unless and until (i) there shall have been delivered to the Fiscal Agent (a) the written consents of Owners of the percentage of the aggregate principal amount of Outstanding Bonds specified in Section 1002, and (b) an Opinion of Counsel stating that such Supplemental Resolution has been duly and lawfully adopted and filed by the System in accordance with the provisions of this Resolution, is authorized or permitted by this Resolution, and is valid and binding upon the System and enforceable in accordance with its terms, and (ii) notice shall have been given as hereinafter in this Section provided. Ownership of Bonds shall be conclusively presumed by the registration books of the System. Any such consent shall be binding upon the Owner of the Bonds giving such consent and, anything in Section 1102 to the contrary notwithstanding, upon any subsequent Owner of such Bonds and of any Bonds issued upon registration of transfer thereof or in exchange therefor (whether or not such subsequent Owner thereof has notice thereof), unless such consent is revoked in writing by the Owner of such Bonds giving such consent or a subsequent Owner thereof by filing with the Fiscal Agent, prior to the time when the written statement of the Fiscal Agent hereinafter in this Section provided for is filed. At any time after the Owners of the required percentages of Bonds shall have filed their consents to the Supplemental Resolution, the Fiscal Agent shall make and file with the System a written statement that the Owners of such required percentage of the aggregate principal amount of Bonds have filed such consents. Such written statement shall be conclusive that such consents have been so filed. At any time thereafter, notice, stating in substance that the Supplemental Resolution (which may be referred to as a Supplemental Resolution adopted by the System on a stated date, a copy of which is on file with the Fiscal Agent) has been consented to by the Owners of the required percentage of the aggregate principal amount of Bonds and will be effective as provided in this Section, shall be given Bondowners by the System by mailing such notice to Bondowners. The System shall file with the Fiscal Agent proof of the mailing of such notice. A record, consisting of the papers required or permitted by this Section 1003 to be delivered to the Fiscal Agent, shall be proof of the matters therein stated.

SECTION 1004.    Modifications by Unanimous Consent.   The terms and provisions of this Resolution and the rights and obligations of the System and of the Owners of the Bonds may be modified or amended in any respect upon the adoption and filing by the System with the Fiscal Agent of a Supplemental Resolution and the consent of the Owners of all of the Bonds then Outstanding, such consent to be given as provided in Section 1003 except that no notice to Bondowners shall be required.

SECTION 1005.    Modification Before Bonds Outstanding.   Prior to the issuance and delivery of the first Series of Bonds under this Resolution, the terms and conditions of this Resolution and the rights and obligations of the System and of the Owners of the Bonds may be modified or amended in any respect without the consent of any person, upon the adoption of a Supplemental Resolution and the delivery to the Fiscal Agent of a copy thereof certified by an Authorized Officer of the System.

SECTION 1006.    Exclusion of Bonds.   Bonds owned or held by or for the account of the System shall not be deemed Outstanding for the purpose of consent or other action or any calculation of Outstanding Bonds provided for in this Article, and the System shall not be entitled with respect to such bonds to give any consent or take any other action provided for in this Article. At the time of any consent or other action taken under this Article, the System shall furnish the Fiscal Agent a certificate of an Authorized Officer, upon which the Fiscal Agent may rely, describing all Bonds so to be excluded.

SECTION 1007.    Notation on Bonds.   Bonds authenticated and delivered after the effective date of any action taken as provided in Article IX or this Article may, and, if the Fiscal Agent so determines, shall, bear a notation by endorsement or otherwise in form approved by the System and the Fiscal Agent as to such action, and in that case upon demand of the Owner of any Bond Outstanding at such effective date and presentation of his Bond for the purpose at the Corporate Trust Office of the Fiscal Agent, suitable notation shall be made on such Bond by the Fiscal Agent as to any such action. If the System or the Fiscal Agent shall so determine, new Bonds so modified to conform to such action shall be prepared, authenticated and delivered, and, upon demand of the Owner of any Bond then Outstanding, shall be exchanged, without cost to such Bondowners for Bonds of the same Series and maturity and then Outstanding, upon surrender of such Bonds.

## ARTICLE XI
## DEFAULTS AND REMEDIES

SECTION 1101.    Events of Default.

Each of the following events shall constitute an Event of Default under this Resolution:

(i)    There shall occur a default in the payment of principal or Redemption Price of or interest on any Bond or payments due to any Parity Obligation or any Subordinate Obligation related thereto in the Currency in which such Bond, Parity Obligation or Subordinate Obligation is payable, after the same shall have become due, whether at maturity or upon call for redemption or otherwise.

(ii)    There shall occur a failure to observe, or a refusal to comply with, the terms of this Resolution or the Bonds, other than a failure or refusal constituting an event specified in paragraph (i) of this paragraph; *provided, however*, that with respect to any failure to observe or refusal to comply with the covenants and agreements set forth in this Resolution, such failure or refusal shall have continued for a period of thirty (30) days after written notice, specifying such failure and requesting that it be remedied, is given to the System by the Fiscal Agent or any Beneficiary. If prior to the expiration of the abovementioned thirty (30) day period, the System shall request in writing an extension of time and the System shall certify in such request that the failure stated in the notice cannot be remedied within such 30-day period, then such thirty (30) day period shall be extended for an additional thirty (30) days if corrective action has been instituted by the System and is being diligently pursued;

*provided*, that all references in this Article XI to the Owners of Bonds exercising or directing the exercise of default remedies shall refer solely to those Bonds as to which an Event of

V-24

UBS-ERS_Ultra_Vires-0087975

Default has been declared hereunder.

SECTION 1102.    Remedies.

1.    The Fiscal Agent may, and upon the written request of the Owners of not less than twenty-five per centum (25%) in principal amount of the Outstanding Bonds, shall, proceed to protect and enforce its rights and the rights of the Bondowners by such of the following remedies, as the Fiscal Agent, being advised by counsel shall deem most effectual to protect and enforce such rights subject to the provisions of Sections 201, 803 and 1206:

(i)    by suit, action or proceeding to enforce all rights of the Bondowners, including the right to collect or require the System to collect Revenues adequate to carry out the covenants, agreements and assignments with respect hereto contained in this Resolution and to require the System to carry out any other covenant or agreement with Bondowners and to perform its duties under the Act;

(ii)    by suit upon the Bonds limited, upon recovery thereunder, to the Pledged Property pledged and assigned under this Resolution;

(iii)    by action or suit in equity, to require the System to account as if it were the trustee of an express trust for the Bondowners, for the Pledged Property pledged and assigned under this Resolution as shall be within its control; and

(iv)    by action or suit in equity, to enjoin any acts or things which may be unlawful or in violation of the rights of the Bondowners or the Beneficiaries.

2.    In the enforcement of any remedy under this Resolution, but subject to Sections 201, 501 and 1206, the Fiscal Agent shall be entitled to sue for, enforce payment on and receive any and all amounts then or during any default becoming, and, at any time remaining, due from the System for principal, Redemption Price, interest or otherwise for Bonds under any provision of this Resolution or any Supplemental Resolution or of or on the Bonds, and the unpaid, with interest on overdue payments, to the extent permitted by law, at the rate or rates of interest specified in such Bonds, together with any and all costs and expenses of collection and of all proceedings hereunder and under such Bonds, without prejudice to any other right or remedy of the Fiscal Agent or of the Bondowners, and to recover and enforce judgment or decree against the System for any portion of such amounts remaining unpaid, with interest, costs and expenses, in any manner provided by law, the moneys adjudged or decreed to be payable.

SECTION 1103.    Priority of Payments After Event of Default.

1.    Subject to Section 804 and after making provision for the payment of any reasonable expenses of the Fiscal Agent and its agents and attorneys necessary in the opinion of the Fiscal Agent to protect the interests of the Owners of the Bonds and the other Beneficiaries, and for the payment of the reasonable charges and expenses and liabilities incurred and advances made by the Fiscal Agent and its agents and attorneys in the performance of their duties under this Resolution, in the event that the funds held by the Fiscal Agent shall be insufficient for the payment of interest and principal or Accreted Amount or Redemption Price then due on the Bonds in the Currency or Currencies in which such Bonds are payable, respectively, and other amounts payable as described in clauses FIRST through FIFTH of this paragraph 1, such funds (excluding funds held for the payment or redemption of particular Bonds which have theretofore become due at maturity or by call for redemption) and any other moneys received or collected by the Fiscal Agent and any moneys or other property distributable in respect of the System's obligations under this Resolution after the occurrence of an Event of Default, shall be applied as follows:

FIRST: to the payment to the Persons entitled thereto of regularly scheduled fees payable under each Ancillary Bond Facility;

SECOND: to the payment to the Persons entitled thereto of all installments of interest on the Senior Bonds and the interest component of Parity Obligations then due, and thereafter, in the order of such installments, and, if the amount available shall not be sufficient to pay in full any installment due on the same date, then to the payment thereof ratably, according to the amounts due on such date, without any discrimination or preference, except as to any difference in the respective rates of interest specified in such Bonds and Parity Obligations, and then to the payment of any interest due and payable after maturity on such Bonds and the interest component of the Parity Obligations, ratably, to the Persons entitled thereto, without any discrimination or preference except as to any difference in the respective rates of interest specified in such Bonds and Parity Obligations;

THIRD: to the payment to the Persons entitled thereto of the unpaid principal or Redemption Price of the Senior Bonds and the unpaid principal component of Parity Obligations, which shall have become due, whether at maturity or by call for redemption, in the order of their due dates and, if the amount available shall not be sufficient to pay in full all such Bonds and the principal component of Parity Obligations due on the same date, then to the payment thereof ratably, according to the amounts of principal or Redemption Price due on such date, without any discrimination or preference;

FOURTH:  to the payment to the Persons entitled thereto of all installments of interest on the Subordinated Bonds and the interest component of Parity Obligations then due, and thereafter, in the order of such installments, and, if the amount available shall not be sufficient to pay in full any installment due on the same date, then to the payment thereof ratably, according to the amounts due on such date, without any discrimination or preference, except as to any difference in the respective rates of interest specified in such Bonds and Parity Obligations, and then to the payment of any interest due and payable after maturity on such Bonds and the interest component of Parity Obligations, ratably, to the Persons entitled thereto, without any discrimination or preference except as to any difference in the respective rates of interest specified in such Bonds and Parity Obligations;

FIFTH: to the payment to the Persons entitled thereto of the unpaid principal or Redemption Price of the Subordinated Bonds and the unpaid principal component of Parity Obligations, which shall have become due, whether at maturity or by call for redemption, in the order of their due dates and, if the amount available shall not be sufficient to pay in full all such Bonds and the principal component of Parity Obligations due on the same date, then to the payment thereof ratably, according to the amounts of principal or

V-25

Redemption Price due on such date, without any discrimination or preference;

SIXTH: to the payment to the Persons entitled thereto of amounts reimbursable or payable by the System under each Credit Facility for draws or payments thereunder to pay principal of or interest on Bonds, whether such reimbursements or payments are made to the Credit Facility Provider as a Bondowner, as a subrogee or otherwise; and

SEVENTH: to the payment to the Persons entitled thereto of amounts payable by the System under each Credit Facility, Liquidity Facility and Qualified Hedge not constituting Parity Obligations or payable pursuant to clauses FIRST through SIXTH of this paragraph.

2.      The provisions of this Section are in all respects subject to the provisions of Section 702.

3.      Whenever moneys are to be applied by the Fiscal Agent pursuant to this Section, such moneys shall be applied by the Fiscal Agent at such times, and from time to time, as provided above. The deposit of such moneys with the Fiscal Agent, or otherwise setting aside such moneys in trust for the proper purpose, shall constitute proper application by the Fiscal Agent and the Fiscal Agent shall incur no liability whatsoever to the System, to any Bondowner to any Beneficiary or to any other Person for any delay in applying any such moneys, so long as the Fiscal Agent acts without gross negligence or willful misconduct. Whenever the Fiscal Agent shall exercise such discretion in applying such moneys, it shall fix the date (which shall be an interest payment date unless the Fiscal Agent shall deem another date more suitable) upon which such application is to be made and upon such date interest on the amounts of principal (or Accreted Amount, if any) to be paid on such date shall cease to accrue. The Fiscal Agent shall give such notice as it may deem appropriate for the fixing of any such date. The Fiscal Agent shall not be required to make payment to the Owner of any Bond unless such Bond shall be presented to the Fiscal Agent for appropriate endorsement or for cancellation if fully paid.

SECTION 1104.      Termination of Proceedings.  In case any proceeding taken by the Fiscal Agent on account of any Event of Default has been discontinued or abandoned for any reason, other than payment in full, then in every such case the System, the Fiscal Agent, the Beneficiaries and the Bondowners shall be restored to their former positions and rights hereunder, respectively, and all rights, remedies, powers and duties of the Fiscal Agent shall continue as though no other such proceeding had been taken.

SECTION 1105.      Bondowners'  Direction  of Proceedings.  Except as otherwise provided in this Resolution, the Owners of a majority in principal amount of the Bonds in order of Class Priority then Outstanding shall have the right, by an instrument or concurrent instruments in writing executed and delivered to the Fiscal Agent, to direct the method of conducting remedial proceedings to be taken by the Fiscal Agent with respect to the Bonds of such Class Priority, provided that such direction shall not be otherwise than in accordance with law or the provisions of this Resolution, and that the Fiscal Agent shall have the right to decline to follow any such direction which in the opinion of the Fiscal Agent would be unjustly prejudicial to Bondowners not parties to such direction or would involve the Fiscal Agent in personal liability.

