**<u>EXHIBIT 6</u>**

# EXPERT REPORT
## OF
# ROBERT W. DOTY


# JULY 1, 2020



## PREPARED AT THE REQUEST OF
## THE GOVERNMENT PARTIES
## AND COMMITTEES


*IN RE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, AS REPRESENTATIVE OF THE EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO, CASE NO. 17-3566 (D.P.R.)*

# T<small>ABLE OF</small> C<small>ONTENTS</small>

INTRODUCTION ....................................................................................................1

SELECT BACKGROUND FACTS...........................................................................5

DISCUSSION OF KEY PRINCIPLES .....................................................................8

ANALYSIS OF THE ERS BOND ISSUANCES.....................................................19

APPENDIX I—MATERIALS REVIEWED..........................................................I-1

APPENDIX II—DEFINITIONS ........................................................................ II-1

APPENDIX III—QUALIFICATIONS AND CURRICULUM VITAE .........................III-1

# EXPERT REPORT OF
# ROBERT W. DOTY

**Re:** *In re Financial Oversight and Management Board for Puerto Rico, as representative of the Employees Retirement System of the Government of the Commonwealth of Puerto Rico*, Case No. 17-3566 (D.P.R.)

# INTRODUCTION

I have been retained by Brown Rudnick LLP ("Counsel"), as counsel to the Financial Oversight and Management Board for Puerto Rico (the "Board") acting through its Special Claims Committee ("SCC"), to prepare this Report in connection with certain litigation (the "Litigation") in the above-referenced case of the Employee Retirement System of the Commonwealth of Puerto Rico ("ERS") pending under Title III of the Puerto Rico Oversight, Management, and Economic Stability Act ("PROMESA"). As part of my engagement, I have also agreed to assist certain other parties who are aligned in interest with the SCC in the Litigation, including (i) the Official Committee of Unsecured Creditors of the Title III Debtors and its counsel, Paul Hastings LLP, Genovese Joblove & Battista PA, and Casillas Santiago Torres LLC; (ii) the Official Committee of Retired Employees of the Commonwealth of Puerto Rico and its counsel, Jenner & Block LLP; (iii) the Puerto Rico Fiscal Agency and Financial Advisory Authority and its counsel, O'Melveny & Myers LLP; and (iv) the Board and its counsel, Proskauer Rose LLP. I have been retained as an independent testifying expert witness. I am over the age of 18 years, and am competent to testify at trial. I have personal knowledge of the matters discussed herein. If called upon, unless stated otherwise, I am prepared to testify consistently with the analysis and opinions I express in this Report.

## A. Assignment

I have been engaged by Counsel in connection with the SCC and other parties' objections and related challenges (collectively, the "Objections") to claims filed in ERS' Title III case by beneficial holders of three series of senior pension funding bonds that ERS issued to the public in 2008 (the "Bonds"[1] or the "ERS Bonds"). My engagement relates to the meaning of certain municipal finance terms used in the ERS Enabling Act relevant to the issuance of the Bonds.

I understand from Counsel that, at all relevant times, the ERS Enabling Act authorized ERS to incur debt through certain means, including "seeking a loan from any financial institution" (or, depending upon the translation of the Act used, "borrowing" from a financial institution) and "direct placements of debt." I also understand that certain beneficial holders of the ERS Bonds ("the ERS Bondholders") have taken the position that the underwritten public

---

[1] *See* Appendix II for definitions of certain capitalized terms used in this Report.

Report of Robert W. Doty
Page 2

offerings through which the Bonds were issued in 2008 constituted "borrowing from a financial institution" by ERS or, alternatively, "direct placements of debt" by ERS, and thus were authorized by the ERS Enabling Act.

Counsel has asked for my expert opinion on the following questions:

1.  Whether ERS' issuance of bonds through underwritten public offerings constituted a "borrowing" or "loan" "from a financial institution" according to the meaning of that terminology as used in municipal finance.

2.  Whether ERS' issuance of bonds through underwritten public offerings constituted "direct placements of debt" according to the meaning of that terminology as used in municipal finance.

## B. Qualifications

I have over 45 years of experience in the finance industry in a diversity of capacities relating to several billions of dollars of municipal and corporate finance transactions in approximately two dozen states.  Over the course of my career, I have participated in a substantial number of municipal securities issues on behalf of issuers, underwriters, investors, and other parties to the transactions.

My experience includes work as special consultant to underwriters, issuers and bond counsel and as financial advisor to bond issuers. In the course of those engagements, I have advised, among other entities, municipal bond issuers, issuer officials, underwriters, and investors in municipal securities offerings.  I have served as a municipal bond underwriter with three firms in three states, have worked with and for underwriters as underwriter counsel and worked with underwriters in numerous municipal bond issues.[2]

I am the author or co-author of numerous books, chapters, and articles on municipal bond transactions and roles and responsibilities of various parties in connection with, and customs, practices and standards of care relating to, municipal securities transactions. Those publications include seminal articles as to disclosure practices, due diligence and investigatory procedures, roles and responsibilities of parties, and fiduciary responsibilities in municipal securities transactions.

I have also held numerous directorship and other leadership positions with a variety of industry organizations, including the Government Finance Officers Association ("GFOA"), where I served as the General Counsel and as a key drafter of authoritative guidance on disclosure and bond offering procedures; the National Federation of Municipal Analysts

---

[2]  In addition, I have participated in a substantial number of corporate stock and bond transactions, both public offerings and private placements.

**Report of Robert W. Doty**
**Page 3**

("NFMA"), where I served on the Board of Governors and as a member and officer of NFMA committees; the National Association of Independent Public Finance Advisors ("NAIPFA"), where I served as Vice President and a member of the Board of Directors and as Chair of NAIPFA's Public Affairs Committee; and the Southern Municipal Finance Society, where I served as President and a Director.  Other examples of my participation in industry organizations include: (i) serving on the Municipal Securities Rulemaking Board's ("MSRB") Municipal Advisor Professional Qualifications Committee designing qualifications requirements for municipal advisors; (ii) serving on the Muni Council, formed initially through the auspices of the MSRB, including as Chair of the Security Committee of the Muni Council in connection with the development of a central post office for issuer and other obligor continuing disclosure filings; (iii) serving as a Subject Matter Expert for the MSRB's eLearning initiative; and (iv) serving as Vice Chair of Committees and Subcommittees of the National Association of Bond Lawyers and the American Bar Association.

The foregoing is a very brief synopsis of my industry experience.  Appendix III of this Report and the accompanying *curriculum vitae* contain a more detailed description of my qualifications and professional background.

## C.  Summary of Opinions

An underwritten public municipal bond offering, such as the 2008 ERS Bond issuances, is not a loan by or borrowing from a financial institution, nor is it a direct placement of debt.

When a municipal bond issuer sells bonds to an underwriting syndicate, the issuer is not regarded in the industry as "borrowing" or "taking a loan" from the underwriting syndicate, the members of which serve only as intermediaries for distributing the bonds to the public; rather, the issuer is regarded as borrowing from the public investors who buy the bonds from the underwriters.  ERS issued the Bonds through underwriting syndicates led by UBS, which marketed and sold the Bonds to public investors.  ERS thus borrowed from these public investors, not from UBS or any of the other member of the underwriting syndicate.

Neither are the ERS Bonds a "direct placement of debt."  In municipal finance and the municipal bond market, some commentators use the terms "direct placement" and "private placement" with differing emphases, and other commentators use the terms synonymously.  Based on my knowledge and experience in the municipal finance industry, the term "direct placement" is commonly understood in municipal finance to be a type of the larger universe of "private placements."  Both a direct placement and a private placement involve the sale of bonds directly to either a single investor or a small number of sophisticated investors.  Neither involves the sale of bonds to the general public through an underwritten public offering.  Because the ERS Bond issuances were underwritten public offerings, they were not "direct placements of debt."

**Report of Robert W. Doty**
**Page 4**

## D.  Documents and Information Considered

This Report takes into account the documentation and recognized and authoritative industry guidance I have reviewed to date, as well as my active participation in the financial markets for more than 45 years.  Appendix I hereto identifies the materials I considered in reaching my opinions.

I understand that I may be asked in the future to review additional documentation or to conduct additional research and analysis.  I also understand that I may be asked to form additional opinions as to other questions upon appropriate review. I reserve the right to modify or supplement this Report in any respect following my review of additional factual information or documents or additional research and analysis or to respond to additional questions.

This Report and the opinions I express herein are based upon my education, specialized training, skill, personal experience and knowledge of common and prevailing roles and responsibilities of parties involved in municipal bond transactions, and of industry customs, practices and standards of care prevailing in the municipal bond market in 1988 and 2008, and upon my consideration of materials discussed herein.

## E.  Compensation

I am an independent consultant, and have no present or contemplated future interest in this matter or personal bias with respect to the parties to the litigation.  My compensation for my work in this matter is $825 per hour, plus my out-of-pocket expenses. The payment of my fees and expenses is not contingent upon the outcome of this matter.

Report of Robert W. Doty
Page 5

# SELECT BACKGROUND FACTS

### A.  The ERS Enabling Act

I have been informed that the Bonds that are the subject of this Litigation were purportedly issued under the "ERS Enabling Act," which is Act No. 447 of the Legislative Assembly of Puerto Rico, approved May 15, 1951, as amended and supplemented, including as amended by Act 46-1988.

I have been informed by Counsel that the official English translation of the Act states as follows:

> The Board of Trustees may authorize the Administrator to seek a loan from any financial institution of the Government of the Commonwealth of Puerto Rico or the Federal Government of the United States of America or through the direct placement of debts, securing said debt with the assets of the System.

I understand that a dispute exists concerning certain alleged errors in the official translation, and that ERS Bondholders argue the following, alternative English translation applies:[3]

> The Board of Trustees may authorize the Administrator to borrow from any financial institution, from the Government of the Commonwealth of Puerto Rico or from the Federal Government of the United States of America, or through the direct placement of debts, securing said debt with the assets of the System.

### B.  The 2008 ERS Bond Issuances

In 2008, ERS issued Bonds in three "series"—Series A Bonds, Series B Bonds and Series C Bonds—in the aggregate principal amount of approximately $3 billion.  The purpose of the Bond offerings as stated by ERS in its Series A Official Statement (the document used to market the Bonds to public investors) was "to increase the funds currently available to pay benefits under the System's largest benefit plan … and to reduce the unfunded accrued actuarial pension

---

[3] I do not opine in this report on the proper English translation of the ERS Enabling Act.  Instead, for the purposes of this Report, I consider both the official English translation and the ERS Bondholders' translation of the statute.  For the avoidance of doubt, my opinions expressed in this Report are no different whether the statute authorized the Administrator "to seek a loan" or "to borrow."

**Report of Robert W. Doty**
**Page 6**

liability of this benefit plan." [4]   The same statement appears in each of ERS' Series B and Series
C Bond Official Statements. [5]

ERS had warnings that the Bond offerings were particularly complex and risky
transactions.  Prior to issuing the Bonds in 2008, the government of Puerto Rico, and
subsequently ERS, investigated multiple sources of raising capital. [6]   In 2007, Merrill Lynch
issued a formal proposal recommending a $7 billion bond issuance. [7]   Credit ratings agencies
expressed multiple concerns about the proposal. [8]   Ultimately, Merrill Lynch was unable to find a
sufficient market for the bonds at the desired terms. [9]   Thereafter, ERS then downsized the
principal amount of the Bond offerings "due to a lackluster demand in the global market." [10]

ERS issued the Bonds in "bona fide public offerings," pursuant to which UBS, and the
other members of the underwriting syndicates, as intermediaries, marketed and sold the Bonds to
public investors. [11]   The Bonds, at the time of issuance, were rated by all three major rating
agencies. [12]

The public offerings were subject to few restrictions on the investor universe to whom the
underwriting syndicates could offer and sell the Bonds.  ERS did not require that investors in the
Bonds be financial institutions or sophisticated investors or that they acquire the Bonds solely for
investment without an intent to distribute in the public municipal bond market.  Finally, there
was no requirement that the Bonds be sold in denominations of $100,000.00 or more, as is
typical in direct placements and other private placements; instead, as is virtually uniform in a
public offering, the Bonds were sold in the typical publicly-offered bond minimum denomination

---

[4]  ERS' Series A Official Statement at 2.

[5]  ERS' Series B Official Statement at 2 and ERS' Series C Official Statement at 2.

[6]  Kobre & Kim Report at 200-207.

[7]  Kobre & Kim Report at 206-208.

[8]  Kobre & Kim Report at 206-208.

[9] Kobre & Kim Report at 206-208.

[10]  Conway MacKenzie Report at 12.

[11]  ERS' Series A Bond Official Statement identifies on its cover twelve underwriters as members of the
syndicate offering, the Series B Bond Official Statement identifies three underwriters, and the Series C
Bond Official Statement identifies twelve underwriters.  While there were overlaps in syndicate
memberships, and all were led by UBS, no two ERS Bond syndicates were exactly alike.

[12]  ERS' Series A Bond Official Statement at 4, Series B Bond Official Statement at 4, and Series C Bond
Official Statement at 4-5.

**Report of Robert W. Doty**
**Page 7**

of $5,000.00 principal amount (or for capitalized interest Bonds, $5,000.00 maturity amount) and integral multiples thereof. [13]

The terms of the Bonds for the benefit of the public investors are set forth in the ERS Pension Funding Bond Resolution and the Supplemental Bond Resolutions for the respective Bonds.  ERS did not engage in any direct negotiations with the public investors in setting these terms or establishing Bond prices. Instead, ERS provided necessary documentation— ERS' Official Statements, Bond Resolutions and other Bond documentation—to UBS and the other underwriters in the respective underwriting syndicates for the underwriters to utilize in their direct discussions and negotiations with public investors for the benefit of ERS.

## C. The Claims and Litigations

As noted above, I understand that the ERS Bondholders have filed claims in ERS' case under Title III of PROMESA for payment on the Bonds.  I further understand that (i) the SCC and other parties have challenged the Bonds on the grounds that the ERS Enabling Act did not permit ERS to issue bonds through public offerings in objections to claims and adversary proceedings, among other avenues, and (ii) the ERS Bondholders have argued in response that the Bond issuances constituted a "loan" or "borrowing" by ERS from a financial institution (specifically, UBS, as underwriter) and/or a "direct placement of debt."

