**EXHIBIT 23**

CONFIDENTIAL
Richard Engman - May 28, 2020

Page 1

```
 1    _____

 2            IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF PUERTO RICO
 3                   PROMESA TITLE III
              CASE NO: 17-BK-03283 (LTS)
 4
      IN RE: THE FINANCIAL OVERSIGHT AND
 5    MANAGEMENT BOARD FOR PUERTO RICO
                  as representative of
 6
      THE COMMONWEALTH OF PUERTO RICO, et al.,
 7              Debtor(s).

 8    _____

              IN THE UNITED STATES DISTRICT COURT
 9            FOR THE DISTRICT OF PUERTO RICO
                     PROMESA TITLE III
10            CASE NO: 17-BK-03566 (LTS)

11    IN RE: THE FINANCIAL OVERSIGHT AND
      MANAGEMENT BOARD FOR PUERTO RICO
12              as representative of

13    THE EMPLOYEES RETIREMENT SYSTEM OF THE
      GOVERNMENT OF THE COMMONWEALTH OF PUERTO
14    RICO,
                Debtor(s).
15    _____

16

17

18            C O N F I D E N T I A L

19

20

21    VIDEOTAPED DEPOSITION UNDER ORAL EXAMINATION OF

22                 RICHARD ENGMAN

23               DATE: May 28, 2020

24

25    REPORTED BY: CHARLENE FRIEDMAN, CCR, RPR, CRR
```

GregoryEdwards, LLC | Worldwide Court Reporting
GregoryEdwards.com | 866-4Team GE

CONFIDENTIAL
Richard Engman - May 28, 2020

Page 38

```
 1    Enabling Act as part of the original
 2    investment decision, which I think was your
 3    question.
 4         Q    Okay.  So to the best of your
 5    knowledge, sitting here today -- let me
 6    actually back up for a moment.
 7              I think you had previously
 8    testified in your prior deposition that you
 9    had assisted with the analysis of ERS
10    bonds -- assisted with the decision whether
11    to purchase ERS bonds or Mason Capital.
12              Is that right?
13         A    Correct.
14         Q    And if I'm understanding you
15    correctly, it sounds like as part of that
16    analysis, you, yourself, did not look to the
17    English or Spanish version of the ERS
18    Enabling Act for purposes of that analysis?
19         A    I -- I don't recall.  I would have
20    read the -- just to be clear, what we're
21    talking about, the Enabling Act, that was, I
22    think, first was enacted in 1951 as opposed
23    to the bond resolution and the security
24    agreement, and those underlying documents, I
25    certainly would have read the bond
```

CONFIDENTIAL
Richard Engman - May 28, 2020

Page 39

```
 1   resolution.  I would have read the exhibits
 2   attached to it.
 3            I can't remember whether the
 4   Enabling Act was part of the bond resolution.
 5   I think it's a public security, and munic --
 6   municipal public security would be -- I don't
 7   have a recollection of looking at the
 8   underlying statutory authorization for the
 9   entity issuing bonds to exist.
10            I wouldn't imagine that I would do
11   that in most situations, buying municipal
12   debt, especially one that has been in
13   existence for 50 years, but I may have.
14       Q    Do you know whether anybody who was
15   performing analysis on the ERS bonds at Mason
16   Capital looked at the ERS Enabling Act to
17   help determine whether to purchase ERS bonds?
18       A    Prior to our first purchase of
19   bonds, I -- I -- same answer.  Daniel may
20   have, but I doubt it.
21            I was -- those issues would have
22   been more on my -- in -- in my metric of
23   analysis.
24       Q    So as you testified previously at
25   your prior deposition and earlier today, it's
```

CONFIDENTIAL
Richard Engman - May 28, 2020

Page 62

```
 1    descent to any decision that I can think of,
 2    but the reality is, like there's a couple of
 3    large holders whose voice probably carries
 4    more water.
 5             But there's -- there's -- I don't
 6    even think we have -- unlike some of the
 7    situations, I'm not sure if -- we also had
 8    engagement letters a long time ago.  I don't
 9    think there's by-laws.
10             You know, it's not a -- so I'm not
11    sure if I answered your question, but I said
12    a lot of things that are relevant to your
13    question.
14        Q    When did Mason Capital become part
15    of this group?
16             MR. PAPEZ:  Object, beyond --
17    beyond the 30(b)(6).
18             But to the extent you know
19    personally, you're free to testify.
20        A    I don't recall.
21             It would be pretty easy to refresh
22    my recollection.  There would be an
23    engagement letter somewhere.
24             I think -- I think it would have
25    been -- we worked with an original member.
```

