## EXHIBIT 24

CONFIDENTIAL
Jordan Mikes, Esq. – March 5, 2020

```
 1                  IN THE UNITED STATES DISTRICT COURT

 2                   FOR THE DISTRICT OF PUERTO RICO

 3

 4         _____

 5         In Re:                               )

 6         THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD   )  PROMESA TITLE III

 7         FOR PUERTO RICO                       )  Case No.

 8                   as representative of        )  17-BK-03283 (LTS)

 9         THE COMMONWEALTH OF PUERTO RICO, et. al,    )

10                   Debtors.                     )

11         _____)

12         In Re:                               )

13         THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD   )  PROMESA Title III

14         FOR PUERTO RICO                       )  Case No.

15                   as representative of        )  17-BK-03566 (LTS)

16         THE EMPLOYEES RETIREMENT SYSTEM OF THE   )

17         GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO, )

18                   Debtor.                      )

19         _____)

20                        CONFIDENTIAL

21         VIDEOTAPED DEPOSITION UNDER ORAL EXAMINATION OF

22                      JORDAN MIKES, ESQ.

23                        March 5, 2020

24

25         REPORTED BY: MICHAEL FRIEDMAN, CCR
```

CONFIDENTIAL
Jordan Mikes, Esq. – March 5, 2020

```
 1              (Whereupon the above mentioned was

 2         marked for Identification.)

 3         Q    -- a document entitled Notice of

 4    Videotaped Deposition of Jordan Mikes.

 5              Have you seen this document before?

 6         A    (Witness reviewing.)

 7              Yes.

 8         Q    Do you understand this is a

 9    deposition notice for your personal

10    testimony?

11         A    Yes.

12         Q    Are you represented by counsel

13    today in your capacity as a 30(b)(6) witness?

14         A    Yes.

15         Q    And is Jones Day your counsel?

16         A    Correct.

17         Q    Is Jones Day also your counsel as

18    the -- in your personal capacity?

19         A    Yes.

20         Q    When did Oaktree first retain Jones

21    Day in connection with the ERS bonds?

22         A    I don't have the specific date off

23    the top of my head, but -- but we've engaged

24    them multiple years ago.

25         Q    Recognizing that you don't have the
```

CONFIDENTIAL
Jordan Mikes, Esq. - March 5, 2020

1    specific date off the top of your head, is

2    there an answer you can give me more specific

3    than multiple years ago?

4         A    Yeah.  This -- this would have

5    been -- we -- we talked to Jones Day dating

6    back as far as, without documents in front of

7    me, probably 2015 or '14.

8         Q    Let's talk a little bit about your

9    educational background.

10             You attended UCLA for undergrad.

11             Is that correct?

12        A    No.  I went to the University of

13    California Berkley.

14        Q    Okay.  And when did you graduate?

15        A    2006.

16        Q    What was your degree?

17        A    Legal studies.

18        Q    And what did you do after

19    graduating in 2006?

20        A    I went directly to law school at

21    the University of Arizona.

22        Q    And when did you graduate from the

23    University of Arizona law school?

24        A    2009.

25        Q    And what did you do next?

CONFIDENTIAL
Jordan Mikes, Esq. - March 5, 2020

```
1          A    Yes.  Well, they represented
2    Underwriter's Counsel in the IPO of Oaktree,
3    so, technically, they did not represent
4    Oaktree.
5          Q    Let's walk through your career at
6    Oaktree Capital Management.
7               When you were hired in 2013, what
8    was your title?
9          A    Assistant vice president legal.
10         Q    What were your duties and
11   responsibilities as assistant vice president
12   legal?
13         A    Okay.  I would assist at that time
14   a -- a senior lawyer who was covering our
15   distressed debt strategy, covering everything
16   related to the funds, including fund
17   formation, so that's negotiation of the terms
18   that clients invest in our funds, you know,
19   analyzing conflicts of interest under --
20   under the Advisers Act, assisting with
21   deal-related work in connection with the
22   deployment of the proceeds of those funds,
23   and that covers everything from bankruptcy
24   restructuring to securities.
25         Q    Is the -- is the distress debt
```

CONFIDENTIAL
Jordan Mikes, Esq. - March 5, 2020

1    by Jones Day.

2          Is that correct?

3      A   Yes.

4      Q   And when did Oaktree join that

5    bondholder group?

6          MR. PAPEZ:  You can answer about

7       when, if you know.

8      A   I don't know off the top of my

9    head.

10     Q   Okay.  Who makes decisions --

11   decisions on behalf of the bondholder group?

