# **EXHIBIT 26**

CONFIDENTIAL
Christopher Delaney - May 29, 2020

Page 1

```
 1   _____

 2          IN THE UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF PUERTO RICO
 3                  PROMESA TITLE III
             CASE NO:  17-BK-03283 (LTS)
 4
     IN RE:  THE FINANCIAL OVERSIGHT AND
 5   MANAGEMENT BOARD FOR PUERTO RICO
                as representative of
 6
     THE COMMONWEALTH OF PUERTO RICO, et al.,
 7          Debtor(s).
     _____
 8
            IN THE UNITED STATES DISTRICT COURT
 9           FOR THE DISTRICT OF PUERTO RICO
                    PROMESA TITLE III
10           CASE NO:  17-BK-03566 (LTS)

11   IN RE:  THE FINANCIAL OVERSIGHT AND
     MANAGEMENT BOARD FOR PUERTO RICO
12              as representative of

13   THE EMPLOYEES RETIREMENT SYSTEM OF THE
     GOVERNMENT OF THE COMMONWEALTH OF PUERTO
14   RICO,
            Debtor(s).
15   _____

16

17

18             C O N F I D E N T I A L

19

20

21   VIDEOTAPED DEPOSITION UNDER ORAL EXAMINATION OF

22              CHRISTOPHER DELANEY

23             DATE: May 29, 2020

24

25   REPORTED BY:  CHARLENE FRIEDMAN, CCR, RPR, CRR
```

GregoryEdwards, LLC | Worldwide Court Reporting
GregoryEdwards.com | 866-4Team GE

CONFIDENTIAL
Christopher Delaney - May 29, 2020

Page 37

```
1        Q    And how long was your conversation
2    with Aton?
3        A    A few minutes.
4        Q    And what did you and Aton discuss
5    regarding your testimony today?
6        A    I asked Aton about other municipal
7    investments we historically made at Glendon.
8        Q    And what historical municipal
9    investments did he tell you about?
10       A    He told -- well, I asked him about
11   specifically Jefferson County bonds that we
12   had made an investment in.
13       Q    My home county.
14       A    I asked him about some American
15   Airlines bonds, municipal bonds that we had
16   purchased, and I asked him about the Liberty
17   bond from Goldman Sachs headquarters, bond
18   called a Liberty municipal bond that we also
19   made an investment.
20       Q    And what did you ask about those
21   three investments?
22       A    I asked him if he ever recalled for
23   those investments looking into the validity
24   of the bonds.
25       Q    And for each bond that you
```

CONFIDENTIAL
Christopher Delaney - May 29, 2020

Page 38

```
 1   discussed, what did he say?
 2        A    For Jefferson County, he says that
 3   he recalled that that was a issue that had
 4   been litigated, and he recalled looking into
 5   it because it was a specific issue that had
 6   been raised.
 7             And that was the extent of his
 8   memory on it.
 9        Q    Did he remember, you know, what
10   year that issue had been raised?
11        A    It was around the time of the
12   bankruptcy, I believe.
13        Q    Okay.
14        A    Of Jefferson County, sorry.
15        Q    And when did Glendon -- did Glendon
16   and Altair may have purchased the Jefferson
17   County bonds?
18        A    It did.
19        Q    And when did it do that?
20        A    I don't have the dates in front of
21   me, unfortunately.
22        Q    And did you ask him anything else
23   about the Jefferson County bonds?
24        A    No.  That was all.
25        Q    And what did you ask about -- you
```

1    paraphrases, discloses the bondholders'
2    interest at a given point in time, and this
3    point in time is July 15th of 2019.
4        A    Okay.
5        Q    And if you'll turn to Exhibit A of
6    this document, which is page 5 of the
7    document itself, you'll see that the last
8    entity listed is Glendon Opportunities and it
9    holds $4 million in ERS bonds, which is in
10   line with what you believe they hold today,
11   correct?
12       A    Correct.
13       Q    Now, if you turn to page -- if you
14   go to page 1 of the document, the first
15   numbered paragraph, which says, "In May 2015
16   certain of the ERS creditors or the
17   investment advisors or managers on behalf of
18   ERS secured -- on behalf of ERS secured
19   creditors retained Jones Day to represent
20   them as counsel in connection with the
21   potential restructuring of the secured bonds,
22   which it defines the ERS bonds."
23            Do you see that?
24       A    I do.
25       Q    Was Glendon Opportunities a part of

