**EXHIBIT 27**

CONFIDENTIAL
Justin Boyer — March 3, 2020

```
1               IN THE UNITED STATES DISTRICT COURT

2                FOR THE DISTRICT OF PUERTO RICO

3

4      _____

5      In Re:                              )

6      THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD  )  PROMESA TITLE III

7      FOR PUERTO RICO                      )  Case No.

8              as representative of         )  17-BK-03283 (LTS)

9      THE COMMONWEALTH OF PUERTO RICO, et. al,  )

10             Debtors.                      )

11     _____)

12     In Re:                              )

13     THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD  )  PROMESA Title III

14     FOR PUERTO RICO                      )  Case No.

15             as representative of         )  17-BK-03566 (LTS)

16     THE EMPLOYEES RETIREMENT SYSTEM OF THE  )

17     GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO, )

18             Debtor.                      )

19     _____)

20

21               CONFIDENITAL

22         Transcript of JUSTIN BOYER

23

24     Reported by:

25     LORRAINE B. ABATE, CSR, RPR
```

CONFIDENTIAL
Justin Boyer - March 3, 2020

1        CONFIDENTIAL - Boyer - March 3, 2020 - CONFIDENTIAL

2                  So they trade mostly on their credit

3        rating, and, you know, on the state that they are

4        issued from.  The percentage of individuals that, you

5        know, have high net worth may impact the relative

6        yields a bit there.

7                  So Master Fund has been the one that I

8        believe has invested probably the most in municipal

9        securities, and Opportunity may have had one or two

10       investments, but not directly related to Puerto Rico.

11                 And the Drawdown funds do have some

12       investments in Puerto Rico, but they overlapped with

13       Master.

14       Q.      So can you give me a ballpark total --

15       well, let me step back.

16                 How long have you been employed by

17       Redwood Capital Management?

18       A.      Since 2001.

19       Q.      Okay.  And since that time, can you give

20       me a ballpark total number of investments you're

21       aware of that Redwood has engaged in relating to

22       municipal or government issued securities?

23       A.      So I believe we produced a list that's a

24       comprehensive list.  Two of them I'm not aware of

25       because they were before I got there.  And I spoke to

CONFIDENTIAL
Justin Boyer - March 3, 2020

Page 23

```
1        CONFIDENTIAL - Boyer - March 3, 2020 - CONFIDENTIAL
2    Jon Kolatch who is the founder of Redwood, and he
3    actually couldn't remember them off the top of his
4    head.
5              As you could imagine, we trade a lot of
6    securities.  Things that happened 10 years ago are
7    not fresh in our minds.
8              And -- but most of -- I mean, all of
9    this has basically been in Puerto Rico complex, and
10   some extent Jefferson County, when it reorganized.
11   We bought some securities I believe on the
12   reorganization.  I was not the analyst on that.
13   Ruben Kliksberg was.
14        Q.    Do you know when that was?
15        A.    I don't want to speculate.  I mean, you
16   could know -- it was when Jefferson County was
17   reorganized.
18        Q.    You alluded to a list that you produced
19   in this litigation and I'll show you that in a little
20   while.
21              But do you recall whether Jefferson
22   County would have been on that list?
23        A.    If it met the criteria that you -- that
24   you had given us, it should have been on the list.
25        Q.    Okay.  All right.  So you mentioned that
```

CONFIDENTIAL
Justin Boyer — March 3, 2020

Page 38

1       CONFIDENTIAL — Boyer — March 3, 2020 — CONFIDENTIAL

2       is to the extent that there's a typical process that

3       Redwood would follow in determining whether or not it

4       wants to invest in municipal or government-issued

5       securities, that would be the, I think, most helpful

6       information to know for purposes of today's exercise.

7               A.      I would say that we generally — I

8       presume that you're asking about Puerto Rico?

