**EXHIBIT 37**

# REBUTTAL EXPERT REPORT
## OF
# ROBERT W. DOTY

## JULY 20, 2020

## PREPARED AT THE REQUEST OF
## THE GOVERNMENT PARTIES
## AND COMMITTEES

*IN RE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, AS REPRESENTATIVE OF THE EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO, CASE NO. 17-3566 (D.P.R.)*

# TABLE OF CONTENTS

**INTRODUCTION** ..................................................................................................................1

    **A.**    **Assignment** ........................................................................................................... 1

    **B.**    **Summary of Opinions** ........................................................................................ 2

    **C.**    **Documents and Information Considered** ....................................................... 2

**DISCUSSION** ........................................................................................................................3

    **A.**    **ERS' Bond Issuances Were Not "Borrowings" from the Underwriters** ..... 3

    **B.**    **The Phrase "Direct Placement" Does Not Refer to a Public Offering by ERS Itself, as Opposed to Through a Conduit** ............................................................ 4

**APPENDIX I—MATERIALS REVIEWED** .............................................................. I-1

# REBUTTAL EXPERT REPORT OF ROBERT W. DOTY

**Re:** ***In re Financial Oversight and Management Board for Puerto Rico, as representative of the Employees Retirement System of the Government of the Commonwealth of Puerto Rico***, **Case No. 17-3566 (D.P.R.)**

## INTRODUCTION

I have been retained by Brown Rudnick LLP ("Counsel"), as counsel to the Financial Oversight and Management Board for Puerto Rico (the "Board") acting through its Special Claims Committee ("SCC"), to prepare this Rebuttal Report in connection with certain litigation (the "Litigation") in the above-referenced case of the Employee Retirement System of the Commonwealth of Puerto Rico ("ERS") pending under Title III of the Puerto Rico Oversight, Management, and Economic Stability Act ("PROMESA"). As part of my engagement, I have also agreed to assist certain other parties who are aligned in interest with the SCC in the Litigation, including (i) the Official Committee of Unsecured Creditors of the Title III Debtors and its counsel, Paul Hastings LLP, Genovese Joblove & Battista PA, and Casillas Santiago Torres LLC; (ii) the Official Committee of Retired Employees of the Commonwealth of Puerto Rico and its counsel, Jenner & Block LLP; (iii) the Puerto Rico Fiscal Agency and Financial Advisory Authority and its counsel, O'Melveny & Myers LLP; and (iv) the Board and its counsel, Proskauer Rose LLP. I have been retained as an independent testifying expert witness. I am over the age of 18 years, and am competent to testify at trial. I have personal knowledge of the matters discussed herein. If called upon, unless stated otherwise, I am prepared to testify consistently with the analysis and opinions I express in this Report.

I prepared an Initial Expert Report in this matter dated July 1, 2020 (my "Initial Report"), which is incorporated herein by reference.

This Rebuttal Expert Report responds to certain assertions made by Professor William Bartley Hildreth in his Expert Report dated July 1, 2020, in this matter (the "Hildreth Report"). My qualifications and compensation arrangement as described in my Initial Report are the same for this Rebuttal Report and, therefore, are not restated herein.

### A. Assignment

For purposes of this Rebuttal Report, Counsel has asked for my expert opinion on the following questions:

1. Whether I agree with Professor Hildreth's conclusion that ERS' issuance of bonds through underwritten public offerings constituted a "borrowing" or "loan" "from a financial institution."

**Rebuttal Report of Robert W. Doty**
Page 2

2. Whether I agree with Professor Hildreth's suggestion that the term "direct placement of debt" refers to any form of financing (including a public bond issuance) conducted by an issuer itself, as opposed to through a conduit.

### B. Summary of Opinions

My conclusions are as follows:

I disagree with Professor Hildreth regarding whether, in municipal bond market terms, ERS "borrowed" from the underwriters. ERS did not borrow from the underwriters. Professor Hildreth does not rely on any materials commonly considered by those in the municipal finance industry to reach his conclusion.

