**EXHIBIT 3:**

(H. B. 2855)
(Conference)

## (No. 116-2011)

(Approved July 6, 2011)

# AN ACT

To      amend **Section 1-105** in order to include temporary employees as members
of the System; amend **Section 2-116** to increase employer contributions;
amend **Section 3-105** to increase employer contributions and prevent them
from being assigned or pledged as collateral by the System to take on loans
as well as require the consent of two-thirds of the members of the Board of
Trustees of the System for such purposes; amend **Section 4-101** to increase
the members of the Board to nine, plus one participant and one pensioner of
the Employee Retirement System of the Government; amend **Section 4-104**
to provide that the Legal Division of the System shall represent the System
in any judicial proceeding; amend **Section 4-105** to require the consent of
two-thirds of the members of the Board of Trustees of the System through
their secrete vote, as well as the enactment of legislation by the Legislative
Assembly, in order to pledge the assets of the System as collateral for any
debt directly incurred, provided that, without such consent, no transaction
shall be valid or binding on the System; amend **Section 4-109** to provide that
a certificate of debt shall be issued and sent to the CRIM and the Secretary
of the Treasury in case that any municipality or municipal entity, agency,
public company, or any other body fails to remit to the System any
contribution and loan payment withheld from employees who participate in
the System, within thirty (30) days following such withholding; that such
debt shall not be cancelled by the Administrator or the Board of the System,
and shall have priority over any other debt under Act No. 447 of May 15,
1951, as amended, known as the "Employee Retirement System of the
Government of the Commonwealth of Puerto Rico"; and for other purposes.

## STATEMENT OF MOTIVES

Through this measure, this Legislative Assembly seeks to protect our public
employees by providing stability to a Retirement System that is undergoing a
serious crisis.

CONFIDENTIAL                                                           GLC-ERS-005283

Act No 447 of May 15, 1951, as amended, established the "Employee Retirement System of the Government of the Commonwealth of Puerto Rico," which created a retirement and benefit system of public employees. According to the provisions of the law in effect, this Retirement System is a trust for public employees whose function is investing and keeping custody of the periodic contributions made by employees and their respective employers in order to be able to make the corresponding future employee pension payments for retirement or disability.

There are several Retirement Systems with defined benefit structures, to wit: the Commonwealth of Puerto Rico Teacher's Retirement System, created by Act No. 91 of March 29, 2004; the Retirement System of the University of Puerto Rico, created by Act No. 1 of January 20, 1966; the Retirement System for the Judiciary of the Commonwealth of Puerto Rico, created by Act No. 12; and the Retirement System of the Puerto Rico Electric Power Authority, which was created through a collective bargaining agreement. The structures of these Systems are very similar to the System in question. However, these systems are not undergoing the same economic crisis as the Employee Retirement System of the Government of the Commonwealth of Puerto Rico.

Between June 30, 2007, and June 30, 2009, the System had a total of 160,053 active participants distributed as follows:

| Year* | Act No. 447 - 1951 | Act No. 1- 1990 | Act No. 305- 1999 | Total Participants |
|--------|--------|--------|--------|--------|
| 30-6-09 | 38,249 | 56,991 | 64,813 | 160,053 |
| 30-6-07 | 46,062 | 58,337 | 66,704 | 171,103 |

*Data from the June 2007 and June 2009 Actuarial Reports of the Retirement System, *Milliman, Wayne, PA*

GLC-ERS-005284

On the other hand, as of June 30, 2009, the Retirement System had 104,971 pensioners, that is, 56,000 more participants than pensioners, which was good. It is evident that the gap between pensioners and participants is closing, which could seriously jeopardize the finances of the System.

**Incentivized Retirements** have contributed to a significant increase in the number of Pensioners who have entered the System, and their pensions, unlike those of **Retirement Windows**, are paid with the funds of the System. Until now, Incentivized Retirements for participants who have attained both the age and the time required to avail themselves of a pension based on merit have been a square deal for the Agencies of the Central Government, Public Corporations, and Municipalities, since thousands of employees are thus removed from their payrolls and 75% of their average salary is then paid by the Retirement System through a pension. This situation clearly accelerates and makes evident the Actuarial Deficit of the System, and also increases the Cash Flow deficit thereof. Although these employees are included in the actuarial studies, the truth is that the percentage of participants eligible to retire who actually do so is never 100%.

