**EXHIBIT 40**



## Yale Law Journal

Volume 61  
Issue 3 *Yale Law Journal*

Article 11

1952

# Corey: Direct Placement of Corporate Securities

Myer Feldman

Follow this and additional works at: https://digitalcommons.law.yale.edu/ylj

### Recommended Citation

Myer Feldman, *Corey: Direct Placement of Corporate Securities*, 61 Yale L.J. (1952).  
Available at: https://digitalcommons.law.yale.edu/ylj/vol61/iss3/11

This Article is brought to you for free and open access by Yale Law School Legal Scholarship Repository. It has been accepted for inclusion in Yale Law Journal by an authorized editor of Yale Law School Legal Scholarship Repository. For more information, please contact julian.aiken@yale.edu.

Case:17-03283-LTS Doc#:14250-40 Filed:09/11/20 Entered:09/11/20 21:53:14 Desc: Exhibit 40 Page 3 of 8

a snappish tone to the current work at times, as when Mills speaks of the United States as a "bureaucratized society of privatized men." When Professor Mills does write such a general estimate of American politics, I hope that he will look more closely at the elements of agreement in the ideology of this country, and that he will take a more exploratory and less nostalgic attitude toward new decision making processes. One tangible demand is for "income security," in the sense of calling upon the government, if necessary, to prevent sudden and large curtailments of income. Price maintenance for the farmers and social security for the workers are positive and not merely negative conceptions. They apply new institutional tests to the functioning of our great industrial society. Another major demand is for the maintenance of high levels of employment and production, and for a rising standard of living. These demands are in varying degrees articulate and effective; and they express themselves through various institutions of consensus (like pressure groups) which Professor Mills tends to judge as selfish, much as political parties were spoken of by the intellectuals of the early years of our Union.

I suspect, too, that Professor Mills needs to experiment with more pluralistic ways of describing the class structure of society. His present use of terms keeps him perpetually undecided about whether he is talking about a middle "class" or middle "classes," and in this wavering usage is reflected a mind alert enough to need a new system of value-institution analysis, and too scholarly to abandon the old before he has found it.

Whatever the reservations, no one who wants to understand America will fail to study this admirable volume.

HAROLD D. LASSWELL†

---

DIRECT PLACEMENT OF CORPORATE SECURITIES. By E. Raymond Corey. Boston: Harvard Graduate School of Business Administration, 1951. Pp. x, 233. $3.50.

THE emergence of direct financing as an important method of obtaining capital funds has been largely a development of the past two decades. It is surprising that there has been so little published discussion. Professor Corey seeks to fill this gap in our literature.

He defines direct placement as "the procedure in which the corporate issuer and the institutional investor deal directly with each other, with or without the aid of an intermediary, in establishing the terms of a security issue, and in which title to the security, or securities, is taken directly by the final holder." It might, more meaningfully, be defined as the method of obtaining funds without resorting to a public offering of securities. Such a definition would place the direct placement in its proper perspective as the other side of the

---

†Professor of Law, Yale Law School.

Case:17-03283-LTS Doc#:14250-40 Filed:09/11/20 Entered:09/11/20 21:53:14 Desc: Exhibit 40 Page 4 of 8

coin from public offerings. The distinction between private and public offerings, until the passage of the Securities Act of 1933, was rather hazy, for prior to that time there was no reason to distinguish between them. Statistics before 1933 are therefore unreliable.

However, with the passage of federal legislation requiring the registration of securities involving a public offering it became necessary to formulate a distinction between public and private financing which would be fair, simple to administer, and which would accomplish the Congressional intent of protecting the public. It was important that there be an element of flexibility in the distinction in order to prevent the ingenious from devising schemes to circumvent the Act. At the same time sufficient rigidity was demanded to give certainty to its administration. To accomplish this dual objective the General Counsel of the Securities and Exchange Commission, in 1935, expressed the opinion that no one factor should determine whether an offering was public or private, but that all of the following factors must be considered: the number of offerees and their relationship to each other and to the issuer, the number of units offered, the size of the offering, and the manner of offering.

