**<u>EXHIBIT 43</u>**

83 FR 44700-01, 2018 WL 4168617(F.R.)

RULES and REGULATIONS

SECURITIES AND EXCHANGE COMMISSION

17 CFR Part 240

[Release No. 34-83885; File No. S7-01-17]

RIN 3235-AL97

## Amendments to Municipal Securities Disclosure

Friday, August 31, 2018

AGENCY: Securities and Exchange Commission.

**\*44700** ACTION: Final rule.

SUMMARY: The Securities and Exchange Commission ("Commission" or "SEC") is adopting amendments to the Municipal Securities Disclosure Rule under the Securities Exchange Act of 1934 ("Exchange Act"). The amendments add transparency to the municipal securities market by increasing the amount of information that is publicly disclosed about material financial obligations incurred by issuers and obligated persons. Specifically, the amendments revise the list of event notices that a broker, dealer, or municipal securities dealer (each a "dealer," and collectively, "dealers") acting as an underwriter ("Participating Underwriter") in a primary offering of municipal securities with an aggregate principal amount of $1,000,000 or more (subject to certain exemptions set forth in the Rule) (an "Offering") must reasonably determine that an issuer or an obligated person has undertaken, in a written agreement or contract for the benefit of holders of the municipal securities, to provide to the Municipal Securities Rulemaking Board ("MSRB").

DATES:

Effective Date: October 30, 2018.

Compliance Date: February 27, 2019.

FOR FURTHER INFORMATION CONTACT: Rebecca Olsen, Acting Director; Ahmed Abonamah, Senior Counsel to the Director; Mary Simpkins, Senior Special Counsel; Hillary Phelps, Senior Counsel; or William Miller, Attorney-Adviser; Office of Municipal Securities, Securities and Exchange Commission, 100 F Street NE, Washington, DC 20549-6628 or at (202) 551-5680.

SUPPLEMENTARY INFORMATION: The Commission is adopting amendments to 17 CFR 240.15c2-12 ("Rule 15c2-12" or "Rule") under the Securities Exchange Act of 1934. The amendments (a) amend the list of events for which notice is to be provided to include (i) incurrence of a financial obligation of the obligated person, if material, or agreement to covenants, events of default, remedies, priority rights, or other similar terms of a financial obligation of the obligated person, any of which affect security holders, if material; and (ii) default, event of acceleration, termination event, modification of terms, or other similar events under the terms of a financial obligation of the obligated person, any of which reflect financial difficulties; and (b) define the term "financial obligation" to mean a (i) debt obligation; (ii) derivative instrument entered into in connection with, or pledged as security or a source of payment for, an existing or planned debt obligation; or (iii) a guarantee of (i) or (ii). The term financial obligation shall not include municipal securities as to which a final official statement has been provided to the Municipal Securities Rulemaking Board consistent with this rule.

I. Executive Summary

II. Background

III. Description of the Amendments to Rule 15c2-12

A. Introduction

1. Incurrence of a Financial Obligation of the Obligated Person, if Material, or Agreement to Covenants, Events of Default, Remedies, Priority Rights, or Other Similar Terms of a Financial Obligation of the Obligated Person, Any of Which Affect Security Holders, if Material

i. Materiality

a. Use of Materiality Standard

b. Guidance

c. Burden of Materiality Determinations

d. Materiality and a Series of Related Financial Obligations

ii. Incurrence of a Financial Obligation

iii. Form of Event Notice

2. "Financial Obligation"

i. Debt Obligation

ii. Derivative Instrument Entered Into in Connection With, or Pledged as Security or a Source of Payment for, an Existing or Planned Debt Obligation

iii. Guarantee of a Debt Obligation or a Derivative Entered Into in Connection With, or Pledged as Security or a Source of Payment for, an Existing or Planned Debt Obligation

iv. Monetary Obligation Resulting From a Judicial, Administrative, or Arbitration Proceeding

v. Exclusion of Municipal Securities as to Which a Final Official Statement Has Been Provided to the MSRB Consistent With Rule 15c2-12 From Definition of "Financial Obligation"

3. Default, Event of Acceleration, Termination Event, Modification of Terms, or Other Similar Events Under the Terms of a Financial Obligation of the Obligated Person, Any of Which Reflect Financial Difficulties

i. Default

ii. Modification of Terms

iii. Other Similar Events

iv. Reflect Financial Difficulties

v. Scope of Financial Obligations Subject to Paragraph (b)(5)(i)(C)(16)

B. Technical Amendment

C. Compliance Date and Transition

Amendments to Municipal Securities Disclosure, 83 FR 44700-01

IV. Paperwork Reduction Act

A. Summary of Collection of Information

1. Collection of Information Prior to Amendments

2. Proposed Amendments to Rule 15c2-12

3. Adopted Amendments to Rule 15c2-12

B. Use of Information

C. Respondents

D. Total Annual Reporting and Recordkeeping Burden

1. Dealers

i. Amendments to Events To Be Disclosed Under a Continuing Disclosure Agreement

a. Estimates in Proposing Release

b. Comments Received

c. Revised Estimates of Burden

ii. One-Time Paperwork Burden

iii. Total Annual Burden for Dealers

2. Issuers

i. Amendments to Event Notice Provisions of the Rule

ii. Total Burden on Issuers for Amendments to Event Notices

iii. Comments Related to Estimated Paperwork Burden on Issuers

iv. Total Burden for Issuers

3. MSRB

4. Total Burden for Dealers Effecting Transactions in the Secondary Market

5. Annual Aggregate Burden for Amendments to Rule 15c2-12

E. Total Annual Cost

1. Dealers and the MSRB

2. Issuers

F. Retention Period of Recordkeeping Requirements

G. Collection of Information Is Mandatory

H. Responses to Collection of Information Will Not Be Kept Confidential

V. Economic Analysis

A. Introduction

B. Economic Baseline

1. The Current Municipal Securities Market

2. Rule 15c2-12

3. MSRB Rules

4. GASB Statement No. 88

5. Federal Tax Law Changes

6. Existing State of Efficiency, Competition, and Capital Formation

C. Benefits, Costs and Effects on Efficiency, Competition, and Capital Formation

1. Anticipated Benefits of Rule 15c2-12 Amendments

i. Benefits to Investors

ii. Benefits to Issuers or Obligated Persons

iii. Benefits to Rating Agencies and Municipal Analysts

2. Anticipated Costs of the Rule 15c2-12 Amendments

i. Costs to Issuers and Obligated Persons

ii. Costs to Dealers

iii. Costs to Lenders

iv. Costs to the MSRB

3. Effects on Efficiency, Competition, and Capital Formation

D. Alternative Approaches

1. Voluntary Disclosures

2. Alternative Timeline

3. Relief for Small Issuers and Obligated Persons

4. Adopt as Proposed, the Broader Definition of Financial Obligation

VI. Regulatory Flexibility Certification

VII. Statutory Authority

Text of Rule Amendments

**\*44701  I. Executive Summary**

In March 2017, the Commission published for comment proposed amendments to Exchange Act Rule 15c2-12 [FN1] designed to facilitate investors' and other market participants' [FN2] access to important information in a timely manner, help enhance transparency in the municipal securities market, and improve investor protection.[FN3] The proposed amendments would have amended the list of event notices that a dealer acting as a Participating Underwriter in an Offering must reasonably determine that an issuer or an obligated person has undertaken, in a written agreement or contract for the benefit of holders of the municipal securities ("continuing disclosure agreement"), to provide to the MSRB. Specifically, the proposed amendments would have amended the list of events for which notice is to be provided to include: (i) Incurrence of a financial obligation of the obligated person, if material, or agreement to covenants, events of default, remedies, priority rights, or other similar terms of a financial obligation of the obligated person, any of which affect security holders, if material; and (ii) default, event of acceleration, termination event, modification of terms, or other similar events under the terms of a financial obligation of the obligated person, any of which reflect financial difficulties.

In addition, the Commission proposed a definition of the term "financial obligation." As proposed, the term financial obligation would have meant a (i) debt obligation; (ii) lease; (iii) guarantee; (iv) derivative instrument; and (v) monetary obligation resulting from a judicial, administrative, or arbitration proceeding. The term financial obligation would not have included municipal securities as to which a final official statement has been provided to the Municipal Securities Rulemaking Board consistent with this rule.

The Commission also proposed a technical amendment to paragraph (b)(5)(i)(C)(14) of the Rule.[FN4]

A wide range of commenters sent comment letters [FN5] to the Commission in response to the proposed amendments. Commenters included issuers, dealer associations, investor associations, attorneys, organizations representing industry participants, the SEC Investor Advisory Committee ("IAC"), the MSRB, and others. While commenters generally supported enhanced transparency in the municipal securities market, many encouraged the Commission to consider narrowing the scope of the proposed amendments to avoid overburdening market participants. Common themes raised in the comment letters include: (i) The perceived vague meaning and overly broad scope of the term "financial obligation"; (ii) the desire for additional guidance with respect to the materiality qualifier in paragraph (b)(5)(i)(C)(15) of the Rule; and (iii) the anticipated burdens and costs associated with complying with the proposed amendments. In addition, the IAC stated its support for the central purpose of the proposed amendments to Rule 15c2-12 and encouraged the Commission to work toward passage of the amendments after considering comments received.[FN6]

The Commission has carefully considered all of the comments and, as discussed below, is adopting the amendments substantially as proposed, with some modifications to address issues raised by commenters.

The amendments address the need for timely disclosure of important information related to an issuer's or obligated person's financial obligations. The Commission believes that the amendments will facilitate investors' and other market participants' access to important information in a timely manner, enhance transparency in the municipal securities market, and improve investor protection. For the reasons discussed in this Adopting Release, the Commission believes that the amendments are consistent with the Commission's mandate to, among other things, adopt rules reasonably designed to prevent fraudulent, deceptive, or manipulative acts or practices in the municipal securities market.[FN7]

**II. Background**

Rule 15c2-12 is designed to address fraud by enhancing disclosure in the municipal securities market by establishing standards for obtaining, reviewing, and disseminating information about municipal securities by their underwriters.[FN8] In 1989, the Commission adopted paragraphs (a) and (b)(1) through (4) of Rule 15c2-12 [FN9] to require dealers acting as Participating

Underwriters in Offerings to obtain, review, and distribute to potential customers copies of the issuer's official statement.[FN10] In 1994, the Commission adopted paragraph (b)(5) of the Rule,[FN11] which became effective in 1995, and was amended in 2008 [FN12] and 2010.[FN13] Paragraph (b)(5) of the Rule prohibits a Participating Underwriter from purchasing or selling municipal securities covered by the Rule in an Offering unless the Participating Underwriter has reasonably determined that an issuer or obligated person [FN14] of **\*44702** municipal securities has undertaken in a continuing disclosure agreement to provide specified information to the MSRB in an electronic format as prescribed by the MSRB.[FN15] The information to be provided consists of: (i) Certain annual financial and operating information and audited financial statements, if available ("annual filings"); [FN16] (ii) timely notices of the occurrence of certain events ("event notices"); [FN17] and (iii) timely notices of the failure of an issuer or obligated person to provide required annual financial information on or before the date specified in the continuing disclosure agreement ("failure to file notices").[FN18]

In July 2012, the Commission issued a Report on the Municipal Securities Market, following a broad review of the municipal securities market that included a series of public field hearings and numerous meetings with market participants.[FN19] The 2012 Municipal Report states, among other things, that the Commission could consider further amendments to Rule 15c2-12 to mandate more specific types of secondary market event disclosures, including disclosure relating to new indebtedness (whether or not such debt is subject to Rule 15c2-12 and whether or not arising as a result of a municipal securities issuance).[FN20] The Commission further stated that market participants raised concerns that issuers and obligated persons may not properly disclose the existence or the terms of bank loans, particularly when the terms of the bank loans may affect the payment priority from revenues in a way that adversely affects bondholders.[FN21]

Currently, the municipal securities market has over $3.844 trillion in principal outstanding.[FN22] At the end of the first quarter of 2018, individuals held, either directly or indirectly through mutual funds, money market funds, closed-end funds, and exchange-traded funds, approximately $2.587 trillion of outstanding municipal securities (over 65 percent of the total amount outstanding).[FN23] According to the MSRB, approximately $2.98 trillion of municipal securities were traded in 2017 in approximately 9.89 million trades.[FN24] There are approximately 50,000 [FN25] state and local issuers of municipal securities, ranging from villages, towns, townships, cities, counties, territories, and states, as well as special districts, such as school districts and water and sewer authorities.[FN26] Municipal securities defaults historically have been rarer than those involving corporate and foreign government bonds.[FN27] Nevertheless, six of the seven largest municipal bankruptcy filings in U.S. history have occurred since 2011,[FN28] and some issuers and obligated persons continue to experience declining fiscal situations and steadily increasing debt burdens.[FN29] These defaults may negatively impact investors in ways other than non-payment, including delayed payments and pricing disruptions in the secondary market.[FN30]

As the Commission discussed in the Proposing Release, in recent years issuers and obligated persons have increasingly used direct purchases of municipal securities [FN31] and direct loans [FN32] (collectively, "direct placements") as alternatives to public offerings of municipal securities.[FN33] **\*44703** Despite continued efforts by market participants to encourage disclosure of certain financial obligations, the MSRB has stated that the number of actual disclosures made is limited. [FN34] The Commission believes that investors and other municipal market participants should have access to continuing disclosure information regarding financial obligations to improve their ability to analyze their investments and, ultimately, make more informed investment decisions. Access to continuing disclosure information also furthers the Commission's original intent behind adopting Rule 15c2-12, which was to prevent fraudulent, deceptive, or manipulative acts or practices in the municipal securities market.[FN35] Accordingly, the Commission believes that amendments to the Rule requiring a Participating Underwriter in an Offering to reasonably determine that an issuer or an obligated person has undertaken, in a continuing disclosure agreement, to provide to the MSRB within ten business days, the event notices specified in new paragraphs (b)(5)(i)(C)(15) and (16), are necessary.

As discussed in detail below, the Commission is adopting, substantially as proposed, amendments to Rule 15c2-12. The amendments add the following events, as proposed, as paragraphs (b)(5)(i)(C)(15) and (16) of the Rule for which a Participating Underwriter in an Offering must reasonably determine that the issuer or obligated person has agreed to provide in its continuing disclosure agreement: (1) Incurrence of a financial obligation of the obligated person, if material, or agreement to covenants,

Amendments to Municipal Securities Disclosure, 83 FR 44700-01

events of default, remedies, priority rights, or other similar terms of a financial obligation of the obligated person, any of which affect securities holders, if material; and (2) Default, event of acceleration, termination event, modification of terms, or other similar events under the terms of a financial obligation of the obligated person, any of which reflect financial difficulties.

In addition, the Commission is adding, substantially as proposed, to paragraph (f) of the Rule, the following definition: The term financial obligation means a (i) debt obligation; (ii) derivative instrument entered into in connection with, or pledged as security or a source of payment for, an existing or planned debt obligation; or (iii) guarantee of (i) or (ii). The term financial obligation shall not include municipal securities as to which a final official statement has been provided to the Municipal Securities Rulemaking Board consistent with this rule.

The Commission is also adopting, as proposed, a technical amendment to paragraph (b)(5)(i)(C)(14) of the Rule.

In keeping with the objectives set forth in the Exchange Act, including Section 15(c)(2),[FN36] and the antifraud provisions of the federal securities laws, the Commission believes the amendments to Rule 15c2-12, as adopted, are reasonably designed to prevent fraudulent, deceptive, or manipulative acts or practices in the municipal securities market. The Commission believes the amendments are consistent with the limitations set forth in Exchange Act Section 15B(d)(1) because the amendments do not require an issuer of municipal securities to make any filing with the Commission or MSRB prior to the sale of municipal securities.[FN37]

## III. Description of the Amendments to Rule 15c2-12

### A. Introduction

Commenters were generally supportive of increased transparency in the municipal securities market.[FN38] Nevertheless, some commenters suggested that the proposed amendments were unnecessary because information about issuer and obligated person financial obligations is already available in audited financial statements, other publicly available documents, and through voluntary disclosures to EMMA.[FN39] One commenter suggested that the proposed amendments were not needed because the Tax Cuts and Jobs Act of 2017 [FN40] has increased the cost of tax-exempt bank direct placements as compared to publicly offered debt, resulting in a likely reversal of the recent growth of direct placements.[FN41]

The Commission acknowledges the efforts of many issuers and obligated persons to be transparent. However, as stated in the Proposing Release, investors and other market participants may not learn that the issuer or obligated person has incurred a financial obligation if the issuer or obligated person does not provide annual financial information or audited financial statements to EMMA or does not subsequently issue debt in a primary offering subject to Rule 15c2-12 that results in the provision of a final official statement to EMMA.[FN42] Further, even if investors and other market participants have access to disclosure about an issuer's or obligated person's incurrence of a financial obligation, such access may not be timely if, for example, the issuer or obligated person has not submitted annual financial information or audited financial statements to EMMA in a timely manner or does not frequently issue debt that results in the provision of a final official statement to EMMA.[FN43] In many cases, this lack of access or delay in access to disclosure means that investors could be making investment decisions, and other market participants could be undertaking credit analyses, without important information.

Additionally, the Commission understands that to the extent information about financial obligations is disclosed and accessible to investors and other market participants, such *44704 information currently may not include certain details about the financial obligations.[FN44] In these cases, investors could be making investment decisions, and other market participants could be undertaking credit analyses, without important information, including the debt payment priority structure of the financial obligation. Furthermore, the Commission understands that investors and other market participants may not have any access or timely access to disclosure regarding the occurrence of events reflecting financial difficulties, including a default, event of acceleration, termination event, modification of terms, or other similar events under the terms of a financial obligation.[FN45] While it could be true in some cases that governing documents prohibit the granting of superior lien rights to other holders of the issuer's or obligated person's debt, there is no set standard of what provisions are set forth in the legal documents governing an

WESTLAW © 2020 Thomson Reuters. No claim to original U.S. Government Works. 7

issuance of municipal securities, and documents and the covenants they contain vary from issuer to issuer.[FN46] Additionally, there are other terms of financial obligations that could affect the issuer's or obligated person's liquidity, overall creditworthiness, or an existing security holder's rights. The amendments would cover any such terms if material and if they affect security holders. Further, the Commission recognizes that some states require that issuers and obligated persons submit their audited financial statements, which provide information about financial obligations, to a state repository within a certain number of days after the end of their fiscal year,[FN47] and that information about financial obligations may be available under state sunshine laws and through improved technology.[FN48] However, deadlines for such audited financial statements under state laws may extend far beyond the ten business days required by the Rule,[FN49] and the procedures for requesting information under sunshine laws may not result in the timely and widespread delivery of such information to market participants. While technology has improved the ability to obtain and disseminate information, EMMA remains the single centralized repository for the electronic collection and availability of continuing disclosure information about municipal securities. Accordingly, the Commission believes these amendments will facilitate investor access to important information in a timely manner and help to enhance transparency.

Additionally, the Commission recognizes that the Tax Cuts and Jobs Act of 2017 may impact the municipal debt market, including, but not limited to the use of direct placements. The amendments are intended to address the need for timely disclosure of important information related to an issuer's or obligated person's financial obligations and cover a variety of obligations incurred by issuers and obligated persons, including but not limited to direct placements.[FN50] Moreover, the Commission believes that given the diverse reasons for which issuers and obligated persons engage in direct placements in lieu of a public offering of municipal securities, it is likely that direct placements will continue to be utilized in the municipal debt market. [FN51]

The Commission also recognizes the efforts of the MSRB, the Financial Industry Regulatory Authority ("FINRA"), academics, and industry groups to promote voluntary disclosure of financial obligations. However, as described in the Proposing Release, despite these ongoing efforts, few issuers or obligated persons have made voluntary disclosures of financial obligations, including direct placements, to the MSRB.[FN52]

### 1. Incurrence of a Financial Obligation of the Obligated Person, if Material, or Agreement to Covenants, Events of Default, Remedies, Priority Rights, or Other Similar Terms of a Financial Obligation of the Obligated Person, Any of Which Affect Security Holders, if Material

The Commission is adopting as proposed new paragraph (b)(5)(i)(C)(15) to the Rule, which requires that a Participating Underwriter in an Offering must reasonably determine that the obligated person has undertaken, in a continuing disclosure agreement, to provide to the MSRB, within ten business days, notice of the incurrence of a financial obligation of the obligated person, if material, or agreement to covenants, events of default, remedies, priority rights, or other similar terms of **\*44705** a financial obligation of the obligated person, any of which affect security holders, if material.

### i. Materiality

Commenters raised a number of concerns related to the materiality qualifier contained in proposed new paragraph (b)(5)(i)(C)(15). Specifically, commenters (a) questioned the Commission's approach to the materiality qualifier in the proposed amendments; [FN53] (b) asked the Commission to provide guidance on how to determine the materiality of a financial obligation; [FN54] (c) stated that the broad scope of the proposed definition of the term "financial obligation" would make materiality determinations challenging and burdensome; [FN55] and (d) requested guidance on how to make materiality determinations in connection with the incurrence of a series of related financial obligations.[FN56] Each of these categories of comments is discussed below.

### a. Use of Materiality Standard

Several commenters addressed the Commission's use of a materiality standard in proposed paragraph (b)(5)(i)(C)(15).[FN57] Some commenters, for example, suggested that the Commission eliminate the materiality qualifier to promote more robust

disclosure of financial obligations,[FN58] while other commenters recommended that the Commission provide mechanical tests for determining when a financial obligation needs to be disclosed.[FN59]

Materiality is a core principle that guides the Commission's approach to securities regulation, and a materiality qualifier has appeared in Rule 15c2-12 since the Rule was amended in 1994.[FN60]

The Commission continues to believe that including a materiality qualifier in the amendments is appropriate as it provides a framework for issuers and obligated persons to assess their disclosure obligations in the context of the specific facts and circumstances. As described in the Proposing Release, the Commission believes that not every incurrence of a financial obligation or agreement to terms is material.[FN61] For example, an issuer or obligated person may incur a financial obligation for an amount that, absent material terms that affect security holders, would not raise the concerns the amendments are intended to address. Utilizing a materiality standard permits an issuer or obligated person to assess its disclosure obligation in the context of the specific facts and circumstances.[FN62] For example, it may be appropriate for issuers and obligated persons to consider not only the source of security pledged for repayment of the financial obligation, but also the rights associated with such a pledge (e.g., senior versus subordinate), par amount or notional amount (in the case of a derivative instrument or guarantee of a derivative instrument), covenants, events of default, remedies, or other similar terms that affect security holders to which the issuer or obligated person agreed at the time of incurrence, when determining its materiality.[FN63] Removing the materiality qualifier could result in the disclosure of financial obligations that, absent other facts or circumstances, would not raise the concerns the amendments are intended to address.

Separately, some commenters suggested that the amendments include a mechanical test for materiality. In 1994, the Commission proposed amendments to Rule 15c2-12 that would have used a mechanical test to identify any "significant obligor" with respect to an issue of municipal securities and require that both the final official statement and the annual financial information provided on an ongoing basis pursuant to the continuing disclosure agreement include disclosure with respect to any significant obligor. [FN64] In response to a number of comments, the Commission adopted amendments to Rule 15c2-12 that eliminated the requirement to provide information about specific "significant obligors" in both the final official statement and on an ongoing basis. Instead, the Commission adopted an approach that leaves to the parties (including the issuer and the underwriter) the determination of whose financial information is material to the offering and required to be included in both the final official statement and provided on an ongoing basis as part of the annual financial information.[FN65] The 1994 Adopting Release stated that the standard set forth in the defined term "final official statement" provided flexibility that many commenters asserted is necessary in determining the content and scope of the disclosed financial information and operating data, given the diversity among types of issuers, types of issues, and sources of repayment." [FN66] The Commission believes this same need for flexibility applies to assessments of financial obligations and the materiality qualifier allows for consideration of diverse sets of factors. Therefore, the Commission does not believe that it would be appropriate to provide a mechanical test for determining the materiality of a financial obligation. Rather, the Commission continues to believe that materiality determinations should be based on whether the information would be important to the **\*44706** total mix of information made available to the reasonable investor.[FN67]

**b. Guidance**

Numerous commenters asked the Commission to provide guidance on how to determine the materiality of a financial obligation, stating that without such guidance, issuers, obligated persons, and dealers would not interpret materiality uniformly.[FN68] Commenters pointed to the challenges faced by issuers and obligated persons when determining materiality in connection with their participation in the Municipalities Continuing Disclosure Cooperation Initiative ("MCDC Initiative") [FN69] as indicative of the lack of clarity that exists with respect to evaluating materiality.[FN70] In particular, commenters stated that the MCDC Initiative failed to produce clear guidance on materiality, resulting in additional market confusion about what constitutes materiality.[FN71] They also stated that following the MCDC Initiative, and absent Commission guidance, Participating Underwriters have been conservatively applying materiality determinations to limit potential liability and requiring issuers and obligated persons to disclose potentially non-material information to EMMA.[FN72]

The Commission believes that the type of analysis undertaken in connection with the MCDC Initiative [FN73] is distinct from the analysis required to determine whether a piece of information is material and must be publicly disclosed to investors in offering materials.[FN74] In the materiality inquiry that issuers, obligated persons, and dealers must regularly undertake when preparing disclosure documents in connection with an Offering, they must assess whether a piece of information at the time of issuance is of a character that there is a substantial likelihood that, under all the circumstances, "the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information available." [FN75] Compliance with these requirements will be evaluated using the same standard.

The Commission believes that the determination by an issuer or obligated person of whether to submit an event notice under paragraph (b)(5)(i)(C)(15) requires the same analysis that is regularly made by such parties when preparing offering documents. Accordingly, under the Rule, as amended, an issuer or obligated person will need to consider whether a financial obligation or the terms of a financial obligation, if they affect security holders, would be important to a reasonable investor when making an investment decision.[FN76] As noted above,[FN77] an issuer or obligated person may consider a number of factors when assessing the materiality of a particular financial obligation.

Due to the flexible facts-and-circumstances approach to assessing materiality, the Commission acknowledges, as raised by commenters, that in the course of providing disclosures to the market about their financial obligations, some issuers and obligated persons may have differing opinions with respect to whether a piece of information would be considered important to a reasonable investor when making an investment decision. Regardless of these potential differences of opinion, the Commission does not believe it is necessary to provide additional guidance at this time. Issuers and obligated persons have the benefit of experience with making materiality determinations under the federal securities laws generally and the Rule specifically. Furthermore, even absent uniformity, the amendments, as discussed throughout this Release, will result in increased timely disclosure in the municipal securities market of important information regarding the financial obligations of issuers and obligated persons. Additionally, the changes made to the proposed definition of financial obligation should also alleviate commenter concerns about assessing the materiality of each financial obligation incurred by issuers and obligated persons. Forms and guidance that the industry may develop in this area could also assist issuers and obligated persons in evaluating which financial obligations should be disclosed pursuant to their continuing disclosure agreements.

### c. Burden of Materiality Determinations

Many commenters stated that materiality determinations would pose **\*44707** challenges given the broad scope of the proposed definition of "financial obligation." [FN78] Commenters argued that ten business days was not enough time to disclose material financial obligations.[FN79] Some commenters stated that without Commission guidance, issuers or obligated persons would likely utilize outside counsel in order to make materiality determinations.[FN80] Commenters stated that to avoid the time and expense of reviewing all of their financial obligations for materiality, and to avoid being second guessed by dealers in the future, they might disclose all financial obligations, flooding EMMA with potentially immaterial information of limited value to investors.[FN81] Commenters also stated that they might seek to avoid the cost, effort, and potential liability associated with summarizing key terms of a transaction by posting entire financing agreements to EMMA.[FN82]

The Commission acknowledges that there will be costs incurred by issuers, obligated persons, and dealers when evaluating whether a financial obligation is material. However, as discussed in Section III.A.2 herein, the Commission is adopting a narrower definition of "financial obligation" than proposed, which will reduce the burden on issuers, obligated persons, and dealers. The adopted definition of financial obligation significantly limits the types of transactions that issuers and obligated persons will need to identify and assess for materiality, and focuses the amendments on debt, debt-like, and debt-related obligations of issuers and obligated persons. The narrowed definition of financial obligation, which only covers those obligations that are debt, debt-like, or debt-related, will result in fewer financial obligations that issuers and obligated persons will need to review for materiality, and should help alleviate commenter concerns about disclosing a material financial obligation within ten business days. In addition, though the period for reporting the incurrence of a material financial obligation does not begin until the date on which the financial obligation is incurred, the Commission understands that most material terms of a financial obligation are typically known to the issuer or obligated person prior to the date of its incurrence. Accordingly, issuers and

obligated persons could begin the process of assessing whether a particular obligation should be disclosed pursuant to paragraph (b)(5)(i)(C)(15) in advance of its incurrence. As a result, the Commission believes ten business days is a reasonable period of time for compliance. Moreover, the ten business day requirement is already in the Rule and introducing an alternate timeline for the amendments could cause confusion, add complexity to the Rule, and increase the compliance burden for issuers, obligated persons, and dealers.

With respect to commenter concerns about the burdens of summarizing the terms of material financial obligations, issuers and obligated persons could consider amending existing disclosure policies and procedures to address the process for evaluating the disclosure of material financial obligations. Amended policies and procedures, in addition to industry practices that may develop, could help issuers and obligated persons streamline the process of disclosing material financial obligations to EMMA, and ease time and cost burdens associated with identifying, assessing, and disclosing material financial obligations.

### d. Materiality and a Series of Related Financial Obligations

Commenters asked whether a series of related financial obligations could be considered material due to their aggregate par amount, though none of the constituent obligations would be material on its own.[FN83] Materiality is determined upon the incurrence of each distinct financial obligation, taking into account all relevant facts and circumstances.[FN84] For example, if the issuer or obligated person enters into a series of transactions that, though related,[FN85] are incurred at different points in time for legitimate business purposes—e.g., to satisfy the necessary conditions for the debt to be considered tax-exempt under provisions of the Internal Revenue Code of 1986, as amended ("IRC")—the issuer or obligated person would need to assess the materiality of each transaction at the time it was incurred.

When an issuer or obligated person is considering whether a series of related transactions is a single incurrence or has been incurred at different points in time for legitimate business purposes for determining materiality under the amendments, such issuer or obligated person must consider all relevant facts and circumstances. An example of the type of facts and circumstances that could indicate that a series of related transactions were incurred separately for legitimate business purposes would be if the series of financial obligations satisfy the requirements set forth in the U.S. Department of Treasury regulations and guidance governing what constitutes a single issue of municipal securities under the IRC.[FN86] The Commission cautions issuers and obligated persons against entering into a series of transactions with a purpose of evading potential disclosure obligations established by paragraphs (b)(5)(i)(C)(15) and (16) of the Rule in a manner that is inconsistent with the purposes of the Rule. [FN87]

### ii. Incurrence of a Financial Obligation

Some commenters recommended that the Commission provide guidance on **\*44708** the meaning of "incurrence." [FN88] The Commission believes that a financial obligation generally should be considered to be incurred when it is enforceable against an issuer or obligated person.[FN89] Disclosure of a material financial obligation at such time would provide investors with important information about the current financial condition and potential liabilities of the issuer or obligated person, including potential impacts to the issuer's or obligated person's liquidity and overall creditworthiness. For example, if an issuer or obligated person enters into an agreement providing for a material drawdown bond,[FN90] or such agreement contains material terms that affect security holders, the issuer or obligated person generally should provide notice at the time the terms of the obligation are legally enforceable against the issuer or obligated person, instead of each time a draw is made.[FN91]

### iii. Form of Event Notice

Commenters observed that the Commission did not prescribe the form of a notice made pursuant to new paragraph (b)(5)(i)(C)(15) [FN92] and some recommended that the Commission dictate the form and content of disclosures made under the new provision.[FN93] One commenter, though, stated that the Commission should avoid being too prescriptive with respect to the form and content of a material event notice submitted under paragraph (b)(5)(i)(C)(15) of the Rule.[FN94] Other commenters expressed concern about what they described as the potential negative impact of the public disclosure of financing documents

on competition among lenders, as well as the possibility for the disclosure of confidential personally identifiable information. [FN95]

The Commission acknowledges commenter concerns regarding what form the notice should take. However, given the diversity of issuers and obligated persons, and in light of the structure of the Rule, the Commission believes at this time that market participants are best suited to consider developing best practices in this area to assist issuers and obligated persons and their advisors in carrying out the objective of the amendments, which is to facilitate the timely delivery of important information to investors and other market participants about issuers' and obligated persons' financial obligations.[FN96] As described in the Proposing Release,[FN97] a material event notice for the events described in paragraph (b)(5)(i)(C)(15) generally should include a description of the material terms of the financial obligation. Examples of some material terms may be the date of incurrence, principal amount, maturity and amortization, interest rate, if fixed, or method of computation, if variable (and any default rates); other terms may be appropriate as well, depending on the circumstances.[FN98] A description of the material terms would help further the availability of information in a timely manner to assist investors in making more informed investment decisions. [FN99] The Commission believes that, depending on the facts and circumstances, it could be consistent with the requirements of the Rule for issuers and obligated persons to either submit a description of the material terms of the financial obligation, or alternatively, or in addition, submit related materials, such as transaction documents, term sheets prepared in connection with the financial obligation, or continuing covenant agreements or financial covenant reports to EMMA. Any such related materials, if submitted as an alternative to a description of the material terms of the financial obligation, should include the material terms of the financial obligation. The amendments do not require the provision of confidential information such as contact information, account numbers, or other personally identifiable information to EMMA. Provided the necessary disclosures are made, the formatting of such disclosures tailored to avoid disclosure of such confidential information would be consistent with Rule 15c2-12.[FN100]

## 2. "Financial Obligation"
In the Proposing Release, the Commission defined the term "financial obligation" to mean a debt obligation, lease, guarantee, derivative instrument, or monetary obligation resulting from a judicial, administrative, or arbitration proceeding,[FN101] but not including municipal securities as to which a final official statement has been provided to the MSRB consistent with Rule 15c2-12.[FN102]

Many commenters criticized the proposed definition of "financial obligation," characterizing it as overbroad and vague.[FN103] In particular, commenters argued that the proposed definition would elicit disclosures of **44709** limited value to investors at a tremendous cost.[FN104] With respect to the value of disclosure, commenters argued that the breadth of the proposed definition would produce disclosures of limited value because it did not distinguish between debt and ordinary financial and operating matters of an issuer or obligated person.[FN105] Commenters also stated that the broad scope of the term "financial obligation," as proposed, would impose substantial burdens on issuers, obligated persons, and other market participants.[FN106] For example, commenters argued that the breadth of the proposed definition of the term "financial obligation" would require a significant amount of issuer or obligated person time and financial and personnel resources to monitor and assess materiality of its financial obligations, which for some issuers or obligated persons could cover thousands of obligations incurred in the normal course of business.[FN107] Commenters argued that the proposed definition of the term "financial obligation," if adopted, would make compliance with the Rule unreasonably costly for some,[FN108] and virtually impossible for others.[FN109] Ultimately, however, despite their objections to the proposed definition of "financial obligation," many of these commenters suggested that the term should at least cover debt and debt-like obligations that could compete with the rights of existing security holders.[FN110]

Not all commenters, however, were critical of the proposed definition of the term "financial obligation." [FN111] Several commenters stated that the proposed definition of the term would provide needed transparency to the municipal securities market.[FN112] For example, one commenter stated that without timely disclosure of this information, investors and other market participants may not be aware that an issuer or obligated person has incurred a material financial obligation or agreed to certain terms that affect security holders.[FN113]

The purpose of the amendments is to facilitate investors' and other market participants' access to timely disclosure of important information related to an issuer's or obligated person's material financial obligations that could impact an issuer's or obligated person's liquidity, overall creditworthiness, or an existing security holder's rights (e.g., a bank loan with a senior position in the debt payment priority structure). With these principles and commenter concerns in mind, the Commission is narrowing the definition of "financial obligation."

