```
 1              UNITED STATES DISTRICT COURT

 2               DISTRICT OF PUERTO RICO

 3
     In Re:                    )      Docket No. 3:17-BK-3283(LTS)
 4                             )
                               )      PROMESA Title III
 5   The Financial Oversight and )
     Management Board for        )
 6   Puerto Rico,               )      (Jointly Administered)
                               )
 7   as representative of        )
                               )
 8   The Commonwealth of        )
     Puerto Rico, et al.         )      September 16, 2020
 9                             )
              Debtors,        )
10
     _____
11
12   In Re:                    )      Docket No. 3:17-BK-4780(LTS)
                               )
13                             )      PROMESA Title III
     The Financial Oversight and )
14   Management Board for        )
     Puerto Rico,               )      (Jointly Administered)
15                             )
     as representative of        )
16                             )
     Puerto Rico Power          )
17   Authority,                 )
                               )
18              Debtor,         )
     _____
19
20                    OMNIBUS HEARING

21    BEFORE THE HONORABLE U.S. DISTRICT JUDGE LAURA TAYLOR SWAIN

22            UNITED STATES DISTRICT COURT JUDGE

23    AND THE HONORABLE U.S. MAGISTRATE JUDGE JUDITH GAIL DEIN

24            UNITED STATES DISTRICT COURT JUDGE

25   _____
```

```
 1    APPEARANCES:

 2    ALL PARTIES APPEARING TELEPHONICALLY

 3
      For The Commonwealth
 4    of Puerto Rico, et al.:  Mr. Martin J. Bienenstock, PHV
                               Mr. Brian S. Rosen, PHV
 5                             Mr. Paul Possinger, PHV

 6    For Puerto Rico Fiscal
      Agency and Financial
 7    Advisory Authority:      Mr. Peter Friedman, PHV
                               Mr. Luis C. Marini Biaggi, Esq.
 8
      For the Official
 9    Committee of Unsecured
      Creditors of all
10    Title III Debtors:       Mr. Luc A. Despins, PHV

11    For Ambac Assurance
      Corporation:             Ms. Atara Miller, PHV
12
      For Consul-Tech
13    Caribe, Inc.:            Mr. Fernando Van Derdys, Esq.

14    For Fuel Line Lenders:   Mr. Michael H. Cassel, PHV

15    For Tradewinds:          Mr. John Arrastia, PHV

16    For Whitefish Energy
      Holdings, LLC:           Ms. Carmen D. Conde, Esq.
17
      For Cobra Acquisitions:  Mr. Abid Qureshi, PHV
18
      For UTIER and SREAEE:    Ms. Jessica E. Mendez Colberg, Esq.
19

20

21

22

23

24
      Proceedings recorded by stenography.  Transcript produced by
25    CAT.
```

```
 1                              I N D E X

 2   WITNESSES:                                            PAGE

 3          None.

 4

 5   EXHIBITS:

 6          None.

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                                    San Juan, Puerto Rico

 2                                    September 16, 2020

 3                                    At or about 9:34 AM

 4                          *      *      *

 5          THE COURT:  Good morning.  This is Judge Swain.

 6          MS. NG:  Hi, Judge.  It's Lisa.

 7          THE COURT:  Good morning.

 8          Ms. Tacoronte, would you please announce the case?

 9          COURTROOM DEPUTY:  Good morning, Judge.  Sure.

10          Bankruptcy case No. 17-3283, In Re:  The Financial

11   Oversight and Management Board for Puerto Rico, as

12   representative of the Commonwealth of Puerto Rico, et al., for

13   Omnibus Hearing.

14          THE COURT:  This is Judge Laura Taylor Swain

15   presiding, and Magistrate Judge Judith G. Dein is also

16   present.

17          Buenos dias.  Welcome counsel, parties in interest,

18   and members of the public and press.  Today's telephonic

19   Omnibus Hearing is occurring in what continue to be

20   challenging times for all stakeholders in these Title III

21   proceedings.

22          Our thoughts remain with all of the people on the

23   island and on the mainland who have been affected directly and

24   indirectly by the novel Coronavirus and with all who have been

25   affected by this year's earthquakes and hurricanes.  We hope
```

1    for progress, health, safety for all as restrictions are

2    lifted and as the country continues to work to recover from

3    the economic fallout and from natural disasters.

4         To ensure the orderly operation of today's telephonic

5    hearing, all parties on the line must mute their phones when

6    they are not speaking.  If you are accessing these proceedings

7    on a computer, please be sure to select mute on both the Court

8    Solutions dashboard and on your phone.  When you need to

9    speak, you must unmute on both the dashboard and the phone.

10        I remind everyone that, consistent with court and

11   judicial conference policies and the Orders that have been

12   issued, no recording or retransmission of the hearing is

13   permitted by any person, including but not limited to the

14   parties, members of the public, and the press.  Violations of

15   this rule may be punished with sanctions.

16        I will be calling on each speaker during the

17   proceedings.  When I do, please identify yourself by name for

18   clarity of the record.  After the speakers listed on the

19   Agenda for each of today's matters have spoken, I may provide

20   an opportunity for other parties in interest to address

21   briefly any issues raised during the course of the

22   presentations that require further remarks.

23        If you wish to be heard under these circumstances,

24   please state your name clearly when I invite you to do so.

25   Don't just use the "wave" on the Court Solutions dashboard,

1   because I may not always be able to see that.  I will call on

2   the speakers if more than one person wishes to be heard.

3           Please don't interrupt each other or me during the

4   hearing.  If we interrupt each other, it is difficult to

5   create an accurate transcript of these proceedings.  Having

6   said that, I apologize in advance for breaking the rule, as I

7   may interrupt if I have questions or if you go beyond your

8   allotted time.  If anyone has any difficulty hearing me or

9   another participant, please say something immediately.

10          The time allotments for each matter and the time

11  allocations for each speaker are set forth in the Agenda that

12  was filed by the Oversight Board on Monday, September 14th,

13  2020.  The Agenda, which was filed at Docket Entry No. 14274

14  in case 17-3283 is available to the public at no cost on Prime

15  Clerk for those who are interested.

16          I encourage each speaker to keep track of his or her

17  own time.  The Court will also be keeping track of the time

18  and will alert each speaker when there are two minutes

19  remaining with one buzz and, when time is up, with two buzzes.

20  And here is an example of the buzz sound.

21          (Sound played.)

22          THE COURT:  If your allocation is two minutes or

23  less, you will just hear the two final buzzes.

24          If we need to take a break, I'll direct everyone to

25  disconnect and dial back in at a specified time.  Our schedule

```
 1  this morning goes to 12:00 noon, and we will recommence at

 2  1:00, if necessary, for an afternoon session.

 3          The first item is, as usual, status reports from the

 4  Oversight Board and AAFAF.  As I requested in the Procedures

 5  Order, these reports have been made in writing in advance of

 6  this telephonic hearing and are available on the public docket

 7  and through Prime Clerk as Docket Entry Nos. 14315 and 14301

 8  in case 17-3283.  I thank the Oversight Board and AAFAF for

 9  the care and detail reflected in the reports, which I find

10  quite comprehensive.

11          I have some questions for the Oversight Board's

12  counsel regarding the claims resolution process.  And who will

13  be speaking on this for the Oversight Board?

14          MR. BIENENSTOCK:  Your Honor, this is Martin

15  Bienenstock.  I think my partner, Brian Rosen, will speak to

16  the claims, the claims process.

17          THE COURT:  Thank you.  And good morning,

18  Mr. Bienenstock.

19          MR. BIENENSTOCK:  Good morning.

20          THE COURT:  Mr. Rosen, are you there?

21          (No response.)

22          MR. BIENENSTOCK:  Your Honor, this is Martin

23  Bienenstock.  My partner must be having some issues with the

24  computer.  I'll do my best to answer the claims process

25  questions.
```

1          THE COURT:  All right.  I guess let me just raise

2     another question.  Ms. Stafford is registered, but as a

3     nonspeaking line.  If she's there and we are able to convert

4     that to a speaking line, is that something you'd prefer?

5          MR. BIENENSTOCK:  That would be fine.

6          THE COURT:  Ms. Ng, is Ms. Stafford on and can we

7     allow her to speak?

8          MS. NG:  Give me one second.  You said Ms. Stafford?

9          THE COURT:  Yes.

10         MS. NG:  I have Mr. Rosen on here from Proskauer.

11         THE COURT:  Yes.

12         MS. NG:  Do you want me to try to unmute him?

13         THE COURT:  Yes, please.

14         MS. NG:  Okay.  Hold on.

15         MR. ROSEN:  Your Honor.

16         THE COURT:  Yes.  Mr. Rosen.

17         MR. ROSEN:  Yes.  I'm sorry.  I've been trying to

18    call out my name for a while.  I'm sorry about that.

19         THE COURT:  I'm sorry.  I don't know why you weren't

20    able to completely unmute yourself, and I apologize if --

21         MR. ROSEN:  Not a problem.

22         THE COURT:  -- the problem was on our end.  So

23    welcome.

24         So going to the questions about the proposal for

25    managing the outstanding claims, the status report includes

1    details on a proposal for dealing with the backlog,

2    specifically involving using a Prime Clerk facility that

3    claimants can come to, to appear telephonically at a hearing

4    concerning the objections.  And I think that this is a

5    promising development, but I do have some logistical questions

6    that you may not be able to answer right away, that I think we

7    all need to think through a bit.  And I need some more

8    information.

9         So, first of all, do you know roughly how many claim

10   objection responses there have been that will need to be

11   addressed in this manner?

12        MR. ROSEN:  Your Honor, I don't have that number

13   readily available for you, because this spans, as Your Honor

14   recalls, going back all the way to December that we kept

15   backlogging all of those.  We could generate that information

16   for you on an objection-by-objection basis, if that's helpful,

17   and we can submit that to the Court hopefully tomorrow or the

18   next day.

19        THE COURT:  That would be very helpful so that we can

20   get a sense of the volume and which sets of claim objections

21   would be taken up in the backlog clearing process.

22        Other questions that I have are how you might be

23   organizing the presentations of the motions and responses so

24   that we can do the hearings in an orderly way.  And in

25   particular, how do you propose providing notice to the

1   claimants of the hearing and their opportunity to appear?

2          For instance, would you be contacting each of the

3   claimants who filed a response so that they know this

4   opportunity and you can confirm whether they intend to show up

5   and whether they need an interpreter?

6          MR. ROSEN:  Your Honor, I think because of the number

7   of omnibus objections that were interposed, it's better if we

8   try, for the Court's benefit, to group those in the categories

9   in which those were interposed:  Some of them deficient

10  claims; some no liability.  And that we group those so that

11  you can have different segments of different categories for

12  different periods of time.

13         I would suggest, though, that we definitely need to

14  notify each and every claimant that did file a response, and

15  to the best of our ability, we'll provide them with written

16  notice.  Some of these people, Your Honor, it's difficult to

17  contact them.  I'm not sure any other way to do it.

18         If the Court thinks that we should try telephonic, we

19  could do that, although I'm not sure that's humanly possible.

20  But definitely we would do it by written notice to each and

21  every one of them.  And we would include --

22         THE COURT:  You could have --

23         MR. ROSEN:  We would include in there, Your Honor,

24  the request if they so desire the need for an interpreter.

25         THE COURT:  Yes.  I was thinking if you would include

1    in there a request that they call or somehow indicate whether

2    they do wish to come to the hearing and whether they need an

3    interpreter, that would help with projections for traffic

4    control and safety measures and appropriate staging in terms

5    of tranches or groups of objectors to be called.

6            And this is fairly granular in terms of logistics,

7    but I think they are important given the public health

8    situation.  I appreciate your offer of a video link.  I think

9    that adds a layer of complexity and something else that could

10   go wrong, so this is something that I would want to do just

11   telephonically.  But what kind of audio equipment do you

12   expect to have there for the interpreters and the speakers?

13           I'm wondering about people having to handle handsets

14   or headsets, and how interpreters and the claimants would be

15   talking to each other and hearing the Court at the same time

16   without getting the sort of feedback and such, and without

17   having to handle things going back and forth.  You know, would

18   there be a couple of sets that could be sanitized between each

19   speaker?  Have you gotten to that level of thinking about how

20   to make sure that everybody stays safe?

21           MR. ROSEN:  Your Honor, we have not gotten down to

22   that level yet, but I would assume that we would have speaker

23   phones available so that there really is no need, other than

24   for court personnel or Prime Clerk personnel, to touch the

25   apparatus.

1    The only issue I would see, Your Honor, is -- and I

2    agree with you about the video hookup, but the question might

3    be if someone wishes to present to you any documentation, our

4    ability to see it -- would you want to receive that well in

5    advance of the hearing?

6    THE COURT:  Yes.  Our practice and, you know, the

7    rules are that people need to file their written responses.

8    And so perhaps the notice can direct people that if there is

9    anything in addition that they want seen, they have to provide

10   it in a particular way by a particular time.  If they want to

11   provide it in paper, perhaps it can be delivered to Prime

12   Clerk and scanned and then e-mailed to all of us.

13   But I think having a video hookup and people putting

14   things spontaneously on an ELMO or something like that is

15   probably not efficient and also would not make a good record

16   for what has been displayed.  And some of it might have to be

17   translated from Spanish.

18   MR. ROSEN:  Okay.

19   THE COURT:  So I think a procedure for submission in

20   advance would be the best thing.

21   MR. ROSEN:  So we'll lay that out, Your Honor, in a

22   notice that will go to all of these people.

23   THE COURT:  Okay.  And do you think, in light of the

24   size of this undertaking and all of the unknowns, would it be

25   best to have a smaller scale test run in the first instance

 1    rather than try to queue up some huge numbers for October?

 2          MR. ROSEN:  We can do that, Your Honor.  I think if

 3    you'll allow us to do it -- we discussed at the outset here,

 4    which is to quantify the exact number.  We'll have a sense as

 5    to how much we will be inundated in October.  They may not be

 6    as large as we forecast.  But I agree, we should -- just like

 7    we did with the ACR and the ADR, Your Honor, we'll do that

 8    test drive and take a subset of whatever that universe is.

 9          THE COURT:  Very good.  And how are you proposing to

10    address the backlog of claim objections for claimants who have

11    not submitted any responses at all?  Because there has been --

12    I'm sorry.  Mr. Rosen.

13          MR. ROSEN:  No.  I apologize for interrupting, Your

14    Honor.

15          My suggestion would be, Your Honor, that we submit

16    orders with respect to those -- where those could be granted,

17    and the balance of those would be heard at whatever hearing

18    format we develop.

19          THE COURT:  So file some sort of notice of

20    presentment, with an order expunging the claims to which there

21    have been no response?

22          MR. ROSEN:  Yes, Your Honor.

23          THE COURT:  Thank you.  That makes sense to me.

24          And so I will look forward to further word and

25    specifics on the proposal.  And I thank you for being so

1   responsive to my question.

2          MR. ROSEN:  Thank you, Your Honor.  And we'll work

3   with your chambers to develop this and get you the

4   information.

5          THE COURT:  Thank you so very much.

6          AAFAF also filed a written status report for which I

7   thank AAFAF and its counsel.  Were there any further remarks

8   that anyone from AAFAF wished to make?

9          MR. MARINI BIAGGI:  Good morning, Your Honor.  Luis

10  Marini, counsel for AAFAF.  We don't have any further remarks

11  at this time.

12         THE COURT:  Good morning, Mr. Marini, and thank you.

13         Do any of the other counsel who are on the line have

14  questions or comments that they wish to make in connection

15  with the status report?  If you do, state your name clearly

16  and then wait for me to call on you to speak.  And I'll wait

17  about 30 seconds for anyone who wants to speak to unmute and

18  say their name.

19         MR. DESPINS:  Good morning, Your Honor.  Luc Despins

20  with Paul Hastings.

21         THE COURT:  Good morning, Mr. Despins.  All right.

22  You may proceed.

23         MR. DESPINS:  Yes.  Very short, Your Honor, because I

24  will address this in the GO Objection context.  But I want to

25  make sure Your Honor knows that what's happening now is we're

1    entering into a phase on the claims objections where

2    substantive claims objections are going to be made.  And that

3    ties into the issue of the fact that people have only one

4    point of reference right now, which is the 3.8 or 3.9 percent

5    distribution to unsecured creditors.  And, you know, that --

6    we think that causes prejudice to them.

7         And I'll address that in the GO Objection context,

8    but I wanted to flag that because we're talking about claims

9    objections.  We're entering a different phase of the claims

10   objection process.  Before we were doing duplicates and

11   ministerial claims objections, but now we're entering in a

12   different phase and I think that it's important to address

13   that.  But I'll do that in the GO context.  Thank you, Your

14   Honor.

15         THE COURT:  Thank you.

16         Is there anyone else who wished to comment?  Waiting

17   a few more seconds.

18         (No response.)

19         THE COURT:  All right, then.  We will now move on to

20   the first of the contested matters, which is Agenda Item II.1,

21   Consul-Tech Caribe's administrative expense motion, which is

22   Docket Entry No. 9845 in case 17-3283.  We have 20 minutes

23   allocated for argument.

24         And the first speaker I have is Mr. Van Derdys for

25   Consul-Tech for eight minutes.

1          MR. VAN DERDYS:  Yes.  Good morning, Your Honor.

2     Fernando Van Derdys from the law firm Reichard & Escalera on

3     behalf of movant, Consul-Tech Caribe.

4          Your Honor, may I begin my argument?

5          THE COURT:  Yes, please.

6          MR. VAN DERDYS:  Sure.  Yes, Your Honor.

7     Particularly, on January 13, 2020, at Docket 9845, to read

8     that, more than seven months ago, Consul-Tech filed its motion

9     for payment of administrative expenses in the amount of 5.1

10    million dollars, $5,120,772.50, to be more precise.

11         After several motions requesting an extension of time

12    to parties' response to Consul-Tech's motion, on August 26,

13    2020, Your Honor, again, seven -- more than seven months after

14    the filing of the motion, the Commonwealth filed its

15    opposition.  The review of the opposition reveals that it is

16    basically the further request for an indefinite -- for a sine

17    die extension of time, Your Honor.

18         In its written arguments that are plus and -- devoid

19    of sound legal basis, it shall proceed to --

20         COURT REPORTER:  I'm sorry, Your Honor.  This is the

21    court reporter.  If counsel could please repeat his last

22    statement --

23         MR. VAN DERDYS:  I'm sorry, ma'am.  I --

24         THE COURT:  And if you'd speak a little bit more

25    slowly and perhaps just slightly louder, that would be

1  helpful.

2        MR. VAN DERDYS:  Thank you.  Thank you.  I'm sorry.

3  I was watching the time.  Right.

4        The Commonwealth's main arguments in its opposition

5  are as follows, or may be simplified as follows:  First, that

6  there are serious -- there is a serious concern as to the

7  validity of the administrative expense claim; second, that

8  Consul-Tech has not provided the Commonwealth with sufficient

9  support to establish its claims; third, that the Commonwealth

10  has not obtained purported data and analysis from the

11  concerned agencies, despite its purported efforts to that

12  effect; and lastly, that the relief sought by Consul-Tech is

13  allegedly contrary to PROMESA Section 305, which prohibits

14  this Honorable Court from interfering with the debtors'

15  property or revenues, absent the consent of the Oversight

16  Board.

17        Okay.  As stated in our brief filed on September 2 at

18  Docket 14168, Your Honor, these allegations, we submit that

19  they are misguided.  First, as to the allegations that there

20  is serious concern as to the validity of the claim, the Court

21  should take notice that if payment analysis of the 5.1 million

22  dollar administrative claim was prepared by the accounting

23  firm Deloitte, which is a highly respected and national firm,

24  both in the U.S. and outside -- and it was prepared at the

25  request of the Commonwealth.  Your Honor, it was submitted as

1    Consul-Tech Exhibit One to its Reply Brief at Docket No.

2    14861.

3         Now, several conclusions are important -- several

4    important conclusions about Consul-Tech's claim are apparent

5    from the Deloitte report, Your Honor.  First of all, according

6    to the Deloitte report, the total net question costs in the

7    report are 2.9 million dollars out of the 5.1 million dollar

8    claim by Consul-Tech.

9         Of those 2.9 million dollars, Your Honor, 1.8 million

10   dollars are invoices that are questioned solely and

11   exclusively on the grounds that they lack certification.

12   Okay.  I mean, they're questioned on grounds other than they

13   lack certification.  Okay.  That means that they're questioned

14   on grounds apart from the certification issues.  And those

15   arguments are contained at items one through 14, part 16 of

16   the Deloitte report, Your Honor.

17        Okay.  Now, if we take the 2.9 million dollars of the

18   general objections, and we deduct the noncertified related

19   costs, Your Honor, that leaves the amount of 1.1 million

20   dollars that are only pending certification by the respective

21   Commonwealth agencies, Your Honor.  So the -- as to those 1.1

22   million dollar invoices, the Deloitte firm did not present any

23   objection as to their validity or propriety, Your Honor.

24        Okay.  So, therefore, we would explain afterwards

25   that the Commonwealth has the duty to certify those invoices

1   because, in effect, the only objection as to them is that they
2   haven't been certified by the agents, but there's no objection
3   as to the validity or propriety.  Okay.
4          Now, the Deloitte -- okay.  There is intimation to
5   certain -- to the certifying invoices, Your Honor.  We have
6   another argument that is apparent from the same Deloitte
7   report.  Okay.  The Deloitte report, at item number 15, item
8   number 15 states that 2.7 million dollars in invoices were
9   challenged as uncertified since they need -- for 5.1 million
10  dollars, Your Honor.  That means that approximately 2.8
11  million dollars of the remaining invoices had to be certified.
12         Now, we concede that out of those 2.8 million dollars
13  in certified invoices, some of them might be subject to
14  additional objections on other grounds.  Now, to extrinsically
15  avoid considering objections other than -- I mean, other than
16  certification, we subtracted the amount of 1.8 million
17  dollars, which are cert -- which are objections dealing with
18  issues other than certification.  And when we subtract the 1.8
19  million dollars from the 2.8 million dollar certified
20  invoices, that leaves invoices which again amount to one
21  million dollars that were properly certified by the government
22  or the related agencies, and as to which Deloitte doesn't
23  express any objection as to the propriety of our recent --
24         (Sound played.)
25         MR. VAN DERDYS:  Your Honor.  Okay.

1          THE COURT:  That means you have two minutes left.

2          MR. VAN DERDYS:  Yes.  Now, under Article 57, Your

3   Honor, the certified invoices must be paid within 15 calendar

4   days after June 2020.  So the government is not abiding by its

5   own rules and regulations.  As to the uncertified invoices,

6   the government must abide by its contractual obligations and

7   pay those invoices, Your Honor.

8          Okay.  Now, concerning the Commonwealth allegation

9   that Consul-Tech has not provided sufficient evidence, Your

10  Honor, the record reflects that Deloitte was able to prepare a

11  full cost analysis with the evidence provided to it.  So the

12  argument as to the evidence is rather a lame argument, because

13  the Commonwealth has the evidence that was sufficient for

14  Deloitte to prepare a report.  Okay.  So that lacks merit.

15         Now, as -- concerning that we are requesting an order

16  to interfere with Section 305 of PROMESA, meaning that we

17  cannot affect the debtors' revenue or property, Your Honor,

18  again, the motion is miscon -- it misconstrues our claim.

19  What we are asking is that the Court -- that the Commonwealth

20  abide by its own rules and regulations and pay according to

21  the laws it has established.

22         And the Commonwealth states that Consul-Tech may be

23  duly paid upon confirmation of the Plan of Adjustment.  Your

24  Honor, facing reality, at this juncture in time, there is no

25  plan in the near future.  Plus, Section 930 of Chapter Nine

 1   doesn't apply here.  And that section penalizes the debtor for

 2   being late and for making a Consul -- I mean, in reality,

 3   Consul-Tech has until -- all the time in the world to confirm

 4   a plan, Your Honor, and that is unfair to create a -- to

 5   Consul-Tech.  What we propose is --

 6           (Sound played.)

 7           MR. VAN DERDYS:  -- in light of this, we ask the

 8   Court to approve the uncontested amounts, and to leave the

 9   rest of the invoices to the ordinary litigation process, Your

10   Honor, resolution process.  Okay.

11           The Commonwealth has the evidence, Your Honor.  Okay.

12   Thank you.

13           THE COURT:  Thank you.  Thank you, Mr. Van Derdys.

14           Mr. Marini for AAFAF for ten minutes.

15           MR. MARINI BIAGGI:  Good morning, Your Honor.  Luis

16   Marini of Marini Pietrantoni Muniz for AAFAF.  May I be heard,

17   Your Honor?

18           THE COURT:  Yes.  Yes, please.

19           MR. MARINI BIAGGI:  Good morning.

20           THE COURT:  Good morning.

21           MR. MARINI BIAGGI:  Your Honor, I'll briefly

22   summarize our position, and then I'll try to respond to the

23   arguments made by the movant.

