POWER PURCHASE AND OPERATING AGREEMENT

BETWEEN

ENERGY ANSWERS ARECIBO, LLC

AND THE

PUERTO RICO ELECTRIC POWER AUTHORITY

## TABLE OF CONTENTS

ARTICLE 1.      DEFINITIONS                                              2
ARTICLE 2 .     SALE AND PURCHASE OF ENERGY                            12
ARTICLE 3 .     NOTICES                                                13
ARTICLE 4 .     PRE-OPERATION PERIOD                                   14
ARTICLE 5.      TERM                                                   17
ARTICLE 6.      REPRESENTATIONS, WARRANTIES, AND COVENANTS             18
ARTICLE 7.      DISPATCHING                                            25
ARTICLE 8.      CONTROL AND OPERATION OF THE FACILITy                  25
ARTICLE 9.      INTERCONNECTION                                        30
ARTICLE 10.     METERING                                               34
ARTICLE 11.     COMPENSATION, PAYMENT AND BILLINGS                     37
ARTICLE 12.     TESTING AND INITIAL SYNCHRONIZATION                    39
ARTICLE 13.     LIABILITy                                              40
ARTICLE 14.     INDEMNIFICATION                                        41
ARTICLE 15.     FORCE MAJEURE                                          44
ARTICLE 16.     TERMINATION                                            46
ARTICLE 17.     BREACH OF AGREEMENT, DELAYS, AND SECURITY            .47
ARTICLE 18.     TAXES AND ENVIRONMENTAL COSTS                         50
ARTICLE 19.     INSURANCE                                             51
ARTICLE 20 .    ASSIGNMENT                                            57
ARTICLE 21 .    QUALIFYING FACILITY STATUS                            60
ARTICLE 22 .    MISCELLANEOUS PROVISIONS                              61
ARTICLE 23.     CHOICE OF LAW AND VENUE                               71

APPENDICES

APPENDIX A  - HOLIDAYS
APPENDIX B  - INTERCONNECTION
APPENDIX C  - EXAMPLE OF PRICE INDEX CALCULATION
APPENDIX D  - MACHINE PARAMETERS MEASUREMENTS AND FIELD TESTS
              REQUIREMENTS
APPENDIX E  - TECHNICAL SPECIFICATIONS FOR THE DYNAMIC SYSTEM
              MONITOR
APPENDIX F  - PREPA RATE SCHEDULE
APPENDIX G  - DESIGN LIMITS



POWER PURCHASE AND OPERATING AGREEMENT

BETWEEN

ENERGY ANSWERS ARECIBO, LLC

AND THE

PUERTO RICO ELECTRIC POWER AUTHORITY

This Agreement (the "Agreement") entered into and effective as of this   4   day of   December   ,

2009 (the "Effective Date") by and between:  the Puerto Rico Electric Power Authority, hereinafter

referred to as PREPA, a public corporation and governmental instrumentality of the Commonwealth

of Puerto Rico, created by Act of May 2, 1941, No. 83, as amended, employer's Social Security

number 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 represented in this act by its Executive Director, Mr. Miguel Angel Cordero

Lopez, of legal age, married, professional engineer, and resident of Caguas, Puerto Rico and Energy

Answers Arecibo, LLC, hereinafter referred to as "Energy Answers" with its principal office at 79 N.

Pearl Street, 4th FL, Albany, NY 12207.  Energy Answers' Federal Identification Number is 800-48-

7517 represented by its President, Mr. Patrick F. Mahoney, of legal age, married and a resident of St.

Croix, U.S. Virgin Islands, who is authorized to sign this Agreement on behalf of Energy Answers as

certified by written resolutions adopted by its Sole Member.  PREPA and Energy Answers are herein

individually referred to as a "Party" and collectively referred to as "Parties.'

RECITALS



WHEREAS, Energy Answers proposes to develop a resource recovery renewable, fuel power plant

in Arecibo, Puerto Rico which will use Fuel derived from municipal solid waste and which will

initially be a Qualifying Facility pursuant to PURPA (the "Facility"); and

WHEREAS, the Facility is currently estimated, without representation, warranty or covenant, to have

a nameplate capacity at commencement of commercial operations of approximately 66 MW (+/-5%),

of which approximately 58 MW (+/-5%) is expected to be available for sale to PREPA; and

Power Purchase and Operating Agreement - PREPA and Energy Answers
Page 2

WHEREAS, Energy Answers desires to sell the Net Electrical Output exclusively to PREPA; and

WHEREAS, PREPA is the electric utility engaged in the generation, transmission, distribution, and sale of electric energy within the Commonwealth of Puerto Rico and desires to purchase all of such electricity produced by the Facility and delivered to the Interconnection Point; and

WHEREAS, the Parties acknowledge that time is of the essence and that a fast track approach must be implemented by both Parties in order to take full advantage of the federal stimulus incentives provided by the American Recovery and Reinvestment Act of 2009 ("ARRA") for shovel-ready renewable energy projects and that ARRA requires a December 31,2013 placed in-service date for the Facility and, accordingly, the Parties desire to use all reasonable efforts in good faith to allow Energy Answers to secure necessary financing or other funding to continue with the Facility's development process and begin construction before December 31, 2010; and

WHEREAS, the Parties will effectuate such sales and purchases of energy in accordance with the terms and conditions of this Agreement.

NOW THEREFORE, in consideration of these premises and of the mutual covenants and agreements set forth herein, Energy Answers and PREPA, intending to be legally bound, hereby agree to the following:



## ARTICLE 1.   DEFINITIONS

Whenever the following terms appear in this Agreement, whether in the singular or in the plural, present or past tense, they shall have the meaning stated below:

1.1    AAA -  means the American Arbitration Association.

1.2    Additional Interconnection Facilities - means all equipment and facilities located on Energy Answers' side of the Interconnection Point constructed and installed for the purpose of

interconnecting the Facility with PREPA's electric transmission and distribution system, as identified in Appendix B.

1.3     Affiliate - means, with respect to a Person, each such other Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person.

104     Agreed Operating Procedures - has the meaning set forth in Section *404*.

1.5     Agreement - has the meaning set forth in the first paragraph of this Agreement.

1.6     Agreement Year - means the period, which begins on the Commercial Operation Date of the Facility and ends on the first anniversary thereof, and each one (1) year period thereafter commencing on each anniversary date.

1.7     ARRA - has the meaning set forth in the fifth recital.

1.8     Billing Period- has the meaning set forth in Section lOA.

l.9     Breach - has the meaning set forth in Section 17.1.

l.10    Business Day - means a Day other than (a) a Saturday, a Sunday or a Day on which commercial banks in San Juan, Puerto Rico are required or authorized to close, or (b) any other Day recognized as a holiday by PREPA, which, as of the date of this Agreement, are those Days listed on Appendix A hereto.  PREPA will promptly notify Energy Answers in writing of any changes to the holidays recognized by PREPA.

1.11    Commencement of Construction - means the issuance by Energy Answers of full notice to proceed under the primary construction contract for the Facility.

1.12    Commercial Operation Date - means the first Day following the date on which the Facility is declared available for continuous operation by Energy Answers subject to the provisions of Articles 4 and 12.

Power Purchase and Operating Agreement - PREPA and Energy Answers
Page 4

1.13    Comparative Fault Standard - means the requirement that the liability of a Party under this Agreement for losses incurred by the other Party with respect to a particular matter for which indemnity would otherwise be provided under Article 14 or Section 6.5 shall be reduced or eliminated, to the extent the circumstances giving rise to such Party's potential liability are caused by the negligence or willful misconduct of the other Party and/or its Indemnitees, and/or the Breach by such other Party and/or its Indemnitees of any of the terms, covenants and conditions of this Agreement.

1.14    Consulting Engineer - means a Person mutually agreed by the Parties to act as the adjudicator of Technical Disputes, which Person shall be selected within sixty (60) Days after the Effective Date or, if not so selected, shall be selected by the AAA, upon the request of either Party; provided that the Parties, by mutual agreement, may select an alternate Consulting Engineer if such alternate has qualifications better suited to providing resolution of a particular Technical Dispute.

1.15    Court of Competent Jurisdiction - means the state courts of the Commonwealth of Puerto Rico, the United States District Court for the District of Puerto Rico, the United States Court of Appeals for the First Circuit, and the United States Supreme Court.

1.16    Day - means the 24-hour period beginning and ending at 12:00 midnight Puerto Rico Time.

1.17    Dependable Capacity - means the net electrical generating capacity of the Facility (gross electric generating capacity less station use) expressed in kilowatts as determined pursuant to testing (as may be conducted by Energy Answers from time to time) and made available from the Facility to PREPA at the Interconnection Point.

1.18    Design Limits - has the meaning set forth in Appendix G hereto.

1.19    Development Abandonment - means that Energy Answers permanently ceases the development of the Facility prior to the Commercial Operation Date, which abandonment

shall be deemed to have occurred only after all of Energy Answers' or its construction contractors' personnel have failed to be present on the Facility site and Energy Answers has otherwise ceased development activities related to the Facility for more than 120 consecutive Days (other than as a result of a Force Majeure, a Legal Challenge or any act or omission by PREPA, including a Breach by PREPA of its obligations hereunder).

1.20   Development Security - has the meaning set forth in Section 17.3.

1.21   Dispute - has the meaning set forth in Section 22.13(a).

1.22   Dispute Notice - has the meaning set forth in Section 22.13(a).

1.23   Effective Date - has the meaning set forth in the first paragraph of this Agreement.

1.24   Emergency - means an operational condition or situation affecting the transmission system of PREPA (including system security and reliability) that in the sole and reasonable judgment of PREPA is likely to result in imminent significant disruption of service to a significant number of customers or is imminently likely to endanger life or property.

1.25   Energy Answers - has the meaning set forth in the first paragraph of this Agreement.

1.26   Energy Answers C & D - has the meaning set forth in Section 19.3.

1.27   Environmental Costs - has the meaning set forth in Section 18.1.



1.28   Exempt Wholesale Generator - means an exempt wholesale generator within the meaning of the Public Utility Holding Company Act of 1935.

1.29   Facility - has the meaning set forth in the first recital.

1.30   FERC - means the Federal Energy Regulatory Commission, or any successor thereto.

1.31   Financial Closing Date - means the first date on which documents that provide binding commitments for funding for the construction of the Facility have been executed and funds for the construction of the Facility are initially drawn by Energy Answers.

1.32   Force Majeure - has the meaning set forth in Section 15.1.

Power Purchase and Operating Agreement - PREPA and Energy Answers

Page 6

1.33    Fuel- means processed refuse fuel.

1.34    GAAP - means Generally Accepted Accounting Principles, as promulgated by the Financial Accounting Standards Board or its predecessors or successors.

1.35    Indemnifying Party and Indemnified Person - have the respective meanings set forth in Section 14.1.

1.36    Indemnitees - means, with respect to either PREPA or Energy Answers, (i) permitted successors and assigns, and (ii) as to both the party and its permitted successors and assigns, their respective lenders, Affiliates, directors, officers, equity-holders, partners, employees, representatives, agents and contractors, and each of their respective heirs, successors and assIgns.

1.37    Initial Interconnection Date - means the first date upon which the Interconnection Facilities are energized and able to (a) deliver electrical energy generated by the Facility to PREPA at the Interconnection Point or (b) receive electrical energy from PREPA.

1.38    Initial Synchronization Date - means the date when Energy Answers' electricity generating equipment is synchronized with PREPA's electrical transmission or distribution equipment.

1.39    Interconnection Facilities - means the PREPA Interconnection Facilities and the Additional Interconnection Facilities.

1.40    Interconnection Point - means Point A as defined in Appendix B, the physical point where Net Electrical Output is delivered to PREPA's system.

1.41    Interest - means the compensation for the accrual of monetary obligations under this Agreement computed Monthly and prorated daily from the time each such obligation is past due based on an annual interest rate equal to the lesser of:   (a) the Prime Commercial Lending Rate as set by Citibank NA., New York, New York or any other bank as mutually agreed by the Parties or any other equivalent rate as mutually agreed by the Parties; and (b)

Power Purchase and Operating Agreement - PREPA and Energy Answers
Page 7

the maximum rate allowable under Article 1649 of the Puerto Rico Civil Code or successor statute applicable to past due amounts.   The provisions of this definition shall not be construed to limit the applicable rate of interest on the project debt.

1.42    Legal Challenge - means any action, suit or proceeding brought or commenced by a third party seeking to contest the validity of this Agreement, any Permit or the development, construction or operation of the Facility which materially impairs the ability of the Parties to perform their respective obligations hereunder or delays the development, construction or operation of the Facility.

1.43    Month - means a calendar month which shall begin at 12:00 midnight on the last Day of the preceding calendar month and end at 12:00 midnight on the last Day of the current calendar month.

1.44    Net Electrical Output or NEO - means the net electrical energy output (expressed in kWh) from the Facility measured at the Interconnection Point.

1.45    Non-Scheduled Outage - means an interruption of all or a portion of the electrical output of the Facility that is required for any purpose including inspection, preventive maintenance, or corrective maintenance and which has not been included in the Scheduled Outage Program.

1.46    Operation Security - has the meaning set forth in Section 17.4.

1.47    Party or Parties - has the meaning set forth in the first paragraph of this Agreement.

1.48    Pending Permits - means Permits required for the construction or operation of the Facility which have been duly and properly filed by Energy Answers and which Energy Answers is prosecuting with due diligence, but which, through no fault of Energy Answers, remain pending with the relevant governmental authority.

Power Purchase and Operating Agreement – PREPA and Energy Answers
Page 8

1.49   Permanent Abandonment **-** means if, after the Commercial Operation Date, Energy Answers, its successors, or assignees, as applicable, permanently shuts down the operations of the Facility.

1.50   Permanent Closing **-** means, after the Commercial Operation Date, (a) the available hours for the Facility equal zero (0) for any period of twenty-four (24) consecutive Months, excluding periods of outages due to Force Majeure, Legal Challenge, Pending Permits or any action or omission of PREPA, including a Breach of this Agreement, or (b) the available hours for the Facility equal zero (0) for any period of forty-two (42) consecutive Months whether or not a Force Majeure event has been claimed by Energy Answers, excluding periods of outages due to any action or omission of PREPA.

1.51   Permits **-** means all permits, licenses, approvals, authorizations, consents, variances or waivers issued by federal and local agencies, commissions, authorities, and regulatory bodies with jurisdiction over Energy Answers and the Facility which are necessary for the development, construction, operation or maintenance of the Facility.

1.52   Person **-** means an individual, partnership, corporation, limited liability company, joint venture, association, joint-stock company, trust, unincorporated organization, or a government or agency or political subdivision thereof.

1.53   Pre-Operation Period **-** means the period beginning on the Initial Synchronization Date and ending on the Commercial Operation Date.

1.54   PREPA Interconnection Facilities **-** means all equipment and facilities located on PREPA's side of the Interconnection Point constructed and installed or upgraded for the purpose of interconnecting the Facility with PREPA's electric transmission and distribution system, as identified in Appendix B.

1.55    Price Index - means the index used to adjust the energy payment pursuant to Section 11.2. The Price Index shall equal 1.0 for Year 2009 and will be calculated after the end of each subsequent Year to equal the sum of (a) the average U.S. Consumer Price Index – All Urban Consumers, Series Id: CUUR000SA0 (Not Seasonally Adjusted, U.S. city average, all items, Base Period 1982-1984 = 100), as published by the Bureau of Labor Statistics ("U.S. CPI") for the twelve (12) Months of the Year preceding the calculation date divided by the U.S. CPI on January 1, 2009, multiplied by 88%, and (b) the average of the energy index reflected in U.S. CPI ("U.S. CPI Energy") for such twelve (12) Months divided by the U.S. CPI Energy on January 1, 2009, multiplied by 12%; provided that the maximum increase in the Price Index in any one Year over the preceding Year is 4%.

The Price Index is expressed mathematically as follows:

$$PI = A/B \, (0.88) + C/D \, (0.12)$$

Where:

A is the average U.S. CPI for the Year preceding the date of calculation

B is the U.S. CPI on January 1, 2009

C is the average U.S. CPI Energy for the Year preceding the date of calculation

D is the U.S. CPI Energy on January 1, 2009

For purposes of this definition the PI shall be rounded to four decimal places.

1.56    Proceeding - has the meaning set forth in Section 14.2.

1.57    Project Lenders - means any Person providing, arranging, insuring or guaranteeing all or part of the construction or permanent financing or other funding, including any tax equity financing, for the Facility or any portion thereof, or any agent, trustee or other Person representing or acting on behalf of any such Person.

1.58    Proposed Initial Synchronization Date - has the meaning set forth in Section 4.2.



Power Purchase and Operating Agreement - PREPA and Energy Answers
Page 10

1.59    Prudent Electrical Practices - means those practices, methods, conduct and actions (including

the practices, methods, conduct and acts engaged in or approved by a significant portion of

the power industry in the United States or Puerto Rico) that, at a particular time, in the

exercise of reasonable discretion at the time a decision was made, could reasonably have

been used in electrical engineering and operations to operate equipment for the generation,

transmission, distribution and delivery or electricity, in a manner consistent with applicable

laws and applicable standards for reliability, safety and economy, including the National

Electrical Safety Code, the National Electrical Code, and any other applicable federal, state

or local code.  Prudent Electrical Practice is not limited to the optimum practice, method or

act to the exclusion of all others, but rather is a spectrum of possible practices, methods or

acts which can fall within this description.

