# **EXHIBIT B**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

----------------------------------------------------------x

In re:                                                    PROMESA
                                                          Title III
THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO
RICO,

     as representative of                               No. 17 BK 3283-LTS

THE COMMONWEALTH OF PUERTO RICO                           (Jointly Administered)
et al.,

         Debtors.[1]
----------------------------------------------------------x

In re:                                                    PROMESA
                                                          Title III
THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO,

     as representative of                               No. 17 BK 3567-LTS

PUERTO RICO HIGHWAYS AND
TRANSPORTATION AUTHORITY,

         Debtor.
----------------------------------------------------------x

OPINION AND ORDER IN CONNECTION WITH PRELIMINARY HEARING REGARDING MOTION
OF ASSURED GUARANTY CORP., ASSURED GUARANTY MUNICIPAL CORP., AMBAC
ASSURANCE CORPORATION, NATIONAL PUBLIC FINANCE GUARANTEE CORPORATION,
AND FINANCIAL GUARANTY INSURANCE COMPANY FOR RELIEF FROM AUTOMATIC
STAY, OR, IN THE ALTERNATIVE, ADEQUATE PROTECTION (DOCKET ENTRY NO. 10102)

---

[1]    The Debtors in these Title III Cases, along with each Debtor's respective Title III case number
and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are
the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK-3283-LTS) (Last Four Digits
of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA")
(Bankruptcy Case No. 17-BK-3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto
Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-LTS)
(Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the
Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-
LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority
("PREPA") (Bankruptcy Case No. 17-BK-4780-LTS) (Last Four Digits of Federal Tax ID:
3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-
5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as
Bankruptcy Case numbers due to software limitations).

APPEARANCES:

FERRAIUOLI LLC

By:    Roberto Cámara-Fuertes
       Sonia Colón
221 Ponce de León Avenue, 5th Floor
San Juan, PR 00917

MILBANK LLP

By:    Dennis F. Dunne
       Atara Miller
       Grant R. Mainland
       John J. Hughes, III
55 Hudson Yards
New York, NY 10001

ARENT FOX LLP

By:    David L. Dubrow
       Mark A. Angelov
1301 Avenue of the Americas
New York, NY 10019

*and*

    Randall A. Brater
1717 K Street, NW
Washington, DC 20006

*Attorneys for Ambac Assurance Corporation*

REXACH & PICÓ, CSP

By:    María E. Picó
802 Ave. Fernández Juncos
San Juan, PR 00907

BUTLER SNOW LLP

By:    Martin A. Sosland
5430 LBJ Freeway, Suite 1200
Dallas, TX 75240

*and*

    Jason W. Callen
150 3rd Ave., S., Suite 1600
Nashville, TN 37201

*Attorneys for Financial Guaranty Insurance
Company*

O'NEILL & BORGES LLC

By:    Hermann D. Bauer
250 Muñoz Rivera Avenue, Suite 800
San Juan, PR 00918-1813

PROSKAUER ROSE LLP

By:    Martin J. Bienenstock
       Brian S. Rosen
       Ehud Barak
       Daniel S. Desantik
Eleven Times Square
New York, NY 10036

*and*

    Michael A. Firestein
    Lary Alan Rappaport
2029 Century Park East, Suite 2400
Los Angeles, CA 90067

*Attorneys for the Financial Oversight and
Management Board for Puerto Rico*

MARINI PIETRANTONI MUÑIZ LLC

By:    Luis C. Marini-Biaggi
       Carolina Velaz-Rivero
250 Ponce de León Avenue, Suite 900
San Juan, PR 00918

O'MELVENY & MYERS LLP

By:    John J. Rapisardi
7 Times Square
New York, NY 10036

*and*

    Peter Friedman
1625 Eye Street, NW
Washington, DC 20006

*and*

    Elizabeth L. McKeen
    Ashley M. Pavel
610 Newport Center Drive, 17th Floor
Newport Beach, CA 92660

*Attorneys for the Puerto Rico Fiscal Agency
and Financial Advisory Authority*

CASELLAS ALCOVER & BURGOS P.S.C.

By:    Heriberto Burgos Pérez
       Ricardo F. Casellas-Sánchez
       Diana Pérez-Seda
P.O. Box 364924
San Juan, PR 00936

CADWALADER, WICKERSHAM & TAFT LLP

By:    Howard R. Hawkins, Jr.
       Mark C. Ellenberg
       William J. Natbony
       Ellen M. Halstead
       Thomas J. Curtin
       Casey J. Servais
200 Liberty Street
New York, NY 10281

*Attorneys for Assured Guaranty Corp. and Assured Guaranty Municipal Corp.*

C. CONDE & ASSOC. LAW OFFICES
By:    Carmen D. Conde Torres
254 San José Street, Suite 5
San Juan, PR 00901-1523

ORRICK, HERRINGTON & SUTCLIFFE LLP

By:    Douglas S. Mintz
1152 15th Street, N.W.
Washington, DC 20005-1706

      *and*

      Laura Metzger
      Peter Amend
      David Litterine-Kaufman
      Monica Perrigino
51 West 52nd Street
New York, NY 10019

*Attorneys for Cantor-Katz Collateral Monitor LLC, as Collateral Monitor for GDB Debt Recovery Authority*

CASILLAS, SANTIAGO & TORRES LLC

By:    Juan J. Casillas Ayala
       Israel Fernández Rodríguez
       Juan C. Nieves González
       Cristina B. Fernández Niggemann
P.O. Box 195075
San Juan, PR 00919

PAUL HASTINGS LLP
By:    Luc A. Despins
       James R. Bliss
       James B. Worthington
       G. Alexander Bongartz
200 Park Avenue
New York, NY 10166

*Attorneys for the Official Committee of Unsecured Creditors*

MCCONNELL VALDÉS LLC

By:    Arturo J. García-Solá
       Alejandro J. Cepeda-Diaz
       Nayuan Zouairabani
270 Muñoz Rivera Avenue, Suite 7
Hato Rey, PR 00918
PO Box 364225
San Juan, PR 00936-4225

*Attorneys for AmeriNational Community Services, LLC as servicer for the GDB Debt Recovery Authority*

LAURA TAYLOR SWAIN, United States District Judge

Before the Court is the *Motion of Assured Guaranty Corp., Assured Guaranty Municipal Corp., Ambac Assurance Corporation, National Public Finance Guarantee Corporation, and Financial Guaranty Insurance Company for Relief from the Automatic Stay, or, in the Alternative, Adequate Protection* (Docket Entry No. 10102 in Case No. 17-3283 and Docket Entry No. 673 in Case No. 17-3567, the "HTA Stay Relief Motion"),[2] filed by Assured Guaranty Corp., Assured Guaranty Municipal Corp., Ambac Assurance Corporation, National Public Finance Guarantee Corporation, and Financial Guaranty Insurance Company (together, the "HTA Movants"). The HTA Movants seek relief from the automatic stay, imposed by section 362 of the Bankruptcy Code,[3] to permit them to seek to apply certain revenues collected by the Commonwealth of Puerto Rico (the "Commonwealth" or "Puerto Rico") and the Puerto Rico Highways and Transportation Authority ("HTA" and, together with the Commonwealth, the "Title III Debtors") to the payment of claims on account of certain bonds issued by HTA. The HTA Movants proffer several legal theories pursuant to which they claim rights to the revenues, including that certain of the revenues are held by the Commonwealth in trust for the benefit of the holders of HTA's bonds (the "Bondholders"), that the revenues are subject to security interests pursuant to certain bond resolutions and a security agreement, and that the revenues are subject to statutory liens imposed by Commonwealth statutes.

The Court held a preliminary hearing on the HTA Stay Relief Motion on June 4, 2020 (the "Preliminary Stay Relief Hearing"). Pursuant to a prior order entered by the Court, the

---

[2]   All docket entry references herein are to entries in Case No. 17-3283, unless otherwise specified.

[3]   The provisions of the Bankruptcy Code cited herein are made applicable in these Title III cases by section 301(a) of the Puerto Rico Oversight, Management, and Economic Stability Act ("PROMESA"). See 48 U.S.C. § 2161(a).

issues to be addressed at the Preliminary Stay Relief Hearing concerned only "whether the

movants have standing to sue and security or other property interests in the relevant revenues."

