# EXHIBIT B

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

---------------------------------------------------------x

In re:

THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO,

      as representative of

THE COMMONWEALTH OF PUERTO RICO
et al.,

          Debtors.[1]

---------------------------------------------------------x

PROMESA
Title III

No. 17 BK 3283-LTS

(Jointly Administered)

OPINION AND ORDER IN CONNECTION WITH PRELIMINARY HEARING REGARDING AMENDED
MOTION OF AMBAC ASSURANCE CORPORATION, FINANCIAL GUARANTY INSURANCE
COMPANY, ASSURED GUARANTY CORP., ASSURED GUARANTY MUNICIPAL CORP.,
AND U.S. BANK TRUST NATIONAL ASSOCIATION, CONCERNING
APPLICATION OF THE AUTOMATIC STAY TO THE REVENUES SECURING PRIFA RUM TAX BONDS

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (the "Commonwealth") (Bankruptcy Case No. 17-BK-3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17-BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

APPEARANCES:

FERRAIUOLI LLC

By:     Roberto Cámara-Fuertes
        Sonia Colón
221 Ponce de León Avenue, 5th Floor
San Juan, PR 00917

MILBANK LLP

By:     Dennis F. Dunne
        Atara Miller
        Grant R. Mainland
        John J. Hughes, III
55 Hudson Yards
New York, NY 10001

ARENT FOX LLP

By:     David L. Dubrow
        Mark A. Angelov
1301 Avenue of the Americas
New York, NY 10019

        and

        Randall A. Brater
1717 K Street, NW
Washington, DC 20006

*Attorneys for Ambac Assurance Corporation*

REXACH & PICÓ, CSP

By:     María E. Picó
802 Ave. Fernández Juncos
San Juan, PR 00907

BUTLER SNOW LLP

By:     Martin A. Sosland
5430 LBJ Freeway, Suite 1200
Dallas, TX 75240

        and

        Jason W. Callen
150 3rd Ave., S., Suite 1600
Nashville, TN 37201

*Attorneys for Financial Guaranty Insurance
Company*

O'NEILL & BORGES LLC

By:     Hermann D. Bauer
250 Muñoz Rivera Avenue, Suite 800
San Juan, PR 00918-1813

PROSKAUER ROSE LLP

By:     Martin J. Bienenstock
        Brian S. Rosen
        Ehud Barak
        Daniel S. Desatik
Eleven Times Square
New York, NY 10036

        and

        Michael A. Firestein
        Lary Alan Rappaport
2029 Century Park East, Suite 2400
Los Angeles, CA 90067

*Attorneys for the Financial Oversight and
Management Board for Puerto Rico, as
representative of the Commonwealth of Puerto
Rico*

MARINI PIETRANTONI MUÑIZ LLC

By:     Luis C. Marini-Biaggi
        Carolina Velaz-Rivero
250 Ponce de León Avenue, Suite 900
San Juan, PR 00918

O'MELVENY & MYERS LLP

By:     John J. Rapisardi
7 Times Square
New York, NY 10036

        and

        Peter Friedman
1625 Eye Street, NW
Washington, DC 20006

        and

        Elizabeth L. McKeen
        Ashley M. Pavel
610 Newport Center Drive, 17th Floor
Newport Beach, CA 92660

CASELLAS ALCOVER & BURGOS P.S.C.

By:   Heriberto Burgos Pérez
       Ricardo F. Casellas-Sánchez
       Diana Pérez-Seda
P.O. Box 364924
San Juan, PR 00936

CADWALADER, WICKERSHAM & TAFT
LLP

By:   Howard R. Hawkins, Jr.
       Mark C. Ellenberg
       William J. Natbony
       Ellen M. Halstead
       Thomas J. Curtin
       Casey J. Servais
200 Liberty Street
New York, NY 10281

*Attorneys for Assured Guaranty Corp. and
Assured Guaranty Municipal Corp.*

RIVERA, TULLA, AND FERRER LLC

By:   Eric A. Tulla
       Iris J. Caberera-Gómez
50 Quisqueya Street
San Juan, PR 00917

HOGAN LOVELLS US LLP

By:   Robin E. Keller
       Ronald Silverman
390 Madison Avenue
New York, NY 10017

*Attorneys for U.S. Bank Trust National
Association, in its capacity as Trustee*

*Attorneys for the Puerto Rico Fiscal Agency
and Financial Advisory Authority*

CASILLAS, SANTIAGO & TORRES LLC

By:   Juan J. Casillas Ayala
       Israel Fernández Rodríguez
       Juan C. Nieves González
       Cristina B. Fernández Niggemann
P.O. Box 195075
San Juan, PR 00919

PAUL HASTINGS LLP

By:   Luc A. Despins
       James R. Bliss
       James B. Worthington
       G. Alexander Bongartz
200 Park Avenue
New York, NY 10166

*Attorneys for the Official Committee of
Unsecured Creditors*

C. CONDE & ASSOCIATES

By:   Carmen D. Conde-Torres
       Luisa S. Valle Castro
254 San José Street, 5th Floor
San Juan, PR 00901

COVINGTON & BURLING LLP

By:   Dianne Coffino
       R. Alexander Clark
620 Eighth Avenue
New York, NY 10018

*Attorneys for Bacardi International Limited and
Bacardi Corporation*

MCCONNELL VALDÉS

By:   Nayuan Zouairbani
       270 Muñoz Rivera Avenue, Suite 7
Hato Rey, PR 00918

*Attorneys for Destileria Serralles, Inc.*

LAURA TAYLOR SWAIN, United States District Judge

Ambac Assurance Corporation ("Ambac"), Assured Guaranty Corp. ("AGC"), Assured Guaranty Municipal Corp. (together with AGC, "Assured"), and Financial Guaranty Insurance Company (collectively, the "PRIFA Insurers") hold or insure more than $829 million in bonds issued by the Puerto Rico Infrastructure Financing Authority ("PRIFA"). The PRIFA Insurers and U.S. Bank Trust National Association, in its capacity as the successor trustee ("U.S. Bank" or the "Trustee" and, together with the PRIFA Insurers, the "PRIFA Movants"), seek relief from the automatic stay in order to pursue litigation in alternative fora to enforce their asserted property rights in certain rum tax revenues that have, according to the PRIFA Movants, been pledged to secure those PRIFA bonds. (See *Amended Motion of Ambac Assurance Corporation, Financial Guaranty Insurance Company, Assured Guaranty Corp., Assured Guaranty Municipal Corp., and U.S. Bank Trust National Association, Concerning Application of the Automatic Stay to the Revenues Securing PRIFA Rum Tax Bonds*, Docket Entry No. 10602 in Case No. 17-3283,[2] the "PRIFA Stay Relief Motion.") In the alternative, the PRIFA Movants seek entry of an order requiring the Commonwealth of Puerto Rico (the "Commonwealth") to provide adequate protection for the PRIFA Movants' alleged collateral. The Financial Oversight and Management Board for Puerto Rico (the "Oversight Board"), as representative of the Commonwealth, opposes the PRIFA Stay Relief Motion and asserts that the PRIFA Movants have no property or security interest in the relevant rum tax revenues. (See *Supplemental Opposition of Commonwealth of Puerto Rico to Amended PRIFA Bondholder Motion to Lift Automatic Stay [ECF No. 10602]*, Docket Entry No. 10611, the "Opposition.") The Puerto Rico

---

[2]     All docket entry references herein are to entries in Case No. 17-3283, unless otherwise specified.

Fiscal Agency and Financial Advisory Authority, the Official Committee of Unsecured

Creditors, Bacardi International Limited, Bacardi Corporation, and Destileria Serralles, Inc. have

filed various briefs in opposition to the PRIFA Stay Relief Motion.

