```
 1                    UNITED STATES DISTRICT COURT

 2                     DISTRICT OF PUERTO RICO

 3
      In Re:                      )        Docket No. 3:17-BK-3283(LTS)
 4                                )
                                  )        PROMESA Title III
 5    The Financial Oversight and )
      Management Board for        )
 6    Puerto Rico,                )        (Jointly Administered)
                                  )
 7    as representative of        )
                                  )
 8    The Commonwealth of         )
      Puerto Rico, et al.         )        September 23, 2020
 9                                )
                    Debtors,      )
10
      _____
11
12    The Financial Oversight and ) Docket No. 3:20-AP-00003(LTS)
      Management Board for        )
13    Puerto Rico,                )
                                  )
14    as representative of        )
                                  )
15    The Commonwealth of         )
      Puerto Rico,                )
16                    Plaintiff,  )
                                  )
17    v.                          )
                                  )
18    Ambac Assurance             )
      Corporation, et al.         )
19                                )
                    Defendants.   )
20
      _____
21

22

23

24

25
```

```
 1  _____

 2

 3  The Financial Oversight and ) Docket No. 3:20-AP-00004(LTS)
    Management Board for        )
 4  Puerto Rico,                )
                                )
 5  as representative of        )
                                )
 6  The Commonwealth of         )
    Puerto Rico,                )
 7              Plaintiff,      )
                                )
 8  v.                          )
                                )
 9  Ambac Assurance             )
    Corporation, et al.         )
10                              )
                Defendants.     )
11

12  _____

13  The Financial Oversight and ) Docket No. 3:20-AP-00005(LTS)
    Management Board for        )
14  Puerto Rico,                )
                                )
15  as representative of        )
                                )
16  The Commonwealth of         )
    Puerto Rico,                )
17              Plaintiff,      )
                                )
18  v.                          )
                                )
19  Ambac Assurance             )
    Corporation, et al.         )
20                              )
                Defendants.     )
21

22  _____

23

24

25
```

```
 1   _____

 2                      HEARING ON MOTIONS

 3     BEFORE THE HONORABLE U.S. DISTRICT JUDGE LAURA TAYLOR SWAIN

 4                  UNITED STATES DISTRICT COURT JUDGE

 5      AND THE HONORABLE U.S. MAGISTRATE JUDGE JUDITH GAIL DEIN

 6                  UNITED STATES DISTRICT COURT JUDGE

 7   _____

 8   APPEARANCES:

 9   ALL PARTIES APPEARING TELEPHONICALLY

10   For The Commonwealth
     of Puerto Rico, et al.:  Mr. Martin J. Bienenstock, PHV
11                            Mr. Michael A. Firestein, PHV
                              Mr. Colin Kass, PHV
12
     For Official Committee
13   of Unsecured Creditors:  Mr. Luc Despins, PHV

14   For Ambac Assurance
     Corporation:             Ms. Atara Miller, PHV
15
     For National Public
16   Finance Guarantee Corp.: Mr. Robert Berezin, PHV

17   For Assured Guaranty
     Corp. and Assured
18   Guaranty Municipal
     Corp.:                   Mr. William J. Natbony, PHV
19
     For AmeriNational
20   Community Services, LLC,
     and Cantor-Katz
21   Collateral Monitor, LLC: Mr. Douglas Mintz, PHV
                              Mr. Nayuan Zouairabani Trinidad, Esq.
22

23

24

25   Proceedings recorded by stenography.  Transcript produced by
     CAT.
```

```
 1                            I N D E X

 2   WITNESSES:                                        PAGE

 3          None.

 4

 5   EXHIBITS:

 6          None.

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          San Juan, Puerto Rico

2          September 23, 2020

3          At or about 9:04 AM

4          *     *     *

5     THE COURT:  Good morning.  This is Judge Swain

6  speaking.

7          MS. NG:  Hi, Judge.  It's Lisa.

8     THE COURT:  Ms. Tacoronte, would you please announce

9  the case?

10          COURTROOM DEPUTY:  Good morning, Your Honor.

11          THE COURT:  Good morning.

12          COURTROOM DEPUTY:  The United States District Court

13  for the District of Puerto Rico is now in session.  The

14  Honorable Laura Taylor Swain presiding.  God save the United

15  States of America and this Honorable Court.

16          For the record, case number 17-3283, *In Re:  The*

17  *Financial Oversight and Management Board for Puerto Rico as*

18  *representative of the Commonwealth of Puerto Rico, et al.*

19  Adversary Proceedings 2020-03, 2020-04, and 2020-05 for motion

20  hearing.

21          THE COURT:  Thank you, Ms. Tacoronte.

22          Again, buenos dias.  Good morning, everyone.  Welcome

23  counsel, parties in interest and members of the public and

24  press.  Today's hearing is for oral argument on the motions

25  for partial summary judgment that have been filed as Docket

1   Entry No. 43 in Adversary Proceeding No. 20-003, Docket Entry

2   No. 40 in Adversary Proceeding No. 20-004, and Docket Entry

3   No. 55 in Adversary Proceeding No. 20-005.

4          To ensure the orderly operation of today's telephonic

5   hearing, all parties on the line must mute their phones when

6   they are not speaking.  If you are accessing these proceedings

7   on a computer, please be sure to select mute on both the Court

8   Solutions dashboard and on your phone.  When you need to

9   speak, remember that you must unmute on both the dashboard and

10  the phone.

11         I remind everyone that, consistent with court and

12  judicial conference policies and the Orders that have been

13  issued, no recording or retransmission of the hearing is

14  permitted by any person, including but not limited to the

15  parties, members of the public or the press.  Violations of

16  this rule may be punished with sanctions.

17         I will be calling on each speaker during these

18  proceedings in the agreed order that is enumerated in the

19  Joint Informative Motion filed yesterday as Docket Entry No.

20  108 in Adversary Proceeding 20-003, filed as Docket Entry No.

21  101 in Adversary Proceeding 20-004, and Docket Entry No. 122

22  in Adversary Proceeding 20-005.

23         When I do call on you, please begin your remarks by

24  identifying yourself by name for clarity of the record.  If

25  you wish to be heard out of order or otherwise need to make a

1   remark, please state your name clearly at the end of an

2   argument segment and request to be heard.  And remember,

3   you'll have to unmute on both your phone and the Court

4   Solutions dashboard.  Don't just use the wave function on the

5   Court Solutions dashboard, because I may not be able to see

6   that.  I will respond to your request and will call on each

7   speaker if more than one person wishes to be heard and I am

8   granting the request.

9        Please don't interrupt each other or me during this

10  hearing.  If we interrupt each other, it is difficult to

11  create an accurate transcript of the proceedings.  But having

12  said that, and as usual, I apologize in advance for breaking

13  this rule, because I may interrupt if I have questions or if

14  you go beyond your allotted time.  If anyone has difficulty

15  hearing me or another participant, please say something right

16  away.

17       The time allotments for each matter and the time

18  allocations for each speaker are set forth in the Joint

19  Informative Motion.  I encourage each speaker to keep track of

20  his or her own time.  The Court will also be keeping track of

21  the time and will alert each speaker when there are two

22  minutes remaining with one buzz, and when time is up with two

23  buzzes.  Here is an example of the buzz sound.

24       (Sound played.)

25       THE COURT:  If your allocation is two minutes or

1   less, you will just hear the final two buzzes.

2        When we take a break, I'll direct everyone to

3   disconnect and dial back in at a specified time.  I'm planning

4   to call breaks at the end of the arguments by the movant and

5   parties supporting the motions, and then between the arguments

6   in opposition to the motions and the rebuttal arguments.  If

7   an argument participant needs me to call a break at another

8   time, unmute on both your phone and the Court Solutions

9   dashboard and say something at an appropriate time.

10        The timing for today's proceedings is from 9:00 to

11  12:45 for the morning session, and then we will resume at 2:15

12  if necessary.  I think that covers all of the logistics and

13  housekeeping issues, and so now we will turn to the oral

14  argument.

15        The first speaker is Mr. Bienenstock on behalf of the

16  Oversight Board, who has been allotted 68 minutes.

17        Mr. Bienenstock.

18        MR. NATBONY:  Judge Swain, I'm sorry.  This is

19  William Natbony on behalf of the Monoline Defendants.  Before

20  we begin, defendants just had a quick request on time

21  allocations.

22        THE COURT:  Yes.

23        MR. NATBONY:  In view of our preparation, we realized

24  we were perhaps a bit optimistic in terms of the ability to

25  get through our arguments in the 96 of 120 allocated minutes

1    requested.  As such, we would respectfully request that an

2    additional ten minutes be added to both Ms. Miller and myself

3    to be safe.

4          The overall time requested would still be within the

5    time allocated by the Court.  So if granted, both Ms. Miller

6    and I would have 40 minutes, rather than 30 minutes, each, and

7    Mr. Berezin would follow with 20 minutes.

8          Thank you, Your Honor.

9          THE COURT:  Thank you.  And so that still keeps you

10    under the 120 minutes?

11          MR. NATBONY:  Yes, Your Honor.

12          THE COURT:  I'm sorry.  Does anyone else wish to be

13    heard on that?  I thought I'd heard another voice.

14          (No response.)

15          THE COURT:  That request is granted.  And so just to

16    confirm, Mr. Natbony for Assured will be allotted 40 minutes,

17    Ms. Miller for Ambac will be allotted 40 minutes, Mr. Berezin

18    will be allotted the 20 minutes that were requested, and the

19    DRA Parties will be allotted the 16 minutes that were

20    requested.

21          MR. NATBONY:  Thank you, Your Honor.

22          THE COURT:  Is that your intent?

23          MR. NATBONY:  Yes, Your Honor.  Thank you.

24          THE COURT:  Thank you.

25          All right.  Then we will open with Mr. Bienenstock.

1      Mr. Bienenstock, you need to unmute on both the

2  dashboard and your phone.

3      And Ms. Ng, would you do whatever you can do to

4  unmute from our end?

5      MR. BIENENSTOCK:  Good morning, Your Honor.  Can you

6  hear me now?

7      THE COURT:  Yes, I can.  Thank you.

8      MR. BIENENSTOCK:  Okay.  Then I just wanted to wish

9  the Court and all parties best of health and the end of the

10  situation as quickly as possible.

11      May it please the Court, my name is Martin

12  Bienenstock of Proskauer Rose, LLP, attorneys for the

13  Oversight Board, as the Title III representative of HTA and

14  PRIFA, and on behalf of C -- of HTA, and on behalf of PRIFA

15  and CCDA, which are not Title III debtors.

16      Your Honor, what I hope to cover in my 68 minutes,

17  and then my colleagues will cover the 56(d) issues later and

18  some ancillary issues that I may not get to, are largely

19  issues raised in the sur-replies, because the other issues

20  have been fully briefed.  And on the issue of law of the case,

21  which defendants make an issue of in their sur-replies,

22  basically we're taking a very practical view.

23      While the Court has discretion to utilize its Stay

24  Relief Opinions as law of the case, we recognize two things:

25  First, the Court was very careful in those Stay opinions to

1    say it was ruling on whether the defendants had established

2    colorable claims; and second, as a practical matter, we don't

3    think the Court is going to enter a judgment here in the

4    summary judgment motions that the Court thinks is wrong.

5         So our position is simply this:  We think the Court

6    was right in all of its reasoning that led to its Stay Relief

7    Opinions.  The defendants have raised nothing since then to

8    demonstrate anything was wrong.  And on that, and subject to

9    any questions, of course, the Court may have, I'm not going to

10   retread that ground on the security interest, property

11   interest, et cetera, except perhaps tangentially, with one

12   exception.

13        In the HTA Sur-reply, the defendants, starting at

14   approximately paragraph nine on page seven of their Sur-reply

15   Brief, make an argument that at least in respect of HTA, that

16   they have a security interest in the monies held in bank

17   accounts at the Commonwealth, because, as we understand their

18   logic, when the payment of the various taxes and license fees

19   came into the Commonwealth, they say they had a perfected

20   security interest in that.  And when it was deposited into a

21   deposit account, the deposit account became proceeds of that.

22   And that would give them an exception to the rule that to have

23   a security interest, a perfected security interest in a

24   deposit account, you need a control agreement.

25        I will take just the next few minutes to point out

1    why they are wrong.  We understand, and I've laid out now the

2    logic, that they have to allege something to get around the

3    fact that they acknowledge and admit that they have no control

4    agreement on the bank accounts of the Commonwealth, which

5    would ordinarily prevent perfection.  So the only thing they

6    can say is its proceeds of something else in which they have a

7    security interest.

8         To do that, they have to show that the Commonwealth

9    has authenticated their security interest in the money or

10   other funds it takes in, which then gets converted into the

11   deposit account.  And what they say in their -- in paragraph

12   nine is that all they have to show is that they had a security

13   interest in a medium of exchange.

14        What they leave out in the definition of "medium of

15   exchange" is the Uniform Commercial Code requires that the

16   medium of exchange has to be adopted by the government as a

17   medium of exchange.  And the government has not adopted

18   deposit accounts as a medium of exchange, and they don't

19   contend that it does.  They just ignore that requirement.

20        They have two problems in establishing their deposit

21   accounts as proceeds of something they had a perfected

22   security interest in.  The first is they assume that the

23   payments for the various license fees, gas taxes, cigarette

24   taxes, et cetera, were made in cash, and there's no basis for

25   that assumption.  But let's even assume that they were right.

1   They then have to show that the Commonwealth has authenticated

2   the fact that it is holding that money for them, for the

3   creditor.

4          And if the Court -- the Court doesn't have to do this

5   now, but I'll just give the references.  In 9 L.P.R.A. Section

6   2021 and in 13 L.P.R.A. Section 31751(a)(1), the Court will

7   see that the relevant statutes provide that the special

8   accounts that the monies go into are not held for the

9   creditors.  They're held for HTA for its corporate purposes.

10         So the defendants fail the first test to establish

11  that the Commonwealth has authenticated the creditors'

12  security interest in what it receives as payment for the

13  various taxes and things that formally would ultimately

14  allocate it to HTA.

15         The next issue that I'm going to take up is the issue

16  that they raise that the statutes in Puerto Rico requiring the

17  Commonwealth to transfer monies to the three instrumentalities

18  are enforceable, notwithstanding *Ohio v. Kovacs*, in which the

19  Supreme Court ruled that the requirement, the statutory

20  requirement to either clean up a contaminated site or to pay

21  for the cleanup was simply a claim in bankruptcy.

22         The fundamental error that the defendants make is not

23  recognizing that all laws, whether statutes, common law, or

24  other sources of law are enforced by orders.  And that was the

25  case in *Ohio v. Kovacs*.  The common law and statutory law in

1    Ohio led to an order requiring the debtor, the ultimate

2    debtor, to pay for a cleanup.

3         The Supreme Court treated the claim as a statutory

4    claim.  It said, "the State argues, however, that the

5    injunction it has secured is not a claim against Kovacs for

6    bankruptcy purposes, because Kovacs' default was a breach of

7    the statute, not a breach of the ordinary commercial contract,

8    which concededly would give rise to a claim.  And Kovacs'

9    breach of his obligation under the injunction did not give

10   rise to a right to payment under the meaning of 101(4)(B).  We

11   are not persuaded by either submission."

12        And then the Supreme Court goes on to say that, to

13   satisfy the purposes of the Bankruptcy Code claim, the word

14   "claim" has to have a broad definition, which would definitely

15   encompass the statutory obligation.  So bottom line, the

16   Monolines' argument that *Kovacs* applies to orders and not

17   statutes is simply not right and logically doesn't make sense,

18   because all statutes, to enforce them, ultimately lead to

19   orders.

20        Now, the next argument I wanted to address is the

21   Monolines' argue that statutes cannot be rejected as executory

22   contracts and must be complied with.  And they cite *Kentucky*

23   *Employees Retirement System*, a recent Sixth Circuit Court of

24   Appeals decision.  They -- by doing that, they create the

25   illogical proposition that while a debtor may breach a promise

1    to pay, it may not breach something less, a promise to fund

2    another entity.  Because that's what they want the

3    Commonwealth to do here, to fund HTA, PRIFA and CCDA.

4         The short answer to their rejection argument is these

5    statutes don't have to be rejected because rejection only

6    applies to executory contracts, and these statutory -- these

7    statutes are not executory.  They are one-way obligations of

8    the Commonwealth to fund the three instrumentalities at issue.

9         The statutes here simply impose obligations on the

10   Commonwealth to transfer money to HTA, PRIFA and CCDA.  No

11   performance by HTA, PRIFA or CCDA is required.  Thus, the

12   statutes here start out as pre-petition claims against the

13   Commonwealth, so rejection is unnecessary to reduce the

14   statutes to claims.  Thus, the statutes are already the

15   equivalent to pre-petition claims.  They don't have to be

16   rejected.

17        Now, we recognize, and the defendants point out that

18   it was in our brief, that we mentioned the rejection power,

19   but we mentioned it in the context that these things result in

20   claims, the same as rejection does, not that the statutes were

21   executory contracts.

22        To best illustrate the fallacy of the Monolines'

23   argument, the Court only needs to consider its consequences.

24   The first consequence is that the Excise Tax Statutes in the

25   case of PRIFA would be the equivalent of nondischargeable,

1  specifically enforceable claims.  The second consequence is

2  that not only the Excise Tax Statutes, but all Puerto Rico law

3  requiring debts to be paid, including the Puerto Rico

4  Constitution requiring the general obligation debt to be paid

5  first from all available resources would become

6  nondischargeable, specifically enforceable debt.

7      Puerto Rico, like all states and territories, also

8  has common law, such as contract law, entitling all

9  debtholders to enforce their debt contracts.  Jurisprudential

10 law is no less enforceable than statutory law.  So accepting

11 the Monolines' argument means all debt must be paid in full

12 because that's what Puerto Rico law says.

13     Unsurprisingly, the statutory and common law of all

14 states and territories requires that valid debt be paid.  If

15 the Monolines are correct, we better notify all bankruptcy

16 judges and debtors across the United States that all debt must

17 be paid in full as long as local law requires it.  This

18 argument dovetails with the Monolines' argument against

19 preemption, which I will address right after addressing the

20 citation to the *Kentucky Employees,* Sixth Circuit decision.

21     There, the Chapter 11 debtor in possession, Seven

22 Counties, was a designated member of the Public Retirement

23 System and became required to pay to the pension plan in 2014

24 an amount equal to 39 percent of each employee's salary.  Even

25 at a 24 percent level, Seven Counties could not afford to

1    operate if it had to pay these pension contributions.

2          *Kentucky Employees* required the Chapter 11 debtor to

3    make the payments.  The decision was entirely based on 28

4    U.S.C. Section 959(b).  That section applied because Seven

5    Counties was held to be eligible for Chapter 11, unlike

6    municipalities which are ineligible pursuant to Bankruptcy

7    Code Sections 109(c) and (d).

8          To be a debtor under Chapter 11, the debtor must be a

9    railroad or a person, and "person" is defined by Bankruptcy

10   Section 101(41) to exclude governmental units like the

11   Commonwealth.  *In re Jefferson County,* 484 B.R. 427, at page

12   433, holds that 28 U.S.C. 959 does not apply to municipal

13   debtors for several reasons, including Tenth Amendment

14   concerns and the practicality that, at the end of the day, any

15   enforcement action would require controlling the debtor

16   county's money, and that is automatically stayed.

17         There, the City of Birmingham and its mayor wanted to

18   sue to compel the debtor, Jefferson County, not to close

19   inpatient and emergency room services for the indigent.

20   Notably, neither *Kentucky Employees* nor *Jefferson County*

21   addressed statutes requiring a Chapter Nine debtor or Title

22   III debtor to make certain payments until certain pre-petition

23   bonds were paid in full.  The statutes here require exactly

24   that.

25         Therefore, here one of the primary issues is whether

1    PROMESA, inclusive of its Title III, preempts those statutes.

2    As the Court knows from our briefs, PROMESA contains multiple

3    independent sources of preemption.  They certainly include

4    PROMESA Sections Four, 108(a)(2), 202, 207 and Title III.

5          Now, the Monolines argue the Excise Tax Statutes are

6    not impliedly preempted.  Starting in 1800, the United States

7    has enacted bankruptcy statutes.  None of them up through the

8    current Bankruptcy Code includes express preemption language,

9    except as the Court has seen in Sections 903 and 904 of the

10   Bankruptcy Code and in Section 303 of Title III.  It was never

11   necessary to have such express preemption language.

12         The Monolines' argument also proves too much, much

13   too much.  The Excise Tax Statutes require the Commonwealth to

14   transfer certain excise taxes to PRIFA until PRIFA's bonds are

15   repaid.  Puerto Rico's Constitution requires the

16   Commonwealth's General Obligation Bonds to be paid first from

17   all available resources, which include the excise taxes, when

18   there is otherwise insufficient revenues to pay all

19   appropriations.  Puerto Rico's common law provides for

20   contract damages and the enforcement of judgments for contract

21   damages.

22         This is all to say the Monolines, without

23   exaggeration, are asking the Court to repudiate the last 220

24   years of bankruptcy law and jurisprudence by enforcing laws

25   requiring debt repayment in full, even during the debtors'

1    Title III case.

2          Aside from implied preemption, PROMESA contained

3    Sections Four, 108(a)(2), 202 and 207, which are totally

4    inconsistent with the enforcement of the Excise Tax Statutes,

5    or they're being rendered non-dischargeable.  If all the

6    instrumentality debt and all the Commonwealth GO debt must be

7    paid in full because Title III does not expressly preempt all

8    those laws, then there's no restructuring available.

9          Moreover, PROMESA Title III does not grant the

10   priority to PRIFA and HTA'S claims against the Commonwealth

11   for appropriations.  That is yet another inconsistency between

12   Title III and the Commonwealth law triggering preemption.

13          THE COURT:  Mr. Bienenstock, I would just like to ask

14   you about the scope of the relief that you're asking for in

15   your preemption directed claim here in these partial summary

16   judgment motions.  Are you saying that the budgets or the

17   general budgetary power of the Oversight Board under PROMESA

18   preempts any claim against the Commonwealth under these

19   transfer statutes completely, or that it is preempting any

20   obligation to pay in a particular period covered by the

21   particular budget?

22          MR. BIENENSTOCK:  Your Honor, I thank you for raising

23   that.  It was a point I was definitely going to get to

24   quickly.  And I'd love to address it now, and obviously will

25   since Your Honor asked.  And I appreciate the way Your Honor

1    parsed and articulated the issues.

2          We are most definitely requesting the latter relief

3    Your Honor mentioned.  Namely, that, among other reasons,

4    PROMESA Section 202 preempts the Commonwealth's obligation to

5    transfer money to the instrumentalities pursuant to those

6    allocable revenue statutes in the briefs.

7          The other issue Your Honor articulated was --

8          THE COURT:  Preempts that obligation for the period

9    covered by the budget?  Wipes it out entirely?  Leaves it as

10   something that might have to be made up in the future?  That's

11   what I'm trying to really understand.

12         MR. BIENENSTOCK:  Okay.  In terms of eliminating the

13   obligation, we're saying that it eliminates the obligation at

14   a minimum for the period of the Fiscal Plan, which can be 20,

15   30, or 40 years.  And, in fact, our Proposed Plan of

16   Adjustment provides additionally that we have a whole list of

17   statutes that we regard as being preempted, and ask, as part

18   of the confirmation order, that the Court would rule on that.

19   But for this purpose, and for this Summary Judgment Motion,

20   we're saying that the obligation is totally preempted.

21         Now, the statutes provide that the obligations last

22   while the debt is outstanding.  The debt, of course, will be

23   dealt with in the Plan of Adjustment.  So the period during

24   which the debt will be outstanding is not going to be that

25   long, but we are saying it's for the total period, or any

1  period we put in the Fiscal Plan and Budget, which has been a

2  pretty long period, because it has to provide for the future.

3          The second issue that the Court asked I think is, are

4  we saying it preempts the claim of the creditors against the

5  Commonwealth for not making those transfers to the

6  instrumentalities.  And, as Your Honor knows, the defendants

7  have raised in their sur-replies that, in fact, they say it's

8  an excuse, a reason not to grant summary judgment, that we

9  have raised the possibility that they might have unsecured

10 claims.  And I -- and these are precisely the claims we were

11 thinking of.

12         If -- in the case of these instrumentalities, we've

13 been referring to them in the briefs as the non-impairment

14 Puerto Rico statutory provisions.  The Commonwealth has these

15 laws on its books, and they're all in the excerpts that we

16 filed for today, providing that the Commonwealth agrees to any

17 holder of the debt that it will not change these allocations

18 to reduce the taxes to below certain levels and will not

19 change the statutes adversely to the instrumentalities, HTA,

20 PRIFA and CCDA.  Because these statutes expressly refer to a

21 commitment to the bondholders, we were acknowledging the

22 possibility that the bondholders might have an unsecured claim

23 for these statutes not being carried out or being preempted.

24         Now, the contrary argument would be that preemption

25 eliminates the statute so they can't have a claim.  That

1    really hasn't been briefed and wasn't one of the things on

2    which we asked for summary judgment.  Additionally, if they

3    had an unsecured claim for that, what would be the amount of

4    it?  It's not -- they don't have a claim that the Commonwealth

5    agreed to pay their debt.  The Commonwealth was agreeing to

6    transfer money to the instrumentality for its corporate

7    purposes.

8         So the amount of that claim might be very small, but

9    whatever, it's not subject to the instant summary judgment

10   motions, because we anticipated that if it ever comes down to

11   the amount of that unsecured claim, there would need to be a

12   hearing on disputed facts most likely.

13        I hope that responds to Your Honor's inquiry.

14        THE COURT:  Most of it.  I just have a follow-up

15   inquiry.

16        MR. BIENENSTOCK:  Sure.  Sure.

17        THE COURT:  So what do you mean when you are

18   requesting disallowance of the claim as preempted?  These are

19   claims that have a figure on them and 50 pages of explanatory

20   theory behind it.  They haven't filed a separate claim for

21   each theory.

22        So are you looking for disallowance of the claim to

23   the extent it's premised on preemption of a certain subset of

24   the obligations, but not necessarily to wipe out this

25   potential residual claim under the non-impairment covenant?

1   What do you expect me to do by way of a ruling in relation to

2   the claims as they have been filed?

3          And this is obviously a question that I could ask in

4   a variation for each of these causes of action, but what does

5   disallowance mean for purposes of this motion practice?

6          MR. BIENENSTOCK:  Okay.  Well, first and foremost, on

7   the counts we chose on which to ask for summary judgment is

8   that we're asking that the Court determine that there are no

9   secured claims for any of these things, because -- largely for

10  all the reasons and more that the Court mentioned in its Stay

11  Relief Opinions of September 9.

12         In terms of disallowance of unsecured claims, the

13  only unsecured claim that we're acknowledging need not

14  necessarily be disallowed as a result of these motions are the

15  unsecured claims for not carrying out the unimpairment

16  statutes.

17         THE COURT:  Thank you.

18         MR. BIENENSTOCK:  Okay.  I just wanted to make -- I

19  hope that answered the Court's question.

20         The next issue that I was going to address is our

21  response to defendant's argument that the Commonwealth has no

22  right to default and that such a right would be a disputed

23  fact.  Monolines argue the Commonwealth may not default

24  without legislation requiring default.  Their Sur-replies make

25  it sound like the Commonwealth or any debtor's right to

1    default is a new epiphany.  Of course it's not.

2         We trust the Monolines each understood that

3    commencing the Title III case would halt payments on unsecured

4    pre-petition debt.  When we say the Commonwealth had a right

5    to default, we did not mean to say the Commonwealth could

6    default with impunity.  We mean, generically, the Commonwealth

7    had a statutory, contractual duty to pay money and failed to

8    do it.  It defaulted.  Whether the Commonwealth has defenses

9    such as preemption is another issue.

10        Now, I do want to mention once for all of these

11   arguments that there is a genuine issue as to whether a

12   statute requiring an appropriation, or providing for an

13   appropriation or a transfer of monies to an instrumentality is

14   an enforceable claim, because governments appropriate money

15   and then they can change their mind and reappropriate

16   differently.  And we've never heard of an instrumentality such

17   as HTA, et cetera, suing the government for changing its mind,

18   saying, no, you owed me a particular appropriation and now you

19   have to give it to me.  But that's an issue that is not being

20   addressed in the summary, but here we're assuming for

21   argument's sake that they do lead to claims.

22        That the Commonwealth definitely had the right to

23   default is supported by the Supreme Court's decision in

24   *Faitoute Iron & Steel Company v. City of Asbury Park*, 316 U.S.

25   502, at page 511.  The Supreme Court ruled, "the necessity

1   compelled by unexpected financial conditions to modify an

2   original arrangement for discharging a city's debt is implied

3   in every such obligation for the very reason that thereby the

4   obligation is discharged, not impaired."

5         Modifying an original arrangement euphemistically

6   means default and negotiate a restructuring.  The Supreme

7   Court used the word "discharge" to mean satisfied under

8   bankruptcy law, not merely to mean a bankruptcy discharge of

9   liability.

10        The whole point of *Faitoute* was that the

11  restructuring of the municipality's debt under state law,

12  whereby less than full interest was paid, was not an

13  impairment of contractual obligations under the Contract

14  Clause, because the restructuring enabled the bondholders to

15  be paid the value or more than the value of their contractual

16  obligations.  Without the restructuring, all they could do was

17  ask the legislature to raise taxes to pay them, which is the

18  same remedy the Monolines have here absent Title III.

19        The Monolines' Contract Clause arguments erroneously

20  assert the Contract Clause does not give rise to dischargeable

21  claims and erroneously hinge on nonmeritorious Contract Clause

22  claims.  The Monolines' insistence that the Commonwealth may

23  not default without legislation authorizing the default

24  clearly arises from the Monolines' recognition that there

25  cannot be a Contract Clause violation without state or

1    territory legislation.

2         But where the Monolines and the Commonwealth part

3    company is the next step.  Namely, whether a statute requiring

4    a default, no different from the Governor ordering a default,

5    impairs contractual obligations.  The Monolines assume it

6    does, and that assumption is wrong.

7         The Contract Clause expressly refers to impairing the

8    "obligation of contracts."  The Monolines' contractual rights

9    to have their bonds repaid were not impaired by the

10   Commonwealth's failure to pay timely and to default.  Whatever

11   contractual obligations the Monolines could enforce before the

12   default and the legislation remain contractual obligations

13   they can enforce in Title III.  In fact, the moratorium

14   legislation and executive orders went out of their way to

15   preserve all the Monolines' rights to principal and interest.

16        Insofar as the Monolines' rights to have the

17   Commonwealth transfer money to HTA, PRIFA and CCDA, the

18   Monolines always had the risk the Commonwealth would fail to

19   do so and never had any collateral security for a Commonwealth

20   default.  But whatever rights the Monolines had to have the

21   Commonwealth transfer money to those entities still exists,

22   subject to preemption by PROMESA, a federal law.

23        On pages 285 through 289 of Your Honor's decision in

24   *Ambac Assurance v. Commonwealth of Puerto Rico,* at 297 F.

25   Supp. 3d. 269, the Court thoroughly analyzed the Contract

1   Clause claims arising out of the moratorium statutes and

2   orders and the Fiscal Plan.  As the Court knows, in the Stay

3   litigation, the Monolines argued the First Circuit's

4   affirmance was on jurisdictional grounds and somehow gutted

5   this Court's rulings on the merits.  But for present purposes,

6   that doesn't matter.

7        The First Circuit did not discuss the Contract Clause

8   claims and certainly did not criticize this Court's reasoning.

9   There is no reason for this Court today to analyze the claims

10  differently than it did in its affirmed decision.

11       This Court concluded at page 289, "plaintiff has thus

12  failed to meet its burden of pleading facts sufficient to

13  allow the Court to draw a reasonable inference that the

14  moratorium legislation, moratorium orders and Fiscal Plan

15  Compliance Act were unreasonable or unnecessary to effectuate

16  an important government purpose.  And as claimed above,

17  plaintiff has failed to allege plausibly that the Fiscal Plan

18  is an exercise of Commonwealth legislative power.

19  Accordingly, the first claim for relief is dismissed," et

20  cetera.

21       Now, this Court --

22       THE COURT:  Now, you're not moving here -- just one

23  second.  Sorry, Mr. Bienenstock.

24       You're not moving here on reasonableness and

25  necessity; is that correct?

1          MR. BIENENSTOCK:  I didn't hear the last part of the

2     question, Your Honor.

3          THE COURT:  The motion here is not premised on lack

4     of a showing of reasonableness and necessity.  The motion, as

5     I understand it, as against the Contract Clause claims is on

6     the question of whether there is an impairment; is that

7     correct?

8          MR. BIENENSTOCK:  We didn't -- we didn't brief the

9     reasonableness and necessity issues, but we do believe that's

10    implicit.  I mean, they're -- they pleaded less in their

11    Proofs of Claim than they did in the Stay litigation.

12         THE COURT:  All right.  I hear you.

13         MR. BIENENSTOCK:  In this Court's September 9, 2020,

14    Opinion on Stay Relief Motions regarding HTA and PRIFA, the

15    Court ruled at page 16, "movants' proposed claims plainly stem

16    from their bond claims, and although styled as requests for

17    declaratory relief, ultimately are vehicles for asserting

18    rights to payment of amounts outstanding under various bond

19    issues.  Indeed, movants identified their constitutional and

20    statutory theories in their Proofs of Claim as bases for their

21    claims for damages on account of defaults that occurred on the

22    relevant bonds."

23         In footnote 14 of that Opinion, the Court noted

24    "notably, although movants insist that their secured status

25    cannot be determined until the validity of the territorial

1  legislation has first been resolved, nowhere do they explain

2  how the relief they intend to seek through their proposed

3  claims would have granted, provide them with a security

4  interest that they do not otherwise have."

5          Nothing has changed between then and now, Your Honor.

6  The Monolines now contend the Contract Clause violations

7  cannot be claimed because their only remedies are declaratory

8  relief and equitable relief.  If the Monolines are serious,

9  they have now admitted they do not have Contract Clause claims

10  within the meaning of Title III.  That is good.  Taking them

11  at their word, they are not asserting secured claims or

12  unsecured claims arising out of their allegations that the

13  Commonwealth violated the Contract Clause.

14          The Commonwealth submits there have been no Contract

15  Clause violations in the first place, but before analyzing

16  that for purposes of summary judgment, I want to explain why

17  their assertions about only being entitled to declaratory and

18  equitable relief are moot.  Outside bankruptcy or Title III,

19  it is understandable that if a state or territory enacts a law

20  unconstitutionally impairing obligations of contract, the

21  remedy is to strike the law, although striking or nullifying

22  the law does not unimpair the contractual obligations.  One

23  would think the contract parties would also have a money

24  claim, but the Monolines here say they only have rights to

25  equitable and declaratory relief at page 24 of their Sur-reply

1    concerning PRIFA.

2         The reason we submit that nullifying the law is moot,

3    however, is that eliminating the moratorium laws and orders

4    has no, zero impact on the Commonwealth or HTA as Title III

5    debtors, because neither the Commonwealth nor HTA are required

6    to pay their pre-PROMESA and pre-Title III obligations until

7    the effectiveness of their plans of adjustment.  And while

8    PRIFA and CCDA are not Title III debtors, they do not have the

9    money to pay bondholders.  So HTA need not pay its bondholders

10   until its Plan is effected.

11        The Commonwealth may never need to transfer monies to

12   HTA pursuant to the pre-petition statutes requiring annual

13   transfers if those statutes are preempted.  If they are not

14   preempted, at most they represent pre-petition obligations,

15   which are not payable until the effectiveness of the

16   Commonwealth's Plan of Adjustment.

17        Impairing contractual obligations by its terms shows

18   it leads to breaches of contract.  The contracts here are bond

19   contracts for the payment of money, and according to the

20   Monolines, the statutes requiring the Commonwealth to transfer

21   monies to HTA, PRIFA and CCDA.  The Monolines' concession,

22   however, that impairing contractual obligations does not give

23   rise to claims for payment of money is most welcome.

24        Second, though the Monolines deny it, the cause of

25   the Commonwealth not transferring money to HTA, PRIFA and CCDA

1    is Title III and PROMESA Section 108(a)(2), 202 and 207, among

2    others, not the moratorium statutes and orders.  The Monolines

3    contend the Oversight Board is making a new argument by

4    alluding to federal law, but the Complaints allege, such as

5    PRIFA Complaint paragraph 134, federal law stopped payments to

6    the instrumentalities.  Count 37 at page 64 is a count devoted

7    to the retention of PRIFA revenues being due to PROMESA.

8    Count 5 at page 48, retention of CCDA revenues per PROMESA.

9           Moreover, the Oversight Board's opening Summary

10   Judgment Briefs argued the retention of the revenues at issue

11   were due to PROMESA.  For example, argument one of the PRIFA

12   Summary Judgment Motion Brief filed April 28 at page 32.

13   There is no basis on which the Monolines can have a secured

14   claim against the Commonwealth for its alleged default, and

15   there is no basis for a nondischargeable claim, because

16   Bankruptcy Code Section 944(b) and (c) list the only

17   nondischargeable claims in Title III, and so-called

18   constitutional claims are not on the list.  Summary judgment

19   on those two points, unsecured and dischargeable, is clearly

20   warranted.

21          Outside Title III and PROMESA, debtors default all

22   the time.  No one contends Chapter Nine debtors such as

23   Detroit, or Chapter 11 debtors such as JC Penney, Neiman

24   Marcus, Hertz Rent-A-Car are authorized to default by law.

25   Default means they are doing something contrary to a legal

1   obligation.  The same as every human being is capable of

2   sinning, every debtor can fail to satisfy a legal obligation.

3          That is what Title III and Chapters Nine and 11

4   handle, defaults not allowed by law.  Indeed, all debtors can

5   default.  What if they lack the money to pay?  They have to

6   default.

7          To create a material disputed fact, the Monolines

8   contend, whether the Commonwealth defaulted due to a

9   moratorium statute or another reason must be determined.  But

10  whether the Governor picks up the phone and tells the

11  Secretary of Treasury not to make a payment, or the

12  Commonwealth legislature enacts a statute providing a payment

13  shall not be made makes no substantive difference, because

14  defaults for either reason leave intact the Commonwealth's

15  contractual obligations which the Monolines enforce by filing

16  Proofs of Claim.

17         Moreover, whether the Commonwealth may default is a

18  legal question, not a fact question.  The Supreme Court

19  answered that question in the affirmative in *Faitoute*, which I

20  explained earlier.  But even if the right to default were a

21  fact issue in dispute, the Contract Clause claims can be

22  determined without reference to the right to default for two

23  reasons.  First, a default with or without legislation does

24  not impair contractual obligations, which is what the Contract

25  Clause protects.

1          HTA's contractual obligation to pay its bondholders

2    was not eliminated by the Commonwealth's default or by any

3    moratorium order or executive order requiring the default.

4    The Commonwealth's obligation, if any, to transfer money to

5    HTA, PRIFA and CCDA will be treated in the Commonwealth's

6    Title III case.  This Title III case will pay the Monolines

7    the value of their contractual obligations from the

8    Commonwealth, if they have any.

9          It is important to understand that the Contract

10   Clause protection of contractual obligations does not convert

11   bad debt into good debt.  For instance, if a debtor is worth

12   600 dollars and owes ten creditors 100 dollars apiece, the

13   value of each creditor's claim is 60 percent of its claim

14   amount.  The Contract Clause doesn't convert a claim worth 60

15   cents on the dollar into a claim worth 100 cents on the

16   dollar.

17         Here, the Monolines' rights to obtain money from HTA,

18   PRIFA or CCDA were dependent on each of those entities

19   receiving money from the Commonwealth.  Before PROMESA, the

20   Commonwealth determined it needed to retain its money for

21   other purposes.  Congress determined the Commonwealth was in a

22   fiscal emergency and could not provide effective services to

23   its residents.  Contract Clause did not eliminate the risk,

24   which always existed.  *Faitoute* provided, the Constitution is

25   intended to preserve practical and substantial rights, not to

1    maintain theories.

2            Second, the Contract Clause claim depends, among

3    other things, on state legislation impairing contractual

4    obligations.  Once PROMESA was enacted on June 30, 2016, and

5    the Oversight Board was appointed on August 31, 2016, many

6    provisions of PROMESA, a federal law, barring debt repayment,

7    among them are Section 207, under which the Oversight Board

8    has to approve any type of exchange, modification, repurchase,

9    issuance, redemption of debt.  Section 202 granting budget

10   power over the -- to the Oversight Board --

11           THE COURT:  Before you go on, Mr. Bienenstock, I'd

12   just like to stop at 207 for a minute.

13           MR. BIENENSTOCK:  Yes.

14           THE COURT:  So 207 doesn't include in its enumerated

15   list of actions requiring Oversight Board approval, ordinary

16   course repayment.  It talks about modification.  It talks

17   about redemption, which I understand colloquially to be

18   buybacks of the outstanding bonds, as opposed to paying P&I

19   amortization.  But it's your position that even regularly

20   scheduled payments on bonds under 207, once PROMESA was

21   enacted and the Oversight Board came in, required specific

22   Oversight Board approval?

23           MR. BIENENSTOCK:  Well, it includes, Your Honor, the

24   word "redeemed."  I mean, the ordinary -- the ordinary course

25   payment is a redemption of that amount of the debt.

1          THE COURT:  Thank you.

2          MR. BIENENSTOCK:  But if for whatever reason the

3     Court does not agree with that interpretation, as I mentioned,

4     202, the power over the budgets, 108(a)(2), that they can't do

5     anything that, in the Oversight Board, impairs or defeats the

6     purposes of PROMESA, which would certainly be paying unsecured

7     pre-petition debt, and all of Title III, are reasons why,

8     absent any legislation, payment of the debt they want of the

9     obligations to the instrumentalities, if there were

10    obligations, was stopped.  And that's the major point.  So if

11    you take 207 out of the equation, it doesn't matter.  There

12    are, you know, Title III, 202, 108(a)(2), there are lots more

13    reasons why the debt could not be repaid.

14          Now, the Monolines claim that the Oversight Board, as

15    a Commonwealth representative, cannot avoid liens as trustee

16    in bankruptcy under the Puerto Rico version of the Uniform

17    Commercial Code.  They are wrong.  First, PROMESA Section

18    301(c)(7) provides that when a Bankruptcy Code provision

19    incorporated into Title III uses the word "trustee," the word

20    "trustee" means Oversight Board.  Second, PROMESA Section

21    301(a) incorporates Bankruptcy Code Section 544.  The

22    Monolines seem to have concentrated on 544(a), but I'm

23    concentrating on 544(b)(1).

24          That provides a trustee, meaning the Oversight Board,

25    because it's incorporated into Title III, may avoid any

transfer of an interest of the debtor in property, or any

obligation incurred by the debtor, that is voidable under

applicable law by a creditor holding an unsecured claim that

is allowable.

Here, the applicable law is the Puerto Rico Uniform

Commercial Code.  UCC Section 9-102(a)(52) defines lien

creditor to include a trustee in bankruptcy.  Therefore, under

PROMESA Section 301(c)(7) and Bankruptcy Code Section

544(b)(1), the Oversight Board is a trustee and is authorized

to avoid any transfer voidable under applicable law by a

creditor holding an allowed claim.  Thus, the Oversight Board,

in its capacity under Section 544 as a trustee, having the

status of a lien creditor pursuant to applicable law, the

Puerto Rico Uniform Commercial Code, can avoid security

interest junior to lien creditors.  UCC Section 9-317(a)(2)

renders unperfected security interests junior to lien

creditors.

The Monolines also argued that Puerto Rico's

sovereign immunity bars the trustee's hypothetical and

judicial lien from attaching to Commonwealth property.  In

response, the Commonwealth pointed out the Bankruptcy Code

Section 106, made applicable by PROMESA Section 301(a), waives

the Commonwealth sovereign immunity.

In their Sur-reply, the Monolines contradict

themselves.  They argue that Section 106 only waives sovereign

1    immunity for actions against the Commonwealth.  Aside from the

2    fact that Section 106 includes no such limitations, the

3    dispute is easily resolved by common sense.  We, meaning me,

4    should never have engaged the Monolines on sovereign immunity

5    in the first place, as opposed to explaining why it does not

6    apply, which I will now do.

7         The Puerto Rico statutes and Puerto Rico sovereign

8    immunity protect it from judicial liens against its own

9    property.  They are intended to do just that, protect the

10   Commonwealth.  Here, the Commonwealth is being given a

11   judicial lien to defeat another creditor's security interest

12   in the Commonwealth's property.  The hypothetical judicial

13   lien is not being used to seize the Commonwealth's property.

14   As such, sovereign immunity never even comes into play.

15        Put differently, the Monolines are asking the Court

16   to deploy sovereign immunity to deprive the Commonwealth of a

17   means to eliminate liens from its own property.  That is the

18   reverse of common sense.

19        The Monolines also argue that United States v.

20   Security Industrial Bank, 459 U.S. 70, at page 75, shows it

21   would be unconstitutional to apply Title III retroactively to

22   avoid unperfected security interests in Puerto Rico.  But the

23   Puerto Rico Uniform Commercial Code has always provided

24   unperfected security interests are junior to lien creditors.

25   Thus, this is not a retroactivity issue.  The Commonwealth

1    could simply grant someone else a lien and, under old law,

2    that would be senior to the unperfected security interest.

3           The Monolines argue the Commonwealth's using HTA to

4    part with contract rights to appropriations from the

5    Commonwealth is a transfer subject to PROMESA Section 407.

6    The Monolines' premise is wrong.  The Commonwealth has not

7    caused HTA to part with contract rights.  Nothing in the

8    record shows the Commonwealth deprived HTA of contract rights.

9    If HTA had contract rights or statutory rights to

10   appropriations from the Commonwealth, it will have an allowed

11   unsecured claim against the Commonwealth per such contract

12   rights.

13          As a practical matter, however, it may well be that

14   instrumentalities such as HTA do not have rights to enforce

15   appropriations, they are revocable gifts from the

16   Commonwealth.  If HTA does have enforceable rights, it will

17   have a claim.

18          The key point is there was no transfer for Section

19   407 purposes.  Nothing caused HTA to transfer whatever rights

20   it had to appropriations from the Commonwealth.  Same for

21   PRIFA and CCDA.

22          The Monolines argue --

23          THE COURT:  Are you going on from 407 or are you

24   continuing 407?

25          MR. BIENENSTOCK:  I'm continuing on 407.

1              THE COURT:  Okay.  At the end of your 407 argument,

2    I'll have a question for you about 407.

3              MR. BIENENSTOCK:  Okay.  Thanks, Your Honor.

4              The Monolines argue PROMESA Section 407 grants them a

5    claim under the first prong of 407 for monies the Commonwealth

6    failed to transfer to HTA, PRIFA and CCDA.  The plain words of

7    Section 407's first prong require property of any territorial

8    instrumentality of Puerto Rico, is transferred in violation of

9    applicable law under which any creditor has a valid pledge,

10   pledge of security interest in or lien on such property, end

11   of quote.

12             The Commonwealth's property is not property of its

13   territorial instrumentality.  Here, the Monolines simply

14   disagree with the Court's ruling that the Commonwealth's

15   property has not been transferred to HTA, PRIFA, CCDA or the

16   bondholders.

17             The Monolines' rationale for ignoring the plain words

18   of Section 407 is that then the Commonwealth's own unlawful

19   conduct, in the form of an unlawful transfer that prevents a

20   security interest from attaching, would immunize itself

21   against liability for that very unlawful conduct.  Here again,

22   the Monolines are contending that the Commonwealth's mere

23   default -- it's not transferring money to HTA, PRIFA and CCDA

24   -- gives rise to a cause of action as if there were a transfer

25   and a remedy that requires payment in full.  To state their

1   contention is to refute it, especially when the words of the

2   first prong of Section 407 already refute it.

3        The Monolines argue the second prong of Section 407

4   reads to the matter it does not read.  Monolines contend the

5   second prong of 407(a) reads, while the Oversight Board for

6   Puerto Rico is in existence, if a violation of applicable law,

7   words they insert, deprives any -- skipping some words --

8   territorial instrumentality of property in violation of

9   applicable law, assuring the transfer of such property to such

10  territorial instrumentality for the benefit of its creditors,

11  then the transferee shall be liable for the value of such

12  property, end of quote.

13       The Monolines, however, simply misstate what the

14  second prong of Section 407 says.  It says, "while an

15  Oversight Board for Puerto Rico is in existence, if any

16  property of any territorial instrumentality of Puerto Rico is

17  transferred in violation of applicable law which deprives any

18  such territorial instrumentality of property in violation of

19  applicable law showing the transfer of such property

20  to such territorial instrumentality for the benefit of its

21  creditors, then the transferee shall be liable for the value

22  of such property."

23       In short, the second prong of Section 407 protects

24  territorial instrumentalities and their creditors of wrongful

25  clawback.  It protects them from getting the money and then

1    losing it due to wrongful clawback.  But if they don't get it

2    in the first place, they can't transfer it, and there's no

3    cause of action under the second prong of Section 407.

4         The fallacy of the Monolines' reading of the second

5    prong of Section 407 is that, again, the Monolines interpret

6    the Commonwealth's simple failure to pay as a wrongful

7    transfer.  What is clear is that a failure to pay may be a

8    default, but it's certainly not a transfer.

9         The Monolines point to House Report No. 114-602 in

10   year 2016 to argue that Section 407 applies to transferred

11   property creditors have or would have a pledge of or security

12   interest in.  That argument fails for three reasons.  First,

13   the "would have" language is contrary to the plain meaning of

14   the statute, which does not include the "would have" language.

15   There is no ambiguity in the statute justifying following a

16   deviation in the legislative history.

17        Second, the legislative history does not help the

18   Monolines.  They ignored that the legislative history they

19   cite restricts itself to transfers of property between

20   instrumentalities.  The Monolines are not complaining about

21   any transfers between instrumentalities.  They complain about

22   the lack of a transfer from the Commonwealth to HTA, PRIFA and

23   CCDA.

24        So the Monolines are asking the Court to take a

25   sentence from the legislative history and, A, disregard the

1    first part about the transfers being between

2    instrumentalities, while, B, crediting the second part, using

3    the words "would have," which are nowhere found in the

4    statute.

5         Third, our prior point about the legislative history

6    cited by the Monolines being entitled to no weight because it

7    is inconsistent with the plain words of the statute is

8    corroborated by Congressman Grijalva's comments in the

9    Congressional Record, which the Monolines should have cited

10   but did not.  Congressman Grijalva explained the following in

11   the June 9, 2016, Congressional Record at pages H3601-H3602.

12   I'll only quote a short part.

13        "But the addition of the language 'or would have' in

14   the Committee Report again reflects staff level text that was

15   not ultimately included in the version approved by the

16   Committee.  The current text provides a cause of action for

17   creditors that, at the time of the alleged unlawful transfer,

18   in fact, had a pledge of, security interest in or lien on the

19   transferred property.  Contrary to the suggestion of the

20   Committee Report, the provision does not permit such a cause

21   of action if the plaintiff only would have, in some future

22   circumstances, such an interest.

23        Indeed, the fact that the addition of the words like

24   'or would have' were discussed, but not ultimately included in

25   the text, is strong evidence that Congress did not intend for

1   such perspective contingent rights to be within the scope of

2   this provision.  It would have been extraordinary to provide

3   certain creditors an argument that federal law establishes for

4   them a property interest where no such property interest

5   existed under the terms of the agreements they negotiated.

6   The Committee rightly declined to do so."

7           Monolines also argue that PROMESA Section 407 claims

8   are nondischargeable, because they are enforceable after stays

9   are no longer in effect.  Bankruptcy courts frequently

10  terminate a stay to allow a creditor to liquidate its claim in

11  another court.  That doesn't mean the claim escapes discharge.

12  Bankruptcy Code Sections 944(b) and (c) make clear all claims

13  are dischargeable.

14          Your Honor, that was the end of my Section 407

15  discussion.

16          THE COURT:  Thank you.  And I just want to come back

17  to 407(b).  The 407 claim is not one that would be enforceable

18  until after the Stay is no longer in effect.  And so in

19  seeking to strike the 407(b) claim now, are you seeking to

20  have me determine that there is -- the 407 claim, no possible

21  factual predicate for that claim ever, so that it would never

22  arise to be enforceable, and it should be dealt with now, even

23  though it's a claim that can't be brought now, continued or

24  something like that?

25          MR. BIENENSTOCK:  Not entirely.  What we're asking

1    for is -- the Monolines filed their Proofs of Claim, and they

2    included in those certain 407 claims.  We are addressing the

3    407 claims they raised, and those are the 407 claims we're

4    asking the Court to rule on for the reasons we've provided.

5          And I guess implicitly, Your Honor, that would mean

6    that Your Honor is modifying the Stay to allow for the current

7    determination of the 407 claims asserted by the bondholders --

8    or by the Monolines.

9          THE COURT:  Thank you.

10         MR. BIENENSTOCK:  The Monolines contend the

11   invalidity of fiscal plans and budgets is a material, disputed

12   fact preventing summary judgment.  First, the fiscal plans

13   form a blueprint between the Oversight Board and the Governor,

14   and the fiscal plans are not self-operative.  They tell the

15   government what the Board wants it to do.  The budgets

16   authorize spending.  To the extent the Monolines have what

17   they call constitutional claims impacted by that spending,

18   nothing has prevented the Monolines from suing for Stay relief

19   or other remedies.  They have already done so numerous times.

20         If, for instance, the Commonwealth determines the

21   budget is spending the Monolines' cash collateral, the Court

22   could grant Stay relief if the Commonwealth does not provide

23   adequate protection.  None of this impacts the allowability of

24   the Monolines' claims at issue here.

25         Moreover, we now know the Monolines do not have

1    secured claims, other than for certain monies in the accounts

2    the Court identified in its Stay Relief Opinions.  Now,

3    however, it is clear the Monolines' collateral is restricted

4    to those funds inside certain accounts.  The Monolines do not

5    agree, but unless the Court changes its mind, they have no

6    Takings claims.

7         The only other constitutional claims are Contract

8    Clause claims.  For those, the Monolines must show state or

9    territorial legislation impairing contractual obligation.  The

10   Monolines allege the budgets are territorial legislation, but

11   the budgets are neither territorial legislation, nor do they

12   create Contract Clause claims.

13        PROMESA puts the Oversight Board in charge of budgets

14   and preempts Commonwealth law providing for budget

15   expenditures.  That is federal law.  It's been held by this

16   Court and affirmed by the First Circuit.

17        The Contract Clause provides, no state shall pass any

18   law impairing the obligation of contracts.  The Commonwealth

19   doesn't pass the budget.  PROMESA deems the budget approved

20   without the Commonwealth passing it.  The budget is not

21   Commonwealth legislation because it is created by the

22   Oversight Board and PROMESA, federal law -- and PROMESA,

23   federal law, deems it approved by the Governor and the

24   legislature.

25        THE COURT:  Mr. Bienenstock, I --

 1           MR. BIENENSTOCK:   The Monolines contend PROMESA

 2   Section --

 3           THE COURT:   I have a question for you about the

 4   deemed approval and the relationship to legislation.   Puerto

 5   Rico is a political entity that has a structure.   It has to

 6   act by various components of its structure.   PROMESA put the

 7   Oversight Board into its structure, but through this provision

 8   that a budget approval by the Oversight Board is deemed to be

 9   approved by the legislature, hasn't Congress put the Oversight

10   Board into the position of doing a legislative act for this

11   particular limited purpose?

12           The statute doesn't just say the Oversight Board's

13   budget is the law.   It says the Oversight budget is deemed to

14   have satisfied the ordinary structural requirements of Puerto

15   Rico law.

16           MR. BIENENSTOCK:   Your Honor, this is, I guess, a

17   chicken and egg issue in that our point is that it's PROMESA,

18   federal law, that adopts the budget, and it imposes it on the

19   local legislature.

20           THE COURT:   Thank you.

21           MR. BIENENSTOCK:   And, you know, that's what Section

22   202 does.   It's federal law, deems the budget approved.

23   It's -- Congress has done that.

24           And for the other -- I want to go on, but even if the

25   Court were to treat the budget as non-federal law, as

1   territorial law, for all the other reasons we've given,

2   there's still no Contract Clause violation.  The budget only

3   authorizes expenditures.

4        The Monolines contend that PROMESA Section 303(3)

5   negates the preemption of the Puerto Rico statutes requiring

6   appropriations to HTA, PRIFA and CCDA.  By its terms, Section

7   303(3) preempts unlawful executive orders, diverting funds

8   from one territorial instrumentality to another or to the

9   Commonwealth.

10       Thus, the words of Section 303(3) show the Monolines

11  are wrong for two reasons.  First, only unlawful executive

12  orders diverting funds are preempted.  In other words,

13  executive orders carrying out a certified budget would not be

14  illegal.  Second, Section 303's carve-out of unlawful

15  executive orders, while not carving out certified budgets and

16  plans of adjustment, show Section 303(3) was solely intended

17  to and restricted to bar territories from engaging in their

18  own debt restructurings involving interdebtor transfers

19  outside of PROMESA in Titles III and VI.

20       And to the Monolines' point that PROMESA encourages

21  voluntary restructurings under Title VI and so Title III

22  shouldn't even be considered, the simple answer is Title VI

23  doesn't even allow for relief to restructure pension plans, of

24  which the Commonwealth has 55 billion dollars, automatic stay

25  and other relief.  So clearly, PROMESA in no way suggests that

1     Title III is disfavored in favor of Title VI.

2          The Monolines argue the Excise Tax Statutes are not

3     impliedly preempted.  Starting in 1800 -- I'm sorry, Your

4     Honor.  I covered that already.

5          The Monolines argue that *Maine Community Health v.*

6     *United States,* at 140 S. Ct. 1308, shows the existence of an

7     obligation is not defeated by the absence of an appropriation.

8     The Commonwealth takes no issue with that proposition.

9     Whatever obligation the Commonwealth had is not eliminated by

10    the Oversight Board's Certified Budget's failure to

11    appropriate money to pay such obligations.

12          The Oversight Board has never argued that its failure

13    to budget payments of an obligation eliminates the obligation.

14    And, Your Honor, this is yet another -- it's an example of why

15    the budget, even if Your Honor treats it as territorial

16    legislation, is not the cause of any impairment of obligations

17    of contract.  If the budget doesn't pay something, that

18    doesn't eliminate the obligation of the contract that it be

19    paid and doesn't eliminate the Monolines' rights to file

20    proofs of claim, which they have.

21          The Monolines, however, cite *Maine Community* for a

22    proposition that it does not support.  Namely, that the

23    pre-PROMESA and pre-Title III appropriation statutes, such as

24    the Excise Tax Statutes, are not preempted by PROMESA and

25    Title III and are specifically enforceable and

1   nondischargeable.  *Maine Community* says nothing about whether

2   PROMESA Sections Four, 108(a)(2), 202 and 207 in Title III

3   preempt Excise Tax Statutes or render them specifically

4   enforceable and nondischargeable.

5          I want to emphasize on this point, the Monolines

6   today and in prior hearings frequently cite Supreme Court and

7   other decisions where failures to make appropriations are met

8   with orders requiring the appropriations or the payment.  And

9   that doesn't demonstrate that here, in Title III, the

10  Monolines are entitled to specific informance -- or

11  nondischargeability.  All it demonstrates is that in all the

12  cases they've cited, including the ones at issue today,

13  they're outside of bankruptcy where the parties can, if they

14  have to, satisfy all obligations.

15         They also cite a 1892 case of *Ferris*.  *Ferris*

16  provides, at page 546, "an appropriation per se merely imposes

17  limitations upon the government's own agents.  It is a

18  definite amount of money entrusted to them for distribution,

19  but its insufficiency does not pay the government's debts, nor

20  cancel its obligations, nor defeat the rights of other

21  parties."

22         We agree with that wholeheartedly.  Our budget's

23  failure to pay, for instance --

24         (Sound played.)

25         MR. BIENENSTOCK:  -- an appropriation to HTA or PRIFA

1    doesn't eliminate any rights.  It just -- it's not paid.  And

2    those contractual obligations survive and can be the subject

3    of proofs of claim.

4         Finally, the Monolines contend they are secured in

5    the Commonwealth -- oh, I covered the bank account issue

6    already.

7         So, Your Honor, I think I might have a few extra

8    minutes, and unless the Court has further questions, I would

9    give those to my colleagues.

10        THE COURT:  Fine.  So there's a minute and a half

11   that will go to your -- the people who will speak after the

12   UCC?  Is that what you want?

13        MR. BIENENSTOCK:  Yes, please, Your Honor.

14        THE COURT:  Very well, then.  Thank you very much,

15   Mr. Bienenstock.

16        And I will now call on counsel for the UCC.  Is that

17   Mr. Despins or Mr. Zwillinger?

18        MR. DESPINS:  It's Luc Despins, Your Honor.  Good

19   morning, Your Honor.

20        THE COURT:  Good morning, Mr. Despins.

21        MR. DESPINS:  So Your Honor, for the record, Luc

22   Despins with Paul Hastings on behalf of the Official Creditors

23   Committee.

24        As Your Honor knows, we filed the very specific

25   joinder in two portions of the Oversight Board's Motion and

1   Supporting Memorandum.  And so we understand that today we

2   have a very limited supporting role, and, therefore, we will

3   not -- probably not use all the time allocated to us in the

4   opening section.

5       Most of the issues have already been covered by

6   Mr. Bienenstock.  We just want to emphasize two issues, Your

7   Honor.  The first one is emphasis on the Oversight Board's

8   Title III preemption argument, which is contained in paragraph

9   97 of Docket No. 56, filed on April 28.  And, basically,

10  that's where the Oversight Board takes the position that the

11  argument that the statutes entitle the bondholders or others

12  to priority are preempted by Title III.

13      The point we want to make is that in the Response,

14  the Monolines and others argue that it cannot be that it was

15  automatic preemption, because Title III was never a sure

16  thing.  It was a potential filing, but never a sure thing.

17  And therefore, there could not be automatic prevention --

18  preemption.  I'm sorry.

19      And obviously we are now in Title III, so we're not

20  sure where that argument gets them.  But more importantly, the

21  attempt to distinguish the cases cited by the Oversight Board,

22  such as *Detroit*, et cetera -- but in doing so, it's very clear

23  that they offer no cases.  Not one case ever cited for the

24  proposition that state law or territorial law priorities are

25  enforceable in any bankruptcy context, Chapter 11, Chapter

1    Nine, or obviously PROMESA.  And we believe that these are,

2    you know, compelling points.

3            Also, we wanted to emphasize the argument that their

4    constitutional claims are mere pre-petition unsecured claims,

5    but you've already practically ruled on that in your September

6    9th Order, so we're not going to repeat that.  And therefore,

7    we would assign any remaining time in our time to

8    Mr. Firestein to the extent he needs it, Your Honor.  Thank

9    you.

10           THE COURT:  Thank you.  I think there's seven minutes

11   and ten seconds left.  Thank you very much, Mr. Despins.

12           So now I will turn to Mr. Firestein.

13           MR. FIRESTEIN:  Good morning, Your Honor.  Can you

14   hear me?

15           THE COURT:  Yes, I can.

16           MR. FIRESTEIN:  Excellent.  Thank you, Your Honor.

17   Michael Firestein of Proskauer on behalf of the debtor, the

18   Commonwealth and the moving parties.

19           I know you heard the substantive arguments from

20   Mr. Bienenstock regarding the claims at issue, and some of

21   that spilled over into what is relevant and, more importantly,

22   not relevant in terms of what presents or couldn't present a

23   triable issue of material fact.  And I agree with

24   Mr. Bienenstock, the defendants' views of what could be a

25   triable issue does not move the needle in terms of the

1    propriety of granting summary judgment on the claims at issue.

2         My purpose, along with Mr. Kass, is to discuss

3    certain Rule 56(d) issues and their lack of impact here.  I

4    won't bury the lead.  We do not believe the alternative relief

5    sought under 56(d) is well taken, or should prevent or defer

6    entry of partial summary judgment in favor of the Commonwealth

7    on the relevant claims.

8         Let me begin with what 56(d) is and is not.  Rule

9    56(d) asks only whether defendants have had an adequate

10   opportunity to demonstrate if there are disputed issues of

11   fact.  What this means is only if defendants can show they've

12   been denied the opportunity to present a material disputed

13   fact to an absence of ability to seek discovery, and such

14   facts are truly material to the issues presented, would Rule

15   56(d) be relevant.

16        This is a tall hurdle given everything that has

17   happened in recent motion practice and the prior findings of

18   the Court.  Indeed, defendants spared no argument from being

19   exhaustively briefed in their oppositions, in my mind,

20   persuasively pointing to the conclusion that any further

21   discovery would be duplicative or cumulative, if material at

22   all.

23        The simple truth is the defendants do not need

24   additional discovery to respond to the motions, despite the

25   number of issues they attempt to raise.  The material issues

1    necessary to these motions remain, and always have been,

2    issues of law grounded in relevant statutes, the undisputed

3    bond documents, and immutable facts.  Indeed, the same

4    undisputed record that has been before the Court on prior

5    occasions, particularly within the claims --

6              THE COURT:  I'm sorry.

7              MR. FIRESTEIN:  Yes, Your Honor.

8              THE COURT:  I'm sorry to interrupt your overview, but

9    you mentioned issues of law that are based on undisputed sets

10   of documents.  With respect to PRIFA, the defendants have

11   argued that there are documents that are -- that the trust

12   documents that have been produced don't seem to be complete,

13   and they refer to what they think are some missing

14   supplemental agreements.  And they are looking for discovery

15   to complete their reference set in aid of determining the

16   document-based arguments with respect to PRIFA.

17             What is your position as to that particular 56(d)

18   request?

19             MR. FIRESTEIN:  I think that that's a makeweight

20   argument.  This is the same Trust Agreement, Your Honor, that

21   they used in connection with the Lift Stay.  And to now

22   suggest that perhaps the document upon which they were relying

23   at that time is now not the document that they think it is, I

24   think is not a basis upon which to deny summary judgment.

25   And, in fact, it's the source of the rights that they claim,

1    or one of the sources of the rights that they claim that they

2    have.

3         So if we're in a world in which the Trust Agreement

4    is not authentic or otherwise applicable, it's difficult to

5    see how they would withstand summary judgment in any event.

6         THE COURT:  Thank you.

7         MR. FIRESTEIN:  Bluntly, Your Honor, defendants have

8    not identified proper subjects for which discovery will

9    matter.  Instead, what they do is try to convince the Court

10   that certain subjects are relevant, but they're not.

11        In any event, defendants' effort is procedurally

12   barred.  Part of the standard in this Circuit is diligence.

13   If you don't act diligently, you can't satisfy Rule 56(d).

14   Regardless of posturing, defendants simply did not act in that

15   way.  They were not denied an opportunity to take discovery or

16   precluded from doing so.  They simply didn't do it, a fact

17   that they don't contest.  Instead, they endeavor to provide

18   excuses for having done so.

19        That failing even to pursue discovery in advance of

20   the months that they had to prepare their oppositions points

21   to the absence of the need for it, particularly given the

22   hundreds of pages of briefing they submitted in opposition

23   regarding every conceivable argument, many of which have been

24   previously decided by this Court and alluded to by

25   Mr. Bienenstock.

1          Now, I know the Court has considered the substantial

2     briefing on the issues, including 56(d), but I want to

3     highlight several specific items in defendants' recent

4     submissions.  They claim the process we use to address 56(d)

5     was procedurally improper.  That's wrong and results form over

6     substance.  Their 56(d) applications were chock-full of legal

7     authorities and merited a comprehensive response.  It was not

8     just declarations.  Indeed, a 56(d) request should be treated

9     as any other motion and responded to in kind.

10          There was no reasonable basis for the Court to avoid

11    the issue on this process point.  It's no different than an in

12    limine or *Daubert* type motion that could be utilized in a Rule

13    56 summary judgment motion.  This argument should be

14    disregarded because it's wrong.  And importantly, I know the

15    Court desires to get to the merits of the gating issues.

16          Defendants also claim we are somehow objecting to the

17    timeliness of their filing.  This is also wrong.  The

18    Commonwealth's argument is that they should have sought

19    discovery long before the filing of the 56(d) in order to

20    satisfy the controlling First Circuit standard.  That's the

21    timeliness, diligence point I made earlier.  And on that,

22    again, they don't dispute the facts.

23          These defendants have never hesitated to pursue

24    discovery when they feel they need it, except here, and that

25    purposeful tactic should not be rewarded.  It wouldn't have

1    violated the Stay, and certainly not to at least ask to do it.

2    Moving to lift the Stay for all kinds of things is a common

3    practice in these Title III cases, something defendants have

4    done repeatedly.  They certainly weren't precluded from doing

5    so, and frankly, they knew exactly how to ask for discovery,

6    which they did, in fact, seek relative to the use of the Lift

7    Stay discovery, in the context of summary judgment, to which

8    we consented.  This argument is not well-founded.  They cannot

9    be allowed to benefit by purposely sitting on their hands.

10            They also claim in their Response they couldn't or

11   shouldn't be required to identify the specific facts they

12   seek, and they can be more general about the issues in

13   question.  That's contrary to First Circuit law.  In the

14   *Resolution Trust* case, the Court clearly notes, discovery

15   sought under Rule 56(d) is not "ordinary," and is more

16   restrictive than what is generally allowed under the Federal

17   Rules.

18            And the *Bad Paper* case, one of my favorite case

19   titles, from the District of New Hampshire, indeed required

20   the parties seeking relief to "identify the specific facts

21   they seek or explain how the information sought would suffice

22   to defeat summary judgment."  They didn't do that here.  We

23   discussed that at length in our submission.  And that does not

24   satisfy the standard under 56(d).

25            But I do want to give a few illustrations of what

58

1    they claim in their recent Response and why those issues don't

2    matter to the motions at hand.  While not exhaustive, it's

3    illustrative of defendants' ill-conceived approach to Rule

4    56(d).  Focusing on HTA, the defendants contend that the

5    Commonwealth's budgeting process and the certification of the

6    same by the FOMB supposedly raises factual issues they want to

7    pursue.  It does not.

8         As Mr. Bienenstock noted, and we have pointed time

9    and again, this Court has repeatedly decided that 106(e)

10   precludes review of the budget certification decisions,

11   including whether the Fiscal Plan complies with Section 201.

12   No discovery on this issue is going to move the needle on

13   summary judgment, and it isn't allowed here, a position made

14   clear as well in our Response to the separate statement claims

15   that they make.

16        Similarly, defendants claim they need to take

17   discovery into the reasoning behind the default by the

18   Commonwealth and its failure to remit the allocable revenues

19   to, in this case, HTA, but equally applicable to PRIFA or,

20   frankly, CCDA.  But the reason for the default is of no moment

21   to this motion.  The question is whether there's a legal

22   consequence for having done so, not that it occurred.

23        We say there's no consequence because they have no

24   secured status on the retained money in question.  So the

25   reason for the retention is immaterial to the issues

1    presented.  And this is a legal issue flushed out in the

2    briefs for which no discovery would benefit the evaluation.

3        To be clear, why some government employee may have

4    determined to retain the monies is not germane to the legal

5    issues presented on the nature, if any, of their liens.  The

6    question is whether it having been done has a legal

7    consequence.  We submit it does not.

8        Likewise, defendants claim that the mere issue of

9    clawback, or the propriety of same, or its trigger is not

10   legal in nature but requires considerable fact discovery.  It

11   does not, as argued in the briefing.

12       This issue principally relates to the Contract

13   Clause, but none of the discovery claimed will, for example,

14   alter the legal issue that, one, PROMESA caused the

15   impairment, if any, in the contracts to which defendants are

16   parties between HTA, for example, and the defendants; or two,

17   that the available resources for the Commonwealth were

18   sufficient to pay the billions of dollars of debt owed on the

19   Commonwealth's GO burden.

20       And a moment of digression, Your Honor, regarding the

21   Court's comments concerning the nature of the motion that's

22   been filed and manner in which the Contract Clause claims have

23   been challenged.  You inquired of Mr. Bienenstock as to

24   whether the issue of "reasonable and necessary" was a part of

25   the motion.  Mr. Bienenstock's response was that it was

1    implicit within the claims.  Whether it is or not implicit,

2    it's not necessary to assess the issues that are capable of

3    resolving these matters at summary judgment.

4         The fact is that, in the briefing that we've

5    submitted in connection with these matters, there are separate

6    and independent legal grounds upon which the Court can

7    disallow the Contract claims in their entirety, as I've

8    noticed -- as I've indicated.

9         THE COURT:  And so you're saying that --

10        MR. FIRESTEIN:  And for the same reasons -- yes, Your

11   Honor?

12        THE COURT:  Are you saying that I can disallow the

13   Contract Clause claims without reaching the clawback issue or

14   the question of whether there is a factual predicate for the

15   assertion that the clawback has been triggered?

16        MR. FIRESTEIN:  Yes.  Yes.  And to be more fulsome in

17   connection with that, that is exactly the point that was made

18   in the briefing.

19        Indeed, one functional and independent ground is

20   if -- even if the Court were to consider that there was an

21   impairment, something with which we disagree, but if there was

22   to be a finding of any kind of impairment, our view under the

23   law is that that impairment would have been caused by PROMESA

24   for the reasons that have been articulated by Mr. Bienenstock.

25   And as a federal law, it is not subject to scrutiny under the

1   Contract Clause.  So without regard for anything else, that

2   would be a basis upon which to disallow the Contract Clause

3   claims.

4           THE COURT:  And even --

5           MR. FIRESTEIN:  And -- yes, Your Honor.

6           THE COURT:  -- as to CCDA, there wouldn't be a

7   necessity to reach the clawback issue?

8           MR. FIRESTEIN:  So CCDA, Your Honor, I'm going to

9   yield to my partner, Mr. Kass, who's going to address, I

10  believe, that exact issue and how it applies relative to CCDA.

11  I expect that he will address that head on.

12          THE COURT:  Thank you.

13          MR. FIRESTEIN:  But let me just conclude that for

14  similar reasons, Your Honor, this Court has already ruled,

15  another area in which they seem to suggest a need to procure

16  discovery into accounting practices or government decisions on

17  the flow of funds, I submit, Your Honor, that does not impact

18  the legal determination presented here about whether

19  defendants have secured claims based on official documents,

20  resolutions, or statutes.

21          Those are the issues, and accounting practices do not

22  affect them for the exact reasons that the Court identified in

23  the preliminary ruling.  And I believe this was specifically

24  included in the PRIFA preliminary ruling, but certainly has

25  larger application.

 1              The simple point is that throwing up dust about

 2      issues of interest to defendants does not mean that if

 3      discovery were permitted, it would shed material light on

 4      whether, with respect to the revenues retained by the

 5      Commonwealth, there was a statutory lien, a security interest,

 6      much less a perfected one, ownership or trust interest in

 7      favor of defendants, or a defense to the 407 claims or the

 8      Contract Clause claims.  That's what's at issue here.

 9              Fundamentally, without that materiality link, the

10      academic inquiries posed have no effect on the pending Summary

11      Judgment Motions.  Accordingly, Your Honor, the 56(d) request

12      should be denied and summary judgment granted on the claims in

13      question for each defendant.

14              Now, as Your Honor asked regarding the CCDA issues,

15      I'm going to, if I can, Your Honor, yield the rest of the time

16      to my partner, Mr. Kass, who will make some observations on

17      that and a few related matters, unless the Court has any

18      questions.

19              THE COURT:  No.  That's fine.  Thank you very much,

20      Mr. Firestein.

21              MR. KASS:  Good morning, Your Honor.  Colin Kass for

22      the Oversight Board.

23              THE COURT:  Good morning.

24              MR. KASS:  Good morning.

25              Following up on what Mr. Firestein just said, I'd

1   like to address a few points specific to CCDA.  As an initial

2   matter, it is important to focus on what defendants claim they

3   need additional discovery for and what they do not.  In their

4   56(d) Declaration, they do not claim they need any additional

5   discovery for their statutory lien claim, their ownership

6   claim, their express statutory or constructive trust claims,

7   or on the issue of perfection.  Rule 56(d), therefore, cannot

8   prevent the grant of summary judgment as to those claims.

9         Defendants' only response to this is that they have

10  not yet filed an answer or counterclaim, but there is nothing

11  in Rule 56(d) or elsewhere that renders the filing of an

12  answer or counterclaim relevant.  A counterclaim, by

13  definition, relates to claims other than the ones at issue in

14  our Motion.  And if their 56(d) Declaration cannot show that

15  discovery is essential to decide our Motion, an answer will

16  not fill that gap.

17        Now, with respect to the claims for which they say

18  they do need additional discovery, those arguments are

19  meritless.  First, they say they need additional discovery as

20  to the identity of the transfer account.  This issue goes

21  primarily to the existence and scope of a security interest.

22  But as we explained in our Reply papers, we agree that the

23  identity of the transfer account is a triable issue.  We are,

24  therefore, not seeking summary judgment disallowing a claimed

25  security interest as to funds that had been deposited into

1    what is ultimately determined to be the transfer account.

2         That fact, however, does not preclude the grant of

3    partial summary judgment on defendants' security interest

4    claims, particularly for funds that defendants claim should

5    have been but were not deposited into the transfer account.

6    As such, discovery concerning the identity of the transfer

7    account is not essential to determine partial summary judgment

8    on the Commonwealth -- in the Commonwealth's favor.

9         Second, defendants claim that they need discovery for

10   purposes of their Section 407 claim, but they concede that the

11   vast bulk of the funds at issue, over a hundred million

12   dollars, have been segregated in the FirstBank account.  And

13   so there is no transfer to the Commonwealth.  No discovery is

14   necessary under Rule 56(d) to grant partial summary judgment

15   as to those funds.

16        THE COURT:  They do claim that there was some

17   transfer back to the Commonwealth, don't they?  In CCDA, there

18   is some noise about some amounts of actual transfers?

19        MR. KASS:  Correct, and I'm about to address that.

20        THE COURT:  Thank you.

21        MR. KASS:  So defendants identify a single

22   post-PROMESA transfer of 15 million dollars, and they say

23   discovery may show additional post-PROMESA transfers to the

24   Commonwealth.  Now, as to the need for discovery, defendants

25   already have all the relevant post-PROMESA account statements

1   from the relevant accounts, and they have not identified any

2   additional transfers to the Commonwealth. So their request

3   for Rule 56 discovery relating to funds other than the 15

4   million dollar transfer rests on sheer speculation --

5           (Sound played.)

6           MR. KASS: -- and should be denied.

7           Now, as to the 15 million dollar transfer, there are

8   many reasons why the Court can and should grant summary

9   judgment as a matter of law. Most importantly, as this Court

10  held in the Lift Stay proceedings, the occupancy taxes are the

11  property of the Commonwealth, and the Commonwealth has never

12  relinquished its ownership of these funds to the transfer --

13  to the Tourism Company. So there is no deprivation of an

14  instrumentality's property.

15          To the extent the Court decides a Section 407 claim

16  on this basis, again, Rule 56(d) discovery is simply

17  unnecessary, and defendants do not argue otherwise. Now, if

18  the Court goes beyond that, then the Section 407 claim fails

19  both for preemption and because of the clawback under Article

20  VI, Section Eight. Those issues were largely addressed by

21  Mr. Bienenstock and Mr. Firestein, but with respect to the

22  Court's specific question on the clawback issue, the

23  defendants' argument is based on a faulty premise of law.

24          The triggering event under the Constitution is that

25  appropriations exceed available resources. That is the only

1    issue that is necessary for the Court to determine, and that

2    can be determined on undisputed facts.  The last dollar

3    defense that they have is statutory in nature and cannot

4    override the constitutional provision.  And so facts relating

5    to the last dollar defense, which is what the defendants are

6    seeking as part of their Rule 56(d) Motion, is simply

7    irrelevant.

8         For that reason, defendants cannot show on the

9    existing record that additional discovery is essential to

10   deciding the Commonwealth's Summary Judgment Motion, and for

11   that reason, the request should be denied.

12        Thank you, Your Honor.

13        THE COURT:  And is your argument that it's undisputed

14   as a matter of fact that appropriations exceed available

15   resources dependent on, first, taking the Congressional

16   finding as an evidentiary fact, and second, assuming that the

17   entire outstanding GO obligation was accelerated, that there

18   is a 17 billion dollar figure implicit in the

19   appropriations test for each and every year?

20        MR. KASS:  Your Honor, I think our position -- so the

21   answer to the question is yes, that is true.  I don't know

22   that it is dependant on the finding of acceleration.  If the

23   Court concludes that acceleration is appropriate, then there's

24   no question, and even the defendants would agree that

25   appropriations exceed available resources.  But even if that

1  is not the case, the fact that the GO debtholders are not

2  being paid, and have not been paid in full, is evidence that

3  they -- is undisputed evidence that appropriations cannot

4  exceed -- that appropriations exceed available resources.

5            THE COURT:  Thank you.

6            So did the two beeps beep?  I think --

7            MR. KASS:  I heard --

8            (Sound played.)

9            THE COURT:  Oh, now they have.  I'm sorry.  Had I

10  prevented you from making a last point, if you have one?

11            MR. KASS:  You did not, Your Honor.  I think that

12  completed my discussion.

13            THE COURT:  All right.  Thank you very much,

14  Mr. Kass.

15            So this concludes the arguments in support -- the

16  opening arguments in support of the Motion.  We will now take

17  a 12-minute break.  And so I would ask that everyone hang up,

18  and then call back in at 10:55.  And then we will proceed with

19  the arguments of the objecting parties in opposition.

20            Thank you.  Talk to you shortly.  We're adjourned.

21            (At 10:43 AM, recess taken.)

22            (At 11:03 AM, proceedings reconvened.)

23            THE COURT:  Good morning.  This is Judge Swain.

24            MS. NG:  Good morning, Judge.  It's Lisa.

25            THE COURT:  Very well.  I'm ready to continue hearing

 1    the arguments, and next up is Mr. Natbony, who is allotted 40

 2    minutes for Assured.

 3             MR. NATBONY:  Thank you, Your Honor.  Can you hear

 4    me?

 5             THE COURT:  Yes, I can.  Good morning.

 6             MR. NATBONY:  Thank you.  Good morning, Your Honor.

 7    May it please the Court.  William Natbony from Cadwalader,

 8    Wickersham & Taft, LLP, speaking this morning on behalf of the

 9    Monoline Defendants.

10             And first, Your Honor, I certainly hope that all

11    counsel, Your Honor, and the court staff are doing well and

12    staying safe during these unusual times.

13             THE COURT:  Thank you.  And that is my hope for

14    everyone as well.

15             MR. NATBONY:  So, Your Honor, plaintiff's motions

16    before the Court relate to a limited number of similar causes

17    of action asserted against each Monoline Defendant and the

18    Trustee.  I will be addressing generally the application and

19    procedural issues pertaining to Rule 56(d), the existence of

20    issues of material fact as relates to the HTA bonds.  Towards

21    that end, like the Board, it is not our intention to argue

22    issues of law already decided by the Court in the Lift Stay

23    Motions, though we respectfully disagree with a number of

24    those rulings and are moving forward with appeals.

25             After me, Ms. Miller will then address Section 407,

1    preemption, and the existence of factual issues for PRIFA and

2    CCDA.   And Mr. Berezin will then address plaintiff's claims

3    concerning the Contract Clause causes of action.

4        Your Honor, plaintiff's motion essentially depends

5    upon two flawed premises.  First, plaintiff argues that the

6    Court's prior Lift Stay decisions require the extreme and

7    extraordinary relief of summary judgment here.  And second,

8    plaintiff contorts the purpose and requirements of Rule 56(d)

9    in a manner wholly inconsistent with applicable law.  I will

10   address each flaw in turn and attempt to address a number of

11   the arguments that Mr. Bienenstock made for the first time in

12   his argument.

13       The plaintiff asserts, Your Honor, that summary

14   judgment is appropriate for certain counts because Your

15   Honor's prior Lift Stay decision concerning the existence of

16   property issues and interests controls here and prevents the

17   existence of material issues of fact.  We disagree.

18       The parties have extensively briefed the issues

19   surrounding construction and interpretation of the Excise Tax

20   Statutes and the existence of a trust relationship, and we

21   believe there is ambiguity and a need for discovery.  But Your

22   Honor has expressed a prior view on these issues, and although

23   we respectfully disagree, we are going to rely on the briefs

24   for them.  But both this Court and the Board do agree that

25   defendants, in fact, have a security interest in excise taxes

1    that actually reach the Fiscal Agent account.  And the Board

2    admits as much, and admits specifically that the 2002 security

3    agreement which applies to all funds, quote, required to be on

4    deposit, not only deposit -- and other documentation create

5    that security interest.  But if monies had been in the Fiscal

6    Agent accounts or should have been, nothing in the Court's

7    prior decision is inconsistent with a finding that defendants

8    have security interests.  So in a sense, even under the

9    Court's prior rulings, the issue is really the size of our

10   secured claim measured by the quantity of excise taxes that

11   reach the Fiscal Agent accounts, and not whether we have a

12   secured claim.

13        The Court's Lift Stay decisions, at least with

14   respect to HTA and PRIFA, are premised on the fact that no

15   excise taxes reached the Fiscal Agent accounts, and therefore,

16   the Commonwealth, rather than the HTA, had control over those

17   taxes.  But the real question here is why did the funds not

18   reach those accounts?  And as we demonstrate in the briefing,

19   the concept of control requires more than physical possession.

20   It requires lawful domination and control.

21        Now, plaintiff says that the reason excise taxes are

22   not reaching the Fiscal Agent accounts is because the

23   Commonwealth is breaching the excise taxes and has a right to

24   do so.  Well, if the Commonwealth was not permitted to breach

25   the excise taxes -- Excise Tax Statutes, then the flow of

1    funds into the Fiscal Agent accounts must resume and the size

2    of our secured claim necessarily increases.

3         So the issues of why such breach is occurring and

4    what is the Commonwealth's rationale for the breach remain

5    issues that must be eventually decided by this Court on a full

6    record and are issues that raise genuine issues of fact.

7    Indeed, the validity of the underlying rationale to the

8    admitted breaches remains very much in dispute.

9         The Board has been all over the place as to why, you

10   know, the funds are not getting to the account.  They do

11   introduce a new theory in their Reply that the Commonwealth

12   doesn't have to comply with the Excise Tax Statutes because of

13   a right to default or a determination to breach.  Of course,

14   that argument by its nature admits that the Commonwealth has

15   defaulted or breached an obligation.  But this new basis

16   replaces the original one, which was advanced in the Summary

17   Judgment Motion, which was that the Moratorium Orders, laws,

18   orders, fiscal plans and budgets caused the Commonwealth not

19   to comply.  But as we established in the opposition, debtors

20   must comply with all valid state and territorial laws.

21        The Board refutes -- now we did --

22        THE COURT:  So Mr. Natbony, are you arguing that if

23   there is a law on the books, notwithstanding bankruptcy, the

24   beneficiary of that law is entitled to specific performance

25   under all circumstances?

1          MR. NATBONY:  Our position would be that the statute

2     that requires that, they do have an obligation to comply with

3     state law.  And the fact of the matter is that the

4     government's reliance on *Kovacs*, which they cite for the

5     proposition that statutory obligations basically can be

6     discharged, doesn't really say what it says.  And that's their

7     reliance on the point that Your Honor is raising.

8          So Mr. Bienenstock, for instance, argued that the

9     Commonwealth's ongoing obligation, you know, is equivalent to

10    the money judgment at issue in *Kovacs*, because the Excise Tax

11    Statutes could be enforced by court order.  But *Kovacs* is

12    clearly distinguishable.  In *Kovacs*, certain statutory

13    obligations had already been reduced to a monetary judgment

14    pre-petition, so it was that pre-petition money judgment, not

15    the statutory obligations themselves, that the Court found to

16    give rise to a right of payment constituting a claim under the

17    Bankruptcy Code.

18         And the Court specifically emphasized that, aside

19    from this pre-petition money judgment, the debtor was

20    otherwise required to comply with statutory obligations going

21    forward, including in the post-petition period.  That's the

22    situation here.  Here, unlike in *Kovacs*, there is no

23    pre-petition money judgment.  There is just the Excise Tax

24    Statutes themselves, which the Commonwealth must comply with.

25         Moreover, as already argued in paragraph four of our

1   Sur-Reply, if defendants did obtain a court order to enforce

2   the Excise Tax Statutes, that order would not be a money

3   judgment requiring the Commonwealth to pay a debt.  It would

4   be a writ of mandamus specifically enforcing the

5   Commonwealth's ministerial, nondiscretionary obligation to

6   transfer the taxes to HTA for the benefit of the bondholders.

7           Now, also --

8           THE COURT:  Just one moment.

9           MR. NATBONY:  Yes, Your Honor.

10          THE COURT:  If the Board is right on the law, and

11  you're saying they're not, but if the Board is correct on the

12  law regarding the ability, I suppose, not to comply with the

13  statute, then the issues of exactly how and why that came

14  about would not be material.  But you're saying that they have

15  to comply, and if they have to comply, then why are the issues

16  of why they haven't complied material?

17          MR. NATBONY:  Yes.  A few --

18          THE COURT:  It's hard for me to see why that's --

19          MR. NATBONY:  A few points, Your Honor.  First of

20  all, as I said, the entire rationale of why they're not

21  complying is an issue in and of itself.  I mean, you know,

22  first they talk about they just have a right to default.  They

23  also say that they have, you know, a power to reject, you

24  know, and that is what they basically say in their papers.

25  But again, statutory obligations are not mere context that can

1   be rejected.

2          But there really is no evidence in this record that

3   the Commonwealth is failing to comply really because of some

4   abstract rights of default or breach.  In fact, the record

5   evidence that is before Your Honor shows that the Commonwealth

6   is not relying on some amorphous right to default or breach,

7   but in fact, because of the moratorium laws and orders.

8          And I would refer you to Exhibit 55 to my

9   Declaration, which is a Commonwealth Treasury spreadsheet,

10  which details revenues that were withheld under the Moratorium

11  Act and related executive orders, and they list by credit,

12  whether it be the various excise taxes under those provisions

13  -- so if the right to breach is the Commonwealth's

14  justification, at minimum, there is a genuine issue of fact

15  that needs to be explored and resolved.

16         We need to know what the true purported justification

17  of the Commonwealth is, and who is going to tell us that, and

18  how it was determined, so that we can literally test it.

19         THE COURT:  The Commonwealth is saying that if

20  there's a breach, whatever reason there is for the breach,

21  your clients still have their contract claim against HTA; HTA

22  has whatever claim it may have against the Commonwealth, if

23  that survives; maybe you have a claim under the nonimpairment

24  covenant against the Commonwealth; but none of those, as a

25  matter of law, is a claim that supports a requirement of

1  specific performance in the absence of ownership interest in

2  these funds.

3  And so if they are right on that view of the law, and

4  I recognize that's a big if and you are and will be arguing

5  the law, but if they're right on that view of the law, then

6  yes, it would be interesting to know why. And yes, it might

7  make them, you know, look worse in some way that may be

8  material down the line somewhere else, but why is that a

9  genuine issue of material fact in connection with this summary

10  judgment motion practice?

11  MR. NATBONY: Again, a few points, Your Honor.

12  First, to the extent that there is a lack of justification to

13  withhold, whatever the reason be, whether it be the breach,

14  whether it be the Moratorium Orders, whether it be the

15  budgets, whether it be, you know, some purported clawback

16  right that justifies retention, the bottom line here is that

17  if those justifications are without basis, then the money

18  needed to be transferred. And HTA would have had control, and

19  the amount of our secured claim would essentially rot.

20  So even under Your Honor's Lift Stay decision that

21  limited the security interest to those monies that would be in

22  the Fiscal Agent account, if there is no justification for

23  lawful control and lawful possession under any of these

24  theories, then the amount of our secured interest goes up

25  because the amount that would be in the fiscal accounts

1   necessarily as a matter of law would have had to have been

2   transferred to those accounts.

3           And, of course, Your Honor, I recognize that in

4   addition, we respectfully disagree with the overall property

5   interest reasoning set forth there.  So if that were to

6   change, that would impact things here as well.

7           THE COURT:  Thank you.

8           MR. NATBONY:  So just as far as the extent the

9   Oversight Board claims that its Fiscal Plans or Budgets,

10  rather than the moratorium laws, are the cause of the failure,

11  again, there's no evidence of that in the record.  If fiscal

12  plans or budgets did have the effect of impairing defendants'

13  bond in this manner, then in theory, the amount of our secured

14  claim would go up, and the fiscal plans and budgets would

15  likewise violate the Contract Clause, as Mr. Berezin will

16  address.

17          And I should also note that the Fiscal Plans and

18  Budgets are also void even under PROMESA, because before

19  developing or certifying a plan or budget, the Oversight Board

20  was required to conduct an analysis of mandatory factors

21  enumerated in Section 201 of PROMESA.  And here, the record

22  evidence shows the Oversight Board did not perform that

23  analysis.  In fact, the Board did not define essential public

24  services, which would have been necessary in order to

25  determine whether a fiscal plan ensures the funding of

1    essential public services as required under Section 201.

2         Now, plaintiff does rely on PROMESA Section 106(e) to

3    assert that defendants could not challenge a certification

4    determination of a fiscal plan or budget, but, however, a

5    certification determination as such term is used in Section

6    106(e) means a determination that the Fiscal Plan or Budget

7    satisfies the mandatory Section 201 factors.

8         Since the Board never performed the Section 201

9    analysis, there is no certification determination to challenge

10   and Section 106(e) doesn't apply.  To the extent plaintiff

11   relies on a clawback theory under Article VI, Section Eight,

12   to justify its retention, material issues of fact do exist

13   concerning whether any clawback was justified.  The

14   Commonwealth's alleged clawback is dependent on an analysis

15   under Article VI, Section Eight, that budget appropriations

16   would need to exceed available resources in every single year

17   that the clawback was purported, and that there would have had

18   to have been no resources available to the Commonwealth to pay

19   the public debt other than the excise taxes in any year where

20   budget appropriations exceeded available resources.

21        These too are factual issues that depend on

22   discovery, which defendants have not had access to yet.  To

23   properly test plaintiff's contention, defendants will require

24   discovery into the Commonwealth's available resources, how

25   those resources were misspent in violation of Article VI,

1    Section Eight, and the uses of any revenues that were

2    retained.

3         Plaintiff asserts that the declaration by Congress

4    four years ago, that the fiscal emergency is tantamount to the

5    required analysis.  Not so.  The generalized declaration of a

6    fiscal emergency is not a substitute for the particularized

7    analysis of resources and expenditures required as a

8    prerequisite to clawback or retention based on a clawback

9    analysis.  There has been no discovery in these cases as to

10   the existence, scope and findings of that required analysis,

11   and such evidence is essential in determining the validity of

12   the Commonwealth's actions here.

13        And, Your Honor, I do want to, at least with respect

14   to HTA, discuss for a minute Fund 278.  Now, I know the Court

15   has already, in the context of the Lift Stay Motion, looked at

16   the existing documents relating to Fund 278; but there is no

17   dispute that Fund 278 exists and is tagged with specific HTA

18   subaccount identifiers, and that Fund 278 transaction approval

19   authority was specifically delegated to HTA.

20        And while I understand the Court initially discounted

21   such evidence, an essential question remains unanswered and

22   should be explored in discovery:  Why was Fund 278 even

23   necessary?  The Commonwealth says it was an accounting

24   mechanism.  Well, an accounting mechanism to account for what?

25   And why was such an accounting needed?

1          When we attempted to seek the justifications of

2    defendant -- of the government's actions with respect to

3    various escrow issues, we were shut down at the 30(b)(6)

4    deposition.  Defendant should have the opportunity to explore

5    these questions in the context of this adversary proceeding

6    and as part of their yet unasserted defenses and

7    counterclaims.

8          Interpretation of the Excise Tax Statutes and whether

9    and to what extent funds have been made available for HTA are,

10   at minimum, mixed questions of law and fact that should not be

11   decided at this early stage on summary judgment.  And I do

12   know that, given Your Honor's Lift Stay Motion decision, there

13   were a number of instances in which Your Honor literally

14   interpreted a number of the statutory provisions.  For

15   instance, the interrelationship between resolution Sections

16   401 and 601; the meaning and the interpretation of the words

17   "other obligation."  And we do take the position that while

18   the Court made determinations about the existence of colorable

19   claims then, the interpretation of these provisions are at

20   least mixed questions of law and fact now which should be

21   decided only after a full record and not at this early stage

22   of summary judgment.

23          I think it is important to spend a few minutes

24   addressing plaintiff's total mischaracterization of Rule 56(d)

25   and its procedural requirements.  Defendants' reliance on Rule

1    56(d) is neither untimely nor procedurally improper.  Rule

2    56(d) is generally the part of a basis for opposing a summary

3    judgment motion.  It's expected, if appropriate, to be part of

4    the file.  It's not a separate motion.  It's not even a motion

5    at all.  It's an appropriate basis for opposing the type of

6    motion that is here, a summary judgment motion.  Just because

7    there may be identified material facts in issue does not mean

8    that there cannot also be a valid basis for denying the Motion

9    and ordering that discovery proceed.

10        Defendants claim that we were not diligent.  Well,

11   that is just not true.  The Board pressed for this schedule

12   for summary judgment motions, preceding answers in discovery,

13   fought discovery, and then accused us of sitting on our hands

14   when, in fact, the timing was actually set by this Court.

15        As was contemplated by this Court, the Motions for

16   Summary Judgment were to be limited to those issues that did

17   not raise material, disputed issues of fact.  And as the Court

18   recognized on the March 4th transcript at pages 220 to 221,

19   and as all the parties understood, defendants would have the

20   right to use 56(d) as a safety valve to oppose summary

21   judgment to the extent the government's motion was overbroad.

22        That is the case here, and defendants have done

23   nothing more than follow the procedures anticipated by the

24   Court by submitting the required declarations under the rule

25   and arguing that discovery is needed.  Those declarations set

1    forth in detail and as required the discovery needed and the

2    disputed facts such discovery related to.

3          Plaintiff's assertion that defendants did not timely

4    request discovery ignores that, over defendants' objection,

5    these cases, including discovery proceedings, were under a

6    Stay Order.  And also, contrary to plaintiff's assertion,

7    defendants' Rule 56(d) argument is not precluded merely

8    because defendants have concurrently attempted to oppose the

9    Summary Judgment Motion as best that they can without

10   discovery.

11         Defendants' papers in numerous places recount the

12   need for discovery, and the case law is clear that

13   simultaneous alternative arguments of this type are not

14   prohibited.  Indeed, what occurred here is quite common and

15   distinctly distinguishable from the few off-point cases relied

16   upon by plaintiff.  In those cases, either the party opposing

17   summary judgment either failed to follow Rule 56(d)

18   requirements, or used Rule 56(d) as a second bite at the apple

19   after the Court had already ruled on summary judgment.  That

20   is not the case here.

21         Plaintiff argues the various 56(d) Declarations are

22   speculative and do not identify the specific facts defendants

23   expect to obtain.  However, as First Circuit case law

24   establishes, the purpose of Rule 56(d) is to reveal unknown

25   facts.  Rule 56(d) does not require or anticipate that a party

1    seeking discovery have a crystal ball to be able to identify

2    the facts that discovery will establish.  Indeed, the

3    existence of discovery, by its very nature, is at least

4    somewhat speculative.  All that is required is that a

5    plausible basis be shown that material facts may conceivably

6    raise a triable issue of fact.

7            To -- plaintiff's cases that they rely upon have

8    facts in which declarations were submitted that -- either had

9    gauzy generalities alleged, merely identified witness lists,

10   were wholly conclusory statements, or mainly issues of law.

11   The declarations set forth in this case, including the Servais

12   Declaration with respect to HTA, and the Hughes Declarations

13   as well, set forth with specificity the discovery sought, and

14   met, under the PHC standard, the "necessarily low" standard of

15   establishing the materiality of the requested discovery.  And

16   indeed, just to give the Court a number of examples, we've

17   talked about the ambiguity of statutes, and the interpretation

18   of statutes, and how the government parties interpreted the

19   statutes and -- by their actions, more recent Fund 278

20   documents accounting for the Sinking Fund, documents relating

21   to the HTA subaccount information, documents relating to the

22   appropriations process, documents relating to any further

23   bond-related agreements or documents that we were not

24   signatories to, documents relating to essential services

25   determinations or clawback uses of funds.

1          I would refer Your Honor to paragraphs 47 to 80 of

2    the Servais Declaration, where we list out all the issues and

3    discovery sought.  The limited discovery that we obtained in

4    the Lift Stay proceedings is no substitute in substance or

5    scope to the full discovery rights within these adversary

6    proceedings, where final claim determinations should be based

7    on a full record.  It should -- is not unimportant to indicate

8    that plaintiff is seeking a final adjudication here of

9    defendants' rights.

10         And the discovery in the Lift Stay actions was

11   limited to just a few paragraphs in the government's briefs,

12   and further limited by Judge Dein's ruling on the Motion to

13   Compel.  And as I said before, during the 30(b)(6) deposition,

14   when we asked about underlying rationales behind certain

15   actions by the government, the government parties objected and

16   directed their witness not to answer.

17         And significantly, the scope of discovery for the

18   Lift Stay Motions was framed and briefed eight weeks before

19   the FOMB even filed its Summary Judgment Motion, so whatever

20   facts and additional facts have been raised by the Motions

21   would not have been addressed then.

22         So a number of points that I would like to address

23   that Mr. Bienenstock pointed to.  Mr. Bienenstock, in relation

24   to the 544 claim, made a statement to Your Honor that what he

25   was really talking about was Section 544(b), not 544(a).

1    Well, if that's the case, that's news to us, because the

2    Complaints and adversary proceedings there do not state causes

3    of action under 544(b).  They only state causes of action

4    under 544(a).

5         And, as we set forth in our brief, the Section 544

6    avoidance claims are time-barred.  I realize Mr. Bienenstock

7    did not address that, but this was all set forth in detail in

8    our papers as to why they are time-barred.

9         Mr. Bienenstock does talk about the hypothetical lien

10   issue, but indeed, under 544, avoidance is not available

11   because no hypothetical judicial lien creditor could exist as

12   to HTA or the Commonwealth under Commonwealth law as is

13   required under Section 544's plain language.  The Commonwealth

14   is protected by sovereign immunity, despite Mr. Bienenstock's

15   allegations, as a matter of policy, prevented from being the

16   subject of an attachment of a judicial lien.

17        We've cited to the Court the *Diaz* case, the *Libortex*

18   case, and Puerto Rico Act 66 of 2014 that basically restrict

19   relief we attest not to attachment of judicial lien, but

20   repayment plans.  And the reasoning behind these prohibitions

21   is to avoid the interference with the execution of public

22   function.  So the Commonwealth is not a Section 544 defendant,

23   and, therefore, Mr. Bienenstock's argument that Section 106

24   applies is just wrong, because by its terms, Section 106 only

25   applies for claims that are against the government.

1          Now, Mr. Bienenstock also talked about PROMESA

2     Section 301(c)(7).  301(c)(7) does not make the Board a

3     trustee in bankruptcy.  It only effectuates a substitution of

4     the term "Oversight Board" for the term "trustee."  It does

5     not provide the Oversight Board as a trustee.  And indeed, if

6     Your Honor looks at the HTA 926 Motion in case 17-3283, it's

7     at ECF 13929, at paragraph 44, note 19, the Board concedes

8     that it is not a trustee.

9          Now, Mr. Bienenstock also talked about, with respect

10    to the perfection issue, that money and -- the medium of

11    exchange argument that Mr. Bienenstock talked about.  Well,

12    Mr. Bienenstock misunderstands our argument that any security

13    interest in deposit accounts would be perfected as a security

14    interest in identifiable proceeds.

15         Well, first of all, I think the Board

16    mischaracterizes the nature of our collateral in its deposit

17    accounts, first of all, because collateral is a deposit

18    account only when it fits the narrow category, when security

19    documents specifically grant a security interest in an account

20    maintained with a debt.  That's not the case here.

21         Resolution Section 601 grants an interest in

22    revenues.  Resolution Section 601 grants a security interest

23    in money, and the Sinking Fund, which is a special fund, not a

24    deposit account at a bank.  So at minimum, there's an issue of

25    fact as to the existence of any deposit account and any

1    deposit or control agreement.  But, of course, even when you

2    get to the issue of money and the protection of money, the

3    fact is the UCC definition of money includes any medium of

4    exchange.

5           We are not saying that deposit accounts are a medium

6    of exchange.  We're saying that money is a medium of exchange,

7    which is how the UCC defines money.  To the extent defendants

8    have a perfected security interest in money, and that money is

9    somehow later transformed into a deposit account, and the

10   deposit account is proceeds of the money, and the perfected

11   security interest would attach to the proceeds -- and, of

12   course, that is under 19 L.P.R.A. 2265(a)(2)(C).

13          But, in any event, the Board's protection argument is

14   irrelevant, because the Board's Complaint never even

15   challenges any security interest in revenues and money.  The

16   entire Complaint is premised on the incorrect notion that

17   defendants' security interest is in deposit accounts as

18   original collateral, which it is not.  So any issues related

19   to defendants' security interest in revenues and money

20   therefore fall outside of the scope of the Complaint, and any

21   arguments by the Board on these issues fail as a pleading

22   matter.

23          Just looking here to see what else I have, if

24   anything.

25          So, Your Honor, where are we, you know, right now?

1    We're in a position -- what's different now?  So we're in a

2    completely different procedural posture than we were when we

3    were before you on the Lift Stay Motion.  There's a different

4    burden.  Plaintiff has the burden here.  There's a different

5    result.  This is a summary judgment proceeding that could have

6    the impact of addressing with finality the Monoline

7    Defendants' rights.

8         The need for a full record and final resolution of

9    facts is extremely important here.  There are broader legal

10   issues that are before the Court here than there were on the

11   limited Lift Stay Motion.  And indeed, our defenses to

12   counterclaims have not even been asserted yet.  From our

13   perspective, it's the plaintiff, the Board, that chose to

14   proceed in this manner and in this largely premature manner.

15   And it's our position, Your Honor, that, as such, the

16   consequences of that should be borne to the plaintiffs in

17   terms of not having the Summary Judgment Motion granted.

18         I think that there's only one more point that I

19   wanted to make before I pass on to Ms. Miller and Mr. Berezin.

20   As Mr. Bienenstock mentioned, at paragraph three of our

21   Sur-Reply, we cited *Kentucky Employees Retirement System*

22   *versus Seven Counties* to establish that statutory obligations

23   are not mere contracts and cannot be rejected.  Well, contrary

24   to Mr. Bienenstock, this proposition in *Kentucky* was not based

25   on 28 U.S.C. § 959(b).  At page three, the Sixth Circuit

1   stated categorically, and without reference to Section 959(b)

2   that, "if the Kentucky Supreme Court found the relationship to

3   be statutory in nature, Seven Counties would be unable to

4   reject its obligation to participate as an executory contract,

5   which would resolve the core claim raised" in the adversary

6   proceeding.

7        The Sixth Circuit went on to say that the issue of

8   whether that obligation must be faithfully maintained during

9   the pendency of proceeding under 28 U.S.C. § 959(b) would

10  remain as a separate issue.  So that should dispose of that.

11       Unless Your Honor has further questions for me, I'm

12  going to defer the remainder of my time to Ms. Miller and

13  Mr. Berezin.

14       THE COURT:  Thank you very much, Mr. Natbony.  I

15  think you have five minutes left of your time.

16       MR. NATBONY:  Thank you, Your Honor.

17       MS. MILLER:  Good morning, Your Honor.

18       THE COURT:  Ms. Miller, good morning.

19       MS. MILLER:  Good morning, Your Honor.  Atara Miller

20  from Milbank on behalf of Ambac.

21       As is becoming routine, I'm going to begin my

22  argument this morning by addressing the preemption arguments

23  raised by the Board.  And for purposes of this discussion,

24  I'll address HTA, PRIFA, and CCDA together.  Later, when it's

25  relevant, I'll go through the specifics of each

1   instrumentality, but for preemption, we can think of them all

2   together.

3          And as Mr. Natbony noted, the procedural posture here

4   is quite different from the last time we discussed this issue.

5   And as Your Honor noted in your questioning of Mr. Bienenstock

6   this morning, the Oversight Board somewhat unconventionally

7   asserts in its Adversary Complaints separate causes of action

8   seeking disallowance of defendants' claim based on different

9   legal theories, rather than seeking disallowance, and then

10  supporting a claim for disallowance with various legal

11  arguments.

12         And in particular, as relevant to the preemption

13  arguments, the Oversight Board asserts counts seeking

14  judgment, disallowing defendants' claim based on unlawful

15  retention of the revenues because the enabling statutes were

16  purportedly, quote, preempted by PROMESA. So this odd

17  pleading approach actually simplifies the preemption analysis,

18  as I think some of Your Honor's questions were teasing out

19  earlier today.

20         So despite moving for summary judgment on those

21  counts seeking to disallow defendants' claim based on the

22  preemption theory, the Oversight Board has acknowledged, and I

23  think even Mr. Bienenstock acknowledged this morning, that

24  preemption is not itself a basis for disallowing defendants'

25  claim. As an example, in the CCDA Reply, at page 55, the

1   Oversight Board states that "PROMESA preempts any territorial
2   law appropriating funds not provided for in an Oversight Board
3   certified budget.  Nothing more.  The legal effect of this
4   action is not to, "strip any claims or rights defendants may
5   have."  Whatever claims or rights they have remain and will
6   receive the treatment provided in an eventual plan of
7   adjustment."
8        Accordingly, the Oversight Board's Motion for Summary
9   Judgment on Counts 5, 26, 47, and 66 of the CCDA Complaint;
10  11, 37, 63, and 87 of the PRIFA Complaint; and 5, 28, 51, 74,
11  97, 119, and 141 of the HTA Complaint should be denied.
12       That raises the question, why, if the Oversight Board
13  recognizes this necessary limitation of any preemption
14  argument, does it spend dozens of pages and did
15  Mr. Bienenstock lead with it in his argument this morning
16  trying to persuade this Court to endorse it.  So if one steps
17  back and considers the big picture, the answer is actually
18  pretty evident.
19       Preemption is the tool that the Oversight Board is
20  looking to use to solidify its absolute, unfettered and
21  unreviewable discretion in controlling creditor outcome.  In
22  an ordinary municipal restructuring, the debtor's actions and
23  the proposed treatment of creditors are constrained by Chapter
24  Nine and evaluated by the Court in a confirmation process; and
25  that is exactly what Title III of PROMESA contemplates.

1              The Oversight Board, however, through preemption, is

2       seeking to eliminate creditors' rights and the obligations of

3       the Commonwealth and its instrumentalities outside of and

4       before the Title III process.  Through Certified Fiscal Plans

5       and Budgets, the Oversight Board theorizes it can choose the

6       winners and losers and lock in the state of those creditors,

7       regardless of whether there is even a pending Title III case.

8              The Title III process, as the Oversight Board would

9       have it, becomes nothing more than an evaluation of whether

10      the Plan conforms to the creditors' rights that the Oversight

11      Board has already unilaterally imposed through the budgets.

12      And I think Mr. Bienenstock said something like, well, it

13      preempts for as long as we decide to have it preempt.  We

14      could do 20 years, 30 years, 40 years.  Whatever we put into a

15      fiscal plan or budget is what would define it.

16             In a preemption world, Title II does the heavy

17      lifting on the restructuring, and Title III just comes in to

18      do the cleanup.  For purposes of the pending Summary Judgment

19      Motion, preemption is still important, however, because it's

20      the purported legal theory for the proposition that either the

21      Commonwealth did not violate any Commonwealth law, because the

22      revenue bond statutes were preempted, or that any breach of an

23      existing obligation was caused by federal, not Commonwealth

24      law.

25             These premises are foundational to the Oversight

1   Board's objection to defendants' Section 407 and Contract

2   Clause claims.  So I am going to -- even though they're

3   preemption -- their Motion for Judgment on their preemption

4   claims can easily be denied, I'm still going to have to engage

5   with it.

6          The Oversight Board again advances, as we heard

7   repeatedly this morning in the rattling off of sections,

8   numerous theories of preemption, framing focused first on

9   express preemption based on Section Four, arising from Section

10  202, 207, Title III, or then, alternatively, implied

11  preemption.  And I'll take them each.

12         First, the Oversight Board contends that by granting

13  fiscal planning and budgeting powers in Sections 201 and 202

14  to the Oversight Board, Congress preempted all Commonwealth

15  laws that obligate the distribution of money not in the

16  budget.  And frankly, on this point, I'm almost never sure

17  when I stand up to speak exactly what the Oversight Board's

18  position is going to be.

19         And there are two oscillating factors that I want to

20  highlight, because I think the inability to lock in on one

21  demonstrates how neither can be a valid reasoning.  And one is

22  whether it's the Fiscal Plan or the Budget that preempt.  And

23  I thought that the Oversight Board had walked away from the

24  notion that the Fiscal Plans preempt by saying, I think

25  expressly, that they recognize that the Fiscal Plans have no

1   legal weight and can't preempt anything.  But I heard

2   Mr. Bienenstock say this morning that the Fiscal Plans and the

3   Budgets preempt, and they need the Fiscal Plans under

4   Mr. Bienenstock's theory, in response to your question of the

5   scope of preemption, because Budgets are annual laws.  And so

6   if they want to have a preemption theory go beyond and cover

7   20, 30, or 40 years, it has to come through the Fiscal Plan.

8          So that's one oscillating point.  And the other one

9   is whether the budgets actually preempt or not, and what

10  they're preempting.

11         So I'm going to assume for purposes now, because I

12  think where Mr. Bienenstock last lay the marker is that the

13  budgets are preempting, so -- but because Commonwealth laws

14  can't preempt anything, as we heard Mr. Bienenstock explain

15  this morning, the Oversight Board argues that the Commonwealth

16  budgets are actually federal laws.  And that's kind of a head

17  scratcher in itself.  And as Your Honor noted, it's actually

18  contradicted by Section 202 itself, which provides that, in

19  the event that even when the Oversight Board develops the

20  budget itself, it has to be, quote, "deemed approved by the

21  Governor and the Legislature."  And that's because you have to

22  have a Commonwealth Act, a Commonwealth Act of law, that

23  dictates to the Commonwealth what expenditures it's going to

24  make in that particular year.

25         The Oversight Board, though, actually recognized as

1   much, and affirmatively argued, for example, at page seven of

2   its CCDA Motion, that the legislature has repealed the revenue

3   bond statutes because, PROMESA § 202(e)(3)(A) expressly

4   provides a Commonwealth budget developed and certified by the

5   Oversight Board is 'deemed to be approved by the Governor and

6   the Legislature.'

7          And that was in response to the argument that says

8   that, actually, the excise taxes have never been repealed.  So

9   where they want to say that they were repealed, it was done by

10  this legislative act, the deemed approval of the budget.

11         This conclusion is all --

12         THE COURT:  Were you -- I'm sorry.  Go on.

13         MS. MILLER:  No.  I was just going to say that this

14  conclusion is also necessitated, although it wasn't raised

15  this morning, by the Supreme Court's decision in *Aurelius*,

16  which recognizes that the Oversight Board, in its action, is

17  exercising territorial, not federal powers.

18         THE COURT:  Yes.  I understand your argument.

19         And so are you saying with respect to the repeal

20  effect, that to the extent there is implicit repeal, it could

21  only be by the approval of the budget, which is necessarily

22  cabined annually by this argument by the Oversight Board, *et*

23  *al*?

24         MS. MILLER:  So I'm actually going to get to the

25  repeal argument a little later, but the basics -- my basic

1  take on it is that a budget can't repeal anything.  I mean,

2  Mr. Bienenstock himself said that the only thing that a budget

3  does is authorize disbursements within a particular year.  It

4  doesn't modify an obligation.

5      And so the repealing of the statute would actually

6  require a modification of the obligation, which nobody

7  suggests that a budget actually does.  The budgets can't

8  repeal laws.  If you want to repeal the obligation, you have

9  to go out and actually change the excise tax law.

10     One interesting note here is that the Oversight

11  Board, in all its discussions, doesn't actually address what

12  would happen if the budget were a Governor or legislature

13  presented budget that was simply certified compliant by the

14  Oversight Board.  And there it would clearly have been

15  expressly and directly passed by the legislature, and -- by

16  the Puerto Rico legislature.  And it seems like the Oversight

17  Board's argument is that its certification would magically

18  convert a Commonwealth statute into a federal law with

19  preemptive power.

20     So, I mean, that's just one way of thinking about

21  this argument that makes it clear that it just can't be right.

22  So as an alterative, the Oversight Board argues that the

23  budgets themselves don't preempt.  I'm not relying on the

24  budget, but I'm only relying on the fact that PROMESA created

25  a conflict upon enactment, that by granting the Oversight

1   Board authority over fiscal plans and budgets, the Oversight

2   Board argues, Congress immediately preempted all Commonwealth

3   laws providing for the disbursement of funds, wiping clean the

4   slate for the Board to start its work and decide how money

5   should be allocated.

6        So under this theory, Congress left the Commonwealth

7   without any authority to make payments or transfers for over a

8   year after PROMESA was enacted until the Oversight Board was

9   appointed and a Commonwealth budget certified.  That's plainly

10  not what happened.  And so the suggestion that all of these

11  laws were actually preempted and couldn't be complied with

12  regardless of, you know, the Certified Budget, I think is sort

13  of logically impossible.  It's also inconsistent with the

14  limited conflict preemption articulated in Section Four.

15       It's hard to believe that through this provision

16  alone, Congress preempted all of the laws obligating the

17  payment or transfer of money.  And numerous sections of

18  PROMESA show that this isn't what Congress intended.

19       I know we discussed them last time.  We have them in

20  our Brief.  I'm not going to go through them again.  But

21  there's no question that, you know, there is at least in

22  Section 303, particular preemption, which specifically

23  identifies particular Commonwealth statutes and executive

24  orders that are being -- that were preempted by Congress.  And

25  the idea that they then, you know, silently preempted every

1   statute that directs money to anybody is just somewhat

2   inconceivable.

3        So at a high level, keeping in mind the balance that

4   Congress was trying to strike between providing Puerto Rico

5   with some relief, but also was protecting creditors, and

6   thinking about the stated goals of PROMESA to allow Puerto

7   Rico to regain access to the capital market, as well as the

8   really complex Title III and Title VI procedures that they

9   developed and built into the statute, it's hard to find

10  credible this idea that they really preempted all of these

11  statutes, including the Revenue Bond Statute, stripping the

12  revenue bondholders of the value of their collateral and

13  leaving them with empty obligations.

14       So Mr. Bienenstock didn't discuss it this morning,

15  but the Oversight Board relies on the First Circuit decisions

16  in *Vazquez-Garced*.  That decision is inapposite.  It doesn't

17  address at all, and I don't think there was discussion of it

18  this morning, but Your Honor I believe at the last hearing

19  actually recognized and asked a question related to this.  But

20  that -- nothing in the First Circuit argument actually went to

21  the effect, if any, the Oversight Board's control over budgets

22  would have over -- on pre-existing obligations.  It dealt

23  exclusively with the ability of the Governor in that instance

24  to reallocate or reprogram monies that had not been spent in a

25  prior fiscal year, a process that was clearly set out in

1  PROMESA, including in Section 204, in a manner that was

2  inconsistent.

3        This Section Four, conflicts preemption, clearly

4  applied there, but the same is not true here.  On this motion,

5  the Oversight Board identifies Section 207 as an additional

6  force of preemption.  As Your Honor noted this morning,

7  Section 207 says nothing about repayment of existing debt

8  obligations.

9        Mr. Bienenstock suggested that the inclusion of

10  redemption does cover that, but redemption does not mean

11  ordinary course scheduled debt payments.  Redemption is a term

12  commonly used.  It means the payments of the estate -- value

13  and any remaining interest at maturity on a bond, not the

14  payment of regularly scheduled debt service.

15        So, you know, if anything, you could look at the fact

16  that Section 207 basically covered every aspect of debt

17  payment reissuance, renegotiation, and required Oversight

18  Board consent; but expressly carved out of that, the ability

19  to repay -- sorry, the ability to continue making scheduled

20  debt service, leaving that within the Commonwealth power and

21  ability.

22        So next, the Oversight Board argues that movant's

23  claims are preempted by Title III of PROMESA, which only

24  recognizes an administrative priority.  And I think Your

25  Honor's probably tired of hearing me say this, but I just want

1    to reiterate that it's Ambac's position, and I know FGIC joins

2    in this position as well, that this theory applies equally to

3    the GO bondholders.  But that the Oversight Board is resisting

4    having that question litigated in that context so that it can

5    use a pretextual settlement thereof for 20 times what they're

6    offering the revenue bondholders as the anchor of a

7    GO-centered Plan of Adjustment.

8         But as against the revenue bonds, the Board's

9    argument fails on the merit, and it's irrelevant, frankly, for

10   purposes of this motion.  Title III addresses only the

11   treatment of claims in a plan of adjustment.  It does not

12   abstractly preempt rights or reprioritize claims.  There's no

13   plan here, and at an appropriate time, we'll talk about it.

14        The Oversight Board suggests that Title III has to

15   preempt, because it would otherwise require payments in full

16   of the revenue bond debt.  But whether or not the debt needs

17   to be paid in full will be determined by the provisions of

18   Title III in a plan of adjustment, as is the case in all

19   municipal bankruptcy proceedings.  Title III is not a source

20   of preemptive elimination of rights before confirmation.

21        In addition to express preemption, the Oversight

22   Board argues that the revenue bond statutes are -- impliedly

23   preempt, as contrary to the overall goal of PROMESA.  This

24   argument also just falls.  Implied preemption is narrow and

25   generally disfavored.  It applies only where two acts cannot

1    be reconciled or consistently stand together.

2         The Oversight Board itself recognizes that the

3    question of whether elimination of the Commonwealth's

4    obligation under the Revenue Bond Statute is necessary for the

5    Commonwealth to achieve fiscal responsibility and access to

6    the capital markets, two of the express purposes of PROMESA,

7    is subject to, quote, opposing views.  This alone precludes

8    summary judgment.  You can't have opposing views on factual

9    questions and still move for summary judgment.

10        This also addresses the argument Mr. Bienenstock

11   raised this morning to -- Section 108(a)(2) would preempt,

12   because again, 108(a)(2) is a reference to the purpose, and as

13   Mr. Bienenstock says, there are conflicting views and ideas

14   about what the purpose of the statute is.

15        The Oversight Board's conclusory assertion that the

16   Commonwealth could not reorganize its debt without revenue

17   bond statutes being preempted, based exclusively on the

18   declaration of Adam Chepenik that it would result in 20

19   percent of the annual spent being outside of the budgeting

20   authority of the Oversight Board, is not enough.  This is a

21   factual question on which defendants have obtained no

22   discovery.

23        The application of implied preemption is also

24   contrary to the expressly defined contours of PROMESA

25   preemption defined by Congress and included in Section Four.

1   In addition to express and implied preemption, the Oversight

2   Board refers again to the non-entrenchment principle.  And I

3   love the image of me, myself being an alchemist, doing magic.

4   I shared it with my children.  They got a great laugh out of

5   it.  But we are not the ones who are introducing or who have

6   ever introduced the non-entrenchment principle.

7           I do think that at least the Oversight Board has now

8   recognized that it is fundamentally distinct from the idea of

9   preemption, but they do advance it as a separate and

10  independent basis to simply avoid paying -- meeting their

11  statutory obligations.  And Mr. Natbony addressed some of it,

12  and I just want to add that, you know, as previously

13  discussed, you know, Mr. Bienenstock talks about 200 years of

14  bankruptcy law preempting.  No one's looking to unwind or undo

15  200 years of jurisprudence.  What we're trying to do is have

16  bankruptcy law apply, as bankruptcy law would apply, and not

17  live in this world where other theories of alternate

18  preemption can avoid rights and have you go into the

19  bankruptcy process naked.  That's not what anybody in

20  bankruptcy ever contemplated, but that's what the Oversight

21  Board would have done here.

22          But the Oversight Board, in suggesting that you can

23  simply default without consequence, is avoiding, you know, 150

24  years of jurisprudence that they don't address, starting with

25  *Von Hoffman versus City of Quincy*, which you know I like, and

1   the progeny from that.  And there, the Court held that it's

2   clear that where a state has authorized a municipal

3   corporation to contract and to exercise the power of local

4   taxation to the extent necessary to meet its engagements, the

5   power thus given cannot be withdrawn until the contract is

6   satisfied.

7        The state and the corporation in such cases are

8   equally bound.  The power given becomes a trust, which the

9   donor cannot annul, and which the donee is bound to execute.

10       And Your Honor asked Mr. Natbony earlier whether, you

11  know, any beneficiary of a statutory obligation is entitled to

12  specific performance under all circumstances.  And while that

13  may be an interesting theoretical question, it has no bearing

14  on the facts before us here.  Right.  What we are dealing with

15  is a fact pattern that's directly analogous to the facts in

16  *Von Hoffman*.  And the Supreme Court has already answered the

17  question that you are entitled to mandamus for specific

18  performance.

19       Now, at argument, Your Honor asks about -- argument

20  on the Lift Stay Motions, Your Honor asked about the interplay

21  between the *Von Hoffman* line of cases and the more modern

22  Contract Clause analysis.  Notably, as I think you identified

23  this morning, the Oversight Board in its Motion does not even

24  suggest that this Court should apply a modern Contract Clause

25  substantial impairment analysis.  It introduces no evidence,

1   probably because it recognizes that it's a clearly factual

2   issue; actually, didn't move for summary judgment on that

3   portion of -- or those portions of the various Contract Clause

4   claims.  I'm not even sure how to characterize their counts.

5           So the counts seeking summary judgment -- seeking

6   disallowance of claims based on Contract Clause, based on the

7   theory that the impairment was reasonable and necessary, are

8   not part of their Motion.  Instead, it just simply reiterates

9   and rests on the same non-entrenchment argument.

10          The only additional argument that the Oversight Board

11  makes is in response to defendants' argument that --

12          THE COURT:  I'm sorry.

13          MS. MILLER:  Go ahead.

14          THE COURT:  I just want to be clear.  You said they

15  just rest on the same non-entrenchment argument.  Do you mean

16  to say that their non-impairment argument always circles back

17  to and boils down to non-entrenchment, or did you mean to say

18  non-impairment?

19          MS. MILLER:  No.  I meant to say non-entrenchment.

20  Meaning that the -- well, I guess they say that there is no

21  impairment, and for that they don't suggest that it was

22  reasonable and necessary impairment.  They just say blanket

23  non-entrenchment means that there's never an impairment.  And

24  they go on and on about how it was enacted by, you know, the

25  1988 legislature, and now we are in the 2020 legislature.  So

```
 1    they're relying on non-entrenchment as a basis for
 2    nonimpairment --
 3              THE COURT:  Thank you.
 4              MS. MILLER:  -- rather than suggesting that it's not
 5    reasonable and necessary.
 6              THE COURT:  Yes.
 7              MS. MILLER:  Or that it was reasonable and
 8    necessary.
 9              THE COURT:  Thank you.
10              MS. MILLER:  The only additional argument that they
11    make in response to the argument that non-entrenchment was
12    purely hypothetical because the laws weren't validly amended
13    is, as I mentioned already, that they were abrogated by the
14    budget, which only reinforces the Contract Clause claim here.
15              So the Revenue Bond Statutes have thus not been
16    preempted by PROMESA, and any violations thereof bring with
17    them the attendant consequences.  And any Title III
18    restructuring must occur against the backdrop of those
19    existing rights and obligations.
20              So unless Your Honor has any other questions on
21    preemption, I'm going to turn to Section 407.
22              THE COURT:  That's fine.  Please do.
23              MS. MILLER:  Okay.  Thank you.
24              Section 407 was included in PROMESA as one of a suite
25    of provisions expressly intended by Congress to protect
```

1    revenue bondholders, and in particular, to address the

2    Commonwealth self-help tactic of taking or redirecting monies

3    pledged to or intended to be used to pay revenue bondholders.

4              As the Senate Republican Policy Committee Legislative

5    Notice makes plain, Section 407 was a direct response to the

6    Commonwealth's diversion of HTA and other revenue bond

7    revenues, which diversion Congress believed it was putting a

8    stop to through the preemption of the relevant executive

9    orders and moratorium acts in Section 303, and a concern that

10   Puerto Rico may attempt to redirect funds again.

11             Congress, in an admittedly less than perfectly

12   crafted provision, created two causes of action:  One, to

13   prevent the transfer of instrumentality property subject to

14   creditor's lien or security interest, and the second, to

15   prevent the diversion of money that is statutorily required to

16   be transferred to an instrumentality for the payment of its

17   own debt.

18             In discussing Section 407, the Oversight Board makes

19   two key errors, in addition to just their error in

20   application.  First, it conflates the two prongs of Section

21   407, contending that both require the transfer or diverted

22   money to be, quote, property of the instrumentality.  And

23   second, it argues that 407 gives rise to an unsecured claim,

24   which although it doesn't say this expressly, it plainly

25   believes it can be impaired under a plan and be paid in what

1    Your Honor has previously described as teeny, tiny, little

2    bankruptcy dollars.

3           The second issue is not properly before the Court on

4    this Motion.  The Oversight Board's Motion seeks summary

5    judgment on the specific counts in its Complaint seeking to

6    disallow the 407 claim.  The Oversight Board's argument that

7    the Court should nonetheless reach this issue is based on

8    their boilerplate prayer for relief in the Complaint, quote,

9    for such other relief as the Court may deem appropriate.  Our

10   view is that that's simply an insufficient basis for the Court

11   to rule on the nature and classification of any resulting 407

12   claim.

13          In any event, the Oversight Board's legal premise

14   regarding the nature of the claim is defeated by Section 407

15   itself, which provides that, "the transferee shall be liable

16   for the value of such property."  When the property at issue

17   is money, as it is here, there's no debate about the value of

18   that property.  Creditors pursuing Section 407 claims,

19   therefore, do not obtain unsecured claims subject to

20   impairment.  They receive the right to receive the value of

21   the improperly transferred or diverted funds.

22          Section 407 creates a bespoke fraudulent

23   transfer-like cause of action enforceable directly by

24   creditors, which returns value.  Section 407 provides some

25   breathing room to the Oversight Board and the Commonwealth by

1   precluding creditors from enforcing Section 407 while a Stay

2   is in effect, but it requires that any transferred or diverted

3   monies be returned to the instrumentalities before the

4   expiration or lifting of the Stay.

5        Stated differently, Section 407 precludes

6   confirmation of any plan premised on the use of monies that

7   belong to an instrumentality or that would deprive an

8   instrumentality of money statutorily allocated to it for

9   payment.

10       The Oversight Board points to Section 201(b)(1)(M) to

11  support its position that an interinstrumentality transfer

12  could be approved in a plan of adjustment or qualifying

13  modification.  The Oversight Board ignores, however, that

14  Section 407 includes no such limitation.  Congress could have

15  included a parallel carve-out from Section 407, but did not.

16  Section 407 is, therefore, better understood as the limitation

17  on interinstrumentality transfers that can be included in a

18  plan.

19       Turning now to the two prongs of Section 407.  The

20  first prong of Section 407 requires:  One, a transfer of

21  property of an instrumentality; two, that the transfer is in

22  violation of applicable law; and three, that the property is

23  subject to a valid pledged security interest or lien on such

24  property, or would be subject to such a pledged security

25  interest or lien absent a violation of applicable law.

1          The Oversight Board relies entirely on its preemption

2   clawback and non-entrenchment arguments to support its

3   contention that the transfer does not violate applicable law.

4   I've already addressed preemption and non-entrenchment.  And

5   as Your Honor has already recognized, clawback is an

6   inherently fact-specific inquiry, which on its own should

7   preclude summary judgment.

8          Whether the property is subject to a valid, pledged

9   security interest or lien is also the subject of much debate,

10  as Your Honor knows.  We previously argued our position to the

11  Court in connection with the Lift Stay Motion, and they are

12  set out in detail in our briefs, understanding and respecting

13  Your Honor's prior rulings, with which I think you know we

14  respectfully disagree.  I'm not going to go over those

15  arguments again here.

16         I'm going to note that -- our position that the first

17  prong of Section 407 does not require an attached, perfected

18  security interest, but rather applies in instances as would be

19  the case here under Your Honor's Lift Stay decisions, at least

20  with respect to HTA and PRIFA, where creditor has a valid

21  lien, but that lien has not yet attached to the property.

22         The Committee Notes on Section 407 directly support

23  this position.  In the Opposition, the Oversight Board, as

24  Mr. Bienenstock cited this morning, in a statement by -- on

25  the House Floor by Representative Grijalva, expressing his

1   opinion on the Committee Note.  That Representative Grijalva

2   felt the need to make the statement on the floor makes plain

3   that the text lends itself to the interpretation presented in

4   the Committee Notes and advanced by defendant.  That Section

5   407 extends to property subject to a lien, whether presently

6   or in the future, if -- flowed as required.

7        Representative Grijalva's speculation about what he

8   believes was the intent of Congress is no more binding or

9   persuasive than the Committee Notes.  And, in fact, Congress

10  took no action in response to Representative Grijalva's

11  comments.  The Notes were allowed to stand, plainly evidence a

12  majority disagreement with his statement.

13       The remaining dispute on the first prong rests on

14  whether the transfers were property of an instrumentality.

15  The Oversight Board contends, and you heard Mr. Bienenstock

16  say it again this morning, that the Court already decided this

17  issue.  But whether the money is property of the

18  instrumentality was not presented in the Lift Stay Motions at

19  all.  The only question that the Court considered was whether

20  the Commonwealth had an interest sufficient to have the Stay

21  applied.

22       The question of whether the instrumentality has a

23  property interest must be evaluated under state law, which

24  creates and defines property.  In HTA -- and here I'm going to

25  walk through each instrumentality separately just because the

1    statutes are obviously different.  In HTA, pursuant to the

2    excise taxes, Treasury is required to deposit the excise taxes

3    into a special fund, quote, in favor of, and in the name of,

4    and for the benefit of HTA, and transfer the excise taxes to

5    HTA's bank account, shall be covered into a special deposit

6    and shall transfer.

7         The Commonwealth has also pledged not to reduce the

8    taxes and to ensure that said amount shall be covered into a

9    special deposit, in the name of and for the benefit of HTA.

10   The Commonwealth thus collects and briefly holds the excise

11   taxes solely in a trust capacity.

12        And on the Lift Stay Motion, the Oversight Board's

13   counter-argument to defendants' argument that this language

14   also gave rise to a trust in favor of the creditors was that

15   the statutes allowed the instrumentalities to use the money

16   for other corporate purposes.  And whether or not that's

17   right, after bonds have been issued, is a question that we

18   dispute.  But there's no suggestion that the trust wouldn't

19   extend to the instrumentalities, giving them a property

20   interest.

21        And similarly, in PRIFA, Section 1914 of the Enabling

22   Act provides that monies, quote, when received by the

23   Department of Treasury of Puerto Rico, shall be covered into a

24   special fund to be maintained by or on behalf of PRIFA.  And

25   that's exactly what's happening now.

1          After being deposited in the Lockbox Account, the

2    first 117 million are being transferred with a note saying

3    "for deposit to the credit of PRIFA," and credited to the

4    Infrastructure Fund, the special fund maintained by the

5    Commonwealth for the benefit of PRIFA.  But all of the first

6    proceeds are property of PRIFA.  Regardless of whether they

7    are actually credited to the infrastructure fund, though, is

8    evidenced by Section 1906(m), among others, which authorized

9    PRIFA to -- well, 1906(m) authorizes PRIFA to pledge its

10   property to secure debt issuances, including, I'm going to

11   quote, "all or any portion of the federal excise taxes or

12   other funds which should have been transferred by the

13   Commonwealth to the Authority."

14          So they have the right to pledge the monies that

15   should have been transferred by the Commonwealth to the

16   Authority, but were not.  So clearly, they have an interest in

17   those monies that allows them to pledge.  The non-transfer of

18   monies does not reduce PRIFA's property or its ability to

19   pledge that property.

20          And the Commonwealth also again covenanted not to

21   limit or alter the rights given to PRIFA until all the bonds

22   are paid in full.  At a very minimum, there's a factual

23   question regarding the nature of the fund into which the

24   monies are being credited and PRIFA's rights with respect

25   thereto.

 1          And with respect to CCDA, the money is held in an

 2    account in the name of the Tourism Company, controlled

 3    entirely by the Tourism Company.  They've been designated as

 4    restrictive in cash balance analysis by the Oversight Board on

 5    the basis that the Commonwealth has no means to access the

 6    money, and that the Commonwealth cannot even de facto obtain

 7    the cash in the account by reducing appropriations, because

 8    there are no annual appropriations to the Tourism Company.

 9          The Oversight Board acknowledges here that, "the

10    Tourism Company may have their legal title or similar

11    attenuated property interest in the occupancy tax revenues."

12    Well, we dispute the characterization, but the acknowledgment

13    that CCDA has a property interest defeats summary judgment on

14    407 with respect to that.

15          Its argument that that property interest --

16          THE COURT:  Just one --

17          MS. MILLER:  Yes.

18          THE COURT:  Just one second.  So you're saying

19    that -- surprisingly, I didn't memorize every single word of

20    all of the briefs.  So you're saying that the Oversight Board

21    acknowledged that the Tourism Company has some sort of bare

22    title interest, or that the CCDA has that interest as to money

23    in accounts of the Tourism Company?  I'm just trying to make

24    sure I followed your last statement.

25          MS. MILLER:  Sure.  It's Reply paragraph 114, at note

1    63, and it's that the Tourism Company has it.  But 407 isn't

2    limited to -- 407 doesn't require the instrumentality to which

3    the proffer -- the money has to flow to be the obligor on the

4    debt.  So the Tourism Company is an instrumentality.  There's

5    no question that this is property of an instrumentality of the

6    debtor -- of the Commonwealth rather.

7            THE COURT:  Thank you.

8            MS. MILLER:  And so it's the Oversight Board's

9    argument that that property interest is insufficient for 407,

10   is -- I mean, they don't cite any support for it, and frankly,

11   it's not supported.

12           The fact that all of the statutorily pledged excise

13   taxes are, at a minimum, property of the respective

14   instrumentalities, frankly makes academic our dispute with the

15   Oversight Board about the elements of the second prong of 407.

16   The second prong makes actionable any transfer which deprives

17   a territorial instrumentality of property in violation of

18   applicable law, assuring the transfer of such property to such

19   territorial instrumentality for the benefit of its creditors.

20   That is a mouthful.

21           The Oversight Board, however, reads the beginning of

22   the first prong of 407, quote, as any property of any

23   territorial instrumentality is transferred as an element of

24   the second prong as well.  The Oversight Boarding argues that

25   it has to be right, because that is the "if" in the "if-then"

1     sequence.  But frankly, there's no reading of Section 407

2     that's grammatically correct, regardless of whose position is

3     adopted.  So applying grammatical rules seems to be misplaced

4     here.

5          The result of the Oversight Board's reading is that

6     the second prong requires, as Mr. Bienenstock explained this

7     morning, an instrumentality getting money and then losing it.

8     So a transfer of property of an instrumentality, and then a

9     transfer that deprives the instrumentality of that property,

10    and then the deprivation and violation of a law assuring the

11    transfer for the benefit of creditors.

12         This strips the word "deprive" used in the statute

13    twice of any meaning.  "Deprived" means to deny possession or

14    use of something.  It's different from taking or even clawing

15    back, which is what the Oversight Board wants to reinterpret

16    it as.

17         The Oversight Board's interpretation also makes this

18    prong, read in its entirety, both illogical and impossible.

19    407 requires the deprivation to be in violation of a law that

20    assures the transfer of property to the instrumentality.

21    Well, how can a transfer of money from an instrumentality ever

22    be in violation of a law assuring the transfer of property to

23    that instrumentality?

24         Congress had the diversion of revenues from the

25    revenue bonds in mind when drafting and adopting Section 407,

1     and they added the second prong for a purpose, not merely to

2     address a theoretical impossibility.  Defendants'

3     interpretation, by contrast, gives meaning to the second

4     prong, in particular by covering transfers which deprive the

5     instrumentality of property that was statutorily obligated to

6     it.

7           This interpretation is also the one that conforms

8     with how the word "such" is used throughout Section 407.  In

9     almost all other instances in that section, property is

10    qualified by the word "such," referring the reader back to the

11    last description of the property, and it could have in the

12    first sentence of the second prong as well.  The second prong

13    of Section 407, however, begins by simply using the word

14    "property," meaning if the instrumentality is deprived of

15    property, any property in violation of a law that assures the

16    transfer of such property, i.e., the property being withheld

17    from the instrumentality for the benefit of the creditors,

18    then the transferee is liable.  It doesn't have to be property

19    of the instrumentality.

20          The Oversight Board also argues that there have been

21    no transfers at all, and that the mere withholding of monies

22    is not sufficient to give rise to a claim under 407.  Based on

23    the limited factual record, this appears to be factually

24    incorrect.  It's also a question of fact, which would preclude

25    summary judgment and the required discovery.

1           THE COURT:  Would you --

2           MS. MILLER:  The CCDA --

3           THE COURT:  Oh, are you wrapping it up?

4           MS. MILLER:  Sure.  Yes.  I'm going to walk through

5    each of them.

6           So at CCDA, as you heard Mr. Kass say, there is no

7    dispute that there was at least one transfer from the Tourism

8    Company to the Commonwealth after the Oversight Board was

9    created.  Mr. Kass then said, well, defendants have all of the

10   evidence they need about all of the other transfers and they

11   haven't identified any.

12          Well, what we have is evidence of Tourism Company

13   accounts, but what we don't have is any evidence of who the

14   recipient was.  And we actually asked for that information.

15   We identified, as outlined in our 56(d) Motion, a number of

16   transfers out of Tourism Company accounts where the recipient

17   was not identified, and which we couldn't match to an in -- a

18   credit to -- on another account statement.  And those could

19   have been to the Commonwealth.  We have no way of knowing

20   whether or not those were transfers to a Commonwealth account

21   or not.  And discovery should be allowed at least to

22   determine whether or not those were made into Commonwealth

23   accounts.

24          And with respect to PRIFA and HTA, the Oversight

25   Board bases its no transfer argument on a line of cases

1    stating generally that the withdrawal or deposit of cash in

2    hand into one's unrestricted checking account is not a

3    transfer, as those monies have the same legal character

4    whether in your pocket or in your checking account.

5            As an initial matter discussed in our Brief, the

6    Oversight Board's narrow interpretation of the word "transfer"

7    ignores the numerous cases holding to the contrary, as well as

8    the broad interpretation afforded to the term "transfer" both

9    by the First Circuit, in the legislative history of Section

10   101(54) of the Bankruptcy Code, which expressly provides that

11   a deposit in a bank account or similar account is a transfer.

12           So even under the cases that the Oversight Board

13   relies on, where a checking account is not a transfer --

14           (Sound played.)

15           MS. MILLER:  -- and these monies have the same legal

16   character, that's not the situation here.  So with respect to

17   both HTA and PRIFA, on HTA monies collected and then deposited

18   to the credit of Fund 278, that designation carries with it

19   certain restrictions reflected in the Commonwealth's

20   accounting statements, making it different from simply

21   unrestricted, untagged cash in the bank.

22           And with respect to PRIFA, the monies are deposited

23   first into a lockbox account, which has -- is an escrow

24   account which has particular restrictions.  The Commonwealth

25   doesn't have access, cannot access them as it would cash in

1    hand.  And then those monies are transferred into various

2    accounts, some of which go with restrictions, and others

3    don't.  But clearly, those are transfers that are changing the

4    legal character and restrictions imposed on the funds.

5         With respect to the final element of the second

6    prong, that the deprivation is in violation of a law assuring

7    the transfer, the Oversight Board actually doesn't even

8    challenge that the laws at issue assure the transfer of

9    property for the benefit of creditors.  And we've already

10   discussed the Oversight Board's contention that no such law

11   was violated because each was preempted.

12        So before I pass the virtual podium to Mr. Berezin,

13   and I hope I can squeeze this in, I just want to make one

14   comment in particular about CCDA, because I think what the

15   Oversight Board is doing on this Motion, frankly, is a little

16   bit of smoke and mirrors.  And in trying to recognize Your

17   Honor's ruling, what they're saying, what you heard Mr. Kass

18   say is, we're only now asking for partial, partial summary

19   judgment with respect to this new category of revenues called

20   retained occupancy taxes, which are defined as occupancy taxes

21   not deposited in the transfer account.

22        Well, the limited discovery that we have shows that

23   this is actually a null set.  There is not a single dollar of

24   hotel occupancy taxes --

25        (Sound played.)

1          MS. MILLER:  -- that did not flow through this --

2     Your Honor, if I could just --

3          THE COURT:  You can finish your thought.

4          MS. MILLER:  Thank you.  That didn't flow through the

5     Scotia Bank 5142 account.  The Oversight Board is, therefore,

6     asking for a hypothetical advisory opinion, and, at the very

7     minimum, it is their burden to show that there are facts that

8     these rulings would actually apply to.  And on that basis,

9     summary judgment should be denied with respect to all of the

10    claims with -- as respect to CCDA.

11         Thank you.

12         THE COURT:  Thank you, Ms. Miller.

13         And so now, Mr. Berezin.

14         MR. BEREZIN:  Yes, Your Honor.  Good afternoon.

15    Robert Berezin.

16         THE COURT:  Good afternoon.

17         MR. BEREZIN:  Thank you.  Robert Berezin, Weil,

18    Gotshal, & Manges, representing National Public Finance

19    Guarantee Corp.

20         I will address for the Monolines the Contract Clause

21    issues raised in the Board's Summary Judgment Motion.  I just

22    note at the beginning that the Board did not move for summary

23    judgment that any impairment was reasonable and necessary, nor

24    have they proffered evidence on that issue, so it would be

25    improper for them to obtain summary judgment on an issue that

1    they raised literally at the midnight hour.  And I won't

2    address any of those points, as they were not in the papers.

3         So I'm going to begin, Your Honor, with whether a

4    change in Commonwealth law impaired bondholders' contracts,

5    and on that point, there's really no dispute that, after

6    November of 2015, Commonwealth law was the opposite of what it

7    was before.  It required excise taxes to be withheld from HTA

8    and the other instrumentalities.  And the record before the

9    Court shows that this change in law has been continuously in

10   effect since November 2015, and notwithstanding the enactment

11   of PROMESA or the filing of the Title III case.

12        Now, in the Motion, the Board argues that this sea

13   change happened due to executive action, but that's not --

14   that's not so.  The impairment began with the Emergency

15   Orders, but the Emergency Orders were legislative actions.

16   They were premised on the police power, which, under the

17   Commonwealth Constitution, is a legislative power.  They were

18   also premised on the clawback provisions of the Constitution,

19   and Constitu -- State Constitution or Commonwealth

20   Constitution is a law for purposes of the Contract Clause.

21        The second Emergency Order has the same -- the same

22   components.  It also purported to be issued under the

23   delegated authority pursuant to the OMB Act.  So it's

24   additional -- for that additional reason, it was a legislative

25   action.

1          For the Moratorium Act and the Moratorium Orders, the

2    Moratorium Act obviously is legislative.  Any act -- expressly

3    delegated the legislature's police power to the Governor, and

4    the Moratorium Orders in turn were expressly issued under the

5    Moratorium Act and purported to exercise the legislature's

6    police power, again under the Commonwealth's Constitution, a

7    legislative power.  Nor did the Moratorium Orders merely

8    execute or carry out the provisions of the Moratorium Act.

9    Instead, the Governor was delegated the power to decide, one

10   way or another, whether the legislature's police power should

11   apply and would apply to the Commonwealth or its

12   instrumentalities.

13         And indeed, the Court has already ruled that it was

14   plausible that the Moratorium Orders constituted exercises of

15   delegated state legislative power and are, therefore, laws in

16   the *Ambac* decision.  And we note that that decision was based

17   on the same record that's before the Court.  Namely, the text

18   of the Moratorium Act and the moratorium laws.  There was

19   nothing special or specific in the allegations that would not

20   be in this, presently before the Court.  So the Moratorium

21   Orders are laws for purposes of the Contract Clause, certainly

22   at this stage.

23         Finally, the Fiscal Plan Compliance Act is obviously

24   a legislation -- a piece of legislation, and is, therefore, a

25   law under the Contract Clause.  So we're not dealing with mere

1    executive action.

2         The Board's second primary argument is that the

3    taking of the excise taxes was permitted by the contracts

4    because there was a valid clawback in each fiscal year since

5    fiscal year 2016.  And I would note, Your Honor, whether a

6    valid clawback was in effect rests at least in part on

7    disputed factual contentions.  That is what the Court found

8    just this month in connection with the CCDA Lift Stay Ruling,

9    and that must be true as well on summary judgment,

10   particularly one filed before answers and discovery.

11        Mr. Natbony pointed out numerous factual issues that

12   are implicated when one needs to determine whether a valid

13   clawback under the Constitution was in effect for each fiscal

14   year.  I will just briefly touch on a few specific examples

15   where the Board contends that they were met.

16        So, in the first instance, the Board points to a

17   legislative finding in PROMESA, Section 405, but those

18   findings are a complete mismatch to the requirements of a

19   valid clawback.  We describe that in detail in our Sur-reply.

20   I won't repeat it, but I think, more importantly, a

21   legislative finding is insufficient to resolve genuine issues

22   of fact on summary judgment, particularly where, as you know,

23   all reasonable inferences have to be drawn in defendants'

24   favor.

25        The Board also argues that, well, the -- upon the

1    filing of the Title III, all 13 billion of GO debt

2    automatically accelerated and became due, and therefore,

3    available resources were insufficient.  But again, in our

4    papers, we demonstrated why that's wrong.

5            Just a few points there.  There's no automatic

6    acceleration provision in the Bankruptcy Code, so you have to

7    default to what the rights of the parties were under

8    Commonwealth law.  That's the premise of bankruptcy.  It

9    doesn't change contract rights or other rights absent an

10   express provision in the Code.

11           And the fact that bankruptcy law values a bankruptcy

12   claim for the full amount of debt doesn't override and has

13   nothing to do with when interest and principal payments are

14   due under Commonwealth law, or how the valid clawback should

15   be determined under the Commonwealth Constitution.  And the

16   Commonwealth Constitution clearly contemplates interest and

17   principal payments would come due over time, and there would

18   be no acceleration, so they clearly haven't met their burden

19   on summary judgment on that issue.

20           Even if available resources, excluding the excise

21   taxes, which are given a second priority under the

22   Constitution and OMB Act, were insufficient to service GO

23   debt, then the excise taxes can be used, but only to pay GO

24   debt during that year.  And the Board cannot show that this

25   occurred, excise taxes weren't used to pay GO debt.  And so

1    what the Board points to is, well, the Proposed Plan of

2    Adjustment.  And that doesn't work for multiple reasons that

3    we pointed out in our papers.

4         I won't belabor those either, but given all of this,

5    Your Honor, there are simply no grounds to grant summary

6    judgment on the question of whether there was no impairment

7    because of a valid clawback.

8         That brings us to the Board's argument that voluntary

9    defaults caused the impairment.  We would just note, Your

10   Honor, that there's no rule of law that a government can

11   change laws, violate statutes without any consequence under

12   the Contract Clause when there's a substantial impairment.

13   There's no case that says to the contrary, that authorizes

14   such a thing.

15        And this isn't just a breach of contract or a default

16   standing alone.  There was a change in law that upended the

17   rules upon which the agreements were entered, and that caused

18   a substantial impairment.  And the Board's argument that the

19   legislative acts only delayed payment, they don't abrogate

20   bondholders' contractual rights, so, therefore, there's no

21   substantial impairment, is just wrong.

22        The way that substantial impairment -- the

23   substantial impairment inquiry is set up, the reasonable

24   expectations of bondholders are paramount.  And there's no

25   question on summary judgment that the reasonable expectation

1  of bondholders, or that excise taxes that were explicitly

2  referenced in all of the official statements that went along

3  with these bonds would be enacted, would not be changed, and

4  that those funds would flow to HTA and to the other

5  instrumentalities to permit timely debt service.

6        So when that flow of funds stopped for years due to

7  legislative acts, that was a substantial impairment under the

8  cases that we have cited and under Contract Clause

9  jurisprudence generally.  In addition, the legislative action

10  here deprived bondholders of security under their contracts.

11  That's true even under the Court's Lift Stay Ruling, because

12  valuable property rights that otherwise would have attached

13  had the flow of funds continued, did not attach due to the

14  change in law.  That is clearly a substantial impairment for

15  sure.

16        So this is a Contract Clause violation.  It's not a

17  simple default.  And that is -- that is another reason why the

18  Board's arguments in favor of summary judgment fail.

19        Next, the Board argues that, well, federal law is

20  really what caused the impairments.  And so, okay, even

21  assuming that there are substantial impairments here, they

22  were caused by federal law.

23        They point to Title III in the first instance.  So in

24  Title III, Your Honor, it's clear that governments --

25  government debtors have -- just like any other debtor, have to

1    comply with the laws while in bankruptcy.  There's no rule

2    that exists in the Bankruptcy Code, there's no section of the

3    Bankruptcy Code that excuses government debtors from complying

4    with statutory law.

5         And this was addressed explicitly in *In Re: New York*

6    *City Off-track Betting Corp,* at 434 B.R. 131.  And certainly,

7    in bankruptcy, the default for creditors' rights is state's --

8    or in this case Commonwealth law, unless there's a specific

9    Bankruptcy Code provision that displaces that law.  And no

10   provision that has been invoked in Title III by the

11   Commonwealth abrogates the Excise Tax Statutes or requires or

12   authorizes the Commonwealth to violate them.

13        The Board points to the automatic stay, and a lot of

14   the arguments they're making here really go to whether there's

15   an immediate remedy for these violations.  But that's a

16   different question than whether those obligations exist and

17   give rise to actionable obligations.

18        And we've certainly moved the Court for -- to lift

19   the stay so that we can pursue our remedies, but the purposes

20   of summary judgment, the obligation in these Excise Tax

21   Statutes absolutely continue in spite of Title III.  Certainly

22   when we get to, as Ms. Miller indicated, the Plan of

23   Adjustment, that's a different issue, and we'll get there when

24   we get there.  But to move for summary judgment now and to

25   point to something in the Bankruptcy Code to say that the

1    obligations don't exist or that there's no -- that there's

2    preemption, is inconsistent with the statutory text.  It is

3    incorrect.

4           The Board also points to the power of rejection.  I

5    think it backed away from that to a certain extent today, but

6    statutes can't be simply rejected.  And in any event, it's a

7    hypothetical.  The Commonwealth has never invoked Section 365

8    in respect of the bonds, in respect of the Excise Tax

9    Statutes, so it's irrelevant.  And rejection, in any event,

10   doesn't destroy underlying contract rights, as was made clear

11   in the Supreme Court's decision in *Mission Products Holding*

12   *versus Tempnology.*

13          The next court refers to Title II and argues, well,

14   it was Title II that caused the impairment.  But we heard

15   today that the budgets only address payments and do not

16   address what do not need to be paid.  And therefore, they

17   don't eliminate the excise tax obligations.  And that may be,

18   but what's happening, as I explained before, is clearly a

19   substantial impairment for all the reasons I've said.

20          And that -- and to the extent that the Board is

21   relying on the budgets as the culprit for that substantial

22   impairment, then that would raise Contract Clause issues,

23   assuming that the Board -- that the Budgets are really

24   relevant.  And I just want to start with that threshold

25   question.

1            The Board, throughout its arguments, assumes that the

2      Fiscal Plan and Budget provisions pertain to the Excise Tax

3      Statutes, and that's a fundamental, mixed legal and factual

4      dispute.  The Commonwealth Fiscal Plans and Budgets address

5      resources that exclude the excise taxes, and this is clear in

6      PROMESA, in Section 201(b)(1)(A), which provides that fiscal

7      plans and budgets must be based on applicable law, which

8      includes the Excise Tax Statutes that specifically exclude

9      them from Commonwealth resources, as well as Section

10     201(b)(1)(M), which prohibits the Commonwealth from using

11     assets, funds, or resources of a territorial instrumentality.

12           And under the Excise Tax Statutes, the excise taxes

13     are HTA's funds, such as Fund 278, and resources, which is a

14     broad term; and therefore, the excise taxes fall outside the

15     scope of the resources covered by the Commonwealth fiscal

16     plans and budgets.  And at a minimum, there's at least a

17     question of fact as to those issues, given the budgeting and

18     other evidence that we have proffered.  But even if the

19     budgets were meant to include excise taxes, which we dispute,

20     the budgets would be Commonwealth legislative actions.

21           FOMB is part of the Commonwealth government.

22     Budgeting is a quintessential legislative exercise.  The

23     budgets, as you pointed out, Your Honor, they can be deemed

24     approved by the Commonwealth Governor and Legislature just

25     like any other Commonwealth law.  So a certified budget is a

1    Commonwealth budget.  It's not federal law.

2          So even if the Commonwealth budgets are the culprit

3    behind the impairment, as opposed to the moratorium laws or

4    acts and other Commonwealth pre-PROMESA enactments and

5    post-PROMESA orders, there still would be a Contract Clause

6    violation.  But the Board argues that Title II of PROMESA

7    expressly authorized or required the budgets to exclude excise

8    tax transfers.  That's an important issue, because if PROMESA

9    doesn't expressly authorize or require the budgets to exclude

10   excise tax transfers, then federal law did not cause the

11   impairment.  FOMB's local legislative actions did.

12         So to show that PROMESA expressly authorizes or

13   requires excise taxes to be excluded, the Board points to

14   PROMESA's provision granting the Board budgeting authority,

15   but those provisions nowhere authorize or require the Board to

16   certify a budget that violates the Excise Tax Statutes or that

17   requires retention of the excise taxes.  To the contrary,

18   numerous provisions in PROMESA show that the fiscal plans and

19   budgets should respect the Excise Tax Statutes.  But in all

20   event -- clearly, federal law does not expressly authorize or

21   require the budgets to override the Excise Tax Statutes.

22         (Sound played.)

23         MR. BEREZIN:  I'm showing I still have a couple

24   minutes, Your Honor?

25         THE COURT:  Yes.  That was the two-minute warning.

1          MR. BEREZIN:  Oh.  Great.  Perfect.

2          So FOMB's real argument underneath it all, because it

3     can't point to an express provision that authorizes a budget

4     to violate these statutory provisions, the real argument is

5     that it's impossible for them to both certify a compliant

6     budget and respect the Excise Tax Statues, because if FOMB

7     could have certified a compliant budget that respected those

8     statutes, then federal law did not cause the impairment, and

9     the budgets, which would be legislative acts, would violate

10    the Contract Clause.

11         And of course whether a budget would have -- whether

12    a budget could have transferred the excise taxes and complied

13    with PROMESA obviously presents profound factual issues that

14    would preclude summary judgment.

15         I would just note at the end, Your Honor, 106(e) does

16    not deprive the Court jurisdiction to determine if a Contract

17    Clause violation occurred.  The Court itself recognized that

18    in *Ambac*.  And it certainly doesn't preclude the inquiry we

19    just discussed, as to whether a fiscal plan or budget could

20    have complied with PROMESA and permitted the flow of excise

21    taxes, an inquiry necessary to determine whether the Title II

22    powers that the Board has really required, really required the

23    impairments that occurred here.

24         With that, I'll conclude, Your Honor, unless you have

25    questions.

1          THE COURT:  No.  You were very thorough.  Thank you,

2     Mr. Berezin.

3          MS. MILLER:  Your Honor, Atara Miller.

4          THE COURT:  Yes.

5          MS. MILLER:  Your Honor, if I may use Mr. Berezin's

6     last 20 seconds, I just have one small point that I realized I

7     neglected to address.

8          THE COURT:  Okay.

9          MS. MILLER:  On 56(d), with respect to PRIFA, Your

10    Honor asked Mr. Firestein about our assertion and showing that

11    there are some questions related to the bond documents and

12    whether it is a complete set.  And I just want to note that

13    Mr. Firestein suggested that we're making great weight of it,

14    but doesn't actually argue that --

15          (Sound played.)

16          MS. MILLER:  -- that the documents --

17          THE COURT:  You can finish.

18          MS. MILLER:  Thank you, Your Honor.  That the

19    documents before the Court are actually the operative or the

20    complete set, which would be their burden on summary judgment.

21    And we've raised a question that at least entitles discovery

22    as to that point.  It would seem that resolving that issue

23    would be a necessary predicate to any final, binding legal

24    determination about the bondholders' rights under the

25    documents that we are talking about.

1              Thank you.

2              THE COURT:  I just have a couple of questions for you

3    about those documents.  On the Trust Agreement discovery

4    issue, from your discussion, it seems like the Supplemental

5    Agreements would just be older versions of the '97 Agreements,

6    and so why would those be material to this motion practice,

7    besides obviously they'd be good to have?  But why are those

8    --

9              MS. MILLER:  So I think, Your Honor, if you look at

10   the document, it's actually hard to know what the supplements

11   would be and whether the document that's added, the '97

12   version, is just the '88 -- a copy, you know, an updated font,

13   but express duplicate of the '88, but incorporating the first

14   and second supplements, or whether it was all integrated into

15   a new sort of whole body.

16             And so that's exactly what we're trying to figure

17   out, which is, it would seem, based on the signature page and

18   the notary page, that the new, updated Trust Agreement is

19   really just a retyped, you know, from typewriter to word

20   processor, version of the '88 Trust Agreement.  But the cover

21   isn't indicating that it was amended by these two supplemental

22   agreements, which have not been put in the record and we have

23   not been able to obtain in discovery.

24             So I don't know, you know.  I can only speculate

25   about what it might be.  That's my best guess about why that

1    document looks so weird and what it might mean.  I wish I had

2    a better answer for Your Honor.

3            THE COURT:  And the second question I have is that,

4    as to the 2005 Supplemental Agreements, you make a

5    representation that you have a good faith basis for claiming

6    that it exists.  Can you be any more explicit about your

7    factual basis for that belief?

8            MS. MILLER:  So our basis for that belief is

9    discussion with the current Trustee.

10           THE COURT:  Thank you very much.

11           At this point, we will start our lunch break.  When

12   we come back at 2:15, we will go on to the argument by the DRA

13   Parties and then the rebuttal arguments.

14           Thank you, Counsel, for these arguments this morning.

15   I hope everyone has a little bit of a chance to rest.  I'm

16   going to a meeting, but I hope you can rest.  And I will look

17   forward to hearing you all at 2:15.

18           Take care.  We are adjourned.

19           (At 12:50 PM, recess taken.)

20           (At 2:19 PM, proceedings reconvened.)

21           THE COURT:  Buenas tardes.  This is Judge Swain.

22   Good afternoon, everyone.

23           MS. NG:  Hi, Judge.

24           THE COURT:  Hi, Lisa.

25           And so we are ready to continue the hearing with the

1    arguments from the DRA Parties.  I have 16 minutes allocated.

2    And who will be starting?

3            MR. MINTZ:  Good afternoon, Your Honor.  Doug Mintz

4    of Orrick on behalf of the DRA Parties, and I'm joined by our

5    co-counsel, Nayuan Zouairabani, from McConnell Valdes.

6            THE COURT:  Good afternoon, Mr. Mintz and

7    Mr. Zouairabani.

8            MR. MINTZ:  Thank you.  Good afternoon, Your Honor.

9    I wish you and all of my friends and colleagues here health

10   and safety, and hope we will get together sometime soon.

11           THE COURT:  I share those hopes and communicate those

12   good wishes as well.

13           MR. MINTZ:  Thank you, Your Honor.  Thank you.

14           THE COURT:  We'll start your clock now.

15           MR. MINTZ:  Thank you.  Your Honor, as you know, the

16   DRA Parties are not defendants here, but we have grave

17   concerns about the sweep of some of the arguments that

18   Mr. Bienenstock has made today and that the Oversight Board

19   has made in some of their pleadings.  Those stand to have an

20   impact on certainly the DRA, but a number of parties that are

21   not even in the room, if the Court were to adopt some of them,

22   some wholecloth.

23           And the Monolines did a very good job at pushing back

24   on a number of those points, but we will speak briefly on

25   three of them and hopefully avoid too much repetition.  I'll

1    speak first on preemption, which is limited by PROMESA with

2    respect to Commonwealth law, and then Mr. Zouairabani will

3    explain why Acts 30 and 31 are not appropriation statutes, and

4    thus, not preempted; and how the Oversight Board has failed to

5    provide any evidence that they have triggered the so-called

6    clawback.

7         So first, with respect to preemption, PROMESA does

8    not preempt Acts 30 and 31.  Congress struck a careful balance

9    with PROMESA and only displaced a narrow category of

10   Commonwealth law, and Acts 30 and 31 are not among them.

11        In Section Four of PROMESA, Congress states "the

12   provisions of this Act shall prevail over any general or

13   specific provisions of territory law, state law or regulations

14   that are inconsistent with this Act."  PROMESA is not a

15   steamroller that flattens every law in its path.  Congress

16   created a scalpel that removes only directly contradictory

17   statutes, which makes sense.  This is not some broad field

18   preemption.

19        The Oversight Board argues that the Fiscal Plan and

20   Budget preempt Acts 30 and 31.  This stretches Section Four

21   far beyond its breaking point.  Acts 30 and 31 do not

22   contradict any provision of the statute.  They are consistent

23   with the statute, as you'll see, and PROMESA makes no effort

24   to preempt them expressly.  To the contrary, the Fiscal Plan

25   and Budget actually must incorporate relevant Commonwealth

1     law.

2           And we list a number of these provisions in our

3     pleadings, but for one example, Section 201(b)(1)(N) of

4     PROMESA says that any fiscal plan shall respect the lawful

5     priorities and lawful liens as may be applicable in the

6     Constitution, other laws or agreements of the covered

7     territory.

8           So it's impossible to see how Congress intended for

9     PROMESA to preempt provisions like Acts 30 and 31.  We can

10    debate what Acts 30 and 31 actually mean, and I'm sure we will

11    at length, but clearly they remain in place.  And because, as

12    Mr. Zouairabani will explain, those statutes are not

13    appropriation statutes, the excise tax revenues should belong

14    to HTA, and DRA should have a lien on those revenues.

15          The Oversight Board tries to argue this is a settled

16    issue.  They state that the First Circuit and this Court have

17    consistently held PROMESA preempts Puerto Rico statutes

18    appropriating money because the budget necessarily must

19    contemplate all expenditures.  But those decisions, like

20    *Vazquez Garced*, one -- simply state that the Commonwealth

21    can't go and spend on its own outside the budget and fiscal

22    plan.  They don't have anything to do with Acts 30 and 31,

23    which are not budgetary allocations or even appropriations, as

24    Mr. Zouairabani will explain.

25          In essence, the Oversight Board wants to use the

1    Fiscal Plan, a document that can't be questioned by anyone, to

2    take interests in the excise tax revenues.  The DRA has a lien

3    on those revenues through HTA, and those liens are property.

4    Bankruptcy law has always been read to protect secured

5    property interests from being taken without compensation.  And

6    case law makes clear, Supreme Court case law, that the Court

7    should not construe a statute to interfere with the DRA's

8    property rights, or anyone's property rights, without

9    Congress' express statement of their intent to do so.  And

10   that's referencing *Security Industrial Bank*, 459 U.S. at 79.

11       The Oversight Board argues they aren't extinguishing

12   the lien, just the revenue source behind the liens, but

13   preserving the property right and the lien.  But that's just

14   word play.  Extinguishing the funding source of those revenues

15   without providing adequate replacement nullifies the lien and

16   destroys the property interest.

17       We don't think this is the context to make such broad

18   and overarching rulings that could affect so many people,

19   including many people not here today, in a way that we believe

20   would be unconstitutional.  We believe those issues are not

21   ripe today, and urge you not to head in that direction.

22       And with that, I will yield to Mr. Zouairabani at

23   this point.

24       THE COURT:  Thank you.

25       MR. ZOUAIRABANI TRINIDAD:  Good afternoon, Your

1   Honor.  Nayuan Zouairabani of McConnell Valdes on behalf of

2   the DRA Parties.

3          THE COURT:  Good afternoon.

4          MR. ZOUAIRABANI TRINIDAD:  Good afternoon.

5          I would like to start off with the concept of

6   appropriation.  As explained in our brief, the Act 30-31

7   revenues do not satisfy the framework to be deemed an

8   appropriation.  They are not funds which flow into the

9   Commonwealth Treasury for discretionary use, and they are not

10  subject to annual allocation in the Commonwealth's budget on a

11  fiscal year by fiscal year basis.  Put another way, if it does

12  not walk like a duck and does not quack like a duck, then it

13  is very clearly not a duck.

14         The legislature knows how to create appropriation

15  statutes, but chose not to do so in this case.  The

16  legislature's intent with the Act 30-31 revenues is therefore

17  clear:  One, they are not discretionary Commonwealth

18  appropriations; two, they are required to be covered into a

19  special deposit for the benefit of HTA for the specific

20  purpose of repaying particular creditors of HTA; and three,

21  the Commonwealth is obligated to transfer and convey these

22  revenues to HTA under Article VI, Section Nine of the

23  Constitution, subject only to the extraordinary exception of

24  the clawback, which, as we will discuss shortly, has not

25  occurred here.

1    Moreover, the First Circuit decisions of

2    *Vazquez-Garced 1*, *Mendez-Nunez*, and *Andalusian* do not assist

3    the FOMB in this regard.  The first case concerns the

4    reprogramming of items from the Commonwealth's annual budget;

5    the second concerns litigation of whether -- reduction of the

6    Puerto Rico Legislature's budget; and the third addressed a

7    controversy over the ERS Statute, which requires specific

8    annual allocations in the Commonwealth's budget.

9        All of these decisions revolve around particular

10   items in the annual Commonwealth budget that require specific

11   budgetary allocations.  The Act 30-31 revenues do not.  Hence,

12   none of these cases are applicable to it.

13       The FOMB tries to bypass it by relying on two

14   additional grounds.  First, that Acts 30 and 31 are subject to

15   the rights of future legislatures to review or amend; and

16   second, their underlying belief that any other interpretation

17   would make it impossible to fulfill their mandate under

18   PROMESA.

19       The FOMB's first argument is irrelevant, because to

20   date, neither the Commonwealth nor the Puerto Rico Legislature

21   have taken any action to repeal or amend Acts 30 and 31.

22   Rather, the only party that has consistently attempted to do

23   so is the FOMB itself, acting outside their mandate through

24   certified budgets and fiscal plans.

25       As discussed in our briefing, the FOMB cannot use

1    their certified budgets and plans as a means to amend Acts 30

2    and 31, because they do not possess the power to legislate.

3    This second argument requires careful scrutiny as it can lead

4    to a very dangerous path.  And this relates both to the issue

5    on appropriations, as well as preemption, as Counsel Mintz

6    just discussed.

7            As the Court noted when the FOMB sought to appoint a

8    chief transformation officer for PREPA, Congress created a

9    carefully calibrated framework when it enacted PROMESA.  It

10   could have chosen to grant the FOMB greater control over the

11   government and its operations, but it did not do so.  PROMESA

12   says what it means and it means what it says.

13           As Counsel Mintz explained, PROMESA specifically

14   preserves Commonwealth law related to creditor priority,

15   security and property rights.  Moreover, Title III does not

16   incorporate the majority of the payment priority under Section

17   507 of the Bankruptcy Code.  And Section 314(b)(6) of PROMESA

18   specifically mandates that, in confirming a Title III plan,

19   the Court must consider whether available remedies under the

20   Commonwealth laws and Constitution would result in a greater

21   recovery to creditors than as provided in the plan.

22           Bear in mind, Your Honor, that Congress decided to

23   make Title III's best interest test significantly different to

24   the one set forth in Chapter Nine.  The FOMB cannot, through

25   the guise of fulfilling its mandate, take certain sections of

1    PROMESA out of context, just as they did in the *PREPA* case, by

2    the way, to turn it into a weapon to preempt laws they deem

3    problematic, like Acts 30 and 31, or even the Puerto Rico

4    Constitution, as they alluded to in their Reply.

5           By the same token, they cannot use PROMESA to convert

6    the Act 30-31 revenues into appropriations that can be

7    discretionarily disposed of through certified plans and

8    budgets.  If we follow the FOMB down this rabbit hole, it

9    will not stop until they essentially rewrite PROMESA to make

10   it easier for them to plot forward with their current Fiscal

11   Plans, Budgets, and Title III Plans in an attempt to obtain

12   unfettered quasi monarchical powers over the Government of

13   Puerto Rico and, ultimately, the people of Puerto Rico.

14          Now, having addressed the FOMB's preemption

15   appropriation arguments, the FOMB is now forced to address the

16   two ton elephant in the room.  That is, the validity of a

17   clawback.

18          As a housekeeping matter, Your Honor, it is the DRA's

19   position that by raising the applicability of clawback in

20   these proceedings, the FOMB has conferred this Court with

21   jurisdiction to adjudicate this controversy on its merit, and

22   thus, has waived any arguments regarding the limitations of

23   Section 305 of PROMESA on this issue.

24          Having clarified with you, we now turn to why the

25   FOMB has failed to show compliance with clawback.  The

1   requirements for activation of a clawback under Puerto Rico

2   law is quite complex, and it's not just limited to one

3   element, as the FOMB oversimplifies in their briefings.

4   Article VI, Sections Seven through Nine of the Puerto Rico

5   Constitution, the OMB Act, and Acts 30 and 31 allow for the

6   potential application of the clawback to the Act 30-31

7   revenues, but only when, one, the fiscal year began with a

8   balanced budget; two, available resources for the fiscal year

9   are insufficient to cover GO debt service; and three, the

10  funds can only be used to pay interest and amortization on GO

11  debt.

12          Under all other circumstances, Article VI, Section

13  Nine of the Constitution mandates that, and I quote, "public

14  funds shall only be disposed of for public purposes pursuant

15  to law," and I end quote.

16          The FOMB makes no effort to evidence compliance with

17  every one of these key factual thresholds.  By limiting its

18  briefing only to the single issue of whether the Commonwealth

19  lacks sufficient available revenue, the FOMB essentially

20  admits their failure.  Accordingly, summary judgment cannot be

21  granted on this matter due to FOMB's inability to meet its

22  burden to show that there is no genuine issue of material fact

23  with respect to any of the requirements for activation of a

24  valid clawback.

25          Lastly, I would like to briefly address Counsel

1   Firestein and Counsel Kass' remarks regarding clawback.  In a

2   nutshell, they assert that clawback is not an issue because

3   the impairment for the Contract Clause is based on the FOMB's

4   preemption/appropriation argument under Title II of PROMESA.

5          (Whereupon the San Juan courtroom was disconnected

6   from the teleconference call.)

7          (At 2:36 PM, the San Juan courtroom was reconnected

8   with the teleconference call.)

9          MS. NG:  Eric can hear us.  The AT&T is good, Judge,

10  right now.

11         THE COURT:  I'm sorry.  I'm hearing voices but not

12  words.  It's very faint.

13         MS. NG:  Judge, can you hear me?

14         THE COURT:  Yes.  Who is that speaking?

15         MS. NG:  It's me, Lisa.

16         THE COURT:  Okay.

17         MS. NG:  Eric says AT&T is fine.  He can hear us.

18         MS. TACORONTE:  Judge, can you hear me?

19         THE COURT:  All right.  And someone else just said,

20  "Judge, can you hear me," so who is that?

21         MS. TACORONTE:  It's Carmen, in San Juan, Your Honor.

22         THE COURT:  Great.  So I think we are all back in the

23  same loop and we can proceed.

24         COURT REPORTER:  Your Honor, would you like me to

25  read what was being said before we were dropped?

1          THE COURT:  Yes.  Actually, that would be helpful.

2    So if you will repeat from where Mr. Zouairabani was talking

3    about what Mr. Firestein and Mr. Kass said about clawback.

4          (Whereupon the court reporter read back the record

5    from page 143, line 1, to page 143, line 4.)

6          THE COURT:  Oh, then you dropped.  Okay.

7          So I will ask Mr. Zouairabani to come back and repeat

8    the end of his argument from that point.

9          MR. ZOUAIRABANI TRINIDAD:  Yes, Your Honor.  Attorney

10   Nayuan Zouairabani for the record.  If I may?

11         THE COURT:  Yes, please.

12         MR. ZOUAIRABANI TRINIDAD:  So what follows that

13   portion is:  What they failed to mention, however, is if the

14   Court were to reject the preemption/appropriation arguments

15   for the reasons already stated, the Court will be required to

16   address clawback to dispose of the FOMB's Contract Clause

17   allegations.  Plus, contrary to the FOMB's assertion

18   otherwise, clawback is still very much in play in this

19   proceeding.

20         And that was the end of my portion.

21         THE COURT:  Thank you.

22         And so, Mr. Firestein, then Mr. Despins said that he

23   was waiving the five minutes for the UCC and contributing them

24   to your time allocation, which means I have you, the Oversight

25   Board, down for 30 minutes now.  And so, Mr. Firestein, are

1    you ready to proceed now?

2           Mr. Firestein, are you here?

3           (No response.)

4           THE COURT:  Lisa, can you hear me?

5           MR. BIENENSTOCK:  Your Honor, this is Martin

6    Bienenstock.  If it's okay, I'll start, and I'll hand things

7    off to Messrs. Firestein and Kass.

8           THE COURT:  That's fine.  I'm just glad we haven't

9    all lost each other again.

10          MR. BIENENSTOCK:  Okay.  Shall I start now?

11          THE COURT:  Yes, please.

12          MR. BIENENSTOCK:  Okay.  Good afternoon, Your Honor.

13   Martin Bienenstock of Proskauer Rose, LLP, for the Oversight

14   Board, as Title III representative for the Commonwealth.

15          I'm going to go mostly in order of the points raised

16   in the opposition this morning, Your Honor.  The first issue

17   related to the Monolines contending they need discovery and a

18   trial, because they have a lien not only on money in the

19   Sinking Fund, et cetera, at HTA, but also on money that should

20   have been sent there.

21          And the reason that's wrong -- there are many reasons

22   why that's wrong.  First, the only entity that granted a

23   security interest to them is HTA, and it could not grant a

24   security interest in funds it didn't have.  Second, they base

25   this on a 2002 Security Agreement which the Court already

1    determined was unauthorized.  Third, even if it had been

2    authorized, the expensive grants of not only funds in the

3    Sinking Fund but funds that should be there was beyond the

4    resolution authorizing the deal in the first place, and,

5    therefore, would have been ineffective.

6         The next point I want to address is the Moratorium

7    Orders.  Mr. Natbony admitted that, as evidence of why money

8    was not funneled to the instrumentalities, were Commonwealth

9    documents saying not to, whether the orders or the statutes,

10   and I guess -- well, whatever he got in discovery indicating

11   that was the case.  That's not the issue here.

12        From the time that the statutes were preempted, that

13   is the cause, at least the legal cause of not transferring.

14   And at the latest, that would be the commencement of the Title

15   III case for the Commonwealth.  And if we were to go not only

16   by Title III but by the preemptive provisions of Title II,

17   then it could be as early as the creation of the Oversight

18   Board and the imposition of the first certified budget.  But I

19   want to be clear.

20        THE COURT:  Mr. --

21        MR. BIENENSTOCK:  So before then --

22        THE COURT:  Mr. Bienenstock.

23        MR. BIENENSTOCK:  Before those two things happened,

24   the cessation of the money was not due to PROMESA, because

25   PROMESA didn't exist.  And they have said they don't have a

1    claim for that within the meaning of the Bankruptcy Code; they

2    are only entitled to equitable and declaratory relief.  Well,

3    the equitable and declaratory relief in the case law and in

4    *Von Hoffman,* that some of the Monolines are fond of citing, is

5    you nullify the offending statute.  And as I explained

6    earlier, the Board has no problem with that here.

7         I assume that when they say they have no claim but

8    they have an entitlement to equitable relief, they are not

9    being cute and clever and saying, well, the equitable relief

10   we're entitled to is the payment of all the money, because

11   that would mean they do have a claim because the Bankruptcy

12   Code defines claim as right to payment.

13        So it really doesn't matter before Title III what the

14   cause was.  At best, if their contractual obligations were

15   impaired, they would have a pre-petition unsecured claim for

16   that impairment.  But since all of the Commonwealth executive

17   orders and moratorium laws went out of their way to preserve

18   all the creditors' rights to principal and interest, et

19   cetera, and so forth, our point is their contractual

20   obligations were intact.

21        What all this, all these statutes and orders amounted

22   to was nothing more than the debtor defaulted.  And no matter

23   how you look at it, at best, it can result in a pre-petition

24   unsecured claim, which they say they don't have.  They only

25   want declaratory and equitable relief.

1          Mr. Natbony next mentioned that the Fiscal Plan

2   didn't identify essential services; therefore, its

3   certification doesn't count.  And he wants discovery on that,

4   and that to be the subject of a trial.  There is no

5   connection, though, as to what suddenly puts the Fiscal Plan

6   into play in connection with the Monolines' Proofs of Claim.

7          To the extent they had collateral, they've asserted

8   secured claims.  They've asserted unsecured claims, priority

9   claims.  None of it depends on a fiscal plan.  They've listed

10  all their entitlements.  And even if they got a list of

11  essential services, they can't do anything about it, because

12  the Court -- the Court is told by PROMESA, 106(e), the

13  certification of fiscal plans can't be -- is outside the

14  Court's jurisdiction.

15         On Section 544(b), Mr. Natbony says a trustee under

16  301(c)(7) is not a trustee in bankruptcy for purposes of the

17  Uniform Commercial Code in Puerto Rico.  Suffice it to say we

18  beg to differ.  What other trustee is there in this case than

19  a Bankruptcy Trustee, a Title III Trustee?

20         Insofar as their statement that I misunderstood their

21  argument about the deposit account, the bottom line is this:

22  They cannot have a security interest in a deposit account

23  without a perfected security interest, without a Deposit

24  Account Control Agreement, a DACA, unless they had a perfected

25  security interest in cash, either by possession or by an

1    authenticated statement of the Commonwealth.

2         And as I pointed out in my early part of my opening,

3    the statutes they point -- the Monolines point to give them

4    that authenticated security interest say the money is being

5    held for the benefit of HTA to use for its corporate purposes,

6    not for the benefit of the bondholders.

7         As far as the *Kentucky Employees* case, suffice it to

8    say, from its very outset, it relies on Section 959(b).  But

9    the Monolines' point, they contend it doesn't rely on 959(b),

10   that that's an ancillary issue, and that what it really says

11   is statutes have to be obeyed, even in bankruptcy.

12        I guess that's where the rubber hits the road here,

13   Your Honor.  If they are right, then I suppose all creditors

14   from now on of municipalities will require the states and the

15   municipalities to pass laws that say all debt shall be paid

16   timely, no matter what, or just all debt shall be paid timely.

17   And then, according to the Monolines, they all have to be

18   specifically performed, which is the equivalent of giving them

19   a super priority during a bankruptcy in contradiction of what

20   the Bankruptcy Code provisions and Title III say.  And I think

21   simply to state their proposition is to refute it.

22        To clarify something that came up this morning and

23   was raised by some of the speakers, while we are -- we, the

24   Board, as the Commonwealth's Title III representative, are

25   primarily concerned, and we brought these Complaints and

1    Summary Judgment Motion to pave the way for a plan of

2    adjustment, and for that, we need to know the amount of

3    secured claims, because they have to be paid the value of

4    their collateral, we have asked in several instances for

5    disallowance of the unsecured claims.  But as I explained this

6    morning, what I carve out of that is, to the extent they have

7    unsecured claims for the non-impairment statutes, where the

8    statute says to all holders of bonds that the transfers shall

9    not be affected adversely to the instrumentality, those

10   unsecured claims we're not asking be disallowed at this time.

11          I want to emphasize, on the preemption point, the

12   different speakers took different approaches to this,

13   including the DRA Parties just now, but from the

14   Commonwealth's point of view and the Oversight Board's,

15   preemption is a preemption of one statute by a Federal

16   Statute.  It's not a fiscal plan.  It's not a budget.  It's

17   not something else.  It's a statute.  And that makes a

18   difference here.  Because we've said, for instance, 202, which

19   gives the Oversight Board budget authority, preempts these

20   statutes.

21          Now, why does it preempt them?  Because 202 says the

22   Oversight Board should determine what to spend money on, and

23   these pre-PROMESA and pre-petition statutes purport to make

24   their own decisions on what to spend money on, inconsistent

25   with letting the Oversight Board determine.  That's it.

 1    That's what preempts these statutes, not the actual budget

 2    that the Oversight Board actually determines later.

 3         More importantly, Title III preempts all statutes

 4    that would purport to pay pre-petition -- pre-petition debt.

 5    And Your Honor asked the question earlier about the timing of

 6    how long does the preemption last, and in the context of 202,

 7    because the Board's budgetary power doesn't last forever, I

 8    was thinking and answering in respect of, well, how long does

 9    it last?  It might last longer than the debt is repaid under

10    the Title III Plan, etc.

11         But I think the way to answer that question is Title

12    III deals with the debt.  It would be completely inconsistent

13    with PROMESA and Title III for the debt to be dealt with under

14    a plan of adjustment and then for a statute to pop up

15    providing for additional payments to HTA to the benefit of its

16    creditors.  So, from our point of view, because of Title III,

17    any debt dealt with in the Title III preempts forever

18    application of statutes that are intended to pay that debt.

19         THE COURT:  And so are you saying that there has not

20    yet been and will not be, until confirmation of a plan, a

21    forever preemption of the statutes, or that the Title II

22    preemption somehow goes year to year but leaves a subsisting

23    liability that then gets dealt with in the plan along with the

24    future liability?  What is it for --

25         MR. BIENENSTOCK:  I'm saying that, in the same way

1    the Board's power to decide what expenses to authorize

2    preempts the relevant statutes here, the Title III, which

3    determines how to deal with debt, preempts the statutes, and

4    preempted them as of the time PROMESA was enacted and the

5    Board was created.

6         That's what's going to determine how to pay the debt,

7    not contrary statutes.  Otherwise, any municipality could pass

8    a law saying, after the bankruptcy, we're going to pay off --

9    we shall pay X, Y, and Z debt.  That would totally gut the

10   purpose of the debt restructuring statute.

11        THE COURT:  But what if Title III was never invoked?

12   What if you ended up having a wonderful, happy experience

13   under Title VI, or for some reason the Title III was

14   discontinued?  So is there a bringing and, you know, departing

15   Title III preemption from the time that PROMESA is enacted?

16        I just don't really understand how that would work.

17        MR. BIENENSTOCK:  Well, if Title VI resolves debt for

18   this purpose, the same as Title III, so I think that would

19   eliminate the statute forever, certainly from the time it did

20   that.  If the Title III case were dismissed, then I could see

21   an argument that the statute, the preempted statute would no

22   longer be preempted.  But if the Title III case or Title VI

23   results in a restructuring of debt, statutes purporting to pay

24   that debt could never be reactivated, because that would undo

25   all the work of the Title III or the Title VI.

1           THE COURT:  And when you say Title III preempts as of

2   the date PROMESA was enacted, where here the Commonwealth

3   didn't start its Title III until a year after PROMESA was

4   enacted, what was the situation vis-a-vis your Title III

5   preemption construct in 2016 and early 2017?

6           MR. BIENENSTOCK:  Well, at that time, Your Honor, the

7   reason I used the earlier date was that the Oversight Board

8   was given budget authority to determine what to spend money

9   on, and that preempted the statutes.  Additionally, once the

10  Title III was commenced, obviously it controlled how and --

11  how this debt would be paid.

12          THE COURT:  Thank you.

13          MR. BIENENSTOCK:  The non-entrenchment issue was

14  raised and questioned as to its relevance.  Its relevance is

15  simply that the statutes they're referring to can be repealed.

16  They're definitely not enforceable against the current

17  legislature's, but they don't really need to be repealed

18  because 202 and Title III preempt them anyway.  So it would be

19  double duty in effect, or belt and suspenders at best.

20          *Von Hoffman* was a Contract Clause case outside of

21  bankruptcy.  That's why there's equitable relief.  It doesn't

22  stand for the proposition that, in bankruptcy, statutes get to

23  be specifically enforced with mandamus, as Ambac urged.  They

24  have a pre-petition, unsecured claim at best for the lack of

25  transferring the money to the different instrumentalities.

1          Under Section 407, Your Honor, the reason summary

2    judgment is appropriate is it's simply that the first prong --

3    I think everyone agrees that there needs to be property

4    transferred of a territorial instrumentality.  And the only

5    way the Monolines get to satisfy that is to say Your Honor was

6    wrong on the Stay Hearing and they have a security interest in

7    Commonwealth property.  But then they also lose on the second

8    prong, saying that there was a transfer.  What they're

9    complaining about is there was no transfer, and the argument

10   that there was a transfer between Commonwealth bank accounts,

11   whether or not they had different restrictions on them, is a

12   red herring, because -- or a straw man, because the transfer

13   between the bank accounts caused no harm to anybody.

14          So they're just trying to check the box, to say there

15   was a transfer, but that transfer between bank accounts is not

16   what is being complained about.  What is being complained

17   about is there was no transfer to the instrumentality.

18          On the second prong of 407, we stand on what I said

19   earlier about their legislative history having no validity for

20   the reasons I mentioned earlier.  I think, frankly, that was

21   accentuated when the argument was made by Ambac that the fact

22   that Congress did not change the legislative report after

23   Congressman Grijalva made his statement in the Congressional

24   Record shows Congress agreed that the legislative report -- I

25   am not aware of any time that happens.  That's what

1    Congressional Reports are for.

2         But the real reason why they lose on this point is

3    that the statute is clear.  It says what it says.  It requires

4    a transfer over a territorial instrumentality, and they don't

5    have it.  They're asking the Court to rewrite the statute for

6    their own purpose.

7         On the issue of the Contract Clause, as I mentioned

8    earlier, we're taking them at their word that they have no

9    claim and they're not going to come around the back end and

10   say, well, they had a claim for an equitable relief in the

11   form of money.  So basically, they have, at best, an unsecured

12   claim for the -- any Contract Clause impairment that existed

13   up to the Title III case being commenced.

14        Okay.  They had a general -- pre-petition, general

15   unsecured claim.  For the purposes for which we brought the

16   Summary Judgment Motion, that would be an excellent ruling.

17   And the amount of that claim can be quantified at any time.

18   What we ask for is they don't have any secured claims.

19        Once the Title III case commenced, and at the latest

20   -- it probably doesn't matter whether it was a few months

21   earlier or later.  Once the Title III case commenced, it was

22   Title III that prevented payments to the instrumentalities on

23   the pre-petition obligations, and the statutes --

24        THE COURT:  And that's because the Oversight Board

25   didn't consent to them being paid?  Title III and 303 preserve

1    Commonwealth power, and 305 allows the Oversight Board to

2    consent to expenditures.  And there's no 363.  So what is it

3    in PROMESA that absolutely prevents the payments from being

4    made?

5         (No response.)

6         THE COURT:  Are you still there?  Oh, no.

7         Can anyone hear me at all?

8         MR. FIRESTEIN:  Yes, Your Honor.  This is Michael

9    Firestein.  I can.  Can you hear me?

10        THE COURT:  I can hear you.

11        MR. FIRESTEIN:  Well, I will tell you that the

12   dashboard, just so you know, the dashboard like -- I wasn't

13   even on it, and it was randomly muting me and kicking me off.

14   So there's some -- there is a gremlin amidst.

15        THE COURT:  Oh, boy.  Ms. Ng, can you hear

16   Mr. Firestein and me?

17        MS. NG:  Yes, I hear you, Judge.  I don't see

18   Mr. Bienenstock on anymore, so he may be trying to log back

19   in.

20        THE COURT:  Okay.  And you still see other people on

21   the dashboard?

22        MS. NG:  Yes.

23        THE COURT:  Okay.  So let's wait and see if

24   Mr. Bienenstock comes back.

25        MS. NG:  Amy, can you hear us?

 1          COURT REPORTER:  Yes, Lisa.  I'm still here.  Thank

 2   you.

 3          THE COURT:  Mr. Firestein, can you text

 4   Mr. Bienenstock and see where he is in the process?

 5          MR. FIRESTEIN:  Well, actually, I cannot text him,

 6   but I know there's people who are on this line that surely

 7   can.

 8          THE COURT:  Okay.  Whoever can text Mr. Bienenstock,

 9   please do.

10          MR. BIENENSTOCK:  Your Honor.

11          THE COURT:  Yes.

12          MR. BIENENSTOCK:  I'm terribly sorry.  I don't know

13   how or why I was disconnected, but I was.

14          THE COURT:  All right.  Well, welcome back.  What was

15   the last thing that you heard?

16          MR. BIENENSTOCK:  I think -- I'm not sure if Your

17   Honor was asking a question.  I think it was about -- I had

18   been addressing the contract, the timing of the Contract

19   Clause, and once the Title III case commenced, that was the

20   cause of any impairment.

21          THE COURT:  Yes.  And so let me see if I can

22   reconstruct my question.  Yes.  My question was in reaction to

23   your assertion that once the Title III case commenced, Title

24   III itself prevented payments being made on the debt.  And I

25   was asking you what in Title III was an absolute prohibition,

1   since 303 preserves governmental power.  Was it the Oversight

2   Board's determination not to consent to the payments being

3   made that is the Title III prevention, or is it some other

4   mechanism?

5        And since we had this mix-up, I'm going to reset you

6   at ten minutes left, because my clock says like 22 minutes.

7   So I'll give you ten minutes.  All right?

8        MR. BIENENSTOCK:  All right.  But that -- does the

9   ten include any time I'd want to give to my colleagues?

10       THE COURT:  It would.

11       MR. BIENENSTOCK:  Okay.  Then I'm going to try to

12   take less than five.

13       But to answer your question, Your Honor, once Title

14   III was commenced, it was up to the Oversight Board, as the

15   Commonwealth's representative, whether to pay, from the very

16   first instance.  And that's what caused the nonpayment.  Power

17   over the Commonwealth's payment of prior debt was given over

18   to the Oversight Board.  That's the inconsistency between

19   Title III for this purpose and the revenue statutes we're

20   dealing with.

21       THE COURT:  And given the Oversight Board's decision

22   not to authorize those payments, the Commonwealth couldn't do

23   anything else and that statute couldn't --

24       MR. BIENENSTOCK:  But it wasn't so much the actual

25   decision not to, and that might manifest the inconsistency or

1    the preemption, but it was the fact that the power to decide

2    was given to the Commonwealth through the Oversight Board and

3    taken away from the pre-petition statute that would otherwise

4    control.

5              THE COURT:   Thank you.

6              MR. BIENENSTOCK:   Okay.   Thanks.

7              On the issue of acceleration, Your Honor, the fact is

8    that, in bankruptcy, you have to file your whole claim.   So

9    the GO, General Obligation debt didn't file one year's payment

10   on their 18 billion of debt.   They filed for 18 billion, and

11   that is the claim.   And that gets treated under the Plan.   So

12   that is the acceleration.   Like it or not, the federal law

13   effectively makes all of the money owing, and under a plan,

14   you can figure out how you're going to pay it.

15             In terms of the argument that the litigants were

16   deprived of liens on money that would have been encumbered, we

17   previously cited to the Court -- I think *Las Vegas Monorail*

18   was one decision, the promises to secure are nothing but

19   unsecured claims.

20             The continued refrain we hear from the Monolines,

21   that government debtors have to comply with statutes, just

22   restates, you know, where the rubber hits the road.   That

23   would mean any statute requiring payment of pre-petition debt

24   has to be paid in full as a priority over everything else,

25   notwithstanding that that's not what Title III or the

1   Bankruptcy Code provide.

2           Your Honor, the rest of my time I'd like to give to

3   Mr. Firestein.

4           THE COURT:  Thank you, Mr. Bienenstock.

5           Mr. Firestein.

6           MR. FIRESTEIN:  Yes, Your Honor.  Can you hear me

7   now?

8           THE COURT:  Yes.  You have six and three-quarter

9   minutes.

10          MR. FIRESTEIN:  Okay.  I probably will yield a couple

11  of minutes to Mr. Kass, but let me just -- again, it's Michael

12  Firestein of Proskauer, on behalf of the moving party and the

13  Commonwealth here.

14          I just want to tick off a few things that relate to

15  some of the observations we heard about 56(d).  One, I think

16  Mr. Natbony indicated that it was sufficient for them to

17  merely file a 56(d) request and that that was enough, and he

18  really only needed to ask for general information.  I beg to

19  differ with that.  I don't think that's what the law is.

20          I think the law is that it does require that

21  defendants, quote -- and this is again from *Bad Paper*, and

22  I'll give another cite as well, identify the specific facts

23  they seek or explain how the information they seek, if

24  collected, would suffice to defeat the summary judgment

25  motion.  That was aptly cited in each of our responses to

1    this, but -- and the *Bad Paper* case involved generalized

2    requests for information regarding certain transactions

3    similar to the requests that are made here.  And that Court

4    rejected those requests as akin to speculation, that there's

5    some relevant evidence not yet discovered that will never

6    suffice to support 56(d) motions.  The First Circuit has

7    likewise adhered to the same ruling and the same standard in

8    the *Mattoon* case, which I believe we cited in our papers.

9         Mr. Natbony also indicated that he -- or he took

10   issue with the notion that, you know, the fact that we were --

11   suggested that they file the fulsome opposition is somehow --

12   you know, makes their filing of a 56(d) request improper.

13   That is not what we argued.  We didn't argue that a request

14   for 56(d) relief, in the alternative, was improper.  But what

15   we did do was cite the case law, including the *C.B. Trucking*

16   case, as well as the *Westernbank versus Kachkar*, and I hope

17   I'm not mispronouncing it, in which the fact that a fulsome

18   opposition has been filed can militate against the notion that

19   56(d), as an alternative request for relief, is something, you

20   know, that is necessary.  And we'll stand by our citation to

21   that authority, but I wanted to be clear about what our

22   argument actually was.

23        In addition, Mr. Natbony made an observation that we

24   needed a full or fuller record of some kind to interpret

25   statutes.  I don't see any information that they've requested

1    that is going to go to the issue of what the interpretation of

2    the statutes should be that is different than what the Court

3    had in front of it and was able to clearly define and

4    interpret, which is the Court's prerogative in the context of

5    the Lift Stay.

6         I'm not going to reargue those points.  The Court's

7    position on those issues is pretty straight forward.  But I do

8    take issue and disagree with the notion that somehow a bigger

9    record of some kind is going to make for a better or different

10   interpretation, which there's no information to suggest that.

11   And indeed, the type of information that they are talking

12   about is the type of information that the Court has already

13   found wanting in terms of value relating to interpretation.

14        And not to be repetitive of it, but the notion of

15   flow of funds or accounting issues and the emphasis on Fund

16   278, you know, I think the *McGirt* case that came out this year

17   from the United States Supreme Court basically stands for the

18   proposition that historical practice is simply not relevant to

19   statutory interpretation.  And the Court has already reached a

20   similar conclusion.

21        Similarly, the rationale for -- or the basis upon

22   which the failure to transfer the HTA allocable revenues, I

23   mean, they put the cart before the horse.  They don't have a

24   protected lien.  There's no property interest that exists

25   here, which we -- reaffirmed by the Court in the 926 Order, at

1    least as it relates to HTA.  So we stand by the proposition

2    that the absence of relevance as to why the money was

3    transferred is the correct conclusion.  The issue is, is there

4    a consequence for not having transferred that money.

5         Focusing on PRIFA for a moment, I know that we had

6    some discussion with the Court about the Trust Agreement --

7         (Sound played.)

8         MR. FIRESTEIN:  -- and I indicated that they rely on

9    that for the proposition that -- for their own positions.

10   Well, the Trust Agreement only goes to -- in any event, the

11   Trust Agreement only goes to the relationship between the

12   Trustee, the bondholders and PRIFA.  The Commonwealth isn't

13   even a party.  So the rights, if any, that would exist

14   relative to the Commonwealth derive from the Enabling Act.

15        And to the discussion you had with Ms. Miller

16   relating to the issues about the original Trust Agreement or

17   other edifications of this, the fact of the matter is that I

18   believe it was Ms. Miller's Declaration that attached to the

19   motions that they filed in January, what they believed to be

20   true and correct copies of the Lift Stay.  So the fact that

21   they are moving back and forth between this issue in order to

22   create some sort of factual dispute I think goes directly to

23   the issue of needing to have something specific that they had

24   in mind, rather than just throwing dust up against the wall.

25        The last point that I want to make has to do with

1    what their right was to pursue discovery.  They talk about

2    their -- what they want to have, but what they don't dispute

3    is that they didn't do anything about it.  They simply didn't

4    ask in any way, shape or form.  And there is nothing that

5    contradicts my declaration relative to what occurred

6    concerning the entire time in which these motions have been

7    pending.

8         And with that, Your Honor, in the absence of

9    questions, I will yield to Mr. Kass for the remaining moment.

10        THE COURT:  Thank you.

11        Mr. Kass, talk fast.

12        MR. KASS:  Good afternoon, Your Honor.  Colin Kass

13   for the Oversight Board.

14        In light of the limited amount of time, I just want

15   to make one point relating to CCDA.  During the defendants'

16   argument, they pointed to a footnote in the Oversight Board's

17   Reply Brief where we note that, at most, defendants have bare

18   legal title to the funds in the Tourism account.  They took

19   that quote out of context.  What we were saying is that --

20        (Sound played.)

21        THE COURT:  You can finish.

22        MR. KASS:  May I finish, Your Honor?

23        THE COURT:  Yes.

24        MR. KASS:  What we were saying was, at most, they

25   have a possessory interest in these funds.  The ownership of

1   these dollars remains with the Commonwealth.  And that is what

2   Section 407 is getting at, is who actually owns the property.

3          And if you think about what defendants are seeking,

4   they are not seeking to get the value of the Tourism Company's

5   possessory interest.  They're seeking to deprive the

6   Commonwealth of the value of its own property, which is the

7   ownership in the occupancy taxes.  And we think that is

8   improper.

9          And with that, I'll yield.

10          THE COURT:  Thank you very much.

11          I'd again like to thank all counsel for these very

12   well thought out, detailed, and well-articulated arguments

13   that will be quite helpful to me in tackling the appropriate

14   disposition of this motion practice.  The Motion is taken

15   under advisement.

16          This concludes today's hearing.  The next scheduled

17   hearing date is the October Omni, which is scheduled for

18   October 28th, 2020.  And that hearing will occur

19   telephonically as well.  The Court will issue a procedures

20   order closer to the date of that hearing.

21          I extend my sincere thanks to the court staff in

22   Puerto Rico, Boston, and New York, and to all who participated

23   today.  I wish you all good health and continued safety in

24   these times.  So stay safe and keep well, everyone.  And I

25   will look forward to the next hearing.

```
 1            We are adjourned.

 2            (At 3:16 PM, proceedings concluded.)

 3                         *      *      *

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1   U.S. DISTRICT COURT    )

 2   DISTRICT OF PUERTO RICO)

 3

 4        I certify that this transcript consisting of 167 pages is

 5   a true and accurate transcription to the best of my ability of

 6   the proceedings in this case before the Honorable United

 7   States District Court Judge Laura Taylor Swain, and the

 8   Honorable United States Magistrate Judge Judith Gail Dein on

 9   September 23, 2020.

10

11

12

13   S/ Amy Walker

14   Amy Walker, CSR 3799

15   Official Court Reporter

16

17

18

19

20

21

22

23

24

25
```

< Dates >
April 28 31:12, 51:9
August 31, 2016 34:5
June 30, 2016 34:4
June 9, 2016 42:11
March 4th 80:18
November 2015 120:10
October 28th, 2020
   165:18
September 23, 2020
   1:16, 5:2, 167:9
September 9 23:11
September 9, 2020
   28:13
September 9th 52:5
'88 132:12, 132:13,
   132:20
'97 132:5, 132:11

< 1 >
1 139:2, 144:5
100 33:12, 33:15
101 6:21
101(4)(B 14:10
101(41) 17:10
101(54) 117:10
106 36:22, 36:25,
   37:2, 84:23, 84:24
106(e 58:9, 77:2,
   77:6, 77:10,
   130:15, 148:12
108 6:20
108(a)(2 18:4, 19:3,
   31:1, 35:4, 35:12,
   49:2, 100:11,
   100:12
109(c 17:7
10:43 67:21
10:55. 67:18
11 16:21, 17:2,
   17:5, 17:8, 31:23,
   32:3, 51:25, 90:10
114 112:25
114-602 41:9
117 111:2
119 90:11
11:03 67:22
12-minute 67:17
120 8:25, 9:10

122 6:21
12:45 8:11
12:50 133:19
13 13:6, 123:1
1308 48:6
131. 126:6
134 31:5
13929 85:7
14 28:23
140 48:6
141 90:11
143 144:5
15 64:22, 65:3, 65:7
150 101:23
16 9:19, 28:15,
   134:1
167 167:4
17 66:18
17-3283 5:16, 85:6
17-BK-3283(LTS 1:6
18 159:10
1800 18:6, 48:3
1892 49:15
19 85:7, 86:12
1906(m 111:8, 111:9
1914 110:21
1988 103:25

< 2 >
20 9:7, 9:18, 20:14,
   91:14, 93:7, 99:5,
   100:18, 131:6
20-003 6:1, 6:20
20-004 6:2, 6:21
20-005. 6:3, 6:22
20-AP-00003(LTS 1:23
20-AP-00004(LTS 2:5
20-AP-00005(LTS 2:25
200 101:13, 101:15
2002 70:2, 145:25
2005 133:4
201 76:21, 77:7,
   77:8, 92:13
201(b)(1)(a 128:6
201(b)(1)(m 107:10,
   128:10
201(b)(1)(n 136:3
201. 58:11, 77:1
2014 16:23, 84:18

2015 120:6
2016 41:10, 153:5
2016. 122:5
2017 153:5
202 18:4, 19:3,
   20:4, 31:1, 34:9,
   35:4, 35:12,
   46:22, 49:2,
   92:10, 92:13,
   93:18, 150:18,
   150:21, 151:6,
   153:18
202(e)(3)(a 94:3
2020 103:25
2020-03 5:19
2020-04 5:19
2020-05 5:19
2021 13:6
204 98:1
207 18:4, 19:3,
   31:1, 34:7, 34:12,
   34:14, 34:20,
   35:11, 49:2,
   92:10, 98:5, 98:7,
   98:16
22 158:6
220 18:23, 80:18
221 80:18
2265(a)(2)(c 86:12
24 16:25, 29:25
26 90:9
269 26:25
278 78:16, 78:17,
   78:18, 78:22,
   82:19, 117:18,
   128:13, 162:16
278. 78:14
28 17:3, 17:12,
   87:25, 88:9, 90:10
285 26:23
289 26:23, 27:11
297 26:24
2:15 8:11, 133:12
2:15. 133:17
2:19 133:20
2:36 143:7

< 3 >
30 9:6, 20:15,

91:14, 93:7,
135:3, 135:8,
135:10, 135:20,
135:21, 136:9,
136:10, 136:22,
139:14, 139:21,
140:1, 141:3,
142:5, 144:25
30(b)(6 79:3, 83:13
30-31 138:6, 138:16,
139:11, 141:6,
142:6
301(a 35:21, 36:22
301(c)(7 35:18,
36:8, 85:2, 148:16
303 18:10, 47:14,
96:22, 105:9,
155:25, 158:1
303(3) 47:4, 47:7,
47:10, 47:16
305 141:23, 156:1
31 135:3, 135:10,
135:21, 136:10,
136:22, 139:14,
140:2, 141:3,
142:5
31. 135:8, 135:20,
136:9, 139:21
314(b)(6 140:17
316 24:24
31751(a)(1 13:6
32. 31:12
363. 156:2
365 127:7
37 31:6, 90:10
3799 167:14
39 16:24
3: 1:6, 1:23, 2:5,
2:25
3:16 166:2
3d 26:25


< 4 >
4. 144:5
40 6:2, 9:6, 9:16,
9:17, 20:15, 68:1,
91:14, 93:7
401 79:16
405 122:17

407(a 40:5
407(b 43:17, 43:19
407. 38:5, 41:3,
107:19, 113:15,
115:8, 115:22
427 17:11
43 6:1
433 17:12
434 126:6
44 85:7
459 37:20, 137:10
47 83:1, 90:9
48 31:8
484 17:11


< 5 >
5 31:8, 90:9, 90:10
50 22:19
502 24:25
507 140:17
51 90:10
511. 24:25
5142 119:5
544 36:12, 83:24,
84:5, 84:10,
84:13, 84:22
544(a 35:22, 83:25,
84:4
544(b 83:25, 84:3,
148:15
544(b)(1 35:23, 36:9
544. 35:21
546 49:16
55 6:3, 47:24, 74:8,
89:25
56 51:9, 56:13, 65:3


< 6 >
60 33:13, 33:14
600 33:12
601 79:16, 85:21,
85:22
63 90:10, 113:1
64 31:6
66 84:18, 90:9
68 8:16, 10:16

< 7 >
70 37:20
74 90:10
75 37:20
79. 137:10


< 8 >
80 83:1
87 90:10


< 9 >
9 13:5
9-102(a)(52 36:6
9-317(a)(2 36:15
903 18:9
904 18:9
926 85:6, 162:25
944(b 31:16, 43:12
959 17:12
959(b 17:4, 87:25,
88:1, 88:9, 149:8,
149:9
96 8:25
97 51:9, 90:11
9:00 8:10
9:04 5:3


< A >
A. 3:15
ability 8:24, 53:13,
73:12, 97:23,
98:18, 98:19,
98:21, 111:18,
167:5
able 7:5, 82:1,
132:23, 162:3
above 27:16
abrogate 124:19
abrogated 104:13
abrogates 126:11
absence 48:7, 53:13,
55:21, 75:1,
163:2, 164:8
absent 25:18, 35:8,
107:25, 123:9
absolute 90:20,
157:25

absolutely 126:21,
  156:3
abstract 74:4
abstractly 99:12
academic 62:10,
  113:14
accelerated 66:17,
  123:2
acceleration 66:22,
  66:23, 123:6,
  123:18, 159:7,
  159:12
accentuated 154:21
accepting 16:10
access 77:22, 97:7,
  100:5, 112:5,
  117:25
accessing 6:6
according 30:19,
  149:17
Accordingly 27:19,
  62:11, 90:8,
  142:20
accounting 61:16,
  61:21, 78:23,
  78:24, 78:25,
  82:20, 117:20,
  162:15
accounts 11:17,
  12:4, 12:18,
  12:21, 13:8, 45:1,
  45:4, 65:1, 70:6,
  70:11, 70:15,
  70:18, 70:22,
  71:1, 75:25, 76:2,
  85:13, 85:17,
  86:5, 86:17,
  112:23, 116:13,
  116:16, 116:23,
  118:2, 154:10,
  154:13, 154:15
accurate 7:11, 167:5
accused 80:13
achieve 100:5
acknowledge 12:3
acknowledged 89:22,
  89:23, 112:21
acknowledges 112:9
acknowledging 21:21,
  23:13

acknowledgment
  112:12
across 16:16
Act 27:15, 46:6,
  46:10, 55:13,
  55:14, 74:11,
  84:18, 93:22,
  94:10, 110:22,
  120:23, 121:1,
  121:2, 121:5,
  121:8, 121:18,
  121:23, 123:22,
  135:12, 138:6,
  138:16, 139:11,
  141:6, 142:5,
  142:6, 163:14
Act. 135:14
acting 139:23
action 17:15, 23:4,
  39:24, 41:3,
  42:16, 42:21,
  68:17, 69:3, 84:3,
  89:7, 90:4, 94:16,
  105:12, 106:23,
  109:10, 120:13,
  120:25, 122:1,
  125:9, 139:21
actionable 113:16,
  126:17
actions 34:15, 37:1,
  78:12, 79:2,
  82:19, 83:10,
  83:15, 90:22,
  120:15, 128:20,
  129:11
activation 142:1,
  142:23
Acts 99:25, 105:9,
  124:19, 125:7,
  129:4, 130:9,
  135:3, 135:8,
  135:10, 135:20,
  135:21, 136:9,
  136:10, 136:22,
  139:14, 139:21,
  140:1, 141:3,
  142:5
actual 64:18, 151:1,
  158:24
Adam 100:18

add 101:12
added 9:2, 115:1,
  132:11
addition 42:13,
  42:23, 76:4,
  99:21, 101:1,
  105:19, 125:9,
  161:23
additional 9:2,
  53:24, 63:3, 63:4,
  63:18, 63:19,
  64:23, 65:2, 66:9,
  83:20, 98:5,
  103:10, 104:10,
  120:24, 139:14,
  151:15
Additionally 20:16,
  22:2, 153:9
addressed 17:21,
  24:20, 65:20,
  83:21, 101:11,
  108:4, 126:5,
  139:6, 141:14
addresses 99:10,
  100:10
addressing 16:19,
  44:2, 68:18,
  79:24, 87:6,
  88:22, 157:18
adequate 44:23,
  53:9, 137:15
adhered 161:7
adjourned 67:20,
  133:18, 166:1
adjudicate 141:21
adjudication 83:8
Adjustment 20:16,
  20:23, 30:7,
  30:16, 47:16,
  99:7, 99:11,
  99:18, 107:12,
  124:2, 126:23,
  150:2, 151:14
adjustment. 90:7
Administered 1:11
administrative 98:24
admit 12:3
admits 70:2, 71:14,
  142:20
admitted 29:9, 71:8,

146:7
admittedly 105:11
adopt 134:21
adopted 12:16,
    12:17, 114:3
adopting 114:25
adopts 46:18
advance 7:12, 55:19,
    101:9
advanced 71:16,
    109:4
advances 92:6
Adversary 5:19, 6:1,
    6:2, 6:3, 6:20,
    6:21, 6:22, 79:5,
    83:5, 84:2, 88:5,
    89:7
adversely 21:19,
    150:9
advisement 165:15
advisory 119:6
affect 61:22, 137:18
affected 150:9
affirmance 27:4
affirmative 32:19
affirmatively 94:1
affirmed 27:10,
    45:16
afford 16:25
afforded 117:8
afternoon 119:14,
    119:16, 133:22,
    134:3, 134:6,
    134:8, 137:25,
    138:3, 138:4,
    145:12, 164:12
Agent 70:1, 70:6,
    70:11, 70:15,
    70:22, 71:1, 75:22
agents 49:17
ago 78:4
agree 35:3, 45:5,
    49:22, 52:23,
    63:22, 66:24,
    69:24
agreed 6:18, 22:5,
    154:24
agreeing 22:5
Agreement 11:24,
    12:4, 54:20, 55:3,

70:3, 86:1, 132:3,
    132:18, 132:20,
    145:25, 148:24,
    163:6, 163:10,
    163:11, 163:16
Agreements 43:5,
    54:14, 82:23,
    124:17, 132:5,
    132:22, 133:4,
    136:6
agrees 21:16, 154:3
ahead 103:13
aid 54:15
akin 161:4
al 1:16, 1:36, 2:18,
    2:38, 3:14, 5:18,
    94:23
alchemist 101:3
alert 7:21
allegations 29:12,
    84:15, 121:19,
    144:17
allege 12:2, 27:17,
    31:4, 45:10
alleged 31:14,
    42:17, 77:14, 82:9
allocable 20:6,
    58:18, 162:22
allocate 13:14
allocated 8:25, 9:5,
    51:3, 96:5, 107:8,
    134:1
allocation 7:25,
    138:10, 144:24
allocations 7:18,
    8:21, 21:17,
    136:23, 139:8,
    139:11
allotments 7:17
allotted 7:14, 8:16,
    9:16, 9:17, 9:18,
    9:19, 68:1
allow 27:13, 43:10,
    44:6, 47:23, 97:6,
    142:5
allowability 44:23
allowable 36:4
allowed 32:4, 36:11,
    38:10, 57:9,
    57:16, 58:13,

109:11, 110:15,
    116:21
allows 111:17, 156:1
alluded 55:24, 141:4
alluding 31:4
almost 92:16, 115:9
alone 96:16, 100:7,
    124:16
already 15:14, 40:2,
    44:19, 48:4, 50:6,
    51:5, 52:5, 61:14,
    64:25, 68:22,
    72:13, 72:25,
    78:15, 81:19,
    91:11, 102:16,
    104:13, 108:4,
    108:5, 109:16,
    118:9, 121:13,
    144:15, 145:25,
    162:12, 162:19
alter 59:14, 111:21
alterative 95:22
alternate 101:17
alternative 53:4,
    81:13, 161:14,
    161:19
alternatively 92:10
although 28:16,
    28:24, 29:21,
    69:22, 94:14,
    105:24
Ambac 1:35, 2:17,
    2:37, 3:21, 9:17,
    26:24, 88:20,
    99:1, 121:16,
    130:18, 153:23,
    154:21
ambiguity 41:15,
    69:21, 82:17
amend 139:15,
    139:21, 140:1
amended 104:12,
    132:21
Amendment 17:13
America 5:15
Amerinational 3:32
amidst 156:14
among 20:3, 31:1,
    34:2, 34:7, 111:8,
    135:10

amorphous 74:6
amortization 34:19,
   142:10
amount 16:24, 22:3,
   22:8, 22:11,
   33:14, 34:25,
   49:18, 75:19,
   75:24, 75:25,
   76:13, 110:8,
   123:12, 150:2,
   155:17, 164:14
amounted 147:21
amounts 28:18, 64:18
Amy 156:25, 167:13,
   167:14
analogous 102:15
analysis 76:20,
   76:23, 77:9,
   77:14, 78:5, 78:7,
   78:9, 78:10,
   89:17, 102:22,
   102:25, 112:4
analyze 27:9
analyzed 26:25
analyzing 29:15
anchor 99:6
ancillary 10:18,
   149:10
Andalusian 139:2
announce 5:8
annual 30:12, 93:5,
   100:19, 112:8,
   138:10, 139:4,
   139:7, 139:10
annually 94:22
annul 102:9
answer 15:4, 47:22,
   63:10, 63:12,
   63:15, 66:21,
   83:16, 90:17,
   133:2, 151:11,
   158:13
answered 23:19,
   32:19, 102:16
answering 151:8
answers 80:12,
   122:10
anticipate 81:25
anticipated 22:10,
   80:23

anybody 97:1,
   101:19, 154:13
anyway 153:18
apiece 33:12
apologize 7:12
Appeals 14:24, 68:24
APPEARANCES 3:9
APPEARING 3:11
appears 115:23
apple 81:18
applicability 141:19
applicable 36:3,
   36:5, 36:10,
   36:13, 36:22,
   39:9, 40:6, 40:9,
   40:17, 40:19,
   55:4, 58:19, 69:9,
   107:22, 107:25,
   108:3, 113:18,
   128:7, 136:5,
   139:12
application 61:25,
   68:18, 100:23,
   105:20, 142:6,
   151:18
applications 56:6
applied 17:4, 98:4,
   109:21
applies 14:16, 15:6,
   41:10, 61:10,
   70:3, 84:24,
   84:25, 99:2,
   99:25, 108:18
apply 17:12, 37:6,
   37:21, 77:10,
   101:16, 102:24,
   119:8, 121:11
applying 114:3
appoint 140:7
appointed 34:5, 96:9
appreciate 19:25
approach 58:3, 89:17
approaches 150:12
appropriate 8:9,
   24:14, 48:11,
   66:23, 69:14,
   80:3, 80:5, 99:13,
   106:9, 154:2,
   165:13
appropriating 90:2,

   136:18
appropriation 24:12,
   24:13, 24:18,
   48:7, 48:23,
   49:16, 49:25,
   135:3, 136:13,
   138:6, 138:8,
   138:14, 141:15
appropriations
   18:19, 19:11,
   38:4, 38:10,
   38:15, 38:20,
   47:6, 49:7, 49:8,
   65:25, 66:14,
   66:19, 66:25,
   67:3, 67:4, 77:15,
   77:20, 82:22,
   112:7, 112:8,
   136:23, 138:18,
   140:5, 141:6
approval 34:15,
   34:22, 46:4, 46:8,
   78:18, 94:10,
   94:21
approve 34:8
approved 42:15,
   45:19, 45:23,
   46:9, 46:22,
   93:20, 94:5,
   107:12, 128:24
approximately 11:14
aptly 160:25
area 61:15
argue 14:21, 18:5,
   23:23, 36:25,
   37:19, 38:3,
   38:22, 39:4, 40:3,
   41:10, 43:7, 48:2,
   48:5, 51:14,
   65:17, 68:21,
   131:14, 136:15,
   161:13
argued 27:3, 31:10,
   36:18, 48:12,
   54:11, 59:11,
   72:8, 72:25, 94:1,
   108:10, 161:13
argues 14:4, 69:5,
   81:21, 93:15,
   95:22, 96:2,

98:22, 99:22,
105:23, 113:24,
115:20, 120:12,
122:25, 125:19,
127:13, 129:6,
135:19, 137:11
arguing 71:22, 75:4,
80:25
arise 43:22
arises 25:24
arising 27:1, 29:12,
92:9
around 12:2, 139:9,
155:9
arrangement 25:2,
25:5
Article 65:19,
77:11, 77:15,
77:25, 138:22,
142:4, 142:12
articulated 20:1,
20:7, 60:24, 96:14
Asbury 24:24
Aside 19:2, 37:1,
72:18
asks 53:9, 102:19
aspect 98:16
assert 25:20, 77:3,
143:2
asserted 44:7,
68:17, 87:12,
148:7, 148:8
asserting 28:17,
29:11
assertion 60:15,
81:3, 81:6,
100:15, 131:10,
144:17, 157:23
assertions 29:17
asserts 69:13, 78:3,
89:7, 89:13
assess 60:2
assets 128:11
assign 52:7
assist 139:2
assume 12:22, 12:25,
26:5, 93:11, 147:7
assumes 128:1
assuming 24:20,
66:16, 125:21,

127:23
assumption 12:25,
26:6
Assurance 1:35,
2:17, 2:37, 3:21,
26:24
assure 118:8
Assured 3:27, 3:28,
9:16, 68:2
assures 114:20,
115:15
assuring 40:9,
113:18, 114:10,
114:22, 118:6
AT&T 143:9, 143:17
Atara 3:22, 88:19,
131:3
attach 86:11, 125:13
attached 108:17,
108:21, 125:12,
163:18
attaching 36:20,
39:20
attachment 84:16,
84:19
attempt 51:21,
53:25, 69:10,
105:10, 141:11
attempted 79:1,
81:8, 139:22
attendant 104:17
attenuated 112:11
attest 84:19
Attorney 144:9
attorneys 10:12
Aurelius 94:15
authentic 55:4
authenticated 12:9,
13:1, 13:11,
149:1, 149:4
authorities 56:7
Authority 78:19,
96:1, 96:7,
100:20, 111:16,
120:23, 129:14,
150:19, 153:8,
161:21
Authority. 111:13
authorize 44:16,
95:3, 129:9,

129:15, 129:20,
152:1, 158:22
authorized 31:24,
36:9, 102:2,
111:8, 129:7,
146:2
authorizes 47:3,
111:9, 124:13,
126:12, 129:12,
130:3
authorizing 25:23,
146:4
automatic 47:24,
51:15, 51:17,
123:5, 126:13
automatically 17:16,
123:2
available 16:5,
18:17, 19:8,
59:17, 65:25,
66:14, 66:25,
67:4, 77:16,
77:18, 77:20,
77:24, 79:9,
84:10, 123:3,
123:20, 140:19,
142:8, 142:19
avoid 35:15, 35:25,
36:10, 36:14,
37:22, 56:10,
84:21, 101:10,
101:18, 134:25
avoidance 84:6,
84:10
avoiding 101:23
aware 154:25
away 7:16, 92:23,
127:5, 159:3


< B >
back 8:3, 43:16,
64:17, 67:18,
90:17, 103:16,
114:15, 115:10,
133:12, 134:23,
143:22, 144:4,
144:7, 155:9,
156:18, 156:24,
157:14, 163:21

backdrop 104:18
backed 127:5
Bad 33:11, 57:18,
  160:21, 161:1
balance 97:3, 112:4,
  135:8
balanced 142:8
ball 82:1
Bank 11:16, 12:4,
  37:20, 50:5,
  85:24, 110:5,
  117:11, 117:21,
  119:5, 137:10,
  154:10, 154:13,
  154:15
bar 47:17
bare 112:21, 164:17
barred 55:12
barring 34:6
bars 36:19
base 145:24
Based 17:3, 54:9,
  61:19, 65:23,
  78:8, 83:6, 87:24,
  89:8, 89:14,
  89:21, 92:9,
  100:17, 103:6,
  106:7, 115:22,
  121:16, 128:7,
  132:17, 143:3
bases 28:20, 116:25
basic 94:25
basically 10:22,
  51:9, 72:5, 73:24,
  84:18, 98:16,
  155:11, 162:17
basics 94:25
basis 12:24, 31:13,
  31:15, 54:24,
  56:10, 61:2,
  65:16, 71:15,
  75:17, 80:2, 80:5,
  80:8, 82:5, 89:24,
  101:10, 104:1,
  106:10, 112:5,
  119:8, 133:5,
  133:7, 133:8,
  138:11, 162:21
Bear 140:22
bearing 102:13

became 11:21, 16:23,
  123:2
become 16:5
becomes 91:9, 102:8
becoming 88:21
beep 67:6
beeps 67:6
beg 148:18, 160:18
began 120:14, 142:7
begin 6:23, 8:20,
  53:8, 88:21, 120:3
beginning 113:21,
  119:22
begins 115:13
behalf 8:15, 8:19,
  10:14, 50:22,
  52:17, 68:8,
  88:20, 110:24,
  134:4, 138:1,
  160:12
behind 22:20, 58:17,
  83:14, 84:20,
  129:3, 137:12
belabor 124:4
belief 133:7, 133:8,
  139:16
believe 28:9, 52:1,
  53:4, 61:10,
  61:23, 69:21,
  96:15, 97:18,
  137:19, 137:20,
  161:8, 163:18
believed 105:7,
  163:19
believes 105:25,
  109:8
belong 107:7, 136:13
below 21:18
belt 153:19
beneficiary 71:24,
  102:11
benefit 40:10,
  40:20, 57:9, 59:2,
  73:6, 110:4,
  110:9, 111:5,
  113:19, 114:11,
  115:17, 118:9,
  138:19, 149:5,
  149:6, 151:15
Berezin 3:25, 9:7,

9:17, 69:2, 76:15,
  87:19, 88:13,
  118:12, 119:13,
  119:14, 119:15,
  119:17, 129:23,
  130:1, 131:2,
  131:5
besides 132:7
bespoke 106:22
best 10:9, 15:22,
  81:9, 132:25,
  140:23, 147:14,
  147:23, 153:19,
  153:24, 155:11,
  167:5
better 16:15,
  107:16, 133:2,
  162:9
Betting 126:6
beyond 7:14, 65:18,
  93:6, 135:21,
  146:3
big 75:4, 90:17
bigger 162:8
billion 47:24,
  66:18, 123:1,
  159:10
billions 59:18
binding 109:8,
  131:23
Birmingham 17:17
bit 8:24, 118:16,
  133:15
bite 81:18
blanket 103:22
blueprint 44:13
Bluntly 55:7
Boarding 113:24
body 132:15
boilerplate 106:8
boils 103:17
Bond 28:16, 28:18,
  30:18, 54:3,
  76:13, 91:22,
  94:3, 97:11,
  98:13, 99:16,
  99:22, 100:4,
  100:17, 104:15,
  105:6, 131:11
bond-related 82:23

bondholders 21:21,
    21:22, 25:14,
    30:9, 33:1, 39:16,
    44:7, 51:11, 73:6,
    97:12, 99:3, 99:6,
    105:1, 105:3,
    120:4, 124:20,
    124:24, 125:1,
    125:10, 131:24,
    149:6, 163:12
Bonds 17:23, 18:14,
    18:16, 26:9,
    34:18, 34:20,
    68:20, 99:8,
    110:17, 111:21,
    114:25, 125:3,
    127:8, 150:8
bonds. 28:22
books 21:15, 71:23
borne 87:16
Boston 165:22
bottom 14:15, 75:16,
    148:21
bound 102:8, 102:9
box 154:14
boy 156:15
breach 14:6, 14:7,
    14:9, 14:25, 15:1,
    70:24, 71:3, 71:4,
    71:13, 74:4, 74:6,
    74:13, 74:20,
    75:13, 91:22,
    124:15
breached 71:15
breaches 30:18, 71:8
breaching 70:23
break 8:2, 8:7,
    67:17, 133:11
breaking 7:12,
    135:21
breaks 8:4
breathing 106:25
Brief 11:15, 15:18,
    28:8, 31:12, 84:5,
    96:20, 117:5,
    138:6, 164:17
briefed 10:20, 22:1,
    53:19, 69:18,
    83:18
briefing 55:22,

56:2, 59:11, 60:4,
    60:18, 70:18,
    139:25, 142:18
briefings 142:3
briefly 110:10,
    122:14, 134:24,
    142:25
Briefs 18:2, 20:6,
    21:13, 31:10,
    59:2, 69:23,
    83:11, 108:12,
    112:20
bring 104:16
bringing 152:14
brings 124:8
broad 14:14, 117:8,
    128:14, 135:17,
    137:17
broader 87:9
brought 43:23,
    149:25, 155:15
budgetary 19:17,
    136:23, 139:11,
    151:7
Budgeting 58:5,
    92:13, 100:19,
    128:17, 128:22,
    129:14
Buenas 133:21
buenos 5:22
built 97:9
bulk 64:11
burden 27:12, 59:19,
    87:4, 119:7,
    123:18, 131:20,
    142:22
bury 53:4
buybacks 34:18
buzz 7:22, 7:23
buzzes 7:23, 8:1
bypass 139:13


< C >
cabined 94:22
Cadwalader 68:7
calibrated 140:9
call 6:23, 7:6, 8:4,
    8:7, 44:17, 50:16,
    67:18

call. 143:6, 143:8
called 118:19
calling 6:17
cancel 49:20
Cantor-katz 3:34
capable 32:1, 60:2
capacity 36:12,
    110:11
capital 97:7, 100:6
care 133:18
careful 10:25,
    135:8, 140:3
carefully 140:9
Carmen 143:21
carried 21:23
carries 117:18
carry 121:8
carrying 23:15,
    47:13
cart 162:23
carve 150:6
carve-out 47:14,
    107:15
carved 98:18
carving 47:15
cases 49:12, 51:21,
    51:23, 57:3, 78:9,
    81:5, 81:15,
    81:16, 82:7,
    102:7, 102:21,
    116:25, 117:7,
    117:12, 125:8,
    139:12
cash 12:24, 44:21,
    112:4, 112:7,
    117:1, 117:21,
    117:25, 148:25
CAT 3:44
categorically 88:1
category 85:18,
    118:19, 135:9
cause 30:24, 39:24,
    41:3, 42:16,
    42:20, 48:16,
    76:10, 106:23,
    129:10, 130:8,
    146:13, 147:14,
    157:20
caused 38:7, 38:19,
    59:14, 60:23,

71:18, 91:23,
124:9, 124:17,
125:20, 125:22,
127:14, 154:13,
158:16
causes 23:4, 68:16,
69:3, 84:2, 84:3,
89:7, 105:12
cents 33:15
certain 17:22,
18:14, 21:18,
22:23, 43:3, 44:2,
45:1, 45:4, 53:3,
55:10, 69:14,
72:12, 83:14,
117:19, 127:5,
140:25, 161:2
Certainly 18:3,
27:8, 35:6, 41:8,
57:1, 57:4, 61:24,
68:10, 121:21,
126:6, 126:18,
126:21, 130:18,
134:20, 152:19
certification 58:5,
58:10, 77:3, 77:5,
77:9, 95:17,
148:3, 148:13
Certified 47:13,
47:15, 48:10,
90:3, 91:4, 94:4,
95:13, 96:9,
96:12, 128:25,
130:7, 139:24,
140:1, 141:7,
146:18
certify 129:16,
130:5, 167:4
certifying 76:19
cessation 146:24
cetera 11:11, 12:24,
24:17, 27:20,
51:22, 145:19,
147:19
challenge 77:3,
77:9, 118:8
challenged 59:23
challenges 86:15
chance 133:15
change 21:17, 21:19,

24:15, 76:6, 95:9,
120:4, 120:9,
120:13, 123:9,
124:11, 124:16,
125:14, 154:22
changed 29:5, 125:3
changes 45:5
changing 24:17,
118:3
Chapter 16:21, 17:2,
17:5, 17:8, 17:21,
31:22, 31:23,
51:25, 90:23,
140:24
Chapters 32:3
character 117:3,
117:16, 118:4
characterization
112:12
characterize 103:4
charge 45:13
check 154:14
checking 117:2,
117:4, 117:13
Chepenik 100:18
chicken 46:17
chief 140:8
children 101:4
chock-full 56:6
choose 91:5
chose 23:7, 87:13,
138:15
chosen 140:10
cigarette 12:23
circles 103:16
Circuit 14:23,
16:20, 27:3, 27:7,
45:16, 55:12,
56:20, 57:13,
81:23, 87:25,
88:7, 97:15,
97:20, 117:9,
136:16, 139:1,
161:6
circumstances 42:22,
71:25, 102:12,
142:12
citation 16:20,
161:20
cite 14:22, 41:19,

48:21, 49:6,
49:15, 72:4,
113:10, 160:22,
161:15
cited 42:6, 42:9,
49:12, 51:21,
51:23, 84:17,
87:21, 108:24,
125:8, 159:17,
160:25, 161:8
citing 147:4
City 17:17, 24:24,
25:2, 101:25,
126:6
claimed 27:16, 29:7,
59:13, 63:24
claiming 133:5
clarified 141:24
clarify 149:22
clarity 6:24
classification
106:11
clawing 114:14
clean 13:20, 96:3
cleanup 13:21, 14:2,
91:18
clear 41:7, 43:12,
45:3, 51:22,
58:14, 59:3,
81:12, 95:21,
102:2, 103:14,
125:24, 127:10,
128:5, 137:6,
138:17, 146:19,
155:3, 161:21
clearly 7:1, 25:24,
31:19, 47:25,
57:14, 72:12,
95:14, 97:25,
98:3, 103:1,
111:16, 118:3,
123:16, 123:18,
125:14, 127:18,
129:20, 136:11,
138:13, 162:3
clever 147:9
clients 74:21
clock 134:14, 158:6
close 17:18
closer 165:20

co-counsel 134:5
Code 12:15, 14:13,
   17:7, 18:8, 18:10,
   31:16, 35:17,
   35:18, 35:21,
   36:6, 36:8, 36:14,
   36:21, 37:23,
   43:12, 72:17,
   117:10, 123:6,
   123:10, 126:2,
   126:3, 126:9,
   126:25, 140:17,
   147:1, 147:12,
   148:17, 149:20,
   160:1
Colin 3:16, 62:21,
   164:12
Collateral 3:35,
   26:19, 44:21,
   45:3, 85:16,
   85:17, 86:18,
   97:12, 148:7,
   150:4
colleagues 10:17,
   50:9, 134:9, 158:9
collected 117:17,
   160:24
collects 110:10
colloquially 34:17
colorable 11:2,
   79:18
comes 22:10, 37:14,
   91:17, 156:24
commenced 153:10,
   155:13, 155:19,
   155:21, 157:19,
   157:23, 158:14
commencement 146:14
commencing 24:3
comment 118:14
comments 42:8,
   59:21, 109:11
Commercial 12:15,
   14:7, 35:17, 36:6,
   36:14, 37:23,
   148:17
commitment 21:21
Committee 3:18,
   42:14, 42:16,
   42:20, 43:6,

   50:23, 105:4,
   108:22, 109:1,
   109:4, 109:9
common 13:23, 13:25,
   16:8, 16:13,
   18:19, 37:3,
   37:18, 57:2, 81:14
commonly 98:12
communicate 134:11
Community 3:33,
   48:5, 48:21, 49:1
Company 24:24, 26:3,
   65:13, 112:2,
   112:3, 112:8,
   112:10, 112:21,
   112:23, 113:1,
   113:4, 116:8,
   116:12, 116:16,
   165:4
Compel 17:18, 83:13
compelled 25:1
compelling 52:2
compensation 137:5
complain 41:21
complained 154:16
complaining 41:20,
   154:9
Complaint 31:5,
   86:14, 86:16,
   86:20, 90:9,
   90:10, 90:11,
   106:5, 106:8
Complaints 31:4,
   84:2, 89:7, 149:25
complete 54:12,
   54:15, 122:18,
   131:12, 131:20
completed 67:12
completely 19:19,
   87:2, 151:12
complex 97:8, 142:2
Compliance 27:15,
   121:23, 141:25,
   142:16
compliant 95:13,
   130:5, 130:7
complied 14:22,
   73:16, 96:11,
   130:12, 130:20
complies 58:11

comply 71:12, 71:19,
   71:20, 72:2,
   72:20, 72:24,
   73:12, 73:15,
   74:3, 126:1,
   159:21
complying 73:21,
   126:3
components 46:6,
   120:22
comprehensive 56:7
computer 6:7
concede 64:10
concededly 14:8
concedes 85:7
conceivable 55:23
conceivably 82:5
concentrated 35:22
concentrating 35:23
concept 70:19, 138:5
concern 105:9
concerned 149:25
concerning 30:1,
   59:21, 64:6, 69:3,
   69:15, 77:13,
   164:6
concerns 17:14,
   134:17, 139:3,
   139:5
concession 30:21
conclude 61:13,
   130:24
concluded 27:11
concluded. 166:2
concludes 66:23,
   67:15, 165:16
conclusion 53:20,
   94:11, 94:14,
   162:20, 163:3
conclusory 82:10,
   100:15
concurrently 81:8
conditions 25:1
conduct 39:19,
   39:21, 76:20
conference 6:12
conferred 141:20
confirm 9:16
confirmation 20:18,
   90:24, 99:20,

107:6, 151:20
confirming 140:18
conflates 105:20
conflict 95:25,
   96:14
conflicting 100:13
conflicts 98:3
conforms 91:10,
   115:7
Congress 33:21,
   42:25, 46:9,
   46:23, 78:3,
   92:14, 96:2, 96:6,
   96:16, 96:18,
   96:24, 97:4,
   100:25, 104:25,
   105:7, 105:11,
   107:14, 109:8,
   109:9, 114:24,
   135:8, 135:11,
   135:15, 136:8,
   137:9, 140:8,
   140:22, 154:22,
   154:24
Congressional 42:9,
   42:11, 66:15,
   154:23, 155:1
Congressman 42:8,
   42:10, 154:23
connection 54:21,
   60:5, 60:17, 75:9,
   108:11, 122:8,
   148:5, 148:6
consent 98:18,
   155:25, 156:2,
   158:2
consented 57:8
consequence 15:24,
   16:1, 58:22,
   58:23, 59:7,
   101:23, 124:11,
   163:4
consequences 15:23,
   87:16, 104:17
consider 15:23,
   60:20, 140:19
considerable 59:10
considered 47:22,
   56:1, 109:19
considers 90:17

consistent 6:11,
   135:22
consistently 100:1,
   136:17, 139:22
consisting 167:4
Constitu 120:19
constituted 121:14
constituting 72:16
Constitution 16:4,
   18:15, 33:24,
   65:24, 120:17,
   120:18, 120:19,
   120:20, 121:6,
   122:13, 123:15,
   123:16, 123:22,
   136:6, 138:23,
   140:20, 141:4,
   142:5, 142:13
constitutional
   28:19, 31:18,
   44:17, 45:7, 52:4,
   66:4
constrained 90:23
construct 153:5
construction 69:19
constructive 63:6
construe 137:7
contained 19:2, 51:8
contains 18:2
contaminated 13:20
contemplate 136:19
contemplated 80:15,
   101:20
contemplates 90:25,
   123:16
contend 12:19, 29:6,
   31:3, 32:8, 40:4,
   44:10, 46:1, 47:4,
   50:4, 58:4, 149:9
contending 39:22,
   105:21, 145:17
contends 31:22,
   92:12, 109:15,
   122:15
contention 40:1,
   77:23, 108:3,
   118:10
contentions 122:7
contest 55:17
context 15:19,

51:25, 57:7,
   73:25, 78:15,
   79:5, 99:4,
   137:17, 141:1,
   151:6, 162:4,
   164:19
contingent 43:1
continue 67:25,
   98:19, 126:21,
   133:25
continued 43:23,
   125:13, 159:20,
   165:23
continuing 38:24,
   38:25
continuously 120:9
contorts 69:8
contours 100:24
contracts 14:22,
   15:6, 15:21, 16:9,
   30:18, 30:19,
   45:18, 59:15,
   87:23, 120:4,
   122:3, 125:10
contracts. 26:8
contractual 24:7,
   25:13, 25:15,
   26:5, 26:8, 26:11,
   26:12, 29:22,
   30:17, 30:22,
   32:15, 32:24,
   33:1, 33:7, 33:10,
   34:3, 45:9, 50:2,
   124:20, 147:14,
   147:19
contradict 36:24,
   135:22
contradicted 93:18
contradiction 149:19
contradictory 135:16
contradicts 164:5
Contrary 21:24,
   31:25, 41:13,
   42:19, 57:13,
   81:6, 87:23,
   99:23, 100:24,
   117:7, 124:13,
   129:17, 135:24,
   144:17, 152:7
contrast 115:3

contributing 144:23
contributions 17:1
Control 11:24, 12:3,
  70:16, 70:19,
  70:20, 75:18,
  75:23, 86:1,
  97:21, 140:10,
  148:24, 159:4
controlled 112:2,
  153:10
controlling 17:15,
  56:20, 90:21
controls 69:16
controversy 139:6,
  141:21
convert 33:10,
  33:14, 95:18,
  141:5
converted 12:10
convey 138:21
convince 55:9
copies 163:20
copy 132:12
core 88:5
Corp 126:6
Corp. 3:25, 3:28,
  3:30, 119:19
corporate 13:9,
  22:6, 110:16,
  149:5
Corporation 1:36,
  2:18, 2:38, 3:22,
  102:3, 102:7
Correct 16:15,
  27:25, 28:7,
  64:19, 73:11,
  114:2, 163:3,
  163:20
corroborated 42:8
Counsel 5:23, 50:16,
  68:11, 133:14,
  140:5, 140:13,
  142:25, 143:1,
  165:11
Count 31:6, 31:8,
  148:3
counter-argument
  110:13
counterclaim 63:10,
  63:12

counterclaims 79:7,
  87:12
Counties 16:22,
  16:25, 17:5,
  87:22, 88:3
Counts 23:7, 69:14,
  89:13, 89:21,
  90:9, 103:4,
  103:5, 106:5
County 17:11, 17:16,
  17:18, 17:20
couple 129:23,
  132:2, 160:10
course 11:9, 20:22,
  24:1, 34:16,
  34:24, 71:13,
  76:3, 86:1, 86:12,
  98:11, 130:11
COURTROOM 5:10,
  5:12, 143:5, 143:7
courts 43:9
covenant 22:25,
  74:24
covenanted 111:20
cover 10:16, 10:17,
  93:6, 98:10,
  132:20, 142:9
covered 19:20, 20:9,
  48:4, 50:5, 51:5,
  98:16, 110:5,
  110:8, 110:23,
  128:15, 136:6,
  138:18
covering 115:4
covers 8:12
crafted 105:12
create 7:11, 14:24,
  32:7, 45:12, 70:4,
  138:14, 163:22
created 45:21,
  95:24, 105:12,
  116:9, 135:16,
  140:8, 152:5
creates 106:22,
  109:24
creation 146:17
credible 97:10
credit 74:11, 111:3,
  116:18, 117:18
credited 111:3,

111:7, 111:24
crediting 42:2
creditor 13:3,
  33:13, 36:3, 36:7,
  36:11, 36:13,
  37:11, 39:9,
  43:10, 84:11,
  90:21, 105:14,
  108:20, 140:14
criticize 27:8
crystal 82:1
CSR 167:14
Ct. 48:6
culprit 127:21,
  129:2
cumulative 53:21
current 18:8, 42:16,
  44:6, 133:9,
  141:10, 153:16
cute 147:9


< D >
DACA 148:24
damages 18:20,
  18:21, 28:21
dangerous 140:4
dashboard 6:8, 6:9,
  7:4, 7:5, 8:9,
  10:2, 156:12,
  156:21
date 139:20, 153:2,
  153:7, 165:17,
  165:20
Daubert 56:12
day 17:14
de 112:6
deal 146:4, 152:3
dealing 102:14,
  121:25, 158:20
deals 151:12
dealt 20:23, 43:22,
  97:22, 151:13,
  151:17, 151:23
debate 106:17,
  108:9, 136:10
debtholders 16:9,
  67:1
debtor 14:1, 14:2,
  14:25, 16:21,

17:2, 17:8, 17:15,
  17:18, 17:21,
  17:22, 23:25,
  32:2, 33:11, 36:1,
  36:2, 52:17,
  72:19, 90:22,
  113:6, 125:25,
  147:22
Debtors 1:18, 10:15,
  16:16, 17:13,
  18:25, 30:5, 30:8,
  31:21, 31:22,
  31:23, 32:4,
  71:19, 125:25,
  126:3, 159:21
debts 16:3, 49:19
decide 63:15, 91:13,
  96:4, 121:9,
  152:1, 159:1
decided 55:24, 58:9,
  68:22, 71:5,
  79:11, 79:21,
  109:16, 140:22
decides 65:15
deciding 66:10
decision 14:24,
  16:20, 17:3,
  24:23, 26:23,
  27:10, 69:15,
  70:7, 75:20,
  79:12, 94:15,
  97:16, 121:16,
  127:11, 158:21,
  158:25, 159:18
decisions 49:7,
  58:10, 61:16,
  69:6, 70:13,
  97:15, 108:19,
  136:19, 139:1,
  139:9, 150:24
Declaration 63:4,
  63:14, 74:9, 78:3,
  78:5, 82:12, 83:2,
  100:18, 163:18,
  164:5
Declarations 56:8,
  80:24, 80:25,
  81:21, 82:8,
  82:11, 82:12
declaratory 28:17,

29:7, 29:17,
  29:25, 147:2,
  147:3, 147:25
declined 43:6
deem 106:9, 141:2
deemed 46:4, 46:8,
  46:13, 93:20,
  94:5, 94:10,
  128:23, 138:7
deems 45:19, 45:23,
  46:22
defaulted 24:8,
  32:8, 71:15,
  147:22
defaults 28:21,
  32:4, 32:14, 124:9
defeat 37:11, 49:20,
  57:22, 160:24
defeated 48:7,
  106:14
defeats 35:5, 112:13
Defendant 23:21,
  62:13, 68:17,
  79:2, 79:4, 84:22,
  109:4
defense 62:7, 66:3,
  66:5
defenses 24:8, 79:6,
  87:11
defer 53:5, 88:12
define 76:23, 91:15,
  162:3
defined 17:9,
  100:24, 100:25,
  118:20
defines 36:6, 86:7,
  109:24, 147:12
definite 49:18
definitely 14:14,
  19:23, 20:2,
  24:22, 153:16
definition 12:14,
  14:14, 63:13, 86:3
Dein 3:6, 83:12,
  167:8
delayed 124:19
delegated 78:19,
  120:23, 121:3,
  121:9, 121:15
demonstrate 11:8,

49:9, 53:10, 70:18
demonstrated 123:4
demonstrates 49:11,
  92:21
denied 53:12, 55:15,
  62:12, 65:6,
  66:11, 90:11,
  92:4, 119:9
deny 30:24, 54:24,
  114:13
denying 80:8
departing 152:14
Department 110:23
depend 77:21
dependant 66:22
dependent 33:18,
  66:15, 77:14
depends 34:2, 69:4,
  148:9
deploy 37:16
Deposit 11:21,
  11:24, 12:11,
  12:18, 12:20,
  70:4, 85:13,
  85:16, 85:17,
  85:24, 85:25,
  86:1, 86:5, 86:9,
  86:10, 86:17,
  110:2, 110:5,
  110:9, 111:3,
  117:1, 117:11,
  138:19, 148:21,
  148:22, 148:23
deposited 11:20,
  63:25, 64:5,
  111:1, 117:17,
  117:22, 118:21
deposition 79:4,
  83:13
deprivation 65:13,
  114:10, 114:19,
  118:6
deprive 37:16,
  107:7, 114:12,
  115:4, 130:16,
  165:5
Deprived 38:8,
  114:13, 115:14,
  125:10, 159:16
deprives 40:7,

40:17, 113:16,
114:9
DEPUTY 5:10, 5:12
derive 163:14
describe 122:19
described 106:1
description 115:11
designated 16:22,
112:3
designation 117:18
desires 56:15
Despins 3:19, 50:17,
50:18, 50:20,
50:21, 50:22,
52:11, 144:22
despite 53:24,
84:14, 89:20
destroy 127:10
destroys 137:16
detail 81:1, 84:7,
108:12, 122:19
detailed 165:12
details 74:10
determination 44:7,
61:18, 71:13,
77:4, 77:5, 77:6,
77:9, 131:24,
158:2
determinations
79:18, 82:25, 83:6
determine 23:8,
43:20, 64:7, 66:1,
76:25, 116:22,
122:12, 130:16,
130:21, 150:22,
150:25, 152:6,
153:8
determined 28:25,
32:9, 32:22,
33:20, 33:21,
59:4, 64:1, 66:2,
74:18, 99:17,
123:15, 146:1
determines 44:20,
151:2, 152:3
determining 54:15,
78:11
Detroit 31:23, 51:22
developed 94:4, 97:9
developing 76:19

develops 93:19
deviation 41:16
devoted 31:6
dial 8:3
dias 5:22
Diaz 84:17
dictates 93:23
differ 148:18,
160:19
difference 32:13,
150:18
different 26:4,
56:11, 87:1, 87:2,
87:3, 87:4, 89:4,
89:8, 110:1,
114:14, 117:20,
126:16, 126:23,
140:23, 150:12,
153:25, 154:11,
162:2, 162:9
differently 24:16,
27:10, 37:15,
107:5
difficult 7:10, 55:4
difficulty 7:14
digression 59:20
diligence 55:12,
56:21
diligent 80:10
diligently 55:13
direct 8:2, 105:5
directed 19:15,
83:16
direction 137:21
directly 95:15,
102:15, 106:23,
108:22, 135:16,
163:22
directs 97:1
disagree 39:14,
60:21, 68:23,
69:17, 69:23,
76:4, 108:14,
162:8
disagreement 109:12
disallow 60:7,
60:12, 61:2,
89:21, 106:6
disallowance 22:18,
22:22, 23:5,

23:12, 89:8, 89:9,
89:10, 103:6,
150:5
disallowed 23:14,
150:10
disallowing 63:24,
89:14, 89:24
disbursement 96:3
disbursements 95:3
discharge 25:7,
25:8, 43:11
dischargeable 25:20,
31:19, 43:13
discharged 25:4,
72:6
discharging 25:2
disconnect 8:3
disconnected 143:5,
157:13
discontinued 152:14
discounted 78:20
discovered 161:5
discretion 10:23,
90:21
discretionarily
141:7
discretionary 138:9,
138:17
discuss 27:7, 53:2,
78:14, 97:14,
138:24
discussed 42:24,
57:23, 89:4,
96:19, 101:13,
117:5, 118:10,
130:19, 139:25,
140:6
discussing 105:18
discussion 43:15,
67:12, 88:23,
97:17, 132:4,
133:9, 163:6,
163:15
discussions 95:11
disfavored 48:1,
99:25
dismissed 27:19,
152:20
displaced 135:9
displaces 126:9

dispose 88:10,
144:16
disposed 141:7,
142:14
disposition 165:14
dispute 32:21, 37:3,
56:22, 71:8,
78:17, 109:13,
110:18, 112:12,
113:14, 116:7,
120:5, 128:4,
128:19, 163:22,
164:2
disputed 22:12,
23:22, 32:7,
44:11, 53:10,
53:12, 80:17,
81:2, 122:7
disregard 41:25
disregarded 56:14
distinct 101:8
distinctly 81:15
distinguish 51:21
distinguishable
72:12, 81:15
distribution 49:18,
92:15
District 1:1, 1:3,
3:4, 3:5, 3:7,
5:12, 5:13, 57:19,
167:1, 167:2,
167:7
diversion 105:6,
105:7, 105:15,
114:24
diverted 105:21,
106:21, 107:2
diverting 47:7,
47:12
Docket 1:6, 1:23,
2:5, 2:25, 5:25,
6:1, 6:2, 6:19,
6:20, 6:21, 51:9
document 54:22,
54:23, 132:10,
132:11, 133:1,
137:1
document-based 54:16
documentation 70:4
documents 54:3,

54:10, 54:11,
54:12, 61:19,
78:16, 82:20,
82:21, 82:22,
82:23, 82:24,
85:19, 131:11,
131:16, 131:19,
131:25, 132:3,
146:9
doing 14:24, 31:25,
46:10, 51:22,
55:16, 57:4,
68:11, 101:3,
118:15
dollar 33:15, 65:4,
65:7, 66:2, 66:5,
66:18, 118:23
dollar. 33:16
dollars 33:12,
47:24, 59:18,
64:12, 64:22,
165:1
dollars. 106:2
domination 70:20
done 44:19, 46:23,
55:18, 57:4,
58:22, 59:6,
80:22, 94:9,
101:21
donee 102:9
donor 102:9
double 153:19
Doug 134:3
Douglas 3:35
dovetails 16:18
down 22:10, 75:8,
79:3, 103:17,
141:8, 144:25
dozens 90:14
DRA 9:19, 133:12,
134:1, 134:4,
134:16, 134:20,
136:14, 137:2,
137:7, 138:2,
141:18, 150:13
drafting 114:25
draw 27:13
drawn 122:23
dropped 143:25,
144:6

duck 138:12, 138:13
due 31:7, 31:11,
32:8, 41:1,
120:13, 123:2,
123:14, 123:17,
125:6, 125:13,
142:21, 146:24
duplicate 132:13
duplicative 53:21
During 6:17, 7:9,
18:25, 20:23,
68:12, 83:13,
88:8, 123:24,
149:19, 164:15
dust 62:1, 163:24
duty 24:7, 153:19


< E >
earlier 32:20,
56:21, 89:19,
102:10, 147:6,
151:5, 153:7,
154:19, 154:20,
155:8, 155:21
early 79:11, 79:21,
146:17, 149:2,
153:5
easier 141:10
easily 37:3, 92:4
ECF 85:7
edifications 163:17
effect 43:9, 43:18,
62:10, 76:12,
90:3, 94:20,
97:21, 107:2,
120:10, 122:6,
122:13, 153:19
effected 30:10
effective 33:22
effectively 159:13
effectiveness 30:7,
30:15
effectuate 27:15
effectuates 85:3
effort 55:11,
135:23, 142:16
egg 46:17
Eight 77:11, 77:15,
78:1, 83:18

Eight. 65:20
either 13:20, 14:11,
    32:14, 81:16,
    81:17, 82:8,
    91:20, 124:4,
    148:25
element 113:23,
    118:5, 142:3
elements 113:15
elephant 141:16
eligible 17:5
eliminate 33:23,
    37:17, 48:18,
    48:19, 50:1, 91:2,
    127:17, 152:19
eliminated 33:2,
    48:9
eliminates 20:13,
    21:25, 48:13
eliminating 20:12,
    30:3
elimination 99:20,
    100:3
elsewhere 63:11
Emergency 17:19,
    33:22, 78:4, 78:6,
    120:14, 120:15,
    120:21
emphasis 51:7,
    162:15
emphasize 49:5,
    51:6, 52:3, 150:11
emphasized 72:18
employee 16:24, 59:3
Employees 14:23,
    16:20, 17:2,
    17:20, 87:21,
    149:7
empty 97:13
enabled 25:14
Enabling 89:15,
    110:21, 163:14
enacted 18:7, 34:4,
    34:21, 96:8,
    103:24, 125:3,
    140:9, 152:4,
    152:15, 153:2,
    153:4
enactment 95:25,
    120:10

enactments 129:4
enacts 29:19, 32:12
encompass 14:15
encourage 7:19
encourages 47:20
encumbered 159:16
end 7:1, 8:4, 10:4,
    10:9, 17:14, 39:1,
    39:10, 40:12,
    43:14, 68:21,
    130:15, 142:15,
    144:8, 144:20,
    155:9
endeavor 55:17
ended 152:12
endorse 90:16
enforce 14:18, 16:9,
    26:11, 26:13,
    32:15, 38:14, 73:1
enforceable 13:18,
    16:1, 16:6, 16:10,
    24:14, 38:16,
    43:8, 43:17,
    43:22, 48:25,
    49:4, 51:25,
    106:23, 153:16
enforced 13:24,
    72:11, 153:23
enforcement 17:15,
    18:20, 19:4
enforcing 18:24,
    73:4, 107:1
engage 92:4
engaged 37:4
engagements 102:4
engaging 47:17
enough 100:20,
    160:17
ensure 6:4, 110:8
ensures 76:25
enter 11:3
entered 124:17
entire 66:17, 73:20,
    86:16, 164:6
entirely 17:3, 20:9,
    43:25, 108:1,
    112:3
entirety 60:7,
    114:18
entities 26:21,

33:18
entitle 51:11
entitled 29:17,
    42:6, 49:10,
    71:24, 102:11,
    102:17, 147:2,
    147:10
entitlement 147:8
entitlements 148:10
entitles 131:21
entitling 16:8
entity 15:2, 46:5,
    145:22
entrusted 49:18
Entry 6:1, 6:2,
    6:19, 6:20, 6:21,
    53:6
enumerated 6:18,
    34:14, 76:21
epiphany 24:1
equal 16:24
equally 58:19, 99:2,
    102:8
equation 35:11
equitable 29:8,
    29:18, 29:25,
    147:2, 147:3,
    147:8, 147:9,
    147:25, 153:21,
    155:10
equivalent 15:15,
    15:25, 72:9,
    149:18
Eric 143:9, 143:17
erroneously 25:19,
    25:21
error 13:22, 105:19
errors 105:19
ERS 139:7
escapes 43:11
escrow 79:3, 117:23
especially 40:1
Esq 3:36
essence 136:25
essential 63:15,
    64:7, 66:9, 76:23,
    77:1, 78:11,
    78:21, 82:24,
    148:2, 148:11
essentially 69:4,

75:19, 141:9,
142:19
establish 13:10,
82:2, 87:22
established 11:1,
71:19
establishes 43:3,
81:24
establishing 12:20,
82:15
estate 98:12
et 1:16, 1:36, 2:18,
2:38, 3:14, 5:18,
11:11, 12:24,
24:17, 27:19,
51:22, 94:22,
145:19, 147:18
etc. 151:10
euphemistically 25:5
evaluated 90:24,
109:23
evaluation 59:2,
91:9
event 55:5, 55:11,
65:24, 86:13,
93:19, 106:13,
127:6, 127:9,
129:20, 163:10
eventual 90:6
eventually 71:5
everyone 5:22, 6:11,
8:2, 67:17, 68:14,
133:15, 133:22,
154:3, 165:24
everything 53:16,
159:24
evidence 42:25,
67:2, 67:3, 74:2,
74:5, 76:11,
76:22, 78:11,
78:21, 102:25,
109:11, 116:10,
116:12, 116:13,
119:24, 128:18,
135:5, 142:16,
146:7, 161:5
evidenced 111:8
evident 90:18
evidentiary 66:16
exact 61:10, 61:22

exactly 17:23, 57:5,
60:17, 73:13,
90:25, 92:17,
110:25, 132:16
exaggeration 18:23
example 7:23, 31:11,
48:14, 59:13,
59:16, 89:25,
94:1, 136:3
examples 82:16,
122:14
exceed 65:25, 66:14,
66:25, 67:4, 77:16
exceeded 77:20
Excellent 52:16,
155:16
except 11:11, 18:9,
56:24
exception 11:12,
11:22, 138:23
excerpts 21:15
exchange 12:13,
12:15, 12:16,
12:17, 12:18,
34:8, 85:11, 86:4,
86:6
exclude 17:10,
128:5, 128:8,
129:7, 129:9
excluded 129:13
excluding 123:20
exclusively 97:23,
100:17
excuse 21:8
excuses 55:18, 126:3
execute 102:9, 121:8
execution 84:21
executive 26:14,
33:3, 47:7, 47:11,
47:13, 47:15,
74:11, 96:23,
105:8, 120:13,
122:1, 147:16
executory 14:21,
15:6, 15:7, 15:21,
88:4
exercise 27:18,
102:3, 121:5,
128:22
exercises 121:14

exercising 94:17
exhaustive 58:2
exhaustively 53:19
Exhibit 74:8
EXHIBITS 4:9
exist 77:12, 84:11,
126:16, 127:1,
146:25, 163:13
existed 33:24, 43:5,
155:12
existence 40:6,
40:15, 48:6,
63:21, 68:19,
69:1, 69:15,
69:17, 69:20,
78:10, 79:18,
82:3, 85:25
existing 66:9,
78:16, 91:23,
98:7, 104:19
exists 26:21, 78:17,
126:2, 133:6,
162:24
expect 23:1, 61:11,
81:23
expectation 124:25
expectations 124:24
expected 80:3
expenditures 45:15,
47:3, 78:7, 93:23,
136:19, 156:2
expenses 152:1
expensive 146:2
experience 152:12
expiration 107:4
explain 29:1, 29:16,
57:21, 93:14,
135:3, 136:12,
136:24, 160:23
explained 32:20,
42:10, 63:22,
114:6, 127:18,
138:6, 140:13,
147:5, 150:5
explaining 37:5
explanatory 22:19
explicit 133:6
explicitly 125:1,
126:5
explore 79:4

explored 74:15,
  78:22
express 18:8, 18:11,
  63:6, 92:9, 99:21,
  100:6, 101:1,
  123:10, 130:3,
  132:13, 137:9
expressed 69:22
expressing 108:25
expressly 19:7,
  21:20, 26:7,
  92:25, 94:3,
  95:15, 98:18,
  100:24, 104:25,
  105:24, 117:10,
  121:2, 121:4,
  129:7, 129:9,
  129:12, 129:20,
  135:24
extend 110:19,
  165:21
extends 109:5
extensively 69:18
extent 22:23, 44:16,
  52:8, 65:15,
  75:12, 76:8,
  77:10, 79:9,
  80:21, 86:7,
  94:20, 102:4,
  127:5, 127:20,
  148:7, 150:6
Extinguishing
  137:11, 137:14
extra 50:7
extraordinary 43:2,
  69:7, 138:23
extreme 69:6
extremely 87:9


< F >
F. 26:24
fact-specific 108:6
facto 112:6
factors 76:20, 77:7,
  92:19
facts 22:12, 27:12,
  53:14, 54:3,
  56:22, 57:11,
  57:20, 66:2, 66:4,

80:7, 81:2, 81:22,
  81:25, 82:2, 82:5,
  82:8, 83:20, 87:9,
  102:14, 102:15,
  119:7, 160:22
factual 43:21, 58:6,
  60:14, 69:1,
  77:21, 100:8,
  100:21, 103:1,
  111:22, 115:23,
  122:7, 122:11,
  128:3, 130:13,
  133:7, 142:17,
  163:22
factually 115:23
fail 13:10, 26:18,
  32:2, 86:21,
  125:18
failed 24:7, 27:12,
  27:17, 39:6,
  81:17, 135:4,
  141:25, 144:13
failing 55:19, 74:3
fails 41:12, 65:18,
  99:9
failure 26:10, 41:6,
  41:7, 48:10,
  48:12, 49:23,
  58:18, 76:10,
  142:20, 162:22
failures 49:7
faint 143:12
faith 133:5
faithfully 88:8
Faitoute 24:24,
  25:10, 32:19,
  33:24
fall 86:20, 128:14
fallacy 15:22, 41:4
falls 99:24
far 76:8, 135:21,
  149:7
fast 164:11
faulty 65:23
favor 48:1, 53:6,
  62:7, 64:8, 110:3,
  110:14, 122:24,
  125:18
favorite 57:18
Federal 26:22, 31:4,

31:5, 34:6, 43:3,
  45:15, 45:22,
  45:23, 46:18,
  46:22, 57:16,
  60:25, 91:23,
  93:16, 94:17,
  95:18, 111:11,
  125:19, 125:22,
  129:1, 129:10,
  129:20, 130:8,
  150:15, 159:12
feel 56:24
fees 11:18, 12:23
felt 109:2
Ferris 49:15
few 11:25, 50:7,
  57:25, 62:12,
  63:1, 73:17,
  73:19, 75:11,
  79:23, 81:15,
  83:11, 122:14,
  123:5, 155:20,
  160:14
FGIC 99:1
field 135:17
figure 22:19, 66:18,
  132:16, 159:14
file 48:19, 80:4,
  159:8, 159:9,
  160:17, 161:11
filed 5:25, 6:19,
  6:20, 21:16,
  22:20, 23:2,
  31:12, 44:1,
  50:24, 51:9,
  59:22, 63:10,
  83:19, 122:10,
  159:10, 161:18,
  163:19
filing 32:15, 51:16,
  56:17, 56:19,
  63:11, 120:11,
  123:1, 161:12
fill 63:16
final 8:1, 83:6,
  83:8, 87:8, 118:5,
  131:23
finality 87:6
Finally 50:4, 121:23
Finance 3:25, 119:18

Financial 1:9, 1:23,
  2:5, 2:25, 5:17,
  25:1
find 97:9
finding 60:22,
  66:16, 66:22,
  70:7, 122:17,
  122:21
findings 53:17,
  78:10, 122:18
Fine 50:10, 62:19,
  104:22, 143:17,
  145:8
finish 119:3,
  131:17, 164:21,
  164:22
Firstbank 64:12
fits 85:18
five 88:15, 144:23
five. 158:12
flattens 135:15
flaw 69:10
flawed 69:5
Floor 108:25, 109:2
flow 61:17, 70:25,
  113:3, 119:1,
  119:4, 125:4,
  125:6, 125:13,
  130:20, 138:8,
  162:15
flowed 109:6
flushed 59:1
focus 63:2
focused 92:8
Focusing 58:4, 163:5
follow 9:7, 80:23,
  81:17, 141:8
follow-up 22:14
followed 112:24
Following 41:15,
  42:10, 62:25
follows 144:12
FOMB 58:6, 83:19,
  128:21, 129:11,
  130:2, 130:6,
  139:2, 139:13,
  139:19, 139:23,
  139:25, 140:7,
  140:10, 140:24,
  141:8, 141:14,

141:15, 141:20,
  141:25, 142:3,
  142:16, 142:19,
  142:21, 143:3,
  144:16, 144:17
fond 147:4
font 132:12
footnote 28:23,
  164:16
force 98:6
forced 141:15
foremost 23:6
forever 151:7,
  151:17, 151:21,
  152:19
form 39:19, 44:13,
  56:5, 155:11,
  164:4
formally 13:13
forth 7:18, 76:5,
  81:1, 82:11,
  82:13, 84:5, 84:7,
  140:24, 147:19,
  163:21
forward 68:24,
  72:21, 133:17,
  141:10, 162:7,
  165:25
fought 80:13
found 42:3, 72:15,
  88:2, 122:7,
  162:13
foundational 91:25
Four 18:4, 19:3,
  49:2, 72:25, 78:4,
  92:9, 98:3,
  135:11, 135:20
Four. 96:14, 100:25
framed 83:18
framework 138:7,
  140:9
framing 92:8
frankly 57:5, 58:20,
  92:16, 99:9,
  113:10, 113:14,
  114:1, 118:15,
  154:20
fraudulent 106:22
frequently 43:9,
  49:6

friends 134:9
front 162:3
fulfill 139:17
fulfilling 140:25
full 16:11, 16:17,
  17:23, 18:25,
  19:7, 25:12,
  39:25, 67:2, 71:5,
  79:21, 83:5, 83:7,
  87:8, 99:15,
  99:17, 111:22,
  123:12, 159:24,
  161:24
fuller 161:24
fully 10:20
fulsome 60:16,
  161:11, 161:17
function 7:4, 84:22
functional 60:19
Fund 15:1, 15:3,
  15:8, 78:14,
  78:16, 78:17,
  78:18, 78:22,
  82:19, 82:20,
  85:23, 110:3,
  110:24, 111:4,
  111:7, 111:23,
  117:18, 128:13,
  145:19, 146:3,
  162:15
fundamental 13:22,
  128:3
Fundamentally 62:9,
  101:8
funding 76:25,
  137:14
funneled 146:8
future 20:10, 21:2,
  42:21, 109:6,
  139:15, 151:24


< G >
Gail 3:6, 167:8
gap 63:16
Garced 136:20
gas 12:23
gating 56:15
gauzy 82:9
gave 110:14

General 16:4, 18:16,
  19:17, 57:12,
  135:12, 155:14,
  159:9, 160:18
generalities 82:9
generalized 78:5,
  161:1
generally 57:16,
  68:18, 80:2,
  99:25, 117:1,
  125:9
generically 24:6
genuine 24:11, 71:6,
  74:14, 75:9,
  122:21, 142:22
germane 59:4
gets 12:10, 51:20,
  151:23, 159:11
getting 40:25,
  71:10, 114:7,
  165:2
gifts 38:15
give 11:22, 13:5,
  14:8, 14:9, 24:19,
  25:20, 30:22,
  50:9, 57:25,
  72:16, 82:16,
  115:22, 126:17,
  149:3, 158:7,
  158:9, 160:2,
  160:22
given 37:10, 47:1,
  53:16, 55:21,
  79:12, 102:5,
  102:8, 111:21,
  123:21, 124:4,
  128:17, 153:8,
  158:17, 158:21,
  159:2
gives 39:24, 105:23,
  115:3, 150:19
giving 110:19,
  149:18
glad 145:8
Go-centered 99:7
goal 99:23
goals 97:6
God 5:14
Gotshal 119:18
Government 12:16,

12:17, 24:17,
  27:16, 44:15,
  49:17, 49:19,
  59:3, 61:16, 72:4,
  79:2, 80:21,
  82:18, 83:11,
  83:15, 84:25,
  124:10, 125:25,
  126:3, 128:21,
  140:11, 141:12,
  159:21
governmental 17:10,
  158:1
governments 24:14,
  125:24
Governor 26:4,
  32:10, 44:13,
  45:23, 93:21,
  94:5, 95:12,
  97:23, 121:3,
  121:9, 128:24
grammatical 114:3
grammatically 114:2
grant 19:9, 21:8,
  38:1, 44:22, 63:8,
  64:2, 64:14, 65:8,
  85:19, 124:5,
  140:10, 145:23
granted 9:5, 9:15,
  29:3, 62:12,
  87:17, 142:21,
  145:22
granting 7:8, 34:9,
  53:1, 92:12,
  95:25, 129:14
grants 39:4, 85:21,
  85:22, 146:2
grave 134:16
Great 101:4, 130:1,
  131:13, 143:22
greater 140:10,
  140:20
gremlin 156:14
Grijalva 42:8,
  42:10, 108:25,
  109:1, 109:7,
  109:10, 154:23
ground 11:10, 60:19
grounded 54:2
grounds 27:4, 60:6,

124:5, 139:14
Guarantee 3:25,
  119:19
Guaranty 3:27, 3:29
guess 44:5, 46:16,
  103:20, 132:25,
  146:10, 149:12
guise 140:25
gut 152:9
gutted 27:4

< H >
H3601-H3602 42:11
half 50:10
halt 24:3
Hampshire 57:19
hand 58:2, 117:2,
  118:1, 145:6
handle 32:4
hands 57:9, 80:13
hang 67:17
happen 95:12
happened 53:17,
  96:10, 120:13,
  146:23
happening 110:25,
  127:18
happens 154:25
happy 152:12
hard 73:18, 96:15,
  97:9, 132:10
harm 154:13
Hastings 50:22
have. 29:4, 90:5
head 61:11, 93:16,
  137:21
Health 10:9, 48:5,
  134:9, 165:23
hear 8:1, 10:6,
  28:1, 28:12,
  52:14, 68:3,
  143:9, 143:13,
  143:17, 143:18,
  143:20, 145:4,
  156:7, 156:9,
  156:10, 156:15,
  156:17, 156:25,
  159:20, 160:6
heard 6:25, 7:2,

7:7, 9:13, 24:16,
    52:19, 67:7, 92:6,
    93:1, 93:14,
    109:15, 116:6,
    118:17, 127:14,
    157:15, 160:15
Hearing 3:3, 5:20,
    5:24, 6:5, 6:13,
    7:10, 7:15, 22:12,
    67:25, 97:18,
    98:25, 133:17,
    133:25, 143:11,
    154:6, 165:16,
    165:17, 165:18,
    165:20, 165:25
hearings 49:6
heavy 91:16
held 11:16, 13:8,
    13:9, 17:5, 45:15,
    65:10, 102:1,
    112:1, 136:17,
    149:5
help 41:17
helpful 144:1,
    165:13
Hence 139:11
herring 154:12
Hertz 31:24
hesitated 56:23
high 97:3
highlight 56:3,
    92:20
hinge 25:21
historical 162:18
history 41:16,
    41:17, 41:18,
    41:25, 42:5,
    117:9, 154:19
hits 149:12, 159:22
Hoffman 101:25,
    102:16, 102:21,
    147:4, 153:20
holder 21:17
holders 150:8
Holding 13:2, 36:3,
    36:11, 117:7,
    127:11
holds 17:12, 110:10
hole 141:8
Honorable 3:4, 3:6,

5:14, 5:15, 167:6,
    167:8
hope 10:16, 22:13,
    23:19, 68:10,
    68:13, 118:13,
    133:15, 133:16,
    134:10, 161:16
hopefully 134:25
hopes 134:11
horse 162:23
hotel 118:24
hour 120:1
House 41:9, 108:25
housekeeping 8:13,
    141:18
HTA'S 19:10
Hughes 82:12
human 32:1
hundred 64:11
hundreds 55:22
hurdle 53:16
hypothetical 36:19,
    37:12, 84:9,
    84:11, 104:12,
    119:6, 127:7


< I >
idea 96:25, 97:10,
    101:8
ideas 100:13
identifiable 85:14
identified 28:19,
    45:2, 55:8, 61:22,
    65:1, 80:7, 82:9,
    102:22, 116:11,
    116:15, 116:17
identifiers 78:18
identifies 96:23,
    98:5
identify 57:11,
    57:20, 64:21,
    81:22, 82:1,
    148:2, 160:22
identifying 6:24
identity 63:20,
    63:23, 64:6
if-then 113:25
ignore 12:19
ignored 41:18

ignores 81:4,
    107:13, 117:7
ignoring 39:17
II 91:16, 127:13,
    127:14, 129:6,
    130:21, 143:4,
    146:16, 151:21
ill-conceived 58:3
illegal 47:14
illogical 14:25,
    114:18
illustrate 15:22
illustrations 57:25
illustrative 58:3
image 101:3
immaterial 58:25
immediate 126:15
immediately 96:2
immunity 36:19,
    36:23, 37:1, 37:4,
    37:8, 37:14,
    37:16, 84:14
immunize 39:20
immutable 54:3
impact 30:4, 53:3,
    61:17, 76:6, 87:6,
    134:20
impacted 44:17
impacts 44:23
impair 32:24
impaired 26:9,
    105:25, 120:4,
    147:15
impaired. 25:4
Impairing 26:7,
    29:20, 30:17,
    30:22, 34:3, 45:9,
    45:18, 76:12
impairments 125:20,
    125:21, 130:23
impairs 26:5, 35:5
implicated 122:12
implicit 28:10,
    60:1, 66:18, 94:20
implicitly 44:5
Implied 19:2, 25:2,
    92:10, 99:24,
    100:23, 101:1
impliedly 18:6,
    48:3, 99:22

important 27:16,
  33:9, 63:2, 79:23,
  87:9, 91:19, 129:8
importantly 51:20,
  52:21, 56:14,
  65:9, 122:20,
  151:3
impose 15:9
imposed 91:11, 118:4
imposes 46:18, 49:16
imposition 146:18
impossibility 115:2
impossible 96:13,
  114:18, 130:5,
  136:8, 139:17
improper 56:5, 80:1,
  119:25, 161:12,
  161:14, 165:8
improperly 106:21
impunity 24:6
in. 12:22, 41:12,
  156:19
inability 92:20,
  142:21
inapposite 97:16
include 18:3, 18:17,
  34:14, 36:7,
  41:14, 128:19,
  158:9
included 42:15,
  42:24, 44:2,
  61:24, 100:25,
  104:24, 107:15,
  107:17
includes 18:8,
  34:23, 37:2, 86:3,
  107:14, 128:8
including 6:14,
  16:3, 17:13,
  49:12, 56:2,
  58:11, 72:21,
  81:5, 82:11,
  97:11, 98:1,
  111:10, 137:19,
  150:13, 161:15
inclusion 98:9
inclusive 18:1
inconceivable 97:2
inconsistency 19:11,
  158:18, 158:25

inconsistent 19:4,
  42:7, 69:9, 70:7,
  96:13, 98:2,
  127:2, 135:14,
  150:24, 151:12
incorporate 135:25,
  140:16
incorporated 35:19,
  35:25
incorporates 35:21
incorporating 132:13
incorrect 86:16,
  115:24, 127:3
increases 71:2
incurred 36:2
independent 18:3,
  60:6, 60:19,
  101:10
indicate 83:7
indicated 60:8,
  126:22, 160:16,
  161:9, 163:8
indicating 132:21,
  146:10
indigent 17:19
Industrial 37:20,
  137:10
ineffective 146:5
ineligible 17:6
inference 27:13
inferences 122:23
informance 49:10
information 57:21,
  82:21, 116:14,
  160:18, 160:23,
  161:2, 161:25,
  162:10, 162:11,
  162:12
Informative 6:19,
  7:19
Infrastructure
  111:4, 111:7
inherently 108:6
initial 63:1, 117:5
initially 78:20
injunction 14:5,
  14:9
inpatient 17:19
inquired 59:23
inquiries 62:10

inquiry 22:13,
  22:15, 108:6,
  124:23, 130:18,
  130:21
insert 40:7
inside 45:4
insist 28:24
insistence 25:22
Insofar 26:16,
  148:20
instance 33:11,
  44:20, 49:23,
  72:8, 79:15,
  97:23, 122:16,
  125:23, 150:18,
  158:16
instances 79:13,
  108:18, 115:9,
  150:4
instant 22:9
Instead 55:9, 55:17,
  103:8, 121:9
instrumentalities
  13:17, 15:8, 20:5,
  21:6, 21:12,
  21:19, 31:6, 35:9,
  38:14, 40:24,
  41:20, 41:21,
  42:2, 91:3, 107:3,
  110:15, 110:19,
  113:14, 120:8,
  121:12, 125:5,
  146:8, 153:25,
  155:22
insufficiency 49:19
insufficient 18:18,
  106:10, 113:9,
  122:21, 123:3,
  123:22, 142:9
intact 32:14, 147:20
integrated 132:14
intend 29:2, 42:25
intended 33:25,
  37:9, 47:16,
  96:18, 104:25,
  105:3, 136:8,
  151:18
intent 9:22, 109:8,
  137:9, 138:16
intention 68:21

interdebtor 47:18
interesting 75:6,
  95:10, 102:13
interests 36:16,
  37:22, 37:24,
  69:16, 70:8,
  137:2, 137:5
interfere 137:7
interference 84:21
interinstrumentality
  107:11, 107:17
interplay 102:20
interpret 41:5,
  161:24, 162:4
Interpretation 35:3,
  69:19, 79:8,
  79:16, 79:19,
  82:17, 109:3,
  114:17, 115:3,
  115:7, 117:6,
  117:8, 139:16,
  162:1, 162:10,
  162:13, 162:19
interpreted 79:14,
  82:18
interrelationship
  79:15
interrupt 7:9, 7:10,
  7:13, 54:8
introduce 71:11
introduced 101:6
introduces 102:25
introducing 101:5
invalidity 44:11
invoked 126:10,
  127:7, 152:11
involved 161:1
involving 47:18
Iron 24:24
irrelevant 66:7,
  86:14, 99:9,
  127:9, 139:19
issuance 34:9
issuances 111:10
issued 6:13, 110:17,
  120:22, 121:4
items 56:3, 139:4,
  139:10
itself 39:20, 41:19,
  73:21, 89:24,

93:17, 93:18,
  93:20, 100:2,
  106:15, 109:3,
  130:17, 139:23,
  157:24


< J >
J. 3:14, 3:30
January 163:19
JC 31:23
Jefferson 17:11,
  17:18, 17:20
job 134:23
joinder 50:25
joined 134:4
joins 99:1
Joint 6:19, 7:18
Jointly 1:11
Juan 5:1, 143:5,
  143:7, 143:21
Judge 3:4, 3:5, 3:6,
  3:7, 5:5, 5:7,
  8:18, 67:23,
  67:24, 83:12,
  133:21, 133:23,
  143:9, 143:13,
  143:18, 143:20,
  156:17, 167:7,
  167:8
judges 16:16
judgment. 57:22
judgments 18:20
judicial 6:12,
  36:20, 37:8,
  37:11, 37:12,
  84:11, 84:16,
  84:19
Judith 3:6, 167:8
junior 36:15, 36:16,
  37:24
jurisdiction 130:16,
  141:21, 148:14
jurisdictional 27:4
jurisprudence 18:24,
  101:15, 101:24,
  125:9
Jurisprudential 16:9
justification 74:14,
  74:16, 75:12,

75:22
justifications
  75:17, 79:1
justified 77:13
justifies 75:16
justify 77:12
justifying 41:15


< K >
Kachkar 161:16
KASS 3:16, 53:2,
  61:9, 62:16,
  62:21, 62:24,
  64:19, 64:21,
  65:6, 66:20, 67:7,
  67:11, 67:14,
  116:6, 116:9,
  118:17, 143:1,
  144:3, 145:7,
  160:11, 164:9,
  164:11, 164:12,
  164:22, 164:24
keep 7:19, 165:24
keeping 7:20, 97:3
keeps 9:9
Kentucky 14:22,
  16:20, 17:2,
  17:20, 87:21,
  87:24, 88:2, 149:7
key 38:18, 105:19,
  142:17
kicking 156:13
kind 56:9, 60:22,
  93:16, 161:24,
  162:9
kinds 57:2
knowing 116:19
knows 18:2, 21:6,
  27:2, 50:24,
  108:10, 138:14
Kovacs 13:18, 13:25,
  14:5, 14:6, 14:8,
  14:16, 72:4,
  72:10, 72:11,
  72:12, 72:22


< L >
lack 28:3, 32:5,

41:22, 53:3,
75:12, 153:24
lacks 142:19
laid 12:1
language 18:8,
18:11, 41:13,
41:14, 42:13,
84:13, 110:13
largely 10:18, 23:9,
65:20, 87:14
larger 61:25
Las 159:17
last 18:23, 20:21,
28:1, 66:2, 66:5,
67:10, 89:4,
93:12, 96:19,
97:18, 112:24,
115:11, 131:6,
151:6, 151:7,
151:9, 157:15,
163:25
Lastly 142:25
Later 10:17, 86:9,
88:24, 94:25,
151:2, 155:21
latest 146:14,
155:19
latter 20:2
laugh 101:4
Laura 3:4, 5:14,
167:7
lawful 70:20, 75:23,
136:4, 136:5
laws 13:23, 18:24,
19:8, 21:15, 30:3,
71:17, 71:20,
74:7, 76:10,
92:15, 93:5,
93:13, 93:16,
95:8, 96:3, 96:11,
96:16, 104:12,
118:8, 121:15,
121:18, 121:21,
124:11, 126:1,
129:3, 136:6,
140:20, 141:2,
147:17, 149:15
lay 93:12
lead 14:18, 24:21,
53:4, 90:15, 140:3

leads 30:18
least 11:15, 57:1,
70:13, 78:13,
79:20, 82:3,
96:21, 101:7,
108:19, 116:7,
116:21, 122:6,
128:16, 131:21,
146:13, 163:1
leave 12:14, 32:14
Leaves 20:9, 151:22
leaving 97:13, 98:20
led 11:6, 14:1
left 52:11, 88:15,
96:6, 158:6
legal 31:25, 32:2,
32:18, 56:6,
58:21, 59:1, 59:4,
59:6, 59:10,
59:14, 60:6,
61:18, 87:9, 89:9,
89:10, 90:3,
91:20, 93:1,
106:13, 112:10,
117:3, 117:15,
118:4, 128:3,
131:23, 146:13,
164:18
legislate 140:2
legislation 23:24,
25:23, 26:1,
26:12, 26:14,
27:14, 29:1,
32:23, 34:3, 35:8,
45:9, 45:10,
45:11, 45:21,
46:4, 48:16,
121:24
Legislative 27:18,
41:16, 41:17,
41:18, 41:25,
42:5, 46:10,
94:10, 105:4,
117:9, 120:15,
120:17, 120:24,
121:2, 121:7,
121:15, 122:17,
122:21, 124:19,
125:7, 125:9,
128:20, 128:22,

129:11, 130:9,
154:19, 154:22,
154:24
Legislature 25:17,
32:12, 45:24,
46:9, 46:19, 94:2,
95:12, 95:15,
95:16, 103:25,
121:3, 121:5,
121:10, 128:24,
138:14, 138:16,
139:6, 139:20,
153:17
Legislature. 93:21,
94:6
legislatures 139:15
lends 109:3
length 57:23, 136:11
less 8:1, 15:1,
16:10, 25:12,
28:10, 62:6,
105:11, 158:12
letting 150:25
level 16:25, 42:14,
97:3
levels 21:18
liability 25:9,
39:21, 151:23,
151:24
liable 40:11, 40:21,
106:15, 115:18
Libortex 84:17
license 11:18, 12:23
lien 36:6, 36:13,
36:15, 36:16,
36:20, 37:11,
37:13, 37:24,
38:1, 39:10,
42:18, 62:5, 63:5,
84:9, 84:11,
84:16, 84:19,
105:14, 107:23,
107:25, 108:9,
108:21, 109:5,
136:14, 137:2,
137:12, 137:13,
137:15, 145:18,
162:24
liens 35:15, 37:8,
37:17, 59:5,

136:5, 137:3,
137:12, 159:16
Lift 54:21, 57:2,
57:6, 65:10,
68:22, 69:6,
69:15, 70:13,
75:20, 78:15,
79:12, 83:4,
83:10, 83:18,
87:3, 87:11,
102:20, 108:11,
108:19, 109:18,
110:12, 122:8,
125:11, 126:18,
162:5, 163:20
lifting 91:17, 107:4
light 62:3, 164:14
likely 22:12
Likewise 59:8,
76:15, 161:7
limine 56:12
limit 111:21
limitation 90:13,
107:14, 107:16
limitations 37:2,
49:17, 141:22
limited 6:14, 46:11,
51:2, 68:16,
75:21, 80:16,
83:3, 83:11,
83:12, 87:11,
96:14, 113:2,
115:23, 118:22,
135:1, 142:2,
164:14
limiting 142:17
line 6:5, 14:15,
75:8, 75:16,
102:21, 116:25,
144:5, 148:21,
157:6
link 62:9
liquidate 43:10
Lisa 5:7, 67:24,
133:24, 143:15,
145:4, 157:1
list 20:16, 31:16,
31:18, 34:15,
74:11, 83:2,
136:2, 148:10

listed 148:9
lists 82:9
literally 74:18,
79:13, 120:1
litigants 159:15
litigated 99:4
litigation 27:3,
28:11, 139:5
little 94:25, 106:1,
118:15, 133:15
live 101:17
LLC 3:33, 3:35
LLP 10:12, 68:8,
145:13
local 16:17, 46:19,
102:3, 129:11
lock 91:6, 92:20
Lockbox 111:1,
117:23
log 156:18
logic 11:18, 12:2
logically 14:17,
96:13
logistics 8:12
long 16:17, 20:25,
21:2, 56:19,
91:13, 151:6,
151:8
longer 43:9, 43:18,
151:9, 152:22
look 75:7, 98:15,
132:9, 133:16,
147:23, 165:25
looked 78:15
looking 22:22,
54:14, 86:23,
90:20, 101:14
looks 85:6, 133:1
loop 143:23
lose 154:7, 155:2
losers 91:6
losing 41:1, 114:7
lost 145:9
lot 126:13
lots 35:12
love 19:24, 101:3
low 82:14
Luc 3:19, 50:18,
50:21
lunch 133:11

< M >
magic 101:3
magically 95:17
Magistrate 3:6,
167:8
Maine 48:5, 48:21,
49:1
mainly 82:10
maintain 34:1
maintained 85:20,
88:8, 110:24,
111:4
major 35:10
majority 109:12,
140:16
makeweight 54:19
man 154:12
Management 1:10,
1:24, 2:6, 2:26,
5:17
mandamus 73:4,
102:17, 153:23
mandate 139:17,
139:23, 140:25
mandates 140:18,
142:13
mandatory 76:20,
77:7
Manges 119:18
manifest 158:25
manner 59:22, 69:9,
76:13, 87:14, 98:1
Marcus 31:24
marker 93:12
market 97:7
markets 100:6
Martin 3:14, 10:11,
145:5, 145:13
match 116:17
material 32:7,
44:11, 52:23,
53:12, 53:14,
53:21, 53:25,
62:3, 68:20,
69:17, 73:14,
73:16, 75:8, 75:9,
77:12, 80:7,
80:17, 82:5,

132:6, 142:22
materiality 62:9,
    82:15
matter 7:17, 11:2,
    27:6, 35:11,
    38:13, 40:4, 55:9,
    58:2, 63:2, 65:9,
    66:14, 72:3,
    74:25, 76:1,
    84:15, 86:22,
    117:5, 141:18,
    142:21, 147:13,
    147:22, 149:16,
    155:20, 163:17
matters 60:3, 60:5,
    62:17
Mattoon 161:8
maturity 98:13
mayor 17:17
Mcconnell 134:5,
    138:1
Mcgirt 162:16
mean 22:17, 23:5,
    24:5, 24:6, 25:7,
    25:8, 28:10,
    34:24, 43:11,
    44:5, 62:2, 73:21,
    80:7, 95:1, 95:20,
    98:10, 103:15,
    103:17, 113:10,
    133:1, 136:10,
    147:11, 159:23,
    162:23
Meaning 14:10,
    29:10, 35:24,
    37:3, 41:13,
    79:16, 103:20,
    114:13, 115:3,
    115:14, 147:1
means 16:11, 25:6,
    31:25, 35:20,
    37:17, 53:11,
    77:6, 98:12,
    103:23, 112:5,
    114:13, 140:1,
    140:12, 144:24
meant 103:19, 128:19
measured 70:10
mechanism 78:24,
    158:4

medium 12:13, 12:14,
    12:16, 12:17,
    12:18, 85:10,
    86:3, 86:5, 86:6
meet 27:12, 102:4,
    142:21
meeting 101:10,
    133:16
member 16:22
members 5:23, 6:15
Memorandum 51:1
memorize 112:19
Mendez-nunez 139:2
mention 24:10,
    144:13
mentioned 15:18,
    15:19, 20:3,
    23:10, 35:3, 54:9,
    87:20, 104:13,
    148:1, 154:20,
    155:7
mere 39:22, 52:4,
    59:8, 73:25,
    87:23, 115:21,
    121:25
merely 25:8, 49:16,
    81:7, 82:9, 115:1,
    121:7, 160:17
merit 99:9, 141:21
merited 56:7
meritless 63:19
merits 27:5, 56:15
Messrs 145:7
met 49:7, 82:14,
    122:15, 123:18
Michael 3:15, 52:17,
    156:8, 160:11
midnight 120:1
Milbank 88:20
militate 161:18
million 64:11,
    64:22, 65:4, 65:7,
    111:2
mind 24:15, 24:17,
    45:5, 53:19, 97:3,
    114:25, 140:22,
    163:24
minimum 20:14,
    74:14, 79:10,
    85:24, 111:22,

113:13, 119:7,
    128:16
ministerial 73:5
Mintz 3:35, 134:3,
    134:6, 134:8,
    134:13, 134:15,
    140:5, 140:13
minute 34:12, 50:10,
    78:14
minutes 7:22, 7:25,
    8:16, 8:25, 9:2,
    9:6, 9:7, 9:10,
    9:16, 9:17, 9:18,
    9:19, 10:16,
    11:25, 50:8,
    52:10, 68:2,
    79:23, 88:15,
    129:24, 134:1,
    144:23, 144:25,
    158:6, 158:7,
    160:9, 160:11
mirrors 118:16
mischaracterization
    79:24
mischaracterizes
    85:16
mismatch 122:18
misplaced 114:3
mispronouncing
    161:17
missing 54:13
Mission 127:11
misspent 77:25
misstate 40:13
misunderstands 85:12
misunderstood 148:20
mix-up 158:5
mixed 79:10, 79:20,
    128:3
modern 102:21,
    102:24
modification 34:8,
    34:16, 95:6,
    107:13
modify 25:1, 95:4
Modifying 25:5, 44:6
moment 58:20, 59:20,
    73:8, 163:5, 164:9
monarchical 141:12
monetary 72:13

monies 11:16, 13:8,
  13:17, 24:13,
  30:11, 30:21,
  39:5, 45:1, 59:4,
  70:5, 75:21,
  97:24, 105:2,
  107:3, 107:6,
  110:22, 111:14,
  111:17, 111:18,
  111:24, 115:21,
  117:3, 117:15,
  117:17, 117:22,
  118:1
Monitor 3:35
Monoline 8:19, 68:9,
  68:17, 87:6
Monorail 159:17
month 122:8
months 55:20, 155:20
moot 29:18, 30:2
Moratorium 26:13,
  27:1, 27:14, 30:3,
  31:2, 32:9, 33:3,
  71:17, 74:7,
  74:10, 75:14,
  76:10, 105:9,
  121:1, 121:2,
  121:4, 121:5,
  121:7, 121:8,
  121:14, 121:18,
  121:20, 129:3,
  146:6, 147:17
mostly 145:15
Motions 3:3, 5:24,
  8:5, 8:6, 11:4,
  19:16, 22:10,
  23:14, 28:14,
  53:24, 54:1, 58:2,
  62:11, 68:15,
  68:23, 80:12,
  80:15, 83:18,
  83:20, 102:20,
  109:18, 161:6,
  163:19, 164:6
mouthful 113:20
movant 8:4, 98:22
movants 28:15,
  28:19, 28:24
move 52:25, 58:12,
  100:9, 103:2,

  119:22, 126:24
moved 126:18
Moving 27:22, 27:24,
  52:18, 57:2,
  68:24, 89:20,
  160:12, 163:21
multiple 18:2, 124:2
Municipal 3:29,
  17:12, 90:22,
  99:19, 102:2
municipalities 17:6,
  149:14, 149:15
municipality 25:11,
  152:7
mute 6:5, 6:7
muting 156:13
myself 9:2, 101:3

< N >
naked 101:19
name 6:24, 7:1,
  10:11, 110:3,
  110:9, 112:2
Namely 20:3, 26:3,
  48:22, 121:17
narrow 85:18, 99:24,
  117:6, 135:9
National 3:24,
  119:18
nature 59:5, 59:10,
  59:21, 66:3,
  71:14, 82:3,
  85:16, 88:3,
  106:11, 106:14,
  111:23
Nayuan 3:36, 134:5,
  138:1, 144:10
necessarily 22:24,
  23:14, 71:2, 76:1,
  82:14, 94:21,
  136:18
necessary 8:12,
  18:11, 54:1,
  59:24, 60:2,
  64:14, 66:1,
  76:24, 78:23,
  90:13, 100:4,
  102:4, 103:7,
  103:22, 104:5,

  104:8, 119:23,
  130:21, 131:23,
  161:20
necessitated 94:14
necessity 24:25,
  27:25, 28:4, 28:9,
  61:7
needed 33:20, 75:18,
  78:25, 80:25,
  81:1, 160:18,
  161:24
needing 163:23
needle 52:25, 58:12
needs 8:7, 15:23,
  52:8, 74:15,
  99:16, 122:12,
  154:3
negates 47:5
neglected 131:7
negotiate 25:6
negotiated 43:5
Neiman 31:23
neither 17:20, 30:5,
  45:11, 80:1,
  92:21, 139:20
New 24:1, 31:3,
  57:19, 71:11,
  71:15, 118:19,
  126:5, 132:15,
  132:18, 165:22
news 84:1
Next 11:25, 13:15,
  14:20, 23:20,
  26:3, 68:1, 98:22,
  125:19, 127:13,
  146:6, 148:1,
  165:16, 165:25
NG 5:7, 10:3, 67:24,
  133:23, 143:9,
  143:13, 143:15,
  143:17, 156:15,
  156:17, 156:22,
  156:25
Nine 11:14, 12:12,
  17:21, 31:22,
  32:3, 52:1, 90:24,
  138:22, 142:4,
  142:13
Nine. 140:24
No. 1:6, 1:23, 2:5,

2:25, 6:1, 6:2,
  6:3, 6:19, 6:20,
  6:21, 41:9, 51:9,
  62:19, 94:13,
  103:19, 131:1,
  156:6
nobody 95:6
noise 64:18
non-dischargeable
  19:5
non-entrenchment
  101:2, 101:6,
  103:9, 103:15,
  103:17, 103:19,
  103:23, 104:1,
  104:11, 108:2,
  108:4, 153:13
non-federal 46:25
non-impairment
  21:13, 22:25,
  103:16, 103:18,
  150:7
non-transfer 111:17
nondischargeability
  49:11
nondischargeable
  15:25, 16:6,
  31:15, 31:17,
  43:8, 49:1, 49:4
nondiscretionary
  73:5
None 4:5, 4:11,
  18:7, 44:23,
  59:13, 74:24,
  139:12, 148:9
nonetheless 106:7
nonimpairment 74:23,
  104:2
nonmeritorious 25:21
nonpayment 158:16
Nor 17:20, 30:5,
  45:11, 49:19,
  49:20, 80:1,
  119:23, 121:7,
  139:20
Notably 17:20,
  28:24, 102:22
notary 132:18
Note 76:17, 85:7,
  95:10, 108:16,

109:1, 111:2,
  112:25, 119:22,
  121:16, 122:5,
  124:9, 130:15,
  131:12, 164:17
noted 28:23, 58:8,
  89:3, 89:5, 93:17,
  98:6, 140:7
Notes 57:14, 108:22,
  109:4, 109:9,
  109:11
Nothing 11:7, 29:5,
  38:7, 38:19,
  44:18, 49:1,
  63:10, 70:6,
  80:23, 90:3, 91:9,
  97:20, 98:7,
  121:19, 123:13,
  147:22, 159:18,
  164:4
Notice 105:5
noticed 60:8
notify 16:15
notion 86:16, 92:24,
  161:10, 161:18,
  162:8, 162:14
notwithstanding
  13:18, 71:23,
  120:10, 159:25
November 120:6
nowhere 29:1, 42:3,
  129:15
null 118:23
nullifies 137:15
nullify 147:5
nullifying 29:21,
  30:2
number 5:16, 53:25,
  68:16, 68:23,
  69:10, 79:13,
  79:14, 82:16,
  83:22, 116:15,
  134:20, 134:24,
  136:2
numerous 44:19,
  81:11, 92:8,
  96:17, 117:7,
  122:11, 129:18
nutshell 143:2

< O >
obeyed 149:11
objected 83:15
objecting 56:16,
  67:19
objection 81:4, 92:1
obligate 92:15
obligated 115:5,
  138:21
obligating 96:16
obligation. 79:17
obligor 113:3
observation 161:23
observations 62:16,
  160:15
obtain 33:17, 73:1,
  81:23, 106:19,
  112:6, 119:25,
  132:23, 141:11
obtained 83:3,
  100:21
obviously 19:24,
  23:3, 51:19, 52:1,
  110:1, 121:2,
  121:23, 130:13,
  132:7, 153:10
occasions 54:5
occupancy 65:10,
  112:11, 118:20,
  118:24, 165:7
occur 104:18, 165:18
occurred 28:21,
  58:22, 81:14,
  123:25, 130:17,
  130:23, 138:25,
  164:5
occurring 71:3
October 165:17
odd 89:16
off-point 81:15
Off-track 126:6
offending 147:5
offer 51:23
offering 99:6
officer 140:8
Official 3:18,
  50:22, 61:19,
  125:2, 167:15
Ohio 13:18, 13:25,

14:1
Okay 10:8, 20:12, 23:6, 23:18, 39:1, 39:3, 104:23, 125:20, 131:8, 143:16, 144:6, 145:6, 145:10, 145:12, 155:14, 156:20, 156:23, 157:8, 158:11, 159:6, 160:10
old 38:1
older 132:5
OMB 120:23, 123:22, 142:5
Omni 165:17
Once 24:10, 34:4, 34:20, 153:9, 155:19, 155:21, 157:19, 157:23, 158:13
one-way 15:7
ones 49:12, 63:13, 101:5
ongoing 72:9
open 9:25
opening 31:9, 51:4, 67:16, 149:2
operate 17:1
operation 6:4
operations 140:11
operative 131:19
Opinion 28:14, 28:23, 109:1, 119:6
Opinions 10:24, 10:25, 11:7, 23:11, 45:2
opportunity 53:10, 53:12, 55:15, 79:4
oppose 80:20, 81:8
opposed 34:18, 37:5, 129:3
opposing 80:2, 80:5, 81:16, 100:7, 100:8
opposite 120:6
Opposition 8:6, 55:22, 67:19, 71:19, 108:23,

145:16, 161:11, 161:18
oppositions 53:19, 55:20
optimistic 8:24
oral 5:24, 8:13
Order 6:18, 6:25, 14:1, 20:18, 33:3, 52:6, 56:19, 72:11, 73:1, 73:2, 76:24, 81:6, 120:21, 145:15, 162:25, 163:21, 165:20
ordering 26:4, 80:9
orderly 6:4
ordinarily 12:5
ordinary 14:7, 34:15, 34:24, 46:14, 57:15, 90:22, 98:11
original 25:2, 25:5, 71:16, 86:18, 163:16
Orrick 134:4
oscillating 92:19, 93:8
others 31:2, 51:11, 51:14, 111:8, 118:2
Otherwise 6:25, 18:18, 29:4, 55:4, 65:17, 72:20, 99:15, 125:12, 144:18, 152:7, 159:3
outcome 90:21
outlined 116:15
outset 149:8
Outside 29:18, 31:21, 47:19, 49:13, 86:20, 91:3, 100:19, 128:14, 136:21, 139:23, 148:13, 153:20
outstanding 20:22, 20:24, 28:18, 34:18, 66:17
overall 9:4, 76:4,

99:23
overarching 137:18
overbroad 80:21
override 66:4, 123:12, 129:21
oversimplifies 142:3
overview 54:8
owed 24:18, 59:18
owes 33:12
owing 159:13
own 7:20, 37:8, 37:17, 39:18, 47:18, 49:17, 105:17, 108:6, 136:21, 150:24, 155:6, 163:9, 165:6
ownership 62:6, 63:5, 65:12, 75:1, 164:25, 165:7
owns 165:2

< P >
P&I 34:18
PAGE 4:3, 11:14, 17:11, 24:25, 27:11, 28:15, 29:25, 31:6, 31:8, 31:12, 37:20, 49:16, 87:25, 89:25, 94:1, 132:17, 132:18, 144:5
pages 22:19, 26:23, 42:11, 55:22, 80:18, 90:14, 167:4
paid 16:3, 16:4, 16:11, 16:14, 16:17, 17:23, 18:16, 19:7, 25:12, 25:15, 48:19, 50:1, 67:2, 99:17, 105:25, 111:22, 127:16, 149:15, 149:16, 150:3, 153:11, 155:25, 159:24
Paper 57:18, 160:21,

161:1
papers 63:22, 73:24,
  81:11, 84:8,
  120:2, 123:4,
  124:3, 161:8
paragraph 11:14,
  12:11, 31:5, 51:8,
  72:25, 85:7,
  87:20, 112:25
paragraphs 83:1,
  83:11
parallel 107:15
paramount 124:24
Park 24:24
parsed 20:1
Part 20:17, 26:2,
  28:1, 38:4, 38:7,
  42:1, 42:2, 42:12,
  55:12, 59:24,
  66:6, 79:6, 80:2,
  80:3, 103:8,
  122:6, 128:21,
  149:2
partial 5:25, 19:15,
  53:6, 64:3, 64:7,
  64:14, 118:18
participant 7:15,
  8:7
participate 88:4
participated 165:22
particular 19:20,
  19:21, 24:18,
  46:11, 54:17,
  89:12, 93:24,
  95:3, 96:22,
  96:23, 105:1,
  115:4, 117:24,
  118:14, 138:20,
  139:9
particularized 78:6
particularly 54:5,
  55:21, 64:4,
  122:10, 122:22
Parties 3:11, 5:23,
  6:5, 6:15, 8:5,
  9:19, 10:9, 29:23,
  49:13, 52:18,
  57:20, 59:16,
  67:19, 69:18,
  80:19, 82:18,

83:15, 123:7,
  133:13, 134:1,
  134:4, 134:16,
  134:20, 138:2,
  150:13
parties. 49:21
partner 61:9, 62:16
party 81:16, 81:25,
  139:22, 160:12,
  163:13
pass 45:17, 45:19,
  87:19, 118:12,
  149:15, 152:7
passed 95:15
passing 45:20
path 135:15, 140:4
pattern 102:15
Paul 50:22
pave 150:1
payable 30:15
paying 34:18, 35:6,
  101:10
payment 11:18,
  13:12, 14:10,
  28:18, 30:19,
  30:23, 32:11,
  32:12, 34:25,
  35:8, 39:25, 49:8,
  72:16, 96:17,
  98:14, 98:17,
  105:16, 107:9,
  124:19, 140:16,
  147:10, 147:12,
  158:17, 159:9,
  159:23
payments 12:23,
  17:3, 17:22, 24:3,
  31:5, 34:20,
  48:13, 96:7,
  98:11, 98:12,
  99:15, 123:13,
  123:17, 127:15,
  151:15, 155:22,
  156:3, 157:24,
  158:2, 158:22
pendency 88:9
pending 62:10, 91:7,
  91:18, 164:7
Penney 31:23
pension 16:23, 17:1,

47:23
people 50:11,
  137:18, 137:19,
  141:13, 156:20,
  157:6
per 31:8, 38:11,
  49:16
percent 16:24,
  16:25, 33:13,
  100:19
Perfect 130:1
perfected 11:19,
  11:23, 12:21,
  62:6, 85:13, 86:8,
  86:10, 108:17,
  148:23, 148:24
perfection 12:5,
  63:7, 85:10
perfectly 105:11
perform 76:22
performance 15:11,
  71:24, 75:1,
  102:12, 102:18
performed 77:8,
  149:18
perhaps 8:24, 11:11,
  54:22
period 19:20, 20:8,
  20:14, 20:23,
  20:25, 21:1, 21:2,
  72:21
permit 42:20, 125:5
permitted 6:14,
  62:3, 70:24,
  122:3, 130:20
person 6:14, 7:7,
  17:9
perspective 43:1,
  87:13
persuade 90:16
persuaded 14:11
persuasive 109:9
persuasively 53:20
pertain 128:2
pertaining 68:19
PHC 82:14
phone 6:8, 6:10,
  7:3, 8:8, 10:2,
  32:10
phones 6:5

PHV 3:14, 3:15,
 3:16, 3:19, 3:22,
 3:25, 3:30, 3:35
physical 70:19
picks 32:10
picture 90:17
piece 121:24
place 29:15, 37:5,
 41:2, 71:9,
 136:11, 146:4
places 81:11
plain 39:6, 39:17,
 41:13, 42:7,
 84:13, 105:5,
 109:2
plainly 28:15, 96:9,
 105:24, 109:11
Plaintiff 1:31,
 2:13, 2:33, 27:11,
 27:17, 42:21,
 68:15, 69:2, 69:4,
 69:5, 69:8, 69:13,
 70:21, 77:2,
 77:10, 77:23,
 78:3, 79:24, 81:3,
 81:6, 81:16,
 81:21, 82:7, 83:8,
 87:4, 87:13
plaintiffs 87:16
planning 8:3, 92:13
Plans 30:7, 44:11,
 44:12, 44:14,
 47:16, 47:23,
 71:18, 76:9,
 76:12, 76:14,
 76:17, 84:20,
 91:4, 92:24,
 92:25, 93:2, 93:3,
 96:1, 128:4,
 128:7, 128:16,
 129:18, 139:24,
 140:1, 141:7,
 141:11, 148:13
plausible 82:5,
 121:14
plausibly 27:17
play 37:14, 137:14,
 144:18, 148:6
played. 7:24, 49:24,
 65:5, 67:8,

117:14, 118:25,
 129:22, 131:15,
 163:7, 164:20
pleaded 28:10
pleading 27:12,
 86:21, 89:17
pleadings 134:19,
 136:3
Please 5:8, 6:7,
 6:23, 7:1, 7:9,
 7:15, 10:11,
 50:13, 68:7,
 104:22, 144:11,
 145:11, 157:9
pledge 39:9, 39:10,
 41:11, 42:18,
 111:9, 111:14,
 111:17, 111:19
pledged 105:3,
 107:23, 107:24,
 108:8, 110:7,
 113:12
plot 141:10
Plus 144:17
PM 133:19, 133:20,
 143:7, 166:2
pocket 117:4
podium 118:12
point. 35:10, 56:11,
 93:8, 131:22,
 135:21, 137:23,
 144:8
pointed 36:21, 58:8,
 83:23, 122:11,
 124:3, 128:23,
 149:2, 164:16
pointing 53:20
points 31:19, 52:2,
 55:20, 63:1,
 73:19, 75:11,
 83:22, 107:10,
 120:2, 122:16,
 123:5, 124:1,
 126:13, 127:4,
 129:13, 134:24,
 145:15, 162:6
police 120:16,
 121:3, 121:6,
 121:10
policies 6:12

Policy 84:15, 105:4
political 46:5
pop 151:14
portion 103:3,
 111:11, 144:13,
 144:20
portions 50:25,
 103:3
posed 62:10
position 11:5,
 34:19, 46:10,
 51:10, 54:17,
 58:13, 66:20,
 72:1, 79:17, 87:1,
 87:15, 92:18,
 99:1, 99:2,
 107:11, 108:10,
 108:16, 108:23,
 114:2, 141:19,
 162:7
positions 163:9
possess 140:2
possession 16:21,
 70:19, 75:23,
 114:13, 148:25
possessory 164:25,
 165:5
possibility 21:9,
 21:22
possible 10:10,
 43:20
post-petition 72:21
post-promesa 64:22,
 64:23, 64:25,
 129:5
posture 87:2, 89:3
posturing 55:14
potential 22:25,
 51:16, 142:6
Power 15:18, 19:17,
 27:18, 34:10,
 35:4, 73:23,
 95:19, 98:20,
 102:3, 102:5,
 102:8, 120:16,
 120:17, 121:3,
 121:6, 121:7,
 121:9, 121:10,
 121:15, 127:4,
 140:2, 151:7,

152:1, 156:1,
158:1, 158:16,
159:1
powers 92:13, 94:17,
130:22, 141:12
practical 10:22,
11:2, 33:25, 38:13
practicality 17:14
practically 52:5
practice 23:5,
53:17, 57:3,
75:10, 132:6,
162:18, 165:14
practices 61:16,
61:21
prayer 106:8
pre-existing 97:22
pre-petition 15:12,
15:15, 17:22,
24:4, 30:12,
30:14, 35:7, 52:4,
72:14, 72:19,
72:23, 147:15,
147:23, 150:23,
151:4, 153:24,
155:14, 155:23,
159:3, 159:23
pre-promesa 30:6,
48:23, 129:4,
150:23
pre-title 30:6,
48:23
preceding 80:12
precisely 21:10
preclude 64:2,
108:7, 115:24,
130:14, 130:18
precluded 55:16,
57:4, 81:7
precludes 58:10,
100:7, 107:5
precluding 107:1
predicate 43:21,
60:14, 131:23
preempt 19:7, 49:3,
91:13, 92:22,
92:24, 93:1, 93:3,
93:9, 93:14,
95:23, 99:12,
99:15, 99:23,

100:11, 135:8,
135:20, 135:24,
136:9, 141:2,
150:21, 153:18
preempted 18:6,
20:17, 20:20,
21:23, 22:18,
30:13, 30:14,
47:12, 48:3,
48:24, 51:12,
89:16, 91:22,
92:14, 96:2,
96:11, 96:16,
96:24, 96:25,
97:10, 98:23,
100:17, 104:16,
118:11, 135:4,
146:12, 152:4,
152:21, 152:22,
153:9
preempting 19:19,
93:10, 93:13,
101:14
preemption/appropria
tion 143:4, 144:14
preemptive 95:19,
99:20, 146:16
Preempts 18:1,
19:18, 20:4, 20:8,
21:4, 45:14, 47:7,
90:1, 91:13,
136:17, 150:19,
151:1, 151:3,
151:17, 152:2,
152:3, 153:1
preliminary 61:23,
61:24
premature 87:14
premise 38:6, 65:23,
106:13, 123:8
premised 22:23,
28:3, 70:14,
86:16, 107:6,
120:16, 120:18
premises 69:5, 91:25
PREPA 140:8, 141:1
preparation 8:23
prepare 55:20
prerequisite 78:8
prerogative 162:4

present 27:5, 52:22,
53:12
presented 53:14,
59:1, 59:5, 61:18,
95:13, 109:3,
109:18
presently 109:5,
121:20
presents 52:22,
130:13
preserve 26:15,
33:25, 147:17,
155:25
preserves 140:14,
158:1
preserving 137:13
presiding 5:14
press 5:24, 6:15
pressed 80:11
pretextual 99:5
pretty 21:2, 90:18,
162:7
prevail 135:12
prevent 12:5, 53:5,
63:8, 105:13,
105:15
prevented 44:18,
67:10, 84:15,
155:22, 157:24
preventing 44:12
prevention 51:17,
158:3
prevents 39:19,
69:16, 156:3
previously 55:24,
101:12, 106:1,
108:10, 159:17
primarily 63:21,
149:25
primary 17:25, 122:2
principal 26:15,
123:13, 123:17,
147:18
principally 59:12
principle 101:2,
101:6
prior 42:5, 49:6,
53:17, 54:4, 69:6,
69:15, 69:22,
70:7, 70:9, 97:25,

108:13, 158:17
priorities 51:24,
  136:5
priority 19:10,
  51:12, 98:24,
  123:21, 140:14,
  140:16, 148:8,
  149:19, 159:24
probably 51:3,
  98:25, 103:1,
  155:20, 160:10
problem 147:6
problematic 141:3
problems 12:20
procedural 68:19,
  79:25, 87:2, 89:3
procedurally 55:11,
  56:5, 80:1
procedures 80:23,
  97:8, 165:19
proceed 67:18, 80:9,
  87:14, 143:23,
  145:1
Proceeding 6:1, 6:2,
  6:3, 6:20, 6:21,
  6:22, 79:5, 87:5,
  88:6, 88:9, 144:19
Proceedings 3:43,
  5:19, 6:6, 6:18,
  7:11, 8:10, 65:10,
  67:22, 81:5, 83:4,
  83:6, 84:2, 99:19,
  133:20, 141:20,
  166:2, 167:6
proceeds 11:21,
  12:6, 12:21,
  85:14, 86:10,
  86:11, 111:6
process 56:4, 56:11,
  58:5, 82:22,
  90:24, 91:4, 91:8,
  97:25, 101:19,
  157:4
processor 132:20
procure 61:15
produced 3:43, 54:12
Products 127:11
proffer 113:3
proffered 119:24,
  128:18

profound 130:13
progeny 102:1
prohibited 81:14
prohibition 157:25
prohibitions 84:20
prohibits 128:10
promise 14:25, 15:1
promises 159:18
prong 39:5, 39:7,
  40:2, 40:3, 40:5,
  40:14, 40:23,
  41:3, 41:5,
  107:20, 108:17,
  109:13, 113:15,
  113:16, 113:22,
  113:24, 114:6,
  114:18, 115:1,
  115:4, 115:12,
  118:6, 154:2,
  154:8, 154:18
prongs 105:20,
  107:19
Proofs 28:11, 28:20,
  32:16, 44:1,
  48:20, 50:3, 148:6
proper 55:8
properly 77:23,
  106:3
property. 40:22,
  106:16
Proposed 20:15,
  28:15, 29:2,
  90:23, 124:1
proposition 14:25,
  48:8, 48:22,
  51:24, 72:5,
  87:24, 91:20,
  149:21, 153:22,
  162:18, 163:1,
  163:9
propriety 53:1, 59:9
Proskauer 10:12,
  52:17, 145:13,
  160:12
protect 37:8, 37:9,
  104:25, 137:4
protected 84:14,
  162:24
protecting 97:5
protection 33:10,

44:23, 86:2, 86:13
protects 32:25,
  40:23, 40:25
proves 18:12
provide 13:7, 20:21,
  21:2, 29:3, 33:22,
  43:2, 44:22,
  55:17, 85:5,
  135:5, 160:1
provided 33:24,
  37:23, 44:4, 90:2,
  90:6, 140:21
provides 18:19,
  20:16, 35:18,
  35:24, 42:16,
  45:17, 49:16,
  93:18, 94:4,
  106:15, 106:24,
  110:22, 117:10,
  128:6
providing 21:16,
  24:12, 32:12,
  45:14, 96:3, 97:4,
  137:15, 151:15
provision 35:18,
  42:20, 43:2, 46:7,
  66:4, 96:15,
  105:12, 123:6,
  123:10, 126:9,
  126:10, 129:14,
  130:3, 135:22
provisions 21:14,
  34:6, 74:12,
  79:14, 79:19,
  99:17, 104:25,
  120:18, 121:8,
  128:2, 129:15,
  129:18, 130:4,
  135:12, 135:13,
  136:2, 136:9,
  146:16, 149:20
Public 3:24, 5:23,
  6:15, 16:22,
  76:23, 77:1,
  77:19, 84:21,
  119:18, 142:13,
  142:14
punished 6:16
purely 104:12
purport 150:23,

151:4
purported 74:16,
  75:15, 77:17,
  91:20, 120:22,
  121:5
purportedly 89:16
purporting 152:23
purpose 20:19,
  27:16, 46:11,
  53:2, 69:8, 81:24,
  100:12, 100:14,
  115:1, 138:20,
  152:10, 152:18,
  155:6, 158:19
purposeful 56:25
purposely 57:9
purposes 13:9, 14:6,
  14:13, 22:7, 23:5,
  27:5, 29:16,
  33:21, 35:6,
  38:19, 64:10,
  88:23, 91:18,
  93:11, 99:10,
  100:6, 110:16,
  120:20, 121:21,
  126:19, 142:14,
  148:16, 149:5,
  155:15
pursuant 17:6, 20:5,
  30:12, 36:13,
  110:1, 120:23,
  142:14
pursue 55:19, 56:23,
  58:7, 126:19,
  164:1
pursuing 106:18
pushing 134:23
Put 21:1, 37:15,
  46:6, 46:9, 91:14,
  132:22, 138:11,
  162:23
puts 45:13, 148:5
putting 105:7


< Q >
quack 138:12
qualified 115:10
qualifying 107:12
quantified 155:17

quantity 70:10
quasi 141:12
questioned 137:1,
  153:14
questioning 89:5
questions 7:13,
  11:9, 50:8, 62:18,
  79:5, 79:10,
  79:20, 88:11,
  89:18, 100:9,
  104:20, 130:25,
  131:11, 132:2,
  164:9
quick 8:20
quickly 10:10, 19:24
Quincy 101:25
quintessential
  128:22
quite 81:14, 89:4,
  142:2, 165:13
quote 39:11, 40:12,
  42:12, 70:3,
  89:16, 93:20,
  100:7, 105:22,
  106:8, 110:3,
  110:22, 111:11,
  113:22, 142:13,
  142:15, 160:21,
  164:19


< R >
rabbit 141:8
railroad 17:9
raise 13:16, 25:17,
  53:25, 71:6,
  80:17, 82:6,
  127:22
raised 10:19, 11:7,
  21:7, 21:9, 44:3,
  83:20, 88:5,
  88:23, 94:14,
  100:11, 119:21,
  120:1, 131:21,
  145:15, 149:23,
  153:14
raises 58:6, 90:12
raising 19:22, 72:7,
  141:19
randomly 156:13

Rather 9:6, 70:16,
  76:10, 89:9,
  104:4, 108:18,
  113:6, 139:22,
  163:24
rationale 39:17,
  71:4, 71:7, 73:20,
  162:21
rationales 83:14
rattling 92:7
Re 1:6, 5:16, 17:11,
  126:5
reach 61:7, 70:1,
  70:11, 70:18,
  106:7
reached 70:15,
  162:19
reaching 60:13,
  70:22
reaction 157:22
reactivated 152:24
read 40:4, 114:18,
  137:4, 143:25,
  144:4
reader 115:10
reading 41:4, 114:1,
  114:5
reads 40:4, 40:5,
  113:21
ready 67:25, 133:25,
  145:1
reaffirmed 162:25
real 70:17, 130:2,
  130:4, 155:2
realize 84:6
realized 8:23, 131:6
reallocate 97:24
really 20:11, 22:1,
  70:9, 72:6, 74:2,
  74:3, 83:25, 97:8,
  97:10, 120:5,
  125:20, 126:14,
  127:23, 130:22,
  132:19, 147:13,
  149:10, 152:16,
  153:17, 160:18
reappropriate 24:15
reargue 162:6
reason 21:8, 25:3,
  27:9, 30:2, 32:9,

32:14, 35:2,
58:20, 58:25,
66:8, 66:11,
70:21, 74:20,
75:13, 120:24,
125:17, 145:21,
152:13, 153:7,
154:1, 155:2
reasonable 27:13,
56:10, 59:24,
103:7, 103:22,
104:5, 104:7,
119:23, 122:23,
124:23, 124:25
reasonableness
27:24, 28:4, 28:9
reasoning 11:6,
27:8, 58:17, 76:5,
84:20, 92:21
reasons 17:13, 20:3,
23:10, 32:23,
35:7, 35:13,
41:12, 44:4, 47:1,
47:11, 60:10,
60:24, 61:14,
61:22, 65:8,
124:2, 127:19,
144:15, 145:21,
154:20
rebuttal 8:6, 133:13
receive 90:6, 106:20
received 110:22
receives 13:12
receiving 33:19
recent 14:23, 53:17,
56:3, 58:1, 82:19
recess 67:21, 133:19
recipient 116:14,
116:16
recognition 25:24
recognize 10:24,
15:17, 75:4, 76:3,
92:25, 118:16
recognized 80:18,
93:25, 97:19,
101:8, 108:5,
130:17
recognizes 90:13,
94:16, 98:24,
100:2, 103:1

recognizing 13:23
reconciled 100:1
reconnected 143:7
reconstruct 157:22
reconvened. 67:22,
133:20
Record 5:16, 6:24,
38:8, 42:9, 42:11,
50:21, 54:4, 66:9,
71:6, 74:2, 74:4,
76:11, 76:21,
79:21, 83:7, 87:8,
115:23, 120:8,
121:17, 132:22,
144:4, 144:10,
154:24, 161:24,
162:9
recorded 3:43
recording 6:13
recount 81:11
recovery 140:21
red 154:12
redeemed. 34:24
Redemption 34:9,
34:17, 34:25,
98:10, 98:11
redirect 105:10
redirecting 105:2
reduce 15:13, 21:18,
110:7, 111:18
reduced 72:13
reducing 112:7
reduction 139:5
refer 21:20, 54:13,
74:8, 83:1
reference 32:22,
54:15, 88:1,
100:12
referenced 125:2
references 13:5
referencing 137:10
referring 21:13,
115:10, 153:15
refers 26:7, 101:2,
127:13
reflected 117:19
reflects 42:14
refrain 159:20
refute 40:1, 40:2,
149:21

refutes 71:21
regain 97:7
regard 20:17, 61:1,
139:3
regarding 28:14,
52:20, 55:23,
59:20, 62:14,
73:12, 106:14,
111:23, 141:22,
143:1, 161:2
Regardless 55:14,
91:7, 96:12,
111:6, 114:2
regularly 34:19,
98:14
regulations 135:13
reinforces 104:14
reinterpret 114:15
reissuance 98:17
reiterate 99:1
reiterates 103:8
reject 73:23, 88:4,
144:14
rejected 14:21,
15:5, 15:16, 74:1,
87:23, 127:6,
161:4
rejection 15:4,
15:5, 15:13,
15:18, 15:20,
127:4, 127:9
relate 68:16, 160:14
related 62:17,
74:11, 81:2,
86:18, 97:19,
131:11, 140:14,
145:17
relates 59:12,
63:13, 68:20,
140:4, 163:1
relating 65:3, 66:4,
78:16, 82:20,
82:21, 82:22,
82:24, 162:13,
163:16, 164:15
relation 23:1, 83:23
relationship 46:4,
69:20, 88:2,
163:11
relative 57:6,

61:10, 163:14,
164:5
relevance 153:14,
163:2
relevant 13:7,
28:22, 52:21,
52:22, 53:7,
53:15, 54:2,
55:10, 63:12,
64:25, 65:1,
88:25, 89:12,
105:8, 127:24,
135:25, 152:2,
161:5, 162:18
reliance 72:4, 72:7,
79:25
relied 81:15
relies 77:11, 97:15,
108:1, 117:13,
149:8
relinquished 65:12
rely 69:23, 77:2,
82:7, 149:9, 163:8
relying 54:22, 74:6,
95:23, 95:24,
104:1, 127:21,
139:13
remain 26:12, 54:1,
71:4, 88:10, 90:5,
136:11
remainder 88:12
remaining 7:22,
52:7, 98:13,
109:13, 164:9
remains 71:8, 78:21,
165:1
remark 7:1
remarks 6:23, 143:1
remedies 29:7,
44:19, 126:19,
140:19
remedy 25:18, 29:21,
39:25, 126:15
remember 6:9, 7:2
remind 6:11
remit 58:18
removes 135:16
render 49:3
rendered 19:5
renders 36:16, 63:11

renegotiation 98:17
Rent-a-car 31:24
reorganize 100:16
repaid 18:15, 26:9,
35:13, 151:9
repay 98:19
repaying 138:20
repayment 18:25,
34:6, 34:16,
84:20, 98:7
repeal 94:19, 94:20,
94:25, 95:1, 95:8,
139:21
repealed 94:2, 94:8,
94:9, 153:15,
153:17
repealing 95:5
repeat 52:6, 122:20,
144:2, 144:7
repeatedly 57:4,
58:9, 92:7
repetition 134:25
repetitive 162:14
replacement 137:15
replaces 71:16
Reply 63:22, 71:11,
89:25, 112:25,
141:4, 164:17
Report 41:9, 42:14,
42:20, 154:22,
154:24
Reporter 143:24,
144:4, 157:1,
167:15
Reports 155:1
represent 30:14
representation 133:5
Representative 1:13,
1:27, 2:9, 2:29,
5:18, 10:13,
35:15, 108:25,
109:1, 109:7,
109:10, 145:14,
149:24, 158:15
representing 119:18
reprioritize 99:12
reprogram 97:24
reprogramming 139:3
Republican 105:4
repudiate 18:23

repurchase 34:8
request 7:2, 7:6,
7:8, 8:20, 9:1,
9:15, 54:18, 56:8,
62:11, 65:2,
66:11, 81:4,
160:17, 161:12,
161:13, 161:19
requested 9:1, 9:4,
9:18, 9:20, 82:15,
161:25
requesting 20:2,
22:18
requests 28:16,
161:2, 161:3,
161:4
require 17:15,
17:23, 18:13,
39:7, 69:6, 77:23,
81:25, 95:6,
99:15, 105:21,
108:17, 113:2,
129:9, 129:15,
129:21, 139:10,
149:14, 160:20
required 15:11,
16:23, 17:2, 30:5,
34:21, 57:11,
57:19, 70:3,
72:20, 76:20,
77:1, 78:5, 78:7,
78:10, 80:24,
81:1, 82:4, 84:13,
98:17, 105:15,
109:6, 110:2,
115:25, 120:7,
129:7, 130:22,
138:18, 144:15
requirement 12:19,
13:19, 13:20,
74:25
requirements 46:14,
69:8, 79:25,
81:18, 122:18,
142:1, 142:23
requires 12:15,
16:14, 16:17,
18:15, 39:25,
59:10, 70:19,
70:20, 72:2,

107:2, 107:20, 114:6, 114:19, 126:11, 129:13, 129:17, 139:7, 140:3, 155:3
requiring 13:16, 14:1, 16:3, 16:4, 17:21, 18:25, 23:24, 24:12, 26:3, 30:12, 30:20, 33:3, 34:15, 47:5, 49:8, 73:3, 159:23
reset 158:5
residents 33:23
residual 22:25
resisting 99:3
Resolution 57:14, 79:15, 85:21, 85:22, 87:8, 146:4
resolutions 61:20
resolve 88:5, 122:21
resolved 29:1, 37:3, 74:15
resolves 152:17
resolving 60:3, 131:22
resources 16:5, 18:17, 59:17, 65:25, 66:15, 66:25, 67:4, 77:16, 77:18, 77:20, 77:24, 77:25, 78:7, 123:3, 123:20, 128:5, 128:9, 128:11, 128:13, 128:15, 142:8
respected 130:7
respectfully 9:1, 68:23, 69:23, 76:4, 108:14
respecting 108:12
respective 113:13
respond 7:6, 53:24
responded 56:9
responds 22:13
Response 23:21, 36:21, 51:13, 56:7, 57:10, 58:1,

58:14, 59:25, 63:9, 93:4, 94:7, 103:11, 104:11, 105:5, 109:10
response. 9:14, 145:3, 156:5
responses 160:25
responsibility 100:5
rest 62:15, 103:15, 133:15, 133:16, 160:2
restates 159:22
restrict 84:18
restricted 45:3, 47:17
restrictions 117:19, 117:24, 118:2, 118:4, 154:11
restrictive 57:16, 112:4
restricts 41:19
restructure 47:23
restructuring 19:8, 25:6, 25:11, 25:14, 25:16, 90:22, 91:17, 104:18, 152:10, 152:23
restructurings 47:18, 47:21
rests 65:4, 103:9, 109:13, 122:6
result 15:19, 23:14, 87:5, 100:18, 114:5, 140:20, 147:23
resulting 106:11
results 56:5, 152:23
resume 8:11, 71:1
retain 33:20, 59:4
retained 58:24, 62:4, 78:2, 118:20
retention 31:7, 31:8, 31:10, 58:25, 75:16, 77:12, 78:8, 89:15, 129:17
Retirement 14:23, 16:22, 87:21
retransmission 6:13

retread 11:10
retroactively 37:21
retroactivity 37:25
returned 107:3
returns 106:24
retyped 132:19
reveal 81:24
Revenue 20:6, 91:22, 94:2, 97:11, 97:12, 99:6, 99:8, 99:16, 99:22, 100:4, 100:16, 104:15, 105:1, 105:3, 105:6, 114:25, 137:12, 142:19, 158:19
revenues 18:18, 31:7, 31:8, 31:10, 58:18, 62:4, 74:10, 78:1, 85:22, 86:15, 86:19, 89:15, 105:7, 114:24, 118:19, 136:13, 136:14, 137:2, 137:3, 137:14, 138:7, 138:16, 138:22, 139:11, 141:6, 142:7, 162:22
revenues. 112:11
reverse 37:18
review 58:10, 139:15
revocable 38:15
revolve 139:9
rewarded 56:25
rewrite 141:9, 155:5
rightly 43:6
ripe 137:21
rise 14:8, 14:10, 25:20, 30:23, 39:24, 72:16, 105:23, 110:14, 115:22, 126:17
risk 26:18, 33:23
road 149:12, 159:22
Robert 3:25, 119:15, 119:17
role 51:2
room 17:19, 106:25,

134:21, 141:16
Rose 10:12, 145:13
rot 75:19
routine 88:21
rubber 149:12,
   159:22
ruled 13:19, 24:25,
   28:15, 52:5,
   61:14, 81:19,
   121:13
Rules 57:17, 114:3,
   124:17
Ruling 11:1, 23:1,
   39:14, 61:23,
   61:24, 83:12,
   118:17, 122:8,
   125:11, 155:16,
   161:7
rulings 27:5, 68:24,
   70:9, 108:13,
   119:8, 137:18


< S >
S. 48:6
S/ 167:13
safe 9:3, 68:12,
   165:24
safety 80:20,
   134:10, 165:23
sake 24:21
salary 16:24
San 5:1, 143:5,
   143:7, 143:21
sanctions 6:16
satisfied 25:7,
   46:14, 102:6
satisfies 77:7
satisfy 14:13, 32:2,
   49:14, 55:13,
   56:20, 57:24,
   138:7, 154:5
save 5:14
saying 19:16, 20:13,
   20:20, 20:25,
   21:4, 24:18, 60:9,
   60:12, 73:11,
   73:14, 74:19,
   86:5, 86:6, 92:24,
   94:19, 111:2,

112:18, 112:20,
   118:17, 146:9,
   147:9, 151:19,
   151:25, 152:8,
   154:8, 164:19,
   164:24
says 16:12, 40:14,
   46:13, 49:1,
   70:21, 72:6,
   78:23, 94:7, 98:7,
   100:13, 124:13,
   136:4, 140:12,
   143:17, 148:15,
   149:10, 150:8,
   150:21, 155:3,
   158:6
scalpel 135:16
schedule 80:11
scheduled 34:20,
   98:11, 98:14,
   98:19, 165:16,
   165:17
scope 19:14, 43:1,
   63:21, 78:10,
   83:5, 83:17,
   86:20, 93:5,
   128:15
Scotia 119:5
scratcher 93:17
scrutiny 60:25,
   140:3
se 49:16
sea 120:12
seconds 52:11, 131:6
Secretary 32:11
Sections 17:7, 18:4,
   18:9, 19:3, 43:12,
   49:2, 79:15, 92:7,
   92:13, 96:17,
   140:25, 142:4
secure 111:10,
   159:18
secured 14:5, 23:9,
   28:24, 29:11,
   31:13, 45:1, 50:4,
   58:24, 61:19,
   70:10, 70:12,
   71:2, 75:19,
   75:24, 76:13,
   137:4, 148:8,

150:3, 155:18
seek 29:2, 53:13,
   57:6, 57:12,
   57:21, 79:1,
   160:23
seeking 43:19,
   57:20, 63:24,
   66:6, 82:1, 83:8,
   89:8, 89:9, 89:13,
   89:21, 91:2,
   103:5, 106:5,
   165:3, 165:4,
   165:5
seeks 106:4
seem 35:22, 54:12,
   61:15, 131:22,
   132:17
seems 95:16, 114:3,
   132:4
seen 18:9
segment 7:2
segregated 64:12
seize 37:13
select 6:7
self-help 105:2
self-operative 44:14
Senate 105:4
senior 38:2
sense 14:17, 37:3,
   37:18, 70:8,
   135:17
sent 145:20
sentence 41:25,
   115:12
separate 22:20,
   58:14, 60:5, 80:4,
   88:10, 89:7, 101:9
separately 109:25
sequence 114:1
serious 29:8
Servais 82:11, 83:2
service 98:14,
   98:20, 123:22,
   125:5, 142:9
Services 3:33,
   17:19, 33:22,
   76:24, 77:1,
   82:24, 148:2,
   148:11
session 5:13, 8:11

set 7:18, 54:15,
  76:5, 80:14,
  80:25, 82:11,
  82:13, 84:5, 84:7,
  97:25, 108:12,
  118:23, 124:23,
  131:12, 131:20,
  140:24
sets 54:9
settled 136:15
settlement 99:5
Seven 11:14, 16:21,
  16:25, 17:4,
  52:10, 87:22,
  88:3, 94:1, 142:4
several 17:13, 56:3,
  150:4
Shall 32:13, 40:11,
  40:21, 45:17,
  106:15, 110:5,
  110:6, 110:8,
  110:23, 135:12,
  136:4, 142:14,
  145:10, 149:15,
  149:16, 150:8,
  152:9
shape 164:4
share 134:11
shared 101:4
shed 62:3
sheer 65:4
short 15:4, 40:23,
  42:12
shortly 67:20,
  138:24
shouldn't 47:22,
  57:11
show 12:8, 12:12,
  13:1, 45:8, 47:10,
  47:16, 53:11,
  63:14, 64:23,
  66:8, 96:18,
  119:7, 123:24,
  129:12, 129:18,
  141:25, 142:22
showing 28:4, 40:19,
  129:23, 131:10
shown 82:5
shows 30:17, 37:20,
  38:8, 48:6, 74:5,

76:22, 118:22,
  120:9, 154:24
shut 79:3
signatories 82:24
signature 132:17
significantly 83:17,
  140:23
silently 96:25
similar 61:14,
  68:16, 112:10,
  117:11, 161:3,
  162:20
Similarly 58:16,
  110:21, 162:21
simple 41:6, 47:22,
  53:23, 62:1,
  125:17
simplifies 89:17
simply 11:5, 13:21,
  14:17, 15:9, 38:1,
  39:13, 40:13,
  55:14, 55:16,
  65:16, 66:6,
  95:13, 101:10,
  101:23, 103:8,
  106:10, 115:13,
  117:20, 124:5,
  127:6, 136:20,
  149:21, 153:15,
  154:2, 162:18,
  164:3
simultaneous 81:13
sincere 165:21
single 64:21, 77:16,
  112:19, 118:23,
  142:18
Sinking 82:20,
  85:23, 145:19,
  146:3
sinning 32:2
site 13:20
sitting 57:9, 80:13
situation 10:10,
  72:22, 117:16,
  153:4
six 160:8
Sixth 14:23, 16:20,
  87:25, 88:7
size 70:9, 71:1
skipping 40:7

slate 96:4
small 22:8, 131:6
smoke 118:16
so-called 31:17,
  135:5
so. 43:6
solely 47:16, 110:11
solidify 90:20
Solutions 6:8, 7:4,
  7:5, 8:8
somehow 27:4, 56:16,
  86:9, 151:22,
  161:11, 162:8
someone 38:1, 143:19
sometime 134:10
somewhat 82:4, 89:6,
  97:1
somewhere 75:8
soon 134:10
Sorry 8:18, 9:12,
  27:23, 48:3,
  51:18, 54:6, 54:8,
  67:9, 94:12,
  98:19, 103:12,
  143:11, 157:12
sort 96:12, 112:21,
  132:15, 163:22
sought 53:5, 56:18,
  57:15, 57:21,
  82:13, 83:3, 140:7
Sound 7:23, 7:24,
  23:25, 49:24,
  65:5, 67:8,
  117:14, 118:25,
  129:22, 131:15,
  163:7, 164:20
source 54:25, 99:19,
  137:12, 137:14
sources 13:24, 18:3,
  55:1
sovereign 36:19,
  36:23, 36:25,
  37:4, 37:7, 37:14,
  37:16, 84:14
spared 53:18
speaker 6:17, 7:7,
  7:18, 7:19, 7:21,
  8:15
speakers 149:23,
  150:12

speaking 5:6, 6:6,
  68:8, 143:14
special 13:7, 85:23,
  110:3, 110:5,
  110:9, 110:24,
  111:4, 121:19,
  138:19
specific 34:21,
  49:10, 50:24,
  56:3, 57:11,
  57:20, 63:1,
  65:22, 71:24,
  75:1, 78:17,
  81:22, 102:12,
  102:17, 106:5,
  121:19, 122:14,
  126:8, 135:13,
  138:19, 139:7,
  139:10, 160:22,
  163:23
specifically 16:1,
  16:6, 48:25, 49:3,
  61:23, 70:2,
  72:18, 73:4,
  78:19, 85:19,
  96:22, 128:8,
  140:13, 140:18,
  149:18, 153:23
specificity 82:13
specifics 88:25
specified 8:3
speculate 132:24
speculation 65:4,
  109:7, 161:4
speculative 81:22,
  82:4
spend 79:23, 90:14,
  136:21, 150:22,
  150:24, 153:8
spending 44:16,
  44:17, 44:21
spent 97:24, 100:19
spilled 52:21
spite 126:21
spreadsheet 74:9
squeeze 118:13
staff 42:14, 68:11,
  165:21
stage 79:11, 79:21,
  121:22

stand 92:17, 100:1,
  109:11, 134:19,
  153:22, 154:18,
  161:20, 163:1
standard 55:12,
  56:20, 57:24,
  82:14, 161:7
standing 124:16
stands 162:17
start 15:12, 96:4,
  127:24, 133:11,
  134:14, 138:5,
  145:6, 145:10,
  153:3
Starting 11:13,
  18:6, 48:3,
  101:24, 134:2
State 7:1, 14:4,
  25:11, 25:25,
  29:19, 34:3,
  39:25, 45:8,
  45:17, 51:24,
  71:20, 72:3, 84:2,
  84:3, 91:6, 102:2,
  102:7, 109:23,
  120:19, 121:15,
  126:7, 135:13,
  136:16, 136:20,
  149:21
Stated 88:1, 97:6,
  107:5, 144:15
statement 58:14,
  83:24, 108:24,
  109:2, 109:12,
  112:24, 116:18,
  137:9, 148:20,
  149:1, 154:23
statements 64:25,
  82:10, 117:20,
  125:2
States 1:1, 3:5,
  3:7, 5:12, 5:15,
  16:7, 16:14,
  16:16, 18:6,
  37:19, 48:6, 90:1,
  135:11, 149:14,
  162:17, 167:7,
  167:8
stating 117:1
Statues 130:6

status 28:24, 36:13,
  58:24
statutorily 105:15,
  107:8, 113:12,
  115:5
statutory 13:19,
  13:25, 14:3,
  14:15, 15:6,
  16:10, 16:13,
  21:14, 24:7,
  28:20, 38:9, 62:5,
  63:5, 63:6, 66:3,
  72:5, 72:12,
  72:15, 72:20,
  73:25, 79:14,
  87:22, 88:3,
  101:11, 102:11,
  126:4, 127:2,
  130:4, 162:19
stayed 17:16
staying 68:12
stays 43:8
steamroller 135:15
Steel 24:24
stem 28:15
stenography 3:43
step 26:3
steps 90:16
stop 34:12, 105:8,
  141:9
stopped 31:5, 35:10,
  125:6
straight 162:7
straw 154:12
stretches 135:20
strike 29:21, 43:19,
  97:4
striking 29:21
strip 90:4
stripping 97:11
strips 114:12
strong 42:25
struck 135:8
structural 46:14
structure 46:5,
  46:6, 46:7
styled 28:16
subaccount 78:18,
  82:21
subject 11:8, 22:9,

26:22, 38:5, 50:2,
60:25, 84:16,
100:7, 105:13,
106:19, 107:23,
107:24, 108:8,
108:9, 109:5,
138:10, 138:23,
139:14, 148:4
subjects 55:8, 55:10
submission 57:23
submission. 14:11
submissions 56:4
submit 30:2, 59:7,
61:17
submits 29:14
submitted 55:22,
60:5, 82:8
submitting 80:24
subset 22:23
subsisting 151:22
substance 56:6, 83:4
substantial 33:25,
56:1, 102:25,
124:12, 124:18,
124:21, 124:22,
124:23, 125:7,
125:14, 125:21,
127:19, 127:21
substantive 32:13,
52:19
substitute 78:6,
83:4
substitution 85:3
suddenly 148:5
sue 17:18
Suffice 57:21,
148:17, 149:7,
160:24, 161:6
sufficient 27:12,
59:18, 109:20,
115:22, 142:19,
160:16
suggest 54:22,
61:15, 102:24,
103:21, 162:10
suggested 98:9,
131:13, 161:11
suggesting 101:22,
104:4
suggestion 42:19,

96:10, 110:18
suggests 47:25,
95:7, 99:14
suing 24:17, 44:18
suite 104:24
super 149:19
Supp 26:25
Supplemental 54:14,
132:4, 132:21,
133:4
supplements 132:10,
132:14
support 48:22,
67:15, 67:16,
107:11, 108:2,
108:22, 113:10,
161:6
supported 24:23,
113:11
Supporting 8:5,
51:1, 51:2, 89:10
supports 74:25
suppose 73:12,
149:13
supposedly 58:6
Supreme 13:19, 14:3,
14:12, 24:23,
24:25, 25:6,
32:18, 49:6, 88:2,
94:15, 102:16,
127:11, 137:6,
162:17
Sur-replies 10:19,
10:21, 21:7, 23:24
Sur-reply 11:13,
11:14, 29:25,
36:24, 73:1,
87:21, 122:19
surely 157:6
surprisingly 112:19
surrounding 69:19
survive 50:2
survives 74:23
suspenders 153:19
Swain 3:4, 5:5,
5:14, 8:18, 67:23,
133:21, 167:7
sweep 134:17
System 14:23, 16:23,
87:21

< T >
tackling 165:13
TACORONTE 5:8, 5:21,
143:18, 143:21
tactic 56:25, 105:2
Taft 68:8
tagged 78:17
taken. 67:21, 133:19
Takings 45:6
talked 82:17, 85:1,
85:9, 85:11
talks 34:16, 101:13
tall 53:16
tangentially 11:11
tantamount 78:4
tardes 133:21
taxation 102:4
Taylor 3:4, 5:14,
167:7
teasing 89:18
teeny 106:1
teleconference
143:6, 143:8
telephonic 6:4
TELEPHONICALLY 3:11,
165:19
tells 32:10
Tempnology 127:12
ten 9:2, 33:12,
52:11, 158:6,
158:7, 158:9
Tenth 17:13
term 77:5, 85:4,
98:11, 117:8,
128:14
terminate 43:10
terms 8:24, 20:12,
23:12, 30:17,
43:5, 47:6, 52:22,
52:25, 84:24,
87:17, 159:15,
162:13
terribly 157:12
territorial 28:25,
39:7, 39:13, 40:8,
40:10, 40:16,
40:18, 40:20,
40:24, 45:9,

45:10, 45:11,
47:1, 47:8, 48:15,
51:24, 71:20,
90:1, 94:17,
113:17, 113:19,
113:23, 128:11,
154:4, 155:4
territories 16:7,
16:14, 47:17
territory 26:1,
29:19, 135:13,
136:7
test 13:10, 66:19,
74:18, 77:23,
140:23
text 42:14, 42:16,
42:25, 109:3,
121:17, 127:2,
157:3, 157:5,
157:8
Thanks 39:3, 159:6,
165:21
themselves 36:25,
72:15, 72:24,
95:23
theoretical 102:13,
115:2
theories 28:20,
34:1, 75:24, 89:9,
92:8, 101:17
theorizes 91:5
theory 22:20, 22:21,
71:11, 76:13,
77:11, 89:22,
91:20, 93:4, 93:6,
96:6, 99:2, 103:7
thereby 25:3
thereof 99:5, 104:16
thereto 111:25
They've 49:12,
53:11, 112:3,
148:7, 148:8,
148:9, 161:25
thinking 21:11,
95:20, 97:6, 151:8
thinks 11:4
Third 42:5, 139:6,
146:1
thorough 131:1
thoroughly 26:25

though 30:24, 43:23,
68:23, 92:2,
93:25, 111:7,
148:5
three 13:17, 15:8,
41:12, 87:20,
87:25, 107:22,
134:25, 138:20,
142:9
three-quarter 160:8
threshold 127:24
thresholds 142:17
throughout 115:8,
128:1
throwing 62:1,
163:24
tick 160:14
time-barred 84:6,
84:8
timeliness 56:17,
56:21
timely 26:10, 81:3,
125:5, 149:16
timing 8:10, 80:14,
151:5, 157:18
tiny 106:1
tired 98:25
Titles 47:19, 57:19
Today 5:24, 6:4,
8:10, 21:16, 27:9,
49:6, 49:12, 51:1,
89:19, 127:5,
127:15, 134:18,
137:19, 137:21,
165:16, 165:23
together 88:24,
89:2, 100:1,
134:10
token 141:5
ton 141:16
took 109:10, 150:12,
161:9, 164:18
tool 90:19
total 20:25, 79:24
totally 19:3, 20:20,
152:9
touch 122:14
Tourism 65:13,
112:2, 112:3,
112:8, 112:10,

112:21, 112:23,
113:1, 113:4,
116:7, 116:12,
116:16, 164:18,
165:4
Towards 68:20
track 7:19, 7:20
transaction 78:18
transactions 161:2
Transcript 3:43,
7:11, 80:18, 167:4
transcription 167:5
transfer-like 106:23
transferee 40:11,
40:21, 106:15,
115:18
transferred 39:8,
39:15, 40:17,
41:10, 42:19,
75:18, 76:2,
105:16, 106:21,
107:2, 111:2,
111:12, 111:15,
113:23, 118:1,
130:12, 154:4,
163:3, 163:4
transferring 30:25,
39:23, 146:13,
153:25
transfers 21:5,
30:13, 41:19,
41:21, 42:1,
47:18, 64:18,
64:23, 65:2, 96:7,
107:17, 109:14,
115:4, 115:21,
116:10, 116:16,
116:20, 118:3,
129:8, 129:10,
150:8
transformation 140:8
transformed 86:9
Treasury 32:11,
74:9, 110:2,
110:23, 138:9
treat 46:25
treated 14:3, 33:5,
56:8, 159:11
treatment 90:6,
90:23, 99:11

treats 48:15
triable 52:23,
    52:25, 63:23, 82:6
trial 145:18, 148:4
tries 136:15, 139:13
trigger 59:9
triggered 60:15,
    135:5
triggering 19:12,
    65:24
TRINIDAD 3:36,
    137:25, 138:4,
    144:9, 144:12
Trucking 161:15
true 66:21, 74:16,
    80:11, 98:4,
    122:9, 125:11,
    163:20, 167:5
truly 53:14
Trust 24:2, 54:11,
    54:20, 55:3,
    57:14, 62:6, 63:6,
    69:20, 102:8,
    110:11, 110:14,
    110:18, 132:3,
    132:18, 132:20,
    163:6, 163:10,
    163:11, 163:16
Trustee 35:15,
    35:19, 35:20,
    35:24, 36:7, 36:9,
    36:12, 36:19,
    68:18, 85:3, 85:5,
    85:8, 133:9,
    148:15, 148:16,
    148:18, 148:19,
    163:12
trustee. 85:4
truth 53:23
try 55:9, 158:11
trying 20:11, 90:16,
    97:4, 101:15,
    112:23, 118:16,
    132:16, 154:14,
    156:18
turn 8:13, 52:12,
    69:10, 104:21,
    121:4, 141:2,
    141:24
Turning 107:19

twice 114:13
two 7:21, 7:22,
    7:25, 8:1, 10:24,
    12:20, 31:19,
    32:22, 47:11,
    50:25, 51:6,
    59:16, 67:6, 69:5,
    92:19, 99:25,
    100:6, 105:12,
    105:19, 105:20,
    107:19, 107:21,
    132:21, 138:18,
    139:13, 141:16,
    142:8, 146:23
two-minute 129:25
type 34:8, 56:12,
    80:5, 81:13,
    162:11, 162:12
typewriter 132:19


< U >
UCC 36:6, 36:15,
    50:12, 50:16,
    86:3, 86:7, 144:23
ultimate 14:1
ultimately 13:13,
    14:18, 28:17,
    42:15, 42:24,
    64:1, 141:13
unable 88:3
unanswered 78:21
unasserted 79:6
unauthorized 146:1
unconstitutional
    37:21, 137:20
unconstitutionally
    29:20
unconventionally
    89:6
underlying 71:7,
    83:14, 127:10,
    139:16
underneath 130:2
understand 11:17,
    12:1, 20:11, 28:5,
    33:9, 34:17, 51:1,
    78:20, 94:18,
    152:16
understandable 29:19

understanding 108:12
understood 24:2,
    80:19, 107:16
undisputed 54:2,
    54:4, 54:9, 66:2,
    66:13, 67:3
undo 101:14, 152:24
unexpected 25:1
unfettered 90:20,
    141:12
Uniform 12:15,
    35:16, 36:5,
    36:14, 37:23,
    148:17
unilaterally 91:11
unimpair 29:22
unimpairment 23:15
unimportant 83:7
United 1:1, 3:5,
    3:7, 5:12, 5:14,
    16:16, 18:6,
    37:19, 48:6,
    162:17, 167:6,
    167:8
units 17:10
unknown 81:24
unlawful 39:18,
    39:19, 39:21,
    42:17, 47:7,
    47:11, 47:14,
    89:14
Unless 45:5, 50:8,
    62:17, 88:11,
    104:20, 126:8,
    130:24, 148:24
unlike 17:5, 72:22
unmute 6:9, 7:3,
    8:8, 10:1, 10:4
unnecessary 15:13,
    27:15, 65:17
unperfected 36:16,
    37:22, 37:24, 38:2
unreasonable 27:15
unrestricted 117:2,
    117:21
unreviewable 90:21
Unsecured 3:19,
    21:9, 21:22, 22:3,
    22:11, 23:12,
    23:13, 23:15,

24:3, 29:12,
31:19, 35:6, 36:3,
38:11, 52:4,
105:23, 106:19,
147:15, 147:24,
148:8, 150:5,
150:7, 150:10,
153:24, 155:11,
155:15, 159:19
Unsurprisingly 16:13
untagged 117:21
until 17:22, 18:14,
28:25, 30:6,
30:10, 30:15,
43:18, 96:8,
102:5, 111:21,
141:9, 151:20,
153:3
untimely 80:1
unusual 68:12
unwind 101:14
updated 132:12,
132:18
upended 124:16
urge 137:21
urged 153:23
uses 35:19, 78:1,
82:25
using 38:3, 42:2,
115:13, 128:10
usual 7:12
utilize 10:23
utilized 56:12


< V >
v. 1:33, 2:15, 2:35,
13:18, 13:25,
24:24, 26:24,
37:19, 48:5
Valdes 134:5, 138:1
valid 16:14, 39:9,
71:20, 80:8,
92:21, 107:23,
108:8, 108:20,
122:4, 122:6,
122:12, 122:19,
123:14, 124:7,
142:24
validity 28:25,

71:7, 78:11,
141:16, 154:19
validly 104:12
valuable 125:12
value 25:15, 33:7,
33:13, 40:11,
40:21, 97:12,
98:12, 106:16,
106:17, 106:20,
106:24, 150:3,
162:13, 165:4,
165:6
values 123:11
valve 80:20
variation 23:4
various 11:18,
12:23, 13:13,
28:18, 46:6,
74:12, 79:3,
81:21, 89:10,
103:3, 118:1
vast 64:11
Vazquez 136:20
Vazquez-garced
97:16, 139:1
Vegas 159:17
vehicles 28:17
version 35:16,
42:15, 132:12,
132:20
versions 132:5
versus 87:22,
101:25, 127:12,
161:16
VI 47:19, 47:21,
47:22, 48:1,
65:20, 77:11,
77:15, 77:25,
97:8, 138:22,
142:4, 142:12,
152:13, 152:17,
152:22, 152:25
view 8:23, 10:22,
60:22, 69:22,
75:3, 75:5,
106:10, 150:14,
151:16
views 52:24, 100:7,
100:8, 100:13
violate 76:15,

91:21, 108:3,
124:11, 126:12,
130:4, 130:9
violated 29:13,
57:1, 118:11
violates 129:16
violation 25:25,
39:8, 40:6, 40:8,
40:17, 40:18,
47:2, 77:25,
107:22, 107:25,
113:17, 114:10,
114:19, 114:22,
115:15, 118:6,
125:16, 129:6,
130:17
Violations 6:15,
29:6, 29:15,
104:16, 126:15
virtual 118:12
vis-a-vis 153:4
voice 9:13
voices 143:11
void 76:18
voidable 36:2, 36:10
voluntary 47:21,
124:8
Von 101:25, 102:16,
102:21, 147:4,
153:20


< W >
wait 156:23
waived 141:22
waives 36:22, 36:25
waiving 144:23
walk 109:25, 116:4,
138:12
walked 92:23
Walker 167:13,
167:14
wall 163:24
wanted 10:8, 14:20,
17:17, 23:18,
52:3, 87:19,
161:21
wanting 162:13
wants 44:15, 114:15,
136:25, 148:3

warning 129:25
warranted 31:20
wave 7:4
weapon 141:2
weeks 83:18
weight 42:6, 93:1,
   131:13
Weil 119:17
weird 133:1
Welcome 5:22, 30:23,
   157:14
well-articulated
   165:12
well-founded 57:8
Westernbank 161:16
Whatever 10:3, 22:9,
   26:10, 26:20,
   35:2, 38:19, 48:9,
   74:20, 74:22,
   75:13, 83:19,
   90:5, 91:14,
   146:10
whereby 25:12
Whereupon 143:5,
   144:4
Whoever 157:8
whole 20:16, 25:10,
   132:15, 159:8
wholecloth 134:22
wholeheartedly 49:22
wholly 69:9, 82:10
Wickersham 68:8
William 3:30, 8:19,
   68:7
winners 91:6
wipe 22:24
Wipes 20:9
wiping 96:3
wish 6:25, 9:12,
   10:8, 133:1,
   134:9, 165:23
wishes 7:7, 134:12
withdrawal 117:1
withdrawn 102:5
withheld 74:10,
   115:16, 120:7
withhold 75:13
withholding 115:21
within 9:4, 29:10,
   43:1, 54:5, 60:1,

83:5, 95:3, 98:20,
   147:1
Without 18:22,
   23:24, 25:16,
   25:23, 25:25,
   32:22, 32:23,
   45:20, 60:13,
   61:1, 62:9, 75:17,
   81:9, 88:1, 96:7,
   100:16, 101:23,
   124:11, 137:5,
   137:8, 137:15,
   148:23
withstand 55:5
witness 82:9, 83:16
WITNESSES 4:3
wonderful 152:12
word 14:13, 25:7,
   29:11, 34:24,
   35:19, 112:19,
   114:12, 115:8,
   115:10, 115:13,
   117:6, 132:19,
   137:14, 155:8
words 39:6, 39:17,
   40:1, 40:7, 42:3,
   42:7, 42:23,
   47:10, 47:12,
   79:16, 143:12
work 96:4, 124:2,
   152:16, 152:25
world 55:3, 91:16,
   101:17
worse 75:7
worth 33:11, 33:14,
   33:15
wrapping 116:3
writ 73:4
wrongful 40:24,
   41:1, 41:6


< Y >
year 41:10, 66:19,
   77:16, 77:19,
   93:24, 95:3, 96:8,
   97:25, 122:4,
   122:5, 122:14,
   123:24, 138:11,
   142:7, 142:8,

151:22, 153:3,
   159:9, 162:16
years 18:24, 20:15,
   78:4, 91:14, 93:7,
   101:13, 101:15,
   101:24, 125:6
yesterday 6:19
yield 61:9, 62:15,
   137:22, 160:10,
   164:9, 165:9
York 126:5, 165:22
yourself 6:24


< Z >
zero 30:4
ZOUAIRABANI 3:36,
   134:5, 134:7,
   135:2, 136:12,
   136:24, 137:22,
   137:25, 138:1,
   138:4, 144:2,
   144:7, 144:9,
   144:10, 144:12
Zwillinger 50:17