**Objection Deadline:  4:00 pm (AST), October 13, 2020**
**Hearing Date:  October 28, 2020**

## UNITED STATES DISTRICT COURT
## DISTRICT OF PUERTO RICO

| | | |
|---|---|---|
| ----------------------------------------------- | X | |
| In re: | : | PROMESA |
| | : | |
| | : | Title III |
| THE FINANCIAL OVERSIGHT | : | |
| AND MANAGEMENT BOARD FOR | : | No. 17 BK 3283-LTS |
| PUERTO RICO, | : | (Jointly Administered) |
|     as representative of | : | |
| THE COMMONWEALTH OF | : | |
| PUERTO RICO, *et al.,* | : | |
| | : | |
|     Debtors. | : | |
| ----------------------------------------------- | X | |

## MOTION OF NATIONAL PUBLIC FINANCE GUARANTEE CORPORATION FOR ENTRY OF AN ORDER DIRECTING AN INDEPENDENT INVESTIGATION

## <u>TABLE OF CONTENTS</u>

Page

PRELIMINARY STATEMENT ........................................................................................ 1

JURISDICTION ............................................................................................................... 5

BACKGROUND .............................................................................................................. 5

I.      THE PLAN SUPPORT AGREEMENTS AND CONFIDENTIAL MEDIATION ............ 5

II.     THE REQUEST FOR ADDITIONAL RULE 2019 DISCLOSURES AND  THE
        COURT'S ORDER REQUIRING ADDITIONAL DISCLOSURES .............................. 11

III.    THE SUPPLEMENTAL RULE 2019 DISCLOSURES DEMONSTRATE THE
        NEED FOR AN INDEPENDENT INVESTIGATION INTO THE TRADING OF
        CERTAIN MEMBERS OF THE HEDGE FUND GROUPS ........................................ 15

IV.     ADDITIONAL CONCERNS RAISED ABOUT CERTAIN MEMBERS OF THE
        HEDGE FUND GROUPS' TRADING ACTIVITIES ................................................... 19

V.      FOMB'S CURRENT NEGOTIATIONS FOR REVISED PSA ...................................... 20

RELIEF REQUESTED ..................................................................................................... 21

BASIS FOR RELIEF REQUESTED .................................................................................. 22

        A.      The Court Has the Authority to and Should Order an Investigation to
                Ensure its Mediation Order and Supplemental Confidentiality Order are
                Enforced .......................................................................................................... 23

                i.      Section 105 Authorizes the Court to Direct an Investigation ................... 24

        B.      Courts Have Ordered Independent Investigations Concerning Similar
                Trading Activity Allegations ............................................................................. 27

        C.      The Court May Direct One of Several Different Entities to Conduct the
                Investigation .................................................................................................... 29

NOTICE .......................................................................................................................... 31

NO PRIOR REQUEST FOR RELIEF ............................................................................... 31

CONCLUSION ................................................................................................................ 31

i

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Bernard v. Galen Group, Inc.*,
  901 F. Supp. 778 (S.D.N.Y. 1995) ..........................................................24

*Official Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics
  Corp. v. Chinery*,
  330 F.3d 548 (3d Cir. 2003)...............................................................25

*In re FiberMark*
  (Case No. 04-10463 Bankr. D. Vt. 2004) .........................................27, 28

*In re Neiman Marcus Group*
  (Case No. 20-32519 Bankr. S.D. Tx. 2020)...........................................30

*In re River Ctr. Holdings, LLC*,
  394 B.R. 704 (Bankr. S.D.N.Y. 2008)..................................................24

*In re Washington Mut., Inc.*,
  2012 WL 1563880 (Bankr. D. Del. Feb. 24, 2012) ........................27, 28

*In re Washington Mut., Inc.*,
  461 B.R. 200 (Bankr. D. Del. 2011), *vacated in part*, 2012 WL 1563880
  (Bankr. D. Del. Feb. 24, 2012) ............................................................28

**Statutes**

11 U.S.C. § 105(a) .................................................................... *passim*

48 U.S.C. § 20.............................................................................5

48 U.S.C. § 2167..........................................................................5

28 U.S.C.A. § 651 *et. seq*................................................... 5, 22, 23-24

**Other Authorities**

L.Cv.R. 83J (D.P.R. 2018)..........................................................5, 21, 22, 24

To the Honorable United States District Judge Laura Taylor Swain:

Creditor National Public Finance Guarantee Corporation ("National") files this motion (the "Motion") for an order, of which a proposed form is attached hereto as <u>Exhibit A</u> (the "Proposed Order"), directing an independent investigation into whether the Court's orders have been violated by trading in the Debtors' securities, including trading in GO Bonds and PBA Bonds during the Title III mediation process in 2019 and 2020.[1]  In support thereof, National respectfully states as follows:

<u>**PRELIMINARY STATEMENT**</u>

1.     This Motion is necessitated by evidence -- derived from the Court-ordered Supplemental 2019 Disclosures -- that the Court's confidentiality orders may have been violated and that, while participating in the Court-ordered Mediation, certain hedge fund creditors may have engaged in improper trading in the Debtors' debt securities, realizing significant profits and improperly positioning themselves to negotiate based on illegitimate incentives and motives.  Such conduct would have materially undermined and negatively impacted the Mediation that resulted in the New PSA, and, according to the recent announcement from the FOMB and the signatories to the New PSA with whom the FOMB continues to negotiate, may likely yield a structurally similar agreement.  An investigation of the conduct of those hedge funds whose recent disclosures suggest potential improper trading activity, discussed in detail below, would be in accord with the Court's September 11, 2019 order, in which the Court stated that it would "not hesitate to take appropriate action" and "evaluate whether to impose sanctions as may be appropriate" for violations of its confidentiality orders.[2]

---

[1]     Capitalized terms shall have the meanings defined below.

[2]     Dkt. No. 8686, at 2.

2.     Further, these issues should be addressed now, and not delayed until confirmation. By doing so, significant adverse consequences to this Title III case may be avoided. Delay could result in contentious litigation and motion practice centering on the trading conduct, and threaten the overall restructuring efforts at the crucial confirmation stage in one of the most watched reorganization proceedings in history. Moreover, any such impropriety, or even the appearance of impropriety, would cast a pall on any resulting restructuring, and impair the ability of the Commonwealth to re-enter the capital markets and realize the benefits intended by Congress in passing PROMESA. Accordingly, National respectfully requests that the Court direct an independent investigation (the "Investigation") to assess whether certain hedge funds adhered to its orders, and whether and the extent to which improper trading occurred and the agreement reached during the Mediation was entered into in bad faith.

3.     As disclosed in the FOMB's September 30, 2020 announcement, the negotiations between the FOMB and the parties to the New PSA are at a stage that warrants the Investigation to occur now. While the parties have exchanged proposals and counter-proposals for a revised plan support agreement, it is clear that an agreement has not been reached yet, and in any case may not be disclosed until the end of October. Coupled with the upcoming gubernatorial election and developments regarding the constituency of the FOMB, a confirmation schedule for any resulting plan of adjustment would thus be months away at best.[3] As a result, there is ample time for the Investigation by an independent party, under the Court's direction, to address the trading issues for the benefit of all parties in interest, including the Commonwealth.

4.     This Motion is based on the Supplemental 2019 Disclosures that the Court ordered the members of the Hedge Fund Groups (among others) to submit in early July, in response to

---

[3]     Dkt. No. 14195, at ¶ 9; Exhibit E.

concerns raised by the UCC and certain other creditors regarding inadequate disclosure regarding those creditors' holdings. The Court ordered those disclosures so that "the Court and parties following the cases are apprised of the economic interests underlying [those parties'] . . . litigation and plan confirmation-related positions."[4]

5.     The troubling implications of many of those disclosures -- which are the basis for, and are presented for the first time to the Court, on this Motion -- would undermine the foundation of any restructuring plan based in whole or in part on the Mediation. Trading activity by some of the members within the Hedge Fund Groups, and the changes in the groups' collective holdings, raise significant concerns as to the legitimacy of the economic interests purportedly represented in the Mediation, and the seeming improper use of information obtained in and concerning the negotiations during the Mediation in violation of the Court's orders concerning confidentiality. These potential improprieties go to the heart of the very concerns motivating the Court to order the Supplemental 2019 Disclosures in the first place -- namely, the hedge funds' economic interests, actions, and motives, and the integrity of any agreements or plans resulting from the Mediation. Any restructuring plan resulting from any agreement reached during such a potentially tainted process would not only be unfair, but would not be confirmable because it would preclude findings necessary for confirmation, including the finding of good faith.

