UNITED STATES DISTRICT COURT
DISTRICT OF PUERTO RICO

----------------------------------------------------------------x

In re:

THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO,

    as representative of

THE COMMONWEALTH OF PUERTO RICO, *et al.*,

    Debtors.[1]

PROMESA
Title III

No. 17 BK 3283-LTS

**Re: ECF No. 13573**

(Jointly Administered)

----------------------------------------------------------------x

AMBAC ASSURANCE CORPORATION,

    Movant,

v.

THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO,

    as representative of

THE COMMONWEALTH OF PUERTO RICO,

    Respondent.

PROMESA
Title III

No. 17 BK 3283-LTS

**This Objection relates only to the Commonwealth and shall only be filed in the lead Case No. 17 BK 3283-LTS.**

----------------------------------------------------------------x

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK-3283- LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17- BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

**OBJECTION OF FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO TO MOTION
OF AMBAC ASSURANCE CORPORATION TO STRIKE CERTAIN
PROVISIONS OF THE AMENDED PLAN SUPPORT AGREEMENT BY
AND AMONG THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD
FOR PUERTO RICO, CERTAIN GO HOLDERS, AND CERTAIN PBA HOLDERS**

## TABLE OF CONTENTS

**Page**

**SUMMARY OF ARGUMENT** ................................................................................................... **1**

**BACKGROUND** ........................................................................................................................... **3**

**ARGUMENT** .................................................................................................................................. **5**

    **I.**    **AMBAC'S SECOND MOTION TO STRIKE IS PROCEDURALLY IMPROPER** ..................................................................................................... **5**

    **II.**   **AMBAC'S SECOND MOTION TO STRIKE IS NOT RIPE FOR ADJUDICATION** ........................................................................................... **7**

   **III.**   **AMBAC'S SECOND MOTION TO STRIKE SHOULD ALSO BE DENIED ON SUBSTANTIVE GROUNDS** ......................................................... **9**

**CONCLUSION** ............................................................................................................................ **13**

To the Honorable United States District Court Judge Laura Taylor Swain:

The Commonwealth of Puerto Rico (the "Commonwealth"), by and through the Financial Oversight and Management Board for Puerto Rico (the "Oversight Board"), as the Commonwealth's sole Title III representative pursuant to section 315(b) of the *Puerto Rico Oversight, Management, and Economic Stability Act* ("PROMESA"),[2] respectfully submits this objection (the "Objection") to the *Motion to Strike Certain Provisions of the Amended Plan Support Agreement by and among the Financial Oversight and Management Board for Puerto Rico, Certain GO Holders, and Certain PBA Holders* [ECF No. 13573] (the "Second Motion to Strike"),[3] filed by Ambac Assurance Corporation ("Ambac") and the *Joinder and Statement in Support of Assured Guaranty Corp. and Assured Guaranty Municipal Corp. with Respect to Ambac's Second Motion to Strike* [ECF No. 14091]. The Commonwealth respectfully requests the Court deny the Second Motion to Strike for the reasons set forth below:

**SUMMARY OF ARGUMENT**

1. PROMESA § 104(g) authorizes the Oversight Board to enter into "such contracts as the Executive Director considers appropriate (subject to the approval of the Chair) consistent with the Oversight Board's bylaws, rules, and regulations to carry out the Oversight Board's responsibilities under this Act." PROMESA § 312(a) provides that only the Oversight Board may file a plan of adjustment. Title III of PROMESA does not incorporate Bankruptcy Code section 363 requiring court approval of uses of property outside the ordinary course of business. Title III does include section 305 barring the Court from interfering with, among other things, "any of the

---

[2] PROMESA has been codified at 48 U.S.C. §§ 2101-2241.

[3] Capitalized terms used but not defined herein shall have the meanings given to them in the Second Motion to Strike.

property or revenues of the debtor." Undaunted by the applicable authorities, Ambac requests the Court to strike provisions from the Oversight Board's plan support agreement in contravention of all the authorities. Moreover, even in the absence of the authorities, it is no more appropriate for the Court to strike provisions from an Oversight Board contract than for the Court to draft an Oversight Board contract. These are not judicial functions on the instant facts.

