# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

```
-----------------------------------------------------------------  x
                                                                   :
In re:                                                             :
                                                                   :   PROMESA
THE FINANCIAL OVERSIGHT AND                                        :   Title III
MANAGEMENT BOARD FOR PUERTO RICO,                                  :
                                                                   :   Case No. 17-BK-3283 (LTS)
         as representative of                                      :
                                                                   :   (Jointly Administered)
THE COMMONWEALTH OF PUERTO RICO, et al.,                           :
                                                                   :
         Debtors.[1]                                               :
-----------------------------------------------------------------  x
```

## JOINT MOTION OF PSA CREDITORS PURSUANT TO SECTION 312 OF PROMESA AND SECTION 105 OF THE BANKRUPTCY CODE TO IMPOSE DEADLINES FOR PLAN OF ADJUSTMENT

---

[1]      The Debtors in these Title III cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK-3283 (LTS)) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284 (LTS)) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567 (LTS)) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566 (LTS)) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17-BK-4780 (LTS)) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5233 (LTS)) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

## <u>TABLE OF CONTENTS</u>

<u>**Page**</u>

PRELIMINARY STATEMENT ................................................................................................1

RELIEF REQUESTED.........................................................................................................7

BACKGROUND ................................................................................................................8

I.      THE COMMONWEALTH'S FINANCIAL DIFFICULTIES AND PROMESA .............8

II.     THE TITLE III CASE, APPOINTMENT OF MEDIATION TEAM AND
INITIAL PLAN OF ADJUSTMENT ....................................................................9

III.    THE CURRENT PLAN OF ADJUSTMENT ...................................................10

IV.    THE GLOBAL PANDEMIC AND THE FOMB'S REVISED FISCAL PLAN .............12

V.     THE CURRENT PLAN OF ADJUSTMENT REMAINS AFFORDABLE AND
FEASIBLE.....................................................................................................15

BASIS FOR REQUESTED RELIEF.........................................................................................23

I.      THE COURT IS AUTHORIZED TO IMPOSE PLAN-RELATED DEADLINES .........23

II.     THE PSA STILL PRESENTS THE COMMONWEALTH WITH THE BEST,
MOST AFFORDABLE OPPORTUNITY TO EXIT TITLE III ......................................25

III.    THE COURT SHOULD SET A DEADLINE FOR THE FOMB TO
PROSECUTE A PLAN OF ADJUSTMENT ...................................................27

CONCLUSION..................................................................................................................30

i

## <u>TABLE OF AUTHORITIES</u>

<b><u>Page</u></b>

### <u>Cases</u>

*In re City of Stockton*,
   486 B.R. 194 (Bankr. E.D. Cal. 2013)..................................................................... 25

*In re County of Orange*,
   183 B.R. 594 (Bankr. C.D. Cal. 1995).................................................................... 28

*In re New York City Off-Track Betting Corp.*,
   434 B.R. 131 (Bankr. S.D.N.Y. 2010).............................................................. 27, 28

*In re New York City Off-Track Betting Corp.*,
   2011 WL 309594 (Bankr. S.D.N.Y. Jan. 25, 2011)............................................... 28

### <u>Statutory Authorities</u>

11 U.S.C. § 101 ......................................................................................................... 1

11 U.S.C. § 904 ....................................................................................................... 24

11 U.S.C. § 930 .................................................................................................... 8, 25

11 U.S.C. § 930(a) ................................................................................................... 25

11 U.S.C. § 930(a)(2) .............................................................................................. 28

11 U.S.C. § 941 ....................................................................................................... 25

48 U.S.C. § 2170 ....................................................................................................... 1

PROMESA § 101(a) ................................................................................................... 2

PROMESA § 301(a) ................................................................................................. 25

PROMESA § 305 ..................................................................................................... 24

PROMESA § 312 ............................................................................................. 6, 8, 25

PROMESA § 312(a) ................................................................................................... 9

PROMESA § 313 ....................................................................................................... 9

PROMESA § 315(a) ................................................................................................... 9

To the Honorable United States District Court Judge Laura Taylor Swain:

The Ad Hoc Group of Constitutional Debtholders (the "Constitutional Debt Group"),[2] Ad Hoc Group of General Obligation Bondholders (the "GO Group"),[3] Lawful Constitutional Debt Coalition (the "LCDC"),[4] and QTCB Noteholder Group (the "QTCB Group"[5] and, collectively with the Constitutional Debt Group, GO Group, and LCDC, the "PSA Creditors")[6] respectfully submit this motion pursuant to sections 312 of the Puerto Rico Oversight, Management, and Economic Stability Act ("PROMESA"), codified at 48 U.S.C. § 2170, et seq., and 105 of the United States Bankruptcy Code, 11 U.S.C. § 101, et seq. (the "Bankruptcy Code")[7] for an order, substantially in the form attached as **Exhibit A** hereto, to impose deadlines with respect to a plan of adjustment.

## PRELIMINARY STATEMENT

1.     During the first hearing in this Title III case, the Court aptly observed that while "[t]he scope and scale of the issues are, … humbling, … [t]he goal of Title III and [the Court's]

---

[2]  The members of the Constitutional Debt Group and their respective holdings are set forth in the *Seventh Supplemental Verified Statement of the Ad Hoc Group of Constitutional Debtholders Pursuant to Federal Rule of Bankruptcy Procedure 2019* (ECF No. 13552).

[3]  The members of the GO Group and their respective holdings are set forth in the *Seventh Supplemental Verified Statement of the Ad Hoc Group of General Obligation Bondholders Pursuant to Bankruptcy Rule 2019* (ECF No. 13553).

[4]  The members of the LCDC and their respective holdings are set forth in the *Eighth Supplemental Verified Statement of the Lawful Constitutional Debt Coalition Pursuant to Federal Rule of Bankruptcy Procedure 2019* (ECF No. 14316).

[5]  The members of the QTCB Group and their respective holdings are set forth in the *Sixth Supplemental Verified Statement of the QTCB Noteholder Group Pursuant Bankruptcy Rule 2019* (ECF No. 13548).

[6]  The PSA Creditors are parties to that certain plan support agreement, dated February 9, 2020 (the "PSA"), with the Financial Oversight and Management Board for Puerto Rico (the "FOMB"), as representative, among others, the Commonwealth of Puerto Rico and the Puerto Rico Public Buildings Authority in their respective Title III cases.  The PSA Creditors do not assume any fiduciary or other duties to any other creditor or person.

[7]  Citations to PROMESA are to the respective uncodified versions.

goal here is to find the way forward." May 17, 2017 Hrg. Tr. 6:17-18, 20-21. Nearly 3-1/2 years later, this Title III process has cost the people of Puerto Rico over $650 million in professional fees but the FOMB has yet to "find the way forward" for the island to exit bankruptcy. Progress requires clear deadlines for the FOMB to prosecute a confirmable plan of adjustment.

2.      Upon enactment on June 30, 2016, PROMESA imposed a six-month automatic stay as protection for the Commonwealth against creditor action while the newly-created FOMB could be empaneled, staffed, and get its bearings, free from the distraction of creditor litigation. Congress directed the FOMB to focus on two overarching goals: achieve fiscal responsibility and restore access to the capital markets. PROMESA § 101(a). Congress also gave Puerto Rico powerful tools to clean up its balance sheet, increase financial transparency, and attract new capital to its shores, including the ability for Puerto Rico and its instrumentalities to restructure their debts through Title III proceedings under PROMESA.

3.      The challenges that Puerto Rico has faced since the commencement of its Title III case have taken a substantial toll on the Commonwealth and its citizens. Those same tragedies and their costs, however, have made Puerto Rico's emergence from bankruptcy and its access to capital markets even more urgent. As esteemed former FOMB Member José Ramón González regretfully noted after announcing his resignation:

> This [bankruptcy] cannot go on forever. No government can sustain its operations and invest in infrastructure for the future without access to capital markets […] It is not possible to sustain economic growth without access to the capital markets.[8]

And Puerto Rico cannot regain access to the capital markets while in bankruptcy.

