**UNITED STATES DISTRICT COURT**
**DISTRICT OF PUERTO RICO**

------------------------------------------------------------x

In re:

THE FINANCIAL OVERSIGHT AND MANAGEMENT
BOARD FOR PUERTO RICO,

      as representative of

THE COMMONWEALTH OF PUERTO RICO, *et al.*,

      Debtors.[1]

------------------------------------------------------------x

AD HOC GROUP OF CONSTITUTIONAL
DEBTHOLDERS, AD HOC GROUP OF GENERAL
OBLIGATION BONDHOLDERS, LAWFUL
CONSTITUTIONAL DEBT COALITION, AND QTCB
NOTEHOLDER GROUP,

      Movants,

v.

THE FINANCIAL OVERSIGHT AND MANAGEMENT
BOARD FOR PUERTO RICO,

      as representative of

THE COMMONWEALTH OF PUERTO RICO,

      Respondent.

------------------------------------------------------------x

PROMESA
Title III

No. 17 BK 3283-LTS

**Re: ECF No. 14478**

(Jointly Administered)

PROMESA
Title III

No. 17 BK 3283-LTS

**This Objection relates only to the
Commonwealth and shall only be
filed in the lead Case No. 17 BK
3283-LTS.**

---

[1]    The Debtors in these Title III Cases, along with each Debtor's respective Title III case number
and the last four (4) digits of each Debtor's federal tax identification number, as applicable,
are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK-3283- LTS) (Last Four
Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation
("COFINA") (Bankruptcy Case No. 17-BK-3284-LTS) (Last Four Digits of Federal Tax ID:
8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case
No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement
System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case
No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric
Power Authority ("PREPA") (Bankruptcy Case No. 17- BK-4780-LTS) (Last Four Digits of
Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy
Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers
are listed as Bankruptcy Case numbers due to software limitations).

**OBJECTION OF FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO TO JOINT MOTION OF PSA
CREDITORS PURSUANT TO SECTION 312 OF PROMESA AND SECTION 105 OF
THE BANKRUPTCY CODE TO IMPOSE DEADLINES FOR PLAN OF ADJUSTMENT**

# TABLE OF CONTENTS

**Page**

SUMMARY OF ARGUMENT ............................................................................... 1

BACKGROUND ................................................................................................... 5

ARGUMENT ...................................................................................................... 10

    **I.**    **THE MOTION IS PREMISED ON FACTUAL INACCURACIES**............. 10

    **II.**   **THE MOTION AMOUNTS TO AN IMPROPER CHALLENGE OF
THE FISCAL PLAN** ......................................................................... 18

    **III.**  **THE CURRENT PLAN OF ADJUSTMENT MAY NOT BE
FEASIBLE** ...................................................................................... 21

    **IV.**  **AN ARBITRARY PLAN CONFIRMATION TIMELINE SERVES
NO MERITORIOUS PURPOSE** ...................................................... 22

CONCLUSION ................................................................................................... 24

To the Honorable United States District Court Judge Laura Taylor Swain:

The Commonwealth of Puerto Rico (the "Commonwealth"), by and through the Financial Oversight and Management Board for Puerto Rico (the "Oversight Board"), as the Commonwealth's sole Title III representative pursuant to section 315(b) of the *Puerto Rico Oversight, Management, and Economic Stability Act* ("PROMESA"),[2] respectfully submits this objection (the "Objection") to the *Joint Motion of PSA Creditors Pursuant to Section 312 of PROMESA and Section 105 of the Bankruptcy Code to Impose Deadlines for Plan of Adjustment* [ECF No. 14478] (the "Motion"),[3] filed by the Ad Hoc Group of Constitutional Debtholders (the "Constitutional Debt Group"), the Ad Hoc Group of General Obligation Bondholders (the "GO Group"), the Lawful Constitutional Debt Coalition (the "LCDC"), and the QTCB Noteholder Group (the "QTCB Group" and, collectively with the Constitutional Debt Group, the GO Group, and LCDC, the "PSA Creditors").  The Commonwealth respectfully requests the Court deny the Motion for the reasons set forth below:

## SUMMARY OF ARGUMENT

1.      At this stage in the Commonwealth's restructuring, there are three possible paths for these Title III cases.  The first is for the Oversight Board to revise the current plan of adjustment in light of COVID-19 and other changes, to provide the Commonwealth with the best chance for economic recovery and the ability to afford to pay a sustainable amount of debt.  In that regard, as soon as practicable after accounting for reduced demand and revenues due to COVID-19 (including, without limitation, the overall reduction in revenues due to the lockdown of the economy, the collapse of tourism, and massive unemployment) and other costs (including costs

---

2       PROMESA has been codified at 48 U.S.C. §§ 2101-2241.

3       Capitalized terms used but not defined herein shall have the meanings given to them in the Motion.

from delays in the Commonwealth implementing structural reforms and efficiency measures in the certified fiscal plans), the Oversight Board intends to file a revised version of the currently proposed plan of adjustment. The second option is for the Oversight Board to continue prosecuting the currently proposed plan of adjustment, which the Oversight Board cannot assert is feasible due to COVID-19 and related factors. Clearly, the second option is not viable because no plan can be confirmed if not feasible. The third choice, and the one that appears urged by the PSA Creditors, is the dismissal of these Title III cases if the PSA Creditor-requested timeline is not met—which would result in all GO debtholders being allowed under the Puerto Rico Constitution to demand the turnover of all available revenues to them from the Secretary of Treasury, amidst the chaos resulting from enormous litigation without the automatic stay. The third path provides the PSA Creditors the most leverage while maximizing chaos and harm to the people of Puerto Rico and undermining the mandate of Congress that Puerto Rico regain market access and fiscal responsibility.

