# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>The Financial Oversight and Management Board for Puerto Rico,<br><br>    as representative of<br><br>The Commonwealth of Puerto Rico, et al.,<br><br>    Debtors. | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |

### RESPONSE OF SCULPTOR CAPITAL LP ON BEHALF OF ITS FUNDS TO MOTION OF NATIONAL PUBLIC FINANCE GUARANTEE CORPORATION FOR AN ORDER DIRECTING AN INDEPENDENT INVESTIGATION; AND JOINDER IN OBJECTION OF QTCB NOTEHOLDER GROUP

To the Honorable United States District Judge Laura Taylor Swain:

    Sculptor Capital LP ("Sculptor") (1) responds to the Motion for Entry of an Order Directing an Independent Investigation [Docket No. 14450] (the "National Motion") filed by National Public Finance Guarantee Corporation ("National"), and (2) joins in the Objection of QTCB Noteholder Group to the National Motion [Docket No. ____] (the "QTCB Response").[1]

---

[1] Capitalized terms not otherwise defined have the meanings ascribed to them in the National Motion. Sculptor more broadly considers "GO Bonds" to include bonds issued *or guaranteed* by the Commonwealth of Puerto Rico, such as Public Buildings Authority Bonds, whether or not the subject of the National Motion. This distinction does not materially affect the arguments presented by either National or Sculptor but is offered for clarity.

## SUMMARY OF RESPONSE

Relying on a flawed understanding of permissible trading and a misleading presentation of Sculptor's trading position, National falsely suggests that Sculptor used material non-public information received through the Mediation process when it bought or sold GO Bonds. National is wrong. Sculptor scrupulously observed applicable trading restrictions and did not trade at any time it was in possession of material non-public information. Sculptor's only trading activity in GO Bonds took place *after* a cleansing event occurred, and never during periods when Sculptor was participating in the Mediation and possessed material non-public information. Sculptor's actions were lawful throughout and in accord with the Court's confidentiality requirements.

To correct National's false allegations and conjecture, Sculptor is voluntarily disclosing its trading history for the GO Bonds. A simple timeline shows that every trade Sculptor executed was initiated *after* cleansing events made those trades permissible:

| Timeline | |
|---|---|
| **Date** | **Event** |
| April 22, 2019 | Sculptor Receives MNPI |
| April 22 to June 16 | **NO TRADES** |
| June 16 | "Cleansing Event": FOMB Publishes PSA |
| June 17 to September 26 | Purchase / Sale of GO Bonds |
| October 2 | Sculptor Receives MNPI |
| October 2 to October 21 | **NO TRADES** |
| October 17 to October 18 | "Cleansing Event" (Oct. 17): AAFAF Publishes Mediation Materials – Cash<br>"Cleansing Event" (Oct. 18): AAFAF Publishes Mediation Materials - Bank |
| October 22 to October 23 | Purchase / Sale of GO/PBA Bonds (not 2012 or 2014) |
| October 25 | Sculptor Receives MNPI |
| October 25, 2019 to February 8, 2020 | **NO TRADES** |
| February 9 | "Cleansing Event": Publication of Amended PSA |
| February 10 to July 7 | Purchase / Sale of GO/PBA Bonds |
| August 15 | Sculptor Receives MNPI |
| August 15 to October 1 | **NO TRADES** |
| October 1 | "Cleansing Event": FOMB Announces PSA Proposals |

National's line graph representing what it presumes to be Sculptor's trading history is deeply misleading because it takes Sculptor's disclosures of its trading positions in 2012 and 2014-vintage bonds on two different dates (September 27, 2019 and February 9, 2020), then simply connects the dots from the first one to the second in a way that suggests Sculptor was actively trading in between, while the Mediation

was active, Sculptor was participating, and Sculptor may have had material non-public information.[2] *See* National Motion, Exhibit C, PDF page 5 of 8.

