# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>The Financial Oversight and Management Board for Puerto Rico,<br><br>    as representative of<br><br>The Commonwealth of Puerto Rico, et al.,<br><br>    Debtors.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |

**OBJECTION OF THE AD HOC GROUP OF GENERAL OBLIGATION BONDHOLDERS TO THE MOTION OF NATIONAL PUBLIC FINANCE GUARANTEE CORPORATION FOR ENTRY OF AN <u>ORDER DIRECTING AN INDEPENDENT INVESTIGATION</u>**

---

[1] The Debtors in these Title III cases, along with each Debtor's respective Title III Case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (the "Commonwealth") (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19 BK 5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as bankruptcy case numbers due to software limitations).

The Ad Hoc Group of General Obligation Bondholders (the "GO Group")[2] hereby files this Objection to the *Motion of National Public Finance Guarantee Corporation for Entry of an Order Directing an Independent Investigation* (Dkt. No. 14450) (the "Motion"),[3] and the *Limited Joinder* thereto (Dkt. No. 14527) filed by the Official Committee of Unsecured Creditors (the "UCC"). In support of its Objection, the GO Group respectfully states as follows:

## INTRODUCTION

National's Motion is baseless and should be swiftly rejected on the merits.

Relying purely on speculation, the Motion suggests that certain of the Commonwealth's largest creditors committed serious violations of the federal securities laws. The targeted creditors have reached agreement with the Oversight Board on a plan of adjustment and continue to work with the Oversight Board to facilitate the Commonwealth's emergence from bankruptcy. National's goal is to disrupt that plan—because National does not like the treatment the plan affords National's interests—without any regard to the truth of the allegations or the harm that they will inflict on the targeted creditors or their managers.

To be perfectly clear, the members of the GO Group did not make a single trade in the securities of Puerto Rico or its instrumentalities while in the possession of material non-public information ("MNPI").

The Motion should be denied.

---

[2] The members of the GO Group file this Objection exclusively on their own behalves and do not assume any fiduciary or other duties to each other or any other entity or individual.

[3] Capitalized terms not defined herein shall have the meanings ascribed to them in the Motion.

**ARGUMENT**

1. The Motion proceeds from National's baseless insinuations that the creditor parties to the New PSA "may have violated the Court's Mediation Order and its Supplemental Confidentiality Order" (Motion ¶ 46) and "engaged in improper trading in the Debtors' debt securities" (*id.* ¶ 1). National speculates "that some members of the Hedge Fund Groups were likely trading the bonds at the same time they were negotiating in the Mediation the treatment of and recoveries for holders of those bonds" (*id.* ¶ 33), and it litters the Motion with references to supposedly "suspicious" (*id.* ¶ 35 n.14) and "questionable" (*id.* ¶ 43) trading.

The Motion is thus an accusation that many institutional investors have committed intentional violations of the securities laws. Claims of this sort, if true, could subject the targeted creditors and their managers to serious sanctions. Accordingly, they should not be advanced—and certainly should not be countenanced by this Court—unless they are supported by a solid foundation of evidence.

But National does not advance a shred of evidence to support these serious charges. National points to bondholder groups' Rule 2019 submissions, stressing that some bondholders increased their holdings of Late Vintage GO Bonds over a period during which the trading prices of at least one series of Late Vintage GO Bonds also increased. See Motion ¶¶ 32-39; see also Motion Ex. C at 7. But those Rule 2019 submissions do not even faintly suggest misuse of confidential mediation information, because the reported changes in holdings occurred over periods that included times when National does not suggest that any relevant mediation was in session.

With respect to the GO Group, National compares holdings as of March 6, 2019, and as of February 18, 2020—a period that began months before National alleges that any relevant

2

mediation sessions were held and ended more than a week after the terms of the New PSA were publicly disclosed. See Motion ¶¶ 16, 19, 26; see also Motion Ex. C at 1. As a matter of basic logic, there is nothing "suspicious" or "questionable" about the change in the holdings of the GO Group's members over this long period, which included *more than six months* during which even National's own account offers no conceivable basis to contend that they were in possession of MNPI that should have restricted them from trading.

Indeed, National's claim is particularly egregious with respect to the GO Group. The *decrease* in the GO Group's holdings of Late Vintage GO Bonds contradicts National's theory that bondholders illicitly *purchased* those bonds as their price appreciated in the months leading up to the New PSA. *E.g.*, Motion ¶¶ 33-34; Motion Ex. C at 7.

