## UNITED STATES DISTRICT COURT
## DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND<br>MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*,<br><br>                    Debtors.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>Re: ECF No. 14478<br><br>(Jointly Administered) |

**AAFAF'S OBJECTION TO THE JOINT MOTION OF PSA CREDITORS PURSUANT TO SECTION 312 OF PROMESA AND SECTION 105 OF THE BANKRUPTCY CODE TO IMPOSE DEADLINES FOR PLAN OF ADJUSTMENT**

To the Honorable United States District Court Judge Laura Taylor Swain:

The Puerto Rico Fiscal Agency and Financial Advisory Authority ("AAFAF"), by and through its undersigned counsel, respectfully submits this objection (the "Objection") to the *Joint Motion of PSA Creditors Pursuant to Section 312 of PROMESA and Section 105 of the Bankruptcy Code to Impose Deadlines for Plan of Adjustment* [D.I. 14478] (the "Motion").[2]  In support of this Objection, AAFAF respectfully states as follows:

---

[1]  The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico ("Commonwealth") (Bankruptcy Case No. 17-BK-3283- LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17- BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

[2] Capitalized terms used but not defined herein have the meaning ascribed to them in the Motion.

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................... 1

THE GOVERNMENT HAS MADE SIGNIFICANT PROGRESS IN  ADVANCING
THE COMMONWEALTH'S RESTRUCTURING EFFORTS....................................... 5

THE MOTION RELIES ON A FLAWED FACTUAL AND LEGAL PREMISE AND
SHOULD BE DENIED ......................................................................... 10

    A.    Significant Structural Reforms Have Been Completed or Are in Progress ......... 11

    B.    The PSA Creditors Plainly Continue to Distort Cash Available for Debt
Service........................................................................................... 14

    C.    Impact of COVID-19 on Puerto Rico and the United States .............................. 16

    D.    Significant TSA Cash Has Not Been Generated Throughout the Pandemic ....... 17

    E.    The Recently Announced FEMA Relief Package Does Not Increase GNP........ 18

    F.    It is Premature to Revise Projections to Reflect Supplemental Security
Income........................................................................................... 18

    G.    The *Off-Track Betting* and COFINA Orders Do Not Support the
Requested Relief ............................................................................... 19

CONCLUSION.................................................................................... 21

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re New York City Off-Track Betting Corp.*,
434 B.R. 131 (Bankr. S.D.N.Y. 2010) ................................................................................. 20

**Statutes**

P.L. 92-603 .......................................................................................................................... 19

P.L. 94-241 .......................................................................................................................... 19

PROMESA § 106(e) ............................................................................................................. 11

PROMESA § 201(e) ............................................................................................................. 11

PROMESA § 203(d) ............................................................................................................. 11

**Other Authorities**

H.R. Res. 1, 92nd Cong. (1972) ........................................................................................... 19

H.R.J. Res. 549, 94th Cong. (1976) ..................................................................................... 19

H.R. Res. 8911, 94th Cong. (1976) ..................................................................................... 19

H.R. Res. 7200, 95th Cong. (1977) ..................................................................................... 19

MSRB ELECTRONIC MUNICIPAL MARKET ACCESS SYSTEM, NOTICE OF POTENTIAL
FINANCING - PUERTO RICO AQUEDUCT AND SEWER AUTHORITY (October 8,
2020), https://emma.msrb.org/P11424408-P11105243-P11515291.pdf ................................. 8

OFFICE OF ECONOMIC STUDIES OF THE ECONOMIC DEVELOPMENT BANK FOR
PUERTO RICO, THE PUERTO RICO ECONOMIC ACTIVITY INDEX ("EDB-EAI")
(June 2020),
https://www.bde.pr.gov/BdeSite/PREDDOCS/EDBEAIJUNE2020.pdf. ................................ 3

PUERTO RICO DEPARTMENT OF LABOR, UNEMPLOYMENT INSURANCE WEEKLY
CLAIMS, https://www.dol.gov/ui/data.pdf (last visited October 12, 2020) ............................. 3

PUERTO RICO FISCAL AGENCY AND FINANCIAL ADVISORY AUTHORITY, PUERTO
RICO DEPARTMENT OF TREASURY - TREASURY SINGLE ACCOUNT ("TSA") FY
2021 CASH FLOW AS OF SEPTEMBER 25, 2020, https://aafaf.pr.gov/wp-
content/uploads/fy20-weeklytsacashflow-9-25-20.pdf ....................................................... 17

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

PUERTO RICO FISCAL AGENCY AND FINANCIAL ADVISORY AUTHORITY, SUMMARY
OF BANK ACCOUNT BALANCES FOR THE GOVERNMENT OF PUERTO RICO AND ITS
INSTRUMENTALITIES - INFORMATION AS OF FEBRUARY 28, 2020 (April 20,
2020), https://www.aafaf.pr.gov/wp-content/uploads/2e-aafaf-bank-account-
balances-gov-pr-instrum-02-28-2020.pdf ................................................................................ 17

PUERTO RICO FISCAL AGENCY AND FINANCIAL ADVISORY AUTHORITY, SUMMARY
OF BANK ACCOUNT BALANCES FOR THE GOVERNMENT OF PUERTO RICO AND ITS
INSTRUMENTALITIES INFORMATION AS OF FEBRUARY 28, 2019 (April 1, 2019),
https://www.aafaf.pr.gov/wp-
content/uploads/FINANCIAL_DOCUMENTS/SUMMARY%20OF%20BANK
%20ACCOUNT%20BALANCES/2019%20ACCOUNT%20BALANCES/2-
2019%20ACCOUNT%20BALANCES.pdf ............................................................................ 18

PUERTO RICO FISCAL AGENCY AND FINANCIAL ADVISORY AUTHORITY, SUMMARY
OF BANK ACCOUNT BALANCES FOR THE GOVERNMENT OF PUERTO RICO AND ITS
INSTRUMENTALITIES INFORMATION AS OF SEPTEMBER 30, 2019 (October 31,
2019), https://www.aafaf.pr.gov/wp-content/uploads/2e-aafaf-bank-account-
balances-gov-pr-instrum-09-30-2019.pdf ............................................................................... 18

U.S. BUREAU OF LABOR STATISTICS - NEW YORK–NEW JERSEY
INFORMATION OFFICE, GEOGRAPHIC INFORMATION: PUERTO
RICO, https://www.bls.gov/regions/new-york-new-jersey/puerto_rico.htm (last
visited October 13, 2020).......................................................................................................... 10

## PRELIMINARY STATEMENT

1.      The PSA Creditors' assertion that Puerto Rico and its people "remain exactly where they were" four years after PROMESA's enactment is wrong and must be corrected.  *See* Motion ¶ 4.  And, it cannot serve as the basis for the deeply ill-advised relief they seek, which would defeat the progress made in these Title III Cases, deprive the people of Puerto Rico of the opportunity to restructure and adjust the Government's debts, and force Puerto Rico into uncertainty as it remains in the grips of a global pandemic.

