**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PUERTO RICO**

| In re: THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, as representative of THE COMMONWEALTH OF PUERTO RICO, Debtor.[1] | PROMESA Title III No. 17 BK 3283-LTS (Jointly Administered) |
| --- | --- |

**AMBAC ASSURANCE CORPORATION'S OBJECTION TO JOINT MOTION OF PSA CREDITORS TO IMPOSE DEADLINES FOR PLAN OF ADJUSTMENT**

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (the "Commonwealth") (Bankruptcy Case No. 17-BK-3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17- BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

Ambac Assurance Corporation ("Ambac"), by and through its undersigned attorneys, objects to the *Joint Motion of PSA Creditors Pursuant to Section 312 of PROMESA and Section 105 of the Bankruptcy Code to Impose Deadlines for Plan of Adjustment* (ECF No. 14478) (the "Motion" or "Mot.")[2] and respectfully states as follows:

1. Ambac objects to the relief requested in the Motion. The GO and PBA PSA Creditors recognize that the relief they request is entirely within the discretion of this Court. The Court should refrain from exercising its discretion in the manner requested. It would be a mistake for the Court to force the Board and the Commonwealth down the path of pursuing confirmation of a plan that is patently unconfirmable, under threat of dismissal of the Title III cases. The Board should instead be directed to focus on re-engaging with *all* creditors to work toward a consensual restructuring that will allow the Commonwealth and its instrumentalities to emerge from Title III, regain access to the capital markets, and start down the road toward continued growth and rebuilding.

## I. THE AMENDED PLAN IS PATENTLY UNCONFIRMABLE AND THE COURT SHOULD DECLINE TO SET A SCHEDULE AT THIS TIME.

2. The Court should deny the Motion in its entirety, as it is not appropriate or helpful to set any schedule on the plan of adjustment at this time.

3. As an initial matter, the PSA Creditors have no greater standing to request that the Court set a particular schedule any other creditor. Despite the impression created by the Amended PSA and the proposed plan, the GO and PBA PSA Creditors are mere general unsecured creditors, and are not entitled to any special treatment or protection by the Court.

[2] Capitalized terms not otherwise defined herein have the same meaning given to them in the Motion.

4. In fact, to the extent that the PSA Creditors' Motion is premised on the theory that they are somehow being injured by the delay, that is false. While Ambac agrees with the PSA Creditors that the Board's fiscal plans are overly conservative and unduly pessimistic (Mot. ¶¶ 31-34), contrary to the PSA Creditors' assertions, it is *revenue bondholders* who are bearing the brunt of these losses, not PSA Creditors. (*See* ECF No. 14547 ¶¶ 31-32.) Under the Amended PSA, the PSA Creditors stand to obtain very high recoveries—up to 74.8%. Even the "cleansing materials" the Board released on September 30, 2020, show relatively high recoveries to the PSA Creditors (the Board offered the PSA Creditors approximately 80% of what they were allocated in the Amended Plan)—while corresponding revenue bondholder recoveries have been reduced to *less than a penny on the dollar*.

5. The cases to which the PSA Creditors cite, to suggest that this Court should consider whether they are being impacted by the continued restructuring process, are wholly inapposite.[3] The PSA Creditors cite no case in which a court dismissed a municipal bankruptcy case or set a schedule for plan confirmation at the request of unsecured creditors and over the objection of the debtor.

6. Even setting aside the PSA Creditors' limited standing, the Motion should be denied because the Amended Plan in its current form is patently unconfirmable—and scheduling any proceedings on it (let alone expedited proceedings) would be a waste of resources. The PSA Creditors trumpet, as a benefit of the proposed plan, continued payment to pensioners. (Mot. ¶ 35.) But the payments to pensioners violate the rights of revenue bondholders. Indeed, the disparate

[3] *In re New York City Off-Track Betting Corp.*, cited by the PSA Creditors for the proposition that a debtor should not be able to delay indefinitely moving towards confirmation, is entirely inapposite. No. 09-17121 MG, 2011 WL 309594, at *1 (Bankr. S.D.N.Y. Jan. 25, 2011). There, the debtor was unable to reorganize absent a legislative fix that was not adopted. *Id.* at *2. *In re County of Orange*, 183 B.R. 594 (Bankr. C.D. Cal. 1995), also cited by the PSA Creditors, merely addresses whether an entity filed for bankruptcy for reasons other than the restructuring of its obligations. *Id.* at 608. The Court there found that the Chapter 9 petition at issue was filed in good faith. *Id.*

treatment accorded to unsecured claimants is one of many reasons the plan is patently unconfirmable in its present state. Proceeding on a substantively flawed plan (particularly one which the Board now contends is not feasible) would simply waste resources and only delay the resolution of these Title III proceedings.

