# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

----------------------------------------------------------------- x

In re:

THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO,

        as representative of

THE COMMONWEALTH OF PUERTO RICO, *et al.*,

        Debtors.[1]

----------------------------------------------------------------- x

:
:
: PROMESA
: Title III
:
: Case No. 17-BK-3283 (LTS)
:
: (Jointly Administered)
:
:
:

## OBJECTION OF THE LAWFUL CONSTITUTIONAL DEBT COALITION TO THE MOTION OF NATIONAL PUBLIC FINANCE GUARANTEE CORPORATION FOR ENTRY OF AN ORDER DIRECTING AN INDEPENDENT INVESTIGATION

---

[1]     The Debtors in these Title III cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK-3283 (LTS)) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284 (LTS)) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567 (LTS)) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566 (LTS)) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17-BK-4780 (LTS)) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5233 (LTS)) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT ............................................................................... 1

BACKGROUND ................................................................................................ 6

    A.    FOMB AND THE OFFICIAL COMMITTEE CALL PBA A "SHAM" AND OBJECT
        TO LATE VINTAGE SECURITIES.................................................................. 6

    B.    LCDC FORMS TO PROTECT PBA AND TAKES POSITIONS *CONTRARY* TO
        FOMB'S AND OFFICIAL COMMITTEE'S .................................................... 7

    C.    LCDC AND SIMILARLY SITUATED CREDITORS NEGOTIATE INITIAL PSA
        WITH FOMB; FOMB OFFERS RECOVERY TO LATE VINTAGE SECURITIES ............ 9

    D.    COURT REFERS PARTIES TO MEDIATION, INCLUDING LATE VINTAGE
        HOLDERS ............................................................................................. 11

    E.    THE TERMS OF THE MEDIATION PROTOCOL............................................... 12

        a.    The Mediation Orders ............................................................. 12

        █    ████████████████████ .................................................. 12

    F.    LCDC'S HOLDINGS DURING CONFIDENTIAL PERIODS ......................... 14

        a.    The Bilateral Negotiations Period (March 14, 2019 – June 16,
            2019) .................................................................................. 15

        b.    The Mediation Period (October 2, 2019 – February 9, 2020) ................. 17

            i.    Holdings Prior to Mediation, Including Added Members ........... 18

            ii.    Two Members' Increased Holdings During Mediation ................ 22

ARGUMENT .................................................................................................... 24

    A.    A COURT-ORDERED INVESTIGATION IS WHOLLY UNWARRANTED BASED
        ON THE RECORD BEFORE THE COURT .................................................... 24

    B.    NO LAW SUPPORTS THE REQUESTED RELIEF........................................... 26

    C.    LCDC'S POSITIONS BEFORE THE TITLE III COURT AND IN SUPPORT OF
        COMPROMISE ARE AND HAVE BEEN CONSISTENT WITH THEIR ECONOMIC
        INTERESTS............................................................................................. 28

CONCLUSION .................................................................................................. 31

i

## <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

### <u>Cases</u>

*In re City of Detroit, Mich.*,
    519 B.R. 67 (Bankr. E.D. Mich. 2014) ............................................................ 28

*Jamo v. Katahdin Fed. Credit Union (In re Jamo)*,
    283 F.3d 392 (1st Cir. 2002) ........................................................................... 26

*New England Dairies, Inc. v. Dairy Mart Convenience Stores, Inc. (In re Dairy Mart*
    *Convenience Stores, Inc.)*,
    351 F.3d 86 (2d Cir. 2003) .............................................................................. 26

*Norwest Bank Worthington v. Ahlers*,
    485 U.S. 197 (1988) ....................................................................................... 26

*In re Nosek*,
    544 F.3d 34 (1st Cir. 2008) ............................................................................. 27

*Official Unsecured Creditors' Committee v. Stern (In re SPM Manufacturing Corp.)*,
    984 F.2d 1305 (1st Cir. 1993) ......................................................................... 28

### <u>Rules / Statutes</u>

11 U.S.C. § 103(f) ..................................................................................................... 28

11 U.S.C. § 105(a) ............................................................................................... passim

11 U.S.C. § 307 ......................................................................................................... 28

11 U.S.C. § 901(a) ..................................................................................................... 28

Fed. R. Bankr. P. 2019 ......................................................................................... passim

Fed. R. Bankr. P. 3007 ............................................................................................... 6

Puerto Rico Constitution, Art. VI, § 2 ........................................................................ 8

To the Honorable United States District Judge Laura Taylor Swain:

The Lawful Constitutional Debt Coalition (the "LCDC"), [2] files this objection (the "Objection") to the *Motion of National Public Finance Guarantee Corporation for Entry of an Order Directing an Independent Investigation* (ECF No. 14450) (the "Motion"), and respectfully states as follows:

## PRELIMINARY STATEMENT[3]

1.      Boiled down to its essence, the Motion asks the people of the Commonwealth of Puerto Rico ("Puerto Rico" or the "Commonwealth") to foot the bill for National Public Finance Guarantee Corporation's ("National") upcoming objection to confirmation of a plan it dislikes.  Not content with trying to forestall Puerto Rico's emergence from bankruptcy through available means based on the merits of confirmation, National now resorts to calling into question the legitimacy of a confidential, court-ordered mediation supervised by federal judges and the integrity of the participants.  The extraordinary relief National seeks is unwarranted by the facts and without support in the law, and should be denied.

2.      The Motion seeks to promote a theory that LCDC members violated the Mediation Protocol and the law by engaging in improper trading and activities that were inconsistent with their legal positions before the Court.  National's contentions are baseless.  The LCDC filed nine separate Rule 2019 Statements in the Title III Case.  The disclosures in the Rule 2019 Statements

---

[2]    The LCDC currently consists of the following institutions: Aristeia Capital, LLC ("Aristeia"), Farmstead Capital Management, LLC ("Farmstead"), FCO Advisors LP ("FCO"), GoldenTree Asset Management LP ("GoldenTree"), Monarch Alternative Capital LP ("Monarch"), Taconic Advisors L.P. ("Taconic"), and Whitebox Advisors LLC ("Whitebox").  The respective holdings of each LCDC members are set forth in the *Eighth Supplemental Verified Statement of the Lawful Constitutional Debt Coalition Pursuant to Federal Rule of Bankruptcy Procedure 2019* (ECF No. 14316).

[3] Capitalized terms not defined in this Preliminary Statement shall have the meanings ascribed to them below.

1

were made at the time and in the manner prescribed by the Federal Rules of Bankruptcy Procedure and this Court's orders. Some of those disclosures overlapped with a period of mediation but are not demarcated into holdings changes pre- or post-mediation. Put another way, the dates of Rule 2019 Statements do not correlate with the period during which the LCDC was engaged in confidential negotiations with the FOMB. Nevertheless, National wrongly implies that any changes in bond holdings reflected in the Rule 2019 Statements overlapping with a period that included both mediation and periods of non-mediation means that the holders traded improperly while participating in mediation. This is erroneous. We set out the relevant facts below, which each LCDC member has individually certified as to its own holdings and actions, to help the Court promptly dispense with National's meritless conjecture.

3.    In addition, the Motion fails to allege a single fact showing any LCDC member breached its obligation of confidentiality in the mediation. That is because there was no such breach by any LCDC member. Likewise, the Motion fails entirely to mention that the mediation was governed by ██████████████  ██████████████  ████████████ ██████████████████████████████████. As is clear from the facts, the totality of the isolated trades were by and among sophisticated institutions ██████████ ████████████████████████████████████████████. *Each of these institutions also signed the New PSA after the trades and support the deal opposed by National*. Indeed, National cannot identify a single party in this historic case (including itself) that could conceivably have been harmed by these transactions.

