**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PUERTO RICO**

```
------------------------------------------------------------------- x
                                                                    :
In re:                                                              :
                                                                    :
THE FINANCIAL OVERSIGHT AND                                         :   PROMESA
MANAGEMENT BOARD FOR PUERTO RICO,                                   :   Title III
                                                                    :
         as representative of                                       :   Case No. 17-BK-3283 (LTS)
                                                                    :
THE COMMONWEALTH OF PUERTO RICO, et al.,                            :   (Jointly Administered)
                                                                    :
                                                                    :
         Debtors.¹                                                  :
------------------------------------------------------------------- x
```

**OBJECTION OF OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO JOINT MOTION OF PSA CREDITORS PURSUANT TO SECTION 312 OF PROMESA AND SECTION 105 OF BANKRUPTCY CODE TO IMPOSE <u>DEADLINES FOR PLAN OF ADJUSTMENT</u>**

---

[1] The Debtors in these Title III cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK-3283 (LTS)) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284 (LTS)) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567 (LTS)) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566 (LTS)) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17-BK-4780 (LTS)) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5233 (LTS)) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

## TABLE OF CONTENTS

**Page**

OBJECTION ................................................................................................................................... 1
    I.     PSA Creditors' Motion Should Be Denied ............................................................. 3
    II.    PSA Creditors' Motion Raises Questions Regarding Oversight Board's
            Prior Representations to the Court ......................................................................... 7
CONCLUSION ............................................................................................................................ 12

To the Honorable United States District Judge Laura Taylor Swain:

The Official Committee of Unsecured Creditors (the "Committee")[1] respectfully submits this Objection (the "Objection") to the *Joint Motion of PSA Creditors Pursuant to Section 312 of PROMESA and Section 105 of the Bankruptcy Code to Impose Deadlines for Plan of Adjustment* [Docket No. 14478] (the "Motion").[2] In support of this Objection, the Committee states as follows:

## OBJECTION

1.      The Committee agrees with the Oversight Board and the other objectors that the relief requested in the Motion should be denied.[3] As detailed below, the Committee believes that there is no basis at this time for the PSA Creditors to seek to impose, by threat of dismissal of these Title III cases, plan-related deadlines on the Oversight Board or for the Court to grant such relief.

2.      Separately, the Committee also files this Objection to raise a number of questions regarding the divergent statements made by the Oversight Board and the PSA Creditors concerning the status of their plan negotiations—particularly in light of the fact that the Court relied on the Oversight Board's prior statements that negotiations are "ongoing" and "continuing" (among other statements) as the basis for denying (a) the Committee's motion to

---

[1] The Committee is the official committee of unsecured creditors for all Title III Debtors, other than PBA and COFINA.

[2] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Motion.

[3] *See Objection of Financial Oversight and Management Board for Puerto Rico to Joint Motion of PSA Creditors Pursuant to Section 312 of PROMESA and Section 105 of the Bankruptcy Code to Impose Deadlines for Plan of Adjustment* [Docket No. 14547] (the "Oversight Board's Objection"); *Objection of National Public Finance Guarantee Corporation to Joint Motion of PSA Creditors Pursuant to Section 312 of PROMESA and Section 105 of the Bankruptcy Code to Impose Deadlines for Plan of Adjustment* [Docket No. 14555]; *AAFAF's Objection to the Joint Motion of PSA Creditors Pursuant to Section 312 of PROMESA and Section 105 of the Bankruptcy Code to Impose Deadlines for Plan of Adjustment* [Docket No. 14558]; *Ambac Assurance Corporation's Objection to Joint Motion of PSA Creditors to Impose Deadlines for Plan of Adjustment* [Docket No. 14559].

1

lift the litigation stay (the "Lift Stay Motion")[4] to pursue its objection to the asserted GO priority (the "GO Priority Objection")[5] and (b) the Committee's subsequent motion for reconsideration of the denial of the Lift Stay Motion (the "Reconsideration Motion").[6] The Committee submits that the Oversight Board and the PSA Creditors should address, among other things, (i) whether the Oversight Board has indeed failed to respond to the PSA Creditors' August 24, 2020 proposal, as the PSA Creditors assert in their Motion, and (ii) how "ongoing" negotiations are consistent with the filing of a motion seeking to compel the Oversight Board to prosecute a prior plan settlement on an arbitrary timeline under the threat of dismissal of these Title III cases. It is certainly no answer, as the Oversight Board suggests in its objection, that the Motion is merely a "negotiation tactic,"[7] as that would take the meaning of the term "negotiation" to an entirely different level.

