UNITED STATES DISTRICT COURT
DISTRICT OF PUERTO RICO

-----------------------------------------------------------x

| | |
|---|---|
| In re: | PROMESA<br>Title III |
| THE FINANCIAL OVERSIGHT AND<br>MANAGEMENT BOARD FOR PUERTO<br>RICO, | |
| as representative of | No. 17 BK 3283-LTS |
| THE COMMONWEALTH OF PUERTO RICO<br>et al., | (Jointly Administered) |
| Debtors.[1] | |

-----------------------------------------------------------x

| | |
|---|---|
| In re: | PROMESA<br>Title III |
| THE FINANCIAL OVERSIGHT AND<br>MANAGEMENT BOARD FOR PUERTO<br>RICO, | |
| as representative of | No. 17 BK 4780-LTS |
| PUERTO RICO ELECTRIC POWER<br>AUTHORITY, | |
| Debtor. | |

-----------------------------------------------------------x

---

[1]  The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (the "Commonwealth") (Bankruptcy Case No. 17-BK-3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17-BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

MEMORANDUM OPINION GRANTING IN PART AND DENYING IN PART PREPA'S
MOTION FOR ENTRY OF AN ORDER ALLOWING ADMINISTRATIVE EXPENSE CLAIM FOR
COMPENSATION FOR FRONT-END TRANSITION SERVICES UNDER THE PUERTO RICO TRANSMISSION
AND DISTRIBUTION SYSTEM OPERATION AND MAINTENANCE AGREEMENT WITH LUMA ENERGY

Before the Court is *PREPA's Motion for Entry of an Order Allowing*

*Administrative Expense Claim for Compensation for Front-End Transition Services Under*

*Puerto Rico Transmission and Distribution System Operation and Maintenance Agreement with*

*LUMA Energy* (Docket Entry No. 2053 in Case No. 17-4780 and Docket Entry No. 13583 in

Case No. 17-3283, the "Administrative Expense Motion" or the "Motion").[2]  The Puerto Rico

Electric Power Authority ("PREPA"), the Financial Oversight and Management Board for Puerto

Rico (the "Oversight Board"), and the Puerto Rico Fiscal Agency and Financial Advisory

Authority ("AAFAF" and, collectively with PREPA and the Oversight Board, the "Government

Parties"), seek an order allowing an administrative expense claim pursuant to Section 503 of the

Bankruptcy Code, 11 U.S.C. § 503,[3] in favor of LUMA Energy, LLC ("ManagementCo") and

LUMA Energy ServCo, LLC (together with ManagementCo, "LUMA Energy" or the

"Operator") for certain payments that are due, or will become due, from PREPA under the

Puerto Rico Transmission and Distribution System Operation and Maintenance Agreement,

dated June 22, 2020, entered into by and among PREPA, the Puerto Rico Public-Private

Partnerships Authority (the "P3 Authority"), and LUMA Energy, as supplemented.  (See

*Declaration of Omar J. Marrero in Support of PREPA's Motion for Entry of an Order Allowing*

*Administrative Expense Claim for Compensation for Front-End Transition Services Under*

---

[2]   All docket entry references herein are to entries in Case No. 17-4780, unless otherwise
specified.

[3]   Section 503 of the Bankruptcy Code is made applicable in these Title III cases by section
301(a) of the Puerto Rico Oversight, Management, and Economic Stability Act
("PROMESA").  See 48 U.S.C. § 2161(a).

*Puerto Rico Transmission and Distribution System Operation and Maintenance Agreement with*

*LUMA Energy*, Docket Entry No. 2053-2 (the "Marrero Declaration"), Ex. B (the "T&D

Contract").)  The Court has subject matter jurisdiction of this contested matter pursuant to 48

U.S.C. § 2166(a).

The Court has considered carefully all of the arguments and submissions[4] made in

connection with the Administrative Expense Motion, including the arguments presented during

---

[4]     In addition to the Administrative Expense Motion and accompanying materials, the Court
has reviewed thoroughly *UTIER and SREAEE's Objection to PREPA's Motion for Entry
of an Order Allowing Administrative Expense Claim for Compensation for Front-End
Transition Services Under Puerto Rico Transmission and Distribution System Operation
and Maintenance Agreement with LUMA Energy at Docket No. 2053* (Docket Entry No.
2128, the "UTIER Objection"); the *Limited Preliminary Objection of Official Committee
of Unsecured Creditors to PREPA's Motion for Entry of an Order Allowing
Administrative Expense Claim for Compensation for Front-End Transition Services
Under Puerto Rico Transmission and Distribution System Operation and Maintenance
Agreement with LUMA Energy* (Docket Entry No. 2132, the "UCC Objection"); the
*Objection of the Fuel Line Lenders to LUMA Energy Administrative Expense Motion*
(Docket Entry No. 2133, the "FLL Objection"); *Cobra Acquisitions LLC's Objection to
PREPA's Motion for Entry of an Order Allowing Administrative Expense Claim for
Compensation for Front-End Transition Services Under Puerto Rico Transmission and
Distribution System Operation and Maintenance Agreement with LUMA Energy* (Docket
Entry No. 2134, the "Cobra Objection"); the *Limited Objection of Whitefish Energy
Holdings, LLC to PREPA's Motion for Entry of an Order Allowing Administrative
Expense Claim for Compensation for Front-End Transition Services Under Puerto Rico
Transmission and Distribution System Operation and Maintenance Agreement with
LUMA Energy* (Docket Entry No. 2138, the "Whitefish Objection"); the *Limited Joinder
of UTIER and SREAEE to the Limited Preliminary Objection of Official Committee of
Unsecured Creditors to PREPA's Motion for Entry of an Order Allowing Administrative
Expense Claim for Compensation for Front-End Transition Services Under Puerto Rico
Transmission and Distribution System Operation and Maintenance Agreement with
LUMA Energy* (Docket Entry No. 2146); the *Omnibus Reply in Support of PREPA
Motion for Entry of Order Allowing Administrative Expense Claim for Compensation for
Front-End Transition Services Under Puerto Rico Transmission and Distribution System
Operation and Maintenance Agreement with LUMA Energy* (Docket Entry No. 2169, the
"Reply"); the *Informative Motion of Fuel Line Lenders Regarding Statement at
September 16, 2020 Omnibus Hearing* (Docket Entry No. 2200); the *Response to
Informative Motion of Fuel Line Lenders Regarding Statement at September 16, 2020
Omnibus Hearing Concerning PREPA's Administrative Expense Motion* (Docket Entry
No. 2201); the *Government Parties' Informative Motion in Connection with LUMA*

