# UNITED STATES DISTRICT COURT
## DISTRICT OF PUERTO RICO

|  |  |
|---|---|
| *In re*<br><br>THE FINANCIAL OVERSIGHT AND<br>MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*<br><br>Debtors.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |

## AMBAC ASSURANCE CORPORATION'S REPLY IN SUPPORT OF ITS MOTION TO STRIKE CERTAIN PROVISIONS OF THE AMENDED PLAN SUPPORT AGREEMENT BY AND AMONG THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, CERTAIN GO HOLDERS, AND CERTAIN PBA HOLDERS

**FERRAIUOLI LLC**

221 Ponce de León Avenue, 5th Floor
San Juan, PR 00917
Telephone: (787) 766-7000
Facsimile:  (787) 766-7001

**MILBANK LLP**

55 Hudson Yards
New York, NY 10001
Telephone: (212) 530-5770
Facsimile:  (212) 822-5770

*Attorneys for Ambac Assurance Corporation*

---

[1]   The Debtors in these Title III cases, along with each Debtor's respective Title III case number listed as a bankruptcy case number due to software limitations and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (the "Commonwealth") (Bankruptcy Case No. 17-BK-3283 (LTS)) (Last Four Digits of Federal Tax ID: 3481), (ii) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566(LTS)) (Last Four Digits of Federal Tax ID: 9686), (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567 (LTS)) (Last Four Digits of Federal Tax ID: 3808), (iv) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284 (LTS)) (Last Four Digits of Federal Tax ID: 8474), and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17-4780 (LTS)) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19 BK 5233-LTS) (Last Four Digits of Federal Tax ID: 3801).

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ................................................................................. 1

ARGUMENT ........................................................................................................... 3

I.      THE MOTION TO STRIKE IS RIPE FOR ADJUDICATION. ...........................................3

II.     THE COURT IS EMPOWERED TO GRANT THE RELIEF REQUESTED...................5

      A.     PROMESA Does Not Bar the Relief Requested. .................................... 5

      B.     The Court's Equitable Powers and Authority Over Claims Allowance
            Permit the Court to Grant the Relief Requested. ..................................... 9

      C.     The Oversight Board Is Not Entitled to Make Unreviewable, Irrevocable
            Commitments to Creditors. .................................................................. 11

III.    THE COURT SHOULD STRIKE THE IDENTIFIED PROVISIONS OF THE
       AMENDED PSA. ..........................................................................................12

      A.     The Court Should Strike the Provisions Identified in the Motion to Strike.......... 12

      B.     The Oversight Board Has No Answer for Ambac's Vote-Buying
            Arguments............................................................................................. 15

CONCLUSION........................................................................................................ 15

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Bank of Marin v. England,*
    385 U.S. 99 (1966)......................................................................................................5

*In re Adelphia Commc'ns Corp.,*
    2006 WL 1529357 (Bankr. S.D.N.Y. June 5, 2006)............................................10

*In re Crocker,*
    362 B.R. 49 (B.A.P. 1st Cir. 2007) .....................................................................10

*In re Fin. Oversight & Mgmt. Bd. for Puerto Rico,*
    2017 WL 7156236 (D.P.R. Aug. 11, 2017) ........................................................14

*In re Fin. Oversight & Mgmt. Bd. for Puerto Rico,*
    2017 WL 7156240 (D.P.R. Nov. 13, 2017) ........................................................14

*In re Ira Haupt & Co.,*
    361 F.2d 164 (2d Cir. 1966)................................................................................10

*In re Jefferson Cty., Ala.,*
    491 B.R. 277 (Bankr. N.D. Ala. 2013) ...............................................................14

*In re Triple A&R Capital Inv. Inc.,*
    519 B.R. 581 (D.P.R. Mar. 12, 2015) .................................................................14

*Méndez-Núñez v. Fin. Oversight & Mgmt. Bd. for Puerto Rico*
    *(In re Fin. Oversight & Mgmt. Bd. for Puerto Rico),*
    916 F.3d 98 (1st Cir. 2019)....................................................................................9

**Statutes**

11 U.S.C. § 105(a) ......................................................................................................9, 10

11 U.S.C. § 363.............................................................................................................6, 8

11 U.S.C. § 502(b) ..........................................................................................................11

11 U.S.C. § 903.................................................................................................................8

48 U.S.C. § 2124(g) ..........................................................................................................6

48 U.S.C. § 2126(e) ..........................................................................................................6

48 U.S.C. § 2161....................................................................................................6, 9, 11

48 U.S.C. § 2163 ..................................................................................................8, 9

48 U.S.C. § 2165 ..............................................................................................6, 7, 9

48 U.S.C. § 2172(a) ...........................................................................................15

**Other Authorities**

H.R. Rep. No. 94-686 (1975), *reprinted in* 1976 U.S.C.C.A.N. 539 ...........................................8

