**UNITED STATES DISTRICT COURT**
**DISTRICT OF PUERTO RICO**

------------------------------------------------ X
                       :

In re:                     :     PROMESA
                       :

THE FINANCIAL OVERSIGHT   :     Title III
AND MANAGEMENT BOARD FOR  :
PUERTO RICO,          :     No. 17 BK 3283-LTS

    as representative of     :     (Jointly Administered)

THE COMMONWEALTH OF    :
PUERTO RICO, *et al.,*     :

    Debtors.          :
------------------------------------------------ X

**REPLY MEMORANDUM IN FURTHER SUPPORT OF MOTION OF NATIONAL
PUBLIC FINANCE GUARANTEE CORPORATION FOR ENTRY OF AN
<u>ORDER DIRECTING AN INDEPENDENT INVESTIGATION</u>**

## <u>TABLE OF CONTENTS</u>

Page

PRELIMINARY STATEMENT ...................................................................................... 1

REPLY ............................................................................................................................ 6

I.   THE COURT HAS THE AUTHORITY TO ENFORCE ITS OWN ORDERS
     INCLUDING BY DIRECTING THE INVESTIGATION ................................. 6

II.  THE INVESTIGATION IS TIMELY AND THE ISSUES RAISED IN THE
     MOTION SHOULD BE ADDRESSED NOW AND NOT AWAIT THE
     CONFIRMATION STAGE ................................................................................11

III. THE HEDGE FUND GROUPS' ATTEMPT TO ESTABLISH NO
     WRONGDOING ONLY FURTHER CONFIRMS THE NEED FOR THE
     INVESTIGATION ........................................................................................... 12

     Trading in "Unrestricted" Periods Does Not Obviate the Need for the
          Investigation ............................................................................................ 13

     The Objections Confirm Trading Occurred During "Restricted" Periods ....................... 14

     The Mediation Agreement Does Not Shield the Hedge Fund Groups' Trading ............. 16

     The Objections' Limited and Incomplete Disclosures Confirm the Investigation is
          Necessary ................................................................................................ 18

     The LCDC Objection Obfuscates Its Positions Concerning the Late Vintage
          Bonds .................................................................................................... 20

IV.  THE COSTS OF AN INDEPENDENT INVESTIGATION DO NOT
     OUTWEIGH ITS NEED AND UTILITY, AND WILL PALE IN COMPARISON
     TO OTHER COSTS ALREADY BEING EXPENDED ................................... 22

V.   THE UCC JOINS NATIONAL'S REQUEST FOR THE INVESTIGATION ................. 24

CONCLUSION ............................................................................................................. 25

i

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re Caesars Entm't Operating Co., Inc.*,
808 F.3d 1186 (7th Cir. 2015) ...................................................................................6

*In re Dairy Mart Convenience Stores, Inc.*,
351 F.3d 86 (2d Cir. 2003)........................................................................................7

*In re Jamo*,
283 F.3d 392 (1st Cir. 2002) .....................................................................................7

*In re River Ctr. Holdings, LLC*,
394 B.R. 704 (Bankr. S.D.N.Y. 2008) ......................................................................6

**Statutes**

11 § U.S.C.A. § 105(a) ........................................................................................6, 7, 8, 10

Bankruptcy Code Section 307 ...........................................................................................11

To the Honorable United States District Judge Laura Taylor Swain:

Creditor National Public Finance Guarantee Corporation ("National") files this memorandum (the "Reply") in further support of the *Motion of National Public Finance Guarantee Corporation For Entry of An Order Directing an Independent Investigation* (Dkt. No. 14450) (the "Motion" or "Mot.") and in reply to the objections, responses, and joinders filed by the QTCB Noteholder Group (Dkt. No. 14553) ("QTCB Objection"), Sculptor Capital Management (Dkt. No. 14554) ("Sculptor Response"), the Ad Hoc Group of GO Bondholders (Dkt. No. 14556) ("GO Objection"), the LCDC (Dkt. No. 14567) ("LCDC Objection"), and the Ad Hoc Group of Constitutional Debtholders (Dkt. No. 14570) ("Constitutional Joinder" and collectively, the "Objections") and the response of the FOMB (Dkt. No. 14539) ("FOMB Response") and limited joinder of the UCC (Dkt. No. 14527) ("UCC Joinder" and together with the Objections and FOMB Response, the "Responses and Objections").[1]  In support of the Reply, National respectfully states as follows:

## PRELIMINARY STATEMENT

1.     National has established the need for an independent investigation.  Among other things, National has shown through specific evidence that the Court's confidentiality orders may have been violated through trading in the Commonwealth's securities by certain participants in the Mediation during the Title III mediation process in 2019 and 2020.  The Responses and Objections do not refute National's showing or in any way alleviate that concern.  On the contrary, the Responses and Objections confirm that the Investigation is necessary.  The FOMB confirms the need for the transparency that National is seeking:  "[p]roviding [the] disclosure [that will be necessary in the Investigation] will put to rest concerns that are affecting these Title III cases and

---

[1]      Capitalized terms not defined herein shall have the meaning ascribed thereto in the Motion.

necessitate responses and the incurrence of fees and expenses in connection therewith."  (FOMB Response, ¶ 5.)

2.     PROMESA was designed to position the Commonwealth to re-enter the capital markets.  Through the Motion, National requests that the Court order the Investigation to ensure the transparency that such re-entry will require -- transparency that is not only in its interest, but in the interests of the numerous other parties and non-parties to this proceeding who have raised concerns about the trading activity of certain members of the Hedge Fund Groups.  National is not the first party to raise these concerns -- both before the Court or otherwise -- and without the Investigation, it will surely not be the last.

3.     The Court plainly has not just the inherent authority, but the explicit authority to direct the requested Investigation under Section 105 of the Bankruptcy Code, which authorizes the Court to take action to enforce its own orders, including the order authorizing the Mediation here. The Responses and Objections do not, as they cannot, challenge this basic principle.  Instead, they ignore the language of Section 105 and relying on cases inapplicable here, argue primarily that PROMESA does not specifically provide for an examiner to conduct the Investigation.  But the Motion does not seek an examiner, and the Court is not limited by the examiner provisions of the Bankruptcy Code to grant the requested relief.  PROMESA in no way by its terms bars the Court from taking the steps to ensure its own Orders have been adhered to, and the Court is not, as the Responses and Objections contend, powerless to order the Investigation.

