## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>     as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*,<br><br>                     Debtors.[1] | PROMESA<br><br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>     as representative of<br><br>THE EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO,<br><br>                     Debtor. | PROMESA<br><br>Title III<br><br>No. 17 BK 3566-LTS<br><br>**RESPONSE TO MOTIONS FOR SUMMARY JUDGMENT ON *ULTRA VIRES* ISSUES** |

---

[1] The Debtors in these jointly-administered PROMESA title III cases (these "Title III Cases"), along with each Debtor's respective title III case number listed as a bankruptcy case number due to software limitations and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are: (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation (Bankruptcy Case No. 17 BK 3284) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); and (v) Puerto Rico Electric and Power Authority (Bankruptcy Case No. 17 BK 4780) (Last Four Digits of Federal Tax ID: 3747).

| | |
|---|---|
| THE SPECIAL CLAIMS COMMITTEE OF THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, ACTING BY AND THROUGH ITS MEMBERS, | Adv. Proc. No. 19-00356 (LTS) |

and

THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF ALL TITLE III DEBTORS (OTHER THAN COFINA),

as co-trustees of

THE EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF PUERTO RICO,

Plaintiff,

v.

DEFENDANT 1M, *et al.*,

Defendants.

| | |
|---|---|
| THE SPECIAL CLAIMS COMMITTEE OF THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, ACTING BY AND THROUGH ITS MEMBERS, | Adv. Proc. No. 19-00357 (LTS) |

and

THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF ALL TITLE III DEBTORS (OTHER THAN COFINA),

as co-trustees of

THE EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF PUERTO RICO,

Plaintiff,

v.

STOEVER GLASS & CO., *et al.*,

Defendant.

| | |
|---|---|
| THE SPECIAL CLAIMS COMMITTEE OF THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, ACTING BY AND THROUGH ITS MEMBERS, | Adv. Proc. No. 19-00359 (LTS) |

and

THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF ALL TITLE III DEBTORS (OTHER THAN COFINA),

as co-trustees of

THE EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF PUERTO RICO,

Plaintiff,

v.

DEFENDANT 1H-78H,

Defendants.

| | |
|---|---|
| THE SPECIAL CLAIMS COMMITTEE OF THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, ACTING BY AND THROUGH ITS MEMBERS, | Adv. Proc. No. 19-00361 (LTS) |

and

THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF ALL TITLE III DEBTORS (OTHER THAN COFINA),

as co-trustees of

THE EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF PUERTO RICO,

Plaintiff,

v.

DEFENDANT 1G-50G, *et al*.,

Defendants.

**RESPONSE OF COMMITTEES TO (I) ERS BONDHOLDERS' MOTION FOR
PARTIAL SUMMARY JUDGMENT ON *ULTRA VIRES* ISSUES AND PROCEEDINGS;
AND (II) MOTION OF BANK OF NEW YORK MELLON, AS FISCAL AGENT,
FOR SUMMARY JUDGMENT PURSUANT TO
<u>FED. R. CIV. P. 56 REGARDING *ULTRA VIRES* CHALLENGE</u>**

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................1

RELEVANT UNDISPUTED FACTS .......................................................................4

ARGUMENT ..............................................................................................................6

I.   The ERS Bonds Are *Ultra Vires* And Void..........................................................6

    A.   The ERS Bonds Were Neither A Loan Nor A Borrowing From The
        Underwriters. ..............................................................................................7

    B.   The 2008 ERS Bond Issuance Was Not A "Direct Placement of Debt." ...................12

    C.   The Enabling Act's Lack Of Express Authority To Issue Bonds Is Fatal To
        The Bondholders' And Fiscal Agent's Arguments....................................15

    D.   The Bondholders' And Fiscal Agent's Other Arguments In Support Of The
        Validity Of The Bonds All Fail. ...............................................................20

    E.   The ERS Bonds Are Void, Not Simply Non-Negotiable. ...........................................21

II.  The Uniform Commercial Code Does Not Validate The *Ultra Vires* ERS Bonds.................26

    A.   UCC §8-202(b) Is Not Applicable To This Dispute......................................................26

    B.   Even If UCC §8-202(B) Could Apply To The ERS Bonds, The Bondholders
        Have Not Established Sufficient Facts To Invoke UCC §8-202, Let Alone
        Prevail Under This Provision As A Matter Of Law. ..................................30

    C.   Even If UCC §8-202(B) Could Apply To The ERS Bonds, The Fiscal Agent
        Cannot Invoke Its Protection. ...................................................................36

        1.   The Fiscal Agent Cannot Escape The Fact That The Bondholders Were
            On Notice That The ERS Bonds Were Issued Without Authority. ......................37

            a.   UCC §8-202(f) Establishes That The Bondholders, Not Cede & Co.,
                Are The "Purchasers" For UCC §8-202 Purposes...........................................37

            b.   The Fiscal Agent Filed Its Claim On Behalf Of The Bondholders And
                Its Claim Is Therefore Dependent On The Bondholders' Notice
                Defense. ...........................................................................44

            2.   The Fiscal Agent Has Failed To Provide An Evidentiary Basis For Its
              Invocation Of UCC §8-202(b). ............................................47

            3.   UCC §8-202 Does Not Protect Holders Who Take By Original Issue
              Where There Is A Constitutional Defect In The Bond's Issuance........................49

a.   The ERS Bonds Violate The Puerto Rico Constitution. ...................................49

b.   Cede & Co. Took By Original Issue. ................................................................52

III. The Bondholders And The Fiscal Agent Cannot Recover In Equity.......................................52

CONCLUSION.............................................................................................................................56

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*ADS Assocs. Grp., Inc. v. Oritani Sav. Bank*,
219 N.J. 496 (2014) ................................................................................27

*Allan Applestein TTEE FBO D.C.A. v. Province of Buenos Aires*,
415 F.3d 242 (2d Cir. 2005)...................................................................39

*Anthony v. Jasper County*,
101 U.S. 693 (1879).........................................................................24, 25

*In re Appraisal of Dell*,
No. 9322-VCL, 2015 WL 4313206 (Del. Ch. Ct. July 30, 2015)...........39

*Ayala v. Junta Cond. Bosque Sereno*,
190 D.P.R. 547 (2014) .......................................................................6, 18

*Bankhaus Herman Lampe KG v. Mercantile-Safe Deposit & Trust Co.*,
466 F.Supp. 1133 (S.D.N.Y. 1979) ........................................................29

*In re Bellanca Aircraft Corp.*,
850 F.2d 1275 (8th Cir. 1988) .................................................................9

*Berrios v UPR*,
116 D.P.R. 88 (1985) ..............................................................................55

*Buchanan v. City of Litchfield*,
102 U.S. 278 (1880)................................................................................21

*Byrd v. Martin, Hopkins, Lemon & Carter, P.C.*,
564 F.Supp. 1425 (W.D. Va. 1983), *aff'd*, 740 F.2d 961 (4th Cir. 1984) ..............................28

*California Nat'l Bank v. Kennedy*,
167 U.S. 363 (1897)................................................................................28

*Cecort Realty Development Inc. v. Llompart-Zeno*,
100 F.Supp.3d 145 (D.P.R. 2015)..............................................50, 51, 53

*City of Brenham v. German-Am. Bank*,
144 U.S. 173 (1892)..........................................................15, 16, 17, 19

*City of Brenham v. German-Am. Bank*,
144 U.S. 549 (1892)................................................................................24

*Collins v. Comm'r of Internal Revenue*,
   3 F.3d 625 (2d Cir. 1993) ...................................................................................9

*In re Color Tile Inc.*,
   92 F.App'x 846 (3d Cir. Feb. 11, 2004) .............................................................39

*Continental Ins. Co. v. Yankee Plastics, Inc.*,
   1977 WL 25562, 21 UCC Rep. Serv. 621 (N.Y. Sup. Ct. April 14, 1977) ...........................29

*De Jesús González v. Autoridad de Carreteras*,
   148 D.P.R. 255 (1999) ...............................................................................50, 51

*District Tp. of Doon v. Cummins*,
   142 U.S. 366 (1892) ....................................................................................28

*Diverse Partners, LP v. Agribank, FCB*,
   No. 16-cv-9526 (VEC), 2017 WL 4119649 (S.D.N.Y. Sept. 14, 2017) .........................40, 43

*Dixon County v. Field*,
   111 U.S. 83 (1884) .....................................................................................28

*Dutton v. City of Aurora*,
   28 N.E. 461 (Ill. 1885) .................................................................................19

*Erie Railroad Co. v. Tompkins*,
   304 U.S. 64 (1938) .....................................................................................17

*In re Financial Oversight and Management Board for Puerto Rico*,
   914 F.3d 694 (1st Cir. 2019) ...........................................................................51

*In re Financial Oversight and Management Board for Puerto Rico*,
   948 F.3d 457 (1st Cir. 2020) .......................................................................51, 52

*Forrest City v. Bank of Forrest City*,
   172 S.W. 1148 (Ark. 1915) ..............................................................................23

*GE Transp. Parts, LLC v. Central Railway Mfg., LLC*,
   No. 19-cv-4826, 2020 WL 3448018 (S.D.N.Y. June 24, 2020) ............................................27

*Holmes v. City of Shreveport*,
   31 F. 113 (W.D. La. 1887) ..............................................................................19

*Humacao Lumber Co. v. American Surety Co. of New York*,
   59 D.P.R. 165 (1941). ...............................................................................21, 22

*Int'l Salt Co., LLC v. City of Boston*,
   590 F.3d 1 (1st Cir. 2009) .............................................................................35

*Keel v. Pulte,*
    10 S.W. 2d 694 (Tex. Comm'n App. 1928)................................................................23

*Lambert v. Kysar,*
    983 F.2d 1110 (1st Cir. 1993) .....................................................................................17

*Las Marias Reference Laboratory Corp. v. Mun. San Juan,*
    159 D.P.R. 868 (2003) .............................................................................21, 24, 35, 53

*In re Lehman Bros. Mortgage-Backed Sec. Lit.,*
    650 F.3d 167 (2d Cir. 2011).........................................................................................8

*Litchfield v. Ballou,*
    114 U.S. 190 (1892).....................................................................................................53

*Marcano Rivera v. Turabo Med. Ctr. P'ship,*
    415 F.3d 162 (1st Cir. 2005) .......................................................................................17

*Marina v. Comisión de Seguridad y Protección Pública,*
    170 D.P.R. 847 (2007) .................................................................................................50

*Merrill v. Town of Monticello,*
    138 U.S. 673 (1891).......................................................................................15, 16, 19

*Merrill v. Town of Monticello,*
    72 F. 462 (7th Cir. 1896) ............................................................................................24

*Met-Al, Inc. v. Hansen Storage Co.,*
    844 F.Supp. 485 (E.D. Wis. 1994).............................................................................29

*Mitchel v. City of Burlington,*
    71 U.S. 270 (1866).......................................................................................................19

*Montgomery v. Hughes Developers, Inc.,*
    873 So.2d 1109 (Ala. 2003) ........................................................................................49

*Morales v. Municipio de Toa Baja,*
    119 D.P.R. 682 (1987) ...........................................................................................24, 53

*Norton v. McOsker,*
    407 F.3d 501 (1st Cir. 2005) .......................................................................................53

*In re Numoda Corp. Shareholders Lit.,*
    No. 9163-VCN, 2015 WL 402265 (Del. Ch. Ct. Jan. 30, 2015) .........................26, 28

*Pacific Improvement Company v. City of Clarksdale,*
    74 F. 528 (5th Cir. 1896) ............................................................................................22

*People v. Mitchell*,
No. B254321, 2015 WL 7778025 (Cal. Ct. App. Dec. 3, 2015) ............................................29

*In re Petrobras Sec. Litig.*,
150 F.Supp.3d 337 (S.D.N.Y. 2015)......................................................................................39

*Plan Bienestar Salud v. Alcalde Cabo Rojo*,
114 D.P.R. 697 (1983) ......................................................................................................54, 55

*Plaza Carolina Mall, L.P. v. Municipality of Barceloneta*,
91 F.Supp.3d 267 (D.P.R. 2015)..............................................................................4, 28, 35

*Plumbers & Pipefitters Nat'l Pension Fund v. Burns*,
967 F.Supp.2d 1143 (N.D. Ohio 2013)...................................................................................8

*Port of Palm Beach Dist. v. Goethals*,
104 F.2d 706 (5th Cir. 1939) ...............................................................................................22

*Raimundi Melendez v. Productora de Agregados*,
162 D.P.R. 215 (2004) ....................................................................................................6, 18

*Rodriguez Ramos v. The Commonwealth of Puerto Rico*,
190 D.P.R. 448 (2014) ...........................................................................................................50

*Rogers v. City of Burlington*,
70 U.S. 654 (1865)..................................................................................................................19

*Russell v. Middletown City School Dist.*,
125 A.641 (Conn. 1924) ........................................................................................................19

*In re Seacoast Anti-Pollution League*,
490 A.2d 1329 (N.H. 1985) ..................................................................................................32

*Sec. & Exch. Comm'n v. Platforms Wireless Int'l Corp.*,
617 F.3d 1072 (9th Cir. 2010) ................................................................................................8

*Sofia Perez Segovia v. Tribunal de Distrito de San Juan*,
69 D.P.R. 4 (1948) ............................................................................................................7, 12

*Springwell Navigation Corp. v. Sanluis Corp., S.A.*,
14 Misc. 3d 1206(A) (N.Y. Sup. Ct. 2006)...........................................................................40

*Suero-Algarin v. CMT Hosp. Hima San Pablo Caguas*,
957 F.3d 30 (1st Cir. 2020)....................................................................................................17

*Torres Pagan v. Municipio Autónomo de Ponce*,
191 D.P.R. 583 (2014) ...........................................................................................................18

*Town of Belleair v. Olds*,
127 F.2d 838 (5th Cir. 1942) ........................................................................28

*Travelers Cas. & Sur. Co. of Am., Inc. v. Northwestern Mut. Life Ins. Co.*,
480 F.3d 499 (7th Cir. 2007) ........................................................................27

*Waisman v. Wagner*,
227 Wis. 193 (1938) .............................................................................53, 54

*Wein v. Carey*,
41 N.Y.2d 498 (1977) ..................................................................................25

*Whitman v. Am. Trucking Ass'ns*,
531 U.S. 457 (2001) ....................................................................................15

**Statutes & Constitutional Provisions**

PR. Const., art. VI, § 9 ...............................................................4, 50, 51, 52

3 L.P.R.A. § 779 ..................................................................................*passim*

10 L.P.R.A. § 1304 .......................................................................................50

19 L.P.R.A § 451 .............................................................................29, 31, 32

19 L.P.R.A. § 1702 .......................................................................................29

19 L.P.R.A. § 1752 ..............................................................................*passim*

31 L.P.R.A. § 4 .............................................................................................18

31 L.P.R.A. § 16 ....................................................................................13, 15

31 L.P.R.A. § 3372 .......................................................................................50

UCC § 1-202 .................................................................................................33

UCC § 2-403 .................................................................................................29

UCC § 3-407 .................................................................................................29

UCC § 8-102 .................................................................................................29

UCC § 8-104 .................................................................................................41

UCC § 8-106 .................................................................................................41

UCC § 8-114 .........................................................................................30, 47

UCC § 8-202 ....................................................................................................... *passim*

UCC § 8-302 ...............................................................................................................29

UCC § 8-503 ...............................................................................................................41

**Other Authorities**

1 Anderson U.C.C. § 1-103:2 ...............................................................................27, 29

2 McQuillin Mun. Corp. § 4:11 (3d ed.).....................................................................16

10 McQuillin Mun. Corp. § 29:15 (3d ed.).................................................................53

15 McQuillin Mun. Corp. § 43:22 (3d ed.).................................................................18

H.R. 127, 147th Reg. Sess. (Del. 2013) ....................................................................28

1985 Op. Sec. Just. No. 11.....................................................................................51, 52

2001 Op. Sec. Just. No. 16..........................................................................................51

The Official Committee of Retired Employees of the Commonwealth of Puerto Rico, the Official Committee of Unsecured Creditors, and the Special Claims Committee of the Financial Oversight and Management Board for Puerto Rico (collectively, the "**Committees**") hereby submit this Response to (i) *ERS Bondholders' Motion for Partial Summary Judgment on Ultra Vires Issues and Proceedings* [Dkt. 971][2] and (ii) *Motion of the Bank of New York Mellon, as Fiscal Agent, for Summary Judgment Pursuant to Fed. R. Civ. P. 56 Regarding Ultra Vires Challenge* [Dkt. 976] (collectively, the "**Motions**").

