# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO<br><br>    as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*,<br><br>    Debtors.[1] | PROMESA<br>Title III<br><br>Case No. 17-BK-03283 (LTS) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>THE EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO,<br><br>    Debtor. | PROMESA<br>Title III<br><br>Case No. 17-BK-03566 (LTS) |
| THE SPECIAL CLAIMS COMMITTEE OF THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, ACTING BY AND THROUGH ITS MEMBERS, | Adv. Proc. No. 19-00356 (LTS) |

---

[1] The Debtors in these Title III cases, along with each Debtor's respective Title III case number listed as a bankruptcy case number due to software limitations and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK-3283 (LTS)) (Last Four Digits of Federal Tax ID: 3481), (ii) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566 (LTS)) (Last Four Digits of Federal Tax ID: 9686), (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567 (LTS)) (Last Four Digits of Federal Tax ID: 3808), (iv) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284 (LTS)) (Last Four Digits of Federal Tax ID: 8474); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17-BK- 4780) (Last Four Digits of Federal Tax ID: 3747).

|  | ) |
| and | ) |
|  | ) |
| THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF ALL TITLE III DEBTORS (OTHER THAN COFINA), | ) ) ) |
|  | ) |
| as co-trustees of | ) |
|  | ) |
| THE EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF PUERTO RICO, | ) ) |
|  | ) |
| Plaintiff, | ) |
|  | ) |
| v. | ) |
|  | ) |
| DEFENDANT 1M, *et al.*, | ) |
|  | ) |
| Defendants. | ) |
|  | ) |

THE SPECIAL CLAIMS COMMITTEE OF THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, ACTING BY AND THROUGH ITS MEMBERS,

and

THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF ALL TITLE III DEBTORS (OTHER THAN COFINA),

as co-trustees of

THE EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF PUERTO RICO,

Plaintiff,

v.

STOEVER GLASS & CO., *et al.*,

Adv. Proc. No. 19-00357 (LTS)

Defendant.

)
)
)
)
)
)
)

THE SPECIAL CLAIMS COMMITTEE OF THE
FINANCIAL OVERSIGHT AND MANAGEMENT
BOARD FOR PUERTO RICO, ACTING BY AND
THROUGH ITS MEMBERS,

    and

THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS OF ALL TITLE III DEBTORS
(OTHER THAN COFINA),

    as co-trustees of

THE EMPLOYEES RETIREMENT SYSTEM OF THE
GOVERNMENT OF PUERTO RICO,

    Plaintiff,

v.

DEFENDANT 1H-78H,

    Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Adv. Proc. No. 19-00359 (LTS)

THE SPECIAL CLAIMS COMMITTEE OF THE
FINANCIAL OVERSIGHT AND MANAGEMENT
BOARD FOR PUERTO RICO, ACTING BY AND
THROUGH ITS MEMBERS,

    and

THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS OF ALL TITLE III DEBTORS
(OTHER THAN COFINA),

    as co-trustees of

)
)
)
)
)
)
)
)
)
)
)
)
)
)

Adv. Proc. No. 19-00361 (LTS)

THE EMPLOYEES RETIREMENT SYSTEM OF THE )
GOVERNMENT OF PUERTO RICO,                )
                                          )
   Plaintiff,              )
                                          )
v.                                        )
                                          )
DEFENDANT 1G-50G, *et al.*,               )
                                          )
   Defendants.             )


-------------------------------------------------------------------- X


**ERS BONDHOLDERS' BRIEF IN OPPOSITION TO THE COMMITTEES'
MOTION FOR SUMMARY JUDGMENT ON *ULTRA VIRES* ISSUES**

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS ................................................................................................. i

INTRODUCTION ....................................................................................................... 1

ARGUMENT ............................................................................................................. 4

I.    The Plain Text of the ERS Enabling Act Authorized ERS to Borrow
Money by Issuing the ERS Bonds ............................................................... 4

    A.    The Enabling Act Authorized ERS to Borrow from Any Financial
Institution or Through Direct Placements of Debt ............................ 5

    B.    ERS "Borrowed" by Issuing the ERS Bonds ................................... 9

    C.    ERS Borrowed "from Any Financial Institution" by Issuing the
ERS Bonds ...................................................................................... 10

        1.    The Underwriters' Resale of the ERS Bonds Is Beside the
Point ................................................................................... 11

        2.    The Committees Have No Answer of from Whom ERS
Borrowed if Not from the Underwriters ............................. 13

        3.    Act 116-2011 Is Consistent with the ERS Bonds Being
Borrowing from Financial Institutions ............................... 15

        4.    The Many Legal Opinions Affirming Validity Are
Consistent with the Bonds Being Borrowing from Financial
Institutions ......................................................................... 17

    D.    Alternatively, ERS Borrowed "Through the Direct Placement of
Debt" by Issuing the ERS Bonds ................................................... 18

    E.    Express Reference to "Bonds" Is Not Required ............................. 21

        1.    The 19th Century Precedent .............................................. 22

        2.    Puerto Rico Law and the Civil Code ................................. 26

        3.    Negotiability Versus Underwritten Offering ...................... 28

II.    Other Materials Confirm the Validity of the ERS Bonds ........................... 31

    A.    *Rivera Torres* ............................................................................... 32

    B.    Agency Interpretations .................................................................. 33

    C.    Other Legislation ........................................................................... 34

    D.    Judicial Admissions ...................................................................... 36

III.    Even if the ERS Bonds Were Invalid, the Committees Have Not Shown
that They Are Unenforceable ..................................................................... 36

    A.    UCC § 8-202 Renders the ERS Bonds Enforceable even if Invalid ........ 37

## TABLE OF CONTENTS
(continued)

| | | | Page |
|---|---|---|---|
| | 1. | UCC 8-202 Applies to the ERS Bonds | 38 |
| | 2. | The Bondholders Are Purchasers for Value Without Notice of the Particular Defect | 43 |
| B. | | The Bondholders Are Entitled to Recover in Equity | 57 |
| CONCLUSION | | | 59 |

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Atl. Cleaners & Dyers, Inc. v. United States*,
   286 U.S. 427 (1932) ................................................................................................21

*Baum-Holland v. Hilton El Con Mgmt., LLC*,
   964 F.3d 77 (1st Cir. 2020)................................................................................ 9, 11

*Bd. of Cnty. Comm'rs v. Williamson*,
   370 P.2d 837 (Okla. 1962)......................................................................................22

*Berrios v. Univ. P.R.*,
   116 D.P.R. 88, 16 P.R. Offic. Trans. 112 (1985)..................................................57

*Black v. Cohen*,
   52 Ga. 621 (1874) ...................................................................................................24

*Bostock v. Clayton Cnty.*,
   140 S. Ct. 1731 (2020) ..................................................................................... 22, 26

*Bunch's Ex'rs v. Fluvanna Cnty.*,
   10 S.E. 532 (Va. 1890) ............................................................................................23

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986) ................................................................................................14

*City of Brenham v. German-Am. Bank*,
   144 U.S. 173 (1892) ........................................................................................*passim*

*Comm'rs of Hendersonville v. C.A. Webb & Co.*,
   61 S.E. 670 (N.C. 1908) .........................................................................................23

*Commonwealth ex rel. Hamilton v. Select & Common Councils of City of
   Pittsburgh*,
   34 Pa. 496 (1859) ....................................................................................................23

*Commonwealth v. Town of Williamstown*,
   30 N.E. 472 (Mass. 1892)................................................................................. 23, 25

*Doty v. Ellsbree*,
   11 Kan. 209 (1873).................................................................................................23

*Dutton v. City of Aurora*,
   28 N.E. 461 (Ill. 1885)...................................................................................... 23, 24

*Erie R. Co. v. Tompkins*,
   304 U.S. 64 (1938) ..................................................................................................26

i

*Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*,
  104 F. Supp. 3d 441 (S.D.N.Y. 2015) ................................................. 13

*Fid. Tr. & Safety Vault Co. v. Mayor of Morganfield*,
  29 S.W. 442 (Ky. 1895) ..................................................................... 23

*Forrest City v. Bank of Forrest City*,
  172 S.W. 1148 (Ark. 1915) ................................................................ 30

*Fullerton v. Cent. Lincoln People's Utility Dist.*,
  201 P.2d 524 (Or. 1948) .................................................................... 26

*Gray v. Noholoa*,
  214 U.S. 108 (1909) ............................................................................. 8

*Holmes v. City of Shreveport*,
  31 F. 113 (C.C.W.D. La. 1887) .......................................................... 24

*In re Bame*,
  252 B.R. 148 (Bankr. D. Minn. 2000) ............................................... 37

*In re Blondheim Real Estate, Inc.*,
  91 B.R. 639 (Bankr. D.N.H. 1988) ............................................... 58, 59

*In re Fin. Oversight & Mgmt. Bd.*,
  914 F.3d 694 (1st Cir. 2019) ............................................................... 5

*In re Fin. Oversight & Mgmt. Bd.*,
  872 F.3d 57 (1st Cir. 2017) ............................................................... 42

*In re Hawaii Corp.*,
  59 B.R. 410 (D. Haw. 1986) ........................................................ 41, 42

*In re Lehman Brothers Mortg.-Backed Sec. Litig.*,
  650 F.3d 167 (2d Cir. 2011) ............................................................. 12

*In re Seacoast Anti-Pollution League*,
  490 A.2d 1329 (N.H. 1985) ............................................................... 56

*In re Thompson*,
  965 F.2d 1136 (1st Cir. 1992) ..................................................... 38, 42

*Int'l Salt Co. v. City of Boston*,
  590 F.3d 1 (1st Cir. 2009) ................................................................. 57

*Keel v. Pulte*,
  10 S.W.2d 694 (Tex. Comm'n App. 1928) .......................................... 30

*Kruesel v. Collin*,
  17 P.2d 854 (Wash. 1933) ................................................................. 22

*Las Marias Reference Lab. Corp. v. Municipality of San Juan*,
159 D.P.R. 868, 2003 WL 21706387 (2003) ........................................................58

*Loan Syndications & Trading Ass'n v. SEC*,
882 F.3d 220 (D.C. Cir. 2018) ........................................................................12

*Merrill v. Town of Monticello*,
138 U.S. 673 (1891) ...............................................................................*passim*

*Merrill v. Town of Monticello*,
72 F. 462 (7th Cir. 1896) ..............................................................................30

*Mitchell v. City of Burlington*,
71 U.S. 270 (1867) ......................................................................................24

*Morales v. Municipality of Toa Baja*,
119 D.P.R. 682, 19 P.R. Offic. Trans. 724 (1987) ...........................................57

*Muscatine Lighting Co. v. City of Muscatine*,
217 N.W. 468 (Iowa 1928) .............................................................................26

*Napert v. Gov't Emps. Ins. Co.*,
No. 13-10530-FDS, 2013 WL 3989645 (D. Mass. Aug. 1, 2013) .........................5

*Noonan v. Wonderland Greyhound Park Realty LLC*,
723 F. Supp. 2d 298 (D. Mass. 2010) ...............................................................5

*Norton v. McOsker*,
407 F.3d 501 (1st Cir. 2005) ...........................................................................57

*Pac. Improvement Co. v. City of Clarksdale*,
74 F. 528 (5th Cir. 1896) ...............................................................................30

*Plan Bienestar Salud v. Alcalde Cabo Rojo*,
114 D.P.R. 697, 14 P.R. Offic. Trans. 896 (1983) .................................... 4, 37, 57

*Plaza Carolina Mall, L.P. v. Municipality of Barceloneta*,
91 F. Supp. 3d 267 (D.P.R. 2015) ...................................................................58

*Police Jury v. Britton*,
82 U.S. 566 (1873) ..................................................................................24, 30

*Port of Palm Beach Dist. v. Goethals*,
104 F.2d 706 (5th Cir. 1939) ..........................................................................29

*Reed v. City of Cedar Rapids*,
113 N.W. 773 (Iowa 1907) .............................................................................26

*Rivera Concepcion v. Puerto Rico*,
682 F. Supp. 2d 164 (D.P.R. 2010) ...............................................................5, 37

*Rivera Torres v. Junta de Retiro Para Maestros,*
    502 F. Supp. 2d. 242 (D.P.R. 2007) ................................................ 32, 46

*Rodríguez Ramos v. ELA,*
    190 D.P.R. 448 (2014) ................................................................................ 58

*Rogers v. City of Burlington,*
    70 U.S. 654 (1866) ...................................................................................... 24

*Russell v. Middletown City Sch. Dist.,*
    125 A. 641 (Conn. 1924) ............................................................... *passim*

*Russello v. United States,*
    464 U.S. 16 (1983) ...................................................................................... 20

*SEC v. Platforms Wireless Int'l Corp.,*
    617 F.3d 1072 (9th Cir. 2010) .................................................................. 12

*Travelers Cas. & Surety Co. of Am. v. Pac. Gas & Elec. Co.,*
    549 U.S. 443 (2007) .................................................................................... 38

*U.S.I. Props. Corp. v. M.D. Constr. Co.,*
    860 F.2d 1 (1st Cir. 1988) .......................................................................... 33

*United States v. Gonzalez,*
    319 F.3d 291 (7th Cir. 2003) ...................................................................... 8

*United States v. López,*
    957 F.3d 302 (1st Cir. 2020) ...................................................................... 37

**STATUTES**

3 L.P.R.A. § 779 (2008) ..................................................................... *passim*

3 L.P.R.A. § 9004 ............................................................................................ 8

4 L.P.R.A. § 1437 ............................................................................................ 8

5 L.P.R.A. § 1019 ............................................................................................ 8

7 L.P.R.A. § 607g ............................................................................................ 8

7 L.P.R.A. § 779c ............................................................................................ 8

10 L.P.R.A. § 691 ............................................................................................ 8

10 L.P.R.A. § 691o .......................................................................................... 8

11 L.P.R.A. § 30c ............................................................................................ 8

18 L.P.R.A. § 392h (2008) ...................................................................... 8, 32

19 L.P.R.A. § 451 ............................................................................. 44, 45, 48

19 L.P.R.A. § 1751 ........................................................................................ 41, 42

19 L.P.R.A. § 1752 (2020) ................................................................................ *passim*

24 L.P.R.A. § 7004a ............................................................................................... 8

26 L.P.R.A. § 2930 ................................................................................................ 8

26 L.P.R.A. § 8084 ................................................................................................ 8

31 L.P.R.A. § 13 .................................................................................................... 5

31 L.P.R.A. § 14 .............................................................................................. 26, 27

31 L.P.R.A. § 15 .................................................................................................. 26

31 L.P.R.A. § 16 ........................................................................................ 22, 26, 27

31 L.P.R.A. § 17 .................................................................................................. 26

31 L.P.R.A. § 18 .................................................................................................. 26

31 L.P.R.A. § 19 .................................................................................................. 26

31 L.P.R.A. § 20 .................................................................................................. 26

31 L.P.R.A. § 21 .................................................................................................. 26

31 L.P.R.A. § 22 .................................................................................................. 26

31 L.P.R.A. § 23 .................................................................................................. 26

11 U.S.C. § 502 ................................................................................................... 38

11 U.S.C. § 510 ................................................................................................... 58

48 U.S.C. § 2103 ................................................................................................. 40

48 U.S.C. § 2161 ............................................................................................. 41, 42

48 U.S.C. § 2175 ................................................................................................. 40

48 U.S.C. § 2231 ................................................................................................. 40

Act 3-2013 ............................................................................................... 16, 34, 53

Act 35-2007 ............................................................................................. 16, 34, 46

Act 116-2011 .................................................................................................. *passim*

## OTHER AUTHORITIES

17 C.F.R. § 240.15c2-12 ...................................................................................... 11

Black's Law Dictionary (11th ed. 2019) ........................................................... 10, 28

*Cambridge Spanish-English Dictionary* ................................................................. 8

64A C.J.S. Municipal Corporations § 2119 ......................................................... 23

4 Collier on Bankruptcy ¶ 502.03 ...................................................................38

FDIC, *Credit Card Securitization Manual*, https://www.fdic.gov/regulations/
examinations/credit_card_securitization/ .............................................13

Fed. Hous. Fin. Agency, *About Fannie Mae & Freddie Mac*,
https://www.fhfa.gov/SupervisionRegulation/FannieMaeandFreddieMac/
Pages/About-Fannie-Mae---Freddie-Mac.aspx ...........................................13

S. Feldstein & F. Fabozzi, ed., *The Handbook of Municipal Bonds*...........................................11

GM Financial, *Understanding Securitization*, https://www.gmfinancial.com/
content/dam/gmf/about-us/understanding-securitizations.pdf;...............................13

15 McQuillin Municipal Corps. § 43:22 (3d ed. 2020)........................................ 22, 23

MSRB Notice 2012-38, msrb.org/Rules-and-Interpretations/Regulatory-
Notices/2012/2012-38.aspx?n=1 .................................................11

UCC § 3-102.........................................................................28

UCC § 8-202.................................................................*passim*

*WordReference.com* ...................................................................7

## INTRODUCTION

The Committees argue that ERS[2] need not repay the $3 billion it borrowed in 2008 because, contrary to the views of the many sophisticated parties involved on all sides of that transaction, ERS did not have statutory authority to enter into it.  Now, more than a decade after the bonds were issued, and long after ERS received $3 billion from the bond purchasers, the Committees would have the Court invalidate the ERS Bonds and require that holders of the bonds repay years of contractual interest payments.  These arguments have no support in the law or the facts.

At the threshold, it is obvious that ERS had statutory authority to issue the ERS Bonds.  In 2008, the ERS Enabling Act authorized ERS to "borrow from any financial institution . . . or through the direct placement of debts."  3 L.P.R.A. § 779(d) (translation of original Spanish).  In passing, the Committees say they dispute this translation of the Enabling Act, but they offer no evidence controverting its accuracy.  Because this translation is supported by dictionary definitions and the only expert opinion on translation offered in these proceedings, it governs this Motion.

