```
 1                    UNITED STATES DISTRICT COURT

 2                    DISTRICT OF PUERTO RICO

 3
      In Re:                  )        Docket No. 3:17-BK-3283(LTS)
 4                            )
                              )        PROMESA Title III
 5    The Financial Oversight and )
      Management Board for    )
 6    Puerto Rico,            )        (Jointly Administered)
                              )
 7    as representative of    )
                              )
 8    The Commonwealth of     )
      Puerto Rico, et al.     )        October 28, 2020
 9                            )
                   Debtors,   )
10
      _____
11

12                        OMNIBUS HEARING

13     BEFORE THE HONORABLE U.S. DISTRICT JUDGE LAURA TAYLOR SWAIN

14               UNITED STATES DISTRICT COURT JUDGE

15     AND THE HONORABLE U.S. MAGISTRATE JUDGE JUDITH GAIL DEIN

16               UNITED STATES DISTRICT COURT JUDGE

17     _____

18
      APPEARANCES:
19
      ALL PARTIES APPEARING TELEPHONICALLY
20

21    For The Commonwealth
      of Puerto Rico, et al.:  Mr. Martin J. Bienenstock, PHV
22                             Mr. Brian S. Rosen, PHV

23    For Puerto Rico Fiscal
      Agency and Financial
24    Advisory Authority:      Mr. Peter Friedman, PHV
                               Mr. Luis C. Marini Biaggi, Esq.
25
```

1  APPEARANCES, Continued:

2  For National Public
   Finance Guarantee
3  Corporation:            Mr. Marc E. Kasowitz, PHV
                           Mr. Adam L. Shiff, PHV

4  For the Official
5  Committee of Unsecured
   Creditors of all
6  Title III Debtors:      Mr. Luc A. Despins, PHV
                           Mr. John Arrastia, PHV

7
   For Ambac Assurance
8  Corporation:            Ms. Atara Miller, PHV

9  For the Lawful
   Constitutional
10 Debt Coalition:         Mr. Susheel Kirpalani, PHV

11 For the QTCB
   Noteholder Group:       Mr. Kurt A. Mayr, PHV
12                         Mr. Sabin Willett, PHV

13 For Sculptor Capital
   Management:             Mr. Thaddeus D. Wilson, PHV

14 For ERS Bondholders:    Mr. Benjamin Rosenblum, PHV

15
   For the Constitutional
16 Debt Group:             Mr. Joseph Palmore, PHV

17 For the Ad Hoc Group
   of General Obligation
18 Bondholders:            Mr. Mark Stancil, PHV

19 For the Ad Hoc Group
   of Constitutional
20 Debtholders:            Ms. Theresa Foudy, PHV

21

22

23

24 Proceedings recorded by stenography.  Transcript produced by
   CAT.
25

```
 1                        I N D E X

 2   WITNESSES:                                          PAGE

 3         None.

 4

 5   EXHIBITS:

 6         None.

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                                   San Juan, Puerto Rico

 2                                   October 28, 2020

 3                                   At or about 9:37 AM

 4                         *     *     *

 5          THE COURT:  Buenos dias.  This is Judge Swain

 6   speaking.

 7          MS. NG:  Judge, give us one more minute, because I

 8   just got a little glitch in Court Solutions, so --

 9          THE COURT:  All right.  I'll wait.

10          MS. NG:  Unfortunately, there's a problem with the

11   connection --

12          Counsel, can you all hear us or no?

13          UNIDENTIFIED PERSON:  We can hear you.

14          UNIDENTIFIED PERSON:  Yes.

15          UNIDENTIFIED PERSON:  Yes.

16          MS. NG:  Okay.  Judge, I'm sorry about that.

17          THE COURT:  All right.  Then we will proceed.

18          Ms. Tacoronte, would you please call the case?

19          COURTROOM DEPUTY:  Good morning, Your Honor.

20          The United States District Court for the District of

21   Puerto Rico is now in session.  The Honorable Laura Taylor

22   Swain presiding.  Also present, the Honorable Judith Dein.

23   God save the United States of America and this Honorable

24   Court.

25          Bankruptcy case --
```

1            THE COURT:  Thank you, Ms. Tacoronte.  I'm sorry.

2            COURTROOM DEPUTY:  I'm sorry, Your Honor.

3            Bankruptcy case 17-3283, *In re:  The Financial*

4    *Oversight and Management Board for Puerto Rico, as*

5    *representative of the Commonwealth of Puerto Rico, et al.*, for

6    Omnibus Hearing.

7            THE COURT:  Thank you, Ms. Tacoronte.

8            And again, buenos dias.  Good morning.  Welcome

9    counsel, parties in interest, and members of the public and

10   press.  This is Judge Laura Taylor Swain speaking.

11           As has been the case with our hearings over the past

12   several months, today's telephonic Omnibus Hearing is

13   occurring in what continue to be challenging times for all

14   stakeholders in these Title III proceedings.

15           Our thoughts remain with all of the people on the

16   island and on the mainland who have been affected by the

17   Coronavirus pandemic, and with all who have been affected by

18   the earthquakes and the hurricanes that have been going on

19   this year.

20           We also note, with sorrow and with sympathy for the

21   Puerto Rico District and First Circuit Court families, this

22   week's passing of Circuit Judge Juan Torruella, who played

23   extraordinary roles in the development of the law and in the

24   life of this island.

25           To ensure the orderly operation of today's telephonic

1    hearing, all parties on the line must mute their phones when

2    they are not speaking.  If you are accessing these proceedings

3    using a phone and a computer, please be sure to select "mute"

4    on both the Court Solutions dashboard and on your phone.  When

5    you need to speak, you must unmute on both the Court Solutions

6    dashboard and on your phone.

7         I remind everyone that, consistent with the court and

8    judicial conference policies and the Orders that have been

9    issued, no recording or retransmission of the hearing is

10   permitted by any person, including but not limited to the

11   parties, members of the public, and the press.  Violations of

12   this rule may be punished with sanctions.

13        I will be calling on each speaker during these

14   proceedings.  When I do, please identify yourself by name for

15   clarity of the record.  After the speakers listed on the

16   Agenda for each of today's matters have spoken, I may provide

17   an opportunity for other parties in interest to address

18   briefly any issues raised during the course of the

19   presentations that require further remarks.  If you wish to be

20   heard under these circumstances, please state your name

21   clearly at the appropriate time.  Don't just use the wave

22   function on the Court Solutions dashboard, but speak your

23   name.  I will call on the speakers if more than one person

24   wishes to be heard.

25        Please don't interrupt each other or me during the

1  hearing.  If we interrupt each other, it is difficult to

2  create an accurate transcript.  Having said that, I apologize

3  in advance for breaking this rule, as I may interrupt if I

4  have questions or if you go beyond your allotted time.  If

5  anyone has difficulty hearing me or another participant,

6  please say something immediately.

7        The time allotments for each matter and the time

8  allocations for each speaker are set forth in the Agenda that

9  was filed by the Oversight Board on Monday, October 26, 2020.

10  The Agenda, which was filed as Docket Entry No. 14930 in Case

11  No. 17-3283 is available to the public at no cost on Prime

12  Clerk for those who are interested.

13        I encourage each speaker to keep track of his or her

14  own time.  The Court will also be keeping track of the time

15  and will alert each speaker when there are two minutes

16  remaining with one buzz, and when time is up, with two buzzes.

17  Here is an example of the buzz sound.

18        (Sound played.)

19        THE COURT:  If your allocation is two minutes or

20  less, you will just hear the two final buzzes.

21        If we need to take a break, I will direct everyone to

22  disconnect and dial back in at a specific time.  This morning

23  we will proceed from 9:30 -- well, from now until 12:50, and

24  there will be a break in between the arguments of the motions.

25  And then, if necessary, we'll resume at 2:10 and go to 5:00.

 1           The first Agenda item is, as usual, status reports

 2    from the Oversight Board and AAFAF.  As I requested in the

 3    Procedures Order, these reports have been made in writing in

 4    advance of this telephonic hearing and are available on the

 5    public docket at Docket Entry Nos. 14949 and 14958 in Case No.

 6    17-3283.  And I thank the Oversight Board and AAFAF for their

 7    comprehensive and detailed reports.

 8           Does counsel for the Oversight Board have any remarks

 9    at this time in addition to the written status report?

10           MR. BIENENSTOCK:  Your Honor, this is Martin

11    Bienenstock.  Sorry.  It took me a while to unmute both

12    buttons.  But no, we don't have anything additional, but, of

13    course, we're ready to answer any questions the Court has.

14           THE COURT:  Thank you.  Good morning,

15    Mr. Bienenstock.  I don't have any questions for the Oversight

16    Board at this time.

17           And so now I will turn to counsel for AAFAF.  Does

18    counsel for AAFAF have any remarks at this time in addition to

19    the written status report?

20           MR. MARINI BIAGGI:  Good morning, Your Honor.  Luis

21    Marini for AAFAF.

22           Your Honor, we don't have anything to add other than

23    what we put in the report.

24           THE COURT:  Thank you, Mr. Marini.  I do have one

25    more question for you.  And I don't know whether you're in a

1    position to answer it, but in reading about the arrangements

2    that have been made to try to subsidize efforts for families

3    to connect their children with distance learning, I was

4    wondering if you know what proportion of Puerto Rico's school

5    children are actually being reached, are actually

6    participating in distance learning at this time?

7        MR. MARINI BIAGGI:  Well, Your Honor, our

8    understanding is that all of them are participating in one of

9    the methods that the Department has for distance learning.

10   They have at least three methods:  They have online learning

11   through a computer; they have distance learning through the

12   government's television program; and they have distance

13   learning where parents can pick up, you know, printed modules

14   for their children.  The students are participating one way or

15   the other throughout them.

16       I don't have the latest figures, Your Honor, in terms

17   of which percentage is involved in which part.  I do know that

18   most of them are taking classes through the online methods

19   that I described.

20       THE COURT:  Well, I'm pleased to hear that, and I am

21   pleased to hear that there are three modalities that are being

22   used vigorously.  Here on the mainland as well there are

23   problems with internet connectivity and making effective

24   distance learning for children.  So thank you for adding that

25   information.

1          Do any other counsel who are on the line have

2    questions or comments in connection with the status reports?

3    State your name clearly now if you do, and then wait for me to

4    call on you to speak.  And I will wait 30 seconds for people

5    to unmute if anyone wants to be heard.

6          (No response.)

7          THE COURT:  All right.  Thank you.  The 30 seconds

8    are up, and so we will go on to the contested matters.

9          Before I hear arguments on the motion for appointment

10   of an independent investigator, I have some comments regarding

11   the PSA Creditors' motion for your consideration that I hope

12   counsel will respond to in their arguments later this morning

13   concerning the PSA Creditors' motion.

14         Having read and considered the submissions on that

15   motion, I believe that this Court has subject matter

16   jurisdiction of the motion and the power to set deadlines.

17   Nevertheless, the relief sought by the PSA Creditors appears

18   to be both inappropriate and Draconian given the Oversight

19   Board's stated intention to engage in further negotiations and

20   ultimately amend the Plan of Adjustment, and given other

21   factors, such as the Oversight Board's membership turnover,

22   the political transitions that are in progress, and the

23   pandemic.

24         What I propose, and what I would like the parties to

25   discuss in their oral arguments, is an order setting a

1   deadline of February 10th, 2021, for the Oversight Board to

2   file a term sheet disclosing the material, economic, and

3   structural terms of the amended plan proposal with which it

4   intends to proceed to confirmation.

5        The Court will expect good faith negotiations by the

6   Board and all relevant stakeholders on the development of such

7   an amended plan.  The terms of the Plan will, thus, have to be

8   on the transition period agenda of the incoming Commonwealth

9   Governor, as well as that of the outgoing administration, and

10  the new members of the Oversight Board will have to work

11  quickly and cooperatively to keep the project going at speed.

12       The term sheet would have to be accompanied by a

13  proposed timetable for the filing of a formal proposed amended

14  plan and disclosure statement, discovery and litigation

15  concerning the disclosure statement, solicitation and voting,

16  and confirmation proceedings.  I invite the parties to make

17  this proposed structure the focus of their remarks, although I

18  am, of course, prepared to hear, within the previously

19  announced time limits, whatever arguments the parties believe

20  are pertinent.

21       And now we will turn to argument on the motion for an

22  independent investigation.  That is National Public Finance

23  Guarantee Corporation's Motion for Independent Investigation,

24  which was filed as Docket Entry No. 14450 in Case No. 17-3283.

25  And we have a total of 60 minutes allotted for argument,

1  beginning with 15 minutes by counsel for National.

2          Counsel for National?  Mr. Kasowitz, or Mr. Shiff,

3  would you please unmute on both the computer and your phone

4  and announce yourself?

5          MR. KASOWITZ:  Your Honor, can you hear me?  We're

6  trying to unmute.

7          THE COURT:  I can hear you now.

8          MR. KASOWITZ:  Thank you very much.  Good morning,

9  Your Honor.  It's Marc Kasowitz for National Public Finance

10 Guarantee Corporation.

11         Your Honor, it's undisputed that certain of the hedge

12 funds that are involved in this proceeding were actively

13 trading in Commonwealth bonds at the same time that they were

14 engaged in a confidential mediation which sought, among other

15 things, to determine the value of those very same bonds.  It's

16 also undisputed that it would have been improper for those

17 hedge funds to engage in that trading using confidential

18 information that they learned during the mediation.

19         The hedge funds' supplemental Rule 2019 Disclosures

20 raise very serious questions, in our view, about whether that

21 is exactly what happened here.  And, Your Honor, those

22 concerns have not been allayed.  If anything, they've only

23 been heightened by the hedge funds' objections to this motion.

24         Here are some examples of the trading that the hedge

25 funds have engaged in that are potentially troubling.  In July

13

1    2019, just days after the initial PSA was announced, Silver

2    Point, which is a member of the Ad Hoc Group of Constitutional

3    Debtholders, held over 50 million dollars in the 2014 series

4    of late vintage GO bonds.  By early February 2020, before the

5    new PSA was announced, Silver Point had increased its position

6    to nearly 300 million dollars.  That's a six-fold increase,

7    Your Honor.  And, obviously, the treatment of those bonds was

8    one of the principal subjects of the mediation.

9         Sculptor Capital, which is a member of the QTCB

10   Group, in September 2019, before the mediation, didn't own any

11   late vintage 2014 GO bonds.  By February 18, 2020, after the

12   new PSA was announced, Sculptor owned approximately 110

13   million dollars of those bonds.  Over the same time period,

14   Sculptor also doubled its holdings of the late vintage 2012 GO

15   bonds from about 40 million to about 80 million dollars.

16        GoldenTree, a member of the LCDC Group, increased its

17   2014 late vintage GO bond holdings five-fold, from about 12

18   million dollars in August 2019, before the mediation began, to

19   over 60 million dollars in February 2020.

20        Overall, Your Honor, from January 2019 to June 2020,

21   based on their own disclosures, members of the hedge fund

22   groups increased their positions in GO and PBA bonds from 5

23   billion to 7.7 billion dollars, a 53 percent increase.

24        Your Honor, these hedge funds were buying up these

25   bonds when they and the other participants in the confidential

1  mediation were negotiating how the bonds, in particular the

2  late vintage GO bonds, would be treated in the new PSA.  And

3  what they were negotiating and agreeing to, negotiations that

4  were, by this Court's Order, required to be confidential, was

5  treatment of those bonds that was dramatically better than the

6  way they were treated in the initial PSA.

7          This has raised questions not just for our client,

8  but also for many others, including other parties in this case

9  and members of Congress.  Your Honor, we respectfully submit

10  that the best, most efficient way to deal with what appears on

11  its face to be potential serious misconduct is to order a

12  prompt investigation by an independent, objective nonparty.

13  Someone who doesn't have any stake in the outcome here.

14          It makes sense to do that now rather than wait for

15  the confirmation, as the hedge funds would prefer.  First, it

16  would ensure an objective evaluation of the facts sooner

17  rather than later.  Second, it would provide full disclosure

18  before the mediation is concluded, which would be valuable

19  information for the participants in the mediation.  And,

20  third, it could help avoid protracted discovery and motion

21  practice at the confirmation stage, and enable the

22  Commonwealth to re-enter the capital markets more quickly.

23          The hedge funds --

24          THE COURT:  Mr. Kasowitz --

25          MR. KASOWITZ:  Yes.

1           THE COURT:  -- I have a question for you.

2           MR. KASOWITZ:  Of course.

3           THE COURT:  If your inferences that there was

4    improper trading on inside information, notwithstanding

5    various blow-outs, are true, who would have been harmed as a

6    result?  Because it seems to me that if it is the municipal

7    bond market participants generally, that sort of alleged

8    misconduct in the securities market would be squarely within

9    the purview of securities regulators.  And if the trades were

10   among the hedge funds themselves, as the respondents to the

11   motions generally allege, with some exceptions, why should

12   Puerto Rico pay to determine whether one of them took

13   advantage of another?

14           And, finally, in the context of confirmation, to the

15   extent you say that this makes for an unfair proposal, there

16   are opportunities to make specific allegations about

17   unfairness of the proposal and litigate those in the context

18   of confirmation.  So why should the Commonwealth fund

19   essentially a securities market investigation that may or may

20   not have a proper factual basis?

21           MR. KASOWITZ:  Yes, Your Honor.  Thank you.  I think

22   there are two reasons.  First, I think that there is -- our

23   concern is that there's a taint on the overall process here.

24   The mediation is a critical process, and critical process for

25   resolving all of these parties' interests.  And if --

1           THE COURT:  A taint on the process -- just a moment.

2    A taint on the process because you think bad people are

3    involved, or is there some specific distortion of the now

4    publicly disclosed economics that will be set up for

5    litigation in connection with the confirmation process?

6           MR. KASOWITZ:  First of all, Your Honor, just to be

7    clear, we're not -- we are not criticizing the mediation

8    process, and we're not criticizing the mediation team members.

9    To the extent that we've had the opportunity to review

10   disclosures and the like, the concern that we have, and that

11   others have as well, is that there has been some trading by

12   certain parties based on information that was supposed to be

13   confidential.  And we think that that taints the overall

14   process and that that -- and that that casts a potential cloud

15   on the interests of the individual creditors here for these

16   bonds, which is not a good thing for the overall resolution of

17   the Commonwealth's issues.

18          The reason that we think that this is a better

19   mechanism, that the appointment of an independent investigator

20   is a better mechanism than waiting until confirmation is that

21   it can be done, we believe, relatively quickly, efficiently,

22   by someone who doesn't have any stake in the matter, rather

23   than waiting for -- and it can be done sooner, in order to

24   clear up and clarify any potential taints.  And rather than

25   waiting for confirmation, which could lead to very broad

1    discovery by lots of different -- by lots of different

2    parties, and potentially protracted motion practice over that

3    discovery, we just think that, under the circumstances, it can

4    be done cheaper now; it can be done effectively now; and it

5    can avoid a taint sooner; and that the relatively small amount

6    of cost would outweigh the -- would outweigh the -- that the

7    benefits to everyone, and to the process, and to the Court,

8    would outweigh the relatively small amount of cost that would

9    be involved.

10              THE COURT:  Thank you.  Please proceed.

11              MR. KASOWITZ:  So the hedge funds here, Your Honor,

12   oppose an investigation.  I'm not sure exactly why they do,

13   because if what they -- if their claim is that they've had

14   absolutely nothing -- done absolutely nothing wrong in

15   connection with their trading, then they shouldn't have any

16   problem having someone independent confirm that.

17              They make several arguments.  We don't think that any

18   of the arguments are availing here.  First, they all deny

19   having traded securities with the use of confidential

20   information.  Some of them, while they admit that they did a

21   lot of trading during the mediation, claim that it was done

22   during so-called unrestricted periods after so-called

23   cleansing materials were publicly released.  Others, like

24   Sculptor, claim that most of their trades were done after the

25   new PSA was announced.  And others admit that they traded

1    during the so-called restricted periods, but procured big boy

2    disclaimers, which they claim mean that they didn't violate

3    any insider trading laws.

4         These hedge funds want everyone, including this

5    Court, to take their word for it that they didn't do anything

6    wrong; but, in fact, we think that the explanations that

7    they've proffered in their objections raise more questions

8    than they answer.  Although the hedge funds point to

9    unrestricted time periods, cleansing materials and other

10   disclosures, they -- all of their objections have avoided the

11   really -- really the key question here, Your Honor, which is

12   whether they were trading using confidential information that

13   they had concerning what was being discussed at the mediation

14   itself.

15        And not to put too fine a point on it, if the

16   discussions, whether formal or informal, among the parties at

17   the mediation signaled that the late vintage bonds were going

18   to receive more favorable treatment in the new PSA, did any

19   hedge funds trade on that information?  None of that, none of

20   that was disclosed in any of the cleansing materials that

21   we're familiar with.  All of that needs to be addressed in an

22   investigation.

23        Second, the LCDC Group argues that their trading is

24   permitted under the explicit terms of the Mediation Agreement.

25   And while it's true that the Mediation Agreement did not

1  prohibit trading by the participants, it also explicitly

2  reminded the participants that any trading needed to be done

3  in compliance with applicable securities laws.  Most

4  importantly, the Mediation Agreement does not permit trading

5  using confidential information and breach of the Court's

6  confidentiality orders, and that's what's at issue here.

7         Now, Your Honor, one thing I should have said -- I'm

8  sorry.  The third argument advanced by the hedge funds is that

9  the Court lacks the authority to order an investigation.  We

10  disagree, Your Honor.  The Court has the inherent power to

11  enforce its own orders, here the Mediation Order and the

12  Supplemental Confidentiality Order, and to protect the

13  inherent integrity of this proceeding.  And if there were any

14  doubt, which there shouldn't be, that should be resolved by

15  Section 105 of the Bankruptcy Code.

16         Fourth, the hedge funds argue that an investigation

17  would be too expensive, but that the hedge funds shouldn't be

18  heard to complain that it's too expensive to investigate their

19  alleged misconduct.  We believe, as I've said before, that an

20  effective investigation could be conducted efficiently and

21  reasonably, and that the benefits of assuring the integrity of

22  the mediation process would be well worth the cost, which we

23  think would be limited and reasonable.

24         Now, Your Honor, the hedge funds say they've done

25  nothing wrong, and perhaps that's right, but given what we

1    already know and the serious issues that have already been

2    raised, we believe that a prompt, independent investigation is

3    the most effective and efficient way to resolve these issues.

4    Respectfully, Your Honor, we believe our motion should be

5    granted.  Thank you.

6            THE COURT:  I have a question for you.  One of your

7    proposals is that the Court direct the U.S. Trustee to

8    undertake the investigation.  What authority do you believe

9    the Court has to direct another branch of government, the

10   Department of Justice, to conduct an investigation where

11   section 307 is not applicable in this case, and I certainly

12   don't have control over the budget of the Department of

13   Justice?

14           MR. KASOWITZ:  I believe that -- we believe, Your

15   Honor, that you have it within the inherent power of your

16   office as an Article III Judge.  There's a -- in the decision

17   *Neiman Marcus Group*, the United States Trustee performed a

18   similar investigation, so we think that you have that

19   authority.

20           THE COURT:  Section 307 applied --

21           (Sound played.)

22           THE COURT:  -- in *Neiman Marcus,* and that provision

23   is not incorporated into PROMESA.

24           MR. KASOWITZ:  Understood, Your Honor.

25           THE COURT:  And the facts were very different.

1   That involved, I think, a committee that the U.S. Trustee had

2   appointed, didn't it?

3           MR. KASOWITZ:  Yes, Your Honor.  But we -- look, we

4   believe that the Court has inherent authority, and certainly

5   the authority to enforce its own orders, both in terms of the

6   Mediation Order and the confidentiality orders and the like.

7   And so whether it's a third party that has had no dealings

8   with respect to this, or whether it's the U.S. Trustee -- and

9   if the U.S. Trustee accepted the appointment and the

10  designation, that would solve any statutory issues here.

11          (Sound played.)

12          THE COURT:  All right.  It seems the time is up.

13  Thank you so much, Mr. Kasowitz.

14          And now we will turn to counsel for the Committee.

15          MR. ARRASTIA:  Good morning, Your Honor.

16          THE COURT:  Good morning.

17          MR. ARRASTIA:  John Arrastia on behalf of the

18  Committee.  Thank you for your time.

19          First off, the Committee believes that this is not

20  something that can be characterized as a two or three party

21  dispute between some parties and the bondholders.  These

22  issues address the fundamental integrity of the Title III

23  proceedings, and those proceedings are predicated on concepts

24  of good faith, fairness and equity.

25          In her Congressional testimony, Ms. Jaresko of the

1   Oversight Board was asked by Congress about insider trading

2   and if the Board had done anything.  And she testified, No.

3   We are not investigating them.  They are in the hands of the

4   Court and the mediator.

5          In her follow-up testimony, written testimony, she

6   identified the 2019 disclosures as one of the practices

7   employed to deter insider trading.  And based on those 2019

8   Disclosures, the Committee joins in National's request.  It

9   hasn't reached the same conclusions, but an independent

10  evaluation highlights questions that merit further

11  investigation in the Committee's view.

12          (Sound played.)

13          MR. ARRASTIA:  Very simple example.

14          THE COURT:  That means two minutes are left.  Yes.

15          MR. ARRASTIA:  Thank you.  That means that -- one

16  example, the 2014 General Obligation Bonds.  In 2019, the

17  Oversight Board sought to disallow claims on that series of

18  bonds.  The only public information of consequence was the

19  January Omnibus Objection that included those bonds, as well

20  as the September 27, 2019, Plan of Adjustment.  That still

21  would disallow claims based on that bond, but the Oversight

22  Board would settle for 35 percent.  That's the range, that's

23  the elements of common knowledge, public knowledge.

24          But nonetheless, within that five-month period, just

25  before the September PSA, to the Amended PSA in February of

1    2020, certain members, not all, but certain members of LCDC

2    and the Ad Hoc Group of Constitutional Debtholders increased

3    their holdings in just that one series of bonds by 354 million

4    dollars.  Meanwhile, the price increased 22 and a half

5    percent.

6              If you go back to the earlier 2019 disclosure date,

7    the numbers get bigger, and the increase in just that one

8    series of bonds almost doubled.  It grew 91 percent, 621

9    million, and the price increased in seven or nine months,

10   depending on the disclosure date, 44 percent.

11             Meanwhile, we know that mediation was ongoing, and

12   settlement proposals were being discussed and exchanged.  And

13   we know that because certain time records have been publicly

14   disclosed, and it identifies that.

15             (Sound played.)

16             MR. ARRASTIA:  So we knew that was happening.

17   Certainly, there's enough to ask questions necessary to

18   confirm the integrity of the process and comply with equitable

19   considerations of these proceedings.  And irrespective of any

20   framework the Court may fashion today, the Committee stands by

21   to assist the Court in any further investigation or

22   evaluation.

23             Thank you for your time, Your Honor.

24             THE COURT:  Thank you, Mr. Arrastia.

25             Now we turn to the motion opponents.  I have, first,

1     the LCDC for ten minutes.

2              MR. KIRPALANI:  Good morning, Your Honor.  It's

3     Susheel Kirpalani.

4              THE COURT:  Good morning, Mr. Kirpalani.

5              MR. KIRPALANI:  Good morning.  For the record, on

6     behalf of the Lawful Constitutional Debt Coalition, or the

7     LCDC, Susheel Kirpalani from Quinn Emanuel.

8              Judge, the members of the LCDC were the first

9     bondholders of Puerto Rico to suggest a compromised path

10    forward that didn't require cutting pensions, didn't impose

11    austerity, and did not debate the Oversight Board's

12    determinations of how much is needed to ensure citizens have

13    essential government services.

14             We entered this case in March of 2019, and the way we

15    saw it, citizens of Puerto Rico were victims of irresponsible

16    fiscal decisions made over decades by politicians with a core

17    network of partners.  National was clearly one of those

18    partners, and despite the self-serving spin in its motion and

19    the tone it takes this morning, National is not the kind of

20    long-term partner that Puerto Rico needs today.

