**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*,<br><br>Debtors.[1] | PROMESA<br><br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>THE EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO,<br><br>Debtor. | PROMESA<br><br>Title III<br><br>No. 17 BK 3566-LTS<br><br>**COMMITTEES' REPLY IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT ON *ULTRA VIRES* ISSUES** |
| THE SPECIAL CLAIMS COMMITTEE OF THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, ACTING BY AND THROUGH ITS MEMBERS,<br><br>and<br><br>THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF ALL TITLE III DEBTORS (OTHER THAN COFINA),<br><br>as co-trustees of | Adv. Proc. No. 19-00356 (LTS) |

---

[1] The Debtors in these jointly-administered PROMESA title III cases (these "Title III Cases"), along with each Debtor's respective title III case number listed as a bankruptcy case number due to software limitations and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are: (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation (Bankruptcy Case No. 17 BK 3284) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); and (v) Puerto Rico Electric and Power Authority  (Bankruptcy Case No. 17 BK 4780) (Last Four Digits of Federal Tax ID: 3747).

THE EMPLOYEES RETIREMENT SYSTEM OF
THE GOVERNMENT OF PUERTO RICO,

                 Plaintiff,

v.

DEFENDANT 1M, *et al.*,

                 Defendants.

---

THE SPECIAL CLAIMS COMMITTEE OF THE
FINANCIAL OVERSIGHT AND MANAGEMENT
BOARD FOR PUERTO RICO, ACTING BY AND
THROUGH ITS MEMBERS,

    and

THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS OF ALL TITLE III DEBTORS (OTHER
THAN COFINA),

    as co-trustees of

THE EMPLOYEES RETIREMENT SYSTEM OF
THE GOVERNMENT OF PUERTO RICO,

                 Plaintiff,

v.

STOEVER GLASS & CO., *et al.*,

                 Defendant.

Adv. Proc. No. 19-00357 (LTS)

---

THE SPECIAL CLAIMS COMMITTEE OF THE
FINANCIAL OVERSIGHT AND MANAGEMENT
BOARD FOR PUERTO RICO, ACTING BY AND
THROUGH ITS MEMBERS,

    and

THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS OF ALL TITLE III DEBTORS (OTHER
THAN COFINA),

    as co-trustees of

THE EMPLOYEES RETIREMENT SYSTEM OF
THE GOVERNMENT OF PUERTO RICO,

Adv. Proc. No. 19-00359 (LTS)

Plaintiff,

v.

DEFENDANT 1H-78H,

Defendants.

THE SPECIAL CLAIMS COMMITTEE OF THE
FINANCIAL OVERSIGHT AND MANAGEMENT
BOARD FOR PUERTO RICO, ACTING BY AND
THROUGH ITS MEMBERS,

  And

THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS OF ALL TITLE III DEBTORS (OTHER
THAN COFINA),

  as co-trustees of

THE EMPLOYEES RETIREMENT SYSTEM OF
THE GOVERNMENT OF PUERTO RICO,

   Plaintiff,

v.

DEFENDANT 1G-50G, *et al.*,

   Defendants.

Adv. Proc. No. 19-0361 (LTS)

**COMMITTEES' REPLY IN SUPPORT OF THEIR MOTION FOR
SUMMARY JUDGMENT ON *ULTRA VIRES* ISSUES**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................... ii

INTRODUCTION ................................................................................................... 1

ARGUMENT ......................................................................................................... 2

I.   The ERS Enabling Act Did Not Authorize The ERS Bonds. .................................. 2

    A.   The ERS Bond Issuances Were Neither A "Loan" Nor A "Borrowing" From A
    Financial Institution. ....................................................................................... 4

        1.   The Bondholders' Irrelevant "Translation" Argument Misses The Point And
        Fails In Any Event. ............................................................................... 4

        2.   The ERS Bonds Do Not Constitute A Borrowing From A Financial
        Institution. ............................................................................................ 6

            a.   The Underwriters' Contractual Obligation To Immediately Resell The
            ERS Bonds To The Investing Public Shows That The Underwriters Were
            Not Lenders. ................................................................................... 6

            b.   The Identity Of The Actual Lender Is Irrelevant Because ERS Was Not
            Authorized To Issue The ERS Bonds Under The ERS Enabling Act. .................. 9

            c.   None Of The Other Legislation Or Extra-Statutory Sources Relied On By
            The Bondholders Supports A Finding That The ERS Enabling Act
            Authorized The ERS Bonds. ................................................................. 10

    B.   The ERS Bond Issuances Were Not A "Direct Placement of Debt" ................................ 11

    C.   The ERS Bonds Are Void, Not Merely Nonnegotiable, Because They Are *Ultra
    Vires.* ............................................................................................................ 14

II.  UCC §8-202 Provides No Refuge From The Committees' *Ultra Vires* Claims ..................... 15

    A.   The Committees Are Not "Issuers" Because They Are Not Obligated On The ERS
    Bonds. ........................................................................................................... 16

    B.   The Bondholders And Fiscal Agent Have Not Met Their Burden Of Showing That
    The Bondholders Purchased Without Notice Of The *Ultra Vires* Issue. ........................... 19

    C.   The Committees Have Not Waived Other Arguments Concerning UCC §8-202. ............ 23

III. The Bondholders Cannot Recover In Equity. ....................................................... 25

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re Am. Pie, Inc.*,
   361 B.R. 318 (Bankr. D. Mass. 2007) ...................................................................19

*Atlantic Cleaners & Dyers, Inc. v. United States*,
   286 U.S. 427 (1932)...............................................................................................12, 13

*Cecort Realty Dev. Inc. v. Llompart-Zeno*,
   100 F.Supp. 3d 145 (D.P.R. 2015).........................................................................25, 26

*City of Brenham v. German-American Bank*,
   144 U.S. 549 (1892)................................................................................................14

*Coons v. Indus. Knife Co., Inc.*,
   620 F.3d 38 (1st Cir. 2010).....................................................................................6, 24

*Correa-Ruiz v. Fortuño*,
   573 F.3d 1 (1st Cir. 2009).......................................................................................3, 10

*In re Cty. of Orange*,
   219 B.R. 543 (Bankr. C.D. Cal. 1997)...................................................................17, 18

*In re Deep Marine Holdings, Inc.*,
   No. 09-39313, 2011 WL 160595 (Bankr. S.D. Tex. Jan. 19, 2011)..................27, 28

*Duckworth v. Pratt & Whitney, Inc.*,
   152 F.3d 1 (1st Cir. 1998).......................................................................................11

*Fed. Commc'ns Comm'n v. AT&T Inc.*,
   562 U.S. 397 (2011)................................................................................................3, 12

*In re Lehman Bros. Inc.*,
   519 B.R. 434 (S.D.N.Y. 2014)...............................................................................26, 27

*Merrill v. Town of Monticello*,
   138 U.S. 673 (1891)................................................................................................14

*In re Quality Processing, Inc.*,
   9 F.3d 1360 (8th Cir. 1993) ....................................................................................16

*Ride & Show Engineering, Inc. v. Walt Disney Parks & Resorts, LLC*,
   Nos. 03-6895 & 03-8293, 2005 WL 6220490 (C.D. Cal. Sept. 22, 2005) ........12, 13

*In re Thompson*,
   965 F.2d 1136 (1st Cir. 1992) ............................................................................17, 18

*U.S.I. Properties Corp. v. M.D. Construction Co.*,
   860 F.2d 1 (1st Cir. 1988) ...........................................................................................10

*In re Woodhaven Townhouse Ass'n, Inc.*,
   570 B.R. 546 (Bankr. N.D. Tex. 2017) ......................................................................20

**Statutes & Rules**

1 L.P.R.A § 59 ..................................................................................................................5

2 L.P.R.A. § 226 ...............................................................................................................5

19 L.P.R.A. § 402 ...........................................................................................................16

31 L.P.R.A. § 13 ...............................................................................................................5

11 U.S.C. § 510(b) ....................................................................................................26, 27

11 U.S.C. § 704 ...............................................................................................................18

11 U.S.C. § 1106 .............................................................................................................18

11 U.S.C. § 1107 .............................................................................................................18

Fed. R. Bankr. P. 3001(f) ...............................................................................................19

UCC § 8-114 (19 L.P.R.A. § 1714) ....................................................................19, 20, 21

UCC § 8-202 (19 L.P.R.A. § 1752) .......................................................................*passim*

The Official Committee of Retired Employees of the Commonwealth of Puerto Rico, the
Official Committee of Unsecured Creditors, and the Special Claims Committee of the Financial
Oversight and Management Board for Puerto Rico (collectively, the "**Committees**") hereby
submit their Reply in Support of Their Motion for Summary Judgment on *Ultra Vires* Issues [ERS
Dkt. 978].

