# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re: | ) |
| | ) |
| | ) PROMESA |
| THE FINANCIAL OVERSIGHT AND | ) Title III |
| MANAGEMENT BOARD FOR PUERTO RICO | ) |
| | ) Case No. 17-BK-03283 (LTS) |
| as representative of | ) |
| | ) |
| THE COMMONWEALTH OF PUERTO RICO, *et al.*, | ) |
| | ) |
| Debtors.[1] | ) |
| | ) |
| | ) |
| In re: | ) |
| | ) PROMESA |
| THE FINANCIAL OVERSIGHT AND | ) Title III |
| MANAGEMENT BOARD FOR PUERTO RICO, | ) |
| | ) Case No. 17-BK-03566 (LTS) |
| as representative of | ) |
| | ) |
| THE EMPLOYEES RETIREMENT SYSTEM OF THE | ) |
| GOVERNMENT OF THE COMMONWEALTH OF | ) |
| PUERTO RICO, | ) |
| | ) |
| Debtor. | ) |
| | ) |
| | ) |
| | ) |
| THE SPECIAL CLAIMS COMMITTEE OF THE | ) |
| FINANCIAL OVERSIGHT AND MANAGEMENT | ) Adv. Proc. No. 19-00356 (LTS) |
| BOARD FOR PUERTO RICO, ACTING BY AND | ) |
| THROUGH ITS MEMBERS, | ) |

---

[1] The Debtors in these Title III cases, along with each Debtor's respective Title III case number listed as a bankruptcy case number due to software limitations and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK-3283 (LTS)) (Last Four Digits of Federal Tax ID: 3481), (ii) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566 (LTS)) (Last Four Digits of Federal Tax ID: 9686), (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567 (LTS)) (Last Four Digits of Federal Tax ID: 3808), (iv) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284 (LTS)) (Last Four Digits of Federal Tax ID: 8474); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17-BK- 4780) (Last Four Digits of Federal Tax ID: 3747).

and                                                                    )
                                                                       )
THE OFFICIAL COMMITTEE OF UNSECURED                                    )
CREDITORS OF ALL TITLE III DEBTORS                                     )
(OTHER THAN COFINA),                                                   )
                                                                       )
     as co-trustees of                        )
                                                                       )
THE EMPLOYEES RETIREMENT SYSTEM OF THE                                 )
GOVERNMENT OF PUERTO RICO,                                             )
                                                                       )
     Plaintiff,                                )
                                                                       )
v.                                                                     )
                                                                       )
DEFENDANT 1M, *et al.*,                                                )
                                                                       )
     Defendants.                               )
                                                                       )
_____                               )
                                                                       )
THE SPECIAL CLAIMS COMMITTEE OF THE                                    )
FINANCIAL OVERSIGHT AND MANAGEMENT                                     )      Adv. Proc. No. 19-00357 (LTS)
BOARD FOR PUERTO RICO, ACTING BY AND                                   )
THROUGH ITS MEMBERS,                                                   )
                                                                       )
                                                                       )
     and                                       )
                                                                       )
THE OFFICIAL COMMITTEE OF UNSECURED                                    )
CREDITORS OF ALL TITLE III DEBTORS                                     )
(OTHER THAN COFINA),                                                   )
                                                                       )
     as co-trustees of                        )
                                                                       )
THE EMPLOYEES RETIREMENT SYSTEM OF THE                                 )
GOVERNMENT OF PUERTO RICO,                                             )
                                                                       )
     Plaintiff,                                )
                                                                       )
v.                                                                     )
                                                                       )
STOEVER GLASS & CO., *et al.*,                                         )
                                                                       )

Defendant.    )
)
)
)
)

THE SPECIAL CLAIMS COMMITTEE OF THE    )     Adv. Proc. No. 19-00359 (LTS)
FINANCIAL OVERSIGHT AND MANAGEMENT  )
BOARD FOR PUERTO RICO, ACTING BY AND   )
THROUGH ITS MEMBERS,              )
)
    and                      )
)
THE OFFICIAL COMMITTEE OF UNSECURED   )
CREDITORS OF ALL TITLE III DEBTORS     )
(OTHER THAN COFINA),            )
)
    as co-trustees of          )
)
THE EMPLOYEES RETIREMENT SYSTEM OF THE  )
GOVERNMENT OF PUERTO RICO,     )
)
    Plaintiff,            )
)
v.                      )
)
DEFENDANT 1H-78H,           )
)
    Defendants.         )
)
)

THE SPECIAL CLAIMS COMMITTEE OF THE    )     Adv. Proc. No. 19-00361 (LTS)
FINANCIAL OVERSIGHT AND MANAGEMENT  )
BOARD FOR PUERTO RICO, ACTING BY AND   )
THROUGH ITS MEMBERS,              )
)
    and                      )
)
THE OFFICIAL COMMITTEE OF UNSECURED   )
CREDITORS OF ALL TITLE III DEBTORS     )
(OTHER THAN COFINA),            )
)
    as co-trustees of          )
)
)

THE EMPLOYEES RETIREMENT SYSTEM OF THE )
GOVERNMENT OF PUERTO RICO,                )
                                          )
          Plaintiff,                      )
                                          )
v.                                        )
                                          )
DEFENDANT 1G-50G, *et al.*,               )
                                          )
          Defendants.                     )

-------------------------------------------------------------------- X


**ERS BONDHOLDERS' REPLY IN SUPPORT OF MOTION FOR PARTIAL
SUMMARY JUDGMENT ON *ULTRA VIRES* ISSUES AND PROCEEDINGS**

## TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................1

ARGUMENT .....................................................................................................2

    I.    The ERS Enabling Act Authorized ERS to Borrow Money by Issuing the
ERS Bonds...............................................................................................2

        A.    The Enabling Act Authorized ERS to Borrow from Financial
Institutions and Through Direct Placements of Debt ...............................3

        B.    ERS Borrowed and Obtained a Loan by Issuing the ERS Bonds .............6

        C.    ERS Borrowed "from Any Financial Institution" by Issuing the
ERS Bonds ...........................................................................................7

        D.    Alternatively, ERS Borrowed "Through the Direct Placement of
Debt" by Issuing the ERS Bonds ..........................................................11

        E.    Express Reference to "Bonds" Is Not Required .....................................14

        F.    Other Authority Confirms the Validity of the ERS Bonds......................20

    II.    Even if the ERS Bonds Were Invalid, They Are Enforceable ...........................22

        A.    UCC § 8-202 Renders the ERS Bonds Enforceable even if Invalid ........22

        B.    The Bondholders Are Entitled to Recover in Equity .............................35

CONCLUSION....................................................................................................37

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Atl. Cleaners & Dyers, Inc. v. United States*,
    286 U.S. 427 (1932) ...............................................................................................14

*Backhaus v. Lee*,
    194 N.W. 887 (N.D. 1923) .....................................................................................17

*Bangor Sav. Bank v. City of Stillwater*,
    49 F. 721 (C.C.D. Minn. 1892)...............................................................................35

*Bd. of Cnty. Comm'rs v. Williamson*,
    370 P.2d 837 (Okla. 1962)......................................................................................15

*Berrios v. Univ. P.R.*,
    116 D.P.R. 88, 16 P.R. Offic. Trans. 112 (1985)...................................................36

*Buchanan v. City of Litchfield*,
    102 U.S. 278 (1880) ...............................................................................................17

*Bunch's Ex'rs v. Fluvanna Cnty.*,
    10 S.E. 532 (Va. 1890) ...........................................................................................15

*City of Brenham v. German Am. Bank*,
    144 U.S. 549 (1892) ...............................................................................................20

*City of Brenham v. German-Am. Bank*,
    144 U.S. 173 (1892) ......................................................................................... 15, 16

*City of Lebanon v. Baird*,
    756 S.W.2d 236 (Tenn. 1988).................................................................................17

*Comm'rs of Hendersonville v. C.A. Webb & Co.*,
    61 S.E. 670 (N.C. 1908) .........................................................................................15

*Commonwealth ex rel. Hamilton v. Select & Common Councils of City of
    Pittsburgh*,
    34 Pa. 496 (1859)....................................................................................................16

i

*Commonwealth v. Town of Williamstown*,
  30 N.E. 472 (Mass. 1892) ................................................................................................15

*Doty v. Ellsbree*,
  11 Kan. 209 (1873) ..........................................................................................................16

*Dutton v. City of Aurora*,
  28 N.E. 461 (Ill. 1885) .....................................................................................................16

*Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*,
  104 F. Supp. 3d 441 (S.D.N.Y. 2015) ...............................................................................8

*Fid. Tr. & Safety Vault Co. v. Mayor of Morganfield*,
  29 S.W. 442 (Ky. 1895), *overruled in part on other grounds*,
  *Belknap v. City of Louisville*, 36 S.W. 1118 (Ky. 1896) ................................................15

*Forrest City v. Bank of Forrest City*,
  172 S.W. 1148 (Ark. 1915) ........................................................................................18, 19

*Gray v. Noholoa*,
  214 U.S. 108 (1909) ...........................................................................................................5

*Humacao Lumber Co. v. Am. Surety Co. of N.Y.*,
  59 D.P.R. 165 (1941) ........................................................................................................18

*In re Fin. Oversight & Mgmt. Bd.*,
  914 F.3d 694 (1st Cir. 2019) ..............................................................................................4

*In re Lehman Brothers Mortg.-Backed Sec. Litig.*,
  650 F.3d 167 (2d Cir. 2011) ...............................................................................................7

*In re Numoda Corp. Shareholders Litigation*,
  No. CV 9163-VCN, 2015 WL 402265 (Del. Ch. Jan. 30, 2015).................................24, 25

*In re Plaza Resort at Palmas, Inc.*,
  741 F.3d 269 (1st Cir. 2014) ............................................................................................10

*In re Seacoast Anti-Pollution League*,
  490 A.2d 1329 (N.H. 1984) ..................................................................................24, 30, 31

*In re Waterloo Organ Co.*,
  134 F. 341 (2d Cir. 1904) .................................................................................................17

*Keel v. Pulte*,
    10 S.W.2d 694 (Tex. Comm'n App. 1928) ................................................................. 18, 19

*Keeler Bros. v. Sch. Dist. No. 3, Sheridan Cty.*,
    205 P. 217 (Mont. 1922) ........................................................................................................ 26

*Kruesel v. Collin*,
    17 P.2d 854 (Wash. 1933) ...................................................................................................... 15

*Las Marias Reference Lab. Corp. v. Municipality of San Juan*,
    159 D.P.R. 868, 2003 WL 21706387 (2003) ..................................................................... 17, 37

*Loan Syndications & Trading Ass'n v. SEC*,
    882 F.3d 220 (D.C. Cir. 2018) ................................................................................................. 8

*Mass. Mun. Wholesale Elec. Co. v. Town of Danvers*,
    577 N.E.2d 283 (Mass. 1991) ................................................................................................. 26

*Merrill v. Town of Monticello*,
    138 U.S. 673 (1891) .......................................................................................................... 15, 16

*Merrill v. Town of Monticello*,
    72 F. 462 (7th Cir. 1896) ........................................................................................................ 20

*Middletown Twp. Policemen's Benev. Ass'n Local No. 124 v. Twp. of*
    *Middletown*,
    744 A.2d 649 (N.J. 2000) ....................................................................................................... 17

*Morales v. Municipio de Toa Baja*,
    119 D.P.R. 682, 19 P.R. Offic. Trans. 724 (1987) .............................................................. 36, 37

*Noe v. Kropf*,
    C.A. No. 4050 (Del. Ch. Jan. 15, 2009) ................................................................................ 23

*Norton v. McOsker*,
    407 F.3d 501 (1st Cir. 2005) ................................................................................................... 37

*Pac. Improvement Co. v. City of Clarksdale*,
    74 F. 528 (5th Cir. 1896) ................................................................................................... 18, 19

