## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND<br>MANAGEMENT BOARD FOR PUERTO RICO,<br><br>        as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO,<br><br>                    Debtor.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br>(Jointly Administered) |

### AMBAC ASSURANCE CORPORATION'S MOTION FOR AN ORDER DIRECTING CASH RULE 2004 DISCOVERY FROM THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (the "Commonwealth") (Bankruptcy Case No. 17-BK-3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17-BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5233-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ................................................................................................ 1

JURISDICTION AND VENUE ............................................................................................... 3

BACKGROUND ..................................................................................................................... 3

ARGUMENT ........................................................................................................................... 6

I.      THE CALCULATION BACK-UP AND PROCESS DOCUMENTS ARE
PLAINLY RELEVANT, WOULD NOT BE BURDENSOME TO PRODUCE,
AND ARE NOT SHIELDED FROM DISCOVERY BY ANY PRIVILEGE
PROTECTIONS. ........................................................................................................... 7

      A.     The Calculation Back-Up and Process Documents Ambac Seeks Are
Relevant to the Financial Condition of the Debtor. ................................................7

      B.     The Board Has Articulated No Undue Burden in Producing the Requested
Materials. ..............................................................................................................13

      C.     The Board's Assertion of the Protections of the Attorney-Client and Work
Product Privileges Over the Calculation Back-Up and Process Documents
Lacks Merit. ..........................................................................................................14

            1.     The Calculation Back-Up and Process Documents Are Not
Protected Work Product or Privileged Material.........................................15

                  a.     The Nature of the Materials Sought Is Factual Information,
Not Legal Advice or Litigation Work Product. ............................15

                  b.     The Engagement Letters Governing the Work Performed
by the Board's Advisors Make Explicit That It Was Mere
Factual Analysis, Not Litigation Work Product or Legal
Advice. ..........................................................................................16

            2.     To the Extent Any Privilege Protections Attached to the
Calculation Back-Up and Process Documents, the Board Waived
Such Protections by Making the Published Reports Publicly
Available. ...................................................................................................19

            3.     Ambac Has a Substantial Need for Any Materials That May Be
Protected Work Product.............................................................................20

            4.     The Board Cannot Carry Its Burden of Demonstrating That the
Requested Documents Are, in Their Entirety, Protected by the
Work Product or Attorney-Client Privileges. ............................................20

RELIEF REQUESTED...........................................................................................................21

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Aponte-Navedo v. Nalco Chem. Co.*,
   268 F.R.D. 31 (D.P.R. 2010) ...................................................................................7

*Autoridad de Carreteras y Transportación v. Transcore Atl., Inc.*,
   319 F.R.D. 422 (D.P.R. 2016) .................................................................................7

*Baez-Eliza v. Instituto Psicoterapeutico de P.R.*,
   275 F.R.D. 65 (D.P.R. 2011) .................................................................................21

*Blattman v. Scaramellino*,
   891 F.3d 1 (1st Cir. 2018)......................................................................................19

*BPP Retail Props., LLC v. N. Am. Roofing Servs., Inc.*,
   300 F.R.D. 59 (D.P.R. 2014) ...................................................................................7

*Cavallaro v. United States*,
   284 F.3d 236 (1st Cir. 2002)..................................................................................18

*Granite Partners, L.P. v. Bear, Stearns & Co. Inc.*,
   184 F.R.D. 49 (S.D.N.Y. 1999) .......................................................................19, 20

*In re Bibhu LLC*,
   2019 WL 171550 (Bankr. S.D.N.Y. Jan. 10, 2019).................................................3

*In re China Fishery Grp. Ltd.*,
   2017 WL 3084397 (Bankr. S.D.N.Y. July 19, 2017) ..............................................6

*In re Correra*,
   589 B.R. 76 (Bankr. N.D. Tex. 2018) ......................................................................6

*In re Corso*,
   328 B.R. 375 (E.D.N.Y. 2005) ................................................................................6

*In re Drexel Burnham Lambert Grp., Inc.*,
   123 B.R. 702 (Bankr. S.D.N.Y. 1991).....................................................................6

*In re Fin. Oversight & Mgmt. Bd. for P.R.*,
   295 F. Supp. 3d 66 (D.P.R. 2018).....................................................................9, 12

*In re Grand Jury Subpoena*,
   274 F.3d 563 (1st Cir. 2001).................................................................................21

*Official Comm. of Unsecured Creditors v. Grant (In re Refco, Inc.),*
    2007 WL 9232701 (N.D. Ill. Jan. 16, 2017) ...................................................................6

*In re San Juan Dupont Plaza Hotel Fire Litig.,*
    859 F.2d 1007 (1st Cir. 1988) .....................................................................................20

*Lawrence E. Jaffe Pension Plan v. Household Int'l, Inc.,*
    244 F.R.D. 412 (N.D. Ill. 2006) ..................................................................................16

*Lluberes v. Uncommon Prods., LLC,*
    663 F.3d 6 (1st Cir. 2011) .....................................................................................14, 19

*Moreno Rivera v. DHL Glob. Forwarding,*
    272 F.R.D. 50 (D.P.R. 2011) .......................................................................................16

*P.R. Dairy Farmers Ass'n v. Comas-Pagán,*
    2018 WL 8545950 (D.P.R. Mar. 6, 2018) ...................................................................12

*Pacamor Bearings, Inc. v. Mineba Co.,*
    918 F. Supp. 491 (D.N.H. 1996) .................................................................................18

*Parker Waichman LLP v. Salas LC,*
    328 F.R.D. 24 (D.P.R. 2018) .........................................................................................7

*Rodríguez v. Torres,*
    2015 WL 1138256 (D.P.R. Mar. 13, 2015) ................................................................11

*Sánchez-Medina v. UNICCO Serv., Co.,*
    265 F.R.D. 24 (D.P.R. 2009) .........................................................................................7

*Sterling Merch., Inc. v. Nestle, S.A.,*
    2008 WL 1767092 (D.P.R. Apr. 15, 2008)..................................................................13

*Town of Grafton v. Pulte Homes of New England, LLC,*
    2014 WL 2155035 (D. Mass. May 21, 2014) ..............................................................19

*United States ex rel. Wollman v. Mass. Gen. Hosp., Inc.,*
    2020 WL 4352915 (D. Mass. July 29, 2020)...............................................................18

