1       UNITED STATES DISTRICT COURT

2       DISTRICT OF PUERTO RICO

3
In Re:                          )        Docket No. 3:17-BK-3283(LTS)
4                               )
                                )        PROMESA Title III
5   The Financial Oversight and )
    Management Board for         )
6   Puerto Rico,                 )        (Jointly Administered)
                                )
7   *as representative of*       )
                                )
8   The Commonwealth of          )
    Puerto Rico, *et al.*        )        November 24, 2020
9                               )
                Debtors,        )
10
_____
11

12
    Wanda Vazquez Garced,       )  Docket No. 3:20-AP-00080(LTS)
13  *et al.*,                   )
                                )        *in 3:17-BK-3283(LTS)*
14              Plaintiffs,     )
                                )
15  v.                          )
                                )
16  The Financial Oversight and )
    Management Board for         )
17  Puerto Rico,                 )
                                )
18              Defendant.      )
19
_____
20

21

22

23

24

25

1

2  _____

3  Wanda Vazquez Garced,        ) Docket No. 3:20-AP-00082(LTS)
   _et al._,                    )
4                               )          _in 3:17-BK-3283(LTS)_
                   Plaintiffs,  )
5                               )
   v.                           )
6                               )
   The Financial Oversight and  )
7  Management Board for         )
   Puerto Rico,                 )
8                               )
                                )
9                  Defendant.   )

10 _____

11
   Wanda Vazquez Garced,        ) Docket No. 3:20-AP-00083(LTS)
12 _et al._,                    )
                                )          _in 3:17-BK-3283(LTS)_
13                 Plaintiffs,  )
                                )
14 v.                           )
                                )
15 The Financial Oversight and  )
   Management Board for         )
16 Puerto Rico,                 )
                                )
17                              )
                   Defendant.   )
18
   _____
19

20

21

22

23

24

25

1

2
————————————————————————————————————————————
Wanda Vazquez Garced,        ) Docket No. 3:20-AP-00084(LTS)
3   _et al._,                     )
                              )         _in 3:17-BK-3283(LTS)_
4                 Plaintiffs,  )
                              )
5   v.                        )
                              )
6   The Financial Oversight and )
    Management Board for       )
7   Puerto Rico,              )
                              )
8                             )
                   Defendant.  )
9

10  ————————————————————————————————————————————

11  Wanda Vazquez Garced,        ) Docket No. 3:20-AP-00085(LTS)
    _et al._,                     )
12                             )         _in 3:17-BK-3283(LTS)_
                 Plaintiffs,  )
13                             )
    v.                        )
14                             )
    The Financial Oversight and )
15  Management Board for       )
    Puerto Rico,              )
16                             )
                              )
17                 Defendant.  )

18  ————————————————————————————————————————————

19            HEARING ON MOTIONS FOR SUMMARY JUDGMENT

20   BEFORE THE HONORABLE U.S. DISTRICT JUDGE LAURA TAYLOR SWAIN

21            UNITED STATES DISTRICT COURT JUDGE

22    AND THE HONORABLE U.S. MAGISTRATE JUDGE JUDITH GAIL DEIN

23            UNITED STATES DISTRICT COURT JUDGE

24  ————————————————————————————————————————————

25

```
1    APPEARANCES:

2    ALL PARTIES APPEARING TELEPHONICALLY

3
     For The Commonwealth
4    of Puerto Rico, et al.:  Mr. Martin J. Bienenstock, PHV
                              Mr. Timothy W. Mungovan, PHV
5

6    For Governor
     Vazquez Garced and
7    the Puerto Rico Fiscal
     Agency and Financial
8    Advisory Authority:     Mr. William J. Sushon, PHV
                             Ms. Amber L. Covucci, Esq.
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23
     Proceedings recorded by stenography.  Transcript produced by
24   CAT.

25
```

```
 1                          I N D E X

 2    WITNESSES:                                    PAGE

 3         None.

 4

 5    EXHIBITS:

 6         None.

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                                    San Juan, Puerto Rico

 2                                    November 24, 2020

 3                                    At or about 10:08 AM

 4                        *     *     *

 5          THE COURT:  Buenos dias.  This is Judge Swain

 6  speaking.

 7          MS. NG:  Hi, Judge.  It's Lisa Ng from your chambers.

 8          THE COURT:  I'm sorry.  There was a little

 9  interference there, Lisa.  Could you say that again?

10          MS. NG:  Hi.  It's Lisa Ng from your chambers.

11  Everybody's here.

12          THE COURT:  Very good.  Ms. Walker, the court

13  reporter, can you hear me?

14          COURT REPORTER:  Yes, Judge.  Good morning.

15          THE COURT:  Thank you.  Good morning.

16          Ms Tacoronte, would you please call the case?

17          COURTROOM DEPUTY:  Yes, Judge.  Good morning.

18          THE COURT  Good morning.

19          COURTROOM DEPUTY:  The United States District Court

20  for the District of Puerto Rico is now in session.  The

21  Honorable Laura Taylor Swain presiding.  Also present, the

22  Honorable Judith Gail Dein.  God save the United States of

23  America and this Honorable Court.

24          Bankruptcy Case No. 2017-3283, *In re:  The Financial*

25  *Oversight and Management Board for Puerto Rico as*
```

1    *representative of the Commonwealth of Puerto Rico, Bankruptcy*

2    *No. 17-3283, Adversary Proceedings 20-80, 20-82, 20-83, 20-84,*

3    *and 20-85, Wanda Vazquez Garced, et al., versus the Financial*

4    *Oversight and Management Board of Puerto Rico,* for hearing on

5    motion.

6             THE COURT:   Again, good morning and welcome, counsel,

7    parties in interest, and members of the public and press.

8    Today's hearing is for oral argument on the motions and

9    cross-motions for summary judgment in the adversary

10   proceedings that were commenced by the Governor and AAFAF

11   against the Oversight Board concerning Acts 82, 138, 176, 181,

12   and 47.

13            To ensure the orderly operation of today's telephonic

14   hearing, all parties on the line must mute their phones when

15   they are not speaking.   If you are accessing these proceedings

16   on a computer, please be sure to select "mute" on both the

17   Court Solutions dashboard and your phone.   When you need to

18   speak, you must unmute on both the dashboard and the phone.

19            I remind everyone that consistent with court and

20   judicial conference policies, and the orders that have been

21   issued, no recording or retransmission of the hearing is

22   permitted by any person, including but not limited to the

23   parties, members of the public, and the press.   Violations of

24   this rule may be punished with sanctions.

25            I will be calling on each speaker during this

1   proceeding in the agreed order that is enumerated in the Joint

2   Informative Motion filed on November 20th, 2020, as *inter*

3   *alia,* Docket Entry No. 54 in Adversary Proceeding No. 20-80.

4   There are parallel entries in the other dockets.

5       When I do call on you, please remember to unmute

6   yourself on both the dashboard and your phone, and begin your

7   remarks by identifying yourself by name for clarity of the

8   record.  If you wish to be heard out of order or otherwise

9   need to make a remark, please state your name clearly at the

10  end of an argument segment and request to be heard.  Don't

11  just use the wave function on the Court Solutions dashboard.

12  I will respond to your request, and, if I deem it appropriate,

13  call on each speaker if more than one person wishes to be

14  heard and I am granting the request.

15      Please do not interrupt each other or me during the

16  hearing.  If we interrupt each other, it's difficult to create

17  an accurate transcript of the proceeding.  But as usual, I

18  apologize in advance for breaking this rule, because I may

19  interrupt if I have questions or you go beyond your allotted

20  time.  If anyone has difficulty hearing me or another

21  participant, please say something right away.

22      The time allotments for each matter and the time

23  allocations for each speaker are set forth in the Joint

24  Informative Motion that, as I noted, has been filed in each of

25  the adversary proceedings.  I encourage each speaker to keep

1   track of his or her own time.  The Court will also be keeping

2   track of the time and will alert each speaker when there are

3   two minutes remaining with one buzz, and when time is up, with

4   two buzzes.  And here is an example of the buzz sound.

5            (Sound played.)

6            THE COURT:  If your allocation is two minutes or

7   less, you will just hear the final buzzes.  If we need to take

8   a break, I will direct everyone to disconnect and dial back in

9   at a specified time.  I will call a break at some point during

10  this morning's proceedings, probably around eleven o'clock,

11  depending on where we are with arguments.  And we are

12  scheduled to go for three hours of argument.

13           Today's hearing will address the following motions

14  and cross-motions:  First, the Oversight Board's Summary

15  Judgment Motion on All Claims and Counterclaims Related to

16  Acts 47, 82, and 81.  That is Docket Entry No. 14 in Adversary

17  Proceeding No. 20-80.  To the extent briefs are duplicative or

18  largely duplicative, I will just cite one filing.

19           I will also address the Governor's Summary Judgment

20  Motion, which is Docket Entry No. 12 in Adversary Proceeding

21  No. 20-82; the Oversight Board's Cross-Motion for Summary

22  Judgment, Docket Entry No. 28 in Adversary Proceeding No.

23  20-82; the Governor's Motion for Summary Judgment, Docket

24  Entry No. 13 in Adversary Proceeding No. 20-83; the Oversight

25  Board's Cross-Motion for Summary Judgment, which is Docket

1    Entry No. 29 in Adversary Proceeding No. 20-83; the Oversight

2    Board's Summary Judgment Motion on All Claims and

3    Counterclaims Related to Acts 47, 82, and 181, Docket Entry

4    No. 13 in Adversary Proceeding No. 20-84; and the Oversight

5    Board's Summary Judgment Motion on All Claims and

6    Counterclaims Relating to Acts 47, 82, and 181, Docket Entry

7    No. 12 in Adversary Proceeding No. 20-85.

8              We will begin with the government's opening for its

9    Motion for Summary Judgment on Acts 138 and 176, and

10   Opposition to Motion for Summary Judgment on Acts 82, 181, and

11   47, for a total of 60 minutes of argument.  And I have down

12   that Mr. Sushon will be the first speaker for 45 minutes.

13             So, Mr. Sushon, you may begin.  Mr. Sushon, I can't

14   hear you, so please unmute yourself on the dashboard and your

15   phone.

16             MR. SUSHON:  Your Honor -- can you hear me now, Your

17   Honor?

18             THE COURT:  Yes, I can.  Good morning, Mr. Sushon.

19             MR. SUSHON:  Thank you, Your Honor.  Bill Sushon from

20   O'Melveny & Myers on behalf of the Governor and AAFAF.

21             With the Court's permission, I will be addressing the

22   substantive summary judgment issues, and my colleague,

23   Ms. Covucci, will address Rule 56(d) issues in opposition to

24   the Board's motions for summary judgment.

25             THE COURT:  Thank you.

1      MR. SUSHON:  Your Honor, we are unfortunately before

2  the Court again for a dispute between the government and the

3  Oversight Board concerning PROMESA Section 204(a).  The

4  government didn't bring these cases lightly, but one thing

5  became evident through the government's correspondence with

6  the Board concerning these five laws, and that's the need for

7  guidance on what Section 204(a) means by the phrase

8  "significantly inconsistent with the fiscal plan."

9      Government employees face the task of preparing

10  204(a) certifications, and they need to determine what this

11  phrase means so that their certifications can be compliant.

12  For its part, the Board has tried to read the significantly

13  inconsistent language out of PROMESA by adopting a fiscal plan

14  provision requiring all new laws to be perfectly fiscal

15  neutral.

16      The government, on the other hand, is trying to

17  understand how much flexibility Congress afforded in adopting

18  a significantly inconsistent standard.  Congress plainly

19  recognized some flexibility is required, but would never

20  have -- or it would have required perfect consistency in the

21  statute, because the Board and the government don't see eye to

22  eye on this critical question.  And the Board tried

23  unilaterally to enjoin the laws without seeking court

24  intervention.  The government has been forced to seek the

25  Court's guidance.

1           Now, one vein flows through all the briefing on these

2    five different laws, Your Honor, and that's the Oversight

3    Board's belief that it has no obligation, whether it's under

4    PROMESA or the Federal Rules, to provide any evidence

5    substantiating its conclusions regarding the newly enacted

6    statutes.  The Board also believes that the government needs

7    not only to substantiate the government's estimate and its

8    certification under PROMESA, but also to anticipate and prove

9    to the Board's sole satisfaction that the government has

10   investigated any possibility, no matter how remote, and can

11   guarantee that each new law will not change the government's

12   expenditures by a single penny.  This heads I win, tails you

13   lose reading of PROMESA, the fiscal plan, and the Federal

14   Rules is unfounded and should be rejected.

15          As for PROMESA, the Board repeatedly states that it

16   has no obligation to justify its decision to reject the

17   Section 204(a) estimate and certification.  And the Board also

18   effectively takes the view that it has the sole discretion to

19   reject 204(a) certifications without having to supply any

20   evidence.

21          In essence, Your Honor, the Board is trying to grant

22   its Section 204(a) decisions the same immunity from review

23   that its certification decisions enjoy under Section 106(e),

24   but Section 106(e) on its face applies only to the Oversight

25   Board's certification determinations under this chapter.  And

1    Section 204(a) doesn't empower the Board to make certification

2    determinations.  Instead, it empowers the Board to send

3    notifications to the Governor, to request that the Governor or

4    direct that the Governor supply additional information, and it

5    empowers the Board to take action, if necessary, to prevent

6    the implementation of a law that violates Section 204(a).  But

7    there's no certification determination by the Board under 204.

8         Now, the Court has read into Section 204 a power by

9    the Board to, "question and, if necessary, bring before the

10   Court challenges," to Section 204(a) estimates and

11   certifications.  And that's Your Honor's Act 29 decision, 403

12   F. Supp. 3d. 1, at 13 to 14.  But that power to question isn't

13   a certification either, and the very fact that the Board has

14   to bring those questions before the Court indicates that they

15   are, in fact, reviewable.

16        So what standard should the Court use to review the

17   Board's challenges to a Section 204(a) estimate or

18   certification?  It would seem that just as this Court found

19   that Congress expected the government to comply with statutory

20   predicates in good faith, the Board should be held to the same

21   standard in exercising its power to question Section 204(a),

22   estimates and certification.

23        Alternatively, because the Board is a Puerto Rico

24   Government instrumentality, it could be required to support

25   its challenge with substantial evidence.  Either way, the

1   Board should be required --

2            THE COURT:  Mr. Sushon.

3            MR. SUSHON:  Yes, Your Honor.

4            THE COURT:  I'm sorry.  May I ask you a question?

5   When you say that good faith is a standard, you say the Board

6   should be held to a good faith standard if the government is

7   to be held to a good faith standard, so what does that mean at

8   the figurative O.K. Corral?  The government says, well, I said

9   it's not significantly inconsistent in good faith.  The Board

10  says, we say it is significantly inconsistent in good faith.

11  What would happen then?  What good would that sort of a

12  standard do?

13           MR. SUSHON:  If we have a circumstance where both

14  sides in good faith say that it's significantly consistent and

15  significantly inconsistent, Your Honor, I believe, in that

16  instance, the tie has to go to the Board.  If both sides are

17  operating in good faith, the Board ultimately would be the one

18  that would prevail in that situation.  But that good faith

19  requires the Board to have an evidentiary basis for its

20  determinations.  And in the cases that are before the Court

21  now, the Board hasn't shown any evidentiary basis for any of

22  its determinations, as we'll discuss.

23           Excuse me, Your Honor.

24           THE COURT:  Has the -- I'm sorry.  May I ask you a

25  question now?

1          MR. SUSHON:  Of course, Your Honor.

2          THE COURT:  All right.  I just heard coughing or

3     something.  I didn't want to disrupt you.

4          So will you discuss what evidentiary basis the

5     government has offered for its assertion that it is acting in

6     good faith?

7          MR. SUSHON:  Yes, Your Honor.  It varies act by act,

8     of course, because some of the acts, let's take Act 176 and

9     Act 138, those acts are fiscally neutral on their face, Your

10    Honor.  And so the government has its process, which was laid

11    out in the declaration from Treasury that we submitted to the

12    Court, where they look at the face of the statute, and if they

13    determine that the statute is fiscally neutral, it's a

14    straight forward process, Your Honor.

15         Then the government simply says there's no effect on

16    expenditures, there's no effect on revenues, and because

17    there's no effect on either of those fiscal measures, then the

18    statute on its face, again, is significantly consistent with

19    the fiscal plan.  Now, in those circumstances, Your Honor,

20    there can be secondary effects of a statute that's facially

21    fiscally neutral.  And the government acknowledges that and

22    understands that, but the government can't be expected to

23    anticipate every possible permutation that the Board could

24    come up with.

25         If the government is able to anticipate those

1   permutations and address them, that's great; but if it can't,

2   then the Board has the power to ask the government to say,

3   okay, we see this or that secondary effect that could arise,

4   please address it.  And the government should do so.  But when

5   the Board is asking that question, it needs to have some sort

6   of evidence to back up the questioning.  It can't just be

7   based on the Board's say-so.

8           Now, with respect to --

9           THE COURT:  May I just go to, say, Act 176.  If you

10  are paying people the same amount for working fewer days,

11  isn't that just by math an increase in compensation?  And if

12  you're saying that, oh, don't worry, we can get all the work

13  covered even if we give our staff more days off, you're either

14  saying that you're overstaffed, or you're, at a minimum, not

15  doing anything that's productive toward head count reduction

16  and right-sizing goals.

17          So how do you say, on its face, this would have no

18  revenue impact, or no expenditure impact, I suppose, would

19  really be the point, because it goes to the cost of labor?

20          MR. SUSHON:  Sure, Your Honor.  Act 176 doesn't exist

21  in a vacuum.  Act 176 is an amendment of Act 8-2017.  And Act

22  8-2017 has the provision in it that requires that vacations be

23  planned in a way that does not interrupt the provision of

24  government services.

25          And so basically, in adopting Act 176, the government

1   is keeping constant the outputs from the government employees,

2   which is the amount of government services that will be

3   provided, and, instead, allowing the inputs to vary.  But if

4   there can be a more efficient production of services by the

5   government employees, then they're allowed to take extra

6   vacation days.  If they can't make up the difference in

7   productivity by being more efficient in some way, whether it's

8   adopting more efficient procedures or just, you know, working

9   harder, skipping their coffee break, whatever those employees

10  may do to make sure the work gets done, if they can't do that,

11  they can't take their vacation days.

12          So if you look at this transaction as the government

13  is procuring services at a cost, it's going to get the same

14  amount of services at the same cost, spending the same amount

15  of money.  And so that is why that is a fiscally neutral law,

16  Your Honor.

17          THE COURT:  Well, they'll spend the same amount of

18  money to get less labor from given individuals.  So to the

19  extent you're getting a productivity boost in efficiency,

20  you're paying a bonus in time off.

21          I don't want to belabor the point, but that's -- I

22  have trouble seeing that as a fiscally neutral decision.  So

23  if you can think of something that I've missed in that,

24  provide it quickly, and then I'll be quiet while you go on.

25          MR. SUSHON:  Well, Your Honor, even if it were viewed

1   as not being a fiscally neutral arrangement, it's still one

2   that, even by the Oversight Board's estimate, could only

3   affect productivity at a maximum of five percent, which at

4   least for purposes of SEC quantitative materiality is

5   presumptively not material, which is certainly a secondary

6   argument.

7         But, you know, again, looking at this, if the

8   government is getting the same amount of services performed

9   for the same amount of money, at least in AAFAF's view and the

10  government's view, that is a fiscally neutral law.  And I

11  understand that Your Honor may disagree with that, but

12  certainly I think it's hard to say that the government is

13  being forced to lay out more dollars, more expenditures, or

14  that it's affecting its revenues when it's spending the same

15  amount of money and getting the same amount of stuff

16  fundamentally.

17        Now, if we look at the other acts, 82, 181, and 47,

18  those are not facially fiscally neutral, Your Honor.  So in

19  those cases, the government has a process that it follows, and

20  it's again laid out in the Treasury declaration, that looks at

21  a number of inputs.  There's also the process that's laid out

22  in the executive order.

23        And the government goes through this process with

24  every law.  It went through the process with these three laws,

25  of making these determinations, running these models, and so

1     forth, and that provides the evidentiary basis for the

2     government's estimates as to the costs of these different

3     acts.  These cost estimates, as you see from the

4     certifications, are not rough approximations.  They're not

5     ranges.  These are things that are calculated, in some

6     instances, down to the penny.  And they are all based on these

7     economic models and fiscal models that the government uses.

8          And so that's the evidentiary basis.  We've laid out

9     the process that the government follows in preparing these

10    certifications.

11          THE COURT:  Thank you.

12          MR. SUSHON:  So the Board also tries to ignore its

13    evidentiary burdens under Rule 56, Your Honor.  We all know

14    the familiar standard.  Where the Board is seeking summary

15    judgment, Rule 56 requires the Board to show that there's no

16    genuine dispute of material fact, and that the Board's

17    entitled to judgment as a matter of law.  Summary judgment

18    can't just be entered on the Board's say-so.

19          As the Court held in *Ortiz Gonzalez versus Velazquez*,

20    quote, a party must bring more to the table than his words,

21    conclusions and opinions.  He must present facts, acts, and

22    documents.  A conclusory statement unsupported by other

23    evidence is insufficient to satisfy the burden on summary

24    judgment.  Were the Court to accept the self-serving

25    statement, summary judgment, brackets, for defendant, close

1  brackets, would always be granted.  And that's 2018 Westlaw

2  11219614 at star three.

3       So the Board has a burden there as well.  And I'd

4  like, Your Honor, to dive into each of the acts and discuss

5  them individually.

6       Looking at Act 176, as Your Honor has identified, the

7  Board challenges that this could somehow reduce employee

8  productivity.  And as I've already explained, at least the

9  government and AAFAF believe that this is a fiscally neutral

10 law, because you're getting the same amount of services for

11 the same price.

12      And we've put that argument front and center from the

13 very beginning, Your Honor.  It was in the certification for

14 Act 176 itself.  And the Board took five months to respond to

15 that certification, and what it did -- it is well aware that

16 the government was looking at the vacation planning element of

17 Act 8-2017 as ensuring fiscal neutrality, and the Board didn't

18 even address the issue, Your Honor.  Instead, it just advanced

19 its theory that Act 176 was not fiscally neutral, because it

20 affected productivity.

21      So then we file our Complaint, we file our summary

22 judgment motion, and the Board has its opportunity to respond.

23 Even then, in opposition to the motion for summary judgment,

24 the Board never addressed the effect of Act 8-2017 and its

25 vacation planning requirement.  It simply ignored the issue.

1          Now, cases are legion, Your Honor, that failing to

2    refute an argument in opposition to a summary judgment motion

3    concedes the point.  And we've cited those cases in our brief,

4    and that should be the end of the matter.  We made our motion

5    for summary judgment.  It was supported by evidence.  The

6    Board didn't address it.  That's that.  So that should be the

7    end of it.  But they waited until their reply on their

8    cross-motion for summary judgment to address this issue for

9    the first time since the law's been passed.

10          And when they did that, they still didn't address the

11   cases that hold that they have conceded the point.  They

12   haven't distinguished them.  They've never explained why they

13   didn't address this issue until their reply brief.  So for

14   that reason alone, summary judgment should be entered for the

15   government.  But as we've already discussed, Your Honor, more

16   fundamentally, the argument fails because the government,

17   under Act 176, will still be getting the same amount of

18   services for the same price.

19          The Board also has an argument that Act 8-2017's

20   vacation planning requirement doesn't apply to sick days, and

21   that's true, Your Honor.  But that doesn't stop Act 8-2017's

22   vacation planning requirement from acting as a firewall,

23   because if too many employees have too many sick days and it

24   begins to interfere with productivity, then employees just

25   under Act 8-2017 won't be allowed to take their vacation days

1    because it will interfere with the government's productivity.

2    So the bottom line here is that the statutory scheme already

3    addresses the concerns the Board has raised, and ensures that

4    the government will be getting what it pays for.

5         Now, Your Honor, I'd like to turn briefly to the

6    Board's authority to enjoin Act 176, because it impairs or

7    defeats PROMESA's purposes.  Here, the Board has none.  As the

8    Board's letters in its brief show, the Board believes that it

9    has the power without court intervention to enjoin acts under

10   PROMESA Section 108.  You can look at the reply brief that the

11   Board filed on its motion, Your Honor, and it says, "here the

12   Oversight Board advised the government of its Section

13   108(a)(2) determinations, including the implementing of Act

14   176, before satisfying Section 204(a)'s requirements that

15   impair or defeat PROMESA's purposes, and that PROMESA enjoins

16   the government from implementing the law."

17        Now, they engage in this semantic exercise of saying

18   that it's PROMESA that enjoins the government instead of the

19   Oversight Board enjoining the government.  But at the end of

20   the day, what the Oversight Board is saying is that once it

21   makes its determination that a law impairs or defeats

22   PROMESA's purposes, an injunction automatically follows

23   without the Court's intervention.  And that's, of course,

24   squarely at odds with Your Honor's decision in the Act 29

25   litigation where you held Section 108(a), "does not itself

1    authorize the Oversight Board to nullify legislation."  So for

2    this --

3         THE COURT:  Can you just for a moment -- I'm sorry.

4    I'm interrupting you again.  But I'd just like to look for a

5    moment at the statutory language of 108(a)(2).  It says,

6    neither the Governor nor the legislature may enact, implement,

7    or enforce any statute, so on and so forth, that would impair

8    or defeat the purposes of this act as determined by the

9    Oversight Board.

10        And so while it doesn't use the language of

11   "injunction" or "stay," and doesn't talk on its face about

12   enforcement, it does seem to contemplate the triggering of

13   some sort of a bar by the fact of the determination of the

14   Oversight Board.  And so perhaps, since Law 29 was in the

15   context of an action being brought by the Oversight Board to

16   enforce that determination, or with an injunction, the Law 29

17   decision is perhaps not inconsistent with the notion that

18   something happened when the Oversight Board made its

19   determination.  The prohibition kicked in.

20        But then either -- if the government goes on and

21   doesn't agree that it's prohibited, the Oversight Board has to

22   cue up a plausible case before the Court, or perhaps, as has

23   happened here, the government has to cue up a case that says,

24   no, in fact, that determination was wrong, and so we're not

25   prohibited.

1          MR. SUSHON:  Your Honor, I think that what you've

2     just described is precisely how the government views the

3     statutory scheme as working.  The concern that the government

4     has is that in the past, the Board has contended that this

5     extrajudicial injunction is in place, and if the government

6     does anything to run afoul of the injunction, it immediately

7     faces the threat of sanctions, which would leave the

8     government in an untenable position, Your Honor, because the

9     government would never be able to question or push back on the

10    Oversight Board's determinations, except in court, without

11    being put in a position of facing a potential sanctions

12    motion.  And that would chill the whole process that Congress

13    has contemplated for these issues of a back and forth between

14    the government and the Board, and a collaborative effort to

15    work through these issues first before we present them to the

16    Court.

17         So, Your Honor, as long as there's no threat of

18    immediate sanction, absent some sort of Court ordered

19    injunction that is then violated, I think that we would all be

20    on the same page.  The concern here is that the Board doesn't

21    seem to take that view.

22         THE COURT:  Thank you.

23         MR. SUSHON:  Thank you, Your Honor.

24         Moving past that, the government's also entitled to a

25    declaration that Act 176 does not impair or defeat PROMESA's

1   purposes, both for the reasons that I've already described,

2   which is that the law is, in fact, fiscally neutral, but also

3   because the Board hasn't presented any evidence of how it

4   arrived at its determination.

5        And there has to be at least some modicum of evidence

6   that the Board has to present here, and all it's done is

7   relied on the Jaresko Declaration to say that the Board

8   determined various things.  But the Board doesn't explain what

9   documents it looked at in making that determination, what

10  other evidence it may have considered, what commissions it

11  studied or what experts it consulted.

12       And the Jaresko Declaration doesn't even say that the

13  Board considered Act 8-2017's vacation planning requirement,

14  which was the primary reason that the government put forth

15  that Act 176 is fiscally neutral.  If the Board didn't

16  consider that primary issue that the government raised, yet

17  reached this determination, that would be arbitrary and

18  capricious.  It would not be backed by substantial evidence,

19  and it would not be an appropriate determination by the Board

20  that could supply the basis for an injunction.

21       I'd now like to turn to Act 138, Your Honor.  Act 138

22  is an Any-Willing-Provider law which addresses the mass exodus

23  of health care professionals from Puerto Rico by ensuring that

24  any qualified health care professional will be admitted to a

25  health insurance company's network.  As we've already

1   discussed, this law is facially neutral.  It doesn't call for

2   the government to spend any money, and it doesn't diminish any

3   revenues.

4          So the government supplied a certification to these

5   facts and said that the -- excuse me, the law is not

6   significantly inconsistent with the fiscal plan.  But the

7   Board wasn't satisfied, and it's criticized the Act 138

8   certification, first of all, as untimely.

9          And I think we can dispense with that quickly, Your

10  Honor.  While the Act 138 certification did come more than

11  seven days after the law was passed, it was before the Board

12  sent a notification to the government that it was untimely.

13  It was before the Board asked the government to supply a

14  certification.  The Board didn't ask for a certification until

15  November 15th, and then set a deadline of November 22nd.  So

16  this certification was in well before that.

17         But the Board also says that the certification is

18  incomplete because it doesn't address two questions:  First,

19  that Act 138 somehow puts Puerto Rico's federal health care

20  funding at risk; and, second, that Act 138 is somehow going to

21  increase health care costs on the island, and that those costs

22  are going to be visited on the government.

23         Now, from the outset, the Board's main problem with

24  the Act 138 certification was that the Board thought that the

25  subject matters covered by Act 138 are preempted by the

1     statutory provisions of Title 42 of the U.S. Code and the

2     related code of federal regulations.  They said that in their

3     November 15th, 2019, letter to the government.  That's

4     Government Exhibit 27.

5           And then the Board followed up on this issue.  It

6     never said anything about the law's effect on the

7     Commonwealth's expenditures, but kept asking again and again

8     for an analysis as to whether federal law conflicts with Act

9     138 such that it could jeopardize the grant of federal funds.

10    It did this in the December 18th, 2019, letter, that's

11    Government Exhibit 29; and again in letters on February 18th,

12    2020, and April 27th, 2020, and that's Government Exhibits 31

13    and 32.

14          But the Board to this day has not explained why it

15    believes that Act 138 conflicts with federal law, and it

16    doesn't explain how that could put Puerto Rico's federal

17    health care funding at issues.  The Board's filed

18    counterclaims, two different declarations, and two briefs on

19    the subject, and it's acknowledged that it's done an analysis.

20    It acknowledged it both in a letter to the government and in

21    its reply brief.  And the Board's never shared this analysis,

22    Your Honor.

23          The only conclusion that I can reach based on that,

24    and I believe the only conclusion that the Court should reach

25    based on that, is that the Board's analysis doesn't back up

1    its concerns, and that's why it won't share the analysis.

2    Instead, it just insists that the government has an obligation

3    to address whatever concern the Board may raise, whether it's

4    supported by evidence or not.

5          And what would happen if the government did that,

6    Your Honor?  The government would unquestionably have spent

7    tens of thousands of dollars of taxpayer money working on this

8    analysis to come to the same conclusion that the Board's

9    analysis apparently reached, which is that there is no

10   conflict and there's no risk to federal funds.  The government

11   shouldn't have to do that just to satisfy the Board's idle

12   speculation.

13         Now, the Board's other contention is that Act 138

14   will somehow inevitably cause the Commonwealth to pay more for

15   health care.  That was really an afterthought until the

16   government filed the summary judgment motion.  The Board made

17   an oblique reference to it in its November 15th letter, asking

18   the government to provide information about, "the impact on

19   the government's medical insurance plan," but without any

20   elaboration.  That's in Government Exhibit 27.

21         The Board didn't say anything further on this issue

22   at all until its April 27th, 2020, letter.  And even there it

23   just made a cryptic reference to "higher MCO PMPM rates."

24   That's in Government Exhibit 32.  But it didn't do anything to

25   connect that issue, which frankly, at least to me, I'm not an

1    expert in this space, doesn't tell me anything about health

2    care costs.  But it certainly didn't make any effort to

3    connect that to the government's having to pay additional

4    money for health care.  But now, in the summary judgment

5    motion, the Board faults the government for failing to answer

6    an unasked question.

7         And in its eagerness to enjoin Act 138, the Board

8    submitted two different declarations trying to substantiate

9    its speculative theory that a law requiring managed care

10   organizations to admit more doctors into their network and

11   increase the number of health care professionals on the island

12   will somehow stifle competition, make health care more

13   expensive, and lay those expenses at the feet of the

14   government.

15        Now, I won't belabor what we've already laid out in

16   our briefs, Your Honor, but the Jaresko and the Ellis

17   Declarations that the Board has relied on are bereft of

18   evidence, bereft of analysis, conclusory and self-serving.

19   And, really, the Board has made only a minimal effort to

20   defend those declarations.

21        In terms of the Jaresko Declaration, the Board did

22   point out that the Jaresko Declaration's erroneous references

23   to Act 82 in a discussion of Act 138 were a scrivener's error,

24   but beyond that, it does nothing to try to put any more meat

25   on the bones, or explain how the Jaresko Declaration satisfies

1    the Board's evidentiary burden.

2         And the Board makes no meaningful effort to salvage

3    the Ellis Declaration either.  Instead, what we have is the

4    Board complaining in a footnote that it has no obligation to

5    disprove the government's estimate.  And it may be true that

6    the Board need not disprove the government's estimates, but

7    the Board has to come forward with some evidence, at least of

8    a material fact dispute as to whether the Board's

9    determinations had a substantial basis.

10        The Board also complains that the Ellis Declaration

11   is so conclusory and speculative, because the Board couldn't

12   get information it needed from the government, and that's just

13   not so, Your Honor.  If the Board needs information from the

14   government, it knows full well that, under Section 104(c)(2)

15   of PROMESA, the Board has the power to get records, documents,

16   information, data, or metadata from the territorial

17   government.

18        And under Section 104(b), the Board can even give

19   that power to Dr. Ellis.  If Dr. Ellis had specific things

20   that he wanted from the government, and they were in

21   furtherance of the Board's powers under the statute, then Dr.

