## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>     as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*,<br><br>          Debtors.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered)<br><br>**Re: ECF Nos. 15171, 15371** |
| THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>     as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO,<br><br>          Movant,<br>v.<br><br>OFFICIAL COMMITTEE OF UNSECURED CREDITORS,<br><br>          Respondent. | |

**JOINT REPORT OF THE COMMONWEALTH OF PUERTO RICO AND OFFICIAL COMMITTEE OF UNSECURED CREDITORS REGARDING MOTION OF THE COMMONWEALTH OF PUERTO RICO PURSUANT TO BANKRUPTCY CODE SECTION 365 FOR ENTRY OF ORDER APPROVING ASSUMPTION OF SETTLEMENT AGREEMENTS WITH GARCÍA RUBIERA CLASS PLAINTIFFS**

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK-3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17-BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

To The Honorable United States District Court Judge Laura Taylor Swain:

Pursuant to the Court's *Order Regarding Arguments and Supplemental Briefing in Connection with Motion of the Commonwealth of Puerto Rico Pursuant to Bankruptcy Code Section 365 for Entry of Order Approving Assumption of Settlement Agreements with García Rubiera Class Plaintiffs* [ECF No. 15371] (the "Supplemental Briefing Order"), the Financial Oversight and Management Board for Puerto Rico (the "Oversight Board"), as sole Title III representative of the Commonwealth of Puerto Rico (the "Commonwealth"), pursuant to section 315(b) of the *Puerto Rico Oversight, Management, and Economic Stability Act* ("PROMESA"),[2] and the Official Committee of Unsecured Creditors for all Title III Debtors, other than PBA and COFINA (the "Committee"), submit this joint report providing supplemental briefing in connection with the *Motion of the Commonwealth of Puerto Rico Pursuant to Bankruptcy Code Section 365 for Entry of Order Approving Assumption of Settlement Agreements with García Rubiera Class Plaintiffs* [ECF No. 15171] (the "Motion").[3]

## Background

1.      On November 17, 2020, the Oversight Board filed the Motion, seeking entry of an order approving the assumption of the Settlement Agreements and such other relief as the Court deems appropriate.

2.      On November 25, 2020, the Committee filed its *Limited Objection of Official Committee of Unsecured Creditors to Motion of Commonwealth of Puerto Rico Pursuant to Bankruptcy Code Section 365 for Entry of Order Approving Assumption of Settlement Agreements with García Rubiera Class Plaintiffs* [ECF No. 15275] (the "Limited Objection").

---

[2]   PROMESA is codified at 48 U.S.C. §§ 2101-2241.

[3]   Capitalized terms not defined herein have the meanings set forth in the Motion.

3.      On December 2, 2020, Plaintiffs filed their *Answer by García Rubiera Class Plaintiffs to the Limited Objection of Official Committee of Unsecured Creditors to Motion of Commonwealth of Puerto Rico Pursuant to Bankruptcy Code Section 365* [ECF No. 15307].

4.      On December 3, 2020, the Oversight Board filed its *Reply in Support of Motion of the Commonwealth of Puerto Rico Pursuant to Bankruptcy Code Section 365 for Entry of Order Approving Assumption of Settlement Agreements with García Rubiera Class Plaintiffs* [ECF No. 15325] (the "Reply").

5.      On December 8, 2020, the Court entered the Supplemental Briefing Order, directing the Oversight Board and the Committee "to meet and confer and to file a joint report by December 16, 2020, setting forth their respective positions concerning whether the Court should apply the Countryman standard, or another standard for which there is precedent, in resolving the Motion." Supplemental Briefing Order at 2.

6.      On December 9, 2020, the Court held a hearing to consider the relief requested in the Motion (the "Hearing").

**I.      The Parties' Respective Positions Regarding Application of the Countryman Standard or Another Standard.**

**A.  The Oversight Board's Position**

> **a.  Regardless of the standard the Court applies, the Court has authority to authorize the Oversight Board to assume or implement the Settlement Agreements.**

7.      As the Oversight Board made clear at the outset of the hearing, the Oversight Board brought its Motion to satisfy a condition of its settlement of Plaintiffs' stay litigation.  After approximately twenty years of litigation with the Commonwealth, Plaintiffs want some assurance they will be paid what the Commonwealth and the Oversight Board are agreeing to pay them.  The Settlement Agreements make eminent economic sense because Plaintiffs' claims are each so small,

that they will each qualify for full payment in a convenience class in whatever plan of adjustment is ultimately confirmed. Moreover, the class attorneys are being paid out of Plaintiffs' distributions. The Court can authorize the Commonwealth to proceed with implementing the Settlement Agreements either through assumption of the Settlement Agreements pursuant to Bankruptcy Code section 365, under its powers to approve settlements pursuant to Rule 9019, or approving the Commonwealth's payments (as the Oversight Board consents to such order pursuant to PROMESA section 305).

### b. The standard for assumption of executory contracts.

8.     The United States Supreme Court explained that an executory contract is "one which performance remains due to some extent on both sides." *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 521-22 n.6 (1984). Notably, the Supreme Court did not mention performance must be material, as the Countryman test requires. *Id*. Rather, the Supreme Court only requires that there be an obligation "to some extent."[4] Here, not only are there material obligation that remain for both parties regarding compliance with the Due Process issues raised by the First Circuit, *see* Reply ¶¶ 8-13, 16, there are at the very least clearly unperformed obligations on both sides to "some extent."

9.     It is especially appropriate for the Court to apply the "functional approach" to determine whether the Settlement Agreements are executory contracts, as it is consistent with the Supreme Court's view. Courts have generally applied either the "Countryman test" or the

---

[4]     Indeed, the cases the Committee cite in support of application of the Countryman test reference *Bildisco*, but the Committee ignores that the Supreme Court did not require that there be material obligations, but only that there be obligations "to some extent." *See Mission Prod. Holdings, Inc. v. Tempnology, LLC (In re Tempnology, LLC)*, 879 F.3d 389, 395–96 (1st Cir. 2018) ("Executory contracts, although not defined in the Bankruptcy Code, are generally considered to be contracts 'on which performance is due **to some extent** on both sides.'" (*quoting In re Mason v. Official Comm. of Unsecured Creditors, for FBI Distrib. Corp. & FBC Distrib. Corp. (In re FBI Distrib. Corp.*), 330 F.3d 36, 40 n.5 (1st Cir. 2003) (emphasis added)); *Parkview Adventist Med. Ctr. v. United States ex rel. Dep't of Health & Human Servs*., 842 F.3d 757, 763 n.12 (1st Cir. 2016) (same).

"functional approach" to determine whether a contract is "executory" for purposes of Bankruptcy Code section 365. Under the Countryman test, the court looks at whether a contract is so unperformed that "a breach by either side would constitute a material breach of the contract." *In re Worldcom, Inc.*, 343 B.R. 486, 493 (Bankr. S.D.N.Y. 2006). Under the functional approach, a court looks to whether assumption or rejection of the contract in question would benefit the debtor's estate, regardless of whether any material obligations remain outstanding on the part of only one party to the contract. *Id.* The "functional approach" thus focuses on whether the purposes of bankruptcy law would be furthered by recognizing a contract is "executory," rather than restricting the analysis to a more rigid definition.

