## UNITED STATES DISTRICT COURT
## DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO,<br><br>Debtor.[1] | PROMESA<br>Title III<br><br>No. 17-BK-3283-LTS<br><br>(Jointly Administered) |
| AMBAC ASSURANCE CORPORATION,<br><br>Movant,<br><br>-v-<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>Respondent. | No. 17-BK-3283-LTS<br><br>**Re: ECF No. 15220** |

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK-3283- LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17- BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5233-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

**OBJECTION OF THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR
PUERTO RICO TO MOTION BY AMBAC ASSURANCE CORPORATION
<u>FOR AN ORDER DIRECTING CASH RULE 2004 DISCOVERY</u>**

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT ................................................................................................ 1

BACKGROUND ................................................................................................................... 4

     I.     The Oversight Board's Ongoing Cash Restriction Analysis. ............................... 4

     II.    Discovery Produced to Ambac to Date....................................................... 8

     III.   Documents Sought by the New Cash Motion...................................................... 10

ARGUMENT ........................................................................................................................ 11

     I.     The Documents Ambac Seeks Are Not Relevant to a Legitimate Rule 2004
          Inquiry.................................................................................................... 11

     II.    Ambac's Requests Necessarily Implicate Privileged Information, and that
           Privilege Has Not Been Waived. ......................................................... 15

CONCLUSION..................................................................................................................... 25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*Bryan Corp. v. Chemwerth, Inc.*,
  296 F.R.D. 31 (D. Mass. 2013)................................................................17

*Colonial Gas Co. v. Aetna Cas. & Sur. Co.*,
  144 F.R.D. 600 (D. Mass. 1992)..............................................................23

*Columbia Data Prods., Inc. v. Autonomy Corp.*,
  No. 11-12077, 2012 WL 6212898 (D. Mass. Dec. 12, 2012)..................16

*Fed. Energy Regulatory Comm'n v. Silkman*,
  C.A. No. 16-0205, 2017 WL 6597510 (D. Mass. Dec. 26, 2017) ...........15

*Ferrara & DiMercurio, Inc. v. St. Paul Mercury Ins. Co.*,
  173 F.R.D. 7 (D. Mass. 1997)..................................................................23

*Goldenson v. Steffens*,
  No. 2:10–cv–00440–JAW, 2013 WL 145587 (D. Me. Jan. 14, 2013) ....24

*Granite Partners v. Bear, Stearns & Co.*,
  184 F.R.D. 49 (S.D.N.Y. 1999) ...............................................................21

*In re Dep't of Justice Subpoenas to ABC*,
  263 F.R.D. 66 (D. Mass. 2009)................................................................24

*In re Eagle-Picher Indus., Inc.*,
  169 B.R. 130 (Bankr. S.D. Ohio 1994).....................................................11

*In re Enron Corp.*,
  281 B.R. 836 (S.D.N.Y. 2002)..................................................................11

*In re Fin. Oversight & Mgmt. Bd. for P.R.*,
  390 F. Supp. 3d 311, 326 (D.P.R. 2019)............................................16, 18

*In re Fin. Oversight & Mgmt. Bd. for P.R.*,
  392 F. Supp. 3d 244 (D.P.R. 2019)..........................................................18

*In re Good Hope Refineries, Inc.*,
  9 B.R. 421 (Bankr. D. Mass. 1981) .........................................................11

*In re Grand Jury Subpoena*,
  220 F.R.D. 130 (D. Mass. 2004)..............................................................23

iv

*In re JMP Newcor Int'l, Inc.*,
    204 B.R. 963 (Bankr. N.D. Ill. 1997) ...................................................................17

*In re PolyMedica Corp. Sec. Litig.*,
    235 F.R.D. 28 (D. Mass. 2006)............................................................................17

*In re Quigley Co., Inc.*,
    No. 04–15739 (SMB), 2009 WL 9034027 (Bankr. S.D.N.Y. Apr. 24, 2009)........................19

*In re Recoton Corp.*,
    307 B.R. 751 (Bankr. S.D.N.Y. 2004)...................................................................11

*In re Symington*,
    209 B.R. 678 (Bankr. D. Md. 1997) .................................................................11, 14

*In re Tyco Int'l., Ltd., Sec. Litig.*,
    MDL No. 02–md–1335–PB, 2007 WL 2682763 (D.N.H. Sept. 7, 2007) ..............................20

*In re Tyco Int'l., Ltd., Sec. Litig.*,
    No. 02–md–1335–PB, 2007 WL 710188 (D.N.H. Mar. 7, 2007) ...........................................21

*In re Wilcher*,
    56 B.R. 428 (N.D. Ill. 1985) ................................................................................12

*Kellogg USA, Inc. v. B. Fernandez Hermanos, Inc.*,
    269 F.R.D. 95 (D.P.R. 2009) ..........................................................................16, 20

*Lawrence E. Jaffe Pension Plan v. Household Int'l, Inc.*,
    244 F.R.D. 412 (N.D. Ill. 2006)............................................................................20

*Precision Airmotive Corp. v. Ryan Ins. Servs., Inc.*,
    No. 2:10–mc–244–JHR, 2011 WL 148818 (D. Me. Jan. 17, 2011) .....................................24

*Puerto Rico Elec. Power Auth. v. Vitol, Inc.*,
    Civil No. 09-2242 (DRD), 2013 WL 12234272 (D.P.R. June 21, 2013) ..............................22

*Rodríguez-Torres v. Gov't Dev. Bank of P.R.*,
    265 F.R.D. 40 (D.P.R. 2010) ..............................................................................15

*Stamps v. Town of Framingham*,
    38 F. Supp. 3d 134 (D. Mass. 2014) .....................................................................24

*Town of Grafton v. Pulte Homes of New England, LLC*,
    C.A. No. 12–10524–TSH, 2014 WL 2155035 (D. Mass. May 21, 2014)..............................21

*United States ex rel. Wollman v. Mass. Gen. Hosp., Inc.*,
    C.A. No. 15-11890-ADB, 2020 WL 4352915 (D. Mass. July 29, 2019) ..............................20

*Vicor Corp. v. Vigilant Ins. Co.*,
   674 F.3d 1 (1st Cir. 2012)..................................................................................17

**STATUTES**

48 U.S.C. §§ 2101-2241 ......................................................................................1

**OTHER AUTHORITIES**

Fed. R. Bankr. P. 2004..............................................................................passim

Fed. R. Bankr. P. 2004(b) ...................................................................................11

To the Honorable United States Magistrate Judge Judith Dein:

