UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

----------------------------------------------------------x

In re:

THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO,

      as representative of

THE COMMONWEALTH OF PUERTO RICO
et al.,

            Debtors. [1]

----------------------------------------------------------x

HON. WANDA VÁZQUEZ GARCED et al.,

      Plaintiffs,

   -v-

THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO,

      Defendant.

----------------------------------------------------------x

HON. WANDA VÁZQUEZ GARCED et al.,

      Plaintiffs,

   -v-

THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO,

PROMESA
Title III

No. 17 BK 3283-LTS

(Jointly Administered)

Adv. Proc. No. 20-080-LTS

Adv. Proc. No. 20-082-LTS

---

[1]    The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (the "Commonwealth") (Bankruptcy Case No. 17-BK-3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17-BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

Defendant.

-------------------------------------------------------------x

HON. WANDA VÁZQUEZ GARCED et al.,

        Plaintiffs,                                   Adv. Proc. No. 20-083-LTS

    -v-

THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO,

        Defendant.

-------------------------------------------------------------x

HON. WANDA VÁZQUEZ GARCED et al.,

        Plaintiffs,                                   Adv. Proc. No. 20-084-LTS

    -v-

THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO,

        Defendant.

-------------------------------------------------------------x

HON. WANDA VÁZQUEZ GARCED et al.,

        Plaintiffs,                                   Adv. Proc. No. 20-085-LTS

    -v-

THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO,

        Defendant.

-------------------------------------------------------------x

OPINION AND ORDER DENYING THE
GOVERNMENT'S MOTIONS FOR SUMMARY JUDGMENT AND
GRANTING IN PART THE OVERSIGHT BOARD'S MOTIONS FOR SUMMARY JUDGMENT

APPEARANCES:

MARINI PIETRANTONI MUÑIZ LLC

By:     Luis C. Marini-Biaggi
        Carolina Velaz-Rivero
250 Ponce de León Avenue, Suite 900
San Juan, PR 00918

O'MELVENY & MYERS LLP

By:     John J. Rapisardi
        William J. Sushon
        Amber L. Covucci
7 Times Square
New York, NY 10036

        *and*

        Peter Friedman
1625 Eye Street, NW
Washington, DC 20006

*Attorneys for Governor Wanda Vázquez
Garced and the Puerto Rico Fiscal Agency
and Financial Advisory Authority*

CANCIO, NADAL & RIVERA, LLC

By:     Angel A. Valencia-Aponte
        Carlos M. Rivera-Vicente
403 Muñoz Rivera Avenue
Hato Rey, PR 00918-1145

*Attorneys for Cooperativa de Farmacias
Puertorriqueñas*

O'NEILL & BORGES LLC

By:     Hermann D. Bauer
250 Muñoz Rivera Avenue, Suite 800
San Juan, PR 00918-1813

PROSKAUER ROSE LLP
By:     Martin J. Bienenstock
        Timothy W. Mungovan
        Hadassa R. Waxman
11 Times Square
New York, NY 10036

        *and*

        Guy Brenner
1001 Pennsylvania Avenue, NW
Suite 600 South
Washington, DC 20004

*Attorneys for the Financial Oversight and
Management Board for Puerto Rico, in its
own right and as representative of the
Commonwealth of Puerto Rico*

LAURA TAYLOR SWAIN, United States District Judge

On June 12, 2020, Governor Wanda Vázquez Garced (the "Governor") and the

Puerto Rico Fiscal Agency and Financial Advisory Authority ("AAFAF" and, together with the

Governor, the "Government") commenced the above-captioned adversary proceedings (the

"Adversary Proceedings") against the Financial Oversight and Management Board for Puerto

Rico (the "Oversight Board" or the "Board") seeking declaratory relief related to five laws that

were enacted by the Commonwealth of Puerto Rico (the "Commonwealth") in late 2019 and

early 2020 and subsequently challenged on various grounds by the Oversight Board.[2]  In each

action, the Government seeks (i) a declaratory judgment that the Government's certification

pursuant to section 204(a) of the Puerto Rico Oversight, Management, and Economic Stability

Act ("PROMESA")[3] was adequate, that the Oversight Board cannot prevent enforcement of the

law, and that any unilateral determinations by the Oversight Board of noncompliance with

section 204(a) are non-binding; and (ii) a declaratory judgment that the Oversight Board cannot

unilaterally enjoin the implementation and enforcement of the relevant law under section

108(a)(2) of PROMESA.  (See *Adversary Complaint for Declaratory Relief Related to Act 82*,

Docket Entry No. 1 in Adversary Proceeding No. 20-00080, the "Act 82 Complaint," ¶¶ 46-54;

*Adversary Complaint for Declaratory Relief Related to Act 138*, Docket Entry No. 1 in

Adversary Proceeding No. 20-00082, the "Act 138 Complaint," ¶¶ 46-54; *Adversary Complaint*

*for Declaratory Relief Related to Act 176*, Docket Entry No. 1 in Adversary Proceeding No. 20-

---

[2]     The Government also commenced a sixth Adversary Proceeding, regarding Act 90-2019, but has voluntarily dismissed that action.  (See Docket Entry No. 5 in Adversary Proceeding No. 20-00081.)

[3]     PROMESA is codified at 48 U.S.C. § 2101 et seq.  References to PROMESA section numbers in the remainder of this Opinion and Order are to the uncodified version of the legislation.

00083, the "Act 176 Complaint," ¶¶ 43-51; *Adversary Complaint for Declaratory Relief Related to Act 181*, Docket Entry No. 1 in Adversary Proceeding No. 20-00084, the "Act 181 Complaint," ¶¶ 41-49; *Adversary Complaint for Declaratory Relief Related to Act 47*, Docket Entry No. 1 in Adversary Proceeding No. 20-00085, the "Act 47 Complaint," ¶¶ 52-60 (together, the "Complaints").)

On July 17, 2020, the Oversight Board filed an answer and counterclaims in each Adversary Proceeding, seeking (i) nullification of the relevant law pursuant to section 104(k) of PROMESA for failure to satisfy section 204(a) of PROMESA; (ii) a preliminary and permanent injunction barring implementation of the relevant law pursuant to sections 104(k) and 204(a)(5) of PROMESA; and (iii) an injunction barring implementation of the relevant law "to carry out" section 108(a)(2) of PROMESA.  (See *Financial Oversight and Management Board for Puerto Rico's Answer and Counterclaims to Adversary Complaint for Declaratory Relief Related to Act 82*, Docket Entry No. 5 in Adversary Proceeding No. 20-00080, the "Act 82 Counterclaims," ¶¶ 30-48, 65-86; *Financial Oversight and Management Board for Puerto Rico's Answer and Counterclaims to Adversary Complaint for Declaratory Relief Related to Act 138*, Docket Entry No. 5 in Adversary Proceeding No. 20-00082, the "Act 138 Counterclaims," ¶¶ 30-70; *Financial Oversight and Management Board for Puerto Rico's Answer and Counterclaims to Adversary Complaint for Declaratory Relief Related to Act 176*, Docket Entry No. 6 in Adversary Proceeding No. 20-00083, the "Act 176 Counterclaims," ¶¶ 13-47; *Financial Oversight and Management Board for Puerto Rico's Answer and Counterclaims to Adversary Complaint for Declaratory Relief Related to Act 181*, Docket Entry No. 6 in Adversary Proceeding No. 20-00084, the "Act 181 Counterclaims," ¶¶ 14-34, 51-69; *Financial Oversight and Management Board for Puerto Rico's Answer and Counterclaims to Adversary Complaint for Declaratory*

*Relief Related to Act 47*, Docket Entry No. 5 in Adversary Proceeding No. 20-00085, the "Act 47 Counterclaims," ¶¶ 17-51 (together, the "Counterclaims"). Additionally, the Oversight Board filed counterclaims in Adversary Proceeding Nos. 20-00080 and 20-00084 seeking (i) nullification of the relevant laws for failure to satisfy section 204(c) of PROMESA; and (ii) preliminary and permanent injunctions barring implementation of the relevant laws under section 104(k) of PROMESA for failure to satisfy section 204(c) of PROMESA. (See Act 82 Counterclaims ¶¶ 49-64; Act 181 Counterclaims ¶¶ 35-50.) On July 30, 2020, the Court consolidated all five Adversary Proceedings "for purposes of motion practice, including any dispositive motions, and discovery." (Docket Entry No. 9 in Adversary Proceeding No. 20-00080.)

Currently before the Court are the Government's motions for summary judgment on its claims related to Acts 138 and 176 (see *Memorandum of Law in Support of Plaintiffs' Motion for Summary Judgment*, Docket Entry No. 12 in Adversary Proceeding No. 20-00082, the "Gov. Act 138 MSJ"; *Memorandum of Law in Support of Plaintiffs' Motion for Summary Judgment*, Docket Entry No. 13 in Adversary Proceeding No. 20-00083, the "Gov. Act 176 MSJ" (together, the "Government's Motions for Summary Judgment")), the Oversight Board's cross-motions for summary judgment in those two Adversary Proceedings (see *Memorandum of Law in Support of Financial Oversight and Management Board for Puerto Rico's Cross-Motion for Summary Judgment and in Opposition to Defendants' Motions for Summary Judgment on All Claims and Counterclaims Related to Acts 138 and 176*, Docket Entry No. 29 in Adversary Proceeding No. 20-00082, the "Bd. Act 138 Cross-MSJ"; Docket Entry No. 30 in Adversary Proceeding No. 20-00083, the "Bd. Act 176 Cross-MSJ"), and the Oversight Board's motions for summary judgment in the Adversary Proceedings relating to Acts 82, 181, and 47 (see

*Memorandum of Law in Support of Financial Oversight and Management Board for Puerto Rico's Motion for Summary Judgment on All Claims and Counterclaims Related to Acts 47, 82, and 181*, Docket Entry No. 16 in Adversary Proceeding No. 20-00080, the "Act 82 MSJ"; Docket Entry No. 15 in Adversary Proceeding No. 20-00084, the "Act 181 MSJ"; Docket Entry No. 13 in Adversary Proceeding No. 20-00085, the "Act 47 MSJ") (collectively, the "Motions for Summary Judgment" or "Motions"). The Court heard argument on the Motions for Summary Judgment on November 24, 2020 and has considered carefully all of the arguments and submissions made in connection with the Motions.[4] The Court has subject matter jurisdiction of these actions pursuant to 48 U.S.C. § 2166.

---

[4] In addition to the Complaints, Counterclaims, and Motions for Summary Judgment set forth above, the Court has received and reviewed the following pleadings in connection with its consideration of the Motions for Summary Judgment: the *Declaration of William J. Sushon, Esq. in Support of Plaintiffs' Motion for Summary Judgment* (Docket Entry No. 13 in Adversary Proceeding No. 20-00082); the *Declaration of William J. Sushon, Esq. in Support of Plaintiffs' Motion for Summary Judgment* (Docket Entry No. 14 in Adversary Proceeding No. 20-00083); the *Statement of Uncontested Material Facts in Support of Plaintiffs' Motion for Summary Judgment* (Docket Entry No. 14 in Adversary Proceeding No. 20-00082, the "Gov. Act 138 SOF"); the *Statement of Uncontested Material Facts in Support of Plaintiffs' Motion for Summary Judgment* (Docket Entry No. 15, in Adversary Proceeding No. 20-00083, the "Gov. Act 176 SOF"); the *Statement of Uncontested Material Facts in Support of the Motion for Summary Judgment of the Financial Oversight and Management Board for Puerto Rico Related to Acts 47, 82, and 181* (Docket Entry No. 17 in Adversary Proceeding No. 20-00080; Docket Entry No. 16 in Adversary Proceeding No. 20-00084; Docket Entry No. 14 in Adversary Proceeding No. 20-00085); the *Declaration of Hadassa Waxman* (Docket Entry No. 18 in Adversary Proceeding No. 20-00080); the *Declaration of Natalie A. Jaresko* (Docket Entry No. 19 in Adversary Proceeding No. 20-00080, the "Jaresko Decl."); the *Declaration of Philip Ellis, Ph.D.* (Docket Entry No. 20 in Adversary Proceeding No. 20-00080); the *Statement of Uncontested Material Facts in Support of Cross-Motion for Summary Judgment of Financial Oversight and Management Board for Puerto Rico Related to Acts 138 and 176* (Docket Entry No. 30 in Adversary Proceeding No. 20-00082; Docket Entry No. 31 in Adversary Proceeding No. 20-00083, the "Bd. Act 176 SOF"); *The Financial Oversight and Management Board for Puerto Rico's Response to Plaintiffs' Statement of Uncontested Material Facts in Support of Plaintiffs' Motion for Summary Judgment Regarding Act 138* (Docket Entry No. 31 in Adversary Proceeding No. 20-00082, the "Bd. Resp. to Act 138 SOF"); *The Financial Oversight and Management Board for*

*Puerto Rico's Response to Plaintiffs' Statement of Uncontested Material Facts in Support of Plaintiffs' Motion for Summary Judgment Regarding Act 176* (Docket Entry No. 32 in Adversary Proceeding No. 20-00083, the "Bd. Resp. to Act 176 SOF"); the *Declaration of Philip Ellis, Ph.D.* (Docket Entry No. 32 in Adversary Proceeding No. 20-00082, the "Ellis Decl."); *The Elected Government's Opposition to Defendant's Motion for Summary Judgment on All Claims and Counterclaims Related to Acts 47, 82, and 181 and Request for Relief Under Rule 56(d)* (Docket Entry No. 36 in Adversary Proceeding No. 20-00080, the "Act 82 Opp."; Docket Entry No. 35 in Adversary Proceeding No. 20-00084, the "Act 181 Opp."; Docket Entry No. 34 in Adversary Proceeding No. 20-00085, the "Act 47 Opp."); the *Declaration of William J. Sushon, Esq. in Opposition to the Financial Oversight and Management Board for Puerto Rico's Motion for Summary Judgment on All Claims and Counterclaims Related to Acts 47, 82, and 181, and Request for Relief under Rule 56(d)* (Docket Entry No. 37 in Adversary Proceeding No. 20-00080); *The Elected Government's Response to Statement of Uncontested Material Facts in Support of the Motion for Summary Judgment of the Financial Oversight and Management Board for Puerto Rico Related to Acts 47, 82, and 181* (Docket Entry No. 38 in Adversary Proceeding No. 20-00080, the "Gov. Resp. to SOF"); the *Declaration of Aixa Cruz Pol in Opposition to Defendant's Motion for Summary Judgment on All Claims and Counterclaims Related to Acts 47, 82, and 181* (Docket Entry No. 39 in Adversary Proceeding No. 20-00080, the "Cruz Decl."); the *Declaration of Alex Lopez Echegaray in Opposition to the Financial Oversight and Management Board for Puerto Rico's Motion for Summary Judgment on All Claims and Counterclaims Related to Acts 47, 82, and 181* (Docket Entry No. 40 in Adversary Proceeding No. 20-00080, the "Lopez Decl."); *The Government's Reply in Further Support of Its Motion for Summary Judgment and Opposition to Cross-Motion for Summary Judgment on All Claims and Counterclaims Related to Acts 138 and 176* (Docket Entry No. 37 in Adversary Proceeding No. 20-00082, the "Gov. Act 138 Reply and Opp."; and Docket Entry No. 38 in Adversary Proceeding No. 20-00083, the "Gov. Act 176 Reply and Opp."); the *Government's Response to Statement of Uncontested Material Facts in Support of Cross-Motion for Summary Judgment of Financial Oversight and Management Board for Puerto Rico Related to Acts 138 and 176* (Docket Entry No. 38 in Adversary Proceeding No. 20-00082; Docket Entry No. 39 in Adversary Proceeding No. 20-00083); the *Reply Memorandum of Law in Support of Financial Oversight and Management Board for Puerto Rico's Motion for Summary Judgment on All Claims and Counterclaims Related to Acts 47, 82, and 181* (Docket Entry No. 49 in Adversary Proceeding No. 20-00080, the "Act 82 Reply"; Docket Entry No. 47 in Adversary Proceeding No. 20-00084; Docket Entry No. 46 in Adversary Proceeding No. 20-00085); *Reply Memorandum of Law in Support of Financial Oversight and Management Board for Puerto Rico's Cross-Motion for Summary Judgment on All Claims and Counterclaims Related to Acts 138 and 176* (Docket Entry No. 40 in Adversary Proceeding No. 20-00082; and Docket Entry No. 41 in Adversary Proceeding No. 20-00083, the "Bd. Act 176 Reply"); the *Notice of Appearance and Second Motion Requesting Leave to File an Amicus Brief and For Amicus Status* (Docket Entry No. 15238 in Case No. 17-3283, the "COOPHARMA Amicus Motion") filed by Cooperativa de Farmacias Puertorriqueñas ("COOPHARMA"); the *Informative Motion of the Financial Oversight and Management*

For the reasons that follow, the Court holds that the Oversight Board is entitled to summary judgment dismissing Count I of the Act 82 Complaint[5] and the Act 138 Complaint,[6] which seek declaratory relief concerning section 204(a) of PROMESA, and Count II of the Act 176 Complaint[7] and the Act 47 Complaint,[8] which seek declaratory relief concerning section 108(a)(2) of PROMESA. The Oversight Board is also entitled to summary judgment in its favor with respect to Act 82 Counterclaim II and Act 138 Counterclaim II, which seek injunctions under section 104(k) of PROMESA barring implementation of the relevant laws under section 204(a)(5) of PROMESA. The Oversight Board is entitled to summary judgment in its favor with respect to Act 176 Counterclaim III and Act 47 Counterclaim III, which seek injunctions barring implementation of the relevant laws under section 108(a)(2) of PROMESA. Additionally, the Oversight Board is entitled to summary judgment in its favor with respect to Act 181 Counterclaim IV,[9] which seeks an injunction under section 104(k) of PROMESA barring

---

*Board for Puerto Rico Submitting Supplemental Documents* (Docket Entry No. 62 in Adversary Proceeding No. 20-00080); *The Government's Statement of Support for Cooperativa de Farmacias Puertorriqueñas's Second Motion Requesting Leave to File an Amicus Brief and for Amicus Status* (Docket Entry No. 63 in Adversary Proceeding No. 20-00080); the *Financial Oversight and Management Board for Puerto Rico's Opposition to Motion of COOPHARMA for Leave to Participate as Amicus Curiae* (Docket Entry No. 65 in Adversary Proceeding No. 20-00080); the *Reply Brief to Financial Oversight Board's Opposition to Amicus Brief by COOPHARMA* (Docket Entry No. 66 in Adversary Proceeding No. 20-00080); *The Government's Informative Motion Regarding Recent Supplemental Authority Supporting Its Opposition to Defendant's Motion for Summary Judgment on All Claims and Counterclaims Related to Acts 47, 82, and 181* (Docket Entry No. 68 in Adversary Proceeding No. 20-00080); and the *Informative Motion of the Financial Oversight and Management Board for Puerto Rico Submitting Supplemental Documents* (Docket Entry No. 69 in Adversary Proceeding No. 20-00080).

