# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

In re:

THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO,

as representative of

THE COMMONWEALTH OF PUERTO RICO,

Debtor.[1]

PROMESA
Title III

No. 17 BK 3283-LTS
(Jointly Administered)

## REPLY OF AMBAC ASSURANCE CORPORATION TO THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO'S OPPOSITION TO MOTION FOR AN ORDER DIRECTING CASH RULE 2004 DISCOVERY

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (the "Commonwealth") (Bankruptcy Case No. 17-BK-3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17-BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5233-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ................................................................................................. 1

ARGUMENT ......................................................................................................................... 3

I.     THE BOARD HAS NOT CARRIED ITS BURDEN OF DEMONSTRATING
THAT THE PROCESS DOCUMENTS ARE IRRELEVANT, PRIVILEGED, OR
UNDULY BURDENSOME TO PRODUCE. ................................................................... 3

     A.    The Process Documents Are Plainly Relevant. ...................................................3

     B.    The Board Has Not Satisfied Its Burden of Demonstrating That Production
of the Process Documents Is Unduly Burdensome..................................................5

     C.    The Board's Privilege Objections Are Misplaced. ..................................................7

          1.    The Involvement of the Board's Counsel in the Cash Restriction
Analysis Does Not Immunize the Analysis from Discovery. ......................7

          2.    Any Applicable Privilege or Work Product Protection Has Been
Waived. ....................................................................................................9

          3.    Ambac Has a Substantial Need for the Process Documents.....................11

          4.    At a Minimum, the Court Cannot Resolve These Privilege
Disputes on the Basis of the Limited, Conclusory Assertions the
Board Has Provided. ................................................................................11

II.    THE BOARD'S LAST-MINUTE PRODUCTION DOES NOT MOOT THE
DISPUTE REGARDING CALCULATION BACK-UP...................................................12

CONCLUSION....................................................................................................................... 13

i

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Galvin v. Pepe*,
 2010 WL 3092640 (D.N.H. Aug. 5, 2010) ..............................................................8

*Greater Newburyport Clamshell All. v. Pub. Serv. Co. of N.H.*,
 838 F.2d 13 (1st Cir. 1988)..............................................................................10

*In re Tyco Int'l Ltd. Multidistrict Litig.*,
 2007 WL 710188 (D.N.H. Mar. 7, 2007) ..............................................................10

*Puerto Rico Elec. Power Auth. v. Vitol, Inc.*,
 2013 WL 12234272 (D.P.R. June 21, 2013)..........................................................11

*Puerto Rico Med. Emergency Grp., Inc. v. Iglesia Episcopal Puertorriqueña, Inc.*,
 318 F.R.D. 224 (D.P.R. 2016) ..........................................................................6

*Republic of Ecuador v. Mackay*,
 742 F.3d 860 (9th Cir. 2014) ............................................................................8

*United States ex rel. Wall v. Vista Hospice Care*,
 319 F.R.D. 498 (N.D. Tex. 2016) ......................................................................9

*Vicor Corp. v. Vigilant Ins. Co.*,
 674 F.3d 1 (1st Cir. 2012)................................................................................12

**Other Authorities**

Fed. R. Civ. P. 26(b)(4)(C) ............................................................................2, 8, 9

To the Honorable United States Magistrate Judge Judith G. Dein:

Ambac respectfully submits this reply in further support of its *Motion for an Order Directing Cash Rule 2004 Discovery from the Financial Oversight and Management Board for Puerto Rico* (ECF No. 15220) (the "<u>Motion</u>" or "<u>Mot.</u>")[2] and in response to the Board's *Objection to Motion by Ambac Assurance Corporation for an Order Directing Cash Rule 2004 Discovery* (ECF No. 15495) (the "<u>Opposition</u>" or "<u>Opp.</u>").

## <u>PRELIMINARY STATEMENT</u>

1.     The Board's arguments against the production of Process Documents rest on conclusory and disputed factual assertions that, even if true, would not justify the Board's broad refusal to produce any of the Process Documents.  The Board's objections should be overruled.