SECTION 1106.      Limitation  on  Rights  of Bondowners.

1.      No Owner of any Bond shall have any right to institute any suit, action, mandamus or other proceeding in equity or at law hereunder, or for the protection or enforcement of any right under this Resolution unless such Owner shall have given to the Fiscal Agent written notice of the Event of Default or breach of duty on account of which such suit, action or proceeding is to be taken, and unless the Owners of not less than 25% in principal amount of the Bonds in the order of Class Priority then Outstanding shall have made written request of the Fiscal Agent after the right to exercise such powers or right of action, as the case may be, shall have occurred, and shall have afforded the Fiscal Agent a reasonable opportunity either to proceed to exercise the powers herein granted or granted under the law or to institute such action, suit or proceeding in its name and unless, also, there shall have been offered to the Fiscal Agent reasonable security and indemnity against the costs, expenses (including legal fees and expenses) and liabilities to be incurred therein or thereby, and the Fiscal Agent shall have refused or neglected to comply with such request within a reasonable time; and such notification, request and offer of indemnity are hereby declared in every such case to be conditions precedent to the execution of the powers under this Resolution or for any other remedy provided hereunder or by law. It is understood and intended that no one or more Owners of the Bonds or other Beneficiary hereby secured shall have any right in any manner whatever by his or their action to affect, disturb or prejudice the security of this Resolution, or to enforce any right hereunder or under law with respect to the Bonds, or this Resolution, except in the manner herein provided, and that all proceedings at law or in equity shall be instituted, had and maintained in the manner herein provided and for the benefit of all Owners of the Outstanding Bonds.  Nothing contained in this Article shall affect or impair the right of any Bondowner to enforce the payment of the principal (or Accreted Amount, if any) of and interest on such Owner's Bonds or the obligation of the System to pay the principal (or Accreted Amount, if any) of and interest on each Bond issued hereunder to the Owner thereof at the time and place in said Bond expressed.

2.      Anything  to  the  contrary contained in this Section notwithstanding, or any other provision of this Resolution, each Owner of any Bond by such Owner's acceptance thereof, shall be deemed to have agreed that any court in its discretion may require, in any suit for the enforcement of any right or remedy under this Resolution, or in any suit against the Fiscal Agent for any action taken or omitted by it as Fiscal Agent, the filing by any party litigant in such suit of an undertaking to pay the reasonable costs of such suit, and that such court may in its discretion assess reasonable costs, including reasonable pre-trial, trial and appellate attorneys' fees, against any party litigant in any such suit, having due regard to the merits and good faith of the claims or defenses made by such party litigant; but the provisions of this paragraph shall not apply to any suit instituted by the Fiscal Agent, to any suit instituted by any Bondowner or group of Bondowners holding at least 25% in principal amount of the Bonds in the order of Class Priority then Outstanding, or to any suit instituted by any Bondowner for the enforcement of the payment of any Bond on or after the respective due date thereof expressed in such Bond.

SECTION 1107.      Possession of Bonds by Fiscal Agent Not Required.  All rights of action under this Resolution or under any of the Bonds, enforceable by the Fiscal Agent, may be enforced by it without the possession of any of the Bonds or the production thereof on the trial or other proceeding relative thereto, and any such suit, action or proceeding instituted by the Fiscal Agent shall be brought in its name for the benefit of all the Owners of such Bonds, subject to the provisions of this Resolution.

SECTION 1108.      Remedies Not Exclusive.  No remedy herein conferred upon or reserved to the Fiscal Agent or to the Owners of the Bonds is intended to be exclusive of any other remedy and each and every such remedy shall be cumulative and

V-26

UBS-ERS_Ultra_Vires-0087977

shall be in addition to any other remedy given hereunder or now or hereafter existing at law or in equity or by statute.

SECTION 1109.   No Waiver of Default.  No delay or omission of the Fiscal Agent, the Beneficiaries or of any Owner of the Bonds to exercise any right or power accruing upon any default shall impair any such right or power or shall be construed to be a waiver of any such default or an acquiescence therein, and every power and remedy given by this Resolution to the Fiscal Agent and the owners of the Bonds or such Beneficiaries, respectively, may be exercised from time to time and as often as may be deemed expedient.

SECTION 1110.   Notice of Event of Default.  The Fiscal Agent shall give to the Bondowners and the Beneficiaries notice of each Event of Default hereunder known to the Fiscal Agent within ninety (90) days after actual knowledge by an Authorized Officer of the Fiscal Agent of the occurrence thereof, unless such Event of Default shall have been remedied or cured before the giving of such notice.  However, except in the case of default in the payment of the principal (or Accreted Amount, if any) or Redemption Price, if any, of or interest on any of the Bonds, the Fiscal Agent shall be protected in withholding such notice if and so long as the board of directors, the executive committee, or a trust committee of directors or responsible officers of the Fiscal Agent in good faith determines that the withholding of such notice is in the interest of the Bondowners and other Beneficiaries.  Each such notice of Event of Default shall be given by the Fiscal Agent by mailing written notice thereof:  (i) to all Owners of Bonds, as the names and addresses of such Owners appear upon the registry books kept by the Fiscal Agent, (ii) to each of the Rating Agencies, and (iii) to such other Persons as may be required by law.

**ARTICLE XII**
**SUBORDINATION PROVISIONS**

SECTION 1201.   Subordination.

(a)   Subordinated Bonds and Subordinate Obligations shall to the extent provided in this Article be subordinate and subject in right of payment to the prior payment in full of the Senior Bonds and Parity Obligations, and the owner of any Subordinated Bond and Subordinate Obligation, whether upon original issue or upon transfer or assignment thereof, accepts and agrees to be bound by such provision. The Fiscal Agent shall be entitled to all rights set forth in this Article with respect to any Senior Bonds and Parity Obligations at any time held by it, to the same extent as any other Owner of Senior Bonds and Parity Obligations. Notwithstanding anything to the contrary contained in this Article XII, in no event shall any amounts payable to the Fiscal Agent under Section 804 be subject to the provisions of this Article XII.

(b)   Upon any payment or distribution of assets of the System upon any dissolution or winding up or total or partial liquidation of the System whether in bankruptcy, insolvency or receivership proceedings, or otherwise,

(1)   all Senior Bonds and Parity Obligations shall first be paid or duly provided for to the extent of such payment or distribution before any payment is made upon the indebtedness evidenced by the Subordinated Bonds or Subordinate Obligations;

(2)   any payment or distribution of assets of the System of any kind or character, whether in cash, property or securities, to which the owners of the Subordinated Bonds or Subordinate Obligations or the Fiscal Agent (on behalf of the Owners of the Subordinated Bonds or the Subordinate Obligations) would be entitled except for the provisions of this Article XII, including any such payment or

distribution which may be payable or deliverable by reason of the payment of any other indebtedness or other obligations of the System being subordinated to the payment of the Subordinated Bonds and Subordinate Obligations, shall be paid by the liquidating trustee or agent or other person making such payment or distribution, whether a trustee in bankruptcy, a receiver or liquidating trustee or otherwise, directly to the owners of Senior Bonds and Parity Obligations, to the extent necessary to pay or provide for the payment of all Senior Bonds and Parity Obligations in full before any payment is made upon the indebtedness evidenced by the Subordinated Bonds and Subordinate Obligations; and

(3)   notwithstanding the foregoing, in the event that, upon any such dissolution or winding up or liquidation, any payment or distribution of assets of the System of any kind or character, whether in cash, property or securities, including any such payment or distribution which may be payable or deliverable by reason of the payment of any other indebtedness or other obligations of the System being subordinated to the payment of the Subordinated Bonds and Subordinate Obligations, shall be received by the Fiscal Agent or by the owners of the Subordinated Bonds or Subordinate Obligations (or by the Fiscal Agent on behalf of the Owners of the Subordinated Bonds or the Subordinate Obligations) before all Senior Bonds and Parity Obligations are paid or duly provided for in full, such payment or distribution shall be paid over to the owners of such Senior Bonds and Parity Obligations for application to the payment thereof until such Senior Bonds and Parity Obligations shall have been paid or provision for such payment shall have been made in full.

Upon any payment or distribution of assets of the System referred to in this Section 1201, the Fiscal Agent and the owners of the Subordinated Bonds and Subordinate Obligations shall be entitled to rely upon (i) any order or decree of a court of competent jurisdiction in which such dissolution, winding up, liquidation or reorganization proceedings are pending or (ii) a certificate of the liquidating trustee or agent or other person making any payment or distribution to the Fiscal Agent or the owners of the Subordinated Bonds and Subordinate Obligations for the purpose of ascertaining the persons entitled to participate in such payment or distribution, the owners of Senior Bonds and Parity Obligations and other indebtedness of the System, the amount thereof or payable thereon, the amount or amounts paid or distributed thereon and all other facts pertinent thereto, or to this Article.

(c)   (1)   In the event that moneys available to pay Bonds shall not be sufficient to pay in full all amounts due on the Bonds, the owners of all Senior Bonds and Parity Obligations then Outstanding shall be entitled to receive payment in full of all principal of and interest on all such obligations then due and payable before the owner of any Subordinated Bond or Subordinate Obligation is entitled to receive any payment from the Pledged Property of principal (and premium, if any) or interest upon such Subordinated Bond and Subordinate Obligation.

(2)   The provisions of subsection (b) and (c) are solely for the purpose of defining the relative rights of the owners of Senior Bonds and Parity Obligations on the one hand, and the owners of Subordinated Bonds and Subordinate Obligations on the other hand, and nothing therein shall impair, as between the System and the owners of the Subordinated Bonds and Subordinate Obligations, the obligation of the System, which is unconditional and absolute, to pay to the owners thereof the principal thereof and premium, if any, and interest thereon in accordance with their terms, nor shall anything therein prevent the owners of the Subordinated Bonds and Subordinate Obligations from exercising all remedies otherwise permitted by applicable law or thereunder upon default thereunder, subject to the rights under subsections (b) and (c) of the owners of Senior Bonds and Parity Obligations to receive cash, property or

V-27

Confidential

UBS-ERS_Ultra_Vires-0087978

securities from the funds pledged to Senior Bonds and Parity Obligations under this Resolution otherwise payable or deliverable to the owners of the Subordinated Bonds and Subordinate Obligations; and insofar as a trustee, fiscal agent or paying agent for such Subordinated Bonds and Subordinate Obligations is concerned, the foregoing provisions shall not prevent the application by such trustee, fiscal agent or paying agent of any moneys deposited with such trustee, fiscal agent or paying agent for the purpose of the payment of or on account of the principal (and premium, if any) and interest on such Subordinated Bonds and Subordinate Obligations if such trustee, fiscal agent or paying agent did not have knowledge at the time of such application that such payment was prohibited by the foregoing provisions.

(d)        No owner of Senior Bonds and Parity Obligations shall be prejudiced in this right to enforce subordination of the Subordinated Bonds and Subordinate Obligations by any act or failure to act on the part of the System.

(e)        Any issue of Subordinated Bonds and Subordinate Obligations may have such rank or priority with respect to any other issue of Subordinated Bonds and Subordinate Obligations as may be provided herein, in the applicable Supplemental Resolution or other instrument securing such issue of Subordinated Bonds and Subordinate Obligations and may contain such other provisions as are not in conflict with the provisions of this Resolution.

SECTION 1202.        Liability of Fiscal Agent and successor Fiscal Agent in respect of Subordination.

With respect to the Owners of Senior Bonds and Parity Obligations, the Fiscal Agent undertakes to perform or to observe only such of its covenants and objectives as are specifically set forth in this Resolution, and no implied covenants or obligations with respect to the owners of Senior Bonds and Parity Obligations shall be read into this Resolution against the Fiscal Agent. Neither the Fiscal Agent nor any successor Fiscal Agent shall be deemed to owe any fiduciary duty to the owners of Subordinated Bonds and Subordinate Obligations and shall not be liable to such owners if it shall mistakenly pay over or transfer to owners of Senior Bonds and Parity Obligations, the System or any other person, moneys to which any owners of Subordinated Bonds and Subordinate Obligations shall be entitled by virtue of this Section 1202 or otherwise; provided, however, that neither the Fiscal Agent nor any successor Fiscal Agent shall be relieved from liability for its own negligent action, its own negligent failure to act, or its own willful misconduct. Notwithstanding any of the provisions of this Section 1202 or any other provision of this Resolution, neither the Fiscal Agent nor any such successor Fiscal Agent shall at any time be charged with knowledge of the existence of any facts that would prohibit the making of any payment of moneys to or by the Fiscal Agent or any such successor Fiscal Agent in respect of Subordinated Bonds and Subordinate Obligations or of any default in the payment of the principal of or premium, if any, or interest on any Subordinated Bonds and Subordinate Obligations, unless and until the Fiscal Agent or such successor Fiscal Agent shall have received written notice thereof from the System or the owners of a majority in principal amount of any class or category of any Subordinated Bonds and Subordinate Obligations or from any fiscal agent or other fiduciary therefor and any financial institution that provides credit or security for any Subordinated Bonds and Subordinate Obligations; and before the receipt of any such written notice, the Fiscal Agent shall be entitled in all respects to assume that no such facts exist; provided, however, that if the Fiscal Agent shall not have received the notice provided for in this Section 1202 at least two Business Days prior to the date upon which by the terms hereof any money may become payable for any purpose (including, without limitation, the payment of the principal of, any premium or interest on any Bond of such series), then, anything herein contained to the contrary notwithstanding, the Fiscal Agent shall have full power and authority to receive such money and to

apply the same to the purposes for which they were received, and shall not be affected by any notice to the contrary that may be received by it within two Business Days prior to such date.