---

[13] Each Supplemental Resolution Section 2.3(d).

Report of Robert W. Doty
Page 8

# <u>DISCUSSION OF KEY PRINCIPLES</u>

To provide context for my analysis, I first provide an overview of certain key principles in municipal finance, including (i) the roles, expectations, and objectives of underwriters in a public municipal bond issuance, and (ii) the meaning and nature of a "direct placement of debt" in municipal finance.

This discussion is based on my decades of experience in the municipal bond industry from the mid-1970s into the 2010s. I also draw upon recognized industry guidance, including guidance offered by the GFOA and by municipal bond underwriter representatives, notably the Securities Industry and Financial Markets Association ("SIFMA"). In addition, I rely upon key recognized municipal bond market legal and financial authorities, such as, among others cited herein, Robert Fippinger and Christopher Mier.

## A. Industry Standards for Underwritten Bond Distributions

### 1. <u>The Role of Underwriters Generally</u>

Underwriters perform an important function by undertaking intensive efforts to identify and negotiate with potential public municipal bond investors who may ultimately purchase and hold municipal bonds. This role of underwriters is critical because municipal bond issuers generally lack the capability, knowledge, sophistication, and investor contacts to be able to identify and negotiate with a broad range of investors for the issuer's bonds.

To carry out a public offering of a municipal bond issuance, an issuer will engage in well-established practices to facilitate the offering and sale of the bonds by underwriters to public investors. Such practices include the issuer's preparation of bond offering documents, known as "official statements," through which the issuer provides substantial detailed information regarding itself and the bond offering. The underwriters will then use this information in their direct discussions and negotiations with public investors regarding the investors' potential purchases of the bonds.

As stated in a "Best Practice" guide published by GFOA, "[t]he primary role of the underwriter in a negotiated sale is to market the issuer's bonds to investors."[14]

GFOA strongly emphasizes the underwriter's ability to obtain the lowest borrowing cost from public investors:

> The issuers (sic) goal in a negotiated bond sale is to obtain the lowest possible borrowing cost for the bonds. To maximize the potential of this occurring, ***the***

---

[14] GFOA, "*Selecting and Managing Underwriters for Negotiated Bond Sales*" (2014).

Report of Robert W. Doty
Page 9

> *issuers goal in the underwriter selection process is to select the underwriter(s) that has the best potential for obtaining the lowest borrowing cost.* Those underwriters are typically the ones that have demonstrated both experience underwriting the type of bonds being proposed and the strongest marketing/distribution capabilities.[15]

Importantly, in its Best Practice, describing "the only legal relationship" between the municipal bond issuer and the underwriters, GFOA adds:

> The *only legal relationship* between the issuer and an underwriter is created by a Bond Purchase Agreement signed at the time of the pricing of the bonds, *wherein the issuer agrees to sell the bonds to the underwriter and the underwriter agrees to purchase the bonds from the issuer* at an agreed upon price.[16]

In 2012, the MSRB published *Interpretive Guidance Concerning the Application of MSRB Rule G-17 to Underwriters of Municipal Securities* (Aug. 2, 2012), preceded by MSRB Notice 2012-38 (July 18, 2012),[17] stating that municipal bond underwriters must disclose to municipal bond issuers that the underwriters' *"primary role is to purchase securities with a view to distribution in an arm's-length commercial transaction with the issuer … ."*[18]

The Securities and Exchange Commission ("SEC") has described the role of underwriters in public bond issuances similarly. For example, in the definition of the term "underwriter" in

---

[15] *Id.* Emphasis added.

[16] *Id.* Emphasis added.

[17] These actions by the MSRB give important recognition to industry practices by municipal bond underwriters. While the MSRB's guidance was issued in 2012, MSRB Notice 2012-38 states that the principles underlying its guidance have been in place for some time: "Although many of the specific elements identified in the Notice are fully articulated by the MSRB for the first time, all of them arise from the same fundamental duty of fairness to the issuer that the MSRB has already required under Rule G-17 for some time. This is particularly true with regard to those elements of the Notice relating to representations made by dealers to issuers … ." MSRB Notice 2012-38 (July 18, 2012). Underwriters are dealers.

[18] MSRB, *Interpretive Guidance Concerning the Application of MSRB Rule G-17 to Underwriters of Municipal Securities* (Aug. 2, 2012); MSRB Notice 2012-38 (July 18, 2012). Emphasis added.

Similarly, Robert Fippinger, a former Board Member of, and General Counsel to, the MSRB and Senior Partner in the law firm of Orrick Herrington, states in his recognized and authoritative treatise, **THE SECURITIES LAW OF PUBLIC FINANCE**, that "Ordinarily, issuers rely on their underwriters to make a distribution."

R. . Fippinger, **THE SECURITIES LAW OF PUBLIC FINANCE** Ch. 10, §10:1.8 at 10-42 (Practising Law Institute, rel. 9/18).

**Report of Robert W. Doty**
**Page 10**

SEC Rule 15c2-12, which governs the disclosure process in municipal bond offerings, the Commission states:

> The term underwriter means any person who has purchased from an issuer of municipal securities ***with a view to***, or offers or sells for an issuer of municipal securities in connection with, ***the offering of any municipal security***, or participates or has a direct or indirect participation in any such undertaking, or participates or has a participation in the direct or indirect underwriting of any such undertaking … .[19]

The common thread across these authorities is that the role of underwriters is described solely in terms of purchasing and reselling the issuers' bonds to investors in the public municipal bond market. None of these respected authorities describe the relationship between municipal bond issuers and intermediating municipal bond underwriting syndicates as involving "borrowings" by the issuers from bond underwriting syndicates or a "loan" by the underwriting syndicates to the issuer. I am not aware of any such authorities describing the relationship between municipal bond issuers and intermediating municipal bond underwriting syndicates as involving "borrowings" by the issuers from bond underwriting syndicates or a "loan" by the underwriting syndicates to the issuer. This understanding and the consistent descriptions of the roles of underwriters are consistent with my decades of experience.

### 2. Underwriting Syndicates

Underwriting syndicates, as contrasted with an individual underwriter, are formed in certain public bond issuances both to share transactional risks among underwriters and to provide enhanced municipal bond distribution capabilities. The underwriting syndicates focus on conducting effective, successful bona fide public offerings of municipal bonds.

I have extensive experience working with underwriting syndicates for municipal bond issuances, including working with front line investment bankers, the underwriting desks of underwriting firms, heads of the sales teams, and individual brokers as they engaged in the process of identifying potential investors, offering bonds to the investors, providing information to the investors regarding the issuers and the bonds, receiving feedback from public investors, and negotiating bond terms with the investors.

As obtaining widespread distribution capabilities for a bond offering is of paramount concern to an issuer, many municipalities contract with underwriting syndicates, which provide greater public bond distribution capabilities than using a single underwriter.[20]

---

[19] SEC Rule 15c2-12(f)(2), 17 C.F.R. §240.15c2-12(f)(2). Emphasis added.

[20] Mr. Fippinger states that "The purpose of a syndicate … is to promote the orderly formation of capital and access to capital over a wide geographic area among a variety of investors."

**Report of Robert W. Doty**
**Page 11**

### 3.   Underwriting Syndicate Distribution Activities and Objectives

In my experience, before municipal bond underwriting syndicates are willing to execute and deliver bond purchase contracts on behalf of an issuer, they will engage in intensive marketing efforts to receive firm commitments from public investors for the issuers' bonds. Ultimately, an underwriting syndicate will seek to firm up as many commitments from public investors as possible, before entering into a bond purchase contract with the issuer.

This is consistent with industry guidance.  In THE FUNDAMENTALS OF MUNICIPAL BONDS, SIFMA describes how underwriting syndicates utilize sales personnel to make sales of the bonds to public investors and contact investors to learn the investors' level of interest in the offered bonds, specifically focusing on the issuers' credit strengths, the terms of the bonds and interest rates offered by the underwriting syndicates.[21]  According to SIFMA, in addition to proposing interest rates for offering the bonds, the underwriting desk of the underwriting syndicate members carefully tracks and maintains records of investor levels of interest and investor feedback about the offering. Once the bond purchase contract is executed, "[t]he syndicate desk then processes orders and allocates bonds [to investors]… ."[22] Thereafter, the underwriters send confirmations to the investors requiring payment by the bond closing date.

In "*The Role of the Underwriter*," a chapter in THE HANDBOOK OF MUNICIPAL BONDS, which is a recognized and respected resource in the municipal bond market, a recognized and highly-regarded municipal bond underwriter official, Christopher J. Mier, CFA, Managing Director, of Loop Capital Markets, echoes many of SIFMA's descriptions regarding the process

---

R. Fippinger, THE SECURITIES LAW OF PUBLIC FINANCE Ch. 10A, §10A:3.1 at 10A-39 (Practising Law Institute, rel. 9/18); *see also* Securities Industry and Financial Markets Association, THE FUNDAMENTALS OF MUNICIPAL BONDS at 102 (6th ed. 2012) (describing reasons why a manager might consider particular entities in a syndicate); *see also* Patricia Tigue, A GUIDE FOR SELECTING FINANCIAL ADVISORS AND UNDERWRITERS, WRITING RFPS AND EVALUATING PROPOSALS at 11-12 (Government Finance Officers Association, 1997) (describing the composition of underwriting syndicates as involving firms "chosen on the basis of their marketing strengths," with certain firms "better able to sell to institutional investors while others are known for their strength in the retail market.").

[21] SIFMA, THE FUNDAMENTALS OF MUNICIPAL BONDS at 104 (6th ed. 2012) (recognizing that "[t]he salespeople … work together with the public finance bankers in the early stages of a deal to develop a marketing plan for the bonds.").

[22] Securities Industry and Financial Markets Association, THE FUNDAMENTALS OF MUNICIPAL BONDS at 97, 99, 104-05 (6th ed. 2012). Emphasis in original.

**Report of Robert W. Doty**
**Page 12**

by which underwriting syndicates enable municipal bond issuers to borrow from public investors.[23]

Mr. Mier describes the bond offering process from its initiation as "an idea" and "a gleam" in "a finance director's eye" until it is "transformed" through organization and activities of the finance team, including the underwriters. Mr. Mier concludes that "[t]he end result of this process is a bond issue that has been sold *to the investing public*—both retail and institutional" through which "the governmental issuer receives the financing that it needs."[24]

Mr. Mier describes the bond sale process in which "hundreds of clients will be contacted by the [underwriting] firm's sales force to determine their interest in the issue."[25]

Confirming industry practice, in 2008, SIFMA finalized its **MODEL BOND PURCHASE AGREEMENT** containing a provision stating "[t]he Underwriters intend to make a bona fide initial public offering of all the Securities at prices no higher than, or yields not lower than, those shown in the Official Statement. The Underwriters reserve the right to lower such initial offering prices as they deem necessary in connection with the marketing of the Securities."[26]

After an underwriting syndicate has marketed bonds to public investors, many of those investors may purchase bonds, while others may decline to make purchases. If there is insufficient interest in the bonds by public investors, the public offering may simply be terminated. I understand that this is what happened in 2007 when Merrill Lynch attempted, and failed, to find public investors to purchase $7 billion of ERS pension funding bonds.

Underwriters and underwriting syndicates are not interested in purchasing the issuer's bonds for investment because they are not in the business of investing in those bonds. That would tie up the firms' capital, which they need for underwriting bonds issued by other issuer clients. Their business is underwriting, not investing in municipal bonds or making loans. They make their profit from selling the bonds they purchase to the end investors (see discussion on

---

[23] S. Feldstein and F. Fabozzi, ed. **THE HANDBOOK OF MUNICIPAL BONDS** Ch. 14, *The Role of the Underwriter* at 265-71 (John Wiley & Sons, Inc. 2008). Emphasis in original.

[24] S. Feldstein and F. Fabozzi, ed. **THE HANDBOOK OF MUNICIPAL BONDS** Ch. 14, *The Role of the Underwriter* at 265 (John Wiley & Sons, Inc. 2008). Emphasis added.

[25] S. Feldstein and F. Fabozzi, ed. **THE HANDBOOK OF MUNICIPAL BONDS** Ch. 14, *The Role of the Underwriter* at 268 (John Wiley & Sons, Inc. 2008). Emphasis in original.

[26] Securities Industry and Financial Markets Association, **BOND PURCHASE AGREEMENT, GENERAL PROVISIONS AND CONDITIONS, GOVERNMENTAL TAX- OR REVENUE-SUPPORTED SECURITIES** at 2 (9/17/08).

**Report of Robert W. Doty**
**Page 13**

compensation below), not from earning interest.  An issuer does not "borrow" or take a "loan" from an underwriter, but from the public investors who buy the bonds from the underwriters.

### 4.  Compensation of Underwriting Syndicates

In my experience, the compensation that an underwriting syndicate receives for selling municipal bonds to public investors is the difference ("spread" or "discount") between the price the syndicates pay the issuers for the bonds and the public offering prices the syndicates receive from the investors.

Reflecting this practice, SIFMA describes the fee as "the *gross spread*, [which] is the difference between the price the underwriter pays the issuer for the bonds and the price at which the bonds are reoffered to the investing public."[27] GFOA agrees in its Best Practice entitled "*Selecting and Managing Underwriters for Negotiated Bond Sales*," describing underwriters' compensation as "the sales commission in the transaction."[28]

In a typical borrowing scenario, by contrast, the lender is entitled to interest payments on the bonds, expects to be repaid the principal amount upon maturity, and is not entitled to any other fee or "spread."

## B.  Industry Standards for Direct Placements of Debt

I have worked on both public offerings of municipal bonds and direct and private placements of municipal bonds at various times in my career, including in the 1980s and the 2000s.  In addition, prior to the 1980s, I worked on corporate public offerings of both stocks and debt securities and numerous direct placements of corporate stocks and debt.  Based on my experience, "direct placements" are types of "private placements," which are direct sales to either a single investor or to a small number of sophisticated investors.[29] Private placements and

---

[27] Securities Industry and Financial Markets Association, **THE FUNDAMENTALS OF MUNICIPAL BONDS** at 97 (6th ed. 2012). Emphasis in original.