CONFIDENTIAL
Richard Engman - May 28, 2020

Page 63

```
 1    It could have been around -- done some of the
 2    non-Title III litigation.
 3            I can't -- I believe that we joined
 4    after the -- one of the first stipulations
 5    that was entered.  I think it was -- I think
 6    it was in Judge De Sosa's court.
 7            I don't think I remember at that
 8    time.  I can't remember if -- if we joined
 9    prior to or after the Title III case was
10    filed.
11       Q    Now, you referred to some original
12    members.
13            Do you know who the original
14    members were?
15       A    I don't know.  I'd have to give you
16    what I think.
17            It could have been Annapolis and
18    Oaktree and King Street and -- I'm not sure.
19       Q    Okay.  Did Mason Capital -- and
20    this is a yes or no question, again, because
21    I -- I don't want you to tell me the advice
22    given.
23            When -- actually, let me phrase it
24    differently.
25            Again, I'm not asking for legal
```

CONFIDENTIAL
Richard Engman - May 28, 2020

Page 64

```
1    advice.
2           When did Mason Capital begin
3    receiving legal advice from Jones Day on the
4    subject of the ERS bonds?
5       A    When we joined the group.
6       Q    Okay.  So, Mr. Engman, if I could
7    direct you to the PDF I had sent in advance
8    of the deposition that begins with PX-030,
9    please.
10      A    Okay.
11           MR. DALSEN:  This will be Exhibit 4
12   to today's deposition, the PDF titled PX-030.
13           (Above-mentioned document marked
14   for Identification.)
15      Q    Mr. Engman, do you recognize
16   Exhibit 4?
17      A    This is -- I just want to make sure
18   that I'm -- this is a chart?
19      Q    That's right.
20           So this -- the PDF is PX-030.  It's
21   a 50-page chart.
22           At the very top of -- in the middle
23   of each of the pages it says Mason Capital
24   Management Fund, LP, and there are multiple
25   columns, beginning with Bates number on
```

CONFIDENTIAL
Richard Engman - May 28, 2020

Page 69

```
1       Q    And so just to be clear of that
2    for -- for Mason Capital, the earliest date
3    that Mason Capital was aware from any source,
4    whether it be itself or counsel, that the ERS
5    bonds may not have been issued with authority
6    or legally issued is November of 2017.
7            Is that correct?
8            MR. PAPEZ:  Objection, asked and
9    answered.
10      A    Well, I -- yeah, I was going to say
11   that the word "aware" seems to have -- have
12   meaning to it, and the context, in 2017,
13   especially that time period, I think it was
14   the beginning of October when both sides were
15   directed to file their summary judgment
16   motions on the lien perfection and extendable
17   lien issues.
18           And so early October both sides
19   filed thousands of pages, and then it was --
20   I don't know -- either October or early
21   November.  Then also, I think it was in
22   November, the reply briefs were the -- the
23   scope adversary, for lack of a better word,
24   with its 40 or 50 issues that were involved,
25   name change, that were actually being
```

CONFIDENTIAL
Richard Engman - May 28, 2020

Page 70

```
 1    litigated hot and heavy, the reply briefs
 2    were filed in November.
 3            The middle of November, the UCC
 4    sought to gain that litigation, the judge
 5    allowed the UCC to intervene in that
 6    litigation and all of the significant issues
 7    that were being litigated, all scheduled for
 8    the hearing in early December.
 9            And so, certainly, my focus was on
10    the thousands of pages and 20 or 30 issues
11    that were part of the summary judgment motion
12    that was being -- actually being litigated.
13    And so the fact that a non-party filed a
14    motion to dismiss that wasn't scheduled for
15    hearing anytime soon, that it wasn't ready to
16    be litigated, that was also -- that contact
17    was secondary to all of the issues that
18    needed to come before it in the lien scope
19    and was treated that way.
20            I -- I can't tell you that I was
21    aware of it.
22       Q    Okay.  So I guess, Mr. Engman,
23    that's a lengthy explanation.
24            Putting aside your own personal
25    focus or awareness for speaking for Mason
```

1   Capital, what is the earliest date Mason
2   Capital was aware from any source that the
3   ERS bonds may not have been issued with
4   authority or legally issued?
5       A    I won't give the whole lengthy
6   answer again, but I will tie it to me.
7            I would have been speaking for
8   Mason Capital.  Mason Capital would have
9   become aware when I became aware.
10           And so, the same answer, only
11  substitute Mason Capital instead of me.
12      Q    And just to be clear, what is the
13  earliest date that you would give them in
14  response to my question?
15      A    Being aware?
16      Q    Yes, sir.
17      A    When -- when the UCC filed its
18  objection and when -- you know, give or take
19  a week or two when that litigation started
20  heating up, and, you know, it then became an
21  issue that was being -- you know, the issue
22  was joined.
23      Q    Okay.  I'm going to ask a slightly
24  different question.  It may be the same
25  answer, but just for sake of completeness,