12         MR. PAPEZ:  Are you talking legal

13      decisions?

14     Q   I'm talking there's a group -- you

15   understand that your -- that Oaktree is part

16   of a group of bondholders --

17     A   Yes.

18     Q   -- that are represented by Jones

19   Day?

20     A   Yes.

21     Q   And on behalf of that group of

22   bondholders, Jones Day has prepared and filed

23   various papers in the litigation.

24         Correct?

25     A   Yes.

CONFIDENTIAL
Jordan Mikes, Esq. - March 5, 2020

Page 133

1      Oaktree made its first investment in ERS

2      bonds?

3           A     Yes.

4           Q     And who did you talk to about what

5      diligence occurred during May 2014?

6           A     I talked to both Bob O'Leary and

7      Dave Brown.

8           Q     And what did Mr. O'Leary or

9      Mr. Brown tell you about the diligence that

10     took place in May 2014?

11          A     Bob mentioned that the diligence

12     included reviewing the offering materials and

13     all the attachments that were attached to it,

14     reviewing the financial statements issued by

15     the Puerto Rico entities, as well as

16     reviewing various analysts' reports that --

17     that flagged that the market may be un -- you

18     know, undervaluing.  And -- and so the gist

19     was public information was reviewed.

20          Q     And did Mr. Brown have a different

21     view of what was reviewed during May 2014?

22          A     No, he had the same view.

23          Q     Other than offering memos,

24     financial statements and reviewing analyst

25     reports, were there any other documents that

CONFIDENTIAL
Jordan Mikes, Esq. - March 5, 2020

Page 153

1    complete list of the documents that Oaktree

2    reviewed in May of 2014?

3        A    Yes.

4        Q    And those documents did not include

5    the ERS Enabling Act or any amendments

6    thereto.

7             Is that correct?

8        A    That's correct.

9        Q    Do you know when the first time was

10   that anyone at Oaktree reviewed the ERS

11   Enabling Act or any amendments thereto?

12       A    I know the first time I reviewed

13   it, and that would have been November 2017,

14   just in my personal capacity, no one at

15   Oaktree reviewed it before 2019.  And I don't

16   know definitively that Emily or -- that Emily

17   reviewed it in 2019, although I would imagine

18   she did review it in 2019.

19       Q    Okay.  I'm not sure I understand

20   your answer.

21            You said that you would have

22   reviewed it in November of 2017.

23       A    Sorry, 2019, November of 2019.

24   That was a mistake.

25       Q    So the first time you reviewed the

CONFIDENTIAL
Jordan Mikes, Esq. - March 5, 2020

Page 154

1    Enabling Act was November 2019.

2            Putting you aside, do you know the

3    first time which anyone at Oaktree reviewed

4    the ERS Enabling Act or any amendment

5    thereto?

6        A    I have no evidence that they were

7    reviewed.

8            But what I said is that we got a

9    notice of validity in 2019 and that would

10   have been flagged to Emily, so she may have

11   reviewed it then.  But there was no review of

12   it prior to the notice of validity.

13       Q    How is it that you know that no one

14   at Oaktree reviewed the Enabling Act prior to

15   November of 2019?

16       A    Because I discussed it with Bob

17   O'Leary, and I discussed it with Dave Brown

18   and Adam Bennett, and none of them had

19   reviewed it prior to that time period.

20           And, in fact, neither -- none of

21   them had reviewed it subsequent to that time

22   period and specifically mentioned it has

23   never been discussed during the pre-2019

24   period of time.

25       Q    Did anyone call Mr. Kreger to ask

CONFIDENTIAL
Jordan Mikes, Esq. - March 5, 2020

Page 156

```
1           MR. PAPEZ:  Objection to the form
2       of the question.  Vague.
3           A    I am now aware in my preparation
4       for this deposition that AAFAF did that.
5           Q    Do you know whether that court
6       filing was provided to anyone at Oaktree in
7       November 2017?
8           A    In discussions with the team
9       members, they never saw any notice of that
10      AAFAF filing.
11              And specifically, there would be,
12      in the ordinary course, no reason it would
13      have because it was an unrelated matter
14      and -- and BONY would not -- would not have
15      sent that to us necessarily, so it doesn't
16      surprise me that we never saw it.
17          Q    Okay.  And so your testimony as the
18      30(b)(6) witness for Oaktree is that Oaktree
19      did not review the ERS Enabling Act or its
20      amendments until November 2019?
21          A    Yes, my -- that's correct.
22          Q    Did Oaktree review at any time Act
23      116?
24          A    We rely on counsel, and I can't
25      personally comment on Act 116.
```