CONFIDENTIAL
Christopher Delaney - May 29, 2020

Page 71

```
1     that group in May of 2015?
2          A    It was.
3          Q    And was Altair a part of that group
4     in May of 2015?
5          A    It was.
6          Q    And do you know or do you recall
7     who else was a member of the group referenced
8     in paragraph 1?
9               MR. FOX:  I just caution you not to
10    answer that if it's based on privileged
11    communication.
12              If you know otherwise, you can
13    answer.
14         A    Yeah, I -- I -- I wouldn't be able
15    to say, then.
16         Q    Okay.  Because any answer you would
17    give me would disclose communication with
18    counsel?
19         A    Yes.  And I -- the other reason, to
20    be frank, is I -- I probably don't have the
21    best memory of who it was at that time.
22         Q    Sure.
23              For -- let's say for Glendon
24    Opportunities and Altair, was Jones Day your
25    counsel prior to May of 2015?
```

CONFIDENTIAL
Christopher Delaney - May 29, 2020

Page 72

```
1      A    Well, Jones Day has been our
2    counsel on various matters prior to that
3    date, I'm sure.
4      Q    And again -- again, just -- just
5    yes or no here.
6      A    Okay.
7      Q    Was -- was Jones Day Glendon and
8    Altair's counsel with respect to the ERS
9    bonds prior to May of 2015?
10     A    Yes, they were.
11     Q    Okay.  Do you know the date, and if
12   so, would you give me the date of when
13   Glendon and Altair retained Jones Day in
14   connection with the ERS bonds?
15     A    I don't have that date.
16     Q    Do you know the year?
17     A    I do not know it for sure.  I'd --
18   I'd be speculating.  I don't.
19     Q    Has any other firm, other than
20   Jones Day, represented Glendon or Altair in
21   connection with the ERS bonds?
22     A    Can you clarify what you mean by
23   represented?
24     Q    Yes.
25          Did they -- they serve as your
```

CONFIDENTIAL
Christopher Delaney - May 29, 2020

Page 87

```
 1      A     I don't recall.  I don't recall
 2   that.
 3      Q     So before -- and we'll stick
 4   with -- let's go back together to PX-5, which
 5   is Exhibit 3.
 6            And the earliest date I see on
 7   either Exhibit A or Exhibit B was by Altair
 8   on November 18th of 2013, correct?
 9      A     Correct.
10      Q     And as far as you know, that is the
11   earliest date any purchase was made for
12   Glendon and Altair in your response?
13      A     To the best of my knowledge.
14      Q     Okay.  Before making that purchase,
15   what documents did Glendon and Altair review
16   in order to make the determination to make
17   the purchase?
18      A     We would have looked at a variety
19   of documents.
20            We would have looked at, you know,
21   documents that contained relevant information
22   for The Commonwealth of Puerto Rico as well
23   as ERS.
24            So we would have looked more
25   broadly at the financial accounts of both.
```

CONFIDENTIAL
Christopher Delaney - May 29, 2020

Page 88

```
 1              We would have looked at the
 2   economic data for the territory of Puerto
 3   Rico, and there's various sources you can get
 4   that from.
 5              And we would have looked at --
 6   specifically for the ERS bonds, the Enabling
 7   Act.  We would have looked at the bond
 8   resolution.  We would have looked at the,
 9   you -- know, the marketing documents, the
10   official statements, which, you know, explain
11   things in more layman's terms.
12       Q    So are you aware that -- before the
13   first purchase was made -- again, that would
14   be November 18 of 2013.
15              Was Altair and Glendon aware of the
16   existence of what in this litigation we're
17   calling the debt authorization language of
18   the ERS Enabling Act?
19              MR. FOX:  Object to form.
20              You need to explain what you mean
21   by that.  You and I have an understanding
22   but --
23              MR. RAIFORD:  Sure.  Sure.
24       Q    In fact, let's then turn -- we'll
25   put the Enabling Act in front of you.
```