9               Q.      Well, I mean, I think earlier you

10      mentioned that Redwood has in the past, invested in

11      not just municipal securities or government

12      securities issued by Puerto Rico entities, but also

13      by other entities; two of which are on the list that

14      I have.  And you also mentioned Jefferson County.

15              A.      Yeah.

16              Q.      So I'm not — at this time, I'm not

17      really directing my questions specifically to Puerto

18      Rico.

19              MS. McGONIGLE:  And so objection, before

20              you answer.  In that case, that's beyond the

21              scope of the deposition topics.  So if you have

22              personal knowledge, you can provide it.

23              A.      Sure.  I mean, like Jefferson County, as

24      I said before, I was not the analyst on the name.

25      But I think that the thesis on our investment there

CONFIDENTIAL
Justin Boyer — March 3, 2020

1    CONFIDENTIAL — Boyer — March 3, 2020 — CONFIDENTIAL

2    was that, you know, it was coming out of bankruptcy.

3    The company -- or the municipality, you know, was

4    able to cement a rate schedule for rate increases on

5    its sewer and water rates that should have, you know,

6    covered the bonds.

7              On top of that, I believe that the bonds

8    were wrapped by a muni insurer, so you had a double

9    sort of level of protection.  And it traded wide to

10   its credit rating, substantially.  And you know, we

11   thought that as it would season, as it would become,

12   you know, investigated by normal course muni buyers,

13   you know, the rates that they would demand to hold

14   those bonds would fall and the prices would

15   appreciate.

16       Q.    So what happens after you've -- strike

17   that.

18             You mentioned before that you like to

19   send e-mail about the potential investment

20   opportunities; is that correct?

21       A.    Yeah.  I mean, the reason why I

22   generally do is because if we discuss something,

23   we'll have the discussion document in front of us.

24       Q.    So to whom would you send an e-mail?

25       A.    Jon Kolatch, Ruben Kliksberg.  Sometimes

CONFIDENTIAL
Justin Boyer - March 3, 2020

Page 46

```
 1      CONFIDENTIAL - Boyer - March 3, 2020 - CONFIDENTIAL
 2              So we rely on sometimes outside sources,
 3      like Reorg Research to keep track of some dockets and
 4      such.  You know, if it's something that we're heavily
 5      involved in like PG&E, I will check the docket
 6      myself, personally.  But generally, we rely on Reorg
 7      to flag, you know, filings.
 8          Q.      But within a bankruptcy case, if there
 9      is a specific litigation related to the security that
10      you're considering investing in, fair to say that you
11      would monitor the pleadings and arguments being made
12      in that litigation?
13              MS. McGONIGLE:  Same objection.  Go
14          ahead.
15          A.      So I don't know if you're getting at
16      that there was an AAFAF challenge to the ERS bonds.
17      I actually was unaware of that, and that's maybe
18      shame on me for not being aware of it as an analyst
19      just in the course of my diligence.  But I was not
20      aware of that when we were purchasing these bonds.
21          Q.      When did you first become aware of
22      anyone having made the argument that the ERS bonds
23      are invalid?
24          A.      It was after we purchased them.  I think
25      it was the FOMB that filed something.  And on the
```

GregoryEdwards, LLC | Worldwide Court Reporting
GregoryEdwards.com | 866-4Team GE

CONFIDENTIAL
Justin Boyer - March 3, 2020

```
 1      CONFIDENTIAL - Boyer - March 3, 2020 - CONFIDENTIAL
 2   AAFAF, I actually got -- was made aware of that
 3   yesterday.
 4                (Boyer Exhibit 1, Committees' and
 5           Government Parties' Amended Notice of Rule
 6           30(b)(6) Deposition of Redwood Master Fund,
 7           Ltd., marked for identification, as of this
 8           date.)
 9                (Boyer Exhibit 2, Notice of Videotaped
10           Deposition of Justin Charles Boyer, marked for
11           identification, as of this date.)
12                (Boyer Exhibit 3, Redwood Master Fund,
13           Ltd.'s Responses and Objections to the
14           Committee's and Government Parties Amended
15           Notice of Rule 30(b)(6) Deposition of Redwood
16           Master Fund, Ltd., marked for identification, as
17           of this date.)
18        Q.    Mr. Boyer, the court reporter has handed
19   you three documents I actually have identified
20   earlier in the deposition today.
21                But Exhibit 1 is the actual Rule
22   30(b)(6) Deposition Notice that the committee and
23   other parties served on Redwood in connection with
24   this litigation.
25                Exhibit 2 is a Deposition Notice
```