I also disagree with Professor Hildreth regarding the meaning, in the municipal bond market, of the term "direct placement," as the opposite of a conduit financing. A "direct placement" in municipal finance is not the opposite of conduit financing, but rather, as described in my Initial Report, the direct sale of debt by a municipal issuer to one or a small group of sophisticated investors. ERS made no such "direct placement" of its Bonds with the underwriters as that term is properly understood in the municipal bond market.

### C. Documents and Information Considered

This Rebuttal Report and my Initial Report take into account the documentation and recognized and authoritative industry guidance I have reviewed to date, as well as my active participation in the financial markets for more than 45 years. Appendix I hereto identifies additional materials I considered in reaching my opinions in this Rebuttal Report.

I understand that I may be asked in the future to review additional documentation or to conduct additional research and analysis. I also understand that I may be asked to form additional opinions as to other questions upon appropriate review. I reserve the right to modify or supplement this Rebuttal Report and my Initial Report in any respect following my review of additional factual information or documents or additional research and analysis or to respond to additional questions.

This Rebuttal Report and my Initial Report and the opinions I express herein and therein are based upon my education, specialized training, skill, personal experience and knowledge of common and prevailing roles and responsibilities of parties involved in municipal bond transactions, and of industry customs, practices and standards of care prevailing in the municipal bond market in 1988 and 2008, and upon my consideration of materials discussed herein.

**Rebuttal Report of Robert W. Doty**
Page 3

# DISCUSSION

### A. ERS' Bond Issuances Were Not "Borrowings" from the Underwriters

Professor Hildreth states a few times (without analysis or authority) that the offerings of the ERS Bonds were "borrowings" directly from the underwriters.[1] At the same time, I counted more than 35 instances in which Professor Hildreth, in discussing the underwriters, refers to "purchases," "purchasers," "purchase contracts," or "purchase prices" of the ERS Bonds. He further notes that ERS' relationship with the underwriters is governed by the Bond Purchase Contracts.[2] From all of this, Professor Hildreth appears to conclude that, because the underwriters purchased the ERS Bonds from ERS as the issuer, ERS "borrowed" from the underwriters. I disagree, as this conclusion is not supported by my understanding or experience in the municipal finance industry.

Professor Hildreth's conclusion is incorrect, because, as discussed in my Initial Report, based on my experience and knowledge of industry customs, practices and standards in the municipal bond market, underwriters and underwriting syndicates enter into *purchase* contracts, not loan or borrowing agreements, with issuers of public bonds. These purchase contracts outline the role of the underwriter, which is that of an intermediary tasked with distributing the bonds to public investors, not that of a lender or investor from whom the issuer "borrows" money. Indeed, Professor Hildreth himself, in multiple instances, refers to the role of an underwriter as an "intermediary" between an issuer and a public investor.[3]

The Bond Purchase Contracts here were no different than typical underwriter purchase contracts. They established purchaser-seller relationships, not lender-borrower relationships, between ERS and the underwriters and obligated the underwriters to make "bona fide public offerings of all the bonds." The Bond Purchase Contracts thus confirm that the underwriters were not lenders to ERS, but instead acted in accordance with industry customs, practices, and standards by purchasing the bonds from ERS and agreeing to facilitate the public offering. The Bond Purchase Contracts also make no reference to "borrowing" relationships, which further indicates the underwriters acted in accordance with industry customs, practices, and standards and therefore were not lenders to ERS or investors from whom ERS "borrowed" money. In my opinion and based on my experience, there is no indication in the Bond Purchase Contracts that ERS "borrowed" from the underwriters.

---

[1] See, *e.g.*, Hildreth Report at ¶¶ 51, 174.

[2] Capitalized terms not defined herein have the meanings given to them in my Initial Report.

[3] See, *e.g.*, Hildreth Report at ¶¶ 64-66, 93.

**Rebuttal Report of Robert W. Doty**
Page 4

Moreover, as stated in the "Best Practice" guide published by the Government Finance Officers Association ("GFOA"), the contractual relationship set forth in the Bond Purchase Contracts between ERS and the underwriters is "the only legal relationship" between them.[4] GFOA adds that "[t]he primary role of the underwriter in a negotiated sale is to market the issuer's bonds to investors."[5] Here, there is no indication the underwriters of the ERS Bonds deviated from this practice as Professor Hildreth suggests.