At this time, we can say that the Retirement System is undergoing the worst and most serious crisis since its creation. This crisis has been slowly draining the System to the extent that, by 2014, its capital assets will have been exhausted and its cash flow deficit will have reach nearly $500 million preventing it from meeting its obligations, namely, the pensions of our retirees. Only employer and individual contributions would be available to pay the System's obligations, which would not be enough. Consequently, an item would have to be included in the General Budget of the Government to defray such annual deficit of approximately $500 million. Therefore, we must find solutions that are proportionate to the problem and not merely superficial.

CONFIDENTIAL

GLC-ERS-005285

When compared to other Retirement Systems, this one is facing the worst financial crisis. We can conclude that the decisions made in connection with this System have been the least conservative and most devastating. The financial crisis of the System must be regarded as a very serious issue, because this is the Retirement System with the most participants and pensioners.

History has shown that this Retirement System has been managed differently *vis-á-vis* other Systems. Since System membership exceeds 100,000 pensioners, it is believed that providing benefits to such pensioners will translate into votes for the Government Administration that offers them. Hence, benefits are provided even though the System lacks the resources to pay for them. The following Table includes some of the laws that have provided benefits that have had to be paid with the System's funds:

| Act No. 15 of December 10, 1975 | $110 Million Loan To the General Budget | The System received $110 million without interests |
|---|---|---|
| Act No. 221 of August 9, 1998 | 3% Raise to Pensioners | Retirement System |
| Act No. 22 of June 30, 2005 | Mandatory Retirement 58 years-old Police officers | Retirement System |
| Act No. 35 of April 24, 2007 | Pension Raise from $300 to $400 | Retirement System Retirement System |
| Executive Order No. 14 of May 24, 2006 | Incentivized Retirement | Retirement System |

Through **Act No. 110-1973** a $100 million dollar loan was granted to the government general budget. Such amount was repaid many years later, without the interests accrued thereon.

CONFIDENTIAL

GLC-ERS-005286

**Act No. 221 of August 9, 1998** increased pensions granted under Act No. 447 of May 15, 1951, as amended, by three (3) percent, effective on or before January 1, 1995. Furthermore, it provided the necessary funds to cover the impact of such increase and established that, each year, municipalities and public corporations would defray the costs of the increase to the annuities of pensioners who were employees thereof. This Act had an estimated cost of $18 million which the System also had to cover.

**Act No. 22 of June 30, 2005,** proposed that members of the Puerto Rico Police and the Firefighters Corps may voluntarily retire after attaining the age of fifty-five (55) and thirty (30) years of service. Retirement will be mandatory as of the date on which participants have completed thirty (30) years of service and attained the age of fifty-eight (58). This Act, which also increased the number of pensioners in the System, and impose no cost whatsoever to be paid to such System, benefits the Central Government by eliminating hundreds of Police officers from its payroll and having the Retirement System pay 75% of their average salary.

**Act No. 35 of April 24, 2007,** set forth that pensioners receiving a monthly pension of less than four hundred dollars ($400) shall, effective on July 1, 2007, receive a one hundred-dollar ($100) raise or the difference between the pension they receive as of June 30, 2007, and four hundred dollars ($400) a month, whichever is less. This raise must have entailed a recurring expense of approximately $20 million which is defrayed by the System. In order to grant this raise, Act No. 35 proposed a **Bond Issue**. The System pledge its assets to make a three billion dollar Bond Issue to pay this raise among other things. This Bond Issue has accelerated the demise of the System, which is set to occur by 2014.

The System has been undergoing serious economic issues, which have not been given the importance they deserve.