Professor Corey quotes this opinion, but places too much stress upon the number of offerees in his analysis. He assumes that an offering to more than twenty-five institutional investors, taking for investment, would be a public offering, subject to the registration provisions of the Act. This, he believes, has been a major deterrent to expansion of the private placement procedure.

Apart from the inconsistency between the claim that direct placement has been hampered by the Securities and Exchange Commission's construction of the Act and the astonishing growth of such securities offerings, Professor Corey's analysis ignores the sentence in the quoted opinion that: "In no sense is the question to be determined exclusively by the number of prospective offerees."

The Commission has tailored its interpretation of the Act to the need to be served.[1] It was aimed at the protection of people unable to protect themselves, so that they, too, might obtain information "comparable to that demanded by competent bankers from borrowers."[2] Obviously, an offering to a small group of large institutional investors, with their own staff of investment analysts, is entitled to different treatment from an offering to the general public. And the Commission has so construed the Act. The General Counsel's opinion, which lists the manner of the offering as a factor in determining whether it is private or public, recognizes this difference as a distinguishing factor. A multitude of staff interpretations lend emphasis to this view.

---

1. The background of the Securities Act is familiar. In the decade following the first World War some 50 billions of new securities were sold to the public, of which half had proved worthless by 1933. To prevent a repetition of such "deliberate overstimulation of the appetite of investors" and the use of "high-pressure salesmanship rather than careful counsel" in the distribution of securities to the public, the Securities Act was passed. H.R. REP. No. 85, 73d Cong., 1st Sess. 2 (1933).

2. *Id.* at 4.

In general, however, the book is an excellent guide to an understanding of the whys and wherefores of direct financing. First, it presents statistics showing the growth of the movement and the predominance of life insurance companies as purchasers. It is estimated that 93 per cent of the total volume of privately negotiated securities was taken by life insurance companies. On this assumption the 18 largest life insurance companies are studied in detail.

The viewpoints of both the institutional investor and the corporate issuer are then examined. Professor Corey concludes that the phenomenal growth of life insurance assets and the limitations upon their investment outlets have compelled them to invade the public securities market. At the same time, the trend toward issuance of long term debt as a medium for financing has increased the amount of securities eligible for insurance company purchases. He asserts that direct placement is preferred by corporate issuers under most circumstances. It permits the issuer to obtain a firm commitment quickly, regardless of a subsequent market. The issuer can explain, in a personal conversation with his lender, any peculiarities in his financial statements. The terms of the issue can be "tailor-made" to the needs of both the issuer and the purchaser. And flotation costs are generally lower. The advantages of the public market are treated more briefly. Such a flotation enables the issuer to obtain a rating from a recognized agency which will assist it in all future financing. It also provides an opportunity to repurchase the security at a discount, and is frequently regarded by company managements as an important element in sound public relations.

In most respects there is general agreement with Professor Corey's analysis. Only when he deals with the cost of flotation is there liable to be a serious difference of opinion. Comparison of such costs are dangerous. The territory is almost completely unexplored, and the inter-relation of the various factors involved in determining cost is as complicated as a stock market prediction. The generalizations offered by Professor Corey, on the basis of isolated offerings, are the product of courage rather than logic. Thus, the conclusion that competitive bidding is more expensive than a private sale is documented by reference to expenses of $37,171 incurred in connection with a private sale of a $12,000,000 bond issue of the Idaho Power Company. Professor Corey compares these expenses with a company estimate of $109,550 for financing carried out by competitive bidding. But these unanalyzed figures are misleading. There is no reference to the higher price these bonds may have brought in a public sale. When it is realized that a difference of a fraction of a point would more than overcome the entire cost of the sale it becomes apparent that the most significant comparisons are those between prices received by use of the two techniques of selling.