As adopted, "financial obligation" means a debt obligation; derivative instrument entered into in connection with, or pledged as security or a source of payment for, an existing or planned debt obligation; or a guarantee of either a debt obligation or a derivative instrument entered into in connection with, or pledged as security or a source of payment for, an existing or planned debt obligation. The term financial obligation does not include municipal securities as to which a final official statement has been provided to the MSRB consistent with Rule 15c2-12.

As discussed below, the definition of the term "financial obligation" does not include ordinary financial and operating liabilities incurred in the normal course of an issuer's or obligated person's business, only an issuer's or obligated person's debt, debt-like, and debt-related obligations.[FN114] The Commission believes that a definition of the term "financial obligation" that distinguishes debt, debt-like, and debt-related obligations from obligations incurred in an issuer's or obligated person's normal course of operations appropriately focuses the amendments on the types of obligations that could impact an issuer's or obligated person's liquidity, overall creditworthiness, or an existing security holder's rights.[FN115] Moreover, in the Commission's view, the adopted definition of the term "financial **\*44710** obligation" will greatly reduce the burden of complying with the amendments, while still capturing important information about the current financial condition of the issuer or obligated person. [FN116] Accordingly, the Commission believes that this definition strikes the appropriate balance between benefits to investors and other market participants and costs of compliance with the Rule.[FN117]

### i. Debt Obligation

As proposed, the term "debt obligation" was intended to capture the short-term and long-term debt obligations of an issuer or obligated person under the terms of an indenture, loan agreement, or similar contract that will be repaid over time.[FN118] As examples, the Commission stated that a direct purchase of municipal securities by an investor and a direct loan by a bank would be debt obligations of an issuer or obligated person.[FN119]

A number of commenters supported the Commission's proposal to require disclosure of debt obligations.[FN120] Even commenters that opposed the Commission's proposed requirement to disclose debt obligations under the Rule advocated for the Commission to encourage voluntary disclosure of such obligations.[FN121]

The Commission continues to believe that the definition of "financial obligation" should include debt obligations because such obligations and their terms could adversely affect the rights of existing security holders, including the seniority status of such security holders, or impact the creditworthiness of an issuer or obligated person.[FN122] Moreover, the Commission believes that undisclosed debt obligations and their terms could adversely affect security holders. Contrary to some commenter sentiment, [FN123] recent events in the direct placement market support this belief.[FN124] Specifically, recent changes to federal tax laws [FN125] have reportedly triggered provisions commonly found in direct placements relating to the rate at which a direct placement will bear interest.[FN126] In the Commission's view, these tax-related provisions are illustrative of the types of terms to which issuers and obligated persons agree when incurring financial obligations that could impair an issuer's or obligated person's liquidity or creditworthiness and, thus, adversely affect the interests of existing security holders. Without paragraph (b)(5)(i)(C)(15), an issuer or obligated person would not, under the terms of a continuing disclosure agreement, be required to assess the materiality of and disclose, if material, either its agreement to such terms that affect security holders or the incurrence of the underlying debt obligation. For these reasons, the Commission believes that the timely disclosure of both the incurrence of a debt obligation, if material, and the obligation's material terms that affect existing security holders, such as those related to the rate at which a debt obligation will bear interest,[FN127] would provide important information about the issuer or obligated person's current financial condition.

In the Proposing Release, the Commission proposed "lease" as a separate element of the definition of "financial obligation." [FN128] Specifically, the Commission stated that the term "lease" was intended to capture a lease that is entered into by an issuer or obligated person, including an operating or capital lease.[FN129] The Commission stated, for example, that if an issuer or obligated person entered into a lease-purchase agreement to acquire an office building or an operating lease to lease an office building for a stated period of time, both would potentially be subject to disclosure under the Proposing Release.[FN130] However, in light of the GASB decision to discontinue use of the "capital lease" and "operating lease" labels in government accounting, the Commission believes it is appropriate to also discontinue its use of such labels in connection with the amendments.[FN131] Thus, although the Commission used the "capital lease" and "operating lease" terminology in the Proposing Release, it is discontinuing the use of such terms in connection with the definition of the term "financial obligation." Instead, as discussed below, the Commission is providing guidance that the term "debt obligation" generally should be considered to include lease arrangements entered into by issuers and obligated persons that operate as vehicles to borrow money.

Commenters criticized the inclusion of leases, without limitation, in the definition of "financial obligation" as **\*44711** overbroad and argued that the Commission should exclude "operating leases" from the definition of "financial obligation." [FN132] For example, commenters argued that information about an issuer's or obligated person's non-debt-related leases would not provide useful information to bondholders, while others stated that the inclusion of leases in the proposed definition of "financial obligation" would result in a "deluge of filings" without adding any significant value to the municipal securities market.[FN133] Commenters also argued that requiring disclosure of all material leases would impose significant burdens on issuers and obligated persons.[FN134] As an alternative to the Commission's proposed treatment of leases, some commenters suggested that the disclosure of "capital leases" under the Rule would be appropriate because such obligations could compete with existing security holders.[FN135] Specifically, one commenter recommended that, subject to the materiality qualifier, the Commission should only require disclosure of leases that operate as a vehicle to borrow money.[FN136]

The Commission agrees with commenters that, as proposed, the term "lease" was too broad. Accordingly, the Commission believes that it is appropriate to limit the Rule's coverage of leases to those that operate as vehicles to borrow money.[FN137] The Commission believes that this is appropriate because a lease entered into as a vehicle to borrow money could represent competing debt of the issuer or obligated person. Such leases implicate the Commission's concerns regarding access to timely disclosure regarding their incurrence or terms because they could, for example, contain acceleration provisions or more restrictive debt service covenants and, as a result, could affect existing security holder's rights.[FN138] Due to the Commission's decision to narrow the scope of leases covered by the amendments to only include those entered into as a vehicle to borrow money, the Commission believes it is appropriate to remove the term "lease" from the definition of "financial obligation." As discussed below, however, leases that operate as vehicles to borrow money generally would be debt obligations and thus would be defined as financial obligations under the Rule. Accordingly, the Commission believes that it is appropriate to (i) remove the term "lease" from the definition of the term "financial obligation;" and (ii) provide guidance that the term "debt obligation" generally should be considered to include lease arrangements entered into by issuers and obligated persons that operate as vehicles to borrow money.

As discussed above, the proposed term "debt obligation" did not include leases because the Commission included the term "lease" as a separate item in the definition of "financial obligation." [FN139] The Commission stated in the Proposing Release that the term "debt obligation" is intended to capture debt obligations of an issuer or obligated person under the terms of an indenture, loan agreement, or similar contract that will be repaid over time. The Commission believes that an obligation to repay borrowed money over time under the terms of a lease is functionally equivalent to a similar obligation that is incurred under the terms of an indenture, loan agreement, or similar contract.[FN140] Accordingly, the Commission believes that a lease entered into as a vehicle to borrow money is more appropriately defined as a variety of "debt obligation" rather than a separate type of "financial obligation" as was proposed. The Commission believes that leases entered into as a vehicle to borrow money are commonly used by municipal securities issuers and obligated persons and, when used, commonly understood to be a tool for facilitating an issuer's or obligated person's ability to borrow money.[FN141] Therefore, under the Rule, a lease that operates

Amendments to Municipal Securities Disclosure, 83 FR 44700-01

as a vehicle to borrow money generally should be treated like an obligation incurred under the terms of an indenture, loan agreement, or similar contract.

In the Proposing Release, the Commission included the phrase "that will be repaid over time" when discussing the term "debt obligation." As adopted, the Rule does not include the phrase "that will be repaid over time" to avoid any suggestion that there is a temporal consideration regarding the repayment period of a short-term or long-term debt obligation that could be used to distinguish an obligation that is **\*44712** a "debt obligation" from one that is not. In the Commission's view, any short-term or long-term debt obligation of an issuer or obligated person under the terms of an indenture, loan agreement, lease, or similar contract [FN142] is covered by the term "debt obligation" regardless of the length of the debt obligation's repayment period.

As adopted, the term "debt obligation" includes short-term and long-term debt obligations of an issuer or obligated person under the terms of an indenture, loan agreement, lease, or similar contract.

With respect to leases that do not operate as vehicles to borrow money, the Commission agrees with commenters that the burden of assessing their materiality and disclosing such leases within ten business days would not justify the benefit of such disclosures. While the Commission continues to believe that lease arrangements that are not vehicles to borrow money might be relevant to the general financial condition of an issuer or obligated person, the Commission also believes that such lease arrangements do not warrant inclusion in the Commission's definition of "financial obligation" because they generally do not represent competing debt of the issuer or obligated person.[FN143] Accordingly, at this time, the Commission does not believe that such leases raise the same concerns regarding timely disclosure of their incurrence as leases entered into as a vehicle to borrow money.[FN144]

### ii. Derivative Instrument Entered Into in Connection With, or Pledged as Security or a Source of Payment for, an Existing or Planned Debt Obligation

As proposed, the term "derivative instrument" was intended to capture any swap, security-based swap, futures contract, forward contract, option, any combination of the foregoing, or any similar instrument to which an issuer or obligated person is a counterparty.[FN145] The Commission stated that though issuers and obligated persons may not use each type of derivative instrument listed, the proposed list was sufficiently broad to cover the use of derivative instruments that may develop in the future.[FN146] As discussed below, many commenters raised questions about the proposed scope of the term "derivative instrument." A common theme was that the Commission should limit the scope of derivative instruments covered by the Rule to those instruments related to debt, such as interest-rate swaps, because only such instruments could compete with the rights of existing securities holders.[FN147] Commenters also stated that an overly broad interpretation of the term would elicit disclosures that would be of minimal value to investors because such instruments would not represent competing debt of an issuer or obligated person.[FN148] Commenters cited instruments entered into to manage fuel prices or power price volatility or to reduce other similar risks related to commodity or future inventory purchases by issuers and obligated persons as the types of instruments that should not be covered by the Rule.[FN149]

The Commission continues to believe derivative instruments should be included in the adopted definition of the term "financial obligation" because such instruments could adversely impact an issuer's or obligated person's liquidity and overall creditworthiness, or adversely affect security holders.[FN150] However, the Commission agrees with commenters that the term, as proposed, was too broad, and is adopting a more tailored approach to derivative instruments by limiting the definition to those that are "entered into in connection with, or pledged as security or a source of payment for, an existing or planned debt obligation." In the Commission's view, derivative instruments entered into in connection with an existing or planned debt obligation such as an interest rate swap could, for example, expose an issuer or obligated person to contingent liquidity risk, such as a requirement to post collateral or pay a termination fee upon the occurrence of certain events,[FN151] any of which could adversely impact the issuer's or obligated person's liquidity and overall creditworthiness, and affect the interests of security holders. Therefore, such instruments raise the Commission's fundamental concern that security holders lack access or lack timely access to information about an issuer's or obligated person's material financial obligations. Accordingly, as adopted, the

definition of "financial obligation" includes a "derivative  **44713**  instrument entered into in connection with, or pledged as security or a source of payment for, an existing or planned debt obligation."

The term "derivative instrument entered into in connection with, or pledged as security or a source of payment for, an existing or planned debt obligation" is not limited to derivative instruments incurred by issuers or obligated persons solely to hedge the interest rate of a debt obligation or to hedge the value of a debt obligation to be incurred in the future.[FN152] Instead, the term covers any type of derivative instrument that could be entered into in connection with, or pledged as security or a source of payment for, an existing or planned debt obligation. Accordingly, the Commission reiterates that the definition captures any swap, security-based swap, futures contract, forward contract, option, any combination of the foregoing, or any similar instrument to which an issuer or obligated person is a counterparty in the adopted definition of "financial obligation" provided that such instruments are related to an existing or planned debt obligation.[FN153] This includes, under certain circumstances, instruments that are related to an existing or planned debt obligation of a third party. To determine whether a derivative instrument that relates to an existing or planned debt obligation of a third party is covered by paragraph (b)(5)(i)(C)(15), the Commission believes that it would be reasonable to distinguish derivative instruments designed to hedge against the risks of a related debt obligation (i.e., debt-related derivatives) from derivative instruments designed to mitigate investment risk. In the Commission's view, the former generally would be covered by paragraph (b)(5)(i)(C)(15), while the latter would not. This definition is sufficiently comprehensive to cover the use of derivative instruments that may develop in the future, while, at the same time, limiting the scope of its current and future application to the types of instruments that are related to an existing or planned debt obligation.

The Commission believes that a debt obligation is "planned" at the time the issuer or obligated person incurs the related derivative instrument if, based on the facts and circumstances, a reasonable person would view it likely or probable that the issuer or obligated person will incur the related yet-to-be-incurred debt obligation at a future date. In the Commission's view, it would be likely or probable that an issuer or obligated person will incur a future debt obligation if, for example, the relevant derivative instrument would serve no economic purpose without the future debt obligation (regardless of whether the future debt obligation is ultimately incurred).[FN154] For example, in a forward starting interest rate swap transaction, an issuer or obligated person typically incurs the forward starting interest rate swap in advance of the incurrence of a debt obligation. As part of such agreement, the issuer or obligated person agrees to pay its counterparty interest at a fixed rate, and, in exchange, the counterparty agrees to provide payments to the issuer or obligated person at a variable rate.[FN155] These payment obligations will commence and the initial rate for the counterparty's variable rate payments will be set only once the related debt obligation is incurred. In addition, upon incurrence of the forward starting interest rate swap, the issuer or obligated person would typically pay a premium to its swap counterparty to establish the fixed rate payment based on the then prevailing interest rates. Accordingly, without the future incurrence of a debt obligation, the forward starting interest rate swap would have no economic value (for the issuer or obligated person). Therefore, the Commission believes that such an instrument would generally serve no economic purpose (for the issuer or obligated person) except if and when it is paired with a planned incurrence of a debt obligation.

Factors relevant to whether an issuer's or obligated person's debt obligation is "planned" might include, but are not limited to, whether: (1) The documents evidencing the relevant derivative instrument explicitly or implicitly assume a future debt obligation; (2) the legislative body of the issuer or obligated person has taken any preliminary (e.g., preliminary resolution) or final (e.g., authorizing resolution) action to authorize the related future debt obligation; or (3) the issuer or obligated person has hired any professionals (e.g., municipal advisor, bond counsel, rate consultant) to assist or advise the issuer or obligated person on matters related to the future debt obligation. Determinations by issuers and obligated persons of whether a derivative instrument contemplates a future debt obligation should prioritize substance over form. In addition, whether a debt obligation is "planned" is based on an objective assessment of the facts and circumstances prevailing at the time of incurrence of the derivative instrument, and is not a bright-line test.

### iii. Guarantee of a Debt Obligation or a Derivative Entered Into in Connection With, or Pledged as Security or a Source of Payment for, an Existing or Planned Debt Obligation

As proposed, the term "guarantee" was intended to capture a contingent financial obligation of the issuer or obligated person to secure obligations of a third-party or obligations of the issuer or obligated person.[FN156] Several commenters requested further clarification or asked that the Commission better define the scope of the term "guarantee." [FN157] In response, the Commission is revising the definition of "financial obligation" with respect to guarantees and clarifying the scope of guarantees that, if material, would be subject to disclosure under the Rule.

As adopted, the term "financial obligation" is defined to include a guarantee of a debt obligation or a derivative instrument entered into in connection with, or pledged as security or a source of payment for, an existing or planned debt obligation. The Commission's refinement of this aspect of the definition of "financial obligation" is generally responsive to commenter requests for greater clarity as to the scope of guarantees covered by the term "financial obligation" and consistent with commenter sentiment that the Rule only cover guarantees that relate to debt, debt-like, or debt-related **44714** obligations.[FN158] In the Commission's view, the adopted rule text eliminates any ambiguity between the proposed rule text and the Commission's intended scope of the term "guarantee."

The Commission continues to believe that the guidance provided in the Proposing Release regarding the term "guarantee" accurately sets forth the coverage of guarantee of a debt obligation or derivative instrument entered into in connection with, pledged as security or a source of payment for, an existing or planned debt obligation by the Rule.[FN159] Moreover, the Commission continues to believe that guarantees should be included in the adopted definition of the term "financial obligation" because such arrangements could impact an issuer's or obligated person's liquidity, overall creditworthiness, or existing security holder's rights. However, to provide additional clarity, the term "guarantee" is intended to capture any guarantee provided by an issuer or obligated person (as a guarantor)" [FN160] for the benefit of itself or a third party, which guarantees payment of a financial obligation.

A guarantee of a debt obligation or a derivative instrument entered into in connection with, or pledged as security or a source of payment for, an existing or planned debt obligation could raise two disclosures under the Rule—one for the guarantor and one for the beneficiary of the guarantee. Specifically, if an issuer or obligated person incurs a material guarantee, such guarantee would be subject to disclosure under the Rule, as amended. For an issuer or obligated person that is the beneficiary of a guarantee provided in connection with a debt obligation or a derivative instrument entered into in connection with, or pledged as security or a source of payment for, an existing or planned debt obligation, the Commission believes that, generally, such beneficiary issuer or obligated person should assess whether such guarantee is a material term of the underlying debt obligation or derivative instrument and, if so (and if the underlying debt obligation or derivative instrument is material), disclose the existence of such guarantee under the Rule.

### iv. Monetary Obligation Resulting From a Judicial, Administrative, or Arbitration Proceeding

As proposed, the term "monetary obligation resulting from a judicial, administrative, or arbitration proceeding" was included in the definition of "financial obligation" because the Commission believed that the requirement to pay such an obligation could adversely impact an issuer's or obligated person's overall creditworthiness and liquidity, and adversely affect security holders. [FN161] Commenters who addressed this issue were almost uniformly opposed to the inclusion of this term in the definition of "financial obligation." [FN162] A common sentiment among commenters was that monetary obligations resulting from a judicial, administrative, or arbitration proceeding are of a fundamentally different character than the other categories included within the definition of financial obligation, and therefore are ill-suited to being subject to the same set of regulatory language and materiality and financial difficulties determinations.[FN163]

Moreover, commenters argued that monitoring the numerous judicial, administrative, and arbitration proceedings to which they are party would be overly burdensome and would require the expenditure of a significant amount of issuer and obligated person time and financial and personnel resources.[FN164] One commenter questioned whether disclosure of these obligations was necessary, suggesting that many issuers and obligated persons have insurance or funding reserves to cover potential fines or penalties incurred through judicial, administrative or arbitration proceedings.[FN165] Another commenter stated that in one of the examples cited by the Commission in the Proposing Release as an instance in which a monetary obligation resulting from

Amendments to Municipal Securities Disclosure, 83 FR 44200-01

a judicial proceeding impaired the liquidity and creditworthiness of an issuer, the obligation had been disclosed in the issuer's publicly available audited financial statements, reviewed by rating agencies, and had been widely covered by media prior to the bankruptcy date.[FN166]

The Commission is revising the definition of the term "financial obligation" to exclude the term "monetary obligation resulting from a judicial, administrative, or arbitration proceeding." The Commission believes that, though a monetary obligation resulting from a judicial, administrative, or arbitration proceeding might be relevant to the general financial condition of an issuer or obligated person, such obligations do not typically impact the rights or interests of security holders as issuers and obligated persons generally have reserve funding or insurance to cover such costs, with such funding and insurance typically being reflected in their financial statements.[FN167] In addition, an initial judgment in a judicial, administrative, or arbitration proceeding may not reflect the ultimate disposition of the proceeding, and years could pass between entry of the initial judgment and the payment of any resulting monetary obligation. Given this delay, the Commission believes that it is unlikely that a monetary obligation resulting from a judicial, administrative, or arbitration proceeding would have an immediate impact on an issuer's or obligated person's liquidity or **44715** creditworthiness or would adversely affect security holders.

Accordingly, at this time, the Commission does not believe that monetary obligations resulting from judicial, administrative, or arbitration proceedings raise the same concerns regarding ready and prompt access to information about their existence as the other types of obligations included in the adopted definition of financial obligation. Therefore, the Commission is removing the term "monetary obligation resulting from a judicial, administrative, or arbitration proceeding" from the term "financial obligation."

### v. Exclusion of Municipal Securities as to Which a Final Official Statement Has Been Provided to the MSRB Consistent With Rule 15c2-12 From Definition of "Financial Obligation"

As proposed and adopted, the term financial obligation does not include municipal securities as to which a final official statement has been provided to the MSRB consistent with Rule 15c2-12.[FN168] In response to the proposed exclusion, some commenters suggested that the Commission should revise the language so the exclusion would apply when the Rule requires a final official statement to be provided to the MSRB rather than when the final official statement has actually been provided to the MSRB by an underwriter.[FN169] According to commenters, such a revision would allow an issuer or obligated person to utilize the exclusion even when an underwriter fails to submit the final official statement to the MSRB.[FN170] The Commission declines to adopt the recommended revision. The Commission continues to believe that the exclusion as proposed is consistent with the current regulatory framework in which an underwriter is responsible for delivering the final official statement to the MSRB. Moreover, this framework establishes appropriate incentives for all involved parties to ensure that the final official statement is, in fact, provided to the MSRB, and helps ensure the relevant information is made available to investors.

Commenters also requested that the Commission revise the proposed language to include an exclusion from disclosure under paragraph (b)(5)(i)(C)(15) for any financial obligation for which a final official statement is provided to the MSRB voluntarily. [FN171] The Commission declines to adopt the recommended revision. The Commission continues to believe that the exclusion should apply only to municipal securities as to which a final official statement is provided to the MSRB consistent with the Rule, and that such final official statement could be provided to the MSRB voluntarily. If such final official statement is provided to the MSRB voluntarily, the Commission believes that such voluntary submission would be made consistent with the Rule if it is provided to the MSRB consistent with the requirements set forth in Rule 15c2-12(b).[FN172] Therefore, for this exclusion to apply, whether the final official statement is submitted voluntarily or not, the issuer or obligated person must submit the final official statement to the MSRB subject to the requirements of Rule 15c2-12(b). This exclusion from the definition of "financial obligation" covers only "municipal securities as to which a final official statement has been provided to the [MSRB] consistent with this rule" [FN173] and does not extend to instruments or obligations (contingent or otherwise) related to such municipal securities. Under a continuing disclosure agreement, an issuer or obligated person will need to disclose any such derivative instrument or guarantee if it is material and affects security holders for purposes of new paragraph (b)(5)(i)(C)(15) of the Rule and make any related disclosures required under new paragraph (b)(5)(i)(C)(16) of the Rule.

**3. Default, Event of Acceleration, Termination Event, Modification of Terms, or Other Similar Events Under the Terms of a Financial Obligation of the Obligated Person, Any of Which Reflect Financial Difficulties**

The Commission is adopting as proposed the amendment to add new paragraph (b)(5)(i)(C)(16) to the Rule, which requires that a Participating Underwriter in an Offering must reasonably determine that the continuing disclosure agreement provides for the submission of notice of the occurrence of a default, event of acceleration, termination event, modification of terms, or other similar events under the terms of a financial obligation of the obligated person, provided the occurrence reflects financial difficulties.

As the Commission stated in the Proposing Release, although the occurrence of the events listed in paragraph (b)(5)(i)(C)(16) may not be common in the municipal market, they can significantly and adversely impact the value of an issuer's or obligated person's outstanding municipal securities.[FN174] The Commission also believes the amendments would facilitate investor access to important information in a timely manner and help to enhance transparency in the municipal securities market and enhance investor protection.

**i. Default**

Two commenters recommended that "default" be revised to "event of default," arguing that "default" was vague while "event of default" is usually defined in transaction documents.[FN175] Because an "event of default" is often specifically defined in transaction documents, it would be more narrowly applied than "default." As described in the Proposing Release, a default could be a monetary default, where an issuer or obligated person fails to pay principal, interest, or other funds due, or a non-payment related default, where an issuer or obligated person fails to comply with specified covenants.[FN176] Typically, if a monetary default occurs, or a non-payment related default is not cured within a specified period, such default becomes an "event of default" and the trustee or counterparty to the financial obligation may exercise legally available rights and remedies for enforcement, including an event of acceleration. The Commission believes that there are defaults that may reflect financial difficulties even if they do not qualify as "events of defaults" under transaction documents. This may constitute important information related to an issuer's or obligated person's material financial obligations that could impact an issuer's or obligated person's liquidity, overall creditworthiness, or an existing security holder's rights. Accordingly, the Commission believes the concept of "default" should be retained as proposed.

**\*44716  ii. Modification of Terms**

One commenter proposed revising "modification of terms" to "modification of material terms" [FN177] and another commenter recommended adding "including written or verbal waivers" after "modification of terms." [FN178] The Commission believes both revisions are unnecessary. A modification of terms would be reported under a continuing disclosure agreement only if the modification "reflect[s] financial difficulties of the issuer or obligated person." This qualifier is included to help target the disclosure of information relevant to investors in making an assessment of the current financial condition of the issuer or obligated person. Accordingly, because the modification of terms already is subject to a qualifier, the Commission believes there is no need to also include a materiality qualifier. Additionally, "modification of terms" is broad, and as such, a written or verbal waiver of a deal provision would be a modification of the terms of an agreement because such waivers are a departure from what was agreed to under the terms of the agreement. Consequently, the Commission is adopting the concept of "modification of terms" without any changes.[FN179]

**iii. Other Similar Events**

One commenter stated that the "other similar events" language was too vague [FN180] and another recommended that the Commission remove it from the rule text.[FN181] The Commission continues to believe that the term should be retained in the rule text to ensure that paragraph (b)(5)(i)(C)(16) covers not only defaults, events of acceleration, termination events, or modifications of terms that reflect financial difficulties of the issuer or obligated person, but also events arising under the terms of a financial obligation that similarly reflect financial difficulties of the issuer or obligated person. As stated in the Proposing

Release, in order to be subject to disclosure under the Rule, the term "other similar events under the terms of a financial obligation of the obligated person reflecting financial difficulties" must necessarily share similar characteristics with one of the preceding listed events (a default, event of acceleration, termination event, or modification of terms).[FN182] The Commission is adopting "other similar event" as proposed to address the disclosure of the occurrence of events that, although not specifically set forth in the rule text, are still relevant to investors and other market participants in making an assessment of the current financial condition of the issuer or obligated person. Such events may have potential adverse impacts on the issuer's or obligated person's liquidity and overall creditworthiness, or affect security holders.

### iv. Reflect Financial Difficulties

Some commenters argued that "reflect financial difficulties" was vague and encouraged the Commission to provide additional guidance to prevent a flood of event notices to EMMA.[FN183] One commenter suggested alternative language that would narrow the events reported under paragraph (b)(5)(i)(C)(16).[FN184] Some commenters, with the goal of prompting more disclosure to the market, encouraged the Commission to remove the reflects financial difficulties qualifier, stating that it would limit the disclosure of the occurrence of events unrelated to financial difficulties, such as legislative dysfunction, but were nonetheless important to investors.[FN185]

The Commission continues to believe that the "reflect financial difficulties" qualifier is appropriate. The Commission believes that the term is not vague, as the concept of "reflecting financial difficulties" has been used in paragraphs (b)(5)(i)(C)(3) and (4) since the 1994 amendments to Rule 15c2-12, and, as such, market participants should be familiar with the concept as it relates to the operation of Rule 15c2-12.[FN186] Furthermore, the Commission also believes that additional guidance on the term would be difficult to provide, due to the diversity of issuers and obligated persons as well as the financial conditions affecting them. Accordingly, the Commission believes that "reflect financial difficulties" is an appropriate qualifier to help target the disclosures to result in information relevant to investors in making an assessment of the current financial condition of the issuer or obligated person. Removing "reflect financial difficulties" could result in overly broad disclosures of event occurrences that would not necessarily be relevant or important to investors' decisions, for instance, by not reflecting on the creditworthiness of an issuer or obligated person.[FN187] Moreover, the narrowed definition of "financial obligation," as adopted, will limit the number of financial obligations that issuers and obligated persons will need to evaluate when considering whether a disclosure is required under paragraph (b)(5)(i)(C)(16) and thereby reduce the burden on issuers, obligated persons, and dealers.

### v. Scope of Financial Obligations Subject to Paragraph (b)(5)(i)(C)(16)

Some commenters stated their belief that paragraph (b)(5)(i)(C)(16) applies to all of an issuer's or obligated person's currently outstanding financial obligations as opposed to just those incurred after the effective date of the amendments.[FN188] Another commenter recommended limiting this event to only those financial obligations that had been previously disclosed under paragraph (b)(5)(i)(C)(15).[FN189]

As discussed below, the amendments will only affect those continuing disclosure agreements entered into on or after the compliance date for these amendments. Issuers and obligated persons with a continuing disclosure agreement entered into on or after the compliance date must disclose, pursuant to paragraph (b)(5)(i)(C)(15), material financial obligations incurred on or after the date on which such a  **\*44717**  continuing disclosure agreement was entered into. However, an event under the terms of a financial obligation pursuant to paragraph (b)(5)(i)(C)(16) that occurs on or after the compliance date must be disclosed regardless of whether such obligation was incurred before or after the compliance date. The Commission believes narrowing paragraph (b)(5)(i)(C)(16) to only financial obligations incurred after the compliance date or disclosed under paragraph (b)(5)(i)(C)(15) would exclude important information regarding the current financial condition of the issuer or obligated person that could negatively impact the issuer's or obligated person's liquidity and overall creditworthiness. Financial obligations incurred prior to the compliance date for these amendments may have long maturity dates and the occurrence of the events set forth in paragraph (b)(5)(i)(C)(16) can significantly and adversely impact the value of an issuer's or obligated person's outstanding municipal securities. Additionally, the Commission believes that the burden on issuers and obligated persons to monitor for these events will be limited because the occurrence of a default, event of acceleration, termination event,

modification of terms, or other similar events, are significant in nature, and therefore issuers and obligated persons should typically be aware that they have occurred.

### B. Technical Amendment

The Commission did not receive any comments on its proposed technical amendment to paragraph (b)(5)(i)(C)(14) of the Rule to remove the term "and" because new events are proposed to be added to paragraph (b)(5)(i)(C) of the Rule. The Commission is adopting this amendment as proposed.

### C. Compliance Date and Transition

The amendments to Rule 15c2-12 will impact only those continuing disclosure agreements entered into in connection with Offerings that occur on or after the compliance date of these amendments.[FN190] Accordingly, continuing disclosure agreements entered into prior to the compliance date would not be required to reflect changes made to the Rule by such amendments. As a result, for municipal securities issued prior to the compliance date, a recommending dealer would not be required to have procedures in place that provide reasonable assurance that it will receive prompt notice of the events added to the Rule by the amendments.[FN191]

Additionally, in the Proposing Release, the Commission stated that the amendments would apply to continuing disclosure agreements that are entered into in connection with Offerings occurring on or after the compliance date of the amendments. [FN192] One commenter inquired whether, under that formulation, a primary offering "occurs" on the date of the distribution of the preliminary official statement or on the date the corresponding issuance of municipal securities is settled and the continuing disclosure agreement is executed.[FN193] For the purposes of these amendments, the Commission believes that an Offering generally should be considered to occur on the date the continuing disclosure agreement is executed. However, if a preliminary official statement is distributed before the compliance date, with an expectation that the Offering will occur on or after the compliance date, the preliminary official statement should generally attach a form of continuing disclosure agreement that reflects the adopted amendments.

In the Proposing Release, the Commission proposed a compliance date three months after the final adoption of the amendments. Several commenters argued that the proposed compliance period of three months after adoption was insufficient.[FN194] Commenters stated that issuers and obligated persons would need to establish and implement procedures to centralize information, which would both be costly and time-consuming.[FN195] Another commenter questioned whether the MSRB would be able to implement the necessary adjustments to EMMA by the compliance date.[FN196] However, another commenter argued that the three-month period was suitable and urged the Commission to make the amendments effective as soon as practicable.[FN197] The Commission has considered these comments and is extending the compliance date to 180 days after publication of the amendments in the Federal Register. The Commission believes that a date of 180 days after publication of the amendments in the Federal Register should be sufficient time for Participating Underwriters to revise their procedures to comply with the Rule, and for issuers and obligated persons to become aware of the amendments and plan for their implementation. Moreover, after consultation by Commission staff with MSRB staff, the Commission believes 180 days after publication of the amendments in the Federal Register will be adequate for the MSRB to make the necessary modifications to the EMMA system. The Commission is establishing February 27, 2019 as the compliance date for these amendments.[FN198]

### IV. Paperwork Reduction Act

The Rule, as amended, contains "collection of information requirements" within the meaning of the Paperwork Reduction Act of 1995 ("PRA").[FN199] In accordance with 44 U.S.C. 3507 and 5 CFR 1320.11, the Commission submitted revisions to the currently approved collection of information titled "Municipal Securities Disclosure" (17 CFR 240.15c2-12) (OMB Control No. 3235-0372) to the Office of Management and Budget ("OMB"). An agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a currently valid control number.

In the Proposing Release, the Commission provided estimates of the burden of complying with the proposed amendments to the Rule and solicited comments on those estimates and the collection of information requirements. On April 26, 2018, the Commission published a notice soliciting comment **\*44718** on the currently approved collection of information; [FN200] the Commission hereby withdraws this notice from the Federal Register, but addresses the comments received [FN201] in response to it below in this Section IV. In the Proposing Release, the Commission stated that the estimates of the effect that the amendments will have on the collection of information were based on data from various sources, including the most recent PRA submission for Rule 15c2-12.[FN202] As discussed above, the Commission received numerous comment letters on the proposed rulemaking. Of the comment letters the Commission received, some commenters addressed the collection of information aspects of the proposal.[FN203] Certain commenters addressed the accuracy of the Commission's burden estimates for the proposed collection of information, stating that the estimates were too low. The Rule as amended includes several modifications or clarifications from the proposed rule amendments that address concerns raised by commenters and that are intended, in part, to decrease implementation burdens relative to the proposal. As discussed in Section III.A.2., the Commission is narrowing the scope of the amendments to Rule 15c2-12 and expects that the total burden of complying with the adopted amendments to Rule 15c2-12 will be significantly lower than the burden of complying with the amendments as originally proposed. Nevertheless, in response to comments received on the burden estimates in the Proposing Release, the Commission is revising its approach to estimating the PRA burden related to the Rule and is increasing its PRA burden estimates related to the amendments and Rule 15c2-12.