24           Our position, Your Honor, as we laid out in our

25   papers, is that their motion should be denied because there is

1    a serious concern as to the validity of their claim, and they

2    have not provided the government with sufficient support to

3    prove that they're entitled to a claim of this magnitude.  And

4    the government has not -- despite their best efforts, they

5    have not been able to obtain all of the data and analysis from

6    the agents involved to support and validate and reconcile the

7    entirety of the claim.

8            Therefore, Your Honor, our position is that the

9    relief requested in the motion is premature at best.  It is

10    also contrary to Section 305 of PROMESA, which this Court and

11    the Court of Appeals have consistently found prohibit the

12    Court from entering orders interfering with the debtors'

13    revenues or property in the absence of the Board's consent.

14            Absent that consent or the government's agreement to

15    pay claims in the ordinary course, PROMESA Section 314(b)(4)

16    also provides that holders of allowed administrative claims

17    have only a right to cash payment on the effective date of a

18    future debtor Plan of Adjustment.

19            Now, the government will continue to do its best

20    efforts to reconcile the claim and offer its payment on a

21    total resolution of the claim.  Now, Your Honor, the

22    government is sympathetic and acknowledges the importance of

23    paying post-petition claims and allowable administrative

24    claims promptly.  However, where as here, the debtor requires

25    the time afforded to PROMESA to continue to analyze,

1    reconcile, and assert defenses, if applicable, to the

2    allowance of post-petition claims, such as movant's, it should

3    be granted that time until a determination of the validity of

4    the claim.

5            This is particularly critical in connection with this

6    claim as the debtor has not obtained sufficient information to

7    determine whether the vast majority of the claim asserted is

8    proper or not.  It has and continues to work to obtain the

9    necessary information from over 20 agencies, which, as we

10   detail in our objection, are agencies primarily involved in

11   dealing with the response to the earthquake and the COVID-19

12   crisis.  And the government continues to reconcile, analyze,

13   and determine whether to object or accept, in part or in

14   whole, their claim.

15           The debtor has to --

16           THE COURT:  Mr. Marini.

17           MR. MARINI BIAGGI:  Yes.

18           THE COURT:  I have a question for you.  Consul-Tech

19   represents in its Reply Brief and Mr. Van Derdys said in his

20   argument today that Consul-Tech believes that approximately

21   2.1 million dollars of the outstanding invoices are not

22   disputed at this time.  Is that correct?

23           MR. MARINI BIAGGI:  No, Your Honor.  They --

24   Consul-Tech makes that argument.  It's in the Deloitte report,

25   which they attached as an exhibit to their Reply.  However,

1    Your Honor, that's not what the Deloitte report states.

2         The Deloitte report raises some objections to claims

3    and identifies others in the report.  Actually, 2.9 -- 2.1

4    million that they detailed, the Deloitte report states that

5    that amount is contingent upon an evaluation of outstanding

6    supporting documentation from CSA for a final resolution of

7    questionable costs.  That's on page nine.

8         The Deloitte report also raises, and -- doesn't get

9    into the issue, but raises a potential objection to the

10   entirety of the claim, as to whether the claim was contracted

11   according to the applicable government contracting guidelines

12   at the time.  So, Your Honor, that position we disagree with.

13   And part of what the government is trying to do is finish the

14   analysis and reconciliation and determine the validity of the

15   entirety of the claim.

16        Now, they also cite to Act 57 as a basis to provide

17   an argument to make a payment now.  And our position, the

18   government's position is that that is not what Act 57

19   provides.  Act 57 -- nowhere in Act 57 is there a waiver or a

20   relinquishment of the government's ability to analyze,

21   reconcile or dispute a claim.  And Act 57 also does not

22   provide a mechanism for partial payments on disputed claims.

23   We understand that that does not apply here, because the claim

24   is disputed for the reasons that we detailed in our -- in our

25   objection.

1        Now, Your Honor, even though they also -- the movant

2   also refers to certifications, even though they have produced

3   some certifications, and the government has some as well, the

4   process of analyzing whether those certifications were

5   rendered according to law, number one, and, number two,

6   whether the underlying contracts were done according to the

7   existing law at the time for government contracting, that

8   process and the reconciliation of the claims is still ongoing.

9        So our position, Your Honor, as we laid out in the

10  papers, is that the motion should be denied, number one,

11  because it is premature.  It should be denied without

12  prejudice to the ability to raise it upon confirmation, or in

13  the alternative, that we be provided time to continue the

14  process of analyzing and reconciling the claim and provide the

15  Court with an update on where we are within 90 days.

16       That's the position we have laid out in our papers,

17  Your Honor.  I don't know if the Court has any additional

18  questions for me.

19       THE COURT:  I have no further questions for you at

20  this time, and so I will return to Mr. Van Derdys for his

21  two-minute rebuttal argument.

22       MR. VAN DERDYS:  Yes, Your Honor.  Thank you.

23       Again, Your Honor, very briefly, we summarize that

24  the Commonwealth has respectively failed to rebut our

25  argument.  The motions do not specify what Consul-Tech has

1   allegedly not provided.  They're only general allegations,

2   Your Honor.

3           Second, the *Detroit* and *Stockton* cases took two years

4   to confirm.  They haven't challenged the fact that at this

5   juncture in time, we don't have any plan to be considered, and

6   they don't know when a plan will be confirmed, Your Honor.

7   And that being the case, the government should follow its own

8   rules and regulations and statutes and stay according to the

9   contract, the contractual rights.  And moreover, in the plan

10  -- he doesn't expect to confirm a Plan of Adjustment within

11  any reasonable amount of time, Your Honor.

12          So we restate the arguments in our motions, and we

13  beg that the Court at least allow the resolution of the

14  amounts that are not in controversy, and which those amounts

15  have been failed to be rebutted by the government, Your Honor.

16  Thank you.

17          THE COURT:  Thank you.

18          I read very carefully all of the submissions before

19  this morning's argument, and I have listened very carefully to

20  these arguments.  Before the Court is Consul-Tech Caribe,

21  Inc.'s Motion for Allowance and Payment of Administrative

22  Expense Claims, which is Docket Entry No. 9845 in case

23  17-3283.  I refer to this as the Motion.

24          Through the Motion, Consul-Tech seeks an order

25  allowing an administrative expense claim in its favor against

1   the Commonwealth in the amount of $5,120,772.50, and directing

2   the Commonwealth to pay Consul-Tech that amount on the first

3   business day after its allowance.  Consul-Tech's counsel has

4   also advocated here for at least a partial payment of the

5   portion of the claim that Consul-Tech argues is undisputed.

6        The Court has considered carefully the parties'

7   submissions in connection with the Motion and the arguments.

8   For the following reasons, the Motion is denied without

9   prejudice.  As this Court has recognized previously in these

10  Title III proceedings, PROMESA does not require Title III

11  debtors to pay administrative expense claims, including those

12  that are undisputed, prior to the effective date of a

13  confirmed Plan of Adjustment.  See 48 United States Code,

14  Section 2174, and Docket Entry No. 8886 in case 17-3283, at

15  pages two to three.

16       Viewing Consul-Tech's arguments against that

17  backdrop, Consul-Tech has failed to proffer any compelling

18  reason for the Court to adjudicate the question of allowance

19  of its claim at this juncture rather than afford the

20  Commonwealth additional time to reconcile the claim,

21  particularly considering AAFAF's representations regarding the

22  active roles of PREMA and other Commonwealth agencies in

23  responding to the earthquakes affecting the island earlier

24  this year, the COVID-19 pandemic, and the recent tropical

25  storms.  The Court is persuaded that it will be mutually

1    beneficial for the parties to further engage in their

2    respective efforts to reconcile Consul-Tech's claims,

3    including by providing responses to any outstanding requests

4    for documentation and by continuing the efforts to resolve the

5    claims consensually.  In the event that the parties are unable

6    to reach agreement following their further meet-and-confer

7    efforts, the Court will consider the merits of Consul-Tech's

8    claim and AAFAF's substantive objections thereto at an

9    appropriate time.

10          Accordingly, the motion is denied without prejudice.

11   The parties are directed to meet and confer in a further

12   effort to obtain any necessary documentation and resolve

13   Consul-Tech's claim consensually.  And in order to assure

14   sufficient time for meaningful progress, the Court will

15   require a joint status report by March 16, 2021, and the Court

16   will enter an order to this effect.

17          Thank you very much, Counsel.

18          MR. VAN DERDYS:  Thank you.

19          THE COURT:  The next contested item on the Agenda is

20   Item II.2, which is PREPA's motion to reject certain power

21   purchase and operating agreements, which is Docket Entry No.

22   13579 in case 17-3283, and Docket Entry No. 2050 in case

23   17-4780.

24          We have a total of 20 minutes allocated for the oral

25   argument, beginning with counsel for PREPA for seven minutes.

1    And I have Mr. Possinger down as the speaker.

2            MR. POSSINGER:  -- representative of PREPA --

3            THE COURT:  Mr. Possinger, are you there?

4            MR. POSSINGER:  Hello.  I am.  Did you hear me, Your

5    Honor?

6            THE COURT:  I heard you for a second and then you cut

7    off.  Can you try unmuting again?

8            MR. POSSINGER:  Yes.

9            THE COURT:  And Ms. Ng, would you try doing whatever

10   you can to unmute?

11           MS. NG:  I unmuted him, because I think he was trying

12   to talk.  So I just unmuted him, and that's why you heard part

13   of it.

14           MR. POSSINGER:  Understood, Your Honor.  I didn't

15   realize I had to unmute on the screen as well as my phone, but

16   I think we're good.

17           THE COURT:  Yes.  Everybody should note, you have to

18   do both with this system, unmute both the screen and the

19   telephone.  Thank you.

20           Good morning, Mr. Possinger.  You may begin.

21           MR. POSSINGER:  Good morning, Your Honor.  This is

22   PREPA'S motion to reject 27 contracts for the development of

23   renewable energy projects.  And before I get started, I just

24   want to point out, so Your Honor has the information, we had

25   three objections filed to this motion.  One of them, GS

1    Fajardo, was withdrawn on Monday, and they also withdrew their

2    motion to sever their contract from these proceedings, in case

3    Your Honor missed that.  I think we just now have two

4    remaining objections to this.

5            THE COURT:  Yes.

6            MR. POSSINGER:  A brief background here.  These

7    contracts go back many years.  They go back to 2011, to 2013.

8    During that time, PREPA entered into around 60 power purchase

9    and operating agreements for the development of renewable

10   energy projects in Puerto Rico, wind -- primarily wind and

11   solar.

12           Of the 60 contracts, some of them have been completed

13   and are now providing power, some remain under consideration

14   by PREPA and the Oversight Board.  The 27 that are subject to

15   this motion are not operational.  Most of them have not even

16   begun construction, and the few that have are in the very

17   early stages of construction.  And this is now, what, seven to

18   nine years after these contracts were signed.

19           Additionally, PREPA has determined that the rates for

20   sale of power from these projects contained in these con -- in

21   each of these 27 contracts significantly exceed the price that

22   PREPA can obtain in the current marketplace, and that would

23   burden PREPA's customers with expensive power when cheaper

24   renewable options are now available.

25           PREPA spent some time reviewing all these contracts

1    throughout 2019.  They attempted to renegotiate certain of

2    those, reviewed all of these factors, the time to completion

3    and the cost of the power ultimately provided by these

4    projects, and determined to terminate each of these 27

5    contracts in accordance with their terms.

6         In March of this year, PREPA sent written notice of

7    termination to each of these counterparties.  The Oversight

8    Board agreed with the decision to terminate and also agreed to

9    seek rejection of the contracts as well to avoid any argument

10   that the termination was either not valid or not effective.

11        On that point, although PREPA doesn't believe it has

12   any liability for breach or termination or rejection damages,

13   we're not seeking any finding in that regard today.  The

14   rights of parties to assert rejection damage claims are not

15   implicated by the relief that we're seeking, they're not

16   prejudiced, and the Order that we -- the Proposed Order that

17   we provided expressly reserves the rights of parties to seek

18   rejection damages.

19        As Your Honor has noted in your decision granting the

20   motion to assume the EcoElectrica and Naturgy contracts, the

21   standard for assumption, or here, rejection, is whether the

22   rejection meets the business judgment rule, which calls for

23   deference to the decision of the PREPA governing board and the

24   Oversight Board in the absence of evidence of bad faith in

25   making the decision to reject.  Here, rejection will clearly

1    benefit PREPA and, more importantly, its customers by

2    relieving them from over market renewable energy costs from

3    projects that may never be built in the first place.

4         As I indicated, we got -- we received three

5    objections.  GS Fajardo withdrew theirs.  Tradewinds Energy

6    asserted an objection, which is really a reservation of rights

7    to make sure that its right to assert a rejection damage claim

8    is not prejudiced by this Order.  Again, the Order does

9    reserve the right for parties to assert rejection damages.

10        The third objection is from a counterparty called GG

11   Alternative, which is cast as a limited objection that appears

12   to oppose rejection on the basis of alleged breaches of its

13   contract by PREPA pre-rejection, and that rejection will cause

14   harm to its business interests and environmental policy.

15        We submitted the Declaration of Fernando Padilla in

16   connection with this motion.  That Declaration doesn't target

17   or discuss any particular contract, but whether PREPA was in

18   breach of any of these contracts isn't relevant to rejection.

19   If anything, it might weigh in favor of the decision to reject

20   to avoid a burdensome share cost.

21        Regarding policy, energy policy, environmental

22   policy, as we've argued several times in this Court, this is

23   not the forum to litigate policy choices.  Energy policy,

24   renewable energy targets are the subject of Puerto Rico law

25   and regulation, the integrated resource plans that are

1    submitted to the Puerto Rico Energy Bureau for approval, and

2    the Certified Fiscal Plans of the Oversight Board.

3         We submit that the rejection of these 27 contracts is

4    consistent with the Certified Fiscal Plan, and we ask that the

5    motion be granted.  With that, unless Your Honor has any

6    questions, I would yield the balance of my time for rebuttal.

7         THE COURT:  Thank you.  I have no further questions

8    at this time, and so I will turn to counsel for Tradewinds,

9    Mr. Arrastia.

10        And remember to unmute both your phone and, if you

11   have your computer interface up, unmute on the computer.

12        MR. ARRASTIA:  Thank you, Your Honor.  This is John

13   Arrastia on behalf of Tradewinds.

14        Originally we had filed the limited objection and

15   reservation of rights solely because of some discomfort over

16   the language, but in its Reply, the Oversight Board clarified

17   its position, and Tradewinds finds that clarification renders

18   the motion and the relief sought acceptable.  So with that,

19   there is no objection after the Reply that was filed by

20   PREPA.

21        THE COURT:  Thank you, Mr. Arrastia.

22        MR. ARRASTIA:  Thank you, Your Honor.

23        THE COURT:  And so now I will turn to counsel for GG,

24   Mr. Santos Barrios, who's been allotted four and a half

25   minutes.

1          Mr. Santos Barrios, you need to unmute your phone and

2     the computer screen.

3          (No response.)

4          THE COURT:  I am not seeing him on the speaking line

5     registration.

6          MS. NG:  Judge, I don't see him on at all.

7          THE COURT:  He's not on at all?  Let's see.  What is

8     his law firm?  I don't have the full list.  So if anyone else

9     from counsel for GG is on with a speaking line, would you

10    please say something if you wish to speak to this motion?

11         (No response.)

12         THE COURT:  It looks like I am not seeing --

13         MS. NG:  Judge, I don't see anybody listed with that

14    law firm as either listening or speaking.

15         MR. POSSINGER:  Your Honor, this is Paul Possinger

16    again.  In advance of this hearing, I reached out to all three

17    counsel, when GS Fajardo's objection was still on the docket,

18    to ask about time allocation.  And I heard from Mr. Arrastia

19    and from GS Fajardo, but I did not hear back from GG

20    Alternative.  And that's why we just put four and a half

21    minutes per side after Mr. Arrastia indicated he would like a

22    minute.

23         THE COURT:  All right.  Well, that explains it.  So

24    there is no appearance, and I see that no informative motion

25    for an appearance was filed by counsel for GG Alternative.

1   And there is no one on the phone lines today.  So if you would

2   like to make whatever concluding remarks you have in mind,

3   Mr. Possinger, I will then make my ruling.

4            MR. POSSINGER:  No, Your Honor, I don't have anything

5   to add to my opening remarks.

6            THE COURT:  Very well then.  I will make my ruling

7   now.

8            The Court has considered carefully the written

9   submissions and arguments.  Actually, what I will do is state

10  now that the motion is granted, and the Court will enter an

11  order explaining its reasoning in short order.

12           MR. POSSINGER:  Thank you, Your Honor.

13           THE COURT:  Thank you.

14           And so the next Agenda Item is PREPA's motion to

15  allow LUMA -- the LUMA administrative expense claim that is

16  Docket Entry 13583 in case 17-3283 and Docket Entry 2053 in

17  case 17-4780.  And 40 minutes have been allowed for arguments,

18  beginning with 12 minutes by Mr. Bienenstock for PREPA.

19           Mr. Bienenstock.

20           MR. BIENENSTOCK:  Yes.  Good morning, Your Honor.

21           THE COURT:  Good morning.

22           MR. BIENENSTOCK:  Martin Bienenstock of Proskauer

23  Rose, LLP, for the Oversight Board as Title III representative

24  of PREPA.

25           Your Honor, the theme of my remarks will be

1  simplification, given all of the pleadings, paper, discovery

2  that has preceded this hearing.  The motion we're addressing

3  was filed by -- on behalf of PREPA on July 7, 2020.  The

4  relief requested is an order providing that LUMA Energy has an

5  administrative claim for unpaid front-end transition

6  obligations incurred under its T&D, Transmission and

7  Distribution Contract, with PREPA.

8          By simplification, what I mean is this:  We submit

9  that the only relevant and material facts that really bear on

10  whether this motion should be granted or denied are the fact

11  that LUMA Energy has this T&D contract with PREPA, which is an

12  undisputed fact.  And everyone has the contract.  It's a

13  matter of public record.

14          We have asserted that there are two statutory bases

15  on which LUMA Energy should be deemed to have its

16  administrative claim.  And I want to emphasize, we are not

17  asking now for the claim to be allowed in any particular

18  amount.  LUMA Energy has to perform in accordance with

19  contracts to entitle itself to be paid any amount, starting

20  with the first penny.

21          And we're not asking the Court to decide in advance

22  whether it's going to satisfy its contractual obligations.

23  What we're asking for, because it's a condition of LUMA

24  Energy's performance of the contract, imposed by LUMA Energy,

25  is simply to register the fact that by entering into this

1   contract with PREPA Energy, if it satisfactorily performs, the

2   claimant will have -- will be an administrative claim under

3   PROMESA.

4           We want to --

5           THE COURT:  I'm sorry, Mr. Bienenstock.  So you're

6   asking for a sort of conceptual approval of expenses incurred

7   under this aspect of --

8           COURT REPORTER:  I'm sorry, Your Honor.  This is Amy,

9   the court reporter.

10          THE COURT:  Yes.

11          COURT REPORTER:  I think something happened in the

12  courtroom and it's not coming through my headphones.

13          THE COURT:  All right.  Do you need me to stop while

14  you figure that out?

15          COURT REPORTER:  If you could, for just one second.

16  Let me try switching headphones and see if that helps.

17          THE COURT:  Yes.  We'll take a pause.

18          (Discussion held off the record)

19          COURTROOM DEPUTY:  Your Honor, we're going to try to

20  continue through the speakers of the courtroom.  I'm going to

21  mute ourselves for a second while I move the equipment so I

22  don't make some unnecessary noise.  Okay?  My apologies.

23          THE COURT:  All right.

24          COURTROOM DEPUTY:  Can you please test the audio,

25  Your Honor?

1          THE COURT:  Testing, one, two, three.

2          COURTROOM DEPUTY:  Your Honor, if you and the parties

3    would be so gracious and speak a little louder and take us in

4    mind, because she's working under difficult conditions.  And

5    our apologies again.

6          THE COURT:  Is there any possibility of being able to

7    swap out that piece of equipment or is this the best that we

8    can do with the reporter working with the speaker?

9          COURTROOM DEPUTY:  Pablo is on his way.  We just

10   don't want to, you know --

11         THE COURT:  All right.

12         COURT REPORTER:  It's not the headphones, Your Honor.

13   It's something in the actual line that feeds to the

14   headphones.

15         THE COURT:  Okay.

16         COURTROOM DEPUTY:  So it's something that Pablo has

17   to deal with, not us, because he's the one that knows what to

18   do.

19         So we don't want to make you wait any longer.  We can

20   continue until he comes in and fixes this.

21         THE COURT:  All right.  Good.  So when he comes in,

22   say something and we will pause again --

23         COURTROOM DEPUTY:  Will do, Your Honor.

24         THE COURT:  -- so that it can be fixed.  All right?

25         COURTROOM DEPUTY:  Thank you very much.

1          THE COURT:  And are you hearing me all right at this

2     volume?

3          COURTROOM DEPUTY:  Yes.

4          THE COURT:  Okay.  I will try to keep my voice up.

5     And so, everyone, thank you for your patience.

6     Mr. Bienenstock, thank you for your patience.

7          The question I was about to ask Mr. Bienenstock is

8     whether the approval that's being sought here is conceptual

9     rather than specific, so that you are not asking me to grant,

10    for instance, the 60 million dollar fixed fee approval as such

11    as an administrative expense now, but rather saying that

12    expenses that are ultimately incurred for services performed

13    and in an approved manner will be considered administrative

14    expenses?

15         MR. BIENENSTOCK:  Yes, Your Honor.  That's exactly

16    right.  I wouldn't describe it as conceptual as much as we're

17    asking for relief as to identifying the type of claim that

18    LUMA Energy has in exchange for performing under the contract,

19    because that's a condition of the contract.

20         We're not asking for the liquidation or amount of the

21    claim, because that, as Your Honor just said, is subject to

22    satisfactory performance of LUMA Energy's contractual

23    obligations.  It's as if LUMA Energy is saying, I will render

24    certain service in exchange for a right to payment that is an

25    administrative right, to the extent I earn it.

1    And it was made part of the contract, and I guess

2  LUMA Energy was wise in doing that given the objections that

3  have come out in opposition to the grant of the administrative

4  status.  It didn't want, and it understandably did not want to

5  perform and then have to find out later whether it had an

6  administrative claim or not.

7    So that's what we're asking for.  I hope that answers

8  Your Honor's question.  If not, I can double back, but --

9    THE COURT:  I think it does.  I am just wondering

10 whether the precise language that you have proposed and that I

11 gather is in the contract is that limited in its effect.  The

12 Proposed Order says, "Pursuant to Sections 503 and 507(a)(2)

13 of the Code, upon entry of this Order, LUMA Energy shall have

14 an allowed administrative expense claim for any accrued and

15 unpaid front-end transition obligations incurred by PREPA

16 under the T&D contract."

17    I'm not sure whether there's a definition of

18 "accrual" or how termination fees or anything like that would

19 fit into the language that's been proposed.  Do you have a

20 view on that?

21    MR. BIENENSTOCK:  Yes, Your Honor.  By "incurred by

22 PREPA under the T&D contract," we believe that means it has to

23 be validly incurred under the contract.  So if LUMA Energy

24 does not perform correctly, then PREPA would not be incurring

25 an obligation under the contract.  To the extent it does

1   perform correctly, then PREPA incurs an administrative expense

2   level liability under the contract to the extent of the

3   satisfactory performance.

4          THE COURT:  Thank you.

5          MR. BIENENSTOCK:  Thank you.

6          So we've proposed two statutory bases for granting

7   this relief.  One is based on Bankruptcy Code Section

8   503(b)(1)(A) for the actual necessary cost of preserving the

9   estate.  And we've explained that while there is no estate in

10  Title III, as there is no estate in Chapter Nine cases, the

11  definition of "property of the estate" in PROMESA Section

12  301(a)(5), interpreting "property of the estate" as property

13  of the debtor, means, for this purpose of 503(b)(1)(A), that

14  the costs are to preserve the debtors' property as opposed to

15  the estate.

16         We recognize that some of the objectants have said,

17  well, 301(a)(5) defines "property of the estate," not just

18  "estate," so the definition does not apply here.  We don't

19  think that's correct, but if it is, then the second statutory

20  basis for the relief is that under the preamble in Bankruptcy

21  Code Section 503(b), it says the Court can allow

22  administrative claims "including."  So "including" means it's

23  not an exclusive list, and for purposes of here, where you

24  don't have an estate, there can be administrative claims for

25  preserving the debtor's property.  And we think basically the

42

1  laws of nature compel that outcome.