1.60    Prudent Utility Practices - means practices, methods, conduct and actions (including the

practices, methods, conduct and acts engaged in or approved by a significant portion of the

power industry in the United States or Puerto Rico) that, at a particular time, in the exercise

of reasonable discretion at the time a decision was made, could have been expected to

accomplish the desired result in a manner consistent with applicable laws and applicable

standards for reliability, safety and economy.  Prudent Utility Practice is not limited to the

optimum practice, method or act to the exclusion of all others, but rather is a spectrum of

possible practices, methods or acts which can fall within this description.

1.61    PURPA - means the Public Utility Regulatory Policies Act of 1978 and the regulations

promulgated thereunder in effect as of the Effective Date or as they are amended in the future

from time to time.

1.62    Qualified Operator - means Energy Answers or an Affiliate of Energy Answers or, if a third

party, another qualified and experienced operator reasonably acceptable to PREPA.

1.63    Qualifying Facility **-** means a facility which is a Qualifying Facility under Section 20I of PURPA.

1.64    Scheduled Outage **-** means a planned interruption of the Net Electrical Output that has been coordinated in advance with PREPA with a mutually agreed start and duration pursuant to Article 8.

1.65    Scheduled Outage Program **-** has the meaning set forth in Section 8.1.

1.66    Taxes **-** has the meaning set forth in Section 18.1.

1.67    Technical Dispute **-** has the meaning set forth in Section 22.13(b).

1.68    Technical Dispute Notice **-** has the meaning set forth in Section 22.13(b).

1.69    Term **-** means the initial Term of this Agreement as specified in Article 5 plus any renewal Term determined pursuant to this Agreement.

I.70    Year **-** means a calendar year, which shall be the twelve (12) Month period beginning 12:00 midnight on December 31 and ending at 12:00 midnight on the subsequent December 31.

1.71    Rules of Interpretation **--** The rules of interpretation listed below shall be followed when interpreting this Agreement:

   1.66.1    Words importing the singular also include the plural and vice versa.

   1.66.2    References to natural persons or parties include any person having legal capacity.

   1.66.3    References to a Person include such Person's successors and assigns; provided, however, that with respect to a Party and its rights and obligations under this Agreement, references to a Party shall only include such Party's successors and assigns if such successors and assigns are permitted by this Agreement.

   1.66.4    Words importing one gender include the other gender.

   1.66.5    The words "include" and "including" mean "including, but not limited to" and corresponding grammatical variants.

1.66.6      Except as otherwise expressly stated herein, all references in this Agreement to this Agreement (including the Appendices hereto) or to contracts, agreements, or other documents shall be deemed to mean this Agreement (including the Appendices hereto) and such contracts, agreements or other documents, as the same may be modified, supplemented, or amended from time to time.

1.66.7      Except as otherwise expressly stated herein, all references to Preambles, Recitals, Sections, Articles, and Appendices in this Agreement are references to the Preamble, Recitals, Sections, Articles, and Appendices of this Agreement.

1.66.8      Words and abbreviations not defined in this Agreement which have well-known technical or design, engineering, or construction industry meanings are used in this Agreement in accordance with such recognized meanings.

1.66.9      The terms "hereof," "herein," "hereto," "hereunder" and words of similar or like import, refer to this entire Agreement, together with its Appendices, and not any one particular Article, Section, Appendix, or other subdivision of this Agreement.

1.66.10    The headings contained in this Agreement are used solely for convenience and do not constitute a part of the Agreement between the Parties hereto, nor should they be used to aid in any manner in the construction of this Agreement.

## ARTICLE 2.    SALE AND PURCHASE OF ENERGY

2.I    Energy Answers agrees to sell and PREPA agrees to accept delivery of and purchase all of the Net Electrical Output at the Interconnection Point, as of and following the Initial Synchronization Date, subject to the terms and conditions of this Agreement. PREPA acknowledges that other operations and facilities may be established within Energy Answers' site in Arecibo, Puerto Rico which may use electricity and steam from the Facility prior to

Power Purchase and Operating Agreement - PREPA and Energy Answers
Page 13

the delivery of the Net Electrical Output to PREPA and that such uses may reduce sales of
energy to PREPA under this Agreement.

2.2     Energy Answers agrees to pay PREPA, for the cost incurred by PREPA in performing the
evaluations and studies such as the interconnection study, voltage schedule, relay review,
standard operating procedures (SOP's), notice to proceed pursuant to Section 9.7,
supervision of switchyard acceptance testing and any other activities of PREPA needed to
interconnect the Facility to PREPA's system, the amount (in U.S. Dollars) resulting from the
product of (a) $5.00, multiplied by (b) the total number of kilowatts of the Facility's
nameplate capacity, as set forth in the primary engineering, procurement and construction
(EPC) contract for the Facility.   Payment will be made on the Financial Closing Date.
PREPA will begin the studies when Energy Answers provides PREPA the data identified in
Section 9.4.

**ARTICLE 3.     NOTICES**

3.1     All notices and other communications hereunder shall be in writing, other than disconnect
orders which may be oral and immediately confirmed by facsimile and shall be deemed duly
given upon receipt after being delivered by hand or sent by registered or certified mail, return
receipt requested, postage prepaid or by recognized overnight courier service or by facsimile,
addressed as follows:

If to Energy Answers to:

        Patrick F. Mahoney
        President
        Energy Answers Arecibo, LLC
        c/o Energy Answers International, Inc.
        79 N. Pearl Street, 4th FL
        Albany, NY 12207

Power Purchase and Operating Agreement - PREPA and Energy Answers
Page 14

With a copy to:

> Jorge 1. San Miguel, Esq.
> O'Neill & Borges
> American International Plaza, Suite 800
> 250 Munoz Rivera Avenue
> San Juan, Puerto Rico 00918-1813

If to PREPA:

> Puerto Rico Electric Power Authority (if by hand)
> **1110** Ponce de Leon Avenue
> Office #714
> Santurce, Puerto Rico

With a copy to:

> Power Purchase Contracts Administration
> Puerto Rico Electric Power Authority (if by mail)
> GPO Box 364267
> San Juan, Puerto Rico 00936-4267
> Attention:   Director of Planning and Environmental Protection

3.2    Either Party hereto may change, by notice as above provided, the Persons or addresses to

which all such notices **are** to be sent.

## ARTICLE 4.    PRE-OPERATION PERIOD

4.1    Energy Answers shall submit to PREPA the following:  (a) a preliminary draft of Energy

Answers' Permit and milestone construction schedule, not later than ninety (90) Days after

the Effective Date; provided that Energy Answers may update and modify such schedule

from time to time in its sole discretion and shall have no obligation to comply with the

preliminary schedule delivered pursuant to this Section 4.1 nor any liability solely as a result

of non-compliance with such schedule, as it may be modified from time to time; (b) the

conceptual engineering and design of the Facility, including the relay protection scheme,

within thirty (30) Days following its completion; (c) the manufacturer's guaranteed

Power Purchase and Operating Agreement - PREPA and Energy Answers
Page 15

performance data required to perform the interconnection study as described in Appendix B[1]

within thirty (30) Days following its receipt by Energy Answers; (d) progress reports in a

form satisfactory to PREPA by the fifth (5th) Business Day of every Month until the

Commercial Operation Date; and (e) any material changes to Energy Answers' Permit and

milestone construction schedule after delivery of the initial schedule pursuant to clause (a)

above.

4.2     Energy Answers shall notify PREPA in writing of the proposed Initial Synchronization Date

and provide the start-up and testing schedule for the Facility not later than sixty (60) Days

prior to the Initial Synchronization Date (such date, the "Proposed Initial Synchronization

Date").  Energy Answers shall have the right to postpone such date with at least two (2)

weeks advance notice to PREPA.  PREPA and Energy Answers shall agree on the actual

Initial Synchronization Date.  PREPA shall have the right to have a representative present

during the initial synchronization.

4.3     Energy Answers shall provide PREPA with relay settings for review and inspection by

PREPA not later than one hundred eighty (180) Days prior to the Proposed Initial

Synchronization Date.  PREPA agrees to provide preliminary comments or suggested

changes which it is entitled to give to Energy Answers pursuant to this Section 4.3 within

thirty (30) Days after Energy Answers submits the relay settings or other information to

PREPA.  If the relay settings provided by Energy Answers for review and inspection are not

found to be acceptable to PREPA, Energy Answers agrees to comply with requests to provide

acceptable relay settings prior to the Initial Synchronization Date made by PREPA in

accordance with Prudent Utility Practices and Prudent Electrical Practices.  PREPA shall

---

[1]  Please provide a copy of the Interconnection Study Application.

work expeditiously and in coordination with Energy Answers to determine mutually acceptable relay settings for the Proposed Initial Synchronization Date not later than ninety (90) Days after PREPA's initial receipt of the relay settings for review and inspection. If the Parties are unable to reach an agreement within ninety (90) Days after PREPA's receipt of the relay settings for review and inspection, then the issue shall be deemed a Technical Dispute and finally resolved according to Section 22.13.

4.4     Energy Answers and PREPA shall develop detailed written operating procedures (the "Agreed Operating Procedures") no later than one hundred eighty (180) Days prior to the Proposed Initial Synchronization Date for the Facility. The Agreed Operating Procedures will be prepared and based on PREPA's standard operating procedures, taking into consideration the design of the Facility and its interconnection to PREPA's electric system. The Agreed Operating Procedures shall define the procedures to be used to integrate the Facility's output into PREPA's system. Topics covered shall include (a) a method of day-to-day communications, (b) key personnel lists for both Energy Answers and PREPA's dispatching centers, (c) clearances and switching practices, (d) outage scheduling, (e) daily available energy reports, (f) the Facility's operations log, (g) reactive power support, and (h) Emergency procedures. The Agreed Operating Procedures may be modified only with the written consent of both Parties.

4.5     PREPA shall prepare and submit to Energy Answers a written voltage schedule for the Facility no later than thirty (30) Days prior to the Proposed Initial Synchronization Date. PREPA may change such voltage schedule upon thirty (30) Days prior written notice to Energy Answers. Energy Answers shall use such voltage schedule in the operation of its Facility provided that it is in accordance with the Design Limits of the Facility and does not otherwise adversely affect the Facility or its operations. This voltage schedule shall be based

on the normally expected operating conditions for the Facility and the reactive power requirements of PREPA's system.

4.6     Energy Answers and PREPA will discuss the Facility design in order to minimize load reductions due to PREPA's operating problems.

4.7     PREPA reserves the right to delay either or both of the actual Initial Interconnection Date and the initial synchronization for the Facility due to problems that are reasonably expected to adversely affect the operations of PREPA's electrical system until such time as such problems are corrected or mitigated to a reasonable degree.  In such event, PREPA shall promptly give Energy Answers notice of such problems and, to the extent that facilities or equipment that Energy Answers has installed and maintains are the cause of such problems, Energy Answers shall promptly remove the cause of such problems with such facilities or equipment, all in accordance with Prudent Electrical Practices and Prudent Utility Practices.

4.8     Energy Answers shall provide PREPA with as-built drawings of the Additional Interconnection Facilities (one line diagram and protection scheme) within one hundred twenty (120) Days after the Commercial Operation Date and within one hundred twenty (120) Days after any material modification of the Facility.

**ARTICLE S.   TERM**

5.1     The Term of this Agreement shall begin with the Effective Date and shall continue for a period of thirty (30) Agreement Years after the Commercial Operation Date, unless extended or earlier terminated in accordance with the terms hereof.  If the Term is extended, the word "Term" shall thereafter be deemed to mean the original Term so extended.

5.2     The Term of this Agreement may be extended by mutual agreement of the Parties for up to two consecutive periods of five (5) years each, following the expiration of the initial thirty

Power Purchase and Operating Agreement – PREPA and Energy Answers
Page 18

(30) Agreement Year Term.  The intention to extend the Term of this Agreement shall be notified in writing by certified or registered mail to the other Party not less than eighteen (18) Months prior to the expiration of the initial Term or other Terms, as the case may be; unless either Party shall give written notice by certified or registered mail to the other of its intent not to extend the Term of this Agreement not less than eighteen (18) Months prior to the expiration of the initial Term or other Term, as the case may be.  During any extension Term, all provisions contained herein remain in effect.

## ARTICLE 6.    REPRESENTATIONS, WARRANTIES, AND COVENANTS

6.1    Energy Answers shall be responsible for procuring all contractual commitments it deems necessary or desirable for, or access to sufficient municipal solid waste for, the Facility to sell Net Electrical Output under this Agreement.  Prior to the Commercial Operation Date, Energy Answers will provide PREPA with a list of the municipalities that are under contract to provide waste to the Facility and the amount of waste that is to be provided by each municipality.

6.2    Energy Answers covenants and warrants that the Facility shall be operated and maintained by a Qualified Operator in accordance with:  (a) the Agreed Operating Procedures; (b) Prudent Electrical Practices; and (c) Prudent Utility Practices, including synchronizing, voltage and reactive power control.

6.3    Energy Answers covenants and warrants that the Design Limits shall have an MVA capability based on a 0.85 power factor (lagging) and that the Facility shall be operated at the voltage levels determined pursuant to Section 4.5.  Energy Answers further agrees that a maximum MVA rating at a 0.85 power factor (lagging) shall be utilized in any calculation to determine the Facility's nameplate capacity.  Energy Answers will validate through testing

Power Purchase and Operating Agreement - PREPA and Energy Answers

Page 19

the manufacturer's power curves for each engine generator. Energy Answers further warrants that it will promptly correct any Facility design or construction defect that causes the Facility to have a material adverse effect on PREPA's voltage level or voltage waveform.

6.4     Energy Answers shall, at all times and in all material respects, comply with laws, ordinances, rules and regulations applicable to it and the use, occupancy, and operation of the Facility, including all environmental laws and regulations. Energy Answers shall give all required notices, shall procure and maintain all Permits and shall pay all charges and fees required in connection therewith. Energy Answers shall complete all environmental impact studies necessary for the design, construction, operation and maintenance of the Facility. Energy Answers shall submit to PREPA copies of all material Permits needed to construct the Facility and the Additional Interconnection Facilities and to operate the Facility.

6.5     Each Party shall have sole responsibility for the payment of any and all fines or other penalties incurred by or imposed upon such Party or its agents, suppliers, employees or subcontractors for noncompliance by such Party, its agents, employees, suppliers, or subcontractors with laws, rules, regulations or ordinances applicable to or in connection with, (a) in the case of Energy Answers, the development, construction, ownership and/or the proper operation of the Facility and the Additional Interconnection Facilities, except to the extent such noncompliance is due to any act or omission of PREPA and (b) in the case of PREPA, the construction, ownership and/or the proper operation of PREPA's electric transmission and distribution system and the PREPA Interconnection Facilities, in each case as determined by applicable governmental authority having jurisdiction over such Party; and, subject to the Comparative Fault Standard and Section 14.2 (which shall govern the indemnity hereinafter provided), such Party shall hold the other Party and such other Party's

Power Purchase and Operating Agreement - PREPA and Energy Answers
Page 20

Indemnitees harmless from any such fines or penalties and expenses related to these, including all reasonable attorneys' fees.

6.6     Energy Answers represents and warrants as of the Effective Date as follows:

(a)     Energy Answers is a limited liability company duly organized, validly existing under the laws of Delaware; Energy Answers has all requisite power and authority to conduct its business, to own its properties, and to execute, to deliver, and to perform its obligations under this Agreement;

(b)     The execution, delivery, and performance by Energy Answers of this Agreement have been duly authorized, and do not and will not (i) require any additional internal consent or approval of Energy Answers; or (ii) violate any provision of Energy Answers' certificate of formation or operating agreement, or any material indenture, contract or agreement to which it is a party or by which it or its properties may be bound, or any law, ordinance, rule, regulation, order, writ, judgment, injunction, decree, determination or award presently in effect;

(c)     Energy Answers is not in default under any document or instrument referred to in clause (ii) of the preceding paragraph (b), which default could reasonably be expected to have a material adverse effect on the ability of Energy Answers to perform its obligations under this Agreement; and

(d)     This Agreement is a legal, valid and binding obligation of Energy Answers, enforceable against Energy Answers in accordance with its terms, except as may be limited by applicable bankruptcy, insolvency or similar laws affecting the enforcement of rights generally.

Power Purchase and Operating Agreement - PREPA and Energy Answers
Page 21

6.7     From and after the Commercial Operation Date, Energy Answers shall maintain a minimum

        working capital in an amount specified by the Project Lenders, but not less than $5 million as

        calculated at the end of each Year in accordance with GAAP.