(*Final Case Management Order for Revenue Bonds*, Docket Entry No. 12186.) The Court has

considered the HTA Stay Relief Motion and all of the arguments and submissions made in

connection with the HTA Stay Relief Motion by the HTA Movants, the Financial Oversight and

Management Board for Puerto Rico (the "Oversight Board"), the Puerto Rico Fiscal Agency and

Financial Advisory Authority ("AAFAF"), the Official Committee of Unsecured Creditors (the

"Committee"), AmeriNational Community Services, LLC, as servicer for the GDB Debt

Recovery Authority, and Cantor-Katz Collateral Monitor LLC, as Collateral Monitor for GDB

Debt Recovery Authority (together, the "DRA Parties," and, together with the HTA Movants, the

Oversight Board, AAFAF, and the Committee, the "Parties").[4]  The Court has subject matter

---

[4]      In addition to the HTA Stay Relief Motion, the Court has carefully reviewed the
following pleadings: *Opposition of Financial Oversight and Management Board for
Puerto Rico to Motion of Assured Guaranty Corp., Assured Guaranty Municipal Corp.,
Ambac Assurance Corporation, National Public Finance Guarantee Corporation, and
Financial Guaranty Insurance Company for Relief from Automatic Stay, or, in the
Alternative, Adequate Protection [ECF No. 673]* (Docket Entry No. 10618, the "FOMB
Opposition"); *Partial Joinder of Official Committee of Unsecured Creditors in Support of
Opposition of Financial Oversight and Management Board for Puerto Rico to Motion of
Assured Guaranty Corp., Assured Guaranty Municipal Corp., Ambac Assurance
Corporation, National Public Finance Guarantee Corporation, and Financial Guaranty
Insurance Company for Relief from Automatic Stay, or, in the Alternative, Adequate
Protection [ECF No. 673]* (Docket Entry No. 10634); *AAFAF's Limited Joinder to the
Opposition of Financial Oversight and Management Board for Puerto Rico to Motion of
Assured Guaranty Corp., Assured Guaranty Municipal Corp., Ambac Assurance
Corporation, National Public Finance Guarantee Corporation, and Financial Guaranty
Insurance Company for Relief from Automatic Stay, or, in the Alternative, Adequate
Protection [ECF No. 673]* (Docket Entry No. 10639); *DRA Parties' Opening Response to
(i) Motion of Assured Guaranty Corp., Assured Guaranty Municipal Corp., Ambac
Assurance Corporation, National Public Finance Guarantee Corporation, and Financial
Guaranty Insurance Company for Relief from Automatic Stay, or, in the Alternative,
Adequate Protection [Dkt. No. 10102], and (ii) Opposition of Financial Oversight and
Management Board for Puerto Rico to Motion of Assured Guaranty Corp., Assured
Guaranty Municipal Corp., Ambac Assurance Corporation, National Public Finance*

*Guarantee Corporation, and Financial Guaranty Insurance Company for Relief from
Automatic Stay, or, in the Alternative, Adequate Protection [Dkt. No. 10613]* (Docket
Entry No. 12396); *Response and Reservation of Rights of Assured Guaranty Corp.,
Assured Guaranty Municipal Corp., Ambac Assurance Corporation, National Public
Finance Guarantee Corporation, and Financial Guaranty Insurance Company
Regarding DRA Parties' Response to (i) Monolines' Motion for Relief from the
Automatic Stay and (ii) Opposition of Financial Oversight and Management Board*
(Docket Entry No. 12491); *The Financial Oversight and Management Board's Response
to DRA Parties' Opening Response to (i) Motion of Assured Guaranty Corp., Assured
Guaranty Municipal Corp., Ambac Assurance Corporation, National Public Finance
Guarantee Corporation, and Financial Guaranty Insurance Company for Relief from
Automatic Stay, or, in the Alternative, Adequate Protection [Dkt. No. 10102], and (ii)
Opposition of Financial Oversight and Management Board for Puerto Rico to Motion of
Assured Guaranty Corp., Assured Guaranty Municipal Corp., Ambac Assurance
Corporation, National Public Finance Guarantee Corporation, and Financial Guaranty
Insurance Company for Relief from Automatic Stay, or, in the Alternative, Adequate
Protection [Dkt. No. 10613]* (Docket Entry No. 12496); *Limited Joinder of Official
Committee of Unsecured Creditors in Support of the Financial Oversight and
Management Board's Response to DRA Parties' Opening Response to (i) Motion of
Assured Guaranty Corp., Assured Guaranty Municipal Corp., Ambac Assurance
Corporation, National Public Finance Guarantee Corporation, and Financial Guaranty
Insurance Company for Relief from Automatic Stay, or, in the Alternative, Adequate
Protection [Dkt. No. 10102], and (ii) Opposition of Financial Oversight and
Management Board for Puerto Rico to Motion of Assured Guaranty Corp., Assured
Guaranty Municipal Corp., Ambac Assurance Corporation, National Public Finance
Guarantee Corporation, and Financial Guaranty Insurance Company for Relief from
Automatic Stay, or, in the Alternative, Adequate Protection [Dkt. No. 10613]* (Docket
Entry No. 12500); *Reply in Support of Motion of Assured Guaranty Corp., Assured
Guaranty Municipal Corp., Ambac Assurance Corporation, National Public Finance
Guarantee Corporation, and Financial Guaranty Insurance Company for Relief from the
Automatic Stay, or, in the Alternative, Adequate Protection* (Docket Entry No. 12996, the
"Reply"); *DRA Parties' Reply to (i) the Financial Oversight and Management Board's
Response to DRA Parties' Opening Response, and (ii) Limited Joinder of Official
Committee of Unsecured Creditors in Support of Financial Oversight and Management
Board's Response to DRA Parties' Opening Brief* (Docket Entry No. 12999); *Sur-Reply
of Financial Oversight and Management Board for Puerto Rico in Opposition to Motion
of Assured Guaranty Corp., Assured Guaranty Municipal Corp., Ambac Assurance
Corporation, National Public Finance Guarantee Corporation, and Financial Guaranty
Insurance Company for Relief from Automatic Stay, or, in the Alternative, Adequate
Protection* (Docket Entry No. 13157, the "Sur-Reply"); *Response of Assured Guaranty
Corp., Assured Guaranty Municipal Corp., Ambac Assurance Corporation, National
Public Finance Guarantee Corporation, and Financial Guaranty Insurance Company to
Sur-Reply of Financial Oversight and Management Board for Puerto Rico in Opposition
to Motion of Assured Guaranty Corp., Assured Guaranty Municipal Corp., Ambac
Assurance Corporation, National Public Finance Guarantee Corporation, and Financial*

jurisdiction of this contested matter pursuant to 48 U.S.C. § 2166(a). For the reasons that follow, the Court concludes that the HTA Movants have not made the preliminary showing necessary to allow the HTA Stay Relief Motion to proceed to a final hearing to the extent that the HTA Stay Relief Motion seeks stay relief or adequate protection with respect to liens or other property interests in Revenues other than those that have been deposited in the Resolution Funds (as defined herein).

## I.

### BACKGROUND

The following facts are undisputed, unless otherwise indicated.

### A. The HTA Enabling Act and the Bond Resolutions

HTA was established as a public corporation by Act No. 74-1965 to facilitate the construction and maintenance of roads and other transportation infrastructure. See 9 L.P.R.A. § 2002. Pursuant to its enabling act (the "HTA Enabling Act"), HTA is statutorily authorized to issue bonds and to secure payment of its bond obligations by, "subject to the provisions of § 8 of Art. VI of the Constitution of the Commonwealth, pledg[ing] to the payment of said bonds and

---

*Guaranty Insurance Company for Relief from Automatic Stay, or, in the Alternative, Adequate Protection* (Docket Entry No. 13223, the "Sur-Sur-Reply"); *DRA Parties' Response to the FOMB's Sur-Reply [Dkt. No. 13157]* (Docket Entry No. 13226); *Informative Motion of HTA Movants Submitting 2002 HTA Bonds' Closing Transcript and Related Documentation* (Docket Entry No. 13377, the "Informative Motion"); *Response of Financial Oversight and Management Board for Puerto Rico to Informative Motion of HTA Movants Submitting 2002 HTA Bonds' Closing Transcript and Related Documentation* (Docket Entry No. 841 in Case No. 17-3567, the "Informative Motion Response"); and *Reply to Oversight Board's Response to Informative Motion of HTA Movants Submitting 2002 HTA Bonds' Closing Transcript and Related Documentation* (Docket Entry No. 13397, the "Informative Motion Reply"). The Court has also reviewed the declarations and exhibits filed in connection with the aforementioned pleadings as well as the *Joint Informative Motion Regarding the Treatment of Exhibits Submitted in Connection with the Lift Stay Motions* (Docket Entry No. 13413).

interest thereon, the proceeds of any tax or other funds which may be made available to the Authority by the Commonwealth." 9 L.P.R.A. § 2004(l).

Pursuant to its authority, HTA has issued bonds (the "Bonds") pursuant to Resolution No. 68-18 (Docket Entry No. 10107-2, the "1968 Resolution"), adopted June 13, 1968, and Resolution No. 98-06 (Docket Entry No. 10107-3, the "1998 Resolution" and, together with the 1968 Resolution, the "Bond Resolutions"), adopted February 26, 1998.

The Bond Resolutions and certain statutory provisions adopted by the Commonwealth in connection with HTA's bond issuances contemplated that certain revenues would provide a source of funds for the repayment of the Bonds. Those revenues include certain toll revenues collected by HTA (the "Toll Revenues") and certain taxes and fees levied and collected by the Commonwealth, including certain excise taxes on fuel, crude oil, oil byproducts, and hydrocarbon mixtures, certain cigarette excise taxes, and certain motor vehicle license fees (collectively, "Excise Tax Revenues," and, together with Toll Revenues, the "Revenues"). (Mot. ¶ 5; FOMB Opp. ¶¶ 37-38.)[5]

---

[5] The 1968 Resolution defines "Revenues" as

> (a) all moneys received by the Authority on account of gasoline tax allocated to the Authority by Act No. 75, approved June 23, 1965; (b) Toll Revenues; (c) the proceeds of any other taxes, fees or charges which the Legislature of Puerto Rico has allocated or may hereafter allocate to the Authority and expressly authorize the Authority to pledge to the payment of the principal of and interest on Bonds or other obligations of the Authority and which are pledged by the Authority to the payment of the principal and interest on Bonds or other obligations issued under the provisions of this Resolution; provided that written notice of such pledge has been delivered to Standard & Poor's Corporation, Moody's Investors Service, Inc. and any other rating agency then rating the bonds; and (d) investment earnings on deposit to the credit of the funds and accounts established hereunder, except for the Construction Fund.