The Court held a preliminary hearing on the issues of standing and secured status

in connection with the PRIFA Stay Relief Motion on June 4, 2020 (the "Preliminary Stay Relief

Hearing"), and has considered carefully all of the arguments and submissions made in

connection with the PRIFA Stay Relief Motion.[3]  The Court has subject matter jurisdiction of

---

[3]      In addition to the PRIFA Stay Relief Motion and the Opposition, the Court has carefully
reviewed the following pleadings: the *Amended Bacardi International Limited's and
Bacardi Corporation's Opposition to Amended Motion of Ambac Assurance Corporation,
Financial Guaranty Insurance Company, Assured Guaranty Corp., Assured Guaranty
Municipal Corp., and U.S. Bank Trust National Association, Concerning Application of
the Automatic Stay to the Revenues Securing PRIFA Rum Tax Bonds* (Docket Entry No.
10616, the "Bacardi Opposition"); the *Joinder by Serralles to the FOMB and Bacardi's
Oppositions to Movants' Amended Motion for Relief from Stay* (Docket Entry No.
10612); the *Partial Joinder of Official Committee of Unsecured Creditors in Support of
Supplemental Opposition of Commonwealth of Puerto Rico to Amended PRIFA
Bondholder Motion to Lift Automatic Stay [ECF No. 10602]* (Docket Entry No. 10635);
*AAFAF's Limited Joinder to the Oppositions of Financial Oversight and Management
Board for Puerto Rico and Bacardi International Limited and Bacardi Corporation to
Motion of Assured Guaranty Corp., Assured Guaranty Municipal Corp., Ambac
Assurance Corporation, National Public Finance Guarantee Corporation, and Financial
Guarantee Insurance Company for Relief from the Automatic Stay, or, in the Alternative,
Adequate Protection [ECF No. 10109]* (Docket Entry No. 10641); the *Reply of Ambac
Assurance Corporation, Financial Guaranty Insurance Company, Assured Guaranty
Corp., Assured Guaranty Municipal Corp., and U.S. Bank Trust National Association, in
Support of Their Amended Motion Concerning Application of the Automatic Stay to the
Revenues Securing PRIFA Rum Tax Bonds* (Docket Entry No. 13310, the "Reply"); the
*Sur-Reply of Commonwealth of Puerto Rico in Opposition to Amended PRIFA
Bondholder Motion to Lift Automatic Stay [ECF No. 10602]* (Docket Entry No. 13159);
the *Limited Joinder of Official Committee of Unsecured Creditors in Support of Sur-
Reply of Commonwealth of Puerto Rico in Opposition to Amended PRIFA Bondholder
Motion to Lift Automatic Stay [ECF No. 10602]* (Docket Entry No. 13171); and *Ambac
Assurance Corporation, Financial Guaranty Insurance Company, Assured Guaranty
Corp., Assured Guaranty Municipal Corp., and U.S. Bank Trust National Association's
Response to the Oversight Board's Sur-Reply in Support of Their Amended Motion
Concerning Application of the Automatic Stay to the Revenues Securing PRIFA Rum Tax
Bonds* (Docket Entry No. 13228, the "Sur-Sur-Reply").  The Court has also reviewed the

this contested matter pursuant to 48 U.S.C. § 2166(a). For the reasons that follow, the Court concludes that the PRIFA Movants have not made the preliminary showing necessary to allow the PRIFA Stay Relief Motion to proceed to a final hearing to the extent that the PRIFA Movants seek stay relief or adequate protection with respect to liens or other property interests in the Rum Tax Remittances (as defined herein) other than those Rum Tax Remittances that have been deposited into the Sinking Fund.

## I.

### BACKGROUND

The following facts are undisputed, unless otherwise indicated.

### A. The PRIFA Enabling Act

The United States Department of the Treasury (the "U.S. Treasury") collects a federal excise tax on rum produced in Puerto Rico and sold on the mainland (the "Rum Taxes"). (Opp. ¶ 27.) Section 7652 of Title 26 of the United States Code provides that "[a]ll taxes collected under the internal revenue laws of the United States on articles produced in Puerto Rico and transported to the United States . . . shall be covered into the treasury of Puerto Rico." 26 U.S.C.A. § 7652(a)(3) (Westlaw through P.L. 116-145); see also id. § 7652(e)(1) ("All taxes collected under section 5001(a)(1) on rum imported into the United States . . . shall be covered into the treasuries of Puerto Rico and the Virgin Islands."). The Rum Taxes are therefore "covered into the treasury of Puerto Rico" by the U.S. Treasury after collection (the "Rum Tax Remittances").

---

declarations and exhibits filed in connection with the aforementioned pleadings as well as the *Joint Informative Motion Regarding the Treatment of Exhibits Submitted in Connection with the Lift Stay Motions* (Docket Entry No. 13413).

In June 1988, the Commonwealth Legislature enacted Act No. 44-1988 (the

"PRIFA Enabling Act"). (Mot. ¶ 9.) PRIFA was created to provide "financial, administrative, or

other assistance to public corporations and instrumentalities of the Commonwealth, to allow

them to fulfill their public purpose to provide, preserve, operate, maintain, repair, replace, and

improve parts of the infrastructure of Puerto Rico." 3 L.P.R.A. § 1901. The PRIFA Enabling

Act authorizes PRIFA to "[b]orrow money and issue bonds . . . for any of its corporate

purposes," and to "pledge any property for the payment of the principal of and interest on any

bonds issued by [PRIFA] . . . and pledge all or a portion of such revenues as [PRIFA] may

receive including, but not limited to, and subject to the provisions of § 8 of Article VI of the

Constitution of the Commonwealth of Puerto Rico, all or any portion of the federal excise taxes

or other funds which should have been transferred by the Commonwealth to [PRIFA]." Id. §

1906(l), (m). If PRIFA secures its bond issuances by a pledge of any of its revenues, "[s]uch

pledge shall be valid and binding from the time it is made without the need for a public or

notarized instrument," and "[t]he revenues so pledged, including those subsequently received by

[PRIFA], shall immediately be subject to said lien without the need of the physical delivery

thereof or any other act." Id. § 1907(a).

Section 1914 of the PRIFA Enabling Act, titled "Special deposit," requires that

the Commonwealth appropriate a specified portion of the Rum Tax Remittances to PRIFA each

fiscal year:

> [T]he first proceeds of the federal excise taxes remitted to the
> Department of the Treasury of Puerto Rico on each fiscal year,
> pursuant to [26 U.S.C. § 7652(a)(3)] . . . in the case of Fiscal Years
> 2006-07 to 2008-09, and in subsequent years until Fiscal Year 2056-
> 57, the participation shall be for an amount of up to one hundred and
> seventeen million dollars ($117,000,000), which when received by
> the Department of the Treasury of Puerto Rico, shall be covered into
> a Special Fund to be maintained by or on behalf of [PRIFA],

designated as the 'Puerto Rico Infrastructure Fund', and be used by [PRIFA] for its corporate purposes . . . . In case the funds collected from said federal excise taxes are insufficient to cover the amounts herein appropriated, the Secretary of the Treasury is authorized to cover said deficiency with any funds available and the Director of the Office of Management and Budget, at the request of [PRIFA] shall include for the budget recommended for the corresponding fiscal year the appropriations needed to cover said deficiencies.