6.     The Investigation would likely begin with the following facts. Prior to the Mediation, the FOMB and certain hedge funds challenged as unconstitutional, and therefore effectively worthless, certain Late Vintage GO Bonds. Accordingly, an earlier agreement, the Initial PSA, had provided holders of those Late Vintage GO Bonds with only a relatively minimal recovery. At the end of the Mediation, some six months later, the New PSA awarded holders of

---

[4]     Dkt. No. 13217, at 12.

those Late Vintage GO Bonds a much higher recovery, nearly double their original recovery and almost on par with holders of the Early Vintage GO Bonds. The Supplemental 2019 Disclosures suggest that while they were confidentially negotiating the New PSA and a restructuring plan for the Commonwealth with the FOMB, a number of hedge funds -- including some within the group that had challenged the validity of those bonds -- traded significant quantities of those Late Vintage GO Bonds, the treatment of which was the very subject of the negotiations in the Mediation.[5]

7.      If the New PSA, or a modified version of the New PSA -- as contemplated by the recent disclosure by the FOMB -- remains the agreement proffered as the basis for confirmation, then the trading activity of at least some of its proponents would be the basis for significant objections and motion practice during the confirmation stage. The Investigation National respectfully requests would allow the Court to get to the bottom of these issues and set a path forward for an efficient, transparent and durable restructuring. If the Investigation concludes that the subject trading was legitimate and did not violate the Court's orders, then much of that motion practice may not be necessary. If the Investigation does not so conclude, however, then the FOMB (and others) would, without the need for further court involvement, understand that a new, untainted agreement is necessary.

8.      The parties to the New PSA were predominately hedge funds that, according to the FOMB, represent 58% of aggregate GO and PBA bondholders -- meaning nearly half of the holders of GO Bonds and PBA Bonds did not sign the New PSA. If any of the New PSA parties used confidential information and/or adjusted their individual holdings to obtain a windfall and entice creditors to support the New PSA, then the Commonwealth, National and other non-parties will have been harmed. All such parties -- who include a substantial portion of the creditor classes, and

---

[5]      *See* Dkt. Nos. 13548, 13552, 13553, 13554.

smaller on-island investors who do not have the wherewithal to challenge the conduct of sophisticated hedge funds -- rely on the Court to protect the integrity of the Mediation it ordered and any potential plan of adjustment for the Commonwealth based thereon, to ensure a fair and proper process for the Debtors and its creditors.

9.     National therefore respectfully requests that the Court exercise its authority, including its inherent authority, to ensure compliance with the Mediation Order and the Supplemental Confidentiality Order -- as it stated it would do in the Supplemental Confidentiality Order -- to order the Investigation.  Such an investigation could be conducted by the United States Trustee or another independent entity.  The investigative body need not be given the responsibility to pursue any claims that may be revealed but rather to issue a written report of findings after its independent Investigation.  Thereafter, the Court, if it so chooses, can determine what action to take to remedy or address any violations that were determined to have occurred that would serve the purpose of enforcing the Court's Mediation Order and protecting the integrity of these proceedings and any future negotiated restructuring.

## JURISDICTION

10.     This Court has jurisdiction to grant the relief requested in this Motion pursuant to section 306 of PROMESA, 48 U.S.C. § 20; Section 105(a) of the United States Bankruptcy Code, 11 U.S.C. § 105(a); the Alternative Dispute Resolution Act of 1998, 28 U.S.C.A. § 651 *et. seq*; and L.Cv.R. 83J (D.P.R. 2018).  Venue is proper under section 307 of PROMESA.  48 U.S.C. § 2167.

## BACKGROUND

### I.     THE PLAN SUPPORT AGREEMENTS AND CONFIDENTIAL MEDIATION

11.     On June 23, 2017, in order to facilitate the resolution of the disputes among the parties, and attempt to achieve a negotiated plan of reorganization in these Title III cases, the Court entered an order, pursuant to its authority under 11 U.S.C. § 105(a), directing mediation (the

5

"Mediation Order"), appointing a mediation team (the "Mediation Team"), and designating the Honorable Barbara J. Houser as the leader of the Mediation Team (the "Mediator").  (Dkt. No. 430.)  The Mediation Order tasked the Mediation Team with "facilitat[ing] confidential settlement negotiations of any and all issues and proceedings arising in the Title III cases and proceedings" and "identify[ing] the issues to be addressed and the sequence in which those issues will be addressed after consulting with all interested parties and after considering confidential mediation statements[.]"  (*Id.*, at 2, 3.)  The Mediation Order also provided that "mediation sessions will be held as necessary, and both the participants and the mediators will be bound by confidentiality" and that the "mediation process will remain confidential and separate from, and will proceed concurrently with, the adjudication of issues and proceedings in the Title III cases and proceedings."  (*Id.*, at 3.)

12.     National is a monoline insurer that was a long-time provider of financial guarantees to a number of the Debtors' debt securities, including insuring scheduled payments of principal and interest on about $3.6 billion of bonds issued or guaranteed by the Commonwealth and other Debtors.  In that capacity, National has taken part in past mediations concerning other aspects of the related Title III cases, and always understood that those mediations and the information exchanged therein were confidential.   Indeed, National was in a unique position in those mediations because -- unlike many other creditors who trade in distressed debt and purchased that debt at a discount looking to make short-term profits -- National is a long-term partner of the Commonwealth that insured bonds at par.

13.     On January 14, 2019, the Financial Oversight and Management Board (the "FOMB") challenged the constitutionality of certain general obligation bonds issued by the

Commonwealth ("GO Bonds") between 2012 and 2014 (the "Late Vintage GO Bonds"),[6] alleging

that they exceeded the debt limit in the Commonwealth's Constitution.  (*See* Dkt. No. 4784.)  In

April 2019, the Lawful Constitutional Debt Coalition ("LCDC") -- a coalition of hedge funds that

represented that they owned GO Bonds issued before 2012 that were not being challenged as

unconstitutional (the "Early Vintage GO Bonds")[7] -- joined in challenging the constitutionality of

the Late Vintage GO Bonds.  (*See* Dkt. Nos. 6179, 6180.)

14.     On May 31, 2019, the FOMB entered into a plan support agreement (the "Initial

PSA") with certain holders of GO Bonds and Puerto Rico Building Authority bonds ("PBA

Bonds"), including all members of the LCDC, and a group of three hedge funds calling itself the

QTCB Noteholder Group.[8]  The signatories to the Initial PSA represented only about 15% of the

total claims of all creditors.[9]  (Dkt. No. 8766-2, at Exhibit B1; *see also* Dkt. No. 7892, at ¶ 3.)

Generally speaking, the parties to the Initial PSA did not hold material amounts of Late Vintage

GO Bonds.  The Initial PSA provided for varying treatment, to be implemented pursuant to a plan

of adjustment ("Initial Plan of Adjustment"), of different GO Bond and PBA Bond claims based

on the series of such bonds and the date of issuance.  (Dkt. No. 8766-3, at Exhibit B-2.)  The Initial

Plan of Adjustment provided for the holders of the Late Vintage GO Bonds (and other debt

challenged as unconstitutional) to have the option to receive a substantially reduced up-front

---

[6]      Given subsequent categorizations in the Initial PSA and New PSA, for the purposes of this Motion, the Late
Vintage GO Bonds include all GO Bonds issued in or after March 2011.

[7]      Given subsequent categorizations in the Initial PSA and New PSA, for the purposes of this Motion, the Early
Vintage GO Bonds include all GO Bonds issued prior to March 2011.