2. Ambac has once again filed a motion to strike certain provisions of the Commonwealth's plan support agreement in an inappropriate effort to exact leverage over the Oversight Board and disrupt the natural plan formulation process. While the timing of the filing is suspect, coming roughly five months after the Amended PSA was executed and made public, there is simply no basis for this Court to adjudicate, or even address, the merits of the Second Motion to Strike. The pleading should be denied as procedurally improper, given the Oversight Board has not filed any motion to approve the Amended PSA, and this Court is not being asked by the Oversight Board to approve any aspects of the Amended PSA. The Amended PSA is nothing more than a standalone contract the Oversight Board, equipped with powers set forth in PROMESA, executed pursuant to PROMESA § 104(g) with a broad spectrum of Commonwealth and PBA creditors. Ambac ignores section 104(g).

3. Further, the Second Motion to Strike would not even be ripe for adjudication if it were within the Court's subject matter jurisdiction given that Ambac complains about provisions (primarily the Breakup Fee) that have not been triggered yet and may never be triggered. The Amended PSA has not been terminated by any party thereto and no party has sought payment of any amounts which may arise thereunder. Ambac is complaining about hypothetical possibilities, and requests the Court to issue remedies now (striking provisions) on topics it lacks subject matter jurisdiction to adjudicate and which may never be ripe in any event. Interestingly, Ambac

repeatedly mentions the Commonwealth's plan of adjustment being "patently unconfirmable," which further highlights Ambac's motive to scuttle a proposed plan it does not like. While a plan of adjustment may be attacked as "patently unconfirmable" at a disclosure statement hearing, as the Court is aware, the Commonwealth's Title III case is not at that stage yet. Ambac's Second Motion to Strike is a thinly-veiled attempt to prematurely raise a dispute that should be decided, if at all, at a later time.

4. Lastly, the Second Motion to Strike should also be denied on substantive grounds as all four of the provisions Ambac takes issue with in the Amended PSA are proper and should be upheld. For all the foregoing reasons, the Court should deny the Second Motion to Strike.

## BACKGROUND

**A. The Initial PSA and Ambac's First Motion to Strike.**

5. On May 31, 2019, a plan support agreement (the "Initial PSA") was executed by and among (a) the Oversight Board, (b) holders of general obligation bond claims and/or Commonwealth guarantee bond claims, and (c) holders of PBA bond claims.

6. On July 16, 2019, Ambac filed its *Motion to Strike Certain Provisions of the Plan Support Agreement By and Among the Financial Oversight and Management Board for Puerto Rico, Certain GO Holders, and Certain PBA Holders* [ECF No. 8020] (the "First Motion to Strike"), wherein Ambac requested the Court to enter an order striking (i) the breakup fee provision within the Initial PSA, (ii) the provisions within the Initial PSA that purportedly deprived non-signatory PBA creditors from the due exercise of their right to propose a "Modification" for PBA under Title VI of PROMESA; (iii) the provision within the Initial PSA that set aside the automatic stay with respect to certain actions; and (iv) the provision within the Initial PSA that purportedly gave the PSA creditors a veto over any plan of adjustment the Oversight Board proposes.

7. The Official Committee of Unsecured Creditors (the "UCC") subsequently joined the First Motion to Strike [ECF No. 8186]. Additionally, the Ad Hoc Group of Constitutional Debt Holders, Ad Hoc Group of GO Bondholders, Assured Guaranty Corp., and Assured Guaranty Municipal Corp. filed a Statement in Support of the First Motion to Strike [ECF No. 8223].

8. On July 24, 2019, the Court referred the First Motion to Strike to mediation before oppositions were due [ECF No. 8244]. During the mediation period, on September 27, 2019, the Oversight Board filed an initial Title III Joint Plan of Adjustment (the "Initial POA") [ECF No. 8765]. At the close of mediation, the Court denied the First Motion to Strike without prejudice to refiling [ECF No. 12189].