---

[8] https://caribbeanbusiness.com/oversight-board-member-jose-ramon-gonzalez-steps-down/?cn-reloaded=1 (last accessed:10/3/2020).

4.     More than four years after PROMESA's enactment, Puerto Rico and its people remain exactly where they were: languishing in bankruptcy, without financial transparency or access to the capital markets.   Bondholders of the Commonwealth's highest priority, constitutionally guaranteed debt, meanwhile, have not been paid in over four years, while the government has continued to timely pay the vast majority of junior, unsecured creditors.   The FOMB's decision not to pay bonds that have clear legal priority and which were consistently represented to investors by Puerto Rico's government to be the most senior obligation of the Commonwealth, has persisted despite the fact that (a) Puerto Rico has generated sufficient cash flows to make all scheduled GO payments, (b) the Commonwealth has outperformed every FOMB financial projection, including generating record tax collections in FY2019, and (c) the Commonwealth has nearly $21 billion in government and instrumentality bank account balances, $9.5 billion of which sits in cash in the Commonwealth's Treasury Single Account ("TSA") and TSA Sweep Account.

5.     Since its first meeting, the FOMB has publicly insisted that Puerto Rico's government and economic policies require considerable structural reforms to achieve fiscal responsibility, growth, and access to the capital markets.  The FOMB admits that it has achieved little progress in implementing those reforms and, in its recently certified revised Fiscal Plan, has all but given up on them.   Indeed, in an exchange regarding the Board's inability to implement its recommended reforms, FOMB member Andrew Biggs said "I don't think it's unreasonable to conclude that you should either have a stronger oversight board or no board at all. A weak board leads to endless trench warfare trying to get politicians to stop acting like politicians."[9]  Rather than negotiate compromises that would advance the interests of the people of Puerto Rico, the

---

[9]   Andrew G. Biggs (@biggsag).  May 27, 2020, 5:39 p.m. Tweet.

FOMB and elected government have engaged in "endless trench warfare," acting at all times as though they can place the economic burden of their collective failure or unwillingness to implement structural reforms squarely and exclusively on the shoulders of Puerto Rico's highest priority creditors.

6.      The PSA Creditors, however, have remained unfailingly committed to achieving a confirmable, feasible, and affordable restructuring that takes account of the Commonwealth's political, economic, and structural realities while complying with PROMESA's requirements. Specifically, the PSA Creditors agreed to compromise their legal entitlements and engage in good-faith negotiations with the FOMB over many months, culminating with the PSA and the filing of a Plan of Adjustment on February 27, 2020 (ECF No. 11946) (the "Current POA" or "Current Plan of Adjustment").[10]  After nearly three years in Title III, this was a major step towards exiting bankruptcy and fulfilling the congressionally mandated goals of achieving fiscal accountability and access to capital markets.

7.      Prior to the global pandemic, the Current POA—including the various compromises of creditor rights embedded therein—was scheduled for creditor consideration and the Court's review before year end.  After the onset of the COVID-19 pandemic, however, the FOMB adjourned consideration of the Current POA *sine die*, citing the need to analyze the pandemic's potential impact on Puerto Rico's economy.

8.      Thereafter, the FOMB—without input from the PSA Creditors—certified a new fiscal plan that, among other things, dramatically reduced projected revenues, not only over the near-term due to the pandemic but also over the full 30-year projection period.  The new fiscal

---

[10]  Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Current Plan of Adjustment.

plan projections were premised on the notion that the pandemic will have a permanent negative impact on Puerto Rico's economy that far exceeds the scope and duration of the projected impact on the mainland.  Despite implausible projections produced by the FOMB—and despite the fact that the Commonwealth continues to outperform the FOMB's projections[11]—the PSA Creditors nonetheless tried in good faith to work within the FOMB's new fiscal plan and find a way forward through potential modifications to the Current POA.  Unfortunately, no agreement was reached.

9.      The FOMB's latest projections notwithstanding, the Current POA was affordable when the FOMB agreed to it after months of analysis and negotiations and it remains affordable today.  Under the deal, bondholders will receive approximately $3.8 billion in cash consideration out of the more than $17 billion of Commonwealth cash previously projected to be available at the beginning of 2020.  Since then, Puerto Rico's cash position has improved dramatically by more than $3 billion to approximately $21 billion.  The Current POA also would significantly de-lever the Commonwealth, calling for approximately 4% of the Commonwealth's own-source revenues to be set aside for debt service on the New GO Bonds.  The Current POA also would fully amortize the bonds during the FOMB's projection period such that the island would have no future maturity walls and in fact zero general obligation debt outstanding in just 20 years—an unprecedented fresh start.

10.      The Current POA was crafted after extensive and intense work and negotiations facilitated by the Mediation Team, and still has the support of holders of approximately 60% of highest priority debt issued by Puerto Rico. [12]  But that continued support cannot be taken for

---

[11] As discussed in Background § IV, *infra*.

[12]   The FOMB correctly noted as recently as September 30, 2020 that the PSA executed in connection with the Current POA remains in effect.   September 30, 2020 FOMB Press Release, available at https://drive.google.com/file/d/1WB2Jzhdl9tOs8gG4NooNgvRTGdfAq9_R/view   (last   accessed: 10/3/2020) (the "FOMB Press Release").

granted.  While the PSA Creditors have offered to further refine the already affordable deal under the Current POA to address the FOMB's concerns regarding any near-term impact of the pandemic, the FOMB has used its exclusive right to file a plan and its implausible assumption that the pandemic has pushed Puerto Rico into a perpetual economic tailspin to forestall Puerto Rico's emergence from bankruptcy.

11.     The FOMB's failure to move the plan process forward threatens a core component of the FOMB's settlement with the PSA Creditors (*i.e.,* progress towards consummation of a transaction by which the Commonwealth would exit bankruptcy and begin repaying its creditors on a reasonable timeframe).  That inaction is also putting Puerto Rico's future at risk and, at this time, requires the Court's intervention.  Specifically, while the FOMB has the exclusive power to file plans of adjustment of the Commonwealth's debts under PROMESA, that exclusive authority is not without a statutory counterweight:  pursuant to PROMESA section 312, Congress expressly authorized the Court to impose a deadline on the FOMB to file a plan.  The PSA Creditors respectfully request that the Court exercise that authority here.  The Commonwealth cannot afford to wait longer.

12.     The FOMB has enjoyed broad discretion for years, yet it still does not have a concrete timeline to emerge from bankruptcy.  This, even though multiple other sovereigns, including Argentina and Ecuador, achieved highly complex restructurings in a matter of mere months during the pandemic.  It is therefore imperative that the FOMB be held to firm deadlines set by the Court, which can be the impetus for moving the cases forward.  As the Court may recall, in the contentious COFINA case, the Court entered an order implementing a protocol which

provided a clear structure and timeline for resolution of that case. So too here, structure and deadlines are needed to bring these cases to conclusion.[13]

13.     The PSA Creditors agree with the Court that "[f]ailure … is not an option" in this Title III case. May 17, 2017 Hrg. Tr. 8:8. But using its exclusive power to formulate serial fiscal plans (which have repeatedly understated actual performance) and adjourn consideration of a plan of adjustment indefinitely is also tantamount to failure. The FOMB's consistent use of conservative and unreliable projections to portray an inescapable downward spiral for the Puerto Rican economy ensures nothing more than the certainty that the Commonwealth will remain locked out of the capital markets. The economic, social, and political costs of remaining in bankruptcy, including its deterrent effect on new investment and capital formation and on access to the capital markets, are harming Puerto Rico and cannot be allowed to continue indefinitely. The Court therefore should grant this motion and impose deadlines that will bring this Title III to a conclusion and fulfill the goals of PROMESA.