2.      The PSA Creditors rely on a host of erroneous facts to support the relief they seek. To begin, the PSA Creditors suggest no progress has been made in Puerto Rico's restructuring to date. The PSA Creditors simply ignore, among other things, (i) the confirmed COFINA plan of adjustment restructuring approximately $18 billion of debt and assuring the Commonwealth of sales and use tax revenues critical to its survival, (ii) PREPA's entry into the LUMA Agreement (as defined below), which laid out the framework for the transformation of Puerto Rico's electricity grid into a modern, efficient system, (iii) the outcome to date of the stay litigation involving over $7 billion of claims from creditors of HTA, PRIFA, and CCDA, which outcome safeguarded the Commonwealth's billions of revenues the PSA Creditors count on to pay GO debt, (iv) the two proposed Commonwealth plans of adjustment achieved with the assistance of the Court-appointed

Mediation Team, which plans have garnered the support of holders of in excess of $10 billion of GO indebtedness, and (v) the successful Title VI restructuring of GDB.  Moreover, the PSA Creditors ignore the evolution of the certified fiscal plans for the Commonwealth, which reduce expenses considerably, while also ignoring the Oversight Board's successful efforts to make sure the Commonwealth's municipalities pay their own healthcare and retirees' pension costs, so the Commonwealth does not have to pay them.

3.     The PSA Creditors also assert that the general obligation bondholders have been subjected to inequitable treatment.  One need only look at the Oversight Board's steps to cut Commonwealth expenses while protecting the Commonwealth's revenues claimed by creditors of HTA, PRIFA, and CCDA to see the GO bondholders have not been treated inequitably.

4.     Further, the PSA Creditors mischaracterize the Oversight Board as having given up on the Commonwealth carrying out necessary structural reforms.  The PSA Creditors' position is curious, as the May 2020 Fiscal Plan clearly states the Oversight Board continues to emphasize the Commonwealth must carry out the necessary structural reforms.  While the Fiscal Plan notes that sufficient progress in this area has not been accomplished by the Commonwealth, the May 2020 Fiscal Plan emphasizes the Oversight Board will continue to require structural reforms.  The structural reforms continue to be a critical component of the May 2020 Fiscal Plan, generating necessary revenues that the Commonwealth needs to sustain the proposed level of debt service and other critical expenses.  Indeed, it may require litigation or other forms of intervention, but the Oversight Board remains fully committed to ensuring that additional structural reform is achieved.

5.     The PSA Creditors inaccurately assert that Puerto Rico has made no progress in Title III and that there has been no financial transparency.  Since its establishment, however, the

Oversight Board has dramatically improved the transparency and controls over the government's finances, as indicated more fully herein.

6.    Substantively, and perhaps most notably, the PSA Creditors are challenging the Oversight Board's certified May 2020 Fiscal Plan.  PROMESA § 106(e), however, divests the Court of subject matter jurisdiction to adjudicate the Motion, because the basis for the relief sought therein amounts to a challenge of the Oversight Board's decision to certify it.

7.    The PSA Creditors not only rely on factual inaccuracies in the Motion, but they also rely on inapposite jurisprudence to support their argument.  The PSA Creditors cite *In re New York City Off-Track Betting Corp.* to support the notion that the Title III cases should be dismissed as if the dismissal of a racetrack case to the detriment of horses and gamblers supports dismissal of a territory case to the detriment of the people.  Further, in *In re New York City Off-Track Betting Corp,* the court dismissed the racetrack case after the <u>debtor</u> requested dismissal due to the delay caused by the legislature.  Here, however, the Oversight Board is adamantly opposing dismissal and there is no evidence of unjustified delay in the plan process.[4]  There has been considerable progress to date and the Oversight Board maintains its efforts to make more meaningful progress in short order.  As shown above, imposing an arbitrary plan confirmation timeline or dismissing these Title III cases at this time will only harm the Commonwealth and its people.  The Motion should be seen for what it is—a negotiation tactic to put pressure on the Oversight Board in an effort to extract further concessions.  The Oversight Board should not be put in a position where it is forced to negotiate under unnecessary duress or in a manner inconsistent with the mandates set forth in PROMESA.

---

[4] To the contrary, the recent adjournment of the plan confirmation schedule is entirely justified.  The entire world remains uncertain of the term and final effect of the COVID-19 pandemic, as everyone awaits a vaccine and better treatments.  Even after the virus becomes seemingly contained, waves of infection continue to rise in certain areas that cause repeated economic lockdowns.

8.      PROMESA section 315 provides the Oversight Board with substantial deference on how to proceed and navigate these cases.  As the Court previously held, ". . . PROMESA provides substantial deference to the strategy and tactics of the Oversight Board." [ECF No. 1855]. The same is true with respect to the negotiations of the plan of adjustment.

9.      For all the foregoing reasons, the Court should deny the Motion.

## BACKGROUND

10.     On May 31, 2019, a mere three months following the confirmation and consummation of the COFINA plan of adjustment,[5] a plan support agreement (the "Initial PSA") was executed by and among (a) the Oversight Board, (b) holders of general obligation bond claims and/or Commonwealth guarantee bond claims, and (c) holders of PBA bond claims, i.e., the LCDC and the QTCB Group.  On September 27, 2019, the Oversight Board filed an initial Title III Joint Plan of Adjustment [ECF No. 8765] (the "Initial POA"), reflecting the plan contemplated by the Initial PSA.

11.     Following the filing of the Initial POA, in an effort to build a broader base of support, the Oversight Board entered mediation (again with the leadership of the Mediation Team) with the PSA Creditors to develop a global compromise and settlement of multiple litigations and the terms of a plan of adjustment for the Commonwealth, PBA, and ERS.

12.     On February 9, 2020, and based upon a negotiated revised proposed plan of adjustment supported by over $9 billion of Commonwealth and PBA indebtedness, a new plan support agreement (the "Current PSA"), replacing the Initial PSA, was executed by and among the

---

[5] Embedded in the COFINA plan of adjustment was a settlement between the Commonwealth and COFINA of the allocation of disputed sales tax revenues, which settlement was necessary before a Commonwealth plan of adjustment could be pursued.