National's use of diagonal lines to connect the two dispersed dates gives the erroneous impression that Sculptor was buying 2012 and 2014 GO Bonds every day between September 27, 2019 and February 9, 2020. In fact, Sculptor never traded at all in these bonds during that time. All post-September 26, 2019 purchases or sales of 2012 and 2014 GO Bonds were made *after* the public announcement of the New PSA on February 9, 2020—a cleansing event that made such trades permissible. Thus, the diagonal line used by National, suggesting trading activity, is in reality a horizontal line, reflecting the fact that there was **no** trading activity between the two dates.

A corrected version of National's chart for Sculptor's 2012 and 2014 GO Bonds transactions would look like this (with actual trades shown in bold lines, National's presentation to the Court in faint lines):

---

[2] While the Mediation, broadly defined, theoretically spanned a long and continuous period of time, there were many periods in which Sculptor was not participating in the Mediation and—more importantly—held no MNPI.



Armed with limited data but unlimited imagination, National fills in its data gaps with what it wishes to be there, and so informs the Court. Its portrayal is entirely incorrect. As shown correctly in this filing, there is no basis for launching an expensive, distracting and baseless investigation. Sculptor's trades were perfectly lawful, comported with this Court's Orders, and respected the confidentiality of the Mediation.

## BACKGROUND AND ANALYSIS

**A.  Under Applicable Law, After Material Non-Public Information Is "Cleansed" Through a Public Release, a Party that Formerly Had Such Information May Trade in Affected Bonds.**

A party holding material non-public information ("MNPI") relevant to a security is generally prohibited from trading in those securities. *See, e.g.*, *Chiarella v. United States*, 445 U.S. 222, 251 (1980) ("[P]ersons having access to confidential material information that is not legally available to others generally are prohibited by Rule 10b–5 from engaging in schemes to exploit their structural informational advantage through trading in affected securities."). However, when non-public information is "blown out" to the public through publication of "cleansing" documents, the party in possession of that information is no longer prohibited from trading until it acquires new MNPI. 17 C.F.R. § 240.10b5-1(b),(c)(2) ("'on the basis of' material nonpublic information"). Cleansing is a commonly accepted practice among securities dealers, particularly in the context of restructuring-related negotiations and transactions. Thus, if Sculptor only bought or sold GO Bonds during periods following the release of cleansing documents—as it did—its transactions were permissible and are not properly subject to any investigation.

**B.  Every Sculptor GO Bonds Transaction Was Preceded by a "Cleansing Event" that Eliminated Restrictions on Investments in GO Bonds.**

In accordance with applicable law and regulations, and under the supervision of Sculptor's Compliance Department, Sculptor takes stringent steps to ensure that it does not initiate trades, such as those of GO Bonds, during periods in which Sculptor possesses MNPI. In this case, Sculptor's Compliance Department, taking a

6

conservative approach, invariably set an internal ban on trading GO Bonds upon notice it was about to receive or actual receipt of MNPI, after which time it initiated no trades of GO Bonds until a party to the Mediation (generally the FOMB) released cleansing information. Each pause in trading ended upon the public disclosure of cleansing documents through Electronic Municipal Market Access site ("EMMA"), which was then typically followed by their further dissemination through a Reorg® Research report or a similar news service. Thus, Sculptor was meticulous about adhering to applicable legal requirements and the Court's Orders.

Sculptor's conformance with this best practice is reflected in its trading history of GO Bonds during the time embraced by the National Motion:

- *April 22, 2019*: Sculptor imposed an internal ban on trading GO Bonds with the receipt of MNPI. Sculptor's aggregate par holdings of GO Bonds on this date totaled $312,135,000.00. *No Sculptor trades in GO Bonds occurred until after cleansing information was released on June 16. As a result, on June 16, the aggregate GO Bonds balance held by Sculptor was still $312,135,000.00, the same as it was at the end of the previous unrestricted period.*

- *June 17, 2019*: Sculptor's internal ban on trading GO Bonds was lifted the day after the FOMB published cleansing materials including the PSA, which was publicized by Reorg® Research in an article titled, "Oversight Board Releases Executed PSA." *See* Exhibit A. Sculptor initiated purchases and sales daily on June 17-21, June 24-25, July 1, September 16 and September 26. Sculptor's aggregate par GO Bonds holdings at the end of this period totaled $378,683,000.00.