Nonetheless, National casually hypothesizes—without any basis—that members of the GO Group (whose holdings of Late Vintage GO Bonds decreased) and members of the other three targeted bondholder groups (whose holdings thereof increased) "were working together to re-allocate these bonds among themselves to benefit them and ensure support for the New PSA." Motion ¶ 35 n.16. That theory is entirely fictitious, as we explain below. But National's theory is also illogical even on its own terms: It would entail the GO Group members selling securities to other bondholders who were participating in the same mediation and had the same information that the GO Group did—a scenario that would completely exculpate the GO Group. National likewise does not explain—because it cannot—how such a collusive arrangement among the parties to the New PSA could possibly have furthered the goals attributed to them.[4]

---

[4] National's Motion is littered with other statements that are factually inaccurate, logically irrelevant to National's theory, or both. For example, National describes the Initial PSA as providing holders of Late Vintage GO Bonds "with only a relatively minimal recovery" and asserts that "the New PSA awarded holders of those Late Vintage GO Bonds a much higher recovery, nearly double their original recovery." Motion ¶ 6. Not so. National is comparing the Late

2. Lest there be any doubt, National's aspersions against the members of the GO Group are not only unsupported; they are categorically false.

The participants in the mediation process well understand the serious legal consequences that could follow from trading securities while in possession of MNPI. Accordingly, the parties have consistently ensured that no information that could potentially constitute MNPI would be provided to bondholders in mediation without reaching a formal understanding, facilitated by the mediation team, as to (i) when such potentially restricting information would be shared with the bondholders and (ii) when the government parties would issue a public disclosure "cleansing" the information and thereby allowing the bondholders to resume trading. Indeed, the Oversight Board's response to National's Motion confirms this mutual understanding, referring to "the periods of 'restriction' established by the Mediation Team." Dkt. No. 14539, at ¶ 5.

In the case of the GO Group, only two such restriction periods applied:

- The first started after 1:00 pm NY time on September 17, 2019, and ended upon the government parties' cleansing release on October 17, 2019, which was made public by 10:20 pm NY time.[5]

---

Vintage GO Bonds' recoveries under the New PSA with the lowball offer proposed in the Initial PSA in "settlement" of an insubstantial challenge to the validity of those bonds, not to the much higher recoveries those bonds would have received under the Initial PSA if the bondholders had litigated the validity challenge to a successful conclusion, as was overwhelming likely. Not surprisingly, the Initial PSA's "settlement" offer was roundly rejected by the market as soon as it was announced.

National also refers (Motion ¶ 37.b) to trading that occurred "[a]fter the New PSA was announced," but any trades made after the terms of the New PSA had become *public* are obviously not evidence of misuse of *confidential* information. Likewise, National's reference to "significant trading activity . . . in the lead up to the announcement of the New PSA" (*id.* ¶ 38) has no logical connection to National's insinuations of improper trading. Countless bondholders were *not* participating in the mediation and were not restricted from trading at that time. Trading by those bondholders does not suggest that any bondholders participating in the mediation misused confidential information.

[5] See Puerto Rico Fiscal Agency and Financial Advisory Authority, Municipal Secondary Market Disclosure, Oct. 17, 2019, https://emma.msrb.org/ES1428126.pdf. The October 17, 2019, cleansing release included two presentations that were provided to the bondholders during the

4

- The second started after 12:24 pm NY time on October 25, 2019,[6] and ended upon the Oversight Board's cleansing release announcing the terms of the New PSA (along with a press release and summary presentation) on February 9, 2020, which was made public by 6:44 pm NY time.[7]

During these two restriction periods, the only members of the GO Group were Aurelius Capital Management, LP and Autonomy Capital (Jersey) LP, acting on behalf of funds managed by them. **Neither they nor any of their managed funds made a single trade in securities issued by Puerto Rico or any of its instrumentalities during those periods**.

3. National's motive is transparent: It is an opponent of the New PSA and the currently pending plan of adjustment, because it objects to the treatment contemplated in that plan for the bonds that National insures. National apparently hopes that the Motion's speculative innuendo will cast a cloud of uncertainty over the parties to the New PSA, and thus frustrate confirmation of the plan.