2.      Over the past several years, Puerto Rico has made substantial and meaningful progress in what is indisputably one of the most complex restructurings of all time: The Government of Puerto Rico has successfully restructured more than $23 billion of debt; implemented the Defined Contribution Plan under Act No. 106 of 2017 to segregate and safeguard employees' retirement' funds; successfully implemented a critical labor reform through Act 4-2017; reorganized and consolidated numerous government agencies; advanced several essential public-private partnerships; and undertaken important measures to increase transparency in the use of public funds (including bi-weekly calls with creditor groups, in depth review and analysis of cash balances as well as a set of reports that are publicly available on the AAFAF website and which had never been available before).  Challenges remain, to be sure, and progress has not always been linear; but it has been tangible and undeniable in the face of severe and unprecedented obstacles.

3.      The Government, even more than the PSA Creditors, fervently wants to conclude Puerto Rico's debt restructuring and close this chapter in Puerto Rico's history, but circumstances (many beyond the control of the Government (and the Oversight Board)) have frustrated the ability to reach this goal.  Over the last three years, Puerto Rico has faced catastrophic natural disasters, political upheaval, extraordinary litigious intransigence from many creditors, and a global

pandemic, all while attempting to resolve the economic crisis that has crippled the Island for more

than a decade:

- *First*, on September 20, 2017, Hurricane Maria made landfall in Puerto Rico as the strongest hurricane to hit the Island in decades, arriving only two weeks after Hurricane Irma substantially impaired Puerto Rico's water and electricity services.  Hurricane Maria crossed Puerto Rico diagonally, entering through the Southeast and exiting through the Northwestern region, leaving behind catastrophic destruction, widespread power outages that lasted months, and more than 2,975 lives tragically lost.  It was the deadliest U.S.-based natural disaster in 100 years, the third costliest hurricane in U.S. history, and resulted in one of the worst humanitarian crises in the Island's modern history.  Puerto Rico's recovery and reconstruction has been a challenging process, in large part due to inequitable funding conditions imposed by the federal government on Puerto Rico in accessing federal disaster relief aid obligated to the Island—conditions which have not been imposed on any other U.S. jurisdiction but Puerto Rico, providing another compelling example of Puerto Rico's disparate and unfair treatment compared to U.S. states given its colonial territory status.

- *Second*, in July of 2019, in the second year of Puerto Rico's Title III cases, then-Governor Ricardo Rosselló resigned and, after a legal conflict over the constitutional order of succession, Secretary of Justice Wanda Vázquez Garced assumed office to complete the former governor's term.  Although Governor Vázquez Garced worked quickly to get up to speed on the complex restructuring process, the sudden government turnover caused temporary delay as the new administration evaluated the Government's continued necessary and proper approach for the Title III Cases.

- *Third*, beginning on December 28, 2019, and while the Island continued its recovery efforts from the hurricanes, a series of earthquakes and aftershocks struck Puerto Rico causing significant damage in the southern and southwestern part of the Island.  On January 7, 2020, a 6.4 magnitude earthquake caused devastating damage to infrastructure, an island-wide power outage and water shortages and threatened the lives of its people.  The earthquakes have caused significant physical damage to residential and commercial structures, required the closing of schools and caused significant damage to the Puerto Rico Electric Power Authority' Costa Sur power plant.  Puerto Rico continues to suffer earthquakes and aftershocks numbering in the thousands since January, including one registering 5.5 as recently as July 6, 2020.

- *Fourth*, in the first quarter 2020, just as progress began to take hold both in recovering from the prior natural disasters and in addressing a Commonwealth restructuring, the COVID-19 virus rapidly spread across the world, inflicting unprecedented human and economic costs.  By mid-March it became amply clear that Puerto Rico would not be immune from the disruptive effects of the pandemic.  To protect lives, Puerto Rico—like most governments around the world—implemented shelter-in-place orders to promote the social distancing necessary to slow the spread of the virus and preserve medical supplies and healthcare services.  Many of these measures remain in place

today—a night-time curfew was extended through October 16, 2020 and most stores, restaurants, malls, and services are operating at lower capacity (limited hours and limited density). Moreover, travelers can only come to Puerto Rico if they produce a negative COVID-19 test or self-quarantine for 14 days. The measures have had an immediate and devastating impact on the economy: the Economic Development Bank-Economic Activity Index, an indicator of general economic activity in Puerto Rico, fell 10.8% year-over-year during the first half of 2020[3] and total unemployment claims in Puerto from mid-March through August exceeded 371,000.[4] The Government continues to address the economic effects of these isolation measures, as well as the trickledown effect of any slowdown of the overall U.S. economy on critical industries, including retail, manufacturing, oil and gas, tourism, gaming and lodging, transportation, healthcare, and education.

4.      Despite these immense obstacles, the Government has worked diligently in its efforts to restore the economy and restructure its debt to a sustainable level. Prior to the COVID-19 crisis, the Government had indicated a desire to cooperate with the Oversight Board and PSA Creditors in seeking approval of a Commonwealth plan of adjustment that took into account protection for public pensioners and appropriate adjustments to creditor recoveries. Before an agreement on such terms was reached, COVID-19 took hold. The COVID-19 impact has no doubt significantly altered the economic landscape in Puerto Rico and rendered the then-existing fiscal plan—the fiscal plan on which the Oversight Board's February 27, 2020 Plan of Adjustment (the "February POA") was based—useless since it did not reflect the new economic realities and uncertainties caused by the pandemic. The Government supported the Oversight Board's responsible decision not to pursue confirmation of a plan of adjustment that is based on assumptions that do not reflect the substantial negative effects of COVID-19 (particularly with respect to debt sustainability and the economic impact of certain cost-cutting measures). Indeed, if the Oversight Board had moved forward with confirmation of the February POA, Puerto Rico

---

[3] *See* OFFICE OF ECONOMIC STUDIES OF THE ECONOMIC DEVELOPMENT BANK FOR PUERTO RICO, THE PUERTO RICO ECONOMIC ACTIVITY INDEX ("EDB-EAI") (June 2020), https://www.bde.pr.gov/BdeSite/PREDDOCS/EDBEAIJUNE2020.pdf.