7. Notably, the PSA Creditors recognize that the plan may change materially before the Board moves forward, suggesting that the deadline be set to move forward on the current plan or to file a new proposed plan and disclosure statement. (Mot. ¶ 47.) Given that, it makes no sense to set a hyper-accelerated schedule on an entirely hypothetical proposed plan and disclosure statement. Neither the Court, nor Ambac, can anticipate what the contours of a hypothetical plan might be and what may be contained in an accompanying disclosure statement. Any effort to assume what objections may be made and how long they would take to litigate is guesswork at best. It would be unreasonable to assume that proceedings arising from a hypothetical plan can be fully accomplished on such an abbreviated (indeed, impossibly so) timeline.

## II. EVEN IF THE COURT WERE INCLINED TO IMPOSE A SCHEDULE, THE PSA CREDITORS' PROPOSED SCHEDULE WOULD NOT PERMIT AN ORDERLY RESOLUTION OF DISPUTED ISSUES.

8. Even in the event that the Court were inclined to set a disclosure statement and confirmation schedule at this time, the schedule must account for the fact that both the disclosure statement and confirmation hearings are likely to be highly contested proceedings. The schedule also must account for the varied and complex issues that will be presented to the Court, as well as the realities of COVID-19 and the delays likely to be caused by the ongoing pandemic and related restrictions, including obstacles to the discovery process. The Court should reject the PSA Creditors' Proposed Schedule, which is unworkable on its face.

**A. The PSA Creditors' Proposed Schedule Leaves No Time for Discovery or Determination of Critical Gating Issues.**

9. Importantly, the Proposed Schedule affords insufficient time for discovery necessary in connection with plan confirmation, and also fails to leave time for critical gating issues.

10. ***Discovery.*** The Board and AAFAF have objected, in the context of pending Rule 2004 discovery, to providing discovery that they have characterized as relating to the disclosure statement or plan confirmation issues. (*See* Exhibits H and I to Joint Status Report with Respect to the Rule 2004 Motions (ECF No. 14438-8 at 3, 7, 9, 11, 13; ECF No. 14438-9 at 3, 7, 9, 11, 12) (objecting to discovery of the Commonwealth's essential public services and operating expenses as relevant to a future confirmation hearing and stating that "[d]iscovery regarding confirmation of any proposed plan of adjustment will occur on a timetable to be established by the Court").) In light of the Government Parties' position on these issues, the parties have not even begun discovery into disclosure statement or plan confirmation issues—and any schedule will need to build in sufficient time for that process to be completed.

11. Further, any schedule must recognize that certain restrictions remain in place in the Commonwealth due to COVID-19. The Government Parties have represented that many of the Commonwealth's employees continue to work remotely without access to certain files and systems (*see* Government Parties' Status Report Regarding Recent Activities in Response to the Ongoing COVID-19 Pandemic (ECF No. 14301); Exhibit B to Joint Status Report with Respect to the Rule 2004 Motions (ECF No. 14438-2)), complicating and delaying discovery. The PSA Creditors' Proposed Schedule takes none of this into account.

12. ***Gating Issues.*** In addition to the issues likely to be raised by any further amended disclosure statement, there are still critical gating issues that remain unresolved. The Court has

not issued a ruling on the merits regarding what rights Ambac and other revenue bond creditors have in the revenue streams pledged to secure bonds issued by Puerto Rico Highways and Transportation Authority ("HTA"), Puerto Rico Infrastructure Financing Authority ("PRIFA"), and Puerto Rico Convention Center District Authority ("CCDA"). The Court's preliminary findings[4] in connection with the Monolines' lift-stay motions[5] do not resolve the questions on the merits. *See Grella v. Salem Five Cent Sav. Bank*, 42 F.3d 26, 34 (1st Cir. 1994) (a ruling on a motion for relief from the automatic stay "is not a ruling on the merits of the underlying claim"). And those preliminary findings on the HTA and PRIFA lift-stay motions are on appeal in any event, and the parties clearly would benefit from the First Circuit's guidance before moving forward with a costly and time-consuming solicitation process.