4.    Notwithstanding that trading could continue during mediation, LCDC's members exercised care and transparency in trading during periods when they engaged in negotiations with the Financial Oversight and Management Board ("FOMB"):

- No LCDC member traded in any securities that were the subject of bilateral confidential negotiations with the FOMB while participating in such negotiations from the moment discussion began on March 14, 2019 until after the public release on June 16, 2019, which led to the Initial PSA;

- Five of the seven members of the LCDC (Aristeia, Farmstead, FCO, Monarch, Taconic) did not trade in any securities that were the subject of confidential mediation while participating in such mediation which began on October 2, 2019 for some firms and ended February 9, 2020 (the "Mediation Period"), which led to the New PSA; and the two LCDC members (GoldenTree and Whitebox) that engaged in a few isolated trades while participating in mediation did so with ████ ████████████████████████████████████ in a manner that complied fully with this Court's Orders ████████████████████ (and those LCDC members are confident that they complied with the applicable securities laws), as described below; and

- From the time it first engaged with the FOMB in March 2019, the FOMB requested and the LCDC provided the FOMB with detailed CUSIP-level holdings information for each member, and the LCDC regularly updated such information to show the FOMB any changes in holdings.

5.    Equally meritless is National's assertion that the economic interests of members of the LCDC are inconsistent with the legal positions taken by the LCDC.  In fact, and as disclosed by the LCDC throughout these proceedings, the aggregate holdings of LCDC members have always been weighted towards bonds issued by PBA and guaranteed by the Commonwealth (the "PBA Bonds") as compared with general obligation bonds issued by the Commonwealth (the "GO

Bonds," and together with the PBA Bonds, the "Constitutional Debt") , and very heavily weighted towards Early Vintage Bonds (*i.e.*, PBA Bonds and GO Bonds issued prior to March 2012) over Late Vintage Bonds (*i.e.,* bonds issued in and after March 2012).   The LCDC's Rule 2019 Statements—the public disclosures that National supposedly relies upon to support an investigation—actually show that the percentage of Early Vintage Bonds held by its members has *never been below 85% of the group's total holdings*.

6.      In other words, the LCDC's positions before the Court as defenders of PBA Bonds generally and Early Vintage Bonds specifically have at all times been consistent with its members' economic interests.  Put even more simply, the LCDC has advocated for respecting the PBA and the relative lawful priority of Early Vintage Bonds because it believed those positions were right on the law.  And, therefore, it should come as no surprise that the compromise negotiated with the FOMB and holders of Late Vintage Bonds—under the auspices of the Mediation Team—is consistent with those positions and interests.[4]  Since National knows it cannot credibly assert that holders of Early Vintage Bonds are not permitted to compromise with holders of Late Vintage Bonds, National resorts to false accusations in an effort to spin an unfair characterization of events.

7.      National tries to buttress its counterfactual insinuation of the LCDC's economic interests by falsely attributing the legal arguments of the FOMB and Official Committee of Unsecured Creditors (the "Official Committee") to the LCDC.  As made plain in LCDC's court filings on the issue of lawful priorities, LCDC did *not* advocate for disallowance of Late Vintage Bonds.  In fact, the LCDC sought to be heard on the claim objection first launched by the FOMB

---

[4]   In any event, there is nothing improper for a party to a litigation to seek to hedge positions or take other efforts to promote a settlement of disputes.  Moreover, it is not uncommon for a creditor in a large bankruptcy case to hold multiple positions in a debtor's capital stack as a means to build consensus among creditors of varying economic interests.

and Official Committee *to differentiate its views* from the objectors in a manner consistent with its members' economic interests.  While the FOMB's and Official Committee's omnibus objections sought to *invalidate* bonds based on allegations that the PBA was a "sham," the LCDC filed its own position that asserted the lawful priority of Early Vintage Bonds, but urged deferral of any ruling on what remedies may be available to Late Vintage Bonds until after the Constitution's interpretation could be determined.  In contrast from the FOMB and Official Committee, the LCDC defended the validity of the PBA and its bonds based on a different read of the Puerto Rico Constitution.

8.      In addition to the absence of any factual grounds for a court-ordered  investigation, the Motion finds no support in the law.  The only statute that National cites to justify its requested relief is section 105(a) of the Bankruptcy Code.  Under binding Supreme Court and First Circuit law, however, that statute cannot act alone and actually undermines the Motion when considering the statute governing Puerto Rico's bankruptcy as a whole.  PROMESA does not incorporate the examiner statute from Chapter 11 into these proceedings, and it further circumscribes the role of the United States Trustee such that any references to the role the United States Trustee plays in Chapter 11 is wholly inapposite.

9.      National's Motion has not been filed with care or diligence.  This has been consistent with National's behavior throughout the case.  The LCDC has repeatedly acted in a constructive manner to compromise and restructure the GO Bond and PBA Bond claims—with significant time and expense expended—in an effort to allow Puerto Rico to exit bankruptcy.  By contrast, National has only looked to pursue litigation in lieu of compromise and at great cost to Puerto Rico.  The Court should thus see the Motion for what it is: an attempt by a party desperate to avoid or delay crystalizing losses that would evidence National's own fundamental

insolvency.  It is for this reason that National seeks to stand in the way of attempts at compromise in this Title III Case.  National's allegations are meritless, designed only to further its own self-interest.  For the reasons stated herein, the Motion should be denied.

<u>**BACKGROUND**</u>

10.     Since its commencement on May 3, 2017, the Commonwealth Title III case (the "<u>Title III Case</u>") has been consumed by protracted and expensive litigation between and among the FOMB, the Commonwealth government, the Official Committee, creditors, and other interested parties.  As relevant to the Motion, these disputes include litigation over the validity and priority of the PBA Bonds and the GO Bonds.

**A.     FOMB AND THE OFFICIAL COMMITTEE CALL PBA A "SHAM" AND OBJECT TO LATE VINTAGE SECURITIES**

11.     Beginning on January 14, 2019 (prior to the formation of the LCDC), the FOMB and the Official Committee objected to the allowance of claims of multiple series of GO Bonds and PBA Bonds.[5]   In their original omnibus objection, known as the 2012-2014 GO Bond Objection, the objectors alleged that the PBA was a "sham" and "alter ego" of the Commonwealth, the PBA Bonds were in reality "direct claims" against the Commonwealth, and on that reasoning, the claims of holders of GO Bonds issued in 2012 and 2014 ("<u>Late Vintage Bonds</u>") are void and

---

[5]   *See e.g.*, *Omnibus Objection of (I) Financial Oversight and Management Board, Acting Through Its Special Claims Committee, and (II) Official Committee of Unsecured Creditors, Pursuant to Bankruptcy Code Section 502 and Bankruptcy Rule 3007, to Claims Filed or Asserted By Holders of Certain Commonwealth General Obligation Bonds* (ECF No. 4784) (the "<u>2012-2014 GO Bond Objection</u>"); *Omnibus Objection of Official Committee of Unsecured Creditors, Pursuant to Bankruptcy Code Section 502 and Bankruptcy Rules 3007, to Claims Filed or Asserted by Holders of Certain 2011 Commonwealth General Obligation Bonds* (ECF No. 7057) (the "<u>2011 GO Bond Objection</u>"); *Omnibus Objection of Official Committee of Unsecured Creditors, Pursuant to Bankruptcy Code Section 502 and Bankruptcy Rule 3007, to Claims Filed or Asserted Against the Commonwealth By Holders of Certain Puerto Rico Public Buildings Authority Bonds* (ECF No. 8141) (the "<u>PBA Bond Objection</u>").

should be disallowed as violations of the Commonwealth's constitutional debt limit under Article VI, Section 2 of the Puerto Rico Constitution (the "Constitutional Debt Limit").