3. The Committee is particularly concerned about the parties' divergent narratives given that it has been excluded from all substantive mediation discussions regarding the Commonwealth plan of adjustment. In fact, the last time that the Committee has had any meeting (whether in person or telephonically) with the Mediation Team and the Oversight Board regarding the Commonwealth plan was in January 2020, and then only to be informed of the settlement reached at the time between the Oversight Board and the PSA Creditors.

---

[4] *Urgent Motion of Official Committee of Unsecured Creditors to Lift Stay to Allow Committee to Pursue Objection to GO Priority* [Docket No. 13726].

[5] *Omnibus Objection of the Official Committee of Unsecured Creditors, Pursuant to Bankruptcy Code Section 502 and Bankruptcy Rule 3007, to Claims Filed or Asserted Against Commonwealth by Holders of General Obligation Bonds Asserting Priority Over Other Commonwealth Unsecured Creditors* [Docket No. 10638].

[6] *Motion, Under Federal Rule of Bankruptcy Procedure 9023, of Official Committee of Unsecured Creditors for Reconsideration of September 17, 2020 Order Denying Motion to Lift Stay to Allow Committee to Pursue Priority Objection to GO Bond Claims* [Docket No. 14444].

[7] Oversight Bd.'s Obj. ¶ 7.

2

**I.       PSA Creditors' Motion Should Be Denied**

4.      Given that the Oversight Board and others have already filed lengthy objections to the PSA Creditors' Motion setting forth their various arguments as to why the Motion should be denied, the Committee will refrain here from repeating arguments already raised, except to emphasize a few points.

5.      First, the Committee disagrees with the PSA Creditors that the current state of play merits the imposition of a rushed confirmation timetable to be enforced by the threat of dismissal of these Title III cases.[8]  Given the magnitude of recent events, including an unprecedented pandemic and related economic disruption, it is certainly not unreasonable for the Oversight Board to take a step back and evaluate its restructuring options.  The resulting delay in the plan process is no basis to impose a series of arbitrary deadlines at the behest of one group of creditors—creditors that are neither secured[9] nor entitled to priority status—in order to force the Oversight Board to prosecute a plan it is not willing to prosecute.  Nor should the Court credit the PSA Creditors' expressions of pious concern for the people of Puerto Rico, expressions that are plainly at odds with the Motion's aggressive posture.  The principal objective of the Motion

---

[8]    To be clear, this Objection is not inconsistent with the Committee's Lift Stay Motion.  The Committee has consistently taken the position that the Oversight Board should take the appropriate time to evaluate its restructuring options.  *See* Lift Stay Mot. ¶ 6 ("To be clear, the Committee is not trying to rush the Oversight Board into agreeing to an imprudent modified settlement. The Oversight Board should take the appropriate time to explore and evaluate the potential paths forward—which would also include further analysis of the Commonwealth's economic outlook."); *Official Committee Of Unsecured Creditors' (A) Response to Status Report of Government Parties Regarding Covid-19 Pandemic and PREPA 9019 RSA Motion [Docket No. 1992 in Case No. 17- 4780] and (B) Statement of Position Regarding Status Report of Financial Oversight and Management Board for Puerto Rico Regarding Covid-19 Pandemic and Proposed Disclosure Statement Schedule [Docket No. 13018 in Case No. 17-3283]* ¶ 9 [Docket No. 13167] ("[T]he Committee is not trying to 'rush' the Oversight Board into agreeing to imprudent settlements. The Oversight Board should take the appropriate time to evaluate the potential paths forward . . . .").  The Lift Stay Motion was concerned only with the Committee's ability to pursue the GO Priority Objection while the Oversight Board evaluated its position.  To put it another way, the Committee did not oppose the Oversight Board's decision to take the time it needs; what the Committee opposed was the stay of the GO Priority Objection remaining in place in the meantime.

[9]    As the Court will recall, the Ad Hoc Group of General Obligation Bondholders previously sought to add GO bondholders as additional members of the Committee. *Motion of the Ad Hoc Group of General Obligation Bondholders to Reconstitute the Official Committee of Unsecured Creditors Pursuant to 11 U.S.C. §§ 105(a) and 1102(a)(4)*, dated July 21, 2017 [Docket No. 694].