---

the September 16, 2020, Omnibus Hearing.  For the following reasons, the Administrative

Expense Motion is granted in part and denied in part.

BACKGROUND

The material facts set forth herein are drawn from the Government Parties'

submissions in support of the Administrative Expense Motion and are undisputed, unless

otherwise indicated.

PREPA filed a petition for relief pursuant to Title III of PROMESA on July 2,

2017.  (Mot. ¶ 11.)  On June 21, 2018, Puerto Rico enacted the "Puerto Rico Electric Power

System Transformation Act," Act No. 120-2018 (as amended, "Act No. 120-2018") which, inter

alia, authorized a transaction under which a private manager would assume operation and

management of PREPA's Transmission and Distribution System (the "T&D System"), while

ownership of the T&D System would remain with PREPA.  (Id. ¶ 16.)  Act No. 120-2018 further

established procedures in connection with the process for obtaining bids from potential private

managers.  (Id.)

Section 5 of Act No. 120-2018 designates the P3 Authority as the Commonwealth

government entity responsible for facilitating public-private partnerships in the electric sector.

---

*Administrative Expense Motion* (Docket Entry No. 2237); and the *Opposing Parties'
Response to Government Parties' Informative Motion in Connection with LUMA
Administrative Expense Motion* (Docket Entry No. 2239, the "UTIER Supplemental
Response").  In light of the September 11, 2020, *Order* entered by the Honorable Judith
Gail Dein (see Docket Entry No. 2190), the Court has not considered the *Joinder to
UTIER and SREAEE's Objection (Docket No. 2128) to PREPA's Motion for Entry of an
Order Allowing Administrative Expense Claim for Compensation for Front-End
Transition Services Under Puerto Rico Transmission and Distribution System Operation
and Maintenance Agreement with LUMA Energy at Docket No. 2053* (Docket Entry No.
2130) in connection with its determination of the Motion.

(Id. ¶ 17 (citing Act No. 120-2018 § 5(a)).)  Pursuant to section 5 of Act No. 120-2018, the P3

Authority established a "Partnership Committee" to oversee the bidding processes and negotiate

agreements in connection with any such partnerships.  (Id. (citing Act No. 120-2018 § 5(c)).)

On June 5, 2018, the P3 Authority, in conjunction with the Oversight Board,

commenced a competitive public bidding and selection process, in accordance with Act No. 120-

2018, for awarding a long-term contract to an operation and maintenance service provider for the

T&D System.  (Id. ¶¶ 18-21.)  Following the completion of that process on January 11, 2020, the

Partnership Committee selected a consortium comprised of ATCO Ltd. (succeeded by Canadian

Utilities Limited), Quanta Services, Inc., and Innovative Emergency Management, Inc., which

thereafter formed LUMA Energy, to serve as Operator of the T&D System.  (Id. ¶ 21.)

On January 17, 2020, the Partnership Committee approved LUMA Energy's final

proposal and a form of the T&D Contract.[5]  (Id. ¶ 23.)  On March 3, 2020, the P3 Authority

submitted that form of the T&D Contract for approval by the Oversight Board.  (Id.)  Following

its review of the submission, the Oversight Board suggested certain revisions, including a

supplement to the T&D Contract (the "Supplemental Agreement") that contemplates, if certain

conditions are not satisfied, LUMA Energy's assumption of operation and maintenance services

for a limited period prior to PREPA's emergence from Title III.  (Id. ¶ 24.)  The Oversight Board

approved the updated T&D Contract, including the Supplemental Agreement, on April 14, 2020.

(Id.)

---

[5]      The T&D Contract assumes that LUMA Energy's management of the T&D System will
commence within a certain period of time, during which a plan of adjustment for PREPA
will be confirmed.  (See T&D Contract § 4.5(q) (specifying, as a condition precedent to
commencement of the O&M Services (as defined below), that a "final plan for the
reorganization of PREPA . . . shall have been approved" by, inter alia, the Title III
Court).)

On May 18, 2020, the P3 Authority commenced an administrative proceeding before the Puerto Rico Energy Bureau ("PREB") seeking the necessary regulatory approval of the T&D Contract.  (Id. ¶ 25.)  On June 17, 2020, PREB issued a *Resolution and Order (Energy Compliance Certificate)* approving the T&D Contract, as required by the terms of the T&D Contract.  (Id.; see Docket Entry No. 2128-5, the "Energy Compliance Certificate.")[6]  On June 22, 2020, both the Commonwealth Government and PREPA, through its Governing Board, approved the T&D Contract.  (Mot. ¶ 26.)  PREPA, the P3 Authority, and LUMA Energy thereafter executed the T&D Contract on the same date.  (Id.)

Under the T&D Contract's terms, LUMA Energy will assume responsibility for management and operation of the T&D System, performing services with respect to "electric transmission, distribution and load serving, long-term planning, dispatch, asset management, community and media relations, public and employee safety, billing and collection, reporting and record keeping, finance and accounting, emergency response, and customer service, among others" (collectively, the "O&M Services").  (Id. ¶ 27 (citing T&D Contract § 5.1 and Annex I).)