Ambac Assurance Corporation ("Ambac") hereby submits this reply in support of the *Motion of Ambac Assurance Corporation to Strike Certain Provisions of the Amended Plan Support Agreement by and among the Financial Oversight and Management Board for Puerto Rico, Certain GO Holders, and Certain PBA Bondholders* [ECF No. 13573] (the "Motion to Strike").[2]  In further support of the Motion to Strike, Ambac respectfully submits as follows:

## PRELIMINARY STATEMENT

1.     The Oversight Board contends that Ambac seeks relief regarding a circumstance that may never come to pass:  the termination of the Amended PSA.  Not so:  the Amended PSA is causing harm now, and will continue to cause harm regardless of whether it is terminated.  But even this contention, central to the Oversight Board's carefully-worded Opposition,[3] is belied by statements the Oversight Board has made to the Court after the Motion to Strike was filed.  It is now inescapably clear that the Oversight Board will not proceed under the Amended PSA; it has admitted that it "cannot assert [the currently proposed plan of adjustment] is feasible."[4]

2.     This recent activity only further highlights the harm flowing from the Amended PSA.  The Oversight Board has exceeded its PROMESA-granted authority:  it has purported to commit $100 million of the Commonwealth's resources (an amount that is ***double*** what the Oversight Board is now proposing to make available to ***all unsecured creditors***), without Commonwealth consent and without Court approval.  This pledge of resources is not merely a

---

[2]     Capitalized terms not defined herein have the meanings given to them in the Motion to Strike.

[3]     *Objection of Financial Oversight and Management Board for Puerto Rico to Motion of Ambac Assurance Corporation to Strike Certain Provisions of the Amended Plan Support Agreement by and among the Financial Oversight and Management Board for Puerto Rico, Certain GO Holders, and Certain PBA Bondholders* [ECF No. 14460] (the "Opposition" or "Opp.").

[4]     *Objection of Financial Oversight and Management Board for Puerto Rico to Joint Motion of PSA Creditors Pursuant to Section 312 of PROMESA and Section 105 of the Bankruptcy Code to Impose Deadlines for Plan of Adjustment* [ECF No. 14547] ("Opposition to PSA Creditors' Motion" or "Opp. to PSA Creditors' Mot.") ¶ 1.

"bad deal."  It is an act *ultra vires*.  And beyond the waste of resources it entails, the threat of the Breakup Fee alone allows the PSA Creditors[5] to continue to exact treatment from the Oversight Board more favorable than their claims merit—to the direct detriment of all other Commonwealth stakeholders—despite the Oversight Board's determination that the structure contained within the Amended PSA is no longer feasible.  The Oversight Board admits as much:  its Opposition to the PSA Creditors' Motion details, at length, the degree to which the Oversight Board has acted to advance the parochial interests of GO bondholders at the direct expense of revenue bondholders.[6]

3.     Granting the relief Ambac seeks will stem this harm.  Striking the Breakup Fee will impact plan negotiations directly, protecting creditors from unwarranted disparate treatment and enabling the Oversight Board to negotiate freely with *all* parties.  And it will benefit the Commonwealth, both by preventing the waste of its scarce resources and by respecting the reservation of its sovereign rights preserved in PROMESA.  As a Court ruling will have immediate consequences on the actions of the parties, the Motion to Strike is ripe for adjudication.

4.     Not only is the relief Ambac seeks ripe, it is within the Court's power to grant.  None of the provisions invoked by the Oversight Board bars the relief Ambac seeks.  And in arguing that the Court is not empowered to effect relief here, the Oversight Board reveals that it has far overstepped its authority:  it has arrogated to itself not only the Commonwealth's power over the use of its property, but certain of the Court's powers as well—in particular, the power to determine the allowability of administrative claims, to adjudicate the application of the automatic

---

[5]   The Ad Hoc Group of Constitutional Debtholders, Ad Hoc Group of General Obligation Bondholders, Lawful Constitutional Debt Coalition ("LCDC"), and QTCB Noteholder Group, as defined in the *Joint Motion of PSA Creditors Pursuant to Section 312 of PROMESA and Section 105 of the Bankruptcy Code to Impose Deadlines for Plan of Adjustment* [ECF No. 14478] ("PSA Creditors' Motion" or "PSA Creditors' Mot.").

[6]   *See* Opp. to PSA Creditors' Mot. ¶¶ 32-35 ("[T]he Oversight Board has initiated and defended a variety of important legal actions that have redounded to the benefit of the GO bondholders.").

stay, and to supervise the Commonwealth's restructuring process.  The Court may, and must, use its equitable powers to keep the Oversight Board operating within bounds.