4.     In fact, the Court has already exercised its authority under Section 105 to appoint an independent agent to serve a function similar to that requested by the Motion.  In connection with the negotiations and disputes between COFINA and the Commonwealth, the FOMB and COFINA creditors agreed that the FOMB should not represent both entities.  Following an

agreement to resolve that conflict, the Court, pursuant to Section 105, among other provisions, appointed independent agents to represent the Commonwealth's and COFINA's interests. Likewise, here, because the FOMB was a material party in the Mediation, it cannot itself conduct the independent investigation.[2]  Hence, just as it did in the COFINA Title III case, Section 105 authorizes the Court here to direct an independent entity to conduct the Investigation in furtherance of the Commonwealth's effort to successfully restructure $35 billion in debt in a closely watched process that must both be fair and appear to be fair.

5.    On the merits, the Objections insist in a conclusory fashion that the Investigation is not necessary because all the trading was entirely proper and appropriate.  The Hedge Fund Groups ask this Court to resolve all of the suspicions raised by their own Supplemental 2019 Disclosures in their favor based on the self-selected and incomplete disclosures they proffered in the Objections.  However, conclusory statements do not and cannot rebut the facts and evidence cited by National, and the Objections raise more questions than they answer.  The Objections fail to provide any trading records or any information about what the hedge funds knew or did not know when they engaged in the trading activity.  They rely significantly on the members of the Hedge Fund Groups having been, for some of the trading activity, deemed "unrestricted" after purported "cleansing" disclosures of certain confidential information about the Mediation.  Such reliance is wholly misplaced.  Trading during an "unrestricted" period does not ensure compliance with the Court's Orders.  The Investigation is necessary to assess whether and to what extent the entity that traded had information that had not been publicly disclosed at the time of the trades, and whether the trades otherwise violated the Court's orders.  Indeed, the Investigation will address whether

---

[2]    However, there is one scenario where the FOMB could undertake the Investigation.  If a special committee of the FOMB was established -- consisting only of members that have been appointed since the New PSA was negotiated and announced, and have not participated in the ongoing negotiations and Mediation -- and that committee retained special investigation counsel, then that committee could conduct the Investigation.

any such "cleansing" disclosures were effective, or whether they, as is nearly certain, did not

disclose all information obtained formally or informally as a result of the Mediation process.  In

fact, contrary to the LCDC Objection, the Mediation Agreement is irrelevant to this Motion.

Nothing in the Mediation Agreement allows -- or would have allowed -- any party thereto to make

any trades based on confidential information obtained formally or informally through the

Mediation.  The Objections give only passing reference to the Court's Orders requiring the

Mediation to be confidential, ignoring that nothing in the Mediation Agreement could or would

ensure compliance with the Court's orders.

6.    The numerous trades that the Objections concede took place alone warrant the

Investigation -- including, among other things, as to whether, even assuming arguendo that such

trades took place during "unrestricted" periods and may not have technically violated the

Mediation Agreement, whether they nonetheless violated the Court's orders; at the time of the

trades what the trading entity knew; and whether that entity was working with any other in

connection with the trades.  None of these issues were sufficiently addressed, if at all, by the

selective disclosures made in the Objections.  National respectfully submits that the requested

Investigation is the only efficient way to address these and other concerns numerous parties have

raised.

7.    Finally, both the FOMB and the Hedge Fund Groups purport to oppose the

Investigation on account of the associated cost to the Commonwealth.  But that rings hollow, to

say the least, particularly in light of the millions of dollars in fees and costs that the FOMB has

already agreed to pay the PSA Creditors in the New PSA, including a $100 million break-up fee.

(Dkt. Nos. 11947-2, Exhibit B at § 6.1(b), 11946, at § 3.5.)  The cost of an expeditious 60-day

Investigation -- compared to the amounts the Commonwealth will have to pay the Hedge Fund

Groups and the nearly $700 million that the Commonwealth has spent to date across all of its Title III cases -- is not a valid reason to deny the Motion.

8.      Moreover, leaving the resolution of the concerns justifying the Investigation for confirmation, as the Objections propose, would be a costly mistake that would undoubtedly lead to more inefficiencies, cost, and delay.  Indeed, the UCC's recent motion for Rule 2004 discovery -- concerning the very issues on which National bases its request for the Investigation -- is confirmation that the issues will be raised and lead to increase costs.[3]  In any event, any cost of the Investigation to ensure the integrity of the Title III process would be well worth it.  And, if the issues really are as clear-cut as the Objections suggest they are, then the Investigation will be quick, easy, and relatively inexpensive, while enabling the Mediation and plan process to continue without any taint.

9.      As the cited in the Motion and the Hedge Fund Groups' own Supplemental 2019 Disclosures confirm, the trading activity materially altered the Mediation participants' economic positions.  Accordingly, and for that reason alone, the Investigation and any costs associated with it are necessary.  While the Hedge Fund Groups try to distract the Court with arguments about National's motives and intent, it is the Hedge Fund Groups whose motives are disingenuous.  Having chosen to execute numerous trades to materially alter their positions as identified in their own disclosures, they now incorrigibly attempt to deflect an inquiry by citing the modest cost of investigating what they did.  As the FOMB notes, the concerns raised by what certain members of the Hedge Fund Groups did are critical to this restructuring, and, as National has shown, it would be beneficial to resolve them now.  The Motion should be granted.

---

[3]      As the Court stated in denying the UCC's motion for Rule 2004 discovery without prejudice, the Court will address similar issues when deciding the Motion.  (Dkt. Nos. 14601, 14603, 14613, p. 5 ("The argument and subsequent rulings on [National's Motion] may inform which issues, if any, are appropriate for further investigation, and the appropriate entity, if any, to conduct such investigation and related discovery.").)

## REPLY

### I.   THE COURT HAS THE AUTHORITY TO ENFORCE ITS OWN ORDERS INCLUDING BY DIRECTING THE INVESTIGATION

10.     Several Objections contend erroneously that this Court does not have the authority to enforce its own orders and to direct an independent party to conduct the Investigation.  They argue that even in the face of compelling evidence that this Court's orders may have been violated through misconduct on the part of certain Mediation participants, the Court is powerless to do anything about such conduct even if it may have undermined the entire Mediation and the New PSA.  (*See* LCDC Objection, ¶¶ 47-53; QTCB Objection, ¶ 10.)