## INTRODUCTION

In their Motions, the Bondholders and the Fiscal Agent argue that: (1) ERS had the authority under the ERS Enabling Act to issue the ERS Bonds; and (2) even if the ERS Bonds were not authorized, either the Bondholders themselves (as the Bondholders argue), or their alleged principal (as the Fiscal Agent argues), can claim the protection of §8-202(b) of the Uniform Commercial Code (the "**UCC**") and therefore recover on their claims even if the ERS bonds are *ultra vires*. Both arguments fail.

***First***, everyone agrees that the ERS Enabling Act did not explicitly authorize ERS to issue the ERS Bonds. The ERS Enabling Act provided ERS with only two options to incur debt—it could "seek a loan" or it could incur debt "through the direct placement of debts." 3 L.P.R.A. §779(d) (2008). The word "bond" is found nowhere in the statute. *Id.* Faced with the absence of any express authority to issue bonds, the Bondholders and Fiscal Agent spin a tortured construction

---

[2] Unless otherwise specified, all references to docket entries are to the ERS Title III Case No. 17-03566. All capitalized terms used herein but not defined shall have the meanings ascribed to them in the Committees' Motion for Summary Judgment [Dkt. 978] and Statement of Undisputed Material Facts [Dkt. 979].

of the ERS Enabling Act and ask the Court to disregard the statute's limitations, to read words into the statute that are not there, and then to ignore well understood finance terms of art.

Indeed, to rule for the Bondholders and Fiscal Agent, the Court must either adopt a construction of "seek a loan" or "borrow" that no one in the finance industry has ever used before, or it must change the statute's language from "direct placement" of debt to "direct debt" placement, and then interpret that phrase to somehow include a public, non-"direct placement" bond issuance. This is a bridge too far. On the other hand, to rule for the Committees, the Court must simply find that the statute means what it says, and that a publicly issued bond offering utilizing an underwriting syndicate (like the ERS Bond issuance) is neither a "loan" or "borrowing" from the underwriters nor a "direct placement of debt."

Finally, the Bondholders' and Fiscal Agent's repeated refrain that the ERS Bonds must be validly authorized because the legal opinions at the time of issuance said so, and because they have not been previously challenged, is equally unpersuasive. No authority supports the Bondholders' and Fiscal Agent's argument that "ratification" can somehow cure an *ultra vires* defect.

**Second**, while the Bondholders and Fiscal Agent take different approaches to try to fit their respective claims within UCC §8-202(b), neither hits the mark. For starters, UCC §8-202(b) is inapplicable where, as here, the bonds are not simply procedurally defective but void *ab initio* under applicable law. But even if UCC §8-202 could apply here, it is of no help to either the Bondholders or the Fiscal Agent. For their part, the Bondholders—who are in an untenable position given that many among them continued to make large purchases of ERS Bonds despite being engaged in formal litigation over the invalidity of the ERS Bonds since 2017—take a surreal approach to the concept of notice. They argue that a party only can be on "notice" of the bonds' invalidity if a court has actually ruled the bonds are invalid and the bondholder buys the bonds

anyway. To be clear, the Bondholders' position is that they could buy more ERS Bond holdings *today* and still be considered without notice of the ERS Bonds' *ultra vires* nature. The Bondholders' position renders UCC §8-202(b) a nullity and turns notice into knowledge beyond all metaphysical doubt—a proposition for which unsurprisingly there is no support. In any event, as laid out in the Committees' motion for summary judgment, the Bondholders plainly were on notice of the potential invalidity of the ERS Bonds while they were making their purchases. Not only have they been litigating the issue for going on three years, but they also sought out legal counsel on the issue, were aware that the Puerto Rico Legislative Assembly called the ERS Bonds "illegal" in 2011, and knew of and reviewed the debt authorization language of the ERS Enabling Act as it existed in 2008. On this undisputed factual record, the Court can and should find that the Bondholders were on notice of the ERS Bonds' invalidity.

The Fiscal Agent takes a very different approach to UCC §8-202(b). It argues that it filed its claim on behalf of itself and Cede & Co. (the registered owner of the ERS Bonds) and that Cede & Co. is a purchaser without notice under the UCC. The Fiscal Agent's reliance on Cede & Co. is a red herring. For bonds (like the ERS Bonds) issued through the indirect holding system, it is the entitlement holders' (the Bondholders) and not the bond owner's (Cede & Co.) notice that matters under UCC §8-202(b). And the Bondholders unquestionably were on notice of the *ultra vires* nature of the ERS Bonds. In addition, the Fiscal Agent's recent revelation that it filed claims on behalf of itself and Cede & Co. alone (seemingly an attempt to distance the Fiscal Agent from the Bondholders' knowledge) is in conflict with the Fiscal Agent's actions on behalf of the Bondholders and other beneficiaries throughout this case. Indeed, if the Fiscal Agent can try to take advantage of the alleged ignorance of one of its constituents (Cede & Co.), it also must be charged with the notice of others (the Bondholders).

Further, even if Cede & Co. was relevant to the inquiry (and it is not), the Fiscal Agent is silent as to whether it or Cede & Co. were on notice of the *ultra vires* nature of the ERS Bonds. But even if the Fiscal Agent could show that Cede & Co. lacked notice of the defect and that its alleged lack of notice  is legally relevant under UCC §8-202(b) (as opposed to the Bondholders' lack of notice), the ERS Bonds still would not be valid in Cede & Co.'s hands. This is because UCC §8-202, by its terms, does not a protect a holder who "takes by original issue" if "the defect involves a violation of a constitutional provision." 19 L.P.R.A. §1752(b)(1). The ERS Bonds are in violation of Article VI, §9 of the Puerto Rico Constitution, which mandates that "public property and funds shall only be disposed of for public purposes, for the support and operation of state institutions, *and pursuant to law*." Puerto Rico Const., art. VI, §9 (emphasis added). Under Puerto Rico law, an *ultra vires* contract is void *ab initio*, meaning that there is nothing for UCC §8-202(b) to validate. *See Plaza Carolina Mall, L.P. v. Municipality of Barceloneta*, 91 F.Supp.3d 267, 290 (D.P.R. 2015). Because Cede & Co. took by original issue, it cannot avail itself of UCC §8-202.

\* \* \*

For all of these reasons, and for the reasons set forth in the Committees' Motion for Summary Judgment [Dkt. 978, 979], the Committees respectfully request that this Court deny the Bondholders' and Fiscal Agent's Motions, and instead grant summary judgment for the Committees.

## RELEVANT UNDISPUTED FACTS

Given that the Committees also have moved for summary judgment on the same two issues as the Bondholders and Fiscal Agent, and to avoid duplication, the Committees refer the Court to, and fully incorporate herein, their Motion for Summary Judgment [Dkt. 978] as well as the Statement of Undisputed Material Facts [Dkt. 979] submitted therewith. The Committees also

incorporate their responses to the Bondholders' and Fiscal Agent's statements of undisputed facts, which will be filed contemporaneously with this Response.

What the parties' submissions show is that there is no dispute of any material fact necessary to decide the legality of the ERS Bonds. The parties agree that in 2008, ERS issued nearly $3 billion in publicly issued bonds using an underwriting syndicate. [Dkt. 971-1 at 2; Dkt. 976 at 5; Dkt. 978 at ¶ 19.] There also is no dispute that ERS purported to issue the ERS Bonds under the ERS Enabling Act. [Dkt. 971-1 at 5; Dkt. 976 at 2; Dkt. 978 at ¶ 14.] The only dispute is a legal one: whether the ERS Enabling Act actually authorized ERS to issue the bonds.

Likewise, there is no dispute of material fact on the question of whether the Bondholders or the Fiscal Agent can avail themselves of UCC §8-202(b) because neither the Bondholders nor the Fiscal Agent provide *any* evidence about what the Bondholders, the Fiscal Agent, or Cede & Co. actually knew or did not know at the time the ERS Bonds were issued or anytime thereafter. The Fiscal Agent rests entirely upon the alleged lack of notice of the Depository Trust Company (the "**DTC**"), which, as set forth below, is irrelevant, and in any event, does not address what Cede & Co. knew. [Dkt. 977 at ¶¶ 30-47.] The Bondholders attempt to mask their lack of any relevant evidence by listing certain facts they contend, *if known*, would suggest a lack of notice under UCC §8-202. But that list is meaningless in light of the Bondholders failure to provide any evidence on the operative factual inquiry: what ***they*** actually knew about the ERS Bonds.  [*See generally* Dkt. 972.]

The Bondholders' reluctance to engage in the operative inquiry about what was known to them is not surprising given that the undisputed facts prevent any finding that they are protected under UCC §8-202. As even the Bondholders have to admit, they have been engaged in litigation

over the validity of the ERS Bonds for years. [Dkt. 971-1 at 38.] The undisputed facts also show

(and the Bondholders have admitted to such facts in their depositions and declarations) that:

- the Bondholders knew that the Legislative Assembly declared the ERS Bonds "illegal" in 2011;
- the Bondholders were aware of and had read the debt authorization language of the ERS Enabling Act, which on its face does not authorize a public bond offering; and
- as early as 2014, the Bondholders' attorneys provided legal advice on this issue to one of the group's members.

[Dkt. 978 at ¶¶ 30-31, 96-98.] As a result, the Bondholders' UCC §8-202(b) defense fails as a

matter of law.

## ARGUMENT

### I.   The ERS Bonds Are *Ultra Vires* And Void.

The threshold issue before the Court is whether the ERS Enabling Act authorized ERS to

issue the ERS Bonds. The Bondholders and Fiscal Agent do not argue that there is any source

other than the ERS Enabling Act that could have given or purported to give ERS the authority to

issue the bonds. Nor could they, as it is well established under Puerto Rico law that "administrative

agencies only have those powers which have been explicitly granted by its enabling act and those

that are indispensable to carry out those which have been conferred." *Raimundi Melendez v.

Productora de Agregados*, 162 D.P.R. 215, 224 (2004). Consequently, if the ERS Bonds were

issued outside the ERS Enabling Act's parameters, the bonds are void: "administrative agencies

cannot act beyond what was delegated to them, such that any administrative action that does not

obey the power conferred to it by way of legislation must be catalogued as *ultra vires*, and therefore

void." *Ayala v. Junta Cond. Bosque Sereno*, 190 D.P.R. 547, 547-48 (2014).

The Bondholders and Fiscal Agent argue that the ERS Bonds fall within the ERS Enabling

Act's statutory grant of authority in two ways: (i) as a borrowing and/or loan from the underwriting

syndicate [Dkt. 971-1 at 9-17]; and (ii) as "direct debt placements" [*id.* at 17-26]. Both arguments

fail as a matter of law.

### A.   The ERS Bonds Were Neither A Loan Nor A Borrowing From The Underwriters.

The Bondholders and Fiscal Agent ask this Court to hold that the ERS Enabling Act's

authorization for ERS to "seek a loan [or 'borrow' under their translation] from a financial

institution" encompasses public bond offerings. To try to fit this square peg into a round hole, the

Bondholders and Fiscal Agent engage in a significant amount of linguistic contortion. As

explained in detail in the Committees' summary judgment motion, there is no basis to accept the

argument that public bond offerings, including the ERS Bond issuance, involve the issuer

borrowing or taking a loan from the participating underwriters. [Dkt. 978 at ¶¶ 46-51.] Nothing in

the Bondholders' or Fiscal Agent's Motions changes this conclusion.[3]

What is most telling about the Bondholders' and Fiscal Agent's argument is that they are

unable to provide *any* support for the proposition that a public bond offering, like the one here,

ever has been viewed, discussed, or classified as a loan or borrowing by the bond issuer from the

underwriters. This complete lack of support is not surprising because, without exception, the role

---

[3] The Bondholders and Fiscal Agent spend a significant amount of time arguing that the English translation of the ERS Enabling Act is incorrect because it translates "tomar prestado" into "seek a loan" as opposed to "borrow." [Dkt. 971-1 at 5-9.] This issue is wholly academic because the ERS Bond issuance involved neither a loan nor any form of borrowing from the underwriters. In any event, the Bondholders' and Fiscal Agent's argument is incorrect, as there is no discrepancy between the Spanish and English versions of the law because "to seek a loan" is a proper translation of "tomar prestado." As the Puerto Rico Supreme Court has acknowledged, so long as the disputed translation is "substantially satisfactory," the courts should not disturb the Government's official translation. *Sofia Perez Segovia v. Tribunal de Distrito de San Juan*, 69 D.P.R. 4, 8 (1948). The only argument the Bondholders present for why the ERS Enabling Act's translation is wrong is the opinion of Dr. Laura Gonzalez. But as laid out in detail in the Committees' Motion to Exclude Dr. Gonzalez's Testimony filed contemporaneously herewith, Dr. Gonzalez is not qualified to offer that opinion. Consequently, there is no basis to disregard the Official English translation of the ERS Enabling Act.

of an underwriter in a public bond offering is *never* described in terms of a lending relationship. Instead, the underwriter is universally acknowledged as a financial intermediary that connects the bond issuer with the investing public. (Ex. 1, Doty Report at 8-10, 12-13.[4])

Consistent with that understanding, courts addressing the role of an underwriter describe the role as "[a]ny intermediary between the issuer and the investor that is an essential cog in the distribution process [for a security]." *Sec. & Exch. Comm'n v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072, 1086 (9th Cir. 2010) (describing an underwriter under the Securities Act of 1933) (internal quotations omitted). As the Second Circuit has explained, "persons playing roles essential in the *actual distribution of securities* qualify as underwriters." *In re Lehman Bros. Mortgage-Backed Sec. Lit.*, 650 F.3d 167, 178 (2d Cir. 2011) (emphasis added). Simply put, "[w]hen a company first issues a bond, underwriters bring the bond to market and act as intermediaries between buyers and sellers." *Plumbers & Pipefitters Nat'l Pension Fund v. Burns*, 967 F.Supp.2d 1143, 1150 (N.D. Ohio 2013).

What the underwriters did in connection with the ERS bond issuances fits the definition of an underwriter to a tee. As with all public bond offerings, and in stark contrast to a lending relationship, the entire purpose of the underwriter syndicate for the ERS Bonds was to work with ERS in marketing the ERS Bonds to the public. (Ex. 1, Doty Report at 6, 8.) Issuers like ERS use underwriters "because municipal bond issuers generally lack the capability, knowledge, sophistication, and investor contacts to be able to identify and negotiate with a broad range of investors for the issuer's bonds." (*Id*. at 8.) In other words, underwriters exist not to hold the underlying debt themselves but to find public investors to do so.

---

[4]   All exhibit references are references to exhibits to the Declaration of Landon S. Raiford, filed contemporaneously herewith.

Undisputed evidence demonstrates that this is the way the relationship worked in connection with ERS's attempts to issue bonds. Originally, ERS sought to issue $7 billion in bonds, but that issuance did not happen because the underwriters could not find a market for that level of debt and were unwilling to take the risk that they could be left holding the bonds. (*Id*. at 6.)