The ERS Enabling Act authorized the issuance of the ERS Bonds both as borrowing from financial institutions and as a direct placement of debt.  First, the undisputed facts show that ERS *did* borrow from financial institutions—that is, the underwriters to which each and every one of the ERS Bonds were sold.  The Committees do not establish otherwise.  In fact, they agree, as they

---

[2] Capitalized terms not defined herein have the meanings given them in the *Bondholders' Motion for Summary Judgment on* Ultra Vires *Issues and Proceedings*, ECF No. 14241, Case No. 17-bk-03283 ("BH UV Motion"), and the *Bondholders Rule 56(b) Statement of Undisputed Facts in Support of Motion for Summary Judgment on* Ultra Vires *Issues and Proceedings*, ECF No. 14242, Case No. 17-bk-03283. Citations to "BH UV 56(b)" throughout this Opposition refer to the *Bondholders Rule 56(b) Statement of Undisputed Facts in Support of Motion for Summary Judgment on* Ultra Vires *Issues and Proceedings*, ECF No. 14242, Case No. 17-bk-03283, Case No. 17-bk-03566, ECF No. 972; Adv. Proc. No. 19-ap-00356, ECF No. 116; Adv. Proc. No. 19-ap-00357, ECF No. 121; Adv. Proc. No. 19-ap-00359, ECF No. 100; Adv. Proc. No. 19-ap-00361, ECF No. 103. For the convenience of the Court, the *Bondholders Rule 56(b) Statement of Undisputed Facts in Support of Motion for Summary Judgment on* Ultra Vires *Issues and Proceedings* is attached as Ex. 1 to the *Declaration of Sparkle L. Sooknanan in Support of ERS Bondholders' Opposition to the Committees' Motion for Summary Judgment on* Ultra Vires *Issues* ("Second Sooknanan UV Decl.") filed herewith.

must, that ERS "borrowed" by selling the bonds. And they do not dispute that ERS sold all the ERS Bonds it ever issued to underwriters; that underwriters paid ERS all of the proceeds ERS ever received; and that the underwriters were all financial institutions. That is the end of the inquiry.

The Committees argue that the underwriters are intermediaries who purchased the ERS Bonds with the intention of reselling them to other investors. Even if true, it is beside the point, since ERS still "borrowed" from the underwriters when it sold the ERS Bonds to them in the first place. The Committees also argue, without support, that the underwriters are not "true lenders," but they do not and cannot tell us who ERS borrowed $3 billion from. Their implicit argument seems to be that ERS borrowed from the second investor to hold an ownership interest in the bonds—that is, the first investor after the underwriters. The Committees offer no basis for that arbitrary rule. But even applying the Committees' own rule, they cannot sustain their burden of proof on summary judgment, because they have offered no evidence establishing that those investors were *not* financial institutions.

Alternatively, the issuance of the ERS Bonds was authorized under the Enabling Act as borrowing through a "direct placement of debt." Financial markets distinguish between direct borrowing, in which a borrower itself issues debt securities, and indirect or conduit borrowing, in which a borrower borrows money via a separate, conduit entity which itself issues debt securities. The Enabling Act refers to that distinction and authorizes debt issued directly by ERS, like the ERS Bonds. The Committees argue that "direct placement of debt" limited ERS to a particular form of debt issuance called a "private placement," and precluded underwritten bond offerings. But they cannot explain why the Legislative Assembly would have restricted ERS's borrowing to private placements, and that reading is also inconsistent with the Enabling Act.

2

This express statutory authorization is precisely why *everyone* involved in the ERS Bond issuance confirmed ERS's ability to issue the ERS Bonds.  The ERS Board of Trustees, ERS's General Counsel, the Government Development Bank's Board of Directors, the Secretary of Justice, and a number of sophisticated law firms and prominent municipal bond lawyers all opined in writing at the time of the issuance that the bonds were fully authorized.  Moreover, in the years that followed, the Puerto Rico legislature repeatedly recognized that the ERS Bonds were existing, valid obligations; the Government Development Bank commissioned a report that made no suggestion that the bonds were invalidly issued; and ERS's counsel investigated the matter yet again and concluded that the bonds were authorized.  Moreover, ERS paid interest on the ERS Bonds as and when due under the terms contained in the bonds for more than eight years; ERS's financial statements consistently reflected the bonds as an outstanding liability (and still do even today); and both ERS and the Oversight Board repeatedly conceded in prior litigation that the ERS Bonds were valid and enforceable.

In the end, the Committees' statutory arguments boil down to the assertion that bonds may not be issued unless there is authorizing legislation that uses the word "bonds."  There is absolutely no support in Puerto Rico law for such a requirement, and numerous state courts have rejected it.  The ERS Enabling Act expressly authorized ERS to issue the ERS Bonds, and nothing more is required.  The ERS Bonds are valid and enforceable, and the Committees' motion must be denied.

In any event, even if the ERS Bonds were invalid, they would still be enforceable for two independent reasons.  First, UCC § 8-202(b) provides for the enforcement of otherwise invalid government securities where, among other things, the government issuer had the authority to borrow money for the stated purpose and received substantial consideration in exchange for the security.  The Committees argue that § 8-202(b) is inapplicable because they are not "issuers."

This is patently incorrect.  The Oversight Board's Special Claims Committee commenced the Clawback Proceedings *as ERS's representative* and asserted that the ERS Bonds are *ultra vires*. And the Oversight Board adopted the Committees' claim objections challenging the validity of the bonds *on behalf of ERS*.  ERS is obviously an issuer, and thus subject to § 8-202.  Regardless, the Government Parties and Committees cannot deprive the Bondholders of their rights under § 8-202 by manipulating the signatories to this Motion.  At bottom, the Committees bring their objections in place of and for ERS, and the Bondholders are entitled to assert all of the same responses that would be available to them vis-á-vis ERS.

Applying UCC § 8-202, the Bondholders are "purchasers for value and without notice of the particular defect."  19 L.P.R.A. § 1752(b)(1).  The Bondholders had no notice of any defect in the ERS Enabling Act.  To the contrary, for more than a decade, dating from the issuance of the bonds to today, the evidence that the ERS Bonds were authorized by the Enabling Act has been overwhelming and uncontroverted.  The Committees' arguments that the Bondholders were on notice of "the particular defect" under § 8-202 are entirely meritless.

Second, the ERS Bonds are also enforceable in equity under Puerto Rico law, which precludes even a government institution like ERS from accepting the benefits of a contract and then refusing to perform its reciprocal duties on grounds of illegality.  *Plan Bienestar Salud v. Alcalde Cabo Rojo*, 114 D.P.R. 697, 14 P.R. Offic. Trans. 896, 903–04 (1983).

## ARGUMENT

## I.  The Plain Text of the ERS Enabling Act Authorized ERS to Borrow Money by Issuing the ERS Bonds

In 2008, the ERS Enabling Act expressly authorized ERS to "borrow from any financial institution . . . or through the direct placement of debts."  3 L.P.R.A. § 779(d) (Spanish); BH UV 56(b) ¶ 16.  The undisputed facts show that ERS did both.  ERS borrowed from a financial

4

institution because it sold nearly $3 billion of ERS Bonds directly and solely to underwriters who were all financial institutions. *Infra* Part I.B–C. And ERS borrowed through a direct debt placement because it issued the debt directly, rather than through a conduit entity. *Infra* Part I.D. ERS therefore had express statutory authority to issue the ERS Bonds.

## A. The Enabling Act Authorized ERS to Borrow from Any Financial Institution or Through Direct Placements of Debt

The Committees say in a footnote that they dispute the Bondholders' translation of the Enabling Act as authorizing ERS to "borrow from any financial institution . . . or through the direct placement of debts." 7 L.P.R.A. § 779(d) (Spanish); BH UV 56(b) ¶¶ 9–16; *see* Committees' Mot. for Summ. J. on *Ultra Vires* Issues at 19 n.19, ECF No. 14246, Case No. 17-bk-03283 ("Committees' Mot."). But the Committees offer neither evidence nor argument controverting the accuracy of the Bondholders' translation. *See* Committees' Mot. at 19 n.19. And their effort to "reserve the right" to contest the proper translation in their reply brief is entirely improper. "Arguments raised for the first time in a reply memorandum will not be considered by this Court." *Rivera Concepcion v. Puerto Rico*, 682 F. Supp. 2d 164, 169 n.5 (D.P.R. 2010); *see also, e.g.*, *Napert v. Gov't Emps. Ins. Co.*, No. 13-10530-FDS, 2013 WL 3989645, at *2 n.4 (D. Mass. Aug. 1, 2013); *Noonan v. Wonderland Greyhound Park Realty LLC*, 723 F. Supp. 2d 298, 349 (D. Mass. 2010).

The Committees lodge no real objection to the Bondholders' translation because it is undisputedly correct. The Committees cannot deny that under Puerto Rico law, if there is any "discrepancy" between the original Spanish text of a statute and the official English translation, the original Spanish controls. 31 L.P.R.A. § 13; *In re Fin. Oversight & Mgmt. Bd.*, 914 F.3d 694, 717 (1st Cir. 2019). The undisputed facts show multiple discrepancies between that Spanish text and the official English translation of that provision, so it is the original Spanish text that governs:

> Autorización para incurrir en deudas.—La Junta de Síndicos podrá
> autorizar al Administrador para tomar prestado de cualquier
> institución financiera, del Gobierno del Estado Libre Asociado de
> Puerto Rico o del gobierno federal de los Estados Unidos de
> América, o mediante colocaciones directas de deuda, garantizando
> dicha deuda por los activos del Sistema. . . .

3 L.P.R.A. § 779(d) (2008) (Spanish).

Properly translated into English from the original Spanish, section 779(d) as it existed in

2008 provided:

> Authorization to incur debts.—The Board of Trustees may authorize
> the Administrator to borrow from any financial institution, from the
> Government of the Commonwealth of Puerto Rico or from the
> Federal Government of the United States of America, or through
> direct debt placements, securing said debt with the assets of the
> System. . . .

BH UV 56(b) ¶ 16.

The correct translation of section 779(d)'s Spanish text differs from the "official"

translation in three ways.[3]   *First*, the official translation omits two commas from the original

Spanish text, BH UV 56(b) ¶ 13, which are bolded and bracketed here:  "The Board of Trustees

may authorize the Administrator to seek a loan from any financial institution**[,]** of the Government

of the Commonwealth of Puerto Rico or the Federal Government of the United States of America**[,]**

or through the direct placement of debts . . . ."  *Compare* 3 L.P.R.A. § 779(d) (2008) (Spanish

version), *with* 3 L.P.R.A. § 779(d) (2008) (English version).   The Retiree Committee has

---

[3] The official English translation provides:

> Authorization to incur debts.—The Board of Trustees may authorize the
> Administrator to seek a loan from any financial institution of the Government of
> the Commonwealth of Puerto Rico or the Federal Government of the United
> States of America or through the direct placement of debts, securing said debt
> with the assets of the System. . . .

3 L.P.R.A. § 779(d) (2008) (English version).

previously conceded this error in the official translation of section 779(d) in its claim objection, although the Retiree Committee then made an error of its own in correcting it, misplacing the first omitted comma.  *See* ECF No. 6482 in Case No. 17-bk-03283, at 5 & n.3.[4]

*Second*, the official translation mistranslates certain instances of the Spanish word "del." BH UV 56(b) ¶ 14.  The word "del" may mean either "of the" or "from the," depending on context. BH UV 56(b) ¶ 14.1.  Here, with the commas from the original Spanish text properly in place, context and parallel structure show that two of the "del"s that were translated as "of the" should have been translated as "from the":  "The Board of Trustees may authorize the Administrator to seek a loan from any financial institution[,] [**from**] the Government of the Commonwealth of Puerto Rico or [**from**] the Federal Government of the United States of America[,] or through the direct placement of debts."  BH UV 56(b) ¶¶ 14, 14.2.  The Retiree Committee and the Oversight Board have previously conceded this error, too—although as a result of their error in placing the first omitted comma, they made one of their corrections to the wrong "del."  ECF No. 6482 in Case No. 17-bk-03283 ¶¶ 10 & n.3, 67–68; ECF No. 9701 in Case No. 17-bk-03283 ¶¶ 7, 11.

*Third*, the official translation mistranslates the Spanish phrase "tomar prestado" as "seek a loan," when it should be translated as "borrow."  BH UV 56(b) ¶ 15.  The phrase "tomar prestado" is a more general term than "seek a loan," and "is not limited to loans specifically."  BH UV 56(b) ¶ 15.1.  Rather, "tomar prestado" means to temporarily take something with the intention of returning it, and is properly translated into English as "borrow."  *See, e.g.*, *Tomar Prestado*, *WordReference.com*,   https://wordreference.com/es/en/translation.asp?spen=tomar%20prestado (translating the phrase as "borrow" and giving, as an example of usage, "Juan borrowed his

---

[4]  The Oversight Board conceded the same by adopting the Retiree Committee's *ultra vires* claim objection. *See* ECF No. 9701 in Case No. 17-bk-03283 ¶¶ 7, 11.

parents' car"); *Tomar Prestado*, *Cambridge Spanish-English Dictionary*, https://dictionary.cambridge.org/us/dictionary/spanish-english/tomar-prestado (translating the phrase as "borrow" and providing that it means "to take (something, often money) temporarily with the intention of returning it").

The phrase "tomar prestado" appears thirteen other places in the Puerto Rico Statutes Annotated, and in nearly every other instance it is translated in the official translation as "borrow," "borrowed," or "borrowing," and not "seek a loan."[5]  That includes official translations of nearly identical Spanish-language provisions in the enabling acts for the Teachers Retirement System and the Commonwealth of Puerto Rico Employees Association, each of which provide that the entity may "borrow from any financial institution . . . or through direct debt placements," 18 L.P.R.A. § 392h(7) (2008); *see also* 3 L.P.R.A. § 9004(q) (same except "direct placement of debt").

The expert opinion from the expert witness retained by certain Bondholders,[6] Dr. Laura Gonzalez, the only expert opinion on translation offered in these proceedings, confirms that this is the proper translation of section 779(d). BH UV 56(b) ¶ 16.

In any event, the proper translation of a foreign language text is a question of fact.  *Gray v. Noholoa*, 214 U.S. 108, 110 (1909); *see also, e.g.*, *United States v. Gonzalez*, 319 F.3d 291, 296

---

[5] *See* 3 L.P.R.A. § 9004(q); 4 L.P.R.A. § 1437(g); 5 L.P.R.A. § 1019(f); 7 L.P.R.A. § 779c; *id.* § 607g; 10 L.P.R.A. § 691(p)(1)(F)(iii), (p)(2)(F)(iii), (q); *id.* § 691*o*(a)(2), (b)(2), (c); 18 L.P.R.A. § 392h(7) (2008); 19 L.P.R.A. § 1752(b)(2) (2020); 26 L.P.R.A. § 2930(4); *id.* § 8084(k).  *But see* 11 L.P.R.A. § 30c (similar translation error to that in the ERS Enabling Act); 24 L.P.R.A. § 7004a (translation does not reflect current Spanish text, including "tomar prestado").

[6] Altair Global Credit Opportunities Fund (A), LLC, Andalusian Global Designated Activity Company, Crown Managed Accounts for and on behalf of Crown/PW SP, Glendon Opportunities Fund, L.P., LMA SPC for and on behalf of Map 98 Segregated Portfolio, Mason Capital Master Fund LP, Oaktree-Forrest Multi-Strategy, LLC (Series B), Oaktree Opportunities Fund IX, L.P., Oaktree Opportunities Fund IX (Parallel), L.P., Oaktree Opportunities Fund IX (Parallel 2), L.P., Oaktree Huntington Investment Fund II, L.P., Oaktree Opportunities Fund X, L.P., Oaktree Opportunities Fund X (Parallel), L.P., Oaktree Opportunities Fund X (Parallel 2), L.P., Oaktree Value Opportunities Fund Holdings, L.P., Oceana Master Fund Ltd., Ocher Rose, L.L.C., Pentwater Merger Arbitrage Master Fund Ltd., PWCM Master Fund Ltd., Redwood Master Fund, Ltd, and SV Credit, L.P.

(7th Cir. 2003). As discussed above, the Bondholders' translation is supported both by dictionary definitions and by the expert opinion of Dr. Gonzalez, and it is consistent with the official translations of numerous other Puerto Rico statutes. As a result, even if the Committees had offered evidence to show a *bona fide* dispute over translation—and they have not—they could not possibly receive summary judgment based on their own view of a disputed question of fact. *See, e.g.*, *Baum-Holland v. Hilton El Con Mgmt., LLC*, 964 F.3d 77, 87 (1st Cir. 2020) (summary judgment inappropriate when there is a "genuine dispute as to any material fact").

The Bondholders' translation therefore must govern this Motion. Under that translation, ERS was authorized to (1) "borrow," (2) "from any financial institution" (3) "or through the direct placement of debts." ERS did all three when it issued the ERS Bonds.[7]

## B. ERS "Borrowed" by Issuing the ERS Bonds

ERS indisputably "borrow[ed]" by issuing the ERS Bonds. The Committees concede that a municipal bond "issuer in a public offering *borrows*." Committees' Mot. at 19–20 (emphasis added). The Committees' own expert, Robert Doty, has written that "[m]unicipal securities issuers . . . *borrow* money in the municipal securities market." BH UV 56(b) ¶ 21 (emphasis added). And Mr. Doty testified in this case that municipal securities are "loans from the investing public," that "[t]he borrower is the governmental issuer," and that "the evidence of the loan" is "the paper bond[]" itself. BH UV 56(b) ¶ 23; Ex. 2 to Sooknanan UV Decl., Doty Dep. at 111–12.[8] The

---

[7] Although the Committees' expert, Robert Doty, did not opine on the proper English translation of section 779(d), he considered both the Bondholders' translation of that provision and the Official English Translation and concluded that his opinions "are no different whether the statute authorized the Administrator 'to seek a loan' or 'to borrow.'" Ex. 4 to Sooknanan UV Decl., at 5 n.3.