21             In June of 2019, the Oversight Board announced an

22    initial PSA supported by us as anchor tenants, along with

23    another group of creditors.  The structure and settlement

24    contained in that plan proposal did not garner enough support

25    to quiet the noise of litigation.  And by late July 2019, this

1    Court Ordered all major creditors into mediation, to be

2    overseen by a mediation team of federal judges.

3         A new PSA came out of that mediation in February

4    2020, and that proposal garnered substantial support.

5    Approximately 60 percent in amount of constitutional debt

6    supported the deal.  National was not among them, however.  We

7    asked National to join us, and they refused.  That's because

8    National didn't like the idea of haircutting constitutional

9    debt to the level that we agreed, because then National would

10   have to make up the difference to its policy holders,

11   including all the post bankruptcy interest payments.

12        And to make things worse for National, the current

13   Plan contemplates very little money to repay the junior rung

14   clawback debt it insured.  If the current Plan became

15   effective, National would be left holding the bag for any

16   amounts not paid by Puerto Rico to bondholders, and that bag

17   is so heavy that it likely tips National into insolvency.  So

18   National will stop at nothing to prevent the new PSA plan or

19   any structurally similar one from going forward.  And so here

20   we are.

21        National's motion charges some very heavy

22   allegations, but are very light on the facts, or even a

23   coherent thesis.  Despite the clear terms of the Mediation

24   Orders themselves, and despite being one of the original

25   signatories to the Mediation Agreement, National ignores the

1   actual terms of these documents when it argues that members of

2   the LCDC somehow violated them.

3          In paragraph one of National's motion, National

4   alleges two things to justify the relief it wants:  One, the

5   Court's confidentiality orders may have been violated; and,

6   two, that while participating in Court-Ordered mediation,

7   certain hedge funds, creditors may have engaged in improper

8   trading.  Based on these allegations, National then says an

9   investigation is appropriate, and I quote, because such

10  conduct would have materially undermined and negatively

11  impacted the mediation that resulted in the new PSA, or some

12  similarly structured forthcoming agreement.

13         Desperate to shift the focus from the fact that

14  National itself is not among the 60 percent of Constitutional

15  Debtholders that agreed to compromise, National adopts the

16  familiar playbook of saying the ones that agreed to haircuts

17  are not the original GO and PBA bondholders.  But National

18  cannot explain the relevance of that assertion.

19         If members of the LCDC are financially able and

20  willing to agree to compromise and provide haircuts and

21  savings to the Commonwealth of Puerto Rico under a plan, it

22  does not mean the haircuts are bad for the Commonwealth.  They

23  are just bad for National.

24         Your Honor, we know that sunlight is the best

25  disinfectant, so we had each member of the LCDC disclose and

1    certify the details of its holdings before and after each

2    phase of negotiations with the Oversight Board.  From our

3    papers, to summarize, no member of the LCDC traded in any

4    constitutional debt during the negotiations that led up to the

5    initial PSA between March and June of 2019.  This is the

6    original agreement that created the framework for paying early

7    vintage bondholders more than late vintage bondholders, for

8    capping early vintage bondholders, and paying late vintage

9    bondholders ahead of clawback bonds and general unsecured

10   creditors.

11          As the Court knows, the level of support for that

12   initial PSA was limited.  The significant holders of late

13   vintage bonds did not think the proposal was fair, and the

14   Court Ordered mediation in July of 2019 and required that the

15   holders of -- late vintage bondholders be included this time.

16          While Your Honor Ordered the mediation in late July,

17   the mediation didn't actually begin for a couple of months,

18   and it didn't begin at the same time for every creditor or

19   every creditor group.  In fact, this is why the Rule 2019

20   statements are not the best way to understand the economic

21   positions of holders at the beginning of each mediation

22   session.  But I want to explain why that doesn't suggest any

23   wrongdoing.

24          The timing of when we filed Rule 2019 statements is

25   dictated by the rule itself and by this Court's Rule 2019

1    orders, not by a mediation protocol.  And it's important to

2    remember in the sense that neither the Board nor the mediation

3    team made any public statements as to when mediations were to

4    begin and for whom.  But that's not to say the Board didn't

5    know the specific holdings of the participants in the

6    mediation.  To the contrary, the Board required creditors to

7    provide CUSIP level information so the Board would know

8    exactly which bonds it was dealing with, ensuring transparency

9    into creditor holdings throughout the negotiations with the

10   issuer.

11        As was certified by each institution as to itself in

12   our Objection, five of our seven members of the LCDC did not

13   buy or sell any constitutional debt securities while

14   participating in mediation.  And as they disclosed through

15   certifications to our Objection, there was nothing nefarious

16   about the isolated transactions that occurred by two of the

17   LCDC while in mediation between October 2019 and February

18   2020.

19        All four of the parties involved in these isolated

20   trades were sophisticated investors who had executed the

21   Mediation Agreement.  These were not trades on the open

22   market, and the trades were conducted in compliance with the

23   mediation protocol, with no breaches of confidentiality.

24   Three of the four parties were signatories to the initial PSA

25   at the time of the transactions.

1          So the result, Judge, is that the bonds that were

2   already locked up by the initial PSA merely changed hands to

3   another signatory who had agreed to the same compromised

4   treatment already.  And the fourth party was an active

5   participant in the then ongoing mediation, and sold some bonds

6   to another participant.  Ultimately, all four of these

7   institutions negotiated and executed the new PSA, supporting

8   the Board's proposed compromise of how all GO and PBA bonds

9   would be treated.

10          That's it.  That's the sum total of trades done by

11  members of the LCDC while engaged in mediation.  This is all

12  set forth in detail, accompanied by certification by the

13  institutions.

14          So having certified the facts --

15          (Sound played.)

16          MR. KIRPALANI:  -- the same way the holdings are

17  certified in Rule 2019 statements to begin with, National

18  changes the basis for the motion in its Reply Brief.  In its

19  Reply, National now says an investigation is needed because

20  it's possible that even when there was no mediation, the

21  trading could have been improper.

22          The inconvenient truth is that the actual facts don't

23  fit National's original narrative.  National wanted to show

24  parties were massively trading during mediation, but that's

25  not true.  And it wanted to say members of the LCDC were

1   taking positions in court that were contrary to their economic

2   interest, and that's not true.

3   　　　　So now National resorts to saying any creditors who

4   participate in mediation may find themselves prohibited from

5   buying or selling bonds even after the mediation is over.

6   Why?  Because the issuer may not have effectively cleansed the

7   mediation participants by disclosing all the needed

8   information.

9   　　　　Judge, National's position would prohibit any party

10  that has ever participated in mediation from ever buying or

11  selling bonds again, irrespective of whether or not mediation

12  is ongoing.  National's new basis for relief requires the

13  participants to prove a negative.  It creates an

14  insurmountable problem for any bankruptcy case where mediation

15  is ordered, including future mediations in this case.

16  　　　　How are creditors supposed to participate in

17  mediation if they can't rely on the rules established for the

18  mediation and the issue of disclosure of material, nonpublic

19  information?  The answer, of course, is that they can't rely

20  on those rules.  And if they can't rely on those rules, they

21  just won't participate.  And that would suit National just

22  fine, because National does not want to see Puerto Rico emerge

23  from bankruptcy unless National is paid in full.  That's what

24  this is about.

25  　　　　The economic interests of the members of the LCDC are

1    all publicly disclosed.  The size of the two transactions that

2    took place among four sophisticated parties during mediation

3    is out, also, now publicly disclosed.

4          (Sound played.)

5          MR. KIRPALANI:  And the world can see it did nothing

6    to undercut the LCDC's overall economic interests, Your Honor.

7          THE COURT:  Thank you.

8          MR. KIRPALANI:  While National disagrees that its

9    junior clawback bonds should receive a very small recovery,

10   and it doesn't think that Constitutional Debtholders should

11   discount or haircut at all, it should register those

12   disagreements as objections to a plan, not by maligning the

13   entire mediation process --

14         THE COURT:  Your time is up.

15         MR. KIRPALANI:  -- and chilling all participation in

16   the future, Your Honor.

17         THE COURT:  Mr. Kirpalani, your time is up.

18         MR. KIRPALANI:  Yes.

19         THE COURT:  Thank you very much.

20         MR. KIRPALANI:  Thank you, Your Honor.

21         THE COURT:  I will now hear from counsel for the

22   Constitutional Debtholders, Ms. Foudy.

23         MS. FOUDY:  Good morning, Your Honor.

24         THE COURT:  Good morning.

25         MS. FOUDY:  Theresa Foudy of Morrison & Foerster on

1   behalf of the Ad Hoc Group of Constitutional Debtholders.

2         I would just note, I notice on the Court Solutions

3   dashboard that it says we represent Fir Tree, so I just

4   wanted -- while, Fir Tree is a member of the Group, we

5   actually represent the Ad Hoc Group of Constitutional

6   Debtholders.

7         Without repeating all of what Mr. Kirpalani said,  I

8   would just note for the record that the Constitutional

9   Debtholders join in the arguments of the Lawful Constitutional

10  Debt Coalition.

11        And I would like to address the lack of authority for

12  the relief that National Public Finance Guarantee Corporation

13  seeks.  While National relies upon the Court's inherent power

14  to enforce its own orders, National's allegations, on their

15  face, do not state a violation of the Court's Mediation Order

16  or the Court's Supplemental Confidentiality Order.  The

17  Court's Mediation Order, as well as the Court's Supplemental

18  Confidentiality Order, which was issued to address the leaking

19  of confidential mediation information to the press, both

20  require that mediation information be kept confidential.

21  Neither Order says one word about trading.

22        National's motion conflates disclosing confidential

23  information with trading, but those are two separate things.

24  National's motion is not about enforcing the Court's orders

25  prohibiting the disclosure of confidential information.

1   Rather, National's motion is about speculation that maybe,

2   perhaps, possibly securities laws could have been violated,

3   because signatories to the Mediation Agreement traded

4   securities at some point in time over the past two years, even

5   though National has presented no evidence that any of those

6   trades were done in violation of the securities laws.

7       National advocates for transparency, but the

8   Constitutional Debtholders have been transparent.  The

9   Constitutional Debtholders have fully disclosed their economic

10  interests in these proceedings and how those interests have

11  changed over time in Rule 2019 statements that are likely the

12  most fulsome and comprehensive Rule 2019 statements ever filed

13  in a case.

14      In addition, in the Constitutional Debtholders'

15  Joinder to the objections to National's motion, the

16  Constitutional Debtholders both attested to their compliance

17  with the Court's Orders and disclosed what trading, if any,

18  was engaged in while participating in the mediation.  While

19  National's Reply Brief dismisses those Disclosures as

20  "counsels' assurances" contained in "legal briefs," each

21  member of the Ad Hoc Group of Constitutional Debtholders

22  verified, under penalty of perjury, that the statements were

23  true.

24      National has not presented one iota of evidence to

25  Your Honor that contradicts those verified statements.

```
 1    Instead, the bondholders are attacked by conjecture and the

 2    blatantly flawed premise that the fact of having traded

 3    somehow equates to that trading having violated the security

 4    laws.

 5          Asking this Court to launch a securities market

 6    investigation, in spite of the complete disclosures made under

 7    penalty of perjury by the Constitutional Debtholders is a

 8    frolic and a detour that would set a terrible precedent --

 9          (Sound played.)

10          MS. FOUDY:  -- and is best avoided.

11          Unless Your Honor has any questions, the Ad Hoc Group

12    of Constitutional Debtholders would rest on the papers and ask

13    this Court to deny National's motion.

14          THE COURT:  Thank you, Ms. Foudy.  I have no

15    questions for you.

16          MS. FOUDY:  Thank you, Your Honor.

17          THE COURT:  So now we will turn to counsel for QTCB

18    for five minutes.  Mr. Mayr.

19          MR. MAYR:  Good morning, Your Honor.  Kurt Mayr of

20    Morgan, Lewis for the --

21          THE COURT:  Hi.

22          MR. MAYR:  -- QTCB Noteholder Group.  Can you hear

23    me?

24          THE COURT:  Yes.  I mispronounced your name.  Hello,

25    Mr. Mayr.
```

1          MR. MAYR:  No problem.  It happens often.

2          I guess, Your Honor, I will begin with one of

3  National's counsel's first statements, which is that it was

4  undisputed that there was trading occurring during mediation.

5  We, the QTCB Noteholder Group, absolutely dispute that.

6          We have filed with the Court our Response with a

7  detailed timeline of our holdings, when we were in mediation

8  with confidential mediation information, when and -- how and

9  when the holdings changed, and when trading occurred.  And

10  when you look at that, you can see that, like any large public

11  structuring case, the negotiation here involves very specific

12  rules of the road that parties whose business it is to trade

13  in bonds, and that have fiduciary duties to their investors to

14  maximize value, will, when necessary, agree to restrict their

15  ability to trade, engage in negotiations with a pre-negotiated

16  exit from the restriction in trading through appropriate

17  cleansing.  And you can see the road map for what happened

18  here in our filing, and you can see that no trades in the QTCB

19  Noteholder Group occurred during any period while they had

20  information in mediation that had not been cleansed.

21          Now, I think National claims it's protecting the

22  integrity of the process.  I actually think this is a

23  full-blown attack on the integrity of the mediation process.

24  National asserts that the Board's cleansing disclosures are

25  insufficient and that it needs to investigate, quote, all

1    information obtained formally or informally as a result of the

2    mediation, and, at another point, suggests that any

3    conversations at any time between investment funds are

4    relevant as well.

5          This is a blatant invasion into the mediation process

6    that would permit National discovery into all discussions in

7    the many months and the very long and hard days of mediation

8    that, for important policy reasons, are protected by mediation

9    privilege.  The expansive nature of the investigation belies

10   National's disingenuous assurance that this is going to be a,

11   quote, quick and easy and relatively inexpensive process.

12   They literally say they need to hear about everything that was

13   ever said to anyone during mediation in order to satisfy their

14   investigation.

15         Granting this motion would have an incredible

16   chilling effect on mediation, because all confidential

17   mediation discussions would be subject to the risk of attack

18   by any party unhappy with the mediation result.

19         Now, I take Your Honor's question about standing at

20   -- you know, National does not claim that it sold bonds or

21   bought bonds from any investment fund that supposedly traded

22   improperly.  It doesn't have standing to pursue that.   The

23   only standing it has to pursue is, you know, issues related

24   directly to this process.  And so they really point to two

25   things.

1          (Sound played.)

2          MR. MAYR:  One, the power of the Court under 105

3  that, as has been said, it only relates to confidentiality,

4  and -- though they don't make a single allegation of any

5  confidential information being disclosed.  Then they speak to

6  the integrity of the Court, the integrity of the process, but

7  they're not seeking to protect the integrity of the process.

8          Congress carefully crafted rules and procedures to

9  protect the integrity of this process.  Rule 2019 applies.

10 Your Honor has augmented 2019, and we have complied.  And

11 that's the level of disclosure that applies to these sorts of

12 issues in this case, and we have complied at all times, above

13 and beyond, including in our Opposition to this motion.

14         Congress provided confirmation protections, the good

15 faith requirements of the Plan, rote designation, equitable

16 subordination rights.  These are all things that National

17 alludes to and will be available to National when ripe.  And

18 now, we might not know what plan is actually going to be

19 pursued and what will be ripe until February 21st, 2021.

20 Clearly, the issues they raise today are not ripe with respect

21 to any particular plan until we know more.

22         And, finally, what they really seek is an examiner.

23 Congress didn't give them that.  What they're really asking

24 Your Honor to do is to use 105 to create an investigatory

25 power that wasn't provided by Congress.

```
1              I also think it's notable that National really stands

2    alone here.  If this outrageous conduct was true -- joinders

3    abound in this case when parties agree with others' requests

4    of the Court.  National and the other monolines frequently

5    join in each other's pleadings.  Other than the UCC's tepid,

6    half-hearted joinder here, no other party has joined in this

7    motion, which speaks strongly to the --

8              (Sound played.)

9              MR. MAYR:  -- submission.  I'll conclude there, Your

10   Honor.

11             THE COURT:  Thank you, Mr. Mayr.

12             MS. NG:  Judge, it's Lisa.  Judge, I'm sorry.  It's

13   Lisa.  I just got an e-mail from Matthew, from Matt, from the

14   DE's office saying that the AT&T -- they're reporting issues

15   with the AT&T conference and AT&T web manager.  So I just

16   wanted to let you know, and let the AT&T participants know

17   also, that I'm keeping an eye on everything.  But hopefully

18   this is something that doesn't affect us, but it may just

19   affect us, so I just wanted to let you know.

20             THE COURT:  I saw that message as well.  And I think

21   we have someone from our team listening through the AT&T line.

22   Have you been able to verify that they are still on and can

23   hear?

24             MS. NG:  Yes, I will check with Eric.

25             THE COURT:  Okay.  I'll wait until you've been able
```

1   to verify with him.

2          MS. NG:  Yes.  Eric says he's fine there so far.

3          THE COURT:  Okay.  So it sounds like our AT&T line is

4   still functioning.

5          MS. NG:  Yes.

6          THE COURT:  So we will continue.

7          MS. NG:  Sorry to interrupt.  I'm sorry, Judge.

8          THE COURT:  Oh, no.  It's nothing to be sorry for.

9   We have to make sure everything is working for everyone.  So

10  thank you, Ms. Ng, for your vigilance on that.

11         The next speaker is Mr. Stancil for three minutes.

12         MR. STANCIL:  Good morning, Your Honor.  Mark Stancil

13  of Willkie, Farr & Gallagher for the Ad Hoc GO Group.  I'll be

14  very brief.  Good morning.

15         We fully agree with the other PSA parties that

16  National's motion is completely lacking in merit.  As we

17  explained in our Opposition, no member of the GO Group made

18  any trades during any restrictive period, which is more than

19  enough basis to reject National's motion summarily.

20         I'd like to very briefly emphasize just two

21  additional points.  First and foremost, the very allegations

22  National has made, no matter how meritless and easily

23  disproven, are severely damaging to the targeted firms.

24         As the Court is well aware, our clients are closely

25  regulated and follow strict trading protocols.  National's

1  very casual suggestion that our clients flouted all of those

2  rules and regulations does serious harms to our clients'

3  businesses.  It's no different from a lawyer publicly accusing

4  another lawyer of egregious ethical violations without

5  foundation.

6        Suppose a lawyer shows up to the courthouse one

7  morning driving a new car, and opposing counsel publicly urges

8  the Court to launch an investigation into whether the lawyer

9  may have misappropriated client funds to buy the car.  Even if

10  the allegation is summarily and quickly disproven --

11        (Sound played.)

12        MR. STANCIL:  -- significant damage is already done.

13  And I think the old saying goes something like a lie can

14  travel halfway around the world while the truth is still

15  lacing up its boots, and that's absolutely the case here.

16        The second point I wanted to emphasize is that the

17  damage is particularly egregious with respect to my clients,

18  who were dragged into National's motion, despite the fact that

19  their Rule 2019 Disclosures do not even fit National's already

20  bogus theory.

21        Your Honor may recall that the GO Group's holdings

22  actually declined during the time period that National claims

23  PSA Creditors were improperly buying certain bonds.  While --

24  rather than acknowledging that disconnect, National casually

25  tosses in a footnote in their motion announcing that perhaps

 1    our client's decrease in holdings is also suspicious, it says.

 2         And then National speculates, without any basis

 3    whatsoever, that PSA Creditors may have been, "working

 4    together to reallocate these bonds among themselves."  This is

 5    pure conspiracy theory nonsense, and the fact that National

 6    continues to cling to it is further proof that this motion is

 7    a self-serving attempt to disrupt the PSA, and it's not a

 8    manifestation of any legitimate concern about the integrity of

 9    the process.

10         And National may not care that its tactics are doing

11    significant harm to the firms that it has nonchalantly accused

12    of serious wrongdoing, but this Court should not countenance

13    National's abuse of the judicial forum.  We respectfully urge

14    the Court to deny the motion.

15         Thank you, Your Honor.

16         THE COURT:  Thank you, Mr. Stancil.

17         Next I have counsel for Sculptor, Mr. Wilson, for

18    three minutes.

19         MR. WILSON:  Good morning, Your Honor.  Thad Wilson

20    from King & Spalding on behalf of Sculptor Capital.

21         National brought its motion without a shred of

22    evidence and based purely on suspicion, suspicion, as you've

23    heard this morning, driven by its opposition to the Plan.

24    National's Motion and Reply offer the Court no facts, just

25    hunches, and very biased hunches at that.  That is

1   specifically true with respect to its false and misleading

2   portrayal of trading by Sculptor Capital's funds.

3           Sculptor has conclusively demonstrated that it did

4   not engage in any trading that violated this Court's orders or

5   any other trading restrictions, and there is no basis

6   whatsoever for the relief National requests.  Indeed, in its

7   Motion and Reply Brief, National does not point to a single

8   instance where Sculptor violated a Court order.  National does

9   not point to a single instance where Sculptor violated any

10  agreement.  And most certainly, National's motion has not

11  shown Sculptor has violated any applicable law.

12          Rather, National, without a shred of evidence, and

13  without even a reasonable basis for its beliefs, lobbed in a

14  Hail Mary and tried to mislead the Court with a chart showing

15  that Sculptor traded in 2012 and 2014 bonds during times

16  Sculptor had or might have had confidential information.  That

17  chart is in National's motion.

18          (Sound played.)

19          MR. WILSON:  It was based on incomplete data, and

20  National filled in the blanks with its imagination.  We caught

21  them misleading the Court.  We pointed it out in our Response,

22  and now National is extremely defensive about it, as the Court

23  can see from National's Reply Brief.

24          To be clear, Sculptor has done nothing wrong.  It has

25  followed its stringent compliance program, and only traded

1  after a cleansing event occurred in a press article relating

2  the cleansing materials was published by the likes of Reorg

3  Research and other news outlets.

4          In our briefing and the demonstrative chart we

5  provided to the Court for today's hearing, that's at Docket

6  No. 14937, Sculptor explained its trading of all GO bonds, not

7  just the 2012 and 2014 bonds.  There is no equivocation.

8  Sculptor's Response addresses all of its trades.

9          As the chart demonstrates, Sculptor only traded after

10 a cleansing event occurred, and usually days after the

11 cleansing event occurred, including after the announcement of

12 the Amended PSA on February 9th.  We merely highlighted the

13 2012 and 2014 bonds in a second chart in the Response, because

14 that's where National most blatantly mislead the Court with a

15 chart showing Sculptor trading in those bonds, when, in

16 reality, Sculptor was not trading in them at all.

17         In the Reply, National focuses only on trading by

18 others.  They point to nothing Sculptor has even arguably done

19 wrong.  But if the Court decides to indulge National's farce

20 and its blatant attempt to derail the confirmation process,

21 there is no justification for including Sculptor in the

22 investigation.

23         (Sound played.)

24         MR. WILSON:  And we ask the Court to deny National's

25 motion.

1              THE COURT:  Thank you, Mr. Wilson.

2              Next I have Mr. Bienenstock for the Oversight Board

3    for four minutes.

4              MR. BIENENSTOCK:  Good morning, Your Honor.  Martin

5    Bienenstock of Proskauer Rose, LLP, for the Oversight Board.

6              THE COURT:  Good morning.

7              MR. BIENENSTOCK:  I have a few points.  I'll try to

8    make them very quickly.

9              Number one, out of respect for the members of

10   Congress who sent the letter to the New York Attorney General

11   asking for investigation, and out of an overall concern for

12   the integrity of the process, the Board fully supports the

13   reference by these Congressional members to the New York

14   Attorney General of this matter to decide if it even warrants

15   an investigation, and if it does, a full investigation, and

16   even prosecution if that's warranted.

17             Second, the Resident Commissioner of Puerto Rico,

18   Jenniffer Gonzalez, referred this same matter to the SEC last

19   week.  Third, the Board, through my firm and my partner,

20   Hadassa Waxman, is referring this to the Department of

21   Justice -- the United States Department of Justice.  Each of

22   these entities can both investigate and prosecute if that's

23   warranted.

24             And more specific -- I want to highlight that

25   National's emphasis that it wants an investigator who cannot

1  prosecute, it is highly suggestive that they want someone who

2  will think of hypothetical possibilities, create a gray area

3  with no resolution.

4       Number two, we have never filed a proposed plan that

5  would discharge one creditor's claim against another, or any

6  type of insider trading claims, and the Board doesn't intend

7  to do that.  So this is really outside of the confirmation

8  process.  The dots are not connected.  Only the Board can

9  propose a plan.

10      To the extent that there was insider trading by

11 bondholders, their good faith is irrelevant to whether the

12 Board is proposing a plan in good faith.  And as the Court

13 mentioned up front, if the settlements of the different

14 issuances of bonds are unfair, everyone can go and prove that

15 at the confirmation hearing.

16      (Sound played.)

17      MR. BIENENSTOCK:  The notion that the expense should

18 not be an issue because so much has been spent on the case in

19 general, I'll actually address more about this in connection

20 with the next motion, but suffice it to say this investigation

21 would be total expense, whereas the expense consumed in the

22 cases has generated multiples of value for the Commonwealth

23 and other creditors.  And I'll explain that later.

24      Additionally, we must realize that there's certainly

25 a plausible possibility that what Mr. Kirpalani and the other

1    creditors' representatives have said is totally correct.   And

2    the people trying to be constructive to come up with a

3    consensual plan of adjustment should not be unfairly made

4    targets with virtually no evidence.

5            And I've actually pointed out how some of the

6    evidence is wrong.   They connect dots suggesting trading

7    during a period when, in fact, the creditors are representing

8    they only traded before and after.

9            And, finally, National can't resist, it seems,

10   harking back to its contention that the Oversight Board in

11   COFINA was conflicted and could not do its job so it needed

12   independent representatives.   As National should and does

13   know, we did that because we thought it was good for the

14   process.   But in that very same stipulation, we reserved the

15   right to impose the settlement, and in actuality, when the

16   Commonwealth representative, the Statutory Creditors

17   Committee, backed out of the deal at the end, we did impose

18   it.

19           So there was no conflict or inability --

20           (Sound played.)

21           MR. BIENENSTOCK:   -- of the Board to act as National

22   is contending.

23           Thank you, Your Honor.

24           THE COURT:   Thank you, Mr. Bienenstock.

25           And now we will return to National's counsel for

1    rebuttal.  I have a total of 12 minutes allocated.

2         MR. KASOWITZ:  Thank you, Your Honor.  Marc Kasowitz

3    for National.

4         Your Honor, it seems as if we've hit a bit of a nerve

5    here.  We laid out in our papers, and in the presentation, and

6    in the argument this morning, that there's been massive

7    trading during the period of time covered by the mediation in

8    the bonds that were subject to the mediation, and that those

9    facts gave rise in a number of different places, including in

10   Congress, before our -- before our -- before we made any

11   motion, and amongst the other parties to this proceeding to

12   request for further information.

13        We made the suggestion in our motion that in order to

14   assure the integrity of this process, the entire mediation and

15   the bankruptcy proceeding, that it would be appropriate to

16   have -- and helpful to have an investigation by an independent

17   party done efficiently and quickly in order to resolve any

18   potential suspicions.  The response of the various hedge fund

19   groups are as -- are as follows, and are not -- and are not

20   valid.

21        LCDC chooses to attack National and National's role

22   on the island, and with respect to this bankruptcy, claiming

23   somehow that the role that it's performed is inappropriate.  I

24   don't understand what the potential -- what the possible basis

25   for that can be.  National's been a long-term partner of the

1   Commonwealth.  It has guaranteed billions of dollars of bonds

2   for the Commonwealth.  It has made payment on those bonds when

3   the guarantees were triggered and the like.  So any kind of

4   claim that LCDC makes to try to distract from what National's

5   necessary and vital role for the Commonwealth has been, is

6   really -- is really baseless.

7            And LCDC also argues that all of -- that all of their

8   trading was fine, but relies on, or necessarily relies on

9   certain unrestricted trading periods and certain purportedly

10  cleansing materials in order to support that.  In order to do

11  that, as we have made clear in our papers, all of the -- all

12  of the arguments that LCDC and others have made here, where

13  they say that there have been cleansing materials which have

14  permitted whatever trading that they have decided to do, we've

15  raised the question, properly so, that those cleansing

16  materials have not, in fact, been cleansing, and that there

17  are questions about whether or not what was really discussed,

18  what was really negotiated during the mediation sessions had

19  been properly disclosed in such a way that would protect --

20  that would protect the trading that followed.