## INTRODUCTION

1.      Unable to rebut the fact that ERS did not have the authority to issue the ERS Bonds,
the Bondholders' and Fiscal Agent's response briefs mischaracterize the Committees' arguments
and, in many instances, reverse the burdens of proof or production. Once this "smoke and mirrors"
routine is exposed, however, it becomes plain that the Bondholders and Fiscal Agent cannot fit a
public bond offering like the ERS Bonds into the language of the ERS Enabling Act as it existed
when ERS issued the ERS Bonds in 2008. This renders the ERS Bonds *ultra vires* and therefore,
void.

2.      To salvage their claims, the Bondholders and Fiscal Agent point to UCC §8-202,
19 L.P.R.A. §1752, but they cannot meet their burden of showing that UCC §8-202 applies. As
the Committees explained in their previous filings, UCC §8-202: (i) does not apply to the
Committees [ERS Dkt. 978 at ¶¶ 83-87; ERS Dkt. 1004 at 26-30]; (ii) does not apply to void
securities like the ERS Bonds [ERS Dkt. 978 at ¶¶ 74-77; ERS Dkt. 1004 at 21-30]; (iii) cannot
protect the initial owner of the ERS Bonds given that the bonds were issued in violation of the
Puerto Rico Constitution [ERS Dkt. 1004 at 48-52]; and (iv) is not available to the Bondholders
because they were on notice of the potential invalidity of the ERS Bonds at all relevant times [ERS
Dkt. 978 at ¶¶ 88-103; ERS Dkt. 1004 at 30-47]. The Bondholders and Fiscal Agent also have no
claim for unjust enrichment or any other equitable remedy under Puerto Rico law. [ERS Dkt. 978

at ¶¶ 78-80; ERS Dkt. 1004 at 52-55.] Thus, nothing can save the Bondholders' and Fiscal Agent's claims, and they should be disallowed.

3.    For these reasons, there is no genuine dispute of material fact as to whether the ERS Bonds were issued *ultra vires* or as to whether the Bondholders and Fiscal Agent have meritorious defenses. The Court should therefore enter summary judgment for the Committees and disallow the Bondholders' and Fiscal Agent's claims based on the ERS Bonds.

## ARGUMENT

4.    The Committees' prior briefs explain in detail why the ERS Bonds cannot be considered either a loan or borrowing from the underwriters or a direct placement of debt [ERS Dkt. 978 at ¶¶ 35-61; ERS Dkt. 1004 at 7-15] and why the Bondholders and Fiscal Agent cannot invoke UCC §8-202 to enforce the *ultra vires* ERS Bonds [ERS Dkt. 978 at ¶¶ 81-103; ERS Dkt. 1004 at 12-15 and 26-52]. The Committees will not repeat those arguments here, but instead incorporate these arguments by reference. To assist the Court, the Committees attach as **Exhibit 1** a chart summarizing the arguments the Bondholders and Fiscal Agent make in their response briefs, and for each such argument, a citation to the pages in the Committees' previous briefing that address those arguments. In this Reply, the Committees limit their arguments to those the Bondholders and the Fiscal Agent made for the first time in their responses to the Committees' summary judgment motion.

### I.    The ERS Enabling Act Did Not Authorize The ERS Bonds.

5.    A plain reading of the ERS Enabling Act shows that the ERS Bonds were issued *ultra vires*. [ERS Dkt. 978 at ¶¶ 35-61; ERS Dkt. 1004 at 7-15.] In analyzing the Bondholders' contrary arguments, it is important to note what is missing.[2] Namely, other than the ERS Bonds,

---

[2] The Fiscal Agent has joined by reference the Bondholders' arguments for why the ERS Bonds are not *ultra vires*. [ERS Dkt. 998 at 2.] Any references to the Bondholders' arguments include the Fiscal Agent.

they fail to provide a single example of a Commonwealth instrumentality engaging in a public bond offering where the underlying enabling legislation did not expressly grant the instrumentality in question the express authority to issue bonds. This failure is not an oversight. No such example exists. In contrast, the Committees have cited nearly 50 examples of the Legislative Assembly explicitly granting instrumentalities the power to issue "bonds" when it wanted to give an instrumentality the authority to issue bonds to the public. [ERS Dkt. 979, Appendix I.]

6.      Likewise, the Bondholders cannot point to a single case from any jurisdiction where limited debt authorization language, such as that found in the ERS Enabling Act, was held to authorize a public bond offering. Instead, the Bondholders rely on a handful of decisions from other jurisdictions where some courts have held that the "express statutory authority to borrow money" without limitation can be sufficient to allow for a public bond offering. [ERS Dkt. 1005 at 22.] This authority is inapposite not only because both United States Supreme Court and Puerto Rico precedent contradict it [ERS Dkt. 1004 at 15-20], but also because the ERS Enabling Act did not grant ERS general borrowing authority, making the Bondholders' citations factually distinguishable.

7.      In sum, the Bondholders' arguments boil down to convincing this Court that it should ignore what the ERS Enabling Act states and instead read words into the statute that simply are not there. The Court should decline this invitation, as it is inconsistent with established cannons of statutory construction—namely, "[i]n construing a statute, we begin with its plain meaning, and if the meaning of the text is unambiguous our task ends there as well." *Correa-Ruiz v. Fortuño*, 573 F.3d 1, 9 (1st Cir. 2009) (internal quotations omitted); *see also Fed. Commc'ns Comm'n v. AT&T Inc.*, 562 U.S. 397, 407 (2011) (rejecting method of statutory construction that seeks the "outer limits of a word's definitional possibilities" in favor of plain reading of the statute). As set

3

forth below and in the Committees' other briefs [ERS Dkt. 1004 at 6-26; ERS Dkt. 978 at ¶¶ 35-

73], the plain meaning of the ERS Enabling Act did not authorize ERS to issue the ERS Bonds.

**A.      The ERS Bond Issuances Were Neither A "Loan" Nor A "Borrowing" From A Financial Institution.**

**1.      The Bondholders' Irrelevant "Translation" Argument Misses The Point And Fails In Any Event.**

8.      The Bondholders' complaint with the official translation of the ERS Enabling Act

is a perfect example of their efforts to engage in misdirection and inappropriate burden-shifting.

The argument misdirects because no matter how the statute is translated, ERS did not have the

authority to issue its bonds. The argument also is plainly wrong.

9.      The Bondholders' irrelevant argument goes like this: (i) the official translation of

the ERS Enabling Act, which states that "[t]he ERS Board of Trustees may authorize the

Administrator ***to seek a loan*** from any financial institution..." is incorrect; (ii) the correct

translation is "[t]he Board of Trustees may authorize the Administrator ***to borrow from*** any

financial institution..."; and (iii) this difference in the translation somehow validates the ERS

Bonds. [ERS Dkt. 1005 at 5-9.] But what is missing is a credible, supported argument explaining

how the authorization to "borrow" or seek a "loan" from a financial institution could be construed

to authorize public bond offerings. As the Committees previously explained and as further

addressed below, when ERS issued its bonds through an underwriting syndicate, it was not

borrowing or seeking a loan from a financial institution, and it was not engaged in the direct

placement of debt. [ERS Dkt. 978 at ¶¶ 46-51; ERS Dkt. 1004 at 7-11.] Therefore, ERS did not

have the authority to issue the ERS Bonds and those bonds are *ultra vires* regardless of how the

ERS Enabling Act is translated.

10.      Moreover, by staking their defense on the translation question (which actually

makes no difference to the outcome here), the Bondholders' defense necessarily rises or falls on

the Court accepting the testimony of their "expert" witness, Dr. Laura Gonzalez. That is because Puerto Rico law holds that the official translation of a statute controls absent a showing that the translation is not "substantially satisfactory." *Segovia v. Tribunal de Distrito de San Juan*, 69 D.P.R. 4, 8 (1948); *see also* 1 L.P.R.A §59; 2 L.P.R.A. §226; 31 L.P.R.A. §13. In other words, the burden is on the Bondholders to show that the official translation of the ERS Enabling Act is not "substantially satisfactory." The burden is not on the Committees to prove up the translation.