*Plan Bienestar Salud v. Alcalde Cabo Rojo*,
    114 D.P.R. 697, 14 P.R. Offic. Trans. 896 (1983) ................................................................. 37

iii

*Plumbers & Pipefitters Nat'l Pension Fund v. Burns*,
    967 F. Supp. 2d 1143 (N.D. Ohio 2013) ............................................................. 8

*Port of Palm Beach Dist. v. Goethals*,
    104 F.2d 706 (5th Cir. 1939) ................................................................... 18, 19

*Rivera Torres v. Junta de Retiro Para Maestros*,
    502 F. Supp. 2d 242 (D.P.R. 2007) ......................................................... 20, 33

*Russell v. Middletown City Sch. Dist.*,
    125 A. 641 (Conn. 1924) ............................................................................ 15

*Russello v. United States*,
    464 U.S. 16 (1983) .................................................................................... 13

*Sanitary & Improvement Dist. No. 272 of Douglas County v. Marquardt*,
    443 N.W.2d 877 (Neb. 1989) (per curiam) ............................................... 24

*SEC v. Platforms Wireless Int'l Corp.*,
    617 F.3d 1072 (9th Cir. 2010) ..................................................................... 7

*Sofia Perez Segovia v. Tribunal de Distrito de San Juan*,
    69 D.P.R. 4 (1948) ............................................................................ 3, 4, 11

*Stifel v. Lac Du Flambeau Band of Lake Superior Chippewa Indians*,
    No. 13-CV-372-WMC, 2014 WL 12489707 (W.D. Wis. May 16, 2014) ............................ 24

*Town of Gilman v. Fernald*,
    141 F. 941 (8th Cir. 1905) ......................................................................... 35

*U.S.I. Props. Corp. v. M.D. Construction Co.*,
    860 F.2d 1 (1st Cir. 1988) ......................................................................... 20

*United States v. Gonzalez*,
    319 F.3d 291 (7th Cir. 2003) ....................................................................... 5

*Vigilant Ins. Co. of Am. v. Hous. Auth. of City of El Paso, Tex.*,
    660 N.E.2d 1121 (N.Y. 1995) .................................................................... 26

**STATUTES**

Act 35-2007 § 5 ........................................................................................ 21

3 L.P.R.A. § 779 (2008) ................................................................... *passim*

iv

19 L.P.R.A. § 451(25) ......................................................................... 27, 31, 32

19 L.P.R.A. § 1752(b) ...............................................................................27

31 L.P.R.A. § 13 .........................................................................................4

31 L.P.R.A. § 16 .......................................................................................12

UCC § 8-202 ...................................................................................... *passim*

UCC § 8-202, cmt. 1 .................................................................................23

UCC § 8-202, cmt. 3 ...........................................................................25, 26

## OTHER AUTHORITIES

7 Hawkland UCC Series § 8-202:6 ..........................................................23

8 Lawrence Anderson on the Uniform Commercial Code § 8-202:10 (3d. ed.) .........................24

10 McQuillin Mun. Corp. § 29:15 (3d ed.) .............................................36

15 McQuillin Mun. Corp. § 43:149 (3d ed.) ...........................................35

*Borrow*, Black's Law Dictionary (11th ed. 2019) ................................6, 9

19 C.J.S. Corporations § 661 ..................................................................17

FDIC, *Credit Card Securitization Manual*, https://www.fdic.gov/regulations/
    examinations/credit_card_securitization/ ...........................................9

Fed. Hous. Fin. Agency, *About Fannie Mae & Freddie Mac*,
    https://www.fhfa.gov/SupervisionRegulation/FannieMaeandFreddieMac/
    Pages/About-Fannie-Mae---Freddie-Mac.aspx ..................................9

GM Financial, *Understanding Securitization*, https://www.gmfinancial.com/
    content/dam/gmf/about-us/understanding-securitizations.pdf..............9

## INTRODUCTION

The Committees continue to argue that ERS[2] need not repay the $3 billion of bonds it sold, because ERS did not have authority to issue bonds. This is both simplistic and untrue: The plain text of the ERS Enabling Act authorized ERS to issue the ERS Bonds, both as borrowing from financial institutions (that is, the underwriters that purchased the bonds) and as a direct placement of debt. 3 L.P.R.A. § 779(d) (2008). The Committees have no real answer to this, except to say that bonds may not be issued unless there is authorizing legislation that uses the word "bonds." Yet there is absolutely no support in Puerto Rico law for such a requirement, and numerous state courts have rejected it. The ERS Enabling Act expressly authorized ERS to issue the ERS Bonds, and nothing more is required.

It is unsurprising, then, that *everyone* involved in the ERS Bond issuance confirmed ERS's ability to issue the ERS Bonds. This included the ERS Board of Trustees, ERS's General Counsel, the Government Development Bank's Board of Directors, the Secretary of Justice, and a number of sophisticated municipal bond lawyers all of whom opined—in writing—that the bonds were fully authorized. In the years that followed, the Puerto Rico legislature repeatedly recognized that the ERS Bonds were existing, valid obligations; the Government Development Bank commissioned a report that made no suggestion that the bonds were invalid; and ERS's counsel investigated the matter yet again and concluded that the bonds were authorized. Consistent with

---

[2] Capitalized terms not defined herein have the meanings given them in the *Bondholders' Motion for Summary Judgment on* Ultra Vires *Issues and Proceedings* ("BH UV Motion"), Case No. 17-bk-03283, ECF No. 14241; Case No. 17-bk-03566, ECF No. 971; Adv. Proc. No. 19-ap-00356, ECF No. 115; Adv. Proc. No. 19-ap-00357, ECF No. 120; Adv. Proc. No. 19-ap-00359, ECF No. 99; Adv. Proc. No. 19-ap-00361, ECF No. 102, and the *Bondholders Rule 56(b) Statement of Undisputed Facts in Support of Motion for Summary Judgment on* Ultra Vires *Issues and Proceedings* ("BH UV 56(b)"), Case No. 17-bk-03283, ECF No. 14242; Case No. 17-bk-03566, ECF No. 972; Adv. Proc. No. 19-ap-00356, ECF No. 116; Adv. Proc. No. 19-ap-00357, ECF No. 121; Adv. Proc. No. 19-ap-00359, ECF No. 100; Adv. Proc. No. 19-ap-00361, ECF No. 103.

these determinations, ERS paid interest on the ERS Bonds for more than eight years; ERS's financial statements consistently reflected the bonds as an outstanding liability (and still do even today); and both ERS and the Oversight Board repeatedly conceded in prior litigation that the ERS Bonds were valid and enforceable.  It would be difficult to imagine a record of validity that was stronger or more consistent.

But even if the ERS Bonds were invalid, they would still be enforceable under UCC § 8-202(b).  That provision provides for the enforcement of otherwise invalid government securities where, among other things, the government issuer had the authority to borrow money for the stated purpose and received substantial consideration in exchange for the security.   Here, the Bondholders' motion for summary judgment established that they are purchasers for value without notice who are entitled to UCC § 8-202(b)'s protection, and the Committees have proffered no evidence to the contrary.  The ERS Bonds are also enforceable in equity under Puerto Rico law.

## ARGUMENT

### I.   The ERS Enabling Act Authorized ERS to Borrow Money by Issuing the ERS Bonds

The essential facts remain straightforward.  When ERS issued its bonds in 2008, the ERS Enabling Act expressly authorized ERS to "borrow from any financial institution . . . or through the direct placement of debts." 3 L.P.R.A. § 779(d) (Spanish); BH UV 56(b) ¶ 16.  It is undisputed that ERS did both:  ERS borrowed from a financial institution because it sold nearly $3 billion of bonds directly and solely to underwriters who were all indisputably financial institutions, *infra* Part I.B–C, and ERS borrowed through a direct debt placement because it issued the debt directly, rather than through a conduit entity, *infra* Part I.D.  Thus, ERS had express statutory authority to issue the ERS Bonds.

A. **The Enabling Act Authorized ERS to Borrow from Financial Institutions and Through Direct Placements of Debt**

In a single footnote, the Committees contest the Bondholders' translation of the Enabling Act as authorizing ERS to "borrow from any financial institution . . . or through the direct placement of debts." 7 L.P.R.A. § 779(d) (Spanish); BH UV 56(b) ¶¶ 9-16. They argue that there is no discrepancy between the original Spanish text and the "official" English translation, because "'to seek a loan' is a proper translation of 'tomar prestado.'" *Resp. of Committees to (I) ERS Bondholders' Mot. Partial for Summ. J. on* Ultra Vires *Issues and Proceedings; and (II) Mot. of Bank of New York Mellon, as Fiscal Agent, for Summ J. Pursuant to Fed. R. Civ. P. 56 Regarding* Ultra Vires *Challenge* at 7 n.3, ECF No. 14983, Case No. 17-bk-03283 ("Committees' Opp.").[3] But the Committees offer neither evidence nor argument supporting this *ipse dixit*. Instead, they cite *Sofia Perez Segovia v. Tribunal de Distrito de San Juan*, 69 D.P.R. 4 (1948), for the proposition that a court should not disturb an official translation when it is "substantially satisfactory." Committees' Opp. at at 7 n.3. But there, the Court found that a Spanish translation of English text was "substantially satisfactory" where the portion of the translation in dispute was not "central" to the issues in the litigation. *Sofia Perez Segovia*, 69 D.P.R. at 8. That is obviously not the case here. Moreover, after finding that the relevant translation was "reasonably adequate," the court in *Sofia Perez Segovia* nonetheless went on to offer its own translation of the original English text. *Id.* at 16.

In any event, the official English translation of section 779(d) is not "substantially satisfactory." *Sofia Perez Segovia*, 69 D.P.R. at 8. As explained in the Motion, the correct

---

[3] *See also* Case No. 17-bk-03566, ECF No. 1004; Adv. Proc. No. 19-ap-00356, ECF No. 137; Adv. Proc. No. 19-ap-00357, ECF No. 142; Adv. Proc. No. 19-ap-00359, ECF No. 121; Adv. Proc. No. 19-ap-00361, ECF No. 122.

translation of section 779(d)'s Spanish text differs from the official translation in three ways.  BH UV Motion 6-8 (explaining that the translation omits two commas from the original Spanish text; mistranslates certain instances of the Spanish word "del"; and mistranslates the Spanish phrase "tomar prestado" as "seek a loan," when it should be translated as "borrow").  Indeed, the Retiree Committee and the Oversight Board previously conceded some of these errors.  *See Omnibus Obj. of Comm. of Retired Emps.* ¶¶ 10 & n.3, 67-68, Case No. 17-bk-03283, ECF No. 6482; *Obj. of Fin. Oversight and Mgmt. Bd.* ¶¶ 7, 11, Case No. 17-bk-03283, ECF No. 9701.  And the Committees ignore that under Puerto Rico law, if there is any "discrepancy" between the original Spanish text of a statute and the official English translation, the original Spanish controls.  31 L.P.R.A. § 13; *In re Fin. Oversight & Mgmt. Bd.*, 914 F.3d 694, 717 (1st Cir. 2019).  In fact, the Committees' own case acknowledges this.  *Sofia Perez Segovia*, 69 D.P.R. at 4.

The Committees also claim that the "only argument" supporting the Bondholders' translation is the expert opinion of Dr. Laura Gonzalez, which the Committees have separately moved to exclude.  Committees' Opp. at 7 n.3.  First, for the reasons stated in the Bondholders' opposition filed herewith, the Committees' motion to exclude Dr. Gonzalez is meritless.  But the Committees' characterization of the Bondholders' evidence is incorrect anyhow.  As explained in the Motion, the Bondholders' translation is supported by dictionary definitions, BH UV Motion at 7-8 (citing dictionaries to argue that the phrase "tomar prestado" means to temporarily take something with the intention of returning it, and is properly translated into English as "borrow"), and it is consistent with the official translations of numerous other Puerto Rico statutes, *id.* at 8 (explaining that the phrase "tomar prestado" appears thirteen other places in the Puerto Rico Statutes Annotated, and in nearly every other instance it is translated in the official translation as

"borrow," "borrowed," or "borrowing," and not "seek a loan"). The expert opinion of Dr. Laura Gonzalez merely confirms the Bondholders' translation of section 779(d). BH UV 56(b) ¶ 16.