*United States v. Mass. Inst. of Tech.,*
    129 F.3d 681 (1st Cir. 1997) ........................................................................................19

*United States v. Textron Inc. & Subsidiaries,*
    577 F.3d 21 (1st Cir. 2009) ..........................................................................................16

*Vázquez v. Exec. Airlines, Inc.,*
    2009 WL 10681024 (D.P.R. Dec. 23, 2009) ...............................................................11

*W Holding Co. v. Chartis Ins. Co. of P.R.*,
   300 F.R.D. 48 (D.P.R. 2014) ..........................................................................................14, 16

**Statutes**

48 U.S.C. § 2121(a) ......................................................................................................................15

48 U.S.C. § 2142 ..........................................................................................................................15

48 U.S.C. § 2145 ..........................................................................................................................15

**Other Authorities**

Fed. R. Bankr. P. 2004 .......................................................................................................... *passim*

Fed. R. Civ. P. 26 ...............................................................................................................7, 11, 21

iv

To the Honorable United States Magistrate Judge Judith G. Dein:

Pursuant to the Court's order dated November 12, 2020 (ECF No. 15093),[2] Ambac

Assurance Corporation ("Ambac") respectfully submits this motion (the "Motion") requesting

entry of an order, substantially in the form of **Exhibit A**, directing the Financial Oversight and

Management Board for Puerto Rico, including in its capacity as representative of the

Commonwealth of Puerto Rico (the "Board"), to produce documents related to the Commonwealth

of Puerto Rico (the "Commonwealth") and the Board's publicly available cash restriction

analyses.[3]

In support of this Motion, Ambac respectfully states as follows:

**PRELIMINARY STATEMENT**

1.      Following an extensive meet-and-confer process, Ambac and the Board have

reached an impasse with respect to two related discovery requests that require the Court's

intervention.

2.      Ambac seeks back-up documentation prepared by the Board's nonlawyer advisors

related to three "cash restriction" analyses that purport to identify the amount of cash held by the

---

[2] Unless otherwise indicated, all ECF numbers referenced in this motion refer to the docket in Case No. 17 BK 3283-LTS.

[3] This Motion is directed to the Board, because Ambac understands that the Board has possession, custody, or control of the documents at issue, but Ambac reserves the right to seek any non-duplicative documents from the Puerto Rico Fiscal Agency and Financial Advisory Authority ("AAFAF").

Consistent with the Court's November 12, 2020 order (*Order* [ECF No. 15093] at 2-3), this Motion addresses only the specific discovery requests as to which Ambac and the Board have reached an impasse. Ambac, the Board, and AAFAF (collectively, the "Parties") have previously indicated in joint status reports (*see* ECF Nos. 14150, 14438, 15025) that they continue to meet-and-confer in good faith regarding other requests Ambac made in *Ambac Assurance Corporation's Motion for Entry of an Order Authorizing Discovery Under Bankruptcy Rule 2004 Concerning Commonwealth Assets* [ECF No. 9022] (the "Assets Rule 2004 Motion") and *Ambac Assurance Corporation's Motion for Entry of an Order Authorizing Discovery Under Bankruptcy Rule 2004 Concerning Commonwealth Cash Restriction Analysis* [ECF No. 9023] (the "Cash Rule 2004 Motion" and, collectively with the Assets Rule 2004 Motion, the "Original Rule 2004 Motions").  Ambac reserves its right to seek additional judicial relief in the event the Parties reach an impasse with regard to those other requests.

Commonwealth and its instrumentalities and classify funds as either restricted (unavailable for distribution to creditors) or unrestricted (available to pay creditors). Specifically, Ambac seeks: (i) back-up materials containing calculations for the reports, such as Excel or dynamic versions of charts and tables contained in such reports that contain the mechanical calculations underlying the amounts included therein; and (ii) process documents that reflect how the Board's nonlawyer advisors evaluated whether certain funds are restricted or unrestricted, including documents and communications reflecting the processes, assumptions, and methodologies used to classify accounts as restricted or unrestricted.

3.      The Board's objections—that the requested documents are irrelevant, unduly burdensome to produce, and privileged—are meritless. Analysis showing the amount of restricted and unrestricted cash available to the Commonwealth is critically important to allow creditors to understand and evaluate the financial condition of the Commonwealth. While the Board has produced some factual source materials and raw data underlying the "cash restriction" analyses it has performed, it is impossible for Ambac or its advisors to evaluate and recreate the conclusions that the Board reached and publicly disclosed without back-up documentation showing how the underlying raw data "maps" to particular conclusions the Board has reached. Similarly, the process documents are important to understanding and placing in proper context the analysis performed to assess restrictions on funds held by Commonwealth entities and instrumentalities.

4.      Producing the requested back-up documentation would be no more burdensome than producing the underlying factual source materials and raw data that the Board has already produced; the requested documents are the kind that the consulting firms that prepared these analyses (Duff & Phelps, LLC and Ernst & Young Puerto Rico LLC) regularly collect and provide in connection with litigation disclosures. The information Ambac seeks is factual rather than legal

in nature and, to the extent any cognizable privilege attached to such information, it was waived when the Board voluntarily disclosed the cash restriction analyses to the public.

5.      Accordingly, discovery of the requested materials should be provided.

## JURISDICTION AND VENUE

6.      The United States District Court for the District of Puerto Rico has subject matter jurisdiction over this matter under 28 U.S.C. § 1331 and Section 306(a) of the Puerto Rico Oversight, Management, and Economic Stability Act ("PROMESA"), 48 U.S.C. § 2166(a).

7.      Venue is proper under 28 U.S.C. § 1391(b) and PROMESA § 307(a), 48 U.S.C. § 2167(a).

## BACKGROUND

8.      On November 8, 2019, the Government[4] filed a motion to strike Ambac's Original Rule 2004 Motions and requested sanctions against Ambac for bringing the Original Rule 2004 Motions.[5]  The Court (Swain, J.) denied the Motion to Strike on January 23, 2020, holding that "Rule 2004 discovery is the appropriate mechanism for use by creditors to obtain information concerning the financial health of the debtor at this stage of the Title III proceedings." (Memorandum Order[6] at 8-9 (citing *In re Bibhu LLC*, 2019 WL 171550, at *2 (Bankr. S.D.N.Y. Jan. 10, 2019) ("The purpose of a Rule 2004 examination is to discover ***the nature and extent of the bankruptcy estate*** in order to distribute the debtor's assets for the benefit of its creditors."