22   Ellis could have demanded that information directly.  The

23   Board never asked for it.  Dr. Ellis never asked for it.  So

24   the notion that the government somehow withheld information

25   from the Board and Dr. Ellis is simply baseless.

1    In addition to its efforts to defend those two

2    declarations, in its reply, the Board also brings forth three

3    new secondary sources that it says are evidence that support

4    its argument.  Well, these aren't evidence, Your Honor.

5    They're not sworn testimony, and they're not even before the

6    Court as exhibits to an attorney declaration.  These are just

7    articles that the Board found on Westlaw or the internet and

8    then cited in their brief.  And for that reason, they should

9    be disregarded.

10    But even if they were properly before the Court, they

11    really wouldn't help the Oversight Board at all, because none

12    of these articles does what the Board thinks they do.  The

13    first article, which really looks like it's an abstract of an

14    article, is by Leemore Dafny, and it comes from a website

15    called *Health Affairs*.  Now, the Board says that this article

16    supports its argument that broader physician networks, those

17    that admit more doctors, are more expensive than narrower

18    physician networks.  Well, the problem with that, Your Honor,

19    is that this abstract itself acknowledges that the study that

20    it describes failed to find a causal relationship between the

21    breadth of a network and prices.

22    The article says, and I quote, we could not establish

23    a causal effect of changes in breadth on premiums, nor could

24    we detect the mechanisms that generated the estimates we

25    obtained.  So much for Mr. Dafny.

1        The next article is a job market paper by Soheil

2   Ghili.  That article doesn't even concern Any-Willing-Provider

3   laws.  Instead, it addresses something called network adequacy

4   regulations which say that managed care organizations have to

5   maintain a minimum number of hospitals in their network.  So

6   it doesn't have anything to do with doctors, and it doesn't

7   have to do with requiring the admission of any willing

8   provider.  Instead, it tells managed care organizations that

9   they have to have a minimum number of hospitals no matter

10  what.

11       Moreover, the article also acknowledges that its

12  study was limited.  It concerned only a subsidized health

13  insurance exchange for the poor in metro Boston, an area of 30

14  miles around a central zip code in Boston.  And it involves

15  only acute health -- acute care hospitals, not all hospitals,

16  and only a group of five insurance companies.  The Board has

17  made no effort to explain how this article that concerns this

18  market and this statute, that are entirely different from the

19  issues presented by Act 138, has any bearing on what's before

20  the Court now.

21       Then there's the third article, Your Honor, and this

22  is the one on which the Board relies most heavily.  It's a

23  piece by Paul Ginsburg entitled, "Analysis:  How Any Willing

24  Provider Makes Health Care More Expensive."  This 2014

25  article, it's not an academic study, and it's not even a

1   statistical analysis.  It's a polemical piece prepared for and

2   at the request of America's Health Insurance Plans.  It says

3   that right on the last page of the article.

4          Now, I didn't know what America's Health Insurance

5   Plans was so I did some research, and according to the New

6   York Times, America's Health Insurance Plans is a huge lobby

7   formed by the merger of two powerful insurance groups.  And

8   that's a September 23rd, 2003, article in the Times entitled,

9   "Health Insurers Gain a Huge New Lobby."

10         America's Health Insurance Plans is a massive

11  organization that represents insurers' interests.  For

12  example, according to the National Journal, America's Health

13  Insurance Plans gave more than a hundred million dollars to

14  the Chamber of Commerce to assist it in staking out a position

15  on the Affordable Care Act.  And that's from a June 13, 2012,

16  article in the National Journal entitled, "Exclusive:  AHIP

17  Gave More Than 100 Million to Chambers' Efforts to Derail

18  Health Care Reform."

19         But worst of all, Your Honor, America's Health

20  Insurance Plans has come under fire for making misleading

21  statements.  For example, factcheck.org criticized one of the

22  organization's TV ads as, "a challenge to common sense," that

23  was based on no evidence.  And that is a factcheck.org piece

24  on the web.  The URL is

25  www.factcheck.org/politics/insurance_industry_ad_makes_fishy_

1  claim_about.HTML.

2          The bottom line here, Your Honor, is that the Board

3  is relying on a polemical piece written by a giant insurance

4  lobby to try to enjoin legislation that was passed by Puerto

5  Rico's duly enacted legislature, and that's just not

6  appropriate evidence for its summary judgment motion.  So the

7  Board's evidentiary -- excuse me.  The Board's effort to fill

8  the evidentiary gaps with these secondary sources should be

9  rejected.

10          Your Honor, I'd like now to turn to the acts on which

11  the Board has moved affirmatively for summary judgment.  Those

12  are Acts 47, 82, and 181.  Act 82 imposes regulations on

13  pharmacy benefit management programs --

14          COURT REPORTER:  I'm sorry, Counsel.  I can't hear --

15  Your Honor, this is the court reporter.  The fire alarm has

16  started.

17          THE COURT:  Is that the fire drill starting?

18          COURTROOM DEPUTY:  Yes, Your Honor.

19          THE COURT:  All right.  Counsel, I understand that

20  there is a fire drill, and it will prevent everybody from

21  being able to hear and the court reporter from being able to

22  work.  And so, unfortunately, we need to take a break right

23  now for the duration of the fire drill, which I'm told will be

24  20 minutes.

25          And so I have roughly eight minutes left in your time

1    on the clock, Mr. Sushon.  I'm sorry to stop you mid sentence.

2    So everyone please log out and log back in in 20 minutes and

3    we will continue.  Thank you for your cooperation.

4          MR. SUSHON:  Thank you, Your Honor.

5          THE COURT:  I'm signing off now.

6          (At 10:54 AM, recess taken.)

7          (At 11:21 AM, proceedings reconvened.)

8          THE COURT:  Good morning again.  This is Judge Swain.

9    I understand that we are all back.

10          Ms. Walker, can you confirm that you can hear us?

11          COURT REPORTER:  Yes, Your Honor.  Thank you.

12          THE COURT:  Thank you very much.

13          So Mr. Sushon will recommence, and I'll set you with

14    eight minutes to go.  You may begin.

15          MR. SUSHON:  Terrific.  Thank you, Your Honor.

16          THE COURT:  Thank you.

17          MR. SUSHON:  Bill Sushon from O'Melveny & Myers for

18    the Governor and AAFAF.

19          So we were moving into the three acts on which the

20    Board seeks summary judgment, which require the Court to

21    resolve the issue of what "significantly inconsistent with the

22    fiscal plan" means.  Now, Your Honor, as I've already alluded

23    to, the Board has tried to read the significantly inconsistent

24    requirement out of Section 204(a) by putting into the fiscal

25    plan a provision that requires every new law to be perfectly

1   revenue neutral.

2         The Board has not explained in any of its briefing

3   how it has the power to amend a federal statute passed by

4   Congress through the fiscal plan.  Instead, it just goes on

5   and doubles down saying that -- in its reply, that every

6   dollar is material and the law is either -- either is or is

7   not revenue neutral.  It can't be partially revenue neutral.

8   And so anything that is non-revenue neutral constitutes a per

9   se significant inconsistency with the fiscal plan.  Until they

10  explain how they can amend a statute, Your Honor, I don't

11  think that that is the standard.

12        Other than that, the Board makes no effort to explain

13  what significant inconsistency really means.  Instead, it

14  simply focuses on the government's effort to explain what the

15  word means and disputes every aspect of it.  But those

16  disputes, Your Honor, should be resolved against the Board.

17        First, the Board contends, contrary to Black's Law

18  Dictionary, that the word "significant" doesn't mean material.

19  Instead, the Board offers an alternative definition, saying

20  that the Court should read the word "significant" to mean,

21  among other things, momentous.  And that's what the Board says

22  is the word's ordinary meaning that must control.

23        Well, if anything, reading "significant" to mean

24  momentous would give a lot more leeway to the government than

25  using the word "material."  Merriam-Webster's online

1    dictionary defines momentous as, "having great meaning or

2    lasting effect."  And according to Merriam-Webster, the

3    synonyms of momentous include the words earth shattering,

4    earth shaking, historic, monumental, and my personal favorite,

5    tectonic.  So the government's argument that significant means

6    material is, if anything, far more conservative than the

7    standard that the Board says should govern what the word

8    significant means.

9         Secondly, the Board erroneously criticizes the

10   government for focusing on quantitative materiality, because

11   that ignores laws that don't have an impact on the

12   government's budget.  But, Your Honor, the government has

13   never argued that significant inconsistency is a purely

14   quantitative analysis.  We acknowledge -- excuse me.

15   Quantitative factors, of course, take center stage, because

16   Section 204(a) focuses primarily on the effects on the

17   government's revenues and expenditures, which are inherently

18   quantitative factors.  But that doesn't mean that qualitative

19   factors don't come into play.  Of course there's room for

20   that.  The problem for the Board is that in their papers, they

21   haven't identified any quantitative or qualitative significant

22   inconsistency with the fiscal plan.

23        Next, the Board misrepresents the government's

24   position as advocating a five percent materiality threshold

25   based on SEC regulation.  That's not what we've done, Your

1   Honor.  We have pointed to that five percent threshold as one

2   measure of quantitative materiality.  Now, it does happen to

3   be particularly appropriate here, because we are talking about

4   revenues and expenditures, which are the same measures that

5   are governed by the SEC in issuers' financial statements, but

6   that doesn't mean the five percent is necessarily the

7   yardstick.

8          What we have shown is that with respect to each of

9   these three laws, their effect is far less than five percent,

10  ranging from .002 percent, to a little more than .1 percent

11  for any of these laws, which are far, far less than the five

12  percent materiality threshold and not enough to be

13  significantly inconsistent.  And it's worth noting that the

14  Board doesn't offer any, any materiality threshold or

15  significant threshold in its papers.  It simply says five

16  percent is too much, without trying to explain what is

17  appropriate.  That's of no help to the government, the Board,

18  or the Court.

19         Next, the Board contends that the government's

20  interpretation of "significantly inconsistent" would allow the

21  government to enact a number of laws, each of which has a

22  small, adverse fiscal impact, but that collectively could have

23  a cumulative effect of 50 percent or greater.  The problem

24  that the Board has identified here is not with the

25  government's proposed materiality standard.  The Board's

1    argument would apply no matter where you set the materiality

2    standard, Your Honor.  If you set it at one percent and the

3    government passed 50 laws, then that would be a 50 percent

4    deviation.  If you set it at half a percent and the government

5    passed a hundred laws, that would still be a 50 percent

6    deviation.

7         The real problem that the Board has identified is

8    that Section 204(a) isn't the right solution to this problem.

9    It doesn't address the issue of cumulative effect.  But other

10   things in PROMESA do.

11        First of all, Section 204(c) prevents runaway

12   government spending by prohibiting reprogramming.  Now, this

13   doesn't mean, as the Board says, that every single penny has

14   to be used exactly as it's set forth in the budget.  There's

15   room here, Your Honor, to move within the same line item, for

16   example, salaries, from paying one person to paying a

17   different person.

18        For example, a government employee may leave and the

19   government may need to hire someone else to do the same job.

20   The fact that the dollars aren't going to the employee who was

21   there when the fiscal plan and the budget were created doesn't

22   mean it's a reprogram.  But Section 204(c) does ensure that

23   the government can't blow a hole in the side of the budget by

24   passing a series of laws that are individually permissible,

25   but collectively have a momentous effect on the government's

1   budget.

2          In addition to Section 204(c), Your Honor, the

3   government has its powers under Section 203(d) to reduce

4   non-debt expenditures if the government spending gets out of

5   whack with the budget.  The Board has the power to do that

6   after certain prerequisites are filled, but it can definitely

7   ensure that this cumulative effect problem that it's

8   identified is not going to be an issue.

9          The bottom line is that there's got to be some

10  measure of significant inconsistency here.  And no matter

11  where that line is drawn, these three laws fall below it.

12          Now, I'd like to turn briefly to Act 82, and I'm just

13  going to highlight a few issues that come out of the reply

14  papers.  The Board contends that Act 82's estimate and

15  certification is defective primarily because the estimate of

16  475,000 dollars is inconsistent with testimony from some

17  unnamed representative of the Puerto Rico Health Insurance

18  Administration that the law could cost 27 million dollars.

19          This is not sufficient to satisfy the evidentiary

20  standards that the Board has to meet.  The Board has never

21  submitted this testimony.  In our papers, we pointed that out.

22  They didn't even submit this testimony in reply.  The only

23  thing that we can deduce from that is that this testimony

24  doesn't exist, because testimony is recorded and should be

25  able to be submitted.

 1              And the Board hasn't even identified who the person

 2    from the Puerto Rico Health Insurance Administration was who

 3    supposedly gave this testimony.  The only defense that the

 4    Board offers to the government's arguments on this score is

 5    that the testimony isn't hearsay, because the Board isn't

 6    relying on it for its truth.  But that's beside the point,

 7    because the testimony isn't before the Court, and we have no

 8    evidence that it actually exists, aside from the Board's

 9    reference to its own letter on the subject.

10              (Sound played.)

11              MR. SUSHON:  The Board also asserts that Act 82 is an

12    improperly --

13              THE COURT:  Okay.  Sum up.  You can briefly sum up,

14    since you hit the two buzzes.

15              MR. SUSHON:  Geez, I've hit the eight minutes

16    already, Your Honor?  I apologize.

17              THE COURT:  No.  That was 45 minutes.  The fire drill

18    came in at 37 of your 45 minutes, so I put you back on for

19    eight minutes --

20              MR. SUSHON:  Yeah, I know --

21              THE COURT:  -- and which you had --

22              MR. SUSHON:  I apologize, Your Honor.

23              In conclusion, the government tried to work with the

24    Oversight Board within PROMESA's framework to pass badly

25    needed legislation, but the government has been met with an

1    ever shifting set of objections from the Board, coupled with

2    tactics designed to deprive the government of the flexibility

3    Congress intended to give it in PROMESA.  We badly need the

4    Court's guidance on what significant inconsistency means, what

5    reprogramming is.

6                I'll now turn it over to Ms. Covucci, Your Honor.

7                THE COURT:  Thank you so much, Mr. Sushon.

8                MR. SUSHON:  Thank you, Your Honor.

9                THE COURT:  Ms. Covucci, you may unmute now.

10   Ms. Covucci?  Ms. Covucci, you have to unmute on both the

11   Court Solutions dashboard and your telephone.

12               MS. COVUCCI:  Good morning, Your Honor.  Can you hear

13   me now?

14               THE COURT:  Yes, I can.  Good morning.

15               MS. COVUCCI:  Thank you, Your Honor.  Sorry about

16   that.  Amber Covucci of O'Melveny & Myers on behalf of AAFAF

17   and the Governor.  I will be addressing our request under Rule

18   56(d) to deny the cross-motion without prejudice to let the

19   parties make complete discovery on requests the government has

20   already served.

21               First, I'd like to address the Oversight Board's

22   argument that the government has waived its right to request

23   Rule 56(d) relief by also filing an opposition on the merits

24   in the alternative.  The fact that the government has

25   established that there are other grounds to deny the motion

1    doesn't mean that it can't also make a Rule 56(d) request.

2           The First Circuit has laid out the structure of Rule

3    56(d) relief in the *PHC* case, that's 762 F.3d 138, decided by

4    the First Circuit in 2014.  And the government relies on that

5    case in its opposition, but the Board does not even address it

6    in the reply.

7           In that case, the plaintiff, like the government,

8    filed a Rule 56(d) affidavit, and in the alternative, they

9    opposed the summary judgment motion on its merits.  The

10   District Court granted the motion on the merits without

11   acknowledging the plaintiff's Rule 56(d) request, in effect,

12   denying the Rule 56(d) request.

13          The First Circuit held that was an abuse of

14   discretion, because the plaintiff met the Rule 56(d) factors,

15   even though plaintiff also opposed the motion on its merits in

16   the alternative.  *In re PHC* is a good analogy to this case,

17   because the government has requested Rule 56(d) relief in its

18   opposition to the motion, and it made its substantive

19   alternative arguments in the alternative.  There's just no

20   basis to argue that requesting Rule 56(d) relief in the

21   alternative to substantive grounds would somehow be

22   inappropriate.

23          The cases the Board relies on -- first, they were all

24   decided before *PHC*, and they can all be distinguished, because

25   they involve non-movants who either didn't request further

1   discovery until after the summary judgment motion had already

2   been fully briefed, or even decided, or they did not meet the

3   requirements of what was then numbered as Rule 56(f) and is

4   now numbered as Rule 56(d).

5       In *C.B. Trucking*, the plaintiff never requested

6   relief under Rule 56(f) at the District Court level at all,

7   and only raised the argument on appeal.  Further, that case

8   was pending in the District Court for about 21 months, but the

9   plaintiff never conducted discovery on the issues central to

10  summary judgment.

11      In *Rodriguez-Cuervos*, similarly, the plaintiff only

12  requested Rule 56(f) relief after he had already lost on

13  summary judgment.  And in *Ayala-Gerena*, the appellants opposed

14  the summary judgment motion without invoking Rule 56(f) at

15  all.  They did not even inform the District Court that

16  discovery was outstanding until the pretrial conference when

17  the summary judgment motion had been fully briefed.

18      In all three of those cases, the non-movant tried to

19  use Rule 56(f) as a second bite of the apple after its first

20  attempt was already complete, and that's not what the

21  government has done here.

22      The only authority the Oversight Board cites, it

23  actually states a party must choose at the outset of briefing

24  between a substantive opposition and a Rule 56(f) or 56(d)

25  request, is *Westernbank*, an unpublished magistrate judge

1    report and recommendation that is inconsistent with First

2    Circuit precedent.  There, the Court's remark that non-movants

3    must choose between a substantive response and Rule 56(f) was

4    dicta, because the magistrate judge also found that the

5    non-movants didn't satisfy Rule 56(f)'s basic requirements.

6    They did not file an affidavit.  They did not identify what

7    additional facts they thought that discovery would reveal.

8    And they didn't explain how that discovery would be material

9    to the motion.

10          And even that remark in dicta was based on a

11   misinterpretation of both *Rodriguez-Cuervos* and *C.B. Trucking*,

12   which, as I've just mentioned, denied 56(f) relief, because

13   those requests were made after the non-movants had already

14   lost the summary judgment motion.  Five years after

15   *Westernbank,* in 2014, the First Circuit acknowledged in *PHC*

16   that parties are free to file a Rule 56(d) request and make a

17   substantive argument in the alternative, and that's exactly

18   what the government has done.

19          Moving on to the actual Rule 56(d) discussion, the

20   First Circuit, again, in *PHC*, has laid out five relevant

21   factors under Rule 56(d), which, when met, warrant a "strong

22   presumption" of relief.  That's 762 F3d 138, at page 144.

23          The Oversight Board does not dispute the first two

24   factors:  That the Sushon Declaration is timely, and that it

25   is authoritative.  So unless the Court has questions about

1  those first two factors, I will focus on the final three

2  today, which are good cause, utility of the discovery, and

3  materiality.

4           THE COURT:  You may proceed to the three.

5           MS. COVUCCI:  Thank you, Your Honor.

6           The government satisfies the third factor, which is

7  that it has shown good cause for not seeking the discovery

8  earlier.  The Board doesn't argue that the government's

9  discovery requests are untimely, and it doesn't cite a single

10  case with similar facts holding that the non-movant waited too

11  long to pursue discovery.  The timeline here is actually much

12  quicker than cases in which courts held that Rule 56(d)

13  applicants waited too long.  For example, as the First Circuit

14  held in *Rivera Almodovar* in 2013, nearly a year.

15          The two cases the Board does use as examples are

16  inapposite.  In *Resolution Trust Corporation*, the First

17  Circuit found that the non-movants actually were diligent in

18  seeking discovery over a three-year period, because there, the

19  summary judgment movant was the cause of most of the delay.

20          And in *Ayala-Gerena*, where the First Circuit held the

21  non-movants had waited too long, they had 18 months in which

22  to conduct discovery, but they served their discovery requests

23  just two weeks before the cutoff date.  Here, the government

24  served its discovery requests well before a discovery deadline

25  had even been set, and just two months, approximately two

1    months after the final pleadings were filed.  There is just no

2    similarity to cases where non-movants waited for a year or

3    more.

4         The Board makes much of the approximately two months

5    between when the pleadings were completed and the government

6    served its discovery request, but the fact that the government

7    pays both its own legal fees and those of the Board is

8    particularly important here.  Nothing about the discovery

9    timeline shows a lack of diligence.  It really just shows that

10   the government is being judicious with its resources.

11        As the Sushon Declaration describes, during meet and

12   confer discussions in late July, the government explained that

13   discovery was going to be necessary before summary judgment

14   would be appropriate.  But the Board said it planned to file

15   summary judgment motions in August.

16        At that point, expecting that the Board's motions

17   were about to be filed, the government decided it would be

18   most efficient to wait for those motions to sharpen the issues

19   in dispute before serving discovery requests.  Of course,

20   those motions never came.

21        In the meantime, the government determined that Acts

22   138 and 176, unlike Acts 82, 181, and 47, could be decided as

23   a matter of law without discovery, and filed its summary

24   judgment motions for those two acts on September 28th, 2020.

25   As soon as the Board filed its cross-motion on October 5th,

1    the government prepared targeted discovery requests focused

2    just on the issues material to the cross-motion, and served

3    them only ten days later, on October 15th.

4         Had the government filed broad ranging discovery at

5    the very outset of the case, it would still have needed to

6    follow up with targeted discovery based on the cross-motion,

7    such as the Ellis deposition notice and discovery requests

8    regarding the Board's reliance on his testimony.  The 56(d)

9    request still would have been necessary, but, meanwhile, the

10   parties would be in the midst of two rounds of discovery, with

11   the government paying for both rather than the single hours at

12   issue now.

13        The fourth and fifth factors of the Rule 56(d)

14   analysis are utility of the discovery and materiality.  Those

15   factors are typically analyzed together, because together they

16   require the government to show that facts probably exist that

17   will influence the outcome of the motion, and the government

18   has done that here.

19        For purposes of the 56(d) request, the materiality

20   threshold is low, because, as the First Circuit has put it,

21   evaluating the potential significance of unknown facts is

22   "something of a metaphysical exercise."  That's in *Resolution*

23   *Trust Corporation*, 22 F.3d 1198, at pages 1207 to 1208, a case

24   that the Oversight Board relies on, although it doesn't

25   discuss the materiality standard in that case.

1          For that reason, courts typically grant 56(d)

2     requests if the non-movant can identify specific facts it

3     expects to reveal in discovery and explain how those facts

4     will affect the outcome of the motion.  And that's just what

5     the government has done.  The government's discovery requests

6     are narrow, and they're targeted to the issues at the heart of

7     the cross-motion.

8          The government seeks responses to eight discovery

9     requests, that's including subparts, 14 interrogatories, and

10    it seeks to take two depositions.  That discovery, at a high

11    level, covers the Oversight Board's internal analysis of the

12    act; the basis for the Oversight Board's determinations that

13    the act violates PROMESA Sections 204(a), 204(c), or 108(a);

14    documents or analysis supporting the Ellis Declaration, if

15    any; and the Oversight Board's process for reviewing the

16    government's 204(a) certifications for newly enacted

17    legislation.

18         Walking through just a few examples of these

19    discovery requests shows that the discovery is key to the

20    outcome of the cross-motion.  For example, Request for

21    Production No. 1-A, that's Government's Exhibit 23, and

22    Interrogatory No. 1, Government's Exhibit 24, seek documents

23    and testimony concerning the Oversight Board's contention that

24    the compliance certifications do not satisfy PROMESA Section

25    204(a).

1          Mr. Sushon has just explained that the cross-motion

2    doesn't include evidence about any analysis the Board did,

3    short of reading the face of the laws, to decide that the

4    certifications for Acts 82, 181, and 47 are not formal, or

5    that those laws are significantly inconsistent with the fiscal

6    plan.  For example, for Act 82, the Board argues that the

7    government's cost estimate is defective because it fails to

8    address so-called conflicts that it claimed might affect

9    federal funding.  But the Board has never explained why it

10   thinks this is the case, and that argument just becomes more

11   perplexing over time because Puerto Rico's federal health care

12   funds continue to flow.

13          (Sound played.)

14          MS. COVUCCI:  Similarly, RFP No. 1-B, and

15   Interrogatories 2 through 4, seek documents and testimony

16   regarding the Board's economic or financial analysis of the

17   challenged acts, if any.  This is also material because, as

18   Mr. Sushon explained, the Board has not supported its

19   cross-motion with evidence that it did any analysis of the

20   three acts beyond reading them and speculating and making

21   determinations about their effects.

22          And the Oversight Board 30(b)(6) deposition, that

23   notice is Government's Exhibit 25, and the Ellis deposition,

24   Government Exhibit 26, will also certainly have an effect on

25   the outcome of the cross-motion, because beyond the face of

1   the laws, the Ellis and Jaresko Declarations are the only

2   evidence the Oversight Board cites.

3           Regarding Act 82, both declarations are careful not

4   to testify that the Oversight Board actually relied on Dr.

5   Ellis' opinion when it made its determination.  Ms. Jaresko's

6   declaration, paragraph 25, states only that the Oversight

7   Board's conclusion is consistent with Dr. Ellis'.

8           If it is true, as would be revealed in discovery,

9   that the Oversight Board did not rely on Dr. Ellis' opinion at

10  the time it made its decision about Act 82, and if it did not

11  consider any other evidence either, that would likely show its

12  decision was not based on substantial evidence and was

13  arbitrary and capricious when made.

14          The Oversight Board cannot carry its summary judgment

15  burden by manufacturing an expert opinion after it has already

16  come to its decision.  And regarding Acts 181 and 47, the

17  Jaresko Declaration simply recites the Oversight Board's

18  determination.  But that is --

19          (Sound played.)

20          MS. COVUCCI:  May I sum up briefly, Your Honor?

21          THE COURT:  Yes, please.

22          MS. COVUCCI:  Thank you.

23          That's just the Board's say-so, and it's simply not

24  enough to carry the Oversight Board's burden on summary

25  judgment.  The Board claims it has done an independent

1   analysis of the act, but it hasn't raised it in summary

2   judgment and it won't show it to us.  The government is

3   entitled to full production of the evidence underlying the

4   Board's decision, or confirmation in discovery that it doesn't

5   exist.

6         Thank you, Your Honor.

7         THE COURT:  Thank you, Ms. Covucci.

8         We now turn to the Oversight Board for its response

9   to the summary judgment motion and openings on its own motions

10  for summary judgment.  And the first speaker is

11  Mr. Bienenstock for 25 minutes.

12        Mr. Bienenstock, would you please unmute on the

13  dashboard and your phone?

14        MR. BIENENSTOCK:  Yes, Your Honor.  Good morning.

15        THE COURT:  Good morning.

16        MR. BIENENSTOCK:  My name is Martin Bienenstock of

17  Proskauer Rose, LLP, appearing for the Financial Oversight and

18  Management Board for Puerto Rico.

19        I wish the Court, and the Board wishes the Court and

20  all parties good health; and we hope to be able to reconvene

21  in San Juan at the earliest possible time.

22        Today the relief the Board seeks --

23        THE COURT:  The Court joins those wishes and hopes.

24        MR. BIENENSTOCK:  Thank you, Your Honor.

25        Today the relief the Board seeks is an order granting

1   the Board's summary judgment motions and denying the

2   government's summary judgment motions.  I will be covering

3   Laws 176 and 138.  And my partner, Tim Mungovan, will cover

4   Laws 47, 82, and 181, which means Mr. Mungovan will also cover

5   the 56(d) motions, so I will take less time than him.

6        Your Honor, previously, such as in the case of Law

7   29, this Court has dealt with new Commonwealth laws that, by

8   their terms, require the Commonwealth to receive less revenues

9   or pay more expenses.  Today, some of the laws at issue

10  directly reduce revenues, as did Law 29, but several of the

11  laws, such as Laws 138 and 176 that I'm about to discuss,

12  impact revenue and expenses, but without the law's language

13  expressly providing for the Commonwealth to pay more expenses

14  or collect less revenues.

15       For instance, Law 176 increases the cost of labor for

16  tens of thousands of employees, but not by paying employees

17  more, rather, by paying them the same amount for less work,

18  which then requires hiring more or laying off less for a

19  smaller population, which is an out-of-pocket cost.

20       The essential issue is the government refuses to

21  recognize the obvious impact of Law 176 on expenses.  In fact,

22  the government's reply brief is very candid in its first

23  paragraph.  It says, "the Board does not contest, and

24  therefore concedes, that Acts 176 and 138 on their faces

25  require no additional government expenditures and do not

1    affect the government's revenues.  Thus, logic and common

2    sense dictate that these acts have no fiscal effects and are

3    not significantly inconsistent with the fiscal plan."

4         In the Board's view, the government has converted

5    Section 204 into a superficial, check-the-box exercise whereby

6    if the law does not expressly require writing checks or

7    reducing revenues, the government can certify it is not

8    significantly inconsistent with the fiscal plan and the

9    Board's hands are tied.  It is concerning that the government

10   would even enact these laws without first having done a

11   substantive analysis.  So today, I'm here to ask the Court to

12   determine that Section 204 is a substantive exercise, not a

13   superficial one, and that Section 108(a)(2) means what it

14   says.

15        Having listened carefully to Mr. Sushon earlier, Your

16   Honor, I think, at the outset, I want to address some basic

17   points that respond to points the government is making.

18   First, it is uncontrovertible that the two compliance

19   certificates or certifications that the government provided

20   for Laws 138 and 176 are, in the case of one of them, a line,

21   and in the case of another, less than a page.

22        Section 204(a)(2) provides that -- (a)(2)(A) provides

23   that a formal estimate must be prepared by an appropriate

24   entity of the territorial government with expertise in budgets

25   and financial management of the impact, if any, that the law

1    will have on expenditures and revenues.  I think we really

2    have to dissect the words to get to the heart of this, because

3    we believe the case begins and stops right there at

4    204(a)(2)(A) of PROMESA.  A formal estimate prepared by

5    someone with expertise in budgets and financial management of

6    the impact that the law will have on expenditures and

7    revenues.  Neither estimate remotely provides any financial

8    information, shows no financial expertise, shows no impact.

9         What those two certifications are, are they are a

10   legal-beagling by someone who decided that, because the laws

11   on their face do not require the government to write checks,

12   per se, or to receive less money, they have no impact and they

13   don't have to prepare an estimate.  Well, the statute doesn't

14   say, tell us what the law says the checks have to be that are

15   going to be written.  The statute asks for the impact.  That

16   is substance.  That requires financial expertise.  And any

17   responsible government, any responsible business person

18   outside of government, would want to know the impact before

19   you go ahead and enact and implement such a law, because

20   impacts are critical.

21        And that raises another issue that is so obvious, at

22   first I was going to hesitate to say it, but it seems to me

23   that's being lost, at least on the government's arguments.

24   The statutory big picture in PROMESA, as the Court and all the

25   parties well know, is that, first, the government and the

1    Board trade fiscal plans and comments, and then a fiscal plan

2    is certified that includes a debt sustainability analysis

3    showing what can be basically offered to creditors.  And then

4    there's a budget, based on the fiscal plan, the debt

5    sustainability analysis, and what the numbers allow for.

6         What we're talking about here in 204 is when the

7    government comes up with a new law after the fiscal plan is

8    certified that changes things.  Well, that's no small matter,

9    because changing expenses can change debt sustainability.  It

10   can change other impacts on the overall economic growth and

11   competition, et cetera.

12        And you can't talk about these things, whether

13   they're five percent or one percent.  They each may be mission

14   critical.  You just never know.  It depends on the individual

15   facts and circumstances.

16        And I guess in tribute to both the government and the

17   Board, even though the Board has been certifying its own

18   fiscal plans, it's after going back and forth with the

19   government.  And they always contain, I would say, even the

20   bulk of what the government is recommending.

21        So I know the Court only sees the disputes, but the

22   reason the Court doesn't even have more is that, for the most

23   part, the issues such as we're dealing with here, are dealt

24   with in advance and incorporated in the fiscal plan, so a

25   later change will not threaten debt sustainability analysis,

1   the budget, and other critical factors.

2           Now, we think the Court could and should rule in our

3   favor on the summary judgment motions on these two laws simply

4   because all you have to do is look at the so-called formal

5   estimate and certificate, and, clearly, it comes nowhere close

6   to doing what 204(a)(2) says has to be done.  There's no

7   scintilla of evidence of any financial expertise of any kind

8   or thinking applied to impact what they did, as I mentioned a

9   moment ago, with legal-beagling.  On the face of the statute,

10  it doesn't say write a check, so we can say it doesn't -- it's

11  not inconsistent with the fiscal plan.

12          On 176, we agree, the Board agrees entirely with how

13  the Court framed it earlier, but I would like to suggest that

14  there are -- in addition to 204(a)(2) being a show-stopper

15  here, there are really two bases, two other bases at least on

16  which the Court, we think, can and should decide in the

17  Board's favor.

18          First, the government's whole case rests on this Law

19  8-2017, which it says preserves the productivity.  Your Honor,

20  8-2017 is Exhibit 59 of the Board for today's hearing.  It's

21  quite long.  I'm not going to try to quote it, but it can all

22  be read.  And the Court will not find the word "productivity"

23  anywhere in the statute.

24          What it basically says, on a general reading, is

25  employees can't all take vacations the same day to leave no

1 │ one back at the ranch to provide services.  They're not

2 │ supposed to be -- services are not supposed to be interrupted.

3 │ So they have to be planned.  And if, at the end of the year,

4 │ an employee ends up, because of that requirement, not having

5 │ been able to take all the employee's vacation days, there are

6 │ special exceptions to other laws that kick in, which allow the

7 │ vacation days to either be monetized or taken in the next

8 │ year.

9 │       So we think that the government's defense to all of

10 │ this, this Act 8-2017, is not a defense at all because it

11 │ doesn't do what the government says it does.  It says, you

12 │ have to provide as many services as you were providing before,

13 │ even though now we're giving you additional vacation days and

14 │ sick days.

15 │       And on that, Your Honor, I want to emphasize and

16 │ assure the Court, and all the parties, and the government, the

17 │ Board never looks at these laws and proposals from a viewpoint

18 │ of can we stop it.  The law looks -- the Board looks at it

19 │ from the opposite point of view:  Can we accommodate what the

20 │ government wants to do?