10.       Many courts, including two Circuit Courts,[5] have endorsed the use of the "functional approach" to determine whether a contract is executory for the purpose of Bankruptcy Code section 365. While the United States Court of Appeals for the First Circuit has not ruled conclusively on the issue, it has recognized the validity of both the Countryman test and the "functional approach." *See In re Electronica, Inc.*, 995 F.2d 320, 322 n.3 (1st Cir. 1993) (explaining both the Countryman test and the functional approach). As a result, "[c]ourts in [the First] circuit apply both tests, often in tandem, and the 1st Circuit has endorsed this approach." *See Stevens v. CSA, Inc.*, 271 B.R. 410, 413 (D. Mass. 2001); *In re Redondo Constr. Corp.*, 2019

---

[5]    The functional approach has been adopted by the Eleventh Circuit and Sixth Circuit. *See Sipes v. Atlantic Gulf Communities Corp. (In re General Dev. Corp.)*, 84 F.3d 1364, 1375 (11th Cir. 1996) ("The Court agrees with the application by the Bankruptcy Court of the 'functional approach' in this case. Under this approach, the question of whether a contract is executory is determined by the benefits that assumption or rejection would produce for the estate."); *Thompkins v. Lil' Joe Records, Inc.*, 476 F.3d 1294, 1306 n.13 (11th Cir. 2007) ("Although we do not find it necessary to reexamine whether the 1989 Agreement was properly treated as 'executory,' we note that the bankruptcy court's approval of the rejection of the 1989 Agreement would be consistent with the 'functional approach' to 'executoriness' that we have tacitly approved in our precedent."); *In re Jolly*, 574 F.2d 349, 350 (6th Cir. 1978), cert denied, 439 U.S. 929 (1978) ("definitions [such as Countryman's] are helpful, but do not resolve this problem. The key, it seems, to deciphering the meaning of the executory contract rejection provisions, is to work backward, proceeding from an examination of the purposes rejection is expected to accomplish. If those objectives have already been accomplished, or if they can't be accomplished through rejection, then the contract is not executory within the meaning of the Bankruptcy Act.").

Bankr. LEXIS 1162, *54 (Bankr. D.P.R. 2019) (same).  Many courts within the First Circuit have

applied the functional approach, focusing on the *equities* of the situation and the *policies* of the

Bankruptcy Code, to determine whether a contract is executory.  *See, e.g., In re Drake*, 136 B.R.

325, 328 (Bankr. D. Mass. 1992) (applying the functional approach and citing to *In re Jolly*, 574

F.2d 349, 351 (6th Cir.)); *In re Gladding Corp.*, 22 B.R. 632, 635 (Bankr. D. Mass. 1982) ("It

seems clear, at least to this court, that bankruptcy courts should not be bound by static definitions

of what is an executory contract [such as Countryman's], but should strive to satisfy the purposes

of the Act in conjunction with the goals of the debtor (or trustee), in order that equity may be

served."); *In re Roxse Homes, Inc.*, 74 B.R. 810, 816 (Bankr. D. Mass. 1987) (relying on functional

approach cases and reasoning in determining whether a contract was executory, noting at the same

time "[t]he definition formulated by Professor Countryman . . . and 'accept[ed]' by Congress, has

been flexibly applied by the courts in light of the purposes and policies of the Code.").

11.    There are many good reasons to favor the "functional approach" over rigid

application of the Countryman test.  When Congress enacted the Bankruptcy Code, it purposefully

declined to include a definition of "executory contract."  The legislative history of Bankruptcy

Code section 365 shows that Congress intended a flexible approach in determining what is an

"executory contract."  As one court noted:

> The express language of § 365 reflects that Congress did not adopt
> a specific definition of an 'executory contract' which would
> require mutual obligations, in spite of its clear opportunity to do so. The
> legislative history to that section evidences that Congress considered
> mutual obligations to be indicative of an executory contract in some,
> but not all, cases: Though there is no precise definition of what
> contracts are executory, it *generally* includes contracts on which
> performance remains due to some extent on both sides. H.R. Rep.
> No. 595, 95th Cong., 1st Sess. 347, reprinted in 1978 U.S. Code
> Cong. & Ad. News 5787, 5844.

6

*In re Arrow Air, Inc.*, 60 B.R. 117, 121 (Bankr. S.D. Fla. 1986) (alteration in original); *see also In re Norquist*, 43 B.R. 224, 227 (E.D. Wash. 1984) ("The Countryman definition was exposed to the judicial market for five years before Congress enacted The Bankruptcy Reform Act of 1978, yet it was not adopted by those who drafted that legislation. . . .  Congress did not adopt a definition of 'executory contract' in The Bankruptcy Reform Act of 1978 in spite of an obvious opportunity to do so.  Legislative history indicates that the enactors were informed only that an executory contract is generally one on which performance is due to some extent on both sides.").

12.     Courts thus recognize the functional approach is consistent with Congress' flexible approach under section 365 and decision not to adopt a rigid definition.  *In re Cardinal Indus.*, 146 B.R. 720, 728 (Bankr. S.D. Ohio 1992) ("The functional approach articulated in *Jolly* is similar to the congressional approach in § 365 of the Bankruptcy Code in that it reflects a general reluctance to provide a precise definition of executory contracts.  This approach has the conceptual advantage of using the underlying purposes of section 365 as benchmarks to define what constitutes an executory contract in bankruptcy.").

13.     Moreover, courts have recognized that the rigid application of the Countryman test would harm the purposes of the Bankruptcy Code and contravene Congressional intent.  *See, e.g.*, *In re Norquist*, 43 B.R. 224, 227 (Bankr. E.D. Wash. 1984) ("[T]he requirement of a remaining material obligation on the part of the non-debtor [under the Countryman test] serves no useful purpose.  It eliminates from the category of executory contracts some obligations which may prove extremely burdensome and, in some cases, obligations which may be prohibitive to the reorganization efforts of the debtor.").  As a result, courts have recognized many exceptions to the Countryman test when necessary to faithfully execute Congress' intent when it enacted the Bankruptcy Code.  *See, e.g., In re Gladding Corp.*, 22 B.R. 632, 635 (Bankr. D. Mass. 1982)

(courts have noted "numerous exceptions to the Countryman definition, such as security agreements, licenses of a patent, trademark, or copyright held by a bankrupt, public utilities, and collective bargaining compacts, all of which have been treated by the courts at one time or another as exceptions to the Countryman rule, and which have been decided on the basis of policy considerations."); *see also In re Norquist*, 43 B.R. 224, 227 (Bankr. E.D. Wash. 1984) (noting "continued adherence to the rigid Countryman definition will merely invite the construction of legal fictions" and noting that the executoriness of real estate contracts was "specifically reaffirmed" by Congress even though it does not fit within the Countryman definition).[6]

14.    In any event, even under the Countryman test, the Settlement Agreements are executory, as material obligations remain unperformed on both sides.  The Settlement Agreements requires cooperation of the parties on a significant  issue—development of content and other related issues for a form of notice—that would comply with the due process concerns that compelled the First Circuit to remand consideration of the Settlement Agreements.  *See* Reply ¶ 16.  But, in the event the Court determines the Countryman test would require a determination that the Settlement Agreements are not "executory," the court should adopt the "functional approach" to avoid frustrating the purposes of PROMESA, the Bankruptcy Code, the Commonwealth's restructuring and resulting in an inequitable outcome.