The Financial Oversight and Management Board for Puerto Rico (the "Oversight Board"), on its own behalf and in its capacity as the sole Title III representative of the Commonwealth of Puerto Rico ("the Commonwealth") pursuant to section 315(b) of the *Puerto Rico Oversight, Management, and Economic Stability Act* ("PROMESA"),[2] respectfully submits this objection (the "Objection") to *Ambac Assurance Corporation's Motion for an Order Directing Cash Rule 2004 Discovery from the Financial Oversight and Management Board for Puerto Rico* [ECF No. 15220] (the "New Cash Motion" or "Mot."), and in support thereof, respectfully states as follows:

## PRELIMINARY STATEMENT

1.      Ambac's New Cash Motion purports to seek documents relating to three "cash restriction analyses" prepared on behalf of the Oversight Board in 2019: (x) the publicly available *IFAT Report on Title III Bank Accounts*, dated March 12, 2019 (the "March 2019 D&P Report"), and (y) two presentations prepared for mediation and ultimately made public as part of a periodic release of "cleansing materials," (i) the "Summary of Cash Restriction Analysis" presentation, dated October 2, 2019, and (ii) the "Bank Account Analysis: Status Update – June 30, 2019 Balances" presentation, also dated October 2, 2019 (collectively, the "October 2019 Presentations," and together with the March 2019 D&P Report, the "2019 Analyses").  Ambac seeks two categories of information:  (i) "Calculation Back-Up Material," which are comprised of "back-up materials containing calculations for the reports, such as Excel or dynamic versions of charts and tables contained in such reports that contain the mechanical calculations underlying the amounts included therein," Mot. at 2, and (ii) "Process Documents," which Ambac describes as

---

[2] PROMESA has been codified at 48 U.S.C. §§ 2101-2241.

the Oversight Board's "nonlawyer" advisors' communications regarding whether certain Commonwealth funds were subject to legal restrictions.

2.    Subsequent to the filing of the New Cash Motion, the Oversight Board produced Calculation Back-Up Material underlying the 2019 Analyses, with internal notes of the Oversight Board's advisors removed, and the Oversight Board understands that aspect of the motion should be resolved.[3]  The Oversight Board has declined to produce the Process Documents for a number of reasons.  To start, and as just noted, the Oversight Board already has produced to Ambac all of the factual source materials and raw data its advisors reviewed in preparing the 2019 Analyses, including all the documents relied upon by the Oversight Board's counsel to identify a particular account as being subject to any legal restrictions.  Ambac therefore has all the materials it needs to conduct its own analysis and to reach its own conclusions regarding applicable legal restrictions.  Second, the 2019 Analyses have been superseded and no longer reflect the Oversight Board's current analysis of restricted and unrestricted cash.  The most current version of the Oversight Board's cash restriction analysis was disclosed publicly as part of a periodic release of "cleansing materials" related to the ongoing mediation efforts (the "December 2020 Presentation").  Finally, even if the Process Documents were relevant (they are not), they are protected, in whole or in part, from disclosure by the attorney-client privilege, the work product protection, and the common interest doctrine, because they contain the Oversight Board's and AAFAF's counsel's legal advice

---

[3] The Oversight Board made this production notwithstanding that the Calculation Back-Up Materials underlying the 2019 Analyses are not relevant to the Commonwealth's financial condition, including which Commonwealth funds are subject to legal restrictions, because they have no bearing on whether an account is or is not subject to legal restrictions on the use of its funds.  That determination is a legal conclusion that can be reached solely on the basis of a review of documents the Oversight Board long ago produced to Ambac.  Specifically, the Oversight Board has produced the factual source materials and raw data reviewed and relied upon by its counsel to reach legal conclusions regarding any legal restrictions.  Ambac's counsel has been and is, right now, in a position to do the exact same work.

regarding which accounts are restricted and why. They also contain the mental impressions and legal analysis of counsel, and were prepared with the expectation that the subject of the cash restriction analyses—the amount of Commonwealth cash that is legally restricted and the amount that is available to pay creditors under a plan of adjustment—could well be the subject of litigation in connection with a contested confirmation hearing.

3. The New Cash Motion is based on two key misunderstandings of the documents sought. *First*, Ambac claims it seeks only documents and communications prepared by the Oversight Board's "nonlawyer" advisors. *See, e.g.*, Mot. at 1. But as Ambac well knows, the Oversight Board's legal advisors were closely involved in the cash restriction analyses. Legal and nonlawyer advisors prepared each of the cash restriction analyses together as a collaborative effort. Legal counsel were responsible for the determinations whether accounts were restricted or unrestricted. There are therefore no readily ascertainable "nonlawyer" communications addressing the Commonwealth's cash restriction judgments, and it would be exceedingly difficult to untangle "nonlawyer" communications from communications in which legal counsel were involved.

4. *Second*, Ambac claims it needs the documents sought in the New Cash Motion because the Oversight Board "intends to rely on these analyses" at the plan of adjustment stage. Mot. at 14. That is not the case. The Oversight Board does not intend to rely on the 2019 Analyses in connection with confirmation. On the contrary, as the Oversight Board has repeatedly informed Ambac, its analysis of the Commonwealth's cash restrictions has long since been updated and remains ongoing. The Oversight Board updated its 2019 Analyses in Exhibit J to the February 2020 Amended Disclosure Statement, which superseded the 2019 Analyses, and on December 19, 2020, the Oversight Board disclosed publicly its most recent cash analysis, the December 2020

3

Presentation.[4]  Any subsequent updates will be made public no later than the filing of any future disclosure statement.  The 2019 Analyses are neither expert reports nor akin to expert reports. Rather, they reflect the views of lawyers at particular points in time based on particular information, all of which has been updated and thus superseded.

5.      In short, the Oversight Board already has provided Ambac with the materials it used to reach the conclusions reflected in the 2019 Analyses (and Exhibit J to the February 2020 Amended Disclosure Statement)[5], and Ambac can decide for itself whether it agrees with the Oversight Board's determinations (which are themselves subject to revision if new factual information is received about the relevant bank accounts).  It does not need either privileged notes or communications among the Oversight Board's counsel and nonlawyer advisors, because those materials are not relevant to the legal question whether an account is restricted or not.  Thus, the Oversight Board should not be required to spend time, effort and scarce resources collecting, searching, reviewing for privilege, and producing irrelevant, non-privileged "Process Documents" concerning the development of the 2019 Analyses.