[5]   (See Adversary Proceeding No. 20-00080.)
[6]   (See Adversary Proceeding No. 20-00082.)
[7]   (See Adversary Proceeding No. 20-00083.)
[8]   (See Adversary Proceeding No. 20-00085.)
[9]   (See Adversary Proceeding No. 20-00084.)

implementation of Act 181 under section 204(c) of PROMESA. The Court denies the

Government's Motions for Summary Judgment in their entirety, and the remaining aspects of the

Oversight Board's Motions for Summary Judgment are also denied. As explained below, and in

accordance with the *Order to Show Cause Regarding Dismissal of Remaining Claims and*

*Counterclaims* that is being entered contemporaneously with this Opinion and Order, the parties

are directed to show cause as to why, in light of the analysis, conclusions, and injunctive relief

granted herein, the remaining claims and counterclaims should not be dismissed as moot or

otherwise for lack of subject matter jurisdiction.

## I.

### BACKGROUND

The following facts are undisputed, except as otherwise indicated.[10]

PROMESA was enacted on June 30, 2016, to address the fiscal emergency in

Puerto Rico created by a "combination of severe economic decline, and, at times, accumulated

operating deficits, lack of financial transparency, management inefficiencies, and excessive

borrowing." 48 U.S.C.A. § 2194(m)(1) (Westlaw through P.L. 116-217). To implement

PROMESA, Congress established the Oversight Board and vested it with authority to provide the

Commonwealth with a "method . . . to achieve fiscal responsibility and access to the capital

markets." Id. § 2121(a). On May 3, 2017, the Commonwealth of Puerto Rico filed its petition

under Title III of PROMESA. On May 9, 2019, the Oversight Board certified a fiscal plan for

---

[10]     Facts characterized as undisputed are identified as such in the parties' statements
pursuant to D.P.R. Local Civil Rule 56 or drawn from evidence as to which there has
been no contrary, non-conclusory factual proffer. Citations to the parties' Local Civil
Rule 56 statements incorporate by reference citations to underlying evidentiary
submissions.

the Commonwealth (Docket Entry No. 56-1 in Adversary Proceeding No. 20-00080, the "2019

Fiscal Plan") and, on June 30, 2019, the Oversight Board certified a budget for fiscal year 2020,

running from July 1, 2019 through June 30, 2020.  (Gov. Resp. to SOF ¶¶ 1-2.)

These Adversary Proceedings arise from ongoing disputes between the

Government and the Oversight Board concerning the interpretation and application of

PROMESA provisions concerning submissions to, and the evaluation of new Commonwealth

legislation by, the Oversight Board.  Both the Government's claims and the Oversight Board's

counterclaims focus on sections 108(a)(2) and 204(a) of PROMESA.  The Oversight Board has

also interposed counterclaims predicated on section 204(c) of PROMESA in the Adversary

Proceedings concerning Act 82 and Act 181.

Section 108(a)(2) of PROMESA provides that "[n]either the Governor nor the

Legislature may . . . enact, implement, or enforce any statute, resolution, policy, or rule that

would impair or defeat the purposes of this chapter, as determined by the Oversight Board."  48

U.S.C.A. § 2128(a)(2) (Westlaw through P.L. 116-217).

Under section 204(a) of PROMESA, the Governor must deliver to the Oversight

Board the text of each new legislative enactment, a "formal estimate prepared by an appropriate

entity of the territorial government with expertise in budgets and financial management of the

impact, if any, that the law will have on expenditures and revenues," id. § 2144(a)(2)(A), and a

certification by an "appropriate entity" regarding whether or not the submitted law is

significantly inconsistent with the fiscal plan for the applicable fiscal year, id. §§ 2144(a)(2)(B)-

(C).  Section 204(a) contemplates responsive action by the Oversight Board with respect to each

law in certain circumstances, with the aim of ensuring the territorial Government's compliance

with the applicable fiscal plan.  See id. § 2144(a).

Section 204(c)(1) of PROMESA, titled "Restrictions on budgetary adjustments," provides that,

> [i]f the Governor submits a request to the Legislature for the reprogramming of any amounts provided in a certified Budget, the Governor shall submit such request to the Oversight Board, which shall analyze whether the proposed reprogramming is significantly inconsistent with the Budget, and submit its analysis to the Legislature as soon as practicable after receiving the request.

Id. § 2144(c)(1). Section 204(c)(2) directs that "[t]he Legislature shall not adopt a reprogramming, and no officer or employee of the territorial government may carry out any reprogramming, until the Oversight Board has provided the Legislature with an analysis that certifies such reprogramming will not be inconsistent with the Fiscal Plan and Budget." Id.

As noted above, these actions relate to the Oversight Board's challenges, under sections 204(a) and 108(a)(2) of PROMESA, to five specific Commonwealth legislative enactments, two of which the Board has also challenged under section 204(c) of PROMESA. Act 82-2019, the "Pharmacy Services and Benefit Managers Regulatory Act," was signed into law on July 30, 2019, and regulates the activities of Pharmacy Benefit Managers ("PBMs") and Pharmacy Benefit Administrators ("PBAs"). (Docket Entry No. 32-1 in Adversary Proceeding No. 20-00080, "Act 82.") Act 138-2019, which the Commonwealth enacted on August 1, 2019, curtails the ability of managed care organizations ("MCOs") to exclude qualified healthcare providers from admission to their preferred-provider networks. (Docket Entry No. 13-2 in Adversary Proceeding No. 20-00082, "Act 138.") On December 16, 2019, the Commonwealth enacted Act 176-2019, which increases public employee vacation and sick leave accrual rates. (Docket Entry No. 14-2 in Adversary Proceeding No. 20-00083, "Act 176.") Act 181-2019, the "Bureau of the Puerto Rico Firefighters Corps Salary Adjustment Act," was signed into law on December 26, 2019. (Docket Entry No. 31-1 in Adversary Proceeding No. 20-00084, "Act

181.")  Act 47-2020, which amends the "Puerto Rico Incentives Code" to broaden health care provider eligibility for certain tax reductions, was signed into law on April 28, 2020.  (Docket Entry No. 30-1 in Adversary Proceeding No. 20-00085, "Act 47.")  Each law, the Government's estimates and certifications pursuant to section 204(a) of PROMESA, and the parties' written correspondence related thereto are described in further detail below.

A.    Acts 82 and 138 (together, the "Healthcare Acts")

Act 82 creates a "Regulatory Law for Pharmacy Benefits and Services Administrators" and establishes an "Office of the Regulatory Commissioner of Pharmacy Benefits and Services Administrators" in the Puerto Rico Department of Health to further regulate PBMs, PBAs, and any similar entity that contracts services from pharmacies in Puerto Rico, among other purposes.  (See Act 82.)  Act 82 changes arrangements between PBMs and pharmacies to require that pharmacies be reimbursed for at least their cost of acquisition of medications, a change that the Oversight Board argues increases costs to the Commonwealth and decreases price competition.  (Act 82 MSJ at 9-10.)  The Government represents that Act 82 was designed to prohibit anticompetitive and deceptive practices that harm consumers.  (Act 82 Opp. at 9.)

Act 138 amends the Insurance Code of Puerto Rico, Act 77-1957, to provide that "[n]o health insurance organization, insurer, third-party administrators, and other health plans may deny provider enrollment applications submitted by" any health care professional if the applicant is qualified to provide health care services in Puerto Rico.  (Act 138 § 1.)  Act 138 further amends Act 77-1957 to prohibit MCOs from unilaterally terminating or rescinding contracts with health care providers.  (Id. § 2.)  According to its Statement of Motives, Act 138

was enacted "to discourage the mass exodus of health professionals and increase the availability of health care services throughout the Island." (Id. at 3.)

On September 12, 2019, AAFAF, the Puerto Rico Department of Treasury (the "Treasury Department"), and the Puerto Rico Office of Management and Budget ("OMB"), on behalf of the Government, submitted to the Oversight Board a copy of Act 138 and a "Compliance Certificate of New Law Pursuant to 48 U.S.C. §[]2144(2)(B)" (Docket Entry No. 1-4 in Adversary Proceeding No. 20-00083, the "Act 138 Certificate"). (See Bd. Resp. to Act 138 SOF ¶ 9.) The Act 138 Certificate, in its entirety, reads as follows:

> **Legislative Measure Number:**
> - Act No. 138-2019 ('Act 138'), herein attached.
>
> **Estimate of Impact of the Legislative Measure on Expenditures and Revenues:**
> - Act 138 has no impact on expenditures or revenues.
>
> **Determination of the Legislative Measure's Compliance with the Fiscal Plan:**
> - Act 138 is not significantly inconsistent with the New Fiscal Plan for Puerto Rico.

(Act 138 Certificate.)

By letter dated November 15, 2019,[11] Oversight Board Executive Director Natalie A. Jaresko, on behalf of the Oversight Board, notified the Governor of several issues regarding both Act 82 and Act 138. With respect to Act 82, Ms. Jaresko's letter explained that, "[w]hile Act 82-2019 was signed into law on July 30, 2019, the Oversight Board has not received the formal cost estimate and certification of compliance or noncompliance as required by

---

[11]   The Oversight Board's November 15, 2019, letter and subsequent correspondence discussed in this background section address Act 90-2019, in addition to Act 82 and Act 138. In setting forth the portions of the parties' correspondence that relate each specific Act at issue, the Court discusses only those aspects that pertain to Acts 82 and 138.

PROMESA Section 204(a)(2)."  (Docket Entry No. 1-4 in Adversary Proceeding No. 20-00080,

at 1.)  As an independent concern, the letter expressed the Board's view that "there is possible

federal preemption of the subject matter covered by Act 82-2019 under the statutory provisions

of Title 42 of the U.S. Code and related Code of Federal Regulations."  (Id.)  The letter requested

both a cost estimate and certification, as well as "an explanation as to why Act 82-2019 is not

preempted."  (Id.)

     Regarding Act 138, Ms. Jaresko's letter explained that a copy of Act 138 and the

Act 138 Certificate were submitted after the seven business-day period mandated by PROMESA,

and that the Act 138 Certificate "fail[s] to provide the formal estimate of the fiscal impact as

required under" section 204(a)(2)(A) of PROMESA.  (Docket Entry No. 13-5 in Adversary

Proceeding No. 20-00082 at 2.)  The Oversight Board also stated its "opinion that the subject

matter covered by . . . Act 138-2019 [is] preempted by the statutory provisions of Title 42 of the

U.S. Code and related Code of Federal Regulations."  (Id.)  The Oversight Board thus requested

"a formal estimate of the impact each Act will have on expenditures and revenues, including the

impact on the government's medical health insurance plan ('Vital'), as required by PROMESA

Section 204(a)(2)(A)," as well as an analysis of Act 138 "in relation to the corresponding federal

statutes to ascertain there are no conflicting provisions that may jeopardize the grant of federal

funds" to the Puerto Rico Department of Health.  (Id.)  The Oversight Board, in conclusion,

reserved its right to take any necessary follow-up action:

> Should the Oversight Board determine that you have failed to
> comply with our directive under Section 204(a)(4)(A), or that a law
> impairs or defeats the purposes of PROMESA, as determined by the
> Oversight Board, we reserve the right to take such actions as we
> consider necessary, consistent with Section 204(a)(5), including
> preventing the enforcement or application of Act 82-2019 . . . and
> Act 138-2019.

(Id.)

On November 18, 2019, the Governor submitted a "Certificate of New Law

Pursuant to 48 U.S.C. §[]2144(2)(B)," in connection with Act 82, after being made aware that

the certification had been overdue for more than three months. (Docket Entry No. 1-5 in

Adversary Proceeding No. 20-00080, the "Act 82 Certificate"; see Gov. Resp. to SOF ¶¶ 21, 25.)

The Act 82 Certificate, in its entirety, reads as follows:

> **Legislative Measure Number:**
> - Act No. 82-2019 ('Act 82'), herein attached.
>
> **Estimate of Impact of the Legislative Measure on Expenditures and Revenues:**
> - Act 82 has an approximate impact of $475,131.47 in the Department of Health's budget. However, Act 82 will be implemented using budgeted resources. If reprogramming of budgeted resources is needed, the appropriate agency will submit to the FOMB a formal request.
> - Act 82 has no impact on revenues.
>
> **Determination of the Legislative Measure's Compliance with the Fiscal Plan:**
> - Act 82 is not significantly inconsistent with the 2019 Fiscal Plan for Puerto Rico.

(Act 82 Certificate.)

By letter dated November 22, 2019, AAFAF Executive Director Omar J. Marrero

responded to the Oversight Board's assertions in its November 15, 2020, letter. (See Docket

Entry No. 13-6 in Adversary Proceeding No. 20-00082; Docket Entry No. 1-6 in Adversary

Proceeding No. 20-00080.) Initially, Mr. Marrero stated that "it is emphatically the public policy

of the Government to comply with Section 204(a) of PROMESA," explaining that "on October

25, 2019, Governor Vázquez signed Executive Order 2019-57 (the 'Executive Order')

establishing streamlined procedures to comply with said Section and ordering compliance and

cooperation from all agencies and dependencies in order to promptly comply with the certificates

mandated by Section 204(a)."  (Docket Entry No. 13-6 in Adversary Proceeding No. 20-00082,

at 1; Docket Entry No. 1-6 in Adversary Proceeding No. 20-00080, at 1.)  Mr. Marrero asserted

that, "[i]n compliance with the Executive Order and Section 204(a), and since I assumed the

position of Executive Director of AAFAF in August, 2019, the Government has sent 204(a)

certifications to the Board for all Acts and Joint Resolutions enacted since that time."  (Docket

Entry No. 13-6 in Adversary Proceeding No. 20-00082, at 1; Docket Entry No. 1-6 in Adversary

Proceeding No. 20-00080, at 1.)  Mr. Marrero also addressed the substantive concerns raised by

the Oversight Board:

> [I]n your second letter you state that for Acts 82 and 138 enacted
> during 2019, the Board believes there is possible federal preemption
> of the subject under the statutory provisions of Title 42 of the U.S.
> Code and related Code of Federal Regulations.  Nothing in Section
> 204(a) of PROMESA allows the Board to request explanations from
> the elected government on alleged federal preemption of enacted
> laws.  Section 204(a)(3) only allows the Board to send notifications
> to the elected government under limited circumstances, specifically,
> if no certifications are sent or, if the Board understands an enacted
> law is significantly inconsistent with the certified fiscal plan.

(Docket Entry No. 13-6 in Adversary Proceeding No. 20-00082, at 2; Docket Entry No. 1-6 in

Adversary Proceeding No. 20-00080, at 2.)

In its December 18, 2019, responsive letter to AAFAF, the Oversight Board

reiterated its position that the Government had failed to comply with section 204(a) of

PROMESA following the enactment of the Healthcare Acts:

> Section 204(a) of PROMESA requires the submission to the
> Oversight Board of all laws not later than 7 business days after the
> law is enacted, together with a formal estimate of its impact and a
> certification of compliance or non-compliance.  As you recognize,
> the government did not submit the required documentation
> concerning the laws . . . referenced in the Oversight Board's
> November 15 letter until November 22, 2019, which was after the
> required submission period.  We must insist that these requirements
> be fulfilled on a timely basis and just as importantly, be incorporated

as part of the legislative process and not left for after enactment of
legislation.

. . .

Regarding our request for an analysis of federal statutes for possible
conflicting provisions regarding Acts 82-2019 . . . and 138-2019, . . .
[w]e point out the Government and the Oversight Board must
cooperate to make sure the measures required to comply with the
certified Fiscal Plan are implemented, and actions inconsistent with
the Fiscal Plan are avoided. To that end, if an enacted law negatively
impacts the Commonwealth's budget because of conflicts with
federal statutes, the law would not be consistent with the certified
Fiscal Plan. Even though a Section 204(a) certificate for Act 82-
2019 was submitted, it is our understanding the estimate is not
'formal' and not accurate because it provides only an 'approximate
impact' of the law on the Department of Health's budget.
Furthermore, the $475,131.47 'approximate impact' provided in the
certificate, is dramatically at odds with other authority on the
subject; specifically, the Health Insurance Administration's recent
testimony at the public hearing that Act 82-2019 would increase the
Government's health plan budget by $27 million. As such, the
Oversight Board has concerns the 'approximate impact' is not
accurate.

In view of the foregoing, . . . we ask you to comply with our request
for an analysis as to whether federal law conflicts with Acts 82-2019
. . . and 138-2019, and whether any conflicts jeopardize the grant of
federal funds.

Please submit the required information by no later than December
27, 2019.

(Docket Entry No. 13-7 in Adversary Proceeding No. 20-00082, at 1-2; Docket Entry No. 1-7 in

Adversary Proceeding No. 20-00080, at 1-2.)

In its December 27, 2019, letter to the Oversight Board, AAFAF reiterated its

assertion that it is "emphatically the public policy of the Government to comply with section

204(a) of PROMESA." (Docket Entry No. 13-8 in Adversary Proceeding No. 20-00082, at 1;

Docket Entry No. 1-8 in Adversary Proceeding No. 20-00080, at 1.) Additionally, AAFAF

challenged the Oversight Board's preemption-based arguments:

Concerning Acts 82-2018 . . . and 138-2019, . . . we believe Section 204(a) of PROMESA does not empower the Board to make determinations on alleged federal preemption of enacted laws. Section 204(a)(3) of PROMESA only allows the Board to send notifications to the elected government under limited circumstances, specifically, if no certifications are sent or, if the Board understands an enacted law is significantly inconsistent with the certified fiscal plan. To this date, we have not received any notification that Acts 82-2019 . . . and 138-2019 are significantly inconsistent with the Fiscal Plan. In your letter you state that 'if an enacted law negatively impacts the Commonwealth's budget because it conflicts with federal statutes, the law would not be consistent with a certified Fiscal Plan'. That is a speculative statement. To begin with, federal preemption is an issue to be determined by the courts and specific tests have been developed by the Supreme Court of the United States to determine preemption issues . . . . Moreover, it is a well-known principle of law that during 'pre-emption analysis, courts . . . assume that the historic police powers of the States are not superseded unless that was the clear and manifest purpose of Congress'. . . . Therefore, the Government of Puerto Rico reiterates the Board has no power under Section 204(a) of PROMESA to determine whether a statute is preempted by federal law. Moreover, absent a specific judicial finding of preemption, it would be speculative to conclude a duly enacted law is inconsistent with the certified Fiscal Plan because of federal preemption.

Finally, regarding your statement that the approximate impact of Act 82-2019 provided in the 204(a) certification is 'dramatically at odds' with a statement provided the Health Insurance Administration at a public hearing, I remind you that the 'appropriate entities of the territorial government' in charge of issuing the certifications are AAFAF, OMB and Treasury. . . . As such, any statement by an agency during the legislative process is subordinate to the determination of the appropriate government entities.