2.     **Relevance.**  The Board admits that it intends to rely on the most up-to-date version of the cash restriction analysis in the forthcoming "contested plan of adjustment" litigation.  (Opp. ¶ 35.)  Given this admission, the Board's suggestion that creditors are entitled to discovery only into raw data on cash restrictions (and not into the Board's analysis of them) is meritless.  The Process Documents that Ambac requests are needed to make sense of the raw data, particularly given the volume of raw data produced and the limited timeframe creditors will have to analyze it.  The Board's argument that only the most recent version of the cash restriction analysis is relevant is also misplaced.  The various iterations of the cash restriction analysis build on each other; it is impossible to understand the current version without discovery into the prior versions.

3.     **Undue Burden.**  The Board's conclusory assertions of "burden" are insufficient to demonstrate an undue burden—and burden issues are not ripe for judicial resolution in any event.

---

[2] Unless otherwise indicated, all ECF numbers referenced in this motion refer to the docket in Case No. 17 BK 3283-LTS.  Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Motion.

Ambac filed this Motion because the Board flatly refused during the meet-and-confer process to produce *any* Process Documents.  The Board is asking the Court here to rule categorically that no Process Documents should be produced.  If the Court disagrees with the Board's contention that Process Documents are categorically exempt from discovery, the Court should direct Ambac and the Board to meet-and-confer to identify an appropriate scope for the production, including the use of appropriately targeted search parameters.

4.  **Privilege.**  The Board rests largely on conclusory characterizations of how the cash restriction analyses were prepared to support its claim of privilege.  These characterizations are disputed as a factual matter and, in any event, are irrelevant.  The Board's Opposition makes explicit that the Board intends to rely on the cash restriction analysis in contested plan confirmation proceedings, putting it forward as a kind of expert analysis of the Commonwealth's available cash.  Settled principles governing the discoverability of expert analysis provide a roadmap for how the Court should resolve the privilege dispute.  Expert conclusions—and assumptions and methodologies—are subject to discovery.  While most communications between lawyers and nonlawyer experts are not discoverable, when lawyers provide "assumptions" that nonlawyers rely on, the communications providing those "assumptions" are discoverable.  Fed. R. Civ. P. 26(b)(4)(C)(iii).  The Board's Opposition suggests that the Board's lawyers provided myriad assumptions (about legal restrictions) that the Board's nonlegal advisors then relied on in preparing the cash restriction analysis.  Simply applying well-settled rules to this context, those assumptions are discoverable and the documents reflecting them must be produced—to enable Ambac to understand what aspects of the cash restriction analysis reflect nonlawyer judgment and what aspects of it are based on assumptions provided by lawyers.

- 2 -

5.     **Calculation Back-Up.**   The Board does not contest Ambac's request for Calculation Back-Up.  As described below, the Board's belated production—of information that the Board steadfastly refused to produce for months—does not moot Ambac's request.  Because that portion of the Motion is uncontested, and to avoid further delays, the Court should grant Ambac's request for Calculation Back-Up and confirm Ambac's entitlement to any additional responsive documents the Board may have.

## ARGUMENT

**I.     THE BOARD HAS NOT CARRIED ITS BURDEN OF DEMONSTRATING THAT THE PROCESS DOCUMENTS ARE IRRELEVANT, PRIVILEGED, OR UNDULY BURDENSOME TO PRODUCE.**

**A.     The Process Documents Are Plainly Relevant.**

6.     The Board argues that the cash restriction analysis is irrelevant.  In the Board's view, Ambac is entitled only to raw factual data about the Commonwealth's financial condition, not discovery into the Board's analysis of that data.  (*See* Opp. ¶ 26.)  This argument is wrong for two reasons.

7.     *First*, the Process Documents that Ambac requests contain critical information and context regarding the raw factual data.  The Board's advisors did not—and plainly could not— reach conclusions about cash restrictions from raw data alone.  Among other things, they had the benefit of numerous communications with Commonwealth entities to understand the raw data and how to properly categorize and analyze it.  Without that context, it would be difficult, if not impossible, for Ambac and other creditors to make heads or tails of the raw data.