SECTION 1203.        When Payment of Subordinated Bonds and Subordinate Obligations Allowed.

Nothing contained in this Resolution or in any Senior Bonds and Parity Obligations or Subordinated Bonds and Subordinate Obligations shall (a) affect the obligation of the System to make, or prevent the System from making, at any time, except as provided in Section 1201, payments of principal of or premium, if any, or interest on Senior Bonds and Parity Obligations or the Subordinated Bonds and Subordinate Obligations, or (b) prevent the application by the Fiscal Agent of any moneys deposited with it hereunder for such purpose to the payment of or on account of the principal of or premium, if any, or interest on Senior Bonds and Parity Obligations or the Subordinated Bonds and Subordinate Obligations, if, at the time of such payment or deposit, the Fiscal Agent did not have at least two Business Days' written notice or actual knowledge of any event prohibiting the making of such deposit by the System.

SECTION 1204.        Subrogation of Owners of Subordinated Bonds and Subordinate Obligations.

Subject to the payment in full of all Senior Bonds and Parity Obligations as provided in Section 1201, the owners of the Subordinated Bonds and Subordinate Obligations shall be subrogated to the rights of the owners of Senior Bonds and Parity Obligations to receive payments or distributions of assets of the System made on Senior Bonds and Parity Obligations until the Subordinated Bonds and Subordinate Obligations shall be paid in full, and no payments or distributions to the owners of Senior Bonds and Parity Obligations by the System or by the owners of the Subordinated Bonds and Subordinate Obligations shall, as between the System and the owners of the Subordinated Bonds and Subordinate Obligations, be deemed to be a payment by the System to or on account of the Subordinated Bonds and Subordinate Obligations, it being understood that the provisions of this Article are and are intended solely for the purpose of defining the relative rights of the owners of the Subordinated Bonds and Subordinate Obligations and of Senior Bonds and Parity Obligations and nothing in this Article is or is intended to, as between the System and the owners of the Subordinated Bonds and Subordinate Obligations, impair the obligation of the System, which is unconditional and absolute, to pay from the sources herein provided to the owners of the Subordinated Bonds and Subordinate Obligations the principal of and premium, if any, and interest on the Subordinated Bonds and Subordinate Obligations in accordance with their terms, nor shall anything in this Article XII prevent the Fiscal Agent or the owner of any Subordinated Bond and Subordinate Obligation from exercising all remedies otherwise permitted by applicable law upon default hereunder, subject to the rights, if any, under this Article XII of the owners of Senior Bonds and Parity Obligations in respect of cash, property or securities of the System received upon the exercise of any such remedy.

SECTION 1205.        Treatment of Ancillary Bond Facilities.

Any payment made under any Ancillary Bond Facility, to the owners of the Subordinated Bonds or Subordinate Obligations having the benefit of such Ancillary Bond Facility, by the appropriate obligor thereof shall be retained by such owners for their own account, and no owner of Senior Bonds or Parity Obligations is to have any right with respect to any such payment so made.

As between the obligor whose Ancillary Bond Facility, secures any Subordinated Bond and Subordinate Obligation and the owner of such Subordinated Bonds and Subordinate Obligations, any payment made on such Subordinated Bond and

V-28

Subordinate Obligation by the System which, under the subordination provisions of this Article, is required to be paid over to the owners of the Senior Bonds or Parity Obligations, shall not constitute a payment on such Subordinated Bond or Subordinate Obligation but, instead, shall be treated for all purposes of such Ancillary Bond Facility, as though such payment had not been made by the System. Until the owner of the Subordinated Bond or Subordinate Obligation so guaranteed has received from the System, or from such obligor, moneys which such owner is entitled to retain for its own account, equal in the aggregate to the principal amount of his Subordinated Bond or Subordinate Obligation and any accrued and unpaid interest thereon, such obligor shall remain liable on its Ancillary Bond Facility, and, unless otherwise provided in such Ancillary Bond Facility, shall not be subrogated to any of the rights of the owner of such Subordinated Bond or Subordinate Obligation.

SECTION 1206.     Amendments to Senior Bonds and Parity Obligations not Requiring Consent of Owners of Subordinated Bonds and Subordinate Obligations.

Unless otherwise provided therefor in the Senior Bonds and Parity Obligations, the owners of the Senior Bonds and Parity Obligations may extend, renew, modify or amend the terms of Senior Bonds or Parity Obligations or any security therefor and release, sell or exchange such security and otherwise deal freely with the System, all without notice to or consent of the owners of the Subordinated Bonds and Subordinate Obligations and without affecting the liabilities and obligations of the System or the owners of the Subordinated Bonds and Subordinate Obligations.

### ARTICLE XIII
### MISCELLANEOUS

SECTION 1301.     Defeasance.

1.     Bonds which are denominated and payable only in Dollars may be defeased pursuant to the provisions of this Section, unless otherwise provided in a Supplemental Resolution. Defeasance provisions, if any, for Bonds denominated in a Foreign Currency or Currencies may be defeased pursuant to the provisions of this Section, as affected by the provisions of the related Supplemental Resolution. The System shall pay and indemnify the Fiscal Agent against any tax, fee or other charge imposed on or assessed against the Defeasance Securities deposited pursuant to this Article or the principal and interest received in respect thereof other than any such tax, fee or other charge which by law is for the account of the Bondowners.

2.     If the System shall pay or cause to be paid, or there shall otherwise be paid, to the Owners of all Bonds then Outstanding, the principal and interest and Redemption Price, if any, to become due thereon, at the times and in the manner stipulated therein and in this Resolution, then, at the option of the System, expressed in an instrument in writing signed by an Authorized Officer of the System and delivered to the Fiscal Agent, the covenants, agreements and other obligations of the System to the Bondowners shall be discharged and satisfied. In such event, and provided that all amounts owing to the Fiscal Agent and all Beneficiaries shall have been fully paid, the Fiscal Agent shall, upon the request of the System, execute and deliver to the System such instruments as may be desirable to evidence such discharge and satisfaction and the Fiscal Agent shall pay over or deliver to the System all money, securities and funds held by it pursuant to this Resolution which are not required for the payment or redemption of Bonds not theretofore surrendered for such payment or redemption.

3.     Bonds (or any portion thereof) for the payment or redemption of which moneys shall have been set aside and shall be held in trust by the Fiscal Agent at the maturity or redemption date thereof shall be deemed to have been

paid within the meaning and with the effect expressed in paragraph 2 of this Section. Any Outstanding Bond (or portion thereof) shall, prior to the maturity or redemption date thereof, be deemed to have been paid within the meaning and with the effect expressed in paragraph 2 of this Section 1301 if (a) in case said Bond (or portion thereof) is to be redeemed on any date prior to its maturity, the System shall have given to the Fiscal Agent irrevocable instructions to give notice of redemption on said date of such Bond as provided in Article IV of this Resolution, (b) there shall have been deposited with the Fiscal Agent either moneys in an amount which shall be sufficient, or Defeasance Securities the principal of and interest on which when due and without reinvestment, except as provided below, will provide moneys which, together with the moneys, if any deposited with the Fiscal Agent at the same time, shall be sufficient to pay when due the principal or Redemption Price, if applicable, and interest due and to become due on said Bond (or portion thereof) on and prior to the redemption date or maturity date thereof, as the case may be, and (c) in the event said Bond is not by its terms subject to redemption or maturity within the next succeeding sixty (60) days, the System shall have given the Fiscal Agent irrevocable instructions to give, not less than seven (7) days after receipt of such instructions, a notice to the Owner of the Bond (or portion thereof) which is to be deemed to have been paid hereunder that the deposit required by (b) above has been made with the Fiscal Agent and that said Bond (or portion thereof) is deemed to have been paid in accordance with this Section and stating such maturity or redemption date upon which moneys are to be available for the payment of the principal or Redemption Price, if applicable, of and interest on said Bond (or portion thereof). Such notice shall be mailed, postage prepaid, to the Owner of said Bond (or portion thereof) at its last mailing address, if any, appearing on the registry books, but such mailing shall not be a condition precedent to the deemed payment of such Bond and failure so to mail, or failure by any Owner to receive, any such notice shall not affect the validity of the defeasance of such Bond (or portion thereof) as herein provided for.

Neither Defeasance Securities nor moneys deposited with the Fiscal Agent pursuant to this Section, nor principal or interest payments on any such Defeasance Securities, shall be withdrawn or used for any purpose other than, and shall be held in trust for, the payment of the principal or Redemption Price, if applicable, of and interest on said Bond (or portion thereof); *provided* that any cash received from such principal or interest payments on such Defeasance Securities deposited with the Fiscal Agent, if not then needed for such purpose, shall, to the extent practicable, be reinvested by the Fiscal Agent at the written direction of the System in Defeasance Securities maturing at the time or times and in the amount or amounts sufficient to pay when due the principal or Redemption Price, if applicable, of and interest to become due on said Bond (or portion thereof) on and prior to such redemption date or maturity date thereof, as the case may be. Any income or interest earned by, or increment to, the investment of any such moneys so deposited, in excess of the amounts required hereinabove to pay the principal of, Redemption Price, if applicable, of and interest on such Bond (or portion thereof), shall be deposited as realized by the Fiscal Agent in the Revenue Account. To the extent required by the provider of a Credit Facility, Bonds to which such Credit Facility relates shall not be deemed paid hereunder unless there shall have been delivered to the Fiscal Agent and the provider of such Credit Facility (a) a verification report of a firm of independent accountants verifying the sufficiency of the escrow created hereunder to timely make full payment of principal or Redemption Price, if applicable, of and interest on such Bond (or portion thereof) to the dates scheduled for such payment, and (b) an Opinion of Counsel to the effect that, based upon the assumptions stated in such opinion, such Bonds **are** deemed to be paid under this Section 1301.

4.     For purposes of determining whether an Adjustable Rate Bond (or any portion thereof) shall be

Confidential

UBS-ERS_Ultra_Vires-0087980

deemed to have been paid prior to the maturity or redemption date thereof, as the case may be, by the deposit of moneys, or Defeasance Securities and moneys, if any, in accordance with the second sentence of paragraph 3 of this Section, the interest to come due on such Adjustable Rate Bond (or portion thereof) on or prior to the maturity date or redemption date thereof, as the case may be, shall be calculated at the Maximum Interest Rate permitted by the terms thereof; *provided, however,* that if on any date, as a result of such Adjustable Rate Bond (or portion thereof) having borne interest at less than such Maximum Interest Rate for any period, the total amount of moneys and Defeasance Securities on deposit with the Fiscal Agent for the payment of interest on such Adjustable Rate Bond (or portion thereof) is in excess of the total amount which would have been required to be deposited with the Fiscal Agent on such date in respect of such Adjustable Rate Bond (or portion thereof) in order to satisfy the second sentence of paragraph 3 of this Section, the Fiscal Agent shall, if requested by the System, pay the amount of such excess to the System free and clear of any trust, pledge, lien, encumbrance or security interest created hereby.

5.      An Option Bond (or any portion thereof) shall be deemed to have been paid in accordance with the second sentence of paragraph 3 of this Section only if, in addition to satisfying the requirements of clauses (a) and (c) of such sentence, there shall have been deposited with the Fiscal Agent moneys in an amount which shall be sufficient to pay when due the maximum amount of principal of and premium, if any, and interest on such Bond (or portion thereof) which could become payable to the Owner of such Bond upon the exercise of any options provided to said Owner; *provided, however,* that if, at the time a deposit is made with the Fiscal Agent pursuant to paragraph 3 of this Section, the options originally exercisable by said Owner are no longer exercisable, such Bond shall not be considered an Option Bond for purposes of this paragraph 5. If any portion of the moneys deposited with the Fiscal Agent for the payment of the principal of and premium, if any, and interest on said Option Bond (or portion thereof) is not required for such purpose, the Fiscal Agent shall, if requested by the System in writing, pay the amount of such excess to the System free and clear of any trust, pledge, lien, encumbrance or security interest created hereby.

6.      Anything in this Resolution to the contrary notwithstanding, but subject to any applicable law to the contrary, any moneys held by the Fiscal Agent in trust for the payment of the principal of or premium, if any, or interest on any Bond which remain unclaimed for two (2) years after the date when such principal, premium, if any, or interest, as the case may be, has become due and payable, either at their stated maturity dates or by call for earlier redemption or otherwise, shall, at the written request of the System, be repaid by the Fiscal Agent to the System, as its absolute property and free from trust, and the Fiscal Agent shall thereupon be released and discharged with respect thereto and the Bondowner shall look only to the System for the payment of such principal, premium, if any, or interest, as the case may be; *provided, however,* that before being required to make any such payment to the System, the Fiscal Agent shall, at the expense of the System, cause to be published once in a newspaper or financial journal, customarily published at least once a day for at least five (5) days (other than legal holidays) in each calendar week, printed in the English language and of general circulation in the Borough of Manhattan, City and State of New York, a notice that said moneys remain unclaimed and that, after a date named in said notice, which date shall be not less than thirty (30) days after the date of the publication of such notice, the balance of such moneys then unclaimed will be returned to the System.

SECTION 1302.      Evidence of Signatures of Bondowners and Owners of Bonds.