[28] GFOA Best Practice: "*Selecting and Managing Underwriters for Negotiated Bond Sales*" (2014) at *gfoa.org/selecting-and-managing-underwriters-negotiated-bond-sales*. *See also* Patricia Tigue, **A GUIDE FOR SELECTING FINANCIAL ADVISORS AND UNDERWRITERS, WRITING RFPS AND EVALUATING PROPOSALS** at 26 (Government Finance Officers Association, 1997) (describing underwriters' compensation as "the underwriters' discount" or "gross spread"); R. Fippinger, **THE SECURITIES LAW OF PUBLIC FINANCE** Ch. 10A, §10A:3.2[A] at 10A-53 (Practising Law Institute, rel. 9/18) (describing underwriter compensation as "the gross spread, that is, the difference between the initial offering price and the amount paid to the issuer … .").

[29] R. Pope, **MAKING GOOD DISCLOSURE** at 53 (Government Finance Officers Association, 2001) ("Securities offerings are generally—but imprecisely—divided into two types—public offerings and private placements. … Private placements are sales of bonds or notes to either a single investor or a small number of sophisticated investors."); J.B. Kurish and Patricia Tigue, **AN ELECTED OFFICIALS**

**Report of Robert W. Doty**
**Page 14**

direct placements are vastly different from, and mutually exclusive of, underwritten public
offerings.

Although industry publications more commonly discuss the term "private placement," a
"direct placement" is a type of private placement and, as noted earlier, the two terms are
sometimes referred to synonymously.  For example, a 2012 article in Corporate Finance Review
states that "[t]he terms 'private placement' and 'direct placement' often refer to direct
placements of debt securities, as well as direct bank loans and other alternative financing
techniques."[30]  Other publications, including from the 1980s and earlier, are in accord.[31]

In the **DICTIONARY OF FINANCE AND INVESTMENT TERMS** (5th ed. 1998),[32] published by
Barron's, a respected and authoritative source in the financial markets, John Downes and Jordan
Elliott Goodman state:

> ***DIRECT PLACEMENT direct sale of securities to one or more
> professional investors***. … They may be bonds … . These investments
> typically require large minimum purchases, often in the millions of
> dollars. Direct placements offer higher potential returns ***than many
> publicly offered securities***. … Buyers of direct placements are large,
> sophisticated financial institutions including insurance companies, banks,

---

**GUIDE TO DEBT ISSUANCE** at 49 (Government Finance Officers Association, 2005 ("A private
placement is the sale of bonds by an issuer directly to investors without a public offering.").  *See also* R.
Fippinger, **THE SECURITIES LAW OF PUBLIC FINANCE** Ch. 10A, §10A:3.4[A] at 10A-57 (Practising
Law Institute, rel. 9/18) (describing "private placements of municipal securities" as including "direct
purchases by a single financial institution.")

[30] Fraser, Devlin and Lawrence, "*Direct Bank Loans to Municipalities by Banks May Be Treated as
Securities*" at 6, n. 5 (Corp. Fin. Rev. Sept./Oct. 2012).

[31] See Note, "*Reforming the Initial Sale Requirements of the Private Placement Exemption*," 86 Harv.
L. Rev. 403, 426 n. 1 (1972) ("The 'private placement' is alternatively described by courts and
commentators as a 'direct placement' or 'private offering.'"); *id*. at n 4 ("Generally, in a public
offering, unlike in a private placement, an underwriter takes title to the securities and then resells
them to the public."); Comment, "*Institutional Investment Through Private Placement of Corporate
Securities*," 53 Colum. L. Rev. 804 (June 1953) ("At different times and in different contexts the
phrases "private deal," "private sale," "private placement" and "direct placement" have been used to
describe the process by which capital is provided for the use of private or quasi-public corporations by
means of direct negotiations either between the suppliers and the recipients, or between the suppliers
and agents for the recipients."); Note, "*A Conduct-Oriented Approach to the Glass-Steagall Act*," 91
Yale L J. 102, 110 n. 68 (1981) ("A private placement, also known as a direct placement, is an
alternative to an open-market sale of securities.").

[32] J. Downes and J. Goodman, **DICTIONARY OF FINANCE AND INVESTMENT TERMS** at 151 (Barron's
Educational Series, Inc., 5th ed. 1998). Emphasis added.

**Report of Robert W. Doty**
**Page 15**

mutual funds, foundations, and pension funds that are able to evaluate
such offerings. **Also called *private placement***

**DIRECT PLACEMENT OF CORPORATE SECURITIES,**[33] by E. Raymond Corey, defines the
term "direct placement" as follows:

> *Direct placement refers … to the procedure in which the corporate*
> *issuer and the institutional investor deal directly with each other, with or*
> *without the aid of an intermediary, in establishing the terms of a security*
> *issue, and in which title to the security, or securities, is taken directly by*
> *the final holder.* Securities negotiated and sold by this method are
> *directly* placed in the sense that they are not first sold to intermediate
> owners (*e.g.*, investment bankers) who have purchased with the intent of
> reselling.

In its book, **THE FUNDAMENTALS OF MUNICIPAL BONDS**, SIFMA describes private
placements as occurring "when the investment banker offers securities to investors, ***without a***
***public offering***."[34] SIFMA further notes that, in a private placement transaction, "the placement
agent (the term for the underwriter in this type of transaction) contacts one or more institutional
investors" and that such investors have the ability to negotiate directly with the issuer and
influence the structure of the deal.[35]

Placement agents, by definition, are "agents." Given that agency role, the contracts
between placement agents and municipal bond issuers are fundamentally different from bond
purchase contracts with underwriters dealing with issuers at arms-length. Both the SEC and the
MSRB have emphasized that placement agents may have fiduciary duties pursuant to state law.

The SEC stated: "a placement agent may have … a fiduciary duty to its client, that
arise[s] as a matter of common law or another statutory or regulatory regime."[36]

The MSRB made clear that underwriters have vastly different roles from that of
placement agents. In that vein, the MSRB requires underwriters to disclose to municipal issuers
that: "The underwriter's primary role is to *purchase securities with a view to distribution* in an
arms'-length commercial transaction with the issuer …" and "the underwriter does not have a
fiduciary duty to the issuer under the federal securities laws and is, therefore, not required by

---

[33] E. Corey, **DIRECT PLACEMENT OF CORPORATE SECURITIES** at 3 (Harvard Univ., 1951). Emphasis in
original.

[34] Securities Industry and Financial Markets Association, **THE FUNDAMENTALS OF MUNICIPAL BONDS**
at 71 (6th ed. 2012). Emphasis added.

[35] *Id.*

[36] SEC Rel. No. 34-70462 at 172, n. 628 (Sept. 20, 2013).

federal law to act in the best interests of the issuer without regard to its own financial or other interests."[37]

Due to key distinctions between underwriters, which act in an arms'-length capacity, and placement agents, which do not, the MSRB exempted placement agents from the requirement of disclosing the absence of the fiduciary duty in relationships between placement agents and issuers because placement agents may in fact owe fiduciary duties to issuers.[38]

The market guidance document entitled *Considerations Regarding Voluntary Secondary Market Disclosure About Bank Loans* ("Considerations About Bank Loans"), which was created by nine authoritative national municipal bond market organizations,[39] is also instructive. The document describes the forms in which direct placements of municipal debt occur as: (i) "a direct purchase—by purchasing a bond directly," or (ii) "a direct loan—by entering into a loan agreement or other type of financing agreement with the issuer."[40] Notably, *Considerations About Bank Loans* states that "[t]he term 'bank loan,' . . . ***does not include*** purchases of bonds by banks in a primary public offering or in the secondary market."[41] The document further notes that "direct purchases" and "direct loans" generally occur without an official statement or other public offering document.[42]

In my experience, investors in direct placements typically agree to restrictions on transfers of the bonds into the public municipal bond market, thus protecting against retail purchases of the bonds without adequate information. The restrictions may take the form of "investment letters" in which the placement investors represent their investment intent or may be imposed by limiting the denominations of the bonds to $100,000 or more or as a single bond issue that cannot be broken into small participations. In a direct placement, an issuer provides confidential continuing information directly to the investors, rather than through a continuing

---

[37] MSRB Notice 2012-38 (July 18, 2012).

[38] MSRB Notice 2012-38 (July 18, 2012) ("in a private placement where a dealer acts as a true placement agent, the disclosure relating to fiduciary duty would be inapplicable and may be omitted due to the existence of similar state law obligations.").

[39] The organizations consist of American Bankers Association, Bond Dealers of America, Government Finance Officers Association, Government Finance Officers Association, Investment Company Institute, National Association of Bond Lawyers, National Association of Independent Public Finance Advisors, National Federation of Municipal Analysts, and Securities Industry and Financial Markets Association.

[40] Considerations About Bank Loans at 1.

[41] Considerations About Bank Loans at 1. Emphasis added.

[42] Considerations About Bank Loans at 2, 4.

**Report of Robert W. Doty**
**Page 17**

disclosure agreement providing for disclosures to the general public through the MSRB or national repositories.

The foregoing industry practices regarding direct placements of debt are echoed strongly in the regulatory actions of the SEC that govern disclosure requirements for municipal bond issuances. For example, SEC Rule 15c2-12,[43] which addresses disclosure by municipal bond issuers to the investing public in the municipal bond market, imposes procedural requirements for public offerings of municipal bonds, including that underwriters must obtain, review, and provide to investors official statements prepared by issuers in those public offerings. The Rule includes an explicit exemption from these requirements, however, for limited offerings that incorporate features of private placement transactions meeting all of the following conditions:[44]

1. The bonds must be issued in "denominations of $100,000 or more;"

2. The bonds must be sold to "no more than thirty-five persons each of whom" the underwriter "reasonably believes [h]as such knowledge and experience in financial and business matters that it is capable of evaluating the merits and risks of the prospective investment;" and

3. No investor can be "purchasing for more than one account or with a view to distributing the securities"

Recently, the SEC issued a concept release proposing a potential rule to allow "direct placements of municipal securities" by municipal advisors to municipal bond issuers (as opposed to placements by underwriters). Once again, the SEC's proposal describes common characteristics of direct placements, requiring that the "entire issuance" be placed with a single "Qualified Provider," described as "(i) a bank, savings and loan association, insurance company, or registered investment company; or (ii) an investment adviser registered with the [SEC] or with a state; or (iii) any other institution with total assets of at least $50 million."[45]

In summary, in my substantial experience in the industry and based on industry guidance a "direct placement of debt" in the municipal bond industry is the opposite of a public offering: it does not involve (and has not in the past involved) an intermediating underwriting syndicate selling bonds to public investors using official statements. Instead, a direct placement involves direct contact and negotiations between municipal bond issuers and institutional or other sophisticated purchasers of the municipal bonds in limited distributions, without public official

---

[43] SEC Rule 15c21-2, 17 C.F.R. §240.15c2-12.

[44] SEC Rule 15c21-2(d), 17 C.F.R. §240.15c2-12(d).

[45] SEC Rel. No. 34-87204, Proposed Exemptive Order Granting a Conditional Exemption from the Broker Registration Requirements of Section 15(a) of the Securities Exchange Act of 1934 for Certain Activities of Registered Municipal Advisors at 11, 12 (Oct. 2, 2019).

**Report of Robert W. Doty**
**Page 18**

statements (although an issuer might assemble information in a limited offering memorandum).
Such offering documents are unnecessary because the investors are able to obtain information
directly from the municipal bond issuers and are better able to bear losses on their investments
than are many public investors.[46]

_____

[46] For this same reason, directly placed bonds are typically not rated because there is no need for ratings.

Report of Robert W. Doty
Page 19

# A<small>NALYSIS OF THE</small> ERS B<small>OND</small> I<small>SSUANCES</small>

### A. ERS Did Not "Borrow" or Take a "Loan" from UBS or Other Members of the Underwriting Syndicates As those Terms are Used in Municipal Finance

As discussed above, based on my decades of experience in the industry and relevant industry guidance, a municipal bond issuer in a public offering conducted through an underwriting syndicate does not "borrow" or take a "loan" from the members of the syndicate. The documents concerning the issuance of the ERS Bonds and the role that UBS, as representative of the underwriting syndicates, played confirm the following:

- The role of the underwriting syndicates with respect to the ERS Bonds was to facilitate the offering and sale of the ERS to public investors – a role typically held by underwriters;

- The transactions were solely purchase-sale transactions;

- The underwriting syndicates, led by UBS, purchased securities with a view to distribution to public investors in arms-length commercial transactions with ERS;

- The underwriting syndicates were compensated as typically expected of an underwriter: through discounts from the public offering price paid by public investors for the Bonds in the transactions;[47] and

- As expected, given the role of an underwriting syndicate, none of the documents governing the issuance of the ERS Bonds reference a borrowing from the underwriting syndicate.

From my review of the bond documents, it is clear the ERS Bond issuance contemplated that UBS and the other members of the underwriting syndicates were fulfilling an intermediating function by buying ERS' Bonds for resale to public investors. For example, in each of the ERS Series A, B and C Bond Letters of Representations to the Underwriters, ERS represented to UBS and the other members of the underwriting syndicates that it was providing the Letters "[i]n order to induce you to enter into the Purchase Contract … and to make the offering and sale of

---

[47] The discounts appear in Section 1 on page 1 of each of the Bond Purchase Contracts.

In addition, the "Underwriting" sections of each of ERS' Official Statements provide the underwriters' discounts "from the initial public offering prices of the … Bonds." Series A Bond Official Statement at 52; Series B Bond Official Statement at 49; and Series C Bond Official Statement at 54.

**Report of Robert W. Doty**
**Page 20**

the Bonds." The Letters say nothing about inducing UBS and the underwriters to allow ERS to "borrow" or take a "loan" from them.

Based on my experience and knowledge of industry customs, practices and standards in the municipal bond market, the relationships between ERS and the intermediating underwriting syndicates would be set forth in a bond purchase contract.[48] Section 4 of the Series A Purchase Contract for the Series A Bond offering specifically describes the responsibilities of UBS and the other underwriters with respect to the ERS Bond issuances as "to make a bona fide public offering of all of the Bonds" and authorizes them to use ERS' Official Statements, Bond Resolutions and other documents in marketing the Bonds to public investors.[49] These provisions show that ERS used the underwriting syndicates not as lenders in a "borrowing" or a "loan," but as intermediaries who would distribute and offer the Bonds for sale to the public.