CONFIDENTIAL
Richard Engman - May 28, 2020

Page 72

1 when -- what is the earliest stage Mason
2 Capital was aware, from any source, of the
3 possibility of the ultra vires issue?
4     A   Yeah, I'm going to give you the
5 same answer, substitute Mason Capital for me
6 personally.
7         In -- you know, in the spirit of
8 candor and completeness, the -- the November
9 pleading was in my files. It's just -- I
10 can't tell you that I read it.
11        And because of all that was going
12 on at the time and the -- and just the -- and
13 they just filed their -- their constitutional
14 challenge. We were in the middle of
15 mediation as well.
16        Just the -- the amount -- the
17 mounting of things that were -- of work to do
18 at that time, that it's not impossible that I
19 read a pleading that wasn't set for hearing
20 anytime in the near term, but it seems
21 unlikely to me.
22    Q   And so it's -- it's your testimony
23 that you do not have a specific recollection
24 of reviewing a file -- filing from
25 November 2017 at the time it was filed.

 1    the fact that it had authority to do this.
 2            So I -- I would have -- but at the
 3    same time, this -- I've been doing this for a
 4    long time.  This is the first time an
 5    entity's actual authority to -- to -- to --
 6    to borrow has been an issue.
 7            So in my whole career, it has been
 8    a check the box, okay.  The rep had
 9    authority, the lawyers say they have
10    authority.  Haven't gone further than that.
11            But it is something that you --
12    that I would have seen at the beginning.  I
13    don't -- just looking -- like I said, at the
14    beginning of this deposition, I doubt -- it
15    may be that I would have gone from reading
16    the resolution and representation of
17    authority and the legal opinions to also look
18    at the underlying organic Enabling Act, but
19    I -- I doubt it, but I would have -- it's
20    possible that I would have looked at it.
21       Q    And just -- just to be clear
22    about -- for the record, what is the -- the
23    earliest date in terms of a month or a year
24    that you would say Mason Capital was aware of
25    the debt authorizing language of the ERS

CONFIDENTIAL
Richard Engman - May 28, 2020

Page 75

```
1    Enabling Act from any source?
2        A    And again, tied to the UCC
3    objection, I don't know if that was August of
4    2018 or -- sometime late summer I think is
5    when it was filed in 2018, but that's when
6    this issue become an issue and one that at
7    least tangentially had to think about.
8        Q    Mr. Engman, what is the -- another
9    question in the same line here.
10            What is the earliest date Mason
11   Capital was aware from any source of the,
12   quote, illegally made, unquote, language in
13   statement of motives in Act 116-2011?
14       A    I can't -- I can't -- I believe the
15   Kobre & Kim report said that, and I -- I
16   don't recall having an outside impact at the
17   time.  If anything, I thought the Kobre & Kim
18   report, read it and thought it kind of
19   exonerated anything else, but I thought there
20   was a reference to it in that.  I think that
21   predated the UCC objection.  If the UCC
22   objection predated the Kobre & Kim, then the
23   UCC objection.
24       Q    Okay.  Just to be clear about that,
25   that last bit of testimony, you're saying
```

CONFIDENTIAL
Richard Engman - May 28, 2020

Page 127

```
 1    And so this wasn't -- Puerto Rico wasn't a
 2    typical Mason investment.  It -- it is and
 3    it's not.
 4            The liquidity is -- it is and that
 5    it's complex, and we like restructuring and
 6    we like -- we like distress.
 7            Among other, we also like
 8    non-restructuring and merger and the like,
 9    but because of the lack of liquidity, any
10    thought was that it might make sense to have
11    it in a sidecar fund rather than in the main
12    fund and so put this together -- put this --
13    I think it was one of the earlier, you know,
14    pieces of paper in that process of seeing if
15    it would make sense to -- to market to
16    investors a Puerto Rico centric fund.
17        Q   Did Mason Capital ever create that
18    sidecar fund?
19        A   We created the sidecar because
20    it -- it didn't -- it didn't -- Ken and Mike
21    and myself are -- I don't know if anybody
22    else.
23            Actually, I think there's one
24    other -- one other investor in it, a
25    relatively small amount, and he's also
```