CONFIDENTIAL
Christopher Delaney - May 29, 2020

Page 91

```
1      Q    Got you.
2           Would you -- by "you," was Glendon
3    and Altair aware that the ERS Enabling Act
4    had been amended in 2011?
5      A    At -- at what point in time?
6      Q    That's a good question.  2011.
7           Please don't ask me to be any more
8    specific.
9      A    No.  I...
10          You're saying that was when there
11   was an amendment?
12     Q    Correct.
13     A    And -- well, just ask the question
14   again, I guess.
15          I just want to make sure I'm
16   answering correctly.
17     Q    Sure.
18          So prior to the first purchase of
19   ERS bonds, was Glendon and Altair aware if
20   the ERS Enabling Act had been amended in
21   2011?
22     A    I believe so, yes.
23     Q    Okay.  So let's turn to tab 8,
24   which is going to be Exhibit 8 to the
25   deposition.  PX-18.
```

CONFIDENTIAL
Christopher Delaney - May 29, 2020

Page 92

```
 1              (Above-mentioned document marked
 2     for Identification.)
 3         Q    Mr. Delaney, have you seen this
 4     document before today?
 5         A    Yes, I have.
 6         Q    And was this document reviewed
 7     prior to the first purchase of ERS bonds?
 8         A    I believe so, yes.
 9         Q    So now if you'll turn -- it doesn't
10     have page numbers, but it has a Bates number,
11     and at the bottom right-hand corner, the page
12     that ends in 5695.
13         A    Okay.
14         Q    And if you'll read this to
15     yourself, the first three sentences of that
16     page.
17         A    Okay.
18         Q    And would you agree that this
19     language is discussing the 2008 ERS bonds,
20     the 3 million bond transaction?
21         A    It -- it doesn't specifically say
22     the 2008 bond issue, but I think that's -- I
23     think that's correct.
24         Q    And then there's the -- the
25     language in the second sentence that says,
```

CONFIDENTIAL
Christopher Delaney - May 29, 2020

Page 139

```
 1      Q    And so, how does a private
 2   placement differ -- how can private placement
 3   differ from a direct placement?
 4      A    Again, I -- I think they're two
 5   different terms describing two different
 6   things.
 7           A direct placement is directly to
 8   an entity.  That's my layman's understanding
 9   of what it is.
10           A private placement could be a
11   direct placement, but it's done in the
12   private domain as opposed to a public domain.
13      Q    Thank you.
14           Again, you're in the home stretch
15   with me.
16           What is the earliest date Glendon
17   was aware from any source that the ERS bonds
18   may not have been issued with authority or
19   legally issued?
20      A    Yeah.  So, you know, I -- prior to
21   preparing for the depositions, I -- I would
22   not have had memory of this.
23           We, of course, prepared and I
24   looked at my files.  And the first time, from
25   looking at those files, I believe that we
```

CONFIDENTIAL
Christopher Delaney - May 29, 2020

Page 140

1 were aware was in 2015, I believe, and it was
2 in a footnote to a memo, and kind of
3 background information about the ERS bonds.
4     Q    And is that answer for Glendon, is
5 it the same answer for Altair?
6     A    Yes.
7     Q    Okay. And then, so if we can go
8 back to -- to tab 32 again, which is
9 Exhibit 14. and I want to look at the exact
10 same privilege log entry that I had you look
11 at before.
12         So that's the first page of the
13 document, the first entry?
14    A    Umm-hmm.
15    Q    And -- and we have August 3, 2015,
16 memorandum from Jones Day regarding ERS
17 bonds.
18         And then next to that, it says,
19 quote, "Illegally made language and footnote
20 and background section."
21         Is that the memo that you were just
22 describing?
23    A    It is.
24    Q    Okay. So is it safe to say that --
25 is your testimony, then, that August 3, 2015