CONFIDENTIAL
Justin Boyer - March 3, 2020

Page 72

```
 1      CONFIDENTIAL - Boyer - March 3, 2020 - CONFIDENTIAL

 2           Q.    Are you done?

 3           A.    Yeah.  Sorry.

 4           Q.    When did Redwood join the bondholder

 5      group that is currently represented by Jones Day?

 6           A.    I'm not certain.  I think it was

 7      sometime in 2019, in the summer of '19 -- or spring.

 8           Q.    Was Redwood part of any bondholder

 9      groups prior to that date?

10                 MS. McGONIGLE:  Objection.  Are you just

11            talking about ERS bonds?

12                 MR. BASSETT:  Yes.

13           A.    No.

14           Q.    Was it part of any groups relating to

15      other Puerto Rico bonds prior to that date?

16                 MS. McGONIGLE:  Objection.

17           A.    Kramer Levin for PREPA.

18           Q.    And when did -- when did Redwood join

19      that group?

20           A.    I don't recall.

21           Q.    Did Redwood have -- did Redwood receive

22      any advice from outside counsel regarding the ERS

23      bonds prior to joining the Jones Day bondholder group

24      sometime in the summer of 2019?

25                 MS. McGONIGLE:  Objection on privilege
```

CONFIDENTIAL
Justin Boyer - March 3, 2020

Page 78

```
 1      CONFIDENTIAL - Boyer - March 3, 2020 - CONFIDENTIAL
 2   statements."
 3               Do you see that?
 4       A.    Yes.
 5       Q.    Are there particular exhibits that were
 6   relied upon by Redwood in purchasing ERS bonds?
 7       A.    I would say the enabling act, which I
 8   believe was an exhibit, and the opinion of counsel
 9   that they were legally issued.
10       Q.    It's your understanding that the
11   enabling act is an exhibit to the official statement?
12       A.    It is.
13       Q.    It goes on to say certain bondholders --
14   take a step back.
15               So when was the first time you reviewed
16   the enabling act?  Strike that.
17               When was the first time Redwood reviewed
18   the enabling act?
19       A.    My understanding is that the enabling
20   act was reviewed in 2018 or so, around the time of
21   that discussion document.  And the other thing I want
22   to say is the bond resolution is another document
23   that we relied upon.
24       Q.    Okay.  And then the last sentence says
25   "Certain bondholders may also have considered and
```

CONFIDENTIAL
Justin Boyer - March 3, 2020

1     CONFIDENTIAL - Boyer - March 3, 2020 - CONFIDENTIAL

2          Q.     So you're saying that this is a

3     different theory all together that nobody in this

4     litigation has raised, to your knowledge?

5          A.     To my knowledge, no.  This had to do

6     with the -- if you made an argument that we didn't

7     have security in the contributions, if they weren't

8     an asset of the system, it would not be.

9          Q.     Okay.  Regardless of whether or not

10    another party has made this particular argument, I

11    just want to be clear because I don't think you

12    actually answered this specific question.

13             But at the time you sent this e-mail, is

14    it true that you believed there was a risk that the

15    debt was voidable?

16             MS. McGONIGLE:  Objection.  Asked and

17        answered.

18         Q.     Yes or no?

19         A.     I was highlighting a hypothetical risk.

20         Q.     You thought there was no risk

21    whatsoever --

22             MS. McGONIGLE:  Objection.

23         Q.     -- that the debt the voidable?

24             MS. McGONIGLE:  Objection.

25         A.     I was highlighting a risk for us to