In support of his conclusion that "ERS borrowed directly from the underwriters instead of retail or institutional investors since it was the underwriters whose money was transferred to ERS[,]"[6] Professor Hildreth does not rely upon or cite to any information or materials normally used or relied upon in the field of municipal finance. As stated in my Initial Report, I am similarly unaware of any such information or materials that support the conclusion that an issuer borrows directly from an underwriter in a public offering context like the one of the ERS Bonds.

**B. The Phrase "Direct Placement" Does Not Refer to a Public Offering by ERS Itself, as Opposed to Through a Conduit**

Professor Hildreth contrasts the concept of a "conduit" bond issue, in which one entity borrows through another public entity that issues bonds, with a "direct placement" of bonds. Professor Hildreth seems to be opining that the term "direct placement" refers to an issuance of bonds by an entity itself, rather than through a conduit.[7] That is not in accord with the usage in the municipal bond market of the term "direct placement."

Although "conduit financing" is not an uncommon practice in the municipal bond industry, based on my extensive knowledge and experience, the term "direct placement" does not refer to the opposite of a conduit financing. In fact, I have never heard the term "direct placement" used to refer to a public offering conducted by the municipal bond issuer itself, as opposed to through a conduit; further, Professor Hildreth provides no authority for that conclusion, and I have not discovered any authority to support that conclusion independently.

As discussed in my Initial Report, with several citations to financial industry literature, the term "direct placement" is a known term having a particular meaning in municipal finance. Specifically, it means a placement of debt in large denominations, generally at least $100,000, directly by an issuer to a single sophisticated investor or small group of

---

[4] GFOA, *Selecting and Managing Underwriters for Negotiated Bond Sales* (2014).

[5] *Id*. Emphasis added.

[6] Hildreth Report at ¶ 51.

[7] See, *e.g.*, Hildreth Report at ¶¶ 50, 51, 72, 98, 174.

**Rebuttal Report of Robert W. Doty**
**Page 5**

sophisticated investors, as opposed to an underwritten public offering. In contrast, the ERS Bonds were (1) sold by ERS to the underwriters (2) for resale in "bona fide public offerings of all of the bonds" to (3) public investors in (4) $5,000 denominations.

Indeed, Professor Hildreth's own authority rebuts his opinion. In discussing "securities" (which include municipal bonds) and "loans," Professor Hildreth cites[8] a paper by the National Association of Bond Lawyers ("NABL") discussing "direct purchases" of municipal bonds (which are the same as "direct placements" viewed from the standpoint of the investor). That paper states:

> the phrase "direct purchase" is used to refer to the purchase of tax-exempt or taxable governmental or conduit bonds by a commercial bank, a bank affiliate, or similar financial entity that *does not involve an underwriting or public offering* … .[9]

Consistent with this quote, and for the reasons discussed in my Initial Report, a "direct placement" does not mean the opposite of a conduit financing.

---

[8] See, *e.g.*, Hildreth Report at ¶ 63.

[9] National Association of Bond Lawyers, *Direct Purchases of State or Local Obligations by Commercial Banks and Other Financial Institutions* ( July 2017) (emphasis supplied).

**Rebuttal Report of Robert W. Doty**
Page 6

I declare under penalty of perjury that the foregoing is true and correct.

**IN WITNESS WHEREOF,** I have executed this Report in Annapolis, Maryland, as of the date set forth below.

**EXECUTED ON:** July 20, 2020

_____
Robert W. Doty

# APPENDIX I–
# <u>MATERIALS REVIEWED</u>

In the preparation of this Rebuttal Report, I have considered the following additional materials (provisions cited in this Rebuttal Report):

**A.** Documents, authorities and other materials, or portions thereof, cited in this Rebuttal Report

**B.** Hildreth Report

**C.** National Association of Bond Lawyers, *Direct Purchases of State or Local Obligations by Commercial Banks and Other Financial Institutions* ( July 2017)