CONFIDENTIAL

## Three Billion-Dollar Bond Issue

We must note that the System was involved in a Bond Issue transaction amounting to $3 billion. Such transaction was so badly structured that, rather than yielding profits, it resulted in tremendous losses that have accelerated the demise of Retirement System. The Bond Issue was illegally made by the System's Administration even though such transaction was submitted to the Legislative Assembly for approval and rejected by the House of Representatives for deeming it detrimental to the System. Such Bond Issue was made notwithstanding the fact that other Retirement Systems in the United States were facing difficulties after carrying out similar transactions. The System was led to believe that the return of the sale of such Bonds would make enough profits to pay bondholders and even defray the cash flow deficit. However, the results proved otherwise. Since day one, such investment did not yield any returns, but rather losses, and the payment to bondholders increased the cash flow deficit on the first year to more than one hundred and ten million dollars annually. At the beginning, the Bond Issue was expected to pay 6.6% interest to bondholders, since profits from the investment of the returns of this Bond Issue were estimated at 11%. When the bond issue was finally made, the expectation was down to 4.4%. This shows that, since the beginning, a loss of approximately 2% was expected. This Bond Issue was so terrible that, from $937,000,000 that were invested in February 2008 there were only $837,000,000 by December 2009. Currently, from a $3 billion Bond Issue, only about $1.3 billion remain.  According to the documents related thereto, such Issue was secured with the employee contributions to be collected in the next fifty years. For such reason, the Retirement System should not be allowed to issue debt, such as stock market bonds, to be secured with its assets.

GLC-ERS-005288

**Actuarial Deficit and Cash Flow Deficit**

As stated above, the Retirement System has been facing not only an actuarial deficit, but also a cash flow deficit so severe that it is slowly draining the System to the extent that, by 2014, its capital assets will have been exhausted. It is necessary to start closing that gap, and there is no doubt that an increase in participant contributions is the solution to raise the funds of the System.

The Actuarial Deficit of this System has been increasing considerably to the point that, from 2001 to 2009, it has doubled, as shown in the Table below:

| Actuarial Deficit of the Retirement System | | | | | |
|---|---|---|---|---|---|
| | **2001** | **2003** | **2005** | **2007** | **2009** |
| **Net Assets** | $2,429,000 | $1,947,000 | $2,328,000 | $2,892,000 | $1,851,000 |
| **Actuarial Obligations** | ($9,882,000) | (11,191,000) | (12,284,000) | (16,770,000) | (18,944,000) |
| **Actuarial Deficit** | ($7,453,000) | ($9,244,000) | ($9,956,000) | ($13,878,000) | ($17,093,000) |

\* **Information supplied by the Employee Retirement System of the Government**

This large deficit should have warned past administrations about the System's situation and encourage them to find solutions to address this issue; however, it was not so.

The cash flow deficit has been increasing precisely due to all the laws that the System has had to finance, along with a $3 billion dollar Bond Issue. The table below shows the timeline of such deficit:

| CASH FLOW DEFICIT* | |
|---|---|
| **1999-2000** | **17 MILLION** |
| **2000-2001** | **93 MILLION** |
| **2001-2002** | **45 MILLION** |
| **2002-2003** | **62 MILLION** |
| **2003-2004** | **58 MILLION** |

CONFIDENTIAL

| 2004-2005 | 138 MILLION |
|-----------|-------------|
| 2005-2006 | 60 MILLION |
| 2006-2007 | 199 MILLION |
| 2007-2008 | 240 MILLION |
| 2008-2009 | 380 MILLION |

**\* Information supplied by the Employee Retirement System of the Government**

This cash flow deficit was defrayed as follows:

**2000-2001 - 93 Million** – This overdraft was subsequently paid to the Bank with the proceeds from the sale of some of the shares of the Puerto Rico Telephone Company which amounted to $172 million.

**2001-2002 - 45 Million** – Paid with the proceeds of the sale of some of the shares of the Puerto Rico Telephone Company.

**2002-2003 - 62 Million** – Assets were sold for the payment thereof.

**2003-2004 - 58 Million -** Assets were sold for the payment thereof.

**2004-2005 - 138 Million** – A loan was taken for the payment thereof.

**2005-2006 - 60 Million -** A loan was taken for the payment thereof.

**2006-2007 - 199 Million** – The Remaining Shares of the Puerto Rico Telephone Company were sold for $529 million for the payment thereof.