Unfortunately it is not possible to make perfect comparisons. This could only be done if a company should, simultaneously, negotiate a private sale and take competitive bids, which, of course, would be impossible. However, there have been numerous instances in which privately negotiated bids have been

rejected by regulatory agencies of the government and competitive bids taken at a subsequent date. Almost invariably, the competitive bids resulted in cheaper financing. For example, in 1942 the New Jersey Public Service Electric & Gas Corp. negotiated a bid of 100 on a $15,000,000 issue of 3 per cent bonds. This was rejected. A little over two months later these bonds were sold competitively for 103.5597, a difference of $533,955. It is estimated that the direct sale flotation costs would have been $40,425, whereas the expenses of flotation by competitive bidding were $69,345. And in 1945, the Pacific Telephone & Telegraph Company rejected a negotiated offer of 100 for $75,000,000 of 2¾ per cent bonds and two months later received a low competitive bid of 102.15, a net interest saving of $1,545,000. In 1949, Indianapolis Power & Light Company, in the same way saved approximately $200,000 by using competitive bidding procedures instead of negotiating its flotation of $8,000,000 worth of bonds.[3]

These examples, of course, are subject to criticism on the ground that two or three months elapsed between the competitive bid and private placement. During this interval, it may be argued, market movements may account for the difference in price. But even when a fair allowance is made for the effect of market changes, there seems to be no appreciable difference in the result. Thus, on February 15, 1949, Duke Power Company sold publicly $40,000,000 of 30 year mortgage bonds with a 2⅞ per cent coupon for 100.83. This was equivalent to a money cost to the company of 2.835 per cent. Two months before, an insurance company bid of 101.47 for a 3⅛ per cent coupon bond, or a money cost of 3.05 per cent, had been rejected. After adding incidental expenses of the public flotation to the expenses of the company it appears that the public flotation cost the company over $2,500,000 less than the privately negotiated bid would have cost. If, further, adjustment is made for the general rise in the bond market that occurred between December 1948 and February 1949, there would still be a saving to the company of over $1,500,000.

Even this analysis, however, is imperfect. Bond averages showing the rise or fall of the market during the interval between the private bid and the public offering do not reflect all of the factors affecting the particular price of a given bond. Recently, a study was made of a $15,000,000 offering by the same Idaho Power Company used by Professor Corey in his analysis. This

---

3. Still other examples are available. In 1944 the Brooklyn Union Gas Company negotiated a bid of 101 for $30,000,000 of 3¾ per cent bonds and $12,000,000 of 4¼ per cent debentures, plus a financial advisor's fee of $100,000. This was rejected. The subsequent competitive bid was not only substantially higher than the negotiated bid but, when the $100,000 fee is taken into consideration, its expenses were lower. In all, the competitive bidding showed savings to the company of approximately $2,700,000. In 1945, a Georgia Power & Light Co. negotiated bid for its $2,500,000 bond issue showing a net interest cost of 3.44 per cent was rejected, and 2 months later the Company received a competitive bid showing a net interest cost of 2.925 per cent, or dollar savings, after subtracting the costs of flotation by each method, of approximately $400,000.

time, however, the bonds were sold publicly, approximately two months after a group of institutional investors had offered to buy them at a money cost to the company of 3.32 per cent. The public price cost the company 3.205 per cent. Thus, even after adding the expenses of public flotation to the interest cost, the company was able to save $486,700. In the interval between the private bid and the public offering bond prices became a little firmer. However, during that same period substantial amounts of unsold offerings overhung the market. Normally, this would have a depressing effect on any new issue. While it is impossible to calculate a precise allowance for this market factor it is apparent that the Idaho bonds must have been priced with a sufficiently liberal yield to assure ready acceptance. Thus, no adjustment for market movements could under these circumstances be justified. Such considerations serve to illustrate the vast complexity of any cost of flotation study.