Discussed below is the revised Paperwork Reduction Act analysis for Rule 15c2-12. First, the Commission provides a summary of the collection of information required under Rule 15c2-12 prior to these amendments, the amendments to Rule 15c2-12 as proposed, and the amendments to Rule 15c2-12 as adopted. Second, the Commission summarizes the use of the information collected under the Rule. Third, the Commission discusses the respondents subject to a collection of information requirement under the Rule. Fourth, the Commission discusses the burdens under the Rule prior to these amendments, estimated burdens in the Proposing Release, and the revised burdens under Rule 15c2-12 as it applies to broker-dealers, issuers of municipal securities, and the MSRB. Finally, the Commission discusses the costs under the Rule prior to these amendments, estimated costs in the Proposing Release, and the revised costs under Rule 15c2-12 to broker-dealers, issuers of municipal securities, and the MSRB.

### *A. Summary of Collection of Information*

### 1. Collection of Information Prior to Amendments

Paragraph (b) of Rule 15c2-12 requires a dealer acting as a Participating Underwriter in an Offering: (1) To obtain and review an official statement "deemed final" by an issuer of the securities, except for the omission of specified information, prior to making a bid, purchase, offer, or sale of municipal securities; (2) in non-competitively bid offerings, to send, upon request, a copy of the most recent preliminary official statement (if one exists) to potential customers; (3) to contract with the issuer to receive, within a specified time, sufficient copies of the final official statement to comply with the Rule's delivery requirement, and the requirements of the rules of the MSRB; (4) to send, upon request, a copy of the final official statement to potential customers for a specified period of time; and (5) before purchasing or selling municipal securities in connection with an offering, to reasonably determine that the issuer or obligated person has undertaken, in a written agreement or contract for the benefit of holders of such municipal securities, to provide annual filings, event notices, and failure to file notices (i.e., continuing disclosure documents) to the MSRB in an electronic format as prescribed by the MSRB.[FN204] In addition, under paragraph (c) of the Rule, a dealer that recommends the purchase or sale of a municipal security is required to have procedures in place that provide reasonable assurance that it will receive prompt notice of any event specified in paragraph (b)(5)(i)(C) of the Rule and any failure to file annual financial information regarding the security.[FN205]

Under paragraph (b)(5)(i)(C) of Rule 15c2-12, dealers acting as Participating Underwriters in Offerings are required to reasonably determine that the issuer or obligated person has undertaken in a continuing disclosure agreement to provide event notices to the MSRB, in an electronic format as prescribed by the MSRB, in a timely manner not in excess of ten business days, when any of the following events with respect to the securities being offered in an offering occurs: (1) Principal and

interest payment delinquencies with respect to the securities being offered; (2) non-payment related defaults, if material; (3) unscheduled draws on debt service reserves reflecting financial difficulties; (4) unscheduled draws on credit enhancements reflecting financial difficulties; (5) substitution of credit or liquidity providers, or their failure to perform; (6) adverse tax opinions, the issuance by the I.R.S. of proposed or final determinations of taxability, Notices of Proposed Issue or other material notices or determinations with respect to the tax status of the security, or other material events affecting the tax status of the security; (7) modifications to rights of security holders, if material; (8) bond calls, if material, and tender offers; (9) defeasances; (10) release, substitution, or sale of property securing repayment of the securities, if material; (11) rating changes; (12) bankruptcy, insolvency, receivership or similar event of the obligated person; (13) consummation of a merger, consolidation, or acquisition, acquisition involving an obligated person or the sale of all or substantially all of the assets of the obligated person, other than in the ordinary course of business, the entry into a definitive agreement to undertake such an action or the termination of a definitive agreement relating to any such actions, other than pursuant to is terms, if material; and (14) appointment of a successor or additional trustee or the change of name of a trustee, if material.[FN206]

## 2. Proposed Amendments to Rule 15c2-12

Under the proposed amendments, the Commission proposed to add two additional event notices that a dealer acting as a Participating Underwriter in an Offering must reasonably determine that an issuer or an obligated person has undertaken, in a written agreement or contract for the benefit of holders of **\*44719** municipal securities, to provide to the MSRB. Specifically, the proposed amendments would have amended the list of events for which notice is to be provided to include the following added two additional events as paragraphs (b)(5)(i)(C)(15) and (16) of Rule 15c2-12: (1) Incurrence of a financial obligation of the obligated person, if material, or agreement to covenants, events of default, remedies, priority rights, or other similar terms of a financial obligation of the obligated person, any of which affect security holders, if material; and (2) default, event of acceleration, termination event, modification of terms, or other similar events under the terms of a financial obligation of the obligated person, any of which reflect financial difficulties.

For purposes of the proposed amendments, the Commission proposed to define the term "financial obligation" to mean a (i) debt obligation; (ii) lease; (iii) guarantee; (iv) derivative instrument; or (v) monetary obligation resulting from a judicial, administrative, or arbitration proceeding. As proposed to be defined, the term financial obligation did not include municipal securities as to which a final official statement has been provided to the Municipal Securities Rulemaking Board consistent with Rule 15c2-12.

## 3. Adopted Amendments to Rule 15c2-12

In response to comments received and as discussed in Section III.A., the Commission has revised its proposed amendments to Rule 15c2-12. The two additional events as paragraphs (b)(5)(i)(C)(15) and (16) of Rule 15c2-12 are unchanged from the Proposing Release: (1) Incurrence of a financial obligation of the obligated person, if material, or agreement to covenants, events of default, remedies, priority rights, or other similar terms of a financial obligation of the obligated person, any of which affect security holders, if material; and (2) default, event of acceleration, termination event, modification of terms, or other similar events under the terms of a financial obligation of the obligated person, any of which reflect financial difficulties.

However, the definition of the term "financial obligation" has been narrowed and is now defined as a (i) debt obligation; (ii) derivative instrument entered into in connection with, or pledged as security or a source of payment for, an existing or planned debt obligation; or (iii) guarantee of (i) or (ii). The terms "lease" and "monetary obligation resulting from a judicial, administrative, or arbitration proceeding" have been removed; the term "derivative instrument" has been limited to those "entered into in connection with, or pledged as security or a source of payment for, an existing or planned debt obligation"; and the term "guarantee" has been limited to guarantees of a "debt obligation" or "derivative instrument entered into in connection with, or pledged as security or a source of payment for, an existing or planned debt obligation." As discussed above in Section III.A.2., these terms were removed or narrowed in response to comments and in order to reduce the burden of complying with the amendments.

*B.* **Use of Information**

The adopted amendments would provide dealers with timely access to important information about municipal securities that they can use to carry out their obligations under securities laws, thereby reducing the likelihood of antifraud violations. This information could be used by individual and institutional investors; underwriters of municipal securities; other market participants, including dealers, analysts, municipal securities issuers, the MSRB, vendors of information regarding municipal securities, the Commission and its staff, and the public generally.[FN207] The adopted amendments will enable market participants to be better informed about material events that occur with respect to municipal securities and their issuers and would assist investors in making decisions about whether to buy, hold or sell municipal securities.

*C.* **Respondents**

In November 2015, OMB approved an extension without change of the approved collection of information associated with the Rule. The approved paperwork collection associated with Rule 15c2-12 applies to dealers, issuers of municipal securities, and the MSRB. The paperwork collection associated with these adopted amendments would apply to the same respondents. Under the Rule prior to these amendments, the Commission estimated that the number of respondents impacted by the paperwork collection associated with the Rule consists of approximately 250 dealers and 20,000 issuers.[FN208] In the Proposing Release, the Commission estimated that the number of respondents would not change because the proposed amendments would not expand the types of securities covered under paragraphs (b)(5) and (c) of the Rule, and thus would not increase the number of dealers or issuers having a paperwork burden. The Commission received one comment that contended that the Commission's estimate of the number of issuers affected was too low.[FN209] As discussed in greater detail below, the Commission continues to believe that its estimate of the number of dealers made in the Proposing Release is appropriate, but is revising its estimate of the number of issuers.

*D.* **Total Annual Reporting and Recordkeeping Burden**

The Commission estimates the aggregate information collection burden for the amended Rule to consist of the following:

**1. Dealers**

In the Proposing Release, consistent with prior estimates, the Commission estimated that approximately 250 dealers potentially could serve as Participating Underwriters in an offering of municipal securities.[FN210] The Commission received no comments on this estimate. The Commission has reviewed this estimate and continues to estimate that, under the amendments, the number of dealers subject to a paperwork burden as Participating Underwriters will be 250.

Under the Rule prior to these amendments, the Commission has estimated that the total annual burden on all 250 dealers is 22,500 hours (90 hours per dealer per year). This estimate is the sum of two separate burdens: (1) 2,500 hours per year for 250 dealers (10 hours per dealer per year) to reasonably determine that the issuer or obligated person has undertaken, in a written agreement or contract, for the benefit of holders of such municipal securities, to provide continuing disclosure documents to the MSRB, and (2) 20,000 hours per year for 250 dealers (80 hours per dealer per year) serving as Participating Underwriters to determine whether issuers or obligated persons have failed to comply, in all material respects, with any previous undertakings in a written contract or agreement specified in paragraph (b)(5)(i) of the Rule.

**i. Amendments to Events To Be Disclosed Under a Continuing Disclosure Agreement**

**a. Estimates in Proposing Release**

In the Proposing Release, the Commission stated it did not expect the  **\*44720**  proposed amendments to increase the annual hourly burden for dealers to reasonably determine that the issuer or obligated person has undertaken, in a written agreement or contract, for the benefit of holders of such municipal securities, to provide continuing disclosure documents to the MSRB.

Thus, the Commission estimated that pursuant to the Rule as proposed to be amended, 250 dealers would continue to incur 2,500 hours per year (10 hours per year per dealer) to make this determination.

However, because the proposed amendments would add two events notices to paragraph (b)(5)(i)(C) of the Rule, the Commission estimated that the amendments to the Rule would result in an increase of 2,500 hours per year (10 hours per dealer per year) for dealers to determine whether issuers or obligated persons have failed to comply, in all material respects, with any previous undertakings in a written contract or agreement specified in paragraph (b)(5)(i) of the Rule. Using the Commission's prior estimate of 20,000 hours per year (80 hours per dealer per year) as a baseline for this burden,[FN211] the Commission estimated that dealers would incur an additional 2,500 hours per year, for a total estimated burden of 22,500 hours per year (90 hours per dealer per year) to make this determination.

Therefore, in the Proposing Release, the Commission estimated that the total annual burden of dealers acting as a Participating Underwriter in an Offering would increase by 2,500 hours to 25,000 hours annually (100 hours per dealer per year).[FN212]

**b. Comments Received**

The Commission received no comments on its estimate that dealers would continue to incur a burden of 2,500 hours per year (10 hours per dealer per year) to reasonably determine that the issuer or obligated person has undertaken, in a written agreement or contract, for the benefit of holders of municipal securities, to provide continuing disclosure documents to the MSRB. However, as discussed in further detail below, the Commission is revising its method for calculating the PRA burden on dealers. Accordingly, this estimate is being changed to reflect the new calculation method.

The Commission received several comments on its estimate that the amendments, by adding two event notices to paragraph (b)(5)(i)(C) of the Rule, would increase the burden on dealers by 2,500 hours (10 hours per dealer per year) to determine whether issuers or obligated persons have failed to comply, in all material respects, with any previous undertakings in a written contract or agreement specified in paragraph (b)(5)(i) of the Rule. One commenter stated that because the amendments were "substantially overbroad in scope," they would subject dealers acting as Participating Underwriters in Offerings to "enormous burdens" beyond what had been estimated.[FN213] Another commenter criticized the Commission's estimate as failing to account for the time needed to interpret the "broad" definition of "financial obligation" contained in the proposed amendments, assess the materiality of events, and complete review procedures.[FN214] That commenter stated that the Commission's estimates of an increase in burden of ten hours per dealer per year, when calculated on a per issuance basis, resulted "in an average additional underwriter burden of approximately 12 minutes" per issuance of municipal securities.[FN215] That commenter further stated that this estimate was unrealistic because each dealer, to comply with the proposed amendments, would have to "obtain a list of all financial obligations (bonds, notes, leases, guarantees, derivatives, and monetary obligations from judicial, administrative, or arbitration proceedings), obtain a copy of the financial obligation," and then perform a series of reviews, including whether the financial obligation is "material," to determine whether the issuer had failed to comply with any previous undertakings in a written contract or agreement specified in paragraph (b)(5)(i) of the Rule.[FN216]

Commenters also criticized the Commission's prior estimate, predating the proposed amendments, that dealers would incur a burden of 20,000 hours per year (80 hours per dealer per year) to determine whether issuers or obligated persons have failed to comply, in all material respects, with any previous undertakings in a written contract or agreement specified in paragraph (b)(5)(i) of the Rule.[FN217] These commenters contended that, irrespective of the increased burden from the proposed amendments, the Commission's prior estimates of this burden on dealers were also far too low.[FN218] One commenter argued that the Commission's prior PRA estimates "greatly underestimated the compliance burdens of the existing Rule," and, noting that the Commission used its prior PRA estimates as the starting point for its new burden estimates, criticized the Commission for its "reliance on inapposite, faulty prior estimates." [FN219] That commenter also argued that "as a result of subsequent Commission actions, its prior estimates are no longer indicative." [FN220] That commenter further discussed prior Commission estimates of PRA burdens attributable to Rule 15c2-12, arguing that the prior estimates had contained "gross inaccuracies" that had not been sufficiently addressed.[FN221]

### c. Revised Estimates of Burden

The Commission has considered the comments received and in response is revising its method to calculate the PRA burden for dealers under Rule 15c2-12. In doing so, the Commission is also revising (1) its estimate that dealers would continue to incur a burden of 2,500 hours per year (10 hours per dealer per year), to reasonably **\*44721** determine that the issuer or obligated person has undertaken, in a written agreement or contract, for the benefit of holders of municipal securities, to provide continuing disclosure documents to the MSRB; (2) its estimate that the amendments would increase the burden on dealers by 2,500 hours (10 hours per dealer per year), to determine whether issuers or obligated persons have failed to comply, in all material respects, with any previous undertakings in a written contract or agreement specified in paragraph (b)(5)(i) of the Rule; and (3) its prior estimates under the Rule, predating the proposed amendments, that the total annual burden for dealers to determine whether issuers or obligated persons have failed to comply, in all material respects, with any previous undertakings in a written contract or agreement specified in paragraph (b)(5)(i) of the Rule was 20,000 hours (80 hours per dealer per year).

In prior PRA submissions, the Commission calculated the PRA burden on dealers on a collective, rather than per issuance, basis, primarily focusing on the number of dealers acting as Participating Underwriters in Offerings. However, in response to comments,[FN222] the Commission is now calculating the PRA burdens on dealers under Rule 15c2-12 on a per issuance of municipal securities basis. The Commission believes this is appropriate because a dealer's obligations under Rule 15c2-12 are triggered by acting as a Participating Underwriter in an Offering. This method is consistent with the Commission's estimates of the PRA burden on issuers for the Rule, which are also calculated on a per event basis.[FN223] The Commission is basing its estimate on the average number of primary market submissions to the MSRB over the past three years—13,658.[FN224]

Using this new method of calculation, the Commission is revising its estimate that dealers would continue to incur a burden of 2,500 hours per year (10 hours per dealer per year), to reasonably determine that the issuer or obligated person has undertaken, in a written agreement or contract, for the benefit of holders of municipal securities, to provide continuing disclosure documents to the MSRB.[FN225] The Commission estimates that dealers will incur a 15 minute burden per issuance of municipal securities to make this determination, resulting in an annual burden on all dealers of approximately 3,415 hours (approximately 13.7 hours per dealer per year).[FN226] This revised estimate constitutes an increase of approximately 915 hours (approximately 3.7 hours per dealer) over the estimates provided in the Proposing Release.[FN227] No commenter provided an estimate for this burden. However, the Commission understands that most continuing disclosure agreements are provided to the dealer by the issuer or obligated person and that most of these agreements are standard form agreements [FN228] of limited length. Further, the Commission believes that the determination required to be made—that the issuer or obligated person has undertaken to provide continuing disclosure documents to the MSRB—is a narrow one that does not require a substantial time commitment from the dealer. For these reasons, the Commission believes the estimate of a 15 minute burden per issuance is appropriate.

The Commission is also revising its estimate that the amendments, by adding two event notices to paragraph (b)(5)(i)(C) of the Rule, would increase the burden on dealers by 2,500 hours per year (10 hours per dealer per year) to determine whether issuers or obligated persons have failed to comply, in all material respects, with any previous undertakings in a written contract or agreement specified in paragraph (b)(5)(i) of the Rule. Under the new method of calculation, the Commission believes that the amendments will, on average, amount to an additional one hour burden per issuance of municipal securities, resulting in an annual increased burden on all dealers of 13,658 hours (approximately 55 hours per year per dealer).[FN229] This revised estimate constitutes an increase of 11,158 hours (approximately 45 hours per dealer), over the estimates provided in the Proposing Release.[FN230] The Commission believes this revised estimate appropriately reflects the concerns raised by commenters while also recognizing that the amendments have been substantially narrowed from the amendments as proposed. The adopted definition of "financial obligation" in the Rule has significantly limited the scope of leases covered [FN231] and no longer covers monetary obligations resulting from a judicial, administrative, or arbitration proceeding.[FN232] Accordingly, dealers, when determining whether issuers or obligated persons have failed to comply with the events added by the amendments, will have a substantially smaller set of "financial obligations" to review.

Finally, the Commission is revising its prior estimates, predating the proposed amendments, that the total annual burden for dealers to determine whether issuers or obligated persons have failed to comply, in all material respects, with any previous

undertakings in a written contract or agreement specified in paragraph (b)(5)(i) of the Rule is 20,000 hours (80 hours per dealer per year). No commenter provided an estimate for this burden. Under the new method of calculation, the Commission believes that dealers will incur 8 hours of burden per issuance of municipal securities to make this determination, resulting in an **\*44722** annual burden on dealers of 109,264 hours (approximately 437 hours per dealer per year).[FN233] This revised estimate constitutes an increase of 89,264 hours (an increase of approximately 357 hours per dealer), over the estimate provided in the Proposing Release.[FN234] The Commission arrived at the 8-hour per issuance burden estimate after considering (1) the comments addressing the prior burden estimates for dealers under Rule 15c2-12, particularly the comments related to the Commission's prior PRA submissions; (2) comments addressing the potential that dealer burdens may have shifted as a result of subsequent Commission action; (3) the MSRB's statistics concerning the number of event notices filed on an annual basis; and (4) the potential volume of documentation to be reviewed under this obligation.[FN235] Based on the Commission's experience, the Commission believes that the estimate of an average burden of 8 hours per issuance is appropriate.

Accordingly, under the Commission's revised estimates, the total annual burden for all dealers acting as Participating Underwriters in Offerings will be 126,337 hours (approximately 505 hours per dealer per year),[FN236] or an average of 9.25 hours per issuance of municipal securities.[FN237] This revised estimate constitutes an increase of 101,337 hours (approximately 405 hours per dealer) over the estimates in the Proposing Release for the entire dealer community.[FN238] The Commission understands that burdens will vary across dealers and across specific issuances depending on numerous factors, such as the frequency of issuances by the issuer, size and complexity of the issuer, and the familiarity of the dealer with the issuer. The burden for some dealers will exceed our estimate, and the burden for others will be less. However, the Commission believes, on balance, that 126,337 hours (on average approximately 505 hours per dealer per year), is a reasonable estimate for the time needed for dealers acting as Participating Underwriters in Offerings to comply with their obligations under Rule 15c2-12.

### ii. One-Time Paperwork Burden

In the Proposing Release, the Commission estimated that each dealer acting as a Participating Underwriter in an Offering would incur a one-time paperwork burden to have its internal compliance attorney prepare and issue a notice advising its employees about the proposed revisions to Rule 15c2-12, including any updates to policies and procedures affected by the proposed amendments.[FN239] Based on prior estimates for similar amendments, the Commission estimated that it would take each dealer's internal compliance attorney approximately 30 minutes to prepare and issue a notice describing the dealer's obligations in light of the Proposed Amendments, for a total one-time, first-year burden of 125 hours for the entire dealer community.[FN240] The Commission also stated that it believed the task of preparing and issuing a notice advising the dealer's employees about the proposed amendments is consistent with the type of compliance work that a dealer typically handles internally.

One commenter expressed concern that the Commission's estimate of the one-time burden on dealers acting as Participating Underwriters in Offerings was too low.[FN241] The commenter stated that dealers would have to "identify their resulting duties, develop procedures for complying with them (including means for determining appropriate review levels and materiality judgments in commonly recurring circumstances), communicate the procedures to applicable personnel, and include the procedures in periodic training." [FN242] The commenter did not provide its own estimate for the one-time burden on dealers. In response to this comment, the Commission is revising its estimate of the time it will take each dealer to prepare and issue a notice advising its employees about the amendments to Rule 15c2-12 from 30 minutes per dealer to five hours per dealer. The Commission believes this revised estimate more accurately captures the time needed to complete the tasks identified by the commenter while also recognizing that the Commission has narrowed the scope of the amendments and removed several terms that commenters had characterized as burdensome and time-consuming to interpret and implement.[FN243]

Accordingly, the Commission estimates that the 250 dealers acting as a Participating Underwriter in Offerings would incur a one-time burden of five hours each, for a total one-time, first year burden of 1,250 hours for all dealers.

### iii. Total Burden for Dealers

Amendments to Municipal Securities Disclosure, 83 FR 44700-01

Under the amendments to Rule 15c2-12 as adopted, the total burden on all dealers would be 127,587 hours for the first year [FN244] and 126,337 hours for each subsequent year.[FN245] Table 1 below briefly summarizes the Commission's PRA burden estimates for dealers in the 2015 PRA Notice (the Commission's most recent estimates prior to these **\*44723** amendments), the Proposing Release, and the Adopting Release.

**Table 1—Summary of PRA Burden Estimates for Dealers**

|  | Annual burden (hours) | One-time burden (hours) |
| --- | --- | --- |
| Part II |  |  |
| Dealers (2015 PRA Notice) | 22,500 | [246] n/a |
| Dealers (Proposing Release) | 25,000 | 125 |
| Dealers (Adopting Release) | 126,337 | 1,250 |

## 2. Issuers

The amendments, as adopted, result in a paperwork burden on issuers of municipal securities. For this purpose, issuers include issuers of municipal securities described in paragraph (f)(4) of the Rule and obligated persons described in paragraph (f)(10) of the Rule.

Under the Rule prior to these amendments and in the Proposing Release, the Commission estimated that 20,000 issuers of municipal securities annually submit to the MSRB approximately 62,596 annual filings, 73,480 event notices, and 7,063 failure to file notices.[FN247] The number of issuers was based on information received from the MSRB in 2015 regarding the number of issuers affected by continuing disclosure agreements. In response to the Proposing Release, the Commission received a comment stating that the true number of issuers affected by Rule 15c2-12 was 34,696, or the number of filings on EMMA in 2016 listed under the category of "audited financial statements or CAFRs." [FN248] However, the Commission believes that category likely overstates the number of issuers affected by continuing disclosure agreements because a large number of those filings may not reflect distinct issuers filing separate audited financial statements. Many of the documents filed under that category are supplemental documents, or multiple years of audited financial statements filed by a single issuer all in one year. Instead, based on recent data provided by the MSRB staff to the Commission staff in conjunction with this rulemaking, the Commission believes that an appropriate revised estimate is that 28,000 issuers are affected by continuing disclosure requirements under Rule 15c2-12.[FN249]

## i. Amendments to Event Notice Provisions of the Rule

The Commission proposes to modify paragraph (b)(5)(i)(C) of the Rule, which presently requires a dealer acting as a Participating Underwriter in an Offering to reasonably determine that an issuer or obligated person has entered into a continuing disclosure agreement that, among other things, contemplates the submission of an event notice to the MSRB in an electronic format upon the occurrence of any events set forth in the Rule. The Rule prior to these amendments contained fourteen such events. The adopted amendments to this paragraph of the Rule add two new event disclosure items: New paragraph (b)(5)(i)(C)(15) contains a new disclosure event in the case of the incurrence of a financial obligation of the obligated person, if

material, or agreement to covenants, events of default, remedies, priority rights, or other similar terms of a financial obligation of the obligated person, any of which affect security holders, if material; and new paragraph (b)(5)(i)(C)(16) requires the disclosure of a default, event of acceleration, termination event, modification of terms, or other similar events under the terms of a financial obligation of the obligated person, any of which reflect financial difficulties. The Commission believes that the adopted amendments to paragraph (b)(5)(i)(C) of the Rule will increase the current annual paperwork burden for issuers because they will result in an increase in the number of event notices to be prepared and submitted.

**ii. Total Burden on Issuers for Amendments to Event Notices**

Under the Rule prior to these amendments, the Commission estimates that issuers prepare and submit annually: (1) 73,480 event notices, with each notice taking approximately two hours to prepare and submit; (2) 62,596 annual filings, with each filing taking approximately seven hours to prepare and submit; and (3) 7,063 failure to file notices, with each notice taking approximately two hours to prepare and submit.[FN250] Accordingly, under the estimate prior to these amendments, issuers would incur a total annual burden of 599,258 hours.[FN251]

In the Proposing Release, the Commission estimated that the amendments to the Rule would result in an increase to the annual total burden of issuers. Specifically, the Commission estimated that the proposed amendment in paragraph (b)(5)(i)(C)(15) of the Rule would increase the total number of event notices submitted by issuers annually by approximately 2,100 notices, and that the proposed amendment in paragraph (b)(5)(i)(C)(16) would increase the total number of event notices submitted by issuers annually by approximately 100 notices. The Commission also estimated that the time required for an issuer to prepare and submit the proposed two additional types of event notices to the MSRB in an electronic format, including time to actively monitor the need for filing, would continue to be approximately two hours per filing, because the two proposed types of event notices would require substantially the same amount of time to prepare as those prepared for existing events. Accordingly, the Commission estimated that the increase in number of event notices would result in an increase of 4,400 hours in the annual paperwork burden for issuers to submit event notices, with a total annual paperwork burden for issuers to submit event notices of approximately 151,360 hours (146,960 hours + 4,400 **\*44724** hours), and a total annual burden on issuers of 603,658 hours.[FN252]

**iii. Comments Related to Estimated Paperwork Burden on Issuers**

The Commission received several comments relating to the estimates of the Paperwork Reduction Act burden on issuers. [FN253] Commenters expressed concern that the Commission's estimates understated the burden of the proposed amendments on issuers because, in large part, the Commission failed to account for the overly broad definition of "financial obligation." One commenter criticized the term financial obligation for requiring "information that is both superfluous to investors and costly for issuers to present," further stating that "leases, for example, are transactions that take place many times per year in many jurisdictions and are commonly related to the ongoing operations of a government." [FN254] Another commenter stated that issuers "enter into a staggering number of leases and other financial obligations, as defined in the Proposed Amendments, in the ordinary course of providing important services to the public." [FN255] And another commenter stated that the definition of financial obligation could capture routine items such as equipment lease programs and short-term maintenance contracts.[FN256] Commenters also criticized the inclusion of "monetary obligation resulting from a judicial, administrative, or arbitration proceeding," stating that issuers could be subject to potentially hundreds of such obligations annually and that monitoring for such obligations would be expensive and time-consuming.[FN257] Many commenters stated that, as defined, "financial obligations" incurred by the issuer would be managed across dozens of departments and that "significant expense and effort" would be required to train employees across these departments and create "a system of coordination and review that would enable the [issuer] to comply" with the proposed amendments.[FN258]

Commenters also criticized the Commission for failing to account for the burden created by what they termed the ambiguity of the term "material." One commenter argued that the Commission, by refusing to give explicit guidance as to materiality, will force issuers to "review voluminous, often inconsistent court decisions and administrative orders in an attempt to give clarity to the term." [FN259] The net result, the commenter argued, is that issuers will expend far more hours than estimated by the Commission to review "even routine financial obligations" for materiality.[FN260]

These commenters generally contended that the burden of complying with the proposed amendments was far greater than the Commission's estimates. One commenter, after surveying its members, estimated that the time needed to ensure compliance with the proposed amendments would be approximately seven hours per event notice required to be filed with the MSRB under the proposed rule.[FN261] Another commenter suggested that the time needed for an issuer to prepare and submit an event notice for the proposed amendments could be up to 100 times greater than the Commission's original estimate of two hours per notice. [FN262] And another commenter estimated that the total annual burden on issuers for preparing and submitting event notices would be 109,292 hours [FN263] for proposed amendment (15) and 530 hours [FN264] for proposed amendment (16). That commenter further estimated that issuers would spend 867,400 hours [FN265] a year monitoring for possibly reportable events and 173,480 hours [FN266] evaluating possibly reportable events. Commenters also criticized past Commission estimates of issuer burden for filing event notices for being "substantially understated." [FN267]

In response to comments, the Commission is revising, from two hours to four hours, its estimate of the average time needed for an issuer to prepare and submit an event notice to the MSRB in an electronic format, including time to actively monitor the need for filing. The Commission believes this change, which recognizes an increased annual burden estimate on issuers of 151,360 hours [FN268] from the estimates in the Proposing Release, appropriately reflects the concerns raised by the commenters that the original estimates were too low.[FN269] This four-hour estimate applies to the average time needed to monitor, prepare, and file all sixteen types of event notices, not just the two new event notices required by the amendments to the Rule. The Commission recognizes that the event notices required by the amendments may on average be more complex and require more than an average of four **44725** hours to monitor, evaluate, prepare, and file. But, as discussed below, the Commission believes that the adopted amendments will generate relatively few event notices and that the majority of the event notices required to be filed under the Rule are not as time-consuming for an issuer to monitor, evaluate, prepare, and file. As even commenters critical of the Commission's estimates stated, "the existing events under Rule 15c2-12 are generally objectively ascertainable by most laymen and rarely occur, making them easily identifiable by issuers and relatively inexpensive to handle." [FN270] Furthermore, the majority of event notices filed on EMMA in recent years have been for bond calls, which is an action typically instituted by the issuer itself and therefore one the issuer would require very little effort to monitor.[FN271] Accordingly, the Commission believes that increasing the estimate of average time needed to monitor, evaluate, prepare, and file an event notice in electronic format to the MSRB to four hours per event notice addresses the comments raised and forms an appropriate average estimate of the burden on issuers to comply with this collection of information requirement under the Rule.

However, the Commission is not changing its estimate that the amendments to the Rule will result in 2,200 additional event notices filed annually, raising the total number of event notices prepared by issuers annually to approximately 75,680. The Commission believes this estimate remains appropriate because of the substantial narrowing of the definition of financial obligation from the definition proposed in Proposing Release.[FN272] The adopted definition of financial obligation removes or extensively limits the definitions, such as the modifications regarding leases, derivatives, and judicial obligations that commenters cited as the most burdensome. The adopted definition of financial obligation is tailored to apply only to debt, debt-like, and debt-related obligations. The adopted definition narrows the number of transactions for which issuers and obligated persons will need to monitor, evaluate, review, or file notices. The Commission believes this change will reduce the burdens of the adopted amendments as compared to the proposed amendments. In particular, the narrowing of "financial obligation" to focus on instruments that compete with a security holder's interests, as a security holder [FN273] will dramatically limit the need for issuers to centralize reporting and analysis for staff across multiple departments.[FN274] Moreover, as discussed in Section III.A.1.i, the Commission has provided examples intended to assist issuers in determining materiality under the Rule, addressing another issue commenters believed added to the burden of compliance with the Rule.

### iv. Total Burden for Issuers

Under the amendments to Rule 15c2-12 as adopted, the total burden on issuers to submit continuing disclosure documents would be 755,018 hours.[FN275] Table 2 below briefly summarizes the Commission's PRA burden estimates for issuers in the 2015 PRA Notice (the Commission's most recent estimates prior to these amendments), the Proposing Release, and the Adopting Release.

Amendments to Municipal Securities Disclosure, 83 FR 44700-01

**Table 2—Summary of PRA Burden Estimates for Issuers**

| | Estimated filings (submissions) | Annual burden (hours) | One-time burden (hours) |
|---|---|---|---|
| Estimates in 2015 PRA Notice | | | |
| Issuers (annual filings) | 62,596 | 438,172 | n/a |
| Issuers (event notices) | 73,480 | 146,960 | n/a |
| Issuers (failure to file notices) | 7,063 | 14,126 | n/a |
| Estimates in Proposing Release | | | |
| Issuers (annual filings) | 62,596 | 438,172 | 0 |
| Issuers (event notices) | 75,680 | 151,360 | 0 |
| Issuers (failure to file notices) | 7,063 | 14,126 | 0 |
| Estimates in Adopting Release | | | |
| Issuers (annual filings) | 62,596 | 438,172 | 0 |
| Issuers (event notices) | 75,680 | 302,720 | 0 |
| Issuers (failure to file notices) | 7,063 | 14,126 | 0 |

**\*44726  3. MSRB**

Under the Rule prior to these amendments, the Commission estimated that the MSRB incurred an annual burden of approximately 12,699 hours to collect, index, store, retrieve, and make available the pertinent documents under the Rule. [FN276] In the Proposing Release, the Commission estimated, based on preliminary consultations between Commission staff and MSRB staff, that 12,699 hours was still a reasonable estimate for this annual burden. The Commission also estimated, based on consultations with the MSRB staff, that the MSRB would require a one-time burden of 1,162 hours to implement the necessary modifications to EMMA to reflect the additional mandatory disclosures under Rule 15c2-12. Accordingly, the Commission estimated that the total burden on the MSRB to collect, store, retrieve, and make available the disclosure documents covered by the Rule would be 13,861 hours [FN277] for the first year and 12,699 hours for each subsequent year.

The Commission received no comments on these estimates. However, the Commission is revising these estimates to correspond with updated estimates provided by the MSRB. The Commission now estimates that the MSRB incurs an annual burden of

approximately 19,500 hours to collect, index, store, retrieve, and make available the pertinent continuing disclosure documents under the Rule.[FN278] The Commission also now estimates that the MSRB would require a one-time burden of 1,700 hours to implement the necessary modifications to EMMA to reflect the additional mandatory disclosures under Rule 15c2-12.[FN279] Accordingly, the Commission estimates that the total burden on the MSRB to collect, store, retrieve, and make available the disclosure documents covered by the Rule would be 21,200 hours [FN280] for the first year and 19,500 hours for each subsequent year. Table 3 below summarizes the Commission's PRA burden estimates for the MSRB in the 2015 PRA Notice (the Commission's most recent estimates prior to these amendments), the Proposing Release, and the Adopting Release.