2        Your Honor, the most telling part of all of the

3  objections is what they do not say.  What they do not say is

4  if there's no administrative claim for performing under the

5  contract, what is there?  How can a Title III debtor have

6  people work under contracts if they don't have a right to be

7  paid before prepetition unsecured claims?   The system just

8  doesn't work.

9        And it cannot be that Congress wrote an absurd

10  statute, so the word "including" really has to be used here if

11  property of the estate is not going to be -- if preserving the

12  estate is not going to be interpreted as preserving property

13  of the debtor.  There must be a way under which it's safe to

14  work for a Title III debtor, and that can only be if there's

15  an administrative claim the Court can grant under 503(b) in

16  exchange for performing under the contract.

17        Now, all of the objections, they're really in two

18  batches.  They either take issue with whether there's benefit

19  under the contract, or they take issue with the effect the

20  grant of this administrative level priority might have on

21  other claimants.

22        In terms of taking issue with whether there is a

23  benefit under the contract, the first thing I'd point out is

24  503(b)(1)(A) doesn't use the word "benefit."

25        (Sound played.)

 1           MR. BIENENSTOCK:  It uses the term preserving,

 2    preserving the property.  But basically, if a contract party

 3    does what the debtor says it must do under the contract, one

 4    cannot second guess later and say it wasn't preserving; it

 5    wasn't maintaining; it wasn't beneficial.  The parties can

 6    only do what the contract says it should do.  It's PREPA's

 7    issue, not the contract party's issue.

 8           Second, to the extent the grant of any admin claim

 9    has an impact on other claims, that's irrelevant.  One cannot

10    say to someone that PREPA does business with, you're supplying

11    labor and materials but because that might have an impact on

12    other claimants, we won't pay you; we'll pay the others.  The

13    system can't work in that fashion.  So that's why while we are

14    sensitive to everybody's positions and needs and concerns, we

15    don't think, for purposes of this motion, that's relevant or

16    material.

17           And those were really my remarks for the direct,

18    unless the Court has questions.

19           THE COURT:  Thank you, Mr. Bienenstock.

20           We will now turn to Mr. Friedman for AAFAF, who's

21    been allocated five minutes.

22           MR. FRIEDMAN:  Thank you, Your Honor.  It's Peter

23    Friedman from O'Melveny & Myers on behalf of AAFAF.

24           Your Honor, LUMA'S agreement to enter into this

25    contract was the culmination of an extensive and comprehensive

1    process motivated by the recognition that the T&D system has

2    to be -- has to be transformed in order to move Puerto Rico's

3    recovery forward.

4         The government parties, all of them, including AAFAF,

5    specifically agreed to seek administrative expense treatment

6    here in exchange for substantial benefits, and we do this

7    against a backdrop of ceaseless litigation over everything

8    that PREPA does.  That's what I want to make clear to the

9    Court and to any -- sort of everybody else listening.  This is

10   not something that AAFAF intends to do with respect to every

11   contract.  This is a particularly unusual one.  And I think

12   the Court knows that from the past three plus years where this

13   is the first time we've sought this relief.

14        The relief is critical because without it, LUMA has

15   the right to walk away.  And as does -- and it made clear in

16   the motion, that would pose substantial problems for Puerto

17   Rico's recovery.

18        The objectors argue that the administrative expense

19   motion has to be denied, and Mr. Bienenstock said, because

20   503(b)(1)(A) only allows for preserving an estate and there is

21   no estate in Title III.  Mr. Bienenstock made some important

22   textual points, but rereading 503 this morning, I just thought

23   it's a clear -- it's a statute that Congress clearly left a

24   lot of work for the Court to do in parsing what makes sense in

25   the context of municipal bankruptcy.

1          And I say that because it was clear when Congress

2    incorporated the statute into PROMESA in total, it was vastly

3    overinclusive.  We know, for example, 503(b)(1)(B) can never

4    apply, because Puerto Rico is subject to certain kinds of

5    taxes; or 503(b)(3)(A) can't apply, because there are no

6    involuntary cases versus a government debtor.  And there are

7    other examples.

8          But with respect to the kind of claim here, either

9    whether under the including theory that Mr. Bienenstock put

10   forward or just the plain textual analysis, there is no

11   structural or logical reason that, with proper government

12   consent, and obviously that includes AAFAF, an administrative

13   claim can't be granted for the purpose of preserving and

14   enhancing PREPA's property.

15         And the other point I want to make is that the

16   objectors' argument effectively I think relies on the *OTB*

17   decision from Judge Glenn in many respects, but I think

18   they're misreading *OTB,* as are -- or at least misapplying it.

19   As the Court knows from the 926 context, Judge Glenn in *OTB*

20   --

21         (Sound played.)

22         MR. FRIEDMAN:  -- has been exceptionally deferential

23   to government powers, and very respectfully, properly of state

24   and municipal sovereignty.  But those concerns are not

25   implicated here, because the Oversight Board debtor -- as

1    debtors' representative for 305 purposes, and AAFAF and the

2    Oversight Board with respect to Section 302 -- or 303, have

3    all consented to the grant of relief.

4           So, in fact, rather than undermining state

5    sovereignty here, it would be enhanced by permitting the

6    debtors and the government together to come to this Court and

7    obtain necessary relief to move the overall restructuring

8    forward.  So the concerns emanating in the *OTB* opinion I don't

9    think are applicable here.

10          Unless the Court has questions, I think those are the

11   key points that AAFAF wanted to make in support of this

12   motion.

13          THE COURT:  Thank you, Mr. Friedman.  I have no

14   further questions for you.

15          MR. FRIEDMAN:  Thank you, Your Honor.

16          THE COURT:  And so we will turn to Mr. Despins, who's

17   been allocated five minutes.

18          Mr. Despins, you need to unmute.

19          MR. DESPINS:  I apologize, Your Honor.  I was

20   unmuting myself.

21          THE COURT:  I hear you.

22          MR. DESPINS:  Good morning again, Your Honor.

23          THE COURT:  Good morning.

24          MR. DESPINS:  As Your Honor knows, because I know

25   you, you've read all the objections, we are not -- I want to

1   be clear, we're not arguing, to start with, we are not raising

2   the issue of the fact that there cannot be administrative

3   expense claims in Title III.  And also, we are not -- the

4   Committee is not opposed to privatization of PREPA.  So I want

5   to make sure that's off the table, because the Oversight Board

6   paints a pretty wide brush when it describes -- with a pretty

7   wide brush when it describes the objectors.

8           So I want to address two issues, Your Honor, today.

9   The first one is the issue of late fees.  And we cited, you

10  know, extensive case law explaining that, you know, late fees

11  for a list of expense claims are not allowable because

12  "there's no benefit to the estate."

13          And I want to make sure Your Honor knows that the

14  concession -- or not the concession, the clarification made by

15  Mr. Bienenstock doesn't resolve that because he's asking the

16  Court to say today that there is a benefit of the estate for

17  these future late fees.  Whether it's 100 dollars or a million

18  dollars is a different story.  I understand that's a reserve.

19  But the issue of benefit to the estate, they're asking you to

20  opine on that today.  And while the cases that --

21          THE COURT:  Mr. Despins.

22          MR. DESPINS:  Yes, Your Honor.

23          THE COURT:  May I just ask you a practical question

24  about late fees?  I'm sure no entity, no debtor wants to incur

25  late fees, but there may be situations in which an entity

1   needs to make cash flow decisions and a contract may provide
2   for a late fee or penalty provision to disincentivize that
3   choice.  But without that choice, there may be a breach of a
4   contract.  So how is it that you say a provision for a late
5   fee and incurring a late fee could never, ever be beneficial
6   to a debtor?
7          MR. DESPINS:  I can only refer, Your Honor, to the
8   cases that we've cited where the courts make a real
9   distinction between late fees incurred in the context of
10  assumption of contracts, which are permissible, but not
11  otherwise, especially the Massachusetts case we've cited.  And
12  all the cases that the Board cited are all in the context of
13  assumptions of leases or contracts, but contained a lengthy
14  provision where the Court expressly said that, we don't need
15  to make a finding of benefit to the estate.
16         But I understand your point practically, Your Honor.
17  I can only tell you that the cases that we've cited, and
18  there's been no contrary cases cited by the Board --
19         (Sound played.)
20         MR. DESPINS:  -- other than the context of assumption
21  of contracts.
22         But let me move on to the second point, because I
23  hear the beep.  The second point is the reasonable veto over a
24  plan.  And I think it's very important to understand what our
25  concern is, Your Honor.  The Board says, don't worry about

1   that because if we use it in the wrong way, they -- we will

2   override that, and we'll get to court and we'll have the Court

3   override that.

4        The Committee is not only concerned about that, but

5   the Committee is concerned about the Board using this consent

6   right or veto right as a sword in the context of a future

7   plan.  The same way, for example, with respect to the RSA

8   Motion, the 9019 Motion, they told you at the beginning of

9   that that it was essential that that motion be granted for

10  privatization to occur.  Well, today we have a motion where

11  there is privatization, but there's no 9019 motion that's been

12  approved.

13       So the point is that they're going to use this as a

14  club, and we don't think it's appropriate.  Surely, there can

15  be a provision that says that the Plan should not affect the

16  rights of LUMA, meaning, you know, the rights to get paid, the

17  right to perform and all of that.  But they shouldn't have

18  general language that says they have a reasonable veto right,

19  because they should not, and the Court should be concerned

20  about giving them that club.

21       Thank you, Your Honor.

22       THE COURT:  Thank you.

23       Next is Mr. Cassel for the Fuel Line Lenders for five

24  minutes.

25       MR. CASSEL:  Good morning, Your Honor.  Michael

1   Cassel of Wachtell, Lipton, Rosen & Katz for the Fuel Line

2   Lenders.

3           THE COURT:  Good morning.

4           MR. CASSEL:  Good morning, Your Honor.

5           We are here objecting on one simple ground, which is

6   that Section 503(b)(1)(A) of the Bankruptcy Code, which

7   provides for administrative expense treatment for the actual

8   necessary cost of preserving the estate, does not apply in the

9   PROMESA context because there is no estate.

10          We've raised this Section 503(b)(1)(A) issue in our

11  objection to the 9019 Motion.  It was never resolved there.

12  And our position is simple:  The statute uses the word

13  "estate."  All parties, Mr. Bienenstock, Mr. Friedman agree

14  there is no estate.  The First Circuit in *Gracia-Gracia* said

15  that the concept of the estate has no role under PROMESA.

16          So our position is supported by the text of the

17  statute.  It's also uniformly supported by the case law,

18  including in Judge Glenn's decision in *Off-Track Betting*,

19  which was a pretty comprehensive examination of both the text

20  of the statute and the policy considerations underlying

21  Chapter Nine.  It also considered the commentary, including

22  *Collier* and *Norton*, and Judge Glenn relied on those.  And all

23  that case law, the commentary squarely rejects what the

24  Oversight Board is presenting today.

25          And in response to that, the government parties make

1    a number of arguments, most of which were raised for the first

2    time in their Reply Brief.  The first argument, and you heard

3    it today from Mr. Friedman, is that Section 503(b)(1)(A)

4    applies, at least when the Oversight Board and AAFAF consent.

5    There's no real support for that position in the statute.

6         It also doesn't distinguish *Off-Track Betting*, which

7    is a case where the debtor there actually expressly consented

8    to the Court determining whether the claim qualified as an

9    administrative expense.  And Judge Glenn rejected the

10   administrative expense, notwithstanding the consent, because

11   requiring the Court to decide questions on whether particular

12   expenses benefit the estate would violate Section 903 of the

13   Bankruptcy Code.

14        And that is mirrored here in PROMESA Section 303,

15   which would simply entangle the Court in questions like, does

16   this particular expense benefit the debtor.  Judge Glenn

17   decided that was an unwise approach to take, even if the

18   government parties consented.

19        The second approach the government parties offer

20   today is that the word "estate" always equals the word

21   "debtor" in PROMESA and Chapter Nine.  That argument, we don't

22   think it works.  It's sort of not supported by the text of

23   PROMESA or Chapter Nine.

24        Mr. Bienenstock referred to PROMESA Section

25   301(c)(5), which, like Section 902 of the Bankruptcy Code,

1   provides that property of the estate, and that's a defined

2   term, "property of the estate" is to be interpreted as

3   property of the debtor.  Section 503(b)(1)(A) does not use the

4   phrase "property of the estate."

5          (Sound played.)

6          MR. CASSEL:  So on the face of the text, it's a

7   definitional tool that PROMESA Section 301(c)(5) just doesn't

8   apply on its terms.

9          Mr. Bienenstock also referred to this sort of

10  generalized administrative expense claim under Section 503(b)

11  without reference to Section 503(b)(1)(A).  Your Honor, that

12  argument never appeared in the government parties' opening

13  brief.  It was raised for the first time in reply in one

14  paragraph.  It's also, we believe, not terribly consistent

15  with the First Circuit's admonition in *Hemingway*

16  *Transportation* that the categories of administrative expenses

17  are to be strictly construed, and if the Oversight Board is

18  proposing essentially a standard list approach to Section

19  503(b), and -- we're not sure how that fits with *Hemingway*

20  *Transportation's* view of administrative expenses.

21         Turning to the last point Mr. Bienenstock raised

22  about sort of laws of nature and how post-petition claimants

23  are to be paid, I think this is actually quite key, because

24  this PROMESA context is really quite different from an

25  ordinary commercial bankruptcy.  In this case, post-petition

1   claimants, the Oversight Board and AAFAF and the government

2   parties can pay them in the ordinary course.  Those claimants

3   can pursue their claims in the Commonwealth courts without

4   regard to the automatic stay, and they're not discharged by

5   confirmation of a plan.

6          But all of this is really quite distinct from an

7   ordinary commercial bankruptcy.  In a commercial bankruptcy,

8   the estate is generally distributed at the conclusion of the

9   case and post-petition creditors have no recourse.  But here

10  that's not the case, and there's no special need to provide an

11  incentive to post-petition creditors when the instrumentality

12  remains in place even post confirmation.

13         And, in fact, I point out, contrary to

14  Mr. Bienenstock's comments here --

15         (Sound played.)

16         MR. CASSEL:  -- *City of San Bernardino* confirmed a

17  Chapter Nine plan without any administrative expense claims

18  being granted under Section 503(b)(1)(A), so it's not

19  absolutely necessary.  In fact, there have been successful

20  Chapter Nine restructurings without them.

21         THE COURT:  Thank you.

22         MR. CASSEL:  So unless the Court has any questions, I

23  request the motion be denied.

24         THE COURT:  Thank you.

25         I turn now to Ms. Mendez Colberg for UTIER.

1          MS. MENDEZ COLBERG:  Good morning, Your Honor.  This

2    is Jessica Mendez.  Can you hear me?

3          THE COURT:  Good morning.  I can hear you.  Thank

4    you.

5          MS. MENDEZ COLBERG:  Thank you.

6          For the record, Jessica Mendez Colberg on behalf of

7    UTIER and the retirement system of the PREPA employees.

8          First, Your Honor, the issue of this motion is a

9    matter that is not ripe for adjudication.  And this is not a

10   litigation tactic to deprive the Court of subject matter

11   jurisdiction, as the government parties referred to.  It is a

12   constitutional mandate.

13         Here, the issuance of the Certificate of Energy

14   Compliance is being challenged before the Puerto Rico Court of

15   Appeals, and this certificate is a legal requirement for the

16   validity of the LUMA contract.  And if it is determined that

17   the certificate is not valid, then the T&D contract is null.

18   Thus, LUMA would have no right to receive payment for the

19   administrative expenses at this time.  And if this motion were

20   to be granted, there would be further litigation.

21         And as the Court pointed out, if this is a conceptual

22   approval of the expenses, rather than a specific approval for

23   administrative expenses, this is then a premature issue that

24   goes to whether it's -- that goes to the requirement of the

25   actual and necessary expenses on this matter and the benefit

1   of those expenses for the debtor.

2          Now, with respect to the benefit, who benefits from

3   the front-end transition services?  Only LUMA does.  The LUMA

4   contract is like if a landlord rents its property, but the

5   landlord pays for every cost associated with the use of his

6   own property, including the rent, while the tenant enjoys it

7   and even makes a profit out of it without those profits

8   benefiting the landlord.

9          The services that LUMA will provide during the

10  transition period are not for PREPA.  These are tasks that

11  LUMA will perform in order to set up shop in Puerto Rico under

12  the T&D contract for which PREPA has to pay for everything

13  with no investment from LUMA.

14         And how can it be said that the front-end transition

15  obligations provide substantial benefit to PREPA when even the

16  Fiscal Plan recognizes the deficits precisely because of the

17  payment of these obligations.  And this is not challenging the

18  certification of the Fiscal Plan.  This is questioning the

19  request for relief on the administrative expenses itself.

20         Now, the government parties question our use of the

21  word "dismantle," but the term "dismantle" came directly from

22  the administrative expense motion, and now they would rather

23  use the term "transform" PREPA.  There is no benefit for the

24  debtor if the goal is to dismantle the debtor.

25         Now, the government parties say that these services

1    will provide substantial benefits in the future, but they fail

2    to specify how those services will actually benefit PREPA now

3    when they all revolve around things that LUMA needs to work on

4    as an essential for conditions to take over the operation.

5         And when they say that LUMA must invest substantial

6    up front time familiarizing with PREPA's processes, PREPA will

7    pay for all of this, sidestepping other creditors with

8    priority like the retirement system.  And the fact that PREPA

9    will continue to own the T&D --

10        (Sound played.)

11        MS. MENDEZ COLBERG:  -- does not speak at all on how

12   the transition services benefit PREPA now and -- just LUMA.

13        Now, with respect to the request under Section 503,

14   we join the Fuel Line Lenders' argument and point out that

15   knowing that the remedy cannot be granted as requested, the

16   government parties go further to request the remedy under

17   Section 503 in general pursuant to Section 105 of the

18   Bankruptcy Code.

19        Now, this would mean an amendment to PROMESA where

20   Congress was careful enough as to not incorporate the concept

21   of the estate into the proceedings, as it did in Chapter Nine

22   cases.  Also, to the context of Section 105 of carrying out

23   the provisions of the Code, and in this case, PROMESA, it's

24   not a logis -- this is not a logistical entitlement that can

25   lead to granting any remedy, especially if it contradicts

1   provisions of the statute.

2          Under Section 105, the Court cannot cite that the

3   provisions of the Bankruptcy Code and PROMESA, along with what

4   other courts have already stated on this matter when it comes

5   to Chapter Nine, that apply also to these proceedings under

6   Title III -- other parties have argued that the motion here

7   does not comply with the concept of paying actual expenses

8   when services have not been performed yet and have been

9   recognized by the Oversight Board, as Mr. Bienenstock

10  established in his argument.  So here, Your Honor, the Court

11  cannot grant the requested relief under the laws of nature

12  only.

13         To conclude, in the absence of a bankruptcy estate,

14  administrative expenses claims should be limited to the

15  expenses incurred in connection with the proceedings and not

16  for operating expenses, as the government parties are

17  requesting here today.  So therefore, Your Honor, the

18  administrative expenses motion should be denied.

19         If the Court has no further questions for us, that

20  would be our argument.

21         THE COURT:  Thank you, Ms. Mendez.

22         I now turn to Mr. Qureshi for Cobra for three

23  minutes.

24         MR. QURESHI:  Good morning, Your Honor.  Abid

25  Qureshi, Akin Gump Strauss Hauer & Feld, on behalf of Cobra.

1  May I proceed, Your Honor?

2           THE COURT:  Yes, please.

3           MR. QURESHI:  Thank you.

4           Your Honor, Cobra's objection to the LUMA motion is

5  once again grounded in consideration of fundamental fairness

6  and equity, and in particular, Your Honor, what we think to be

7  the very important principle in any bankruptcy context, that

8  similarly situated creditors be treated the same.

9           And fundamentally, Your Honor, what PREPA is

10 proposing with LUMA fails to adhere to that principle.  That

11 is a principle that we think this Court can and should

12 enforce.

13          And in particular, Your Honor, PREPA argues that the

14 LUMA expenses are actual and necessary under 503(b),

15 notwithstanding the fact that the services have not yet been

16 performed.  In stark contrast, as Your Honor is aware, Cobra

17 has performed and remains uncompensated for services that

18 exceed 200 million dollars in value.

19          The Cobra contract, like the LUMA contract, was

20 approved by PREPA --

21          (Sound played.)

22          MR. QURESHI:  -- after multiple levels of review.

23 And, Your Honor, each of FEMA, as well as the Rand

24 Corporation, have already affirmed the reasonableness of

25 Cobra's costs and its services.  And the Rand report in

1   particular provides a detailed and independent assessment of

2   the reasonableness of both the rates charged and the services

3   provided.  Indeed, Your Honor, I suspect that one of the

4   driving reasons why LUMA requested a -- or indeed insisted

5   upon administrative expense approval in advance is precisely

6   to avoid the fate that has befallen Cobra.

7           So what are we asking for in this context, Your

8   Honor?  What we are asking for is that to the extent this

9   Court is inclined to approve the LUMA motion, that the

10  approval should be conditioned upon Cobra similarly being

11  permitted to proceed now to make its showing that its services

12  were actual and necessary under Section 503(b) of the

13  Bankruptcy Code.

14          To be clear, Your Honor, our argument with respect to

15  Cobra would fully preserve PREPA's argument that, as a result

16  of the pending criminal proceedings or the pending FEMA review

17  process, our claims should not ultimately be allowed.  We're

18  not suggesting that that be prejudiced in any way, but we do

19  think, Your Honor, that the underlying principle that

20  similarly situated creditors be treated the same is a very

21  important one.  It's fundamental to the bankruptcy process,

22  and it's a principle that should be adhered to in the present

23  context.

24          And with that, Your Honor, I'm happy to address any

25  questions the Court may have.

1          THE COURT:  Thank you, Mr. Qureshi.  I don't have any

2    questions for you at this time.

3          And so I will turn to Ms. Conde Torres for Whitefish.

4    Please remember to unmute both the phone and the computer

5    screen.

6          Is Carmen Conde Torres on the line?  Ms. Ng, she's

7    registered?

8          MS. CONDE TORRES:  Yes, I'm registered and I am

9    unmuted.

10          THE COURT:  Oh, very good.  Thank you.

11          MS. CONDE TORRES:  May I address you, Your Honor?

12          THE COURT:  Yes, please.

13          MS. CONDE TORRES:  Yes, Your Honor.  PREPA's response

14    to Whitefish's limited objection is that the impact of LUMA's

15    estimated administrative expense of 136 million in one year on

16    all the creditors of same high priority status is not

17    relevant.

18          Your Honor, PREPA is wrong.  LUMA's administrative

19    expense requirement cannot be taken isolated or in a vacuum of

20    other fiscal responsibilities of same rank.  PROMESA's purpose

21    is to stabilize finances as a whole in order to incentivize

22    business.  PREPA's current financial condition is a serious

23    concern even to LUMA.  The current risk is to undisputed

24    existing administrative expense creditors waiting in line for

25    over two years.  Why must we take the risk?

1      It is undisputed, Your Honor, that Whitefish provided

2  the greatest benefit to this debtor under the greatest

3  emergency faced by Puerto Rico after Hurricane Maria and in a

4  total blackout of the island.  Whitefish restored over 200

5  miles of transmission lines, the backbone of PREPA.  Whitefish

6  energized the hospitals, the main businesses, and the City of

7  San Juan.

8      For over two and a half years, Whitefish has received

9  no payment.  It is owed, as of this date, 141 million dollars,

10  of which 106 million are principal owed.  LUMA is requesting a

11  blanket order and a comfort order for 173 million dollars.  As

12  to Whitefish's contract, there has been no improprieties at

13  all found.

14      (Sound played.)

15      MS. CONDE TORRES:  Termination of the contract was

16  not related to performance, and OIG's only concern is the

17  reasonability of certain fees, which are very similar to

18  LUMA's.  For over two years --

19      THE COURT:  Ms. Conde Torres, would you wrap up?

20  Your time has expired.

21      MS. CONDE TORRES:  Yes.  PREPA'S Omnibus Reply has

22  failed to address Whitefish's concerns, has failed to provide

23  assurances of collection to creditors of equally high priority

24  status.  Until such concerns are satisfactorily addressed,

25  this millionaire blanket order requested by PREPA for

1   administrative expense shall not be allowed, Your Honor.

2             THE COURT:  Thank you.

3             And now I'll return to Mr. Bienenstock for rebuttal

4   remarks.

5             MR. BIENENSTOCK:  Thank you, Your Honor.  I'll have

6   to go a little bit quickly to address everything.

7             THE COURT:  But keep your voice up and make sure that

8   your words are distinct, please.