6.8     In the event Energy Answers intends to sell the Facility, it shall notify PREPA of its intention

        to sell sixty (60) Days in advance of the intended date of such sale.  PREPA shall have the

        right to approve the new owner, which approval shall not be unreasonably withheld,

        conditioned or delayed.

6.9     Energy Answers agrees that, following the Financial Closing Date, and thereafter during the

        Term of this Agreement, it will cause to be delivered to PREPA yearly its certified financial

        statements prepared in accordance with GAAP.

6.10    Energy Answers agrees that it will cause to be delivered to PREPA an annual certification of

        the names of its corporate officers.

6.11    PREPA agrees that all information obtained from Energy Answers, which is not otherwise

        generally available to the public (but without limitation of any liability PREPA may have to

        Energy Answers for information having become generally available to the public through the

        negligence or willful misconduct of any of PREPA, its Affiliates or their respective

        employees, agents and representatives), shall be kept confidential and used solely by PREPA

        in connection with the performance of its obligations under this Agreement.  Disclosure of

        such information may be made only within PREPA's organization to key personnel, and to

        third parties serving as PREPA's legal, financial or technical advisors, whose duties justify

        their need to review and know such material.  PREPA shall require each Person (and

        personnel thereof) to agree for the benefit of Energy Answers to maintain the confidentiality

        of such information.  To the extent PREPA is required to disclose such information by any

        court, governmental agency or to the extent necessary to secure governmental approval or

authorization, PREPA shall use its reasonable efforts to seek a confidentiality agreement that assures confidential treatment of the information consistent with the terms of this Section 6.11. In the event PREPA is not successful in obtaining a confidentiality agreement, PREPA shall use reasonable efforts to obtain through court action the appropriate protective order.

6.12    PREPA hereby represents and warrants that, throughout the Term, all payments by PREPA to Energy Answers under this Agreement shall be treated as current expenses as defined by the terms of the Trust Agreement dated as of January I, 1974, as amended, (the "1974 Agreement") between PREPA and State Street Bank and Trust Company, as successor trustee, and any successor indentures or agreement, including any amendments, supplements or modifications thereto. PREPA represents and warrants that it has provided to Energy Answers a true and complete copy of the 1974 Agreement as in effect on the Effective Date. PREPA further covenants to provide to Energy Answers copies of all amendments, supplements and modifications to the 1974 Agreement. If reasonably requested by Energy Answers, PREPA shall use all commercially reasonable efforts to cause State Street Bank and Trust Company to deliver written confirmation of the foregoing, in form and substance reasonably satisfactory to Energy Answers and the Project Lenders.

6.13    PREPA shall cause its counsel to issue an opinion in a form reasonably acceptable to Energy Answers and the Project Lenders on the Financial Closing Date (or such other date as reasonably requested by the Project Lenders).

6.14    (a)    Energy Answers agrees to use its reasonable efforts, when soliciting and obtaining personnel to perform services for the Facility in Puerto Rico, to achieve a goal that not less than thirty percent (30%) of the total personnel hours expended in Energy Answers' performance of the construction services in Puerto Rico pursuant to this Agreement prior to the Commercial Operation Date and not less than fifty percent

Power Purchase and Operating Agreement - PREPA and Energy Answers
Page 23

(50%) expended in Energy Answers' performance of the services pursuant to this Agreement following the Commercial Operation Date shall be performed by individuals who are bona fide residents of Puerto Rico as defined in subsection 6.14(c).

(b)    Energy Answers agrees to use its reasonable efforts, when soliciting and selecting subcontractors and vendors to perform services for the Facility in Puerto Rico, to achieve a goal that not less than thirty percent (30%) of such construction services hereafter performed in Puerto Rico pursuant to this Agreement prior to the Commercial Operation Date, as measured by person-hours on an annual basis, shall be performed by business concerns that are owned and controlled by one or more individuals who are bona fide residents of Puerto Rico as defined in subsection 6.14(c).  For purposes of the preceding sentence, "owned and controlled" means a business:  (i) which is at least fifty-one percent (51%) owned by one or more of such individuals (e.g., in the case of a corporate form of organization such individuals must hold at least fifty-one percent (51%) of all voting stock of the corporation; in the case of a partnership or other form of business concern such individuals must hold at least fifty-one percent (51%) of the beneficial interests in the partnership or business concern); and (ii) whose management and daily business operations are controlled by one or more of such Persons (who need not be owners of the business).

(c)    For purposes of this Section 6.14, an individual shall be considered a bona fide resident of Puerto Rico, if said individual has been a resident of Puerto Rico immediately prior to commencing work on the Facility.  To the extent that despite Energy Answers' reasonable efforts Energy Answers has failed to achieve the goals set forth in Section 6.14(a) or Section 6.14(b), Energy Answers may for purposes of

calculating satisfaction of said goals include the services of individuals who at some time prior to commencing work on the Facility, but not necessarily including the period of time immediately prior to commencing work on the Facility, were residents of Puerto Rico for at least five (5) consecutive years and who relocated to Puerto Rico in order to perform work on the Facility. Energy Answers shall, in good faith, be entitled to rely on the representation of each individual applicant and of each subcontractor or vendor as to whether such individual, subcontractor or vendor meets the criteria set forth herein. Energy Answers shall require equivalent undertakings from its subcontractors.

(d)    Nothing contained herein shall be interpreted as obligating Energy Answers to take any action which would be in violation of the United States Constitution, federal law or the laws of Puerto Rico or of any affirmative action program or equal opportunity obligation to which Energy Answers or its Affiliates are or may be bound under federal law or the laws of Puerto Rico.

6.15    PREPA represents and warrants as of the Effective Date as follows:

(a)    Pursuant to Act No. 83 of May 2, 1941, as amended, PREPA is a public corporation duly organized and validly existing under the laws of the Commonwealth of Puerto Rico and has all requisite power and authority to conduct its business, to own its properties, and to execute, to deliver, and to perform its obligations under this Agreement; and

(b)    This Agreement is a legal, valid, and binding obligation of PREPA, enforceable against PREPA in accordance with its terms, except as may be limited by applicable bankruptcy, insolvency or similar laws affecting the enforcement of rights generally.

Power Purchase and Operating Agreement – PREPA and Energy Answers
Page 25

6.16   Neither Party shall be relieved of its obligations under this Agreement as a result of subcontracting any of its obligations to a third party.

6.17   PREPA agrees that it will use all reasonable efforts to assist Energy Answers in obtaining any Permits to the extent requested by Energy Answers.

## ARTICLE 7.   DISPATCHING

7.1   The Facility will be designated by PREPA as a "must run" unit (to the full extent of the Dependable Capacity) and will not be disconnected except to the extent necessary due to Force Majeure or an Emergency that cannot be avoided or mitigated without the shutdown or disconnection of the Facility.

7.2   PREPA may require Energy Answers to reduce the amount of Net Electrical Output due to operating problems that may affect safety margins or reliability levels in PREPA's transmission system; provided, however, any reduction in the level of Net Electrical Output required by PREPA hereunder shall be based upon and implemented in a manner consistent with Prudent Utility Practices and within the Design Limits.  PREPA shall not be entitled to reduce Net Electrical Output under this Agreement due to (a) economic factors, (b) any inconvenience, or other condition not expressly included in the preceding sentence, (c) any condition of any nature including those specified in the preceding sentence if PREPA is not promptly and prudently seeking a remedy or cure in accordance with Prudent Utility Practices, or (d) any other circumstance that can be mitigated by PREPA through economic means.

## ARTICLE 8.   CONTROL AND OPERATION OF THE FACILITY

8.1   Energy Answers shall, at least sixty (60) Days prior to the Commercial Operation Date, submit a written schedule of Scheduled Outages ("Scheduled Outage Program") for the

Power Purchase and Operating Agreement - PREPA and Energy Answers

Page 26

remaining portion of the first Year of the Facility's operations and, if the Commercial

Operation Date occurs after September I, for the following Year, setting forth the proposed

Scheduled Outage periods. Thereafter, Energy Answers shall submit to PREPA, in writing,

by September I of each Year, its proposed Scheduled Outage Program for the next Year.

8.2     Energy Answers shall use reasonable efforts to notify PREPA of any Non-Scheduled Outages

at least twenty four (24) hours in advance and coordinate all Non-Scheduled Outages with

PREPA.

8.3     If an Emergency is declared by PREPA, PREPA's dispatching centers may disconnect the

Facility from PREPA's system to the extent permitted by Section 7.1. If a curtailment

pursuant to Section 7.2 is declared by PREPA, PREPA's dispatching centers may curtail the

Facility's output to the extent permitted by Section 7.2. The Facility will remain

disconnected from PREPA's system following an Emergency until Energy Answers has

received permission to reconnect from PREPA's dispatching center. Any disconnection or

reduction in the Facility's output required by PREPA under this Agreement shall be of no

greater scope and of no longer duration than is required by the Emergency or operating

problem pursuant to Section 7.2, consistent with Prudent Utility Practices. Upon an

Emergency or curtailment pursuant to Section 7.2 that results in any disconnection or

reduction in the Facility's output, PREPA shall, as soon as practicable after the occurrence of

the Emergency or operating problem, provide written notice to Energy Answers describing

the particulars of the occurrence and its estimated duration and shall diligently use all

reasonable efforts, consistent with Prudent Utility Practices, to remedy the Emergency or

operating problem. In any situation where PREPA causes a reduction of Net Electrical

Output or a disconnection of the Facility, PREPA shall treat the Facility no less favorably

than other facilities connected to PREPA's grid.

8.4    PREPA shall have no liability to Energy Answers in connection with any disconnection or reduction in the Facility's output required by PREPA under Section 7.1, Section 7.2 or Section 8.3 unless (a) the Facility is otherwise capable of generating and delivering electrical output, (b) Energy Answers has provided PREPA with written notice of such capability, and (c) the duration of any such disconnection or curtailment (or combination thereof) has exceeded the applicable waiting period set forth in the next three sentences after delivery of Energy Answers' notice to PREPA.  With respect to a disconnection or curtailment that is not attributable to severe weather conditions, the waiting period shall be the earliest to occur of (i) twenty-four (24) consecutive hours, (ii) twenty-four (24) hours in the aggregate during any thirty (30) day period and (iii) one hundred twenty (120) hours in the aggregate during any Year.  With respect to a disconnection or curtailment that is attributable to severe weather conditions, excluding a hurricane or tropical storm, the waiting period shall be the earlier to occur of (i) two (2) consecutive Days and (ii) two hundred forty (240) hours in the aggregate during any Year.  With respect to a disconnection or curtailment that is attributable to a hurricane or tropical storm, the waiting period shall be three hundred thirty six (336) hours in the aggregate during any Year.  To the extent a disconnection or curtailment (or combination thereof) exceeds any of the time periods described in the preceding sentences (as applicable), then, notwithstanding anything in this Agreement to the contrary, PREPA shall pay Energy Answers for the curtailed energy in an amount equal to, for each hour during the period of curtailment, the product of (a) the Dependable Capacity just prior to the occurrence of the disconnection or curtailment (less the amount of Net Electrical Output actually delivered and paid for during such hour of curtailment) multiplied by (b) the applicable price per kilowatt hour determined in accordance with Section 11.2.  PREPA's liability pursuant to this Section 8.4 for any single disconnection or curtailment shall not



Power Purchase and Operating Agreement - PREPA and Energy Answers
Page 28

exceed the amount of any deductible under Energy Answer's business interruption insurance policy, which shall not exceed the amount payable to Energy Answers for thirty (30) Days' of Net Electrical Output where the Facility is operating at its Dependable Capacity.

8.5     Each Party shall cooperate with the other in establishing Emergency plans, including recovery from a local or widespread electrical blackout; voltage reduction in order to effect load curtailment; and other plans which may arise.  Energy Answers shall make technical information and data available to PREPA concerning start-up times and black-start capabilities.

8.6     If the Facility has a Scheduled Outage or a Non-Scheduled Outage, and such Scheduled Outage or Non-Scheduled Outage occurs or would occur coincident with an Emergency, PREPA may request that Energy Answers shall make all good faith efforts, consistent with Prudent Utility Practices and with PREPA's approval, to reschedule the Scheduled Outage or Non-Scheduled Outage or if the Scheduled Outage or Non-Scheduled Outage has begun, to expedite the completion thereof.

8.7     Energy Answers shall provide as a minimum at its expense the following communication facilities linking the Facility with PREPA's dispatching centers:  .

(a)     One dual ported Remote Terminal Unit ("RTU"), including setup installation and configuration, which shall be specified by PREPA.

(b)     Two voice grade telecommunication circuits for the RTU.  One for communication with Monacillos Transmission Center ("Monacillos TC"), the other for Ponce Transmission Center ("Ponce TC").

(c)     A voice telephone extension for the purpose of accessing PREPA's dial-up metering equipment and for communicating with PREPA's dispatching centers.

Power Purchase and Operating Agreement - PREPA and Energy Answers
Page 29

(d)     Telephone line and equipment to transmit and receive facsimile messages to confirm the oral communication between PREPA and Energy Answers.

(e)     The communication facilities shall provide for digital access using PREPA's TDM (Time Division Multiplexer) and Ethernet network.

(f)     One voice grade telecommunication circuit for the Facility backup telemeter's communication with Monacillos Te.

(g)     Energy Answers shall supply and install a Dynamic System Monitor (cabinet version) for recording power disturbances and to measure the generating units and system response to disturbances.  The specifications for the Dynamic System Monitor are included in Appendix E.

Items provided by Energy Answers in accordance with this Section 8.7 shall be subject to the approval of PREPA, which approval shall not be unreasonably withheld or delayed.

8.8     Each Party shall keep complete and accurate records and other data required for the proper administration of this Agreement.

(a)     All such records shall be maintained for a minimum of five (5) years after the preparation of such record or data and for any additional length of time required by regulatory agencies with jurisdiction over the Parties; provided, however, that neither Party shall dispose of or destroy any records that are specifically designated by the other Party even after five (5) years without thirty (30) Days prior notice to the other Party.  If notice is given to the notifying Party during the thirty (30) Day period, the notifying Party shall promptly deliver the records and data to the Party wishing to retain the records.

(b)     Energy Answers shall maintain an accurate and up-to-date operating log at the Facility with records of (i) real and reactive power for each hour, (ii) changes in

Case:17-03283-LTS   Doc#:14343-2   Filed:09/18/20   Entered:09/18/20 10:27:51   Desc:
Exhibit B- CONTRATO PPOA ENERGY ANSWERS   Page 32 of 89
Power Purchase and Operating Agreement - PREPA and Energy Answers

Page 30

operating status and Scheduled Outages, and (iii) any unusual conditions found during inspections.

(c)     Either Party shall have the right from time to time, upon fourteen (14) Days written notice to the other Party and during regular business hours, to examine the records and data of the other Party relating to the proper administration of this Agreement any time during the period the records are required to be maintained.

8.9   At PREPA's request, Energy Answers shall provide certifications of tests and inspections of the electric and protection equipment, which may impact PREPA's electrical system. PREPA shall have the right to visit and visually monitor the Facility during operation and testing, including any acceptance testing of the Facility.

## ARTICLE 9.     INTERCONNECTION

9.1   Appendix B sets forth the best available information as of the date hereof, prepared by PREPA in accordance with Prudent Electrical Practices and Prudent Utility Practices, regarding:  (a) a description of the Interconnection Facilities, (b) a specification of the Interconnection Point, (c) the evaluations and studies needed to interconnect the Facility to PREPA's system, (d) the manufacturer's guaranteed performance data required to perform the interconnection study, (e) the preliminary equipment data for all Interconnection Facilities, (f) the materials and equipment necessary for the Interconnection Facilities, and (g) other information as mutually agreed upon by the Parties.  The Parties acknowledge that Appendix B shall be further expanded and supplemented in writing following the Effective Date, subject to Section 22.21, to incorporate information not available as of the date hereof.  PREPA shall prepare such supplements in accordance with Prudent Electrical Practices and

Prudent Utility Practices and in consultation with Energy Answers through design review meetings and other communications and presentations.

9.2    Energy Answers shall, at its own cost, design, obtain the land rights necessary for, acquire all materials and equipment necessary for, construct, and install the Additional Interconnection Facilities. Energy Answers shall, at its own cost, design, acquire all materials and equipment necessary for, construct, install and turnover to PREPA the PREPA Interconnection Facilities. PREPA shall provide to Energy Answers sufficient access to PREPA's properties and facilities without interference during normal business hours and such other times, all as may be reasonably necessary or appropriate for Energy Answers to complete the installation of the PREPA Interconnection Facilities. PREPA shall monitor the acceptance testing of the Additional Interconnection Facilities by Energy Answers. Energy Answers shall own and be responsible for operating and maintaining the Additional Interconnection Facilities at its sole cost and in accordance with Prudent Electrical Practices and Prudent Utility Practices. The design of the Additional Interconnection Facilities shall be part of the project design to be submitted by Energy Answers for approval to the Permits and Regulations Administration of Puerto Rico. To the extent that PREPA delays the Initial Interconnection Date, the Initial Synchronization Date or the Commercial Operation Date for reasons that are not due to problems with facilities or equipment that Energy Answers has installed and maintains that are reasonably expected to adversely affect the operations of PREPA's electrical system as provided in Section 4.7, the running of any time periods or time requirements imposed upon Energy Answers, including those under Section 16.1 and in the definition of "Development Abandonment," shall be suspended until, as applicable, the Initial Interconnection Date, the Initial Synchronization Date or the Commercial Operation Date occurs.