Each of the Bond Resolutions contemplates appointment of a "bank or trust company appointed by" HTA to serve as fiscal agent (the "Fiscal Agent").  (1968 Resolution at 5; 1998 Resolution at 7.)  Section 401 of each of the Bond Resolutions[6] provides for the creation of certain special funds with enumerated sub-accounts (collectively, the "Resolution Funds")—held by the Fiscal Agent—and each contains a covenant requiring HTA to deposit the Revenues into the Resolution Funds monthly.  Section 401 of each of the Bond Resolutions further provides that

> The moneys in said Funds and Accounts [i.e., the Resolution Funds] shall be held by the Fiscal Agent in trust and applied as hereinafter provided with regard to each such Fund and Account and, pending such application, shall be subject to a lien and charge in favor of the holders of the bonds issued and outstanding under this Resolution and for the further security of such holders until paid out or transferred as herein provided.

(1968 Resolution at 11.)  The 1998 Resolution defines "Revenues" as

> [A]ll moneys received by the Authority on account of the crude oil tax allocated to the Authority by Act No. 34, approved July 16, 1997, as amended, all Existing Tax and Fee Revenues upon the repeal and cancellation of the 1968 Resolution, any tolls or other charges imposed by the Authority for the use of any of the Toll Facilities other than Existing Toll Facilities Revenues received by the Authority prior to the repeal and cancellation of the 1968 Resolution, the proceeds of any other taxes, fees or charges which the Legislature of Puerto Rico may hereafter allocate to the Authority and expressly authorize the Authority to pledge to the payment of the principal of and interest on bonds or other obligations of the Authority and which are pledged by the Authority to the payment of the principal of and interest on bonds or other obligations issued under the provisions of this Resolution, and investment earnings on deposits to the credit of funds and accounts established hereunder, except for the Construction Fund.

(1998 Resolution at 13.)

---

[6]  Section 401 of the 1968 Resolution is similar, but not identical, to section 401 of the 1998 Resolution.  Neither the Court nor the parties have identified differences between the two provisions that are material for purposes of the Preliminary Stay Relief Hearing.

(1968 Resolution at 41; 1998 Resolution at 47.)[7] It is undisputed by the Parties that section 401 of each Bond Resolution thereby provides a lien on the Revenues transferred into the Resolution Funds created pursuant to the Bond Resolutions.

Pursuant to section 406 of the 1968 Resolution and section 410 and 411 of the 1998 Resolution, "moneys held for the credit of" the Resolution Funds "shall be held in trust and disbursed by the Fiscal Agent" for payment of the interest, principal and purchase or redemption price of the Bonds, "and such moneys are hereby pledged to and charged with the payments mentioned in this Section." (1968 Resolution at 46; 1998 Resolution at 55.) Section 501 of each of the Bond Resolutions provides that the "moneys deposited with the Fiscal Agent under the provisions" thereof "shall be held in trust and applied only in accordance with the provisions" of the respective Bond Resolution, "and shall not be subject to lien or attachment by any creditor of" HTA. (1968 Resolution at 47; 1998 Resolution at 56.)

Article VI of each of the Bond Resolutions is titled "Particular Covenants." (1968 Resolution at 50; 1998 Resolution at 58.) Section 601 of the 1968 Resolution provides as follows:

> Payment of Principal Interest and Premium. The Authority covenants that it will promptly pay the principal of and the interest on every bond issued under the provisions of this Resolution at the places, on the dates and in the manner provided herein and in said bonds and in any coupons appertaining to said bonds, and any premium required for the retirement of said bonds by purchase or redemption, according to the true intent and meaning thereof. Except as in this Resolution otherwise provided, the principal, interest and premiums are payable solely from Revenues and from any funds received by the Authority for that purpose from the

---

[7] Although section 401 of the 1998 Resolution appears to contemplate that the Revenue Fund (as defined in the 1998 Resolution) is one of the funds "held by the Fiscal Agent," section 601 of the 1998 Resolution describes the Revenue Fund as one from which HTA is required to transfer moneys monthly. Resolution of any potential discrepancy regarding custody of the Revenue Fund is not material to the Court's analysis herein.

Commonwealth which Revenues and funds are hereby pledged to
the payment thereof in the manner and to the extent hereinabove
particularly specified.

(1968 Resolution at 50.)  Section 601 of the 1998 Resolution provides as follows:

The Authority covenants that it will promptly pay the principal of
and the interest on every bond issued under the provisions of this
Resolution at the places, on the dates and in the manner provided
herein and in said bonds and any premium required for the
retirement of said bonds by purchase or redemption, according to
the true intent and meaning thereof.  Except as in this Resolution
otherwise provided, such principal, interest and premiums are
payable solely from Revenues and other moneys deposited to the
credit of the Revenue Fund and from any funds received by the
Authority for that purpose from the Commonwealth, which
Revenues, moneys and funds are hereby pledged (with such
priorities with respect to the use and disposition of Revenues as are
in this Resolution specified) to the payment thereof in the manner
and to the extent hereinabove particularly specified.

(1998 Resolution at 58.)

HTA issued additional resolutions that "pledged" certain Revenues for payment

of the Bonds.  Resolution No. 83-01, dated February 24, 1983, recognized that the

Commonwealth had passed legislation authorizing HTA to pledge the proceeds of certain

automobile license fees to the payment of bonds and other HTA obligations.  (Docket Entry No.

13004-57, "Resolution No. 83-01" at 2.)  Pursuant to Resolution No. 83-01, HTA "pledged"

those Revenues to payment of Bonds issued pursuant to the 1968 Resolution.  Similarly,

Resolution No. 98-08, dated February 26, 1998, "pledged" certain Toll Revenues to payment of

Bonds issued pursuant to the 1968 Resolution.  (Docket Entry No. 13004-58, "Resolution No.

98-08," and, together with Resolution No. 83-01, the "Supplemental Resolutions.")

In 2002, HTA issued additional Bonds pursuant to the 1998 Resolution.  HTA

issued Resolution No. 2002-04 (the "2002 Resolution"), dated as of January 25, 2002, which

authorized the issuance of Series D Bonds, Series E Bonds, and Series F Bonds under certain

provisions of the 1998 Resolution. The 2002 Resolution stated that the Series D Bonds were

"authorized to be issued pursuant to the provisions of Section 208 of the" 1998 Resolution. (See

Docket Entry No. 13377-1 at p. 11 of 58.) The 2002 Resolution stated that the Series E and F

Bonds were "authorized to be issued pursuant to the provisions of Section 209 of the" 1998

Resolution. (See Docket Entry No. 13377-1 at pp. 14, 15 of 58.) According to the HTA

Movants, the 2002 Resolution authorized entry into a security agreement dated February 7, 2002.

(Docket Entry No. 10107-5, the "2002 Security Agreement"). The 2002 Security Agreement

was executed by the Fiscal Agent and an unidentified individual purporting to sign on behalf of

HTA.[8] The 2002 Security Agreement purports to grant a security interest to the Bondholders as

follows:

> In order to provide security for the Debtor's payment of principal
> of, premium (if any) and interest on its Transportation Revenue
> Bonds in accordance with their respective terms and the terms of
> the [1998] Resolution, Debtor hereby grants to the Secured Party a
> security interest in the Puerto Rico Highway and Transportation
> Authority Transportation Revenue Bonds Interest and Sinking
> Fund (and all accounts therein) and Puerto Rico Highway and
> Transportation Authority Transportation Revenue Fund (and all
> accounts therein), maintained under the [1998] Resolution, and all
> amounts required to be on deposit therein by the terms of the
> [1998] Resolution, including all proceeds and all after-acquired
> property, subject to application as permitted by the [1998]
> Resolution. Remedies for failure of the Debtor to make timely
> payment of principal of, premium (if any) and interest on the
> Transportation Revenue Bonds or failure of the Debtor to fulfill its
> other covenants contained in the [1998] Resolution for the benefit
> of the owners of Transportation Revenue Bonds shall be as
> established by law.

(2002 Security Agreement at 1.)

---

[8]    The HTA Movants and the Oversight Board appear to agree that the signature on the
2002 Security Agreement is that of the Executive Director of HTA. (See Info. Mot.
Resp. ¶¶ 1, 4 (arguing that HTA's Executive Director was not authorized to execute the
2002 Security Agreement); Info. Mot. Reply ¶ 4 (arguing that the Executive Director had
authority to execute the 2002 Security Agreement).)