3 L.P.R.A. § 1914. Section 1914 further empowers PRIFA to "segregate a portion of said Funds into one (1) or more sub-accounts, subject to the provisions of Section 8 of Article VI of the Constitution of the Commonwealth of Puerto Rico for the payment of the principal and interest on bonds and other obligations of" PRIFA, and expressly provides that the "moneys of the Special Fund [i.e., the Puerto Rico Infrastructure Fund] may be used for the payment of interest and for the amortization of the public debt of the Commonwealth, as provided in said Section 8, only when the other resources available referred to in said Section are insufficient for such purposes." Id.

The PRIFA Enabling Act further provides that any bonds issued by PRIFA "shall not constitute an indebtedness of the Commonwealth nor of any of its political subdivisions, and neither the Commonwealth nor any of its political subdivisions shall be liable therefor, and such bonds shall be payable solely out of those funds pledged for the payment thereof." Id. § 1910. However, section 1913 of the PRIFA Enabling Act, titled "Covenant of Commonwealth with bondholders," provides that the Commonwealth "pledges and agrees with the holders of any bonds issued under this chapter and with those persons or entities that enter into contracts with [PRIFA] . . . that it shall not limit or alter the rights hereby conferred to [PRIFA] until such bonds and the interest thereon are paid in full." Id. § 1913. PRIFA, as an agent of the Commonwealth, is "authorized to include this pledge on behalf of the Commonwealth on such bonds or contracts." Id.

B.  The Trust Agreement

PRIFA has issued approximately $1.612 billion in bonds pursuant to the terms of the Trust Agreement dated October 1, 1988, between PRIFA and the Trustee.[4]  (Docket Entry No. 10602-2, the "Trust Agreement").  (Opp. ¶ 36 (citing Trust Agreement); cf. Mot. ¶ 15 ("PRIFA has issued approximately $1.8 billion in bonds . . . pursuant to the Trust Agreement.").)  Section 601 of the Trust Agreement, titled "Payment of Principal, Interest and Premium; Pledge of Pledged Revenues," provides that the principal of and the interest on bonds issued under the Trust Agreement "are payable solely from the Pledged Revenues."  (Trust Agreement § 601.)  "Pledged Revenues" are in turn defined in section 101 of the Trust Agreement as "Special Tax Revenues and any other moneys that have been deposited to the credit of the Sinking Fund."  (Id. § 101.)  "Special Tax Revenues" are "the Offshore Excise Taxes deposited to the credit of the Puerto Rico Infrastructure Fund pursuant to the [PRIFA Enabling] Act," and "Offshore Excise Taxes" are "the federal excise taxes on rum and other articles produced in Puerto Rico and sold in the United States that are collected by the United States government and remitted to the Puerto Rico Treasury Department pursuant to the Code and other provisions of law."  (Id.)  The "Sinking Fund" is "the 'Puerto Rico Infrastructure Financing Authority Special Tax Revenue Bonds Sinking Fund', a special fund created and designated by Section 401" of the Trust Agreement.  (Id.)

Section 401 of the Trust Agreement, titled "Sinking Fund and Accounts," provides in relevant part as follows:

> A special fund is hereby created and designated 'Puerto Rico
> Infrastructure Financing Authority Special Tax Revenue Bonds
> Sinking Fund' (herein sometimes called the 'Sinking Fund') to be

---

[4]  Citibank N.A. was designated as the original trustee, and U.S. Bank Trust National Association has since been named as successor trustee.  (See Mot. ¶ 15 n.7.)

held by the Trustee. . . . Subject to the terms and conditions set forth
in this Agreement, moneys held to the credit of the Sinking Fund
shall be held in trust and disbursed by the Trustee for the purposes
set forth below. . . . [PRIFA] shall maintain with a Qualified
Depositary the Puerto Rico Infrastructure Fund. [PRIFA] shall not
pledge or create any liens upon any moneys in the Puerto Rico
Infrastructure Fund. As promptly as practicable upon the receipt of
Special Tax Revenues or other moneys deposited to the credit of the
Puerto Rico Infrastructure Fund, [PRIFA] shall withdraw an amount
of such Special Tax Revenues and other moneys to make the
following deposits in the following order . . . .

(Id. § 401.) Section 401 goes on to specify amounts to be deposited in the various sub-accounts

of the Sinking Fund. (Id.) Additionally, section 405 of the Trust Agreement provides that "[a]ll

moneys which the Trustee shall have withdrawn from the accounts of the Sinking Fund, or shall

have received from any other source and set aside or deposited with any paying agent for the

purpose of paying any of the [PRIFA bonds] hereby secured . . . shall be held in trust" for the

PRIFA bondholders. (Id. § 405.) Section 501 of the Trust Agreement requires that "[a]ll

moneys deposited under [the Trust Agreement] with the Trustee . . . shall be held in trust under

the terms hereof, and shall not be subject to lien or attachment by any creditor of PRIFA." (Id. §

501.)

   In addition to providing that the principal of and the interest on bonds issued

under the Trust Agreement "are payable solely from the Pledged Revenues," section 601 of the

Trust Agreement states that nothing in the PRIFA bonds or in the Trust Agreement "shall be

deemed to constitute the Bonds a debt or obligation of the Commonwealth of Puerto Rico or any

of its political subdivisions, and neither the Commonwealth of Puerto Rico nor any of its

political subdivisions shall be liable for the payment of the principal of or the interest on the

Bonds." (Id. § 601.) Section 603 of the Trust Agreement provides that, "[i]f the amount of

projected Special Tax Revenues in any fiscal year of the Commonwealth is less than the

maximum amount required to be so deposited under the [PRIFA Enabling] Act, [PRIFA] shall request the Director of the Office of Budget and Management of the Commonwealth to include in the budget the necessary appropriations to cover such deficiency."  (Id. § 603.)

### C. The Lockbox Agreement, Moratorium Acts, and Clawback Orders

On May 5, 2015, Citibank, N.A., as the lockbox bank, Banco Popular de Puerto Rico, as trustee, Citibank, N.A., as paying agent, and the Government of Puerto Rico entered into a Lockbox Agreement.  (See Docket Entry No. 10616-4, the "Lockbox Agreement.")  Pursuant to the terms of the Lockbox Agreement, the Secretary of the Commonwealth Treasury owns a lockbox account maintained at Citibank, N.A. (the "Lockbox Account") (see Bacardi Opp. ¶ 9), the Rum Tax Remittances are deposited by the Commonwealth into the Lockbox Account after receipt from the federal government (see Opp. ¶¶ 28, 69), and payments from the Lockbox Account are made in accordance with a "stipulated payment sequence" (Bacardi Opp. ¶ 9). Specifically, in each fiscal year, the first $117 million of Offshore Excise Taxes received in the Lockbox Account must be transferred to the Commonwealth's Treasury Single Account (the "TSA") for deposit to the credit of PRIFA.  (Bacardi Opp. ¶ 9 (citing Lockbox Agreement § 5).) The next $5 million of Offshore Excise Taxes received in the Lockbox Account are thereafter transferred to the TSA for deposit to the credit of the Puerto Rico Science and Technology Trust, and certain amounts of the Offshore Excise Taxes are distributed to the Puerto Rico Conservation Trust Fund in accordance with a formula prescribed by Puerto Rico law.  (Id.) Offshore Excise Taxes are then distributed to certain rum producers in accordance with incentive agreements between the rum producers and the Commonwealth.  (Id.)  Any remaining Offshore Excise Taxes are transferred to the TSA.  (Id.)  The Commonwealth has not appropriated or transferred any of the Rum Tax Remittances to PRIFA, and no Rum Tax Remittances retained by

the Commonwealth have been deposited into the Sinking Fund, since November 30, 2015. (Opp. ¶ 48.)