[8]      As of July 3, 2020, all of the members of the QTCB Noteholder Group were also the members of the
Commonwealth Bondholder Group.  (Dkt. No. 13548, Ex. A; Dkt. No. 13549, Ex. A.)  For ease of reference in this
motion, any reference to the QTCB Noteholder Group shall include the Commonwealth Bondholder Group.

[9]      The Initial PSA was announced publicly on June 16, 2019.  FOMB, *Oversight Board Reaches Agreement on
a Framework to Restructure $45 Billion of Liabilities – Agreement a Milestone Towards Resolving Puerto Rico's
Debt Crisis*, (June 16, 2019), https://drive.google.com/file/d/13RFAuRJX6Tkya66DTPz3V2uEUiTjwqvQ/view.

recovery between 35 and 45 cents on the dollar (as compared to a baseline recovery of 64 cents for the holders of the non-challenged debt, subject to increase depending on the outcome of the challenged debt litigation), or to agree to pursue their claims in a litigation trust where they would recover, if successful, additional amounts, but, if unsuccessful, receive less than they would have under the up-front recovery option.  (Dkt. No. 8766, at 264-297.)

15.    On July 24, 2019, the Court entered an order temporarily staying adversary proceedings and contested matters, to facilitate negotiations among the FOMB, the Debtors, and creditors of a restructuring plan with sufficient support to be confirmable.  (Dkt. No. 8244.)  In that same order, the Court ordered a mediation to attempt to resolve the remaining issues in this case (the "Mediation").  The Mediation Order provided that the Mediation and any information disclosed therein were confidential, and accordingly that information could not be used for trading purposes.

16.    The Mediation began in September 2019 and the participants included:  the FOMB, the Puerto Rico Fiscal Agency and Financial Advisory Authority ("AAFAF"), and the LCDC, the QTCB Noteholder Group, the Ad Hoc Group of General Obligation Bondholders (the "Ad Hoc Group of GO Bondholders"), and the Ad Hoc Group of Constitutional Debtholders (collectively, the "Hedge Fund Groups").  (Dkt. No. 11746, at ¶ 20; *Commonwealth Mediation Expected to Kick Off After Labor Day Weekend; Sequencing of Gating Issues Seen as Crucial to Process*, Reorg Research (Aug. 27, 2019).)  At the start of the Mediation, it was widely understood that the Initial PSA was a first offer and a plan could not be confirmed in the Title III cases since it lacked sufficient creditor support.  (Dkt. No. 7892, at ¶ 3.)

17.     Because there had been several notorious breaches of the Court-ordered confidentiality of mediation sessions,  threatening the integrity of the process, at the September 11, 2019 omnibus hearing, the Court stated:

> I've seen media reports indicating that several so-called sources have provided media outlets with information regarding work by the mediation team and mediation participants that is being done pursuant to the Court's July 24th, 2019, Order, which is docket entry number 8244 in the 3283 case.  **For example, on August 27th, 2019, Reorg Research released an alert titled, Commonwealth Mediation Expected to Kick Off After Labor Day Weekend, Sequencing of Gating Issues Seen as Crucial to the Process.  This article contains information attributed to at least five unnamed sources, and includes what purport to be very specific details regarding the status of the ongoing mediation.  In a September 5th, 2019, article published in the Bond Buyer, a person described as an anonymous bondholder source familiar with the process provided alleged details about the current focus of the mediation efforts.**
>
> *            *            *
>
> In light of the recently published articles, I'm deeply concerned that parties have forgotten or perhaps have chosen to ignore what was clearly stated in the original Orders designating and appointing the mediation team.   Today I will issue a Supplemental Order regarding the confidentiality of ongoing mediation efforts, and the Order will provide **that if any additional breaches of mediation confidentiality appear to occur, the Court will not hesitate to take appropriate action to determine the source of the leak and to evaluate whether sanctions may be appropriate**. . . .  I am directing the attorneys for each mediation participant to bring these remarks and the Order to the attention of their clients and the other advisors to the clients who are involved with the mediation.

(Sept. 11, 2019 Tr. at 26:16-27:7; 28:16-29:9 (emphasis supplied).)

18.     The Court thereafter entered a supplemental confidentiality order to the Mediation Order (the "Supplemental Confidentiality Order") which provides:  "The mediation process in this case was established as a confidential one.  (*See* Docket Entry No. 430.)  For the avoidance of doubt and in order to safeguard the confidentiality and efficacy of the ongoing mediation efforts, *the Court hereby orders that all participants in the mediation process are bound by the confidentiality restrictions imposed by this Court and the Mediation Team*."  (Dkt. No. 8686, at 1 (emphasis supplied).)   The Court also reiterated that if "any further breaches of mediation

confidentiality appear to occur, ***the Court will not hesitate to take appropriate action to determine
the source of the leak and to evaluate whether to impose sanctions as may be appropriate***." (*Id.*,
at 2 (emphasis supplied).)

19.     Ultimately, the parties to the Mediation did reach a new plan support agreement
(the "New PSA"), announced on February 9, 2020, whose signatories included, *inter alia*, the
FOMB, certain GO Bondholders and PBA holders, the LCDC, the QTCB, the Ad Hoc Group of
GO Bondholders and the Ad Hoc Group of Constitutional Debtholders.  Notably, neither the Ad
Hoc Group of GO Bondholders nor the Ad Hoc Group of Constitutional Debtholders, both holders
of Late Vintage GO Bonds, previously signed the Initial PSA.  The parties to the New PSA were
predominately hedge funds that, according to the FOMB, represent 58% of aggregate GO and PBA
bondholders -- meaning that once again nearly half of the holders GO Bonds and PBA Bonds did
not sign the New PSA.  (*See* Ex. B.)

20.     The two newly participating *ad hoc* groups obtain significantly improved treatment
with the New PSA.  It provides for the treatment of GO Bonds and PBA Bonds pursuant to an
amended plan of adjustment that would purportedly settle outstanding disputes in connection with
such bonds.  Importantly, the New PSA essentially *doubles* the recovery for the Late Vintage GO
Bonds, the same bonds that the FOMB and certain hedge funds had only months earlier argued
were unconstitutional and had little to no value.  Moreover, the hedge funds that participated in the
Mediation also enriched their recoveries with other provisions such as an exorbitant $100 million
break-up fee to be paid if the New PSA is terminated by the FOMB *for any reason* other than a
breach by a non-governmental party or the Court denies confirmation of the plan.[10]  (Dkt. Nos.
11947-2, Exhibit B at § 6.1(b), 11946, at § 3.5.)

---

[10]     On July 7, 2020, Ambac (as defined below) filed a motion to strike certain provision of the New PSA (the
"Motion to Strike").  (Dkt. No. 13573.)  Ambac argued that certain portions of the New PSA, including the $100

21.     Prior to the public announcement of the New PSA, on February 5, 2020, the *Wall Street Journal* reported that a deal had been reached among the FOMB and certain holders of the GO Bonds and the PBA Bonds.[11]   The article attributed this report to "people familiar with the matter."   (*Id.*)   Thereafter, the prices for the series 2014 "late vintage" bonds jumped to between 72 and 76 cents on the dollar, up from 65 cents a month earlier, and 53 cents six months earlier. (*See* Dkt. No. 11951; *accord Puerto Rico Bonds Trade Higher in Wake of Report of Tentative Deal*, Reuters, Feb. 6, 2020.)

## II.     THE REQUEST FOR ADDITIONAL RULE 2019 DISCLOSURES AND THE COURT'S ORDER REQUIRING ADDITIONAL DISCLOSURES

22.     Response to the New PSA, including concerns with the agreements being reached, was swift.   On February 25, 2020, the Official Committee of Unsecured Creditors (the "Committee" or "UCC") filed a motion seeking, among other things, additional disclosures under Rule 2019 (the "UCC Motion").   (Dkt. No. 11746.)   In support of the UCC Motion, the Committee relied on the Hedge Fund Groups' then-current Rule 2019 disclosures, as well as their pleadings, objections, and legal positions in this case.   The UCC Motion argued that various hedge groups had either failed to disclose cross holdings or simply lumped together all of their holdings into one category -- "GO Bonds" or "Constitutional Debt" -- such that it was impossible for the parties in interest in the Title III cases to have a full understanding of those hedge fund groups' economic positions with respect to the bonds.   (Dkt. 11746, at ¶¶ 26-29, 42.)