**B.     The Amended PSA and Ambac's Second Motion to Strike.**

9. On February 9, 2020, and based upon a negotiated revised plan of adjustment supported by over $9 billion of Commonwealth and PBA indebtedness, a new plan support agreement (the "Amended PSA"), replacing the Initial PSA, was executed by and among (a) the Oversight Board, (b) holders of general obligation bond claims and/or Commonwealth guarantee bond claims, and (c) holders of PBA bond claims.

10. On February 28, 2020, an amended proposed plan of adjustment [ECF No. 11946] (the "Amended POA") was filed, reflecting the plan contemplated by the Amended PSA.

11. On July 7, 2020, Ambac filed its Second Motion to Strike, seeking an order from this Court striking (i) the Breakup Fee provision within the Amended PSA, (ii) the Oversight Board's covenant to prevent parties in interest from bringing claim objections (litigating issues settled in the proposed plan), (iii) if the Breakup Fee is not stricken, the provision within the Amended PSA that sets aside the automatic stay with respect to actions that would trigger the Breakup Fee, and (iv) the provisions within the Amended PSA that purportedly give certain

4

Amended PSA creditors a veto over the form and substance of any plan of adjustment the Oversight Board proposes or debt securities to be issued thereunder.

12. On August 25, 2020, Assured Guaranty Corp. and Assured Guaranty Municipal Corp. filed a joinder and statement in support of Ambac's Second Motion to Strike [ECF No. 14091].

## ARGUMENT

### I. AMBAC'S SECOND MOTION TO STRIKE IS PROCEDURALLY IMPROPER

13. Ambac seeks an order from this Court striking certain provisions of the Amended PSA, but the Amended PSA is not a pleading before this Court. The Oversight Board has not filed any motion to approve the Amended PSA, and this Court is not being asked by the Oversight Board to approve any aspect of the Amended PSA.

14. In substance, Ambac is attacking the Oversight Board's power under PROMESA to enter into a contract, but feels unobligated to cite PROMESA § 104(g) empowering the Oversight Board to enter into any contracts to carry out its responsibilities under PROMESA. Manifestly, one responsibility is to accomplish a debt restructuring because without it, the Commonwealth cannot regain market access. Ambac wants the Court to take over for the Oversight Board and determine what contracts it should enter into, as if Bankruptcy Code section 363 applies, which it does not. In turn, because the contract entails use of Commonwealth property and revenues, Ambac wants the Court to override the bar of PROMESA § 305.

15. PROMESA § 104(g) expressly provides the Oversight Board's contracts are governed by what the Executive Director considers appropriate, with the approval of the Chair. As such, there is no basis for Ambac to challenge, and for this Court to entertain a challenge, that the Executive Director's determination that entering into the Amended PSA was "appropriate . . . to

carry out the Oversight Board's responsibilities under [PROMESA]," especially given the Oversight Board is the party with the exclusive power to formulate and file a plan of adjustment. *See* PROMESA § 312(a) ("Only the Oversight Board . . . may file a plan of adjustment of the debts of the debtor."). This Court should not strike provisions of a contract that was validly executed by the Oversight Board pursuant to the express terms of PROMESA and which contract is not before the Court in any way. More fundamentally, Ambac nowhere identifies the source of the Court's power to impose a new contract on the parties to the Amended PSA. That is because courts do not have the power, at least in these circumstances, to direct parties to enter into contracts the courts draft.

16. Further, Ambac complains that the Amended POA is "patently unconfirmable" (*see* Second Motion to Strike ¶¶ 13, 37) in an effort to prove that termination of the Amended PSA is a foregone conclusion. The "patently unconfirmable" argument, however, is typically raised in connection with a disclosure statement hearing. *See, e.g., In re Am. Capital Equip., LLC*, 688 F.3d 145, 154 (3d Cir. 2012) ("[A] bankruptcy court may address the issue of plan confirmation where it is obvious at the disclosure statement stage that a later confirmation hearing would be futile because the plan described by the disclosure statement is patently unconfirmable."). Notably, the Breakup Fee is not even triggered if this Court denies confirmation of the Plan. *See* Amended PSA § 6.1(b) ("[I]n the event this Agreement is terminated pursuant to the terms of Section 7.1(c)(i) thereof or the Oversight Board terminates this Agreement for any reason other than (i) a breach of this Agreement by a non-Governmental Party, (ii) *the denial of confirmation of the Plan by the Title III Court*, the aggregate PSA Restriction Fee and Consummation Costs, in the amount of One Hundred Million Dollars ($100,000,000.00), shall be paid . . . .") (emphasis added). In any event, Ambac will have the opportunity to raise any such argument at the disclosure statement