## RELIEF REQUESTED

14.     The PSA Creditors respectfully request  an order, pursuant to section 105(a) of the Bankruptcy Code and section 312 of PROMESA, imposing the following deadlines relating to a plan of adjustment for the Commonwealth of Puerto Rico and Public Buildings Authority:

a. By no later than **November 30, 2020**, the FOMB shall either (i) file a statement confirming that it intends to prosecute the Current POA; (ii) file and serve a modified version of the Current POA, with a modified disclosure statement; or (iii) file and serve a plan of adjustment for the Commonwealth and the Public Buildings Authority that the FOMB intends to prosecute towards confirmation, with an accompanying disclosure statement;[14]

---

[13]   *See* Stipulation and Order Approving Procedure to Resolve Commonwealth-COFINA Dispute (ECF No. 996).

[14]   The PSA parties "irrevocably and unconditionally" submitted to the "jurisdiction of [the Title III] Court" with respect to "any matter under or arising out of or in connection with [the PSA]." PSA § 8.6. The Board has a duty to "prosecut[e], in a timely and appropriate manner, the approval of the Disclosure Statement and confirmation of the Plan," PSA § 4.1(b), and the PSA parties may bring an action before this Court to

b. The FOMB shall provide parties with not less than approximately 60 days' notice of the disclosure statement such that the Court may consider the adequacy of the disclosure statement for the plan by no later than **February 1, 2021**;

c. The FOMB shall distribute ballots for the plan providing not less than approximately 90 days for voting on the plan such that tabulation will be completed no later than **April 30, 2021**;

d. The Court will consider confirmation of the plan by no later than **May 31, 2021**; and

e. Consummation of the plan must occur by no later than **June 30, 2021**.

To the extent the FOMB is unwilling or unable to move forward, the Court should dismiss the Title III cases under section 930 of the Bankruptcy Code.

## **BACKGROUND**

### I.   **THE COMMONWEALTH'S FINANCIAL DIFFICULTIES AND PROMESA**

15.   The Commonwealth stopped making debt service payments in mid-2016 on its full faith and credit general obligations bonds and/or Commonwealth-guaranteed bonds (amounting to approximately $18 billion of claims) ("Constitutional Debt").  In light of the Commonwealth's financial difficulties, on June 30, 2016, Congress enacted PROMESA, which provides a framework for the Commonwealth to restructure its debt.  PROMESA also created the FOMB as an entity "within the territorial government" responsible for "providing a method for [the Commonwealth] to achieve fiscal responsibility and access to the capital markets."  PROMESA § 101(a).

---

seek specific performance.  PSA § 8.15.  Even if the Board were to invoke Section 7.2(b)'s termination provision due to "a material adverse change which renders the confirmation of the Plan not feasible," it would be for this Court—not the Board—to decide whether such a plan would fail a "feasibility" challenge. The PSA Creditors reserve all rights under the PSA, including without limitation the right to invoke the Court's authority to order "specific performance and injunctive or other similar relief" under section 8.15 of the PSA.

16.     Title III authorizes the FOMB to commence a process similar to chapter 9 of the Bankruptcy Code to allow the Commonwealth to restructure and discharge its legacy debt pursuant to a court-approved plan of adjustment.  The FOMB is the sole representative of the debtor in a case filed under Title III and is empowered to "take any action necessary on behalf of the debtor to prosecute the case of the debtor….".  PROMESA § 315(a).  Only the FOMB can file or modify a plan of adjustment for the debtors.  PROMESA §§ 312(a), 313.

## II.   THE TITLE III CASE, APPOINTMENT OF MEDIATION TEAM AND INITIAL PLAN OF ADJUSTMENT

17.     On May 3, 2017, the FOMB filed a petition for relief under Title III of PROMESA on behalf of the Commonwealth in the United States District Court for the District of Puerto Rico (the "Title III Case").

18.     Since its inception, the Title III Case has been consumed with complex and costly litigation between and among the FOMB, the Commonwealth government, creditors, and other interested parties.  In order to facilitate a successful, consensual resolution of the many disputed issues, the Court entered an Order designating a team of sitting federal judges (the "Mediation Team") to conduct confidential settlement negotiations of any and all issues and proceedings arising in the Title III Case (ECF No. 329) (the "Mediation Order").

19.     On May 31, 2019, the FOMB and certain participating creditors agreed upon terms for a plan support agreement, including a term sheet for a proposed Commonwealth plan of adjustment (the "Initial Plan").[15]  On July 24, 2019, in response to a FOMB motion requesting a stay of litigation of certain matters to be settled under a plan of adjustment implementing the Initial

---

[15] On June 16, 2019, the FOMB released the terms of the Initial Plan that it had entered into with holders of roughly 16% of outstanding Constitutional Debt.  The FOMB filed the Initial Plan on June 27, 2019. *See*, Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al. (ECF No. 8765).

PSA or to be litigated after consummation of the plan, the Court granted a stay on certain conditions as reflected in its *Order Regarding Stay Period and Mandatory Mediation* (ECF No. 8244) (the "Stay Order").  The Stay Order directed substantially all parties embroiled in active litigation to participate in mediation supervised by the Mediation Team.[16]

### III.    THE CURRENT PLAN OF ADJUSTMENT

20.    In October 2019, several months after entry of the Stay Order, the Mediation Team commenced a comprehensive mediation process with a broader cross-section of creditors than had participated in the negotiations that resulted in the Initial Plan.  The mediation included all four of the ad hoc groups of holders of Constitutional Debt, which included substantial holders of Constitutional Debt issued in or prior to 2011 (the "Early Vintage Bonds") and after 2011 (the "Late Vintage Bonds" ).  After several months of negotiation, the mediation process produced a global compromise regarding the terms of a plan with vastly more creditor support (including both Early Vintage Bonds and Late Vintage Bonds) than the Initial Plan.  Among other things, the PSA provided for a fixed recovery for Early Vintage Bonds that was higher than Late Vintage Bonds, reflecting a compromise of their respective lawful priority that would be effectuated under a forthcoming plan of adjustment.

21.    On February 9, 2020, the FOMB announced the current PSA, which provides a framework for a confirmable plan of adjustment that would settle all litigation concerning the Constitutional Debt as well as an agreement by the parties to the PSA to the proposed treatment of different vintages of Constitutional Debt.  The PSA was favorably received by the market and garnered further support totaling approximately $10.7 billion of Constitutional Debt claims that

---

[16] *See* Stay Order at 1-2 (directing Mediation Team to work with creditors to identify and sequence the issues that must be litigated or otherwise resolved in order to achieve confirmation of a plan of adjustment for the Commonwealth).

became parties to the PSA, representing approximately 58% of outstanding Constitutional Debt claims.

22.     On February 28, 2020, the FOMB filed the Current POA, incorporating the terms of the PSA, and an accompanying disclosure statement (ECF No. 11947) (the "Disclosure Statement"). On February 28, 2020, the FOMB also filed a motion seeking approval of the disclosure statement, approval of solicitation procedures with respect to the Current POA, and setting of related deadlines (ECF No. 11947) (the "Plan Solicitation Motion"). The Plan Solicitation Motion scheduled a hearing for the Court to consider approval of the Disclosure Statement for June 3, 2020 and confirmation of the Current POA in October 2020. In order to provide the Debtors with the opportunity to confirm the Current POA without the overhang of premature plan-related litigation, the Court entered an Order maintaining the stay of litigation concerning the validity, priority, and secured status of the Constitutional Debt pending confirmation of the Current POA.[17]

23.     In March 2020, the global pandemic caused the FOMB to seek to adjourn the hearing on the Disclosure Statement and related deadlines *sine die* in order to assess the pandemic's impact on Puerto Rico.[18] The Court granted the adjournment and directed the FOMB to file a status report regarding proposed scheduling for the Current POA and Disclosure Statement by May 1, 2020.[19] The FOMB has since filed three additional status reports, each time stating that it was not yet prepared to move forward with respect to the Disclosure Statement (ECF Nos. 13018,

---

[17]   *See* Final Order Regarding (A) Stay Period and (B) Mandatory Mediation, and (C) Certain Deadlines Related Thereto (ECF. No. 12189).