Oversight Board and the PSA Creditors.[6]  On February 28, 2020, an amended proposed plan of adjustment [ECF No. 11946] (the "Current POA") and related disclosure statement [ECF No. 11947] (the "Disclosure Statement") were filed, reflecting the plan of adjustment contemplated by the Current PSA.  Subsequent executed joinders or purchases of outstanding debt have brought support for the Current POA in excess of $10 billion of Commonwealth and PBA indebtedness.

13.    On March 23, 2020, the Oversight Board filed its *Urgent Motion to Adjourn Hearing to Consider the Adequacy of Information Contained in the Disclosure Statement and Related Deadlines* [ECF No. 12485] (the "Adjournment Motion"), requesting that the hearing to consider the Disclosure Statement (the "Disclosure Statement Hearing") and related deadlines be adjourned because "COVID-19 and the economic effects therefrom, including from the closure of all non-essential businesses on Puerto Rico, cannot be calculated at this time and the attention of the Government is dedicated to addressing the pandemic."  Adjournment Motion ¶ 4.

14.    On March 27, 2020, the Court granted the Adjournment Motion [ECF No. 12549], adjourning the Disclosure Statement Hearing without scheduling a new date and directing the Debtors to file a status report by May 1, 2020 to set forth the measures being taken to address the pandemic and a proposed schedule for the Disclosure Statement Hearing.

15.    On May 1, 2020, the Oversight Board filed the May 1, 2020 Status Report, which noted that, among other things, "[g]iven the continuing uncertainty created by COVID-19 pandemic, the Oversight Board's immediate focus is to ensure the health and well-being of the people of Puerto Rico and to assess the short- and medium-term impact of the pandemic on Puerto Rico's economy . . . .  Before the Debtors' plan of adjustment and disclosure statement process can move forward, the Oversight Board must assess the pandemic's impact and the extremely

---

[6] Specifically, the Initial PSA was terminated consensually and the Current PSA was entered into in lieu thereof.

difficult recovery ahead for Puerto Rico." May 1, 2020 Status Report ¶¶ 12-13. The Oversight Board requested in the May 1, 2020 Status Report that it be permitted to provide the Court with an updated status report on the Oversight Board's position on or before July 15, 2020, "which will allow the Oversight Board time to assess a proposed timeline in light of the certified budgets and fiscal plans." *Id.* ¶ 13. On May 1, 2020, the Court granted the Oversight Board's request [ECF No. 13023].

16.     On May 27, 2020, the Oversight Board certified the fiscal plan for the Commonwealth of Puerto Rico (the "May 2020 Fiscal Plan").

17.     On July 1, 2020, the Oversight Board announced that (a) its Chair, Mr. José B. Carrión, would not be available for re-nomination for a second term as member of the Oversight Board and that Mr. Carrión's last day serving on the Oversight Board would be October 5, 2020, or when the President and Congress appoint a successor, whichever happens first and (b) member Carlos M. García would not be available to serve a second term and would only remain on the Oversight Board until August 31, 2020. Subsequently, José Ramon González announced his intention not to stand for re-nomination and that he would be leaving the Oversight Board on August 31, 2020. Most recently, on October 8, 2020, Judge Arthur González's holdover status on the Oversight Board terminated upon the President's appointment of Justin Peterson to that position.

18.     On July 15, 2020, the Oversight Board filed the July 15, 2020 Status Report, which noted that, among other things, "[i]n the current absence of a vaccine and/or therapy that cures COVID-19, the Oversight Board continues to believe the primary focus of the Government and the Oversight Board should be directed to protecting the health and welfare of the people of Puerto Rico from the COVID-19 virus, while also slowly and prudently reopening critical businesses as

7

appropriate and providing the people of Puerto Rico with ongoing reasonable, comprehensive, and sustainable solutions." July 15, 2020 Status Report ¶ 7.

19.     The Oversight Board requested in the July 15, 2020 Status Report that it be permitted to provide the Court with an updated status report on the Oversight Board's position on or before September 11, 2020, "which will allow the Oversight Board time to assess the fiscal plan's assumptions, and report on the progress (and, hopefully, the completion) of plan discussions with AAFAF, creditors, and the Court-appointed mediation team." *Id.* ¶ 19. On July 20, 2020, the Court granted the Oversight Board's request, and scheduled September 9, 2020 as the date for filing the next status report [ECF No. 13733].

20.     On September 9, 2020, the Oversight Board filed the September 9, 2020 Status Report, which noted that, among other things, "[t]he Oversight Board has also resumed formal discussions with creditors party to the Plan Support Agreement, as amended on March 13, 2020 and April 1, 2020, with the guidance of the mediation team led by the Honorable Judge Barbara J. Houser, to address the new reality created by the COVID-19 pandemic. Additionally, the Oversight Board and its advisors have engaged in active dialogue with individual creditors and their respective advisors, both those party to the Plan Support Agreement as well as other notable parties in interest." September 9, 2020 Status Report ¶ 14. As for the plan and disclosure statement process, the September 9, 2020 Status Report provided:

> While parties have re-engaged, both formally and informally, in light of (a) the nascent stage of such discussions, (b) the current state of material litigations before the Court, the determinations of which shall influence the tenor of such discussions, and (c) the political and electoral process on-Island, the Oversight Board submits it is premature to propose a schedule for consideration of the Debtors' Plan and Disclosure Statement. First, certain diligence must be performed to address inquiries for information or possible avenues for resolution. Second, although the Commonwealth's fiscal plan has been certified, the Oversight Board is mindful that the uncertainty of the timing of the cessation of the ongoing COVID-19 pandemic, fiscal and economic determinations announced by authorities in connection with

the pandemic, and the challenges presented by the severe drought conditions in July and the ongoing hurricane season require that the fiscal plan's assumptions continue to be tested in the coming months. (Of course, droughts and hurricanes are always possible and all fiscal plans, budgets, and plans of adjustment must contemplate their risks). Third, political and legislative calendars, including the ongoing electoral process and the closure of the current legislative sessions, impact the timing associated with receiving governmental assent and gaining legislative approval for the issuance of indebtedness pursuant to a plan of adjustment, which approval is deemed desirable due to its impact on the debt's trading value.