- *October 2, 2019*: Sculptor re-imposed its internal ban on trading GO Bonds when Sculptor received MNPI through the Mediation process. *No Sculptor trades in GO Bonds occurred until five days after cleansing information was released on October 17 and 18. As a result, on October 18, the aggregate GO Bonds par balance held by Sculptor was still $378,683,000.00, the same as it was at the end of the previous unrestricted period.*

- *October 18, 2019*: Sculptor's internal ban on trading GO Bonds was lifted the day after FOMB posted the MNPI provided during the Mediation on EMMA,

which was then publicized through Reorg® Research on October 17 in an article titled, "AAFAF Posts Mediation-Related Documents to EMMA; Filing Includes Oversight Board Presentations on Commonwealth Fiscal Plan Risks, Cash Restriction Analysis." The following day, AAFAF posted additional bank-related information in a blowout publicized through Reorg® Research under the article titled, "Mediation-Related Cleansing Materials Reveal $6.8B Unrestricted Cash Estimate, Discuss Risks to Commonwealth Fiscal Plan." *See* Exhibit B. Five days after the first information blowout, on October 22 and 23, Sculptor sold certain GO and/or PBA Bonds—though not any 2012 or 2014-vintage bonds, as National suggests in its chart labeled Exhibit C to the National Motion. Sculptor's aggregate GO Bonds holdings at the end of this period totaled $342,798,000.00.

- *October 25, 2019*: Sculptor re-imposed its internal ban on trading GO Bonds when Sculptor received MNPI through the Mediation process. *Sculptor made no trades in any GO Bonds until <u>after</u> cleansing information was released on February 9, 2020. As a result, on February 9, 2020, the aggregate GO Bonds balance held by Sculptor was still $342,798,000.00, the same as it was at the end of the previous unrestricted period.*

- *February 9, 2020*: Sculptor's internal ban on trading GO Bonds was lifted after the Amended Plan Support Agreement (the "Amended PSA") was posted on EMMA and publicized through Reorg® Research that same date in an article titled "BREAKING: PROMESA Oversight Board Discloses 'Global Settlement' With Holders of $8B in GO, PBA Bonds." *See* Exhibit C. Sculptor purchased or sold GO Bonds after the public release of the Amended PSA on February 10-14, March 4-6, March 25, and July 6-7. Sculptor's GO Bonds holdings at the end of this period totaled $528,286,000.00.

- *August 15, 2020*: Sculptor re-imposed its internal ban on trading GO Bonds with receipt of MNPI through the Mediation process. *Sculptor made no trades in any GO Bonds from July 8 to October 1, 2020. As a result, on October 1, 2020, the aggregate GO Bonds balance held by Sculptor was still $528,286,000.00, the same as it was at the end of the previous unrestricted period.*

- *October 1, 2020*: Sculptor's internal ban on trading GO Bonds was lifted the day after the September 30, 2020 publication of FOMB's and creditors' PSA proposals, publicized through Reorg® Research that same date in an article titled, "Revised Plan Proposals From PROMESA Oversight Board, PSA Creditors Would Increase Cash Consideration by $2B, Lower Cap on Maximum Annual Debt Service; Proposals Differ Over Composition of Total Consideration." *See* Exhibit D. As of the time of this Response, Sculptor is not prohibited from trading because, since September 30, 2020, Sculptor has received no MNPI.

8

**C. National Does Not Claim Sculptor Violated Any Confidentiality Obligations.**

National extensively discusses this Court's Mediation and Supplemental Confidentiality Orders, but it makes no attempt to tie any disclosures to Sculptor (or anyone else). Rather, it conflates "trading" with "disclosing confidential information."