---

course of mediation. The first of those presentations was provided after 1:00 pm NY time on September 17, 2019. On the afternoon of October 18, 2019, the government parties publicly disclosed an additional presentation that had been provided during the course of mediation, which did not contain MNPI. See Puerto Rico Fiscal Agency and Financial Advisory Authority, Municipal Secondary Market Disclosure, Oct. 18, 2019, https://emma.msrb.org/ES1313849-ES1026367-ES1428326.pdf. For the avoidance of doubt, no member of the GO Group traded in securities of Puerto Rico or its instrumentalities between the end of the restriction period on October 17, 2019, and the government parties' public disclosure of that presentation on October 18.

[6] A confidential settlement proposal from the Oversight Board was conveyed to the members of the GO Group by separate emails at 12:24 pm NY time and 12:25 pm NY time on October 25, 2019.

[7] See Puerto Rico Fiscal Agency and Financial Advisory Authority, Municipal Secondary Market Disclosure, Feb. 9, 2020, https://drive.google.com/file/d/1_JApEw_dGRQCpgAVo0SaffZrVuap6WqQ/view; Financial Oversight and Management Board for Puerto Rico, Media Release, Oversight Board Reaches New, More Favorable Agreement to Restructure $35 Billion of Liabilities, Feb. 9, 2020, https://drive.google.com/file/d/1bE04jvOmiJObY4OMtohmJmZkTaCUUurl/view; Financial Oversight and Management Board for Puerto Rico, Commonwealth of Puerto Rico Title III Case: Plan Support Agreement, Feb. 9, 2020, https://drive.google.com/file/d/1uyS9_npXsV7cUfMI0cwxENUuc0A5hboG/view.

5

To state the obvious, National is free to object to the proposed plan of adjustment on any legitimate ground it believes is available. But that is not what this Motion represents, and the Court should not countenance National's tactics.

4. The UCC's Limited Joinder does not offer any arguments in support of National's Motion. Instead, the UCC argues that, if the Court were to grant National's Motion, then the UCC should be appointed to conduct the requested investigation. See Limited Joinder ¶ 8.

Granting that additional request would only add insult to injury, by ensuring that the costs of conducting the wasteful investigation that National proposes would be borne entirely by the Commonwealth. The UCC's advisors have billed the Commonwealth for more than $88 million in total fees and expenses through May 31, 2020 (with more than $79 million of that total approved by this Court for payment). Particularly in light of the startling quantity of Commonwealth resources that the UCC has *already* consumed in these Title III cases, there is no basis for expanding the UCC's mandate in the manner proposed.

## CONCLUSION

The Motion should be denied.

Dated: October 13, 2020                           Respectfully submitted,

/s/ Ramón Rivera Morales                          /s/ Mark T. Stancil
J. Ramón Rivera Morales                           Mark T. Stancil (admitted *pro hac vice*)
USDC-PR Bar No. 200701                            WILLKIE FARR & GALLAGHER LLP
Andrés F. Picó Ramírez                            1875 K Street, N.W.
USDC-PR Bar No. 302114                            Washington, DC 20006
JIMÉNEZ, GRAFFAM & LAUSELL                        Telephone: (202) 303-1133
P.O. Box 366104                                   Facsimile: (202) 303-2133
San Juan, PR 00936                                Email: mstancil@willkie.com
Telephone: (787) 767-1030
Facsimile: (787) 751-4068
Email: rrivera@jgl.com


/s/ Andrew N. Rosenberg                           /s/ Lawrence S. Robbins
Andrew N. Rosenberg (admitted *pro hac vice*)     Lawrence S. Robbins (admitted *pro hac vice*)
Karen R. Zeituni (admitted *pro hac vice*)        Gary A. Orseck (admitted *pro hac vice*)
PAUL, WEISS, RIFKIND, WHARTON                     Donald Burke (admitted *pro hac vice*)
& GARRISON LLP                                    ROBBINS, RUSSELL, ENGLERT, ORSECK,
1285 Avenue of the Americas                       UNTEREINER & SAUBER LLP
New York, NY 10019                                2000 K Street, N.W., 4th Floor
Telephone: (212) 373-3000                         Washington, DC 20006
Email: arosenberg@paulweiss.com                   Telephone: (202) 775-4500
                                                  Facsimile: (202) 775-4510
                                                  Email: lrobbins@robbinsrussell.com


*Counsel to the Ad Hoc Group of General Obligation Bondholders*