[4] *See* PUERTO RICO DEPARTMENT OF LABOR, UNEMPLOYMENT INSURANCE WEEKLY CLAIMS, https://www.dol.gov/ui/data.pdf (last visited October 12, 2020).

would have been unable to sustain the debt burden contemplated by such plan and it would have

tied Puerto Rico's hands with statutory liens and debt service at levels that would have forced a

default and cut back funding to areas critical to growing the economy.  Additionally, the health

safety, and welfare of the people of Puerto Rico—over 50% of which live in poverty and still have

not recovered from the hurricanes and earthquakes—would have been jeopardized as well.  In that

regard, it is important to remember that Commonwealth revenues are susceptible to small

adjustments in GDP; the impact of the pandemic results in significant downward adjustments of

the revenues available to protect the health, welfare and safety of Puerto Rico.

5.      Nevertheless, the Government remains willing to engage with the Oversight Board

and the creditors on a Commonwealth plan of adjustment so long as the process is designed to

ensure that the rights and interests of Puerto Rico's people are protected.  The unrealistic timeline

the PSA Creditors propose seemingly ignores the setbacks and realities forced upon Puerto Rico

over the last six months due to the ongoing COVID-19 crisis and, if such deadlines were imposed,

they would severely undermine the Government's ability to carry out its obligation to protect its

people.  The PSA Creditors fundamentally misstate the dire economic circumstances facing Puerto

Rico, and seek to advance a restructuring plan that is grounded in outdated assumptions that have

no basis in the current economic reality.  In seeking to move forward at any cost, the PSA creditors

hope to impose such a flawed plan, without recognizing the potential disastrous consequences it

will have for the lives and future of Puerto Rico's people for generations to come.[5]

6.      Moreover, the proposal that the Title III Cases should be dismissed if the Oversight

Board will not meet the PSA Creditors' deadline to pursue an unfeasible plan of adjustment should

---

[5] The timing of the Motion is particularly inappropriate given that both the elected Government and the Oversight
Board will undergo significant changes in leadership in the upcoming months.  An election for a new Governor of
Puerto Rico will be held on November 3, 2020 and four Oversight Board members, including the Chairman of the
Board, recently resigned or their term ended, and there are now only four active members on the Board today.

4

be disregarded out of hand given the substantial work that has been done in these Title III Cases and remains to be done to put Puerto Rico on the path to fiscal sustainability.  Dismissal of the Title III Case would end the litigation stay and unleash another round of piecemeal litigation (similar to what Puerto Rico and its people experienced prior to 2017) and would do nothing to advance a restructuring or repayment of debt.  Such a result would also deprive Puerto Rico of other critical benefits conferred by Title III, including a centralized forum for the orderly resolution of disputes and access to a sophisticated mediation team lead by Judge Houser.

7.    The PROMESA Title III Cases remain the best and only hope for a solution to end Puerto Rico's fiscal crisis and restore the Island to prosperity.  Accordingly, the Motion should be denied in all respects.

## THE GOVERNMENT HAS MADE SIGNIFICANT PROGRESS IN ADVANCING THE COMMONWEALTH'S RESTRUCTURING EFFORTS

8.    In June of 2016, following a prolonged period of economic difficulties and increasing levels of debt, Congress enacted PROMESA to address Puerto Rico's debt crisis.  While PROMESA has flaws, Congress did give the Oversight Board important tools for Puerto Rico to achieve fiscal responsibility and to achieve debt reductions.  One such tool was the right to commence a Title III case on behalf of Puerto Rico, which it did on May 3, 2017.

9.    Shortly before Puerto Rico's Title III filing, AAFAF's powers were expanded to represent Puerto Rico and its agencies, public corporations and instrumentalities in this historic and monumental restructuring.  Since that time, AAFAF, on behalf of the elected Government, has played an active role in the Title III Cases, as well as the fiscal plan and budgeting process imposed by PROMESA and the Oversight Board.

10.    This process has been met with successes, challenges, and at times, disagreement with the Oversight Board and creditors, particularly when the Oversight Board has infringed on

the Government's political powers, or when creditors have pursued largely fruitless, delay-driven, scorched earth litigation. But notwithstanding moments of disagreement, more often than not AAFAF has worked productively with the Oversight Board and creditors and, together, have restructured more than $23 billion of Puerto Rico's indebtedness.[6]

11.    The Government, with the support of the Oversight Board, first successfully tackled the restructuring of the Government Development Bank for Puerto Rico ("GDB"). The restructuring deal was a first of its kind, developed in reliance on Title VI of PROMESA. To put the transaction in perspective, GDB was the pillar of Puerto Rico's modernization program when it was founded in the early 1950s. It was also ground zero for the Island's devastating fiscal and economic crisis, and its history and financial troubles were deeply entangled with the Commonwealth's and its public corporations. The aftermath of that crisis left GDB saddled with more than $5 billion of debt and Island investors facing significant financial losses. Less than one year from PROMESA's enactment, AAFAF successfully reached an agreement with GDB's diverse body of creditors, with more than 400 parties holding in excess of $2.5 billion in claims signing a Restructuring Support Agreement. In November of 2018, this Court approved the Title VI transaction and it was implemented shortly after. The landmark restructuring—which covered the first $5 billion of Puerto Rico's total $74 billion of funded debt—represented the first restructuring accomplished in Puerto Rico's 10-year fiscal crisis, marking a significant step in Puerto Rico's economic recovery.

12.    On the heels of the success of the GDB transaction, the Government and the Oversight Board completed the restructuring of $17.6 billion of sales tax revenue bonds issued by the Puerto Rico Sales Tax Financing Corporation ("COFINA"). The COFINA transaction was the

---

[6] This amount reflects the completion of various complex transactions, including the restructuring of all or a portion of the debt issued by COFINA, GDB, PRASA, and PRIFA, as described below.

culmination of over two years of tireless work and vigorous negotiations between multiple parties, which settled the "all or nothing" litigation over the narrow legal issue of ownership of the Pledged Sales Taxes (the "COFINA-Commonwealth Dispute"). The COFINA plan of adjustment garnered overwhelming support, with creditors holding more than $14.5 billion of bond claims accepting the plan. In addition to settling the COFINA-Commonwealth Dispute—a critical step needed to pave the way for the restructuring of Puerto Rico's remaining funded debt—the transaction provides COFINA with more than $17 billion in debt service savings and the Government with access to $425 million annually, on average, for 40 years, which can be used to fund operations and, hopefully, provide recoveries to creditors. The settlement of the COFINA-Commonwealth Dispute was a sentinel event for the Commonwealth just as much as it was for COFINA.