13. Moreover, the Court has deferred resolution of key factual and legal issues concerning *inter alia* constitutional and statutory causes of action involving all three revenue bonds and, as to the CCDA revenue bonds, the identity of the Transfer Account and the parties' respective rights in the Transfer Account Monies. (ECF No. 14187 at 7-8.) Many of these issues have been presented in the Board's pending motions for partial summary judgment—but even a resolution of those motions (where the Monolines have been precluded from raising defenses and counterclaims) will likely leave undecided many of these same issues concerning the rights of

[4] *See Memorandum Opinion and Order Denying HTA and PRIFA Revenue Bond Stay Relief Motions* (ECF No. 14186); *Memorandum Order Regarding CCDA Revenue Bond Stay Relief Motion* (ECF No. 14187).

[5] *See Motion of Assured Guaranty Corp., Assured Guaranty Municipal Corp., Ambac Assurance Corporation, National Public Finance Guarantee Corporation, and Financial Guaranty Insurance Company for Relief from the Automatic Stay, or, in the Alternative, Adequate Protection* (ECF No. 10102); *Ambac Assurance Corporation, Financial Guaranty Insurance Company, Assured Guaranty Corp., Assured Guaranty Municipal Corp., and the Bank of New York Mellon's Motion Concerning Application of the Automatic Stay to the Revenues Securing the CCDA Bonds* (ECF No. 10104); *Amended Motion of Ambac Assurance Corporation, Financial Guaranty Insurance Company, Assured Guaranty Corp., Assured Guaranty Municipal Corp., and U.S. Bank Trust National Association, Concerning Application of the Automatic Stay to the Revenues Securing PRIFA Rum Tax Bonds* (ECF No. 10602).

revenue bond creditors. Indeed, the partial summary judgment motions address only a limited number of claims brought by the Board; the Board has not even sought summary judgment with respect to 273 claims that would need to be addressed in future litigation.[6]

14. Other gating issues, particularly the purported priority treatment of those general obligation bonds and the validity of general obligation bond claims in light of the debt limit provision of the Puerto Rico constitution (*see* ECF No. 4784 ¶ 10), also must be resolved before the Court could consider any plan. In some instances, these complex legal issues involve novel questions regarding provisions of the Puerto Rico Constitution, and all parties must have a full and fair opportunity to brief these issues prior to any confirmation hearing.

15. The Court also needs sufficient time to consider objections to the treatment of pension obligations, disputes regarding the financial projections, and any disputes concerning the fiscal plan, before it can make a decision on confirmation. Given the wide range of issues that the Board has chosen to punt to the confirmation process, this process will be broader than and more complex than any prior bankruptcy proceeding—involving a number of novel legal issues that are still being actively litigated. Any schedule the Court enters should reflect that reality.

**B. The PSA Creditors' Proposed Schedule Is Significantly Shorter than Even the Extremely Aggressive Schedule the Court Adopted Prior to the Pandemic.**

16. Setting aside the substantive defects with the Amended Plan, the Proposed Schedule is unworkable and the deadlines therein would be impossible to meet. The timeframes proposed by the PSA Creditors would go far beyond the extremely aggressive timeframe previously adopted by the Court on March 10, 2020 (ECF No. 12187). Ambac and numerous other

[6] *See Memorandum of the Commonwealth of Puerto Rico, By and Through the Financial Oversight and Management Board, in Support of Motion Pursuant to Bankruptcy Rule 7056 for Partial Summary Judgment Disallowing Claims* (ECF No. 44, Case No. 20-00003-LTS; ECF No. 41, Case No. 20-00004-LTS; ECF No. 56, Case No. 20-00005-LTS

creditors objected to even that schedule as unrealistically aggressive. (*See* March 4, 2020 Omnibus Hr'g Tr. at 125:16-129:12 and 142:18-143:8.) The Proposed Schedule would go far beyond that and deny objecting creditors adequate time to present their objections.