12.     Building upon the legal position asserted in the 2012-2014 GO Bond Objection, the Official Committee filed a supplemental omnibus objection known as the 2011 GO Bond Objection and the PBA Bond Objection seeking to disallow earlier vintage GO Bonds and PBA Bonds, too.  Based on its own analysis of the Constitutional Debt Limit calculations, the Official Committee decided to expand its claims and asserted that GO Bonds and PBA Bonds were essentially the same direct obligation, and accordingly any GO Bonds or PBA Bonds issued in or after March 2011 should be considered "Late Vintage Bonds"[6] issued in excess of the Constitutional Debt Limit.  The Official Committee once again stated all claims relating to such bonds should be disallowed.

13.     On February 15, 2019, the Court entered an *Order Establishing Initial Procedures With Respect to the 2012-2014 GO Bond Objection* (ECF No. 5143) (the "Procedures Order") directing all interested parties in the 2012-2014 GO Bond Objection to file notices of participation by April 16, 2019.

**B.     LCDC FORMS TO PROTECT PBA AND TAKES POSITIONS *CONTRARY* TO FOMB'S AND OFFICIAL COMMITTEE'S**

14.     In February 2019, three creditors with shared interests by virtue of their holdings primarily of PBA Bonds and GO Bonds issued prior to 2012 (the "Early Vintage Bonds") banded into the LCDC to advance their interests of holders of PBA Bonds, generally, and other Early

---

[6]     The terminology of "Late Vintage Bonds" can be confusing because whether a bond exceeded the Constitutional Debt Limit depends on whose legal argument is accepted.  The LCDC employs the term herein to correspond to the LCDC's legal position, not the FOMB's, the Official Committee's, or of some other party.  As such, "Late Vintage Bonds" are bonds issued from and after March 2012.

Vintage Bonds.[7]  At all times, the LCDC members collectively held more PBA Bonds than GO

Bonds.[8]  Similarly, the LCDC's aggregate holdings of Constitutional Debt were always heavily

weighted towards Early Vintage Bonds.[9]

      15.     On April 11, 2019, as required by the Procedures Order, the LCDC filed its initial

pleading in this Title III case: a *Notice of Participation* (ECF No. 6179) and supporting *Statement*

*of Position* (ECF No. 6180).  In its Notice of Participation, the LCDC stated that, while it disagreed

with the FOMB that the PBA was a sham or alter ego of the Commonwealth, it agreed that the

2012 and 2014 GO Bonds were issued in violation of the Constitutional Debt Limit based upon a

different legal theory than the FOMB's.[10]  The LCDC's Statement of Position explained that the

PBA was a lawfully created juridical entity and that the PBA Bonds were not "direct" obligations

of the Commonwealth.  Accordingly, the LCDC argued that the annual scheduled debt service on

the PBA Bonds would not come within the first prong of the Constitutional Debt Limit as a direct

obligation of the Commonwealth, but debt service on PBA Bonds, to the extent actually paid from

the Commonwealth, plainly constitute Commonwealth payments "for principal and interest on

account of any outstanding obligations evidenced by bonds or notes guaranteed by the

Commonwealth" and thus come within the second prong of the Constitutional Debt Limit.  Puerto

Rico Constitution, Art. VI, § 2.  As such, the LCDC explained its legal position that any payments

by the Commonwealth on account of principal and interest due on PBA Bonds (regardless of what

---

    [7]  The LCDC subsequently grew to include eight (8) members.  It currently has seven (7) members.

    [8]  In its verified statements filed in accordance with Rule 2019 of the Federal Rules of Bankruptcy
Procedure ("Rule 2019 Statements"), the aggregate amount of the LCDC holdings of PBA Bonds was never
less than 54.2% of the aggregate amount of all of the LCDC's holdings of Constitutional Debt.

    [9]  As set forth in its Rule 2019 Statements, the aggregate amount of the LCDC holdings of Early
Vintage Bonds was never less than 85.6% of the aggregate amount of the LCDC holdings of Constitutional
Debt.

    [10]  The LCDC has never objected to GO Bonds or PBA Bonds issued in 2011.

they are called) would need to be included and accounted for when calculating the Constitutional Debt Limit because all PBA Bonds were guaranteed by the Commonwealth.

16.     Once these payments are counted towards the Constitutional Debt Limit under prong two, the LCDC argued that the Commonwealth breached the Constitutional Debt Limit beginning on March 29, 2012, when it issued GO Bonds, series A and B, pursuant to a bond resolution adopted on March 7, 2012.  Accordingly, the LCDC asserted that any GO Bond, PBA Bond, or other Commonwealth-guaranteed bond issued on or after March 29, 2012 was issued in excess of the Constitutional Debt Limit.  The LCDC did not take a position on the appropriate remedy for bonds issued in violation of the Constitutional Debt Limit, stating that "[w]hether or not [the challenged] GO bonds and guarantees have any allowable claim, they clearly are not entitled to any lawful priority under Commonwealth law." *Statement of Position* ¶ 10.[11]  Critically, unlike the FOMB and Official Committee, the LCDC never asserted that Late Vintage Bonds were void *ab initio* or "out of the money".

### C.     LCDC AND SIMILARLY SITUATED CREDITORS NEGOTIATE INITIAL PSA WITH FOMB; FOMB OFFERS RECOVERY TO LATE VINTAGE SECURITIES

17.     Beginning in the afternoon of March 14, 2019, the LCDC (then consisting of four members) and another *ad hoc* group of holders of primarily Early Vintage PBA Bonds (the "QTCB

---

[11]     Subsequently, on January 8, 2020, the LCDC filed an omnibus claim objection to certain GO Bonds, PBA Bonds, and other Commonwealth-guaranteed bonds issued in and after 2012 (ECF No. 9730) (the "LCDC Claim Objection").  The LCDC Claim Objection was filed pursuant to a Court's scheduling order, which set January 8, 2020 as the deadline to file any additional omnibus claim objections disputing the validity of claims related to GO Bonds, PBA Bonds, and other Commonwealth-guaranteed bonds.  The relief sought by the LCDC Claim Objection is consistent with the LCDC's previously-filed Statement of Position.  In the LCDC Claim Objection, the LCDC reserved its rights with respect to an appropriate remedy for bonds issued in violation of the Constitutional Debt Limit, stating "that, regardless of whether such GO bonds and Commonwealth-guaranteed bonds have any allowable claim, they are not entitled to the same relative lawful priority under the Puerto Rico Constitution and applicable Commonwealth law as the Commonwealth's full faith and credit bonds that did not violate the Constitutional Debt Limit."  *See* LCDC Claim Objection ¶ 5.

Noteholder Group")[12] engaged in bilateral negotiations with the FOMB concerning the treatment of PBA Bonds and GO Bonds under a potential Commonwealth plan of adjustment.  In order to facilitate the negotiations, the participating LCDC members, the participating QTCB Noteholder Group members, the FOMB, and the Puerto Rico Fiscal Agency and Financial Advisory Authority ("AAFAF"), as representative of the Commonwealth government, entered into a non-disclosure agreement to govern the discussions and the receipt and disclosure of any confidential information that may be provided during the negotiations (the "Confidentiality Agreement").

18.      On May 31, 2019, the FOMB and the participating creditors agreed upon terms for a plan support agreement, including a term sheet for how holders of Early Vintage Bonds and Late Vintage Bonds would be treated under a proposed Commonwealth plan of adjustment (the "Initial PSA").[13]  On June 16, 2019, the FOMB publicly released the terms of the Initial PSA that it had entered into with holders of over 40% of outstanding Early Vintage PBA Bonds and approximately 16% of overall Constitutional Debt.[14]  The Initial PSA set forth the FOMB's proposed settlement of the relative entitlements of various series of Constitutional Debt and, in the event the holders of Late Vintage Bonds did not accept the settlement, provided for a post-confirmation mechanism to resolve the FOMB's omnibus objection to the validity of Constitutional Debt issued in and after 2012.