3

is to use the threat of dismissal[10] to force the Oversight Board to pursue (and perhaps also to intimidate others, such as members of the Oversight Board and/or the Puerto Rico legislature, into approving) the plan of adjustment contemplated by the current PSA—a plan that would provide extremely generous recoveries to GO/PBA bondholders while crushing on-island creditors even without taking into account the current public health and economic crises. Worse, the PSA Creditors seek to force the Oversight Board to move forward with such plan before the full fiscal impact of these crises is known.

6. Second, the plan of adjustment contemplated by the current PSA is plainly not confirmable, and, accordingly, it would be an extraordinary waste of time and resources to force the Oversight Board to press forward, against its will, with such a plan. Among other things, based on the Oversight Board's estimates in the Disclosure Statement, the proposed plan would leave unsecured on-island creditors and small businesses with an estimated recovery of only 3.9%, while unsecured GO/PBA bondholders would receive a blended estimated recovery of more than $73%.[11] In effect, and notwithstanding that the alleged GO priority does not apply in Title III cases, virtually all value would flow to the GO/PBA bondholders (which are largely Wall Street distressed hedge funds that acquired their bonds for a fraction of the value that they now stand to receive), while leaving a mere pittance to other unsecured creditors. This lopsided treatment is further exacerbated under the Oversight Board's and PSA Creditors' just released amended plan proposals, which were exchanged as part of the mediation process supervised by the Mediation Team. As the Committee previously noted, these proposals reflect that both the Oversight Board and the PSA Creditors agree that "Non-GO/PBA Creditors" would only receive

---

[10] Dismissal of these Title III cases would mean the end of the automatic stay, resulting in a chaotic "rush to the courthouse" with creditors attempting to exercise remedies against the Commonwealth.

[11] *See* Disclosure Statement at 14-17 [Docket No. 11947].

4

$50 million in total consideration, thereby leaving them with an estimated recovery of **only 0.37%**.[12]

7. Third, the PSA Creditors' complaints that they have not received payment on their GO and PBA bonds since the passage of PROMESA ring hollow. They are sophisticated hedge funds that specialize in distressed investing and knew exactly what they were getting into when they bought their (defaulted or soon to be defaulted) bonds at steep discounts in the secondary market. The PSA Creditors understood that they would be unsecured creditors who, unlike secured creditors, have no entitlement to current payment of postpetition interest or adequate protection. Moreover, they knew that section 363 of the Bankruptcy Code does not apply in a Title III case and, thus, that the Commonwealth would enjoy the ability to pay prepetition claims without the need for Court approval. In any event, the PSA Creditors voluntarily entered into the PSA with the Oversight Board and no one is forcing them now to agree to a new settlement. If they are dissatisfied with the pace of the Oversight Board's decision-making, they can refuse to enter into a new settlement and/or exercise remedies (if any) they may have under the current PSA.

8. Fourth, the Committee also strongly disagrees with numerous of the legal and factual assertions made in the Motion, including, most notably, the assertion that the GO and PBA bond claims enjoy priority over general unsecured creditors in Title III. The Committee has already demonstrated in its GO Priority Objection that no such priority exists in Title III—although the Committee is currently barred from prosecuting that objection. In addition, the Committee also disagrees with the PSA Creditors' assertion that "the vast majority"[13] of

---

[12] *See* Reconsideration Mot., Ex. 1, August 24 PSA Creditors Proposal, dated August 24, 2020, at 3; *Id.*, Ex. 3, Fiscal Plan Macroeconomic Overview and Revised Plan of Adjustment Proposal, dated Aug. 18, 2020, at 12.

[13] Mot. ¶ 4.

5

unsecured claims have been paid. The Oversight Board's own claims estimates in the Disclosure Statement indicate that there are approximately $5.5 billion of general unsecured claims.[14] The Committee reserves all its rights in regard to these and other erroneous assertions made by the PSA Creditors.

9. <u>Finally</u>, contrary to the PSA Creditors' suggestion, the relief they seek is not comparable to the protocol approved by the Court to resolve the Commonwealth-COFINA dispute (the "<u>Commonwealth-COFINA Stipulation</u>").[15] The Commonwealth-COFINA Stipulation was a **consensual framework** that did **not** impose any deadlines on the Oversight Board or other signatories against their will. As the Court will recall, the Commonwealth-COFINA Stipulation was designed to resolve a critical dispute—*i.e.*, the ownership, as between the Commonwealth and COFINA, of certain sales and use taxes—by appointing, with the consent of the Oversight Board, a Commonwealth agent and a COFINA agent empowered to litigate and settle such dispute. The stipulation did not impose any deadlines by which a settlement had to be reached; and only **if** a settlement were reached would a 45-day period for filing a plan go into effect.[16] The Commonwealth-COFINA stipulation also involved a dispute regarding the alleged ownership of assets by COFINA, not the allowance and/or treatment of unsecured claims. The Commonwealth-COFINA Stipulation is nothing like the PSA Creditors'