---

[6]     Unión de Trabajadores de la Industria Eléctrica y Riego, Inc. ("UTIER"), Sistema de Retiro de los Empleados de la Autoridad de Energía Eléctrica (together with UTIER, the "Union Entities"), and a group of environmental advocacy organizations moved to intervene in the PREB administrative proceedings and for reconsideration of PREB's issuance of the Energy Compliance Certificate.  (See UTIER Obj. ¶ 23; Docket Entry Nos. 2128-2, 2128-3, 2128-4.)  PREB denied UTIER's petition for intervention on June 18, 2020, and, as of the date of this Memorandum Opinion, the motions for reconsideration and the other petitions for intervention remain pending before PREB.  (See generally In re Certificate of Energy Compliance, Case No.: NEPR-AP-2020-0002 (P.R. Pub. Serv. Reg. Bd.) (electronic docket available at https://energia.pr.gov/numero_orden/nepr-ap-2020-0002/) (last visited October 19, 2020).  UTIER also filed an appeal of PREB's decisions to the Puerto Rico Court of Appeals and an emergency motion to stay the effects of the Energy Compliance Certificate pending its appeal.  The emergency motion was denied by the Court of Appeals on July 3, 2020 (see Docket Entry No. 2186-1), and UTIER's appeal was subsequently dismissed for lack of jurisdiction on September 28, 2020 (see Docket Entry No. 2237-2).

The Government Parties represent that "[t]he role of LUMA Energy is strategically important given its proven experience and capacity to manage large federally-funded projects as well as its associated project management capacity needed to execute important reconstruction work on the island's grid."  (Mot. ¶ 28 (citing Marrero Decl. ¶ 14).)  The Government Parties further assert that the O&M Services "should benefit PREPA and its customers by putting PREPA's power grid on a path to become a more modern, sustainable, reliable, efficient, cost-effective, and resilient T&D System."  (Mot. ¶ 29 (citing Marrero Decl. ¶¶ 9-16).)

The T&D Contract contemplates a "Front-End Transition Period" prior to commencement of the O&M Services (see T&D Contract §§ 1.1, 4.1), during which ManagementCo will perform "Front-End Transition Services," including

> (i) mobilization of the LUMA Energy transition team, (ii) transition of management, (iii) employee hiring and establishment of benefit plans for employees of LUMA Energy, (iv) information technology transition and development, (v) development of a system remediation plan and initial operating and capital budgets, (vi) preparation to take over customer services and billing and other financial management functions, (vii) preparation for management of federal funding, (viii) increasing emergency response preparedness, and (ix) assessment of the chain of supply for fuel and power.

(Mot. ¶ 31; see also T&D Contract § 1.1 and Annex II.)  The Government Parties assert that the Front-End Transition Services "are an essential prerequisite to LUMA Energy's ability to assume full control over the operation and maintenance of the T&D System and PREPA gaining the full benefits the Government Parties expect to achieve under the T&D Contract."  (Mot. ¶ 31 (citing T&D Contract, Annex II; Marrero Decl. ¶¶ 17-21).)  Moreover, the Government Parties proffer their determination that PREPA will, prior to LUMA Energy's commencement of the O&M Services, "realize significant benefits from the Front-End Transition Services, including: (i) locating inefficiencies in the T&D System; (ii) identifying and implementing non-personnel

related cost-saving measures; (iii) preparing for management of federal funding; (iv) assessing and improving the chain of supply for fuel and power; [and] (v) supporting privatization efforts regarding PREPA's generation assets."  (Id. (citing Marrero Decl. ¶ 22).)  The Front-End Transition Period, which LUMA Energy estimates will last approximately one year, began when the T&D Contract was executed on June 22, 2020.  (See Mot. ¶ 35 (citing Marrero Decl. ¶ 19).)

Section 4.6 of the T&D Contract requires PREPA to pay ManagementCo a "Front-End Transition Service Fee" comprised of (i) the specified hourly rate for each employee of ManagementCo (and its affiliates) providing Front-End Transition Services, multiplied by the number of hours worked by each such employee in providing Front-End Transition Services; plus (ii) a fixed fee in the amount of $60 million (the "Fixed Fee"), payable in twelve monthly installments of $5 million starting at the commencement of the Front-End Transition Period; plus (iii) "all other reasonable and documented costs and expenses incurred by ManagementCo (without markup for profit) that are necessary and reasonable in the course of providing the Front-End Transition Services" and satisfying certain conditions precedent to LUMA Energy taking over the O&M Services.  (T&D Contract § 4.6(b).)  Section 4.6 also requires PREPA to fund 4.5 months of the Front-End Transition Service Fee into a designated account upon commencement of the Front-End Transition Period and to replenish that amount on a monthly basis to maintain the initial balance.  (Id. § 4.6(c).)  In compliance with that provision, PREPA deposited $59,374,000 into a designated account on June 22, 2020.  (Mot. ¶ 35 (citing Marrero Decl. ¶ 19).)

In addition to requiring payment of the Front-End Transition Service Fee, the T&D Contract provides that PREPA will indemnify LUMA Energy for any claims or damages arising from PREPA's operation of the T&D System.  (T&D Contract § 18.2.)  Furthermore, the

T&D Contract provides for payment during the Front-End Transition Period of (i) interest, at the Prime Rate (as defined in the T&D Contract) plus 2%, on any overdue payments (the "Late Fees") (id. § 20.7), and (ii) if the T&D Contract is terminated during the Front-End Transition Period for any reason other than as a result of LUMA Energy's acts, omissions, or breach, "any reasonable and documented costs and expenses incurred by ManagementCo (without markup for profit) that are necessary and reasonable in the course of terminating the activities undertaken in connection with the Front-End Transition Services" (id. § 4.8(b)(vi)(B)).