5.     The Oversight Board's defense of the harmful provisions of the Amended PSA Ambac identifies falls flat.  Attempting to invoke the COFINA Title III plan support agreement as precedent for the Amended PSA, the Oversight Board fails to acknowledge that it contained *no* break-up fee.  And, tellingly, the Oversight Board offers no response to Ambac's argument that the PSA Fees constitute vote-buying.  Surely this is because it is indisputable that the PSA Fees were included precisely to induce eligible creditors to vote in favor of the Amended POA.

6.     It is clearer now than ever that in agreeing to the Amended PSA (and the Original PSA before it), the Oversight Board acted in a manner contrary to its charter.  In the Amended PSA, the Oversight Board breaches its duty to be a responsible fiduciary of the debtor it represents, harming not only the Commonwealth but the many, many stakeholders in this restructuring process.  The Court can remedy that injustice by granting the Motion to Strike.

## ARGUMENT

### I.     THE MOTION TO STRIKE IS RIPE FOR ADJUDICATION.

7.     The Oversight Board attempts to delay a ruling on the Motion to Strike by claiming that any harm the Amended PSA might cause is speculative, and that the Motion to Strike therefore is not ripe.  (*See* Opp. ¶¶ 18-21.)  This contention, already unpersuasive when argued in its Opposition, has since been negated in briefing on the PSA Creditors' Motion.

8.     In opposing that motion, which seeks to enforce the Amended PSA by imposing deadlines for hearings on the Amended Disclosure Statement and Amended POA, the Oversight Board has made unmistakably clear that it is unwilling to move forward under the Amended PSA. The Oversight Board even represents the different "paths" preferred by the Oversight Board and the PSA Creditors as mutually exclusive.  (*See* Opp. to PSA Creditors' Mot. ¶ 1.)  Critically, the

3

Oversight Board argues that the Amended PSA causes concrete harm: "the [Amended] PSA *would saddle the Commonwealth with . . . significantly more leverage than the top 25 most indebted states*." (*Id.* (emphasis added).)  The Oversight Board then unequivocally states that the Amended POA—based upon the Amended PSA—is not feasible.  (*Id.* ¶ 48 ("*[T]here is no question that the Oversight Board cannot currently claim the Current POA is feasible*[.]" (emphasis added)).)

9.      The Oversight Board is in a bind.  Either it supports a deal that it does not believe is feasible (all the while expending untold dollars in litigating it to a denial of confirmation),[7] or it terminates and triggers the Breakup Fee, as the Amended PSA, at present, allows.

10.     Even if the Amended PSA is not terminated, its continued existence—without the modifications proposed in the Motion to Strike—is causing harm now.  The threat of the Breakup Fee alone has clear consequences:  the PSA Creditors may exert undue leverage on the Oversight Board, securing a far better deal for themselves than other creditors by virtue of the $100 million sword hanging over the Oversight Board's head.  Granting Ambac the relief it seeks now would protect all of the Commonwealth's creditors—either from the waste of resources incurred in the Breakup Fee itself, or from the inequitable treatment that results from the PSA Creditors' improper advantage secured under threat of the Breakup Fee.  It would also protect the Commonwealth:  not only from a needless expenditure of its resources, but also (as discussed *infra* at II.A-B) from the Oversight Board's encroachment on powers reserved to the Commonwealth through PROMESA.

11.     Further, striking the Breakup Fee now, before a new plan and possibly a new plan support agreement are presented, prevents a precedent under which all future cooperating creditors

---

[7]     *Compare* Amended PSA § 6.1(b)(ii) (the Breakup Fee is not payable if the Court *denies confirmation* of the Amended POA, which requires litigation to confirmation) *with id.* §§ 6.1(b), 7.1(b)(vi) (the Breakup Fee is payable if the Oversight Board terminates the Amended PSA because "the economic situation of the Commonwealth suffers a material adverse change which renders the confirmation of the [Amended POA] not feasible and consummation of the Plan impracticable").

expect, as the price of their support, a generous administrative claim in the event their agreed deal falls apart. Were this to become common practice, the eventual plan of adjustment that proceeds to confirmation will be saddled with administrative claims for breach of plan support agreements that serve no restructuring purpose, and provide those once-favored creditors with a windfall.

12.    Granting the Motion to Strike will have immediate, tangible effects on the actions of the parties. It will jump-start the Oversight Board's presently-stalled plan negotiations and will enable other stakeholders to work with the Board on more equitable, alternative plan constructs. The Motion to Strike is ripe for adjudication, and the Court may and should consider it now.