11.     That is not the case.  As discussed in the Motion, Section 105 gives the Court the authority to enforce its rules and orders and to take actions and make determinations necessary to prevent an abuse of process.  *See In re River Ctr. Holdings, LLC*, 394 B.R. 704, 711 (Bankr. S.D.N.Y. 2008) (Section 105(a) permits courts to enforce their previous orders.); *In re Caesars Entm't Operating Co., Inc.*, 808 F.3d 1186, 1188 (7th Cir. 2015) (Section 105(a) authorizes the action requested where that action "is likely to enhance the prospects for a successful resolution of the disputes attending [the] bankruptcy.").  Here, Section 105 authorizes the Court to enforce its Mediation Order and Supplemental Confidentiality Order by directing the Investigation.

12.     The Objections fail to cite authority suggesting otherwise; offering instead several flawed and unsupported arguments that Section 105 does not provide the Court with the appropriate authority to order the Investigation.  The Objections ignore the plain language of Section 105, which *itself* explicitly grants the Court the power to "take[] any action or make[] any determination necessary or *appropriate to enforce or implement court orders*."  11 § U.S.C.A. § 105(a) (emphasis supplied).  Thus, the text of Section 105 provides the Court with the authority to direct the Investigation.

13.     The LCDC's contention that Section 105 "may be invoked only if, and to the extent

that, the equitable remedy dispensed by the court is necessary to preserve an identifiable right

conferred elsewhere in the Bankruptcy Code[,]" is misplaced and relies on a case that is entirely

distinguishable from the circumstances here.  (LCDC Objection, ¶ 48 (quoting *In re Jamo*, 283

F.3d 392, 403 (1st Cir. 2002))).  In *Jamo*, the issue concerned whether certain sanctions should

stand -- despite the fact that no stay violation had occurred -- based on the provision in Section

105 granting the Court the rights to "effectuate the provisions of the Bankruptcy Code."  *Jamo* at

403.  The First Circuit in *Jamo* was not addressing the situation here where the Court would be

relying on the provision in Section 105 permitting it to take action "to enforce or implement its

orders," or to create an equitable remedy and is therefore not applicable here.

14.     The LCDC's reliance on *In re Dairy Mart Convenience Stores, Inc.*, 351 F.3d 86,

(2d Cir. 2003), is likewise misplaced since in that case, the Second Circuit was addressing Section

105's provision concerning the authority to carry out "provisions of the Bankruptcy Code, rather

than to . . . do the right thing."  (LCDC Objection, ¶ 49 (quoting *In re Dairy Mart*, 351 F.3d at 92).)

The Second Circuit in *Dairy Mart* did not address the provision in Section 105(a) that grants the

Court the power to "take [] any action or make[] any determination necessary or appropriate to

enforce or implement court orders."  11 § U.S.C.A. § 105(a).  Thus, *Dairy Mart* is also not

applicable here.

15.     Section 105 indisputably grants courts the authority to enforce their own orders,

and nothing in the cherry-picked language quoted in the LCDC Objection from cases that do not

address that provision of Section 105 changes the effect of the plain language of that statute.

Indeed, the LCDC, while seeming to acknowledge the undeniable -- that Section 105(a) grants this

Court the power to direct the Investigation as a means to enforce its orders -- argues that

"National's failure to properly identify any violation of a court order requires denial of the Motion." (LCDC Objection, ¶ 52.) As the entire point of the Investigation is to determine whether this Court's Mediation order and Supplemental Confidentiality Order were violated, positing the Investigation's very conclusion as a necessary predicate for the Court's authority to direct it is circular, puts the cart before the horse, and cannot be accepted.

16.     The LCDC and QTCB Noteholder Group also both argue that the Motion is a disguised request for an examiner, and the QTCB Objection cites cases that refuse to appoint a trustee under Section 105 where Section 1104 provides an alternative solution.   (*See* QTCB Objection, ¶ 8 (citing *In re Plaza de Diego Shopping Ctr., Inc.*, 911 F.2d 820, 832 (1st Cir. 1990); *In re Adelphia Commc'ns Corp.*, 336 B.R. 610, 664 (Bankr. S.D.N.Y. 2006)); LCDC Objection, ¶ 50 (citing *In re Nosek*, 554 F.3d 34, 44 (1st Cir. 2008)).)  That argument is specious and the cases cited are wholly inapposite.  Section 1104 is not available here, and in any event, National is neither seeking the appointment of a trustee nor an examiner, and certainly not to circumvent other provisions of the Code available to National.

17.     Moreover, while certain sections of PROMESA provide that the FOMB can serve an investigative function (*see* PROMESA §§ 104, 105, and 106), National is not seeking to circumvent those provisions since that remedy cannot be deployed here given that the FOMB has been heavily involved in the Mediation and cannot conduct an independent investigation.  The FOMB effectively concedes as much:   while the FOMB acknowledges the benefit of the Investigation and "welcomes the opportunity" for all mediation participants to be cleared of wrongdoing -- it does not argue that it should lead the Investigation.  (FOMB Response, ¶ 5.)  That void can be -- and precedent in these Title III cases establishes that it has been -- filled by an independent investigator under Section 105.

18.     The Court has previously relied on its authority pursuant to Section 105 to take action similar to that requested here to address disputes between COFINA and the Commonwealth. In June 2017, the Commonwealth and COFINA, acting through the FOMB, submitted a Motion for Order Approving Procedure to Resolve Commonwealth-COFINA Dispute.  (Dkt. No. 303.)  In a dispute regarding the pledged sales tax and whether it was property of the Commonwealth or "an allowable claim of the Commonwealth having priority over all claims of COFINA[,]" (Dkt. No. 303, ¶ 17), COFINA and the Commonwealth sought the entry of an order approving the appointment of independent oversight board agents to "serve separately" and for the Court to approve certain procedures related to the parameters of the powers and authority of those agents. (*Id*., ¶ 28.)