Moreover, under the Purchase Contract, and unlike a lender, the underwriters were contractually bound "to make a bona fide public offering of all the [ERS] Bonds, solely within Puerto Rico, at prices not in excess of the initial public offering prices … set forth on the inside cover page of the Official Statement." (Ex. 2, Series A Purchase Contract at ¶ 4.) The Bondholders and Fiscal Agent attempt to obfuscate this point by noting there are situations where lenders intend to and do resell loans. True but irrelevant. The pertinent factual point is not that the underwriters had the intent to resell the bonds to the public; it is that the underwriters were legally obligated to make a public offering under their contract with ERS. This, of course, makes sense given that the *sine qua non* of a public bond offering is to make the debt instrument available to the investing public. The Bondholders and Fiscal Agent have not (and cannot) point to a single example where a lender, as opposed to an underwriter, is contractually bound to make its loan available for public purchase.

Further, the "hallmark" of a loan or borrowing is the lender's "absolute right to repayment of funds advanced." *See In re Bellanca Aircraft Corp.*, 850 F.2d 1275, 1277 (8th Cir. 1988); *accord Collins v. Comm'r of Internal Revenue,* 3 F.3d 625, 631 (2d Cir. 1993). Here, the underwriters' sole compensation for bringing the ERS Bonds to market was the difference between the underwriters' purchase price and the price at which the bonds were sold to the public. In response, the Bondholders and Fiscal Agent argue, without support, that ERS was, in fact, "liable to the

underwriters as holders of ownership interests in the bonds for the payment of interest and principal." [Dkt. 971-1 at 14.] But the Bondholders and Fiscal Agent admit that the underwriters were never the registered owners of the bonds [*Id*. at 13 n.11] and fail to set forth any evidence showing that any underwriter ever was an "entitlement holder" of the ERS Bonds. And if this were the case, the Fiscal Agent would know because "[t]ransfers of these indirect security entitlement positions among [DTC's] members are tracked electronically through DTC's automated system." [Dkt. 976 at 12.]

Consistent with the economic reality of the ERS Bond issuance, none of the operative documents governing either the ERS Bonds or the underwriters' relationship with ERS speak in terms of a loan or borrowing *vis-à-vis* the underwriters. Indeed, as Mr. Doty explains, "it is clear the ERS Bond issuance contemplated that UBS and the other members of the underwriting syndicates were fulfilling an intermediating function by buying ERS' Bonds for resale to public investors." (Ex. 1, Doty Report at 19.) Accordingly, "[t]he transactions conform to the typical municipal bond market standard of purchase and sale transactions. Thus, ERS did not 'borrow' or take a 'loan' from the underwriting syndicates." (*Id*. at 21.)

Against all of this, the Bondholders and Fiscal Agent make the unsupported argument that the underwriters actually were lenders because under the Purchase Contract the underwriters purchased the ERS Bonds and transferred money to ERS for that purchase. [Dkt. 971-1 at 13.] But this would turn every underwriter in a public bond offering into a lender—a proposition for which there is zero historical support in the municipal finance industry, as the Bondholders' expert himself acknowledged. (Ex. 3, Hildreth Dep. Tr. 156:4-22). The Bondholders' and Fiscal Agent's argument that every purchaser is necessarily a lender is plainly incorrect and requires one to simply

10

ignore what is obvious: that the underwriters' purchase of the ERS Bonds for immediate resale in no way constitutes a loan or other borrowing.

The Bondholders and Fiscal Agent also set forth a strawman argument: "if the Committees and Government Parties were correct that a holder that resells its ownership interests in the bonds rather than holding them to maturity is not a lender, then it would be the identity of the *current* holder that mattered," and because the moving Bondholders are "financial institutions," the ERS Bonds fit within the Enabling Act. [Dkt. 971-1 at 15 (original emphasis).] But that tortured argument is not the Committees' position at all. The question here, at least as framed by the Bondholders, is whether the 2008 ERS Bond issuance was a loan (or borrowing in their parlance) from the underwriters (which are financial institutions) *at the time the ERS Bonds were issued* such that the ERS Bonds fit within the ERS Enabling Act. While the answer to that question is "no," that answer is derived from the undisputed nature of the role underwriters play in a public bond issuance and is in no way based on an argument that a transfer of an interest in a bond somehow retroactively alters the issuer-investor relationship. The key here is that the underwriters were never lenders in the first place.

In conclusion, this Court should reject the Bondholders' and Fiscal Agent's attempt to fundamentally alter the financial markets' understanding of what the nature of a public bond offering entails. Instead, the Court should recognize what the entire universe of public municipal bond literature concludes—that the underwriter is a financial intermediary that helps connect the bond issuer with public bond investors (the ultimate purchasers of the bonds) and the bond issuer therefore does not engage in a borrowing (or receive a loan) from the underwriter.

### B. The 2008 ERS Bond Issuance Was Not A "Direct Placement of Debt."

The Bondholders and Fiscal Agent also incorrectly argue that the ERS Bond issuance fits under the ERS Enabling Act because it constitutes a "direct debt placement." [Dkt. 971-1 at 17.] This argument depends upon a misreading of the ERS Enabling Act and fails for multiple reasons.

*For starters*, the phrase "direct debt placement" does not even appear in the ERS Enabling Act. Instead, the ERS Enabling Act authorizes ERS to engage in the "direct placement of debts." 3 L.P.R.A. §779(d) (2008). And unlike the argument over the correct translation of "tomar prestado," the Bondholders and Fiscal Agent do not claim that the Commonwealth's official translation of the phrase "colocaciones directas de deuda" into "the direct placement of debts" is incorrect. [*See* Dkt. 971-1 at 6-9 (noting the "three ways" the Bondholders and Fiscal Agent believe the "Spanish text differs from the 'official' translation," which do not include the translation of "direct placement of debts").] Instead, the Bondholders and Fiscal Agent simply change the phrasing without any support or explanation. This sleight of hand, however, is contrary to Puerto Rico law, which holds that so long as a disputed translation is "substantially satisfactory," the courts should not disturb the Government's official translation. *Sofia Perez Segovia v. Tribunal de Distrito de San Juan*, 69 D.P.R. 4, 8 (1948). Here, the Court must find that official translation to be "substantially satisfactory" as the Bondholders have offered no evidence or argument to challenge it.

*Second*, the Bondholders' and Fiscal Agent's linguistic gymnastics are obviously intended to avoid the fact that the phrase actually used in the ERS Enabling Act—direct placement—is a well-recognized financial term of art that describes a specific type of bond offering. [Dkt. 978 at ¶¶ 52-57.] Direct placements have two distinguishing features: (1) the lack of an arms-length underwriter or other financial intermediary; and (2) the solicitation of a limited group of investors,

12

rather than the general public. It is undisputed that the ERS Bonds lack both of these defining characteristics, and the Bondholders do not even attempt to argue otherwise.

**Third**, to bolster their argument that the phrase "direct placement of debts" should be read as "direct debt placement," the Bondholders and Fiscal Agent incorrectly point to the use of the word "direct" in other provisions in the ERS Enabling Act. [Dkt. 971-1 at 17-18.] They claim that elsewhere the word "direct" is used "to refer to that distinction between debt incurred directly and debt incurred through a conduit entity" and therefore "direct" must have the same meaning here. [*Id.*] That is wrong for two reasons. It ignores that under Puerto Rico law, "[t]echnical terms and phrases used in the arts and sciences shall be interpreted according to their received meaning and acceptation with the experts and authorities in the science, art or profession to which they refer." 31 L.P.R.A. §16. And the Bondholders and Fiscal Agent present no rebuttal to the fact that "direct placement" has for decades had a well-established meaning in finance.

This argument also misidentifies the problem. The issue is not whether *directas* (direct) is translated differently throughout the ERS Enabling Act. It is not. The issue is that the Bondholders and Fiscal Agent fail to recognize that the placement of the word "direct" in the four examples they rely upon leads to different results because of how "direct" is used in each instance. [Dkt. 971-1 at 18 & n.13.] The primary example the Bondholders and Fiscal Agent rely upon—the prohibition found in §779(b)(2)(A)(ii), which prohibited ERS from investing in "private placings"—does not imply, as the Bondholders argue, that the phrase "colocaciones directas de deuda" should be translated into "direct debt placement." [Dkt.971-1 at 18 (citing §779(2)(A)(ii)).] As explained in the Committees' brief, "direct placement" and "private placement" are terms that are used synonymously so the fact that the Puerto Rico Legislative Assembly would use both terms is of no significance to the outcome of this dispute. [Dkt. 978 at ¶ 61.]

The other three examples, which the Bondholders relegate to a footnote, fare no better. [Dkt. 971-1 at 18 n.13.] For example, section 779(b) sets forth the types of assets in which ERS may invest its own assets. One such asset class is "fixed yield securities," which is defined to include "Bonds, notes or other evidence of indebtedness … that represent direct obligations or are secured by the good faith and credit of the government entities." 3 L.P.R.A. §779(b)(1)(C). The Bondholders and Fiscal Agent are wrong that "direct" as used in section 779(b) is drawing a distinction between the direct obligations of a government entity as opposed to the obligations incurred by a conduit entity. Instead, the distinction being drawn is between obligations where the governmental entity is directly liable as opposed to obligations that are guaranteed through a pledge of that entity's full faith and credit, with the Legislative Assembly giving ERS the ability to invest in both.

The Bondholders and Fiscal Agent also argue that section 779(b)(1)(F) supports their position. [Dkt. 971-1 at 18 n.13.] But section 779(b)(1)(F) simply includes within its definition of "fixed yield securities" "[f]inancial instruments constituted directly or indirectly on financial obligations such as mortgage loans, instruments secured by such loans, as well as automobile loans and lease contracts." 3 L.P.R.A. §779(b)(1)(F). Thus, "directly" and "indirectly" as used in this provision of the ERS Enabling Act refers to the relationship of a financial instrument to the underlying financial obligation and makes clear that ERS is authorized to invest in financial dirivatives or other instruments based indirectly on underlying mortgage or auto loans/contracts. This language, too, has nothing to do with distinguishing between debts issued by a government entity itself and debts issued through a conduit structure created by the government entity, as the Bondholders and Fiscal Agent claim.

The Bondholders and Fiscal Agent also cite section 779(b)(3) which authorizes ERS to "invest up to a maximum of 15% of its total resources in direct or indirect investments in income-yielding real estate." 3 L.P.R.A. §779(b)(3). [Dkt. 971-1 at 18 n.3.] But again, "direct" and "indirect" are not used to distinguish between direct and conduit financing but are used simply to allow ERS either to directly invest in real estate or passively invest in real estate through an investment that itself has real estate holdings.

In sum, the Bondholders' and Fiscal Agent's examples of where ERS is itself authorized to invest in certain types of asset classes are reeds far too slender to support their reading of the statute. Particularly in light of Puerto Rico's mandate that terms of art are to be given their technical usage (31 L.P.R.A. §16), this Court should interpret "direct placement of debts" in a way that does no violence to how the statute is actually written.

### C.    The Enabling Act's Lack Of Express Authority To Issue Bonds Is Fatal To The Bondholders' And Fiscal Agent's Arguments.

Even if there were a question as to whether the Bondholders' and Fiscal Agent's fundamentally implausible reading of the ERS Enabling Act might have merit (and there is not), any such doubt would be removed by the fact that the word "bond" does not appear in the ERS Enabling Act's debt authorization provision. Logic dictates that if the Puerto Rico Legislative Assembly had intended ERS to engage in public bond offerings, it would have said so explicitly. As the Supreme Court has noted, legislatures "do[] not, one might say, hide elephants in mouseholes," particularly with respect to the scope of an agency's power. *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001) (vacating *ultra vires* agency action).

This conclusion is further supported by the fact that the Supreme Court has long held that a general grant of authority to a municipality to incur debt does not give that entity the power to issue bonds to the public. *Merrill v. Town of Monticello*, 138 U.S. 673, 686 (1891); *City of*

*Brenham v. German-Am. Bank*, 144 U.S. 173, 181-82 (1892). The Bondholders and Fiscal Agent attempt to diminish the importance of these cases by noting that they construe the law of specific states and that the state courts that have addressed this issue directly are split over whether a general borrowing power equates to the ability to issue bonds in a public offering. [Dkt. 971-1 at 20-21.] The Bondholders and Fiscal Agent then argue there is no basis for this Court to conclude that a Puerto Rico court would follow the Supreme Court's rule. That is incorrect.

*First*, the Bondholders inaccurately characterize *Merrill* and *Brenham* as cases concerning the power to issue municipal bonds only under Indiana and Texas law. While the Supreme Court analyzed the authority of the municipalities to issue bonds under the respective state laws, the Court's analysis of the issue plainly used general principals of law and applied them to the pertinent state law. It cannot be seriously argued that when the Supreme Court held in *Merrill* that "there is a marked legal difference between the power to give a note to a lender for the amount of money borrowed, or to a creditor for the amount due, and the power to issue for sale, in open market, a bond, as a commercial security…," that the Court was only prescribing a rule of law applicable to Indiana. 138 U.S. at 687. In so doing, the Court consulted a preeminent municipal law treatise when discussing the standard for adjudicating *ultra vires* challenges, and that treatise endorsed Dillon's Rule for this purpose. 138 U.S. at 681. Dillon's Rule provides that municipalities can only exercise powers that statutes grant to them using "express words," plus powers that are "necessary," "essential," or "indispensable" to those express powers. *Id.*; *see also* 2 McQuillin Mun. Corp. §4:11 (3d ed.) (discussing Dillon's Rule as followed in numerous jurisdictions today). The rule further incorporates a strict construction principle: "[a]ny fair, reasonable doubt concerning the existence of power is resolved by the courts against the [municipal] corporation, and the power is denied." 138 U.S. at 681. Critically, after reciting Dillon's Rule, the *Merrill* Court

cited case law originating from California, Connecticut, Illinois, Kentucky, Louisiana, Michigan, Mississippi, Nebraska, and Tennessee as consistent with that rule. *Id.* at 681-82, 687-91 (collecting cases).

Similarly, when the Court in *Brenham* affirmed the "well-settled rule that any doubt as to the existence of such power [of a municipality to issue bonds] ought to be determined against its existence" because "[i]t is easy for [a] legislature to confer upon a municipality, when it is constitutional to do so, the power to issue negotiable bonds," 144 U.S. at 182, it was not limiting these principles to Texas law only. Any doubt on this point is put aside by the fact that the *Brenham* court overruled its previous decision on the ability of an Iowa municipality to issue bonds. This would have been wholly unnecessary if, as the Bondholders and Fiscal Agent assert, *Brenham* was confined to Texas law. 144 U.S. at 187.

Moreover, the fact that these cases pre-dated *Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938), is irrelevant. *Erie* simply requires federal courts in diversity cases to apply the substantive law of the forum state. *Erie* has two "twin aims": the "discouragement of forum-shopping" and the "avoidance of inequitable administration of the laws." *Suero-Algarin v. CMT Hosp. Hima San Pablo Caguas*, 957 F.3d 30, 39 (1st Cir. 2020). Recognizing *Erie*'s purpose, the First Circuit has repeatedly held that *Erie* has no application where the substantive law of the forum state and principles of federal law do not conflict. *Lambert v. Kysar,* 983 F.2d 1110, 1116-17 (1st Cir. 1993); *see also Suero-Algarin*, 957 F.3d at 42-43; *Marcano Rivera v. Turabo Med. Ctr. P'ship*, 415 F.3d 162, 172-73 (1st Cir. 2005).