[8] Citations to "Sooknanan UV Decl." refer to the *Declaration of Sparkle L. Sooknanan in Support of ERS Bondholders' Motion for Partial Summary Judgment on* Ultra Vires *Issues and Proceedings*, dated September 11, 2020, Case No. 17-bk-03283, ECF No. 14243; Case No. 17-bk-03566, ECF No. 973; Adv. Proc. No. 19-ap-00356, ECF No. 117; Adv. Proc. No. 19-ap-00357, ECF No. 122; Adv. Proc. No. 19-ap-00359, ECF No. 101; and Adv. Proc. No. 19-ap-00361, ECF No. 104.

expert retained by certain Bondholders,[9] W. Bartley Hildreth, Ph.D., agreed. BH UV 56(b) ¶ 22 ("ERS borrowed directly from the underwriters" when it issued the ERS Bonds.). Indeed, that ERS "borrow[ed]" by issuing the ERS Bonds should be obvious. To "borrow" is simply "[t]o receive money with the understanding or agreement that it must be repaid, usu[ally] with interest." *Borrow*, Black's Law Dictionary (11th ed. 2019). When ERS sold the ERS Bonds, it did just that: it received money—the purchase price of the ERS Bonds—in exchange for the ERS Bonds themselves, in which ERS "promise[d] to pay" principal and interest on the bonds as it became due. *See* Exs. 43–45 to Sooknanan UV Decl. (Purchase Contracts); Exs. 2–4 to Second Sooknanan UV Decl. (Specimen ERS Bonds).

## C. ERS Borrowed "from Any Financial Institution" by Issuing the ERS Bonds

The undisputed facts also show that when ERS borrowed by issuing the ERS Bonds, it borrowed "from any financial institution"—namely, from the underwriters that purchased all of the ERS Bonds. The Committees cannot deny that ERS sold to the underwriters 100% of the ERS Bonds ever issued. BH UV 56(b) ¶ 50. They cannot deny that the underwriters paid ERS 100% of the proceeds that ERS ever received for issuing the ERS Bonds. BH UV 56(b) ¶ 57. And they cannot deny that every underwriter was a financial institution. BH UV 56(b) ¶¶ 53–54.[10] These

---

[9] *See supra* note 6.

[10] Each underwriter was an SEC-registered securities broker-dealer or an FDIC-insured depository institution. BH UV 56(b) ¶ 54. They consisted of every, or nearly every, major financial institution doing business in the Commonwealth, plus some smaller brokers: UBS Financial Services Incorporated of Puerto Rico; Popular Securities; Santander Securities; BBVAPR MSD; Merrill Lynch & Co.; Scotia Capital; Citigroup; Oriental Financial Services Corporation; TCM Capital; Lehman Brothers; Samuel A. Ramirez & Co., Inc.; Wachovia Capital Markets, LLC; Eurobank MSD; and Oriental Financial Services Corp. BH UV 56(b) ¶¶ 53.1–53.3. Each of those entities was, as a matter of plain meaning, a "financial institution"—a "business, organization, or other entity that manages money, credit, or capital, such as *a bank*, credit union, savings-and-loan association, *securities broker or dealer*, pawnbroker, or investment company." *Financial Institution*, Black's Law Dictionary (11th ed. 2019) (emphases added). ERS's Rule 30(b)(6) designee, Luis Collazo, admitted to a similar definition of financial institution. BH UV 56(b) ¶ 55 ("[A]n entity that works with financial instruments, financial transactions, and they are duly registered and authorized to carry out those types of transactions, from giving out loans to different types of financing."). Mr. Collazo further

facts alone show that ERS borrowed "from any financial institution" by selling all of the ERS

Bonds to the underwriters, and accepting payment for the ERS Bonds from those underwriters.

The evidence indisputably supports each of those points, but if the Committees were somehow to

deny any of them—and to date they have not—it could at most create a dispute of fact that would

preclude summary judgment for the Committees. *See, e.g.*, *Baum-Holland*, 964 F.3d at 87.

### 1.   The Underwriters' Resale of the ERS Bonds Is Beside the Point

In denying that ERS borrowed from the underwriters, the Committees argue that the

underwriters were merely intermediaries who purchased the ERS Bonds with the intention of

quickly reselling them to other investors.[11]   Committees' Mot. at 19–21.   But the Committees'

argument is, once again, beside the point, because it looks at the transaction from the standpoint

of the underwriters, and not—as the ERS Enabling Act stipulates—from the standpoint of ERS.

The Committees' sources show *only* that underwriters buy bonds from issuers with the intention

of reselling them—they say nothing at all about whether an issuer borrows from underwriters when

it sells bonds to them.  *See* 17 C.F.R. § 240.15c2-12(f)(8) (underwriters are those who "purchase[]

from an issuer of municipal securities with a view to . . . the offering of any municipal security");

MSRB Notice 2012-38[12] (stating an underwriters' "primary role is to purchase securities with a

view to distribution in an arm's-length commercial transaction with the issuer"); S. Feldstein & F.

---

admitted on behalf of ERS that most of the underwriters involved in the issuances of ERS Bonds were financial institutions, and he was not sure about the rest only because he was not familiar with them.  BH UV 56(b) ¶¶ 56–56.3.

[11] The ERS Bonds themselves were never resold.  Rather, as is commonly the case in modern financial markets, when ERS sold the ERS Bonds to the underwriters, ERS and the underwriters agreed that ERS would issue a single paper bond certificate for each maturity of each series of the ERS Bonds to the Depository Trust Company or DTC, via DTC's nominee, Cede & Co.  BH UV 56(b) ¶ 61.  Those paper bond certificates have never been resold; even today, Cede & Co. is the registered owner of all ERS Bonds ever issued.  BH UV 56(b) ¶¶ 61–62.  All subsequent transactions involving the ERS Bonds—like the vast majority of bond transactions today—have been sales of beneficial "ownership interests" in the ERS Bonds, not transfers of the ERS Bonds themselves.  BH UV 56(b) ¶ 62.

[12] msrb.org/Rules-and-Interpretations/Regulatory-Notices/2012/2012-38.aspx?n=1.

11

Fabozzi, ed., *The Handbook of Municipal Bonds* at 265–71 (describing the underwriters' role in purchasing bonds from issuers and reselling them, and never addressing whether the issuer borrows from underwriters by selling them bonds); *SEC v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072, 1086 (9th Cir. 2010) (reiterating the statutory definition of "underwriter" from the Securities Act as "any person who has purchased from an issuer with a view to, or offers or sells for an issuer in connection with, the distribution of any security"); *In re Lehman Brothers Mortg.-Backed Sec. Litig.*, 650 F.3d 167, 175 (2d Cir. 2011) (similar).  Instead, the Committees simply assume that a "true lender"—whatever that means—must be compensated "through payments of interest and principal over time," rather than through resale of the debt.  Committees' Mot. at 20.  And the Committees' expert similarly assumes *without citation* that a "typical borrowing scenario" involves a "lender [who] is entitled to interest payments on the bonds, expects to be repaid the principal amount upon maturity, and is not entitled to any other fee or 'spread.'"  Ex. 4 to Sooknanan UV Decl., at 13.  Although it is far from clear what this proposition means, it has no relevance here, where the question is what occurred in this "borrowing scenario."  And in any event, the fact remains that this same expert testified in his deposition and wrote in a handbook he authored for the use of the municipal securities industry that an issuer of government bonds "borrows" when it issues those bonds.  BH UV 56(b) ¶ 21.

The Committees' assumption that a "true lender" must hold debt to maturity rather than reselling it would come as quite a shock to the large swaths of the modern financial system that are built on the resale of debt by the initial lender.  "Syndicated [bank] loans are 'actively traded amongst financial institutions in a secondary market place,' and purchased on these markets by a range of investors . . . ."  *Loan Syndications & Trading Ass'n v. SEC*, 882 F.3d 220, 223 (D.C. Cir. 2018) (quoting Wells Fargo & Company, Comment on Credit Risk Retention Proposed Rules 27

(July 28, 2011)).   Residential mortgages are almost invariably resold by the initial lending institution, and ultimately securitized and funded by purchases of mortgage-backed securities.  *See, e.g.*, *Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*, 104 F. Supp. 3d 441, 462–63 (S.D.N.Y. 2015).  "Fannie Mae and Freddie Mac buy mortgages from lenders and either hold these mortgages in their portfolios or package the loans into mortgage-backed securities (MBS) that may be sold. Lenders use the cash raised by selling mortgages to [Fannie and Freddie] to engage in further lending."  Fed. Hous. Fin. Agency, *About Fannie Mae & Freddie Mac*, https://www.fhfa.gov/ SupervisionRegulation/FannieMaeandFreddieMac/Pages/About-Fannie-Mae---Freddie-Mac.aspx.  Car loans and credit card debt are similarly resold by lenders and securitized as a matter of course.  *See, e.g.*, GM Financial, *Understanding Securitization*, https://www.gmfinancial.com/ content/dam/gmf/about-us/understanding-securitizations.pdf; FDIC, *Credit Card Securitization Manual*, https://www.fdic.gov/regulations/examinations/credit_card_securitization/.   No one would argue that the inevitability of such resale means that a borrower who obtains a bank loan, a mortgage, a car loan, or a credit card has not thereby "borrowed" from the lending institution.  The same is true here: ERS borrowed from the underwriters when it sold them the bonds, and what the underwriters did with the ERS Bonds after that does nothing to change that fact.

2.   Underwriters
    The Committees Have No Answer of from Whom ERS Borrowed if Not from the

More fundamentally, ERS plainly borrowed from *someone* when it accepted $3 billion in exchange for the ERS Bonds.  Yet the Committees have not identified the lender from whom they believe ERS borrowed.  Their expert Mr. Doty opined that the lender is whoever happens to own the bonds at any given time:  "if Alice owns the bond . . . Alice is the lender," "if Alice sells the bond to Bob, then Bob becomes the lender," and "if Bob sells to Carol, then Carol becomes the lender," so that "the identity of the lender can change over the life of the bond issue."  BH UV

56(b) ¶ 27.  Under that analysis, the lenders today are the Bondholders—the current holders of the ERS Bonds.  After all, every single prior holder of the ERS Bonds that are now held by the Bondholders has resold its ERS Bonds, just like the underwriters did, rather than holding them and being compensated solely "through payments of interest and principal over time," as the Committees assume a lender must be.  Committees' Mot. ¶ 47.  But the Committees agree that the Bondholders are all "sophisticated financial institutions," Committees' Mot. ¶ 27, so if the lenders from whom ERS borrowed are the Bondholders, then ERS borrowed from financial institutions as the ERS Enabling Act authorized it to do.[13]  Even if the Committees rejoined that it is the lender at the time of issuance that matters, that would only confirm that ERS borrowed from the underwriters, because the underwriters bought all of the bonds from ERS and were the sole holders of the bonds at the instant that ERS issued them.

The Committees' implicit argument seems to be that it is the *second* investor to hold an ownership interest in the bonds—the first investor after the underwriter—whose identity matters.  *See* Committees' Mot. ¶ 20.  The Committees provide no basis for such an odd, *ad hoc* rule.  Their reason for excluding the underwriters from consideration—resale—would also apply to all investors other than the current holders.  But even if it were somehow the second investor that mattered, the Committees' Motion would still fail.  The Committees, as the moving parties, have the burden of proof on this Motion.  *E.g.*, *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  And they have proffered no evidence whatsoever about the identities of the purchasers to whom the underwriters first resold the ERS Bonds, and who thereafter directly or indirectly sold the bonds to the Bondholders.  The Committees therefore cannot show that those purchasers, too, were not

---

[13] The same, of course, may not be true for individual, on-island investors in the bonds who are not signatories to this Motion.

financial institutions, and thus cannot show that the ERS Bonds were not fully authorized by the ERS Enabling Act even on the Committees' highly improbable, only-the-second-investor-counts, approach. Indeed, the only evidence in the discovery record concerning who purchased the ERS Bonds from the underwriters concerns the Puerto Rico Funds—admitted financial institutions who purchased many of their ownership interests of ERS Bonds directly from the underwriters. BH UV 56(b) ¶¶ 81.15, 93.[14]

### 3. Act 116-2011 Is Consistent with the ERS Bonds Being Borrowing from Financial Institutions

The Committees also argue that "the statute's legislative history"—by which the Committees mean the Legislative Assembly's amendment to the ERS Enabling Act in 2011, three years *after* the ERS Bonds were issued—is inconsistent with the Bondholders' argument. Committees' Mot. ¶ 50. The Committees point out that in the 2011 amendment, the Legislative Assembly restricted ERS from engaging in a "direct placements of debt," but not from borrowing from a financial institution. *Id.* They speculate that this amendment would have been "pointless" if ERS could issue bonds by selling them to financial institutions. *Id.*

This is a bizarre argument for the Committees to make. A necessary premise of the argument is that the Legislative Assembly wrote Act 116-2011 to amend the portion of the Enabling Act that in fact had authorized ERS to issue the ERS Bonds, in order to prohibit future

---

[14] The Committees do not and cannot argue that the underwriters were agents who, acting on behalf of others, merely passed the bonds along. There is no question that it was the underwriters who took ownership of the bonds and who assumed the attendant risks of ownership, such as a decline in the value of the bonds or a failure to resell the bonds. Ex. 2 to Sooknanan UV Decl., at 106–08. Indeed, the Committee's expert unequivocally opined that the underwriters were not acting as agents for ERS in the ERS Bond transaction:

> Q: [A]re the underwriters agents of ERS?
> A: No

Ex. 15 to Second Sooknanan UV Decl., at 79.

borrowing along the same lines. But that would be necessary only if the Enabling Act had, in fact, authorized the issuance of the ERS Bonds. Far from helping the Committees, accepting their premise that Act 116-2011 must have amended the bond-authorizing language from the Enabling Act would only confirm that the bonds were authorized when ERS issued them.

Moreover, the Committees' Act 116-2011 argument also assumes that it is appropriate to consider subsequent legislation for evidence of the proper interpretation of section 779(d), a provision enacted in 1988. If the Court does so, however, it must consider the entire body of subsequent legislation, not just a single portion of Act 116-2011 in isolation. Far from supporting the Committees' position, other legislation strongly confirms that the Enabling Act authorized ERS to issue the ERS Bonds. After the ERS Board of Trustees authorized the issuance of the ERS Bonds in 2007, and after public reporting on ERS's plan to issue such bonds without further legislative authorization, BH UV 56(b) ¶¶ 37.1–37.4, the Legislative Assembly stated in Act 35-2007 that "[t]he funds needed to cover the cost [of] the increase in the minimum amount of the pensions . . . shall proceed from the resources obtained through the issue of" the ERS Bonds. Act 35-2007 § 5. This plainly shows that the Legislative Assembly believed the Enabling Act authorized the issuance of ERS Bonds. Similarly, in the very provision of Act 116-2011 on which the Committees' argument relies, the Legislative Assembly stated that the ERS Bonds "bear[] between 6.25% to 6.35% interest to bondholders, thus encumbering employer contributions of the System for up to fifty years"—effects that were possible only if the ERS Bonds were valid. Act 116-2011 § 7(d). And in Act 3-2013, the Legislative Assembly declared that ERS "is under the obligation to repay" the ERS Bonds. Act 3-2013, Statement of Motives. The Committees' only answer is to speculate, without evidence, that the Legislative Assembly may have been wrong about the proper interpretation of the Enabling Act in 2007, Committees' Mot. ¶ 68, and that the

other statements reflect political justifications, *id.* ¶¶ 70 n.26, 71—but that conjecture could equally be true of the statements the Committees rely on.

    4.   The Many Legal Opinions Affirming Validity Are Consistent with the Bonds Being Borrowing from Financial Institutions

Finally, the Committees argue that the many legal opinions affirming the validity of the ERS Bonds stated that the ERS Bond issuance was authorized as the direct placement of debt, not as borrowing from financial institutions. Committees' Mot. ¶ 51. This, too, is a strange argument for the Committees to make, because it assumes the accuracy of the numerous legal opinions affirming the validity of the ERS Bonds. If the opinions are accurate, then the ERS Bonds are valid, and the Committees' *ultra vires* argument fails.

In any event, the Committees' representation of what the legal opinions say is simply false. The March 9, 2007 legal opinion from Fiddler Gonzalez & Rodriguez ("Fiddler") emphasized *both* the authorization to "seek a loan"[15] *and* the authorization to borrow "through the direct placement of debts" in concluding that the ERS Enabling Act authorized ERS to issue the ERS Bonds. Ex. 6 to Sooknanan UV Decl. The many other pre-issuance legal opinions from Fiddler affirming the ERS Bonds' validity did not differentiate between the two authorizations and said nothing about a "direct placement," but simply opined that the ERS Bonds and the Bond Resolution were fully authorized, including under the Enabling Act, and legally binding. BH UV 56(b) ¶¶ 46.1–46.8. The same is true of the opinions from ERS's General Counsel affirming the ERS Bonds' validity, BH UV 56(b) ¶¶ 46.9–46.10, and of the opinions from the Secretary of Justice affirming that the "transactions contemplated by" certain issuance documents—that is, the issuance of the ERS

---

[15] The Fiddler opinion quoted the official translation of the Enabling Act, which is—as explained above—inaccurate. *Supra* Part I.A.