21           The reality here is that there has been a cloud

22  that's been created by enormous trading during a settlement

23  period, a confidential mediation period, in the very bonds,

24  the values and treatment of which are being discussed in the

25  mediation.  And in fact, there's been a run-up in the price of

1   those bonds prior to the time that the Amended PSA was

2   announced.

3          That causes suspicions.  It's caused suspicions in

4   Congress.  It's caused suspicions by others.  And we have

5   properly, and in a straight forward, and, frankly, in a

6   restrained way, raised the issue that the entire process and

7   mediation would benefit from an independent investigation now

8   rather than waiting until the confirmation time.  And that

9   suggestion, which, if LCDC, Sculptor, QTCB and others had no

10  issue with it, had no concern about the bona fides of their

11  trading, they would have welcomed, if the issues are as cut

12  and dry as they argue that they are here.

13         Now, QTCB, during the course of its argument, said

14  something that I actually thought was sort of nothing that any

15  other party here has taken a position about.  I thought that

16  counsel made the argument, and I'll be corrected if I'm wrong,

17  that it was okay to trade on confidential information, that

18  the Mediation Order and the confidentiality provisions didn't

19  prohibit that trading.  I can't imagine that that is a

20  principle that the Court would endorse.

21         So, you know, from National's point of view, and

22  notwithstanding the efforts by the various hedge fund groups

23  to try to either distract from the matter at hand, or to try

24  to claim that they are being unfairly attacked, which was not

25  National's intention here, our view is that an investigation

1    done promptly and conducted efficiently would remove the taint

2    that publicly exists with respect to the massive trading that

3    has gone on in bonds which have been discussed during the

4    course of the -- during the course of the mediation.  That

5    that is a necessary and important step to happen here.

6          As to the question of -- as to the point that the Ad

7    Hoc Group of Constitutional Debtholders made to the effect

8    that such an investigation would set an unwelcome precedent

9    for the future, I don't believe, we don't believe, and

10    National doesn't believe that that's the case.  This trading

11    has been unusually large, in a concentrated period of time,

12    and under circumstances in which debt that had been viewed at

13    one point prior to the mediation as not having very much

14    value, increased tremendously in the market to have the same

15    value as the early vintage debt.

16          So we think that there are unique facts here

17    concerning the trading during the pendency of the mediation

18    that necessitate the attention of a -- of a fast and

19    appropriate mechanism and process to remove any taints.

20          Thank you, Your Honor.

21          THE COURT:  Thank you, Mr. Kasowitz.

22          Did counsel for QTCB want to come back in and clarify

23    anything, or is there anyone else who wants to say anything?

24    I'll wait 30 seconds for people to announce their names.

25          MR. MAYR:  Yes, Your Honor.  You've got Kurt Mayr

1    here for the QTCB Noteholders Group.

2              THE COURT:  Yes, Mr. Mayr.

3              MR. MAYR:  I would like to address the comment, but I

4    would also pause to let others indicate their interest.

5              THE COURT:  Well, I will let you speak, and then I

6    will pause for others.

7              MR. MAYR:  Okay.  I'm not sure how counsel for

8    National came up with the comments that he made.  I don't

9    think anything that I said indicated that it was okay for

10   people to trade while in possession of confidential, nonpublic

11   information.  And to the extent that anything I said could

12   have been construed that way, that is not what I intended.

13             THE COURT:  Thank you.

14             Does anyone else wish to be heard further on this

15   motion?  I'll wait 30 seconds.

16             MR. ARRASTIA:  Yes, Your Honor.  This is John

17   Arrastia on behalf of the Committee.

18             THE COURT:  Mr. Arrastia, please proceed.

19             MR. ARRASTIA:  Yes.  Very briefly, Your Honor.

20             The only concern that I would point out for the

21   Court's consideration is if there is a referral to an

22   investigative authority such as the Securities and Exchange

23   Commission, or the Department of Justice, then the Court loses

24   control over those proceedings.

25             And if we do proceed toward confirmation, and, for

1    example, hypothetically, there's a confirmation in 2021, but

2    then there is, again, hypothetically, a criminal or civil -- a

3    finding of criminal or civil liability for improper conduct

4    that comes out in 2022 or 2023, then what we're going to have

5    is questions that will come up after the fact.  And as I'm

6    sure the Court is aware, once a referral is made, the Court

7    has less impact and control over its ability to control the

8    process.

9         Thank you.

10        THE COURT:  Well, if there really is wrongdoing in

11   the market, A, I can't prevent regulatory or prosecutorial

12   agency activity, and, B, even if I had an investigation that

13   did or did not find impropriety, there's always the risk that

14   there might be found some impropriety in the markets, so how

15   is this proposed investigation an effective prophylactic

16   against the possibility that you just framed?

17        MR. ARRASTIA:  Well, I think that -- thank you for

18   the question, Your Honor.  I think it appears to be really two

19   related but different issues.  And I think that an

20   investigative authority does have certain responsibilities to

21   the marketplace, but I would respectfully suggest that in

22   PROMESA, there's a separate -- a separate concern, which is

23   the integrity of the process and making sure that we proceed

24   through this and through confirmation in the appropriate

25   manner that reflects the fairness, the equity, and the good

1   faith that's required of the process.

2           So I think there's two slightly different issues that

3   do have overlap.  But, for example, the Securities and

4   Exchange Commission's controlled about the -- concerned about

5   the markets, and whether something happened in the markets,

6   whereas -- and the Court may not have that as an issue before

7   it, but it does have PROMESA, which is slightly different.

8   And I think that there are two slightly different issues, and

9   I think that there's two slightly different considerations,

10  and they don't overlap entirely.

11          I hope that answers the Court's question.

12          THE COURT:  Thank you.  I hear your response.

13          Is there anyone else who wishes to be heard briefly?

14  I'm going to wait the 30 seconds now.

15          (No response.)

16          THE COURT:  All right.  The 30 seconds are up.  And I

17  am ready to rule on this motion.  I thank counsel for their

18  submissions and for their fulsome arguments this morning,

19  which were very helpful to the Court.

20          Before the Court is the motion of National Public

21  Finance Guarantee Corporation for entry of an order directing

22  an independent investigation, Docket Entry No. 14450 in Case

23  No. 17-3283, which I'll refer to as the Motion.

24          Through the Motion, National Public Finance Guarantee

25  Corporation, which I'll refer to as National, seeks entry of

1    an order directing an independent investigation by the United

2    States Trustee or "another independent entity" into whether

3    certain participants in the Title III mediation process in

4    2019 and 2020 violated this Court's orders governing mediation

5    confidentiality, including whether those parties traded in

6    securities while in possession of confidential information

7    about or obtained during mediation.

8         The Court has jurisdiction of this contested matter

9    pursuant to Section 306(a) of PROMESA.  The Court has

10   considered carefully all of the parties' submissions in

11   connection with the Motion.

12        For the following reasons, the Motion is denied.  The

13   Court reserves the right to make non-substantive changes and

14   corrections in any transcription of this oral decision.

15        Neither PROMESA nor any provision of the Bankruptcy

16   Code that is incorporated into Title III explicitly authorizes

17   this Court to initiate an independent investigation along the

18   lines of the investigation sought by National.  There is,

19   similarly, no statutory or other authority granting the Court

20   the power to direct the United States Trustee, which is part

21   of the United States Department of Justice, to conduct such an

22   investigation.

23        In fact, Congress excluded from PROMESA both Section

24   1104(c) of the Bankruptcy Code, which provides for the

25   appointment of an examiner to investigate "allegations of

1   fraud, dishonesty, incompetence, misconduct, mismanagement or

2   irregularity in the management of the affairs of the debtor,"

3   and Section 307 of the Bankruptcy Code, which authorizes the

4   United States Trustee to "appear and be heard on any issue."

5           Against this statutory backdrop, National relies on

6   Section 105 of the Bankruptcy Code, which is made applicable

7   in these Title III cases by Section 301(a) of PROMESA as the

8   principal legal basis for its motion.  Section 105(a) provides

9   that the Court, "may issue any order, process, or judgment

10  that is necessary or appropriate to carry out the provisions

11  of" the Bankruptcy Code, and since it's incorporated into

12  PROMESA, that would be with respect to PROMESA as well.

13          The Court's equitable power under Section 105(a) is

14  not unlimited, however.  As the First Circuit has held,

15  Section 105(a) may be invoked, "only if and to the extent that

16  the equitable remedy dispensed by the Court is necessary to

17  preserve an identifiable right conferred elsewhere in the

18  Bankruptcy Code."  I am quoting from *In re: Jamo*, 283 F.3d

19  392, at 403, a First Circuit decision from 2002, and I omitted

20  citations.

21          Here, as noted, Congress did not incorporate into

22  PROMESA the Bankruptcy Code provision allowing for the

23  appointment of an examiner, and National has identified no

24  other right under the Bankruptcy Code that it seeks to

25  preserve through its motion.

1            The Court concludes that Section 105(a) is, at best,

2    a weak source for authority to take a particular action that

3    Congress has expressly denied the Court authority to take,

4    especially one involving an entity, the United States Trustee,

5    whose role in these Title III proceedings is limited.

6            To the extent that the Court does, in fact, have the

7    power under Section 105(a) of the Bankruptcy Code to order an

8    investigation into the allegations here, the Court declines to

9    exercise any such discretionary authority to do so.  National

10   has not proffered evidence sufficient to support a reasonable

11   inference that any participant in the Title III mediation

12   process has traded on inside information to the detriment of

13   counterparties or the market, much less to the detriment of

14   the Title III and mediation processes.

15           The charges advanced in connection with the Motion

16   are sensational and largely speculative, particularly insofar

17   as they purport to show a problem undermining the integrity of

18   these proceedings, as opposed to possible misconduct in the

19   securities market.  With respect to the latter concern, the

20   Court has no relative advantage over prosecutorial and

21   regulatory bodies when it comes to initiating an investigation

22   into National's allegations, and it is not appropriate to

23   burden the Commonwealth's already challenged resources to

24   bankroll a speculative venture because certain creditors want

25   to have more ammunition for potential challenges to an

1    eventual plan and its proponents.

2         If National develops information that would support a

3    colorable challenge to the voting or economic position of an

4    entity identified in National's motion, or any other party in

5    interest, National will have ample opportunity to commence

6    specific motion practice in connection with proceedings

7    concerning the Plan.  For these reasons, National's motion is

8    denied.

9         For similar reasons, the Court declines the Official

10   Committee of Unsecured Creditors' offer of its investigatory

11   services, which are expensive and would be cast into shadow by

12   its own strategic priorities.

13        To be clear, the Court takes seriously all

14   allegations of improprieties, including those at issue here,

15   and is deeply concerned that all of the proceedings in the

16   Title III cases and the mediation be fair and appropriate, and

17   be seen as fair and appropriate.  In this instance, however,

18   law enforcement and/or regulatory agencies are better suited

19   to investigate the existence of any misconduct and its impact

20   on transaction counterparties and bond markets than the Court

21   is.

22        The Court will, therefore, focus its deployment of

23   the limited judicial and debtor resources on moving these

24   cases forward toward the confirmation or rejection of proposed

25   plans of adjustment and litigation in that context.  The

1   motion is denied, and the Court will enter an order reflecting

2   this decision.

3           We will now take a break until 11:20, and then I will

4   hear argument on the PSA motion.  All participants must

5   disconnect from the Court Solutions lines and call back in

6   time to resume at 11:20.

7           Thank you very much.  I look forward to resuming

8   shortly.

9           (At 11:06 AM, recess taken.)

10          (At 11:31 AM, proceedings reconvened.)

11          THE COURT:  This is Judge Swain speaking.

12          MS. NG:  Yes, Judge.  It's Lisa.

13          THE COURT:  Very good.  Again, good morning,

14  everyone.  We are now ready to turn to the PSA Creditors'

15  motion to impose deadlines for plan of adjustment, which is

16  Docket Entry No. 14478 in Case No. 17-3283.

17          I note before we begin the arguments that, despite

18  the press reports, I have not yet made a formal ruling on this

19  motion.  I shared what I shared earlier about my inclinations,

20  which are fairly strong, in order to afford the parties notice

21  of what I am thinking and what I'd particularly like to hear

22  about in connection with the arguments.

23          We have 60 minutes in total allocated for the

24  arguments.  And first up is counsel for the LCDC,

25  Mr. Kirpalani, for ten minutes.

1          MR. KIRPALANI:   Thank you, Your Honor.   Susheel

2     Kirpalani of Quinn, Emanuel, Urquhart & Sullivan on behalf of

3     the Lawful Constitutional Debt Coalition.

4          Judge, we are obviously one of the movants in the

5     joint motion of the PSA Creditors seeking to impose

6     plan-related deadlines on the Oversight Board in this historic

7     case.   I think Your Honor knows we were one of the original

8     anchor tenants of the initial PSA, and we are an anchor tenant

9     of the last Plan of Adjustment filed by the Board.   And we

10    have been working very hard since the inception of this

11    coalition to find a viable path forward for the Commonwealth

12    of Puerto Rico.

13         I'm not going to go through a lot of the arguments

14    that are already set forth in the papers in light of Your

15    Honor's ruling this morning.   And I was hoping perhaps

16    instead, if I could focus my remarks on Your Honor's

17    inclinations that were announced at the outset.   I just think

18    it's a better use of Your Honor's time.

19         Judge, we've been working with Mr. Bienenstock and

20    Mr. Rosen, as well as their investment bankers and their

21    municipal bankers at Citibank for years.   The Court knows very

22    well that we have been -- and including some of the members of

23    the LCDC who were participants in the COFINA Title III case,

24    and the reason I reference it is two-fold.   First, the

25    Oversight Board is very proud, as it should be, as should

1   AAFAF be, of the historic restructuring of 18 billion dollars

2   of sales tax bonds that shaved six billion of them off and

3   saved the Commonwealth and the people of Puerto Rico hundreds

4   and hundreds of millions of dollars of bond repayments.

5           And that structure, despite still being unrated, is

6   doing very well, and I think it's one of the true gems and

7   success stories of the case.  And while they say that success

8   has many parents, the truth of the matter is, Judge, that the

9   COFINA deal happened.  It happened in the timetable that

10  occurred because of this Court, not because of any of us.  It

11  was the Court.

12          And I actually went back and looked at this in

13  preparing for today's argument.  The Court had issued an

14  Order.  It was in the nature of a stipulation, but it had the

15  force of a Court order.  It was a so-ordered stipulation.  And

16  that Order had not just the agents being delegated authority,

17  but it had deadlines.  The deadlines were really tight right

18  at the outset of these historic cases.

19          And then the twin hurricanes occurred and the

20  deadlines were pushed out a little, but there were still

21  deadlines, because I think the Court knew, and all the

22  participants knew, that deadlines make progress.  And that's

23  what we're asking for here.

24          We didn't -- we apologize if the motion appeared

25  Draconian, but perhaps that may be because Your Honor doesn't

1  realize just how close the parties remain on the overall

2  restructuring terms.  I'm not going to go into anything in

3  mediation, of course, but the PSA has not been terminated.

4  Two proposals were disclosed publicly.  The gap between those

5  proposals is really not insurmountable.  And rather than have

6  a deadline imposed on a mere term sheet, Your Honor, these

7  term sheets, which Mr. Rosen and I have worked on together for

8  many years, have gotten so detailed that they are, for all

9  intents and purposes, an entire plan.

10        And the Oversight Board already has a plan.  Even if

11  it changes -- let's say the Oversight Board says, I'm not

12  going to go with what's in the PSA, we're going to go and do

13  something else.  Whatever they do, they have all of the

14  frameworks, definitions, et cetera, laid out in a plan and a

15  disclosure statement.  It won't take them three and a half

16  months to put a term sheet together.

17        And what I would urge, Your Honor, is that -- to look

18  back at the COFINA stipulation that had actually a 45-day

19  deadline.  After the agents reached an agreement on a

20  compromise, the Oversight Board was compelled to file a full

21  plan, not a term sheet for a plan, a full plan within 45 days.

22  So they complied with that, and we got COFINA restructured and

23  out of bankruptcy.

24        And so here, Your Honor, the two things I'd like the

25  Court to consider is if February 10th is what Your Honor

1   thinks is an appropriate period of time for the Oversight

2   Board to -- frankly, to fish or cut bait on the PSA that no

3   one yet has terminated, despite many missed milestones, but if

4   that's the period of time that the Court believes is prudent

5   and appropriate, you know, we are not going to disagree with

6   the Court's judgment on that.

7       What we would ask you to reconsider, however, is that

8   it shouldn't be a deadline for a term sheet.  A term sheet is

9   really not to an operative document.  It doesn't advance the

10  case at all.  And they -- the Oversight Board has all the

11  tools it needs to file a new plan.

12      And I would imagine that Mr. Rosen and

13  Mr. Bienenstock could easily provide a plan to the Court.

14  They even noted in their pleadings that they're working on

15  something right now and they will be in a position to file it.

16  So having -- and I think they were referring to something

17  earlier than February.  But having a deadline in place is

18  important because of the discipline that we believe the case

19  so sorely needs, but it really should be a deadline that is

20  for an actual legal, binding document, like a plan, not a term

21  sheet.

22      And so if the Court thinks February 10th is

23  appropriate, that should be the deadline for the Oversight

24  Board to file a plan and disclosure statement, together with

25  proposed moving forward dates.  Because the other point to

1    make here, Your Honor, is that filing a plan, even a plan

2    itself, doesn't really advance the case.  We've had one on

3    file for eight months.  Not being critical about all the

4    things that have happened, we have to take notice of them.

5    It's affecting life all over the world.  But having the

6    additional deadlines, when do people get to see a disclosure

7    statement that's been approved by the Court?  When do people

8    get to vote on that, up or down?  And when does Your Honor get

9    to decide up or down, whether it meets the requirements of

10   PROMESA?  Those subsequent deadlines are, frankly, even more

11   important than the first deadline.

12          So if the Court could consider our timetable and

13   adjust it, we would greatly appreciate that, Your Honor.  And

14   other than that, I'm here to answer questions.  Like I said,

15   I've kind of thrown away my entire script, because I think the

16   Court correctly concluded, you have jurisdiction.  We're not

17   attacking the fiscal plan.  There's no need for me to go into

18   that.

19          THE COURT:  Well, I thank you for your adaptability

20   and for those remarks.  I don't have questions for you.  At

21   this point, I'd like to hear from other speakers, and so I

22   will turn to Mr. Stancil for the Ad Hoc GO bondholders.

23          MR. STANCIL:  Good morning, Your Honor.  Mark Stancil

24   for Willkie Farr for the Ad Hoc GO Group.

25          I don't have a lot to add to Mr. Kirpalani.  We

1    would, likewise, support that proposed modification to Your

2    Honor's indication, I would say, you expressed earlier today.

3    I think I would just add one more reason that I think is

4    mentioned in our motion, but I think it would be very helpful

5    in expediting the process generally and clarifying the path

6    forward to make that a plan and disclosure statement deadline

7    instead.  And that is, as Your Honor is aware, there is -- and

8    we find this in the footnotes of our filings -- there is a

9    question as to whether we would need to seek some sort of

10   enforcement remedy under the PSA, and a term sheet might leave

11   us with a little bit of disconnect perhaps between whether

12   whatever the Board is proposing in the way of a term sheet is,

13   in fact, consistent with the PSA, or not something permitted

14   by the PSA existing.

15        And so I think it will just help everybody's

16   discussions and evaluation if we're doing an apples-to-apples

17   comparison of what I would say is the current PSA and

18   whatever -- the current plan, pardon me, and whatever may come

19   out of this process.  So we support Mr. Kirpalani's proposed

20   modification, and I think, you know, this will help everybody

21   communicate more effectively and hopefully more consensually.

22        THE COURT:  Thank you, Mr. Stancil.

23        I will now turn to Mr. Palmore for the Constitutional

24   Debtholders Group.

25        MR. PALMORE:  Thank you, Judge Swain.  Joseph Palmore

1   of Morrison & Foerster for the Ad Hoc Group of Constitutional

2   Debtholders.

3          Our group is not a frequent visitor to the podium in

4   this case.  Our decision to join this motion and appear here

5   today shows how critical we believe this matter is, and that

6   it's critical that these Title III proceedings be put on a

7   path to completion.

8          We appreciate the Court's indication that it is

9   inclined to impose a deadline, but I would associate myself

10  with the remarks of Mr. Kirpalani and Mr. Stancil, that we

11  believe that the deadline should be for the filing of a plan

12  and a disclosure statement.

13         Term sheets, we assume that by a term sheet, the

14  Court would mean something that was sufficiently detailed that

15  parties, all parties could understand what was being proposed.

16  And I would submit that the delta between a meaningful term

17  sheet and an actual plan and disclosure statement is not

18  significant enough to forebear from making this deadline for

19  the filing of a plan and a disclosure statement.

20         That's a legally operative document.  And then with

21  meaningful deadlines behind it, we think that would be the

22  best course to take us on the path toward completing these

23  proceedings.

24         If the Court has no other questions, I'll yield the

25  balance of my time.

1              THE COURT:  Thank you, Mr. Palmore.

2              I'll turn now to Mr. Mayr.

3              MR. WILLETT:  Good morning, Your Honor.  It's Sabin

4    Willett, actually, from Morgan Lewis.  I'm handling this one

5    for the QTCB Group.

6              THE COURT:  Hello, Mr. Willett.

7              MR. WILLETT:  Good morning.  I don't have much to add

8    either.

9              Mr. Kirpalani explained that deadlines are a really

10   handy tool in a lawyer's toolbox, and they help us explain to

11   our clients why we need to focus on this problem today and not

12   later.  The question, I guess, that's left is what sort of

13   deadline, for a term sheet or a plan.

14             And I think you've heard everything I might say about

15   why a plan deadline will be more practical here.  The only

16   point I'd emphasize is that I think everything you've heard

17   from us will apply just as equally to Mr. Bienenstock.  And I

18   have no doubt that he will pursue vigorously and in good

19   faith, but he has a client, too.  So if you arm both his side

20   and the creditors' side with that tool, we will be able to all

21   move the case much more promptly.

22             Thank you, Your Honor.

23             THE COURT:  Thank you, Mr. Willett.

24             And so next up is the Oversight Board, by

25   Mr. Bienenstock, on my list at least.  Remember you have to

1    unmute both your computer and your phone.

2          Mr. Bienenstock?  I can't hear you yet.  I'm hearing

3    somebody.

4          MR. BIENENSTOCK:  I'm sorry.  Can you hear me now,

5    Your Honor?

6          THE COURT:  I can hear you now.  Thank you.

7          MR. BIENENSTOCK:  Okay.  Thank you.  Martin

8    Bienenstock of Proskauer Rose, LLP, for the Oversight Board,

9    as the Commonwealth's Title III representative.

10         Your Honor, first, thank you for letting us know

11   about your preliminary thoughts on this motion at the outset

12   of the hearing today, because it enabled us to contact our

13   client.  So let me first address that, and then some of the

14   issues raised by the creditors orally, and one or two in their

15   papers.

16         As far as the February 10 deadline, the Oversight

17   Board can definitely file a proposed term sheet by February

18   10, 2021, and perhaps significantly earlier than that.   The

19   term sheet would be based on the current certified Fiscal

20   Plan.

21         If it turns out that, due to the change in membership

22   of the Oversight Board, or other factors, that a new fiscal

23   plan is required, then the new fiscal plan would be unlikely

24   to be certified before April or May, which would make it

25   highly impracticable, if not impossible, to file a term sheet

1  before the new certified -- the new fiscal plan is certified.

2  And if that happened, we would obviously -- if that situation

3  is arising, we would obviously come to the Court and explain

4  the situation.

5        In respect of the -- I think the sole issue that's

6  really been raised by the creditors this morning is they would

7  prefer to have a full plan and disclosure statement rather

8  than a term sheet.  I would first say that is doable for the

9  reasons that Mr. Kirpalani gave.  But having said that, that's

10  probably not -- should not or we would prefer that not to be

11  part of the order for the following reason:  If it turns out

12  that we bury the terms of the existing proposed plan and do

13  not have constituencies signed on to the revision, then when

14  we file the term sheet or plan disclosure statement, we would

15  be asking the Court for time to further negotiate to see if

16  support can be -- can be obtained.  And then it would

17  obviously require some tweaks to whatever we file, and then it

18  would make most sense efficiently to then do the new plan and

19  proposed disclosure statement.

20        If we already have support when we file a revised

21  proposed plan, then it would make perfect sense to file the

22  actual documents, as opposed to the term sheet, but we don't

23  know now which situation we're going to have.  So we'd like to

24  have the flexibility to do what makes most sense at the time.

25        In terms of some of the comments in the creditors'

1   papers, the one point I'd like to make, because I think in --

2   as Your Honor can tell, the GO Creditors making this motion

3   and the Board have a lot of commonality in that each side, for

4   some of the same and maybe some different reasons, wants to

5   get on with this and wants to get the debt restructuring done

6   to enable Puerto Rico to regain market access.  From the

7   Board's point of view, and obviously from the creditors' point

8   of view, it's better -- time is money, and we get that.

9         And where we differed from the Draconian consequences

10  -- and let me just make clear that nowhere in our papers did

11  we ever suggest the Court did not have the power to give us a

12  deadline, failing which the Court would dismiss the case.

13  It's that we concluded the same as the Court, that that would

14  be a fairly Draconian remedy that would not benefit the people

15  of Puerto Rico, to say the least.  And so we were objecting to

16  the remedy, not the Court's power.

17        Our views on the Court's power over the Fiscal Plan

18  are well-known, and I don't have to get into that.  But the

19  other theme in many of the creditors' pleadings is that

20  there's been no progress.  And I think any of the creditors

21  would -- and these are highly sophisticated investors,

22  probably the best in the world.  If they were presented with

23  an investment where they could get five to ten times their

24  money in a few years, they would all be delighted, because

25  that's not the average rate of return.

1          So while they -- they refer to 650 or 800 million

2    dollars as the cost of these cases, and I know it always makes

3    a good newspaper headline, you know, what the professionals

4    are being paid, you know, the Board, AAFAF, the committees, et

5    cetera, when one sits down and says, well, let's see what's

6    been accomplished, the Commonwealth had obligations of what

7    the ERS Bondholders said to the First Circuit were in excess

8    of two billion -- I think they even said five billion, but

9    it's two to three billion -- to take money to pay to those

10   bondholders if they were going to pay pensions.  And the

11   Commonwealth, subject to a certiorari request that's pending,

12   the Commonwealth has been relieved, because of the Board's

13   efforts, of that two to three billion dollars.

14          From the GO Creditors point of view, it's in process,

15   but based on the Court's ruling that the monolines hadn't made

16   a colorable case that they had claims against the clawback

17   revenues at the Commonwealth level, with HTA due to receive

18   roughly five billion of that, and PRIFA about another two

19   billion, and CCDA half a billion plus, that's another seven

20   and a half billion dollar savings that is money that is

21   available to the Commonwealth and debt service that would

22   otherwise not be available.

23          The Commonwealth's litigation so that municipalities

24   would pay for their own retirees, saving over 200 million a

25   year, you know, over a period of five years, that's a billion

1    or more.  So add it all up.  And for the price of 650 or 800

2    million dollars, the Commonwealth, and particularly the GO

3    Creditors, have saved over eight billion.

4         And I say this because I think that most graphically

5    illuminates the fact that this is not a case where there has

6    been no progress.  It was kind of Mr. Kirpalani to point to

7    COFINA, and then there was GDB, and then there was all the

8    savings in the Fiscal Plan that the Board has accomplished,

9    and the structural reforms it has both partially accomplished

10   and partially needs to enforce going forward, but great

11   progress has been made that you can identify in hard numbers.

12        And I don't think any -- as I said, any of the hedge

13   fund creditors typically invest where you get ten to one on

14   your money, or even five to one, or three to one for that

15   matter.  So this is not a situation where this is a draining

16   expense that's not producing value.  It's producing so much

17   value, it offsets the expense by multiples.