11.     The Bondholders have not and cannot meet that burden. For starters, the Bondholders acknowledge, as they must, that the ERS Enabling Act is not the only time that the Office of Legislative Services of Puerto Rico has translated the phrase "*tomar prestado*" as "to seek a loan" in enabling act legislation. [ERS Dkt. 1005 at 8 n.5 (citing 11 L.P.R.A §30(c).)] That fact negates the argument that different translations of the phrase in other statutes necessarily means the official translation of "*tomar prestado*" in the ERS Enabling Act is not "substantially satisfactory."

12.     That leaves the Bondholders with only the testimony of their expert, Dr. Gonzalez. But Dr. Gonzalez admits she is not an expert in translating Spanish to English. [*See* ERS Dkt. 997 at ¶ 2.] For this and other reasons, the Committees have moved to strike Dr. Gonzalez's opinion. [ERS Dkt. 997.] If the Court grants this motion, the Bondholders are left with no admissible evidence or any credible argument that the official translation of the phrase "*tomar prestado*" is not substantially satisfactory, and thus their defense based on this alternative translation fails as a matter of law.

13.     Perhaps in recognition that Dr. Gonzalez's testimony might be questioned, the Bondholders also attempt to prevail on a technicality, arguing that the Committees have somehow waived their right to contest the correct translation of "*tomar prestado*" by not addressing the

translation arguments in their opening summary judgment brief. [ERS Dkt. 1005 at 5.] But this argument incorrectly shifts the evidentiary burden. Under Puerto Rico law, the Bondholders bear the burden of showing that the official translation of the Enabling Act is not "substantially satisfactory." *Segovia*, 69 D.P.R. at 8. The Committees therefore were under "no obligation" to "anticipate and respond" to the translation arguments in their motion for summary judgment. *See Coons v. Indus. Knife Co., Inc.*, 620 F.3d 38, 44 (1st Cir. 2010). Instead, the initial burden was on the Bondholders to explain why the Official Translation is wrong. The Committees have waived nothing.

## 2. The ERS Bonds Do Not Constitute A Borrowing From A Financial Institution.

14. But even if the Bondholders' proffered translation is considered, summary judgment is still warranted for the Committees because the ERS Bonds do not constitute a "borrowing" from the underwriters. Indeed, the Bondholders cannot point to a single example where anyone has ever classified a public bond offering as a borrowing from the underwriters. This Court should decline the invitation to be the first to do so based on the Bondholders' novel arguments, addressed below and in the Committees' prior filings. [ERS Dkt. 978 at ¶¶ 46-51; ERS Dkt. 1004 at 7-11.]

### a. *The Underwriters' Contractual Obligation To Immediately Resell The ERS Bonds To The Investing Public Shows That The Underwriters Were Not Lenders.*

15. In their response brief, the Bondholders do not dispute that the underwriters that initially purchased the ERS Bonds—like every other underwriter in a public bond offering—were contractually obligated to immediately resell the bonds to public investors. Instead, they argue that the underwriters' contractual obligation to do so was "beside the point, because it looks at the transaction from the standpoint of the underwriters, and not—as the ERS Enabling Act stipulates—

from the standpoint of ERS." [ERS Dkt. 1005 at 11.] This is a meaningless statement. The ERS Enabling Act is not concerned with anyone's "standpoint." Instead, it authorizes ERS to "borrow" (the Bondholders' translation) from a "financial institution," and this is never how public bond offerings have been described in the finance world. Moreover, the ERS Bonds are not, in fact, a borrowing from the underwriters because the legal nature of the relationship between the issuer and the underwriters is not, and has never been considered, a lending relationship—it is a purchase and sale for the express purpose of intermediating an offering of bonds to the public. [*See* ERS Dkt. 978 at ¶¶ 47-49.]

16.     Moreover, to the extent ERS's perspective does matter, ERS plainly did not intend to borrow from the underwriters. The first page of the Series A Offering Statement makes this clear when it states, "The Senior Pension Funding Bonds, Series A…are a series of Bonds being offered exclusively in the Commonwealth of Puerto Rico." [Commonwealth Dkt. 14250-3 at PR-ERS-000003223.] There is no evidence that ERS believed or intended it would "borrow" from the underwriters. Nor could it given that the Bondholders' theory of public bond offerings as disguised loans has never been adopted or even expressed by anyone else and certainly not by any credible municipal finance experts.

17.     Indeed, even the Bondholders' expert Dr. Hildreth hedges on this point. His analysis consists of two unsupported statements that "ERS borrowed directly from the underwriters…since it was the underwriters whose money was transferred to ERS." [ERS Dkt. 974 at ¶¶ 51, 174.] But tellingly, Dr. Hildreth himself later contradicts this *ipse dixit* conclusion when he states that "[g]overnmental entities borrowing large sums of money turn to financial intermediaries to facilitate the financial transaction. The financial intermediaries that underwrite the financial transaction are known as Underwriters…." [*Id.* at ¶¶ 92-93.] If the underwriters were

7

themselves the lenders, there would be no need for the borrower to have a "financial intermediary" in the first place.

18.     The Bondholders also mischaracterize certain of the Committees' arguments. In explaining the differences between a loan and an underwriter's agreement, the Committees noted that in an actual borrowing the lender is compensated through payments of principal and interest, which is how the investors in the ERS Bonds are compensated. [ERS Dkt. 978 at ¶47.] In contrast, as the Committees' expert explained, underwriters are compensated through the "underwriters' spread"—*i.e.*, the difference between the price at which they bought the ERS Bonds and the price at which they resold them to the public investors. [*Id.*] The Bondholders have taken this argument (which they do not attempt to rebut) and turned it into something completely different; namely, that the Committees are arguing that a lender "must hold debt to maturity rather than reselling it…." [ERS Dkt. 1005 at 12.] But that plainly is not the Committees' argument. The Committees' argument (again, unrebutted) is that the underwriters are not lenders because they exist solely to facilitate the sale of bonds to public investors, not to act as lenders or investors themselves.

19.     The Bondholders' misunderstanding makes irrelevant their response to the strawman argument they have erected: that the resale of loan debt is common. The Bondholders are correct that "[n]o one would argue that the inevitability of such resale means that a borrower who obtains a bank loan, a mortgage, a car loan, or a credit card has not thereby 'borrowed' from the lending institution." [*Id.* at 13.] Unlike those lending institutions, however, an underwriter never intends to serve as a "lender" to the issuer; it simply acts as an intermediary. Indeed, as the Committees have explained, the underwriters' purchase contracts ***required*** them to immediately resell the bonds to investors. [ERS Dkt. 1004 at 9.] This makes an underwriter fundamentally different from a bank that makes car or home loans and a credit card company.

> **b.    The Identity Of The Actual Lender Is Irrelevant Because ERS Was Not Authorized To Issue The ERS Bonds Under The ERS Enabling Act.**

20.    The Bondholders make much of their argument that "ERS plainly borrowed from *someone*" when it issued the ERS Bonds, but that the "Committees have not identified the lender from whom they believe ERS borrowed." [ERS Dkt. 1005 at 13 (original emphasis).] They further contend that if the current Bondholders, some of which are financial institutions, are considered the lenders, then ERS's "borrowing" from such entities was authorized. [*Id.* at 14.] These arguments miss the point entirely.

21.    The Committees' argument is that a government instrumentality does not have the authority to engage in public bond offerings absent express authority to issue such "bonds" and certainly cannot make a public bond offering based on the authority to "borrow from a financial institution." [ERS Dkt. 978 at ¶¶ 37-45; ERS Dkt. 1004 at 15-20.] This is so because an underwritten public bond offering is never referred to in such terms and is fundamentally not a loan from a financial institution but rather a sale of bonds to the general public. Because the language authorizing ERS to seek a loan or borrow from a financial institution does not authorize a public bond issuance, the identity of the lender or bondholder at any given time does not matter at all. To the extent the Bondholders imply that the Committees' arguments somehow turn on the answer to this question, they are wrong.