And, again, the Committees have failed to offer any evidence on this point. For months, the Committees were on notice of the Bondholders' translation, but they made no effort to engage an expert to offer a competing translation and even now have not offered competent evidence supporting the "official" translation. This failure is dispositive of the question, because the proper translation of a foreign language text is a question of fact. *Gray v. Noholoa*, 214 U.S. 108, 110 (1909); *see also, e.g.*, *United States v. Gonzalez*, 319 F.3d 291, 296 (7th Cir. 2003). Because the Bondholders' translation is supported both by dictionary definitions and by the expert opinion of Dr. Gonzalez, and is consistent with the official translations of many other Puerto Rico statutes, it must govern this motion.

Ultimately, the Committees lodge no real objection to the Bondholders' translation because it is undisputedly correct. Probably, this explains the Committees' fallback position that the translation issue is "wholly academic because the ERS Bond issuance involved neither a loan nor any form of borrowing from the underwriters." Committees' Opp. at 7 n.3. It also explains why the Committees' expert did not opine on the proper English translation of section 779(d) and instead concluded that his opinions "are no different whether the statute authorized the Administrator 'to seek a loan' or 'to borrow.'" Ex. 4 to Sooknanan UV Decl., at 5 n.3.[4]

---

[4] Citations to "Sooknanan UV Decl." refer to the *Declaration of Sparkle L. Sooknanan in Support of ERS Bondholders' Motion for Partial Summary Judgment on* Ultra Vires *Issues and Proceedings*, dated September 11, 2020, Case No. 17-bk-03283, ECF No. 14243; Case No. 17-bk-03566, ECF No. 973; Adv. Proc. No. 19-ap-00356, ECF No. 117; Adv. Proc. No. 19-ap-00357, ECF No. 122; Adv. Proc. No. 19-ap-00359, ECF No. 101; and Adv. Proc. No. 19-ap-00361, ECF No. 104.

**B. ERS Borrowed and Obtained a Loan by Issuing the ERS Bonds**

The Committees argue that the ERS Bonds were neither a borrowing nor a loan. But ERS indisputably "borrow[ed]" and obtained "a loan" by issuing the ERS Bonds. Committees' Opp. at 7-11. As we pointed out before, the Committees' expert, Robert Doty, unequivocally wrote that "[m]unicipal securities issuers . . . *borrow* money in the municipal securities market." BH UV 56(b) ¶ 21 (emphasis added). And Doty testified in his deposition that municipal securities are "loans from the investing public," that "[t]he borrower is the governmental issuer," and that "the evidence of the loan" is "the paper bond[]" itself. BH UV 56(b) ¶ 23; Ex. 2 to Sooknanan UV Decl., at 111:21–112:1. The Bondholders' expert, W. Bartley Hildreth, Ph.D., agreed. BH UV 56(b) ¶ 22 ("ERS borrowed directly from the underwriters" when it issued the ERS Bonds.). Indeed, that ERS "borrow[ed]" by issuing the ERS Bonds should be obvious. To "borrow" is simply "[t]o receive money with the understanding or agreement that it must be repaid, usu[ally] with interest." *Borrow*, Black's Law Dictionary (11th ed. 2019).

Thus, as both of the experts and other corroborating authority have said, ERS borrowed money and took out a loan when it issued its bonds. When ERS sold the ERS Bonds, it received money—the purchase price of the ERS Bonds—in exchange for the ERS Bonds themselves, in which ERS "promise[d] to pay" principal and interest on the bonds as it became due. *See* Exs. 43-45 to Sooknanan UV Decl. (Purchase Contracts); Exs. 2-4 to Second Sooknanan UV Decl. (Specimen ERS Bonds).[5] This is why the Committees have previously conceded that a municipal

---

[5] Citations to "Second Sooknanan UV Decl." refer to the *Declaration of Sparkle L. Sooknanan in Support of ERS Bondholders' Opposition to the Committees' Motion for Summary Judgment on* Ultra Vires *Issues*, dated October 28, 2020, Case No. 17-bk-03283, ECF No. 14986; Case No. 17-bk-03566, ECF No. 1006; Adv. Proc. No. 19-ap-00356, ECF No. 136; Adv. Proc. No. 19-ap-00357, ECF No. 141; Adv. Proc. No. 19-ap-00359, ECF No. 119; and Adv. Proc. No. 19-ap-00361, ECF No. 123.

bond "issuer in a public offering *borrows*."  *Committees' Mot. for Summ. J. on* Ultra Vires *Issues*
at 19-20, ECF No. 14246, Case No. 17-bk-03283 ("Committees' Mot.") (emphasis added).[6]

### C.  ERS Borrowed "from Any Financial Institution" by Issuing the ERS Bonds

There also is no dispute that ERS's borrowing was "from any financial institution"—that
is, the underwriters who purchased all of the ERS Bonds.  There is no denying that ERS sold to
the underwriters 100% of the ERS Bonds ever issued.  BH UV 56(b) ¶ 50.  Similarly, the
Committees cannot dispute that the underwriters paid ERS 100% of the proceeds that ERS ever
received for issuing the ERS Bonds.  BH UV 56(b) ¶ 57.  Nor can they deny that every single
underwriter was a financial institution.  BH UV 56(b) ¶¶ 53-54; BH UV Motion at 12-13.  These
facts show that ERS borrowed "from any financial institution" by selling all of the ERS Bonds to
the underwriters, and accepting payment for the ERS Bonds from those underwriters.

The Committees argue that underwriters were merely "financial intermediar[ies] that
connect[ed] the bond issuer with the investing public."  Committees' Opp. at 8.  This is entirely
beside the point, because it looks at the transaction from the standpoint of the underwriters, and
not—as the ERS Enabling Act stipulates—from the standpoint of ERS.  The Committees' sources
show only that underwriters buy bonds from issuers with the intention of reselling them—they say
nothing at all about whether an issuer borrows from underwriters when it sells bonds to them.  *See
SEC v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072, 1086 (9th Cir. 2010) (reiterating the
statutory definition of "underwriter" from the Securities Act as "any person who has purchased
from an issuer with a view to, or offers or sells for an issuer in connection with, the distribution of
any security"); *In re Lehman Brothers Mortg.-Backed Sec. Litig.*, 650 F.3d 167, 175 (2d Cir. 2011)

---

[6] *See also* Case No. 17-bk-03566, ECF No. 978; Adv. Proc. No. 19-ap-00356, ECF No. 120; Adv. Proc. No.
19-ap-00357, ECF No. 125; Adv. Proc. No. 19-ap-00359, ECF No. 104; and Adv. Proc. No. 19-ap-00361, ECF No.
107.

(similar); *Plumbers & Pipefitters Nat'l Pension Fund v. Burns*, 967 F. Supp. 2d 1143, 1150 (N.D. Ohio 2013) (similar).  And the Committees' expert, Mr. Doty, similarly assumes *without citation* that the underwriters were mere "intermediaries" and that ERS "did not borrow or take a loan from [them]."  Ex. 4 to Sooknanan UV Decl., at 6, 19.  Of course, the fact that underwriters may see themselves as mere intermediaries does not change the fact that ERS irrevocably and unconditionally sold all of its right, title, and interest in those bonds to the underwriters in return for about $3 billion in cash; what the underwriters next planned to do made no difference to ERS's ownership of the money or the underwriters' ownership of the bonds.  And it is puzzling how Mr. Doty can offer the opinion that this bond sale was not a borrowing when—long before he became an expert here—he wrote in a handbook he authored for the use of the municipal securities industry that an issuer of government bonds "borrows" when it issues bonds.  BH UV 56(b) ¶ 21.

The Committees contend that underwriters "exist not to hold the underlying debt themselves but to find public investors to do so," but that does not explain why bond issuers are not borrowers and underwriters are not lenders.  Committees' Opp. at 8.  Indeed, large swaths of the modern financial system are built on the resale of debt by the initial lender.  "Syndicated [bank] loans are 'actively traded amongst financial institutions in a secondary market place,' and purchased on these markets by a range of investors . . . ."  *Loan Syndications & Trading Ass'n v. SEC*, 882 F.3d 220, 223 (D.C. Cir. 2018) (quoting Wells Fargo & Company, Comment on Credit Risk Retention Proposed Rules 27 (July 28, 2011)).  Residential mortgages are almost invariably resold by the initial lending institution, and ultimately securitized and funded by purchases of mortgage-backed securities.  *See, e.g.*, *Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*, 104 F. Supp. 3d 441, 462-63 (S.D.N.Y. 2015).  "Fannie Mae and Freddie Mac buy mortgages from lenders and either hold these mortgages in their portfolios or package the loans into mortgage-

backed securities (MBS) that may be sold.  Lenders use the cash raised by selling mortgages to [Fannie and Freddie] to engage in further lending." Fed. Hous. Fin. Agency, *About Fannie Mae & Freddie Mac*, https://www.fhfa.gov/SupervisionRegulation/FannieMaeandFreddieMac/Pages/About-Fannie-Mae---Freddie-Mac.aspx.  Car loans and credit card debt are similarly resold by lenders and securitized as a matter of course.  *See, e.g.*, GM Financial, *Understanding Securitization*, https://www.gmfinancial.com/content/dam/gmf/about-us/understanding-securitizations.pdf; FDIC, *Credit Card Securitization Manual*, https://www.fdic.gov/regulations/examinations/credit_card_securitization/.  No one would argue that the inevitability of such resale means that a borrower who obtains a bank loan, a mortgage, a car loan, or a credit card has not thereby "borrowed" from the lending institution.  The underwriters *raison d'etre* may well be to resell at a profit the debt they underwrite, but still it is—and was—debt in the first place.

The Committees point to the Purchase Contracts and other operative documents as proof positive that ERS did not borrow from the underwriters, since those documents do not describe the transaction as borrowing.  Committees' Opp. at 9-10.  Again, this is irrelevant, since it is the substance of the transaction that governs.  As explained above, those documents show that ERS received money in exchange for the ERS Bonds, and that ERS "promise[d] to pay" principal and interest on the bonds when due.  *See* Exs. 43-45 to Sooknanan UV Decl. (Purchase Contracts); Exs. 2-4 to Second Sooknanan UV Decl. (Specimen ERS Bonds).  This, of course, is the very definition of borrowing.  *See supra* 6; *Borrow*, Black's Law Dictionary (11th ed. 2019) (to "borrow" is "[t]o receive money with the understanding or agreement that it must be repaid, usu[ally] with interest").  The Committees make the point that the "hallmark" of borrowing is the "absolute right to repayment of funds advanced."  Committees' Opp. at 9-10.  This may well be true, but when ERS borrowed nearly $3 billion from the underwriters, the underwriters *did* have

9

such a right to repayment and ERS *was* liable to the underwriters for the payment of principal and interest. Again, Mr. Doty's testimony in these proceedings is instructive. He admitted that it was the underwriters who took ownership of the bonds and who assumed the attendant risks of ownership, such as a decline in the value of the bonds or a failure to resell the bonds. Ex. 2 to Sooknanan UV Decl., at 106-08.