---

[4] "Government" refers, collectively, to the Board and AAFAF.

[5] *Urgent Motion of Financial Oversight and Management Board for Puerto Rico and Puerto Rico Fiscal Agency and Financial Advisory Authority to Strike (A) Ambac Assurance Corporation's Motion for Entry of Order Authorizing Discovery Under Bankruptcy Rule 2004 Concerning Commonwealth Assets [ECF No. 9022] and (B) Ambac Assurance Corporation's Motion for Entry of Order Authorizing Discovery Under Bankruptcy Rule 2004 Concerning Commonwealth Cash Restriction Analysis [ECF No. 9023] and for Sanctions* [ECF No. 9131], ¶¶ 36-38 (the "Motion to Strike").

[6] "Memorandum Order" refers to the *Memorandum Order Denying Motion to Strike Certain Rule 2004 Applications* [ECF No. 10332].

(emphasis added)).)  Judge Swain directed that discovery be provided into "major aspects of the Commonwealth's financial condition that will be relevant to a plan of adjustment[,]" and ordered the Parties to meet and confer concerning the scope of the discovery Ambac seeks through the Original Rule 2004 Motions.  (*Id.* at 9-10.)

9.     The Parties have held several meet-and-confers pursuant to the Court's order, as reflected in the status reports that have been provided to the Court.[7]  On November 12, 2020, the Court denied Ambac's Original Rule 2004 Motions without prejudice "[i]n light of the substantial work the [P]arties have done narrowing the issues and resolving disputes initially presented in the [Original] Rule 2004 Motions[,] . . . and to avoid confusion of the record," and ordered that Ambac file a new motion "limited to the issues in dispute."[8]  Ambac and the Board have recently reached an impasse on two related requests, as described below.

10.     A key issue for creditors in assessing the Commonwealth's financial condition is the amount of "unrestricted" cash held by the Commonwealth, meaning the amount of cash that is potentially available for distribution to creditors.  The Government has publicly released at least three cash restriction analyses, which classify cash held by the Commonwealth as either restricted (unavailable to pay creditors) or unrestricted (available for distribution to creditors as part of a plan of adjustment).

11.     The three reports are as follows:  *First*, Duff & Phelps, LLC ("Duff & Phelps") prepared a report for the Board analyzing the bank accounts of Commonwealth entities, including any documented legal restrictions on funds in such accounts; this report was made publicly

---

[7] (*See* ECF Nos. 10875, 11787, 12484, 12711, 13192, 13723, 14150, 14438, 15025.)

[8] (*Order* [ECF No. 15093] at 2-3.)

available on the Board's website on March 15, 2019 (the "Duff & Phelps Report").[9]  *Second*, the
Board and its advisor, Ernst & Young Puerto Rico LLC ("Ernst & Young"), prepared a
presentation with their analysis of the Commonwealth's cash status, including what cash they
deemed restricted or unrestricted, and published it to the Electronic Municipal Market Access
System on October 17, 2019 (the "Cash Restriction Analysis").[10]  *Third*, the day after publishing
the Cash Restriction Analysis, the Board published an analysis related to the Commonwealth's
bank accounts, which was also prepared with the assistance of Ernst & Young (the "Bank Account
Analysis" and, together with the Duff & Phelps Report and Cash Restriction Analysis, the
"Published Reports").[11]

12.    Ambac has requested back-up materials for the Published Reports, specifically:
(i) factual source materials and raw data underlying the Published Reports;[12] (ii) back-up materials
containing calculations made to create the reports, including Microsoft Excel or other dynamic
versions of summary charts and tables contained in the Published Reports showing the
mathematical tabulations and calculations that were performed to generate the summary charts and
tables presented in the Published Reports (the "Calculation Back-Up");[13] and (iii) process
documents that reflect the Board's nonlawyer advisors' review procedure and protocol for

---

[9] (*See* Ex. B, IFAT Report on Title III Bank Accounts, dated March 12, 2019);  *see also* FINANCIAL
OVERSIGHT & MANAGEMENT BOARD FOR PUERTO RICO: DOCUMENTS,
https://oversightboard.pr.gov/documents/ (last accessed November 19, 2020).

[10] (*See* Ex. C, Mediation: Summary of Cash Restriction Analysis, dated October 2, 2019); *see also*
*Mediation-Related Cleansing Materials Reveal $6.9B Unrestricted Cash Estimate, Discuss Risks to
Commonwealth Fiscal Plan*, REORG RESEARCH, Oct. 18, 2019.

[11] (*See* Ex. D, Bank Account Analysis: Status Update – June 30, 2019 Balances, dated October 2, 2019);
*see also AAFAF Posts Oversight Board Mediation Materials Related to Bank Account Analysis*, REORG
RESEARCH, Oct. 18, 2019.

[12] (*See* Ex. E, Ltr. from Ambac to the Government, dated Feb. 4, 2020, at 3.)

[13] (*See* Ex. F, Ltr. from Ambac to the Government, dated Apr. 8, 2020, at 1.)

assessing classifications, how funds were determined to be restricted or unrestricted, and documents and communications reflecting the processes, assumptions, and methodologies used to classify accounts (the "Process Documents").[14]  While the Board agreed to produce the factual source materials and raw data (part (i)), it has refused to produce the Calculation Back-Up or the Process Documents (parts (ii) and (iii)).[15]

## ARGUMENT

13.     Rule 2004 provides, *inter alia*, a means to obtain information concerning the "financial condition of the debtor . . . [or] any other matter relevant to the case or to the formulation of a plan."  Fed. R. Bankr. P. 2004(b).  "The understanding generally acceptable today is that the scope of Rule 2004 examination is very broad."  *In re Drexel Burnham Lambert Grp., Inc.*, 123 B.R. 702, 711 (Bankr. S.D.N.Y. 1991).  "Indeed, the scope of [Rule 2004] examination is broader than discovery permitted under the Federal Rules of Civil Procedure."  *In re Corso*, 328 B.R. 375, 383 (E.D.N.Y. 2005); *see also, e.g.*, *In re China Fishery Grp. Ltd.*, 2017 WL 3084397, at *4 (Bankr. S.D.N.Y. July 19, 2017) (same); *Official Comm. of Unsecured Creditors v. Grant (In re Refco, Inc.)*, 2007 WL 9232701, at *3 (N.D. Ill. Jan. 16, 2017) (same); *In re Drexel Burnham Lambert Grp., Inc.*, 123 B.R. at 711 (same); *In re Correra*, 589 B.R. 76, 109 (Bankr. N.D. Tex. 2018) (same).