21 │       But to determine if we can accommodate, we have to

22 │ have a real analysis with a real impact.  And if there's a

23 │ cost, and here there is a cost, we then have to set about

24 │ finding if there's a way to bridge that cost, to offset that

25 │ cost in some manner within the rest of the fiscal plan and the

1    budget.  And nothing stops the government from coming back in

2    the future, but, for now, there are certificates which were

3    not what 204(a)(2) had -- requires in the first place, are

4    showstoppers.  And as the Court saw from all the

5    correspondence back and forth between the government and the

6    Board, it was a stiff arm.  We don't have to give you more

7    information, was basically what the government was telling us.

8    And so there was no ability to try to figure out how to make

9    this work.

10        And, you know, the other answer to the

11   government's -- to the government's case here is, as the Court

12   mentioned earlier, we're trying to right-size to a much

13   smaller population and continuing outmigration.  So if they

14   have excess capacity -- I mean, the Court went through this,

15   so I'm not going to belabor it.  We have to reduce that,

16   otherwise, we're not an efficient government providing

17   services at a minimum cost to the taxpayer.

18        THE COURT:  And so to be a formal estimate on this

19   issue of the sort that the Board is looking for, would you

20   give me -- describe some characteristics.  You said it doesn't

21   reflect financial expertise, it doesn't engage the

22   productivity issue, but, yes, are you saying there need to be

23   spreadsheets that in this case would look at, you know, how

24   many employees, how many more days, what those days would be

25   in terms of average salary, you know, accounting principles?

1    You know, what do you believe formality means in an estimate?

2         And as the government points out, it does say, the

3    statute says, estimate.  It doesn't say precise costing out.

4    So what are the minimum objective characteristics of a formal

5    estimate that the Oversight Board looks for?

6         MR. BIENENSTOCK:  Okay, Your Honor.  And I can answer

7    that.  I just want a caveat that, as the Court knows, I'm just

8    a lawyer.  But I would start by saying it's not as if there is

9    a rigid list of requirements so that either side can play a

10   game of gotcha.

11        That's not what this is about.  This is getting to

12   the heart of the matter.  And I think -- the reason I said I

13   think I can answer that question here and now is that in this

14   case, the Board's letters, and Ms. Jaresko's declaration, give

15   the government the guts to the problem.

16        You're dealing with a five percent reduction in

17   available employee hours that translates into 2,400 employees.

18   So an example of a governmental, formal estimate would say,

19   okay, taking -- I don't know if this would be right, but, for

20   example purposes, you know, taking the number of services we

21   provided last year as a benchmark, or maybe it should be upped

22   or downed by a certain amount, here was our overcapacity, if

23   we had any, last year; here's what the fiscal plan is asking

24   for, a reduction in employee count for right-sizing.  That's

25   already assumed in the fiscal plan and budget to take effect.

1    That would leave still an overcapacity that would cover the

2    required services or it would not.  And if it would not, then

3    here would be the cost of not reducing -- not right-sizing by

4    the same amount, or right-sizing on a slower schedule over the

5    next X years or whatever.  And here's how we think we can deal

6    with it.

7            Something that gets to the heart of the matter, Your

8    Honor.  As I said, we're not playing gotcha.  We're saying

9    something that makes sense, that deals with the impact, that's

10   clearly what I think any logical business person, government

11   person, anyone who's in charge of a budget and responsible,

12   who has to live within their means, would want to do that.

13           And it's just amazing that it wasn't done here.  It

14   has to be done in all these cases, because you can't be an

15   efficient, responsible government if you don't do the type of

16   thing I think I just described.

17           So I hope that was responsive to what the Court was

18   asking.

19           THE COURT:  Thank you.

20           MR. BIENENSTOCK:  And, you know, before I get to

21   108(a)(2), I want to just say that the -- since the

22   government's so-called formal estimate provided us virtually

23   nothing, Ms. Jaresko and the Board didn't even really have to

24   go back to the government and say, hey, by the way, your

25   changes to vacation and sick day policy are a five percent

1  charge, the equivalent of 2,400 full-time employees.  But she

2  did say it, and she gave them the problem that any logical

3  person would have to deal with.

4       And now it's in the government's ballpark.  And it

5  has been from the get-go.  Okay.  So deal with it.  Show us

6  how this works.  Clearly, Act 8-2017 doesn't tell employees,

7  you're just not getting all the sick days -- or the vacation

8  days you want, but I won't rehash that argument.

9       Now, on 108(a)(2), we agree entirely with the Court's

10  articulation, especially the concept that the way it's

11  written, once the Board makes a determination, some type of

12  bar is triggered.  I don't agree with the way Mr. Sushon

13  rearticulated it.

14       I want to mention why it's so important, that bar is

15  so important.  If the Court looks at Exhibits 44 and 54 of the

16  Board for today's hearing, you'll see the government's two

17  letters telling the Board, in response to Board requests, that

18  it has already implemented Laws 138 and 176.  Well, that's a

19  big problem, and that's what 108(a)(2) was supposed to

20  prevent.

21       And, again, not to ignore the obvious, 108(a)(2) is

22  in Title I.  It's a power given to the Board and restrictions

23  on the government before you ever get to Title II.  And it

24  covers a lot more than Section 204.  It covers any purposes of

25  PROMESA as determined by the Board.  And that doesn't have

1  meaning unless the government is supposed to do what the

2  statute says:  Stop, don't enact, don't implement, once that

3  trigger is identified for you by the Board.  And as the Court

4  said, there are no words of "injunction," no one's looking for

5  contempt, at least up until now.  We've never seen that would

6  serve a purpose, but there could and should be consequences.

7       What consequences?  That would be determined by Your

8  Honor based on the facts and circumstances of each

9  circumstance.  But 108(a)(2) is there -- will have no

10  meaning, it's virtually written out of the statute if we take

11  the government's point of view, which is we have to go to

12  court first, and we have to initiate it, and we have to win

13  before the government is supposed to stop, because we're

14  losing what we are already losing now.  They go implement, and

15  now we're behind the eight ball.

16       Now, I think I have three minutes left.  I'll get to

17  Law 138 for which their formal estimate is all of a line.  It

18  says there is no significant impact.  Again, an issue of legal

19  beagling.  And as the Oversight Board explained in the lengthy

20  colloquy that the parties had in their letters, and as

21  Ms. Jaresko's declaration shows, there's 4.2 billion that --

22  being spent on health care under the fiscal plan and budget.

23  And roughly two billion or more of that comes from the federal

24  government.

25       We've had a classic business person's concern:  How

 1    will the Federal Government react to the fact that you're

 2    passing a law that decreases price competition, leading to a

 3    likely increase in health care costs?  Is that going to

 4    jeopardize what you get?  Any reasonable person would have

 5    that concern.

 6            We were not asking for a legal preemption analysis.

 7    And that was originally articulated in the 204 process.  As

 8    things went on, the Board said, as the correspondence shows --

 9    and the government should not be the one to say we were late,

10    not after the way it treats the seven-day deadline on the

11    formal estimates.  But the Board --

12            (Sound played.)

13            MR. BIENENSTOCK:  The Board identified its concerns

14    about a law that, you know, Mr. Sushon described as

15    Any-Willing-Provider.  So as Mr. --

16            THE COURT:  Mr. Bienenstock, let me ask you this:  Is

17    there a particular provision in the relevant federal medical

18    funding law that you -- the Board believes conditions the

19    funding on something that is clearly violated by this

20    Any-Willing-Provider law, or is this more a political Gestalt

21    concern?  What is it you're looking to them to specifically

22    analyze?

23            MR. BIENENSTOCK:  Okay.  So on Medicaid, we do think

24    the entire statute preempts their law.  But outside of

25    Medicaid, what we were concerned with was -- Your Honor used

1  the word gestalt.  It was more of since, as the government --

2  I think the Court and the creditors all know, every year we

3  bite our fingernails wondering what the government's going to

4  do for Puerto Rico on health care.  And, in fact, as you know,

5  the Board is criticized by the creditors for not assuming in

6  our fiscal plans that we are going to get a certain amount of

7  money every year, because the government typically doesn't

8  commit for more than a year now.  Now, it has, I think,

9  committed for two years or something of that order.  And it's

10 a negotiated number.

11      So we were concerned, well, how is it going to react.

12 And we know you can't predict the future and things like that,

13 but the government has lobbyists in Washington.

14      (Sound played.)

15      MR. BIENENSTOCK:  It's a well-known procedure.  And

16 we can make inquiries to find out what kinds of things are the

17 people who make these decisions concerned with the most, but I

18 think more to the point, Your Honor, under 108(a)(2) and 204,

19 there's a concern about, first, running afoul of the

20 provisions in Section 204 that go to promoting competition.

21 When you say that a managed care organization can no longer

22 exclude people based on prices for services, then not only do

23 the new people coming into the network have no price control,

24 but the people in the network say, hey, if they can have

25 whatever prices they want, we want that, too.

1          Also, you have the problem that Mr. --

2          THE COURT:  I'll need you just to sum up --

3          MR. BIENENSTOCK:  I will.

4          THE COURT:  -- because you are over --

5          MR. BIENENSTOCK:  I will.  These are my last

6    comments, Your Honor.

7          THE COURT:  Okay.

8          MR. BIENENSTOCK:  So, as Mr. Ellis said, you have --

9    there are just some health care providers that are known to

10   order unnecessary tests, have other issues.  Here you can only

11   exclude a person if they've been already found guilty of some

12   fraud or something on the provider.  That's not health --

13   that's not healthy, pardon the pun.

14         So we have these concerns.  And the government has

15   done nothing in its formal estimate or otherwise to show why

16   we should not have those concerns.  And as the Jaresko

17   Declaration shows, we have a fixed amount in the budget and

18   fiscal plan that counts on certain tax revenues.

19         Mr. Ellis says, well, if you're going to raise the

20   cost of businesses for health care because there are no more

21   price controls, then you're going to have less tax revenues.

22   So we have all these concerns, and we couldn't give them more

23   facts, because --

24         THE COURT:  Okay.  Thank you, Mr. Bienenstock.

25         MR. BIENENSTOCK:  Okay.  I'm sorry for going over,

1    Your Honor.  Thank you.

2              THE COURT:  Thank you.

3              All right.  Next is Mr. Mungovan.

4              MR. MUNGOVAN:  Good morning, Your Honor.  This is Tim

5    Mungovan.  Can you hear me?

6              THE COURT:  Yes, I can.  Good morning.

7              MR. MUNGOVAN:  Good morning.  May it please the

8    Court.  For the record, my name is Tim Mungovan.  And with the

9    Court's permission, I will address Act 47 first, followed by

10   Act 82, and then Act 181.

11             Act 47 provides --

12             THE COURT:  Please proceed.

13             MR. MUNGOVAN:  -- a tax cut for health care

14   professionals that will indisputably reduce revenues

15   potentially by tens of millions of dollars a year.

16             The Oversight Board is entitled to summary judgment

17   on its three counterclaims pursuant to Sections 204(a) and

18   108(a)(2) of PROMESA and on the government's claims.  First,

19   the government provided a defective estimate under Section

20   204(a)(2)(A).  I'll simply incorporate Mr. Bienenstock's

21   portion of the argument on what would constitute an acceptable

22   estimate for the Oversight Board, and simply point out that

23   the government Section 204(a) certification for Act 47 states

24   that it, quote, could have an estimated annual impact on

25   revenues of 25.7 million dollars.  That's Hearing Exhibit

1 Three.

2        The government did not provide any data or any

3 analysis supporting its, quote, estimated annual impact.

4 Subsequently, the government revised its own estimate,

5 revealing more defects than its original estimate.  The

6 revised estimate is contained within the government's letter

7 dated May 28, 2020, which is Exhibit No. 6 to the government's

8 complaint, and that's Hearing Exhibit No. 5.

9        The government's letter states --

10        THE COURT:  The government's hearing exhibit or your

11 hearing exhibit?

12        MR. MUNGOVAN:  I apologize, Your Honor.  That's the

13 Oversight Board's Hearing Exhibit No. 5.

14        THE COURT:  Thank you.

15        MR. MUNGOVAN:  The government's letter states, quote,

16 the revised estimate varies from the original Section 204

17 certification, since the first estimate only took into account

18 the type of physicians not qualified in the previous laws that

19 were incorporated in Act 47.

20        The letter goes on to state that, "this last estimate

21 provides a more precise impact."  The implication of this

22 revised estimate is that the first estimate was based on

23 incorrect assumptions.  And the best evidence that the first

24 estimate was defective is that the government's new estimate

25 substantially increased the impact from 25.7 million dollars

1   to a high of 40 million, and overall range of 540,000 to 40

2   million.

3           The revised estimate has its own defects, and in the

4   new range of the financial impact, relates only to 2020.  This

5   quote made clear in the Law 29 decision that a formal estimate

6   has to compensate the entire period within the fiscal plan.

7   The government now claims that this revised estimate is not,

8   in fact, an estimate.  See the government's Response to the

9   Board's Statement of Uncontested Material Facts at page 37,

10  and that's paragraph 85.  That statement is belied by the

11  government's own words in its own letter dated May 28.

12          I'll shift to my second point on Act 47.  The

13  government certification that Act 47 is not significantly

14  inconsistent with the fiscal plan is wrong for two reasons.

15  First, the act on its face will decrease revenues that are

16  assumed in the fiscal plan, that -- tens of millions of

17  dollars a year with no offsetting savings.  It is undisputed

18  that Act 47 reduces revenues with no offsetting savings, and

19  that's based on the government's Response to the Statement of

20  Uncontested Facts, paragraph 64.

21          Second, the Act is directly inconsistent with the

22  fiscal plan.  The 2019 Fiscal Plan is attached to the

23  government's Complaint as Exhibit One, and it's also attached

24  to the Jaresko Declaration as Exhibit One.  It's also Hearing

25  Exhibit 55, which is the Board's hearing exhibit.

1          Section 14.3 of the 2019 Fiscal Plan is entitled,

2    Implementation and Enforcement of Revenue Measures.  And

3    Subsection 14.3.3, which appears on page 124 of the 2019

4    Fiscal Plan, is entitled, Principle of Revenue Neutrality.

5    And I would simply direct the Court to read that paragraph,

6    and request that it do so, because that paragraph bears

7    directly on this particular act in question here.  The 2020

8    Fiscal Plan includes the same text as the 2019 Fiscal Plan,

9    and that's at Exhibit 2, and that's Hearing Exhibit 56.  It's

10   within Section 218 of Hearing Exhibit 56.

11         Ultimately, in light of the failure of Act 47 to

12   achieve revenue neutrality through decreasing revenues,

13   without reducing spending, Act 47 is specifically and

14   significantly inconsistent with the fiscal plan.

15         The Oversight Board is also entitled to summary

16   judgment on its counterclaim under Section 108(a)(2) of

17   PROMESA.  The Oversight Board determined that the

18   implementation of Act 47 impairs and defeats the purposes of

19   PROMESA, and advised the government of that fact in the

20   Board's letter dated May 21, 2020.  And that Act 47 must not

21   be implemented at that time.  That's Hearing Exhibit Four.

22         Despite that directive, it is undisputed that the

23   government advised the Board on June 18, 2020, that Act 47,

24   "will be fully implemented."  That's Hearing Exhibit Eight.

25   The Board's determination that Act 47 impairs or defeats the

1   purposes of PROMESA is based on substantial record evidence,

2   and that determination was not arbitrary or capricious in any

3   respect.  The act reduces tax revenues --

4           THE COURT:  I'm sorry.

5           MR. MUNGOVAN:  Yes, Your Honor.

6           THE COURT:  It sounds like you're going on to -- I

7   want you to enumerate what you're characterizing as

8   substantial record evidence.

9           MR. MUNGOVAN:  I will do so, Your Honor.

10          The act reduces tax revenues with no offsetting cost

11  savings.  In addition, as set forth above, as I just detailed,

12  the government has not complied with Section 204(a) of

13  PROMESA.  And then the Board's determinations on these points

14  are established in paragraphs 145 through 171 of Ms. Jaresko's

15  declaration.

16          As Ms. Jaresko stated in her declaration, an annual

17  revenue loss of up to 40.1 million dollars was not anticipated

18  in the fiscal plan.  That's Jaresko, paragraph 162.  As

19  Ms. Jaresko also stated in her declaration, the Oversight

20  Board has determined an annual revenue loss of up to 40

21  million dollars would impair the Commonwealth's ability to

22  obtain fiscal stability and market access.  That's paragraph

23  163 of the Jaresko Declaration.

24          Ms. Jaresko also stated in her declaration that the

25  Oversight Board has further determined the revenue loss would

1    undermine the Oversight Board's revenue projections, enlarge

2    deficits, make it more difficult to achieve fiscal targets,

3    and diminish funds the Commonwealth can use to promote

4    economic growth.  And that's in paragraph 164 of the Jaresko

5    Declaration.

6          Unless the Court has questions around Act 47 or the

7    specific discussion on Section 108(a)(2), I would like to move

8    on to Act 82.

9          THE COURT:  You may move on.  Thank you.

10          MR. MUNGOVAN:  Thank you, Your Honor.

11          Act 82 controls arrangements between pharmacies and

12    pharmacy benefit managers in a manner that raises prices and

13    diminishes price competition between pharmacies, as I will

14    explain.  Act 82 also creates a new office increasing the

15    annual cost of government.

16          The Oversight Board is entitled to summary judgment

17    on its counterclaims pursuant to Sections 204(a), 204(c), and

18    108(a)(2) of PROMESA, and on the government's affirmative

19    claims.  I will address the Board's counterclaims in turn, but

20    first I want to point out that there is a detailed factual

21    history between the government and the Board with respect to

22    this act.

23          The factual history is located at Hearing Exhibits 11

24    through 23.  On the positive side, that history shows a

25    significant effort by the Board to engage with the government

1  to understand the impact of Act 82, as well as the

2  government's analysis of that impact.  On the negative side,

3  that history shows the government simply deflecting the

4  Board's concerns, and actually actively recharacterizing the

5  Board's concerns, and then dismissing those concerns as

6  illegitimate.

7      The Court will, of course, draw its own inferences,

8  but those communications do inform the overall analysis of

9  both the government's affirmative claims and the Board's

10 counterclaims, and, particularly, the government's repeated

11 invocation of good faith.  The Board -- excuse me, the

12 Governor failed to provide a compliant formal estimate as

13 required by Section 204(a)(2)(A).  The certification provides

14 no detail whatsoever, which is necessary to substantiate the

15 accuracy and plausibility of the government's estimate.  The

16 certification simply states that, quote, Act 82 has an

17 approximate impact of $475,131.47 in the Department of

18 Health's budget.  And that's Hearing Exhibit 12.

19     The Board had good reason to question the accuracy of

20 that estimate in light of the public testimony of officials

21 from the Puerto Rico Health Insurance Administration that Act

22 82 will increase the Commonwealth's health plan budget by 27

23 million dollars.  The Board explained this concern in its

24 first letter to the government dated December 18, 2019, which

25 is Hearing Exhibit 14.  The Board is not asserting that this

1    testimony is truthful or that it is accurate.  Instead, the

2    Board is simply pointing out that this testimony by the Puerto

3    Rico Health Insurance Administration raises concerns for the

4    Board as to the accuracy of the government's formal estimate

5    under 204(a).

6            THE COURT:  Can you identify that testimony,

7    including where it was given and who said it, and point the

8    government to a copy of it?

9            MR. MUNGOVAN:  You know, Your Honor, I can't right

10   now, no.  But I do recall reading a law last night that the

11   law on its face does seem to address this testimony in the

12   preamble of the law.  And it seems to reject that testimony

13   that was offered.  I cannot be 100 percent certain that it's

14   the same testimony, Your Honor, but the Board raised the

15   testimony in its letter.  And the government responded in its

16   letter back to the Board in response to the Board's letter.  I

17   think it's dated December 18th.  And the government responded,

18   I believe, later in December, and referenced the exact same

19   testimony.  And then rejected it as a basis on which to

20   address the Board's concern.

21           And so I can't answer your question directly right

22   now, Your Honor.  I will look into it, and we can supplement

23   the record, if the Court permits.  But I do not know precisely

24   where that testimony currently is.

25           THE COURT:  Thank you.

1           MR. MUNGOVAN:   The second defect in the Board's

2    estimate -- excuse me, the government's estimate, the second

3    defect is with respect to the approximate impact.  It does not

4    estimate the impact of the law over the five-year period,

5    which is a requirement, as the Court knows from the Law 29

6    decision.

7           And it's undisputed that the approximate impact of

8    475,000 dollars in the Act 82 certification is for fiscal year

9    2020 based on the government's Response to the Statement of

10   Material Facts.  And that's paragraph 22 in the Government's

11   Response to the Statement of Uncontested Material Facts.

12          The third reason that the estimate is defective is

13   that the government does not assess whether Act 82 could

14   jeopardize the Puerto Rico Department of Health's receipt of

15   federal funds.  Now, I will concede that a lot of ink has been

16   spilled on this issue, with the government repeatedly, I

17   believe, evading this issue by recharacterizing the Board's

18   request in seeking a preemption analysis.

19          The Board repeatedly clarified its position on the

20   issue with various communications with the government, and

21   those are in Hearing Exhibits 14, 16, 19, and 22.  And the

22   Board has submitted substantial evidence establishing several

23   key points validating its concern as follows:  The Federal

24   Government provides billions of dollars in aid to the

25   Commonwealth to ensure access to affordable health care, and

1    the fiscal plan assumes, and the Commonwealth depends upon,

2    the receipt of that aid.   That evidence is set forth in the

3    Jaresko Declaration, paragraphs 12 and 47, and also in the

4    2019 Fiscal Plan at pages 26 through 38, 92 through 96, and

5    111 through 119.

6         The Governor's certification that Act 82 is not

7    significantly inconsistent with the fiscal plan is erroneous

8    for two reasons.  First, the conclusion is based on a

9    defective estimate, as I just previously described, and the

10   act is not revenue neutral as required by the fiscal plan.  It

11   is undisputed that the 2019 Fiscal Plan and the 2020 Fiscal

12   Plan state that laws must be revenue neutral.  And that's

13   undisputed based on the Government's Response to the Statement

14   of Uncontested Facts, paragraph four.

15        The government certification acknowledges on its face

16   that the act will have an approximate impact of 450,000

17   dollars on expenditures.  The act provides for no

18   corresponding increase in revenues or reduction in

19   expenditures without any offsetting savings or revenues.

20        Finally, with respect to the --

21        THE COURT:  May I?

22        MR. MUNGOVAN:  Yes, Your Honor.

23        THE COURT:  What do you say to the government's

24   argument that, using the revenue neutrality provision as an

25   absolute benchmark or cut piece deprives "significant" of any

1    meaning at all in that the government should be able to raise

2    a little issue here, raise a little issue there, in order to

3    be a government?

4            MR. MUNGOVAN:  So I would say two things with respect

5    to that, Your Honor.  First of all, it is set forth in the

6    fiscal plan in order to achieve a balanced budget and balanced

7    finances and to restore the Commonwealth to fiscal

8    responsibility and access to the capital markets, which are

9    core requirements of PROMESA.

10            The Board has set forth the provision that achieves

11   those core purposes of PROMESA, fiscal responsibility and

12   access to capital markets.  The fact that the government

13   believes that that provision could be used in a way, meaning

14   the neutrality could be used in a way to weed out

15   "significantly," I believe -- and we would argue in response,

16   that that's not, in fact, what is happening.

17            And, two, the Board, as a practical matter, can

18   accept, and it's specifically set forth in PROMESA later in

19   Section 204(a) that the Board can accept inconsistencies that

20   -- based on an explanation from the government that it finds

21   reasonable.  And so I don't accept and the Board rejects the

22   concept that that provision in the fiscal plan somehow strips

23   out the word "significantly," because the Board has the

24   ability to accept any inconsistency, if the explanation

25   provided is reasonable.

1          And what I would say is here the Board was waiting

2     for these explanations.  The Board was engaging with the

3     government on these acts.  And in each case -- and the

4     government turned around and commenced litigation against the

5     Board without having effectively provided the information that

6     the Board needed in order to make the determination.

7          Ultimately, what I would say with respect to this

8     specific act, Your Honor, we're just looking at the 450,000

9     dollars that is the estimated impact on the face of the

10    certification and finding that it is insignificant, but that

11    doesn't even account for the deficiencies in the certification

12    itself.

13         THE COURT:  Thank you.

14         MR. MUNGOVAN:  The Oversight Board is entitled to

15    summary judgment on its counterclaim under Section 204(c) as

16    Act 82 reprograms, and necessarily reprograms in violation of

17    PROMESA Section 204(c).  The act spends approximately 450,000

18    dollars, in part to establish a new administrative office.

19    This expenditure is not provided for in the 2019 Fiscal Plan

20    or the 2020 Fiscal Plan.  That's set forth in the Jaresko

21    Declaration, paragraph 29.

22         The Governor's certification states that the money

23    for Act 82 will come from, quote, budgeted resources and, if

24    necessary, reprogrammed funds.  Indeed, the government's

25    opposition brief at page 30 points to a series of line items

1   in the budget, which it intends to use as the source of those

2   funds.  But, as Ms. Jaresko points out in her declaration,

3   this is a reprogramming from the Board's perspective.  And

4   that's in the Jaresko Declaration, paragraphs 26, 27, 31, 32,

5   33, and 61.

6        The government did not submit a request for the

7   Oversight Board to approve this reprogramming, nor did the

8   Board ever give its approval.  And it's undisputed that the

9   government did not identify the budgeted resources that it

10   intended to use, notwithstanding the belated statement in its

11   brief.  The Government's Response to the Statement of

12   Uncontested Material Facts confirms that this is a matter that

13   is not in dispute before the Court.  That's on page 40 in

14   paragraph 42.

15        The Oversight Board is entitled to summary judgment

16   on its counterclaim under Section 108(a)(2) of PROMESA.  The

17   Board determined that Act 82 impairs or defeats the purposes

18   of PROMESA and informed the government of that fact.  That's

19   in the Board's April 27 letter, which is Hearing Exhibit 16,

20   and in the Board's June 23, 2020, letter, which is Hearing

21   Exhibit 22.

22        The Board's determination is based on substantial

23   evidence and is not arbitrary or capricious.  The act adds to

24   the cost of government.  It is inconsistent with the fiscal

25   plan.  It relies on reprogramming.  It decreases price

1  competition, and increases the cost of health care, among

2  other things, as I will describe.

3          The Board's determinations on these points are

4  established in paragraphs 19 through 61 of Ms. Jaresko's

5  declaration.  Specifically with respect to decreasing price

6  competition and increasing the health care costs of the

7  Commonwealth, the Board's determinations are consistent with

8  and substantiated by Dr. Ellis.

9          Dr. Ellis states in his declaration that Act 82 will

10  raise costs for private insurance plans and its Medicaid plans

11  by requiring pharmacy benefit managers who administer those

12  plans' drug benefits to increase their payments to pharmacies,

13  while competition among pharmacies to charge less for drugs is

14  diminished.  That's Dr. Ellis' declaration in paragraphs 14

15  and 21.

16          The increases in costs for funds to benefit managers

17  will adversely affect the fiscal position of the Commonwealth

18  by increasing spending on Medicaid and reducing income tax

19  revenues.  And Act 82 may also increase the costs borne by the

20  Commonwealth in provision of subsidized insurance to public

21  sector employees and their families.  That's the Ellis

22  Declaration, paragraphs 15 and 22.

23          The government informed the Board that it was

24  proceeding with implementing Act 82, notwithstanding the

25  Board's directive not to do so.  That's in the Board's letter

1   to the government dated June 15, 2020, which is Hearing

2   Exhibit 20, and the government's letter in response dated June

3   18, 2020.

4           I'll just finish on Act 82 with respect to the

5   evidence related to Dr. Ellis.  The Board isn't arguing that

6   Dr. Ellis is right.  The Board isn't arguing that, in fact,

7   the Court should find that Act 82 increases costs, at least

8   with respect to Section 108(a)(2).  The Board's argument is

9   that it determined that it impairs or defeats the purposes of

10  PROMESA, because it may do those things.  And the government

11  is implementing a law without having fully engaged with the

12  Board on those issues.

13          And Dr. Ellis' declaration simply confirms the

14  legitimacy of the Board's concerns, and, therefore, satisfies

15  the standards that this Court set in Law 29, that the Board's

16  actions or determinations, under 108(a)(2), are not arbitrary

17  or capricious.  And they're clearly not based on the

18  substantial record evidence that the Board has submitted,

19  including in the Jaresko Declaration.

20          Unless the Court has questions concerning Act 82,

21  I'll move to Act 81 -- excuse me, 181.

22          THE COURT:  You may go on.

23          MR. MUNGOVAN:  Thank you, Your Honor.

24          Act 181 provides for a 1,500 dollars annual salary

25  increase to the members of the Bureau of the Fire Department.

1    The Oversight Board is entitled to summary judgment on its

2    counterclaims pursuant to Sections 204(a), 204(c) and

3    108(a)(2) of PROMESA, and on the government's affirmative

4    claims.

5         The Governor failed to provide a compliant, formal

6    estimate as required by Section 204(a)(2)(A).  The Governor's

7    certification concedes that the act will increase expenditures

8    in the annual amount of 2.8 million dollars.  The Board

9    doesn't dispute that cost or the accuracy of that cost, but

10   rather the government's conclusion that the act is not

11   significantly inconsistent with the fiscal plan, because it,

12   quote, is plausible that the new tax, that's in brackets, with

13   this new law, provides sufficient resources to completely fund

14   the salary increase.

15        There's no formal estimate of the impact that this

16   new tax is intended to fund, a salary increase.  In its letter

17   to the government dated May 11, 2020, which is Hearing Exhibit

18   27, the Board informed the government that, quote, the

19   government's estimates of Act 181's financial impact are

20   admittedly grounded in hypothetical facts, and the Governor's

21   analysis is couched in uncertainty.

22        The Board directed the government to, one, provide a

23   complete formal estimate showing when the acts would commence

24   to be collected; explain why the government believes the

25   annual tax collections are plausible to cover the cost of the

1   salary increase; and, three, the impacts on the fiscal plan if

2   the government's projections turn out to be too optimistic.

3   The government never responded with a formal estimate, and

4   indeed conceded in September that it was unable to provide a

5   formal estimate.

6         The Governor's certification that Act 181 is

7   significantly inconsistent with the fiscal plan is erroneous

8   for two reasons.  First, the act is not revenue neutral as

9   required by the fiscal plan.  The act provides for an

10  unconditional salary increase that is purportedly funded by a

11  contingent revenue stream.  In other words, the salary

12  increase goes into effect even if the tax collection is not

13  sufficient to cover the costs.

14        Second, the act changes the increase provided in the

15  fiscal plan from a contingent increase into an unconditional

16  increase.  The 2020 Fiscal Plan provides for an increase of

17  1,500 dollars for firefighters that is conditioned on the

18  collection of special revenues.  That's in the Jaresko

19  Declaration, paragraph 120, and it's in the 2020 Fiscal Plan

20  at 178. Instead of paying the increase as and when the special

21  revenue funds, i.e., the tax, are collected or the funds are

22  collected, in fact, Act 181 pays the salary increase in the

23  hope that the tax generates enough revenue to pay for the

24  increase.

25        The Oversight Board is entitled to summary judgment

1   on its counterclaims under Section 204(c), as Act 181

2   reprograms in violation of Section 204(c).  The government

3   certification expressly relies on reprogramming and states, if

4   the primary sources to cover for the salary increase are

5   insufficient, Act 181 requires the Office of Management and

6   Budget to allocate resources to sustain the increase for the

7   employees.  That's Hearing Exhibit 26.

8          And then it says, if an internal reprogramming of

9   budgeted resources is needed, the Department of Public Safety

10  will submit to the Oversight Board a formal request.  The

11  government admits that it will seek a reprogramming to fund a

12  shortfall in the Government's Response to the Statement of

13  Uncontested Material Facts.  That's in paragraphs 50 and 62 of

14  its Response to the Statement of Uncontested Material Facts.

15         The reprogramming is a concrete risk, because, as of

16  September, the government had not yet collected sufficient

17  taxes to cover the cost of an increase, but was nevertheless

18  proceeding with implementing an increase with retroactive

19  effect.  In its letter dated September 8, 2020, which is

20  Hearing Exhibit 62, the government indicated that, one, the

21  three percent tax was implemented on June 26, 2020; two, less

22  than half of the anticipated tax revenue had been collected;

23  and three, the Governor -- excuse me, the Office of the

24  Commissioner of Insurance is unable to estimate future Act 181

25  collections.

1           By implementing the salary increase with retroactive

2    effect, with a clear funding shortfall and no ability to

3    estimate future Act 181 collections, the government is

4    effectuating a reprogramming with respect to Act 181.

5           Finally, the Oversight Board is entitled to summary

6    judgment on its counterclaim under Section 108(a)(2).  The

7    Board determined that Act 181 impairs or defeats the purposes

8    of PROMESA and informed the government of that fact.  That's

9    in the Board's May 11 letter, which is Hearing Exhibit 27.

10          The Board's determination is based on substantial

11   record evidence that is not arbitrary or capricious.  The act

12   creates an unconditional raise, relies on an uncertain funding

13   mechanism that has so far fallen short, and the government

14   admits that it cannot estimate future revenues from the tax.

15   The Board's determinations on these points are established in

16   paragraphs 119 through 143 of Ms. Jaresko's declaration.

17          The government informed the Board that it was

18   proceeding with implementing Act 82, notwithstanding the

19   Board's directive not to do so.  That's set forth in the

20   Board's letter to the government dated June 15, which is

21   Hearing Exhibit 30, and the government's letter dated June 18,

22   2020, which is Hearing Exhibit 31.

23          Shifting, if I could, Your Honor, just briefly, at

24   the end, in my last few minutes to the government's Rule 56 --

25   or 56(d) argument.

1          THE COURT:  Yes.

2          MR. MUNGOVAN:  I believe I can be brief.

3          The government has failed to show that it cannot

4   present facts essential to justify its opposition.  Indeed,

5   the government responded substantively to each of the Board's

6   arguments.