---

[6]    Notably, courts have relied on the fact that Professor Countryman himself endorsed an approach determining whether a contract is executory based on the purposes of the Bankruptcy Code.  *In re Arrow Air, Inc.*, 60 B.R. 117, 122 (Bankr. S.D. Fla. 1986) ("Professor Countryman suggested that executory contracts should be 'defined in light of the purpose for which the trustee is given the option to assume or reject. Similar to his general power to abandon or accept the property, this is an option to be exercised when it will benefit the estate.'" (internal citation omitted)); *see also Cohen v. Drexel Burnham Lambert Grp.*, 138 B.R. 687, 700 (Bankr. S.D.N.Y. 1992) ("[E]xecutoriness was . . . window dressing for a decision premised in the first instance on the benefit-to-the estate criterion . . . ."); *see also In re Booth*, 19 B.R. 53, 57 (Bankr. D. Utah 1982) ("Sections 365(i) and 365(j), far from representing the Countryman test, are a tonic for the consequence of its application.  This suggests that, in the final analysis, executory contracts are measured not by a mutuality of commitments but by the nature of the parties and the goals of reorganization.").

15.     Under the functional approach, because any Plan of Adjustment will provide a full recovery to individual claims equal to or less than $150[7] owed to each class member per vehicle per year, Plaintiffs will be paid in full whether the Settlement Agreements are assumed or not, and whether or not Plaintiffs prevail on their Lift Stay Motion.[8]   However, if the Settlement Agreements are not assumed, the Commonwealth will expend resources only to <u>delay</u> the eventual payment in full of Plaintiffs' claims as convenience class claims—resources that would otherwise benefit other creditors, including the Committee's constituency.   There is no benefit to the Commonwealth or its stakeholders achieved by the denying assumption of the Settlement Agreements merely to delay the inevitable payment of Plaintiffs' claims in full.  In addition, delay will deprive the Commonwealth from the benefits of the Settlement Agreements as funds made available to the Commonwealth will remains subject to litigation.

16.     Furthermore, there is no danger of "ignor[ing] the statutory mandate that the contract be executory under § 365" in applying the functional approach here.[9]   As the Supreme Court explained, an executory contract is "one which performance remains due ***to some extent*** on both sides."  *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 521-22 n.6 (1984).  As of the Petition Date,[10] there were outstanding obligations on both sides at least ***to some extent.***   Both the

---

[7]   The annual premium that was paid by each member of Plaintiffs' class was $99 or $148, depending on vehicle type, per vehicle per year.  Approximately 50,604 claims have been submitted pursuant to the Settlement Agreements.

[8]   In this respect, *Enterprise Energy Corp. v. United States (In re Columbia Gas Sys. Inc.)*, 50 F.3d 233, 244 (3d Cir. 1995), is distinguishable because Plaintiffs' class members would **<u>not</u>** receive any higher priority to payment of the claim.

[9]   *See Butler v. Resident Care Innovation Corp.*, 241 B.R. 37, 44 (D.R.I. 1999).

[10]   The time for determining whether outstanding obligations exist is "at the time the bankruptcy petition is filed," which the Committee concedes in its Limited Objection.  *In re High Voltage Eng'g Corp.*, 397 B.R. 579, 598 (Bankr. D. Mass. 2008), *aff'd*, 403 B.R. 163 (D. Mass. 2009); *see* Limited Objection ¶ 8 ("Thus, for the Settlement Agreements to be executory, the Oversight Board must demonstrate that, ***as of the Petition Date*** . . . ." (emphasis added)).

Commonwealth and Plaintiffs had an ongoing obligation to jointly develop the contents of the individualized notices to be provided to Plaintiffs' class members, general publication and radio notices, and an internet portal as of the Petition Date.  Reply ¶¶ 12-13.

> **c. Application of the functional approach would lead to assumption of the Settlement Agreements.**

17.     <u>Under the functional approach, the Settlement Agreements are executory contracts</u>. Assumption of the Settlement Agreements will benefit the Commonwealth and its creditors by ending a nearly 20-year saga in connection with the Prepetition Actions, and avoiding further litigation of property issues raised in the Lift Stay Motion.  The First Circuit suggested when ordering a partial remand, the monies at issue could well constitute a statutory trust in favor of Plaintiffs.  Absent assumption of the Settlement Agreements, this issue may have to be litigated. *See Gracia-Gracia v. Fin. Oversight & Mgmt. Bd. (In re Fin. Oversight & Mgmt. Bd. of P.R.)*, 939 F.3d 340, 351 (1st Cir. 2019).  As noted above, further litigation of the parties' respective property interests in the insurance premium funds held by the Commonwealth accomplishes nothing and would waste Commonwealth resources, because Plaintiffs' members' claims would likely fall, under any conceivable plan, as a member of convenience class and receive essentially the same treatment as if the Settlement Agreements were assumed.[11]  Further, as explained below, if the Settlement Agreements are not assumed, the Commonwealth will be unable to unlock the benefits of the Settlement Agreements and gain access to the moneys that have escheated.

18.     In this regard, *In re Structurlite Plastics Corp.*, 86 B.R. 922 (Bankr. S.D. Ohio 1988), cited by the Committee at the Hearing, is inapposite.  The court in *Structurlite* determined

---

[11]  *See, e.g.*, Eighth Amended Plan for the Adjustment of Debts of the City of Detroit, Art. I.A.76., *In re City of Detroit, Michigan*, Case No. 13-53846 (Bankr. E.D. Mich. Oct. 22, 2014) [ECF No. 8045] (providing convenience class claims equal to or less than $25,000.00).

under the functional approach the harm to the estate and creditor body of assuming the contract and paying prepetition medical claims in full outweighed the benefits of avoiding labor unrest. *Id.* at 928. Here, as noted above, there would be harm to the Commonwealth and its stakeholders by not assuming the Settlement Agreements and, instead, expending resources unnecessarily to delay payment—which the Committee ignores. Furthermore, Plaintiffs have asserted trust and ownership interests in the segregated funds held by the Commonwealth, which distinguishes their claims from general unsecured claims. Indeed, the First Circuit determined that the property interest issue was significant in remanding the Lift Stay Motion to this Court to decide such issue.