6.      For the foregoing reasons, and as further described below, the New Cash Motion should be denied.

## BACKGROUND

### I.      The Oversight Board's Ongoing Cash Restriction Analysis.

7.      The Oversight Board, acting through its financial and legal advisors, has been engaged in review and analysis of the Commonwealth's bank accounts since early 2018.  The

---

[4] *See* https://emma.msrb.org/P11450397-P11124337-P11535399.pdf.

[5] "Amended Disclosure Statement" refers to the *Disclosure Statement for the Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* [ECF No. 11947], filed on February 28, 2020.

purpose of that review has been to assess how much cash the Commonwealth holds in its accounts, how much of that cash is subject to legal restrictions on its use, and how much is available to pay creditors pursuant to a plan of adjustment.  The Oversight Board has made five iterations of its cash restriction analysis available to creditors to date: the three 2019 Analyses, the summary of account restrictions identified in Exhibit J to the Amended Disclosure Statement, and the December 2020 Presentation.

8.     The 2019 Analyses were prepared as of particular dates, and did not reflect the Oversight Board's final conclusions regarding restricted and unrestricted cash.  The documents themselves make this clear.  For example, the March 2019 D&P Report includes a section titled "Next Steps," which identified additional tasks and assessments to further develop the analysis in the March 2019 D&P Report.  *See* Mot., Ex. B at 24-25.  Likewise, the October 2019 Presentations are both marked "Preliminary and Subject to Material Revision," and both note the Oversight Board is continuing to review and diligence asserted restrictions.  *See* Mot., Ex. C at 1, Ex. D at 4. Further, one of the October 2019 Presentations also includes a "Next Steps" section, which identifies several outstanding tasks the Oversight Board expected to undertake as part of its ongoing analysis.  One step to be performed was to "finalize legal analysis on restricted versus unrestricted balances."  *Id.*, Ex. D at 16.

9.     Although the Oversight Board's analysis remains ongoing, at present, the December 2020 Presentation disclosed on December 19, 2020 is the most up-to-date version of the Oversight Board's cash restriction analysis that has been made publicly available.  The December 2020 Presentation supersedes all prior analyses, including the three 2019 Analyses, and Exhibit J to the Amended Disclosure Statement filed on February 28, 2020.  As Ambac itself conceded, the Oversight Board's ongoing analysis of applicable cash restrictions has resulted in

the reclassification of several accounts from restricted to unrestricted—*increasing* the total amount of unrestricted cash that is available to creditors such as Ambac based on the Oversight Board's continuing analysis of Commonwealth accounts holding funds above $6.9 million.  Mot. at 8 n.18.

10.     Each iteration of the Oversight Board's cash analysis has been the product of close collaboration between the Oversight Board's financial and legal advisors.  That also is apparent from the reports of the analyses themselves.  The March 2019 D&P Report, for example, acknowledges D&P relied on O'Neill & Borges, LLC ("O'Neill"), the Oversight Board's outside counsel in Puerto Rico, for legal due diligence regarding asserted restrictions on the use of certain Commonwealth cash accounts.  *See* Mot., Ex. B at 12-13.  As the March 2019 D&P Report explains, O'Neill assessed the applicability of any claimed restrictions and, where necessary, sought additional information to support or clarify those claimed restrictions.  A chart reflecting the status of O'Neill's legal due diligence analysis as of the date of the March 2019 D&P Report was attached to the report as Appendix C-11.  *Id.*

11.     Following the publication of the March 2019 D&P Report, the Oversight Board continued its analysis of applicable restrictions with the assistance of O'Neill and the support of additional financial and legal advisors, including Ernst & Young ("EY"), PJT Partners ("PJT"), and Proskauer Rose LLP ("Proskauer").  *See* Am. Discl. Stmt. at 105-106.  Working together, EY, PJT, Proskauer, and O'Neill gathered additional factual materials and data from account holders at the Commonwealth and its agencies, as well as from the financial institutions maintaining the relevant bank accounts.  *Id.* at 106-107.  Those materials included documents reflecting the current status of the Commonwealth's accounts, including any updates as to the balances in those accounts, as well as documents provided by the Commonwealth and its agencies relating to potential legal restrictions on the accounts.  *Id.*

12.     The Oversight Board's nonlawyer advisors and its legal counsel then worked together to analyze the documents collected. *Id.* at 108-112.  Counsel made assessments as to which accounts were subject to legal restrictions based on the information provided by accountholders in support of alleged restrictions and legal research and analysis. *Id.*  Legal and financial advisors then together prepared summaries regarding total unrestricted and restricted cash. *Id.* at 109-112.  When necessary, the Oversight Board's advisors also solicited advice and support from advisors to AAFAF, including certain of its legal advisors, O'Melveny & Myers and Pietrantoni Méndez & Alvarez LLC, as well as certain of its financial advisors, Ankura Consulting Group LLC and Conway MacKenzie, Inc.  That collaboration resulted in the publication of the analyses set forth in the October 2019 Presentations, and subsequently, the superseding analyses set forth in Exhibit J to the Amended Disclosure Statement, and most recently, the December 2020 Presentation.

13.     The October 2019 Presentations were first made available to creditors for purposes of mediation, and they each bear the legend "Provided Pursuant to Court-Ordered Mediation."  The October 2019 Presentations also made clear legal counsel played a prominent role.  For example, both presentations included the legend "Prepared with Advice of and at the Request of Counsel."   In addition, one presentation notes that a "[s]ignificant volume of supporting documentation was reviewed by legal counsel to make a determination on the classification of restrictions," Mot., Ex. D, at 7, and notes the "Legal Due Diligence team" continued to request additional documentation concerning potentially applicable restrictions, *id.* at 9.  In addition, that presentation noted that account classifications remained "subject to legal review and material change." *See, e.g.*, *id.* at 13.

14.     On February 28, 2020, the Oversight Board publicly filed an iteration of its cash restriction analysis as Exhibit J to the Amended Disclosure Statement.

15.     The December 2020 Presentation was first made available to creditors for purposes of mediation, and bears the legend "Provided Pursuant to Court-Ordered Mediation."  The December 2020 Presentation also bears the legend "Prepared with Advice of and at the Request of Counsel," making clear, again, that legal counsel played an important role.  The Oversight Board's review and analysis of the Commonwealth's cash accounts, as well as its review and analysis of documentation supporting alleged restrictions, remains ongoing, and the Oversight Board anticipates providing a further update to its cash restriction analysis in conjunction with the filing of a further amended plan of adjustment.