(Docket Entry No. 13-8 in Adversary Proceeding No. 20-00082, at 1-2 (internal citations omitted);

Docket Entry No. 1-8 in Adversary Proceeding No. 20-00080, at 1-2 (internal citations omitted).)

The Oversight Board sent its next letter regarding Act 82 and Act 138 to AAFAF on April 27, 2020. (See Docket Entry No. 13-9 in Adversary Proceeding No. 20-00082; Docket Entry No. 1-9 in Adversary Proceeding No. 20-00080.) It reads, in relevant part, as follows:

On November 15, 2019, the Oversight Board asked AAFAF for an analysis of [the Healthcare Acts] to determine whether any provisions jeopardize the grant of federal funds to the Puerto Rico Department of Health ('PRDH') (the 'Requested Analysis'). Twice, AAFAF failed to provide this information, and instead claimed incorrectly the Oversight Board was requesting a federal preemption analysis of [the Healthcare Acts]. In its letter dated February 18, 2020, the Oversight Board again asked AAFAF for the Requested Analysis, as [the Healthcare Acts] could potentially imperil the Commonwealth's receipt of federal funds, making clear it was not asking for a preemption analysis. The Oversight Board asked for a response by February 21, 2020, but has received no response.

PROMESA Section 204(a)(2)(A) requires the Governor to submit 'a formal estimate prepared by an appropriate entity of the territorial government with expertise in financial management of the impact, if any, that the law will have on expenditures and revenues.' Any complete formal estimate must take into account any impact on future inflows or outflows of funds, including monies from the federal government. As Judge Swain recently ruled in the Law 29 matter,[12] these estimates must cover the fiscal impact of these laws over the entire period covered by the 2019 Fiscal Plan. *Opinion and Order Granting in Part the Oversight Board's Motion for Summary Judgment, Fin. Oversight & Mgmt. Bd. for P.R. v. Vázquez Garced*, Adv. Proc. No. 19-00393 [ECF No. 107] (Apr. 15, 2019). Accordingly, we request again that the Government provide complete formal estimates for [the Healthcare Acts], pursuant to Section 204(a)(2)(A), including the Requested Analysis.

As the Government has so far failed to confirm that its analysis took into account germane factors pertaining to [the Healthcare Acts] and their impact on federal funding, we have conducted our own

---

12  On August 22, 2019, in <u>Financial Oversight & Management Board for Puerto Rico v. Vázquez Garced (In re Financial Oversight & Management Board for Puerto Rico)</u>, 403 F. Supp. 3d 1 (D.P.R. 2019) ("<u>Law 29 I</u>"), this Court denied the Governor and AAFAF's motion to dismiss an action by the Oversight Board seeking to nullify and enjoin implementation of certain legislative measures, including the "Act for Reductions of the Administrative Burdens of the Municipalities" ("Law 29"), which provided for spending outside of the Commonwealth's certified fiscal plan. On April 15, 2020, the Court granted in part the Oversight Board's motion for summary judgment and declared that Law 29 and several joint resolutions were unenforceable, and further held that the Governor and AAFAF were enjoined from implementing and enforcing Law 29 on the basis that it violated sections 108(a)(2), 204(a), and 204(c) of PROMESA. <u>See</u> <u>Fin. Oversight & Mgmt. Bd. for P.R. v. Vázquez Garced (In re Fin. Oversight & Mgmt. Bd. for P.R.)</u>, 616 B.R. 238 (D.P.R. 2020) ("<u>Law 29 II</u>").

analysis.  After reviewing each act and its necessary consequences, we have the following questions regarding the financial assumptions on which the laws appear to be based and the implications of those assumptions and laws and we request the required formal estimates to address them:

**Act 82**

- Does AAFAF expect the pharmacy reimbursement floor (i.e., the lowest Pharmacy Benefit Manager ('PBM') reimbursement sufficient to offset fully the pharmacy's acquisition cost) to have a downstream effect on PBM or Managed Care Organization ('MCO') rates on a Per Member Per Month ('PMPM') basis?

- How will the potential impact from increases in PMPM rates be mitigated to maintain compliance with the Certified Commonwealth Fiscal Plan?

. . .

**Act 138**

- What mechanisms does AAFAF anticipate will be established to enforce this provision?  How will situations in which MCOs and providers cannot reach agreement on contract rates be mediated?

- Does AAFAF anticipate enactment of non-participating provider laws ('Non-Par') to regulate payments when MCOs and providers are unable to come to an agreement?

- Given anticipated enforcement mechanisms, does AAFAF expect this law to cause higher MCO PMPM rates?

- How will potential impact from increases in PMPM rates be mitigated to maintain compliance with the Certified Commonwealth Fiscal Plan?

Please provide the necessary formal estimates, including the information requested above, no later than May 8, 2020.  Moreover, with your May 8, 2020 response, we request that you confirm that the [laws] have not yet been implemented and will not be implemented until this issue is resolved.

Pursuant to PROMESA Section 108(a)(2), the Governor and Legislature are each enjoined from, among other things, implementing any statute or rule that impairs or defeats the purposes of PROMESA as determined by the Oversight Board. To avoid any misunderstanding, please be advised the Oversight Board has determined implementation of [the Healthcare Acts] prior to satisfaction of the requirements of Section 204 would impair and defeat the purposes of PROMESA, such as preventing implementation of new laws prior to satisfaction of the requirements of Section 204.

Finally, in her April 15, 2020 opinion, Judge Swain affirmed Section 204(a) authorizes the Oversight Board to move for the nullification of legislation where the Commonwealth has failed to comply with PROMESA. Accordingly, the Oversight Board reserves the right to take such actions as it deems necessary, consistent with Sections 104(k), 108(a) and 204(a)(2), including seeking remedies for preventing the enforcement of the [laws].

(Docket Entry No. 13-9 in Adversary Proceeding No. 20-00082, at 1-3; Docket Entry No. 1-9 in

Adversary Proceeding No. 20-00080, at 1-3.)

In a letter dated May 8, 2020, AAFAF asserted that "no revised [section 204(a)]

certifications are necessary, and the Board's threat to invalidate the Healthcare Acts under

PROMESA section 108(a) as impairing the purposes thereof is misplaced." (Docket Entry No.

13-10 in Adversary Proceeding No. 20-00082, at 1; Docket Entry No. 1-10 in Adversary

Proceeding No. 20-00080, at 1.) It went on to explain that,

Section 204(a) requires that the Government provide only a 'formal estimate . . . of the impact, if any, that the law will have on expenditures and revenues.' Thus, section 204(a) does not require the Government to anticipate every possible scenario. Rather, all that is required is a 'good faith' effort to determine the financial effects of a new law and the new law's consistency with the existing fiscal plan.

In light of the foregoing, we are convinced that the Government's section 204(a) certifications for the Healthcare Acts easily satisfy such statutory requirement. The section 204(a) certifications of the Healthcare Acts were prepared by the Puerto Rico Office of Management and Budget, which is the Government agency

primarily responsible for managing the Government's finances and budgetary matters . . . . [T]he certifications describe[] the estimated effect of the applicable law on the Government's expenditures and revenues.  For example, the Act 82 certification states that it will have an 'approximate impact of $475,131.47 in the Department of Health's budget' but will be 'implemented using budgeted resources,' such that a formal request for reprogramming is not required.  In addition, the . . . Act 138 certification[] conclude[s] that there is 'no impact on expenditures and revenues.' . . . [T]he certifications conclude that the Healthcare Acts are 'not significantly inconsistent with the New Fiscal Plan for Puerto Rico.' To the extent such certifications include all of the required elements under section 204(a)(2) and were provided in good faith, the Government has fully satisfied the applicable PROMESA's [sic] requirements.

As to the Board's speculation regarding preemption by or potential conflicts with federal law, we believe there is no need for the Government to respond thereto.  *First*, this is a legal—not financial or budgetary—issue that is not the proper subject of a section 204(a)(2) certification. In such regard, nothing in PROMESA requires the Government to provide the Board with a legal opinion. Moreover, section 204(a)(2) is focused solely on financial and budgetary concerns, requiring the certification to describe only the 'impact' on 'expenditures and revenues'—not legal issues. Furthermore, to evidence the Congressional intent behind section 204(a)(2) certifications, we just need to look at who is responsible to prepare the certification; a government entity 'with expertise in budgets and financial management'.

*Second*, even if there were such an obligation, the analysis the Board requests would shed no light on whether the laws at issue are significantly inconsistent with whatever fiscal plan should be guiding Puerto Rico's spending going forward.  In its most recent status report to the Title III Court, the Board acknowledged that 'the COVID-19 pandemic has reshaped the economic landscape of the world, including Puerto Rico' and 'the Oversight Board must assess this new and changing landscape, beginning with the development of a revised Commonwealth fiscal plan and budget.'  As a result, the May 9, 2019 Fiscal Plan for the Commonwealth (the most recent certified plan) will change in a matter of weeks, as the Board acknowledged, and must be revised to reflect Puerto Rico's new, post-pandemic economic reality.

Moreover, even if the Healthcare Acts' consistency with the May 2019 Fiscal Plan were still meaningful, the preemption analysis the

Board has requested would still serve no meaningful purpose under PROMESA. If the Oversight Board were correct that the Healthcare Acts were preempted, those laws would be nullified and have no effect whatsoever. In other words, assuming the laws were preempted, the effect on the fiscal plan—in whatever form it takes after its current revisions—would be zero. As I have explained in prior letters to you, the ultimate decision on whether a law is preempted rests with the courts, not with the Government or the Oversight Board. . . .

For similar reasons, the Healthcare Acts do not 'impair or defeat the purposes of' PROMESA under section 108(a). The Oversight Board's purpose under PROMESA is 'to provide a method for a covered territory to achieve *fiscal responsibility and access to the capital markets*.' Judge Swain found Act 29 unenforceable in large part because she determined it would 'deprive[] the Commonwealth of hundreds of millions of dollars, . . . thereby diminishing market access.' In contrast, the Oversight Board has identified *no* fiscal effect from the . . . Healthcare Acts that would be inconsistent with the currently operative May 2019 Fiscal Plan.

(Docket Entry No. 13-10 in Adversary Proceeding No. 20-00082, at 1-3; Docket Entry No. 1-10 in Adversary Proceeding No. 20-00080, at 1-3.)[13]

Finally, on June 23, 2020, the Oversight Board sent AAFAF a letter setting forth the Board's "limit[ed] . . . response to the following few critical issues with the goal of narrowing or eliminating matters in dispute and the subject of the complaints filed by the Governor and AAFAF with respect to" the Healthcare Acts:

---

[13]    As discussed further below, after the Government commenced the Adversary Proceedings, the Governor sent the Oversight Board a letter dated June 18, 2020, explaining that Act 82 "has only been partially implemented," owing to "the ongoing COVID-19 pandemic," and that "the Regulatory Office and Commissioner Regulator established under Act 82-2019 still need to be created and appointed. The Regulatory Office is expected to incur substantially all of the estimated expenditures related to the implementation of Act 82-2019." (Docket Entry No. 5-3 in Adversary Proceeding No. 20-00080, at 1.) It also states that, "[b]ecause the Regulatory Office is not yet operational, the Government has not yet incurred the estimated expenditures for Act 82-2019." (Id.) As for Act 138, the same letter simply states that "[t]he Office of the Insurance Commissioner has certified that Act 138-2019 is currently being implemented." (Id. at 2.)

First, the Oversight Board is not seeking a preemption analysis from the Governor or AAFAF. We seek an analysis assessing whether [the Healthcare Acts] jeopardize the grant of federal funds to the Puerto Rico Department of Health. Accordingly, the Oversight Board continues to seek formal estimates under PROMESA Section 204(a)(2)(A), which must consider whether [the Healthcare Acts] will jeopardize the grant of federal funds.

Second, the Oversight Board rejects your assertion that revisions to the Fiscal Plan alleviate the Government of its Section 204(a) obligations. The fact that fiscal plans may be in the process of being revised does not exempt the submission of such formal estimates pursuant to PROMESA Section 204(a)(2)(A). There is a certified Fiscal Plan currently in effect, and Section 204(a) certifications must address consistency with the active Fiscal Plan. To the extent the Governor's certification differs under the 2020 Fiscal Plan compared to the 2019 Fiscal Plan, you should make that clear in your certification.

Third, the certification of compliance for Act 82 states that although the measure would have an 'approximate impact of $475,131.47 in the Department of Health's budget,' Act 82 does not warrant a reprogramming request as it would be 'implemented using budgeted resources,' such that a formal request for reprogramming is not required. Your explanation is not consistent with PROMESA. PROMESA Section 204(c)(2) prohibits any reprogramming without the Oversight Board's review and certification that such spending will not be inconsistent with the certified Fiscal Plan, regardless of whether the proposed reprogramming purports to use 'budgeted resources.' The Oversight Board is prepared to treat your letter as a request for a certification of such reprogramming under PROMESA Section 204(c)(2), but to evaluate your request, you must first identify which budgeted resources you intend to use to cover the approximate impact your certification specifies.

Finally, as to the statement that [the Healthcare Acts] do not impair or defeat the purposes of PROMESA because 'the Oversight Board has identified *no* fiscal effect from [the Healthcare Acts] that would be inconsistent with the currently operative May 2019 Fiscal Plan,' [the Healthcare Acts] do in fact impair and defeat the purposes of PROMESA, as determined by the Oversight Board because, among other reasons, the Government has not complied with Section 204(a) or Section 204(c) (in the case of Act 82).

(Docket Entry No. 13-15 in Adversary Proceeding No. 20-00082, at 1-2; Docket Entry No. 5-4 in Adversary Proceeding No. 20-00080, at 1-2.)

### B. Act 176

Act 176 amends the Government of Puerto Rico Human Resources Administration and Transformation Act, Act 8-2018, and the Fiscal Plan Compliance Act, Act 26-2017, to increase the accrual rates of vacation days and sick days for public employees to from 2 or 1.25 to 2.5 days per month, and from 1 to 1.5 days per month, respectively.[14] (Act 176 §§ 1-4.)

On December 26, 2019, AAFAF, the Treasury Department, and OMB, on behalf of the Government, submitted to the Oversight Board a copy of Act 176 and a "Compliance Certificate of New Law Pursuant to 48 U.S.C. §[]2144(2)(B)" (Docket Entry No. 14-3 in Adversary Proceeding No. 20-00083, the "Act 176 Certificate"). (See Bd. Resp. to Act 176 SOF ¶ 7.) The Act 176 Certificate, in its entirety, reads as follows:

**Legislative Measure Number:**

- Act No. 176-2019 ('Act 176'), herein attached.

**Estimated Impact of the Legislative Measure on Expenditures and Revenues:**

- Act 176 amends Act 8-2017, known as the 'Government of Puerto Rico Human Resources Administration and Transformation Act', and Act 26-2017, known as the 'Fiscal Plan Compliance Act', in order to allow government employees to accrue 2.5 vacation days and 1.5 sick days per calendar month.
- The accrual caps for vacation and sick days remain at 60 and 90 days respectively. Additionally, Act 176 does not alter the prohibition established in Act 26-2017, with regard to the liquidation of vacation days accumulated in excess of the 60 days statutory limit.

---

[14] Under the amendments to Act 26-2017, the sick day accrual rate for Government employees who are not subject to Act 8-2018 remains unchanged at 1.5 days per month. (See Jaresko Decl. ¶ 94.)

- As prior to its enactment, government employees may only liquidate vacation days when there is a cessation from service. Act 176 does not allow public employees the liquidation of sick days.
- In addition, every governmental entity and instrumentality is required to formulate and manage a personnel vacation plan for each calendar year, which shall be strictly complied with by all employees, in order to ensure that said employees do not accumulate excess vacation days, while ensuring that the services provided by the corresponding governmental entities and instrumentalities are not interrupted.
- Consequently, insofar as Act 176 merely adjusts the accretion of vacation and sick days for public employees, but while strictly adhering to the liquidation prohibitions established in the 2019 New Fiscal Plan for Puerto Rico and Act 26-2017, we conclude that Act 176 has no impact on expenditures.
- Act 176 has no impact on revenues.

**Determination of the Legislative Measure's Compliance with the Fiscal Plan:**

- Act 176 is not significantly inconsistent with the 2019 Fiscal Plan for Puerto Rico.

(Act 176 Certificate.)

By letter dated May 11, 2020, the Oversight Board wrote the Governor and the Commonwealth Legislature "pursuant to Section 204(a) of PROMESA" and provided notice that the Act 176 Certificate "was not accompanied by the estimate required under paragraph (2)(A) of Section 204(a)." (Docket Entry No. 14-4 in Adversary Proceeding No. 20-00083, at 1.) The Oversight Board asserted that the Act 176 Certificate "fails to account for Act 176's impact on employee productivity, given that it permits employees to take more vacation days during the year," noting that "if full-time employees utilize all of the additional days Act 176 makes available to them (12-21 days depending on employee group), there could be a productivity loss of approximately five percent, which in Fiscal Year 2021 is akin to losing the full-time equivalent production of 2,400 public employees." (Id. at 1-2.) The Oversight Board asserted

that, by failing to account for this impact of Act 176, the Act 176 Certificate was deficient and therefore directed the Government, "pursuant to Section 204(a)(4)(A), to provide a complete formal estimate by May 19, 2020 taking lost productivity into account." (Id. at 2.) The Oversight Board also advised the Government of its determination under section 108(a)(2) of PROMESA that implementation of Act 176 impairs and defeats the purposes of PROMESA:

> Pursuant to PROMESA Section 108(a)(2), the Governor and Legislature are each enjoined from, among other things, implementing any statute or rule that impairs or defeats the purposes of PROMESA as determined by the Oversight Board. To avoid any misunderstanding, please be advised the Oversight Board has determined implementation of Act 176-2019 prior to satisfaction of the requirements of Section 204 would impair and defeat the purposes of PROMESA, such as preventing implementation of new laws prior to satisfaction of the requirements of Section 204(a).

(Id.) The Oversight Board further "reserve[d] the right to take such actions as it considers necessary, consistent with Sections 204(a)(5) and 108(a)(2), including preventing and seeking remedies for the enforcement or application of Act 176-2019." (Id.)