8.     This is particularly true given the volume of raw data and the limited timeframe creditors will have to analyze it.  The raw data the Board's advisors analyzed consists of more than 14,600 documents (more than 200,000 pages of material), much of it in Spanish.  The volume of this material is such that it took the Board's advisors more than a year just to produce the first

iteration of their analysis.  At this point, the Board has been refining its analysis for more than

three years (Duff & Phelps was originally retained in January 2018).  The Board knows well that,

without a targeted set of Process Documents, Ambac and other creditors will not be able to

efficiently conduct their own analysis of the raw data—certainly not on the highly expedited

timeframe for plan confirmation that the Court will set once the Board files a new plan of

adjustment or term sheet on February 10, 2021.[3]

9.      *Second*, the Board concededly intends to put the cash restriction analysis directly

at issue in the upcoming "litigation regarding a contested plan of adjustment."  (Opp. ¶ 35; *see

also id.* ¶ 15.)  Because there is no question that the Board will rely on the cash restriction analysis

when plan confirmation proceedings commence, the analysis itself is a proper subject for

discovery.  Given the expedited timeline that the Court previously set for plan confirmation,

Ambac cannot wait until plan confirmation proceedings for the Board to produce critical

discovery.  Ambac and the Board need to make progress on this discovery now.

10.     The Board tries to chop the various iterations of the cash restriction analysis into

discrete pieces, arguing that it will not rely on the *previous* iterations of the cash restriction analysis

when plan confirmation proceedings commence.  (*Id.* ¶ 4.)  But each of the Published Reports are

steps along the way in the cash restriction analysis the Board's advisors have undertaken.  The

analysis has been iterative, and updated over time—including with work performed by different

advisors.  As a result, discovery into the various iterations is necessary to understand the current

version.  In many instances, determinations about restrictions may have been made in the original

---

[3] *Cf. Order (I) Scheduling a Hearing to Consider the Adequacy of Information Contained in the Disclosure
Statement, (II) Establishing the Deadline for Filing Spanish Translation of the Disclosure Statement, (III)
Establishing the Deadline for Filing Objections to the Disclosure Statement and Replies Thereto, and (IV)
Granting Related Relief*, March 10, 2020 [ECF No. 12187] at 3 (original confirmation schedule, setting the
deadline for objections to the Disclosure Statement for April 24, 2020 and the hearing for June 3 and June
4, 2020).

iteration of the cash restriction analysis (the Duff & Phelps Report) and never revisited in subsequent iterations—so the only way to understand the restriction determinations is through discovery into the original iteration.

11.    Prior iterations of the cash restriction analysis are relevant for the additional reason that changes in the Board's determinations regarding restrictions will be critical disputed issues at the plan confirmation stage.  Among other questions that the Court will need to confront are: (i) why substantial increases in the Commonwealth's cash balances have not translated into increased cash available for distribution to creditors; (ii) why *restricted* cash increased by approximately $2.6 billion from June 30, 2019 to June 30, 2020; and (iii) why the Commonwealth and the Board previously attacked restrictions on certain COFINA-related cash that, by almost every measure, was at least as "restricted" as any current Commonwealth cash.  A comparison of prior versions of the cash restriction analysis to the current version will shed light on these issues.

### B.    The Board Has Not Satisfied Its Burden of Demonstrating That Production of the Process Documents Is Unduly Burdensome.