1.      Any request, consent, revocation of consent or other instrument which this Resolution may require

or permit to be signed and executed by the Bondowners may be in one or more instruments of similar tenor, and shall be signed or executed by such Bondowners in person or by their attorneys appointed in writing. The fact and date of the execution by any Bondowner or his attorney duly authorized in writing of such instruments may be proved by a guarantee of the signature thereon by a bank or trust company or by the certificate of any notary public or other officer authorized to take acknowledgments of deeds, that the person signing such request or other instrument acknowledged to him the execution thereof, or by an affidavit of a witness of such execution, duly sworn to before such notary public or other officer. Where such execution is by an officer of a corporation or association or a member of a partnership, or on behalf of such a corporation, association or partnership, such signature guarantee, certificate or affidavit shall constitute proof of his authority.

2.      The ownership of Bonds and the amount, numbers and other identification, and date of holding the same shall be proved by the registry books.

3.      Any request or consent by the Owner of any Bond shall bind all future Owners of such Bond in respect of anything done or suffered to be done by the System or the Fiscal Agent in accordance therewith.

SECTION 1303.      Moneys Held for Particular Bonds. The amounts held by the Fiscal Agent for the payment of the interest, principal or Redemption Price due on any date with respect to particular Bonds shall, on and after such date and pending such payment, be set aside on its books and held in trust by it for the Owners of such Bonds.

SECTION 1304.      Preservation and Inspection of Documents. All documents received by the Fiscal Agent under the provisions of this Resolution shall be retained in its possession and shall be subject at all reasonable times to the inspection of the System, and any Bondowner or other Beneficiary and their agents and their representatives any of whom may make copies thereof.

SECTION 1305.      Parties Interested Herein. Nothing in this Resolution expressed or implied is intended or shall be construed to confer upon, or to give to, any Person, other than the System, the Fiscal Agent, the Beneficiaries, and the Owners of the Bonds, any right, remedy or claim under or by reason of this Resolution or any covenant, condition or stipulation thereof; and all the covenants, stipulations, promises and agreements in this Resolution contained by and on behalf of the System shall be for the sole and exclusive benefit of the System, the Fiscal Agent, the Beneficiaries, and the Owners of the Bonds.

SECTION 1306.      No Personal Liability. Neither the members of the System nor any other Person executing the Bonds or an Ancillary Bond Facility shall be subject to any personal liability or accountability by reason of the issuance or execution and delivery thereof.

SECTION 1307.      Successors and Assigns. Whenever in this Resolution the System is named or referred to, it shall be deemed to include its successors and assigns and all the covenants and agreements in this Resolution contained by or on behalf of the System shall bind and inure to the benefit of its successors and assigns whether so expressed or not.

SECTION 1308.      Severability of Invalid Provisions. If any one or more of the covenants or agreements provided in this Resolution on the part of the System or the Fiscal Agent to be performed should be contrary to law, then such covenant or covenants, agreement or agreements, shall be deemed severable from the remaining covenants and agreements, and shall in no way affect the validity of the other provisions, of this

Confidential

UBS-ERS_Ultra_Vires-0087981

Resolution.

SECTION 1309.    Headings.  The section headings contained herein are for reference purposes only and will not affect in any way the meaning or interpretation of this Resolution.

SECTION 1310.    Conflict.  All resolutions or parts of resolutions or other proceedings of the System in conflict herewith be and the same are repealed insofar as such conflict exists.

SECTION 1311.    Governing Law.  This Resolution shall be governed by, and construed and enforced in accordance with, the laws of the Commonwealth; provided, however, that the formalities leading to the creation of the trusts contained in this Resolution shall be governed by the laws of the State of New York and, provided further, to the maximum extent permitted by applicable law, the rights, duties, privileges and immunities of the Fiscal Agent, any paying agent and Bond Registrar, shall be governed by the law of the jurisdiction in which its Corporate Trust Office is located.

SECTION 1312.    Notices.  Any notice, demand, direction, request or other instrument authorized or required by this Resolution to be given to or filed with the System or the Fiscal Agent shall be deemed to have been sufficiently given or filed for all purposes of this Resolution if and when delivered:

To the System: Employees Retirement System of the Government of the Commonwealth of Puerto Rico
P.O. Box 42003
San Juan, Puerto Rico 00940

437 Ponce de León Avenue
Stop 32½
Hato Rey, Puerto Rico 00918

Telephone:(787) 754-4545
Fax:        (787) 250-7251
Attn.:     Administrator

To the Fiscal Agent:   The Bank of New York
101 Barclay Street
Floor 7W
New York, New York 10286

Telephone:(212) 815-6955
Fax:        (212) 815-5595 or 5596
Attn.:     Northern Municipals Department

The System or the Fiscal Agent by notice to the other may designate additional or different addresses for subsequent notices or communications.  Notwithstanding the foregoing, any notice, demand, request or other instrument to be given or filed with the Fiscal Agent shall be effective only upon receipt by the Fiscal Agent.

The Fiscal Agent shall have the right, but shall not be required, to rely upon and comply with instructions and directions sent by e-mail, facsimile and other similar unsecured electronic methods by persons believed by the Fiscal Agent to be authorized to give instructions and directions on behalf of the System.  The Fiscal Agent shall have no duty or obligation to verify or confirm that the person who sent such instructions or directions is, in fact, a person authorized to give instructions or directions on behalf of the System; and the Fiscal Agent shall have no liability for any losses, liabilities, costs or expenses incurred or sustained by the System as a result of such reliance upon or compliance with such instructions or directions.  The System agrees to assume all risks arising out of the use of such electronic methods to submit instructions and directions to the Fiscal Agent, including without limitation the risk of the Fiscal Agent acting on unauthorized instructions, and the

risk of interception and misuse by third parties.

SECTION 1313.    Jury Trial Waiver.  EACH PARTY HERETO, AND EACH BONDOWNER AND BENEFICIARY BY ITS ACCEPTANCE OF THE BENEFITS OF THIS RESOLUTION, HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS RESOLUTION.

SECTION 1314.    Effective Date.  This Resolution shall take effect immediately upon its adoption.

Confidential

UBS-ERS_Ultra_Vires-0087982

**EXHIBIT A**

**SECURITY AGREEMENT**

This SECURITY AGREEMENT, dated as of _____, 2008, is by and between the Employees Retirement System of the Government of the Commonwealth of Puerto Rico (the "Debtor") and Owners (this and other capitalized terms used herein and not otherwise defined herein shall have the meanings given to them in the Resolution referenced below) from time to time of the Pension Funding Bonds of the Debtor (the "Pension Funding Bonds") issued from time to time pursuant to the provisions of the Debtor's Resolution No. ___, adopted on _____, 2008, as amended and supplemented from time to time (the "Resolution"), and other Beneficiaries, which Owners and Beneficiaries are represented for purposes of this Security Agreement by The Bank of New York, as fiscal agent under the Resolution (the "Secured Party"). Capitalized words not defined herein shall have the meaning ascribed to them in the Resolution.

In order to provide security for the Debtor's payment of principal of, premium (if any) and interest on its Pension Funding Bonds and payment to Beneficiaries and the Fiscal Agent in accordance with their respective terms and the terms of the Resolution, Debtor hereby grants to the Secured Party a security interest in all Revenues; all right, title and interest of the System in and to Revenues, and all rights to receive the same; the Funds, Accounts, and Subaccounts held by the Fiscal Agent, and moneys and securities and, in the case of the Debt Service Reserve Account, Reserve Account Cash Equivalents, from time to time held by the Fiscal Agent under the terms of this Resolution, subject to the application thereof as provided in the Resolution; any and all other rights and real or personal property of every kind and nature from time to time hereafter pledged and assigned by the System to the Fiscal Agent as and for additional security for the Bonds and Parity Obligations; and, any and all cash and non-cash proceeds, products, offspring, rents and profits from any of the Pledged Property mentioned described herein, including, without limitation, those from the sale, exchange, transfer, collection, loss, damage, disposition, substitution or replacement of any of the foregoing.

Remedies for failure of the Debtor to make timely payment of principal of, premium (if any) and interest on the Pension Funding Bonds or failure of the Debtor to fulfill its other covenants contained in the Resolution for the benefit of the Owners of the Pension Funding Bonds are as set forth in the Resolution.

The Debtor shall cause UCC financing statements and continuation statements to be filed, as appropriate, and the Secured Party shall not be responsible for any UCC filings.

**EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO**

By : _____
             Name and Title:

THE BANK OF NEW YORK, as Fiscal Agent under the Resolution

By : _____
             Name and Title:

V-32

    UBS-ERS_Ultra_Vires-0087983

*EXHIBIT B*

**DEFINITIONS**

*The following terms shall, for all purposes of this Resolution, have the following meanings, unless the context shall clearly indicate some other meaning:*

**Administrator** shall mean the Administrator of the System pursuant to the Act.

**Account or Accounts** shall mean any account or accounts, including, without limitation, bank, deposit or securities accounts, as the case may be, established and created pursuant to this Resolution, but does not include any escrow or other fund or account established or created pursuant to Section 1301.

**Accreted Amount** shall mean, on any date and with respect to any particular Capital Appreciation Bond or Convertible Capital Appreciation Bond, the initial principal amount at issuance of such Bond plus accretion of principal, based on compounding on each Accretion Date to the date of maturity thereof (with respect to a Capital Appreciation Bond) or to the Current Interest Commencement Date (with respect to a Convertible Capital Appreciation Bond) at the same interest rate as shall produce a compounded amount on such date of maturity or Current Interest Commencement Date, as applicable, equal to the principal amount thereof on such date; *provided*, that Accreted Amount on any day which is not an Accretion Date shall be determined on the assumption that the Accreted Amount accrues in equal daily amounts between Accretion Dates.

**Accretion Date** shall mean the date on which interest on a Capital Appreciation Bond or Convertible Capital Appreciation Bond is compounded and added to principal in the form of Accreted Amount, as set forth in the related Supplemental Resolution.

**Accrued Payment Obligation** shall mean, with respect to any Class of Bonds and the related Parity Obligations or Subordinate Obligations, and for any Bond Year, as of any date, the aggregate of the Principal Installments of and interest on such Bonds, and the principal and interest components of such related Parity Obligations or Subordinate Obligations, due and unpaid during such Bond Year (or, in the case of Debt Service Account deposits, for Bonds with scheduled payments due more frequently than semi-annually, the current Bond Year and the first three months of the following Bond Year); *provided* that in the case of Adjustable Rate Bonds or Bonds other than fixed rate Bonds denominated in U.S. dollars, the interest shall be based on the Assumed Interest Rate.  For purposes of this definition, principal, interest or other obligations for the payment for which the Fiscal Agent shall hold in escrow sufficient funds in a segregated account (including the Capitalized Interest Account and any escrow for the payment of Bonds that are defeased as provided in this Resolution) shall not be taken into consideration.

**Act** shall mean Act No. 447 of the Legislative Assembly of Puerto Rico, approved May 15, 1951, as amended and supplemented.

**Adjustable Rate** shall mean a variable, adjustable, convertible or similar interest rate or rates to be borne by a Series of Bonds or any one or more maturities within a Series of Bonds, for which the method of computing such variable interest rate is specified in the Supplemental Resolution authorizing such Bonds; *provided*, that the related Supplemental Resolution shall specify (i) whether a Qualified Hedge is to be applicable to such Adjustable Rate Bonds and, if not, to the extent not so applicable, a Maximum Interest Rate, and (ii) the

method or methods for determining the Adjustable Rate and the frequency of change thereof; and *provided further*, that the method or methods for determining the Adjustable Rate may include the selection of such rate by an indexing agent or remarketing agent as provided in an agreement between the System and such agent, the utilization of an index or indices as described in the related Supplemental Resolution, the utilization of an auction as described in the related Supplemental Resolution, or such other standard or standards set forth by the System in the related Supplemental Resolution or any combination of the foregoing; and *provided further*, that the Adjustable Rate may never exceed any Maximum Interest Rate related thereto or, if none, the Legal Maximum Interest Rate.

**Adjustable Rate Bond** shall mean any Bond which bears an Adjustable Rate, *provided* that a Bond the interest rate on which shall have been fixed for the remainder of the term thereof shall no longer be deemed to bear interest at an Adjustable Rate.

**Amortized Value**, when used with respect to Investment Obligations purchased at a premium above or a discount below par, shall mean the value at any given date, as calculated by the Fiscal Agent, obtained by dividing the total premium or discount at which such Investment Obligations were purchased by the number of interest payment dates remaining to maturity on such Investment Obligations after such purchase and by multiplying the amount so calculated by the number of interest payment dates having passed since the date of such purchase; and (i) in the case of Investment Obligations purchased at a premium, by deducting the product thus obtained from the purchase price, and (ii) in the case of Investment Obligations purchased at a discount, by adding the product thus obtained to the purchase price.

**Ancillary Bond Facility** shall mean each Credit Facility, each Liquidity Facility, each Qualified Hedge, and each Standby Purchase Agreement.

**Ancillary Facility Providers** shall mean, collectively, each Credit Facility Provider, each Liquidity Facility Provider, each Qualified Hedge Provider, and each Standby Purchase Facility Provider.

**Assumed Interest Rate** shall mean, for Adjustable Rate Bonds, (i) a fixed rate payable by the System under a related Qualified Hedge plus the fixed component of interest on the related Bonds, if any, not included in the payments to be made under the Qualified Hedge by the Qualified Hedge Provider, (ii) for any Qualified Hedge that shall provide for payments from the System that result in a capped rate on the Adjustable Rate Bonds, such capped rate, or (iii) for any Adjustable Rate Bonds that shall not be the subject of a Qualified Hedge, the lesser of the Maximum Interest Rate established therefor and the Legal Maximum Interest Rate.  The Supplemental Resolution relating to Bonds other than fixed rate Bonds denominated in U.S. dollars may include other provisions for determining the Assumed Interest Rate.