The Bond closing documentation does not indicate that ERS had a "borrowing" or "loan" relationship with the underwriters. In fact, I could not find any mention of a "borrowing" by ERS from the underwriting syndicates anywhere in any of the Series A, B or C Bond documents I have reviewed. (See Appendix I, Materials Reviewed.) None of the Bond Resolution or Supplemental Bond Resolutions describe the relationship between ERS and the underwriting syndicates as involving a "borrowing" by ERS from the syndicates. And none of ERS' Official Statements, Bond Counsel Opinions, ERS General Counsel Opinions, or Secretary of Justice Opinions describe the relationships between ERS and the underwriting syndicates as involving a "borrowing" by ERS from the syndicates.

The Purchase Contracts between ERS and the underwriters are not borrowing or loan agreements; they are purchase and sale contracts in which the underwriters agree to make "bona fide" public distributions of ERS' Bonds to public investors. The underwriters agree to purchase the Bonds and to re-sell them. They do not agree to participate in a "borrowing" by ERS. The underwriters do not agree to invest in the Bonds because that is not their business model. Indeed, such a practice would inhibit their ability to conduct future underwriting business with other issuer clients by tying up their net capital.[50]

-------------------

[48] In "*The Role of Counsel to the Underwriters*," another chapter in **THE HANDBOOK OF MUNICIPAL BONDS**, Mary G. Wilson, a municipal bond underwriter counsel, states that "The bond purchase agreement sets forth the financial and business terms of the underwriting agreements between the issuer and the underwriter … . The bond purchase agreement provides for the sale of the bonds to the underwriter … ." S. Feldstein and F. Fabozzi, ed. **THE HANDBOOK OF MUNICIPAL BONDS** Ch. 6, *The Role of Counsel to the Underwriters* at 86 (John Wiley & Sons, Inc. 2008).

[49] Series A Bond Purchase Contract §4 on page 3. The Series B Bond Purchase Contract §4 on page 3 and Series C Bond  Purchase Contract §4 on page 3 contain closely similar provisions.

[50] The SEC set forth net capital requirements in SEC Rule 15c3-1, 17 C.F.R. §240.15c3-1.

**Report of Robert W. Doty**
**Page 21**

A "borrowing" or "loan" agreement would set forth, among other things, the terms of the borrowing, including repayment terms, ERS financial and operational covenants, requirements that ERS provide information directly to the underwriting syndicates, interest rates, default provisions, and enforcement provisions. The Purchase Contracts do none of that. I have seen no such "borrowing" agreement with the underwriting syndicates in connection with the ERS Series A, B or C Bond offerings. The fact that the ERS Bond issuances were not borrowings from or loans by the underwriting syndicates is consistent with my 45 years of experience in the municipal bond market and my earlier experience in the corporate securities market.

As noted above, ERS sold the Bonds to the underwriters at a discount from the initial public offering price. The underwriters would have received their transactional compensation from selling the Bonds to public investors above the discounted price. The underwriters would not have been compensated through the receipt of interest payments, as would be the case if a true borrowing relationship existed between ERS and the underwriters.

In summary, in accordance with market standards, the underwriters were not investors in the ERS Bonds; they were bond underwriters that bought and sold the bonds. The transactions conform to the typical municipal bond market standard of purchase and sale transactions. Thus, ERS did not "borrow" or take a "loan" from the underwriting syndicates.

To view the underwriting relationship as a "borrowing" or "loan" from a "financial institution" would be an aberration and would be inconsistent with municipal bond industry standards and my decades of experience in the market.

### B. ERS Did Not Make a "Direct Placement of Debt" in its Bond Offerings

As discussed above, in municipal finance, a "direct placement of debt" involves the sale of municipal securities by an issuer directly to a single or small group of sophisticated investors. Here, the ERS Bonds were sold to the public at large through underwritten public bond offerings, and bond sales were not restricted to experienced or sophisticated investors or to financial institutions. As such, the ERS Bond issuances were not "direct placements of debt."

In my experience, if the ERS Bond offerings were "direct placements of debt," in addition to a small number of sophisticated investors, I would expect to see direct negotiation of Bond terms between ERS and each of the investors. That did not happen in connection with any of the Bond offerings. ERS did not itself identify the investors, market the Bonds directly to investors, or engage in negotiations with investors. Instead, the underwriting syndicates undertook those investor contacts in the process of offering and selling ERS' Bonds to public investors. ERS prepared its multi-hundred page Official Statements and provided those documents to the underwriting syndicates specifically for the syndicates to distribute public information regarding ERS broadly, not within a controlled confidential group. The investors did not negotiate terms directly with ERS as the issuer.

**Report of Robert W. Doty**
**Page 22**

Other aspects of the Bond issuances are also contrary to what I would expect to see in a direct placement transaction.  For example, I would not expect to see:

- Ratings for the Bonds by all three major rating agencies, which ratings typically do not exist for directly placed bonds because the sophisticated investors in such bonds can and do rely primarily upon their own credit research.

- A Master Continuing Disclosure Agreement [51] requiring ongoing public disclosures, as the issuer in a direct placement would typically provide information directly to the end purchasers.

- A complete lack of restrictions on the resale of the Bonds in the public market (including the use of minimum denominations of $5,000, rather than $100,000), which restrictions are a necessary component of a direct placement.

Based on all the foregoing, it is my opinion that ERS would not have been viewed in the industry as making a "direct placement of debt" in connection with the ERS Bond issuances.  In fact, because ERS Bonds were part of underwritten public bond offerings, they are in my opinion the direct opposite of a "direct placement of debt."

---

[51] Master Continuing Disclosure Agreement dated January 31, 2008, between ERS and the Commonwealth of Puerto Rico.

I declare under penalty of perjury that the foregoing is true and correct.

**IN WITNESS WHEREOF,** I have executed this Report in Annapolis, Maryland, as of the date set forth below.

**EXECUTED ON:** July 1, 2020

_____

**Robert W. Doty**

# APPENDIX I—

# MATERIALS REVIEWED

## APPENDIX I–
## <u>MATERIALS REVIEWED</u>

In the preparation of this Report, I have considered the following materials (provisions cited in the Report):

**A.** Documents, authorities and other materials, or portions thereof, cited in the Report

**B.** Bond Resolution

**C.** First Supplemental Bond Resolution

**D.** Second Supplemental Bond Resolution

**E.** Third Supplemental Bond Resolution

**F.** Series A Purchase Contract

**G.** Series B Purchase Contract

**H.** Series C Purchase Contract

**I.** Series A Bond Counsel Opinion

**J.** Series B Bond Counsel Opinion

**K.** Series C Bond Counsel Opinion

**L.** Series A Official Statement

**M.** Series B Official Statement

**N.** Series C Official Statement

**O.** Specimen of the Series A Bonds

**P.** Specimen of the Series B Bonds

**Q.** Specimen of the Series C Bonds

**R.** Series A Bond ERS General Counsel Opinion

**S.** Series B Bond ERS General Counsel Opinion

**T.** Series C Bond ERS General Counsel Opinion

**U.** Series A Bond Secretary of Justice Opinion

**V.** Series B Bond Secretary of Justice Opinion

**Report of Robert W. Doty**
**Appendix I-2**

**W.** Series C Bond Secretary of Justice Opinion

**X.** ERS Series A Bond Letter of Representations to the Underwriters

**Y.** ERS Series B Bond Letter of Representations to the Underwriters

**Z.** ERS Series C Bond Letter of Representations to the Underwriters

**AA.** ERS Master Continuing Disclosure Agreement

**BB.** Conway MacKenzie Report

**CC.** Kobre & Kim Report

**DD.** R. Fippinger, **THE SECURITIES LAW OF PUBLIC FINANCE** Chs. 5, 10, 10A (Practising Law Institute)

**EE.** R. Pope, **MAKING GOOD DISCLOSURE** (Government Finance Officers Association, 2001)

**FF.** Municipal Securities Rulemaking Board, *Interpretive Guidance Concerning the Application of MSRB Rule G-17 to Underwriters of Municipal Securities* (Aug. 2, 2012)

**GG.** MSRB Notice 2012-38, *Guidance on Implementation of the Interpretive Notice* (July 18, 2012)

**HH.** Securities Industry and Financial Markets Association, **BOND PURCHASE AGREEMENT, GENERAL PROVISIONS AND CONDITIONS, GOVERNMENTAL TAX- OR REVENUE-SUPPORTED SECURITIES** (9/17/08)

**II.** Securities Industry and Financial Markets Association, **THE FUNDAMENTALS OF MUNICIPAL BONDS** (6th ed. 2012)

**JJ.** S. Feldstein and F. Fabozzi, ed. **THE HANDBOOK OF MUNICIPAL BONDS** Ch. 6, *The Role of Counsel to the Underwriters* and Ch. 14, *The Role of the Underwriter* (John Wiley & Sons, Inc. 2008)

**KK.** Government Finance Officers Association, "*Best Practice: Selecting and Managing Underwriters for Negotiated Bond Sales*" (2014)

**LL.** Patricia Tigue, **A GUIDE FOR SELECTING FINANCIAL ADVISORS AND UNDERWRITERS, WRITING RFPS AND EVALUATING PROPOSALS** (Government Finance Officers Association, 1997)

**MM.** J.B. Kurish and Patricia Tigue, **AN ELECTED OFFICIALS GUIDE TO DEBT ISSUANCE** (Government Finance Officers Association, 2005)

**Report of Robert W. Doty**
**Appendix I-3**

**NN.** *Considerations Regarding Voluntary Secondary Market Disclosure About Bank Loans* (May 2013)

**OO.** SEC Rule 15c2-12, 17 C.F.R. §240.15c2-12

**PP.** SEC Rule 144, 17 C.F.R. §230.144

**QQ.** SEC Rel. No. 34-87204, Proposed Exemptive Order Granting a Conditional Exemption from the Broker Registration Requirements of Section 15(a) of the Securities Exchange Act of 1934 for Certain Activities of Registered Municipal Advisors (Oct. 2, 2019)

**RR.** SEC Rel. No. 34-70462 at 172, n. 628 (Sept. 20, 2013)

**SS.** Note, "*Reforming the Initial Sale Requirements of the Private Placement Exemption,*" 86 Harv. L. Rev. 403 (1972)

**TT.** Comment, "*Institutional Investment Through Private Placement of Corporate Securities,*" 53 Colum. L. Rev. 804 (June 1953)

**UU.** Note, "*A Conduct-Oriented Approach to the Glass-Steagall Act,*" 91 Yale L J. 102, 110 (1981)

**VV.** J. Downes and J. Goodman, **DICTIONARY OF FINANCE AND INVESTMENT TERMS** at 151 (Barron's Educational Series, Inc., 5th ed. 1998)

# APPENDIX II—

## <u>DEFINITIONS</u>

# APPENDIX II–
## DEFINITIONS

The following defined terms are used in this Report:

**A.** The term "*Bond Counsel Opinions*" means, collectively, the Series A Bond Counsel Opinion, the Series B Bond Counsel Opinion, and the Series C Bond Counsel Opinion.

 **1.** The term "*Series A Bond Counsel Opinion*" means the Bond Counsel Opinion dated January 31, 2008, of Fiddler Gonzalez & Rodriguez, P.S.C. relating to the Series A Bonds.

 **2.** The term "*Series B Bond Counsel Opinion*" means the Bond Counsel Opinion dated June 2, 2008, of Fiddler Gonzalez & Rodriguez, P.S.C. relating to the Series B Bonds.

 **3.** The term "*Series C Bond Counsel Opinion*" means the Bond Counsel Opinion dated June 30, 2008, of Fiddler Gonzalez & Rodriguez, P.S.C. relating to the Series C Bonds.

**B.** The term "*Bond Resolution*" means the Pension Funding Bond Resolution adopted on January 24, 2008, by ERS' Board of Trustees.

**C.** The term "*Supplemental Bond Resolutions*" means, collectively, the First Supplemental Bond Resolution, the Second Supplemental Bond Resolution, and the Third Supplemental Bond Resolution.

 **1.** The term "*First Supplemental Resolution*" means the First Supplemental Pension Funding Bond Resolution adopted on January 29, 2008, by ERS' Board of Trustees.

 **2.** The term "*Second Supplemental Resolution*" means the Second Supplemental Pension Funding Bond Resolution adopted on May 27, 2008, by ERS' Board of Trustees.

 **3.** The term "*Third Supplemental Resolution*" means the Third Supplemental Pension Funding Bond Resolution adopted on June 26, 2008, by ERS' Board of Trustees.

**D.** The term "*Bonds*" or "*ERS Bonds*" means, collectively, the Series A Bonds, the Series B Bonds, and the Series C Bonds.

 **1.** The term "*Series A Bonds*" means ERS' $1,588,810,799.60 Senior Pension Funding Bonds, Series A dated January 31, 2008.

 **2.** The term "*Series B Bonds*" means ERS' $1,058,634,613.05 Senior Pension Funding Bonds, Series B dated June 2, 2008.

Report of Robert W. Doty
Appendix II-2

    **3.** The term "*Series C Bonds*" means ERS' $303,202,930 Senior Pension Funding Bonds, Series C dated June 30, 2008.

**E.** The term "*Bond Purchase Contracts*" means, collectively, the Series A Bond Purchase Contract, the Series B Bond Purchase Contract, and the Series C Bond Purchase Contract.

    **1.** The term "*Series A Bond Purchase Contract*" means the Amended and Restated Purchase Contract dated January 29, 2008, between ERS and UBS, as representative of the underwriting syndicate, relating to the marketing and sale for ERS of the Series A Bonds by the underwriting syndicate.

    **2.** The term "*Series B Bond Purchase Contract*" means the Purchase Contract dated May 28, 2008, between ERS and UBS, as representative of the underwriting syndicate, relating to the marketing and sale for ERS of the Series B Bonds by the underwriting syndicate.

    **3.** The term "*Series C Bond Purchase Contract*" means the Purchase Contract dated June 26, 2008, between ERS and UBS, as representative of the underwriting syndicate, relating to the marketing and sale for ERS of the Series C Bonds by the underwriting syndicate.

**E.** The term "*Conway MacKenzie Report*" means Review of the Events and Decisions That Have Led to the Current Financial Crisis of the Employees Retirement System of the Government of Puerto Rico Report prepared by Conway MacKenzie, Inc. for the Employees Retirement System of Government of Puerto Rico and Government Development Bank for Puerto Rico, as Fiscal Agent of the Government of Puerto Rico (Oct. 2010).