CONFIDENTIAL
Christopher Delaney - May 29, 2020

Page 141

```
 1    is the first time -- is the earliest date
 2    Glendon or Altair became aware from any
 3    source that the ERS bonds may not have been
 4    issued with authority or legally issued?
 5            MR. FOX:  Object to form.
 6       A    Again, I -- you know, prior to
 7    having prepared for the deposition and
 8    reviewed my files, that's not something that
 9    I would have recalled.
10            But in going through the files, we
11    found this reference in -- in the footnote of
12    the memo.
13       Q    Got it.  Thank you.
14            And what is the earliest date that
15    Glendon or Altair became aware from any
16    source of the possibility of the ultra vires
17    issue?
18       A    Yeah, the first date, to be frank,
19    that I was aware of it, was when the
20    complaint was made.  I think it was sometime
21    at the end of 2017, and the complaint was
22    made by some government party.  I'm not -- or
23    it could be one of the committees.
24            I'm not entirely sure who initiated
25    the complaint.
```

CONFIDENTIAL
Christopher Delaney - May 29, 2020

Page 142

```
1      Q    So in your mind, and we had this
2    August 3rd memo from Jones Day that quotes
3    the illegally made language.
4            In your mind, that is different
5    from the possibility of the ultra vires
6    issue?
7      A    Yeah, it is.  Yeah.
8      Q    Okay.  And -- and how so?
9            Can you explain that distinction
10   that you're drawing?
11     A    Yeah.  You know, the November --
12   again, November 2017 is when I understood it
13   to be a legal issue that had been brought up.
14           I'll be honest, we were starting to
15   sell position at that time, so I can't say
16   that I actually recalled being entirely aware
17   then, but in preparing obviously for the
18   deposition, I -- I referenced the files and
19   saw that that was the case.
20           How's that distinct from the memo?
21           Again, I -- I don't recall the
22   footnote of the memo or -- or referring to it
23   prior to preparing for the deposition, but
24   obviously, in preparing for the deposition,
25   we found that in the file.
```

CONFIDENTIAL
Christopher Delaney - May 29, 2020

Page 143

```
1         Q    Got it.  Thank you.
2              And what is the earliest date that
3    Glendon and Altair were aware, from any
4    source, of the debt -- debt authorizing
5    language of the ERS Enabling Act as that act
6    existed in 2008 then?
7         A    Again, I don't -- I wouldn't have
8    recalled other than preparing for the
9    deposition, and obviously, in preparing, we
10   found in the files a reference to that, and
11   that was our relief from stay motions in
12   2016.
13             I believe the debt authorizing
14   language was quoted in there or somewhere.
15        Q    If you could -- so this is PX-32,
16   the document you were just in.
17             Turn to the second page, if you
18   will, and look for the entry that has the --
19   the number that ends in 250 and dated
20   February 29, 2016.
21             You'll see description memorandum
22   prepared by Jones Day regarding your response
23   and then, quote, "debt authorization -- a
24   debt authorizing language."
25             Is that the -- is that the document
```

GregoryEdwards, LLC | Worldwide Court Reporting
GregoryEdwards.com | 866-4Team GE

CONFIDENTIAL
Christopher Delaney - May 29, 2020

Page 144

```
 1    you were referring to in your testimony?
 2         A    Oh, yeah.  I -- I -- that may be
 3    it.  It was -- yeah, that's correct.  That's
 4    correct.
 5         Q    For the first time in my career, a
 6    document refreshed someone's recollection.
 7    They always say -- they always say no.
 8              Okay.  So let me ask the question
 9    again based on now looking at this document.
10              What is the earliest date Glendon
11    or Altair was aware from any source of the
12    debt authorizing language of the ERS Enabling
13    Act as that act existed in 2008?
14         A    Again, prior to having prepared and
15    reviewed the files, there would be just no
16    way that I could recall that.
17              But in preparing, we found these
18    files in 2016.  I guess there's the -- the
19    stay relief and a memorandum, it looks like,
20    from Jones Day.
21         Q    And it's dated February 29, 2016,
22    correct?
23         A    Correct.
24         Q    Okay.  And then, again, we can use
25    this document as a guide, but what is the
```