**2007-2008 - 240 Million** – Paid with the proceeds from the Sale of the Bond Issue.

**2008-2009 - 380 Million -** Paid with the proceeds from the Sale of the Bond Issue.

**2009-2010 - 520 Million -** Paid with the proceeds from the Sale of the Bond Issue.

According to Act No. 447, *supra*, the Central Government has contributed to the Actuarial Deficit and the Cash Flow Deficit of the System, because its employer contributions have been less than what the law itself requires. The following table shows what the Government should have paid on account of employer contributions versus what it has actually paid:

GLC-ERS-005290

| | Deficiency in the Required Employer Contribution Versus the Contribution Made | | | | |
|---|---|---|---|---|---|
| Year | Required Employer Contribution* | Employer Contribution | Contribution Discrepancy | % Employer Contribution Made | % Employer Contribution Not Made |
| 2004 | $   578,387,000 | $330,336,000 | $248,051,000 | 57.11% | 46.89% |
| 2005 | $   578,387,000 | $374,823,000 | $203,504,000 | 64.80% | 37.20% |
| 2006 | $   816,472,000 | $559,198,000 | $257,274,000 | 68.49% | 31.51% |
| 2007 | $   816,472,000 | $566,524,000 | $249,948,000 | 69.39% | 30.61% |
| 2008 | $1,191,275,000 | $581,285,000 | $609,990,000 | 48.80% | 51.20% |
| 2009 | $1,258,695,000 | $594,509,000 | $664,186,000 | 47.23% | 52.77% |
| 2010 | $1,459,774,000 | $590,742,000 | $869,032,000 | 40.47% | 59.53% |

*Data from the June 2009 Actuarial Report of the Retirement System, *Milliman, Wayne, PA*

Looking at the actuarial deficit and the cash flow deficit we can conclude that there is an imbalance between the actual income of the System and what it needs order to pay its short- and long-term obligations. In Section 21 of Act No. 1, *supra*, a new formula was established to solve this situation by decreasing the deficit caused by a deficiency in contributions. This changed the financing formula of the System. The System's income on account of individual and employer contributions, as well as investments, were intended to provide financing to the System. Under this new formula, employers would assume the responsibility of contributing the difference between the total cost of the System and participant contributions, as well as administration costs. However, this formula has never been implemented by any subsequent administrations of the Retirement System. Today, this is one of the reasons why the actuarial deficit has increased to the point that the System already has its days numbered. The new formula was never implemented and the Act failed to fix a term to review the employer contributions thereunder. This formula was once applied to the Aqueduct and Sewers Authority

CONFIDENTIAL

and, according to the Retirement System, the Authority owes it $833,219,000 on account of employer contributions. The State Insurance Fund also owes $984,943,000. Undoubtedly, a payment plan is necessary to collect this accrued debt; however, such payment plan should not extend beyond ten years given the economic crisis that the Retirement System is presently facing. After the approval of said Act, it was recommended that employer contributions be reviewed by the System every two years.

**Change in Employer and Individual Contributions**

The contributions schedule has been changing through different legislations. However, we must recognize that, since 1990, the contributions have not been increased. The Table below shows the different legislations that have introduced changes to individual and employer contribution schedules:

| Amendments to Act No. 447 of May 15, 1951 | Individual Contribution | Employer Contribution |
|---|---|---|
| Act No. 447 of May 15, 1951 | 5.5% | 4.5% |
| Act No. 162 of July 20, 1979 | 7% | 7% |
| Act No. July 1st, 1982 | 8% | 8% |
| Act No. 1 of February 16, 1990 | 8.275% | 9.275% |

The actuarial study conducted in 2003, recommended that employers should make a contribution of 16.915% in order for the System to remain balanced. This did not occur, and today we see the results.

**Contribution Remittance Debts**

Failure to implement Section 2-116 of Act No. 447, *supra*, now has make it necessary to increase contributions as a short-term solution to the cash flow problem. Thus, said Section is hereby amended to provide that such formula shall be reviewed every two (2) years.

CONFIDENTIAL

GLC-ERS-005292

Carelessness and delay are the order of the day in the Retirement System. Hence, it is necessary to amend the form and manner of sending remittances thereto. Even though previous laws have attempted to implement various remedies, such remedies have been neglected and, therefore, ineffective. The fastest and simplest solution is to enable the System to collect the debt of the municipalities directly from the CRIM, whenever a municipality fails to send their remittances within thirty days, or directly from the Department of the Treasury in the case of agencies that fail to pay within the term provided therefor. Nothing justifies an agency or mayor that withholds contributions and loan payments from the wages of participants and fails to remit such moneys to the Retirement System. We must put an end to this wrongful practice because it not only affects the finances of the System, but also participants themselves when they apply for loans and their applications are rejected because their accounts are past due. This also causes participants to be denied their rights to retire. Thus, we seek to provide that, if municipalities fail to send remittances to the System within 30 days, the System shall issue a Certification to the CRIM so that the latter pays such debt with the funds of the municipality. With regard to Government agencies, we further provide that the System shall issue a certification of debt to the Secretary of the Treasury and the latter shall issue a payment charged to the funds of such agency within 30 days. Debts owed by Government agencies, public corporations, and instrumentalities in connection with the remittance of individual and employer contributions and other payments to the retirement System shall have priority over any other debt. If there is any discrepancy between any Government agency, public corporation, and instrumentality and the System in connection with remittances, such discrepancy shall be notified to the Commission to Solve Controversies of Payments and Debts among Government Agencies. There is no justifiable reason