Perhaps the only definite conclusion we are able to reach with our present limited knowledge is that by far the greatest portion of the cost of flotation consists of underwriters' discounts and commissions. Studies made by the Securities and Exchange Commission of 30 billions of securities, representing 3,444 issues, between 1945 and 1949, indicate that $2.64 of every $100 raised was used to pay the cost of flotation. Of the $2.64, commissions and discounts to investment bankers totalled $2.12, or over 80 per cent. This cost is a hidden cost when there is a direct placement. But certainly the institutional investor must provide in its price both for reimbursement of its investigation expenses and in many cases for a fee paid investment bankers for advice and assistance in connection with the issue.

Since the passage of the Securities Act, the compensation to underwriters has been markedly reduced. Presumably, this reflects the more stable character of the issues now sold as well as the influence of the provisions which require the underwriter to disclose his total remuneration.

In conclusion, Professor Corey suggests that the Securities Act be revised "(1) to make public offering a far more attractive method of security flotation and (2) to broaden the private market." If the total sales of securities be considered as a whole it is apparent that these objectives are mutually inconsistent, for the broadening of one market necessarily results in restricting the other. It is apparent, however, that Professor Corey means that the revision of the Act should relieve issuers in both markets of their present obligations. Specifically, he suggests that the registration process be simplified to the point where a corporation could sell its issues without "waiting until certain financial statements are available," and the definition of "public offering" should depend "on the nature of [the] investors and on the presence or absence of any intent to resell the issue." With respect to the first suggestion, the Securities and Exchange Commission is engaged in the continuous process of simplifying the registration statements required by the Securities Act. But it properly regards the protection of the public as its paramount consideration. Certainly, full financial statements are the minimum that a purchaser

of securities is entitled to have. As previously indicated, the second specific suggestion has been incorporated in the definition of "public offering" at least since 1935.

Undoubtedly, direct placement needs more research and more first-hand investigation. Professor Corey has been a pioneer, setting up targets for criticism, and establishing landmarks for others to embellish.

MYER FELDMAN†

CIVIL LIBERTIES UNDER ATTACK. By Henry Steele Commager, Robert K. Carr, Zechariah Chafee Jr., Walter Gellhorn, Curtis Bok, and James P. Baxter III. Edited by Clair Wilcox. William J. Cooper Foundation Lectures, Swarthmore College. Philadelphia: University of Pennsylvania Press, 1951. Pp. 155. $3.50.

PROFESSOR Paul Freund of the Harvard Law School once remarked that the charge against the Joint Anti-Fascist Refugee Committee (placed on the Attorney General's list of subversive organizations) seemed to be that they were "prematurely anti-fascist." In the same vein, many books in recent years which have protested against infringements upon civil liberties have seemed to lack popular response because they were "premature" protests—protests against restrictions which had not percolated down far enough into the national system to cause widespread concern. With the publication of Alan Barth's *The Loyalty of Free Men*, Walter Gellhorn's *Security, Loyalty and Science,* and now, six lectures gathered in *Civil Liberties Under Attack,* the time seems to have become "mature" for re-examining our civil freedoms, 1951 edition.

The issuance of this book is reminiscent of May, 1920, in the period of the notorious Palmer Raids and the anti-radical terror which followed World War One. Then, twelve of America's most distinguished attorneys—essentially conservative men like Roscoe Pound, Felix Frankfurter, Ernst Freund, Zechariah Chafee Jr. and Francis Fisher Kane—issued a report to the American people on the illegal practices of the U.S. Department of Justice, as a response of conscience to the severe restrictions upon civil liberties then current.[1] In this volume, six nationally prominent, essentially conservative writers have again assembled to report on the status of our liberties.

Although dealing with separate topics, two conclusions are presented by each of these authors: first, that restrictions upon civil freedoms in the United

---

†Attorney, Securities and Exchange Commission. The views expressed in this review are those of the writer, and are not to be construed as those of the Securities and Exchange Commission or any other member of its Staff.

1. To the American People, Report Upon the Illegal Practices of the United States Department of Justice, Washington, D.C. (National Popular Government League, May, 1920).