**Table 3—Summary of PRA Burden Estimates for the MSRB**

|  | Annual burden (hours) | One-time burden (hours) |
| --- | --- | --- |
| MSRB (2015 PRA Notice) | 12,699 | n/a |
| MSRB (Proposing Release) | 12,699 | 1,162 |
| MSRB (Adopting Release) | 19,500 | 1,700 |

**4. Total Burden for Dealers Effecting Transactions in the Secondary Market**

Under the Rule prior to these amendments and in the Proposing Release, the Commission made no estimate of the burden on dealers effecting transactions in the secondary market to comply with Rule 15c2-12. Two commenters characterized this as an omission.[FN281] Those commenters cited to obligations, under Rule 15c2-12(c) and MSRB Rule G-47, which those commenters stated required dealers in the secondary market to disclose material information to investors, expressing concern that the proposed amendments would greatly increase the burden on such dealers.[FN282] One commenter estimated that the total annual burden on dealers effecting transactions in the secondary market would be 14,224,229 hours.[FN283]

The Commission continues to believe that neither the adopted amendments nor Rule 15c2-12 prior to amendment contains "collection of information requirements" within the meaning of the PRA on dealers effecting transactions in the secondary market. Rule 15c2-12(c) requires only that a dealer acting in the secondary market have "procedures in place that provide reasonable assurance that it will receive prompt notice of any event disclosed pursuant to paragraph (b)(5)(i)(C), paragraph (b)(5)(i)(D), and paragraph (d)(2)(ii)(B)" of the Rule. To the extent that dealers effecting transactions in the secondary market review and disclose material to customers, those associated burdens stem from antifraud provisions and MSRB rules that are not subject to this PRA analysis.

**5. Annual Aggregate Burden for Amendments to Rule 15c2-12**

The Commission estimates that the ongoing annual aggregate information collection burden for the Rule after giving effect to the amendments would be 900,855 hours.[FN284]

*E. Total Annual Cost*

**1. Dealers and the MSRB**

In the Proposing Release, the Commission stated that it did not expect dealers to incur any additional external costs associated with the proposed amendments to the Rule because the proposed amendments do not change the obligation of dealers under the Rule to reasonably determine that the issuer or obligated person has undertaken, in a written agreement or contract, for the benefit of holders of such municipal securities, to provide continuing **\*44727** disclosure documents to the MSRB, and to determine whether the issuer or obligated person has failed to comply with such undertakings in all material respects.[FN285] To the extent that dealers would incur a one-time burden of preparing and issuing a notice advising the dealer's employees about the amendments, the Commission believed that the work would be consistent with the type of compliance work that a dealer typically handles internally, and that the dealer would not incur any additional external costs.[FN286] The Commission received no comments on this estimate and continues to believe that this estimate is appropriate.

Also in the Proposing Release, the Commission stated that it did not expect the MSRB to incur any additional external costs associated with the proposed amendments to the Rule. The Commission believed that the MSRB would not incur additional external costs specifically associated with modifying the indexing system to accommodate the amendments to the Rule because the MSRB would implement those changes internally. The Commission received no comments on this estimate. After consultation of the Commission staff with MSRB staff, the Commission continues to believe that this estimate is appropriate. Additionally, in the Proposing Release, the Commission estimated that the MSRB expends $10,000 annually in hardware and software costs for the MSRB's EMMA system.[FN287] After consultation of the Commission staff with MSRB staff, the Commission now estimates that the MSRB expends $520,000 annually in hardware and software costs for the MSRB's EMMA system.[FN288]

Under the amendments to Rule 15c2-12 as adopted, the total external costs to dealers would be zero and the total external costs to the MSRB would be $520,000 annually. Table 4 below summarizes the Commission's PRA external cost estimates for dealers and the MSRB in the 2015 PRA Notice (the Commission's most recent estimates prior to these amendments), the Proposing Release, and the Adopting Release.

**Table 4—Summary of PRA Cost Estimates for Dealers and the MSRB**

|  | Annual external cost | One-time external cost |
|---|---|---|
| Estimates in 2015 PRA Notice |  |  |
| Dealers | $0 | n/a |
| MSRB | 10,000 | n/a |
| Estimates in Proposing Release |  |  |
| Dealers | 0 | $0 |
| MSRB | 10,000 | 0 |
| Estimates in Adopting Release |  |  |
| Dealers | 0 | 0 |

| | | |
|---|---|---|
| MSRB | 520,000 | 0 |

## 2. Issuers

In the Proposing Release, the Commission stated that it believes issuers generally would not incur external costs associated with the preparation of event notices filed under the amendments, because issuers would generally prepare the information contained in the continuing disclosures internally.

However, the Commission recognized that issuers would be subject to some costs associated with the amendments to the Rule if they paid third parties to assist them with their continuing disclosure responsibilities. Under the Rule prior to these amendments, the Commission estimated that up to 65% of issuers may use designated agents to submit some or all of their continuing disclosure documents to the MSRB for a fee estimated to range from $0 to $1,500 per year, with an average total annual cost incurred by issuers using the services of a designated agent of $9,750,000.[FN289] In the Proposing Release, the Commission modified this estimate to account for the estimated increase in filings as a result of the proposed amendments. The Commission estimated that the proposed amendments would result in 2,200 more event notices filed annually, increasing costs for issuers using a designated agent for submission of event notices to the MSRB of approximately six percent, to $10,335,000.[FN290]

The Commission received no comments on this estimate. The Commission continues to believe that the amendments will result in an increase of 2,200 event notices filed [FN291] and that the amendments will increase costs for the issuers using a designated agent by approximately six percent. The Commission also continues to believe that up to 65% of issuers may use designated agents; however, the Commission is revising its calculations to correspond with its revised estimate of the number of issuers affected by continuing disclosure agreements consistent with the Rule, which has changed from 20,000 in the Proposing Release to 28,000.[FN292] As a result, the Commission is making two adjustments. First, the Commission is revising its estimate of the cost to issuers who may **\*44728** use designated agents under the Rule prior to these amendments to reflect the increase in the number of issuers who may use designated agents.[FN293] Second, the Commission is increasing the estimated cost to issuers who may use designated agents under the Rule by six percent, to account for the estimated increased costs as a result of the amendments to issuers who use designated agents. Accordingly, the Commission now estimates an average total annual cost incurred by issuers using the services of a designated agent for the Rule prior to these amendments of $13,650,000 [FN294] and further estimates that those costs would be increased by approximately six percent as a result of the amendments, to $14,469,000.[FN295]

In the Proposing Release, the Commission also estimated that issuers would incur some cost to revise their current template for continuing disclosure agreements to reflect the proposed amendments to the Rule. The Commission stated its belief that continuing disclosure agreements tend to be standard form agreements. As it did in response to prior amendments to the Rule in 2010,[FN296] the Commission estimated that it would take an outside attorney approximately 15 minutes to revise the template for continuing disclosure agreements for the proposed amendments to the Rule.[FN297] The Commission estimated that each issuer, if it employed an outside attorney to update its template for continuing disclosure agreements, would incur a cost of approximately $100, for a one-time total cost of $2,000,000 for all issuers.[FN298] The Commission received one comment on this estimate. The commenter agreed that updating the template was "a relatively simple process," but stated that the Commission failed to account for the time spent reviewing the revised continuing disclosure agreement.[FN299] Because continuing disclosure agreements tend to be standard form agreements and because the updates required to continuing disclosure agreements by these amendments amount to simply adding the text of two additional events,[FN300] the Commission continues to believe that the estimate of 15 minutes per issuer is appropriate and accounts for the average total cost incurred by each issuer to update and review its template for continuing disclosure agreements. However, as a result of the Commission's revised estimate of issuers affected by continuing disclosure requirements under Rule 15c2-12,[FN301] the Commission now estimates a one-time total cost of $2,800,000 for all issuers.[FN302]

The Commission did not estimate any other external costs incurred by issuers as a result of the proposed amendments. Several commenters disagreed, stating that due to the proposed broad definition of financial obligation and commenters' view that

there was lack of clarity around materiality, issuers would rely, in some part, on outside counsel to assist in the monitoring, evaluating, preparing, and filing of the event notices required by the proposed amendments.[FN303] One commenter, citing those same reasons, reported that 97% of survey respondents indicated that outside counsel would be required when preparing an event notice under the proposed amendments.[FN304] Another commenter reported that it would need to "enter into new engagements with subject matter experts" to determine whether certain financial obligations needed to be disclosed under the proposed amendments.[FN305]

The Commission has considered these comments and is revising its cost estimates for issuers. As discussed in Section III.A.2., the Commission has clarified and narrowed the scope of the amendments which will substantially lessen the burden on issuers of monitoring, evaluating, preparing, and filing event notices required by the amendments to the Rule. The Commission expects that any external costs that would have been incurred by issuers under the proposed amendments would be similarly reduced by those changes. The Commission also believes that the adopted amendments, by focusing on debt, debt-like, and debt-related obligations, will reduce the need for issuers to obtain outside counsel to assist with an event notice.[FN306]

However, the Commission acknowledges that some issuers may retain outside counsel to assist in the evaluation and preparation of some of the more complex event notices as a result of the amendments to the Rule. As discussed above, the Commission estimates that the amendments will generate 2,200 additional event notices a year.[FN307] The Commission believes a reasonable estimate is that issuers may retain outside counsel on half of those event notices, 1,100, while preparing the other half solely internally.[FN308] The Commission further believes that, for those 1,100 complex event notices in which issuers and obligated persons seek assistance from outside counsel, one-half of the burden of preparation of the event notices (including time for monitoring and evaluation) will be carried by issuers internally (four hours), and the other-half of the burden will be carried by outside professionals retained by the issuer (four hours).[FN309] Thus, the Commission now estimates that issuers will incur an approximate annual total cost of $1,760,000 [FN310] to **\*44729** employ outside counsel to assist in the examination, preparation, and filing of certain event notices.

Under the amendments to Rule 15c2-12 as adopted, the total cost to issuers would be $16,229,000 annually,[FN311] with a one-time cost of $2,800,000.[FN312] Table 5 below summarizes the Commission's PRA external cost estimates for issuers in the 2015 PRA Notice (the Commission's most recent estimates prior to these amendments), the Proposing Release, and the Adopting Release.

**Table 5—Summary of PRA Cost Estimates for Issuers**

| | Annual external cost | One-time external cost |
|---|---|---|
| Estimates in 2015 PRA Notice | | |
| Issuers (that use the services of a designated agent to submit continuing disclosure documents) | $9,750,000 | n/a |
| Estimates in Proposing Release | | |
| Issuers (that use the services of a designated agent to submit continuing disclosure documents) | 10,335,000 | $0 |

| | | |
|---|---|---|
| Issuers (to update template for continuing disclosure agreements to reflect the proposed amendments) | 0 | 2,000,000 |
| Estimates in Adopting Release | | |
| Issuers (that use the services of a designated agent to submit continuing disclosure documents) | 14,469,000 | 0 |
| Issuers (to update template for continuing disclosure agreements to reflect the amendments) | 0 | 2,800,000 |
| Issuers (to hire outside counsel to assist in preparing event notices) | 1,760,000 | 0 |

## F. Retention Period of Recordkeeping Requirements

As an SRO subject to 17 CFR 240.17a-1 (Rule 17a-1 under the Exchange Act), the MSRB is required to retain records of the collection of information for a period of not less than five years, the first two years in an easily accessible place. Broker-dealers registered pursuant to Exchange Act Section 15 are required to comply with the books and records requirements of 17 CFR 240.17a-3 and 240.17a-4 (Exchange Act Rules 17a-3 and 17a-4). Participating Underwriters and dealers transacting business in municipal securities are subject to existing recordkeeping requirements of the MSRB.[FN313] The amendments to the Rule would contain no recordkeeping requirements for any other persons.

## G. Collection of Information Is Mandatory

Any collection of information pursuant to the amendments to the Rule would be a mandatory collection of information.

## H. Responses to Collection of Information Will Not Be Kept Confidential

The collection of information pursuant to the amendments to the Rule would not be kept confidential and would be publicly available.[FN314] Specifically, the collection of information that would be provided pursuant to the continuing disclosure documents under the amendments would be accessible through the MSRB's EMMA system and would be publicly available via the internet.

## V. Economic Analysis

### A. Introduction

The Commission is adopting, substantially as proposed, amendments to Rule 15c2-12 under the Exchange Act to revise the list of event notices that a Participating Underwriter in an Offering must reasonably determine an issuer or obligated person has agreed to provide to the MSRB in its continuing disclosure agreement.

As discussed above, the main difference between the Rule as proposed [FN315] and the Rule as adopted [FN316] is that the definition of financial obligation is narrower in the adopted amendments. The Commission believes that the revisions being made to the proposed definition do not qualitatively change the overall assessment of the economic impacts from the Proposing Release. While the amendments being adopted may result in a smaller increase in disclosure than the proposed amendments because of the narrower scope of the definition of financial obligation, they will still lead to an increase in disclosure compared to a baseline that consists of the existing regulatory framework for municipal securities disclosure, including Rule 15c2-12 prior to these amendments, and current relevant MSRB rules. Therefore, the economic effects of the amendments being adopted remain qualitatively consistent with those under the  **44730**  proposed amendments. More discussion on the relative costs and benefits of the two approaches and why some of the economic effects cannot be quantified follow in later sections.[FN317]

As discussed in the Proposing Release, the need for more timely disclosure of information in the municipal securities market about financial obligations is highlighted by market developments beginning in 2009 which feature the increasing use of direct placements by issuers and obligated persons as financing alternatives to public offerings of municipal securities.[FN318] According to the Consolidated Reports of Condition and Income ("Call Report") filed by financial institutions,[FN319] the dollar amount of commercial bank loans to state and local governments has nearly tripled since the financial crisis, increasing from $66.5 billion as of the end of 2010 to $190.5 billion by the end of first quarter 2018. In comparison, the dollar amount of municipal securities outstanding remained relatively flat over the same time period.[FN320]

The use of direct placements or other debt obligations may benefit issuers and obligated persons in the form of convenience or lower borrowing costs relative to a public offering of municipal securities—there is typically no requirement to prepare an offering document or obtain a credit rating, liquidity facility, or bond insurance.[FN321] On the other hand, the use of these financial obligations may negatively affect existing investors for several reasons. First, the incurred financial obligations, if material, could substantially increase or change an issuer's or obligated person's overall indebtedness and impact its liquidity and overall creditworthiness, and thereby affect the value of the municipal securities held by investors. Second, an issuer or obligated person may agree to covenants of a financial obligation that may negatively affect security holders' contractual rights. For example, the covenants could alter the debt payment priority structure of the issuer's or obligated person's outstanding securities, or pledge the assets previously available to secure the bonds to the lender, both of which could dilute existing security holders' claims or create contingent liquidity risk, credit risk, or refinancing risk. Similarly, "default, event of acceleration, termination event, modification of terms, or other similar events under the terms of a financial obligation" as included in the rule text in paragraph (b)(5)(i)(C)(16), could also impact the value of municipal securities held by investors.[FN322]

However, under the current regulatory framework, investors and other market participants may not have any access or timely access to information related to the incurrence of financial obligations and other events included in the amendments, despite their potential impact on the risks of, and returns to, municipal securities.[FN323] Moreover, to the extent information about a financial obligation is disclosed and accessible to investors and other market participants, such information currently may not include certain details about a financial obligation.[FN324] As a result, investors could be making investment decisions on whether to buy, sell or hold municipal securities without current information about an issuer's or obligated person's outstanding debt and other market participants could also be undertaking credit analyses without such information.

As described in Section III.A and the Proposing Release, numerous market participants, including the MSRB, FINRA, academics, and industry groups, have encouraged issuers and obligated persons to voluntarily disclose information about certain financial obligations.[FN325] However, despite these ongoing efforts, few issuers or obligated persons have made voluntary disclosures of financial obligations, including direct placements, to the MSRB.

The Commission is mindful of the costs imposed by and benefits obtained from its rules. In the Proposing Release, the Commission solicited comments on all aspects of the costs and benefits associated with the amendments, including any effect the Rule may have on efficiency, competition, and capital formation. The Commission has considered these comments, which are discussed in more detail in the sections below, and continues to believe that the amendments to Rule 15c2-12 will facilitate investors' and other market participants' access to more timely and informative disclosure in the secondary market about financial obligations of issuers and obligated persons. The Commission believes that more timely and informative disclosure allows investors to make more informed investment decisions and analysts to produce more informed analyses, and such disclosure can therefore enhance transparency in the municipal securities market and investor protection. The discussion below elaborates on the likely costs and benefits of the amendments and their potential impact on efficiency, competition, and capital formation.

Where possible, the Commission has attempted to quantify the costs, benefits, and effects on efficiency, competition, and capital formation that may result  **44731**  from the Rule amendments. However, the Commission is unable to quantify some of the economic effects of the amendments because many of the key variables or inputs for calculating such effects are not available. For example, the Commission is unable to reasonably estimate the scope of the improvement in pricing of municipal securities under the amendments. In order to estimate the improvement in pricing, one needs to first estimate the level of the mispricing

under both the Rule prior to these amendments and the amended Rule, and to do that requires information about the true value, or fundamental value, of securities. That fundamental value, in turn, depends on a number of factors, many of which are not observable. As one example, credit risk of the issuer or obligated person is a crucial factor in determining the value of its securities. But as already discussed, issuers and obligated persons may incur material financial obligations without disclosing them for an extended period of time under current rules. Since it is not known whether issuers and obligated persons have incurred material financial obligations and the resulting amount of debt they have outstanding, and since the terms of such financial obligations, including interest rate, maturity, and priority structure are also unknown, the Commission cannot measure the change in estimates of issuers' and obligated persons' credit risks that the Commission anticipates would result from this new information. Without robust estimates of credit risk, among other necessary inputs, it is not possible to quantify the improvement in pricing, even if it is assumed the amendments would completely eliminate mispricing.

Similarly, due to an absence of data, the Commission is unable to provide a reasonable estimate of the potential change in borrowing costs issuers or obligated persons may experience as a result of the amendments. For example, loan rate determinants include the characteristics of the issuer or obligated person (e.g., size, credit risk, etc.), loan characteristics (e.g., size of the loan, maturity, priority structure and covenants, etc.), and the issuer's or obligated person's relationship with the lenders (e.g., the length of the relationship and the number of lenders). Because of the unavailability of this information, the Commission is not able to quantify the amendments' impact on borrowing costs.

There are other factors that also limit the Commission's ability to quantify the future economic impact of the amendments. For example, recent federal tax law changes may also affect borrowing costs of issuers and obligated persons as well as investor demand for municipal debt, among other things.[FN326] Because the impacts from the changes in the federal tax laws and the amendments are likely to overlap, it may not be possible to disentangle the two. In addition, the amendments' impact may vary significantly across different issuers and obligated persons, which poses additional challenges to quantifying the amendments' effects. Additional discussion of these factors and issues on quantification follows in later sections.

### B. Economic Baseline

To assess the economic impact of the amendments to Rule 15c2-12, the Commission is using as its baseline the existing regulatory framework for municipal securities disclosure, including Rule 15c2-12 prior to these amendments, and current relevant MSRB rules.

### 1. The Current Municipal Securities Market

As discussed above and in the Proposing Release, the need for more timely and informative disclosure of financial obligations is highlighted by market developments beginning in 2009, which feature the increasing use of direct placements by issuers and obligated persons as financing alternatives to public offerings of municipal securities. Below is an overview of the current state of the municipal securities market and issuers' and obligated persons' use of direct placements based on data from the Federal Reserve Board's Flow of Funds data,[FN327] and Call Report data from the FDIC.[FN328]

According to Flow of Funds data, the notional amount of the total municipal securities outstanding in the U.S. was $3.84 trillion as of the end of the first quarter of 2018.[FN329] Prior to (and during) the 2008 financial crisis, the amount of municipal securities outstanding was increasing steadily, growing from $2.87 trillion in 2004 to a post-crisis peak of $3.94 trillion in 2010. [FN330] Since 2010, the overall size of the municipal securities market has remained flat.[FN331]

However, the involvement of commercial banks in the municipal capital markets has increased dramatically in terms of purchases of municipal securities and extensions of loans to state and local governments and their instrumentalities.[FN332] U.S. chartered depository institutions' holdings of outstanding municipal securities have grown rapidly, from 6.46% of the total outstanding (or $254.6 billion) in 2010 to 14.4% of the total outstanding (or $554.4 billion) in the first quarter of 2018, an over two-fold increase.[FN333] The fastest growth has been in direct lending to state and local governments and their instrumentalities. The dollar amount of bank loans to state and local governments has nearly tripled since the 2008 financial

crisis, increasing from $66.5 billion at the end of 2010 to $190.5 billion by the end of the first quarter of 2018, or equivalently, an increase from 1.69% of total municipal securities outstanding to 4.95%.[FN334]

The incurrence of financial obligations can result in an increase in the issuer's or obligated person's outstanding debt, negatively affecting the liquidity and creditworthiness of the issuer or obligated person and the prices of their outstanding municipal securities. However, currently, there is a lack of secondary market disclosure about these financial obligations, a topic that has been discussed by the MSRB, certain market participants, and academics.[FN335] As a result, investors and other market participants may not have access or timely access to information regarding financial obligations, and such information may not be incorporated in the prices of issuers' or obligated persons' outstanding municipal securities. As discussed in the Proposing Release, recognizing the **44732** credit implications of direct placements, at least one rating agency now requires, and other rating agencies strongly encourage, issuers and obligated persons to notify them of the incurrence of direct placements, and to provide all relevant documentation related to such indebtedness.[FN336] This rating agency also stated it may suspend or withdraw its ratings should issuers and obligated persons fail to provide such notification in a timely manner.[FN337] While such efforts can induce more disclosure and help mitigate mispricing, each rating agency would have to implement a similar process to collect the same information, and issuers and obligated persons would have to provide identical responses multiple times, which might not be an efficient way to increase disclosure in the municipal securities market.

## 2. Rule 15c2-12

As discussed above, the Commission first adopted Rule 15c2-12 in 1989 as a means reasonably designed to prevent fraud in the municipal securities market by enhancing the quality, timing, and dissemination of disclosures in the municipal securities primary market.[FN338] Currently, Rule 15c2-12, most recently amended in 2010, prohibits a Participating Underwriter from purchasing or selling municipal securities in connection with an Offering unless the Participating Underwriter reasonably determines that the issuer or obligated person has undertaken in a continuing disclosure agreement to provide the MSRB with: (1) Annual filings; (2) event notices; and (3) failure to file notices.[FN339] The Rule prior to these amendments does not impose on a Participating Underwriter any obligation to reasonably determine that an issuer or obligated person has undertaken in its continuing disclosure agreement to disclose the events covered in these amendments. As discussed in Section III.A, investors and other market participants may not learn that the issuer or obligated person has incurred a financial obligation if the issuer or obligated person does not provide annual financial information or audited financial statements to EMMA or does not subsequently issue debt in a primary offering subject to Rule 15c2-12 that results in the provision of a final official statement to EMMA.

Even if investors and other market participants have access to disclosure about an issuer's or obligated person's financial obligations, such access may not be timely if, for example, the issuer or obligated person has not submitted annual financial information or audited financial statements to EMMA in a timely manner or does not frequently issue debt that results in a final official statement being provided to EMMA. Typically, as discussed above and in the Proposing Release, investors and other market participants do not have access to an issuer's or obligated person's annual financial information or audited financial statements until several months or up to a year after the end of the issuer's or obligated person's applicable fiscal year, and a significant amount of time could pass before an issuer's or obligated person's next primary offering subject to Rule 15c2-12. [FN340]

Furthermore, to the extent the information about financial obligations is disclosed and accessible to investors and other market participants, such information currently may not include certain details about the financial obligations. Specifically, disclosure of a financial obligation in an issuer's or obligated person's financial statements may be a line item about the amount of the financial obligation, and may not provide investors and other market participants with information relating to an issuer's or obligated person's agreement to covenants, events of default, remedies, priority rights, or other similar terms of a financial obligation, any of which affect security holders, if material.[FN341]

## 3. MSRB Rules

MSRB rules do not address the disclosure of the events covered in the amendments. However, as described above and in the Proposing Release, the MSRB has highlighted the increased use of direct placements as a financing alternative.[FN342] The MSRB has encouraged issuers to voluntarily disclose direct placements on EMMA,[FN343] including providing instructions to issuers on how they may provide such disclosures using EMMA. Despite the MSRB's efforts to encourage voluntary disclosure, the number of disclosures made using EMMA has been limited.[FN344]

In March 2016, the MSRB published a regulatory notice requesting comment on a concept proposal to require municipal advisors to disclose information regarding the direct placements of their municipal entity clients to EMMA.[FN345] On August 1, 2016, the MSRB announced that it had decided not to pursue the ideas set forth in the MSRB Request for Comment. Many who commented on the MSRB's Request for Comment stated that the best way to ensure disclosure of direct placements is to amend Rule 15c2-12.[FN346]

### 4. GASB Statement No. 88

GASB released in April 2018 Statement No. 88, Certain Disclosures Related to Debt, including Direct Borrowings and Direct Placements.[FN347] In issuing the guidance, GASB stated the "guidance [is] designed to enhance debt-related disclosures in notes to financial statements, including those addressing direct borrowings and direct placements." [FN348] GASB Statement No. 88 states "[t]he primary objective of this Statement is to improve the information that is disclosed in notes to government financial statements related to debt, including direct borrowings and direct placements. It also clarifies which liabilities governments should include when disclosing information related to debt. This Statement defines debt for purposes of disclosure in notes to financial statements. . . ." [FN349]

GASB Statement No. 88 also "requires that additional essential information related to debt be disclosed in notes to financial statements, including unused lines of credit, assets pledged as collateral for the debt, and terms specified in debt agreements related to significant events of default with finance-related consequences, significant termination events with finance-related consequences, and significant subjective accelerations clauses." [FN350]

As discussed more fully above, although GASB Statement No. 88 could result in the disclosure of more information related to debt disclosed in issuers' or obligated persons' audited financial statements consistent with that **\*44733** under new paragraph (b)(5)(i)(C)(15) of the Rule, the new guidance does not improve the timeliness of the disclosure investors and market participants will receive, nor does it cover the events under paragraph (b)(5)(i)(C)(16) of the Rule.[FN351] Additionally, currently, not all state and local governments follow GASB standards for their annual financial reports.[FN352]

### 5. Federal Tax Law Changes

Recent changes to federal tax laws [FN353] could impact, or may have already impacted, the municipal securities market in several ways. First, because the new law caps the state and local tax deduction allowed to be taken on an individual federal income tax return, the law may increase the demand for tax-free investments such as municipal bonds, driving up bond prices and driving down bond yields.[FN354]

Second, a decline in the federal corporate income tax rate may increase the interest rates on issuers' or obligated persons' direct placements, reducing the demand for direct placements. Prior to the changes in the federal tax law, municipal issuers and obligated persons enjoyed lower interest rates than their corporate counterparts in part because banks benefitted from tax-free interest income. The reduction in the corporate income tax rate diminishes the relative benefit for the municipal tax exemption, making direct placements less attractive.[FN355] In addition, as discussed above, interest rates on issuers' and obligated persons' direct placements may also increase as a result of certain provisions being triggered by the reduction in the federal corporate income tax rate,[FN356] reducing the demand for direct placements.

Third, as discussed above, because the new tax law eliminated state and local governments' ability to use tax-exempt bonds to advance refund outstanding bonds, some issuers and obligated persons may be incentivized to use complex strategies and

derivative products to refund outstanding bond issues,[FN357] potentially increasing these issuers' and obligated persons' credit risk.

**6. Existing State of Efficiency, Competition, and Capital Formation**

Under current rules, certain inefficiencies may arise in the municipal securities market as a result of the lack of timely disclosure of information on important credit events. As discussed above and in the Proposing Release, currently investors and other market participants may not learn about the new information related to the issuer's or obligated person's financial obligations for months or over a year after the end of the issuer's or obligated person's fiscal year. Since the market is not able to incorporate into prices the most recent credit risk information about issuers and obligated persons, the securities offered by issuers or obligated persons of different credit risks could be priced identically. For example, all else equal, an issuer or obligated person that incurs a large amount of undisclosed financial obligations may be more likely to default on its payment obligations than one that does not. However, in the absence of public disclosure, market participants could assign the same price to both issuers' or obligated persons' securities. Mispricing on the basis of undisclosed risks could lead to inefficiency in the allocation of financial resources across high- and low-risk issuers and obligated persons.

Rule 15c2-12 prior to these amendments may create competitive advantages for certain market participants. As discussed above and in the Proposing Release, because the market might not be able to differentiate securities offered by high-risk issuers and obligated persons from those offered by low-risk issuers and obligated persons because of lack of disclosures under Rule 15c2-12 prior to these amendments, low-risk issuers and obligated persons could be subject to disadvantages if they are unable to credibly demonstrate to market participants that they are low-risk. As another example, municipal securities investors are also in a disadvantageous position relative to private lenders. As discussed above and in the Proposing Release, the terms of a financial obligation incurred by an issuer or obligated person may include covenants that alter the debt payment priority structure of the issuer's or obligated person's outstanding securities, or give the lender a lien on assets or revenues that were previously pledged to secure repayment of an issuer's or obligated person's outstanding municipal securities, effectively diluting existing security holders' claims and adversely affecting their contractual rights without their knowledge. In the Commission's view, the existence of these scenarios does not represent a fully competitive market.

The price inefficiencies in the municipal securities market and the disparity in available information for different types of investors could result in inefficient allocation of capital. For example, as mentioned above, the inability of the market to differentiate high-risk issuers or obligated persons from low-risk ones could lead to a mismatch of investors to securities appropriate for their risk preferences, leading to suboptimal allocation of capital.

*C. Benefits, Costs and Effects on Efficiency, Competition, and Capital Formation*

The Commission has considered the potential costs and benefits associated with the amendments and the comments received regarding the proposed amendments.[FN358] The Commission continues to believe that the primary economic benefits of the amendments stem from the potential improvement in the timeliness and informativeness of municipal securities disclosure. The Commission believes that the Rule 15c2-12 amendments will facilitate investors' access to more timely and informative disclosure, help investors make more informed investment decisions, and enhance investor protection. The Commission also believes that improved disclosure can assist other market participants, including rating agencies and municipal securities analysts, in providing more accurate credit ratings and credit analyses as they will have more timely **\*44734** access to information regarding an issuer's or obligated person's outstanding debt. Disclosure that is both more timely and informative can positively affect efficiency, competition, and capital formation.

At the same time, the Commission continues to recognize that the amendments will introduce costs to relevant parties, including issuers, obligated persons, dealers, and lenders. However, it is the Commission's belief that the costs are justified in light of the benefits. A discussion of the economic costs and benefits of the amendments, including the effects on efficiency, competition, and capital formation, is set forth in more detail below.

**1. Anticipated Benefits of Rule 15c2-12 Amendments**

**i. Benefits to Investors**

The Commission believes that these amendments may yield several benefits to municipal securities investors. First, the amendments will facilitate investors' access to more timely and informative disclosures about an issuer's or obligated person's financial obligations, and thereby assist them in making more informed investment decisions when trading in the secondary market.

As discussed in the Proposing Release, the information regarding the events described in the amendments is relevant for investors' investment decision making. For example, the incurrence of a financial obligation that results in an increase or change in an issuer's or obligated person's outstanding debt may impact the issuer's or obligated person's liquidity and overall creditworthiness. For another example, an agreement to covenants, events of default, remedies, priority rights, or other similar terms of a financial obligation, any of which affect security holders, may result in, among other things, contingent liquidity and credit risks that potentially impact the issuer's or obligated person's liquidity and overall creditworthiness and reduce value for existing security holders.[FN359] The occurrence of a default, event of acceleration, termination event, modification of terms, or other similar event under terms of a financial obligation of the issuer or obligated person, any of which reflects financial difficulties, could provide relevant information regarding whether the financial condition of the issuer or the obligated person has changed or worsened, and whether the issuer or obligated person has agreed to new terms that would provide the counterparty with superior rights to assets or revenues that were previously pledged to existing security holders.[FN360] All these events contain relevant information about the underlying risk of a municipal security, and can have a direct impact on its pricing. Without such information, the prices of municipal securities could be distorted from their fundamental value in both the primary and secondary markets.

However, currently, investors and other market participants may not have any access or timely access to information related to the incurrence of financial obligations and other events included in the amendments. For example, investors and other market participants may not learn of these events if the issuer or obligated person does not provide annual financial information or audited financial statements to EMMA or does not subsequently issue debt in a primary offering subject to Rule 15c2-12 that results in the provision of a final official statement to EMMA. Further, even if investors and other market participants have access to disclosure about these events, such access may not be timely if, for example, the issuer or obligated person has not submitted annual financial information or audited financial statements to EMMA in a timely manner or does not frequently issue debt that results in a final official statement being provided to EMMA. Typically, as discussed above and in the Proposing Release, investors and other market participants do not have access to an issuer's or obligated person's annual financial information or audited financial statements until several months or up to a year after the end of the issuer's or obligated person's applicable fiscal year, and a significant amount of time could pass before an issuer's or obligated person's next primary offering subject to Rule 15c2-12.

Moreover, to the extent the information about financial obligations is disclosed and accessible to investors and other market participants, such information currently may not include certain details. Specifically, the disclosure may include only the existence of the financial obligation that the issuer or obligated person has incurred, but not specified material terms of the financial obligation that can affect security holders, including those terms that, for example, affect security holders' priority rights. Therefore, existing security holders could be making investment decisions without the knowledge that the value of the securities and their contractual rights have been adversely impacted, and potential investors could be buying these securities at an inflated price. As such, the current level of disclosure regarding an issuer's or obligated person's financial obligations is neither timely nor adequately informative.

To the extent that investors in the municipal securities market rely on credit ratings as a meaningful indicator of credit risk, the recent efforts of certain credit rating agencies to collect information from issuers and obligated persons about the incurrence of direct placements may help improve the accuracy of credit ratings and mitigate potential mispricing in the municipal securities market.[FN361] However, because not all credit rating agencies require information on direct placements to provide a rating,

and there are other undisclosed financial obligations and significant events (such as defaults) that may affect the issuers' and obligated persons' creditworthiness besides the incurrence of financial obligations, such efforts alone are unlikely to remove all potential mispricing related to direct placements.