9             MR. BIENENSTOCK:  Yes.  Yes, Your Honor.  And thanks

10  for the reminder.

11            THE COURT:  I'm starting your three minutes now.

12            MR. BIENENSTOCK:  Thanks.  Thanks for that, too.

13            Okay.  The Committee's objection that the

14  supplemental agreement provides LUMA Energy a veto over the

15  Plan is not relevant to this.  For all the Committee knows,

16  PREPA could have said, and could say at any time to LUMA

17  Energy, we don't want to do a plan that you don't find

18  satisfactory, because you're operating the transmission and

19  distribution.

20            But again, that's really -- if we were asking to

21  assume a contract for the Court's approval, that would be

22  relevant.  It's not relevant here.

23            In terms of the Fuel Line Lenders' objections of

24  "property of the estate" not being the same thing as "estate,"

25  I'd like to give an analogy.  When people in my firm write in

1    a pleading "at this point in time," I immediately cross out

2    "at this point in" because point in time is the same as time.

3    Property of the estate is the estate.  It has no other

4    meaning.  So to say property of the estate means property of

5    debtor but estate doesn't mean debtor's property is just

6    wrong.

7              (Sound played.)

8              MR. BIENENSTOCK:  We raise this in the Reply

9    because -- the 503(b) inclusive language in the Reply because

10   that's when it became relevant.  If I understood correctly,

11   they're saying this doesn't matter because the claim would not

12   be discharged, but that's totally wrong.  301(a) of PROMESA

13   incorporates 944 of the Bankruptcy Code.  944(b) discharges

14   all claims through confirmation.

15             We understand that some people think this is, quote,

16   dismantling PREPA.  We don't think it's dismantling.  It's

17   improving.  But again, AAFAF asked the Court to weigh in on

18   the contract, not the issue at hand.  In terms of fundamental

19   fairness, Cobra's issue is not an admin claim.  It is being

20   treated similarly.  Cobra's issue is whether the claim should

21   be allowable given the criminal proceedings and everything

22   else.

23             And as far as Whitefish is concerned, everyone doing

24   business with PREPA creates admin claims if they satisfy their

25   obligations.  So this motion has no impact on the risk to

1  Whitefish or anyone else.  Every day that PREPA does business,

2  claims are accrued.  They're administrative under PROMESA.

3  And so their objection that it's bad that the Court recognize

4  that here isn't meritorious because their concern about risk

5  is not impacted by what the Court does here.  They're impacted

6  by every liability that PREPA incurs every day, regardless of

7  what the Court does on this motion.

8          Subject to the Court's questions, those were my

9  responses, Your Honor.

10          THE COURT:  Thank you, Mr. Bienenstock.  I have no

11  further questions for you.

12          The Court reserves decision and will issue a written

13  decision promptly.  I thank counsel for their arguments.

14          The final contested matter on the Agenda this morning

15  is the UCC's urgent motion to lift the stay to pursue its

16  objection to GO priority.  That is Docket Entry No. 13726 in

17  case 17-3283.  We have a total of 20 minutes allocated, and we

18  begin with Mr. Despins, who has six minutes.

19          MR. DESPINS:  Good morning -- good afternoon, Your

20  Honor.  Good morning.  Can you hear me?

21          THE COURT:  It's still morning, and I can hear you.

22  So please keep your voice up.

23          MR. DESPINS:  Some of us are actually in a different

24  time zone.

25          THE COURT:  It's morning here.

1        MR. DESPINS:  So Your Honor will recall that on March

2    10th, you entered the Order staying our GO Priority Objection.

3    And at that -- at that time, there was a proposed plan that

4    reflected the settlement with some of the GO noteholders.  And

5    obviously we disagreed with that at the time, but there was

6    ostensibly a basis to do it, which was this Plan and the

7    settlement.

8        We disagreed at that time, also, and I think it's

9    important to go through that, because we believed that the

10   request we were requesting was very narrow, meaning that an

11   objection with respect to -- solely with the priority of

12   whether they're entitled to priority in Title III or not is

13   very narrow.  It does not involve discovery.  And also because

14   the Board had already taken the position that there are no

15   state law or territory law priorities in Title III.  But

16   nevertheless, the Court issued the Stay.

17       And at the time, we pointed out that, you know, the

18   best way to resolve these issues, we know from COFINA, which

19   is the only Title III case that's been resolved, we know that

20   it's to bring them on for a resolution.  And ultimately,

21   that's how COFINA was resolved.

22       And also, the point we made then is that the Court is

23   already resolving very complex, much more complex and much

24   more fact-intensive issues right now with ERS, the monolines,

25   et cetera, and therefore, there was no compelling reason not

1    to go forward.  But in any event, there was a basis at the

2    time.

3            We renewed our motion in July saying, Judge, that

4    basis doesn't exist anymore.  And Your Honor adjourned or

5    scheduled our motion on that -- on our motion, the hearing on

6    our motion to today.  And what time shows -- what we know now

7    is that we were right in July, because there was no deal then,

8    and we're still right today in the sense that the Board is

9    very clear today that it's the hope of a settlement.  They

10   want to reach a settlement, which is a worthwhile goal.

11           We don't begrudge them that, but that's the only hook

12   that they have.  There's no other hook than the desire to

13   settle.  They list a number of issues that are impediments to

14   achieving that goal, including the election, the fact there

15   are elections in Puerto Rico, and the point is that nothing is

16   going to happen, or there's no imminent settlement at all.

17           And our position has always been, if they have a

18   settlement, ultimately they're free to bring it to court at

19   any stage of the litigation that we would be authorized to

20   continue, which is our objection to the claims.  So our point

21   is that, at this point, there is no basis to deprive us of our

22   statutory right to object and to proceed with our objection

23   based on this desire to settle and this concept that we're

24   somehow invading exclusivity, it's just made out of whole

25   cloth.

1      There's no precedent for that.  There's no basis for

2  that.  And we believe that after four years, since the

3  appointment of the Board, they've had tons of time to

4  accomplish that.  So this is not trying to take -- it's not a

5  gotcha saying, "Oh, you're not ready now, so we want to be

6  heard."  No.  This has been percolating for more than four

7  years, and therefore, we think it's important that it goes

8  forward.

9      And this is -- the arguments the Board is making are

10  particularly weak in light of the lack of Section 1106, the

11  lack -- in the PROMESA statute.  1106 is the hook that allows

12  a debtor in possession of trustee to say, hey, I should be

13  controlling the claims process.  That position was not

14  imported into -- was not enacted into PROMESA.

15      (Sound played.)

16      MR. DESPINS:  And therefore, that -- you know, it's a

17  compelling reason why this objection should go forward.  And

18  Your Honor, unsecured creditors are being deprived their due

19  process rights today because of this.  As I mentioned, there

20  is the claims objection process that's unfolding.  There's a

21  mention in the Reply, or the Objection filed by the Oversight

22  Board that sort of in a simple way it says, well, we'll talk

23  to the Committee later when we have a better understanding of

24  the size of their claims.

25      The subtext of that is, we'll get all the claims

 1    disallowed based on the fact that people think that they have

 2    to get three percent, or 3.8 percent.  And that is just wrong

 3    because, you know, people are not going to spend money, hire

 4    counsel to defend their claims if they think they're going to

 5    get three percent.  It's a real issue.  And we believe that is

 6    a denial of due process to the Committee and to the claimants

 7    it represents, and, therefore, it is fundamental that this go

 8    forward at this point.

 9            Thank you, Your Honor.

10            THE COURT:  Thank you, Mr. Despins.

11            I now have Ms. Miller for two minutes for Ambac.

12            MS. MILLER:  Good morning, Your Honor.  Atara Miller

13    from Milbank for Ambac.

14            THE COURT:  Good morning.

15            MS. MILLER:  Your Honor, it's clear that the

16    Oversight Board here is using the Stay to continue to try to

17    negotiate and devise a new settlement and a new plan that

18    again favor certain creditors over others without legal

19    support.  And what's particularly telling, in some of the

20    changed circumstances, and Mr. Despins identified some of

21    them, but some of the other notable changes are -- and

22    developments since the Stay was first enacted, is that the

23    Oversight Board continued pressing its objection to the

24    revenue bond claim.

25            And in particular, in that regard, it raised in the

1    Lift Stay Motion initially, and we see it again in the -- in

2    the summary judgment motions that are pending, this idea in

3    their legal position that Title III preempts all state law

4    priorities. That's important, because the purported GO

5    priority is the foundational touchstone of the PSA and the

6    settlement. And now that there isn't a settlement, it would

7    seem like the perfect opportunity, once the Oversight Board is

8    already litigating that issue and pressing their position on

9    the effect of Title III on state law priorities, to have that

10   issue resolved across the board for creditors uniformly so

11   that we can all understand what relative priorities we walk

12   into the restructuring process with or not, rather than, you

13   know, create a settlement with the group they decided is

14   easiest to settle with, hang it on this asserted and purported

15   priority, say nobody can get paid unless they get paid, so you

16   should be saying thank you to your 3.9 cents because they're

17   only getting 75 cents, and move on from there.

18            And while there's a settlement, we understand that

19   there is at least a jurisprudential basis for this Court to

20   impose a stay. But at this point, there is no settlement.

21   Creditors have the right --

22            (Sound played.)

23            MS. MILLER:  -- to pursue claim objections, and we

24   think that the Stay should be lifted.

25            THE COURT:  Thank you, Ms. Miller.

1          MS. MILLER:  Thank you.

2          THE COURT:  Now for the Oversight Board.  We have ten

3     minutes.

4          MR. BIENENSTOCK:  Thank you, Your Honor.  This is

5     Martin Bienenstock of Proskauer Rose, LLP, for the Oversight

6     Board, as Title III representative of the debtors.

7          I'm going to go in order of the points I copied down.

8     Mr. Despins mentioned that the Court is already resolving

9     complex issues concerning ERS and the monolines, et cetera.

10    That's correct.  And that is because the Oversight Board, as

11    debtors' representative, asked the Court to do that; and in

12    some cases, the other -- the counterparties, whether it be the

13    ERS bondholders or the monolines, also asked for that.

14         But that's quite different than the Court proceeding

15    to resolve an issue that is key for the Oversight Board to use

16    in formulating a plan, which would no longer be available for

17    that purpose if it were litigated.  And I'll get to

18    Ms. Miller's comments about favoring creditors in a few

19    moments.

20         The argument that the desire to settle is the only

21    hook the Oversight Board has, which the Committee argued, is

22    simply wrong.  The hook, to use their language, is what we

23    wrote in our pleadings, which is exclusivity.  We were granted

24    the exclusive right to propose a plan.  We can't do that if a

25    key issue in the plan is hijacked.

1          But then there's another issue that the Committee and

2     the monolines have not raised, and I call that issue for this

3     purpose "looking down the line."  Let's hypothesize that the

4     Court were to allow the priority of the GO claims to be

5     litigated and for the Committee to be a litigant, as it has

6     requested.  That doesn't mean that the Committee can control

7     the objection or the settlement to the objection.

8          They are -- the Committee is proceeding based on

9     Bankruptcy Code Section 502(a), which says a party in interest

10    can object to a claim.  There are 165,000 proofs of claim

11    filed in these cases.  There may not be 165,000 claimants who

12    ask to participate or who impose their absolute right to

13    participate in this priority objection, but there's sure going

14    to be more than one.

15         If that were to go forward, clearly the Oversight

16    Board would have to appear, as per itself and as

17    representative of the debtors, in that litigation.  And one

18    has to believe that other creditors who feel they have an

19    interest would want to participate, too.  So what does that

20    mean?

21         Well, that means that absent the Court determining

22    that while everyone can appear and be heard, only the debtor

23    and the debtors' representative can control the objection and

24    the settlement, then we're back -- if the Judge did not decide

25    that, if the Court did not decide that, then we have a war

1    without any rules or mode of resolution, which clearly cannot

2    be the case.

3         So I would submit, Your Honor, that the Committee has

4    not connected the dots.  The fact that it has standing to

5    object doesn't mean it can control the objection or settle the

6    objection.  And unless it could, which it has shown no

7    authority why it could, then it gains nothing by this, and

8    nothing would be gained by the Court allowing that process to

9    go forward.

10        In terms of Section 1106 not being incorporated, 1106

11   is not incorporated into Title III, as it is not incorporated

12   into Chapter Nine, because of the Tenth Amendment.  Of course

13   the debtor has power to control claims against the debtor.

14   And notably, the GO claims are not against the Committee, and

15   they're not against Ambac.  They are against the debtor.

16        The Committee's constituency may be affected by that

17   priority, as Ambac may be affected, but the claims are not

18   against them.  And the fact that 1106 is not incorporated into

19   Title III only shows that it didn't need to be, because the

20   debtors' general control under the Tenth Amendment, which

21   Congress has given the territories the benefit of, supplants

22   or amounts to the equivalent of 1106.

23        Ambac's argument that the Board wants to use the Stay

24   to favor creditors fails on its face.  And the reason why it

25   fails on its face is this:  To the extent that the Board comes

1    up with a plan that is confirmable, then whatever the Board is

2    doing in negotiating with creditors is perfectly fine and

3    legal.  To the extent that the Board favors creditors, certain

4    creditors, contrary to the law, the plan is not going to be

5    confirmed.  So Ambac's argument goes nowhere, because it won't

6    have a confirmable plan confirmed against it if the Board were

7    doing something wrong, and that's its protection.

8         Your Honor, those are, subject to the Court's

9    questions -- well, only one other point I wanted to make.  The

10   deal with the existing bondholders still exists.  Now, we

11   understand that the Committee and Ambac say that, in light of

12   the new Fiscal Plan, that deal, they say it's dead.  We say it

13   needs to be amended.

14        As Your Honor knows, plans of adjustment, like

15   Chapter 11 reorganization plans, get amended right up through

16   the confirmation hearing.  There is nothing wrong with that.

17   It doesn't mean deals are dead.  It means that they need to be

18   adjusted.

19        And as Your Honor knows, there is ongoing mediation.

20   There is a desire on all parties' parts to get to a deal, to

21   finish the debt restructuring, because that will help

22   immeasurably in getting the Commonwealth to once again have

23   market access.  So to say the deal is dead and, therefore,

24   there's no reason for this, aside from the other reasons that

25   the litigation wouldn't accomplish what they think it would

1    accomplish, their argument is simply wrong that the deal is

2    dead.

3              A need to amend is common, constant, and doesn't

4    change the fact that the parties are at the table desiring to

5    hammer out a revised deal.  Thank you, Your Honor.

6              THE COURT:  Thank you.

7              Would you please address Mr. Despins' concern that

8    with substantive objections being raised, unsecured creditors

9    who might otherwise want to fight for the vitality of their

10   claims may be discouraged from doing so by the fact that the

11   only thing on the table is a plan that provides so little for

12   the unsecured creditors, whereas the UCC and others have a

13   vision of a world in which there might be a greater recovery

14   worth fighting for?

15             MR. BIENENSTOCK:  Well, let me start by saying

16   that --

17             (Sound played.)

18             MR. BIENENSTOCK:  -- the Oversight Board -- the

19   Oversight Board wants to maximize creditor recoveries, too,

20   although we totally understand that when we come out with a

21   plan that has very small recoveries for some creditors, it

22   doesn't seem that way to them.

23             First, we have to recognize what we're dealing with.

24   We've got about 18 billion of GO bonds and another five plus

25   billion of GO guaranteed debt that has the same priority.

1    That is the lion's share of the liability here.  A lot of the

2    other unsecured debt that was not GO debt has actually been

3    paid.  And, you know, Mr. Despins doesn't recognize that, but

4    he knows that that has happened during the case.

5         All I can say is what will be left after a

6    settlement -- the GO debt is going to get the lion's share of

7    the assets under any scenario, because it's the lion's share

8    of the debt, of the total debt.  To the extent that a

9    settlement of the priority is out of bounds, the Court is not

10   going to approve it.

11        So it's not clear to us that the other unsecured

12   claimholders are disadvantaged at all, because, I mean,

13   frankly, if they -- if they lose the priority challenge, they

14   will come out worse.  They could lose a hundred percent of

15   what they -- what they would lose, a hundred percent of what

16   they have.  They are not satisfied with what they have, and we

17   are sensitive to that and understand it.  But they have a

18   gigantic downside, so they -- that's the most I can say about

19   what their incentive is, Your Honor.

20        THE COURT:  Thank you.

21        And now I'll return to Mr. Despins for rebuttal.

22        MR. DESPINS:  Yes, Your Honor.

23        So let me just address the last point first.  The

24   fact that the bondholders will get the lion's share, that's

25   such a misleading statement.  If the priority does not apply,

1    we're pari passu with them.  So if they get 60 cents on the

2    dollar, we would get 60 cents on the dollar.  If they get 80

3    cents on the dollar, we would get 80 cents on the dollar.  So

4    this is a non sequitur.

5         And there is a huge prejudice.  Practically, it's

6    almost -- I know you're going to think it's an exaggeration,

7    but denial of the advice of counsel -- I mean, not in a

8    criminal context, but the point is that no sane creditor would

9    hire counsel for a million dollar claim knowing that what they

10   can get is 30,000 dollars, which is the current "settlement"

11   that the Board proposed on that issue.  They would never do

12   that.  But they're forced to go through that now, while we're

13   precluded from showing them and from prevailing on the

14   argument that we're pari passu with the bondholders.  That's a

15   huge issue.

16        The argument that there is a -- and that is an issue

17   for today, Your Honor.  The argument that somehow the deal is

18   not dead -- we haven't terminated.  Of course they're not

19   going to terminate it, Your Honor, because there's a symbiotic

20   relationship between the bondholders and the Board, because

21   they believe that, they say that the deal is not dead.  That,

22   Your Honor, will preclude us from going forward.

23        So that's -- these are the magic words they need to

24   say and they'll get protected from an objection.  And

25   obviously the bondholders are not anxious to have that

1    objection heard, because they know the Board is going to be in

2    a position of actually taking the same position they have

3    taken before with respect to the priorities in Title III and

4    say there are no priorities, no state law priorities in Title

5    III.  That's very important.

6            The issue of controlling the settlement, we've never

7    said we could control the settlement.  We want our objection

8    to go forward.  And if, in fact, after they're -- hearing the

9    objection, or during that time they come back and say, Judge,

10   we have a settlement, you know, we're not saying they can't do

11   that.  We will fight them, depending on the settlement.  If

12   the settlement is pari passu or close to it, then we may be

13   okay with it.  But if not, we may contest that.  But we're not

14   asking the Court today to rule that we have the exclusive

15   right to settlement.

16           And this issue that there's going to be disorganized

17   war --

18           (Sound played.)

19           MR. DESPINS:  Your Honor, two seconds to finish.

20           THE COURT:  Yes.

21           MR. DESPINS:  In ERS, we filed an objection, the

22   ultra vires objection.  The Committee did that.  And is there

23   chaos in that case?  No.  There are a number of parties

24   involved.  They're taking positions on our objection.  And

25   that's going to be heard and decided in due course.

1          It's exactly the same.  This concept that somehow

2   there's going to be chaos is nowhere -- there's no basis for

3   that, Your Honor.

4          And also, the last point is, Your Honor, if they want

5   to say that they have a right to stop us from proceeding

6   because of their exclusive right to file an objection, which

7   we don't believe they do, or because of their exclusive right

8   to file a plan, let's be honest, intellectually honest in the

9   rule and actually say that's the basis to do that.  We don't

10  believe there's any such basis, but at least we should be

11  intellectually honest about it and not trying to say, because

12  we haven't terminated the settlement.

13         And so, Your Honor, on all -- for all these reasons,

14  we're asking you to terminate the Stay today and allow us to

15  proceed with the GO Priority Objection.  Thank you, Your

16  Honor.

17         THE COURT:  Thank you, Mr. Despins.

18         And thank you, all counsel, for those arguments and

19  for the submissions in advance of today's proceedings, which I

20  have read thoroughly.  And I've listened very carefully to

21  everything that has been said.

22         Before the Court is the *Urgent Motion of the Official*

23  *Committee of Unsecured Creditors to Lift Stay to Allow*

24  *Committee to Pursue Objection to GO Priority*, which is Docket

25  Entry No. 13726 in Case No. 17-3283.  I will refer to it as

1  the Motion.

2       This Motion was filed by the UCC, which has filed an

3  objection to general obligation, or GO, bondholder priority in

4  the form of an Omnibus Objection of the Official Committee of

5  Unsecured Creditors, Pursuant to Bankruptcy Code Section 502

6  and Bankruptcy Rule 3007, to Claims Filed or Asserted Against

7  Commonwealth by Holders of General Obligation Bonds Asserting

8  Priority Over Other Commonwealth Unsecured Creditors, which is

9  Docket Entry No. 10638 in Case No. 17-3283.  I'll refer to

10 that as the GO Priority Objection.

11      That GO Priority Objection was stayed by this Court's

12 Final Order regarding, A, stay period; B, mandatory mediation;

13 and C, certain deadlines related thereto, which is Docket

14 Entry No. 12189 in Case No. 17-3283.  I refer to that as the

15 Stay Order.

16      The Motion requests entry of an order modifying the

17 Stay Order to allow the UCC to pursue its GO Priority

18 Objection.  The Motion is opposed by the Oversight Board,

19 which seeks to preserve the Stay while it pursues a settlement

20 of GO bond-related issues in furtherance of a plan of

21 adjustment with which it can move forward.

22      The Court has considered carefully the parties'

23 submissions and arguments made today.  The Court has

24 jurisdiction of this motion practice pursuant to Section

25 306(a) of PROMESA.

1    The Court now makes this oral ruling and reserves the

2  right to make nonsubstantive corrections in the transcript of

3  the ruling.  The Motion is denied without prejudice for the

4  following reasons.  The Stay was put in place for the purpose

5  of allowing the Oversight Board to pursue its efforts to

6  confirm a plan of adjustment that involves the settlement of

7  certain key issues.  The UCC alleges that the particular

8  settlement at the heart of the Proposed Plan of Adjustment is

9  long gone, and that the Plan confirmation process is,

10 therefore, indefinitely paused.  Nevertheless, the Oversight

11 Board has proffered that the relevant parties are engaged in a

12 good faith effort to forge a revised agreement that can serve

13 as the predicate for a confirmable plan of adjustment.

14    That negotiations persist refutes the notion that no

15 modified agreement can ever be reached, and the Court declines

16 to pronounce dead at this juncture a strategy that may still

17 have vitality.  More importantly, the Stay need not be

18 continued indefinitely.  It can be kept in place for a further

19 period, as the Court finds appropriate under the

20 circumstances, subject to future review.

21    Of course, the ultimate duration is not yet certain

22 and can't be.  Among other things, there are the ongoing and

23 potential future further effects of COVID-19, hurricanes,

24 drought, earthquakes, membership turnover on the Oversight

25 Board, political change within the Commonwealth, and

1    unforeseen future events.  Such variables may cumulatively

2    extend the timetable for reaching a confirmable plan of

3    adjustment, but they neither doom the project nor portend an

4    endless Stay.  Nor is there any evidence that the Oversight

5    Board has any incentive to drag on negotiations in a truly

6    indefinite manner.

7          Turning to the *Villafañe-Colon* factors, the parties

8    argue that these factors, which the Court looked to in

9    determining that it was appropriate to impose the current

10   Stay, support their respective positions.  Those factors are:

11   (1) hardship resulting from not staying a proceeding; (2) the

12   potential prejudice to parties if the Stay is granted; and (3)

13   the economical use of party and judicial resources.

14         Based on these factors, the Court found in March of

15   this year that a stay was merited with respect to the GO

16   Priority Objection.  The Court now finds that these same

17   factors favor keeping the Stay in place for a further period

18   of time.

19         First, the Commonwealth would suffer hardship from a

20   termination of the Stay.  It is possible that allowing the GO

21   Priority Objection to proceed at this time could cause the

22   Oversight Board settlement negotiations to collapse and open

23   the door to a large volume of litigation that would further

24   disrupt or disrail negotiations, and would certainly ramp up

25   the burden on the Commonwealth and the Oversight Board's

1  resources of litigating another set of complex issues.  Such

2  litigation is unlikely to be concluded quickly, particularly

3  in light of what is already in progress and queued up, and the

4  stakeholders' fondness for appellate litigation.

5      Second, keeping the Stay in place for the GO Priority

6  Objection, at least for the next six months, will not unduly

7  prejudice general unsecured creditors.  The Court's prior

8  determination on this point still holds true.  The UCC's

9  rights and unsecured creditors' rights to object to an amended

10  Plan of Adjustment and to accept a proposed settlement are

11  still preserved.  The fact that the Oversight Board needs more

12  time than it originally anticipated is not itself a threat to

13  the UCC's rights.