Power Purchase and Operating Agreement - PREPA and Energy Answers
Page 32

9.3     Energy Answers shall make commercially reasonable efforts to acquire for itself or through a

        govermnent agency or municipality the land rights necessary to locate the Additional

        Interconnection Facilities, including identification of the owners of the land through which

        the Additional Interconnection Facilities will be located and making commercially

        reasonable, good faith offers to acquire the necessary rights.  PREPA will take all reasonable

        efforts to assist Energy Answers in obtaining the necessary land rights for the Additional

        Interconnection Facilities to the extent requested by Energy Answers.   In the event any

        judicial proceedings cause a delay in the construction of the Interconnection Facilities that

        jeopardizes the Facility, (a) PREPA shall not be responsible for any consequences of such

        delay unless and to the extent that PREPA's own acts or omissions have substantially caused

        or contributed to such delay and such delay has resulted in Energy Answers incurring

        material additional costs and (b) Energy Answers shall receive a day-for-day extension to any

        deadlines provided for in this Agreement, including those set forth in the definition of

        "Development Abandonment" and in Section 16.1.

9.4     Energy Answers shall provide to PREPA the data listed in Appendix B by the dates specified

        therein.

9.5     PREPA shall perform an interconnection study and provide it to Energy Answers within

        sixty (60) Days after Energy Answers provides to PREPA the preliminary equipment data

        identified in Appendix B.  The interconnection study shall, at a minimum, (a) determine the

        power capabilities of the major interconnection equipment required to complete the

        Interconnection Facilities, (b) determine the maximum fault currents necessary to specify

        short circuit duty and interrupting ratings, (c) determine transformer tap ranges necessary for

        proper control of voltage and reactive power flow, and (d) designate the PREPA dispatching

        centers that will coordinate the operation of the Facility.   The Interconnection Facilities'

Power Purchase and Operating Agreement - PREPA and Energy Answers
Page 33

design shall be consistent with Prudent Utility Practices considering the functional one-line interconnector diagram and the specifications contained in Appendix B and provided to PREPA pursuant to Section 9.4. Additional studies of stability, motor starting, and transients shall be performed as necessary to allow the timely progress of the detailed design of the Interconnection Facilities.

9.6    Energy Answers shall provide the following information to PREPA, which information PREPA shall have the right to review, comment on, and approve, which approval shall not be unreasonably withheld: (a) a detailed design and list of the equipment required for the Interconnection Facilities; and (b) the estimated time required to construct the Interconnection Facilities.

9.7    Within thirty (30) Days after PREPA's receipt of the information submitted by Energy Answers in accordance with Section 9.6, PREPA shall either issue Energy Answers a notice to proceed or notify Energy Answers in writing of any disagreement with the information provided. In such event, Energy Answers and PREPA will use reasonable efforts to reach an agreement. If the Parties are unable to reach an agreement within thirty (30) Days after Energy Answers' receipt of such notice of disagreement, then such issues shall be deemed a Technical Dispute and finally resolved according to Section 22.13. Energy Answers shall not purchase, construct or install the Interconnection Facilities until receipt of a Notice to Proceed from PREPA, which notice shall constitute acceptance by PREPA of the design of the Interconnection Facilities. Once the Notice to Proceed is received by Energy Answers, Energy Answers shall use its reasonable efforts to complete the construction and installation of the Interconnection Facilities in accordance with the project schedule specified in Section 4.1, as such schedule may be modified by Energy Answers from time to time in its sole discretion.

Power Purchase and Operating Agreement - PREPA and Energy Answers
Page 34

9.8     PREPA reserves the right to require Energy Answers to modify or expand protective devices

in the Additional Interconnection Facilities, to the extent that such modifications or

expansions (i) are in conformance with Prudent Electrical Practices and Prudent Utility

Practices, (ii) represent a meaningful technological improvement over the existing protective

devices incorporated in the Additional Interconnection Facilities, (iii) are part of a system-

wide upgrade to interconnection facilities (including PREPA's interconnection facilities)

throughout PREPA's service territory and (iv) are no more onerous or extensive than

modifications or expansions to protective systems in interconnection facilities that are being

required at other generation facilities connected to PREPA's grid.

9.9     Each Party shaH notify the other in advance of any changes to its system that would affect the

proper coordination of protective devices on the two interconnected systems.


## ARTICLE 10.   METERING

10.1    PREPA shaH own and maintain all meters and metering devices (including RTUs) used to

measure the delivery and receipt of Net Electrical Output, for payment purposes.  Energy

Answers shall install primary and back-up meters and metering devices subject to Section

10.3 as part of the Additional Interconnection Facilities; provided that such meters and

metering devices shaH be subject to PREPA's approval as provided in Article 9.

10.2    All meters and metering equipment used to determine the Net Electrical Output delivered to

PREPA shall be located at the Interconnection Point and sealed.  The seals may only be

broken by PREPA personnel when the meters are to be inspected, tested or adjusted.  PREPA

shaH give Energy Answers two (2) weeks prior written notice thereof and Energy Answers

shall have the right to have a representative present during the meter inspection, testing or

adjustment.  If either Party believes that there has been a meter failure or stoppage, it shall

Power Purchase and Operating Agreement - PREPA and Energy Answers
Page 35

immediately notify the other Party to coordinate an inspection or test at the earliest convenient date.

10.3    At least annually, at PREPA's cost and, in addition from time to time upon two (2) weeks prior written notice by either Party at its cost (unless the results demonstrate that meters for which PREPA has operation and maintenance responsibility are outside the limits established in American National Standard Institute Code for Electricity Metering (ANSI C 12.16, latest version) ("ANSI CI2.16"), in which case such additional tests shall be at PREPA's cost), PREPA will test and calibrate the meter(s), including backup meters, in accordance with the provisions for meter testing as established by ANSI CI2.16.  When, as a result of such a test, a meter is found to be within the range specified by the standard, no adjustment will be made to the amount paid to Energy Answers for Net Electrical Output delivered to PREPA.  If the meter is found to be outside the range specified by the standard, (a) the meter shall be adjusted, repaired, replaced, and/or recalibrated as near as practicable to a condition of zero error by the Party owning such defective or inaccurate device at that Party's expense; and (b) PREPA will use the backup meters to calculate the correct amount of Net Electrical Output delivered to PREPA for the actual period during which inaccurate measurements were made.  If the actual period cannot be determined to the mutual satisfaction of the Parties, a period equal to the time elapsed since the most recent test, but in no case for a period in excess of six (6) Months will be used.  If the backup meters are not available, or if the testing of the backup meters demonstrates that those meters are out of calibration, the meter readings shall be adjusted based on the corrected meter readings of the most accurate meter for the actual period during which inaccurate measurements were made.  If the actual period cannot be determined to the mutual satisfaction of the Parties, for a period equal to one half of the time elapsed since the most recent test, but in no case for a period in excess of six (6) Months

would be used.  To the extent that the adjustment period covers a period of deliveries for which payment has already been made by PREPA, PREPA shall use the corrected measurements as determined in accordance with this Section 1003 to recalculate the amount due for the period of the inaccuracy and shall subtract the previous payments by PREPA for this period from such recomputed amount.  If the difference is a positive number, the difference shall be paid by PREPA to Energy Answers; if the difference is a negative number, that difference shall be paid by Energy Answers to PREPA or PREPA may offset such amounts against payments due to Energy Answers by PREPA hereunder.  Payment of such difference by the owing Party shall be made not later than thirty (30) Days after the owing Party receives notice of the amount due, unless PREPA elects payment via an offset. Each Party shall comply with any reasonable request of the other Party concerning the sealing of meters, the presence of a representative of the other Party when the seals are broken and the test is made, and other matters affecting the accuracy of the measurement of electricity delivered from the Facility.

10.4    During each one (1) Year period, following the Initial Interconnection Date, PREPA shall read the meters at least twelve (12) times to determine the amount of Net Electrical Output delivered to PREPA from the Facility.  The period between such meter readings (the "Billing Period") shall not exceed thirty-three (33) Days nor be less than twenty-eight (28) Days.  The Billing Period schedule shall be prepared by PREPA and submitted to Energy Answers on or before January 1 of each Year.  PREPA shall notify Energy Answers in advance of any change to the Billing Period schedule.  Energy Answers may be present at its option, during all meter readings.  PREPA shall provide Energy Answers with a written statement containing the results of such meter readings within ten (10) Days following the reading.

**ARTICLE 11.   COMPENSATION, PAYMENT AND BILLINGS**

11.1   PREPA shall pay Energy Answers for Net Electrical Output, measured in accordance with Section 1003, beginning with the Pre-Operation Period and continuing for each Billing Period throughout the Term of this Agreement.   The calculation of this payment is as set forth in Section 11.2.

11.2   Energy Payment **-** The price for sales of Net Electrical Output shall be calculated as follows:

$$EP = \$0.10 \text{ x NEO x PI}$$

Where:

EP is the Energy Payment

NEO is the Net Electrical Output expressed in kilowatt hours

PI is the Price Index

11.3   On or before the fifteenth (15th) Day following the end of each Billing Period (or if later, within five (5) Days after Energy Answers receives the meter reading data pursuant to Section 10.4), Energy Answers shall provide PREPA with a written invoice for the Net Electrical Output delivered to PREPA, and such invoice shall be paid by PREPA within forty-seven (47) Days after the end of the Billing Period.   Interest shall accrue on the payments due to Energy Answers commencing on the Day after the date on which PREPA is required to make any such payment pursuant to the preceding sentence.   Notwithstanding the payment requirements set forth in this Section, any amounts owed to a Party by the other Party pursuant to this Agreement that are not paid when due to the Party to whom they are owed, may, at the discretion of such obligee Party be offset against the amounts due to the other Party from such obligee Party; provided that such amounts are undisputed or have been determined to be owed to the obligee Party by a final, non-appealable judgment or award pursuant to Section 22.13; and provided, further, that the obligee Party shall provide the other

Power Purchase and Operating Agreement – PREPA and Energy Answers
Page 38

Party with five (5) Business Days' advance written notice describing in reasonable detail the amounts to be set off before effecting any such set off. Payments to a Party shall be made by wire transfer to an account with a bank to be specified by such Party in writing, which specification shall be notified to the other Party at least thirty (30) Days prior to the Initial Synchronization Date, or with such other banks as may thereafter be specified by a Party in writing. Either Party may by written notice to the other, change the address to which such payments to the notifying Party are to be sent.

11.4   An example of the calculation of the payment for sales of Net Electrical Output for a Billing Period is included in Appendix C.

11.5   To the extent that PREPA enters into or modifies or amends a power purchase and operating agreement or other similar agreement within thirty-six (36) months after the Effective Date with an owner or developer (or an affiliate thereof) of a waste to energy generation or similar facility and such agreement or amendment or modification provides for an energy payment that is higher, when measured on a kilowatt hour basis, than the energy payment provided in Section 11.2, PREPA shall provide a copy of such agreement, amendment or modification (with all pricing information included) to Energy Answers within ten (10) Days of the execution or conclusion of such agreement, amendment or modification and the Parties shall thereafter promptly (and in any event within thirty (30) Days of the date of such notice) amend this Agreement to increase the energy payment in Section 11.2 to match the energy payment provided in such other agreement, amendment or modification. To the extent that the price in any such other agreement or amendment or modification to an agreement provides for a capacity price in addition to an energy payment, PREPA shall provide a copy of such agreement, amendment or modification (with all pricing information included) to Energy Answers within ten (10) Days of the execution or conclusion of such agreement,

Power Purchase and Operating Agreement - PREPA and Energy Answers
Page 39

amendment or modification and if Energy Answers reasonably determines that the pricing

provided in such agreement, amendment or modification is more favorable than the energy

price in Section 11.2, the Parties shall thereafter promptly (and in any event within thirty (30)

Days of the date of such notice) amend this Agreement to change the pricing in Section 11.2

to match the pricing provided in such other agreement, amendment or modification.

**ARTICLE 12. TESTING AND INITIAL SYNCHRONIZATION**

12.1    Subject to Section 2.1, Energy Answers declares (but does not represent, warrant or
covenant) that the estimated nameplate capacity for the Facility at commencement of
commercial operations is expected to be approximately 66 MW (+/-5%) of which
approximately 58 MW (+/-5%) is expected to be available for sale to PREPA.

12.2    Following the acceptance tests of the Facility, Energy Answers shall notify PREPA in writing
of the test results, the Dependable Capacity and the Commercial Operation Date.  PREPA
may have an eyewitness during the performance of the tests.

12.3    The acceptance test for the Facility shall include the Machine Parameters Measurements and
Field Tests Requirements specified in Appendix D.

12.4    Following the initial acceptance tests, Energy Answers shall be permitted to conduct periodic
tests of Dependable Capacity, not more than twice annually.  Such retests shall include the
Machine Parameters Measurements and Field Tests Requirements specified in Appendix D.
PREPA, at its option, may have an eyewitness during the performance of the tests.  Upon the
completion of any such periodic performance test, Energy Answers shall provide PREPA
with a report of the performance test results and related test data.  Energy Answers may
conduct up to two (2) additional periodic performance tests to establish the Dependable

Power Purchase and Operating Agreement - PREPA and Energy Answers

Page 40

Capacity if Energy Answers is not satisfied with any periodic performance test.  Energy Answers shall nominate an adjusted Dependable Capacity to PREPA based on such retests.

## ARTICLE 13.  LIABILITY

13.1    Each Party shall be responsible for the energy and facilities located on its respective side of the Interconnection Point.  The energy made available by Energy Answers to PREPA under this Agreement shall become the property of PREPA at the Interconnection Point, and Energy Answers shall not be liable to PREPA for loss or damage to PREPA's generation, transmission, and distribution system, resulting directly or indirectly from the use, misuse or presence of said energy once it passes the Interconnection Point.

13.2    Further, notwithstanding anything to the contrary in this Agreement, neither Party nor its officers, directors, agents, employees and representatives shall in any event be liable to the other Party or its officers, directors, agents, employees or representatives for claims for incidental, consequential or indirect damages to Persons or property, whether arising in tort, contract or otherwise, connected with or resulting from performance or non-performance under this Agreement; provided that the payments described in Sections 8.4 and 14.4 and 14.5 shall not be subject to the restrictions set forth in this Section 13.2.

13.3    Nothing in this Article 13 shall relieve either Party of its obligation to make payments that become due pursuant to Article II.  In the event of a billing Dispute between the Parties, each Party will continue to make payment of amounts that are not in Dispute, and either Party may invoke the provisions of Section 22.13 with respect to the matter or matters in Dispute.

13.4    Energy Answers' liability to PREPA under this Agreement until the Financial Closing Date, whether based on contract, warranty or tort, including intentional acts, errors or omissions, negligence, indemnity, strict liability, or otherwise, or any other claim or cause of action,

with respect to any claim or cause of action, shall not exceed the amount of the Development

Security provided pursuant to Section 17.3. The Parties shall determine the aggregate limit

on Energy Answers' liability for the period following the Financial Closing Date III

consultation with the Project Lenders and by no later than the Financial Closing Date.

## ARTICLE 14.  INDEMNIFICATION

14.1    Subject to the provisions of this Article 14, each party (the "Indemnifying Party") shall

indemnify and hold harmless the other Party and each of its Indemnitees (each such Person,

an "Indemnified Person") from and against any and all damages, claims, losses, liabilities,

actions, causes of action, costs, expenses and obligations (including all attorneys' fees)

whether arising in contract, tort or otherwise to third parties for or on account of injury,

bodily or otherwise, or death of persons or for damage to or destruction of third party

property, in each case to the extent resulting from or arising out of the Indemnifying Party's

gross negligence or willful misconduct. The indemnity provisions of this Section 14.1 shall

be subject to the Comparative Fault Standard.