B.  Revenue Bond Statutes

The Commonwealth also enacted several laws concerning the financing arrangement underlying the Bonds (the "Excise Tax Statutes").  See 13 L.P.R.A. § 31751;[9] 9 L.P.R.A. §§ 2021, 5681.  While varying somewhat in their language, each of the Excise Tax Statutes authorizes HTA to pledge certain Revenues for the payment of bond obligations and other HTA obligations.  See 13 L.P.R.A. §§ 31751(a)(1)(C), 31751(a)(3)(C); 9 L.P.R.A. §§ 2021, 5681.  Each also includes a qualification that any such pledge is subject to Section 8 of Article VI of the Constitution of Puerto Rico.[10]  Id.  The Excise Tax Statutes also contain certain commitments from the Commonwealth, including that the Commonwealth will not reduce the relevant Excise Taxes.  See 13 L.P.R.A. §§ 31751(a)(1)(D), 31751(a)(3)(D); 9 L.P.R.A. §§ 2021, 5681.  Section 31751 of title 13 of the Civil Code further provides certain commitments from the Commonwealth for the benefit of Bondholders, including promises to not reduce or eliminate certain Excise Taxes, and a commitment "to ensure that" certain Excise Tax proceeds "shall be covered into a special deposit in the name and for the benefit of" HTA until HTA's bond obligations have been paid in full.  13 L.P.R.A. § 31751(a)(1)(D).

---

[9]  Citations herein to 13 L.P.R.A. § 31751 are to the consolidated English-language version submitted by the HTA Movants (Docket Entry No. 10107-4).  (See Mot. ¶ 9 n.4 (stating that the "version of 13 L.P.R.A § 31751 published on Westlaw and Lexis is not current"); see also FOMB Opp. ¶ 15 n.8.)

[10]  Section 8 of Article VI of the Constitution of the Commonwealth of Puerto Rico provides as follows:

> In case the available revenues including surplus for any fiscal year are insufficient to meet the appropriations made for that year, interest on the public debt and amortization thereof shall first be paid, and other disbursements shall thereafter be made in accordance with the order of priorities established by law.

Section 31751(a)(1)(G) of title 13 further provides that "on or after the Effective

Date of the Lien (as such term is defined in Section 12A of Act No. 74 of June 23, 1965, as

amended by this Act), the special deposit established in subsection (a)(1)" and certain Excise

Tax Revenues "shall belong to the Highways and Transportation Authority for the benefit of the

holders of the bonds issued under the Resolution of 1968 . . . and the Resolution of 1998 . . . , as

applicable." 13 L.P.R.A. §§ 31751(a)(1)(G). The Oversight Board asserts—and the HTA

Movants have not disputed—that the "Effective Date of the Lien" did not occur, and the

provision was therefore never triggered. (See FOMB Opp. ¶ 92 & n.43.)

### C. Fund 278

The Commonwealth's accounting system tracks receipt of certain revenues,

including the Excise Tax Revenues, by marking them with a "Fund 278" designation in the

Puerto Rico Information and Financial Accounting System. (Ahlberg Dep. 57:22-58:12.)[11]

Prior to the cessation of transfers of Excise Tax Revenues to HTA, transfers of Fund 278 monies

to HTA were effectuated by "SC 735" vouchers. (Reply ¶ 22; Sur-Reply ¶¶ 28-29 & n.46.)

Such transfers were initiated at HTA's direction, but required authorization from a representative

from the Commonwealth Treasury. (Reply ¶ 28; Sur-Sur-Reply ¶ 10.)

### D. Non-Payment of Bond Obligations

On November 30, 2015, Governor Alejandro García-Padilla issued an

administrative bulletin directing the Treasury Secretary to retain the Excise Tax Revenues for

---

[11] The HTA Movants and the Oversight Board dispute whether revenues other than Excise
Tax Revenues receive the Fund 278 designation. (Sur-Reply ¶ 34; Sur-Sur-Reply ¶¶ 5,
7.)

payment of the Commonwealth's public debt instead of for payment of Bond obligations.  (Mot. ¶ 21 (citing Docket Entry No. 10107-25).)

On April 6, 2016, the Governor signed into law the Puerto Rico Emergency Moratorium and Rehabilitation Act, Act No. 21-2016, which authorized the Governor to declare a state of emergency for the Commonwealth or any of its instrumentalities.  (Id. ¶ 22 (citing Docket Entry No. 10107-26).)  The Governor thereafter issued a series of Administrative Bulletins that effectively prevented the payment of principal and interest on HTA Bonds.  (Id.)

PROMESA was enacted on June 30, 2016, to address the fiscal emergency in Puerto Rico created by a "combination of severe economic decline, and, at times, accumulated operating deficits, lack of financial transparency, management inefficiencies, and excessive borrowing."  48 U.S.C.A. § 2194(m)(1) (Westlaw through P.L. 116-145).[12]  Following the enactment of PROMESA and the appointment of the Oversight Board, the Oversight Board has certified a series of fiscal plans and budgets that have provided for use of the Toll Revenues to fund HTA's operating expenses and the retention of the Excise Taxes by the Commonwealth for purposes other than payment of the Bond obligations.  (Mot. ¶ 33; FOMB Opp. ¶¶ 45, 49.)

## II.

### DISCUSSION

#### A.  Legal Standard

The HTA Stay Relief Motion is brought under section 362(d) of the Bankruptcy Code.  Section 362(d) of the Bankruptcy Code provides that, on "request of a party in interest and after notice and a hearing, the court shall grant relief from the stay" provided under section

---

[12]    PROMESA is codified at 48 U.S.C. §§ 2101 et seq.

362(a) "for cause, including the lack of adequate protection of an interest in property of such

party in interest," or, "with respect to a stay of an act against property under [section 362(a)], if –

(A) the debtor does not have an equity in such property; and (B) such property is not necessary to

an effective reorganization[.]"  11 U.S.C.A. § 362(d)(1)-(2) (Westlaw through P.L. 116-145).  A

movant has the initial burden of establishing prima facie eligibility for relief from an automatic

stay.  See Fin. Oversight & Mgmt. Bd. for P.R. v. Gracia-Gracia (In re Fin. Oversight & Mgmt.

Bd. for P.R.), 939 F.3d 340, 347 (1st Cir. 2019) (citing Mazzeo v. Lenhart (In re Mazzeo), 167

F.3d 139, 142 (2d Cir. 1999)).  After that initial burden is met, the moving party bears the

ultimate burden of proof on the issue of the debtor's equity in property, and the party opposing

stay relief has the ultimate burden of proof on all other issues.  See 11 U.S.C. § 362(g).

    Where, as here, a movant seeks relief from the automatic stay to pursue remedies

with respect to assets allegedly securing obligations, or for an award of adequate protection, the

court does not fully and finally adjudicate the merits of the parties' underlying claims of security

or beneficial interests in resolving the stay relief motion.  Rather, the court must determine

"whether the party seeking relief has a colorable claim to property of the estate."  Grella v.

Salem Five Cent Sav. Bank, 42 F.3d 26, 33 (1st Cir. 1994).  In Grella, the First Circuit

analogized this determination to that required in the context of a hearing for preliminary

injunctive relief, stating that a claim is colorable where there is a "reasonable likelihood that a

creditor has a legitimate claim or lien as to a debtor's property."  Id.; see Mission Prod.

Holdings, Inc. v. Schleicher & Stebbins Hotels, L.L.C. (In re Old Cold, LLC), 602 B.R. 798, 825

(B.A.P. 1st Cir. 2019) (characterizing a "colorable claim" as one "that is legitimate and that may

reasonably be asserted, given the facts presented and the current law") (quoting Jin Qing Li v.

Rosen (In re Jin Qing Li), BAP No. NC-17-1062-STaB, 2018 WL 1354548, at *4 (B.A.P. 9th

Cir. Mar. 12, 2018)). "This is a low threshold: A colorable claim (one seemingly valid and

genuine) is not a difficult standard to meet." In re Old Cold, 602 B.R. at 825 (quoting In re

Pansier, No. 18-22297-beh, 2019 WL 1495100, at *4 (Bankr. E.D. Wis. Apr. 3, 2019)). In

evaluating whether a movant has demonstrated a colorable claim, however, the court considers

not only the movant's legal and factual contentions, but also defenses raised by the non-moving

party, weighing all relevant arguments in determining whether the movant has shown the

requisite reasonable likelihood of success. See Grella, 42 F.3d at 34 ("[A] court may take into

account any matter that bears directly on the debtor's equity, or that clearly refutes a creditor's

claim to the property.").

       If a movant satisfies the threshold "colorable claim" standard, the court must then

assess whether the movant has shown cause under 11 U.S.C. § 362(d)(1) or otherwise met its

burden under 11 U.S.C. § 362(d)(2). See, e.g., Gracia-Gracia, 939 F.3d at 350 (to prevail under

§ 362(d)(1), stay relief movants must show that the relevant factors weigh in their favor); In re

Old Cold, 602 B.R. at 823-24 (noting that "the issue in the Stay Relief Motion was whether [the

movant] had met its burden of establishing a colorable claim of a lien on property of the Debtor's

estate and, if so, whether [the movant] was entitled to stay relief under § 362(d)(2) . . . ."). At

this preliminary stage, the Court limits its inquiry to whether the HTA Movants have shown a

reasonable likelihood that they possess a legitimate lien against, or other property interest in, the

relevant assets.[13]

---

[13]    Although, as noted above, the subject matter of the preliminary hearing also included
"whether the movants have standing to sue," the Oversight Board has conceded that its
arguments concerning standing are coextensive with its arguments that the HTA Movants
lack liens or other property interests with respect to the Revenues. (Tr. 111:4-21.)