On June 28, 2015, Governor Alejandro García-Padilla (the "Governor") announced that the Commonwealth could not pay its debts. (Mot. ¶ 20.) On November 30, 2015, the Governor issued Administrative Bulletin OE-2015-046 (Docket Entry No. 10602-4, the "First Clawback Order"), which declared that the cash flow projection for the relevant fiscal year was insufficient to pay general obligation debt and to continue paying routine government expenses. (Mot. ¶ 21.) The First Clawback Order directed the Secretary of the Commonwealth Treasury to halt the transfer of Rum Tax Remittances to PRIFA. (Id. (citing First Clawback Ord. at 3).)

On April 6, 2016, the Governor signed into law the Puerto Rico Emergency Moratorium and Rehabilitation Act, Act No. 21-2016 (Docket Entry No. 10602-5, the "Moratorium Act"), which authorized the Governor to declare a state of emergency for the Commonwealth or any of its instrumentalities. (Id. ¶ 22 (citing Moratorium Act § 201(a)).) The Governor thereafter issued a series of Administrative Bulletins that effectively prevented the payment of principal and interest on PRIFA bonds. (Id.) Specifically, the Governor declared a state of emergency over PRIFA and stayed all litigation arising from nonpayment of PRIFA bonds (see Docket Entry No. 10602-6, Administrative Bulletin OE-2016-14), suspended all PRIFA bond payments (see Docket Entry No. 10602-7, Administrative Bulletin EO-2016-30), and halted the Commonwealth's obligation to transfer revenues to PRIFA (see Docket Entry No. 10602-8, Administrative Bulletin EO-2016-31). (Mot. ¶ 22.)

The Puerto Rico Oversight, Management, and Economic Stability Act ("PROMESA") was enacted on June 30, 2016, in order to address the fiscal emergency in Puerto

Rico created by a "combination of severe economic decline, and, at times, accumulated operating

deficits, lack of financial transparency, management inefficiencies, and excessive borrowing."

48 U.S.C.A. § 2194(m)(1) (Westlaw through P.L. 116-145).[5]  The Governor thereafter signed

into law the Amended Moratorium Act on January 29, 2017.  (Mot. ¶ 25.)  The Commonwealth

"has not made any payment on its public debt since 2016."  (Id. ¶ 26.)

        D.   Procedural History

        At the time of the Commonwealth's Title III filing on May 3, 2017, Ambac and

Assured were involved in three pending lawsuits challenging the Commonwealth's alleged

diversion of the Rum Tax Remittances, as well as other "pledged revenues."  (Mot. ¶ 30.)  Two

of these lawsuits were brought against Commonwealth officials and sought injunctive and

declaratory relief to "halt the diversion of the [first $117 million of Rum Tax Remittances each

fiscal year] and other pledged revenues."  (Id. (citing Assured Guar. Corp. v. García-Padilla, No.

3:16-cv-01037 (D.P.R., filed Jan. 7, 2016) and Ambac Assurance Corp. v. Rosselló Nevares, No.

3:17-cv-01568 (D.P.R., filed May 2, 2017)).)  The third lawsuit was brought in the United States

District Court for the District of Columbia against the U.S. Treasury and the United States

Secretary of the Treasury for an equitable lien on the first $117 million of Rum Taxes collected

by the U.S. Treasury each fiscal year and injunctive relief prohibiting the U.S. Treasury from

remitting any Rum Taxes to the Commonwealth until resolution of the aforementioned lawsuits

against Commonwealth officials.  (Id. (citing Ambac Assurance Corp. v. U.S. Dep't of Treasury,

No. 1:17-cv-00809 (D.D.C., filed May 2, 2017) (the "U.S. Treasury Action")).)  All three of

these lawsuits were stayed after the filing of the Commonwealth's Title III petition.  (Id.)

---

[5]      PROMESA is codified at 48 U.S.C. § 2101 et seq.  References to "PROMESA" sections
in this Opinion and Order are to the uncodified version of the statute.

On May 30, 2019, Ambac filed a motion in this Court seeking entry of an order

declaring that the automatic stay does not apply to the U.S. Treasury Action or prohibit the

commencement of an action against the Commonwealth and certain rum companies to enforce

the PRIFA Movants' alleged lien and to prevent the continuing appropriation of the first $117

million of Rum Tax Remittances each fiscal year (the "PRIFA Clawback Action" and, together

with the U.S. Treasury Action, the "PRIFA Enforcement Actions").  (See *Ambac Assurance

Corporation's Motion and Memorandum of Law in Support of Its Motion Concerning

Application of the Automatic Stay to the Revenues Securing PRIFA Rum Tax Bonds*, Docket

Entry No. 7176, the "Initial PRIFA Stay Relief Motion.")  In the alternative, Ambac sought relief

from the automatic stay to pursue the PRIFA Enforcement Actions in alternative fora.  (Id.)

Further in the alternative, Ambac sought an order requiring the Commonwealth to provide

adequate protection for Ambac's alleged collateral.  (Id.)  Financial Guaranty Insurance

Company and Assured joined the Initial PRIFA Stay Relief Motion.  (See Docket Entry Nos.

7546 and 8024.)

A hearing in connection with the Initial PRIFA Stay Relief Motion, limited to

"oral argument on the legal issues of standing and secured status only," which were raised by the

Oversight Board as threshold defenses to the Initial PRIFA Stay Relief Motion, was scheduled to

be heard at the July 24, 2019, Omnibus Hearing.  (See *Order Regarding Argument and

Discovery in Connection with Ambac Assurance Corporation's Motion Concerning Application

of the Automatic Stay*, Docket Entry No. 7420.)  At the July 24, 2019, Omnibus Hearing, the

Court announced a short-term stay of certain pending litigation in the Title III cases in order to

allow litigants to work with the Mediation Team to "identify key and gating issues, assess their

crosscutting and collateral implications, seek to reach substantial consensus as to the

prioritization of matters for litigation or mediation, and formulate a proposed schedule and appropriate notice and participation mechanisms that are as standardized and comprehensive as possible." (Docket Entry No. 8266, July 24, 2019 Hr'g Tr., at 56:1-10.) Ambac and the Oversight Board agreed to include the Initial PRIFA Stay Relief Motion in that mediation process. (Id. at 71:22-24, 80:19-24.)

At the end of the stay period, the Court set a briefing schedule for the PRIFA Stay Relief Motion, including a schedule for any motion for leave to amend the Initial PRIFA Stay Relief Motion. (See Docket Entry No. 10595.) The PRIFA Movants filed a motion to amend the Initial PRIFA Stay Relief Motion (see Docket Entry No. 10109), which the Court granted on January 31, 2020 (see Docket Entry No. 10591). The PRIFA Movants thereafter filed the PRIFA Stay Relief Motion.

## II.

### DISCUSSION

Consistent with the *Final Case Management Order for Revenue Bonds* (Docket Entry No. 12186), the Court, having held the Preliminary Stay Relief Hearing, limits its attention herein to the parties' contentions concerning the PRIFA Movants' "standing to sue and security or other property interests in the" Rum Tax Remittances. The resolution of the PRIFA Movants' claims regarding standing to seek stay relief under section 362 of the Bankruptcy Code, cause for such stay relief, and adequate protection is dependent on the determination of whether and to what extent the PRIFA Movants have made the requisite demonstration that they have cognizable and enforceable property interests in the Rum Tax Remittances. The Court will

therefore, in the first instance, analyze the parties' contentions with respect to the PRIFA

Movants' property interests in Rum Tax Remittances.