---

million break-up fee provision, should be stricken because they violate PROMESA and hinder the ability of the Commonwealth to effectively restructure.   (Dkt. No. 13573, at ¶¶ 1-4, 6-7, 31(c), 35-37, 43-44, 47, 54-57.)   On August 25, 2020, Assured (as defined below) joined Ambac's Motion to Strike.   (Dkt. No. 14091.)   Opposition papers to the Motion to Strike currently must be filed by October 6, 2020 and reply papers by October 20, 2020.   (Dkt. No. 14109.)

[11]     Matt Wirz and Andrew Scurria, *Puerto Rico Bondholders Reach Tentative Deal With Oversight Board*, Wall St. J., (Feb. 5, 2020), https://www.wsj.com/articles/puerto-rico-bondholders-reach-tentative-deal-with-oversight-board-11580934722.

23.     On March 13, 2020, monoline insurers Assured Guaranty Municipal Corp., Assured Guaranty Corp. (collectively, "Assured"), Ambac Assurance Corporation ("Ambac"), and Financial Guaranty Insurance Company ("FGIC," and together with Assured and Ambac the "Other Monolines") filed an amended cross-motion joining the UCC Motion, seeking further additional disclosures under Rule 2019, and asserting concerns regarding certain creditors' Rule 2019 disclosures that warranted more detailed disclosures for the parties involved in the Mediation (the "Cross-Motion" and together with the UCC Motion, the "Rule 2019 Motions"). (Dkt. No. 12296.)

24.     In the UCC Motion, the Committee argued that it was essential that the entities that had previously filed Rule 2019 disclosures be required to supplement those disclosures so that their bond holdings could be understood on a series-by-series basis. The Committee contended that since the New PSA provides for treatment based on the particular series of Commonwealth bonds different from the treatment of those bonds in the Initial PSA, and both plan treatments were negotiated with those entities, the information was vital to understand the true economic interest of those groups that support the New PSA (and agreed thereunder to settle challenges to the validity of certain Commonwealth and PBA bonds). (Dkt. No. 11746, at ¶ 5.) The UCC Motion requested that the Court require each group to more specifically disclose their holdings of bonds according to a specific categorization scheme, adopted from the New PSA. (Dkt. No. 11746-1, at ¶¶ 2, 5.)

25.     A central argument in the UCC Motion was that some of the members of the Hedge Fund Groups involved in the Mediation were trading large quantities of GO Bonds -- often significantly increasing their holdings of the bonds -- at the same time they were negotiating the treatment of those same bonds in the Mediation. In particular, as noted in the UCC Motion, the LCDC collectively increased its holdings of GO Bonds by at least $700 million between June 2019

and February 2020.  (Dkt. Nos. 11746, at ¶ 23, 7465, 8639, 9732, 11161.)  Similarly, the Ad Hoc Group of Constitutional Debtholders collectively increased its holdings of GO Bonds by over $200 million from July 2019 to February 2020.  (Dkt. Nos. 11746, at ¶ 23, 7952, 10742.)  And the QTCB Noteholder Group collectively increased its holdings of GO Bonds by over $300 million between September 2019 and February 2020.  (Dkt. Nos. 11746, at ¶ 23, 8618, 11293.)

26.     During the Mediation and while negotiating the New PSA, certain members of many of these groups appear to have acquired GO Bonds by the hundreds of millions, and conversely, members of the Ad Hoc Group of GO Bondholders, decreased its GO Bonds holdings by approximately $266 million between March 2019 and February 2020.  (Dkt. Nos. 11746, at ¶ 23, 5444 and 11431.)  As the Committee noted, despite the substantial trading of the GO Bonds, none of the Hedge Funds Groups' disclosures specified which particular series of GO or PBA Bonds were being traded, leaving the other parties in interest, the Mediator, and the Court in the dark.  (Dkt. No. 11746, at ¶ 23.)

27.     In response, the LCDC, the QTCB Noteholder Group, and the Ad Hoc Group of GO Bondholders filed objections arguing that additional disclosures were not required.  (*See* Dkt. Nos. 12482, 12476, 12478.)

28.     On May 26, 2020, the Court issued an opinion granting in part and denying in part the Rule 2019 Motions (the "May 26 Opinion").  (Dkt. No. 13217.)  In the May 26 Opinion, the Court required the Hedge Fund Groups to supplement their disclosures to include "distinct disclosable economic interests in relation to each of the Title III Debtors, whether or not the reporting entity contends that it is taking a position before the Court with respect to fewer than all of the Title III Debtors."  (Dkt. No. 13217, at 17.)  The Court ordered those parties to submit revised disclosures by July 3, 2020.  (*Id.*, Addendum A, at § B.)

13

29.     Based on its analysis under Rule 2019 of the previously filed disclosures and the-then current Case Management Order ("CMO"), the Court noted that the prior disclosures:

> did not break down debt by series or other subdivisions that are . . . relevant to the discernment of the degree to which particular creditors could benefit from the plan and, Movants argue, to creditors' motivations in supporting or opposing the plan and its predecessor incarnation.

(Dkt. No. 13217, at 11.)

30.     The Court also held that the "need for such specificity in these Title III cases to ensure that the Court and parties following the cases are apprised of the economic interests underlying the Hedge Fund Groups' litigation and plan confirmation-related positions has become apparent with the particularized claim objection practice and plan proposals that have emerged in arguments presented to the Court since the beginning of 2019."  (Dkt. No. 13217, at 12.)  Lastly, the Court stated:

> Disclosure of only undifferentiated categories does not provide interested parties with information concerning the 'cross-structure holdings of the investors involved in ad hoc groups,' . . . and raises the risk of 'a situation where, although a creditor is nominally a member of a certain class of creditors through ownership of securities in that class, the creditor may in fact have a total economic interest adverse to the class as a whole.'

(*Id*., at 12-13 (quoting *In re Washington Mut., Inc.* and a law review article, "Who Is at the Table? Interpreting Disclosure Requirements for Ad Hoc Groups of Institutional Investors Under Federal Rule of Bankruptcy Procedure 2019")).)

31.     Accordingly, the Court held, "[a]ugmentation of the initial reporting is therefore required to comply with Rule 2019 and serve the purposes of Rule 2019 and the related disclosure provision of the [CMO]."  (Dkt. No. 13217, at 13.)  The Court also required retroactive initial reporting and revision of previously-filed supplemental reports "[b]ecause the aggregate reporting approach in the Groups' initial and supplemental filings do not provide an appropriate baseline for

14

the analytical opportunities that must be made available to stakeholders and the public in the

context of these complex, interrelated Title III cases[.]"[12]  (*Id.*)

## III.   THE SUPPLEMENTAL RULE 2019 DISCLOSURES DEMONSTRATE THE NEED FOR AN INDEPENDENT INVESTIGATION INTO THE TRADING OF CERTAIN MEMBERS OF THE HEDGE FUND GROUPS

32.    Supplemental Rule 2019 disclosures were filed on or about July 3, 2020 by, *inter
alia*, the LCDC, the QTCB Noteholder Group,[13] the Ad Hoc Group of Constitutional Debtholders,
and the Ad Hoc Group of GO Bondholders (the "Supplemental 2019 Disclosures").  (*See* Dkt. Nos.
13548, 13552, 13553, 1355.)

33.    The Supplemental 2019 Disclosures raise very serious concerns.  They show that
some members of the Hedge Fund Groups were likely trading the bonds at the same time they
were negotiating in the Mediation the treatment of and recoveries for holders of those bonds, and
in particular, the bonds receiving better treatment in the New PSA than in the Initial PSA.  Some
of the most troubling trading activity reflected in the Supplemental 2019 Disclosures concerns the
acquisition/trading of Late Vintage GO Bonds.   In fact, before the Mediation, the QTCB
Noteholder Group and the LCDC, whose members were signatories to the Initial PSA, collectively
each held relatively small amounts of Late Vintage GO Bonds, which at the time were being
challenged in court as unconstitutional.