hearing and will also be able to interpose objections to plan confirmation at the appropriate time and in the appropriate manner. There is no reason Ambac should be permitted to raise such theories in connection with a plan support agreement not before the Court. Indeed, the Oversight Board recently released cleansing materials, including an August 24, 2020 plan support agreement proposal from creditors and an August 18, 2020 fiscal plan macroeconomic overview and revised plan of adjustment proposal, noting that debt restructuring negotiations remain ongoing and the Amended PSA has not been terminated.

17. Accordingly, Ambac's Second Motion to Strike is procedurally improper, outside the Court's subject matter jurisdiction, and should be denied.

## II. AMBAC'S SECOND MOTION TO STRIKE IS NOT RIPE FOR ADJUDICATION

18. Even if the Court were empowered to review contracts that PROMESA assigns to the judgment of the Oversight Board, it is hornbook law that "[a] claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. U.S.*, 523 U.S. 296, 300 (1998) (internal quotations and citation omitted). The Second Motion to Strike takes particular issue with the Breakup Fee in the Amended PSA,[4] but the Breakup Fee is not payable unless and until the Amended PSA is terminated. *See* Amended PSA § 6.1(b). Accordingly, the validity of the Breakup Fee is not ripe for adjudication given that the underlying triggering event may not occur. Ambac concedes as much by arguing "[t]he termination of the Amended PSA is a <u>virtual</u> inevitability." Second Motion to Strike ¶ 36 (emphasis supplied). The dispute cannot be ripe until after the Amended PSA has been terminated and the Breakup Fee has been triggered.

---

[4] Ambac also complains about the Consummation Costs and the PSA Restriction Fee in the Amended PSA. *See* Second Motion to Strike ¶ 40. Notably, Ambac did not complain about similar fees when it was the beneficiary of them in connection with the COFINA plan support agreement.

19. Indeed, the Delaware Chancery Court has recently applied the ripeness doctrine to avoid adjudicating a contract provision when such provision would only be triggered upon contract termination and the contract remained in place:

> In my opinion, it would be premature and ill-considered to attempt to adjudicate Mrs. Fields' implied covenant claim because the License Agreement has not been terminated and remains in place for all the reasons discussed previously. Indeed, Interbake has continued to serve as licensee during the pendency of this litigation under the Standstill Order. To wade into issues of transition before the transition actually has happened would amount to the rendering of an advisory opinion. Accordingly, Count IV will be dismissed without prejudice for lack of ripeness.

*Mrs. Fields Brand, Inc. v. Interbake Foods LLC*, 2017 Del. Ch. LEXIS 113 at *104-05 (Del. Ct. Chan. June 26, 2017). The Ninth Circuit similarly held in *Cal. Energy Res. Conservation & Dev. Comm'n v. Johnson*, 807 F.2d 1456 (9th Cir. 1986) that a challenge to certain provisions in a contract was not ripe for review when such provisions had yet to be implemented. There, the plaintiff argued, among other things, that a provision in a power marketing agency's contract violated the Pacific Northwest Electric Power Planning and Conservation Act by establishing a rate for electric power without conforming to the prescribed ratemaking procedures. The Ninth Circuit held the challenge was not ripe for review:

> General contract provision 8(h) has never been implemented. No actual rate made in violation of section 7 of the Regional Act is being challenged in this action. Rather, CEC challenges a contract provision, entirely dormant to date, that seems to set limits within which rates will perhaps someday be established . . . . A decision at this juncture would resolve a dispute about hypothetical rates. Courts have no business adjudicating the legality of non-events . . . . The basic rationale of the ripeness doctrine is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.