[18]   Urgent Motion to Adjourn Hearing to Consider the Adequacy of Information Contained in the Disclosure Statement and Related Deadlines (ECF No. 12485) (the "Adjournment Motion").

[19]   Order Granting Motion to Adjourn Hearing to Consider the Adequacy of Information Contained in the Disclosure Statement and Related Deadlines (ECF No. 12549).

13660, and 14195).  The most recent status report informed the Court that the FOMB had resumed

formal discussions with the PSA Creditors with the assistance of the Mediation Team "to address

the new reality created by the COVID-19 pandemic" and therefore it was premature to schedule a

Disclosure Statement hearing.  (ECF No. 14195 at ¶¶ 14-15).  The FOMB's next status report is

due by October 25, 2020.

24.     On September 30, 2020, the FOMB announced that it had not reached agreement

with the PSA Creditors regarding potential modifications to the Current POA and published the

proposal that the FOMB made to the PSA Creditors on July 30, 2020 and the PSA Creditors'

August 24, 2020 counter-proposal.  *See* FOMB Press Release.  From and after August 24, 2020,

the FOMB did not respond to the PSA Creditors' counterproposal.  The FOMB Press Release also

stated that the parties were continuing to negotiate and that the PSA has not been terminated.  *Id.*

## IV.     THE GLOBAL PANDEMIC AND THE FOMB'S REVISED FISCAL PLAN

25.     Beginning in mid-March 2020, as prospective partners with the FOMB and in good

faith reliance on each party's obligations under the PSA, the PSA Creditors reached out to the

FOMB to discuss what changes, if any, may be warranted to the May 9, 2019 Certified Fiscal Plan

(the "2019 Certified Fiscal Plan") in light of the global COVID-19 pandemic.  The FOMB declined

the PSA Creditors' invitation to have those discussions, telling them that it was compelled to focus

on establishing a new budget for 2021, which must be approved in accordance with

Commonwealth law prior to the commencement of the new fiscal year (*i.e.*, July 1, 2020).  Had

the FOMB merely established a new budget for 2021, nothing would have prevented the FOMB

from continuing to prosecute the PSA in accordance with its contractual undertakings, because the

transactions contemplated by the PSA largely take place based on events after fiscal year 2021.

Moreover, as counsel for the FOMB has stated to the Court, a certified fiscal plan is not set in stone but remains subject to modification.[20]

26.    Instead, on May 27, 2020, the FOMB certified a new fiscal plan (the "May 2020 Fiscal Plan") that was based on a lower set of projected cash flows, making it appear that the PSA would need to be amended to adjust debt service payments in a manner consistent with the new projected cash flows.  Many of the FOMB's downward adjustments were based on its forecast that the global pandemic would dramatically and disproportionately impact Puerto Rico's economic activity for the entirety of the *30-year* fiscal plan period.  Others were attributable to the continued disagreement between the FOMB and Puerto Rico's elected officials over structural reforms and measures, and to the FOMB's inability or unwillingness to have the Commonwealth implement those reforms and measures.

27.    In the FOMB's words, "[s]ince 2017, the Oversight Board has worked with the Government to implement numerous structural reforms, but there has been little meaningful progress in most areas."[21]  Instead of insisting on the implementation of those reforms, the FOMB has abandoned them, and the impact of that abandonment is substantial: under the May 2020 Fiscal Plan, the Commonwealth's own source revenues from FY2020 – FY2049 decreased by $40 billion, with approximately 30% of that due to reductions in measures and/or failure to implement structural reforms that had *already* been substantially pared back from what the FOMB had called for in prior fiscal plans, resulting in tens of billions of dollars in lost fiscal surplus.

---

[20]    *See* Tr., 6/3/20 at 20:5-11 (Mr. Bienenstock: "That, in turn, was a certification without the Board or anyone, for that matter, having enough data to know the crux of the ultimate impact of COVID-19 on the economy of Puerto Rico. And as the Board has always said, it changes its fiscal plan either when it finds it made an error, or when there's new evidence on a material issue, new information, it adjusts it.").

[21]    May 27, 2020 Certified Fiscal Plan for the Commonwealth of Puerto Rico, at 17.  Available at https://drive.google.com/file/d/1ayjLxr74cKpFo4B2sAToSj-OeJOYvFO5/view    (last    accessed: 10/3/2020).

28.     The FOMB and Government did not abandon these measures and reforms because they believed the measures unnecessary, unimportant, or unachievable.  To the contrary, FOMB members have been very vocal about the seminal role these measures play in the Commonwealth's economic future.  For example, FOMB then-Chairman José Carrión and FOMB Member Andrew Biggs wrote in the Washington Post that "Puerto Rico may shed some debt via bankruptcy and rebuild its infrastructure using federal aid, but without a robust commitment to economic reform, the underlying weaknesses that made Puerto Rico vulnerable to bankruptcy will remain."[22]

29.     More recently, then-Member José Ramón González admitted to the Caribbean Business that the Board and Government had been unable even to generate up to date audited financial statements for the Commonwealth.  Calling it a "major unachieved objective," Mr. González noted: "You cannot have a serious discussion about fiscal equilibrium and sustainability if you don't have audited financial statements for the Commonwealth."[23]  Mr. González also told El Nuevo Día that the FOMB and Government "appear to have lost the ability to execute, to carry out basic management processes that any Enterprise, big or small, has to undertake in order to survive" explaining, also, that the FOMB and Government have "failed to demand more of [themselves] to do what needs to be done."[24]

30.     The PSA Creditors were not involved in the discussions between Puerto Rico's elected officials and the FOMB regarding reforms and measures, just as they had no involvement in the formulation of the May 2020 Fiscal Plan.   Yet those very same creditors—the

---

[22]    December   17,   2018   Carrion   and   Biggs   Opinion   Piece.   Available   at
https://www.washingtonpost.com/opinions/dont-blame-puerto-ricos-poor-economy-on-hurricanes/2018/12/17/206a5734-f181-11e8-9240-e8028a62c722_story.html (last accessed: 10/3/2020).

[23] https://caribbeanbusiness.com/oversight-board-member-jose-ramon-gonzalez-steps-down/?cn-reloaded=1 (last accessed: 10/3/2020).

[24]    https://www.elnuevodia.com/noticias/locales/notas/jose-ramon-gonzalez-rompe-el-silencio-tras-su-salida-de-la-junta-de-supervision-fiscal/

Commonwealth's highest-priority bondholders—will bear the economic burden of the FOMB's and the Commonwealth's collective failure or unwillingness to implement these structural reforms.

## V. THE CURRENT PLAN OF ADJUSTMENT REMAINS AFFORDABLE AND FEASIBLE[25]

31.     The FOMB's Revised Fiscal Plan assumes that the pandemic will have a permanent negative impact on Puerto Rico from which its economy will never recover.  But the hopeless projections underpinning the FOMB's May 2020 Fiscal Plan do not reflect the Commonwealth's reality.  Puerto Rico has outperformed every revenue projection the FOMB has ever made, even after the 2017 hurricanes, the 2020 earthquakes, and now the global COVID-19 pandemic:

**General Fund Revenue**[26]



---

[25]   The analysis presented herein is intended as illustrative evidence of the Current POA's affordability under current circumstances, rather than an exhaustive presentation of all of the abundant evidence supporting that conclusion.

[26] Figures in the chart in millions. Projections per each respective fiscal plan. FY2018, FY2019 and FY2020 based on projected revenues post measures. FY2019 and FY2020 projections deduct earned income tax credit of approximately $204 million. The May 27, 2020 Fiscal Plan figure excludes the $601 million of deferred tax revenues that is expected to be collected in FY2021. FY2018 actuals per Hacienda report (http://www.hacienda.pr.gov/sites/default/files/ingresos_netos_fondo_general_2009-2018_0.pdf).
FY2019      and      FY2020      actuals      per      Hacienda      report (http://www.hacienda.gobierno.pr/sites/default/files/ingresos_netos_jun_20120_r.pdf).