The Oversight Board submits that only a brief respite is required to complete such diligence and to discern the possible direction of such discussions. Specifically, with creditor parties re-engaged, the Oversight Board (and the Mediation Team) will realize in short order whether a modified plan of adjustment is capable of being reached. Likewise, the Oversight Board and AAFAF will know whether any remaining hurdles of such plan can be overcome or if the electoral process will need to be completed before that might occur.

September 9, 2020 Status Report ¶¶ 15-16.

21.     The Oversight Board requested in the September 9, 2020 Status Report that it be permitted to provide the Court with an updated status report on the Oversight Board's position on or before October 25, 2020, "which will allow the Oversight Board time to assess the fiscal plan's assumptions, and report on the progress (and, hopefully, the completion) of plan discussions with AAFAF, creditors and the Court-appointed mediation team." *Id.* ¶ 16.

22.     Since the filing of the September 9, 2020 Status Report, the Oversight Board and parties to the Plan Support Agreement continued mediation over revised terms to a plan of adjustment under the direction of Judges Houser and Colton and pursuant to the terms of the Mediation Agreement. Based upon such agreement, on September 30, 2020, and to address the needs of certain PSA Creditors, the Oversight Board publicly disclosed the proposals that had been exchanged by the Oversight Board and the PSA Creditors on August 18, 2020 and August 24, 2020, respectively. As noted therein, the Oversight Board proposed a reduction in recovery from

that set forth in the Current POA as a result of the economic effects of COVID-19, while the PSA

Creditors held steadfast to the present value recoveries outlined in the Current POA.

23.     On October 6, 2020, and not wanting to await the Oversight Board's upcoming

Status Report, the PSA Creditors filed the Motion.

## ARGUMENT

## I.     THE MOTION IS PREMISED ON FACTUAL INACCURACIES

24.     The PSA Creditors propound a variety of statements that are inaccurate in an effort

to bolster the unwarranted relief they seek.   The major factual inaccuracies in the Motion are

addressed in turn below.

### A.     The Oversight Board Has Made and Continues to Make Substantial Progress in These Title III Cases

25.     The PSA Creditors imply that no progress has been made to date in these Title III

Cases.   *See* Motion ¶ 4 ("More than four years after PROMESA's enactment, Puerto Rico and its

people remain exactly where they were: languishing in bankruptcy, without financial transparency

or access to the capital markets."); Motion ¶ 53 ("The FOMB has been in place for more than four

years.   The Title III cases, however, have been bogged down with contentious and expensive

litigation, costing the citizens of Puerto Rico more than $650 million dollars in professional fees

as well as the lost opportunity costs arising from the stigma of bankruptcy.").

26.     One has only to look at the docket, to see the lion's share of the litigation was

commenced by the creditors.   Indeed, it was one of the PSA Creditors that prosecuted a lawsuit

complaining the Oversight Board was unconstitutional under the Appointments Clause.[7]

---

[7] *See* Case No. 17-BK-3283-LTS, ECF No. 913 (motion of various holders of GO bonds to dismiss the Title III cases based on Appointments Clause of the U.S. Constitution).

Similarly, GO creditors attempted to take control of all clawback revenues and special property tax revenues.[8]

27.     In 2018, the Oversight Board, in its capacity as Administrative Supervisor, oversaw the consensual modification of GDB's bonded debt pursuant to PROMESA Title VI and defended the Title VI modification from various challenges by the UCC.  The Oversight Board also negotiated resolutions to a variety of disputes relating to COFINA, eventually confirming a plan of adjustment for COFINA's debts on February 5, 2019 and consummating such plan shortly thereafter.  *See* Case No. 17-BK-3284-LTS, ECF No. 561.  Further, the Oversight Board facilitated a reprofiling of PRASA's debt.  COFINA, GDB, and PRASA alone account for approximately $24 billion of Puerto Rico's $74 billion in bond debt, and their successful restructurings are significant building blocks for the Oversight Board to accomplish its overall mandate to achieve fiscal responsibility and access to capital markets for Puerto Rico.

28.     Further, on June 22, 2020, with the Oversight Board and the Governor's approval (and following significant efforts by the Oversight Board), PREPA entered into the *Puerto Rico Transmission and Distribution System Operation and Maintenance Agreement* with LUMA Energy (the "LUMA Agreement").  The LUMA Agreement lays out the framework for the privatization of PREPA's transmission and distribution system, an action that will contribute greatly to the transformation of Puerto Rico's electricity grid into a modern, reliable, and efficient system.

29.     In stay litigation commenced by creditors, the Oversight Board procured judgments ruling the creditors had not proven colorable claims to interests in the clawback revenues.[9]  That

---

[8] *See ACP Master, Ltd., et al. v. Fin. Oversight & Mgmt. Bd. for P.R.*, Case No. 17-AP-189-LTS, ECF No. 1.

[9] *See* Case No. 17-BK-3283-LTS, ECF Nos. 13541 (Title III Court opinion rejecting arguments HTA bondholders had colorable claims to property interests in retained revenues conditionally appropriated to HTA), 13542 (Title III

litigation benefitted the PSA Creditors and safeguarded the clawback revenues for the Commonwealth.

30.     Additionally, the Oversight Board has made considerable progress in the claims administration process to date.  Specifically, the Oversight Board has expunged approximately 44,000 of the approximately 166,000 claims filed to date, which has eliminated over $42 trillion in claims filed against the Commonwealth.  The Oversight Board has objected to an additional approximately 57,000 claims awaiting disposition, which amounts to an additional approximately $5 billion in claims that may be expunged.