When the Court ordered the Mediation to take place, it generally stated that "the participants and the mediators will be bound by confidentiality." Exhibit E, at 2 (Docket No. 430). The Mediation Order did not limit the parties' rights to trade GO Bonds whenever permitted by applicable law. *Id.* Similarly, the Supplemental Confidentiality Order does not expand the parties' confidentiality obligations. It reaffirmed that "all participants in the mediation process are bound by the confidentiality restrictions imposed by this Court and the Mediation Team." Exhibit F, at 1.

In thirty-one pages of briefing, National offers the Court nothing to suggest that Sculptor (1) traded on MNPI, (2) disclosed an iota of confidential information, or (3) violated any of its obligations under the Court's Orders or applicable laws and regulations. As discussed in detail in the QTCB Response, blind speculation does not justify derailing the plan process through the appointment of a quasi-examiner.

## JOINDER IN THE QTCB RESPONSE

Sculptor joins in the QTCB Response and adopts those arguments as if fully set forth herein. Sculptor reserves its rights to refine or adopt its joinder at later stages of briefing or argument.[3]

Sculptor also objects to the requested, prospective appointment of the Official Committee of Unsecured Creditors ("UCC") as investigator, based on its prior record of asserting meritless claims against Sculptor. The UCC—represented by its current litigation counsel—previously filed a meritless fraudulent transfer adversary proceeding against Sculptor in connection with what the UCC claimed was Sculptor's holdings of Puerto Rico Employees Retirement System ("ERS") bonds. Notwithstanding the fact that Sculptor never owned any ERS bonds, it took more than a year for the UCC to admit its error and amend its complaint to drop its claims, and then only after repeated efforts by Sculptor to make this fact easily understandable to the UCC.[4] The UCC is therefore not qualified and ill-suited to conduct a widespread investigation of all noteholders at the estate's expense.

---

[3] In light of the meritless factual allegations in the National Motion, Sculptor reserves its rights to request reimbursement of legal fees and expenses due to, among other things, National's lack of reasonable inquiry, its lodging factual allegations lacking evidentiary support, and its use of its motion for an improper purpose, including harassment, delay, or increased cost of litigation. While Sculptor believes it proper to defer pursuit of any such request until after the Court renders its ruling on the National Motion, Sculptor reserves its right to bring such a request at the appropriate time.

[4] Compare Complaint, Adv. Pro. 19-00355 (May 19, 2019) with Amended Complaint, Adv. Pro., 19-00355 (July 7, 2020) (dropping claims against Sculptor).

10

## **CONCLUSION**

For the foregoing reasons, Sculptor respectfully requests that the Court deny the National Motion or, in the alternative, exclude Sculptor from any order authorizing an investigation.

Dated: October 13, 2020

| | |
|---|---|
| **KING & SPALDING LLP** | **CORREA-ACEVEDO & ABESADA LAW OFFICES, PSC** |
| */s/ Richard H. Walker* | */s/ Sergio Criado* |
| Richard H. Walker (*pro hac vice* pending) | Sergio Criado |
| 1700 Pennsylvania Avenue, 2nd Floor | USDC-PR No. 226307 |
| Washington, D.C. 20006 | Roberto Abesada-Agüet |
| Tel. (202) 737-0500 | USDC-PR No. 216706 |
| rwalker@kslaw.com | Centro Internacional de Mercadeo, Torre II |
| Thaddeus D. Wilson (*pro hac vice* pending) | # 90 Carr. 165, Suite 407 |
| Jonathan W. Jordan (*pro hac vice* pending) | Guaynabo, P.R. 00968 |
| 1180 Peachtree Street, 35th Floor | Tel. (787) 273-8300 |
| Atlanta, Georgia 30309 | Fax (787) 273-8379 |
| Tel: (404) 572-4600 | ra@calopsc.com |
| thadwilson@kslaw.com | scriado@calopsc.com |
| jjordan@kslaw.com | |

*Co-Counsel for Sculptor Capital LP*

11