13.     It should be noted that the GDB and COFINA restructurings were accomplished less than 20 months into the Title III Cases. This achievement is truly remarkable when considering the devastation and disruption resulting from Hurricane Maria during this same time— which created the largest blackout in U.S. history, left much of Puerto Rico without clean food and water for months, and left people to deal with crippling emotional and psychological damage.

14.     Following completion of the GDB and COFINA restructurings, and Puerto Rico's continued long and difficult process of rebuilding and revitalizing the Island in the aftermath of the Hurricane, the Government completed several out-of-court restructurings. For example, after years of forbearance and negotiation with the USDA, EPA and U.S. Treasury, on July 26, 2019, the Puerto Rico Aqueduct and Sewer Authority ("PRASA") consummated the modification of nearly $1 billion of debts under federal programs. The transaction addressed short and medium term liquidity issues for PRASA, eliminated nearly $1 billion in Commonwealth guarantees, cleared the way for PRASA's proposed P3 projects, and set PRASA on a path to credit

rehabilitation and reestablishing market access in the medium term.[7]  AAFAF also completed an out-of-court exchange of nearly $170 million of PRIFA-Ports bonds, thereby enabling the Ports Authority to focus its efforts on public-private partnerships and other long-term capital improvement initiatives.

15.    All of these complex restructuring transactions and accomplishments were completed against the backdrop of a multitude of litigations involving the Government and the Oversight Board, which often absorbed the Government's time, attention, and the resources of its professionals.  Ironically, the PSA Creditors complain that litigation has "consumed" the Title III Cases, when, in fact, the majority of such litigation was and continues to be creditor-initiated.[8]  *See* Motion ¶ 18.  For example:

- *HTA, PRIFA, CCDA, Lift Stay Proceedings* - On January 16, 2020, the monoline insurers and bond trustees of HTA, PRIFA, and CCDA bonds filed motions to lift the automatic stay, or in the alternative, for adequate protection of their alleged security interests in certain conditionally pledged bond revenue.  On July 2, 2020, this Court declined to lift the Title III automatic stay for HTA and PRIFA bondholders, concluding that excise and rum tax revenues conditionally allocated to HTA and PRIFA were not subject to bondholder liens, except to the extent deposited in the bond trustee accounts.[9]  These proceedings followed various unsuccessful suits by monoline insurers and the Peaje group to force payment on purported special revenue bonds and to invalidate various fiscal plans and commonwealth statutes.

- *ERS Stay Relief and Adequate Protection Motions* - On February 21, 2019, the ERS Bondholders renewed their lift stay request and this Court granted summary judgment in favor of ERS, finding that Bankruptcy Code section 552 prevents the ERS bondholders' security interests from attaching to revenues received by ERS post-

---

[7] PRASA recently completed a transaction to provide PRASA with approximately $163 million for wastewater projects through state revolving fund program-related loans. And just last week AAFAF and PRASA announced the prospect of a senior debt refunding transaction in the near-term.  *See* MSRB ELECTRONIC MUNICIPAL MARKET ACCESS SYSTEM, NOTICE OF POTENTIAL FINANCING - PUERTO RICO AQUEDUCT AND SEWER AUTHORITY (October 8, 2020), https://emma.msrb.org/P11424408-P11105243-P11515291.pdf.

[8] The most compelling example of such disruptive litigation was, in fact, brought by one of the PSA Creditors in its failed pursuit all the way to the Supreme Court to find the Oversight Board members were improperly constituted, potentially threatening billions of dollars in completed debt restructuring proceedings.

[9] With respect to CCDA, Judge Swain confirmed that collection on CCDA debt is also subject to the automatic stay, though there will be further litigation on whether the bank account into which certain CCDA revenue is deposited is subject to bondholders' liens.

petition, and finding that employers' contributions are not "special revenues" within the meaning of Bankruptcy Code section 902. The First Circuit unanimously affirmed this Court's decision.

- *GO Bondholders' Suit Against the Government Parties* - On June 29, 2017, a group of the Commonwealth's general obligation bondholders filed a lawsuit alleging that the Oversight Board and the Commonwealth improperly allocated retained revenues and special property tax revenues to expenditures other than payment of general obligation bonds. This Court granted the defendants' motion to dismiss and dismissed the case with prejudice. The First Circuit affirmed the Court's dismissal.

Although litigation has been and continues to be time consuming and expensive, it has brought clarity and begun defining the rights of key creditor constituencies, thereby building the foundation necessary for the parties to eventually reach consensus on the terms of a Commonwealth plan (or if no such consensus is possible, proscribe treatment in a plan of adjustment).

16.      Finally, as it has been since the inception of the Title III Cases, the Government continues to be committed to reaching an agreement with the Oversight Board and creditors on a comprehensive Commonwealth plan of adjustment. When the Oversight Board filed its initial Title III plan of adjustment for the Commonwealth, ERS, and PBA on September 27, 2019, the Government expressed it would not oppose the plan (notwithstanding that it left open the possibility of public retiree pension cuts that the Government fundamentally opposed). It was only months later when the Oversight Board and the PSA Creditors entered into an amended PSA and filed the February POA, which enhanced the recoveries and legal protection for the Commonwealth's financial creditors while imposing a disproportionate burden on Puerto Rico's public retirees, that the Government opposed the Plan. Presciently, the Government also expressed its concerns that the amended PSA might leave Puerto Rico without enough resources in case of an emergency or to invest in its public services and people. But even then, the Commonwealth remained engaged in good faith discussions with the Oversight Board and creditors and did not object to this Court's stay of all plan related litigation while the plan process unfolded.

9

17.     Then Puerto Rico, along with the rest of the world, was confronted with the unprecedented challenge based on the outbreak of COVID-19.  As the situation escalated, it quickly became evident that the spread of COVID-19 and the closure of all non-essential businesses, would cause extensive economic dislocation.  As a result, the Government supported the Oversight Board's decision not to pursue confirmation of the February POA in the face of the economic uncertainties brought by the pandemic.