17. For example, under the Proposed Schedule, the Board would be required to release a revised plan of adjustment and disclosure statement by November 30, 2020—which would leave affected parties just ***63 days*** (over the holiday season) in which to digest the revised plan, brief any objections to the disclosure statement, and prepare for a hearing on that statement by February 1, 2021 (compared with 96 days under the Court's original, extremely aggressive schedule).

18. In a case of this complexity, it is unlikely that the Court would not identify at least some areas where the proposed disclosures need to be more robust. Using COFINA as a barometer for a realistic schedule in the context of a largely consensual confirmation (which this would not be), the Court sought a revised disclosure statement and that disclosure statement was not approved until nine days after the hearing. The Proposed Schedule would unreasonably constrain the Court and effectively present it from carefully considering the issues presented at the disclosure statement hearing.

19. Moreover, while the PSA Creditors' Proposed Schedule purports to require "not less than approximately 90 days for voting," there are only 88 days between the proposed February 1, 2021 hearing and April 30, 2021 (the proposed deadline for tabulating votes)— a reduction from the Court's previously entered schedule, which left 107 days for voting (ECF Nos. 10756, 10808, 12187)—and all of those days would be available only if the proposed disclosure statement were approved immediately at the proposed February 1 hearing without any revisions.

20. This also would leave inadequate time to present plan confirmation issues. As a point of comparison, the revenue bond lift-stay motions—which touched on but did not fully

resolve the status of just a subset of claims, and involved very limited discovery—took nine months to be resolved, from the time the first brief was filed until the Court's final orders. The process for addressing challenges to the plan necessarily will involve consideration of a broader set of issues, including not just the unresolved revenue bond issues but also key issues concerning the treatment of pensions, general obligation bonds, and other creditors. These issues cannot be resolved in a few months, particularly given that any plan at this stage would be hotly contested and opposed by numerous parties.

21. Complying with the original schedule imposed by the Court would have required a Herculean effort by all parties involved. The Proposed Schedule goes a step further and requires the impossible of the Court and the parties, and, therefore, should be rejected.

## CONCLUSION

22. The Proposed Schedule puts the proverbial cart before the horse by attempting to rush through a confirmation process which may ultimately be entirely undone by a resolution of these issues. This is an invitation to risk an enormous waste of the time, effort, and resources of the Court, the debtor, and creditors; the Court should therefore decline it.

23. For the foregoing reasons, Ambac respectfully opposes the Motion.

Dated: October 13, 2020
San Juan, Puerto Rico

**FERRAIUOLI LLC**

By: /s/ *Roberto Cámara-Fuertes*
Roberto Cámara-Fuertes (USDC-PR No. 219002)
Sonia Colón (USDC-PR No. 213809)
221 Ponce de León Avenue, 5th Floor
San Juan, PR 00917
Telephone: (787) 766-7000
Facsimile: (787) 766-7001
Email: rcamara@ferraiuoli.com
scolon@ferraiuoli.com

**MILBANK LLP**

By: /s/ *Atara Miller*
Dennis F. Dunne (admitted *pro hac vice*)
Atara Miller (admitted *pro hac vice*)
Grant R. Mainland (admitted *pro hac vice*)
John J. Hughes, III (admitted *pro hac vice*)
Jonathan Ohring (admitted *pro hac vice*)
55 Hudson Yards
New York, NY 10001
Telephone: (212) 530-5000
Facsimile: (212) 530-5219
Email: ddunne@milbank.com
amiller@milbank.com
gmainland@milbank.com
jhughes2@milbank.com
johring@milbank.com

***Attorneys for Ambac Assurance Corporation***

**CERTIFICATE OF SERVICE**

I hereby certify that on this same date a true and exact copy of this notice was filed with the Clerk of Court using the CM/ECF system, which will notify a copy to counsel of record.

/s/ *Roberto Cámara-Fuertes*
Roberto Cámara-Fuertes (USDC-PR No. 219002)
221 Ponce de León Avenue, 5th Floor
San Juan, PR 00917
Telephone: (787) 766-7000
Facsimile: (787) 766-7001
Email: rcamara@ferraiuoli.com