---

[12]   The members of the QTCB Noteholder Group and their respective holdings are set forth in the *Sixth Supplemental Verified Statement of the QTCB Noteholder Group Pursuant Bankruptcy Rule 2019* (ECF No. 13548).

[13]   On or about May 23, 2019, three additional holders of Constitutional Debt (Aristeia, Farmstead and FCO) joined the LCDC, executed joinders to the Confidentiality Agreement and subsequently signed the Initial PSA as LCDC members.

[14]   *See* https://emma.msrb.org/ER1234908-ER966036-ER1366964.pdf.

19.     Shortly after the announcement of the Initial PSA, the FOMB filed a motion with the Court requesting a comprehensive stay on certain litigation matters addressed in the Initial PSA, which matters were to be subject either to proposed settlements or post-confirmation litigation contemplated by a forthcoming plan of adjustment.[15]  Numerous creditors objected to the stay motion, citing limited support and legal obstacles to consideration of the plan of adjustment contemplated by the Initial PSA.

### D.     COURT REFERS PARTIES TO MEDIATION, INCLUDING LATE VINTAGE HOLDERS

20.     On July 24, 2019, following a hearing on the matter, the Court granted a stay on certain litigation as reflected in its *Order Regarding Stay Period and Mandatory Mediation* (ECF No. 8244) (the "Stay Order").  Critically, the Stay Order directed substantially all creditor constituencies embroiled in active litigation with the FOMB to participate in mediation, to be conducted under the auspices of a team of sitting federal judges, led by Chief Bankruptcy Judge Barbara J. Houser of the United States Bankruptcy Court for the Northern District of Texas, to identify and sequence the issues that must be litigated or otherwise resolved in order to achieve confirmation of a plan of adjustment for the Commonwealth.  *See* Stay Order at 1-2.[16]  Mediation did not begin with respect to any LCDC members until October 2, 2019 when the FOMB made a presentation to participating LCDC members of the FOMB's analysis of restrictions purportedly limiting the use of cash held by the Commonwealth.[17]

---

[15]   On September 27, 2019, the FOMB filed a plan of adjustment based upon the Initial PSA.  *See Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.*, (ECF. No. 8765) (the "Initial Plan").

[16]   The Stay Order also required the Mediation Team to engage with interested parties and file a report with the Court regarding, among other things, the Mediation Team's recommendations with respect to a process for considering approval of any plan of adjustment filed during the stay period.  *Id.* at 2.

[17]   On October 17, 2019, the FOMB publicly disclosed the materials regarding cash restrictions presented to creditors through a posting on EMMA.  *See* https://emma.msrb.org/ES1313543-ES1026175-ES1428126.pdf.

E.      THE TERMS OF THE MEDIATION PROTOCOL

       a.      *The Mediation Orders*

21.     Shortly after the commencement of the Title III Case, and in order to facilitate a successful, consensual resolution of the many disputed issues facing the Commonwealth and its creditors, the Court entered an Order designating the Mediation Team to conduct confidential settlement negotiations of any and all issues and proceedings arising in the Title III Case (ECF No. 329) (the "Mediation Order").[18]

22.     On September 11, 2019, following media reports concerning the upcoming mediation that the Court had directed in the Stay Order, the Court entered an *Order Regarding Mediation Confidentiality Restrictions* (ECF No. 8686) (the "Supplemental Mediation Order" and, together with the Mediation Order, the "Mediation Orders").  In the Supplemental Mediation Order, the Court reiterated that the "mediation process in this case was established as a confidential one[,] … and in order to safeguard the confidentiality and efficacy of the ongoing mediation efforts, the Court hereby orders that all participants in the mediation process are bound by the confidentiality restrictions imposed by this Court and the Mediation Team."  *See id.* at 1.  The Court further warned that "[i]n the event that any further breaches of mediation confidentiality appear to occur, the Court will not hesitate to take appropriate action to determine the source of the leak and to evaluate whether to impose sanctions as may be appropriate."  *Id.* at 2.



---

[18]   The Mediation Order also provided that "[m]ediation sessions will be held as necessary, and both the participants and the mediators will be bound by confidentiality."  *Id.* at 3.  Thereafter, mediation sessions were held from time to time on different issues in different Title III cases.





25.

### F.   LCDC's Holdings During Confidential Periods[26]

26.   In an effort to reach agreement with the FOMB, members of the LCDC (along with other *ad hoc* creditor groups) have engaged in two discrete negotiation periods during which participating creditors were subject to confidentiality restrictions. *First*, the bilateral negotiations that occurred from March 14, 2019 to June 16, 2019 (the "Bilateral Negotiations Period"), which culminated with the FOMB's disclosure of the Initial PSA through a posting on EMMA.[27]  And *second*, the mediation among the FOMB and the four *ad hoc* creditor groups that occurred from

---



[26]   By its signature on the signature block, each member of the LCDC certifies the facts pertaining to itself herein as true and correct.  No member can certify the accuracy of information concerning another member, aggregate information or conduct attributable to another member.

[27]   https://emma.msrb.org/ER1366964.pdf.

14

October 2, 2019 to February 9, 2020, which culminated with the FOMB's disclosure of a new PSA dated February 9, 2020 (the "New PSA"). Not all members of the LCDC participated in the confidential negotiation or mediation during the entirety of the Bilateral Negotiations Period or the Mediation Period.

a.      *The Bilateral Negotiations Period (March 14, 2019 – June 16, 2019)*

27.      Bilateral negotiations between and among the FOMB, LCDC, and the QTCB Noteholder Group began the afternoon of March 14, 2019. At that time, the LCDC consisted of four members: GoldenTree, Monarch, Taconic, and Whitebox. As set forth in the table below, those four members did not engage in *any* trading activity in Constitutional Debt during the Bilateral Negotiations Period, which concluded on June 16, 2019 when the parties executed and disclosed the Initial PSA:[28]

| Holdings as of March 14, 2019 ($MM) | | | | |
|---|---|---|---|---|
| | GoldenTree | Whitebox | Monarch | Taconic |
| Early Vintage PBA | $354.1 | $39.0 | $173.2 | $55.0 |
| 2012 PBA | 8.5 | 5.8 | 5.2 | 16.7 |
| **Total PBA** | **$362.6** | **$44.8** | **$178.4** | **$71.6** |
| Early Vintage GO | $13.3 | $110.7 | $181.1 | $42.5 |
| 2012 GO | - | - | - | 0.5 |
| 2014 GO | - | - | - | - |
| **Total GO** | **$13.3** | **$110.7** | **$181.1** | **$43.0** |
| **GO and PBA Holdings** | **$375.8** | **$155.5** | **$359.5** | **$114.6** |

*Note: CABs accreted through March 14, 2019. Disclosable economic interests include bonds insured in either primary or secondary markets.*

---

[28]   Early Vintage GO and Early Vintage PBA includes bonds issued prior to 2012. 2012 GO and 2012 PBA includes all bonds issued in 2012. 2014 GO includes all bonds issued in 2014. Holdings based on *Seventh Supplemental Verified Statement of the Lawful Constitutional Debt Coalition Pursuant to Federal Rule of Bankruptcy Procedure 2019* (ECF No. 13554).

| Holdings as of June 16, 2019 ($MM) | | | | |
|---|---|---|---|---|
| | **GoldenTree** | **Whitebox** | **Monarch** | **Taconic** |
| Early Vintage PBA | $354.1 | $39.0 | $173.2 | $55.0 |
| 2012 PBA | 8.5 | 5.8 | 5.2 | 16.7 |
| **Total PBA** | **$362.6** | **$44.8** | **$178.4** | **$71.6** |
| | | | | |
| Early Vintage GO | $13.3 | $110.7 | $181.1 | $42.5 |
| 2012 GO | - | - | - | 0.5 |
| 2014 GO | - | - | - | - |
| **Total GO** | **$13.3** | **$110.7** | **$181.1** | **$43.0** |
| | | | | |
| **GO and PBA Holdings** | **$375.8** | **$155.5** | **$359.5** | **$114.6** |