---

[14] The Disclosure Statement notes that the estimated allowed amount of general unsecured claims in Class 41 is $5,566,100,716. Disclosure Statement at 320. This estimate is also consistent with the recovery percentage provided for that class. In particular, the Disclosure Statement estimates that the recovery percentage for non-GO unsecured claims against the Commonwealth is approximately 3.9%. Disclosure Statement at 17-18. Given that the total consideration to be made available under the previous Commonwealth plan of adjustment to such non-GO unsecured claims would be approximately $527 million, Current POA § 1.126, the implied estimated aggregate amount of non-GO unsecured claims is approximately $13.5 billion (*i.e.*, $527 million divided by 3.9%). This means that the estimated aggregate amount of general unsecured claims, after excluding the approximately $8 billion in unsecured claims asserted by holders of revenue bonds, is approximately $5.5 billion.

[15] *Stipulation and Order Approving Procedure to Resolve Commonwealth-COFINA Dispute* [Docket No. 996].

[16] *Id.* ¶ 4.l.

attempt here to force the Oversight Board to prosecute, against its will, a plan of adjustment on a rushed confirmation timetable.

10. That being said, the Commonwealth-COFINA Stipulation does demonstrate one important thing: litigation of key issues is critical to laying the groundwork for a consensual restructuring. In fact, to date, the COFINA Title III case is the only case that has resulted in the confirmation of a plan of adjustment—and the litigation of the ownership dispute over SUT taxes, including discovery and summary judgment briefing, was instrumental to bringing about that consensual plan of adjustment. In this regard, it is particularly ironic that the Oversight Board's Objection touts the importance of litigation in clarifying the rights of creditors and advancing these Title III cases, including objections to claims asserted by holders of certain revenue bonds.[17] The Committee could not agree more that targeted litigation of key threshold issues is critical to a successful (and consensual) resolution of these Title III cases. Nevertheless, the Oversight Board has yet to offer any cogent explanation as to why the GO/PBA bondholders' claims have been exempted from such clarifying litigation, including the Committee's challenge of the asserted GO priority (even though the Oversight Board has consistently taken the position that no such priority applies in Title III).

## II. PSA Creditors' Motion Raises Questions Regarding Oversight Board's Prior Representations to the Court

11. The Motion also raises a number of questions that need to be addressed regarding the Oversight Board's prior representations to this Court concerning the status of the negotiations between the Oversight Board and the PSA Creditors—representations that the Court relied upon in its decisions denying the Committee's Lift Stay Motion and Reconsideration Motion.

---

[17] *See, e.g.*, Oversight Bd.'s Obj. at 12-13.

12. Throughout September 2020, the Oversight Board repeatedly asserted that negotiations were "ongoing" and "continuing" and that the parties were "making progress." For example:

- In its September 1, 2020 objection to the Committee's Lift Stay Motion, the Oversight Board asserted that it was "**making progress**"[18] and "pleased with the progress made" towards a renegotiated plan settlement and that "such progress has been transparently communicated with the Court and the public."[19]

- In its September 9, 2020 status report, the Oversight Board stated that parties were "**re-engaged**" in plan negotiations.[20]

- At the September 16, 2020 hearing on the Committee's Lift Stay Motion, counsel for the Oversight Board stated that "there is **ongoing** mediation," "[t]here is a desire on all parties' parts to get to a deal," and that the "common" and "constant" need to amend the deal did not "change the fact that the parties **are at the table** desiring to hammer out a revised deal."[21]

- In their September 25, 2020 PREPA status report, the Oversight Board, AAFAF, and PREPA, commenting on the September 16, 2020 hearing in further support of their objection to the Committee's motion to terminate the PREPA Rule 9019 motion, noted that the Committee had argued that the Commonwealth plan settlement had fallen apart "[n]otwithstanding **the Oversight Board's representations that the parties were continuing to negotiate**."[22]

- In its September 30, 2020 public statement issued in connection with the release of the Oversight Board's presentation regarding its July 30, 2020 proposal (the "July 30 Proposal") and the PSA Creditors' August 24, 2020 counterproposal (the "August 24 Counterproposal"), the Oversight Board stated that it and the PSA Creditors "**continue to negotiate** in an effort to enable Puerto Rico to exit the Title III bankruptcy proceedings as soon as

---

[18] *Objection of Financial Oversight and Management Board for Puerto Rico to Urgent Motion of Official Committee of Unsecured Creditors to Lift Stay to Allow Committee to Pursue Objection to GO Priority* ¶ 6 [Docket No. 14141].