As relevant here, the Supplemental Agreement portion of the T&D Contract imposes a condition to commencement of the O&M Services that any confirmation order for a PREPA plan of adjustment must be "reasonably acceptable" to LUMA Energy (Supplemental Agreement § 6.1), and provides for a $115 million termination fee in favor of LUMA Energy in the event that PREPA does not obtain confirmation of a plan of adjustment within eighteen months of the Supplemental Agreement's effective date (id. §§ 7.1, 7.2).

Section 4.1(c) of the T&D Contract requires PREPA to file a motion seeking confirmation that any accrued and unpaid portion of the Front-End Transition Service Fee, as well as the additional amounts described above that PREPA must pay under the T&D Contract during the Front-End Transition Period (referred to collectively in the Motion and herein as the "Front-End Transition Obligations"), will receive administrative expense treatment in PREPA's Title III case:

> No later than ten (10) Business Days after the [T&D Contract is executed, PREPA] shall file a motion with the Title III Court seeking administrative expense treatment for any accrued and unpaid amounts required to be paid by [PREPA] under [the T&D Contract] during the Front-End Transition Period, including the Front-End Transition Service Fee.

(T&D Contract § 4.1(c)(i).)  Section 4.1(c) further provides that ManagementCo may terminate

the T&D Contract upon 30 days' notice if such motion has not been approved by this Court on or

before a date that is 90 days after its filing, subject to a 45-day extension by the P3 Authority in

its sole discretion, or such later date as ManagementCo and the P3 Authority agree.  (Id.

§ 4.1(c)(ii).)

   PREPA filed the Administrative Expense Motion, in accordance with section

4.1(c)(i) of the T&D Contract, on July 7, 2020.  Several creditors and creditor constituencies

(collectively, the "Objecting Parties")[7] have opposed the Motion on various grounds.


DISCUSSION

   Section 503 of the Bankruptcy Code provides, in relevant part, that "(a) [a]n

entity may . . . file a request for payment of an administrative expense" and, "(b) [a]fter notice

and a hearing, there shall be allowed administrative expenses . . . including—(1)(A) the actual,

necessary costs and expenses of preserving the estate[.]"  11 U.S.C.A. § 503 (Westlaw through

P.L. 116-164).  Section 301(a) of PROMESA, 48 U.S.C. § 2161(a), expressly incorporates

section 507(a)(2) of the Bankruptcy Code, 11 U.S.C. § 507(a)(2), which gives priority to

administrative expenses that are allowed under section 503(b) of the Bankruptcy Code, and

section 301(c)(5) of PROMESA provides that "[t]he term 'property of the estate', when used in a

section of [the Bankruptcy Code] made applicable in a case under this subchapter by subsection

---

[7]  The Objecting Parties are (i) the Union Entities; (ii) the Official Committee of Unsecured
Creditors (the "UCC"); (iii) Cortland Capital Market Services LLC, as successor
administrative agent under a Credit Agreement, dated May 4, 2012, among PREPA,
Scotiabank de Puerto Rico and certain lenders (collectively, the "Fuel Line Lenders");
(iv) Cobra Acquisitions LLC ("Cobra"); and (v) Whitefish Energy Holdings, LLC
("Whitefish").

(a), means property of the debtor."  48 U.S.C.A. § 2161(c)(5) (Westlaw through P.L. 116-164).

In the First Circuit, "a request for priority payment of an administrative expense pursuant to

Bankruptcy Code § 503(a) may qualify if (1) the right to payment arose from a postpetition

transaction with the debtor estate, rather than from a prepetition transaction with the debtor, and

(2) the consideration supporting the right to payment was beneficial to the estate of the debtor."

Woburn Assocs. v. Kahn (In re Hemingway Transp., Inc.), 954 F.2d 1, 5 (1st Cir. 1992)

(citations omitted).  "The burden of proving entitlement to priority payment as an administrative

expense . . . rests with the party requesting it" id. (citations omitted), and the Court has broad

discretion in determining whether to grant a request for such priority treatment, see In re

Jeans.com, 491 B.R. 16, 23 (Bankr. D.P.R. 2013) (citation omitted).

       The Government Parties contend that the Front-End Transition Obligations

qualify as actual and necessary costs of preserving the estate under section 503(b)(1)(A) because

the Front-End Transition Services will be performed after PREPA's Title III petition date and

will benefit PREPA and its customers.  (See Mot. ¶¶ 38-41.)  Additionally, citing In re Craig

County Hospital Authority, 572 B.R. 340 (Bankr. N.D. Okla. 2017), a decision under Chapter 9

of the Bankruptcy Code, the Government Parties assert that the Front-End Transition Obligations

are entitled to administrative expense priority under Title III, because (i) the relevant services are

actual and necessary to preserve the operations of the debtor, and (ii) the debtor consents to

administrative expense treatment of the claim.  (See Mot. ¶¶ 42-43.)  In their Reply, the

Government Parties also argue that the Court can grant the relief requested in the Motion

pursuant to sections 503(b) and 105(a)[8] of the Bankruptcy Code, both of which are made

---

[8]     Section 105(a) empowers the Court to "issue any order, process, or judgment that is
necessary or appropriate to carry out the provisions of" the Bankruptcy Code.  11
U.S.C.A. § 105 (Westlaw through P.L. 116-164).

applicable in this case by section 301(a) of PROMESA, because the list of allowable

administrative expense categories in section 503(b) is not exclusive and the Court has the

authority to allow types of administrative expenses that are not expressly listed in the statute to

carry out the purposes of Title III.  (Reply ¶ 23.)