## II.    THE COURT IS EMPOWERED TO GRANT THE RELIEF REQUESTED.

13.    In arguing that the Court may not review the commitments it has made in the Amended PSA, the Oversight Board reveals what it believes to be the sources of its authority for entering into the Amended PSA in the first place. Each falls apart under scrutiny. Not only is the Court empowered to review the Oversight Board's agreements in the Amended PSA, the Court's review will establish that the Oversight Board has acted well beyond its mandate.

14.    And while the Oversight Board touts its broad discretion under PROMESA, it is the Court, not the Oversight Board, that is charged with overseeing the Commonwealth's restructuring process. It is the Court that must ensure that all parties to this restructuring, including the Oversight Board, comport with the equitable principles that are the bedrock of federal bankruptcy law. *See Bank of Marin v. England*, 385 U.S. 99, 103 (1966) ("There is an overriding consideration that equitable principles govern the exercise of bankruptcy jurisdiction."). Contrary to the assertions made in the Opposition, the Court is empowered to grant the relief requested here.

### A.    PROMESA Does Not Bar the Relief Requested.

15.    The volley of various PROMESA provisions and exclusions the Oversight Board invokes in its Opposition does not foreclose the relief Ambac requests. None of the provisions the

Oversight Board identifies—PROMESA Section 104(g), PROMESA Section 305, or the absence of Bankruptcy Code Section 363—preclude the Court's adjudication of the Motion to Strike.

16.    ***Section 104(g)***.  The Oversight Board argues that this Court may not usurp its power to enter into contracts granted in PROMESA Section 104(g).  But Section 104(g) does not grant the Oversight Board power to enter into any contract it wishes, and it certainly does not insulate all commitments the Oversight Board makes from judicial review.

17.    The type of contract governed by Section 104(g) is a far cry from the incredibly substantial financial commitments of the Amended PSA.  Section 104(g) permits the Executive Director, with only the Chair's approval, to enter into contracts that are "appropriate . . . to carry out the Oversight Board's responsibilities" under PROMESA.  48 U.S.C. § 2124(g).  The limited grant of power in this section—exercised by the non-member Executive Director, with the approval of only one Board member—cannot sanitize a contract for a $100 million gratuity.

18.    Perhaps the Oversight Board confuses Section 104(g) with Section 106(e).  But unlike "certification determinations" under Section 106(e), the Oversight Board's determination to enter into a contract under Section 104(g), to the extent Section 104(g) applies here at all, is *not* expressly excepted from this Court's review.

19.    ***Section 305.***  The Oversight Board asserts, cursorily, that "because the [Amended PSA] entails use of Commonwealth property and revenues, Ambac wants the Court to override the bar of PROMESA § 305."  (Opp. ¶ 14.)  At best, this is an overly-simplistic reading of Section 305; at worst, it is an intentional misunderstanding.

20.    The reservation of territorial power contained in Section 305 distinguishes between the Oversight Board and the territory itself.  Section 301 defines "debtor" to mean "the territory or covered territorial instrumentality concerning which a case under this subchapter has been

commenced"; Section 305 provides that "unless the Oversight Board consents or the plan so provides, the court may not . . . interfere with" powers or property "of the debtor." That this section refers separately to the Oversight Board and to the "debtor" is significant.

21.   The Commonwealth states clearly that it "has . . . not consented to any term of the PSA, including the allowance of an administrative expense claim of $100 million as a 'Breakup Fee' to the PSA Creditors in the event the Oversight Board terminates the PSA or seeks to modify the proposed plan of adjustment that triggers the Breakup Fee."[8]  As the Commonwealth does not desire to use its property in the manner demanded in the Amended PSA, it is the Oversight Board, not Ambac, that misunderstands Section 305.  Far from reserving the enjoyment of property and revenues to the Commonwealth—the stated purpose of Section 305—the Oversight Board asks the Court to interpret this section as authorizing the Oversight Board to *direct* the use of Commonwealth property in a manner expressly contrary to the wishes of the Commonwealth itself.

22.   But Section 305 restricts the Court from interfering with the general sovereign rights of *the Commonwealth*, not the Oversight Board, and does not prevent the Court from overseeing the Board's restructuring activities.  In bankruptcy-related matters, the Court retains authority:  no plan of adjustment may become effective without the Court's approval.  Nothing in PROMESA gives the Oversight Board the right to bind the Commonwealth to a contract to pay $100 million when the Commonwealth does not consent to this use of its property—and certainly not Section 305, which bars interference with the *Commonwealth's* use of its own property.[9]

---

[8]   *Statement of Position of AAFAF Regarding Ambac Assurance Corporation's Motion to Strike Certain Provisions of the Amended Plan Support Agreement by and among the Financial Oversight* and *Management Board for Puerto Rico, Certain GO Holders, and Certain PBA Bondholders* [ECF No. 14465] ("AAFAF Statement") ¶ 2.