19.     The FOMB, COFINA, and the Commonwealth invoked Section 105 as one of the predicates for the proposed relief.  After the Court directed the FOMB to seek the agreement of the interested parties to a procedure for resolving the dispute, COFINA and the Commonwealth requested the appointment of independent debtor representatives for each of the Commonwealth and CONFINA to "fully advocate . . . to reach a fair resolution." (*Id*., ¶ 37.)  In support of these appointments, the parties, including the FOMB, cited to the inherent authority of the Court under Bankruptcy Code Section 105(a), among other authorities, to permit the appointment of agents to negotiate on behalf of the Commonwealth and COFINA.  (*Id*., ¶¶ 39-40.)  Ultimately, the Court so-ordered the Stipulation and Order Approving Procedure to Resolve Commonwealth-COFINA Dispute and appointed independent agents for the Commonwealth and COFINA.  (Dkt. No. 996.)

20.     Although PROMESA provided the FOMB with the authority to represent both the Commonwealth and COFINA, the FOMB determined that it could not do so since there was a conflict and dispute between the Commonwealth and COFINA.  As a result, the Court relied on

Section 105 to appoint independent entities to represent the Commonwealth and COFINA since the FOMB could not do so. The same principle applies here. As in the Commonwealth-COFINA dispute, the FOMB here cannot conduct the Investigation since it was a central player in the Mediation and it therefore is neither independent nor disinterested. Therefore, directing an independent entity to conduct the Investigation is a more efficient and conflict-free means of accomplishing the goals of ensuring that there are no adverse consequences to this Title III case from potential improper trading in violation of the Court's orders.

21.     Further, the Responses and Objections object to the proposal in the Motion that the United States Trustee's Office be directed to conduct the Investigation, and argue that the United States Trustee does not have the statutory authority to conduct the Investigation. Again, that argument misses the mark. National does not assert that the United States Trustee has such independent authority since Section 307 of the Bankruptcy Code has not been incorporated into PROMESA. However, nothing in PROMESA or the Bankruptcy Code prevents the Court from independently directing the United States Trustee to conduct the Investigation, including with the assistance of counsel, which is precisely what National proposed in the Motion. The United States Trustee's independence and expertise makes that office a natural pick to conduct the Investigation, especially in this high-profile and unique proceeding. Given the disparate interests of the positions of the various parties in this case, the United States Trustee's office is uniquely qualified and situated to conduct the Investigation in a manner that will be fair to all parties.

22.     Moreover, if the Court directed the United States Trustee to conduct the Investigation, it will not have unlimited authority or an unlimited role in this case. The Court can, and should, provide a limited and appropriately cabined role for the United States Trustee (or any independent party, for that matter) in any order directing it to conduct the Investigation.

10

## II. THE INVESTIGATION IS TIMELY AND THE ISSUES RAISED IN THE MOTION SHOULD BE ADDRESSED NOW AND NOT AWAIT THE CONFIRMATION STAGE

23.     As detailed in the Motion (Mot., ¶¶ 55-56), the trading activity by certain members of the Hedge Fund Groups during the Mediation, which they concede occurred, should be addressed now and not wait, as the Objections contend, for the confirmation stage of this case. Given that the FOMB is going through a transition with new members coming on and others still to leave, and, as the FOMB's recent disclosures make clear, the FOMB is currently negotiating with the Hedge Fund Groups, it will be months, at best, before any plan of adjustment is proposed either based on the New PSA or some yet to be agreed revised version of the New PSA. Thus, now is an ideal time to conduct the 60-day Investigation that National proposes since it will not delay any plan of adjustment. The purported concerns in the Responses and Objections about any potential delay are therefore baseless.

24.     Instead of conducting the Investigation now while there is a lull in the road to confirmation, the Hedge Fund Groups argue that any questions or concerns generated by *their behavior* should not be answered until confirmation. (QTCB Objection, ¶¶ 1, 10, 12; LCDC Objection, ¶ 46; GO Objection, ¶ 3.) However, the issues raised in the Responses and Objections confirm that now is undoubtedly the most efficient time to conduct the Investigation. In particular, the FOMB recognized the pall that the trading issues have already cast over the New PSA and the Mediation, and acknowledged the significant benefit to resolving those issues. (FOMB Response, ¶ 5.) Similarly, if, as the Objections contend, there has been no wrongdoing, and that can be easily proven by a transparent review of the Hedge Fund Groups' records, then it is better for all parties that the Investigation resolve those issues now instead of waiting for costly and time consuming litigation during confirmation. With all the concerns raised regarding the Hedge Fund Groups'

trading activity by both parties and non-parties, these issues are not going away absent an impartial investigation.

25.     In fact, although the Responses and Objections attempt to characterize the Investigation solely about National and its positions, the Motion is the *fourth* instance where parties and non-parties have brought these trading issues to light.[4]  (*See* Mot., ¶ 41, n.19 (discussing Ms. Long's letters); Mot., ¶¶ 22-31 (discussing the UCC and Other Monolines' Rule 2019 Motions); Mot., ¶ 40 (discussing the Congressional Letter).)  There is simply no basis to the Hedge Fund Groups' attempt to characterize the concerns in the Motion and the request for an investigation as a National only issue -- it is a potential problem to the integrity of the Title III process and all creditors.  PROMESA was designed to position the Commonwealth back in the capital markets and to do so requires complete transparency.  The capital markets will not be available to the Commonwealth going forward if future creditors believe that the integrity of any restructuring is called into question.  Therefore, there is no justifiable reason to await confirmation and add to the numerous issues that will need to be addressed at that time, when this problem can be properly and expeditiously resolved now by the Investigation.

## III.    THE HEDGE FUND GROUPS' ATTEMPT TO ESTABLISH NO WRONGDOING ONLY FURTHER CONFIRMS THE NEED FOR THE INVESTIGATION

26.     In the Objections, the Hedge Fund Groups contend that the Investigation is unnecessary because they can assure the Court that they did nothing improper and did not violate the Court's orders.  Instead of providing documentary support to confirm the alleged propriety of their trading, the Hedge Fund Groups merely submit self-serving "evidence," while ironically

---

[4]     Indeed, the UCC, who initiated the Rule 2019 Motions, recently filed an urgent motion authorizing discovery concerning bond trading under Bankruptcy Rule 2004.  (Dkt. Nos. 14601, 14603, 14613.)  Though it was denied without prejudice, the UCC's discovery motion further evidences that the relief sought in the Motion is not unique to the wants of National and that the Hedge Fund Groups' trading issues are not going to be avoided.