Here, *Erie* does not invalidate *Merrill* or *Brenham,* as their holdings are consistent with Puerto Rico law. In fact, the Puerto Rico Supreme Court has used language remarkably similar to Dillon's Rule to describe the scope of agencies' authority to act: an "administrative agenc[y] only

ha[s] those powers which have been *explicitly* granted by its enabling act and those that are *indispensable* to carry out those which have been conferred," *Melendez*, 162 D.P.R. at 224 (emphasis added); "[n]either necessity nor utility nor convenience can replace the statute as a source of power of an agency," *Torres Pagan v. Municipio Autónomo de Ponce*, 191 D.P.R. 583, 586 (2014); and "any doubt with respect of the existence of that [agency] power must be resolved against its exercise." *Id.*

The Civil Code further provides that "[a]cts executed contrary to the provisions of law are void except when the law preserves their validity." 31 L.P.R.A. §4; *see also* 15 McQuillin Mun. Corp. §43:22 (3d ed.) ("[A]uthority to issue bonds can be conferred only by language which leaves no reasonable doubt of an intention to grant it, and . . . if the intention of a statute purporting to authorize the issuance of bonds is doubtful, the doubt will be resolved against the authority to issue the bonds"). Moreover, as the Committees noted in their summary judgment motion, the Puerto Rico Legislative Assembly has been consistent in expressly authorizing its governmental entities to issue bonds when it intends to grant that authority and does so even when it also provides the instrumentality general authority to engage in borrowing. [Dkt. 979-1, App. I (listing over fifty instances where the Puerto Rico Legislative Assembly expressly grants an instrumentality the general authority to issue bonds).] The fact that no such language appears in the ERS Enabling Act is telling and defeats the Bondholders' and Fiscal Agent's unsupported and contrary argument.

By requiring broad, express authority for a governmental entity to issue bonds, Puerto Rico law matches *Merrill* and *Brenham*. And applying *Merrill*, *Brenham*, and Puerto Rico law means that the ERS Bonds are *ultra vires* because the ERS Enabling Act contains no express language authorizing ERS to issue bonds in a public offering. *See Ayala*, 190 D.P.R. at 547-48 (Puerto Rico's "administrative agencies cannot act beyond what was delegated to them" and any such

18

action "must be catalogued as ultra vires, and therefore void"); *accord Merrill*, 138 U.S. at 687-88; *Brenham*, 144 U.S. at 182.

**Finally**, even if Puerto Rico law would equate a statute's grant of broad borrowing authority with the ability to issue bonds in a public offering, as the Bondholders and Fiscal Agent argue, the ERS Bonds still would fall outside the scope of the Enabling Act. The Bondholders and Fiscal Agent provide a handful of examples where certain states have allowed broad, general borrowing authority to encompass the issuance of public bonds. But the statutory language at issue in those cases is in sharp contrast to the ERS Enabling Act. For example, the Supreme Court of Errors of Connecticut held that a statute providing "that the several school districts in this state are hereby empowered to borrow money, for any purpose for which they are now authorized to lay a tax" was sufficient to authorize bond issuances. *Russell v. Middletown City School Dist.*, 125 A.641, 642 (Conn. 1924). Likewise, the statutory language in *Dutton v. City of Aurora* provided that "such cities, incorporated towns, and villages may borrow money…." 28 N.E. 461, 462 (Ill. 1885). The same general authority to "borrow money" also appears in the later overturned cases of *Rogers v. City of Burlington*, 70 U.S. 654, 657 (1865), and *Mitchel v. City of Burlington*, 71 U.S. 270, 271 (1866) (charter allowed city corporation to "borrow money for any public purpose"). Finally, in *Holmes v. City of Shreveport*, the relevant statute expressly authorized the issuance of bonds. 31 F. 113, 114 (W.D. La. 1887).

By contrast, the ERS Enabling Act does not confer this type of broad, limitless power. To the contrary, the ERS Enabling Act limited ERS's borrowing ability to loans from financial institutions, the federal government, or the Commonwealth itself, or through the direct placement of debts (as that term is universally understood in finance). 3 L.P.R.A §779(d). That limited authority does not provide the broad grant that some courts in other jurisdictions have interpreted

19

to include the ability to issue bonds. Therefore, the Court should not rely upon these decisions and instead should hold that ERS lacked the authority to issue bonds in public offerings.

### D. The Bondholders' and Fiscal Agent's Other Arguments In Support Of The Validity Of The Bonds All Fail.

Because the ERS Enabling Act plainly did not authorize the ERS Bonds, that is the end of the inquiry. The Bondholders' and Fiscal Agent's attempts to validate the ERS Bonds by pointing to (i) the *Rivera Torres v. Junta de Retiro Para Maestros* decision; (ii) purported agency interpretations; and (iii) subsequent legislation all fail for the reasons set forth in the Committees' Motion for Summary Judgment, which are incorporated in full here. [Dkt. 978 at ¶¶ 62-73.]

The Bondholders and Fiscal Agent do make one new argument in their summary judgment motion that was not present in their previous filings—namely, that this Court should discount the fact that Act 116 expressly states that "[t]he [ERS] Bond Issue was illegally made by the System's Administration even though such transaction was submitted to the Legislative Assembly for approval and rejected by the House of Representatives for deeming it detrimental to the System." (Ex. 4, Act 116-2011, Statement of Motives, at GLC-ERS-005288.) They reason that this statement is irrelevant because the bond issuance the Legislative Assembly rejected was the original plan to have the ERS Bonds issued as obligations of the Commonwealth. [Dkt. 971-1 at 30-31.] So what. The obvious point the Legislative Assembly was making is that, having failed in its effort to raise funds through a public offering of Commonwealth bonds for ERS's benefit, ERS's Administration illegally conducted its own public bond offering.

Equally unavailing is the Bondholders' and Fiscal Agent's argument that because Act 116 is predominately forward-looking, that means the Legislative Assembly was conceding the validity of the ERS Bond issuance. But the fact that the Legislative Assembly modified the ERS Enabling Act to make sure an illegal bond issuance would not occur again is not an acknowledgment of the

validity of the 2008 bond issuance; it is a product of the fact that the Legislative Assembly cannot change the past. Instead, the Legislative Assembly expressly acknowledged the invalidity of the 2008 bond issuance and changed the law to help ensure that ERS did not issue such bonds again. And none of the Bondholders' and Fiscal Agent's arguments concerning implied ratification (which does not exist under Puerto Rico law) can change the fact that when the Legislative Assembly directly spoke about the ERS Bonds, it declared them to be illegal.

Ultimately, the Bondholders' and Fiscal Agent's ratification arguments amount to nothing more than a distraction. The ERS Bonds do not fall under the wording of the ERS Enabling Act. Thus, there is no need for the Court to attempt to interpret the ERS Enabling Act by trying to divine meaning from what ERS or the Legislative Assembly thought of the legality of the ERS Bonds at different points in time over the past twelve years. ERS did not have the statutory authority to issue the ERS Bonds, and so they are *ultra vires* and void.

### E.      The ERS Bonds Are Void, Not Simply Non-Negotiable.

The Bondholders and Fiscal Agent also argue that a finding that the ERS Bonds were issued without authority "would not render the ERS Bonds or the secured debt that they represent void or unenforceable, but merely non-negotiable." [Dkt. 971-1 at 24.] As explained in the Committees' Motion for Summary Judgment, this argument is baseless. [Dkt. 978 at ¶¶ 74-77.]

*First*, it ignores that in Puerto Rico, as elsewhere, when a government instrumentality takes an *ultra vires* action, that action is void. *See Las Marias Reference Lab. Corp. v. Mun. San Juan*, 159 D.P.R. 868, 874 (2003) (holding that *ultra vires* governmental contract is "void"); *Buchanan v. City of Litchfield*, 102 U.S. 278, 288 (1880) ("[T]here would seem to be no escape from the conclusion that the bonds are void for the want of legal authority to issue them at the time they were issued."). In fact, the Puerto Rico Supreme Court has expressly refused to enforce an *ultra vires* municipal bond. In *Humacao Lumber Co. v. American Surety Co. of New York*, the plaintiff

21

received a purported municipal bond "charged to the budget of the municipality…." 59 D.P.R. 165, 166 (1941). Because the bond was *ultra vires*, which rendered it "null and void," the Puerto Rico Supreme Court held that the bondholder was not entitled to make *any* claim based upon its bond, including alleged tort claims. *Id*. at 170.

**Second**, the Bondholders and Fiscal Agent rely upon inapposite case law to argue that bonds are only void "where the municipality lacked the authority to borrow at all...." [Dkt. 971-1 at 25.] But as the decisions they rely upon show, no court has held that so long as the municipality has some ability to borrow, a defective bond issuance is valid in the hands of a good faith purchaser. For example, the Bondholders and Fiscal Agent cite *Port of Palm Beach Dist. v. Goethals*, but there the court held "[w]e have no doubt the District had power to issue the paper." 104 F.2d 706, 708 (5th Cir. 1939). The issue before the court was whether the Board of Commissions had failed to follow the procedure to expressly authorize a specific instrument. *Id.* at 708-09.

Likewise, the Bondholders and Fiscal Agent rely on *Pacific Improvement Company v. City of Clarksdale*, but that case too is inapplicable. 74 F. 528 (5th Cir. 1896). There, the town of Clarksdale approved the issuance of coupon bonds pursuant to a state law that expressly allowed the municipality "to subscribe to the capital stock of railroad companies, payable in negotiable coupon bonds of the city." *Id*. at 529. Later, the town of Clarksdale became the city of Clarksdale and the city of Clarksdale (as successor) issued the bonds. *Id*. at 529-30. Due to intervening changes in the law, however, the city of Clarksdale did not have the authority to issue the bonds (although it was undisputed the town of Clarksdale did at the time the bond issuance was approved). *Id.* Under these circumstances, the Fifth Circuit held that because the town of Clarksdale had the undisputed authority to issue the bonds when it agreed to do so, the original

bondholders could enforce the bonds against its successor-in-interest, but the bonds could not be negotiated to a new holder. *Id*. at 532-33. In contrast, at no time did ERS have the authority to issue the ERS Bonds.

In *Keel v. Pulte*, another case cited by the Bondholders and Fiscal Agent, the City of Gainesville was given express authorization to issue the bonds through a city ordinance. 10 S.W. 2d 694, 695-96 (Tex. Comm'n App. 1928). The bonds nevertheless were defective because the city charter required that voters approve any bond issuance and no such vote was held. *Id*. at 696. Because the city was given legislative authority to issue the bonds but failed to follow the correct procedures, the court held that the bonds were enforceable in the hands of the original owners because these requirements "would not have effect to exclude by implication the authority to create the indebtedness in question, and to provide for its payment, in the mode and for the purpose proposed." *Id*. at 697. But here, ERS in fact lacked the ability to issue public bonds in the first instance, making *Keel* inapplicable.

The Bondholders and Fiscal Agent also cite *Forrest City v. Bank of Forrest City*, but that case did not involve bonds at all but promissory notes. 172 S.W. 1148, 1149 (Ark. 1915). And in any event, the issue there was not with the authority to incur the debt (which was expressly authorized by the city council), but with a constitutional provision prohibiting municipalities from issuing interest-bearing debt. *Id*. at 1151. This is important because the Supreme Court in *Merrill* (which the *Forrest City* court cited and relied upon in coming to its holding) drew a clear distinction between a municipality's ability to issue bonds for sale to the public and its power to issue bonds or other securities as mere evidence of indebtedness to a particular lender or creditor:

> It is admitted that the power to borrow money, or to incur indebtedness, carries with it the power to issue the usual evidences of indebtedness, by the corporation, to the lender or other creditor. Such evidences may be in the form of promissory notes, warrants, and, perhaps, most generally, in that of

> a bond. But there is a marked legal difference between the power to give a
> note to a lender for the amount of money borrowed, or to a creditor for the
> amount due, and the power to issue for sale, in open market, a bond, as a
> commercial security, with immunity, in the hands of a bona fide holder for
> value, from equitable defenses.

*Id*. at 1150 (quoting *Merrill*, 138 U.S. at 687). Consequently, because negotiable instruments such

as promissory notes are treated differently than publicly offered bonds, the court allowed the

plaintiff to assert a claim against the principal indebtedness (which was unquestionably valid), but

held that its obligation to pay interest was void. *Id.* at 1151. To the extent *Forrest City* provides

any guidance for this case, it does not help the Bondholders or Fiscal Agent because the court

voided the interest component of the debt obligation because there was no legal basis for the

municipality to incur interest-bearing debt. Applying that reasoning to the case at bar, no part of

the ERS Bond debt is valid and therefore all of the ERS bond debt is void.[5]

In sum, none of the Bondholders' or Fiscal Agent's cited cases stand for the proposition

that a court may enforce a bond issuance where the municipality lacked the ability to issue the type

of challenged bond in the first place. Nor could these cases so hold in light of the United States

Supreme Court's holding in *Anthony v. Jasper County* that "[i]f the power exists in the

municipality, the *bona fide* holder is protected against mere irregularities in the manner of its

---

[5] The Bondholders and Fiscal Agent also wrongly claim that the *Merrill* plaintiff's efforts to collect in equity
on remand "failed only on statute of limitations grounds," implying that but for the limitations problem, the
plaintiff in Merrill could have collected. [Dkt. 971-1 at 25.] This is a complete invention. Because the claims
were dismissed on statute of limitations grounds, the lower court never considered the merits of the
underlying claim. *Merrill v. Town of Monticello*, 72 F. 462, 463 (7th Cir. 1896). Likewise, the Bondholders
and Fiscal Agent inaccurately argue that the Supreme Court allowed the plaintiff in *Brenham* to sue the city
on the underlying debt. Instead, the Supreme Court allowed the plaintiff the opportunity to present to the
lower court new claims under the equitable theory of money had and received; the Supreme Court did not
address those claims itself in the first instance. *City of Brenham v. German-Am. Bank*, 144 U.S. 549, 549-
50 (1892). The ultimate resolution of *Brenham* is lost to time, but in Puerto Rico a finding that the ERS
Bonds are *ultra vires* defeats any and all claims made in connection with the bonds. *Las Marias v. Mun.
San Juan*, 159 D.P.R. 868, 874 (2003) (rejecting equitable claims made on an *ultra vires* contract); *Morales
v. Municipio de Toa Baja*, 119 D.P.R. 682 (1987) (refusing to apply equitable principles to enforce *ultra
vires* contract because "[t]o decide otherwise is to promote gross noncompliance by public officers of the
laws and regulations that govern their actions").

execution, but if there is a want of power, no legal liability can be created." 101 U.S. 693, 697 (1879); *accord Wein v. Carey*, 41 N.Y.2d 498, 501 (1977) ("[A] distinction must be made between lack of patent authority to issue securities, by reason of which securities may be wholly void, and latent infirmities, such as lack of underlying preconditions, whether of substance or form, which may render public securities subject only to remedies not enforceable against bona fide holders for value.").The point here is that ERS did not have the authority to issue public bonds at all. Put differently, barring a change in the law, there were no sets of facts under which ERS could have issued the ERS Bonds. As a result, the ERS Bonds are null and void.

*Third*, nothing in Article 8 of the UCC supports the Bondholders' or Fiscal Agent's argument. Under Article 8, a bond is either valid or invalid. Unlike Article 3, which applies to certain negotiable instruments (but which expressly excludes bonds), Article 8 does not contain the concept of non-negotiability.

*Fourth*, even if the Bondholders' and Fiscal Agent's position on non-negotiability had merit, it would not help them here. This is so because the Bondholders acquired their bonds in the secondary market (*i.e.*, through the negotiation of the bonds) and, therefore, the bonds are invalid in their hands even under their own proposed rule.

\* \* \*

In sum, the Court should grant summary judgment in favor of the Committees on the question of whether the ERS Bonds were invalidly issued and should hold that the ERS Bonds are *ultra vires*.

## II.      The Uniform Commercial Code Does Not Validate The *Ultra Vires* ERS Bonds.

Because the ERS bonds are *ultra vires*, the court should further hold that the ERS

Bondholders' claims and the claims of the Fiscal Agent are unenforceable. The Bondholders and

Fiscal Agent both argue otherwise, claiming that even if the ERS Bond issuance was *ultra vires*,

their claims are enforceable by operation of UCC §8-202(b). This argument fails for two reasons.