Bonds—did not require "further legislation[,] authorization[,] consent[,] or approval," BH UV

56(b) ¶¶ 46.11–46.12.  These unanimous legal opinions strongly support the validity of the ERS

Bonds, but contrary to the Committees' representation, they do not specifically address whether

they are authorized as borrowing from financial institutions, as direct placements of debt, or both.[16]

### D. Alternatively, ERS Borrowed "Through the Direct Placement of Debt" by Issuing the ERS Bonds

The issuance of the ERS Bonds was also authorized as borrowing through a "direct

placement of debt."  The Committees' contrary argument assumes that when the Legislative

Assembly in 1988 authorized ERS to borrow though direct debt placements, it intended to limit

ERS to a particular form of debt issuance called a "private placement," and to preclude

underwritten bond offerings.  They argue that in 1988, private placements "were a popular form

of debt financing and at the time even exceeded public bond issuances."  Committees' Mot. ¶ 57.

But the source they cite concerns debt financing for corporations and says not a word about private

placements by government entities like ERS.  *See* Ex. 44 to Decl. of Nicholas A. Bassett ("Bassett

Decl.").[17]  It also explains that for large issues of debt like the ERS Bonds, issuance costs "are

generally lower in the public market" than in private placements, *id.* at 79—raising the question,

for which the Committees have no answer, of why the Legislative Assembly would have restricted

ERS to private placements.

---

[16] The Committees also argue that the Official Statements "cited ERS's ability to borrow money 'through the direct placement of debts' as the sole basis for its authority to issue the ERS bonds."  Committees' Mot. ¶ 30.  Not so. The Official Statements state that "The [Enabling] Act authorizes [ERS] to borrow money, including through the direct placement of debt, and secure any such borrowing with its assets."  Exs. 8-10 to Sooknanan UV Decl., at 7. They therefore invoke the entirety of ERS's authority to "borrow money," and do not state that such borrowing is limited to direct placements of debt.

[17] Citations to "Basset Decl." refer to the Declaration of Nicholas A. Bassett, dated September 11, 2020, Case No. 17-bk-03283, ECF No. 14250; Case No. 17-bk-03566, ECF No. 980; Adv. Proc. No. 19-ap-00356, ECF No. 122; Adv. Proc. No. 19-ap-00357, ECF No. 127; Adv. Proc. No. 19-ap-00359, ECF No. 106; and Adv. Proc. No. 19-ap-00361, ECF No. 109.

There is a far simpler explanation for what the Legislative Assembly meant when it authorized ERS to borrow through direct placements of debt: it authorized ERS to borrow money directly, rather than indirectly through a conduit entity. Contrary to the Committees' assertion (again without citation) that "the law had never distinguished between bonds issued by a municipality itself and bond[s] issued by a conduit entity," Committees' Mot. ¶ 61, the Bondholders' expert explained that the distinction between direct and conduit financing is a well-established distinction in the municipal finance market. Ex. 1 to Declaration of Dr. W. Bartley Hildreth, ¶ 72, ECF No. 14244, Case No. 17-bk-03283 ("Hildreth Decl."); Ex. 2 to Hildreth Decl., ¶¶ 9–13.[18] The Committees' expert, too, described conduit financings in his book on municipal bonds, and explained how they differed from other municipal financings. Ex. 5 to Second Sooknanan UV Decl., at 165–66. He further explained that a purpose of using a conduit financing is to circumvent "restrictions or state law idiosyncrasies" that would prevent a direct bond issuance. *Id.* The evidence thus clearly shows that there is a well-established "distin[ction] between bonds issued by a municipality itself and bond[s] issued by a conduit entity." Committees' Mot. ¶ 61. But at a minimum, there is a dispute of fact on that question, precluding summary judgment in the Committees' favor.

Moreover, the Bondholders' reading is consistent with the rest of section 779 of the Enabling Act. Section 779 used a different term, "private placings" (in Spanish, "colocaciones privadas"), when it prohibited ERS from investing in private placements of debt. 3 L.P.R.A. § 779(b)(2)(A)(ii) (2008). Courts presume that a legislature "act[ed] intentionally and purposely"

---

[18] Citations to the "Hildreth Decl." refer to the Declaration of Dr. W. Bartley Hildreth, dated September 9, 2020, Case No. 17-bk-03283, ECF No. 14244; Case No. 17-bk-03566, ECF No. 974; Adv. Proc. No. 19-ap-00356, ECF No. 118; Adv. Proc. No. 19-ap-00357, ECF No. 123; Adv. Proc. No. 19-ap-00359, ECF No. 102; and Adv. Proc. No. 19-ap-00361, ECF No. 105.

when "includ[ing] particular language in one section of a statute but omit[ting] it in another."
*Russello v. United States*, 464 U.S. 16, 23 (1983) (citation omitted).  Thus, the fact that the Puerto
Rico legislature used the term "private" or "privadas" when indisputably addressing private debt
placements shows that its use of the different term "direct" or "directas" in the language at issue
addresses a different subject.

That conclusion is reinforced by the Enabling Act's use of the word "direct" (in Spanish,
"directa") to refer to the distinction between direct obligations of an issuer and indirect obligations
via a conduit entity.  In particular, section 779(b)(1)(C) defined "fixed yield securities" to include
"Bonds, notes or evidence of indebtedness, whether exempted or taxable securities that represent
direct obligations or are secured by the good faith and credit of the government entities,
instrumentalities, enterprises or public corporations and any other government entities created
under the laws of the Government of the United States, any of its states, or of the Commonwealth
of Puerto Rico."  3 L.P.R.A. § 779(b)(1)(C).  The Committees argue that this is not a reference to
direct versus conduit issuances, but instead "is distinguishing between obligations that an entity
owes directly, as primary obligor, and those that it owes indirectly as a guarantor or provider of
other security."  Committees' Mot. ¶ 59.  But that is just the point.  Conduit bonds are often issued
by governmental issuers for the benefit of private borrowers.  Ex. 5 to Second Sooknanan UV
Decl., at 165–66.  In many such cases, "the actual governmental issuers have no actual or implied
liability to investors"—only the ultimate borrowers do.  *Id.* at 165.  By restricting covered debt
investments to "direct obligations" or those "secured by the good faith and credit of" government
entities, section 779(b)(1)(C) excludes conduit bonds that are supported only by the credit of a
private borrower and not by the credit of a government entity.  Section 779(b)(1)(C) therefore in

fact uses "direct" precisely to refer to the distinction between direct and conduit debt on which the Bondholders rely.[19]

The "natural presumption [is] that identical words used in different parts of the same act are intended to have the same meaning," *Atl. Cleaners & Dyers, Inc. v. United States*, 286 U.S. 427, 433 (1932), so the legislature's use of the term "directa" in other parts of section 779 to refer to direct obligations of ERS confirms that the legislature was in fact authorizing ERS to issue debt for which it was directly liable, instead of using a conduit to issue the bonds. It is undisputed that ERS's issuance of the ERS Bonds was "direct" rather than "indirect" in this sense, because ERS issued the ERS Bonds itself, and was the direct obligor on those bonds. BH UV 56(b) ¶ 37. The issuance of the ERS Bonds was therefore authorized as a "direct debt placement[]" under the plain text of the ERS Enabling Act, and the Committees' summary judgment motion should be denied.

### E.  Express Reference to "Bonds" Is Not Required

The Committees also argue that Enabling Act's debt authorizing language is inadequate because a municipality's authority "to issue 'negotiable bonds' for sale to the public must be expressly granted by the legislature and cannot be implied from a general power to borrow money or incur debts." Committees' Mot. ¶ 37. For the reasons given in the previous sections, however, the Enabling Act did expressly authorize ERS to issue the ERS Bonds, because it authorized ERS to borrow from financial institutions and through direct debt placements, and because the issuance

---

[19] Similarly, section 779(b)(1)(F) referred to "[f]inancial instruments constituted directly or indirectly on financial obligations such as mortgage loans, instruments secured by such loans, as well as automobile loans and lease contracts," and section 779(b)(3) referred to "direct or indirect investments in income-yielding real estate." The Committees again contend that the word "direct" in these provisions "refer[s] to the relationship of a financial instrument to an underlying financial obligation." Committees' Mot. ¶ 60. Again, that is exactly the distinction between direct and conduit bond issuances, because in conduit bond issuances, the bond instruments are issued by a third-party issuer that does not bear the underlying financial obligation. *See* Ex. 5 to Second Sooknanan UV Decl., at 165–66.

of the ERS Bonds fell within both authorizations.  "The rules relating to statutes generally are usually applied in construing enactments authorizing the issuance of bonds."  15 McQuillin Municipal Corps. § 43:22 (3d ed. 2020).  And there is no "such thing as a 'canon of donut holes,' in which [a legislature's] failure to speak directly to a specific case that falls within a more general statutory rule creates a tacit exception.  Instead, when [a legislature] chooses not to include any exceptions to a broad rule, courts apply the broad rule."  *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1747 (2020).  Moreover, "[i]t is a basic rule of statutory construction [in Puerto Rico] that when the law grants power to do something, any lesser action included therein is also authorized implicitly."  31 L.P.R.A. § 16 ann. 1.  The Enabling Act's express borrowing authorization therefore authorized ERS to issue the ERS Bonds.  The fact that the Enabling Act did not specifically refer to a public bond offering is therefore beside the point.

The Committees' contrary argument is against even the weight of the 19th-century case law on which it relies.  It is entirely unsupported by Puerto Rico law and contrary to the Civil Code's provisions governing statutory construction.  And it conflates two separate concepts— "negotiability," which was the concern of the 19th century cases but which the Committees elsewhere concede is irrelevant here, and a "public offering," which is the Committees' concern here but was nowhere at issue in the 19th-century precedent.

1. The 19th Century Precedent

Courts across the country have held for more than a century that municipalities with express statutory authority to borrow money may carry out that authority by selling bonds.[20]  As

---

[20] *See, e.g.*, *Bd. of Cnty. Comm'rs v. Williamson*, 370 P.2d 837, 838 (Okla. 1962) ("To our way of thinking, where the power to borrow is granted, the power to issue bonds is implied."); *Kruesel v. Collin*, 17 P.2d 854, 855 (Wash. 1933) ("[W]here the power to borrow is granted, the power to issue bonds is implied if the borrowing is to enable the county to perform a duty or function imposed upon it by the state."); *Russell v. Middletown City Sch. Dist.*, 125 A. 641, 645 (Conn. 1924) ("[T]he power to issue bonds implied from the express power to borrow has been recognized as legal in the majority of the older states, and especially in New England, and that corporate securities

the Pennsylvania Supreme Court explained in 1859, when an issuer with authority to borrow does

so by issuing bonds, "[i]n substance, the money is borrowed from the purchasers of the bonds; it

is advanced on the faith of the [issuer's] obligations, for the very purpose for which the [issuer]

was authorized to raise it." *Hamilton*, 34 Pa. at 511. Under such circumstances, a court "cannot

be expected to decide that the bonds are illegal, because the [authorizing legislation] did not specify

what securities might be given for the money borrowed." *Id.*[21]

---

have been issued and are now outstanding in large amounts, based upon this understanding of the law."); *Comm'rs of Hendersonville v. C.A. Webb & Co.*, 61 S.E. 670, 671 (N.C. 1908) ("[W]hen the power to incur a debt for a necessary expense exists, there would seem to be no good reason or principle of law to prevent the governing authorities of a town from making provision for the present or ultimate payment of such a debt, by issuing bonds for the purpose . . . ."); *Commonwealth v. Town of Williamstown*, 30 N.E. 472, 473 (Mass. 1892) ("We can have no doubt . . . that in this commonwealth the power given to these towns to raise these large or unusual sums of money by loan, no conditions or restrictions being imposed, carried with it the power to issue bonds,—a method which certainly enabled the towns to seek the best markets."); *Fid. Tr. & Safety Vault Co. v. Mayor of Morganfield*, 29 S.W. 442, 444 (Ky. 1895) ("The issuance of the bonds of said city in payment of said indebtedness was but an incident of same; some form of evidence of such indebtedness being necessary . . . ."), *overruled in part on other grounds, Belknap v. City of Louisville*, 36 S.W. 1118 (Ky. 1896); *Bunch's Ex'rs v. Fluvanna Cnty.*, 10 S.E. 532, 533 (Va. 1890) ("[W]e do not doubt that it was competent for the county court, under the authority conferred by the act, to issue bonds for the money authorized to be borrowed. The power to do so was implied in the power to borrow."); *Dutton v. City of Aurora*, 28 N.E. 461, 462 (Ill. 1885) ("Having power to borrow money, the power to issue bonds therefor results as a necessary incident, and the circuit court properly refused to enjoin the issuing of the bonds."); *Doty v. Ellsbree*, 11 Kan. 209, 213 (1873) ("[P]ower to borrow money carries with it the power to issue the ordinary evidences and security of a loan, and among them are county bonds."); *Commonwealth ex rel. Hamilton v. Select & Common Councils of City of Pittsburgh*, 34 Pa. 496, 511 (1859).

[21] Treatises confirm that in most jurisdictions, authority to borrow and enter contracts implies authority to issue bonds. The C.J.S. Municipal Corporations writes,

> It has been held that power conferred on a municipality to make contracts necessarily includes authority to issue bonds and that power to issue bonds may be implied from power given to a municipality to contract debts. On the other hand, where the corporation has no power to incur a particular indebtedness, it has no power to issue a bond therefor.

64A C.J.S. Municipal Corporations § 2119 (footnotes omitted). Reflecting the split of authority discussed above, C.J.S. also writes that "[i]t has been both affirmed and denied that authority to issue bonds may be implied from power to borrow money." *Id.*

Similarly, the McQuillin Treatise explains that "[t]he rules relating to statutes generally are usually applied in construing enactments authorizing the issuance of bonds." 15 McQuillin Municipal Corps. § 43:22. And while McQuillin states that "the general rule is that there is no authority to issue bonds unless it has been expressly conferred," *id.* § 43:20, the ERS Enabling Act *did* expressly confer authority to borrow from financial institutions or through direct debt placements, and thus to carry out the issuance of the ERS Bonds.

The 19th century cases on which the Committees and Government Parties rely are the exception, not the rule. *Merrill v. Town of Monticello*, 138 U.S. 673 (1891), and *City of Brenham v. German-Am. Bank*, 144 U.S. 173 (1892), were outliers even in the late 19th century. Until they were decided, "the courts, federal and state, almost uniformly held that the power to borrow money carried with it the power to issue negotiable bonds." *Russell*, 125 A. at 642; *see also supra* note 20. As the Illinois Supreme Court put it, "[h]aving power to borrow money, the power to issue bonds therefor results as a necessary incident." *Dutton*, 28 N.E. at 462; *see also, e.g.*, *Rogers v. City of Burlington*, 70 U.S. 654, 666 (1866) ("[T]he issuing of bonds by a municipal corporation as material aid in the construction of a railroad is merely a customary and convenient mode of borrowing money to accomplish the object," and allowed pursuant to authority to borrow.); *Mitchell v. City of Burlington*, 71 U.S. 270, 273 (1867) ("[T]he power to borrow money for any public purpose" included the power to issue bonds.); *Holmes v. City of Shreveport*, 31 F. 113, 120 (C.C.W.D. La. 1887) ("[W]e are, after a very careful and general examination of authorities, unable to find a single case in which the power of the city's agents to execute negotiable or commercial instruments, or promissory notes, to evidence the credit price of a thing which they were authorized to secure, provide for, or purchase, was judicially denied."); *Black v. Cohen*, 52 Ga. 621, 624 (1874) (holding that the power to make contracts includes power to issue bonds, because "a bond is nothing more than a contract under seal").

Beginning in 1873, however, the Supreme Court became concerned about fraudulent practices related to bond issuances—practices of which there is no evidence whatsoever in this case. *See Police Jury v. Britton*, 82 U.S. 566, 571 (1873). After a series of cases "in one way or another narrow[ing] the scope of the doctrine" recognizing implied power to issue bonds, *Russell*, 125 A. at 643, the Court held in *Merrill*—a case in which a town official had absconded with most

of the bond proceeds—that in Indiana where a town had only implied authority to borrow, it did not have authority under Indiana law to issue negotiable bonds.  138 U.S. at 686.  In *City of Brenham*, a majority then overruled precedent to hold that even express authority to borrow did not covey authority to issue negotiable bonds under Texas law.  144 U.S. at 182, 186.  This was a sea change, as both *Merrill* and the dissent in *City of Brenham* make clear.  *Merrill*, 138 U.S. at 692 ("It is true that there is a considerable number of cases . . . which hold a contrary doctrine.");  *City of Brenham*, 144 U.S. at 196–97 (Harlan, J., dissenting) ("The aggregate amount of negotiable notes and bonds, executed by municipal corporations, for legitimate purposes, under express power to borrow money simply, and now outstanding in every part of the country, must be enormous.").

    *City of Brenham* was a closely divided decision on a question of state law, however, and most states did not follow it.  The Connecticut Supreme Court held in *Russell* that the power to issue bonds where borrowing was authorized was "so firmly established by usage and authority that it can only be taken away by legislative denial or limitation, and ought not to be negatived by judicial interpretation."  125 A. at 645.  The Massachusetts Supreme Judicial Court held that "[h]owever it may be elsewhere," in Massachusetts, towns' power to "raise these large or unusual sums of money by loan, no conditions or restrictions being imposed, carried with it the power to issue bonds."  *Town of Williamstown*, 30 N.E. at 473.  Many other states did the same.  *See supra* note 20; *Russell*, 125 A. at 643 ("The [*Brenham* rule] obtains in Alabama, Illinois, Louisiana, New Jersey, and Texas, while the older rule is in force in Massachusetts, Arkansas, Georgia, Kentucky, Nevada, Ohio, New York, Rhode Island, Virginia, and Wisconsin.").