18        But that said, I'd like to go back to the fact that

19   we are not far in spirit at all from where the creditors are

20   coming from.  We want to get on with the restructuring.  As I

21   said, we may well file a term sheet or entire plan before

22   February 10.  It's certainly -- if we can, that's what the

23   Board wants to do.  But if we end up filing something without

24   creditor support, then we're probably going -- almost

25   certainly going to be asking the Court to defer the -- what

1    will definitely be, you know, a litigation explosion on

2    confirmation in terms of discovery, et cetera, notwithstanding

3    everything that's gone before, while we see if we can convert

4    whatever we file into something that has creditor support, if

5    we don't start out with that.

6         And unless the Court has questions, those are the

7    only remarks I think are relevant anymore, given the Court's

8    suggestion.

9         THE COURT:   Thank you.  Before you sign off, I want

10   to make sure that I understand your scenario.  So it sounds as

11   though you would be comfortable with my saying, there must be

12   a term sheet at a minimum, and preferably an amended plan and

13   disclosure statement, no later than February 10th, 2021.   If

14   you file it as a term sheet, it will likely be because you

15   haven't garnered your critical mass of support yet.

16        As I said before, when I gave the heads-up this

17   morning, I said that in addition to the term sheet, I would

18   require you to file a specific proposed schedule for getting

19   to disclosure statement consideration and any associated

20   discovery or litigation solicitation confirmation proceedings.

21   So in the scenario where you say you have the Board's proposal

22   without the critical mass of support and, therefore, you

23   haven't filed a full amended plan and disclosure statement,

24   would you then anticipate that your proposed schedule would

25   include some sort of specific period during which you seek to

1  garner that support, and at the end of which you must file the

2  proposed plan and disclosure statement no matter what, and

3  then the remainder of the litigation schedule?

4          (Sound played.)

5          MR. BIENENSTOCK:  With one -- Your Honor, with one

6  caveat, I think the answer is yes, although the words, the

7  phrase "no matter what" are a little bit scary, but --

8          THE COURT:  We have to move --

9          MR. BIENENSTOCK:  But the caveat is this, as I

10 mentioned:  If the Board determines it has to change the

11 Fiscal Plan and so that any term sheet based on the existing

12 one would potentially be moot or ineffective, then I would

13 propose that we simply come and tell the Court that and what

14 the situation is.

15         What I've said already is it would likely be that a

16 new fiscal plan could be done by April or May.  But whatever

17 it is, we'd like some sort of provision where we can tell the

18 Court, so that if it just doesn't make sense to do it by

19 February 10, if we already know that we have to change things,

20 we could explain the situation to the Court and make a

21 recommendation as to what makes most sense in those

22 circumstances.

23         THE COURT:  So you wouldn't anticipate saying this is

24 a term sheet reflecting the plan as we would propose to put it

25 forward; it would require changes in the Fiscal Plan; that

74

1    process will take X period of time; therefore, here's our

2    timetable that includes revision of the Fiscal Plan, and then

3    the Plan and Disclosure Statement, so on and so forth?  Why

4    can't you tell me that?

5          (Sound played.)

6          MR. BIENENSTOCK:  Well, I just want to make sure,

7    Your Honor, I understand.  If we're going to change the Fiscal

8    Plan, we may not know -- like, for instance, if in December or

9    January we knew that the membership of the Board has changed

10   and the new membership wants a new fiscal plan, we won't know

11   necessarily what the new debt sustainability is going to be

12   until that plan is done.  So it would be difficult to file a

13   term sheet.

14         Now, I suppose it's possible that we would know where

15   we're heading, but that will depend on the thoughts of the new

16   Board members that we can't today predict.  So what I'm saying

17   is we're fine filing a term sheet or a plan by February 10

18   based on the existing fiscal plan, and providing, as the Court

19   mentioned, a proposed schedule for further negotiations, if

20   necessary, discovery, disclosure statement hearing, et cetera,

21   voting, et cetera.  But if we have to change the fiscal plan

22   and we don't know what those changes are going to be in

23   advance, then I'm saying we'd like the opportunity just to

24   tell the Court that's the situation we're in, and we'll need

25   until April or May until we know what the -- what the terms of

1    that plan could be.

2           THE COURT:  Thank you.  That's clearer for me.

3           I think what I would be inclined to do is two things:

4    First of all, even with the February 10th proposal, I would

5    still expect the periodic status reports, including the

6    December 4th status report that you had proposed to file, so

7    that we're not in a complete black box between now and

8    February.  My inclination would be to have a schedule that

9    requires the filing by February 10th.  And maybe that's a

10    schedule that requires, at a minimum, a term sheet, though

11    preferably a plan and disclosure statement with a proposed

12    schedule.

13           And so that means that if you don't believe that you

14    can make that deadline because of the need for a change in the

15    Fiscal Plan, you would have to, in a status report or by

16    motion, which probably would make more sense, ask for an

17    alteration of that schedule for the specific reason that the

18    new Board wants to revisit or needs to revisit the Fiscal

19    Plan, and tell me the specific changes that you would want to

20    make in my timetable.

21           I would rather not have a timetable order that has

22    if-then statements that might be triggered on less than the

23    full clarity that we might be able to get as to the reasoning

24    for it under a structure that would require a specific request

25    for an alteration in the schedule.  I hope that makes some

1    sense.

2              MR. BIENENSTOCK:  Yes.  Your Honor -- Your Honor?

3              THE COURT:  Yes.  Yes.

4              MR. BIENENSTOCK:  Oh, I don't know if Your Honor

5    heard it, but there was a voice that I heard that came out of

6    the blue.  But anyway, I did hear what Your Honor said, and

7    that all seems workable from the Board's point of view.

8              THE COURT:  Thank you, Mr. Bienenstock.  And I hope

9    the disembodied voice doesn't interfere too much.

10             Okay.  Now I will turn to Mr. Friedman for AAFAF.

11             MR. FRIEDMAN:  Good morning, Your Honor.  It's Peter

12   Friedman from O'Melveny & Myers on behalf of AAFAF.

13             I think, largely, I have the same view as

14   Mr. Bienenstock.  Overall, I do want to note that, as we did

15   in our papers, cataloged, the last four years cannot be

16   properly characterized in stasis.  There's been a lot of

17   success, been a lot of obviously spectacular challenges, both

18   natural -- there have been some, you know, obviously,

19   frustrations, but there has been a lot of progress overall.

20             Mr. Kirpalani talked about COFINA, and I think that

21   one of the important lessons about COFINA in terms of going

22   forward on any time line, but especially one that is

23   expedited, is that the government and all parts of the Puerto

24   Rico Government, from the executive branch to the legislative

25   branch, were on board and able to do the things that have made

1    COFINA a highly successful credit, one that, as Mr. Kirpalani

2    points out, isn't rated but is a par -- really is a par

3    security.

4         And there was legislation.  There was the stand-up of

5    a new entity with -- you know, and there was a lot of

6    cooperation, in part because the government's needs were met

7    in that case.  Congress provided confirmation protections, the

8    good faith requirements of the Plan, wrote designation,

9    equitable subordination rights. And so what -- however things

10   move forward, it's going to be critical for AAFAF and the next

11   Puerto Rico Government to be involved.

12        And obviously, as we mentioned in our status report,

13   AAFAF is extremely committed, at the direction of the Governor

14   and AAFAF's leadership, to being cooperative with whomever

15   emerges as the winner next week.  There will be a new

16   governor.  We don't know who it is, but AAFAF is already

17   preparing for a transition, as are other branches of the

18   government.

19        Given that -- the deadline the Court has imposed,

20   we'll obviously have a substantial amount of work to do even

21   before the next governor is inaugurated on January 1st, to

22   make sure that that governor and his administration is

23   prepared to be able to work with the Board and stakeholders in

24   order to be in a position either to, you know, be on board

25   with the Plan, or if it's not, to be prepared to, you know,

1   make clear what its needs would be in order to have -- to be

2   able to support a plan.

3        You know, that plan, I think as we highlighted in our

4   papers, whatever it is may not be something that creditors all

5   want.  I think we cataloged some of the overly optimistic

6   assessments that creditors may be making about cash on hand,

7   or the SSI decision, or the effect and immediacy of FEMA aid

8   and what effect those might have.  So the government may

9   continue to have concerns about the projections or projected

10  uses of funds.  We'll obviously continue to communicate those

11  to the Board and creditors, but overall -- and I guess the

12  last point I'd make, Your Honor, is that we do think that some

13  flexibility is necessary, along the lines that Mr. Bienenstock

14  pointed out, not only are there going to be some new Board

15  members, there will be, as you know, a new governor.

16       That governor will have to engage in a fiscal plan

17  process for the first time.  As the Court knows, that's, I

18  think, a highly involved process.  And so if there is some

19  kind of new fiscal plan, we can assume that fiscal plan may

20  take some work from the government's role.  It's a role the

21  government has always taken seriously and put a tremendous

22  amount of effort into, and a tremendous amount of dialogue

23  with the Oversight Board.  And if the Oversight Board is going

24  down the path of a new fiscal plan, the government's -- you

25  know, I know how this government --

```
 1              (Sound played.)

 2              MR. FRIEDMAN:  -- takes its fiscal plan

 3    responsibility, and we assume the next government will take it

 4    equally seriously.

 5              So that's really the sum total of my remarks, Your

 6    Honor, and I appreciate the time to address the Court this

 7    morning.

 8              THE COURT:  Thank you, Mr. Friedman.

 9              Next I have Ms. Miller from Ambac for five minutes.

10              MS. MILLER:  Good morning, Your Honor.  Atara Miller

11    from Milbank on behalf of Ambac.

12              THE COURT:  Good morning.

13              MS. MILLER:  Your Honor, before I -- good morning.

14    Before I address your proposal for resolving potentially this

15    motion, I just want to make one quick point, because a lot has

16    been made by a number of parties, including Mr. Kirpalani and

17    Mr. Bienenstock, about the fact that no party has yet

18    terminated the PSA.  And as Your Honor knows, there is a

19    hundred million dollar breakup fee in the PSA.  But that fee

20    is payable to the creditors if they terminate only if the

21    Oversight Board actually modifies the treatment of the GO

22    bonds in an amended plan.  And hence, the sparring about

23    whether the deadline this Court sets be to file a term sheet

24    or to actually file an amended plan.

25              And Mr. Bienenstock's sort of spar back was, we'll go
```

1   forward and file something, but you won't be happy with it,

2   because it's going to be based on the current Fiscal Plan.

3   And we've already seen the Oversight Board's proposal and term

4   sheet under the current Fiscal Plan.  So this motion, as much

5   as anything, is really about forcing the Oversight Board to

6   either move forward with this sweetheart deal for the PSA

7   Creditors, or to come clean and formally modify the GO bond

8   treatment, allowing the PSA Creditors to terminate, line their

9   pockets with a hundred million dollars of the Commonwealth's

10   money, and then go back to the table and negotiate a new deal.

11        Your Honor, as we've said often, we think that the

12   best path forward for Puerto Rico is through a consensual

13   deal.  And we urge the Oversight Board, as Your Honor

14   suggested in your opening remarks of this hearing, to

15   constructively engage during this time with all creditors in

16   an effort to arrive at such an arrangement.  And we urge the

17   Oversight Board and its new members to use the opportunity

18   that this time would allow to critically review its Fiscal

19   Plan, as Mr. Bienenstock suggested.  Some of the new members

20   of the Oversight Board might want the reasonableness of the

21   assumptions and projections, including based on actual

22   performance, the Commonwealth's cash position, to audit the

23   pension claims and then reengage with all creditors to build

24   consensus.

25        And Mr. Kirpalani, in his remarks, credited this

1    Court and the deadlines that Your Honor set for the success

2    and speed of the COFINA deal, which we certainly believe and

3    agree had an important role to play.  But another key

4    component, which is one that Mr. Friedman alluded to, was the

5    ability to build consensus.  Having everybody, all interested

6    stakeholders around the table, including the Oversight Board

7    and the favored creditors, deciding that it was better to

8    compromise to reach a largely consensual deal that could then

9    move expeditiously to confirmation.

10        And the deadlines that Mr. Kirpalani referred to both

11   this morning and included in their motions are only viable in

12   a world like COFINA, where there's a plan supported by all

13   major creditors.  If we don't have that, we're going to end up

14   in the world that Mr. Bienenstock referenced, which is -- I

15   think he described it as an explosion of litigation leading up

16   to confirmation.

17        That is going to be a very long, painful, and

18   expensive process for Puerto Rico, and one that will leave it

19   reputationally battered and hard pressed to regain access to

20   the capital markets, including, in particular, through revenue

21   bonds, which often provide the most cost effective means of

22   raising capital for municipalities.

23        So we agree with --

24        (Sound played.)

25        MS. MILLER:  -- Your Honor.  I think you said there

1  has to be a time that -- the time is now.  And that we all

2  start moving forward, and we hope that we can do it

3  constructively and consensually, to put Puerto Rico back on

4  its feet for now and well into the future.

5          Unless Your Honor has any questions, thank you.

6          THE COURT:  I don't at this point.  Thank you,

7  Ms. Miller.

8          Next on my list is Mr. Despins for the UCC for five

9  minutes.

10         MR. DESPINS:  Good afternoon, Your Honor.  Luc

11  Despins with Paul Hastings on behalf of the Committee.  I'll

12  be, I think, shorter than five minutes.

13         Obviously the Committee supports the denial of the

14  motion.  As to the other aspects that are being discussed, you

15  know, the Committee is obviously in favor of, you know, the

16  engagement by creditors in negotiations, but as we pointed out

17  in our Response, you know, we have practically not been

18  involved since January.  And then we were involved just to be

19  told of the result of the negotiations.

20         And now we see in the term sheets that are now public

21  that the Board and the creditors have agreed that -- as a

22  grand total of 50, 5-0, million dollars, that will be

23  available to Unsecured Creditors, which is, you know -- so

24  it's difficult to see how this is going to play out, meaning

25  that's the only thing that they've actually agreed on, that we

1   would get 50 million dollars.

2        Of course, we were never involved in those

3   discussions.  And so are we going to be involved in the

4   renegotiation of that point, or that's already a fait

5   accompli?  Don't know.

6        In that regard, I would note that both the Board and

7   Bondholders judiciously avoided any -- addressing the

8   questions that we raised as to who knew what and when, when

9   the Court was considering our two motions.  And, in fact, the

10  Bondholders in their pleading, Docket No. 14666, actually

11  confirmed that there were no negotiations going on at the time

12  of the September -- sub 16th, or something like that, hearing.

13       So, you know, the bottom line is we're happy to

14  engage in constructive negotiations, but we are a little bit

15  concerned that this may not happen unless the Court directs

16  specifically that this happens with respect to the Committee.

17       Thank you, Your Honor.

18       THE COURT:  Thank you.

19       Now for the ERS bondholders.  Mr. Rosenblum, for two

20  minutes.

21       MR. ROSENBLUM:  Good afternoon, Your Honor.  Benjamin

22  Rosenblum from Jones Day on behalf of the ERS Bondholder

23  Group.

24       We are in favor of moving these cases forward.

25  However, we don't support the current plan, and we don't

1    support that moving forward.  As with others, we are very much

2    in support of a more consensual and implicit process here.  I

3    want to emphasize that nobody had talked to the ERS

4    Bondholders about a plan on the merits for well over a year,

5    and we would appreciate having those conversations.

6         Briefly, with respect to some of Mr. Bienenstock's

7    remarks, we take issue with the boasting or positive spin

8    about the litigation that the debtors have initiated against

9    various of the creditors, including the ERS Bondholders.  I

10   also disagree with the characterization or suggestion that

11   litigation has somehow led to the resolution of the ERS

12   Bondholders' claims, or whether that focus on litigation has

13   actually led to the advancement of these cases.

14        As evidenced by the numerous adversary cases

15   commenced by the debtors against the ERS Bondholders and

16   others, there clearly is no resolution of our claims against

17   either the Commonwealth or ERS.  I'm encouraged by Your

18   Honor's opening remarks encouraging parties to engage in good

19   faith negotiations.  And I just want to express that the ERS

20   Bondholders hope that we get an opportunity to be part of

21   those discussions.

22        Thank you, Your Honor.

23        THE COURT:  Thank you, Mr. Rosenblum.

24        And before we go back to Mr. Kirpalani, I'd ask

25   Mr. Bienenstock whether he wishes to respond to any of the

1    concerns that have been expressed regarding broader

2    collaboration in negotiations toward the Amended Plan, which

3    is, as others have noted, something that I expect.

4            So, Mr. Bienenstock, did you wish to say anything

5    further?

6            MR. BIENENSTOCK:  Sure.  Your Honor, Martin

7    Bienenstock of Proskauer Rose, LLP, for the Oversight Board as

8    Title III representative for the Commonwealth.  And thank you,

9    Your Honor, for giving me the opportunity.  So I'll keep --

10   I'll keep the privilege very short.

11           As a general matter, the Oversight Board, of course,

12   wants to maximize agreement to the plan from all

13   constituencies.  Hypothetically, if a constituency basically

14   lets it be known that it's really not willing to discuss

15   anything that's any distance, any measurable distance from

16   payment in full, we know that that's a waste of time.  So

17   constituencies that fall into that category, you know, we just

18   know, and we assume the mediators know, but whether they do or

19   not -- that's not anyone's useful allocation of time.  But to

20   the extent that reasonable discussions can be had, of course

21   we want to have them with all possible constituencies.  And

22   we've had them with Retirees, with Unions, with PBA Creditors,

23   and with different tranches of the GO Creditors.

24           Now, I know, for instance, that the General Creditors

25   Committee, it's one of the parties this morning that, you

1    know, basically is requesting a seat at the table, not as if,

2    you know, we don't -- we haven't spoken to them, and lines of

3    communication are always open.  But, as Your Honor knows,

4    they're also the ones who are currently asking the First

5    Circuit to expedite their appeal of their -- the timing of

6    their ability to attack the GO priority.

7            Now, we are all, I guess, experienced enough,

8    sophisticated enough, and have a large enough sense of humor

9    to know that we can talk to one another even if simultaneously

10   one of the parties is taking a position in the Court that

11   would torch all the other arrangements that we've made.

12   But -- so while yes, we do -- we will -- I can commit to this:

13   We will at least touch base with all the major constituencies

14   who have spoken up, and if there's any even modest likelihood

15   of reaching an arrangement, we will pursue it.

16           To the extent it becomes clear, and sometimes it

17   becomes clear very fast, that there's -- there can be no

18   meeting of the minds because there's just too big a distance,

19   you know, I can't say that we're going to ask the mediators or

20   some such thing to create a whole big mediation with such

21   parties if we know in advance we're just too far apart.  But

22   we are also -- we all have enough gray hair and experience to

23   know that sometimes the biggest distances and hardest

24   positions, at one point in a case, somehow transform.  And so

25   we're not going to write anyone off.  And we are optimistic

1    and open, but we're also going to be practical.

2           I hope that responds to what Your Honor was asking.

3           THE COURT:  Thank you.  I will just say that I will

4    expect, and will probably say something to this effect in

5    writing, that negotiations during this period are expected to

6    be ones in which the Oversight Board and all relevant

7    stakeholders will act in good faith and responsibly toward the

8    goal of, as I articulated, the goal of a substantially

9    consensual plan.  You can hear that as consensual as possible,

10   as broad support as possible, but that is so terribly

11   important for efficient progress and for progress that

12   redounds to a good result for creditors and for Puerto Rico.

13          So I thank you for your undertaking, Mr. Bienenstock,

14   and for the willingness that other stakeholders here have

15   expressed to work in good faith toward a plan design with

16   broader support.

17          So with that, I return to Mr. Kirpalani.

18          MR. KIRPALANI:  Thank you, Your Honor.

19          So a few reactions, and perhaps a little bit of

20   context.  First, Mr. Bienenstock mentioned that the Oversight

21   Board is changing over or potentially changing over some

22   members, and there may need to be a new opinion on a fiscal

23   plan in, you know, the late first quarter or early second

24   quarter of 2021.

25          The point I wanted to make here, Judge, is that

1    there's a fiscal plan that's done every year.  A fiscal plan

2    is done for a 30-year period of time.  And it's hard to sit

3    and hear statements about a fiscal plan having a dramatic

4    impact on whether a plan of adjustment should go forward or

5    not go forward, because, like I said, it changes every year.

6    Whereas new bonds that are going to be issued go out for

7    decades.

8         And so just because there's a new fiscal plan, it

9    doesn't mean that there would necessarily be a new plan of

10   adjustment.  If that were the case, we would never have

11   finality in the Title III case at all.

12        To give some context, and this is in our papers, it's

13   really important to kind of grasp this, and I don't think

14   anybody has really tried to walk the Court through it.  The

15   COFINA deal also impacts the fiscal plan, right?  But the

16   COFINA deal used up about, I'm using very round numbers, 500

17   million dollars a year.  So of own-source revenues, if you

18   include COFINA assets as part of the own-source revenue, under

19   the 2020 Fiscal Plan that was filed by the Board, there's

20   about 15 billion dollars a year of own-source revenue.

21   Fifteen billion.

22        And under our new PSA, 1.5 billion, again, round

23   numbers, of the 15 billion for 2020, but it's 1.5 billion per

24   year would generally be consumed by COFINA, plus new GO Bonds.

25   That's it.  1.5 billion.

1          And where we are with the Board right now, from the

2     public disclosures, is they brought that number down quite

3     dramatically.  We tried to meet them somewhere in the middle,

4     and we'll see what the Board decides to do in the future.

5          The point of this, though, Your Honor, is that we are

6     talking about roughly nine percent or so of the own-source

7     revenues per year for 30 years that would be dedicated to debt

8     service.  So when Mr. Bienenstock says, well, there may need

9     to be a new fiscal plan that changes the debt sustainability,

10     it just doesn't necessarily add up that way, because 90

11     percent plus of the fiscal plan is used for other things that

12     have nothing to do with debt service.

13          And so while we are here --

14          (Sound played.)

15          MR. KIRPALANI:   -- trying to ask the Title III Court

16     to help us restructure Puerto Rico and get out of bankruptcy,

17     the Board takes the position, we can't debate the Fiscal Plan.

18     Fine.  We've lived with that.  But then they can't say, well,

19     the Fiscal Plan is the reason why we can't actually do the

20     debt restructuring, because it doesn't add up, not legally,

21     and not as a matter of actual math.  So I wanted the Court to

22     understand that.

23          The second thing, Judge, is that I didn't hear

24     Mr. Bienenstock actually disagree that he could file a plan by

25     February 10th.  I think we all know how good the lawyers are

1    at Proskauer.  We've seen the volume of paper and the

2    sophistication of the transactions that they can implement.

3    And as I said earlier, and I think the other PSA Creditors

4    support this as well, whatever plan the Board wants to move

5    forward on should be the plan that they file by that date.

6         They can file the term sheet earlier if the Board

7    believes it's prudent, from a case management perspective, to

8    put a term sheet out, have parties reengage.  We welcome all

9    of it, all of it.  But to have a deadline of February 10th,

10   when it's only October 28th now, to just put a term sheet out,

11   and then perhaps have a plan process begin at that point, we

12   will be just watching the island continue to stockpile cash

13   while GO Bondholders, which have the highest constitutional

14   priority, are left unpaid, and every other current expense of

15   Puerto Rico is paid.

16        Now, we get it.  There are certain things that we can

17   try to push and certain things we can't try to push.  We

18   didn't want to.  We wanted to compromise what our rights are

19   and accept haircuts that would enable pensioners to be treated

20   fairly and essential services to be paid.  But the delay upon

21   delay, without any actual end in sight, is why we felt

22   compelled to file the motion.

23        So I think, Your Honor, the Board should file a term

24   sheet soon, sooner than February 10th, if that's their

25   proposed course of action.  February 10th should be the

```
 1    deadline for a plan and disclosure statement that gets the

 2    ball rolling.  And hopefully, Your Honor, what the Court said,

 3    on May 17th, I think it was, 2017, that, you know, we will see

 4    an end to these cases.  Failure is not an option.  And the

 5    hope that you inspired in all of us will come to fruition in

 6    calendar year 2021.

 7              Thank you, Judge.

 8              (Sound played.)

 9              THE COURT:  Thank you, Mr. Kirpalani.

10              I ask that you all just wait patiently with me for a

11    minute.

12              Thank you for your patience.  I am now going to make

13    my ruling.

14              Before the Court is the Joint Motion of PSA Creditors

15    Pursuant to Section 312 of PROMESA and Section 105 of the

16    Bankruptcy Code to Impose Deadlines for Plan of Adjustment,

17    which is Docket Entry No. 14478 in Case No. 17-3283.  This

18    motion was filed by the Ad Hoc Group of Constitutional

19    Debtholders, the Ad Hoc Group of General Obligation

20    Bondholders, the Lawful Constitutional Debt Coalition, and the

21    QTCB Noteholder Group, which I'll refer to collectively as the

22    PSA Creditors, or Movants.

23              The motion is the subject of several objections by

24    the Oversight Board, AAFAF, National, Ambac, and the UCC, as

25    well as a statement by the ERS Bondholders, and the Movants
```

1    have filed a Reply.  The Court has considered carefully the

2    parties' submissions and the arguments made on the record

3    today.  Again, the Court appreciates the parties reorienting

4    their remarks to address specifically the Court's preannounced

5    inclination as to the ruling.

6          The Court has jurisdiction of this motion under

7    Section 306(a) of PROMESA.  The Court now makes its oral

8    ruling as to the motion, and reserves the right to make

9    non-substantive corrections in the transcript of the ruling.

10         The motion is denied in part and granted in part for

11   the following reasons:  The parties don't dispute the Court's

12   authority to impose deadlines, but only the propriety of

13   imposing those requested by the PSA Creditors, together with a

14   predetermined sanction of dismissing the Title III case if

15   such aggressive deadlines are not met.  At issue then is a

16   prudential dispute rather than a legal one.

17         Section 312(b) of PROMESA clearly provides that "if

18   the Oversight Board does not file a plan of adjustment with

19   the petition, the Oversight Board shall file a plan of

20   adjustment at the time set by the court."  Moreover, Section

21   105(a) of the Bankruptcy Code, as incorporated by Section

22   301(a) of PROMESA, supplements the Court's inherent authority

23   to manage its docket and courtroom in an efficient manner by

24   recognizing the Court's authority to issue any order that is

25   necessary or appropriate to carry out the provisions of

1 | PROMESA.

2 |     While the Court is not persuaded that the specific

3 | relief requested by the moving creditors is appropriate, the

4 | Court does find that a near term deadline for a definitive

5 | action with respect to the contours of an amended plan

6 | proposal is necessary and should help to focus the existing

7 | members of the Board, new political leaders, and new members

8 | of the Board on the need to work with each other and with

9 | creditors to find a path to a realistic exit from Title III.

10 |     While it is certainly true that progress has been

11 | made in the more than three years that these cases have been

12 | pending, despite an extraordinary confluence of natural

13 | disasters and political upheaval, there probably will never be

14 | a time when the unexpected can't be expected to occur, and a

15 | confirmable plan, preferably a substantially consensual one,

16 | is necessary for Puerto Rico and its instrumentalities to

17 | truly move forward as contemplated by PROMESA.

18 |     The Court agrees with the objectors that the

19 | deadlines sought by Movants are unrealistically harsh, and

20 | Movants have indicated that they will not push back on the

21 | Court's inclination to make the first critical deadline one

22 | that is early in 2021.  The Court finds that that is

23 | appropriate given the ongoing pandemic issues, the changes in

24 | Oversight Board membership, and Puerto Rico's elections and

25 | their aftermath.

1          So, the specific relief that was requested is denied,

2    but the Court is nevertheless persuaded that successful work,

3    including meaningful negotiations, may be facilitated by

4    imposing a deadline for the Oversight Board to produce a

5    substantial product early in 2021.  Logically, the power to

6    impose a deadline for filing a plan of adjustment also

7    empowers the Court to set deadlines relating to plan

8    amendments.  Moreover, Section 105, and the Court's inherent

9    authority provide ample grounds for the Court to require the

10   Oversight Board, which must leave this process and stake out

11   the territory for a confirmable plan of adjustment, consensual

12   or otherwise, to formulate and disclose the material terms

13   upon which it intends to proceed, and to disclose the material

14   terms or a formal plan amendment.