22.    Indeed, if the Bondholders were correct that the ERS Bonds were intended to be borrowings from financial institutions, one would have expected the ERS Bond Resolution to limit the sale of the ERS Bonds to financial institutions only, instead of making the bond offering a public offering available to anyone. The Bondholders' argument is also illogical because it establishes a test that would vary depending on who invested in the public bonds at any given moment. For the bonds to be valid, they must have been authorized by the ERS Enabling Act at

the time and in the manner that they were originally issued. The ERS Enabling Act contains no language that would justify assessing whether a bond issuance is valid based upon who holds the bonds at a given time. The Court should read the Enabling Act as it was written and hold that ERS did not have the authority to issue public bonds.

> ### c.   None Of The Other Legislation Or Extra-Statutory Sources Relied On By The Bondholders Supports A Finding That The ERS Enabling Act Authorized The ERS Bonds.

23.     The Bondholders continue to argue that the Court should look beyond the text of the ERS Enabling Act to conclude that ERS had the authority to issue the ERS Bonds. They point to Act 116-2011, which declared the ERS Bonds "illegal," and to other legislation and various non-statutory documents and claim that these statutes and documents validate the ERS Bonds even though they came into existence after the bonds were issued. [ERS Dkt. 1005 at 15-17.] The Committees have already explained why this is incorrect. In sum, the language of the ERS Enabling Act is clear, it did not authorize the ERS Bonds, and the Bondholders' attempts to reverse engineer a different result by relying on sources outside of the ERS Enabling Act's text not only misconstrues those sources, but is also irrelevant. [ERS Dkt. 978 at ¶¶ 62-73.] As the First Circuit instructs, "[i]n construing a statute, we begin with its plain meaning, and if the meaning of the text is unambiguous our task ends there as well." *Fortuño*, 573 F.3d at 9 (internal quotations omitted).

24.     To counter this point and justify their reliance on extra-statutory sources, the Bondholders incorrectly rely upon *U.S.I. Properties Corp. v. M.D. Construction Co.*, 860 F.2d 1 (1st Cir. 1988). In *U.S.I. Properties*, the First Circuit addressed an *ultra vires* challenge by looking first to the statutory text. Unlike here, however, the plain language of the relevant statutes in that case strongly suggested that the governmental instrumentality ***did*** have the statutory authority to take the challenged action. *Id*. at 8. There, as the Bondholders do here, the party challenging the plain meaning of the text with outside materials had an uphill battle to climb. The First Circuit

held that the challenging party failed to meet that burden, as not only did the wording of the statute

suggest a different result, but the agency's interpretation of that statute also was in conformity with

the statute's text. *Id*. In other words, the agency's interpretation was given deference because it fit

within the language of the statute at issue.

25.     In contrast, the materials the Bondholders rely upon here do not comport with the

plain language of the ERS Enabling Act and thus carry no weight. *Duckworth v. Pratt & Whitney,

Inc.*, 152 F.3d 1, 6 (1st Cir. 1998) ("No deference is due the administrative agency's interpretation

if it conflicts with unambiguous language"). The rule could not be otherwise. If an agency's

determination that it has the power to take an action was dispositive then the *ultra vires* doctrine

would be a dead letter. In any case, by taking the challenged action, the agency presumably

believed it had the authority to do so. But the entire purpose of the *ultra vires* doctrine is to correct

a governmental entity's miscalculation regarding the scope of its authority.

**B.     The ERS Bond Issuances Were Not A "Direct Placement of Debt."**

26.     The Bondholders' second argument for why the ERS Bonds are not *ultra vires* is

their contention that the ERS Bonds constitute a "direct placement of debt." To make this

argument, however, the Bondholders engage in a sleight of hand. They change, without any

support, the official translation of "direct placement of debt" to "direct debt placement" and then

argue that a "direct debt placement" actually means the "direct" debt of an entity as opposed to

debt issued through a conduit entity. [ERS Dkt. 1005 at 18-19.] As the Committees have explained

previously, this argument fails because: (i) the Bondholders have not shown that the official

English translation of "direct placement of debt" is not substantially satisfactory; (ii) "direct

placements" of debt (synonymously called a "private placement") is a well understood term of art

in finance constituting the antithesis of a public bond offering such as the ERS Bonds; and

(iii) because this phrase is an accepted term of art in the municipal finance industry, Puerto Rico

11

law requires this Court to read the ERS Enabling Act consistent with the meaning ascribed to the phrase by industry experts. [ERS Dkt. 1004 at 12-14.]

27.     Without repeating these arguments, the Committees note that the Bondholders' arguments about direct and conduit financing are irrelevant. No one disputes that there is a "distinction between direct and conduit financing." [ERS Dkt. 1005 at 19.] The dispute is that the term "direct placement" is not—and has never been—used to refer to this distinction. While the Bondholders cite nothing to support their reading of "direct placement," the Committees cite dozens of examples spanning decades where "direct placement" is used to mean a private sale of securities to a small number of sophisticated purchasers—in other words, the exact opposite of the public bond offering that occurred here. [ERS Dkt. 978 at ¶¶ 52-56.]

28.     Finally, while the Committees have already explained why the use of "*direct*as" in other sections of the ERS Enabling Act does not support the Bondholders' direct/conduit distinction, one comment in the Bondholders' response brief merits attention. [ERS Dkt. 976 at ¶¶ 58-61; ERS Dkt. 1004 at 13-15.] The Bondholders quote *Atlantic Cleaners & Dyers, Inc. v. United States*, 286 U.S. 427, 433 (1932), for the proposition that the "natural presumption [is] that identical words used in different parts of the same act are intended to have the same meaning." [ERS Dkt. 1005 at 21.] This argument, however, ignores that the pertinent language here is not merely the word "direct" but the term of art "direct placement." The manner in which the word "direct" is used by itself in other sections of the ERS Enabling Act has no bearing on the meaning of "direct placement," which is a term of art. *See AT&T*, 562 U.S. at 405 (rejecting relevance of the dictionary definition of "personal" because the statutory text at issue "refer[red] not just to the word 'personal,' but to the term 'personal privacy'"); *Ride & Show Engineering, Inc. v. Walt Disney Parks & Resorts, LLC*, Nos. 03-6895 & 03-8293, 2005 WL 6220490, at *26 (C.D. Cal.

Sept. 22, 2005) (rejecting "process of construction, which relies on bifurcating the separate components of a unitary term of art and defining them in isolation"). This is yet another example of the Bondholders ignoring the actual issues presented and instead attacking straw man arguments that the Committees have not made and that are irrelevant to the issue before the Court.

29.     In any event, *Atlantic Cleaners* is of no help to the Bondholders because the Supreme Court held that identical terms used in different parts of the same statute need ***not*** have the same meaning when the context suggests otherwise. To provide the context the Bondholders did not, the Supreme Court observed:

> Most words have different shades of meaning, and consequently may be variously construed, not only when they occur in different statutes, but when used more than once in the same statute or even in the same section. Undoubtedly, there is a natural presumption that identical words used in different parts of the same act are intended to have the same meaning. But the presumption is not rigid and readily yields whenever there is such variation in the connection in which the words are used as reasonably to warrant the conclusion that they were employed in different parts of the act with different intent. Where the subject-matter to which the words refer is not the same in the several places where they are used, or the conditions are different, or the scope of the legislative power exercised in one case is broader than that exercised in another, the meaning well may vary to meet the purposes of the law, to be arrived at by a consideration of the language in which those purposes are expressed, and of the circumstances under which the language was employed.

> It is not unusual for the same word to be used with different meanings in the same act, and there is no rule of statutory construction which precludes the courts from giving to the word the meaning which the Legislature intended it should have in each instance.

*Id*. at 433 (internal citations omitted). So too here. All of the Bondholders' examples of the use of the word "direct" concern the types of investments ERS itself could make. In contrast, the language this Court is addressing concerns the manner in which ERS could incur debt—a materially different context. Therefore, under the Bondholders' own authority, their argument fails.

C.     **The ERS Bonds Are Void, Not Merely Nonnegotiable, Because They Are *Ultra Vires.***

30.     As they previously argued, the Bondholders contend that if the ERS Bonds were issued outside of the authority provided in the ERS Enabling Act, that fact simply makes the bonds nonnegotiable. [ERS Dkt. 1005 at 28-31.] The Committees have explained why this argument is both wrong and irrelevant. [ERS Dkt. 1004 at 21-25.]