And finally, the Committees still cannot identify who ERS borrowed $3 billion from. They maintain that ERS did not borrow those funds from either the underwriters or the current holders of the bonds. Committees' Opp. at 11. The Committees' own expert, Mr. Doty, opined in these proceedings that the lender is whoever happens to own the bonds at any given time, so that "the identity of the lender can change over the life of the bond issue," BH UV 56(b) ¶ 27; BH UV Motion at 14-15, but the Committees now disclaim this position entirely and say that this "is not the Committees' position at all," Committees' Opp. at 11. Instead, the Committees' implicit argument seems to be that it is the *second* investor to hold an ownership interest in the bonds—the first investor after the underwriter—whose identity matters. But there is no reason to apply such an odd, *ad hoc* rule, and even applying it, the Committees cannot show that the ownership interests in the Bonds currently held by the Bondholders were not sold by the underwriters to other financial institutions at the time of the original issue. BH UV Motion at 15-16. Ultimately, the facts are clear: ERS borrowed from the underwriters, because the underwriters bought all of the bonds from ERS and were the sole holders of the bonds at the instant that ERS issued them. BH UV Motion at 12-17. The underwriters were therefore the lenders at the time of the ERS Bond issuance, and so ERS borrowed from them by issuing the bonds, as section 779(d) authorized ERS to do. This should be the end of the matter, and there is no need for the Court to reach the remaining issues. *In re Plaza Resort at Palmas, Inc.*, 741 F.3d 269, 274 (1st Cir. 2014) ("Statutory construction in

Puerto Rico begins with the text of the underlying statute, and ends there as well if the text is
unambiguous.").

### D. Alternatively, ERS Borrowed "Through the Direct Placement of Debt" by Issuing the ERS Bonds

The Committees next argue that the bond issuance was not a direct placement of debt under
the Enabling Act. Committees' Opp. at 12-15. To begin, the Committees argue that the Enabling
Act does not use the term "direct debt placement," and they again invoke *Sofia Perez Segovia*, 69
D.P.R. at 8, to argue that the "official" English translation controls. Committees' Opp. at 12. The
Committees invent a dispute that does not exist. The Bondholders' Motion made no argument
about the translation of this portion of the Enabling Act, and the terms "direct placement of debt"
(used in the Enabling Act) and "direct debt placement" (used at times in the Motion) mean the
same thing. Indeed, the Committees fail to explain the difference.

Meanwhile, the Committees argue that when the Legislative Assembly in 1988 authorized
ERS to borrow through "a direct placement of debt," it actually intended to limit ERS to a
particular form of debt issuance called a "private placement" and to preclude underwritten bond
offerings. Committees' Opp. at 12. To state the obvious, the Enabling Act's debt authorizing
language does not authorize only "private placements"; it does not even use those words. And in
support of their claims, the Committees offer only the bald assertion that "direct placement" is a
"well-recognized financial term of art that describes" a "private placement." Committees' Opp.
at 12. The Committees' related briefing cites a single source that concerns debt financing for
corporations and says not a word about private placements by government entities like ERS.
Committees' Mot. ¶ 57 (citing Ex. 44 to Bassett Decl.[7]). It also explains that for large issues of

---

[7] Citations to "Basset Decl." refer to the *Declaration of Nicholas A. Bassett*, dated September 11, 2020, Case
No. 17-bk-03283, ECF No. 14250; Case No. 17-bk-03566, ECF No. 980; Adv. Proc. No. 19-ap-00356, ECF No. 122;

debt like the ERS Bonds, issuance costs "are generally lower in the public market" than in private placements, Ex. 44 to Bassett Decl., at 79—raising the question, for which the Committees have no answer, of why the Legislative Assembly would have restricted ERS to private placements when public bond issuances would have saved ERS significant amounts of money.

As we have said before, there is a far simpler explanation for what the Legislative Assembly meant when it authorized ERS to borrow through a direct placement of debt: It authorized ERS to borrow money directly, rather than indirectly through a conduit entity, a well-established distinction in the municipal finance market.  BH UV Motion at 17-19; Ex. 1 to Hildreth Decl., ¶ 72; Ex. 2 to Hildreth Decl., ¶¶ 9-13.[8]  The Committees' own expert, Mr. Doty, described conduit financings in his book on municipal bonds, and explained how they differed from other municipal financings.  Ex. 5 to Second Sooknanan UV Decl., at 165-66.  He further explained that a purpose of using a conduit financing is to circumvent "restrictions or state law idiosyncrasies" that would prevent a direct bond issuance.  *Id.*  As the Committees themselves recognize, "[t]echnical terms and phrases used in the arts and sciences shall be interpreted according to their received meaning and acceptation with the experts and authorities in the science, art or profession to which they refer."  31 L.P.R.A. § 16.

The Committees also have no real answer to the argument that this reading is consistent with the rest of section 779 of the Enabling Act.  Unable to explain why section 779 used a different term, "private placings" (in Spanish, "colocaciones privadas"), when it prohibited ERS from

---

Adv. Proc. No. 19-ap-00357, ECF No. 127; Adv. Proc. No. 19-ap-00359, ECF No. 106; and Adv. Proc. No. 19-ap-00361, ECF No. 109.

[8] Citations to the "Hildreth Decl." refer to the *Declaration of Dr. W. Bartley Hildreth*, dated September 9, 2020, Case No. 17-bk-03283, ECF No. 14244; Case No. 17-bk-03566, ECF No. 974; Adv. Proc. No. 19-ap-00356, ECF No. 118; Adv. Proc. No. 19-ap-00357, ECF No. 123; Adv. Proc. No. 19-ap-00359, ECF No. 102; and Adv. Proc. No. 19-ap-00361, ECF No. 105.

investing in private placements of debt, 3 L.P.R.A. § 779(b)(2)(A)(ii) (2008), the Committees claim (without support) that the Legislative Assembly used the words "direct placement" and "private placement" synonymously. Committees' Opp. at 13. But courts presume that a legislature "act[ed] intentionally and purposely" when "includ[ing] particular language in one section of a statute but omit[ting] it in another." *Russello v. United States*, 464 U.S. 16, 23 (1983) (citation omitted). Thus, the fact that the Puerto Rico legislature used the term "private" or "privadas" when indisputably addressing private debt placements shows that its use of the different term "direct" or "directas" in the language at issue addresses a different subject.

That conclusion is reinforced by the Enabling Act's use of the word "direct" (in Spanish, "directa") to refer to the distinction between direct obligations of an issuer and indirect obligations via a conduit entity. In particular, section 779(b)(1)(C) defined "fixed yield securities" to include "Bonds, notes or evidence of indebtedness, whether exempted or taxable securities that represent direct obligations or are secured by the good faith and credit of the government entities, instrumentalities, enterprises or public corporations and any other government entities created under the laws of the Government of the United States, any of its states, or of the Commonwealth of Puerto Rico." 3 L.P.R.A. § 779(b)(1)(C). The Committees argue that this is not a reference to direct versus conduit issuances, but instead is distinguishing between "obligations where the governmental entity is directly liable as opposed to obligations that are guaranteed through a pledge of that entity's full faith and credit." Committees' Opp. at 14. But that is just the point. Conduit bonds are often issued by governmental issuers for the benefit of private borrowers. Ex. 5 to Second Sooknanan UV Decl., at 165-66. In many such cases, "the actual governmental issuers have no actual or implied liability to investors"—only the ultimate borrowers do. *Id.* at 165. By restricting covered debt investments to "direct obligations" or those "secured by the good faith and

credit of" government entities, section 779(b)(1)(C) excludes conduit bonds that are supported only by the credit of a private borrower and not by the credit of a government entity.  Section 779(b)(1)(C) therefore in fact uses "direct" precisely to refer to the very distinction between direct and conduit debt that the Bondholders rely upon.

Similarly, section 779(b)(1)(F) referred to "[f]inancial instruments constituted directly or indirectly on financial obligations such as mortgage loans, instruments secured by such loans, as well as automobile loans and lease contracts," and section 779(b)(3) referred to "direct or indirect investments in income-yielding real estate."  The Committees again contend that the word "direct" in these provisions "refers to the relationship of a financial instrument to the underlying financial obligation."  Committees' Opp. at 14-15.  Again, that is exactly the distinction between direct and conduit bond issuances, because in conduit bond issuances, the bond instruments are issued by a third-party issuer that does not bear the underlying financial obligation.  *See* Ex. 5 to Second Sooknanan UV Decl., at 165-66.

In the end, the Committees cannot ignore the "natural presumption that identical words used in different parts of the same act are intended to have the same meaning."  *Atl. Cleaners & Dyers, Inc. v. United States*, 286 U.S. 427, 433 (1932).  Consequently, the legislature's use of the term "directa" in other parts of section 779 to refer to direct obligations of ERS confirms that the legislature was in fact authorizing ERS to issue debt for which it was directly liable, instead of using a conduit to issue the bonds.  And it is undisputed that ERS's issuance of the ERS Bonds was "direct" rather than "indirect" in this sense, because ERS issued the ERS Bonds itself, and was the direct obligor on those bonds.  BH UV 56(b) ¶ 37.

### E.  Express Reference to "Bonds" Is Not Required

The Committees are left to argue that the Enabling Act did not authorize the ERS Bonds because "the word 'bond' does not appear in the ERS Enabling Act's debt authorization

provision." Committees' Opp. at 15. According to the Committees, "if the Puerto Rico Legislative Assembly had intended ERS to engage in public bond offerings, it would have said so explicitly." *Id.* But as explained before, the Enabling Act *did* expressly authorize ERS to issue the ERS Bonds. *Supra* Part I.A–D; BH UV Motion at 9-19. The fact that the Enabling Act did not specifically refer to a public bond offering is irrelevant.

The Committees continue to rely on *Merrill v. Town of Monticello*, 138 U.S. 673 (1891), and *City of Brenham v. German-Am. Bank*, 144 U.S. 173 (1892). Committees' Opp. at 15-18. But as explained before, *Merrill* and *City of Brenham* are not controlling and were outliers even when they were decided in the late 19th century. *See* BH UV Motion at Part I.C. They do not consider the law of Puerto Rico (which was not even a territory of the United States at that time), much less the meaning of a provision of the ERS Enabling Act—section 779(d)—enacted nearly a century later in 1988, or how that provision applies to a bond issuance in 2008.

The Committees continue to ignore that courts across the country have held for more than a century that municipalities with express statutory authority to borrow money may carry out that authority by selling bonds.[9] For example, as the Pennsylvania Supreme Court explained in 1859,

---

[9] *See, e.g.*, *Bd. of Cnty. Comm'rs v. Williamson*, 370 P.2d 837, 838 (Okla. 1962) ("To our way of thinking, where the power to borrow is granted, the power to issue bonds is implied."); *Kruesel v. Collin*, 17 P.2d 854, 855 (Wash. 1933) ("[W]here the power to borrow is granted, the power to issue bonds is implied if the borrowing is to enable the county to perform a duty or function imposed upon it by the state."); *Russell v. Middletown City Sch. Dist.*, 125 A. 641, 645 (Conn. 1924) ("[T]he power to issue bonds implied from the express power to borrow has been recognized as legal in the majority of the older states, and especially in New England, and that corporate securities have been issued and are now outstanding in large amounts, based upon this understanding of the law."); *Comm'rs of Hendersonville v. C.A. Webb & Co.*, 61 S.E. 670, 671 (N.C. 1908) ("[W]hen the power to incur a debt for a necessary expense exists, there would seem to be no good reason or principle of law to prevent the governing authorities of a town from making provision for the present or ultimate payment of such a debt, by issuing bonds for the purpose . . . ."); *Commonwealth v. Town of Williamstown*, 30 N.E. 472, 473 (Mass. 1892) ("We can have no doubt . . . that in this commonwealth the power given to these towns to raise these large or unusual sums of money by loan, no conditions or restrictions being imposed, carried with it the power to issue bonds,—a method which certainly enabled the towns to seek the best markets."); *Fid. Tr. & Safety Vault Co. v. Mayor of Morganfield*, 29 S.W. 442, 444 (Ky. 1895) ("The issuance of the bonds of said city in payment of said indebtedness was but an incident of same; some form of evidence of such indebtedness being necessary . . . ."), *overruled in part on other grounds*, *Belknap v. City of Louisville*, 36 S.W. 1118 (Ky. 1896); *Bunch's Ex'rs v. Fluvanna Cnty.*, 10 S.E. 532, 533 (Va. 1890) ("[W]e do not

15

when an issuer with authority to borrow does so by issuing bonds, "[i]n substance, the money is borrowed from the purchasers of the bonds; it is advanced on the faith of the [issuer's] obligations, for the very purpose for which the [issuer] was authorized to raise it." *Hamilton*, 34 Pa. at 511. Under such circumstances, a court "cannot be expected to decide that the bonds are illegal, because the [authorizing legislation] did not specify what securities might be given for the money borrowed." *Id.*[10]

The Committees assert, yet again without any support, that "Puerto Rico law matches *Merrill* and *Brenham*" by "requiring broad, express authority for a governmental entity to issue bonds." Committees' Opp. at 18. But there is no reason to conclude that Puerto Rico law applies any such rule. To the contrary, as we explained, Puerto Rico's civil code does not provide a special bond-specific rule of construction; makes clear that the unambiguous text of a written statute must control; and provides that technical terms and phrases must be interpreted according to their "received meaning and acceptation with the experts and authorities." *See* BH UV Motion at 23. And as discussed above, *supra* Part I.B, the experts on both sides agree that the issuance of bonds is borrowing. The issuance of the ERS Bonds therefore fell within the express authorization of section 779(d), as the civil code requires the Court to construe it.