14.     Even under the narrower Rule 26 standard, "[i]f there is some legitimate relevance to the requested information and if no cognizable privilege attaches, it ought to be discoverable— at least in the absence of some countervailing consideration, *e.g.*, that production would be

---

[14] (*See* Ex. G, Ltr. from Ambac to the Government, dated June 18, 2020, at 5-6.)

[15] (*See* Ex. H, Ltr. from the Board to Ambac, dated Feb. 25, 2020, at 1; Ex. I, Ltr. from Ambac to the Government, dated Sept. 10, 2020, at 4; Ex. J, Ltr. from the Board to Ambac, dated Sept. 29, 2020, at 1; ECF No. 14438 at 6 (Sept. 30, 2020 Joint Status Report); ECF No. 15025 at 4-5 (Nov. 5, 2020 Joint Status Report).)

disproportionately onerous or burdensome . . . ." *Parker Waichman LLP v. Salas LC*, 328 F.R.D.

24, 26 (D.P.R. 2018); *see also* Fed. R. Civ. P. 26(b)(1) ("Parties may obtain discovery regarding

any nonprivileged matter that is relevant to any party's claim or defense and proportional to the

needs of the case," and such discovery "need not be admissible in evidence to be discoverable").

I.   **THE CALCULATION BACK-UP AND PROCESS DOCUMENTS ARE PLAINLY
     RELEVANT, WOULD NOT BE BURDENSOME TO PRODUCE, AND ARE NOT
     SHIELDED FROM DISCOVERY BY ANY PRIVILEGE PROTECTIONS.**

15.   The Board objects that the Calculation Back-Up and Process Documents Ambac

seeks are irrelevant, would be unduly burdensome to produce, and are protected from disclosure

by the attorney-client and work product privileges.   As discussed *infra*, each of the Board's

objections lack merit.

A.   **The Calculation Back-Up and Process Documents Ambac Seeks Are Relevant
     to the Financial Condition of the Debtor.**

16.   "[A] party resist[ing] the production of evidence [] 'bears the burden of establishing

lack of relevancy or undue burden.'" *Autoridad de Carreteras y Transportación v. Transcore Atl.,
Inc.*, 319 F.R.D. 422, 427 (D.P.R. 2016) (quoting *Sánchez-Medina v. UNICCO Serv. Co.*, 265

F.R.D. 24, 27 (D.P.R. 2009)).   "[G]eneralized objections to an opponent's discovery requests are

insufficient." *Id.* (citations omitted).   "On the contrary, the party resisting discovery must show

specifically how each interrogatory or request for production is not relevant or how each question

is overly broad, burdensome or oppressive." *Id.* at 430 (quoting *Sánchez-Medina*, 265 F.R.D. at

27); *see also, e.g.*, *BPP Retail Props., LLC v. N. Am. Roofing Servs., Inc.*, 300 F.R.D. 59, 61

(D.P.R. 2014) (same); *Aponte-Navedo v. Nalco Chem. Co.*, 268 F.R.D. 31, 36 (D.P.R. 2010)

(same).

17.   The Board's relevance objection is primarily premised on its position that the

Published Reports have been superseded by the Amended Disclosure Statement,[16] and therefore the calculations in those reports are "irrelevant to determine the amounts the Commonwealth and its instrumentalities have on hand now, or as of the date of any future analysis."[17]

18.     But the Calculation Back-Up and Process Documents Ambac seeks are plainly relevant to the question of how much unrestricted cash is available to the Commonwealth. Creditors have a right to challenge the correctness of the analysis contained in the Amended Disclosure Statement, and prior analysis contained in the Published Reports is relevant to allowing creditors to assess and challenge the accuracy of what assertions the Board makes in the Amended Disclosure Statement.  Insight into these prior analyses is all the more necessary due to the dramatic change in the amounts of unrestricted cash reported in each iteration of the cash restriction analysis.[18]  Changes in the Board's analysis over time, and the assumptions and approaches underlying it, are proper areas that Ambac and other creditors can challenge prior to the confirmation of a plan of adjustment.  The analyses in the Published Reports—which, as modified, led to the Amended Disclosure Statement—are directly relevant to understanding the Board's approach to these issues, which is the first step in allowing Ambac and other creditors to raise issues that the Court can consider and resolve as part of plan confirmation proceedings.

---

[16] "Amended Disclosure Statement" refers to *Disclosure Statement for the Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* [ECF No. 11947].

[17] (Ex. K, Ltr. from the Board to Ambac, dated June 22, 2020, at 2.)

[18] For instance, the Duff & Phelps Report estimated that approximately $4.6 billion in "unrestricted" cash was available as of June 30, 2018, the Cash Restriction Analysis estimated that approximately $6.9 billion in "unrestricted" cash was available as of June 30, 2019, and the Amended Disclosure Statement estimated that approximately $10.4 billion in "unrestricted" cash was available as of December 31, 2019.  (*Compare* Ex. B, IFAT Report on Title III Bank Accounts, dated March 12, 2019, at 15 tbl.2, *with* Ex. C, Mediation: Summary of Cash Restriction Analysis, dated October 2, 2019, at 1, *and* Amended Disclosure Statement at 110.)  To effectively evaluate (and where necessary, challenge) the Board's representations, Ambac must understand whether these changes (and any future changes) reflect new information, new financial conditions, or new judgment calls made by the Board regarding its classification of certain funds as restricted or unrestricted.

19.     Indeed, the Board's objections are undermined by the fact that it agreed to produce factual source materials and raw data underlying the Published Reports, not just the Amended Disclosure Statement—plainly reflecting the Board's own recognition that the Published Reports are relevant.