7          None of the discovery that the government is seeking

8   is capable of influencing the outcome of the motion for

9   summary judgment.  The question is whether the government

10  complied with PROMESA.  For example, the question under 204(a)

11  is whether the government provided a plausible and accurate

12  formal estimate and a correct certification.  Under 204(c),

13  the question is whether Act 82 and Act 181 improperly rely on

14  reprogramming.  Under 108(a)(2), the question is not whether

15  the Board's determination is correct, but whether it is

16  arbitrary and capricious.

17         The Board provided substantial evidence for its

18  determinations with respect to each act on that point through

19  the declarations of --

20         (Sound played.)

21         MR. MUNGOVAN:  -- Ms. Jaresko and Dr. Ellis.  All of

22  the evidence that the Court needs to adjudicate these motions

23  is set forth in the documents presented and as part of the

24  summary judgment record.

25         As I stated earlier, the declarations of Dr. Ellis

1   and Ms. Jaresko are not proving that the law is significantly

2   inconsistent.  They validate the Board's concerns under each

3   of the provisions on which the Board has brought claims.  And

4   for that reason, the government's claim that it needs

5   discovery is unavailing.

6          I'll finish with the last point, which is that the

7   *PHC* case that the government cites to, and specifically with

8   respect to counsel's reliance on it in oral argument today --

9   I would simply direct the Court respectfully to the *PHC* case,

10  as I believe that it is a long way from the facts in this case

11  and the circumstances in this case.  But regardless,

12  ultimately, the core point under 56(d) is that the government

13  does not need discovery in order to prove an essential aspect

14  of its case.

15         Thank you, Your Honor.

16         THE COURT:  Thank you, Mr. Mungovan.

17         We will now return to the government's counsel for

18  rebuttal, beginning with Mr. Sushon for 25 minutes.

19         MR. SUSHON:  Yes.  Thank you, Your Honor.  Bill

20  Sushon from O'Melveny & Myers for AAFAF and the Governor.

21         Your Honor, one thing that we still haven't heard

22  from the Oversight Board is any effort to describe what

23  significant inconsistency actually means.  And another thing

24  that we haven't heard from the Oversight Board, Your Honor, is

25  what justification it has for adopting a fiscal neutrality

1  requirement in a fiscal plan that somehow trumps Section

2  204(a).

3      Now, Mr. Mungovan said that that's not actually what

4  the Board is trying to do, and it's not what the Board is

5  doing here with respect to these laws.  But the Board in its

6  Reply Brief on its Motion for Summary Judgment on Acts 47, 82,

7  and 181 said, and I quote, "every dollar is material."  That's

8  their reply at 13.  And again, "A law either is or is not

9  revenue neutral; it cannot be partially revenue neutral, and

10  thus, non-revenue neutrality constitutes a per se significant

11  inconsistency."

12      So while Mr. Mungovan may say that that's not what

13  the Board is trying to do, his reply brief says otherwise.

14  And that's not what Congress intended when it adopted PROMESA.

15      Now, I'd like to turn briefly, Your Honor, to Act

16  176, the vacation statute.  And one issue that arises with

17  that is the Board has focused on the notion that there will be

18  greater expenses incurred by virtue of Act 176.  Now, we

19  dispute that that's the case, Your Honor, but regardless,

20  Section 204(a) doesn't talk about expenses.  It talks about

21  expenditures.  And those are two different things.

22      Merriam-Webster's dictionary defines an expenditure

23  as a payment made in the course of achieving a result.  And as

24  I've already argued to the Court, Your Honor, Act 176 doesn't

25  result in any additional payment being made.  The payments

1    being made stay the same under Act 176.

2          An expense, on the other hand, is defined by

3    Merriam-Webster as a financial burden or outlay.  And while

4    there may be an argument to be had as to whether Act 176

5    creates an additional financial burden, there is no argument

6    that it requires actually making any more payments to

7    employees.

8          So the Act 176 argument, I think, if Mr. Bienenstock

9    is to be held to his word, that we should look at the words

10   that are in Section 204(a).  The Board's argument that Act 176

11   results in some sort of expenditures that aren't accounted for

12   just isn't correct.

13         Now, Mr. Bienenstock also criticized the government

14   for engaging in a check-the-box exercise with respect to

15   these -- with respect to these certifications.  But he hasn't

16   acknowledged, and no one on the Board's side has acknowledged,

17   Your Honor, the procedures that the government has put in

18   place to create these certifications.

19         This is not a check-the-box exercise.  These are

20   estimates that are calculated down to the penny, where it's

21   appropriate under a process that's been established through

22   executive orders from the government, and under a process

23   that's described at length in the declaration from Treasury

24   that we submitted to the Court.  And so this is not just a

25   check-the-box exercise.  This is the government trying its

1    best to provide an estimate of the expenditure and revenue

2    impacts of these new laws.

3            When Mr. Bienenstock was asked what would be required

4    to make this not a check-the-box exercise in his view, he

5    really couldn't describe what the Board was looking for.  And

6    that's part of the problem that we face here, Your Honor.  The

7    government is trying to do what it needs to do under the

8    statute, and it's trying to cooperate and it's trying to

9    comply.  But it's being met with constant shifting demands

10   from the Board as to what the Board thinks needs to be in one

11   of these certifications to pass muster.  And when the

12   government tries to push back and say that something isn't

13   actually required, for example, because Act 8-2017's vacation

14   planning requirements obviate the need to conduct a

15   productivity analysis, the Board just insists that it's

16   correct and the government is wrong, and that's the end of the

17   story.

18           And this is why the Board's challenges to these

19   certifications need to be backed up by evidence.  And while

20   we've heard Mr. Mungovan talk about the evidence, the

21   substantial record evidence that supports the Board's

22   determinations, again, all we're referred to are the face of

23   the law itself, the certification itself, and Ms. Jaresko's

24   conclusory declaration as to what the Board determined, rather

25   than what evidence the Board considered, what process the

1  Board followed, what experts the Board relied on, and so

2  forth.

3        So we need to have some sort of real guidance here as

4  to the way this process should work, and it seems that the

5  appropriate way to do that is to hold the Board to a

6  requirement that it have some evidence for its determinations

7  and some evidence for its questions for the government.  But

8  here we have none.  Excuse me, Your Honor.

9        As to Mr. Bienenstock's point that the government's

10  position on Section 108(a)(2) would write it out of the

11  statute, that's simply not the case, Your Honor.  We

12  understand what Section 108(a)(2) provides, and we understand

13  that it gives the Board substantial leverage with respect to

14  new laws.

15        And so the government is making its effort to comply,

16  but it cannot do so if it's under the threat of sanction for

17  failing to abide by an injunction that the Board makes without

18  any substantial evidence, which is really what is happening

19  here, Your Honor.  And if the Board is concerned --

20        THE COURT:  Do you --

21        MR. SUSHON:  I'm sorry.

22        THE COURT:  Let me ask you a question.

23        (At 12:59 PM, the connection in the U.S. District

24  Court in San Juan was interrupted.)

25        (At 1:02 PM, the connection was re-established.)

1      MS. NG:  Yes.  It seems everybody got disconnected.

2  Let me redo everything.

3      THE COURT:  Okay.  So should --

4      MS. NG:  Amy?

5      COURT REPORTER:  Yes, Lisa.  I'm here.

6      I'm sorry, Your Honor.  The call dropped.  Do you

7  want me to read back the last thing I heard?

8      THE COURT:  Okay.  Well, you don't have control over

9  that particular part of technology.  Let's just make sure that

10  we still have on everybody we're supposed to have on.

11      Mr. Sushon, are you still there?

12      MR. SUSHON:  Yes, I'm still here, Your Honor.

13      THE COURT:  All right.  And, Lisa, is the AT&T line

14  still connected?

15      MS. NG:  Eric, if you can hear me, just text me.

16      Yes, he can hear.

17      THE COURT:  Okay.  Great.  So, Ms. Walker, would you

18  explain what you got before you dropped off?

19      COURT REPORTER:  Yes, Your Honor.

20      (Whereupon the reporter read back into the record

21  from page 91, line 14, to page 91, line 18.)

22      THE COURT:  All right.  Mr. Sushon, I believe I had

23  asked you as a follow-up to that whether the government

24  understands that it may be operating at its own risk, because

25  if it doesn't comply, the Board can seek relief, appropriate

1   relief from the Court.

2           MR. SUSHON:  Yes, Your Honor.  I recall the question.

3   And in some respects, I feel like John Belushi's character in

4   *Animal House*.  I was rolling.  So I can't remember exactly

5   what I said, but --

6           THE COURT:  This is --

7           MR. SUSHON:  But what I do recall in particular, Your

8   Honor, was saying that of course the Board has the power to go

9   to the Court for injunction under Section 108(a)(2).  And

10  Section 204(a)(5) also provides -- not 204(a)(5), but 204(a)

11  provides the Board with the power to seek other remedies to

12  ensure that a statute that's significantly inconsistent with

13  the fiscal plan doesn't have an adverse effect.

14          And so the Commonwealth, the government recognizes

15  that risk, Your Honor, but what it can't have is the Board

16  going forward and putting the government on its heels, and

17  stopping the government from pursuing statutes without some

18  evidentiary basis, Your Honor.  And so that's one issue.

19          And then I was about to turn, I now recall, Your

20  Honor, to Mr. Bienenstock's argument that 108(a)(2) will be

21  rendered a dead letter, because the government can just go

22  ahead and implement statutes until the Board can get to the

23  Court and get the Court's intervention, and that can take a

24  long time.

25          Well, aside from the threat that Your Honor has

 1  already identified, which is that there may, in fact, be other

 2  remedies that the Board could seek, there's also the fact that

 3  courts are used to moving quickly.  And while I wouldn't

 4  suggest that the parties should be before Your Honor on every

 5  single statute and every single little dispute, the fact of

 6  the matter is the Board can go and get a temporary restraining

 7  order.  It can get an injunction.  It can get other

 8  provisional remedies that are necessary to preserve the status

 9  quo if, in fact, it feels that the government's proceeding

10  with implementing a new statute is such a serious threat.  So

11  108(a)(2) is hardly a dead letter, Your Honor.

12          Turning to Act 138, Mr. Bienenstock described the

13  concern about the federal funding for Puerto Rico's health

14  care as being a classic business person's concern, Your Honor.

15  And, of course, Mr. Mungovan said that the Board's concern

16  wasn't with any kind of -- excuse me -- legal issues or

17  preemption.  But Mr. Bienenstock, during the course of his

18  argument, if -- I believe I heard him right, described the

19  Board's concern that the entire Medicaid Statute preempts

20  Puerto Rico's law.

21          Now, that's different from what the Board has been

22  saying in its papers.  It's the first time we've heard any

23  real explanation as to what the Board thought that it was

24  getting at with this issue.  I don't think that it's correct

25  as a legal matter, Your Honor, but if it were, if, in fact,

1    Act 138 were preempted by the Medicaid Statute, then the

2    solution is easy, Your Honor, because Act 138 would be

3    rendered a nullity.  And there would be no problem with it

4    being significantly inconsistent with the fiscal plan.

5            So that is really --

6            THE COURT:  Wouldn't there still be a practical

7    problem if, in fact, Act 138 were implemented and you went

8    forward under it before such a determination is made; and,

9    indeed, you have higher cost people coming in who may raise a

10   benchmark; and controlling that may well not be the easiest

11   thing in the world, so that extra money will have been spent

12   before somebody, maybe me, determines that Act 138 is

13   preempted, and that money shouldn't have been spent at all?

14           MR. SUSHON:  Well, Your Honor, first of all, the

15   effects that are being described here on the government's

16   coffers, if they even existed, are so indirect that the amount

17   of time that it would take for them to come home to roost

18   would be much more time than it would take for the Court to

19   determine this issue, especially if it were to do so on an

20   expedited basis.  But more fundamentally, Your Honor, there's

21   still no evidence before the Court that Act 138 would have

22   that effect.  All we have are conclusory statements from the

23   Board's hired expert after the fact.

24           They don't say that he actually advised the Board on

25   this stuff when they were thinking about it.  But even if you

1    assume that he were, all you have are his conclusory

2    statements that this is going to increase health care costs,

3    and that those costs are going to be visited on the

4    Commonwealth.  There's no real analysis here, and his

5    statements are all hypothetical and conjectural.  It's

6    something may happen, or that it could happen, or that it's

7    very likely that something may happen, but that's not evidence

8    that these things will happen.

9         And we've even heard the Board say that they don't

10   need to show that what Mr. Ellis is saying is actually true.

11   They just believe that what Mr. Ellis is saying, it -- even

12   after the fact, as part of this lawyer orchestrated theater

13   that the Board has put together, is somehow enough to justify

14   the Board's decisions.  So the concern is really not supported

15   by any evidence, Your Honor.

16        Now -- I apologize, Your Honor.  So I'd like to turn

17   briefly to Act 47, which I didn't have the opportunity to

18   address in my opening remarks, and I apologize.  Time flies

19   when you're having fun.  So I've used more than my allotted

20   time.

21        Candidly, the government recognizes that Act 47's

22   expected expenditure of 25 million dollars per year, even in

23   the context of a multibillion dollar fiscal plan, is a large

24   sum of money.  Now, as we did show in our brief, Your Honor,

25   the overall fiscal effect still amounts to only .5 percent,

1    and it doesn't truly significantly deviate from the fiscal

2    plan.

3              But I will also say, Your Honor, that the Governor

4    only signed Act 47 and certified that it was not significantly

5    inconsistent with the fiscal plan after receiving assurances

6    from the Oversight Board's municipal affairs and legislative

7    review director that the Board had no issue with Act 47.  And

8    the Board doesn't dispute this.

9              Now, the Board argues in a footnote in its brief that

10   the government can't rely on statements from Oversight Board

11   officials.  And whether that's correct or not as a technical

12   matter with PROMESA, the fact that the Board is willing to

13   disavow its agents' statements undermines the Board's working

14   relationship with the government and the trust that is

15   essential to PROMESA's power sharing arrangement.

16             Now, with respect to the other concerns the Board has

17   raised with the Act 47 certification, they're without merit.

18   First, the Board insists that the government has to compute

19   the worst case when preparing a Section 204(a) certification,

20   and that should be the benchmark that's used to determine

21   whether a statute is significantly inconsistent with the

22   fiscal plan.  But that's not what PROMESA says.

23             PROMESA says that the government must prepare a

24   formal estimate.  And the Court has held that that estimate

25   has to be in good faith.  And we understand that, Your Honor,

1    and our understanding is that a good faith estimate should be

2    the best estimate, the one that the government believes is the

3    most likely result of the law, not the worst thing that could

4    happen in a doomsday scenario.

5          If that were what Congress wanted the government to

6    do, it could have done so very easily in Section 204(a).  It

7    could have said the government must prepare a worst case

8    scenario analysis of the new statute.  Congress didn't say

9    that.

10         Now, the Board also contends that there was a paucity

11   of economic analysis supporting the estimate for Act 47, but

12   as we've shown in our papers, Your Honor, the certification

13   laid out all the factors that could affect the estimate.  And

14   after that, the government engaged in a back and forth with

15   the Oversight Board as to the factors that affect the

16   estimate.  Let's find the estimate -- and the government gave

17   the Board additional information so that the parties could

18   have a discussion about the estimate.

19         Now, you know, and that was met with the Board saying

20   that the government ignored the Board's request and didn't

21   respond to the request, and that's just not true.  The

22   government did its best to work with the Board on this issue.

23   And it's certainly not the case, as the Board has argued, that

24   submitting a new range of estimates at the Board's request

25   somehow concedes that the original estimate was wrong or

1  without basis or inexact.

2       When the government gave the Board the full range of

3  estimates, first of all, it wasn't in a certification, but

4  setting that aside, that range was from 500,000 dollars to 40

5  million dollars.  The 25 million dollars a year estimate that

6  the government provided in the first place falls within the

7  midpoint of that range.  Frankly, above the midpoint of that

8  range.  And so that range only confirms that that 25 million

9  dollars per year estimate was on target.

10       In sum, Your Honor, Act 47 provides a textbook

11  example of the government's efforts to work with the Board in

12  good faith on new legislation to help the people of Puerto

13  Rico.  And the Board has rewarded the government's efforts by

14  reneging on a Board agent's word, accusing a government of

15  being reckless by submitting a well-supported estimate of the

16  financial effects, and misrepresenting the government's

17  efforts to work with the Board.

18       I'd also now like to turn, with Your Honor's

19  permission, to Act 82.

20       THE COURT:  Yes.

21       MR. SUSHON:  And the Board's argument that Act 82 is

22  an improper reprogramming.  The Board is now arguing, Your

23  Honor, that the government cannot, without a reprogramming

24  request, use budgeted resources for the very purpose for which

25  they're budgeted to cover modest additional spending

1   contemplated by a new law.

2          As we showed in our briefs, Your Honor, the Health

3   Department has a budget for fiscal year 2021 totaling more

4   than 74 million dollars.  Of that, 61 million dollars is for

5   salaries, six million is for materials and supplies, and

6   nearly six million is for other professional services.  By

7   reducing each of these sets of expenditures by a small amount,

8   the government can easily pay the salaries for new employees

9   required to implement Act 82; it can purchase supplies for the

10  new office; and it can employ any professionals whose services

11  may be needed to get that office up and running.

12         The shifting of expenditures within a budget line

13  item is not a reprogramming.  That's because money earmarked

14  for salaries is still going to pay salaries.  Dollars for

15  supplies are still going to purchase supplies.  And the

16  professional services budget is going to be used to pay for

17  professional services.

18         The Board doesn't dispute that meaningfully.

19  Instead, it just says that the government has the burden of

20  demonstrating in -- Act 82 will not require a reprogramming.

21  But that's not the way PROMESA works.  It doesn't put the

22  burden on the government to prove that something is not a

23  reprogramming.  And because the Board is the one seeking

24  summary judgment on this issue, they bear the evidentiary

25  burden.

 1             I'd now like to turn briefly to Act 181, Your Honor.
 2   The --
 3             THE COURT:  Oh, I'm sorry.  Just one moment.
 4             Ms. Ng, are you still on?  Ms. Ng?
 5             (No response.)
 6             THE COURT:  I just got an e-mail from her that says,
 7   Amy says P.R. is disconnected.
 8             Ms. Walker, are you on from Puerto Rico?  Can you
 9   hear us?
10             COURT REPORTER:  I'm sorry, Your Honor.  I believe
11   that e-mail was from earlier when we were disconnected.
12             MS. NG:  Yes, Judge.  It just came in.
13             THE COURT:  Okay.  It just came in now.  So, fine.
14             So, Mr. Sushon, we will set you for six minutes to go
15   because of these interruptions.  So that's a little more than
16   you had on the clock.  All right.  So we'll restart you at six
17   minutes to go.
18             MR. SUSHON:  Thank you very much, Your Honor.  I
19   appreciate that.
20             I'd now like to turn to Act 81 briefly, Your Honor.
21   The Board contends that Act 81's estimate is deficient,
22   because it fails to account for the fiscal effects if the new
23   tax won't cover the cost.  That's their main concern.  But
24   that's a red herring, Your Honor.
25             That's because the Act 81 estimate tells the Board

1   that if the new tax were, in fact, to achieve no revenue, then

2   the worst case scenario that the Board wants to hear so much

3   is that the pay increase will be $2,809,386.84.  That

4   represents only approximately .012 percent of the

5   Commonwealth's total expenditures.  And the actual amount at

6   issue here is less, Your Honor.

7         Now, it's true that there's been a shortfall in the

8   new tax revenues, but the remaining amount to be paid by the

9   government for the firefighters amounts only to 1,700,000

10  dollars, or a tiny bit more.  And that's only .008 percent of

11  the fiscal plan's anticipated expenditures.  Under any

12  measure, this can't be significantly consistent with the

13  fiscal plan.

14        Now, this tiny amount also puts to light the Board's

15  argument that Act 81 requires a reprogramming.  The Fire

16  Department's payroll budget exceeds 56 million dollars, and

17  there's no reason that the government should not be able to

18  find a way to cover the 1.7 million out of that budgeted

19  amount.

20        Nevertheless, because the Act 181 certification

21  acknowledges that, if the government can't do that, it would

22  seek a reprogramming, the Board has jumped on that and said

23  that this statute is undeniably a reprogramming, but that's

24  not the case.  If, in fact, for some reason the government

25  needs to reprogram money to cover the firefighters' increase,

1   it will go to the Board and request that funding.  And if that

2   funding isn't forthcoming, Your Honor, the government is not

3   going to pay the increase.  It will have to roll it back.

4        But unless the government has the flexibility to try

5   to cover new costs within budgeted resources or else ask the

6   Board for a reprogramming if one becomes necessary, the

7   government is essentially going to be unable to function.  We

8   have all sorts of things that come up during the course of a

9   fiscal year, Your Honor.  And we've seen many of them in

10  Puerto Rico during the time that we've been working together

11  on these cases.

12       We've seen Category 5 hurricanes, earthquakes, and

13  the coronavirus pandemic, to name just three.  And if the

14  government doesn't have flexibility to try to deal with those

15  things, as long as it's not significantly inconsistent with

16  the fiscal plan, then it will be completely ineffective.  This

17  is why Congress gave us a flexible framework in PROMESA.  It

18  allows the government breathing room to do what's necessary,

19  but adds the protections in Section 204(c)'s reprogramming

20  prohibition, and the Board's power under 203 to reduce

21  non-debt expenditures to ensure that fiscal responsibility

22  remains paramount.

23       The Board --

24       THE COURT:  Mr. Sushon.

25       MR. SUSHON:  Yes, Your Honor.

1          THE COURT:  I'm sorry.  May I stop you here?  We're

2    not talking about hurricanes here.  The Board says that the

3    fiscal plan included a specific funded raise for the

4    firefighters.  The government apparently decided there should

5    be a bigger raise for the firefighters and there should be a

6    new revenue source that also isn't contemplated by the fiscal

7    plan, to the extent that fiscal plans and revenue neutrality

8    and compliance with the fiscal plan and the policy choices in

9    the fiscal plans are tools that the Board deems necessary to

10   restore fiscal responsibility, et cetera.

11         Why is it that the notion that a statute that changes

12   the compensation arrangement for firefighters from what's

13   provided in the fiscal plan is significantly inconsistent with

14   the fiscal plan?

15         MR. SUSHON:  Well, Your Honor, we go back to the very

16   small amount of money that's at issue here, which again is at

17   most .012 percent of the government's overall fiscal plan.  By

18   any measure, that can't be significantly inconsistent with the

19   fiscal plan.

20         Now, the government has to have some flexibility to

21   make policy choices, and if it's one that only affects the

22   fiscal plan in the amount of .012 percent, and the government

23   can find a way to pay for it within budgeted line items that

24   are earmarked for the same purpose, the firefighters' pay,

25   then the government should have that flexibility.  And PROMESA

1  provides that flexibility, Your Honor.

2         Now, merely acknowledging the possibility that that

3  won't happen, and telling the Oversight Board, in that case,

4  we're going to comply with PROMESA and come to you for a

5  reprogramming, and saying that if the reprogramming doesn't

6  happen, the government is going to stop paying the increase is

7  exactly the kind of thing that PROMESA contemplates, Your

8  Honor.

9         We're not flouting PROMESA.  We're complying with

10 PROMESA in every way, and trying to reassure the Board that

11 that's what we're going to do.  But the Board sees us on that

12 as some kind of a vice, and this is just not helpful for the

13 power sharing arrangement.  It creates a negative dynamic,

14 and, you know, it creates frustration on both sides, if that's

15 the way that the Board is going to treat these things.

16        The bottom line is that this is a law that is not

17 significantly inconsistent with the fiscal plan, and as of

18 right now, does not require reprogramming.  And the Board has

19 consistently over the years now told the government it's okay

20 to pass new laws that cost more so long as you offset them

21 with some kind of new revenue or some kind of other cost cut.

22        (Sound played.)

23        MR. SUSHON:  And the government has tried to do that

24 here, Your Honor, by saying it was going to pass a new tax.

25 And the Board has told the government that, well, you can't do

1   that either, because even passing a new tax to cover a new

2   expense is a reprogramming.

3           So with that, Your Honor, again, the Board here is

4   trying to eradicate Section 204(a)'s significantly

5   inconsistent standard, and it still hasn't explained how it

6   has the power to do that when it's trying to basically amend

7   the statute that was passed by Congress.  After arguing

8   consistently for years that the government can enact laws

9   requiring new expenditures as long as they're offset by new

10  revenue streams, the Board is now arguing that new taxes are

11  impermissible reprogramming.

12          And even where the government is trying to use

13  budgeted resources for their budgeted purposes in support of a

14  new law, the Board is crying foul.  And the Board is

15  disclaiming any obligation under PROMESA or the Federal Rules

16  to support its conclusions with evidence of any kind.  This is

17  why we need the Court to intervene here and tell the parties

18  what rules govern.

19          We need the Court to make clear that the Oversight

20  Board, just like the government, must discharge its Section

21  204(a) duties in good faith, including by supporting its

22  claims with evidence.  The Court needs to make clear that the

23  Board cannot rewrite PROMESA to eliminate the significant

24  inconsistency standard and explain that de minimis deviations

25  from the fiscal plan, such as those presented by these five

1   laws, are not significant.

2   And the Court needs to make clear that the government

3   has the power to use budgeted monies for their budgeted

4   purposes even if the expenditures are in support of newly

5   enacted laws.

6   THE COURT:  Thank you.

7   MR. SUSHON:  Unless the Court has any questions, Your

8   Honor, I'll defer to Ms. Covucci.

9   THE COURT:  Thank you very much, Mr. Sushon.

10   Ms. Covucci.

11   MR. SUSHON:  Thank you very much, Your Honor.

12   MS. COVUCCI:  Thank you, Your Honor.  Thank you, Your

13   Honor.

14   THE COURT:  Thank you.

15   MS. COVUCCI:  Angela Covucci from O'Melveny & Myers

16   for AAFAF and the Governor.

17   I'll start with the *PHC* case, which counsel attempted

18   to distinguish by saying that there are some factual

19   differences, but the Board doesn't dispute that *PHC* recognizes

20   that parties can file a 56(d) request in the alternative to a

21   substantive response, just as the government did.  And *PHC*

22   also lays out a very functional framework of the five factors,

23   which the Board also doesn't dispute.

24   I'll also note that in *PHC*, there actually had been

25   slightly more discovery accomplished in the case than here,

1    but the First Circuit still granted the 56(d) request.  But

2    similarly, in that case, there had been no discovery -- no

3    depositions taken and only very minimal document discovery,

4    which is still more than we've gotten the chance to do here.

5        The Board's argument on 56(d) essentially boils down

6    to saying that no discovery the government could obtain could

7    possibly affect the outcome of the cross-motion, because the

8    Oversight Board just carries no burden to justify its decision

9    beyond what it has given in the conclusory declaration and by

10   looking at the face of the law.

11       Mr. Sushon has already explained why that isn't the

12   case, so I won't belabor it.  But to the extent this Court

13   finds that the Oversight Board has any burden at all, whether

14   that burden is characterized as good faith, the duty not to be

15   arbitrary and capricious, or to support its decision with

16   substantial evidence, the government is entitled to full

17   discovery into that evidence, and it is very likely that that

18   evidence will affect the outcome of the cross-motion.  It's

19   also extremely likely that that evidence exists, even though

20   the Oversight Board does not seem to want to provide it.

21       The 56(d) standard requires that the non-movant

22   articulate facts that it expects to uncover in discovery that

23   will affect the outcome of the motion, and one fact that we

24   think has become quite clear through the briefing and at oral

25   argument is that the Oversight Board did not actually rely on

1   Dr. Ellis' opinion at the time it made its decision.  And that

2   is the operative time for any determination under either the

3   arbitrary and capricious standard, or the substantial evidence

4   standard.

5          (Sound played.)

6          MS. COVUCCI:  In both the Jaresko Declaration and

7   here at our oral argument, the Board has said that the Ellis

8   Declaration -- or, I'm sorry, that the Oversight Board's

9   determination was consistent with and substantiated by the

10  Ellis Declaration, not that the Board actually relied on it.

11  And that is not enough to come up with a post hoc explanation

12  for a decision that's already been made.  The government is

13  entitled to discovery about what actually happened and what

14  evidence was before the Board, if the Board is going to carry

15  its summary judgment burden.

16         The Board also can't actually point to the testimony

17  that it claims it relies on for Act 82.  That's another fact

18  that we expect can come out in discovery that will be relevant

19  to whether the Board is considering evidence and what that

20  evidence was.

21         Similarly, the Board also has not addressed the

22  government's point that, for Act 47, a representative of the

23  Board told the government, a litigation assistant, that the

24  Board had no problem with the bill that ultimately became Act

25  47 being enacted into law.  Something changed along the way.

1  The Oversight Board argues that it has made internal analyses

2  of the laws, and it claims in its reply, pages 32 to 33, that

3  if it produced those internal analyses, they would support the

4  Oversight Board's determinations.  But it hasn't done that,

5  and it's trying to prevent the government from obtaining

6  discovery into those exact issues.

7          So, as Mr. Sushon has already explained, the Court

8  should deny the cross-motions as a matter of law if it finds

9  that the Oversight Board is to carry any burden under PROMESA.

10  But if the Court is inclined to place any weight at all on the

11  conclusory declaration --

12          (Sound played.)

13          MS. COVUCCI:  May I sum up, Your Honor?

14          THE COURT:  Yes, please.

15          MS. COVUCCI:  Thank you.

16          If the Court is inclined to place -- to place even

17  the slightest weight on the conclusory declarations that the

18  Oversight Board has put forth, the government is entitled to

19  full discovery and to the evidence or not on which those

20  declarations were based.

21          Thank you, Your Honor.

22          THE COURT:  Thank you.

23          And so now we go into the homestretch of the

24  Oversight Board's rebuttal arguments, beginning with

25  Mr. Bienenstock for 12 minutes.

1           MR. BIENENSTOCK:  Thank you, Your Honor.  Martin

2    Bienenstock from Proskauer Rose, LLP, for the Oversight Board.

3    May it please the Court.

4           Mr. Sushon's first point about not defining

5    significantly inconsistent has several responses.  One is that

6    it's probably not a one size fits all.  It depends what kind

7    of law is at issue, and what part of the fiscal plan or budget

8    it's inconsistent with.

9           But, in any event, Mr. Sushon admitted during his

10   rebuttal that he -- the government has recognized from the

11   outset that the Board has imposed a revenue neutrality

12   principle about all new legislation, so that basically moots

13   the concept of is something significantly inconsistent.

14          You have to find a way to make new laws, not --

15   taking into account the fiscal plan, the budget, the debt

16   sustainability, et cetera, revenue neutral, for all the

17   reasons I mentioned in my earlier argument.  It just upsets

18   everything else that's going on.  And we have to look at this

19   as an integral, overall process where everything does affect

20   everything else, so you can't just pull one thing out of

21   kilter.

22          Now, when it comes to 204 --

23          THE COURT:  So is it your position --

24   Mr. Bienenstock, so is it your position that something that is

25   not absolutely revenue neutral to whatever degree is by

1   definition significantly inconsistent and, therefore, in

2   violation of 204?

3           MR. BIENENSTOCK:  No.  I'm not going to that extreme,

4   and that's why I said one size does not fit all.  You would

5   have to look at the facts and circumstance and what is the

6   magnitude of the expense.  If you're dealing with, for

7   instance, a four billion dollar health budget, a lot less than

8   five percent could be significantly inconsistent.  It could be

9   hundreds of millions -- or tens of millions of dollars.

10          If you're looking at insignificant things, you might

11  come up with a totally different answer.  So again, as a

12  matter of fact --

13          THE COURT:  Mr. Bienenstock, if you could just --

14          MR. BIENENSTOCK:  Yes.

15          THE COURT:  Mr. Bienenstock, I'm sorry.  You cut in

16  and out for me.  I missed some words.

17          Ms. Walker, were you able to hear what Mr.

18  Bienenstock was saying?

19          COURT REPORTER:  Yes, Your Honor.  The last thing I

20  heard from Mr. Bienenstock was --

21           (Whereupon the court reporter read into the record

22  from page 112, line 9, to page 112, line 11.)

23          THE COURT:  Okay.  Did it mechanically cut of or did

24  it cut off because I interrupted him?

25          COURT REPORTER:  For me, Your Honor, it cut off

1 because you interrupted him.

2      THE COURT:  Okay.  I apologize to both of you.  For

3 some reason, in my connection I was dropping some words from

4 Mr. Bienenstock.

5      So we'll set the clock back a minute.  And,

6 Mr. Bienenstock, would you just take yourself back 30 seconds

7 or so and tell me the last two points that you were making,

8 because I missed some of the words.  Sorry.

9      MR. BIENENSTOCK:  Sure.  I was saying that one of the

10 reasons why I said earlier that one size does not fit all for

11 this is you have to look at the facts and circumstances.  A

12 tiny budget item is one thing.  If you're dealing with health

13 care, you can't say because it's a four billion dollar annual

14 expense, you're entitled to vary from it by five percent,

15 because that's a huge amount of money.

16      So it depends on the circumstance.  And that's why

17 one size does not fit all.  And Mr. Sushon admitted that he

18 knows we've had a revenue neutrality policy, but again, it's

19 applied with the rule of reason.

20      Mr. Sushon's next point was he parsed the difference

21 between a dictionary definition of expenditure and expense for

22 purposes of 204(a)(2).  It's ironic that the government

23 totally reads out of that statute the expertise involved, the

24 impact, as opposed to the facial, superficial instruction of

25 the statute, but when it comes to the word "expenditures,"

1   they're trying to make a distinction between expenditures and

2   expense.

3          The bottom line is there is no distinction. If we're

4   trying to get savings -- well, first, he defined expenditures,

5   and his definition was, payment for a result. Well, okay.

6   The payroll is for the result of the quantity of services

7   we've been receiving, and the Law 138 -- 176 now changes that

8   to reduce the services we're receiving by five percent. And

9   so even using his definitions, it doesn't save the fact that

10  176 just increases expense or expenditures without any

11  authorization, and gets in the way of the right-sizing that's

12  part of the fiscal plan.

13         Mr. Sushon resisted mightily the notion that there

14  could be any consequence for the government proceeding with a

15  law that the Board has determined impairs or defeats PROMESA

16  purposes before the -- there's an evidentiary hearing at the

17  Court's request. That creates two mammoth problems. The

18  first is it's totally contrary to the words of 108(a)(2). And

19  the second is it puts a very unfair burden on the Court and

20  the Board to run to court. They should just obey the law as

21  it's written.