19.    While the Committee asserts Plaintiffs' counsel's claims will exceed the proposed $10,000 threshold, the Commonwealth Settlement Agreement provides that attorneys' fees will be funded by a 20% holdback of all claims paid to Plaintiffs' class members. In that respect, payment to Plaintiffs' counsel is merely an allocation of Plaintiff class's distribution—not a separate claim.[12] Commonwealth Settlement Agreement § 6.F.i. ("Counsel for Plaintiff Class shall receive in attorney's fees, 20% of all reimbursements and credits made by the Department of the Treasury to Class member . . . . The 20% amount shall be withheld by the Department of the Treasury from every reimbursement or credit granted to individuals comprising the class, to pay counsel for the class the litigation costs and attorney's fees."). While the payment of attorneys' fees are made by the Commonwealth under the Commonwealth Settlement Agreement, such mechanism is borne out of practical necessity that it would be impossible for Plaintiffs' counsel to collect the 20% holdback from hundreds of thousands of individuals, rather than an intent for the Commonwealth

---

[12]   The Commonwealth Settlement Agreement provides a total of $1,375,000 in advances on attorneys' fees from the 20% holdback of all claims paid to Plaintiffs' class members. To fully fund such advances, only $6,875,000 valid claims will need to be submitted. Approximately 50,604 have been submitted, which claims may cover multiple vehicles and multiple years over a twelve (12) year period between 1998 to 2010. Approximately $76.1 million of funds held by the Commonwealth has been segregated for accounting purposes as of March 2018. *Gracia-Gracia*, 939 F.3d at 351 (1st Cir. 2019).

to incur any obligation.[13]   Accordingly, given the outstanding issue regarding Plaintiffs' property interests in the segregated funds held by the Commonwealth, and the inevitable payment in full of Plaintiffs' claims under a plan of adjustment, there is no harm to the Commonwealth or its general unsecured claimholders in assuming the Settlement Agreements, while there will be if they are not assumed and the Commonwealth is forced to expend resources litigating the Lift Stay Motion unnecessarily.

20.     Furthermore, the Commonwealth will be able to release any segregated funds for other uses after fulfilling its obligations under the Due Process Clause and the Settlement Agreements, which will benefit the Commonwealth and its creditors.  Because the First Circuit ordered in 2013 that no further funds could escheat until the Commonwealth fulfilled its obligations under the Due Process Clause, the Commonwealth has continued to segregate funds for accounting purposes.  *See García-Rubiera v. Fortuño*, 727 F.3d 102, 105, 110 (1st Cir. 2013) ("In the meantime, we order that no duplicate premiums shall escheat to the Commonwealth until it has established and complied with a reimbursement procedure which meets the basic requirements of constitutional due process."); *Gracia-Gracia*, 939 F.3d at 351 (1st Cir. 2019) ("'[A]pproximately $76.1 million corresponding to unclaimed funds from 2006 to present' are 'segregated into a separate account in the General Fund for accounting purposes.'").  More fundamentally, the "functional test" as well as the Countryman test looks to achieve an equitable result.  *See In re Electronica, Inc.*, 995 F.2d 320, 322 n.3 (1st Cir. 1993); *In re Arrow Air, Inc.*, 60 B.R. 117, 122 (Bankr. S.D. Fla. 1986).  Assumption of the motion provides  relief for Plaintiff's

---

[13]   The Commonwealth Settlement Agreement does not prohibit recoupment of any overpayments to Plaintiffs' counsel if claims are not sufficient to fund the advances.  Indeed, the plain language of the Commonwealth Settlement Agreement provides, "[T]he Department of the Treasury shall ***advance*** . . . attorney's fees to counsel for Plaintiff Class . . . ."  Commonwealth Settlement Agreement ¶ 6.F.ii (emphasis added).

members that have been waiting to be reimbursed for nearly 20 years for small amounts of money and have litigated this issue no less than four times before the First Circuit. Further, it is "bankruptcy policy that settlements should be favored." *In re Kaiser Steel Corp.*, 105 B.R. 971, 978 (D. Colo. 1989). The Committee's position would undermine a valuable settlement of the Commonwealth and require the continuation of costly litigation at significant cost to the Commonwealth the parties have determined to settle. Recognizing the Settlement Agreements— which still have significant unperformed obligations on both sides—remain executory would thus greatly further bankruptcy policy, as well as benefit the Commonwealth and all its stakeholders.

21.     Accordingly, assumption of the Settlement Agreements benefits the Commonwealth and its creditors by avoiding unnecessary litigation that achieves nothing for the Commonwealth, and by providing the Commonwealth access to funds that continue to be segregated for accounting purposes pursuant to the First Circuit's order. This Court should (a) grant the relief requested in the Motion, or in the alternative, an order providing the Commonwealth will make payments pursuant to the Settlement Agreements, which the Oversight Board consents to pursuant to PROMESA section 305,[14] and (b) overrule the Committee's Limited Objection.

*     *     *     *     *

---

[14]   The Court may nonetheless determine that relief pursuant to the Motion is unnecessary because the inapplicability of Bankruptcy Code section 363 to the Title III case permits the Commonwealth to make payments pursuant to the Settlement Agreements. *See* PROMESA § 301.

B.  **The Committee's Position**

22.      As the Committee explained in its objection,[15] the Settlement Agreements[16] are

not executory contracts under the standard definition of executory contracts—*i.e.*, they are not

contracts with material obligations outstanding on both sides (the "Countryman Test")[17]—and,

therefore, the Settlement Agreements cannot be assumed under section 365 of the Bankruptcy

Code.[18]  While the Committee believes the Court should apply the Countryman Test, application

of the "Functional Approach" does not change the result—the Assumption Motion must be

denied under either analysis.

    A.      **Court Should Employ Countryman Test**

23.      Although the Functional Approach is not expressly prohibited by the First Circuit

Court of Appeals, the Countryman Test has long been accepted by the majority of courts

---

[15]   *Limited Objection of Official Committee of Unsecured Creditors to Motion of Commonwealth of Puerto Rico Pursuant to Bankruptcy Code Section 365 for Entry of Order Approving Assumption of Settlement Agreements with García Rubiera Class Plaintiffs* [Docket No. 15275] (the "Limited Objection").

[16]   Capitalized terms used but not otherwise defined herein have the meanings set forth in the Limited Objection or Assumption Motion.

[17]   The Committee notes that the Countryman Test was the definition advanced by the Oversight Board in its Motion.  *See* Assumption Mot., at 7 n. 4 [Docket No. 15171].  It is unclear to the Committee how the Oversight Board is able to adopt an entirely different theory through its reply.