## II.     Discovery Produced to Ambac to Date.

16.     On October 28, 2019, Ambac filed *Ambac Assurance Corporation's Motion for Entry of Order Authorizing Discovery Under Bankruptcy Rule 2004 Concerning Commonwealth Cash Restriction Analysis* [ECF No. 9023] (the "Original Cash Motion"), seeking authorization to serve fifty-five separate document requests seeking information regarding the Oversight Board's cash restriction analysis.  Among other things, the Original Cash Motion sought back-up materials underlying the 2019 Analyses.

17.     On January 23, 2020, this Court entered the *Memorandum Order Denying Motion to Strike Certain Rule 2004 Applications* [ECF No. 10332] (the "Strike Order"), which directed the parties to meet and confer regarding the Original Cash Motion and "identify parameters for disclosure . . . that are designed to provide Ambac with core information sufficient to obtain a basic understanding of major aspects of the Commonwealth's financial condition that will be relevant to a plan of adjustment."  Strike Order at 9-10.  Subsequently, Ambac prioritized its

requests and sought, *inter alia*, "all documents relied upon in connection with" the March 2019 D&P Report and the October 2019 Presentations. *See* Mot., Ex. E, at 3.

18.  In response to Ambac's requests, the Oversight Board agreed to produce the factual source materials and raw data underlying the March 2019 D&P Report and the October 2019 Presentations.  The Oversight Board has subsequently produced to Ambac over 14,000 documents, which consist of (i) documents showing the balances in the Commonwealth's accounts, in the form of balance sheets and account statements; (ii) communications between the Oversight Board and its advisors, on the one hand, and the Commonwealth agencies, on the other hand, regarding the collection of the financial data; and (iii) documents provided by Commonwealth agencies showing the bases for any claimed restrictions on use of funds.

19.  The documents produced by the Oversight Board are precisely the same documents reviewed and relied upon by its financial and legal advisors, including D&P, EY, PJT, O'Neill, and Proskauer, in assessing and determining the amounts of restricted and unrestricted cash held by the Commonwealth in its bank accounts.

20.  Ambac and the Oversight Board provided periodic status reports to the Court throughout 2020 [ECF Nos. 10875, 11787, 12484, 12711, 13192, 13723, 14150, 14438, 15025, 15350], detailing the parties' efforts to work cooperatively and to provide Ambac with "core information sufficient to obtain a basic understanding of major aspects of the Commonwealth's financial condition that will be relevant to a plan of adjustment."  Strike Order at 9-10.  In light of the parties' progress in resolving issues and narrowing the matters in dispute, this Court denied Ambac's Original Cash Motion without prejudice on November 12, 2020, and directed Ambac to file a new Rule 2004 motion "limited to the issues in dispute."  [ECF No. 15093].  The New Cash Motion followed.

### III.    Documents Sought by the New Cash Motion

21.    After the voluminous discovery it has already received, in the New Cash Motion Ambac *also* seeks the production of the Calculation Back-Up Materials and the Process Documents for the 2019 Analyses—even though those materials are not relevant, and, in large part, privileged.

22.    As noted above, subsequent to the filing of the Rule 2004 Motion, the Oversight Board produced to Ambac Calculation Back-Up Materials underlying the March 2019 D&P Report and the October 2019 Presentations, with internal notes of the Oversight Board's advisors removed.  These materials consist of Excel spreadsheets that either directly show the calculations underlying the 2019 Analyses, including dynamic versions of tables contained in those Analyses, or contain the data necessary to reconstruct the calculations underlying the 2019 Analyses.  While the Oversight Board understands these materials should resolve Ambac's request for Calculation Back-Up Material, on December 22, 2020, Ambac's counsel informed counsel for the Oversight Board that it was not yet in a position to determine whether the Oversight Board's December 20, 2020 production resolves that aspect of Ambac's current motion.  *See* Exhibit 1, December 22, 2020 Email J. Hughes to M. Dale.

23.    Based on the Oversight Board's production of the Calculation Back-Up Material, the Oversight Board believes the only category of documents that remains at issue is the Process Documents, which Ambac describes as  documents reflecting the Oversight Board's "nonlawyer advisors' review procedure and protocol for assessing classifications, how funds were determined to be restricted or unrestricted, and documents and communications reflecting the processes, assumptions, and methodologies used to classify accounts."  Mot. Ex. A at 2 ¶ 2.  Because both legal and financial advisors worked collaboratively to prepare the preliminary cash analyses, it would be very difficult to separate the Oversight Board's "nonlawyer advisors' communications"

10

from communications involving legal counsel.  At a minimum, significant redaction would likely be necessary.

## **ARGUMENT**

I.      **The Documents Ambac Seeks Are Not Relevant to a Legitimate Rule 2004 Inquiry.**

24.     Rule 2004 allows, upon order of the court, the "examination" of any entity.  That examination may relate "only to the acts, conduct, or property or to the liabilities and financial condition of the debtor, or to any matter which may affect the administration of the debtor's estate[.]" Fed. R. Bankr. P. 2004(b).  Ambac, as the party "seeking to conduct a 2004 examination, has the burden of showing good cause for the examination it seeks."  *In re Eagle-Picher Indus., Inc.*, 169 B.R. 130, 134 (Bankr. S.D. Ohio 1994).

25.     While permissible discovery under Rule 2004 is broad, it "is not unlimited."  *See In re Enron Corp.*, 281 B.R. 836, 840 (S.D.N.Y. 2002).  The purpose of a Rule 2004 examination is to "assist a party in interest in determining the nature and extent of the bankruptcy estate, revealing assets, examining transactions and assessing whether wrongdoing has occurred."  *In re Recoton Corp.*, 307 B.R. 751, 755 (Bankr. S.D.N.Y. 2004); *In re Good Hope Refineries, Inc.*, 9 B.R. 421 (Bankr. D. Mass. 1981) (the primary purpose of a Rule 2004 examination is to permit the party in interest to quickly ascertain the extent and location of the estate's assets).  The examination "must be both relevant and reasonable," and may not be used "to annoy, embarrass or oppress the party being examined."  *See In re Symington*, 209 B.R. 678, 684 (Bankr. D. Md. 1997).  To effectuate these limitations, a bankruptcy court may "need to limit the normally broad inquiry under Rule 2004 to preserve properly-claimed privileges, or to prevent overly-broad, oppressive or unfair inquiries into topics that are irrelevant to a review of the conduct and assets of debtors."  *Id.* at 687.  Consistent with these principles, in the Strike Order, Judge Swain

11

previously authorized Ambac to seek "core information sufficient to obtain a basic understanding of major aspects of the Commonwealth's financial condition that will be relevant to a plan of adjustment."  Strike Order at 9-10.