On May 19, 2020, AAFAF responded to the Oversight Board's May 11, 2020, letter. (See Docket Entry No. 14-5 in Adversary Proceeding No. 20-00083.) AAFAF asserted that, contrary to the Oversight Board's "implied contention, there is no requirement that the certification account for any speculative decrease in 'employee productivity,'" reiterating that "PROMESA section 204(a) requires only that the Government provide a 'formal estimate . . . of the impact, if any, that the law will have on *expenditures and revenues*.'" (Id. at 1-2 (citation omitted) (ellipses in original).) AAFAF insisted that the Act 176 Certificate "does exactly that":

> As explained [in the Act 176 Certificate], 'Act 176 has no impact on expenditures' because the law 'merely adjusts the accretion of vacation and sick days for public employees.' Moreover, the additional vacation and sick day accruals will not affect expenditures because Act 176-2019: (i) retains existing limitations on the liquidation of vacation days, which cannot be paid until the

> employee no longer works for the Government and only up to the
> existing 60-day statutory limit; and (ii) does not allow for the
> liquidation of sick days at all.  Under Act 176-2019, employees will
> be paid the same regardless of the accrual rate for vacation and sick
> days, and any expenditures made to departing Government
> employees for their unused vacation and sick days cannot exceed
> the limits established under Act 26-2017.  The Board's May 2019
> Commonwealth Fiscal Plan provides for these expenditures, and, in
> such regard, Act 176-2019 does not alter them in any way
> whatsoever.

(Id. at 2.)

Furthermore, AAFAF explained the rationale underlying its conclusion in the Act

176 Certificate that Act 176 has no impact on revenues: "nothing in Act 176-2019 prevents or

otherwise prohibits the Government from continuing to collect revenue in the ordinary course of

its operations.  The accrual of additional vacation and sick days each month has no impact on the

Government's revenue collection processes."  (Id.)  AAFAF also asserted that "[n]othing in

PROMESA section 204(a) requires the Government to speculate about unlikely outcomes or

analyze every possible effect of a law, no matter how remote."  (Id.)  According to AAFAF's

letter, the Oversight Board's position "ignores a key consideration in the Act 176-2019

compliance certificate," namely, that "all governmental entities must create strict personnel

vacation plans for each fiscal year to prevent the accumulation of excess vacation days and

ensure the continuity of uninterrupted government services."  (Id. (citation omitted).)  AAFAF

asserted that "[t]his internal control measure protects against potential abuse of accrual policy,

which appears to be the root of the Board's employee productivity concerns."  (Id. at 2-3.)

AAFAF concluded by asserting that "PROMESA does not mandate the analysis the Board has

required *ultra vires*, and the certificate for Act 176-2019 is sufficient."  (Id. at 3.)

C. Act 181

Act 181 increases salaries to the civil members and officials of the Bureau of the
Puerto Rico Firefighters Corp by $125 a month (or $1,500 annually), effective retroactively on
July 1, 2020, with a total estimated annual cost of $2,809,386.84. (Act 181; Gov. Resp. to SOF ¶
48; Jaresko Decl. ¶ 124.) It is undisputed that this increase is in addition to the salary increase
already contemplated within the fiscal plans: an annual increase of $500 in the 2019 Fiscal Plan;
and a further increase of $1,500 in the 2020 Fiscal Plan. (Gov. Resp. to SOF ¶¶ 43-44.) Section
4 of Act 181 provides that funds generated from inspections under the "Puerto Rico Department
of Public Safety Act," shall first go to pay for the salary raise before being deposited into the
general fund, and sections 6 and 7 establish a tax on fire and allied lines insurance premiums (the
"3% Tax") to offset the pay raise. (Act 181, at 4-6.)

On January 23, 2020, the Governor submitted to the Oversight Board a
"Certification of Act 181-2019 ('Act 181')." (Docket Entry No. 1-4 in Adversary Proceeding
No. 20-00084, the "Act 181 Certificate.") The Act 181 Certificate, in its entirety, reads as
follows:

**Introduction**

- The Financial Oversight and Management Board for Puerto
  Rico ('Oversight Board') certified the Fiscal Plan for the
  Government of Puerto Rico on May 9, 2019 ('Fiscal Plan')
  and the budget for Fiscal Year 2020 on June 30, 2019 (the
  'Budget').
- Pursuant to Section 204 of the *Puerto Rico Oversight,
  Management, and Economic Stability Act* ('PROMESA'),
  this certification is being submitted to the Oversight Board
  with respect to Act 181.

**Summary of Act 181:**

- Act 181 provides a monthly salary increase of $125.00 to the
  members of the Fire Bureau of Puerto Rico beginning on July
  1st, 2020. Said increase is equivalent to an annual sum of
  $2,809,386.84.

### Estimated Impact of Act 181 Upon Expenditures and Revenues:

- Act 181 purports to satisfy the salary increase for members of the Fire Bureau of Puerto Rico with a 3% tax on fire and allied lines insurance policies (payable by the insurer).
- According to data pertaining to year 2017, the tax would have produced approximately $4,119,030.00 in new revenue. On the other hand, the tax would have provided estimated new revenue for $6,987,360.00 according to insurance policies subscribed during year 2018. Therefore, it is plausible that the new imposition provides sufficient resources to completely fund the salary increase.
- Additionally, Act 181 provides that the fees charged by the safety inspections carried out by the Bureau are to be directed to cover for the salary increase. In case the salary increase for the members of the Fire Bureau is fully covered, Act 181 requires any excess of inspection fees to be credited to the General Fund.
- If the primary sources to cover for the salary increase are insufficient, Act 181 requires the Office of Management and Budget to allocate resources to sustain the increase for the employees.
- If an internal reprogramming of budgeted resources is needed, the Department of Public Safety will submit to the Financial Oversight and Management Board for Puerto Rico a formal request.

### Determination of the Legislative Measure's Compliance with the Fiscal Plan:

- Act 181 is not significantly inconsistent with the 2019 Fiscal Plan for Puerto Rico.

(Act 181 Certificate.)

By letter dated May 11, 2020, the Oversight Board notified the Governor and the Legislature that the Act 181 Certificate was deficient, "couched in uncertainty," and "admittedly grounded in hypothetical facts." (Docket Entry No. 1-5 in Adversary Proceeding No. 20-00084, at 2.) As such, the Board argued, "the Compliance Certification for Act 181 was not accompanied by the estimate required under paragraph (2)(A) of Section 204(a)," and the Board directed the Government, "pursuant to Section 204(a)(4)(A), to provide a complete formal estimate by May 19, 2020 showing when the tax would commence to be collected, why you

believe the annual tax collections in a sufficient amount from the first year of the increase are

plausible, and the impacts on the fiscal plan if your projections are too optimistic." (Id. at 1-2.)

The same letter also included the following invocation of section 108(a)(2):

> Pursuant to PROMESA Section 108(a)(2), the Governor and
> Legislature are each enjoined from, among other things,
> implementing any statute or rule that impairs or defeats the purposes
> of PROMESA as determined by the Oversight Board. To avoid any
> misunderstanding, please be advised the Oversight Board has
> determined implementation of Act 181-2019 prior to satisfaction of
> all Section 204 requirements would impair and defeat the purposes
> of PROMESA, such as preventing implementation of new laws prior
> to satisfaction of the requirements of Section 204.
>
> Should you fail to comply with this directive, the Oversight Board
> reserves the right to take such actions as it considers necessary,
> consistent with Sections 204(a)(5) and 108(a)(2), including
> preventing and seeking remedies for the enforcement or application
> of Act 181-2019.

(Id. at 2.)

The Governor never provided any follow-up analysis but AAFAF responded, on

May 19, 2020, that the Act 181 Certificate was sufficient as originally submitted. (Gov. Resp. to

SOF ¶¶ 56-57; Docket Entry No. 1-6 in Adversary Proceeding No. 20-00084, at 4-7.) The letter

responded that, "[b]y definition, an **estimate** of future expenditures and revenues is a projection

based on hypothetical facts and is uncertain," that "Section 204(a) requires nothing more," that

the offsets were "more than sufficient to cover" the costs of Act 181, and that this Court's Law

29 decisions show that "PROMESA section 204(a) requires only a 'good faith' effort to

determine the new law's financial effects and consistency with the existing fiscal plan." (Docket

Entry No. 1-6 in Adversary Proceeding No. 20-00084, at 4-5 (emphasis in original).) Notably,

the letter also responds to the Board's assertion that section 108(a)(2) enjoined implementation

of Act 181, and argues that the Board has consistently misconstrued the Law 29 decisions as

justifying the repeated invocation of section 108(a)(2) to the effect that "implementation of [the

laws] prior to satisfaction of all section 204 requirements would impair and defeat the purposes

of PROMESA."  (Id. at 5-7.)

On September 3, 2020, the Oversight Board sent a letter requesting information

regarding the 3% Tax and its implementation, and in the following terms:

> As of this letter, we have not received any information regarding the
> implementation or collection of these new taxes.  As you know, the
> certified Fiscal Plan provides that these new revenues will flow into
> a Special Revenue Fund and as such cannot be spent before
> collections occur.  We therefore request information regarding (i)
> whether the Government has implemented the tax and if so, when;
> (ii) whether the Government has begun to collect the corresponding
> tax revenue and the amount collected to date, if any; (iii) whether
> the current collections and/or estimates of future collections will be
> recurring and constant to cover the Commonwealth's increased
> expenditures due to the salary increases envisioned in Act 181; and
> (iv) if the current and expected collections will cover the referenced
> salary increase, please tell us the precise date the Government
> started implementing the monthly salary increase for firefighters.

(Docket Entry No. 19-7 in Adversary Proceeding No. 20-00080, at 1.)  The Board reiterated that

"any implementation of Act 181 that is not in accordance with the certified Fiscal Plan violates

PROMESA section 108(a)(2) which bars enactment and implementation of laws impairing or

defeating PROMESA's purposes as determined by the Oversight Board.  Accordingly, the

Oversight Board reserves all rights for violations of the injunction in section 108(a)(2)."  (Id. at

2.)

On September 8, 2020, AAFAF responded to the Oversight Board's questions,

indicating that (i) the 3% Tax had been implemented through Ruling Letter CN-2020-282 issued

on June 26th, 2020; (ii) less than half of the anticipated tax revenue had been collected to date;

and (iii) the Office of the Commissioner of Insurance was unable to estimate future Act 181

collections.  (Gov. Resp. to SOF ¶¶ 59-60; Jaresko Decl. ¶¶ 138-39; Docket Entry No. 19-8 in

Adversary Proceeding No. 20-00080.)

        D.  <u>Act 47</u>

        Act 47 was signed into law on April 28, 2020, to expand the number of healthcare

professionals who are eligible for incentive tax benefits to include general practitioners and

specialists in such fields as audiology, chiropractic, and optometry, in a manner that reduces

revenues without providing any offsetting cost savings.  (Act 47; Jaresko Decl. ¶¶ 144-45; Gov.

Resp. to SOF ¶¶ 63-64.)  Act 47's "Statement of Motives" explains that the purpose of the law is

to encourage more of the island's 10,500 enrolled physicians to join the existing ranks of

practitioners, who currently number 9,000.  (Act 47, at 1-2.)  Those figures suggest that 1,500

physicians are enrolled but not practicing medicine in Puerto Rico.  The Government notes that,

in April 2020, the Oversight Board's Municipal Affairs and Legislative Review Director, Mr.

German Ojeda, had assured the Governor's Legislative Affairs Adviser by phone that the Board

had "no issue" with Act 47 becoming law.  (Act 47 Opp., at 13 (citing Lopez Decl. ¶ 4); Gov.

Resp. to SOF ¶ 63.)

        On May 4, 2020, the Governor submitted to the Oversight Board a "Certificate of

New Law Pursuant to 48 U.S.C. §[]2144(2)(B)."  (Docket Entry No. 1-4 in Adversary

Proceeding No. 20-00085, the "Act 47 Certificate.")  The Act 47 Certificate, in its entirety, reads

as follows:

> **Legislative Measure Number:**
> - Act No. 47-2020 ('Act 47'), herein attached.
> - Act 47 incorporates technical adjustments to Sections
>   1020.02 (10), 2021.03 (a) and 2023.02 of the Puerto Rico
>   Incentives Code in order to provide tax incentives to more
>   categories of health professionals. This legislation serves the
>   public interest by promoting the retention of professionals in

the health field, such a feat is particularly relevant in light of the COVID-19 pandemic.

**Estimate of Impact of the Legislative Measure on Expenditures and Revenues:**

- Act 47 has no impact on expenditures.
- Act 47 could have an estimated annual impact on revenues for $25.7 million dollars. However, said amount will depend: (1) medical professionals that request tax incentives; (2) medical professionals ultimately approved to receive such incentives in light of the requisites; and (3) income ultimately reported by the qualified professionals. In other words, the impact provided by the Puerto Rico Department of the Treasury consists in an educated estimate that must revised on an annual basis in order to provide an accurate impact on the revenues.

**Determination of the Legislative Measure's Compliance with the Fiscal Plan:**

- Act 47 is not significantly inconsistent with the 2019 Fiscal Plan for Puerto Rico.

(Act 47 Certificate.)

On May 21, 2020, the Oversight Board notified the Governor and Legislature that the estimate and certification were both deficient and lacked "even the barest specificity" needed for a "formal estimate" of Act 47's impact, and thus the Board needed a formal estimate under section 204(a)(4)(A) showing "[m]inimum and maximum" estimates of each variable in the certification and of Act 47's impact on the 2019 Fiscal Plan.  (Docket Entry No. 1-5 in Adversary Proceeding No. 20-00085; Gov. Resp. to SOF ¶¶ 68-69, 73.)[15]  AAFAF's estimate

---

[15]     Specifically, the Oversight Board's letter requested a "complete formal estimate by May 28, 2020, identifying, among other things:

1. The total number of medical practitioners who are eligible to seek approval for the tax incentive;
2. Minimum and maximum estimates of the percentage of medical practitioners applying for this incentive;

assumes, by not forecasting any variance in the estimate from year to year, that Act 47's impact

will be constant over the five-year term of the 2019 Fiscal Plan, yet AAFAF admits that its

"educated estimate" must be "revised on an annual basis" to be "accurate." (Gov. Resp. to SOF

¶¶ 71-72.) The Board's letter observed that, "[g]iven the number of variables cited in the

Compliance Certification, it seems unlikely that a properly constructed formal estimate would

assume identical costs in each year." (Docket Entry No. 1-5 in Adversary Proceeding No. 20-

00085, at 2.)

The Oversight Board's letter also disputed the Governor's conclusion that Act 47

is not significantly inconsistent with the 2019 Fiscal Plan and queried how Act 47 "can be

anything other than significantly inconsistent with the certified Fiscal Plan," as it risked violating

revenue neutrality and lacked offsets for the projected tens of millions of dollars it would cost

annually.[16] (Id. at 3.) The Board advised the Government against implementing Act 47, which it

maintained "would impair and defeat the purposes of PROMESA." (Id.)

---

      3. The number of medical practitioners by each area of specialty or
      sub-specialty who are eligible to seek approval for the tax incentive;
      4. Minimum and maximum estimates of these medical practitioners'
      estimated income, listed by each area of specialty or sub-specialty;
      and
      5. Minimum and maximum estimates of the Act's impact on the
      certified Fiscal Plan based on the income reported by such
      practitioners in previous years.

(Docket Entry No. 1-5 in Adversary Proceeding No. 20-00085, at 2.)

[16]   Revenue neutrality is defined in Section 14.3.3 of the 2019 Fiscal Plan, and constitutes
the principle that any tax reforms or initiatives by the Government that reduce tax
revenues must be accompanied by offsetting revenue measures. (Hrg. Tr., Docket Entry
No. 54 in Adversary Proceeding No. 20-00085, at 70:1-14; 120:16-121:15 (citing 2019
Fiscal Plan, at 124; 2020 Fiscal Plan, Docket Entry No. 1-1 in Adversary Proceeding No.
20-00085, at 218)).

On May 28, 2020, without addressing the Oversight Board's other directives,

AAFAF provided an impact range with a minimum cost of $540,000 and a maximum cost of

$40.1 million, annually based on 7,188 potentially eligible professionals, but continued to

maintain that Act 47 is not significantly inconsistent with the 2019 Fiscal Plan.  (Docket Entry

No. 1-6 in Adversary Proceeding No. 20-00085; Gov. Resp. to SOF ¶¶ 78-79, 83.)  Although the

parties dispute in the instant motion practice whether May 28, 2020, constitutes a revised

estimate, AAFAF's letter describes it as such.  (Docket Entry No. 1-6 in Adversary Proceeding

No. 20-00085, at 3.)  The Government's responsive letter explains the new estimate, and clarifies

its position on PROMESA sections 108(a)(2) and 204, as follows:

> Although we believe that further information in support of our Act
> 47-2020 compliance certification is not necessary or required under
> PROMESA section 204(a), the Government is willing to provide the
> following additional information as requested in your letter in the
> interest of transparency:
>
> 1. According to the records and data provided by the Treasury
> Department, there is an approximate universe of 9,222 doctors in
> Puerto Rico (using data corresponding to 2018). From this
> approximate universe, the Government estimates (using data
> corresponding to 2018) that around 5,137 medical practitioners
> could qualify for the tax incentives offered by a previous iteration to
> 47-2020 (Act 14-2017[] and Act 60-2019).
>
> 2. Based on these estimates, the Government projects that Act 47-
> 2020 could have an estimated impact on income for 2020 in the
> range of $[]540,000.00 to $40,100,000.00, since there are 7,188
> people who could qualify, but not necessarily qualify for the tax
> incentives.
>
> 3. The revised estimate varies from the original Section 204
> certification, since the first estimate only took into account the type
> of physicians not qualified in the previous laws that were
> incorporated into Act 47-2020 to will [sic] enjoy the exemption now
> in under Law 14-2017 and[/]or Law 60-2019.  This took the average
> of this benefits actual [sic] to estimate the effect for those new type
> of professionals as it is are [sic] registered in SURI with a NAICS
> code representing health occupations.

4. On the other hand, this last estimate provides a more precise impact since it takes into account the taxpayer of unqualified medical practitioners from the income tax base. This considers your net income subject to tax and both the classification of this as registered in the SURI Merchants Registry with a NAICS code favored in Act 47-2020 and of all NAICS related to health professionals is considered. In addition, the occupation reported in your Income Tax return is considered to the health occupations.

The [Oversight Board's] Letter further asserts that the compliance certificate is deficient because Act 47-2020's effect is 'grossly overbroad' by 'provid[ing] exemptions for several classes of health practitioners . . . whose services do not appear implicated by the COVID-19 pandemic . . . and does not assist the Commonwealth in addressing the pandemic.' Again, this argument misapplies the statute. Under PROMESA section 204(a), the Board may challenge a compliance certification based solely on the new law's financial effect on the fiscal plan, not the public policy of the duly elected Government. While the Board and the Government can certainly discuss differences of opinion on issues of public policy, PROMESA does not grant the Board unilateral authority to prevent the implementation of new laws simply because the Board disagrees with the Government's public policy decisions. The Government's foremost responsibility is to protect the health, safety, and welfare of the people of Puerto Rico, and the Board should not act in a way that could be seemed by the innocent eye as an attempt to usurp these unique political and governmental powers.