12.    The Board asserts that, if Ambac obtains "without limitation" every single communication the Board's nonlawyer advisors ever had, "the Board [would have] to review over 70,000 documents."  (Opp. ¶ 29.)  This assertion distorts Ambac's request and is based on a misunderstanding of what is before the Court on this Motion.  The Board's position during the meet-and-confer process was a flat-out refusal to produce *any* Process Documents.[4]   In its Opposition, the Board again takes the position that Ambac's request should be categorically denied.  Because the Board refused to produce any Process Documents, Ambac and the Board

---

[4] (*See* Ex. R, Ltr. from the Board to Ambac, dated Sept. 29, 2020, at 1-2); *Joint Status Report of Movant Ambac Assurance Corporation and Respondents the Financial Oversight and Management Board for Puerto Rico, as Representative of the Commonwealth of Puerto Rico, and the Puerto Rico Fiscal Agency and Financial Advisory Authority with Respect to the Rule 2004 Motions* [ECF No. 14438], dated Sept. 30, 2020, at 6.

never discussed the *scope* of any search that the Board might undertake. Such "scope" objections are thus not ripe for resolution. If the Court does not agree with the Board's position—that Ambac is entitled to nothing—then Ambac and the Board would need to separately meet-and-confer about search parameters (and raise any disputes with the Court at that time, in the event they were unable to agree on a reasonable scope).

13.    Ambac notes that, if anything, the Board's ability to suddenly calculate for its Opposition that there are 70,000 hits only underscores that the documents Ambac is seeking can readily be collected and searched. The Board did not mention this 70,000-document figure at any point during the meet-and-confer process, nor does its Opposition disclose how it was derived. But the Board has told Ambac (in connection with other requests) that it has a master repository of documents and emails that are collected for these Title III cases generally. (*See* Mot. Ex. Q, Ltr. from Ambac to the Government, dated Aug. 17, 2020, at 5.) The undeniable inference is that the Board queried its pre-existing electronic database of documents—presumably using broad search terms and an expansive list of custodians—to come up with 70,000 search term "hits."

14.    That the documents appear to have been already collected and so easily searchable underscores that there is no undue burden involved in producing them. Ambac and the Board can meet-and-confer about targeted search terms, custodian limitations, and date ranges to efficiently identify the most relevant material—mindful of the need to balance the legitimate needs of Ambac and other creditors for discovery with cost, burden, and proportionality considerations. This is essentially what the Court has previously ordered the Parties to do.[5] The Board, however, simply

---

[5] *See, e.g.*, Memorandum Order (ECF No. 10332) at 9-10 (authorizing Ambac to seek Rule 2004 discovery regarding the Commonwealth's cash and directing the Parties' to "meet and confer in good faith . . . . to identify parameters for" authorized discovery); *see also, e.g.*, *Puerto Rico Med. Emergency Grp., Inc. v. Iglesia Episcopal Puertorriqueña, Inc*., 318 F.R.D. 224, 229 (D.P.R. 2016) (granting in part motion to compel and encouraging the parties "to communicate regarding the scope of the [discovery] required").

refused to engage on the topic of Process Documents, instead asserting that they are categorically not subject to discovery—which is what necessitated this Motion.

### C. The Board's Privilege Objections Are Misplaced.

#### 1. The Involvement of the Board's Counsel in the Cash Restriction Analysis Does Not Immunize the Analysis from Discovery.

15.     The Board does not dispute that it has at least some non-privileged material responsive to Ambac's request for Process Documents, including, among others, communications with third parties outside the zone of privilege.  Its assertion of privilege rests entirely on the theory that, because the Board's lawyers "were closely involved in the cash restriction analyses," it is impossible to disaggregate legal work product from nonlawyer work.  (Opp. ¶ 3; *see also id.* ¶¶ 31-36.)  This theory does not withstand even a modicum of scrutiny.

16.     As the Board's Opposition makes explicit, the Board plans to use "its cash restriction analysis in conjunction with the filing of a further amended plan of adjustment." (*Id.* ¶ 15; *see also id.* ¶ 35.)  The Board intends for the analysis to serve the same function as an expert report—summarizing the Board's analysis as to why almost none of the approximately $25 billion the Commonwealth has in the bank is available to pay creditors.  December 2020 Presentation[6] at 7.  Given the Board's admitted plans to use the analysis in this way, the normal rules governing discovery of expert analysis should guide the Court in resolving this privilege dispute.  Lawyers often are "closely involved in" work by experts (Opp. ¶ 3), with the final work product reflecting input from lawyers.