**Authorized Officer** shall mean (i) in the case of the System, the Administrator, and when used with reference to any act or document, any other person authorized by resolution of the System to perform such act or sign such document (the Fiscal Agent may request that the System deliver an officers' certificate setting forth the names of individuals and/or titles of officers authorized at such time to take specified actions pursuant to this Resolution), and (ii) in the case of the Fiscal Agent, any officer assigned to the Northern Municipals Department (or any successor division or unit) of the Fiscal Agent located at the Corporate Trust Office, or such other address as the Fiscal Agent may designate from time to time by notice to the

V-33

UBS-ERS_Ultra_Vires-0087984

System, who shall have direct responsibility for the administration of this Resolution, and for the purposes of the thirteenth sentence of Section 802 of this Resolution shall also include any other officer of the Fiscal Agent to whom any matter is referred because of such officer's knowledge of and familiarity with the particular subject.

**Beneficiaries** shall mean (i) the Owners of Bonds Outstanding, (ii) Credit Facility Providers and Liquidity Facility Providers as to which there are Parity Obligations or Subordinate Obligations outstanding, and (iii) Qualified Hedge Providers as to which there are Qualified Hedges outstanding.

**Bond** or **Bonds** shall mean the initial Series of Bonds and any additional Bonds authorized to be issued on a parity therewith pursuant to Section 202 or 708.

**Bondowner** shall mean any person who shall be the registered owner of any Outstanding Bond or Bonds.

**Bond Payment Date** shall mean each date on which Principal Installments of and/or interest on Bonds are due and payable by the System.

**Bond Year** shall mean a twelve-month period commencing on the second day of July in any calendar year and ending on the first day of July in the immediately succeeding calendar year.

**Business Day** shall mean any day other than (i) a Saturday or Sunday, or (ii) a day on which banking institutions in San Juan, Puerto Rico, New York, New York, or any city in which the principal office of the Fiscal Agent, Ancillary Facility Providers (if any), the Remarketing Agent (if any), the Tender Agent (if any), or the Auction Agent (if any) is located are authorized or required by law or executive order to remain closed.

**Capital Appreciation Bonds** shall mean the Bonds of any Series so designated in a Supplemental Resolution; *provided, however,* that the term "Capital Appreciation Bonds" shall only be used with respect to Bonds the interest on which is payable only at maturity or earlier redemption or acceleration of maturity, in amounts determined by reference to the Accreted Amount of each Bond.

**Capitalized Interest Account** shall mean the Capitalized Interest Account established pursuant to Section 502.

**Class** shall mean the designation of Bonds by whether they are Senior Bonds or Subordinated Bonds.

**Class Priority** shall mean, at any time that there shall be Subordinated Bonds Outstanding, and with respect to funding of Debt Service Accounts and Debt Service Reserve Accounts pursuant to Section 504, and payment of Bonds upon an Event of Default under Article XI, funding or payment of the total amount then owing, as applicable, in the order of Senior Bonds and Parity Obligations first until full funding or payment thereof, followed by Subordinated Bonds and Subordinate Obligations of the highest payment priority next until full funding or payment thereof.

**Code** shall mean the United States Internal Revenue Code of 1986, as amended.

**Commonwealth** shall mean the Commonwealth of Puerto Rico.

**Convertible Capital Appreciation Bonds** shall mean Bonds which, on or prior to the Current Interest Commencement Date, have the characteristics of Capital Appreciation Bonds and, after the Current Interest Commencement Date, have the characteristics of Current Interest Bonds, in each case with such further terms and conditions as may be designated therefor in the Supplemental Resolution authorizing such Bonds.

**Corporate Trust Office** shall mean the office of the Fiscal Agent at which at any particular time its corporate trust business shall be principally administered, which office at the date of the adoption of this Resolution is located at 101 Barclay Street, 7W, New York, New York 10286, Attention: Northern Municipals Department, or such other address as the Fiscal Agent may designate from time to time by notice to the System, or the principal corporate trust office of any successor Fiscal Agent (or such other address as such successor Fiscal Agent may designate from time to time by notice to the System).

**Covered Payroll** shall mean the payroll of all employees of an Employer, other than its irregular and transitory employees, and other than the employees who are covered by one of the Commonwealth's other retirement systems (it being understood that the payroll of employees covered by the System's defined contribution plan constitutes Covered Payroll).

**Credit Facility** shall mean each irrevocable letter of credit, bond insurance policy, surety bond, loan agreement, or other agreement, facility or insurance or guaranty arrangement issued or extended by a bank, a trust company, a national banking association, an organization subject to registration with the Board of Governors of the Federal Reserve System under the Bank Holding Company Act of 1956 or any successor provisions of law, a federal branch pursuant to the International Banking Act of 1978 or any successor provisions of law, a savings bank, a savings and loan association, a Federal Home Loan Bank, a corporation, an insurance company or association chartered or organized under the laws of any state of the United States of America, the Government National Mortgage Association or any successor thereto, Fannie Mae, the Federal Home Loan Mortgage Corporation or any successor thereto, or any other federal or state agency or instrumentality approved by the System, which secures the payment of any Bond, or pursuant to which the System is entitled to obtain moneys to pay, in the Currency in which the Bonds of such Series are payable, the principal or Redemption Price of Bonds (or any related Qualified Hedges) due in accordance with their respective terms plus accrued interest thereon to the date of payment thereof in accordance herewith and with the Supplemental Resolution authorizing such Bonds, whether or not the System is in default under this Resolution; *provided,* that use of a Credit Facility shall not result, at the time of delivery of the Credit Facility, in a reduction in the Rating of any Bonds Outstanding; and *provided further,* that a substitute Credit Facility may be obtained from time to time (i) which shall contain the same material terms as set forth in the Credit Facility for which substitution is made, and (ii) will not, in and of itself, result in a Rating of the related Bonds lower than those which then prevailed.

**Credit Facility Provider** shall mean the Person who has executed a Credit Facility with the System, or otherwise has provided a Credit Facility at the request of the System, for the benefit of any of the Bonds.

**Currency** shall mean Dollars or Foreign Currency or Currency Unit.

**Currency Unit** shall mean a composite currency or currency unit the value of which is determined by reference to the value of the currencies of any group of countries.

**Current Interest Bonds** shall mean Bonds that bear interest which is not compounded but is payable on a current basis on established dates prior to maturity.

Confidential

UBS-ERS_Ultra_Vires-0087985

**Current Interest Commencement Date** shall mean the date established prior to the issuance of each Series of Convertible Capital Appreciation Bonds, at which time the periodic compounding of interest ceases and on and after which date interest is payable currently on the Accreted Amounts on the next ensuing interest payment dates.

**Debt Service Account** shall mean the Account by that name established by Section 502.

**Debt Service Reserve Account** shall mean the Account by that name established by Section 502.

**Debt Service Reserve Requirement** shall mean, as of any date of calculation, fifty percent (50%) of the average of the Accrued Payment Obligation as of the first Business Day of each Bond Year for each of the following five (5) Bond Years.

**Defeasance Obligations** shall mean any of the following which are not callable or redeemable at the option of the issuer thereof, if and to the extent the same are at the time legal for the investment of the System's funds:

(i)       Government Obligations;

(ii)      Defeased Municipal Obligations;

(iii)     certificates, depositary receipts or other instruments which evidence a direct ownership interest in obligations described in clauses (i) or (ii) above or in any specific interest or principal payments due in respect thereof; *provided, however,* that the custodian of such obligations or specific interest or principal payments shall be a bank or trust company organized under the laws of the United States of America, of the Commonwealth, or of any state or territory of the United States of America or of the District of Columbia, with a combined capital stock, surplus and undivided profits of at least $50,000,000 or the custodian is appointed by or on behalf of the United States of America; and *provided further, however,* that except as may be otherwise required by law, such custodian shall be obligated to pay to the holders of such certificates, depositary receipts or other instruments the full amount received by such custodian in respect of such obligations or specific payments and shall not be permitted to make any deduction therefrom; or

(iv)      a share or interest in a mutual fund, partnership or other fund wholly comprised of obligations described in clauses (i) through (v) above.

**Defeased Municipal Obligations** shall mean any bonds or other obligations of any state or territory of the United States of America, of the Commonwealth, or of any agency, instrumentality or local governmental unit of any such state or territory or Commonwealth which are not callable at the option of the obligor prior to maturity or as to which irrevocable instructions have been given by the obligor to call on the date specified in the notice; and

(i)       which are rated, based on an irrevocable escrow account or fund (the "escrow"), in the highest Rating category of any Rating Agency; or

(ii)      (a) which are fully secured as to principal, interest and redemption premium, if any, by an escrow consisting only of cash or Government Obligations, which escrow may be applied only to the payment of such principal and interest and redemption premium, if any, on such bonds or other obligations on the maturity date or dates thereof or the specified redemption date or dates pursuant to such irrevocable instructions, as appropriate, and (b) which escrow is sufficient, without reinvestment, as verified by a nationally recognized independent certified public accountant, or other nationally recognized verification agent acceptable to the Fiscal Agent, to pay principal of and interest and redemption premium, if any, on the bonds or other obligations described in this paragraph on the maturity date or dates specified in the irrevocable instructions referred to above, as appropriate.

**Dollar** or $ shall mean a dollar or other equivalent unit in such coin or currency of the United States as at the time of payment is legal tender for the payment of public and private debts.

**Employers** shall mean, pursuant to the Act, the government of Puerto Rico, or any Public Enterprise, or municipality, but shall exclude, however, those subsidiary enterprises of government instrumentalities whose employees, in the judgment of the Board of Trustees of the System, may not have a clear relationship of employee and employer with regard to the Commonwealth.

**Employers' Contributions** shall mean the contributions paid from and after the date hereof that are made by the Employers and any assets in lieu thereof or derived thereunder which are payable to the System pursuant to Sections 2-116, 3-105 and 4-113 of the Act.

**Employers' Contribution Rate** shall mean the rate of contribution of each Employer to the System, initially 9.275% of the Covered Payroll.

**Event of Default** shall mean an event described in paragraph 1 of Section 1101.

**Financing Costs** shall mean, with respect to any Bonds, all costs of issuance and any other fees, discounts, expenses and costs related to issuing, securing and marketing the Bonds.

**First Supplemental Resolution** shall mean the First Supplemental Pension Funding Bond Resolution, adopted by the System on [January 24, 2008], in connection with the issuance of the Series A Bonds.

**Fiscal Agent** shall mean the bank, trust company or national banking association appointed pursuant to Section 801, and its successor or successors and any other bank, trust company or national banking association which may at any time be substituted in its place pursuant to the provisions of this Resolution.

**Fiscal Year** shall mean the fiscal year of the Commonwealth Government beginning July 1 of each calendar year.

**Fitch** shall mean Fitch Ratings, and its successors and assigns.

**Fixed Tender Bond** shall mean any Bond, not constituting an Adjustable Rate Bond, which by its terms must be tendered by the Owner thereof for purchase by or for the account of the System prior to the stated maturity thereof.

V-35

UBS-ERS_Ultra_Vires-0087986

**Foreign Currency** shall mean a currency issued by the government of any country other than the United States or a composite currency or currency unit the value of which is determined by reference to the values of the currencies of any group of countries.

**Fund** or **Funds** shall mean any fund or funds established and created pursuant to this Resolution, but does not include any escrow or other fund or account established or created pursuant to Section 1301.

**GDB** shall mean Government Development Bank for Puerto Rico and its successors and permitted assigns.

**General Reserve Account** shall mean the Account by that name established by Section 509.

**Government Obligations** shall mean direct obligations of, or obligations the principal of and the interest on which are unconditionally guaranteed by, the United States of America and entitled to the full faith and credit thereof.

**Interest Subaccount** shall mean the Interest Subaccount established in the Debt Service Account by Section 502.

**Investment Obligations** shall mean and include any of the following securities, if and to the extent the same are at the time legal for investment of the System's funds created by this Resolution for the benefit of the Bondowners:

(i) Defeasance Obligations;

(ii) Defeased Municipal Obligations;

(iii) public housing bonds issued by public agencies or municipalities and fully secured as to the payment of both principal and interest by a pledge of annual contributions under an annual contributions contract or contracts with the United States of America; temporary notes, preliminary loan notes or project notes issued by public agencies or municipalities, in each case fully secured as to the payment of both principal and interest by a requisition or payment agreement with the United States of America; or obligations issued by any state or territory or any public agencies or municipalities which are obligations rated in the highest Rating category by a Rating Agency;

(iv) direct and general obligations of any state or territory of the United States to the payment of the principal of and interest on which the full faith and credit of such jurisdiction is pledged which obligations are rated in either of the two highest Rating categories by a Rating Agency;

(v) direct obligations of, or obligations guaranteed as to timely payment of principal and interest by, the Federal National Mortgage Association, the Federal Home Loan Mortgage Corporation, or the Federal Farm Credit System;

(vi) prime commercial paper of a corporation incorporated under the laws of any state or territory of the United States of America, rated "P-1", "A-1" or "F1" by Moody's, Standard & Poor's or Fitch, respectively;

(vii) money market shares of a diversified open-end management investment company

as defined in the Investment Company Act of 1940, which company has been rated "A" or better by Moody's, Standard & Poor's or Fitch or money market accounts of the Fiscal Agent or any bank or trust company organized under the laws of the United States or any state thereof, which has a combined capital and surplus of not less than $50,000,000;

(viii) deposits evidenced by certificates of deposit issued by banks (which may include the Fiscal Agent) that are members of the Federal Deposit Insurance Corporation, provided that such time deposits are fully secured by obligations described in clause (i) or (ii) above, which such obligations at all times have a market value (exclusive of accrued interest) at least equal to the amount of such bank deposits so secured, including interest;

(ix) repurchase agreements relating to securities of the type specified in clauses (i) and (ii) above, *provided* that such securities in an amount at least equal to the face value of such agreements shall be delivered as security for such agreements to (or for) the account of the Fiscal Agent to be held therein during the term of the agreements;

(x) investment agreements, secured or unsecured, with any Person whose debt securities are rated at least "AA" (or equivalent rating of short-term obligations if the investment is for a period not exceeding one year) by Standard & Poor's or equivalent Rating by Moody's, Fitch or other Rating Agency; and

(xi) any other obligations conforming to System guidelines for investment as provided by the System to the Fiscal Agent from time to time, so long as such obligations are rated at least in the two highest Rating Categories of each of the Rating Agencies and are approved by the applicable Credit Facility Provider.