**D.** The term "*ERS*" means the Employees Retirement System of the Government of the Commonwealth of Puerto Rico.

**E.** The term "*ERS Bondholders*" means certain beneficial holders of the ERS Bonds.

**F.** The term "*ERS Enabling Act*" means Act No. 447 of the Legislative Assembly of Puerto Rico, approved May 15, 1951, as amended and supplemented, including amendment by Act 46-1988.

**G.** The term "*ERS General Counsel Opinions*" means, collectively, the Series A Bond ERS Counsel Opinion, the Series B Bond ERS Counsel Opinion, and the Series C Bond ERS Counsel Opinion.

    **1.** The term "*Series A Bond ERS General Counsel Opinion*" means the Opinion dated January 31, 2008, of Marilyn Cuevas Silvagnoli, Esq. relating to the Series A Bonds.

Report of Robert W. Doty
Appendix II-3

**2.** The term "*Series B Bond ERS General Counsel Opinion*" means the Opinion dated June 2, 2008, of Marilyn Cuevas Silvagnoli, Esq. relating to the Series B Bonds.

**3.** The term "*Series C Bond ERS Counsel Opinion*" means the Opinion dated June 30, 2008, of Marilyn Cuevas Silvagnoli, Esq. relating to the Series C Bonds.

**H.** The term "*ERS Letters of Representations to the Underwriters*" means, collectively, the ERS Series A Bond Letter of Representations to the Underwriters, ERS Series B Bond Letter of Representations to the Underwriters, and the ERS Series C Bond Letter of Representations to the Underwriters.

**1.** The term "*ERS Series A Bond Letter of Representations to the Underwriters*" means the Letter of Representations dated January 30, 2008, of ERS to UBS and the other underwriters of the Series A Bonds.

**2.** The term "*ERS Series B Bond Letter of Representations to the Underwriters*" means the Letter of Representations dated June 2, 2008, of ERS to UBS and the other underwriters of the Series B Bonds.

**3.** The term "*ERS Series C Bond Letter of Representations to the Underwriters*" means the Letter of Representations dated June 26, 2008, of ERS to UBS and the other underwriters of the Series C Bonds.

**I.** The term "*GFOA*" means the Government Finance Officers Association of the United States and Canada.

**J.** The term "*Kobre & Kim Report*" means The Independent Investigator's Final Investigative Report prepared by Kobre & Kim LLP for The Financial Oversight & Management Board for Puerto Rico Special Investigation Committee (Aug. 20, 2018).

**K.** The term "*Master Continuing Disclosure Agreement*" means the Master Continuing Disclosure Agreements dated January 31, 2008, between ERS and the Commonwealth of Puerto Rico.

**L.** The term "*MSRB*" means the Municipal Securities Rulemaking Board.

**F.** The term "*Official Statements*" means, collectively, the Series A Bond Official Statement the Series B Bond Official Statement, and the Series C Bond Official Statement.

**1.** The term "*Series A Bond Official Statement*" means ERS' Official Statement dated January 29, 2008, for the offering and sale of the Series A Bonds to investors.

**2.** The term "*Series B Bond Official Statement*" means ERS' Official Statement dated May 28, 2008, for the offering and sale of the Series B Bonds to investors.

**Report of Robert W. Doty**
**Appendix II-4**

    **3.** The term "*Series C Bond Official Statement*" means ERS' Official Statement dated June 26, 2008, for the offering and sale of the Series C Bonds to investors.

**M.** The term "*SEC*" means the Securities and Exchange Commission.

**N.** The term "*Secretary of Justice Opinions*" means, collectively, the Series A Bond Secretary of Justice Opinion, the Series B Bond Secretary of Justice Opinion, and the Series C Bond Secretary of Justice Opinion.

    **1.** The term "*Series A Bond Secretary of Justice Opinion*" means the Opinion dated January 31, 2008, of Roberto J. Sanchez Ramos, Esq. relating to the Series A Bonds.

    **2.** The term "*Series B Bond Secretary of Justice Opinion*" means the Opinion dated June 2, 2008, of Roberto J. Sanchez Ramos, Esq. relating to the Series B Bonds.

    **3.** The term "*Series C Bond Secretary of Justice Opinion*" means the Opinion dated June 30, 2008, of Roberto J. Sanchez Ramos, Esq. relating to the Series C Bonds.

**G.** The term "*SIFMA*" means the Securities Industry and Financial Markets Association.

**H.** The term, "*UBS*" means UBS Financial Services Incorporated of Puerto Rico, as representative of the underwriting syndicates distributing the respective ERS' Bonds.

# APPENDIX III—

## <u>QUALIFICATIONS AND CURRICULUM VITAE</u>

# APPENDIX III—
## <u>QUALIFICATIONS AND CURRICULUM VITAE</u>

1.  A current true and accurate copy of my *Curriculum Vitae* reflecting my qualifications and experience appears below.

2.  As described in my *Curriculum Vitae*, I have over 45 years of experience in the finance industry in a diversity of capacities relating to several billions of dollars of municipal and corporate finance transactions in approximately two dozen states.

3.  I have served as a municipal bond underwriter with three firms in three states, have represented underwriters as underwriter counsel, served as a consultant to underwriters, and worked with underwriters in numerous municipal bond issues.

4.  I have participated in numerous municipal securities issues as municipal bond counsel, issuer counsel, underwriter counsel, disclosure counsel, trustee counsel, promoter/developer counsel, and investor counsel.

5.  My experience includes work as special consultant to underwriters, issuers and bond counsel and as financial advisor to bond issuers. I have worked closely with numerous bond counsel, issuer counsel and underwriter counsel, and have advised municipal bond issuers, issuer officials, underwriters, and investors, among other things, in municipal securities offerings.

6.  I was a partner in the bond counsel firm known at the time as Squire, Sanders & Dempsey, now known as Squire Patton Boggs. The firm was, and still is, one of the leading bond and underwriter counsel firms in the United States.

7.  In the process of serving in various capacities in the municipal bond market, I have participated in the interview and selection processes for bond counsel and underwriters to work in municipal bond offerings, have negotiated on behalf of issuers with bond counsel, underwriters, and underwriter counsel, and have worked many times closely with, and observed the work of, bond counsel, issuer counsel, underwriters, and underwriter counsel.

8.  In the period from 1987 to 1990, I worked with state agencies that had acquired municipal bonds in direct placements of debt, and with their underwriters, in packaging for the secondary market sales of portfolios of such municipal debt. The transactions occurred separately from the acquisition transactions, often years later.

9.  Prior to the 1980s, I worked on both public offerings of corporate securities (stocks and bonds) and direct placements of corporate securities (stocks and bonds).

10. I have worked with and advised issuers, underwriters, private promoters/developers, and others in structuring complex financial transactions, and have assisted issuers in connection with financial planning and with workouts of numerous defaulted municipal securities issues.

**Report of Robert W. Doty**
**Appendix III-2**

11. In addition, I have discussed the roles and responsibilities of bond counsel, issuer counsel, issuers and issuer officials, underwriters, and underwriter counsel as a member of panels at numerous national and regional conferences, seminars and workshops sponsored by the National Association of Bond Lawyers, the International Municipal Lawyers Association, the California Debt and Investment Advisory Commission, the Practising Law Institute, and other recognized municipal bond market organizations. In those activities, I observed and learned more about the roles, responsibilities and prevailing practices of underwriter counsel, bond counsel, disclosure counsel, issuer counsel, issuers, issuer officials, underwriters, and other parties.

12. I served, and worked closely with many investors, underwriters and other market participants, as a member of the Board of Governors of the National Federation of Municipal Analysts ("NFMA"), and member and officer of NFMA committees, including as Chair of an NFMA disclosure committee and a member of the NFMA Industry Practices Committee. I have served as a member of NFMA committees preparing Best Practices and White Papers on expert work products (such as feasibility analyses, market and demand studies and appraisals), charter school finance, conflicts of interest, market practices and an advanced distressed debt conference.

13. I am a recipient of NFMA's Municipal Industry Contribution Award.

14. I have taught in law schools, among other things, municipal finance law, professional responsibility, securities law, advanced securities law, corporation law, advanced corporation law, corporate finance law, and agency and partnership law; have taught in-house courses for leading bond counsel law firms on securities law; have taught an in-house course for a leading financial consultant firm on roles and responsibilities of financial consultants; and am a recognized speaker on municipal finance at numerous institutes, conferences, seminars and other programs. One of the courses I structured and taught was an internal course at a major bond counsel firm on underwriter counseling.

15. I have been qualified in and testified as an expert witness on the finance industry in federal courts in Kentucky, Illinois and Iowa, and state courts in Arizona, California, Colorado, Connecticut, Florida, Nevada, New Jersey and Virginia; before Administrative Law Judges of the Securities and Exchange Commission; before arbitration panels of the Financial Industry Regulatory Authority and the American Arbitration Association; and by video before a New Mexico special legislative investigative Subcommittee in an impeachment proceeding. My testimony as an expert witness has included testimony as an expert for the SEC's Division of Enforcement in proceedings brought by the SEC.

16. I am a member of the American Association of Individual Investors ("AAII") and have published in the AAII Journal.

**Report of Robert W. Doty**
**Appendix III-3**

17. I have attended investor conferences sponsored by NFMA, Morningstar and AAII and listened to and discussed concerns and interests of investors.

18. As a member of industry committees, I have participated with others in the preparation of a number of nationally- and regionally-recognized publications providing disclosure, investigatory (due diligence) and related guidance applicable to municipal securities transactions. Those publications include, without limitation, successive editions of the Government Finance Officers Association of the United States and Canada's ("GFOA") **DISCLOSURE GUIDELINES FOR STATE AND LOCAL GOVERNMENT SECURITIES** over a period of almost two decades.

19. I am a former General Counsel to the GFOA.

20. I served as Editor and Coordinator of the 1987 edition of **DISCLOSURE ROLES OF COUNSEL**, sponsored by the National Association of Bond Lawyers and a Section and a Subcommittee of the American Bar Association. In that role, I coordinated, combined and edited the work products produced by national committees of attorneys experienced in municipal securities customs, practices and standards of care.

21. I was a principal drafter, together with a national committee of issuer counsel, of the Exposure Draft of the **FINANCING PROCEDURES CHECKLISTS** (Apr. 2007) of the International Municipal Lawyers Association ("IMLA") for attorneys representing local governmental securities issuers.

22. I served for many years as Chair and Co-Chair of IMLA's Section on Economic Development/Finance & Securities.

23. I received IMLA's award as its Most Outstanding Associate Member.

24. I am the author or co-author of numerous books, chapters, articles on municipal bond transactions and roles and responsibilities of various parties in connection with, and customs, practices and standards of care relating to, those transactions. Those publications include seminal articles as to disclosure practices, due diligence and investigatory procedures, roles and responsibilities of parties, and fiduciary responsibilities in municipal securities transactions.

25. I am the author of the **BLOOMBERG VISUAL GUIDE TO MUNICIPAL BONDS** (John Wiley & Sons and Bloomberg Press, 2012), which discusses in plain English for investors and market participants the diversity and complexity of municipal finance.

26. I am the author of **EXPANDING MUNICIPAL SECURITIES ENFORCEMENT: PROFOUND CHANGES FOR ISSUERS AND OFFICIALS** (International Municipal Lawyers Association, 2016). The book discusses significant expansion from 2013 to 2016 in the enforcement

Report of Robert W. Doty
Appendix III-4

activities of the Securities and Exchange Commission relating to municipal bond issuers, issuer officials, underwriters and financial advisors.

27. I also am the author of MUNICIPAL SECURITIES LAW & PRACTICE: REGULATION, DISCLOSURE AND ENFORCEMENT, 212 Securities Practice Series (Bloomberg BNA 2014, rev. 2015, 2016 and 2017), which discusses the pattern of securities regulation in the municipal bond market and enforcement actions over the past 45 years.

28. My writings have been cited favorably in a number of judicial decisions and by the Financial Industry Regulatory Authority. The Securities and Exchange Commission also has cited my writings favorably in SEC Staff Reports, in connection with the SEC's proposal of SEC Rule 15c2-12 governing disclosure procedures in municipal finance transactions, and in the publication in 1988 and 1989 of the SEC's interpretation on underwriter investigatory responsibilities.

29. I served on the Muni Council, formed initially through the auspices of the Municipal Securities Rulemaking Board, consisting of approximately 20 professional associations representing the major municipal bond market participant sectors for the creation of a "central post office" for filings of issuer and obligor continuing disclosure documents. I served as Chair of the Security Committee of the Muni Council.

30. I served as President and a Director of the Southern Municipal Finance Society; member and officer of committees or subcommittees of the National Association of Bond Lawyers and Sections of Business Law and State and Local Government Law of the American Bar Association; and a member of GFOA's Disclosure Task Force.

31. I served as Vice President and a member of the Board of Directors of the National Association of Independent Public Finance Advisors ("NAIPFA") and as Chair of NAIPFA's Public Affairs Committee.

32. Among the consulting clients I have served are the counsel to the Division of Enforcement of the Securities and Exchange Commission, counsel to the Financial Industry Regulatory Authority, the Office of the California Attorney General, the California Department of Corporations, a United States Attorney, a County District Attorney, counsel to a special investigative subcommittee of the New Mexico House of Representatives in connection with impeachment proceedings relating to a State official, and counsel to investors, underwriters, issuers, issuer officials, bond counsel, financial consultants, developers/promoters, indenture trustees and others involved in finance transactions in a number of states.

33. I was selected as one of a five-member United States delegation formed by the Smithsonian Institution's Woodrow Wilson International Center for Scholars and by the National Committee on United States-China Relations to consult with officials of the Peoples Republic of China in Beijing, Shanghai and Hangzhou.

# ROBERT DOTY
## CURRICULUM VITAE

Robert Doty has been involved for decades in the finance industry as a municipal securities financial and municipal advisor, special consultant, investment banker (underwriter), and bond and securities lawyer and underwriter counsel. In the process, Mr. Doty participated in the successful completion of billions of dollars of municipal finance and corporate finance transactions, including representations benefiting more than 150 governmental entities in approximately two dozen states. He worked with a substantial diversity of credit types in the market for municipal bond and other municipal securities, as well as numerous corporate credits. Mr. Doty is President and proprietor of AGFS, his consulting firm.