CONFIDENTIAL

GLC-ERS-005293

for a Government agency to owe excessive sums of money to the Retirement
System.

**Retirement Savings Accounts**

This measure introduces changes to the Retirement Savings Account
Program. Employer contributions are increased from 9.275% to 11.5% and, 20% of
such amount shall be granted to the Participants of the Program. Even though this
Act specifically provides that employer contributions shall be deposited in the
System to increase its assets, reduce its actuarial deficit, and enable the System to
meet its future obligations, it should be clarified that employer contributions shall
not be used or pledged as collateral by the System to take on loans. In order to do
so, the consent of two-thirds of the members of the Board of Trustees of the
System through their secret vote, and the enactment of legislation approved by
two-thirds of the members of the Legislative Assembly shall be necessary.

The changes made through the amendments being introduced may seem
somewhat drastic, but we should bear in mind that in *Bayrón Toro v. Sierra* (119
DPR 605), our highest Court held, in a discussion about the constitutional bar
against the impairment of contractual obligations, that a balance must be
established when making reasonable and necessary changes to save the actuarial
solvency of the Retirement System to safeguard the interests of the participants.

All contribution increases herein provided are established for the purposes of
attaining an actuarial balance between the income of the System and the payment
of its obligations and expenditures. For such reason, it is necessary to conduct an
actuarial study as part of this measure. The flow of funds from contributions plus
the yield of the System's assets must be sufficient to cover administrative costs and
the payment of benefits.

CONFIDENTIAL

This Retirement System must achieve financial stability, and the Government should protect it out of deference and respect to our pensioners who worked hard and contributed to build the Puerto Rico that we enjoy today.

With the approval of this measure, this Legislative Assembly seeks to strengthen the Employee Retirement System of the Government of the Commonwealth of Puerto Rico to ensure its financial stability and guarantee that both participants and pensioners can rest assured that their future will be financially stable, and that, at the end of their public service, the Retirement System shall provide them financial security in their retirement.

***BE IT ENACTED BY THE LEGISLATIVE ASSEMBLY OF PUERTO RICO:***

Section 1.- Section 1-105 of Act No. 447 of May 15, 1951, as amended, is hereby amended to read as follows:

"Section 1-105.- Membership.-

(a)     The membership of the system shall be constituted by every person who holds a regular position as a career or trust, or temporary employee or with probationary personnel status in any executive department, agency, administration, board, commission, office or instrumentality of the Executive Branch, by the Justices of the Peace, the regular employees and officials of the Judiciary Branch and the regular officials and employees of the Legislative Assembly of Puerto Rico, and by all regular officials and employees of the municipalities, including the mayors. Municipal temporary employees shall not be participants of the Retirement System.

(b)     Regular and temporary employees of those public enterprises and municipalities who are participating employers of the system shall also be participating members of the system, subject to what is established in Section 1-110 of this Act.

GLC-ERS-005295

(i)      …………………………………………………………………......

……………………………………………………………………………………."

Section 2.- Section 2-101 of Act No. 447 of May 15, 1951, as amended, is hereby amended to read as follows:

"**Section 2-101.- Retirement Annuity**.-

(a)      Upon separation from service, on or after reaching the ages, and after completing the period of service indicated below, all participants who have not been reimbursed their accrued contributions shall be entitled to receive a retirement annuity.  Said annuity shall start on the date on which the participant files his/her application for retirement, but in no case before his/her separation from the service.

………………………………………………………………………………

(b)      The preceding provisions of this Section shall not be applicable to officer participants of this System who have served as mayors for at least eight (8) years.