Under the amendments to Rule 15c2-12, Participating Underwriters in an Offering are required to reasonably determine that an issuer or obligated person has agreed in its continuing disclosure agreement to provide notices for the new events within ten business days. Consequently, pursuant to the amendments, municipal securities investors and other market participants will have access to the specified disclosures within ten business days as opposed to waiting for the issuer's or obligated person's next primary offering subject to Rule 15c2-12, waiting for the release of annual financial information or audited financial statements, or having no access to such information at all. In addition, the event notices generally should include a description of material terms of the financial obligations, which might include the date of incurrence, principal amount, maturity and amortization, interest rate, if fixed, or method of computation, if variable (and any default rates),[FN362] so the disclosures provided to the MSRB should be informative about not just the existence of the incurred financial obligation, but generally should also include additional details about the **\*44735** incurred financial obligation. More timely and informative disclosure can help reduce mispricing in the municipal securities market, and allow investors to make more accurate assessments of the risks associated with their investments, and ultimately allow them to make more informed investment decisions.[FN363]

Second, more timely and informative disclosures may reduce the information disadvantage investors have relative to other more informed parties such as issuers, obligated persons, counterparties, and lenders, and enhance their protection. As discussed above and in the Proposing Release, for example, a bank loan agreement could alter the debt payment priority structure of the issuer's or obligated person's outstanding securities, or give the lender a lien on assets or revenues that also secure the repayment of an issuer's or obligated person's outstanding municipal securities, diluting existing security holders' claims and adversely affecting their contractual rights. However, under the Rule prior to these amendments, existing security holders may not learn about such events and may therefore be unable to take any actions they might have taken had they been informed, such as exiting their position. More timely and informative disclosure of the events covered in the amendments should promote a fairer information environment that allows current investors to monitor whether their contractual rights have been negatively impacted by undisclosed financial obligations and take appropriate actions.

### ii. Benefits to Issuers or Obligated Persons

In the Proposing Release, the Commission discussed that the amendments would benefit issuers and obligated persons because greater transparency regarding an issuer's or obligated person's financial obligations might lead to a decrease in borrowing costs, particularly the costs associated with their public debt. One comment the Commission received urged the Commission to further study borrowing costs, because the commenter asserted that the Commission "does not genuinely address systemic increased borrowing costs that may result from this rule." [FN364] The Commission discussed the potential for increased borrowing costs in its proposal for amendments to Rule 15c2-12.[FN365]

As discussed in the Proposing Release, in the context of corporate disclosure, economic theories suggest information asymmetry can lead to an adverse selection problem and reduce the level of liquidity.[FN366] In an asymmetric information environment, uninformed investors recognize that they may be disadvantaged when trading with privately or better informed counterparties, and therefore either price-protect or exit the market to minimize possible losses from trading under such circumstances. Both of these actions can reduce the liquidity in the corporate securities market. Because illiquidity and high bid-ask spreads impose transaction costs on investors, and investors demand compensation for the transaction costs they bear, high illiquidity and information asymmetry lead to high cost of capital.[FN367] Therefore, by committing to increased levels of disclosure, a firm can reduce information asymmetry, and thereby mitigate the risk of adverse selection faced by investors and the discount they demand, and ultimately decrease the firm's cost of capital. The arguments linking information asymmetry and adverse selection to cost of capital apply to financial markets more generally. In particular, the Commission believes that a similar analysis can be applied to municipal securities, and therefore, the amendments should result in greater municipal securities disclosures and may decrease the cost of public debt for issuers and obligated persons.

The Commission continues to believe that the additional disclosures are likely to reduce borrowing costs for issuers or obligated persons. The Commission has further examined academic studies on the relationship between disclosures and municipal borrowing costs in light of commenter concerns. While relatively limited, most of the available studies on disclosure and municipal borrowing costs provide evidence that more disclosure regulation or stringent accounting and auditing requirements are associated with lower municipal borrowing costs. This literature also supports the Commission's view that disclosure reduces information asymmetry and the cost of capital.[FN368]

Also in response to the commenter's concern, the Commission further considered the amendments' impact on the cost of issuers' and obligated persons' private debt, including direct placements and other financial obligations. As discussed in the Proposing Release, the amendments should promote competition for investment opportunities between municipal securities investors and private lenders by reducing information asymmetry.[FN369] Accordingly, it is possible that increased disclosure from municipal issuers and obligated persons may result in lower costs of privately placed debt for them. Additionally, the potential decrease in the cost of public debt as a result of the amendments could also put competitive pressure on loan pricing, and drive down the cost of private debt including direct placements and other financial obligations. Limited existing research on the cost of private debt finds that companies that consistently make detailed, timely, and informative disclosures face lower interest costs on private debt contracts.[FN370] Other publicly available information such as auditor assurance is also shown to be used by private lenders to determine loan rates.[FN371] These findings suggest that, despite lenders' ability to gather private information **\*44736** from borrowers, they still incorporate the quality of a company's disclosure in their estimation of its default risk, a primary determinant of loan pricing.[FN372]

Overall, the Commission believes that the amendments could benefit issuers and obligated persons by reducing the cost of both publicly issued and privately placed debt including direct placements and other financial obligations. The Commission also recognizes that borrowing costs could increase in some cases as a result of the amendments, which would constitute a cost to issuers and obligated persons. More discussion on the cost and overall impact of the amendments will be provided in a later section.[FN373]

### iii. Benefits to Rating Agencies and Municipal Analysts

The Commission continues to believe that the amendments will help rating agencies and municipal analysts gain access to more updated information about the issuer's and obligated person's credit and financial position at a lower cost. As discussed in the Proposing Release, rating agencies and municipal analysts have stated on a number of occasions that direct placements can have credit implications for ratings on an issuer's or obligated person's outstanding municipal securities.[FN374] Rating agencies must expend resources to collect information about financial obligations including direct placements to provide more accurate ratings. One rating agency stated that it would suspend or withdraw ratings if issuers or obligated persons do not provide such notification in a timely manner.[FN375] The process for suspending or withdrawing ratings could also be costly for a rating agency.[FN376] The amendments may reduce the need for rating agencies or analysts to separately implement a process to gain more timely access to the information regarding issuers' and obligated persons' financial obligations. Therefore, under the amendments, rating agencies and municipal analysts may have access to information they need to produce more accurate credit ratings and analyses at a lower cost. A portion of any cost savings may be passed through to investors and represent a benefit to them depending on how much they rely on rating agencies for information.

### 2. Anticipated Costs of the Rule 15c2-12 Amendments

### i. Costs to Issuers and Obligated Persons

The Commission expects that, under the amendments, issuers and obligated persons will experience an increase in administrative costs from undertaking in their continuing disclosure agreements to produce the additional event notices. As discussed above, [FN377] an advantage of a direct placement versus a public offering of municipal securities is the lower costs because, among other things, there is no requirement to prepare a public offering document for the borrowing transaction. Under the amendments, Participating Underwriters in Offerings will be required to reasonably determine that issuers or obligated persons

have undertaken in a continuing disclosure agreement to submit event notices to the MSRB within ten business days of the events. Issuers and obligated persons providing notices in a manner consistent with the amendments will incur a cost to do so.

As discussed in Section IV.D.2 and Section IV.E.2, after carefully considering the comments received, the Commission is revising certain estimates of the annual paperwork burden and related cost for all issuers and obligated persons.[FN378] According to these new estimates, the Commission currently anticipates that issuers and obligated persons will incur an annual total cost of $4,928,000 in the preparation of additional event notices.[FN379] The Commission also estimates that issuers and obligated persons will incur an additional estimated annual cost of $819,000 in fees for designated agents to assist in the submission of event notices.[FN380] In addition, the Commission estimates that each issuer or obligated person, if it employs an outside attorney to update its template for continuing disclosure agreements, will incur a cost of approximately $100, for a one-time total cost of $2,800,000 for all issuers and obligated persons.[FN381]

Another area of inquiry is the potential of the amendments and resulting disclosures to increase the cost of financial obligations for issuers and obligated persons. In response to the comment mentioned above,[FN382] the Commission has also further considered whether borrowing costs may increase under the amendments. As discussed above and in the Proposing Release, currently, an issuer or obligated person may agree to provide superior rights to the counterparty in assets or revenues that were previously pledged to existing security holders when they incur a financial obligation without disclosing this information to the public. Public disclosure of such arrangements under the amendments, therefore, could potentially reduce opportunities for lenders to move ahead in the priority queue either because issuers and obligated persons are discouraged from providing lenders with priority at the current level, or because investors demand covenants which prevent issuers and obligated persons from doing so and reduce the benefits lenders currently enjoy. Currently, while investors may also claim their rights under the covenants, they may not be aware that their rights have been affected without the disclosures, and therefore may fail to make such claims.

In addition, as also discussed above and in the Proposing Release, existing banking literature suggests that lenders develop proprietary information about the borrower during a lending relationship because they actively engage in information gathering and **\*44737** monitoring.[FN383] Lenders and borrowers tend to form stable relationships, and such stability provides economies of scale for the lenders to offset the costly information production and monitoring and benefits the borrowers by increasing the availability of financing and lowering overall borrowing costs.

Therefore, to the extent that the disclosure of material terms of financial obligations may reduce lenders' information advantage, there could be incentive for lenders to increase loan rates as a way of compensating for the lost benefit. However, as stated above, the amendments do not specify or dictate the form and content of the disclosure.[FN384] Therefore, the level of disclosure's impact on the lending relationship and rate will depend partly upon the amount of the disclosure issuers and obligated persons actually provide in their event notices. The Commission also notes that, regardless of the amount of the increase in disclosure, lenders' information advantage over other investors still remains because of the very nature of the lending business—lenders actively engage in information gathering and monitoring of the borrowers and develop proprietary information in the course of the lending relationship, and the loans they make are likely to remain senior to other obligations in the debt priority queue because of the lending relationship they form.[FN385] The amendments' impact on existing lending relationships thus may be limited.

One commenter expressed concerns over "the systemic increased borrowing costs that may result from this rule could drastically affect [the] entire municipal direct placement market and possibly shut many smaller actors out of the market completely." [FN386] The Commission has carefully considered the comment and further assessed the amendments' likely effects on issuers' and obligated persons' borrowing costs. While the Commission recognizes that the amendments may potentially increase the cost of private debt including direct placements and other financial obligations as discussed above, it has also identified and elaborated on, in prior sections, the multiple forces that could drive down the borrowing costs as a result of the increased disclosure, and potentially offset the cost increases posited by the commenter.[FN387] As stated above, the increase in disclosure could decrease the information asymmetry in the market and therefore the cost of public debt.[FN388] Also as stated above, cheaper public debt may drive down the cost of private debt including direct placements and other financial obligations,

because lenders may consider offering lower rates in order to stay competitive.[FN389] Moreover, as discussed before, existing empirical research does not provide evidence that disclosure increases the cost of the privately placed debt, at least in the case of corporate debt.[FN390] Therefore, the Commission believes that the increase in disclosure would not necessarily lead to an increase in borrowing costs for issuers and obligated persons when the countervailing effects of the amendments are viewed in totality. The Commission continues to believe that there is a greater likelihood for the overall borrowing costs to decrease than increase.

Regarding the commenter's concern on the amendments' impact on small issuers and obligated persons, the Commission recognizes that certain small issuers and obligated persons that are particularly reliant on private debt including direct placements or other financial obligations may choose to stay out of the public debt market should they find the additional disclosure becomes too burdensome or costly; however, the amendments should not significantly affect their ability to borrow in the private market given that this has been their primary funding source. Therefore, the Commission disagrees with the commenter's assessment that amendments' impact on the municipal direct placement market may "possibly shut many smaller actors out of the market completely." [FN391]

Currently, the Commission is unable to provide reasonable estimates of the potential change in borrowing costs as a result of the amendments. The same comment also expressed concern that the Commission's attempts to quantify the amendments' potential impact on borrowing costs may be insufficient.[FN392] The Commission has carefully considered the comment. However, our assessment remains unchanged for several reasons.

First, issuers' and obligated persons' borrowing costs include two components—the cost of public debt and the cost of privately placed debt including direct placements and other financial obligations. Both types of costs may vary significantly depending on a number of factors. For example, yields for municipal bonds offered to the public are affected by, among other things, the size of the issuance, credit rating, underwriter reputation, maturity and credit enhancement for bonds. Loan rate determinants include the characteristics of the issuer or obligated person (e.g., size, credit risk, etc.), loan characteristics (e.g., size of the loan, maturity, priority structure and covenants, etc.), and the issuer's or obligated person's relationship with lenders (e.g., the length of the relationship and the number of lenders). While some of these loan rate determinants are observable, many are not readily available or are unobservable, such as loan level characteristics and issuers' or obligated persons' relationship with lenders. Without such information, we are unable to provide a reasonable estimate on how much borrowing costs may increase or decrease. In addition, as discussed above, the increase in disclosure may have both increasing and decreasing effects on borrowing costs.

Second, the amendments' impact on borrowing costs may vary significantly across different types of issuers or obligated persons. For example, under the current Rule, securities issued by issuers or obligated persons that have incurred a significant amount of previously undisclosed financial obligations may be priced the same by the market as those that did not incur such undisclosed financial obligations. However, if these financial obligations were incurred after the implementation of the amendments, the enhanced disclosure would allow the market to incorporate the credit risk information and differentiate the two types of issuers or obligated persons when pricing their outstanding securities. As a result, all else equal, the issuers or obligated persons that incurred financial obligations could experience an increase in borrowing costs (e.g., bond yields) while those that did not incur financial obligations may not. Similarly, the amendments may also have a **\*44738** differential impact on borrowing costs for issuers or obligated persons depending on their level of reliance on private borrowing. Issuers or obligated persons that are more reliant on private borrowing may experience less benefit or more cost than those that are not. For example, if some issuers or obligated persons are mostly funded by private debt, including direct placements and other financial obligations, and have few public bond issuances outstanding, they may disclose more information regarding their financial obligations under the amendments, assuming they keep the same borrowing pattern or debt structure, but may have little to gain from reductions in the cost of issuing public debt, if any, associated with their disclosures. On the other hand, if issuers or obligated persons are primarily funded by public debt, their compliance costs under the amendments will be relatively lower because they incur fewer financial obligations, while the potential benefit from the decrease in the cost of public debt would be larger. To the extent that this difference in funding structure could be particularly the case for small and large issuers and obligated persons,[FN393] they

may be impacted differentially by the amendments. Again, we are unable to estimate the impact on borrowing costs because of the unavailability of loan-level data. In addition, borrowing costs could also depend on the actual level of the disclosure issuers or obligated persons committed themselves to provide under their continuing disclosure agreements, which could vary significantly across issuers and obligated persons.

Finally, recent changes to federal tax laws [FN394] may also impact the borrowing costs of issuers and obligated persons in ways that complicate assessment of the likely impacts of the amendments on borrowing costs in the future when certain data (e.g., bond yields) become available. As discussed above,[FN395] on one hand, because the new law caps the state and local tax deduction allowed to be taken on an individual federal income tax return, the law may increase the demand for tax-free investments such as municipal bonds, driving up bond prices and driving down yields.[FN396] On the other hand, as also discussed above, a decline in the federal corporate income tax rate may increase the interest rates on issuers' or obligated persons' direct placements because of the diminished relative benefit for the municipal tax exemption as well as certain gross-up provisions being triggered.[FN397] Because the impacts from the tax law changes and the amendments are likely to overlap, it may not be possible to disentangle the two.

### ii. Costs to Dealers

Pursuant to Rule 15c2-12, a dealer acting as a Participating Underwriter in an Offering has an existing obligation to contract to receive the final official statement.[FN398] The final official statement includes, among other things, a description of any instances in the previous five years in which the issuer or obligated person failed to comply, in all material respects, with any previous undertakings in a written contract or agreement to provide certain continuing disclosures.[FN399] Dealers acting as Participating Underwriters in an Offering also have an existing obligation under Rule 15c2-12 to reasonably determine that an issuer or obligated person has undertaken in its continuing disclosure agreement, for the benefit of holders of the municipal securities, to provide notice to the MSRB of specified events. In addition, dealers are prohibited under Rule 15c2-12 from recommending the purchase or sale of municipal securities unless they have procedures in place that provide reasonable assurance that they will promptly receive event notices and failure to file notices with respect to the recommended securities. Dealers typically use EMMA or other third party vendors to satisfy this existing obligation.

As a practical matter, dealers' obligations under the Rule 15c2-12 amendments will include verifying that the continuing disclosure agreement contains an undertaking by the issuer or obligated person to provide the additional event notices to the MSRB, verifying whether the issuer or obligated person has complied with its prior undertakings, and verifying whether the final official statement includes, among other things, an accurate description of the issuer's or obligated person's prior compliance with continuing disclosure obligations.

As discussed in Section IV.D.1, the Commission is revising its estimate of the one-time and annual burden on dealers.[FN400] Meanwhile, the Commission continues to believe that dealers would not incur any additional external costs and that the task of preparing and issuing a notice advising the dealer's employees about the amendments is consistent with the type of compliance work that a dealer typically handles internally.[FN401] Based on the new estimates, as a result of the amendments, dealers would incur an annual internal compliance cost of $5,366,880 for the first year, and $4,916,880 in subsequent years.[FN402]

### iii. Costs to Lenders

Under the amendments, lenders may incur costs stemming from the disclosure about financial obligations and the terms of the agreements creating such obligations. As discussed above and in the Proposing Release, lenders may enjoy certain priority rights in these financial arrangements which may not be publicly disclosed or reflected in the price of the issuer's or obligated person's outstanding municipal securities. However, as discussed above, while the increased level of disclosure may reduce lenders' information advantage over other investors, it does not eliminate this advantage because private lenders such as banks actively engage in information gathering and monitoring of borrowers and thus develop proprietary information during the lending relationship. Disclosure is also unlikely to alter the lender's senior status in the debt priority queue. To the extent that the benefits from a previously undisclosed financial arrangement are reduced by the increased disclosure, lenders will incur

a cost, but such a cost translates into benefits to investors, because the benefit originally accrued to lenders at the expense of investors in municipal securities.

In addition, since the amendments may decrease the costs incurred by issuers and obligated persons in connection with the issuance of public debt and increase the demand for public issuance, lenders may experience reduced investment opportunities, or may have to decrease loan rates in order to stay competitive, either of which **\*44739** could generate a cost to them. However, the Commission does not believe the amendments will significantly alter the composition of the existing municipal debt market. While some issuers and obligated persons, seeing the cost of public debt decrease, may have incentives to increase public issuance, issuers and obligated persons that are heavily reliant on direct placements may see the increase in disclosure as more costly than the benefit from the reduced cost of public debt, and therefore choose to use private debt exclusively. For reasons similar to those discussed above, the Commission is unable to quantify the amendments' impact on lenders because of the lack of data on loan characteristics and lending relationships.

### iv. Costs to the MSRB

The Rule 15c2-12 amendments will increase the type of event notices submitted to the MSRB which may result in the MSRB incurring costs associated with such additional notices. As discussed in Section IV.D.3, after further discussion with the MSRB, the Commission is revising its burden estimate for the MSRB to implement the necessary modifications to EMMA.[FN403] According to the MSRB, the total estimated one-time cost to the MSRB of updating EMMA would be $91,358.[FN404]

### 3. Effects on Efficiency, Competition, and Capital Formation

The Rule 15c2-12 amendments have the potential to affect efficiency, competition, and capital formation by improving the timeliness and informativeness of municipal securities disclosure and reducing information asymmetry in the market.

As discussed above and in the Proposing Release, lack of disclosure can lead to information asymmetry and mispricing. When the market is not able to incorporate the most recent credit risk information about issuers and obligated persons in the pricing of municipal securities, such prices will not reflect the true risk associated with any particular security. The securities offered by low-risk issuers or obligated persons could be undervalued and the ones offered by high-risk issuers or obligated persons overvalued, and investors may not be able to distinguish between the two.[FN405] Moreover, as stated in the Proposing Release, the inability of the market to differentiate the high-risk and low-risk issuers and obligated persons could create incentives for some high-risk issuers or obligated persons to further exploit the mispricing by incurring more financial obligations because it is relatively cheaper than a public offering, a scenario that may sustain or even amplify the market inefficiency. Because we believe the amendments will facilitate investors' and other market participants' access to more timely and informative disclosure about financial obligations of issuers and obligated persons, we also believe that as the credit risk information gets incorporated in the pricing of municipal securities in a more timely manner, the level of mispricing will be mitigated, and the municipal securities market will become more efficient.[FN406]

In addition, as we have also discussed before, at least one rating agency currently requires issuers and obligated persons to provide notification and documentation of the incurrence of certain financial obligations, including direct placements, in order to maintain their credit ratings, a process that may involve duplicative costs, because each rating agency would have to implement a similar process to collect the same information, and issuers and obligated persons would have to provide identical responses multiple times.[FN407] Therefore, the amendments may improve efficiency in the disclosure process by eliminating such potential duplicative costs.

The Commission also believes that by potentially reducing information asymmetries between municipal securities investors and other more-informed market participants, including issuers, obligated persons and lenders, the Rule 15c2-12 amendments can promote competition in the municipal debt market. One commenter expressed concern that disclosure of pricing terms of loans in ten business days may "set an unrealistic expectation among other obligated persons as to the appropriate pricing for their direct purchase loan transactions" and early disclosures may have an "anti-competitive" effect that may increase pricing

by setting a "benchmark" for certain transactions.[FN408] The Commission disagrees with this comment, and believes that, on balance, disclosing pricing terms should inform issuers and obligated persons about the approximate lending rate in the market. [FN409] Such disclosure adds to the information lenders, issuers, and obligated persons can use in their negotiations and should help promote competition among suppliers of capital.

The Commission also stated in the Proposing Release that more timely and informative disclosure could reduce a lender's competitive advantage over municipal securities investors under the Rule prior to these amendments, and facilitate competition for investment opportunities in the municipal debt market.[FN410] Currently, for example, a bank loan agreement could give the lender a lien on assets or revenues that were previously pledged to secure repayment of an issuer's or obligated person's outstanding municipal securities, effectively diluting the cash flow claims of existing security holders and adversely affecting their contractual rights. However, existing security holders may not learn about such events and therefore would be unable to take any action. Accordingly, the Commission continues to believe that the amendments will promote a fairer, more efficient, and more competitive municipal securities market.

In addition, the amendments to Rule 15c2-12 may also promote competition among issuers or obligated persons looking for funding. For example, all else equal, the issuers or obligated persons that have incurred a large amount of undisclosed financial obligations are likely to be riskier than those that have not. However, under the Rule prior to these amendments, **\*44740** securities offered by issuers or obligated persons with different levels of credit risks may be priced identically by the market due to the lack of disclosure, placing more creditworthy issuers and obligated persons at a competitive disadvantage. Since the increase in disclosure could improve pricing efficiency and reduce mispricing, the amendments may promote competition for capital among issuers and obligated persons.

The Commission continues to believe that the Rule 15c2-12 amendments can help facilitate capital formation by improving market efficiency and liquidity. As illustrated by the example above, mispricing and market inefficiencies can lead to a situation where the securities offered by the high-risk issuers and obligated persons—those that incurred a large amount of undisclosed financial obligations—are priced identically to those offered by the low-risk issuers and obligated persons. The inability to differentiate the two types of investment opportunities by the market could lead to underinvestment in the low-risk securities and overinvestment in the other, leading to suboptimal allocation of capital. By increasing the timeliness and informativeness of disclosure, the amendments can reduce mispricing in the market and thus reduce potential for price inefficiencies, resulting in improved allocation of capital.

More timely and informative disclosure could also improve market liquidity and therefore facilitate capital formation. According to academic research, disclosure policy influences market liquidity because uninformed investors, concerned about asymmetric information, price protect themselves in their securities transactions by offering to sell at a premium or buy at a discount. This price protection could be manifested in higher bid-ask spreads could lead to reduced market liquidity.[FN411] Therefore, by reducing information asymmetry in the municipal securities market, the amendments can potentially improve liquidity in the municipal market, which could allow capital to be better deployed at an aggregate level and result in more efficient capital allocation. Additionally, as the municipal securities market becomes more transparent, and as investors become aware of stronger protections, they may be more likely to participate in the municipal securities market as a result. Therefore, to the extent that increased participation in the municipal securities market reflects new investment, as opposed to substitution away from other securities markets, enhanced disclosure could also positively affect capital formation.

### D. Alternative Approaches

In addition to the Rule 15c2-12 amendments, the Commission has considered several reasonable alternatives, which are discussed below.

### 1. Voluntary Disclosures

Instead of these amendments, the Commission could encourage issuers and obligated persons to voluntarily disclose on an ongoing basis the new events covered in the amendments. A number of commenters recommended the Commission further explore this approach. For example, one commenter challenged the Commission's characterization of the existing level of the voluntary disclosure as limited, arguing that such conclusion was "hastily" drawn and recommended further exploration of voluntary disclosure.[FN412] Another commenter pointed out that the volume of the voluntary disclosure has increased since the MSRB introduced the new EMMA features in September 2016 to facilitate filings, arguing that the Commission understated the efficacy of voluntary reporting and suggested postponing the amendments for a two-year period to allow for voluntary disclosure to continue to develop or encourage undertakings to include voluntary commitments.[FN413] While the Commission recognizes that the level of the voluntary disclosure has increased since the new EMMA features were introduced and the Proposing Release was issued, the level of the bank loans to state and local governments has also increased since the estimate set forth in the Proposing Release—from $153.3 billion at the end of 2015 to $190.5 billion at the end of first quarter 2018, a 24% increase. In addition, many of the disclosures provided to EMMA come from a relatively small number of issuers or obligated persons. Therefore, the increase is not uniformly distributed across issuers or obligated persons. Though the Commission recognizes the potential for the level of voluntary disclosure to continue to increase, it believes it is unrealistic to assume that it would reach the same level of disclosure as under these amendments as the commenter suggested.[FN414]

While the Commission recognizes the benefits of voluntary disclosure for issuers and obligated persons, we continue to believe that voluntary disclosure alone is not sufficient for the level of investor protection the amendments are designed to achieve. The current level of the voluntary disclosure of issuers' and obligated persons' financial obligations is not sufficient, and that is why, as discussed in Section II, municipal market participants, the MSRB, and industry groups have made continuous efforts to elicit more disclosure.[FN415] It is unclear that any efforts to encourage voluntary disclosure on the Commission's part would provide greater incentives for issuers or obligated persons to disclose than these existing voluntary measures. Therefore, as discussed above, the Commission believes it is unlikely that the voluntary disclosure would reach the same level of timeliness and informativeness as the disclosure under the amendments is designed to achieve.

## 2. Alternative Timeline

Issuers and obligated persons could be provided additional time (e.g., 15 days, 30 days, etc.) beyond the ten business day requirement that currently applies to the disclosure of material events under the Rule to provide additional event notices resulting from the amendments to the MSRB. Under the amendments, the new event notices must be provided to the MSRB in a timely manner not in excess of ten business days after the occurrence of the event.

As discussed in Section II and Section III.1.i.c, commenters were concerned that ten business days was not enough time to disclose material financial obligations. The Commission is adopting a narrower definition of "financial obligation" than proposed, which will reduce the burden on issuers, obligated persons, and dealers by significantly limiting the number of transactions that they will need to identify and assess for materiality. The narrower definition could partially alleviate this concern.

 *44741   Under the alternative timeline approach, issuers' and obligated persons' operational burden could be slightly reduced but their substantive obligation to provide disclosure would remain. Moreover, investors and other market participants would receive less timely disclosure. The alternative would thus provide investors with less protection, and the market would not operate as efficiently as it might be under the amendments.

## 3. Relief for Small Issuers and Obligated Persons

As discussed above,[FN416] to the extent that some small issuers and obligated persons could be more reliant on private debt than public debt,[FN417] these issuers or obligated persons may experience significantly more disclosure-related costs, while incurring a relatively smaller benefit from a decreased cost of public debt. Some commenters expressed concerns over this possible differential impact.[FN418] In connection with these comments, the Commission considered an exemption for small issuers and obligated persons.

Under this alternative, the disclosure-related costs associated with the amendments would be eliminated for small issuers and obligated persons and their disclosure and borrowing practices would stay the same as the baseline scenario. However, it is possible that over time their securities could become further mispriced and potentially less attractive to investors compared to those issued by issuers and obligated persons that provide more disclosure. But issuers and obligated persons would be able to provide voluntary disclosure if they believe the benefits of more accurate pricing offset the cost of disclosure.

Under this alternative, investors in municipal securities that are exempt from disclosure requirements under the final rules would not experience the full benefits discussed above because they would not receive more timely and informative disclosures about small issuers' and obligated persons' financial obligations than they would otherwise receive under the amendments, as adopted.

**4. Adopt as Proposed, the Broader Definition of Financial Obligation**

Another alternative approach is to adopt, as proposed, the broader definition of financial obligation. In the Proposing Release, the Commission defined the term "financial obligation" to mean a debt obligation, lease, guarantee, derivative instrument, or monetary obligation resulting from a judicial, administrative, or arbitration proceeding, but not include municipal securities as to which a final official statement has been provided to the MSRB consistent with Rule 15c2-12.[FN419] Commenters criticized the definition as overbroad and vague and expressed concerns that the broad scope of the term financial obligation, as proposed, would impose substantial burdens on issuers, obligated persons, and other market participants.[FN420]

As discussed above, the Commission is narrowing the definition of "financial obligation." As adopted, "financial obligation" means a debt obligation; derivative instrument entered into in connection with, or pledged as security or a source of payment for, an existing or planned debt obligation; or a guarantee of either a debt obligation or a derivative instrument entered into in connection with, or pledged as security or a source of payment for, an existing or planned debt obligation. The term financial obligation does not include municipal securities as to which a final official statement has been provided to the MSRB consistent with the Rule.

If the amendments to the Rule were adopted as proposed, investors and other participants would receive more information related to issuers' and obligated persons' financial obligations because of the proposed broader definition of "financial obligation." This alternative could allow credit rating agencies and municipal analysts to produce more accurate ratings and forecasts, and could yield greater improvements in market efficiency. This alternative could also allow those investors capable of interpreting broader information about issuers' and obligated persons' obligations to make more informed financial decisions. However, the Commission also recognizes that a higher volume of disclosure may not benefit all investors equally. The Commission believes that the information disclosed under this alternative would include information about obligations incurred in an issuer's or obligated person's normal course of operations that do not impact an issuer's or obligated person's liquidity, overall creditworthiness, or an existing security holder's rights and thus may not be as relevant to investment decisions.[FN421] Additionally, issuers, obligated persons, and Participating Underwriters would incur higher costs and attendant legal exposure associated with disclosing this additional information pursuant to the amendments under this alternative.

**VI. Regulatory Flexibility Certification**

The Commission certified, under section 605(b) of the Regulatory Flexibility Act,[FN422] that, when adopted, the proposed amendments to the Rule would not have a significant economic impact on a substantial number of small entities. This certification was set forth in Section VII of the Proposing Release, where the Commission explained that no Participating Underwriters would be small entities.[FN423] The Commission solicited comments regarding this certification and received no comments. The Commission continues to believe this certification is appropriate.

**VII. Statutory Authority**

Pursuant to the Exchange Act, and particularly Sections 2, 3(b), 10, 15(c), 15B, 17 and 23(a)(1) thereof, 15 U.S.C. 78b, 78c(b), 78j, 78*o*(c), 78*o*-4, 78q and 78w(a)(1), the Commission is adopting amendments to § 240.15c2-12 of title 17 of the Code of Federal Regulations in the manner set forth below.

**Text of Rule Amendments**

**List of Subjects in 17 CFR Part 240**
Brokers, Reporting and recordkeeping requirements, Securities.

For the reasons set out in the preamble, title 17, chapter II, of the Code of Federal Regulations is amended as follows.

**PART 240—GENERAL RULES AND REGULATIONS, SECURITIES EXCHANGE ACT OF 1934**
1. The authority citation for part 240 continues to read in part as follows:

 **\*44742** Authority: 15 U.S.C. 77c, 77d, 77g, 77j, 77s, 77z-2, 77z-3, 77eee, 77ggg, 77nnn, 77sss, 77ttt, 78c, 78c-3, 78c-5, 78d, 78e, 78f, 78g, 78i, 78j, 78j-1, 78k, 78k-1, 78*l*, 78m, 78n, 78n-1, 78*o*, 78*o*-4, 78*o*-10, 78p, 78q, 78q-1, 78s, 78u-5, 78w, 78x, 78*ll*, 78mm, 80a-20, 80a-23, 80a-29, 80a-37, 80b-3, 80b-4, 80b-11, 7201 et seq., and 8302; 7 U.S.C. 2(c)(2)(E); 12 U.S.C. 5221(e)(3); 18 U.S.C. 1350; Pub. L. 111-203, 939A, 124 Stat. 1376 (2010); and Pub. L. 112-106, sec. 503 and 602, 126 Stat. 326 (2012), unless otherwise noted.
 \* \* \* \* \*17 CFR § 240.15c2-12
2. Section 240.15c2-12 is amended by:

a. In paragraph (b)(5)(i)(C)(14), removing the word "and"; and

b. Adding paragraphs (b)(5)(i)(C)(15) and (16) and (f)(11).

The additions read as follows.
 17 CFR § 240.15c2-12

**§ 240.15c2-12 Municipal securities disclosure.**
\* \* \* \* \*
(b) \* \* \*

(5)(i) \* \* \*

(C) \* \* \*

(15) Incurrence of a financial obligation of the obligated person, if material, or agreement to covenants, events of default, remedies, priority rights, or other similar terms of a financial obligation of the obligated person, any of which affect security holders, if material; and

(16) Default, event of acceleration, termination event, modification of terms, or other similar events under the terms of a financial obligation of the obligated person, any of which reflect financial difficulties; and
 \* \* \* \* \*
(f) \* \* \*

(11)(i) The term financial obligation means a:

(A) Debt obligation;

(B) Derivative instrument entered into in connection with, or pledged as security or a source of payment for, an existing or planned debt obligation; or

(C) Guarantee of paragraph (f)(11)(i)(A) or (B).

(ii) The term financial obligation shall not include municipal securities as to which a final official statement has been provided to the Municipal Securities Rulemaking Board consistent with this rule.
 * * * * *
By the Commission.

Dated: August 20, 2018.

Brent J. Fields,

Secretary.


Note: The following appendix will not appear in the Code of Federal Regulations.


**Exhibit A**

**Key to Comment Letters Submitted in Connection With the Adopting Release Amendments to Exchange Act Rule 15c2-12 (File No. S7-01-17)**
1. Letter from John M. McNally, Hawkins Delafield & Wood LLP, to Brent J. Fields, Secretary, Commission, dated March 21, 2017 ("Hawkins Letter").

2. Letter from Jody Johnson, to Brent J. Fields, Secretary, Commission, dated April 2, 2017 ("Johnson Letter").

3. Letter from Clifford M. Gerber, President, National Association of Bond Lawyers, to Shagufta Ahmed, Desk Officer for the Securities and Exchange Commission, Office of Information and Regulatory Affairs, Office of Management and Budget, and to Brent J. Fields, Secretary, Commission, dated April 11, 2017 ("NABL OMB Letter").

4. Letter from Lynnette Kelly, Executive Director, Municipal Securities Rulemaking Board, to Brent J. Fields, Secretary, Commission, dated April 14, 2017 ("MSRB Letter").

5. Letter from David Lisante, J.D. Candidate 2017, Cornell Law School, to Brent J. Fields, Secretary, Commission, dated April 20, 2017 ("Lisante Letter").