14      Moreover, it has been made clear to anyone following

15  these proceedings sufficiently to know the proposed allocation

16  under the Plan proposal that is in place.  It is obvious that

17  there are arguments and continue to be arguments regarding GO

18  priority, potential legal issues with the allocations that

19  have been proposed, the basis of the GO Priority Objection

20  that is proposed to be pursued, and the visions for a

21  potential outcome of that objection.  All of those arguments

22  have been and continue to be exposed in the context of these

23  proceedings.

24      Third, upon considering whether continuing the Stay

25  is the most economical use of party and judicial resources,

1   the Court again finds that it is. It is highly unlikely that

2   resolution of the GO Priority Objection could be accomplished

3   quickly, even without discovery, given, as I've already noted,

4   the already large volume of pending litigation, and, frankly,

5   the parties' predilection for extensive briefing and pursuing

6   appeals.

7           Moreover, as previously noted, the probability is

8   high that allowing the GO Priority Objection to proceed at

9   this time would also prompt other litigants to seek similar

10  relief, especially if the settlement negotiations do fall

11  apart. Keeping the stay in place for at least several more

12  months will allow the Oversight Board, which has the sole

13  authority to propose a plan of adjustment, the Commonwealth,

14  and a significant group of stakeholders to continue their

15  efforts to negotiate a settlement that could form a basis for

16  an amended and confirmable plan of adjustment, and prevents,

17  or at least keeps in abeyance, a scenario in which litigation

18  flourishes and stymies forward movement.

19          Continuing the Stay currently remains the most

20  economical use of party and judicial resources. Accordingly,

21  the Court will enter an Order denying the Motion without

22  prejudice to renewal no earlier than for the March 2021

23  Omnibus Hearing. Thank you.

24          Are there any other matters that need to be addressed

25  today? I will wait 30 seconds for anyone to unmute and state

1    their name if they wish to be heard.  Remember, if you want to

2    unmute, you have to unmute both your phone and your computer

3    interface.

4            (No response.)

5            THE COURT:  All right.  The 30 seconds have passed.

6            This concludes the hearing Agenda for the September

7    Omnibus Hearing.  The next scheduled hearing date is the

8    hearing on the motions for partial summary judgment in the

9    revenue bond adversary proceeding, which is scheduled for

10   September 23rd, 2020, a week from today.

11           Please note that the hearing will begin at 9:00 AM,

12   instead of the previously announced 9:30 AM start time.  The

13   hearing will occur telephonically, and the Court will issue a

14   procedures order providing appropriate logistical details in

15   short order.

16           As always, I thank the court staff in Puerto Rico,

17   Boston, and New York for their work in preparing for and

18   conducting today's hearing, and their ongoing outstanding

19   support of the administration of these very complex cases.

20   And I also thank counsel for their cooperation in these

21   virtual proceeding procedures.

22           Stay safe and keep well, everyone.  We are adjourned.

23           (At 11:47 AM, proceedings concluded.)

24                       *    *    *

25

```
 1  U.S. DISTRICT COURT    )

 2  DISTRICT OF PUERTO RICO)

 3

 4      I certify that this transcript consisting of 85 pages is

 5  a true and accurate transcription to the best of my ability of

 6  the proceedings in this case before the Honorable United

 7  States District Court Judge Laura Taylor Swain, and the

 8  Honorable United States Magistrate Judge Judith Gail Dein on

 9  September 16, 2020.

10

11

12

13  S/ Amy Walker

14  Amy Walker, CSR 3799

15  Official Court Reporter

16

17

18

19

20

21

22

23

24

25
```

< Dates >
August 26, 2020
    16:12
January 13, 2020
    16:7
July 7, 2020 36:3
June 2020 20:4
March 16, 2021 28:15
March 2021 83:22
September 14th, 2020
    6:12
September 16, 2020
    1:16, 4:2, 85:9
September 2 17:17
September 23rd, 2020
    84:10
$5,120,772.50 16:10,
    27:1
(1) 81:11
(2) 81:11
(3) 81:12

< 0 >
000 76:10

< 1 >
1.1 18:19, 18:21
1.8 18:9, 19:16,
    19:18
100 47:17
105 56:17, 56:22,
    57:2
106 61:10
10638 79:9
10th 65:2
11 73:15
1106 67:10, 67:11,
    72:10, 72:18
1106. 72:22
11:47 84:23
12 35:18
12189 79:14
12:00 7:1
13579 28:22
13583 35:16
136 60:15
13726 64:16, 78:25
14 18:15

141 61:9
14168 17:18
14274 6:13
14301 7:7
14315 7:7
14861. 18:2
15 19:7, 19:8, 20:3
16 18:15
165,000 71:10, 71:11
17-3283 4:10, 6:14,
    27:14, 28:22,
    35:16
17-3283. 7:8, 15:22,
    26:23, 64:17,
    78:25, 79:9, 79:14
17-4780. 28:23,
    35:17
17-BK-3283(LTS 1:6
17-BK-4780(LTS 1:23
173 61:11
18 74:24
1:00 7:2

< 2 >
2.1 23:21, 24:3
2.7 19:8
2.8 19:10, 19:12,
    19:19
2.9 18:7, 18:9,
    18:17, 24:3
20 15:22, 23:9,
    28:24, 64:17
200 58:18, 61:4
2011 30:7
2013. 30:7
2019. 31:1
2050 28:22
2053 35:16
2174 27:14
27 29:22, 30:14,
    30:21, 31:4, 33:3

< 3 >
3.8 15:4, 68:2
3.9 15:4, 69:16
30 14:17, 76:10,
    83:25, 84:5
3007 79:6

301(a 63:12
301(a)(5 41:12,
    41:17
301(c)(5 51:25, 52:7
302 46:2
303 46:2, 51:14
305 17:13, 20:16,
    22:10, 46:1
306(a 79:25
314(b)(4 22:15
3799 85:14
3: 1:6, 1:23

< 4 >
40 35:17
48 27:13

< 5 >
5.1 16:9, 17:21,
    18:7, 19:9
502 79:5
502(a 71:9
503 40:12, 44:22,
    56:13, 56:17
503(b 41:21, 42:15,
    52:10, 52:19,
    58:14, 59:12, 63:9
503(b)(1)(a 41:8,
    41:13, 42:24,
    44:20, 50:6,
    50:10, 51:3, 52:3,
    52:11, 53:18
503(b)(1)(b 45:3
503(b)(3)(a 45:5
507(a)(2 40:12
57 20:2, 24:16,
    24:18, 24:19,
    24:21

< 6 >
60 30:8, 30:12,
    39:10, 76:1, 76:2

< 7 >
75 69:17

< 8 >
80 76:2, 76:3
85 85:4
8886 27:14

< 9 >
90 25:15
9019 49:8, 49:11,
    50:11
902 51:25
903 51:12
926 45:19
930 20:25
944 63:13
944(b 63:13
9845 15:22, 16:7,
    26:22
9:00 84:11
9:30 84:12
9:34 4:3

< A >
A. 2:19
AAFAF 7:4, 7:8,
    14:6, 14:7, 14:8,
    14:10, 21:14,
    21:16, 27:21,
    28:8, 43:20,
    43:23, 44:4,
    44:10, 45:12,
    46:1, 46:11, 51:4,
    53:1, 63:17
abeyance 83:17
Abid 2:34, 57:24
abide 20:6, 20:20
abiding 20:4
ability 10:15, 12:4,
    24:20, 25:12, 85:5
able 6:1, 8:3, 8:20,
    9:6, 20:10, 22:5,
    38:6
absence 22:13,
    31:24, 57:13
Absent 17:15, 22:14,
    71:21
absolute 71:12
absolutely 53:19

absurd 42:9
accept 23:13, 82:10
acceptable 33:18
access 73:23
accessing 5:6
accomplish 67:4,
    73:25, 74:1
accomplished 83:2
accordance 31:5,
    36:18
according 18:5,
    20:20, 24:11,
    25:5, 25:6, 26:8
Accordingly 28:10,
    83:20
accounting 17:22
accrual 40:18
accrued 40:14, 64:2
accurate 6:5, 85:5
achieving 66:14
acknowledges 22:22
Acquisitions 2:34
ACR 13:7
across 69:10
Act 24:16, 24:18,
    24:19, 24:21
active 27:22
actual 38:13, 41:8,
    50:7, 54:25, 57:7,
    58:14, 59:12
Actually 24:3, 35:9,
    51:7, 52:23, 56:2,
    64:23, 75:2, 77:2,
    78:9
add 35:5
addition 12:9
additional 19:14,
    25:17, 27:20
Additionally 30:19
address 5:20, 13:10,
    14:24, 15:7,
    15:12, 47:8,
    59:24, 60:11,
    61:22, 62:6, 74:7,
    75:23
addressed 9:11,
    61:24, 83:24
addressing 36:2
adds 11:9
adhere 58:10

adhered 59:22
adjourned 66:4,
    84:22
adjudicate 27:18
adjudication 54:9
adjusted 73:18
Adjustment 20:23,
    22:18, 26:10,
    27:13, 73:14,
    79:21, 80:6, 80:8,
    80:13, 81:3,
    82:10, 83:13,
    83:16
admin 43:8, 63:19,
    63:24
Administered 1:11,
    1:28
administration 84:19
admonition 52:15
ADR 13:7
advance 6:6, 7:5,
    12:5, 12:20,
    34:16, 36:21,
    59:5, 78:19
adversary 84:9
advice 76:7
Advisory 2:13
advocated 27:4
affect 20:17, 49:15
affected 4:23, 4:25,
    72:16, 72:17
affecting 27:23
affirmed 58:24
afford 27:19
afforded 22:25
afternoon 7:2, 64:19
afterwards 18:24
agencies 17:11,
    18:21, 19:22,
    23:9, 23:10, 27:22
Agency 2:12
Agenda 5:19, 6:11,
    6:13, 15:20,
    28:19, 35:14,
    64:14, 84:6
agents 19:2, 22:6
ago 16:8
agree 12:2, 13:6,
    50:13
agreed 31:8, 44:5

agreement 22:14,
  28:6, 43:24,
  62:14, 80:12,
  80:15
agreements 28:21,
  30:9
Akin 57:25
al 1:16, 2:7, 4:12
alert 6:18
allegation 20:8
allegations 17:18,
  17:19, 26:1
alleged 32:12
allegedly 17:13,
  26:1
alleges 80:7
allocated 15:23,
  28:24, 43:21,
  46:17, 64:17
allocation 6:22,
  34:18, 82:15
allocations 6:11,
  82:18
allotments 6:10
allotted 6:8, 33:24
Allow 8:7, 13:3,
  26:13, 35:15,
  41:21, 71:4,
  78:14, 78:23,
  79:17, 83:12
allowable 22:23,
  47:11, 63:21
Allowance 23:2,
  26:21, 27:3, 27:18
allowed 22:16,
  35:17, 36:17,
  40:14, 59:17, 62:1
allowing 26:25,
  72:8, 80:5, 81:20,
  83:8
allows 44:20, 67:11
almost 76:6
already 57:4, 58:24,
  65:14, 65:23,
  69:8, 70:8, 82:3,
  83:3, 83:4
Alternative 25:13,
  32:11, 34:20,
  34:25
although 10:19,

  31:11, 74:20
Ambac 2:21, 68:11,
  68:13, 72:15,
  72:17, 72:23,
  73:5, 73:11
amend 74:3
amended 73:13,
  73:15, 82:9, 83:16
Amendment 56:19,
  72:12, 72:20
Among 80:22
amount 16:9, 18:19,
  19:16, 19:20,
  24:5, 26:11, 27:1,
  27:2, 36:18,
  36:19, 39:20
amounts 21:8, 26:14,
  72:22
Amy 37:8, 85:13,
  85:14
analogy 62:25
analysis 17:10,
  17:21, 20:11,
  22:5, 24:14, 45:10
analyze 22:25,
  23:12, 24:20
analyzing 25:4,
  25:14
announce 4:8
announced 84:12
answer 7:24, 9:6
answers 40:7
anticipated 82:12
anxious 76:25
anybody 34:13
apart 18:14, 83:11
apologies 37:22,
  38:5
apologize 6:6, 8:20,
  13:13, 46:19
apparatus 11:25
apparent 18:4, 19:6
Appeals 22:11,
  54:15, 83:6
appear 9:3, 10:1,
  71:16, 71:22
appearance 34:24,
  34:25
APPEARANCES 2:2
appeared 52:12

APPEARING 2:4
appears 32:11
appellate 82:4
applicable 23:1,
  24:11, 46:9
applies 51:4
apply 21:1, 24:23,
  41:18, 45:4, 45:5,
  50:8, 52:8, 57:5,
  75:25
appointment 67:3
appreciate 11:8
approach 51:17,
  51:19, 52:18
appropriate 11:4,
  28:9, 49:14,
  80:19, 81:9, 84:14
approval 33:1, 37:6,
  39:8, 39:10,
  54:22, 59:5,
  59:10, 62:21
approve 21:8, 59:9,
  75:10
approved 39:13,
  49:12, 58:20
approximately 19:10,
  23:20
argue 44:18, 81:8
argued 32:22, 57:6,
  70:21
argues 27:5, 58:13
arguing 47:1
argument 15:23,
  16:4, 19:6, 20:12,
  23:20, 23:24,
  24:17, 25:21,
  25:25, 26:19,
  28:25, 31:9,
  45:16, 51:2,
  51:21, 52:12,
  56:14, 57:10,
  57:20, 59:14,
  59:15, 70:20,
  72:23, 73:5, 74:1,
  76:14, 76:16,
  76:17
arguments 16:18,
  17:4, 18:15,
  21:23, 26:12,
  26:20, 27:7,

27:16, 35:9,
35:17, 51:1,
64:13, 67:9,
78:18, 79:23,
82:17, 82:21
around 30:8, 56:3
Arrastia 2:29, 33:9,
33:12, 33:13,
33:21, 33:22,
34:18, 34:21
Article 20:2
aside 73:24
aspect 37:7
assert 23:1, 31:14,
32:7, 32:9
Asserted 23:7, 32:6,
36:14, 69:14, 79:6
Asserting 79:7
assessment 59:1
assets 75:7
associated 55:5
assume 11:22, 31:20,
62:21
assumption 31:21,
48:10, 48:20
assumptions 48:13
Assurance 2:21
assurances 61:23
assure 28:13
Atara 2:22, 68:12
attached 23:25
attempted 31:1
audio 11:11, 37:24
Authority 1:33,
2:13, 72:7, 83:13
authorized 66:19
automatic 53:4
available 6:14, 7:6,
9:13, 11:23,
30:24, 70:16
avoid 19:15, 31:9,
32:20, 59:6
aware 58:16
away 9:6, 44:15


< B >
back 6:25, 9:14,
11:17, 30:7,
34:19, 40:8,

71:24, 77:9
backbone 61:5
backdrop 27:17, 44:7
background 30:6
backlog 9:1, 9:21,
13:10
backlogging 9:15
bad 31:24, 64:3
balance 13:17, 33:6
Bankruptcy 4:10,
41:7, 41:20,
44:25, 50:6,
51:13, 51:25,
52:25, 53:7,
56:18, 57:3,
57:13, 58:7,
59:13, 59:21,
63:13, 71:9, 79:5,
79:6
Barrios 33:24, 34:1
Based 41:7, 66:23,
68:1, 71:8, 81:14
bases 36:14, 41:6
basically 16:16,
41:25, 43:2
basis 9:16, 16:19,
24:16, 32:12,
41:20, 65:6, 66:1,
66:4, 66:21, 67:1,
69:19, 78:2, 78:9,
78:10, 82:19,
83:15
batches 42:18
bear 36:9
became 63:10
beep 48:23
befallen 59:6
beg 26:13
begin 16:4, 29:20,
64:18, 84:11
beginning 28:25,
35:18, 49:8
begrudge 66:11
begun 30:16
behalf 16:3, 33:13,
36:3, 43:23, 54:6,
57:25
believe 31:11,
40:22, 52:14,
67:2, 68:5, 71:18,

76:21, 78:7, 78:10
believed 65:9
believes 23:20
beneficial 28:1,
43:5, 48:5
benefit 10:8, 32:1,
42:18, 42:23,
47:12, 47:16,
47:19, 48:15,
51:12, 51:16,
54:25, 55:2,
55:15, 55:23,
56:2, 56:12, 61:2,
72:21
benefit. 42:24
benefiting 55:8
benefits 44:6, 55:2,
56:1
Bernardino 53:16
best 7:24, 10:15,
12:20, 12:25,
22:4, 22:9, 22:19,
38:7, 65:18, 85:5
better 10:7, 67:23
Betting 50:18, 51:6
beyond 6:7
BIAGGI 2:14, 14:9,
21:15, 21:19,
21:21, 23:17,
23:23
billion 74:24, 74:25
bit 9:7, 16:24, 62:6
blackout 61:4
blanket 61:11, 61:25
bond 68:24, 84:9
bond-related 79:20
bondholder 79:3
bondholders 70:13,
73:10, 75:24,
76:14, 76:20,
76:25
Bonds 74:24, 79:7
Boston 84:17
bounds 75:9
breach 31:12, 32:18,
48:3
breaches 32:12
break 6:24
breaking 6:6
Brian 2:8, 7:15

Brief 17:17, 18:1,
  23:19, 30:6, 51:2,
  52:13
briefing 83:5
briefly 5:21, 21:21,
  25:23
bring 65:20, 66:18
brush 47:6, 47:7
Buenos 4:17
built 32:3
burden 30:23, 81:25
burdensome 32:20
Bureau 33:1
business 27:3,
  31:22, 32:14,
  43:10, 60:22,
  63:24, 64:1
businesses 61:6
buzz 6:19, 6:20
buzzes 6:19, 6:23


< C >
C. 2:14
calendar 20:3
call 6:1, 8:18,
  11:1, 14:16, 71:2
called 11:5, 32:10
calling 5:16
calls 31:22
care 7:9
careful 56:20
carefully 26:18,
  26:19, 27:6, 35:8,
  78:20, 79:22
Caribe 2:25, 15:21,
  16:3, 26:20
Carmen 2:32, 60:6
carrying 56:22
Case 4:8, 4:10,
  6:14, 7:8, 15:22,
  26:7, 26:22,
  27:14, 28:22,
  30:2, 35:16,
  35:17, 47:10,
  48:11, 50:17,
  50:23, 51:7,
  52:25, 53:9,
  53:10, 56:23,
  64:17, 65:19,

72:2, 75:4, 77:23,
  78:25, 79:9,
  79:14, 85:6
cases 26:3, 41:10,
  45:6, 47:20, 48:8,
  48:12, 48:17,
  48:18, 56:22,
  70:12, 71:11,
  84:19
cash 22:17, 48:1
CASSEL 2:27, 49:23,
  49:25, 50:1, 50:4,
  52:6, 53:16, 53:22
cast 32:11
CAT 2:49
categories 10:8,
  10:11, 52:16
cause 32:13, 81:21
causes 15:6
ceaseless 44:7
cents 69:16, 69:17,
  76:1, 76:2, 76:3
cert 19:17
certain 19:5, 28:20,
  31:1, 39:24, 45:4,
  61:17, 68:18,
  73:3, 79:13, 80:7,
  80:21
certainly 81:24
Certificate 54:13,
  54:15, 54:17
certification 18:11,
  18:13, 18:14,
  18:20, 19:16,
  19:18, 55:18
certifications 25:2,
  25:3, 25:4
Certified 19:2,
  19:11, 19:13,
  19:19, 19:21,
  20:3, 33:2, 33:4
certify 18:25, 85:4
certifying 19:5
cetera 65:25, 70:9
challenge 75:13
challenged 19:9,
  26:4, 54:14
challenging 4:20,
  55:17
chambers 14:3

change 74:4, 80:25
changed 68:20
changes 68:21
chaos 77:23, 78:2
Chapter 20:25,
  41:10, 50:21,
  51:21, 51:23,
  53:17, 53:20,
  56:21, 57:5,
  72:12, 73:15
charged 59:2
cheaper 30:23
choice 48:3
choices 32:23
Circuit 50:14, 52:15
circumstances 5:23,
  68:20, 80:20
cite 24:16, 57:2
cited 47:9, 48:8,
  48:11, 48:12,
  48:17, 48:18
City 53:16, 61:6
claimant 10:14, 37:2
claimants 9:3, 10:1,
  10:3, 11:14,
  13:10, 42:21,
  43:12, 52:22,
  53:1, 53:2, 68:6,
  71:11
claimholders 75:12
clarification 33:17,
  47:14
clarified 33:16
clarity 5:18
clear 44:8, 44:15,
  44:23, 45:1, 47:1,
  59:14, 66:9,
  68:15, 75:11,
  82:14
clearing 9:21
clearly 5:24, 14:15,
  31:25, 44:23,
  71:15, 72:1
Clerk 6:15, 7:7,
  9:2, 11:24, 12:12
close 77:12
cloth 66:25
club 49:14, 49:20
Cobra 2:34, 57:22,
  57:25, 58:4,

58:16, 58:19,
58:25, 59:6,
59:10, 59:15,
63:19, 63:20
Code 27:13, 40:13,
41:7, 41:21, 50:6,
51:13, 51:25,
56:18, 56:23,
57:3, 59:13,
63:13, 71:9, 79:5
COFINA 65:18, 65:21
COLBERG 2:36, 53:25,
54:1, 54:5, 54:6,
56:11
collapse 81:22
collection 61:23
Collier 50:22
comes 38:20, 38:21,
57:4, 72:25
comfort 61:11
coming 37:12
comment 15:16
commentary 50:21,
50:23
comments 14:14,
53:14, 70:18
commercial 52:25,
53:7
Committee 2:17,
47:4, 49:4, 49:5,
62:13, 62:15,
67:23, 68:6,
70:21, 71:1, 71:5,
71:6, 71:8, 72:3,
72:14, 72:16,
73:11, 77:22,
78:23, 78:24, 79:4
common 74:3
Commonwealth 1:15,
2:6, 4:12, 16:14,
17:4, 17:8, 17:9,
17:25, 18:21,
18:25, 20:8,
20:13, 20:19,
20:22, 21:11,
25:24, 27:1, 27:2,
27:20, 27:22,
53:3, 73:22, 79:7,
79:8, 80:25,
81:19, 81:25,

83:13
compel 42:1
compelling 27:17,
65:25, 67:17
completed 30:12
completely 8:20
completion 31:2
complex 65:23, 70:9,
82:1, 84:19
complexity 11:9
Compliance 54:14
comply 57:7
comprehensive 7:10,
43:25, 50:19
computer 5:7, 7:24,
33:11, 34:2, 60:4,
84:2
con 30:20
concede 19:12
concept 50:15,
56:20, 57:7,
66:23, 78:1
conceptual 37:6,
39:8, 39:16, 54:21
concern 17:6, 17:20,
22:1, 48:25,
60:23, 61:16,
64:4, 74:7
concerned 17:11,
49:4, 49:5, 49:19,
63:23
concerning 9:4,
20:8, 20:15, 70:9
concerns 43:14,
45:24, 46:8,
61:22, 61:24
concession 47:14
conclude 57:13
concluded 82:2
concluded. 84:23
concludes 84:6
concluding 35:2
conclusion 53:8
conclusions 18:3,
18:4
CONDE 2:32, 60:3,
60:6, 60:8, 60:11,
60:13, 61:15,
61:19, 61:21
condition 36:23,

39:19, 60:22
conditioned 59:10
conditions 38:4,
56:4
conducting 84:18
confer 28:11
conference 5:11
confirm 10:4, 21:3,
26:4, 26:10, 80:6
confirmable 73:1,
73:6, 80:13, 81:2,
83:16
confirmation 20:23,
25:12, 53:5,
53:12, 63:14,
73:16, 80:9
confirmed 26:6,
27:13, 53:16,
73:5, 73:6
Congress 42:9,
44:23, 45:1,
56:20, 72:21
connected 72:4
connection 14:14,
23:5, 27:7, 32:16,
57:15
consensually 28:5,
28:13
consent 17:15,
22:13, 22:14,
45:12, 49:5, 51:4,
51:10
consented 46:3,
51:7, 51:18
consider 28:7
consideration 30:13,
58:5
considerations 50:20
considered 26:5,
27:6, 35:8, 39:13,
50:21, 79:22
considering 19:15,
27:21, 82:24
consistent 5:10,
33:4, 52:14
consistently 22:11
consisting 85:4
constant 74:3
constituency 72:16
constitutional 54:12

construction 30:16,
  30:17
construed 52:17
Consul 21:2
Consul-tech 2:24,
  15:21, 15:25,
  16:3, 16:8, 16:12,
  17:8, 17:12, 18:1,
  18:4, 18:8, 20:9,
  20:22, 21:3, 21:5,
  23:18, 23:20,
  23:24, 25:25,
  26:20, 26:24,
  27:2, 27:3, 27:5,
  27:16, 27:17,
  28:2, 28:7, 28:13
contact 10:17
contacting 10:2
contained 18:15,
  30:20, 48:13
contest 77:13
contested 15:20,
  28:19, 64:14
context 14:24, 15:7,
  15:13, 44:25,
  45:19, 48:9,
  48:12, 48:20,
  49:6, 50:9, 52:24,
  56:22, 58:7, 59:7,
  59:23, 76:8, 82:22
contingent 24:5
continue 4:19,
  22:19, 22:25,
  25:13, 37:20,
  38:20, 56:9,
  66:20, 68:16,
  82:17, 82:22,
  83:14
continued 68:23,
  80:18
continues 5:2, 23:8,
  23:12
Continuing 28:4,
  82:24, 83:19
contract. 40:16
contracted 24:10
contracting 24:11,
  25:7
contracts 25:6,
  29:22, 30:7,