14.2    An Indemnified Person shall give prompt written notice to the Indemnifying Party of any

demand, action, suit, proceeding or discovery of fact upon which such Indemnified Person

intends to base a claim for indemnification under this Agreement; provided, however, that no

failure to give such notice will relieve the Indemnifying Party of any liability that it may have

to the Indemnified Person, except to the extent that the Indemnifying Party is materially

prejudiced by such failure. The Indemnifying Party may (a) participate in such action, suit or

proceeding ("Proceeding") and (b) elect by notice to the Indemnified Person to assume the

defense of the Proceeding with counsel reasonably satisfactory to the Indemnified Person

unless (i) the Indemnifying Party is also a party to the Proceeding and the Indemnified Person

determines in good faith that joint representation would be inappropriate, (ii) there should arise any conflict of interest between two or more Indemnified Persons in the Proceeding which would render such joint representation inappropriate, (iii) the Indemnifying Party fails to promptly assume the defense of the Proceeding as provided above, or (iv) the Proceeding could result in any criminal charges being made against either the Indemnifying Party or the Indemnified Party. If the Indemnifying Party assumes the defense of the Proceeding (A) the Indemnifying Party will not, as long as it diligently conducts the defense, be liable to the Indemnified Person under this Article 14 for any fees of other counsel or any other expenses with respect to the defense of the Proceeding subsequently incurred by the Indemnified Person in connection with the defense of the Proceeding, other than reasonable costs of investigation, and (B) no compromise or settlement of the claims may be effected by the Indemnifying Party without the Indemnified Person's written consent (which consent will not be unreasonably withheld, conditioned or delayed) unless (x) there is no finding or admission of any violation of legal requirements or any violation of the rights of any Person and no effect on any other claims that may be made against the Indemnified Person and (y) the sole relief provided is monetary damages that are paid in full by the Indemnifying Party.  The provisions of this Section 14.2 shall apply to the indemnity provided pursuant to Sections 6.5, 14.1 and 14.3.

14.3    Each Party shall indemnify and hold harmless the other Party and such other Party's Indemnitees for any and all judgments (including expenses such as reasonable costs and attorneys' fees) incurred by such other Party or its Indemnitees as a result of claims of any nature whatsoever resulting from any environmental harm due to the actions of the Indemnifying Party or its agents or employees in the design, planning, construction or operation of (a) in the case of Energy Answers, the Facility and the Additional

Power Purchase and Operating Agreement - PREPA and Energy Answers
Page 43

Interconnection Facilities (with respect to the Additional Interconnection Facilities, until the earlier to occur of transfer of title or of care, custody and control to PREPA), and (b) in the case of PREPA, the PREPA Interconnection Facilities, the operation of the Additional Interconnection Facilities (with respect to the Additional Interconnection Facilities, from and after the earlier to occur of transfer of title or of care, custody and control to PREPA) and any other component of PREPA's electric transmission and distribution system, or in either case arising as a result of the presence at such property (and at the applicable time) of pollutants, hazardous substances, materials or wastes in excess of amounts and concentrations permitted by applicable federal or Commonwealth laws, rules or regulations then in effect.  In the event the Indemnifying Party under this Section 14.3 fails to reimburse the Indemnified Person hereunder for such expenses incurred by the Indemnified Person within thirty (30) Days of receipt of written notice from the Indemnified Person stating that such expenses were incurred, the Indemnified Person (or the Party associated therewith if the Indemnified Person is not a Party) may offset the amount of such expenses against amounts, if any, due under this Agreement to the Indemnifying Party from the Indemnified Person (or the Party associated therewith if the Indemnified Person is not a Party); provided that such amounts are undisputed or have been determined to be owed to the Indemnified Person by a final, non-appealable judgment or award pursuant to Section 22.13; and provided, further, that the Indemnified Person shall provide the Indemnifying Party with five (5) Business Days' advance written notice describing in reasonable detail the amounts to be set off before effecting any such set off.  In the event the Indemnifying Party Disputes that claimed expenses are due to the actions of the Indemnifying Party or its agents or employees, such Dispute shall be resolved pursuant to Section 22.13.  The indemnity provided in this Section 14.3 shall be subject to the Comparative Fault Standard and the provisions of Section 14.2.



Power Purchase and Operating Agreement - PREPA and Energy Answers
Page 44

14.4    To the extent that the Facility is otherwise ready to commence performance testing or achieve commercial operations and PREPA's own actions or failures to act directly cause delays to the commencement of such performance testing or to the Commercial Operation Date that, in either case, exceed the scheduled date for any such event by seven (7) Days, the Facility shall thereupon be deemed to have begun to deliver Net Electric Output to the Interconnection Point on a continuous basis at a capacity of 58 MW (subject to a true up after determination of the Dependable Capacity) and PREPA shall pay for such deemed Net Electric Output at the price set out in Section 11.2 and indemnify Energy Answers for any other losses that may be incurred by Energy Answers as a result of such delays until performance testing or commercial operation, as applicable, occurs.

14.5    In addition to the foregoing, to the extent that PREPA's acts or failures to act directly cause delays to Energy Answers' project schedule for the Facility (and Energy Answers' own acts or failures to act are not the primary cause for such delays) such that the Facility is not placed in-service by December 31, 2013 for purposes of the grants for specified energy property in lieu of tax credits provided under ARRA or any implementing regulations or administrative guidance thereunder, PREPA shall indemnify Energy Answers for the grants in lieu of investment tax credits to which Energy Answers would have been entitled had it achieved a placement in-service date of December 31, 2013 or earlier for purposes of ARRA and any regulations or administrative guidance thereunder and was otherwise eligible to receive the grants in lieu of investment tax credits to the fullest extent provided by law.

## ARTICLE 15.   FORCE MAJEURE

15.1    "Force Majeure" means any cause beyond the reasonable control of and not the result of the fault or negligence of the Party claiming the Force Majeure.  Except as provided in Section

Power Purchase and Operating Agreement - PREPA and Energy Answers
Page 45

15.4, the Party claiming the Force Majeure shall be excused from performing hereunder and shall not be liable for damages or otherwise to the extent the non-performance or inability to perform is due to a Force Majeure event.  The burden of proof as to whether a Force Majeure event has occurred and caused a non-performance or inability to perform shall be on the Party claiming the Force Majeure.  The suspension of performance shall be of no greater scope and of no longer duration than is required by the Force Majeure event, consistent with Prudent Utility Practices.

15.2     Provided that the provisions of Section 15.1 are met, Force Majeure events may include the following:  acts of God, strikes, industrial disturbances, acts of public enemy, war, blockades, boycotts, riots, insurrections, epidemics, earthquakes, storms, floods, civil disturbances, lockouts, fires, explosions, interruptions of services due to the act or failure to act of any governmental authority and requirements of, actions by or failures to act by any governmental authority taken after the Effective Date (including the adoption or change in any rule or regulation or environmental constraints lawfully imposed by such governmental authority) but only to the extent such requirements, actions, or failures to act prevent or delay performance; and inability, despite due diligence, to obtain any licenses, permits, or approvals required by any governmental authority.

15.3     A Party claiming excuse due to Force Majeure shall, within ten (10) Days after the occurrence of the Force Majeure, give the other Party written notice describing the particulars of the occurrence and its estimated duration and shall diligently use all reasonable efforts, consistent with Prudent Utility Practices, to remedy its inability to perform and resume in full its performance under this Agreement; provided that this obligation shall not require the settlement of any strike, walkout or other labor dispute on terms which, in the sale judgment of the Party involved in the dispute are contrary to its best interest.

Power Purchase and Operating Agreement - PREPA and Energy Answers
Page 46

15.4   Neither Party shall be excused by reason of Force Majeure from the obligation to make any

payments, when due, to the other Party.

15.5   If a Party Disputes the other Party's claim of Force Majeure, such Dispute shall be resolved

pursuant to Section 22.13.

## ARTICLE 16.   TERMINATION

16.1   Termination of this Agreement shall occur only upon:  (a) expiration of the Term of this

Agreement as provided in Article 5; (b) mutual written consent of the Parties; (c) the election

of PREPA following a Development Abandonment, Permanent Abandonment or Permanent

Closing, as provided below; (d) the election of the non-defaulting Party following the

occurrence of a Breach under Article 17; (e) the election of PREPA following delay by

Energy Answers in achieving the Commercial Operation Date by sixty (60) Months after the

Effective Date, as extended by a Force Majeure event, Pending Permits or a Legal Challenge

or any delay caused by any act or omission of PREPA, but in no event longer than eighty four

(84) Months, as extended by any delay caused by any act or omission of PREPA; (f) the

election of Energy Answers if the amendment to this Agreement contemplated in Section

22.21 is not executed within thirty (30) Days after the Effective Date; and (g) the

circumstances provided in Section 16.2.

16.2   The Parties agree that the continued effectiveness of this Agreement is dependent on Energy

Answers' determination that the Facility to be constructed in accordance with this Agreement

is financially feasible.  If Energy Answers notifies PREPA that the Facility is not financially

feasible on or before the Financial Closing Date, either Party may terminate this Agreement

without liability.

16.3   Cancellation, expiration or earlier termination of this Agreement shall not relieve the Parties of obligations incurred prior to, or as a result of, such cancellation, expiration or earlier termination of this Agreement, which by their nature should survive such events, including this Section 16.3 and Articles 13 and 14.   Without limiting the foregoing, termination of this Agreement shall not discharge either Party hereto from any obligation it owes to the other Party under this Agreement by reason of any transaction, loss, cost, damage, expense or liability which shall occur or arise (or the circumstances, events, or basis of which shall occur or arise) prior to termination.   It is the intent of the Parties hereby that any such obligation owed (whether the same shall be known or unknown at termination or whether the circumstances, events or basis of the same shall be known or unknown at termination) shall survive termination.   Any indebtedness by either Party to the other shall be considered payable within ninety (90) Days of the termination of this Agreement.



**ARTICLE 17.   BREACH OF AGREEMENT, DELAYS, AND SECURITY**

17.1   A "Breach" of this Agreement shall be deemed to exist upon any of the following events:

(a)   A default by a Party in the due and punctual payment of any monetary amount to be paid to the other Party when and as the same becomes due and payable, and the same is not cured within thirty (30) Days after the date on which the defaulting Party receives written notice from the other Party of such failure; and

(b)   Subject to Article 15, a default by a Party in the performance of, or in compliance with, any of the other terms, covenants, or conditions contained in this Agreement, and the same is not cured within one hundred twenty (120) Days after the date on which the defaulting Party receives written notice from the other Party of such failure, or such longer period (not to exceed an additional cure period of one hundred

Power Purchase and Operating Agreement - PREPA and Energy Answers
Page 48

fifty (150) Days if the default is capable of being cured and the defaulting Party is

diligently pursuing such cure).

17.2    Upon the occurrence of a Breach, the non-defaulting Party shall be entitled to invoke its

remedies under this Agreement and/or under the law.  If the other Party Disputes in writing

that a Breach by it has occurred, the Parties shall resolve the matter in the manner prescribed

in Section 22.13.

17.3    Within one hundred twenty (120) Days after the Effective Date, Energy Answers shall

provide to PREPA, at Energy Answers' sole expense, an irrevocable direct pay letter of, or

letters of credit issued by, a local bank or any other bank, which issuing bank and letters of

credit shall be subject to PREPA's approval (such approval not to be unreasonably withheld,

conditioned or delayed) in the amount of one hundred fifty thousand dollars ($150,000) (the

"Development Security").  The Development Security shall be maintained until the close of

business on the Business Day prior to the Financial Closing Date.  PREPA may make draws

on the Development Security (not to exceed the face amount thereof) to the extent that

payments under this Agreement are due and payable and undisputed by Energy Answers (or

determined to be due by a final, non-appealable judgment or award pursuant to Section

22.13) and are not paid within the time periods provided herein and PREPA provides thirty

(30) Days' written notice of such intent to draw.  In addition, upon a Development

Abandonment prior to Financial Closing that is not directly caused by PREPA's own actions

or failures to act, PREPA may draw the full undrawn amount of the Development Security

and upon such drawing, notwithstanding any other provision in this Agreement to the

contrary, Energy Answers shall be discharged and released from any obligations or liabilities

under or pursuant to this Agreement with no further action or acknowledgment necessary.

Power Purchase and Operating Agreement: PREPA and Energy Answers
Page 49

17.4    Within ninety (90) Days before the Commercial Operation Date, Energy Answers shall provide to PREPA, at Energy Answers' sole expense, an irrevocable direct pay letter of, or letters of credit issued by, a local bank or any other bank, which such issuing bank and letters of credit shall be subject to PREPA's approval, such approval not to be unreasonably withheld, conditioned or delayed, in the amount of thirty dollars ($30) per kilowatt of generating capacity (the "Operation Security"). The Operation Security shall be maintained for the Term of this Agreement. Upon a Breach under Article 17 by Energy Answers, PREPA may draw from the Operation Security required above to pay any damages PREPA may be entitled to under this Agreement; provided that PREPA either obtains (a) the written agreement of Energy Answers to the level of such damages (after giving effect to the deduction of any amounts which Energy Answers asserts are due and payable to it from PREPA but remain unpaid), or (b) obtains a judgment pursuant to the Dispute resolution mechanism provided in Section 22.13 requiring that Energy Answers pay such amount to PREPA free of any escrow or similar security arrangement. If the Operation Security will expire or cease to exist prior to such agreement or judgment and Energy Answers fails to provide a replacement Operation Security at least thirty (30) Days prior to the expiration of the then current Operation Security, PREPA may draw from the Operation Security an amount equal to the lesser of(i) PREPA's claim of damages and (ii) the remaining undrawn face amount of the Operation Security (after giving effect to the deduction of any amounts which Energy Answers has asserted to PREPA, on or before the date of such drawing, are due and payable to it from PREPA but remain unpaid); provided that PREPA places the amount so drawn in an escrow account in a bank, and pursuant to escrow arrangements reasonably acceptable to Energy Answers until the appropriate amount of damages due to PREPA (after giving effect to the aforesaid deductions, if any) is determined or, if earlier,

Case:17-03283-LTS   Doc#:14343-2   Filed:09/18/20   Entered:09/18/20 10:27:51   Desc:
Exhibit B- CONTRATO PPOA ENERGY ANSWERS   Page 52 of 89
Power Purchase and Operating Agreement - PREPA and Energy Answers

Page 50

until a replacement Operation Security is provided to PREPA (upon which issuance of a replacement Operation Security, the amounts deposited in the escrow account shall immediately be released to Energy Answers). Following such agreement or determination PREPA may draw from the escrow account (or from any replacement Operation Security) and retain amounts equal to the amount of damages, if any, determined in the aforesaid manner to be due to PREPA, and PREPA shall deliver to Energy Answers all amounts remaining in the escrow account, if any. The costs of such escrow account shall be borne by PREPA. Drawing under the Operation Security shall not be the exclusive remedy available to PREPA.

## ARTICLE 18.  TAXES AND ENVIRONMENTAL COSTS

18.1  "Taxes" shall mean any and all taxes, fees or other charges of any nature, excluding income taxes and repatriation (tollgate) taxes, that are imposed or assessed on or as a result of the ownership or operations of the Facility by federal or municipal governmental bodies or agencies responsible for implementing tax laws, rules, regulations or orders.  "Enviromnental Costs" shall mean any and all fixed and variable costs incurred by Energy Answers resulting from the imposition or assessment on or as a result of the ownership or operations of the Facility by laws, rules, regulations or orders relating to the environment issued by federal or municipal governmental bodies or agencies.  Subject to Section 22.16, Energy Answers shall be responsible for all income taxes, repatriation (tollgate) taxes, Taxes and Enviromnental Costs applicable to the construction and operation of the Facility.

18.2  Energy Answers will promptly pay and discharge all lawful Taxes, assessments and governmental charges or levies imposed upon or in respect of all or any part of its property or business, all trade accounts payable in accordance with usual and customary business terms,

and all claims for work, labor or materials which, if unpaid, might become a lien or charge upon any of its property; provided, however, that Energy Answers shall not be required to pay any such Tax, assessment, charge, levy, account payable or claim if: (a) the validity, applicability or amount thereof is being contested in good faith by appropriate actions or proceedings which will prevent the forfeiture or sale of any property of Energy Answers or any material interference with the use thereof by Energy Answers, and (b) Energy Answers shall set aside on its books reserves deemed by it to be adequate with respect thereto.

## ARTICLE 19.  INSURANCE

19.1    Energy Answers shall obtain and maintain in full force and effect during the life of this Agreement and thereafter as provided herein, policies of insurance covering all operations engaged in by this Agreement, which shall be formally agreed with insurance companies authorized to do business in Puerto Rico, and to that effect it shall provide in original certificates of insurance and endorsements, as follows:

(a)    Workman's Compensation Insurance:  Energy Answers shall provide and maintain Workmen's Compensation Insurance as required by the Workmen's Compensation Act of the Commonwealth of Puerto Rico.  Energy Answers shall also be responsible for compliance with said Workmen's Compensation Act by all his subcontractors, agents, and invitees.  Energy Answers shall furnish PREPA a certificate from the State Insurance Fund showing that all personnel employed in the work are covered by the Workmen's Compensation Insurance, in accordance with this Agreement. Imported technical personnel are exempted, as per Act of May 16, 1958 No 16. Energy Answers shall furnish evidence of such exemption and certificate from the insurance carrier covering said personnel.

Power Purchase and Operating Agreement - PREPA and Energy Answers
Page 52

(b)     Commercial General Liability Insurance:   Energy Answers shall provide and maintain Commercial General Liability Insurance with limits of $1,000,000 per occurrence and $2,000,000 aggregate.

(c)     Automobile Liability Insurance:   Energy Answers shall provide and maintain Automobile Liability Insurance with limits of $1,000,000 combined single limit covering all owned, non-owned and hired automobiles.