B.    Statutory Lien

The HTA Movants assert that the Excise Tax Statutes create statutory liens

against HTA and the Commonwealth to secure the payment of the Bonds (Mot. ¶ 72 (citing 13

L.P.R.A. § 31751; 9 L.P.R.A. §§ 2021, 5681).)  The HTA Movants contend that the Excise Tax

Statutes create statutory liens because they contain "mandatory, self-executing 'shall' language,"

"identify the specific taxes that serve as collateral," and "requir[e] that such taxes be used to pay

for debt service on the Bonds."  (Mot. ¶ 72.)  The Oversight Board contends that those

provisions cannot create statutory liens because they merely authorize HTA to grant liens, rather

than set out conditions or circumstances upon which liens are triggered.  (FOMB Opp. ¶ 101-02

(citing Peaje Invs. LLC v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight & Mgmt.

Bd. for P.R.), 899 F.3d 1, 12 (1st Cir. 2018), cert. denied 139 S. Ct. 1169, 203 L. Ed. 2d 197

(2019) (mem.). ("Because the Act does not automatically trigger a lien upon the performance of

a specified condition, apart from the Authority's decision to grant a lien, it does not create a

statutory lien.")).)  The Oversight Board further argues that no such liens can be granted against

Commonwealth assets in light of the restrictions on liability imposed by 9 L.P.R.A. § 2015,

which provides that bonds issued by HTA shall not be a debt of the Commonwealth.  (FOMB

Opp. ¶ 100.)  In response, the HTA Movants contend that the statutes use "shall" language to

place a charge on certain proceeds for purposes of repayment of the Bonds, thereby creating liens

in favor of HTA and/or the Bondholders.  (Reply ¶¶ 46-51, 54.)  The HTA Movants also argue

that Peaje concerned different statutory provisions than those relied on in the HTA Stay Relief

Motion.  (Reply ¶¶ 53-54.)

The HTA Movants have failed to demonstrate that they have colorable claims to

statutory liens securing repayment of the Bonds arising out of the Excise Tax Statutes.

1.    Statutory Liens Allegedly Encumbering HTA Assets

To begin with, the First Circuit's decision in Peaje establishes that the language in the Excise Tax Statutes cannot create statutory liens against HTA assets.  In Peaje, the First Circuit addressed whether the HTA Enabling Act created a statutory lien securing bonds issued by HTA.  In relevant part, the HTA Enabling Act provides that HTA "is hereby empowered to . . . borrow money for any of its corporate purposes, and to issue bonds of the Authority in evidence of such indebtedness and to secure payment of bonds and interest thereon by pledge of, or other lien on, all or any of its properties, revenues or other income . . . ."  9 L.P.R.A. § 2004(l).  It further provides that HTA "may . . . issue and sell its own bonds," 9 L.P.R.A. § 2012(a), which "may be authorized by resolution or resolutions of the Authority . . . ."  9 L.P.R.A. § 2012(b).  The First Circuit noted that "the 'essence' of a statutory lien [is] 'the need, or lack of need, for an agreement or judgment to create the lien,'" 899 F.3d at 10 (quoting 2 Collier on Bankruptcy ¶ 101.53 (16th ed.)), and held that the HTA Enabling Act did not create a statutory lien because, under the HTA Enabling Act, "[a] pledge of revenues does not attach automatically when [HTA] passes a resolution issuing bonds.  Rather, it arises only when [HTA] chooses to grant it."  Id. at 12.

Here, the Excise Tax Statutes similarly do not establish statutory liens against HTA property.  Section 31751(a)(1)(C) of title 13 provides as follows:

> The Highways and Transportation Authority is hereby authorized to commit or pledge the proceeds of the collection thus received on gasoline and the tax of four cents (4¢) on gas oil or diesel oil fixed in Section 3020.06 and the amount appropriated by virtue of this Subtitle of the excise tax on crude oil, partially finished and finished oil by-products, and any other mixture of hydrocarbons fixed in Section 3020.07, for the payment of the principal and the interest on bonds or other obligations or for any other legal purpose of the Authority.  Said commitment or pledge shall be subject to the provisions of Section 8 of Item VI of the Constitution of the

> Commonwealth of Puerto Rico. The proceeds of said collection
> shall be solely used for the payment of interest and amortization
> of the public debt, as provided in said Section 8 of Item VI of the
> Constitution, until the other resources available to which reference
> is made in said section are insufficient for such purposes.
> Otherwise, the proceeds of said collection, in the amount that may
> be necessary, shall be used solely for the payment of the principal
> and interest on bonds and other obligations of the Authority and to
> comply with any stipulations agreed to by the latter with the holders
> of said bonds or other obligations.

13 L.P.R.A. § 31751(a)(1)(C) (emphasis added).  Section 31751(a)(3)(C) of title 13 similarly

provides as follows with respect to cigarette excise taxes:

> The Highways and Transportation Authority is hereby authorized
> to pledge or encumber the proceeds from the excise tax on
> cigarettes established in Section 3020.05 for the payment of the
> principal of and interest on any bonds or other obligation or for any
> other lawful purpose of the Authority.  Such pledge or
> encumbrance shall be subject to the provisions of Section 8 of
> Article VI of the Constitution of Puerto Rico. The proceeds from
> such taxes shall be used solely for the payment of the interest on
> and amortization of the public debt, as provided in Section 8 of
> Article VI of the Constitution of the Government of Puerto Rico,
> insofar as the other available resources referred to in said Section
> do not suffice to attain such purposes. Otherwise, the proceeds
> from said tax, in the necessary amount, shall be used solely for the
> payment of principal of and interest on the bonds and other
> obligations of the Authority and to meet any stipulation agreed on
> by the Authority to the holders of its bonds and other obligations.

13 L.P.R.A. § 31751(a)(3)(C) (emphasis added).  These provisions do not provide for an

automatic pledge of assets by HTA upon the occurrence of specified circumstances or

conditions; rather, the pledge "arises only when [HTA] chooses to grant it," Peaje, 899 F.3d at

12, and the provisions even recognize that HTA has authority to use the proceeds thereof "for

any . . . lawful purpose" of HTA or "other obligations of" HTA.[14]  These provisions therefore do

not create statutory liens in HTA property.

---

[14]     Although the HTA Movants theorize that the "context and purpose" of the statutory
language authorizing HTA to use the Excise Taxes for "other obligation[s] or any lawful

The other Excise Tax Statutes cited by the HTA Movants do not establish statutory liens for substantially the same reason. Section 2021 of title 9 provides that HTA is "<u>authorized</u> to pledge or pignorate the proceeds" that it receives of certain automobile license fees, but gives HTA authority to also use the proceeds it receives for "its corporate purposes" and "the payment of . . . other obligations of" HTA. 9 L.P.R.A. § 2021 (emphasis added). Section 5681 of title 9 similarly "<u>authorize[s]</u> [HTA] to pledge or encumber the proceeds of" certain motor vehicle license fees, which may be used for any "lawful purpose" of HTA and "the payment of . . . other obligations of" HTA. 9 L.P.R.A. § 5681 (emphasis added).

The HTA Movants have therefore failed to demonstrate that the Excise Tax Statutes afford them colorable claims to statutory liens against HTA assets.

2. <u>Statutory Liens Allegedly Encumbering Commonwealth Assets</u>

The HTA Movants further contend that certain other statutory provisions create liens against Commonwealth assets for the benefit of HTA or its Bondholders. For example, Section 31751(a)(1)(D) of title 13 provides commitments from the Commonwealth for the benefit of the Bondholders to not reduce or eliminate the applicable Excise Taxes and to "ensure that said amounts shall be covered into a special deposit in the name and for the benefit of the Highways and Transportation Authority of Puerto Rico, as provided in this Section, until said bonds issued at any time, including their interest, have been paid in full." Additionally, language

. . . purpose" is to allow HTA to fund its own operations after payment of its obligations under the "waterfall" created by the Bond Resolutions (Reply ¶ 15), neither that mandate nor the specific pledges provided in the Bond Resolutions are established by statute. <u>Cf.</u> <u>Peaje</u>, 899 F.3d at 12 ("Peaje's backup argument is that, even if the Enabling Act does not by itself create a statutory lien, the Act together with the 1968 Resolution does. Peaje is correct that the Resolution contains mandatory language suggestive of lien creation. . . . But the Resolution poses a new problem for Peaje—to quote the Title III court, 'the 1968 Resolution is not a statute.'").

in sections 2021 and 5681 of title 9 and section 31751(a)(1) and (3) of title 13 provides

commitments to not eliminate or reduce certain Excise Taxes and to use certain Excise Taxes for

payment of bonds and other obligations of HTA. See, e.g., 13 L.P.R.A. §§ 31751(a)(1)(C),

31751(a)(3)(C). The HTA Movants contend that these provisions create statutory liens against

Commonwealth assets for the benefit of HTA or its Bondholders.

        The HTA Movants' argument fails due to the limitations imposed by 9 L.P.R.A.