    A. <u>Legal Standard</u>

    The PRIFA Stay Relief Motion is brought under section 362(d) of the Bankruptcy

Code.[6]  Section 362(d) of the Bankruptcy Code provides that, on "request of a party in interest

and after notice and a hearing, the court shall grant relief from the stay" provided under section

362(a) "for cause, including the lack of adequate protection of an interest in property of such

party in interest," or, "with respect to a stay of an act against property under [section 362(a)], if –

(A) the debtor does not have an equity in such property; and (B) such property is not necessary to

an effective reorganization[.]"  11 U.S.C.A. § 362(d)(1)-(2) (Westlaw through P.L. 116-145).  A

movant has the initial burden of establishing prima facie eligibility for relief from the automatic

stay.  <u>See</u> <u>Gracia-Gracia v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight & Mgmt.</u>

<u>Bd. for P.R.</u>), 939 F.3d 340, 347 (1st Cir. 2019) (citing <u>Mazzeo v. Lenhart (In re Mazzeo)</u>, 167

F.3d 139, 142 (2d Cir. 1999)).  After that initial burden is met, the moving party bears the

ultimate burden of proof on the issue of the debtor's equity in property, and the party opposing

stay relief has the ultimate burden of proof on all other issues.  <u>See</u> 11 U.S.C. § 362(g).

    Where, as here, a movant seeks relief from the automatic stay to pursue remedies

with respect to assets allegedly securing obligations, or for an award of adequate protection, the

court does not fully and finally adjudicate the merits of the parties' underlying claims of security

or beneficial interests in resolving the stay relief motion.  Rather, the court must determine

"whether the party seeking relief has a colorable claim to property of the estate."  <u>Grella v.</u>

---

[6]    The provisions of the Bankruptcy Code cited herein are made applicable in these Title III
cases by section 301(a) of PROMESA.  <u>See</u> 48 U.S.C. § 2161.

Salem Five Cent Sav. Bank, 42 F.3d 26, 33 (1st Cir. 1994). In Grella, the First Circuit analogized this determination to that required in the context of a hearing for preliminary injunctive relief, stating that a claim is colorable where there is a "reasonable likelihood that a creditor has a legitimate claim or lien as to a debtor's property." Id.; see Mission Prod. Holdings, Inc. v. Schleicher & Stebbins Hotels, L.L.C. (In re Old Cold, LLC), 602 B.R. 798, 825 (B.A.P. 1st Cir. 2019) (characterizing a "colorable claim" as one "that is legitimate and that may reasonably be asserted, given the facts presented and the current law") (quoting Jin Qing Li v. Rosen (In re Jin Qing Li), BAP No. NC-17-1062-STaB, 2018 WL 1354548, at *4 (B.A.P. 9th Cir. Mar. 12, 2018)). "This is a low threshold: A colorable claim (one seemingly valid and genuine) is not a difficult standard to meet." In re Old Cold, 602 B.R. at 825 (quoting In re Pansier, No. 18-22297-beh, 2019 WL 1495100, at *4 (Bankr. E.D. Wis. Apr. 3, 2019)). In evaluating whether a movant has demonstrated a colorable claim, however, the court considers not only the movant's legal and factual contentions, but also defenses raised by the non-moving party, weighing all relevant arguments in determining whether the movant has shown the requisite reasonable likelihood of success. See Grella, 42 F.3d at 34 ("[A] court may take into account any matter that bears directly on the debtor's equity, or that clearly refutes a creditor's claim to the property.").

If a movant satisfies the threshold "colorable claim" standard, the court must then assess whether the movant has shown cause under 11 U.S.C. § 362(d)(1) or otherwise met its burden under 11 U.S.C. § 362(d)(2). See, e.g., Gracia-Gracia, 939 F.3d at 350 (to prevail under § 362(d)(1), stay relief movants must show that the relevant factors weigh in their favor); In re Old Cold, 602 B.R. at 823-24 (noting that "the issue in the Stay Relief Motion was whether [the movant] had met its burden of establishing a colorable claim of a lien on property of the Debtor's

estate and, if so, whether [the movant] was entitled to stay relief under § 362(d)(2)"). At this preliminary stage, the Court limits its inquiry to whether the PRIFA Movants have shown a reasonable likelihood that they possess a legitimate lien against, or other property interest in, the relevant assets.

For the reasons that follow, the Court concludes that the PRIFA Movants have failed to demonstrate that they have a colorable claim to a security or beneficial interest in the Rum Tax Remittances other than those Rum Tax Remittances deposited into the Sinking Fund.

B. <u>Nature and Extent of PRIFA Movants' Security Interest</u>

The Court begins its analysis by reviewing the operative statutory and contractual structure, which is described in additional detail in the Background Section of this Opinion and Order, to determine whether and to what extent the governing statutes and/or agreements grant the PRIFA Movants a security interest in the Rum Tax Remittances.

1. <u>Cover Over Statute and PRIFA Enabling Act</u>

The United States Code requires that Rum Taxes collected by the U.S. Treasury be "covered into the treasury of Puerto Rico." 26 U.S.C.A. § 7652(a)(3) (Westlaw through P.L. 116-145).[7] The PRIFA Enabling Act created PRIFA, a public corporation and instrumentality of the Commonwealth, and generally authorizes PRIFA to borrow money and issue bonds for any

---

[7]     Since 2015, as noted above, the Commonwealth of Puerto Rico Department of the Treasury (the "Commonwealth Treasury") has maintained a Lockbox Account from which the Rum Taxes received from the U.S. Treasury are disbursed to various Commonwealth instrumentalities in accordance with a stipulated payment sequence. The Lockbox Agreement governing this sequence provides that, in each fiscal year, the first $117 million of Offshore Excise Taxes received in the Lockbox Account must be transferred to the Commonwealth's TSA for deposit to the credit of PRIFA. (See Bacardi Opp. ¶ 9 (citing Lockbox Agreement § 5).) Because the existence of the Lockbox Agreement and Lockbox Account is not material to the Court's analysis of the PRIFA Movants' property interests, if any, in the Rum Tax Remittances, the Court will not address the mechanics of those Lockbox-related documents in detail herein.

of its corporate purposes.  See 3 L.P.R.A. §§ 1901, 1906.  Specifically, the "Special deposit"

provision of the PRIFA Enabling Act provides that the first $117 million of the Rum Tax

Remittances each fiscal year, once remitted to the Commonwealth Treasury, "shall be covered

into a Special Fund to be maintained by or on behalf of [PRIFA], designated as the 'Puerto Rico

Infrastructure Fund', and be used by [PRIFA] for its corporate purposes."  Id. § 1914.  The

PRIFA Enabling Act also empowers PRIFA to segregate a portion of the funds deposited into the

Infrastructure Fund into sub-accounts, subject to Section 8 of Article VI of the Commonwealth

Constitution, for the payment of the principal and interest on PRIFA bonds and other obligations

of PRIFA, and provides that monies in the Infrastructure Fund "may be used for the payment of

interest and for the amortization of the public debt of the Commonwealth, as provided in said

Section 8, only when the other resources available referred to in said Section are insufficient for

such purposes."  Id.  The PRIFA Enabling Act authorizes PRIFA to issue bonds and to "pledge

any property for the payment of the principal of and interest on any bonds issued by [PRIFA] . . .

and pledge all or a portion of such revenues as [PRIFA] may receive, including, but not limited

to, and subject to the provisions of § 8 of Article VI of the [Commonwealth Constitution], all or

any portion of the federal excise taxes or other funds which should have been transferred by the

Commonwealth" to PRIFA.  Id. § 1906(l), (m).  If PRIFA secures its bonds with a pledge of all

or part of any of its revenues, such pledge "shall be valid and binding from the time it is made

without the need for a public or notarized instrument."  Id. § 1907(a).  The PRIFA Enabling Act

also includes a "Covenant of Commonwealth with bondholders" provision, which provides that

the Commonwealth "pledges and agrees with" bondholders "that it shall not limit or alter the

rights hereby conferred to [PRIFA] until such bonds and the interest thereon are paid in full."  Id.