---

[12]    The Court declined to adopt the UCC's proposal that the disclosures should be grouped into the classification
structure in the New PSA.  (Dkt. No. 13217, at 13.)

[13]    As disclosed in their respective Supplemental 2019 Disclosures, the QTCB Noteholder Group and the
Commonwealth Bondholder Group contained the same members, and the holdings information for the QTCB
Noteholder Group and Commonwealth Bondholder Group are the same as of January 14, 2019 and June 24, 2020.
(*See* Dkt. Nos. 13548, Ex. A; 13549, Ex. A.)  However, the Supplemental 2019 Disclosure of the Commonwealth
Bondholder Group provides additional holdings information as of March 1, 2019.  (*Compare* Dkt. No. 13548, Ex. A
*with* Dkt. No. 13549, Ex. A.)  For ease of reference, the additional March 1, 2019 holdings disclosed in the
Commonwealth Bondholder Group's Supplemental 2019 Disclosure are included in the QTCB Noteholder Group
holdings discussed herein.  (*See* Ex. C.)

34.     In particular, as noted above, the LCDC itself had joined in the challenge to the constitutionality of the Late Vintage GO Bonds.  (*See* Dkt. No. 9730.)  Yet as the attached graphs show, *see* Ex. C, at p. 2, certain members of the Hedge Fund Groups, including members of the LCDC, appear to have started to increase their position in the Late Vintage GO Bonds during the private and confidential Mediation and negotiation of the New PSA, which ultimately led to a greater recovery for those very bonds.  Notably, while its members did not formally withdraw their challenge to the constitutionality of the Late Vintage GO Bonds during the Mediation or even disclose their holdings in these late vintage bonds to the public, the LCDC, collectively greatly increased its holdings in those bonds, and ultimately agreed to the New PSA providing its members a substantially increased recovery for those bonds.

35.     The Supplemental 2019 Disclosures also show that during the Mediation, certain members of the Hedge Fund Groups generally traded and materially altered their holdings in the very bonds that were being negotiated in the Mediation.  From January 2019 to June 2020,[14] members of the Hedge Fund Groups increased their holdings in the GO Bonds and PBA Bonds from $5 billion to $7.7 billion -- an increase of 53% in total -- which amounts to approximately 47% of the Commonwealth's $16.5 billion of GO Bond and PBA Bond debt.  Specifically, the LCDC had the largest increase in holdings, from collectively holding approximately $764 million in early 2019 to over $2 billion as of June 2020 -- an increase of nearly $1.25 billion or 163%.[15]

---

[14]     The primary focus here is on the suspicious trading during the Mediation from September 2019 through February 2020.  However, in order for the investigation to be complete, it should also review the hedge funds' trading activity throughout at least 2019-2020, including the negotiation of the Initial PSA and the New PSA, as well as their activities after the Mediation and announcement of the New PSA through today.

[15]     On September 15, 2020, the LCDC filed its Eighth Supplemental Verified 2019 Disclosure Statement with its holdings as of September 4, 2020.  (Dkt. No. 14316.)  That filing disclosed that the LCDC's collective holdings of Commonwealth GO Bonds and PBA Bonds have decreased by over $14 million since filing its July 3 Supplemental 2019 Disclosures, and that hedge fund Marble Ridge Capital LP is no longer a member of the group, presumably related to, as discussed *infra*, its reported liquidation after its founder, Daniel Kamensky, was recently arrested for crimes he allegedly committed in connection with the Neiman Marcus Chapter 11 proceedings.

(*See* Ex. C, at p. 1.)   Similarly, the Ad Hoc Group of Constitutional Debtholders' collective

holdings increased by 94% or over $1.3 billion from approximately $1.4 billion in early 2019 to

over $2.7 billion as of June 2020.  (*Id.*)  The QTCB Noteholder Group's collective holdings went

up by 28%, from $1.5 billion in early 2019 to just over $1.9 billion in June 2020.  (*Id.*)  The Ad

Hoc Group of GO Bondholders sold over $300 million in bonds during the same period, going

from holding nearly $1.4 billion in early 2019, to just under $1.1 billion in June 2020 for a decrease

of 22%.[16]  (*Id.*)

36.     After the announcement of the New PSA in February 2020, some members of these

Hedge Fund Groups sold off substantial portions of the Late Vintage GO Bonds just after the prices

for those bonds had jumped substantially as a result of their more favorable treatment in the New

PSA.  (*See* Ex. C, at pp. 2, 7.)

37.     The Supplemental 2019 Disclosures are also rife with specific examples of

questionable activity.  By way of illustration, between mid to late 2019, when the Initial PSA was

announced and the Initial Plan of Adjustment was filed, and February 9, 2020, when the New PSA

was announced, at least three funds, Sculptor Capital Management, Silver Point Capital, and

GoldenTree Asset Management, traded significant amounts of the exact bonds they had been

negotiating about in the Mediation.  (*See* Ex. C, at pp. 4-6.)

      a.  In September 2019, Sculptor Capital Management, part of the QTCB Noteholder

          Group, did not hold any 2014 GO Bonds, a Late Vintage GO Bond.  By February

          18, 2020, its 2014 GO Bond holdings increased to approximately $110 million.

---

[16]     The significant increases in holdings by certain members of these groups coinciding with the decrease in
position by certain members of other groups is also suspicious and should be investigated, including whether those
funds were working together to re-allocate these bonds among themselves to benefit them and ensure support for the
New PSA.

(*See* Ex. C, at p. 4.)  Similarly, its 2012 GO Bond holdings increased significantly (more than doubling) during the same time period.  (*Id.*)

b.   In July 2019, days after the Initial PSA was announced, Silver Point Capital, part of the Ad Hoc Group of Constitutional Debtholders, held just more than $50 million of 2014 GO Bonds, part of the Late Vintage GO Bonds.  Thereafter, its holdings of those bonds increased substantially until February 3, 2020, topping off at nearly $300 million.  After the New PSA was announced, Silver Point Capital sold a majority of its holdings and held less than $100 million of 2014 bonds by March 10, 2020.  (*See* Ex. C, at p. 5.)  Silver Point Capital's holdings of 2012 GO Bonds followed a similar trend during the same time period -- increasing from a little more than $10 million in July 2019 to over $55 million by February 3, 2020 (all but $9 million of which was sold off as of March 10, 2020).  (*Id.*)

c.   GoldenTree Asset Management significantly increased its holdings of 2014 GO Bonds, part of the Late Vintage GO Bonds, between July 2019 after the Initial PSA was announced, from $12 million in August 2019 to over $60 million as of February 14, 2020.  By mid-March 2020, GoldenTree Asset Management sold a portion of their 2014 GO Bonds and by June 24, 2020 held less than $23 million of 2014 GO Bonds (approximately a third of its February 2020 holdings).  (*See* Ex. C, at p. 6.)

38.     In addition to the Supplemental 2019 Disclosures, publicly available prices of GO Bonds suggest that significant trading activity took place in the lead up to the announcement of the New PSA.  For example, in the weeks and months leading up to the public release of the New PSA -- with its favorable treatment of Late Vintage GO Bonds -- prices for one such bond, the 2014 GO Bonds, increased substantially, which reflects increased demand, and in particular,

buying activity for those bonds.  Specifically, between December 1, 2019 and February 4, 2020

(the day before the *Wall Street Journal* report leaking the New PSA and its terms), prices for the

2014 GO Bonds increased from trading at approximately 59 cents on the dollar to 68 cents on the

dollar.  (*See* Ex. C at p. 7.)

39.    These are only a few limited examples from publicly-available bond prices and the

Supplemental 2019 Disclosures, which themselves only list holdings as of a certain date, and not

the type of trading records with the dates of each trade, that should be part of the Investigation.

The purpose of the Investigation would be to assess and report on the details of these trades, as

well as any additional trading activities by these funds and other funds whose public filings suggest

inappropriate activity.