*Cal. Energy Res. Conservation & Dev. Comm'n*, 807 F.2d at 1463-64 (internal citations and quotations omitted).

20. Here, as in *Interbake Foods* and *Cal. Energy Res. Conservation*, there is no basis for the Court to review the contract provisions at issue before the provisions have been triggered. This applies to the Breakup Fee as well as the other provisions targeted by Ambac (*e.g.*, the Oversight Board's covenant to prevent objections to claims held by the PSA Creditors to avoid litigation of issues proposed to be settled).

21. While certain parties have asserted that recent disclosures by the Oversight Board concerning ongoing negotiations with parties to the Amended PSA raise the specter that the Amended PSA is not "alive," such notion is misplaced and the parties seek to address the effects of the COVID-19 pandemic in a manner contemplated by the Amended PSA and no party has sought to terminate the Amended PSA.

### III. AMBAC'S SECOND MOTION TO STRIKE SHOULD ALSO BE DENIED ON SUBSTANTIVE GROUNDS

22. Ambac complains about four provisions in the Amended PSA: (i) the Breakup Fee provision; (ii) the Oversight Board's covenant to prevent parties in interest from bringing claim objections; (iii) if the Breakup Fee is not stricken, the provision within the Amended PSA that sets aside the automatic stay with respect to actions that would trigger the Breakup Fee; and (iv) the provisions within the Amended PSA that purportedly give certain Amended PSA creditors a veto over the form and substance of any plan of adjustment the Oversight Board proposes or debt securities to be issued thereunder. For the following reasons, all four of the preceding provisions in the Amended PSA are proper, and Ambac's Second Motion to Strike should also be denied on the merits.

23. First, even if the Breakup Fee were to be triggered, there is no basis upon which Ambac could restrict the payment. Section 363 of the Bankruptcy Code does not apply to Title III and section 305 of PROMESA prevents this Court from interfering with the Commonwealth's use of its property. Thus, the Commonwealth may use its property as it sees fit, subject to Titles I and II of PROMESA, without the need for court approval.[5] The Breakup Fee, if triggered, would eventually be distributed pursuant to a confirmed plan of adjustment, but not on account of the recipients' prepetition claims. To the contrary, the Breakup Fee is a payment arising on the termination of the Amended PSA (if that were to occur), the distribution of which would be delayed until the effective date of a confirmed plan of adjustment.

24. Ambac argues the Oversight Board has consented to the inapplicability of section 305 protection with respect to the Breakup Fee, because section 7.1(b) of the Amended PSA provides the Amended PSA may be terminated if "a court of competent jurisdiction issues a ruling, judgment, or order making illegal or otherwise preventing or prohibiting the consummation of the Plan." Second Motion to Strike ¶ 11. Ambac's desperate argument is completely misguided—the Oversight Board's agreement to abide by an order prohibiting consummation of a plan of adjustment is not remotely a waiver of section 305 with respect to the Breakup Fee. Rather, such provision gives rise to a right of termination, with a payment of the Breakup Fee (if ever triggered) upon the eventual consummation of a plan of adjustment. The Oversight Board's recognition that

---

[5] *See In re City of Stockton*, 486 B.R. 194, 199 (Bankr. E.D. Cal. 2013) ("Hence, § 904 means that the City can expend its property and revenues during the chapter 9 case as it wishes. It can pay any debt in full without permission from this court."); *Aurelius Capital Master, Ltd. v. Puerto Rico*, 919 F.3d 638, 648–49 (1st Cir. 2019) (concluding that section 305 bars the Title III Court from preventing the Commonwealth from using certain Commonwealth revenues for the payment of general obligation debt); *In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*, 927 F.3d 597, 602 (1st Cir. 2019) (denying creditor's request to compel Commonwealth's remittance of toll revenues, vehicle fees, and excise taxes to HTA and then to the bank for payment to Bondholders under section 305 because the "requested relief would require the Title III Court itself to direct the Commonwealth's use of its revenues and property in a manner that contravenes the expressed will of the Commonwealth legislature, the Governor of Puerto Rico, and the Oversight Board").

the Amended PSA may be terminated if a court prevents consummation of the proposed plan, is a far cry from consenting to an order barred by section 305 or waiving section 305.