32.     The FOMB's revenue projections following the impact of hurricanes Irma and Maria illustrate the FOMB's penchant for overly pessimistic economic forecasts following significant events.  Specifically, after Hurricane Maria's landfall in September 2017, the FOMB issued a fiscal plan on April 19, 2018 showing General Fund revenue projections[27] for FY2018, FY2019, and FY2020 of $8.2 billion, $8.5 billion, and $9.0 billion, respectively.  In FY2018, FY2019, and FY2020, however, the Commonwealth actually collected $9.3 billion, $11.4 billion, and $9.3 billion in General Fund revenues, respectively.  The Commonwealth's actual collections, therefore, were approximately 14%, 33%, and 4% higher than the FOMB's pessimistic forecast in 2018 (FY2020 outperformance was notwithstanding the impact of the pandemic in the last quarter of FY2020).

33.     In fact, the Commonwealth had record-high tax collections in FY2019, the one year since bankruptcy without a crisis.  The FOMB's historical forecasts for FY2019 reflect the difficulty of projecting revenue streams even a couple of years in the future.  The pandemic's onset prompted the FOMB to revise its already pessimistic projections further downward over the 30-year life of the fiscal plan based upon the assumption that Puerto Rico has entered a tailspin from which it will never escape.  To put this remarkable assumption in perspective, even in the midst of a pandemic, the Commonwealth generated a significant cash build of $1.5 billion in the TSA account and the Government of Puerto Rico and its instrumentalities generated a cash build of $5.7 billion during FY2020.  Once again, FY2020 General Fund revenues outperformed the May 2020 Fiscal Plan even though the plan was constructed one month before the end of the fiscal year.

---

[27] General Fund Revenue projections from Exhibit 81 of the April 19, 2018 Certified Fiscal Plan plus revenue measures less earned income tax credit of approximately $204 million in FY2019 and FY2020.

34.     Even if the Court were to credit the May 2020 Fiscal Plan's pessimistic assumptions, the current POA remains feasible.  That is because the POA's affordability depends primarily on the cash position of the Commonwealth as of the Effective Date of the Current POA, and only on a small sliver of the projected cash flows over the course of the next 20 years.  The Commonwealth continues to stockpile cash.  In fact, since the outset of the Title III cases, Puerto Rico has generated sufficient cash build to make all scheduled payments on its Constitutional Debt:

### Increase in Cash vs. Status Quo GO / PBA Debt Service[28]

|  | FY2017 | FY2018 | FY2019 | FY2020 | Cumulative Total |
|---|---|---|---|---|---|
| Treasury Single Account (including TSA Sweep Account) | $1,799 | $3,181 | $7,278 | $8,775 | |
| *Change in TSA (including TSA Sweep Account) Balance* | *1,555* | *1,382* | *4,097* | *1,497* | **8,531** |
| Cash Balance of the Government of Puerto Rico and its Instrumentalities | 5,825 | 9,498 | 14,709 | 20,438 | |
| *Change in Government of Puerto Rico and its Instrumentalities Cash Balance* | *2,021* | *3,673* | *5,211* | *5,729* | **16,634** |
| Status Quo GO / PBA Debt Service | 1,343 | 1,317 | 1,342 | 1,371 | **5,374** |

35.     The Commonwealth, meanwhile, has not made any debt service payments on its highest priority Constitutional Debt since mid-2016, while continuing to pay other creditors throughout the bankruptcy process virtually on a current basis.[29]  The Commonwealth also has made all payments on its new pay-as-you-go public employee pension system.  According to the Commonwealth's FY2021 budget, $2.055 billion or 21% of the General Fund budget is dedicated to PayGo pension payments.  The Current POA does not preclude the Commonwealth from continuing to make these payments or affect its ability to do so.

---

[28]   Figures in the chart in millions. The TSA is the Commonwealth's main operational bank account in which a majority of receipts from Governmental funds are deposited and from which most expenses are disbursed.  FY2018 to FY2020 cash balances per the respective Summary of Bank Account Balances and includes the TSA sweep account balances.  FY2017 cash balances per the Comprehensive Annual Financial Report and includes $1.8 billion of restricted cash and cash equivalents.

[29] Commonwealth Treasury Single Account Report, 6/30/2020, at 5/22 ("There has also been a $90M build in AP since the lockdown was imposed on March 15, 2020. This signals invoice processing delays due to COVID-19 and the imposed lockdown may be driving an additional slowdown in vendor disbursements"). Available      at      https://www.aafaf.pr.gov/wp-content/uploads/1A-FY20TSA-Cash-Flow-June2020-v17_RELEASE.pdf (last accessed 10/3/2020).

36.     The Current POA also reduces the Commonwealth's funded bond debt and unsecured claims from $35 billion[30] to $11 billion, *a 70% reduction*, and ensures that the Commonwealth will have just $7.9 billion of debt outstanding in five years and only $5.3 billion in 10 years.  Importantly, the debt fully amortizes in only 20 years, which is unique when compared to the other restructurings that assume debt will be refinanced.   And the Current POA shortens debt service from 30 to 20 years relative to the Initial POA; the Commonwealth keeps the last ten years of cash flows, which aggregated to $4.8 billion. The chart below shows the reduction in the Commonwealth's annual debt service from pre-Title III levels:

## COMMONWEALTH PLUS COFINA DEBT SERVICE ($MM)

The Settlement reduces Commonwealth plus COFINA debt service from an average of $3,134MM to $1,472MM over the next ten years





---

[30] Includes General Obligation, Public Building Authority, Highways and Transportation Authority, Convention Center, Puerto Rico Infrastructure Financing Authority, Metropolitan Bus Authority, Employee Retirement Systems, Government Development Bank Debt Recovery Authority, and other Commonwealth guaranteed claims.

37.     The Current POA would require the Commonwealth to dedicate only 8.91% of its own-source and COFINA revenues as projected in the May 2019 Certified Fiscal Plan to annual debt service on the New GO Bonds and COFINA Senior Lien Bonds and COFINA Junior Lien Bonds.[31]   That 8.91% is below the FOMB's own 9.16% target[32], the 15% Puerto Rico constitutional debt limit, and the 14% – 23% of revenue targeted by the International Monetary Fund.[33]  Equally telling is that the maximum annual debt service on New GO Bonds and COFINA Junior Lien Bonds under the Current POA is only 4.80% of the Commonwealth's consolidated revenues[34] for FY 2020.

38.     To put in perspective the negligible impact that the certification of the May 2020 Fiscal Plan had on the affordability of the PSA, consider that based on the May 2019 Certified Fiscal Plan (which informed the negotiation of the PSA) the maximum amount of debt payments in any year contemplated by the PSA was 8.91% of the Commonwealth's FY2020 combined own-source plus COFINA revenues.[35]   Under the FOMB's May 2020 Fiscal Plan, meanwhile, the maximum amount of such payments was approximately 9.69% of projected FY2020 combined own-source plus COFINA revenues.  This implies a negligible difference of 78 basis points (0.78%)—or annual debt service of approximately $115 million, which is 0.2% of the

---

[31] Based on Commonwealth own-source revenue and COFINA revenue for FY2020 per the May 9, 2019 Certified Fiscal Plan of $16.5 billion.

[32] As referenced on page 5 of the PSA Public Summary https://drive.google.com/file/d/1vVUT722_ai0VOfrzYbEwWHCwzhsMrvWH/view.

[33] International Monetary Fund debt sustainability framework published March 19, 2019.

[34] As projected in the May 27, 2020 Certified Fiscal Plan, page 261, line titled "Revenue Post Measures".