**B.     The Oversight Board Has Addressed All Competing Stakeholder Concerns**

31.     The PSA Creditors argue the general obligation bondholders have been subjected to inequitable treatment.  *See* Motion ¶ 50 ("During its nearly 3.5 years in Title III, the Commonwealth has continued to pay billions of dollars to trade and other favored creditors while failing to pay anything to holders of its Constitutional Debt . . . .  The inequitable treatment will end only upon confirmation of a plan of adjustment or dismissal of the Title III case, which would allow creditors to assert their rights under applicable non-bankruptcy law.").

32.     The PSA Creditors, however, have inaccurately framed the role of the Oversight Board and what has been accomplished to date.  The notion that the Oversight Board has only benefited other stakeholders at the expense of the GO debt is entirely misplaced.  In fact, the Oversight Board has initiated and defended a variety of important legal actions that have redounded to the benefit of the GO bondholders.  As shown above, the Oversight Board has filed objections to the claims of monoline insurers and the fiscal agents for the HTA, CCDA, and PRIFA

---

Court opinion rejecting arguments PRIFA bondholders had colorable claims to property interests in retained revenues conditionally appropriated to PRIFA).

bonds, and defended lift stay motions filed by the same parties against the Commonwealth. *See* Case No. 20-03 (objecting to PRIFA bondholder claims), 20-04 (objecting to CCDA bondholder claims), 20-05 (objecting to HTA bondholder claims), Case No. 17-BK-3283-LTS, ECF Nos. 10102 (HTA bondholders' motion to lift the stay), 10104 (CCDA bondholders' motion to lift the stay), 10109 (PRIFA bondholders' motion to lift the stay) (collectively, the "Revenue Bond Actions"). In the Revenue Bond Actions, the monoline insurers and fiscal agents have asserted a variety of property interests in certain streams of revenues collected by the Commonwealth, totaling over $2 billion, which the Commonwealth intended to fund the plan of adjustment distributions that will, in turn, pay GO bondholders. *See, e.g.,* Case No. 20-05, ECF No. 56, ¶ 21, n.19. The monolines and fiscal agents maintained that those revenues could not be used to pay GO bondholders, but instead had to be used to repay the revenue bonds. After substantial briefing by the Oversight Board, the Title III Court entered opinions determining the vast majority of the revenue bondholders' arguments did not establish colorable claims. *See* ECF Nos. 13540, 13541, 13542 (the "Lift Stay Decisions"). While many issues remain undecided, and the Lift Stay Decisions have been appealed to the First Circuit, the Oversight Board's efforts in the Revenue Bond Actions have already significantly improved the GO Bondholders' position in these Title III cases and very likely increased their future recovery.

33.     Additionally, the Oversight Board has confirmed that potentially hundreds of millions, if not billions, of dollars of employer contributions paid by employers—including the Commonwealth, which is the largest employer on the Island—participating in the ERS retirement system are not subject to the security interest of ERS bondholders. *See In re Fin. Oversight and Mgt. Bd. for Puerto Rico*, 948 F.3d 457, 468 (1st Cir. 2020). Accordingly, such payments are unencumbered by the ERS bondholders' alleged security interest, and available for distribution to

GO Bondholders and other creditor constituencies.  Further, ERS bondholder litigation remains outstanding, including in connection with the ERS bondholders' assertion that they are entitled to billions of dollars in administrative expense claims from the Commonwealth as a result of the passage of Act 106-2017 and Joint Resolution 188, which collectively changed the retirement system from a pre-funded system to a pay-as-you-go ("PayGo") system.  *See* Case No. 17-bk-3566, ECF No. 891.  The Oversight Board's motion to dismiss such claims remains *sub judice*; if and when such claims are dismissed and such dismissal is no longer appealable, that will further increase the funds available for the Commonwealth.  Until then, the Oversight Board must account for the possibility the Commonwealth is on the hook for the alleged administrative claim.

34.  Moreover, the Oversight Board's prosecution and success in litigation seeking to enjoin the implementation of Law 29-2019 has further benefitted the GO bondholders.  On May 17, 2019, the Commonwealth enacted Law 29-2019, which eliminated municipalities' obligations to reimburse the Commonwealth for healthcare and pension payments to their retirees, at an estimated cost of over $1.7 billion over 5 years.  *See Fin. Oversight & Mgmt. Bd. v. Garced (In re Fin. Oversight & Mgmt. Bd.)*, 616 B.R. 238, 242 (D.P.R. 2019).  The Oversight Board filed a complaint seeking to enjoin the implementation of Law 29-2019 under PROMESA.  After briefing, the Court granted the Oversight Board's motion for summary judgment, enjoining the implementation of Law 29 and deeming it a nullity.  *Id*. at 248.  This decision alone preserved almost $2 billion of the Commonwealth's assets, leaving those funds available for other purposes.[10]  The Law 29 litigation is just one example of a methodical process in place to protect the forecasted surplus available in the certified fiscal plan.  In reality, the Oversight Board conducts

---

[10] In fact, the Oversight Board has routinely fought to stop the enforcement of laws that are inconsistent with the fiscal plan, which laws would spend Commonwealth funds not foreseen by the fiscal plan or budget.  Such efforts result in more cash for the Commonwealth, which redounds to the benefit of Commonwealth stakeholders.

detailed reviews of every law submitted under the Section 204 process to validate whether the certifications of each law may have a negative fiscal impact and could impact, among other things, the forecasted financial surplus available to fund future debt service.  These assessments closely analyze whether the law would expend funds not foreseen by the fiscal plan or annual budget. While these evaluations do not always end up seeking court remedies, the process takes place for each law consistently.