18.     Nearly six months later, COVID-19 persists, as does the possibility of a "second wave."  In the face of these uncertainties, the Government's top priority continues to be safeguarding public health and safety, ensuring the provision of public services (including health services, unemployment, and economic distress), and coordinating rehabilitative economic measures.  The Government is closely monitoring the virus' progression as it seeks to reopen economic activities in a controlled and safe manner.  Although the full extent of the financial and economic impact of COVID-19 on Puerto Rico remains uncertain, it is clear that the Government, as with many other jurisdictions in the U.S. and across the world, continues to face a global worldwide challenge which has negatively impacted virtually all areas of Puerto Rico's economy.[10]

### THE MOTION RELIES ON A FLAWED FACTUAL AND LEGAL PREMISE AND SHOULD BE DENIED

19.     Even if COVID-19 were not still a factor impacting Puerto Rico, the PSA Creditors' attempt to place unrealistic deadlines on the Title III Cases based on the flawed factual premise that the Government and the Oversight Board have failed to accomplish meaningful change for

---

[10] The Economic Development Bank-Economic Activity Index, an indicator of general economic activity in Puerto Rico, fell 10.8% year-over-year during the first half of 2020.  *See, supra*, note 3.  In addition, Puerto Rico has lost approximately 66,700 non-farm payroll jobs since the pandemic started.  U.S. BUREAU OF LABOR STATISTICS - NEW YORK–NEW JERSEY INFORMATION OFFICE, GEOGRAPHIC INFORMATION: PUERTO RICO, https://www.bls.gov/regions/new-york-new-jersey/puerto_rico.htm (last visited October 13, 2020).

Puerto Rico over the past three and half years must be rejected.  As detailed below, the PSA Creditors distort and misconstrue several key facts, creating a false and self-serving narrative in support of the relief requested.

**A.  Significant Structural Reforms Have Been Completed or Are in Progress**

20.    The PSA Creditors argue that the Government should impose deadlines on the Title III plan of adjustment process because the Oversight Board and the Commonwealth have purportedly failed in the efforts to impose the "structural reforms [necessary] to achieve fiscal responsibility, growth, and access to the capital markets."  *See* Motion ¶ 5.  As a threshold matter, this argument entirely misses the mark.  Title III is not designed to achieve structural reform.  Title III—titled "Adjustment of Debts"—is focused on cutting debt to a sustainable level.  Creditor complaints about what measures should be included in the Certified Fiscal Plan or how such Certified Fiscal Plan should be enforced (all of which is governed by Title II of PROMESA), should have no bearing whatsoever on how this Court adjudicates the Title III Cases.[11]

21.    Regardless, over the last several years the Government and the Oversight Board have in fact worked together to implement substantial structural reforms.  These structural reforms include:

- *Human Capital and Welfare Reforms:*  On January 26, 2017, the Government enacted the Labor Transformation and Flexibility Act, the most comprehensive change in Puerto Rico's labor laws in the last 50 years.  This Act amended labor legislation with the intent to improve labor market competitiveness, enhance labor participation, and limit employee turnover.  Notable changes aimed at reducing employment-related costs, such as increasing minimum probation period, amending accrual of vacation leave, and adjusting Christmas bonus criteria, among others.

---

[11] PROMESA was structured specifically to strike this balance.  PROMESA gives the Oversight Board sole and exclusive power to certify a fiscal plan, including any structural reforms included therein, and immunizes that decision from judicial review.  *See* PROMESA §§ 106(e), 201(e).  If a fiscal plan is not complied with, the Oversight Board, not the Title III Court, is authorized to impose remedial measures. *See* PROMESA § 203(d).

- *Ease of Doing Business Reforms*: In the last three years, the Government has achieved significant milestones in its ongoing efforts to digitize Government services to improve speed and accessibility through the Single Business Portal ("SBP") launched in July 2018, which currently includes an online filing system for defined Acts (Acts 14, 20 and 22), but will ultimately consolidate permit requests, filing for incentives and annual reporting.

    o *Paying Taxes:*  The Treasury Department has been continuously upgrading its internal system known as "SURI," and for fiscal year 2020 all income tax filings were able to be submitted online though this portal.

    o *Permit Reforms:*  Starting in fiscal year 2018, a Joint Resolution to overhaul the Island's permitting process was completed.  As a result, various permits were consolidated under a Single Permit (or "Permiso Unico" in Spanish) or a Consolidated Construction Permit (known as a "PCOC" in Spanish).  In order to streamline the permitting process, the SBP was utilized as a one-stop shop for all commercial permitting needs.  In order to continue to improve permitting on the Island, the Government is relying heavily on the success of its SBP portal. Along with the Joint Resolution to modernize the permitting process, over the next five years the Government will receive grant funding in order to complete necessary updates to its SBP.  The improvements will create synergies across various agencies responsible for emitting permits, and the platform will become more user friendly, thus making the permitting process more efficient.

    o *InvestPR & Discover Puerto Rico:*  Another important milestone to the Island's ease of doing business reforms was achieved when InvestPR ("IPR") and Discover Puerto Rico ("DPR") went live.  Their impact is already noticeable. During fiscal year 2020, DPR helped generate over $400 million in hotel revenue, helped increase tourist visits outside of San Juan to an average of 69% of incoming guests, and have generated over 650 leads for corporate events.

    o *Registering Property:*  An important initiative to improve the ease of registering a property was formalized in February 2020, when the Department of Justice together with the University of Puerto Rico ("UPR") created a task force of University students that will reduce the Property Registry backlog of over 400,000 documents within the next four years.  Just after two weeks of progress with the help of the UPR task force, the Registry had exceeded monthly objectives.  However, like many other initiatives, these efforts are currently paused due to the COVID-19 virus emergency.  The Property Registry will continue its effort with the UPR in order to reduce the document backlog.

    o *Occupational Licensing Reform:* As a separate initiative to improve the ease of doing business in Puerto Rico, the Government has begun to identify occupational licenses that are either outdated or are lacking enough board members to process approvals.  These efforts will ultimately favor the entrepreneurship sector because it removes hurdles from start-ups across various

12

industries.  The ongoing COVID-19 emergency on the Island is expected to delay certain of these efforts already underway.

- *Education Reforms:*  The Puerto Rico Department of Education ("<u>PRDE</u>") has outlined a series of reforms aimed at adapting the agency to the continuing decline in student enrollment through a greater focus on quality of teaching and academic performance.  Key to these reforms are the PRDE's investment in teachers and students through various initiatives, including back-to-school and distance learning plans, evidence based curriculum improvements, and teacher training executed in collaboration with UPR. Teacher development and retention will be carried out through collaborative trainings and mentorship programs, as well as salary increases for all licensed teachers.  Through the federal stimulus package recently approved by the U.S. Congress, the CARES Act could allocate approximately $328 million towards PRDE's school system.

- *Healthcare Reform:*  Starting on July 1, 2021, the Puerto Rico Health Insurance Administration ("<u>ASES</u>") will implement the Medicaid DRG payment system for hospitals.  This will accomplish the long-term goal of flattening the curve of hospital cost increases in Puerto Rico.  In addition, ASES has entered into various agreements to implement new technology infrastructure designed to improve capabilities to detect, analyze and report on potential fraud, waste, and abuse of the Medicaid program, among other things.