*Note: CABs accreted through June 16, 2019. Disclosable economic interests include bonds insured in either primary or secondary markets.*

28.     On May 23, 2019, Aristeia, Farmstead, and FCO joined the LCDC and signed joinders to the Confidentiality Agreement at that time.  These three new members of the LCDC also signed the Initial PSA on June 16, 2019.  As set forth in the table below, between May 23, 2019—the time when each of the new members signed the Confidentiality Agreement—and June 16, 2019—when the Initial PSA was publicly disclosed—these three new LCDC members did not engage in *any* trading activity in Constitutional Debt:[29]

---

[29]   Early Vintage GO and Early Vintage PBA includes bonds issued prior to 2012. 2012 GO and 2012 PBA includes all bonds issued in 2012. 2014 GO includes all bonds issued in 2014.  June 16, 2019 holdings based on *Seventh Supplemental Verified Statement of the Lawful Constitutional Debt Coalition Pursuant to Federal Rule of Bankruptcy Procedure 2019* [ECF No. 13554].

| Holdings as of May 23, 2019 ($MM) | | | |
| --- | --- | --- | --- |
| | Aristeia | Farmstead | FCO |
| Early Vintage PBA | $94.7 | $67.4 | $9.1 |
| 2012 PBA | - | - | - |
| **Total PBA** | $94.7 | $67.4 | $9.1 |
| | | | |
| Early Vintage GO | $19.5 | $41.8 | $55.4 |
| 2012 GO | - | - | - |
| 2014 GO | - | - | 5.0 |
| **Total GO** | $19.5 | $41.8 | $60.4 |
| | | | |
| **GO and PBA Holdings** | $114.2 | $109.2 | $69.5 |

*Note: CABs accreted through May 23, 2019. Disclosable economic interests include bonds insured in either primary or secondary markets.*

| Holdings as of June 16, 2019 ($MM) | | | |
| --- | --- | --- | --- |
| | Aristeia | Farmstead | FCO |
| Early Vintage PBA | $94.7 | $67.4 | $9.1 |
| 2012 PBA | - | - | - |
| **Total PBA** | $94.7 | $67.4 | $9.1 |
| | | | |
| Early Vintage GO | $19.5 | $41.8 | $55.4 |
| 2012 GO | - | - | - |
| 2014 GO | - | - | 5.0 |
| **Total GO** | $19.5 | $41.8 | $60.4 |
| | | | |
| **GO and PBA Holdings** | $114.2 | $109.2 | $69.5 |

*Note: CABs accreted through June 16, 2019. Disclosable economic interests include bonds insured in either primary or secondary markets.*

    b.   <u>*The Mediation Period (October 2, 2019 – February 9, 2020)*</u>

29.    As noted, the Stay Order directed the parties, including the LCDC, to engage in mediation, under the supervision of the Mediation Team, in the hopes of reaching agreement on the terms of a plan of adjustment that would garner additional support beyond what the Initial PSA achieved or otherwise to set up a sensible litigation plan.

30.    This mediation, between and among the FOMB and representatives of the four major creditor groups holding Constitutional Debt—which now included significant holders of

Late Vintage Bonds—began on October 2, 2019.  As explained below, not all members of each group began participating in the mediation at the same time.  Ultimately, however, the parties reached a global resolution of all disputes that was documented in the New PSA.  On February 9, 2020, the FOMB publicly disclosed the terms of the New PSA through postings on its website and on EMMA.[30]  The New PSA has garnered support from holders of approximately 60% of Constitutional Debt.[31]  On February 27, 2020, the FOMB filed a plan of adjustment to implement the transactions set forth in the New PSA (the "<u>Current Plan</u>").[32]

### i.  Holdings Prior to Mediation, Including Added Members

31.    By October 2, 2019, when the mediation process that led to the New PSA commenced, the LCDC had grown from its original four members to seven members.  There were no further negotiations between members of the LCDC and the FOMB from the time of the release of the Initial PSA up until the start of mediation on October 2, 2019, and the holdings of the LCDC increased significantly during this period.  Pursuant to the terms of the Initial PSA, all Constitutional Debt acquired by the members of the LCDC during this period were automatically bound to support the settlements offered by the FOMB.

32.    Five LCDC members, GoldenTree, FCO, Monarch, Taconic, and Whitebox participated in mediation for the entirety of the Mediation Period.  The following tables shows the

---

[30]   *See* https://emma.msrb.org/ES1344275-ES1048205-ES1452453.pdf.

[31]   *See Notice of Second Amendment to Plan Support Agreement and Support for Plan Support Agreement* available at https://emma.msrb.org/ES1369614-ES1066891-ES1473465.pdf.

[32]   *See Amended Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.*(ECF No. 11946).

holdings of the five LCDC members at the commencement of the Mediation Period, the end of the

Mediation Period and the variance:[33]

| Holdings as of the Beginning of Mediation Participation ($MM) | | | | | |
|---|---|---|---|---|---|
| | GoldenTree | Whitebox | Monarch | Taconic | FCO |
| Early Vintage PBA | $401.5 | $43.6 | $164.9 | $87.5 | $9.1 |
| 2012 PBA | 21.0 | 7.9 | 8.0 | 18.8 | - |
| **Total PBA** | **$422.6** | **$51.5** | **$172.9** | **$106.3** | **$9.1** |
| | | | | | |
| Early Vintage GO | $112.1 | $109.5 | $228.5 | $88.8 | $55.4 |
| 2012 GO | 14.6 | 5.6 | 6.0 | 27.2 | - |
| 2014 GO | 46.8 | 7.2 | 20.8 | 6.7 | - |
| **Total GO** | **$173.5** | **$122.2** | **$255.3** | **$122.8** | **$55.4** |
| | | | | | |
| **GO and PBA Holdings** | **$596.0** | **$173.7** | **$428.2** | **$229.1** | **$64.5** |

*Note: CABs accreted through October 1, 2019. Disclosable economic interests include bonds insured in either primary or secondary markets.*

| Holdings as of the End of Mediation Participation ($MM) | | | | | |
|---|---|---|---|---|---|
| | GoldenTree | Whitebox | Monarch | Taconic | FCO |
| Early Vintage PBA | $443.4 | $61.2 | $164.9 | $87.5 | $9.1 |
| 2012 PBA | 56.8 | 19.6 | 8.0 | 18.8 | - |
| **Total PBA** | **$500.2** | **$80.8** | **$172.9** | **$106.3** | **$9.1** |
| | | | | | |
| Early Vintage GO | $114.6 | $110.8 | $228.5 | $88.8 | $55.4 |
| 2012 GO | 14.6 | 5.6 | 6.0 | 27.2 | - |
| 2014 GO | 46.8 | 9.7 | 20.8 | 6.7 | - |
| **Total GO** | **$176.0** | **$126.0** | **$255.3** | **$122.8** | **$55.4** |
| | | | | | |
| **GO and PBA Holdings** | **$676.2** | **$206.8** | **$428.2** | **$229.1** | **$64.5** |

*Note: CABs accreted through February 9, 2020. Disclosable economic interests include bonds insured in either primary or secondary markets.*

---

[33]   Early Vintage GO and Early Vintage PBA includes bonds issued prior to 2012. 2012 GO and
2012 PBA includes all bonds issued in 2012.  2014 GO includes all bonds issued in 2014.  An earlier Rule
2019 Statement erroneously understated Monarch's holdings by $1.3 million during the Mediation Period
due to one CUSIP that was inadvertently excluded from Monarch's aggregate holdings.