[19] *Id.* ¶ 27.

[20] *Status Report of Financial Oversight and Management Board for Puerto Rico Regarding COVID-19 Pandemic and Proposed Disclosure Statement Schedule* ¶ 15 [Docket No. 14195] (emphasis added).

[21] Sept. 16, 2020 Hr'g Tr. at 73:17-20; 74:3-5 (emphases added).

[22] *Status Report of the Government Parties Regarding the Covid-19 Pandemic and the 9019 Motion* ¶ 13 [Docket No. 14410].

8

> reasonably possible with an agreement to restructure Puerto Rico's debt to a sustainable level."[23]

13. Importantly, the Court relied on these statements in denying the Committee's Lift Stay Motion and the Reconsideration Motion. First, in denying the Committee's Lift Stay Motion, at the September 16, 2020 hearing, the Court rejected the Committee's position that the plan settlement was "long gone," reasoning that "**the Oversight Board has proffered that the relevant parties are engaged in a good faith effort to forge a revised agreement**"[24] and, further, "[t]hat **negotiations persist** refutes the notion that no modified agreement can ever be reached."[25] Moreover, in its October 5, 2020 order denying the Committee's Reconsideration Motion,[26] the Court reasoned as follows:

> Indeed, as the Oversight Board made clear in its public statement, the Oversight Board and principal creditor parties "**continue to negotiate**" and the Plan Support Agreement "has not been terminated." (Docket Entry No. 14444-3.) Given that **negotiations are still ongoing** and that the Plan Support Agreement has not been terminated, the rationale underlying the Court's Order remains undisturbed.[27]

In short, the Oversight Board's representations that negotiations were ongoing formed the foundation for this Court's decisions to bar the Committee from pursuing the GO Priority Objection.

14. Since then, the Oversight Board has continued to assert that negotiations are ongoing. For example, on October 6, 2020, the Oversight Board stated that:

---

[23] Reconsideration Mot. Ex. 2, Statement of the Financial Oversight and Management Board for Puerto Rico, dated Sept. 30, 2020, at 1.

[24] Sept. 16, 2020 Hr'g Tr. at 80:9-12 (emphasis added).

[25] *Id.* at 80:14-15 (emphasis added).

[26] *Order Denying Motion, Under Federal Rule of Bankruptcy Procedure 9023, of Official Committee of Unsecured Creditors for Reconsideration of September 17, 2020 Order Denying Motion to Lift Stay to Allow Committee to Pursue Priority Objection to GO Bond Claims* [Docket No. 14452].

[27] *Id.* at 2.

9

> While certain parties have asserted that recent disclosures by the Oversight Board concerning **ongoing negotiations with parties to the Amended PSA raise the specter that the Amended PSA is not "alive," such notion is misplaced** and the parties seek to address the effects of the COVID-19 pandemic in a manner contemplated by the Amended PSA and no party has sought to terminate the Amended PSA.[28]

Moreover, the Oversight Board notes in its objection to the PSA Creditors' Motion that since September 9, 2020 "the Oversight Board and parties to the Plan Support Agreement continued mediation over revised terms to a plan of adjustment."[29]

15. In contrast to the foregoing, the PSA Creditors' Motion paints a very different picture, suggesting that negotiations between the PSA Creditors and the Oversight Board are at an impasse and, apparently, have been so for the last six weeks. Among other things, the Motion states that "[f]rom and after August 24, 2020, the [Oversight Board] did not respond to the PSA Creditors' counterproposal."[30] Indeed, it is questionable how the very existence of the Motion—which seeks entry of an order forcing the Oversight Board to file a plan or confirm its intention to prosecute the current plan at the threat of dismissal of these cases—is consistent with ongoing positive negotiations between the Oversight Board and the GO/PBA bondholders.

16. The Committee also notes that the Oversight Board's statements at the September 16, 2020 hearing raise questions that need to be addressed regarding the actions (or lack thereof) of the PSA Creditors. Representatives of the PSA Creditors were present at the September 16, 2020 hearing and listened to the Oversight Board's statements that negotiations were ongoing and that parties were at the negotiation table and, thus, that the Committee should not be allowed

---

[28] *Objection of Financial Oversight and Management Board for Puerto Rico to Motion of Ambac Assurance Corporation to Strike Certain Provisions of the Amended Plan Support Agreement by and Among the Financial Oversight and Management Board for Puerto Rico, Certain GO Holders, and Certain PBA Holders* ¶ 21 [Docket No. 14460] (emphasis added).