By and large, each of the Objecting Parties opposes the Administrative Expense

Motion on separate, independent bases, though several of their arguments overlap.  The Union

Entities challenge the Motion as unripe and argue that there is no administrative expense priority

for necessary costs and expenses of preserving the estate in Title III because there is no concept

of an "estate" in PROMESA.  They assert, in the alternative, that the Motion fails to satisfy the

applicable standard for administrative expense priority and that section 201(B)(1) of PROMESA

forecloses the relief sought in the Motion.  The Fuel Line Lenders likewise maintain that section

503(b)(1)(A) does not authorize administrative expense treatment for a Title III debtor's

operating expenses.  In the UCC Objection, which the Union Entities have partially joined, the

UCC takes issue with several specific provisions of the T&D Contract and the Supplemental

Agreement.  Finally, both Cobra and Whitefish maintain that the Court should account for the

interests of PREPA's other post-petition creditors in evaluating the Administrative Expense

Motion.[9]  The Court addresses the Objecting Parties' arguments in turn below.

A.  Ripeness of the Administrative Expense Motion

The Union Entities contend that the Motion is not ripe for adjudication because

PREB's issuance of the Energy Compliance Certificate in connection with the T&D Contract is

being challenged by the Union Entities and other parties through motions for reconsideration

---

[9]      Several Objecting Parties sought discovery in connection with the Administrative
Expense Motion.  All such requests were denied by Judge Dein in her August 13, 2020,
*Order on Discovery* (Docket Entry No. 2140).

before PREB, and before the courts of Puerto Rico.  (See UTIER Obj. ¶ 14; UTIER Supp. Resp.)

Consideration of the Motion at this juncture would be premature, the Union Entities argue,

because issuance of a valid Energy Compliance Certificate is a condition to the effectiveness of

the T&D Contract (see T&D Contract § 2.2(b)(i)) and a requirement under Puerto Rico law (22

L.P.R.A. § 1115), and until the pending challenges are fully resolved it is uncertain whether the

T&D Contract will remain viable.  (See UTIER Obj. ¶¶ 14-15.)  The Union Entities thus

conclude that the Motion requests an impermissible advisory opinion and the Court lacks

jurisdiction of the Motion.

Ripeness "has roots in both the Article III case or controversy requirement and in

prudential considerations."  Reddy v. Foster, 845 F.3d 493, 500 (1st Cir. 2017) (internal

quotation marks and citation omitted).  The doctrine "seeks to prevent the adjudication of claims

relating to contingent future events that may not occur as anticipated, or indeed may not occur at

all."  Id. (internal quotation marks and citation omitted).  "[A] claim is ripe only if the party

bringing suit can show both that the issues raised are fit for judicial decision at the time the suit

is filed and that the party bringing suit will suffer hardship if 'court consideration' is withheld."

Labor Relations Div. of Constr. Indus. of Mass., Inc. v. Healey, 844 F.3d 318, 326 (1st Cir.

2016) (citation omitted).  "The burden to prove ripeness is on the party seeking jurisdiction."  Id.

(citation omitted).

Here, the Government Parties have met their burden of showing that the issues

presented to the Court through their Motion are currently fit for adjudication notwithstanding the

pending challenges to PREB's decision to issue an Energy Compliance Certificate.  The

Government Parties have demonstrated that they would suffer hardship if the Motion were either

denied without prejudice or adjourned.  It is undisputed that the T&D Contract has been

approved under Puerto Rico law, that an Energy Compliance Certificate satisfying the contractual and legal requirements identified by the Union Entities was issued by PREB on June 17, 2020, that the Front-End Transition Period has commenced, and that LUMA Energy is performing its obligations under the T&D Contract.  Because the T&D Contract is currently in effect and the Government Parties were contractually obligated to file the Motion promptly after execution of the agreement, the relief sought in the Motion—namely, a determination that certain of LUMA Energy's fees are entitled to administrative expense priority—does not rest on any contingent future event.  Indeed, the Motion seeks relief with respect to services that are currently being performed as well as such services to be performed and for which compensation will properly be payable under the remainder of the T&D Contract period.  While it is possible that PREB's decision could be reversed at a later date, that contingency does not render unripe a request for administrative expense priority treatment for amounts that are currently accruing and payable under an operative contract.  PREPA, moreover, would be harmed if the Motion were not adjudicated now, because such delay would trigger LUMA Energy's right to terminate the T&D Contract, which, if exercised, would indisputably hinder the transformation of PREPA's T&D System—a transformation process that is mandated by Commonwealth law.  Accordingly, the Court has subject matter jurisdiction of the Motion, and the Motion is currently ripe for review.

  B. <u>Availability of Administrative Expense Priority for Operating Expenses in Title III</u>

    The Union Entities and the Fuel Line Lenders argue that the Motion must be denied because there is no "estate" under PROMESA and, as a result, there can be no "necessary costs and expenses of preserving the estate" within the meaning of section 503(b)(1)(A) of the Bankruptcy Code.  (<u>See</u> UTIER Obj. ¶ 25; FLL Obj. ¶ 4.)  In support of their theory, the Union