[9]   Further, Section 305 expressly empowers the Court to order relief where the Oversight Board so consents.  The Oversight Board placed the Amended PSA squarely before the Court as part of the proposed disclosure package for which it intended to seek Court approval.  (*See* Dkt. No. 11947-2

23.     ***Absence of Section 363.*** Section 363 of the Bankruptcy Code generally requires debtors to seek court approval for the use of their property.  PROMESA, like Chapter 9 of the Bankruptcy Code, omits this section for governmental debtors.  But PROMESA's exclusion of Section 363 cannot mean, and does not mean, that the Oversight Board (as the debtor's representative) is entitled to use the Commonwealth's property in any manner it pleases, all without being subject to judicial review.

24.     PROMESA, like Chapter 9, contains provisions that protect the sovereign powers of governmental debtors.  In its haste to shore up its authority to enter into the Amended PSA, the Oversight Board comes into direct conflict with PROMESA § 303, which reserves *to the Commonwealth*, not the Oversight Board, "the exercise of the political or governmental powers of the territory . . . including expenditures for such exercise."  48 U.S.C. § 2163.[10]

25.     The Oversight Board may step into the shoes of the Commonwealth only for those purposes specifically enumerated in PROMESA:  powers related to fiscal plans and budgets under Title II; the ability to develop and prosecute restructuring plans under Titles III and VI.  But the Oversight Board is not entitled to commit the Commonwealth to enormous contractual undertakings.  At the very least, it cannot justify this usurpation of governmental power by citing only *the absence* of a provision applicable to other debtors.

---

(Amended PSA as Ex. B to Amended Disclosure Statement).)  Indeed, obtaining Court approval is the only manner by which Oversight Board might bind the Commonwealth to a $100 million payment.

[10]   This provision ensures that PROMESA comports with the Tenth Amendment.  *See* H.R. Rep. No. 94-686, at 19 (1975), *reprinted in* 1976 U.S.C.C.A.N. 539, 557 (Section 83 of the Bankruptcy Act (predecessor to 11 U.S.C. § 903 and PROMESA § 303) "prevent[s] the statute or the court from interfering with the power constitutionally reserved to the State by the Tenth Amendment" and "makes it clear that the chapter may not be construed to limit or impair the power of the State").

**B.      The Court's Equitable Powers and Authority Over Claims Allowance Permit the Court to Grant the Relief Requested.**

26.      Far from preventing the relief Ambac requests, PROMESA in fact demands it.  The Oversight Board contends that it has the ability to bind the Commonwealth to a $100 million payment without Court approval and without the Commonwealth's consent.  The Oversight Board's prerogatives under PROMESA, broad though they may be, do not stretch that far.

27.      ***Equitable power to protect restructuring process***.  As detailed above, it is the Commonwealth, not the Oversight Board, that is empowered to use and enjoy its property without Court interference.  *See* 48 U.S.C. § 2165 (PROMESA § 305).  It is the Commonwealth, not the Oversight Board, to which the exercise of political and governmental powers is reserved.  *See* 48 U.S.C. § 2163 (PROMESA § 303).  Yet the Commonwealth "has . . . not consented to any term of the [Amended] PSA."  (AAFAF Statement ¶ 2.)  The Oversight Board has acted outside of its authority in committing $100 million of Commonwealth's property in the Amended PSA.

28.      The Court is empowered to order relief to correct this serious overreach.  As discussed *supra* at II.A, none of the provisions the Oversight Board invokes prevent the Court's review.  To the contrary, the Oversight Board's assertion, laid plain in its Opposition, of unreviewable authority to spend the Commonwealth's money as it chooses brings the Board into direct conflict with PROMESA Section 303.[11]  The Court's broad equitable power under Bankruptcy Code Section 105(a) (incorporated by PROMESA § 301(a)), if it means anything, must empower the Court to determine whether the Oversight Board has acted beyond its authority.

---

[11] *Cf. Méndez-Núñez v. Fin. Oversight & Mgmt. Bd. for Puerto Rico (In re Fin. Oversight & Mgmt. Bd. for Puerto Rico)*, 916 F.3d 98, 116 (1st Cir. 2019) (the Commonwealth's "power . . . to control, by legislation or otherwise, the territory" is subject to the Oversight Board's powers "to approve Fiscal Plans and Budgets," but not subject to the Oversight Board's actions generally).