claiming that in its Motion, National failed to submit any evidence.  (QTCB Objection, ¶¶ 3, 7, and Exhibit A; Sculptor Response, pp. 3-5, 7-8; GO Objection, ¶¶ 1-2; LCDC Objection, ¶¶ 31-38, 42-46; Constitutional Joinder, ¶¶ 2-3.)  None of the Responses and Objections, however, dispute the factual accuracy of the information provided by National in the Motion.  Nor could they since the information in the Motion is based on the Hedge Fund Groups' own Supplemental 2019 Disclosures -- the same disclosures they fought hard against having to make in connection with the Rule 2019 Motions.  The Objections attempt to explain away the issues raised by the Supplemental 2019 Disclosures by voluntarily disclosing selective information about the members of the Hedge Fund Groups' trading activity that purports to exculpate them from any wrongdoing. However, the Hedge Fund Groups' attempts to end the Investigation before it even starts with nothing more than limited and self-selected disclosures in their lawyers' legal briefs demonstrate why an investigation is necessary.  These limited and incomplete "disclosures" in the Objections cannot substitute for a truly independent investigation that will determine whether the hedge funds' actions were appropriate and in compliance with the Court's orders.

**Trading in "Unrestricted" Periods Does Not Obviate the Need for the Investigation**

27.     The majority of the Objections contend that the Hedge Fund Groups' trading was not improper because it was done during "unrestricted" periods during the Mediation as a result of "cleansing materials" released to the public.  (*See* QTCB Objection, ¶ 5; Sculptor Response, pp. 2-3, 6-8; GO Objection, ¶ 2.)  However, even assuming there could have been some legitimate trading during those "unrestricted" periods, that does not address the concerns raised in the Motion. The Hedge Fund Groups have not, because they cannot, point to any part of the "cleansing materials" that would inform non-parties to the Mediation that the New PSA being negotiated and discussed among the parties to the Mediation provided for changes in treatment of the Late Vintage

13

GO and PBA Bonds.  Thus, even if they were "cleansed" as to certain issues during the confidential

Mediation, the Hedge Fund Groups were not necessarily cleansed as to all relevant issues.

28.    The arguments presented in the Responses and Objections presuppose the

"cleansing disclosures" contained any and all potential confidential information the Hedge Fund

Groups obtained up to that point in the process.  But the information disclosed to the market may

not have contained all information received by members of the Hedge Fund Groups, including

information received through formal and informal discussions and other channels.    The

Investigation is necessary to assess whether certain members of the Hedge Fund Groups were

exploiting other confidential information that they learned formally, and more importantly,

informally during the Mediation that was not available to the public, such as the proposed structure

of a deal, other creditors' positions or proposals, the likelihood of a deal being struck, and the

parties who might join.  Even if these materials were "cleansing," it is difficult to imagine, and the

Objections provide no evidence to suggest, that the Hedge Funds Groups' access to this

information in the weeks leading up to their release did not provide their members with a

significant informational advantage relative to other market participants.[5]    Therefore, the

Investigation will need to review the confidential information such funds received formally *and*

*informally* from other participants to the Mediation both before and during any "unrestricted"

periods.

**The Objections Confirm Trading Occurred During "Restricted" Periods**

29.    While it should be evident that certain trading was impermissible even during an

unrestricted period, the Objections also confirm that certain hedge funds *did, in fact, engage in*

---

[5]    The mere fact that a transaction occurred after a "cleansing disclosure" is not dispositive of its propriety and
could still allow for members of the Hedge Fund Groups to profit from the in-depth understanding they received
through participation in the Mediation.

*trading while trading was purportedly "restricted."*   However, the Ad Hoc Group of Constitutional Debtholders admit that two of its current members did make trades during the Mediation.  (Constitutional Joinder, ¶ 3, n.4.)  One such member who traded during that time period is Silver Point Capital, whose positions National specifically addressed in the Motion, noting an increase in its holdings of Late Vintage GO Bonds from July 2019 through March 2020.  (Mot., ¶ 37(b), Ex. C.)  Not only did Silver Point's holdings of 2012 and 2014 GO Bonds increase exponentially around the time of the Mediation -- its holdings in 2014 GO Bonds increased by hundreds of millions of dollars -- it also had only a nominal investment in Early Vintage GO Bonds in stark contrast to its investment in the Late Vintage GO Bonds.  (Mot. Ex. C, p. 5.)  Providing no details or evidence concerning Silver Point Capital's trades or how they complied with the Court's orders, the Ad Hoc Group of Constitutional Debtholders relies solely on the unsupported contention that the trades are not evidence of wrongdoing because while "Silver Point Capital, L.P.'s public trading desk traded during the mediation period" it did so while not allegedly "in possession of confidential information (*i.e.*, materials obtained in connection with participating in the mediation process)."  (Constitutional Joinder, ¶ 3.)  The Investigation is necessary to investigate and address Silver Point's trading, rather than relying solely on counsel's assurances that all such trading was entirely proper.

30.     The LCDC also admits that certain of its members traded during a period when trading would have been "restricted."  (LCDC Objection, ¶¶ 36-38.)  For instance, the LCDC concedes that GoldenTree -- whose increase in holdings was also referenced in the Motion (Mot., 37(c), Ex. C) -- executed trades during a "restricted" period.  The LCDC Objection attempts to explain those trades without any documentary support by claiming, in part, that the trades were either made to other participants in the Mediation or were accompanied by letters illustrating that

15

the counter-party either understood it lacked the confidential information from the Mediation the LCDC had access to, or it had similar access.  (LCDC Objection, ¶¶ 37-38, n.38, n.39.)  In addition to the fact that the LCDC does not provide any authority to show that the trades were indeed proper if they took place as the LCDC claims, they also fail to address the concerns raised in the Motion that trades like those "raise significant concerns as to the legitimacy of the economic interests purportedly represented in the Mediation[.]"  (Mot., ¶ 5.)  The LCDC Objection only further demonstrates the need for the Investigation to investigate the Objections' descriptions of the trading and to assess what each entity knew at the time of those trades, as well as the sufficiency of the letters that were referenced, but not attached as an exhibit.  Moreover, the Investigation needs to address why these trades were made, who the particular entity was working with and for what purpose, and did the trades have anything to do with the then-ongoing negotiations in the Mediation.