***First***, UCC §8-202 does not apply to an issuance that is deemed void *ab initio* under

applicable law. *See In re Numoda Corp. Shareholders Lit.*, No. 9163-VCN, 2015 WL 402265, at

*7-8 (Del. Ch. Ct. Jan. 30, 2015) (citing *Noe v. Kropf,* C.A. No. 4050, at 12-13 (Del. Ch. Jan. 15,

2009)). ***Second***, even if UCC §8-202 could provide the ERS Bondholders or the Fiscal Agent with

a safe harbor, neither has established the predicate facts necessary for validation of the ERS Bonds,

let alone established an undisputed record entitling them to rely upon this provision as a matter of

law.

### A.      UCC §8-202(b) Is Not Applicable To This Dispute.

The Bondholders' and the Fiscal Agent's arguments fail because UCC §8-202(b) is not

applicable to a bond issuance that is void *ab initio*. When applicable, UCC §8-202(b) treats a

defective security as "valid in the hands of a purchaser for value and without notice of the particular

defect…." 19 L.P.R.A. §1752(b)(1). As the Committees argued in their summary judgment brief,

by its terms UCC §8-202(b) cannot apply to the objections of the Committees because the

Committees are not "issuers" under the UCC. [Dkt. 978 at ¶¶ 83-87.] But even if the Bondholders

and Fiscal Agent could overcome this hurdle, UCC §8-202 still would not apply because the *ultra*

*vires* nature of the ERS Bonds renders them void *ab initio*, meaning that there is nothing for UCC

§8-202 to validate.

As a starting point, it is well recognized that "[t]he Uniform Commercial Code is not self-

contained [and] itself states that 'unless displaced by the particular provisions of the [UCC], the

principles of law and equity … shall supplement its provisions." *Travelers Cas. & Sur. Co. of Am., Inc. v. Northwestern Mut. Life Ins. Co.*, 480 F.3d 499, 503-04 (7th Cir. 2007); *accord GE Transp. Parts, LLC v. Central Railway Mfg., LLC*, No. 19-cv-4826, 2020 WL 3448018, at *5 (S.D.N.Y. June 24, 2020) (applying common law in contract dispute where Article 2 did not plainly "displace the common law rule"). Put differently, "[t]he UCC does not purport to preempt the entire body of law affecting the rights and obligations of parties to a commercial transaction" *ADS Assocs. Grp., Inc. v. Oritani Sav. Bank*, 219 N.J. 496, 516 (2014), or "those general principles of law which are applicable not only to commercial law but which run through many other branches or areas of the law and . . . are fundamental to the American system of jurisprudence and its legal philosophy." 1 Anderson U.C.C. §1-103:2 (3d. ed.). Nor does the UCC "contain any penal provision and, therefore, does not displace any . . . general principle of illegality of contracts." *Id.* at §1-103:245. "Consequently, the UCC does not validate contracts expressly condemned and declared to be void by the statute of a state, nor those forbidden by the policy of its laws." *Id.*

Stated differently, the UCC cannot make valid what is void, and because ERS had no authority to issue bonds in a public offering, the ERS Bonds are *ultra vires* in the truest sense, and are invalid and unenforceable in the hands of any holder, no matter the circumstances. This limitation on UCC §8-202's ability to validate *ultra vires* or otherwise void securities has been recognized even outside of the government context. For example, in 2009, the Court of Chancery of Delaware refused to even consider UCC §8-202's potential applicability to purported holders of unauthorized shares of a private corporation on the grounds that:

> The Ameristar shares issued to Turnaround by Kropf were void ab initio, meaning they were invalid when they were issued. It is important, therefore, to stress that unless the charter says otherwise, a board of an issuing corporation is the only entity that has the legal authority to issue securities on behalf of that corporation. ***Any action taken where authority is lacking will constitute more than a mere defect as contemplated by section 8-***

> *202(b)(1). Turnaround purchased shares that in effect never existed. Therefore, Turnaround is not entitled to any protection under the Delaware Uniform Commercial Code."*

(Ex. 5, *Noe v. Kropf,* C.A. No. 4050, at 12-13 (Del. Ch. Jan. 15, 2009) (emphasis added).)

As the Delaware Chancery Court later explained in *In re Numoda Corporation Shareholders Litigation*, the *Noe v. Kropf* decision prompted the Delaware legislature to amend the Delaware General Corporation Law in 2013 to provide that "no defective corporate act or putative stock shall be void or voidable solely as a result of a failure of authorization if ratified . . . or validated." 2015 WL 402265 at *7. The proponents of the new legislation explained that the General Corporation Law had to be amended to no longer declare defective stock issuances void in order to "to give effect to the provisions of Section 8-202(b) of the Delaware Uniform Commercial Code . . . [given] the suggestion of the Court of Chancery in *Noe v. Kropf* . . . that the provisions of the Delaware Uniform Commercial Code cannot validate stock that under the General Corporation Law is void." H.R. 127, 147th Gen. Assemb., Reg. Sess. (Del. 2013). The fact that the Delaware legislature needed to change the law that rendered the stock void proves the inherent limitations on the UCC's ability to validate otherwise invalid securities.

The Delaware Court of Chancery's holding is consistent with well-established pre-Code law that bonds that are as a matter of law *a legal nullity* can never be deemed valid in anyone's hands. Such bonds do not contain a simple defect but are "wholly void, and of no legal effect." *California Nat'l Bank v. Kennedy*, 167 U.S. 363, 368 (1897). *Accord District Tp. of Doon v. Cummins*, 142 U.S. 366, 374 (1892); *Dixon County v. Field*, 111 U.S. 83, 97 (1884); *Byrd v. Martin, Hopkins, Lemon & Carter, P.C.*, 564 F.Supp. 1425, 1429 (W.D. Va. 1983), *aff'd*, 740 F.2d 961 (4th Cir. 1984); *Town of Belleair v. Olds*, 127 F.2d 838, 839-40 (5th Cir. 1942). And Puerto Rico law is explicit on this point—a public contract that does not strictly comply with *all* applicable legal requirements is void *ab initio*. *Plaza Carolina Mall*, 91 F.Supp.3d at 290.

The statutory text of UCC §8-202 further supports this reasoning. UCC §8-202 only protects a "purchaser" of a "security," both of which are defined, in part, by reference to non-UCC law. The definition of "security" requires "an *obligation* of an issuer or a[n] . . . *interest* in an issuer or in property or an enterprise of an issuer." 19 L.P.R.A. §1702(a)(15) (emphasis added); *see also* Official Comment 15 to UCC §8-102 (explaining that the definition of "security" requires an "*interest or obligation*" that is fully transferable, divisible, and of a type traded on securities markets). Similarly, the definition of "purchase" (and, thus, "purchaser") requires "[a] voluntary transaction *creating an interest in property*." *See* 19 L.P.R.A. §§451(32)-(33). Because the UCC neither defines nor purports to govern the existence of an "obligation" or "interest," the Court must look to applicable non-UCC law to determine whether those prerequisites exist. *See* 1 Anderson U.C.C. §1-103:2 (3d. ed.) ("When the circumstances are such that the UCC does not determine the rights of the parties, resort is to be made to non-UCC law."); *see also Bankhaus Herman Lampe KG v. Mercantile-Safe Deposit & Trust Co.*, 466 F.Supp. 1133, 1144-45 n. 26 (S.D.N.Y. 1979) (rejecting applicability of UCC §§8-202 and 8-302 after determining that stolen certificate engravings did not fall within the UCC's definition of a "security" after construing the undefined term "issued" to require a voluntary transfer of possession); *Continental Ins. Co. v. Yankee Plastics, Inc.*, 1977 WL 25562, 21 UCC Rep. Serv. 621, 622-23 (N.Y. Sup. Ct. April 14, 1977); *see also People v. Mitchell*, No. B254321, 2015 WL 7778025, at *4 (Cal. Ct. App. Dec. 3, 2015) (rejecting applicability of UCC section 3-407 to a forged check because, under California law, a forged check is void *ab initio* and therefore not capable of creating a preexisting "obligation of a party" as required by section 3-407); *Met-Al, Inc. v. Hansen Storage Co.*, 844 F.Supp. 485, 489-90 (E.D. Wis. 1994) (rejecting applicability of good faith purchaser status under UCC §2-403 to party holding void, rather than voidable, title to goods).

29

As noted above, under Puerto Rico law, public contracts that do not strictly comply with all applicable legal requirements are void *ab initio*. Thus, because the ERS Bonds violated the carefully delineated restrictions the Puerto Rico Legislative Assembly imposed on ERS's power to borrow money, they are nullities and did not create any "obligation" or "interest" in ERS or its property. Consequently, neither Cede & Co. nor the Bondholders are "purchasers" of "securities" within the scope of Article 8. UCC §8-202 is therefore not applicable to the ERS Bonds.

**B.**   **Even if UCC §8-202(b) Could Apply To The ERS Bonds, The Bondholders Have Not Established Sufficient Facts To Invoke UCC §8-202, Let Alone Prevail Under This Provision As A Matter Of Law.**

When UCC §8-202(b) does apply, it only allows an invalid bond to be deemed "valid in the hands of a purchaser for value and without notice of the particular defect…." 19 L.P.R.A. §1752(b)(1). The Bondholders argue that they are entitled to judgment as a matter of law that they purchased without such notice. This argument is baseless.

*First*, the Bondholders' argument can be disposed of for the simple reason that the Bondholders present no evidence concerning what *they* actually knew or did not know. Under UCC §8-114(4),  it is the Bondholders' burden to show that they were "without notice of the defect" under UCC §8-202(b). 19 L.P.R.A. §1714(4). While the Bondholders rely on various documents that were created in connection with the 2008 issuance of the ERS Bonds (a resolution from the ERS Board of Trustees, the Official Statement, the Bond Resolution, *etc*.) nowhere in their brief or in their statements of fact do the Bondholders state that *they* read or relied upon any of these documents (or any other document, representation, or fact) at the time they made their various purchases. [Dkt. 971-1 at 35-36.] The Bondholders plainly cannot meet their burden by remaining silent as to what they knew at the time they purchased their interests in the ERS Bonds. Whatever benefit, if any, the Bondholders' list of facts could provide to a hypothetical bondholder is irrelevant here because the Bondholders do not contend that any of their number knew or

reviewed any of the documents that they contend support the conclusion that the ERS Bonds were validly issued.

***Second***, the undisputed facts show that each Bondholder was on notice of the *ultra vires* nature of the ERS Bonds (*i.e.*, that the ERS Bonds were not a loan (or a borrowing) from a financial institution, or a "direct placement of debt") when they made their purchases of ERS Bonds. Under the UCC, a party had notice of a fact if they had: (a) "actual knowledge" of that fact; (b) "received a notice or notification" of that fact; or (c) "from all the facts and circumstances known to him at the time in question … ha[d] reason to know" of that fact. 19 L.P.R.A §451(25). In their Motion for Summary Judgment, the Committees have laid out undisputed facts demonstrating the Bondholders' notice, and the Committees incorporate those arguments by reference here. [Dkt. 978 at ¶¶ 88-103.] To summarize, the Bondholders purchased ERS Bonds after: (i) reviewing the debt authorization language of the ERS Enabling Act; (ii) knowing of Act 116's statement that the ERS Bonds were "illegally issued"; (iii) seeking legal advice on the *ultra vires* issue; (iv) retaining counsel who was aware of the *ultra vires* issue; and (v) engaging in formal litigation with the Committees over whether the ERS Bonds are *ultra vires* for not complying with the ERS Enabling Act. [*Id*.]

The Bondholders' arguments that these undisputed facts do not establish notice fall short. On the "actual knowledge" notice prong, the Bondholders argue that to have actual knowledge of the defect requires "an affirmative determination of invalidity," which presumably will not occur until this Court rules that the ERS Bonds are *ultra vires*. [Dkt. 971-1 at 37.] Put differently, under the Bondholders' purported test, a party could purchase ERS Bonds *today* and still not be on notice for the purposes of UCC §8-202(b). But neither logic nor the case law supports that conclusion.

To begin, a ruling by this Court that the ERS Bonds were not authorized by the ERS Enabling Act will not make the ERS Bonds invalid. The reason the ERS Bonds are invalid is because the ERS Enabling Act only allows ERS to take a loan (or borrow according to the Bondholders) or engage in a direct placement of debt under specified circumstances not applicable here. All of the facts required to support the conclusion of invalidity were actually known to the Bondholders at the time they were making their bond purchases, including through filings made in these cases. The UCC does not require actual knowledge of the legal conclusion that a bond issuance is defective, just the facts that gave the Bondholders' "reason to know" that this cold be the case. 19 L.P.R.A §451(25) (defining "notice" in terms of "facts"). The Bondholders have no argument they were not aware of the pertinent facts, and they can take no shelter in the fact that a court has not yet formally ruled the ERS Bonds are invalid. And even if an "affirmative determination of invalidity" was required, the Legislative Assembly's determination, as reflected in Act 116, that the ERS Bonds were "illegally issued," would suffice. Further, the Bondholders' argument ignores the text of UCC §8-202(b), which states that "[t]he following rules apply if an issuer *asserts* that a security is not valid." (emphasis added). It does not state that "[t]he following rules apply when an issuer *proves through an affirmative determination of invalidity* that a security is not valid." Similarly, UCC §8-202(b) looks to whether the bondholder had notice of the "particular defect," not to whether the bondholder had notice of "an affirmative determination" of the defect.

In support of their contrary argument, the Bondholders cite *In re Seacoast Anti-Pollution League*, which involved a three-step financing for the construction of a nuclear power plant. 490 A.2d 1329 (N.H. 1985). An appeal was filed after the public utility commission approved the step two financing, which included the issuance of securities. *Id.* at 1331-32. After affirming the

commission's decision, the court, in *dicta*, addressed the hypothetical of what would have happened to the securities had the Court had rejected the commission's order. *Id*. at 1338-40. The Court indicated that the fact of an appeal would not be "*per se*" notice of a defect under UCC §8-202 because, otherwise, an appeal would "effectively suspend the operation of an issuing order by casting doubt on the subsequent validity of the securities issued," and New Hampshire law expressly provides a very limited set of circumstances where the commission's order may be suspended. *Id*. at 1339. This hypothetical turned on the court attempting to harmonize UCC §8-202 with a more specific state law governing the particular security at issue. It does not, as the Bondholders maintain, stand for the proposition that a challenge to a security cannot put purchasers on notice of a defect in the issuance of that security. And in any event, the *Seacoast* court only stated that, in that specific instance, the "notice only of the appeal" of the commission's order would be insufficient. *Id*. The court said nothing as to the facts implicated in that appeal that could put a securities purchaser on notice. Here, the Committees and Government Parties—and the Bondholders—have filed pleadings addressing the validity of the ERS Bonds, and the Committees and Government Parties have presented in those filings the pertinent facts as to why the ERS Bonds are invalid.

As to the second type of notice provided for in the UCC, the Bondholders argue that they still have not "'received a notice or notification' that the ERS Enabling Act did not authorize the ERS Bonds … because there has been no determination by anyone with authority that the ERS Enabling Act did not authorize the issuance of the ERS Bonds." [Dkt. 971-1 at 38.] Once again, the Bondholders misapprehend the nature of the notice inquiry. The relevant question is not, as the Bondholders put it, whether they were on notice of a "legal determination" that the ERS Bonds are invalid. [*Id.*] Instead it is whether they were aware of the facts that put them on notice of the

issue. UCC §1-202(a) ("a person has 'notice' of a fact…."). That is why UCC §8-202 applies when an issuer "asserts" a defect in a bond. If the question was whether a party had notice of a legal determination that a bond was defective, there would be no reason for UCC §8-202(b) to exist: as the Bondholders note, "no rational investor would purchase a security if it had actual knowledge that the security was invalid." [Dkt. 971-1 at 38.] Here, the pleadings by AAFAF, the Commonwealth, and the Committees all serve as a notification of the facts relevant to invalidity of those bonds and the legal bases for why those facts compel that conclusion. The Bondholders have no plausible argument otherwise.