*Merrill* and *City of Brenham* are not controlling.[22] They concern questions of Indiana and

Texas law, respectively, and were decided nearly half a century before *Erie R. Co. v. Tompkins*,

304 U.S. 64 (1938), when the Supreme Court still decided matters of state law for itself rather than

looking to state court decisions. They do not consider the law of Puerto Rico (which was not even

a territory of the United States at that time), much less the meaning of a provision of the ERS

Enabling Act—section 779(d)—that was enacted nearly a century later in 1988, or how that

provision applies to a bond issuance that occurred in 2008. Nor do they consider the governing

modern, textual approaches to statutory interpretation, under which "when [a legislature] chooses

not to include any exceptions to a broad rule, courts apply the broad rule." *Bostock*, 140 S. Ct. at

1747.

2.   Puerto Rico Law and the Civil Code

There is no reason to conclude that Puerto Rico law applies a bond-specific rule of statutory

construction akin to that adopted by *City of Brenham* and *Merrill*. No court has ever so held. Such

a rule contradicts the modern, textual approach to statutory interpretation under which, "when [a

legislature] chooses not to include any exceptions to a broad rule, courts apply the broad rule." *Id.*

Moreover, Puerto Rico is a civil law jurisdiction, so its rules of statutory construction are set forth

in the civil code. *See* 31 L.P.R.A. §§ 14–23. Nothing in the civil code provides for a special bond-

specific rule of construction. *See id.* To the contrary, the civil code makes clear that the

---

[22] The UCC also cited *Fullerton v. Central Lincoln People's Utility District*, 201 P.2d 524, 528 (Or. 1948), *Muscatine Lighting Co. v. City of Muscatine*, 217 N.W. 468 (Iowa 1928), and *Reed v. City of Cedar Rapids*, 113 N.W. 773, 775 (Iowa 1907). But *Fullerton* involved an explicit statutory *prohibition* on bond issuances without voter approval. 201 P.2d at 531 ("The prohibition against issuing either general obligation or revenue bonds without voter approval is so explicit that we believe that it cannot be overcome by anything short of a clear and positive implication to be found in the language of the statute."). There is no similar prohibition under Puerto Rico law. And *Reed* and *Muscatine Lighting* applied a rule of Iowa law that does not, of course, govern in Puerto Rico. *See Muscatine*, 217 N.W. at 471 (applying the "settled law *of this jurisdiction*" (emphasis added)); *Reed*, 113 N.W. at 775 ("[W]e cannot without changing the rule for this state and overruling the cases hitherto cited approve the issuance" of bonds based on authority to borrow.).

26

unambiguous text of a written statute *must control*, *id.* § 14, and that "[t]echnical terms and phrases used in the arts and sciences shall be interpreted according to their received meaning and acceptation with the experts and authorities . . . ," *id.* § 16. And "[i]t is a basic rule of statutory construction [in Puerto Rico] that when the law grants power to do something, any lesser action included therein is also authorized implicitly." *Id.* § 16 ann. 1. As explained above, *supra* Part I.B, the experts on both sides agree that the issuance of bonds is borrowing. The issuance of the ERS Bonds therefore fell within the express authorization of section 779(d), as the civil code requires the Court to construe it.

Even if the Court could construe a statute based on diffuse policy preferences in the face of unambiguous text and undisputed meaning of technical terms—and it cannot—a special rule that a statute authorizing borrowing does not thereby authorize bond issuance would serve no policy purpose today. As the Uniform Law Commission has explained, the problem of unauthorized bond issuances "has been alleviated by the present practice of requiring legal opinions as to the validity of the issue," so that "[t]he bulk of the case law on this point is nearly 100 years old and it may be assumed that the question now seldom arises." UCC § 8-202 cmt. 3. Yet the reasons for concluding that an authorization to borrow authorizes the issuance of bonds remain. Today as much as in 1892, "[t]hose who have money to lend will not lend it upon mere vouchers or certificates of indebtedness," but often demand "negotiable notes [or] bonds." *City of Brenham*, 144 U.S. at 196 (Harlan, J., dissenting). Today as in 1924,

> the power to borrow is practically ineffective where large loans are concerned, unless resort may be had to ordinary and well–recognized methods of issuing corporate securities, and any attempt to evidence indebtedness by instruments not fully negotiable would either fail, or, if carried out, could only be effected with inconvenience in debt administration, and the burden of higher interest charges which are uniformly imposed on any security which departs from the ordinary type prevailing in the investment market.

*Russell*, 125 A. at 645.  The Legislative Assembly authorized ERS to borrow from financial institutions and through direct debt placements without further limiting the form of such borrowing.  The issuance of the ERS Bonds complied with the express provisions of the Enabling Act, and that is all that is required.

3.  Negotiability Versus Underwritten Offering

Finally, the Committees' reliance on *Merrill* and *City of Brenham* conflates negotiability with an underwritten offering, when the two are entirely separate concepts.  *Merrill* and *City of Brenham* were entirely concerned with negotiability—the fact that negotiable bonds "in the hands of bona fide purchasers before maturity, will be subject to no legal or equitable defenses in favor of the maker."  *Merrill*, 138 U.S. at 684; *Brenham*, 144 U.S. at 181 (majority opinion).  Contrary to the Committees' argument, Committees' Mot. ¶ 74, "negotiability" in this common law sense addressed by *Merrill* and *City of Brenham* in the 19th century was *not* the same thing as transferability.[23]  Rather, "negotiability" referred specifically to the fact that certain forms of commercial paper—including bonds—were not subject to personal defenses in the hands of a bona fide purchaser for value.  *Merrill*, 138 U.S. at 684; *City of Brenham*, 144 U.S. at 181; *see also Negotiable*, Black's Law Dictionary (11th ed. 2019) (quoting an early 20th century treatise describing this "acquired signification" of the term).  Obligations that were non-negotiable in this sense could still be transferred—they just remained subject to whatever defenses the obligor might have had against the initial obligee.

It was the issue of personal defenses that expressly motivated *Merrill* and *City of Brenham*.  In the 19th century Supreme Court's view, the issuance of negotiable bonds "ha[d] been the means

---

[23] The definition of "negotiable" under the UCC is different, *see Negotiable*, Black's Law Dictionary (11th ed. 2019); UCC § 3-102.  But the UCC did not, of course, exist in the 19th century when *Merrill* and *City of Brenham* were decided.

. . . of imposing upon counties and other local jurisdictions burdens of a most fraudulent and iniquitous character, and of which they would have been summarily relieved had not the obligations been such as to protect them from question in the hands of *bona fide* holders." *Merrill*, 138 U.S. at 688–89 (quoting *Police Jury*, 82 U.S. at 571).  Concerns about negotiability were the explicit motivation for *Merrill* and *City of Brenham*, and it was specifically the authority to issue negotiable paper that was restricted by those decisions.  *See, e.g.*, *Merrill*, 138 U.S. at 691–92 ("In the present case all that can be contended for is that the town had the power to contract a loan under certain specified restrictions and limitations. Nowhere in the statute is there any express power given to issue negotiable bonds as evidence of such loan."); *Brehnam*, 144 U.S. at 181 ("That in exercising its power to borrow not exceeding $15,000 on its credit, for general purposes, the city could give to the lender, as a voucher for the repayment of the money, evidence of indebtedness in the shape of non-negotiable paper, is quite clear; but that does not cover the right to issue negotiable paper or bonds, unimpeachable in the hands of a *bona fide* holder.").

The Committees argue that "the negotiability of the ERS Bonds has no applicability to this dispute and should be ignored."  Committees' Mot. ¶ 77.  That is indeed correct, for the Committees have not argued that ERS has any personal defenses against the original holders of the ERS Bonds (the underwriters) that would make negotiability in the common law sense relevant. But it is a surprising concession from the Committees, because it shows why *Merrill* and *City of Brenham*, which were exclusively concerned with the issues of negotiability and authority to issue negotiable paper, have nothing to do with the validity of the ERS Bonds.  Indeed, even states that require express authority for municipalities to issue negotiable paper generally provide that "where such authority is lacking, such a paper is not void, but merely not negotiable.  It is still an evidence of debt." *Port of Palm Beach Dist. v. Goethals*, 104 F.2d 706, 709 (5th Cir. 1939); *see also, e.g.*,

29

*Pac. Improvement Co. v. City of Clarksdale*, 74 F. 528, 534 (5th Cir. 1896) ("[W]hen negotiable securities, instead of nonnegotiable instruments, have been employed in settlement of lawful debts, the negotiable bonds so given have, when they were being sued upon, been treated, in a number of reported cases both in federal and state courts, as evidences of the debt, and on them, in the hands of third parties, recovery has been had against such defendant corporation," even though the issuer lacked the power to issue negotiable securities.); *Keel v. Pulte*, 10 S.W.2d 694, 697–98 (Tex. Comm'n App. 1928) (explaining that warrants issued by the city would be enforceable but nonnegotiable, "though couched in terms importing negotiability," because the city lacked authority to issue negotiable instruments); *Forrest City v. Bank of Forrest City*, 172 S.W. 1148, 1150 (Ark. 1915) (fact that city could not issue negotiable note did not render note unenforceable, only subject to personal defenses). For this reason, in *City of Brenham* itself, the Supreme Court, after ruling that the city lacked authority to issue negotiable bonds, amended its judgment in response to a rehearing petition to allow the holders to sue the city on the underlying debt. *See* 144 U.S. at 549–50. Similarly, in *Merrill*, the bondholders' effort—after the Court's ruling that their bonds were issued without authority—to recover at least the principal cost of their bonds failed only on statute of limitations grounds. *See Merrill v. Town of Monticello*, 72 F. 462, 464 (7th Cir. 1896). Thus, a lack of authority to issue negotiable bonds would not preclude recovery, but merely mean that the bonds themselves would not be treated as negotiable documents.

This makes sense. The Supreme Court's concern, in narrowly construing municipal authority to issue negotiable paper under Texas and Indiana law, was with "burdens of a most fraudulent and iniquitous character" that would have been unenforceable "had not the obligations been such as to protect them from question in the hands of *bona fide* holders." *Police Jury*, 82 U.S. at 571. That concern is fully remedied by recognizing that the underlying secured debt, which

ERS indisputably had the authority to incur, is valid, but treating that debt as subject to any personal defenses that ERS may have against the initial purchasers. The Committees and Government Parties have asserted no such defenses in their complaints, and thus the ERS Bonds are enforceable evidence of the underlying secured debt, which ERS had the undisputed authority to incur, even if ERS lacked authority to issue negotiable paper.

In contrast to their concern with negotiability, *Merrill* and *City of Brenham* said nothing at all about what the Committees say is the problem with the ERS Bond offering—the use of underwriters. That is because *Merrill* and *City of Brenham* did not involve underwriters. As the Committees concede, an underwriter in a public offering purchases bonds from the issuer and resells them to third-party investors. Committees' Mot. ¶ 48. In *Merrill*, the city delivered the bonds without payment to a member of the town's board of trustees, J.C. Wilson. 138 U.S. at 675. Wilson was supposed to sell the bonds as the town's agent and pass the proceeds on to the town, but he instead absconded with most of the proceeds—nicely illustrating the comparative advantage of an underwritten offering, in which the issuer gets its money from the underwriters up-front. *Id.* at 676. In *City of Brenham*, the city sold the bonds directly to individual investors. 144 U.S. at 181–82. Thus, neither case was an underwritten public offering as the Committees define that term, and neither case addressed the authorization required to undertake such an offering, as distinct from the authorization needed to issue negotiable bonds through other means.

## II. Other Materials Confirm the Validity of the ERS Bonds

In addition to the ERS Enabling Act, a mountain of evidence both before and after ERS issued the ERS Bonds in 2008 confirms the validity of the ERS Bonds, including (a) a decision of this Court interpreting an identical statutory provision, (b) ERS's own interpretation of the ERS Enabling Act, (c) other enactments by the Puerto Rico legislature, and (d) ERS's prior judicial admissions before this Court.

31

A. *Rivera Torres*

The one case to address the issue confirms ERS's authority to issue bonds.  In *Rivera Torres v. Junta de Retiro Para Maestros*, 502 F. Supp. 2d. 242 (D.P.R. 2007), Judge Gelpí ruled that the Teachers Retirement System's enabling act, authorized TRS to "enter into contracts, make loans, *issue bonds*, and invest . . . funds."  *Rivera Torres*, 502 F. Supp. 2d at 254–55 (emphasis added); *see also id.* at 258 (explaining that TRS "has the capacity to issue bonds"). TRS had conceded as much, even though it was seeking to minimize its independent authority in order to benefit from the Commonwealth's Eleventh Amendment immunity.  *Id.* at 257.  And Judge Gelpí further held, rejecting the TRS's contrary argument, that the enabling act did not "limit[] . . . [TRS's] ability to enter into contracts, make loans, issue bonds and invest funds."  *Id.* at 255.  The sole statutory authority for bond issuance was a provision of the Teachers Retirement System's enabling act that was identically worded (in Spanish) to Section 779(d), the debt authorizing provision for ERS.  *See* 18 L.P.R.A. § 392h(7).  Thus, *Rivera Torres* held that a statute identically worded to the ERS Enabling Act authorized TRS to "issue bonds," and "did not limit" that authority.

The Committees completely misunderstand the significance of *Rivera Torres*.  The point is not that "because the ERS Enabling Act did not expressly prohibit the issuance of bonds, ERS has the authority to engage in public bond offerings."  Committees' Mot. ¶ 63.  Rather, the point is that the debt-authorizing provision of the ERS Enabling Act expressly authorized ERS to issue bonds, just as Judge Gelpí held an identical provision of the TRS enabling act authorized TRS to do.  And while the Committees argue that Judge Gelpí's holding was not "made in reference to the TRS Enabling Act's debt authorization provision," Committees Mot. ¶ 64, it plainly was, because there was no other statutory authority for TRS to issue bonds, as Judge Gelpí held TRS was authorized to do.

### B. Agency Interpretations

The Committees all but concede that the First Circuit's decision in *U.S.I. Properties Corp. v. M.D. Construction Co.*, 860 F.2d 1, 8 (1st Cir. 1988), requires the Court to defer to ERS's own interpretation of the ERS Enabling Act so long as that interpretation is reasonable. Committees' Mot. ¶¶ 65–66. *U.S.I. Properties* is directly on point. The First Circuit rejected an *ultra vires* challenge to a Commonwealth instrumentality's actions, explaining the instrumentality "had approval from its own counsel and from its finance committee" to act as it had, and that the Government Development Bank had also signed off. 860 F.2d at 8. Given those approvals, the First Circuit thought it "amazing that an ultra vires argument should arise at all." *Id.* Explaining that "under Puerto Rico law, great deference is due to an agency's construction of its powers pursuant to its organic act," the First Circuit upheld the instrumentality's authority to act as it had—even though the Puerto Rico Department of Justice had later reached the opposite conclusion. *Id.*

*U.S.I. Properties* applies *a fortiori* here. Much like the actions at issue in *U.S.I. Properties*, the issuance of the ERS Bonds was approved by ERS's own counsel, by ERS's Board, and by the Government Development Bank. And unlike in *U.S.I. Properties*, ERS also had the approval of the Secretary of Justice, which has never been rescinded. BH UV 56(b) ¶ 46.11. The Committees attempt to distinguish *U.S.I Properties* on the ground that unlike the activity at issue in *U.S.I. Properties*, ERS's borrowing authority is "ancillary to its purpose." Committees' Mot. ¶ 65. The premise is questionable at best: the Legislative Assembly granted ERS borrowing authority as part of an amendment intended to assist ERS in addressing a serious funding deficit. 1988 Amendment, Statement of Motives. And regardless, nothing in *U.S.I. Properties* embodies a distinction between core and ancillary activities. 860 F.2d at 8. To the contrary, the First Circuit

held broadly that "under Puerto Rico law, great deference is due to an agency's construction of its powers pursuant to its organic act." *Id.* That holding plainly applies here.

The Committees are thus reduced to arguing that ERS's interpretation of the Enabling Act as authorizing the issuance of ERS Bonds was not even reasonable. Committees' Mot. ¶ 66. This strains credulity. As explained above, Section 779(d)'s text straightforwardly authorized ERS to issue the ERS Bonds. *Supra* Part I. And as far as the record reveals, every single person or entity ever to consider whether the ERS Enabling Act authorized the issuance of the ERS Bonds up until the middle of 2017 concluded that the issuance was authorized and the resulting bonds were valid. *Infra* Part III.A.2. That includes not only ERS, ERS's general counsel, ERS's accountants, the Government Development Bank, the Secretary of Justice, and the Legislative Assembly, but also all of the buyers of ERS Bonds—both the underwriters and the secondary-market investors—who invested $3 billion on the understanding that the bonds were authorized and enforceable. *Infra* Part III.A.2. It would be truly remarkable if all of those persons and entities reached that conclusion based on a reading of the Enabling Act that was not even "reasonable." Put differently, if the only "'plain reading' of the ERS Enabling Act was that it did not authorize underwritten public bond offerings," Committees' Mot. ¶ 66, then why did *no one think so* for nearly a decade after the ERS Bonds were issued?

### C. Other Legislation

As discussed above, other enactments by the Puerto Rico legislature, both before and after the ERS Bonds were issued, further confirm that the legislature authorized ERS to issue the ERS Bonds in the ERS Enabling Act. *Supra* Part I.C.3. These include the legislature's explicit command in Act 35-2007 that bond proceeds be used to fund benefit increases, the amendments to the Enabling Act in Act 116-2011 that restricted ERS's future debt-issuing powers while also recognizing the validity of the existing debt, and the legislature's recognition in Act 3-2013 that

the ERS Bonds were valid and had to be paid. The Committees have no answer to any of this legislation except to imply that the legislature must have been confused or mistaken.