15         Therefore, the Court is Ordering the Oversight Board

16   to file, by February 10th, 2021, at a minimum, an informative

17   motion comprising a term sheet disclosing the material,

18   economic and structural features of an amended plan of

19   adjustment that the Oversight Board intends to propose for

20   confirmation, and preferably, a formal, proposed amended plan

21   and disclosure statement, together with a proposed timetable

22   for the remaining events through confirmation, including, if

23   necessary, formal plan and proposed disclosure statement, and

24   certainly including discovery and litigation in connection

25   with the proposal, solicitation, voting and confirmation

1    proceedings.

2         If the Board does not file a formal, proposed amended

3    plan and disclosure statement on or before February 10th, the

4    timetable must be a very tight timetable to a formal proposed

5    plan of adjustment and then the subsequent events.  In

6    developing the amended plan of adjustment, the Oversight Board

7    and other relevant stakeholders are encouraged to negotiate

8    responsibly and in good faith.  Failure to comply with the

9    February 10th, 2021, deadline may result in the consideration

10   of more stringent measures.

11        The Court does recognize that there may be some

12   motion practice in relation to some of these requirements, and

13   that will be taken up on its merits, if necessary, in terms of

14   any requested changes to the timing.  Of course, nothing in

15   this Order precludes the Oversight Board from filing a formal

16   amended plan of adjustment prior to the deadline.  At a

17   minimum, the Board has to disclose the basic material elements

18   of the proposal and a specific timetable.

19        The disclosure required by this Order is in addition

20   to periodic reports pursuant to the Order Regarding Status

21   Report of Financial Oversight and Management Board for Puerto

22   Rico Regarding COVID-19 Pandemic and Proposed Disclosure

23   Statement Schedule.  That Order is at ECF No. 14679.

24        In its most recent such status report filed at ECF

25   No. 14923, the Oversight Board has proposed to file a further

1  status report by December 4th, 2020, and so the next status

2  report shall be filed on or before that date.

3       Accordingly, the Joint Motion of PSA Creditors

4  Pursuant to Section 312 of PROMESA and Section 105 of the

5  Bankruptcy Code to Impose Deadlines For Plan of Adjustment,

6  Docket Entry No. 14478, is granted to the extent that the

7  Oversight Board is required to develop and disclose the

8  contours of its proposed amended plan, and propose a schedule

9  for the path to confirmation as outlined in these remarks, and

10  is denied in all other respects.  And the Court will enter an

11  order promptly embodying this ruling.

12       Thank you all for your arguments, for your

13  submissions, and again, for your pivot to address the Court's

14  specific concerns and proposals.  Are there any other matters

15  that anyone wants to address today?  I will wait 30 seconds

16  for anyone to speak who wants to be heard.

17       (No response.)

18       THE COURT:  Very well.  This concludes the hearing

19  Agenda for today.  Tomorrow's telephonic hearing concerning

20  Omnibus Claim Objections will begin at 9:30 AM Atlantic

21  Standard Time.

22       As always, I thank the court staff in Puerto Rico,

23  Boston and New York for their work in preparing for and

24  conducting today's hearing, and for their outstanding ongoing

25  support of the administration of these very complex cases.

1          Stay safe and keep well, everyone.  We are adjourned.

2          (At 12:39 PM, proceedings concluded.)