31.     In the Bondholders' response, they argue that the Committees "conflate[] negotiability with an underwritten offering, when the two are entirely separate concepts." [ERS Dkt. 1005 at 28.] Based on this statement, the Bondholders ask the Court to conclude that the *ultra vires* nature of the ERS Bonds does not render the ERS Bonds incapable of being transferred, but merely subjects the holder of the bonds to any legal or equitable defenses ERS can assert against making payment on the bonds. [*Id.*] If true, that is a Pyrrhic victory for the Bondholders. As the Committees have explained, under Puerto Rico law an *ultra vires* act is a legal nullity and cannot be enforced against a governmental instrumentality. [ERS Dkt. 978 at ¶¶ 74-80; ERS Dkt. 1004 at 6, 21-22.] Thus, by the Bondholders' own argument, they are subject to that defense and therefore the Bondholders cannot enforce the ERS Bonds. In short, the Bondholders' discussion of what negotiability meant in the 19th century proves the Committees' point that the Bondholders cannot collect on the ERS Bonds.

32.     In any event, the Bondholders have once again misrepresented the Committees' argument. The Bondholders argue that the Committees' reliance on the Supreme Court's decisions in *Merrill v. Town of Monticello*, 138 U.S. 673 (1891) and *City of Brenham v. German-American Bank*, 144 U.S. 549 (1892) is misplaced because they say "nothing at all about what the Committees say is the problem with the ERS Bond offering—the use of underwriters." [ERS Dkt. 1005 at 31.] The problem with the ERS Bond offerings is that they were issued outside the

authority given to ERS under the ERS Enabling Act. *Merrill* and *Brenham* are exactly on point because they stand for the proposition that even the general authority to borrow (which ERS did not have) is insufficient to confer the ability to make a public bond offering. The presence or absence of an underwriter has nothing to do with why *Merrill* and *Brenham* support the Committees' position that the ERS Bonds are *ultra vires* and void. The Committees respectfully submit that the Court should grant summary judgment for the Committees on the *ultra vires* issue.

## II.       UCC §8-202 Provides No Refuge From The Committees' *Ultra Vires* Claims.

33.       Faced with the fact that the ERS Bonds are *ultra vires*, the Bondholders and Fiscal Agent both assert the bonds are still valid in their hands under UCC §8-202, albeit under different theories. [ERS Dkt. 998 at 5-19; ERS Dkt. 1005 at 37-56.] The Committees already have explained why UCC §8-202 does not apply here. In summary: (i) UCC §8-202 applies to securities issued with a "defect" going to their validity, not securities issued with a total lack of authority such as the ERS Bonds [ERS Dkt. 1004 at 26-30]; (ii) in any event, UCC §8-202 is inapplicable to the Committees' *ultra vires* arguments because it applies only when an "issuer" asserts that a security is invalid, and the Committees are not "issuers" as defined in the UCC [ERS Dkt. 978 at ¶¶ 83-87]; (iii) contrary to the Fiscal Agent's novel argument, it is the notice of the beneficial owners (*i.e.*, the Bondholders), not the registered owner (*i.e.*, Cede & Co.), that matters for UCC §8-202 purposes [ERS Dkt. 1004 at 37-47]; (iv) the Bondholders purchased their ERS Bonds with notice of the *ultra vires* issue [ERS Dkt. 978 at ¶¶ 88-103; ERS Dkt. 1004 at 30-36]; and (v) Cede & Co. cannot avail itself of UCC §8-202 in any event because Cede & Co. would be an original issue purchaser and the ERS Bonds were issued in violation of the Puerto Rico Constitution [ERS Dkt. 1004 at 49-52.] The Committees confine the discussion below to the few new arguments raised in the Bondholders' and Fiscal Agent's response briefs.

**A.    The Committees Are Not "Issuers" Because They Are Not Obligated On The
ERS Bonds.**

34.    As previously explained, UCC §8-202 has no applicability here because the
Committees are not "issuers" of the ERS Bonds. [ERS Dkt. 978 at ¶¶ 83-87.] The Bondholders
and Fiscal Agent argue that the Committees are "issuers" for purposes of UCC §8-202 because the
UCC defines "issuer" to include any person who "becomes responsible for, or in place of another
person" who was the original issuer. [ERS Dkt. 998 at 11-13; ERS Dkt. 1005 at 38-43.] As
previously explained, however, a person only becomes "responsible for" or "in place of" an issuer
when that person becomes obligated on a security (*e.g.*, as successor by merger) or is otherwise
the obligor in economic reality even if its name is not on the certificate (*e.g.*, where a special
purpose entity issues securities as nominee for its parent company). Obviously, in asserting the
invalidity of the ERS Bonds, the Committees have in no way become obligated for their payment
and thus have not become their "issuers" within the meaning of the UCC. Contrary to the Fiscal
Agent's and Bondholders' unsupported argument, this standard is not met by a third party
challenging the validity of a security on a ground the issuer also could have raised.

35.    The Bondholders and Fiscal Agent further argue that the policy behind UCC §8-
202 would be violated if the provision were not applied to the Committees' *ultra vires* objection.
This is simply not true. UCC Article 8 does not displace non-UCC state law relating to securities
where that law does not contradict the UCC. 19 L.P.R.A. §402 ("Unless displaced by the particular
provisions of [Puerto Rico's UCC], the general principles of law of our jurisdiction shall
supplement its provisions"); *accord In re Quality Processing, Inc.*, 9 F.3d 1360, 1364-65 (8th Cir.
1993). Stated differently, where the UCC is silent other applicable law applies. By its plain terms,
UCC §8-202 prescribes rules that apply when an "issuer," as defined in UCC Article 8, asserts that
a security is invalid. It does not purport to cover a situation where an assertion of invalidity is made

by a party other than an "issuer." In such a situation, the enforceability of an invalid security will depend on non-UCC estoppel law. As set forth in the Committees' prior briefing, under Puerto Rico law, any contract entered into by a government entity without authorization is null and void, and the government entity cannot be estopped from asserting its invalidity. [ERS Dkt. 978 at ¶¶ 74-77.]

36.     The Bondholders and Fiscal Agent also contend that UCC §8-202 applies even if the Committees are not "issuers" because ERS has also challenged the ERS Bonds. [ERS Dkt. 998 at 9-11; ERS Dkt. 1005 at 39-40.] This argument fails on multiple levels. *First*, ERS is not a party to the claim objections or adversary proceedings asserting that the ERS Bonds are invalid. *Second*, the definition of "issuer" in the UCC does not include "representatives" of the issuer (*e.g.*, the FOMB or the SCC), even though the UCC separately defines that term. *Third*, even if ERS itself were also challenging the validity of the ERS Bonds, that would not mean UCC §8-202 could be invoked against the Committees, which are pursuing their challenges independently from and not derivatively of ERS.[3]

37.     Finally, the fact that the Committees are creations of the Title III process does not turn them into "issuers" of the ERS Bonds within the meaning of the UCC. The Bondholders cite *In re Thompson*, 965 F.2d 1136, 1147 (1st Cir. 1992), for the proposition that creditors may object to claims "only if 'the bankruptcy court permits the creditor to object in the trustee's stead.'" [ERS Dkt. 1005 at 42.] *Thompson*, however, involved chapter 7 of the Bankruptcy Code, not PROMESA, and the court's conclusion that only the trustee may pursue claim objections without leave of court stems from the fact that a chapter 7 trustee serves as a fiduciary for all estate creditors. The same is not true, however, in a chapter 9 case or under PROMESA, where neither a

---

[3] The SCC does not join in the arguments set forth in paragraphs 36-38.

government debtor nor, under PROMESA, the FOMB acts as a fiduciary for creditors.[4] *See In re Cty. of Orange*, 219 B.R. 543, 557 (Bankr. C.D. Cal. 1997) (a chapter 9 debtor "does not assume the same fiduciary responsibilities that a trustee has under the Code" because section "1107(a), which affords the debtor-in-possession with all the rights [and] responsibilities of a trustee, is not incorporated into chapter 9, nor is section 704").

38.     In this Title III case, the Committee and the Retiree Committee have ***independent standing*** to object to claims under section 502 of the Bankruptcy Code. They were in no need of derivative standing to challenge the ERS Bonds' validity, and they are not objecting as the "issuer" of the bonds on ERS's behalf. Finally, even if the Committees did "step into ERS's shoes" in pursuing their objections, neither the Fiscal Agent nor the Bondholders have provided any authority for the proposition that all arguments available against ERS are also available against the Committees, even in the face of a statute that, by its terms, applies only to ERS.[5] Accordingly, and for all the reasons previously set forth, UCC §8-202 cannot save the Bondholders' and Fiscal Agent's claims from the Committees' *ultra vires* objection.[6]

---

[4] Section 704 of the Bankruptcy Code and the cases interpreting it set out a chapter 7 trustee's fiduciary duties. Sections 1106 and 1107 of the Bankruptcy Code incorporate section 704 into chapter 11 cases and thus confer the same fiduciary duties on chapter 11 trustees and debtors-in-possession. None of sections 704, 1106, and 1107 is incorporated into chapter 9 or PROMESA.