Finally, even if the *City of Brenham* rule somehow applied in Puerto Rico and meant that the ERS Enabling Act did not authorize ERS to issue *negotiable* bonds, that conclusion would not

_____

doubt that it was competent for the county court, under the authority conferred by the act, to issue bonds for the money authorized to be borrowed. The power to do so was implied in the power to borrow."); *Dutton v. City of Aurora*, 28 N.E. 461, 462 (Ill. 1885) ("Having power to borrow money, the power to issue bonds therefor results as a necessary incident, and the circuit court properly refused to enjoin the issuing of the bonds."); *Doty v. Ellsbree*, 11 Kan. 209, 213 (1873) ("[P]ower to borrow money carries with it the power to issue the ordinary evidences and security of a loan, and among them are county bonds."); *Commonwealth ex rel. Hamilton v. Select & Common Councils of City of Pittsburgh*, 34 Pa. 496, 511 (1859).

[10] As the Bondholders' Motion explained, treatises confirm that in most jurisdictions, authority to borrow and enter contracts implies authority to issue bonds. BH UV Motion at 22 n.15.

render the ERS Bonds or the secured debt that they represent void or unenforceable, but merely *non-negotiable*. The Committees' contrary arguments, Committees' Opp. at 21-25, are grounded in the faulty premise that all *ultra vires* actions are void, *id.* at 12. The Committees are wrong.

There is ample precedent highlighting the distinction between *ultra vires* acts "in the primary sense," which are "act[s] utterly beyond the jurisdiction of a municipal corporation," and *ultra vires* acts in the "secondary sense," which arise from "the irregular exercise of a basic power under the legislative grant." *Middletown Twp. Policemen's Benev. Ass'n Local No. 124 v. Twp. of Middletown*, 744 A.2d 649, 652 (N.J. 2000).[11] It is also well accepted that "the plea of *ultra vires* will not prevail in cases where the transaction is not forbidden by statute." *In re Waterloo Organ Co.*, 134 F. 341, 343 (2d Cir. 1904). The Committees ignore this authority and instead pluck seemingly favorable cases without providing the relevant context. Committees' Opp. at 21-22. But the Committees' cases are inapposite because they all involved governmental acts in direct contravention of a statute or budget—an *ultra vires* act in the primary sense. *See Las Marias Reference Lab. Corp. v. Mun. San Juan*, 159 D.P.R. 868, 877-78 (2003) (explaining that "as a constitutive element of every municipal contract, the law requires, *inter alia*, that a copy of the contract be registered and forwarded to the Office of the Controller" and the "letter of the law clearly states that such mandate will admit 'no exception whatsoever'"); *Buchanan v. City of Litchfield*, 102 U.S. 278, 288 (1880) (issuance of bonds void because they "created an indebtedness

---

[11] *See also Backhaus v. Lee*, 194 N.W. 887, 889 (N.D. 1923) (explaining that "the doctrine of *ultra vires* in the law of municipal corporations has not always been applied by the courts in the same sense or with the same meaning"; "[s]trictly speaking, an act is *ultra vires* when it is wholly beyond the power of the municipal corporation under any circumstances to perform it"); *City of Lebanon v. Baird*, 756 S.W.2d 236, 243 (Tenn. 1988) ("If a city's action is *ultra vires*, not because the power has not been granted to it to act in the first instance, but because the city failed to exercise a power it has in the manner prescribed by controlling law, the question is what consequences flow from voiding the action."); 19 C.J.S. Corporations § 661 (detailing courts that have "held that the fact that a corporate act is *ultra vires* does not mean that the act is necessarily void, or even voidable").

in excess of the amount to which municipal indebtedness is restricted by the Constitution");
*Humacao Lumber Co. v. Am. Surety Co. of N.Y.*, 59 D.P.R. 165, 169 (1941) (explaining that
"certificates were made when they could not be made, that is, when the budget allocation had
already been used up").

Here, no one disputes that ERS had the power to borrow money, issue bonds, and "secur[e]
said debt with the assets of the System."  3 L.P.R.A. § 779(d); Committees' Opp. at 12
(acknowledging ERS had the authority to issue a "specific type of bond offering").  Although the
Committees attempt to couch their argument in terms of ERS lacking patent authority to issue
bonds, the Committees actually dispute the *form* that those bond offerings took.  Committees' Opp.
at 24-25.  In such circumstances, as the Bondholders previously explained, even states that require
express authority for municipalities to issue negotiable paper generally provide that "where such
authority is lacking, such a paper is not void, but merely not negotiable. It is still an evidence of
debt."  *Port of Palm Beach Dist. v. Goethals*, 104 F.2d 706, 709 (5th Cir. 1939); *see also Pac.
Improvement Co. v. City of Clarksdale*, 74 F. 528, 534 (5th Cir. 1896) ("[W]hen negotiable
securities, instead of nonnegotiable instruments, have been employed in settlement of lawful debts,
the negotiable bonds so given have, when they were being sued upon, been treated, in a number
of reported cases both in federal and state courts, as evidences of the debt, and on them, in the
hands of third parties, recovery has been had against such defendant corporation," even though the
issuer lacked the power to issue negotiable securities); *Keel v. Pulte*, 10 S.W.2d 694, 697-98 (Tex.
Comm'n App. 1928) (same); *Forrest City v. Bank of Forrest City*, 172 S.W. 1148, 1150 (Ark.
1915) (same).

The Committees claim that these cases are irrelevant.  Committees' Opp. at 22-24.  Not so.
In each case, the court noted that the power to issue the paper, regardless of whether it could be

considered negotiable or not, could be implied from the power to contract debt.  *See, e.g.*, *Port of Palm Beach Dist.*, 104 F.2d at 708-09 (the district "had power to issue the paper" "[b]y implication" from its power "to employ an engineer"); *Pac. Improvement Co.*, 74 F. at 533 (if it "were not otherwise satisfied of the power of the defendant corporation to give negotiable bonds in settlement of the debt of its predecessor," "[t]he power to contract such a debt, on the part of such a corporation, carries with it the authority to give valid evidences of debt, such as warrants, vouchers, or promises to pay the debt"); *Keel*, 10 S.W.2d at 697 (the "power to issue negotiable paper for public improvements" "does not impliedly deprive the governing body of the authority to make those same improvements on credit, and to issue nonnegotiable interest-bearing obligations of the municipality for the debt thus created, if elsewhere the authority to make the improvements is conferred").

The Committees also emphasize the distinction between a public bond offering, where a bona fide holder for value takes free of equitable defenses, and a bond or other paper issued as evidence of indebtedness.  Committees' Opp. at 23-24.  This, too, is irrelevant.  Whatever the form, even where a municipality lacks authority to issue a negotiable instrument, the bonds are still enforceable subject to the issuer's personal defenses.  *Forrest City*, 172 S.W. at 1149-50 ("if the municipal corporation had the power to make the contract for which the notes were given, such power carried with it the right to agree with the creditor as to the time and mode of payment of the debt").[12]

Indeed, in *City of Brenham* itself, the Supreme Court, after ruling that the city lacked authority to issue negotiable bonds, amended its judgment in response to a rehearing petition to

---

[12] In *Forrest City*, the only reason the city could not issue interest-bearing debt was because the state's constitution *prohibited* it from doing so, not because the city was prohibited from issuing interest-bearing debt absent the constitution's prohibition.  172 S.W. at 1151.

allow the holders to sue the city on the underlying debt. *See City of Brenham v. German Am. Bank*, 144 U.S. 549, 549-50 (1892). Similarly, in *Merrill*, after the Court's ruling that their bonds were issued without authority, the bondholders' suit to recover at least the principal cost of their bonds failed on statute of limitations grounds. *See Merrill v. Town of Monticello*, 72 F. 462, 464 (7th Cir. 1896). The Committees' attempt to recast these decisions is misleading. Committees' Opp. at 24 n.5. *City of Brenham* and *Merrill* ultimately have no bearing on the validity of the ERS Bonds. They illustrate that the lack of authority to issue negotiable bonds does not automatically preclude recovery. If it did, the inquiry would have ended with the Supreme Court's decisions.

**F.  Other Authority Confirms the Validity of the ERS Bonds**

As we have explained before, in addition to the ERS Enabling Act itself, a mountain of other evidence confirms the validity of the bonds, including (a) a decision of this Court in *Rivera Torres v. Junta de Retiro Para Maestros*, 502 F. Supp. 2d. 242 (D.P.R. 2007), interpreting an identical statutory provision; (b) ERS's own interpretation of the ERS Enabling Act, which is entitled to deference under *U.S.I. Props. Corp. v. M.D. Construction Co.*, 860 F.2d 1, 8 (1st Cir. 1988); (c) other enactments by the Puerto Rico legislature, including Act 35-2007, Act 116-2011, and Act 3-2013; and (d) ERS's prior judicial admissions before this Court that the ERS Bonds are valid and enforceable. BH UV Motion at Part I.D. The Committees incorporate their prior briefing on these points, Committees' Opp. at 20, and the Bondholders do the same, *ERS Bondholders' Brief in Opp. to the Committees' Mot. For Summ. J. on* Ultra Vires *Issues* at Part II, ECF No. 14985, Case No. 17-bk-03283 ("BH Opp.").[13]

---

[13] *See also* Case No. 17-bk-03566, ECF No. 1005; Adv. Proc. No. 19-ap-00356, ECF No. 135; Adv. Proc. No. 19-ap-00357, ECF No. 140; Adv. Proc. No. 19-ap-00359, ECF No. 118; and Adv. Proc. No. 19-ap-00361, ECF No. 122.

The Committees focus here only on the factually inaccurate statement in Act 116's Statement of Motives that "[t]he Bond Issue was illegally made by the System's Administration even though such transaction was submitted to the Legislative Assembly for approval and rejected by the House of Representatives for deeming it detrimental to the System." Act 116-2011 at 6; Committees' Opp. at 20-21. They claim that the legislature was making "[t]he obvious point" that, "having failed in its effort to raise funds through a public offering of Commonwealth bonds for ERS's benefit, ERS's Administration illegally conducted its own public bond offering." Committees' Opp. at 20. However, the only thing that is "obvious" is what the Legislative Assembly actually said, and it is clear that that statement had no connection to the ERS Bond issuance. BH UV Motion at 30-31; BH Opp. at 35-36. The Committees also continue to press the argument that the legislature's decision to amend the ERS Enabling Act in 2011 proves that the ERS Bond issuance in 2008 was void. Committees' Opp. at 20. A necessary premise of this bizarre argument is that the Legislative Assembly wrote Act 116 to amend the very portion of the Enabling Act that had originally authorized ERS to issue the ERS Bonds in order to prohibit ERS from taking future borrowings along the same lines. But that would be necessary only if the Enabling Act had, in fact, authorized the issuance of the ERS Bonds back in 2008. If credited, the Committees' argument would simply confirm what the Bondholders have been saying all along.