20.     Moreover, the Court (Swain, J.) has already found, in connection with its ruling denying the Motion to Strike, that Rule 2004 is an appropriate mechanism "to gain general information regarding the debtor's financial condition (***including information that may assist a creditor in evaluating a pending or anticipated plan proposal, or in formulating a negotiation or litigation strategy***)" (Memorandum Order at 8 (emphasis added)), and that Ambac need not wait until there is a plan confirmation discovery process in place to seek discovery on these points. (*Id.* at 8-9 ("Rule 2004 discovery is the appropriate mechanism for use by creditors to obtain information concerning the financial health of the debtor at this stage of the Title III proceedings.").) Relatedly, in *In re Financial Oversight and Management Board for Puerto Rico*, 295 F. Supp. 3d 66, 69, 74 (D.P.R. 2018), this Court (Dein, M.J.) considered movants' (including Ambac's) request for "information related to the prior and ongoing development of fiscal plans, including formula[e] and assumptions underlying those plans and communications between and among [r]espondents and [r]espondents' respective officials, employees, consultants, and representatives[,]" and held that such information was discoverable. In reaching that conclusion, this Court held that the requested "information not only f[ell] squarely within the purpose of Rule 2004, but is instructive in developing an understanding of any future plan of adjustment[,]" and was "important for the [m]ovants to have so that they c[ould] assess the financial condition of the debtor and participate in a plan confirmation process." *Id.* at 73.

21.     Indeed, the Court previously entered a schedule that contemplated that a *hearing* to consider the adequacy of the Amended Disclosure Statement would take place less than four months after it was filed.  (*Order (I) Scheduling a Hearing to Consider the Adequacy of Information Contained in the Disclosure Statement, (II) Establishing the Deadline for Filing Spanish Translation of the Disclosure Statement, (III) Establishing the Deadline for Filing Objections to the Disclosure Statement and Replies Thereto, and (IV) Granting Related Relief* [ECF No. 12187], at 3.)  If the Parties and the Court are to be in a position to move forward with plan confirmation proceedings on anything close to that timetable, it is critical to make progress on discovery now and to enable creditors to evaluate the various positions that the Board has reached regarding the amount of unrestricted cash available for distribution.

22.     In any event, the factual source materials and raw data that the Board has produced are insufficient to understand and recreate the analyses reflected in the Published Reports.  It is impossible for Ambac or its advisors to recreate the analyses captured in the Published Reports without the back-up documentation Ambac seeks.  Ambac's advisors need the Calculation Back-Up so that they can understand *how* the Board derived the numbers presented in the Published Reports from the raw data and source materials produced.  Similarly, Ambac's advisors need the Process Documents so that they can understand *how* it was determined whether certain funds should be classified as restricted or unrestricted.

23.     The Board also objects that all information regarding ***how*** the Board's nonlawyer advisors conducted their cash restriction analysis is irrelevant.[19]  But creditors are not required to accept the Board's restriction classifications at face value.  The processes, assumptions, and methodologies used by the Board's nonlawyer advisors to assess classifications are relevant to

---

[19] (Ex. J, Ltr. from the Board to Ambac, dated Sept. 29, 2020, at 1-2.)

enable creditors and the Court to evaluate the meaning of the findings for the Commonwealth's overall financial condition. To the extent that the Board's analysis narrowly construes what accounts are classified as "restricted," that could have one set of implications for the debtor's overall financial condition—while a broader construction could have very different implications. It is thus important for creditors to understand what the Board's analysis means and how the Board arrived at it.

24.     Ambac notes that it is unclear why the Calculation Back-Up documents, in particular, are even controversial. As the Board recognized early on, the factual source materials and raw data related to the Published Reports that Ambac sought, and the Board agreed to produce, are "akin to the 'materials relied upon' in an expert report."[20] The Calculation Back-Up documents are no different. Ordinarily, the calculations that an expert witness performs to reach his or her opinions must be produced so that the opposing party has the means to evaluate the basis for the expert's opinions. *See* Fed. R. Civ. P. 26(a)(2)(B)(ii); *Rodríguez v. Torres*, 2015 WL 1138256, at *6 (D.P.R. Mar. 13, 2015); *Vázquez v. Exec. Airlines, Inc.*, 2009 WL 10681024, at *2-3 (D.P.R. Dec. 23, 2009). While the Calculation Back-Up has not (yet) been cited by any expert, the calculations plainly are the kind of information that is routinely produced as part of expert discovery—making it difficult to understand why the Board is opposing disclosure here.

25.     Moreover, as the Published Reports reflect the Board's only analysis of unrestricted cash, it is obvious that the Board will rely on these reports in some form at the plan of adjustment stage. There is no reason to delay creditors in assessing that information. Limiting or delaying this disclosure plainly would require delays once the Board is prepared to move forward with a

---

[20] (*See* Ex. L, Email from the Government to Ambac, dated Feb. 11, 2020, at 2.)

plan of adjustment, so considerations of the public interest and judicial efficiency militate in favor of resolving these discovery issues now.

26.     The Board also argued that Ambac's request for Calculation Back-Up documents is irrelevant because the calculations that went into such analyses assessed the Commonwealth's cash position at a specific moment in time and, therefore, are "irrelevant to determine the amounts the Commonwealth and its instrumentalities have on hand now, or as of the date of any future analysis."[21]  But the Amended Disclosure Statement alone does not allow Ambac to understand how restricted and unrestricted classifications changed over time.  Ambac is entitled to explore the evolution of that analysis and the justifications for and calculations that support it.  To the extent that the Board's position in the Amended Disclosure Statement is contrary to its own prior analyses (which it publicly disclosed), creditors are entitled to inquire into those changes and present arguments to the Court regarding any disputes.  *See In re Fin. Oversight & Mgmt. Bd. for P.R.*, 295 F. Supp. 3d at 72 (holding Ambac and similarly situated creditors are entitled to seek discovery of "all information that bears on how the [plan of adjustment] was developed, what assumptions, projections and data were used, and what assumptions, projections and data were rejected"); *P.R. Dairy Farmers Ass'n v. Comas-Pagán*, 2018 WL 8545950, at *2 (D.P.R. Mar. 6, 2018) (compelling production of documents supporting defendant's decision regarding the regulated price of milk, including "discover[y] [into] the justifications and calculations that led to the regulated prices of milk set by [defendant]"), *mot. for reconsideration denied*, 2019 WL 2464388 (D.P.R. Mar. 8, 2019).