22         Now, when it gets to evidence, the government totally

23  overlooks 108(a)(1), which provides that the Governor and

24  legislature may not supervise or review the activities,

25  conduct of the Board and its members. Now, I would say that

1    of course in court, the matter is the Court reviewing, but at

2    the instance of the government.  But at a minimum, 108(a)(1)

3    shows how much deference Congress intended to give to the

4    Oversight Board in saying the government and legislature

5    cannot review it, and 108(a)(2) is based on determinations

6    made by the Board.

7         And when it gets to 108(a)(2), Your Honor, that is a

8    legal determination of purposes of PROMESA.  So the Board only

9    wants to do the right thing, and is rational, and it always

10   has reasons for things it's doing.  But it's not as if the

11   government gets to second guess what the Board decides as a

12   legal matter is a purpose of PROMESA.

13        On the issue of federal funds, Your Honor, I wanted

14   to correct something I said earlier that -- I said earlier

15   mistakenly that Medicaid preempts all P.R. law.  I was

16   referring in my mind to the Ellis Declaration at paragraph 31,

17   and it doesn't refer to Medicaid.  It says, quote, Medicare

18   Advantage plans are exempt from Act 138 due to the federal

19   preemption of most state level regulations governing health

20   plans.  So I'm sorry that I misspoke Medicaid for Medicare

21   Advantage, but that's what I was referring to earlier.

22        The bottom line is that neither for Act 138 or 176

23   did the government's certificate get close to being a formal

24   estimate.  It shows no financial expertise, no impact.  In one

25   case, it's barely a line long.  Both cases show they were not

1   prepared by financial -- with financial acumen.  They were

2   prepared by legal beagling.  And so the notion that anything

3   gets past that is that -- they haven't shown a way where they

4   can get past that hurdle.

5        There was just one other point I wanted to make, Your

6   Honor.  I just have to review my notes for a second.  I guess

7   the last point is that when it comes to whether the government

8   is entitled to continue implementing both Acts 138 and 176,

9   the fact is that every day they continue doing it, they create

10  more harm.  And the process, the actual analysis of a real

11  formal estimate has not been allowed to proceed.

12       And the point I was searching for was this.

13  Mr. Sushon referred to all of these models that somehow

14  underlie the certificates the government has been giving the

15  Board under 204(a)(2).  Your Honor, one only has to look at

16  the certificates for Acts 138 and 176 to know that they are

17  not the product of any model, any spreadsheet, any financial

18  analysis whatsoever.  They are the product of someone --

19       (Sound played.)

20       MR. BIENENSTOCK:  -- deciding that the statute didn't

21  say write a check, and, therefore, they can't have any impact.

22  And I think that really ends the matter for those two issues.

23       And unless the Court has any questions, I'm finished,

24  Your Honor.

25       THE COURT:  Thank you, Mr. Bienenstock.  I don't have

1    any further questions for you.

2         And so we will turn to Mr. Mungovan.

3         MR. MUNGOVAN:  Good afternoon, Your Honor.  Timothy

4    Mungovan again for the Oversight Board, and I will address

5    again Acts 47, 82, and 181.

6         Let me start with the revenue neutrality issue first.

7    The Board does not -- excuse me.  The Court does not need to

8    find that the laws violate a revenue neutrality provision in

9    the fiscal plan in order to determine that the government's

10   certification that the laws are not significantly inconsistent

11   with the fiscal plan is erroneous.  So we don't need fiscal

12   neutrality on any of these three laws.

13        Let me explain.  So even Mr. Sushon says that 25

14   million dollars with respect to Act 47 is a lot of money.  And

15   the Board contends that if you accept the 25 million, and it

16   could be as much as 40 million according to the government's

17   own certification or estimate, that is a number that on any

18   measure is significantly inconsistent with the fiscal plan,

19   particularly if you stack that up over a five-year period.

20        We're talking about something that could exceed 100

21   million dollars.  And I would be willing to venture that many

22   of the stakeholders, with respect to Puerto Rico and the

23   finances of Puerto Rico, would agree that a hundred million

24   dollars plus over a five-year period is significantly

25   inconsistent with the fiscal plan for the Commonwealth.

1        With respect to Act 82, Act 82 is defective, and it

2   reads -- specifically, the estimate is defective, because the

3   estimate covers only one year, as I indicated in my opening

4   remarks.  And Act 82, on its face, because it only covers one

5   year, it fails to satisfy the requirement that this Court

6   found as part of Law 29, that an estimate must take into

7   consideration the impact for the entirety of the fiscal plan

8   period, which this certificate and estimate does not do.

9   There's also evidence, albeit it arguable, that the act will

10  increase costs for the Commonwealth, and, specifically, in the

11  amount of 25 million dollars, which I will return to once I

12  finish this point about revenue neutrality.

13       And then, thirdly, with respect to Act 181, Act 181

14  is directly inconsistent with the 2019 Fiscal Plan, and let me

15  be more specific on that.  The Governor's certification at Act

16  181 is not significantly inconsistent with the fiscal plan.

17  It is erroneous, because the 1,500 dollars annual increase is

18  not included in the 2019 Fiscal Plan.

19       It is undisputed that the 2019 Fiscal Plan provided

20  funding to increase firefighters' salaries by 500 dollars

21  annually, and that's Hearing Exhibit 55, at page 99, and the

22  Government's Response to the Statement of Uncontested Facts,

23  at paragraph 43.  So there's no need for revenue neutrality

24  analysis around Act 181.

25       Specifically, with respect to revenue neutrality for

1   both Acts 181 --

2         THE COURT:  Before you go on to revenue --

3         MR. MUNGOVAN:  Yes, Your Honor.

4         THE COURT:  I'm sorry, Mr. Mungovan.  Before you go

5   on to revenue neutrality, I think the argument I last heard

6   about 181 is that the -- yes, the fiscal plan has a specific

7   compensation increase for firefighters, but the government

8   needs to have -- needs to have flexibility to make a different

9   policy decision about how much to compensate firefighters,

10  especially if, at the end of the day, it doesn't cost that

11  much.  Therefore, it's not a significant inconsistency.

12        What does the Board say to that?

13        MR. MUNGOVAN:  Well, what I would say, Your Honor, is

14  with respect to what is the significant inconsistency and what

15  is not, as Mr. Bienenstock said, it's not one size fits all,

16  but I will point out that there are core points, core points

17  in the fiscal plan, and among them is growth.  And one of the

18  concerns that is implicit throughout the fiscal plan is a

19  question around spending on head count and spending on

20  salaries, as opposed to capital expenditures.

21        And so expenditures that promote growth are the types

22  of things that the Board could hypothetically say are not

23  significantly inconsistent with the fiscal plan, even though

24  they're not expressly provided for in the fiscal plan, and

25  even though there may not be a funding mechanism that is

1    provided for them.  It's the capital expenditures that promote

2    growth for infrastructure and the like.

3         Here, this type of salary increase, where the Board

4    has already provided for a salary increase, is just the type

5    of thing that does not necessarily promote growth.  And while

6    the Board recognizes, I would say implicitly, the

7    extraordinary sacrifices of the firefighters and, frankly, all

8    first responders, as is set forth throughout the fiscal plan,

9    at the same time, this type of expenditure is not necessarily

10   contributing to the growth of the economy of the Commonwealth.

11   And, therefore, it could be reasonably deemed to be

12   significantly inconsistent with the fiscal plan, especially

13   because the fiscal plan does not provide for a 1,500 dollars

14   annual increase.  It provides for a 500 dollars annual

15   increase.

16        THE COURT:  Thank you.

17        MR. MUNGOVAN:  But I will say, Your Honor, with

18   respect to Act 181 and Act 47, those are tax driven acts in

19   that the funding mechanism for Act 181 is a tax.  And Act 47

20   is a tax incentive act in order to, as Mr. Sushon stated,

21   retain medical professionals on the island of Puerto Rico.  I

22   would say that those two particular acts are directly

23   inconsistent with a specific provision in the fiscal plan.

24        And I mentioned it earlier, but I will read it now.

25   This is on page 124 of the 2019 Fiscal Plan at subsection

1    14.3.3.  And it states, Puerto Rico needs to drive towards

2    more formality and increased compliance within the tax base,

3    but it cannot lose revenues in the process.  Therefore, any

4    tax reform or tax law initiatives that the government

5    undertakes or pursues during a year, within the 2019 Fiscal

6    Plan period, must be revenue neutral.  That is, all tax

7    reductions must be accompanied by specific offset and revenue

8    measures of a sufficient amount identified in the enabling

9    legislation.

10         So this isn't just a generic revenue neutrality here

11   with respect to Act 181 or Act 47 that is being invoked and

12   that these two acts are inconsistent with.  It is a very

13   specific provision which we cited in our brief and referenced

14   in our brief that these acts are inconsistent with.  And that

15   ties directly to the tax aspect of these acts and the effect

16   that they will have.

17         I just want to mention a couple of additional points,

18   Your Honor, if I may.

19         THE COURT:  Yes.

20         MR. MUNGOVAN:  With respect to Act 47, we heard quite

21   strong language from counsel to the government with respect to

22   what was characterized as the Board's agent reneging on a

23   discussion around whether the Board has or does not have a

24   problem or did not have a problem with Act 47 in its

25   preenactment phases.  And putting aside the evidentiary

1    issues, and putting aside the emotion of it, I would simply

2    point out that this type of circumstance is expressly provided

3    and addressed in PROMESA itself.  And that is at,

4    specifically, Section 204(a)(6).

5         And to avoid any confusion, and maybe further

6    discussion around it, I will simply read the relevant portion.

7    What it says is, "preliminary review of proposed acts" --

8    which is exactly what we're talking about here based on the

9    evidence that the government has submitted.

10        "At the request of the legislature, the Oversight

11   Board may conduct a preliminary review of proposed legislation

12   before the legislature to determine whether the legislation as

13   proposed would be consistent with the applicable fiscal plan

14   under this subtitle, except that any such preliminary review

15   shall not be binding on the Oversight Board in reviewing any

16   law subsequently submitted under this subsection."

17        So this really doesn't have anything to do with the

18   operative relationship between the Board and the government

19   with respect to discussing legislation.  And even assuming,

20   for the sake of argument, that a statement that there was --

21   the Board had no problem with the bill in its form at the

22   time, it is beside the point.  That evidence is irrelevant to

23   the question of whether or not the government has complied

24   with Section 204(a) of PROMESA.

25        And then the last point that I would like to make,

1   Your Honor, is with respect to Act 82.  And I had indicated to

2   you that I recalled reading last night that section of the Act

3   that addressed this issue of -- apparently this issue of the

4   testimony and the potential cost of the act.  And I would -- I

5   would direct the Court to the act itself.

6        And I'm just bringing up the precise section and

7   exhibit number.  I believe, Your Honor, it is Hearing Exhibit

8   80 -- excuse me, Hearing Exhibit 10 for Act 82, which is the

9   certified English translation of the act.  And then I'm

10  looking specifically at page five of the act, using the

11  internal page numbering of the act itself.  And using the ECF

12  docket numbering system, it's page six of 34.  This is

13  docket --

14       THE COURT:  Yes.  I have it here.

15       MR. MUNGOVAN:  This is document no. 18-1.  The first

16  paragraph is the paragraph that I was referring to.  And it

17  may not be specifically responsive to the Court's question,

18  but I wanted to highlight it for you.  It states, it has been

19  mentioned that the implementation of a regulatory office may

20  have a potential fiscal impact of approximately 25 million

21  dollars.  In what pertains to this statement, we must argue

22  that these amounts are not supported by any empirical data

23  whatsoever.  For such reason, it would be irresponsible for

24  this legislative assembly to approve these unfounded

25  allegations in a study when the lives and health of thousands

1    of patients are on the line.  Moreover, the economic aspects

2    cannot and should not be above the preservation of human

3    lives.

4            So, again, Your Honor, it's not entirely responsive,

5    and I don't have the testimony at hand, or whatever submission

6    was made, and I will locate that and submit it to the Court if

7    the Court is willing to accept it.

8            It appears, however, that there was some evidence

9    admitted as part of the legislative history and the

10   negotiation of this particular act that suggested that the act

11   could have a cost of 25 million dollars, which is consistent

12   with the Board's letters to the Commonwealth Government with

13   respect to this particular act, and informs, in part, the

14   concerns that the Board had with respect to the government's

15   estimate of the act's impact on the expenditures of the

16   Commonwealth.

17           THE COURT:  Yes.  You may submit specific information

18   about the statements supplementally, but promptly.

19           MR. MUNGOVAN:  Thank you, Your Honor.  We will do so.

20           Unless the Court has further questions, I do not have

21   other arguments or points that I would like to make.

22           THE COURT:  Thank you.  I have no further questions.

23           The Court reserves decision on these motions and will

24   rule as promptly as possible.

25           I thank you all for these very well prepared,

1   thoughtful, thorough, and helpful oral arguments.  This

2   concludes today's hearing.  The next scheduled hearing date is

3   the December Omnibus Hearing, which is scheduled for December

4   9th, 2020.  That hearing will occur telephonically as well,

5   and the Court will issue a procedures order providing the

6   logistical details closer to the date of that hearing.

7          Is there anything further that we need to take up

8   this afternoon, Counsel?  I'll wait 30 seconds for anyone to

9   unmute who wants to say something.

10          (No response.)

11          THE COURT:  Okay.  I'm cheating you and stopping at

12   20 seconds, because it doesn't sound like anyone is going to

13   offer anything.

14          So, as always, I thank the court staff in Puerto

15   Rico, Boston and New York for their work with us in supporting

16   these matters.  I wish you all good holidays, safety, and good

17   health.

18          We are adjourned.  Thank you.  Good afternoon.

19          (At 1:58 PM, proceedings concluded.)

20                    *     *     *

21

22

23

24

25

```
 1   U.S. DISTRICT COURT     )

 2   DISTRICT OF PUERTO RICO)

 3

 4        I certify that this transcript consisting of 126 pages is

 5   a true and accurate transcription to the best of my ability of

 6   the proceedings in this case before the Honorable United

 7   States District Court Judge Laura Taylor Swain, and the

 8   Honorable United States Magistrate Judge Judith Gail Dein on

 9   November 24, 2020.

10

11

12

13   S/ Amy Walker

14   Amy Walker, CSR 3799

15   Official Court Reporter

16

17

18

19

20

21

22

23

24

25
```

< Dates >
14.3.3 70:3
14.3.3. 121:1
82 may 80:19
April 27 79:19
April 27th, 2020
   27:12, 28:22
December 18, 2019
   73:24
December 18th 74:17
December 18th, 2019
   27:10
December 9th, 2020
   125:3
February 18th, 2020
   27:11
June 13, 2012 33:15
June 15 85:20
June 15, 2020 81:1
June 18, 2020 70:23,
   81:2, 85:21
June 23, 2020 79:20
June 26, 2020 84:21
May 11 85:9
May 11, 2020 82:17
May 21, 2020 70:20
May 28 69:11
May 28, 2020 68:7
November 15th 26:15,
   28:17
November 15th, 2019
   27:3
November 22nd 26:15
November 24, 2020
   1:16, 6:2, 126:9
October 15th 48:3
October 5th 47:25
September 23rd, 2003
   33:8
September 28th, 2020
   47:24
September 8, 2020
   84:19
$2,809,386.84. 102:3
$475,131.47 73:17
.002 38:10
.008 102:10
.012 102:4, 104:17,
   104:22
.1 38:10

.5 96:25


< 0 >
000 40:16, 75:8,
   76:16, 78:8,
   78:17, 99:4, 102:9


< 1 >
1 13:12, 49:22,
   81:24, 83:17,
   102:9, 118:17,
   120:13
1-A 49:21
1-B 50:14
1.7 102:18
10 123:8
100 33:17, 74:13,
   117:20
104(b 30:18
104(c)(2 30:14
106(e 12:23, 12:24
108(a 22:25, 49:13
108(a)(1 114:23,
   115:2
108(a)(2 22:13,
   23:5, 54:13,
   61:21, 62:9,
   62:19, 62:21,
   63:9, 65:18,
   67:18, 70:16,
   72:7, 72:18,
   79:16, 81:8,
   81:16, 82:3, 85:6,
   86:14, 91:10,
   91:12, 93:9,
   93:20, 94:11,
   114:18, 115:5,
   115:7
108. 22:10
10:08 6:3
10:54 35:6
11 72:23
11. 112:22
111 76:5
112 112:22
11219614 20:2
119 85:16
119. 76:5

1198 48:23
11:21 35:7
12 9:20, 10:7, 76:3,
   110:25
12. 73:18
120 83:19
1207 48:23
1208 48:23
124 70:3, 120:25
126 126:4
12:59 91:23
13 9:24, 10:4, 13:12
13. 88:8
138. 53:3
14 9:16, 49:9,
   75:21, 80:14,
   92:21
14. 13:12, 73:25
14.3 70:1
143 85:16
144. 45:22
145 71:14
15 80:22
16 75:21, 79:19
162. 71:18
163 71:23
164 72:4
17-3283 7:2
17-BK-3283(LTS 1:6,
   1:26, 2:7, 2:24,
   3:6, 3:23
171 71:14
176. 16:9, 62:18,
   88:18, 89:1
178. 83:20
18 46:21
18-1. 123:15
18. 92:21
181 7:11, 10:3,
   10:6, 10:10,
   18:17, 47:22,
   50:4, 51:16, 53:4,
   81:24, 82:19,
   83:6, 83:22, 84:1,
   84:5, 84:24, 85:3,
   85:7, 86:13, 88:7,
   101:1, 102:20,
   118:13, 118:16,
   119:1, 119:6,
   120:18, 120:19,

121:11
181. 34:12, 67:10,
    81:21, 85:4,
    117:5, 118:24
19 75:21, 80:4
1:02 91:25
1:58 125:19


< 2 >
2 50:15, 70:9
2,400 60:17, 62:1
2.8 82:8
20 34:24, 35:2,
    81:2, 125:12
20-80 7:2
20-80. 8:3, 9:17
20-82 7:2, 9:21,
    9:23
20-83 7:2, 9:24,
    10:1
20-84 7:2, 10:4
20-85 7:3
20-85. 10:7
20-AP-00080(LTS 1:24
20-AP-00082(LTS 2:5
20-AP-00083(LTS 2:22
20-AP-00084(LTS 3:4
20-AP-00085(LTS 3:21
2013 46:14
2014 32:24, 45:15
2014. 43:4
2017-3283 6:24
2018 20:1
2019 69:22, 70:1,
    70:3, 70:8, 76:4,
    76:11, 78:19,
    118:14, 118:18,
    118:19, 120:25,
    121:5
2020 8:2, 70:7,
    75:9, 76:11,
    78:20, 83:16,
    83:19
2020. 69:4
2021 100:3
203 103:20
203(d 40:3
204 13:8, 54:5,
    54:12, 56:6, 64:7,

65:18, 65:20,
68:16, 111:22,
112:2
204(a) 22:14, 106:4
204(a)(2 54:22,
    57:6, 57:14, 59:3,
    113:22, 116:15
204(a)(2)(a 55:4,
    67:20, 73:13, 82:6
204(a)(5 93:10
204(a)(6 122:4
204(c 39:11, 39:22,
    40:2, 49:13,
    72:17, 78:15,
    78:17, 82:2, 84:1,
    84:2, 86:12
204(c) 103:19
204. 13:7, 62:24
20th 8:2
21 44:8
21. 80:15
218 70:10
22 48:23, 75:10
22. 75:21, 79:21,
    80:22
23 49:21
23. 72:24
24 49:22
25 50:23, 51:6,
    52:11, 87:18,
    96:22, 99:5, 99:8,
    117:13, 117:15,
    118:11, 123:20,
    124:11
25.7 67:25, 68:25
26 50:24, 76:4, 79:4
26. 84:7
27 40:18, 73:22,
    79:4, 82:18
27. 27:4, 28:20,
    85:9
28 9:22
29 10:1, 13:11,
    22:24, 23:14,
    23:16, 27:11,
    53:7, 53:10, 69:5,
    75:5, 81:15, 118:6
29. 78:21

< 3 >
30 32:13, 78:25,
    85:21, 113:6,
    125:8
30(b)(6 50:22
31 27:12, 79:4,
    115:16
31. 85:22
32 79:4, 110:2
32. 27:13, 28:24
33 79:5, 110:2
34. 123:12
37 41:18, 69:9
3799 126:14
38 76:4
3: 1:6, 1:24, 1:26,
    2:5, 2:7, 2:22,
    2:24, 3:4, 3:6,
    3:21, 3:23
3d 13:12


< 4 >
4 50:15
4.2 63:21
40 69:1, 71:20,
    79:13, 99:4,
    117:16
40.1 71:17
403 13:11
42 27:1
42. 79:14
43. 118:23
44 62:15
45 10:12, 41:17,
    41:18
450 76:16, 78:8,
    78:17
47. 7:12, 68:19,
    69:12, 97:7
475 40:16, 75:8


< 5 >
5 103:12
5. 68:8, 68:13
50 38:23, 39:3,
    39:5, 84:13
500 81:24, 83:17,
    99:4, 118:17,

118:20, 120:13,
 120:14
54 8:3, 62:15
540,000 69:1
55 69:25, 118:21
56 19:13, 19:15,
 85:24, 102:16
56(d 10:23, 42:18,
 42:23, 43:1, 43:3,
 43:8, 43:11,
 43:12, 43:14,
 43:17, 43:20,
 44:4, 44:24,
 45:16, 45:19,
 45:21, 46:12,
 48:8, 48:13,
 48:19, 49:1, 53:5,
 85:25, 87:12,
 107:20, 108:1,
 108:5, 108:21
56(f 44:3, 44:6,
 44:12, 44:14,
 44:19, 44:24,
 45:3, 45:12
56(f) 45:5
56. 70:9, 70:10
59 57:20

< 6 >
6 68:7
60 10:11
61 80:4, 100:4
61. 79:5
62 84:13, 84:20
64. 69:20

< 7 >
700 102:9
74 100:4
762 43:3, 45:22

< 8 >
8-2017 16:22, 20:17,
 20:24, 21:19,
 21:21, 21:25,
 25:13, 57:19,
 57:20, 58:10,

62:6, 90:13
8-2017. 16:21
80 123:8
81 81:21, 101:20,
 101:21, 101:25,
 102:15
81. 9:16
82. 72:8, 99:19,
 109:17, 123:1
85. 69:10

< 9 >
9 112:22
91 92:21
92 76:4
96 76:4
99 118:21

< A >
a)(2)(a 54:22
AAFAF 7:10, 10:20,
 18:9, 20:9, 35:18,
 42:16, 87:20,
 107:16
abide 91:17
ability 59:8, 71:21,
 77:24, 85:2, 126:5
able 15:25, 24:9,
 34:21, 40:25,
 52:20, 58:5, 77:1,
 102:17, 112:17
above 71:11, 99:7,
 124:2
absent 24:18
absolute 76:25
absolutely 111:25
abstract 31:13,
 31:19
abuse 43:13
academic 32:25
accept 19:24, 77:18,
 77:19, 77:21,
 77:24, 117:15,
 124:7
acceptable 67:21
access 71:22, 75:25,
 77:8, 77:12
accessing 7:15

accommodate 58:19,
 58:21
accompanied 121:7
accomplished 107:25
according 33:5,
 33:12, 37:2,
 117:16
account 68:17,
 78:11, 101:22,
 111:15
accounted 89:11
accounting 59:25
accuracy 73:15,
 73:19, 74:4, 82:9
accurate 8:17, 74:1,
 86:11, 126:5
accusing 99:14
achieve 70:12, 72:2,
 77:6, 102:1
achieves 77:10
achieving 88:23
acknowledge 37:14
acknowledged 27:19,
 27:20, 45:15,
 89:16
acknowledges 15:21,
 31:19, 32:11,
 76:15, 102:21
acknowledging 43:11,
 105:2
acting 15:5, 21:22
action 13:5, 23:15
actions 81:16
actively 73:4
activities 114:24
actual 45:19, 102:5,
 116:10
actually 41:8,
 44:23, 46:11,
 46:17, 51:4, 73:4,
 87:23, 88:3, 89:6,
 90:13, 95:24,
 96:10, 107:24,
 108:25, 109:10,
 109:13, 109:16
acumen 116:1
acute 32:15
addition 31:1, 40:2,
 57:14, 71:11
additional 13:4,

29:3, 45:7, 53:25,
  58:13, 88:25,
  89:5, 98:17,
  99:25, 121:17
address 9:13, 9:19,
  10:23, 16:1, 16:4,
  20:18, 21:6, 21:8,
  21:10, 21:13,
  26:18, 28:3, 39:9,
  42:21, 43:5, 50:8,
  54:16, 67:9,
  72:19, 74:11,
  74:20, 96:18,
  117:4
addressed 20:24,
  109:21, 122:3,
  123:3
addresses 22:3,
  25:22, 32:3
addressing 10:21,
  42:17
adds 79:23, 103:19
adequacy 32:3
adjourned 125:18
adjudicate 86:22
administer 80:11
Administered 1:11
Administration
  40:18, 41:2,
  73:21, 74:3
administrative 78:18
admission 32:7
admit 29:10, 31:17
admits 84:11, 85:14
admitted 25:24,
  111:9, 113:17,
  124:9
admittedly 82:20
adopted 88:14
adopting 11:13,
  11:17, 16:25,
  17:8, 87:25
ads 33:22
advance 8:18, 56:24
advanced 20:18
Advantage 115:18,
  115:21
Adversary 7:2, 7:9,
  8:3, 8:25, 9:16,
  9:20, 9:22, 9:24,

10:1, 10:4, 10:7
adverse 38:22, 93:13
adversely 80:17
advised 22:12,
  70:19, 70:23,
  95:24
Advisory 4:15
advocating 37:24
Affairs 31:15, 97:6
affect 18:3, 49:4,
  50:8, 54:1, 80:17,
  98:13, 98:15,
  108:7, 108:18,
  108:23, 111:19
affected 20:20
affecting 18:14
affects 104:21
affidavit 43:8, 45:6
affirmative 72:18,
  73:9, 82:3
affirmatively 34:11
Affordable 33:15,
  75:25
afforded 11:17
afoul 24:6, 65:19
afternoon 117:3,
  125:8, 125:18
afterthought 28:15
Agency 4:14
agent 99:14, 121:22
agents 97:13
ago 57:9
agree 23:21, 57:12,
  62:9, 62:12,
  117:23
agreed 8:1
agrees 57:12
ahead 55:19, 93:22
AHIP 33:16
aid 75:24, 76:2
al 1:16, 1:25, 2:6,
  2:23, 3:5, 3:22,
  4:7, 7:3
alarm 34:15
albeit 118:9
alert 9:2
alia 8:3
allegations 123:25
allocate 84:6
allocation 9:6

allocations 8:23
allotments 8:22
allotted 8:19, 96:19
allow 38:20, 56:5,
  58:6
allowed 17:5, 21:25,
  116:11
allowing 17:3
allows 103:18
alluded 35:22
Almodovar 46:14
alone 21:14
already 20:8, 21:15,
  22:2, 25:1, 25:25,
  29:15, 35:22,
  41:16, 42:20,
  44:1, 44:12,
  44:20, 45:13,
  51:15, 60:25,
  62:18, 63:14,
  66:11, 88:24,
  94:1, 108:11,
  109:12, 110:7,
  120:4
alternative 36:19,
  42:24, 43:8,
  43:16, 43:19,
  43:21, 45:17,
  107:20
Alternatively 13:23
although 48:24
amazing 61:13
Amber 4:16, 42:16
amend 36:3, 36:10,
  106:6
amendment 16:21
America 6:23, 33:2,
  33:4, 33:6, 33:10,
  33:12, 33:19
among 36:21, 80:1,
  80:13, 119:17
amount 16:10, 17:2,
  17:14, 17:17,
  18:8, 18:9, 18:15,
  20:10, 21:17,
  53:17, 60:22,
  61:4, 65:6, 66:17,
  82:8, 95:16,
  100:7, 102:5,
  102:8, 102:14,

102:19, 104:16,
  104:22, 113:15,
  118:11, 121:8
amounts 96:25,
  102:9, 123:22
Amy 92:4, 101:7,
  126:13, 126:14
analogy 43:16
analyses 110:1,
  110:3
analyze 64:22
analyzed 48:15
Angela 107:15
Animal 93:4
annual 67:24, 68:3,
  71:16, 71:20,
  72:15, 81:24,
  82:8, 82:25,
  113:13, 118:17,
  120:14
annually 118:21
answer 29:5, 59:10,
  60:6, 60:13,
  74:21, 112:11
anticipate 12:8,
  15:23, 15:25
anticipated 71:17,
  84:22, 102:11
Any-willing-provider
  25:22, 32:2,
  64:15, 64:20
apologize 8:18,
  41:16, 41:22,
  68:12, 96:16,
  96:18, 113:2
apparently 28:9,
  104:4
appeal 44:7
APPEARANCES 4:2
APPEARING 4:4, 52:17
appears 70:3, 124:8
appellants 44:13
apple 44:19
applicable 122:13
applicants 46:13
applied 57:8, 113:19
applies 12:24
apply 21:20, 39:1
appreciate 101:19
appropriate 8:12,

25:19, 34:6, 38:3,
  38:17, 47:14,
  54:23, 89:21,
  91:5, 92:25
approval 79:8
approve 79:7, 123:24
approximate 73:17,
  75:3, 75:7, 76:16
approximately 46:25,
  47:4, 78:17,
  102:4, 123:20
approximations 19:4
arbitrary 25:17,
  51:13, 71:2,
  79:23, 81:16,
  85:11, 86:16,
  108:15, 109:3
area 32:13
arguable 118:9
argue 43:20, 46:8,
  77:15, 123:21
argued 37:13, 88:24,
  98:23
argues 50:6, 97:9,
  110:1
arguing 81:5, 81:6,
  99:22, 106:7,
  106:10
arguments 9:11,
  41:4, 43:19,
  55:23, 86:6,
  110:24, 124:21,
  125:1
arise 16:3
arm 59:6
around 9:10, 32:14,
  72:6, 78:4,
  118:24, 119:19,
  121:23, 122:6
arrangement 18:1,
  97:15, 104:12,
  105:13
arrangements 72:11
arrived 25:4
article 31:13,
  31:14, 31:15,
  31:22, 32:1, 32:2,
  32:11, 32:17,
  32:21, 32:25,
  33:3, 33:8, 33:16

articles 31:7, 31:12
articulate 108:22
articulated 64:7
articulation 62:10
aside 41:8, 93:25,
  99:4, 121:25,
  122:1
asks 55:15
aspect 36:15, 87:13,
  121:15
aspects 124:1
assembly 123:24
asserting 73:25
assertion 15:5
asserts 41:11
assess 75:13
assist 33:14
assistant 109:23
assume 96:1
assumed 60:25, 69:16
assumes 76:1
assuming 65:5,
  122:19
assumptions 68:23
assurances 97:5
assure 58:16
AT&T 92:13
attached 69:22,
  69:23
attempt 44:20
attempted 107:17
attorney 31:6
August 47:15
authoritative 45:25
Authority 4:15,
  22:6, 44:22
authorization 114:11
authorize 23:1
automatically 22:22
available 60:17
average 59:25
avoid 122:5
aware 20:15
away 8:21
Ayala-gerena 44:13,
  46:20


< B >
back 9:8, 16:6,

24:9, 24:13,
27:25, 35:2, 35:9,
41:18, 56:18,
58:1, 59:1, 59:5,
61:24, 74:16,
90:12, 92:7,
92:20, 98:14,
103:3, 104:15,
113:5, 113:6
backed 25:18, 90:19
badly 41:24, 42:3
balanced 77:6
ball 63:15
ballpark 62:4
Bankruptcy 6:24, 7:1
bar 23:13, 62:12,
62:14
barely 115:25
base 121:2
based 16:7, 19:6,
27:23, 27:25,
33:23, 37:25,
45:10, 48:6,
51:12, 56:4, 63:8,
65:22, 68:22,
69:19, 71:1, 75:9,
76:8, 76:13,
77:20, 79:22,
81:17, 85:10,
110:20, 115:5,
122:8
baseless 30:25
bases 57:15
basic 45:5, 54:16
basically 16:25,
56:3, 57:24, 59:7,
106:6, 111:12
basis 14:19, 14:21,
15:4, 19:1, 19:8,
25:20, 30:9,
43:20, 49:12,
74:19, 93:18,
95:20, 99:1
beagling 63:19,
116:2
bear 100:24
bearing 32:19
bears 70:6
became 11:5, 109:24
become 108:24

becomes 50:10, 103:6
begin 8:6, 10:8,
10:13, 35:14
beginning 20:13,
87:18, 110:24
begins 21:24, 55:3
behalf 10:20, 42:16
behind 63:15
belabor 17:21,
29:15, 59:15,
108:12
belated 79:10
belied 69:10
belief 12:3
believe 14:15, 20:9,
27:24, 55:3, 60:1,
74:18, 75:17,
77:15, 86:2,
87:10, 92:22,
94:18, 96:11,
101:10, 123:7
believes 12:6, 22:8,
27:15, 64:18,
77:13, 82:24, 98:2
below 40:11
Belushi 93:3
benchmark 60:21,
76:25, 95:10,
97:20
benefit 34:13,
72:12, 80:11,
80:16
benefits 80:12
bereft 29:17, 29:18
beside 41:6, 122:22
best 68:23, 90:1,
98:2, 98:22, 126:5
beyond 8:19, 29:24,
50:20, 50:25,
108:9
big 55:24, 62:19
bigger 104:5
Bill 10:19, 35:17,
87:19, 109:24,
122:21
billion 63:21,
63:23, 112:7,
113:13
billions 75:24
binding 122:15

bit 102:10
bite 44:19, 65:3
Black 36:17
blow 39:23
boils 108:5
bones 29:25
bonus 17:20
boost 17:19
borne 80:19
Boston 32:13, 32:14,
125:15
bottom 22:2, 34:2,
40:9, 105:16,
114:3, 115:22
brackets 19:25,
20:1, 82:12
breadth 31:21, 31:23
break 9:8, 9:9,
17:9, 34:22
breaking 8:18
breathing 103:18
bridge 58:24
Brief 21:3, 21:13,
22:8, 22:10,
27:21, 31:8,
53:22, 78:25,
79:11, 86:2, 88:6,
88:13, 96:24,
97:9, 121:13,
121:14
briefed 44:2, 44:17
briefing 12:1, 36:2,
44:23, 108:24
briefly 22:5, 40:12,
41:13, 51:20,
85:23, 88:15,
96:17, 101:1,
101:20
briefs 9:17, 27:18,
29:16, 100:2
bring 11:4, 13:9,
13:14, 19:20
bringing 123:6
brings 31:2
broad 48:4
broader 31:16
brought 23:15, 87:3
Budget 37:12, 39:14,
39:21, 39:23,
40:1, 40:5, 56:4,