[18]   The Committee already demonstrated in its Limited Objection that, as of the Petition Date, Plaintiffs had no material obligations remaining under the Settlement Agreements, but the case is even stronger as of the date of the Motion, by which time the noticing and claims process under the Settlement Agreements had been completed and there was no obligation of any kind left under the Settlement Agreements other than the Commonwealth's obligation to make payments.  *See, e.g., In re Wang Labs., Inc.*, 154 B.R. 389, 391 (Bankr. D. Mass. 1993) ("The Court holds that the determination of whether a contract is executory is to be made not at the time of filing, but at the time that the issue is before the Court."); *see also, e.g., In re Drake*, 136 B.R. 325, 328 (Bankr. D. Mass. 1992) ("obligation to pay money does not make the contract executory"); *In re Placid Oil Co.*, 72 B.R. 135, 138 (Bankr. N.D. Tex. 1987) ("The Debtor's only duty under the Premium Agreement is to pay money, which cannot alone suffice as a matter of law." (citing *Lubrizol Enterps. v. Richmond Finishers, Inc.,* 756 F.2d 1043, 1046 (4th Cir.1985))).  Indeed, the principle that a one-sided payment obligation by one party to a contract cannot make such contract executory is highlighted in the legislative history to section 365.  *See* H.R. REP. 95-595, 347, 1978 U.S.C.C.A.N. 5963, 6303-04 ("A note is not usually an executory contract if the only performance that remains is repayment.  Performance on one side of the contract would have been completed and the contract is no longer executory.").

nationally, which the First Circuit has recognized on multiple occasions.[19]  While the First

Circuit noted in *La Electronica* that "[a] few courts . . . hold that the determination whether a

contract is 'executory' requires a more 'functional' approach,"[20] in recent years the First Circuit

has implicitly rejected the functional approach by defining executory contracts as those involving

obligations on both sides.[21]

24.    Moreover, the merit of the Countryman Test is that it respects the statutory

mandate that contracts subject to section 365 of the Bankruptcy Code in fact be "executory."  By

contrast, the Functional Approach "expressly ignores the statutory mandate that the contract be

executory under § 365,"[22] in contravention of the Supreme Court's instruction that courts enforce

the language of a statute according to its terms.[23]  Therefore, the Committee submits that the

Court should employ the Countryman Test when analyzing the Settlement Agreements.

---

[19]    *See Gallivan v. Springfield Post Rd. Corp.*, 110 F.3d 848, 851 (1st Cir. 1997) (noting that "[f]ederal courts have pretty generally settled upon" the Countryman Test); *La Electronica, Inc. v. Capo-Roman* (*In re La Electronica, Inc.),* 995 F.2d 320, 323 n.3 (1st Cir. 1993) ("[M]ost courts adopt the position advanced by Professor Vern Countryman.").

[20]    *In re La Electronica, Inc.*, 995 F.2d 320, 322 n.3 (1st Cir. 1993).

[21]    *See e.g.*, *Mission Prod. Holdings, Inc. v. Tempnology, LLC (In re Tempnology, LLC)*, 879 F.3d 389, 395–96 (1st Cir. 2018) ("Executory contracts, although not defined in the Bankruptcy Code, are generally considered to be contracts 'on which performance is due to some extent **on both sides**.'" (*quoting In re Mason v. Official Comm. of Unsecured Creditors, for FBI Distrib. Corp. & FBC Distrib. Corp. (In re FBI Distrib. Corp.*), 330 F.3d 36, 40 n.5 (1st Cir. 2003).)(emphasis added); *Parkview Adventist Med. Ctr. v. United States ex rel. Dep't of Health & Human Servs*., 842 F.3d 757, 763 n.12 (1st Cir. 2016) (same).  This language referencing obligations "on both sides" comes directly from the Supreme Court, itself quoting legislative history.  *See FBI Distrib. Corp.*, 330 F.3d at 40 n.5 (quoting *NLRB v. Bildisco & Bildisco,* 465 U.S. 513, 522 (1984)).

[22]    *Butler v. Resident Care Innovation Corp.*, 241 B.R. 37, 44 (D.R.I. 1999).  *See also In re Child World, Inc.,* 147 B.R. 847, 851 (Bankr. S.D.N.Y. 1992) ("Manifestly, [the Functional Approach] ignores the statutory requirement that the contract to be assumed or rejected must be 'executory.'").

[23]    *Butler*, 241 B.R. at 44  ("[I]f a Court only examines whether the rejection of the contract will benefit the estate by utilizing the 'functional analysis' it must necessarily ignore the clear and unambiguous language in the statute." (quoting *U.S. v. Ron Pair Enterprises,* 489 U.S. 235, 241, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989))).

**B.      Even If Functional Approach Applied, Settlement Agreements Cannot Be Assumed**

25.      Even if the Court were inclined to adopt the Functional Approach here, it does not

provide a basis for the assumption of the Settlement Agreements.  At this point, the only

obligation remaining under the Settlement Agreements is the Commonwealth's obligation to pay

claims.[24]  Under these circumstances, there cannot be any benefit from assumption of these

agreements.  Further, the supposed "settlement" of the stay relief litigation does not constitute a

benefit either, given that the Oversight Board is proposing to pay the Plaintiffs and their

attorneys *in full*.  This is no settlement at all.

a)      Functional Test Requires Benefit to Estate from Assumption of Settlement
Agreements

26.      The Functional Test is "a result-oriented approach that focuses on whether the

estate will benefit from the assumption or rejection of the contract rather than looking at

mutuality of commitments."[25]  In other words, the entire purpose of this doctrine is to achieve a

***result that is beneficial to the debtor's estate*** through the rejection of burdensome contracts and

the assumption of profitable ones.[26]  Accordingly, courts employing the Functional Approach

---

[24]    The Committee reiterates that, as discussed in its Limited Objection, there were no material obligations on the part of the Plaintiffs under the Settlement Agreements even as far back as the Petition Date.  By that time, ***the content of notice documents was agreed upon by the parties***, and the Plaintiffs no longer had any obligations (if they ever had any such obligations) regarding formulating these notices.  This point is demonstrated by the form notices attached to the Commonwealth Settlement Agreement.  *See Notice of Filing of Supplemental Documents* [Docket No. 15387].  The absence of such obligations on the part of the Plaintiffs is further evidenced by the Commonwealth's representation during the 2018 lift-stay litigation that "*[a]ll the various notices (regular mail, radio, and newspaper) are drafted* but have not yet been delivered."  *Supplemental Brief and Declaration in Compliance with March 9, 2018 Court Order* ¶ 8 [Docket No. 2795] (emphasis added).

[25]    3 Collier on Bankruptcy ¶ 365.02[2][a] (16th 2020).