26.     Ambac cannot show good cause for the Rule 2004 examination it seeks here because the documents it demands are not relevant to the Commonwealth's affairs or financial condition, the administration of the Commonwealth's property, or to any other legitimate purpose under Rule 2004.  *In re Wilcher*, 56 B.R. 428, 433 (N.D. Ill. 1985) (citing *In re Johns-Manville Corp.*, 42 B.R. at 364) (holding a requested Rule 2004 examination was improper because it sought discovery as to "matters having no relationship to the debtor's affairs or no effect on the administration of the estate").  Neither the Calculation Back-Up Materials (which the Oversight Board has now produced) nor the Process Documents are relevant to the Commonwealth's financial affairs or to the determination of what Commonwealth cash is and is not subject to a legal restriction on its use.  These materials do not contain information supporting or disproving any asserted restrictions—indeed, as explained above, Ambac is already in possession of the documents relevant to both issues.  Ambac claims it needs the Calculation Back-Up Materials and the Process Documents, in addition to the core factual data already produced, because it is "not required to accept the Board's restriction classifications at face value."  Mot. at 10.  But the Oversight Board does not dispute Ambac is entitled to assess the restriction classifications for itself; that is why it provided Ambac with the factual source materials and data it produced.  Ambac can evaluate those documents and make its own determinations, using its own counsel, as to which accounts it believes are available to pay debt service.

27.     Instead, the Process Documents contain the Commonwealth's advisors' interim, non-final, and subsequently superseded *thoughts and analysis*.[6]   The Process Documents are irrelevant because they include communications regarding the Oversight Board's (and, in some cases, AAFAF's) legal advisors' interim views regarding potential restrictions on accounts.  But any individual attorney's impressions or assessments of a potential restriction classification is not itself factual information relevant to the Commonwealth's financial condition generally or, specifically, whether cash in any particular bank account is legally restricted.  What *is* relevant to the Commonwealth's financial condition and any legal cash restrictions are the amount of money in its accounts and documents purporting to place or recite restrictions on the use of those funds to pay creditors.  Ambac already has access, through the Oversight Board's prior productions, to the same documents examined by the Oversight Board's legal counsel to make assessments as to whether accounts are or are not restricted, and Ambac's counsel can review and analyze those documents and reach their own conclusions.

28.     Nevertheless, Ambac claims it is "entitled" to these documents because it believes it has the right to "explore the evolution" of the Oversight Board's analysis and "to understand how restricted and unrestricted classifications changed over time."  Mot. ¶ 26.  Ambac, however, provides no legal authority for that proposition, because there is none.  Indeed, the only apparent purpose for Ambac's request is to examine how the Commonwealth's advisors' thought processes

---

[6] Prior to producing any Calculation Back-Up Material, the Oversight Board removed legal advisors' notes, interim analyses, and internal, preliminary impressions as to whether certain restrictions applied to certain accounts.  These notes are not themselves factual information relevant to determining whether cash is or is not restricted.   They reflect only the preliminary views of counsel for the Oversight Board regarding potentially applicable restrictions, compiled for purposes of internal discussion while legal counsel was in the process of preparing the subsequently-superseded 2019 Analyses.  They are therefore not relevant to understanding what cash is and is not subject to any legal restriction, and for the reasons set forth in section II below, are protected by the attorney-client, work product, and common interest privileges.

may have changed over time—in other words, potentially to "annoy" or "embarrass" the Oversight
Board by exposing purported flaws or inconsistencies, even though the "evolution" of the
Oversight Board's analysis has, by Ambac's own admission, only increased the total amount of
unrestricted cash available to creditors.  That is not a proper purpose for a Rule 2004 examination,
*see In re Symington*, 209 B.R. at 684, especially where the analyses at issue have already been
superseded and are still a work-in-progress.

29.     Ambac also claims producing the Process Documents would not be burdensome,
Mot. at ¶¶ 24-27, but that is also wrong.  As Ambac is aware, at least six Oversight Board advisory
firms and at least five AAFAF advisory firms, as well as personnel with the Oversight Board,
AAFAF, and numerous agencies within the Commonwealth, have participated in the development
of the cash analyses over a period of more than two years.  *See* Exhibit 2, November 16, 2020
Letter M. Dale to J. Hughes.   Ambac seeks, apparently without limitation, any communications
between and among nonlawyer advisors, as well as internal communications within those advisors'
firms, for that entire period (and, as noted above, as a practical matter Ambac's requests will
implicate a large volume of communications with the Oversight Board's legal counsel).  Based on
a preliminary assessment of potentially relevant communications, Ambac's requests could require
the Board to review over 70,000 documents, not including internal communications of its
nonlawyer advisors, EY, PJT, and D&P.

30.     Although Ambac purports to limit its requests to the Oversight Board's
"nonlawyer" advisors, that limitation does not meaningfully narrow the scope of its requests
because, as explained above, the cash analyses were a collaborative effort of legal and nonlegal
advisors.  With regard to the restriction assessments, there is no readily ascertainable collection of
potentially relevant communications exchanged only by the Oversight Board's nonlawyer

14

advisors.  Any attempt to separate nonlawyer advisors' communications from communications involving counsel would only further multiply the burden on the Oversight Board, requiring careful review and extensive redaction of privileged information from tens of thousands of documents.  *See Rodríguez-Torres v. Gov't Dev. Bank of P.R.*, 265 F.R.D. 40, 43-4 (D.P.R. 2010) (denying motion to compel because the requests were likely to implicate hundreds, if not thousands, of documents, including confidential and potentially privileged information of little relevance, and would greatly increase costs and burdens on the parties); *Fed. Energy Regulatory Comm'n v. Silkman*, C.A. No. 16-0205, 2017 WL 6597510, at *8 (D. Mass. Dec. 26, 2017) (affirming magistrate judge's decision to deny production of privileged documents, reasoning that the request was "beyond the bounds of proportionality").

## II.   **Ambac's Requests Necessarily Implicate Privileged Information, and that Privilege Has Not Been Waived.**

### A.   **The Attorney-Client Privilege, the Work Product Doctrine, and the Common Interest Doctrine All Apply.**

31.     Even if the Process Documents were relevant—and they are not—they nevertheless implicate information that is protected from disclosure by the attorney-client privilege, the work product doctrine, and the common interest doctrine.  The Process Documents Ambac seeks—documents and communications reflecting the process by which the Oversight Board classified accounts as restricted or unrestricted—necessarily include privileged material, because as explained above, the process by which accounts were classified as legally restricted or unrestricted was conducted by the Oversight Board's counsel.