Finally, the Letter also continues to reiterate the blanket incantation that 'implementation of Act 47-2020, prior to satisfaction of all Section 204 requirements, would impair and defeat the purposes of PROMESA,' and therefore the Government is enjoined from implementing Act 47-2020 pursuant to PROMESA section 108(a). In our May 19 letter, we explained how the Title III Court recently made clear in *Fin. Oversight & Mgmt. Bd. for Puerto Rico v. Vázquez Garced (In re Fin. Oversight & Mgmt. Bd. for Puerto Rico)*, Adv. Proc. No. 19-00393 (LTS), 2020 WL 1873380 (D.P.R. Apr. 15, 2020) that the Board must demonstrate a 'rational basis' in exercising its discretion under PROMESA section 108(a)(2). Hence, the Board's formulaic conclusion that Act 47-2020 impairs and defeats PROMESA's purposes—without identifying the *significantly* inconsistent fiscal effect of the Act 47-2020 on the May 2019 Fiscal Plan (as discussed above)—shows that there is no rational basis for preventing Act 47-2020's implementation.

(Docket Entry No. 1-6 in Adversary Proceeding No. 20-00085, at 2-4.)

In a response letter dated June 5, 2020, the Oversight Board claimed the estimate "inappropriately minimizes the economic impact of Act 47," given that Act 47 could cost $200 million over five years, which would be "significantly inconsistent" with the fiscal plans, and the Governor failed to explain the inconsistency to the Board's satisfaction.  (Docket Entry No. 1-7 in Adversary Proceeding No. 20-00085, at 1-2; Gov. Resp. to SOF ¶¶ 84-86.)  The Government had responded that Act 47 is not significantly inconsistent with the 2019 Fiscal Plan because any revenue differential constitutes less than 0.128% of the plan's annual revenue projections. (Docket Entry No. 1-6 in Adversary Proceeding No. 20-00085, at 1-2; Gov. Resp. to SOF ¶ 85.) The Board's counterargument was that "the relevant analysis of the financial costs of Act 47 is its impact on the Commonwealth's own-source revenues, in the General Fund, not on all revenues received by the Commonwealth" and that, "[b]y comparing the estimated cost of Act 47 to all revenues received by the Commonwealth, [AAFAF's] Letter overstates the amount of the Commonwealth's revenue and understates the relative cost of Act 47."  (Docket Entry No. 1-7 in Adversary Proceeding No. 20-00085, at 1.)

Although the Government did not detail its analytical process for certifications in its pre-litigation correspondence, the Government proffers in the instant motion practice that it "has a carefully designed, formal process for providing section 204(a) certifications that ensure that they are both formal and accurate as contemplated by PROMESA."  (Gov. Resp. to SOF ¶¶ 26, 33, 34, 37, 68, 69.)

E.   Procedural Background

The Government commenced the Adversary Proceedings on June 12, 2020.  In Count I of each complaint, the Government seeks a declaratory judgment that the Government's

cost estimate in its certification satisfies the "formal estimate" requirement under section 204(a)(2)(A) of PROMESA, and that the Government's determination that the relevant law is "not significantly inconsistent" with the applicable fiscal plan satisfies the relevant requirement under PROMESA section 204(a)(2)(B).  (See, e.g., Act 138 Compl. ¶¶ 49, 50.)  In connection with Count I of each complaint, the Government also seeks declarations that the Oversight Board lacked authority to (i) send a notification of failure to provide an estimate pursuant to section 204(a)(3)(A) of PROMESA, (ii) direct the Governor to provide a "missing" estimate pursuant to section 204(a)(4)(A) of PROMESA, (iii) send a notification of failure to provide a certification pursuant to section 204(a)(3)(B) of PROMESA, and (iv) direct the Governor to provide a "missing" certificate pursuant to section 204(a)(4)(A) of PROMESA.  (See, e.g., id.) Additionally, the Government seeks a declaration with respect to each of the laws that the Oversight Board cannot "take such actions as it considers necessary . . . to ensure that the enactment or enforcement of the law will not adversely affect the territorial government's compliance with the Fiscal Plan, including preventing the enforcement or application of the law" under section 204(a)(5) of PROMESA.  (See, e.g., id. ¶ 51.)  In Count II of each complaint, the Government seeks a declaration that the Oversight Board's invocation of section 108(a)(2) of PROMESA "is and was of no force and is and was without any effect with respect to the validity and enforcement" of the relevant law.  (See, e.g., id. ¶ 54.)

Following the Government's commencement of the Adversary Proceedings, by letter to the Governor dated June 15, 2020, the Oversight Board inquired as to whether the Government of Puerto Rico had implemented Acts 82, 138, 176, and 181 of 2019, and Act 47 of 2020, "notwithstanding the Oversight Board's instructions to the contrary pursuant to several provisions of PROMESA."  (See Docket Entry No. 5-2 in Adversary Proceeding No. 20-00080.)

In response, AAFAF informed the Oversight Board by letter dated June 18, 2020, that, inter alia,
(i) "Act 82-2019 has only been partially implemented," and that "[b]ecause the Regulatory
Office is not yet operational, the Government has not yet incurred the estimated expenditures for
Act 82-2019"; (ii) the "Office of the Insurance Commissioner has certified that Act 138-2019 is
currently being implemented"; (iii) the "Office of Administration and Transformation of Human
Resources has certified that Act 176-2019 has been implemented to calculate public employee
vacation and sick days since January 2020"; (iv) "Act 181-2019 is in the process of being
implemented"; and (v) "[i]t is the Government's position that Act 47-2020 will be fully
implemented." (See Docket Entry No. 5-3 in Adversary Proceeding No. 20-00080.)

The Oversight Board filed answers and counterclaims in the Adversary
Proceedings on July 17, 2020. Counterclaim I in each action requests an order pursuant to
section 104(k) of PROMESA nullifying the relevant law on the grounds that the Government
failed to comply with section 204(a) of PROMESA. (See, e.g., Act 138 Counterclaims ¶ 40.)
Counterclaim II in each action seeks a preliminary and permanent injunction pursuant to sections
104(k) and 204(a)(5) of PROMESA barring the Government from implementing, enforcing, or
applying the relevant law, in light of the alleged failure to comply with section 204(a) of
PROMESA. (See, e.g., id. ¶ 48.) Counterclaim III in Adversary Proceeding Nos. 20-00082, 20-
00083, and 20-00085, and Counterclaim V in Adversary Proceeding Nos. 20-00080 and 20-
00084 seek injunctions barring implementation and enforcement of the relevant laws pursuant to
sections 104(k) and 108(a)(2) of PROMESA. (See, e.g., id. ¶ 70; Act 82 Counterclaims ¶ 86.)
Finally, Counterclaim III in Adversary Proceeding Nos. 20-00080 and 20-00084 requests
nullification—and Counterclaim IV of the same Adversary Proceedings requests preliminary and
permanent injunctions barring implementation—of the relevant laws under section 104(k) of

PROMESA on the grounds that the Government failed to comply with section 204(c) of

PROMESA. (See, e.g., Act 82 Counterclaims ¶¶ 54, 64.) As noted previously, the Court has

entered an order consolidating these Adversary Proceedings "for purposes of motion practice,

including any dispositive motions, and discovery." (Docket Entry No. 9 in Adversary

Proceeding No. 20-00080, at 2.)

On September 28, 2020, the Government moved for summary judgment on its

claims related to Acts 138 and 176. (Gov. Act 138 MSJ; Gov. Act 176 MSJ.) On October 5,

2020, the Oversight Board filed motions for summary judgment on the Government's claims in

the Act 82, Act 181, and Act 47 Complaints, and on all corresponding counterclaims. (Act 82

MSJ; Act 181 MSJ; Act 47 MSJ.) On October 19, 2020, the Oversight Board filed cross-

motions for summary judgment on the Government's claims in the Acts 138 and 176 complaints,

and on all corresponding counterclaims. (Bd. Act 138 Cross-MSJ; Bd. Act 176 Cross-MSJ.) On

October 23, the Government filed opposition briefs to the Oversight Board's Motions for

Summary Judgment in the Act 82, Act 181, and Act 47 Complaints, in which the Government

also requested relief under Rule 56(d) of the Federal Rules of Civil Procedure to conduct

discovery in advance of any resolution of the motion practice in the Oversight Board's favor.

(Act 82 Opp.; Act 181 Opp.; Act 47 Opp.)


II.

STANDARDS UNDER FED. R. CIV. P. 56

The pending motions and cross-motions are brought pursuant to Rule 56 of the

Federal Rules of Civil Procedure.[17]  Under Federal Rule of Civil Procedure 56(a), summary

judgment is appropriate when "the movant shows that there is no genuine dispute as to any

material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

56(a).  Material facts are those that "possess[] the capacity to sway the outcome of the litigation

under the applicable law," and there is a genuine factual dispute where an issue "may reasonably

be resolved in favor of either party."  Vineberg v. Bissonnette, 548 F.3d 50, 56 (1st Cir. 2008)

(internal quotation marks and citations omitted).  The Court must "review the material presented

in the light most favorable to the non-movant, and . . . must indulge all inferences favorable to

that party."  Petitti v. New England Tel. & Tel. Co., 909 F.2d 28, 31 (1st Cir. 1990) (internal

quotation marks and citations omitted).  When a properly supported motion for summary

judgment is made, the non-moving party "must set forth specific facts showing that there is a

genuine issue for trial."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986) (internal

quotation marks and citation omitted).  The non-moving party can avoid summary judgment only

by providing properly supported evidence of disputed material facts.  See LeBlanc v. Great Am.

Ins. Co., 6 F.3d 836, 841-42 (1st Cir. 1993).

Under Rule 56(d), "[i]f a nonmovant shows by affidavit or declaration that, for

specified reasons, it cannot present facts essential to justify its opposition" to summary

judgment, "the court may: (1) defer considering the motion or deny it; (2) allow time to obtain

affidavits or declarations or to take discovery; or (3) issue any other appropriate order."  Fed. R.

Civ. P. 56(d).  A party seeking denial or deferral of a motion for summary judgment under Rule

56(d) must "(i) 'show good cause for the failure to have discovered the facts sooner'; (ii) 'set

---

[17]     Federal Rule of Civil Procedure 56 is made applicable in these Adversary Proceedings by
Federal Rule of Bankruptcy Procedure 7056.  See 48 U.S.C. § 2170.

forth a plausible basis for believing that specific facts . . . probably exist'; and (iii) 'indicate how the emergent facts . . . will influence the outcome of the pending summary judgment motion.'" In re PHC Inc. S'holder Litig., 762 F.3d 138, 143 (1st Cir. 2014) (quoting Resolution Trust Corp. v. N. Bridge Assocs., Inc., 22 F.3d 1198, 1203 (1st Cir. 1994)). Stated differently, a nonmovant seeking discovery under Rule 56(d) must meet the requirements of "authoritativeness, timeliness, good cause, utility, and materiality." Id. at 144 (quoting Resolution Trust Corp., 22 F.3d at 1203).

III.

DISCUSSION

The Government moves for summary judgment on both counts of its Complaints in Adversary Proceeding Nos. 20-00082 and 20-00083. The Oversight Board seeks summary judgment in its favor on each of its Counterclaims and on each of the Government's counts in each of the Adversary Proceedings. The following section discusses the provisions of PROMESA that the parties have relied on in support of their respective claims.

A.   Statutory Framework Under PROMESA

1.   Section 108(a)(2) of PROMESA

Section 108(a)(2) of PROMESA provides that "[n]either the Governor nor the Legislature may (1) exercise any control, supervision, oversight, or review over the Oversight Board or its activities; or (2) enact, implement, or enforce any statute, resolution, policy, or rule that would impair or defeat the purposes of [PROMESA], as determined by the Oversight Board." 48 U.S.C.A. § 2128(a) (Westlaw through P.L. 116-217). The Oversight Board is

authorized, under section 104(k) of PROMESA, to "seek judicial enforcement of its authority to carry out its responsibilities under this Act." Id. § 2124(k).

In Law 29 II, this Court, having considered the Oversight Board's "operational similarity" to an agency of the federal government, determined that the arbitrary and capricious standard applied to review of the Oversight Board's determinations under section 108(a)(2). 616 B.R. at 252-53 (citing 48 U.S.C. § 2121(c)(2); Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837 (1984)). Under that standard, "the Court must decide whether the Oversight Board's determinations were supported by a rational basis and must affirm the Oversight Board's decisions if they are 'reasoned, and supported by substantial evidence in the record.'" Id. at 253 (quoting Trafalgar Capital Assoc., Inc. v. Cuomo, 159 F.3d 21, 26 (1st Cir. 1998)). The Court found that PROMESA established "the Oversight Board's determinations as the benchmark for the operation of section 108(a)(2)'s prohibition of territorial actions that 'would impair or defeat the purposes of' PROMESA." Id. (citing 48 U.S.C. §§ 2121(a), 2128(a)(2)). Thus, the Court found that the Oversight Board's determinations regarding section 108(a)(2) should only be set aside if they were "arbitrary, capricious, or manifestly contrary to the statute." Id. at 254 (quoting Chevron, 467 U.S. at 843-44).

The Court held that the Oversight Board determinations in connection with Law 29—which eliminated the obligation of municipalities to contribute to the Commonwealth government health plan and its pay-as-you-go pension system—"pass[ed] muster under this test." Id. Specifically, the Court upheld the Board's determinations that Law 29 (i) "appropriate[d] funding that is not included in certified fiscal plans and budgets"; (ii) "[was] significantly inconsistent with the fiscal plans and budgets certified by the" Oversight Board, as supported by "a rational basis and substantial record evidence"; and (iii) increased

Commonwealth expenses, impairing the "functioning of financial measures approved by the
Oversight Board in the exercise of powers explicitly conferred upon it by PROMESA," as shown
by undisputed facts.  Id.

In connection with the instant motion practice, the Government argues that, in
light of the U.S. Supreme Court's determination in Financial Oversight & Management Board
for Puerto Rico v. Aurelius Investment, LLC (In re Financial Oversight & Management Board
for Puerto Rico), 140 S. Ct. 1649, 1659 (2020) ("Aurelius"), that the Oversight Board is an entity
within the government of Puerto Rico, the Chevron "arbitrary and capricious" standard is no
longer the correct standard of review for the Oversight Board's section 108(a)(2) determinations
because it is used to review federal, not state or territory, actions.  The Government therefore
asserts that the "substantial evidence" standard that is applied under Puerto Rico law to the
review of actions of Commonwealth agencies must be applied to review of actions of the
Oversight Board.  To the extent that there is actually a difference between the two standards,
however, the Oversight Board is a sui generis entity created within the Puerto Rico government
by Congress acting pursuant to its territorial governance authority and nothing in Aurelius
requires the Court to modify its approach to review of Oversight Board determinations under
section 108(a)(2).

The Aurelius decision was focused narrowly on the applicability of the
Appointments Clause and does not undermine this Court's prior reasoning about the level of
deference properly afforded to Oversight Board determinations on account of the Oversight
Board's "operational similarity" to a federal agency.  Id. at 1665; Law 29 II, 616 B.R. at 252.
The Oversight Board asserts, in any event, that the two standards are materially the same, and
accepts that the arbitrary and capricious standard involves an examination of whether substantial

evidence exists showing that a determination is neither arbitrary nor capricious.  (Act 82 Reply at

10 (citing Ass'n of Data Processing Serv. Orgs., Inc. v. Bd. of Governors of Fed. Reserve Sys.,

745 F.2d 677, 684 (D.C. Cir. 1984); Buffonge v. Prudential Ins. Co. of Am., 426 F.3d 20, 27 (1st

Cir. 2005); Leahy v. Raytheon Co., 315 F.3d 11, 17 (1st Cir. 2002); and Law 29 II, 616 B.R. at

253).)  The Puerto Rico "substantial evidence" standard requires "relevant evidence as a

reasonable mind might accept as adequate to support a conclusion."  SPRINTCOM, Inc. v.

Puerto Rico Regulations & Permits Admin., 553 F. Supp. 2d 87, 91-93 (D.P.R. 2008).  As this

Court recognized in Law 29 II, the inquiry as to whether the determination in question is

supported by substantial evidence is appropriately considered as part of arbitrary and capricious

review.  See 616 B.R. at 252-53.  Indeed, where there are pertinent factual issues, such an

inquiry would seem unavoidable.  The Court will therefore evaluate the Oversight Board's

section 108(a)(2) determinations at issue here under the arbitrary and capricious standard.

Moreover, as discussed further below, and for reasons similar to those set forth above and in Law

29 II, the Court will apply the "arbitrary and capricious" standard of review to the Oversight

Board's determinations under section 204(a) that are at issue in the instant motion practice.

2.   Section 204(a) of PROMESA

Section 204(a) of PROMESA establishes a sequential process for the submission

of new legislative enactment to the Oversight Board and related Oversight Board action under

certain circumstances.  Section 204(a)(1) generally requires the Governor to submit laws to the

Oversight Board within seven business days of their enactment.[18]  With each such submission,

---

[18]      Section 204(a)(1) provides as follows:

> Except to the extent that the Oversight Board may provide otherwise
> in its bylaws, rules, and procedures, not later than 7 business days
> after a territorial government duly enacts any law during any fiscal

section 204(a)(2) generally requires the Governor to provide the Oversight Board with

documentation addressing two issues.  The Governor must deliver a "formal estimate prepared

by an appropriate entity of the territorial government with expertise in budgets and financial

management of the impact, if any, that the law will have on expenditures and revenues."  48

U.S.C.A. § 2144(a)(2)(A) (Westlaw through P.L. 116-217).  The Governor must also provide a

certification by the "appropriate entity" that the submitted law "is not significantly inconsistent

with the Fiscal Plan for the fiscal year," id. § 2144(a)(2)(B), or that the submitted law is

"significantly inconsistent with the Fiscal Plan for the fiscal year," id. § 2144(a)(2)(C).

Pursuant to section 204(a)(3) of PROMESA,[19] the Oversight Board "shall send a

notification to the Governor and the Legislature" if the Governor fails to submit an estimate, fails

to submit a certification, or submits a certification that a law is significantly inconsistent with the

fiscal plan.  Id. § 2144(a)(3).

---

year in which the Oversight Board is in operation, the Governor
shall submit the law to the Oversight Board.

48 U.S.C.A. § 2144(a)(1) (Westlaw through P.L. 116-217).

[19]    Section 204(a)(3) provides as follows:

The Oversight Board shall send a notification to the Governor and
the Legislature if—
(A) the Governor submits a law to the Oversight Board under this
subsection that is not accompanied by the estimate required under
paragraph (2)(A);
(B) the Governor submits a law to the Oversight Board under this
subsection that is not accompanied by either a certification
described in paragraph (2)(B) or (2)(C); or
(C) the Governor submits a law to the Oversight Board under this
subsection that is accompanied by a certification described in
paragraph (2)(C) that the law is significantly inconsistent with the
Fiscal Plan.