17.     The normal rules that govern the boundaries of expert discovery make clear that the Board's broad assertion of privilege here should be rejected.  Lawyers' strategic communications

---

[6] "December 2020 Presentation" refers to *Creditor Mediation Cash Support Materials* distributed in connection with the December 17, 2020 mediation session and made public on December 19, 2020, *available at* https://emma.msrb.org/P11450397-P11124337-P11535399.pdf.

with experts are ordinarily not discoverable—and for that reason, Ambac is not seeking those. (Mot. ¶ 32.)  But the conclusions an expert reaches and the methodologies used ordinarily are discoverable.  *See Republic of Ecuador v. Mackay*, 742 F.3d 860, 869-70 (9th Cir. 2014).  And certain communications between counsel and an expert are discoverable—particularly, communications "identify[ing] facts[,] data . . . [or] *assumptions that [a] party's attorney provided and that the expert relied on in forming the opinions to be expressed*."  Fed. R. Civ. P. 26(b)(4)(C)(ii)-(iii) (emphasis added); *see also Galvin v. Pepe*, 2010 WL 3092640, at *4-5 (D.N.H. Aug. 5, 2010) (ordering disclosure of lawyer communications where expert considered the communications in formulating its opinion).  Ambac's request for Process Documents simply seeks documents of this nature—the process, or methods, used to create the cash restriction analysis and any "assumptions" relied on.

18.     In its Opposition, the Board claims that huge swaths of the cash restriction analysis are based on lawyer-driven assumptions.  For instance, the Board contends that the Board's "[c]ounsel made assessments as to which accounts were subject to legal restrictions based on information provided by accountholders in support of alleged restrictions and legal research and analysis[,]" and that its "[l]egal and financial advisors then together prepared summaries regarding total unrestricted and restricted cash."  (Opp. ¶ 12.)

19.     The Board seems to think this cuts against Ambac's request and cloaks the work of the Board's nonlawyers advisors in privilege—but in fact it means the opposite.  The "assumptions" the Board's lawyers provided and "that the expert relied on" in reaching conclusions are discoverable.  Fed. R. Civ. P. 26(b)(4)(C)(iii).  Litigants and the Court need to understand what aspects of an "analysis" that is being put forward are based on some kind of nonlegal judgment and expertise, and which portions of it are based on "assumptions" provided

by counsel—the validity of which the Court must evaluate independently. *Cf. United States ex rel. Wall v. Vista Hospice Care*, 319 F.R.D. 498, 502 (N.D. Tex. 2016) (where lawyers draft "significant portions" of an expert analysis, then the "lawyer-expert communication . . . must be disclosed under Rule 26(a)(2)(B) and is discoverable under Rule 26(b)(4)(C)(ii) and (iii)").

20.     To be clear, Ambac is not seeking the Board's internal legal memoranda or strategic discussions with nonlawyers regarding the overall approach to the restriction analysis. Rather, Ambac's request is simply for documents that make clear what process the nonlawyers followed in reaching determinations about restrictions—including any choices nonlawyers made about which assumptions to rely on and why. If it is indeed the case that the nonlawyers did nothing more than mechanically apply assumptions provided to them by the Board's lawyers, then the Board should produce documents showing as much.

21.     The Board's suggestion that it would be too "difficult to untangle" privileged and non-privileged documents is also meritless. (*See* Opp. ¶ 3; *see also id.* ¶¶ 29-30.) Litigants in complex litigation matters like this one routinely review documents to determine which are privileged and which are not. The Board has already made a number of productions in these Title III cases that required a privilege review. With an appropriately narrow and targeted scope for review, there is no reason why a privilege review—which is routine, indeed, a matter of course in discovery—presents an undue burden.

## 2.     Any Applicable Privilege or Work Product Protection Has Been Waived.

22.     The Board's argument against waiver does not meaningfully grapple with the subject-matter waiver doctrine. The subject matter that the Board has voluntarily disclosed is its cash restriction analysis. The Process Documents that Ambac seeks fall squarely within that subject. The Board does not show otherwise.