**Legal Maximum Interest Rate** shall mean the highest rate of interest or highest true interest cost that by law may be borne by any Bonds; at present, 12% per annum.

**Liquidity Facility** shall mean an irrevocable letter of credit, surety bond, loan agreement, Standby Purchase Agreement, line of credit or other agreement or arrangement issued or extended by a bank, a trust company, a national banking association, an organization subject to registration with the Board of Governors of the Federal Reserve System under the Bank Holding Company Act of 1956 or any successor provisions of law, a federal branch pursuant to the International Banking Act of 1978 or any successor provisions of law, a savings bank, a savings and loan association, a Federal Home Loan Bank, an insurance company or association chartered or organized under the laws of the Commonwealth or any state of the United States of America, the Government National Mortgage Association or any successor thereto, Federal National Mortgage Association or any successor thereto, the Federal Home Loan Mortgage Corporation or any successor thereto, or any other government sponsored enterprise or federal, state or Commonwealth agency or instrumentality approved by the System, pursuant to which the System is entitled to obtain moneys upon the terms and conditions contained therein for the purchase or redemption of Bonds tendered for purchase or redemption in accordance with the terms hereof and of the Supplemental Resolution authorizing such Bonds; *provided*, that the use of the Liquidity Facility shall not result, at the time it is delivered, in a reduction in the Rating of any Bonds Outstanding; and *provided further* that a substitute Liquidity Facility may be obtained from time to time (i) which shall contain the same material terms as set forth in the Liquidity Facility for which

Confidential

UBS-ERS_Ultra_Vires-0087987

substitution is being made, and (ii) will not, in and of itself, result in a Rating of any Bonds Outstanding lower than those which then prevailed.

**Liquidity Facility Provider** shall mean the Person who has executed a Liquidity Facility with the System, or otherwise has provided a Liquidity Facility at the request of the System, for the benefit of any of the Bonds.

**Maturity Amount** shall mean the Accreted Amount of any Capital Appreciation Bond or Convertible Capital Appreciation Bond due as of the stated maturity thereof.

**Maximum Interest Rate** shall mean, with respect to any particular Adjustable Rate Bond, a numerical rate of interest, which shall be set forth in the Supplemental Resolution authorizing such Bond, that as a matter of contract shall be the maximum rate at which such Bond may bear interest at any time; provided, that the Maximum Interest Rate may not exceed the Legal Maximum Interest Rate.

**Moody's** shall mean Moody's Investors Service, and its successors and assigns.

**Operating Expenses** shall mean the reasonable out-of-pocket expenses of the System related to the issuance of the Bonds (including, without limitation, the out-of pocket costs of preparation of accounting and other reports, costs of maintenance of the ratings on Bonds, and insurance premiums, deductibles and retention payments,), legal fees, fees and expenses incurred for professional consultants and fiduciaries, and regularly scheduled fees payable under each Credit Facility and Liquidity Facility. Whenever a requisition for "Operating Expenses" from the Revenue Account shall be made pursuant to Section 505, a certificate of an Authorized Officer of the System, stating that such amount constitutes "Operating Expense" as defined in this Resolution, shall be delivered to the Fiscal Agent. Operating Expenses shall not include those expenses owed to the Fiscal Agent under Section 804.

**Opinion of Counsel** shall mean an opinion signed by an attorney or firm of attorneys of recognized standing (who may be counsel to the System) of recognized standing in the field of law relating to municipal bonds selected by the System and satisfactory to the Fiscal Agent.

**Option Bond** shall mean any Bond which by its terms may be tendered by and at the option of the Owner thereof for redemption or purchase by (or for the account of) the System prior to the stated maturity thereof, or the maturity of which may be extended by and at the option of the Owner thereof.

**Original Principal Amount** shall mean the original principal amount of any Capital Appreciation Bond or Convertible Capital Appreciation Bond at the date of original issuance, as stated in the Supplemental Resolution relating to such bonds.

**Outstanding**, when used with reference to the Bonds as a whole or the Bonds of a Series, shall mean, as of any date, the Bonds or Bonds of such Series, as the case may be, theretofore or thereupon being delivered and issued under the provisions of this Resolution, except:

(i)    any Bonds canceled by or surrendered for cancellation to the Fiscal Agent at or prior to such date;

(ii)    Bonds deemed to have been paid as provided in Section 1301;

(iii)    Bonds in lieu of or in substitution for which other Bonds shall have been authenticated and delivered pursuant to Article III or Section 1007;

(iv)    Option Bonds tendered or deemed tendered in accordance with the provisions of the Supplemental Resolution authorizing such Bonds on the applicable tender date, if the purchase price thereof and interest thereon through such date shall have been paid or amounts are available and set aside for such payment as provided in such Supplemental Resolution, except to the extent such tendered Option Bonds are held by the System or a Credit Facility Provider or a Liquidity Facility Provider and/or thereafter may be resold pursuant to the terms thereof and of such Supplemental Resolution; and

(v)    as may be provided with respect to such Bonds by the Supplemental Resolution authorizing such Bonds;

provided, however, that in determining whether the Owners of the requisite principal amount of Outstanding Bonds have given any request, demand, authorization, direction, notice, consent or waiver hereunder, (i) Bonds owned by the System shall be disregarded and deemed not to be Outstanding, except that, in determining whether the Fiscal Agent shall be protected in relying upon any such request, demand, authorization, direction, notice, consent or waiver, only Bonds which an Authorized Officer of the Fiscal Agent knows to be so owned shall be so disregarded. Bonds so owned which have been pledged in good faith may be regarded as Outstanding if the pledgee establishes to the satisfaction of the Fiscal Agent the pledgee's right so to act with respect to such Bonds and that the pledgee is not the System, and (ii) the principal amount of a Convertible Capital Appreciation Bond or a Capital Appreciation Bond that shall be deemed Outstanding for such purposes shall be the Accreted Amount thereof except as otherwise provided in this Resolution.

**Owner** or **Owner of Bonds** shall mean each Bondowner.

**Parity Hedge Obligations** shall mean, as allocated to a Series of Bonds pursuant to the terms of the related Supplemental Resolution, fixed and scheduled payments by the System under Qualified Hedges.  Parity Hedge Obligations shall not include, among other things, any costs, indemnities, termination payments or similar non-recurring amounts, or any amortization of such non-recurring amounts.

**Parity Obligations** shall mean, collectively, all Parity Reimbursement Obligations and Parity Hedge Obligations.

**Parity Reimbursement Obligations** shall mean, as allocated to a Series of Bonds pursuant to the terms of the related Supplemental Resolution, fixed and scheduled payments due from the System to any Credit Facility Provider or Liquidity Facility Provider, as provided by Section 206, whether such reimbursements or payments are made to the Credit Facility Provider or Liquidity Facility Provider as a Bondowner, as a subrogee or otherwise.  Parity Reimbursement Obligations shall include, among other things, reimbursements of direct-pay letters of credit to be drawn on each principal and/or interest payment date.

V-37

**Person** or **Persons** shall mean an individual, partnership, limited liability partnership, corporation, limited liability corporation, trust or unincorporated organization and a government or agency or political subdivision or branch thereof.

**Pledged Property** shall mean the following, collectively (but without duplication), except as otherwise may be provided with respect to a Series of Bonds by the Supplemental Resolution authorizing such Bonds:

    1.      All Revenues.

    2.      All right, title and interest of the System in and to Revenues, and all rights to receive the same.

    3.      The Funds, Accounts, and Subaccounts held by the Fiscal Agent, and moneys and securities and, in the case of the Debt Service Reserve Account, Reserve Account Cash Equivalents, from time to time held by the Fiscal Agent under the terms of this Resolution, subject to the application thereof as provided in this Resolution and to the provisions of Sections 1301 and 1303.

    4.      Any and all other rights and personal property of every kind and nature from time to time hereafter pledged and assigned by the System to the Fiscal Agent as and for additional security for the Bonds and Parity Obligations.

    5.      Any and all cash and non-cash proceeds, products, offspring, rents and profits from any of the Pledged Property mentioned described in paragraphs (1) through (4) above, including, without limitation, those from the sale, exchange, transfer, collection, loss, damage, disposition, substitution or replacement of any of the foregoing.

**Principal Installment** shall mean, as of any date with respect to any Series, so long as any Bonds thereof are Outstanding, the sum of (i) the principal amount and Accreted Amount (to the extent applicable) of Bonds of such Series (including the principal amount of Option Bonds tendered for payment and not purchased) due (or so tendered for payment and not purchased) on such date for which no Sinking Fund Installments have been established, and (ii) the unsatisfied balance (determined as provided in Section 507) of any Sinking Fund Installments due on such date for Bonds of such Series, together with the premiums, if any, payable upon the redemption of such Bonds by application of such Sinking Fund Installments.

**Principal Subaccount** shall mean the Principal Subaccount established in the Debt Service Account by Section 502.

**Public Enterprise** shall mean any government instrumentality or public corporation of the Commonwealth.

**Qualified Hedge** shall mean, with respect to particular Bonds, (i) any financial arrangement (a) which is entered into by the System with an entity that is a Qualified Hedge Provider at the time the arrangement is entered into, (b) which is a cap, floor or collar, forward rate, future rate, swap (such swap may be based on an amount equal either to the principal amount of such Bonds as may be designated or a notional principal amount relating to all or a portion of the principal amount of such Bonds), asset, index, Currency, price or market-linked transaction or agreement, other exchange or rate protection transaction agreement, other

similar transaction (however designated), or any combination thereof, or any option with respect to any of the foregoing, executed by the System, and (c) which has been designated as a Qualified Hedge with respect to such Bonds in a written determination signed by an Authorized Officer and delivered to the Fiscal Agent, and (ii) any Credit Facility securing the obligations of the System under any financial arrangement described in clause (i) above. Each Qualified Hedge shall provide that the System and the Qualified Hedge Provider shall provide not less than ten-days' prior written notice of any amendment to the Fiscal Agent.

**Qualified Hedge Provider** shall mean a Person whose long-term obligations, other unsecured, long-term obligations, financial program rating, counterparty rating, or claims paying ability, or whose payment obligations under an agreement that would be a Qualified Hedge are guaranteed by an entity whose long term debt obligations, other unsecured long term obligations, financial program rating, counterparty rating, or claims paying ability, are rated, or whose payment obligations under an interest rate exchange agreement are collateralized in such manner as to cause such agreement to be rated, at the time of the execution of such Qualified Hedge, either (i) at least as high as the third highest Rating Category of each Rating Agency, but in no event lower than any Rating Category designated by any such Rating Agency for the Bonds subject to such Qualified Hedge (without reference to bond insurance, if any), or (ii) any such lower Rating Categories which each such Rating Agency indicates in writing to the System and the Fiscal Agent will not, by itself, result in a reduction or withdrawal of its Rating (without reference to bond insurance, if any) on the Outstanding Bonds, and (iii) a Person whose payment obligations under an interest rate exchange agreement are subject to collateralization requirements that, as evidenced in writing to the System and the Fiscal Agent by each Rating Agency, will not, by itself, result in a reduction or withdrawal of its Rating (without reference to bond insurance, if any) on the Outstanding Bonds.

**Rating** shall mean a rating published by a Rating Agency with respect to any or all Bonds. Any provision of this Resolution that specifies that an action may not be taken if it shall result in a reduction, suspension or withdrawal of the Rating of the Bonds, with respect to any Bonds that are the subject of a Credit Facility, shall mean the Rating of such Bonds without taking into account the credit enhancement provided by such Credit Facility.

**Rating Agency** shall mean each nationally recognized statistical rating organization then maintaining a rating on the Bonds at the request of the System.

**Rating Category** shall mean one of the generic rating categories of any Rating Agency without regard to any refinement or gradation of such rating within any such category by a numerical modifier or otherwise.

**Record Date** shall mean, with respect to each payment of interest on a Bond, each date specified as the "record date" therefor in the Supplemental Resolution authorizing such Bond, or if no such date is specified, the 15th day of the month preceding the date of such payment.

**Redemption Account** shall mean the Account by that name established by Section 502.

**Redemption Price** shall mean, when used with respect to a Bond (other than a Convertible Capital Appreciation Bond or a Capital Appreciation Bond) or a portion thereof to be redeemed, the principal amount of such Bond or such portion thereof plus the applicable premium, if any, and, when used with respect to a Convertible Capital Appreciation Bond or a Capital Appreciation Bond, shall mean the Accreted Amount on

Confidential

UBS-ERS_Ultra_Vires-0087989

the date of redemption of such Bond (or portion thereof) plus the applicable premium, if any, payable in either case upon redemption thereof, pursuant to this Resolution and the applicable Supplemental Resolution.