Mr. Doty served as Chair and Co-Chair of the Section on Economic Development/Finance & Securities of the International Municipal Lawyers Association. He received IMLA's **MOST OUTSTANDING ASSOCIATE MEMBER AWARD**.



Mr. Doty served as a member of the Board of Governors and Executive Committee, as a member of the Industry Practices Committee, and as Chair of a disclosure committee of the National Federation of Municipal Analysts (NFMA). He is a recipient of NFMA's **MUNICIPAL INDUSTRY CONTRIBUTION AWARD**. He also served as the President and a Director of the Southern Municipal Finance Society.

Mr. Doty served as a member of the Professional Qualifications Advisory Committee of the Municipal Securities Rulemaking Board and as a Subject Matter Expert for the MSRB's eLearning initiative. Mr. Doty also served for two years as Vice President of the National Association of Independent Public Finance Advisors (NAIPFA) (now, the National Association of Municipal Advisors), and served for several years as a member of NAIPFA's Board of Directors and Chair of its Public Affairs Committee. He represented NAIPFA on the Muni Council, a group of approximately 20 national associations from across the major municipal bond market sectors developing improvements in the municipal bond market's continuing disclosure practices.

Mr. Doty is a nationally and regionally recognized authority on public finance, and in particular, aspects of the municipal bond market relating to municipal securities law, municipal disclosure and due diligence, fiduciary duties, and roles and responsibilities of parties. He served for more than three decades in the development of disclosure guidelines and due diligence procedures respecting state and local government securities. Among other things, Mr. Doty served as General Counsel to, and a principal drafter, as a member of national industry committees, of the **DISCLOSURE GUIDELINES FOR STATE AND LOCAL GOVERNMENT SECURITIES** and other disclosure guidelines, of the Government Finance Officers Association. Mr. Doty was active for two decades on the Government Finance Officers Association's Disclosure Task Force, and served actively on committees and subcommittees of the American Bar Association and the National Association of Bond Lawyers. He served as Coordinator and Reporter, as a member of a national industry committee, of **DISCLOSURE ROLES OF COUNSEL IN STATE AND LOCAL GOVERNMENT SECURITIES OFFERINGS** (1st ed. 1987), sponsored by a subcommittee and a section of the American Bar Association and the National Association of Bond Lawyers. Mr. Doty served as a principal drafter, as a member of national industry

Robert W. Doty
Summary
Page 2

committees, of the NFMA's **WHITE PAPER ON EXPERT WORK PRODUCTS** (2011) and
NFMA's **WHITE PAPER ON THE DISCLOSURE OF POTENTIAL CONFLICTS OF INTEREST IN
MUNICIPAL FINANCE TRANSACTIONS** (2015) and the Exposure Draft of IMLA's **FINANCING
PROCEDURES CHECKLISTS** (2007). He also served on the NFMA Task Force on pension
disclosure, and served on NFMA's industry committee on charter school disclosure. He served
as a member of the NFMA Industry Practices Committee, which prepared NFMA's **WHITE
PAPER ON BEST MUNICIPAL BOND ISSUANCE PRACTICES** (2014).

Regionally, Mr. Doty served as a Principal Drafter and Coordinator of the Project Team,
working with State agency staff, for the preparation of the California Debt and Investment
Advisory Commission's **GUIDELINES FOR LEASES AND CERTIFICATES OF PARTICIPATION**, an
important form of California public finance. He serve from 2012 to 2013 as an industry
consultant to the Commission. He is also author of a series of papers and draft disclosure
guidelines that foreshadowed the Commission's publication of its **DISCLOSURE GUIDELINES FOR
LAND-BASED FINANCINGS**, such as for assessment districts and special tax districts.

Mr. Doty participated in a wide variety of activities related to municipal securities
transactions, including the issuance of municipal bonds, notes, leases, certificates of participation
and other municipal securities for many types of governmental issuers; workouts and forensic
analysis of and litigation regarding defaulted municipal bonds and other troubled municipal
securities issues; tender offers; and federal and state enforcement investigations. The
governmental entities benefited by Mr. Doty include cities, multi-state interlocal agencies, water
and wastewater agencies, counties, schools, assessment districts, special taxing districts,
authorities, colleges, public utilities, state agencies, joint powers or joint action agencies, power
authorities, and recreation and park, community service and other forms of special agencies and
districts. He was instrumental in the development of sophisticated pooled and other financing
structures.

Mr. Doty is the author and co-author of several books and chapters and over 80 articles on
municipal bonds, corporate finance and related subjects. Mr. Doty's most recent book is
**EXPANDING MUNICIPAL SECURITIES ENFORCEMENT: PROFOUND CHANGES FOR ISSUERS AND
OFFICIALS** (International Municipal Lawyers Association, 2016). The book discusses the
significant expansion from 2013 to 2016 in the enforcement activities of the Securities and
Exchange Commission relating to municipal bond issuers and officials. Not only did the scope of
securities law enforcement actions increased greatly in terms of number and subject matter, but
penalties imposed were substantially more exacting for both municipal issuers and officials.

Mr. Doty's other recent books are **THE BLOOMBERG VISUAL GUIDE TO MUNICIPAL
BONDS** (John Wiley & Sons 2011) and **MUNICIPAL SECURITIES LAW & PRACTICE:
REGULATION, DISCLOSURE AND ENFORCEMENT,** 212 Securities Practice Series (Bloomberg
BNA 2014, rev. 2015, 2016, 2017). **THE BLOOMBERG VISUAL GUIDE**, which includes
contributions from a number of market participants, is directed to explaining in plain English to
retail investors, issuers, students and market professionals seeking to expand their knowledge of
municipal finance, the complexity and diversity of municipal securities, a variety of municipal
securities structures, and why traditional municipal securities are sound. The book also points out
certain market sectors that offer greater rewards and greater risks, and considerations and sources
of information for investors. **MUNICIPAL SECURITIES LAW & PRACTICE** discusses the pattern of

**Robert W. Doty**
**Summary**
**Page 3**

securities regulation in the municipal securities market and enforcement actions over the past 45 years. Mr. Doty's other writings include seminal works in the mid-1970s on municipal securities law and municipal securities disclosure and due diligence and later seminal publications on fiduciary duties and roles and responsibilities of parties in municipal bond offerings and other municipal securities transactions. Mr. Doty's writings have been cited favorably by the Securities and Exchange Commission and the Financial Industry Regulatory Authority and in judicial decisions on municipal securities law.

Mr. Doty frequently served as Chair and speaker at national and regional conferences regarding state and local government finance, including among them, from the late 1980s into this century, the **ANNUAL INSTITUTES ON MUNICIPAL FINANCE** sponsored by the Practising Law Institute in New York. Mr. Doty was selected as one of a five-member United States delegation formed by the Smithsonian Institution's Woodrow Wilson International Center for Scholars and by the National Committee on United States-China Relations to consult with officials of the Peoples Republic of China.

Mr. Doty has served as a consultant to lawyers in almost three dozen states on a variety of matters relating to the finance industry, municipal securities law, municipal disclosure, due diligence, roles and responsibilities of parties, and municipal finance, including counsel to municipal securities issuers, underwriters, bond counsel, trustees, investors and governmental agencies, such as counsel to the Division of Enforcement of the Securities and Exchange Commission (as well as in opposition to the Division), the Financial Industry Regulatory Authority, the California Department of Corporations, the Office of the California Attorney General, a United States Attorney, a District Attorney, and a special investigative subcommittee of the New Mexico House of Representatives. In such consultations, Mr. Doty may provide information regarding municipal finance to parties unfamiliar with the municipal market and may engage in forensic analysis of municipal securities transactions.

When appropriate, Mr. Doty has served as a municipal bonds expert witness. He has testified as an expert on the finance industry in federal courts in Kentucky, Illinois and Iowa, and in state courts in Arizona, California, Colorado, Connecticut, Florida, Nevada, New Jersey and Virginia; before Administrative Law Judges of the Securities and Exchange Commission; before arbitration panels of the Financial Industry Regulatory Authority and the American Arbitration Association; and by video before the special investigative Subcommittee of the New Mexico House of Representatives.

Mr. Doty received his law degree from Harvard Law School. He is a member of numerous market associations representing issuers, investors, counsel and others.

**ROBERT W. DOTY**
**988 Placid Court**
**Arnold, MD 21012**
**Telephone: (916) 761-3432**
**Email: Robert.Doty@AGFS.com**

## <u>CURRICULUM VITAE</u>

**Degrees Earned:**

Harvard Law School, Ll.B, 1967
University of Houston, B.A., *cum laude,* 1964
*Phi Kappa Phi* Honor Society

**Professional Certifications**
**and Registrations:**

Bar examinations in California (retired), Texas (retired) and Maryland (Out of State Attorneys Exam)

Prior Professional Certifications: National Association of Securities Dealers, Inc.—Series 24 (Principal—twice), Series 7 (Registered Representative), Series 63 (State) (No longer in effect)

Certified Independent Public Finance Advisor examination (National Association of Independent Public Finance Advisors) (No longer in effect)

Municipal Advisor Registered with Securities and Exchange Commission and Municipal Securities Rulemaking Board (No longer in effect)

**Memberships and Offices:**

*Selected activities*—Member, Industry Practices Committee (2013), Board of Governors and Executive Committee (1990-92), Industry Practices Committee (1991), Certificate Committee (Chair, 1992-95), National Federation of Municipal Analysts (now inactive); International Municipal Lawyers Association (now inactive), Chair and Co-Chair, Section on Economic Development/Finance & Securities (2012-2019), Chair, Section on Economic Development, Taxation and Finance (2005-07), Vice Chair (2004-05) and Recorder (2003-04), Recorder, Associate Member Department (2002-03); Member, Professional Qualifications Advisory Committee, Municipal Securities Rulemaking Board (2011-12); Subject Matter Expert for the MSRB's eLearning initiative (2017); Muni Council (2002- 2005), Security Committee (Chair, 2004-2005); Vice President (2006-08), and member, Board of Directors and Chair, Public Affairs Committee, National Association of Independent Public Finance Advisors (2004-08); Director and President (1990-92), Southern Municipal Finance Society; Board of Editorial Advisors, Municipal Finance Journal (1990-2019); Disclosure Task Force, Government Finance Officers Association (1975-1991); Subcommittee

**Robert W. Doty**
*Curriculum Vitae*
**Page 2**

on Municipal and Governmental Obligations (Vice Chair 1980s),
American Bar Association (1980s); Special Committee on Securities
Law and Disclosure, National Association of Bond Lawyers (1980s)

*Professional memberships:*

Attorney bar regulatory associations and authorities in California
(inactive); New York (inactive), Maryland, the District of Columbia,
Texas (inactive), and Ohio (inactive). Past memberships through 2019:
the National Federation of Municipal Analysts (now inactive), the
Municipal Analysts Group of New York (now inactive), the Government
Finance Officers Association (Associate Member) (now inactive), the
International Municipal Lawyers Association (Associate Member) (now
inactive), the American Bar Association (now inactive); the National
Association of Bond Lawyers (Associate Member) (now inactive), and
the Securities Experts' Roundtable (now inactive).

**Professional Recognition:**

Chair and Co-Chair, Section on Economic Development/Finance &
Securities (2012-2019), Chair, Economic Development, Taxation and
Finance Section (2005-07), International Municipal Lawyers Association

*Most Outstanding Associate Member Award,* International Municipal
Lawyers Association

Member, Industry Practices Committee (2013), National Federation of
Municipal Analysts (past Member of Board of Governors, Executive
Committee and Chair, Certificate Committee)

*Municipal Industry Contribution Award,* National Federation of
Municipal Analysts

Industry consultant, California Debt & Investment Advisory Commission
(2012-2013)

Member, Professional Qualifications Advisory Committee, Municipal
Securities Rulemaking Board (2011-2012)

Subject Matter Expert for the MSRB's eLearning initiative (2017)

Member, Organizing Committees, Brandeis Municipal Finance
Conferences (2013-2015)

Cited favorably by the Securities and Exchange Commission in its
Release No. 34-26100, 53 F.R. 37778 (Sept. 28, 1988), proposing Rule
15c2-12 effectively to regulate municipal disclosure in the issuance of
municipal securities; the SEC Staff Report on the Municipal Securities
Market at n. 93 (Sept. 1993); and the SEC Staff Report on the Municipal
Securities Market at 7 n. 29, 24 n. 125, 34 n. 185 (July 2012)

**Robert W. Doty**
*Curriculum Vitae*
Page 3

Cited favorably by the Financial Industry Regulatory Authority (FINRA) in setting its 2013 "Business Conduct and Sales Practice Priorities (Jan. 11, 2013)

Cited favorably in the following judicial decisions: *In re New York City Municipal Securities Litigation,* 507 F.Supp. 169, 183 nn. 31 and 33, 184 n. 35 (S.D.N.Y. 1980) (co-authored article and congressional testimony); *In re Washington Public Power Supply System Securities Litigation,* 623 F.Supp. 1466, 1479 (W.D. Wash. 1985) (co-authored article); *Brown v. City of Covington,* 805 F.2d 1266, 1270 (6th Cir. 1986) (co-authored article); *Sonnenfeld v. City of Denver,* 100 F.3d 744, 746 (10th Cir. 1996) (co-authored article)

Testified as an expert in the finance industry in federal courts in Kentucky, Illinois and Iowa, and state courts in Arizona, California, Colorado, Connecticut, Florida, Nevada, New Jersey, and Virginia; before Administrative Law Judges of the Securities and Exchange Commission; before arbitration panels of the Financial Industry Regulatory Authority and the American Arbitration Association; and by video before a special investigative Subcommittee of the House Rules and Order of Business Committee of the New Mexico House of Representatives

Selected as one of a five-member United States delegation formed by the Smithsonian Institution's Woodrow Wilson International Center for Scholars and by the National Committee on United States-China Relations to consult with officials of the Peoples Republic of China and of the Cities of Beijing, Shanghai and Hangzhou, together with academicians and interested professionals in the PRC, as to the potential functioning of a municipal securities market in the PRC; role as a member of the delegation was to discuss legal and financial aspects of, and disclosure and due diligence mechanisms for, formation of a municipal securities market for financing environmental infrastructure in the PRC