………………………………………………………………………………

The maximum retirement annuity to be granted under this subsection shall be ninety percent (90%) of the highest salary that the mayor may have earned.

The payments of the retirement annuity shall begin as of the filing date of the retirement application, but never before the mayor has attained fifty (50) years of age.

………………………………………………………………………………

(f)      The deferred retirement annuity provided in this Section shall take effect at the participant's request."

Section 3.- Section 2-116 of Act No. 447 of May 15, 1951, as amended, is hereby amended to read as follows:

CONFIDENTIAL

GLC-ERS-005296

"**Section 2-116.- Employer Contributions**.-

(a)   Employer's contributions shall cover the difference between the total cost of the benefits provided by the System and the costs of administration, reduced by the portion contributed by participants.

(b)   …………………………………………………………………..

(c)   …………………………………………………………………..

(d)   Starting on July 1st, 2011, the employer shall contribute to the appropriate System a minimum percentage equal to ten point two hundred seventy-five (10.275) of the compensation regularly received by the participants, and shall make such contributions concurrently with employee contributions, as provided by this Act. As of July 1st, 2011 and until June 30, 2016, the minimum employer contribution minimum of ten point two hundred seventy-five percent (10.275%) shall be increased annually each July 1st. Such increase shall be equal to one percent (1%) of the compensation that participants regularly receive.  As of July 1st, 2016 and until June 30, 2021, the minimum employer contribution rate in effect as of June 30 of each year shall be increased annually by one point twenty-five percent (1.25%) of the compensation that participants regularly receive.

Provided, that the established increases applicable to Municipalities for Fiscal Years 2011-2012, 2012-2013, and 2013-2014 shall be included in the budget proposal submitted to the Legislative Assembly by the Office of Management and Budget.

(e)   Any difference between the contribution required by subsection (c)(3) of this Section and the minimum contribution established in subsection (d) of this Section shall constitute a deficiency in the employer contribution. The obligation accrued as a result of this deficiency shall constitute an actuarial deficit for the System and an obligation of the employer.

CONFIDENTIAL

(f)    ………………………………………………………………..

(g)    ……………………………………………………………."

Section 4.- Section 3-105 of Act No. 447 of May 15, 1951, as amended, is hereby amended to read as follows:

"**Section 3-105.- Retirement Savings Account Program – Employer Contributions**.-

Starting on July 1st, 2011, it shall be mandatory for every employer to contribute to the System a sum equal to ten point two hundred seventy-five (10.275%) of the compensation of each participant of the Program while such participant is an employee. These contributions shall be deposited in the System to increase the level of the assets of the System, reduce the actuarial deficit, and enable the System to meet its future obligations. As of July 1st, 2012 and until June 30, 2016, the minimum employer contribution rate of ten point two hundred seventy-five percent (10.275%) shall be increased annually each July 1st. Such increase shall be equal to one percent (1%) of the compensation that participants regularly receive. As of July 1st 2016 and until June 30, 2021, the minimum employer contribution rate in effect on June 30 of each year shall be increased annually by one point twenty-five percent (1.25%) of the compensation regularly received by participants. Provided, that the established increases applicable to Municipalities for Fiscal Years 2011-2012, 2012-2013, and 2013-2014 shall be included in the budget proposal submitted to the Legislative Assembly by the Office of Management and Budget. Said employer contributions may not be assigned or pledged as collateral by the System to take on loans. In order for such employer contributions to be assigned or pledged as collateral by the System to take on loans, the consent of two-thirds of the members of the Board of Trustees of the System through their secret vote and the enactment of legislation which shall be passed by the affirmative vote of two-thirds of the members of the Legislative

Assembly shall be necessary. In the event that an amendment is introduced in the Legislative Assembly to eliminate the provisions of this Act regarding the consent required to take on loans pledging employer contributions as collateral, the consent of two-thirds of the members of the Legislative Assembly shall be necessary to pass such amendment."

Section 5.- Section 4-101 of Act No. 447 of May 15, 1951, as amended, is hereby amended to read as follows:

"**Section 4-101.- Administration.-**

The system created by this Act shall be considered a trust. Any change in the benefit structure of the trust, which results in an increase in the amount of annuities or other benefits, shall be supported with prior actuarial studies to determine its cost, and the corresponding legislation shall provide for its financing.