6. Letter from Ken Martin, Assistant Commissioner Financial Services/CFO, Texas Higher Education Coordinating Board, to Brent J. Fields, Secretary, Commission, dated May 1, 2017 ("THECB Letter").

7. Letter from Tyler Brown, J.D. Candidate, Boston College Law School, to Brent J. Fields, Secretary, Commission, dated May 1, 2017 ("Brown Letter").

8. Letter from Michael Phemister, Vice President, Treasury Management, Dallas Fort Worth International Airport, to Brent J. Fields, Secretary, Commission, dated May 4, 2017 ("DFW Letter").

9. Letter from Michael A. Genito, Commissioner of Finance, City of White Plains, New York, to Brent J. Fields, Secretary, Commission, dated May 5, 2017 ("White Plains Letter").

10. Letter from Brian C. Massey, Finance Director, Outagamie County, Wisconsin, to Brent J. Fields, Secretary, Commission, dated May 5, 2017 ("Outagamie Letter").

11. Letter from Erich Mueller, Finance Director, City of Troutdale, Oregon, to Brent J. Fields, Secretary, Commission, dated May 8, 2017 ("Troutdale Letter").

12. Letter from Neal D. Suess, President/CEO, Loup River Public Power District, to Brent J. Fields, Secretary, Commission, dated May 9, 2017 ("Loup Power Letter").

13. Letter from Tracy Ginsburg, Executive Director, Texas Association of School Business Officials, to Brent J. Fields, Secretary, Commission, dated May 9, 2017 ("TASBO Letter").

14. Letter from Marina Scott, City Treasurer, Salt Lake City, Utah, to Brent J. Fields, Secretary, Commission, dated May 9, 2017 ("Salt Lake City Letter").

15. Letter from Chad D. Gee, Superintendent, Yorktown Independent School District, Texas, to Brent J. Fields, Secretary, Commission, dated May 9, 2017 ("Yorktown SD Letter").

16. Letter from Julie Egan, Chair, and Lisa Washburn, Chair, Industry Practices Procedures, National Federation of Municipal Analysts, to Brent J. Fields, Secretary, Commission, dated May 10, 2017 ("NFMA Letter").

17. Letter from Robert Scott and Keith Dagen, Co-Chairs, Financial Reporting and Regulatory Response Committee, Government Finance Officers Association of Texas, to Brent J. Fields, Secretary, Commission, dated May 10, 2017 ("GFOA TX Letter").

18. Letter from Jeff N. Heiner, President, Board of Education, Ogden City School District, Utah, to Brent J. Fields, Secretary, Commission, dated May 10, 2017 ("Ogden Letter").

19. Letter from Martin W. Bates, Ph.D., J.D., Superintendent, and Terry Bawden, Board President, Granite School District, Utah, to Brent J. Fields, Secretary, Commission, dated May 11, 2017 ("Granite SD Letter").

20. Letter from Grant Whitaker, President & CEO, Utah Housing Corporation, to Brent J. Fields, Secretary, Commission, dated May 11, 2017 ("UHC Letter").

21. Letter from Ann Mackiernan, Chief Financial Officer, Tualatin Hills Park & Recreation District of Oregon, to Brent J. Fields, Secretary, Commission, dated May 12, 2017 ("THPRD Letter").

22. Letter from Arthur J. "Grant" Lacerte, Vice President and General Counsel, Kissimmee Utility Authority, Florida, to Brent J. Fields, Secretary, Commission, dated May 12, 2017 ("Kissimmee Letter").

23. Letter from Dr. Marcelo Cavazos, Superintendent, Arlington Independent School District, Texas, to Brent J. Fields, Secretary, Commission, dated May 12, 2017 ("Arlington SD Letter").

24. Letter from Cynthia A. Nichol, Chief Financial Officer, Port of Portland, Oregon, to Brent J. Fields, Secretary, Commission, dated May 12, 2017 ("Port Portland Letter").

25. Letter from Kristin M. Bronson, City Attorney, City and County of Denver, Colorado, to Brent J. Fields, Secretary, Commission, dated May 12, 2017 ("Denver Letter").

26. Letter from Ted Wheeler, Mayor, City of Portland, Oregon, to Brent J. Fields, Secretary, Commission, dated May 12, 2017 ("Portland Letter").

27. Letter from Michele Trongaard, Assistant Superintendent for Finance and Operation, Wylie Independent School District, Texas, to Brent J. Fields, Secretary, Commission, dated May 15, 2017 ("Wylie SD Letter").

28. Letter from Dorothy Donohue, Deputy General Counsel, Securities Regulation, Investment Company Institute, to Brent J. Fields, Secretary, Commission, dated May 15, 2017 ("ICI Letter").

29. Letter from Dennis M. Kelleher, President & CEO, Better Markets, Inc., to Brent J. Fields, Secretary, Commission, dated May 15, 2017 ("BM Letter").

30. Letter from David W. Osburn, General Manager, Oklahoma Municipal Power Authority, to Brent J. Fields, Secretary, Commission, dated May 15, 2017 ("OMPA Letter").

31. Letter from Kurt J. Nagle, President and CEO, American Association of Port Authorities, to Brent J. Fields, Secretary, **\*44743** Commission, dated May 15, 2017 ("AAPA Letter").

32. Letter from Leslie M. Norwood, Managing Director and Associate General Counsel, Securities Industry Financial Markets Association, to Brent J. Fields, Secretary, Commission, dated May 15, 2017 ("SIFMA Letter").

33. Letter from Clifford M. Gerber, President, National Association of Bond Lawyers, to Brent J. Fields, Secretary, Commission, dated May 15, 2017 ("NABL Letter").

34. Letter from Charisse Mosely, Deputy City Controller, City of Houston, Texas, to Brent J. Fields, Secretary, Commission, dated May 15, 2017 ("Houston Letter").

35. Letter from Joanne Wamsley, Vice President for Finance and Deputy Treasurer, Arizona State University, to Brent J. Fields, Secretary, Commission, dated May 15, 2017 ("AZ Universities Letter").

36. Letter from Leo Karwejna, Managing Director and Chief Compliance Officer, PFM, to Brent J. Fields, Secretary, Commission, dated May 15, 2017 ("PFM Letter").

37. Letter from Robert W. Doty, to Brent J. Fields, Secretary, Commission, dated May 15, 2017 ("Doty Letter").

38. Letter from Noreen Roche-Carter, Chair, Tax and Finance Task Force, Large Public Power Council, Sacramento, California, to Brent J. Fields, Secretary, Commission, dated May 15, 2017 ("LPPC Letter").

39. Letter from Rebecca L. Peace, Deputy Executive Director and Chief Counsel, Pennsylvania Housing Finance Agency, to Brent J. Fields, Secretary, Commission, dated May 15, 2017 ("PHFA Letter").

40. Letter from John J. Wagner, Kutak Rock LLP, to Brent J. Fields, Secretary, Commission, dated May 15, 2017 ("Kutak Rock Letter").

41. Letter from Michael Nicholas, Chief Executive Officer, Bond Dealers of America, to Brent J. Fields, Secretary, Commission, dated May 15, 2017 ("BDA Letter").

42. Letter from Kevin M. Burke, President and CEO, Airports Council International, North America, to Brent J. Fields, Secretary, Commission, dated May 15, 2017 ("ACI Letter").

43. Letter from Marty Dreischmeier, Chief Financial Officer, WPPI Energy, to Brent J. Fields, Secretary, Commission, dated May 15, 2017 ("WPPI Letter").

44. Letter from Diana Pope, Director, Financing and Investment Division, and Lee McElhannon, Director, Bond Finance, Financing and Investment Division, Georgia State Financing and Investment Commission, to Brent J. Fields, Secretary, Commission, dated May 15, 2017 ("GA Finance Letter").

45. Letter from Ken Miller, NAST President, Treasurer, State of Oklahoma, National Association of State Treasurers, to Brent J. Fields, Secretary, Commission, dated May 15, 2017 ("NAST Letter").

46. Letter from Timothy Cameron, Esq. Head, and Lindsey Weber Keljo, Esq., Managing Director and Associate General Counsel, Asset Management Group, SIFMA, to Brent J. Fields, Secretary, Commission, dated May 15, 2017 ("SIFMA AMG Letter").

47. Letter from Cristeena G. Naser, Vice President, Center for Securities, Trust & Investments, American Bankers Association, to Brent J. Fields, Secretary, Commission, dated May 15, 2017 ("ABA Letter").

48. Letter from Robert W. Scott, Director of Finance, City of Brookfield, Wisconsin, to Brent J. Fields, Secretary, Commission, dated May 15, 2017 ("Brookfield Letter").

49. Letter from Richard Doyle, City Attorney, City of San Jose, California, to Brent J. Fields, Secretary, Commission, dated May 15, 2017 ("San Jose Letter").

50. Letter from Donna Murr, President, National Association of Health and Educational Facilities Finance Authorities, to Brent J. Fields, Secretary, Commission, dated May 15, 2017 ("NAHEFFA Letter").

51. Form Letter from Issuers in the State of Oregon ("Form Letter").

52. Letter from Christopher Alwine, Head of Municipal Money Market and Bond Groups, The Vanguard Group, Inc., to Brent J. Fields, Secretary, Commission, dated May 15, 2017 ("Vanguard Letter").

53. Letter from Susan Gaffney, Executive Director, National Association of Municipal Advisors, to Brent J. Fields, Secretary, Commission, dated May 15, 2017 ("NAMA Letter").

54. Letter from Emily S. Brock, Director, Federal Liaison Center, Government Finance Officers Association, to Brent J. Fields, Secretary, Commission, dated May 15, 2017 ("GFOA Letter").

55. Letter from Walker R. Stapleton, State Treasurer, and Ryan Parsell, Deputy Treasurer, State of Colorado, to Brent J. Fields, Secretary, Commission, dated May 15, 2017 ("CO Treasury Letter").

56. Letter from Glenn Hegar, Texas Comptroller of Public Accounts, to Brent J. Fields, Secretary, Commission, dated May 15, 2017 ("TCPA Letter").

57. Letter from Tracy Olsen, Business Administrator, Nebo School District, Utah, to Brent J. Fields, Secretary, Commission, dated May 15, 2017 ("Nebo SD Letter").

58. Letter from Garth Rieman, Director of Housing Advocacy and Strategic Initiatives, National Council of State Housing Agencies, to Brent J. Fields, Secretary, Commission, dated May 15, 2017 ("NCSHA Letter").

59. Letter from Paula Stuart, Chief Executive Officer, Digital Assurance Certification, to Brent J. Fields, Secretary, Commission, dated May 16, 2017 ("DAC Letter").

60. Letter from Sophia D. Skoda, Director of Finance, East Bay Municipal Utility District, California, to Brent J. Fields, Secretary, Commission, dated May 17, 2017 ("East Bay Letter").

61. Letter from Keith Paul Bishop, Former California Commission of Corporations, to Brent J. Fields, Secretary, Commission, dated June 1, 2017 ("Bishop Letter").

62. Letter from Michael Cohen, Director, California Department of Finance, to Brent J. Fields, Secretary, Commission, dated June 28, 2017 ("CA Finance Letter").

63. Letter from Clifford M. Gerber, President, National Association of Bond Lawyers, to Brent J. Fields, Secretary, Commission, dated August 29, 2017 ("NABL II Letter").

64. Letter from Alexandra M. MacLennan, President, National Association of Bond Lawyers, to Brent J. Fields, Secretary, Commission, dated June 13, 2018 ("NABL III Letter").

65. Letter from School Improvement Partnership to Pamela Dyson, Director/Chief Information Officer, Commission, dated May 31, 2018 ("SIP Letter").

[FR Doc. 2018-18279 Filed 8-30-18; 8:45 am]

BILLING CODE 8011-01-P

Footnotes

1   See 17 CFR 240.15c2-12(a), (b)(5)(i), (b)(5)(i)(C).

2   Other market participants include dealers, analysts, and vendors of information regarding municipal securities. Though investors and dealers are the intended beneficiaries of improved access to information about the financial obligations of issuers and obligated persons, the Commission expects that both groups will also benefit indirectly due to the improved ability of analysts and vendors of information regarding municipal securities to access this information.

3   See Exchange Act Release No. 80130 (Mar. 1, 2017), 82 FR 13928 (Mar. 15, 2017) ("Proposing Release"). The comment period for the proposed amendments expired on May 15, 2017.

4   The Commission proposed a technical amendment to paragraph (b)(5)(i)(C)(14) of the Rule to remove the term "and" since new events were proposed to be added to paragraph (b)(5)(i)(C) of the Rule.

5   See SEC Comments on Proposed Rule: Proposed Amendments to Exchange Act Rule 15c2-12, available at https://www.sec.gov/comments/s7-01-17/s70117.htm.

6   SEC Investor Advisory Committee, Recommendation of Market Structure Subcommittee of IAC: Select Enhancements to Protect Retail Investors in Municipal and Corporate Bonds (June 5, 2018) ("IAC Recommendation") (adopted by the IAC on June 14, 2018), available at https://www.sec.gov/spotlight/investor-advisory-committee-2012/iac061418-market-structure-subcommittee-recommendation.pdf.

7   15 U.S.C. 78*o*(c).

8   See Exchange Act Release No. 34-26985 (June 28, 1989), 54 FR 28799 (July 10, 1989) ("1989 Adopting Release"). For additional information relating to the history of the Rule, see Exchange Act Release No. 34-34961 (Nov. 10, 1994), 59 FR 59590 (Nov. 17, 1994)("1994 Amendments Adopting Release"), Exchange Act Release No. 34-59062 (Dec. 5, 2008), 73 FR 76104 (Dec. 15, 2008)

("2008 Amendments Adopting Release"), and Exchange Act Release No. 34-62184A (May 27, 2010), 75 FR 33100 (June 10, 2010) ("2010 Amendments Adopting Release").

9   See 1989 Adopting Release, supra note 8.

10   See 17 CFR 240.15c2-12(b).

11   See 1994 Amendments Adopting Release, supra note 8.

12   See 2008 Amendments Adopting Release, supra note 8.

13   See 2010 Amendments Adopting Release, supra note 8. The 2010 Amendments (a) require Participating Underwriters to reasonably determine that an issuer or obligated person has agreed to provide event notices in a timely manner not in excess of ten business days after the event's occurrence; (b) include new events for which a notice is to be provided; (c) modify the events that are subject to a materiality determination before triggering a requirement to provide notice to the MSRB; and (d) revise an exemption for certain offerings of municipal securities with put features. The Commission also provided interpretive guidance on Participating Underwriter responsibilities under the antifraud provisions of the federal securities laws in response to market participants' concerns that some issuers and obligated persons were not consistently submitting continuing disclosure documents in accordance with the undertakings made in their continuing disclosure agreements.

14   The term "obligated person" means any person, including an issuer of municipal securities, who is either generally or through an enterprise fund, or account of such person committed by contract or other arrangements to support payment of all, or part of the obligations of the municipal securities to be sold in the Offering (other than providers of municipal bond insurance, letters of credit, or other liquidity facilities). 17 CFR 240.15c2-12(f)(10).

15   On December 5, 2008, the Commission adopted amendments to Rule 15c2-12 to provide for the Electronic Municipal Market Access ("EMMA") system. EMMA is established and maintained by the MSRB and provides free public access to disclosure documents. The 2008 Amendments designated the EMMA system as the single centralized repository for the electronic collection and availability of continuing disclosure information about municipal securities. The 2008 Amendments require the Participating Underwriter to reasonably determine that the issuer or obligated person has undertaken in its continuing disclosure agreement to provide continuing disclosure documents: (i) Solely to the MSRB; and (ii) in an electronic format and accompanied by identifying information, as prescribed by the MSRB. See 2008 Amendments Adopting Release, supra note 8. See also Exchange Act Release No. 34-58255 (July 30, 2008), 73 FR 46138 (Aug. 7, 2008) ("2008 Proposing Release"). The 2008 Amendments became effective on July 1, 2009.

16   See 17 CFR 240.15c2-12(b)(5)(i)(A) and (B).

17   See 17 CFR 240.15c2-12(b)(5)(i)(C). Under the Rule prior to these amendments, the following events require notice in a timely manner not in excess of ten business days after the occurrence of the event: (1) Principal and interest payment delinquencies; (2) non-payment related defaults, if material; (3) unscheduled draws on debt service reserves reflecting financial difficulties; (4) unscheduled draws on credit enhancements reflecting financial difficulties; (5) substitution of credit or liquidity providers, or their failure to perform; (6) adverse tax opinions, the issuance by the Internal Revenue Service of proposed or final determinations of taxability, Notices of Proposed Issue (IRS Form 5701-TEB) or other material notices or determinations with respect to the tax status of the security, or other material events affecting the tax status of the security; (7) modifications to rights of security holders, if material; (8) bond calls, if material, and tender offers; (9) defeasances; (10) release, substitution, or sale of property securing repayment of the securities, if material; (11) rating changes; (12) bankruptcy, insolvency, receivership or similar event of the obligated person; (13) the consummation of a merger, consolidation, or acquisition involving an obligated person or the sale of all or substantially all of the assets of the obligated person, other than in the ordinary course of business, the entry into a definitive agreement to undertake such an action or the termination of a definitive agreement relating to any such actions, other than pursuant to its terms, if material; and (14) appointment of a successor or additional trustee or the change of name of a trustee, if material. In addition, Rule 15c2-12(d) provides full and limited exemptions from the requirements of Rule 15c2-12. See 17 CFR 240.15c2-12(d).

18   See 17 CFR 240.15c2-12(b)(5)(i)(D). Annual filings, event notices, and failure to file notices are referred to collectively herein as "continuing disclosure documents."

19   See Securities and Exchange Commission, Report on the Municipal Securities Market (July 31, 2012) ("2012 Municipal Report"), available at https://www.sec.gov/news/studies/2012/munireport073112.pdf.

20   Id.

21   Id.

22   See Federal Reserve Board, Financial Accounts of the United States: Flow of Funds, Balance Sheets, and Integrated Macroeconomic Accounts (First Quarter 2018) (June 7, 2018), available at https://www.federalreserve.gov/releases/z1/20180308/z1.pdf.

23   See id. As of the first quarter of 2018, the amount of municipal securities held directly by the household sector was $1.64 trillion and mutual funds, money market funds, closed-end funds, and exchange-traded funds collectively held $946.4 billion.

24   See MSRB, 2017 Fact Book (Mar. 18, 2018), available at http://www.msrb.org/#/media/Files/Resources/MSRB-Fact-Book-2017.ashx?la=en.

25    See MSRB, Self-Regulation and the Municipal Securities Market (Jan. 2018), available at http://www.msrb.org/Market-Topics/#/media/8059A52FBF15407FA8A8568E3F4A10CD.ashx.

26    See Registration of Municipal Advisors, Exchange Act Release No. 34-70462 (Sept. 20, 2013), 78 FR 67468 (Nov. 12, 2013).

27    See 2012 Municipal Report, supra note 19 (citing Moody's, The U.S. Municipal Bond Rating Scale: Mapping to the Global Rating Scale and Assigning Global Scale Ratings to Municipal Obligations (Mar. 2007), available at https://www.moodys.com/sites/products/DefaultResearch/102249_RM.pdf; and Report to Accompany H.R. 6308, H.R. Rep. No. 110-835, at section 205 (Feb. 14, 2008), available at https://www.gpo.gov/fdsys/pkg/CRPT-110hrpt835/html/CRPT-110hrpt835.htm).

28    The six largest municipal bankruptcies, ranked by amount of debt, are Puerto Rico, in 2017 ($73 billion in debt); Detroit, Michigan, in 2013 ($18 billion in debt); Jefferson County, Alabama, in 2011 ($4.2 billion in debt); Orange County, California, in 1994 ($2.0 billion in debt); Stockton, California, in 2012 ($1.0 billion in debt); and San Bernardino, California, in 2012 ($492 million in debt). See Detroit's Bankruptcy Is the Nation's Largest, N.Y. Times (July 18, 2013), available at http://www.nytimes.com/interactive/2013/07/18/us/detroit-bankruptcy-is-the-largest-in-nation.html; see also Mary Williams Walsh, Puerto Rico Declares a Form of Bankruptcy, N.Y. Times (May 3, 2017), available at https://www.nytimes.com/2017/05/03/business/dealbook/puerto-rico-debt.html.

29    E.g., City of Hartford, Connecticut. See Jenna Carlesso, State Leaders: Hartford Bailout Imminent, Hartford Courant (Feb. 9, 2018), available at http://www.courant.com/community/hartford/hc-news-hartford-oversight-board-20180208-story.html.

30    See 2012 Municipal Report, supra note 19.

31    For example, an investor purchasing a municipal security directly from an issuer or obligated person.

32    For example, a lender entering into a bank loan, loan agreement, or other type of financing agreement with an issuer or obligated person.

33    See Proposing Release, supra note 3, 82 FR at 13929.

34    In 2016, the MSRB enhanced EMMA to allow submitters of continuing disclosure to efficiently identify "Bank Loan/Alternative Financing Filings" as the type of filing. See MSRB, MSRB Improves Bank Loan Disclosure on EMMA website (Sept. 26, 2016), available at http://msrb.org/News-and-Events/Press-Releases/2016/MSRB-Improves-Bank-Loan-Disclosure-on-EMMA-website. In a letter to the SEC Investor Advocate in October 2017, the MSRB stated its concern that although the number of bank loan disclosures made to EMMA had increased substantially from prior years, only 1,100 bank loan documents were posted to the EMMA website (as of October 2017), representing only a small fraction of bank loans outstanding. See Letter from Lynnette Kelly, Executive Director, MSRB, to Rick Fleming, Investor Advocate, Securities and Exchange Commission (Oct. 17, 2017), available at http://www.msrb.org/Market-Topics/#/media/0E3E9F81C7BA4EB38EE80857FE378F18.ashx.

According to information received by Commission staff from MSRB staff, the MSRB received 648 filings during calendar year 2017 under the "Bank Loan/Alternative Financing Filing" category.

35    See 1989 Adopting Release, supra note 8.

36    17 CFR 240.15c2-12 was adopted under a number of Exchange Act provisions, including Section 15(c); 15 U.S.C. 78*o*(c).

37    See Proposing Release, supra note 3, 82 FR at 13931.

38    See, e.g., Houston Letter; Denver Letter; DFW Letter; GFOA Letter; BDA Letter; MSRB Letter.

39    See, e.g., Arlington SD Letter (stating that its audited financial statements contain information about financial obligations and state law requires disclosure of audited financial statements within 150 days of the end of the fiscal year); NABL Letter (stating that (i) information about financial obligations is already available due to state sunshine laws and improvements in technology, (ii) bond documents prohibit the grant of superior interests in the trust estate or such terms are permitted by outstanding bond contracts, and the risks of such terms are priced into the value of outstanding bonds, and (iii) that voluntary disclosure initiatives should be allowed to further develop); NABL III Letter (stating that Government Accounting Standards Board ("GASB") Statement No. 88—Certain Disclosures Related to Debt, including Direct Borrowings and Direct Placement (March 2018) ("GASB Statement No. 88") requires additional information related to debt be disclosed in audited financial statements reducing the disclosure benefits of the amendments). GASB Statement No. 88 is available at http://www.gasb.org/jsp/GASB/Document_C/DocumentPage?cid=1176170308047&acceptedDisclaimer=true.

40    See Tax Cuts and Jobs Act of 2017, Public Law 115-97, 131 Stat. 2054 (2017).

41    See NABL III Letter.

42    See Proposing Release, supra note 3, 82 FR at 13929.

43    Id.

44    GASB Statement No. 88 has gone into effect for reporting periods beginning after June 15, 2018. See GASB Statement No. 88, supra note 39. GASB Statement No. 88 "requires that additional essential information related to debt be disclosed in notes to financial statements, including unused lines of credit, assets pledged as collateral for the debt, and terms specified in debt agreements related to significant events of default with finance-related consequences, significant termination events with finance-related consequences,

and significant subjective accelerations clauses." The Commission understands that those issuers and obligated persons who adhere to GASB standards when preparing their financial statements could provide information in their audited financial statements similar to that covered under new paragraph (b)(5)(i)(C)(15) of the Rule. However, while GASB establishes generally accepted accounting principles (GAAP) that are used by many states and local governments, there are no uniformly applied accounting standards in the municipal securities market. See 2012 Municipal Report, supra note 19. Further, there is no requirement in Rule 15c2-12 that an issuer or obligated person undertake in its continuing disclosure agreement to provide audited financial statements to the MSRB. See 17 CFR 240.15c2-12(b)(5)(i)(B) (limiting the requirement of audited financial statements to "when and if available"). While the Commission supports efforts to improve the transparency and usefulness of financial statements, GASB Statement No. 88 is not a substitute for these amendments. Industry commentators have expressed a similar view. See generally, Standard and Poor's Global Ratings, Bank Loan Structures Risk Remain, But GASB 88 Is A Positive Step Toward Transparency in Financial Reporting (May 2, 2018), available at https://www.spratings.com/documents/20184/86957/Bank+Loan+Structures+Risks+Remain+But+GASB88+Is+A+Positive +Step+Toward+Transparency+In+Financial+Reporting_May-02-2018.pdf/07d7140a-0019-4907-8ab9-35d7b463e77c (stating "[m]arkets function most efficiently when all stakeholders have symmetrical or equal access to material information. Although the [GASB Statement No. 88] release speaks to required disclosures, not all public finance issuers comply with GAAP standards or adopt all GASB statements. Consequently, we believe the municipal market is not functioning as effectively as it could around a bank loan structure. Nevertheless, the [GASB Statement No. 88] release is a significant positive development that signals even to those who have not adopted GASB statements that the marketplace is developing higher expectations about disclosures").

45    See 2012 Municipal Report, supra note 19.

46    Municipal Market Bank Loan Disclosure Task Force, Considerations Regarding Voluntary Secondary Market Disclosure About Bank Loans (May 1, 2013) ("Considerations Regarding Voluntary Secondary Market Disclosure About Bank Loans"), available at http:// www.nfma.org/assets/documents/position.stmt/wp.direct.bank.loan.5.13.pdf, (stating "Bank loan covenants and events of default can be different from or set at higher levels than those applicable to outstanding bonds, thereby enabling the bank to assert remedies prior to other bondholders (which may effectively prioritize repayment of the bank loan)" and also stating "[c]ertain assets previously available to secure bonds may be pledged to the bank as security for the bank loan"). The Task Force was composed of representatives from the American Bankers Association, Bond Dealers of America, Government Finance Officers Association, Investment Company Institute, National Association of Bond Lawyers ("NABL"), National Association of Health and Educational Facilities Finance Authorities, National Association of Independent Public Finance Advisors, National Federation of Municipal Analysts, and Securities Industry and Financial Markets Association.

47    See Arlington SD Letter.

48    See NABL Letter.

49    Id.

50    For a discussion of the definition of the term "financial obligation," see infra Section III.A.2.

51    For example, Federal Deposit Insurance Corporation ("FDIC") data show the amount of bank direct lending to state and local governments and their instrumentalities during the first quarter of 2018 ($190,533,184,000) remains at a similar level to that of the fourth quarter of 2017 ($190,531,792,000). For a discussion of these data, see infra note 319 and related text.

52    For a discussion of market participant efforts to promote voluntary disclosure of certain financial obligations, see Proposing Release, supra note 3, 82 FR at 13929-30. See also supra note 34.

53    See, e.g., NFMA Letter; Vanguard Letter; and ICI Letter.

54    Several commenters also stated their concern about the lack of guidance with respect to determining the materiality of covenants, events of default, remedies, priority rights, or other similar terms of a financial obligation of the obligated person, any of which affect security holders. See, e.g., LPPC Letter; Kutak Rock Letter; Brown Letter; NABL Letter. The discussion in this section regarding materiality applies to these comments.

55    For further discussion of the term financial obligation, including comments received, see infra Section III.A.2.

56    See, e.g., SIFMA AMG Letter (asking for clarification that a series of related financial transactions must be aggregated for the purpose of assessing materiality); GFOA TX Letter (stating the difficulties in disclosing material derivative instruments as the amount of the financial obligation can fluctuate with the market).

57    See, e.g., DFW Letter; BDA Letter; Kutak Rock Letter; PFM Letter; Houston Letter; NABL Letter.

58    See NFMA Letter (recommending that the disclosure of debt obligations should not be subject to a materiality qualifier); Vanguard Letter (recommending disclosure of an issuer's entire debt portfolio, including terms of direct placements and bank agreements); ICI Letter (recommending the removal of the second materiality qualifier and mandating disclosure for "any terms in connection with a financial obligation that affect security holders").

59    See BDA Letter (stating "some of those tests could include a percentage of the financial obligation as compared to total outstanding bonds, annual debt service as compared to annual revenues or expenditures, or some other comparable mechanical measurement").

60 See 1994 Amendments Adopting Release, supra note 8.

61 See Proposing Release, supra note 3, 82 FR at 13935-36.

62 See THECB Letter ("[w]hat constitutes materiality can vary by entity based on the size of the overall balance sheet, the size of existing obligations or the size of the overall bond portfolio"). While the Commission agrees with that statement, these are not the only factors that are relevant in evaluating the particular facts and circumstances.

63 See, e.g., UHC Letter (requesting that the Commission "acknowledge that a financial obligation payable primarily or exclusively from one source of revenues would likely not be material to security holders of municipal securities payable primarily or exclusively from a separate or distinct source of revenues of the same issuer or obligated person"). The Commission believes that an issuer or obligated person would have to assess a number of factors when assessing materiality, including the source of security pledged to the security holders. See also NABL Letter.

64 See Exchange Act Release No. 34-33742 (Mar. 9, 1994), 59 FR 12759 (Mar. 17, 1994). The proposed term "significant obligor" was defined to mean any person who, directly or indirectly, is the source of 20 percent or more of the cash flow servicing obligations on the municipal securities.

65 See 1994 Amendments Adopting Release, supra note 8; see also 17 CFR 240.15c2-12(b)(5)(i)(A) and (f)(3).

66 See 1994 Amendments Adopting Release, supra note 8 at 59593.

67 See Statement of the Commission Regarding Disclosure Obligations of Municipal Securities Issuers and Others, Exchange Act Release No. 34-33741 (Mar. 9, 1994), 59 FR 12748 (Mar. 17, 1994) ("1994 Interpretive Release").

68 See, e.g., GFOA Letter; Denver Letter; THECB Letter (stating that "what constitutes an obligation and what is material, are vague in this amendment" and "what constitutes materiality can vary by entity based on the size of the overall balance sheet, the size of existing obligations or the size of the overall bond portfolio"); see also Brown Letter (suggesting definitions of materiality the Commission could adopt); but see also ACI Letter (urging the Commission to reject a one-size-fits-all definition of materiality, since what is material to a small issuer may not be material to a larger issuer).

69 In March 2014, the Division of Enforcement announced the MCDC Initiative, a voluntary program to encourage underwriters and issuers and obligated persons to self-report federal securities law violations involving inaccurate certifications in primary offerings where issuers and obligated persons represented in their final official statements that they had complied with previous continuing disclosure agreements when they had not. The Commission brought settled actions against 71 issuers and obligated persons under the MCDC Initiative. See SEC Charges 71 Municipal Issuers in Muni Bond Disclosure Initiative (Aug. 24, 2016) ("SEC Charges 71 Municipal Issuers"), available at https://www.sec.gov/news/pressrelease/2016-166.html.

70 See, e.g., DFW Letter.

71 See, e.g., NABL Letter (stating "particularly since the MCDC Initiative, Commission interpretations of 'material' are too vague, ambiguous, and unpredictable to enable issuers and underwriters to clearly determine when notice of an event must be filed or when a failure to file must be disclosed").

72 See, e.g., Granite SD Letter; Portland Letter; NABL Letter (stating that some compliance departments and investment banks now refuse to engage in materiality evaluations of prior events and continuing disclosure deficiencies).

73 See Proposing Release at supra note 3, 82 FR at 13930 and note 15.

74 The inquiry undertaken in connection with the MCDC Initiative required an assessment of whether the issuer or obligated person materially fulfilled its contractual obligations under its continuing disclosure agreement, which required a consideration of applicable state law and basic principles of contract law.

75 See 1994 Interpretive Release, supra note 67 (quoting TSC Industries, Inc. v. Northway, Inc., 426 U.S. 438, 440 (1976)). The principles behind this inquiry are consistent each time the question of whether a piece of information is material is presented, but the factors considered by issuers and obligated persons while undertaking such an inquiry are not uniform because it is a facts and circumstances driven analysis. This inquiry is distinct from the inquiry issuers, obligated persons, and underwriters conducted as part of the MCDC Initiative, which required an assessment of the issuer's or obligated person's performance of its contractual continuing disclosure obligations.

76 Issuers and obligated persons have undertaken this type of analysis in the context of the Rule since 1994 when the Rule was amended to prohibit Participating Underwriters from purchasing or selling municipal securities in connection with an Offering unless the Participating Underwriter has "reasonably determined" that an issuer or an obligated person has undertaken in a continuing disclosure agreement to provide continuing disclosure information regarding the security and the issuer or obligated person for the life of the municipal security including notices of the occurrence of certain events, if material. See 1994 Amendments Adopting Release, supra note 8.

Since 2010, paragraphs (b)(5)(i)(C)(2), (7), (8), (10), (13), and (14) of the Rule have required a materiality analysis. See 2010 Amendments Adopting Release, supra note 8. See also supra note 17. Four of those paragraphs, (b)(5)(i)(C)(2), (7), (8), and (10), have required a materiality analysis since 1994. See 1994 Amendments Adopting Release, supra note 8.

Furthermore, this type of analysis is frequently conducted under the securities laws, whereby materiality is determined by reference to whether there is a substantial likelihood that a reasonable security holder would consider the information important in deciding whether to buy or sell a security. See Basic, Inc. v. Levinson, 485 U.S. 224 (1988).

77 See note 63 and accompanying text.

78 See, e.g., Portland Letter; Denver Letter; ACI Letter.

79 See, e.g., Portland Letter; ACI Letter; Kutak Rock Letter; San Jose Letter.

80 See, e.g., Denver Letter; San Jose Letter; White Plains Letter; see also TASBO Letter (stating that "the analysis of agreements and instruments captured under the definition of "financial obligations" under the proposed regulations will require subject matter experts to review the financial obligations—which they otherwise would not be engaged to review—in detail and make nuanced determinations as to materiality").

81 See, e.g., ACI Letter; AAPA Letter; see also PFM Letter (stating that absent clarity from the Commission on materiality, "issuers and investors will likely be harmed by the potential of disclosing information that could prove to be irrelevant to the credit of a particular municipal securities transaction").

82 See ABA Letter; East Bay Letter.

83 See, e.g., SIFMA AMG Letter (asking for clarification that a series of related financial transactions must be aggregated for the purpose of assessing materiality); GFOA TX Letter (stating the difficulties in disclosing material derivative instruments as the amount of the financial obligation can fluctuate with the market).