30:12, 30:18,
  30:21, 30:25,
  31:5, 31:9, 31:20,
  32:18, 33:3,
  36:19, 42:6,
  48:10, 48:13,
  48:21
contractual 20:6,
  26:9, 36:22, 39:22
contradicts 56:25
contrary 17:13,
  22:10, 48:18,
  53:13, 73:4
contrast 58:16
control 11:4, 71:6,
  71:23, 72:5,
  72:13, 72:20, 77:7
controlling 67:13,
  77:6
controversy 26:14
convert 8:3
cooperation 84:20
copied 70:7
Coronavirus 4:24
Corporation 2:22,
  58:24
correct 23:22,
  41:19, 70:10
corrections 80:2
correctly 40:24,
  41:1, 63:10
cost 6:14, 20:11,
  31:3, 32:20, 41:8,
  50:8, 55:5
costs 18:6, 18:19,
  24:7, 32:2, 41:14,
  58:25
Counsel 4:17, 7:12,
  14:7, 14:10,
  14:13, 16:21,
  27:3, 28:17,
  28:25, 33:8,
  33:23, 34:9,
  34:17, 34:25,
  64:13, 68:4, 76:7,
  76:9, 78:18, 84:20
counterparties 31:7,
  70:12
counterparty 32:10
country 5:2

couple 11:18
course 5:21, 22:15,
  53:2, 72:12,
  76:18, 77:25,
  80:21
COURTROOM 4:9,
  37:12, 37:19,
  37:20, 37:24,
  38:2, 38:9, 38:16,
  38:23, 38:25, 39:3
courts 48:8, 53:3,
  57:4
COVID-19 23:11,
  27:24, 80:23
create 6:5, 21:4,
  69:13
creates 63:24
creditor 74:19, 76:8
Creditors 2:18,
  15:5, 53:9, 53:11,
  56:7, 58:8, 59:20,
  60:16, 60:24,
  61:23, 67:18,
  68:18, 69:10,
  69:21, 70:18,
  71:18, 72:24,
  73:2, 73:3, 73:4,
  74:8, 74:12,
  74:21, 78:23,
  79:5, 79:8, 82:7,
  82:9
criminal 59:16,
  63:21, 76:8
crisis 23:12
critical 23:5, 44:14
cross 63:1
CSA 24:6
CSR 85:14
culmination 43:25
cumulatively 81:1
current 30:22,
  60:22, 60:23,
  76:10, 81:9
currently 83:19
customers 30:23,
  32:1
cut 29:6

< D >

D. 2:32
damage 31:14, 32:7
damages 31:12,
    31:18, 32:9
dashboard 5:8, 5:9,
    5:25
data 17:10, 22:5
date 22:17, 27:12,
    61:9, 84:7
day 9:18, 27:3,
    64:1, 64:6
days 20:4, 25:15
dead 73:12, 73:17,
    73:23, 74:2,
    76:18, 76:21,
    80:16
deadlines 79:13
deal 38:17, 66:7,
    73:10, 73:12,
    73:20, 73:23,
    74:1, 74:5, 76:17,
    76:21
dealing 9:1, 19:17,
    23:11, 74:23
deals 73:17
debt 73:21, 74:25,
    75:2, 75:6, 75:8
Debtor 1:35, 21:1,
    22:18, 22:24,
    23:6, 23:15,
    41:13, 41:25,
    42:5, 42:13,
    42:14, 43:3, 45:6,
    45:25, 47:24,
    48:6, 51:7, 51:16,
    51:21, 52:3, 55:1,
    55:24, 61:2, 63:5,
    67:12, 71:22,
    72:13, 72:15
Debtors 1:18, 2:19,
    17:14, 20:17,
    22:12, 27:11,
    41:14, 46:1, 46:6,
    70:6, 70:11,
    71:17, 71:23,
    72:20
December 9:14
decide 36:21, 51:11,
    71:24, 71:25
decided 51:17,

69:13, 77:25
decision 31:8,
    31:19, 31:23,
    31:25, 32:19,
    45:17, 50:18,
    64:12, 64:13
decisions 48:1
Declaration 32:15,
    32:16
declines 80:15
deduct 18:18
deemed 36:15
defend 68:4
defenses 23:1
deference 31:23
deferential 45:22
deficient 10:9
deficits 55:16
defined 52:1
defines 41:17
definitely 10:13,
    10:20
definition 40:17,
    41:11, 41:18
definitional 52:7
Dein 1:41, 4:15,
    85:8
delivered 12:11
Deloitte 17:23,
    18:5, 18:6, 18:16,
    18:22, 19:4, 19:6,
    19:7, 19:22,
    20:10, 20:14,
    23:24, 24:1, 24:2,
    24:4, 24:8
denial 68:6, 76:7
denied 21:25, 25:10,
    25:11, 27:8,
    28:10, 36:10,
    44:19, 53:23,
    57:18, 80:3
denying 83:21
depending 77:11
deprive 54:10, 66:21
deprived 67:18
DEPUTY 4:9, 37:19,
    37:24, 38:2, 38:9,
    38:16, 38:23,
    38:25, 39:3
DERDYS 2:25, 15:24,

16:1, 16:2, 16:6,
    16:23, 17:2,
    19:25, 20:2, 21:7,
    21:13, 23:19,
    25:20, 25:22,
    28:18
describe 39:16
describes 47:6, 47:7
desire 10:24, 66:12,
    66:23, 70:20,
    73:20
desiring 74:4
Despins 2:19, 14:19,
    14:21, 14:23,
    46:16, 46:18,
    46:19, 46:22,
    46:24, 47:21,
    47:22, 48:7,
    48:20, 64:18,
    64:19, 64:23,
    65:1, 67:16,
    68:10, 68:20,
    70:8, 74:7, 75:3,
    75:21, 75:22,
    77:19, 77:21,
    78:17
despite 17:11, 22:4
detail 7:9, 23:10
detailed 24:4,
    24:24, 59:1
details 9:1, 84:14
determination 23:3,
    82:8
determine 23:7,
    23:13, 24:14
determined 30:19,
    31:4, 54:16
determining 51:8,
    71:21, 81:9
Detroit 26:3
develop 13:18, 14:3
development 9:5,
    29:22, 30:9
developments 68:22
devise 68:17
devoid 16:18
dial 6:25
dias 4:17
die 16:17
different 10:11,

10:12, 15:9,
15:12, 47:18,
52:24, 64:23,
70:14
difficult 6:4,
10:16, 38:4
difficulty 6:8
direct 6:24, 12:8,
43:17
directed 28:11
directing 27:1
directly 4:23, 55:21
disadvantaged 75:12
disagree 24:12
disagreed 65:5, 65:8
disallowed 68:1
disasters 5:3
discharged 53:4,
63:12
discharges 63:13
discomfort 33:15
disconnect 6:25
discouraged 74:10
discovery 36:1,
65:13, 83:3
discuss 32:17
discussed 13:3
Discussion 37:18
disincentivize 48:2
dismantle 55:21,
55:24
dismantling 63:16
disorganized 77:16
displayed 12:16
dispute 24:21
disputed 23:22,
24:22, 24:24
disrail 81:24
disrupt 81:24
distinct 53:6, 62:8
distinction 48:9
distinguish 51:6
distributed 53:8
Distribution 15:5,
36:7, 62:19
District 1:1, 1:3,
1:39, 1:40, 1:42,
85:1, 85:2, 85:7
Docket 1:6, 1:23,
6:13, 7:6, 7:7,

15:22, 16:7,
17:18, 18:1,
26:22, 27:14,
28:21, 28:22,
34:17, 35:16,
64:16, 78:24,
79:9, 79:13
documentation 12:3,
24:6, 28:4, 28:12
doing 15:10, 29:9,
40:2, 63:23, 73:2,
73:7, 74:10
dollar 17:22, 18:7,
18:22, 19:19,
39:10, 76:2, 76:3,
76:9
dollar. 76:2, 76:3
dollars 16:10, 18:7,
18:9, 18:10,
18:17, 18:20,
19:8, 19:10,
19:11, 19:12,
19:17, 19:19,
19:21, 23:21,
47:17, 47:18,
58:18, 61:9,
61:11, 76:10
done 25:6
doom 81:3
door 81:23
dots 72:4
double 40:8
down 11:21, 29:1,
70:7, 71:3
downside 75:18
drag 81:5
drive 13:8
driving 59:4
drought 80:24
due 67:18, 68:6,
77:25
duly 20:23
duplicates 15:10
duration 80:21
During 5:16, 5:21,
6:3, 30:8, 55:9,
75:4, 77:9
duty 18:25

< E >
e-colon 81:7
e-mailed 12:12
E. 2:36
earlier 27:23, 83:22
early 30:17
earn 39:25
earthquake 23:11
earthquakes 4:25,
27:23, 80:24
easiest 69:14
Ecoelectrica 31:20
economic 5:3
economical 81:13,
82:25, 83:20
effect 17:12, 19:1,
28:16, 40:11,
42:19, 69:9
effective 22:17,
27:12, 31:10
effectively 45:16
effects 80:23
efficient 12:15
effort 28:12, 80:12
efforts 17:11, 22:4,
22:20, 28:2, 28:4,
28:7, 80:5, 83:15
eight 15:25
either 31:10, 34:14,
42:18, 45:8
election 66:14
elections 66:15
ELMO 12:14
emanating 46:8
emergency 61:3
emphasize 36:16
employees 54:7
enacted 67:14, 68:22
encourage 6:16
end 8:22
endless 81:4
energized 61:6
Energy 2:31, 29:23,
30:10, 32:2, 32:5,
32:21, 32:23,
32:24, 33:1, 36:4,
36:11, 36:15,
36:18, 36:24,
37:1, 39:18,
39:22, 39:23,

40:2, 40:13,
40:23, 54:13,
62:14, 62:17
enforce 58:12
engage 28:1
engaged 80:11
enhanced 46:5
enhancing 45:14
enjoys 55:6
enough 56:20
ensure 5:4
entangle 51:15
enter 28:16, 35:10,
43:24, 83:21
entered 30:8, 65:2
entering 15:1, 15:9,
15:11, 22:12,
36:25
entirety 22:7,
24:10, 24:15
entitle 36:19
entitled 22:3, 65:12
entitlement 56:24
entity 47:24, 47:25
Entry 6:13, 7:7,
15:22, 26:22,
27:14, 28:21,
28:22, 35:16,
40:13, 64:16,
78:25, 79:9,
79:14, 79:16
environmental 32:14,
32:21
equally 61:23
equals 51:20
equipment 11:11,
37:21, 38:7
equity 58:6
equivalent 72:22
ERS 65:24, 70:9,
70:13, 77:21
Escalera 16:2
especially 48:11,
56:25, 83:10
Esq 2:14, 2:25,
2:32, 2:36
essential 49:9, 56:4
essentially 52:18
establish 17:9
established 20:21,

57:10
estate 41:9, 41:10,
41:11, 41:12,
41:15, 41:17,
41:18, 41:24,
42:11, 42:12,
44:20, 44:21,
47:16, 47:19,
48:15, 50:8, 50:9,
50:14, 50:15,
51:12, 51:20,
52:1, 52:2, 53:8,
56:21, 57:13,
62:24, 63:3, 63:4,
63:5
estate. 47:12,
50:13, 52:4
estimated 60:15
et 1:16, 2:7, 4:12,
65:25, 70:9
evaluation 24:5
event 28:5, 66:1
events 81:1
Everybody 11:20,
29:17, 43:14, 44:9
everyone 5:10, 6:24,
36:12, 39:5,
63:23, 71:22,
84:22
everything 44:7,
55:12, 62:6,
63:21, 78:21
evidence 20:9,
20:11, 20:12,
20:13, 21:11,
31:24, 81:4
exact 13:4
exactly 39:15, 78:1
exaggeration 76:6
examination 50:19
example 6:20, 45:3,
49:7
examples 45:7
exceed 30:21, 58:18
exceptionally 45:22
exchange 39:18,
39:24, 42:16, 44:6
exclusive 41:23,
70:24, 77:14,
78:6, 78:7

exclusively 18:11
exclusivity 66:24,
70:23
Exhibit 18:1, 23:25
EXHIBITS 3:9
exist 66:4
existing 25:7,
60:24, 73:10
exists 73:10
expect 11:12, 26:10
Expense 15:21, 17:7,
26:22, 26:25,
27:11, 35:15,
39:11, 40:14,
41:1, 44:5, 44:18,
47:3, 47:11, 50:7,
51:9, 51:10,
51:16, 52:10,
53:17, 55:22,
59:5, 60:15,
60:19, 60:24, 62:1
expenses 16:9, 37:6,
39:12, 39:14,
51:12, 52:16,
52:20, 54:19,
54:22, 54:23,
54:25, 55:1,
55:19, 57:7,
57:14, 57:15,
57:16, 57:18,
58:14
expensive 30:23
expired 61:20
explain 18:24
explained 41:9
explaining 35:11,
47:10
explains 34:23
exposed 82:22
express 19:23
expressly 31:17,
48:14, 51:7
expunging 13:20
extend 81:2
extension 16:11,
16:17
extensive 43:25,
47:10, 83:5
extent 39:25, 40:25,
41:2, 43:8, 59:8,

72:25, 73:3, 75:8
extrinsically 19:14


< F >
face 52:6, 72:24,
    72:25
faced 61:3
facility 9:2
facing 20:24
fact 15:3, 26:4,
    36:10, 36:12,
    36:25, 46:4, 47:2,
    53:13, 53:19,
    56:8, 58:15,
    66:14, 68:1, 72:4,
    72:18, 74:4,
    74:10, 75:24,
    77:8, 82:11
fact-intensive 65:24
factors 31:2, 81:7,
    81:8, 81:10,
    81:14, 81:17
facts 36:9
fail 56:1
failed 25:24, 26:15,
    27:17, 61:22
fails 58:10, 72:24,
    72:25
fairly 11:6
fairness 58:5, 63:19
faith 31:24, 80:12
Fajardo 30:1, 32:5,
    34:17, 34:19
fall 83:10
fallout 5:3
familiarizing 56:6
far 63:23
fashion 43:13
fate 59:6
favor 26:25, 32:19,
    68:18, 72:24,
    81:17
favoring 70:18
favors 73:3
fee 39:10, 48:2,
    48:5
feedback 11:16
feeds 38:13
feel 71:18

fees 40:18, 47:9,
    47:10, 47:17,
    47:24, 47:25,
    48:9, 61:17
Feld 57:25
FEMA 58:23, 59:16
Fernando 2:25, 16:2,
    32:15
few 15:17, 30:16,
    70:18
fight 74:9, 77:11
fighting 74:14
figure 37:14
file 10:14, 12:7,
    13:19, 78:6, 78:8
Filed 6:12, 6:13,
    10:3, 14:6, 16:8,
    16:14, 17:17,
    29:25, 33:14,
    33:19, 34:25,
    36:3, 67:21,
    71:11, 77:21,
    79:2, 79:6
filing 16:14
Final 6:23, 24:6,
    64:14, 79:12
finances 60:21
Financial 1:9, 1:26,
    2:12, 4:10, 60:22
find 7:9, 40:5,
    62:17
finding 31:13, 48:15
finds 33:17, 80:19,
    81:16, 83:1
fine 8:5, 73:2
finish 24:13, 73:21,
    77:19
firm 16:2, 17:23,
    18:22, 34:8,
    34:14, 62:25
First 7:3, 9:9,
    12:25, 15:20,
    15:24, 17:5,
    17:19, 18:5, 27:2,
    32:3, 36:20,
    42:23, 44:13,
    47:9, 50:14, 51:1,
    51:2, 52:13,
    52:15, 54:8,
    68:22, 74:23,

75:23, 81:19
Fiscal 2:11, 33:2,
    33:4, 55:16,
    55:18, 60:20,
    73:12
fit 40:19
fits 52:19
five 43:21, 46:17,
    49:23, 74:24
fixed 38:24, 39:10
fixes 38:20
flag 15:8
flourishes 83:18
flow 48:1
follow 26:7
following 27:8,
    28:6, 80:4, 82:14
follows 17:5
fondness 82:4
forced 76:12
forecast 13:6
forge 80:12
form 79:4, 83:15
format 13:18
formulating 70:16
forth 6:11, 11:17
forum 32:23
forward 13:24, 44:3,
    45:10, 46:8, 66:1,
    67:8, 67:17, 68:8,
    71:15, 72:9,
    76:22, 77:8,
    79:21, 83:18
found 22:11, 61:13,
    81:14
foundational 69:5
four 33:24, 34:20,
    67:2, 67:6
frankly 75:13, 83:4
free 66:18
Friedman 2:13,
    43:20, 43:22,
    43:23, 45:22,
    46:13, 46:15,
    50:13, 51:3
front 56:6
front-end 36:5,
    40:15, 55:3, 55:14
Fuel 2:27, 49:23,
    50:1, 56:14, 62:23

full 20:11, 34:8
fully 59:15
fundamental 58:5,
   59:21, 63:18, 68:7
fundamentally 58:9
furtherance 79:20
future 20:25, 22:18,
   47:17, 49:6, 56:1,
   80:20, 80:23, 81:1

< G >
G. 4:15
Gail 1:41, 85:8
gained 72:8
gains 72:7
gather 40:11
General 18:18, 26:1,
   49:18, 56:17,
   72:20, 79:3, 79:7,
   82:7
generalized 52:10
generally 53:8
generate 9:15
getting 11:16,
   69:17, 73:22
GG 32:10, 33:23,
   34:9, 34:19, 34:25
gigantic 75:18
Give 8:8, 62:25
given 11:7, 36:1,
   40:2, 63:21,
   72:21, 83:3
giving 49:20
Glenn 45:17, 45:19,
   50:18, 50:22,
   51:9, 51:16
goal 55:24, 66:10,
   66:14
gotcha 67:5
gotten 11:19, 11:21
governing 31:23
Gracia-gracia 50:14
gracious 38:3
grant 39:9, 40:3,
   42:15, 42:20,
   43:8, 46:3, 57:11
granted 13:16, 23:3,
   33:5, 35:10,
   36:10, 45:13,

49:9, 53:18,
   54:20, 56:15,
   70:23, 81:12
granting 31:19,
   41:6, 56:25
granular 11:6
greater 74:13
greatest 61:2
ground 50:5
grounded 58:5
grounds 18:11,
   18:12, 18:14,
   19:14
group 10:8, 10:10,
   69:13, 83:14
groups 11:5
GS 29:25, 32:5,
   34:17, 34:19
guaranteed 74:25
guess 8:1, 40:1,
   43:4
guidelines 24:11
Gump 57:25

< H >
H. 2:27
half 33:24, 34:20,
   61:8
hammer 74:5
hand 63:18
handle 11:13, 11:17
handsets 11:13
hang 69:14
happen 66:16
happened 37:11, 75:4
happening 14:25
happy 59:24
hardship 81:11,
   81:19
harm 32:14
Hastings 14:20
Hauer 57:25
headphones 37:12,
   37:16, 38:12,
   38:14
headsets 11:14
health 5:1, 11:7
hear 6:23, 29:4,
   34:19, 46:21,

48:23, 54:2, 54:3,
   64:20, 64:21
heard 5:23, 6:2,
   13:17, 21:16,
   29:6, 29:12,
   34:18, 51:2,
   71:22, 77:1,
   77:25, 84:1
heard. 67:6
Hearing 1:38, 4:13,
   4:19, 5:5, 5:12,
   6:4, 6:8, 7:6,
   9:3, 10:1, 11:2,
   11:15, 12:5,
   13:17, 34:16,
   36:2, 39:1, 66:5,
   73:16, 77:8,
   83:23, 84:6, 84:7,
   84:8, 84:11,
   84:13, 84:18
hearings 9:24
heart 80:8
held 37:18
Hello 29:4
help 11:3, 73:21
helpful 9:16, 9:19,
   17:1
helps 37:16
Hemingway 52:15,
   52:19
high 60:16, 61:23,
   83:8
highly 17:23, 83:1
hijacked 70:25
hire 68:3, 76:9
Hold 8:14
Holders 22:16, 79:7
Holdings 2:32
holds 82:8
honest 78:8, 78:11
Honorable 1:39,
   1:41, 17:14, 85:6,
   85:8
hook 66:11, 66:12,
   67:11, 70:21,
   70:22
hookup 12:2, 12:13
hope 4:25, 40:7,
   66:9
hopefully 9:17

hospitals 61:6
huge 13:1, 76:5,
   76:15
humanly 10:19
hundred 75:14, 75:15
Hurricane 61:3
hurricanes 4:25,
   80:23
hypothesize 71:3


< I >
idea 69:2
identified 68:20
identifies 24:3
identify 5:17
identifying 39:17
II.1 15:20
II.2 28:20
III 1:8, 1:25, 2:19,
   4:20, 27:10,
   35:23, 41:10,
   42:5, 42:14,
   44:21, 47:3, 57:6,
   65:12, 65:15,
   65:19, 69:3, 69:9,
   70:6, 72:11,
   72:19, 77:3, 77:5
immeasurably 73:22
immediately 6:9,
   63:1
imminent 66:16
impact 43:9, 43:11,
   60:14, 63:25
impacted 64:5
impediments 66:13
implicated 31:15,
   45:25
importance 22:22
important 11:7,
   15:12, 18:3, 18:4,
   44:21, 48:24,
   58:7, 59:21, 65:9,
   67:7, 69:4, 77:5
importantly 32:1,
   80:17
imported 67:14
impose 69:20, 71:12,
   81:9
imposed 36:24

improprieties 61:12
improving 63:17
Inc. 2:25, 26:21
incentive 53:11,
   75:19, 81:5
incentivize 60:21
inclined 59:9
include 10:21,
   10:23, 10:25
includes 8:25, 45:12
including 5:13,
   27:11, 28:3,
   41:22, 42:10,
   44:4, 45:9, 50:18,
   50:21, 55:6, 66:14
including. 41:22
inclusive 63:9
incorporate 56:20
incorporated 45:2,
   72:10, 72:11,
   72:18
incorporates 63:13
incur 47:24
incurred 36:6, 37:6,
   39:12, 40:15,
   40:21, 40:23,
   48:9, 57:15
incurring 40:24,
   48:5
incurs 41:1, 64:6
indefinite 16:16,
   81:6
indefinitely 80:10,
   80:18
independent 59:1
indicate 11:1
indicated 32:4,
   34:21
indirectly 4:24
information 9:8,
   9:15, 14:4, 23:6,
   23:9, 29:24
informative 34:24
initially 69:1
insisted 59:4
instance 10:2,
   12:25, 39:10
instead 84:12
instrumentality
   53:11

integrated 32:25
intellectually 78:8,
   78:11
intend 10:4
intends 44:10
interest 4:17, 5:20,
   71:9, 71:19
interested 6:15
interests 32:14
interface 33:11,
   84:3
interfere 20:16
interfering 17:14,
   22:12
interposed 10:7,
   10:9
interpreted 42:12,
   52:2
interpreter 10:5,
   10:24, 11:3
interpreters 11:12,
   11:14
interpreting 41:12
interrupt 6:3, 6:4,
   6:7
interrupting 13:13
intimation 19:4
inundated 13:5
invading 66:24
invest 56:5
investment 55:13
invite 5:24
invoices 18:10,
   18:22, 18:25,
   19:5, 19:8, 19:11,
   19:13, 19:20,
   20:3, 20:5, 20:7,
   21:9, 23:21
involuntary 45:6
involve 65:13
involved 22:6,
   23:10, 77:24
involves 80:6
involving 9:2
irrelevant 43:9
island 4:23, 27:23,
   61:4
isolated 60:19
issuance 54:13
issue 12:1, 15:3,