(d)     Excess Umbrella Liability Insurance:  Energy Answers shall provide and maintain Excess Umbrella Liability Insurance with limits of $4,000,000 per occurrence in excess of the limits of insurance provided in subparagraph (c) above.

(e)     All Risk Physical Damage Property Insurance:  Energy Answers shall provide and maintain All Risk Physical Damage Property Insurance, including machinery coverage, to cover all real and personal property of Energy Answers (including earthquake and hurricane occurrence) to one hundred percent (100%) of replacement cost to the extent available on commercially reasonable terms as determined by Energy Answers and subject to a reasonable deductible, which shall be the total responsibility of the Energy Answers.  This policy of insurance shall be placed into effect on the Commercial Operation Date.

19.2    Requirements under the Policies:   The Commercial General Liability Insurance and Automobile Liability Insurance required under this Agreement shall be endorsed to include:

(a)     As Additional Insured, using ISO Additional Insured Endorsement CG 20 26 **11 85** or a substitute providing equivalent coverage:

           Puerto Rico Electric Power Authority

           Risk Management Office

           PO Box 364267

Power Purchase and Operating Agreement - PREPA and Energy Answers

Page 53

San Juan, PR 00936-4267

(b)     A thirty (30) Days' cancellation or nonrenewable notice to be sent by certified mail

with return receipt to the above address.

(c)     An endorsement including this Agreement under contractual liability coverage and

identifying it by number, date and the Parties.

(d)     Waiver of Subrogation in favor of PREPA.

(e)     The breach of any of the Warranties or Conditions in these policies by the Contractor

shall not prejudice PREPA's rights under this policy.

19.3    Construction Facility Requirements:   The contractors and designers retained by Energy

Answers to construct the Facility (such persons, "Energy Answers C & D") shall obtain and

maintain in full force and effect before the Commencement of Construction of the Facility,

policies of insurance covering all constructions engaged in by this Agreement, which shall be



formally agreed with insurance companies authorized to do business in Puerto Rico, and to

that effect Energy Answers shall provide in the original certificate of insurance and

endorsements, as follows:

(a)     Workmen's Compensation Insurance:   Energy Answers C & D shall provide and

maintain Workmen's Compensation Insurance as required by the Workmen's

Compensation Act of the Commonwealth of Puerto Rico.   Energy Answers C & D

shall also be responsible for compliance with said Workmen's Compensation Act by

all its subcontractors, agents, and invitees.   Energy Answers C & D shall furnish

PREPA a certificate from the State Insurance Fund showing that all personnel

employed in the work are covered by the Workmen's Compensation Insurance, in

accordance with this Agreement.   Imported technical personnel are exempted, as per

Act of May 16, 1958, No. 16.  Energy Answers C & D shall furnish evidence of such

exemption and certificate from the insurance carrier covering said personnel.

(b)     Employer's Liability Insurance:  Energy Answers C & D shall provide and maintain

Employer's Liability Insurance with minimum bodily injury limits of $1,000,000 for

each employee and $1,000,000 for each accident, covering against the liability

imposed by law upon Energy Answers C & D as a result of bodily injury, by accident

or disease, including death arising out of and in the course of employment, outside of

and in the course of employment, and outside of and distinct from any claim under

the Workmen's Compensation Act of the Commonwealth of Puerto Rico.

(c)     Commercial General Liability Insurance:  Energy Answers C & D shall provide and

maintain Commercial General Liability Insurance ("CGL") with limits of $1,000,000

per occurrence and $2,000,000 aggregate.   There shall be no endorsement or

modification of the CGL limiting the scope of coverage for liability arising from

pollution, explosion, collapse, or underground property damage.  Continuing CGL

insurance shall cover liability arising from products-completed operations and

liability assumed under an insured contract for at least three (3) years following

substantial completion of the work.

(d)     Automobile Liability Insurance:  Energy Answers C & D shall provide and maintain

Automobile Liability Insurance with limits of $1,000,000 combined single limit

covering all owned, non-owned and hired automobiles.

(e)     Excess Umbrella Liability Insurance:  Energy Answers C & D shall provide and

maintain Excess Umbrella Liability Insurance with limits of $4,000,000 per

occurrence in excess of the limits of insurance provided in subparagraph (c) above.

(f)     Professional Liability Insurance:  Energy Answers C & D shall provide and maintain Professional Liability Insurance for all architectural and engineering professionals and for other insurable design, project management and construction management professionals engaged throughout the duration of the Construction Services, with a coverage limit not less than $2,000,000 each claim and in the aggregate.  Such professional liability insurance shall cover claims arising out of negligent acts, errors and omissions or breach of professional duty in connection with the professional services performed for the Facility, and shall be maintained in full force and effect during the terms of this Agreement and for a period of three (3) years after substantial completion of the Facility.

(g)     Environmental Liability Insurance:  Energy Answers C & D shall provide and maintain Environmental Liability Insurance with limits of $1,000,000 per occurrence and $2,000,000 aggregate.

(h)     Builder's Risk Insurance:  Energy Answers C & D shall provide and maintain in force Builder's Risk Insurance for the entire work.  Such insurance shall be written in an amount equal to the total contract sum as well as subsequent modifications of that sum.  The insurance shall apply on a replacement cost basis and coverage shall be written on a completed value form as follows:

(i)     The insurance as required in this Section 19.3(h) shall cover the entire work at the Facility site, and shall also cover portions of the work located away from the Facility site but intended for use at the Facility site, and shall also cover portions of the work in transit.  The policy shall include as insured property scaffolding, false work, and temporary buildings located at the Facility site.  The policy shall cover the cost of removing debris, including

Power Purchase and Operating Agreement - PREPA and Energy Answers

Page 56

(ii)     Energy Answers C & D shall provide and maintain boiler and machinery insurance, if any, required by the contract documents or by law, covering insured objects during installation and until final acceptance by PREPA. This insurance shall name as insured PREPA, Contractor and all subcontractors and sub-subcontractors in the work.

(iii)    The insurance as required above shall be written to cover all risks of physical loss except those specifically excluded in the policy, and shall inure at least against the perils of fire, lightning, explosion, windstorm or hail, smoke aircraft or vehicles, riot or civil commotion, theft, vandalism, malicious mischief, earthquake, windstorm and collapse.

(iv)     Any deductible applicable to the insurance purchased in compliance with this requirement shall be paid by Energy Answers C & D.

(v)      Waiver of Subrogation.  Energy Answers C & D waive all rights against PREPA and its officers, directors, agents, and employees for recovery for damages caused by fire and other perils to the extent covered by builders risk or property insurance purchased pursuant to the requirements of this Section 19.3(h), or any other property insurance applicable to the work.

19.4    Requirements under the Policies:   The Commercial General Liability Insurance and Automobile Liability Insurance required under this Agreement shall be endorsed to include:

(a)      As Additional Insured, using ISO Additional Insured Endorsement CG 20 26 11 85 or a substitute providing equivalent coverage:

         Puerto Rico Electric Power Authority

Power Purchase and Operating Agreement - PREPA and Energy Answers
Page 57

Risk Management Office

PO Box 364267

San Juan, PR 00926-4267

(b)    A thirty (30) Days' cancellation or nomenewable notice to be sent by certified mail
       with return receipt to the above address.

(c)    An endorsement including this Agreement under contractual liability coverage and
       identifying it by number, date and the Parties.

(d)    Waiver of Subrogation in favor of PREPA.

(e)    The breach of any of the Warranties or Conditions in these policies by the Contractor
       shall not prejudice PREPA's rights under this policy.

## ARTICLE 20.   ASSIGNMENT

20.1   This Agreement shall not be assigned or transferred by either Party without the prior written
       consent of the other Party, which consent shall not be umeasonably withheld, conditioned or
       delayed.   Any attempt to assign this Agreement without the prior written consent of the
       corresponding Party shall be void.

20.2   Notwithstanding the provisions of Section 20.1, Energy Answers shall have the right to
       assign this Agreement without PREPA's consent to the Project Lenders as partial collateral
       security in order to obtain financing or other funding.   PREPA agrees to enter into a consent
       to assignment with the Project Lenders containing terms and conditions that are customary
       for transactions of this kind and acknowledges that the Project Lenders may require certain
       modifications to this Agreement.   PREPA agrees to cooperate in good faith in this regard and
       to provide other customary and reasonable documents and acknowledgments as the Project
       Lenders may reasonably request.   In addition, Energy Answers shall have the right to assign

Power Purchase and Operating Agreement - PREPA and Energy Answers

Page 58

this Agreement to any trustee under the financing documents or corporation or partnership.

If Energy Answers shall assign this Agreement pursuant to this Section 20.2, then so long as

any such assignment, or any consolidation, modification or extension of any such assignment

shall remain outstanding, the following provisions shall apply:

(a)      Following receipt by PREPA of written notice of such assignment, PREPA shall, if

serving notice upon Energy Answers pursuant to the provisions of this Agreement,

also serve a copy of such notice upon the assignee, at the address provided in the

notice of assignment.

(b)      From and after the date that such notice has been given to an assignee, said assignee

shall have an extended period for remedying or commencing the remedy of any

alleged default, or causing the same to be remedied, equal to thirty (30) Days in

addition to the cure period given to Energy Answers pursuant to the terms of this

Agreement to remedy (or such additional period as PREPA may agree with, and for

the benefit of, the Project Lenders).  PREPA shall accept such performance by or on

behalf of such assignee as if the same had been done by Energy Answers.

(c)      The making of an assignment pursuant to the preceding provisions of this Section

shall not be deemed to constitute an assignment or transfer of this Agreement, nor

shall any assignee referred to above, as such, be deemed to be an assignee or

transferee of this Agreement so as to require such assignee, as such, to assume the

performance of any of the terms and conditions of Energy Answers to be performed

hereunder; provided, however, that the purchaser at any sale of this Agreement in any

proceeding for the foreclosure of any assignment, or the assignee or transferee of this

Agreement in any proceedings for the foreclosure of any assignment, or the assignee

or transferee of this Agreement under any instrument of assignment or transfer in lieu

Power Purchase and Operating Agreement - PREPA and Energy Answers
Page 59

ofthe foreclosure ofany assignment, shall be deemed to be an assignee or transferee within the meaning ofthis subsection and shall be deemed to have agreed to perform all of the terms, covenants and conditions on the part of Energy Answers to be performed hereunder from and after the date ofsuch purchase and assignment.

(d)  Notwithstanding any other provision ofthis Agreement, any sale ofthis Agreement in any proceeding for the foreclosure ofany assignment, or the assignment or transfer of this Agreement in lieu ofthe foreclosure ofany assignment, shall be deemed to be a permitted sale, transfer or assignment ofthis Agreement, and this Agreement shall continue in full force and effect following any such sale, transfer or assignment.

(e)  No agreement between PREPA and Energy Answers modifying, amending, canceling or surrendering this Agreement shall be effective without the prior written consent of all assignees.

(f)  Ifthis Agreement is terminated prior to the expiration ofthe Term due to a Breach by Energy Answers (in which case PREPA shall notify the Project Lenders of such termination) or if this Agreement is rejected or disaffirmed pursuant to any bankruptcy law or proceeding or other similar law or proceedings affecting creditors' rights generally with respect to a bankruptcy proceeding relating to Energy Answers or otherwise, PREPA agrees, ifthere are outstanding obligations to a Project Lender, subject to the receipt ofall necessary approvals, to enter into a new power purchase and operating agreement with the Project Lender (or its designee or nominee; provided that such designee or nominee either is controlled by the Project Lender or is approved by PREPA) for the remainder ofthe Term upon all ofthe covenants, agreements, terms, provisions and limitations ofthis Agreement, effective as ofthe date ofsuch termination.

Power Purchase and Operating Agreement – PREPA and Energy Answers
Page 60

20.3    Notwithstanding the provisions of Section 20.1, Energy Answers reserves the right to assign
all of its rights, title and interest under this Agreement to any Affiliate of Energy Answers
without the consent of PREPA, provided such Affiliate agrees to be bound by the terms of
this Agreement and to fully perform the obligations of Energy Answers hereunder.  PREPA
shaH be notified of Energy Answers' intention to assign this Agreement at least thirty (30)
Days in advance.  Upon such assignment, Energy Answers will thereafter be relieved of aH
obligations arising under this Agreement.

## ARTICLE 21.   QUALIFYING FACILITY STATUS

Energy Answers will cause the Facility to achieve status as a Qualifying Facility pursuant to
PURPA and agrees to maintain the Facility's status as a Qualifying Facility or as an Exempt
Wholesale Generator.  For the avoidance of doubt, in the event the Facility loses its status as
a Qualifying Facility pursuant to PURPA, Energy Answers shaH vigorously pursue and use
reasonable efforts to re-obtain Qualifying Facility status or qualify as an Exempt Wholesale
Generator.  Notwithstanding the above, should Energy Answers be unable to obtain such
status, this Agreement shaH remain in fuH force and effect and Energy Answers shaH comply,
in its relationship with PREPA, with aH other provisions of PURPA and the regulations
approved under PURPA by FERC or any successor applicable to the relationship between
qualifying facilities and electric utilities, in particular those provisions that protect, defend,
preserve and/or are propitious to electric utilities; provided, however, that nothing under
PURPA or the regulations thereunder shaH materiaHy adversely affect in any way the rights,
duties, and obligations of the Parties under this Agreement.

Power Purchase and Operating Agreement – PREPA and Energy Answers
Page 61

## ARTICLE 22.  MISCELLANEOUS PROVISIONS

22.1   This Agreement, including the appendices hereto, may be amended or waived only by written agreement between the Parties.  A waiver of any Breach shall extend only to the particular Breach waived and shall not limit or otherwise affect any rights that either Party may have with respect to any other or future Breach.

22.2   The failure of either Party to insist in anyone or more instances upon strict performance of any provisions of this Agreement, or to take advantage of any of its rights hereunder, shall not be construed as a waiver of any such provisions or the relinquishment of any such right or any other right hereunder, which shall remain in full force and effect, unless such waiver is in a written agreement between the Parties.

22.3   This Agreement is intended solely for the benefit of the Parties hereto and, solely to the extent rights thereto are provided in this Agreement, for the benefit of the Project Lenders as third party beneficiaries.  Nothing in this Agreement shall be construed to create any duty to, or standard of care with reference to, or any liability to, any Person not a Party to this Agreement.

22.4   No officer, employee, or agent of Energy Answers or PREPA or municipal governments shall be entitled to any share or part of this Agreement or to any benefit that may arise therefrom that would be in violation of any law, rule, regulation order, or policy of the Commonwealth of Puerto Rico or PREPA.

22.5   Prior to the execution of this Agreement, Energy Answers shall submit to PREPA a sworn statement to the effect that, as of the Effective Date, neither Energy Answers nor any of its partners, directors, officials, employees, parent company, subsidiaries or any entity that constitutes the alter ego of Energy Answers have been convicted of, nor have they pled guilty to, any crime as enumerated in Article 3 of Public Law No. 458 of December 29, 2000 of the

Power Purchase and Operating Agreement - PREPA and Energy Answers

Page 62

Commonwealth of Puerto Rico, as amended. In accordance with Article 6 of Public Law No. 458 of December 29, 2000 of the Commonwealth of Puerto Rico, as amended, Energy Answers acknowledges that its conviction or guilty plea for any of the crimes as enumerated in Article 3 of such Act shall entail, in addition to any other applicable penalty, the automatic rescission of this Agreement. In addition, but only to the extent required by Public Law No. 458, PREPA shall have the right to demand the reimbursement of payments made pursuant to this Agreement that directly result from the committed crime.

22.6    This Agreement shall not be interpreted or construed to create an association, joint venture, or partnership between the Parties or to impose any partnership obligation or liability upon either Party.  Neither Party shall have any right, power or authority to enter into any agreement or undertaking for, or act on behalf of, or to act as, or be an agent or representative of, or to otherwise bind, the other Party.

22.7    PREPA agrees to provide electric service to Energy Answers as requested by Energy Answers, at the most advantageous rate available to Energy Answers, which rates shall in no event be higher than the rates set forth in Appendix F.

22.8    Certifications:

(a)      Income Tax Certification - Energy Answers certifies and warrants that to its actual knowledge as of the Effective Date it does not owe any Taxes to the Commonwealth of Puerto Rico.  According to Letter Number 1300-13-97 issued by the Treasury Department of Puerto Rico, Energy Answers shall submit an Income Tax Filing Certificate issued by the Treasury Department of Puerto Rico, Area of Internal Revenues, assuring that Energy Answers (or any predecessor entity) has filed its past five years' Income Tax Returns thirty (30) Days prior to the Financial Closing Date. To provide such certification, Energy Answers will use the Request for Copy and/or

Certification of Income Tax Return Form issued by the Treasury Department of Puerto Rico.  Energy Answers shall also submit a Certification of Debt issued by the Treasury Department of Puerto Rico, Area of Internal Revenues.  It is expressly agreed that this condition is an essential requirement of this Agreement and if the above certification is not correct in all material respects, Energy Answers will be required to correct this deficiency.