§ 2015 on the scope of the Commonwealth's liability with respect to HTA-issued bonds. That

provision provides as follows:

> Except as to any bonds of the Authority the payment of which is
> guaranteed by the Commonwealth of Puerto Rico, the bonds issued
> by the Authority shall not be a debt of the Commonwealth of
> Puerto Rico or any of its political subdivisions, and neither the
> Commonwealth of Puerto Rico nor any such political subdivision
> shall be liable thereon, nor shall such bonds or the interest thereon
> be payable out of any funds other than those pledged for the
> payment of such bonds and interest thereon pursuant to the
> provisions of § 2004(l) of this title.

9 L.P.R.A. § 2015. In turn, Section 2004(l) provides as follows:

> [The Authority is hereby empowered] [t]o borrow money for any
> of its corporate purposes, and to issue bonds of the Authority in
> evidence of such indebtedness and to secure payment of bonds and
> interest thereon by pledge of, or other lien on, all or any of its
> properties, revenues or other income, and subject to the provisions
> of § 8 of Art. VI of the Constitution of the Commonwealth, pledge
> to the payment of said bonds and interest thereon, the proceeds of
> any tax or other funds which may be made available to the
> Authority by the Commonwealth.

9 L.P.R.A. § 2004(l). Thus, the Commonwealth may only be liable for HTA's Bond obligations

to the extent such obligations are "payable out of . . . funds . . . pledged for the payment of such

bonds and interest thereon pursuant to the provisions of § 2004(l) of this title,"[15] 9 L.P.R.A.

---

[15]    It is not clear to the Court whether the HTA Movants' statement that "the first clause of 9
L.P.R.A. § 2015 expressly contemplates that HTA Bonds can be 'guaranteed by the

§ 2015, and the permissible scope of such pledges is limited to "the proceeds of any tax or other

funds which may be made available to the Authority by the Commonwealth." 9 L.P.R.A.

§ 2004(l). Put another way, section 2015 establishes that Commonwealth assets are only

available to be pledged to satisfy debts to HTA's Bondholders to the extent that the

Commonwealth makes such assets "available" to HTA. Thus, any rights conferred on the HTA

Movants by the Excise Tax Statutes do not extend to Excise Tax Revenues that the

Commonwealth has not chosen to transfer to make available to HTA.

       Here, the Commonwealth has decided not to transfer the Excise Tax Revenues to

HTA, and those Revenues therefore are not available to HTA. See Mot. ¶ 33 ("[The Oversight

Board has] developed a series of fiscal plans . . . , each of which has . . . provided that . . . the

Excise Taxes will continue to be diverted from HTA to the Commonwealth and consumed for

purposes other than payment of the Bonds, including purposes wholly unrelated to HTA."). The

HTA Movants are not "able to enforce [their alleged] statutory lien in rem against . . . property in

the hands of the Commonwealth" (Reply ¶ 50), because that property has not been "made

available" by the Commonwealth to HTA.

       The HTA Movants' argument that "made available" means "able to be used or

obtained; at someone's disposal" (Reply ¶ 41 n.48 (quoting Available, Oxford English

---

Commonwealth,' in which case 9 L.P.R.A. § 2015 does not apply" (Sur-Sur-Reply ¶ 2
n.3) is intended to assert that the Commonwealth has guaranteed the Bonds, or whether
the HTA Movants merely intended to highlight an inaccurate statement made by the
Oversight Board concerning the scope of 9 L.P.R.A. § 2015. If the HTA Movants
intended the former, a single unsupported sentence at the end of a footnote of
approximately 300 words is not adequate to meaningfully present the issue to the Court,
and the HTA Movants should have raised the argument in a prior brief. In any event, the
HTA Movants have not provided a basis to conclude that a statutory obligation to transfer
funds constitutes a guarantee within the meaning of 9 L.P.R.A. § 2015, nor otherwise
demonstrated that the Commonwealth has undertaken or delivered any guarantee of the
HTA bonds.

Dictionary (2020)), fails to establish that Excise Taxes that are within the possession and control of the Commonwealth—and which the Commonwealth has used for other purposes rather than transferring them to HTA—are "available" to HTA, and they therefore cannot provide the HTA Movants with a viable exception to the limitation on liability imposed by section 2015. The Excise Taxes are not "able to be used or obtained" by HTA nor are they at HTA's disposal; they are within the possession and control of the Commonwealth.

The HTA Movants' observation that the Spanish-language title of 13 L.P.R.A. § 31751 uses the same word ("disposición") that was translated as "available" in 9 L.P.R.A. § 2004(l) does not establish any basis to believe that they have similar or identical meanings. (Reply ¶ 41 n.48.) Even fully crediting the implication that the HTA Movants wish the Court to draw, the use of the word "disposición" at most would raise an inference that 13 L.P.R.A. § 31751 was intended to result in funds being available to HTA; however, because the statute itself does not give HTA control over the tax monies, any such intention would not affect the Court's conclusion that such funds actually have not been made available to HTA. A statutorily-expressed intention to transfer monies or direction to use monies in a particular manner would not, absent further operative provisions, render them actually available to HTA for its uses or for the benefit of HTA's Bondholders.

C.    Alleged Statutorily Established Ownership of the Revenues

The HTA Movants assert that, pursuant to the Excise Tax Statutes, the Bondholders are the equitable owners of the Excise Tax Revenues. For this argument, they rely on Asociación de Subscripción Conjunta del Seguro de Responsabilidad Obligatorio v. Flores Galarza, 484 F.3d 1 (1st Cir. 2007) ("Flores Galarza"), and Gracia-Gracia. Both Flores Galarza

and Gracia-Gracia involve the Commonwealth's compulsory liability insurance system (as modified, "Law 253"), which at all relevant times required liability insurance coverage for all motor vehicles that travel on public thoroughfares in the Commonwealth. Flores Galarza, 484 F.3d at 6. Every vehicle owner was required to either (i) pay the compulsory liability insurance premium to the Secretary of the Treasury when licensing a vehicle or (ii) opt out by purchasing equivalent or better private insurance. Id. at 7. The Secretary of the Treasury was required to give the premiums to the Compulsory Liability Joint Underwriting Association of Puerto Rico, or the "JUA." Id. Drivers without proof of private insurance at the time of licensing had to pay the premium and were entitled to reimbursement by the JUA. Id. Under Law 253, all private insurers were required to provide compulsory liability insurance in one of two ways: (i) private insurers were required to provide compulsory liability insurance to motor vehicle owners that requested it, unless those owners were "high-risk drivers," and (ii) private insurers were required to provide compulsory liability insurance as members of the JUA. Id. (citation omitted). In Flores Galarza, the JUA alleged that the Secretary of the Treasury had wrongfully withheld insurance premiums from January 2000 through November 2002 in order to alleviate the Commonwealth's cash flow problems. Id. at 10-11. The First Circuit held that the JUA, rather than the Commonwealth, was the owner of the diverted premiums:

> Law 253 gives the JUA the power to hold property, and provides that the JUA 'shall receive' premiums from the Secretary and that the Secretary 'shall transfer' these premiums to the JUA. While the Secretary collects the insurance premiums and holds them for some unspecified amount of time before relinquishing them to the JUA, the Secretary is not an insurer—he is merely the custodian of these funds. As a custodian, the Secretary has no entitlement to the premiums, and his woefully undeveloped argument that the premiums do not vest in the JUA until the Secretary transfers them does not convince us otherwise.

Id. at 29. Similarly, the First Circuit in Gracia-Gracia—which involved claims asserted by a

class of motorists who had paid duplicate premiums, rather than by the JUA—held that the claimants had made a prima facie showing of the existence of a trust relationship based on statutory language requiring the Secretary of Treasury to hold the relevant funds "in its fiduciary capacity." 939 F.3d at 351; <u>see</u> 26 L.P.R.A. § 8055(j) ("The Secretary of the Treasury shall retain the funds transferred by the Joint Underwriting Association in its fiduciary capacity for a five (5)-year term counting from the date on which the retained funds are transferred by the Joint Underwriting Association to the Secretary of the Treasury.").

<u>Flores Galarza</u> and its progeny are not instructive for purposes of this motion practice. Here, specific resolutions govern the relationship between HTA and the Bondholders. Moreover, the Excise Tax Statutes provide commitments to transfer certain of the Revenues to HTA for the benefit of the Bondholders, but do not go so far as to purport to grant property rights in the Revenues before they are transferred. Section 31751(a)(1)(G), which does provide for an explicit transfer of an ownership interest in the Excise Taxes, demonstrates that, had the Commonwealth intended to transfer ownership of the Excise Taxes, it could have done so, but that provision never became effective by its own terms.