§ 1913. The same provision authorizes PRIFA, "as an agent of the Commonwealth, . . . to include this pledge on behalf of the Commonwealth on such bonds or contracts." Id.

In sum, the PRIFA Enabling Act mandates that the Commonwealth transfer the first $117 million of Rum Tax Remittances received each fiscal year to accounts held by or maintained on behalf of PRIFA to be used by PRIFA for its corporate purposes. The Enabling Act further empowers, but does not require, PRIFA to issue bonds and to secure those bonds with a pledge of its property, including Rum Tax Remittances that "should have been transferred by" the Commonwealth to PRIFA, subject to Section 8 of Article VI of the Commonwealth Constitution. The Commonwealth "pledge[d] and agree[d]" with PRIFA's future bondholders that it would not limit or alter the rights conferred to PRIFA in the PRIFA Enabling Act until the PRIFA bonds are paid in full, authorizing PRIFA as the Commonwealth's agent to include the pledge and agreement as part of bond issuances or contracts.

The PRIFA Enabling Act does not effect the issuance of any bonds, nor does it include any pledge of security. The PRIFA Enabling Act simply mandates the transfer of the first $117 million in Rum Tax Remittances each fiscal year to the Infrastructure Fund for PRIFA's corporate purposes and provides that the principal of and interest on bonds issued by PRIFA "may be secured by a pledge of all or part of any of its revenues . . . all as provided in the trust agreement or resolution under which the bonds are issued." 3 L.P.R.A. § 1907(a).[8]

---

[8]     Specifically, the PRIFA Enabling Act provides that "the participation shall be for an amount of up to one hundred and seventeen million dollars ($117,000,000)" each fiscal year. 3 L.P.R.A. § 1914. The PRIFA Movants assert that, under Puerto Rico law, "'participation' equates to ownership," and the Court should therefore construe this provision of the PRIFA Enabling Act as evidence that PRIFA, not the Commonwealth, owns the first $117 million of Rum Tax Remittances received from the federal government each fiscal year. (Mot. ¶ 56.) The PRIFA Movants' citations to statutes relating to ownership interests in partnerships and joint ventures, and to a First Circuit

Although the Commonwealth covenanted with future PRIFA bondholders in the PRIFA Enabling Act not to alter PRIFA's rights, that covenant is not itself a pledge of security. The Court therefore concludes that there is no language in the PRIFA Enabling Act that itself creates a lien or a property interest in connection with the Commonwealth's statutory obligation to transfer the first $117 million in Rum Tax Remittances to the Infrastructure Fund each fiscal year.

2.   Trust Agreement

To determine how and to what extent PRIFA exercised its authority under the PRIFA Enabling Act to issue bonds and to pledge revenue as security for those bonds, the Court turns to the Trust Agreement. As described in more detail above, the Trust Agreement is a contract between PRIFA and the Trustee, dated October 1, 1988. The Trust Agreement provides for the creation of a Sinking Fund with three separate sub-accounts, and for the payment of bond service and redemption obligations from the Sinking Fund sub-accounts. (Trust Agreement § 401.) Section 401 of the Trust Agreement specifically provides that monies held to the credit of the Sinking Fund "shall be held in trust." (Id.) Additionally, the Trust Agreement requires that PRIFA maintain the Infrastructure Fund, from which Special Tax Revenues are to be withdrawn and deposited into the Sinking Fund, and expressly prohibits PRIFA from "pledg[ing] or creat[ing] any liens" on any monies in the Infrastructure Fund. (Id.) Section 405 of the Trust Agreement provides that monies withdrawn from the Sinking Fund or deposited with any paying agent for the purpose of paying PRIFA bonds are to be held in trust for bondholders. Section

---

decision regarding a loan participation contract, provide no support for their reading of an ownership transfer into the use of the word "participation" in the PRIFA Enabling Act.

501 further provides that monies deposited with the Trustee pursuant to the Trust Agreement are to be held in trust and are not subject to a lien or attachment by any of PRIFA's creditors.

In section 601 of the Trust Agreement, PRIFA covenants that it will pay the bonds, and that the bond payments will be made solely from Pledged Revenues, which are pledged in the amount and to the extent specified in the preceding provisions of the Trust Agreement. Section 601 further provides that the bonds issued by PRIFA under the Trust Agreement are not an obligation of the Commonwealth or its political subdivisions and that neither the Commonwealth nor its political subdivisions have any liability on the bonds. In section 602 of the Trust Agreement, PRIFA again covenants that it will not use the Pledged Revenues for any purpose other than as provided in the Trust Agreement. PRIFA obligates itself in section 603 of the Trust Agreement to make requests to the Secretary of the Commonwealth Treasury for budget appropriations to cover bond service shortfalls in the event that the amount of Special Tax Revenues deposited to the credit of the Infrastructure Fund are insufficient to permit PRIFA to make deposits into the Sinking Fund as required by section 401 of the Trust Agreement.

The Trust Agreement provides that the principal of and the interest on bonds issued by PRIFA under the Trust Agreement "are payable solely from the Pledged Revenues." (Trust Agreement § 601.) "Pledged Revenues" are "Special Tax Revenues and any other moneys that have been deposited to the credit of the Sinking Fund," "Special Tax Revenues" are "the Offshore Excise Taxes deposited to the credit of the Puerto Rico Infrastructure Fund pursuant to the [PRIFA Enabling] Act," and "Offshore Excise Taxes" are "the federal excise taxes on rum and other articles produced in Puerto Rico and sold in the United States that are collected by the United States government and remitted to the Puerto Rico Treasury Department

pursuant to the Code and other provisions of law." (Id. § 101.) The "Sinking Fund" is "the 'Puerto Rico Infrastructure Financing Authority Special Tax Revenue Bonds Sinking Fund', a special fund created and designated by Section 401" of the Trust Agreement. (Id.)

The Trust Agreement is plainly the only instrument through which PRIFA purported to grant a security interest or to create a trust in connection with its bond issuances. As these cited provisions of the Trust Agreement make clear, the Trust Agreement recognizes the Infrastructure Fund as a creature of the PRIFA Enabling Act. As permitted by the PRIFA Enabling Act, the Trust Agreement creates separate sub-accounts which comprise the Sinking Fund. These sub-accounts are distinguished from the Infrastructure Fund. PRIFA is required by the terms of the Trust Agreement to make withdrawals from the Infrastructure Fund for deposit into the Sinking Fund, but it is the Sinking Fund only that is required to be held in trust, and therefore the Sinking Fund only which could give rise to a security interest in favor of PRIFA's bondholders. Pledged Revenues, from which PRIFA covenants to make its bond payments, are those pledged in the amount and to the extent provided in the Trust Agreement provisions preceding section 501, which specifically provides that all monies deposited with the Trustee shall be held in trust. Section 401 of the Trust Agreement further provides that PRIFA cannot pledge the monies that are in the Infrastructure Fund, although the PRIFA Enabling Act does not itself prohibit such a pledge.

The PRIFA Movants contend that the use of the term "Pledged Revenues" in section 601 of the Trust Agreement, which provides in pertinent part that bond payments are "payable solely from the Pledged Revenues, which Pledged Revenues are hereby pledged to the payment thereof in the manner and to the extent hereinabove particularly specified," nevertheless broadens the scope of the security granted by the express terms of Article IV of the Trust

Agreement.  Section 101 of the Trust Agreement defines "Pledged Revenues" as "the Special

Tax Revenues and any other moneys that have been deposited to the credit of the Sinking Fund."