## IV.    ADDITIONAL CONCERNS RAISED ABOUT CERTAIN MEMBERS OF THE HEDGE FUND GROUPS' TRADING ACTIVITIES

40.    Concerns about the changes in the holdings of certain members of the Hedge Fund

Groups have been raised both within and outside this Title III case.  Most recently, on August 5,

2020, several members of Congress sent a letter to New York State Attorney General Letitia James

("NYAG") requesting that she open an investigation into possible Martin Act violations by several

New York hedge funds[17] (the "Congressional Letter" attached hereto as Ex. D).  In particular, the

Congressional Letter highlights that the Supplemental 2019 Disclosures reveal that "members of

the LCDC significantly increased their holdings of bonds they argued in court were of no value

while engaging in confidential mediation talks about their restructuring."  (Ex. D, at 2.)  The

Congressional Letter argued that there is a strong possibility that some of the hedge funds may

---

[17]    Although members of Congress requested that the NYAG conduct an investigation, it is unknown whether any such investigation has begun or will ever begin.  Further, any NYAG investigation will not be designed to address whether any parties violated the Court's orders, nor will the results of that investigation be shared with the parties in interest to this Title III case.  Therefore, National respectfully submits that the NYAG's efforts will not serve as a substitute for the Investigation it seeks herein.

19

have traded on non-public information "while using the PROMESA restructuring process to artificially manipulate bond markets." [18]  (*Id.*, at 1.)

41.  Earlier, soon after the New PSA was announced, Cate Long an analyst, researcher, and market commentator, had submitted a series of letters to the Court setting forth the basis for her belief that some members of the Hedge Fund Groups had engaged in improper trading of GO Bonds using confidential information acquired during the Mediation while the treatment of those bonds was being negotiated.[19]  (*See* Dkt. Nos. 10821, 11951, 12252.)  The Court reviewed and publicly filed Ms. Long's correspondence, noting that while the Court "cannot respond individually to all those who have expressed their thoughts or concerns, [it] is deeply mindful of the impact of the fiscal crisis on lives, institutions, and expectations, and of the importance of the issues that are raised in these unprecedented cases."  (*See* Dkt. Nos. 10821, at 1, 11951, at 1, 12252, at 1.)

## V.  FOMB'S CURRENT NEGOTIATIONS FOR REVISED PSA

42.  The FOMB previously disclosed that it was re-negotiating the New PSA with some of the parties to that agreement.  (*See* Dkt. No. 1495.)  In contrast to the negotiations during the Mediation, when no public announcements were made about the terms being negotiated, on

---

[18]  The *Wall Street Journal* reported on the Congressional Letter to the New York Attorney General.  Natalie Andrew and Andrew Scurria, *New York Lawmakers Seek Probe of Puerto Rico Bondholders*, Wall St. J. (Aug. 5, 2020, 5:15 PM), https://www.wsj.com/articles/new-york-lawmakers-seek-probe-of-puerto-rico-bondholders-11596646984?mod=lead_feature_below_a_pos1.

[19]  Ms. Long's first letter, dated February 5, 2020, concerned what she described as "[c]oordinated leaks of material non-public information regarding mediation between [the FOMB] and certain creditor groups."  (Dkt. No. 10821, at 2.)  Her second letter, dated February 25, 2020, concerned what she viewed as "apparent massive insider trading."  (Dkt. No. 11951, at 2.)  Specifically, she argued:  "Because parties involved in mediation have traded hundreds of millions of dollars of GO/PBA during the restricted period they damaged the integrity of the municipal market and likely were able to purchase securities from market participants who only knew that a litigation stay . . . was imposed and then lifted."  (*Id.*)  In her final letter, dated March 6, 2020, Ms. Long reiterated the previous points and also wrote to "document the solicitation that the so-called [LCDC] is engaged in of the proposed plan of adjustment by running radio and newspaper ads and placing editorials in Puerto Rico newspapers to gather support for their inside traded deal prior to the court approving a disclosure statement."  (Dkt. No. 12252, at 3.)

September 30, 2020, the FOMB and the creditors with whom it was negotiating publicly announced an update on the ongoing negotiations.  (*See* Ex. E.)  The parties disclosed that they had exchanged multiple proposals for revised terms of a revised New PSA, that negotiations were continuing, and that the FOMB would update the Court on the negotiations in late October 2020. (*See PROMESA Oversight Board, PSA Creditors Release Cleansing Materials Including Revised Plan of Adjustment, PSA Proposals as Negotiations Continue*, Reorg Research (Sept. 30, 2020).) The announcement also disclosed publicly some of the specific terms of the proposals, which confirmed that the terms of those proposals were based on and structurally similar to the terms of the New PSA.  (*See Revised Plan Proposals From PROMESA Oversight Board, PSA Creditors Would Increase Cash Consideration by $2B, Lower Cap on Maximum Annual Debt Service; Proposals Differ Over Composition of Total Consideration*, Reorg Research (Oct. 1, 2020).)

43.     In sum, analysis of the original and Supplemental 2019 Disclosures, as set forth in this Motion, the Rule 2019 Motions, the Congressional Letter, and correspondence to the Court, reflects a troubling pattern of potential violations of the Court's orders and questionable trading, all of which threaten the integrity of the Mediation process and any negotiated agreement that may be reached.  National respectfully submits that no plan or agreement based on such questionable activity and bond holdings should go forward unless and until there is an independent Investigation with access to all necessary trading information and, if appropriate, any wrongdoing resolved by the Court.

## RELIEF REQUESTED

44.     National respectfully requests that the Court direct the Investigation to be conducted by an independent entity pursuant to Section 105 of the Bankruptcy Code, the Alternative Dispute Resolution Act of 1998 and/or Rule 83J of the Court's Rules, and the Court's prior orders, including the Mediation Order and the Supplemental Confidentiality Order.  The

Investigation should determine whether certain parties that participated in the Mediation may have: (1) improperly breached the confidentiality of the Mediation and thus the Court's Mediation Order and Supplemental Confidentiality Order, and/or (2) traded bonds while in possession of non-public information about or obtained during the Mediation, either of which would irreparably harm the integrity of the New PSA and any revised agreement based on the New PSA, such as the agreement currently being negotiated by the FOMB and some of the signatories to the New PSA.  For the avoidance of doubt, National does not seek that the investigating entity be granted the power to bring any claims that may be apparent or available after the Investigation, but only that the results of that Investigation be made available to the Court and the parties in this Title III case to permit them to determine what, if any, action should be taken to address any improper conduct.

45.     Because timeliness is important to this Title III case, and given that the FOMB is currently negotiating with some of the parties to the New PSA concerning revised terms and has asked for more time to continue to do so, National respectfully requests that its Motion be granted and whichever independent entity that conducts the Investigation be directed to file with the Court a final report with supporting documentation within 60 days.

**BASIS FOR RELIEF REQUESTED**

46.     There is substantial reason to believe that some of the participants in the Mediation, notably certain hedge funds, may have violated the Court's Mediation Order and its Supplemental Confidentiality Order (*see* Dkt. No. 430, at 3; Dkt. No. 8686; 28 U.S.C.A. § 651 *et. seq*; and L.Cv.R. 83J (D.P.R. 2018)) by improperly:  (1) leaking or using confidential information from the Mediation, and/or (2) potentially manipulating the market for the relevant bonds or engaging in potentially improper trading based on non-public information gleaned during the Mediation.  In its May 26 Opinion, the Court ordered, among other things, supplemental and retroactive Rule 2019 disclosures to allow creditors and parties in interest to assess the parties' economic interests

and how those changed over the relevant time period, which would enable other parties to assess whether further scrutiny was warranted.  The Court recognized that "an appropriate baseline for the analytical opportunities . . . must be made available to stakeholders and the public in the context of these complex, interrelated Title III cases[.]"  (Dkt. No. 13217, at 13.)  Accordingly, the Investigation is warranted under the Mediation Order, the Supplemental Confidentiality Order, 11 USC § 105(a) and the general powers of the Court to determine whether:  (1) confidential non-public information was shared or used in breach of the confidentiality provisions of the Mediation Order and Supplemental Confidentiality Order, and/or (2) any improper trading activity was undertaken based on confidential information obtained via the Mediation or otherwise.