25. Second, the Oversight Board's covenant to prevent parties in interest from bringing claim objections relating to the GO Bonds, the PBA Bonds, or the PRIFA BANs in Section 4.1(f) of the Amended PSA is not an outright ban on third parties' ability to assert such claim objections. On the contrary, it is consistent with the underlying premise that the Amended PSA and the corresponding plan of adjustment reflect a global compromise and settlement of issues under mediation. But, while the Oversight Board would oppose efforts of other parties to litigate issues to be settled, the covenant only applies to the Oversight Board (not to third parties) and specifically refers to the Oversight Board "taking all <u>reasonable efforts</u> to prevent" any such claim objection by a third party. In other words, the Oversight Board is free to covenant that it will take reasonable action to prevent third parties from bringing claim objections given that such claim objections would violate the spirit of the agreement embodied in the Amended PSA. The Oversight Board has <u>not</u> covenanted that no such claim objections will be filed, as the Oversight Board lacks power to control the actions of third parties.

26. Third, for creditors to sign up to a postpetition Amended PSA promising a breakup fee on termination, creditors have to be assured their termination rights will not be blocked by the automatic stay. There is no basis for Ambac to impose a duty on a party attempting to terminate the Amended PSA to seek court approval when the Oversight Board has expressly excepted such action from the automatic stay under the Amended PSA. There are countless instances where a debtor has consented to automatic stay relief, and the Oversight Board is clearly operating within its scope of permitted authority when it agreed to Amended PSA § 7.1(d), which provision sets

aside the automatic stay with respect to actions taken by PSA Creditors to terminate the Amended PSA (to the extent the automatic stay is applicable).

27. Fourth, the Oversight Board has operated entirely within its authority by agreeing in the Amended PSA that the plan of adjustment and any debt securities issued thereunder must be acceptable in form and substance to the Constitutional Debt Group, the GO Group, the LCDC Group, and the QTCB Group. Without such a provision, the consideration the creditors bargained for could be eviscerated by other provisions inserted into the plan of adjustment. The clear necessity for such provisions is demonstrated by the fact that such provision is similar, if not identical, to the COFINA plan support agreement to which Ambac was a party and pursuant to which it received significant consideration. Indeed, the Oversight Board is unaware of any plan support agreement executed in recent memory where the creditor signatories did not have certain consent rights built into the agreement. The creditors provided with the consent rights under the Amended PSA would not have executed the agreement without such consent rights, and the Oversight Board appropriately followed the countless precedential authority in agreeing to such provision in the Amended PSA. By plucking four provisions out of context, Ambac attempted to depict these provisions as unnatural and illegal, when in fact they are virtually all compelled by simple logic and fairness.

*[Remainder of page intentionally left blank]*

**CONCLUSION**

28. For the foregoing reasons, the Court should deny the Second Motion to Strike.

Dated: October 6, 2020
       San Juan, Puerto Rico

Respectfully submitted,

*/s/ Hermann D. Bauer*
Hermann D. Bauer
USDC No. 215205
**O'NEILL & BORGES LLC**
250 Muñoz Rivera Ave., Suite 800
San Juan, PR 00918-1813
Tel: (787) 764-8181
Fax: (787) 753-8944
Email: hermann.bauer@oneillborges.com

*/s/ Martin J. Bienenstock*
Martin J. Bienenstock (*pro hac vice*)
Brian S. Rosen (*pro hac vice*)
**PROSKAUER ROSE LLP**
Eleven Times Square
New York, NY 10036
Tel: (212) 969-3000
Fax: (212) 969-2900
Email: mbienenstock@proskauer.com
Email: brosen@proskauer.com

*Attorneys for the Financial Oversight and Management Board for Puerto Rico, as representative of the Commonwealth of Puerto Rico*