[35] The PSA debt service (including COFINA) is 6.54% of Own Source, COFINA and Federal Fund revenues under the FY2020 revenue projections in the May 9, 2019 Certified Fiscal Plan and 6.67% in the May 27, 2020 Certified Fiscal Plan.

Commonwealth's FY2020 GNP projections per the May 2020 Fiscal Plan (or 0.5% of the Commonwealth's FY2021 budget of $22.2 billion).[36]

39.     Even still, the PSA provides the FOMB, Commonwealth, and PSA Creditors with additional flexibility to adjust its terms, if necessary.  For example, the Initial POA (which was based on the October 23, 2018 Certified Fiscal Plan) contemplated the issuance of 30-year bonds with maximum annual debt service of approximately 9.18% of FY2019 own-source revenues plus COFINA revenues.  By contrast, the Current POA only includes 20-year bonds where payments do not exceed 8.91% of FY2020 own-source revenues plus COFINA revenues.  To the extent that the FOMB desired lower annual payments while maintaining the same overall value, nothing would prevent the FOMB from issuing proposed securities with maximum annual debt service being slightly higher, or with a longer duration (up to 10 additional years).  Such modifications are admittedly feasible, and, as mentioned, the PSA and Current POA provide flexibility to achieve and implement them in the context of an amendment to the Current POA.  Indeed, on August 17, 2020, just prior to the commencement of formal mediation, the PSA Creditors shared their own detailed collaborative analysis of the May 2020 Fiscal Plan along with an appeal to common sense that, even if the FOMB refuses to adjust its projections, the transactions contemplated by the PSA remain viable.

40.     The transactions' viability is further underscored by the Commonwealth's current situation.  The Commonwealth's current cash balances, for example, are significantly higher than when the Current POA was filed in February 2020.  As of August 31, 2020, per AAFAF's

---

[36] FY2021 Commonwealth budget includes $10.0 billion from the General Fund, $3.3 billion from the Special Revenue Funds and $8.9 billion from Federal Funds. The Commonwealth budget does not include separately managed entities, such as Puerto Rico Electric Power Authority and Puerto Rico Aqueduct and Sewer Authority.

Summary of Bank Account Balances, the total bank account balances for the Government and its instrumentalities was $20.7 billion.[37]  Those same accounts were at $17.3 billion as of January 31, 2020 and $17.2 billion as of December 31, 2019.[38]

41.    The Commonwealth also now stands to benefit from the federal government's recently announced $12.8 billion Federal Emergency Management Agency relief package for Puerto Rico, which includes (a) $10.5 billion to fund the repair and replacement of PREPA' power generation and transmission systems and office buildings, and (b) $2.3 billion to restore school buildings and educational facilities.[39]  This aid package funding will increase GNP over the next 7 years by up to 1.5% annually and increase aggregate primary surplus from FY2021 through FY2028 by approximately $1.8 billion.[40]

42.    Similarly encouraging, on August 3, 2020, U.S. District Court for the District of Massachusetts held that the exclusion of Puerto Rico residents from Supplemental Security Income (SSI), Supplemental Nutritional Assistance Program (SNAP) and the Low-Income Subsidy (LIS) for Medicare Part D benefits is unconstitutional.  Puerto Rico economic think tank, Center for a New Economy, estimates that this ruling would have an annual, recurring economic impact of "up to $5.3BN in new benefits or approximately 7.5% of Puerto Rico's GNP."[41]

---

[37] https://www.aafaf.pr.gov/financial-documents/summary-of-bank-account-balances/

[38] https://www.aafaf.pr.gov/financial-documents/summary-of-bank-account-balances.

[39] https://app.reorg.com/documents/20200918/5f64dac49ee33.pdf.

[40] Miller Buckfire analysis based on methodology utilized in the May 27, 2020 Certified Fiscal Plan for disaster recovery federal funds. Assumes a 15.5% pass-through rate for FEMA funding for PREPA, a 23.5% pass through rate for FEMA funding for Department of Education and an economic multiplier of 1.34. Assumes funds will be spent over 7 years and an unwinding of economic impact over five years. In calculating surplus, assumes revenue as a percentage of nominal GNP is consistent with the percentage implied by the May 27, 2020 Certified Fiscal Plan and expenses are unchanged.

[41] https://translate.googleusercontent.com/translate_c?depth=1&nv=1&pto=aue&rurl=translate.google.com&sl=es&sp=nmt4&tl=en&u=https://grupocne.org/2020/08/13/weekly-review-13-agosto-2020/&usg=ALkJrhh3oNGX4zWtwUD6whH9_8GPIqAjOQ

43.     Yet unlike its practice of assuming the worst when faced with changed circumstances, the FOMB's May 2020 Fiscal Plan either does not incorporate or explains away the above-mentioned factors despite their obvious material positive impact on Puerto Rico's economy.  The May 2020 Fiscal Plan and the Commonwealth's historical and current economic performance clearly evidence that Puerto Rico can afford to pay all debt service on its Constitutional Debt now.  Puerto Rico remains in bankruptcy, therefore, not because it cannot pay its Constitutional Debt, but because the FOMB projects that there will be deficits over ten years from now.  Quite simply, there is no precedent for a debtor (corporate or sovereign) that has been in bankruptcy for almost 4 years choosing to stay in bankruptcy based on doomsday deficit projections a decade in the future.

44.     Remaining in bankruptcy without any defined process to confirm a plan of adjustment threatens to squander the Commonwealth's real and current opportunity to emerge from bankruptcy and regain access to the capital markets in a period of unprecedented low interest rates.[42]



_____
[42] Graph illustrates the U.S. General Obligation BBB Muni 10-Year Yields (BS1252) since May 2017 per Bloomberg.

22

45.     Emergence would also generate substantial Title III-related expense savings for the Commonwealth and will create opportunities for new investment generation and capital formation. The impact even of the first benefit cannot be overstated: Title III expenses from FY2021 to FY2024 are projected to be $400 million.[43]

46.     The Current POA, therefore, provides an opportunity to restructure the Commonwealth's highest priority debt on extremely favorable terms, discharge billions of dollars in claims, and exit bankruptcy without affecting the government's ability to serve its people.

47.     The PSA Creditors remain ready, willing, and able to perform the PSA, including to modify details of the Plan that would provide similar economic treatment to holders of Constitutional Debt on different terms if required by actual changes to the Puerto Rico economy. The PSA Creditors also remain ready, willing, and able to consider any modifications that the FOMB may propose.  The FOMB, however, must *decide* to get Puerto Rico out of bankruptcy. The FOMB has shown it cannot do so on its own; only court-imposed deadlines will propel the Commonwealth forward.

## BASIS FOR REQUESTED RELIEF

## I.      THE COURT IS AUTHORIZED TO IMPOSE PLAN-RELATED DEADLINES

48.     The federalism concerns that animate municipal bankruptcy cases create an uneven playing field between debtors and creditors.  In a municipal bankruptcy case, creditors cannot terminate exclusivity to file their own plan, seek to convert a municipal bankruptcy case, or appoint a trustee or examiner, nor is a liquidation possible.  Moreover, the Court's authority over a municipal debtor is constrained since the Court is prohibited from interfering with the debtor's

---

[43] May 27, 2020 Certified Fiscal Plan for the Commonwealth of Puerto Rico, at PDF page 261 (Exhibit 138 row titled "Restructuring/Title III Costs").  Available at https://drive.google.com/file/d/1ayjLxr74cKpFo4B2sAToSj-OeJOYvFO5/view (last accessed: 10/3/2020).

property or revenues or its use and enjoyment of any incoming-generating property.  PROMESA
§ 305; 11 U.S.C. § 904.  Consequently, a municipal debtor does not require Court approval to use,
sell, or lease its property.  Thus, a municipal debtor can choose which creditors it will pay during
the pendency of the bankruptcy with little or no judicial oversight.