35.     Notably, the Oversight Board's prudent fiscal behavior is ensuring GO claimholders will have a source of repayment pursuant to a plan of adjustment.  Indeed, the Oversight Board's certified budget imposes on the Commonwealth a substantial reduction in appropriations that would otherwise deplete the amounts available to the Commonwealth's claimholders.[11]  In other words, if the Oversight Board's certified budget would not have excluded certain standing appropriations, it would have been impossible to balance the budget and the Commonwealth would be required to appropriate hundreds of millions of dollars annually.  Pre-PROMESA statutes mandate appropriation of more than $2.3 billion annually from the Commonwealth to various instrumentalities and agencies of the Commonwealth (more than 20% of the budget).  Declaration of Adam Chepenik ¶ 6 [Case No. 20-00005, ECF No. 58].

### C.   The Oversight Board Continues to Push Structural Reforms in the May 2020 Fiscal Plan

36.     The PSA Creditors mischaracterize the Oversight Board as having given up on the Commonwealth carrying out necessary structural reforms.  *See* Motion ¶ 5 ("Since its first meeting, the FOMB has publicly insisted that Puerto Rico's government and economic policies require considerable structural reforms to achieve fiscal responsibility, growth, and access to the capital

---

[11] The Oversight Board's certified budget also imposes significant measures on the Commonwealth designed to reduce expenses, including without limitation, the rightsizing of the Commonwealth's workforce.

markets.  The FOMB admits that it has achieved little progress in implementing those reforms and, in its recently certified revised Fiscal Plan, has all but given up on them.").

37.     The PSA Creditors' position is baffling, as the May 2020 Fiscal Plan is clear that the Oversight Board continues to require necessary structural reforms.  While the Fiscal Plan mentions progress in this area has been insufficient, there is no question that the May 2020 Fiscal Plan assumes further structural reforms will be implemented in full.  The projected surpluses in the May 2020 Fiscal Plan cannot be achieved without the full implementation of the structural reforms contained therein.  Specifically, the May 2020 Fiscal Plan provides:

> Since 2017, the Oversight Board has worked with the Government to implement numerous structural reforms, but there has been little meaningful progress in most areas. The structural reforms remaining in the 2020 Fiscal Plan are those where there has been alignment with the Government on the need to pursue change. That being said, as a result of natural disasters and poor implementation, meaningful progress on most reforms has been delayed. As such, the 2020 Fiscal Plan provides an updated forecast reflecting such delays but also outlining the potential positive impact looking forward (Exhibit 3).

May 2020 Fiscal Plan, at 17.

38.     Notably, the PSA Creditors nowhere disclose anything the Oversight Board could have done to compel more implementation of measures but did not do.  The May 2020 Fiscal Plan details a variety of specific structural reforms anticipated in the following specific areas: (i) human capital and welfare reforms (*id.* at 79-96); (ii) K-12 education reform (*id.* at 102-113); (iii) ease of doing business reform (*id.* at 116-132); (iv) power sector reform (*id.* at 134-140); and (v) infrastructure reform (*id.* at 141-144).  The PSA Creditors' assertion that the Oversight Board has given up on structural reforms is simply wrong.

### D.     The PSA Creditors Mischaracterize the Title III Restructuring Fees

39.     The PSA Creditors make it appear as though the Commonwealth itself is incurring a disproportionate cost of the Title III Cases.  *See* Motion ¶ 1 ("Nearly 3-1/2 years later, this Title

III process has cost the people of Puerto Rico over $650 million in professional fees but the FOMB has yet to 'find a way forward' for the island to exit bankruptcy.").  The restructuring fees incurred to date, however, represent the cost not only for the Commonwealth, but also, for the many instrumentalities that are undergoing, or have already completed, their own restructuring (*e.g.*, COFINA, PREPA, HTA, ERS, PBA, etc.).  Such costs are not just those of the Government and the Oversight Board—they include the cost of the financial creditors, the retiree committee, the UCC, the mediators, among others.

40.     Assuming the remaining costs for the Title III cases are equivalent to those projected by the May 2020 Fiscal Plan, the total cost for Puerto Rico's restructuring will likely total less than 1.0% of the $130 billion in liabilities being restructured.  For reference, the City of Detroit's chapter 9 professional costs were 0.97% of the total liabilities of $18 billion that were restructured there.

### E.     The Oversight Board has Dramatically Improved the Transparency and Controls over the Government's Finances

41.     The PSA Creditors inaccurately assert that Puerto Rico has made no progress in Title III and that there has been no financial transparency.  *See* Motion ¶ 4 ("More than four years after PROMESA's enactment, Puerto Rico and its people remain exactly where they were: languishing in bankruptcy, without financial transparency or access to the capital markets.").

42.     Since its establishment, however, the Oversight Board has dramatically improved the transparency and controls over the government's finances.  For instance, during Fiscal Year 2020, the Oversight Board engaged in a comprehensive, in-depth Fiscal Year 2021 budget development process to enhance the level of due diligence at the agency level and on spending categories, provide additional transparency beyond simply personnel and non-personnel (including not only General Funds but also Special Revenue Fund budgets previously not publicly issued),

17

and improve budgetary controls and reporting.  For the first time, this year's budget includes budgetary incentives tied to the achievement of certain critical milestones.  The budget continues to enhance transparency in Government spending by incorporating program-level detail for certain key agencies and additional reporting.  Further, the Oversight Board carried out prolific analyses of the hundreds of Commonwealth bank accounts.  When the Oversight Board was originally appointed, there was no transparency of the Commonwealth's bank accounts and purported restrictions of the cash in such accounts.  The Oversight Board carried out the difficult task of analyzing such accounts and any restrictions on the use of cash in such accounts, and the Oversight Board published its findings in the current publicly filed Disclosure Statement.