- *Pension Reform:*  On June 22, 2020, the Government launched the Defined Contribution Plan under Puerto Rico Act No. 106 of 2017, which enables all plan participants to manage their own retirement funds in online retirement accounts with various investment options.  This was an historic moment for the people of Puerto Rico—one of the most significant public pension reforms since the creation of ERS itself in 1951.  The Plan is but one piece of the broader pension reforms that the Government has endorsed to advance Puerto Rico's financial restructuring and to meet PROMESA's mandate to provide adequate funding for the public pension systems.

- *Energy Sector Reform*:  In January 2018, the Government announced its intent to transform and modernize the electric system through private operation or ownership of the assets of PREPA.  In furtherance thereof, the Puerto Rico Public Private Partnership Authority (the "<u>P3 Authority</u>") conducted a procurement process to select a private operator for PREPA's transmission and distribution system (the "<u>T&D System</u>") and selected a consortium composed of: (i) ATCO Ltd. ("<u>ATCO</u>"), Quanta Services, Inc. ("<u>Quanta</u>") and Innovative Emergency Management, Inc. ("<u>IEM</u>"), which consortium has been incorporated as LUMA Energy ("<u>LUMA Energy</u>"), to enter into under an operations and maintenance agreement (the "<u>T&D Contract</u>"). Pursuant to the T&D Contract, signed by the parties on June 22, 2020, LUMA Energy will assume responsibility for the management, operation, maintenance, repair, restoration, and replacement and other related services for the T&D System, including electric transmission, distribution and load serving, long-term planning, dispatch, asset management, community and media relations, public and employee safety, billing and collection, reporting and record keeping, finance and accounting, emergency response,

13

and customer service, among others (collectively, the "O&M Services").  In addition to the day-to-day operations and maintenance functions, and as part of the O&M Services, LUMA Energy will play an integral role in executing PREPA's energy-grid modernization strategy, as well as actively participating and assisting in the deployment of federal funding for grid reconstruction.  The T&D Contract will be in effect for fifteen years from service commencement, unless extended or earlier terminated in accordance with the terms thereof.

The P3 Authority is currently running a process to award one or more contracts to private operators to manage, operate, maintain, administer the asset management of, and decommission, where applicable, certain base-load generation plants and gas turbine peaking plants (the "Legacy Generation Assets") located throughout the island of Puerto Rico pursuant to a long-term public private partnership contract with a term tied to the remaining useful lives of the Legacy Generation Assets.  On September 18, 2020, the P3 Authority announced that in response to a request for qualifications, it had received interest from more than ten world-class operators.  The process is now proceeding to the request for proposals stage.

## B.  The PSA Creditors Continue to Distort Government Cash Available for Debt Service

22.    The PSA Creditors continue to distort the cash balances available for creditor recoveries, implying that the headline number of $21 billion that is deposited in Government and instrumentality bank accounts should be available for such use.  *See* Motion ¶ 4.  As the PSA Creditors are plainly well aware the $21 billion number does not accurately portray governmental liquidity for every purpose, much less for paying Commonwealth creditors.  These reports include the bank accounts of legally separate public corporations, such as PREPA and PRASA, among others, which funds are not available to Commonwealth creditors.  It also includes more than $400 million in pension funds that belong solely to Government employees and which the Government disclaims any interest; $3.2 billion in funds appropriated by the federal government solely to address COVID-19 issues; the Puerto Rico unemployment trust fund; lottery funds; and other federal funds used for public housing and other purposes.  These amount to billions of dollars not available for creditors or even general Commonwealth use, and it is offensive to imply that cash balances included in areas such as the unemployment trust fund are available for creditor recoveries.

14

23.    It is very clear from the monthly reports AAFAF publishes on government cash balances (which are the very first of their kind in Puerto Rico's history) that these reports encompass funds (i) received from the federal government or restricted by federal law or regulation for specific uses (*e.g.*, Medicaid funds and CARES Act funds), (ii) belong to third parties (*e.g.*, child support payments held in accounts under the custody of the Child Support Administration and Government employees' personal retirement funds), (iii) are restricted for use due to contracts with third parties (*e.g.*, debt service reserve funds held by the trustee), and (iv) restricted pursuant to court order.   The PSA Creditors complain about a lack of transparency, but when the Government and Oversight Board provide transparency—as they have repeatedly done with respect to the cash accounts—the PSA Creditors misuse that information without any regard for precision or accuracy.

24.    Moreover, building cash balances is beneficial and necessary to Puerto Rico's financial health.   Even prior to the global spread of COVID-19, the Government strongly advocated for the retention of certain levels of excess cash or additional resources so that Puerto Rico would be prepared to address its next unexpected crisis.   The events of the last several months have vindicated and reinforced this policy, as substantial resources have been and will continue to be needed to respond to and mitigate the negative effects of COVID-19.   Even with the funds that Puerto Rico will receive from federal programs, the lingering uncertainties regarding the long-term effects of COVID-19 and ongoing natural disasters pose a substantial risk to the future economic recovery of Puerto Rico.   Upon its emergence from Title III, the Commonwealth's cash position will be dictated by the effective date of any confirmed plan of adjustment (which will surely use a meaningful portion of cash balances to satisfy creditor claims) and, to the maximum extent possible, the Government continues to believe it should utilize any excess available

15

resources after such effective date to reinvest in areas earmarked as the most critical to Puerto
Rico's future economic growth.

**C.  Impact of COVID-19 on Puerto Rico and the United States Mainland**

25.    The PSA Creditors contend that the Certified Fiscal Plan projections reflect a
permanent negative impact on Puerto Rico's economy that far exceeds the scope and duration of
the projected impact on the U.S. mainland.  *See* Motion ¶ 8.  This is an incorrect characterization
and again distorts the truth.  In fact, the Certified Fiscal Plan models the impact of the COVID-19
pandemic on the Puerto Rican economy through two different channels. First, the Oversight Board
estimates a gross income loss due to effects of the pandemic.  This gross income loss is actually
more than fully offset by expected subsidy relief mostly provided by the federal government
through the CARES Act as well as other enacted legislation, resulting in a net positive impact over
FY2020-21 in the Certified Fiscal Plan model.  Second, the pandemic affects the Puerto Rican
economy indirectly, by causing a slowdown in the mainland United States, which spills over to
Puerto Rico.  Due to the close economic ties between Puerto Rico and the U.S. mainland, economy
activity on the U.S. mainland has always been a key driver of the Certified Fiscal Plan model.  The
Certified Fiscal Plan model uses the Congressional Budget Office's ("CBO") forecasts for U.S.
GDP growth as of April 2020.  No adjustments are made to these forecasts, and no changes were
made in the 2020 Fiscal Plan with regard to the economic relationship between U.S. mainland
GDP and Puerto Rico GNP.  The changes in the Certified Fiscal Plan's economic forecast
attributable to the COVID-19 pandemic are the result of the changes to the forecast in the U.S.
GDP, as determined by the CBO.  No additional assumptions were made in the Certified Fiscal
Plan model to increase or prolong the effect of the pandemic slowdown in Puerto Rico
independently of the mainland U.S.  Because Puerto Rico has a negative structural real GNP
growth rate, it is not expected to experience the same economic recovery following the pandemic

16

as the mainland U.S.[12]  This negative structural growth rate has been consistently reflected in reported figures as well as previous iterations of the Fiscal Plan.