| Holdings Variance During the Mediation Period ($MM) | | | | | |
| --- | --- | --- | --- | --- | --- |
| | GoldenTree | Whitebox | Monarch | Taconic | FCO |
| Early Vintage PBA | $41.8 | $17.5 | - | - | - |
| 2012 PBA | 35.8 | 11.8 | - | - | - |
| **Total PBA** | **$77.6** | **$29.3** | - | - | - |
| | | | | | |
| Early Vintage GO | $2.5 | $1.3 | - | - | - |
| 2012 GO | - | - | - | - | - |
| 2014 GO | - | 2.5 | - | - | - |
| **Total GO** | **$2.5** | **$3.8** | - | - | - |
| | | | | | |
| **GO and PBA Holdings** | **$80.1** | **$33.1** | - | - | - |

*Note: CABs accreted through the respective as of date. Disclosable economic interests include bonds insured in either primary or secondary markets.*

33.    Three of those members—FCO, Monarch, and Taconic—had no changes to their Constitutional Debt holdings during the Mediation Period, which ended on February 9, 2020 with the public release of the New PSA.[34]  The other two—GoldenTree and Whitebox—engaged in a few isolated trades, described below.

34.    Two other members of the LCDC, Farmstead and Aristeia, did not participate in mediation until December 19, 2019 and December 20, 2019, respectively.  Neither Farmstead nor Aristeia had any change in holdings of Constitutional Debt during their participation in mediation, which ended on February 9, 2020 with the public release of the New PSA.  The following tables shows the holdings of these two LCDC members as of the date each member began participating in the mediation, as of the date of the end of mediation and the variance:[35]

---

[34]    An earlier Rule 2019 Statement erroneously understated Monarch's holdings by $1.3 million during the Mediation Period due to one CUSIP that was inadvertently excluded from Monarch's aggregate holdings.

[35]    Early Vintage GO and Early Vintage PBA includes bonds issued prior to 2012. 2012 GO and 2012 PBA includes all bonds issued in 2012. 2014 GO includes all bonds issued in 2014.

| Holdings as of the Beginning of Mediation Participation ($MM) | | |
| --- | --- | --- |
| **Holding Date** | **12/20/2019** | **12/19/2019** |
| | **Aristeia** | **Farmstead** |
| Early Vintage PBA | $188.3 | $44.4 |
| 2012 PBA | - | - |
| **Total PBA** | **$188.3** | **$44.4** |
| | | |
| Early Vintage GO | $49.5 | $72.0 |
| 2012 GO | - | - |
| 2014 GO | - | - |
| **Total GO** | **$49.5** | **$72.0** |
| | | |
| **GO and PBA Holdings** | **$237.8** | **$116.4** |

*Note: CABs accreted through the respective as of date. Disclosable economic interests include bonds insured in either primary or secondary markets.*

| Holdings as of the End of Mediation Participation ($MM) | | |
| --- | --- | --- |
| | **Aristeia** | **Farmstead** |
| Early Vintage PBA | $188.3 | $44.4 |
| 2012 PBA | - | - |
| **Total PBA** | **$188.3** | **$44.4** |
| | | |
| Early Vintage GO | $49.5 | $72.0 |
| 2012 GO | - | - |
| 2014 GO | - | - |
| **Total GO** | **$49.5** | **$72.0** |
| | | |
| **GO and PBA Holdings** | **$237.8** | **$116.4** |

*Note: CABs accreted through February 9, 2020. Disclosable economic interests include bonds insured in either primary or secondary markets.*

| Holdings Variance During Mediation Participation ($MM) | | |
| --- | --- | --- |
| **Mediation Participation Dates** | **12/20/2019 to 2/9/2020** | **12/19/2019 to 2/9/2020** |
| | **Aristeia** | **Farmstead** |
| Early Vintage PBA | - | - |
| 2012 PBA | - | - |
| **Total PBA** | **-** | **-** |
| | | |
| Early Vintage GO | - | - |
| 2012 GO | - | - |
| 2014 GO | - | - |
| **Total GO** | **-** | **-** |
| | | |
| **GO and PBA Holdings** | **-** | **-** |

*Note: CABs accreted through the respective as of date. Disclosable economic interests include bonds insured in either primary or secondary markets.*

35.     A former member of the LCDC, Marble Ridge Capital LP ("Marble Ridge"), joined the LCDC on January 27, 2020.  Marble Ridge became a participant in the mediation when it

joined the LCDC; it held approximately $75.1 million in Constitutional Debt at the time and its holdings were reflected in this amount upon disclosure of the New PSA on February 9, 2020, evidencing no change in holdings during the relevant period.  Marble Ridge withdrew from the LCDC upon announcing its intent to wind up its affairs.[36]

### ii.    Two Members' Increased Holdings During Mediation

36.    The remaining two LCDC members—GoldenTree and Whitebox—participated in the mediation for the entirety of the Mediation Period and increased their holdings of Constitutional Debt during this time.  The increase in GoldenTree's holdings resulted from two transactions.  *First*, on August 15, 2019, prior to the start of mediation, GoldenTree publicly announced that an affiliate had reached an agreement to acquire Syncora Guarantee, Inc., a monoline insurer that among its business operations held or insured certain GO Bonds and PBA Bonds.[37]  Upon regulatory review and approval, this transaction closed on or about December 30, 2019 (during the mediation).  At the time of closing of the acquisition, Syncora owned or insured approximately $26.8 million in Early Vintage Bonds that came under GoldenTree's control as a result of the acquisition and these bonds were thereupon included in GoldenTree's holdings and automatically made subject to the Initial PSA.  Again, this was an acquisition of an entire monoline insurer, not just a bond portfolio, which was negotiated and executed *prior to the start of the mediation*.

37.    Second, GoldenTree engaged in a pair of related transactions in PBA Bonds shortly after the commencement of the mediation, which were executed on October 8 and 24, 2019.  In

---

[36]   The undersigned counsel provides this information to the Court based on information provided by Marble Ridge during the time it was a member of the LCDC.

[37]   *See* https://www.globenewswire.com/news-release/2019/08/15/1902268/0/en/Syncora-Holdings-Ltd-Announces-Agreement-to-Sell-Syncora-Guarantee-Inc-for-392-5-Million-to-Star-Insurance-Holdings-LLC-and-Corporate-Gove.

those transactions, GoldenTree purchased approximately $82.62 million in aggregate notional amount of PBA Bonds from Fir Tree Partners ("Fir Tree"), ███████████████████ ██████████ retained approximately $53.34 million in aggregate notional amount, and sold the remaining portion to Whitebox.  The bonds purchased by GoldenTree on October 8, 2019, were Late Vintage PBA Bonds, and the bonds purchased on October 24, 2019 were Early Vintage PBA Bonds.[38]  In an effort to be transparent, GoldenTree ███████████████████████████ ███████████████████████████████████████████████████████ ████████.  Upon GoldenTree and Whitebox acquiring these bonds, they too automatically became subject to the terms of the Initial PSA.

38.     On December 19, 2019, Whitebox purchased approximately $3.8 million in aggregate notional amount of Early Vintage and Late Vintage GO Bonds from BlackRock, Inc. ("BlackRock"), █████████████████████████████████████████████ █████████████████████████████.[39]  These bonds, too, automatically became subject to the terms of the Initial PSA.

---

[38]     Because Fir Tree was not actively participating in the mediation at the time, and after GoldenTree had consulted with outside securities counsel, Fir Tree and GoldenTree documented Fir Tree's informed decision to trade notwithstanding that it lacked certain information from the mediation, and also documented Fir Tree's non-receipt of any confidential information from GoldenTree.