[29] Oversight Bd.'s Obj. ¶ 22.

[30] Mot. ¶ 24. As discussed in the Reconsideration Motion, the PSA Creditors' August 24 Counterproposal was far apart (to the tune of $3 billion) from the Oversight Board's July 30 Proposal with respect to the amount of proposed GO bondholder consideration.

10

to proceed with its GO Priority Objection.[31] Regardless, none of the PSA Creditors' representatives spoke up to correct or clarify these statements, though only a few weeks later they would file a motion demanding the imposition of plan deadlines, including because the Oversight Board has failed to respond to the August 24 Counterproposal.

17. In light of the statements made to the Court and the public, the Committee believes that the Oversight Board and the PSA Creditors need to address how those statements are consistent with the state of affairs reflected in the Motion. In particular, the Oversight Board should address the following questions:

(a) Is the PSA Creditors' statement that the Oversight Board has not responded to the August 24 Counterproposal accurate? If not, on what date did it respond?

(b) At the time of the September 16, 2020 hearing, when was the last time that the Oversight Board and the PSA Creditors had exchanged proposals?

(c) At the time of the September 30, 2020 public statement, when was the last time that the Oversight Board and the PSA Creditors had exchanged proposals?

(d) At the September 16, 2020 hearing, when counsel to the Oversight Board represented that mediation was "ongoing" and that the PSA Creditors and Oversight Board were "at the table," were these statements accurate? If so, how can these statements be reconciled with the Motion?

(e) In its September 30, 2020 public statement, when the Oversight Board represented that the PSA Creditors and the Oversight Board "continued to negotiate," was that statement accurate? If so, how can that statement be reconciled with the Motion?

(f) When did the Oversight Board and/or its counsel first learn that the PSA Creditors were considering the filing of the Motion?

18. In addition, the PSA Creditors should address the following questions:

---

[31] Of course, these statements by the Oversight Board were beneficial to the PSA Creditors because they did not want the Committee to go forward with its GO Priority Objection.

11

    (a)    Were there any communications between the PSA Creditors and the Oversight Board regarding the filing of the Motion prior to its filing? If so, when?

    (b)    When the PSA Creditors and/or their representatives heard the representations of the counsel to the Oversight Board at the September 16, 2020 hearing regarding the status of negotiations, did they believe these representations were completely accurate?

    (c)    If the PSA Creditors and/or their representatives did not believe that the representations of the counsel to the Oversight Board at the September 16, 2020 hearing were completely accurate, why did the PSA Creditors and/or their representatives not challenge, correct, qualify, or respond to such comments during the hearing?

## **CONCLUSION**

19.    Based on the foregoing, the Court should deny the PSA Creditors' Motion.

[*Remainder of page intentionally left blank.*]

WHEREFORE, the Committee respectfully requests that the Court deny the Motion.

Dated: October 14, 2020

By: /s/ Luc A. Despins

PAUL HASTINGS LLP
Luc A. Despins, Esq. *(Pro Hac Vice)*
Nicholas A. Bassett, Esq. *(Pro Hac Vice)*
G. Alexander Bongartz, Esq. *(Pro Hac Vice)*
200 Park Avenue
New York, New York 10166
Telephone: (212) 318-6000
lucdespins@paulhastings.com
nicholasbassett@paulhastings.com
alexbongartz@paulhastings.com

*Counsel to the Official Committee of Unsecured Creditors*

By: /s/ Juan J. Casillas Ayala

CASILLAS, SANTIAGO & TORRES LLC
Juan J. Casillas Ayala, Esq. (USDC - PR 218312)
Israel Fernández Rodríguez, Esq. (USDC - PR 225004)
Juan C. Nieves González, Esq. (USDC - PR 231707)
Cristina B. Fernández Niggemann, Esq. (USDC - PR 306008)
PO Box 195075
San Juan, Puerto Rico 00919-5075
Telephone: (787) 523-3434 Fax: (787) 523-3433
jcasillas@cstlawpr.com
ifernandez@cstlawpr.com
jnieves@cstlawpr.com
cfernandez@cstlawpr.com

*Local Counsel to the Official Committee of Unsecured Creditors*