Entities and the Fuel Line Lenders rely principally on In re New York City Off-Track Betting
Corp., 434 B.R. 131 (Bankr. S.D.N.Y. 2010), and bankruptcy treatises cited therein.  In Off-
Track Betting, which involved creditors' applications for immediate payment of certain fees over
the municipal debtor entity's objection, the court concluded that, "[b]ecause a chapter 9 debtor's
property remains its own and does not inure into a bankruptcy estate as provided by section 541
of the Bankruptcy Code, there can be no administrative expenses for 'the actual and necessary
costs of preserving the estate' as contemplated by section 503(b)(1)(A) of the Bankruptcy Code."
Id. at 142.  The Fuel Line Lenders also cite the First Circuit's observation in Gracia-Gracia v.
Financial Oversight & Management Board for Puerto Rico (In re Financial Oversight &
Management Board for Puerto Rico), 939 F.3d 340, 349 (1st Cir. 2019), that there is no "estate"
in the PROMESA context.  (See FLL Obj. ¶¶ 6-7.)  The Fuel Line Lenders note that, although
PROMESA incorporates section 503 in its entirety, section 503 contains other subsections that
would never apply under PROMESA, and argue that the statutory text and context preclude the
applicability of section 503(b)(1)(A) under PROMESA.  (See id. ¶ 13.)  The Fuel Line Lenders
also cite decisions in the chapter 9 context in which courts have determined that particular
Bankruptcy Code provisions referring to a debtor's "estate" are inapplicable in Chapter 9 which,
like PROMESA, does not incorporate the Bankruptcy Code provision, section 541, that defines
"estate" and "property of the estate."  (See id. ¶ 12 (citing City of Cent. Falls v. Cent. Falls
Teachers' Union (In re Cent. Falls), 468 B.R. 36, 50 (Bankr. D.R.I. 2012); In re Lake Lotawana
Community Improvement Dist., No. 10-44629-can9, 2017 WL 1968282, at *2 (W.D. Mo. May
11, 2017)).)

   This Court is, however, persuaded that the text and structure of PROMESA
compel the conclusion that operating expenses of PREPA are eligible for administrative expense

priority under section 503(b)(1)(A) of the Bankruptcy Code.  To begin with, section 301(a) of

PROMESA incorporates section 503 of the Bankruptcy Code in its entirety into Title III.

Congress's decision to carve out specific subsections of other incorporated Bankruptcy Code

provisions, while incorporating section 503 in its entirety, provides a strong indication that

Congress did not intend to preclude the applicability of section 503(b)(1)(A) in the Title III

context.  See, e.g., 48 U.S.C.A. § 2161(a) (Westlaw through P.L. 116-164) (incorporating into

PROMESA, inter alia, sections "1123(a)(1), 1123(a)(2), 1123(a)(3), 1123(a)(4), 1123(a)(5),

1123(b), [and] 1123(d)" of the Bankruptcy Code).  Particularly in light of PROMESA section

301(c)(5), which directs that Bankruptcy Code references to property of the estate be read as

references to property of the debtor, a reading of section 503(b)(1)(A) as entirely inapplicable in

Title III would defy the plain text of section 301(a), which states that the Bankruptcy Code

provisions enumerated therein "apply in a case under" Title III.  Id.; see Maine People's All. and

Nat. Res. Def. Council v. Mallinckrodt, Inc., 471 F.3d 277, 290 (1st Cir. 2006) ("[C]ourts should

strive to interpret statutes as a whole and to give effect to every word and phrase." (citations

omitted)).  Section 301(c)(5) of PROMESA dovetails with and gives relevant meaning to section

503(b)(1)(A) by providing that the term "property of the estate," when used in an incorporated

provision of the Bankruptcy Code, means property of the debtor.  48 U.S.C. § 2161(c)(5).

Indeed, although section 541 of the Bankruptcy Code, which is titled "Property of the estate," is

excluded from PROMESA, its definition of the term estate as meaning the subset of a debtor's

property that is the subject of proceedings under the Bankruptcy Code suggests that there is no

conceptual basis for excluding expenses relating to the preservation of property of a debtor in

Title III debt adjustment proceedings from treatment as administrative expenses.  See 11

U.S.C.A. § 541(a)(1) (Westlaw through P.L. 116-164) ("The commencement of a case under

section 301, 302, or 303 of this title creates an estate.  Such estate is comprised of all the

following property . . . [including, with exceptions not relevant here,] all legal or equitable

interests of the debtor in property as of the commencement of the case.").  In Bankruptcy Code

reorganization and Title III debt adjustment proceedings, there is a need to preserve the value of

property that is being marshaled or reorganized to benefit the entity's stakeholders and permit the

entity to emerge in a viable state.  Section 301(c)(5) of PROMESA is therefore properly read as

applying not only to incorporated provisions of the Bankruptcy Code that use the specific term

"property of the estate," but also to provisions such as section 503(b)(1)(A) that perform relevant

functions and contain the term "estate."  See, e.g., 48 U.S.C. § 2161(a) (incorporating into

PROMESA, inter alia, sections 502, 507(a)(2), and 510); 11 U.S.C.A. § 502(e)(1)(A) (Westlaw

through P.L. 116-164) (referring to a "creditor's claim against the estate"); id. § 507(a)(2)

(affording priority to "fees and charges assessed against the estate" under the statutes governing

fees and costs imposed by the federal judiciary); id. § 510(c)(2) (permitting the court to "order

that any lien securing . . . a subordinated claim be transferred to the estate").[10]

       The cases cited by the Union Entities and the Fuel Line Lenders in support of

their position are not controlling and are unpersuasive in the context of the instant Motion

practice.  Although the debtor in Off-Track Betting consented to the court's adjudication of the

administrative expense motion filed there, see 434 B.R. at 142, it did not, as the Government

Parties have done in this case, affirmatively seek allowance of the administrative expense claims

---

[10]    The narrower construction of PROMESA section 301(c)(5) endorsed by the Union
Entities and the Fuel Line Lenders which, if adopted by the Court, would nullify any
incorporated provisions of the Bankruptcy Code that contain the term "estate" but not the
term "property of the estate," finds no support in the statutory text.  Moreover, the fact
that certain other subsections of section 503 plainly cannot apply in PROMESA (see,
e.g., 11 U.S.C. § 503(b)(2)) does not preclude the Court from giving force to section
503(b)(1)(A) to the fullest extent practicable.