29.     Abuse of authority cannot be tolerated, especially when that abuse infringes on the constitutionally-protected sovereignty of the Commonwealth, or even when it appears to do so. After all, "[t]he conduct of bankruptcy proceedings not only should be right but must seem right." *In re Ira Haupt & Co.*, 361 F.2d 164, 168 (2d Cir. 1966) (Friendly, J.).  As counsel to the LCDC has noted earlier in these cases:  "[I]t is imperative that the Oversight Board's actions be beyond reproach and taken in good faith.  Only then will creditors view the Oversight Board as an impartial arbiter, whose actions are designed to achieve fiscal responsibility and access to capital markets."[12]

30.     To protect the integrity of the Commonwealth's restructuring process and to ensure sovereignty considerations are respected, the Court may and must use its broad equitable powers to ensure the Oversight Board acts within the bounds of its PROMESA-granted authority.  *See, e.g.*, *In re Adelphia Commc'ns Corp.*, No. 02-41729 (REG), 2006 WL 1529357, at *4 (Bankr. S.D.N.Y. June 5, 2006) ("Section 105(a) of the Bankruptcy Code provides broad equitable power for a Bankruptcy Court to maintain its own jurisdiction and to facilitate the reorganization process."); *In re Crocker*, 362 B.R. 49, 57 (B.A.P. 1st Cir. 2007) (recognizing the bankruptcy court's "broad equitable powers" granted under Section 105(a)).

31.     ***Claims allowance authority***.  Moreover, the Court is unquestionably empowered to evaluate the allowability of an administrative expense claim.  The Oversight Board again oversteps its bounds in promising an "allowed" administrative expense claim to the PSA Creditors for the amount of the Breakup Fee.  *See* Amended PSA § 6.1(b) (PSA Creditors "entitled to receive the PSA Restriction Fee in the form of an ***allowed*** administrative expense claim") (emphasis added).

---

[12]   *Statement of the COFINA Senior Bondholders' Coalition in Response to Debtors' Status Report Regarding (A) Financial Disclosures to Creditors and (B) Status of Settlement Discussions* [ECF No. 464] at 5.

32.     It is the Court's province, not the Oversight Board's, to determine the allowability

of a claim.  *See* 11 U.S.C. § 502(b) ("the court, after notice and a hearing," shall rule on allowability

of claims) (incorporated into PROMESA by 48 U.S.C. § 2161(a)).  The Oversight Board again

usurps the Court's authority in purporting to commit to an "allowed" administrative expense claim

through the Amended PSA—particularly when the claim to be "allowed" has no restructuring

value and serves only to prejudice all stakeholders that will not share in this gratuity.

33.     The Court can and should strike the Breakup Fee from the Amended PSA for this

reason.  In the alternative, the Court should clarify that the allowability of a claim shall be

determined by the Court at the appropriate time, as provided under PROMESA.

### C.     The Oversight Board Is Not Entitled to Make Unreviewable, Irrevocable Commitments to Creditors.

34.     The Oversight Board knows by now that flexibility is crucial in these cases.  The

Commonwealth has faced a number of disasters during its restructuring process—but also has far

outperformed its cash projections, and repeatedly.  Before the current fiscal plan, the Oversight

Board had certified four separate fiscal plans for the Commonwealth; several of these revisions

were necessitated by crises.  Now, facing another crisis in the form of COVID-19, the Oversight

Board has repeated this now-familiar process.

35.     Ambac does not contest that changes to the fiscal plan may indeed be warranted

(although it agrees with the PSA Creditors that the Oversight Board has a proven tendency to rely

on "overly pessimistic economic forecasts following significant events" (PSA Creditors' Mot.

¶¶ 32-34)).  But Ambac does take issue with the Oversight Board attaching a $100 million price

tag to its ability to make those changes.  The knowledge, borne from experience, that external

events might necessitate changes renders the agreement to the Breakup Fee a breach of the Board's

duty to be a responsible fiscal steward for the Commonwealth.

36.     PROMESA does not vest the Oversight Board with unbridled power.  In whose interest does the Oversight Board act when it pledges $100 million of the Commonwealth's money, payable in precisely the circumstances in which the Commonwealth has the least to spare (*and* when the Oversight Board is pressing for austerity measures)?  The answer is no one's interest, save a select group of hedge fund creditors.  The Court should ensure the Oversight Board is acting in the best interests of the Commonwealth and its stakeholders by granting the Motion to Strike.

## III.   THE COURT SHOULD STRIKE THE IDENTIFIED PROVISIONS OF THE AMENDED PSA.

### A.   The Court Should Strike the Provisions Identified in the Motion to Strike.

37.     Almost as an afterthought, the Oversight Board's Opposition briefly mentions each of the provisions Ambac identifies in its Motion to Strike.  Each provision, offensive before, is even more troubling now, and the Oversight Board's tepid defenses fail to prove otherwise.