**The Mediation Agreement Does Not Shield the Hedge Fund Groups' Trading**

31.     The LCDC Objection is the only Objection that relies on the Mediation Agreement. (LCDC Objection, ¶¶ 23-25.)  The LCDC's Mediation Agreement argument is a red herring.  The Mediation Agreement cannot mean what the LCDC effectively contends -- that "nothing in the Agreement creates a duty not to trade securities" during the Mediation even if such trading utilizes confidential material the parties have access to as a result of the Mediation.  (LCDC Objection, ¶ 24.)  The LCDC cannot expect this Court to believe that parties to the Mediation Agreement could trade any time they wanted with the benefit of confidential information learned from the Mediation.[6]  Further, as the LCDC acknowledges, parties cannot contract around the securities

---

[6]     Significantly, the LCDC Objection is also the only Objection that does not argue that trading was outright prohibited during the "restricted" periods.  (*Compare* LCDC Objection, ¶¶ 4, 24-25 *with* QTCB Objection, ¶¶ 4-6; Sculptor Response, pp. 6-7; GO Objection, ¶ 2.)  The Investigation is necessary to address this inconsistency among the Hedge Fund Groups as well.

laws.  Nor does compliance with that agreement ensure compliance with the Court's orders.  The Investigation is necessary to determine whether the Court's orders were adhered to, not whether the parties complied with the Mediation Agreement.[7]  Moreover, the Reservation of Rights provision in the Mediation Agreement provides, among other things, that neither National nor any party waived their rights to bring claims or seek relief for violations of confidentiality, the Court's orders, or securities law under the Bankruptcy Code, PROMESA, or any other applicable statutes or laws.  (LCDC Objection Ex. A, § XII.)

32.     The LCDC is also wrong with its conjecture as to why National did not reference the Mediation Agreement in the Motion.  National chose not to include the Mediation Agreement because it is not dispositive or even relevant to the issues.  It does not override the Supplemental Confidentiality Order or address compliance with those orders.  The LCDC contends that the Mediation Agreement is a shield that protects it from allegations of trading based on information it obtained through the Mediation.  That is simply not so.  The Mediation Agreement neither protects nor cleanses such trades, and the Investigation is necessary to determine when such trades were made what information was known at that time by that entity and why the trade was made.  Nothing in any of the Objections sufficiently addresses, let alone establishes, why any of the trades were made.  That issue should be paramount in the Investigation.

33.     Further, when explaining away GoldenTree's trades during the "restricted" period -- which took place immediately after it admittedly received confidential information in the Mediation -- the LCDC Objection redacts portions of their Objection it served on National,

---

[7]     While the LCDC claims the FOMB was aware of its trading activity during the Mediation through CUSIP-level holdings information that they purportedly provided regularly to the FOMB, this fact, if true, does not absolve its members of potential wrongdoing and certainly not absent full transparency of those disclosures.  (LCDC Objection, ¶¶ 4, 45.)  To the contrary, the LCDC's position further confirms the need for the Investigation to analyze those disclosures, which have not been provided to National, as well as exemplifying why in this instance the FOMB cannot serve as the independent entity directed to conduct the Investigation.

meaning that the LCDC improperly submitted portions of its Objection *ex parte* to the Court. (LCDC Objection, ¶¶ 37, 43.)  In its motion to seal its Objection, the LCDC contends that it "has been informed" that the redacted material is "covered by the Mediation privilege, and accordingly should not be unsealed."  (Dkt. No. 14567 at n.2.)  The LCDC does not provide any information about the basis for the privilege or how the LCDC's voluntary and affirmative use of that information in a public court filing does not waive any privilege, or, at a minimum, how doing so permits it to redact such information and withhold it from National.  The LCDC cannot use the Mediation privilege as both a sword and a shield by choosing to rely on this information in a filing with the Court, but at the same time refusing to disclose that information to National.  This type of *ex parte* communication is inappropriate and begs more questions that only the Investigation can answer.  In fact, the Court should not consider the so-called privileged information in deciding the Motion and should strike it from the record.[8]

**The Objections' Limited and Incomplete Disclosures Confirm the Investigation is Necessary**

34.     It is now increasingly apparent that GO Bonds and PBA Bonds, of both late and early vintage, were traded, but the appropriateness and propriety of those trades has not been satisfactorily addressed.  Nothing in any of the Court's orders permit the parties to the Mediation to use the information learned therein to trade or alter their positions.

35.     The Objections also fail to address or counter the facts in the Motion regarding the price and demand increases of the GO Bonds leading up to the February 9, 2020 announcement of the New PSA.  (Mot., ¶¶ 21, 38-39.)  These suspicious price increases leading up to the February

---

[8]     The Mediation Agreement, to the extent it is even arguably relevant to the issues in the Motion, provides that the parties thereto "agrees it will never rely on or attempt to introduce into evidence, or use in any deposition or otherwise discovery, any Confidential Information made or offered by a Participating Party during the course of the mediation other than in connection with the enforcement of the Agreement."  (LCDC Objection Ex. A, § IV at p. 8.)  The LCDC, in trying to affirmatively use the redacted GoldenTree confidential information has done exactly that in violation of the Mediation Agreement.  This is a separate basis alone to strike the material that the LCDC redacted.

18

9 announcement are sufficient reason alone to justify the Investigation.  Although most of the
Objections contend that the members of their respective groups did not make any trades in early
2020 before the announcement of the New PSA, the Ad Hoc Group of Constitutional Debtholders
is silent as to that point.  Instead, it admits that two of its hedge fund members, one being Silver
Point, traded during the Mediation period but does not provide any information as to when those
trades occurred.  (Constitutional Joinder, ¶ 3.)  Therefore, the Investigation is necessary to make
that determination.  Moreover, even assuming that none of the members of the Hedge Fund Groups
traded in January or February leading up to the announcement of the New PSA, the Investigation
is needed to address whether any entities disclosed the status of the negotiations to anyone outside
the Mediation in violation of the Court's orders.  The increase in price and demand for the bonds
leading up to the announcement of the New PSA seems not to be a mere coincidence.  The
Investigation must review whether any entity improperly shared information about the Mediation
with other entities who then traded based on that information and contributed to the increase in
market prices.

36.    Sculptor Capital attempts to turn the tables on National by suggesting that National
argued that it was trading every day during the Mediation, but it contends that it did not trade until
after the New PSA.  (Sculptor Response, pp. 3-5.)  Sculptor Capital is wrong.  The information in
the chart National included with the Motion concerning Sculptor Capital reflects the information
from the only two disclosures Sculptor Capital made around the Mediation -- one in early
September 2019 before the Mediation began and one in mid-February 2020 after the New PSA
was announced -- and shows the significant increase in their holdings during that time period.  The
chart does not suggest that the trading was a daily affair, but rather reports the facts that were
reported by Sculptor Capital.  National did not, nor does it, have access to other information

19

regarding Sculptor Capital's trading or the dates the trading took place -- only Sculptor does, which is precisely why the Investigation should go forward.