*Finally*, the Bondholders argue that they also did not have notice under the third notice prong of the UCC because, based on "all the facts and circumstances known to" the Bondholders, they did not have "reason to know" that the ERS Bonds were *ultra vires* at the time they made their bond purchases. [Dkt. 971-1 at 39, 42.] The undisputed factual record, however, plainly shows this is untrue, as the Bondholders purchased ERS Bonds despite: (i) having read the ERS Enabling Act and understood that it was the only possible and purported source of authority for the ERS Bonds; (ii) being aware that the Puerto Rico Legislative Assembly had stated that the bonds were illegal; (iii) having sought and received counsel on the issue of whether the ERS Bonds were *ultra vires*; and (iv) engaging in active litigation over that issue. [Dkt. 978 at ¶¶ 88-103.] The Bondholders undisputedly had "reason to know" that the ERS Bonds were defective.

To counter this factual record, the Bondholders point to the existence of certain legal opinions and other documents that state, without analysis, that the ERS Bonds were valid. But again, the Bondholders never contend that they reviewed or relied upon these documents before purchasing their interests in the ERS Bonds. Consequently, these documents carry no weight in

offsetting what the Bondholders have admitted they knew and cannot support a finding as a matter of law that the ERS Bonds are valid in the Bondholders' hands under UCC §8-202(b).

The Bondholders also decry any suggestion that the ERS Enabling Act plays a role in the notice inquiry, arguing that not even sophisticated bondholders will perform diligence into whether a bond issuance is valid because that "is not how the municipal bond market works." [Dkt. 971-1 at 39.] Even if that were so, the law provides otherwise. Indeed, Puerto Rico law is clear that when a private party contracts with the Commonwealth or one of its instrumentalities, that party is presumed to know the scope of the entity's authority to make contracts. *Plaza Carolina Mall*, 91 F.Supp.3d at 290-91. "Parties that contract with a municipality are aware of the need to conduct themselves in accordance with" the municipality's contracting regulations. *Las Marias*, 159 D.P.R. at 875; *accord Int'l Salt Co., LLC v. City of Boston*, 590 F.3d 1, 6 (1st Cir. 2009) (applying Massachusetts law).

The Bondholders also argue that the Puerto Rico Legislative Assembly's statement that the ERS Bonds were "illegally made" is insufficient, not because that conclusion is wrong, but because the Legislative Assembly's description of the procedural history of the ERS Bonds is in the Bondholders' view not accurate. [Dkt. 971-1 at 40-41.] Quibbling over the legislature's recitation of the factual background does not change the fact that the legislature informed the world in 2011 that the ERS Bonds were illegal. And it is hard to imagine a more direct statement that would put the Bondholders on notice that the ERS Bonds were defectively issued.

Moreover, to the extent the Bondholders suggest that ERS came to the conclusion that the ERS Bonds were valid in 2012, their purported evidence shows no such thing. [Dkt. 971-1 at 41.] The portion of the board minutes the Bondholders rely on is a discussion about a derivative complaint filed against ERS that challenged, among other things, the ERS Bonds' pledging of

employer contributions as collateral. [Dkt. 973, Sooknanan UV Decl., Ex. 81 at 10.] During that discussion, internal ERS counsel expressed the opinion that ERS "has the capacity to incur in debt, to pledge its assets and to consider that part of their assets are future contributions." [*Id.*] Nothing in those comments confirms the validity of the ERS Bonds. Regardless, those comments are completely irrelevant to this Court's inquiry, both because the Bondholders do not assert that they relied on those comments in making purchases, and because an *ultra vires* action cannot be ratified by someone's statement or opinion to the contrary.

### C.   Even if UCC §8-202(b) Could Apply To The ERS Bonds, The Fiscal Agent Cannot Invoke Its Protection.

As noted above, the Fiscal Agent has not joined the Bondholders' argument as to why they are protected by UCC §8-202(b). Instead, the Fiscal Agent argues that its claim is protected by UCC §8-202(b) because the "Fiscal Agent filed its claim against ERS on behalf of itself and the Bondowner [and] [t]he sole Bondowner is, and always has been, Cede & Co., as nominee of The Depository Trust Company." [Dkt. 976 at 3.] Further, according to the Fiscal Agent, Cede & Co. purchased the ERS Bonds without notice of their defect. [*Id.*] To the extent the Court reaches the question of notice under UCC §8-202(b), the Court should reject the Fiscal Agent's argument for at least four reasons: (1) the Fiscal Agent is charged with the Bondholders' not Cede & Co.'s notice; (2) the Fiscal Agent's purported evidence should be stricken; (3) even if Cede & Co.'s notice was relevant, the Fiscal Agent offers *no* evidence about the Fiscal Agent's or Cede & Co.'s knowledge or lack of knowledge of the ERS Bonds' invalidity; and (4) if Cede & Co.'s notice was relevant, UCC §8-202 does not apply to original holders (like Cede & Co.) where the "defect [in the bonds] involves a violation of a constitutional provision." 19 L.P.R.A. §1752(b)(1).

### 1. The Fiscal Agent Cannot Escape The Fact That The Bondholders Were On Notice That The ERS Bonds Were Issued Without Authority.

Apparently recognizing that the Bondholders cannot establish that they purchased the ERS Bonds "without notice" of the *ultra vires* issue, the Fiscal Agent makes a novel and highly counterintuitive argument. Specifically, the Fiscal Agent argues that whether the Bondholders purchased "without notice" is irrelevant to its claim for payment on the bonds because Cede & Co., which holds legal title to the bond certificates, is the "purchaser" for purposes of UCC §8-202. [Dkt. 976 at 17-24.] According to the Fiscal Agent, the Committees' "assumption" that the Bondholders are "purchasers" of the ERS Bonds for UCC §8-202 purposes is "flatly wrong." [*Id.* 976 at 20]. But this is also the "assumption" of the Bondholders, who, as addressed above, argue that "the undisputed facts show that [UCC §8-202(b)] applies here and that the Bondholders are 'purchaser[s] for value and without notice' who are entitled to its protection." [Dkt. 971-1 at 33.] For the reasons discussed below, the "purchaser" of the ERS Bonds for UCC §8-202 purposes is the Bondholders.

### a. UCC §8-202(f) Establishes That the Bondholders, Not Cede & Co., Are The "Purchasers" for UCC §8-202 Purposes.

When UCC §8-202 was promulgated decades ago, the indirect (or "book-entry") holding system for securities did not exist. In the indirect holding system, investors (here, the Bondholders) do not take legal title to securities or receive physical certificates. Rather, legal title to a "global" security certificate is held by a clearing corporation or its nominee (here, Cede & Co. as nominee of DTC). The beneficial ownership rights of the investors are then reflected in "book entries" on the clearing corporation's system. The purpose of this system, which is copiously described in the Fiscal Agent's memorandum, is to make securities markets more efficient by minimizing paperwork and obviating the need to physically transfer certificates when securities are traded. [*See generally* Dkt. 976 at 10-17.]

37

Article 8 was revised in 1994 to accommodate the indirect holding system as it had come to be established in the market. In the terminology of revised Article 8, the rights acquired by an investor with respect to a security are referred to as a "security entitlement," and the investor is referred to as an "entitlement holder." The investor's security entitlement is connected to the security through a chain of "securities intermediaries" with the clearing corporation at the end of the chain. In the Fiscal Agent's description, "[t]he beneficial holders have security entitlements— claims against their brokers, which have claims against DTC's participants, which have claims against DTC." [Dkt. 976 at 20.]

As recognized in the Reporter's Notes for revised Article 8, "[t]he introduction of the securities account entitlement concept seems to require some adaptation of the Part 2 rules concerning defenses." (Ex. 6, UCC Reporter's Notes at 26.) In particular, under the original Article 8, investors such as the Bondholders were described as "purchasers of the security," even if the security was held by a "financial intermediary" on the investor's behalf. (*See id*.) However, "[u]nder Revised Article 8, investors who hold indirectly are not described as purchasers of the security, but as purchasers of securities account entitlements . . . The beneficial owners would hold securities account entitlements, but would not [be] the purchasers or subsequent purchasers of the bond itself." (*Id*.) Thus, because UCC §8-202(b) only applies to the "purchasers" of a security, that provision would not, without some adaptions, apply to the investors (the entitlement holders) as intended. (*Id*.)

As a "quick fix" to this problem, the drafters added UCC §8-202(f), which provides that "[i]f a security is held by a securities intermediary against whom an entitlement holder has a security entitlement with respect to the security, the issuer may not assert any defense that the issuer could not assert if the entitlement holder had [held] the security directly." (*Id*.; *see also* 19

L.P.R.A. §1752(f).) Thus, if a security is held indirectly in the form of a security entitlement, UCC §8-202 looks through the securities intermediary to the ultimate entitlement holder (*i.e.*, the investor) such that the rules apply "equally" in the indirect holding system as in the direct holding system. (Ex. 6, UCC Reporter's Notes at 26.)  This is not a unique concept in Article 8, and when faced with disputes involving the indirect holding system, courts routinely look beyond the knowledge, actions, or rights of the entity holding record title to a security and focus instead on the knowledge, actions, or rights of the investors who beneficially owned the security and who were the real parties in interest. *See, e.g.*, *Allan Applestein TTEE FBO D.C.A. v. Province of Buenos Aires*, 415 F.3d 242, 244-45 (2d Cir. 2005) (permitting beneficial owners to sue to enforce rights under bonds); *In re Petrobras Sec. Litig.*, 150 F.Supp.3d 337, 342 (S.D.N.Y. 2015) (rejecting argument that domestic settlement of securities trades through DTC/Cede was sufficient to overcome the rule against extraterritorial application of the securities laws, where the trades were ordered by overseas beneficial owners); *In re Appraisal of Dell*, No. 9322-VCL, 2015 WL 4313206, at *24 n.23 (Del. Ch. Ct. July 30, 2015) (collecting cases where Delaware courts disregarded DTC/Cede & Co. as the recordholder and "look[ed] through" to individual entitlement holders to determine stock ownership as of record date); *In re Color Tile Inc.*, 92 F.App'x 846, 851 (3d Cir. Feb. 11, 2004) (describing Cede as a mere "conduit for the transmission of dividends…" for the benefit of beneficial owners).

In so doing, courts are merely recognizing the reality of the indirect holding system. As DTCC (the holding company for DTC) has stated, "while the securities are registered in the name Cede & Co., DTC merely holds them as record owner—you [the investor] are always the beneficial, or actual, owner of the securities. This means you're entitled to *all* the benefits—and risks—associated with owning the stock." (Ex. 7, Depository Trust & Clearing Corporation, *Life*

*Cycle of a Security*, at 10 (2010) (emphasis added).)[6] Consequently, the Fiscal Agent is correct when it states that DTC played only a "ministerial role" in connection with the ERS Bonds. [Dkt. 976 at 5.] As one court noted:

> as a practical matter, the beneficial owner is the only person that has an interest in pursuing any rights or remedies under the Notes; Cede, as a street name, has no interest in enforcing the notes. Indeed, Cede may not even have Article III standing to bring suit for breach of the Agreement because, if Cede has no actual interest in the Notes beyond just holding them in the form of a Global Security for others, Cede may not have suffered any injury in fact from breach of the Agreement.

*Diverse Partners, LP v. Agribank, FCB*, No. 16-cv-9526 (VEC), 2017 WL 4119649, at *5 (S.D.N.Y. Sept. 14, 2017); *accord Springwell Navigation Corp. v. Sanluis Corp., S.A.*, 14 Misc. 3d 1206(A), at *5 (N.Y. Sup. Ct. 2006) (describing Cede & Co. as "merely a mechanism" that "provide[s] perfunctory services which facilitate investing").

Consistent with this understanding, and as noted above, the Bondholders argue (directly contrary to the Fiscal Agent's argument) that UCC §8-202 applies to them because the entire purpose of UCC §8-202(f) is to apply the rules of UCC §8-202 to the indirect holding system [Dkt. 971-1 at 33.] The Fiscal Agent acknowledges UCC §8-202(f) in a footnote but asserts that it provides entitlement holders with "certain parallel protections" and does not change the fact that Cede & Co. is the only relevant entity for the purposes of evaluating the Fiscal Agent's claims. [Dkt. 976 at 20 n.14.] In other words, the Fiscal Agent argues that, at least with respect to its claim, the Court should read UCC §8-202 as if the ERS Bonds were issued in the direct holding system

---

[6] Assuming the DTC Operational Arrangements are properly before this Court (and, as noted below, they are not), the DTC Operational Arrangements in force at the time the ERS Bonds were issued confirms this arrangement. [Dkt. 977 Ex. 9, Ex. A at 35) ("DTC shall treat any [DTC] Participant having Securities credited to its DTC accounts as entitled to the full benefits of ownership of such Securities.").] The ERS Offering Statement is in accord. [Dkt. 980 Ex. 3, App. IX ("The deposit of the Series A Bonds with DTC and their registration in the name of Cede & Co. or such other nominee do not effect any change in beneficial ownership. . . .").

and because the Bondholders are not technically the "purchasers" their existence is irrelevant. This reading cannot be right.[7] Taking the Fiscal Agent's reading to its logical conclusion, the Bondholders could recover on the ERS Bonds via the Fiscal Agent's claim on Cede & Co.'s behalf *even if the Bondholders' themselves purchased with indisputable notice of the bonds' invalidity*. In fact, under the Fiscal Agent's reading, an investor could purchase bonds in the secondary market with admitted notice of a final judicial determination that they were issued *ultra vires* and yet the security entitlement held by that purchaser would still be enforceable if the clearing corporation that took legal title to the bonds at issuance was without notice of any such issue at the time.[8]

Such an interpretation would thus lead to arbitrarily different results under the direct and indirect holding systems. Under the direct holding system, there is no question that an original purchaser's notice or lack thereof would have no bearing on whether a defectively issued security was valid "in the hands" of a subsequent "purchaser for value" under UCC §8-202(b)(1). If the subsequent purchaser had notice of the defect, the issuer would not be precluded from asserting invalidity as a defense against that subsequent purchaser. According to the Fiscal Agent, however, this all changes in the indirect holding system simply because the subsequent purchaser acquires a security entitlement rather than legal title to a physical certificate. This makes little sense. Indeed, it would be absurd to suggest that something so fundamental to the operation of UCC §8-202(b) would change depending on whether a particular security is held "directly" or "indirectly,"

---

[7] In addition to ignoring the effect of UCC §8-202(f), the Fiscal Agent's argument paints with too broad a brush. Contrary to the Fiscal Agent's argument, multiple UCC provisions use "purchaser" broadly to include entitlement holders like the Bondholders. *See, e.g.*, UCC §8-106(d)(1) ("A purchaser has 'control' of a security entitlement if the purchaser becomes the entitlement holder. . . ."); UCC §8-104(c) ("A person who acquires a security entitlement to a security or other financial asset has the rights specified in Part 5, but is a purchaser of any security, security entitlement, or other financial asset held by the securities intermediary only to the extent provided in Section 8-503.")

[8] The fact that the Bondholders do not join this "get out of jail free" argument speaks volumes for just how fundamentally flawed the Fiscal Agent's argument is.

particularly given that the entire point of UCC §8-202(f) is to ensure that UCC §8-202(b) applies "equally" to the direct and indirect holding systems. Official Comment 5, UCC §8-202(f).