The Committees instead focus on a lone statement in the Statement of Motives for Act 116-2011: "The Bond Issue was illegally made by the System's Administration even though such transaction was submitted to the Legislative Assembly for approval and rejected by the House of Representatives for deeming it detrimental to the System." Act 116-2011 at 6. But that statement is factually inaccurate. An issuance of bonds *by ERS* was never "submitted to the Legislative Assembly," much less rejected by that body. BH UV 56(b) ¶ 37.5. Rather, this portion of the Statement of Motives seems to be referring to a different proposed transaction, in which it was proposed that the Commonwealth itself would issue general obligation bonds to help fund ERS. BH UV 56(b) ¶¶ 34–36. That different transaction, with the Commonwealth as the borrower, did indeed require legislative authorization, and the required legislation was never passed. *Id.* But the issuance of bonds by ERS was a distinct transaction for which authorizing legislation was never sought, because all involved believed and opined that ERS's existing authority under the Enabling Act was sufficient. BH UV 56(b) ¶¶ 34–36, 37–37.2, 46–46.13. In any event, whatever the Legislative Assembly meant by the factually inaccurate "illegally made" statement—which appears from context to be the prudence of the bond issuance in light of the investment returns between 2008 and 2011, Act 116-2011 at 6—Act 116 plainly recognized and provided for the continued enforceability of the ERS Bonds, going on to argue that "the Retirement System should not be allowed to issue debt, such as stock market bonds, to be secured with its assets." Act 116-2011 at 6. "Should not be allowed" is not, of course, the same as "was not allowed." And while Act 116 amended the ERS Enabling Act to prohibit bonds in the future, nothing the legislature said in that statute supports the conclusion that before the amendment, ERS lacked the authority

to issue the bonds.  Indeed, if ERS had always lacked that authority, there would have been no need for the legislature to prohibit future "Bond Issues."

### D.  Judicial Admissions

While the Committees argue that ERS's prior statements are not binding judicial admissions, they do not and cannot deny that ERS in fact has repeatedly represented in recent judicial proceedings that the ERS Bonds are valid and that courts relied upon those representations. ERS did so before Judge Besosa in 2016, when it stipulated that the ERS Bonds were "authorized" by ERS "[p]ursuant to the authority granted to it under the Enabling Act," Joint Stips. of Movants, the Commonwealth Respondents, and the Employees Retirement System ¶ 6, No. 3:16-cv-02696 (D.P.R. Nov. 2, 2016), ECF No. 65, and that "[t]he ERS Bond Resolution adopted on January 24, 2008, is a valid and binding contract between the ERS and holders of ERS Bonds," *id.* ¶ 11. Later, ERS argued in opposing adequate protection in that case that "under the clear terms of the Bond Resolution, the [Bondholders] have *valid and enforceable liens* over hundreds of millions of dollars of ERS revenue, which will continue to grow." Respondent Employees Retirement System of the Government of the Commonwealth of Puerto Rico's Br. in Opp'n to Mot. for Relief from the PROMESA Automatic Stay at 10, No. 3:16-cv-2696 (D.P.R. Oct. 26, 2016), ECF No. 52 (emphasis added).

### III. Even if the ERS Bonds Were Invalid, the Committees Have Not Shown that They Are Unenforceable

Even if ERS lacked the statutory authority to issue the ERS Bonds, the bonds are enforceable for two independent reasons.  *First*, the Bondholders are entitled to protection under UCC § 8-202, which provides for the enforcement of otherwise invalid government securities where the government issuer had the authority to borrow money for the stated purpose and received substantial consideration in exchange for the security.  19 L.P.R.A. § 1752.  *Second*, the ERS

Bonds are enforceable in equity under Puerto Rico law, which precludes even a government institution like ERS from accepting the benefits of a contract and then refusing to perform its reciprocal duties on grounds of illegality.  *Plan Bienestar Salud*, 114 D.P.R. 697, 14 P.R. Offic. Trans. at 903–04.  Because the Committees have not established that the Bonds are unenforceable, the Court should deny summary judgment.

### A.  UCC § 8-202 Renders the ERS Bonds Enforceable even if Invalid

Even if ERS lacked the authority to issue the ERS Bonds, the ERS Bonds would still be enforceable under revised § 8-202 of the UCC,[24] 19 L.P.R.A. § 1752.  Under § 8-202, "[a] security . . . , even though issued with a defect going to its validity, is valid in the hands of a purchaser for value and without notice of the particular defect."  19 L.P.R.A. § 1752(b)(1).  Section 8-202 provides that it is the duty of the issuer, not of the purchaser, to ensure that the security complies with the law governing its issue.  UCC § 8-202 cmt. 3; *see also In re Bame*, 252 B.R. 148, 156 (Bankr. D. Minn. 2000) ("[T]he unambiguous import of Article 8 is that the issuer of the certificated security bears the risk of improperly issued securities or other defects.").

At the outset, the Committees challenge the Bondholders' ability to invoke § 8-202 on two grounds only: (1) that § 8-202 is inapplicable because the Committees are not "issuers," and (2) that the Bondholders had notice of "potential invalidity."  Committees' Mot. Part IV.  The Committees do not otherwise challenge the applicability of § 8-202(b)(1)–(2), waiving any such arguments.  *United States v. López*, 957 F.3d 302, 309 (1st Cir. 2020) ("[I]t is settled beyond hope of contradiction that arguments not made in an . . . opening brief are deemed abandoned."); *Rivera*

---

[24] All references to UCC § 8-202 herein are to revised § 8-202.

*Concepcion v. Puerto Rico*, 682 F. Supp. 2d 164, 169 n.5 (D.P.R. 2010) ("Arguments raised for the first time in a reply memorandum will not be considered by this Court.").

The undisputed facts show that UCC § 8-202 applies here and that the Bondholders are "purchaser[s] for value and without notice" who are entitled to its protection.

### 1. UCC 8-202 Applies to the ERS Bonds

The Committees argue that § 8-202 is somehow inapplicable because they, the Committees, are not "issuers," and § 8-202 specifies that its "rules apply if an issuer asserts that a security is not valid." This argument is baseless and it fails for a number of reasons.

At the outset, with respect to the Claim Objections of the Retiree Committee and the Creditors' Committee, the identity of the objecting party is entirely irrelevant. Under § 502(b)(1) of the Bankruptcy Code, a claim is allowable unless it is "unenforceable against the debtor." 11 U.S.C. § 502(b)(1). "The effect of § 502(b)(1) is to make available to the trustee any defense to a claim that would have been available to the debtor." 4 Collier on Bankruptcy ¶ 502.03(2)(b) (16th 2020); *see also Travelers Cas. & Surety Co. of Am. v. Pac. Gas & Elec. Co.*, 549 U.S. 443, 450 (2007) (citing Collier on Bankruptcy). Conversely, if a defense is not available to the debtor or the debtor's trustee, the defense is not available to another party who acts "in the trustee's stead." *See In re Thompson*, 965 F.2d 1136, 1147 (1st Cir. 1992) (providing that creditors may make objections only if "the bankruptcy court permits the creditor to object in the trustee's stead"). Thus, the identity of the objecting party has no place in the § 502(b)(1) analysis. Here, even if ERS lacked the statutory authority to issue the ERS Bonds, the Bondholders' claims are enforceable *against ERS*, because UCC § 8-202 precludes ERS (*i.e.*, the issuer) from asserting a defense "going to [the] validity" of the bonds. § 8-202. *See infra* Part III.A.2; BH UV Motion, Part II.B. The Committees may not manipulate the § 502(b)(1) standard by asserting a defense not available to the debtor.

38

In any event, it is obvious that ERS *is* challenging the validity of the ERS Bonds.  The
Oversight Board's Special Claims Committee commenced the Clawback Proceedings, in which it
asserts that the ERS Bonds are *ultra vires* and thus not valid, explicitly "as representative of the
Employees Retirement System of the Government of Puerto Rico ('ERS')."[25]   In those
proceedings, ERS is attempting to recover interest payments that it previously made on the ERS
Bonds.  And the Oversight Board adopted the claim objections filed by the Retiree Committee and
the Creditors' Committee on behalf of ERS, arguing that the ERS Bonds are *ultra vires*.  *See* ECF
No. 9701 in Case No. 17-bk-03283 ¶¶ 6-7, 11 ("As set forth in the respective claims objections of
the Retiree Committee and Creditors' Committee, the ERS Bonds issuance was *ultra vires*."); *id.*
at 1 (Objection filed by "[ERS], by and through the [Oversight Board], as the Debtor's sole
representative pursuant to [PROMESA]").[26]  Thus, ERS, an indisputable "issuer," by means of its
admitted "representative," the Oversight Board, has indeed "assert[ed] that [the ERS Bonds] are
not valid," rendering UCC § 8-202 applicable.   Any doubt on that score is eliminated by
PROMESA itself, which provides that "[t]he Oversight Board in a case under this subchapter is

---

[25] Second Am. Adversary Compl. to Avoid & Recover Fraudulent Transfers & to Disallow Claims Pursuant
to 11 U.S.C. §§ 502, 544, 548, & 550 & Other Law at 3, 19-00356-LTS (D.P.R. Aug. 23, 2019), ECF No. 19; Am.
Adversary Compl. to Avoid & Recover Fraudulent Transfers & to Disallow Claims Pursuant to 11 U.S.C. §§ 502,
544, 548, & 550 & Other Law at 2, 19-00357-LTS (D.P.R. Aug. 23, 2019), ECF No. 20; Adversary Compl. to Avoid
& Recover Fraudulent Transfers & to Disallow Claims Pursuant to 11 U.S.C. §§ 502, 544, 548, & 550 & Other Law
at 2, 19-00359-LTS (D.P.R. Aug. 23, 2019); Am. Adversary Compl. to Avoid & Recover Fraudulent Transfers & to
Disallow Claims Pursuant to 11 U.S.C. §§ 502, 544, 548, & 550 & Other Law at 2, 19-00361-LTS (D.P.R. Aug. 23,
2019), ECF No. 14.

[26] Although it did not sign this Motion, counsel to the Oversight Board, Proskauer Rose, actively participated
in this litigation *on behalf of ERS*.  Counsel served discovery on *ultra vires* issues, Exs. 6–8 to Second Sooknanan UV
Decl.; argued the discovery motions related to *ultra vires* issues before Magistrate Judge Dein, *e.g.*, Ex. 9 to Second
Sooknanan UV Decl.; worked with Mr. Doty, the expert retained by the Oversight Board's Special Claims Committee
on these issues, Ex. 4 to Sooknanan UV Decl., at 1 (noting that Mr. Doty was retained by the Oversight Board's
Special Claims Committee and "agreed to assist certain other parties who are aligned in interest" with the Special
Claims Committee in this litigation, including "the Board and its counsel, Proskauer Rose LLP"); deposed
Dr. Hildreth, the Bondholders' expert on these issues, Ex. 3 to Sooknanan UV Decl., at 10, 14; and deposed several
of the Bondholders, Exs. 89-97 to Sooknanan UV Decl.

the representative of the debtor," ERS.  48 U.S.C. § 2175(b).  Indeed, that is the only capacity in
which the Oversight Board appears in these PROMESA proceedings.

The Committees' contrary argument is nonsensical.  They rely on PROMESA's definition
of "issuer," *see* Committees' Mot. ¶ 86, but the question is not what the term "issuer" means in
PROMESA, but rather what the term "issuer" means in the UCC, so it is the UCC's definition that
governs.  Their suggestion that the "issuer" definition in PROMESA somehow preempts the
"issuer" definition in the UCC makes no sense—there is preemption only in cases of
"inconsisten[cy]" between PROMESA and Puerto Rico law, 48 U.S.C. § 2103, and there is nothing
inconsistent about a term having different definitions for different purposes.  And even if the
PROMESA definition somehow applied, the analysis would remain the same.  The relevant
"issuer" under that definition is ERS,[27] and ERS, via its statutory "representative," the Oversight
Board (and its Special Claims Committee), has indeed "assert[ed] that [the ERS Bonds] are not
valid."  The Oversight Board may not be "the 'enterprise' ultimately responsible for the ERS
Bonds," Committees' Mot. ¶ 86, but it is litigating these proceedings—and has standing to do so—
solely as the statutory "representative" of ERS.  And the fact that the Creditors' Committee and
the Retiree Committee *also* argue that the ERS Bonds are invalid makes no difference.  By its plain
text, § 8-202 applies "if an issuer asserts that a security is not valid," not "if *only* an issuer asserts
that a security is not valid."  That should be the end of the matter.

The Committees' contention that they may deprive the Bondholders of their rights under
§ 8-202 by having creditors' committees bring a claim objection on the issuer's behalf lacks any
textual, precedential, or policy support.  The official comments to § 8-202 explain that § 8-202(b)

---

[27] PROMESA defines "Issuer" as *either* the Commonwealth *or* "an Authorized Territorial Instrumentality
that has issued or guaranteed at least one Bond that is Outstanding."  48 U.S.C. § 2231(a)(8).  ERS falls into the latter
category.  *See id.* § 2231(a)(2), (e).

is intended to cover "the rights of the purchaser for value . . . against the issuer," as opposed to "against other claimants to the security."  UCC § 8-202 cmt. 1.  Thus, "subsection (b) embod[ies] the concept that it is the duty of the issuer, not of the purchaser, to make sure that the security complies with the law governing its issue." *Id.* cmt. 3.  "Subsection (b) gives to a purchaser for value without notice of the defect the right to enforce the security against the issuer despite the presence of a defect that otherwise would render the security invalid." *Id.*  "[E]nforc[ing] the security against the issuer," of course, is precisely what the Committees are seeking to prevent the Bondholders from doing.   Allowing such an end-run around § 8-202(b)(1) would directly undermine the provision's purpose.  And nothing in the official comments or the text of § 8-202 suggests that a good faith purchaser for value loses its "right to enforce the security" just because a third party raises a defense of invalidity on the original issuer's behalf, rather than the original issuer doing so itself.

Rather, under the UCC's definition of "issuer," the Committees count as "issuer[s]" for purposes of the *ultra vires* defense, because they raise that defense on behalf of ERS, an undisputed "issuer."  The UCC's definition of "issuer" "[w]ith respect to an obligation on or a defense to a security" is not limited to the entity whose name is on the security or who creates the property interest represented by the security, but also includes anyone who "becomes responsible for, or in place of, another person described as an issuer" in the UCC.  19 L.P.R.A § 1751(a)(4)–(b).  The one court to address the question, *In re Hawaii Corp.*, 59 B.R. 410, 412 (D. Haw. 1986), held that a bankruptcy trustee, "by operation of the Bankruptcy Act, falls within" the "[b]ecomes responsible for or in place of" portion of the definition.  The Oversight Board, and thus its Special Claims Committee, is therefore an "issuer" for purposes of § 8-202.  *See* 48 U.S.C. § 2161(c)(7)

("The term 'trustee', when used in a section of Title 11 made applicable in a case under this subchapter by subsection (a), means the Oversight Board . . . .").

The same conclusion follows for the other committees, at least "[w]ith respect to" the *ultra vires* defense. For one thing, the First Circuit has stated that ordinarily, the "trustee alone may interpose objections to proofs of claim," and that creditors may make objections only if "the bankruptcy court permits the creditor to object in the trustee's stead."[28] *Thompson*, 965 F.2d at 1147. While the First Circuit has held that, notwithstanding related dicta in *Thompson*, creditors' committees can intervene as of right in PROMESA adversary proceedings, *see In re Fin. Oversight & Mgmt. Bd.*, 872 F.3d 57, 63 (1st Cir. 2017), nothing about that holding suggests that Committees' claim objections are not still made "in the trustee's stead," which in PROMESA would mean the Oversight Board's stead. 48 U.S.C. § 2161(c)(7). Indeed, the First Circuit cited with approval a S.D.N.Y. Bankruptcy decision recognizing that intervenors are not "'the possessors of causes of action,'" but merely "interested parties." 872 F.3d at 64 (quoting *In re Adelphia Commc'ns Corp.*, 285 B.R. 848, 851 (Bankr. S.D.N.Y. 2002)). And because the Creditors' Committee and the Retiree Committee are raising the objections "in the trustee's stead," they are "issuers" for the same reason that *In re Hawaii* held a bankruptcy trustee to be an issuer. *See* 59 B.R. at 412.[29]

Regardless, as a matter of plain meaning, all of the Committees bring their claim objections "in place of" ERS, and thus are issuers "[w]ith respect to" the asserted defenses. 19 L.P.R.A.

---

[28] The Committees cite out-of-circuit authority to argue the contrary and ignore the First Circuit's controlling precedent. Committees' Mot. ¶ 87.

[29] The Committees cite cases addressing creditors' committees right to object to claims without obtaining court permission. Committees' Mot. ¶ 87. That is beside the point. Whatever the scope of the Committees' standing and the associated procedural issues, the Committees' objection to the validity of the ERS Bonds is necessarily an assertion of an argument belonging to ERS, the issuer, because ERS—not the Committees—is the obligor of the ERS Bonds.

§ 1751.  The Bondholders do not bring any claim against the Committees, so the Committees have

no direct interest in whether the ERS Bonds are enforced.  The Committees' interest comes entirely

via ERS's interest—if the Committees can relieve ERS from paying the ERS Bonds, then the

Committees will benefit.  The Committees are therefore raising objections "in place of" ERS, and

thus are "issuer[s]" for purposes of those defenses, and subject to § 8-202(b)(1).  Thus, the

Bondholders are entitled to assert all the same responses to those objections that would be available

to them vis-á-vis ERS.