3                              *     *     *

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1 ‖ U.S. DISTRICT COURT     )
 2 ‖ DISTRICT OF PUERTO RICO)
 3 ‖
 4 ‖     I certify that this transcript consisting of 98 pages is
 5 ‖ a true and accurate transcription to the best of my ability of
 6 ‖ the proceedings in this case before the Honorable United
 7 ‖ States District Court Judge Laura Taylor Swain, and the
 8 ‖ Honorable United States Magistrate Judge Judith Gail Dein on
 9 ‖ October 28, 2020.
10 ‖
11 ‖
12 ‖
13 ‖ S/ Amy Walker
14 ‖ Amy Walker, CSR 3799
15 ‖ Official Court Reporter
16 ‖
17 ‖
18 ‖
19 ‖
20 ‖
21 ‖
22 ‖
23 ‖
24 ‖
25 ‖
```

< Dates >
"may 55:9
August 2019 13:18
December 4th 75:6
December 4th, 2020
  96:1
February 10 67:16,
  71:22, 73:19,
  74:17
February 10, 2021
  67:17
February 18, 2020
  13:11
February 2020 13:4,
  13:19, 25:3, 28:17
February 21st, 2021
  37:19
February 9th 43:12
January 1st 77:21
January 2019 13:20
July 2019 12:25,
  24:25
June 2020 13:20
May 17th 91:3
October 2019 28:17
October 26, 2020 7:9
October 28, 2020
  1:16, 4:2, 98:9
October 28th 90:10
September 2019 13:10
September 27, 2019
  22:20


< 1 >
1.5 88:22, 88:23,
  88:25
105 19:15, 37:2,
  37:24, 55:6,
  91:15, 94:8, 96:4
105(a 55:8, 55:13,
  55:15, 56:1, 56:7,
  92:21
10th 11:1, 61:25,
  62:22, 72:13,
  75:4, 75:9, 89:25,
  90:9, 90:24,
  90:25, 94:16,
  95:3, 95:9
110 13:12

1104(c 54:24
11:06 58:9
11:20 58:3
11:20. 58:6
11:31 58:10
12 13:17, 47:1
12:39 97:2
12:50 7:23
14450 11:24, 53:22
14478 58:16, 91:17,
  96:6
14666 83:10
14679. 95:23
14923 95:25
14930 7:10
14937 43:6
14949 8:5
14958 8:5
15 12:1, 88:20,
  88:23
16th 83:12
17-3283 5:3, 7:11,
  53:23
17-3283. 8:6, 11:24,
  58:16, 91:17
17-BK-3283(LTS 1:6
18 60:1


< 2 >
200 70:24
2002 55:19
2012 13:14, 42:15,
  43:7, 43:13
2014 13:3, 13:11,
  13:17, 22:16,
  42:15, 43:7, 43:13
2017 91:3
2019 12:19, 22:6,
  22:7, 22:16, 23:6,
  24:14, 24:21,
  27:14, 27:19,
  27:24, 27:25,
  29:17, 33:11,
  33:12, 37:9,
  37:10, 40:19, 54:4
2019. 27:5
2020 23:1, 54:4,
  88:19, 88:23
2021 11:1, 52:1,

94:16, 95:9
2021. 72:13, 87:24,
  91:6, 93:22, 94:5
2022 52:4
2023 52:4
22 23:4
283 55:18
2:10 7:25


< 3 >
30 10:4, 10:7,
  50:24, 51:15,
  53:14, 53:16,
  89:7, 96:15
30-year 88:2
300 13:6
301(a 55:7, 92:22
306(a 54:9, 92:7
307 20:11, 20:20,
  55:3
312 91:15, 96:4
312(b 92:17
35 22:22
354 23:3
3799 98:14
392 55:19
3: 1:6


< 4 >
40 13:15
403 55:19
44 23:10
45 61:21
45-day 61:18


< 5 >
5 13:22
5-0 82:22
50 13:3, 82:22, 83:1
500 88:16
53 13:23
5:00. 7:25


< 6 >
60 11:25, 13:19,
  25:5, 26:14, 58:23

621 23:8
650 70:1, 71:1

< 7 >
7.7 13:23

< 8 >
80 13:15
800 70:1, 71:1

< 9 >
90 89:10
91 23:8
98 98:4
9:30 7:23, 96:20
9:37 4:3

< A >
A. 2:11, 2:22
AAFAF 8:2, 8:6,
    8:17, 8:18, 8:21,
    60:1, 70:4, 76:10,
    76:12, 77:10,
    77:13, 77:14,
    77:16, 91:24
ability 35:15, 52:7,
    81:5, 86:6, 98:5
able 26:19, 38:22,
    38:25, 66:20,
    75:23, 76:25,
    77:23, 78:2
abound 38:3
above 37:12
absolutely 17:14,
    35:5, 40:15
abuse 41:13
accept 90:19
accepted 21:9
access 69:6, 81:19
accessing 6:2
accompanied 11:12,
    29:12
accompli 83:5
accomplished 70:6,
    71:8, 71:9
Accordingly 96:3

accurate 7:2, 98:5
accused 41:11
accusing 40:3
acknowledging 40:24
act 46:21, 87:7
action 56:2, 90:25,
    93:5
active 29:4
actively 12:12
activity 52:12
actual 26:1, 29:22,
    62:20, 65:17,
    68:22, 80:21,
    89:21, 90:21
actuality 46:15
actually 9:5, 27:17,
    32:5, 35:22,
    37:18, 40:22,
    45:19, 46:5,
    49:14, 60:12,
    61:18, 66:4,
    79:21, 79:24,
    82:25, 83:10,
    84:13, 89:19,
    89:24
Ad 2:33, 2:37, 13:2,
    23:2, 32:1, 32:5,
    33:21, 34:11,
    39:13, 50:6,
    63:22, 63:24,
    65:1, 91:18, 91:19
Adam 2:6
adaptability 63:19
add 8:22, 63:25,
    64:3, 66:7, 71:1,
    89:10, 89:20
adding 9:24
addition 8:9, 8:18,
    33:14, 72:17,
    95:19
additional 8:12,
    39:21, 63:6
Additionally 45:24
address 6:17, 21:22,
    32:11, 32:18,
    45:19, 51:3,
    67:13, 79:6,
    79:14, 92:4,
    96:13, 96:15
addressed 18:21

addresses 43:8
addressing 83:7
adjourned 97:1
adjust 63:13
Adjustment 10:20,
    22:20, 46:3,
    57:25, 58:15,
    59:9, 88:4, 88:10,
    91:16, 92:18,
    92:20, 94:6,
    94:11, 94:19,
    95:5, 95:6, 95:16,
    96:5
Administered 1:11
administration 11:9,
    77:22, 96:25
admit 17:20, 17:25
adopts 26:15
advance 7:3, 8:4,
    62:9, 63:2, 74:23,
    86:21
advanced 19:8, 56:15
advancement 84:13
advantage 15:13,
    56:20
adversary 84:14
Advisory 1:39
advocates 33:7
affairs 55:2
affect 38:18, 38:19
affected 5:16, 5:17
affecting 63:5
afford 58:20
aftermath 93:25
afternoon 82:10,
    83:21
agencies 57:18
Agency 1:38, 52:12
Agenda 6:16, 7:8,
    7:10, 8:1, 11:8,
    96:19
agents 60:16, 61:19
aggressive 92:15
agree 26:20, 35:14,
    38:3, 39:15, 81:3,
    81:23
agreed 25:9, 26:15,
    26:16, 29:3,
    82:21, 82:25
agreeing 14:3

Agreement 18:24,
    18:25, 19:4,
    25:25, 26:12,
    27:6, 28:21, 33:3,
    42:10, 61:19,
    85:12
agrees 93:18
ahead 27:9
aid 78:7
al 1:16, 1:34, 5:5
alert 7:15
allayed 12:22
allegation 37:4,
    40:10
allegations 15:16,
    25:22, 26:8,
    32:14, 39:21,
    54:25, 56:8,
    56:22, 57:14
allege 15:11
alleged 15:7, 19:19
alleges 26:4
allocated 47:1,
    58:23
allocation 7:19,
    85:19
allocations 7:8
allotments 7:7
allotted 7:4, 11:25
allow 80:18
allowing 55:22, 80:8
alluded 81:4
alludes 37:17
almost 23:8, 71:24
alone 38:2
already 20:1, 29:2,
    29:4, 40:12,
    40:19, 56:23,
    59:14, 61:10,
    68:20, 73:15,
    73:19, 77:16,
    80:3, 83:4
alteration 75:17,
    75:25
Although 11:17,
    18:8, 73:6
Ambac 2:14, 79:9,
    79:11, 91:24
amend 10:20
Amended 11:3, 11:7,

11:13, 22:25,
    43:12, 49:1,
    72:12, 72:23,
    79:22, 79:24,
    85:2, 93:5, 94:18,
    94:20, 95:2, 95:6,
    95:16, 96:8
amendment 94:14
amendments 94:8
America 4:23
ammunition 56:25
among 12:14, 15:10,
    18:16, 25:6,
    26:14, 31:2, 41:4
amongst 47:11
amount 17:5, 17:8,
    25:5, 77:20, 78:22
amounts 25:16
ample 57:5, 94:9
Amy 98:13, 98:14
anchor 24:22, 59:8
and/or 57:18
announce 12:4, 50:24
announced 11:19,
    13:1, 13:5, 13:12,
    17:25, 24:21,
    49:2, 59:17
announcement 43:11
announcing 40:25
answer 8:13, 9:1,
    18:8, 30:19,
    63:14, 73:6
answers 53:11
anticipate 72:24,
    73:23
anybody 88:14
anyway 76:6
apart 86:21
apologize 7:2, 60:24
appeal 86:5
appear 55:4, 65:4
APPEARANCES 1:29,
    2:1
appeared 60:24
APPEARING 1:31
appears 10:17,
    14:10, 52:18
apples-to-apples
    64:16
applicable 19:3,

20:11, 42:11, 55:6
applied 20:20
applies 37:9, 37:11
apply 66:17
appointed 21:2
appointment 10:9,
    16:19, 21:9,
    54:25, 55:23
appreciate 63:13,
    65:8, 79:6, 84:5
appreciates 92:3
appropriate 6:21,
    26:9, 35:16,
    47:15, 50:19,
    52:24, 55:10,
    56:22, 57:16,
    57:17, 62:1, 62:5,
    62:23, 92:25,
    93:3, 93:23
approved 63:7
Approximately 13:12,
    25:5
April 67:24, 73:16,
    74:25
area 45:2
arguably 43:18
argue 19:16, 49:12
argues 18:23, 26:1,
    48:7
argument 11:21,
    11:25, 19:8, 47:6,
    49:13, 49:16,
    58:4, 60:13
arguments 7:24,
    10:9, 10:12,
    10:25, 11:19,
    17:17, 17:18,
    32:9, 48:12,
    53:18, 58:17,
    58:22, 58:24,
    59:13, 92:2, 96:12
arising 68:3
arm 66:19
around 40:14, 81:6
arrangement 80:16,
    86:15
arrangements 9:1,
    86:11
ARRASTIA 2:12,
    21:15, 21:17,

22:13, 22:15,
23:16, 23:24,
51:16, 51:17,
51:18, 51:19,
52:17
arrive 80:16
Article 20:16, 43:1
articulated 87:8
aspects 82:14
assertion 26:18
asserts 35:24
assessments 78:6
assets 88:18
assist 23:21
associate 65:9
associated 72:19
assume 65:13, 78:19,
79:3, 85:18
assumptions 80:21
Assurance 2:14,
36:10
assurances 33:20
assure 47:14
assuring 19:21
AT&T 38:14, 38:15,
38:16, 38:21, 39:3
Atara 2:15, 79:10
Atlantic 96:20
attack 35:23, 36:17,
47:21, 86:6
attacked 34:1, 49:24
attacking 63:17
attempt 41:7, 43:20
attention 50:18
attested 33:16
Attorney 44:10,
44:14
audit 80:22
augmented 37:10
austerity 24:11
Authority 1:39,
19:9, 20:8, 20:19,
21:4, 21:5, 32:11,
51:22, 52:20,
54:19, 56:2, 56:3,
56:9, 60:16,
92:12, 92:22,
92:24, 94:9
authorizes 54:16,
55:3

available 7:11, 8:4,
37:17, 70:21,
70:22, 82:23
availing 17:18
average 69:25
avoid 14:20, 17:5
avoided 18:10,
34:10, 83:7
aware 39:24, 52:6,
64:7
away 63:15


< B >
back 7:22, 23:6,
46:10, 50:22,
58:5, 60:12,
61:18, 71:18,
79:25, 80:10,
82:3, 84:24, 93:20
backdrop 55:5
backed 46:17
bad 16:2, 26:22,
26:23
bag 25:15, 25:16
bait 62:2
balance 65:25
ball 91:2
bankers 59:20, 59:21
bankroll 56:24
Bankruptcy 4:25,
5:3, 19:15, 25:11,
30:14, 30:23,
47:15, 47:22,
54:15, 54:24,
55:3, 55:6, 55:11,
55:18, 55:22,
55:24, 56:7,
61:23, 89:16,
91:16, 92:21, 96:5
base 86:13
Based 13:21, 16:12,
22:7, 22:21, 26:8,
41:22, 42:19,
67:19, 70:15,
73:11, 74:18,
80:2, 80:21
baseless 48:6
basic 95:17
basically 85:13,

86:1
basis 15:20, 29:18,
30:12, 39:19,
41:2, 42:5, 42:13,
47:24, 55:8
battered 81:19
became 25:14
becomes 86:16, 86:17
began 13:18
begin 27:17, 27:18,
28:4, 29:17, 35:2,
58:17, 90:11,
96:20
beginning 12:1,
27:21
behalf 21:17, 24:6,
32:1, 41:20,
51:17, 59:2,
76:12, 79:11,
82:11, 83:22
behind 65:21
beliefs 42:13
belies 36:9
believe 10:15,
11:19, 16:21,
19:19, 20:2, 20:4,
20:8, 20:14, 21:4,
50:9, 50:10,
62:18, 65:5,
65:11, 75:13, 81:2
believes 21:19,
62:4, 90:7
benefit 49:7, 69:14
benefits 17:7, 19:21
Benjamin 2:28, 83:21
best 14:10, 26:24,
27:20, 34:10,
56:1, 65:22,
69:22, 80:12, 98:5
better 14:5, 16:18,
16:20, 57:18,
59:18, 69:8, 81:7
beyond 7:4, 37:13
BIAGGI 1:40, 8:20,
9:7
biased 41:25
big 18:1, 86:18,
86:20
bigger 23:7
biggest 86:23

billion 13:23, 60:1,
    60:2, 70:8, 70:9,
    70:13, 70:18,
    70:19, 70:20,
    70:25, 71:3,
    88:20, 88:21,
    88:22, 88:23,
    88:25
billions 48:1
binding 62:20
bit 47:4, 64:11,
    73:7, 83:14, 87:19
black 75:7
blanks 42:20
blatant 36:5, 43:20
blatantly 34:2,
    43:14
blow-outs 15:5
blue 76:6
boasting 84:7
bodies 56:21
bogus 40:20
bona 49:10
bond 13:17, 15:7,
    22:21, 57:20,
    60:4, 80:7
Bondholder 83:22
Bondholders 2:28,
    2:35, 21:21, 24:9,
    25:16, 26:17,
    27:7, 27:8, 27:9,
    27:15, 34:1,
    45:11, 63:22,
    70:7, 70:10, 83:7,
    83:10, 83:19,
    84:4, 84:9, 84:12,
    84:15, 84:20,
    90:13, 91:20,
    91:25
boots 40:15
Boston 96:23
bottom 83:13
bought 36:21
box 75:7
boy 18:1
branch 20:9, 76:24,
    76:25
branches 77:17
breach 19:5
breaches 28:23

break 7:21, 7:24,
    58:3
breaking 7:3
breakup 79:19
Brian 1:35
Brief 29:18, 33:19,
    39:14, 42:7, 42:23
briefing 43:4
Briefly 6:18, 39:20,
    51:19, 53:13, 84:6
briefs 33:20
broad 16:25, 87:10
broader 85:1, 87:16
brought 41:21, 89:2
budget 20:12
Buenos 4:5, 5:8
build 80:23, 81:5
burden 56:23
bury 68:12
business 35:12
businesses 40:3
buttons 8:12
buy 28:13, 40:9
buying 13:24, 30:5,
    30:10, 40:23
buzz 7:16, 7:17
buzzes 7:16, 7:20

< C >
C. 1:40
calendar 91:6
call 4:18, 6:23,
    10:4, 58:5
calling 6:13
Capital 2:25, 13:9,
    14:22, 41:20,
    42:2, 81:20, 81:22
capping 27:8
car 40:7, 40:9
care 41:10
carefully 37:8,
    54:10, 92:1
carry 55:10, 92:25
cases 45:22, 55:7,
    57:16, 57:24,
    60:18, 70:2,
    83:24, 84:13,
    84:14, 91:4,
    93:11, 96:25

cash 78:6, 80:22,
    90:12
cast 57:11
casts 16:14
casual 40:1
casually 40:24
CAT 2:48
cataloged 76:15,
    78:5
category 85:17
caught 42:20
caused 49:3, 49:4
causes 49:3
caveat 73:6, 73:9
CCDA 70:19
certain 12:11,
    16:12, 23:1,
    23:13, 26:7,
    40:23, 48:9,
    52:20, 54:3,
    56:24, 90:16,
    90:17
Certainly 20:11,
    21:4, 23:17,
    42:10, 45:24,
    71:22, 71:25,
    81:2, 93:10, 94:24
certification 29:12
certifications 28:15
certified 28:11,
    29:14, 29:17,
    67:19, 67:24, 68:1
certify 27:1, 98:4
certiorari 70:11
cetera 61:14, 70:5,
    72:2, 74:20, 74:21
challenge 57:3
challenged 56:23
challenges 56:25,
    76:17
challenging 5:13
change 67:21, 73:10,
    73:19, 74:7,
    74:21, 75:14
changed 29:2, 33:11,
    35:9, 74:9
changes 29:18,
    54:13, 61:11,
    73:25, 74:22,
    75:19, 88:5, 89:9,

93:23, 95:14
changing 87:21
characterization
  84:10
characterized 21:20,
  76:16
charges 25:21, 56:15
chart 42:14, 42:17,
  43:4, 43:9, 43:13,
  43:15
cheaper 17:4
check 38:24
children 9:3, 9:5,
  9:14, 9:24
chilling 31:15,
  36:16
chooses 47:21
Circuit 5:21, 5:22,
  55:14, 55:19,
  70:7, 86:5
circumstances 6:20,
  17:3, 50:12, 73:22
citations 55:20
Citibank 59:21
citizens 24:12,
  24:15
civil 52:2, 52:3
Claim 17:13, 17:21,
  17:24, 18:2,
  36:20, 45:5, 48:4,
  49:24, 96:20
claiming 47:22
claims 22:17, 22:21,
  35:21, 40:22,
  45:6, 70:16,
  80:23, 84:12,
  84:16
clarify 16:24, 50:22
clarifying 64:5
clarity 6:15, 75:23
classes 9:18
clawback 25:14,
  27:9, 31:9, 70:16
clean 80:7
cleansed 30:6, 35:20
cleansing 17:23,
  18:9, 18:20,
  35:17, 35:24,
  43:1, 43:2, 43:10,
  43:11, 48:10,

48:13, 48:15,
  48:16
clear 16:7, 16:24,
  25:23, 42:24,
  48:11, 57:13,
  69:10, 78:1,
  86:16, 86:17
clearer 75:2
Clearly 6:21, 10:3,
  24:17, 37:20,
  84:16, 92:17
Clerk 7:12
client 14:7, 40:9,
  41:1, 66:19, 67:13
clients 39:24, 40:1,
  40:2, 40:17, 66:11
cling 41:6
close 61:1
closely 39:24
cloud 16:14, 48:21
Coalition 2:19,
  24:6, 32:10, 59:3,
  59:11, 91:20
Code 19:15, 54:16,
  54:24, 55:3, 55:6,
  55:11, 55:22,
  55:24, 56:7,
  91:16, 92:21, 96:5
Code. 55:18
COFINA 46:11, 59:23,
  60:9, 61:18,
  61:22, 71:7,
  76:20, 76:21,
  77:1, 81:2, 81:12,
  88:15, 88:16,
  88:18, 88:24
coherent 25:23
collaboration 85:2
collectively 91:21
colorable 57:3,
  70:16
comes 52:4, 56:21
comfortable 72:11
coming 71:20
commence 57:5
commenced 84:15
comment 51:3
comments 10:2,
  10:10, 51:8, 68:25
Commission 51:23,

53:4
Commissioner 44:17
commit 86:12
committed 77:13
Committee 2:9, 21:1,
  21:14, 21:18,
  21:19, 22:8,
  22:11, 23:20,
  46:17, 51:17,
  57:10, 82:11,
  82:13, 82:15,
  83:16, 85:25
committees 70:4
common 22:23
commonality 69:3
Commonwealth 1:15,
  1:33, 5:5, 11:8,
  12:13, 14:22,
  15:18, 16:17,
  26:21, 26:22,
  45:22, 46:16,
  48:1, 48:2, 48:5,
  56:23, 59:11,
  60:3, 67:9, 70:6,
  70:11, 70:12,
  70:17, 70:21,
  70:23, 71:2, 80:9,
  80:22, 84:17, 85:8
communicate 64:21,
  78:10
communication 86:3
comparison 64:17
compelled 61:20,
  90:22
complain 19:18
complete 34:6, 75:7
completely 39:16
completing 65:22
completion 65:7
complex 96:25
compliance 19:3,
  28:22, 33:16,
  42:25
complied 37:10,
  37:12, 61:22
comply 23:18, 95:8
component 81:4
comprehensive 8:7,
  33:12
comprising 94:17

compromise 26:15,
    26:20, 29:8,
    61:20, 81:8, 90:18
compromised 24:9,
    29:3
computer 6:3, 9:11,
    12:3, 67:1
concentrated 50:11
concepts 21:23
concern 15:23,
    16:10, 41:8,
    44:11, 49:10,
    51:20, 52:22,
    56:19
concerned 53:4,
    57:15, 83:15
concerning 10:13,
    11:15, 18:13,
    50:17, 57:7, 96:19
concerns 12:22,
    78:9, 85:1, 96:14
conclude 38:9
concluded 14:18,
    63:16, 69:13
concluded. 97:2
concludes 56:1,
    96:18
conclusions 22:9
conclusively 42:3
conduct 20:10,
    26:10, 38:2, 52:3,
    54:21
conducted 19:20,
    28:22, 50:1
conducting 96:24
conference 6:8,
    38:15
conferred 55:17
confidential 12:14,
    12:17, 13:25,
    14:4, 16:13,
    17:19, 18:12,
    19:5, 32:19,
    32:20, 32:22,
    32:25, 35:8,
    36:16, 37:5,
    42:16, 48:23,
    49:17, 51:10, 54:6
Confidentiality
    19:6, 19:12, 21:6,

26:5, 28:23,
    32:16, 32:18,
    37:3, 49:18, 54:5
confirm 17:16, 23:18
confirmable 93:15,
    94:11
confirmation 11:4,
    11:16, 14:15,
    14:21, 15:14,
    15:18, 16:5,
    16:20, 16:25,
    37:14, 43:20,
    45:7, 45:15, 49:8,
    51:25, 52:1,
    52:24, 57:24,
    72:2, 72:20, 77:7,
    81:9, 81:16,
    94:20, 94:22,
    94:25, 96:9
confirmed 83:11
conflates 32:22
conflict 46:19
conflicted 46:11
confluence 93:12
Congress 14:9, 22:1,
    37:8, 37:14,
    37:23, 37:25,
    44:10, 47:10,
    49:4, 54:23,
    55:21, 56:3, 77:7
Congressional 21:25,
    44:13
conjecture 34:1
connect 9:3, 46:6
connected 45:8
connection 4:11,
    10:2, 16:5, 17:15,
    45:19, 54:11,
    56:15, 57:6,
    58:22, 94:24
connectivity 9:23
consensual 46:3,
    80:12, 81:8, 84:2,
    87:9, 93:15, 94:11
consensually 64:21,
    82:3
consensus 80:24,
    81:5
consequence 22:18
consequences 69:9

consider 61:25,
    63:12
consideration 10:11,
    51:21, 72:19, 95:9
considerations
    23:19, 53:9
considered 10:14,
    54:10, 92:1
considering 83:9
consistent 6:7,
    64:13
consisting 98:4
conspiracy 41:5
constituencies
    68:13, 85:13,
    85:17, 85:21,
    86:13
constituency 85:13
constructive 46:2,
    83:14
constructively
    80:15, 82:3
construed 51:12
consumed 45:21,
    88:24
contact 67:12
contained 24:24,
    33:20
contemplated 93:17
contemplates 25:13
contending 46:22
contention 46:10
contested 10:8, 54:8
context 15:14,
    15:17, 57:25,
    87:20, 88:12
continue 5:13, 39:6,
    78:9, 78:10, 90:12
Continued 2:1
continues 41:6
contours 93:5, 96:8
contradicts 33:25
contrary 28:6, 30:1
control 20:12,
    51:24, 52:7
controlled 53:4
conversations 36:3,
    84:5
convert 72:3
cooperation 77:6

cooperative 77:14
cooperatively 11:11
core 24:16
Coronavirus 5:17
Corporation 2:5,
   2:15, 11:23,
   12:10, 32:12,
   53:21, 53:25
correct 46:1
corrected 49:16
corrections 54:14,
   92:9
correctly 63:16
cost 7:11, 17:6,
   17:8, 19:22, 70:2,
   81:21
Counsel 4:12, 5:9,
   8:8, 8:17, 8:18,
   10:1, 10:12, 12:1,
   12:2, 21:14,
   31:21, 34:17,
   35:3, 40:7, 41:17,
   46:25, 49:16,
   50:22, 51:7,
   53:17, 58:24
counsels 33:20
countenance 41:12
counterparties
   56:13, 57:20
couple 27:17
course 6:18, 8:13,
   11:18, 15:2,
   30:19, 49:13,
   50:4, 61:3, 65:22,
   83:2, 85:11,
   85:20, 90:25,
   95:14
Court-ordered 26:6
court. 92:20
courthouse 40:6
COURTROOM 4:19, 5:2,
   92:23
covered 47:7
COVID-19 95:22
crafted 37:8
create 7:2, 37:24,
   45:2, 86:20
created 27:6, 48:22
creates 30:13
credit 77:1

credited 80:25
creditor 27:18,
   27:19, 28:9, 45:5,
   71:24, 72:4
criminal 52:2, 52:3
critical 15:24,
   63:3, 65:5, 65:6,
   72:15, 72:22,
   77:10, 93:21
critically 80:18
criticizing 16:7,
   16:8
CSR 98:14
current 25:12,
   25:14, 64:17,
   64:18, 67:19,
   80:2, 80:4, 83:25,
   90:14
currently 86:4
CUSIP 28:7
cut 49:11, 62:2
cutting 24:10


< D >
D. 2:26
damage 40:12, 40:17
damaging 39:23
dashboard 6:4, 6:6,
   6:22, 32:3
data 42:19
date 23:6, 23:10,
   90:5, 96:2
dates 62:25
Day 83:22
days 13:1, 36:7,
   43:10, 61:21
DE 38:14
deadline 11:1, 61:6,
   61:19, 62:8,
   62:17, 62:19,
   62:23, 63:11,
   64:6, 65:9, 65:11,
   65:18, 66:13,
   66:15, 67:16,
   69:12, 75:14,
   77:19, 79:23,
   90:9, 91:1, 93:4,
   93:21, 94:4, 94:6,
   95:9, 95:16

Deadlines 10:16,
   58:15, 59:6,
   60:17, 60:20,
   60:21, 60:22,
   63:6, 63:10,
   65:21, 66:9, 81:1,
   81:10, 91:16,
   92:12, 92:15,
   93:19, 94:7, 96:5
deal 14:10, 25:6,
   46:17, 60:9, 80:6,
   80:10, 80:13,
   81:2, 81:8, 88:15,
   88:16
dealing 28:8
dealings 21:7
debate 24:11, 89:17
Debt 2:19, 2:31,
   24:6, 25:5, 25:9,
   25:14, 27:4,
   28:13, 32:10,
   50:12, 50:15,
   59:3, 69:5, 70:21,
   74:11, 89:7, 89:9,
   89:12, 89:20,
   91:20
Debtholders 2:39,
   13:3, 23:2, 26:15,
   31:10, 31:22,
   32:1, 32:6, 32:9,
   33:8, 33:9, 33:14,
   33:16, 33:21,
   34:7, 34:12, 50:7,
   64:24, 65:2, 91:19
debtor 55:2, 57:23
Debtors 1:18, 2:11,
   84:8, 84:15
decades 24:16, 88:7
December 74:8
decide 44:14, 63:9
decided 48:14
decides 43:19, 89:4
deciding 81:7
decision 20:16,
   54:14, 55:19,
   58:2, 65:4, 78:7
decisions 24:16
declined 40:22
declines 56:8, 57:9
decrease 41:1

dedicated 89:7
deeply 57:15
defensive 42:22
defer 71:25
definitely 67:17,
  72:1
definitions 61:14
definitive 93:4
Dein 1:25, 4:22,
  98:8
delay 90:20, 90:21
delegated 60:16
delighted 69:24
delta 65:16
demonstrated 42:3
demonstrates 43:9
demonstrative 43:4
denial 82:13
denied 54:12, 56:3,
  57:8, 58:1, 92:10,
  94:1, 96:10
deny 17:18, 34:13,
  41:14, 43:24
Department 9:9,
  20:10, 20:12,
  44:20, 44:21,
  51:23, 54:21
depend 74:15
depending 23:10
deployment 57:22
DEPUTY 4:19, 5:2
derail 43:20
described 9:19,
  81:15
design 87:15
designation 21:10,
  37:15, 77:8
Desperate 26:13
Despins 2:11, 82:8,
  82:10, 82:11
Despite 24:18,
  25:23, 25:24,
  40:18, 58:17,
  60:5, 62:3, 93:12
detail 29:12
detailed 8:7, 35:7,
  61:8, 65:14
details 27:1
deter 22:7
determinations 24:12

determine 12:15,
  15:12
determines 73:10
detour 34:8
detriment 56:12,
  56:13
develop 96:7
developing 95:6
development 5:23,
  11:6
develops 57:2
dial 7:22
dialogue 78:22
dias 4:5, 5:8
dictated 27:25
differed 69:9
difference 25:10
different 17:1,
  20:25, 40:3,
  45:13, 47:9,
  52:19, 53:2, 53:7,
  53:8, 53:9, 69:4,
  85:23
difficult 7:1,
  74:12, 82:24
difficulty 7:5
direct 7:21, 20:7,
  20:9, 54:20
directing 53:21,
  54:1
direction 77:13
directly 36:24
directs 83:15
disagree 19:10,
  62:5, 84:10, 89:24
disagreements 31:12
disagrees 31:8
disallow 22:17,
  22:21
disasters 93:13
discharge 45:5
discipline 62:18
disclaimers 18:2
disclose 26:25,
  94:12, 94:13,
  95:17, 96:7
disclosed 16:4,
  18:20, 23:14,
  28:14, 31:1, 31:3,
  33:9, 33:17, 37:5,

  48:19, 61:4
disclosing 11:2,
  30:7, 32:22, 94:17
Disclosures 12:19,
  13:21, 16:10,
  18:10, 22:6, 22:8,
  33:19, 34:6,
  35:24, 40:19, 89:2
disconnect 7:22,
  40:24, 58:5, 64:11
discount 31:11
discovery 11:14,
  14:20, 17:1, 17:3,
  36:6, 72:2, 72:20,
  74:20, 94:24
discretionary 56:9
discuss 10:25, 85:14
discussed 18:13,
  23:12, 48:17,
  48:24, 50:3, 82:14
discussions 18:16,
  36:6, 36:17,
  64:16, 83:3,
  84:21, 85:20
disembodied 76:9
dishonesty 55:1
disinfectant 26:25
disingenuous 36:10
dismiss 69:12
dismisses 33:19
dismissing 92:14
dispensed 55:16
disproven 39:23,
  40:10
dispute 21:21, 35:5,
  92:11, 92:16
disrupt 41:7
distance 9:3, 9:6,
  9:9, 9:11, 9:12,
  9:24, 85:15, 86:18
distances 86:23
distortion 16:3
distract 48:4, 49:23
District 1:1, 1:3,
  1:23, 1:24, 1:26,
  4:20, 5:21, 98:1,
  98:2, 98:7
doable 68:8
Docket 1:6, 7:10,
  8:5, 11:24, 43:5,

53:22, 58:16,
   83:10, 91:17,
   92:23, 96:6
document 62:9,
   62:20, 65:20
documents 26:1,
   68:22
doing 41:10, 60:6,
   64:16
dollar 70:20, 79:19
dollars 13:3, 13:6,
   13:13, 13:15,
   13:18, 13:19,
   13:23, 23:4, 48:1,
   60:1, 60:4, 70:2,
   70:13, 71:2, 80:9,
   82:22, 83:1,
   88:17, 88:20
done 16:21, 16:23,
   17:4, 17:14,
   17:21, 17:24,
   19:2, 19:24, 22:2,
   29:10, 33:6,
   40:12, 42:24,
   43:18, 47:17,
   50:1, 69:5, 73:16,
   74:12, 88:1, 88:2
dots 45:8, 46:6
doubled 13:14, 23:8
doubt 19:14, 66:18
down 63:8, 63:9,
   70:5, 78:24, 89:2
Draconian 10:18,
   60:25, 69:9, 69:14
dragged 40:18
draining 71:15
dramatic 88:3
dramatically 14:5,
   89:3
driven 41:23
driving 40:7
dry 49:12
due 67:21, 70:17
during 6:13, 6:18,
   6:25, 12:18,
   17:21, 17:22,
   18:1, 27:4, 29:24,
   31:2, 35:4, 35:19,
   36:13, 39:18,
   40:22, 42:15,

46:7, 47:7, 48:18,
   48:22, 49:13,
   50:3, 50:4, 50:17,
   54:7, 72:25,
   80:15, 87:5
duties 35:13

< E >
e-mail 38:13
E. 2:5
earlier 23:6, 58:19,
   62:17, 64:2,
   67:18, 90:3, 90:6
early 13:4, 27:6,
   27:8, 50:15,
   87:23, 93:22, 94:5
earthquakes 5:18
easily 39:22, 62:13
easy 36:11
ECF 95:23, 95:24
economic 11:2,
   27:20, 30:1,
   30:25, 31:6, 33:9,
   57:3, 94:18
economics 16:4
effect 36:16, 50:7,
   78:7, 78:8, 87:4
effective 9:23,
   19:20, 20:3,
   25:15, 52:15,
   81:21
effectively 17:4,
   30:6, 64:21
efficient 14:10,
   20:3, 87:11, 92:23
efficiently 16:21,
   19:20, 47:17,
   50:1, 68:18
effort 78:22, 80:16
efforts 9:2, 49:22,
   70:13
egregious 40:4,
   40:17
eight 63:3, 71:3
either 49:23, 66:8,
   77:24, 80:6, 84:17
elections 93:24
elements 22:23,
   95:17

elsewhere 55:17
Emanuel 24:7, 59:2
embodying 96:11
emerge 30:22
emerges 77:15
emphasis 44:25
emphasize 39:20,
   40:16, 66:16, 84:3
employed 22:7
empowers 94:7
enable 14:21, 69:6,
   90:19
enabled 67:12
encourage 7:13
encouraged 84:17,
   95:7
encouraging 84:18
end 46:17, 71:23,
   73:1, 81:13,
   90:21, 91:4
endorse 49:20
enforce 19:11, 21:5,
   32:14, 71:10
enforcement 57:18,
   64:10
enforcing 32:24
engage 10:19, 12:17,
   35:15, 42:4,
   78:16, 80:15,
   83:14, 84:18
engaged 12:14,
   12:25, 26:7,
   29:11, 33:18
engagement 82:16
enormous 48:22
enough 23:17, 24:24,
   39:19, 65:18,
   86:7, 86:8, 86:22
ensure 5:25, 14:16,