[5] The best the Fiscal Agent can do is cite case law standing for the proposition that, in a chapter 11 case, an objecting party has available to it all defenses available to the debtor. The Fiscal Agent asserts that the converse must also be true, but it provides no support for this assertion. [ERS Dkt. 998 at 7-9.]

[6] A more detailed discussion of *In re Thompson* and the rights of the Committee to pursue claim objections in Title III can be found in the Committee of Unsecured Creditors' *Supplemental Brief Regarding Standing and Timing Issues in Connection with Objection to Proof of Claim Number 18449 Filed by U.S. Bank National Association, in its Capacity as Trustee for Non-Recourse PREPA Bonds* [Case No. 17-4780, Dkt. 1767].

**B.**     **The Bondholders And Fiscal Agent Have Not Met Their Burden Of Showing That The Bondholders Purchased Without Notice Of The *Ultra Vires* Issue.**

39.     As previously explained, the Bondholders and Fiscal Agent have failed to show that the Bondholders lacked notice of the *ultra vires* nature of the ERS Bonds at the time they acquired their holdings. [ERS Dkt. 978 at ¶¶ 88-103; ERS Dkt. 1004 at 30-36.] Instead, the record shows beyond a doubt that the Bondholders were on notice of the bonds' invalidity for numerous reasons, including because they (i) reviewed the Enabling Act, the Official Statements, the 2011 Amendments, and various other sources of information that would have alerted them to the *ultra vires* issue; (ii) acquired some of their bonds after the *ultra vires* issue was first raised in the Title III cases; and/or (iii) sought advice from counsel on the issue. The Bondholders' and Fiscal Agent's responses to these arguments misstate the law, misrepresent the record, and should be rejected.

40.     As an initial matter, the Bondholders and Fiscal Agent apply the wrong burden of proof. Under UCC §8-114(4), 19 L.P.R.A. §1714(4), the Bondholders—not the Committees— bear the burden of showing that the Bondholders were "without notice of the defect" under UCC §8-202(b). 19 L.P.R.A. §1714(4). The Fiscal Agent concedes this point. [*See* ERS Dkt. 976 at 8-9 ("If the objecting party shows that a defense or defect exists, the claimant has the burden of establishing that it or some person under whom it claims 'is a person against whom the defense or defect cannot be asserted.'") (quoting U.C.C. §8-114(4)).] Nevertheless, in opposing the Committees' summary judgment motion, both the Bondholders and Fiscal Agent attempt to flip this burden on its head by arguing that, under Bankruptcy Rule 3001(f), a party objecting to a claim bears the burden of proof. This argument misses the mark. Once an objecting party rebuts the *prima facie* validity of a claim, the burden shifts to the claimant to support its claim in accordance with applicable law. *See In re Am. Pie, Inc.*, 361 B.R. 318, 324–25 (Bankr. D. Mass. 2007) ("Although their proofs of claim constituted prima facie evidence of the validity and amount of

the claim, the Trustee's Motion for Summary Judgment has the effect of shifting the burden to the Defendants to establish that their claims, in fact, are secured.") (internal citations omitted).[7] Here, the Committees have more than rebutted the presumptive validity of the ERS Bond claims by presenting evidence that the bonds were issued *ultra vires* and are therefore null and void. The Committees need not submit further evidence as to each and every counterargument or defense that a Bondholder might raise in attempting to enforce the ERS Bonds under the UCC. This burden falls squarely on the shoulders of the Bondholders and Fiscal Agent as claimants. *See* U.C.C. §8-114(4).

41.     Attempting, however, to reverse this burden, the Fiscal Agent accuses the Committees of failing to present evidence of whether the registered owner of the ERS Bonds, *i.e.*, Cede & Co., had notice of their invalidity. As discussed at length in the Committees' opposition to the Fiscal Agent's summary judgment motion, the Fiscal Agent is wrong that Cede & Co. is the "purchaser" of the ERS Bonds whose knowledge is controlling for UCC §8-202 purposes. It is instead the knowledge of the Bondholders (the entitlement holders who acquired their interests in the secondary market) that matters, while Cede & Co.'s knowledge (or lack thereof) is irrelevant. [ERS Dkt. 1004 at 36-47.] In any event, the Fiscal Agent has failed to present any evidence concerning Cede & Co's supposed lack of knowledge. The Fiscal Agent has pointed only to a declaration purporting to attest to the lack of knowledge of DTC, which is a separate entity from Cede & Co.[8] There is nothing in the record about what Cede & Co. did or did not know.

---

[7] *See also In re Woodhaven Townhouse Ass'n, Inc.*, 570 B.R. 546, 550 (Bankr. N.D. Tex. 2017) ("[O]nce an objecting party produces evidence [or presents argument] rebutting a proof of claim, the burden then lies with whichever party would normally bear such burden under relevant substantive law.").

[8] For the reasons discussed in the *Committees' Motion to Strike Declaration of John Faith and Accompanying Exhibit From the Motion of the Bank of New York Mellon, as Fiscal Agent, for Summary Judgment Pursuant to Fed. R. Civ. P. 56 Regarding Ultra Vires Challenge* [ERS Dkt. 1000], the Court should not consider the DTC declaration in any event because it consists of evidence that was not properly disclosed in discovery.

42.    The Fiscal Agent further contends that, even if the entitlement holders' knowledge (as opposed to Cede & Co.'s) is controlling under UCC §8-202, the Committees' motion must be denied because the Committees have "fail[ed] to present any facts or make any argument that each and every entitlement holder" (*i.e.*, every holder other than the Bondholders involved in this litigation) had notice of the defect.[9] [ERS Dkt. 998 at 16.] Again, the Fiscal Agent improperly shifts the burden of proof. The Committees have no obligation to demonstrate that every single bondholder had notice of the defect going to the ERS Bonds' validity; rather, once the Committees have demonstrated that the ERS Bonds are invalid as a result of the defect, any claimant invoking UCC §8-202 must show that they are "person[s] against whom the…defect cannot be asserted." U.C.C. §8-114(4). Absent such proof, the ERS Bonds are unenforceable in their hands.

43.    The Bondholders fall into the same trap as the Fiscal Agent. They spend pages of their opposition arguing that "all the facts and circumstances known to" them—including, among other things, ERS's financial statements, ratings agency reports, and a 2010 Conway MacKenzie report—indicated that the ERS Bonds were validly issued. [*See* ERS Dkt. 1005 at 45-48.] Nowhere, however, do the Bondholders cite any evidence in the record that they actually had knowledge of these materials when they made their purchases. The reason is simple: there is no such evidence. Because the Bondholders have presented no evidence that they relied on statements that the ERS Bonds were validly issued, they cannot carry their burden under UCC §8-202.

---

[9] In making this argument, the Fiscal Agent continues to vacillate about for whose behalf it filed its proof of claim. In its own motion for summary judgment, the Fiscal Agent asserts that it filed its claim on behalf of Cede & Co. alone. [ERS Dkt. 976 at 3.] In its response to the Committees' motion for summary judgment, however, it asserts it also filed its proof of claim on behalf of all beneficial owners in ERS Bonds. [ERS Dkt. 998 at 16.] The Fiscal Agent's "moving target" approach to summary judgment underlies the *Committees' Motion to Strike Declaration of John Faith and Accompanying Exhibit From the Motion of the Bank of New York Mellon, as Fiscal Agent, for Summary Judgment Pursuant to Fed. R. Civ. P. 56 Regarding Ultra Vires Challenge* [ERS Dkt. 1000].