Moreover, this argument assumes that the Court should consider subsequent legislation for evidence of the proper interpretation of section 779(d), a provision enacted in 1988. If the Court does so, it must also consider the entire body of subsequent legislation, including the Legislative Assembly's statement in Act 35 that "[t]he funds needed to cover the cost [of] the increase in the minimum amount of the pensions . . . shall proceed from the resources obtained through the issue of" the ERS Bonds. Act 35-2007 § 5. Critically, this statement was made *after* the ERS Board

21

authorized the issuance of the ERS Bonds in 2007, and *after* public reporting on ERS's plan to issue such bonds without further legislative authorization, BH UV 56(b) ¶¶ 37.1-37.4, demonstrating that the Legislative Assembly believed the Enabling Act authorized the issuance of ERS Bonds. The Committees have no explanation for this statement in Act 35.

## II.  Even if the ERS Bonds Were Invalid, They Are Enforceable

The Bondholders' Motion pointed out that, whatever ERS' authority to issue them, the ERS Bonds would be enforceable for two independent reasons: (1) the Bondholders are entitled to protection under UCC § 8-202 and (2) the ERS Bonds are enforceable in equity under Puerto Rico law. BH UV Motion at Parts II and III; BH Opp. at Part III. The Committees lodge no credible opposition to those arguments.

### A.  UCC § 8-202 Renders the ERS Bonds Enforceable even if Invalid

Even if ERS lacked the authority to issue the ERS Bonds, the bonds would still be enforceable under revised § 8-202 of the UCC, 19 L.P.R.A. § 1752. The Committees argue that (1) § 8-202 does not apply to this dispute and (2) § 8-202 is not satisfied as to the Bondholders. Neither argument is new, and neither is correct.

#### 1.  UCC 8-202 Applies to the ERS Bonds

The Committees incorporate by reference their previous arguments that UCC § 8-202 is inapplicable because the Committees are not "issuers." Committees' Opp. at 26. This argument is baseless, as the Bondholders previously explained. BH Opp. at 38-43. The Committees also revive the equally incorrect argument (previously advanced by the Retiree Committee, *see Omnibus Objection of Comm. of Retired Emps.* ¶¶ 83-89, No. 17-bk-03283, ECF No. 6482 (Apr. 23, 2019)) that UCC § 8-202 does not apply to a bond issuance that is void *ab initio*, and additionally claim that § 8-202 does not apply by its own terms because a bond that is void is not

a "security" under Section 8 of the UCC.  Committees' Opp. at 26-30.  The Committees are wrong.

UCC § 8-202 plainly applies to invalid bonds.  That is its entire purpose.

*First*, the Committees rely on a single Delaware Court of Chancery oral ruling to argue that

UCC § 8-202 applies only to irregular exercises of valid power rather than interests issued *ultra*

*vires*.  Committees' Opp. at 27-28; *see Noe v. Kropf*, C.A. No. 4050 (Del. Ch. Jan. 15, 2009).  In

*Noe*, the court found that shares issued to a purchaser were *void ab initio* because they were not

issued by the board of a corporation, and therefore the purchaser was "not entitled to any protection

under the Delaware Uniform Commercial Code."  *Noe*, C.A. No. 4050 at 12-13.  Beyond being

non-binding and providing no analysis whatsoever, *Noe* is at odds with the plain text of § 8-202,

is contrary to the weight of authority on the scope of § 8-202, and has been subsequently

undermined by the Delaware legislature and Delaware Chancery Court.

Section 8-202(b) by its terms applies when "an issuer asserts that a security is not *valid*,"

and it protects purchasers for value without notice of "a defect going to its *validity*."  UCC § 8-

202(b)(1) (emphasis added).[14]  And the official comments to § 8-202 make clear that neither a

"defect in form *[n]or the invalidity* of a security [is] normally available to the issuer as a defense."

UCC § 8-202, cmt. 1 (emphasis added).  In other words, § 8-202 applies to an invalid security

regardless of whether the defect goes to the issuer's power to issue the security or to the issuer's

compliance with the formalities required by applicable law.

---

[14] Although § 8-202 does not expressly define the term "valid," the 1950 proposed final draft of UCC Section 8 defined "valid" as *both* "within the issuer's power, authorized, free of fraud and duress, *and* in compliance with any applicable constitutional, statutory, charter and other regulatory provisions governing the authorization or issue of the security."  7 Hawkland UCC Series § 8-202:6, at n.4 (emphasis added) (quoting Uniform Commercial Code, Proposed Final Draft § 8-103(1) (Spring 1950)).  It is unclear why the definition was not included in the next draft.  *See id.* ("[T]he spring 1951 draft did include notations to facilitate comparison with the 1950 draft, each section being noted as either a change of form only, a minor change of substance, or a major change of substance.  The definitional provisions of Article 8 were all marked as changes of form only.").

The case law interpreting § 8-202 confirms that it applies to *ultra vires* bonds. *See Sanitary & Improvement Dist. No. 272 of Douglas County v. Marquardt*, 443 N.W.2d 877, 880-81 (Neb. 1989) (per curiam) (noting that § 8-202 could apply to a municipal corporation's issuance of securities for the construction of an irrigation system that was later determined to be void because the securities were issued as part of a fraudulent scheme); *Stifel v. Lac Du Flambeau Band of Lake Superior Chippewa Indians*, No. 13-CV-372-WMC, 2014 WL 12489707, at *20 (W.D. Wis. May 16, 2014) (the "defendants are unlikely to succeed in invalidating" bonds that were *void ab initio* because it "is inconsistent with principles of equity and with the way the Uniform Commercial Code [] is generally interpreted"); *In re Seacoast Anti-Pollution League*, 490 A.2d 1329, 1339 (N.H. 1984) (UCC § 8-202 "recognize[s] the need to protect purchasers of securities," regardless of whether "an order authorizing the issuance of securities" is later overturned).

Moreover, *Noe* stands on shaky ground even in Delaware, as the Committees' own cases illustrate. *See In re Numoda Corp. Shareholders Litigation*, No. CV 9163-VCN, 2015 WL 402265, at *7 (Del. Ch. Jan. 30, 2015) (internal citations omitted) (quoting H.R. 127, 147th Gen. Assemb., Reg. Sess. (Del. 2013)) (explaining that the Delaware legislature amended Delaware General Corporation Law to "overturn the holdings in case law that corporate acts or transactions and stock found to be 'void' … may not be ratified or otherwise validated on equitable grounds"). And the Committees' speculation about the Delaware legislature's intentions in 2013 is equally misplaced. Importantly, the Committees overlook that the legislature was legislating against the backdrop of cases that *did not interpret § 8-202* because that section cannot formally "validate" or "make[] the security valid; the defect or invalidity is merely ignored and the security regarded as valid when the question is raised in the courts." 8 Lawrence Anderson on the Uniform Commercial Code § 8-202:10, at 105-06 (3d. ed.). Therefore, the Delaware legislature "create[d] a flexible

24

standard that the Court can use to fix a range of defective corporate acts," including "an *ultra vires* act." *In re Numoda Corp. Shareholders Litig.*, 2015 WL 402265, at *10. As the Delaware Chancery Court noted, allowing validation of any corporate act is "consistent with Section[] 8-202," despite the "contrary suggestion … in *Noe*." *Id.* at *8 & n.86.

*Second*, the Committees continue to rely on outdated pre-UCC precedent to argue that § 8-202 does not apply to invalid bonds. Committees' Opp. at 28. But the official comments to § 8-202 explain that the line of precedent on which the Committees rely, which allowed "estoppel in favor of purchasers for value without notices" but "qualified" that rule "by requiring that the municipality have power to issue the security," was "simplif[ied]" and incorporated into § 8-202(b)(1). UCC § 8-202, cmt. 3. Under the "simplif[ied]" approach adopted by the UCC, there are only "two conditions for an estoppel against a governmental issuer: (1) [s]ubstantial consideration given, and (2) power in the issuer to borrow money *or* issue the security for the stated purpose." *Id.* (emphasis added). In the case of the ERS Bonds, as the Bondholders' Motion explained, ERS met these conditions because it received substantial consideration and indisputably had the power to borrow money for the stated purpose. BH UV Motion at 33-34. Thus, the ERS Bonds satisfy the statutory test that was explicitly adopted to replace the approach of the Committees' pre-UCC precedent.

In any event, even if § 8-202(b) were applicable only to an irregularity and not to an *ultra vires* act, it would still validate the ERS Bonds. As already explained, there is no dispute that ERS had the authority to incur debt, including secured debt. *Supra* Part I; BH UV Motion at Part I. Nor is there any dispute that ERS had the authority to incur that debt by selling bonds. *Supra* Part I; BH UV Motion at Part I. The sole contention is that ERS was required to sell those bonds directly to investors, instead of to an underwriter for resale to investors. Even under the pre-UCC

rule, when a government takes an action "which, under existing law, it has authority to make, but fails to follow the procedure laid down by statute, [the action] is not 'ultra vires,' but irregular." *Keeler Bros. v. Sch. Dist. No. 3, Sheridan Cty.*, 205 P. 217, 219 (Mont. 1922).   Because ERS indisputably had the authority to incur secured debt and to sell bonds, a failure to follow the proper procedure in how those bonds were sold is all that has been alleged against ERS.   Under those circumstances, the bonds are "not 'ultra vires,' but irregular." *Id.*   The very purpose of § 8-202(b) is to make it "the duty of the issuer, not of the purchaser, to make sure that the security complies with the law governing its issue."   UCC § 8-202, cmt. 3.   And so even if the Committees' unprecedentedly narrow construction of § 8-202 were somehow correct, the ERS Bonds would still be enforceable under that provision.

*Third*, the Committees make the bootstrap argument that the Bondholders are not "purchasers" of "securities" under § 8-202 because the definition of a "security" requires an "obligation" or "interest," and the ERS Bonds did not create an "obligation" or "interest" in ERS or its property.   Committees' Opp. at 29-30.   This argument is meritless.   A bond cannot shed its status as a security merely because the Committees say so.   After all, the void *ab initio* treatment is "a legal fiction"; "[i]n reality, an agreement, under which the parties performed, did exist prior" to a "decision that it is void."   *Mass. Mun. Wholesale Elec. Co. v. Town of Danvers*, 577 N.E.2d 283, 293 (Mass. 1991).   It is indisputable that Section 8 of the UCC "governs stocks, bonds and other evidences of indebtedness."   *Vigilant Ins. Co. of Am. v. Hous. Auth. of City of El Paso, Tex.*, 660 N.E.2d 1121, 1125 (N.Y. 1995).   It is also undisputed that ERS had the power to borrow money, and sold bonds by granting the Bondholders a security interest in certain "Pledged Property" of ERS.   *Omnibus Objection of Comm. of Retired Emps.* ¶ 18, Case No. 17-bk-03283, ECF No. 6482.   The Committees' argument boils down to an "assert[ion] that a security is not

valid." 19 L.P.R.A. § 1752(b). And, as explained above, § 8-202(b)(2) tells the court exactly what
to do in such a scenario: a bond is enforceable if the issuer "received a substantial consideration
for the issue" and the issuer "has power to borrow money." Here, ERS met these conditions
because it received substantial consideration and had the power to borrow money for the stated
purpose. BH UV Motion at 33-34.

### 2. The Bondholders Are Purchasers for Value Without Notice of the Particular Defect

The undisputed facts also show that the Bondholders are "purchaser[s] for value and
without notice of the particular defect" who are entitled to the protection of UCC § 8-202.[15] To
be clear, this "particular defect" would have been a specific shortcoming, namely, that the ERS
Enabling Act did not authorize the issuance of the ERS Bonds because it precluded an underwritten
bond offering. But no Bondholder could credibly have had notice of any such "particular defect."
In fact, the record shows just the opposite: For more than a decade, dating from the issuance of the
bonds in 2008 to today, the evidence that the ERS Bonds were authorized by the Enabling Act has
been overwhelming and uncontroverted. BH UV Motion at 35-42.