---

[21] (Ex. K, Ltr. from the Board to Ambac, dated June 22, 2020, at 2.)

### B. The Board Has Articulated No Undue Burden in Producing the Requested Materials.

27.     The Board's objection that producing the back-up documentation Ambac seeks would be unduly burdensome also lacks merit.  The Board has pointed to no burden beyond the ordinary expense involved in producing documents.[22]  The burden of producing Calculation Back-Up and Process Documents is not materially greater than the burden of producing the factual source materials and raw data for the Published Reports, which the Board has already done.

28.     A party "cannot rely on a mere assertion that compliance would be burdensome and onerous without showing the manner and extent of the burden and the injurious consequences of insisting upon compliance." *Sterling Merch., Inc. v. Nestle, S.A.*, 2008 WL 1767092, at *2 (D.P.R. Apr. 15, 2008).  The Board cannot make that showing here.  Through its classification of funds as restricted or unrestricted, the Board is seeking to eliminate billions of dollars from the pool of funds potentially available to satisfy creditors.  It is not an "undue" burden to insist upon discovery that would allow creditors to understand how the amounts of restricted and unrestricted funds were calculated and how those classifications were determined.

29.     Nor is there much of a burden, if any, involved in producing the Calculation Back-Up and Process Documents Ambac seeks.  The Board has already produced the factual source materials and raw data underlying the Published Reports.  If anything, the burden involved in producing the Process Documents and Calculation Back-Up would be much less, since these are targeted collections of materials compiled by the Board's advisors.

---

[22] (*See* Ex. M, Ltr. from the Board to Ambac, dated July 17, 2020, at 2 (arguing that complying with the requests would be "unduly expensive and would waste the [] Board's scarce resources").)

C.    **The Board's Assertion of the Protections of the Attorney-Client and Work Product Privileges Over the Calculation Back-Up and Process Documents Lacks Merit.**

30.    "[T]he party asserting work product privilege . . . has the burden of establishing its applicability to the contested document[s] as well as the burden of showing that it has not been waived." *W Holding Co. v. Chartis Ins. Co. of P.R.*, 300 F.R.D. 48, 51 (D.P.R. 2014) (internal citations omitted). Similarly, "[t]he party invoking [attorney-client] privilege must show both that it applies and that it has not been waived." *Lluberes v. Uncommon Prods., LLC*, 663 F.3d 6, 24 (1st Cir. 2011) (citing *XYZ Corp. v. United States (In re Keeper of the Records)*, 348 F.3d 16, 22 (1st Cir. 2003)). The Board cannot carry its burden of establishing that the Calculation Back-Up and Process Documents Ambac seeks are exempt from disclosure as work product or attorney-client privileged communications.

31.    *First*, the nature of the information Ambac seeks is not work product or privileged legal advice or communications; it is factual data compiled by consultants. *Second*, even if the material had been privileged at some point, the Board waived the privilege by voluntarily disclosing the Published Reports (and it is beyond dispute that the Board intends to rely on these analyses in the litigation, which again necessarily waives the privilege). *Third*, even if the Board had a valid claim of work protect protection over these materials—and it does not—Ambac has a compelling need for them that overrides the qualified immunity afforded to ordinary work product. *Fourth*, because the Board has not even collected the material (let alone prepared a privilege log for the material), the Board necessarily has failed to carry its burden of proving an exemption from discovery.

- 14 -

1.      **The Calculation Back-Up and Process Documents Are Not Protected Work Product or Privileged Material.**

32.     The nature of the documents Ambac seeks is not work product or privileged material.  Ambac is not requesting that the Court order disclosure of memoranda drafted by the Board's attorneys or any communications they may have had with advisors.  Ambac merely seeks the Calculation Back-Up and Process Documents that were prepared or used by Ernst & Young, Duff & Phelps, and other nonlawyer advisors.  These documents reflect purely *factual* analysis, not legal advice, that were prepared for non-litigation purposes.

a.      **The Nature of the Materials Sought Is Factual Information, Not Legal Advice or Litigation Work Product.**

33.     Although the Board has certain responsibilities in the context of a bankruptcy filing under Title III, its duties and powers under PROMESA are not limited to the context of bankruptcy litigation.  Outside of the litigation context, the Board is responsible for, *inter alia*:  (1) "provid[ing] a method for [the Commonwealth] to achieve fiscal responsibility and access to the capital markets[,]" PROMESA § 101(a), 48 U.S.C. § 2121(a); (2) developing, submitting, approving, and certifying budgets, *id.* § 202, 48 U.S.C. § 2142; and (3) submitting recommendations regarding actions the Commonwealth may take to "promote the financial stability, economic growth, management responsibility, and service delivery efficiency" of the Commonwealth, *id.* § 205, 48 U.S.C. § 2145.

34.     Analysis of the Commonwealth's cash position, and the restrictions on funds held by the Commonwealth, is part and parcel of the Board's duties to shepherd the Commonwealth towards fiscal stability—duties that extend far beyond its role in bankruptcy litigation.  While such analysis may be relevant to issues that are being litigated here, this is very basic financial analysis that the Board and its advisors would be required to perform whether or not any litigation was pending or anticipated.  Indeed, there is no requirement in PROMESA that Title III proceedings

- 15 -

be commenced.  By the same token, a company's annual financial reports may be relevant to various ongoing litigation matters, but such reports are not privileged as a result.  *See W Holding Co.*, 300 F.R.D. at 51 (memorandum prepared "to document [] facts and events related to" loan that was subject to litigation at the time the memorandum was drafted was not work product because the plaintiff "had a legal obligation to file public financial statements and to restate its financials when a material misstatement had been made" whether or not litigation was ongoing).

35.     To the contrary, "[m]aterials assembled in the ordinary course of business . . . are not under the qualified immunity provided" by the work product doctrine.  *Moreno Rivera v. DHL Glob. Forwarding*, 272 F.R.D. 50, 60 (D.P.R. 2011) (citing *United States v. Textron Inc. & Subsidiaries*, 577 F.3d 21, 30 (1st Cir. 2009)).  "It is not enough to trigger work product protection that the subject matter of a document relates to a subject that might conceivably be litigated." *Textron Inc. & Subsidiaries*, 577 F.3d at 29 (citations omitted).  Nor is it sufficient that the materials are relevant to ongoing litigation; the Board must show that the materials were *not* "prepared in the ordinary course of business [and] would [not] have been prepared in 'essentially the same form irrespective of . . . litigation.'" *See W Holding Co.*, 300 F.R.D. at 51 (quoting *Maine v. U.S. Dep't of the Interior*, 298 F.3d 60, 70 (1st Cir. 2002)).  The Board cannot make that showing with respect to the Calculation Back-Up or Process Documents.