57:1, 59:1, 60:25,
61:11, 63:22,
66:17, 73:18,
73:22, 77:6, 79:1,
84:6, 100:3,
100:12, 100:16,
102:16, 111:7,
111:15, 112:7,
113:12
budgeted 78:23,
79:9, 84:9, 99:24,
99:25, 102:18,
103:5, 104:23,
106:13, 107:3
budgets 54:24, 55:5
Buenos 6:5
bulk 56:20
burden 19:23, 20:3,
30:1, 51:15,
51:24, 89:3, 89:5,
100:19, 100:22,
100:25, 108:8,
108:13, 108:14,
109:15, 110:9,
114:19
burdens 19:13
Bureau 81:25
business 55:17,
61:10, 63:25,
94:14
businesses 66:20
buzz 9:3, 9:4
buzzes 9:4, 9:7,
41:14

< C >
calculated 19:5,
89:20
call 6:16, 8:5,
8:13, 9:9, 26:1,
92:6
called 31:15, 32:3
calling 7:25
candid 53:22
Candidly 96:21
capable 86:8
capacity 59:14
capital 77:8, 77:12,
119:20, 120:1

capricious 25:18,
51:13, 71:2,
79:23, 81:17,
85:11, 86:16,
108:15, 109:3
careful 51:3
carefully 54:15
carries 108:8
carry 51:14, 51:24,
109:14, 110:9
cases 11:4, 14:20,
18:19, 21:1, 21:3,
21:11, 43:23,
44:18, 46:12,
46:15, 47:2,
61:14, 103:11,
115:25
CAT 4:47
Category 103:12
causal 31:20, 31:23
cause 28:14, 46:2,
46:7, 46:19
caveat 60:7
center 20:12, 37:15
central 32:14, 44:9
certain 40:6, 60:22,
65:6, 66:18, 74:13
certainly 18:5,
18:12, 29:2,
50:24, 98:23
certificate 57:5,
115:23, 118:8
certificates 54:19,
59:2, 116:14,
116:16
certifications
11:10, 11:11,
12:19, 13:11,
19:4, 19:10,
49:16, 49:24,
50:4, 54:19, 55:9,
89:15, 89:18,
90:11, 90:19
certified 56:2,
56:8, 97:4, 123:9
certify 54:7, 126:4
certifying 56:17
cetera 56:11,
104:10, 111:16
challenge 13:25,

33:22
challenged 50:17
challenges 13:10,
13:17, 20:7, 90:18
Chamber 33:14
Chambers 6:7, 6:10,
33:17
chance 108:4
change 12:11, 56:9,
56:10, 56:25
changed 109:25
changes 31:23, 56:8,
61:25, 83:14,
104:11, 114:7
changing 56:9
chapter 12:25
character 93:3
characteristics
59:20, 60:4
characterized
108:14, 121:22
characterizing 71:7
charge 61:11, 62:1,
80:13
cheating 125:11
check 57:10, 116:21
check-the-box 54:5,
89:14, 89:19,
89:25, 90:4
checks 54:6, 55:11,
55:14
chill 24:12
choices 104:8,
104:21
choose 44:23, 45:3
Circuit 43:2, 43:4,
43:13, 45:2,
45:15, 45:20,
46:13, 46:17,
46:20, 48:20,
108:1
circumstance 14:13,
63:9, 112:5,
113:16, 122:2
circumstances 15:19,
56:15, 63:8,
87:11, 113:11
cite 9:18, 46:9
cited 21:3, 31:8,
121:13

cites 44:22, 51:2,
    87:7
claim 87:4
claim_about 34:1
claimed 50:8
Claims 9:15, 10:2,
    10:5, 51:25,
    67:18, 69:7,
    72:19, 73:9, 82:4,
    87:3, 106:22,
    109:17, 110:2
clarified 75:19
clarity 8:7
classic 63:25, 94:14
clear 69:5, 85:2,
    106:19, 106:22,
    107:2, 108:24
Clearly 8:9, 57:5,
    61:10, 62:6,
    64:19, 81:17
clock 35:1, 101:16,
    113:5
close 19:25, 57:5,
    115:23
closer 125:6
Code 27:1, 27:2,
    32:14
coffee 17:9
coffers 95:16
collaborative 24:14
colleague 10:22
collect 53:14
collected 82:24,
    83:21, 83:22,
    84:16, 84:22
collection 83:12,
    83:18
collections 82:25,
    84:25, 85:3
collectively 38:22,
    39:25
colloquy 63:20
comes 31:14, 56:7,
    57:5, 63:23,
    111:22, 113:25,
    116:7
coming 59:1, 65:23,
    95:9
commence 82:23
commenced 7:10, 78:4

comments 56:1, 66:6
Commerce 33:14
Commissioner 84:24
commissions 25:10
commit 65:8
committed 65:9
common 33:22, 54:1
Commonwealth 1:15,
    4:6, 7:1, 27:7,
    28:14, 53:7, 53:8,
    53:13, 71:21,
    72:3, 73:22,
    75:25, 76:1, 77:7,
    80:7, 80:17,
    80:20, 93:14,
    96:4, 102:5,
    117:25, 118:10,
    120:10, 124:12,
    124:16
communications 73:8,
    75:20
companies 32:16
company 25:25
compensate 69:6,
    119:9
compensation 16:11,
    104:12, 119:7
competition 29:12,
    56:11, 64:2,
    65:20, 72:13,
    80:1, 80:6, 80:13
complaining 30:4
complains 30:10
Complaint 20:21,
    68:8, 69:23
complete 42:19,
    44:20, 82:23
completed 47:5
completely 82:13,
    103:16
compliance 49:24,
    54:18, 104:8,
    121:2
compliant 11:11,
    73:12, 82:5
complied 71:12,
    86:10, 122:23
comply 13:19, 90:9,
    91:15, 92:25,
    105:4

complying 105:9
compute 97:18
computer 7:16
concede 75:15
conceded 21:11, 83:4
concedes 21:3,
    53:24, 82:7, 98:25
concept 62:10,
    77:22, 111:13
concern 24:3, 24:20,
    28:3, 32:2, 63:25,
    64:5, 64:21,
    65:19, 73:23,
    74:20, 75:23,
    94:13, 94:14,
    94:15, 94:19,
    96:14, 101:23
concerned 32:12,
    64:25, 65:11,
    65:17, 91:19
concerning 7:11,
    11:3, 11:6, 49:23,
    54:9, 81:20
concerns 22:3, 28:1,
    32:17, 64:13,
    66:14, 66:16,
    66:22, 73:4, 73:5,
    74:3, 81:14, 87:2,
    97:16, 119:18,
    124:14
concluded. 125:19
concludes 125:2
conclusion 27:23,
    27:24, 28:8,
    41:23, 51:7, 76:8,
    82:10
conclusions 12:5,
    19:21, 106:16
conclusory 19:22,
    29:18, 30:11,
    90:24, 95:22,
    96:1, 108:9,
    110:11, 110:17
concrete 84:15
conditioned 83:17
conditions 64:18
conduct 46:22,
    90:14, 114:25,
    122:11
conducted 44:9

confer 47:12
conference 7:20,
    44:16
confirm 35:10
confirmation 52:4
confirms 79:12,
    81:13, 99:8
conflict 28:10
conflicts 27:8,
    27:15, 50:8
confusion 122:5
Congress 11:17,
    11:18, 13:19,
    24:12, 36:4, 42:3,
    88:14, 98:5, 98:8,
    103:17, 106:7,
    115:3
conjectural 96:5
connect 28:25, 29:3
connected 92:14
connection 91:23,
    91:25, 113:3
consequence 114:14
consequences 63:6,
    63:7
conservative 37:6
consider 25:16,
    51:11
consideration 118:7
considered 25:10,
    25:13, 90:25
considering 109:19
consistency 11:20
consistent 7:19,
    14:14, 15:18,
    51:7, 80:7,
    102:12, 109:9,
    122:13, 124:11
consistently 105:19,
    106:8
consisting 126:4
constant 17:1, 90:9
constitute 67:21
constitutes 36:8,
    88:10
consulted 25:11
contain 56:19
contained 68:6
contemplate 23:12
contemplated 24:13,

100:1, 104:6
contemplates 105:7
contempt 63:5
contended 24:4
contends 36:17,
    38:19, 40:14,
    98:10, 101:21,
    117:15
contention 28:13,
    49:23
contest 53:23
context 23:15, 96:23
contingent 83:11,
    83:15
continue 35:3,
    50:12, 116:8,
    116:9
continuing 59:13
contrary 36:17,
    114:18
contributing 120:10
control 36:22,
    65:23, 92:8
controlling 95:10
controls 66:21,
    72:11
converted 54:4
cooperate 90:8
cooperation 35:3
copy 74:8
core 77:9, 77:11,
    87:12, 119:16
coronavirus 103:13
Corporation 46:16,
    48:23
Corral 14:8
correct 86:12,
    86:15, 89:12,
    90:16, 94:24,
    97:11, 115:14
correspondence 11:5,
    59:5, 64:8
corresponding 76:18
cost 16:19, 17:13,
    17:14, 19:3,
    40:18, 50:7,
    53:15, 53:19,
    58:23, 58:24,
    58:25, 59:17,
    61:3, 66:20,

71:10, 72:15,
    79:24, 80:1, 82:9,
    82:25, 84:17,
    95:9, 101:23,
    105:20, 105:21,
    119:10, 123:4,
    124:11
costing 60:3
costs 19:2, 26:21,
    29:2, 64:3, 80:6,
    80:10, 80:16,
    80:19, 81:7,
    83:13, 96:2, 96:3,
    103:5, 118:10
couched 82:21
coughing 15:2
Counsel 7:6, 34:14,
    34:19, 87:8,
    87:17, 107:17,
    121:21, 125:8
count 16:15, 60:24,
    119:19
counterclaim 70:16,
    78:15, 79:16, 85:6
Counterclaims 9:15,
    10:3, 10:6, 27:18,
    67:17, 72:17,
    72:19, 73:10,
    82:2, 84:1
counts 66:18
couple 121:17
coupled 42:1
course 15:1, 15:8,
    22:23, 37:15,
    37:19, 47:19,
    73:7, 88:23, 93:8,
    94:15, 94:17,
    103:8, 115:1
COURTROOM 6:17,
    6:19, 34:18
courts 46:12, 49:1,
    94:3
cover 53:3, 53:4,
    61:1, 82:25,
    83:13, 84:4,
    84:17, 99:25,
    101:23, 102:18,
    102:25, 103:5,
    106:1
covered 16:13, 26:25

covering 53:2
covers 49:11, 62:24,
    118:3, 118:4
COVUCCI 4:16, 10:23,
    42:6, 42:9, 42:10,
    42:12, 42:15,
    42:16, 46:5,
    50:14, 51:20,
    51:22, 52:7,
    107:8, 107:10,
    107:12, 107:15,
    109:6, 110:13,
    110:15
create 8:16, 89:18,
    116:9
created 39:21
creates 72:14,
    85:12, 89:5,
    105:13, 105:14,
    114:17
creditors 56:3,
    65:2, 65:5
critical 11:22,
    55:20, 56:14, 57:1
criticized 26:7,
    33:21, 65:5, 89:13
criticizes 37:9
Cross-motion 9:21,
    9:25, 21:8, 42:18,
    47:25, 48:2, 48:6,
    49:7, 49:20, 50:1,
    50:19, 50:25,
    108:7, 108:18
cross-motions 7:9,
    9:14, 110:8
crying 106:14
cryptic 28:23
CSR 126:14
cue 23:22, 23:23
cumulative 38:23,
    39:9, 40:7
currently 74:24
cut 67:13, 76:25,
    105:21, 112:15,
    112:23, 112:24,
    112:25
cutoff 46:23


< D >

Dafny 31:14, 31:25
dashboard 7:17,
    7:18, 8:6, 8:11,
    10:14, 42:11,
    52:13
data 30:16, 68:2,
    123:22
date 46:23, 125:2,
    125:6
dated 68:7, 69:11,
    70:20, 73:24,
    74:17, 81:1, 81:2,
    82:17, 84:19,
    85:20, 85:21
day 22:20, 27:14,
    57:25, 61:25,
    116:9, 119:10
days 16:10, 16:13,
    17:6, 17:11,
    21:20, 21:23,
    21:25, 26:11,
    48:3, 58:5, 58:7,
    58:13, 58:14,
    59:24, 62:7, 62:8
de 106:24
dead 93:21, 94:11
deadline 26:15,
    46:24, 64:10
deal 61:5, 62:3,
    62:5, 103:14
dealing 56:23,
    60:16, 112:6,
    113:12
deals 61:9
dealt 53:7, 56:23
debt 56:2, 56:4,
    56:9, 56:25,
    111:15
Debtors 1:18
December 74:18,
    125:3
decide 50:3, 57:16
decided 43:3, 43:24,
    44:2, 47:17,
    47:22, 55:10,
    104:4
decides 115:11
deciding 116:20
decision 12:16,
    13:11, 17:22,

22:24, 23:17,
    51:10, 51:12,
    51:16, 52:4, 69:5,
    75:6, 108:8,
    108:15, 109:1,
    109:12, 119:9,
    124:23
decisions 12:22,
    12:23, 65:17,
    96:14
Declarations 27:18,
    29:8, 29:17,
    29:20, 31:2, 51:1,
    51:3, 86:19,
    86:25, 110:17,
    110:20
decrease 69:15
decreases 64:2,
    79:25
decreasing 70:12,
    80:5
deduce 40:23
deem 8:12
deemed 120:11
deems 104:9
defeat 22:15, 23:8,
    24:25
defeats 22:7, 22:21,
    70:18, 70:25,
    79:17, 81:9, 85:7,
    114:15
defect 75:1, 75:3
defective 40:15,
    50:7, 67:19,
    68:24, 75:12,
    76:9, 118:1, 118:2
defects 68:5, 69:3
defend 29:20, 31:1
Defendant 1:36,
    2:17, 2:34, 3:16,
    3:33, 19:25
defense 41:3, 58:9,
    58:10
defer 107:8
deference 115:3
deficiencies 78:11
deficient 101:21
deficits 72:2
defined 89:2, 114:4
defines 37:1, 88:22

defining 111:4
definitely 40:6
definition 36:19,
  112:1, 113:21,
  114:5
definitions 114:9
deflecting 73:3
degree 111:25
Dein 3:40, 6:22,
  126:8
delay 46:19
demanded 30:22
demands 90:9
demonstrating 100:20
denied 45:12
deny 42:18, 42:25,
  110:8
denying 43:12, 53:1
Department 73:17,
  75:14, 81:25,
  84:9, 100:3,
  102:16
depending 9:11
depends 56:14, 76:1,
  111:6, 113:16
deposition 48:7,
  50:22, 50:23
depositions 49:10,
  108:3
deprive 42:2
deprives 76:25
DEPUTY 6:17, 6:19,
  34:18
Derail 33:17
describe 59:20,
  80:2, 87:22, 90:5
described 24:2,
  25:1, 61:16,
  64:14, 76:9,
  89:23, 94:12,
  94:18, 95:15
describes 31:20,
  47:11
designed 42:2
Despite 70:22
detail 73:14
detailed 71:11,
  72:20
details 125:6
detect 31:24

determination 13:7,
  22:21, 23:13,
  23:16, 23:19,
  23:24, 25:4, 25:9,
  25:17, 25:19,
  51:5, 51:18,
  62:11, 70:25,
  71:2, 78:6, 79:22,
  85:10, 86:15,
  95:8, 109:2,
  109:9, 115:8
determinations
  12:25, 13:2,
  14:20, 14:22,
  18:25, 22:13,
  24:10, 30:9,
  49:12, 50:21,
  71:13, 80:3, 80:7,
  81:16, 85:15,
  86:18, 90:22,
  91:6, 110:4, 115:5
determine 11:10,
  15:13, 54:12,
  58:21, 95:19,
  97:20, 117:9,
  122:12
determined 23:8,
  25:8, 47:21,
  62:25, 63:7,
  70:17, 71:20,
  71:25, 79:17,
  81:9, 85:7, 90:24,
  114:15
determines 95:12
deviate 97:1
deviation 39:4, 39:6
deviations 106:24
dial 9:8
dias 6:5
dicta 45:4, 45:10
dictate 54:2
Dictionary 36:18,
  37:1, 88:22,
  113:21
difference 17:6,
  113:20
differences 107:19
different 12:2,
  19:2, 27:18, 29:8,
  32:18, 39:17,

88:21, 94:21,
  112:11, 119:8
difficult 8:16, 72:2
difficulty 8:20
diligence 47:9
diligent 46:17
diminish 26:2, 72:3
diminished 80:14
diminishes 72:13
direct 9:8, 13:4,
  70:5, 87:9, 123:5
directed 82:22
directive 70:22,
  80:25, 85:19
directly 30:22,
  53:10, 69:21,
  70:7, 74:21,
  118:14, 120:22,
  121:15
director 97:7
disagree 18:11
disavow 97:13
discharge 106:20
disclaiming 106:15
disconnect 9:8
disconnected 92:1,
  101:7, 101:11
discretion 12:18,
  43:14
discuss 14:22, 15:4,
  20:4, 48:25, 53:11
discussed 21:15,
  26:1
discussing 122:19
discussion 29:23,
  45:19, 72:7,
  98:18, 121:23,
  122:6
discussions 47:12
dismissing 73:5
dispense 26:9
disprove 30:5, 30:6
dispute 11:2, 19:16,
  30:8, 45:23,
  47:19, 79:13,
  82:9, 88:19, 94:5,
  97:8, 100:18,
  107:19, 107:23
disputes 36:15,
  36:16, 56:21

disregarded 31:9
disrupt 15:3
dissect 55:2
distinction 114:1,
   114:3
distinguish 107:18
distinguished 21:12,
   43:24
District 1:1, 1:3,
   3:38, 3:39, 3:41,
   6:19, 6:20, 43:10,
   44:6, 44:8, 44:15,
   91:23, 126:1,
   126:2, 126:7
dive 20:4
Docket 1:6, 1:24,
   2:5, 2:22, 3:4,
   3:21, 8:3, 9:16,
   9:20, 9:22, 9:23,
   9:25, 10:3, 10:6,
   123:12, 123:13
dockets 8:4
doctors 29:10,
   31:17, 32:6
document 108:3,
   123:15
documents 19:22,
   25:9, 30:15,
   49:14, 49:22,
   50:15, 86:23
doing 16:15, 57:6,
   88:5, 115:10,
   116:9
dollar 36:6, 88:7,
   96:23, 112:7,
   113:13
dollars. 112:9
done 17:10, 25:6,
   27:19, 37:25,
   44:21, 45:18,
   48:18, 49:5,
   51:25, 54:10,
   57:6, 61:13,
   61:14, 66:15,
   98:6, 110:4
doomsday 98:4
doubles 36:5
down 10:11, 19:6,
   36:5, 89:20, 108:5
downed 60:22

draw 73:7
drawn 40:11
drill 34:17, 34:20,
   34:23, 41:17
drive 121:1
driven 120:18
dropped 92:6, 92:18
dropping 113:3
drug 80:12
drugs 80:13
due 115:18
duly 34:5
duplicative 9:17,
   9:18
duration 34:23
during 7:25, 8:15,
   9:9, 47:11, 94:17,
   103:8, 103:10,
   111:9, 121:5
duties 106:21
duty 108:14
dynamic 105:13


< E >
e-mail 101:6, 101:11
eagerness 29:7
earlier 46:8, 54:15,
   57:13, 59:12,
   86:25, 101:11,
   111:17, 113:10,
   115:14, 115:21,
   120:24
earliest 52:21
earmarked 100:13,
   104:24
earth 37:3, 37:4
earthquakes 103:12
easiest 95:10
easily 98:6, 100:8
easy 95:2
ECF 123:11
economic 19:7,
   50:16, 56:10,
   72:4, 98:11, 124:1
economy 120:10
effect 15:15, 15:16,
   15:17, 16:3,
   20:24, 27:6,
   31:23, 38:9,

38:23, 39:9,
   39:25, 40:7,
   43:11, 50:24,
   60:25, 83:12,
   84:19, 85:2,
   93:13, 95:22,
   96:25, 121:15
effect. 37:2
effectively 12:18,
   78:5
effects 15:20,
   37:16, 50:21,
   54:2, 95:15,
   99:16, 101:22
effectuating 85:4
efficiency 17:19
efficient 17:4,
   17:7, 17:8, 47:18,
   59:16, 61:15
effort 24:14, 29:2,
   29:19, 30:2,
   32:17, 34:7,
   36:12, 36:14,
   72:25, 87:22,
   91:15
Efforts 31:1, 33:17,
   99:11, 99:13,
   99:17
eight 34:25, 35:14,
   41:15, 41:19,
   49:8, 63:15
Eight. 70:24
Either 13:13, 13:25,
   15:17, 16:13,
   23:20, 30:3, 36:6,
   43:25, 51:11,
   58:7, 60:9, 88:8,
   106:1, 109:2
elaboration 28:20
element 20:16
eleven 9:10
eliminate 106:23
emotion 122:1
emphasize 58:15
empirical 123:22
employ 100:10
employee 20:7,
   39:18, 39:20,
   58:4, 58:5, 60:17,
   60:24

employees 11:9,
  17:1, 17:5, 17:9,
  21:23, 21:24,
  53:16, 57:25,
  59:24, 60:17,
  62:1, 62:6, 80:21,
  84:7, 89:7, 100:8
empower 13:1
empowers 13:2, 13:5
enabling 121:8
enact 23:6, 38:21,
  54:10, 55:19,
  63:2, 106:8
enacted 12:5, 34:5,
  49:16, 107:5,
  109:25
encourage 8:25
end 8:10, 21:4,
  21:7, 22:19, 58:3,
  85:24, 90:16,
  119:10
ends 58:4, 116:22
enforce 23:7, 23:16
Enforcement 23:12,
  70:2
engage 22:17, 59:21,
  72:25
engaged 81:11, 98:14
engaging 78:2, 89:14
English 123:9
enjoin 11:23, 22:6,
  22:9, 29:7, 34:4
enjoining 22:19
enjoins 22:15, 22:18
enjoy 12:23
enlarge 72:1
enough 38:12, 51:24,
  83:23, 96:13,
  109:11
ensure 7:13, 39:22,
  40:7, 75:25,
  93:12, 103:21
ensures 22:3
ensuring 20:17,
  25:23
entered 19:18, 21:14
entire 64:24, 69:6,
  94:19
entirely 32:18,
  57:12, 62:9, 124:4

entirety 118:7
entitled 19:17,
  24:24, 32:23,
  33:8, 33:16, 52:3,
  67:16, 70:1, 70:4,
  70:15, 72:16,
  78:14, 79:15,
  82:1, 83:25, 85:5,
  108:16, 109:13,
  110:18, 113:14,
  116:8
entity 54:24
entries 8:4
Entry 8:3, 9:16,
  9:20, 9:22, 9:24,
  10:1, 10:3, 10:6
enumerate 71:7
enumerated 8:1
equivalent 62:1
eradicate 106:4
Eric 92:15
erroneous 29:22,
  76:7, 83:7,
  117:11, 118:17
erroneously 37:9
error 29:23
especially 62:10,
  95:19, 119:10,
  120:12
Esq 4:16
essence 12:21
essential 53:20,
  86:4, 87:13, 97:15
essentially 103:7,
  108:5
establish 31:22,
  78:18
established 42:25,
  71:14, 80:4,
  85:15, 89:21
establishing 75:22
estimated 67:24,
  68:3, 78:9
estimates 13:10,
  13:22, 19:2, 19:3,
  30:6, 31:24,
  64:11, 82:19,
  89:20, 98:24, 99:3
et 1:16, 1:25, 2:6,
  2:23, 3:5, 3:22,

4:7, 7:3, 56:11,
  104:10, 111:16
evading 75:17
evaluating 48:21
event 111:9
Everybody 6:11,
  34:20, 92:1, 92:10
everyone 7:19, 9:8,
  35:2
everything 92:2,
  111:18, 111:19,
  111:20
evident 11:5
evidentiary 14:19,
  14:21, 15:4, 19:1,
  19:8, 19:13, 30:1,
  34:7, 34:8, 40:19,
  93:18, 100:24,
  114:16, 121:25
exact 74:18, 110:6
exactly 39:14,
  45:17, 93:4,
  105:7, 122:8
example 9:4, 33:12,
  33:21, 39:16,
  39:18, 46:13,
  49:20, 50:6,
  60:18, 60:20,
  86:10, 90:13,
  99:11
examples 46:15,
  49:18
exceed 117:20
exceeds 102:16
except 24:10, 122:14
exceptions 58:6
excess 59:14
exchange 32:13
exclude 65:22, 66:11
Exclusive 33:16
Excuse 14:23, 26:5,
  34:7, 37:14,
  73:11, 75:2,
  81:21, 84:23,
  91:8, 94:16,
  117:7, 123:8
executive 18:22,
  89:22
exempt 115:18
exercise 22:17,

54:5, 54:12,
89:14, 89:19,
89:25, 90:4
exercise. 48:22
exercising 13:21
Exhibits 5:9, 27:12,
31:6, 62:15,
72:23, 75:21
exist 16:20, 40:24,
48:16, 52:5
existed 95:16
exists 41:8, 108:19
exodus 25:22
expect 109:18
expected 13:19,
15:22, 96:22
expecting 47:16
expects 49:3, 108:22
expedited 95:20
expenditure 16:18,
78:19, 88:22,
90:1, 96:22,
113:21, 120:9
expenditures 12:12,
15:16, 18:13,
27:7, 37:17, 38:4,
40:4, 53:25, 55:1,
55:6, 76:17,
76:19, 82:7,
88:21, 89:11,
100:7, 100:12,
102:5, 102:11,
103:21, 106:9,
107:4, 113:25,
114:1, 114:4,
114:10, 119:20,
119:21, 120:1,
124:15
expense 89:2, 106:2,
112:6, 113:14,
113:21, 114:2,
114:10
expenses 29:13,
53:9, 53:12,
53:13, 53:21,
56:9, 88:18, 88:20
expensive 29:13,
31:17
Expensive. 32:24
expert 29:1, 51:15,

95:23
expertise 54:24,
55:5, 55:8, 55:16,
57:7, 59:21,
113:23, 115:24
experts 25:11, 91:1
explain 25:8, 27:16,
29:25, 32:17,
36:10, 36:12,
36:14, 38:16,
45:8, 49:3, 72:14,
82:24, 92:18,
106:24, 117:13
explained 20:8,
21:12, 27:14,
36:2, 47:12, 50:1,
50:9, 50:18,
63:19, 73:23,
106:5, 108:11,
110:7
explanation 77:20,
77:24, 94:23,
109:11
explanations 78:2
expressly 53:13,
54:6, 84:3,
119:24, 122:2
extent 9:17, 17:19,
104:7, 108:12
extra 17:5, 95:11
extrajudicial 24:5
extraordinary 120:7
extreme 112:3
extremely 108:19
eye 11:21, 11:22

< F >
F. 13:12
F.3d 43:3, 48:23
F3d 45:22
face 11:9, 12:24,
15:9, 15:12,
15:18, 16:17,
23:11, 50:3,
50:25, 55:11,
57:9, 69:15,
74:11, 76:15,
78:9, 90:6, 90:22,
108:10, 118:4

faces 24:7, 53:24
facial 113:24
facially 15:20,
18:18, 26:1
facing 24:11
factcheck 33:25
factcheck.org 33:21,
33:23
factor 46:6
factors 37:15,
37:18, 37:19,
43:14, 45:21,
45:24, 46:1,
48:13, 48:15,
57:1, 98:13,
98:15, 107:22
Facts 19:21, 26:5,
45:7, 46:10,
48:16, 48:21,
49:2, 49:3, 56:15,
63:8, 66:23, 69:9,
69:20, 75:10,
75:11, 76:14,
79:12, 82:20,
84:13, 84:14,
86:4, 87:10,
108:22, 112:5,
113:11, 118:22
factual 72:20,
72:23, 107:18
failed 31:20, 73:12,
82:5, 86:3
failing 21:1, 29:5,
91:17
fails 21:16, 50:7,
101:22, 118:5
failure 70:11
faith 13:20, 14:5,
14:6, 14:7, 14:9,
14:10, 14:14,
14:17, 14:18,
15:6, 73:11,
97:25, 98:1,
99:12, 106:21,
108:14
fall 40:11
fallen 85:13
falls 99:6
familiar 19:14
families 80:21

far 37:6, 38:9,
    38:11, 85:13
faults 29:5
favor 57:3, 57:17
favorite 37:4
Federal 12:4, 12:13,
    26:19, 27:2, 27:8,
    27:9, 27:15,
    27:16, 28:10,
    36:3, 50:9, 50:11,
    63:23, 64:1,
    64:17, 75:15,
    75:23, 94:13,
    106:15, 115:13,
    115:18
feel 93:3
feels 94:9
fees 47:7
feet 29:13
few 40:13, 49:18,
    85:24
fewer 16:10
fifth 48:13
figurative 14:8
figure 59:8
file 20:21, 45:6,
    45:16, 47:14,
    107:20
filed 8:2, 8:24,
    22:11, 27:17,
    28:16, 43:8, 47:1,
    47:17, 47:23,
    47:25, 48:4
filing 9:18, 42:23
fill 34:7
filled 40:6
final 9:7, 46:1,
    47:1
Finally 76:20, 85:5
finances 77:7,
    117:23
Financial 1:9, 1:31,
    2:12, 2:29, 3:11,
    3:28, 4:14, 6:24,
    7:3, 38:5, 50:16,
    52:17, 54:25,
    55:5, 55:7, 55:8,
    55:16, 57:7,
    59:21, 69:4,
    82:19, 89:3, 89:5,

99:16, 115:24,
    116:1, 116:17
find 31:20, 57:22,
    65:16, 81:7,
    98:16, 102:18,
    104:23, 111:14,
    117:8
finding 58:24, 78:10
finds 77:20, 108:13,
    110:8
fine 101:13
fingernails 65:3
finish 81:4, 87:6,
    118:12
finished 116:23
Fire 33:20, 34:15,
    34:17, 34:20,
    34:23, 41:17,
    81:25, 102:15
firefighters 83:17,
    102:9, 102:25,
    104:4, 104:5,
    104:12, 104:24,
    118:20, 119:7,
    119:9, 120:7
firewall 21:22
fiscally 15:9,
    15:13, 15:21,
    17:15, 17:22,
    18:1, 18:10,
    18:18, 20:9,
    20:19, 25:2, 25:15
fit 112:4, 113:10,
    113:17
fits 111:6, 119:15
Five 11:6, 12:2,
    18:3, 20:14,
    32:16, 37:24,
    38:1, 38:6, 38:9,
    38:11, 38:15,
    45:14, 45:20,
    56:13, 60:16,
    61:25, 106:25,
    107:22, 112:8,
    113:14, 114:8,
    123:10
five-year 75:4,
    117:19, 117:24
fixed 66:17
flexibility 11:17,

11:19, 42:2,
    103:4, 103:14,
    104:20, 104:25,
    105:1, 119:8
flexible 103:17
flies 96:18
flouting 105:9
flow 50:12
flows 12:1
focus 46:1
focused 48:1, 88:17
focuses 36:14, 37:16
focusing 37:10
follow 48:6
follow-up 92:23
followed 27:5, 67:9,
    91:1
following 9:13
follows 18:19, 19:9,
    22:22, 75:23
footnote 30:4, 97:9
forced 11:24, 18:13
form 122:21
formal 50:4, 54:23,
    55:4, 57:4, 59:18,
    60:4, 60:18,
    61:22, 63:17,
    64:11, 66:15,
    69:5, 73:12, 74:4,
    82:5, 82:15,
    82:23, 83:3, 83:5,
    84:10, 86:12,
    97:24, 115:23,
    116:11
formality 60:1,
    121:2
formed 33:7
forth 8:23, 19:1,
    23:7, 24:13,
    25:14, 31:2,
    39:14, 56:18,
    59:5, 71:11, 76:2,
    77:5, 77:10,
    77:18, 78:20,
    85:19, 86:23,
    91:2, 98:14,
    110:18, 120:8
forthcoming 103:2
forward 15:14, 30:7,
    93:16, 95:8

foul 106:14
found 13:18, 31:7,
  45:4, 46:17,
  66:11, 118:6
four 112:7, 113:13
Four. 70:21, 76:14
fourth 48:13
framed 57:13
framework 41:24,
  103:17, 107:22
Frankly 28:25, 99:7,
  120:7
fraud 66:12
free 45:16
front 20:12
frustration 105:14
full 30:14, 52:3,
  99:2, 108:16,
  110:19
full-time 62:1
fully 44:2, 44:17,
  70:24, 81:11
fun 96:19
function 8:11, 103:7
functional 107:22
fund 82:13, 82:16,
  84:11
fundamentally 18:16,
  21:16, 95:20
funded 83:10, 104:3
funding 26:20,
  27:17, 50:9,
  64:18, 64:19,
  85:2, 85:12,
  94:13, 103:1,
  103:2, 118:20,
  119:25, 120:19
funds 27:9, 28:10,
  50:12, 72:3,
  75:15, 78:24,
  79:2, 80:16,
  83:21, 115:13
furtherance 30:21
future 59:2, 65:12,
  84:24, 85:3, 85:14