[26]    *See e.g. In re ASPC Corp.,* 601 B.R. 766, 797 (Bankr. S.D. Ohio 2019) ("[E]ven though there may be material obligations outstanding on the part of only one of the parties to the contract, it may nevertheless be deemed executory under the functional approach if its assumption or rejection [would] ***ultimately benefit the estate and its creditors.***" (quoting *In re Structurlite Plastics Corp.,* 86 B.R. 922, 928 (Bankr. S.D. Ohio 1988))(emphasis added); *Cohen v. Drexel Burnham Lambert Grp. (In re Drexel Burnham Lambert Grp., Inc.),* 138 B.R. 687, 709 (Bankr. S.D.N.Y. 1992) (stating that "trustee must determine whether ***the estate will benefit more*** from breach and payment of the resulting claim in Bankruptcy Dollars, or by performance") (emphasis added); *In re Structurlite Plastics Corp.,* 86 B.R. at 928  (under the Functional Approach, courts perform an analysis "looking

16

have denied assumption where it will not benefit the estate.  This was the ruling in *In re Structurlite Plastics Corp.*, where the court denied assumption under the Functional Approach because the court could ***not*** conclude "that the benefit to the estate and its creditors of assumption would outweigh the ***detriment to the estate and the creditor body resulting from full payment of the pre-petition medical claims at this stage of the case***."[27]   Another example is the Third Circuit's decision in *Columbia Gas*, which is on all fours with the situation here (as explained in the Limited Objection).  In that case, the Third Circuit, after ruling that the class action settlement was not executory under the Countryman Test, noted that "[a]n examination of the purpose of § 365 leads to the same result" because "[t]he only functional difference between assumption and rejection in this case, were the contract to be considered executory, is that assumption would give the [plaintiff] class a higher priority to the unpaid $15 million."[28]

27.     Critically, under the Functional Approach, a contract should not be assumed if its only effect is to ***elevate selected prepetition creditors into administrative expense claimants that are to be paid in full***.[29]  This is also the case here, because assumption of the Settlement Agreements will only result in the preferred treatment of certain creditors, *i.e.*, the Plaintiffs and their attorneys.

---

*first to the relative benefits and burdens to the estate of assumption or rejection*, and then reasoning backward to a determination as to the executory nature of the contract in question") (emphasis added).

[27]   86 B.R. at 928  (emphasis added).

[28]   *Enter. Energy Corp. v. United States (In re Columbia Gas Sys. Inc.)*, 50 F.3d 233, 244 (3d Cir. 1995).

[29]   *See e.g.*, *In re Drexel Burnham Lambert Grp., Inc.,* 138 B.R. at 703 (option to assume or reject "should not extend to situations where the only effect of its exercise would be to prejudice other creditors of the estate." quoting Countryman, Executory Contracts in Bankruptcy: Part I, 57 Minn. L. Rev. 439, 450 (1973)) (emphasis added).  *See also Gallivan v. Springfield Post Rd. Corp.*, 110 F.3d 848, 851 (1st Cir. 1997) (where the nonbankrupt party has fully performed . . . assumption would be of no benefit to the estate, serving only to convert the nonbankrupt's claim into a first priority expense of the estate at the expense of the other creditors" (quoting *In re Columbia Gas System, Inc.,* 50 F.3d at 239))(emphasis added).

b)    <u>Assumption of Settlement Agreements Will Not Benefit Commonwealth</u>

28.    Under the Functional Approach, the Settlement Agreements should not be assumed.  As an initial matter, the Committee understands that the claims submission process has concluded,[30] and, therefore, the only obligation outstanding under the Settlement Agreements is the Commonwealth's obligation to pay claims.[31]  There is nothing left, even arguably, for the Plaintiffs to do.[32]  Thus, if the Court focuses its analysis on the costs and benefits of the Settlement Agreements themselves, the analysis is over almost before it has begun—assumption provides no benefit to the Commonwealth in the form of any remaining contractual performance on the part of Plaintiffs or their attorneys.

29.    Moreover, the answer is no different if the Court were to accept the Oversight Board's argument that it should consider alleged extra-contractual benefits of assumption, namely, benefits purportedly flowing from the settlement of Plaintiffs' lift stay motion.  This argument fails as well: the supposed "settlement" of that motion is no settlement at all because the Oversight Board is proposing that the claims of the Plaintiffs and their attorneys be paid ***in full***.

---

[30]    According to the website maintained by Plaintiffs' attorney Franciso E. Colón Ramírez, class members "have until July 16, 2020 to present their claims to the Department of the Treasury for reimbursement of duplicate premiums."  *See* Franciso E. Colón Ramírez *, About $175 MILLION dollars are owed to the people of Puerto Rico. Be sure to submit your claim,* https://www.tureembolso.com/english.  *See also Notice of Appearance Joining as Counsel* [Docket No. 8885] (explaining retirement of Plaintiffs' attorney Antonio J. Amadeo Murga and joinder of Mr. Colón Ramírez as co-counsel to the Plaintiffs).

[31]    The Oversight Board has not disclosed the aggregate amount of claims submitted pursuant to the Settlement Agreements, making the Oversight Board's burden to show assumption is justified all the more difficult.

[32]    To be clear, the Committee does not concede that the submission of claim forms is a contractual obligation—as explained by *Columbia Gas*, it is merely a condition.  *See In re Columbia Gas Sys. Inc.*, 50 F.3d at 241.  The lesson of that case here is clear.  A member of the Plaintiffs' class may fail to return a form required for payment, and the Commonwealth would then not need to pay, but that is not a breach.  The Commonwealth not paying a person who fails to submit a form is not an instance of breach excused by such failure, but an example of compliance with the terms of the contract, under which submission of the form is a condition of payment.

30.      This point becomes obvious if one compares the scenario in which the lift stay motion is "settled" (as contemplated by the Assumption Motion) to a scenario in which the lift stay motion is litigated and, ultimately, results in an adverse ruling to the Commonwealth (*i.e.*, the Plaintiffs prevail on their trust arguments).  In either scenario, the Commonwealth has to make payment in full.  The alleged settlement here is not a settlement, but a surrender by the Oversight Board.  It does not do what settlements by their nature must: reflect the risks associated with uncertain litigation outcomes through a compromise in which both sides make some concession (based on the probability of success).  Here, the Oversight Board would instead "settle" the lift stay motion as if it were ***certain*** that the Plaintiffs will prevail on their trust arguments—a position that is untenable given that previously the Oversight Board and Commonwealth vehemently and persuasively denied the existence of such a trust.  Indeed, the more likely outcome in the lift stay litigation is a ruling that there is no trust.[33]  Should that be the result, the Plaintiffs and their attorneys will be treated as unsecured creditors that would not be required to be paid in full, thus allowing the Commonwealth (and by extension other unsecured creditors) to save significant sums.

31.      Notably, the savings from treating the Plaintiffs and their attorneys as general unsecured creditors under an eventual plan of adjustment will be considerable ***even if*** the Plaintiffs are included in a convenience class that will be paid in full under an eventual plan of adjustment, as the Oversight Board apparently intends to do (although it remains to be seen whether this will, in fact, happen).[34]  This is because, as explained in further detail below, the

---

[33]   The Commonwealth and Oversight Board have extensively briefed the trust issue.  The continuing existence of some modicum of risk of an adverse result does not mean that an adverse result is likely, let alone certain. Indeed, the Commonwealth and Oversight Board's prior fervent belief that no trust has been created makes the current proposed surrender all the more inexplicable.