#### i.     *The Attorney-Client Privilege*

32.     The Process Documents are overwhelmingly protected by the attorney-client privilege.  Although Ambac purports to seek only "nonlawyer" communications regarding the process by which accounts were classified as restricted or unrestricted, the Oversight Board's

15

counsel drove that process.  Accordingly, documents reflecting the process by which restriction determinations were made necessarily include either communications with the Oversight Board's counsel, exchanged for the purpose of providing legal advice to the Oversight Board regarding available unrestricted cash, or nonlawyer communications that contain or reflect the Oversight Board's counsel's legal advice.  Process Documents containing or reflecting such legal advice fall squarely within the bounds of the attorney-client privilege. *Kellogg USA, Inc. v. B. Fernandez Hermanos, Inc.*, 269 F.R.D. at 98, 101; *In re Fin. Oversight & Mgmt. Bd. for P.R.*, 390 F. Supp. 3d 311, 326 (D.P.R. 2019).

33.  The participation of nonlawyer advisors in the creation of the Process Documents does not alter this result.  The attorney-client privilege is preserved where communications are shared with "third parties employed to assist a lawyer in rendering legal advice," and the following three elements are met: (1) the third party is "necessary, or at least highly useful, for the effective consultation between the client and the lawyer which the privilege is designed to permit"; (2) the third party serves to "translate information between the client and the attorney"; and (3) the third party communications are "made for the purpose of rendering legal advice, rather than business advice." *Columbia Data Prods., Inc. v. Autonomy Corp.*, No. 11-12077, 2012 WL 6212898, at *15 (D. Mass. Dec. 12, 2012) (internal citations omitted).  All three elements are plainly met here. The assistance of EY, PJT, and D&P was critical to O'Neill's and Proskauer's ability to render legal advice because counsel required the assistance of financial advisors to understand the Commonwealth's complex cash account systems and to assist counsel in identifying and analyzing documentation regarding accounts potentially subject to legal restrictions. *In re Fin. Oversight & Mgmt. Bd. for P.R.*, 390 F. Supp. 3d at 326 (upholding an assertion of privilege over communications with third parties who serve a "critical role in translating complex information

16

necessary to effectuate [Puerto Rico's] restructuring").   Further, the communications were exchanged for the purpose of assisting O'Neill and Proskauer in providing advice to the Oversight Board regarding which accounts were subject to legal restrictions.

ii.      *Work Product Doctrine*

34.      To qualify for work product protection in the First Circuit, documents must contain "an attorney or other representative's 'mental impressions, conclusions, opinion, or legal theories,'" *Vicor Corp. v. Vigilant Ins. Co.*, 674 F.3d 1, 18 (1st Cir. 2012), and must have been "prepared or obtained because of the prospect of litigation."  *In re PolyMedica Corp. Sec. Litig.*, 235 F.R.D. 28, 30 (D. Mass. 2006).  The Process Documents meet this test as well.

35.      The Process Documents contain the mental impressions, conclusions, and theories of the Oversight Board's legal and nonlawyer advisors.  They were created in anticipation of litigation, because they were prepared in preparation for potential litigation regarding a contested plan of adjustment—and in particular, in preparation for potential creditor challenges to the Oversight Board's legal restriction determinations.  *Bryan Corp. v. Chemwerth, Inc.*, 296 F.R.D. 31, 38 (D. Mass. 2013) (work product doctrine protects documents "created in connection with [] investigation, evaluation, and preparation concerning a potential lawsuit . . .  and "encompasses documents that are prepared in anticipation of litigation by . . . a party's consultant or agent"); *In re JMP Newcor Int'l, Inc.*, 204 B.R. 963, 964 n.2 (Bankr. N.D. Ill. 1997) ("There is no doubt that the Notes were prepared in contemplation of litigation.  The Creditors' Committee retained Seyfarth . . . to represent them in a contested confirmation hearing.").

36.      Accordingly, the overwhelming majority of the Process Documents are protected from disclosure by the work product doctrine.

17

iii.    *Common Interest Doctrine*

37.    To the extent the Process Documents were disclosed to AAFAF, they would still be protected from disclosure pursuant to the common interest doctrine because the Oversight Board and AAFAF share a common interest in cash restriction analyses.  In the First Circuit, an assertion of common interest requires the parties to share "an identical (or nearly identical) legal interest as opposed to a merely similar interest." *In re Fin. Oversight & Mgmt. Bd.*, 390 F. Supp. 3d at 327 (quoting *FDIC v. Ogden Corp.*, 202 F.3d 454, 461 (1st Cir. 2000)).

38.    This Court has repeatedly upheld assertions of common interest privilege as between AAFAF and the Oversight Board where both entities share legal interests in common. *In re Fin. Oversight & Mgmt. Bd.*, 390 F. Supp. 3d at 327 (D.P.R. 2019) (finding a common interest in pension reform for the benefit of pensioners); *In re Fin. Oversight & Mgmt. Bd. for P.R.*, 392 F. Supp. 3d 244, 255 (D.P.R. 2019) (same).  Here, AAFAF and the Oversight Board share a common interest in evaluating the legal bases for restrictions on the Commonwealth's use of cash. They also share a common interest in "restoring Puerto Rico to fiscal responsibility and prosperity," which necessarily requires an understanding of the money potentially available to pay creditors.  390 F. Supp. 3d at 327.  Disclosure of the Process Documents to AAFAF or its advisors therefore does not waive privilege.

39.    Ambac challenges the Oversight Board's assertions of the attorney-client, work product doctrine, and common interest doctrine on two principal grounds: first, according to Ambac, the documents in question cannot be privileged because they contain mere "factual data," and not legal advice or mental impressions; and second, Ambac contends the documents were prepared for a business, rather than a legal, purpose.  Both challenges fail because they misapprehend the nature of the documents at issue.

40.     *First*, Ambac's assertion the Process Documents are "factual information" is simply incorrect.  The Process Documents are not factual in nature—on the contrary, they primarily consist of communications exchanged between, among, and within the Oversight Board's and AAFAF's financial advisors, which, as explained, necessarily include counsel's discussion and legal analysis regarding the bases for asserted restrictions.  Those communications are also protected from disclosure for the reasons set forth above.