48 U.S.C.A. § 2144(a)(3) (Westlaw through P.L. 116-217).

If the Governor fails to submit an estimate or certification, section 204(a)(4)(A)

provides the Oversight Board with authority to direct the Governor to supply the missing

submission.  See id. § 2144(a)(4)(A).  If the Governor submits a certification that the law was

significantly inconsistent with the governing fiscal plan, section 204(a)(4)(B) provides the

Oversight Board with authority to direct the territorial government to "correct the law to

eliminate the inconsistency" or to "provide an explanation for the inconsistency that the

Oversight Board finds reasonable and appropriate."  Id. § 2144(a)(4)(B).

Section 204(a)(5) provides that, if the territorial government fails to comply with

the Oversight Board's direction pursuant to section 204(a)(4), "the Oversight Board may take

such actions as it considers necessary, consistent with this chapter, to ensure that the enactment

or enforcement of the law will not adversely affect the territorial government's compliance with

the Fiscal Plan, including preventing the enforcement or application of the law."  Id.

§ 2144(a)(5).

In Law 29 I, this Court rejected the Government's argument, raised at the motion

to dismiss stage, that a governor's certification under section 204(a) that a newly enacted law is

not significantly inconsistent with the operative fiscal plan, irrespective of its accuracy or

completeness, insulates that law from scrutiny by the Oversight Board.  403 F. Supp. 3d at 12-13

("Defendants explicitly argue that delivery of any sort of estimate on official agency letterhead,

no matter how conclusory or incomplete, . . . is effective to insulate the legislation from any

challenge by the Oversight Board . . . .  Defendants' position elevates form over substance and is

. . . not consistent with the letter, spirit, or legislative context of the statutory provisions upon

which Defendants rely.").  The Court expressly held that the Oversight Board possesses the

authority to challenge the sufficiency and accuracy of revenue estimates and certifications

regarding significant inconsistencies with fiscal plans.  Id. ("It must be assumed in construing

PROMESA, a statute that created the Oversight Board and fiscal plan structure as means of

remedying long-standing deficits and fiscal irregularities, that Congress expected the Governor

and the relevant territorial entity to comply with the statutory predicates in good faith, and the

statute does not expressly provide that the Governor's documentation is preclusive of inquiries as

to its sufficiency or accuracy.").  In observing that Congress expected the territorial entity to act

in good faith, the Court did not find that good faith alone would overcome any need for

sufficiency or accuracy of documentation required under section 204(a).

Subsequently, in Law 29 II, the Court granted summary judgment in favor of the

Oversight Board on its claim against the Government pursuant to section 204(a)(5) of

PROMESA seeking nullification of, and injunctive relief barring the enforcement of, Law 29

based on the Government's failure to comply with section 204(a)(1) of PROMESA.  616 B.R. at

248.  The Government had provided the Oversight Board with a certificate pursuant to 48 U.S.C.

§ 2144(a)(2)(b) (the "Law 29 Certificate") which contained "estimate[s] of impact" of Law 29 on

the Commonwealth government health plan of approximately $766 million over the five-year

period covered by the fiscal plan, and on the Commonwealth's pay-as-you-go pension system of

approximately $166 million in Fiscal Year 2020 alone, without including an estimate of the

impact on the pension system with respect to subsequent fiscal years and instead noting that an

actuarial study as to those amounts was forthcoming.  Id. at 242-43.  The Law 29 Certificate

nevertheless stated that Law 29 was not significantly inconsistent with the applicable fiscal plan.

Id. at 243.  The Oversight Board notified the Government by letter that the Law 29 "Certificate

was 'deficient' because it 'failed to provide the formal estimate of the fiscal impact that [Law 29]

will have, as required under paragraph (2)(A) of Section 204(a)' of PROMESA."  Id. (citations

omitted) (alteration in original).  More specifically, the Board asserted that the Law 29

Certificate could not have validly concluded that Law 29 was not significantly inconsistent with

the Fiscal Plan without the referenced actuarial study regarding its impact on the pension system

having been completed, and without having included an analysis of the impact that Law 29 will

have on the Commonwealth's applicable fiscal plan.  Id.  The Government did not respond to the

Oversight Board's letter, prompting the Board to seek relief from this Court.  Id.

        Once again rejecting the Government's argument that PROMESA does not

empower the Oversight Board to challenge the Governor's section 204(a) certifications and

estimates, the Court concluded that the undisputed facts established that the Governor's estimate

and certification regarding Law 29 were non-compliant with section 204(a)(2) of PROMESA

because they failed to account for the entire period covered by the applicable fiscal plan.  Id. at

248.  The Court also based its conclusion on the undisputed fact that the Government had failed

to respond to the Oversight Board's notification pursuant to section 204(a)(3) of PROMESA,

noting that "Section 204(a)(5) allows the Oversight Board to prevent the application or

enforcement of a law when the Commonwealth government fails to comply with a direction

given by the Oversight Board pursuant to section 204(a)(4) of PROMESA."  Id.  The Court thus

enjoined the Government from implementing and enforcing Law 29 and deemed law 29 a

nullity.  Id.

        Consistent with the Court's approach with respect to Oversight Board

determinations under section 108(a)(2) of PROMESA, the Court will review the Board's

challenges under section 204(a) of PROMESA to the sufficiency and accuracy of the

Government's estimates regarding impacts on revenues and expenditures and its certifications

regarding significant inconsistencies with fiscal plans under the arbitrary and capricious standard.

>    3.  Section 204(c) of PROMESA

Section 204(c) of PROMESA provides that the "Legislature shall not adopt a reprogramming, and no officer or employee of the territorial government may carry out any reprogramming, until the Oversight Board has provided the Legislature with an analysis that certifies such reprogramming will not be inconsistent with the Fiscal Plan and Budget."  48 U.S.C.A. § 2144(c)(2) (Westlaw through P.L. 116-217).

If reprogramming is likely necessary to implement a new law, the Government may not unilaterally reprogram funds, but must submit to the Oversight Board's analysis and certification process for reprogramming requests because once "a certified budget is in full effect as of the first day of the covered period, means and sources of government spending are necessarily rendered unavailable if they are not provided for within the budget." Rosselló Nevares v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight & Mgmt. Bd. for P.R.), 330 F. Supp. 3d 685, 704 (D.P.R. 2018), aff'd, 945 F.3d 3 (1st Cir. 2019).  This Court has held, and the First Circuit has concurred, that "[i]t beggars reason, and would run contrary to the reliability and transparency mandates of PROMESA, to suppose that a budget for a fiscal year could be designed to do anything less than comprehend all projected revenues and financial resources, and all expenditures, for the fiscal year." Id.  Consequently, "if a certified budget is to have 'full force and effect,' subsection 202(e)(3)(C) [of PROMESA], there can be no spending from sources not listed in that budget, regardless of what any territorial laws say." Vázquez Garced v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight & Mgmt. Bd. for P.R.), 945 F.3d 3, 8 (1st Cir. 2019) (quoting Rosselló Nevares, 330 F. Supp. 3d at 704).

In <u>Law 29 II</u>, this Court declined to "distinguish between a reprogramming and the creation of a revenue deficiency in the budget that the Government would likely have to remedy through reprogramming." <u>Law 29 II</u>, 616 B.R. at 249 (internal quotations omitted). The Court held that reprogramming occurs where funds are appropriated "for expenses not provided for in a certified budget." <u>Id.</u> Reprogramming after failing to obtain certification of such reprogramming violates PROMESA § 204(c)(2), and is subject, under section 104(k) of PROMESA, to a mandatory permanent injunction prohibiting implementation and enforcement of the relevant law by this Court. <u>Id.</u> at 250.

Against that backdrop, the Court turns next to the specific claims and counterclaims that have been asserted in each Adversary Proceeding. For the reasons explained below, the Oversight Board is entitled to summary judgment dismissing Count I of the Act 138 and Act 82 Complaints and Count II of the Act 176 and Act 47 Complaints, and to judgment as a matter of law with respect to Act 138 Counterclaim II, Act 82 Counterclaim II, Act 176 Counterclaim III, Act 47 Counterclaim III, and Act 181 Counterclaim IV. The Government's Motions for Summary Judgment are denied in their entirety. The remaining aspects of the Oversight Board's Motions for Summary Judgment are also denied. Pursuant to the *Order to Show Cause Regarding Dismissal of Remaining Claims and Counterclaims* that is being entered contemporaneously with this Opinion and Order, the parties are directed to show cause as to why, given the analysis and conclusions herein, the remaining counts and counterclaims should not be dismissed as moot or otherwise for lack of subject matter jurisdiction.

B. <u>Act 82 (Adversary Proceeding No. 20-00080) – Section 204(a) of PROMESA</u>

The Oversight Board seeks summary judgment in its favor on Count I of the Act 82 Complaint, and on Act 82 Counterclaims I and II, arguing that the Governor failed to comply

with the estimate and certification requirements of section 204(a), and that Act 82 is significantly inconsistent with the Fiscal Plan because it will increase expenditures by at least $475,131.47 without any offsetting savings or revenues.  (Act 82 MSJ at 29.)  As noted above, Act 82 establishes certain pharmacy service provider pricing formulas and regulatory provisions relating to PBMs and PBAs.  The Oversight Board argues that the Governor failed to (i) submit a timely estimate and certification; (ii) provide a compliant estimate; and (iii) comply with the FOMB's directive to submit a compliant estimate as required by PROMESA section 204(a).  (Id. at 29-30.)  The Oversight Board asserts that section 204(a) has been violated in that the estimate and certification provided were submitted more than four months late (id. at 30 (citing Act 82 Compl. ¶¶ 31, 34)); the estimate submitted was informal and approximate, lacking any supporting data or analysis (id. at 30 (citing Docket Entry No. 1-7 in Adversary Proceeding No. 20-00080, at 2)); and the Governor refused to provide additional analysis in response to the Board's request citing public testimony by the Puerto Rico Health Insurance Administration that Act 82 would cost about $27 million annually (id. at 30 (citing Jaresko Decl. ¶ 45; Docket Entry No. 1-7 in Adversary Proceeding No. 20-00080, at 2)).  The Oversight Board also argues that the Governor's proffered approximation of the statute's impact fails to specify whether it covers the entire period of the Fiscal Plan or only 2020, and that the estimate fails to consider whether Act 82 jeopardizes the health department's receipt of federal funds.  (Id. at 31.)  Finally, the Oversight Board maintains that the Governor has repeatedly failed to provide a compliant estimate as requested by the Board under section 204(a)(3) of PROMESA.  (Id. at 32.)[20]

_____

[20]    To the extent the Oversight Board's correspondence pressed the Government for an analysis of how Act 82 could affect the receipt of federal funds, the correspondence reveals practically no articulable basis for the Oversight Board's concerns.  This Court does not reach whether the Board's request for such analysis was arbitrary and capricious, however, because the Government's section 204(a) noncompliance is already

The Court finds that the undisputed factual record, when viewed in the light most favorable to the Governor, establishes that the Government failed to comply with its statutory responsibility to provide a formal estimate and certification that was sufficiently informative and complete, such that the Oversight Board's determination of noncompliance and its ultimate decision to seek injunctive relief under section 204(a)(5) after repeated attempts to obtain a formal estimate and certification are neither arbitrary nor capricious. The only certificate of compliance and estimate submitted by the Government, which together comprise less than half a page of text, plainly fall short of even facial compliance with the formal estimate requirement; they provide no context or analysis to support the certification's assertion of consistency with the fiscal plan imposed by PROMESA § 204(a). (See Docket Entry No. 1-5 in Case No. 20-00080; cf. Law 29 I, 403 F. Supp. 3d at 14.) This Court has held that section 204(a)(2)(A) requires that a "formal estimate" cover "revenue and expenditure effects of new legislation," in enough detail to estimate the law's impact over the full duration of the relevant fiscal plan. Law 29 I, 403 F. Supp. 3d at 13-14. Apart from providing an "approximate impact" on the Department of Health's budget, such information is largely missing from the Act 82 Certificate. (Docket Entry No. 1-5 in Case No. 20-00080.) The "formality" requirement for an estimate is not satisfied by the mere presentation of a figure on official letterhead, yet that is the only formal feature of the Act 82 Certificate. (Id.; Law 29 I, 403 F. Supp. 3d at 12-13 ("Defendants explicitly argue that delivery of any sort of estimate on official agency letterhead, no matter how conclusory or incomplete, . . . is effective to insulate the legislation from any challenge by the Oversight Board,

_____

patent in that the Board's request for evidence in support of the Government's estimate was never satisfied, nor were its other, more specific questions about the anticipated impact of PMPM rates on the fiscal plan answered. (Docket Entry No. 1-7 in Adversary Proceeding No. 20-00080, at 1-2; Docket Entry No. 1-9 in Adversary Proceeding No. 20-00080, at 1-3.)

. . . [but] Defendants' position elevates form over substance and is . . . not consistent with the

letter, spirit, or legislative context of the statutory provisions upon which Defendants' rely.").)

The document does not proffer even a narrative explanation of how the estimate was derived.

      Despite the Government's insistence, in a post hoc affidavit that provides no

methodological or computational detail to support a certification, that it follows a rigorous

protocol for calculating fiscal impacts of new laws, absolutely no supporting rationale for the

impact estimate of $475,131.47 has been provided to the Oversight Board, let alone any clearly

articulated compound estimate that covers the entire duration of the 2019 Fiscal Plan.  (Compare

Cruz Decl. ¶¶ 6-18, with Act 82 Certificate.)  In short, the Government has failed to show its

work in support of its "formal" estimate and certification.

      Furthermore, ever since the Oversight Board issued its letter of December 18,

2019, expressing concerns over whether the Government's estimate was accurate, the

Government was afforded several opportunities to cure the perceived deficiencies and provide

some sort of substantiation, but the Government declined to provide anything more.  (Docket

Entry No. 1-7 in Adversary Proceeding No. 20-00080, at 1-2.)  Rather than provide insight into

the basis of its assertions, the Government quibbled that the Oversight Board's reliance on a

contradictory statement by the Health Insurance Administration was misplaced, and insisted that

only estimates provided by AAFAF, the OMB, and the Treasury Department are worthy of

attention.  (Docket Entry No. 1-8 in Adversary Proceeding No. 20-00080, at 2.)  In its letter of

April 27, 2020, the Oversight Board made clear that it wanted the formal estimate to "take into

account any impact on future inflows or outflows of funds, including monies from the federal

government," to explain how Act 82 would impact the fiscal plan by increasing PMPM rates,

and explain whether sufficient offsets could counteract such impacts. (Docket Entry No. 1-9 in

Adversary Proceeding No. 20-00080, at 1-2.)

Even if not every element of the Oversight Board's request for information was

grounded in the statutory structure with sufficient clarity to support a non-arbitrary finding of

noncompliance with section 204(a)(2) of PROMESA, the Board's determination that the

Government failed to satisfy those requirements is plainly not arbitrary or capricious, for the

simple reason that the Government made no effort to clarify the cumulative estimate for the

duration of the fiscal plan, or even explain how it reached its estimate. As this Court has

previously held, "[t]he Oversight Board is not required to prove to the Court that [a law] is

significantly inconsistent with the fiscal plan" to show that the Government failed to comply

with its obligation under section 204(a)(1) of PROMESA. Law 29 II, 616 B.R. at 248. It was

therefore neither arbitrary nor capricious for the Oversight Board to determine that the

Government had failed to provide a sufficiently "formal estimate" or "certification."

For the foregoing reasons, summary judgment is granted in favor of the Oversight

Board with respect to Count I of the Act 82 Complaint and Act 82 Counterclaim II. The Court

holds that the Governor has failed to comply with section 204(a)(1) of PROMESA, since it failed

to substantiate its estimate and failed to distinguish between the short-term impact of Act 82 and

its projected impact for the duration of the 2019 Fiscal Plan,[21] and that the Oversight Board has

the authority pursuant to section 204(a)(5) of PROMESA to prevent enforcement of a law to

ensure that the law will not adversely affect compliance with the applicable fiscal plan.[22] The

---

[21]  The Court declines to address other arguments regarding the untimeliness of the Act 82 Certificate and whether the Government should have conducted an analysis of the impact Act 82 could have on the receipt of federal funds.

[22]  Nor has the Government demonstrated that it lacks access to any evidence relating to any material fact that is necessary to oppose the Oversight Board's motion for summary

Oversight Board's determinations that enforcement and implementation of this law, which is

projected to involve significant expenditures that are not clearly provided for in the fiscal plan

and for which the Government has not provided the requisite analytical support, should be

prevented is neither arbitrary nor capricious, and establishes the Oversight Board's legal

entitlement under section 104(k) and 205(a)(5) of PROMESA to injunctive relief barring the

implementation and enforcement of Act 82.[23]  The Court denies summary judgment on all

counterclaims seeking nullification of Act 82 because the Oversight Board has not demonstrated

that such drastic relief is warranted under these particular circumstances.[24]

---

judgment, such that discovery under Rule 56(d) of the Federal Rules of Civil Procedure
would be appropriate.  See In re PHC, 762 F.3d at 143.

[23]  The Court's grant of injunctive relief could be revisited if there emerge any significant
changes in legal or factual conditions as to make such relief equitable.  See Agostini v.
Felton, 521 U.S. 203, 215-16 (1997) (recognizing appropriateness of relief from an
injunction under Rule 60(b)(5) of the Federal Rules of Civil Procedure where Movant
shows a significant change in factual conditions, statutory law, or decisional law); Sierra
Club v. U.S. Army Corps of Engineers, 732 F.2d 253, 256 (2d Cir. 1984) (noting that "a
court may modify a final or permanent injunction only where conditions have so changed
as to make such relief equitable, i.e., a significant change in the law or facts").

[24]  Given the foregoing conclusions, and as set forth in the accompanying Order to Show
Cause Regarding Dismissal of Remaining Claims and Counterclaims, the parties are
directed to show cause in writing as to why the Court should not dismiss the following
count and counterclaims as moot or otherwise for lack of subject matter jurisdiction:
Count II of the Act 82 Complaint, which seeks a declaratory judgment that the Oversight
Board cannot unilaterally enjoin implementation and enforcement of Act 82 under
section 108(a)(2) of PROMESA; Act 82 Counterclaim I, which seeks nullification of Act
82 under section 104(k) of PROMESA for failure to satisfy section 204(a) of
PROMESA; Act 82 Counterclaim III, which seeks nullification of Act 82 under section
104(k) of PROMESA for failure to satisfy section 204(c) of PROMESA; Act 82
Counterclaim IV, which seeks a preliminary and permanent injunction barring
implementation of Act 82 under section 104(k) of PROMESA for failure to satisfy
section 204(c) of PROMESA; and Act 82 Counterclaim V, which seeks an injunction
barring the implementation of Act 82 under section 108(a)(2) of PROMESA.

C.  Act 138 (Adversary Proceeding No. 20-00082) – Section 204(a) of
PROMESA

As discussed above, Act 138 limits MCOs' ability to deny healthcare providers

access to MCOs' preferred provider networks and to terminate contracts with such providers.