23.     In arguing that subject-matter waiver is inapplicable here, the Board relies on a case involving disclosures made "in SEC filings rather than a judicial proceeding." *In re Tyco Int'l Ltd. Multidistrict Litig.*, 2007 WL 710188, at *1 (D.N.H. Mar. 7, 2007).  That case merely applied the principle that "*extrajudicial* disclosure of attorney-client communications, not thereafter used by the client to gain adversarial advantage in judicial proceedings cannot work an implied waiver[.]" *Id.* (emphasis added) (internal quotation marks omitted) (quoting *XYZ Corp. v. United States (In re Keeper of the Records)*, 348 F.3d 16, 24 (1st Cir. 2003)).  That principle has no relevance here, because the Board disclosed the cash restriction analysis to creditors directly in the context of this litigation—and admits that it will put the cash restriction analysis directly at issue during contested plan confirmation proceedings.

24.     The Board also contends that implied waiver is inappropriate because "the Oversight Board has not affirmatively used the 2019 Analyses in litigation, and it does not plan to do so, as they have long since been superseded" by subsequent iterations of the cash restriction analysis.  (Opp. ¶ 47.)  But the Board does not dispute that the cash restriction analyses are iterative and cumulative, with more recent analyses based in large part on the prior versions.  (*See, e.g.*, Amended Disclosure Statement (ECF No. 11947) at 105-06 (Board "leveraged and enhanced procedures noted in the [Duff & Phelps Report] to rollforward [account] balances to the" measurement date used in the Amended Disclosure Statement).)  Given that, creditors are entitled to discovery into all the iterations of the analysis, which are necessary to understand the final version—as well as the changes over time.  "[A] privileged party cannot fairly be permitted to disclose as much as he [or she] pleases and then to withhold the remainder to the detriment of the [other party]."  *Greater Newburyport Clamshell All. v. Pub. Serv. Co. of N.H.*, 838 F.2d 13, 20 (1st

Cir. 1988); *Puerto Rico Elec. Power Auth. v. Vitol, Inc.*, 2013 WL 12234272, at *6 (D.P.R. June 21, 2013).

### 3. Ambac Has a Substantial Need for the Process Documents.

25.    As shown above, the Process Documents are not privileged or work product.  Even if they were work product, moreover, Ambac has a substantial need for the documents.  The Board argues that Ambac "can review [the raw data] and reach its own conclusions as to whether funds are restricted."  (Opp. ¶ 50.)  But as shown above, without the benefit of the Process Documents, Ambac and other creditors cannot meaningfully recreate the analysis the Board's advisors prepared or reach their own conclusions about it.  The Board was able to create that analysis only with the benefit of countless non-privileged communications and procedures that Ambac and other creditors do not have.  The Process Documents are thus critical to fill a gap and allow creditors to actually recreate the Board's analysis and reach their own conclusions.

26.    Ambac is not seeking counsel's mental impressions, only Process Documents— documents reflecting the process the Board's nonlawyer advisors used to reach certain conclusions, or documents showing the "assumptions" the Board's counsel provided and which nonlawyers relied on—not strategic communications or mental impressions that go beyond what the Board's nonlawyer advisors relied on to create the cash restriction analysis.

### 4. At a Minimum, the Court Cannot Resolve These Privilege Disputes on the Basis of the Limited, Conclusory Assertions the Board Has Provided.

27.    The Board's failure to provide a privilege log precludes the Court from upholding the Board's claim of privilege on the current record.  The Board offers nothing more than conclusory assertions and argumentative characterizations about how the cash restriction analysis was prepared—entirely untethered to any actual Process Documents at issue.  This Court cannot resolve privilege disputes on nothing more than a litigant's unsupported say-so.  The Board has

the burden of proving its claims of privilege, not merely asserting them. *Vicor Corp. v. Vigilant Ins. Co.*, 674 F.3d 1, 17 (1st Cir. 2012) ("The party asserting the attorney-client or work product privilege bears the burden of showing that the privilege applies.").