**Refunding Bonds** shall mean all Bonds authenticated and delivered on original issuance pursuant to Section 204 or thereafter authenticated and delivered in lieu of or in substitution for any such Bond pursuant to this Resolution and the applicable Supplemental Resolution.

**Reserve Account Cash Equivalent** shall mean a letter of credit, insurance policy, surety, guaranty or other security arrangement provided to the Fiscal Agent as a substitute for the deposit of cash and/or Investment Securities, or another Reserve Account Cash Equivalent, in the Debt Service Reserve Account pursuant to Section 506. Each such arrangement shall be provided by a Person whose claims paying ability has been assigned a rating from each Rating Agency at least equal to the then existing rating on the Bonds or whose unsecured, long-term debt securities are rated by each Rating Agency at least equal to the then existing Rating on the Bonds (or the highest short-term rating if the Reserve Account Cash Equivalent has a remaining term measured from the date it is provided not exceeding one year).

**Resolution** shall mean this Bond Resolution, as from time to time amended or supplemented by Supplemental Resolutions.

**Revenue Account** shall mean the Account by that name established by Section 502.

**Revenues** shall mean the following, collectively (but without duplication), except as otherwise may be provided with respect to a Series of Bonds by the Supplemental Resolution authorizing such Bonds:

1.    All Employers' Contributions received by the System or the Fiscal Agent.

2.    With respect to any particular Bonds, the proceeds of any draw on or payment under any Credit Facility which is intended for the payment of such Bonds, but only for purposes of such payment and not for other purposes of this Resolution.

3.    Net amounts received by the System pursuant to a Qualified Hedge.

4.    Income and interest earned and gains realized in excess of losses suffered by any Fund, Account, or Subaccount held by the Fiscal Agent under the terms of this Resolution, subject to the provisions of Sections 1301 and 1303.

5.    Any other revenues, fees, charges, surcharges, rents, proceeds or other income and receipts received by or on behalf of the System or by the Fiscal Agent, lawfully available for the purposes of this Resolution and deposited by or on behalf of the System or by the Fiscal Agent in any Fund, Account, or Subaccount held by the Fiscal Agent under the terms of this Resolution, subject to the provisions of Sections 1301 and 1303.

**Security Agreement** means the Security Agreement dated as of January 31, 2008 between the System and the Fiscal Agent, in the form appended hereto as Appendix A.

**Senior Bonds** shall mean the Series A Bonds and any Bonds of a Class the priority of payment of which under this Resolution is equal with that of the Series A Bonds.

**Serial Bonds** shall mean Bonds which have no Sinking Fund Installment.

**Series** shall mean all of the Bonds authenticated and delivered on original issuance identified pursuant to a Supplemental Resolution as a separate series of Bonds, and any Bonds thereafter authenticated and delivered in lieu of or in substitution therefor pursuant to Article III or Section 1007, regardless of variations in maturities, principal amounts, interest rates or other provisions.

**Series A Bonds** shall mean the System's Senior Pension Funding Bonds, Series A, the initial Series of Bonds to be issued under this Resolution.

**Sinking Fund Installment** shall mean, when used with respect to any Series of Bonds, the amount of principal or Accreted Amount, as the case may be, due prior to maturity on Bonds of a given maturity on any particular due date as specified in the Supplemental Resolution pursuant to which such Series was issued.

**Standard & Poor's** shall mean Standard & Poor's Ratings Service, a division of The McGraw-Hill Companies, Inc., and its successors and assigns.

**Standby Purchase Agreement** shall mean an agreement by and between the System and another Person pursuant to which such Person is obligated to purchase Option Bonds or Fixed Tender Bonds tendered for purchase.

**Standby Purchase Provider** shall mean the Person who has executed a Standby Purchase Agreement with the System.

**Subaccount** or **Subaccounts** shall mean any subaccount or subaccounts, as the case may be, in each case which may be in the form of a separate account, established or created pursuant to this Resolution, but does not include any escrow or other fund or account established or created pursuant to Section 1301.

**Subordinated Bonds** shall mean Bonds of a Series, the priority of payment of which under this Resolution is subordinate to payment of the Senior Bonds.

**Subordinate Obligations** shall mean, as allocated to each Series of Bonds by Class pursuant to the terms of the related Supplemental Resolution, payment obligations to Persons of the type that otherwise would be classified under this Resolution as Parity Obligations but are subject instead, pursuant to the provisions of the applicable Supplemental Resolutions, to subordination to Parity Obligations under this Resolution on the terms and conditions set forth in such Supplemental Resolutions.

**Supplemental Resolution** shall mean any resolution supplemental to or amendatory of this Resolution or any Supplemental Resolution, adopted by the System in accordance with Articles IX and X.

**Term Bonds** shall mean Bonds having a single stated maturity date, some of which may have Sinking Fund Installments to be specified in a Supplemental Resolution.

The terms "hereby," "hereof," "hereto,"

V-39

UBS-ERS_Ultra_Vires-0087990

"herein," "hereunder," and any similar terms as used in this
Resolution, refer to this Resolution. All references to Articles and
Sections in this Resolution refer to the Articles and Sections hereof
unless otherwise expressly stated.

V-40

Confidential                                                                   UBS-ERS_Ultra_Vires-0087991

**Appendix VI**

Confidential

UBS-ERS_Ultra_Vires-0087992

Appendix VII

**Form of Opinion of Bond Counsel**

**FIDDLER GONZALEZ & RODRIGUEZ, P.S.C.**

ATTORNEYS AND COUNSELLORS AT LAW

PO BOX 363507

SAN JUAN, PR 00936-3507

TELEPHONE (787) 753-3113
FAX (787) 759-3123

254 MUÑOZ RIVERA AVENUE
CORNER CHARDÓN STREET
6TH FLOOR
SAN JUAN, PUERTO RICO 00918

June __, 2008

Employees Retirement System of the Government
    of the Commonwealth of Puerto Rico
437 Ponce de León Avenue
San Juan, Puerto Rico

Re:    **Employees Retirement System of the Government of the
        Commonwealth of Puerto Rico
        Pension Funding Bonds, Series C Bonds**

Ladies and Gentlemen:

We have examined the Constitution and the laws of the Commonwealth of Puerto Rico (the "Commonwealth"), including Act No. 447 of the Legislature of Puerto Rico, approved May 15, 1951, as amended and supplemented (the "Act"), creating the Employees Retirement System of the Government of the Commonwealth of Puerto Rico (the "System") as a trust, to provide pension and other benefits to retired employees of the central government, municipalities and public Systems of the Commonwealth.

We have also examined a certified copy of a Pension Funding Bond Resolution (the "General Resolution), adopted by the Board of Trustees of the System on January 24, 2008, and a Second Supplemental Pension Funding Bond Resolution, adopted by the Board of Trustees of the System on June __, 2008 (the "Supplemental Resolution," and together with the General Resolution, the "Resolution"), and other proofs submitted relative to the issuance of the System's Senior Pension Funding Bonds, Series C in the aggregate principal amount of $_____ (the "Bonds").  Capitalized words not defined herein shall have the meanings ascribed to them in the Resolution.

The Bonds are issuable as fully registered bonds, without coupons, in denominations of $5,000 (maturity amount) each or integral multiples thereof.

The Bonds are issued under and pursuant to the Resolution for the purpose of (i) increasing the total assets currently available to pay benefits under the System's largest defined benefit plan, (ii) reducing the unfunded accrued actuarial pension liability of the benefit plan, and (iii) making deposits in various funds and accounts established under the Resolution.

VII-1

UBS-ERS_Ultra_Vires-0087993

The Bonds are limited, non-recourse obligations of the System, payable solely from and secured by a pledge and assignment of Employer Contributions and all other Revenues (as defined in the Resolution) derived therefrom, certain funds held under the Resolution, together with income earned thereon (collectively referred to herein as the "Pledged Property"), pledged therefor under the Resolution.

The Bonds bear interest and are subject to redemption prior to maturity as set forth in the Resolution.

The principal of the Bonds is payable at the principal corporate trust office of the Fiscal Agent in New York, New York. The interest on the Bonds is payable by check mailed to the registered owner at the address appearing on the registration books of the System on the relevant record date or, in certain circumstances set forth in the Resolution, by wire transfer to a designated account.

From such examination, and having regard to legal questions we deem relevant, we are of the opinion that:

(1)     The Act is valid in all respects material to this opinion, and the System is a duly constituted governmental instrumentality of the Commonwealth, deemed as a trust.

(2)     The Resolution has been duly adopted by, and is legal, valid and binding upon, the System, enforceable in accordance with its terms.

(3)     The Bonds have been duly authorized by the System and constitute legal, valid and binding limited obligations of the System payable solely from, and secured by a valid and binding pledge of, the Pledged Property, subject only to the provisions of the Resolution permitting use of such Pledged Property and its application for the purposes and on the terms and conditions provided in the Resolution.

(4)     The Bonds do not constitute a debt, obligation or pledge of the full faith, credit or taxing power of the Commonwealth or any of its municipalities or political subdivisions or instrumentalities (other than the System), and neither the Commonwealth nor any of its municipalities or political subdivisions or instrumentalities (other than the System), shall be liable for the payment thereof.

(5)     Interest on the Bonds is excluded from gross income and exempt from Puerto Rico income and withholding taxes, including the alternative minimum tax imposed by Section 1017 of the Puerto Rico Internal Revenue Code of 1994, as amended (the "P.R. Code").

(6)     The Bonds are exempt from property taxes imposed by the Municipal Property Tax Act of 1991, as amended, and interest thereon is exempt from the municipal license tax imposed by the Municipal License Tax Act of 1974, as amended.

(7)     The transfer of the Bonds by (i) gift will not be subject to gift tax under the P.R. Code in the case of donors who are residents of the Commonwealth at the time the gift is made, and (ii) death will not be subject to estate tax under the P.R. Code in the case of a decedent who at the time of death was (x) a resident of Puerto Rico, and (y) a United States citizen who acquired such citizenship solely by reason of birth or residence in Puerto Rico.

(8)     Gain recognized from the sale or exchange of a Bond will be subject to income tax under the P.R. Code to taxpayers subject to Puerto Rico income tax on such gains, including individuals residing in Puerto Rico and corporations and partnerships organized under the laws of the Commonwealth.

Confidential                                                                     UBS-ERS_Ultra_Vires-0087994

(9)     The Bonds will be considered an obligation of an instrumentality of Puerto Rico for purposes of (i) the non-recognition of gain rules of Section 1112(f)(2)(A) of the P.R. Code applicable to certain involuntary conversions, and (ii) the exemption from the surtax imposed by Section 1102 of the P.R. Code available to corporations and partnerships that have a certain percentage of their net income invested in obligations of instrumentalities of Puerto Rico and certain other investments.

(10)     Interest on the Bonds constitutes "industrial development income" under Section 2(j) of the Puerto Rico Industrial Incentives Act of 1963, the Puerto Rico Industrial Incentives Act of 1978, the Puerto Rico Tax Incentives Act of 1987, and the Puerto Rico Tax Incentives Act of 1998, as amended (collectively, the "Acts"), when received by a holder of a grant of tax exemption issued under any of the Acts that acquired the Bonds with "eligible funds," as such term is defined in the Acts.

Based on the provisions of the United States Internal Revenue of 1986, as amended (the "U.S. Code"), and the regulations thereunder, now in force:

(1)     Interest on the Bonds received by, or "original issue discount" (within the meaning of the U.S. Code) accrued to, an individual who is a *bona fide* resident of Puerto Rico within the meaning of Section 937 of the U.S. Code during the entire taxable year in which such interest is received or "original issue discount" is accrued will constitute gross income from sources within Puerto Rico and, therefore, is excludable from gross income for purposes of the U.S. Code pursuant to section 933(1) thereof.

(2)     Interest received or accrued, or original issue discount, on the Bonds is not subject to United States federal income tax if the holder of the Bonds is a corporation organized under the laws of Puerto Rico ("Puerto Rico Corporation") and such interest is not effectively connected with the conduct of a trade or business in the United States by such Puerto Rico Corporation, such Puerto Rico Corporation is not a foreign personal holding company, a controlled foreign corporation or a passive foreign investment company under the U.S. Code, and such Puerto Rico Corporation is not treated as a domestic corporation for the purposes of the U.S. Code.

(3)     Interest on the Bonds is not excludable from the gross income of the recipient thereof for federal income tax purposes under Section 103(a) of the U.S. Code.

(4)     Pursuant to the provisions of Section 1.937-2 of the Regulations issued under the U.S. Code, the source of the income from the sale of personal property by a bona fide resident of Puerto Rico within the meaning of Section 937 of the Code shall be determined under the rules of Section 865 of the U.S. Code. Accordingly, the gain on the sale or exchange of the Bonds recognized by an individual who is a *bona fide* resident of Puerto Rico, within the meaning of Section 937 of the U.S. Code, during the entire taxable year in which the source of the gain must be determined, will constitute Puerto Rico source income and, therefore, qualify for the income exclusion under in Section 933(1) of the U.S. Code, provided (i) that such Bonds do not constitute inventory in the hands of such individual and (ii) if the Bonds were owned before the individual became a bona fide resident of Puerto Rico, that for any of the 10 years preceding the taxable year for which the source of the gain must be determined, the individual was not a resident of the United States (other than a bona fide resident of Puerto Rico).

A Puerto Rico Corporation that invests in the Bonds will be subject to U.S. federal income tax on a gain from a disposition of Bonds only if the gain is effectively connected to a U.S. trade or business carried on by the Puerto Rico Corporation.