Co-Chair, with The Honorable Gui Minjie, Vice Chairman of the China Securities Regulatory Commission, of the Securities Law Panel at the 22nd Biennial Congress of the World Jurist Association held in Beijing and Shanghai

**Professional Activities:**

AGFS, Arnold, Maryland (formerly, American Governmental Financial Services Company, Sacramento, California, and Doty Research & Development Company, Houston, Texas), President and proprietor, 1987-present; research, publications and consulting services regarding municipal securities law, municipal disclosure and due diligence, fiduciary duties, and roles and responsibilities of parties in municipal securities transactions (formerly, also a financial advisory firm providing advice to local governments)

**Robert W. Doty**
*Curriculum Vitae*
**Page 4**

Government Financial Strategies, Inc., Sacramento, California, Senior Advisor and Counsel to the Executive Team, 2012 to 2013, financial advisor to state and local governments respecting the conduct of their financings and other financial matters

George K. Baum & Company, Sacramento; Vice President, 1990-1991; origination of state and local government finance transactions; one of two senior bankers in the California office of the firm

University of Houston, School of Law; Visiting Professor and Adjunct Professor, 1987-1989; taught Business Organizations (emphasizing corporate and securities laws) and State and Local Government Finance (a course I developed)

Underwood, Neuhaus & Co. Incorporated, Houston; First Vice President, 1986-1987; public finance securities origination

Boettcher & Co., Inc., Denver; Vice President, 1984-1986; Rocky Mountain region public finance securities origination and financial institution securitization transactions

Squire, Sanders & Dempsey, Washington and Cleveland; Partner, 1979-1984; bond, underwriter, issuer, investor and trustee counsel; legal aspects of state and local government finance, tax-exempt industrial, commercial, real estate and hospital finance, and financial institution securitization transactions; member, Disclosure Committee; prepared firm forms of hospital financing documents; prepared an internal firm course on legal counseling of underwriters

Government Finance Officers Association, Washington; General Counsel and Director of Fiscal Policy, 1977-1979; a principal drafter with national industry committees of nationally-recognized disclosure guidelines for state and local government securities transactions; securities and tax law liaison with the federal government on behalf of state and local governments

Government Finance Officers Association, Washington, 1975, consultant under National Science Foundation grant regarding research and drafting of disclosure considerations for municipal securities offerings

Creighton University, School of Law, Omaha; Assistant Professor of Law and Associate Professor of Law, 1973-1976; taught Advanced Securities Law, Corporations, Advanced Corporations, Agency and Partnership, Professional Responsibility, and a Seminar on the Preparation of Registration Statements (a seminar I developed)

Kutak Rock, Omaha; Special Consultant, 1974-1975; reviewed the firm's securities law practices and taught an internal securities law course for the firm's attorneys

**Robert W. Doty**
*Curriculum Vitae*
**Page 5**

Fulbright & Jaworski, Houston; Associate, 1967-1973; securities and corporate law; preparation of registration statements, proxy statements, and merger and acquisition agreements, and general securities law and corporate advice

**Books and Database:**

EXPANDING MUNICIPAL SECURITIES ENFORCEMENT: PROFOUND CHANGES FOR ISSUERS AND OFFICIALS (International Municipal Lawyers Association, 2016)

MUNICIPAL SECURITIES LAW & PRACTICE: REGULATION, DISCLOSURE, DUE DILIGENCE AND ENFORCEMENT, 212 Securities Practice Series (Bloomberg BNA 2014, rev. 2015, 2016, 2017)

THE BLOOMBERG VISUAL GUIDE TO MUNICIPAL SECURITIES (John Wiley & Sons, Inc., print and electronic editions 2012)

MUNICIPAL ADVISOR RESOURCES (AGFS, 2011)

FROM TURMOIL TO TOMORROW--THE EMERGING NEW WORLD OF MUNICIPAL FINANCE (AGFS, 2010)

INFRASTRUCTURE FINANCE: TRENDS AND TECHNIQUES, Chapter on "*Funding Clean Water Systems in a Prosperous China*" (Euromoney Books, London, 2008)

STATE AND LOCAL GOVERNMENT DEBT ISSUANCE AND MANAGEMENT SERVICE (Sheshunoff Information Services, Inc., 1996 and subsequent revisions) (co-author of portions of book on securities law and disclosure)

SECURITIES LAW FOR MUNICIPAL FINANCE ADVISORS—A COMPILATION [sm] (AGFS, 2001)

SECURITIES LAW FOR THE MUNICIPAL MARKET [sm] (Goodman Publishing, 2002-03)

AGFS MUNICIPAL SECURITIES LAW AND DISCLOSURE DATABASE [sm] (online service through AGFS) (approximately 2001-02)

SIGNIFICANT BRIEFS FROM KEY MUNICIPAL SECURITIES ENFORCEMENT ACTIONS [sm] (AGFS, 2001)

LIFE AFTER WPPSS—ISSUER DISCLOSURE IN THE STATE AND LOCAL GOVERNMENT SECURITIES MARKET (Packard Press, Philadelphia, 1988-89)

**Robert W. Doty**
*Curriculum Vitae*
**Page 6**

THE FEDERAL LAW OF PUBLIC FINANCE, four volumes (Sorg Printing Company, Chicago, 1988) (co-author with John C. Bates, Jr.)

STATE AND LOCAL GOVERNMENT DEBT FINANCING (D. Gelfand, ed., Callaghan & Co., Deerfield, IL, 1986, 1988 revision and cum. supps. 1986, 1987, 1988, 1989, 1990, 1991 and 1992), "Chapter 2—*Traditional Bonds and Notes*" (co-author with Jeffrey S. Green), "Chapter 8— *Application of the Securities Laws & Market Standards to State & Local Government Securities Transactions,"* and "Chapter 8A—*Disclosure Process in State and Local Government Securities Transactions"*

**Market Guidance and Related Publications:**

RECOMMENDED BEST PRACTICES IN CHARTER SCHOOL FINANCINGS (2017, *National Federation of Municipal Analysts*) (member of national industry committee)

WHITE PAPER ON THE DISCLOSURE OF POTENTIAL CONFLICTS OF INTEREST IN MUNICIPAL FINANCE TRANSACTIONS (2015, *National Federation of Municipal Analysts*) (member of national industry committee)

WHITE PAPER ON BEST MUNICIPAL BOND ISSUANCE AND DISCLOSURE PRACTICES (2014, *National Federation of Municipal Analysts*) (member of NFMA's Industry Practices Committee)

WHITE PAPER ON EXPERT WORK PRODUCTS (*National Federation of Municipal Analysts*, 2011) (member of a national industry committee)

FINANCING PROCEDURES CHECKLISTS (*International Municipal Lawyers Association*, Exposure Draft 2007) (member of a national industry committee)

GUIDELINES FOR LEASES AND CERTIFICATES OF PARTICIPATION (California Debt Advisory Commission, 1993) (Coordinator and a principal drafter for the Project Team working with State agency staff)

DISCLOSURE GUIDELINES FOR STATE AND LOCAL GOVERNMENT SECURITIES (Government Finance Officers Association, 1991 edition) (a principal drafter as a member of a national industry committee)

DISCLOSURE GUIDELINES FOR STATE AND LOCAL GOVERNMENT SECURITIES (Government Finance Officers Association, 1988 edition) (a principal drafter as a member of a national industry committee)

DISCLOSURE ROLES OF COUNSEL IN STATE AND LOCAL GOVERNMENT SECURITIES OFFERINGS (Section of Urban, State and Local Government Law of the American Bar Association, 1st ed. 1987), sponsored by Subcommittee on Municipal and Governmental Obligations, Committee on Federal Regulation of Securities, Section of

**Robert W. Doty**
*Curriculum Vitae*
**Page 7**

Corporation, Banking and Business Law, American Bar Association; Section of Urban, State and Local Government Law, American Bar Association; and Committee on Federal Securities Law, National Association of Bond Lawyers (Reporter and Coordinator as a member of a national industry committee)

**OFFICIAL STATEMENTS FOR OFFERINGS OF SECURITIES BY STATE AND LOCAL GOVERNMENTS—EXAMPLES AND GUIDELINES** (Government Finance Officers Association, 1981) (a principal drafter as a member of a national industry committee)

**DISCLOSURE GUIDELINES FOR OFFERINGS OF SECURITIES BY STATE AND LOCAL GOVERNMENTS** (Government Finance Officers Association, 1979 revision) (a principal drafter as a member of a national industry committee)

**DISCLOSURE GUIDELINES FOR OFFERINGS OF SECURITIES BY STATE AND LOCAL GOVERNMENTS** (Government Finance Officers Association, 1976 original version) (a principal drafter as a member of a national industry committee)

**GUIDELINES FOR USE BY STATE AND LOCAL GOVERNMENTS IN THE PREPARATION OF YEARLY INFORMATION STATEMENTS AND OTHER CURRENT INFORMATION** (Government Finance Officers Association, 1979) (a principal drafter as a member of a national industry committee)

**PROCEDURAL STATEMENTS IN CONNECTION WITH DISCLOSURE GUIDELINES** (Government Finance Officers Association, 1978) (a principal drafter as a member of a national industry committee)

**TENTATIVE DISCLOSURE GUIDELINES FOR DEVELOPERS,** a precursor for the California Debt Advisory Commission's 1996 Guidelines

**Selected Publications:**

"*The SEC Raises the Stakes: How the Recent Amendments to Rulen15c2-12 Will Affect Municipal Bond Issuers*," 59 Mun. Law. No. 6 (Nov.-Dec. 2018) (Co-author with Randall Kulat)

"*Conflict of Interest Issues Are Pivotal for Municipal Advisors*" (The Bond Buyer Sept. 25, 2018)

"*Municipal Advisors' Fiduciary Duty of Care Is More Than Just 'Professional Standards'*" (The Bond Buyer Sept. 17, 2018)

"*Setting Standards of Practice for Consultants*" 38 Mun. Fin. J. 15 (Winter 2018) (Panelist)

"*Regulation and Your Consultants: Drawing the Line*" 38 Mun. Fin. J. 25 (Winter 2018) (Panelist)

**Robert W. Doty**
*Curriculum Vitae*
**Page 8**

"*Duty of Care Enforcement for Municipal Advisors*" (The Bond Buyer Online Aug. 30, 2017)

"*What the SEC Has Achieved (So Far) Through Enforcement*" (The Bond Buyer Online, Aug. 30, 2016)

"*Expanding Municipal Securities Enforcement: Profound Changes For Issuers and Officials*" (The Bond Buyer Online, July 12, 2016)

"*The Past and Future of Municipal Securities--Fortieth Anniversary of the Municipal Securities Rulemaking Board*," Mun. Fin. J. 1 (2016) (Panelist)

"*John Petersen: A Municipal Market Giant*" 33 Mun. Fin. J. 13 (Winter 2013)

"*Telling Myth from Reality in MuniLand*," Govt. Fin. Rev. 17 (GFOA Feb. 2013)

"*Diversity & Risks of Municipal Bonds*" presented at the 2012 Municipal Finance Conference conducted by the Brandeis International Business School on August 3, 2012, and published in 34(2) Mun. Fin. J. 55 (Summer 2013)

*H.R. 2827—Potential Loss of Important Protections for Municipal Securities Issuers,"* Mun. Lawyers 18 (July/Aug. 2012)

"*The Readily-Identifiable Riskiest Municipal Securities: Due Diligence Does Make a Difference*" 32(2) Mun. Fin. J. 63 (2011)

"*Preliminary Observations on the Dodd-Frank Wall Street Reform and Consumer Protection Act as It Applies to the Municipal Securities Market*" 31(2) Mun. Fin, J. 99 (Summer 2010)

"*Bid-Rigging Investigations in the Municipal Markets: Current and Future*" 23 Journal of Taxation & Regulation of Financial Institutions 41 (July/Aug. 2010)

"*Pennsylvania School Districts v. JP Morgan—A Case Study for Issuers on Reading and Understanding Agreements Before Signing*" 30(4) Mun. Fin. J. 79 (Winter 2010)

"*Kentucky v. Davis—Protection for State Tax Exemptions for Bonds*" Mun. Law. 24 (Nov./Dec. 2008)

"*Securities Law Application to Municipal Finance Transactions—Continued Expansion & A Market in Flux, Part 2*" 29(1) Mun. Fin. J. 31 (Spring 2008)

**Robert W. Doty**
*Curriculum Vitae*
**Page 9**

"*Securities Law Application to Municipal Finance Transactions—
Continued Expansion & a Market in Flux, Part I*" 28(4) Mun. Fin. J. 63
(Winter 2008)

"*Municipal Securities Law and Disclosure Developments—Securities
Law Application to Municipal Finance Transactions Is Coming of Age,*"
27(4) Mun. Fin. J. 55 (Winter 2007)

"*Funding Clean Water Systems in a Prosperous China,*" submitted to
2006 China International Conference in Finance, Xi'an, China, and
subsequently revised and expanded under the title "*Funding Clean
Drinking Water Systems in a Prosperous China*"

"*A Clean Water Funding Plan for a Prosperous China,*" 790 Working
Papers of the 22nd Congress on the Law of the World (World Jurist
Association, Sept. 2005)

"*Lease-Purchase Financings in China—Financial Instruments for
Environmental Infrastructure,*" 25(4) Municipal Finance Journal 1
(Winter 2005)

"*Municipal Finance Advising, Part I: Fiduciary Relationships of
Municipal Finance Advisors with Their Issuer Clients,*" 33 Urb. Law 225
(Spring 2001)

"*Municipal Finance Advising, Part II: Managing Relationships of
Municipal Finance Advisors with Issuers*" 33 Urb. Law 259 (Spring
2001)

"*Special Disclosure Considerations for State and Local Government
Securities Issuers,*" 18 Mun. Fin J. 42 (Summer 1997)

"*Disclosure Responsibilities and Substance in Tax-Exempt Land-Based
Financings,*" Mun. Fin J. (Winter 1996) [containing Tentative
Disclosure Guidelines for Developers]

"*The Revolution in Municipal Securities Disclosure Practice,*" 2
Insights: Corp. & Sec. L. Advisor No. 11 at 3 (Nov. 1988) (co-author
with John M. Gardner)

"*Searching for Standards: Disclosure in the Municipal Securities
Market,*" 1976 Duke L.J. 1177 (1977) (co-author with Dr. John E.
Petersen, Dr. Ronald W. Forbes and Donald D. Bourque)

"*The Federal Securities Laws and Transactions in Municipal
Securities,*" 71 Nw. U.L. Rev. 283 (1976) (co-author with Dr. John E.
Petersen)

"*Application of the Antifraud Provisions of the Federal Securities Laws
in Exempt Offerings: Duties of Underwriters and Counsel,*" 16 B.C. Ind.