A Board of Trustees is hereby created and established, which shall be responsible for the enforcement of the provisions of this Act. Said Board shall consist of eleven (11) members, four (4) of whom shall be ex-officio members, to wit: The Secretary of the Treasury, the Commissioner of Municipal Affairs, the President of the Government Development Bank for Puerto Rico, and the Director of the Director of the Human Resources Office. Three (3) members shall be appointed by the Governor of Puerto Rico for terms of three (3) years each, and shall perform their duties until a successor is appointed and takes office. Two (2) of these members shall be participants of the System created by this Act and the other one shall be a participant of the Retirement System of the Judiciary, both shall have at least ten (10) years of credited service on the date of their appointment. Of the remaining four (4) members, two (2) shall be pensioners of each system, appointed by the Governor for terms of three (3) years and shall perform their duties until a successor is appointed and takes office. The other two

GLC-ERS-005299

(2) members shall be the Chairs of the Federation of Mayors and the Association of Mayors of Puerto Rico, respectively.

The ex-officio members may designate delegates to represent them at meetings of the Board and in any other activities within their duties as members of the Board, except when the Chair of the Board requires their attendance.

The System hereby created shall be organized as an agency of the Government of Puerto Rico, independent and separate from others. Neither the Board of Trustees nor the Administration shall be subject to provisions of the 'General Services Administration Act,' or of the Office of Management and Budget Organic Act'; they shall, however, be individual Administrators under the provisions of Act No. 184 of August 3, 2004, as amended, known as the 'Puerto Rico Public Service Personnel Act.'"

Section 6.- Section 4-104 of Act No. 447 of May 15, 1951, as amended, is hereby amended to read as follows:

"**Section 4-104.- Treasurer and Legal Counsel of the System.-**

The Secretary of the Treasury shall be the Treasurer of the System and:

(a)     Act as the official custodian of the cash belonging to the System and hold said cash subject to the orders of the Board;

(b)     …………………………………………………………………

(c)     …………………………………………………………………

(d)     …………………………………………………………………

The System's Legal Division shall represent the System in any judicial proceedings including lawsuits, trials, actions, and proceedings related to the investments made by the Administrator as specified in Sections 4-106 and 4-108. The Department of Justice shall continue to handle any pending legal proceeding at the time of approval of this Act until its resolution, along with an attorney of the

GLC-ERS-005300

Retirement System Legal Division, and both shall be equally responsible for the defense and processing thereof.

………………………………………………………………………………"

Section 7.- Section 4-105 of Act No. 447 of May 15, 1951, as amended, is hereby amended to read as follows:

(a)   …………………………………………………………………………

(b)   …………………………………………………………………………

(c)   …………………………………………………………………………

(d)   Authorization to Incur Debts.- The Board of Trustees may authorize the Administrator to take on a loan from any financial institution of the Government of the Commonwealth of Puerto Rico or the Federal Government of the United States of America. Bond Issues are hereby prohibited as part of the direct placement of debts secured with the assets of the System. For the direct placement of debts secured with the assets of the System, the consent of two-thirds of the members of the Board of Trustees of the System, through their secret vote, as well as the enactment of legislation by the Legislative Assembly to such purposes shall be necessary. This voting shall be detailed in the minutes of the Board by recording therein the number of votes in favor, against, and/or abstained. If the placement is made without such consent, it shall not be valid or binding on the System. In the event that an amendment is introduced in the Legislative Assembly to provide for the placement of direct debt secured with the assets of the System, the consent of two-thirds of the members of the Legislative Assembly shall be necessary to pass such amendment. It is hereby clarified for future generations that the Retirement System made a Bond Issue amounting to three billion dollars, which bears between 6.25% to 6.35% interest to bondholders, thus encumbering employer contributions of the System for up to fifty years. Such Bond Issue was made even though the System had been undergoing a cash flow

deficit for several years. Such action has significantly contributed to the financial crisis of the System. The interest accrued on these obligations shall be exempt from the payment of income tax to the Commonwealth of Puerto Rico."

Section 8.- Section 4-109 of Act No. 447 of May 15, 1951, as amended, is hereby amended to read as follows:

**"Section 4-109.- Penalties. -**

(a)    …

       …

(e)    If the director fails to meet the certification and notice requirement imposed by this Section, he/she shall be guilty of a misdemeanor and, upon conviction, shall be punished by imprisonment for a term of six (6) months or by a fine of five thousand dollars ($5,000) or both, at the discretion of the Court. Such fine shall be paid from his/her own pocket.