84 For a discussion of the term "incurred," see infra Section III.A.1.ii.

85 Relevant factors that could indicate that a series of financial obligations incurred close in time are related include the following: (i) Share an authorizing document, (ii) have the same purpose, or (iii) have the same source of security.

86 See 26 CFR 1.150-1(c); see Internal Revenue Service, Lesson 2: Advanced Topics in Arbitrage, available at https://www.irs.gov/pub/irs-tege/02PhaseIILesson02-AdvancedTopicsinArbitrage.pdf (IRS educational materials provided to the public containing the conditions under which separate bond series are considered to be a single issue for arbitrage purposes, stating: "[IRC] Regulations § 1.150-1(c)(1) provides that the term issue means two or more bonds that meet all of the following requirements: (i) Sold at substantially the same time (less than 15 days apart), (ii) sold pursuant to the same plan of financing, and (iii) reasonably expected to be paid from the same source of funds. For example, bonds sold to finance a single facility or related facilities are considered part of the same financing plan, but short-term bonds to finance working capital and long-term bonds to finance capital projects would not be considered part of the same plan. Certificates of participation in a lease and general obligation bonds secured by tax revenues would not be considered part of the same plan").

87 U.S. Department of Treasury regulations similarly warn against entering "into a transaction or series of transactions with respect to one or more issues with a principal purpose of transferring to nongovernmental persons (other than as members of the general public) significant benefits of tax-exempt financing in a manner that is inconsistent with the purposes of section 141 [of the Internal Revenue Code]." See 26 CFR 1.141-14.

88 See SIFMA AMG Letter; see also NABL Letter.

89 This is consistent with similar concepts in Exchange Act Form 8-K. Specifically, the instructions for Item 2.03 of Form 8-K provide that "[a] registrant has no obligation to disclose information under this Item 2.03 until the registrant enters into an agreement enforceable against the registrant, whether or not subject to conditions, under which the direct financial obligation will arise or be created or issued." See 17 CFR 249.308.

90 See NABL, Direct Purchases of State or Local Obligations by Commercial Banks and Other Financial Institutions (July 2017), available at https://www.nabl.org/DesktopModules/Bring2mind/DMX/Download.aspx?portalid=0&EntryId=1118 ("Certain direct purchase financings are structured as 'draw-down bonds.' Under this structure, the purchaser from time to time makes advances [to the issuer or obligated person], up to a maximum aggregate principal amount of the bonds, over a limited period of time, rather than advancing all proceeds of the bonds at the initial closing, as in a typical publicly-offered borrowing").

91 The Commission likewise believes that a financial obligation is incurred with regard to a derivative instrument when the derivative instrument is enforceable against an issuer or obligated person. See infra note 155.

92 See Kutak Rock Letter (stating that unlike corporate issuers, there is no checklist or guidepost to assist issuers and obligated persons determine what must be included in disclosure); see also AZ Universities Letter (stating that there are no standard EMMA disclosure forms provided by the Commission or the MSRB and issuers will be left on their own to determine the proper format and scope of event notices posted on EMMA).

93 See Vanguard Letter (recommending that the Commission require the disclosure of financial covenant reports, similar to what is provided to banks under loan agreements); BDA Letter (stating that the amendments should require issuers and obligated persons to include in any filing a description to investors describing what is material about the event); NFMA Letter (encouraging the Commission to require in the rule text that either all relevant agreements or a detailed summary of terms of the financial transaction

be posted along with the notice of incurrence to EMMA); and IAC Recommendation, supra note 6 (suggesting that the Commission clarify that disclosures made under the amendments should include information about the incurrence and amount of indebtedness as well as information about financial covenants).

94    See DAC Letter.

95    See ABA Letter (urging the Commission to provide a mechanism for redacting confidential and personally identifiable information and stating that disclosure of pricing terms may set unrealistic expectations for other issuers and may have an anti-competitive effect by setting a pricing benchmark for certain transactions); see also LPPC Letter (stating that the disclosure of covenants, events of default, remedies, priority rights, or other similar terms could adversely impact an issuer's ability to effectively negotiate or enter into future agreements and could be used by the issuer's counterparties to strengthen their negotiating positions).

96    Industry organizations have developed recommendations for voluntary disclosure of direct placements. Such groups and others could, for example, develop a form submission document and guidance for market participants. See, e.g., Considerations Regarding Voluntary Secondary Market Disclosure About Bank Loans, supra note 46.

97    See Proposing Release, supra note 3, 82 FR at 13937.

98    Id.

99    Id.

100   The Commission further notes that information about financial obligations, including transaction documents, would likely be available under state sunshine laws.

101   See Proposing Release, supra note 3, 82 FR at 13957.

102   See id.

103   See, e.g., AAPA Letter; ABA Letter, Form Letter.

104   See GFOA Letter; Brookfield Letter; GFOA TX Letter; Kissimmee Letter.

105   See BDA Letter; Portland Letter (pertaining to leases); GFOA Letter (pertaining to derivative instruments). See also IAC Recommendation, supra note 6 (stating, "One term that could be better defined is 'financial obligation', which should pick up indebtedness and similar obligations but should not be so broad as to pick up items such as ordinary course leases").

106   With respect to issuers and obligated persons, see generally GFOA Letter; NAHEFFA Letter; NCHSA Letter; and CA Finance Letter; and with respect to dealers, see also SIFMA Letter.

107   See AAPA Letter (stating that "many leases and legal or administrative proceedings are part of normal business operations"); ACI Letter ("the term 'financial obligation' is very broad and would include many business and legal obligations that are not direct placements of municipal securities or bank loans and that are not generally considered to be indebtedness . . . US airports are party to well over 50,000 leases"); DAC Letter ("the scope of financial obligations [covers] obligations well beyond bank loans and direct sales . . . potentially requir[ing] issuers and obligated persons to identify, summarize, disclose, track and analyze, within tight timeframes, the incurrence and performance of a far broader range of activities"); GFOA Letter ("information suggested in the proposed requirements (e.g., leases, derivatives) includes transactions that may occur multiple times a year through the normal operating activities of state and local governments and are not on par with debt obligations"); NAHEFFA Letter ("the broad definition of financial obligation could pick up financial aid contracts, health insurance contracts, food service contracts, research agreements, management contracts, sports venue contracts, equipment and vehicle leases, among other contracts"); NAMA Letter ("the definition of 'financial obligations' is too broad and will require the consideration of the materiality of many types of financings and financial obligations that do not affect a government or entity's ability to pay debt . . . [many] are part of the day-to-day 'operations' of governments"); Denver Letter ("the City is currently a party to thousands of contracts . . . [and] is involved in hundreds of administrative and arbitration proceedings every year"); Portland Letter ("we agree that the incurrence of a bank loan or other debt obligation is something that should be disclosed to the market, [but] we are concerned that the definition . . . is easily interpreted to include varying types of leases, such as those for the copiers, lawn mowers, and other minor equipment acquisitions").

108   See, e.g., THPRD Letter ("the scope [of] 'financial obligations' covered under the Proposed Amendment is overly broad and would be costly for our organization to monitor"); Port Portland Letter ("[t]o comply with the proposed amendments, issuers would have to create a centralized mechanism to monitor the creation and modification of a wide variety of financial instruments . . . [d]oing so would be unnecessarily burdensome and expensive").

109   See, e.g., AZ Universities Letter (stating that "a significant investment of time and money by the Universities will be necessary to monitor the need for filing an event notice under the Proposed Amendments . . . and the widely publicized lack of funding for public universities does not permit the necessary funding to restructure the Universities' processes or hire additional staff and engage outside legal counsel at significant expense solely to comply with the Proposed Amendments"); see also SIFMA Letter (arguing that it would be "virtually impossible" for registered representatives to comply with their obligations under MSRB Rule G-47).

110   See BDA Letter ("BDA believes that the primary investor desire for information giving rise to the Proposed Amendments is the way that bank debt competes with publicly traded bonds"); see also NAMA Letter; Portland Letter; Form Letter.

111  See, e.g., ICI Letter; BM Letter; NFMA Letter; SIFMA AMG Letter. For example, one commenter suggested that the Commission add "crowdfunding campaigns or public projects that pledge future revenues to backers of the projects" to the definition of "financial obligation." See BM Letter. In the Commission's view, the contractual arrangement between the issuer or obligated person and its backers memorializing the pledge of future revenues derived from the project could be a "debt obligation" for purposes of the Rule depending on the facts and circumstances. Accordingly, the Commission does not believe it is necessary to separately include crowdfunding-related obligations in the adopted definition of financial obligation.

112  See BM Letter; ICI Letter; Doty Letter.

113  See ICI Letter.

114  Cf. BDA Letter (observing that the "primary investor desire for information giving rise to the Proposed Amendments is the way that bank debt competes with publicly traded bonds, and this competition is nothing new in the municipal securities market").
   For a description of commenter arguments that the term "financial obligation" should distinguish between debt and ordinary financial or operating matters, see supra notes 105 and 107.

115  Several commenters supported this type of approach to the disclosure of "financial obligations." See, e.g., LPPC Letter (stating "LPPC believes that the Proposed Amendments should be narrowly tailored to require municipal issuers only to provide notice of the incurrence of bank loans, private placements or direct purchases of debt obligations, and derivative instruments that are entered into in connection with, and hedge, debt obligations of an issuer"). See also IAC Recommendation, supra note 6.

116  See generally, Proposing Release, supra note 3, 82 FR at 13936. For the Commission's analysis of the costs and benefits of the amendments, see infra Section V.C.

117  Compare ICI Letter (arguing that "timely disclosure" of financial obligations is necessary because "such information may significantly impact the fundamental value that investors place on a municipal bond and is therefore necessary to accurately assess, monitor, and compare credit quality of securities and issuers") with GFOA Letter (arguing that the "proposed additional 'financial obligations' covered by Rule 15c2-12 would be information that is both superfluous to investors and costly for issuers to present outside of financial statements"). See generally, infra Section V for the Commission's economic analysis of the amendments.

118  See Proposing Release, supra note 3, 82 FR at 13937.

119  Id.

120  See, e.g., Portland Letter (stating "we agree that the incurrence of a bank loan or other debt obligation is something that should be disclosed to the market"); SIFMA Letter (stating "[w]e support event notice disclosure of incurrence of debt through a direct purchase, private placement, or bank loan[s]"); NAST Letter (stating "we believe that enhanced and uniform disclosure related to bank loan debt would be beneficial for issuers and investors"); NAMA Letter (stating "the definition of 'financial obligation' should focus only o[n] specific behavior for which the SEC has expressed concern, namely, bank loans and private placements"). See also SIFMA AMG Letter (recommending that debt obligation be replaced with the definition of "direct financial obligation" in Item 2.03(c) ("Creation of a Direct Financial Obligation or an Obligation under an Off-Balance Sheet Arrangement of a Registrant") of Form 8-K).

121  See, e.g., NABL Letter; GFOA Letter. Despite the efforts of the MSRB and other market participants, voluntary disclosures remain relatively infrequent; moreover, under a voluntary disclosure regime, investors would not benefit from the uniform requirements of the Rule. Accordingly, and as discussed in Section III.A. and Section V.D. infra, and in the Proposing Release, the Commission does not believe that voluntary disclosure of debt obligations would fully achieve the Commission's objectives.

122  See Proposing Release, supra note 3, 82 FR at 13937-38.

123  See NABL Letter (arguing that the Commission has not provided adequate evidence of investor harm related to undisclosed debt obligations).

124  See Lynn Hume, Spike in Issuer Bank Loan Rates Feared as Drop in Corporate Tax Rate Looms, The Bond Buyer (Dec. 8, 2017), available at https://www.bondbuyer.com/news/issuers-bank-loan-rate-may-spike-with-drop-in-corporate-tax-rate.

125  See Tax Cuts and Jobs Act of 2017, supra note 40.

126  These terms operate such that a decline in the federal corporate income tax rate will increase the overall cost of the related direct placement to the issuer or obligated person, usually by either: (1) Increasing the interest rate paid by the issuer or obligated person to the lender, or (2) requiring the issuer or obligated person to make periodic cash payments to the lender in addition to any required interest payments. The purpose of these terms is to allow banks to maintain their after-tax yield regardless of the corporate income tax rate. The Commission understands that many of these provisions are automatically triggered upon a reduction of the federal corporate income tax rate. See Richard A. Newman et al., How to Calculate the Gross-Up, The Bond Buyer (Jan. 18, 2018), available at https://www.bondbuyer.com/opinion/how-banks-may-calculate-the-gross-up-on-direct-placement-bonds (stating that interest rates paid by issuers and obligated persons could increase by as much as 102 basis points as a result of such terms).

127  See supra Section III.A.1.iii (discussion of information that should be included in an event notice).

128  See Proposing Release, supra note 3, 82 FR at 13937-38.

129   Id. at 13937.

130   See Proposing Release, supra note 3, 82 FR at 13937-38.

131   For a description of GASB's decision to discontinue its use of the "capital lease" and "operating lease" terminology, see Governmental Accounting Standards Board, Statement No. 87—Leases (June 2017), available at http://www.gasb.org/jsp/GASB/Document_C/ DocumentPage?cid=1176169170145&acceptedDisclaimer=true.

132   See, e.g., Portland Letter; San Jose Letter; BDA Letter; East Bay Letter. See also IAC Recommendation, supra note 6.

133   See, e.g., GFOA Letter (suggesting that disclosure of operating leases would be "superfluous to investors"); East Bay Letter (stating that it "does not believe the minutiae of day to day operations would be helpful information for bond holders"). See, e.g., Port Portland Letter (stating "the sheer number of leases to which the Port is a party could create a volume of postings that would overwhelm participants in the municipal market"); ACI Letter.

134   See, e.g., UHC Letter ("The broad definition of leases implicates a variety of lease arrangements executed by UHC in the ordinary course of business, including office leases, copier leases, etc. . . . [i]dentifying and evaluating the materiality of every one of these arrangements . . . would be burdensome and costly").

135   See White Plains Letter; SIFMA AMG Letter.

136   See BDA Letter.

137   See id.; White Plains Letter.

138   See BDA Letter.

139   See Proposing Release, supra note 3, 82 FR at 13937.

140   See generally Association for Governmental Lease and Finance, An Introduction to Municipal Lease Financing: Answers to Frequently Asked Questions (July 1, 2000) ("Municipal Lease Financing"), available at https://aglf.memberclicks.net/assets/docs/ municipal_lease_financing.pdf; see also BDA Letter (arguing that "the definition of financial obligation should be narrowed to include only obligations for borrowed money, leases that operate as vehicles to borrow money, and derivatives that are executed for the purpose of hedging these types of transactions").

141   For example, the types of leases that could be debt obligations include, but are not limited to, lease-revenue transactions and certificates of participation transactions. Typically, in a lease-revenue transaction, an issuer or obligated person borrows money to finance an equipment or real property acquisition or improvement and a lease secures the issuer's or obligated person's obligation to make principal and interest payments to the lender. See Municipal Lease Financing, supra note 140; see also CA Finance Letter (stating that the majority of its municipal securities transactions are structured as lease-revenue transactions). In a certificates of participation transaction, the issuer or obligated person sells certificates of participation and the proceeds of the certificates are used, typically, to finance an equipment or real property acquisition or improvement by the issuer or obligated person. The issuer or obligated person, typically, will, as part of the transaction, execute a lease with a trustee, which serves as the mechanism through which the trustee receives payments from the issuer or obligated person. The trustee then proportionately distributes the lease payments it receives from the issuer or obligated person to certificate holders to pay principal and interest when and as due. See Municipal Lease Financing, supra note 140.

   Moreover, in the context of Rule 15c2-12, the Commission is not limiting the term "debt obligation" to debt as it may be defined for state law purposes, but instead is applying it more broadly to circumstances under which an issuer or obligated person has borrowed money. Debt, as defined for state law purposes, "ordinarily means general obligation debt. Typically, the limitation is interpreted to exclude revenue bonds, special fund obligations, and other debt which is not backed by the full faith and credit of the [issuer] coupled by the unlimited power to levy an ad valorem tax to pay such debt." See Nat'l Ass'n of Bond Lawyers, Fundamentals of Municipal Bond Law 25 (2018). The Commission believes that, for the purposes of Rule 15c2-12, a narrow interpretation of "debt" would be under-inclusive because issuers and obligated persons can, and often do, borrow money through a variety of transactions, many of which would not qualify as "debt" under relevant state laws. See id. (describing forms of debt that would not be "debt" as ordinarily defined by state law). See also Steven Maguire and Jeffrey M. Stupak, Cong. Research Serv., RL30638, Tax-Exempt Bonds: A Description of State and Local Government Debt (2015), available at https://www.hsdl.org/?view&did=761823 (stating that "an advantage of [lease rental revenue bonds and certificates] is that many states' constitutional and statutory definitions do not consider this type of financing to be debt[.]").

   For a discussion of when a debt obligation is incurred for purposes of the Rule, see supra Section III.A.1.ii.

142   A "similar contract" could, for example, include a line of credit obtained from a bank or other lender.

143   See BDA Letter (stating that leases entered into in the ordinary course of an issuer's operations do not represent competing debt and should be excluded from the definition of financial obligation); see also TASBO Letter (stating that operating transactions "have little or no impact on a school district's ability to pay debt service on public securities secured by a separate unlimited ad valorem debt service tax").

A determination of whether a lease is a "debt obligation" should be based on the substance of the arrangement, not its label. Accordingly, any type of lease arrangement could, under the appropriate facts and circumstances, be a "debt obligation" and be subject to disclosure under the Rule, if it is entered into as a vehicle to borrow money and is material.

144 Several commenters stated that such disclosures would likely be available in an issuer's or obligated person's audited financial statements. See, e.g., Arlington SD Letter; Lebanon Letter. Examples of such leases that are typically not vehicles to borrow money that are common among issuers and obligated persons include, but are not limited to: Commercial office building leases (see San Jose Letter), airline and concessionaire leases at airport facilities (see ACI Letter and DFW Letter), and copy machine leases (see PFM Letter). Unless they are a debt obligation under the Rule, disclosure of these types of lease arrangements pursuant to the Rule will not be required. However, issuers and obligated persons may choose to voluntarily disclose such leases to EMMA.

145 See Proposing Release, supra note 3, 82 FR at 13938.

146 Id.

147 See, e.g., LPPC Letter.

148 See id., Kissimmee Letter; BDA Letter; and WPPI Letter (stating "in the normal course of operations, power utilities enter physical commodities derivatives and we would strongly oppose the inclusion of these lengthy contracts as a material event").

149 See LPPC Letter.

150 In its comment letter, NABL argued that the Commission offered little evidence of the need for disclosure of derivative instruments. See NABL Letter. But see NFMA, Recommended Best Practices in Disclosure for Direct Purchase Bonds, Bank Loans, and Other Bank-Borrower Agreements (June 2015), available at http://www.nfma.org/assets/documents/RBP/rbp_bankloans_615.pdf (stating, "In any credit analysis, liquidity is a key component. Bank loans—like a host of other financial products, including LOCs, liquidity facilities, and swaps—often include obligor payment provisions that change upon the occurrence of certain events. These 'triggers' can result in the acceleration of debt payments or in the requirement for the payment or posting of collateral for termination payments, either of which can potentially impair obligor liquidity"). See also Elizabeth Campbell, Chicago Settling $390 Million Tab When City Can Least Afford It, Bloomberg (Mar. 17, 2016), available at https://www.bloomberg.com/news/articles/2016-03-17/chicago-settling-390-million-tab-when-city-can-least-afford-it (stating that the City of Chicago had already paid about $290 million to exit various swaps and was planning to spend $100 million more). See also Government Finance Officers Association, Potential Impacts of Tax Reform on Outstanding and Future Municipal Debt Issuance (Feb. 2018), available at http://www.gfoa.org/potential-impacts-tax-reform-outstanding-and-future-municipal-debt-issuance (highlighting derivatives as a tool to simulate tax-exempt advance refundings, which were abolished under recent changes to the federal tax laws, and reminding issuers to "fully understand" the "specific benefits, risks, and costs" of such a financial tool), and Brian Tumulty, What GFOA is Warning on Alternatives to Advance Refundings, The Bond Buyer (Feb. 15, 2018), available at https://www.bondbuyer.com/news/what-gfoa-is-warning-on-alternatives-to-advance-refundings?brief=00000159-f607-d46a-ab79-fe27f2be0000.

151 See e.g., Ianthe Jeanne Dugan, School District, Bank in Swap Clash, Wall St. J. (May 24, 2011), available at https://www.wsj.com/articles/SB10001424052702303654804576341772921133838 (discussing potential swap termination fee liability of a school district to its swap counterparty); see also Statement of State College Area School District Board of School Directors (Jan. 14, 2013) ("State College Area Swap Statement"), available at http://www.statecollege.com/news/local-news/state-college-area-school-district-agrees-to-9-million-payment-in-interest-rate-swap-agreement-with-royal-bank-of-canada,1222044/.

152 For a discussion of when an issuer or obligated person should assess the materiality of a derivative instrument entered into in connection with, or pledged as security or a source of payment for, an existing or planned debt obligation, see supra Section III.A.1.ii.

153 See Proposing Release, supra note 3, 82 FR at 13938.

154 See State College Area Swap Statement, supra note 151.

155 For purposes of paragraph (b)(5)(i)(C)(15), a forward starting interest rate swap generally would mean any swap used in the municipal debt market that is anticipated to be cash settled at the time of incurrence of a debt obligation, swap anticipated to be part of a synthetic fixed rate debt obligation, or similar product.
For a discussion of when a forward starting interest rate swap is "incurred," see supra Section III.A.1.ii. If the incurrence of such a swap is material, a forward starting interest rate swap would be disclosed within ten business days of its incurrence because, in the Commission's view, the issuer's or obligated person's contingent obligation to make payments, post collateral, etc. would begin at the point of incurrence of the swap, not if or when the planned debt obligation is incurred because the terms of the swap will be set at the time that the swap is incurred. As a result, the issuer or obligated person would, at that time, assume market risk (e.g., interest rate fluctuations) and counterparty risk (e.g., counterparty liquidity).

156 See Proposing Release, supra note 3, 82 FR at 13938.

157 See, e.g., OMPA Letter; Oregon Treasurer Letter; WPPI Letter.

158 See BDA Letter; ICI Letter; SIFMA AMG Letter.

159     See Proposing Release, supra note 3, 82 FR at 13938. As stated in the Proposing Release, under certain circumstances, in order to facilitate a financing by a third party, an issuer or obligated person may provide a guarantee to reduce risks to the provider of the financing and lower the cost of borrowing for the third party. That guarantee may assume different forms including a payment guarantee or other arrangement that could expose the issuer or obligated person to a contingent financial obligation. For example, an issuer that is a county could agree to guarantee the repayment of municipal securities issued by a town located in the county. In this instance, the county could be required to use its own funds to repay the town's municipal securities. Furthermore, an issuer or obligated person may provide a guarantee with respect to its own financial obligation. For example, an issuer or obligated person could, in connection with the issuance of variable rate demand obligations, agree to repurchase, with its own capital, bonds that have been tendered but are unable to be remarketed. In this instance, the issuer or obligated person uses its own funds to purchase the bonds instead of a third party liquidity facility. A guarantee provided for the benefit of a third party or a self-liquidity facility or other contingent arrangement would be a guarantee under the amendments.

160     For a discussion of materiality considerations in connection with the Rule, see supra Section III.A.1.i, and for a discussion of the form of event notices provided under paragraph (b)(5)(i)(C)(15) of the Rule, see supra Section III.A.1.iii.

161     See Proposing Release, supra note 3, 82 FR at 13938.

162     See, e.g., GA Finance Letter ("The SEC should exclude monetary obligations resulting from judicial, administrative, or arbitration proceedings from the definition of financial obligation."); DAC Letter (same); see also Denver Letter; Houston Letter; San Jose Letter.

163     See DAC Letter.

164     See, e.g., San Jose Letter ("[T]he City is involved in a variety of administrative, judicial and arbitration proceedings at any given time."); Denver Letter ("[T]he City is involved in hundreds of judicial, administrative and arbitration proceedings every year . . . [i]n the vast majority of cases, staff involved in these contracts, regulatory, judicial and administrative proceedings are not aware of the Rule, making the likelihood of an inadvertent non-compliance much greater . . . [t]he City anticipates a significant amount of time, expense and resources would be required to actively monitor its financial obligations, if the term remains so broadly defined").

165     See LPPC Letter.

166     See NABL Letter.

167     See LPPC Letter (arguing that issuers and obligated persons typically have funding reserves and insurance to cover costs related to judicial, administrative, or arbitration hearings).

168     See Proposing Release, supra note 3, 82 FR at 13957.

169     See, e.g., DAC Letter; see also GA Finance Letter.

170     See, e.g., DAC Letter.

171     See id.

172     The Commission understands that issuers and obligated persons have since 1995 followed a similar approach with respect to voluntarily submitted final official statements when choosing to opt out of the small issuer exception of Rule 15c2-12(d)(2)(ii)(A). Cf. Division of Market Regulation, U.S. Securities and Exchange Commission, Staff Opinion Letter on Rule 15c2-12 (June 23, 1995), at Question 17, available at https://www.sec.gov/info/municipal/nabl-1-interpretive-letter-1995-06-23.pdf (staff guidance regarding an issuer's or obligated person's obligations under the Rule if such issuer or obligated person chooses to opt out of the small issuer exception of Rule 15c2-12(d)(2)(ii)(A)).

173     See 17 CFR 240.15c2-12(f) (emphasis added).

174     See Proposing Release, supra note 3, 82 FR at 13941.

175     See Kutak Rock Letter; DAC Letter.

176     See Proposing Release, supra note 3, 82 FR at 13940.

177     See DAC Letter.

178     See SIFMA Letter.

179     The Commission believes that a "modification of terms" occurs when such modified terms become enforceable against the issuer or obligated person which is consistent with the Commission's view of when a financial obligation is incurred. See supra Section III.A.1.ii.

180     See San Jose Letter.

181     See DAC Letter.

182     See Proposing Release, supra note 3, 82 FR at 13939-40.

183     See, e.g., ABA Letter; Brookfield Letter; Bishop Letter; Kutak Rock Letter.

184     See SIFMA Letter (recommending the Commission consider replacing "reflecting financial difficulties" with "materially impairs the ability of an issuer/obligated person to pay debt service as scheduled on outstanding obligations," or "materially impairs the creditworthiness of the issuer/obligated person").

185  See ICI Letter; Vanguard Letter; SIFMA AMG Letter; see also NFMA Letter (arguing that "the triggering of an event related to financial difficulties should always be publicly disclosed on EMMA, without regard to the materiality of the obligation itself").

186  See Proposing Release, supra note 3, 82 FR at 13939.

187  For example, as described in the Proposing Release, an issuer or obligated person may covenant to provide the counterparty with notice of change in its address and may not promptly comply with the covenant. A failure to comply with such a covenant may not reflect financial difficulties; therefore, absent other circumstances, this event likely does not raise the concerns the amendments are intended to address. On the other hand an issuer or obligated person could agree to replenish a debt service reserve fund if draws have been made on such fund. In this example, if an issuer or obligated person fails to comply with such covenant, then such an event likely should be disclosed to investors and other market participants. See Proposing Release, supra note 3, 82 FR at 13939.
Issuers and obligated persons may consider disclosing the occurrence of events that do not reflect financial difficulties as a matter of best practice if they believe investors would find those occurrences important.

188  See Kutak Rock Letter; NAMA Letter.

189  See SIFMA Letter.

190  For a discussion of how issuers and obligated persons should proceed when a preliminary official statement is distributed prior to the compliance date, but the Offering is settled and the continuing disclosure agreement is executed after the compliance date, see below in this Section III.C.

191  In the Proposing Release, the Commission stated that under paragraph (c) of the Rule, a dealer cannot recommend the purchase or sale of a municipal security unless such dealer has procedures in place that provide reasonable assurance that it will receive prompt notice of any event disclosed pursuant to paragraphs (b)(5)(i)(C) and (D) and paragraph (d)(2)(ii)(B) of the Rule with respect to the security. The Commission recognized that for continuing disclosure agreements entered into prior to the compliance date, the recommending dealer would receive notice solely of those events covered by that continuing disclosure agreement, which would likely not include any of the items added by the amendments. See Proposing Release, supra note 3, 82 FR at 13941. The Commission solicited comments on the impact of the proposed amendments with respect to recommending dealers. With the exception of one related comment that is discussed in Section IV.D.4., the Commission received no comments on this subject.

192  See id.

193  See Hawkins Letter.

194  See GFOA Letter; ABA Letter; BDA Letter; NABL Letter.

195  See GFOA Letter; NABL Letter; NAMA Letter.

196  See ABA Letter.

197  See ICI Letter.

198  If any of the provisions of these amendments, or the application thereof to any person or circumstance, is held to be invalid, such invalidity shall not affect other provisions or application of such provisions to other persons or circumstances that can be given effect without the invalid provision or application.

199  44 U.S.C. 3501 et seq.

200  Proposed Collection; Comment Request (Extension: Rule 15c2-12, SEC File No. 270.330, OMB Control No. 3235-0372), 83 FR 18358 (Apr. 26, 2018).

201  See SIP Letter; NABL III Letter.

202  See Submission for OMB Review; Comment Request (Extension: Rule 15c2-12, SEC File No. 270.330, OMB Control No. 3235-0372), 80 FR 9758 (Feb. 24, 2015) ("2015 PRA Notice").

203  See, e.g., NABL OMB Letter; GFOA Letter; Kutak Rock Letter; ABA Letter; AZ Universities Letter; Arlington SD Letter; Denver Letter; NAHEFFA Letter; NCSHA Letter; SIFMA Letter; SIP Letter; and TASBO Letter.

204  See 17 CFR 240.15c2-12(b).

205  See 17 CFR 240.15c2-12(c).

206  See 17 CFR 240.15c2-12(b)(5)(i)(C).

207  See supra Section I.

208  See 2015 PRA Notice, supra note 202. The number of issuers in the estimate reflects those issuers that are affected by the continuing disclosure requirements of Rule 15c2-12.

209  See NABL OMB Letter.

210  See Proposing Release, supra note 3, 82 FR at 13943; 2015 PRA Notice, supra note 202.

211  As discussed above, under the Rule prior to these amendments, the Commission estimated that dealers would incur a burden of 20,000 hours (80 hours per year per dealer) to determine whether issuers or obligated persons have failed to comply, in all material respects, with any previous undertakings in a written contract or agreement specified in paragraph (b)(5)(i) of the Rule.

212    This estimate reflected the following: 2,500 hours (estimate for dealers to reasonably determine that the issuer or obligated person has undertaken, in a written agreement or contract, for the benefit of holders of municipal securities, to provide continuing disclosure documents to the MSRB) + [20,000 hours (estimate under the Rule prior to these amendments for dealers to determine whether issuers or obligated persons have failed to comply, in all material respects, with any previous undertakings in a written contract or agreement specified in paragraph (b)(5)(i) of the Rule) + 2,500 hours (estimate of the increased burden due to the amendments on dealers to determine whether issues or obligated persons have failed to comply, in all material respects, with any previous undertakings in a written contract or agreement specified in paragraph (b)(5)(i) of the Rule)] = 25,000 hours.

213    See ABA Letter.

214    See NABL OMB Letter.

215    See id.

216    See id.

217    As discussed above, under the Rule prior to these amendments, the Commission estimated that the total annual burden for dealers to determine whether issuers or obligated persons have failed to comply, in all material respects, with any previous undertakings in a written contract or agreement specified in paragraph (b)(5)(i) of the Rule was 20,000 hours, or 80 hours per year per dealer. The Commission used this estimate as a baseline for its estimate in the Proposing Release, concluding that the proposed amendments would add 2,500 hours of additional burden on dealers to perform this task, for a total of 22,500 hours.

218    See, e.g., NABL OMB Letter; SIFMA Letter.

219    See NABL OMB Letter.

220    See id.

221    See id. (highlighting the "substantial 'due diligence' time" spent by underwriters to determine whether issuers or obligated persons have failed to comply, in all material respects, with any previous undertakings in a written contract or agreement specified in paragraph (b)(5)(i) of the Rule).

222    See id.

223    See infra Section IV.D.2.

224    According to the MSRB Fact Book for each respective year, in 2017 there were 12,709 primary market submissions to the MSRB, in 2016 there were 14,314 primary market submissions to the MSRB, and in 2015 there were 13,952 primary market submissions to the MSRB. 12,709 + 14,314 + 13,952 = 40,975. 40,975/3 = 13,658. See MSRB 2017 Fact Book, supra note 24.

225    As discussed above, this estimate received no comments from commenters and the Commission continues to believe that this burden is unaffected by the amendments. This estimate is being revised solely to correspond with the Commission's new method of calculation.

226    13,658 (estimated annual issuances) x .25 (hourly burden to reasonably determine that the issuer or obligated person has undertaken, in a written agreement or contract, for the benefit of holders of such municipal securities, to provide continuing disclosure documents to the MSRB) = 3,414.5 hours. 3,414.5 hours/250 (estimated number of dealers) = 13.65 hours.

227    In the Proposing Release, the Commission estimated dealers would continue to incur a burden of 2,500 hours per year, or ten hours per year per dealer, to reasonably determine that the issuer or obligated person has undertaken, in a written agreement or contract, for the benefit of holders of municipal securities, to provide continuing disclosure documents to the MSRB. 3,415 hours - 2,500 hours = 915 hours.

228    Although not required by the Commission, a staff letter suggested that a standard form should be used. See Letter from Catherine McGuire, Chief Counsel, Division of Market Regulation, U.S. Securities and Exchange Commission, to John S. Overdorff, Chair, Securities Law and Disclosure Committee, Nat' Ass'n of Bond Lawyers (Sept. 19, 1995) ("NABL 2"), available at https:// www.sec.gov/info/municipal/nabl-2-interpretive-letter-1995-09-19.pdf (stating that such documents "should list all events in the same language as is contained in the rule, without any qualifying words or phrases").

229    13,658 (estimated annual issuances) x 1 (average additional hourly burden per issuance as a result of the amendments) = 13,658 hours. 13,658 hours/250 (estimated number of dealers) = 54.63 hours.

230    In the Proposing Release, the Commission estimated that the amendments to the Rule would result in an additional 2,500 hours annually (an additional 10 hours per year per dealer) for dealers to determine whether issuers or obligated persons have failed to comply, in all material respects, with any previous undertakings in a written contract or agreement specified in paragraph (b)(5)(i) of the Rule. 13,658 hours (new estimate of annual increased burden on dealers) - 2,500 hours (previous estimate) = 11,158 hours. 11,158/250 (estimated number of dealers) = 44.63 hours.

231    See supra Section III.A.2.i.

232    See supra Section III.A.2.iv.

233   13,658 (estimated annual issuances) x 8 (average burden estimate per issuance for dealers to determine whether issuers or obligated persons have failed to comply, in all material respects, with any previous undertakings in a written contract or agreement specified in paragraph (b)(5)(i) of the Rule) = 109,264 hours. 109,264 hours/250 (estimated number of dealers) = 437.05 hours.