24:9, 42:18,
42:19, 42:22,
43:7, 47:2, 47:9,
47:19, 50:10,
54:8, 54:23,
63:18, 63:19,
63:20, 64:12,
68:5, 69:8, 69:10,
70:15, 70:25,
71:1, 71:2, 76:11,
76:15, 76:16,
77:6, 77:16, 84:13
issued 5:12, 65:16
issues 5:21, 7:23,
18:14, 19:18,
47:8, 65:18,
65:24, 66:13,
70:9, 79:20, 80:7,
82:1, 82:18
Item 7:3, 15:20,
19:7, 28:19,
28:20, 35:14
items 18:15
itself 36:19, 55:19,
71:16, 82:12

< J >
J. 2:7
Jessica 2:36, 54:2,
54:6
John 2:29, 33:12
join 56:14
joint 28:15
Jointly 1:11, 1:28
Juan 4:1, 61:7
Judge 1:39, 1:40,
1:41, 1:42, 4:5,
4:6, 4:9, 4:14,
4:15, 34:6, 34:13,
45:17, 45:19,
50:18, 50:22,
51:9, 51:16, 66:3,
71:24, 77:9, 85:7,
85:8
judgment 31:22,
69:2, 84:8
judicial 5:11,
81:13, 82:25,
83:20

Judith 1:41, 4:15,
85:8
July 66:3, 66:7
juncture 20:24,
26:5, 27:19, 80:16
jurisdiction 54:11,
79:24
jurisprudential
69:19

< K >
Katz 50:1
keep 6:16, 39:4,
62:7, 64:22, 84:22
Keeping 6:17, 81:17,
82:5, 83:11
keeps 83:17
kept 9:14, 80:18
key 46:11, 52:23,
70:15, 70:25, 80:7
kind 11:11, 45:8
kinds 45:4
knowing 56:15, 76:9
knows 14:25, 38:17,
44:12, 45:19,
46:24, 47:13,
62:15, 73:14,
73:19, 75:4

< L >
labor 43:11
lack 18:11, 18:13,
67:10, 67:11
lacks 20:14
laid 21:24, 25:9,
25:16
lame 20:12
landlord 55:4, 55:5,
55:8
language 33:16,
40:10, 40:19,
49:18, 63:9, 70:22
large 13:6, 81:23,
83:4
last 16:21, 52:21,
75:23, 78:4
lastly 17:12
late 21:2, 47:9,

47:10, 47:17,
47:24, 47:25,
48:2, 48:4, 48:5,
48:9
later 40:5, 43:4,
67:23
Laura 1:39, 4:14,
85:7
law 16:2, 25:5,
25:7, 32:24, 34:8,
34:14, 47:10,
50:17, 50:23,
65:15, 69:3, 69:9,
73:4, 77:4
laws 20:21, 42:1,
52:22, 57:11
lay 12:21
layer 11:9
lead 56:25
leases 48:13
least 26:13, 27:4,
45:18, 51:4,
69:19, 78:10,
82:6, 83:11, 83:17
leave 21:8
leaves 18:19, 19:20
left 20:1, 44:23,
75:5
legal 16:19, 54:15,
68:18, 69:3, 73:3,
82:18
Lenders 2:27, 49:23,
50:2, 56:14, 62:23
lengthy 48:13
less 6:23
level 11:19, 11:22,
41:2, 42:20
levels 58:22
liability 10:10,
31:12, 41:2, 64:6,
75:1
Lift 64:15, 69:1,
78:23
lifted 5:2, 69:24
light 12:23, 21:7,
67:10, 73:11, 82:3
limited 5:13, 32:11,
33:14, 40:11,
57:14, 60:14
Line 2:27, 5:5, 8:3,

8:4, 14:13, 34:4,
    34:9, 38:13,
    49:23, 50:1,
    56:14, 60:6,
    60:24, 62:23
line. 71:3
lines 35:1, 61:5
link 11:8
lion 75:1, 75:6,
    75:7, 75:24
Lipton 50:1
liquidation 39:20
Lisa 4:6
list 34:8, 41:23,
    47:11, 52:18,
    66:13
listed 5:18, 34:13
listened 26:19,
    78:20
listening 34:14,
    44:9
litigant 71:5
litigants 83:9
litigate 32:23
litigated 70:17,
    71:5
litigating 69:8,
    82:1
litigation 21:9,
    44:7, 54:10,
    54:20, 66:19,
    71:17, 73:25,
    81:23, 82:2, 82:4,
    83:4, 83:17
little 16:24, 38:3,
    62:6, 74:11
LLC 2:32
LLP 35:23, 70:5
logical 45:11
logis 56:24
logistical 9:5,
    56:24, 84:14
logistics 11:6
long 80:9
longer 38:19, 70:16
look 13:24
looked 81:8
looking 71:3
looks 34:12
lose 75:13, 75:14,

75:15
lot 44:24, 75:1
louder 16:25, 38:3
Luc 2:19, 14:19
Luis 2:14, 14:9,
    21:15
LUMA'S 43:24


< M >
ma'am 16:23
magic 76:23
Magistrate 1:41,
    4:15, 85:8
magnitude 22:3
main 17:4, 61:6
mainland 4:23
maintaining 43:5
majority 23:7
Management 1:10,
    1:27, 4:11
managing 8:25
mandate 54:12
mandatory 79:12
manner 9:11, 39:13,
    81:6
March 31:6, 65:1,
    81:14
Maria 61:3
MARINI 2:14, 14:9,
    14:10, 14:12,
    21:14, 21:15,
    21:16, 21:19,
    21:21, 23:16,
    23:17, 23:23
market 32:2, 73:23
marketplace 30:22
Martin 2:7, 7:14,
    7:22, 35:22, 70:5
Massachusetts 48:11
material 36:9, 43:16
materials 43:11
matter 6:10, 36:13,
    54:9, 54:10,
    54:25, 57:4,
    63:11, 64:14
matters 5:19, 15:20,
    83:24
maximize 74:19
mean 18:12, 19:15,

21:2, 36:8, 56:19,
    63:5, 71:6, 71:20,
    72:5, 73:17,
    75:12, 76:7
meaning 20:16,
    49:16, 63:4, 65:10
meaningful 28:14
means 18:13, 19:10,
    20:1, 40:22,
    41:13, 41:22,
    63:4, 71:21, 73:17
measures 11:4
mechanism 24:22
mediation 73:19,
    79:12
meet 28:11
meet-and-confer 28:6
meets 31:22
members 4:18, 5:14
membership 80:24
Mendez 2:36, 53:25,
    54:1, 54:2, 54:5,
    54:6, 56:11, 57:21
mention 67:21
mentioned 67:19,
    70:8
merit 20:14
merited 81:15
meritorious 64:4
merits 28:7
Michael 2:27, 49:25
Milbank 68:13
miles 61:5
Miller 2:22, 68:11,
    68:12, 68:15,
    69:23, 69:25,
    70:1, 70:18
million 16:10,
    17:21, 18:7, 18:9,
    18:17, 18:19,
    18:22, 19:8, 19:9,
    19:11, 19:12,
    19:16, 19:19,
    19:21, 23:21,
    24:4, 39:10,
    47:17, 58:18,
    60:15, 61:9,
    61:10, 61:11, 76:9
millionaire 61:25
mind 35:2, 38:4

ministerial 15:11
minute 34:22
minutes 6:18, 6:22,
   15:22, 15:25,
   20:1, 21:14,
   28:24, 28:25,
   33:25, 34:21,
   35:17, 35:18,
   43:21, 46:17,
   49:24, 57:23,
   62:11, 64:17,
   64:18, 68:11, 70:3
mirrored 51:14
misapplying 45:18
miscon 20:18
misconstrues 20:18
misguided 17:19
misleading 75:25
misreading 45:18
missed 30:3
mode 72:1
modified 80:15
modifying 79:16
moments 70:19
Monday 6:12, 30:1
money 68:3
monolines 65:24,
   70:9, 70:13, 71:2
months 16:8, 16:13,
   82:6, 83:12
motions 9:23, 16:11,
   25:25, 26:12,
   69:2, 84:8
motivated 44:1
movant 16:3, 21:23,
   23:2, 25:1
move 15:19, 37:21,
   44:2, 46:7, 48:22,
   69:17, 79:21
movement 83:18
multiple 58:22
municipal 44:25,
   45:24
Muniz 21:16
mute 5:5, 5:7, 37:21
mutually 27:25
Myers 43:23
myself 46:20

< N >
name 5:17, 5:24,
   8:18, 14:15,
   14:18, 84:1
narrow 65:10, 65:13
national 17:23
natural 5:3
nature 42:1, 52:22,
   57:11
Naturgy 31:20
near 20:25
necessary 7:2, 23:9,
   28:12, 41:8, 46:7,
   50:8, 53:19,
   54:25, 58:14,
   59:12
need 5:8, 6:24, 9:7,
   9:10, 10:5, 10:13,
   10:24, 11:2,
   11:23, 12:7, 19:9,
   34:1, 37:13,
   46:18, 48:14,
   53:10, 72:19,
   73:17, 74:3,
   76:23, 80:17,
   83:24
needs 43:14, 48:1,
   56:3, 73:13, 82:11
negotiate 68:17,
   83:15
negotiating 73:2
negotiations 80:14,
   81:5, 81:22,
   81:24, 83:10
neither 81:3
net 18:6
Nevertheless 65:16,
   80:10
New 68:17, 73:12,
   84:17
Next 9:18, 28:19,
   35:14, 49:23,
   82:6, 84:7
Ng 4:6, 8:6, 8:8,
   8:10, 8:12, 8:14,
   29:9, 29:11, 34:6,
   34:13, 60:6
Nine 20:25, 30:18,
   41:10, 53:17,
   53:20, 56:21,

57:5, 72:12
Nine. 24:7, 50:21,
   51:21, 51:23
No. 1:6, 1:23, 4:10,
   6:13, 13:13,
   15:22, 18:1,
   26:22, 27:14,
   28:21, 28:22,
   64:16, 67:6,
   77:23, 78:25,
   79:9, 79:14
nobody 69:15
noise 37:22
non 76:4
noncertified 18:18
None 3:5, 3:11
nonspeaking 8:3
nonsubstantive 80:2
noon 7:1
Nor 81:3, 81:4
Norton 50:22
Nos. 7:7
notable 68:21
notably 72:14
note 29:17, 84:11
noted 31:19, 83:3,
   83:7
noteholders 65:4
nothing 66:15, 72:7,
   72:8, 73:16
notice 9:25, 10:16,
   10:20, 12:8,
   12:22, 13:19,
   17:21, 31:6
notify 10:14
notion 80:14
notwithstanding
   51:10, 58:15
novel 4:24
nowhere 24:19, 73:5,
   78:2
null 54:17
number 9:12, 10:6,
   13:4, 19:7, 19:8,
   25:5, 25:10, 51:1,
   66:13, 77:23
numbers 13:1

< O >

O'melveny 43:23
object 23:13, 66:22,
   71:10, 72:5, 82:9
objectants 41:16
objecting 50:5
objection-by-objecti
   on 9:16
objections 9:4,
   9:20, 10:7, 13:10,
   15:1, 15:2, 15:9,
   15:11, 18:18,
   19:14, 19:15,
   19:17, 24:2, 28:8,
   29:25, 30:4, 32:5,
   40:2, 42:3, 42:17,
   46:25, 62:23,
   69:23, 74:8
objectors 11:5,
   44:18, 45:16, 47:7
Obligation 40:25,
   79:3, 79:7
obligations 20:6,
   36:6, 36:22,
   39:23, 40:15,
   55:15, 55:17,
   63:25
obtain 22:5, 23:8,
   28:12, 30:22, 46:7
obtained 17:10, 23:6
obvious 82:16
obviously 45:12,
   65:5, 76:25
occur 49:10, 84:13
occurring 4:19
October 13:1, 13:5
Off-track 50:18,
   51:6
offer 11:8, 22:20,
   51:19
Official 2:16,
   78:22, 79:4, 85:15
OIG 61:16
Okay 8:14, 12:18,
   12:23, 17:17,
   18:12, 18:13,
   18:17, 18:24,
   19:3, 19:4, 19:7,
   19:25, 20:8,
   20:14, 21:10,
   21:11, 37:22,

38:15, 39:4,
   62:13, 77:13
Omnibus 1:38, 4:13,
   4:19, 10:7, 61:21,
   79:4, 83:23, 84:7
once 58:5, 69:7,
   73:22
One 6:2, 6:19, 8:8,
   10:21, 15:3, 18:1,
   18:15, 19:20,
   25:5, 25:10,
   29:25, 35:1,
   37:15, 38:1,
   38:17, 41:7, 43:3,
   43:9, 47:9, 50:5,
   52:13, 59:3,
   60:15, 71:17, 73:9
one. 44:11, 59:21,
   71:14
ongoing 25:8, 73:19,
   80:22, 84:18
open 81:22
opening 35:5, 52:12
operating 28:21,
   30:9, 57:16, 62:18
operation 5:4, 56:4
operational 30:15
opine 47:20
opinion 46:8
opportunity 5:20,
   10:1, 10:4, 69:7
oppose 32:12
opposed 41:14, 47:4,
   79:18
opposition 16:15,
   17:4, 40:3
options 30:24
oral 28:24, 80:1
Order 7:5, 13:20,
   20:15, 26:24,
   28:13, 28:16,
   31:16, 32:8,
   35:11, 36:4,
   40:12, 40:13,
   44:2, 55:11,
   60:21, 61:11,
   61:25, 65:2, 70:7,
   79:12, 79:15,
   79:16, 79:17,
   83:21, 84:14,

84:15
orderly 5:4, 9:24
Orders 5:11, 13:16,
   22:12
ordinary 21:9,
   22:15, 52:25,
   53:2, 53:7
organizing 9:23
Originally 33:14,
   82:12
ostensibly 65:6
OTB 45:16, 45:18,
   45:19, 46:8
others 24:3, 43:12,
   68:18, 74:12
otherwise 48:11,
   74:9
ourselves 37:21
outcome 42:1, 82:21
outset 13:3
outside 17:24
outstanding 8:25,
   23:21, 24:5, 28:3,
   84:18
overall 46:7
overinclusive 45:3
override 49:2, 49:3
owed 61:9, 61:10
own 6:17, 20:5,
   20:20, 26:7, 55:6,
   56:9


< P >
Pablo 38:9, 38:16
Padilla 32:15
PAGE 3:3, 24:7
pages 27:15, 85:4
paid 20:3, 20:23,
   36:19, 42:7,
   49:16, 52:23,
   69:15, 75:3
paints 47:6
pandemic 27:24
paper 12:11, 36:1
papers 21:25, 25:10,
   25:16
paragraph 52:14
pari 76:1, 76:14,
   77:12

parsing 44:24
part 18:15, 23:13,
   24:13, 29:12,
   40:1, 42:2
partial 24:22, 27:4,
   84:8
participant 6:9
participate 71:12,
   71:13, 71:19
particular 9:25,
   12:10, 32:17,
   36:17, 51:11,
   51:16, 58:6,
   58:13, 59:1,
   68:25, 80:7
Particularly 16:7,
   23:5, 27:21,
   44:11, 67:10,
   68:19, 82:2
partner 7:15, 7:23
parts 73:20
party 43:2, 43:7,
   71:9, 81:13,
   82:25, 83:20
passed 84:5
passu 76:1, 76:14,
   77:12
past 44:12
patience 39:5, 39:6
Paul 2:9, 14:20,
   34:15
pause 37:17, 38:22
paused 80:10
pay 20:7, 20:20,
   22:15, 27:2,
   27:11, 43:12,
   53:2, 55:12, 56:7
paying 22:23, 57:7
Payment 16:9, 17:21,
   22:17, 22:20,
   24:17, 26:21,
   27:4, 39:24,
   54:18, 55:17, 61:9
payments 24:22
pays 55:5
penalizes 21:1
penalty 48:2
pending 18:20,
   59:16, 69:2, 83:4
penny 36:20

people 4:22, 10:16,
   11:13, 12:7, 12:8,
   12:13, 12:22,
   15:3, 42:6, 62:25,
   63:15, 68:1, 68:3
per 34:21, 71:16
percent 15:4, 68:2,
   68:5, 75:14, 75:15
percolating 67:6
perfect 69:7
perfectly 73:2
perform 36:18, 40:5,
   40:24, 41:1,
   49:17, 55:11
performance 36:24,
   39:22, 41:3, 61:16
performed 39:12,
   57:8, 58:16, 58:17
performing 39:18,
   42:4, 42:16
performs 37:1
perhaps 12:8, 12:11,
   16:25
period 55:10, 79:12,
   80:19, 81:17
periods 10:12
permissible 48:10
permitted 5:13,
   59:11
permitting 46:5
persist 80:14
person 5:13, 6:2
personnel 11:24
persuaded 27:25
Peter 2:13, 43:22
phase 15:1, 15:9,
   15:12
phone 5:8, 5:9,
   29:15, 33:10,
   34:1, 35:1, 60:4,
   84:2
phones 5:5, 11:23
phrase 52:4
PHV 2:7, 2:8, 2:9,
   2:13, 2:19, 2:22,
   2:27, 2:29, 2:34
piece 38:7
Pietrantoni 21:16
place 32:3, 53:12,
   80:4, 80:18,

81:17, 82:5,
   82:16, 83:11
plain 45:10
Plans 32:25, 33:2,
   73:14, 73:15
played. 6:21, 19:24,
   21:6, 42:25,
   45:21, 48:19,
   52:5, 53:15,
   56:10, 58:21,
   61:14, 63:7,
   67:15, 69:22,
   74:17, 77:18
pleading 63:1
pleadings 36:1,
   70:23
Please 4:8, 5:7,
   5:17, 5:24, 6:3,
   6:9, 8:13, 16:5,
   16:21, 21:18,
   34:10, 37:24,
   58:2, 60:4, 60:12,
   62:8, 64:22, 74:7,
   84:11
Plus 16:18, 20:25,
   44:12, 74:24
point 15:4, 29:24,
   31:11, 42:23,
   45:15, 48:16,
   48:22, 48:23,
   49:13, 52:21,
   53:13, 56:14,
   63:1, 63:2, 65:22,
   66:15, 66:20,
   66:21, 69:20,
   73:9, 75:23, 76:8,
   78:4, 82:8
point. 68:8
pointed 54:21, 65:17
points 44:22, 46:11,
   70:7
policies 5:11
policy 32:14, 32:21,
   32:22, 32:23,
   50:20
political 80:25
portend 81:3
portion 27:5
pose 44:16
position 21:22,

21:24, 22:8,
24:12, 24:17,
24:18, 25:9,
25:16, 33:17,
50:12, 50:16,
51:5, 65:14,
66:17, 67:13,
69:3, 69:8, 77:2
positions 43:14,
77:24, 81:10
possession 67:12
possibility 38:6
possible 10:19,
81:20
POSSINGER 2:9, 29:1,
29:2, 29:3, 29:4,
29:8, 29:14,
29:20, 29:21,
30:6, 34:15, 35:3,
35:4, 35:12
post 53:12
post-petition 22:23,
23:2, 52:22,
52:25, 53:9, 53:11
potential 24:9,
80:23, 81:12,
82:18, 82:21
Power 1:32, 28:20,
30:8, 30:13,
30:20, 30:23,
31:3, 72:13
powers 45:23
practical 47:23
Practically 48:16,
76:5
practice 12:6, 79:24
pre-rejection 32:13
preamble 41:20
preceded 36:2
precedent 67:1
precise 16:10, 40:10
precisely 55:16,
59:5
preclude 76:22
precluded 76:13
predicate 80:13
predilection 83:5
preempts 69:3
prefer 8:4
prejudice 15:6,

25:12, 27:9,
28:10, 76:5, 80:3,
81:12, 82:7, 83:22
prejudiced 31:16,
32:8, 59:18
PREMA 27:22
premature 22:9,
25:11, 54:23
PREPA'S 29:22, 61:21
prepare 20:10, 20:14
prepared 17:22,
17:24
preparing 84:17
prepetition 42:7
present 4:16, 12:3,
18:22, 59:22
presentations 5:22,
9:23
presenting 50:24
presentment 13:20
preserve 41:14,
59:15, 79:19
preserved 82:11
preserving 41:8,
41:25, 42:11,
42:12, 43:1, 43:2,
43:4, 44:20,
45:13, 50:8
presiding 4:15
press 4:18, 5:14
pressing 68:23, 69:8
pretty 47:6, 50:19
prevailing 76:13
prevents 83:16
previously 27:9,
83:7, 84:12
price 30:21
primarily 23:10,
30:10
Prime 6:14, 7:7,
9:2, 11:24, 12:11
principal 61:10
principle 58:7,
58:10, 58:11,
59:19, 59:22
prior 27:12, 82:7
priorities 65:15,
69:4, 69:9, 69:11,
77:3, 77:4
privatization 47:4,

49:10, 49:11
probability 83:7
probably 12:15
problem 8:21, 8:22
problems 44:16
procedure 12:19
Procedures 7:4,
84:14, 84:21
proceed 14:22,
16:19, 58:1,
59:11, 66:22,
78:15, 81:21, 83:8
proceeding 70:14,
71:8, 78:5, 81:11,
84:9, 84:21
Proceedings 2:48,
4:21, 5:6, 5:17,
6:5, 27:10, 30:2,
56:21, 57:5,
57:15, 59:16,
63:21, 78:19,
82:15, 82:23,
84:23, 85:6
process 7:12, 7:16,
7:24, 9:21, 15:10,
21:9, 21:10, 25:4,
25:8, 25:14, 44:1,
59:17, 59:21,
67:13, 67:19,
67:20, 68:6,
69:12, 72:8, 80:9
processes 56:6
produced 2:48, 25:2
proffer 27:17
proffered 80:11
profit 55:7
profits 55:7
progress 5:1, 28:14,
82:3
prohibit 22:11
prohibits 17:13
project 81:3
projections 11:3
projects 29:23,
30:10, 30:20,
31:4, 32:3
PROMESA 1:8, 1:25,
17:13, 20:16,
22:10, 22:15,
22:25, 27:10,

37:3, 41:11, 45:2,
50:9, 50:15,
51:14, 51:21,
51:23, 51:24,
52:7, 52:24,
56:19, 56:23,
57:3, 60:20,
63:12, 64:2,
67:11, 67:14,
79:25
promising 9:5
prompt 83:9
promptly 22:24,
64:13
pronounce 80:16
proofs 71:10
proper 23:8, 45:11
properly 19:21,
45:23
Property 17:15,
20:17, 22:13,
41:11, 41:12,
41:14, 41:17,
41:25, 42:11,
42:12, 43:2,
45:14, 52:1, 52:2,
52:3, 52:4, 55:4,
55:6, 62:24, 63:3,
63:4, 63:5
proposal 8:24, 9:1,
13:25, 82:16
propose 9:25, 21:5,
70:24, 83:13
Proposed 31:16,
40:10, 40:12,
40:19, 41:6, 65:3,
76:11, 80:8,
82:10, 82:15,
82:19, 82:20
proposing 13:9,
52:18, 58:10
propriety 18:23,
19:3, 19:23
Proskauer 8:10,
35:22, 70:5
protected 76:24
protection 73:7
prove 22:3
provide 5:19, 10:15,
12:9, 12:11,

24:16, 24:22,
25:14, 48:1,
53:10, 55:9,
55:15, 56:1, 61:22
provided 17:8, 20:9,
20:11, 22:2,
25:13, 26:1, 31:3,
31:17, 59:3, 61:1
provides 22:16,
24:19, 50:7, 52:1,
59:1, 62:14, 74:11
providing 9:25,
28:3, 30:13, 36:4,
84:14
provision 48:2,
48:4, 48:14, 49:15
provisions 56:23,
57:1, 57:3
PSA 69:5
public 4:18, 5:14,
6:14, 7:6, 11:7,
36:13
PUERTO 1:3, 1:11,
1:16, 1:28, 1:32,
2:7, 2:11, 4:1,
4:11, 4:12, 30:10,
32:24, 33:1, 44:2,
44:16, 45:4,
54:14, 55:11,
61:3, 66:15,
84:16, 85:2
punished 5:15
purchase 28:21, 30:8
purported 17:10,
17:11, 69:4, 69:14
purpose 41:13,
45:13, 60:20,
70:17, 71:3, 80:4
purposes 41:23,
43:15, 46:1
Pursuant 40:12,
56:17, 79:5, 79:24
Pursue 53:3, 64:15,
69:23, 78:24,
79:17, 80:5
pursued 82:20
pursues 79:19
pursuing 83:5
put 34:20, 45:9,
80:4

putting 12:13


< Q >
qualified 51:8
quantify 13:4
question 8:2, 12:2,
14:1, 18:6, 23:18,
27:18, 39:7, 40:8,
47:23, 55:20
questionable 24:7
questioned 18:10,
18:12, 18:13
questioning 55:18
questions 6:7, 7:11,
7:25, 8:24, 9:5,
9:22, 14:14,
25:18, 25:19,
33:6, 33:7, 43:18,
46:10, 46:14,
51:11, 51:15,
53:22, 57:19,
59:25, 60:2, 64:8,
64:11, 73:9
queue 13:1
queued 82:3
quickly 62:6, 82:2,
83:3
quite 7:10, 52:23,
52:24, 53:6, 70:14
quote 63:15
Qureshi 2:34, 57:22,
57:24, 57:25,
58:3, 58:22, 60:1