(b)    Department of Labor and Human Resources Certification - Energy Answers certifies and warrants that as of the Effective Date it has paid to the Department of Labor and Human Resources any required employee contributions, in accordance with the Puerto Rico Employment Security Act (unemployment, temporary disability or sickness or social security for chauffeurs).  It shall also be Energy Answers' responsibility to require all its subcontractors to comply with such provisions of the Puerto Rico Employment Security Act.  It is expressly agreed that this condition is an essential requirement of this Agreement and if the above certification is not correct in all material respects, Energy Answers will be required to correct this deficiency.

(c)    Municipal Revenues Collection Center Certification - Energy Answers and all of its subcontractors must provide a certification to the Municipal Revenues Collection Center that Energy Answers and all subcontractors have, to their respective actual knowledge, paid any and all applicable property Taxes and do not owe any property Taxes.

22.9   This Agreement shall inure to the benefit of and be binding upon Energy Answers and PREPA and their respective successors and assigns.

22.10  This Agreement is intended by the Parties as the final expression of their agreement and is intended also as a complete and exclusive statement of the terms of their agreement with

Case:17-03283-LTS    Doc#:14343-2    Filed:09/18/20    Entered:09/18/20 10:27:51    Desc:
Exhibit B- CONTRATO PPOA ENERGY ANSWERS    Page 66 of 89

Power Purchase and Operating Agreement - PREPA and Energy Answers
Page 64

respect to the subject matter hereof and supersedes all prior written and oral understandings between the Parties with respect thereto.

22.11    If any provision hereof shall be held invalid, illegal or unenforceable by the holding of an arbitral authority convened pursuant to Section 22.13 or a Court of Competent Jurisdiction, such holding shall not invalidate or render unenforceable any other provision hereof.

22.12    Energy Answers certifies as of the Effective Date that to its actual knowledge it does not receive payment or benefit of any nature for services rendered regularly through an appointment to a governmental agency, body, public corporation or municipality of Puerto Rico.

22.13    Dispute Resolution:



(a)    It is the Parties' intent that disputes arising under or relating to the terms of this Agreement or the Breach, termination or validity thereof ("Dispute") be resolved as expeditiously as possible by negotiation and mutual agreement, or, failing such resolution, in accordance with the provisions set forth in this Section.  In the event of a Dispute under this Agreement, the disputing Party shall promptly provide written notice of the Dispute (a "Dispute Notice") to the other Party.  Following delivery of the Dispute Notice, the Parties shall either (i) agree to submit such Dispute to technical arbitration as provided in clause (b) below or (ii) absent such agreement, nominate a member of its respective senior management, who shall have decision-making authority on behalf of such Party, and such senior management members shall promptly meet and seek to achieve settlement, if possible, by negotiation and mutual agreement.  If the Dispute is not resolved or submitted to Technical Arbitration within forty-five (45) Days after the Dispute Notice is received by the recipient Party (or such longer period of time as may be mutually agreed by the

Power Purchase and Operating Agreement - PREPA and Energy Answers
Page 65

Parties), then either Party may submit the Dispute to mandatory arbitration, which shall be administered by the AAA in accordance with the provisions of its Commercial Arbitration Rules and the Expedited Procedures thereof, then in effect (the "Rules"). The arbitration shall be conducted by a panel of three arbitrators, one selected by each party in accordance with the Rules and the third selected by the two party appointed arbitrators within twenty Days of the appointment of the second arbitrator. Any arbitrator not timely selected shall, at the request of any party, be appointed in accordance with AAA's listing, ranking and striking process. All hearings shall be held and the award shall be rendered in San Juan, Puerto Rico.

(b)     If a Dispute hereunder is one that the Parties agree is of a technical nature that would be best resolved through technical arbitration proceedings before the Consulting Engineer, either Party may submit such Dispute (a "Technical Dispute") to binding arbitration (a "Technical Arbitration") before the Consulting Engineer in accordance with the Expedited Arbitration Rules of the AAA, then in effect, by providing to the other Party and the Consulting Engineer a written notice of arbitration, specifying the matter to be arbitrated (a "Technical Dispute Notice"). The arbitration before the Consulting Engineer shall be held in San Juan, Puerto Rico, unless otherwise agreed in writing by the Parties. Within thirty (30) Days of the engagement of the Consulting Engineer for a Technical Dispute (or such longer period of time as the Parties may mutually agree), the Consulting Engineer shall conduct a hearing; provided that the Parties may agree in writing to waive the hearing and have the Consulting Engineer reach a decision on the basis of written submissions alone. The Consulting Engineer shall render a written decision on the Technical Dispute as soon as practicable after the close of the hearing. The Consulting Engineer shall have no

Power Purchase and Operating Agreement - PREPA and Energy Answers
Page 66

authority to award damages excluded by this Agreement, the Parties hereby waiving their right, if any, to recover such excluded damages in connection with any Technical Dispute.

(c)     Any arbitration conducted pursuant to this Section 22.13 shall be governed by the Federal Arbitration Act, 9 U.S.C. § I et seq. which shall control over any local law regarding arbitration. The award rendered in any such arbitration shall be final and binding on the Parties, may be entered and enforced in any Court of Competent Jurisdiction, and shall be subject to judicial review only on the grounds contained in the Federal Arbitration Act. Unless the Consulting Engineer or arbitral panel, as applicable, decides otherwise, the expenses of the arbitration proceedings, including the expenses of the Consulting Engineer and the arbitrators, but excluding the Parties' own expenses and attorneys' fees, shall be shared equally by the Parties. The Parties are committed to the prompt and efficient resolution of Disputes. Accordingly, if one or more arbitrations (or Technical Arbitrations) are already pending with respect to a Dispute under this Agreement or any related agreement, including but not limited to the interconnection agreement for the Facility, then any Party may request that any arbitration or any new Dispute arising under this Agreement be consolidated into any prior arbitration. The new Dispute or arbitration shall be so consolidated; provided that the arbitral tribunal for the prior arbitration determines that: (i) the new Dispute or arbitration presents significant issues of law or fact common with those in the pending arbitration; (ii) no Party would be unduly prejudiced and (iii) consolidation under these circumstances would not result in undue delay for the prior arbitration. Any such order of consolidation issued by the arbitral tribunal shall be final and binding upon the Parties. The Parties waive any

Power Purchase and Operating Agreement - PREPA and Energy Answers

Page 67

right they have to appeal or to seek interpretation, revision or annulment of such order of consolidation under the AAA Rules or in any court. The arbitral tribunal for the arbitration into which a new Dispute is consolidated shall serve as the arbitral tribunal for the consolidated arbitration. The Parties agree that upon such an order of consolidation, they will promptly dismiss any arbitration brought under this Agreement or any related Agreement, the subject of which has been consolidated into another arbitral proceeding under this Agreement or related agreement.

22.14   Energy Answers certifies as of the Effective Date, to its actual knowledge, that no public employee has any personal or economic interest in this Agreement.

22.15   Energy Answers agrees to comply with the provisions of Act of June 18, 2002, No 84, which establishes a Code of Ethics for the Contractors, Suppliers and Economic Incentive Applicants of the Executive Agencies of the Commonwealth of Puerto Rico.

22.16   During the Term of this Agreement, upon and following the occurrence of any change in law, including changes in applicable Tax or environmental law, which causes an increase in Energy Answers' actual costs when supplying the products or services to be acquired by PREPA, Energy Answers shall be entitled to an adjustment to the energy payment provided under Section 11.2 to compensate Energy Answers for such increased costs.

22.17   Energy Answers shall be considered as an independent contractor, for all material purposes under this Agreement, and all Persons engaged or contracted by Energy Answers for the performance of its obligations herein, shall be considered as its employees or agents or those of its subcontractors, and not as employees or agents of PREPA.

22.18   All invoices submitted by Energy Answers shall include the following Certification in order to be processed for payment by PREPA:

No Interest Certification:

Power Purchase and Operating Agreement - PREPA and Energy Answers

Page 68

Under penalty of absolute nullity, I hereby certify that to our actual knowledge no employee, official or director of PREPA is a Party or has any interest in the profits or benefits to be obtained under this Agreement, or if any employee, official or director of PREPA has any interest in the profits or benefits under this Agreement, a waiver has been previously obtained. **I,** also certify that the only consideration to provide the services under this Agreement is the payment agreed with PREPA's authorized representative under this Agreement. The total amount of this invoice is fair and correct. The services were provided and no payment has been received for this invoice.

_____

Contractor's Signature

22.19   Any credits, environmental attributes, emissions reductions, offsets, allowances or benefits, however entitled (or payments in lieu thereof), whether monetary, fiscal or in the form of physical property, now or in the future available to the Facility, as a facility that generates electricity from renewable or non-polluting resources, to the energy produced by the Facility or to Energy Answers as the owner or operator of the Facility, in each case, from any government, regulatory agency or third party, shall inure to the benefit of and remain the property of Energy Answers. Such credits and other items referenced in the sentence above shall include any credits or other environmental attributes now or in the future available to producers of electricity from renewable energy sources, such as wind power and waste to energy projects, whether or not arising under any Renewable Portfolio Standards ("RPS'), as well as renewable energy credits ("RECs") and green tags (collectively, "Green Credits") and investment tax credits ("ITCs"), production tax credits ("PTCs") and similar credits. The

Power Purchase and Operating Agreement - PREPA and Energy Answers
Page 69

credits and other items governed by this Section 22.19 shall also include credits, benefits, allowances, offsets or environmental attributes, however entitled, under or arising from programs or auctions or other means implemented by or required of or by utilities to reduce $CO_2$ or other emissions (collectively, "ERCs").  Energy Answers retains the sole right to market and sell any such Green Credits, ERCs or other similar credits or benefits available to this Facility and to retain the proceeds therefrom, provided that Energy Answers shall be obligated to pay to PREPA an amount equal to one third (⅓) of the net revenues that Energy Answers receives in connection with any sale of such Green Credits, ERCs or other similar credits or benefits (other than any sale or disposition of ITCs, PTCs or other similar tax credits or any accelerated depreciation benefits).  For the purposes of this section, "net revenues" shall mean an amount equal to the total revenues received from a sale less any and all expenses associated with the verification, certification, transfer, sale and/or marketing of, or collection of revenues from, the Green Credits ERCs or other similar credits or benefits that are part of the transaction.

If the Commonwealth of Puerto Rico or the Federal Government enacts legislation or promulgates regulations requiring PREPA to abide by an RPS or any similar program requiring PREPA to include renewable energy in its portfolio of generation, or any law requires PREPA to comply with $CO_2$ or other emission reductions, PREPA can utilize the Green Credits produced by Energy Answers in the Facility or any ERCs claimed by or granted to Energy Answers in connection with the Facility to meet its obligations under such legislation or regulations, subject to the payment described in the following sentence, and Energy Answers shall cooperate with PREPA and shall take all steps necessary for such utilization, including without limiting the scope of the foregoing, execution of documents and participation in filings with governmental agencies.  Moreover, if the legislation

Power Purchase and Operating Agreement - PREPA and Energy Answers

Page 70

approved by the Commonwealth of Puerto Rico or the Federal Government or regulations

promulgated pursuant to any such legislation provides that the Green Credits or ERCs

available to the Facility may be used to comply with the enacted legislation or regulations

and PREPA reasonably concludes that such credits are necessary for such compliance,

Energy Answers will convey to PREPA such Green Credits or ERCs or provide to PREPA

agreed upon benefits associated therewith, in exchange for two thirds (⅔) of the lesser of (a)

any amounts in respect of the Green Credits or ERCs conveyed from Energy Answers to

PREPA that are paid or payable in respect of Green Credits or ERCs by PREPA or by any

other governmental authority having jurisdiction over such Green Credits or ERCs or (b) any

amounts or charges (measured against the number or amount of Green Credits or ERCs

conveyed by Energy Answers) that would be incurred or payable by PREPA pursuant to any

RPS or other applicable law as a result of a failure by PREPA to comply with such renewable

energy standard or similar legal requirement.  In no event shall Energy Answers be required

to transfer to PREPA any PTCs, ITCs, grants in lieu thereof or other tax benefits (or proceeds

of the foregoing) associated with the Facility or otherwise available to Energy Answers.

22.20   PREPA unconditionally and irrevocably agrees that the execution, delivery and performance

by it of this Agreement and the other project documents to which it is a party constitute

private and commercial acts.  In furtherance of the foregoing, PREPA hereby irrevocably and

unconditionally agrees that to the extent permitted by applicable law, (a) should any

proceedings be brought against PREPA or its assets in any jurisdiction in connection with

this Agreement or any of the transactions contemplated by this Agreement, no claim of

immunity from such proceedings shall be claimed by or on behalf of PREPA on behalf of

itself or any of its assets; (b) it waives any right of immunity which it or any of its assets now

has or may have in the future in any jurisdiction in connection with any such proceedings;

and (c) consents generally in respect of the enforcement of any judgment against it in any such proceedings in any jurisdiction, to the giving of any relief or the issuance of any process in connection with such proceedings, including the making, enforcement or execution against or in respect of any of its assets.

22.21   The Parties acknowledge and agree that Appendices B, D, E and G will be expanded, supplemented and modified in writing after the Effective Date and that those expanded, supplemented and modified Appendices shall become part of this Agreement without any further amendment or action required once mutual agreement on such expanded, supplemented and modified Appendices has been reached; provided that if mutual agreement regarding such expanded, supplemented and modified Appendices does not occur by the date that is thirty (30) Days after the Effective Date, Energy Answers shall have the right to terminate this Agreement with no further liability.

22.22   Counterparts.  This Agreement may be executed in any number of counterparts with the same effect as if both Parties hereto had signed the same document.  All counterparts shall be construed together and shall constitute one instrument.

## ARTICLE 23.   CHOICE **OF** LAW AND VENUE

23.1   This Agreement shall be governed by, construed and enforced in accordance with the laws of the Commonwealth of Puerto Rico and, to the extent applicable, the laws of the United States of America.  The Parties herein agree to submit themselves to the appropriate administrative body having jurisdiction over the Parties and this Agreement and to the non-exclusive jurisdiction of a Court of Competent Jurisdiction.

Power Purchase and Operating Agreement – PREPA and Energy Answers
Page 72

IN WITNESS WHEREOF, the Parties hereto have agreed to execute this Agreement in San Juan,

Puerto Rico, as of the date first written above.

PUERTO RICO ELECTRIC                    ENERGY ANSWERS ARECIBO, LLC
POWER AUTHORITY


_____          _____
Miguel A. Cordero López                 Patrick F. Mahoney      .
Executive Director                      President

**Appendix A . HOLIDAYS**

The following holidays are recognized by PREPA. **All** holidays that fall on a Sunday are observed the following day, Monday.

<u>CELEBRATION</u>

| | |
|---|---|
| January 1 | New Year's Day |
| January 6 | Three Kings Day |
| 2nd Monday in January | E.M. de Hostos |
| 3rd Monday in January | Martin Luther King |
| 3rd Monday in February | George Washington |
| March 22 | Abolition of Slavery |
| Friday of Holy Week | Good Friday |
| 3rd Monday in April | Jose de Diego |
| Last Monday in May | Memorial Day |
| July4 | Independence Day |
| 3rd Monday in July | Luis Munoz Rivera |
| 4th Monday in July | Jose Celso Barbosa |
| July 25 | Commonwealth Constitution |
| 1st Monday in September | Labor Day |
| October 12 | Columbus Day |
| November 11 | Veterans Day |
| 4th Thursday in November | Thanksgiving Day |
| December 25 | Christmas Day |

Page 1 of 1

## Appendix B . INTERCONNECTION

**Part A.  Interconnection Data.**

Seller shall provide the following information to PREPA within ninety (90) Days following the Effective Date.  Data submitted in a preliminary or estimated form shall be updated within thirty (30) Days after final equipment arrangements and specifications are established.

1. Electrical one-line diagram of the Facility.

2. Explanation of proposed equipment protection and control scheme (may be shown functionally on the one-line diagram).

3. Site plan showing plant layout, property lines, access roads and switchyard boundaries.

4. Preliminary equipment layout and arrangement for switchyard and generator step-up transformers (GSU).

5. Reactive Power Capacity curve of generators.

6. Station auxiliary load.

7. Station auxiliary transformer data -  impedance, connection winding, load loss and no load tap changer.

8. GSU impedance, load loss, no load taps changer, connection and winding.

9. Generator reactances.

    a. Saturated and unsaturated;
    b. Synchronous, transient, sub transient, and rotor mutual;
    c. Direct axis and quadrature axis.



10. Stator leakage reactances.

11. Generator Short Circuit Ratio.

12. Generator kilowatt rating.

13. Generator kilovar rating.

14. Explanation of the excitation system and the IEEE Excitation System Model including time constants, gains, limits, block diagrams, exciter saturation curves and configuration.