Moreover, the Revenues are not special purpose, third-party payments for insurance premiums that are required to be used to provide insurance or refunded to the payors. Unlike individual motor vehicle owners required to pay premiums for car insurance under the structure of Law 253, which expressly promised those individuals either insurance or a refund, the Bondholders lent money to HTA and received Bonds in return under specific conditions spelled out in the Bond Resolutions. Neither the Bond Resolutions nor the Excise Tax Statutes promise the Bondholders that the Commonwealth will pay them, and section 2015 of title 9 expressly provides that the Commonwealth is not liable for HTA's Bond obligations. The HTA

Movants have, accordingly, failed to establish a colorable claim to equitable or beneficial

ownership of Revenues that have not been deposited with the Fiscal Agent as contemplated by

the Bond Resolutions.[16]

Finally, the HTA Movants' arguments concerning Fund 278 fail to establish that

HTA or the Bondholders have a colorable claim to ownership of the Revenues. The HTA

Movants contend that HTA was granted authority to approve withdrawals of monies that are in

the Commonwealth's possession that were designated as Fund 278 monies. (Reply ¶ 22.) The

HTA Movants have, however, conceded that the Fund 278 designation does not itself create a

property interest; rather, they contend that "the Debtors' recognition of HTA's authority to

approve transfers from Fund 278 serves as confirmation of a pre-existing property interest."

(Sur-Sur-Reply ¶ 10 n.30 ("Movants are not asserting that the delegation of authority created an

ownership interest in the HTA Excise Taxes.").)

Regardless of how, as a factual matter, Fund 278 monies were treated, even

implicit "recognition" of authority cannot itself confer authority, and the HTA Movants have not

demonstrated a legal basis for their assertion that Fund 278 monies are actually owned by HTA.

Regardless of how much deference the Commonwealth's and HTA's cash management practices

provided to HTA, such practices cannot be the basis for recognizing rights that are not provided

by the governing statutes, resolutions, and instruments. The documents cited by the HTA

Movants to support their view of how the Commonwealth and HTA treated Fund 278 monies do

---

[16]     The HTA Movants also ask that the Court find that a constructive trust or, in the
alternative, a resulting trust, has arisen as a result of "the Debtors' diversion of the
Pledged Revenues for improper purposes." (Mot. ¶ 61.) In light of the Court's
conclusion that the Bond Resolutions, HTA Enabling Act, and Excise Tax Statutes limit
the scope of the HTA Movants' security interest to Revenues deposited into the
Resolution Funds, the HTA Movants have not raised a colorable claim of entitlement to
equitable relief in the form of a constructive or resulting trust. (Id.)

not provide such legal authority. Designation of certain cash flows does not, without more, establish rights to those revenues. Thus, the Court rejects the HTA Movants' arguments that are founded in accounting terminology and principles rather than in law; such arguments are insufficient to demonstrate that the Bondholders have been granted a lien or other property right in Revenues beyond those provided by the plain terms of the Bond Resolutions.

Additionally, as a factual matter, the HTA Movants' proposition that HTA exercises plenary authority over Fund 278 monies is contradicted by their concession that, with respect to the SC 735 vouchers identified by the HTA Movants, "a Treasury signature was needed before transfers out of the TSA took place." (Sur-Sur-Reply ¶ 10.) While the HTA Movants contend that there is no evidence "that Treasury exercised independent control by rejecting or blocking any of the Fund 278 withdrawals directed by HTA" (Sur-Sur-Reply ¶ 10), the concession that actions by Commonwealth agents were required to "implement[] the necessary steps to carry out the transactions initiated and authorized by HTA" (Sur-Sur-Reply ¶ 10) is inconsistent with the HTA Movants' assertion that the Fund 278 monies were treated as HTA's assets and subject to HTA's unilateral control (Reply ¶ 19), or that the "Commonwealth made such revenues available to HTA by the Fund 278 designation and the ability of HTA to approve Fund 278 transactions." (Reply ¶ 41 n.48.)

The HTA Movants have therefore failed to demonstrate a colorable claim to equitable or beneficial ownership interests in the Excise Taxes that have not been transferred to HTA and deposited in the Resolution Funds.

D.      Security Interest

        1.      The Bond Resolutions and the Supplemental Resolutions

The HTA Movants argue that they have a security interest in the Revenues,

including HTA's right to receive the Revenues (Reply ¶ 5), arising out of section 601 of each of the Bond Resolutions. (See, e.g., Mot. ¶ 68; Reply ¶ 36.) In particular, the HTA Movants argue that the Bond Resolutions "pledge[]" the Revenues and thereby create a security interest for the benefit of the Bondholders even if those Revenues are not actually transferred to HTA and actually deposited in the Resolution Funds in the manner required by the Bond Resolutions. The HTA Movants contend that the Supplemental Resolutions also recognize a security interest in the Revenues within their scope. (Reply ¶ 44.)

Further parsing the wording of each of the Bond Resolutions, the HTA Movants contend that the phrases "received by the Authority for that purpose from the Commonwealth" and "deposited to the credit of the Revenue Fund" in section 601 of the Bond Resolutions do not modify the word "Revenues," and further argue that the phrase "hereby pledged to the payment thereof in the manner and to the extent hereinabove particularly specified" refers to the manner and extent of payment of the Bond obligations, not the extent of the liens established by the Bond Resolutions. (Reply ¶¶ 36-42.) The HTA Movants rely on the "last antecedent" canon of interpretation—which provides that "a limiting clause or phrase should be read to modify only the noun or phrase that it immediately follows"—as support for their interpretation of section 601 of the Bond Resolutions. (See Reply ¶ 37 (citing Barnhart v. Thomas, 540 U.S. 20, 21 (2003); Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 221-24 (2012)).)

In response, the Oversight Board contends that, although section 401 of each of the Bond Resolutions unambiguously establishes security interests in "certain revenues of HTA . . . both received by HTA and actually deposited with the Fiscal Agent to the credit of a special fund," section 601 of each of the Bond Resolutions does not expand the scope of those liens

beyond those created pursuant to section 401. (FOMB Opp. ¶ 21, 28.) As to the 1968

Resolution, the Oversight Board notes that section 601 states that the Bonds are "are payable

solely from Revenues and from any funds received by the Authority for that purpose from the

Commonwealth which Revenues and funds are hereby pledged to the payment thereof in the

manner and to the extent hereinabove particularly specified . . . ." (1968 Resolution at 50.) As

to the 1998 Resolution, the Oversight Board notes that section 401 states that the Bonds "are

payable solely from Revenues and other moneys deposited to the credit of the Revenue Fund and

from any funds received by the Authority for that purpose from the Commonwealth, which

Revenues, moneys and funds are hereby pledged (with such priorities with respect to the use and

disposition of Revenues as are in this Resolution specified) to the payment thereof in the manner

and to the extent hereinabove particularly specified . . . ." (1998 Resolution at 58.) Additionally,

as to both Bond Resolutions, the Oversight Board contends that section 601's use of the phrase

"in the manner and to the extent hereinabove particularly specified" limits the scope of any lien

established therein to the scope of the lien established by section 401, thereby limiting the lien

granted by the Bond Resolutions to Revenues that are actually received by HTA and actually

deposited in the applicable Resolution Fund. (FOMB Opp. ¶¶ 23, 30.)

       The Oversight Board's more limited reading of Section 601 is consistent with the

grammar of section 601 and the overall content and expressed purpose of the Bond

Resolutions.[17] The specific scope of the security interests established by the Bond Resolutions is

---

[17]     The Oversight Board is not judicially estopped from disputing the scope of the HTA
Movants' lien. (See Mot. ¶ 70.) The First Circuit in Peaje Invs. LLC v. García-Padilla,
845 F.3d 505 (1st Cir. 2017) did not rely on any acknowledgement of a lien by the
Oversight Board in rendering its decision. Rather, the First Circuit stated that the motion
failed because the movant had not alleged that future toll revenues would be inadequate
to satisfy its interest in repayment of the bonds. See id. at 514 ("While Peaje may have
had a contractual right to monthly deposits with the fiscal agent and the maintenance of

delineated in section 401 of each of the Bond Resolutions.  Section 401 unambiguously provides

for a "lien and charge in favor of the holders of the bonds issued and outstanding under" the

Bond Resolutions "and for the further security of such holders until paid out or transferred" as

provided in the Bond Resolutions.  (1968 Bond Resolution at 41; 1998 Bond Resolution at 47.)

Various sections of Article IV of each of the Bond Resolutions provide for specific payment

mechanics and priorities with respect to the Resolution Funds.  Thus, the limiting phrase "hereby

pledged to the payment thereof in the manner and to the extent hereinabove particularly

specified" in section 601 of each Bond Resolution logically imports the scope of the pledge,

mechanics, and detailed limitations contained elsewhere in the Bond Resolutions.  The

Bondholders' reading of that phrase would render section 401 superfluous.

   Moreover, the Bondholders' interpretation is contradicted by the forms of bond

attached to each of the Bond Resolutions.[18]  (See, e.g., 1968 Resolution at 22 (referencing "the

fund charged with and pledged to the payment of the interest on and the principal of the bonds"),

24 ("The Resolution provides for the creation of a special fund designated 'Puerto Rico Highway

Authority Highway Revenue Bonds Interest and Sinking Fund', which special fund is pledged to

and charged with the payment of the principal of and the interest on all bonds issued under the

provisions of the Resolution . . . ."); 1998 Resolution at 19 (referencing "the funds charged with

---

the accounts at particular levels, its protected interest for purposes of the lift-stay motion
was limited to its interest in repayment of the debt owed. . . .  Nowhere in its district court
filings did Peaje claim that the current diversion of toll revenues would leave that interest
inadequately protected.  In light of Peaje's admitted security interest in future toll
revenues, this omission was fatal.").  In light of the "fatal" failure to allege the
insufficiency of the adequate protection, it cannot be said that the First Circuit relied on
any acknowledgement of a security interest by the Oversight Board.