Invoking the "last-antecedent" canon of statutory construction, the PRIFA Movants argue that

the "that have been deposited" qualifier applies only to the reference to "any other moneys," and

that the Pledged Revenues definition renders all Special Tax Revenues, whether or not they have

been deposited to the credit of the Sinking Fund, subject to the pledge in favor of bondholders.

The PRIFA Movants' construction is inconsistent with the specific terms of section 401 of the

Trust Agreement, which sets forth the scope of the pledge and, without using the term "Pledged

Revenues," delineates carefully between the Infrastructure Fund (which holds Special Tax

Revenues, which are deposits of Offshore Excise Taxes received from the U.S. Treasury) and the

Sinking Fund (into which such Special Tax Revenues are to be deposited in amounts sufficient to

cover bond-related obligations), subjecting only the Sinking Fund to the trust relationship created

by the Trust Agreement.  Section 401, furthermore, specifically prohibits the pledge or the

creation of a lien on the Infrastructure Fund, which holds the Special Tax Revenues before they

are transferred to the Sinking Fund.

Section 401 cannot support the PRIFA Movants' reading of the definition of

Pledged Revenues.  Used in section 601 as a shorthand for the product of the trust and pledge

commitments carefully delineated in section 401, "Pledged Revenues" can only refer to amounts

(including Special Tax Revenues) that are actually deposited into the Sinking Fund.  The

structure of the Trust Agreement thus demonstrates that application of the last-antecedent canon

to interpret the definition of Pledged Revenues is inappropriate.  Indeed, the "series-qualifier"

canon, which the First Circuit has used in construing similar language in instruments defining the

scope of security for bonds issued by another Commonwealth instrumentality, applies and

underscores the propriety of reading the reference to Special Tax Revenues as qualified by the

requirement of a deposit into the Sinking Fund.

   In <u>Fin. Oversight & Mgmt. Bd. for P.R. v. Andalusian Glob. Designated Activity

Co. (In re Fin. Oversight & Mgmt. Bd. for P.R.)</u>, the First Circuit described the series-qualifier

canon as follows: "[w]hen several words are followed by a clause which is applicable as much to

the first and other words as to the last, the natural construction of the language demands that the

clause be read as applicable to all."  948 F.3d 457, 467 (1st Cir. 2020) (citing <u>Paroline v. United

States</u>, 572 U.S. 434, 447 (2014)).  In <u>Andalusian</u>, the First Circuit examined the meaning of the

term "Employers' Contributions," which was defined by the governing bond resolution as "the

contributions paid from and after the date hereof that are made by the Employers and any assets

in lieu thereof or derived thereunder which are payable to the System pursuant to Sections 2-116,

3-105 and 4-113 of the [Enabling] Act."  <u>Id.</u> at 464.  The First Circuit concluded that the limiting

clause (<u>i.e.</u>, "which are payable to the System pursuant to Sections 2-116, 3-105 and 4-113") was

equally applicable to both of the antecedent phrases (<u>i.e.</u>, "any assets in lieu thereof or derived

thereunder" <u>and</u> "the contributions paid from and after the date hereof that are made by the

Employers") and therefore applied the limiting clause to each category of assets.  <u>Id.</u> at 467.

   This Court finds the First Circuit's reasoning to be equally applicable to the

present dispute regarding the meaning of the term "Pledged Revenues."  Here, the limiting clause

(<u>i.e.</u>, "that have been deposited to the credit of the Sinking Fund") applies logically to both of the

relevant antecedent phrases (<u>i.e.</u>, "Special Tax Revenues" and "any other moneys").  It follows

that, consistent with the specific trust-creation provisions of the Trust Agreement, the Pledged

Revenues encompass only monies that have been deposited to the credit of the Sinking Fund, and

not monies in the Commonwealth TSA or the PRIFA Infrastructure Fund.  The PRIFA Movants'

argument that the Trust Agreement's prohibition on pledges of assets in the Infrastructure Fund
applies only to pledges in support of future securities junior to the bonds presently at issue finds
no foundation in the plain language of the Trust Agreement.

***

In sum, the PRIFA Enabling Act grants no security interest to PRIFA
bondholders.  The trust and pledge commitments between PRIFA and its bondholders are instead
made in and defined by the terms of the Trust Agreement.  The Trust Agreement, in turn,
imposes trust and pledge obligations in favor of PRIFA's bondholders only with respect to funds
actually deposited into the Sinking Fund, and expressly prohibits PRIFA from pledging or
creating any liens upon any assets in the Infrastructure Fund, which is where the Special Tax
Revenues are held for PRIFA's corporate purposes.  The Court therefore concludes that the
PRIFA Movants have not proffered a colorable claim that they have an enforceable interest in
Rum Tax Remittances that have not been deposited into the Sinking Fund, and that the PRIFA
Movants therefore cannot show cause for relief from stay to pursue the PRIFA Enforcement
Actions based on rights under the statute or the Trust Agreement, nor have they made a colorable
showing of entitlement to adequate protection.

> C.  Equitable Arguments

The PRIFA Movants also invoke a number of equitable doctrines, claiming that,
because the first $117 million of Rum Tax Remittances received by the Commonwealth Treasury
each fiscal year are destined under the PRIFA Enabling Act for PRIFA, which is obligated to use
the Rum Tax Remittances as a source of payments for the bonds, the Rum Tax Remittances are

funds in which PRIFA's bondholders have a legal interest that should be enforced or protected by equitable remedies.

        1.  <u>PRIFA's Alleged Equitable Ownership of the Rum Tax Remittances</u>

        In support of their contention that PRIFA is, at all times, the equitable owner of the first $117 million in Rum Tax Remittances each fiscal year, the PRIFA Movants rely on <u>Asociación de Subscripción Conjunta del Seguro de Responsabilidad Obligatorio v. Flores Galarza</u>, 484 F.3d 1 (1st Cir. 2007) ("<u>Flores Galarza</u>"), and <u>Gracia-Gracia</u>. Both <u>Flores Galarza</u> and <u>Gracia-Gracia</u> involve the Commonwealth's compulsory liability insurance system (as amended, "Law 253"), which at all relevant times required liability insurance coverage for all motor vehicles that travel on public thoroughfares in the Commonwealth. <u>Flores Galarza</u>, 484 F.3d at 6. Every vehicle owner was required to either (i) pay the compulsory liability insurance premium to the Secretary of the Commonwealth Treasury when licensing a vehicle or (ii) opt out by purchasing equivalent or better private insurance. <u>Id.</u> at 7. The Secretary of the Commonwealth Treasury was required to give the premiums to the Compulsory Liability Joint Underwriting Association of Puerto Rico, or the "JUA." <u>Id.</u> Drivers without proof of private insurance at the time of licensing had to pay the premium and were entitled to reimbursement by the JUA. <u>Id.</u> Under Law 253, all private insurers were required to provide compulsory liability insurance in one of two ways: (i) private insurers were required to provide compulsory liability insurance to motor vehicle owners that requested it, unless those owners were "high-risk drivers," and (ii) private insurers were required to provide compulsory liability insurance as members of the JUA. <u>Id.</u> (citations omitted). In <u>Flores Galarza</u>, the JUA alleged that the Secretary of the Commonwealth Treasury had wrongfully withheld insurance premiums from January 2000 through November 2002 in order to alleviate the Commonwealth's cash flow

problems.  Id. at 10-11.  The First Circuit held that the JUA, rather than the Commonwealth, was

the owner of the diverted premiums:

> Law 253 gives the JUA the power to hold property, and provides
> that the JUA 'shall receive' premiums from the Secretary and that
> the Secretary 'shall transfer' these premiums to the JUA.  While the
> Secretary collects the insurance premiums and holds them for some
> unspecified amount of time before relinquishing them to the JUA,
> the Secretary is not an insurer—he is merely the custodian of these
> funds.  As a custodian, the Secretary has no entitlement to the
> premiums, and his woefully undeveloped argument that the
> premiums do not vest in the JUA until the Secretary transfers them
> does not convince us otherwise.