> **A.**     **The Court Has the Authority to and Should Order an Investigation to Ensure its Mediation Order and Supplemental Confidentiality Order are Enforced**

47.     In the Supplemental Confidentiality Order, the Court stated, in no uncertain terms, that the Mediation established in this case relies on confidentiality:  "[I]n order to safeguard the confidentiality and efficacy of the ongoing mediation efforts, the Court hereby orders that all participants in the mediation process are bound by the confidentiality restrictions imposed by this Court and the Mediation Team."  (Dkt. No. 8686, at 1.)  The Mediation Order set forth that the Mediation was to be confidential and bound the participants to confidentiality.  (*See* Dkt. No. 430.)  The Supplemental Confidentiality Order also clarified that there will be consequences for breaching that confidentiality:  "In the event that any further breaches of mediation confidentiality appear to occur, the Court will not hesitate to take appropriate action to determine the source of the leak and to evaluate whether to impose sanctions as may be appropriate."  (Dkt. No. 8686, at 1-2.)

48.     The statute and local rule granting the Court the authority to utilize mediation also recognize the importance of confidentiality to the mediation process.  The Alternative Dispute

Resolution Act of 1998, 28 U.S.C.A. § 651 *et. seq.*, gives bankruptcy courts the authority to order

parties to mediation, and requires all federal district courts to authorize, by local rule, an alternative

dispute resolution procedure in civil cases, including bankruptcy proceedings.  In Puerto Rico,

mediation is governed by Rule 83J of the District Court Rules and that rule requires confidentiality

in mediated proceedings.  *See* L.Cv.R. 83J (D.P.R. 2018).

49.     Courts have routinely concluded that confidentiality is essential to ensuring

mediation programs are successful.  *See, e.g.*, *Bernard v. Galen Group, Inc.*, 901 F. Supp. 778, 784

(S.D.N.Y. 1995) ("[B]reach of the applicable confidentiality provisions threatens the integrity of

the entire [p]rogram.").

### i.     Section 105 Authorizes the Court to Direct an Investigation

50.     In the Mediation Order, the Court relied on Section 105 of the Bankruptcy Code to

establish the Mediation Team.  (*See* Dkt. 430, at 2.)  Section 105 also empowers bankruptcy courts

to enforce, even on their own accord, their previously-issued orders, stating, in relevant part:  "No

provision of this title providing for the raising of an issue by a party in interest shall be construed

to preclude the court from, *sua sponte*, taking any action or making any determination *necessary*

*or appropriate to enforce or implement court orders or rules . . . .*"  11 U.S.C. § 105(a) (emphasis

supplied).  Clearly, "section 105(a) plainly may be used to enforce and implement earlier orders."

*In re River Ctr. Holdings, LLC*, 394 B.R. 704, 711 (Bankr. S.D.N.Y. 2008) (internal quotations

omitted).

51.     Here, the Court has the authority under Section 105 to enforce the confidentiality

provisions of the Mediation Order and the Supplemental Confidentiality Order by directing an

independent party to conduct the Investigation.  The Investigation would be in furtherance of those

orders and the goals set forth therein.  It would also be a natural outgrowth of the authority that

Section 105 provides for the Court to direct an Investigation in relation to those initial orders.

24

52.     Section 105 provides bankruptcy courts with the power to "issue any order, process, or judgement that is necessary or appropriate to carry out the provisions" of the Bankruptcy Code -- including their equitable powers.  11 U.S.C. § 105(a).  Under this provision, the Court is afforded the equitable power to craft flexible remedies in situations where the Bankruptcy Code's (or by extension PROMESA's) other provisions fail to allow the Court to achieve those statutes' larger intended purpose.  *See, e.g., Official Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery*, 330 F.3d 548, 568 (3d Cir. 2003).

53.     Here, there is ample evidence, as discussed above, in the Supplemental 2019 Disclosures, among other things, to warrant the Investigation into the conduct of the particular individual participants in the Mediation, whose disclosures demonstrate potential suspicious material changes in their relevant holdings, including their trading activity during the Mediation and whether that activity violated any of the Court's orders.  The Investigation is necessary to determine whether the individual participants whose disclosures raise suspicion violated the Mediation Order, the Supplemental Confidentiality Order, or any other orders or laws, or abused the process, or acted in bad faith, and if so, the impacts of such violations.  Such Investigation is a natural consequence of that Mediation Order and the Supplemental Confidentiality Order, which put all parties on warning that consequences -- including a potential investigation and the issuance of sanctions -- for any breach would follow.

54.     The trading activity of those creditors that participated in the Mediation and whose disclosures raise concerns could have profound implications for this case.  The possibility that leaks and/or improper trading using confidential information from the Mediation occurred will threaten the overall restructuring of the Commonwealth's debts.  There can be no doubt that, absent an investigation, those creditors' trading activity will feature prominently in other creditors'

objections to confirmation of any plan of adjustment based in whole or in part on the New PSA. Any restructuring plan resulting from the New PSA would not have been proposed in good faith nor would it be in the best interests of the Debtors or creditors.  The scrutiny of the specific creditors' relevant bond holdings will also be the basis for potential substantial litigation and motion practice to disallow or subordinate claims, or designate votes at the confirmation stage.

55.     An investigation now could instead address these issues before they result in further proceedings on the New PSA or a revised agreement that is currently being negotiated, according to the FOMB's latest disclosures.  Doing so would avoid such costly and time-consuming litigation while, most importantly, ensuring that this restructuring may proceed apace without the overhang of suspicious trading activity.  As the FOMB stated in its recent announcement about the status of its re-negotiations with some of the New PSA signatories, the FOMB is currently negotiating with those creditors concerning revised terms of the New PSA, but no revised agreement has been reached yet.  (*See* Exhibit E; *see also* Dkt. No. 14195, at ¶¶ 14-16.)  Additionally, three out of the seven FOMB members have chosen not to seek re-nomination when their terms expired on August 31 and October 5 and will need to be replaced.  (Dkt. No. 14195 at ¶ 9.)  Moreover, a new Governor of Puerto Rico will be elected in November.  Thus, it is in the best interest of all parties to have an independent party investigate these issues now since there will be at least months before the confirmation stage of any new plan given the FOMB's recent update about its negotiations, and before the parties spend considerable time and money litigating a plan that the Investigation could make clear is fatally flawed.  The results of such an investigation could yield a legitimate explanation for the trading activity detailed herein.  If the Investigation determines that there were no violations of the Court's orders or other improprieties, then that result could help streamline the confirmation process.

56.     In contrast, the Investigation may adduce evidence that would clearly affect the

viability of any plan that resulted from the Mediation and the parties' ongoing negotiations -- which

the FOMB's announcement makes clear is based on the New PSA.  Such findings could promote

the integrity of the process and the effective use of Court and party resources by potentially

avoiding substantial discovery and litigation concerning these issues in connection with a

confirmation hearing.  At a minimum, the Investigation would provide all parties with the facts

and circumstances concerning the trading activity to allow each interested party to assess what

litigation or motion practice to pursue, if any, concerning such conduct.  Far from a theoretical

exercise, or a waste of resources, the Investigation will have concrete, practical consequences and

is essential to the administration of this case, judicial economies, and the integrity of the Title III

process and PROMESA.

57.     Therefore, in line with the Court's Mediation Order and the Supplemental

Confidentiality Order, and Section 105(a), the Court should direct an independent party to conduct

the Investigation.

**B.      Courts Have Ordered Independent Investigations Concerning
          Similar Trading Activity Allegations**

58.     Although the types of concerns raised about the trading activity in this case have

not been raised with courts in the very limited number of prior municipal restructurings, there are

other Chapter 11 cases where similar issues have been raised, and where the courts have ordered

investigations.  For example, in both *In re Washington Mutual* and *In re FiberMark*, the bankruptcy

court ordered investigations to assess allegations raised about trading activity in those respective

cases.