49.     In deference to the sovereignty of the territory, Congress did not confer expansive
jurisdiction on the Court to balance the rights of creditors and debtors in the same manner as it has
for other financially distressed entities.  Instead, Congress gave only one party—the FOMB—the
right to file and prosecute a plan of adjustment for the territory and its instrumentalities.

50.     The exclusive right to file a plan carries with it the potential for abuse: creditors
have limited ability to advance the restructuring while debtors can avoid paying creditors for
extended periods of time until they succumb to pressure.   During its nearly 3-½ years in Title III,
the Commonwealth has continued to pay billions of dollars to trade and other favored creditors
while failing to pay anything to holders of its Constitutional Debt, resulting in  a massive cash
build-up of over $20 billion of total cash across the Commonwealth government, with more than
$9 billion in the Commonwealth TSA alone.   The inequitable treatment will end only upon
confirmation of a plan of adjustment or dismissal of the Title III case, which would allow creditors
to assert their rights under applicable non-bankruptcy law.  The plan of adjustment process is one
of the few tools available to protect creditors' rights in municipal bankruptcies.  *See In re City of
Stockton*, 486 B.R. 194, 199 (Bankr. E.D. Cal. 2013) (noting that the debtor's "day of reckoning
comes at the plan confirmation hearing").

51.     Congress did not leave municipal debtor's enormous exclusivity power unchecked.
In Chapter 9, federal courts have the power to impose deadlines on the debtor and, in the absence
of the debtor achieving a confirmable plan, the ultimate power to dismiss the case entirely.  *See* 11

U.S.C. § 930.  PROMESA, similarly, authorizes the Court to impose a deadline on the FOMB to file a plan.  PROMESA § 312.

52.     In order to advance these cases, the PSA Creditors request that the Court set deadlines for the FOMB to prosecute or modify the Current POA.  Once such deadlines are set pursuant to section 312 of PROMESA, the appropriate remedy for failure to meet such deadlines is dismissal pursuant to section 930(a) of the Bankruptcy Code, 11 U.S.C. § 930(a) (authorizing Court to dismiss case for cause, including unreasonable delay that is prejudicial to creditors or the failure to abide by any plan filing deadline established under section 941).  *See* PROMESA section 301(a) (incorporating Bankruptcy Code section 930 into PROMESA 120 days after the Title III case is commenced).

## II.     THE PSA STILL PRESENTS THE COMMONWEALTH WITH THE BEST, MOST AFFORDABLE OPPORTUNITY TO EXIT TITLE III

53.     The FOMB has been in place for more than four years.  The Title III cases, however, have been bogged down with contentious and expensive litigation, costing the citizens of Puerto Rico more than $650 million dollars in professional fees as well as the lost opportunity costs arising from the stigma of bankruptcy.  On February 9, 2020, following 10 months of concerted negotiations, the FOMB released the terms of the PSA it had reached with creditors holding nearly half of its Constitutional Debt.  Since its release, the market has reacted favorably to the terms of the PSA, with creditor support for the PSA increasing to approximately 60% of holders of Constitutional Debt.

54.     The PSA, the product of intense, months-long negotiations overseen by the Mediation Team, represents a significant milestone for not only the PSA parties but also all of Puerto Rico stakeholders. The PSA provides a pathway for Puerto Rico to achieve financial responsibility through a significantly de-levered balance sheet (reducing bonded indebtedness and

unsecured claims from approximately \$35 billion to approximately \$11 billion), a manageable debt load (9.69% of annual internal revenues),[44] and a timely exit from Title III, thereby creating an opportunity for Puerto Rico to regain access to the capital markets.

55.     Notwithstanding the onset of the pandemic, the PSA remains the best path for the Commonwealth to emerge from Title III.  As the FOMB noted in the FOMB Press Release, the PSA has not been terminated and the parties to the PSA have been engaged in mediation seeking to negotiate modifications to the PSA.  While the PSA Creditors believe that the debt service payments required under the PSA remain affordable, the PSA Creditors have displayed flexibility in response to the FOMB's concerns regarding the Puerto Rico economy.  That is why the PSA Creditors made a proposal to the FOMB that would replace a significant amount of the new debt to be issued by the Commonwealth with a contingent value instrument that would align the interests of creditors with the interests of Puerto Rico.  In other words, creditors would receive payments on account of the contingent instrument only when the Commonwealth was meeting or exceeding projections in the May 2020 Fiscal Plan.

56.     Yet despite the PSA Creditors' flexibility—as well as the substantial benefits the Commonwealth would reap from the confirmation of the Current POA and from emergence—the FOMB's actions indicate that it is not prepared to move the process forward of its own volition. As noted, since the FOMB sought in March 2020 to adjourn the Court's consideration of the Disclosure Statement and related deadlines *sine die* in order to consider the impact of the pandemic on Puerto Rico and the ability to perform its obligations under the Current POA (ECF No. 12485), the FOMB has stated repeatedly that it was not yet prepared to move forward with respect to

---

[44] As projected in the May 27, 2020 Certified Fiscal Plan, page 261, line titled "Adj. Revenue Post Measures (Excl. Federal Transfers)" plus COFINA Revenues.

scheduling hearings for the Disclosure Statement and Current POA (ECF Nos. 13018, 13660, and 14195). In its latest status report, the FOMB failed again to provide any timeframe for moving these cases to conclusion, informing the Court that it intends to provide a further update on October 25, 2020. It is appropriate, therefore, for the Court to impose deadlines for the FOMB with respect to the plan confirmation process, including to prosecute the Current POA, modify the Current POA, or file a new plan.

## III.   THE COURT SHOULD SET A DEADLINE FOR THE FOMB TO PROSECUTE A PLAN OF ADJUSTMENT

57.     The FOMB should not be permitted to delay, indefinitely, moving forward towards confirmation of the Current POA or a new plan while creditors are being substantially harmed. This was the court's concern in *In re New York City Off-Track Betting Corp.*, 434 B.R. 131, 158 (Bankr. S.D.N.Y. 2010), which involved a chapter 9 debtor that needed legislative intervention if it was to successfully reorganize. After the New York state legislature indicated that it wished to wait another year before deciding whether to act, the court declared, "[t]he State Legislature may be able to wait a year, but this Court cannot." *Id.* at 158. The court emphasized that creditors were being substantially harmed by the delay and contemplated dismissal pursuant to section 930(a)(2). *See id.* Ultimately, the legislature failed to intervene, and the debtor later requested dismissal of the case, which the court granted while again emphasizing how the delay had prejudiced the creditors. *See In re New York City Off-Track Betting Corp.,* 2011 WL 309594, at *2 (Bankr. S.D.N.Y. Jan. 25, 2011). These same principles apply here.

58.     Reasonable deadlines would ensure that the FOMB makes proper use of PROMESA by working towards a feasible plan, which would facilitate the twin Congressional goals of achieving fiscal responsibility and regaining capital market access. *See In re County of Orange*, 183 B.R. 594, 608 (Bankr. C.D. Cal. 1995) (evaluating whether the chapter 9 debtor was

27

acting in good faith in accordance with the reorganization provisions by pursuing a "speedy, efficient reorganization").  Since its filing on February 28, 2020, the FOMB has not moved forward towards prosecuting the Current POA; instead, it has sought to renegotiate its terms, based upon a newly-certified fiscal plan, but has not provided a time frame for when it will propose plan modifications or move forward towards confirmation.

59.     The PSA Creditors remain ready, willing, and able to honor their contractual obligations—and they expect the FOMB to do the same.  The PSA creditors have also displayed meaningful flexibility, through their willingness to engage in negotiations with the FOMB regarding potential modifications to the Current POA.  In light of these ongoing efforts, the Court agreed to continue its broad stay of litigation concerning issues to be resolved pursuant to the Plan for a period of up to six months (*i.e.*, until March 2021).[45]  The PSA Creditors seek judicial involvement at this time, however, because they believe court-imposed deadlines on the FOMB would aid the progress towards prosecuting or modifying the Current POA on a timetable consistent with the recently-imposed stay.