43.     The transparency extends to all forms of fiscal governance across the government. As Exhibit 129 in the May 2020 Fiscal Plan demonstrates, the Oversight Board now requires nearly 30 additional weekly, monthly, and quarterly reports from the government on its cash position, budget to actuals, payroll, tax expenditures, PayGo, among other measures.  Many of these reports are posted on the government's website for public evaluation, which illustrates a serious and credible improvement in the transparency of the government's operations.  The Oversight Board has taken many steps to ensure the transparency of its processes.  This includes holding public hearings, working sessions, and even incentivizing accounting employees in this year's budget to produce the required data on a timely basis.  The Oversight Board, however, cannot itself issue, prepare, or manage the Government's audit process.

## II.     THE MOTION AMOUNTS TO AN IMPROPER CHALLENGE OF THE FISCAL PLAN

44.     In the Motion, the PSA Creditors specifically challenge the Oversight Board's decision to certify the May 2020 Fiscal Plan.  *See* Motion ¶ 8 ("[T]he FOMB – without input from the PSA Creditors – certified a new fiscal plan that, among other things, dramatically reduced

18

projected revenues, not only over the near-term due to the pandemic but also over the full 30-year projection period."); Motion ¶ 9 ("The FOMB's latest projections notwithstanding, the Current POA was affordable when the FOMB agreed to it after months of analysis and negotiations and it remains affordable today.").  The PSA Creditors further inaccurately assert that the May 2020 Fiscal Plan was considered and certified by the Oversight Board without the involvement of the PSA Creditors and their advisors.[12]

45.     PROMESA § 106(e), however, divests the Court of subject matter jurisdiction to adjudicate the Motion, because the basis for the relief sought therein amounts to a challenge of the Oversight Board's decision to certify the Commonwealth's Fiscal Plan.  Congress gave the Oversight Board "sole discretion" to certify or reject a Fiscal Plan.  PROMESA § 201(c)(3)(A). And, it precluded any second-guessing of the Oversight Board by enacting § 106(e), which provides that "[t]here shall be no jurisdiction in any United States district court to review challenges to the Oversight Board's certification decisions under this Act."  *See, e.g., Méndez-Núñez v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, 916 F.3d 98, 112 (1st Cir. 2019) ("PROMESA grants the [Oversight] Board exclusive authority to certify Fiscal Plans and Territory Budgets for Puerto Rico. It then insulates those certification decisions from judicial review in § 106(e)"); *Ambac Assur. Corp. v. Puerto Rico (In re Fin. Oversight & Mgmt. Bd.)*, 927 F.3d 597, 602 (1st Cir. 2019) (same); *see also Ambac Assur. Corp. v. Comm. of P.R. (In re Fin. Oversight & Mgmt. Bd.)*, 297 F. Supp. 3d 269, 283-84 (D.P.R. 2018) (rejecting challenge to certification of fiscal plan pursuant to PROMESA § 106(e)).

---

[12] Rather, the PSA Creditors and their financial and legal professionals submitted a detailed presentation to the Oversight Board's advisors, which presentation helped shaped some of the components of the May 2020 Fiscal Plan.

46.     Congress passed PROMESA to deal with Puerto Rico's "fiscal emergency crisis"
– "a combination of severe economic decline, and at times, accumulated operating deficits, lack
of financial transparency, management inefficiencies and excessive borrowing," which "[has
made] the Government of Puerto Rico . . . unable to provide its citizens with effective services."
PROMESA § 405(m)(1), (2).  The Fiscal Plan "serves as the cornerstone for structural reforms
[the Oversight Board] deems necessary to ensure the Commonwealth will be on a path towards
fiscal responsibility and access to capital markets." H.R. Rep. 114-602 at 45; *see also* PROMESA
§ 405(m)(4).[13]   Anticipating that creditors would contest the fiscal projections and reforms
necessary to resolve Puerto Rico's dire fiscal emergency, Congress placed sole authority for all
determinations regarding review and certifications of the Fiscal Plan in the Oversight Board.  *Id.*

47.     Congress set forth the provisions governing the development, review, and
certification of the Fiscal Plan in PROMESA § 201.  Puerto Rico must develop a fiscal plan to
achieve those goals and other express goals.  *Id.* § 201(a), (b).[14]  The Oversight Board, in turn, has
the sole and exclusive authority to determine a proposed fiscal plan's compliance with the
requirements of § 201(b), and to approve and certify a plan proposed by the Governor.  *See id.* §§
201(a), 201(c)(3) (Oversight Board has the "sole discretion" to determine whether the proposed
fiscal plan "satisfies the [] requirements" in § 201(b)).  If the Oversight Board determines in its
sole discretion to approve a fiscal plan pursuant to § 201(c)(3), then it "***shall*** deliver a compliance
certification for such Fiscal Plan to the Governor and the Legislature." *Id.* § 201(e)(1) (emphasis
added).  To ensure that the requirements of § 201 are not disrupted by creditor litigation, Congress

---

[13] That section provides for a "comprehensive approach to fiscal, management, and structural problems and
adjustments that exempts no part of the Government of Puerto Rico is necessary, involving independent oversight and
a Federal statutory authority for the Government of Puerto Rico to restructure debts in a fair and orderly process."

[14] PROMESA "establishes the method for developing Fiscal Plans" for Puerto Rico "that will provide the appropriate
elected officials with the autonomy to develop such Fiscal Plan with guidance from the" Oversight Board.  H.R. Rep.
114-602 at 45.

dictated that "*[t]here shall be no jurisdiction* in any United States district court to review challenges to the FOMB's certification determinations under this Act."). *Id*. § 106(e) (emphasis added). Thus, it is obvious that the Oversight Board's certification of the Fiscal Plan as compliant with PROMESA cannot be challenged by the PSA Creditors.[15]