**D.  Significant TSA Cash Has Not Been Generated Throughout the Pandemic**

26.     The PSA Creditors similarly distort facts to argue that the Commonwealth generated a significant cash build of $1.5 billion in the TSA account during the pandemic.  *See* Motion ¶ 33.  This is grossly inaccurate.  To put into perspective, from February 28, 2020[13] to September 25, 2020,[14] the TSA account increased from $9.14 billion to $9.55 billion, which is less than a 5% increase.  Compared to the same period in 2019, from February 28, 2019[15] to September 30, 2019,[16] the TSA account increased from $4.995 billion to $8.278 billion, a 66% increase.[17]

---

[12] Puerto Rico does not simply mirror the mainland U.S. but experiences its own economic dynamics.  Trend GNP growth in Puerto Rico is considerably more negative than U.S. GDP growth.  For example, average annual real economic growth in Puerto Rico between 2009 and 2019 was -1.1%, while for the mainland U.S. it was 2.4% over the same period.  Due to differences in economic fundamentals, Puerto Rico's economic growth has consistently been forecast to remain below US mainland growth, even prior to the onset of the COVID-19 pandemic.

[13] PUERTO RICO FISCAL AGENCY AND FINANCIAL ADVISORY AUTHORITY, SUMMARY OF BANK ACCOUNT BALANCES FOR THE GOVERNMENT OF PUERTO RICO AND ITS INSTRUMENTALITIES - INFORMATION AS OF FEBRUARY 28, 2020 (April 20, 2020),  https://www.aafaf.pr.gov/wp-content/uploads/2e-aafaf-bank-account-balances-gov-pr-instrum-02-28-2020.pdf.

[14] PUERTO RICO FISCAL AGENCY AND FINANCIAL ADVISORY AUTHORITY, PUERTO RICO DEPARTMENT OF TREASURY - TREASURY SINGLE ACCOUNT ("TSA") FY 2021 CASH FLOW AS OF SEPTEMBER 25, 2020, https://aafaf.pr.gov/wp-content/uploads/fy20-weeklytsacashflow-9-25-20.pdf.

[15] PUERTO RICO FISCAL AGENCY AND FINANCIAL ADVISORY AUTHORITY, SUMMARY OF BANK ACCOUNT BALANCES FOR THE GOVERNMENT OF PUERTO RICO AND ITS INSTRUMENTALITIES INFORMATION AS OF FEBRUARY 28, 2019 (April 1, 2019), https://www.aafaf.pr.gov/wp-content/uploads/FINANCIAL_DOCUMENTS/SUMMARY%20OF%20BANK%20ACCOUNT%20BALANCES/2019%20ACCOUNT%20BALANCES/2-2019%20ACCOUNT%20BALANCES.pdf.

[16] PUERTO RICO FISCAL AGENCY AND FINANCIAL ADVISORY AUTHORITY, SUMMARY OF BANK ACCOUNT BALANCES FOR THE GOVERNMENT OF PUERTO RICO AND ITS INSTRUMENTALITIES INFORMATION AS OF SEPTEMBER 30, 2019 (October 31, 2019), https://www.aafaf.pr.gov/wp-content/uploads/2e-aafaf-bank-account-balances-gov-pr-instrum-09-30-2019.pdf.

[17] The reflected TSA account balances are inclusive of monies in the TSA Account and in the Sweep Account.

**E.  The Recently Announced FEMA Relief Package Does Not Increase GNP**

27.    The PSA Creditors contend that the Commonwealth stands to benefit from the federal government's recently announced $12.8 billion FEMA relief package for Puerto Rico.  *See* Motion ¶ 41.  However, even after this announcement, the aggregate amount of FEMA related funds obligated to Puerto Rico still falls within the $45.7 billion of FEMA related obligations included in the Certified Fiscal Plan.  Prior to the FEMA relief package for Puerto Rico, the aggregate amount of funds obligated to Puerto Rico were approximately $18.1 billion.  After accounting for the additional $11.6 billion of obligated FEMA-related federal funds[18] to PREPA and the Department of Education, the aggregate obligations now totals approximately $29.7 billion,[19] an amount which is clearly within the $45.7 billion of FEMA related obligations included in the Certified Fiscal Plan.  While the Government continues to work with FEMA to obtain additional monies obligated, the ultimate amount of those obligations is unknown.  Thus, concluding that this recently announced package would increase GNP is misleading as this package is not incremental to what is already included in the Certified Fiscal Plan. Moreover, it would be particularly inappropriate to revise those estimates given the history of substantial and unwarranted delays in the federal government administering disaster relief funds to Puerto Rico. Finally, asserting that this is a basis for the relief sought here is unsupportable.

**F.  It is Premature to Revise Projections to Reflect Supplemental Security Income**

28.    The PSA Creditors highlight the August 3, 2020 ruling by the U.S. District Court for the District of Massachusetts that the exclusion of Puerto Rico residents from Supplemental Security Income ("SSI"), among other benefits, is unconstitutional, suggesting this warrants a

---

[18] Excludes the approximately $1.2 billion cost share component.

[19] Per FEMA website as of October 9, 2020, the total obligated FEMA funds were $29,687,051,549.

revision to the Certified Fiscal Plan. *See* Motion ¶ 42. Although the Government agrees that the recent ruling is encouraging, until there is a final judicial or legislative resolution on SSI for Puerto Rico residents, it is not prudent to include the potential benefit in the Certified Fiscal Plan, and it certainly provides no basis for forcing the Oversight Board into moving forward on a specific plan of adjustment right now or dismissing the Title III Case. There have been numerous attempts made by the Federal Government to enact legislation providing Supplemental Social Security to resident of Puerto Rico, including Social Security Amendments of 1972 (*see* H.R. Res. 1, 92nd Cong. (1972); P.L. 92-603), Covenant to Establish a Commonwealth of the Northern Mariana Islands in Political Union with the United States of America (*see* H.R.J. Res. 549, 94th Cong. (1976); P.L. 94-241), Supplemental Security Income Amendments of 1976 (*see* H.R. Res. 8911, 94th Cong. (1976); and Public Assistance Amendments of 1977 (*see* H.R. Res. 7200, 95th Cong. (1977)). In each instance, the final bill passed by Congress did not include provisions providing for the inclusion of Puerto Rican residents in the Supplemental Social Security program. While there has been positive traction on elevating these issues, the fact remains that there is still no legislation providing for these benefits nor has the issue been ruled on by the Supreme Court. It would be irresponsible for the Government and Oversight Board to ascribe any economic impact to a speculative benefit.