[39]     In an abundance of caution, all of Whitebox's trades during the Mediation Period were executed pursuant to letters acknowledging that Whitebox and its institutional counter-parties had equal access to information provided during the mediation.

## **ARGUMENT**

### A.   A Court-Ordered Investigation Is Wholly Unwarranted Based On The Record Before The Court

39.     National premises its call for a court-appointed investigation in large part on alleged concerns of suspicious trading during the Mediation Period.  There was no suspicious trading by LCDC members.

40.     As detailed above, while participating in the mediation, six of eight LCDC members did not trade *at all* in Constitutional Debt during their participation in the mediation.

41.     Moreover, the few isolated trades during the Mediation Period complied with the Court's Mediation Orders █████████████████████.  The Court's Mediation Orders spoke only to the duty of confidentiality in mediation and did not speak at all to trading, let alone impose a trading prohibition. ████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████  ███████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████

42.     The isolated trades here by GoldenTree and Whitebox did not breach any duty █ ███████████████████████ prejudice any party or in any way violate the Court's Mediation Orders. GoldenTree's acquisition of Syncora (an insurance company) should not even be regarded as trading during the Mediation Period. GoldenTree signed the purchase agreement to acquire Syncora *in August 2019, prior to the Mediation Period*, when GoldenTree did not possess

confidential information; it closed the acquisition in December 2019 because it needed to wait for regulatory approval.  There is nothing problematic about this acquisition.

43.     GoldenTree's and Whitebox's isolated trades during the Mediation Period likewise did not breach any duty or the Mediation Protocol.  The pair of transactions executed on October 8 and 24, 2019—when GoldenTree purchased Fir Tree's PBA bonds and then sold a portion to Whitebox—involved  neither  the  giving  nor  receipt  of  any  confidential  information██

████████████████████████████████████████████████████████████████████████

████████████████████████████.  Moreover, GoldenTree, in an effort to be transparent,

███████████████████████████████████████████████.

44.     Whitebox's  trade  with  BlackRock  on  December  19,  2019  ██████████████

███████████████████████████     ██████████████████████████████████

█████████████████████████████████████████  As confirmed in a letter executed in connection with the trade, Whitebox and Blackrock had equal access to confidential mediation information.  No confidentiality obligations were contravened by this trade

██████████████████████████████████████████████████████████

45.     Moreover, these transactions were duly reflected in the CUSIP-level holdings information of each member of LCDC provided and updated to the FOMB on a regular basis.

46.     Nothing on this record warrants further investigation, let alone a court-ordered investigation  that  would  further  delay  these  proceedings  and  do  so  at  the  expense  of  the Commonwealth.  The focus of all parties should be on formulating and presenting a plan that can be confirmed and allow the Commonwealth to exit bankruptcy.  Any challenges to the plan that are ultimately made should be considered at that time.  There is no evidence that any LCDC

member breached confidentiality.   National's conjecture, based on misleading charts that inaccurately suggest significant trading during the Mediation Period, does not change that.

### B.   NO LAW SUPPORTS THE REQUESTED RELIEF

47.     National asks the Court to order the commission of an "independent investigator" to conduct a boundless examination based solely upon section 105(a) of the Bankruptcy Code and the "general powers of the Court."  Mot. ¶ 48.  These legal underpinnings do not support National's requested relief.

48.     It is hornbook law that, in bankruptcy matters, any equitable powers of the court must be "exercised within the confines of the Bankruptcy Code."  *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 206 (1988).   ("Whatever equitable powers remain in the bankruptcy courts must and can be exercised within the confines of the Bankruptcy Code.").   The text of section 105(a) of the Bankruptcy Code—which authorizes a court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title"—embodies this limitation on the equitable powers of the court.   11 U.S.C. § 105(a); PROMESA § 301(a) (incorporating section 105 of the Bankruptcy Code into a case under Title III).   Thus, the First Circuit has cautioned that the authority bestowed upon courts pursuant to section 105(a) "may be invoked only if, and to the extent that, the equitable remedy dispensed by the court is necessary to preserve ***an identifiable right conferred elsewhere in the Bankruptcy Code***."  *Jamo v. Katahdin Fed. Credit Union (In re Jamo)*, 283 F.3d 392, 403 (1st Cir. 2002) (emphasis added).   Section 105(a) of the Bankruptcy Code, therefore, does not stand alone and provide a basis for the Court to grant National's Motion.

49.     National does not cite to any other provision of the Bankruptcy Code (or PROMESA) to which its requested section 105(a) order would be tethered.   Simply put, the Court does not have the "equitable power" to issue the order requested.  *See New England Dairies, Inc.*

*v. Dairy Mart Convenience Stores, Inc. (In re Dairy Mart Convenience Stores, Inc.)*, 351 F.3d 86, 92 (2d Cir. 2003) ("The equitable power conferred on the bankruptcy court by section 105(a) is the power to exercise equity in carrying out the *provisions* of the Bankruptcy Code, rather than to further the purposes of the Code generally, or otherwise to do the right thing.") (emphasis in original). This is sufficient reason for the Court to deny National's Motion.

50.       National's requested relief under section 105(a) is further undermined by the omission from PROMESA Title III of the Bankruptcy Code provision that authorizes the appointment of an examiner or trustee (section 1104 of the Bankruptcy Code). *See* PROMESA § 301(a) (listing Bankruptcy Code provisions applicable to a Title III case and omitting Bankruptcy Code section 1104). National's Motion asks the Court to invoke section 105(a) not to *implement a provision* of PROMESA, but to *circumvent its omission* of an examiner statute.[40] The Court should not permit this end run around PROMESA. *Cf. In re Nosek*, 544 F.3d 34, 44 (1st Cir. 2008) ("§ 105(a) may not be invoked where the result of its application would be inconsistent with any other Code provision or it would alter other substantive rights set forth in the Code").

51.       Acknowledging PROMESA's omission of section 1104 of the Bankruptcy Code is a problem, National suggests that the Office of the U.S. Trustee should serve as the "independent entity" to conduct National's requested investigation. Mot. ¶ 63. This suggestion, however, ignores the fact that, unlike in a Chapter 11 case (such as *Neiman Marcus*, for example), the U.S. Trustee's role is significantly curtailed in a case under Title III of PROMESA. Like Chapter 9 of the Bankruptcy Code, Title III of PROMESA does not incorporate section 307 of the Bankruptcy

---

[40]       National's reliance on *Washington Mutual* and *FiberMark* (Mot. ¶¶ 59-61), in which the courts appointed examiners to conduct investigations, confirms that National is in fact seeking the appointment of an examiner-like entity. Those cases are wholly inapposite on the facts, as well as the statute governing those proceedings.

Code, pursuant to which the U.S. Trustee "may raise and may appear and be heard on any issue in any case or proceeding under [title 11]."  11 U.S.C. § 307; *see also In re City of Detroit, Mich.*, 519 B.R. 67, 677 (Bankr. E.D. Mich. 2014) ("Despite the sweeping language of section 307, the Court concludes that sections 103(f) and 901(a) establish that the U.S. Trustee has no statutory standing in chapter 9 cases.").  Congress expressly limited the role of the U.S. Trustee in Title III cases; the Court should not accept National's invitation to expand it.

52.     Finally, while section 105(a) gives courts the authority to implement their own orders, National has failed to point to any provision of the Mediation Orders that the Court would be implementing.  ██████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

██████, section 105(a) cannot be used to modify contracts.  *See Official Unsecured Creditors' Committee v. Stern (In re SPM Manufacturing Corp.)*, 984 F.2d 1305, 1311 (1st Cir. 1993) ("[S]ection 105(a) [does not] authorize courts to . . . expand contractual obligations of parties.").  National's failure to properly identify any violation of a court order requires denial of the Motion.