at issue.  Whereas "[r]espect for the sovereignty of state entities" and the limitations imposed by

section 903 of the Bankruptcy Code "strongly caution[ed] against the [c]ourt intruding upon" the

debtor's operations in Off-Track Betting, 434 B.R. at 142-43, similar concerns are not implicated

here, where both the Oversight Board and AAFAF have consented for purposes of sections 303

and 305 of PROMESA to the relief requested in the Administrative Expense Motion.  Off-Track

Betting's analysis is also unhelpful here because it neither addressed the fact that section 503 is

incorporated in full into chapter 9, nor considered the possibility that Congress intended the term

"estate" in section 503(b)(1)(A) to be replaced with the term "debtor" in the chapter 9 context in

light of section 902(1).  The Fuel Line Lenders' reliance on Gracia-Gracia is similarly misplaced,

as the First Circuit's statement that "the concept of 'the estate' has no role under PROMESA"

was made in the context of its discussion regarding the scope of the automatic stay, 939 F.3d at

349, and, in any event, it is in no way inconsistent with the notion that Congress intended the

word "estate" in incorporated provisions of the Bankruptcy Code to mean "debtor."  In re Central

Falls and In re Lake Lotawana are inapposite as well, as neither case involved provisions of the

Bankruptcy Code that were expressly incorporated by reference into chapter 9.

Accordingly, the Court concludes that section 503(b)(1)(A) of the Bankruptcy

Code, as incorporated into PROMESA, makes administrative expense priority available for the

"necessary costs and expenses of preserving" PREPA during the course of its Title III case.[11]

C.  Whether the Front-End Transition Obligations Qualify for Administrative Expense
    Priority Under Section 503(b)(1)(A) of the Bankruptcy Code

Having concluded that section 503(b)(1)(A) applies in Title III, the Court turns

---

[11]  Because the Court has determined that section 503(b)(1)(A) applies in Title III, the Court
      need not address, and expresses no opinion regarding, the Government Parties'
      alternative theories as to why the Front-End Transition Obligations are eligible for
      administrative expense priority treatment.

next to whether the Front-End Transition Obligations qualify for administrative expense priority

under the applicable standard.  As noted above, administrative expense treatment is available

under section 503(b)(1)(A) when (i) the right to payment arises post-petition, and (ii) the

consideration supporting the right to payment benefits the estate (or, in this case, PREPA).  <u>See</u>

<u>In re Hemingway Transp., Inc.</u>, 954 F.2d at 5.  In light of the restrictions on judicial authority

and the scope of PROMESA that are imposed by sections 303 and 305 of the statute, Oversight

Board and debtor consent are also relevant considerations.

   Through the Marrero Declaration, the Government Parties have provided

evidence of their determination that numerous aspects of the Front-End Transition Services will

inure to PREPA's benefit.  (<u>See</u>, <u>e.g.</u>, Marrero Decl. ¶¶ 20-21 ("The Front-End Transition

Services include mobilization of the LUMA Energy transition team, transition of management,

mobilization of employees and establishment of benefit plans for employees of LUMA Energy,

information technology transition and development, development of a system remediation plan

and initial operating and capital budgets, preparation to take over customer services and billing

and other financial management functions, preparing to manage federal funding, increasing

emergency response preparedness, and assessing the chain of supply for fuel and power . . . .

The performance of these services is an essential prerequisite to LUMA Energy's ability to

assume full control over the T&D System and the commencement of the O&M Services."); <u>id.</u>

¶ 22 ("[D]uring the Front-End Transition Period, and even before assumption of full O&M

Services, PREPA expects to realize significant benefits from the Front-End Transition Services,

including: (i) locating inefficiencies in the T&D System; (ii) identifying and implementing non-

personnel related cost-saving measures; (iii) preparing for management of federal funding; (iv)

assessing and beginning to improve the chain of supply for fuel and power; and (v) supporting

privatization efforts regarding PREPA's generation assets.").  The Court concludes that the

Government Parties' proffers are sufficient to support a determination by this Court that the

Front-End Transition Service costs that are properly incurred and payable under the T&D

Contract will benefit PREPA.  The Union Entities, which argue that PREPA cannot benefit from

the services, raise energy policy and governmental structural issues that are not pertinent to this

determination, and offer no legal support for their assertion that the Government Parties must

establish benefits of the Front-End Transition Services through expert testimony.  PROMESA

affords the Government Parties substantial discretion and autonomy in establishing government

policy, and expressly precludes the Court from interfering with such efforts.  See 48 U.S.C.

§§ 2163, 2165.  The Court thus rejects the Union Entities' argument that the Government Parties

have not sustained their burden under section 503(b)(1)(A).

Nor do the UCC's challenges to the $60 million Fixed Fee and Late Fee

components of the Front-End Transition Obligations (see UCC Obj. ¶ 10; T&D Contract §§ 4.6,

20.7) establish that such amounts cannot qualify for administrative expense status under section

503(b)(1)(A).  As the Government Parties point out, the Fixed Fee was intended as consideration

for LUMA Energy's front-end investments, including its mobilization efforts, and the

Government Parties have clarified that the "Motion only seeks an allowed administrative

expense claim for services LUMA Energy actually renders."  (Reply ¶ 34.)  That assertion is

consistent with the language of the Government Parties' proposed *Order Allowing*

*Administrative Expense Claim for Compensation for Front-End Transition Services Under the*

*Puerto Rico Transmission and Distribution System Operation and Maintenance Agreement with*

*LUMA Energy* (Docket Entry No. 2053-1), which refers to an "administrative expense claim for

any accrued and unpaid Front-End Transition Obligations incurred by PREPA under the T&D

Contract."  In support of its argument concerning Late Fees, the UCC has identified non-binding

decisions holding that certain late fees were not eligible for administrative expense status.  (See

UCC Obj. ¶ 14 (citing In re Davenport Beverage Corp., 505 B.R. 374, 381 (Bankr. D. Mass.