38.     *Breakup Fee*.  The Oversight Board admits that it may be required to pay the $100 million Breakup Fee as an administrative expense claim in connection with a future plan of adjustment.  Tellingly, the Oversight Board can muster no better defense than perhaps that it is a "fit" use of funds:  "the Commonwealth may use its property as it sees fit."  (Opp. ¶ 23.)  But even this defense betrays the root of the problem:  "the Commonwealth" *does not* "see[] fit" to use its property in this manner, as AAFAF affirms.  (*See* AAFAF Statement ¶ 2.)  And as discussed *supra*, the Oversight Board does not have independent authority to approve that payment.

39.     What's more, the Oversight Board states—possibly to head off confirmation objections premised on unequal treatment of similarly-situated claims—that the Breakup Fee would be distributed "not on account of the recipients' prepetition claims."  This affirms that the Breakup Fee uses Commonwealth resources for a purpose *other* than payment of claims, further underscoring that the Breakup Fee serves no restructuring purpose and is purely a gratuity.

12

40.     And while the Oversight Board attempts to invoke the COFINA Title III plan
support agreement as evidence that the Amended PSA is proper (*see* Opp. ¶¶ 18 n.4, 27), the Board
omits to mention that the COFINA agreement contained no break-up fee at all,[13] and indeed fails
to explain why, if unnecessary in the context of COFINA, the Breakup Fee is warranted here.

41.     ***Covenant to prevent claim objections***.  The Oversight Board engages in sophistry
to argue that its covenant to prevent parties from bringing claim objections against GO Bonds,
PBA Bonds, and PRIFA BANs "is not an outright ban" on parties' ability to object to claims, "as
the Oversight Board lacks power to control the actions of third parties."  (Opp. ¶ 25.)

42.     But the Oversight Board continues to oppose the litigation of issues "settled" in the
Amended PSA,[14] despite the fact that there is no longer an agreement on which such "settlement"
could arguably be premised.  The Oversight Board is preventing the lawful exercise of creditor
rights.  This would be troubling even were there a purported "settlement" of issues in place.  Now
that there is not, this covenant serves no purpose other than to give GO bondholders leverage in
negotiations via a purported priority that is unwarranted and—crucially—*untested* by litigation.

43.     This undertaking is extraordinarily valuable.  It insulates GO bondholders from
valid attack on their purported priority—making them the only group of creditors protected from
the Oversight Board's aggressive litigation machine.  The Oversight Board has admitted as much.[15]

---

[13]   *Compare Amended and Restated Plan Support Agreement (COFINA)* [ECF No. 4364-2] § 6.2 (if plan
support agreement is terminated, no "Consummation Costs" are payable); *with* Amended PSA § 6.1(b)
(aggregate PSA Restriction Fee and Consummation Costs, up to $100 million, payable in the event of
termination (with few exceptions)).

[14]   One recent example is the Oversight Board's opposition to the Creditors' Committee's efforts to lift
the stay on GO bond claim objection procedures.  *See Objection of Financial Oversight and
Management Board for Puerto Rico to Urgent Motion of Official Committee of Unsecured Creditors
to Lift Stay to Allow Committee to Pursue Objection to GO Priority* (ECF No. 14141).

[15]   *See* Opp. to PSA Creditors' Mot. ¶¶ 32-35 ("the Oversight Board has initiated and defended a variety
of important legal actions that have redounded to the benefit of the GO bondholders").

13

And the Court has seen this covenant in action: the LCDC demonstrated its true worth in forcing the Oversight Board to pull back on creditor priority arguments in the lift-stay proceedings.[16]

44.    The covenant to prevent creditors from bringing claim objections contained in Amended PSA § 4.1(f) should be stricken. If the Oversight Board desires to continue putting a thumb on the scale for GO bondholders, it should be forced to defend that position on grounds other than that the Amended PSA requires it to do so.

45.    ***Waiver of automatic stay***. The Oversight Board's defense of its waiver of the automatic stay to allow the PSA Creditors to terminate the Amended PSA is particularly unenthusiastic. Claiming "countless instances" where debtors consent to stay relief, the Oversight Board cites to none (Opp. ¶ 26); it further omits to mention that a great many of these "countless instances" *require Court approval*, even with debtor consent.[17] At minimum, the Oversight Board should not be allowed to waive the stay unilaterally *in the face of objection* from other creditors.

46.    For the automatic stay exists to protect *creditors* as well as debtors.[18] Removing Court approval for the stay to be lifted eliminates a fundamental creditor protection. The Oversight Board is not empowered to eliminate this protection, and invades the Court's authority in purporting to do so. Section 7.1(d) of the Amended PSA should be stricken.