37.     Sculptor Capital and the LCDC also confine their discussion of Late Vintage GO Bonds to bonds that were issued in 2012 and 2014, thereby excluding any potential transaction involving 2011 GO Bonds issued in or after March 2011 as the Motion discusses.  (Sculptor Response, pp. 4-5; Mot., n.6; LCDC Objection, ¶ 5.)  Whatever the reason for that description and limitation, the Investigation is necessary to review trading in the 2011 Late Vintage GO Bonds as well.  What is clear is that at some point during the time period between their disclosures, Sculptor Capital and certain members of the LCDC traded millions in GO Bonds and PBA Bonds.  At this point, neither National nor the Court can confirm when the trades took place and whether they complied with the Court's orders without the benefit of an independent investigation with access to Sculptor Capital's and the LCDC's detailed trading records and the justification supporting those trades.

**The LCDC Objection Obfuscates Its Positions Concerning the Late Vintage Bonds**

38.     The LCDC attempts to argue that its positions in Court were never inconsistent with its economic interests as a reason to stifle the Investigation.  (LCDC Objection, ¶¶ 54-57.)  In doing so, the LCDC Objection misstates National's argument.  In the Motion, National argued, based on the facts, that although the LCDC challenged the Late Vintage GO Bonds, some of its members bought those bonds during the Mediation.  (Mot., ¶ 34.)  Further, after those trades, the New PSA was agreed to, including by the LCDC, and provided for better financial treatment for the Late Vintage GO Bonds.  (*Id*, ¶¶ 6, 33.)  The LCDC Objection does not show anything different than what National alleged in the Motion.

39.     The LCDC Objection attempts to downplay its challenge to the Late Vintage GO Bonds.  In its Objection, the LCDC stated that rather than challenge the Late Vintage GO Bonds

as worthless, it "explicitly urged deferral of the appropriate remedy for bonds issued in violation of the Constitutional Debt Limit, until after the Court (or the Supreme Court of Puerto Rico) determines the threshold issue of interpreting the Puerto Rico Constitution." (LCDC Objection, ¶ 56.)  The reality is, however, the LCDC also has repeatedly challenged the Late Vintage GO Bonds by arguing that those bonds should be treated differently (and worse) than Early Vintage GO Bonds.  (*See* Dkt. No. 9730, ¶ 5 ("However, the LCDC submits that, regardless of whether such GO bonds and Commonwealth-guaranteed bonds have any allowable claim, ***they are not entitled to the same relative lawful priority*** under the Puerto Rico Constitution and applicable Commonwealth law as the Commonwealth's full faith and credit bonds that did not violate the Constitutional Debt Limit.") (emphasis supplied); *see also* Dkt. No. 6180, ¶ 10 ("The Commonwealth's failure to comply with this Constitutional mandate resulted in the issuance of . . . full faith and credit GO bonds and guarantees in 2012 and 2014 that violated the express terms of the Constitutional Debt Limit.  Whether or not such GO bonds and guarantees have any allowable claim, ***they clearly are not entitled to any lawful priority under Commonwealth law***.") (emphasis supplied).)  The LCDC's legal position was therefore that the Late Vintage GO Bonds should not be entitled to the same recovery as the Early Vintage GO Bonds.  That position is in contrast to the New PSA where the LCDC agreed to treat the Late Vintage GO Bonds essentially the same as the Early Vintage GO Bonds.  (Mot., ¶¶ 6, 33.)  Prior to the New PSA, the LCDC had consistently argued that the Late Vintage GO Bonds should not be worth the same as Early Vintage GO Bonds, even filing an objection to that effect, and yet now, after certain members traded into those bonds, they have agreed to essentially the same treatment for the bonds in the New PSA.  The reasons for those trades, regardless of whether they took place in a "restricted" or

21

"unrestricted" period, is an essential part of the Investigation, and an issue that the Objections do not address.[9]

## IV.   THE COSTS OF AN INDEPENDENT INVESTIGATION DO NOT OUTWEIGH ITS NEED AND UTILITY, AND WILL PALE IN COMPARISON TO OTHER COSTS ALREADY BEING EXPENDED

40.   The Responses and Objections also incredibly argue, without any support, that the Investigation will be too costly to the Commonwealth, and that National is seeking to avoid paying its own costs during confirmation discovery and instead seeks to pass those costs to the Commonwealth.   (QTCB Objection, ¶¶ 10-11; LCDC Objection, ¶¶ 9, 53; GO Objection, ¶ 4; FOMB Response, ¶ 7.)   These cost-based arguments do not outweigh the substantial need for the Investigation -- as shown by the Hedge Fund Groups' own disclosures and Objections -- and are the height of audacity coming from the Hedge Fund Groups and the FOMB considering the millions of dollars the Commonwealth has already paid in these cases, and the hundreds of millions more promised to the Hedge Fund Groups in the New PSA.

41.   The Responses and Objections' focus on the cost of the Investigation is nothing more than a distraction.   The Motion seeks a short, expeditious investigation that will cost no more than is reasonable given the size of the Commonwealth's estate and the importance of its restructuring.   If the Hedge Fund Groups' trades are as appropriate and straight-forward as they proclaim in the Responses and Objections, than the cost of providing the necessary transparency will not be significant.   The Court, of course, also maintains the ability to ensure the costs of the

---

[9]   Finally, although the Objections attempt to turn National's request for the Investigation into a referendum on whether National has proven claims of securities fraud or other criminal violations (*see, e.g.,* GO Objection, ¶ 1), the need for the Investigation is not based on National alleging, much less proving, securities fraud.   National need only establish -- which it has -- that there was suspicious trading activity threatening the integrity and apparent fairness of the New PSA, any plan that was based thereon, and a potential restructuring of the Commonwealth's debts.

Investigation are on budget, managed, and streamlined, all of which can be guaranteed by the Hedge Fund Groups' cooperation.