Further showing why the Fiscal Agent is wrong is the fact that UCC §8-202(b) expressly distinguishes between original issue purchasers and subsequent purchasers where a security was issued in violation of a constitutional provision. In such cases, "the security is valid in the hands of a purchaser for value and without notice of the defect, *other than one who takes by original issue* [i.e., a subsequent purchaser for value]." 19 L.P.R.A. §1752(b)(1) (emphasis added). The Fiscal Agent's argument, however, would render this distinction meaningless because, if the clearing corporation is the "purchaser" of a security for UCC §8-202 purposes in the indirect holding system, there could never be a subsequent "purchaser for value" because legal ownership of the security does not change when the security trades in the market.[9] Rather, as noted above, transactions in the security are reflected in "book entries" on the clearing corporation's system while the security itself remains "immobilized." As referenced in the Official Comments to UCC §8-202, this is precisely one of the interpretive problems that subsection "(f)" was intended to resolve.

Moreover, as noted above, and as the Fiscal Agent is at pains to point out, the securities intermediary that is technically the "purchaser" of an indirectly held security (here, Cede & Co.) performs a "ministerial role" and has "no duty of due diligence." [Dkt. 976 at 5, 22.] It makes no sense that an issuer's ability to assert the invalidity of a security would depend on whether the "purchaser" was "without notice" on the part of a ministerial intermediary which, in the Fiscal

---

[9] If this were true, however, it would provide another reason to dismiss the Bondholders' claims. If there is no such thing as a "subsequent purchaser," by operation of UCC §8-202(f), the Bondholders would have to be entities that took by original issue and thus prohibited from invoking UCC §8-202(b) due to the fact that the ERS Bond offering violated the Puerto Rico Constitution, as explained *infra*.

Agent's words, "does not have a responsibility[] to monitor or ascertain the compliance of any transactions in securities with any local, state, federal, or foreign laws or regulations thereunder." [*Id*. at 5.] In fact, the Fiscal Agent's argument would effectively eliminate an issuer's ability to challenge *any* defective bond issuance. In the indirect holding system, no individual investor qualifies as a direct "purchaser" of a security. Instead, the direct "purchaser" will always be Cede & Co and, according to the Fiscal Agent, Cede & Co. will never investigate or receive notice of a security's invalidity because it is not authorized to do anything more than hold the security and engage in related ministerial tasks. At bottom, the Fiscal Agency is arguing that an agency relationship structured to ensure willful blindness suffices for UCC §8-202 for every single public bond offering. That cannot be how UCC §8-202(b) and (f) operate. Instead, the focus of the test must be on the actual investors in a security, who are the only real parties in interest with the financial incentive to perform such due diligence. *Accord Diverse Partners,* 2017 WL 4119649, at *5 ("[A]s a practical matter, the beneficial owner is the only person that has an interest in pursuing any rights or remedies under the Notes."). Thus, the Bondholders' notice of any defect is the only notice relevant to the policy determinations reflected in UCC §8-202.

Finally, according to the Fiscal Agent, an entitlement holder has no direct rights against the issuer for payment on a security. Rather, as the Fiscal Agent describes it, an entitlement holder has a claim against its broker, which has a claim against a DTC participant, which has a claim against DTC, which (through its nominee record owner, Cede & Co.) has a claim against the issuer. [Dkt. 976 at 16, 20]. Thus, on the Fiscal Agent's own account, UCC §8-202(f) could not have been intended to create "parallel protections" for entitlement holders because an issuer would never be asserting invalidity as a defense against an entitlement holder. [*Id.* n.14.]

43

In short, as the Official Comments to UCC §8-202 make clear, subsection (f) was added "to ensure that the defense preclusion rules developed for the direct holding system will also apply to the indirect holding system." Official Comment 5, UCC §8-202. Subsection (f) adapts UCC §8-202 to the indirect holding system by providing that the defense preclusion rules of UCC §8-202 should be applied *as if* the entitlement holder were the direct holder of the security. The provision makes no distinction between defenses asserted against an entitlement holder and defenses asserted against the securities intermediary that is the technical "purchaser." The only question is whether the issuer could assert the defense "if the entitlement holder held the security directly." UCC §8-202(f). The Court should reject the Fiscal Agent's attempts to work around UCC §8-202(f).

### b. The Fiscal Agent Filed Its Claim on Behalf of the Bondholders and Its Claim Is Therefore Dependent on the Bondholders' Notice Defense.

An additional reason to reject the Fiscal Agent's position is the fact that, contrary to its argument now, the Fiscal Agent did not just file its proof of claim on behalf of only itself and Cede & Co. It filed its claim on behalf of the Bondholders (and other beneficial interest owners) as well, and throughout the course of these proceedings it has made that point clear. For example, in its proof of claim the Fiscal Agent states that:

> Pursuant to the Security Agreement … between ERS and the Fiscal Agent, **for the benefit of the Owners and other Beneficiaries**, and to provide security for ERS's payment of principal of, premium (if any), and interest on the Bonds and **payment of amounts due to the Owners and other Beneficiaries**…. ERS granted in favor of the Fiscal Agent a security interest in the Pledged Property…."

(Claim No. 16775, Add. at ¶ 13) (emphasis added).)

The Fiscal Agent's claim also states that the "nature and amount of [the Fiscal Agent's] claim" against ERS are based, in part, on "[a]ny and all claims, causes of action, rights, and/or remedies that the Fiscal Agent or the Owners may have against the Commonwealth arising at law

44

or in equity based upon or relating to the Resolution, the Bonds, or the Pledged Property….” (*Id.* at ¶ 17.) There is no doubt that “Owners” as used in the proof of claim means the Bondholders (and other beneficial owners). In fact,  the Fiscal Agent states that its claim includes “[a]ny and all other claims, causes of action, rights, and/or remedies that the Fiscal Agent or the Owners may have … that have been or may be asserted in present or future litigations . . . including, without limitation, the adversary proceeding captioned *Altair Global Credit Opportunities Fund (A), LLC, et al. v. The Commonwealth of Puerto Rico, et al.* Adv. Pro. Nos. 17-219-LTS (D.P.R.) and 17-220-LTS (D.P.R.)” (*Id.*) Cede & Co. is not a party to Adversary Proceeding No. 17-219 or 17-220.

Further, since the filing of its proof of claim, the Fiscal Agent consistently has noted that it filed its claim on behalf of the Bondholders. For example, in the *ERS Bondholders' Supplement to Proofs of Claim and Motions for Allowance of Administrative Expense Claims*, filed jointly by the Bondholders and the Fiscal Agent, the Fiscal Agent states that it filed the Supplement “as Fiscal Agent for the ERS Bonds, for and on behalf of itself and all beneficial owners of ERS Bonds (including members of the ERS Bondholder Groups).” [Dkt. 848 at 2.] In addition, the Fiscal Agent explicitly noted in the Supplement that “[t]he Fiscal Agent filed master bond proofs of claim to asserts [sic] rights to payment from ERS and the Commonwealth on behalf of itself and all beneficial owners of the ERS Bonds….” [*Id.* at n.3; *see also* Dkt. 89 at 4 (asking the Court to “grant[] the Fiscal Agent, for the benefit of itself, all Bondowners, and other Beneficiaries, (a) relief from the automatic stay….).][10]

---

[10] On the other hand, there is no evidence that the Fiscal Agent has consulted DTC or Cede & Co. about this litigation. In fact, Mr. Faith's Declaration states that even though the *ultra vires* dispute has been present since 2017, DTC only “has recently been informed that certain parties have argued that the ERS Bonds were issued without proper authority.” [Dkt. 977, Ex. 9 at ¶ 10.] Moreover, the Fiscal Agent never disclosed DTC or Cede & Co. as entities having discoverable information in these cases (*see generally* Ex. 8, Fiscal Agent's Initial Disclosures), and it is the Bondholders who are literally directing and approving the Fiscal Agent's actions in this dispute (Ex. 9, BH-ERS-JD-000001-04).

It is far too late in the day for the Fiscal Agent to disavow the Bondholders. In any event, the Fiscal Agent's prior representations are correct—the Fiscal Agent is an agent for all beneficial interest holders in the ERS Bonds. The Security Agreement, for example, was entered into between, on the one hand, ERS, and, on the other hand, the "owners …and other Beneficiaries, which Owners and Beneficiaries are represented for purposes of this Security Agreement by The Bank of New York, as fiscal agent under the Resolution…." (Ex. 10, Bond Resolution, Ex. A at VI-30 (Security Agreement)). Likewise, under the Bond Resolution, the Fiscal Agent was required to give all beneficiaries notice of any event of default unless the Fiscal Agent "determines that the withholding of such notice is in the interest of the Bondowners and other Beneficiaries." (Ex. 10, Bond Resolution at §1110.)

Moreover, Section 1102 of the Bond Resolution sets forth the Fiscal Agent's remedies in the event of a default and authorizes the Fiscal Agent to commence an "action or suit in equity, to enjoin any acts or things which may be unlawful or in violation of the rights of the Bondowners or the Beneficiaries." (*Id.* §1102(1)(iv).) Finally, in connection with the filing of the Committees' Objections, the Bondholders invoked Section 1105 and directed that the Fiscal Agent, among other things, (i) "file a joinder to the [Bondholders'] response(s) to the Ultra Vires Issue…"; (ii) "refrain from preparing or filing any pleadings in the Pending ERS Litigation that the Fiscal Agent is not directed to prepare or file by the [Bondholders] (or their counsel)"; and (iii) "accept and follow any additional lawful directions or instructions delivered jointly by the [Bondholders'] counsel to the Fiscal Agent…." (Ex. 9, at BH-ERS-JD000002-03.) In response, the Fiscal Agent "acknowledge[d] and agree[d] to the terms of [the] direction letter." (Id. at BH-ERS-JD000024.)

This, of course, makes sense. The Fiscal Agent serves as agent over the ERS Bonds, and the property rights that compose those bonds have been split between Cede & Co. (which holds

bare legal title) and the beneficial interest holders such as the Bondholders (which hold the economic interest in the bonds). There can be no question that the Fiscal Agent is an agent for the Bondholders. In fact, for the Fiscal Agent to ignore the Bondholders turns the true relationship between the parties on its head. As noted above, the Bondholders are the true parties in interest with full beneficial ownership of the bonds and the exposure to the risk and reward of bond ownership. Cede & Co., by contrast, is a mere administrative agent and ministerial intermediary whose very limited authority appears designed to never allow it to fully evaluate the legality of the bonds it passively holds for the benefit of the beneficial owners. Therefore, for the Fiscal Agent to prevail, it must show that the Bondholders (the parties whose interests the Fiscal Agent has sought to protect throughout this litigation) are protected by UCC §8-202. But the Fiscal Agent has presented no evidence about whether the Bondholders were on notice of the ERS Bonds' defect and chose not to join the Bondholders' arguments on this point. Given that, and the fact that the Bondholders are not protected by UCC §8-202 because they were on notice of the defective nature of the ERS Bonds, the Fiscal Agent's motion should be denied.

### 2. The Fiscal Agent Has Failed To Provide An Evidentiary Basis For Its Invocation Of UCC §8-202(b).

Even if Cede & Co. was the relevant entity under UCC §8-202(b), the Fiscal Agent's motion still should be denied. Under UCC §8-114(4), and as the Fiscal Agent concedes, it bears the burden of proving its lack of notice under UCC §8-202(b). [Dkt. 976 at 8-9.] The Fiscal Agent cannot meet that burden for two reasons.

*First*, the only evidence that the Fiscal Agent has presented on this issue was not disclosed in discovery. As set forth in the *Committees' Motion To Strike Declaration of John Faith and Accompanying Exhibit,* filed contemporaneously with this Response, the Fiscal Agent did not disclose Mr. Faith as a witness with relevant knowledge in its Initial Rule 26 Disclosures or

produce the document that accompanies Mr. Faith's Declaration in response to document requests. Rule 37(c)(1) therefore compels this Court to strike that evidence and not consider it in connection with the Fiscal Agent's summary judgment motion or its response to the Committees' summary judgment motion. Because this is the only evidence that the Fiscal Agent offered and because the Fiscal Agent bears the burden of proof on the notice issue, the Court must reject this defense and find as a matter of law it does not apply to the Fiscal Agent.

*Second*, even if the Court does not strike Mr. Faith's Declaration and the supporting document, this evidence is still insufficient because it addresses only DTC's alleged lack of notice and not the Fiscal Agent's notice or Cede & Co.'s notice. Indeed, while the entire thrust of the Fiscal Agent's brief is that "[u]nder UCC §8-202(b), the Bonds are treated as valid and enforceable in the hands of Cede & Co. … because Cede & Co. purchased the Bonds for value … and … had no notice that ERS lacked statutory authority to issue the Bonds" [Dkt. 976 at 3], all of the Fiscal Agent's proffered facts pertain not to Cede & Co. but to DTC. But, critically, DTC is a separate legal entity the Fiscal Agent did not file its claim on behalf of and the Fiscal Agent does not allege that DTC is a "purchaser" for purposes of UCC §8-202(b).[11] [*See generally* Dkt. 977 ¶¶ 32, 36-47; Faith Decl., Managing Partner at DTC]. Consequently, the Fiscal Agent has presented no facts

---

[11] Cede & Co. is a New York General Partnership. (*See* Ex. 11, *Petroleos De Venezuela S.A. v. MUFG Union Bank, N.A.*, 19-CV-10023-KPF (S.D.N.Y.), Dkt. 114-14). DTC is a limited-purpose trust company organized under the New York Banking Law. (*See* Ex. 12, Rules, By-laws and Organization Certificate of The Depository Trust Company at 1.)

upon which this Court can find that Cede & Co. was not on notice of the *ultra vires* nature of the

ERS Bonds.

### 3. UCC §8-202 Does Not Protect Holders Who Take By Original Issue Where There Is A Constitutional Defect In The Bond's Issuance.

Finally, even if Cede & Co. could be considered the relevant "purchaser" under UCC §8-

202(b), the Fiscal Agent's motion still should be denied because, as a matter of law, UCC §8-

202(b) does not protect Cede & Co. given that under UCC §8-202(b)(1):

> a security . . . even though issued with a defect going to its validity, is valid
> in the hands of a purchaser for value and without notice of the particular
> defect *unless the defect involves a violation of a constitutional provision*.
> In that case, the security is valid in the hands of a purchaser for value and
> without notice of the defect, *other than one who takes by original issue*.

19 L.P.R.A. §1752(b)(1) (emphasis added). Official Comment 3 to UCC §8-202 explains that

"[t]his Article leaves to the law of each particular State the rights of a purchaser on original issue

of a security with a constitutional defect." *Id.* at Official Comment 3; *see also Montgomery v.*

*Hughes Developers, Inc.*, 873 So.2d 1109, 1115 (Ala. 2003) (explaining that, to the extent a

security was void because it violated Alabama's Constitution, the UCC provides no remedy). Here,

the ERS Bonds violated Article VI, section 9 of the Puerto Rico Constitution. Thus, because Cede

& Co. took legal ownership of the ERS Bonds "by original issue," UCC §8-202(b) does not apply.

### a. The ERS Bonds Violate the Puerto Rico Constitution.

By its plain language, UCC §8-202(b)'s constitutional defect exclusion applies to *any*

violation of *any* constitutional provision. Here, the ERS Bonds violate section 9 of Article VI of

the Puerto Rico Constitution, which mandates that "public property and funds shall only be

disposed of for public purposes, for the support and operation of state institutions, *and pursuant*

*to law*." Puerto Rico Const., art. VI, §9 (emphasis added). The emphasized language makes compliance with all applicable legal requirements a constitutional imperative.[12]

Courts are in accord: "the Puerto Rico Supreme Court case law is crystal clear in pointing out that public contracts which do not follow the strict letter of the law . . . are null and void . . . for they infringe principles of public order in the management of public moneys." *Cecort Realty Development Inc. v. Llompart-Zeno*, 100 F.Supp.3d 145, 157 (D.P.R. 2015). "To fulfill this constitutional mandate, the Legislature has passed laws imposing fiscal and governmental contracting controls. Thus . . . a contract between a private party and the State that does not comply with these laws will be null and void." *Rodriguez Ramos v. The Commonwealth of Puerto Rico*, 190 D.P.R. 448, 456-57 (2014) (nullifying oral contract because it violated law requiring public contracts to be in writing); *accord Marina v. Comisión de Seguridad y Protección Pública*, 170 D.P.R. 847, 853-54 (2007) (nullifying award of public contract because the bidders failed to submit mandatory affidavit disclosing criminal convictions).