2.  <u>The Bondholders Are Purchasers for Value Without Notice of the Particular Defect</u>

The Bondholders are also "purchaser[s] for value and without notice of the particular

defect" who are entitled to the protection of UCC § 8-202.[30]  The Committees argue that the

Bondholders cannot invoke § 8-202 because each Bondholder "admit[ted] it was on notice of the

*ultra vires* issue."[31]  Committees' Mot. ¶ 89.  They then provide a table summarizing the dates of

those alleged admissions.  *Id.*  This is manifestly false and misleading.  The Bondholders made no

such admissions.  In fact, the Committees' table, which itself omits many of the Bondholders,

summarizes an appendix buried in their Rule 56(b) statement that lists dates *the Committees*

*contend* the Bondholders were on notice of "potential invalidity" based on a number of events.  In

any event, the Committees are wrong.

---

[30] For the reasons given in the Fiscal Agent's Response to the Committees' Motion for Summary Judgment on *Ultra Vires* issues, to be filed contemporaneously herewith, § 8-202(b) *also* provides a defense with respect to the claims by the Fiscal Agent on behalf of Cede & Co. as nominee of The Depository Trust Company, the sole holder of the bonds themselves.

[31] The Committees assert, without support, that the Bondholders are "all hedge funds."  Committees' Mot. ¶ 82.  This is false, *see* ECF No. 114 in Case No. 17-bk-03283 ¶ 1 ("The Puerto Rico Funds are Puerto Rico-based mutual funds [whose] shareholders consist primarily of individual retirees (and near retirees) that reside in Puerto Rico."), and entirely irrelevant.  Moreover, the Committees ignore that their attempts to invalidate the ERS Bonds obviously would harm the many individual holders of beneficial interests in the bonds.

Under the UCC, "[a] person has 'notice' of a fact when: (a) He has actual knowledge of it; or (b) he has received a notice or notification of it, or (c) from all the facts and circumstances known to him at the time in question he has reason to know that it exists." 19 L.P.R.A. § 451(25). For purposes of § 8-202(b), the question is whether the Bondholders had notice under that definition of the "particular defect" rendering the ERS Bonds invalid—that is, notice that the ERS Enabling Act in fact did not authorize the issuance of the ERS Bonds because it precluded an underwritten bond offering. In this respect, the Committees' arguments on notice fail at the threshold. The Committees argue that the Bondholders cannot invoke § 8-202 because they had "knowledge of the *ultra vires* issue or of facts that would give [them] reason to know of the issue." Committees' Mot. ¶ 88. But mere notice of an "issue" is not sufficient under § 8-202; notice of the "particular defect" is required. The Bondholders had no notice that the ERS Enabling Act did not authorize the issuance of the ERS Bonds because it in fact precluded underwritten bond offerings. Rather, the record is clear that for more than a decade, dating from the issuance of the bonds in 2008 to today, the evidence that the ERS Bonds were authorized by the Enabling Act has been overwhelming and uncontroverted.

*First*, there is no evidence in the record that any Bondholder, at the time of its purchases of ERS Bonds, "ha[d] actual knowledge" that the ERS Bonds were not authorized by the ERS Enabling Act. 19 L.P.R.A. § 451(25). The Committees do not appear to argue otherwise, and for good reason. It should be obvious that no rational investor would purchase a security if it had actual knowledge that the security was invalid.[32]

---

[32] The absence of record evidence is particularly telling given that the Bondholders all produced documents in response to the Committees' extensive document requests and representatives of each Bondholder were deposed by the Committees and Government Parties.

*Second*, there is also no evidence in the record that any Bondholder had "received a notice or notification" under 19 L.P.R.A. § 451(25) that the ERS Enabling Act did not authorize the ERS Bonds. The Committees do not point to any such notice or notification, except to argue that the Oversight Board and AAFAF somehow "provided notice" in late-2017 when they raised the *ultra vires* argument for the first time in court filings. As discussed below, those court filings did not put the Bondholders on notice that the ERS Bonds were unauthorized under the Enabling Act. *Infra* Part III.A.2.d. And otherwise, no "notice or notification" of invalidity exists, even today, because there has been no determination by anyone with authority that the ERS Enabling Act did not authorize the issuance of the ERS Bonds.

*Finally*, that leaves the third prong of the UCC's "notice" definition—whether, "from all the facts and circumstances known to" the Bondholders when they purchased their interests in ERS Bonds, the Bondholders had "reason to know that" the ERS Enabling Act in fact had not authorized the issuance of the ERS Bonds. 19 L.P.R.A. § 451(25). They plainly did not in light of the overwhelming evidence that the ERS Bonds were authorized by the ERS Enabling Act.

More than a decade ago, ERS's Board of Trustees approved the issuance of the ERS Bonds. The bonds were then issued pursuant to a resolution from the ERS Board, which the Board affirmed was "adopted pursuant to the provisions of the [ERS Enabling] Act." BH UV 56(b) ¶ 43. They were offered via Official Statements that were accompanied by a form legal opinion from Puerto Rico bond counsel—whose job it was to analyze and confirm validity—confirming that the bonds had been "duly authorized" by ERS and "constitute[d] legal valid and binding limited obligations of the System." BH UV 56(b) ¶¶ 46.1–46.2. In addition, prior to the offering, ERS itself had leaked to the press a more substantive legal opinion from bond counsel confirming ERS's authority to issue the bonds under the Enabling Act. BH UV 56(b) ¶¶ 37.1–37.4. And both ERS's

45

General Counsel and the Commonwealth's Secretary of Justice provided legal opinions that the bonds were validly issued.  BH UV 56(b) ¶¶ 46.9–46.12.  Moreover, by the time the ERS Bonds were issued, Judge Gelpí had ruled in *Rivera Torres v. Junta de Retiro Para Maestros*, 502 F. Supp. 2d 242 (D.P.R. 2007), that identical language authorized bond issuances, and the Legislative Assembly had expressly instructed ERS to use funds from the bond issuance to pay benefits in Act 35-2007 § 5.  And as the Committees are aware, in its exhaustive investigative report commissioned by the Oversight Board itself, Kobre & Kim found no evidence "that any material concerns about [legislative] authorization were raised prior to issuance" of the ERS Bonds.  BH UV 56(b) ¶ 79.

After ERS issued the bonds, the evidence of validity continued.  ERS paid the bonds in full and on time for nearly a decade.  BH UV 56(b) ¶¶ 64–65.  ERS's financial statements, from issuance up until today, have always recognized the ERS Bonds as a valid, outstanding liability of ERS.  BH UV 56(b) ¶ 66.  ERS obtained investment-grade ratings for the ERS Bonds, and argued against rating downgrades.  BH UV 56(b) ¶¶ 63, 76.  In 2011, ERS's Administrator even told the press that he "urge[d] everyone who wants to buy [the ERS Bonds] to do so because it is a great investment."  BH UV 56(b) ¶ 73.  The Legislative Assembly recognized the validity of the ERS Bonds in subsequent legislation enacted in 2011 and 2013, including by specifically amending the ERS Enabling Act in 2011 to limit *future* bond issuances.  *Supra* at Part I.C.3; Part II.C.  Even when ERS stopped making payments on the eve of these restructuring proceedings, ERS raised no argument that the bonds were invalid—to the contrary, it admitted their validity.  *Supra* Part II.D.  And ERS's Board of Trustees, to this day, has never rescinded its authorization to issue the bonds or otherwise concluded that the bonds are invalid.  BH UV 56(b) ¶ 80.

This staggering evidence of validity continued despite an independent investigation into the issuance of the ERS Bonds. In 2010, ERS and the Government Development Bank commissioned the consulting firm Conway MacKenzie to investigate the ERS Bond issuance. BH UV 56(b) ¶ 67. In its resulting report, Conway MacKenzie found much to criticize about the bond issuance, but it made no suggestion whatsoever that the ERS Bonds were not authorized by the Enabling Act. BH UV 56(b) ¶ 69.

After reviewing the Conway MacKenzie report, ERS's Administrator and Board of Trustees then received legal advice from outside counsel in February 2012 addressing the subject of the validity or invalidity of the ERS Bonds under the ERS Enabling Act. BH UV 56(b) ¶ 71. According to minutes from an ERS board meeting that have been posted publicly on an ERS website for years, that counsel told ERS's Board that the bonds had been validly issued: "Attorney Rivera believes that the System has authority to incur debt, pledge its assets and has authority to consider future contributions as part of its assets. Anthony Murray, Esq. added that proof of this is that the Legislative Assembly amended Act No. 447 to limit these procedures." BH UV 56(b) ¶ 72. After receipt of this legal advice, ERS made no determination or contention that the ERS Bonds were invalid, commence any legal challenge to the ERS Bonds, or cease paying interest on the ERS Bonds. BH UV 56(b) ¶¶ 64–65, 77–78. And even today, ERS's audited financial statements list the ERS Bonds as an outstanding liability of ERS. BH UV 56(b) ¶ 66.

Similarly, the Legislative Assembly held a number hearings on the bond issuance in 2011, yet then recognized the validity of the ERS Bonds and specifically amended the ERS Enabling Act in 2011 to limit *future* bond issuances. *Supra* Part I.C.3. Indeed, it is undisputed that ERS *itself* made no determination that the ERS Bonds were invalid before mid-2017—and even then, the

supposed determination was made by outside counsel as a litigation position, and was never approved by the ERS Board. BH UV 56(b) ¶¶ 77, 80.

These undisputed facts demonstrate that, "from all the facts and circumstances known to" the Bondholders when they purchased their interests in ERS Bonds, they had no "reason to know that" the ERS Enabling Act did not authorize the issuance of those Bonds because it precluded an underwritten bond offering. 19 L.P.R.A. § 451(25). In the face of this evidence, the Committees muster together four categories of "facts and circumstances" they claim gave the Bondholders "reason to know" of the "particular defect" under § 8-202. None suffices.

<p style="text-align:center">a.    <u>The Bond Resolution, Official Statements, and ERS Enabling Act</u></p>

The Committees first argue that the Bondholders had "reason to know" that the ERS Enabling Act did not authorize the ERS Bonds because the Bondholders reviewed the Act itself, the Bond Resolution, and the Official Statements. This argument is meritless.

Starting with the Enabling Act, the Committees argue that the Bondholders had notice that the ERS Bonds were unauthorized because the relevant statutory provision, section 779(d), said nothing about ERS's ability to issue public bonds and the Bondholders were aware of that provision. Committees' Mot. ¶ 92. This is nonsensical. The text of the ERS Enabling Act could not have placed the Bondholders on notice for the simple reason that no one has ever concluded from that text that the ERS Bonds are unauthorized. Indeed, in more than a decade, *everyone has concluded the opposite*. As discussed above, at the time of the bond issuance, Bond Counsel, ERS's general counsel, and the Secretary of Justice concluded that the bonds were validly issued. *Supra* pp. 45–46. And ERS's Board—obviously well aware of same text of the Enabling Act— voted to authorize the issuance of the bonds. BH UV 56(b) ¶ 42. If this Court rules that the ERS Bonds were not authorized by the Enabling Act, it will be the first body with any authority to say so. It strains credulity to argue that the Bondholders were on notice that the ERS Enabling Act did

<p style="text-align:center">48</p>

not authorize the issuance of the bonds because they were aware of the debt-authorizing provision of the Enabling Act—particularly when ERS's Board, ERS's general counsel, Bond Counsel, and the Secretary of Justice were unquestionably aware of the same debt-authorizing provision and unambiguously concluded that the bonds were valid. *Supra* pp. 45–46.

Moreover, to hold that the Enabling Act itself placed the Bondholders on notice that the ERS Bonds were invalid in the face of so much contrary evidence would be to require all investors to re-assess for themselves the validity of every security they purchase. That is not how the municipal bond market works. As the Bondholders' expert Dr. Hildreth explained,

> Making either the purchasers of securities entitlements or DTC responsible for reviewing legislation or conducting other diligence in connection with bond issues or secondary market purchases could impede issuer access to financial markets, with a resulting decrease in the efficiency of government operations. Imposing such risks could reduce demand, increase interest rates paid by issuers, limit negotiability of municipal bonds, and impair bond values.

BH UV 56(b) ¶ 31. Dr. Hildreth further explained that "[a] reasonable investor cannot be expected to uncover material facts that vary from what the professionals involved with the transaction state in market-oriented certifications." BH UV 56(b) ¶ 32. There is no dispute of fact on these points. The Committees' expert Mr. Doty similarly admitted that it is bond counsel's obligation "to deliver an opinion stating that the bonds have been validly issued," and that "investors' analysis of the legality of bonds they are considering purchasing 'centers on the bond counsel's opinion.'" BH UV 56(b) ¶ 29. And Mr. Doty's book—which he intended to be "a guide to investors in municipal securities," BH UV 56(b) ¶ 30—never once suggests that investors should examine enabling legislation for themselves to assure themselves of validity before purchasing municipal securities. BH UV 56(b) ¶ 30.1. Indeed, the chapter "Considerations When Buying" says nothing about enabling legislation at all. BH UV 56(b) ¶ 30.2.

Relatedly, the Committees argue that the Official Statements put the Bondholders on notice. They focus on the text of the Enabling Act cited in the Official Statements and argue that it is "well-understood in the industry" that a direct placement of debt is not a private placement. Committees' Mot. ¶ 90. Again, there is no evidence that *anyone* has ever concluded from that text in the Enabling Act that the ERS Bonds are unauthorized. To the contrary, ERS's general counsel, Bond Counsel, and the Secretary of Justice concluded the opposite at the time the ERS Bonds were issued. *Supra* pp. 45–46. And again, the Committees do not explain—because they cannot—how or why the Bondholders should have reached a different conclusion.

The Committees also argue that the ERS Bond issuances should have raised "red flags" because the disclosures were "highly unusual." Committees' Mot. ¶ 91. Aside from providing absolutely no factual support for this assertion, the Committees again ignore that the Official Statements were accompanied by a legal opinion from Puerto Rico bond counsel confirming the validity of the bonds. *Supra* pp. 45–46. And, despite listing many conceivable risks associated with the ERS Bonds, the Official Statements said nothing to suggest that the ERS Bonds might lack statutory authorization. BH UV 56(b) ¶ 41. In fact, absolutely nothing in the hundreds of pages even hinted at it. This is unsurprising. As discussed above, even before the offering, ERS itself had leaked to the press a substantive legal opinion from bond counsel discussing, and confirming, ERS's authority to issue the ERS Bonds under the ERS Enabling Act. *Supra* p. 45. In any event, any "red flags" or "highly unusual disclosures" do not constitute notice of the "particular defect," which is what is required under UCC § 8-202(b)—that is, notice that the ERS Enabling Act did not authorize the issuance of the ERS Bonds because it precluded an underwritten bond offering.

b. Statement in Act 116

The Committees next argue that a statement from the Legislative Assembly in the Statement of Motives for Act 116 "put the world" on notice that the ERS Enabling Act did not authorize the ERS Bonds.  Committees' Mot. ¶¶ 93–95.[33]  The Committees are wrong, and the acknowledgments from certain Bondholders that they had actual knowledge of that statement are wholly irrelevant.

*First*, the statement in Act 116 is factually inaccurate.  The Committees selectively include only a portion of that statement, which reads in full: "The Bond Issue was illegally made by the System's Administration even though such transaction was submitted to the Legislative Assembly for approval and rejected by the House of Representatives for deeming it detrimental to the System."  Act 116-2011 at 6.  An issuance of bonds *by ERS* was never "submitted to the Legislative Assembly," much less rejected by that body.  BH UV 56(b) ¶¶ 37.5, 70.4–70.5; *supra* Part II.C.  Rather, the statement seems to be referring to a different proposed transaction, in which it was proposed that the Commonwealth itself would issue general obligation bonds to help fund ERS.  BH UV 56(b) ¶ 70.6.  That different transaction, with the Commonwealth as the borrower, did require legislative authorization, and the required legislation was never passed.  BH UV 56(b) ¶¶ 36–37.  But the issuance of bonds by ERS was a distinct transaction for which authorizing legislation was never sought, because all involved believed and opined that ERS's existing authority under the Enabling Act was sufficient.  BH UV 56(b) ¶¶ 37.1–37.5, 46.1–46.12, 70.4–70.6.  The Legislative Assembly's factually inaccurate statement in Act 116's Statement of

---

[33] This argument does not apply to the Bondholders' holdings of ERS Bonds purchased before the enactment of Act 116-2011.

Motives cannot possibly have placed the Bondholders on notice that the ERS Enabling Act did not authorize the issuance of the ERS Bonds.

*Second*, Act 116's operative text itself confirmed the continued validity of the ERS Bonds. As discussed previously, Act 116 changed the ERS Enabling Act to prohibit bonds in the future. *Supra* Part I.C.3. If ERS had always lacked the authority to issue bonds, there would have been no need for the Legislative Assembly to prohibit *future* bond issuances. *Supra* Part I.C.3. Act 116 also included a statement that the issuance of the ERS Bonds had "encumber[ed] employer contributions . . . for up to fifty years" and that it had "'significantly contributed to the financial crisis of' ERS," BH UV 56(b) ¶ 70.2—effects that were possible only if the ERS Bonds were valid and enforceable. *Supra* Part I.C.3. As a whole, then, Act 116 put no one on notice that the ERS Bonds were unauthorized.