   24:12
ensuring 28:8
enter 58:1, 96:10
entered 24:14
entire 31:13, 47:14,
   49:6, 61:9, 63:15,
   71:21
entirely 53:10
entities 44:22
entity 54:2, 56:4,
   57:4, 77:5

Entry 7:10, 8:5,
  11:24, 53:21,
  53:22, 53:25,
  58:16, 91:17, 96:6
equally 66:17, 79:4
equates 34:3
equitable 23:18,
  37:15, 55:13,
  55:16, 77:9
equity 21:24, 52:25
equivocation 43:7
Eric 38:24, 39:2
ERS 2:28, 70:7,
  83:19, 83:22,
  84:3, 84:9, 84:11,
  84:15, 84:17,
  84:19, 91:25
especially 56:4,
  76:22
Esq 1:40
essential 24:13,
  90:20
essentially 15:19
established 30:17
et 1:16, 1:34, 5:5,
  61:14, 70:4, 72:2,
  74:20, 74:21
ethical 40:4
evaluation 14:16,
  22:10, 23:22,
  64:16
event 43:1, 43:10,
  43:11
events 94:22, 95:5
eventual 57:1
everybody 64:15,
  64:20, 81:5
everyone 6:7, 7:21,
  17:7, 18:4, 39:9,
  45:14, 58:14, 97:1
everything 36:12,
  38:17, 39:9,
  66:14, 66:16, 72:3
evidence 33:5,
  33:24, 41:22,
  42:12, 46:4, 46:6,
  56:10
evidenced 84:14
exactly 12:21,
  17:12, 28:8

examiner 37:22,
  54:25, 55:23
example 7:17, 22:13,
  22:16, 52:1, 53:3
examples 12:24
exceptions 15:11
excess 70:7
Exchange 51:22, 53:4
exchanged 23:12
excluded 54:23
executed 28:20, 29:7
executive 76:24
exercise 56:9
EXHIBITS 3:9
existence 57:19
existing 64:14,
  68:12, 73:11,
  74:18, 93:6
exists 50:2
exit 35:16, 93:9
expansive 36:9
expect 11:5, 75:5,
  85:3, 87:4
expected 87:5, 93:14
expedite 86:5
expedited 76:23
expediting 64:5
expeditiously 81:9
expense 45:17,
  45:21, 71:16,
  71:17, 90:14
expensive 19:17,
  19:18, 57:11,
  81:18
experience 86:22
experienced 86:7
explain 26:18,
  27:22, 45:23,
  66:10, 68:3, 73:20
explained 39:17,
  43:6, 66:9
explanations 18:6
explicit 18:24
explicitly 19:1,
  54:16
explosion 72:1,
  81:15
express 84:19
expressed 64:2,
  85:1, 87:15

expressly 56:3
extent 15:15, 16:9,
  45:10, 51:11,
  55:15, 56:6,
  85:20, 86:16, 96:6
extraordinary 5:23,
  93:12
extremely 42:22,
  77:13
eye 38:17


< F >
F.3d 55:18
face 14:11, 32:15
facilitated 94:3
fact 18:6, 26:13,
  27:19, 34:2,
  40:18, 41:5, 46:7,
  48:16, 48:25,
  52:5, 54:23, 56:6,
  64:13, 71:5,
  71:18, 79:17, 83:9
factors 10:21, 67:22
facts 14:16, 20:25,
  25:22, 29:14,
  29:22, 41:24,
  47:9, 50:16
factual 15:20
failing 69:12
Failure 91:4, 95:8
fair 27:13, 57:16,
  57:17
fairly 58:20, 69:14,
  90:20
fairness 21:24,
  52:25
fait 83:4
faith 11:5, 21:24,
  37:15, 45:11,
  45:12, 53:1,
  66:19, 77:8,
  84:19, 87:7,
  87:15, 95:8
fall 85:17
false 42:1
familiar 18:21,
  26:16
families 5:21, 9:2
far 39:2, 67:16,

71:19, 86:21
farce 43:19
Farr 39:13, 63:24
fashion 23:20
fast 50:18, 86:17
favor 82:15, 83:24
favorable 18:18
favored 81:7
features 94:18
February 11:1,
    22:25, 61:25,
    62:17, 62:22,
    72:13, 75:4, 75:8,
    75:9, 89:25, 90:9,
    90:24, 90:25,
    94:16, 95:3, 95:9
federal 25:2
fee 79:19
feet 82:4
felt 90:21
FEMA 78:7
few 44:7, 69:24,
    87:19
fides 49:10
fiduciary 35:13
Fifteen 88:21
figures 9:16
filed 7:9, 7:10,
    11:24, 27:24,
    33:12, 35:6, 45:4,
    59:9, 72:23,
    88:19, 91:18,
    92:1, 95:24, 96:2
filing 11:13, 35:18,
    63:1, 65:11,
    65:19, 71:23,
    74:17, 75:9, 94:6,
    95:15
filings 64:8
filled 42:20
final 7:20
finality 88:11
finally 15:14,
    37:22, 46:9
Finance 2:4, 11:22,
    12:9, 32:12,
    53:21, 53:24
Financial 1:9, 1:38,
    5:3, 95:21
financially 26:19

find 30:4, 52:13,
    59:11, 64:8, 93:4,
    93:9
finding 52:3
finds 93:22
Fine 18:15, 30:22,
    39:2, 48:8, 74:17,
    89:18
Fir 32:3, 32:4
firm 44:19
firms 39:23, 41:11
First 5:21, 8:1,
    14:15, 15:22,
    16:6, 17:18,
    21:19, 23:25,
    24:8, 35:3, 39:21,
    55:14, 55:19,
    58:24, 59:24,
    63:11, 67:10,
    67:13, 68:8, 70:7,
    75:4, 78:17, 86:4,
    87:20, 87:23,
    93:21
fish 62:2
fit 29:23, 40:19
five 28:12, 34:18,
    69:23, 70:8,
    70:18, 70:25,
    71:14, 79:9, 82:8,
    82:12
five-fold 13:17
five-month 22:24
flawed 34:2
flexibility 68:24,
    78:13
flouted 40:1
focus 11:17, 26:13,
    57:22, 59:16,
    66:11, 84:12, 93:6
focuses 43:17
Foerster 31:25, 65:1
follow 39:25
follow-up 22:5
followed 42:25,
    48:20
following 54:12,
    68:11, 92:11
follows 47:19
footnote 40:25
footnotes 64:8

force 60:15
forcing 80:5
forebear 65:18
foremost 39:21
formal 11:13, 18:16,
    58:18, 94:14,
    94:20, 94:23,
    95:2, 95:4, 95:15
formally 36:1, 80:7
formulate 94:12
forth 7:8, 29:12,
    59:14, 74:3
forthcoming 26:12
forum 41:13
forward 24:10,
    25:19, 49:5,
    57:24, 58:7,
    59:11, 62:25,
    64:6, 71:10,
    73:25, 76:22,
    77:10, 80:1, 80:6,
    80:12, 82:2,
    83:24, 84:1, 88:4,
    88:5, 90:5, 93:17
FOUDY 2:39, 31:22,
    31:23, 31:25,
    34:10, 34:14,
    34:16
found 52:14
foundation 40:5
four 28:19, 28:24,
    29:6, 31:2, 44:3,
    76:15
Fourth 19:16, 29:4
framed 52:16
framework 23:20,
    27:6
frameworks 61:14
frankly 49:5, 62:2,
    63:10
fraud 55:1
frequent 65:3
frequently 38:4
Friedman 1:39,
    76:10, 76:11,
    76:12, 79:2, 79:8,
    81:4
frolic 34:8
front 45:13
fruition 91:5

frustrations 76:19
full 14:17, 30:23,
   44:15, 61:20,
   61:21, 68:7,
   72:23, 75:23,
   85:16
full-blown 35:23
fully 33:9, 39:15,
   44:12
fulsome 33:12, 53:18
function 6:22
functioning 39:4
fund 13:21, 15:18,
   36:21, 47:18,
   49:22, 71:13
fundamental 21:22
funds 12:12, 12:17,
   12:19, 12:23,
   12:25, 13:24,
   14:15, 14:23,
   15:10, 17:11,
   18:4, 18:8, 18:19,
   19:8, 19:16,
   19:17, 19:24,
   26:7, 36:3, 40:9,
   42:2, 78:10
future 30:15, 31:16,
   50:9, 82:4, 89:4


< G >
Gail 1:25, 98:8
Gallagher 39:13
gap 61:4
garner 24:24, 73:1
garnered 25:4, 72:15
gave 47:9, 68:9,
   72:16
GDB 71:7
gems 60:6
General 2:34, 22:16,
   27:9, 44:10,
   44:14, 45:19,
   85:11, 85:24,
   91:19
generally 15:7,
   15:11, 64:5, 88:24
generated 45:22
gets 91:1
getting 72:18

give 4:7, 37:23,
   69:11, 88:12
Given 10:18, 10:20,
   19:25, 72:7,
   77:19, 93:23
giving 85:9
glitch 4:8
goal 87:8
God 4:23
Goldentree 13:16
Gonzalez 44:18
gotten 61:8
governing 54:4
Government 9:12,
   20:9, 24:13,
   76:23, 76:24,
   77:6, 77:11,
   77:18, 78:8,
   78:20, 78:21,
   78:24, 78:25, 79:3
Governor 11:9,
   77:13, 77:16,
   77:21, 77:22,
   78:15, 78:16
grand 82:22
granted 20:5, 92:10,
   96:6
Granting 36:15,
   54:19
graphically 71:4
grasp 88:13
gray 45:2, 86:22
great 71:10
greatly 63:13
grew 23:8
grounds 94:9
groups 13:22, 47:19,
   49:22
Guarantee 2:4,
   11:23, 12:10,
   32:12, 53:21,
   53:24
guaranteed 48:1
guarantees 48:3
guess 35:2, 66:12,
   78:11, 86:7


< H >
Hadassa 44:20

Hail 42:14
hair 86:22
haircut 31:11
haircuts 26:16,
   26:20, 26:22,
   90:19
haircutting 25:8
half 23:4, 61:15,
   70:19, 70:20
half-hearted 38:6
halfway 40:14
hand 49:23, 78:6
handling 66:4
hands 22:3, 29:2
handy 66:10
happen 50:5, 83:15
happened 12:21,
   35:17, 53:5, 60:9,
   63:4, 68:2
happening 23:16
happens 35:1, 83:16
happy 80:1, 83:13
hard 36:7, 59:10,
   71:11, 81:19, 88:2
hardest 86:23
harking 46:10
harm 41:11
harmed 15:5
harms 40:2
harsh 93:19
Hastings 82:11
heading 74:15
headline 70:3
heads-up 72:16
hear 4:12, 4:13,
   7:20, 9:20, 9:21,
   10:9, 11:18, 12:5,
   12:7, 31:21,
   34:22, 36:12,
   38:23, 53:12,
   58:4, 58:21,
   63:21, 67:2, 67:4,
   67:6, 76:6, 87:9,
   88:3, 89:23
heard 6:20, 6:24,
   10:5, 19:18,
   41:23, 51:14,
   53:13, 55:4,
   66:14, 66:16,
   76:5, 96:16

Hearing 1:22, 5:6, 5:12, 6:1, 6:9, 7:1, 7:5, 8:4, 43:5, 45:15, 67:2, 67:12, 74:20, 80:14, 83:12, 96:18, 96:19, 96:24
hearings 5:11
heavy 25:17, 25:21
hedge 12:11, 12:17, 12:19, 12:23, 12:24, 13:21, 13:24, 14:15, 14:23, 15:10, 17:11, 18:4, 18:8, 18:19, 19:8, 19:16, 19:17, 19:24, 26:7, 47:18, 49:22, 71:12
heightened 12:23
held 13:3, 55:14
Hello 34:24, 66:6
help 14:20, 64:15, 64:20, 66:10, 89:16, 93:6
helpful 47:16, 53:19, 64:4
hence 79:22
highest 90:13
highlight 44:24
highlighted 43:12, 78:3
highlights 22:10
highly 45:1, 67:25, 69:21, 77:1, 78:18
historic 59:6, 60:1, 60:18
hit 47:4
Hoc 2:33, 2:37, 13:2, 23:2, 32:1, 32:5, 33:21, 34:11, 39:13, 50:7, 63:22, 63:24, 65:1, 91:18, 91:19
holders 25:10, 27:12, 27:15, 27:21

holding 25:15
holdings 13:14, 13:17, 23:3, 27:1, 28:5, 28:9, 29:16, 35:7, 35:9, 40:21, 41:1
Honorable 1:23, 1:25, 4:21, 4:22, 4:23, 98:6, 98:8
hope 10:11, 53:11, 75:25, 76:8, 82:2, 84:20, 87:2, 91:5
hopefully 38:17, 64:21, 91:2
hoping 59:15
HTA 70:17
humor 86:8
hunches 41:25
hundred 79:19, 80:9
hundreds 60:3, 60:4
hurricanes 5:18, 60:19
hypothetical 45:2
Hypothetically 52:1, 52:2, 85:13


< I >
idea 25:8
identifiable 55:17
identified 22:6, 55:23, 57:4
identifies 23:14
identify 6:14, 71:11
if-then 75:22
ignores 25:25
III 1:8, 2:11, 5:14, 20:16, 21:22, 54:3, 54:16, 55:7, 56:5, 56:11, 56:14, 57:16, 59:23, 65:6, 67:9, 85:8, 88:11, 89:15, 92:14, 93:9
illuminates 71:5
imagination 42:20
imagine 49:19, 62:12
immediacy 78:7
immediately 7:6
impact 52:7, 57:19,

88:4
impacted 26:11
impacts 88:15
implement 90:2
implicit 84:2
important 28:1, 36:8, 50:5, 62:18, 63:11, 76:21, 81:3, 87:11, 88:13
importantly 19:4
Impose 24:10, 46:15, 46:17, 58:15, 59:5, 65:9, 91:16, 92:12, 94:6, 96:5
imposed 61:6, 77:19
imposing 92:13, 94:4
impossible 67:25
impracticable 67:25
improper 12:16, 15:4, 26:7, 29:21, 52:3
improperly 36:22, 40:23
improprieties 57:14
impropriety 52:13, 52:14
inability 46:19
inappropriate 10:18, 47:23
inaugurated 77:21
inception 59:10
inclination 75:8, 92:5, 93:21
inclinations 58:19, 59:17
inclined 65:9, 75:3
include 72:25, 88:18
included 22:19, 27:15, 81:11
includes 74:2
including 6:10, 14:8, 18:4, 25:11, 30:15, 37:13, 43:11, 43:21, 47:9, 54:5, 57:14, 59:22, 75:5, 79:16, 80:21, 81:6, 81:20, 84:9, 94:3, 94:22, 94:24
incoming 11:8

incompetence 55:1
incomplete 42:19
inconvenient 29:22
incorporate 55:21
incorporated 20:23,
    54:16, 55:11,
    92:21
increase 13:6,
    13:23, 23:7
increased 13:5,
    13:16, 13:22,
    23:2, 23:4, 23:9,
    50:14
incredible 36:15
Independent 10:10,
    11:22, 11:23,
    14:12, 16:19,
    17:16, 20:2, 22:9,
    46:12, 47:16,
    49:7, 53:22, 54:1,
    54:2, 54:17
indicate 51:4
indicated 51:9,
    93:20
indication 64:2,
    65:8
individual 16:15
indulge 43:19
ineffective 73:12
inexpensive 36:11
inference 56:11
inferences 15:3
informal 18:16
informally 36:1
information 9:25,
    12:18, 14:19,
    15:4, 16:12,
    17:20, 18:12,
    18:19, 19:5,
    22:18, 28:7, 30:8,
    30:19, 32:19,
    32:20, 32:23,
    32:25, 35:8,
    35:20, 36:1, 37:5,
    42:16, 47:12,
    49:17, 51:11,
    54:6, 56:12, 57:2
informative 94:16
inherent 19:10,
    19:13, 20:15,

21:4, 32:13,
    92:22, 94:8
initial 13:1, 14:6,
    24:22, 27:5,
    27:12, 28:24,
    29:2, 59:8
initiate 54:17
initiated 84:8
initiating 56:21
inside 15:4, 56:12
insider 18:3, 22:1,
    22:7, 45:6, 45:10
insofar 56:16
insolvency 25:17
inspired 91:5
instance 42:8, 42:9,
    57:17, 74:8, 85:24
Instead 34:1, 59:16,
    64:7
institution 28:11
institutions 29:7,
    29:13
instrumentalities
    93:16
insufficient 35:25
insured 25:14
insurmountable
    30:14, 61:5
integrity 19:13,
    19:21, 21:22,
    23:18, 35:22,
    35:23, 37:6, 37:7,
    37:9, 41:8, 44:12,
    47:14, 52:23,
    56:17
intend 45:6
intended 51:12
intends 11:4, 94:13,
    94:19
intention 10:19,
    49:25
intents 61:9
interest 5:9, 6:17,
    25:11, 30:2, 51:4,
    57:5
interested 7:12,
    81:5
interests 15:25,
    16:15, 30:25,
    31:6, 33:10

interfere 76:9
internet 9:23
interrupt 6:25, 7:1,
    7:3, 39:7
invasion 36:5
invest 71:13
investigate 19:18,
    35:25, 44:22,
    54:25, 57:19
investigating 22:3
investigative 51:22,
    52:20
investigator 10:10,
    16:19, 44:25
investigatory 37:24,
    57:10
investment 36:3,
    36:21, 59:20,
    69:23
investors 28:20,
    35:13, 69:21
invite 11:16
invoked 55:15
involved 9:17,
    12:12, 16:3, 17:9,
    21:1, 28:19,
    77:11, 78:18,
    82:18, 83:2, 83:3
involves 35:11
involving 56:4
iota 33:24
irregularity 55:2
irrelevant 45:11
irrespective 23:19,
    30:11
irresponsible 24:15
island 5:16, 5:24,
    47:22, 90:12
isolated 28:16,
    28:19
issuances 45:14
issue 19:6, 30:18,
    45:18, 49:6,
    49:10, 53:6, 55:9,
    57:14, 68:5, 84:7,
    92:15, 92:24
issue. 55:4
issued 6:9, 32:18,
    60:13, 88:6
issuer 28:10, 30:6

issues 6:18, 16:17,
  20:1, 20:3, 21:10,
  21:22, 36:23,
  37:12, 37:20,
  38:14, 49:11,
  52:19, 53:2, 53:8,
  67:14, 93:23
item 8:1
itself 18:14, 26:14,
  27:25, 28:11, 63:2

< J >
J. 1:34
Jamo 55:18
January 22:19, 74:9,
  82:18
Jaresko 21:25
Jenniffer 44:18
job 46:11
John 2:12, 21:17,
  51:16
join 25:7, 32:9,
  38:5, 65:4
Joinder 33:15, 38:6
joinders 38:2
joined 38:6
joins 22:8
Joint 59:5, 91:14,
  96:3
Jointly 1:11
Jones 83:22
Joseph 2:31, 64:25
Juan 4:1, 5:22
Judge 1:23, 1:24,
  1:25, 1:26, 4:5,
  4:7, 4:16, 5:10,
  5:22, 20:16, 24:8,
  29:1, 30:9, 38:12,
  39:7, 58:11,
  58:12, 59:4,
  59:19, 60:8,
  64:25, 87:25,
  89:23, 91:7, 98:7,
  98:8
judges 25:2
judgment 55:9, 62:6
judicial 6:8, 41:13,
  57:23
judiciously 83:7

Judith 1:25, 4:22,
  98:8
July 27:14, 27:16
June 24:21, 27:5
junior 25:13, 31:9
jurisdiction 10:16,
  54:8, 63:16, 92:6
Justice 20:10,
  20:13, 44:21,
  51:23, 54:21
justification 43:21
justify 26:4

< K >
Kasowitz 2:5, 12:2,
  12:5, 12:8, 12:9,
  14:24, 14:25,
  15:2, 15:21, 16:6,
  17:11, 20:14,
  20:24, 21:3,
  21:13, 47:2, 50:21
keep 7:13, 11:11,
  85:9, 85:10, 97:1
keeping 7:14, 38:17
kept 32:20
key 18:11, 81:3
kind 24:19, 48:3,
  63:15, 71:6,
  78:19, 88:13
King 41:20
knowledge 22:23
known 85:14
knows 27:11, 59:7,
  59:21, 78:17,
  79:18, 86:3
Kurt 2:22, 34:19,
  50:25

< L >
L. 2:6
lacing 40:15
lack 32:11
lacking 39:16
lacks 19:9
laid 47:5, 61:14
large 35:10, 50:11,
  86:8
largely 56:16,

76:13, 81:8
last 44:18, 59:9,
  76:15, 78:12
late 13:4, 13:11,
  13:14, 13:17,
  14:2, 18:17,
  24:25, 27:7, 27:8,
  27:12, 27:15,
  27:16, 87:23
later 10:12, 14:17,
  45:23, 66:12,
  72:13
latest 9:16
latter 56:19
launch 34:5, 40:8
Laura 1:23, 4:21,
  5:10, 98:7
law 5:23, 42:11,
  57:18
Lawful 2:17, 24:6,
  32:9, 59:3, 91:20
laws 18:3, 19:3,
  33:2, 33:6, 34:4
lawyer 40:3, 40:4,
  40:6, 40:8, 66:10
lawyers 89:25
LCDC 13:16, 18:23,
  23:1, 24:1, 24:7,
  24:8, 26:2, 26:19,
  26:25, 27:3,
  28:12, 28:17,
  29:11, 29:25,
  30:25, 31:6,
  47:21, 48:4, 48:7,
  48:12, 49:9,
  58:24, 59:23
lead 16:25
leaders 93:7
leadership 77:14
leading 81:15
leaking 32:18
learned 12:18
learning 9:3, 9:6,
  9:9, 9:10, 9:11,
  9:13, 9:24
least 9:10, 66:25,
  69:15, 86:13
leave 64:10, 81:18,
  94:10
led 27:4, 84:11,

84:13
left 22:14, 25:15,
  66:12, 90:14
legal 33:20, 55:8,
  62:20, 92:16
legally 65:20, 89:20
legislation 77:4
legislative 76:24
legitimate 41:8
less 7:20, 52:7,
  56:13, 75:22
lessons 76:21
letter 44:10
letting 67:10
level 25:9, 27:11,
  28:7, 37:11, 70:17
Lewis 34:20, 66:4
liability 52:3
lie 40:13
life 5:24, 63:5
light 25:22, 59:14
likelihood 86:14
likely 25:17, 33:11,
  72:14, 73:15
likes 43:2
likewise 64:1
limited 6:10, 19:23,
  27:12, 56:5, 57:23
limits 11:19
line 6:1, 10:1,
  38:21, 39:3,
  76:22, 80:8, 83:13
lines 54:18, 58:5,
  78:13, 86:2
Lisa 38:12, 38:13,
  58:12
list 66:25, 82:8
listed 6:15
listening 38:21
literally 36:12
litigate 15:17
litigation 11:14,
  16:5, 24:25,
  57:25, 70:23,
  72:1, 72:20, 73:3,
  81:15, 84:8,
  84:11, 84:12,
  94:24
little 4:8, 25:13,
  60:20, 64:11,

73:7, 83:14, 87:19
lived 89:18
LLP 44:5, 67:8, 85:7
lobbed 42:13
locked 29:2
Logically 94:5
long 36:7, 81:17
long-term 24:20,
  47:25
look 21:3, 35:10,
  58:7, 61:17
looked 60:12
loses 51:23
lot 17:21, 59:13,
  63:25, 69:3,
  76:16, 76:17,
  76:19, 77:5, 79:15
lots 17:1
Luc 2:11, 82:10
Luis 1:40, 8:20

< M >
Magistrate 1:25,
  98:8
mainland 5:16, 9:22
major 25:1, 81:13,
  86:13
maligning 31:12
manage 92:23
Management 1:10,
  2:26, 5:4, 55:2,
  90:7, 95:21
manager 38:15
manifestation 41:8
manner 52:25, 92:23
map 35:17
Marc 2:5, 12:9, 47:2
March 24:14, 27:5
Marcus 20:17, 20:22
MARINI 1:40, 8:20,
  8:21, 8:24, 9:7
Mark 2:35, 39:12,
  63:23
market 15:7, 15:8,
  15:19, 28:22,
  34:5, 50:14,
  52:11, 56:13,
  56:19, 69:6
marketplace 52:21

markets 14:22,
  52:14, 53:5,
  57:20, 81:20
Martin 1:34, 8:10,
  44:4, 67:7, 85:6
Mary 42:14
mass 72:15, 72:22
massive 47:6, 50:2
massively 29:24
material 11:2,
  30:18, 94:12,
  94:13, 94:17,
  95:17
materially 26:10
materials 17:23,
  18:9, 18:20, 43:2,
  48:10, 48:13,
  48:16
math 89:21
Matt 38:13
matter 7:7, 10:15,
  16:22, 39:22,
  44:14, 44:18,
  49:23, 54:8, 60:8,
  65:5, 71:15, 73:2,
  73:7, 85:11, 89:21
matters 6:16, 10:8,
  96:14
Matthew 38:13
maximize 35:14,
  85:12
Mayr 2:22, 34:18,
  34:19, 34:22,
  34:25, 35:1, 37:2,
  38:9, 38:11,
  50:25, 51:2, 51:3,
  51:7, 66:2
mean 18:2, 26:22,
  65:14, 88:9
meaning 82:24
meaningful 65:16,
  65:21, 94:3
means 22:14, 22:15,
  75:13, 81:21
Meanwhile 23:4,
  23:11
measurable 85:15
measures 95:10
mechanism 16:19,
  16:20, 50:19

mediations 28:3, 30:15
mediator 22:4
mediators 85:18, 86:19
meet 89:3
meeting 86:18
meets 63:9
member 13:2, 13:9, 13:16, 26:25, 27:3, 32:4, 33:21, 39:17
members 5:9, 6:11, 11:10, 13:21, 14:9, 16:8, 23:1, 24:8, 26:1, 26:19, 28:12, 29:11, 29:25, 30:25, 44:9, 44:13, 59:22, 74:16, 78:15, 80:17, 80:19, 87:22, 93:7
membership 10:21, 67:21, 74:9, 74:10, 93:24
mentioned 45:13, 64:4, 73:10, 74:19, 77:12, 87:20
mere 61:6
merely 29:2, 43:12
merit 22:10, 39:16
meritless 39:22
merits 84:4, 95:13
message 38:20
met 77:6, 92:15
methods 9:9, 9:10, 9:18
middle 89:3
Milbank 79:11
milestones 62:3
Miller 2:15, 79:9, 79:10, 79:13, 81:25, 82:7
million 13:3, 13:6, 13:13, 13:15, 13:18, 13:19, 23:3, 23:9, 70:1, 70:24, 71:2, 79:19, 80:9,

82:22, 83:1, 88:17
millions 60:4
minds 86:18
minimum 72:12, 75:10, 94:16, 95:17
minute 4:7, 91:11
minutes 7:15, 7:19, 11:25, 12:1, 22:14, 24:1, 34:18, 39:11, 41:18, 44:3, 47:1, 58:23, 58:25, 79:9, 82:9, 82:12, 83:20
misappropriated 40:9
misconduct 14:11, 15:8, 19:19, 55:1, 56:18, 57:19
mislead 42:14, 43:14
misleading 42:1, 42:21
mismanagement 55:1
mispronounced 34:24
missed 62:3
modalities 9:21
modest 86:14
modification 64:1, 64:20
modifies 79:21
modify 80:7
modules 9:13
moment 16:1
Monday 7:9
money 25:13, 69:8, 69:24, 70:9, 70:20, 71:14, 80:10
monolines 38:4, 70:15
months 5:12, 23:9, 27:17, 36:7, 61:16, 63:3
moot 73:12
Morgan 34:20, 66:4
Morrison 31:25, 65:1
motions 7:24, 15:11, 81:11, 83:9
Movants 59:4, 91:22, 91:25, 93:19,

93:20
move 66:21, 73:8, 77:10, 80:6, 81:9, 90:4, 93:17
moving 57:23, 62:25, 82:2, 83:24, 84:1, 93:3
Ms 2:15, 2:39, 4:7, 4:10, 4:16, 4:18, 5:1, 5:7, 21:25, 31:22, 31:23, 31:25, 34:10, 34:14, 34:16, 38:12, 38:24, 39:2, 39:5, 39:7, 39:10, 58:12, 79:9, 79:10, 79:13, 81:25, 82:7
multiples 45:22, 71:17
municipal 15:6, 59:21
municipalities 70:23, 81:22
mute 6:1, 6:3
Myers 76:12
myself 65:9

< N >
name 6:14, 6:20, 6:23, 10:3, 34:24
names 50:24
narrative 29:23
natural 76:18, 93:12
nature 36:9, 60:14
near 93:4
nearly 13:6
necessarily 48:8, 74:11, 88:9, 89:10
necessary 7:25, 23:17, 35:14, 48:5, 50:5, 55:10, 55:16, 74:20, 78:13, 92:25, 93:6, 93:16, 94:23, 95:13
necessitate 50:18
need 6:5, 7:21, 36:12, 63:17,

64:9, 66:11,
74:24, 75:14,
87:22, 89:8, 93:8
needed 19:2, 24:12,
29:19, 30:7, 46:11
needs 18:21, 24:20,
35:25, 62:11,
62:19, 71:10,
75:18, 77:6, 78:1
nefarious 28:15
negative 30:13
negatively 26:10
negotiate 68:15,
80:10, 95:7
negotiated 29:7,
48:18
negotiating 14:1,
14:3
negotiation 35:11
negotiations 10:19,
11:5, 14:3, 27:2,
27:4, 28:9, 35:15,
74:19, 82:16,
82:19, 83:11,
83:14, 84:19,
85:2, 87:5, 94:3
Neiman 20:14, 20:22
Neither 28:2, 32:21,
54:15
nerve 47:4
network 24:17
Nevertheless 10:17,
94:2
news 43:3
newspaper 70:3
Next 39:11, 41:17,
44:2, 45:20,
66:24, 77:10,
77:15, 77:21,
79:3, 79:9, 82:8,
96:1
NG 4:7, 4:10, 4:16,
38:12, 38:24,
39:2, 39:5, 39:7,
39:10, 58:12
nine 23:9, 89:6
No. 1:6, 7:10, 7:11,
8:5, 11:24, 22:2,
39:8, 43:6, 53:22,
53:23, 58:16,

83:10, 91:17,
95:23, 95:25, 96:6
nobody 84:3
noise 24:25
non-substantive
54:13, 92:9
nonchalantly 41:11
None 3:5, 3:11,
18:19
nonetheless 22:24
nonparty 14:12
nonpublic 30:18,
51:10
nonsense 41:5
nor 28:2, 54:15
Nos. 8:5
notable 38:1
note 5:20, 32:2,
32:8, 58:17,
76:14, 83:6
noted 55:21, 62:14,
85:3
Noteholder 2:22,
34:22, 35:5,
35:19, 91:21
Noteholders 51:1
nothing 17:14,
19:25, 25:18,
28:15, 31:5, 39:8,
42:24, 43:18,
49:14, 89:12,
95:14
notice 32:2, 58:20,
63:4
notion 45:17
notwithstanding
15:4, 49:22, 72:2
nowhere 69:10
Number 44:9, 45:4,
47:9, 79:16, 89:2
numbers 23:7, 71:11,
88:16, 88:23
numerous 84:14


< O >
O'melveny 76:12
objecting 69:15
Objection 22:19,
28:12, 28:15

Objections 12:23,
18:7, 18:10,
31:12, 33:15,
91:23, 96:20
objective 14:12,
14:16
objectors 93:18
Obligation 2:34,
22:16, 91:19
obligations 70:6
obtained 36:1, 54:7,
68:16
Obviously 13:7,
59:4, 68:2, 68:3,
68:17, 69:7,
76:17, 76:18,
77:12, 77:20,
78:10, 82:13,
82:15
occur 93:14
occurred 28:16,
35:9, 35:19, 43:1,
43:10, 43:11,
60:10, 60:19
occurring 5:13, 35:4
offer 41:24, 57:10
office 20:16, 38:14
Official 2:8, 57:9,
98:15
offsets 71:17
often 35:1, 80:11,
81:21
Okay 4:16, 38:25,
39:3, 49:17, 51:7,
51:9, 67:7, 76:10
old 40:13
omitted 55:19
Omnibus 1:22, 5:6,
5:12, 22:19, 96:20
once 52:6
one. 92:16
ones 26:16, 86:4,
87:6
ongoing 23:11, 29:5,
30:12, 93:23,
96:24
online 9:10, 9:18
open 28:21, 86:3,
87:1
opening 80:14, 84:18

operation 5:25
operative 62:9,
  65:20
opinion 87:22
opponents 23:25
opportunities 15:16
opportunity 6:17,
  16:9, 57:5, 74:23,
  80:17, 84:20, 85:9
oppose 17:12
opposed 56:18, 68:22
opposing 40:7
Opposition 37:13,
  39:17, 41:23
optimistic 78:5,
  86:25
option 91:4
oral 10:25, 54:14,
  92:7
orally 67:14
Ordered 25:1, 27:14,
  27:16, 30:15
Ordering 94:15
orderly 5:25
Orders 6:8, 19:6,
  19:11, 21:5, 21:6,
  25:24, 26:5, 28:1,
  32:14, 32:24,
  33:17, 42:4, 54:4
original 25:24,
  26:17, 27:6,
  29:23, 59:7
Others 14:8, 16:11,
  17:23, 17:25,
  38:3, 43:18,
  48:12, 49:4, 49:9,
  51:4, 51:6, 84:1,
  84:16, 85:3
otherwise 70:22,
  94:12
outcome 14:13
outgoing 11:9
outlets 43:3
outlined 96:9
outrageous 38:2
outset 59:17, 60:18,
  67:11
outside 45:7
outstanding 96:24
outweigh 17:6, 17:8

Overall 13:20,
  15:23, 16:13,
  16:16, 31:6,
  44:11, 61:1,
  76:14, 76:19,
  78:11
overlap 53:3, 53:10
overly 78:5
overseen 25:2
own 7:14, 13:10,
  13:21, 19:11,
  21:5, 32:14,
  57:12, 70:24
own-source 88:17,
  88:18, 88:20, 89:6
owned 13:12


< P >
PAGE 3:3
pages 98:4
paid 25:16, 30:23,
  70:4, 90:15, 90:20
painful 81:17
Palmore 2:31, 64:23,
  64:25, 66:1
Pandemic 5:17,
  10:23, 93:23,
  95:22
paper 90:1
papers 27:3, 34:12,
  47:5, 48:11,
  59:14, 67:15,
  69:1, 69:10,
  76:15, 78:4, 88:12
par 77:2
paragraph 26:3
pardon 64:18
parents 9:13, 60:8
part 9:17, 54:20,
  68:11, 77:6,
  84:20, 88:18,
  92:10
partially 71:9,
  71:10
participant 7:5,
  29:5, 29:6, 56:11
participants 13:25,
  14:19, 15:7, 19:1,
  19:2, 28:5, 30:7,

30:13, 38:16,
  54:3, 58:4, 59:23,
  60:22
participate 30:4,
  30:16, 30:21
participated 30:10
participating 9:6,
  9:8, 9:14, 26:6,
  28:14, 33:18
participation 31:15
particular 14:1,
  37:21, 56:2, 81:20
particularly 40:17,
  56:16, 58:21, 71:2
partner 24:20,
  44:19, 47:25
partners 24:17,
  24:18
parts 76:23
party 21:7, 21:20,
  29:4, 30:9, 36:18,
  38:6, 47:17,
  49:15, 57:4, 79:17
passing 5:22
past 5:11, 33:4
path 24:9, 59:11,
  64:5, 65:7, 65:22,
  78:24, 80:12,
  93:9, 96:9
patience 91:12
patiently 91:10
Paul 82:11
pause 51:4, 51:6
pay 15:12, 70:9,
  70:10, 70:24
payable 79:20
paying 27:6, 27:8
payment 48:2, 85:16
payments 25:11
PBA 13:22, 26:17,
  29:8, 85:22
penalty 33:22, 34:7
pendency 50:17
pending 70:11, 93:12
pension 80:23
pensioners 90:19
pensions 24:10,
  70:10
people 5:15, 10:4,
  16:2, 46:2, 50:24,

51:10, 60:3, 63:6,
    63:7, 69:14
per 88:23, 89:7
percent 13:23,
    22:22, 23:5, 23:8,
    23:10, 25:5,
    26:14, 89:6, 89:11
percentage 9:17
perfect 68:21
performance 80:22
performed 20:17,
    47:23
perhaps 19:25, 33:2,
    40:25, 59:15,
    60:25, 64:11,
    67:18, 87:19,
    90:11
period 11:8, 13:13,
    22:24, 35:19,
    39:18, 40:22,
    46:7, 47:7, 48:23,
    50:11, 62:1, 62:4,
    70:25, 72:25,
    74:1, 87:5, 88:2
periodic 75:5, 95:20
periods 17:22, 18:1,
    18:9, 48:9
perjury 33:22, 34:7
permit 19:4, 36:6
permitted 6:10,
    18:24, 48:14,
    64:13
PERSON 4:13, 4:14,
    4:15, 6:10, 6:23
perspective 90:7
persuaded 93:2, 94:2
pertinent 11:20
Peter 1:39, 76:11
petition 92:19