44.     In addition, the Bondholders ignore or mischaracterize the evidence in the record showing that they *did* have notice of the defect in the ERS Bonds' issuance (*i.e.*, ERS's lack of statutory authorization to issue bonds in public offerings). For example, the Bondholders contend that it is "manifestly false and misleading" for the Committees to say that the Bondholders have admitted to being aware of the *ultra vires* issue. [ERS Dkt. 1005 at 43.] Not so. As the chart attached to the Committees' opening memorandum shows, it is undisputed that each of the Bondholders acquired at least some of its holdings after it either (i) sought advice from counsel on the issue of the validity or invalidity of the ERS Bonds or (ii) became aware of the *ultra vires* issue as raised in the Title III cases. [ERS Dkt. 979, Appendix II.] There is nothing false or misleading about these undisputed facts. Knowing this, the Bondholders pivot to making the novel argument that "notice" for UCC §8-202 purposes requires notice of "an affirmative determination of invalidity." [ERS Dkt. 1005 at 56.] As discussed in the Committees' opposition, however, this interpretation of the notice requirement is absurd. [ERS Dkt. 1004 at 31-33.] It would effectively read the notice requirement out of the statute, because, as the Bondholders themselves observe, "[i]t should be obvious that no rational investor would purchase" an invalid bond. [ERS Dkt. 1005 at 44.]

45.     The Bondholders are similarly wrong in asserting that their receipt of advice from counsel on the potential invalidity or illegality of the ERS Bonds would not put them on notice of the defect. [ERS Dkt. 1005 at 53-55.] The Bondholders' position seems to be that, unless their counsel specifically advised them that the ERS Bonds were invalid and the Bondholders agreed with that advice, they would not be on notice under UCC §8-202. Setting aside that the Bondholders have refused to reveal the content of their counsel's advice on the basis of privilege, it cannot be the law that an investor must have formed an opinion or belief that the bonds at issue

were in fact invalid prior to making its purchase. It is far more sensible to conclude that an investor has "notice" for UCC §8-202 purposes if it acquired its bonds with knowledge of the possible defect—*e.g.*, with knowledge of the potential *ultra vires* argument—and therefore knowingly assumed the risk of the bonds' potential invalidity.

46.     In sum, the Committees have set forth ample evidence of facts that, at a minimum, would have given the Bondholders "reason to know" of the *ultra vires* issue, which is all the UCC requires. On the other hand, the Bondholders and Fiscal Agent present ***no*** evidence on the issue of the Bondholders' "notice" under UCC §8-202. On this record, the Court should enter summary judgment for the Committees.

## C.     The Committees Have Not Waived Other Arguments Concerning UCC §8-202.

47.     As noted above, the Committees have argued in their opposition to the Bondholders' and Fiscal Agent's motions that UCC §8-202 is inapplicable to the Committees' challenge to the ERS Bonds for additional reasons. Specifically, the Committees have explained that (i) UCC §8-202 applies only to securities issued with a "defect" in their validity, not securities issued with a total lack of authority [ERS Dkt. 1004 at 26-30]; and (ii) contrary to the Fiscal Agent's claims, Cede & Co. cannot avail itself of UCC §8-202 because, under the Fiscal Agent's theory, Cede & Co. was an original issue purchaser, and the ERS Bonds were issued in violation of the Puerto Rico Constitution [*id.* at 49-52].

48.     In their opposition to the Committees' summary judgment motion, the Bondholders argue that the Committees are foreclosed from raising arguments regarding UCC §8-202 that they did not initially raise in their motion. [ERS Dkt. 1005 at 37.] There is no merit to this argument. As discussed above, the Committees were under no obligation to affirmatively address UCC §8-202, as it is not their burden to establish that UCC §8-202 is inapplicable. They addressed UCC

§8-202 in their objection and opening summary judgment memorandum because they expected the Bondholders to invoke this provision and thought it advantageous to raise certain arguments preemptively. This in no way precludes the Committees from raising any additional arguments in opposition to the Bondholders' or Fiscal Agent's summary judgment motions. None of the Bondholders' cases suggest a different rule. Every case cited by the Bondholders stands for the unremarkable position that a party may not introduce new grounds for why summary judgment is proper in a reply brief. These cases neither hold nor even suggest that a party may not raise additional arguments responding to a motion for summary judgment or rebutting arguments raised by the opposition's response brief. In any event, the First Circuit has flatly rejected any such rule. *Coons*, 620 F.3d at 44 ("there is no obligation" for a moving party to "anticipate and respond" to potential counter-arguments to a motion for summary judgment).

49.   Indeed, the unconstitutionality of the ERS Bonds only became relevant when the Fiscal Agent argued in its opening summary judgment memorandum that Cede & Co., as nominee of the clearing agent (DTC) with which the ERS Bond certificates were deposited at issuance, is the "purchaser" of the ERS Bonds for UCC §8-202 purposes. [ERS Dkt. 998 at 4.] As set forth in the Committees' opposition to the Bondholder's and Fiscal Agent's summary judgment motions, if Cede & Co. were the "purchaser" for purposes of UCC §8-202 (which it is not), the provision would not apply because, on its face, it does not validate a security issued in violation of a constitutional provision if the security is in the hands of an original issue purchaser (which Cede & Co. would be), as opposed to a holder who purchased in the secondary market. [ERS Dkt. 1004 at 49-52.]

50.   In any event, all of the arguments set forth herein were raised by the Committees in their opposition to the Bondholders' and Fiscal Agent's motions for summary judgment, and

the Court can consider the arguments in that context. And, of course, the Bondholders and the

Fiscal Agent will have the opportunity to respond to those arguments in their summary judgment

reply memoranda. This is precisely how summary judgment briefing is supposed to work.

## III.   The Bondholders Cannot Recover In Equity.

51.    The Bondholders' final argument is that even if the ERS Bonds are *ultra vires* and

even if UCC §8-202(b) does not allow the Bondholders to enforce the bonds, they still have unjust

enrichment claims. [ERS Dkt. 1005 at 57-59.] This argument is incorrect. [*See* ERS Dkt. 978 at

¶¶ 78-80; ERS Dkt. 1004 at 52-55.] In Puerto Rico, when a governmental contract is *ultra vires*,

"[n]o unjust enrichment recourse is available. This is the end of this relationship, period." *Cecort*

*Realty Dev. Inc. v. Llompart-Zeno*, 100 F.Supp. 3d 145, 164 (D.P.R. 2015).

52.    In their response, the Bondholders attempt to narrow the scope of this rule. They

first argue that Puerto Rico's prohibition on unjust enrichment claims based on *ultra vires* actions

does not apply because only "the form of the issuance," and not the amount of the ERS Bonds was

prohibited by law. [ERS Dkt. 1005 at 58.] The Bondholders do not cite any case that supports that

proposition. Moreover, the Bondholders' purported limitation cannot explain away cases such as

*Las Marias Reference Laboratory Corp. v. Municipality of San Juan*, where the Puerto Rico

Supreme Court held a contract was *ultra vires* (and immune from an unjust enrichment claim) not

because the amount of the debt was legally problematic but because the municipality did not

comply with the legal requirements to enter into a binding contract. 159 D.P.R. 868 (2003).

53.    To address this problem, the Bondholders divine a second limitation; namely, that

the courts will refuse an equitable remedy only where the contracting party should have known

the contract was *ultra vires*. [ERS Dkt. 1005 at 58.] This too is wrong and no case provides such

a limitation. To the contrary, in Puerto Rico, "[p]arties that contract with a municipality are aware

of the need to conduct themselves in accordance with" the law governing municipalities' contracts.

*Las Marias*, 159 D.P.R. at 875. In any event, even if Puerto Rico law required a finding that the contracting party should have known the governmental agency lacked the authority to enter into the contract, there is no question the Bondholders possessed such knowledge. [*See* ERS Dkt. 978 at ¶¶ 88-103.]

54.     Still unable to distinguish all the cases cited by the Committees, the Bondholders create a third purported limitation—that equitable remedies are unavailable only where the benefit from the *ultra vires* contract goes only to a third party. [ERS Dkt. 1005 at 57-58.] Again, no court ever has so held. The Bondholders' attempt to limit every case that holds that an *ultra vires* government contract precludes an unjust enrichment finding to the facts of that particular case not only runs contrary to logic but to the case law itself. When it comes to an *ultra vires* contract, "[n]o matter how the parties characterize the relationship, no matter the hierarchy of the institutions or parties involved, the contract is unacceptable….No unjust enrichment recourse is available." *Cecort*, 100 F.Supp.3d at 163.