*First*, the Committees misunderstand both the notice standard and the record evidence
when they argue that the Bondholders have presented "no evidence concerning what they actually
knew or did not know." Committees' Opp. at 30. Under the UCC, a person may have "notice" of
a particular fact if she "has actual knowledge of it." 19 L.P.R.A. § 451(25). There is no evidence
in the record that any Bondholder, at the time of its purchases of ERS Bonds, had actual knowledge
that the bonds were not authorized by the ERS Enabling Act because the Act precluded an

---

[15] For the reasons given in the *Reply in Support of the Fiscal Agent's Motion for Summary Judgment*, to be
filed contemporaneously herewith, § 8-202(b) also provides a defense with respect to the claims by the Fiscal Agent
on behalf of Cede & Co. as nominee of The Depository Trust Company, the sole holder of the bonds themselves.

underwritten bond offering.  And the Bondholders have cited a mountain of evidence to the contrary.  BH UV Motion at 35-42.  The Committees have advanced no evidence to suggest that the Bondholders had actual knowledge of their "particular defect," and that alone is dispositive of summary judgment.  And this point is self-evident: No rational investor would purchase a security if she had actual knowledge that the security was invalid.

*Second*, the Committees incorporate arguments made in their own motion for summary judgment with respect to notice.  Committees' Opp. at 31.  As the Bondholders explained in opposing that motion, the Committees' arguments are meritless.  BH Opp. at Part III.A.2.  The Committees also suggest that the Bondholders could somehow have "actual knowledge" without an affirmative determination of invalidity.  Committees' Opp. at 31.  This is nonsensical.  Again, the Committees misstate the notice standard under UCC § 8-202 when they repeatedly refer to "notice of the *ultra vires* issue."  Committees' Mot. at 42-51; Committees' Opp. 30-36.  UCC § 8-202 requires notice of the "particular defect" rendering the bonds invalid, and not simply notice of an "issue."  UCC § 8-202.  Here, that means that the Bondholders must have "actual knowledge" that the ERS Enabling Act did not authorize the issuance of the ERS Bonds because it precluded an underwritten bond offering.  It is impossible to have such notice because no court has ever so held.  The fact that interested litigants are making that argument—among countless other arguments, strewn across hundreds of filings—does not make it so, especially given the overwhelming evidence to the contrary.  BH UV Motion at Part II.B; BH Opp. at Part III.A.2; *infra* at 32-35.  In fact, this is why ERS itself continues to this day to recognize the ERS Bonds as an outstanding liability on its financial statements: "because the Court has not made a final ruling regarding th[e *ultra vires*] issue." BH UV 56(b) ¶ 66; Ex. 11 to Second Sooknanan UV Decl., at 302-03.

The Committees confuse the issue when they say that "a ruling by this Court … will not make the ERS Bonds invalid"; rather, it is the text of the Enabling Act.  Committees' Opp. at 32. The question here is one of notice (and, with respect to this argument, "actual" notice).  And the text of the Enabling Act did not put anyone on notice that the ERS Bonds were unauthorized because the Act prohibited underwritten bond offerings.  In more than a decade, *every single person who looked at the issue has concluded the opposite*.  As previously explained, at the time of the bond issuance, ERS's outside Bond Counsel, ERS's internal general counsel, and the Secretary of Justice all concluded that the bonds were validly issued.  BH Opp. at 45-46, 48-50. And ERS's Board—obviously well aware of same text of the Enabling Act—voted to authorize the issuance of the bonds.  BH UV 56(b) ¶ 42.  If this Court rules that the ERS Bonds were not authorized by the Enabling Act, it will be the first body with any authority to say so.  It strains credulity to argue that the Enabling Act itself put the Bondholders on notice that it did not authorize the issuance of the bonds because it precluded an underwritten bond offering—particularly when ERS's Board, ERS's general counsel, Bond Counsel, and the Secretary of Justice were unquestionably aware of the same language in the Act and unambiguously concluded that the bonds were valid.  BH Opp. at 45-46, 48-50.  Moreover, to hold that the Enabling Act itself placed the Bondholders on notice in the face of so much contrary evidence would be to require all investors to re-assess for themselves the validity of every security they purchase, which is not how the municipal bond market—or any other securities market—works.  BH UV Motion at 39-40; BH Opp. at 49.

Perhaps recognizing the strangeness of their position, the Committees resort to the equally meritless argument that the language in Act 116's Statement of Motives was an "affirmative determination of invalidity."  Committees Opp. at 32.  We have dealt with this before: the

statement was factually inaccurate and did not provide the requisite notice anyway, BH UV Motion at 30-31, 40-41; BH Opp. at 35-36, 51-53, particularly since ERS itself sought legal advice considering Act 116 and concluded that the bonds had been validly issued, BH UV Motion at 41-42; BH Opp. at 52-53.  The Committees dismiss this evidence, claiming that "[n]othing in [internal ERS counsel's comments] confirms the validity of the ERS Bonds."  Committees' Opp. at 35-36.  But this is false.  The public board minutes reveal that counsel told ERS's Board in no uncertain terms that the bonds had been validly issued: "Attorney Rivera believes that the System has authority to incur debt, pledge its assets and has authority to consider future contributions as part of its assets. Anthony Murray, Esq. added that proof of this is that the Legislative Assembly amended Act No. 447 to limit these procedures."  BH UV 56(b) ¶ 72.  The Committees claim the comments are entirely irrelevant because "the Bondholders do not assert that they relied on them." Committees' Opp. at 36.  But the Committees misunderstand the significance of this legal advice.  The Committees place the statement in Act 116's Statement of Motives at the center of their notice arguments.  Because that statement did not lead ERS to conclude that the ERS Bonds were invalid—even when ERS specifically looked into it through counsel—there is no basis to conclude that Act 116 should have led the Bondholders to reach that conclusion, either.

The Committees also have no answer for *In re Seacoast Anti-Pollution League*, 490 A.2d at 1339, which held that a pending appeal challenging the validity of bonds "does not amount to notice of a defect" under UCC § 8-202(b) because "[t]o hold otherwise would be to permit an appealing party to usurp the role allocated to this court" as "every appeal would create a 'defect' that would effectively suspend the operation of an issuing order by casting doubt on the subsequent validity of the securities issued, thereby making them unmarketable or substantially reducing their market value."  According to the Committees, *Seacoast* is irrelevant because the court there found

only that a "notice only of the appeal" was insufficient to establish notice, and did not address whether "the facts implicated in that appeal" could provide notice. Committees' Opp. at 33. The Committees are plainly grasping at straws. *Seacoast* was not limited to a notice of appeal. The court specifically concluded that the "mere possibility" that the order in question may "be overturned on appeal ... [did] not amount to notice of a defect *per se*." *Seacoast*, 490 A.2d at 1339. Similarly, the Committees cannot explain why the mere possibility that this Court may accept the arguments made in this complex litigation provides the requisite notice under UCC § 8-202. Indeed, if the Committees and ERS had the courage of their convictions, ERS's financial statements would no longer record the ERS Bonds as a $3 billion liability. But they do, BH UV 56(b) ¶ 66; Ex. 11 to Second Sooknanan UV Decl., at 302-03, because as even ERS inherently recognizes, the fact that lawyers make arguments does not mean that every argument will prevail. Half the time, one side or the other loses.

The Committees also seem to misunderstand the mechanics of UCC § 8-202, when they argue that it applies "if an issuer asserts that a security is not valid," not when "an issuer proves through an affirmative determination of invalidity that a security is not valid." Committees' Opp. at 32. UCC § 8-202 applies here because ERS has asserted that the ERS Bonds were invalidly issued. And the Bondholders are entitled to its protection because they are "purchaser[s] for value and without notice of the particular defect" under that provision.

*Third*, the Committees address the second notice prong under the UCC—receipt of "a notice or notification of" the particular defect, 19 L.P.R.A. § 451(25), and argue that the pleadings by AAFAF, the Commonwealth, and the Committees all serve as such notice. The Bondholders have previously explained why this argument fails. BH UV Motion at 42; BH Opp. at 55-56.

*Finally*, the Committees claim that "all the facts and circumstances" gave the Bondholders "reason to know," 19 L.P.R.A. § 451(25), "that the ERS Bonds were *ultra vires*." Committees' Opp. at 34-36. The Committees again incorporate their prior briefing to support this argument, Committees' Opp. at 34, but those arguments fail for the reasons previously provided, BH UV Motion at Part II.B; BH Opp. at Part III.A.2. The Committees also claim that the "Bondholders have admitted they knew" that the bonds were defective. Committees' Opp. at 35. This is false and misleading, perhaps deliberately so. The Bondholders have made no such admissions and the Committees have cited no supporting evidence. At bottom, the Committees have no answer for the overwhelming evidence in the record supporting the validity of the bonds. They ask the Court to disregard the evidence, because the Bondholders have not alleged that they reviewed or relied on it. But the Committees again ignore the notice standard. The question is whether, "all the facts and circumstances" gave the Bondholders "reason to know" that the ERS Enabling Act in fact did not authorize the issuance of the ERS Bonds because it precluded an underwritten bond offering. The record evidence makes clear that the Bondholders had no such evidence.

The record evidence on this point bears repeating. More than a decade ago, ERS's Board of Trustees approved the issuance of the ERS Bonds. The bonds were then issued pursuant to a resolution from the ERS Board, which the Board affirmed was "adopted pursuant to the provisions of the [ERS Enabling] Act." BH UV 56(b) ¶ 43. They were offered via Official Statements that were accompanied by a form legal opinion from Puerto Rico bond counsel—whose job it was to analyze and confirm validity—confirming that the bonds had been "duly authorized" by ERS and "constitute[d] legal valid and binding limited obligations of the System." BH UV 56(b) ¶¶ 46.1-46.2. In addition, prior to the offering, ERS itself had leaked to the press a more substantive legal opinion from bond counsel confirming ERS's authority to issue the bonds under the Enabling Act.

32

BH UV 56(b) ¶¶ 37.1-37.4.  And both ERS's General Counsel and the Commonwealth's Secretary of Justice provided legal opinions that the bonds were validly issued.  BH UV 56(b) ¶¶ 46.9-46.12. Moreover, by the time the ERS Bonds were issued, Judge Gelpí had ruled in *Rivera Torres v. Junta de Retiro Para Maestros*, 502 F. Supp. 2d 242 (D.P.R. 2007), that identical language authorized bond issuances, and the Legislative Assembly had expressly instructed ERS to use funds from the bond issuance to pay benefits in Act 35-2007 § 5.  And as the Committees are aware, in its exhaustive investigative report commissioned by the Oversight Board itself, Kobre & Kim found no evidence "that any material concerns about [legislative] authorization were raised prior to issuance" of the ERS Bonds.  BH UV 56(b) ¶ 79.

After ERS issued the bonds, the evidence of validity continued.  ERS paid the bonds in full and on time for nearly a decade.  BH UV 56(b) ¶¶ 64-65.  ERS's financial statements, from issuance up until today, have always recognized the ERS Bonds as a valid, outstanding liability of ERS.  BH UV 56(b) ¶ 66.  ERS obtained investment-grade ratings for the ERS Bonds, and argued against rating downgrades.  BH UV 56(b) ¶¶ 63, 76.  In 2011, ERS's Administrator even told the press that he "urge[d] everyone who wants to buy [the ERS Bonds] to do so because it is a great investment."  BH UV 56(b) ¶ 73.  The Legislative Assembly recognized the validity of the ERS Bonds in subsequent legislation enacted in 2011 and 2013, including by specifically amending the ERS Enabling Act in 2011 to limit *future* bond issuances.  BH Opp. at Part I.C.3; Part II.C.  Even when ERS stopped making payments on the eve of these restructuring proceedings, ERS raised no argument that the bonds were invalid—to the contrary, it admitted their validity.  BH Opp. at Part II.D.  And ERS's Board of Trustees, to this day, has never rescinded its authorization to issue the bonds or otherwise concluded that the bonds are invalid.  BH UV 56(b) ¶ 80.