       **b.     The Engagement Letters Governing the Work Performed by the Board's Advisors Make Explicit That It Was Mere Factual Analysis, Not Litigation Work Product or Legal Advice.**

36.     This conclusion is further supported by the engagement letters through which the Board's nonlawyer advisors, Duff & Phelps and Ernst & Young, were retained to provide work in connection with the Published Reports.  Neither Duff & Phelps nor Ernst & Young were retained by the Board's general or litigation counsel, as is customary for a litigation-related engagement. *See Lawrence E. Jaffe Pension Plan v. Household Int'l, Inc.*, 244 F.R.D. 412, 420-21 (N.D. Ill.

- 16 -

2006) (upholding privilege over Ernst & Young work product where Ernst & Young retained by
defendants' general counsel for express purpose of assisting in provision of legal advice).  Rather,
both Duff & Phelps and Ernst & Young were retained directly by the Board's executive director,
evidence that their work was a business-as-usual engagement not being carried out under the
supervision of counsel.  (Ex. N, Duff & Phelps Engagement Letter (Jan. 31, 2018) at 6; Ex. O,
Amendment No. 4 to Ernst & Young Statement of Work (Mar. 12, 2019) at 5.)[23]

37.    Contrasting Duff & Phelps' and Ernst & Young's engagement letters further shows
that, at the very least, Ernst & Young was hired solely for a business-as-usual retention, *not* for the
purposes of litigation.  Whereas the Duff & Phelps engagement letter recites that Duff & Phelps is
reaching advice and opinions that "may be presented in a legal forum[,]" and further indicates that
materials exchanged between the Board and Duff & Phelps would be attorney-client privileged
and/or attorney work product information (Ex. N, Duff & Phelps Engagement Letter (Jan. 31,
2018) at 1, 2), the subsequently executed Ernst & Young engagement letter lacks any such
provisions.  (*See generally* Ex. O, Amendment No. 4 to Ernst & Young Statement of Work (Mar.
12, 2019).)  Indeed, the Ernst & Young engagement was described in business-as-usual terms—
with Ernst & Young being tasked to "assist with the collection of data from governmental
agencies," a fundamentally factual function.  (*Id.* at 1; *see also id.* (prohibiting Ernst & Young
from "provid[ing] any opinions or reach[ing] any conclusions regarding the restricted or
unrestricted nature" of funds).)  In fact, Ernst & Young expressly *disclaimed* any involvement in
the litigation process—noting in its letter that its services are "advisory in nature" and "[n]one of
the [s]ervices or any [r]eports [it provides] will constitute any legal opinion or advice."  (*Id.* at 3.)

---

[23] While Exhibit O relates specifically to the work Ernst & Young performed in connection with the Cash
Restriction Analysis and Bank Account Analysis, the initial engagement letter through which Ernst &
Young was retained was similarly executed by the Board's executive director, not the Board's general or
litigation counsel.  (Ex. P, Ernst & Young Statement of Work (Sept. 12, 2017) at 7.)

38.     This confirms that, at a minimum, no aspect of Ernst & Young's analysis may be treated as privileged or work product material.  *See United States ex rel. Wollman v. Mass. Gen. Hosp., Inc.*, 2020 WL 4352915, at \*9 (D. Mass. July 29, 2020) (Dein, M.J.) (declining to afford a report and related documents work product protections where "there [wa]s no indication in the engagement letter . . . that the [i]nvestigation was intended to relate to [] [l]itigation"); *Pacamor Bearings, Inc. v. Mineba Co.*, 918 F. Supp. 491, 513-15 (D.N.H. 1996) (noting one has a more meritorious claim of work product protections where "clarity of purpose [is provided] in the engagement letter" in compelling production of at-issue documents (citation and internal quotation marks omitted)).  Indeed, in *Cavallaro v. United States*, 284 F.3d 236, 239 (1st Cir. 2002), the court rejected a similar argument that Ernst & Young's materials "were protected by the attorney-client privilege because the [at-issue] documents were created by, or provided to, Ernst & Young in the course of the efforts of" a law firm retained by the client "to provide legal advice."  Relying on, *inter alia*, the engagement letter through which Ernst & Young was retained, the court declined to shield the requested materials from disclosure because Ernst & Young was merely "providing accounting services" to its client, rather than rendering any legal advice itself.  *Id.* at 240, 247-49.

39.     Although the Duff & Phelps engagement letter recites that Duff & Phelps' advice and opinions "may be presented in a legal forum[,]" Duff & Phelps expressly stated that it "is not rendering any legal advice in this matter, and all legal advice being provided . . . shall be [the Board's] sole responsibility."  (Ex. N, Duff & Phelps Engagement Letter (Jan. 31, 2018) at 1.)  The purely factual Calculation Back-Up and Process Documents that Duff & Phelps used to prepare the Published Reports that the Board later voluntarily disclosed are not legal advice or litigation work product.  Rather, they merely relate to a factual analysis that was performed as part of the ordinary course of the Board's business—not in relation to any pending or anticipated litigation.

- 18 -

Moreover, any privilege that could have attached was waived by the Board upon its voluntary disclosure of that information.  *See infra* Arg. I.C.2.

> **2.      To the Extent Any Privilege Protections Attached to the Calculation Back-Up and Process Documents, the Board Waived Such Protections by Making the Published Reports Publicly Available.**

40.      Even assuming *arguendo* that the Calculation Back-Up and Process Documents for the Published Reports contained any work product or privileged material, the reports were made publicly available, including to creditors with legal interests adverse to those of the Board.  It is well settled that "disclosing material in a way inconsistent with keeping it from an adversary waives work product protection." *Blattman v. Scaramellino*, 891 F.3d 1, 5 (1st Cir. 2018) (citation omitted); *see also, e.g.*, *United States v. Mass. Inst. of Tech.*, 129 F.3d 681, 687 (1st Cir. 1997) ("[D]isclosure to an adversary, real or potential, forfeits work product protection.").  Similarly, the protections afforded by the attorney-client privilege are waived "when otherwise privileged communications are disclosed to a third party" because "such disclosure destroys the confidentiality upon which the privilege is premised." *Lluberes*, 663 F.3d at 24 (internal quotation marks and citations omitted).