< G >
Gail 3:40, 6:22,
  126:8

Gain 33:9
game 60:10
gaps 34:8
Garced 1:24, 2:5,
  2:22, 3:4, 3:21,
  4:12, 7:3
Gave 33:13, 33:17,
  41:3, 62:2, 98:16,
  99:2, 103:17
Geez 41:15
general 57:24
generated 31:24
generates 83:23
generic 121:10
genuine 19:16
Gestalt 64:20, 65:1
get-go 62:5
gets 17:10, 40:4,
  61:7, 114:11,
  114:22, 115:7,
  115:11, 116:3
getting 17:19, 18:8,
  18:15, 20:10,
  21:17, 22:4,
  60:11, 62:7, 94:24
Ghili 32:2
giant 34:3
Ginsburg 32:23
give 16:13, 30:18,
  36:24, 42:3, 59:6,
  59:20, 60:14,
  66:22, 79:8, 115:3
given 17:18, 62:22,
  74:7, 108:9
gives 91:13
giving 58:13, 116:14
goals 16:16
God 6:22
Gonzalez 19:19
gotcha 60:10, 61:8
gotten 108:4
govern 37:7, 106:18
governed 38:5
governing 115:19
governmental 60:18
Governor 4:11, 7:10,
  9:19, 9:23, 10:20,
  13:3, 13:4, 23:6,
  35:18, 42:17,
  73:12, 76:6,

78:22, 82:5, 82:6,
  82:20, 83:6,
  84:23, 87:20,
  97:3, 107:16,
  114:23, 118:15
grant 12:21, 27:9,
  49:1
granted 20:1, 43:10,
  108:1
granting 8:14, 52:25
Great 16:1, 37:1,
  92:17
greater 38:23, 88:18
grounded 82:20
grounds 42:25, 43:21
group 32:16
groups 33:7
growth 56:10, 72:4,
  119:17, 119:21,
  120:2, 120:5,
  120:10
guarantee 12:11
guess 56:16, 115:11,
  116:6
guidance 11:7,
  11:25, 42:4, 91:3
guilty 66:11
guts 60:15


< H >
half 39:4, 84:22
hand 11:16, 89:2,
  124:5
hands 54:9
happen 14:11, 28:5,
  38:2, 96:6, 96:7,
  96:8, 98:4, 105:3,
  105:6
happened 23:18,
  23:23, 109:13
happening 77:16,
  91:18
hard 18:12
harder 17:9
hardly 94:11
harm 116:10
head 16:15, 119:19
heads 12:12
healthy 66:13

hear 6:13, 9:7,
  10:14, 10:16,
  34:14, 34:21,
  35:10, 42:12,
  67:5, 92:15,
  92:16, 101:9,
  102:2, 112:17
heard 8:8, 8:10,
  8:14, 15:2, 87:21,
  87:24, 90:20,
  92:7, 94:18,
  94:22, 96:9,
  112:20, 119:5,
  121:20
hearsay 41:5
heart 49:6, 55:2,
  60:12, 61:7
heavily 32:22
heels 93:16
held 13:20, 14:6,
  14:7, 19:19,
  22:25, 43:13,
  46:12, 46:14,
  46:20, 89:9, 97:24
help 31:11, 38:17,
  99:12
helpful 105:12,
  125:1
herring 101:24
hesitate 55:22
high 49:10, 69:1
higher 28:23, 95:9
highlight 40:13,
  123:18
hire 39:19
hired 95:23
hiring 53:18
historic 37:4
history 72:21,
  72:23, 72:24,
  73:3, 124:9
hit 41:14, 41:15
hoc 109:11
hold 21:11, 91:5
holding 46:10
hole 39:23
holidays 125:16
home 95:17
homestretch 110:23
Honorable 3:38,

3:40, 6:21, 6:22,
  6:23, 126:6, 126:8
hope 52:20, 61:17,
  83:23
hopes 52:23
hospitals 32:5,
  32:9, 32:15
hours 9:12, 48:11,
  60:17
House 93:4
HTML 34:1
Huge 33:6, 33:9,
  113:15
human 124:2
hundred 33:13, 39:5,
  117:23
hundreds 112:9
hurdle 116:4
hurricanes 103:12,
  104:2
hypothetical 82:20,
  96:5
hypothetically
  119:22


< I >
I. 62:22
identified 20:6,
  37:21, 38:24,
  39:7, 40:8, 41:1,
  63:3, 64:13, 94:1,
  121:8
identify 45:6, 49:2,
  74:6, 79:9
identifying 8:7
idle 28:11
ignore 19:12, 62:21
ignored 20:25, 98:20
ignores 37:11
II 62:23
III 1:8
illegitimate 73:6
immediate 24:18
immediately 24:6
immunity 12:22
impact. 68:21
impacts 55:20,
  56:10, 83:1, 90:2
impair 22:15, 23:7,

24:25, 71:21
impairs 22:6, 22:21,
  70:18, 70:25,
  79:17, 81:9, 85:7,
  114:15
impermissible 106:11
implement 23:6,
  55:19, 63:2,
  63:14, 93:22,
  100:9
Implementation 13:6,
  70:2, 70:18,
  123:19
implemented 62:18,
  70:21, 84:21, 95:7
implemented. 70:24
implementing 22:13,
  22:16, 80:24,
  81:11, 84:18,
  85:1, 85:18,
  94:10, 116:8
implication 68:21
implicit 119:18
implicitly 120:6
important 47:8,
  62:14, 62:15
imposed 111:11
imposes 34:12
improper 99:22
improperly 41:12,
  86:13
in. 23:19
inapposite 46:16
inappropriate 43:22
incentive 120:20
inclined 110:10,
  110:16
include 37:3, 50:2
included 104:3,
  118:18
includes 56:2, 70:8
including 7:22,
  22:13, 49:9, 74:7,
  81:19, 106:21
income 80:18
incomplete 26:18
inconsistencies
  77:19
inconsistency 36:9,
  36:13, 37:13,

37:22, 40:10,
42:4, 77:24,
87:23, 106:24,
119:11, 119:14
inconsistency. 88:11
incorporate 67:20
incorporated 56:24,
68:19
incorrect 68:23
increased 68:25,
121:2
increases 53:15,
80:1, 80:16, 81:7,
114:10
increasing 72:14,
80:6, 80:18
incurred 88:18
independent 51:25
indicated 84:20,
118:3, 123:1
indicates 13:14
indirect 95:16
indisputably 67:14
individual 56:14
individually 20:5,
39:24
individuals 17:18
ineffective 103:16
inevitably 28:14
inexact 99:1
inferences 73:7
influence 48:17
influencing 86:8
inform 44:15, 73:8
information 13:4,
28:18, 30:12,
30:13, 30:16,
30:22, 30:24,
55:8, 59:7, 78:5,
98:17, 124:17
Informative 8:2,
8:24
informed 79:18,
80:23, 82:18,
85:8, 85:17
informs 124:13
infrastructure 120:2
inherently 37:17
initiate 63:12
initiatives 121:4

injunction 22:22,
23:11, 23:16,
24:5, 24:6, 24:19,
25:20, 63:4,
91:17, 93:9, 94:7
ink 75:15
inputs 17:3, 18:21
inquiries 65:16
insignificant 78:10,
112:10
insists 28:2, 90:15,
97:18
instance 14:16,
53:15, 112:7,
115:2
instances 19:6
Instead 13:2, 17:3,
20:18, 22:18,
28:2, 30:3, 32:3,
32:8, 36:4, 36:13,
36:19, 74:1,
83:20, 100:19
instruction 113:24
instrumentality
13:24
insufficient 19:23,
84:5
Insurance 25:25,
28:19, 32:13,
32:16, 33:2, 33:4,
33:6, 33:7, 33:10,
33:13, 33:20,
34:3, 40:17, 41:2,
73:21, 74:3,
80:10, 80:20,
84:24
Insurers 33:9, 33:11
integral 111:19
intended 42:3,
79:10, 82:16,
88:14, 115:3
intends 79:1
inter 8:2
interest 7:7
interests 33:11
interfere 21:24,
22:1
interference 6:9
internal 49:11,
84:8, 110:1,

110:3, 123:11
internet 31:7
interpretation 38:20
Interrogatories
49:9, 50:15
Interrogatory 49:22
interrupt 8:15,
8:16, 8:19, 16:23
interrupted 58:2,
112:24, 113:1
interrupted. 91:24
interrupting 23:4
interruptions 101:15
intervene 106:17
intervention 11:24,
22:9, 22:23, 93:23
investigated 12:10
invocation 73:11
invoked 121:11
invoking 44:14
involve 43:25
involved 113:23
involves 32:14
ironic 113:22
irrelevant 122:22
irresponsible 123:23
island 26:21, 29:11,
120:21
issued 7:21
issuers 38:5
issues 10:22, 10:23,
24:13, 24:15,
27:17, 32:19,
40:13, 44:9,
47:18, 48:2, 49:6,
56:23, 66:10,
81:12, 94:16,
110:6, 116:22,
122:1
item 39:15, 100:13,
113:12
items 78:25, 104:23
itself 20:14, 22:25,
31:19, 78:12,
90:23, 122:3,
123:5, 123:11


< J >
J. 4:7, 4:15

jeopardize 27:9,
    64:4, 75:14
job 32:1, 39:19
John 93:3
joins 52:23
Joint 8:1, 8:23
Jointly 1:11
Journal 33:12, 33:16
Juan 6:1, 52:21,
    91:24
Judge 3:38, 3:39,
    3:40, 3:41, 6:5,
    6:7, 6:14, 6:17,
    35:8, 44:25, 45:4,
    101:12, 126:7,
    126:8
judicial 7:20
judicious 47:10
Judith 3:40, 6:22,
    126:8
July 47:12
jumped 102:22
justification 87:25
justify 12:16, 86:4,
    96:13, 108:8


< K >
keep 8:25
keeping 9:1, 17:1
kept 27:7
key 49:19, 75:23
kick 58:6
kicked 23:19
kilter 111:21
kind 57:7, 94:16,
    105:7, 105:12,
    105:21, 106:16,
    111:6
kinds 65:16
known 66:9
knows 30:14, 60:7,
    75:5, 113:18


< L >
L. 4:16
labor 16:19, 17:18,
    53:15
lack 47:9

laid 15:10, 18:20,
    18:21, 19:8,
    29:15, 43:2,
    45:20, 98:13
language 11:13,
    23:5, 23:10,
    53:12, 121:21
large 96:23
largely 9:18
last 33:3, 60:21,
    60:23, 66:5,
    68:20, 74:10,
    85:24, 87:6, 92:7,
    112:19, 113:7,
    116:7, 119:5,
    122:25, 123:2
lasting 37:2
late 47:12, 64:9
later 48:3, 56:25,
    74:18, 77:18
Laura 3:38, 6:21,
    126:7
law. 22:16
lawyer 60:8, 96:12
lay 18:13, 29:13
laying 53:18
lays 107:22
leading 64:2
least 18:4, 18:9,
    20:8, 25:5, 28:25,
    30:7, 55:23,
    57:15, 63:5, 81:7
leave 24:7, 39:18,
    57:25, 61:1
Leemore 31:14
leeway 36:24
left 34:25, 63:16
legal 47:7, 63:18,
    64:6, 94:16,
    94:25, 115:8,
    115:12, 116:2
legal-beagling
    55:10, 57:9
legion 21:1
legislation 34:4,
    41:25, 49:17,
    99:12, 111:12,
    121:9, 122:11,
    122:12, 122:19
legislation. 23:1

legislative 97:6,
    123:24, 124:9
legislature 23:6,
    34:5, 114:24,
    115:4, 122:10,
    122:12
legitimacy 81:14
length 89:23
lengthy 63:19
less 9:7, 17:18,
    38:9, 38:11, 53:5,
    53:8, 53:14,
    53:17, 53:18,
    54:21, 55:12,
    66:21, 80:13,
    84:21, 102:6,
    112:7
letter 27:3, 27:10,
    27:20, 28:17,
    28:22, 41:9, 68:6,
    68:9, 68:15,
    68:20, 69:11,
    70:20, 73:24,
    74:15, 74:16,
    79:19, 79:20,
    80:25, 81:2,
    82:16, 84:19,
    85:9, 85:20,
    85:21, 93:21,
    94:11
letters 22:8, 27:11,
    60:14, 62:17,
    63:20, 124:12
level 44:6, 49:11,
    115:19
leverage 91:13
light 70:11, 73:20,
    102:14
lightly 11:4
likely 51:11, 64:3,
    96:7, 98:3,
    108:17, 108:19
limited 7:22, 32:12
line 7:14, 22:2,
    34:2, 39:15, 40:9,
    40:11, 54:20,
    63:17, 78:25,
    92:13, 92:21,
    100:12, 104:23,
    105:16, 112:22,

114:3, 115:22,
  115:25, 124:1
Lisa 6:7, 6:9, 6:10,
  92:5, 92:13
list 60:9
listened 54:15
litigation 22:25,
  78:4, 109:23
little 6:8, 38:10,
  77:2, 94:5, 101:15
live 61:12
lives 123:25, 124:3
LLP 52:17, 111:2
lobby 33:6, 34:4
Lobby. 33:9
lobbyists 65:13
locate 124:6
located 72:23
log 35:2
logic 54:1
logical 61:10, 62:2
logistical 125:6
long 24:17, 46:11,
  46:13, 46:21,
  57:21, 87:10,
  93:24, 103:15,
  105:20, 106:9,
  115:25
longer 65:21
look 15:12, 17:12,
  18:17, 22:10,
  23:4, 57:4, 59:23,
  74:22, 89:9,
  111:18, 112:5,
  113:11, 116:15
looked 25:9
Looking 18:7, 20:6,
  20:16, 59:19,
  63:4, 64:21, 78:8,
  90:5, 108:10,
  112:10, 123:10
looks 18:20, 31:13,
  58:17, 58:18,
  60:5, 62:15
lose 12:13, 121:3
losing 63:14
loss 71:17, 71:20,
  71:25
lost 44:12, 45:14,
  55:23

lot 36:24, 62:24,
  75:15, 112:7,
  117:14
low 48:20


< M >
Magistrate 3:40,
  44:25, 45:4, 126:8
magnitude 112:6
main 26:23, 101:23
maintain 32:5
mammoth 114:17
managed 29:9, 32:4,
  32:8, 65:21
Management 1:10,
  1:32, 2:13, 2:30,
  3:12, 3:29, 6:25,
  7:4, 34:13, 52:18,
  54:25, 55:5, 84:5
managers 72:12,
  80:11, 80:16
manner 58:25, 72:12
manufacturing 51:15
market 32:1, 32:18,
  71:22
markets 77:8, 77:12
Martin 4:7, 52:16,
  111:1
mass 25:22
massive 33:10
Material 18:5,
  19:16, 30:8, 36:6,
  36:18, 37:6, 45:8,
  48:2, 50:17, 69:9,
  75:10, 75:11,
  79:12, 84:13,
  84:14
material. 36:25,
  88:7
materiality 18:4,
  37:10, 37:24,
  38:2, 38:12,
  38:14, 38:25,
  39:1, 46:3, 48:14,
  48:19, 48:25
materials 100:5
math 16:11
matter 8:22, 12:10,
  19:17, 21:4, 32:9,

39:1, 40:10,
  47:23, 56:8,
  60:12, 61:7,
  77:17, 79:12,
  94:6, 94:25,
  97:12, 110:8,
  112:12, 115:1,
  115:12, 116:22
matters 26:25,
  125:16
maximum 18:3
MCO 28:23
mean 14:7, 36:18,
  36:20, 36:23,
  37:18, 38:6,
  39:13, 39:22,
  43:1, 59:14
meaning 36:22, 37:1,
  63:1, 63:10, 77:1,
  77:13
meaningful 30:2
meaningfully 100:18
means 11:7, 11:11,
  35:22, 36:13,
  36:15, 37:5, 37:8,
  42:4, 53:4, 54:13,
  60:1, 61:12, 87:23
meantime 47:21
meanwhile 48:9
measure 38:2, 40:10,
  102:12, 104:18,
  117:18
Measures 15:17,
  38:4, 70:2, 121:8
meat 29:24
mechanically 112:23
mechanism 85:13,
  119:25, 120:19
mechanisms 31:24
Medicaid 64:23,
  64:25, 80:10,
  80:18, 94:19,
  95:1, 115:15,
  115:17, 115:20
medical 28:19,
  64:17, 120:21
Medicare 115:17,
  115:20
meet 40:20, 44:2,
  47:11

members 7:7, 7:23,
  81:25, 114:25
mention 62:14,
  121:17
mentioned 45:12,
  57:8, 59:12,
  111:17, 120:24,
  123:19
merely 105:2
merger 33:7
merit 97:17
merits 42:23, 43:9,
  43:10, 43:15
Merriam-webster
  36:25, 37:2,
  88:22, 89:3
met 41:25, 43:14,
  45:21, 90:9, 98:19
metadata 30:16
metaphysical 48:22
metro 32:13
mid 35:1
midpoint 99:7
midst 48:10
mightily 114:13
miles 32:14
Million 33:13,
  33:17, 40:18,
  67:25, 68:25,
  69:1, 69:2, 71:17,
  71:21, 73:23,
  82:8, 96:22, 99:5,
  99:8, 100:4,
  100:5, 100:6,
  102:16, 102:18,
  117:14, 117:15,
  117:16, 117:21,
  117:23, 118:11,
  123:20, 124:11
millions 67:15,
  69:16, 112:9
mind 115:16
minimal 29:19, 108:3
minimis 106:24
minimum 16:14, 32:5,
  32:9, 59:17, 60:4,
  115:2
minute 113:5
minutes 9:3, 9:6,
  10:11, 10:12,

34:24, 34:25,
  35:2, 35:14,
  41:15, 41:17,
  41:18, 41:19,
  52:11, 63:16,
  85:24, 87:18,
  101:14, 101:17,
  110:25
misinterpretation
  45:11
misleading 33:20
misrepresenting
  99:16
misrepresents 37:23
missed 17:23,
  112:16, 113:8
mission 56:13
misspoke 115:20
mistakenly 115:15
model 116:17
models 18:25, 19:7,
  116:13
modest 99:25
modicum 25:5
moment 23:3, 23:5,
  57:9, 101:3
momentous 36:21,
  36:24, 37:1, 37:3,
  39:25
monetized 58:7
money 17:15, 17:18,
  18:9, 18:15, 26:2,
  28:7, 29:4, 55:12,
  65:7, 78:22,
  95:11, 95:13,
  96:24, 100:13,
  102:25, 104:16,
  113:15, 117:14
monies 107:3
months 20:14, 44:8,
  46:21, 46:25,
  47:1, 47:4
monumental 37:4
moots 111:12
morning 6:14, 6:15,
  6:17, 6:18, 7:6,
  9:10, 10:18, 35:8,
  42:12, 42:14,
  52:14, 52:15,
  67:4, 67:6, 67:7

MOTIONS 3:37, 7:8,
  9:13, 10:24,
  47:15, 47:16,
  47:18, 47:20,
  47:24, 52:9, 53:1,
  53:2, 53:5, 57:3,
  86:22, 124:23
movant 46:19
move 39:15, 72:7,
  72:9, 81:21
moved 34:11
Moving 24:24, 35:19,
  45:19, 94:3
multibillion 96:23
municipal 97:6
muster 90:11
mute 7:14, 7:16
Myers 10:20, 35:17,
  42:16, 87:20,
  107:15

< N >
name 8:7, 8:9,
  52:16, 67:8,
  103:13
narrow 49:6
narrower 31:17
National 33:12,
  33:16
nearly 46:14, 100:6
necessarily 38:6,
  78:16, 120:5,
  120:9
necessary 13:5,
  13:9, 47:13, 48:9,
  73:14, 78:24,
  94:8, 103:6,
  103:18, 104:9
need 7:17, 8:9, 9:7,
  11:6, 11:10, 30:6,
  34:22, 39:19,
  42:3, 59:22, 66:2,
  87:13, 90:14,
  90:19, 91:3,
  96:10, 106:17,
  106:19, 117:7,
  117:11, 118:23,
  125:7
needed 30:12, 41:25,

48:5, 78:6, 84:9,
  100:11
needs 12:6, 16:5,
  30:13, 86:22,
  87:4, 90:7, 90:10,
  102:25, 106:22,
  107:2, 119:8,
  121:1
negative 73:2,
  105:13
negotiated 65:10
negotiation 124:10
Neither 23:6, 55:7,
  115:22
network 25:25,
  29:10, 31:21,
  32:3, 32:5, 65:23,
  65:24
networks 31:16,
  31:18
neutral 11:15, 15:9,
  15:13, 15:21,
  17:15, 17:22,
  18:1, 18:10,
  18:18, 20:9,
  20:19, 25:2,
  25:15, 26:1, 36:1,
  36:7, 36:8, 76:10,
  76:12, 83:8, 88:9,
  111:16, 111:25,
  121:6
Neutrality 20:17,
  70:4, 70:12,
  76:24, 77:14,
  87:25, 88:10,
  104:7, 111:11,
  113:18, 117:6,
  117:8, 117:12,
  118:12, 118:23,
  118:25, 119:5,
  121:10
Nevertheless 84:17,
  102:20
newly 12:5, 49:16,
  107:4
Next 32:1, 37:23,
  38:19, 58:7, 61:5,
  67:3, 113:20,
  125:2
NG 6:7, 6:10, 92:1,

92:4, 92:15,
  101:4, 101:12
night 74:10, 123:2
No. 1:6, 1:24, 2:5,
  2:22, 3:4, 3:21,
  6:24, 7:2, 8:3,
  9:16, 9:17, 9:20,
  9:21, 9:22, 9:24,
  10:1, 10:4, 10:7,
  41:17, 49:21,
  49:22, 50:14,
  68:7, 68:8, 68:13,
  74:10, 112:3,
  123:15
non-debt 40:4,
  103:21
non-movant 44:18,
  46:10, 49:2,
  108:21
non-movants 43:25,
  45:2, 45:5, 45:13,
  46:17, 46:21, 47:2
non-revenue 36:8,
  88:10
None 5:5, 5:11,
  22:7, 31:11, 86:7,
  91:8
nor 23:6, 31:23,
  79:7
note 107:24
noted 8:24
notes 116:6
Nothing 29:24, 47:8,
  59:1, 61:23, 66:15
notice 48:7, 50:23
notification 26:12
notifications 13:3
noting 38:13
notion 23:17, 30:24,
  88:17, 104:11,
  114:13, 116:2
notwithstanding
  79:10, 80:24,
  85:18
November 8:2
nowhere 57:5
nullify 23:1
nullity 95:3
number 18:21, 29:11,
  32:5, 32:9, 38:21,

60:20, 65:10,
  117:17, 123:7
numbered 44:3, 44:4
numbering 123:11,
  123:12
numbers 56:5


< O >
o'clock 9:10
O'melveny 10:20,
  35:17, 42:16,
  87:20, 107:15
O. 14:8
obey 114:20
objections 42:1
objective 60:4
obligation 12:3,
  12:16, 28:2, 30:4,
  106:15
oblique 28:17
obtain 71:22, 108:6
obtained 31:25
obtaining 110:5
obviate 90:14
obvious 53:21,
  55:21, 62:21
occur 125:4
odds 22:24
offer 38:14, 125:13
offered 15:5, 56:3,
  74:13
offers 36:19, 41:4
Office 72:14, 78:18,
  84:5, 84:23,
  100:10, 100:11,
  123:19
Official 126:15
officials 73:20,
  97:11
offset 58:24,
  105:20, 106:9,
  121:7
offsetting 69:17,
  69:18, 71:10,
  76:19
Okay 16:3, 41:13,
  60:6, 60:19, 62:5,
  64:23, 66:7,
  66:24, 66:25,

92:3, 92:8, 92:17,
101:13, 105:19,
112:23, 113:2,
114:5, 125:11
Omnibus 125:3
once 22:20, 62:11,
63:2, 118:11
One. 69:24
online 36:25
opening 10:8, 96:18,
118:3
openings 52:9
operating 14:17,
92:24
operation 7:13
operative 109:2,
122:18
opinion 51:5, 51:9,
51:15, 109:1
opinions 19:21
opportunity 20:22,
96:17
opposed 43:9, 43:15,
44:13, 113:24,
119:20
opposite 58:19
Opposition 10:10,
10:23, 20:23,
21:2, 42:23, 43:5,
43:18, 44:24,
78:25, 86:4
optimistic 83:2
oral 7:8, 87:8,
108:24, 109:7,
125:1
orchestrated 96:12
order 8:1, 8:8,
18:22, 52:25,
65:9, 66:10, 77:2,
77:6, 78:6, 87:13,
94:7, 117:9,
120:20, 125:5
ordered 24:18
orderly 7:13
orders 7:20, 89:22
ordinary 36:22
org/politics/insuran
ce_industry_ad_mak
es_fishy_ 33:25
organization 33:11,

33:22, 65:21
organizations 29:10,
32:4, 32:8
original 68:5,
68:16, 98:25
originally 64:7
Ortiz 19:19
otherwise 8:8,
59:16, 66:15,
88:13
out-of-pocket 53:19
outcome 48:17, 49:4,
49:20, 50:25,
86:8, 108:7,
108:18, 108:23
outlay 89:3
outmigration 59:13
outputs 17:1
outset 26:23, 44:23,
48:5, 54:16,
111:11
outside 55:18, 64:24
outstanding 44:16
overall 56:10, 69:1,
73:8, 96:25,
104:17, 111:19
overcapacity 60:22,
61:1
overlooks 114:23
overstaffed 16:14
own 9:1, 41:9, 47:7,
52:9, 56:17, 68:4,
69:3, 69:11, 73:7,
92:24, 117:17


< P >
PAGE 5:3, 24:20,
33:3, 45:22,
54:21, 69:9, 70:3,
78:25, 79:13,
92:21, 112:22,
118:21, 120:25,
123:10, 123:11,
123:12
pages 48:23, 76:4,
110:2, 126:4
paid 102:8
pandemic 103:13
paper 32:1

papers 37:20, 38:15,
40:14, 40:21,
94:22, 98:12
paragraph 51:6,
53:23, 69:10,
69:20, 70:5, 70:6,
71:18, 71:22,
72:4, 75:10,
76:14, 78:21,
79:14, 83:19,
115:16, 118:23,
123:16
paragraphs 71:14,
76:3, 79:4, 80:4,
80:14, 80:22,
84:13, 85:16
parallel 8:4
paramount 103:22
pardon 66:13
parsed 113:20
part 11:12, 56:23,
78:18, 86:23,
90:6, 92:9, 96:12,
111:7, 114:12,
118:6, 124:9,
124:13
partially 36:7, 88:9
participant 8:21
particular 64:17,
70:7, 92:9, 93:7,
120:22, 124:10,
124:13
particularly 38:3,
47:8, 73:10,
117:19
PARTIES 4:4, 7:7,
7:14, 7:23, 42:19,
45:16, 48:10,
52:20, 55:25,
58:16, 63:20,
94:4, 98:17,
106:17, 107:20
partner 53:3
party 19:20, 44:23
pass 41:24, 90:11,
105:20, 105:24
passed 21:9, 26:11,
34:4, 36:3, 39:3,
39:5, 106:7
passing 39:24, 64:2,

106:1
past 24:4, 24:24,
  116:3, 116:4
patients 124:1
paucity 98:10
Paul 32:23
pay 28:14, 29:3,
  53:9, 53:13,
  83:23, 100:8,
  100:14, 100:16,
  102:3, 103:3,
  104:23, 104:24
paying 16:10, 17:20,
  39:16, 48:11,
  53:16, 53:17,
  83:20, 105:6
payment 88:23,
  88:25, 114:5
payments 80:12,
  88:25, 89:6
payroll 102:16,
  114:6
pays 22:4, 47:7,
  83:22
pending 44:8
penny 12:12, 19:6,
  39:13, 89:20
people 16:10, 65:17,
  65:22, 65:23,
  65:24, 95:9, 99:12
per 36:8, 55:12,
  88:10, 96:22, 99:9
percent 18:3, 37:24,
  38:1, 38:6, 38:9,
  38:10, 38:12,
  38:16, 38:23,
  39:2, 39:3, 39:4,
  39:5, 56:13,
  60:16, 61:25,
  74:13, 84:21,
  96:25, 102:4,
  102:10, 104:17,
  104:22, 112:8,
  113:14, 114:8
perfect 11:20
perfectly 11:14,
  35:25
performed 18:8
perhaps 23:14,
  23:17, 23:22

period 46:18, 69:6,
  75:4, 117:19,
  117:24, 118:8,
  121:6
permissible 39:24
permission 10:21,
  67:9, 99:19
permits 74:23
permitted 7:22
permutation 15:23
permutations 16:1
perplexing 50:11
person 7:22, 8:13,
  39:16, 39:17,
  41:1, 55:17,
  61:10, 61:11,
  62:3, 63:25, 64:4,
  66:11, 94:14
personal 37:4
perspective 79:3
pertains 123:21
pharmacies 72:11,
  72:13, 80:12,
  80:13
pharmacy 34:13,
  72:12, 80:11
phases 121:25
PHC 43:3, 43:16,
  43:24, 45:15,
  45:20, 87:7, 87:9,
  107:17, 107:19,
  107:21, 107:24
phone 7:17, 7:18,
  8:6, 10:15, 52:13
phones 7:14
phrase 11:7, 11:11
PHV 4:7, 4:8, 4:15
physician 31:16,
  31:18
physicians 68:18
picture 55:24
piece 32:23, 33:1,
  33:23, 34:3, 76:25
place 24:5, 59:3,
  89:18, 99:6,
  110:10, 110:16
plainly 11:18
plaintiff 43:7,
  43:11, 43:14,
  43:15, 44:5, 44:9,

44:11
Plaintiffs 1:27,
  2:8, 2:25, 3:7,
  3:24
plan. 11:8, 54:3
planned 16:23,
  47:14, 58:3
planning 20:16,
  20:25, 21:20,
  21:22, 25:13,
  90:14
Plans 33:2, 33:5,
  33:6, 33:10,
  33:13, 33:20,
  56:1, 56:18, 65:6,
  80:10, 80:12,
  104:7, 104:9,
  115:18, 115:20
plausibility 73:15
plausible 23:22,
  82:12, 82:25,
  86:11
play 37:19, 60:9
played. 9:5, 41:10,
  50:13, 51:19,
  64:12, 65:14,
  86:20, 105:22,
  109:5, 110:12,
  116:19
playing 61:8
pleadings 47:1, 47:5
Please 6:16, 7:16,
  8:5, 8:9, 8:15,
  8:21, 10:14, 16:4,
  35:2, 51:21,
  52:12, 67:7,
  67:12, 110:14,
  111:3
plus 117:24
PM 91:23, 91:25,
  125:19
PMPM 28:23
point 9:9, 16:19,
  17:21, 29:22,
  41:6, 47:16,
  58:19, 63:11,
  65:18, 67:22,
  69:12, 72:20,
  74:7, 86:18, 87:6,
  87:12, 91:9,

109:16, 109:22,
111:4, 113:20,
116:5, 116:7,
116:12, 118:12,
119:16, 122:2,
122:25
point. 21:3, 21:11,
122:22
pointed 38:1, 40:21
pointing 74:2
points 54:17, 60:2,
71:13, 75:23,
78:25, 79:2, 80:3,
85:15, 113:7,
119:16, 121:17,
124:21
polemical 33:1, 34:3
policies 7:20
policy 61:25, 104:8,
104:21, 113:18,
119:9
political 64:20
poor 32:13
population 53:19,
59:13
portion 67:21, 122:6
position 24:8,
24:11, 33:14,
37:24, 75:19,
80:17, 91:10,
111:23, 111:24
positive 72:24
possibility 12:10,
105:2
possible 15:23,
52:21, 124:24
possibly 108:7
post 109:11
potential 24:11,
48:21, 123:4,
123:20
potentially 67:15
power 13:8, 13:12,
13:21, 16:2, 22:9,
30:15, 30:19,
36:3, 40:5, 62:22,
93:8, 93:11,
97:15, 103:20,
105:13, 106:6,
107:3

powerful 33:7
powers 30:21, 40:3
pparently 123:3
practical 77:17,
95:6
preamble 74:12
precedent 45:2
precise 60:3, 68:21,
123:6
precisely 24:2,
74:23
predicates 13:20
predict 65:12
preempted 26:25,
95:1, 95:13
preemption 64:6,
75:18, 94:17,
115:19
preempts 64:24,
94:19, 115:15
preenactment 121:25
prejudice 42:18
preliminary 122:7,
122:11, 122:14
premiums 31:23
prepare 55:13,
97:23, 98:7
prepared 33:1, 48:1,
54:23, 55:4,
116:1, 116:2,
124:25
preparing 11:9,
19:9, 97:19
prerequisites 40:6
present 6:21, 19:21,
24:15, 25:6, 86:4
presented 25:3,
32:19, 86:23,
106:25
preservation 124:2
preserve 94:8
preserves 57:19
presiding 6:21
press 7:7, 7:23
presumption 45:22
presumptively 18:5
pretrial 44:16
prevail 14:18
prevent 13:5, 34:20,
62:20, 110:5

prevents 39:11
previous 68:18
previously 53:6,
76:9
price 20:11, 21:18,
64:2, 65:23,
66:21, 72:13,
79:25, 80:5
prices 31:21, 65:22,
65:25, 72:12
primarily 37:16,
40:15
primary 25:14,
25:16, 84:4
Principle 70:4,
111:12
principles 59:25
private 80:10
probably 9:10,
48:16, 111:6
problem 26:23,
31:18, 37:20,
38:23, 39:7, 39:8,
40:7, 60:15, 62:2,
62:19, 66:1, 90:6,
95:3, 95:7,
109:24, 121:24,
122:21
problems 114:17
procedure 65:15
procedures 17:8,
89:17, 125:5
proceed 46:4, 67:12,
116:11
Proceeding 8:1, 8:3,
8:17, 9:17, 9:20,
9:22, 9:24, 10:1,
10:4, 10:7, 80:24,
84:18, 85:18,
94:9, 114:14
Proceedings 4:46,
7:2, 7:10, 7:15,
8:25, 9:10, 35:7,
125:19, 126:6
process 15:10,
15:14, 18:19,
18:21, 18:23,
18:24, 19:9,
24:12, 49:15,
64:7, 89:21,