[34]   While the Committee would have no objection to the convenience class proposed in prior filed plans of adjustment, those prior proposals are not the same as the Court being confronted with an actual confirmed plan

Plaintiffs' attorneys have separate claims that far exceed any conceivable convenience class threshold, and thus, absent assumption, would fall within the general unsecured creditor class.[35]

32.     The math here is straightforward.  In the absence of a true settlement, assumption (1) is significantly more costly to the Commonwealth than rejection and treating Plaintiffs and their attorneys as unsecured creditors (the most likely result of such rejection) and (2) essentially has the same cost as an (unlikely) scenario in which rejection is followed by litigation that results in an adverse ruling on the existence of a trust.  The only difference between assumption and the latter "worst case" scenario would be the cost of litigation; however, it is difficult to believe that the cost of such litigation will be anywhere near the millions of dollars the Oversight Board proposes to siphon away from general unsecured creditors.[36]

33.     Finally, the Oversight Board argues that one of the benefits of assumption is the release of allegedly segregated funds.  The Committee disputes that there are any segregated funds, and the Commonwealth and Oversight Board have alleged repeatedly that those funds are merely held separately for "accounting purposes."[37]  In any event, there is no evidence that the

---

of adjustment, or even a filed plan of adjustment that the Oversight Board seeks to confirm, neither of which at this point exists.  In other words, it is premature to make rulings now based on hypothetical plans of adjustment.

[35]   The Oversight Board's most recent disclosed plan proposals indicate the Oversight Board intends for general unsecured creditors to receive a recovery percentage of less than 1% under a Commonwealth plan of adjustment.

[36]   The Committee notes that the pleadings in the lift stay litigation carried out in 2018 before this Court were submitted by the Commonwealth Department of Justice, and thus likely prepared at a much-reduced cost as compared to the cost of using outside counsel.  Presumably, the Department of Justice would be assigned to handle any continuation of the lift-stay litigation, especially given the saliency of issues of Puerto Rico law.

[37]   *See Supplemental Brief and Declaration in Compliance with March 9, 2018 Court Order* ¶ 9 [Docket No. 2795] ("[F]unds received before 2006 are property of the Commonwealth and funds received after 2006 are deposited into a "reserve account" **for accounting purposes**.")(emphasis added); *Commonwealth of Puerto Rico's Reply to Movants' Supplementary Memorandum in Compliance With Order of March 9th and March 13th, 2018* ¶ 6 [Docket No. 2820] ("[F]unds are segregated into a separate account in the General Fund **for accounting purposes**.") (emphasis added); *Brief for Debtor-Appellee*, at 36, *Gracia-Gracia v. Fin. Oversight & Mgmt. Bd. for P.R. ex rel Puerto Rico*, No. 18-1463 (1st Cir. Apr. 5, 2019) *("[T]here is nothing in the record below indicating the premiums paid during the period from 2006 to 2010 were segregated from other funds in the General Fund, though there was an accounting entry providing they were held in a "reserve account".")* (emphasis added).

Commonwealth requires these funds for other purposes at this time such that releasing the funds provides some material benefit.[38]  In fact, publicly available information shows that the Commonwealth has plenty of cash on hand.[39]  Accordingly, there is no negative impact from waiting to use the funds until confirmation of a plan of adjustment.[40]

34.     Given the above, the Court, if it decides to apply the Functional Approach, should nevertheless deny the Assumption Motion because assumption does not benefit the Commonwealth and only serves to prejudice general unsecured creditors.

c)     Plaintiffs' Attorneys Claims Are Separate

35.     At the December 9, 2020 hearing, the Oversight Board disagreed with the Committee's characterization of the Plaintiffs' attorneys' claims as separate, alleging that the attorney claims "are paid out of a 20 percent holdback of all the claims paid,"[41] a feature of the Settlement Agreements that is "merely an allocation of proceeds, not a separate claim of Plaintiffs' counsel."[42]

36.     On this point, the Oversight Board is incorrect.  The Commonwealth Settlement Agreement clearly provides that **_the Commonwealth_** (not the Plaintiffs) must pay the Plaintiffs' attorneys 20% of the total reimbursement amount.[43]  That obligation is a "claim" under section

---

[38]   This is especially the case when the Oversight Board's proposal for releasing the allegedly segregated funds involves spending millions of dollars to unnecessarily pay the Plaintiffs and their attorneys in full.

[39]   _See_ Puerto Rico Department of Treasury, _Treasury Single Account ("TSA") FY 2021 Cash Flow_, at 5, 8 (showing TSA balance of $9.235 billion as of December 4, 2020), https://www.aafaf.pr.gov/.

[40]   Plan confirmation would result in the release of these allegedly segregated funds, as would lift stay litigation in which the Commonwealth prevailed (the mostly likely result of such litigation).

[41]   Dec. 9 Hr'g Tr. at 27:5-6.

[42]   _Id._ 27: 8-9.

[43]   Under the Commonwealth Settlement Agreement, that payment was to be made directly from the Commonwealth to the attorneys through the payment of $1,375,000 in advances, plus 20% of the amounts reimbursed during the claims period.  Commonwealth Settlement Agreement ¶ 6. F(ii)(5), ¶ 6. F(v).  The Commonwealth Settlement Agreement does not describe a mechanism for the potential recoupment of such advances in the event they exceed 20% of total reimbursements.

101(5) of the Bankruptcy Code.[44]  Further, under applicable non-bankruptcy law,[45] the attorneys,

even if not considered "parties" to the settlement agreement, would have an independent right to

enforce the agreement pursuant to Puerto Rico Rule of Civil Procedure 51.6.[46]  This independent

enforcement right is consistent with Puerto Rico contract law, which generally allows contracts

to benefit third parties and provides third parties the right to enforce such contracts.[47]  Moreover,

contrary to the Oversight Board's position, the Plaintiffs would not have claims against the

Commonwealth for the entire 100% of the reimbursements under the Commonwealth Settlement

Agreement, because the Commonwealth Settlement Agreement does not entitle them to such

100% payment.[48]  Indeed, had the Commonwealth Settlement Agreement been drafted to provide

only a 100% payment claim to the Plaintiffs, it would have forced the attorneys to look to

thousands of individual Plaintiffs for payment of fees, a result the parties surely did not intend.[49]

---

[44] Defining "claim" as, a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured" or a "right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured." 11 U.S.C. §101(5)(A), (B).

[45] *See e.g., Official Comm. of Unsecured Creditors of Schlotzsky's, Inc. v. Grant Thornton, L.L.P. (In re Schlotzsky's, Inc.)*, 351 B.R. 430, 437 (Bankr. W.D. Tex. 2006) ("State law controls . . . questions surrounding enforceability, severability, and remedies associated with executory contracts.").  *See also, e.g., In re Indep. Am. Real Estate, Inc.*, 146 B.R. 546, 553 (Bankr. N.D. Tex. 1992) ("State law specifies the remedies of a non-breaching party to a contract when the contract is breached, to the extent state law does not contravene the Bankruptcy Code."); *In re Audra-John Corp.*, 140 B.R. 752, 757 (Bankr. D. Minn. 1992) (same).