41.     *Second*, Ambac contends the cash restriction analysis is "very basic financial analysis" the Oversight Board would have performed "whether or not any litigation was pending or anticipated."  Mot. at 15.  That is also not the case.  The 2019 Analyses were prepared to assess the Commonwealth's available cash and determine how much would be available for distribution to creditors pursuant to a plan.  Analyses of cash available for distribution to creditors in a potentially contested restructuring is hardly an ordinary-course business activity.  *See In re Quigley Co., Inc.*, No. 04–15739 (SMB), 2009 WL 9034027, at *6 (Bankr. S.D.N.Y. Apr. 24, 2009) (holding documents "created because of the anticipated bankruptcy" that "relate to issues triggered by the bankruptcy case, and would not have been created if Quigley never contemplated or filed bankruptcy" were prepared in anticipation of litigation and not in ordinary course of business). The Oversight Board's cash restriction analyses are not something the Commonwealth did (in the ordinary course or otherwise) prior to this Title III case.  And, as explained above, the 2019 Analyses were prepared with the expectation the amount of available cash could well be subject to litigation in a contested plan of adjustment hearing.  It is particularly apparent the October 2019 Presentations were prepared in anticipation of litigation—both were prepared specifically *for mediation*.  And as a result, they are both expressly drafted as creditor-facing documents and seek

to answer creditor questions regarding the Commonwealth's available cash, such as explaining the

bases for the Commonwealth's claimed fiscal outperformance.  *See, e.g.*, Mot., Ex. C, at 2.[7]

42.     Ambac also contends that, since neither EY nor D&P purported to provide legal

advice in their engagement letters, communications underlying the March 2019 D&P Report and

the October 2019 Presentations cannot be protected by privilege.  But whether EY or D&P

themselves provided legal opinions or advice is of no moment; whether the Process Documents

are privileged turns upon whether they contain the legal opinions or advice provided by counsel

for the Oversight Board or for AAFAF.  As explained above, they do.[8]

**B.     No Applicable Privilege Has Been Waived**

43.     Ambac also contends the Oversight Board has waived any privilege as to

documents underlying the 2019 Analyses by making those reports publicly available.  That is also

not correct, because the Oversight Board has never disclosed the information it seeks to protect

here—the analysis, thoughts, and impressions of its advisors.

44.     In the First Circuit, where privilege is waived by disclosure, that waiver is limited

to "those subject areas covered; . . . subjects not broached . . . are not waived."  *In re Tyco Int'l.,*

---

[7] Even if the Court were to agree the 2019 Analyses were prepared in part for a business purpose, it is evident they were *also* prepared for a potential litigation regarding a plan of adjustment, and "[i]n the First Circuit, such dual-purpose documents are protected by work product protection." *Kellogg*, 269 F.R.D. at 100.

[8] Ambac cites several cases as claimed support for its argument the EY and D&P engagement letters require a finding the Process Documents are not privileged, but none compels that result. Other factors of significance in those case include, for example, whether litigation is imminent, the actual work performed, the necessity of the services provided to the litigation, and the format the report took.  *See, e.g.*, *United States ex rel. Wollman v. Mass. Gen. Hosp., Inc.*, C.A. No. 15-11890-ADB, 2020 WL 4352915 (D. Mass. July 29, 2019) (Dein, M.J.) (finding no litigation imminent); *Lawrence E. Jaffe Pension Plan v. Household Int'l, Inc.*, 244 F.R.D. 412 (N.D. Ill. 2006) (finding advisor not necessary to litigation services).  Here, for the reasons explained above, each of those factors weighs heavily in favor of a determination the privilege applies.

*Ltd.*, *Sec. Litig.,* MDL No. 02–md–1335–PB, 2007 WL 2682763, at \*2 (D.N.H. Sept. 7, 2007).

Courts in this circuit have therefore held that disclosure of a report in a manner inconsistent with

the applicability of a pertinent privilege may waive privilege as to the report itself, but "does not

result in a waiver of the attorney client privilege" as to drafts of that report or "underlying

documents." *In re Tyco Int'l., Ltd.*, *Sec. Litig.,* No. 02–md–1335–PB, 2007 WL 710188, at \*2

(D.N.H. Mar. 7, 2007).  For the same reason, disclosure of the 2019 Analyses did not waive any

assertion of privilege as to the attorney notes and communications made in connection with those

reports.  Finding broad waiver here—where the Oversight Board disclosed only its preliminary

analyses, but not any of the thought processes, communications, or discussion underlying the

determinations reflected in its preliminary analyses—would be inconsistent with the First Circuit's

narrow view of waiver's scope.

45.     The cases cited by Ambac do not compel otherwise, because in neither instance did

the court order the relief Ambac seeks here, the disclosure of privileged notes and communications

among a party's advisors.  In *Granite Partners v. Bear, Stearns & Co.,*, 184 F.R.D. 49 (S.D.N.Y.

1999), the court found the disclosing party, a bankruptcy trustee, had waived an assertion of

privilege as to interview notes because it quoted from those notes directly in a final, published

investigation report, thereby putting the contents of the notes at issue.  *Id.* at 55.  Fairness then

dictated opposing parties be entitled to see the entire interview notes.  The Oversight Board has

neither quoted from nor otherwise disclosed the material it seeks to withhold here.  Further,

although the *Granite Partners* court also required disclosure of other documents relied upon by

the bankruptcy trustee, including financial analyses and other, non-quoted interview notes on

which the preparer of the report relied, that order is consistent with the Oversight Board's position

21

here.  The documents the court ordered disclosed in *Granite Partners* are precisely the type of factual source materials and data the Oversight Board already has produced to Ambac.

46.     In addition, Ambac misstates the court's holding in *Town of Grafton v. Pulte Homes of New England, LLC*, C.A. No. 12–10524–TSH, 2014 WL 2155035 (D. Mass. May 21, 2014): the court did not, as Ambac contends, order the disclosure of "all documents and communications related to a report published by the Office of the Massachusetts Inspector General [the "OIG"]," Mot. at 19-20.  Rather, the court simply denied the OIG's motion to quash a third-party subpoena and ordered the OIG to produce non-privileged documents, *id.* at 6; no determinations were made as to whether documents sought by the subpoena were privileged, and the OIG remained "free to assert [] privilege" to any documents it sought to protect.