The Government seeks summary judgment in its favor on Count I of the Act 138 Complaint,

arguing that the Act 138 Certificate satisfies section 204(a) because it was provided in good faith

by an appropriate entity of the territorial government with expertise in budgets and financial

management, and Act 138 on its face requires no additional expenditures and does not reduce

revenues.  (See Gov. Act 176 MSJ at 15.)  The Oversight Board opposes the Government's

motion and cross-moves for summary judgment on Count I of the Act 138 Complaint and Act

138 Counterclaims I and II based on its theory that Act 138 will cause MCOs to incur higher

costs, which will ultimately be borne by the Commonwealth.  (Bd. Act 138 Cross-MSJ at 22-23.)

The Oversight Board asserts that the Act 138 Certificate failed to comply with section 204(a)

because it incorrectly concluded that Act 138 is not significantly inconsistent with the Fiscal

Plan, and because it lacked a compliant formal estimate of Act 138's fiscal impact.  (Id. at 24.)

The Oversight Board also argues that the Government's Act 138 Certificate was deficient

because it failed to account for whether Act 138 could jeopardize the Puerto Rico Department of

Health's receipt of federal funds.  (Id. at 24-25.)

The Court concludes that the Oversight Board is entitled to summary judgment

dismissing Count I of the Act 138 Complaint and summary judgment in its favor on Act 138

Counterclaim II.  As an initial matter, it is undisputed that the Act 138 Certificate contains only

the conclusory statements that "Act 138 has no impact on expenditures or revenues" and that

"Act 138 is not significantly inconsistent with the New Fiscal Plan for Puerto Rico," and is

devoid of any analysis or data supporting those assertions.  (Docket Entry No. 13-3 in Adversary

Proceeding No. 20-00083.)  This is unsurprising, however, as the declaration of the Treasury

Department that was proffered by the Government in connection with the instant motion practice

demonstrates that the Government's procedure for assessing new laws that do not expressly call

for changes in revenues or expenditures, such as Act 138, for compliance with PROMESA does

not contemplate an analytical step that would account for any of the laws' collateral fiscal

effects.  (See Cruz Decl. ¶ 4 ("The Office of Legal Affairs reads and analyzes the content of each

new law or joint resolution.  If the language of the new law or joint resolution does not present

an issue of fiscal effect, the Office of Legal Affairs recommends that the Office of Economic and

Financial Affairs issue a certification under PROMESA section 204(a) that the new law or joint

resolution has no effect on expenditures and revenues.").)  The Act 138 Certificate, containing

even less content than the Act 82 Certificate, lacks a formal estimate and certification that is

sufficiently informative and complete to satisfy the Government's obligations under section

204(a)(2).  Cf. Law 29 I, 403 F. Supp. 3d at 12-13 (Government's conclusory estimate not

effective to insulate new legislation from challenge by the Oversight Board).

        It is also undisputed that the Oversight Board requested revisions to the Act 138

Certificate to remedy its failure to include a formal estimate of Act 138's fiscal impact, as

required by section 204(a)(2)(A) of PROMESA.  (See, e.g., Docket Entry No. 13-5 in Adversary

Proceeding No. 20-00082, at 2.)  In its April 27, 2020, letter to AAFAF, the Oversight Board

posed specific questions apparently aimed at determining the anticipated costs associated with

Act 138 and its effect on the Commonwealth's compliance with the applicable fiscal plan.

(Docket Entry No. 13-9 in Adversary Proceeding No. 20-00082, at 2.)  For example, the Board

inquired as to whether AAFAF expects Act 138 to cause higher MCO PMPM rates.  (Id.)  The

Oversight Board also asked how the potential impact from increases in PMPM rates will be

mitigated to maintain compliance with the applicable fiscal plan. (Id.). The Government refused to provide responses to the Board's questions and has consistently maintained that no revisions to the Act 138 Certificate are necessary. (See Docket Entry No. 13-10 in Adversary Proceeding No. 20-00082, at 1.)

Given the conclusory nature of the Act 138 Certificate, it was not difficult for the Oversight Board to make the required evidentiary showing to support a finding that its decisions to send the Government a section 204(a)(3) notification and direct the Government to provide the missing estimate and certification under section 204(a)(4)(A) had rational bases, and the Board has made such a showing here. In the context of the instant motion practice, the Oversight Board has submitted evidence supporting its proffer that the Oversight Board has determined that Act 138 will result in increased healthcare costs which will ultimately be borne by the Commonwealth,[25] as well as additional evidence that substantiates its theory.[26] In response, the Government points principally to Act 138's intended purposes as articulated in the statute by the Legislative Assembly, which focus on the retention of medical professionals rather than costs associated with incentivizing such retention by impeding the ability of MCOs to reject

---

[25]   (See Jaresko Decl. ¶ 70 ("The Oversight Board . . . determined Act 138 will inhibit MCOs' ability to control costs because they will be forced to accept providers with more expensive practice patterns."); id. ¶ 71 ("The Oversight Board believes that such additional costs [associated with Act 138] will be borne by the Commonwealth, even though they are not accounted for in the Fiscal Plan.").)

[26]   (See, e.g., Ellis Decl. ¶ 14 ("Act 138 will almost certainly increase costs for private insurance plans and Medicaid plans in Puerto Rico by prohibiting those plans from excluding doctors, hospitals, and other providers of care from the plans' networks, and thereby reducing incentives for such providers to compete on price."); id. ¶ 15 ("Increases in costs for health plans in Puerto Rico, such as managed care organizations ('MCOs'), will adversely affect the fiscal position of the Commonwealth by increasing spending on Medicaid and reducing income tax revenues (due to increases in costs for employer-sponsored insurance). Act 138 may also increase the costs borne by the Commonwealth in the provision of subsidized insurance to public sector employees and their families.").)

membership applications on price grounds and to remove providers from networks.  (See Gov.

Act 138 Reply and Opp. at 26 ("Act 138 was enacted in response to 'an unprecedented public

health crisis, which has [made] it increasingly difficult for the people to obtain basic and

specialized health care service' because of the massive 'brain drain' of healthcare professionals

leaving the Island." (quoting Act 138 at 2)).)  Those statutory provisions, which speak solely to

the intended purpose and not any fiscal effects of Act 138, do not frame any genuine issue of

material fact as to whether the Oversight Board's fiscal concerns associated with Act 138 and its

decision to request revisions to the Act 138 Certificate were rational and supported by substantial

evidence.[27]

In sum, given the conclusory nature of the Act 138 Certificate and the Oversight

Board's rational concerns regarding Act 138's economic effects, no reasonable fact finder could

conclude that the Board's challenge to the estimate and certification in the Act 138 Certificate

was arbitrary or capricious.  Furthermore, because it is undisputed that the Government failed to

comply with the Oversight Board's directive under section 204(a)(4)(A) of PROMESA to correct

the deficient Act 138 Certificate or otherwise address the pertinent fiscal issues identified by the

Oversight Board, the Board's determination to seek injunctive relief under sections 104(k) and

204(a)(5) was also supported by a rational basis.  Accordingly, the Board is entitled to summary

---

[27]   Because the Court concludes that the Oversight Board's section 204(a) requests were
warranted based on the Government's failure to adequately address the Board's concerns
regarding the Act 138's general economic impact, the Court declines to address the
parties' arguments concerning the timeliness of the Act 138 Certificate and whether the
Government should have conducted an analysis of the impact Act 138 could have on the
Puerto Rico Department of Health's receipt of federal funds.  Indeed, with respect to the
latter issue, counsel for the Oversight Board admitted during oral argument that the
Board's inquiries related to federal funding were meant to elicit prognostication about
political dynamics of future health care funding negotiations with mainland authorities.
(See Hrg. Tr., Docket Entry No. 46 in Adversary Proceeding No. 20-00082, at 63:16-
65:17.)

judgment dismissing Count I of the Act 138 Complaint and to summary judgment in its favor on

Act 138 Counterclaim II.  The Government is enjoined, pursuant to sections 104(k) and

204(a)(5) of PROMESA, from implementing and enforcing Act 138.  See Law 29 II, 616 B.R. at

248 ("Section 204(a)(5) allows the Oversight Board to prevent the application or enforcement of

a law when the Commonwealth government fails to comply with a direction given by the

Oversight Board pursuant to section 204(a)(4) of PROMESA.").[28]  The Court denies summary

judgment on all counterclaims seeking nullification of Act 138 because the Oversight Board has

not demonstrated that such drastic relief is warranted under these particular circumstances.[29]

    D.   Act 176 (Adversary Proceeding No. 20-00083) – Section 108(a)(2) of
         PROMESA

In the Adversary Proceeding pertaining to Act 176, which increases the accrual

rate of public employee vacation and sick days, the Government moves for summary judgment

in its favor on Count II of the Act 176 Complaint, arguing that the Oversight Board has no

---

[28]   The Court's grant of injunctive relief could be revisited if there emerge any significant
changes in legal or factual conditions as to make such relief equitable.  See Agostini, 521
U.S. at 215-16 (recognizing appropriateness of relief from an injunction under Rule
60(b)(5) of the Federal Rules of Civil Procedure where Movant shows a significant
change in factual conditions, statutory law, or decisional law); Sierra Club, 732 F.2d at
256 (noting that "a court may modify a final or permanent injunction only where
conditions have so changed as to make such relief equitable, i.e., a significant change in
the law or facts").

[29]   Given the foregoing conclusions, and as set forth in the accompanying Order to Show
Cause Regarding Dismissal of Remaining Claims and Counterclaims, the parties are
directed to show cause in writing as to why the Court should not dismiss the following
count and counterclaims as moot or otherwise for lack of subject matter jurisdiction:
Count II of the Act 138 Complaint, which seeks a declaratory judgment that the
Oversight Board cannot unilaterally enjoin implementation and enforcement of Act 138
under section 108(a)(2) of PROMESA; Act 138 Counterclaim I, which seeks nullification
of Act 138 under section 104(k) of PROMESA for failure to satisfy section 204(a) of
PROMESA; and Act 138 Counterclaim III, which seeks an injunction under section
108(a)(2) of PROMESA barring the implementation of Act 138.

authority under section 108(a)(2) to unilaterally enjoin the Government from implementing Act

176, and that the Oversight Board's determination that Act 176 impairs or defeats PROMESA's

purposes lacked the requisite evidentiary support.  (See Gov. Act 176 MSJ at 19-23.)  The

Oversight Board opposes the Government's motion and cross-moves for summary judgment on

Count II of the Act 176 Complaint and Act 176 Counterclaim III, arguing that its determination

that Act 176 impairs or defeats the purposes of PROMESA is neither arbitrary nor capricious and

that its announcement of its determination was sufficient to trigger section 108(a)(2)'s statutory

ban on Government action as to which the Oversight Board has made such a finding.  (Bd. Act

176 Cross-MSJ at 21-22.)

   The Court concludes that the Oversight Board is entitled to summary judgment

dismissing Count II of the Act 176 Complaint and summary judgment in its favor on Act 176

Counterclaim III.  It is undisputed that Act 176 permits Commonwealth government employees

to accrue and take additional vacation and sick days with no other change in compensation

levels.  (See Bd. Act 176 SOF ¶ 43.)  It is also undisputed that the applicable fiscal plan requires

the Government to implement headcount-reduction measures to right-size the Government's

workforce to a level commensurate with the current size of the Commonwealth's population,

which has diminished over the past several years.  (See id. ¶ 35; Jaresko Decl. ¶ 17 ("The Fiscal

Plan . . . provides for right-sizing measures which include reducing headcount of public

employees in some instances."); 2019 Fiscal Plan at 24 ("In the past five years, Puerto Rico's

population has trended downward by 1-2% every year as residents have left to seek opportunities

elsewhere and birth rates have declined.").)  Common sense and basic principles of economics

dictate that, by allowing sick days and vacation days to accrue more quickly, without reducing

pay levels, Act 176 affects expenditures by increasing the price that the Government pays for

labor—causing the Government to pay the same amount of money to each person for fewer days worked.  The Oversight Board expressed this obvious concern in terms of lost "productivity," computing the working hours forgone.  The Oversight Board has, furthermore, submitted evidence supporting its proffer that the Board had determined that Act 176 "undermines the ability to right-size the workforce to the population size as contemplated in the Fiscal Plan by reducing the required work days for Government employees, effectively reducing the amount of services, without also reducing salaries and wages."  (Jaresko Decl. ¶ 107.)

    The Government argues that the Oversight Board's concerns about lost productivity are unfounded because the Government has in place legal requirements that prohibit employee vacations from interfering with the provision of Government services.  (See Gov. Act 176 Reply and Opp. at 5-6 (citing Act 8-2017 § 9.1.1(b)).)  The Government's reliance on Act 8-2017 is unavailing.  In the Act 176 Certificate, the Government explained that "every governmental entity and instrumentality is required to formulate and manage a personnel vacation plan for each calendar year, which shall be strictly complied with by all employees, in order to ensure that said employees do not accumulate excess vacation days, while ensuring that the services provided by the corresponding governmental entities and instrumentalities are not interrupted."  (Docket Entry No. 14-3 in Adversary Proceeding No. 20-00083.)  Even if that assertion is true, it does not necessarily follow that Act 176 does not increase the Commonwealth's labor costs.  Act 8-2017 simply provides that "[e]ach Agency is required to devise a vacation plan for every calendar year, in collaboration with the supervisors and employees, whereby it shall be established the period during which employees shall enjoy their vacation time in the manner that is more compatible with the needs for service."  Act 8-2017 § 9.1.1(b).  Nothing about that provision dispels the Oversight Board's legitimate concerns

regarding Act 176's inconsistency with the right-sizing measures contemplated in the applicable

fiscal plan.  The Government's asserted ability to cover necessary services with fewer workers

while providing more time off to all of its employees is not indicative of a basis for progress

toward right-sizing to reduce labor costs and increase the efficient deployment of the workforce.

(See, e.g., 2019 Fiscal Plan, at 76 ("A new model for government operations will 'right-size' the

Government through agency consolidation and reduction and/or elimination of government

services."); id. at 82 (Government right-sizing measures should be implemented to "improv[e]

agency operational expenditures" and ensure that agencies "deliver services in as efficient a

manner as possible").)

        Accordingly, the Oversight Board's determination that Act 176 impairs

PROMESA's purposes of guiding the Commonwealth to fiscal responsibility and ensuring the

efficient provision of public services, see 48 U.S.C. §§ 2141(b)(1)(B), (F), is supported by

substantial record evidence, including (i) the text of Act 176, which permits public employees to

accrue more sick and vacation days per year without otherwise modifying their compensation;

(ii) the applicable fiscal plan, which requires the Government to implement headcount-reduction

measures to right-size the Government's workforce to the population's size; and (iii) the Jaresko

Declaration, which evidences the Oversight Board's determinations that Act 176 undermines the

ability to right-size the workforce to the population size as contemplated in the applicable fiscal

plan and the Oversight Board's efforts to fulfill its statutory mission to guide the Commonwealth

to fiscal responsibility (see Jaresko Decl. ¶¶ 107-08.)  No further evidence or analysis is

necessary to support the Oversight Board's rational conclusion that Act 176 will impair or defeat

PROMESA's purposes.  Similarly, for the reasons discussed above, the Board's refusal to

modify its position in light of Act 8-2017's vacation scheduling provisions had a rational basis.

Thus, no reasonable fact finder could determine that the Oversight Board's section 108(a)(2)

determination was arbitrary or capricious.  The Oversight Board is therefore entitled to summary

judgment dismissing Count II of the Act 176 Complaint and summary judgment in its favor on

Act 176 Counterclaim III.  The Government is enjoined, pursuant to sections 104(k) and

108(a)(2) of PROMESA, from implementing and enforcing Act 176.[30]  The Court denies

summary judgment on all counterclaims seeking nullification of Act 176 because the Oversight

Board has not demonstrated that such drastic relief is warranted under these particular

circumstances.[31]

Although, for the reasons discussed above, summary judgment in favor of the

Oversight Board is warranted on Count II of the Act 176 Complaint, which requests declarations

that "the Board's invocation of PROMESA section 108(a)(2) is and was of no force and is and

was without any effect with respect to the validity and enforcement of Act 176" and that "any

---

[30]   The Court's grant of injunctive relief could be revisited if there emerge any significant changes in legal or factual conditions as to make such relief equitable.  See Agostini, 521 U.S. at 215-16 (recognizing appropriateness of relief from an injunction under Rule 60(b)(5) of the Federal Rules of Civil Procedure where Movant shows a significant change in factual conditions, statutory law, or decisional law); Sierra Club, 732 F.2d at 256 (noting that "a court may modify a final or permanent injunction only where conditions have so changed as to make such relief equitable, i.e., a significant change in the law or facts").

[31]   Given the foregoing conclusions, and as set forth in the accompanying Order to Show Cause Regarding Dismissal of Remaining Claims and Counterclaims, the parties are directed to show cause in writing as to why the Court should not dismiss the following count and counterclaims as moot or otherwise for lack of subject matter jurisdiction: Count I of the Act 176 Complaint, which seeks a declaratory judgment that the Act 176 Certificate satisfies the requirements of section 204(a) of PROMESA, that the Oversight Board cannot prevent enforcement of the law, and that any unilateral determinations by the Oversight Board of noncompliance with section 204(a) are non-binding; Act 176 Counterclaim I, which seeks nullification of Act 176 under section 104(k) of PROMESA for failure to satisfy section 204(a) of PROMESA; and Act 176 Counterclaim II, which seeks a preliminary and permanent injunction under sections 104(k) and 204(a)(5) of PROMESA barring the implementation of Act 176.

Board action to invalidate or prevent the enforcement of Act 176 without first seeking judicial
approval of such action, exceeds the Board's powers under PROMESA section 108(a)(2) and
would be unlawful, and are null and void" (Act 176 Compl. ¶ 51; id. at 20-21), it is appropriate
to reiterate the Court's holding in Law 29 II that "Section 108(a) does not itself authorize the
Oversight Board to nullify legislation."  616 B.R. at 252.  Rather, "104(k) allows the Oversight
Board to seek judicial enforcement of its authority to carry out its responsibilities under
PROMESA, including its responsibilities pursuant to section 108(a)."  Id.  A proper declaration
of a negative section 108(a)(2) determination by the Board triggers a statutory prohibition on
action by the Government to go forward with the targeted statute, resolution, policy, or rule, but
it does not empower the Oversight Board unilaterally to void the legislation or create an
injunction.  The Board appears to have conceded in its Act 176 Reply that it must seek relief
from this Court in the event that the Government disregards its section 108(a)(2) determinations
(see Bd. Act 176 Reply at 7).