28.    The Board does not dispute that there is at least some non-privileged material responsive to Ambac's request for Process Documents.  Rather than forcing the Court to speculate in a vacuum as to how many (if any) of the Process Documents might be privileged, the Board should be required to review them and prepare a log articulating any assertions of privilege, in the normal course.  Ambac and the Board can then meet-and-confer regarding specific assertions of privilege and raise disputes to the Court as necessary for resolution on a full record.  Absent a privilege log, the Board's assertions of privilege should be deemed waived.  (Mot. ¶¶ 45-46.)

## II.    THE BOARD'S LAST-MINUTE PRODUCTION DOES NOT MOOT THE DISPUTE REGARDING CALCULATION BACK-UP.

29.    The Board does not expressly oppose the portion of Ambac's Motion seeking production of Calculation Back-Up, and it should be granted.

30.    The Board's belated production on December 20, 2020, of certain materials sought by Ambac does not moot Ambac's Motion.  Although the Board's December 20 production contains much of the information Ambac has been seeking in connection with the Published Reports, the production still lacks certain account identifiers that Ambac and its advisors need to track the account classifications over time.  Additionally, Ambac will require Calculation Back-Up related to the December 2020 Presentation, the latest iteration of the cash restriction analysis that was made publicly available after Ambac's Motion was filed.  Ambac assumes that producing these materials would not be controversial.

31.    Nevertheless, a formal court order compelling this discovery is necessary.  As the Board's belated production illustrates, the Board has been dragging its feet and refusing to comply

even with clearly reasonable requests for information—forcing Ambac to resort to the instant Motion to get basic data that the Board belatedly recognized it had no defensible basis for withholding.  Ambac's request for Calculation Back-Up never should have been controversial. Nevertheless, the Board refused to produce those documents in numerous meet-and-confers and forced Ambac to incur the expense of drafting the Motion—before flip-flopping when Ambac sought judicial relief.

32.     To avoid any further delays, the Court should grant this aspect of Ambac's Motion so that Ambac can obtain the remaining Calculation Back-Up documents that it needs.

## **CONCLUSION**

33.     In light of the foregoing, Ambac requests that this Court grant the Motion in its entirety and enter the Proposed Order attached as Exhibit A to the Motion.

Dated:  January 8, 2021
       San Juan, Puerto Rico

**FERRAIUOLI LLC**

By: /s/ *Roberto Cámara-Fuertes*
        Roberto Cámara-Fuertes (USDC-PR No.
        219002)
        Sonia Colón (USDC-PR No. 213809)
        221 Ponce de León Avenue, 5th Floor
        San Juan, PR 00917
        Telephone: (787) 766-7000
        Facsimile:  (787) 766-7001
        Email:  rcamara@ferraiuoli.com
                scolon@ferraiuoli.com

**MILBANK LLP**

By: /s/ *Atara Miller*
        Dennis F. Dunne (admitted *pro hac vice*)
        Atara Miller (admitted *pro hac vice*)
        Grant R. Mainland (admitted *pro hac vice*)
        John J. Hughes, III (admitted *pro hac vice*)
        Jonathan Ohring (admitted *pro hac vice*)
        55 Hudson Yards
        New York, NY 10001
        Telephone:  (212) 530-5000
        Facsimile:  (212) 530-5219
        Email:  ddunne@milbank.com
                amiller@milbank.com
                gmainland@milbank.com
                jhughes2@milbank.com
                johring@milbank.com

*Attorneys for Ambac Assurance Corporation*

- 14 -

## CERTIFICATE OF SERVICE

I hereby certify that, on this same date, I electronically filed the foregoing with the

Clerk of the Court using the CM/ECF system, which will send notification of such filing to all

CM/ECF participants in this case.

/s/ *Roberto Cámara-Fuertes*
Roberto Cámara-Fuertes (USDC-PR No. 219002)
221 Ponce de León Avenue, 5th Floor
San Juan, PR 00917
Telephone: (787) 766-7000
Facsimile:  (787) 766-7001
Email:  rcamara@ferraiuoli.com