Confidential

UBS-ERS_Ultra_Vires-0087995

(5)      The transfer of the Bonds by death or gift will not be subject to estate or gift tax under the U.S. Code in the case of decedents or donors who, at the time of death or gift, are (a) residents of Puerto Rico and (b) (i) United States citizens that acquired such citizenship solely by reason of birth or residence in Puerto Rico or (ii) not United States citizens.

In addition to the opinions above we would like to bring to your attention that: (a) the P.R. Code does not provide rules with respect to the treatment of the excess, if any, of the amount due at maturity of a Bond over its initial offering price (the "Accretion Amount") and that under the current administrative practice followed by the Puerto Rico Department of the Treasury, the Accretion Amount is treated as interest; (b) prospective owners of the Bonds, including but not limited to financial institutions, should be aware that ownership of the Bonds may result in having a portion of their interest and other expenses attributable to interest on the Bonds disallowed as deductions for purposes of computing the regular tax and the alternative minimum tax for Puerto Rico income tax purposes; and (c) the U.S. Code provides special rules for the taxation of shareholders of foreign corporations that qualify as "controlled foreign corporations," "personal holding companies," "foreign personal holding companies" or "passive foreign investment companies," as such terms are defined by the U.S. Code.

In connection with the foregoing statements about certain United States federal tax consequences arising from the ownership of, receipt or accrual of interest on, or the disposition of the Bonds, be advised that pursuant to the U. S. Internal Revenue Service Circular No. 230:

(a)      These tax statements are not intended or written to be used, and cannot be used by any taxpayer, for purposes of avoiding penalties that may be imposed on the taxpayer by the Internal Revenue Service.

(b)      These statements were written in connection with the promotion or marketing of the Bonds.

(c)      Each prospective purchaser of the Bonds should seek tax advice from an independent tax advisor based on its particular circumstances.

We express no opinion regarding any other federal, Commonwealth or state tax consequences with respect to the Bonds.  We are rendering our opinion under existing statutes and court decisions, and regulations as of the issue date, and assume no obligation to update our opinion after the issue date to reflect any future action, fact or circumstance, or change in law or interpretation, or otherwise.

In rendering this opinion, we are advising you that the enforceability of the Bonds and the Resolution may be limited by bankruptcy, moratorium, insolvency, or other laws affecting creditors' rights or remedies and is subject to general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

We have also examined an executed Bond and in our opinion the form of said Bond and its execution are regular and proper.

Very truly yours,

VII-1

UBS-ERS_Ultra_Vires-0087996

Appendix VIII

## BOOK-ENTRY SYSTEM

### The Depository Trust Company

DTC will act as securities depository for the Series C Bonds. The Series C Bonds will be issued as fully-registered securities registered in the name of Cede & Co. (DTC's partnership nominee). One fully-registered Bond certificate will be issued for each stated maturity of the Series C Bonds, each in the aggregate principal amount (initial principal amount in the case of the Capital Appreciation Bonds) of such maturity, and will be deposited with DTC. SO LONG AS CEDE & CO. IS THE REGISTERED OWNER OF THE SERIES C BONDS, AS NOMINEE FOR DTC, REFERENCES HEREIN TO BONDHOLDERS OR OWNERS OF THE SERIES C BONDS (OTHER THAN UNDER THE CAPTION "TAX MATTERS") SHALL MEAN CEDE & CO. AND SHALL NOT MEAN THE BENEFICIAL OWNERS OF THE SERIES C BONDS.

DTC, the world's largest depository, is a limited-purpose trust company organized under the New York Banking Law, a "banking organization" within the meaning of the New York Banking Law, a member of the Federal Reserve System, a "clearing corporation" within the meaning of the New York Uniform Commercial Code, and a "clearing agency" registered pursuant to the provisions of Section 17A of the Securities Exchange Act of 1934, as amended (the "Exchange Act"). DTC holds and provides asset servicing for over 2.2 million issues of U.S. and non-U.S. equity, corporate and municipal debt issues, and money market instruments from over 100 countries that DTC's Participants ("Direct Participants") deposit with DTC. DTC also facilitates the post-trade settlement among Direct Participants of sales and other securities transactions in deposited securities, through electronic computerized book-entry transfers and pledges between Direct Participants' accounts. This eliminates the need for physical movement of securities certificates. Direct Participants include both U.S. and non-U.S. securities brokers and dealers, banks, trust companies, clearing corporations, and certain other organizations. DTC is a wholly-owned subsidiary of The Depository Trust & Clearing Corporation ("DTCC"). DTCC, in turn, is owned by a number of Direct Participants of DTC and Members of the National Securities Clearing Corporation, Fixed Income Clearing Corporation, and Emerging Markets Clearing Corporation, (NSCC, FICC, and EMCC, also subsidiaries of DTCC), as well as by the New York Stock Exchange, Inc., the American Stock Exchange LLC, and the National Association of Securities Dealers, Inc. Access to the DTC system is also available to others such as both U.S. and non-U.S. securities brokers and dealers, banks, trust companies, and clearing corporations that clear through or maintain a custodial relationship with a Direct Participant, either directly or indirectly ("Indirect Participants"). DTC has S&P's highest rating; AAA. The DTC Rules applicable to its Participants are on file with the Securities and Exchange Commission ("SEC"). More information about DTC can be found at www.dtcc.com and www.dtc.org.

Purchases of the Series C Bonds under the DTC system must be made by or through Direct Participants, which will receive a credit for the Series C Bonds on DTC's records. The ownership interest of each actual purchaser of the Series C Bonds ("Beneficial Owner") is in turn to be recorded on the Direct and Indirect Participants' records. Beneficial Owners will not receive written confirmation from DTC of their purchase. Beneficial Owners are, however, expected to receive written confirmations providing details of the transaction, as well as periodic statements of their holdings, from the Direct or Indirect Participant through which the Beneficial Owner entered into the transaction.

Transfers of ownership interests in the Series C Bonds are to be accomplished by entries made on the books of Direct and Indirect Participants acting on behalf of Beneficial Owners. Beneficial Owners

Confidential

UBS-ERS_Ultra_Vires-0087997

will not receive certificates representing their ownership interests in the Series C Bonds, except in the event that use of the book-entry system for the Series C Bonds is discontinued.

To facilitate subsequent transfers, the Series C Bonds deposited by Direct Participants with DTC are registered in the name of DTC's partnership nominee, Cede & Co., or such other name as may be requested by an authorized representative of DTC. The deposit of the Series C Bonds with DTC and their registration in the name of Cede & Co. or such other nominee do not effect any change in beneficial ownership. DTC has no knowledge of the actual Beneficial Owners of the Series C Bonds; DTC's records reflect only the identity of the Direct Participants to whose accounts such Series C Bonds are credited, which may or may not be the Beneficial Owners. The Direct and Indirect Participants will remain responsible for keeping account of their holdings on behalf of their customers.

Conveyance of notices and other communications by DTC to Direct Participants, by Direct Participants to Indirect Participants, and by Direct Participants and Indirect Participants to Beneficial Owners will be governed by arrangements among them, subject to any statutory or regulatory requirements as may be in effect from time to time.

Redemption notices shall be sent to DTC. If less than all of the Series C Bonds are being redeemed, DTC's practice is to determine by lot the amount of the interest of each Direct Participant in such issue to be redeemed.

Neither DTC nor Cede & Co. (nor such other DTC nominee) will consent or vote with respect to Series C Bonds unless authorized by a Direct Participant in accordance with DTC's Procedures. Under its usual procedures, DTC mails an Omnibus Proxy to the System as soon as possible after the record date. The Omnibus Proxy assigns Cede & Co.'s consenting or voting rights to those Direct Participants to whose accounts the Series C Bonds are credited on the record date (identified in a listing attached to the Omnibus Proxy).

Redemption proceeds, distributions, and dividend payments on the Series C Bonds will be made to Cede & Co., or such other nominee as may be requested by an authorized representative of DTC. DTC's practice is to credit Direct Participants' accounts upon DTC's receipt of funds and corresponding detail information from the System or the Fiscal Agent on payable dates in accordance with their respective holdings shown on DTC's records. Payments by Participants to Beneficial Owners will be governed by standing instructions and customary practices, as is the case with securities held for the accounts of customers in bearer form or registered in "street name," and will be the responsibility of such Participant and not of DTC, the Fiscal Agent, or the System, subject to any statutory or regulatory requirements as may be in effect from time to time. Payment of redemption proceeds, distributions, and dividend payments to Cede & Co. (or such other nominee as may be requested by an authorized representative of DTC) is the responsibility of the System or the Fiscal Agent, disbursement of such payments to Direct Participants will be the responsibility of DTC, and disbursement of such payments to the Beneficial Owners will be the responsibility of Direct and Indirect Participants.

DTC may discontinue providing its services as securities depository with respect to the Series C Bonds at any time by giving reasonable notice to the System or the Fiscal Agent. Under such circumstances, in the event that a successor depository is not obtained, Series C Bond certificates are required to be printed and delivered.

The System may decide to discontinue use of the system of book-entry only transfers through DTC (or a successor securities depository). In that event, Series C Bond certificates will be printed and delivered to DTC.

Confidential

NONE OF THE SYSTEM, THE FISCAL AGENT OR THE UNDERWRITERS WILL HAVE ANY RESPONSIBILITY OR OBLIGATION TO DIRECT PARTICIPANTS, INDIRECT PARTICIPANTS OR ANY BENEFICIAL OWNER WITH RESPECT TO (I) THE ACCURACY OF ANY RECORDS MAINTAINED BY DTC, ANY PARTICIPANT OR INDIRECT PARTICIPANT; (II) THE PAYMENT BY DTC OR ANY DIRECT PARTICIPANT OR INDIRECT PARTICIPANT OF ANY AMOUNT WITH RESPECT TO THE PRINCIPAL OF, OR PREMIUM, IF ANY, OR INTEREST ON, THE SERIES C BONDS; (III) ANY NOTICE WHICH IS PERMITTED OR REQUIRED TO BE GIVEN TO BONDHOLDERS; (IV) ANY CONSENT GIVEN BY DTC OR OTHER ACTION TAKEN BY DTC AS A BONDHOLDER; OR (V) THE SELECTION BY DTC OR ANY DIRECT PARTICIPANT OR INDIRECT PARTICIPANT OF ANY BENEFICIAL OWNERS TO RECEIVE PAYMENT IN THE EVENT OF ANY PARTIAL REDEMPTION OF THE SERIES C BONDS.

Confidential                                                                                     UBS-ERS_Ultra_Vires-0087999

Appendix IX

**Table of Accreted Amounts per $5,000 maturity amount**

| Date | 2028 CAB | 2029 CAB | 2030 CAB | 2031 CAB | 2032 CAB | 2033 CAB | 2034 CAB |
|------|----------|----------|----------|----------|----------|----------|----------|
| 06/02/08 | | | | | | | |
| 7/1/2008 | | | | | | | |
| 1/1/2009 | | | | | | | |
| 7/1/2009 | | | | | | | |
| 1/1/2010 | | | | | | | |
| 7/1/2010 | | | | | | | |
| 1/1/2011 | | | | | | | |
| 7/1/2011 | | | | | | | |
| 1/1/2012 | | | | | | | |
| 7/1/2012 | | | | | | | |
| 1/1/2013 | | | | | | | |
| 7/1/2013 | | | | | | | |
| 1/1/2014 | | | | | | | |
| 7/1/2014 | | | | | | | |
| 1/1/2015 | | | | | | | |
| 7/1/2015 | | | | | | | |
| 1/1/2016 | | | | | | | |
| 7/1/2016 | | | | | | | |
| 1/1/2017 | | | | | | | |
| 7/1/2017 | | | | | | | |
| 1/1/2018 | | | | | | | |
| 7/1/2018 | | | | | | | |
| 1/1/2019 | | | | | | | |
| 7/1/2019 | | | | | | | |
| 1/1/2020 | | | | | | | |
| 7/1/2020 | | | | | | | |
| 1/1/2021 | | | | | | | |
| 7/1/2021 | | | | | | | |
| 1/1/2022 | | | | | | | |
| 7/1/2022 | | | | | | | |
| 1/1/2023 | | | | | | | |
| 7/1/2023 | | | | | | | |
| 1/1/2024 | | | | | | | |
| 7/1/2024 | | | | | | | |
| 1/1/2025 | | | | | | | |
| 7/1/2025 | | | | | | | |
| 1/1/2026 | | | | | | | |
| 7/1/2026 | | | | | | | |
| 1/1/2027 | | | | | | | |
| 7/1/2027 | | | | | | | |
| 1/1/2028 | | | | | | | |
| 7/1/2028 | | | | | | | |
| 1/1/2029 | | | | | | | |

IX-1

UBS-ERS_Ultra_Vires-0088000

| Date | 2028 CAB | 2029 CAB | 2030 CAB | 2031 CAB | 2032 CAB | 2033 CAB | 2034 CAB |
|------|----------|----------|----------|----------|----------|----------|----------|
| 7/1/2029 | | | | | | | |
| 1/1/2030 | | | | | | | |
| 7/1/2030 | | | | | | | |
| 1/1/2031 | | | | | | | |
| 7/1/2031 | | | | | | | |
| 1/1/2032 | | | | | | | |
| 7/1/2032 | | | | | | | |
| 1/1/2033 | | | | | | | |
| 7/1/2033 | | | | | | | |
| 1/1/2034 | | | | | | | |
| 7/1/2034 | | | | | | | |

IX-2

UBS-ERS_Ultra_Vires-0088001