**Robert W. Doty**
*Curriculum Vitae*
**Page 10**

& Com. L. Rev. 393 (1975)

*"Analysis—Regulation of the Municipal Securities Market and Its Relationship to the Governmental Issuer"* (Municipal Finance Officers Association, 1975) (co-author with Dr. John E. Petersen)

**Speaking Since 2005:**

Mr. Doty has served actively as a speaker on municipal bonds, municipal securities law, disclosure, due diligence and roles and responsibilities of parties for more than the past four decades. Among other things, from the late 1980s into the 2000s, Mr. Doty served as Program Chair and Speaker for Practising Law Institute's *Annual Institutes on Municipal Finance Law* in New York.

The following are Mr. Doty's speaking engagements since 2005:

January 2006, Participant in the MSRB's Municipal Market Roundtable, representing National Association of Independent Public Finance Advisors, Washington, DC

April 2006, Moderator: "After *Kelo v. New London*: The Federal and State Response," International Municipal Lawyers Association, Joint Meeting of State League Counsel and Section on Economic Development, Taxation and Finance, *Mid-Year Conference,* Washington, DC

August 2006, Speaker: "Financing Public Water and Wastewater Systems," Smart Metering West Coast Conference, San Francisco, CA

September 2006, Speaker: "Potential Issuer Actions to Mitigate Securities Law Liability;" and Moderator: "Public Finance," International Municipal Lawyers Association, *Annual Conference,* Portland, OR

October 2006, Moderator: "Fiduciary Duties," Moderator: "Transactional Analyses for Clients," Moderator: "Broker-Dealer Requirements Applicable to Advisors," and Moderator: "The Role of Financial Advisors in School Finance: A Study," National Association of Independent Public Finance Advisors, *Annual Conference*, Boston, MA

November 2006, Speaker: "Municipal Bonds Fraud," California District Attorneys Association, San Francisco

January 2007, Participant in the MSRB's Municipal Market Roundtable, representing National Association of Independent Public Finance Advisors, Washington, DC

April 2007, Speaker: "IMLA's **FINANCING PROCEDURES CHECKLISTS**;" International Municipal Lawyers Association, *Mid-Year Conference,* Washington, DC

**Robert W. Doty**
*Curriculum Vitae*
Page 11

July 2007, Provided materials: "IMLA's **FINANCING PROCEDURES CHECKLISTS**;" *Annual Seminar*, Florida Municipal Attorneys Association, Amelia Island, FL

September 2007, Moderator and Speaker: "Establishing Issuer Due Diligence and Disclosure Programs;" *6th Annual Pre-Conference Seminar at The Bond Buyer's Annual California Public Finance Conference*, California Debt and Investment Advisory Commission and The Bond Buyer, San Diego, CA

October 2007, Moderator: Panels on "Current SEC, MSRB and IRS Issues," and "Credit Analysis in Municipal Finance," National Association of Independent Public Finance Advisors, *Annual Conference*, Indianapolis, IN

November 2007, Moderator and Speaker: "Hot Topics in Disclosure;" *CDIAC Disclosure Seminar*, California Debt and Investment Advisory Commission, San Mateo, CA

January 2008, Participant in the MSRB's Municipal Market Roundtable, representing National Association of Independent Public Finance Advisors, Washington, DC

September 2008, Speaker: "Emerging Issues in the Municipal Securities Market," International Municipal Lawyers Association, *2008 Annual Conference,* Las Vegas, NV

September 2008, Speaker: "Developments in Continuing Disclosure, " CDIAC Disclosure Seminar on "*Understanding Municipal Securities Regulations*," California Debt and Investment Advisory Commission, San Diego, CA

October 2008, Moderator, "Fundamentals of Financial Advising—What Newer Financial Advisors Need to Know;" Moderator, "Regulatory Activities Affecting Municipal Finance;" Moderator and Speaker: "Project Dynamics—Investigation; Private Parties; Experts;" Moderator, "Financing Public Infrastructure in China;" National Association of Independent Public Finance Advisors, *Annual Conference,* Seattle, WA

October 2008, Speaker: "Emerging Issues in the Municipal Securities Market, " *2008 California Controller's Conference with County Auditors*, Monterrey, CA

March 2009, Speaker, "Bond Financing for Environmental Infrastructure," *China Water Industry Net (CWIN) Seminar*, Beijing

April 2009, Prepared Materials for Presentation, "Recreation and Park District Financings, "California Association of Recreation and Park Districts, *Annual Conference,* Incline Village, NV

**Robert W. Doty**
*Curriculum Vitae*
**Page 12**

May 2009, Interview, DerivActive.com, "Regulation of Financial Advisors," online podcasts

February 2010, Panelist, "The DC Impact on (or Menace to) Municipal Credit," *National Federation of Municipal Analysts Advanced Seminar on Tax-Backed Bonds and Federal Intervention, Reform and Influence over the Municipal Market*, Palm Beach, FL

March 2010, Panelist, "Issuers' Roundtable: Developing and Implementing Financial Strategies for Adjusting to a New Normal," *Information Management Network*, Huntington Beach, CA

March 2010, Speaker, "From Turmoil to Tomorrow: The Emerging New World for Municipal Finance," *Bond Attorneys Spring Workshop*, Palm Beach, FL

May 2010, Panelist, "Expert Work Products White Paper," *National Federation of Municipal Analysts Annual Conference*, Santa Ana Pueblo, NM

October 2010, Panelist: "Rules of Engagement: Inside the SEC's Muni Market Project**,**" *Bond Buyer 20th Annual Public Finance Conference*, San Francisco

October 2010, Speaker: "The Substantial Municipal Market Changes During the Financial Crisis," *National Association of Independent Public Finance Advisors Annual Conference*, Detroit

November 2010, Chair, "Significant Municipal Securities Law & Market Developments for Local Governments," *International Municipal Lawyers Association Teleconference*

January 2011, Speaker, "Exploratory Teleconference on Municipal Advisor Regulation of Municipal Officials," *International Municipal Lawyers Association Teleconferences*

Feb./March/May 2011, Chair, "Municipal Finance Series," *International Municipal Lawyers Association Teleconferences*

Sept. 2011, Speaker, "Issuer Disclosure Procedures," International Municipal Lawyers Association, *2011 Annual Conference,* Chicago, IL

Sept. 2011, Speaker, "Steps for Pro-Active Issuers," *2011 Annual Bond Buyer Pre-Conference,* California Debt and Investment Advisory Commission, San Diego, CA

Feb. 2012, Speaker: "Stepping Forward: The Role of the Finance Officer in Today's Market," *2012 Annual California Society of Municipal*

**Robert W. Doty**
*Curriculum Vitae*
**Page 13**

*Finance Officers Pre-Conference,* California Debt and Investment Advisory Commission, Anaheim, CA

March 2012, Speaker: "Looming Traps for Unsophisticated Issuers," *2012 Bond Attorneys Winter Workshop*, Palm Beach, FL

April 2012, Speaker and Moderator: "Recent Securities Law Developments Affecting Municipal Issuers," *Teleconference Series,* International Municipal Lawyers Association

April 2012, "Recent Securities Law Developments Affecting Municipal Issuers," *2012 Mid-Year Conference*, International Municipal Lawyers Association, Washington, DC

May 2012, Speaker and Moderator: "Municipal Securities Rulemaking Board's Role for the Protection of Issuers," *Teleconference Series,* International Municipal Lawyers Association

Written and oral testimony prepared at the request of the House Committee on Financial Services, Subcommittee on Capital Markets and Government Sponsored Enterprises, at a Hearing on the Impact of the Dodd-Frank Act on Municipal Finance on July 20, 2012

Aug. 2012, *"Diversity & Risks of Municipal Bonds,"* selected for presentation at the 2012 Municipal Finance Conference conducted by the Brandeis International Business School

Sept. 2012, "Major SEC Pronouncements Affecting Municipal Issuer Rights and Responsibilities," *Teleconference Series,* International Municipal Lawyers Association

Oct. 2012, Speaker, "Credit Disclosure in General Obligation and General Fund Securities," *Advanced Distressed Debt Conference,* National Federation of Municipal Analysts

Oct. 2012, Speaker: "Municipal Finance & SEC Regulations," and Speaker and Moderator: "Recent SEC & MSRB Developments on Municipal Securities Law & Disclosure," International Municipal Lawyers Association, *2012 Annual Conference,* Austin, TX

March 2013, Speaker: "What Are General Obligation Bonds & General Fund Securities & What Disclosure Is Appropriate?" *2013 Bond Attorneys Winter Workshop*, Palm Beach, FL

March 2013, Speaker: "Diversity & Risks of Municipal Bonds," Arizona State University School of Public Affairs, *Municipal Finance Challenge 2013*, Phoenix

**Robert W. Doty**
*Curriculum Vitae*
Page 14

April 2013, "Responsibilities of Municipal Advisors" and "Diversity & Risks of Municipal Bonds," U.S. Bank Trust Administrators Teleconferences

April-May 2013, Panelist: "Charter School and Conflicts of Interest Disclosure," National Federation of Municipal Analysts, *30th Annual Conference*, San Diego

July 2013, Speaker: "Charter School and Conflicts of Interest Disclosure," Gates Foundation/LISC Bond Investor Conference, New York

Sept. 2013, Speaker: "Best Practices and Principles for Improving Disclosure to Issuers in California," *2013 Annual Bond Buyer Pre-Conference,* California Debt and Investment Advisory Commission, Los Angeles

Sept. 2013, Speaker: "Recent SEC & MSRB Developments on Municipal Securities Law & Disclosure," International Municipal Lawyers Association, *2013 Annual Conference,* San Francisco

Feb. 2014, Speaker: "General Obligation Bonds?" *2014 Bond Attorneys Winter Workshop*, Palm Beach, FL

April 2013, Panelist, "Municipal Advisor Regulation" Bond Buyer Webinar

June 2014, Moderator, "SEC Self-Reporting Initiative for Issuers and Other Recent Disclosure Actions: Decisions for Municipal Lawyers," International Municipal Lawyers Association Webinar

July/August 2014, Discussant, "Bankruptcy Premium in the Municipal Securities Market," 2014 Municipal Finance Conference conducted by the Brandeis International Business School

Feb. 2015, Speaker: "Regulation of Municipal Advisors" *2015 Bond Attorneys Winter Workshop*, Palm Beach, FL

Apr. 2015, Speaker: "Recent Developments in Municipal Securities Law: How Municipal Officials Can Be Barred for Life!!" *2015 Mid-Year Conference, International Municipal Lawyers Association*, Washington, DC

June 2015, Speaker: "*Navigating Municipal Bond Offerings Amid Increased SEC Scrutiny and Enforcement*," Strafford Webinars

Oct. 2015, Panelist: "*The Past and Future of Municipal Securities: 40th Anniversary of the Municipal Securities Rulemaking Board*," Association for Budgeting and Financial Management,

**Robert W. Doty**
*Curriculum Vitae*
Page 15

Washington, DC, remarks published in 37(1) Mun. Fin. J. 1
(Spring 2016)

Apr. 2016, Moderator: "Recent Developments in Municipal Securities
Law," *2016 Mid-Year Seminar, International Municipal Lawyers
Association*, Washington, DC

July 2016, Discussant: Paper on "*Municipal Borrowing Costs and State
Policies for Distressed Municipalities*," 5th Annual Municipal Finance
Conference, The Brookings Institution, Brandeis University and
Washington University, Washington, DC

Sept. 2016, Panelist and Moderator, "*Expanding Municipal Securities
Enforcement: Profound Changes for Issuers & Officials*," International
Municipal Lawyers Association, Washington

Sept. 2016, Speaker, "*Expanding Municipal Securities Enforcement:
Profound Changes for Issuers & Officials*," California Debt and
Investment Advisory Commission, Los Angeles

Oct. 2016, Panelist, "*Hot Topics in Municipal Securities Law*," Bond
Attorneys Workshop, Chicago

March 2017, Panelist: "*GFOA Disclosure Guidelines: A Retrospective
and Reappraisal*" National Association of Bond Lawyers 2017 Tax and
Securities Law Institute, Washington, DC

Apr. 2017, Moderator and Panelist: "*Municipal Securities Disclosure:
Selected Key Issues for Issuers & Officials*," International Municipal
Lawyers Association 2017 Mid-Year Seminar, Washington, DC

May 2017, Speaker: "*Navigating Municipal Bond Offerings,*" Strafford
Webinars

August 2017, Moderator and Panelist: "*Recent Developments in
Municipal Securities Law*," International Municipal Lawyers Association
Webinar

Sept. 2017, Speaker, "*Setting Standards of Practice for Consultants*,"
and Facilitator: "*Regulation and Your Consultants: Drawing the Line*,"
California Debt and Investment Advisory Commission, Carlsbad, CA

Oct. 2017, Panelist: "*Current Municipal Securities Issues for Issuers &
Officials*," International Municipal Lawyers Association 2017 Annual
Conference, Niagara Falls

Apr. 2018, Panelist: "*Key Focal Points for Issuer Counsel Regarding
Bond Issues and Securities Law Compliance*," International Municipal
Lawyers Association 2018 Mid-Year Seminar, Washington

**Robert W. Doty**
*Curriculum Vitae*
**Page 16**

Oct. 2018, Panelist: "*SEC's 2018 Amendments to Rule 15c2-12*,"
International Municipal Lawyers Association 2018 Annual Conference,
Houston

Nov. 2019, Moderator: "*Coping with the New Disclosure Mandates of
SEC Rule 15c2-12*," International Municipal Lawyers Association

Nov. 2019, Moderator: "*Managing Your Municipal Advisors*," and
Speaker: "*Fiduciary Duties of Municipal Advisors (And Counsel)*,"
International Municipal Lawyers Association