(f)    In the event that the director of an agency, public corporation or municipality knowingly, willfully, and without just cause fails to remit the funds owed to the System after he/she has been notified by the Administrator, he/she shall be guilty of a felony and, upon conviction, shall be punished by imprisonment for a fixed term of six (6) years or a fine of ten thousand dollars ($10,000) or both, at the discretion of the Court. Such fine shall be paid from his/her own pocket.

(g)    Municipal debts on account of individual or employer contributions, which are in arrears for more than thirty (30) days, shall have priority over any other debt of any municipality or municipal entity having participants in the Retirement System. If such municipality or municipal entity fails to remit to the Retirement System employer or individual contributions withheld from employees who participate in the Retirement System, within thirty (30) days following such withholding, the Administrator shall issue a Certificate of debt to the CRIM and

CONFIDENTIAL

immediately remit such funds to the System in the amount owed. Such debt shall not be cancelled by the Administrator or the Board of the System.

(h)     Debts on account of individual or employer contributions owed to the Retirement System, which are in arrears for more than thirty (30) days, shall have priority over any other debt of any agency, public company, or any entity having participants in the Retirement System. If any agency, public company, or any entity having participants in the Retirement System fails to remit to the Retirement System the employer or individual contributions withheld from employees who participate in the Retirement System, within thirty (30) days following such withholding, the Administrator shall issue a Certificate of debt to the Secretary of the Treasury and immediately remit such funds to the System in the amount owed. Such debt shall not be cancelled by the Administrator or the Board of the System."

Section 9.- It is hereby provided that, after an actuarial analysis of this bill, if the sum of individual or employer contributions exceed the cash flow necessary to meet the obligation, the remainder thereof may not be used and shall be directly treated as capital to be invested every year.

Section 10.- The operating budget of the System may not exceed 20% of the employer contributions of the Retirement Systems administered by the Retirement System Administration.

Section 11.- Insofar as the System is not at least 75% funded, no Incentivized Retirement may be granted.  However, if such retirements are granted, the cost of any pension that exceeds the normal retirement of such agency shall be paid to the System for a five-year period.

Section 12.- Within one hundred twenty (120) days as of the effective date of this Act, the Administrator may amend any Regulations so as to adjust them to this new Act, and approve the Personnel Regulations, and any other, as directed through this or any other Act providing therefor.  If the Administrator is not able to

make such amendments within such term, he/she shall request the Legislative Assembly for additional time.

Section 13.- Severability Clause

If any section or part of this Act were ruled null or unconstitutional by any competent court, such ruling shall not affect, impair, or invalidate the remaining provisions thereof.  Any law or part thereof that is in conflict with any provisions of this Act is hereby repealed.

Section 14.- This Act shall take effect on July 1, 2011.

CONFIDENTIAL

# CERTIFICATION

I hereby certify to the Secretary of State that the following **Act No. 116-2011 (H. B. 2855)**

**(Conference)** of the **5th Session of the 16th Legislature** of Puerto Rico:

**AN ACT**   to amend **Section 1-105** in order to include temporary employees as members of the System; amend **Section 2-116** to increase employer contributions; amend **Section 3-105** to increase employer contributions and prevent them from being assigned or pledged as collateral by the System to take on loans as well as require the consent of two-thirds of the members of the Board of Trustees of the System for such purposes; amend **Section 4-101** to increase the members of the Board to nine, plus one participant and one pensioner of the Employee Retirement System of the Government; amend **Section 4-104** to provide that the Legal Division of the System shall represent the System in any judicial proceeding; amend **Section 4-105** to require the consent of two-thirds of the members of the Board of Trustees of the System through their secrete vote, as well as the enactment of legislation by the Legislative Assembly, in order to pledge the assets of the System as collateral for any debt directly incurred, provided that, without such consent, no transaction shall be valid or binding on the System; etc.

has been translated from Spanish to English and that the English version is correct.

In San Juan, Puerto Rico, on the 18th day of April, 2013.

Juan Luis Martínez Martínez
Acting Director

CONFIDENTIAL                                                                                 GLC-ERS-005305