234   In the Proposing Release, the Commission estimated that the dealer burden, not including the proposed amendments, for determining whether issuers or obligated persons have failed to comply, in all material respects, with any previous undertakings in a written contract or agreement specified in paragraph (b)(5)(i) of the Rule, was 20,000 hours (80 hours per year per dealer). See Proposing Release, supra note 3, 82 FR at 13943-44 and note 131. 109,264 hours (revised estimate of this dealer burden) - 20,000 hours (estimate in the Proposing Release) = 89,264 hours. 89,264/250 (estimated number of dealers) = 357.05 hours.

235   See MSRB 2017 Fact Book, supra note 24.

236   109,264 hours (revised estimate of dealer burden, prior to these amendments, to determine whether issuers or obligated persons have failed to comply, in all material respects, with any previous undertakings in a written contract or agreement specified in paragraph (b)(5)(i) of the Rule) + 13,658 hours (revised estimate of additional dealer burden, due to the amendments, to determine whether issuers or obligated persons have failed to comply, in all material respects, with any previous undertakings in a written contract or agreement specified in paragraph (b)(5)(i) of the Rule) + 3,415 hours (revised annual estimate for dealers to reasonably determine that the issuer or obligated person has undertaken, in a written agreement or contract, for the benefit of holders of such municipal securities, to provide continuing disclosure documents to the MSRB) = 126,336.5 hours. 126,337 hours/250 (estimated number of dealers) = 505.35 hours.

237   0.25 hour (revised estimate of burden per issuance for dealer to reasonably determine that the issuer or obligated person has undertaken, in a written agreement or contract, for the benefit of holders of municipal securities, to provide continuing disclosure documents to the MSRB) + 1 hour (revised estimate of additional burden per issuance, due to the amendments, for dealers to determine whether issuers or obligated persons have failed to comply, in all material respects, with any previous undertakings in a written contract or agreement specified in paragraph (b)(5)(i) of the Rule) + 8 hours (revised estimate of burden per issuance, prior to these amendments, for dealers to determine whether issuers or obligated persons have failed to comply, in all material respects, with any previous undertakings in a written contract or agreement specified in paragraph (b)(5)(i) of the Rule) = 9.25 hours per issuance.

238   126,337 hours (revised estimate of total dealer burden) - 25,000 hours (estimate of total dealer burden in Proposing Release) = 101,337 hours. 101,337 hours/250 (estimated number of dealers) = 405.35 hours.

239   See Proposing Release, supra note 3, 82 FR at 13944.

240   See id.

241   See NABL OMB Letter.

242   See id.

243   See supra Sections III.A.1 and III.A.2.

244   126,337 hours (revised estimate of total annual burden for dealers acting as a Participating Underwriter) + 1,250 hours (estimated one-time burden for dealers acting as a Participating Underwriter) = 127,587 hours.

245   See supra note 236.

246   The 2015 PRA Notice contained no estimates of one-time burdens and costs because the approved collection of information associated with the Rule had not changed.

247   See Proposing Release, supra note 3, 82 FR at 13944; 2015 PRA Notice, supra note 202.

248   See NABL OMB Letter.

249   28,000 is the current approximate number of issuers identified in MSRB Form G-32 filings as agreeing to provide continuing disclosure information under Rule 15c2-12 dating from June 2018 back to February 2011, when the MSRB first began collecting such information.

250   See 2015 PRA Notice, supra note 202.

251   73,480 (annual number of event notices) x 2 (estimate of average hours needed to prepare and submit each) + 62,596 (annual number of annual filings) x 7 (estimate of average hours needed to prepare and submit each) + 7,063 (annual number of failure to file notices) x 2 (estimate of average hours needed to prepare and submit each) = 599,258 hours.

252   75,680 (annual number of event notices including additional 2,200 event notice burden created by amendments) x 2 (average estimate of hours needed to prepare and submit each) + 62,596 (average number of annual filings) x 7 (average estimate of hours needed to prepare and submit each) + 7,063 (average number of failure to file notices) x 2 (average estimate of hours needed to prepare and submit each) = 603,658 hours. The Commission believed that the proposed amendments would not affect the number of annual filings or failure to file notices required to be filed by issuers, so those estimates were unchanged from the estimates under the Rule prior to these amendments. See 2015 PRA Notice, supra note 202.

253   See GFOA Letter; NABL OMB Letter; Kutak Rock Letter; ABA Letter; SIP Letter.

254   See GFOA Letter.

255   See NABL OMB Letter.

256   See Kutak Rock Letter.

257   See, e.g. Houston Letter; Denver Letter.

258   See Denver Letter. See also, e.g. AZ Universities Letter; Kutak Rock Letter; NABL OMB Letter; NAHEFFA Letter.

259   See NABL OMB Letter.

260   See id.

261   See GFOA Letter ("Respondents estimated that the average amount of internal staff time committed to ensuring compliance to the proposed amendments would be 7.3 hours per material event and 7.8 per occurrence, modification of terms or other similar event").

262   See Kutak Rock Letter.

263   See NABL OMB Letter. The commenter estimated that one-quarter of 34,696 issuers (as discussed above, the Commission believes this likely overstates the number of issuers) would each file three material event notices annually under the proposed amendment (15), and each notice would take 4.2 hours to prepare and file. Using these estimates, issuers would file an additional 26,022 event notices to comply with proposed amendment (15) based off the following: 34,696 (estimated number of issuers) x .25 (estimated percentage of such issuers filing event notices under proposed amendment (15)) x 3 (number of event notices needed to be filed be each such issuer) = 26,022 filings. The commenter did not provide any basis for its estimate that one-quarter of issuers would need to file event notices, or any basis for its estimate that each such issuer would file three event notices, which would result in an additional 26,022 filings. Moreover, the commenter was basing its estimates on the proposed amendments, not the narrowed, adopted definition of "financial obligation."

264   See id. The commenter estimated that 100 notices would need to be filed under proposed amendment (16), and that each would take 5.3 hours to prepare and file. The commenter's estimate that each such notice would take 5.3 hours to prepare and file is based on a survey response.

265   See id. The commenter estimated that 34,696 issuers would each need 25 hours a year to monitor and elevate possibly reportable events under the proposed amendments. The commenter did not provide a basis for its estimate that every issuer would need 25 hours a year to monitor for such events.

266   See id. The commenter estimated that one-half of 34,696 issuers would need ten hours a year to evaluate possibly reportable events. The commenter did not provide a basis for its estimate that one-half of issuers would need to evaluate possibly reportable events, and its estimate that such an evaluation would take ten hours a year.

267   See id.

268   75,680 (annual number of event notices) x 4 (revised estimate of hours needed to prepare and submit each) = 302,720 hours. This number includes and incorporates its estimate that the amendments, as adopted, add an additional 2,200 event notices to the burden estimates. The burden estimate in the Proposing Release was 75,680 event notices at 2 hours each, equaling 151,360 hours. 302,720 hours - 151,360 hours = 151,360 hours of increased burden over the estimate in the Proposing Release.

269   The Commission is not adopting the estimates of total burden provided by the commenters because those estimates were in response to amendments that have since been substantially narrowed. See supra Section III.A.2.

270   See Kutak Rock Letter.

271   According to the 2017 MSRB Fact Book, bond call notices in 2017 were 63% of total event notices (38,198 of 60,883 total event notices). In 2016, bond call notices were 66% (41,862 of 63,586 event notices) of total event notices. See MSRB 2017 Fact Book, supra note 24.

272   Other than comments in the NABL OMB Letter discussed above in note 263, the Commission did not receive comments quantifying the increase in the total number of event notices that issuers would file because of the proposed amendments. As previously stated, the narrowing of the definition of "financial obligation" from the definition proposed in the Proposing Release should reduce the number of required filings. Nonetheless, in light of the comments in the NABL OMB Letter suggesting that filings resulting from the proposed amendments might be higher than the Commission originally estimated, in light of a lack of data to quantify a reduction in filings resulting from the narrowed scope of the amendments, and to provide an estimate for the paperwork burden that would not be under-inclusive, the Commission has elected to retain the proposed estimate at this time.

273   See supra Section III.A.2.i.

274   Compare, e.g., Denver Letter (the broad scope of financial obligation will require "significant expense and effort . . . [to] train relevant City employees across dozens of departments and agencies and to create a system of coordination and review") and TASBO Letter ("school districts will be required to restructure their organizations and establish review processes in order to vet the types of 'financial obligations' captured under the broad definition included in the proposed regulations.") with BDA Letter (if the definition of financial

obligation were "properly crafted around competing debt, all of the material 'financial obligations' would ordinarily fall within the responsibility of that one department because it tends to be responsible for all debt of the issuer").

275    438,172 hours (estimated burden for issuers to submit annual filings) + 302,720 hours (estimated annual burden for issuers to submit event notices under the amendments) + 14,126 hours (estimated annual burden for issuers to submit failure to file notices) = 755,018 hours.

276    See 2015 PRA Notice, supra note 202.

277    First-year burden for the MSRB: 12,699 hours (estimate of annual burden in the Proposing Release) + 1,162 hours (estimate for one-time burden to implement the proposed amendments) = 13,861 hours.

278    According to the MSRB, its estimated annual burden has changed from 12,699 hours to 19,500 hours due to a change in the method of calculation used by the MSRB to estimate annual burden.

279    According to the MSRB, its estimated one-time burden has changed from 1,162 hours to 1,700 hours after further assessment of the work needed to prepare EMMA for two new event notices.

280    First-year burden for the MSRB: 19,500 hours (estimated annual burden) + 1,700 hours (estimate for one-time burden to implement the amendments) = 21,200 hours.

281    See NABL OMB Letter and SIFMA Letter.

282    See id.

283    See NABL OMB Letter. The commenter derived this estimate by multiplying 9,358,046 (the number of municipal securities trades reported by the MSRB in 2016) by 76% (the purported percentage of such transactions that would require review) and then by 2 (how many hours such a review would take). The 76% figure was the mean response in the commenter's survey to the question "what percentage [of issuers] have outstanding 'financial obligations' that you believe the SEC might determine to be material . . . ?" The estimate that it would take two hours for a dealer to complete its due diligence was apparently derived from a survey response indicating that an issuer's redacted financial obligations to be reviewed would average 39 pages in length.

284    126,337 hours (total estimated annual burden for dealers) + 755,018 hours (total estimated annual burden for issuers) + 19,500 hours (total estimated annual burden for MSRB) = 900,855 hours. The initial first-year burden would be 903,805 hours: 127,587 hours (total estimated burden for dealers in first year) + 755,018 hours (total estimated burden for issuers in first year) + 21,200 hours (total estimated burden for MSRB in the first year) = 903,805 hours.

285    See Proposing Release, supra note 3, 82 FR at 13946.

286    Id.

287    Id.

288    According to the MSRB, its estimated annual cost has changed to $520,000 after a change in the method of calculation used by the MSRB to estimate annual cost. This estimate corresponds to the estimated annual cost in hardware and software costs to operate the continuing disclosure service for the MSRB's EMMA system.

289    See Proposing Release, supra note 3, 82 FR at 13946. The Commission estimated the following: 20,000 (number of issuers) x .65 (percentage of issuers that may use designated agents) x $750 (estimated average annual cost for issuer's use of designated agent) = $9,750,000. See also 2015 PRA Notice, supra note 202.

290    Id.

291    See supra Section IV.D.2.iii.

292    See supra Section IV.D.2 (revising the estimated number of issuers affected by continuing disclosure agreements consistent with the Rule from 20,000 to 28,000). This revision is necessary because the Commission's prior calculations in the Proposing Release relied on an estimate of 65% of 20,000 issuers.

293    Previously, the Commission estimated that 65% of 20,000 issuers would use designated agents for the submission of event notices to the MSRB. See 2015 PRA Notice, supra note 202. The Commission now estimates that 65% of 28,000 issuers may use designated agents.

294    28,000 issuers (revised estimate of issuers affected by continuing disclosure agreements consistent with the Rule) x .65 (percentage of issuers that may use designated agents) x $750 (estimated average annual cost for issuer's use of designated agent for the Rule prior to these amendments) = $13,650,000.

295    28,000 (number of issuers) x .65 (percentage of issuers that may use designated agents) x $795 ($750 x 1.06) (estimated average annual cost for issuer's use of designated agent under the amendments to the Rule) = $14,469,000. The increase in annual cost as a result of the amendments is $819,000 ($14,469,000 - $13,650,000 = $819,000).

296    See 2010 Amendments Adopting Release, supra note 8.

297    See Proposing Release, supra note 3, 82 FR at 13946.

298    Id. 20,000 issuers x $100 = $2,000,000.

299     See Kutak Rock Letter.

300     See NABL 2, supra note 228.

301     See supra Section IV.D.2.

302     28,000 issuers (revised estimate of issuers affected by continuing disclosure requirements under the Rule) x $400 (hourly wage for an outside attorney) x .25 hours (estimated time for outside attorney to revise a continuing disclosure document in accordance with the amendments to the Rule) = $2,800,000 (total one-time cost for all issuers). See also Proposing Release, supra note 3, 82 FR at 13946 and note 153. The Commission recognizes that the costs of retaining outside professionals may vary depending on the nature of the professional services, but for purposes of this PRA analysis we estimate that costs of outside counsel would be an average of $400 per hour.

303     See NAMA Letter; ABA Letter; Arlington SD Letter; GFOA Letter.

304     See GFOA Letter. According to the commenter, it surveyed 174 GFOA members primarily responsible for debt disclosure in their respective jurisdictions.

305     See Arlington SD Letter.

306     See, e.g., NAMA Letter (stating the "too broad" definition of financial obligation would force issuers to consult counsel for "many types of financings and financial obligations that do not affect a government['s] . . . ability to pay debt); see also BDA Letter (stating if the definition of financial obligation were focused on competing debt, the responsibility to assess whether an event notice was needed would be handled by an issuer's debt finance department).

307     See supra Section IV.D.2.iii.

308     While some commenters stated that the assistance of outside counsel would be required on nearly all event notices under the proposed amendments, the Commission believes that the narrowed scope of the adopted amendments, as well as the examples provided in Section III.A.1. intended to assist issuers in determining materiality under the Rule, will substantially reduce the need for issuers to consult with outside counsel.

309     See NABL OMB Letter (survey of outside bond counsel: "If asked to prepare a summary of a financial obligation, on average how many hours would be required to comply?" Median answer—4 hours).

310     1,100 (number of event notices requiring outside counsel) x 4 (estimated time for outside attorney to assist in the preparation of such event notice) x $400 (hourly wage for an outside attorney) = $1,760,000. The Commission recognizes that the costs of retaining outside professionals may vary depending on the nature of the professional services, but for purposes of this PRA analysis we estimate that costs of outside counsel would be an average of $400 per hour.

311     $1,760,000 (annual cost to employ outside counsel to assist in preparation of certain event notices) + $14,469,000 (annual cost to employ designated agents to submit event notices) = $16,229,000.

312     See supra note 302.

313     See MSRB Rules G-8, G-9. Exchange Act Rules 17a-3 and 17a-4 state that, for purposes of transactions in municipal securities by municipal securities brokers and municipal securities dealers, such entities will be deemed in compliance with Exchange Act Rules 17a-3 and 17a-4 if they are in compliance with MSRB Rules G-8 and G-9, respectively.

314     Continuing disclosure agreements may not be available if they are not subject to state Freedom of Information Act requirements. Internal dealer notices would not generally be publicly available but may be available to the Commission, the MSRB, and FINRA.

315     See Proposing Release, supra note 3, 82 FR at 13937. In the Proposing Release, the Commission defined the term "financial obligation" to mean a debt obligation, lease, guarantee, derivative instrument, or monetary obligation resulting from a judicial, administrative, or arbitration proceeding, but not including municipal securities as to which a final official statement has been provided to the MSRB consistent with Rule 15c2-12.

316     See supra Section III.A.2. The adopted definition of financial obligation removes the term "lease" and "monetary obligation resulting from a judicial, administrative, or arbitration proceeding" from the proposed definition of financial obligation, and limits the coverage of derivative or guarantee to those related to a debt obligation. The Commission believes the revised definition helps distinguish debt and debt-like obligations from obligations incurred in an issuer's or obligated person's normal course of operations, and focuses the amendments on the types of obligations that could compete with a security holder's interests.

317     See infra Section V.C.2.i and Section V.D.1.

318     See Proposing Release, supra note 3, 82 FR at 13929.

319     Federal Deposit Insurance Corporation, Consolidated Reports of Condition and Income, available at https://www.fdic.gov/regulations/resources/call/index.html. According to the FDIC, every national bank, state member bank, insured state nonmember bank, and savings association is required to file a call report as of the close of business on the last day of each calendar quarter. The dollar amount of commercial bank loans to state and local governments is computed using Call Report data, available at https://cdr.ffiec.gov/public/. The dollar amount is the sum of item RCON2107, "OBLIGATIONS (OTHER THAN SECURITIES AND

LEASES) OF STATES AND POLITICAL SUBDIVISIONS IN THE U.S," across all the depository institutions for the stated time period. Item RCON2107 is defined as follows: "Includes all obligations of states and political subdivisions in the United States (including those secured by real estate), other than leases and other those obligations reported as securities issued by such entities in 'Securities Issued by States Political Subdivision in the U.S. (8496, 8497, 8498, and 8499)' or 'Mortgage-backed securities (8500, 8501, 8502, and 8503).' Excludes all such obligations held for trading. States and political subdivisions in the U.S. includes: (1) The fifty states of the United States and the District of Columbia and their counties, municipalities, school districts, irrigation districts, and drainage and sewer districts; and (2) the governments of Puerto Rico and of the U.S. territories and possessions and their political subdivisions." See Board of Governors of the Federal Reserve System, Micro Data Reference Manual, available at http://www.federalreserve.gov/apps/mdrm/data-dictionary (includes detailed variable definition).

320    As of the end of 2010, the dollar amount of municipal securities outstanding was $3.94 trillion. See SIFMA, US Bond Market Issuance and Outstanding, available at https://www.sifma.org/wp-content/uploads/2017/06/cm-us-bond-market-sifma.xls ("SIFMA Bond Data"). See also Board of Governors of the Federal Reserve System, Federal Reserve Board Historical Flow of Funds, available at https://www.federalreserve.gov/datadownload/Choose.aspx?rel=z1 ("Historical Flow of Funds"). As of the end of the first quarter of 2018, the dollar amount of municipal securities outstanding was $3.84 trillion. See Flow of Funds, supra note 22 at 121 Table L. 212.

321    See Daniel Bergstresser and Peter Orr, Direct Bank Investment in Municipal Debt, 35 Mun. Fin. J. 1, 3 (2014) ("Bergstresser and Orr"); California Debt and Investment Advisory Commission, New Frontiers in Public Finance: A Return to Direct Lending (Oct. 3, 2012), available at http://www.treasurer.ca.gov/cdiac/webinars/2012/20121003/presentation.pdf.

322    Although historically municipal securities have had significantly lower rates of default than corporate and foreign government bonds, as mentioned in Section II, defaults by issuers and obligated persons have occurred. Since 2011, the municipal securities market has experienced six of the seven largest municipal bankruptcy filings in U.S. history. See supra note 28.

323    See supra Section III.A. See also Proposing Release, supra note 3, 82 FR at 13929-30.

324    Id.

325    See supra note 52. See also Bergstresser and Orr, supra note 321.

326    See supra notes 124, 125, and 126.

327    Municipal securities are defined in the table description for the Flow of Funds data as follows. "Municipal securities are obligations issued by state and local governments, nonprofit organizations, and nonfinancial corporate businesses. State and local governments are the primary issuers; detail on both long and short-term (original maturity of 13 months or less) debt is shown. This instrument excludes trade debt of, and U.S. government loans to, state and local governments. Debt issued by nonprofit organizations includes nonprofit hospital bonds and issuance to finance activities such as lending to students. Debt issued by the nonfinancial corporate business sector includes industrial revenue bonds. Most municipal debt is tax-exempt; that is, the interest earned on holdings is exempt from federal income tax. Since 1986, however, some of the debt issued has been taxable, including the Build America Bonds authorized under the American Recovery and Reinvestment Act of 2009." See Federal Reserve Board, Financial Accounts of the United States: All Table Descriptions, at 31-32 (Mar. 8, 2018) available at http://www.federalreserve.gov/apps/fof/Guide/z1_tables_description.pdf.

328    See Call Report, supra note 319.

329    Flow of Funds, supra note 22, at 121 Table L. 212.

330    See SIFMA Bond Data, supra note 320.

331    See id.

332    See Bergstresser and Orr, supra note 321.

333    See SIFMA Bond Data and Historical Flow of Funds, supra note 320.

334    See Call Report, supra note 319. See also SIFMA Bond Data, supra note 320.

335    See supra note 52. See also Bergstresser and Orr, supra note 321.

336    See Proposing Release supra note 3, 82 FR at 13934.

337    See id.

338    See supra Section II.

339    See supra notes 16, 17, and 18.

340    See Proposing Release, supra note 3, 82 FR at 13929.

341    See supra note 97.

342    See Proposing Release, supra note 3, 82 FR at 13933 and note 76.

343    See supra note 52.

344    See supra note 34.

345    See id.

346    See Proposing Release, supra note 3, 82 FR at 13933 and note 76.

347    See GASB Statement No. 88—Certain Disclosures Related to Debt, including Direct Borrowings and Direct Placements, supra note 44.

348    See GASB, GASB Establishes New Guidance on Debt Disclosures, Addresses Direct Borrowings and Direct Placements (Apr. 2, 2018), available at http://www.gasb.org/cs/Satellite?c=GASBContent_C&cid=1176170309590&d=Touch&pagename=GASB®GASBContent_C®GASBNewsPage.

349    See GASB Statement No. 88—Certain Disclosures Related to Debt, including Direct Borrowings and Direct Placements, supra note 44.

350    Id.

351    See supra note 44.

352    See, e.g., Emilia Istrate, Cecilia Mills and Daniel Brookmyer, National Association of Counties, Counting Money: State and GASB Standards for County Financial Reporting (Feb. 2016), available at http://www.naco.org/sites/default/files/documents/CountingMoney_FullReport.pdf.

353    See supra note 125.

354    See, e.g., Carla Fried, The Tax Law Gives Municipal Bonds a New Allure, N.Y. Times, (Feb. 23, 2018), available at https://www.nytimes.com/2018/02/23/business/the-tax-law-gives-municipal-bonds-a-new-allure.html.

355    See, e.g., Kyle Glazier, Why Muni Issuers Are Eschewing Bank Loans, The Bond Buyer, (May 21, 2018), available at https://www.bondbuyer.com/news/why-muni-issuers-are-eschewing-bank-loans (noting that "issuers are already removing direct bank loans from their portfolios in favor of other types of more traditional debt thanks to the new tax law as well as rising interest rate").

356    See supra notes 124 and 126.

357    See, e.g., Lynn Hume, Alternatives to Tax-exempt Advance Refundings Would Cost Issuers, The Bond Buyer (Nov. 22, 2017), available at https://www.bondbuyer.com/news/issuers-have-costlier-alternatives-to-advance-refundings; GFOA, Potential Impacts of Tax Reform on Outstanding and Future Municipal Debt Issuance, available at http://www.gfoa.org/potential-impacts-tax-reform-outstanding-and-future-municipal-debt-issuance; see also supra note 139. See also supra note 150.

358    The Commission understands that it is possible that the issuer or obligated person may not comply with its previous continuing disclosure undertakings and may not provide the MSRB with notice of the events pursuant to Rule 15c2-12 amendments, in which case, the actual costs and benefits of the amendments would depend on the issuer's or obligated person's commitment to disclosure.

359    See Proposing Release supra note 3, 82 FR at 13935-36.

360    See id. at 13940.

361    See supra note 336. For academic evidence on pricing effect of credit rating agencies' actions, see John R. M. Hand, Robert W. Holthausen, and Richard W. Leftwich, The Effect of Bond Rating Agency Announcements on Bond and Stock Prices, 47 J. Fin. 733 (1992).

362    See supra Section III.A.1.iii.

363    As discussed above in Section V.B.5, the amendments could be particularly informative in light of the recent changes to federal tax law. The tax reform bill passed in December 2017 eliminated state and local governments' ability to use tax-exempt bonds to advance refund outstanding bonds, which may incentivize some issuers to use complex strategies and derivative products to refund outstanding bond issues. See supra note 309 and accompanying text. These derivatives entered into in connection with a debt obligation would be disclosed under the amendments, and keep investors and other market participants informed about the credit risk associated with the derivatives.

364    See Lisante Letter.

365    See Proposing Release, supra note 3, 82 FR at 13952.

366    See Proposing Release, supra note 3, 82 FR at 13952 (citing Douglas W. Diamond and Robert E. Verrecchia, Disclosure, Liquidity, and the Cost of Capital, 46 J. Fin. 1325 (1991)).

367    See Proposing Release, supra note 3, 82 FR at 13952.

368    See William R. Baber and Angela K. Gore, Consequences of GAAP Disclosure Regulation: Evidence from Municipal Debt Issues, 83 Acct. Rev. 565 (2008). See also Robert W. Ingram and Ronald M. Copeland, Municipal Market Measures and Reporting Practices: An Extension, 20 J. Acct. Res. 766 (1982). See also Earl D. Benson, Barry R. Marks and Krishnamurthy K. Raman, State Regulation of Accounting Practices and Municipal Borrowing Costs, 3 J. Acct. & Pub. Pol'y 107 (1984). See also Lisa M. Fairchild and Timothy W. Koch, The Impact of State Disclosure Requirements on Municipal Yields, 51 Nat'l Tax J. 733 (1998).

For additional reference to borrowing costs in corporate securities markets, see also Christian Leuz and Peter D. Wysocki, The Economics of Disclosure and Financial Reporting Regulation: Evidence and Suggestions for Future Research, 54 J. Acct. Res. 525 (2016); Thomas E. Copeland and Dan Galai, Information Effects on the Bid[hyphen]Ask Spread, 38 J. Fin. 1457 (1983); David

Easley and Maureen O'Hara, Price, Trade Size, and Information in Securities Markets, 19 J. Fin. Econ. 69 (1987); David Easley and Maureen O'Hara, Information and the Cost of Capital, 59 J. Fin. 1553 (2004); Yakov Amihud and Haim Mendelson, Asset Pricing and the Bid-Ask Spread, 17 J. Fin. 223 (1986).

369   See Proposing Release, supra note 3, 82 FR at 13954.

370   See Sumon C. Mazumdar and Partha Sengupta, Disclosure and the Loan Spread on Private Debt, 61 Fin. Analysts J. 83 (2005).

371   See David W. Blackwell, Thomas R. Noland and Drew B. Winters, The Value of Auditor Assurance: Evidence from Loan Pricing, 36 J. Acct. Res. 57 (1998).

372   See supra note 370.

373   See infra Section V.C.2.i.

374   See Moody's Investors Service, Special Comment: Direct Bank Loans Carry Credit Risks Similar to Variable Rate Demand Bonds for Public Finance Issuers (Sept. 15, 2011); see also Proposing Release, supra note 3, 82 FR at 13934 note 81.

375   See Proposing Release, supra note 3, 82 FR at 13934 note 81.

376   See id.

377   See supra Section V.A.

378   See supra Section IV.D.2 and Section IV.E.2.

379   As discussed in Section IV.E.2, the amendments are estimated to generate 2,200 additional event notices, half of which will be prepared internally, at an average of four hours per notice, and half of which will require an average of four hours of internal work and four hours of external work per notice. 1,100 (number of event notices solely using internal compliance attorney) x 4 (estimated time for internal attorney to assist in the preparation of such event notice) x $360 (hourly wage for an internal attorney) + 1,100 (number of event notices requiring both internal compliance attorney and outside counsel) x (4 (estimated time for outside attorney to assist in the preparation of such event notice) x $400 (hourly wage for an outside attorney) + 4 (estimated time for an internal attorney to assist in the preparation of such event notice) x $360 (hourly wage for an internal attorney)) = $4,928,000. The $360 per hour estimate for an internal compliance attorney is from SIFMA's Management and Professional Earnings in the Securities Industry (2013), modified by Commission staff to account for an 1,800-hour work-year and multiplied by 5.35 to account for bonuses, firm size, employee benefits and overhead, and adjusted for inflation. For a discussion on the cost of retaining outside professionals, see supra note 310.

380   See supra Section IV.E.2. As discussed above, the Commission estimated that 65% of issuers may use designated agents to submit some or all of their continuing disclosure documents to the MSRB. Based on the Commission's revised estimates of the number of issuers, the Commission estimates that the average total annual cost that would be incurred by issuers that use the services of a designated agent would be $13,650,000. See supra note 294. The Commission estimates that the two amendments would cause issuers that use the services of a designated agent to incur additional costs of six percent, or $819,000 ($13,650,000 x 6% = $819,000), for a total of $14,469,000. See supra note 295.

381   See supra note 302.

382   See Lisante Letter.

383   See Mitchell A. Petersen and Raghuram G. Rajan, The Benefits of Lending Relationships: Evidence from Small Business Data, 49 J. Fin. 3 (1994).

384   See supra Section III.A.1.iii.

385   According to academic literature, it is a generally accepted fact that bank debt is typically senior to that of other creditors, particularly for small-business borrowers. See Stanley D. Longhofer and Jo[atilde]o A. C. Santos, The Importance of Bank Seniority for Relationship Lending, 9 J. Fin. Interm. 57 (2000). See also Ivo Welch, Why Is Bank Debt Senior? A Theory of Asymmetry and Claim Priority Based on Influence Costs, 10 Rev. Fin. Stud. 1203 (1997). Recent evidence suggests that this is also true for municipalities. See infra note 393.

386   See Lisante Letter.

387   See supra Section V.C.1.ii.

388   See id.

389   See id.

390   See id.

391   See Lisante Letter.

392   Id.

393   A recent unpublished working paper finds that small municipalities are particularly reliant on private bank financing. See Ivan Ivanov and Tom Zimmermann, Claim Dilution in the Municipal Debt Market, Finance and Economics Discussion Series 2018-011 (2018), available at https://doi.org/10.17016/FEDS.2018.011.

394   See supra note 125.

395  See supra Section V.B.5.

396  See, e.g., supra note 354 and accompanying text.

397  See supra notes 124, 126, and 355.

398  17 CFR 240.15c2-12(a) and (b)(3).

399  17 CFR 240.15c2-12(f)(3).

400  See supra Section IV.D.1.

401  See supra Section IV.E.1.

402  First year costs: 1,250 hours (first year burden on dealers) x $360 (average hourly cost of internal compliance attorney) + 13,658 hours (annual increased hourly burden on dealers due to the amendments) x $360 (average hourly cost of internal compliance attorney) = $5,366,880. Subsequent annual costs: 13,658 hours (annual increased hourly burden on dealers due to the amendments) x $360 (average hourly cost of internal compliance attorney) = $4,916,880.

403  See supra Section IV.D.3.

404  This estimate was provided to the Commission by MSRB staff and reflects the MSRB's assessment of the costs it expects to incur to implement the necessary modifications to EMMA, based on an estimated 1,700 hour schedule. In particular, it reflects an estimate of 1,700 (estimated hours of burden) x $53.74 (the mean hourly wage for a 2,080-hour work-year for Software Developers, Systems Software as provided in the U.S. Department of Labor, Bureau of Labor Statistics, Occupational Employment and Wages, May 2017, available at https://www.bls.gov/oes/current/oes151133.htm#nat) = $91,358.

405  Specifically, when there is asymmetric information about material risks, investors may not be able to distinguish low-risk securities from high-risk securities. In such cases, market participants will only value securities as if they bear an average level of risk, undervaluing low-risk securities and overvaluing high-risk securities. Such mispricing can harm market efficiency and distort capital allocation. See, e.g., Paul M. Healy and Krishna G. Palepu, Information Asymmetry, Corporate Disclosure, and the Capital Markets: A Review of the Empirical Disclosure Literature, 31 J. Acct. & Econ. 405 (2001).

406  Depending on data availability and market conditions, some of these effects could be evaluated after the implementation of the amendments. For example, disclosure of relevant information in event notices may manifest as transaction activity, as market participants update their valuations for municipal securities. Further, reductions in information asymmetry may reduce the dispersion in prices for transactions that occur close in time.

407  See supra note 336.

408  See ABA Letter (stating "disclosure of pricing on a near "real time" basis (e.g., within ten business days of closing) may set an unrealistic expectation among other obligated persons as to the appropriate pricing for their direct purchase loan transactions").

409  The Commission has also recognized that to the extent that the lenders' information advantage may be reduced, they would incur a cost. See Section V.C.2.iii for relevant discussion.

410  See Proposing Release, supra note 3, 82 FR at 13954.

411  See Michael Welker, Disclosure Policy, Information Asymmetry, and Liquidity in Equity Markets, 11 Contemp. Acct. Res. 801 (1995) (Welker provides evidence that disclosure policy reduces information asymmetry and increases liquidity in equity markets). See also Christian Leuz and Robert E. Verrecchia, The Economic Consequences of Increased Disclosure, 38 J. Acct. Res. 91 (2000).

412  See Lisante Letter (commenting that the rejection of voluntary approaches is potentially problematic given that the Commission cannot quantify the economic effects).

413  See NABL Letter ("Reviewing filings under the subcategory 'Bank Loan/Alternative Financings Filings' yielded the following results: 79 disclosures in 2015, 364 disclosures in 2016 and 338 disclosures in 2017 (through April 14, 2017)" and "[a]t this rate of increase, even if the Proposed Amendments are not adopted, voluntary disclosures may soon reach the Commission's expected number of annual filings under the Proposed Amendments (2,200)").

414  Id.

415  See supra Section II; see also supra note 34.

416  See supra Section V.C.2.i.

417  See supra note 393 and accompanying text.

418  See NABL Letter ("smaller issuers will be less able to accommodate the substantial burdens of the Proposed Amendments, and the purported investor benefit will be more substantially outweighed by these burdens"). See also ABA Letter (pointing out that direct bank loans provide access to funding at a cost that is lower than accessing the public municipal securities market and it is particularly the case for smaller municipalities; and smaller obligated persons could lack the resources and expertise to process the disclosure); Lisante Letter (stating that smaller actors could be shut out of the market due to the amendments' impact).

419  See Proposing Release, supra note 3, 82 FR at 13937.

420  See supra note 81.

421    The Commission's belief is informed by comments received in response to the proposed amendments and is reflected in the Commission's decision to narrow the adopted definition of the term "financial obligation" to debt, debt-like, and debt-related obligations of an issuer or obligated person that could impact an issuer's or obligated person's liquidity, overall creditworthiness, or an existing security holder's rights. See supra Section III.A.2.

422    5 U.S.C. 605(b).

423    See Proposing Release, supra note 3, 82 FR at 13956.

---

**End of Document**                                        © 2020 Thomson Reuters. No claim to original U.S. Government Works.