< R >
raise 8:1, 25:12,
63:8
raised 5:21, 50:10,
51:1, 52:13,
52:21, 68:25,
71:2, 74:8
raises 24:2, 24:8,
24:9
raising 47:1
ramp 81:24
Rand 58:23, 58:25
rank 60:20
rates 30:19, 59:2

rather 13:1, 20:12,
  27:19, 39:9,
  39:11, 46:4,
  54:22, 55:22,
  69:12
Re 1:6, 1:23, 4:10
reach 28:6, 66:10
reached 34:16, 80:15
reaching 81:2
read 16:7, 26:18,
  46:25, 78:20
readily 9:13
ready 67:5
real 48:8, 51:5,
  68:5
reality 20:24, 21:2
realize 29:15
really 11:23, 32:6,
  36:9, 42:10,
  42:17, 43:17,
  52:24, 53:6, 62:20
reason 27:18, 45:11,
  65:25, 67:17,
  72:24, 73:24
reasonability 61:17
reasonable 26:11,
  48:23, 49:18
reasonableness
  58:24, 59:2
reasoning 35:11
reasons 24:24, 27:8,
  59:4, 73:24,
  78:13, 80:4
rebut 25:24
rebuttal 25:21,
  33:6, 62:3, 75:21
rebutted 26:15
recall 65:1
recalls 9:14
receive 12:4, 54:18
received 32:4, 61:8
recent 19:23, 27:24
recognition 44:1
recognize 41:16,
  64:3, 74:23, 75:3
recognized 27:9,
  57:9
recognizes 55:16
recommence 7:1
reconcile 22:6,

22:20, 23:1,
  23:12, 24:21,
  27:20, 28:2
reconciliation
  24:14, 25:8
reconciling 25:14
record 5:18, 12:15,
  20:10, 36:13,
  37:18, 54:6
recorded 2:48
recording 5:12
recourse 53:9
recover 5:2
recoveries 74:19,
  74:21
recovery 44:3,
  44:17, 74:13
refer 26:23, 48:7,
  78:25, 79:9, 79:14
reference 15:4,
  52:11
referred 51:24,
  52:9, 54:11
refers 25:2
reflected 7:9, 65:4
reflects 20:10
refutes 80:14
regard 31:13, 53:4,
  68:25
Regarding 7:12,
  27:21, 32:21,
  79:12, 82:17
regardless 64:6
register 36:25
registered 8:2,
  60:7, 60:8
registration 34:5
regulation 32:25
regulations 20:5,
  20:20, 26:8
Reichard 16:2
reject 28:20, 29:22,
  31:25, 32:19
rejected 51:9
rejection 31:9,
  31:12, 31:14,
  31:18, 31:21,
  31:22, 31:25,
  32:7, 32:9, 32:12,
  32:13, 32:18, 33:3

rejects 50:23
related 18:18,
  19:22, 61:16,
  79:13
relationship 76:20
relative 69:11
relevant 32:18,
  36:9, 43:15,
  60:17, 62:15,
  62:22, 63:10,
  80:11
relied 50:22
relief 17:12, 22:9,
  31:15, 33:18,
  36:4, 39:17, 41:7,
  41:20, 44:13,
  44:14, 46:3, 46:7,
  55:19, 57:11,
  83:10
relies 45:16
relieving 32:2
relinquishment 24:20
remain 4:22, 30:13
remaining 6:19,
  19:11, 30:4
remains 53:12,
  58:17, 83:19
remarks 5:22, 14:7,
  14:10, 35:2, 35:5,
  35:25, 43:17, 62:4
remedy 56:15, 56:16,
  56:25
Remember 33:10,
  60:4, 84:1
remind 5:10
reminder 62:10
render 39:23
rendered 25:5
renders 33:17
renegotiate 31:1
renewable 29:23,
  30:9, 30:24, 32:2,
  32:24
renewal 83:22
renewed 66:3
rent 55:6
rents 55:4
reorganization 73:15
repeat 16:21
Reply 18:1, 23:19,

23:25, 33:16,
33:19, 51:2,
52:13, 61:21,
63:8, 63:9, 67:21
report 8:25, 14:6,
14:15, 18:5, 18:6,
18:7, 18:16, 19:7,
20:14, 23:24,
24:1, 24:2, 24:3,
24:4, 24:8, 28:15,
58:25
Reporter 16:20,
16:21, 37:8, 37:9,
37:11, 37:15,
38:8, 38:12, 85:15
reports 7:3, 7:5,
7:9
representations
27:21
representative 1:13,
1:30, 4:12, 29:2,
35:23, 46:1, 70:6,
70:11, 71:17,
71:23
represents 23:19,
68:7
request 10:24, 11:1,
16:16, 17:25,
53:23, 55:19,
56:13, 56:16,
65:10
requested 7:4, 22:9,
36:4, 56:15,
57:11, 59:4,
61:25, 71:6
requesting 16:11,
20:15, 57:17,
61:10, 65:10
requests 28:3, 79:16
require 5:22, 27:10,
28:15
requirement 54:15,
54:24, 60:19
requires 22:24
requiring 51:11
rereading 44:22
reservation 32:6,
33:15
reserve 32:9, 47:18
reserves 31:17,

64:12, 80:1
resolution 7:12,
21:10, 22:21,
24:6, 26:13,
65:20, 72:1, 83:2
resolve 28:4, 28:12,
47:15, 65:18,
70:15
resolved 50:11,
65:19, 65:21,
69:10
resolving 65:23,
70:8
resource 32:25
resources 81:13,
82:1, 82:25, 83:20
respect 13:16,
44:10, 45:8, 46:2,
49:7, 55:2, 56:13,
59:14, 65:11,
77:3, 81:15
respected 17:23
respectfully 45:23
respective 18:20,
28:2, 81:10
respectively 25:24
respects 45:17
respond 21:22
responding 27:23
response 10:3,
10:14, 13:21,
16:12, 23:11,
50:25, 60:13
response. 7:21,
15:18, 34:3,
34:11, 84:4
responses 9:10,
9:23, 12:7, 13:11,
28:3, 64:9
responsibilities
60:20
responsive 14:1
rest 21:9
restate 26:12
restored 61:4
restrictions 5:1
restructuring 46:7,
69:12, 73:21
restructurings 53:20
result 59:15

resulting 81:11
retirement 54:7,
56:8
retransmission 5:12
return 25:20, 62:3,
75:21
reveals 16:15
revenue 20:17,
68:24, 84:9
revenues 17:15,
22:13
review 16:15, 58:22,
59:16, 80:20
reviewed 31:2
reviewing 30:25
revised 74:5, 80:12
revolve 56:3
RICO 1:3, 1:11,
1:16, 1:28, 1:32,
2:7, 2:11, 4:1,
4:11, 4:12, 30:10,
32:24, 33:1, 44:2,
44:17, 45:4,
54:14, 55:11,
61:3, 66:15,
84:16, 85:2
rights 26:9, 31:14,
31:17, 32:6,
33:15, 49:16,
67:19, 82:9, 82:13
ripe 54:9
risk 60:23, 60:25,
63:25, 64:4
role 50:15
roles 27:22
Rose 35:23, 70:5
Rosen 2:8, 7:15,
7:20, 8:10, 8:15,
8:16, 8:17, 8:21,
9:12, 10:6, 10:23,
11:21, 12:18,
12:21, 13:2,
13:12, 13:13,
13:22, 14:2, 50:1
roughly 9:9
RSA 49:7
Rule 5:15, 6:6,
31:22, 77:14,
78:9, 79:6
rules 12:7, 20:5,

20:20, 26:8, 72:1
ruling 35:3, 35:6,
  80:1, 80:3
run 12:25

< S >
S. 2:8
S/ 85:13
safe 11:20, 42:13,
  84:22
safety 5:1, 11:4
sale 30:20
San 4:1, 53:16, 61:7
sanctions 5:15
sane 76:8
sanitized 11:18
Santos 33:24, 34:1
satisfactorily 37:1,
  61:24
satisfactory 39:22,
  41:3, 62:18
satisfied 75:16
satisfy 36:22, 63:24
saying 39:11, 39:23,
  63:11, 66:3, 67:5,
  69:16, 74:15,
  77:10
says 40:12, 41:21,
  43:3, 43:6, 48:25,
  49:15, 49:18,
  67:22, 71:9
scale 12:25
scanned 12:12
scenario 75:7, 83:17
schedule 6:25
scheduled 66:5,
  84:7, 84:9
screen 29:15, 29:18,
  34:2, 60:5
Second 8:8, 17:7,
  26:3, 29:6, 37:15,
  37:21, 41:19,
  43:4, 43:8, 48:22,
  48:23, 51:19, 82:5
seconds 14:17,
  15:17, 77:19,
  83:25, 84:5
Sections 40:12
seeing 34:4, 34:12

seek 31:9, 31:17,
  44:5, 83:9
seeking 31:13, 31:15
seeks 26:24, 79:19
seem 69:7, 74:22
seen 12:9
segments 10:11
select 5:7
sense 9:20, 13:4,
  13:23, 44:24, 66:8
sensitive 43:14,
  75:17
sent 31:6
September 84:6
sequitur 76:4
serious 17:6, 17:20,
  22:1, 60:22
serve 80:12
service 39:24
services 39:12,
  55:3, 55:9, 55:25,
  56:2, 56:12, 57:8,
  58:15, 58:17,
  58:25, 59:2, 59:11
session 7:2
set 6:11, 55:11,
  82:1
sets 9:20, 11:18
settle 66:13, 66:23,
  69:14, 70:20, 72:5
settlement 65:4,
  65:7, 66:9, 66:10,
  66:16, 66:18,
  68:17, 69:6,
  69:13, 69:18,
  69:20, 71:7,
  71:24, 75:6, 75:9,
  76:10, 77:6, 77:7,
  77:10, 77:11,
  77:12, 77:15,
  78:12, 79:19,
  80:6, 80:8, 81:22,
  82:10, 83:10,
  83:15
seven 16:8, 16:13,
  28:25, 30:17
sever 30:2
several 16:11, 18:3,
  32:22, 83:11
shall 16:19, 40:13,

62:1
share 32:20, 75:1,
  75:6, 75:7, 75:24
shop 55:11
short 14:23, 35:11,
  84:15
shouldn't 49:17
show 10:4
showing 59:11, 76:13
shown 72:6
shows 66:6, 72:19
side 34:21
sidestepping 56:7
signed 30:18
significant 83:14
significantly 30:21
similar 61:17, 83:9
similarly 58:8,
  59:10, 59:20,
  63:20
simple 50:5, 50:12,
  67:22
simplification 36:1,
  36:8
simplified 17:5
simply 36:25, 51:15,
  70:22, 74:1
sine 16:16
situated 58:8, 59:20
situation 11:8
situations 47:25
six 64:18, 82:6
size 12:24, 67:24
slightly 16:25
slowly 16:25
small 74:21
smaller 12:25
solar 30:11
sole 83:12
solely 18:10, 33:15,
  65:11
Solutions 5:8, 5:25
somehow 11:1, 66:24,
  76:17, 78:1
someone 12:3, 43:10
sorry 8:17, 8:18,
  8:19, 13:12,
  16:20, 16:23,
  17:2, 37:5, 37:8
sort 11:16, 13:19,

37:6, 44:9, 51:22,
  52:9, 52:22, 67:22
sought 17:12, 33:18,
  39:8, 44:13
Sound 6:20, 6:21,
  16:19, 19:24,
  21:6, 42:25,
  45:21, 48:19,
  52:5, 53:15,
  56:10, 58:21,
  61:14, 63:7,
  67:15, 69:22,
  74:17, 77:18
sovereignty 45:24,
  46:5
Spanish 12:17
spans 9:13
speaker 5:16, 6:11,
  6:16, 6:18, 11:19,
  11:22, 15:24,
  29:1, 38:8
speakers 5:18, 6:2,
  11:12, 37:20
speaking 5:6, 7:13,
  8:4, 34:4, 34:9,
  34:14
special 53:10
specific 39:9, 54:22
specifically 9:2,
  44:5
specifics 13:25
specified 6:25
specify 25:25, 56:2
spend 68:3
spent 30:25
spoken 5:19
spontaneously 12:14
squarely 50:23
SREAEE 2:36
stabilize 60:21
staff 84:16
Stafford 8:2, 8:6,
  8:8
stage 66:19
stages 30:17
staging 11:4
stakeholders 4:20,
  82:4, 83:14
standard 31:21,
  52:18

standing 72:4
stark 58:16
start 47:1, 74:15,
  84:12
started 29:23
starting 36:19,
  62:11
state 5:24, 14:15,
  35:9, 45:23, 46:4,
  65:15, 69:3, 69:9,
  77:4, 83:25
stated 17:17, 57:4
statement 16:22,
  75:25
States 1:1, 1:40,
  1:42, 19:8, 20:22,
  24:1, 24:4, 27:13,
  85:7, 85:8
status 7:3, 8:25,
  14:6, 14:15,
  28:15, 40:4,
  60:16, 61:24
statute 42:10,
  44:23, 45:2,
  50:12, 50:17,
  50:20, 51:5, 57:1,
  67:11
statutes 26:8
statutory 36:14,
  41:6, 41:19, 66:22
Stay 26:8, 53:4,
  64:15, 65:16,
  68:16, 68:22,
  69:1, 69:20,
  69:24, 72:23,
  78:14, 78:23,
  79:12, 79:15,
  79:17, 79:19,
  80:4, 80:17, 81:4,
  81:10, 81:12,
  81:15, 81:17,
  81:20, 82:5,
  82:24, 83:11,
  83:19, 84:22
stayed 79:11
staying 65:2, 81:11
stays 11:20
stenography 2:48
Stockton 26:3
stop 37:13, 78:5

storms 27:25
story 47:18
strategy 80:16
Strauss 57:25
strictly 52:17
structural 45:11
stymies 83:18
Subject 19:13,
  30:14, 32:24,
  39:21, 45:4,
  54:10, 64:8, 73:8,
  80:20
submission 12:19
submissions 26:18,
  27:7, 35:9, 78:19,
  79:23
submit 9:17, 13:15,
  17:18, 33:3, 36:8,
  72:3
submitted 13:11,
  17:25, 32:15, 33:1
subset 13:8
substantial 44:6,
  44:16, 55:15,
  56:1, 56:5
substantive 15:2,
  28:8, 74:8
subtext 67:25
subtract 19:18
subtracted 19:16
successful 53:19
suffer 81:19
sufficient 17:8,
  20:9, 20:13, 22:2,
  23:6, 28:14
sufficiently 82:15
suggest 10:13
suggesting 59:18
suggestion 13:15
summarize 21:22,
  25:23
summary 69:2, 84:8
supplants 72:21
supplemental 62:14
supplying 43:10
support 17:9, 22:2,
  22:6, 46:11, 51:5,
  68:19, 81:10,
  84:19
supported 50:16,

50:17, 51:22
supporting 24:6
Surely 49:14
suspect 59:3
Swain 1:39, 4:5,
  4:14, 85:7
swap 38:7
switching 37:16
sword 49:6
symbiotic 76:19
sympathetic 22:22
system 29:18, 42:7,
  43:13, 44:1, 54:7,
  56:8

< T >
T&D 36:6, 36:11,
  40:16, 40:22,
  44:1, 54:17,
  55:12, 56:9
table 47:5, 74:4,
  74:11
Tacoronte 4:8
tactic 54:10
target 32:16
targets 32:24
tasks 55:10
taxes 45:5
Taylor 1:39, 4:14,
  85:7
telephone 29:19
telephonic 4:18,
  5:4, 7:6, 10:18
TELEPHONICALLY 2:4,
  9:3, 11:11, 84:13
ten 21:14, 70:2
tenant 55:6
Tenth 72:12, 72:20
term 43:1, 52:2,
  55:21, 55:23
terminate 31:4,
  31:8, 76:19, 78:14
terminated 76:18,
  78:12
Termination 31:7,
  31:10, 31:12,
  40:18, 61:15,
  81:20
terms 11:4, 11:6,

31:5, 42:22, 52:8,
  62:23, 63:18,
  72:10
terribly 52:14
territories 72:21
territory 65:15
test 12:25, 13:8,
  37:24
Testing 38:1
text 50:16, 50:19,
  51:22, 52:6
textual 44:22, 45:10
Thanks 62:9, 62:12
theirs 32:5
theme 35:25
theory 45:9
thereto 28:8, 79:13
they'll 76:24
they've 67:3
thinking 10:25,
  11:19
thinks 10:18
Third 17:9, 32:10,
  82:24
thoroughly 78:20
though 10:13, 25:1,
  25:2
thoughts 4:22
threat 82:12
three 29:25, 32:4,
  34:16, 44:12,
  57:22, 62:11,
  68:2, 68:5
three. 27:15, 38:1
throughout 31:1
ties 15:3
timetable 81:2
Title 1:8, 1:25,
  2:19, 4:20, 27:10,
  35:23, 41:10,
  42:5, 42:14,
  44:21, 47:3, 57:6,
  65:12, 65:15,
  65:19, 69:3, 69:9,
  70:6, 72:11,
  72:19, 77:3, 77:4
Today 4:18, 5:4,
  5:19, 23:20,
  31:13, 35:1, 47:8,
  47:16, 47:20,

49:10, 50:24,
  51:3, 51:20,
  57:17, 66:6, 66:8,
  66:9, 67:19,
  76:17, 77:14,
  78:14, 78:19,
  79:23, 83:25,
  84:10, 84:18
together 46:6
tomorrow 9:17
tons 67:3
took 26:3
tool 52:7
TORRES 60:3, 60:6,
  60:8, 60:11,
  60:13, 61:15,
  61:19, 61:21
total 18:6, 22:21,
  28:24, 45:2, 61:4,
  64:17, 75:8
totally 63:12, 74:20
touch 11:24
touchstone 69:5
track 6:16, 6:17
Tradewinds 2:29,
  32:5, 33:8, 33:13,
  33:17
traffic 11:3
tranches 11:5
Transcript 2:48,
  6:5, 80:2, 85:4
transcription 85:5
transform 55:23
transformed 44:2
transition 36:5,
  40:15, 55:3,
  55:10, 55:14,
  56:12
translated 12:17
Transmission 36:6,
  61:5, 62:18
Transportation
  52:16, 52:20
treated 58:8, 59:20,
  63:20
treatment 44:5, 50:7
tropical 27:24
true 82:8, 85:5
truly 81:5
trustee 67:12

try 8:12, 10:8,
  10:18, 13:1,
  21:22, 29:7, 29:9,
  37:16, 37:19,
  39:4, 68:16
trying 8:17, 24:13,
  29:11, 67:4, 78:11
turn 33:8, 33:23,
  43:20, 46:16,
  53:25, 57:22, 60:3
Turning 52:21, 81:7
turnover 80:24
two 6:18, 6:19,
  6:22, 6:23, 20:1,
  25:5, 26:3, 27:15,
  30:3, 36:14, 38:1,
  41:6, 42:17, 47:8,
  60:25, 61:8,
  61:18, 68:11,
  77:19
two-minute 25:21
type 39:17


< U >
UCC 64:15, 74:12,
  79:2, 79:17, 80:7,
  82:8, 82:13
ultimate 80:21
ultimately 31:3,
  39:12, 59:17,
  65:20, 66:18
ultra 77:22
unable 28:5
uncertified 19:9,
  20:5
uncompensated 58:17
uncontested 21:8
underlying 25:6,
  50:20, 59:19
undermining 46:4
understand 24:23,
  47:18, 48:16,
  48:24, 63:15,
  69:11, 69:18,
  73:11, 74:20,
  75:17
understandably 40:4
understanding 67:23
Understood 29:14,

  63:10
undertaking 12:24
undisputed 27:5,
  27:12, 36:12,
  60:23, 61:1
unduly 82:6
unfair 21:4
unfolding 67:20
unforeseen 81:1
uniformly 50:17,
  69:10
United 1:1, 1:40,
  1:42, 27:13, 85:6,
  85:8
universe 13:8
unknowns 12:24
Unless 33:5, 43:18,
  46:10, 53:22,
  69:15, 72:6
unlikely 82:2, 83:1
unmute 5:9, 8:12,
  8:20, 14:17,
  29:10, 29:15,
  29:18, 33:10,
  33:11, 34:1,
  46:18, 60:4,
  83:25, 84:2
unmuted 29:11,
  29:12, 60:9
unmuting 29:7, 46:20
unnecessary 37:22
unpaid 36:5, 40:15
Unsecured 2:17,
  15:5, 42:7, 67:18,
  74:8, 74:12, 75:2,
  75:11, 78:23,
  79:5, 79:8, 82:7,
  82:9
Until 21:3, 23:3,
  38:20, 61:24
unusual 44:11
unwise 51:17
update 25:15
Urgent 64:15, 78:22
uses 43:1, 50:12
using 9:2, 49:5,
  68:16
usual 7:3
UTIER 2:36, 53:25,
  54:7

< V >
vacuum 60:19
valid 31:10, 54:17
validate 22:6
validity 17:7,
  17:20, 18:23,
  19:3, 22:1, 23:3,
  24:14, 54:16
validly 40:23
value 58:18
VAN 2:25, 15:24,
  16:1, 16:2, 16:6,
  16:23, 17:2,
  19:25, 20:2, 21:7,
  21:13, 23:19,
  25:20, 25:22,
  28:18
variables 81:1
vast 23:7
vastly 45:2
versus 45:6
veto 48:23, 49:6,
  49:18, 62:14
video 11:8, 12:2,
  12:13
view 40:20, 52:20
Viewing 27:16
Villafa 81:7
violate 51:12
Violations 5:14
vires 77:22
virtual 84:21
vision 74:13
visions 82:20
vitality 74:9, 80:17
voice 39:4, 62:7,
  64:22
volume 9:20, 39:2,
  81:23, 83:4


< W >
Wachtell 50:1
wait 14:16, 38:19,
  83:25
Waiting 15:16, 60:24
waiver 24:19
walk 44:15, 69:11

Walker 85:13, 85:14
wanted 15:8, 46:11,
   73:9
wants 14:17, 47:24,
   72:23, 74:19
war 71:25, 77:17
watching 17:3
wave 5:25
weak 67:10
week 84:10
weigh 32:19, 63:17
Welcome 4:17, 8:23
whatever 13:8,
   13:17, 29:9, 35:2,
   73:1
whereas 74:12
Whether 10:4, 10:5,
   11:1, 11:2, 23:7,
   23:13, 24:10,
   25:4, 25:6, 31:21,
   32:17, 36:10,
   36:22, 39:8, 40:5,
   40:10, 40:17,
   42:18, 42:22,
   45:9, 47:17, 51:8,
   51:11, 54:24,
   63:20, 65:12,
   70:12, 82:24
Whitefish 2:31,
   60:3, 60:14, 61:1,
   61:4, 61:5, 61:8,
   61:12, 61:22,
   63:23, 64:1
whole 23:14, 60:21,
   66:24
wide 47:6, 47:7
wind 30:10
wise 40:2
wish 5:23, 11:2,
   14:14, 34:10, 84:1
wished 14:8, 15:16
wishes 6:2, 12:3
withdrawn 30:1
withdrew 30:1, 32:5
within 20:3, 25:15,
   26:10, 80:25
without 11:16,
   25:11, 27:8,
   28:10, 44:14,
   48:3, 52:11, 53:3,

   53:17, 53:20,
   55:7, 68:18, 72:1,
   80:3, 83:3, 83:21
WITNESSES 3:3
wondering 11:13,
   40:9
word 13:24, 42:10,
   42:24, 50:12,
   51:20, 55:21
words 62:8, 76:23
work 5:2, 14:2,
   23:8, 42:6, 42:8,
   42:14, 43:13,
   44:24, 56:3, 84:17
working 38:4, 38:8
works 51:22
world 21:3, 74:13
worry 48:25
worse 75:14
worth 74:14
worthwhile 66:10
wrap 61:19
write 62:25
writing 7:5
written 10:15,
   10:20, 12:7, 14:6,
   16:18, 31:6, 35:8,
   64:12
wrote 42:9, 70:23


< Y >
year 4:25, 27:24,
   31:6, 60:15, 81:15
years 26:3, 30:7,
   30:18, 44:12,
   60:25, 61:8,
   61:18, 67:2, 67:7
yield 33:6
York 84:17
yourself 5:17, 8:20


< Z >
zone 64:24