15. Additional data necessary for initial transient stability study.  At a minimum:

    a. H - Inertia constants of turbo generators shaft (MW-second/MVA).

    b. $R_a$ - Stator resistances of generators.

    c. Generators time constants:

        i. Open circuit and short circuit;
        ii. Transient and sub transient;
        iii. Direct axis and quadrature axis.

    d. Generator saturation curves.

    e. Explanation of the mechanical system. IEEE Turbines Governor (mechanical system) Model covering speed governing, turbine time constants, gains, limits, block diagrams, damping coefficient, droop, dead band, and configuration.

    f. Over speed protection system - purpose, model, description, setting, data, and curves (as fast valving).

    g. Any other control system model (as compensator, stabilizer and excitation limiter models), including the time constants, gains, limits, description, block diagrams and configuration.

16. Seller's requirements for power supplied by PREPA during construction and start-up.

17. Project schedule (I-J or bar chart format) including but not limited to the following milestones:



    · QF status obtained
    · Engineering 30% complete
    · One-line diagram approved
    · Financial Closing Date
    · Major licenses/permits
    · Major material procurement
    · Start Construction
    · Engineering 70% complete
    · Utility technical submittals complete
    · Operating procedures finalized
    · Start test and start-up
    · Initial synchronizing date
    · Commercial operation

18. PSSE Mathematical Model (Parameters and Data Requirements):

    The Contractor shall submit to PREPA the PSSE mathematical model with the following information and data related to the proposed units. The data shall be

submitted initially in a preliminary or estimated form. The data shall be updated and officially certified according to PREPA requirements when final field adjustments and machine parameters measurements and field tests are performed to the units by the contractor:

1. Turbo-Generators data, including but not limited to the following:

   a. MVA Base and Voltage Base
   b. MVA, MW and MVAR Ratings
   c. Voltage Ratings
   d. Inertia Constant of Turbo Generators
   e. Moment of Inertia
   f. Speed (rpm)
   g. Ra - Stator Resistances
   h. Generator Saturation Curves
   i. Reactive Power Capacity Curves
   j. Generator Short Circuit Ratio
   k. Generator Reactances
      1) Saturated and Unsaturated
      2) Synchronous, Transient, Subtransient and Rotor Mutual
      3) Direct Axis and Quadrature Axis
      4) Positive, Negative and Zero Sequence
   l. Generator Time Constants
      1) Open Circuit and Short Circuit
      2) Transient and Subtransient
      3) Direct Axis and Quadrature Axis
   m. Stator Leakage Reactances
   n. Over Speed Protection System - purpose, model, description setting, data, and curves.



2. Excitation System Data, Excitation System Dynamic Mathematical Model and Detailed Explanation.

   a. IEEE Excitation System Model, including but not limited to the time constants, gains, limits, block diagrams, exciter saturation curves and configuration.
   b. The dynamic mathematical model of the excitation system shall be fully compliant with the latest and future versions of PSS/E dynamic simulations platform.
   c. Any other control system model (as compensator, stabilizer and excitation limiter models), inclUding but not limited to the time constants, gains, limits, description, block diagrams and configuration.

3. Turbine Speed Control and Mechanical System Data, Turbine Speed Control and Mechanical System Dynamic Mathematical Model and Detailed Explanation.

a. Turbine System Model - IEEE Turbine Speed Control and Mechanical System Model, including but not limited to the speed governing, turbine time constants, gains, limits, damping coefficient, droop, dead band, block diagrams and configuration.

b. The dynamic mathematical model of the turbines system shall be fully compliant with the latest and future versions of PSS/E dynamic simulations platform.

4. Manufacturer standard assumption values, or field settable ranges, for all gains, time constants, and limits appearing in the excitation and mechanical systems block diagrams, and in any other control system.

5. Generators step up (GSU) transformers data (manufacturer test report), including but not limited to the impedance, connection, winding, MVA ratings, voltage ratings, load loss (kW) and no load tap changer.

6. Turbo-generators protective relays - purpose, description, data, and setting (as loss of field, negative-sequence, ground over current and directional relays).

7. Station auxiliary load (MW and MVAR).



8. Station auxiliary and start-up transformers data (if required), including but not limited to the impedance, connection winding, MVA ratings, voltage rating, load loss (kW) and no load tap changer.

987604.01-D.C. Server 1A - MSW

**Part B.  Description of Interconnection Facilities.**



987604.01-D.C. Server 1A - MSW

**Appendix C – Example of Price Index Calculation**

**An example of the calculation of PREPA's Energy Payment for a Billing Period follows:**

I.   **Assumptions**

1 The Net Electrical Output (NEO) for the Billing Period is 31,700,000 KWh.                                31,700,000

2 The price paid for NEO on January 1, 2009 is $0.1 O/kwh.                                                        $0.10

**3 The Price Index is as defined in paragraph 1.55 of the PPOA.**

4 The calculation of the Energy Payment is on January 1,2010.

**The average US CPI is the average U.S. Consumer Price Index – All Urban**
Consumers, Series Id:  CUUROOOSAO (Not Seasonally Adjusted, U.S. city average,
all items, Base Period 1982-1984 = 100), as pUblished by the Bureau of Labor
5 Statistics ("U.S. CPI").

6 The average US CPI from January 1,2009, to January 1,2010 = 103 = (A).                                    103.00  (A)

7 The US CPI on January 1, 2009 = 100 = (B).                                                                    100.00  (B)

8 The average US CPI Energy from January 1, 2009 to January 1, 2010 =184 =(C).                          184.00  (C)

9 The US CPI Energy on January 1, 2009 = 175 = (0).                                                            175.00  (0)

II.   **Calculation of the Price Index**

PI = A/B (0.88) + C/O (0.12)

PI = 103/100' 0.88 + 184/175' 0.12

                                                                PI =   1.032571429          1.03257

III.   **Calculation of the Energy Payment for the Billing Period**

EP = $0.10 * NEO * PI

EP = $0.10' 31,700,000 '1.03257

                                                                EP =  $3,273,251.43      $3,273,251.43



## Appendix D . MACHINE PARAMETERS MEASUREMENTS AND FIELD TESTS REQUIREMENTS

Energy Answers shall perform on-site machine parameters measurements and field tests for the identification, development and validation of the dynamic mathematical models and parameters required by PREPA for the synchronous generator, excitation system and turbine speed control and mechanical systems. Tests shall be conducted according to standardized procedures established by companies with worldwide technical expertise in the performance of machine parameters measurements and field tests for developing, improving and validating dynamic mathematical models for synchronous generators, excitation systems and turbine speed control and mechanical systems. The test procedures for the machine parameters measurements and field tests shall be submitted to PREPA officials for evaluation and final approval at least three months in advance before the test's date.

Energy Answers shall coordinate with PREPA officials meetings and presentations to discuss the specific aspects related to the planning and performance of the machine parameters measurements and field tests. Energy Answers shall coordinate with PREPA officials for the witnessing of the machine parameters measurements and field tests. The field data and graphs accumulated by the installed data acquisition measuring systems (DSM, AQX, DeS, etc.) shall be stored in digital media and submitted to PREPA as part of the acceptance tests and validation process. After completion of the field machine parameters measurement tests, Energy Answers shall coordinate with PREPA officials for the on-site witnessing of the mathematical model development process. Energy Answers shall submit to PREPA a comprehensive official final report with the field test results data and graphs. The document shall include a thorough description of the machine parameters measurements and field tests performed as well as correlated technical explanations for each one of the test steps and results.

The dynamic mathematical models (for synchronous generator, excitation system and turbine speed control and mechanical syste'm) developed from the machine parameters measurements and field tests shall be compliant with the latest and future versions of PSS/E. After completion of the field machine parameters measurement tests, Energy Answers shall coordinate with PREPA officials for the on-site witnessing of the mathematical model development process. The on-site witnessing of the mathematical model development process shall include the direct participation of at least two PREPA engineers during the analysis and simulations required by the mathematical model developers. Energy Answers shall submit to PREPA a written official certification from Power Technologies International (developers of PSS/E) that establishes the mathematical models and parameters full compliance with PSS/E dynamic simulations platform. The final mathematical models of the synchronous generator, excitation system and turbine speed control and mechanical system shall be submitted to PREPA officials for evaluation and approval.

987541.01-D.C. Server IA - MSW

If the mathematical models developed from the machine parameters measurements and field tests are not compliant with any dynamic mathematical model available at the PSSE dynamic models library, Energy Answers shall be responsible for the development of mathematical models (for synchronous generator, excitation system, turbine speed control and mechanical system) compatible with the latest and future versions of PSS/E dynamic simulations software package. These models shall be tested, validated and approved by Power Technologies International previous to its submittal to PREPA. Energy Answers shall submit a written official certification from Power Technologies International that establishes the full compliance of any user written mathematical models developed or derived from the machine parameters measurements with the latest and future versions of PSS/E dynamic simulations software platform.



987541.01-D.C. Server 1A - MSW

Appendix E • TECHNICAL SPECIFICATION FOR DYNAMIC SYSTEM MONITOR

1. Introduction

The following specification defines the minimum requirements for an instrument used in the monitoring and register of dynamic disturbances on electric power systems and are subject to revision upon notice from PREPA as described in the relevant sections of the Power Purchase and Operating Agreement between Energy Answers and PREPA.

2. Hardware

2.1 Inputs

2.1.1 The equipment shall have at least 32 analog inputs with a minimum resolution of 16 bit for the AID converter and minimum sampling rate of 1000 samples/second.   The analog inputs shall permit at least the following types of signals:

a. Seven (7) ac voltages (125 V rms minimum)
b. Six (6) ac currents ( 5 A rms minimum)
c. Two (2) dc voltages of at least 800 V
d. Two (2) dc signals of the range of 0 -  100 mV
e. Fifteen (15) dc signals of the range of 0 -  20 mA

2.1.2 The equipment shall have at least 16 digital inputs.  The minimum input voltage range of the digital inputs should be 0 - 250 V.  The digital inputs should be included as a user defined software triggering input.

2.1.3 The equipment shall be able to record power system frequency with a resolution of at least 0.001 Hz.

2.2 The equipment shall have a built-in microprocessing unit with color monitor, keyboard and mouse from which all commands, controls and setup parameters may be entered.  All setup parameters shall be store in a non-volatile media, to prevent loss of setup data if power is interrupted.  This microprocessing unit shall be of industrial grade to insure long life in a typical substation or generation plant environment.

2.3 Memory and storage capacity

The equipment shall have a solid state memory (hard disk or flash) with the required capacity to store at least 500 events of at least 2 minutes of length (each) with one cycle of resolution.

The equipment shall maintain the date and time in an internal battery-backed clock.



2.4  The equipment shall have an Ethernet *10/100* Mbps port (LAN interface) for local or remote network communication.

2.5  Power Source

The equipment shall operate from a voltage source of 120 Vac $\pm$ 10%, 60 Hz.

2.6  Signal Conditioning modules

The equipment should have modules with the capacity of perform basic filtering functions like low-pass, high-pass, band-pass and band-stop.  Also the modules shall have the capacity of perform adjustable attenuation and gain of the signals.

2.7  Measurement accuracy

2.7.1  Voltage measurement error shall be less than $\pm$ 1 % of reading

2.7.2  Current measurement error shall be less than $\pm$1% of reading

## 3. Software

3.1  The software platform of the equipment shall be Windows and shall be compatible with the latest version of windows operation systems.

3.2  The equipment remote communication shall be thru TCP/IP network connectivity (LAN).  The remote communication should permit at least the set up and data retrieval of the equipment.   The equipment should have the capability to perform at least the following functions remotely:

Modification of the configuration
Retrieval of captured events
Remote event triggering

3.3  The equipment shall have the capacity of time synchronization with GPS system via a network time server.  Optionally the equipment could have an IRIG-B serial time code interface for the GPS synchronization.

3.4  Triggers

3.4.1  The equipment shall support user defined programmable triggers.  Triggering shall be initiated based upon primary quantities (voltage, current, and frequency), calculated quantities (watts, Var, power factor, etc), or digital signals.

3.4.2  The trigger thresholds shall be based upon the following:
Level threshold (high level, low level, in-band, out-band, etc)
Rate of change (ex. frequency variation (df/dt))

Manual input (keyboard trigger)
Request from remote computer
Event input status (digital signal)

3.4.3   A re-trigger function shall be available that permits the equipment to generate a new event register if a second disturbance is detected while the recording of the first disturbance is still in process.  This process should continue if more disturbances occur in the new registers.

3.5   The acquisition software shall include a user selectable pre-trigger interval option as well as a user defined post trigger interval for the information captured.  The range of the pre-trigger interval should be from 0 to 60 seconds and the range for the post trigger interval should be of at least 0 to 120 seconds.  In addition, the date, time, and type of trigger that initiated the event shall be included as part of the disturbance record.

3.6   The acquisition software shall have the following capabilities:

Time displays (ex. Oscilloscope)
Multiple displays in real-time and multiple signals in displays
Display resizing in real time
Programmable conversion of range and units of signals
Independent range for signals

3.7   The acquired data shall be available in a format directly compatible with Siemens Power Technologies International (Siemens PTI) PSS/E plotting software.

3.8   The software shall support data export in ASCII, CSV and PSS/E formats.

3.9   The software shall support image export in JPG, BMP and GIF formats.

3.10   The software shall have the following analysis capabilities for the data and signals (actual and calculated):



Fast Fourier Transform (FFT)
Peak analysis
Filter functions
Series and scalar mathematic (square root, inversion, square, gain, offset, etc)

3.11   The software shall performs the following power engineering calculations and measurements:

-   Three phase and single phase Power (Real, reactive, apparent)
Power Factor
Power angle

Page 3 of 4

- rms line and phase voltage
- rms current
- Power system frequency
- DC voltage and currents

## 4. General

### 4.1 Environmental Conditions

4.1.1  Operating temperature:  0° C to 50° C

4.1.2  Operating humidity:  95 %, non-condensing

### 4.2  Equipment cabinet and corresponding accessories

The cabinet should have test switches at the front of the panel for the three phase voltages and currents of two generators and a phase A voltage of the bus.  The test switches should have a minimum rating of 600 V rms and 30 A rms; semi flush mounted, back connected, equal or similar to ABB FT-1, style no. 129A514G01.

The signals (analog and digital) should terminate on terminal blocks inside the cabinet, before the connection to the Dynamic System Monitor.  The AC, DC, digital, exciter voltage and exciter current signals should be in different terminal blocks.  The terminal blocks should have a minimum rating of 600 V rms and 30 A rms (**except the exciter voltages signals**, see below).  Examples of terminal blocks are:  GE CR151B2 and Marathon 1512 STD.  The current signals should terminate on shorting type heavy duty terminal blocks equal or similar to Marathon, catalog number 1506SC.  The terminal blocks used for the excitation voltage of the generators must have a nominal voltage capacity greater than 800 V DC.  A switch or breaker for isolation purposes is also required for the excitation voltage signals.

### 4.3  Documentation

4.3.1  The equipment shall include a documentation package that contains the user, operation and maintenance manuals and the mechanical and electrical equipment drawings.  The documentation should be in hard copy and in digital format.

4.3.2  The equipment documentation shall include a copy of the software.

### 4.4  Warranty

The equipment warranty shall include part and service for a period not less than 36 months from the delivery day.

987537.1A-D.C. Server 1A - MSW

## Appendix G . DESIGN LIMITS

Objective

This Appendix specifies the Design Limits applicable to the Facility.

ll   Design Limits

The Facility will consist of 2 Babcock Power, Inc., spreader-stoker boilers, each with a design heat input rate of 450 MMBtu/hr, which translates to an approximate Processed Refuse Fuel feed rate of 1,000 tons per day, each.   Steam from the boilers will be introduced into a nominal 66 MW turbine generator capable of passing and condensing the full amount of steam, less bleed for in-plant usage. The following are preliminary Design Limits specifications for the Facility.  They are subject to revision after final equipment selection.

1. Rated power              _____ kW
2. Rated voltage            _____ V
3. Rated frequency          _____ HZ
4. Step-Up Transformer

   • Connection             _____ V(Y-grounded) *l*              kV(delta)
   • Capacity               _____ MVA
   • Impedance              Z =            %, XIR ratio of          _
                            Z= _____ +j _____ %
   • No-load taps at        _____ %, 0, +          %

5. Frequency Trip Time

   • _____ _____ Hz                tripping (_          )
   • _____ _____ Hz          _____ sec
   • _____ _____ Hz          _____ sec
   
   • <         or >          Hz   Instantaneous trip

6. Voltage range (%)        Trip time (s)

   • 115 - 130              0.1
   • 110-115                1.0
   • 90 - 110               Continuous operation

Page 1 of 2

987530.1A-D.C. Server 1A - MSW

- 85 - 90                600
- 75 - 85*               10
- 70 - 75*               1
- 0-70                Instantaneous

\* With reduced output.

7. Protection

The Facility comes with a multi-functional relay with the following protection functions:

- Overvoltage (              )
- Undervoltage (              )
- Overfrequency (              )
- Underfrequency (              )
- Voltage imbalance (              )

Additionally, the main circuit breaker              provides overcurrent protection

(              ) and comes with instantaneous, short-time and long-time settings.



987530.1A-D.C. Server IA - MSW