[18] The Court does not rely upon the forms of bond to vary the meaning of the Bond
Resolutions but, rather, to provide context and additional support for the meaning that is
apparent from the plain text of the Bond Resolutions.

and pledged to the payment of the interest on and the principal of the bonds"), 20 ("The

Resolution provides for the creation of another special fund . . . , which special fund is pledged to

and charged with the payment of the principal of and the premium, if any, and the interest on the

senior bonds.").  Notably, although, like section 601, the forms of bond refer to "pledges" of the

Revenues, they only recognize a "charge" against property in connection with the Resolution

Funds.[19]  (See, e.g., id.)  Cf. 11 U.S.C.A. § 101(37) (Westlaw through P.L. 116-145) ("The term

'lien' means charge against or interest in property to secure payment of a debt or performance of

an obligation.").

       The limited scope of section 601 of each of the Bond Resolutions finds further

support in the scope of the "pledge" therein.  The HTA Movants have not demonstrated a

reasonable likelihood that the phrases "received by the Authority for that purpose from the

Commonwealth" and "deposited to the credit of the Revenue Fund" in section 601 of the Bond

Resolutions do not modify the scope of the pledge of Revenues.  Notwithstanding the HTA

Movants' advocacy of the "last antecedent" canon, the First Circuit's decision in Fin. Oversight

& Mgmt. Bd. for P.R. v. Andalusian Glob. Designated Activity Co. (In re Fin. Oversight &

Mgmt. Bd. for P.R.), 948 F.3d 457 (1st Cir. 2020) held that the "series qualifier" canon was an

appropriate interpretive tool in resolving whether a limiting clause in a Puerto Rico bond

resolution modified only the last antecedent phrase or whether it modified all prior antecedents.

Id. at 467.  Pursuant to that canon, "[w]hen several words are followed by a clause which is

applicable as much to the first and other words as to the last, the natural construction of the

language demands that the clause be read as applicable to all."  Id. (quoting Paroline v. United

---

[19]    The "pledges" in the Supplemental Resolutions similarly lack references to a lien or
charge or other language indicating that they intend to expand the scope of sections 401
and 601 rather than provide unsecured promises to deposit Revenues in the manner
required by the Bond Resolutions.

<u>States</u>, 572 U.S. 434, 447 (2014)); <u>see also</u> <u>Jama v. ICE</u>, 543 U.S. 335, 345 n.4 (2005)

(suggesting that the "structure" of a statutory provision militates against application of the last

antecedent canon where the "modifying clause appear[s] not in a structurally discrete statutory

provision, but at the end of a single, integrated list").

       Its application is appropriate here because, particularly in light of the explicit

provisions of Article IV of the resolutions, the qualifier "received by [HTA] for that purpose

from the Commonwealth" is equally applicable to both nouns in the phrase "Revenues and . . .

any funds" (from section 601 of the 1968 Resolution).  Similarly, the qualifier "deposited to the

credit of the Revenue Fund" (from section 601 of the 1998 Resolution) is equally applicable to

both "Revenues and other moneys."  Thus, the series qualifier canon supports application of the

qualifier to those antecedents in the respective Bond Resolutions, and controverts the HTA

Movants' expansive reading of section 601.

       Accordingly, the HTA Movants have not established a prima facie security

interest in the Revenues.

### 2.   2002 Security Agreement

       The HTA Movants also argue that, even if section 401 of each of the Bond

Resolutions does not contemplate a lien against all of the Revenues, the terms of the 2002

Security Agreement grant them a security interest in "all amounts required to be on deposit" in

the Resolution Funds by the 1998 Resolution.  (Mot. ¶ 66 n.17.)  In response, the Oversight

Board argues that HTA was required to issue a resolution approving the 2002 Security

Agreement, that it never did so, that the 2002 Security Agreement could not have expanded the

scope of the collateral authorized by the 1998 Resolution, and that any security interest created

by the 2002 Security Agreement was never perfected.  (FOMB Opp. ¶¶ 75-78.)

With respect to the authorization issue, the Oversight Board argues that, pursuant to the HTA Enabling Act, HTA is only empowered to issue bonds and secure their repayment if it is authorized to do so by resolution.  See 9 L.P.R.A. § 2012(b) ("The bonds may be authorized by resolution or resolutions of the Authority . . . and may contain such other terms and covenants as such resolution or resolutions may provide."); 9 L.P.R.A. § 2012(e)(1) ("Any resolution or resolutions authorizing any bonds may contain provisions, which shall be a part of the contract with the holders of the bonds . . . [a]s to the disposition of the entire gross or net revenues and present or future income or other funds of the Authority, including the pledging of all or any part thereof to secure payment of the principal of and interest on the bonds to the extent permitted by the provisions of § 2004(l) of this title . . . .").  The Oversight Board contends that, absent a resolution authorizing the lien contemplated in the 2002 Security Agreement, the 2002 Security Agreement is ineffective to grant a security interest broader than the one contained in the Bond Resolutions.  (FOMB Opp. ¶ 75.)  The HTA Movants argue that the provisions of the HTA Enabling Act cited by the Oversight Board authorize, but do not require, a resolution.  (Reply ¶ 43 n.53.)  They further cite the broad terms of section 2004(h) and (l), which empower HTA to "secure repayment of bonds" and to "make contracts and to execute all instruments necessary or incidental in the exercise of any of its powers."  (Reply ¶ 43 n.53 (quoting 9 L.P.R.A. § 2004(h), (l)).)

The structure of and language used in the HTA Enabling Act support the Oversight Board's interpretation.  Although section 2004 broadly empowers HTA to engage in activities—like issuing bonds and entering into contracts—that allow it to fulfill its purposes, certain subsequent sections of the HTA Enabling Act, such as section 2012, provide specific limitations on HTA's authority and conduct.  Interpreting the broad language of section 2004(h)

and (l) as the final word on the scope of HTA's authority to issue bonds would render section

2012 superfluous. Likewise, interpreting the provisions of section 2012 as purely discretionary

because they use the word "may" would render them effectively meaningless because, under the

HTA Movants' interpretation, HTA is free to disregard all such provisions at will with no

limitation, including provisions stating that HTA's bonds "may mature at such time or times not

exceeding fifty (50) years from their respective dates" and "may bear interest at such rate or rates

not exceeding the maximum rate then permitted by law . . . ." 9 L.P.R.A. § 2012(b). Rather, the

use of the verb "may" in section 2012 signifies delineation of the permitted scope of HTA's

authority with respect to the subject matter therein. The provisions of section 2012(b) and (e) are

therefore discretionary in the sense that HTA need not issue bonds and therefore has discretion

as to whether it chooses to exercise the authority set forth in section 2012, but mandatory in the

sense that HTA's authority is constrained by the requirements set forth therein.

Thus, to render the 2002 Security Agreement effective against HTA and expand

the scope of the security interest established by the Bond Resolutions, HTA was required to issue

a resolution approving the security interest described therein. The HTA Movants have not

established that HTA has done so. Rather, the HTA Movants point to language from Resolution

No. 2002-04, dated January 25, 2002 (Docket Entry No. 13377-1, "Resolution No. 2002-04"),

authorizing the issuance of bonds pursuant to certain sections of the 1998 Bond Resolution.

(Info. Mot. Reply ¶¶ 2, 3 (citing Resolution No. 2002-04 §§ 3-6, 18.).) None of the provisions in

Resolution No. 2002-04 approves the security interest purportedly granted in the 2002 Security

Agreement. The HTA Movants have not demonstrated the connection between issuance of the

Series D Bonds, Series E Bonds, and Series F Bonds contemplated by Resolution No. 2002-04

and an authorization to provide additional security for those bonds beyond an observation that

the 2002 Security Agreement was included "at Tab 57 in the 2002 closing binder" and an

unsupported assertion that the 2002 Security Agreement was an "essential factor of the bonds."

(Info. Mot. Reply ¶ 3.)  However, even assuming that the security interest described in the 2002

Security Agreement was an "essential" aspect of the issuance of the Series D Bonds, Series E

Bonds, and Series F Bonds contemplated by Resolution No. 2002-04, authorization of the

issuance of bonds and of the form of those bonds does not constitute authorization of the grant of

a security interest.


CONCLUSION

For the foregoing reasons, the HTA Stay Relief Motion is denied to the extent it

seeks stay relief or adequate protection with respect to liens or other property interests in

Revenues other than those that have been deposited in the Resolution Funds.  The Parties are

directed to meet and confer and file a joint report as to their positions on the nature, scope and

scheduling of further proceedings that they may believe are necessary in connection with the

HTA Stay Relief Motion, including any proceedings concerning stay relief with respect to the

HTA Movants' assertion of unsecured claims.  If no further proceedings are necessary, the Court

will enter an order terminating the HTA Stay Relief Motion as denied for the reasons stated in

this Opinion and Order.  The Parties must use their best good faith efforts to present a joint

proposal.  The joint report must be filed by July 9, 2020, at 5:00 p.m. (Atlantic Standard Time).


SO ORDERED.

Dated: July 2, 2020

      /s/ Laura Taylor Swain
LAURA TAYLOR SWAIN
United States District Judge