Id. at 29.  Similarly, the First Circuit in Gracia-Gracia—which involved claims asserted by a

class of motorists who had paid duplicate premiums, rather than by the JUA—held that the

claimants had made a prima facie showing of the existence of a trust relationship based on

statutory language requiring the Secretary of the Commonwealth Treasury to hold the relevant

funds "in its fiduciary capacity."  939 F.3d at 351; see 26 L.P.R.A. § 8055(j) ("The Secretary of

the Treasury shall retain the funds transferred by the Joint Underwriting Association in its

fiduciary capacity for a five (5)-year term counting from the date on which the retained funds are

transferred by the Joint Underwriting Association to the Secretary of the Treasury.").

Flores Galarza and its progeny are not instructive for purposes of this motion

practice.  Here, a specific Trust Agreement governs the relationship between PRIFA and its

bondholders.  The revenues at issue are not special purpose, third-party payments for insurance

premiums that are required to be used to provide insurance or refunded to the payors.  The

Internal Revenue Code expressly provides for the turnover of the Rum Taxes by the U.S.

Treasury to the Commonwealth Treasury.  The Commonwealth has statutorily obligated itself to

pay the first $117 million of those Rum Tax Remittances to PRIFA for PRIFA's general

corporate purposes, but it has not created a trust or secured that obligation through the PRIFA

Enabling Act. Unlike individual motor vehicle owners required to pay premiums for car insurance under the structure of Law 253, which expressly promised those individuals either insurance or a refund from the entity tasked with providing the insurance, the PRIFA bondholders lent money to PRIFA and received bonds in return under specific conditions spelled out in the Trust Agreement. The Trust Agreement does not promise those bondholders that the Commonwealth will pay them and it did not impose a trust relationship on the Rum Tax Remittances before the Rum Tax Remittances are deposited into the Sinking Fund. The PRIFA Movants have, accordingly, failed to establish a colorable claim to equitable or beneficial ownership of Rum Tax Remittances that have not been deposited into the Sinking Fund.[9]

2. <u>Special Deposit and Equitable Lien Arguments</u>

The PRIFA Movants assert that the title of section 1914 of the PRIFA Enabling Act – "Special deposit" – signifies that the Commonwealth transferred ownership of the first $117 million of Rum Tax Remittances to PRIFA and intended to hold those revenues only in a fiduciary capacity for PRIFA and its bondholders. (See Reply ¶ 28; Sur-Sur-Reply ¶ 19 ("[A] 'Special Deposit,' 3 L.P.R.A. § 1914, . . . is an accounting term of art routinely used and understood generally and by the Commonwealth to refer to moneys held in a fiduciary capacity in a special fund.").) The PRIFA Movants' "Special Deposit" argument regarding the Infrastructure Fund, which is founded in accounting terminology and principles rather than in law and, in any event, is insufficient to demonstrate that the PRIFA bondholders have been

---

[9]    The PRIFA Movants also ask that the Court find that a constructive trust or, in the alternative, a resulting trust, has arisen as a result of "the diversion of the Pledged Rum Taxes for improper purposes." (Mot. ¶ 59.) In light of the Court's conclusion that the PRIFA Enabling Act and the Trust Agreement, when read together, unambiguously limit the scope of the PRIFA Movants' security interest to Rum Tax Remittances deposited into the Sinking Fund, the PRIFA Movants have not raised a colorable claim of entitlement to equitable relief in the form of a constructive or resulting trust. (<u>Id.</u>)

granted a security interest in Rum Tax Remittances in the Infrastructure Fund, also fails to
establish a colorable claim of property rights in the Rum Tax Remittances that have not been
deposited into the Sinking Fund.

Additionally, the PRIFA Movants' equitable lien argument fails in light of the
Court's conclusions regarding the operation of the PRIFA Enabling Act and the Trust
Agreement, which are unambiguous and do not indicate any intent to provide the PRIFA
Movants with a lien, equitable or otherwise, on assets beyond monies deposited into the Sinking
Fund.

\*\*\*

For the foregoing reasons, the PRIFA Movants have not demonstrated that they
have a reasonable likelihood of success in establishing a legal basis for their claims of property
interests that underlie the PRIFA Enforcement Actions and their request for adequate protection,
and thus have failed to establish that they have the requisite colorable claim.[10]  The PRIFA
Movants do not have a lien, equitable or otherwise, enforceable against the first $117 million of
Rum Tax Remittances each fiscal year unless and until those funds are deposited into the Sinking
Fund.  Accordingly, the Court concludes that the PRIFA Movants cannot meet their burden of

---

[10]     The Court notes that, although the PRIFA Enabling Act and the Trust Agreement are
unambiguous, additional evidence of record supports this interpretation.  For example,
the relevant offering statements are illustrative of information consistent with the Trust
Agreement.  (See Opp. ¶ 15 n.10 (citing 2005 Official Statement and 2006 Official
Statement, the "Offering Statements").)  The Offering Statements provide in relevant part
that the PRIFA bonds are payable "solely from, and secured by a pledge of, the revenues
and other moneys deposited in the [Sinking Fund] established under the Trust
Agreement."  (See Opp. ¶ 40 (citing Offering Statements at 9).)  The Offering Statements
also define "Pledged Revenues" as "proceeds of the federal excise tax imposed on rum
and other articles produced in Puerto Rico and sold in the United States that are
transferred to the Commonwealth . . . and deposited to the credit of the Sinking Fund"
and "any other funds appropriated" to PRIFA "that are deposited to the credit of the
Sinking Fund."  (Id.)

showing cause for relief from the automatic stay or entitlement to adequate protection, and the

PRIFA Stay Relief Motion is denied to the extent that it seeks stay relief or adequate protection

with respect to Rum Tax Remittances outside of the Sinking Fund.[11]


III.

CONCLUSION

In light of the foregoing conclusions, the PRIFA Stay Relief Motion is denied to

the extent that it seeks stay relief or adequate protection with respect to the Rum Tax

Remittances other than those Rum Tax Remittances that have been deposited into the Sinking

Fund. The parties are directed to meet and confer and file a joint report as to their positions on

the nature, scope, and scheduling of any further proceedings that they may believe are necessary

in connection with the PRIFA Stay Relief Motion, including any proceedings concerning stay

relief with respect to the PRIFA Movants' assertion of unsecured claims. If no further

proceedings are necessary, the Court will enter an order terminating the PRIFA Stay Relief

Motion as denied for the reasons stated in this Opinion and Order. The parties must use their

---

[11]     The Court, having already determined that the PRIFA Movants have an insufficient
likelihood of success in demonstrating an interest in the Rum Tax Remittances outside of
the Sinking Fund, need not engage the parties' arguments regarding the propriety of
clawbacks pursuant to Article VI, Section 8 of the Commonwealth Constitution.

best good faith efforts to present a joint proposal.  The joint report must be filed by July 9, 2020,

at 5:00 p.m. (Atlantic Standard Time).


       SO ORDERED.

Dated: July 2, 2020


                                        /s/ Laura Taylor Swain

                                   LAURA TAYLOR SWAIN

                                   United States District Judge