59.     In *In re Washington Mutual, Inc*., (Case No. 08-12229-MFW, Bankr. D. Del 2008)

("*Washington Mutual*"), after a reorganization process that dragged on for three years, most of the

27

parties to the case (including the debtor and most large creditors), reached a global settlement

agreement connected to a sixth amended reorganization plan.  *See In re Washington Mut., Inc.*,

2012 WL 1563880, at *4 (Bankr. D. Del. Feb. 24, 2012).  At an initial confirmation hearing,

allegations of insider trading by several settlement participants surfaced.  Specifically, four hedge

funds that sat on a creditors' committee during negotiations were accused of trading on nonpublic

information gleaned during the settlement discussions.  *See In re Washington Mut., Inc.*, 461 B.R.

200, 239 (Bankr. D. Del. 2011), *vacated in part*, 2012 WL 1563880 (Bankr. D. Del. Feb. 24, 2012).

Thereafter, the *Washington Mutual* Court appointed an examiner to conduct an investigation of the

allegations.  *See Washington Mutual* Dkt. No. 5120.

60.     Similarly, in *In re FiberMark* (Case No. 04-10463 Bankr. D. Vt. 2004)

("*FiberMark*"), while the reorganization was at a standstill over a dispute as to who would control

the company when it exited bankruptcy, two of the UCC members accused the third of engaging

in insider trading by using confidential information it obtained as a result of its seat on the UCC.

The court issued an order to show cause why an examiner should not be appointed to conduct an

investigation to assess the allegations (*FiberMark* Dkt. No. 1354), and eventually appointed an

examiner to investigate the claims.  (*FiberMark* Dkt. No. 1427.)

61.     The investigations in both *Washington Mutual* and *FiberMark* were conducted via

examiners appointed under Bankruptcy Code Section 1104, which has not been incorporated into

PROMESA.  However, as noted above, Section 105 permits the Court to order the Investigation

as a mechanism to enforce its prior orders, each of which relied on Section 105, and the rationale

that underlies the investigations ordered in those cases is identical to the rationale for the

Investigation here.  The Court's inherent authority over its own cases, including its authority to

enforce its own orders, as well as its equitable powers, permit it to order the Investigation into

whether certain bondholders engaged in improper activity based on information obtained from a confidential and court-ordered mediation.  Bondholders that engaged in such conduct should not be able to avoid scrutiny or an investigation because they bought their securities from a municipality that is afforded bankruptcy protection under PROMESA -- based on Chapter 9 -- rather than from a corporation, like *Washington Mutual* or *FiberMark*, that receives its protection under Chapter 11.

### C.  The Court May Direct One of Several Different Entities to Conduct the Investigation

62.     Under Section 105, the Court has broad discretion as to who it would direct to conduct the Investigation.  Given the potential ramifications of the Investigation, the Court should ensure that an independent entity conducts the Investigation.  The results of the Investigation will touch on nearly all creditors and greatly impact the overall restructuring of the Commonwealth's debt, so true independence should be a requisite.  The Court has several options to choose from for such an independent investigator.

63.     The Court can (and should) direct the United States Trustee (the "UST") to conduct the Investigation, with the assistance of independent outside counsel, if necessary.  Although the UST may not traditionally have a substantial role in municipal restructuring cases under Chapter 9 of the Bankruptcy Code, the UST is uniquely and well-situated to conduct the Investigation and can be empowered to hire outside counsel to assist in the Investigation as necessary.

64.     If the Court elects to direct the UST to conduct the Investigation, the UST's role will continue to be appropriately limited.  The UST will direct the Investigation and issue appropriate reports and findings.  Those findings and the UST's analysis will provide the Court with the requisite information to guide its determination of how best to handle the potential violations of the Court's orders and breaches of confidentiality in the Mediation.  To be clear, if

29

the Court chooses this route, the UST's role will be purely investigatory -- the UST will not bring claims, take a position one way or the other on potential sanctions or claims, or otherwise do anything to veer into the supervisorial authority it has in other non-municipal cases.  Importantly, although the UST traditionally plays a smaller role in Chapter 9 cases, nothing in Chapter 9 or PROMESA precludes the Court from directing the UST to conduct the requested Investigation.

65.     Further, there is recent precedent for a bankruptcy court to direct the UST to conduct the Investigation.  In *In re Neiman Marcus Group* (Case No. 20-32519 Bankr. S.D. Tx. 2020) ("*Neiman Marcus*"), Marble Ridge LP ("Marble Ridge"), a member of the Unsecured Creditors Committee in that case (the "Neiman UCC"), and seemingly, now a former member of the LCDC in this Title III case, was accused of breaching its fiduciary duties by allegedly engaging in conduct designed to manipulate the plan-bidding process.  Specifically, Marble Ridge's principal manager, Dan Kamensky ("Kamensky"), was accused of leveraging his business relationship and position as a co-chair of the Neiman UCC to dissuade a competing bid to the detriment of unsecured creditors.  (*See Neiman Marcus* Dkt. No. 1427.)  The court in *Neiman Marcus* issued an order that, among other things, directed the UST to file a statement of position within 14 days, addressing "all conduct of Marble Ridge and Mr. Kamensky since appointment to the [Neiman] UCC."  (*Neiman Marcus* Dkt. No. 1442, at 2.)  The order directed the Neiman UCC professionals to provide the UST with all information in their possession concerning the matter.  (*See id*.)  As in the Neiman Marcus case, the Court can also direct the UST to conduct the Investigation and issue a report or statement of position so that any further action may be taken, if appropriate.

66.     Alternatively, the Court may direct another party to conduct the Investigation.  The identity of the entity or individuals who conduct the Investigation is not critical, as long as that

30

entity or those individuals are sufficiently independent and are directed to conduct the Investigation by the Court.  The critical aspect is that the Court direct some entity to conduct the Investigation to protect this Title III case and all of its creditors.

## NOTICE

67.    Notice of this Motion has been provided to the Standard Parties as defined in the Thirteenth Amended Case Management Procedures.  (Dkt. No. 13512-1, at 4-6.)  National submits that under the circumstances no other notice needs to be provided.

## NO PRIOR REQUEST FOR RELIEF

68.    National has made no previous request for relief sought herein to this or any other Court.

## CONCLUSION

**WHEREFORE,** National respectfully requests that the Court direct an independent Investigation as set forth herein and consistent with the Proposed Order, and that National be granted such other and further relief as is just and proper.

Dated: October 5, 2020

San Juan, Puerto Rico

**ADSUAR MUNIZ GOYCO**
**SEDA & PEREZ-OCHOA PSC**
208 Ponce de León Avenue, Suite 1600
San Juan, PR 00936
Telephone: (787) 756-9000
Facsimile: (787) 756-9010

By: */s/ Eric Pérez-Ochoa*
     Eric Pérez-Ochoa
     USDC-PR No. 206,314
     Email: epo@amgprlaw.com

By: */s/ Luis A. Oliver-Fraticelli*
     Luis A. Oliver-Fraticelli
     USDC-PR No. 209,204
     Email: loliver@amgprlaw.com

*Attorneys for National Public Finance*
*Guarantee Corporation*

**KASOWITZ BENSON TORRES LLP**
1633 Broadway
New York, New York 10019
Telephone: (212) 506-1700
Facsimile:  (212) 506-1800


*/s/ Marc E. Kasowitz*
     Marc E. Kasowitz (*pro hac vice* forthcoming)
     Adam L. Shiff (*pro hac vice* forthcoming)
     Kenneth R. David (*pro hac vice* forthcoming)
     Sondra D. Grigsby (*pro hac vice* forthcoming)
     Email:    mkasowitz@kasowitz.com
                 ashiff@kasowitz.com
                 kdavid@kasowitz.com
                 sgrigsby@kasowitz.com

*Special Counsel for National Public Finance*
*Guarantee Corporation*

32

**CERTIFICATE OF SERVICE**

I hereby certify that on October 5, 2020, I caused the foregoing document to be electronically filed with the Clerk of the Court for the United States District Court for the District of Puerto Rico by using the CM/ECF system, which sent notification of such filing to all CM/ECF participants.

San Juan, Puerto Rico
October 5, 2020


By: */s/ Eric Pérez-Ochoa*
Eric Pérez-Ochoa