60.     Simply put, the cost and deterrent to new capital formation occasioned by remaining in bankruptcy for 40 months cannot be permitted to continue.  To ensure that the FOMB works in good faith towards an exit from Title III, as PROMESA contemplates, the plan of adjustment process must have binding deadlines for the FOMB to prosecute the Current POA, including by proposing any modifications thereto as permitted under section 313 of PROMESA. Accordingly, the PSA Creditors respectfully request the Court enter an order, pursuant to section

---

[45] *See* Order Denying Urgent Motion of Official Committee of Unsecured Creditors to Lift Stay to Allow Committee to Pursue Objection to GO Priority (ECF No. 14331).

105(a) of the Bankruptcy Code and 312 of PROMESA, imposing the following plan-related deadlines:

    a.  By no later than **November 30, 2020**, the FOMB shall either: (i) file a statement confirming that it intends to prosecute the Current POA; (ii) file and serve a modified version of the Current POA, with a modified disclosure statement; or (iii) file and serve a plan of adjustment for the Commonwealth and the Public Buildings Authority that the FOMB intends to prosecute towards confirmation, with an accompanying disclosure statement;

    b.  The FOMB shall provide parties with not less than approximately 60 days' notice of the disclosure statement such that the Court may consider the adequacy of the disclosure statement for the plan by no later than **February 1, 2021**;

    c.  The FOMB shall distribute ballots for the plan providing not less than approximately 90 days for voting on the plan such that tabulation will be completed no later than **April 30, 2021**;

    d.  The Court will consider confirmation of the plan by no later than **May 31, 2021**; and

    e.  Consummation of the plan must occur by no later than **June 30, 2021**.

## <u>CONCLUSION</u>

**WHEREFORE**, the PSA Creditors respectfully request that the Court enter an order, substantially in the form attached hereto as **<u>Exhibit A</u>**, granting the relief requested in this Motion and such other and further relief as the Court deems just and proper.

DATED:  October 6, 2020

Respectfully submitted,

| | |
|---|---|
| **REICHARD & ESCALERA** | **QUINN EMANUEL URQUHART & SULLIVAN, LLP** |
| **By :**  /s/ Rafael Escalera | **Susheel Kirpalani** (*pro hac vice*) |
| **Rafael Escalera** | susheelkirpalani@quinnemanuel.com |
| USDC No. 122609 | |
| escalera@reichardescalera.com | **Daniel Salinas** |
| | USDC-PR 224006 |
| **Sylvia M. Arizmendi** | danielsalinas@quinnemanuel.com |
| USDC-PR 210714 | |
| arizmendis@reichardescalera.com | **Eric Kay** (*pro hac vice*) |
| | erickay@quinnemanuel.com |
| **Carlos R. Rivera-Ortiz** | |
| USDC-PR 303409 | **Zachary Russell** (*pro hac vice*) |
| riverac@reichardescalera.com | zacharyrussell@quinnemanuel.com |
| | |
| 255 Ponce de León Avenue | 51 Madison Avenue, 22nd Floor |
| MCS Plaza, 10th Floor | New York, New York 10010-1603 |
| San Juan, Puerto Rico 00917-1913 | Telephone:  (212) 849-7000 |
| Telephone:  (787) 777-8888 | |

*Co-Counsel for the Lawful Constitutional Debt Coalition*

G. CARLO-ALTIERI LAW OFFICES, LLC

By: */s/ Gerardo A. Carlo*
Gerardo A. Carlo
USDC PR No. 112009
Telephone: (787) 247-6680
gacarlo@carlo-altierilaw.com

By: */s/ Mª Mercedes Figueroa y Morgade*
Mª Mercedes Figueroa y Morgade
USDC PR No. 207108
Telephone: (787) 234-3981
figueroaymorgadelaw@yahoo.com

254 San Jose St., Third Floor
San Juan, Puerto Rico 00901
Telephone: (787) 247-6680
Facsimile: (787) 919-0527

MORRISON & FOERSTER LLP

By: */s/ Gary S. Lee*
James M. Peck (admitted *pro hac vice*)
Gary S. Lee (admitted *pro hac vice*)
Lena H. Hughes
Andrew R. Kissner (admitted *pro hac vice*)
250 West 55th Street
New York, New York 10019
Telephone: (212) 468-8000
Facsimile: (212) 468-7900
jpeck@mofo.com
glee@mofo.com
lhughes@mofo.com
akissner@mofo.com

-and-

Joseph R. Palmore
2000 Pennsylvania Avenue, NW
Washington, D.C. 20006
Telephone: (202) 887-6940
Facsimile: (202) 887-0763
jpalmore@mofo.com

*Counsel for the Ad Hoc Group of Constitutional Debtholders*

31

**JIMÉNEZ, GRAFFAM & LAUSELL**

/s/ *Ramón Rivera Morales*
J. Ramón Rivera Morales
USDC-PR Bar No. 200701
Andrés F. Picó Ramírez
USDC-PR Bar No. 302114
P.O. Box 366104
San Juan, PR 00936
Telephone: (787) 767-1030
Facsimile: (787) 751-4068
Email: rrivera@jgl.com

**WILLKIE FARR & GALLAGHER LLP**

/s/ *Mark T. Stancil*
Mark T. Stancil (admitted *pro hac vice*)
1875 K Street, N.W.
Washington, DC 20006
Telephone: (202) 303-1133
Facsimile: (202) 303-2133
Email: mstancil@willkie.com

**PAUL, WEISS, RIFKIND, WHARTON
& GARRISON LLP**

/s/ *Andrew N. Rosenberg*
Andrew N. Rosenberg (admitted *pro hac vice*)
Karen R. Zeituni (admitted *pro hac vice*)
1285 Avenue of the Americas
New York, NY 10019
Telephone: (212) 373-3000
Email: arosenberg@paulweiss.com

**ROBBINS, RUSSELL, ENGLERT, ORSECK,
UNTEREINER & SAUBER LLP**

/s/ *Lawrence S. Robbins*
Lawrence S. Robbins (admitted *pro hac vice*)
Gary A. Orseck (admitted *pro hac vice*)
Donald Burke (admitted *pro hac vice*)
2000 K Street, N.W., 4th Floor
Washington, DC 20006
Telephone: (202) 775-4500
Facsimile: (202) 775-4510
Email: lrobbins@robbinsrussell.com

*Co-Counsel for the Ad Hoc Group of General Obligation Bondholders*

**MORGAN, LEWIS & BOCKIUS LLP**

*/s/ Kurt A. Mayr*
Kurt A. Mayr (admitted pro hac vice)
David L. Lawton (admitted pro hac vice)
Shannon B. Wolf (admitted pro hac vice)
One State Street
Hartford, CT 06103-3178
Tel. (860) 240-2700
Fax: (860) 240-2701
kurt.mayr@morganlewis.com
david.lawton@morganlewis.com
shannon.wolf@morganlewis.com

Sabin Willett (admitted pro hac vice)
One Federal Street
Boston, MA 02110-1726
Tel: (617) 951-8775
sabin.willett@morganlewis.com

**CORREA-ACEVEDO   &   ABESADA   LAW
OFFICES, PSC**

Sergio Criado
USDC-PR No. 226307
Roberto Abesada-Agüet
USDC-PR No. 216706
Centro Internacional de Mercadeo, Torre II
# 90 Carr. 165, Suite 407
Guaynabo, P.R.  00968
Tel. (787) 273-8300
Fax (787) 273-8379
ra@calopsc.com
scriado@calopsc.com

*Co-Counsel for the QTCB Noteholder Group*

## **CERTIFICATE OF SERVICE**

I hereby certify that on this same date, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to counsel for the parties of record.

<u>/s/*Carlos R. Rivera-Ortiz*</u>
USDC-PR 303409