## III.    THE CURRENT PLAN OF ADJUSTMENT MAY NOT BE FEASIBLE

48.    The Motion argues that, "[n]otwithstanding the onset of the pandemic, the PSA remains the best path for the Commonwealth to emerge from Title III" and that "the PSA Creditors believe that the debt service payments required under the PSA remain affordable" Motion ¶ 55. The Current PSA, including the previously restructured COFINA debt, dedicates over $1.47 billion of own-source revenues to debt service for the next twenty years.  Given the current fiscal environment and structural changes to the economy, however, the Oversight Board believes it is appropriate to consider the top 25 most indebted states, which have an average debt service ratio of 6.40% and implies a Maximum Annual Debt Service ("MADS") cap of $970 million based on the May 2020 Fiscal Plan.  When considering the top 10 most indebted states, the average debt service ratio increases to 8.60% and implies a MADS amount of $1.30 billion, which is still lower than the Current PSA.  In other words, the Current PSA would saddle the Commonwealth with more leverage than the top 10 most indebted states and significantly more leverage than the top 25 most indebted states.  Even if the MADS cap analysis may not be the most appropriate indicator of sustainability, there is no question that the Oversight Board cannot currently claim the Current

---

[15] Notably, PROMESA makes non-justiciable a number of matters that ordinarily may be contested in a Chapter 9 case, such as whether a debtor is insolvent (*see* 11 U.S.C. § 109(c)(3), which does not apply under PROMESA)) or whether Puerto Rico engaged in good faith efforts to reach a consensual restructuring with creditors prior to the Oversight Board issuing a restructuring certification (a matter which under PROMESA the Oversight Board is permitted to certify in its sole discretion. *See* § 206(a), (b), and therefore is unreviewable).  Taken together, these sections emphasize that the creditors are not entitled to second-guess certain key decisions that are part of a critical path towards Puerto Rico's emergence from its fiscal crisis.

POA is feasible given the impact of COVID-19 on the island and the Commonwealth's liquidity

in the near-term given the May 2020 Fiscal Plan projections.  The Oversight Board was established

to relieve the Commonwealth of an excessive debt burden, not to facilitate it.

## IV.   AN ARBITRARY PLAN CONFIRMATION TIMELINE SERVES NO MERITORIOUS PURPOSE

49.     The inability to prosecute immediately a proposed Commonwealth plan of

adjustment is as frustrating to the Oversight Board as it is to creditors.  But Hurricane Maria, the

earthquakes, and COVID-19 were not subject to the Oversight Board's control.  The entire country

is suffering from uncertainty as to the length, outcome, and consequences of the COVID-19

pandemic, and there is no reason the Commonwealth's situation is more certain than everywhere

else.  In addition to relying on inaccurate facts, the PSA Creditors rely on inapposite jurisprudence

to support their argument.  They cite *In re New York City Off-Track Betting Corp.* to support the

notion that the Title III cases should be dismissed, but the court there dismissed the case after the

<u>debtor</u> requested such relief given the delay caused by the legislature.  *See In re New York City*

*Off-Track Betting Corp.*, 434 B.R. 131 (Bankr. S.D.N.Y. 2010); 2011 WL 309594 (Bankr.

S.D.N.Y. 2011).  Here, however, the Oversight Board is adamantly opposing the relief sought by

the PSA Creditors, and there is no evidence of unjustified delay in the plan confirmation process.

There has been considerable progress to date and the Oversight Board remains hopeful that

meaningful progress will continue in short order.  Imposing an arbitrary plan confirmation timeline

or dismissing these Title III cases at this time will cause plenty of chaos, but no benefit for the

people of Puerto Rico.

50.     The relief sought in the Motion fails to account for the complexity of these cases.

The PSA Creditors' argument fails to address the interests of Puerto Rico as a whole.  As this

Court and the First Circuit have previously recognized, "unlike the commercial focus of

bankruptcy cases of private entities, the 'primary purpose' of governmental insolvency proceedings 'is not future profit, but rather continued provision of public services.'" *In re Fin. Oversight & Mgmt. Bd. for P.R.*, 432 F. Supp. At 30 (citing *In re Mount Carbon Metro. Dist.*, 242 B.R. 18, 34 (Bankr. D. Colo. 1999)); *see also Andalusian*, 954 F.3d at 7 (recognizing "obvious differences" between governmental bankruptcies and commercial private party bankruptcies). PROMESA designates the Oversight Board as the entity responsible for developing a "holistic approach" to these proceedings that "balance[s] and prioritize[s] the relevant issues and concerns in developing fiscal arrangements and plans of adjustment." *In re Fin. Oversight & Mgmt. Bd. for P.R.*, 423 F. Supp. at 30.   In doing so, PROMESA contemplates substantial deference to the Oversight Board as it formulates its holistic approach. *Id*. at 31; *see also* 48 U.S.C. §§ 2128, 2141, 2142, 2172.  The wisdom of this approach is highlighted by the shifting economic and political landscape, and it would run contrary to the deference PROMESA affords the Oversight Board to impose arbitrary deadlines to undertake this vital work that will shape the course of Puerto Rico's future.

*[Remainder of page intentionally left blank]*

## **CONCLUSION**

51.    For the foregoing reasons, the Court should deny the Motion.

Dated: October 13, 2020
     San Juan, Puerto Rico

                              Respectfully submitted,

                              */s/ Hermann D. Bauer*
                              Hermann D. Bauer
                              USDC No. 215205
                              **O'NEILL & BORGES LLC**
                              250 Muñoz Rivera Ave., Suite 800
                              San Juan, PR 00918-1813
                              Tel: (787) 764-8181
                              Fax: (787) 753-8944
                              Email: hermann.bauer@oneillborges.com

                              */s/ Martin J. Bienenstock*
                              Martin J. Bienenstock (*pro hac vice*)
                              Brian S. Rosen (*pro hac vice*)
                              **PROSKAUER ROSE LLP**
                              Eleven Times Square
                              New York, NY 10036
                              Tel:  (212) 969-3000
                              Fax:  (212) 969-2900
                              Email: mbienenstock@proskauer.com
                              Email : brosen@proskauer.com

                              *Attorneys for the Financial Oversight and*
                              *Management Board for Puerto Rico, as*
                              *representative of the Commonwealth of Puerto Rico*