## G. The *Off-Track Betting* and COFINA Orders Do Not Support the Requested Relief

29.     The PSA Creditors improperly cite *In re New York City Off-Track Betting Corp.*, 434 B.R. 131, 158 (Bankr. S.D.N.Y. 2010) for the principle that creditors are substantially harmed by a yearlong delay in the confirmation of a government debtor's plan of adjustment. *See* Motion ¶ 57. There is a stark difference in the magnitude of the functions and debt of the New York City Off–Track Betting Corporation ("OTB") and the Commonwealth of Puerto Rico. OTB was a public benefit corporation that operated an off-track pari-mutuel betting system on horse races. As

19

of its petition date, OTB owed approximately $120 million, excluding accrued long term postemployment benefits.[20]  The Commonwealth is a central government in charge of, among other functions, the health, safety, and economic well-being of over three million American citizens.  Excluding unfunded pension obligations, as of the filing of the Title III Cases, the Commonwealth and its various public corporations owe approximately $74 billion in public sector indebtedness.  These simple comparisons demonstrate the impropriety behind the PSA Creditors' analogizing a horse race betting public corporation's restructuring experience to that of the Commonwealth of Puerto Rico and its instrumentalities.

30.     Moreover, while PSA Creditors emphasize how OTB's confirmation delay prejudiced its creditors and led to the Court's decision to dismiss the chapter 9 proceeding, they fail to mention that, prior to dismissal, OTB ceased operations and concluded all efforts to seek plan confirmation.[21]  The Court ultimately dismissed the *Off-Track Betting* bankruptcy based, in large part, on the fact that there existed no possibility of reorganizing OTB.[22]  Such is not the case with respect to the Commonwealth.  While the Commonwealth and the other Title III debtors face highly complex and challenging restructuring prospects, the Government remains fully committed to the restructuring of the Debtor entities through the Title III process set forth under PROMESA.

31.     Finally, the PSA Creditors cite to the protocols this Court entered in the COFINA case to support their argument that the Court should set plan deadlines in the Commonwealth proceedings.  *See* Motion ¶ 12.  However, the COFINA protocols were the product of a stipulation between the Commonwealth and COFINA to resolve the COFINA-Commonwealth Dispute.  *See*

---

[20] *See* Declaration of Robert J. Garry in Support of the Chapter 9 Petition and the Statement of Qualifications, *In re New York City Off-Track Betting Corp*, No. 09–17121 (MG) (Bankr. S.D.N.Y. 2010), ECF No. 2.

[21] *In re New York City Off-Track Betting Corp.*, No. 09-17121 MG, 2011 WL 309594, at *3 (Bankr. S.D.N.Y. Jan. 25, 2011); *see* Motion ¶ 57.

[22] *Off-Track Betting Corp.*, 2011 WL 309594, at *2-*3.

Docket No. 996.  This Court did not set scheduling deadlines in COFINA pursuant PROMESA section 312(b).  Rather, such deadlines were the product of a global settlement, not a contested matter with COFINA's bondholders.  And, of course, COFINA was a single securitization vehicle with no operations, and its case hinged on two discrete litigations, one between two creditor groups and one with the Commonwealth.  That case bears little resemblance to this one.

## CONCLUSION

32.     The Motion is yet another example in a series of expensive and wasteful litigation tactics employed by the Commonwealth's creditors—much of which has been rebuffed by the Oversight Board and Government.  It seeks to distort the purpose of a Title III case and to equate a corporate restructuring to the complexities of restructuring the debt of a government entity, which is ultimately and primarily accountable to its people.  While the Government's resolve to achieve fiscal responsibility and access to the capital markets for Puerto Rico remains strong, addressing the economic, social and health challenges imposed by COVID-19 continues to be the Government's top priority.  And the reality is the February POA needs fundamental reevaluation as there has been a seismic shift in economic assumptions in the aftermath of the pandemic.

33.     Nevertheless, the Government endorses the principle of advancing the plan of adjustment process, but that process must protect the rights and interests of the people of Puerto Rico.  The Oversight Board should first reach consensus with the Government and move expeditiously to negotiate, propose and defend a plan of adjustment that achieves the goals of PROMESA.  The timeline proposed by the PSA Creditors, which contemplates a decision on a plan of adjustment by November 30, 2020—only days after a new Governor will be elected and well before he or she will be sworn into office—does not come close to meeting the Government's objective of ensuring a fair and orderly process that does not prejudice the people of Puerto Rico. This timeline is completely unrealistic and, frankly, offensive to the people of Puerto Rico.  Aside

21

from ignoring the significant progress made to date as described above, the Motion does not take into account that both the Government and the Oversight Board will undergo substantial changes in leadership over the upcoming months; both of whom continue to address the impacts of COVID-19 on the people and economy of Puerto Rico.  The Motion should therefore be denied in its entirety.

Dated: October 13, 2020
       San Juan, Puerto Rico


Respectfully submitted,

| | |
|---|---|
| */s/ John J. Rapisardi* | */s/ Luis C. Marini-Biaggi* |
| John J. Rapisardi | Luis C. Marini-Biaggi |
| Nancy Mitchell | USDC No. 222301 |
| Peter Friedman | Carolina Velaz-Rivero |
| Maria DiConza | USDC No. 300913 |
| (Admitted *Pro Hac Vice*) | **MARINI PIETRANTONI MUÑIZ LLC** |
| **O'MELVENY & MYERS LLP** | 250 Ponce de León Ave. |
| 7 Times Square | Suite 900 |
| New York, NY 10036 | San Juan PR 00918 |
| Tel:  (212) 326-2000 | Tel: (787) 705-2171 |
| Fax:  (212) 326-2061 | Fax: (787) 936-74943 |
| | |
| *Attorneys for the Puerto Rico Fiscal* | *Attorneys for the Puerto Rico Fiscal* |
| *Agency and Financial Advisory Authority* | *Agency and Financial Advisory Authority* |

23