53.     National's Motion is not only made of whole cloth, it reveals National's motives.  National wants only one thing:  to prevent Puerto Rico from emerging from bankruptcy until and unless Puerto Rico pays every penny owed to National (with interest).  Until then, National wants the people of Puerto Rico to fund its costs of litigating issues that it may want to raise to contest confirmation of any plan consistent with the New PSA.

C.      **LCDC'S POSITIONS BEFORE THE TITLE III COURT AND IN SUPPORT OF COMPROMISE ARE AND HAVE BEEN CONSISTENT WITH THEIR ECONOMIC INTERESTS**

54.     Seemingly aware that its requested relief finds no support in the Mediation Protocol or PROMESA, National next questions the motivations of the LCDC (and other creditor groups) by contending that their supplemental disclosures under Rule 2019 show that their legal positions

before this Court were inconsistent with their economic interests.  National's allegations as to the

LCDC are not well-pleaded, and collapse when confronted with the facts.

55.     Since its formation nearly 18 months ago, on behalf of its members, the LCDC  has

consistently defended the validity of the PBA and the priority of Early Vintage Bonds (*i.e.* bonds

issued prior to March 2012) relative to Late Vintage Bonds (*i.e.* bonds issued in and after March

2012).  The LCDC has never been shy—and in fact has been quite specific about—this position.

*See* LCDC Statement of Position; and LCDC Claim Objection.  As its public disclosures

demonstrate, the members of the LCDC have, at all times, held bonds heavily weighted towards

Early Vintage Bonds, with the percentage of Early Vintage Bonds never being below 85% of their

total holdings (even including new LCDC members who held some Late Vintage Bonds when they

joined).  Quite simply, there is no "there" there when it comes to the LCDC members' economic

interests or legal argument motivations.  Rather, the LCDC members' interests and arguments have

remained the same since inception and are completely aligned with one another.[41]

56.     Moreover, the LCDC has not advocated for disallowance of Late Vintage Bonds

and did not adopt the FOMB's and Official Committee's omnibus objections at all.  The fact that

the FOMB and Official Committee have argued that Late Vintage Bonds should be disallowed and

not receive any distribution under a plan of adjustment has nothing to do with the LCDC.  Precisely

because it doubts (and has always doubted) the ability to make bonds go "poof!", in both its

Statement of Position and the LCDC Claim Objection, the LCDC explicitly urged deferral of the

appropriate remedy for bonds issued in violation of the Constitutional Debt Limit, until after the

---

[41]   In any event, there is nothing improper of a party to a litigation seeking to hedge positions or
take other efforts to promote a settlement of disputes.

Court (or the Supreme Court of Puerto Rico) determines the threshold issue of interpreting the Puerto Rico Constitution.

57.     The Current Plan, in any event, represents a global settlement proposed by the FOMB that resolves any and all arguments that could be made by holders of Constitutional Debt. While National is undoubtedly unhappy with the Current Plan, it should not be permitted to challenge it at the Commonwealth's and its people's expense via scorched-earth litigation tactics that only serve to further delay the progress of this case and to prevent the Commonwealth from emerging from bankruptcy with a sustainable debt load as promptly as feasible.  National and any other party opposed to the Current Plan will have an opportunity to raise their purported "good faith" objections at the appropriate time and have the Court consider such objections based on the applicable legal standards and evidence it adduces at confirmation on its own dime.  At bottom, National's Motion reeks of desperation, seeking to delay the Commonwealth's exit from bankruptcy and its own day of reckoning.

## <u>CONCLUSION</u>

58.     WHEREFORE, the LCDC respectfully requests that the Court enter an Order

denying the National Motion and grant any other and further relief as is just and proper.

DATED:  October 13, 2020

Respectfully submitted,

| | |
|---|---|
| **REICHARD & ESCALERA** | **QUINN EMANUEL URQUHART & SULLIVAN, LLP** |
| | |
| **By :**  *<u>/s/ Rafael Escalera</u>* | |
| **Rafael Escalera** | **Susheel Kirpalani** (*pro hac vice*) |
| USDC No. 122609 | susheelkirpalani@quinnemanuel.com |
| escalera@reichardescalera.com | |
| | **Daniel Salinas** |
| **Sylvia M. Arizmendi** | USDC-PR 224006 |
| USDC-PR 210714 | danielsalinas@quinnemanuel.com |
| arizmendis@reichardescalera.com | |
| | **Eric Kay** (*pro hac vice*) |
| **Carlos R. Rivera-Ortiz** | erickay@quinnemanuel.com |
| USDC-PR 303409 | |
| riverac@reichardescalera.com | **Kate Scherling** (*pro hac vice*) |
| | katescherling@quinnemanuel.com |
| 255 Ponce de León Avenue | |
| MCS Plaza, 10th Floor | 51 Madison Avenue, 22nd Floor |
| San Juan, Puerto Rico 00917-1913 | New York, New York 10010-1603 |
| (787) 777-8888 | (212) 849-7000 |

*Co-Counsel for the Lawful Constitutional Debt Coalition*

Aristeia Capital, LLC, on behalf of certain funds under management ("Aristeia"), certifies that the holdings and trading information of Aristeia contained in this Objection is true and correct.


ARISTEIA CAPITAL, LLC,
ON BEHALF OF CERTAIN FUNDS UNDER
MANAGEMENT


By: _____
Name:  Andrew B. David
Title:   Chief Operating Officer

Farmstead Capital Management, LLC, on behalf of certain funds under management ("Farmstead"), certifies that the holdings and trading information of Farmstead contained in this Objection is true and correct.

FARMSTEAD CAPITAL MANAGEMENT, LLC,
ON BEHALF OF CERTAIN FUNDS UNDER
MANAGEMENT

By: _____
Name: Michael Scott
Title:   Managing Member

FCO Advisors LP, on behalf of certain funds and accounts under management ("FCO"), certifies that the holdings and trading information of FCO contained in this Objection is true and correct.

FCO ADVISORS LP,
ON BEHALF OF CERTAIN FUNDS AND
ACCOUNTS UNDER MANAGEMENT

By: _____
Name: Hector Negoni
Title: CEO

Goldentree Asset Management, LP, on behalf of certain funds under management ("Goldentree"), certifies that the holdings and trading information of Goldentree contained in this Objection is true and correct.

GOLDENTREE ASSET MANAGEMENT LP,
ON BEHALF OF CERTAIN FUNDS UNDER
MANAGEMENT

By: _____
Name:
Title:

**Peter Alderman**
**Vice President**

Monarch Alternative Capital LP, on behalf of certain funds under management ("Monarch"), certifies that the holdings and trading information of Monarch contained in this Objection is true and correct.

MONARCH ALTERNATIVE CAPITAL LP,
ON BEHALF OF CERTAIN FUNDS UNDER
MANAGEMENT

By: _____
Name:
Title:   Andrew Herenstein
       Managing Principal

Taconic Capital Advisors L.P., on behalf of certain funds under management ("Taconic"),
certifies that the holdings and trading information of Taconic contained in this Objection is true
and correct.

TACONIC CAPITAL ADVISORS L.P.,
ON BEHALF OF CERTAIN FUNDS UNDER
MANAGEMENT

By: _Elizabeth Keeley_
Name: Elizabeth Keeley
Title:   Chief Operating Officer & General Counsel

Whitebox Advisors LLC, on behalf of certain funds under management ("Whitebox"), certifies that the holdings and trading information of Whitebox contained in this Objection is true and correct.

WHITEBOX ADVISORS LLC,
ON BEHALF OF CERTAIN FUNDS UNDER
MANAGEMENT

By: _____
Name: Luke Harris
Title: General Counsel – Corporate, Transactions &
Litigation