2014) (denying motion for administrative expense treatment of late fees accrued after lease

rejection); In re DVI, Inc., 308 B.R. 703, 708 (Bankr. D. Del. 2004) (same)).)  At least one court,

however, has considered late fees actual and necessary costs of preserving the estate under

section 503(b)(1)(A).  See In re Lenz, 90 B.R. 458, 460 (Bankr. D. Colo. 1988) (granting

allowed administrative expense claim under section 503(b)(1)(A) for homeowners' association

assessments, including late charges and interest).  The Court declines to foreclose altogether the

possibility that any Late Fees incurred in connection with the Front-End Transition Obligations

(and under the T&D Contract more generally) could qualify as administrative expenses under

section 503(b)(1)(A), although the Government Parties have failed to proffer an adequate factual

basis upon which the Court can conclude at this stage that such fees categorically constitute

actual and necessary costs of preserving PREPA.  The Motion is thus denied without prejudice

solely to the extent that it seeks an allowed administrative expense claim for any amounts that

might become due under section 20.7 of the T&D Contract as a result of PREPA's untimely

payment of any Front-End Transition Obligations.  Any renewed application must be

accompanied by a record demonstrating that any Late Fees actually incurred were reasonable and

necessary for the preservation of PREPA.

The UCC further argues that LUMA Energy's "consent rights" to PREPA's

eventual plan of adjustment under section 6.1 of the Supplemental Agreement should be limited,

and that the $115 million termination fee as currently structured should be "denied."  (See UCC

Obj. ¶¶ 4-8.)  The UCC concedes that the Supplemental Agreement is not currently before the

Court for approval, and does not explain what it seeks in urging "denial" of a contract provision that is not the subject of the Motion practice.  (See id. ¶¶ 8, 9.)  Although the UCC is correct that the provisions it challenges could theoretically prevent PREPA from receiving the full benefits contemplated by the T&D Contract, that possibility has no bearing on the only question before the Court at this juncture: whether the Front-End Transition Obligations can qualify as administrative expenses of PREPA.  Moreover, the Supplemental Agreement contemplates separate motion practice seeking administrative expense treatment for amounts that become due under the Supplemental Agreement (see Supplemental Agreement § 2.3), and the UCC can raise its concerns if and when that process is commenced.  The Court, therefore, rejects the UCC's arguments pertaining to the Supplemental Agreement as largely irrelevant to the Administrative Expense Motion.

Finally, Cobra's, Whitefish's, and UTIER's respective variations of the basic argument that the Court should focus on the interests of other creditors in evaluating the Motion (see Cobra Obj. ¶ 1; Whitefish Obj. ¶ 25; UTIER Obj. ¶ 72) are likewise unavailing.  The particular effects that granting the Motion might have on Cobra, Whitefish, UTIER, or any other individual creditor of PREPA have no bearing on whether the Front-End Transition Obligations are entitled to administrative expense priority.  As this Court has recognized previously, "[t]he goal of these PROMESA cases . . . is not merely to maximize creditors' recoveries"; instead, they "require a more holistic approach that focuses on the continuation and future of a government and its instrumentalities and their ability to meet the needs of the Commonwealth's residents as well as provide proper recompense of creditors."  In re Fin. Oversight & Mgmt. Bd. for P.R., 432 F. Supp. 3d 25, 30 (D.P.R.), aff'd, 954 F.3d 1 (1st Cir. 2020), and appeal dismissed, No. 20-1123, 2020 WL 5650418 (1st Cir. Apr. 3, 2020); (see also Discovery Order at 6 ("[T]he

purposes of the Title III proceeding are not narrowly focused on operation of the debtors for the benefit of the creditors or any particular stakeholder constituency.")).  The Court declines to entertain these Objecting Parties' attempts to litigate issues pertaining to their own claims against PREPA in the context of the instant Motion practice.

Accordingly, the Court concludes that the Government Parties have satisfied their burden of demonstrating that the Front-End Transition Obligations other than any Late Fees associated therewith (as so limited, the "Allowable Front-End Transition Obligations") are, to the extent incurred and payable under the T&D Contract, reasonable and necessary expenses of preserving PREPA under section 503(b)(1)(A).[12]  The Government Parties have, however, failed to establish on the current record that Late Fees on any unpaid Allowable Front-End Transition Obligations qualify as administrative expenses under section 503(b)(1)(A), and therefore the Motion is denied without prejudice as to such fees.

*[Remainder of page intentionally left blank]*

---

[12]    The Court rejects as impermissible under section 106(e) of PROMESA, 48 U.S.C. § 2126(e), the Union Entities' argument (see UTIER Obj. ¶¶ 73-82) that granting the relief sought in the Motion would contravene subsections 201(b)(1)(B) and 201(b)(1)(C) of PROMESA, which, respectively, require Fiscal Plans to "ensure the funding of essential public services" and "provide adequate funding for public pension systems[.]"  48 U.S.C. § 2141(b)(1)(B), (C).  See Méndez-Núñez v. Fin. Oversight & Mgmt. Bd. for P.R., (In re Fin. Oversight & Mgmt. Bd. for P.R.), 916 F.3d 98, 112 (1st Cir. 2019) ("PROMESA grants the [Oversight] Board exclusive authority to certify Fiscal Plans and Territory Budgets for Puerto Rico.  It then insulates those certification decisions from judicial review . . . .").

<u>C</u>ONCLUSION

For the foregoing reasons, the Motion is granted in part and denied in part to the extent set forth above.  The Court will enter a separate order resolving the Motion.

Dated: October 19, 2020

 /s/ Laura Taylor Swain
LAURA TAYLOR SWAIN
United States District Judge