---

[16]    *See Informative Motion of the Lawful Constitutional Debt Coalition Regarding Argument in Connection with June 4, 2020 Preliminary Hearing on Revenue Bond Lift-Stay Motions* [ECF No. 13359] ¶ 8 (reporting that after discussions with the LCDC, "the Oversight Board will not be seeking any rulings regarding preemption" of priorities under Commonwealth law in the lift-stay proceedings).

[17]    *See In re Triple A&R Capital Inv. Inc.*, 519 B.R. 581, 584 (D.P.R. Mar. 12, 2015) (where debtor consented to waive the stay, the court must still approve stay relief). Indeed, the Oversight Board's own practice has been to seek Court approval to lift the stay. *See, e.g.*, *In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*, 2017 WL 7156240 (D.P.R. Nov. 13, 2017) (with Oversight Board consent, Court lifted stay for lawsuit to proceed); *In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*, 2017 WL 7156236 (D.P.R. Aug. 11, 2017) (with Oversight Board consent, Court lifted stay for appeal to proceed).

[18]    *See* Motion to Strike ¶ 47; *In re Jefferson Cty., Ala.*, 491 B.R. 277, 285 (Bankr. N.D. Ala. 2013) (quoting H.R. Rep. No. 95–595, at 340 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6296–97) ("The automatic stay also provides creditor protection. Without it . . .[t]hose who acted first would obtain payment of the claims in preference to and to the detriment of other creditors.").

14

47.    ***PSA Creditor veto over plan of adjustment contents.***  The Oversight Board is similarly halfhearted in defending its agreement to give the PSA Creditors veto rights over the content of the plan of adjustment.  While arguing that such consent rights are common in other complex restructurings, the Oversight Board fails to note the crucial difference between those complex chapter 11 cases and these:  here, the Oversight Board *alone* has the power to propose restructurings under PROMESA.  *See* 48 U.S.C. § 2172(a) (PROMESA § 312(a)).  By delegating that specifically-reserved power to a favored group of creditors—thereby abdicating its duty to act as impartial arbiter—the Oversight Board again acts contrary to its mandate under PROMESA.

**B.    The Oversight Board Has No Answer for Ambac's Vote-Buying Arguments.**

48.    Conspicuously absent from the Opposition is any rebuttal to Ambac's argument that the PSA Fees constitute impermissible vote-buying.  (*See* Motion to Strike ¶ 40.)  This silence is a tacit admission that the PSA Fees were a vote-buying gambit—albeit one that purchased support for a plan the Oversight Board no longer wishes to pursue.

49.    This is not a responsible way to run a restructuring process:  promising the PSA Fees in exchange for votes, only to be saddled with a gratuitous "allowed" administrative claim in the form of the Breakup Fee when the exigencies of circumstance necessitate a change in direction.  Striking the Breakup Fee here and now not only will keep the Oversight Board acting within its authority (while giving it the flexibility that the Commonwealth's restructuring requires), but also will prevent the future use of this tactic as negotiations—with a broader range of parties—continue.

## CONCLUSION

For the reasons set forth herein, Ambac respectfully requests that the Court grant the relief requested in the Motion to Strike.

Dated:  October 20, 2020
         San Juan, Puerto Rico

**FERRAIUOLI LLC**

By: /s/ *Roberto Cámara-Fuertes*
         Roberto Cámara-Fuertes (USDC-PR No. 219002)
         Sonia Colón (USDC-PR No. 213809)
         221 Ponce de León Avenue, 5th Floor
         San Juan, PR 00917
         Telephone: (787) 766-7000
         Facsimile:  (787) 766-7001
         Email:  rcamara@ferraiuoli.com
                  scolon@ferraiuoli.com

**MILBANK LLP**

By: /s/ *Atara Miller*
         Dennis F. Dunne (admitted *pro hac vice*)
         Atara Miller (admitted *pro hac vice*)
         Grant R. Mainland (admitted *pro hac vice*)
         John J. Hughes, III (admitted *pro hac vice*)
         Jonathan Ohring (admitted *pro hac vice*)
         55 Hudson Yards
         New York, NY 10001
         Telephone: (212) 530-5770
         Facsimile:  (212) 822-5770
         Email: ddunne@milbank.com
                  amiller@milbank.com
                  gmainland@milbank.com
                  jhughes2@milbank.com
                  johring@milbank.com

*Attorneys for Ambac Assurance Corporation*

16

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on this same date, I electronically filed the foregoing with the Clerk
of the Court using the CM/ECF system, which will send notification of such filing to all CM/ECF
participants in this case.

/s/ *Roberto Cámara-Fuertes*
Roberto Cámara-Fuertes (USDC-PR No. 219002)
221 Ponce de León Avenue, 5th Floor
San Juan, PR 00917
Telephone: (787) 766-7000
Facsimile:  (787) 766-7001
Email:  rcamara@ferraiuoli.com