42.    The cost of the 60-day Investigation will also pale in comparison to the exorbitant amounts that the Commonwealth has paid and will pay going forward.  Indeed, the New PSA alone provides that certain of the Hedge Fund Groups that agreed to the New PSA will be entitled to fees over $100 million, and that the collective group of hedge funds that agreed to the New PSA would potentially be entitled to a $100 million break-up fee.  (Dkt. Nos. 11946, at § 3.3, 11947-2, Exhibit B at § 6.1(a); Mot., ¶ 20.)  None of the Responses and Objections even considered or mentioned any of these costs -- all to be borne by the Commonwealth -- when baselessly criticizing the potential costs of the Investigation.

43.    Any additional expense associated with the Investigation is vastly outweighed by the benefits and necessity of the Investigation.  As discussed *supra*, the Hedge Fund Groups concede that trading took place during and around the Mediation, including after they received confidential information -- including multiple trades during the time periods trading was purportedly "restricted."  (LCDC Objection, ¶¶ 36-38, 42-45; QTCB Objection, ¶ 7 and Exhibit A; GO Objection, ¶ 2; Sculptor Response, p. 2-4, 6-8; Constitutional Joinder, ¶ 3, n.4.)  If the members of the Hedge Fund Groups did not undertake this trading, then the Investigation would be unnecessary.  Given their decisions to trade bonds around and during the Investigation -- and in a way that altered their holdings in materials ways -- the Hedge Fund Groups should not be able to avoid an issue of their own making simply because there will be relatively minimal cost to the Commonwealth.

44.     Finally, the Objections' contention that by requesting the Investigation National is seeking to avoid its own cost related to confirmation discovery, is absurd.[10]   The Motion demonstrates that a truly independent investigation -- not conducted by an interested party such as National or another creditor -- is the best way to minimize (a) the criticisms or attacks on the results of such an investigation; (b) the costs of conducting the Investigation; and (c) the delay, if any, the Investigation may cause in the Commonwealth ultimately restructuring its debts and exiting this case.  If National were to offer to conduct the Investigation itself, the same Hedge Fund Groups would undoubtedly claim the Investigation was biased -- like they do in response to the UCC Joinder and its proposal that the UCC conduct the Investigation.  The Hedge Fund Groups cannot have it both ways.

## V.     THE UCC JOINS NATIONAL'S REQUEST FOR THE INVESTIGATION

45.     Further evidencing that the trading issues raised in the Motion are neither a National-only concern nor going away any time soon without the Investigation, the UCC filed a limited joinder to the Motion that joins in the request for the Investigation.  (UCC Joinder, ¶¶ 1-2.)  The UCC also proposed that it be directed to conduct the Investigation.  (UCC Joinder, ¶¶ 2-8.)  All of the other Responses and Objections contend that the UCC is not the proper entity to conduct the Investigation because it is neither independent nor disinterested, in particular because it filed the first Rule 2019 Motion.  (QTCB Objection, ¶ 12; Sculptor Response, p. 10; GO Objection, ¶ 4; Constitutional Joinder, ¶ 1; FOMB Response, ¶ 8.)  Given these positions, National respectfully submits that the Court should direct a different entity other than the UCC to conduct

---

[10]     The argument that National is seeking to avoid its own costs for confirmation discovery is also belied by the LCDC Objection's other contention that National has been highly litigious in this case.  (LCDC Objection, ¶¶ 9, 57.)  If National has been as litigious as the LCDC contends, then it is clear that National is not afraid to incur its own costs to pursue whatever motion practice or litigation it deems appropriate and necessary.  The reality is, of course, that National is neither as litigious as the LCDC suggests, nor looking to pass its own costs onto the Commonwealth.

the Investigation, namely an entity whose independence cannot be questioned.  The importance of the Investigation is too great to have an entity that numerous parties in the case will contend is not independent or unbiased, however accurate or inaccurate that belief may be, to conduct the Investigation.  The entity directed to undertake the Investigation should be both truly independent and appear to be truly independent, such that the results of the Investigation cannot be reasonably questioned by the parties or anyone outside this case.  To preserve the integrity of this Title III case to the parties, the Commonwealth's citizens, and the capital markets as a whole, the Investigation is necessary to address the issues raised, and an unquestionable independent entity should conduct the Investigation.

46.    Based on the above, National respectfully requests that the Court overrule the Responses and Objections and grant the Motion.

## **<u>CONCLUSION</u>**

**WHEREFORE,** National respectfully requests that the Court direct an independent Investigation as set forth in the Motion and consistent with the Proposed Order, and that National be granted such other and further relief as is just and proper.

Dated:  October 20, 2020


San Juan, Puerto Rico

<table>
<tr><td>

**ADSUAR MUNIZ GOYCO**
**SEDA & PEREZ-OCHOA PSC**
208 Ponce de León Avenue, Suite 1600
San Juan, PR 00936
Telephone: (787) 756-9000
Facsimile: (787) 756-9010


By: */s/ Eric Pérez-Ochoa*
   Eric Pérez-Ochoa
   USDC-PR No. 206,314
   Email: epo@amgprlaw.com


By: */s/ Luis A. Oliver-Fraticelli*
   Luis A. Oliver-Fraticelli
   USDC-PR No. 209,204
   Email: loliver@amgprlaw.com


*Attorneys for National Public Finance*
*Guarantee Corporation*

</td><td>

**KASOWITZ BENSON TORRES LLP**
1633 Broadway
New York, New York 10019
Telephone: (212) 506-1700
Facsimile:  (212) 506-1800


*/s/ Marc E. Kasowitz*
   Marc E. Kasowitz (*pro hac vice*)
   Adam L. Shiff (*pro hac vice*)
   Kenneth R. David (*pro hac vice*)
   Sondra D. Grigsby (*pro hac vice*)
   Email:    mkasowitz@kasowitz.com
            ashiff@kasowitz.com
            kdavid@kasowitz.com
            sgrigsby@kasowitz.com


*Special Counsel for National Public Finance*
*Guarantee Corporation*

</td></tr>
</table>

### CERTIFICATE OF SERVICE

I hereby certify that on October 25, 2020, I caused the foregoing document to be electronically filed with the Clerk of the Court for the United States District Court for the District of Puerto Rico by using the CM/ECF system, which sent notification of such filing to all CM/ECF participants.

San Juan, Puerto Rico
October 25, 2020

By: */s/ Eric Pérez-Ochoa*
Eric Pérez-Ochoa