To be clear, this rule is unbending. "[T]here is no way to elude strict compliance with law and regulation, no matter how laudable the purpose is behind the contractual relationship." *Cecort*, 100 F.Supp.3d at 157; *accord De Jesús González v. Autoridad de Carreteras*, 148 D.P.R. 255, 268 (1999) (applying Article VI, §9 to nullify contract entered into by the Puerto Rico Highway Authority "without rigorously observing the usual rules and practices that are followed in these public contracts"). In *Cecort*, for example, these principles nullified a lease under which the Puerto

---

[12] This principle is also embodied in §1207 of the Puerto Rico Civil Code, 31 L.P.R.A. §3372 ("The contracting parties may make the agreement and establish the clauses and conditions which they may deem advisable, *provided they are not in contravention of law, morals, or public order*") (emphasis added), as well as §1304 of the Puerto Rico Code of Commerce, 10 L.P.R.A §1304 ("*Unlawful agreements can not serve as the basis for any obligation or cause of action*, even where they involve commercial transactions") (emphasis added). As these statutes also constitute applicable law, they are incorporated into Article VI, §9 of the Puerto Rico Constitution.

Rico Judicial Branch leased two high-rise buildings from a private landlord because the lease had

not been subject to a mandatory public bidding process, which Puerto Rico law required. 100

F.Supp.3d at 163. The court did not mince words:

> No public bidding therefore, null and void. No matter how the parties
> characterize the relationship, no matter the hierarchy of the institutions or
> parties involved, the contract is unacceptable. …. Each party must bear its
> loss. No unjust enrichment recourse is available. This is the end of this
> relationship, period.

*Id*. at 164.

Several opinions of the Puerto Rico Secretary of Justice are similarly instructive on this

point. *See, e.g.,* 2001 Op. Sec. Just. No. 16 (finding contract that violated a public corporation's

enabling act also "violates Art VI, Sec. 9 of the Constitution, thereby resulting contrary to the

principle of public order and, for that reason, *nulo ab initio*, pursuant to §1207 of the Civil

Code[.]"); 1985 Op. Sec. Just. No. 11 ("[A]ny disbursement of [public] funds not expressly or

implicitly authorized by law constitutes a violation of the norm established in the Constitution [of

Puerto Rico].").

Under these principles, the ERS Bonds violate the Puerto Rico Constitution. ERS, as a

government agency, must comply with section 9 of Article VI. *See In re Fin. Oversight and Mgt.

Bd. for Puerto Rico*, 914 F.3d 694, 704 (1st Cir. 2019) ("[ERS] is a trust and government agency

. . ."); *Cecort*, 100 F.Supp.3d at 163 ("*[E]very government entity* is obligated to fully comply with

the essence of the principle set forth in section 9 of Article VI of the Constitution of the

Commonwealth of Puerto Rico") (emphasis added)); *De Jesús González*, 148 D.P.R. at 268

(same).

The ERS Bonds also constitute a use or disposition of public funds within the meaning of

Article VI, §9 because they were "payable solely from and secured solely by a pledge of Employer

Contributions" (*see, e.g.,* Ex. 13, Series A Offering Statement at 1), which, "in turn, were allocated

51

to the System through annual appropriations in the Commonwealth budgets." *In re Fin. Oversight and Mgt. Bd. for Puerto Rico*, 948 F.3d 457, 464 (1st Cir. 2020); *see also* 1985 Op. Sec. Just. No. 11 ("Appropriations granted by law to an agency have the character of public funds and any disbursement of said funds not expressly or implicitly authorized by law constitutes a violation of the norm established in the Constitution.").

Finally, as extensively detailed in the Committees' opening brief, because the ERS Bonds were sold to the general public through underwritten public offerings, they constitute an incurrence of debt outside of the means prescribed in the ERS Enabling Act and therefore not "pursuant to law" under Article VI, §9. The ERS Bonds are subject to a defect "involving a violation of a constitutional provision" within the meaning of UCC §8-202(b).

### b. Cede & Co. Took By Original Issue.

There is no dispute that the ERS Bond certificates were originally issued to, and have at all times remained held by, Cede & Co., as nominee of the DTC, the clearing corporation for the bonds. [*See, e.g.,* Dkt. 976 at 3 ("The sole Bondowner is, and always has been, Cede & Co., as nominee of The Depository Trust Company."); Dkt. 971-1 at 13 n.11 ("The ERS Bonds themselves were never resold . . . even today, Cede & Co. is the registered owner of all ERS Bonds ever issued").] Therefore, there can be no dispute that, to the extent the ERS Bonds violated a constitutional provision, Cede & Co. cannot invoke UCC §8-202(b) to validate the ERS Bonds. Given that the Fiscal Agent's entire argument depends on Cede & Co. being protected by UCC §8-202(b), the Fiscal Agent's motion should be denied for this reason alone.

## III. The Bondholders And The Fiscal Agent Cannot Recover In Equity.

Tacitly acknowledging the problems with their arguments, the Bondholders resort to equity, claiming that even if they cannot enforce the ERS Bonds, they should be allowed to recover in equity under an unjust enrichment theory. This argument is easily rejected because the Puerto

Rico Supreme Court has held that no party has "any remedy in equity, such as unjust enrichment" under an *ultra vires* contract. *Las Marias*, 159 D.P.R. at 875; *accord Norton v. McOsker*, 407 F.3d 501, 506 (1st Cir. 2005) ("'[T]he doctrine of estoppel … has no application to a contract … which is void because it violates … the dictates of public policy'") (changes in original) (quoting *Doherty v. Bartlett*, 81 F.2d 920, 925 (1st Cir. 1936)); *Morales v. Municipio de Toa Baja*, 119 D.P.R. 682, 736 (1987) (refusing to apply equitable principles to enforce *ultra vires* contract because "[t]o decide otherwise is to promote gross noncompliance by public officers of the laws and regulations that govern their actions"). When a governmental contract is *ultra vires*, the Puerto Rico Supreme Court has ruled that "[n]o unjust enrichment recourse is available. This is the end of this relationship, period." *Cecort*, 100 F.Supp.3d at 164.

Thus, an *ultra vires* finding is fatal to all of the Bondholders' and Fiscal Agent's claims. The Puerto Rico Supreme Court has explained that the purpose of the *ultra vires* doctrine is to "protect the interests and the money of the people that the government represents" and is therefore "applied inflexibl[y]" to protect the public from having to pay for *ultra vires* actions. *Las Marias*, 159 D.P.R. at 875.

Although these Puerto Rico decisions decide the question, the law is the same elsewhere. As one commentator summarized:

> If a contract is ultra vires, it is wholly void. Because the contract is void, (a) no recovery can be had against the municipality on it; (b) there can be no ratification, except by the legislature; (c) the municipality cannot be estopped to deny the validity of the contract; and (d) there can be no recovery on an implied contract, although it has been executed and the municipality has received the benefit of the contract.

10 McQuillin Mun. Corp. §29:15 (3d ed.); *accord Litchfield v. Ballou*, 114 U.S. 190, 193 (1885) ("If this prohibition is worth anything it is as effectual against the implied as the express promise, and is as binding in a court of chancery as a court of law."); *Waisman v. Wagner*, 227 Wis. 193,

193 (1938) (applying Wisconsin law and dismissing fraud-based claims against municipality in connection with an ultra vires contract because "[a]greements that are beyond the power of a city to make are void").

The Bondholders unsuccessfully attempt to distinguish these cases by asserting a litany of factually distinguishing features. But going to such lengths to distinguish the cases actually proves the point: that courts have refused to allow claims of any nature for an *ultra vires* act under a whole host of factual scenarios shows that the rule is one of general applicability and in no way dependent upon factual nuances.

The weakness in the Bondholders' argument is further shown in that they can only point to one decision—*Plan Bienestar Salud v. Alcalde Cabo Rojo*—to support their argument that equitable claims can survive an *ultra vires* finding. 114 D.P.R. 697, 702 (1983). But even that case supports the Committees' position, as the court affirmed the principle that "[t]he doctrine of unjust enrichment is not considered applicable … when its application is contrary to clear public policy, embodied in a statute or, we could add, in the Constitution." 114 D.P.R. at 702. *Plan Bienstar* involved a municipality's failure to make certain payments to a health plan pursuant to an administrative order issued by the municipality. *Id.* at 698. The plan brought suit and the municipality argued that it did not have to pay because another clause of the order governing the hiring of employees was *ultra vires*.

The court did not reach the *ultra vires* issue and instead held that even if the order was *ultra vires*, the plan could recover in equity. In doing so, the Court noted that this was an exceptional case that warranted deviation from the traditional rule that a governmental *ultra vires* action is wholly void and cannot give rise to any claim. In fact, the court noted that this was the first time it had allowed a recovery for an allegedly *ultra vires* action, stating that "[i]n the case of

Puerto Rico, the situation that the court has faced up to now have not led to the application of the doctrine of unjust enrichment." *Id*. at 701.

The court allowed the unjust enrichment claim in *Plan Bienestar* only because Puerto Rico legislation "promotes" the "contracting between a municipality and a certified association of public servants regarding the subscription to a plan of medical-hospital services." *Id.* The alleged defect was that the hiring of those employees "takes place in the context of something similar to a collective agreement, an act not allowed to our municipalities." *Id*. Important to the Court, however, was the fact that the plaintiff's "lawsuit does not try to put such a collective agreement into effect" but instead sought to enforce "the clause, entirely separable" from the alleged *ultra vires* provision that pertains to the agreement regarding the providing of health services, over which the government unquestionably had the authority to agree. *Id*. at 702. Based on the "specific circumstances of this case" the Court ordered the municipality to pay its debt. *Id.*

*Plan Biensestar* is plainly distinguishable. Here, the action challenged by the Committees (the issuance of the ERS Bonds) is the *ultra vires* action. And unlike in *Plan Biensestar,* there is no law that specifically grants ERS the power to issue bonds in a public offering. Consequently, to allow any claim on account of the ERS Bonds would be to run afoul of the express public policy of Puerto Rico, and the *Plan Biensestar* decision is clear that "unjust enrichment is not considered applicable … when its application is contrary to a clear public policy embodied in a statute or … the Constitution." *Id*. at 702.[13]

To conclude, if the ERS Bond issuance was *ultra vires*, it is void and the Bondholders can assert no equitable claims on account of or in connection with the ERS Bonds.

---

[13] The Bondholders also cite *Berrios v UPR*, 116 D.P.R. 88 (1985), a wrongful death case tainted with attorney misconduct. *Berrios* does not involve or discuss principles applicable to an *ultra vires* action.

# CONCLUSION

For all of the foregoing reasons and those set forth in the Committees' Motion for Summary Judgment On The *Ultra Vires* Issues, the Court should deny the Bondholders' and Fiscal Agent's motions for summary judgment, grant the Committees' Motion for Summary Judgement On The *Ultra Vires* Issues, and grant such other relief as may be just.

Dated: October 28, 2020                   */s/ Robert D. Gordon*
San Juan, Puerto Rico

JENNER & BLOCK LLP
Robert Gordon (admitted *pro hac vice*)
Richard Levin (admitted *pro hac vice*)
919 Third Ave
New York, NY 10022-3908
rgordon@jenner.com
rlevin@jenner.com
212-891-1600 (telephone)
212-891-1699 (facsimile)

Catherine Steege (admitted *pro hac vice*)
Melissa Root (admitted *pro hac vice*)
Landon Raiford (admitted *pro hac vice*)
353 N. Clark Street
Chicago, IL 60654
csteege@jenner.com
mroot@jenner.com
lraiford@jenner.com
312-222-9350 (telephone)
312-239-5199 (facsimile)

- and –

*/s/ A.J. Bennzar-Zequeria*

BENNAZAR, GARCÍA &
MILIÁN, C.S.P
A.J. Bennazar-Zequeira
Héctor M. Mayol Kauffmann
Francisco del Castillo Orozco
Edificio Union Plaza,
1701 Avenida Ponce de León
#416
Hato Rey, San Juan
Puerto Rico 00918
ajb@bennazar.org
hector.mayol@bennazar.com
787-754-9191 (telephone)
787-764-3101 (facsimile)

*Counsel for the Official
Committee of
Retired Employees of Puerto Rico*

- and –

*/s/ Luc A. Despins*

PAUL HASTINGS LLP
Luc A. Despins, Esq. *(Pro Hac
Vice)*
James R. Bliss (*Pro Hac Vice*)
200 Park Avenue
New York, New York 10166
Tel: (212) 318-6000
lucdespins@paulhastings.com

Nicholas A. Bassett, Esq. (*Pro
Hac Vice*)
2050 M Street NW
Washington, D.C. 20036
Tel: (202) 551-1700
nicholasbassett@paulhastings.com

*Counsel to the Official Committee
of Unsecured*

*Creditors for all Title III Debtors
(other than COFINA and PBA)*[14]

- and –

/s/ Juan J. Casillas Ayala
CASILLAS, SANTIAGO &
TORRES LLC
Juan J. Casillas Ayala, Esq.
(USDC - PR 218312)
Israel Fernández Rodríguez, Esq.
(USDC - PR 225004)
Juan C. Nieves González, Esq.
(USDC - PR 231707)
Cristina B. Fernández Niggemann,
Esq. (USDC - PR 306008)
PO Box 195075
San Juan, PR 00919-5075
Tel.: (787) 523-3434 Fax: (787)
523-3433
jcasillas@cstlawpr.com
ifernandez@cstlawpr.com
jnieves@cstlawpr.com
cfernandez@cstlawpr.com

*Local Counsel to the Official
Committee of Unsecured Creditors
for all Title III Debtors (other than
COFINA and PBA)*[15]

- and –

---

[14] As it relates to the Committee's Omnibus Claims Objection at Commonwealth Dkt. 5580, except as to the argument set forth in section II(A) herein.

[15] As it relates to the Committee's omnibus claims objections at Commonwealth Dkts. 5580 and 5586 and Adversary Proceeding Nos. 19-356, 19-357, and 19-361.

*/s/ John Arrastia*
GENOVESE JOBLOVE &
BATTISTA, P.A.
John Arrastia, Esq. (*Pro Hac
Vice*)
John H. Genovese, Esq. (*Pro Hac
Vice*)
Jesus M. Suarez, Esq. (*Pro Hac
Vice*)
Mariaelena Gayo-Guitian, Esq.
(*Pro Hac Vice*)
100 SE 2nd Street, Suite 4400
Miami, Florida 33131
Tel: 305-349-2300
jarrastia@gjb-law.com
jgenovese@gjb-law.com
jsuarez@gjb-law.com
mguitian@gjb-law.com

*Special Litigation Counsel to the
Official Committee of Unsecured
Creditors* [16]

- and –

*/s/ Sunni Beville*
Sunni P. Beville, Esq. (*pro hac
vice*)
Tristan G. Axelrod, Esq. (*pro hac
vice*)
One Financial Center
Boston, MA 02111
Tel: (617) 856-8200
sbeville@brownrudnick.com

*Counsel to the Financial
Oversight and
Management Board, acting
through the
members of the Special Claims
Committee*

- and –

---

[16] As it relates to Adversary Proceeding Nos. 19-356, 19-357, 19-359, and 19-361.

_/s/ Kenneth Suria_
ESTRELLA, LLC
Alberto Estrella (USDC-PR
209804)
Kenneth C. Suria (USDC-PR
213302)
P. O. Box 9023596
San Juan, Puerto Rico 00902–
3596
Tel.: (787) 977-5050
Fax: (787) 977-5090

_Local Counsel to the Financial
Oversight and
Management Board, acting
through the members
of the Special Claims Committee_