*Third*, like some of the Bondholders, ERS itself was of course well aware of the statement in Act 116 that the ERS Bond issuances were "illegally made." Indeed, as discussed above, ERS sought legal advice in February 2012 from outside counsel addressing the subject of the validity or invalidity of the ERS Bonds under the Enabling Act. *Supra* p. 47. That legal advice expressly considered the 2011 amendments to the Enabling Act, BH UV 56(b) ¶ 71, and as disclosed in the publicly available ERS Board of Trustees meeting minutes, concluded that the bonds had been validly issued. *Supra* p. 47. After specifically considering Act 116 and receiving legal advice about it, ERS made no determination that the ERS Bonds were invalid and took no steps to have the ERS Bonds declared invalid, for more than eight years after Act 116 was passed. BH UV 56(b) ¶¶ 77–78. Instead, ERS kept paying the ERS Bonds as before, BH UV 56(b) ¶¶ 64–65, and admitted that they were valid and enforceable, *supra* Part II.D. Here again, given that Act 116 did not lead ERS itself to conclude that the ERS Bonds were invalid—even when ERS specifically

looked into it through counsel—there is no basis for concluding that Act 116 should have led anyone else to reach that conclusion, either.  In short, contrary to the Committees' argument, Act 116 did not put even ERS on notice that the Enabling Act did not authorize the issuance of the bonds, much less "the world."

*Fourth*, Act 116 did not articulate any explanation for *why* the bond issuance was supposedly "illegally made"—it merely complained about its wisdom.  And Act 116-2011's operative text confirmed the continued validity of the ERS Bonds, as did subsequent legislative enactments.  *Supra* Part II.C.  For the Bondholders to lose the protection of § 8-202, they must have had "notice of the *particular defect*."  19 L.P.R.A. § 1752(b)(1) (emphasis added).  The legislature's general complaint that the issue was "illegally made" did not give the Bondholders notice of the supposed "particular defect" that the ERS Enabling Act precluded an underwritten bond offering, particularly considering the legislature's subsequent recognition in 2013 that ERS was "under the obligation to repay these bonds from the employer contributions it receives."  Act 3-2013, Statement of Motives.

### c.  Legal Advice or Communications with Counsel

The Committees next make the remarkable argument that any Bondholder who had communications with counsel about the validity of the ERS Bonds prior to purchasing those bonds necessarily had notice that the ERS Enabling Act did not authorize the bonds.  Committees' Mot. ¶ 96.  They go further still to argue that certain of the Bondholders were on notice simply because they retained Jones Day.[34]  Committees' Mot. ¶ 96.  This is absurd.

---

[34] The Committees concede that these arguments do not apply to the Puerto Rico Funds.  Committees' Mot. ¶ 96.

To begin, the Committees again misstate the standard when they claim that the Bondholders "had knowledge of the *ultra vires* issue." Committees' Mot. ¶ 96. Mere knowledge of an "issue" is not sufficient. Rather, under § 8-202(b), the question is whether the Bondholders had notice of the "particular defect" rendering the ERS Bonds invalid—that is, notice that the ERS Enabling Act *in fact* did not authorize the issuance of the ERS Bonds because it precluded an underwritten bond offering. The record evidence amply demonstrates that the Bondholders did not have such notice given that, among other things, everyone involved in the ERS Bond issuance opined in writing that ERS was authorized to issue the ERS Bonds, and the Puerto Rico legislature repeatedly recognized that the ERS Bonds were existing, valid obligations. *Supra* pp. 45–47.

Next, the Committees misrepresent the record when they suggest that one Bondholder, SV Credit, received legal advice in February 2014 that the ERS Bond issuance was *ultra vires*. Committees' Mot. ¶ 97. The declaration the Committees cite states only that SV Credit had "discussions with counsel" about "the legality, illegality, validity, or invalidity of the ERS Bonds." Ex. 30 to Bassett Decl., ¶ 3.[35] Nothing in the record says anything about the content of that legal advice or indicates that there was any "possibility that the ERS Bonds were issued *ultra vires*." Committees' Mot. ¶ 97. In fact, the very declaration states that SV Credit "did not have any concerns about ERS's authority to issue bonds at the time [it] made the investments." Ex. 30 to

---

[35] Of course, the record is clear that other Bondholders did not seek or receive legal advice on the validity, invalidity, legality, or illegality of the ERS Bonds until years later. *See* Ex. 52 to Bassett Decl., ¶ 7 (earliest date Andalusian sought or received legal advice was December 14, 2017); Ex. 53 to Bassett Decl., ¶ 7 (earliest date any of the Oaktree Funds sought or received legal advice was December 14, 2017); Ex. 54 to Bassett Decl., ¶ 7 (earliest date Ocher Rose sought or received legal advice was December 14, 2017); Ex. 55 to Bassett Decl., ¶ 7 (earliest date any of the Pentwater Funds sought or received legal advice was March 12, 2019); Ex. 56 to Bassett Decl., ¶ 7 (Redwood Master Fund did not seek or receive legal advice before the commencement of these proceedings in the fall of 2019); Ex. 10 to Second Sooknanan UV Decl., 77:24-78:7 (earliest date Mason Capital sought or received advice from counsel was August of 2018).

Bassett Decl., ¶ 3. This should come as no surprise in light of the overwhelming evidence confirming the validity of the ERS Bonds. *Supra* pp. 45–48.

At bottom, the Committees assert that receipt of legal advice on the question of validity somehow equates to notice that the bond issuance was in fact unauthorized. This is an especially strange position, since, as discussed above, ERS itself received legal advice on the subject of the validity or invalidity of the ERS Bonds before they were issued in 2008, and again in February 2012, and still made no determination or contention that the bonds were allegedly invalid until it adopted that litigation position well after these Title III proceedings commenced. *Supra* p. 45–48.

The Committees' related argument that every Bondholder that later retained Jones Day and joined the ERS Bondholder group was somehow on notice that the ERS Bonds were unauthorized is equally unavailing. Again, those actions could not possibly have put the Bondholders on notice that the ERS Enabling Act did not authorize the issuance of the bonds, particularly given the mountain of evidence establishing exactly the opposite. *Supra* pp. 45–48.

    d.   AAFAF's 2017 Filings

Finally, the Committees argue that in November 2017, the Oversight Board and AAFAF put the Bondholders on notice that the ERS Enabling Act had not authorized the ERS Bonds when they filed briefs in the Title III proceedings arguing the same. Committees' Mot. ¶¶ 99–102.[36] As a preliminary matter, this argument does not apply to the Bondholders' many holdings purchased before November 2017. But even as to later purchases, the litigation filings in question did not put anyone on notice that the ERS Bonds were invalid.

---

[36] The Oversight Board did not argue that the ERS Bonds were unauthorized. Rather, in an attempt to preserve the argument, the Board mentioned the *ultra vires* issue in a single sentence in a footnote. Mem. in Supp. of Mot. for Summ. Judg. of Employ. Ret. Sys. of the Gov't of Commonwealth of Puerto Rico at 11 n.6, 17-00213-LTS (D.P.R. Nov. 3, 2017), ECF No. 91.

As an initial matter, the November 2017 filings added nothing to public record. The filings argued for the first time that the ERS Bonds were invalid. But the basis for those arguments was nothing more than the Enabling Act itself and the statement in Act 116. And as discussed previously, the Enabling Act and Act 116 did not place the Bondholders on notice that the Enabling Act did not authorize the ERS Bonds. *Supra* Part III.A.2.a and b. The fact that interested litigants were now arguing the opposite added no new factual evidence, and did nothing to change that.

In any event, notice that someone had *argued* that the ERS Bonds were invalid is not and cannot be enough under § 8-202—notice of an affirmative determination of invalidity is required. That is because if the ERS Bonds are invalid, it is because the ERS Enabling Act *in fact* did not authorize them, and not because someone argued as much. Countless allegations and arguments of all sorts are commonly made in complex litigation, and it cannot be the case that any such argument must be treated immediately as equivalent to a proven claim. *See In re Seacoast Anti-Pollution League*, 490 A.2d 1329, 1339 (N.H. 1985) (holding that a pending appeal challenging the validity of bonds "does not amount to notice of a defect" under UCC § 8-202(b) because "[t]o hold otherwise would be to permit an appealing party to usurp the role allocated to this court" as "every appeal would create a 'defect' that would effectively suspend the operation of an issuing order by casting doubt on the subsequent validity of the securities issued, thereby making them unmarketable or substantially reducing their market value."). In fact, shortly before AAFAF's November 2017 filing, ERS itself admitted in PROMESA proceedings that the ERS Bonds were valid and enforceable. *Supra* Part II.D. And, even today, ERS itself recognizes the ERS Bonds as an outstanding liability on its financial statements. BH UV 56(b) ¶ 66; Ex. 11 to Second Sooknanan UV Decl., at 302–03 (stating the ERS Bonds are still included on ERS's financial statements "because the Court has not made a final ruling regarding th[e *ultra vires*] issue").

**B. The Bondholders Are Entitled to Recover in Equity**

Even if ERS lacked authority to issue the ERS Bonds at the time of issuance, and even if

UCC § 8-202(b) did not render the ERS Bonds enforceable in the Bondholders' hands, the

Bondholders would still be entitled to recover in equity, under the doctrine of unjust enrichment.

In arguing otherwise, the Committees misrepresent the governing Puerto Rico law by ignoring

cases "accept[ing] the rule that, in the proper circumstances, a plaintiff may invoke against the

State the doctrines o[f] one's own acts, equitable estoppel and good faith," and "reject[ing] any

rules or interpretations that could lead to a result contrary to good faith." *Berrios v. Univ. P.R.*,

116 D.P.R. 88, 16 P.R. Offic. Trans. 112, 125–26 (1985). The Committees' reliance on cases

applying other state law, including *International Salt Co. v. City of Boston*, 590 F.3d 1, 7 (1st Cir.

2009), thus misses the mark. Contrary to the Committees' arguments, under Puerto Rico law,

equity will enforce otherwise-void contracts against the government, as "the elementary principles

of equity, in the civil law sense of the word, are offended by a municipality's benefitting from an

agreement . . . , while at the same time evading all the responsibilities it freely assumed." *See Plan

Bienestar Salud*, 114 D.P.R. 697, 14 P.R. Offic. Trans. at 903–04. Those principals are fully

applicable here, where ERS received nearly $3 billion dollars for issuing the ERS Bonds, which

the Committees would allow ERS to keep while disavowing any repayment obligation.

The cases that the Committees cite in opposition to these principles are inapposite. *Morales

v. Municipality of Toa Baja*, 119 D.P.R. 682, 19 P.R. Offic. Trans. 724 (1987), involved purchases

that were made in excess of budgetary appropriations. In such a case, the liability itself—in any

form—existed in violation of a legal limitation on liabilities of any sort. Similarly, *Norton v.

McOsker*, 407 F.3d 501, 506 (1st Cir. 2005)—a Rhode Island-law dispute about promises made

within an adulterous relationship—involved an effort to enforce a promise the very substance of

which violated Rhode Island public policy. Here, in contrast, it is undisputed that ERS was fully

57

authorized to incur the $3 billion in debt represented by the ERS Bonds—the asserted problem is simply the form of the issuance—so enforcing the underlying debt in equity would not violate any express legal limitation.

In *Las Marias Reference Laboratory Corp. v. Municipality of San Juan*, 159 D.P.R. 868, 2003 WL 21706387 (2003), the court believed that the contracting party had assumed the risk of the government's lack of authority: "Las Marías had done business with the Municipality before and, thus, should have known the rules that govern contracts of this type. However, it relied on some letters to attempt to renew the contracts, even though it knew—or should have known—that said documents alone were insufficient to create obligations that could be demandable from the Municipality." *Id.* at *8. Likewise, in *Rodríguez Ramos v. ELA*, 190 D.P.R. 448, 467 (2014), the court observed that the contracting attorney knew that he was rendering legal services without a written contract binding the Commonwealth. Here, in contrast, the ERS Bonds were sold with ample and detailed assurances of their validity. *Supra* pp. 45–46. And in *Plaza Carolina Mall, L.P. v. Municipality of Barceloneta*, 91 F. Supp. 3d 267 (D.P.R. 2015), there was no benefit to the government entity—just private benefit—and thus no question of an unjust enrichment remedy: the court invalidated an illegal contract that would have funneled tax money to a private shopping mall.

Finally, the Committees' backstop invocation of 11 U.S.C. § 510(b) misses the point entirely, because the Bondholders are not *seeking* "a greater recover then they have the right to receive under the terms of the Bonds." Committees' Mot. ¶ 80. The purpose of § 510(b) is to prevent "an equity security-holder" from improving the priority of its claim against a debtor to that of an unsecured creditor by alleging some form of fraud. *See In re Blondheim Real Estate, Inc.*, 91 B.R. 639, 640 (Bankr. D.N.H. 1988). Nothing like that is at issue here. The Bondholders are

not equity security holders, and they do not seek to improve the priority of their claims—they just want to enforce the ERS Bonds against ERS according to the terms of those bonds, to receive "the liquidated, unpaid amount due and owing *on the instrument itself*." *Id.* The Committees' contrary argument that such a claim is subject to subordination under § 510(b) is exactly the argument that *In re Blondheim* rejected as "truly revolutionary and not within any required reading of the statutory language and its underlying legislative history." *Id.* at 642.

Accordingly, the Court should deny the Committees' motion for summary judgment.

## CONCLUSION

For the foregoing reasons, the Court should deny the Committees' motion for summary judgment and overrule the Committees' objections to the Bondholders' claims.

In San Juan, Puerto Rico, today Wednesday October 28, 2020.

/s/Alfredo Fernández-Martínez
Alfredo Fernández-Martínez
DELGADO & FERNÁNDEZ, LLC
PO Box 11750
Fernández Juncos Station
San Juan, Puerto Rico 00910-1750
Tel. (787) 274-1414
Fax: (787) 764-8241
afernandez@delgadofernandez.com
USDC-PR 210511

/s/ Bruce Bennett
Bruce Bennett (*pro hac vice*)
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, CA 90071
Tel. (213) 489-3939
Fax: (213) 243-2539
bbennett@jonesday.com

Benjamin Rosenblum (*pro hac vice*)
JONES DAY
250 Vesey Street
New York, New York 10281
Tel. (212) 326-3939
Fax: (212) 755-7306
brosenblum@jonesday.com

Geoffrey S. Stewart (*pro hac vice*)
Matthew E. Papez (*pro hac vice*)
Sparkle L. Sooknanan (*pro hac vice*)
JONES DAY
51 Louisiana Ave. N.W.
Washington, DC 20001
Tel. (202) 879-3435
Fax: (202) 626-1700
gstewart@jonesday.com
mpapez@jonesday.com
ssooknanan@jonesday.com

David R. Fox (*pro hac vice*)
JONES DAY
100 High Street, 21st Floor
Boston, MA 02110
Tel. (617) 449-6943
Fax: (617) 449-6999
drfox@jonesday.com

*Counsel for Altair Global Credit Opportunities Fund (A), LLC, Andalusian Global Designated Activity Company, Crown Managed Accounts for and on behalf of Crown/PW SP, Glendon Opportunities Fund, L.P., LMA SPC for and on behalf of Map 98 Segregated Portfolio, Mason Capital Master Fund LP, Oaktree-Forrest Multi-Strategy, LLC (Series B), Oaktree Opportunities Fund IX, L.P., Oaktree Opportunities Fund IX (Parallel), L.P., Oaktree Opportunities Fund IX (Parallel 2), L.P., Oaktree Huntington Investment Fund II, L.P., Oaktree Opportunities Fund X, L.P., Oaktree Opportunities Fund X (Parallel), L.P., Oaktree Opportunities Fund X (Parallel 2), L.P., Oaktree Value Opportunities Fund Holdings, L.P., Oceana Master Fund Ltd., Ocher Rose, L.L.C., Pentwater Merger Arbitrage Master Fund Ltd., PWCM Master Fund Ltd., Redwood Master Fund, Ltd, and SV Credit, L.P.*

*/s/ Alicia I. Lavergne-Ramírez*

José C. Sánchez-
Castro USDC-PR
213312
jsanchez@sanchezlrv.com

Alicia I. Lavergne-Ramírez
USDC-PR 215112
alavergne@sanchezlrv.com

SÁNCHEZ/LRV LLC
270 Muñoz Rivera Avenue, Suite 1110
San Juan, PR 00918
Tel. (787) 522-6776
Fax: (787) 522-6777

*/s/ Jason N. Zakia*

Glenn M. Kurtz (*pro hac vice*)
John K. Cunningham (*pro hac vice*)
WHITE & CASE LLP
1221 Avenue of the Americas
New York, NY 10036
Tel. (212) 819-8200
Fax (212) 354-8113
gkurtz@whitecase.com
jcunningham@whitecase.com

Jason N. Zakia (*pro hac vice*)
Cheryl T. Sloane (*pro hac vice*)
Jesse L. Green (*pro hac vice*)
WHITE & CASE LLP
200 S. Biscayne Blvd., Suite 4900
Miami, FL 33131
Tel. (305) 371-2700
Fax (305) 358-5744
jzakia@whitecase.com

*Counsel for Defendants Puerto Rico AAA Portfolio Bond Fund, Inc.; Puerto Rico AAA Portfolio Bond Fund II, Inc., Puerto Rico AAA Portfolio Target Maturity Fund, Inc.; Puerto Rico Fixed Income Fund, Inc.; Puerto Rico Fixed Income Fund II, Inc.; Puerto Rico Fixed Income Fund III, Inc.; Puerto Rico Fixed Income Fund IV, Inc.; Puerto Rico Fixed Income Fund V, Inc.; Puerto Rico Fixed Income Fund VI, Inc.; Puerto Rico GNMA & U.S. Government Target Maturity Fund, Inc.; Puerto Rico Mortgage-Backed & U.S. Government Securities Fund, Inc.; Tax-Free Puerto Rico Fund, Inc.; Tax-Free Puerto Rico Fund II, Inc.; Tax-Free Puerto Rico Target Maturity Fund, Inc.; and UBS IRA Select Growth & Income Puerto Rico Fund*