phase 27:2
phone 6:3, 6:4, 6:6,
    12:3, 67:1
phones 6:1
phrase 73:7
PHV 1:34, 1:35,
    1:39, 2:5, 2:6,
    2:11, 2:12, 2:15,
    2:19, 2:22, 2:23,
    2:26, 2:28, 2:31,
    2:35, 2:39

pick 9:13
pivot 96:13
place 31:2, 62:17
places 47:9
plan-related 59:6
plans 57:25
plausible 45:25
play 81:3, 82:24
playbook 26:16
played 5:22
played. 7:18, 20:21,
    21:11, 22:12,
    23:15, 29:15,
    31:4, 34:9, 37:1,
    38:8, 40:11,
    42:18, 43:23,
    45:16, 46:20,
    73:4, 74:5, 79:1,
    81:24, 89:14, 91:8
pleading 83:10
pleadings 38:5,
    62:14, 69:19
Please 4:18, 6:3,
    6:14, 6:20, 6:25,
    7:6, 12:3, 17:10,
    51:18
pleased 9:20, 9:21
plus 70:19, 88:24,
    89:11
PM 97:2
pockets 80:9
podium 65:3
Point 13:2, 13:5,
    18:8, 18:15, 33:4,
    36:2, 36:24,
    40:16, 42:7, 42:9,
    43:18, 49:21,
    50:6, 50:13,
    51:20, 62:25,
    63:21, 66:16,
    69:1, 69:7, 70:14,
    71:6, 76:7, 78:12,
    79:15, 83:4,
    86:24, 87:25,
    89:5, 90:11
point. 82:6
pointed 42:21, 46:5,
    78:14, 82:16
points 39:21, 44:7,
    77:2

policies 6:8
policy 25:10, 36:8
political 10:22,
    93:7, 93:13
politicians 24:16
portrayal 42:2
position 9:1, 13:5,
    30:9, 49:15, 57:3,
    62:15, 77:24,
    80:22, 86:10,
    89:17
positions 13:22,
    27:21, 30:1, 86:24
positive 84:7
possession 51:10,
    54:6
possibilities 45:2
possibility 45:25,
    52:16
possible 29:20,
    47:24, 56:18,
    74:14, 85:21,
    87:9, 87:10
possibly 33:2
post 25:11
potential 14:11,
    16:14, 16:24,
    47:18, 47:24,
    56:25
potentially 12:25,
    17:2, 73:12,
    79:14, 87:21
power 10:16, 19:10,
    20:15, 32:13,
    37:2, 37:25,
    54:20, 55:13,
    56:7, 69:11,
    69:16, 69:17, 94:5
practical 66:15,
    87:1
practically 82:17
practice 14:21,
    17:2, 57:6, 95:12
practices 22:6
pre-negotiated 35:15
preannounced 92:4
precedent 34:8, 50:8
precludes 95:15
predetermined 92:14
predicated 21:23

predict 74:16
prefer 14:15, 68:7,
  68:10
preferably 72:12,
  75:11, 93:15,
  94:20
preliminary 67:11
premise 34:2
prepared 11:18,
  77:23, 77:25
preparing 60:13,
  77:17, 96:23
present 4:22
presentation 47:5
presentations 6:19
presented 33:5,
  33:24, 69:22
preserve 55:17,
  55:25
presiding 4:22
press 5:10, 6:11,
  32:19, 43:1, 58:18
pressed 81:19
prevent 25:18, 52:11
previously 11:18
price 23:4, 23:9,
  48:25, 71:1
PRIFA 70:18
Prime 7:11
principal 13:8, 55:8
principle 49:20
printed 9:13
prior 49:1, 50:13,
  95:16
priorities 57:12
priority 86:6, 90:14
privilege 36:9,
  85:10
probably 68:10,
  69:22, 71:24,
  75:16, 87:4, 93:13
problem 4:10, 17:16,
  30:14, 35:1,
  56:17, 66:11
problems 9:23
Procedures 8:3, 37:8
proceed 4:17, 7:23,
  11:4, 17:10,
  51:18, 51:25,
  52:23, 94:13

proceeding 12:12,
  19:13, 47:11,
  47:15
Proceedings 2:47,
  5:14, 6:2, 6:14,
  11:16, 21:23,
  23:19, 33:10,
  51:24, 56:5,
  56:18, 57:6,
  57:15, 58:10,
  65:6, 65:23,
  72:20, 95:1, 97:2,
  98:6
processes 56:14
procured 18:1
produce 94:4
produced 2:47
producing 71:16
product 94:5
professionals 70:3
proffered 18:7,
  56:10
program 9:12, 42:25
progress 10:22,
  60:22, 69:20,
  71:6, 71:11,
  76:19, 87:11,
  93:10
prohibit 19:1, 30:9,
  49:19
prohibited 30:4
prohibiting 32:25
project 11:11
projected 78:9
projections 78:9,
  80:21
PROMESA 1:8, 20:23,
  52:22, 53:7, 54:9,
  54:15, 54:23,
  55:7, 55:12,
  55:22, 63:10,
  91:15, 92:7,
  92:17, 92:22,
  93:1, 93:17, 96:4
prompt 14:12, 20:2
promptly 50:1,
  66:21, 96:11
proof 41:6
proper 15:20
properly 48:15,

  48:19, 49:5, 76:16
prophylactic 52:15
proponents 57:1
proportion 9:4
proposal 11:3,
  15:15, 15:17,
  24:24, 25:4,
  27:13, 72:21,
  75:4, 79:14, 80:3,
  93:6, 94:25, 95:18
proposals 20:7,
  23:12, 61:4, 61:5,
  96:14
propose 10:24, 45:9,
  73:13, 73:24,
  94:19, 96:8
Proposed 11:13,
  11:17, 29:8, 45:4,
  52:15, 57:24,
  62:25, 64:1,
  64:19, 65:15,
  67:17, 68:12,
  68:19, 68:21,
  72:18, 72:24,
  73:2, 74:19, 75:6,
  75:11, 90:25,
  94:20, 94:21,
  94:23, 95:2, 95:4,
  95:22, 95:25, 96:8
proposing 45:12,
  64:12
propriety 92:12
prosecute 44:22,
  45:1
prosecution 44:16
prosecutorial 52:11,
  56:20
Proskauer 44:5,
  67:8, 85:7, 90:1
protect 19:12, 37:7,
  37:9, 48:19, 48:20
protected 36:8
protecting 35:21
protections 37:14,
  77:7
protocol 28:1, 28:23
protocols 39:25
protracted 14:20,
  17:2
proud 59:25

prove 30:13, 45:14
provide 6:16, 14:17,
  26:20, 28:7,
  62:13, 81:21, 94:9
provided 37:14,
  37:25, 43:5, 77:7
provides 54:24,
  55:8, 92:17
providing 74:18
provision 20:22,
  54:15, 55:22,
  73:17
provisions 49:18,
  55:10, 92:25
prudent 62:4, 90:7
prudential 92:16
Public 2:3, 5:9,
  6:11, 7:11, 8:5,
  11:22, 12:9,
  22:18, 22:23,
  28:3, 32:12,
  35:10, 53:20,
  53:24, 82:20, 89:2
publicly 16:4,
  17:23, 23:13,
  31:1, 31:3, 40:3,
  40:7, 50:2, 61:4
published 43:2
punished 6:12
pure 41:5
purely 41:22
purport 56:17
purportedly 48:9
purposes 61:9
Pursuant 54:9,
  91:15, 95:20, 96:4
pursue 36:22, 36:23,
  66:18, 86:15
pursued 37:19
purview 15:9
push 90:17, 93:20
pushed 60:20
put 8:23, 18:15,
  61:16, 65:6,
  73:24, 78:21,
  82:3, 90:8, 90:10

< Q >
QTCB 2:21, 13:9,

34:17, 34:22,
  35:5, 35:18, 49:9,
  49:13, 50:22,
  51:1, 66:5, 91:21
quarter 87:23, 87:24
question 8:25, 15:1,
  18:11, 20:6,
  36:19, 48:15,
  50:6, 52:18,
  53:11, 64:9, 66:12
questions 7:4, 8:13,
  8:15, 10:2, 12:20,
  14:7, 18:7, 22:10,
  23:17, 34:11,
  34:15, 48:17,
  52:5, 63:14,
  63:20, 65:24,
  72:6, 82:5, 83:8
quick 36:11, 79:15
quickly 11:11,
  14:22, 16:21,
  40:10, 44:8, 47:17
quiet 24:25
Quinn 24:7, 59:2
quite 89:2
quote 26:9, 35:25,
  36:11
quoting 55:18


< R >
raise 12:20, 18:7,
  37:20
raised 6:18, 14:7,
  20:2, 48:15, 49:6,
  67:14, 68:6, 83:8
raising 81:22
range 22:22
rate 69:25
rated 77:2
Rather 14:14, 14:17,
  16:22, 16:24,
  33:1, 40:24,
  42:12, 49:8, 61:5,
  68:7, 75:21, 92:16
Re 1:6, 5:3, 55:18
re-enter 14:22
reach 81:8
reached 9:5, 22:9,
  61:19

reaching 86:15
reactions 87:19
read 10:14
reading 9:1
ready 8:13, 53:17,
  58:14
realistic 93:9
reality 43:16, 48:21
realize 45:24, 61:1
reallocate 41:4
really 18:11, 36:24,
  37:22, 37:23,
  38:1, 45:7, 48:6,
  48:17, 48:18,
  52:10, 52:18,
  60:17, 61:5, 62:9,
  62:19, 63:2, 66:9,
  68:6, 77:2, 79:5,
  80:5, 85:14,
  88:13, 88:14
reason 16:18, 59:24,
  64:3, 68:11,
  75:17, 89:19
reasonable 19:23,
  42:13, 56:10,
  85:20
reasonableness 80:20
reasonably 19:21
reasoning 75:23
reasons 15:22, 36:8,
  54:12, 57:7, 57:9,
  68:9, 69:4, 92:11
rebuttal 47:1
recall 40:21
receive 18:18, 31:9,
  70:17
recent 95:24
recess 58:9
recognize 95:11
recognizing 92:24
recommendation 73:21
reconsider 62:7
reconvened. 58:10
record 6:15, 24:5,
  32:8, 92:2
recorded 2:47
recording 6:9
records 23:13
recovery 31:9
redounds 87:12

reengage 80:23, 90:8
refer 53:23, 53:25,
    70:1, 91:21
reference 44:13,
    59:24
referenced 81:14
referral 51:21, 52:6
referred 44:18,
    81:10
referring 44:20,
    62:16
reflecting 58:1,
    73:24
reflects 52:25
reforms 71:9
refused 25:7
regain 69:6, 81:19
regard 83:6
Regarding 10:10,
    85:1, 95:20, 95:22
register 31:11
regulated 39:25
regulations 40:2
regulators 15:9
regulatory 52:11,
    56:21, 57:18
reject 39:19
rejection 57:24
related 36:23, 52:19
relates 37:3
relating 43:1, 94:7
relation 95:12
relative 56:20
relatively 16:21,
    17:5, 17:8, 36:11
released 17:23
relevance 26:18
relevant 11:6, 36:4,
    72:7, 87:6, 95:7
relief 10:17, 26:4,
    30:12, 32:12,
    42:6, 93:3, 94:1
relies 32:13, 48:8,
    55:5
relieved 70:12
rely 30:17, 30:19,
    30:20
remain 5:15, 61:1
remainder 73:3
remaining 7:16,

94:22
remarks 6:19, 8:8,
    8:18, 11:17,
    59:16, 63:20,
    65:10, 72:7, 79:5,
    80:14, 80:25,
    84:7, 84:18, 92:4,
    96:9
remedy 55:16, 64:10,
    69:14, 69:16
Remember 28:2, 66:25
remind 6:7
reminded 19:2
remove 50:1, 50:19
renegotiation 83:4
Reorg 43:2
reorienting 92:3
repay 25:13
repayments 60:4
repeating 32:7
Reply 29:18, 29:19,
    33:19, 41:24,
    42:7, 42:23,
    43:17, 92:1
Report 8:9, 8:19,
    8:23, 75:6, 75:15,
    77:12, 95:21,
    95:24, 96:1, 96:2
Reporter 98:15
reporting 38:14
reports 8:1, 8:3,
    8:7, 10:2, 58:18,
    75:5, 95:20
represent 32:3, 32:5
representative 1:13,
    5:5, 46:16, 67:9,
    85:8
representatives
    46:1, 46:12
representing 46:7
reputationally 81:19
request 22:8, 47:12,
    70:11, 75:24
requested 8:2,
    92:13, 93:3, 94:1,
    95:14
requesting 86:1
requests 38:3, 42:6
require 6:19, 24:10,
    32:20, 68:17,

72:18, 73:25,
    75:24, 94:9
required 14:4,
    27:14, 28:6, 53:1,
    67:23, 95:19, 96:7
requirements 37:15,
    63:9, 77:8, 95:12
requires 30:12,
    75:9, 75:10
Research 43:3
reserved 46:14
reserves 54:13, 92:8
Resident 44:17
resist 46:9
resolution 16:16,
    45:3, 84:11, 84:16
resolve 20:3, 47:17
resolved 19:14
resolving 15:25,
    79:14
resorts 30:3
resources 56:23,
    57:23
respect 21:8, 37:20,
    40:17, 42:1, 44:9,
    47:22, 50:2,
    55:12, 56:19,
    68:5, 83:16, 84:6,
    93:5
Respectfully 14:9,
    20:4, 41:13, 52:21
respects 96:10
respond 10:12, 84:25
respondents 15:10
responds 87:2
Response 35:6,
    42:21, 43:8,
    43:13, 47:18,
    53:12, 82:17
response. 10:6,
    53:15, 96:17
responsibilities
    52:20
responsibility 79:3
responsibly 87:7,
    95:8
rest 34:12
restrained 49:6
restrict 35:14
restricted 18:1

restriction 35:16
restrictions 42:5
restrictive 39:18
restructure 89:16
restructured 61:22
restructuring 60:1,
    61:2, 69:5, 71:20,
    89:20
result 15:6, 29:1,
    36:1, 36:18,
    82:19, 87:12, 95:9
resulted 26:11
resume 7:25, 58:6
resuming 58:7
Retirees 70:24,
    85:22
retransmission 6:9
return 46:25, 69:25,
    87:17
revenue 81:20,
    88:18, 88:20
revenues 70:17,
    88:17, 89:7
review 16:9, 80:18
revised 68:20
revision 68:13, 74:2
revisit 75:18
rights 37:16, 77:9,
    90:18
ripe 37:17, 37:19,
    37:20
rise 47:9
risk 36:17, 52:13
road 35:12, 35:17
role 47:21, 47:23,
    48:5, 56:5, 78:20,
    81:3
roles 5:23
rolling 91:2
Rose 44:5, 67:8,
    85:7
Rosen 1:35, 59:20,
    61:7, 62:12
Rosenblum 2:28,
    83:19, 83:21,
    83:22, 84:23
rote 37:15
roughly 70:18, 89:6
round 88:16, 88:22
Rule 6:12, 7:3,

12:19, 27:19,
    27:24, 27:25,
    29:17, 33:11,
    33:12, 37:9,
    40:19, 53:17
rules 30:17, 30:20,
    35:12, 37:8, 40:2
ruling 58:18, 59:15,
    70:15, 91:13,
    92:5, 92:8, 92:9,
    96:11
run-up 48:25
rung 25:13


< S >
S. 1:35
S/ 98:13
Sabin 2:23, 66:3
safe 97:1
sales 60:2
San 4:1
sanction 92:14
sanctions 6:12
satisfy 36:13
save 4:23
saved 60:3, 71:3
saving 70:24
savings 26:21,
    70:20, 71:8
saw 24:15, 38:20
saying 26:16, 30:3,
    38:14, 40:13,
    72:11, 73:23,
    74:16, 74:23
says 26:8, 29:19,
    32:3, 32:21, 39:2,
    41:1, 61:11, 70:5,
    89:8
scary 73:7
scenario 72:10,
    72:21
Schedule 72:18,
    72:24, 73:3,
    74:19, 75:8,
    75:10, 75:12,
    75:17, 75:25,
    95:23, 96:8
school 9:4
script 63:15

Sculptor 2:25, 13:9,
    13:12, 13:14,
    17:24, 41:17,
    41:20, 42:2, 42:3,
    42:8, 42:9, 42:11,
    42:15, 42:16,
    42:24, 43:6, 43:8,
    43:9, 43:15,
    43:16, 43:18,
    43:21, 49:9
seat 86:1
SEC 44:18
Second 14:17, 18:23,
    40:16, 43:13,
    44:17, 87:23,
    89:23
seconds 10:4, 10:7,
    50:24, 51:15,
    53:14, 53:16,
    96:15
Section 19:15,
    20:11, 20:20,
    54:9, 54:23, 55:3,
    55:6, 55:7, 55:8,
    55:13, 55:15,
    56:1, 56:7, 91:15,
    92:7, 92:17,
    92:20, 92:21,
    94:8, 96:4
Securities 15:8,
    15:9, 15:19,
    17:19, 19:3,
    28:13, 33:2, 33:4,
    33:6, 34:5, 51:22,
    53:3, 54:6, 56:19
security 34:3, 77:3
seek 37:22, 64:9,
    72:25
seeking 37:7, 59:5
seeks 32:13, 53:25,
    55:24
seems 15:6, 21:12,
    46:9, 47:4, 76:7
seen 57:17, 80:3,
    90:1
select 6:3
self-serving 24:18,
    41:7
sell 28:13
selling 30:5, 30:11

sensational 56:16
sense 14:14, 28:2,
    68:18, 68:21,
    68:24, 73:18,
    73:21, 75:16,
    76:1, 86:8
sent 44:10
separate 32:23,
    52:22
September 22:25,
    83:12
series 13:3, 22:17,
    23:3, 23:8
serious 12:20,
    14:11, 20:1, 40:2,
    41:12
seriously 57:13,
    78:21, 79:4
service 70:21, 89:8,
    89:12
services 24:13,
    57:11, 90:20
session 4:21, 27:22
sessions 48:18
set 7:8, 10:16,
    16:4, 29:12, 34:8,
    50:8, 59:14, 81:1,
    92:20, 94:7
sets 79:23
setting 10:25
settle 22:22
settlement 23:12,
    24:23, 46:15,
    48:22
settlements 45:13
seven 23:9, 28:12,
    70:19
several 5:12, 17:17,
    91:23
severely 39:23
shadow 57:11
shall 92:19, 96:2
shared 58:19
shaved 60:2
sheets 61:7, 65:13,
    82:20
Shiff 2:6, 12:2
shift 29:13
short 85:10
shorter 82:12

shortly 58:8
shouldn't 17:15,
    19:14, 19:17, 62:8
show 29:23, 56:17
showing 42:14, 43:15
shown 42:11
shows 40:6, 65:5
shred 41:21, 42:12
side 66:19, 66:20,
    69:3
sight 90:21
sign 72:9
signaled 18:17
signatories 25:25,
    28:24, 33:3
signatory 29:3
signed 68:13
significant 27:12,
    40:12, 41:11,
    65:18
significantly 67:18
Silver 13:1, 13:5
similar 20:18,
    25:19, 57:9
similarly 26:12,
    54:19
simple 22:13
simply 73:13
simultaneously 86:9
single 37:4, 42:7,
    42:9
sit 88:2
sits 70:5
situation 68:2,
    68:4, 68:23,
    71:15, 73:14,
    73:20, 74:24
six 60:2
six-fold 13:6
size 31:1
slightly 53:2, 53:7,
    53:8, 53:9
small 17:5, 17:8,
    31:9
so-called 17:22,
    18:1
so-ordered 60:15
sold 29:5, 36:20
sole 68:5
solicitation 11:15,

72:20, 94:25
Solutions 4:8, 6:4,
    6:5, 6:22, 32:2,
    58:5
solve 21:10
somebody 67:3
somehow 26:2, 34:3,
    47:23, 84:11,
    86:24
Someone 14:13,
    16:22, 17:16,
    38:21, 45:1
sometimes 86:16,
    86:23
somewhere 89:3
soon 90:24
sooner 14:16, 16:23,
    17:5, 90:24
sophisticated 28:20,
    31:2, 69:21, 86:8
sophistication 90:2
sorely 62:19
sorrow 5:20
Sorry 4:16, 5:1,
    5:2, 8:11, 19:8,
    38:12, 39:7, 39:8,
    67:4
sort 15:7, 49:14,
    64:9, 66:12,
    72:25, 73:17,
    79:25
sorts 37:11
sought 10:17, 12:14,
    22:17, 54:18,
    93:19
Sound 7:17, 7:18,
    20:21, 21:11,
    22:12, 23:15,
    29:15, 31:4, 34:9,
    37:1, 38:8, 40:11,
    42:18, 43:23,
    45:16, 46:20,
    73:4, 74:5, 79:1,
    81:24, 89:14, 91:8
sounds 39:3, 72:10
source 56:2
Spalding 41:20
spar 79:25
sparring 79:22
speaker 6:13, 7:8,

7:13, 7:15, 39:11
speakers 6:15, 6:23,
    63:21
speaking 4:6, 5:10,
    6:2, 58:11
speaks 38:7
specific 7:22,
    15:16, 16:3, 28:5,
    35:11, 44:24,
    57:6, 72:18,
    72:25, 75:17,
    75:19, 75:24,
    93:2, 94:1, 95:18,
    96:14
specifically 42:1,
    83:16, 92:4
spectacular 76:17
speculates 41:2
speculation 33:1
speculative 56:16,
    56:24
speed 11:11, 81:2
spent 45:18
spin 24:18, 84:7
spirit 71:19
spite 34:6
spoken 6:16, 86:2,
    86:14
squarely 15:8
SSI 78:7
staff 96:22
stage 14:21
stake 14:13, 16:22,
    94:10
stakeholders 5:14,
    11:6, 77:23, 81:6,
    87:7, 87:14, 95:7
Stancil 2:35, 39:11,
    39:12, 40:12,
    41:16, 63:22,
    63:23, 64:22,
    65:10
stand-up 77:4
Standard 96:21
standing 36:19,
    36:22, 36:23
stands 23:20, 38:1
start 72:5, 82:2
stasis 76:16
State 6:20, 10:3,

32:15
stated 10:19
Statement 11:14,
    11:15, 61:15,
    62:24, 63:7, 64:6,
    65:12, 65:17,
    65:19, 68:7,
    68:14, 68:19,
    72:13, 72:19,
    72:23, 73:2, 74:3,
    74:20, 75:11,
    91:1, 91:25,
    94:21, 94:23,
    95:3, 95:23
statements 27:20,
    27:24, 28:3,
    29:17, 33:11,
    33:12, 33:22,
    33:25, 35:3,
    75:22, 88:3
States 1:1, 1:24,
    1:26, 4:20, 4:23,
    20:17, 44:21,
    54:2, 54:20,
    54:21, 55:4, 56:4,
    98:7, 98:8
Status 8:1, 8:9,
    8:19, 10:2, 75:5,
    75:6, 75:15,
    77:12, 95:20,
    95:24, 96:1
Statutory 21:10,
    46:16, 54:19, 55:5
Stay 97:1
stenography 2:47
step 50:5
stipulation 46:14,
    60:14, 60:15,
    61:18
stockpile 90:12
stop 25:18
stories 60:7
straight 49:5
strategic 57:12
strict 39:25
stringent 42:25,
    95:10
strong 58:20
strongly 38:7
structural 11:3,

71:9, 94:18
structurally 25:19
structure 11:17,
    24:23, 60:5, 75:24
structured 26:12
structuring 35:11
students 9:14
sub 83:12
subject 10:15,
    36:17, 47:8,
    70:11, 91:23
subjects 13:8
submission 38:9
submissions 10:14,
    53:18, 54:10,
    92:2, 96:13
submit 14:9, 65:16
subordination 37:16,
    77:9
subsequent 63:10,
    95:5
subsidize 9:2
substantial 25:4,
    77:20, 94:5
substantially 87:8,
    93:15
success 60:7, 76:17,
    81:1
successful 77:1,
    94:2
suffice 45:20
sufficient 56:10
sufficiently 65:14
suggest 24:9, 27:22,
    52:21, 69:11
suggested 80:14,
    80:19
suggesting 46:6
suggestion 40:1,
    47:13, 49:9, 72:8,
    84:10
suggestive 45:1
suggests 36:2
suit 30:21
suited 57:18
Sullivan 59:2
sum 29:10, 79:5
summarily 39:19,
    40:10
summarize 27:3

sunlight 26:24
Supplemental 12:19,
    19:12, 32:16,
    32:17
supplements 92:22
support 24:24, 25:4,
    27:11, 48:10,
    56:10, 57:2, 64:1,
    64:19, 68:16,
    68:20, 71:24,
    72:4, 72:15,
    72:22, 73:1, 78:2,
    83:25, 84:1, 84:2,
    87:10, 87:16,
    90:4, 96:25
supported 24:22,
    25:6, 81:12
supporting 29:7
supports 44:12,
    82:13
Suppose 40:6, 74:14
supposed 16:12,
    30:16
supposedly 36:21
Susheel 2:19, 24:3,
    24:7, 59:1
suspicion 41:22
suspicions 47:18,
    49:3, 49:4
suspicious 41:1
sustainability
    74:11, 89:9
Swain 1:23, 4:5,
    4:22, 5:10, 58:11,
    64:25, 98:7
sweetheart 80:6
sympathy 5:20


< T >
table 80:10, 81:6,
    86:1
Tacoronte 4:18, 5:1,
    5:7
tactics 41:10
taint 15:23, 16:1,
    16:2, 17:5, 50:1
taints 16:13, 16:24,
    50:19
taken. 58:9

talked 76:20, 84:3
targeted 39:23
targets 46:4
tax 60:2
Taylor 1:23, 4:21,
    5:10, 98:7
team 16:8, 25:2,
    28:3, 38:21
telephonic 5:12,
    5:25, 8:4, 96:19
TELEPHONICALLY 1:31
television 9:12
ten 24:1, 58:25,
    69:23, 71:13
tenant 59:8
tenants 24:22, 59:8
tepid 38:5
terminate 79:20,
    80:8
terminated 61:3,
    62:3, 79:18
terms 9:16, 11:3,
    11:7, 18:24, 21:5,
    25:23, 26:1, 61:2,
    68:12, 68:25,
    72:2, 74:25,
    76:21, 94:12,
    94:14, 95:13
terrible 34:8
terribly 87:10
territory 94:11
testified 22:2
testimony 21:25,
    22:5
Thad 41:19
Thaddeus 2:26
theme 69:19
themselves 15:10,
    25:24, 30:4
themselves. 41:4
theory 40:20, 41:5
Theresa 2:39, 31:25
thesis 25:23
they've 12:22,
    17:13, 18:7,
    19:24, 82:25
thinking 58:21
thinks 62:1, 62:22
Third 14:20, 19:8,
    21:7, 44:19

though 33:5, 37:4,
    72:11, 75:10, 89:5
thoughts 5:15,
    67:11, 74:15
Three 9:10, 9:21,
    21:20, 28:24,
    39:11, 41:18,
    61:15, 70:9,
    70:13, 71:14,
    93:11
throughout 9:15,
    28:9
thrown 63:15
tight 60:17, 95:4
timeline 35:7
timetable 11:13,
    60:9, 63:12, 74:2,
    75:20, 75:21,
    94:21, 95:4, 95:18
timing 27:24, 86:5,
    95:14
tips 25:17
Title 1:8, 2:11,
    5:14, 21:22, 54:3,
    54:16, 55:7, 56:5,
    56:11, 56:14,
    57:16, 59:23,
    65:6, 67:9, 85:8,
    88:11, 89:15,
    92:14, 93:9
today 5:12, 5:25,
    6:16, 23:20,
    24:20, 37:20,
    43:5, 60:13, 64:2,
    65:5, 66:11,
    67:12, 74:16,
    92:3, 96:15,
    96:19, 96:24
together 41:4, 61:7,
    61:16, 62:24,
    92:13, 94:21
Tomorrow 96:19
tone 24:19
took 8:11, 15:12,
    31:2
tool 66:10, 66:20
toolbox 66:10
tools 62:11
torch 86:11
Torruella 5:22

tosses 40:25
total 11:25, 29:10,
    45:21, 47:1,
    58:23, 79:5, 82:22
totally 46:1
touch 86:13
toward 51:25, 57:24,
    65:22, 85:2, 87:7,
    87:15
track 7:13, 7:14
trade 18:19, 35:12,
    35:15, 49:17,
    51:10
traded 17:19, 17:25,
    27:3, 33:3, 34:2,
    36:21, 42:15,
    42:25, 43:9, 46:8,
    54:5, 56:12
trades 15:9, 17:24,
    28:20, 28:21,
    28:22, 29:10,
    33:6, 35:18,
    39:18, 43:8
tranches 85:23
transaction 57:20
transactions 28:16,
    28:25, 31:1, 90:2
Transcript 2:47,
    7:2, 92:9, 98:4
transcription 54:14,
    98:5
transform 86:24
transition 11:8,
    77:17
transitions 10:22
transparency 28:8,
    33:7
transparent 33:8
travel 40:14
treated 14:2, 14:6,
    29:9, 90:19
treatment 13:7,
    14:5, 18:18, 29:4,
    48:24, 79:21, 80:8
Tree 32:3, 32:4
tremendous 78:21,
    78:22
tremendously 50:14
tried 42:14, 88:14,
    89:3

triggered 48:3,
    75:22
troubling 12:25
true 15:5, 18:25,
    29:25, 30:2,
    33:23, 38:2, 42:1,
    60:6, 93:10, 98:5
truly 93:17
Trustee 20:7, 20:17,
    21:1, 21:8, 21:9,
    54:2, 54:20, 55:4,
    56:4
truth 29:22, 40:14,
    60:8
try 9:2, 44:7, 48:4,
    49:23, 90:17
trying 12:6, 46:2,
    89:15
turn 8:17, 11:21,
    21:14, 23:25,
    34:17, 58:14,
    63:22, 64:23,
    66:2, 76:10
turnover 10:21
turns 67:21, 68:11
tweaks 68:17
twin 60:19
Two 7:15, 7:16,
    7:19, 7:20, 15:22,
    21:20, 22:14,
    26:4, 26:6, 28:16,
    31:1, 32:23, 33:4,
    36:24, 39:20,
    45:4, 52:18, 53:2,
    53:8, 53:9, 61:4,
    61:24, 67:14,
    70:8, 70:9, 70:13,
    70:18, 75:3, 83:9,
    83:19
two-fold 59:24
type 45:6
typically 71:13

< U >
UCC 38:5, 82:8,
    91:24
Ultimately 10:20,
    29:6
undercut 31:6

undermined 26:10
undermining 56:17
understand 27:20,
    47:24, 65:15,
    72:10, 74:7, 89:22
understanding 9:8
Understood 20:24
undertake 20:8
undertaking 87:13
undisputed 12:11,
    12:16, 35:4
unexpected 93:14
unfair 15:15, 45:14
unfairly 46:3, 49:24
unfairness 15:17
Unfortunately 4:10
unhappy 36:18
UNIDENTIFIED 4:13,
    4:14, 4:15
Unions 85:22
unique 50:16
United 1:1, 1:24,
    1:26, 4:20, 4:23,
    20:17, 44:21,
    54:1, 54:20,
    54:21, 55:4, 56:4,
    98:6, 98:8
Unless 30:23, 34:11,
    72:6, 82:5, 83:15
unlikely 67:23
unlimited 55:14
unmute 6:5, 8:11,
    10:5, 12:3, 12:6,
    67:1
unpaid 90:14
unrated 60:5
unrealistically
    93:19
unrestricted 17:22,
    18:9, 48:9
Unsecured 2:9, 27:9,
    57:10, 82:23
until 7:23, 16:20,
    37:19, 37:21,
    38:25, 49:8, 58:3,
    74:12, 74:25
unusually 50:11
unwelcome 50:8
upheaval 93:13
urge 41:13, 61:17,

urges 40:7
Urquhart 59:2
useful 85:19
uses 78:10
using 6:3, 12:17,
   18:12, 19:5, 88:16
usual 8:1


< V >
valid 47:20
valuable 14:18
value 12:15, 35:14,
   45:22, 50:14,
   50:15, 71:16,
   71:17
values 48:24
various 15:5, 47:18,
   49:22, 84:9
venture 56:24
verified 33:22,
   33:25
verify 38:22, 39:1
viable 59:11, 81:11
victims 24:15
view 12:20, 22:11,
   49:21, 49:25,
   69:7, 69:8, 70:14,
   76:7, 76:13
viewed 50:12
views 69:17
vigilance 39:10
vigorously 9:22,
   66:18
vintage 13:4, 13:11,
   13:14, 13:17,
   14:2, 18:17, 27:7,
   27:8, 27:13,
   27:15, 50:15
violate 18:2
violated 26:2, 26:5,
   33:2, 34:3, 42:4,
   42:8, 42:9, 42:11,
   54:4
violation 32:15,
   33:6
Violations 6:11,
   40:4
virtually 46:4

visitor 65:3
vital 48:5
voice 76:5, 76:9
volume 90:1
vote 63:8
voting 11:15, 57:3,
   74:21, 94:25


< W >
wait 4:9, 10:3,
   10:4, 14:14,
   38:25, 50:24,
   51:15, 53:14,
   91:10, 96:15
waiting 16:20,
   16:23, 16:25, 49:8
walk 88:14
Walker 98:13, 98:14
wanted 29:23, 29:25,
   32:4, 38:16,
   38:19, 40:16,
   87:25, 89:21,
   90:18
wants 10:5, 26:4,
   44:25, 50:23,
   69:4, 69:5, 71:23,
   74:10, 75:18,
   85:12, 90:4,
   96:15, 96:16
warranted 44:16,
   44:23
warrants 44:14
waste 85:16
watching 90:12
wave 6:21
Waxman 44:20
weak 56:2
web 38:15
week 5:22, 44:19,
   77:15
Welcome 5:8, 90:8
welcomed 49:11
well-known 69:18
Whatever 11:19,
   48:14, 61:13,
   64:12, 64:18,
   68:17, 72:4,
   73:16, 78:4, 90:4
whatsoever 41:3,

42:6
Whereas 45:21, 53:6,
   88:6
whether 8:25, 12:20,
   15:12, 18:12,
   18:16, 21:7, 21:8,
   30:11, 40:8,
   45:11, 48:17,
   53:5, 54:2, 54:5,
   63:9, 64:9, 64:11,
   79:23, 84:12,
   84:25, 85:18, 88:4
whole 86:20
whom 28:4
whomever 77:14
Willett 2:23, 66:3,
   66:4, 66:6, 66:7,
   66:23
willing 26:20, 85:14
willingness 87:14
Willkie 39:13, 63:24
Wilson 2:26, 41:17,
   41:19, 42:19,
   43:24, 44:1
winner 77:15
wish 6:19, 51:14,
   85:4
wishes 6:24, 53:13,
   84:25
within 11:18, 15:8,
   20:15, 22:24,
   61:21
Without 32:7, 40:4,
   41:2, 41:21,
   42:12, 42:13,
   71:23, 72:22,
   90:21
WITNESSES 3:3
wondering 9:4
word 18:5, 32:21
words 73:6
work 11:10, 77:20,
   77:23, 78:20,
   87:15, 93:8, 94:2,
   96:23
workable 76:7
worked 61:7
working 39:9, 41:3,
   59:10, 59:19,
   62:14

world 31:5, 40:14,
  63:5, 69:22,
  81:12, 81:14
worse 25:12
worth 19:22
write 86:25
writing 8:3, 87:5
written 8:9, 8:19,
  22:5
wrongdoing 27:23,
  41:12, 52:10
wrote 77:8


< Y >
year 5:19, 70:25,
  84:4, 88:1, 88:5,
  88:17, 88:20,
  88:24, 89:7, 91:6
years 33:4, 59:21,
  61:8, 69:24,
  70:25, 76:15,
  89:7, 93:11
yield 65:24
York 44:10, 44:13,
  96:23
yourself 6:14, 12:4