55.     Finally, the Committees have argued [ERS Dkt. 978 at ¶ 80] that even if the Bondholders could possess an unjust enrichment claim, such a claim would be subordinated under section 510(b) of the Bankruptcy Code as a claim "for damages arising from the purchase or sale" of a security. 11 U.S.C. §510(b). The Bondholders argue that this provision only prevents an "'equity security-holder' from improving the priority of its claim against a debtor to that of an unsecured creditor by alleging some form of fraud" and that "[n]othing like that is at issue here." [ERS Dkt. 1005 at 58.] The Bondholders are wrong on many fronts.

56.     *First*, by its plain language, section 510(b) does not apply only to "equity security holders" but to any claim for damages arising from the purchase or sale of a security, including a debt security. *See, e.g., In re Lehman Bros. Inc.*, 519 B.R. 434, 442-43 (S.D.N.Y. 2014) ("Courts

also recognize that the claimant need not be an actual security holder, and the debtor need not be

the issuer of the security for section 510(b) to apply.") In turn, courts have had no difficulty

applying section 510(b) to claims arising from bonds issued by the debtor. *Id.* at 446 ("[B]onds, in

keeping with their common meaning, are included in the [section 510(b)] definition of security.").

57.     *Second*, section 510(b), again by its plain terms, is not limited to fraud-based

claims. "[S]ection 510(b) has been applied broadly to subordinate claims arising in a variety of

contexts, such as…breach of contract claims….Courts have also subordinated claims for

contribution, indemnification and reimbursement…." *Id.* at 442. And even if section 510(b) were

so limited, that would not help the Bondholders who have asserted a litany of fraud based claims

in connection with the ERS Bonds. [*See generally* ERS Dkt. 848.] Briefing on the Committees'

and Oversight Board's motions to dismiss these claims is completed and is awaiting this Court's

ruling.

58.     *Third*, the Bondholders are incorrect that "they just want to enforce the ERS Bonds

against ERS according to the terms of those bonds, to receive the liquidated, unpaid amount due

and owing on the instrument itself." [ERS Dkt. 1005 at 59 (internal quotations and emphasis

omitted).] If the Court considers the merits of the Bondholders' unjust enrichment claim, it already

would have held that the ERS Bonds are *ultra vires* and void—a fact the Bondholders concede.

[*Id.* at 57.] As a result, the Bondholders' unjust enrichment claim cannot and is not seeking to

enforce the ERS Bonds. Instead, it seeks "damages" for the loss the Bondholders suffered as a

result of their attempted purchase of a legal nullity. This is precisely the type of situation section

510(b) contemplates and any unjust enrichment claim must be subordinated. *Lehman Bros.*, 519

B.R. at 445 (applying section 510(b) to attempted, but unsuccessful, purchase of a bond); *In re

Deep Marine Holdings, Inc.*, No. 09-39313, 2011 WL 160595, at *7 (Bankr. S.D. Tex. Jan. 19,

2011) (finding mandatory subordination under 510(b) of unjust enrichment (and other claims) as unjust enrichment claim was "causally linked" to claimant's security holdings in the debtor).

*****

59.     To conclude, the initial questions for this Court are: (i) whether the ERS Bonds were issued in conformity with the ERS Enabling Act; and (ii) if they were not, what is the legal consequence of that fact. The Committees have shown that there is no plausible reading of the ERS Enabling Act that allows ERS to make a public bond offering. The ERS Bonds are therefore *ultra vires*. The Committees also have shown that an *ultra vires* act (including an *ultra vires* bond offering) is a legal nullity under Puerto Rico law and that the ERS Bonds are not valid in the Bondholders' or Fiscal Agent's hands under the UCC. Consequently, the ERS Bonds are unenforceable, and the Committees should be granted summary judgment.

Dated: November 19, 2020          */s/ Robert D. Gordon*
San Juan, Puerto Rico


JENNER & BLOCK LLP
Robert Gordon (admitted *pro hac vice*)
Richard Levin (admitted *pro hac vice*)
919 Third Ave
New York, NY 10022-3908
rgordon@jenner.com
rlevin@jenner.com
212-891-1600 (telephone)
212-891-1699 (facsimile)

Catherine Steege (admitted *pro hac vice*)
Melissa Root (admitted *pro hac vice*)
Landon Raiford (admitted *pro hac vice*)
353 N. Clark Street
Chicago, IL 60654
csteege@jenner.com
mroot@jenner.com
lraiford@jenner.com
312-222-9350 (telephone)
312-239-5199 (facsimile)

- and –

*/s/ A.J. Bennzar-Zequeria*
BENNAZAR, GARCÍA & MILIÁN,
C.S.P
A.J. Bennazar-Zequeira
Héctor M. Mayol Kauffmann
Francisco del Castillo Orozco
Edificio Union Plaza,
1701 Avenida Ponce de León #416
Hato Rey, San Juan
Puerto Rico 00918
ajb@bennazar.org
hector.mayol@bennazar.com
787-754-9191 (telephone)
787-764-3101 (facsimile)

*Counsel for the Official Committee of
Retired Employees of Puerto Rico*

- and –

/s/ Luc A. Despins

PAUL HASTINGS LLP
Luc A. Despins, Esq. *(Pro Hac Vice)*
James R. Bliss (*Pro Hac Vice*)
200 Park Avenue
New York, New York 10166
Tel: (212) 318-6000
lucdespins@paulhastings.com

Nicholas A. Bassett, Esq. (*Pro Hac Vice*)
2050 M Street NW
Washington, D.C. 20036
Tel: (202) 551-1700
nicholasbassett@paulhastings.com

*Counsel to the Official Committee of Unsecured*
*Creditors for all Title III Debtors (other than COFINA and PBA)*[10]

- and –

/s/ Juan J. Casillas Ayala

CASILLAS, SANTIAGO & TORRES LLC
Juan J. Casillas Ayala, Esq. (USDC - PR 218312)
Israel Fernández Rodríguez, Esq. (USDC PR 225004)
Juan C. Nieves González, Esq. (USDC - PR 231707)
Cristina B. Fernández Niggemann, Esq. (USDC - PR 306008)
PO Box 195075
San Juan, PR 00919-5075
Tel.: (787) 523-3434 Fax: (787) 523-3433
jcasillas@cstlawpr.com
ifernandez@cstlawpr.com

---

[10] As it relates to the Committee's Omnibus Claims Objection at Commonwealth Dkt. 5580, except as to the argument set forth in section II(A) of the Committees' *Response to Motions for Summary Judgment on Ultra Vires Issues* [ERS Dkt. 1004], as incorporated or referenced herein.

jnieves@cstlawpr.com
cfernandez@cstlawpr.com

*Local Counsel to the Official Committee
of Unsecured Creditors for all Title III
Debtors (other than COFINA and PBA)*[11]

- and –

/s/ John Arrastia
GENOVESE JOBLOVE &
BATTISTA, P.A.
John Arrastia, Esq. (*Pro Hac Vice*)
John H. Genovese, Esq. (*Pro Hac Vice*)
Jesus M. Suarez, Esq. (*Pro Hac Vice*)
Mariaelena Gayo-Guitian, Esq. (*Pro
Hac Vice*)
100 SE 2nd Street, Suite 4400
Miami, Florida 33131
Tel: 305-349-2300
jarrastia@gjb-law.com
jgenovese@gjb-law.com
jsuarez@gjb-law.com
mguitian@gjb-law.com

*Special Litigation Counsel to the
Official Committee of Unsecured
Creditors*[12]

- and –

/s/ Sunni Beville
Sunni P. Beville, Esq. (*pro hac vice*)
Tristan G. Axelrod, Esq. (*pro hac vice*)
One Financial Center
Boston, MA 02111
Tel: (617) 856-8200
sbeville@brownrudnick.com

*Counsel to the Financial Oversight and
Management Board, acting through the*

---

[11] As it relates to the Committee's omnibus claims objections at Commonwealth Dkts. 5580 and 5586 and Adversary
Proceeding Nos. 19-356, 19-357, and 19-361.

[12] As it relates to Adversary Proceeding Nos. 19-356, 19-357, 19-359, and 19-361.

*members of the Special Claims*
*Committee*

- and –

*/s/ Kenneth Suria*
ESTRELLA, LLC
Alberto Estrella (USDC-PR 209804)
Kenneth C. Suria (USDC-PR 213302)
P. O. Box 9023596
San Juan, Puerto Rico 00902–3596
Tel.: (787) 977-5050
Fax: (787) 977-5090

*Local Counsel to the Financial*
*Oversight and*
*Management Board, acting through the*
*members*
*of the Special Claims Committee*