This uncontroverted evidence of validity continued despite an independent investigation into the issuance of the ERS Bonds. In 2010, ERS and the Government Development Bank commissioned the consulting firm Conway MacKenzie to investigate the ERS Bond issuance. BH UV 56(b) ¶ 67. In its resulting report, Conway MacKenzie found much to criticize about the bond issuance, but it made no suggestion whatsoever that the ERS Bonds were not authorized by the Enabling Act. BH UV 56(b) ¶ 69.

After reviewing the Conway MacKenzie report, ERS's Administrator and Board of Trustees then received legal advice from outside counsel in February 2012 addressing the subject of the validity or invalidity of the ERS Bonds under the ERS Enabling Act. BH UV 56(b) ¶ 71. According to minutes from an ERS board meeting that have been posted publicly on an ERS website for years, that counsel told ERS's Board that the bonds had been validly issued: "Attorney Rivera believes that the System has authority to incur debt, pledge its assets and has authority to consider future contributions as part of its assets. Anthony Murray, Esq. added that proof of this is that the Legislative Assembly amended Act No. 447 to limit these procedures." BH UV 56(b) ¶ 72. After receipt of this legal advice, ERS made no determination or contention that the ERS Bonds were invalid, did not commence any legal challenge to the ERS Bonds, and instead continued paying interest on the ERS Bonds. BH UV 56(b) ¶¶ 64-65, 77-78. And even today, ERS's audited financial statements list the ERS Bonds as an outstanding liability of ERS. BH UV 56(b) ¶ 66.

Similarly, the Legislative Assembly held a number of hearings on the bond issuance in 2011, yet then recognized the validity of the ERS Bonds and specifically amended the ERS Enabling Act in 2011 to limit *future* bond issuances. BH Opp. at Part I.C.3. Indeed, it is undisputed that ERS *itself* made no determination that the ERS Bonds were invalid before mid-

2017—and even then, the supposed determination was made by outside counsel as a litigation position, and was never approved by the ERS Board. BH UV 56(b) ¶¶ 77, 80.

## B. The Bondholders Are Entitled to Recover in Equity

As the Bondholders' Motion explained, even if ERS lacked authority to issue the ERS Bonds at the time of issuance, and even if UCC § 8-202(b) did not render the ERS Bonds enforceable in the Bondholders' hands, the Bondholders would still be entitled to recover in equity. The Committees are wrong when they argue that an *ultra vires* finding is fatal to the Bondholders' ability to recovery in equity. Committees' Opp. at 52-55.

It is well-settled that if a municipality issues bonds "for money borrowed, the fact that the bonds are *ultra vires* will not preclude a recovery of the sum loaned, in an action for money [] received, where the municipality had the power to borrow the money." 15 McQuillin Mun. Corp. § 43:149 (3d ed.); *see also Bangor Sav. Bank v. City of Stillwater*, 49 F. 721, 721-22 (C.C.D. Minn. 1892) ("It is the settled doctrine that if a municipal corporation has received money for an authorized purpose, derived from the issue of illegal and void bonds, and has applied it to that purpose, an action will lie as for money had and received, although the corporation had no authority to issue the bonds."); *Town of Gilman v. Fernald*, 141 F. 941, 944 (8th Cir. 1905) ("Notwithstanding" the fact that a municipality's "bonds … were void for want of power to issue them," "the money loaned, if used by the municipality for its own benefit, may be recovered."). This principle governs this exact situation. ERS borrowed $3 billion to keep the ERS system afloat, and the Bondholders can recover in equity even if this Court concludes that ERS lacked the authority to issue the bonds.

Although the Committees discuss at length how the *ultra vires* doctrine generally interacts with principles of equity, they miss the point: A contract that is "beyond the scope of the powers of a municipal corporation …[, but] not prohibited by statute, is *ultra vires* but not illegal in the

true sense of that term."  10 McQuillin Mun. Corp. § 29:15 (3d ed.).  The "distinction may be of little practical importance," but can be the dividing line for whether principles of equity can be applied.  While there may be "no room for the application of the principles of equity" where it would entail a "violation[] of the laws, of public policy, and of public order," *Morales v. Municipio de Toa Baja*, 119 D.P.R. 682, 19 P.R. Offic. Trans. 724, 735-36 (1987), merely pointing out that an act is *ultra vires* because the municipality has no express authority to act is not enough to close the gates of equity.  In other words,

> Equity will not relieve a municipal corporation from an *ultra vires* contract without providing for the restoration of the property received.  The doctrine of *ultra vires* when invoked for or against a municipal corporation should not be allowed to prevail when it would defeat the ends of justice and work a legal wrong.

10 McQuillin Mun. Corp. § 29:15 n.20 (3d ed.) (citing *Walker v. City of Richmond*, 189 S.W. 1122 (Ky. 1916)).  Here, if the Committees are correct that the ERS Bonds are *ultra vires*, then ERS received billions of dollars as a windfall for its own violation of the ERS Enabling Act.  The Bondholders bear no responsibility for ERS's statutory violation.  To permit ERS to retain billions of dollars it gained for violating its own governing statute at the expense of innocent investors would surely offend the elementary principles of equity.

In arguing otherwise, the Committees misrepresent the governing Puerto Rico law by ignoring cases "accept[ing] the rule that, in the proper circumstances, a plaintiff may invoke against the State the doctrines o[f] one's own acts, equitable estoppel and good faith," and "reject[ing] any rules or interpretations that could lead to a result contrary to good faith."  *Berrios v. Univ. P.R.*, 116 D.P.R. 88, 16 P.R. Offic. Trans. 112, 125-26 (1985).  Contrary to the Committees' arguments, under Puerto Rico law, equity will enforce otherwise-void contracts against the government, as "the elementary principles of equity, in the civil law sense of the word,

are offended by a municipality's benefitting from an agreement . . . , while at the same time evading all the responsibilities it freely assumed." *See Plan Bienestar Salud v. Alcalde Cabo Rojo*, 114 D.P.R. 697, 14 P.R. Offic. Trans. 896, 903-04 (1983). Those principles are fully applicable here.

The cases that the Committees cite in opposition to these principles are inapposite. In *Las Marias Reference Lab. Corp. v. Municipality of San Juan*, 159 D.P.R. 868, 2003 WL 21706387 (2003), the court believed that the contracting party had assumed the risk of the government's lack of authority: "Las Marías had done business with the Municipality before and, thus, should have known the rules that govern contracts of this type. However, it relied on some letters to attempt to renew the contracts, even though it knew—or should have known—that said documents alone were insufficient to create obligations that could be demandable from the Municipality." *Id.* at *8. *Morales v. Municipality of Toa Baja*, 119 D.P.R. 682, 19 P.R. Offic. Trans. 724 (1987), involved purchases that were made in excess of budgetary appropriations. In such a case, the liability itself—in any form—existed in violation of a legal limitation on liabilities of any sort. Similarly, *Norton v. McOsker*, 407 F.3d 501, 506 (1st Cir. 2005)—a Rhode Island-law dispute about promises made within an adulterous relationship—involved an effort to enforce a promise the very substance of which violated Rhode Island public policy. Here, in contrast, it is undisputed that ERS was fully authorized to incur the $3 billion in debt represented by the ERS Bonds—the asserted problem is simply the form of the issuance—so enforcing the underlying debt in equity would not violate any express legal limitation.

## CONCLUSION

For the foregoing reasons, the Court should grant the Bondholders' motion for partial summary judgment.

In San Juan, Puerto Rico, today Thursday November 19, 2020.

/s/Alfredo Fernández-Martínez
Alfredo Fernández-Martínez
DELGADO & FERNÁNDEZ, LLC
PO Box 11750
Fernández Juncos Station
San Juan, Puerto Rico 00910-1750
Tel. (787) 274-1414
Fax: (787) 764-8241
afernandez@delgadofernandez.com
USDC-PR 210511

/s/ Bruce Bennett
Bruce Bennett (*pro hac vice*)
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, CA 90071
Tel. (213) 489-3939
Fax: (213) 243-2539
bbennett@jonesday.com

Benjamin Rosenblum (*pro hac vice*)
JONES DAY
250 Vesey Street
New York, New York 10281
Tel. (212) 326-3939
Fax: (212) 755-7306
brosenblum@jonesday.com

Geoffrey S. Stewart (*pro hac vice*)
Matthew E. Papez (*pro hac vice*)
Sparkle L. Sooknanan (*pro hac vice*)
JONES DAY
51 Louisiana Ave. N.W.
Washington, DC 20001
Tel. (202) 879-3435
Fax: (202) 626-1700
gstewart@jonesday.com
mpapez@jonesday.com
ssooknanan@jonesday.com

David R. Fox (*pro hac vice*)
JONES DAY
100 High Street, 21st Floor
Boston, MA 02110
Tel. (617) 449-6943
Fax: (617) 449-6999
drfox@jonesday.com

*Counsel for Altair Global Credit Opportunities Fund (A), LLC, Andalusian Global Designated Activity Company, Crown Managed Accounts for and on behalf of Crown/PW SP, Glendon Opportunities Fund, L.P., LMA SPC for and on behalf of Map 98 Segregated Portfolio, Mason Capital Master Fund LP, Oaktree-Forrest Multi-Strategy, LLC (Series B), Oaktree Opportunities Fund IX, L.P., Oaktree Opportunities Fund IX (Parallel), L.P., Oaktree Opportunities Fund IX (Parallel 2), L.P., Oaktree Huntington Investment Fund II, L.P., Oaktree Opportunities Fund X, L.P., Oaktree Opportunities Fund X (Parallel), L.P., Oaktree Opportunities Fund X (Parallel 2), L.P., Oaktree Value Opportunities Fund Holdings, L.P., Oceana Master Fund Ltd., Ocher Rose, L.L.C., Pentwater Merger Arbitrage Master Fund Ltd., PWCM Master Fund Ltd., Redwood Master Fund, Ltd, and SV Credit, L.P.*

*/s/ Alicia I. Lavergne-Ramírez*

José C. Sánchez-
Castro USDC-PR
213312
jsanchez@sanchezlrv.com

Alicia I. Lavergne-Ramírez
USDC-PR 215112
alavergne@sanchezlrv.com

SÁNCHEZ/LRV LLC
270 Muñoz Rivera Avenue, Suite 1110
San Juan, PR 00918
Tel. (787) 522-6776
Fax: (787) 522-6777

*/s/ Jason N. Zakia*

Glenn M. Kurtz (*pro hac vice*)
John K. Cunningham (*pro hac vice*)
WHITE & CASE LLP
1221 Avenue of the Americas
New York, NY 10036
Tel. (212) 819-8200
Fax (212) 354-8113
gkurtz@whitecase.com
jcunningham@whitecase.com

Jason N. Zakia (*pro hac vice*)
Cheryl T. Sloane (*pro hac vice*)
Jesse L. Green (*pro hac vice*)
WHITE & CASE LLP
200 S. Biscayne Blvd., Suite 4900
Miami, FL 33131
Tel. (305) 371-2700
Fax (305) 358-5744
jzakia@whitecase.com

*Counsel for Defendants Puerto Rico AAA Portfolio Bond Fund, Inc.; Puerto Rico AAA Portfolio Bond Fund II, Inc., Puerto Rico AAA Portfolio Target Maturity Fund, Inc.; Puerto Rico Fixed Income Fund, Inc.; Puerto Rico Fixed Income Fund II, Inc.; Puerto Rico Fixed Income Fund III, Inc.; Puerto Rico Fixed Income Fund IV, Inc.; Puerto Rico Fixed Income Fund V, Inc.; Puerto Rico Fixed Income Fund VI, Inc.; Puerto Rico GNMA & U.S. Government Target Maturity Fund, Inc.; Puerto Rico Mortgage-Backed & U.S. Government Securities Fund, Inc.; Tax-Free Puerto Rico Fund, Inc.; Tax-Free Puerto Rico Fund II, Inc.; Tax-Free Puerto Rico Target Maturity Fund, Inc.; and UBS IRA Select Growth & Income Puerto Rico Fund*