41.      Having disclosed the ultimate analysis, the Board cannot assert privilege or work product protections over the Calculation Back-Up and Process Documents that allow creditors to recreate and understand the analysis.  Privilege cannot be used as both a sword and a shield, *Granite Partners, L.P. v. Bear, Stearns & Co. Inc.*, 184 F.R.D. 49, 54 (S.D.N.Y. 1999), and the rule of completeness would require that the Board, having waived any privilege protections as to the contents of the Published Reports, cannot assert such protections now to preclude discovery into the calculations and analysis that supported the publicly reported numbers.

42.      For instance, in *Town of Grafton v. Pulte Homes of New England, LLC*, the court compelled production of "all documents and communications" related to a report published by the

Office of the Massachusetts Inspector General because "issues of fundamental fairness would preclude [plaintiff] from introducing the [report] as evidence if [d]efendants were not able to adequately test the conclusions and findings therein." 2014 WL 2155035, at *2, *4, *5, *7 (D. Mass. May 21, 2014); *see also Granite Partners, L.P.*, 184 F.R.D. at 54-56 (compelling production of documents underlying published report because "the inclusion of [the expert's] findings in the published report placed the accuracy of [the expert's] data and the validity of [the expert's] analyses at issue and, thus, waive[ed] privilege on the supporting documents").

> **3.     Ambac Has a Substantial Need for Any Materials That May Be Protected Work Product.**

43.     Even if the Board had a valid claim of work product protection—and it does not— "[c]ourts typically afford ordinary work product only a qualified immunity, subject to a showing of substantial need and undue hardship[.]"  *In re San Juan Dupont Plaza Hotel Fire Litig.*, 859 F.2d 1007, 1014-15 (1st Cir. 1988).  Ambac has a compelling need for the information it seeks because without the Calculation Back-Up and Process Documents, neither Ambac nor other creditors have any means of assessing the validity of the Board's representations in the Published Reports as to the amount of cash available to the Commonwealth or the basis upon which funds were classified as restricted or unrestricted.  Nor can Ambac obtain this information from any source other than the Board or its advisors that prepared the Published Reports.

> **4.     The Board Cannot Carry Its Burden of Demonstrating That the Requested Documents Are, in Their Entirety, Protected by the Work Product or Attorney-Client Privileges.**

44.     In any event, the Board has failed to carry its burden of demonstrating any cognizable privilege because it has failed to collect and review the specific documents claimed to

be privileged.[24]

45.    As discussed *supra*, the only documentary evidence shows that, at the very least, Ernst & Young's work was performed as part of the ordinary course of the Board's business, rather than in relation to any pending or anticipated litigation.  There is nothing in the discovery record supporting the Board's broad-brush invocation of privilege, without any analysis of specific documents.  At a minimum the Board should collect and review the documents, and provide a log of each purportedly privileged document and identify who was copied on them.  *See* Fed. R. Civ. P. 26(b)(5)(A); *Baez-Eliza v. Instituto Psicoterapeutico de P.R.*, 275 F.R.D. 65, 70 (D.P.R. 2011) (noting that Rule 26(b)(5)(A)(ii) "requires the filing of a privilege log containing specific information to support" a claim of privilege).

46.    Having failed to do so, the Board has waived its claim of privilege and the information should be ordered produced.  *See In re Grand Jury Subpoena*, 274 F.3d 563, 576-77 (1st Cir. 2001) (rejecting assertions of attorney-client and work product privileges due to, *inter alia*, party's failure to provide a privilege log and holding that "[a] party that fails to submit a privilege log is deemed to waive the underlying privilege claim").

## **RELIEF REQUESTED**

47.    In light of the foregoing, Ambac requests that this Court issue an order directing the Board to produce documents related to the Commonwealth and the Board's publicly available cash restriction analyses.

48.    WHEREFORE, Ambac respectfully requests that this Court (i) enter the Proposed Order attached hereto as Exhibit A granting the relief requested herein, and (ii) grant Ambac such other relief as is just and proper.

---

[24] (*See* Ex. Q, Ltr. from Ambac to the Government, dated Aug. 17, 2020, at 5; Ex. I, Ltr. from Ambac to the Government, dated Sept. 10, 2020, at 5.)

Dated:  November 20, 2020
      San Juan, Puerto Rico

**FERRAIUOLI LLC**

By: /s/ *Roberto Cámara-Fuertes*
    Roberto Cámara-Fuertes (USDC-PR No. 219002)
    Sonia Colón (USDC-PR No. 213809)
    221 Ponce de León Avenue, 5th Floor
    San Juan, PR 00917
    Telephone: (787) 766-7000
    Facsimile:  (787) 766-7001
    Email:  rcamara@ferraiuoli.com
        scolon@ferraiuoli.com

**MILBANK LLP**

By: /s/ *Atara Miller*
    Dennis F. Dunne (admitted *pro hac vice*)
    Atara Miller (admitted *pro hac vice*)
    Grant R. Mainland (admitted *pro hac vice*)
    John J. Hughes, III (admitted *pro hac vice*)
    Jonathan Ohring (admitted *pro hac vice*)
    55 Hudson Yards
    New York, NY 10001
    Telephone:  (212) 530-5000
    Facsimile:  (212) 530-5219
    Email:  ddunne@milbank.com
        amiller@milbank.com
        gmainland@milbank.com
        jhughes2@milbank.com
        johring@milbank.com

*Attorneys for Ambac Assurance Corporation*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on this same date, I electronically filed the foregoing with the

Clerk of the Court using the CM/ECF system, which will send notification of such filing to all

CM/ECF participants in this case.

/s/ *Roberto Cámara-Fuertes*
Roberto Cámara-Fuertes (USDC-PR No. 219002)
221 Ponce de León Avenue, 5th Floor
San Juan, PR 00917
Telephone: (787) 766-7000
Facsimile:  (787) 766-7001
Email:  rcamara@ferraiuoli.com