89:22, 90:25,
91:4, 111:19,
116:10, 121:3
procuring 17:13
produced 4:46, 110:3
product 116:17,
116:18
Production 17:4,
49:21, 52:3
productive 16:15
productivity 17:7,
17:19, 18:3, 20:8,
20:20, 21:24,
22:1, 57:19,
57:22, 59:22,
90:15
professional 25:24,
100:6, 100:16,
100:17
professionals 25:23,
29:11, 67:14,
100:10, 120:21
programs 34:13
prohibited 23:21,
23:25
prohibiting 39:12
prohibition 23:19,
103:20
projections 72:1,
83:2
promote 72:3,
119:21, 120:1,
120:5
promoting 65:20
promptly 124:18,
124:24
properly 31:10
proposals 58:17
proposed 38:25,
122:7, 122:11,
122:13
Proskauer 52:17,
111:2
protections 103:19
prove 12:8, 87:13,
100:22
provide 12:4, 17:24,
28:18, 58:1,
58:12, 68:2,
73:12, 82:5,

82:22, 83:4, 90:1,
108:20, 120:13
provided 17:3,
54:19, 60:21,
61:22, 67:19,
77:25, 78:5,
78:19, 83:14,
86:11, 86:17,
99:6, 104:13,
118:19, 119:24,
120:1, 120:4,
122:2
Provider 32:8,
32:24, 66:12
providers 66:9
provides 19:1,
54:22, 55:7,
67:11, 68:21,
73:13, 75:24,
76:17, 81:24,
82:13, 83:9,
83:16, 91:12,
93:10, 93:11,
99:10, 105:1,
114:23, 120:14
providing 53:13,
58:12, 59:16,
125:5
proving 87:1
provision 11:14,
16:22, 16:23,
35:25, 64:17,
76:24, 77:10,
77:13, 77:22,
80:20, 117:8,
120:23, 121:13
provisional 94:8
provisions 27:1,
65:20, 87:3
Public 7:7, 7:23,
73:20, 80:20, 84:9
pull 111:20
pun 66:13
punished 7:24
purchase 100:9,
100:15
purely 37:13
purportedly 83:10
purpose 63:6, 99:24,
104:24, 115:12

purposes 18:4, 22:7,
22:15, 22:22,
23:8, 25:1, 48:19,
60:20, 62:24,
70:18, 71:1,
77:11, 79:17,
81:9, 85:7,
106:13, 107:4,
113:22, 114:16,
115:8
pursuant 67:17,
72:17, 82:2
pursue 46:11
pursues 121:5
pursuing 93:17
push 24:9, 90:12
put 20:12, 24:11,
25:14, 27:16,
29:24, 41:18,
48:20, 89:17,
96:13, 100:21,
110:18
puts 26:19, 102:14,
114:19
putting 35:24,
93:16, 121:25,
122:1

< Q >
qualified 25:24,
68:18
qualitative 37:18,
37:21
Quantitative 18:4,
37:10, 37:14,
37:15, 37:18,
37:21, 38:2
quantity 114:6
question 11:22,
13:9, 13:12,
13:21, 14:4,
14:25, 16:5, 24:9,
29:6, 60:13, 70:7,
73:19, 74:21,
86:9, 86:10,
86:13, 86:14,
91:22, 93:2,
119:19, 122:23,
123:17

questioning 16:6
questions 8:19,
  13:14, 26:18,
  45:25, 72:6,
  81:20, 91:7,
  107:7, 116:23,
  117:1, 124:20,
  124:22
quicker 46:12
quickly 17:24, 26:9,
  94:3
quiet 17:24
quite 57:21, 108:24,
  121:20
quo 94:9
quote 19:20, 31:22,
  57:21, 67:24,
  68:3, 68:15, 69:5,
  73:16, 78:23,
  82:12, 82:18,
  88:7, 115:17

< R >
raise 28:3, 66:19,
  77:1, 77:2, 80:10,
  85:12, 95:9,
  104:3, 104:5
raised 22:3, 25:16,
  44:7, 52:1, 74:14,
  97:17
raises 55:21, 72:12,
  74:3
ranch 58:1
range 69:1, 69:4,
  98:24, 99:2, 99:4,
  99:7, 99:8
ranges 19:5
ranging 38:10, 48:4
rates. 28:23
rather 48:11, 53:17,
  82:10, 90:24
rational 115:9
Re 1:6, 6:24, 43:16
re-established.
  91:25
reach 27:23, 27:24
reached 25:17, 28:9
react 64:1, 65:11
read 11:12, 13:8,

35:23, 36:20,
  57:22, 70:5, 92:7,
  92:20, 112:21,
  120:24, 122:6
reading 12:13,
  36:23, 50:3,
  50:20, 57:24,
  74:10, 123:2
reads 113:23, 118:2
real 39:7, 58:22,
  91:3, 94:23, 96:4,
  116:10
really 16:19, 28:15,
  29:19, 31:11,
  31:13, 36:13,
  47:9, 55:1, 57:15,
  61:23, 90:5,
  91:18, 95:5,
  96:14, 116:22,
  122:17
rearticulated 62:13
reason 21:14, 25:14,
  31:8, 49:1, 56:22,
  60:12, 73:19,
  75:12, 87:4,
  102:17, 102:24,
  113:3, 113:19,
  123:23
reasonable 64:4,
  77:21, 77:25
reasonably 120:11
reasons 25:1, 69:14,
  76:8, 83:8,
  111:17, 113:10,
  115:10
reassure 105:10
rebuttal 87:18,
  110:24, 111:10
recall 74:10, 93:2,
  93:7, 93:19
recalled 123:2
receipt 75:14, 76:2
receive 53:8, 55:12
receiving 97:5,
  114:7, 114:8
recess 35:6
recharacterizing
  73:4, 75:17
recites 51:17
reckless 99:15

recognize 53:21
recognized 11:19,
  111:10
recognizes 93:14,
  96:21, 107:19,
  120:6
recommence 35:13
recommendation 45:1
recommending 56:20
reconvene 52:20
reconvened. 35:7
record 8:8, 67:8,
  71:1, 71:8, 74:23,
  81:18, 85:11,
  86:24, 90:21,
  92:20, 112:21
recorded 4:46, 40:24
recording 7:21
records 30:15
red 101:24
redo 92:2
reduce 20:7, 40:3,
  53:10, 59:15,
  67:14, 103:20,
  114:8
reduces 69:18, 71:3,
  71:10
reducing 54:7, 61:3,
  70:13, 80:18,
  100:7
reduction 16:15,
  60:16, 60:24,
  76:18
reductions 121:7
refer 115:17
reference 28:17,
  28:23, 41:9
referenced 74:18,
  121:13
references 29:22
referred 90:22,
  116:13
referring 115:16,
  115:21, 123:16
reflect 59:21
reform 121:4
Reform. 33:18
refuses 53:20
refute 21:2
Regarding 12:5,

48:8, 50:16, 51:3,
  51:16
regardless 87:11,
  88:19
regulation 37:25
regulations 27:2,
  32:4, 34:12,
  115:19
regulatory 123:19
rehash 62:8
reject 12:16, 12:19,
  74:12
rejected 12:14,
  34:9, 74:19
rejects 77:21
Related 9:15, 10:3,
  27:2, 81:5
relates 69:4
Relating 10:6
relationship 31:20,
  97:14, 122:18
relevant 45:20,
  64:17, 109:18,
  122:6
reliance 48:8, 87:8
relied 25:7, 29:17,
  51:4, 91:1, 109:10
relief 42:23, 43:3,
  43:17, 43:20,
  44:6, 44:12,
  45:12, 45:22,
  52:22, 52:25,
  92:25, 93:1
relies 32:22, 43:4,
  43:23, 48:24,
  79:25, 84:3,
  85:12, 109:17
rely 51:9, 86:13,
  97:10, 108:25
relying 34:3, 41:6
remaining 9:3, 102:8
remains 103:22
remark 8:9, 45:2,
  45:10
remarks 8:7, 96:18,
  118:4
remedies 93:11,
  94:2, 94:8
remember 8:5, 93:4
remind 7:19

remote 12:10
remotely 55:7
rendered 93:21, 95:3
reneging 99:14,
  121:22
repeated 73:10
repeatedly 12:15,
  75:16, 75:19
Reply 21:7, 21:13,
  22:10, 27:21,
  31:2, 36:5, 40:13,
  40:22, 43:6,
  53:22, 88:6, 88:8,
  88:13, 110:2
report 45:1
Reporter 6:13, 6:14,
  34:14, 34:15,
  34:21, 35:11,
  92:5, 92:19,
  92:20, 101:10,
  112:19, 112:21,
  112:25, 126:15
representative 1:13,
  7:1, 40:17, 109:22
represents 33:11,
  102:4
reprogram 39:22,
  102:25
reprogrammed 78:24
reprogramming 39:12,
  42:5, 79:3, 79:7,
  79:25, 84:3, 84:8,
  84:11, 84:15,
  85:4, 86:14,
  99:22, 99:23,
  100:13, 100:20,
  100:23, 102:15,
  102:22, 102:23,
  103:6, 103:19,
  105:5, 105:18,
  106:2, 106:11
reprograms 78:16,
  84:2
Request 8:10, 8:12,
  8:14, 13:3, 33:2,
  42:17, 42:22,
  43:1, 43:11,
  43:12, 43:25,
  44:25, 45:16,
  47:6, 48:9, 48:19,

49:20, 70:6,
  75:18, 79:6,
  84:10, 98:20,
  98:21, 98:24,
  99:24, 103:1,
  107:20, 108:1,
  114:17, 122:10
requested 43:17,
  44:5, 44:12
requesting 43:20
requests 42:19,
  45:13, 46:9,
  46:22, 46:24,
  47:19, 48:1, 48:7,
  49:2, 49:5, 49:9,
  49:19, 62:17
require 35:20,
  48:16, 53:8,
  53:25, 54:6,
  55:11, 100:20,
  105:18
required 11:19,
  11:20, 13:24,
  14:1, 61:2, 73:13,
  76:10, 82:6, 83:9,
  90:3, 90:13, 100:9
requirement 20:25,
  21:20, 21:22,
  25:13, 35:24,
  58:4, 75:5, 88:1,
  91:6, 118:5
requirements 22:14,
  44:3, 45:5, 60:9,
  77:9, 90:14
requires 14:19,
  16:22, 19:15,
  35:25, 53:18,
  55:16, 59:3, 84:5,
  89:6, 102:15,
  108:21
requiring 11:14,
  29:9, 32:7, 80:11,
  106:9
research 33:5
reserves 124:23
resisted 114:13
Resolution 46:16,
  48:22
resolve 35:21
resolved 36:16

resources 47:10,
  78:23, 79:9,
  82:13, 84:6, 84:9,
  99:24, 103:5,
  106:13
respectfully 87:9
respects 93:3
respond 8:12, 20:14,
  20:22, 54:17,
  98:21
responded 74:15,
  74:17, 83:3, 86:5
responders 120:8
Response 45:3, 52:8,
  62:17, 69:8,
  69:19, 74:16,
  75:9, 75:11,
  76:13, 77:15,
  79:11, 81:2,
  84:12, 84:14,
  107:21, 118:22
response. 101:5,
  125:10
responses 49:8,
  111:5
responsibility 77:8,
  77:11, 103:21,
  104:10
responsible 55:17,
  61:11, 61:15
responsive 61:17,
  123:17, 124:4
rest 58:25
restart 101:16
restore 77:7, 104:10
restraining 94:6
restrictions 62:22
rests 57:18
result 88:23, 88:25,
  98:3, 114:5, 114:6
results 89:11
retain 120:21
retransmission 7:21
retroactive 84:18,
  85:1
return 87:17, 118:11
reveal 45:7, 49:3
revealed 51:8
revealing 68:5
revenues 15:16,

18:14, 26:3,
  37:17, 38:4, 53:8,
  53:10, 53:14,
  54:1, 54:7, 55:1,
  55:7, 66:18,
  66:21, 67:14,
  67:25, 69:15,
  69:18, 70:12,
  71:3, 71:10,
  76:18, 76:19,
  80:19, 83:18,
  85:14, 102:8,
  121:3
review 12:22, 13:16,
  97:7, 114:24,
  115:5, 116:6,
  122:7, 122:11,
  122:14
reviewable 13:15
reviewing 49:15,
  115:1, 122:15
revised 68:4, 68:6,
  68:16, 68:22,
  69:3, 69:7
rewarded 99:13
rewrite 106:23
RFP 50:14
right-size 59:12
right-sizing 16:16,
  60:24, 61:3, 61:4,
  114:11
rigid 60:9
rises 88:16
risk 26:20, 28:10,
  84:15, 92:24,
  93:15
Rivera 46:14
Rodriguez-cuervos
  44:11, 45:11
roll 103:3
rolling 93:4
room 37:19, 39:15,
  103:18
roost 95:17
Rose 52:17, 111:2
rough 19:4
roughly 34:25, 63:23
rounds 48:10
Rules 12:4, 12:14,
  106:15, 106:18

run 24:6, 114:20
runaway 39:11
running 18:25,
  65:19, 100:11


< S >
S/ 126:13
sacrifices 120:7
Safety 84:9, 125:16
sake 122:20
salaries 39:16,
  100:5, 100:8,
  100:14, 118:20,
  119:20
salary 59:25, 81:24,
  82:14, 82:16,
  83:1, 83:10,
  83:11, 83:22,
  84:4, 85:1, 120:3,
  120:4
salvage 30:2
San 6:1, 52:21,
  91:24
sanction 24:18,
  91:16
sanctions 7:24,
  24:7, 24:11
satisfaction 12:9
satisfied 26:7
satisfies 29:25,
  46:6, 81:14
satisfy 19:23,
  28:11, 40:19,
  45:5, 49:24, 118:5
satisfying 22:14
save 6:22, 114:9
savings 69:17,
  69:18, 71:11,
  76:19, 114:4
saw 59:4
say-so 16:7, 19:18,
  51:23
saying 16:12, 16:14,
  22:17, 22:20,
  36:5, 36:19,
  59:22, 60:8, 61:8,
  93:8, 94:22,
  96:10, 96:11,
  98:19, 105:5,

105:24, 107:18,
108:6, 112:18,
113:9, 115:4
scenario 98:4, 98:8,
102:2
schedule 61:4
scheduled 9:12,
125:2, 125:3
scheme 22:2, 24:3
scintilla 57:7
score 41:4
scrivener 29:23
se 36:9, 55:12,
88:10
searching 116:12
SEC 18:4, 37:25,
38:5
Second 26:20, 44:19,
69:12, 69:21,
75:1, 75:2, 83:14,
114:19, 115:11,
116:6
secondary 15:20,
16:3, 18:5, 31:3,
34:8
Secondly 37:9
seconds 113:6,
125:8, 125:12
Sections 49:13,
67:17, 72:17, 82:2
sector 80:21
seeing 17:22
seek 11:24, 49:22,
50:15, 84:11,
92:25, 93:11,
94:2, 102:22
seeking 11:23,
19:14, 46:7,
46:18, 75:18,
86:7, 100:23
seeks 35:20, 49:8,
49:10, 52:22,
52:25
seem 13:18, 23:12,
24:21, 74:11,
108:20
seems 55:22, 74:12,
91:4, 92:1
seen 63:5, 103:9,
103:12

sees 56:21, 105:11
segment 8:10
select 7:16
self-serving 19:24,
29:18
semantic 22:17
send 13:2
sense 33:22, 54:2,
61:9
sent 26:12
sentence 35:1
September 83:4,
84:16
series 39:24, 78:25
serious 94:10
serve 63:6
served 42:20, 46:22,
46:24, 47:6, 48:2
services 16:24,
17:2, 17:4, 17:13,
17:14, 18:8,
20:10, 21:18,
58:1, 58:2, 58:12,
59:17, 60:20,
61:2, 65:22,
100:6, 100:10,
100:16, 100:17,
114:6, 114:8
serving 47:19
session 6:20
set 8:23, 26:15,
35:13, 39:1, 39:2,
39:4, 39:14, 42:1,
46:25, 58:23,
71:11, 76:2, 77:5,
77:10, 77:18,
78:20, 81:15,
85:19, 86:23,
101:14, 113:5,
120:8
sets 100:7
setting 99:4
seven 26:11
seven-day 64:10
several 53:10,
75:22, 111:5
shaking 37:4
shall 122:15
share 28:1
shared 27:21

sharing 97:15,
105:13
sharpen 47:18
shattering 37:3
shift 69:12
Shifting 42:1,
85:23, 90:9,
100:12
short 50:3, 85:13
shortfall 84:12,
85:2, 102:7
shouldn't 28:11,
95:13
Show 19:15, 22:8,
48:16, 51:11,
52:2, 62:5, 66:15,
86:3, 96:10,
96:24, 115:25
show-stopper 57:14
showed 100:2
showing 56:3, 82:23
shown 14:21, 38:8,
46:7, 98:12, 116:3
shows 47:9, 49:19,
55:8, 63:21, 64:8,
66:17, 72:24,
73:3, 115:3,
115:24
showstoppers 59:4
sick 21:20, 21:23,
58:14, 61:25, 62:7
side 39:23, 60:9,
72:24, 73:2, 89:16
sides 14:14, 14:16,
105:14
signed 97:4
significance 48:21
significant 36:9,
36:13, 36:18,
36:20, 36:23,
37:5, 37:8, 37:13,
37:21, 38:15,
40:10, 42:4,
63:18, 72:25,
76:25, 87:23,
88:10, 106:23,
107:1, 119:11,
119:14
signing 35:5
similar 46:10

similarity 47:2
Similarly 44:11,
    50:14, 108:2,
    109:21
simply 15:15, 20:25,
    30:25, 36:14,
    38:15, 51:17,
    51:23, 57:3,
    67:20, 67:22,
    70:5, 73:3, 73:16,
    74:2, 81:13, 87:9,
    91:11, 122:1,
    122:6
single 12:12, 39:13,
    46:9, 48:11, 94:5
situation 14:18
six 100:5, 100:6,
    101:14, 101:16,
    123:12
size 111:6, 112:4,
    113:10, 113:17,
    119:15
skipping 17:9
slightest 110:17
slightly 107:25
slower 61:4
small 38:22, 56:8,
    100:7, 104:16
smaller 53:19, 59:13
so-called 50:8,
    57:4, 61:22
Soheil 32:1
sole 12:9, 12:18
solution 39:8, 95:2
Solutions 7:17,
    8:11, 42:11
somebody 95:12
somehow 20:7, 26:19,
    26:20, 28:14,
    29:12, 30:24,
    43:21, 77:22,
    88:1, 96:13,
    98:25, 116:13
someone 39:19, 55:5,
    55:10, 116:18
soon 47:25
Sorry 6:8, 14:4,
    14:24, 23:3,
    34:14, 35:1,
    42:15, 66:25,

71:4, 91:21, 92:6,
    101:3, 101:10,
    104:1, 109:8,
    112:15, 113:8,
    115:20, 119:4
sort 14:11, 16:5,
    23:13, 24:18,
    59:19, 89:11, 91:3
sorts 103:8
Sound 9:4, 9:5,
    41:10, 50:13,
    51:19, 64:12,
    65:14, 86:20,
    105:22, 109:5,
    110:12, 116:19,
    125:12
sounds 71:6
source 79:1, 104:6
sources 31:3, 34:8,
    84:4
space 29:1
speaker 7:25, 8:13,
    8:23, 8:25, 9:2,
    10:12, 52:10
speaking 6:6, 7:15
special 58:6, 83:18,
    83:20
specific 30:19,
    49:2, 72:7, 78:8,
    104:3, 118:15,
    119:6, 120:23,
    121:7, 121:13,
    124:17
Specifically 64:21,
    70:13, 77:18,
    80:5, 87:7, 118:2,
    118:10, 118:25,
    122:4, 123:10,
    123:17
specified 9:9
speculating 50:20
speculation 28:12
speculative 29:9,
    30:11
spend 17:17, 26:2
spending 17:14,
    18:14, 39:12,
    40:4, 70:13,
    80:18, 99:25,
    119:19

spends 78:17
spent 28:6, 63:22,
    95:11, 95:13
spilled 75:16
spreadsheet 116:17
spreadsheets 59:23
squarely 22:24
stability 71:22
stack 117:19
staff 16:13, 125:14
stage 37:15
stakeholders 117:22
staking 33:14
standard 11:18,
    13:16, 13:21,
    14:5, 14:6, 14:7,
    14:12, 19:14,
    36:11, 37:7,
    38:25, 39:2,
    48:25, 106:5,
    106:24, 108:21,
    109:3, 109:4
standards 40:20,
    81:15
star 20:2
start 60:8, 107:17,
    117:6
started 34:16
starting 34:17
state 8:9, 68:20,
    76:12, 115:19
stated 71:16, 71:19,
    71:24, 86:25,
    120:20
Statement 19:22,
    19:25, 69:9,
    69:10, 69:19,
    75:9, 75:11,
    76:13, 79:10,
    79:11, 84:12,
    84:14, 118:22,
    122:20, 123:21
statements 33:21,
    38:5, 95:22, 96:2,
    96:5, 97:10,
    97:13, 124:18
States 1:1, 3:39,
    3:41, 6:19, 6:22,
    12:15, 44:23,
    51:6, 67:23, 68:9,

68:15, 73:16,
78:22, 80:9, 84:3,
121:1, 123:18,
126:7, 126:8
statistical 33:1
status 94:8
statutes 12:6,
93:17, 93:22
statutory 13:19,
22:2, 23:5, 24:3,
27:1, 55:24
stay 23:11, 89:1
stenography 4:46
stiff 59:6
stifle 29:12
Stop 21:21, 35:1,
58:18, 63:2,
63:13, 104:1,
105:6
stopping 93:17,
125:11
stops 55:3, 59:1
story 90:17
straight 15:14
stream 83:11
streams 106:10
strips 77:22
strong 45:21, 121:21
structure 43:2
studied 25:11
study 31:19, 32:12,
32:25, 123:25
stuff 18:15, 95:25
subject 26:25,
27:19, 41:9
submission 124:5
submit 40:22, 79:6,
84:10, 124:6,
124:17
submitted 15:11,
29:8, 40:21,
40:25, 75:22,
81:18, 89:24,
122:9, 122:16
submitting 98:24,
99:15
subparts 49:9
Subsection 70:3,
120:25
subsection. 122:16

Subsequently 68:4,
122:16
subsidized 32:12,
80:20
substance 55:16
substantial 13:25,
25:18, 30:9,
51:12, 71:1, 71:8,
75:22, 79:22,
81:18, 85:10,
86:17, 90:21,
91:13, 91:18,
108:16, 109:3
substantially 68:25
substantiate 12:7,
29:8, 73:14
substantiated 80:8,
109:9
substantiating 12:5
substantive 10:22,
43:18, 43:21,
44:24, 45:3,
45:17, 54:11,
54:12, 107:21
substantively 86:5
subtitle 122:14
sufficient 40:19,
82:13, 83:13,
84:16, 121:8
suggest 57:13, 94:4
suggested 124:10
Sum 41:13, 51:20,
66:2, 96:24,
99:10, 110:13
superficial 54:5,
54:13, 113:24
supervise 114:24
Supp 13:12
supplement 74:22
supplementally
124:18
supplied 26:4
supplies 100:5,
100:9, 100:15
supply 12:19, 13:4,
25:20, 26:13
support 13:24, 31:3,
106:13, 106:16,
107:4, 108:15,
110:3

supported 21:5,
28:4, 50:18,
96:14, 123:22
supporting 49:14,
68:3, 98:11,
106:21, 125:15
supports 31:16,
90:21
suppose 16:18
supposed 58:2,
62:19, 63:1,
63:13, 92:10
supposedly 41:3
sustain 84:6
sustainability 56:2,
56:5, 56:9, 56:25,
111:16
Swain 3:38, 6:5,
6:21, 35:8, 126:7
sworn 31:5
synonyms 37:3
system 123:12

< T >
table 19:20
Tacoronte 6:16
tactics 42:2
tails 12:12
taken. 35:6
talks 88:20
target 99:9
targeted 48:1, 48:6,
49:6
targets 72:2
task 11:9
tax 66:18, 66:21,
67:13, 71:3,
71:10, 80:18,
82:12, 82:16,
82:25, 83:12,
83:21, 83:23,
84:21, 84:22,
85:14, 101:23,
102:1, 102:8,
105:24, 106:1,
120:18, 120:19,
120:20, 121:2,
121:4, 121:6,
121:15

taxes 84:17, 106:10
taxpayer 28:7, 59:17
Taylor 3:38, 6:21,
   126:7
technical 97:11
technology 92:9
tectonic 37:5
telephone 42:11
telephonic 7:13
TELEPHONICALLY 4:4,
   125:4
tells 32:8, 101:25
temporary 94:6
ten 48:3
tens 28:7, 53:16,
   67:15, 69:16,
   112:9
terms 29:21, 53:8,
   59:25
Terrific 35:15
territorial 30:16,
   54:24
testify 51:4
testimony 31:5,
   40:16, 40:21,
   40:22, 40:23,
   40:24, 41:3, 41:5,
   41:7, 48:8, 49:23,
   50:15, 73:20,
   74:1, 74:2, 74:6,
   74:11, 74:12,
   74:14, 74:15,
   74:19, 74:24,
   109:16, 123:4,
   124:5
tests 66:10
text 70:8, 92:15
textbook 99:10
theater 96:12
theory 20:19, 29:9
they'll 17:17
They've 21:12, 66:11
thinking 57:8, 95:25
thinks 31:12, 50:10,
   90:10
third 32:21, 46:6,
   75:12
thirdly 118:13
thorough 125:1
though 43:15, 56:17,

58:13, 108:19,
   119:23, 119:25
thoughtful 125:1
thousands 28:7,
   53:16, 123:25
threat 24:7, 24:17,
   91:16, 93:25,
   94:10
threaten 56:25
three 9:12, 18:24,
   31:2, 35:19, 38:9,
   40:11, 44:18,
   46:1, 50:20,
   63:16, 67:17,
   83:1, 84:21,
   84:23, 117:12
three-year 46:18
Three. 20:2, 46:4,
   68:1, 103:13
threshold 37:24,
   38:1, 38:12,
   38:14, 38:15,
   48:20
throughout 119:18,
   120:8
tie 14:16
tied 54:9
ties 121:15
Tim 53:3, 67:4, 67:8
timeline 46:11, 47:9
timely 45:24
Timothy 4:8, 117:3
tiny 102:10, 102:14,
   113:12
Title 1:8, 27:1,
   62:22, 62:23
Today 7:8, 7:13,
   9:13, 46:2, 52:22,
   52:25, 53:9,
   54:11, 57:20,
   62:16, 87:8, 125:2
together 48:15,
   96:13, 103:10
took 20:14, 68:17
tools 104:9
total 10:11, 102:5
totaling 100:3
totally 112:11,
   113:23, 114:18,
   114:22

toward 16:15
towards 121:1
track 9:1, 9:2
trade 56:1
transaction 17:12
Transcript 4:46,
   8:17, 126:4
transcription 126:5
translates 60:17
translation 123:9
Treasury 15:11,
   18:20, 89:23
treat 105:15
treats 64:10
tribute 56:16
tried 11:12, 11:22,
   35:23, 41:23,
   44:18, 105:23
tries 19:12, 90:12
trigger 63:3
triggered 62:12
triggering 23:12
trouble 17:22
Trucking 44:5, 45:11
true 21:21, 30:5,
   51:8, 96:10,
   98:21, 102:7,
   126:5
truly 97:1
trumps 88:1
Trust 46:16, 48:23,
   97:14
truth 41:6
truthful 74:1
try 29:24, 34:4,
   57:21, 59:8,
   103:4, 103:14
trying 11:16, 12:21,
   29:8, 38:16,
   59:12, 88:4,
   88:13, 89:25,
   90:7, 90:8,
   105:10, 106:4,
   106:6, 106:12,
   110:5, 114:1,
   114:4
turn 22:5, 25:21,
   34:10, 40:12,
   42:6, 52:8, 72:19,
   83:2, 88:15,

93:19, 96:16,
99:18, 101:1,
101:20, 117:2
turned 78:4
Turning 94:12
TV 33:22
type 61:15, 62:11,
68:18, 120:3,
120:4, 120:9,
122:2
types 119:21
typically 48:15,
49:1, 65:7

< U >
Ultimately 14:17,
70:11, 78:7,
87:12, 109:24
unable 83:4, 84:24,
103:7
unasked 29:6
unavailing 87:5
uncertain 85:12
uncertainty 82:21
unconditional 83:10,
83:15, 85:12
Uncontested 69:9,
69:20, 75:11,
76:14, 79:12,
84:13, 84:14,
118:22
uncontrovertible
54:18
uncover 108:22
undeniably 102:23
underlie 116:14
underlying 52:3
undermine 72:1
undermines 97:13
understand 11:17,
18:11, 34:19,
35:9, 73:1, 91:12,
97:25
understanding 98:1
understands 15:22,
92:24
undertakes 121:5
undisputed 69:17,
70:22, 75:7,

76:11, 76:13,
79:8, 118:19
unfair 114:19
unfortunately 11:1,
34:22
unfounded 12:14,
123:24
unilaterally 11:23
United 1:1, 3:39,
3:41, 6:19, 6:22,
126:6, 126:8
unknown 48:21
Unless 45:25, 63:1,
72:6, 81:20,
103:4, 107:7,
116:23, 124:20
unlike 47:22
unmute 7:18, 8:5,
10:14, 42:9,
42:10, 52:12,
125:9
unnamed 40:17
unnecessary 66:10
unpublished 44:25
unquestionably 28:6
unsupported 19:22
untenable 24:8
Until 21:7, 21:13,
26:14, 28:15,
28:22, 36:9, 44:1,
44:16, 63:5, 93:22
untimely 26:8,
26:12, 46:9
upped 60:21
upsets 111:17
URL 33:24
uses 19:7
using 36:25, 76:24,
114:9, 123:10,
123:11
usual 8:17
utility 46:2, 48:14

< V >
v. 1:29, 2:10, 2:27,
3:9, 3:26
vacation 17:6,
17:11, 20:16,
20:25, 21:20,

21:22, 21:25,
25:13, 58:5, 58:7,
58:13, 61:25,
62:7, 88:16, 90:13
vacations 16:22,
57:25
vacuum 16:21
validate 87:2
validating 75:23
varies 15:7, 68:16
various 25:8, 75:20
vary 17:3, 113:14
Vazquez 1:24, 2:5,
2:22, 3:4, 3:21,
4:12, 7:3
vein 12:1
Velazquez 19:19
venture 117:21
versus 7:3, 19:19
vice 105:12
view 12:18, 18:9,
18:10, 24:21,
54:4, 58:19,
63:11, 90:4
viewed 17:25
viewpoint 58:17
views 24:2
violate 117:8
violated 24:19,
64:19
violates 13:6, 49:13
violation 78:16,
84:2, 112:2
Violations 7:23
virtually 61:22,
63:10
virtue 88:18
visited 26:22, 96:3

< W >
W. 4:8
wait 47:18, 125:8
waited 21:7, 46:10,
46:13, 46:21, 47:2
waiting 78:1
waived 42:22
Walker 6:12, 35:10,
92:17, 101:8,
112:17, 126:13,

126:14
Walking 49:18
Wanda 1:24, 2:5,
   2:22, 3:4, 3:21,
   7:3
wanted 30:20, 98:5,
   115:13, 116:5,
   123:18
wants 58:20, 102:2,
   115:9, 125:9
warrant 45:21
Washington 65:13
wave 8:11
web 33:24
website 31:14
weed 77:14
weeks 46:23
weight 110:10,
   110:17
welcome 7:6
well-known 65:15
well-supported 99:15
Westernbank 44:25,
   45:15
Westlaw 20:1, 31:7
whack 40:5
whatever 17:9, 28:3,
   61:5, 65:25,
   111:25, 124:5
whatsoever 73:14,
   116:18, 123:23
whereby 54:5
Whereupon 92:20,
   112:21
whether 12:3, 17:7,
   27:8, 28:3, 30:8,
   56:12, 75:13,
   86:9, 86:11,
   86:13, 86:14,
   86:15, 89:4,
   92:23, 97:11,
   97:21, 108:13,
   109:19, 116:7,
   121:23, 122:12,
   122:23
whole 24:12, 57:18
William 4:15
Willing 32:7, 32:23,
   97:12, 117:21,
   124:7

win 12:12, 63:12
wish 8:8, 52:19,
   125:16
wishes 8:13, 52:19,
   52:23
withheld 30:24
within 39:15, 41:24,
   58:25, 61:12,
   68:6, 69:6, 70:10,
   99:6, 100:12,
   103:5, 104:23,
   121:2, 121:5
without 11:23,
   12:19, 22:9,
   22:23, 24:10,
   28:19, 38:16,
   42:18, 43:10,
   44:14, 47:23,
   53:12, 54:10,
   70:13, 76:19,
   78:5, 81:11,
   91:17, 93:17,
   97:17, 99:1,
   99:23, 114:10
WITNESSES 5:3
wondering 65:3
word 36:15, 36:18,
   36:20, 36:22,
   36:25, 37:7,
   57:22, 65:1,
   77:23, 89:9,
   99:14, 113:25
words 19:20, 37:3,
   55:2, 63:4, 69:11,
   83:11, 89:9,
   112:16, 113:3,
   113:8, 114:18
work 16:12, 17:10,
   24:15, 34:22,
   41:23, 53:17,
   59:9, 91:4, 98:22,
   99:11, 99:17,
   125:15
working 16:10, 17:8,
   24:3, 28:7, 97:13,
   103:10
works 62:6, 100:21
world 95:11
worry 16:12
worst 33:19, 97:19,

98:3, 98:7, 102:2
worth 38:13
write 55:11, 57:10,
   91:10, 116:21
writing 54:6
written 34:3, 55:15,
   62:11, 63:10,
   114:21
www 33:25


< Y >
yardstick 38:7
year 46:14, 47:2,
   58:3, 58:8, 60:21,
   60:23, 65:2, 65:7,
   65:8, 67:15,
   69:17, 75:8,
   96:22, 99:5, 99:9,
   100:3, 103:9,
   118:3, 118:5,
   121:5
years 45:14, 61:5,
   65:9, 105:19,
   106:8
York 33:6, 125:15
yourself 8:6, 8:7,
   10:14, 113:6


< Z >
zip 32:14