[46] *See* 32 L.P.R.A. App. I, § 51.6 ("When an order is made in favor of a person who is not a party to the action, he may enforce obedience to the order by the same process as if he were a party . . . .").  *See also Empresas Inabon, Inc. v. Gotay (In re Empresas Inabon, Inc.)*, 358 B.R. 487, 524 (Bankr. D.P.R. 2006) ("[A] judicial compromise . . . may be enforced as if it were a final judgment through an execution of judgment proceeding." (citing *Citibank v. Dependable Ins. Co., Inc.*, 121 D.P.R. 503, 516, 21 P.R. Offic. Trans. 496, 508–509 (1988))).

[47] *See* 31 L.P.R.A. § 3374 ("Should the contract contain any stipulation in favor of a third person, he may demand its fulfilment, provided he has given notice of his acceptance to the person bound before it may have been revoked."); *M.R. (Vega Alta), Inc. v. Caribe Gen. Elec. Prod., Inc.*, 31 F. Supp. 2d 226, 238 (D.P.R. 1998) ("Puerto Rico law recognizes a cause of action in favor of a third-party beneficiary to a contract.").

[48] *See* 31 L.P.R.A. § 3471 ("If the terms of a contract are clear and leave no doubt as to the intentions of the contracting parties, the literal sense of its stipulations shall be observed."); 31 L.P.R.A. § 3024 ("The losses and damages for which a debtor in good faith is liable, are those foreseen or which may have been foreseen, at the time of constituting the obligation, and which may be a necessary consequence of its nonfulfillment.").

[49] Nor can there be any dispute as to the attorneys' claims to their advances, to be paid directly to them on a fixed schedule regardless of the status of the claims reimbursement process.  Commonwealth Settlement Agreement ¶

**C.**   **Court Should Not Approve Payment in Full on Alternative Grounds Not Presented in the Oversight Board's Pleadings**

37.     At the hearing held on December 9, 2020, counsel to the Oversight Board announced, for the first time, that the Oversight Board sought "in the alternative . . . an order simply approving the Commonwealth's payment of claims under its settlement agreements."[50] Counsel to the Oversight Board then proposed that the Court could grant such relief under "Rule 9019, and pursuant to its general authority, under [section] 105," and that, "[a]lternatively, the Court could simply authorize lifting of the automatic stay for those payments to be made."[51]

38.     The Court should reject the Oversight Board's request for alternative relief given its severe procedural flaws, which violate the Committee's right to due process.  The Oversight Board's approach, invoking boilerplate language from the Assumption Motion requesting "such other and further relief as the Court may deem appropriate"[52] to seek multiple forms of alternative relief it had never mentioned in its pleadings, is highly unusual.  In fact, the Committee's counsel has never witnessed such a use of boilerplate at a hearing, and this last minute request effectively denies the Committee and other parties in interest the opportunity to respond, given that the requested alternative relief was not properly noticed in accordance with the Federal Rules of Bankruptcy Procedure and this Court's case management procedures.[53]

---

F(ii).  As noted above, the Commonwealth Settlement Agreement does not describe a mechanism for the potential recoupment of such advances in the event they exceed 20% of total reimbursements.

[50]   Dec. 9 Hr'g Tr. at14: 23 – 15:1.  *See also Id.* 15:10-14 ("[I]f the Court determines that the settlement agreements are not executory, the parties are satisfied with lesser relief simply confirming that the Commonwealth may make the payments pursuant to the settlement agreement.").

[51]   Dec. 9 Hr'g Tr. 16: 2-5.

[52]   Assumption Mot., at 11.

[53]   *See e.g.,* FED. R. BANKR. P. 9019(a) ("On motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement.  Notice shall be given to creditors, the United States trustee, the debtor, and indenture trustees as provided in Rule 2002 and to any other entity as the court may direct."); FED. R. BANKR. P. 4001(d) (establishing requirements for contents, service, and objection deadlines in connection with motions for approval of agreements to modify or terminate the automatic stay).

39.     Finally, the Committee submits that the Oversight Board's request for alternative

relief fails substantively under Rule 9019 and other relevant legal standards.  To the extent the

Court wishes to consider the Oversight Board's requested alternative relief, the Committee

requests that the Court provide the Committee the opportunity to brief the underlying issues.

*[Remainder of Page Left Intentionally Blank]*

Dated: December 16, 2020
     San Juan, Puerto Rico

Respectfully submitted,

*/s/ Martin J. Bienenstock*
Martin J. Bienenstock
Jeffrey W. Levitan
Ehud Barak
(Admitted *Pro Hac Vice*)
**PROSKAUER ROSE LLP**
Eleven Times Square
New York, NY 10036
Tel: (212) 969-3000
Fax: (212) 969-2900

Steve Y. Ma (Admitted *Pro Hac Vice*)
**PROSKAUER ROSE LLP**
2029 Century Park East, Suite 2400
Los Angeles, CA 90067-3010
Telephone:  (310) 557-2900
Facsimile:  (310) 557-2193

*Attorneys for the Financial*
*Oversight and Management Board*
*as Representative for the Commonwealth*

*/s/ Hermann D. Bauer*
Hermann D. Bauer
**O'NEILL & BORGES LLC**
250 Muñoz Rivera Ave., Suite 800
San Juan, PR 00918-1813
Tel: (787) 764-8181
Fax: (787) 753-8944

*Co-Attorneys for the Financial*
*Oversight and Management Board*
*as Representative for the Commonwealth*

By: */s/ Luc A. Despins*
**PAUL HASTINGS LLP**
Luc A. Despins, Esq. *(Pro Hac Vice)*
James R. Bliss, Esq. *(Pro Hac Vice)*
James B. Worthington, Esq. *(Pro Hac Vice)*
G. Alexander Bongartz, Esq. *(Pro Hac Vice)*
200 Park Avenue
New York, New York 10166
Telephone: (212) 318-6000
lucdespins@paulhastings.com
jamesbliss@paulhastings.com
jamesworthington@paulhastings.com
alexbongartz@paulhastings.com

*Counsel to the Official Committee of Unsecured
Creditors*

By: */s/ Juan J. Casillas Ayala*
**CASILLAS, SANTIAGO & TORRES LLC**
Juan J. Casillas Ayala, Esq. (USDC - PR 218312)
Israel Fernández Rodríguez, Esq. (USDC - PR 225004)
Juan C. Nieves González, Esq. (USDC - PR 231707)
Cristina B. Fernández Niggemann, Esq. (USDC - PR
306008)
PO Box 195075
San Juan, Puerto Rico 00919-5075
Telephone: (787) 523-3434 Fax: (787) 523-3433
jcasillas@cstlawpr.com
ifernandez@cstlawpr.com
jnieves@cstlawpr.com
cfernandez@cstlawpr.com

*Local Counsel to the Official Committee of Unsecured
Creditors*