47.     Ambac also contends disclosure of the Process Documents is necessary because "[p]rivilege cannot be used as both a sword and a shield," and since the Oversight Board has disclosed the 2019 Analyses, fairness requires the disclosure of materials underlying those analyses.  Mot. at 19.  The implied waiver Ambac seeks, however, is appropriate only where a party seeks to gain advantage by affirmatively disclosing "favorable advice while asserting its privilege on unfavorable advice."  *Puerto Rico Elec. Power Auth. v. Vitol, Inc.*, Civil No. 09-2242 (DRD), 2013 WL 12234272, at *6 (D.P.R. June 21, 2013).  But the Oversight Board has not affirmatively used the 2019 Analyses in litigation, and it does not plan to do so, as they have long since been superseded by, among other things, Exhibit J to the February 2020 Disclosure Statement and the December 2020 Presentation.  Indeed, as explained above, the two October 2019 Presentations were made for purposes of mediation—not litigation—and were disclosed only as part of a routine release of cleansing materials.  Accordingly, because the Oversight Board will

not rely on the 2019 Analyses in litigation, fairness does not require the disclosure of the documents at issue here.

### C.   Ambac Has Not Shown Good Cause to Override the Privilege

48.   Ambac also contends it is entitled to the Process Documents because it has a "compelling need" for these documents.  It has not come close to making the required showing.

49.   As explained above, the Process Documents contain the thoughts and mental impressions of attorneys.  "Opinion work product revealing an attorney's mental impressions receive[s] heightened protection," *Colonial Gas Co. v. Aetna Cas. & Sur. Co.*, 144 F.R.D. 600, 605 (D. Mass. 1992), and Ambac must show a compelling need to override the privilege.  *In re Grand Jury Subpoena*, 220 F.R.D. 130, 145 (D. Mass. 2004).  To make that showing, Ambac must demonstrate the information requested is critical to its claims and cannot be obtained from other sources.  *See, e.g.*, *Ferrara & DiMercurio, Inc. v. St. Paul Mercury Ins. Co.*, 173 F.R.D. 7, 14 (D. Mass. 1997).

50.   Ambac supports its "compelling need" argument by asserting, in summary fashion, the Process Documents are necessary to "assess[] the validity of the Board's representations . . . as to the amount of cash available to the Commonwealth or the basis upon which funds were classified as restricted or unrestricted."  Mot. at 20.  There is no need for Ambac to challenge those "representations," however, because the 2019 Analyses were expressly tentative and subject to change, and have since been superseded by updated analyses.  In any event, the documents Ambac seeks are not necessary to assess the Board's "representations."  As explained above, the factual source materials and data utilized by the Oversight Board in making its determinations has already been produced to Ambac.  It can review those materials and reach its own conclusions as to whether funds are restricted.  With the production of Calculation Back-Up Materials, Ambac also now has data used to arrive at the calculations in the March 2019 D&P Report and the October

23

2019 Presentations, and can recreate those calculations for itself.  The Oversight Board's advisors'

thoughts and impressions are not necessary to that analysis, and there is therefore no basis to

override the work product protection.

### D.    Failure to Provide a Privilege Log Has Also Not Waived the Privilege

51.    Ambac also contends the Oversight Board has waived any privilege over the

Process Documents because it has not collected or reviewed the documents it claims are privileged.

That argument also fails.

52.    A finding that privilege has been waived by failure to provide a log is "the most

extreme sanction" and is "reserved for cases where the offending party committed unjustified delay

in responding to discovery." *Stamps v. Town of Framingham*, 38 F. Supp. 3d 134, 142 (D. Mass.

2014).  Mitigating circumstances, such as the breadth of a request, militate against a demand for

waiver.  *Id.*; *see also In re Dep't of Justice Subpoenas to ABC*, 263 F.R.D. 66, 72 (D. Mass. 2009)

(magnitude of document request is mitigating factor in finding waiver of privilege).  A finding of

waiver is particularly inappropriate where the party seeking discovery has not even demanded the

production of such a log.  *Precision Airmotive Corp. v. Ryan Ins. Servs., Inc.*, No. 2:10–mc–244–

JHR, 2011 WL 148818, at *6 (D. Me. Jan. 17, 2011) (declining to find waiver when opposing

party never requested production of a privilege log).  Here, multiple mitigating factors apply, and

there is therefore no justification for applying the "extreme sanction" of waiver.

53.    As explained above, there is reason to believe the Process Documents Ambac seeks

number in the tens of thousands.  And, as also explained above, the Process Documents are not

relevant to any legitimate inquiry into the Oversight Board's preliminary cash restriction analyses.

Indeed, under these circumstances, even requiring the Oversight Board to collect and log the

documents Ambac seeks would itself impose a substantial burden that is not proportional to the

needs of the matter.  *See, e.g.*, *Goldenson v. Steffens*, No. 2:10–cv–00440–JAW, 2013 WL 145587,

at *10 (D. Me. Jan. 14, 2013) (holding that, where document requests were overbroad and the majority of documents sought were likely privileged, "the burden of creating a privilege log and granting the Plaintiffs' motion to compel outweighed the benefit of a log or access to what would likely be a small number of documents").

54.     Accordingly, in light of the irrelevance of the documents at issue, the overbreadth of Ambac's requests, and Ambac's failure to even demand a privilege log be prepared, all relevant factors weigh in favor of a determination the Board has not waived its privilege assertions.

## **CONCLUSION**

55.     For the foregoing reasons, the Oversight Board respectfully requests the Motion be denied.

*[Remainder of page intentionally left blank]*

25

Dated: December 23, 2020
San Juan, Puerto Rico

Respectfully submitted,

*/s/ Hermann D. Bauer*
Hermann D. Bauer
USDC No. 215205
Carla García Benítez
USDC No. 203708
**O'NEILL & BORGES LLC**
250 Muñoz Rivera Ave., Suite 800
San Juan, PR 00918-1813
Tel: (787) 764-8181
Fax: (787) 753-8944
Email: hermann.bauer@oneillborges.com
Email: carla.garcia@oneillborges.com

Martin J. Bienenstock (*pro hac vice*)
Margaret A. Dale (*pro hac vice*)
Michael T. Mervis (*pro hac vice*)
Laura E. Stafford (*pro hac vice*)
**PROSKAUER ROSE LLP**
Eleven Times Square
New York, NY 10036
Tel:  (212) 969-3000
Fax:  (212) 969-2900
Email: mbienenstock@proskauer.com
Email: mdale@proskauer.com
Email: mmervis@proskauer.com
Email: lstafford@proskauer.com

*Attorneys for the Financial Oversight and
Management Board for Puerto Rico, on its
own behalf and as representative of the
Commonwealth of Puerto Rico*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on this same date, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notifications of such filing to all CM/ECF participants in this case.

*/s/ Hermann D. Bauer*
Hermann D. Bauer