E.  Act 181 (Adversary Proceeding No. 20-00084) – Section 204(c) of
PROMESA

The Oversight Board seeks summary judgment in its favor on Act 181
Counterclaims III and IV, arguing that the Governor admits that Act 181 (which provides a
retroactive pay raise for firefighters) would cost $2.8 million and that the taxes imposed therein
may not cover those costs, thus implicating a need for reprogramming that has neither been
requested nor authorized, in violation of section 204(c) of PROMESA, but the Governor has
nonetheless stated that the law would be implemented on September 30, 2020, with retroactive
effect.  (Act 181 MSJ at 34 (citing Docket Entry No. 1-4 in Adversary Proceeding No. 20-00084;
Gov. Resp. to SOF ¶ 62; Jaresko Decl. ¶ 141).)  The Board also argues that Act 181
impermissibly imposes a spending decision on it, contrary to sections 201 through 204 of

PROMESA.  (Id. at 35 (citing Jaresko Decl. ¶ 143).)  Finally, the Board contends that, even if

taxes contemplated by Act 181 offset the salary raises, a law allowing the Governor to spend

outside the certified budget is inconsistent with PROMESA and thus is preempted because it

would undermine the FOMB's budgetary authority.  (Id. at 35-36 (quoting Vázquez Garced, 945

F.3d at 8 ("Simply put, if a certified budget is to have 'full force and effect,' there can be no

spending from sources not listed in that budget, regardless of what any territorial laws say."), and

citing Law 29 II, 616 B.R. at 249).)  The Court finds that Act 181 violates section 204(c), both

because it will likely require reprogramming, and because it purports to spend funds from a

source not listed in any certified budget by creating the 3% Tax.

In its Law 29 II decision, this Court rejected the notion that there is any

meaningful distinction between reprogramming and a revenue deficiency in the budget that the

Government would likely need to remedy through reprogramming, and the Court does so again

here.  See Law 29 II, 616 B.R. at 249.  The Government may not avoid the bar on

implementation of statutes calling for unauthorized reprogramming by holding onto its cards and

waiting until a post-implementation date to request reprogramming if the law as written is likely

to require reprogramming due to insufficiency of budgeted funds.  Here, the Government's Act

181 Certificate indicates that, should the 3% Tax and inspection revenues not cover the cost of

Act 181, and it appears from the record that they do not, the Government will formally request

reprogramming or stop paying the salary increase.  (Gov. Resp. to SOF ¶ 50.)  If the Government

does not stop paying the increased salaries, the statute creates a spending deficit that will likely

need to be remedied through reprogramming.  (Docket Entry No. 31-1 in Adversary Proceeding

No. 20-00084.)  Given that the Government did not seek or obtain an Oversight Board-approved

reprogramming, the implementation of Act 181 violates section 204(c) of PROMESA.

Accordingly, because the undisputed facts establish that Act 181 creates a revenue

deficiency in the budget that the Government would likely need to remedy through

reprogramming that has been neither requested nor authorized, Act 181 is in violation of section

204(c) of PROMESA, and the Oversight Board is entitled to summary judgment in its favor on

Counterclaim IV.[32]  The Government is enjoined, under sections 104(k) and 204(c) of

PROMESA, from implementing and enforcing Act 181.  See Law 29 II, 616 B.R. at 248

("Section 204(a)(5) allows the Oversight Board to prevent the application or enforcement of a

law when the Commonwealth government fails to comply with a direction given by the

Oversight Board pursuant to section 204(a)(4) of PROMESA.").[33]  The Court denies summary

judgment on all counterclaims seeking nullification of Act 181 because the Oversight Board has

not demonstrated that such drastic relief is warranted under these particular circumstances.[34]

---

[32]    Nor has the Government demonstrated that it lacks access to any genuinely disputed
material fact necessary to oppose the Oversight Board's Motion, such that discovery
under Rule 56(d) of the Federal Rules of Civil Procedure would be appropriate.  See In re
PHC, 762 F.3d at 143.

[33]    The Court's grant of injunctive relief could be revisited if there emerge any significant
changes in legal or factual conditions as to make such relief equitable.  See Agostini, 521
U.S. at 215-16 (recognizing appropriateness of relief from an injunction under Rule
60(b)(5) of the Federal Rules of Civil Procedure where Movant shows a significant
change in factual conditions, statutory law, or decisional law); Sierra Club, 732 F.2d at
256 (noting that "a court may modify a final or permanent injunction only where
conditions have so changed as to make such relief equitable, i.e., a significant change in
the law or facts").

[34]    Given the foregoing conclusions, and as set forth in the accompanying Order to Show
Cause Regarding Dismissal of Remaining Claims and Counterclaims, the parties are
directed to show cause in writing as to why the Court should not dismiss the following
counts and counterclaims as moot or otherwise for lack of subject matter jurisdiction:
Count I of the Act 181 Complaint, which seeks a declaratory judgment that the Act 181
Certificate satisfies the requirements of section 204(a) of PROMESA, that the Oversight
Board cannot prevent enforcement of the law, and that any unilateral determinations by

F.  <u>Act 47 (Adversary Proceeding No. 20-00085) – Section 108(a)(2) of
PROMESA</u>

With respect to Act 47, which expands the number of healthcare professionals

who are eligible for incentive tax benefits without providing any offsetting cost savings, the

Oversight Board seeks summary judgment in its favor on Count II of the Act 47 Complaint and

on Act 47 Counterclaim III, arguing that the "estimated" loss of revenue associated with Act 47

"would impair the Commonwealth's ability to attain fiscal stability and market access," in

violation of section 108(a)(2) of PROMESA.  (Act 47 MSJ at 26 (citing Gov. Resp. to SOF ¶ 81;

Jaresko Decl. ¶ 163; Docket Entry No. 1-6 in Adversary Proceeding No. 20-00085, at 3).)  The

Oversight Board further argues that the loss of revenue would "undermine the Oversight Board's

revenue projections, enlarge deficits, make it more difficult to achieve fiscal targets, and

diminish funds that the Commonwealth can use to promote economic growth."  (<u>Id.</u> (citing

PROMESA §§ 201(b)(1)(A), (D), (G), (I), (J); SOF ¶ 82; Jaresko Decl. ¶ 164; Docket Entry No.

1-6 in Adversary Proceeding No. 20-00085, at 3).)  Based on its determination that the loss of

tens of millions of dollars would defeat or impair PROMESA's purposes, which was

communicated to the Government in the course of correspondence concerning section 204(a)

compliance, the Oversight Board seeks an order enjoining the implementation and enforcement

---

the Oversight Board of noncompliance with section 204(a) are non-binding; Count II of
the Act 181 Complaint, which seeks a declaratory judgment that the Oversight Board
cannot unilaterally enjoin the implementation of Act 181 under section 108(a)(2) of
PROMESA; Act 181 Counterclaim I, which seeks nullification of Act 181 under section
104(k) of PROMESA for failure to satisfy section 204(a) of PROMESA; Act 181
Counterclaim II, which seeks a preliminary and permanent injunction under sections
104(k) and 204(a)(5) of PROMESA barring the implementation of Act 181; Act 181
Counterclaim III, which seeks nullification of Act 181 under section 104(k) of
PROMESA for failure to satisfy section 204(c) of PROMESA; and Act 181 Counterclaim
V, which seeks an injunction barring implementation of Act 181 for failing to satisfy
section 108(a)(2) of PROMESA.

of Act 47.  (Id. at 22, 26-27 (citing Law 29 II, 616 B.R. at 254-55).)  In its letter of May 21,

2020, the Board cited the inconsistency of the revenue deficit with the revenue neutrality

principle established by the fiscal plan, among other issues; stated that it had determined that the

loss of revenue associated with implementing Act 47 "would impair and defeat the purposes of

PROMESA"; and advised that Act 47 "must not be implemented at this time."  (Docket Entry

No. 1-5 in Adversary Proceeding No. 20-00085.)  As the Jaresko Declaration explains in support

of the Board's determination, the Board reasons that Act 47 would violate the revenue neutrality

principle as set forth in the 2019 Fiscal Plan, impair the Commonwealth's ability to attain fiscal

stability and market access, undermine the Oversight Board's revenue projections, enlarge

deficits, make it more difficult to achieve fiscal targets, and diminish funds the Commonwealth

can use toward growth.  (Jaresko Decl. ¶¶ 157, 159, 163-65.)  The same letter informed the

Government that it was "enjoined" from implementing Act 47 because the Board had determined

that Act 47 would impair and defeat the purposes of PROMESA.  (Docket Entry No. 1-5 in

Adversary Proceeding No. 20-00085, at 3.)

            In its May 28, 2020, response, the Government objected to the Oversight Board's

"blanket incantation that 'implementation of Act 47-2020, prior to satisfaction of all Section 204

requirements, would impair and defeat the purposes of PROMESA,' and therefore the

Government is enjoined from implementing Act 47-2020 pursuant to PROMESA section

108(a)."  (Docket Entry No. 1-6 in Adversary Proceeding No. 20-00085, at 4.)  The Government

argued that the Law 29 decisions imposed a "rational basis" standard on the Oversight Board's

determinations, and that the Board's failure to substantiate its claims of significant

inconsistencies with the 2019 Fiscal Plan revealed the lack of a rational basis.  (Id. at 4.)  The

Oversight Board responded, in part, by threatening to "seek judicial relief" if the Government

failed to forgo implementing or revising Act 47. (Docket Entry No. 1-7 in Adversary Proceeding No. 20-00085, at 2.)

At the hearing on the instant summary judgment motions, counsel for the Oversight Board emphasized that Act 47 violates a specific requirement of revenue neutrality regarding tax measures, as set forth in Section 14.3.3 of the 2019 Fiscal Plan. (Hrg. Tr., Docket Entry No. 54 in Adversary Proceeding No. 20-00085, at 70:1-14; 120:16-121:15 (citing 2019 Fiscal Plan, at 124; 2020 Fiscal Plan, at 218)). That provision states as follows:

Principle of Revenue Neutrality

Puerto Rico needs to drive toward more formality and increased compliance within the tax base, but it cannot lose revenues in the process. Therefore, any tax reform or tax law initiatives that the Government undertakes or pursues during a year within the 2019 Fiscal Plan period must be revenue neutral, that is, all tax reductions must be accompanied by offsetting revenue measures of a sufficient amount identified in the enabling legislation. Each tax measure must also include confidence building elements, such as behavioral adjustments and reasonable capture rates. To ensure revenue neutrality, the implementation of any tax law initiatives must occur sequentially, with the Government ensuring that initiatives are paid for before rates are reduced. Enforcement mechanisms must be part of any tax initiative package to prevent a scenario where tax reductions are not accompanied by sufficient offsetting revenue measures identified in the enabling legislation.

(2019 Fiscal Plan, at 124; 2020 Fiscal Plan, at 218.)

The Court finds that the Oversight Board's determination under section 108(a)(2) regarding Act 47 was neither arbitrary or capricious, and that the Government's implementation violates section 108(a)(2). By identifying a contradiction between Act 47's tax revenue reductions and the express language of section 14.3.3 of the 2019 Fiscal Plan, the Oversight Board has substantiated its rational basis for asserting that Act 47 clearly contradicts PROMESA's expressed purpose of entrusting the Oversight Board with the sole responsibility of

establishing fiscal plans as part of "a method for a covered territory to achieve fiscal responsibility and access to the capital markets." 48 U.S.C.A. §§ 2121(a), 2141(b)(1) (Westlaw through P.L. 116-217). The fact that Act 47 has the undisputed potential to reduce revenues by about $200 million over five years by creating tax incentives with no offsets to make it revenue neutral renders its implementation a flagrant and significant deviation from section 14.3.3 of the 2019 Fiscal Plan. Since PROMESA charges the Oversight Board with providing a method for Puerto Rico to achieve fiscal responsibility and fiscal plans are a key instrument under PROMESA for the achievement of the statute's goals, it is neither arbitrary nor capricious for the Oversight Board to determine that a direct violation (at least of this magnitude of uncompensated revenue reduction) of a clear Fiscal Plan policy position does, in fact, impair or defeat PROMESA's purposes. 48 U.S.C.A. §§ 2121(a), 2141(b)(1) (Westlaw through P.L. 116-217).

Act 47 directly thwarts a fiscal responsibility method established by the Oversight Board, specifically the revenue neutrality principle as set forth in the 2019 Fiscal Plan, placing Act 47 into direct conflict with PROMESA's purpose of allowing the Board to establish a "method . . . to achieve fiscal responsibility and access to the capital markets." (Id.) Because the Oversight Board's determination that Act 47 violates section 108(a)(2) of PROMESA by violating the revenue neutrality principle within the 2019 Fiscal Plan is neither arbitrary nor capricious, and because the underlying contradiction undermines the Oversight Board's "method . . . to achieve fiscal responsibility and access to the capital markets" which PROMESA indicates is the purpose for the Oversight Board, injunctive relief is appropriate under section 108(a)(2).

For the foregoing reasons, the Oversight Board's motion for summary judgment is granted with respect to Count II of the Act 47 Complaint and Act 47 Counterclaim III. The

Court holds that the Board has shown a rational basis to support its determination that Act 47 violates section 108(a)(2) of PROMESA and that its reasoning is supported by substantial evidence in the form of the estimation of the magnitude of the likely impact and the specific revenue-neutrality provision of the 2019 and 2020 Fiscal Plans.[35]  As a result, the Government is enjoined, under sections 104(k) and 108(a)(2) of PROMESA, from implementing and enforcing Act 47.[36]  The Court denies summary judgment on all counterclaims seeking nullification of Act 47 because the Oversight Board has not demonstrated that such drastic relief is warranted under these particular circumstances.[37]

---

[35]  Nor has the Government demonstrated that it lacks access to any genuinely disputed material fact necessary to oppose the Oversight Board's Motion, such that discovery under Rule 56(d) of the Federal Rules of Civil Procedure would be appropriate.  See In re PHC, 762 F.3d at 143.

[36]  The Court's grant of injunctive relief could be revisited if there emerge any significant changes in legal or factual conditions as to make such relief equitable.  See Agostini, 521 U.S. at 215-16 (recognizing appropriateness of relief from an injunction under Rule 60(b)(5) of the Federal Rules of Civil Procedure where Movant shows a significant change in factual conditions, statutory law, or decisional law); Sierra Club, 732 F.2d at 256 (noting that "a court may modify a final or permanent injunction only where conditions have so changed as to make such relief equitable, i.e., a significant change in the law or facts").

[37]  Given the foregoing conclusions, and as set forth in the accompanying Order to Show Cause Regarding Dismissal of Remaining Claims and Counterclaims, the parties are directed to show cause in writing as to why the Court should not dismiss the following count and counterclaims as moot or otherwise for lack of subject matter jurisdiction: Count I of the Act 47 Complaint, which seeks a declaratory judgment that the Act 47 Certificate satisfies the requirements of section 204(a) of PROMESA, that the Oversight Board cannot prevent enforcement of the law, and that any unilateral determinations by the Oversight Board of noncompliance with section 204(a) are non-binding; Act 47 Counterclaim I, which seeks nullification of Act 47 under section 104(k) of PROMESA for failure to satisfy section 204(a) of PROMESA; and Act 47 Counterclaim II, which seeks a preliminary and permanent injunction under sections 104(k) and 204(a)(5) of PROMESA barring the implementation of Act 47.

IV.

<span style="text-align:center">CONCLUSION</span>

For the foregoing reasons, the Oversight Board is entitled to summary judgment

dismissing Count I of the Act 82 and 138 Complaints (Docket Entry No. 1 in Adversary

Proceeding No. 20-00080 ¶¶ 46-51, and Docket Entry No. 1 in Adversary Proceeding No. 20-

00082 ¶¶ 46-51), and Count II of the Act 176 and 47 Complaints (Docket Entry No. 1 in

Adversary Proceeding No. 20-00083 ¶¶ 49-51, and Docket Entry No. 1 in Adversary Proceeding

No. 20-00085 ¶¶ 58-60), and to judgment as a matter of law with respect to Act 138

Counterclaim II (Docket Entry No. 5 in Adversary Proceeding No. 20-00082 ¶¶ 40-48), Act 82

Counterclaim II (Docket Entry No. 5 in Adversary Proceeding No. 20-00080 ¶¶ 40-48), Act 176

Counterclaim III (Docket Entry No. 6 in Adversary Proceeding No. 20-00083 ¶¶ 31-47), Act 47

Counterclaim III (Docket Entry No. 5 in Adversary Proceeding No. 20-00085 ¶¶ 36-51), and Act

181 Counterclaim IV (Docket Entry No. 6 in Adversary Proceeding No. 20-00084 ¶¶ 41-50).

The Government's Motions for Summary Judgment are denied in their entirety, as are the

remaining aspects of the Oversight Board's Motions for Summary Judgment.  The Government

is hereby enjoined from implementing and enforcing Acts 82, 138, 176, 181, and 47.[38]  The

accompanying *Order to Show Cause Regarding Dismissal of Remaining Claims and

Counterclaims* directs the parties to show cause as to why, in light of the foregoing analysis and

decision, the remaining counts and counterclaims should not be dismissed as moot or otherwise

---

[38]     This Court has also reviewed, and now grants, the COOPHARMA Amicus Motion,
because COOPHARMA has shown that it has a special interest that justifies permitting it
to be heard on this motion practice.  See Strasser v. Doorley, 432 F.2d 567, 569 (1st Cir.
1970); In re Fin. Oversight & Mgmt. Bd. for P.R., 361 F. Supp. 3d 203, 216 n.10 (D.P.R.
2019).

for lack of subject matter jurisdiction.[39]

This Opinion and Order resolves Docket Entry No. 14 in Adversary Proceeding No. 20-00080; Docket Entry Nos. 12 and 28 in Adversary Proceeding No. 20-00082; Docket Entry Nos. 13 and 29 in Adversary Proceeding No. 20-00083; Docket Entry No. 13 in Adversary Proceeding No. 20-00084; Docket Entry No. 12 in Adversary Proceeding No. 20-00085; and Docket Entry No. 15238 in Case No. 17-3283.


SO ORDERED.

Dated: December 23, 2020

/s/ Laura Taylor Swain
LAURA TAYLOR SWAIN
United States District Judge

---

[39] The remaining claims are, (i) in Adversary Proceeding No. 20-00080, Count II of the Act 82 Complaint and Act 82 Counterclaims I, III, IV, and V (Docket Entry Nos. 1 and 5); (ii) in Adversary Proceeding No. 20-00082, Count II of the Act 138 Complaint and Act 138 Counterclaims I and III (Docket Entry Nos. 1 and 5); (iii) in Adversary Proceeding No. 20-00083, Count I of the Act 176 Complaint and Act 176 Counterclaims I and II (Docket Entry Nos. 1 and 6); (iv) in Adversary Proceeding No. 20-00084, Counts I and II of the Act 181 Complaint, as well as Act 181 Counterclaims I, II, III, and V (Docket Entry Nos. 1 and 6); (v) in Adversary Proceeding No. 20-00085, Count I of the Act 47 Complaint, as well as Act 47 Counterclaims I and II (Docket Entry Nos. 1 and 5).