```
 1                    UNITED STATES DISTRICT COURT

 2                    DISTRICT OF PUERTO RICO

 3
      Ambac Assurance            ) Docket No. 3:20-AP-00068(LTS)
 4    Corporation,               )
                                 )        in 3:17-BK-3283(LTS)
 5                Plaintiff,      )
                                 )
 6    v.                         )        January 12, 2021
                                 )
 7    The Financial Oversight and )
      Management Board for       )
 8    Puerto Rico,               )
                                 )
 9                               )
                     Defendant.  )
10
      _____
11

12                HEARING ON MOTION TO DISMISS CASE

13     BEFORE THE HONORABLE U.S. DISTRICT JUDGE LAURA TAYLOR SWAIN

14                UNITED STATES DISTRICT COURT JUDGE

15     _____

16    APPEARANCES:

17    ALL PARTIES APPEARING TELEPHONICALLY

18
      For The Commonwealth
19    of Puerto Rico, et al.:  Mr. Martin J. Bienenstock, PHV

20    For Puerto Rico Fiscal
      Agency and Financial
21    Advisory Authority:      Mr. Peter Friedman, PHV

22    For The Retiree
      Committee:               Mr. Ian Gershengorn, PHV
23
      For The U.S. Department
24    of Justice:              Mr. Bradley Humphreys, PHV

25
```

```
 1    APPEARANCES, Continued:

 2    For Ambac Assurance
      Corporation:                Ms. Elizabeth Prelogar, PHV
 3

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24    Proceedings recorded by stenography.  Transcript produced by
      CAT.
25
```

```
 1                          I  N  D  E  X

 2   WITNESSES:                                          PAGE

 3         None.

 4

 5   EXHIBITS:

 6         None.

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                                      San Juan, Puerto Rico

 2                                      January 12, 2021

 3                                      At or about 9:56 AM

 4                              *    *    *

 5          THE COURT:  Good morning.  This is Judge Swain

 6   speaking.

 7          MS. NG:  Good morning, Judge.  It's Lisa.  Everybody

 8   is here.

 9          THE COURT:  Thank you.

10          And, Ms. Tacoronte, would you please call the case?

11          COURTROOM DEPUTY:  Yes, Your Honor.

12          The United States District Court for the District of

13   Puerto Rico is now in session.  The Honorable Laura Taylor

14   Swain presiding.

15          AP case 20-6 --

16          THE COURT:  Ms. Tacoronte, I'm having difficulty

17   hearing you.

18          COURTROOM DEPUTY:  I'm sorry, Your Honor.  How about

19   now?

20          THE COURT:  That's much better.  Thank you.

21          COURTROOM DEPUTY:  Sure.

22          AP case --

23          THE COURT:  And so are you going to call the caption

24   of the adversary, also?

25          COURTROOM DEPUTY:  Yes, Your Honor.
```

1          *In re:   The Financial Oversight Board of Puerto Rico,*

2     *et al.*, Case No. 17-3283; AP Case No. 20-68, *Ambac Assurance*

3     *Corporation versus the Financial Oversight and Management*

4     *Board for Puerto Rico, et al.*, for hearing on motion.

5          THE COURT:   Thank you.

6          And buenos dias.   Welcome counsel, parties in

7     interest, and members of the public and press.   Today's

8     hearing is for oral argument on the defendants' Motion to

9     Dismiss the Complaint filed in Adversary Proceeding No. 20-68.

10          To ensure the orderly operation of today's telephonic

11    hearing, all parties on the line must mute their phones when

12    they are not speaking.   If you are accessing these proceedings

13    on a computer, please make sure to select "mute" on both the

14    Court Solutions dashboard and your phone.   When you need to

15    speak, you must unmute on both the dashboard and the phone.

16          I remind everyone that consistent with court and

17    judicial conference policies, and the orders that have been

18    issued, no recording or retransmission of the hearing is

19    permitted by any person, including but not limited to the

20    parties, members of the public, and the press.   Violations of

21    this rule may be punished with sanctions.

22          I will be calling on each speaker during this hearing

23    in the agreed order that is enumerated in the Joint

24    Informative Motion filed at Docket Entry No. 58 on the

25    adversary proceeding docket on January 8, 2021.   When I do,

1   please begin your remarks by identifying yourself by name for

2   clarity of the record.

3           If you wish to be heard out of order, or otherwise

4   need to make a remark, please state your name clearly at the

5   end of an argument segment and request to be heard.  Don't

6   just use the "wave" on the Court Solutions dashboard.  Speak,

7   I will respond to your request, and I will call on each

8   speaker if more than one person wishes to be heard and I am

9   granting the request.

10          Please do not interrupt each other or me during this

11  hearing.  If we interrupt each other, it is difficult to

12  create an accurate transcript of the proceeding.  Having said

13  that, I apologize in advance for breaking this rule, as I may

14  interrupt if I have questions or if you go beyond your

15  allotted time.  If anyone has difficulty hearing me or another

16  participant, please say something right away.

17          The time allotments for each speaker and for each

18  segment of the argument are set forth in the Joint Informative

19  Motion filed in the adversary proceeding.  I encourage each

20  speaker to keep track of his or her own time.  The Court will

21  also be keeping track of the time and will alert each speaker

22  when there are two minutes remaining with one buzz, and when

23  time is up, with two buzzes.

24          Here is an example of the buzz sound.

25          (Sound played.)

1          THE COURT:  If your allocation is two minutes or

2     less, you will just hear the final two buzzes.

3          If we need to take a break, I will direct everyone to

4     disconnect and to dial back in at a specified time.  And the

5     argument is scheduled to run for two hours, that is, from now

6     until just about noon, Atlantic Standard Time.

7          And so I will now turn to the arguments on the

8     motion.  First, I have the Oversight Board for 25 minutes.

9          MR. BIENENSTOCK:  Good morning, Judge Swain.  My name

10     is Martin Bienenstock, of the law firm Proskauer Rose, LLP,

11     and we represent the Oversight Board as Title III

12     representative of the Commonwealth.

13          THE COURT:  Good morning, Mr. Bienenstock.

14          MR. BIENENSTOCK:  We wish the Court, its staff, and

15     all parties a happy, healthy new year; swift vaccinations; and

16     look forward to returning to San Juan.

17          The relief the Oversight Board seeks this morning is

18     an order dismissing Ambac's Complaint dated May 26, 2020,

19     pursuant to the Oversight Board's Motion to Dismiss dated

20     August 17, 2020.  While we believe it is a threshold issue

21     that Ambac is estopped on multiple grounds from participating

22     in the Title III cases, accepting a billion dollar recovery,

23     and three years later contending PROMESA Titles I, II, and III

24     are unconstitutional, and demanding the Oversight Board and

25     its members be enjoined from "any further action whatsoever in

1    connection with" those titles of PROMESA, I have to leave that

2    threshold issue, because my colleague, Peter Friedman of

3    O'Melveny, will be discussing that.

4         I will argue why the Uniformity Clause does not apply

5    to PROMESA, and its application to Puerto Rico's minimum of

6    141 eligible Title III debtors, and why even if it does apply,

7    based on two United States Supreme Court decisions, all

8    relevant provisions of PROMESA satisfy the uniformity

9    requirement.

10        Although the first sentence of Ambac's preliminary

11   statement provides, "Congress enacted a private bankruptcy

12   bill for Puerto Rico alone," Ambac shifts gears on page four

13   of its brief and asserts PROMESA is not a local law, and on

14   page 21, asserts it is a national law.  Before I explain why

15   Ambac is wrong, I want to point out that by arguing PROMESA is

16   a national law and not a local law, Ambac effectively admits

17   the Territories Clause in Article IV, Section 3 of the

18   Constitution is not for local laws subject to the Bankruptcy

19   Uniformity Clause in Article I, Section 8, Clause 4 of the

20   Constitution.  There is no other reason to argue the local,

21   national distinction.

22        The Territories Clause uses the word "all" and is

23   pretty clear.  "Congress shall have power to dispose of and

24   make all needful rules and regulations respecting the

25   territory or other property belonging to the United States."

1          The Bankruptcy Uniformity Clause in Article I,

2    Section 8, Clause 4 of the Constitution also clearly provides

3    it applies to the United States, and no one contends Puerto

4    Rico is a state.  It provides, Congress shall have power to

5    establish "uniform laws on the subject of bankruptcies

6    throughout the United States."

7          On the national statute issue, Ambac's brief, at

8    pages 21 through 28, contends Title III is a national statute.

9    Ambac asserts two tests for whether PROMESA Title III is a

10   local or national law.  At page four of its brief, Ambac

11   asserts, "no local law could, as PROMESA does, authorize

12   federal courts to discharge debt held by creditors

13   nationwide."  Ambac's second test, also on page four of its

14   brief, is whether a state legislature could enact PROMESA

15   Title III.  As I am about to show, the Supreme Court has

16   expressly ruled to the contrary on both issues.

17         First I'll address the creditor location test.  The

18   Oversight Board responded to these issues on pages 11 to 16 of

19   its Reply Brief, and I will not rehash what we said.  I want

20   to make just three points now.  First, Title III is a local

21   statute, because it only discharges debt of Puerto Rico

22   governmental entities.  And this Court, in PROMESA Section

23   306(b), is only granted property jurisdiction over property of

24   the Puerto Rico Title III debtors.

25         Pursuant to logic and the United States Supreme Court

1   jurisprudence that entities outside Puerto Rico own Puerto

2   Rico debt does not render Title III a national statute.

3   Indeed, if Ambac's theory is correct, Title III would be an

4   international statute, because entities outside the United

5   States own some of its debt.  Moreover, on Ambac's theory,

6   Title III would bounce back and forth from being a local,

7   national, and international statute, based on where the debt

8   trades and resides any given night, even though Title III's

9   provisions and consequences do not change.

10          Second, Ambac ignores the fundamental basis of

11  bankruptcy jurisdiction.  Title III is also a local statute,

12  because it operates in rem.  The significance of in rem

13  jurisdiction is that Title III's discharge frees up only

14  property of Puerto Rico entities and their future earning

15  power.

16          Third, the Supreme Court ruled in *Central Virginia v.*

17  *Katz*, 546 U.S. 356, at pages 369 and 70, that, "Bankruptcy

18  jurisdiction, as understood today and at the time of the

19  framing, is principally in rem jurisdiction."  The Supreme

20  Court went on to say, in bankruptcy, "the Court's jurisdiction

21  is premised on the debtor and his estate, and not on the

22  creditors."

23          In respect of Ambac's contention that the Territories

24  Clause does not mean what it says, namely, Congress can make

25  all needful rules and regulations, and only authorizes

1   Congress to enact laws a state can enact, there is no such

2   rule.  The Supreme Court has demonstrated time and again there

3   is no such rule.  And Ambac hasn't shown it would be breached

4   by PROMESA in any event.  To be clear, the Oversight Board's

5   motion does not require a ruling that there are no constraints

6   on the Territories Clause legislation, only that the

7   Uniformity Clause is either not a constraint or is not

8   violated here.

9          Empirically, history shows Congress enacted special

10  debtor-creditor laws for territories.  In *Hayman v. Moxley*, at

11  the Oversight Board's Reply Brief at page ten, the Circuit

12  Court of Appeals for the District of Columbia enforced an Act

13  of Congress entitled, An Act for the Relief of Insolvent

14  Debtors Within the District of Columbia.  That law provided

15  discharges.

16         Before getting to the Article III example, I will

17  cover the tax cases, because Ambac supports its local law

18  argument with a phrase from the *Binns* opinion.  Article I,

19  Section 8, Clause 1 of the Constitution contains a Uniformity

20  Clause for taxes requiring, "all duties imposed and excises

21  shall be uniform throughout the United States."

22         The Supreme Court has at least twice ruled the Tax

23  Uniformity Clause does not apply to territories:  Once in

24  *Gibbons v. District of Columbia*, where the real property tax

25  in the District of Columbia was one and a half percent on some

1    property and one and a quarter percent on other property; and

2    once in *Binns v. United States,* that affirmed a license tax in

3    the territory of Alaska, which was not imposed on the rest of

4    the country.

5         The Supreme Court found these cases easy.  For

6    instance, in *Binns,* at page 494, the Court took as a given

7    that "Congress has undoubtedly the power by direct legislation

8    to impose these license taxes upon the residents of Alaska,

9    providing that when collected, they are paid to a treasurer of

10   the territory."

11        Ambac takes a snippet from *Binns* at page 12 of its

12   brief, says, quote, Congress and the government of the

13   territories has plenary power, save as controlled by the

14   provisions of the Constitution.  Ambac asserts that last

15   phrase, "controlled by the provisions of the Constitution,"

16   means the Congressional power to legislate for the territory

17   is controlled by the Uniformity Clause.  But *Binns* itself

18   shows that is not what the Supreme Court was saying.

19        First, the facts in *Binns*, at page 487, show it was a

20   local statute, even though it applied to persons and

21   corporations anywhere in the world.  The tax required that

22   any -- that "any person or persons, corporation or company,

23   prosecuting or attempting to prosecute any of the following

24   lines of business within the District of Alaska shall first

25   apply for and obtain license so to do from a district court or

1    a subdivision thereof in said district, and pay for said

2    license for the respective lines of business and trade as

3    follows:  To-wit, transfer companies, 50 dollars per annum."

4    I've read it to show the tax applied to any person or

5    corporation, which would include a person, a corporation

6    residing anywhere in the United States, or the world.

7         Second, *Binns'* holding refutes Ambac, because its

8    holding is that Congress can impose license taxes in Alaska

9    without making them uniform across the United States.  Then,

10   at page 496, *Binns* explains exactly what being subject to the

11   provisions of the Constitution means.  *Binns* rules, "in order

12   to avoid any misapprehension that we may add -- any

13   misapprehension, we may add that this opinion must not be

14   extended to any case, if one should arise, in which it is

15   apparent that Congress is, by some special system of license

16   taxes, seeking to obtain from a territory of the United States

17   revenue for the benefit of the nation, as distinguished from

18   that necessary for the support of the territorial government."

19        Applying that principle here, if Congress enacted a

20   statute for Puerto Rico that restructured debt of both Puerto

21   Rico and non-Puerto Rico entities, the statute would be

22   subject to the Uniformity Clause, but Congress restricted

23   PROMESA in all its titles to Puerto Rico.

24        Now for the Article III examples.  In short, when

25   legislating under the Territories Clause, Congress is neither

14

1   restricted by Article III's requirement of judges having

2   lifetime tenure and irreducible compensation, nor of the

3   requirement that admiralty jurisdiction be reserved to the

4   Federal Courts.

5        The *American Insurance Company* decision cited in the

6   Oversight Board's opening and reply briefs provides, at page

7   546, quote, although admiralty jurisdiction can be exercised

8   in the states in those courts only which are established in

9   pursuance of the third Article of the Constitution, the same

10  limitation does not extend to the territories.  In legislating

11  for them, Congress exercises the combined powers of the

12  general and of the state government.  Thus, Ambac's state

13  government only rule was disproved 127 years ago.  And, Judge,

14  it gets better with age.

15       In its seminal *Northern Pipeline* decision, the

16  Supreme Court quoted and adopted that same language and more.

17  The Supreme Court, in its *Northern Pipeline* decision, 458 U.S.

18  50, shows Ambac is wrong in two ways:  First, the Supreme

19  Court comes right out and rules Congress' legislation under

20  the Territories Clause is an exception to Article III.

21  Second, the Supreme Court rules Congress' power of government

22  over the territories is "complete."

23       Here's what *Northern Pipeline* says at pages 64 and

24  65.  Appellants first rely upon a series of cases in which

25  this Court has upheld the creation by Congress of non-Article

1   III territorial courts.  This exception from the general

2   prescription of Article III dates from the earliest days of

3   the Republic when it was perceived that the framers intended

4   that, as to certain geographical areas in which no state

5   operated as sovereign, Congress was to exercise the general

6   powers of government.

7           For example, in *American Insurance Company v. Canter*,

8   the Court observed that Article IV bestowed upon Congress

9   alone a complete power of government over territories not

10  within the states that constituted the United States.  The

11  Court then acknowledged Congress' authority to create courts

12  for those territories that were not in conformity with Article

13  III.  Such courts were -- and then skipping a few lines, the

14  *Northern Pipeline* decision says, although admiralty

15  jurisdiction can be exercised in the states in those courts

16  only which are established in pursuance of the third Article

17  of the Constitution, the same limitation does not extend to

18  the territories.  In legislating for them, Congress exercises

19  the combined powers of the general and of the state

20  government.

21          The Court followed the same reasoning when it

22  reviewed Congress' creation of non-Article III courts in the

23  District of Columbia.  It noted that there was in the district

24  no division of powers between the general and state

25  governments.  Congress has the entire control over the

1    district for every purpose of government, and it is reasonable

2    to suppose that, in organizing a judicial department here, all

3    judicial power necessary for the purposes of government would

4    be vested in the courts of justice.

5            Although *Northern Pipeline* was a plurality holding,

6    *American Insurance* was a majority and had no dissent.

7    Additionally, the Supreme Court has approved *Northern*

8    *Pipeline,* and has followed its holding several times, for

9    instance, in *Stern v. Marshall*, 564 U.S. 462, at pages 484,

10   487, 493, 494 and 495.

11           Finally, nowhere does Ambac explain why this Court

12   should assume the framers of the Constitution were so

13   narrow-minded that they assumed a United States bankruptcy law

14   could apply to every property law and debtor-creditor regimen

15   anywhere the United States might acquire a territory in the

16   rest of the world.  For instance, in Canada and other

17   jurisdictions, they have a debtor-creditor concept called a

18   floating charge.  It's not easy to categorize it as a secured

19   claim or unsecured claim.  The U.S. Bankruptcy Code imposes

20   interest requirements.  Some parts of the world do not allow

21   interest.  And so on.

22           While the Oversight Board submits that even if there

23   is a uniformity requirement, Title III does not need to be

24   uniform with Chapter Nine, it is anyway, because the Supreme

25   Court's *Blanchette* decision shows the existence of an

1    authority that formulates and even makes determinations about

2    the reorganization plan, does not render a bankruptcy regime

3    nonuniform from regimes not having such an authority.

4         In short, Ambac's arguments that Title III is

5    nonuniform with Chapters 9 and 11 are soundly refuted by the

6    Supreme Court decisions Ambac cites.  First, history and logic

7    have a lot to say here.  Since Congress enacted its first

8    bankruptcy legislation in 1800, Congress has enacted different

9    bankruptcy laws for individuals liquidating their assets,

10   individuals with regular income desiring a payment plan,

11   individuals and entities desiring to reorganize, farmers,

12   railroads, single asset debtors, small businesses,

13   municipalities, commodity brokers, stockbrokers, clearing

14   banks, and debtors subject to foreign proceedings.

15        All those different regimens are in Title 11 of the

16   United States Code, and broker dealers are eligible for

17   bankruptcy under the Securities Investor Protection Act of

18   1970.  It cannot be that a bankruptcy regimen for a territory

19   and its instrumentalities must be uniform with all those

20   regimens, and if it must be uniform, which regimen must it be

21   uniform with.  It can't be uniform with all of them.

22        Ambac takes Chapter Nine as the standard, and that

23   has initial and superficial appeal, because Chapter Nine is

24   for governmental units, albeit not territories.  But its

25   appeal is only superficial, because Chapter Nine was

1   constructed to avoid violating the 10th Amendment.  That is

2   why there is no provision for an oversight board or trustee.

3           Precisely because territories are not within the 10th

4   Amendment, PROMESA imposes an oversight board with numerous

5   powers incompatible with the Tenth Amendment.  Thus, Ambac's

6   position defies the Supreme Court's teaching in *Blanchette*

7   that, quote -- this is 419 U.S., at 159 -- the uniformity

8   provision does not deny Congress power to take into account

9   differences that exist between different parts of the country,

10  when -- to fashion legislation to resolve geographically

11  isolated problems.  We, therefore, agree with the special

12  court that the Uniformity Clause was not intended to hobble

13  Congress by forcing it into nationwide enactments to deal with

14  conditions calling for remedy only in certain regions.

15          Ambac does not recognize Congress' power to deal with

16  special and unique problems, rather, it rides two horses:  On

17  one horse, it tries mightily to shoehorn Puerto Rico, with its

18  141 eligible governmental debtors, into the *Gibbons* case,

19  striking down a private bankruptcy bill for one debtor and one

20  court.  On the other horse, Ambac packs its contentions about

21  lack of uniformity, which generally fall into two batches.  In

22  one batch, Ambac complains about provisions it contends allow

23  the Oversight Board -- or cause the Oversight Board to believe

24  it can pick winners and losers.  In the second batch, Ambac

25  points to a Title III provision providing the Oversight Board

1    the power to limit the amount of debt issued under a Title III

2    plan of adjustment by its debt sustainability analysis in its

3    certified fiscal plan, although the Court is not required to

4    confirm any plan the Oversight Board proposes.

5          As far as there being nonuniform provisions allowing

6    the Oversight Board to pick winners and losers, PROMESA

7    Section 301(a) shows indisputably that the same unfair

8    discrimination provision in Chapters 9 and 11 is in Title III,

9    along with a host of other identical provisions.

10         I want to focus on Ambac's contention that PROMESA

11   Section 314(b)(7) renders Title III nonuniform with Chapters 9

12   and 11.  It provides as conditions confirmation that, "the

13   plan is consistent with the applicable fiscal plan certified

14   by the Oversight Board under Title II."

15         Ambac's contention is demonstrably wrong.  Ambac

16   doesn't mention that the Supreme Court has already rejected

17   such an argument in the context of one of its main

18   authorities, *Blanchette v. Connecticut General Insurance*

19   *Corporations*, 419 U.S. 102, at page 163.  There, Justice

20   Douglas in dissent argued Ambac's argument.  Justice Douglas

21   argued that, because Section 77 reorganization's required

22   under Section 77(d), the Interstate Commerce Commission

23   define the plan as fair and equitable before it can be

24   confirmed, but the Rail Act did not require the Interstate

25   Commerce Commission -- I'm sorry.  That the Rail Act did not

1    require the Interstate Commerce Commission to make such

2    finding.  The Rail Act provisions for railroads in the Midwest

3    were not uniform with Section 77 Railroad Reorganization

4    provisions.

5          The ICC had more power than the Oversight Board in

6    that its word was final on valuation and many other fact

7    issues.  Parenthetically, in response to Ambac's complaint

8    that the Oversight Board represents each Title III debtor even

9    when they have claims against one another, the ICC controlled

10   in Section 77 reorganization plans of every railroad, whether

11   competitors or not.  Section 77(b) provided, "no plan shall be

12   approved or confirmed by the judge in any proceeding under

13   this section unless the plan shall first have been approved by

14   the commission and certified to the Court."

15         Justice Douglas' dissent in *Blanchette* also cites

16   *Ecker v. Western P.R. Corp.*, 318 U.S. 448, and specifically

17   pages 472 to 476, which shows how many more powers the

18   Interstate Commerce Commission had over Section 77 railroad

19   reorganizations than the Oversight Board has over a Title III

20   plan of adjustment.  But the Supreme Court rejected the

21   contention that these powers that the ICC had over the Court

22   rendered Section 77 nonuniform to the Rail Act.  The ICC not

23   only had to approve the plan, it also made key unreviewable

24   findings about it.  The ICC determined valuation, which

25   directly controlled which of the creditor's claims and

1    shareholder's interests could participate in the

2    reorganization value.

3         *Ecker* ruled, quote, the power of the Court does not

4    extend to participation in all responsibilities of the

5    commission.  Valuation is a function limited to the

6    Commission, without the necessity of approval by the Court.

7    The first sentence of the last paragraph of (e) provides, if

8    it shall be necessary to determine the value of any property

9    for any purpose under this section, the Commission shall

10   determine such value and certify the same to the Court in its

11   report on the plan.

12        The *Ecker* Court goes on to talk about the ICC's power

13   over the public interest, determining whether the plan was in

14   the public interest, the formulation of the classification,

15   and other key issues to any reorganization plan.  The Court in

16   *Ecker* said leaving the problems of public interest to the

17   Commission was not a departure from precedent.  The phrase had

18   been employed long before in the grant of authority to

19   supervise the issue of securities.

20        The Court went on to say, the development of the

21   capitalization of the reorganized company, which is entrusted

22   solely to the Commission under the requirement that the plan

23   be compatible with the public interest, is that relating to

24   the total amount of issuable securities and the quality of the

25   securities to be issued.  So long as legal standard is

 1    followed --

 2              (Sound played.)

 3              MR. BIENENSTOCK:   -- the judgment of the Commission

 4    on such capitalization is final.

 5              Ambac's shoehorning into *Gibbons* just doesn't work.

 6    Puerto Rico is not one debtor.  It's 63 initially covered

 7    entities, plus 78 municipalities, for 141.  Currently, there

 8    are six Title III cases pending.  They could not be more

 9    different:  Different creditors, different issues, different

10    governmental functions, different outcomes, COFINA,

11    Commonwealth, PREPA, HTA.  Your Honor understands.

12              THE COURT:  Yes.

13              MR. BIENENSTOCK:  Ambac's position destroys the

14    policies to be served by Title III by defying the Supreme

15    Court's teaching that Congress can address geographically

16    unique problems.  As this Court knows, PROMESA is strong

17    medicine.  It causes Congress to create an Oversight Board

18    with lots of powers over the territorial government.  The

19    Commonwealth Government's strong opposition to those powers

20    has punctuated plenty of litigation in this Court.

21              While Ambac attempts to show the Virgin Islands was

22    over leveraged and shut out of the debt markets, Ambac hasn't

23    alleged and provided a scintilla of evidence showing the

24    Virgin Islands want that medicine or have asked for it.  That

25    is critical for a very important reason.  The lesson here is

1    that the appointment of an oversight board is what prevents

2    Title III from being a moral hazard in which governments run

3    up debt out of control on the theory they can discharge it in

4    Title III.  The loss of important governmental and political

5    powers to an oversight board is what deters territory

6    governments from both irresponsibly incurring debt and failing

7    to try to deal with their own debt by imposing measures to

8    restore fiscal responsibility.  Ambac's position, however,

9    destroys all that.

10           According to Ambac, Title III either needs to

11   eliminate the Oversight Board to make it uniform, or all

12   territories need the appointment of an oversight board

13   immediately.  Ambac's first alternative eliminates --

14           (Sound played.)

15           MR. BIENENSTOCK:  May I just finish the sentence,

16   Your Honor?

17           THE COURT:  Yes, you may.

18           MR. BIENENSTOCK:  Thanks.

19           Ambac's first alternative eliminates the only

20   component of PROMESA designed to restore fiscal responsibility

21   and market access, while Ambac's second alternative

22   indiscriminately usurps local government power from all

23   territories that have been fiscally responsible.

24           THE COURT:  Thank you, Mr. Bienenstock.

25           MR. BIENENSTOCK:  Your Honor, subject to the Court's

1   questions, I would end here, subject to the rebuttal time.

2        THE COURT:  Yes.  Thank you.  You've been quite

3   comprehensive in your remarks, and so I don't have questions

4   for you at this point.

5        We will turn to AAFAF, which has been allotted six

6   minutes.

7        MR. FRIEDMAN:  Good morning, Your Honor.  Happy new

8   year.  Peter Friedman of O'Melveny & Myers.  I'm going to

9   discuss estoppel and laches.

10       So I think one of the keys to understand -- if you

11  look at Ambac's Complaint, which makes clear that it's about

12  the statute as written, not about as applied, if you look at

13  the chart in their Complaint on page 47, every single

14  allegation and provision of PROMESA that they allege is

15  nonuniform is clearly identified and is knowable.  And if you

16  look at its Complaint at paragraphs 68 to 73, in their own

17  words they say the differences have affected the entire Title

18  III case.

19       So they knew about this years ago.  And they knew

20  when they talk about various issues, like the Commonwealth and

21  the Oversight Board's refusal to pay special revenues over to

22  them, which has been clear from the very beginning of the

23  case.  And they knew, when they talk about fiscal plans, which

24  were promulgated even -- that had no room for debt service,

25  which were promulgated even before the Title III case was

1    initiated.  They knew, and that knowledge is one of three

2    interlocking strands joined together to bar the Complaint,

3    because knowledge we understand is the benefit they received.

4    And together, those three aggregate to constitutional

5    estoppel, judicial estoppel, and the application of laches.

6           With respect to constitutional estoppel, this

7    Complaint came three years into the Title III cases.  And

8    we've cited numerous cases that say when you receive a benefit

9    under a statute, you cannot subsequently turn around and

10   challenge the constitutionality of that statute.  And Ambac's

11   response boils down to, well, we didn't really receive a

12   benefit in respect to COFINA, because we just participated.

13   But that's not true, and we know it's not true for several

14   reasons.

15          We know it's not true, as we pointed out, because the

16   Confirmation Order says that Ambac and other parties received

17   special fees on account of their efforts in assisting with the

18   formulation of the COFINA Plan.  We know that Ambac touted the

19   COFINA Plan in connection with various public statements its

20   made.  We know because Ambac signed the PSA.  And in Sections

21   4.6(c) and (f), Ambac didn't just simply sit by passively with

22   the PSA, but it agreed to support the COFINA Plan, to support

23   the COFINA Disclosure Statement, and even in 4.6(f), it agreed

24   to support the Commonwealth-COFINA settlement in the

25   Commonwealth Title III case.

1      To put it -- to be any plainer, they

2  received substantial benefits, and they are nothing like the

3  school child who had to pay an extra fee in the *Kadrmas* case

4  to ride across in a bus, across the tundras of North Dakota to

5  get to school.  That is not Ambac, and that's a completely

6  different situation.

7      The *Kadrmas* case, which they cite to say means that

8  if you just sit by and do the bare necessities, you can't be

9  constitutionally estopped, there is no resemblance to this

10  situation.  And neither did the *Abie* case which they cite to

11  say that they didn't receive a meaningful benefit, because

12  there is somebody waiting for years to bring suit.  And of

13  course the difference they overlook in the *Abie* case is that

14  the *Abie* plaintiff lost immediately when they tried to

15  challenge the statute, and that the Court held it wasn't

16  constitutionally estopped was a subsequent challenge many

17  years later.

18      With respect to judicial estoppel, it's good to

19  remember just about exactly two years ago today when we were

20  all in person, Ambac came to the Court and said that the Court

21  could pass on a COFINA new bond legislation precisely because

22  PROMESA was different than Chapter Nine.

23      (Sound played.)

24      MR. FRIEDMAN:  That argument helped fill a void that

25  -- the Court had pointed out that it wasn't clear it had the

1   authority to do certain things.  Ambac stepped into that void

2   to say the differences between the two statutes were important

3   and meaningful, and I think the Court relied on that.  And

4   it's precisely the kind of fast and loose behavior that we see

5   applications estopped.

6        With respect to laches, again, we know this case has

7   gone on for more than three years.  We know that rights have

8   been determined, contracts have been rejected, hundreds of

9   millions of dollars have been spent, and Ambac didn't bring

10  its facial challenge to this statute.  And Ambac's response

11  is, well, we were trying to work things out or consensually

12  negotiate and, therefore, we weren't obligated to bring suit

13  immediately.

14       Your Honor, the ECF is littered with receipts that

15  just demolish that argument.  Ambac has relentlessly pursued

16  lawsuits arguing the unfit constitutionality of various

17  behaviors by the Commonwealth and AAFAF.  So it's just simply

18  not credible to argue that they were sitting and trying to

19  resolve things consensually while, at the same time, pursuing

20  suits arguing a whole variety of constitutional infirmities in

21  the Title III cases and fiscal plans.

22       Your Honor, the last issue I want to address is the

23  issue of whether you can grant -- well, you can hold laches is

24  inapplicable as a defense to prospective relief.  And what I

25  would say is that it fails at the inception.  This isn't

1    prospective relief.  This would destroy an ongoing project.

2    As I said, there are contracts that have been rejected; rights

3    have been determined; funds have already been expended.  Cases

4    would potentially have to be dismissed if the Court were to

5    enter the relief.  Not even potentially.  Would undoubtedly

6    have to be granted.  A motion to dismiss the case would

7    undoubtedly have to be granted if this Ambac request is

8    granted.

9            (Sound played.)

10           MR. FRIEDMAN:  And that's not simply prospective

11   relief.

12           Unless the Court has any questions, I reserve the

13   remainder of my time for rebuttal, Your Honor.

14           THE COURT:  Thank you, Mr. Friedman.

15           Next I have the Retiree Committee for three minutes.

16           MR. GERSHENGORN:  Thank you, Your Honor.  May it

17   please the Court, Ian Gershengorn from Jenner & Block.

18           I want to make three principal points in my time this

19   morning.  First, the uniformity provision of the Bankruptcy

20   Clause in Article I does not apply when Congress enacts a

21   local, debt-related law under Article IV.  Mr. Bienenstock

22   made the textual points, and I won't repeat them, but I want

23   to add that the textual reading makes good sense.

24           Article I contains careful limits on Congressional

25   power, because sovereign states demanded uniform treatment in

 1    return for relinquishing their sovereignty to the Federal

 2    Government.  By contrast, the Territories Clause is an

 3    expressed disuniformity provision.  Article IV allows Congress

 4    to make all needful rules and regulations for the territories,

 5    and to act in ways, as the Supreme Court has said, that would

 6    exceed its powers or at least be very unusual in other

 7    contexts.

 8         Ambac says that this Court should ignore all this and

 9    apply a functional analysis, but it's the text that governs.

10    And as a textual matter, any uniformity requirement is a limit

11    on Congress' Article I power, not its Article IV powers.

12    Regardless, Ambac gets the functionality analysis wrong,

13    because it ignores the function of Article IV.

14         The framers gave Congress a broad latitude --

15         (Sound played.)

16    MR. GERSHENGORN:   -- to develop innovative approaches

17    to territorial government, consistent with the need for

18    inventive statesmanship in the territories.  It, thus, would

19    be wrong as a functional matter to apply a uniformity

20    straitjacket to local territorial legislation.

21         My second point this morning is that this is local

22    legislation.  How do you know that?  The Supreme Court in

23    *Aurelius* said so.  The Court said Congress exercised its power

24    under Article IV to, quote, make local, debt-related law, and

25    that PROMESA creates a process for determining, quote, certain

1  local policies related to local fiscal responsibility in

2  respect to local matters.

3        Ambac makes two principal counter arguments:  First,

4  it argues that PROMESA can't be local, because it supposedly

5  has nationwide effect, but that's the precise argument that

6  *Aurelius* made and the Supreme Court rejected.  Second, Ambac

7  argues that PROMESA is not local, because a local legislature

8  could not have passed it, but no case requires that Congress'

9  Article IV power be viewed through the prism of what a

10  hypothetical local legislature could or could not do.

11        When Congress acts in the territories, Congress has,

12  quote, full and complete legislative authority over the people

13  of the territory.  The right question under *Binns* is not what

14  a local legislature could do, but rather whether Congress

15  acted to benefit a territory, rather than the nation.

16        Finally, Your Honor, I want to just say a word about

17  why PROMESA is constitutional, even if the Uniformity Clause

18  applies.  Ambac relies on *Gibbons*, but the bottom line is that

19  Puerto Rico is fundamentally different from a single railroad.

20  It's a sovereign government, not a private corporation.  And

21  it has a responsibility for providing essential government

22  services to three million people, and those services were at

23  risk.

24        In *Blanchette*, the Supreme Court said the Uniformity

25  Clause was not intended to hobble Congress by forcing it into

 1  nationwide enactments to deal with conditions calling for a
 2  remedy only in certain regions.  If *Blanchette* means anything
 3  at all, it means that Congress can pass PROMESA to address the
 4  fiscal sovereignty of Puerto Rico and to protect the health of
 5  its residents.
 6            (Sound played.)
 7            MR. GERSHENGORN:  If the Court has no questions, I'll
 8  save the remainder of the time for rebuttal.
 9            THE COURT:  Thank you, Mr. Gershengorn.
10            And now, for the United States, I have an allocation
11  of eight minutes.
12            Mr. Humphreys, would you unmute yourself on the
13  dashboard and on your phone?
14            MR. HUMPHREYS:  I apologize.  It's my first time,
15  Your Honor.  I'm now unmuted on both.
16            THE COURT:  Thank you.
17            MR. HUMPHREYS:  Good morning, Your Honor.
18            THE COURT:  Good morning, Mr. Humphreys.
19            MR. HUMPHREYS:  Happy new year.  Thank you.
20            THE COURT:  Happy new year.
21            MR. HUMPHREYS:  Brad Humphreys of the United States
22  Department of Justice on behalf of the United States.
23            The question of whether PROMESA violates the
24  uniformity provision in Article I, Section 8, does not present
25  a closed question, and accepting Ambac's arguments would

1    require the Court to disregard decades of precedent

2    interpreting Article I's uniformity provisions.  As the Court

3    is well aware, Congress enacted PROMESA pursuant to its

4    authority in Article IV, which authorizes Congress to make all

5    needful rules and regulations respecting a territory.

6            As the Supreme Court recently reiterated in *Aurelius*,

7    Article IV gives Congress the power to legislate for the

8    territories in ways that it would not be able to, or at least

9    would be very unusual in other contexts.  And similarly, as

10   Mr. Gershengorn just pointed out, the Supreme Court has said

11   that Article IV gives Congress broad latitude to develop

12   innovative approaches to territorial governments.  And that's

13   from the Supreme Court's decision in *Puerto Rico v. Sanchez*

14   *Valle*.

15           In PROMESA, Congress looked to the unique

16   circumstances facing the people and Government of Puerto Rico

17   caused by the debt crisis in 2016, and developed a local,

18   debt-related law based on those particular circumstances.

19   Ambac, of course, claims that Congress was limited by the

20   uniformity requirement in Article I, Section 8, of the

21   Bankruptcy Clause specifically; but as the government

22   explained in its briefs, that limitation applies only when

23   Congress exercises its Article I enumerated powers, not when

24   it's legislating for territories under Article IV.  And Ambac

25   lacks a convincing argument why a limitation on Congress'

1  Article I powers would apply when it's actually exercising its

2  Article IV authority as local, debt-related law, as the Court

3  recognized in *Aurelius*, particularly in light of the Supreme

4  Court's decision in *Binns*, which Mr. Bienenstock discussed at

5  length.

6          That a uniformity requirement does not apply is also

7  clear from the specific language of the provision, which

8  requires uniformity only throughout the United States.  That

9  limitation has been interpreted, with respect to the taxation

10 uniformity requirement, to exclude Puerto Rico explicitly.

11 Moreover, accepting Ambac's contrary argument would create

12 significant tension with the Supreme Court's decision in

13 *Puerto Rico v. Franklin California Tax-Free Trust*, which held

14 that Puerto Rico is not a state for the purposes of the

15 Bankruptcy Code's gateway provision, and that Puerto Rico's

16 municipalities, therefore, could not avail themselves of the

17 Chapter Nine reorganization.

18          If the uniformity requirement, in fact, applied to

19 Puerto Rico, then there could potentially be a conflict and

20 create a uniformity issue in the Bankruptcy Code itself,

21 potentially going back to the 1930s.  And nothing in the

22 *Franklin* case suggests, however, that there is such a problem.

23 It's simply implausible, in light of *Franklin,* to believe that

24 Congress has treated Puerto Rico differently for many decades

25 if the uniformity requirement is as stringent as Ambac

1    asserts.

2         I'd also note that the Supreme Court cited the

3    uniformity requirement when deciding *Franklin*, and there was a

4    concurrence addressing the issue at length in the Circuit

5    Court decision.  So it's not as if the Supreme Court were not

6    aware of the Article I, Section 8, requirement when it decided

7    the case.

8         Applying the uniformity requirement and the

9    Bankruptcy Clause to Puerto Rico would also be inconsistent

10   with how courts have interpreted other uniformity requirements

11   in Article I.  The courts have long interpreted the uniformity

12   requirement for naturalization, which is contained in the same

13   sentence of Article I, Section 8, to allow Congress to set

14   different rules among the territories.  Specifically, I'd

15   point the Court to the Ninth Circuit's decision in *Eche,* where

16   the Court concluded that the uniformity requirement did not

17   prevent Congress from treating differently citizens from the

18   Commonwealth, the Northern Mariana islands.  And, of course,

19   Congress has long set different rules for naturalization of

20   residents in different territories, as we discussed in our

21   brief.

22         Furthermore, as to the Taxation Clause in Article I,

23   Section 8, which also includes a uniformity requirement, the

24   Court in *Binns*, of course, upheld taxes that applied only to

25   the *Binns*' -- territory of Alaska.  It's also telling that

1   residents of Puerto Rico at present are taxed differently in

2   some ways than residents in the 50 states, in a way that is

3   beneficial to residents of Puerto Rico.  And those differences

4   could arguably be unlawful if the uniformity requirements for

5   taxation in Article I, Section 8, were as stringent as Ambac

6   claims.

7          Ambac asks the Court to ignore all of this, the

8   structure, text, other cases interpreting uniformity

9   requirements, and to conduct a so-called functional analysis

10  to decide whether the uniformity requirement and the

11  Bankruptcy Clause applies to the territories.  However, the

12  Supreme Court in *Blanchette* and *Ptasynski* has instructed that

13  the Uniformity Clause should be interpreted consistently with

14  each other.  So the Court should not simply ignore those cases

15  in the context of taxation and naturalization in favor of a

16  free-floating outcome driven test like Ambac advances.

17         Indeed, the government submits that it would defy

18  core principles of interpretation to say that uniformity in

19  one clause means something completely different when used in a

20  different clause in the same section.  Because the Bankruptcy

21  Clause's uniformity provision does not apply, Ambac's

22  challenge to PROMESA fails.

23         However, even if the Court could get past that

24  threshold issue, which we don't think is possible, PROMESA

25  would still be constitutional if the uniformity requirement

1    were to apply.  That requirement in the Bankruptcy Clause is

2    inherently flexible and allows Congress to pass legislation to

3    solve geographically isolated problems.

4         Indeed, the Supreme Court has invalidated a law as

5    inconsistent with the Bankruptcy Clause only once, in *Gibbons,*

6    where it concluded that Congress had --

7         (Sound played.)

8         MR. HUMPHREYS:  -- effectively created a private

9    bankruptcy law.  Even in *Gibbons*, however, the Court

10   emphasized that the uniformity requirement is not a

11   straitjacket that forbids Congress from distinguishing among

12   classes of debtors.

13        And, of course, the Supreme Court upheld the

14   bankruptcy statute that was limited to a specific region in

15   *Blanchette*, explaining that the uniformity provision does not

16   deny Congress to take into account differences that exist in

17   different parts of the country, and to fashion legislation to

18   solve geographically isolated problems.  There can be no

19   serious question that that's exactly what Congress did in

20   PROMESA.

21        In 2016, Puerto Rico faced a crushing public debt

22   crisis, and had lost access to credit markets, and it had lost

23   the ability to provide its citizens with effective services.

24   In other words, the evil to be remedied, the statute, was

25   Puerto Rico's local public debt crisis.  So it was within

1  Congress' power to design a solution to address that problem

2  without violating the Uniformity Clause, and the Court need

3  only look to *Blanchette*.

4       And as the Supreme Court indicated in *Ptasynski*, even

5  where Congress has drawn distinctions based on geography,

6  courts should be reluctant to disturb Congress' judgment with

7  respect to enormously complex problems just like this.

8       If the Court has no further questions, I will

9  conclude my remarks.

10       THE COURT:  Thank you, Mr. Humphreys.

11       MR. HUMPHREYS:  Thank you, Your Honor.

12       THE COURT:  I now have an allocation of 60 minutes

13  for argument on behalf of Ambac.  Who is speaking first?

14       MS. PRELOGAR:  Yes.  Good morning, Your Honor.  This

15  is Elizabeth Prelogar from Cooley representing Ambac.

16       THE COURT:  Good morning, Ms. Prelogar.

17       MS. PRELOGAR:  Your Honor, good morning.

18       This case raises a critically important question

19  under the Constitution of whether Congress may permissibly

20  single out one territory, Puerto Rico, and create for it a

21  unique bankruptcy process that differs from all other debt

22  restructuring proceedings, whether compared to other

23  territories, compared to other governmental entities, or

24  compared to any other conceivable class of debtors.  PROMESA

25  violates the bankruptcy uniformity requirement and the

1    Constitution, and the Motion to Dismiss should be denied.

2           The parties on the other side have made a number of

3    claims in defense of PROMESA, both at the hearing today and in

4    their briefs, that really fall into four main categories:

5    About whether the bankruptcy uniformity requirement applies in

6    the territory; whether PROMESA can qualify as a uniform law;

7    whether the constitutional violation here could be fixed by

8    extending PROMESA; and then a number of procedural objections.

9    And I want to make sure to respond to each of those issues,

10   but I'll take them in order and begin with the threshold

11   question of whether PROMESA is subject to the uniformity

12   requirement in the first place.

13          The Oversight Board's theory here is that because

14   Congress invoked its Article IV powers when it enacted

15   PROMESA, all other constitutional constraints and limitations

16   on Congress' authority are inapplicable.  Essentially, this is

17   an argument that the Constitution just doesn't apply when

18   Congress takes action related to the territories, and that

19   categorical claim is inconsistent with precedent.  Most

20   notably --

21          THE COURT:  Ms. Prelogar, there's maybe a bit of an

22   overstatement.  They're saying that the Constitution applies.

23   They're citing Article IV of the Constitution, but they're

24   saying that Article I does not govern Article IV.

25          So I realize that one has to be aggressive in one's

1   argument, but please be as precise as you can be.

2         MS. PRELOGAR:  Absolutely, Your Honor.  And it's

3   absolutely the case that they've argued that, when Congress

4   here relies on Article IV, that's the source of authority; but

5   the important thing to recognize is that would effectively

6   make the invocation of Article IV authority an on-off switch

7   for any other restrictions in the Constitution.  But so long

8   as Congress is taking action related to the territories, so

9   long as it's making needful rules and regulations with respect

10  to the territories, it's not necessary to look at other

11  constraints in the Constitution.  And we think that that's at

12  odds with Supreme Court precedent.

13        Most notably and most recently, it conflicts with the

14  Supreme Court's decision just last term in the *Aurelius* case

15  -- of course, Your Honor's familiar with that -- involving

16  PROMESA itself and the Appointments Clause challenge.  And I

17  do want to pause on *Aurelius* for a minute and walk through it,

18  because I think that it refutes the suggestion that the

19  Oversight Board has made here that any law enacted pursuant to

20  Article IV qualifies as a local law.

21        So the Oversight Board has made clear in its Reply

22  Brief that it's using these terms, local law, national law, to

23  refer to Article IV exercises of authority, which is Article

24  I.  And the Oversight Board has contended that so long as it's

25  an Article IV statute, or that was the source of authority

1    that Congress invoked, automatically it qualifies as a local

2    law.  But if that were right -- the Supreme Court of course

3    recognized in *Aurelius* that Congress had invoked Article IV to

4    pass PROMESA, and that could have been the end of the Court's

5    analysis.  In the Oversight Board's view, the Court could have

6    just stopped there and said, okay, it's an Article IV statute;

7    therefore, it's a local law, and it's not necessary to

8    consider then whether the Appointments Clause would operate as

9    some kind of restriction or restraint on what Congress has

10   done.  But that's not what the Supreme Court did.

11       The Court went on to consider the purpose of the

12   Appointments Clause and emphasize that that purpose is to

13   ensure political accountability, and ran through the text and

14   the history of the clause.  And it was specifically noted that

15   many times Congress had complied with the Appointments Clause

16   in appointing officers of the United States who were

17   exercising power in the territory.

18       So, ultimately, the Court in *Aurelius* concluded that

19   Congress can be bound by the Appointments Clause when it

20   creates officers of the United States, even if it's acting

21   pursuant to Article IV, and even if those officers are

22   exercising power in or in relation to the territories.

23       Now, Mr. Gershengorn this morning and the parties

24   generally have emphasized the second holding in *Aurelius*.

25   This was the holding, of course, that the Board members are

1    local officers.  But there the Supreme Court was considering

2    the classification of the Board members themselves.  It wasn't

3    considering the classification of PROMESA.  And the holding

4    with respect to the Oversight Board members turned on the fact

5    that they were exercising primarily local duties in these

6    proceedings.  In fact, the Court emphasized that the Oversight

7    Board members were, effectively, like any state or local

8    officials, to supervise bankruptcy proceedings under Chapter

9    Nine.

10         That doesn't mean that PROMESA is a local law any

11   more than Chapter Nine would be a local law just because state

12   and local officers supervise the bankruptcy proceedings on

13   behalf of the debtor.  So we do think that *Aurelius* itself

14   forecloses this idea that PROMESA automatically qualifies as a

15   local law just because of the invocation of Article IV

16   authority, or just because of the fact that Congress is taking

17   action that's related to a territory.

18         The central precedent that the Oversight Board has

19   relied on, and it's come up in several of the presentations

20   this morning, is *Binns versus United States*.  But we actually

21   think that this proves the point and shows the distinction

22   between what truly qualifies as a local law passed by Congress

23   with respect to a territory, that is, Congress stepping into

24   the shoes of what a state legislature could do, versus

25   Congress having to rely on its unique federal authority in

1    order to pass a statute.

2         And so maybe I could just walk through the facts of

3    *Binns* for a moment.  *Binns* involved a tax for Alaska when

4    Alaska was still a territory.  At that point, Alaska didn't

5    have its own legislature, and so there was no other entity

6    that could have passed any kind of tax to pay for territorial

7    government.  What the Supreme Court said is that Congress has

8    the power to levy taxes, and here I'm going to quote, in like

9    manner, as the legislature of a state may tax the people of a

10   state for state purposes.

11        This is the kind of reasoning the Court has

12   frequently employed in this context.  *Cincinnati Soap* is

13   another example, where the Court said Congress has, quote,

14   equivalent power of a state in comparable circumstances.  And,

15   again, this is based on the practical consideration that there

16   might not be another entity that's available to create the

17   structures of local government for a territory to pass local

18   legislation, particularly if, as in Alaska, there was no

19   territorial legislature, and so an exercise in this local

20   authority.

21        And this explains the language about Congress being

22   able to act in ways that are unusual.  The Court has

23   emphasized that Congress can essentially act as a state or

24   municipality may act, and it's not bound by the same

25   constitutional restrictions that, for example, create the

1   structures of the Federal Government.  But the key limitation

2   that was recognized in *Binns* and in other cases is that

3   Congress must be doing what a state or locality could do.

4        And we think that the final paragraph of *Binns* makes

5   this point perfectly clear, because that was the point in the

6   decision where the Supreme Court said that if Congress had

7   instead passed the tax for the benefit of the nation, and so

8   it was doing something that no state or locality could do, the

9   analysis would be different.  In that respect, Congress would

10  be exercising authority at the national legislature, and so

11  could be subject to these other constitutional constraints,

12  even though it would still be applying that tax in the

13  territory.

14       In its Reply Brief, the Oversight Board asserts and

15  emphasizes that the tax in *Binns* was paid into the national

16  Treasury.  And they say, well, no state could do that, collect

17  a tax and pay it to the national Treasury, but of course no

18  state could have the members of Congress pass a law for it

19  either.  These are little procedural details.  They don't go

20  to the substance of the law and the question of whether that

21  substance is something that falls within the domain of a state

22  and local jurisdiction.

23       In *Binns*, the Supreme Court deemed it critical that

24  the funds that went into the Treasury also came out of the

25  Treasury to pay for the governance of the territory.  So this

1   is really equivalent to what any state could do in collecting

2   a tax and then using that tax to pay for the structures of the

3   state government.  And that was a critical element of the

4   Court's analysis in recognizing that Congress could lawfully

5   impose that tax in Alaska, just as a state could.

6           So with respect to this local law issue, the relevant

7   inquiry becomes, could a state or local government pass a law

8   like PROMESA.  And the answer to that is clearly no.  No one

9   on the other side is really arguing differently.  It's

10  acknowledged by the Oversight Board that principles of

11  preemption, and of course the Contracts Clause, would mean

12  that no state could create this kind of nationwide scheme for

13  the discharge of debt.

14          And, of course, this Court need look no further than

15  to what Puerto Rico actually did when it tried to pass its own

16  debt restructuring scheme.  But Puerto Rico took this approach

17  in the Debt Recovery Act, and it was invalidated by the

18  Supreme Court in the *Franklin California Tax-Free Trust* case.

19  So that demonstrates and further confirms that this isn't the

20  kind of local law that would fall within the subject matter or

21  domain of any state or locality, and that makes sense.

22          PROMESA is a national bankruptcy law.  The statute

23  restructures debt.  It provides a mechanism for this Article

24  III court to exercise nationwide jurisdiction and order the

25  discharge of debt held by creditors nationwide, not just

1    confined to Puerto Rico.  Those judgments are entitled to full

2    faith and credit.  And so this looks nothing like the kind of

3    law that any state or local government could pass in the

4    exercise of its police powers or in otherwise attempting to

5    manage its local affairs.  And for that reason, PROMESA

6    necessarily depends on Congress' federal authority in this

7    regard to have that capacity and authority to pass national

8    bankruptcy law.  So that's an authority that's been recognized

9    to be circumscribed by the uniformity requirement.

10            I want to respond for a moment to the points that

11   Mr. Gershengorn and Mr. Humphreys raised about whether the

12   analysis turns on whether Congress invoked Article I or

13   whether it invoked Article IV, but for purposes of analyzing

14   bankruptcy uniformity, that distinction doesn't matter.  And

15   we think that is perfectly clear from the analysis of the

16   Supreme Court in *Gibbons,* where the United States made the

17   same type of argument that there was another source of

18   Congress' authority to pass the statute there, specifically,

19   the Commerce Clause.

20            And so the United States said, because there was that

21   Commerce Clause authority, it wasn't necessary to look at the

22   Bankruptcy Clause at all or to apply the bankruptcy uniformity

23   requirement.  So what *Gibbons* said is it doesn't matter if

24   there are multiple sources of authority to enact the law.  The

25   relevant question is, does this law touch on the subject of

1    bankruptcy.  In other words, is it a law that's addressed to

2    the relations of a debtor and its creditors?  Is it a law that

3    orders the discharge of debt?  If so, then it's a bankruptcy

4    law, and Congress can't avoid application of the uniformity

5    requirement by suggesting that there's actually some other

6    source of law that exists that fully justifies the action it

7    took.

8         So we think that the distinction here between

9    "person" in Article I and Article IV is beside the point.  The

10   relevant question is, is PROMESA a bankruptcy law.  And the

11   answer is yes.

12        I want to emphasize as well, though, that rather than

13   applying any bright-line rule about whether PROMESA is subject

14   to the uniformity requirement, the right approach here is to

15   follow the functional analysis.  This is the Supreme Court's

16   test, and it's the way that it has approached these various

17   questions about whether different constitutional provisions

18   apply in the territories.

19        And there was a statement in the Reply Brief that

20   questions where this test comes from or asked what the

21   grounding was.  The answer is this comes straight from the

22   Supreme Court.  That was the language, in fact, that the

23   Supreme Court used in the *Boumediene* case.  There the Court

24   specifically said that it was applying a functional approach,

25   and the Court summarized and traced the Supreme Court's

1    decisions in this area, looking at a wide variety of different

2    constitutional provisions to determine whether those

3    provisions did or did not apply in the territory.

4           So the idea that --

5           THE COURT:  Pardon me, Ms. Prelogar.  *Boumediene*,

6    again, was looking at the question of sovereignty, correct?

7           MS. PRELOGAR:  It was looking at the question of

8    whether the Suspension Clause applied extraterritorially,

9    outside the United States.

10          THE COURT:  Yes.  And that related to whether the

11   geographical area involved was actually de facto or de jure

12   under the sovereignty of the United States?

13          MS. PRELOGAR:  Yes.  That was one of the issues in

14   *Boumediene*, but it relied --

15          THE COURT:  And that's the context in which the

16   functional language came up as I recall.

17          MS. PRELOGAR:  Yes.  But I think what's clear is that

18   in articulating that test, what the *Boumediene* court did is it

19   looked at a number of precedents involving the territories;

20   and specifically analyzed the approach the Court had taken in

21   prior cases about whether constitutional provisions had

22   applied; and specifically discussed a number of the cases that

23   we've been discussing here this morning with respect to the

24   same questions of purpose of constitutional provisions, the

25   same questions of the practical effect of extending these

1    provisions to the territories.

2          And I should emphasize, of course, that there are a

3    number of additional cases that consider these same types of

4    issues, about whether particular provisions in the

5    Constitution extend to the territories, in a number of

6    contexts.  The Court has looked at the Commerce Clause.  It's

7    looked at, for example, the prohibition on passing ex post

8    facto laws and bills of attainder.  Various provisions of the

9    Bill of Rights have been recognized to apply to the territory,

10   and so would constrain Congress' action.  That includes the

11   First Amendment, the Fourth Amendment, the Eighth Amendment.

12         And so I think that what this analysis demonstrates

13   is that when Congress is taking action with respect to a

14   territory, in each instance it's necessary to look at a

15   particular constitutional provision and evaluate it on its own

16   terms.  That, in fact, explains the Article III examples that

17   Mr. Bienenstock had cited this morning.

18         I want to pause for a moment on the *American*

19   *Insurance Company versus 356 Bales of Cotton* case.  We think

20   that that case is consistent with the pragmatic functional

21   approach that the Supreme Court has taken in looking at

22   whether particular constitutional provisions apply in the

23   territories.  So that was a case where the Congress had

24   created territorial courts.  It was in Florida, when Florida

25   was still a territory.  And the Supreme Court emphasized

1    there, and its analysis is repeated in any number of cases,

2    that Congress has to have the power to structure territorial

3    government.  It has to have the power to create court systems,

4    to create territorial legislatures, to delegate certain

5    responsibilities to those territorial legislatures.

6          And in doing so, as a practical matter, and as a part

7    of this functional approach, the Court has recognized that

8    there are practical reasons not to give life tenure to

9    territorial judges.  For example, Florida later became a

10   state.  What would have become of the life-tenured municipal

11   judges if, in fact, that Article III restriction had applied?

12         So there were practical reasons not to extend the

13   Article III life tenure requirement to the territorial court.

14   There were also practical reasons to ensure that the

15   territorial courts could exercise admiralty jurisdiction, and

16   that's because there were no federal courts operating side by

17   side in Florida that could have exercised that jurisdiction.

18   There it was a salvage claim.  And so the concern was that the

19   territorial government simply couldn't have functioned if

20   there were particular types of claims, like salvage claims,

21   that couldn't be heard in the territorial court.

22         None of this analysis suggests that Congress is just

23   free from all constitutional constraints when it invokes

24   Article IV.  We think these cases just show that Congress

25   wasn't required to follow that particular Article III

1     constraint in creating territorial courts for practical

2     reasons.

3          And I'll emphasize as well that there's no

4     explanation on the other side for why bankruptcy uniformity

5     should not apply in the territories, looking again at the

6     purpose of the constitutional provision, whether the purpose

7     would be advanced by applying the law in the territories, and

8     further looking at whether there would be any practical

9     obstacles.

10          The purpose of the uniformity requirement, and this

11    comes from cases like *Gibbons*, is to essentially prevent

12    discrimination against creditors and thereby protect national

13    commerce.  So the time of a binding -- there were a wide

14    variety of state discharge schemes in bankruptcy.  There was a

15    wide variation, and, in particular, a lot of discrimination

16    against out-of-state creditors, against British creditors.

17    And so the framers thought that Congress should have this

18    power to create a unique -- I'm sorry, a uniform bankruptcy

19    scheme that would guard against legislating so narrowly that

20    it would enable this type of discrimination, and thereby,

21    would be able to protect national commerce.  And that purpose

22    is fully advanced by having the uniformity requirement apply

23    in the territories.

24          Puerto Rico, of course, has long participated in the

25    national market for municipal debt.  It's issued many, many

1    billions of dollars in bonds that are held by creditors

2    throughout the nation.  And, of course, these proceedings will

3    affect the interest of investors and creditors around the

4    nation.

5         So inventing bankruptcy laws for the territories from

6    the uniformity requirement we think would harm national

7    commerce by undermining the predictability and fairness of

8    commercial regulations.  It would harm the very debt market

9    that Puerto Rico wants to gain access to again.  And there's

10   no practical impediment to applying the bankruptcy uniformity

11   laws in the territories.

12        This isn't like the example of the territorial

13   courts, unlike tenure.  In fact, Puerto Rico was subject to a

14   Chapter Nine bankruptcy for many decades, and there were no

15   suggestions that that created any kind of practical problem or

16   otherwise infringed on the flexibility that Congress might

17   otherwise need with respect to the territories.

18        The emphasis on the purpose of Article IV, to give

19   Congress flexibility as a general matter, it doesn't answer

20   the question of why Congress specifically needs that

21   flexibility to depart from the uniform Bankruptcy Rules in the

22   territories.  And so the Supreme Court analysis in *Aurelius,*

23   we think has equal application here.

24        With respect to the Appointments Clause, the Court

25   said, why should it be different just because the law relates

52

1    to Puerto Rico and other Article IV entities.  We don't think

2    that there's any good answer to that question here.

3           I want to make a final point in response to the

4    arguments relying on tax uniformity precedent.  And

5    Mr. Humphreys has also referred to the naturalization

6    precedent.  At the outset, as I've mentioned, this is a

7    provision-specific approach.  The Supreme Court has never

8    applied a one-size-fits-all analysis to the various

9    constitutional provisions.  And instead, in all of these

10   cases, it's looked at the purpose of a particular provision

11   and analyzed whether that should apply in the territories.

12          So at the outset, naturalization uniformity serves a

13   different purpose.  There would be practical obstacles to

14   applying those naturalization rules across the board to

15   territories, when some may actually disassociate from the

16   United States and no longer have a political relationship,

17   others might become ever closer and maybe achieve statehood.

18          Tax uniformity also serves a different purpose.  It's

19   about making sure that Congress doesn't favor certain states

20   over others.  So it's not intended to standardize creditor

21   relief in the same way that bankruptcy uniformity is.  And

22   Congress' taxing power as well wasn't intended to preempt

23   state tax authorities.

24          States, of course, have wide variation in their tax

25   schemes today, and that's why cases like *Binns* could recognize

1    that Congress can create local taxes that reflect that same

2    divergence, because any state or locality could do the same

3    thing.  But more fundamentally, the tax uniformity precedent

4    traces back to the Supreme Court's decision in *Downes versus*

5    *Bidwell*.  And this, of course, was one of the Insular Cases.

6         Those cases have been wholly discredited.  They rest

7    on the racist colonial theories that inhabitants of

8    territories are members of an alien race, that effectively

9    inhabitants of territories aren't entitled to the same kind of

10   constitutional protection as other citizens of the United

11   States.  And so the analysis in the tax uniformity precedent,

12   and specifically Mr. Humphreys had emphasized this throughout

13   the United States' language, that goes directly back to the

14   view that you could treat territories as not being part of the

15   United States, because of this alien race theory that is

16   wholly discredited.

17        In the First Circuit, of course, and the Supreme

18   Court have both said that the Insular Cases should not be

19   extended.  So our submission is that it wouldn't be proper to

20   reflexively apply on tax uniformity precedent here -- those

21   precedents serve a different purpose, and to try to extend

22   their analysis automatically to bankruptcy uniformity we think

23   would represent an extension of the Insular Cases that the

24   Supreme Court has already disavowed.

25        This really actually comes full circle to the

1  Oversight Board's assertion that statutes passed pursuant to

2  Article IV are, therefore, local laws, which therefore means

3  that Congress can do whatever it wants with the territories,

4  even if there would otherwise be constitutional restrictions

5  on its authority.  That would be perhaps the biggest extension

6  of the Insular Cases of all, and it's not the law.  The

7  Supreme Court has rejected it.  The First Circuit has rejected

8  it.  And we would ask this Court to reject it as well.

9          I'd like to turn now to the substantive uniformity

10  argument, and move on to our arguments that Puerto Rico -- I'm

11  sorry, that PROMESA violates the uniformity requirement.

12  Mr. Humphreys at the outset has emphasized that Congress has

13  flexibility under the uniformity requirement, but uniformity

14  is not toothless.

15          I'm sorry, Your Honor.  Can you hear me?

16          THE COURT:  Yes, I can.  I'm sorry.  I'm just

17  trying -- I interrupted you a couple of times, and I'm trying

18  to restrain myself so that you can speak.

19          MS. PRELOGAR:  I'm sorry.  For some reason I wasn't

20  lighting up on the screen dashboard, so I was worried that I

21  had lost the connection.

22          THE COURT:  No.  I hear you very clearly.

23          MS. PRELOGAR:  Excellent.

24          So as I was saying, the uniformity requirement isn't

25  toothless.  If you look at Supreme Court precedent, you can

1    distill two different types of restraints, and PROMESA here

2    violates each of them.  First, the Supreme Court recognized in

3    the *Gibbons* case that Congress cannot legislate for such a

4    narrow class of debtors that it effectively constitutes a

5    private bankruptcy bill.

6         In *Gibbons*, Congress had passed a statute for a

7    particular railroad bankruptcy, and had given priority to the

8    claims of one group of creditors, the employees, over other

9    groups of creditors, the bondholders.  And what the Supreme

10   Court said is that the statute was problematic, because

11   Congress had legislated too narrowly; that it was effectively

12   attempting to address the problems of one regional railroad,

13   rather than to create a set of rules that could apply equally

14   to all creditors and all debtors in a class.

15        And then the second requirement that the Supreme

16   Court has recognized is one of geographic uniformity.  Of

17   course we acknowledge, and it's come up here again several

18   times today, that Congress can respond to geographically

19   isolated problems, for example, with respect to industries.

20   So if you can imagine, if an industry was clustered in one

21   region, Congress wouldn't, on that basis alone, be

22   disempowered from acting.  But Congress can't define the

23   problem as one of geography itself, or else it would end run

24   the basic bankruptcy policy of guarding against geographic

25   discrimination.

1        And just to try to make this more clear with a

2   concrete example, if Congress created one bankruptcy scheme

3   for California, and then a different bankruptcy regime for New

4   York, that would aim at the very evil that the Bankruptcy

5   Clause is intended to address.  And so those kinds of explicit

6   geographic distinctions in bankruptcy laws are disapproved.

7        Now, the Oversight Board relies on *Blanchette,* and

8   notes that there there was a geographic definition in that

9   statute; that in *Blanchette*, the railroads that were covered

10   by that statute were defined in terms of the region where they

11   operated.  But the critical thing to recognize is that the

12   geographic definition in *Blanchette* was effectively shorthand,

13   because it was possible to define that debtor class without

14   reference to geography.  The Supreme Court emphasized that

15   fact.  The Court said, this law applies to all relevant

16   railroads then operating across the United States, and for

17   that reason, the Court could conclude that it operated

18   uniformly with respect to the debtor class, and also uniformly

19   with respect to all creditors of the debtor class.  In other

20   words, that the definition of the region there didn't obscure

21   that this was actually a law that was uniform throughout the

22   United States.

23        But here PROMESA transgresses both of these

24   limitations.  It's effectively a private bankruptcy bill for

25   Puerto Rico, and Puerto Rico is a geographically defined

1   debtor.  There can be no real dispute that Puerto Rico stands

2   alone in having access to the unique Title III discharge of

3   debt proceedings in PROMESA.

4        There was a brief argument, I believe, in the

5   briefings by the Retiree Committee and the United States that

6   the statute defines the word "territory" to include other

7   territories.  But the critical point is Congress purposefully

8   excluded those other territories from PROMESA, and made clear

9   that, in that way, only Puerto Rico would have access to

10  PROMESA's debt adjustment process.

11       And then as well, geography alone determines the

12  statute's coverage.  There's no way to describe the debtor

13  class subject to PROMESA without using that geographic

14  definition.  And Congress recognized this problem that there

15  is emphasis.  In Section 3(b), this is a severability

16  provision, Congress expressly noted that PROMESA could be

17  invalidated as a nonuniform bankruptcy statute in recognition

18  that PROMESA applies to Puerto Rico and not to a broader

19  debtor class.

20       So although we recognize that Congress has

21  flexibility under the bankruptcy uniformity requirement,

22  looking at the specific limitations that have been

23  acknowledged in the case law, we think that PROMESA violates

24  both of them.

25       Now, the Oversight Board has emphasized, and it came

1    up again this morning, that PROMESA applies not just to the

2    Commonwealth, but also to the instrumentalities.  And the

3    problem with that argument is that the debtor class here is

4    defined in express terms about the entities' relationship to

5    each other, and again, it's defined in express geographic

6    terms.  So it's not like this is a statute that is aimed at a

7    particular industry, or a statute that aims at particular

8    status, like municipal status.

9         I think Mr. Bienenstock ticked off a long list of

10   different types of industries that had been regulated under

11   bankruptcy law, but here the debtor class is expressly defined

12   in terms of the relation of the class of debtors to one

13   another.  The Section 511 defines Puerto Rico as the

14   Commonwealth and its instrumentalities.  Section 519 defines

15   the instrumentalities as being part of the territory.  And

16   PROMESA further underscores its relationship in a variety of

17   ways.

18        We've emphasized, of course, that the Oversight Board

19   serves as the sole statutory representative of all the

20   governmental entities in Puerto Rico.  And this Court, the

21   First Circuit, have both said and emphasized that the Board

22   can carry out those duties in a holistic manner.  So in taking

23   steps on behalf of the instrumentality, it can consider the

24   interests of the Commonwealth as well.  And as a practical

25   matter, this is, I think, also critically important.  The

1    financial interests of the Commonwealth and the

2    instrumentalities that are being adjudicated in these Title

3    III proceedings have been found by the Court to be intertwined

4    in various respects.

5         The Oversight Board made this clear in the COFINA

6    proceeding when it said multiple times that COFINA had to go

7    forward first as a gating item in the *Commonwealth* case,

8    because whether the sales and use taxes were the property of

9    COFINA or available resources of the Commonwealth was one of

10   the critical, dominant, disputed legal issues in the case.

11   And as a practical matter as well, the Commonwealth has

12   exercised substantial control over revenues that are owed by

13   statute to the instrumentalities.

14        Your Honor is well aware Ambac's objected to that and

15   believes it's unlawful; but for present purposes, it shows the

16   relatedness of the debtors covered by PROMESA, and underscores

17   that this law implicates the same concerns as a private

18   bankruptcy bill.  Because if Congress is permitted to

19   legislate so narrowly, if it can effectively define a debtor

20   class in terms of this express relationship between the

21   debtors, as here, then it can discriminate against creditors

22   and undermine national commerce in ways that the founders

23   aimed to prevent through adoption of the uniformity

24   requirement.

25        It would be, for example, no different than

1    legislating private bankruptcy relief for members of one

2    family, or to legislate a private bankruptcy bill for all the

3    governmental units of just one state or one city.  When the

4    relationship between the debtors is the defining element of

5    the class, then the interests in *Gibbons* equally applies.  And

6    the interest in avoiding the possibility of discrimination,

7    and in protecting national commerce, we think should carry

8    weight.

9            The Oversight Board has also argued that PROMESA was

10   simply a response to a geographically isolated problem.  And

11   we think that that is flawed both factually and legally, so

12   I'd like to briefly walk through each of those points.

13           Factually, Puerto Rico was not the only territory in

14   financial distress when PROMESA was enacted.  As we've

15   explained in our briefing, Guam and the U.S. Virgin Islands

16   had, likewise, seen their debt-to-GDP ratios balloon.  Both of

17   those territories had outstanding pension obligations that

18   could raise questions about whether they would be able to

19   continue their debt service at existing levels.

20           In early 2017, the U.S. Virgin Islands actually had

21   more debt per capita than Puerto Rico.  I believe it had

22   19,000 dollars per person, whereas Puerto Rico had 12,000 per

23   person.  And, in fact, the Virgin Islands had lost access to

24   capital markets at favorable interest rates, and some of its

25   bonds had been downgraded to junk status.

1          So the suggestion here that Puerto Rico stood alone,

2     that it was the only territory that was in financial distress,

3     or that could conceivably at some point need access to

4     restructuring relief, is belied by the facts and the existence

5     of other crises in other territories at the same time.  But

6     the more important point I think is the legal one, which is

7     that if Congress could really draw these kinds of fine

8     distinctions, and could say that Puerto Rico can have this

9     bankruptcy bill, because it's most in need of reorganization,

10    and it, therefore, can constitute its own debtor class, that

11    would effectively mean that there's nothing left of the

12    bankruptcy uniformity requirement.

13         At that point, Congress could always define the

14    problem narrowly, and it could create nonuniform laws down the

15    line by identifying each particular debtor, looking at that

16    debtor's financial situation, trying to identify

17    characteristics that it thinks warrant a bankruptcy bill, and

18    then creating that bankruptcy bill.  And if that's all that

19    that uniformity requires, is for Congress to identify the

20    particular problems of a particular debtor, and then try to

21    address that particular issue, the uniformity would have very

22    little application at all.

23         It's also not clear that this should even be about

24    present financial distress.  So this is the test the Oversight

25    Board has offered where they focused on the notion that Puerto

1    Rico was most in need of restructuring, but the problem with

2    that is that these kinds of bankruptcy regimes should be

3    forward looking.  The whole point is to create a uniform and

4    stable set of rules about how the market is going to operate.

5    And that's, of course, how Chapter Nine bankruptcy works.

6          In the Chapter Nine context, there is a set of rules,

7    and municipalities and their creditors know those rules.

8    Notwithstanding the fact that some municipalities may never

9    need bankruptcy relief at all, the statute is not focused on

10   kind of -- that present financial situation.

11         So for those reasons, we don't think that PROMESA can

12   be justified here as a response to a geographically isolated

13   problem without essentially reducing the scope of the

14   uniformity requirement in ways that contrast sharply with what

15   the Supreme Court has recognized is available under the

16   uniformity requirement.

17         Finally, I want to briefly respond to

18   Mr. Bienenstock's point about the asserted similarity between

19   PROMESA and Chapter Nine.  And at the outset, I want to

20   emphasize that of course PROMESA creates a fundamentally

21   different set of rules for Puerto Rico as compared to all

22   other territories, because no other territory has access to

23   court-supervised debt restructuring at all.  The other

24   territories are boxed out of and closed out of having

25   bankruptcy relief.

1          And so in that sense, just thinking about the

2     comparison, PROMESA creates an entirely different set of rules

3     for Puerto Rico as would be applied in any other territory,

4     and that is one of the relevant distinctions that we think

5     matter for uniformity purposes.  But even just looking at

6     Chapter Nine, there are a number of differences between the

7     scheme that PROMESA creates and other bankruptcy laws, and

8     they fall into -- we've listed a number of provisions in our

9     Complaint and discuss a number of provisions in our briefing.

10         I wanted to quickly walk through the three principal

11    categories of difference that we see.  The first is PROMESA's

12    plan confirmation provision.  This is Section 314(b)(7).

13    Mr. Bienenstock discussed it as well.  This is the provision

14    that provides that a plan can only be confirmed if it's

15    consistent with the Board's certified fiscal plan.  And the

16    fiscal plan provision, which is Section 201, then settles,

17    establishes exclusive requirements for allocating funding

18    among the Commonwealth's creditors.

19         And the Board has said that it can interpret and

20    apply those requirements in its discretion, but the issue here

21    and the problem we perceive is that the fiscal plan then

22    becomes a critical input into the plan of adjustment.  And

23    that has no comparable analog in Chapter Nine.  There's no

24    equivalent to 314(b)(7) in Chapter Nine at all.

25         The fiscal plan isn't just projection.  It's

1    determination by the Oversight Board about how much money the

2    Commonwealth can expend to service its debt, and how to

3    allocate that funding among different creditors.  So this

4    really does, in our view, raise the risk that the fiscal plan

5    will essentially be used to set a benchmark for feasibility in

6    a way that differs from other municipal bankruptcies.  And

7    that's the first category.

8           The second category is the limitations on judicial

9    review.  So this comes from Section 106(e).  It applies, of

10   course, to the Board's certification decision and its

11   certification of the fiscal plan.  But the Board has suggested

12   it has authority under PROMESA to allocate the Commonwealth's

13   revenue among creditors in a manner that it asserts can't be

14   reviewed at plan confirmation.  And if that were true, that

15   would be another substantial difference between how Chapter

16   Nine operates and how PROMESA works.

17          And then the final category I would point to is the

18   role of the Oversight Board itself.  The Oversight Board,

19   again, is the sole statutory representative for all of the

20   debtors.  It has taken over the functions in this bankruptcy

21   proceeding that would otherwise, in the Chapter Nine context,

22   be exercised by state and local officials.  And those state

23   and local officials would not have the same conflict of

24   interest that we perceive the Board to have.  They also would

25   be politically accountable in a way that the Board is not.

1    They would be accountable to the public, to creditors, and to

2    their constituents.  So, in that sense, we think that there

3    are any number of differences between PROMESA and Chapter Nine

4    that are relevant here.

5           In its briefing, the Board suggests that, actually,

6    the Court shouldn't look at Titles I and II of PROMESA at all.

7    Instead, the Court should just focus on Title III.  Of course,

8    just focusing on Title III, there are fundamental

9    distinctions, as I just mentioned, for example, with the plan

10   confirmation provision.  More fundamentally, these are an

11   integrated bankruptcy scheme.  Title III itself incorporates

12   and relies on Title I and Title II authority.

13          So as I just mentioned, of course, the plan

14   confirmation provision directly incorporates the Board's

15   certified fiscal plan by requiring that consistency with the

16   fiscal plan for purposes of confirming the plan.  And Title I,

17   in the existence of an Oversight Board that's created under

18   that provision, itself provides the gateway to the bankruptcy

19   proceedings, because absent having an Oversight Board created

20   in accordance with Section 101 of PROMESA, an entity isn't

21   entitled to adjust its debt under the statute at all.

22          So in that sense, we think that these provisions all

23   do form an integrated scheme.  And I would point as well to

24   Congress' own determination in this regard.  Congress

25   expressly linked these provisions for purposes of

1   severability.  It provided that if Title III is invalid, then

2   Titles I and II of PROMESA should be invalidated as well.  So

3   we think that's further evidence that Congress itself viewed

4   these provisions as operating and working together, in tandem,

5   to create the debt adjustment scheme that's at the core of

6   PROMESA.  But it also means the severability provision -- that

7   this issue is a little bit academic, because whether or not

8   the Court looks at Titles I and II, for purposes of assessing

9   the uniformity, it's clear that Title III is a bankruptcy

10  statute; that it addresses the subject of the relations

11  between debtors and creditors; and for that reason as well,

12  the severability provision and the lack of the possibility of

13  severability demonstrates that all three of these titles have

14  to rise or fall together.

15       My final point on this is just to emphasize again

16  that Congress itself recognized that a court could find

17  PROMESA to be nonuniform.  That's why it included the language

18  in Section 3(b), specifically acknowledging that a court could

19  hold that PROMESA is invalid as a nonuniform bankruptcy

20  statute.  We think the Court should reach that conclusion

21  here.

22       Now I'll turn, unless the Court has questions, to the

23  severability issues.  And I'll be brief on this, because the

24  parties' briefs discussed this in full.  There hasn't been a

25  lot of discussion about it at the hearing this morning, but I

1    did want to quickly touch on our perspective on why the

2    Severability Clause cannot be implemented in this case.

3            So Section 3(b) is a provision where Congress

4    recognized at the outset that PROMESA could be declared

5    unconstitutional, but then said that the fix here is that the

6    Court shall extend PROMESA -- and this is a quote -- to any

7    other similarly situated territory, end quote, that requests

8    the establishment of an Oversight Board.  We don't think that

9    fix can be implemented.  And there are really two key problems

10   to focus on.

11           The first is that Congress didn't define what

12   characteristics or criteria should be used to determine if a

13   territory is substantially similar, and that's a legislative

14   judgment.  It goes to the question of what the debtor class

15   should be, which entities PROMESA should cover in the first

16   place.  That's the legislative domain to determine exactly

17   what the scope of the debtor class should be for bankruptcy

18   purposes.

19           And it's not as though there's only one way to draw

20   the line.  One possible way would be to say that all

21   territories should be covered, that, basically, the status of

22   being a territory is itself the similar situation that the

23   territories confront.  But there are other ways.  The

24   Oversight Board has suggested that the level of financial

25   distress should be relevant.  And then that raises the

1    question, well, what is the relevant level?  Is it with a

2    metric?  Is it debt-to-GDP ratio?  Is it having bonds

3    downgraded to junk status?  Is it losing access to capital

4    markets?  Our submission is that those are questions for

5    Congress to answer.

6          The Oversight Board suggests that the Court would

7    have to consider substantial similarity as part of

8    adjudicating the claim in the first place, but that's not

9    actually how uniformity analysis proceeds.  It's not necessary

10   to consider what lines Congress could draw, or to go beyond

11   and try to dictate for Congress how it has to legislate on a

12   more uniform basis.  That's not the role of the Court.

13   Instead, what the Court does in a uniformity challenge is to

14   look at the lines that Congress actually did draw and

15   adjudicate their constitutionality.

16          And then finally, even if it were possible to get

17   past this hurdle and to identify the similarly situated

18   territories, the problem is that there is no way to implement

19   the Severability Clause without adding words and provisions to

20   PROMESA that aren't currently there.  So, again, under Section

21   302, an entity can only qualify as a debtor if it has an

22   oversight board established for it under Section 101.  And

23   this is a limitation that's repeated throughout other

24   provisions of PROMESA.

25          So, for example, in Section 5(7), this is another

1    definitional provision, a covered territory is defined as a

2    territory for which an oversight board has been established

3    under Section 101.  But the problem is that if you've looked

4    to Section 101, there's no provision there that provides any

5    mechanism to establish an oversight board for any other

6    territory.  Section 101 is focused and creates the Oversight

7    Board for Puerto Rico alone.

8            So that means that to try to implement this

9    severability fix, the Court would have to actually add words

10   to the statute, add provisions to the statute that aren't

11   currently there, and add this mechanism into Section 101.  And

12   that's not how severability analysis generally works.  It's

13   about striking words from a statute and removing an

14   unconstitutional provision.  It's not about adding provisions

15   that aren't currently there.

16           The other side has invoked cases like *Barr versus*

17   *American Association of Political Consultants*, but that

18   actually reflects the traditional way that severability works.

19   There, there was an unconstitutional limitation in a statute

20   that the Court can strike, and it had the effect of expanding

21   the statute's scope.  But the Court didn't add any words to

22   the statute to do that.

23           This stands in sharp contrast, and I'll just note

24   that we really boiled the ocean here in looking for comparable

25   situations where either a Severability Clause like this

1   exists, or where courts have considered and -- considered

2   whether to enforce such a clause, and we couldn't find

3   anything.  This is a really unique kind of provision.  And

4   ultimately, although Congress recognized the uniformity

5   problem inherent in PROMESA, it didn't provide an appropriate

6   mechanism for the Court to fix it itself.  That has to be the

7   work of Congress, to draft the uniform statutes that can

8   provide bankruptcy relief to Puerto Rico and a wider debtor

9   class.

10          THE COURT:  I do have a question for you about this.

11  If the Court were to take Congress at its word, and extended

12  the statute, using the words of Congress, to similarly

13  situated territories that request an oversight board, by the

14  structure of PROMESA, the territory, the would-be similarly

15  situated territory can't get any further until it has an

16  oversight board, because, otherwise, Title II doesn't operate

17  and the Title III petition can't be filed.

18          So doesn't that language essentially funnel the

19  threshold question of what territory is sufficiently

20  situated -- similarly situated to merit an oversight board,

21  back to Congress, so that Congress is making the determination

22  as to whether the particular territory is eligible, but what

23  the Court would be doing would be taking up Congress'

24  invitation or grant of permission to open this line of

25  application back to Congress under this statute?

1          So it seems to me that Congress is not requiring the

2    Court to decide who is similarly situated today, except that

3    it would have to be a territory, and giving Congress the

4    opportunity to make the finer distinctions on a particular

5    record with respect to a particular territory.  So why is that

6    a problem?

7          MS. PRELOGAR:  Well, I think it's absolutely right

8    that Congress would be best positioned and is the only entity

9    with authority to make the determination about which

10   territories are similarly situated.  So what that means is it

11   would require further Congressional action to expand PROMESA's

12   scope and to ensure that there were other territories that had

13   access to bankruptcy.

14         And, in fact, in the drafting history, originally,

15   Congress had drafted this to provide a mechanism in Section

16   101 for other territories to have oversight boards established

17   for them, but Congress expressly removed that provision from

18   the statute before finalizing PROMESA.  And that's what

19   ultimately turned this into a statute that was focused only on

20   Puerto Rico.

21         If I'm understanding Your Honor's question correctly,

22   I think the problem is that this really does have to go back

23   to Congress.  So there's no way for the Court itself to

24   determine the similarly situated territories and then add that

25   provision to PROMESA.  That's what all the parties have

1    understood the Severability Clause to dictate.  And it's not

2    an enforceable remedy.  This means that it would have to go

3    back to Congress, and then Congress could take that action and

4    make the determination about how to legislate with a broader

5    debtor class in mind.

6              THE COURT:  Thank you.

7              MS. PRELOGAR:  I'd like to turn now to the procedural

8    issues in the case, and I want to begin with laches in

9    particular.  And I want to respond to the allegations that the

10   suit is untimely.

11             There have been a lot of words thrown around in the

12   briefing that this was strategic delay, that this was

13   gamesmanship on Ambac's part, and I want to push back

14   forcefully on that characterization.  The critical thing to

15   recognize here is that -- the way that the injury to

16   creditors, and to Ambac in particular, has become more

17   apparent and more concrete over time through the course of the

18   proceedings.

19             So it's not as though Ambac was immediately injured

20   in a concrete sense, in a practical way, by the fact that

21   Congress passed this nonuniform statute.  We're not purporting

22   to be constitutional purists who just have an abstract or

23   academic interest in ensuring that Congress stays within

24   constitutional limits.  Instead, we're arguing that Congress

25   exceeded those limits in a manner that over time has enabled

1    the Oversight Board to discriminate against creditors in

2    profound ways that finally prompted Ambac to file this suit.

3         And litigation like this is an investment.  There's

4    always a question of whether it's worth it to bring a case.

5    In the beginning, and in the prior phases of this proceeding,

6    it wasn't fully apparent how these nonuniform provisions of

7    PROMESA would be interpreted, or what authority the Board

8    would seek to claim under the provision.  This was a novel

9    thing for us to see.  There wasn't anything exactly like it.

10        And earlier on, in fact, the Board adhered far more

11   closely to normal bankruptcy procedure.  For example, in the

12   COFINA Title III, the Board appointed an independent

13   representative to represent COFINA, that thus eliminated the

14   same concerns about conflicts of interest.  And it also wasn't

15   clear in the beginning exactly how PROMESA would be

16   interpreted, what some of these nonuniform provisions would

17   mean in practice, what practical effects they would have.  But

18   as time has gone on, as we've received additional decisions

19   from this Court and from the First Circuit, it's illuminated

20   the meaning of those provisions.

21        And I'm thinking here, for example, of decisions

22   about Section 106(e), and the nonreviewability of the

23   Oversight Board's fiscal plan.  Of course, there have been the

24   decisions I referred to earlier from this Court and from the

25   First Circuit on the holistic approach that the Board may

1    employ in these proceedings.

2         As this Court knows, Ambac's resisted many of these

3    interpretations at nearly every turn.  But the point is that

4    PROMESA's nonuniform provisions, as they have been

5    interpreted, have made far more clearly the various ways in

6    which PROMESA operates differently from other bankruptcy laws.

7         And the other relevant change here has been how the

8    Oversight Board has, over the course of the Title III

9    proceedings, itself taken increasingly expansive positions

10   about the authority that it thinks has been granted under

11   PROMESA.  Those positions have themselves brought into sharper

12   and more concrete focus the harms that are caused by the lack

13   of uniformity.

14        So, for example, the Board's theory of preemption has

15   evolved over time, and now the Board is arguing that PROMESA

16   preempts all pre-PROMESA territorial law.  But the Board's

17   further saying that it can selectively invoke that preemption

18   rationale to, in essence, choose for itself, pick the winners

19   and losers of which creditors to favor in the Title III

20   proceeding.  And that's culminated in the Proposed Plan of

21   Adjustment that we're currently reviewing, that gives 90

22   percent recovery to the pension claimants, and then gives

23   nearly all of the remaining plan consideration to the GO

24   bondholders, while revenue bondholders would receive less than

25   one percent on their claims.

1           So, you know, ultimately, when a party's injury like

2   this becomes more pronounced or more apparent over time,

3   courts have recognized that laches shouldn't stand as a bar to

4   the suit.  And I would point the Court in particular to the

5   decision in *Garza*.  This is a decision we cite from the Ninth

6   Circuit that involved an unconstitutional redistricting plan.

7           There the Ninth Circuit recognized that the

8   plaintiff's challenge to the plan was on its face, and could

9   have been brought at the moment the plan was adopted; but the

10  plaintiffs had waited to see how the injury would develop,

11  what that plan would produce.  And it wasn't until after

12  several election cycles, when it became clear that that plan

13  was producing serious concrete injury, that the plaintiff

14  filed suit.  And the Ninth Circuit has said that that period

15  of delay was justified given the way that the facts on the

16  ground had shifted.

17          A contrary rule, of course, would force litigants to

18  file suit instead at the earlier possible moment, so

19  incentivize, essentially, constitutional litigation, and

20  discourage waiting and any possible voluntary dispute

21  resolution.

22          The other point I want to make on the laches claim is

23  that the arguments to laches really ignore the legal framework

24  here that applies to claims like this one where we're seeking

25  prospective relief for an ongoing injury, and it's really

1    important to emphasize that context.  Our argument here is

2    that PROMESA is an unconstitutional statute that creates

3    ongoing injury, that didn't just happen at one discrete moment

4    in time when Congress passed the statute, but rather creates

5    the potential for harm that exists and continues to this day.

6         And courts are cautious about applying laches to

7    claims for prospective relief generally, but especially to an

8    unconstitutional statute that affects a wide variety of

9    people.  But part of that is the practical recognition that

10   the harm truly can't be said to be remote in time in that

11   instant.  You know, the typical case of laches, the harm

12   happened at one point in the past, many years have elapsed,

13   and then the plaintiff seeks a retrospective remedy.  And

14   there there might be prejudice, because witnesses memories

15   might fade, documents might have gotten lost, and so that's

16   kind of the quintessential application where laches has been

17   held to apply.

18        But there's a fundamental difference when there's an

19   ongoing constitutional injury.  And, again, *Garza*, the Ninth

20   Circuit case I've referred to, recognized this principle and

21   held that even though the plaintiff had waited years to

22   challenge the unconstitutional redistricting plan, laches

23   didn't bar the claim.

24        There's a practical component as well, of course,

25   because if an unconstitutional statute remains in effect, then

1   it could trigger a new lawsuit at any time.  There's not the

2   same idea or prospect that there's a discrete past injury that

3   happened so long ago that now the parties' rights have kind of

4   become settled through the passage of time.

5           Here, for example, imagine if the Oversight Board

6   were to file a new Title III tomorrow, let's say for PRIFA.

7   There would be no argument that a uniformity challenge could

8   be barred in the context of that Title III.  So there's no way

9   to get the repose of the laches doctrine in that.  There's no

10  way that -- have it be a concrete past dispute that's settled.

11  The only way to get the repose is to actually adjudicate the

12  constitutional issue and decide whether or not PROMESA is a

13  constitutional bankruptcy statute.

14          Just one final point on laches with respect to

15  prejudice.  Mr. Friedman had mentioned that the money that the

16  parties have expended is part of the Title III proceedings,

17  but it's important to recognize that laches looks at whether

18  the delay itself is what caused the injury.  It's almost like

19  a detrimental reliance kind of inquiry.  And here there's just

20  no reasonable argument that these fees would not have been

21  expended if the suit had been filed earlier.

22          The Appointments Clause litigation was pending the

23  whole time.  Other challenges, of course, had been pending.

24  And it hasn't stopped the Oversight Board from pressing

25  forward, so I don't think there's any real argument to be made

1      that the Oversight Board would have discontinued its efforts

2      in these Title III proceedings if only the suit had been filed

3      earlier.  And for that reason, we don't think laches can bar

4      this suit.

5            I'll turn now to the estoppel doctrine.  I want to

6      emphasize at the outset, Mr. Friedman has kind of generally

7      referred to equitable principles, but these are doctrines,

8      narrow doctrines with distinct elements.  And here, down the

9      line, none of the elements of constitutional or judicial

10     estoppel are satisfied.

11           So just focusing in on constitutional estoppel for a

12     moment, the Supreme Court has made clear that the statute has

13     to create a unique benefit that didn't previously exist, and

14     then the litigant has to voluntarily elect to receive that

15     benefit, so essentially opt into the statute for a scheme in

16     the first place.  You can't choose to receive a benefit and

17     then seek to remove conditions on the receipt of the benefit

18     under the statute.  It's basically the articulation the Court

19     has adopted.

20           But here there's no benefit in the first place.

21     PROMESA doesn't create new or special rights for creditors.

22     It, in fact, provides a debt adjustment mechanism that

23     interferes with their pre-existing rights.  So it stands in

24     sharp contrast to cases where the Court has concluded that

25     there was a statutory benefit.

1          For example, *Robertson versus FEC*, the Oversight

2    Board cites this case, that was a statute that created a pool

3    of money for presidential candidates who could voluntarily

4    choose to accept those matching funds.  There's nothing like

5    that here.  Their sole argument is that Ambac obtained a

6    benefit in COFINA based on the amounts it lists in terms of

7    the COFINA Plan.

8          But the Board ignores that Ambac was owed more than

9    it was paid.  And there's just no case suggesting that a

10   bankruptcy statute that authorizes the discharge of debt and

11   impairs the obligation of contracts can instead be

12   characterized as a benefit to creditors for estoppel purposes.

13   It essentially requires changing the frame of reference and

14   saying, well, Ambac could have been paid even less.

15         And that's essentially what the argument is here,

16   that in a world without PROMESA, Ambac is actually better off

17   now in the grand scheme of things, but that's just not how

18   constitutional estoppel works.  And I point the Court to the

19   Supreme Court's decision in the *Kadrmas* case.  This was the

20   school bus fee case.

21         There the argument was made that absent that school

22   bus statute, the plaintiff would have had to pay even more

23   money, because private bus transportation costs ten times the

24   amount of the public bus fee.  And the Court rejected that

25   argument and said, you can't characterize a benefit in that

1  way.  We think the same argument applies here.

2          There's also not the same showing of voluntariness.

3  Ambac, of course, had no control over whether to become

4  subject to PROMESA.  It was the Board that decided in its sole

5  discretion to file the Title III proceeding in PROMESA -- I'm

6  sorry, for COFINA.  And at that point, of course, Ambac tried

7  to defend its rights and interests in the context of the

8  COFINA proceeding, but we've cited ample precedent that

9  emphasizes that when a plaintiff seeks to protect its business

10 interests under a statute that it had no choice to become

11 subject to in the first place, it is not estopped.  And those

12 cases include *Abie*, *State Banks*, also the *Union Pacific*

13 *Railroad Company* case.

14         Turning quickly to judicial estoppel, the key problem

15 here is there's no directly inconsistent position.  Ambac has

16 never argued that PROMESA is not subject to bankruptcy

17 uniformity.  It's never argued that PROMESA satisfies

18 bankruptcy uniformity.  That issue just hasn't previously been

19 presented, discussed by Ambac, or adjudicated by this Court.

20         The theory of judicial estoppel rests on a single

21 filing in the COFINA proceeding, where Ambac was addressing a

22 different issue, a discrete issue this Court had posed about

23 whether the Court had authority to rule on the validity of the

24 new bond legislation.  But that was a question of statutory

25 authority or inherent authority of this Court to be able to

1    consider Commonwealth law.  There was no issue presented of

2    whether Congress had validly passed PROMESA under the

3    bankruptcy uniformity requirement.  And that's an important

4    thing to recognize.

5         The First Circuit precedent required a directly

6    inconsistent position, a mutually exclusive position.  So, for

7    example, in the *Lydon versus Boston Sand and Gravel* case,

8    which we've cited, the litigant said in the first proceeding

9    the state law provided the exclusive remedy --

10        (Sound played.)

11        MS. PRELOGAR:  -- and then turned around in the

12   second case and argued that federal law provided the exclusive

13   remedy.  That's a case where a litigant took a directly

14   inconsistent position on the exact issue that was presented,

15   and the Court held that judicial estoppel could apply.  But

16   this case is far more comparable to the ones we've cited,

17   where the allegation instead is that there's been some kind of

18   implicit change of position, and that the Court should read

19   something into that.

20        I would point the Court to the *RFF Family Partnership*

21   case, which we think demonstrates, based on very similar

22   reasoning, that there's just no argument here that the

23   directly inconsistent position prong could be satisfied.

24        I'll make just one quick point about the contractual

25   bar claim.  The Oversight Board didn't mention it today, and

1    practically abandoned the claim in its Reply Brief.  And we

2    think that's for good reason.

3            There's no showing here that this lawsuit in any way

4    violates the COFINA Plan Support Agreement.  The COFINA Plan

5    became effective nearly two years ago now.  The Plan Support

6    Agreement has terminated, and by its own terms, it has no

7    continuing effect.  That comes from Section 6.1(b) of the Plan

8    Support Agreement, which says that the agreement was over when

9    the Plan was substantially consummated.  That was back in

10   February, 2019.  And it also comes from the Section 6.2

11   provisions that expressly state that, after termination, all

12   the other provisions are null and void and have no force and

13   effect.  It lists some provisions that survive termination,

14   but the contractual claims that the Board is pressing here

15   isn't included on that list.

16           The Oversight Board doesn't engage with the

17   contractual terms at all.  We think the terms are clear, and

18   squarely foreclose the Board's claims.  But I should just

19   emphasize, as my final point, that even if the PSA were still

20   in effect, this suit does not violate it, because the COFINA

21   Plan has been consummated and can't be undone.  The old bonds

22   have been canceled.  The new bonds have issued.  They've

23   traded on public markets.  The distributions have been made.

24           (Sound played.)

25           MS. PRELOGAR:  So for that -- so I will just conclude

1    by saying that --

2              THE COURT:  Yes, please finish your sentence.

3              MS. PRELOGAR:  Thank you.  Thank you.  I appreciate

4    that.

5              That there's no real claim here, nor could there be,

6    that there's a contractual violation.  And for these reasons,

7    there's no basis to dismiss the Complaint, and we would

8    respectfully request that you deny the Board's Motion to

9    Dismiss.

10             THE COURT:  Thank you, Ms. Prelogar.

11             MS. PRELOGAR:  Thank you.

12             THE COURT:  We will now turn to the rebuttal

13   arguments, and first up is the Retiree Committee for five

14   minutes.

15             MR. GERSHENGORN:  Thank you, Your Honor.  Ian

16   Gershengorn again.

17             I just want to make a few quick points.  First, with

18   respect to whether the Uniformity Clause applied, Ambac

19   contends, and you've heard this morning that our position is

20   based on the idea that all constitutional constraints are

21   inapplicable; there's an on-off switch or a categorical bar.

22   But as Your Honor observed, that is not our argument.  Our

23   argument is specific to the Bankruptcy Clause and the

24   bankruptcy uniformity provisions.

25             So to be clear, we think that it doesn't apply for

1      two main reasons:  One, because the Bankruptcy Clause is not a

2      structural limit on all federal power, but instead a tailored

3      limit on a particular enumerated Article I power.   And,

4      second, because the Supreme Court and other courts have

5      already held that the other uniform provisions in the Revenue

6      Clause and the Naturalization Clause do not limit Congress'

7      powers in the territories.

8           Second, Ambac said we don't identify any reason not

9      to apply the Bankruptcy Uniformity Clause to the territories,

10     but that simply isn't true.  There's a very clear reason, and

11     that is, the point of Article IV is disuniformity.  It is to

12     give Congress a wide berth for inventive statesmanship.

13          As the Supreme Court has said, it's intended to give

14     broad latitude to develop innovative approaches to territorial

15     governance.  Presumably, that is exactly why the Court has not

16     applied the uniformity provisions of the tax -- of the Revenue

17     Clause, and why courts have not apply the uniformity provision

18     of the Naturalization Clause to the territories.

19          In response, and this is my third point, Ambac says

20     that somehow you should distinguish between the Revenue

21     Uniformity Clause and the Naturalization Uniformity Clause on

22     the one hand, and bankruptcy on the other.  But that is flatly

23     wrong.  First, the text is exactly the same for all three

24     provisions.  It would be an extraordinary means of

25     constitutional interpretation to interpret the exact same

1  clause in neighboring provisions in diametrically opposed

2  ways.

3         Second, of course the Court itself has looked to all

4  three clauses when interpreting each other.  That was true in

5  *Blanchette*, and it was true in *Ptasynski*, in which in both of

6  those cases, the court looked to the other provisions in

7  interpreting the provision before it.  All three provisions

8  use the same text, and the Court ostensibly interpreted them

9  all of a piece.

10        Third, Ambac says that you shouldn't rely on *Binns*

11  and the Revenue Clause, because it's an extension of the

12  Insular Cases, but that is simply not the case.  In fact,

13  *Binns* itself, which applied, of course, to Alaska, started the

14  analysis by saying on page 490 of the opinion, it is

15  unnecessary to consider the decisions in the Insular Cases,

16  though it is clear that *Binns* is not an Insular Case and that

17  the logic in *Binns* controls this Court.

18        And fourth, on this point, Ambac says that *Gibbons*

19  makes clear that the Territory Clause can't be used to, quote,

20  unquote, override the Bankruptcy Clause.  But in *Gibbons*, it

21  was a very different issue, because reliance on the Commerce

22  Clause there would have rendered the uniformity --

23        (Sound played.)

24        MR. GERSHENGORN:  -- entirely null and void.  But, of

25  course, that's not the case here.

1          If you apply -- if you don't apply uniformity to the

2    Territories Clause -- the Uniformity Clause of the bankruptcy

3    provision has ample scope, the scope it has always had, to

4    prevent discrimination among the United States.

5          Let me turn now to whether this is a local statute.

6    Again, Ambac mischaracterizes our argument by saying, we think

7    any time Congress invokes Article IV, that's a local statute.

8    That is not our position.  Our position is that this is, by

9    its terms, a local law.  We think *Aurelius* makes that clear.

10          Ambac says that *Aurelius* held something different,

11   and of course they do, but *Aurelius*' discussion of whether

12   officials' duties were primarily local is obviously relevant

13   to whether PROMESA itself is local.  And what the Court said

14   was the Board's duties are "quintessentially local," because

15   they, quote, concern the finances of the Commonwealth, not the

16   United States.

17          Ambac then repeats its argument that a state

18   legislature could not pass it, but that misunderstands

19   Congress' territories power.  What the Court has said is

20   Congress has, quote, full and complete legislative power over

21   the people of the territories, and practically unlimited

22   powers of legislation over the territories.

23          Finally, let me address Ambac's argument that this is

24   somehow a private bill.  I believe counsel said this is like

25   an act for a single family.  Well, of course Puerto Rico

1   provides services to three million people, and Congress found

2   expressly that fiscal emergencies were limiting its power to

3   do so.  That is nothing like a family or a single railroad.

4          I also want to say, in *Ptasynski*, one of the things

5   the Court said that really hasn't gotten a lot of play here

6   today is that whereas here Congress has exercised its

7   considered judgment with respect to an enormously complex

8   problem, we are reluctant to disturb its determination.  It

9   seems to me that the Supreme Court's wisdom there with respect

10  to the Uniformity Clause and the revenue -- the uniformity

11  provision in the Revenue Clause applies directly to the issue

12  before this Court today.  The uniformity provision was not

13  intended by Congress --

14          (Sound played.)

15          MR. GERSHENGORN:  -- to -- nationwide enactment to

16  deal with local conditions.  We think that Ambac's arguments

17  here today are non-persuasive, Your Honor.

18          Thank you, Your Honor.

19          THE COURT:  Thank you, Mr. Gershengorn.

20          We now have rebuttal from AAFAF for two minutes.

21          Mr. Friedman, I think you need to unmute.  Remember

22  it's both the dashboard and your phone.

23          Mr. Friedman, I'm still not hearing you.

24          MR. FRIEDMAN:  In order to --

25          THE COURT:  There you are.

1          MR. FRIEDMAN:   Thank you, Your Honor.

2          I have a lot to say.  I'm going to try to say it as

3    clearly as I can.

4          The first is that Ambac has completely ignored that

5    it brought a facial challenge to that institute.  There was no

6    response to that argument.  If you go back and read its

7    original Complaint, starting from day one of this case, they

8    have complained about Section 106; they have complained about

9    illegal fiscal plans; they have complained about unlawful

10   takings.  None of that has changed.  And the argument that

11   somehow things are different now is just incorrect.

12         Second of all, Ms. Prelogar completely misunderstands

13   the conflicts and holistic approach decisions of this Court

14   and the First Circuit which relate to established principles

15   under Chapter Nine, that this Court and the First Circuit have

16   cited and do not rely entirely on PROMESA precedents.  So it's

17   just inaccurate to say that those have only evolved over time.

18   Those relate to Eighth and Ninth Circuit decisions that

19   interpret, excuse me, Chapter Nine for years.

20         The third point I want to make is that certainly

21   Ambac could have acted more quickly on this.  It could have

22   sought injunctive relief.  So the idea that it didn't delay is

23   untrue.

24         The next point I want to make with respect to laches

25   is Ms. Prelogar cites the *Garza* case, but of course that case

1    had nothing to do with ongoing restrictions.  The plaintiffs

2    there wanted to go in and seek, for example, to revoke the

3    votes of legislatures that had been effected under prior

4    districts.  That would be the equivalent of the remedy sought

5    here.  This is to destroy an ongoing project.

6        There was no response to arguments about rejecting

7    contracts or rights that have already been determined.  Only a

8    focus on fees.  And speaking of fees, Ms. Prelogar completely

9    ignored the fact that her client signed up to the Plan Support

10   Agreement with COFINA, not to receive benefits under a plan of

11   adjustment, but to receive unique and special benefits in

12   securities design and payments of tens of millions of dollars

13   of legal and professional fees.  That's not being a simple

14   recipient of a plan treatment.

15       (Sound played.)

16       MR. FRIEDMAN:  That is being a strong proponent of a

17   plan.

18       Your Honor, if I may just finish.  And, finally, on a

19   very specific issue, I would encourage the Court to go back

20   and read paragraph four in Ambac's pleading in support of

21   COFINA where it, with respect to specifically Section 314,

22   focuses on a substantive difference, and notes -- between the

23   Bankruptcy Code and PROMESA, and says, in putting that

24   provision in, Congress recognized Puerto Rico's mixed

25   sovereign status, and squarely put in this Court's

1  jurisdiction the ability to review and confirm the validity of

2  Commonwealth law.  And notes that the entirety of PROMESA has

3  passed in connection and in conjunction with the Territories

4  Clause.  And I think that completely undermines the idea that

5  there's nothing inconsistent about the position they're taking

6  now and the position they took then.

7          Thank you, Your Honor.

8          THE COURT:  Thank you, Mr. Friedman.

9          And, Mr. Bienenstock, we have you allocated for 11

10 minutes.

11         MR. BIENENSTOCK:    Thank you, Your Honor.

12         I was heartened by the number of things Ambac is not

13 contesting.  We explained that whether a law is a local law

14 depends on whose debt is being dealt with.  It's Puerto Rico's

15 debt and its instrumentalities.  Whose property?  It's their

16 property.  Not what creditors -- where creditors are on any

17 night all around the world, because it makes no sense that you

18 can go from a local to a national to an international statute

19 based on where the creditors holding debt happened to be.

20         And there was no answer to the fact that in *Binns*,

21 the tax was imposed on anyone all around the world who owned a

22 business needing a license in the territory of Alaska at that

23 time.

24         THE COURT:  I recognize -- but I heard her argue

25 quite forcefully about national economic effects and effects

1  on markets in arguing for uniformity.  So, you know, that may

2  have been an indirect way of responding.  I'll have to reflect

3  on all of this more thoroughly of course.

4  MR. BIENENSTOCK:   Right.  And in response to that,

5  Your Honor, there is -- every transaction in commerce is going

6  to affect supply and demand, which ultimately affects

7  everything else.  We think that's a -- that argument has never

8  been picked up by federal jurisprudence, as to what makes a

9  statute local or national.

10  In terms of the argument that Chapter Nine is

11  national, yes, because it applies across the United States to

12  every municipality and governmental unit, other than the

13  states themselves.  Title III is just the opposite.  It

14  applies to only territories, and according to Ambac, only one

15  territory, Puerto Rico.

16  Now, in terms of a key assertion that we explained in

17  our briefs and in argument this morning, that Congress can

18  pass local laws using what power the state would have, in this

19  case, the Puerto Rico territorial government and Congress'

20  general powers.  And to support that, we took the language

21  from the *American Insurance* case which said, in legislating

22  for them, Congress exercises the combined powers of the

23  general and of the state government.  And that language was

24  picked up and endorsed yet again in *Northern Pipeline*, as I

25  explained earlier.

1           Ambac has no answer.  They simply flip back to the

2    party line:  No, the state government can't do it; it can't be

3    local.  And that's just contrary to the law.  Then what they

4    say is they tie that to the Supreme Court's decision striking

5    down or affirming the First Circuit, which struck down the

6    Debt Enforcement Act in Puerto Rico.

7           That is not a viable argument for Ambac.  And the

8    reason is that Justice Thomas begins the Supreme Court's

9    decision in that case with a paragraph that says, basically,

10   the issue is whether the Federal Bankruptcy Code preempts

11   state bankruptcy laws that enable insolvent municipalities to

12   restructure their debts over the objections of creditors, and

13   instead requires municipalities to restructure such debts

14   under Chapter Nine of the Bankruptcy Code.  And Justice Thomas

15   cites 11 U.S.C. 903(1), which is the statute that the Supreme

16   Court said prohibited Puerto Rico from passing its own

17   statute.

18          Clearly, Ambac cannot have a meritorious argument in

19   saying Congress can't use its own power, because it passed a

20   statute that denied other states or territories of that power.

21   If Congress -- Congress can enact that statute and can repeal

22   that statute.  So Ambac is basically arguing that Congress

23   disqualified itself from being able to pass Title III by

24   telling other jurisdictions they can't do it.  Well, Congress

25   doesn't have to disqualify itself, and clearly that was not

1   its intention.  It's completely counter productive.

2        As far as the functional test, Your Honor, as Ambac

3   admitted this morning, the functional test comes out of the

4   *Boumediene* case that it cites, and the *Boumediene* case

5   explicitly, explicitly relies on the Insular Cases, which are

6   exactly the cases the Oversight Board and all of the other

7   parties in support of the Motion to Dismiss disavowed relying

8   on.  And it's interesting, because Ambac accuses us in its

9   brief of relying on the Insular Cases, which we expressly

10  disclaimed, and then it relies on *Boumediene*.

11       But the second point on the functional test is, you

12  know, Ambac said again this morning, so what's so bad about

13  applying the Uniformity Clause, you know, great for commerce,

14  great for this, great for that.  And that's the problem with

15  the functional test:  Anything you like you say applies.

16       Well, different people will have different opinions

17  as to whether it's actually beneficial to the United States of

18  America and its territories to impose on territories the same

19  laws you imposed on other municipalities.  At the very

20  minimum, that's debatable.  And that's the problem with the

21  functional test.  It comes out whichever way you want it to

22  come out, depending on your point of view.  So there's no

23  objectivity, no test, nothing that could lead nine courts out

24  of ten, or even seven out of ten, to come out the same way,

25  because it's all subject to whether -- what policies you

1    believe should be furthered and what policies are hindered.

2         In terms of Ambac's arguments that there was this

3    growing recognition of the meaning of PROMESA, and the

4    Oversight Board's increasing, I guess in their view, more

5    extreme powers -- I mean, the uniformity question cannot be

6    decided based on Ambac's private beliefs or its

7    characterizations of what it thinks the Oversight Board was

8    doing.  There was no answer whatsoever to the fact that

9    PROMESA doesn't have any priority provision that changes the

10   priority of Ambac's claims from what they would be in Chapter

11   9 or Chapter 11.  As I said earlier, Title III incorporates

12   the exact same, identical, unfair discrimination statute as

13   applies in Chapter 9 and Chapter 11.

14        Instead of answering on the merits, Ambac just lapses

15   back to its overarching descriptions of its mindset, which is

16   it thinks that we're going overboard or some such thing.  But

17   that's not law.  That's just ranting against something they

18   don't like.

19        And as far as feeling that their property interests

20   are treated differently, and that's why we need a --

21   uniformity in position, let's look at the record.  They

22   asserted rights under Bankruptcy Code Section 928.  This Court

23   and the First Circuit rejected their contentions.  They

24   applied for cert to the Supreme Court, and it was denied.  It

25   wasn't a matter of Title III changing their property rights.

1   It was the fact that they didn't have the rights they thought
2   they had.
3          (Sound played.)
4          MR. BIENENSTOCK:  And they were governed by the same
5   provisions as would be in the other chapters.
6          In the -- as far as their argument that the holistic
7   approach is what's different in Title III, the First Circuit
8   and this Court have said in the decisions on the 926 Trustee
9   issues that they were taking from Chapter Nine cases the
10  holistic approach.  So Ambac has stepped into a trap it made
11  by itself.  It says the holistic approach makes it nonuniform.
12  That was taken from the chapters that they say should apply
13  here.  And they're just a hundred percent wrong in their
14  assertions.
15         As far as 106(e), the fact that fiscal plan
16  certifications cannot be reviewed by the Court says nothing
17  about confirmation of a Chapter 11 plan.  And they had no
18  answer to the fact that, as I explained at length earlier, in
19  the *Blanchette* case, the Interstate Commerce Commission made
20  major determinations about value, allocation, capitalization,
21  public interest; and that, the Supreme Court said, did not
22  make the Rail Act nonuniform with Section 77.
23         Ambac has no answer for that.  They just repeat the
24  argument they started with, that they don't like 106(e), and
25  they don't like the fact that 314(b)(7) says the plan of

1  adjustment needs to be consistent with the fiscal plan.  All

2  the Board gets to do there is say how much debt it believes

3  can be sustained by the reorganized debtor.  And, frankly, if

4  any debtor ever got up before Your Honor and said, Your Honor,

5  I don't think I can carry more than X debt --

6           (Sound played.)

7           MR. BIENENSTOCK:  -- I respectfully submit, Your

8  Honor would not believe that plan is feasible if its proponent

9  is saying, I can't afford it.  And that's all 314(b)(7) does.

10          I guess my time has run out, so subject to any of the

11 Court's questions, I'm concluded, Your Honor.

12          THE COURT:  Thank you, Mr. Bienenstock.  I don't have

13 further questions for you.  And so I thank you and all of the

14 counsel who've presented excellent, clear arguments that give

15 the Court much more food for thought, in addition to the

16 extensive briefing that has been filed.

17          I take this motion under advisement, and this

18 concludes today's hearing.  I would like to note, for

19 everyone's benefit, that there have been some inaccurate press

20 reports that there is a hearing scheduled for February 10th.

21 So please be aware, and I ask any press representatives who

22 may be listening in to note that no hearing has been scheduled

23 for February 10th.  That is a submission deadline.  That is

24 not a hearing date.

25          The next scheduled hearing is the hearing concerning

1  Omnibus Claim Objections, which will be held on January 14th,

2  this Thursday, beginning at 9:30 AM Atlantic Standard Time,

3  which is 8:30 AM Eastern Standard Time, with the usual

4  telephone observation units.  There is a procedures order on

5  file.

6          As always, I want to thank the marvelous court staff

7  in Puerto Rico, Boston, and New York.  They do constant,

8  effective, efficient work in preparing for and in supporting

9  the conduct of these hearings, and all of the administration

10  of these cases.  So thank you to the staff, as well as to

11  counsel who argued today.  That concludes my remarks.

12          I urge everyone to stay safe and keep well.  And get

13  a vaccine as soon as you're eligible.  Take care, everyone.

14  Thank you.

15          (Proceedings concluded.)

16                    *     *     *

17

18

19

20

21

22

23

24

25

```
 1   U.S. DISTRICT COURT    )

 2   DISTRICT OF PUERTO RICO)

 3

 4       I certify that this transcript consisting of 98 pages is

 5   a true and accurate transcription to the best of my ability of

 6   the proceedings in this case before the Honorable United

 7   States District Court Judge Laura Taylor Swain on January

 8   12, 2021.

 9

10

11

12   S/ Amy Walker

13   Amy Walker, CSR 3799

14   Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25
```

< Dates >
August 17, 2020 7:20
February, 2019 82:10
January 12, 2021
  1:11, 4:2, 98:7
January 14th 97:1
January 8, 2021 5:25
May 26, 2020 7:18


< 0 >
000 60:22


< 1 >
1 11:19
101 65:20, 69:4,
  69:6, 71:16
101. 68:22, 69:3,
  69:11
102 19:19
106 88:8
106(e 64:9, 73:22,
  95:15, 95:24
10th 18:1, 18:3,
  96:20, 96:23
11 9:18, 17:5,
  17:15, 19:8, 90:9,
  92:15, 95:17
11. 19:12, 94:11,
  94:13
12 12:11
12,000 60:22
127 14:13
141 8:6, 18:18
141. 22:7
159 18:7
16 9:18
163. 19:19
17-3283 5:2
17-BK-3283(LTS 1:8
1800 17:8
19 60:22
1930s 33:21
1970. 17:18


< 2 >
20-6 4:15
20-68 5:2

20-68. 5:9
20-AP-00068(LTS 1:6
201 63:16
2016 32:17, 36:21
2017 60:20
21 8:14, 9:8
25 7:8
28 9:8


< 3 >
3 8:17
3(b 57:15, 66:18,
  67:3
301(a 19:7
302 68:21
306(b 9:23
314 89:21
314(b)(7 19:11,
  63:12, 63:24,
  95:25, 96:9
318 20:16
356 10:17, 48:19
369 10:17
3799 98:13
3: 1:6, 1:8


< 4 >
4 8:19, 9:2
4.6(c 25:21
4.6(f 25:23
419 18:7, 19:19
448 20:16
458 14:17
462 16:9
47 24:13
472 20:17
476 20:17
484 16:9
487 12:19, 16:10
490 85:14
493 16:10
494 12:6, 16:10
495. 16:10
496 13:10


< 5 >
5(7) 68:25

50 13:3, 14:18, 35:2
511 58:13
519 58:14
546 10:17, 14:7
564 16:9
58 5:24


< 6 >
6.1(b 82:7
6.2 82:10
60 37:12
63 22:6
64 14:23
65. 14:24
68 24:16


< 7 >
70 10:17
73 24:16
77 19:21, 20:3,
  20:10, 20:18,
  20:22
77(b 20:11
77(d 19:22
77. 95:22
78 22:7


< 8 >
8 8:19, 9:2, 11:19,
  31:24, 32:20,
  34:6, 34:13,
  34:23, 35:5
8:30 97:3


< 9 >
9 17:5, 19:8, 19:11,
  94:11, 94:13
90 74:21
903(1) 92:15
926 95:8
928. 94:22
98 98:4
9:30 97:2
9:56 4:3

< A >
AAFAF 24:5, 27:17,
    87:20
abandoned 82:1
Abie 26:10, 26:13,
    26:14, 80:12
ability 36:23, 90:1,
    98:5
able 32:8, 42:22,
    50:21, 60:18,
    80:25, 92:23
absent 65:19, 79:21
Absolutely 39:2,
    39:3, 71:7
abstract 72:22
academic 66:7, 72:23
accept 79:4
accepting 7:22,
    31:25, 33:11
access 23:21, 36:22,
    51:9, 57:2, 57:9,
    60:23, 61:3,
    62:22, 68:3, 71:13
accessing 5:12
accordance 65:20
According 23:10,
    91:14
account 18:8, 25:17,
    36:16
accountability 40:13
accountable 64:25,
    65:1
accurate 6:12, 98:5
accuses 93:8
achieve 52:17
acknowledge 55:17
acknowledged 15:11,
    44:10, 57:23
acknowledging 66:18
acquire 16:15
across 13:9, 26:4,
    52:14, 56:16,
    91:11
Act 11:12, 11:13,
    17:17, 19:24,
    19:25, 20:2,
    20:22, 29:5,
    42:22, 42:23,
    42:24, 44:17,
    86:25, 92:6, 95:22

acted 30:15, 88:21
acting 40:20, 55:22
action 7:25, 38:18,
    39:8, 41:17, 46:6,
    48:10, 48:13,
    71:11, 72:3
acts 30:11
actually 33:1,
    41:20, 44:15,
    46:5, 47:11,
    52:15, 53:25,
    56:21, 60:20,
    65:5, 68:9, 68:14,
    69:9, 69:18,
    77:11, 79:16,
    93:17
add 13:12, 13:13,
    28:23, 69:9,
    69:10, 69:11,
    69:21, 71:24
adding 68:19, 69:14
addition 96:15
additional 48:3,
    73:18
Additionally 16:7
address 9:17, 22:15,
    27:22, 31:3, 37:1,
    55:12, 56:5,
    61:21, 86:23
addressed 46:1
addresses 66:10
addressing 34:4,
    80:21
adhered 73:10
adjudicate 68:15,
    77:11
adjudicated 59:2,
    80:19
adjudicating 68:8
adjust 65:21
Adjustment 19:2,
    20:20, 57:10,
    63:22, 66:5,
    74:21, 78:22,
    89:11, 96:1
administration 97:9
admiralty 14:3,
    14:7, 15:14, 49:15
admits 8:16
admitted 93:3

adopted 14:16, 75:9,
    78:19
adoption 59:23
advance 6:13
advanced 50:7, 50:22
advances 35:16
Adversary 4:24, 5:9,
    5:25, 6:19
advisement 96:17
Advisory 1:36
affairs 45:5
affect 51:3, 91:6
affected 24:17
affects 76:8, 91:6
affirmed 12:2
affirming 92:5
afford 96:9
age 14:14
Agency 1:35
aggregate 25:4
aggressive 38:25
ago 14:13, 24:19,
    26:19, 77:3, 82:5
agree 18:11
agreed 5:23, 25:22,
    25:23
Agreement 82:4,
    82:6, 82:8, 89:10
aim 56:4
aimed 58:6, 59:23
aims 58:7
al 1:32, 5:2, 5:4
Alaska 12:3, 12:8,
    12:24, 13:8,
    34:25, 42:3, 42:4,
    42:18, 44:5,
    85:13, 90:22
albeit 17:24
alert 6:21
alien 53:8, 53:15
allegation 24:14,
    81:17
allegations 72:9
allege 24:14
alleged 22:23
allocate 64:3, 64:12
allocated 90:9
allocating 63:17
allocation 7:1,
    31:10, 37:12,

95:20
allotments 6:17
allotted 6:15, 24:5
allow 16:20, 18:22,
  34:13
allowing 19:5
allows 29:3, 36:2
almost 77:18
alone 8:12, 15:9,
  55:21, 57:2,
  57:11, 61:1, 69:7
already 19:16, 28:3,
  53:24, 84:5, 89:7
alternative 23:13,
  23:19, 23:21
Although 8:10, 14:7,
  15:14, 16:5, 19:3,
  57:20, 70:4
Amendment 18:1,
  18:4, 18:5, 48:11
America 93:18
American 14:5, 15:7,
  16:6, 48:18,
  69:17, 91:21
among 34:14, 36:11,
  63:18, 64:3,
  64:13, 86:4
amount 19:1, 21:24,
  79:24
amounts 79:6
ample 80:8, 86:3
Amy 98:12, 98:13
analog 63:23
analysis 19:2, 29:9,
  29:12, 35:9, 40:5,
  43:9, 44:4, 45:12,
  45:15, 46:15,
  48:12, 49:1,
  49:22, 51:22,
  52:8, 53:11,
  53:22, 68:9,
  69:12, 85:14
analyzed 47:20,
  52:11
analyzing 45:13
annum. 13:3
answer 44:8, 46:11,
  46:21, 51:19,
  52:2, 68:5, 90:20,
  92:1, 94:8, 95:18,

95:23
answering 94:14
anyway 16:24
AP 4:15, 4:22, 5:2
apologize 6:13,
  31:14
apparent 13:15,
  72:17, 73:6, 75:2
appeal 17:23, 17:25
Appeals 11:12
APPEARANCES 1:26,
  2:1
APPEARING 1:28
Appellants 14:24
applicable 19:13
application 8:5,
  25:5, 46:4, 51:23,
  61:22, 70:25,
  76:16
applications 27:5
applied 12:20, 13:4,
  24:12, 33:18,
  34:24, 47:8,
  47:22, 49:11,
  52:8, 63:3, 83:18,
  84:16, 85:13,
  94:24
applies 9:3, 30:18,
  32:22, 35:11,
  38:5, 38:22,
  56:15, 57:18,
  58:1, 60:5, 64:9,
  75:24, 80:1,
  87:11, 91:11,
  91:14, 93:15,
  94:13
Applying 13:19,
  34:8, 43:12,
  46:13, 46:24,
  50:7, 51:10,
  52:14, 76:6, 93:13
appointed 73:12
appointing 40:16
appointment 23:1,
  23:12
Appointments 39:16,
  40:8, 40:12,
  40:15, 40:19,
  51:24, 77:22
appreciate 83:3

approach 44:16,
  46:14, 46:24,
  47:20, 48:21,
  49:7, 52:7, 73:25,
  88:13, 95:7,
  95:10, 95:11
approached 46:16
approaches 29:16,
  32:12, 84:14
appropriate 70:5
approval 21:6
approve 20:23
approved 16:7,
  20:12, 20:13
area 47:1, 47:11
areas 15:4
arguably 35:4
argue 8:4, 8:20,
  27:18, 90:24
argued 19:20, 19:21,
  39:3, 60:9, 80:16,
  80:17, 81:12,
  97:11
argues 30:4, 30:7
arguing 8:15, 27:16,
  27:20, 44:9,
  72:24, 74:15,
  91:1, 92:22
arguments 7:7, 17:4,
  30:3, 31:25, 52:4,
  54:10, 75:23,
  83:13, 87:16,
  89:6, 94:2, 96:14
arise 13:14
around 25:9, 51:3,
  72:11, 81:11,
  90:17, 90:21
articulating 47:18
articulation 78:18
asks 35:7
asserted 62:18,
  94:22
assertion 54:1,
  91:16
assertions 95:14
asserts 8:13, 8:14,
  9:9, 9:11, 12:14,
  34:1, 43:14, 64:13
assessing 66:8
asset 17:12

assets 17:9
assisting 25:17
Association 69:17
assume 16:12
assumed 16:13
Assurance 1:6, 2:3,
   5:2
Atlantic 7:6, 97:2
attainder 48:8
attempting 12:23,
   45:4, 55:12
attempts 22:21
Aurelius 29:23,
   30:6, 32:6, 33:3,
   39:14, 39:17,
   40:3, 40:18,
   40:24, 41:13,
   51:22, 86:9,
   86:10, 86:11
authorities 19:18,
   52:23
authorize 9:11
authorizes 10:25,
   32:4, 79:10
automatically 40:1,
   41:14, 53:22
avail 33:16
available 42:16,
   59:9, 62:15
avoid 13:12, 18:1,
   46:4
avoiding 60:6
aware 32:3, 34:6,
   59:14, 96:21
away 6:16


< B >
back 7:4, 10:6,
   33:21, 53:4,
   53:13, 70:21,
   70:25, 71:22,
   72:3, 72:13, 82:9,
   88:6, 89:19, 92:1,
   94:15
bad 93:12
Bales 48:19
balloon 60:16
bankruptcies 9:5,
   64:6

Banks 17:14, 80:12
bar 25:2, 75:3,
   76:23, 78:3,
   81:25, 83:21
bare 26:8
Barr 69:16
barred 77:8
based 8:7, 10:7,
   32:18, 37:5,
   42:15, 79:6,
   81:21, 83:20,
   90:19, 94:6
basic 55:24
basically 67:21,
   78:18, 92:9, 92:22
basis 10:10, 55:21,
   68:12, 83:7
batch 18:22, 18:24
batches 18:21
became 49:9, 75:12,
   82:5
become 49:10, 52:17,
   72:16, 77:4, 80:3,
   80:10
becomes 44:7, 63:22,
   75:2
begin 6:1, 38:10,
   72:8
beginning 24:22,
   73:5, 73:15, 97:2
begins 92:8
behalf 31:22, 37:13,
   41:13, 58:23
behavior 27:4
behaviors 27:17
belied 61:4
beliefs 94:6
believe 7:20, 18:23,
   33:23, 57:4,
   60:21, 86:24,
   94:1, 96:8
believes 59:15, 96:2
belonging 8:25
benchmark 64:5
beneficial 35:3,
   93:17
benefit 13:17, 25:3,
   25:8, 25:12,
   26:11, 30:15,
   43:7, 78:13,

78:15, 78:16,
   78:17, 78:20,
   78:25, 79:6,
   79:12, 79:25,
   96:19
benefits 26:2,
   89:10, 89:11
berth 84:12
beside 46:9
best 71:8, 98:5
bestowed 15:8
better 4:20, 14:14,
   79:16
beyond 6:14, 68:10
Bidwell 53:5
Bienenstock 1:32,
   7:9, 7:10, 7:13,
   7:14, 22:3, 22:13,
   23:15, 23:18,
   23:24, 23:25,
   28:21, 33:4,
   48:17, 58:9,
   62:18, 63:13,
   90:9, 90:11, 91:4,
   95:4, 96:7, 96:12
biggest 54:5
Bill 8:12, 18:19,
   48:9, 55:5, 56:24,
   59:18, 60:2, 61:9,
   61:17, 61:18,
   86:24
billion 7:22
billions 51:1
bills 48:8
binding 50:13
Binns 11:18, 12:2,
   12:6, 12:11,
   12:17, 12:19,
   13:7, 13:10,
   13:11, 30:13,
   33:4, 34:24,
   34:25, 41:20,
   42:3, 43:2, 43:4,
   43:15, 43:23,
   52:25, 85:10,
   85:13, 85:16,
   85:17, 90:20
bit 38:21, 66:7
Blanchette 16:25,
   18:6, 19:18,

20:15, 30:24,
31:2, 35:12,
36:15, 37:3, 56:7,
56:9, 56:12, 85:5,
95:19
Block 28:17
boards 71:16
boiled 69:24
boils 25:11
bond 26:21, 80:24
bondholders 55:9,
74:24
bonds 51:1, 60:25,
68:2, 82:21, 82:22
Boston 81:7, 97:7
bottom 30:18
Boumediene 46:23,
47:5, 47:14,
47:18, 93:4, 93:10
bounce 10:6
bound 40:19, 42:24
boxed 62:24
Brad 31:21
Bradley 1:42
breached 11:3
break 7:3
breaking 6:13
Brief 8:13, 9:7,
9:10, 9:14, 9:19,
11:11, 12:12,
34:21, 39:22,
43:14, 46:19,
57:4, 66:23, 82:1,
93:9
briefing 60:15,
63:9, 65:5, 72:12,
96:16
briefings 57:5
briefly 60:12, 62:17
briefs 14:6, 32:22,
38:4, 66:24, 91:17
bright-line 46:13
bring 26:12, 27:9,
27:12, 73:4
British 50:16
broad 29:14, 32:11,
84:14
broader 57:18, 72:4
broker 17:16
brokers 17:13

brought 74:11, 75:9,
88:5
buenos 5:6
bus 26:4, 79:20,
79:22, 79:23,
79:24
business 12:24,
13:2, 80:9, 90:22
businesses 17:12
buzz 6:22, 6:24
buzzes 6:23, 7:2

< C >
California 33:13,
44:18, 56:3
call 4:10, 4:23, 6:7
called 16:17
calling 5:22, 18:14,
31:1
Canada 16:16
canceled 82:22
candidates 79:3
Canter 15:7
capacity 45:7
capita 60:21
capital 60:24, 68:3
capitalization
21:21, 22:4, 95:20
caption 4:23
care 97:13
careful 28:24
carry 58:22, 60:7,
96:5
CAT 2:48
categorical 38:19,
83:21
categories 38:4,
63:11
categorize 16:18
category 64:7, 64:8,
64:17
cause 18:23
caused 32:17, 74:12,
77:18
causes 22:17
cautious 76:6
Central 10:16, 41:18
cert 94:24
certain 15:4, 18:14,

27:1, 29:25, 31:2,
49:4, 52:19
certainly 88:20
certification 64:10,
64:11
certifications 95:16
certified 19:3,
19:13, 20:14,
63:15, 65:15
certify 21:10, 98:4
challenge 25:10,
26:15, 26:16,
27:10, 35:22,
39:16, 68:13,
75:8, 76:22, 77:7,
88:5
challenges 77:23
change 10:9, 74:7,
81:18
changed 88:10
changes 94:9
changing 79:13,
94:25
Chapter 16:24,
17:22, 17:23,
17:25, 26:22,
33:17, 41:8,
41:11, 51:14,
62:5, 62:6, 62:19,
63:6, 63:23,
63:24, 64:15,
64:21, 65:3,
88:15, 88:19,
91:10, 92:14,
94:10, 94:11,
94:13, 95:9, 95:17
Chapters 17:5, 19:8,
19:11, 95:5, 95:12
characteristics
61:17, 67:12
characterization
72:14
characterizations
94:7
characterize 79:25
characterized 79:12
charge 16:18
chart 24:13
child 26:3
choice 80:10

choose 74:18, 78:16,
  79:4
Cincinnati 42:12
circle 53:25
Circuit 11:11, 34:4,
  34:15, 53:17,
  54:7, 58:21,
  73:19, 73:25,
  75:6, 75:7, 75:14,
  76:20, 81:5,
  88:14, 88:15,
  88:18, 92:5,
  94:23, 95:7
circumscribed 45:9
circumstances 32:16,
  32:18, 42:14
cite 26:7, 26:10,
  75:5
cited 14:5, 25:8,
  34:2, 48:17, 80:8,
  81:8, 81:16, 88:16
cites 17:6, 20:15,
  79:2, 88:25,
  92:15, 93:4
citing 38:23
citizens 34:17,
  36:23, 53:10
city 60:3
Claim 16:19, 38:19,
  49:18, 68:8, 73:8,
  75:22, 76:23,
  81:25, 82:1, 83:5,
  97:1
claimants 74:22
claims 20:9, 20:25,
  32:19, 35:6, 38:3,
  49:20, 55:8,
  74:25, 75:24,
  76:7, 82:14,
  82:18, 94:10
clarity 6:2
class 37:24, 55:4,
  55:14, 56:13,
  56:18, 56:19,
  57:13, 57:19,
  58:3, 58:11,
  58:12, 59:20,
  60:5, 61:10,
  67:14, 67:17,
  70:9, 72:5

classes 36:12
classification
  21:14, 41:2, 41:3
clauses 85:4
clear 8:23, 11:4,
  24:11, 24:22,
  26:25, 33:7,
  39:21, 43:5,
  45:15, 47:17,
  56:1, 57:8, 59:5,
  61:23, 66:9,
  73:15, 75:12,
  78:12, 82:17,
  83:25, 84:10,
  85:16, 85:19,
  86:9, 96:14
clearing 17:13
Clearly 6:4, 9:2,
  24:15, 44:8,
  54:22, 74:5, 88:3,
  92:18, 92:25
client 89:9
closed 31:25, 62:24
closely 73:11
closer 52:17
clustered 55:20
Code 16:19, 17:16,
  33:15, 33:20,
  89:23, 92:10,
  92:14, 94:22
COFINA 22:10, 25:12,
  25:18, 25:19,
  25:22, 25:23,
  26:21, 59:5, 59:6,
  59:9, 73:12,
  73:13, 79:6, 79:7,
  80:6, 80:8, 80:21,
  82:4, 82:20,
  89:10, 89:21
colleague 8:2
collect 43:16
collected 12:9
collecting 44:1
colonial 53:7
Columbia 11:12,
  11:14, 11:24,
  11:25, 15:23
combined 14:11,
  15:19, 91:22
comes 14:19, 46:20,

46:21, 50:11,
  53:25, 64:9, 82:7,
  82:10, 93:3, 93:21
Commerce 19:22,
  19:25, 20:1,
  20:18, 45:19,
  45:21, 48:6,
  50:13, 50:21,
  51:7, 59:22, 60:7,
  85:21, 91:5,
  93:13, 95:19
commercial 51:8
Commission 19:22,
  19:25, 20:1,
  20:14, 20:18,
  21:5, 21:6, 21:9,
  21:17, 21:22,
  22:3, 95:19
Committee 1:39,
  28:15, 57:5, 83:13
commodity 17:13
Commonwealth 1:31,
  7:12, 22:11,
  22:19, 24:20,
  25:25, 27:17,
  34:18, 58:2,
  58:14, 58:24,
  59:1, 59:7, 59:9,
  59:11, 63:18,
  64:2, 64:12, 81:1,
  86:15, 90:2
Commonwealth-cofina
  25:24
companies 13:3
Company 12:22, 14:5,
  15:7, 21:21,
  48:19, 80:13
comparable 42:14,
  63:23, 69:24,
  81:16
compared 37:22,
  37:23, 37:24,
  62:21
comparison 63:2
compatible 21:23
compensation 14:2
competitors 20:11
complained 88:8,
  88:9
complains 18:22

Complaint 5:9, 7:18,
    20:7, 24:11,
    24:13, 24:16,
    25:2, 25:7, 63:9,
    83:7, 88:7
complete 15:9,
    30:12, 86:20
complete. 14:22
completely 26:5,
    35:19, 88:4,
    88:12, 89:8, 90:4,
    93:1
complex 37:7, 87:7
complied 40:15
component 23:20,
    76:24
comprehensive 24:3
computer 5:13
conceivable 37:24
conceivably 61:3
concept 16:17
concern 49:18, 86:15
concerning 96:25
concerns 59:17,
    73:14
conclude 37:9,
    56:17, 82:25
concluded 34:16,
    36:6, 40:18,
    78:24, 96:11
concluded. 97:15
concludes 96:18,
    97:11
conclusion 66:20
concrete 56:2,
    72:17, 72:20,
    74:12, 75:13,
    77:10
concurrence 34:4
conditions 18:14,
    19:12, 31:1,
    78:17, 87:16
conduct 35:9, 97:9
conference 5:17
confined 45:1
confirm 19:4, 90:1
Confirmation 19:12,
    25:16, 63:12,
    64:14, 65:10,
    65:14, 95:17

confirmed 19:24,
    20:12, 63:14
confirming 65:16
confirms 44:19
conflict 33:19,
    64:23
conflicts 39:13,
    73:14, 88:13
conformity 15:12
confront 67:23
Congressional 12:16,
    28:24, 71:11
conjunction 90:3
Connecticut 19:18
connection 8:1,
    25:19, 54:21, 90:3
consensually 27:11,
    27:19
consequences 10:9
consider 40:8,
    40:11, 48:3,
    58:23, 68:7,
    68:10, 81:1, 85:15
consideration 42:15,
    74:23
considered 70:1,
    87:7
considering 41:1,
    41:3
consistency 65:15
consistent 5:16,
    19:13, 29:17,
    48:20, 63:15, 96:1
consistently 35:13
consisting 98:4
constant 97:7
constituents 65:2
constitute 61:10
constituted 15:10
constitutes 55:4
Constitution 8:18,
    8:20, 9:2, 11:19,
    12:14, 12:15,
    13:11, 14:9,
    15:17, 16:12,
    37:19, 38:1,
    38:17, 38:22,
    38:23, 39:7,
    39:11, 48:5
constitutionality

25:10, 27:16,
    68:15
constitutionally
    26:9, 26:16
constrain 48:10
constraint 11:7,
    50:1
constraints 11:5,
    38:15, 39:11,
    43:11, 49:23,
    83:20
constructed 18:1
Consultants 69:17
consummated 82:9,
    82:21
contained 34:12
contains 11:19,
    28:24
contended 39:24
contending 7:23
contends 9:3, 9:8,
    18:22, 83:19
contention 10:23,
    19:10, 19:15,
    20:21
contentions 18:20,
    94:23
contesting 90:13
context 19:17,
    35:15, 42:12,
    47:15, 62:6,
    64:21, 76:1, 77:8,
    80:7
contexts 29:7, 32:9,
    48:6
continue 60:19
Continued 2:1
continues 76:5
continuing 82:7
Contracts 27:8,
    28:2, 44:11,
    79:11, 89:7
contractual 81:24,
    82:14, 82:17, 83:6
contrary 9:16,
    33:11, 75:17, 92:3
contrast 29:2,
    62:14, 69:23,
    78:24
control 15:25, 23:3,

59:12, 80:3
controlled 12:13, 12:15, 12:17, 20:9, 20:25
controls 85:17
convincing 32:25
Cooley 37:15
core 35:18, 66:5
Corp. 20:16
Corporation 1:7, 2:4, 5:3, 12:22, 13:5, 30:20
Corporations 12:21, 19:19
correct 10:3, 47:6
correctly 71:21
costs 79:23
Cotton 48:19
counsel 5:6, 86:24, 96:14, 97:11
counter 30:3, 93:1
country 12:4, 18:9, 36:17
couple 54:17
court-supervised 62:23
Court. 20:14
COURTROOM 4:11, 4:18, 4:21, 4:25
Courts 9:12, 14:4, 14:8, 15:1, 15:11, 15:13, 15:15, 15:22, 16:4, 34:10, 34:11, 37:6, 48:24, 49:15, 49:16, 50:1, 51:13, 70:1, 75:3, 76:6, 84:4, 84:17, 93:23
cover 11:17, 67:15
coverage 57:12
covered 22:6, 56:9, 59:16, 67:21, 69:1
create 6:12, 15:11, 22:17, 33:11, 33:20, 37:20, 42:16, 42:25, 44:12, 49:3, 49:4, 50:18, 53:1, 55:13, 61:14,

62:3, 66:5, 78:13, 78:21
created 36:8, 48:24, 51:15, 56:2, 65:17, 65:19, 79:2
creates 29:25, 40:20, 62:20, 63:2, 63:7, 69:6, 76:2, 76:4
creating 50:1, 61:18
creation 14:25, 15:22
credible 27:18
credit 36:22, 45:2
creditor 9:17, 20:25, 52:20
creditors 9:12, 22:9, 44:25, 46:2, 50:12, 50:16, 51:1, 51:3, 55:8, 55:9, 55:14, 56:19, 59:21, 62:7, 63:18, 64:3, 64:13, 65:1, 66:11, 72:16, 73:1, 74:19, 78:21, 79:12, 90:16, 90:19, 92:12
creditors. 10:22
crises 61:5
crisis 32:17, 36:22, 36:25
criteria 67:12
critical 22:25, 43:23, 44:3, 56:11, 57:7, 59:10, 63:22, 72:14
critically 37:18, 58:25
crushing 36:21
CSR 98:13
culminated 74:20
Currently 22:7, 68:20, 69:11, 69:15, 74:21
cycles 75:12

< D >
Dakota 26:4
dashboard 5:14, 5:15, 6:6, 31:13, 54:20, 87:22
date 96:24
dated 7:18, 7:19
dates 15:2
day 76:5, 88:7
days 15:2
de 47:11
deadline 96:23
deal 18:13, 18:15, 23:7, 31:1, 87:16
dealers 17:16
dealt 90:14
debatable 93:20
debt-related 28:21, 29:24, 32:18, 33:2
debt-to-gdp 60:16, 68:2
debtor 10:21, 18:19, 20:8, 22:6, 41:13, 46:2, 56:13, 56:18, 56:19, 57:1, 57:12, 57:19, 58:3, 58:11, 59:19, 61:10, 61:15, 61:16, 61:20, 67:14, 67:17, 68:21, 70:8, 72:5, 96:3, 96:4
debtor-creditor 11:10, 16:14, 16:17
Debtors 8:6, 9:24, 11:14, 17:12, 17:14, 18:18, 36:12, 37:24, 55:4, 55:14, 58:12, 59:16, 59:21, 60:4, 64:20, 66:11
debts 92:12, 92:13
decades 32:1, 33:24, 51:14
decide 35:10, 71:2, 77:12
decided 34:6, 80:4,

94:6
deciding 34:3
decision 14:5,
    14:15, 14:17,
    15:14, 16:25,
    32:13, 33:4,
    33:12, 34:5,
    34:15, 39:14,
    43:6, 53:4, 64:10,
    75:5, 79:19, 92:4,
    92:9
decisions 8:7, 17:6,
    47:1, 73:18,
    73:21, 73:24,
    85:15, 88:13,
    88:18, 95:8
declared 67:4
deemed 43:23
defend 80:7
Defendant 1:18
defendants 5:8
defense 27:24, 38:3
defies 18:6
define 19:23, 55:22,
    56:13, 59:19,
    61:13, 67:11
defined 56:10,
    56:25, 58:4, 58:5,
    58:11, 69:1
defines 57:6, 58:13,
    58:14
defining 60:4
definition 56:8,
    56:12, 56:20,
    57:14
definitional 69:1
defy 35:17
defying 22:14
delay 72:12, 75:15,
    77:18, 88:22
delegate 49:4
demand 91:6
demanded 28:25
demanding 7:24
demolish 27:15
demonstrably 19:15
demonstrated 11:2
demonstrates 44:19,
    48:12, 66:13,
    81:21

denied 38:1, 92:20,
    94:24
deny 18:8, 36:16,
    83:8
depart 51:21
Department 1:41,
    16:2, 31:22
departure 21:17
depending 93:22
depends 45:6, 90:14
DEPUTY 4:11, 4:18,
    4:21, 4:25
describe 57:12
descriptions 94:15
design 37:1, 89:12
designed 23:20
desiring 17:10,
    17:11
destroy 28:1, 89:5
destroys 22:13, 23:9
details 43:19
determination 64:1,
    65:24, 70:21,
    71:9, 72:4, 87:8
determinations 17:1,
    95:20
determine 21:8,
    21:10, 47:2,
    67:12, 67:16,
    71:24
determined 20:24,
    27:8, 28:3, 89:7
determines 57:11
determining 21:13,
    29:25
deters 23:5
detrimental 77:19
develop 29:16,
    32:11, 75:10,
    84:14
developed 32:17
development 21:20
dial 7:4
diametrically 85:1
dias 5:6
dictate 68:11, 72:1
difference 26:13,
    63:11, 64:15,
    76:18, 89:22
differences 18:9,

24:17, 27:2, 35:3,
    36:16, 63:6, 65:3
differently 33:24,
    34:17, 35:1, 44:9,
    74:6, 94:20
differs 37:21, 64:6
difficult 6:11
difficulty 4:16,
    6:15
direct 7:3, 12:7
directly 20:25,
    53:13, 65:14,
    80:15, 81:5,
    81:13, 81:23,
    87:11
disapproved 56:6
disassociate 52:15
disavowed 53:24,
    93:7
discharge 9:12,
    10:13, 23:3,
    44:13, 44:25,
    46:3, 50:14, 57:2,
    79:10
discharges 9:21,
    11:15
disclaimed 93:10
Disclosure 25:23
disconnect 7:4
discontinued 78:1
discourage 75:20
discredited 53:6,
    53:16
discrete 76:3, 77:2,
    80:22
discretion 63:20,
    80:5
discriminate 59:21,
    73:1
discrimination 19:8,
    50:12, 50:15,
    50:20, 55:25,
    60:6, 86:4, 94:12
discuss 24:9, 63:9
discussed 33:4,
    34:20, 47:22,
    63:13, 66:24,
    80:19
discussing 8:3,
    47:23

discussion 66:25,
   86:11
disempowered 55:22
Dismiss 1:22, 5:9,
   7:19, 28:6, 38:1,
   83:7, 83:9, 93:7
dismissed 28:4
dismissing 7:18
dispose 8:23
disproved 14:13
dispute 57:1, 75:20,
   77:10
disputed 59:10
disqualified 92:23
disqualify 92:25
disregard 32:1
dissent 16:6, 19:20,
   20:15
distill 55:1
distinct 78:8
distinction 8:21,
   41:21, 45:14, 46:8
distinctions 37:5,
   56:6, 61:8, 63:4,
   65:9, 71:4
distinguish 84:20
distinguished 13:17
distinguishing 36:11
distress 60:14,
   61:2, 61:24, 67:25
distributions 82:23
District 1:1, 1:3,
   1:23, 1:24, 4:12,
   11:12, 11:14,
   11:24, 11:25,
   12:24, 12:25,
   13:1, 15:23, 16:1,
   98:1, 98:2, 98:7
districts 89:4
disturb 37:6, 87:8
disuniformity 29:3,
   84:11
divergence 53:2
division 15:24
Docket 1:6, 5:24,
   5:25
doctrine 77:9, 78:5
doctrines 78:7, 78:8
documents 76:15
doing 43:3, 43:8,

49:6, 70:23, 94:8
dollar 7:22
dollars 13:3, 27:9,
   51:1, 60:22, 89:12
domain 43:21, 44:21,
   67:16
dominant 59:10
done 40:10
Douglas 19:20, 20:15
down 18:19, 25:11,
   61:14, 78:8, 92:5
Downes 53:4
downgraded 60:25,
   68:3
draft 70:7
drafted 71:15
drafting 71:14
draw 61:7, 67:19,
   68:10, 68:14
drawn 37:5
driven 35:16
during 5:22, 6:10
duties 11:20, 41:5,
   58:22, 86:12,
   86:14


< E >
earlier 73:10,
   73:24, 75:18,
   77:21, 78:3,
   91:25, 94:11,
   95:18
earliest 15:2
early 60:20
earning 10:14
Eastern 97:3
easy 12:5, 16:18
ECF 27:14
Eche 34:15
Ecker 20:16, 21:3,
   21:12, 21:16
economic 90:25
effect 30:5, 47:25,
   69:20, 76:25,
   82:7, 82:13, 82:20
effected 89:3
effective 36:23,
   82:5, 97:8
effectively 8:16,

36:8, 39:5, 41:7,
   53:8, 55:4, 55:11,
   56:12, 56:24,
   59:19, 61:11
effects 73:17, 90:25
efficient 97:8
efforts 25:17, 78:1
eight 31:11
Eighth 48:11, 88:18
either 11:7, 23:10,
   43:19, 69:25
elapsed 76:12
elect 78:14
election 75:12
element 44:3, 60:4
elements 78:8, 78:9
eligible 8:6, 17:16,
   18:18, 70:22,
   97:13
eliminate 23:11
eliminated 73:13
eliminates 23:13,
   23:19
Elizabeth 2:4, 37:15
emergencies 87:2
emphasis 51:18,
   57:15
emphasize 40:12,
   46:12, 48:2, 50:3,
   62:20, 66:15,
   76:1, 78:6, 82:19
emphasized 36:10,
   40:24, 41:6,
   42:23, 48:25,
   53:12, 54:12,
   56:14, 57:25,
   58:18, 58:21
emphasizes 43:15,
   80:9
Empirically 11:9
employ 74:1
employed 21:18,
   42:12
employees 55:8
enable 50:20, 92:11
enabled 72:25
enact 9:14, 11:1,
   45:24, 92:21
enacted 8:11, 11:9,
   13:19, 17:7, 17:8,

32:3, 38:14,
39:19, 60:14
enactment 87:15
enactments 18:13,
31:1
enacts 28:20
encourage 6:19,
89:19
end 6:5, 24:1, 40:4,
55:23, 67:7
endorsed 91:24
enforce 70:2
enforceable 72:2
enforced 11:12
Enforcement 92:6
engage 82:16
enjoined 7:25
enormously 37:7,
87:7
ensure 5:10, 40:13,
49:14, 71:12
ensuring 72:23
enter 28:5
entire 15:25, 24:17
entirely 63:2,
85:24, 88:16
entirety 90:2
entities 9:22, 10:1,
10:4, 10:14,
13:21, 17:11,
22:7, 37:23, 52:1,
58:4, 58:20, 67:15
entitled 11:13,
45:1, 53:9, 65:21
entity 42:5, 42:16,
65:20, 68:21, 71:8
entrusted 21:21
Entry 5:24
enumerated 5:23,
32:23, 84:3
equal 51:23
equally 55:13, 60:5
equitable 19:23,
78:7
equivalent 42:14,
44:1, 63:24, 89:4
especially 76:7
essence 74:18
essential 30:21
Essentially 38:16,

42:23, 50:11,
62:13, 64:5,
70:18, 75:19,
78:15, 79:13,
79:15
establish 9:5, 69:5
established 14:8,
15:16, 68:22,
69:2, 71:16, 88:14
establishes 63:17
establishment 67:8
estate 10:21
estopped 7:21, 26:9,
26:16, 27:5, 80:11
estoppel 24:9, 25:5,
25:6, 26:18, 78:5,
78:10, 78:11,
79:12, 79:18,
80:14, 80:20,
81:15
et 1:32, 5:2, 5:4
evaluate 48:15
event 11:4
Everybody 4:7
everyone 5:16, 7:3,
96:19, 97:12,
97:13
everything 91:7
evidence 22:23, 66:3
evil 36:24, 56:4
evolved 74:15, 88:17
ex 48:7
exact 81:14, 84:25,
94:12
exactly 13:10,
26:19, 36:19,
67:16, 73:9,
73:15, 84:15,
84:23, 93:6
example 6:24, 11:16,
15:7, 42:13,
42:25, 48:7, 49:9,
51:12, 55:19,
56:2, 59:25, 65:9,
68:25, 73:11,
73:21, 74:14,
77:5, 79:1, 81:7,
89:2
examples 13:24,
48:16

exceed 29:6
exceeded 72:25
Excellent 54:23,
96:14
except 71:2
exception 14:20,
15:1
excises 11:20
exclude 33:10
excluded 57:8
exclusive 63:17,
81:6, 81:9, 81:12
excuse 88:19
exercise 15:5,
42:19, 44:24,
45:4, 49:15
exercised 14:7,
15:15, 29:23,
49:17, 59:12,
64:22, 87:6
exercises 14:11,
15:18, 32:23,
39:23, 91:22
exercising 33:1,
40:17, 40:22,
41:5, 43:10
EXHIBITS 3:9
exist 18:9, 36:16,
78:13
existence 16:25,
61:4, 65:17
existing 60:19
exists 46:6, 70:1,
76:5
expand 71:11
expanding 69:20
expansive 74:9
expend 64:2
expended 28:3,
77:16, 77:21
explain 8:14, 16:11
explained 32:22,
60:15, 90:13,
91:16, 91:25,
95:18
explaining 36:15
explains 13:10,
42:21, 48:16
explanation 50:4
explicit 56:5

explicitly 33:10,
  93:5
express 58:4, 58:5,
  59:20
expressed 29:3
expressly 9:16,
  57:16, 58:11,
  65:25, 71:17,
  82:11, 87:2, 93:9
extend 14:10, 15:17,
  21:4, 48:5, 49:12,
  53:21, 67:6
extended 13:14,
  53:19, 70:11
extending 38:8,
  47:25
extension 53:23,
  54:5, 85:11
extensive 96:16
extra 26:3
extraordinary 84:24
extraterritorially
  47:8
extreme 94:5


< F >
face 75:8
faced 36:21
facial 27:10, 88:5
facing 32:16
fact 20:6, 33:18,
  41:4, 41:6, 41:16,
  46:22, 48:16,
  49:11, 51:13,
  56:15, 60:23,
  62:8, 71:14,
  72:20, 73:10,
  78:22, 85:12,
  89:9, 90:20, 94:8,
  95:1, 95:15,
  95:18, 95:25
facto 47:11, 48:8
facts 12:19, 42:2,
  61:4, 75:15
Factually 60:11,
  60:13
fade 76:15
failing 23:6
fails 27:25, 35:22

fair 19:23
fairness 51:7
faith 45:2
fall 18:21, 38:4,
  44:20, 63:8, 66:14
falls 43:21
familiar 39:15
Family 60:2, 81:20,
  86:25, 87:3
far 19:5, 73:10,
  74:5, 81:16, 93:2,
  94:19, 95:6, 95:15
farmers 17:11
fashion 18:10, 36:17
fast 27:4
favor 35:15, 52:19,
  74:19
favorable 60:24
feasibility 64:5
feasible 96:8
February 96:20,
  96:23
FEC 79:1
Federal 9:12, 14:4,
  29:1, 41:25, 43:1,
  45:6, 49:16,
  81:12, 84:2, 91:8,
  92:10
fee 26:3, 79:20,
  79:24
feeling 94:19
fees 25:17, 77:20,
  89:8, 89:13
few 15:13, 83:17
file 73:2, 75:18,
  77:6, 80:5, 97:5
filed 5:9, 5:24,
  6:19, 70:17,
  75:14, 77:21,
  78:2, 96:16
filing 80:21
fill 26:24
final 7:2, 20:6,
  22:4, 43:4, 52:3,
  64:17, 66:15,
  77:14, 82:19
finalizing 71:18
Finally 16:11,
  30:16, 62:17,
  68:16, 73:2,

86:23, 89:18
finances 86:15
Financial 1:13,
  1:35, 5:1, 5:3,
  59:1, 60:14, 61:2,
  61:16, 61:24,
  62:10, 67:24
find 66:16, 70:2
finding 20:2
findings 20:24
fine 61:7
finer 71:4
finish 23:15, 83:2,
  89:18
firm 7:10
Fiscal 1:34, 19:3,
  19:13, 23:8,
  23:20, 24:23,
  27:21, 30:1, 31:4,
  63:15, 63:16,
  63:21, 63:25,
  64:4, 64:11,
  65:15, 65:16,
  73:23, 87:2, 88:9,
  95:15, 96:1
fiscally 23:23
five 83:13
fix 67:5, 67:9,
  69:9, 70:6
fixed 38:7
flatly 84:22
flawed 60:11
flexibility 51:16,
  51:19, 51:21,
  54:13, 57:21
flexible 36:2
flip 92:1
floating 16:18
Florida 48:24, 49:9,
  49:17
focus 19:10, 65:7,
  67:10, 74:12, 89:8
focused 61:25, 62:9,
  69:6, 71:19
focuses 89:22
focusing 65:8, 78:11
follow 46:15, 49:25
followed 15:21,
  16:8, 22:1
following 12:23

follows 13:3
food 96:15
forbids 36:11
force 75:17, 82:12
forcefully 72:14,
  90:25
forcing 18:13, 30:25
foreclose 82:18
forecloses 41:14
foreign 17:14
form 65:23
formulates 17:1
formulation 21:14,
  25:18
forth 6:18, 10:6
forward 7:16, 59:7,
  62:3, 77:25
found 12:5, 59:3,
  87:1
founders 59:22
four 8:12, 9:10,
  9:13, 38:4, 89:20
Fourth 48:11, 85:18
frame 79:13
framers 15:3, 16:12,
  29:14, 50:17
framework 75:23
framing 10:19
Franklin 33:13,
  33:22, 33:23,
  34:3, 44:18
frankly 96:3
free 49:23
free-floating 35:16
frees 10:13
frequently 42:12
Friedman 1:36, 8:2,
  24:7, 24:8, 26:24,
  28:10, 28:14,
  77:15, 78:6,
  87:21, 87:23,
  87:24, 88:1,
  89:16, 90:8
full 30:12, 45:1,
  53:25, 66:24,
  86:20
fully 46:6, 50:22,
  73:6
function 21:5, 29:13
functional 29:9,

29:19, 35:9,
  46:15, 46:24,
  47:16, 48:20,
  49:7, 93:2, 93:3,
  93:11, 93:15,
  93:21
functionality 29:12
functioned 49:19
functions 22:10,
  64:20
fundamental 10:10,
  65:8, 76:18
fundamentally 30:19,
  53:3, 62:20, 65:10
funding 63:17, 64:3
funds 28:3, 43:24,
  79:4
funnel 70:18
furthered 94:1
future 10:14

< G >
gain 51:9
gamesmanship 72:13
Garza 75:5, 76:19,
  88:25
gateway 33:15, 65:18
gating 59:7
gave 29:14
gears 8:12
General 14:12, 15:1,
  15:5, 15:19,
  15:24, 19:18,
  51:19, 91:20,
  91:23
generally 18:21,
  40:24, 69:12,
  76:7, 78:6
geographic 55:16,
  55:24, 56:6, 56:8,
  56:12, 57:13, 58:5
geographical 15:4,
  47:11
geographically
  18:10, 22:15,
  36:3, 36:18,
  55:18, 56:25,
  60:10, 62:12
geography 37:5,

55:23, 56:14,
  57:11
Gershengorn 1:39,
  28:16, 28:17,
  29:16, 31:7, 31:9,
  32:10, 40:23,
  45:11, 83:15,
  83:16, 85:24,
  87:15, 87:19
gets 14:14, 29:12,
  96:2
getting 11:16
Gibbons 11:24,
  18:18, 22:5,
  30:18, 36:5, 36:9,
  45:16, 45:23,
  50:11, 55:3, 55:6,
  60:5, 85:18, 85:20
give 49:8, 51:18,
  84:12, 84:13,
  96:14
given 10:8, 12:6,
  55:7, 75:15
gives 32:7, 32:11,
  74:21, 74:22
giving 71:3
gotten 76:15, 87:5
govern 38:24
governance 43:25,
  84:15
governed 95:4
Government 12:12,
  14:12, 14:13,
  14:21, 15:6, 15:9,
  15:20, 16:1, 16:3,
  22:18, 22:19,
  23:22, 29:2,
  29:17, 30:20,
  30:21, 32:16,
  32:21, 35:17,
  42:7, 42:17, 43:1,
  44:3, 44:7, 45:3,
  49:3, 49:19,
  91:19, 91:23, 92:2
government. 13:18
governmental 9:22,
  17:24, 18:18,
  22:10, 23:4,
  37:23, 58:20,
  60:3, 91:12

governments 15:25,
    23:2, 23:6, 32:12
governs 29:9
grand 79:17
grant 21:18, 27:23,
    70:24
granted 9:23, 28:6,
    28:7, 28:8, 74:10
granting 6:9
Gravel 81:7
great 93:13, 93:14
ground 75:16
grounding 46:21
grounds 7:21
group 55:8
groups 55:9
growing 94:3
Guam 60:15
guard 50:19
guarding 55:24
guess 94:4, 96:10

< H >
half 11:25
hand 84:22
happen 76:3
happened 76:12,
    77:3, 90:19
Happy 7:15, 24:7,
    31:19, 31:20
harm 51:6, 51:8,
    76:5, 76:10, 76:11
harms 74:12
Hayman 11:10
hazard 23:2
health 31:4
healthy 7:15
hear 7:2, 54:15,
    54:22
heard 6:3, 6:5, 6:8,
    49:21, 83:19,
    90:24
HEARING 1:22, 4:17,
    5:4, 5:8, 5:11,
    5:18, 5:22, 6:11,
    6:15, 38:3, 66:25,
    87:23, 96:18,
    96:20, 96:22,
    96:24, 96:25

hearings 97:9
heartened 90:12
held 9:12, 26:15,
    33:13, 44:25,
    51:1, 76:17,
    76:21, 81:15,
    84:5, 86:10, 97:1
helped 26:24
hindered 94:1
history 11:9, 17:6,
    40:14, 71:14
hobble 18:12, 30:25
hold 27:23, 66:19
holding 13:7, 13:8,
    16:5, 16:8, 40:24,
    40:25, 41:3, 90:19
holistic 58:22,
    73:25, 88:13,
    95:6, 95:10, 95:11
Honorable 1:23,
    4:13, 98:6
horse 18:17, 18:20
horses 18:16
host 19:9
hours 7:5
HTA 22:11
Humphreys 1:42,
    31:12, 31:14,
    31:17, 31:18,
    31:19, 31:21,
    36:8, 37:10,
    37:11, 45:11,
    52:5, 53:12, 54:12
hundred 95:13
hundreds 27:8
hurdle 68:17
hypothetical 30:10

< I >
I. 34:11, 39:24
Ian 1:39, 28:17,
    83:15
ICC 20:5, 20:9,
    20:21, 20:22,
    20:24, 21:12
idea 41:14, 47:4,
    77:2, 83:20,
    88:22, 90:4
identical 19:9,

94:12
identified 24:15
identify 61:16,
    61:19, 68:17, 84:8
identifying 6:1,
    61:15
ignore 29:8, 35:7,
    35:14, 75:23
ignored 88:4, 89:9
ignores 10:10,
    29:13, 79:8
II 7:23, 65:6,
    65:12, 66:2, 66:8,
    70:16
II. 19:14
illegal 88:9
illuminated 73:19
imagine 55:20, 77:5
immediately 23:13,
    26:14, 27:13,
    72:19
impairs 79:11
impediment 51:10
implausible 33:23
implement 68:18,
    69:8
implemented 67:2,
    67:9
implicates 59:17
implicit 81:18
important 22:25,
    23:4, 27:2, 37:18,
    39:5, 58:25, 61:6,
    76:1, 77:17, 81:3
impose 12:8, 13:8,
    44:5, 93:18
imposed 11:20, 12:3,
    90:21, 93:19
imposes 16:19, 18:4
imposing 23:7
inaccurate 88:17,
    96:19
inapplicable 27:24,
    38:16, 83:21
incentivize 75:19
inception 27:25
include 13:5, 57:6,
    80:12
included 66:17,
    82:15

includes 34:23,
    48:10
including 5:19
income 17:10
incompatible 18:5
inconsistent 34:9,
    36:5, 38:19,
    80:15, 81:6,
    81:14, 81:23, 90:5
incorporates 65:11,
    65:14, 94:11
incorrect 88:11
increasing 94:4
increasingly 74:9
incurring 23:6
independent 73:12
indicated 37:4
indirect 91:2
indiscriminately
    23:22
indisputably 19:7
individuals 17:9,
    17:10, 17:11
industries 55:19,
    58:10
industry 55:20, 58:7
infirmities 27:20
Informative 5:24,
    6:18
infringed 51:16
inhabitants 53:7,
    53:9
inherent 70:5, 80:25
inherently 36:2
initial 17:23
initially 22:6
initiated 25:1
injunctive 88:22
injured 72:19
injury 72:15, 75:1,
    75:10, 75:13,
    75:25, 76:3,
    76:19, 77:2, 77:18
innovative 29:16,
    32:12, 84:14
input 63:22
inquiry 44:7, 77:19
Insolvent 11:13,
    92:11
instance 12:6, 16:9,

16:16, 48:14
instant 76:11
Instead 43:7, 52:9,
    65:7, 68:13,
    72:24, 75:18,
    79:11, 81:17,
    84:2, 92:13, 94:14
institute 88:5
instructed 35:12
instrumentalities
    17:19, 58:2,
    58:14, 58:15,
    59:2, 59:13, 90:15
instrumentality
    58:23
Insular 53:5, 53:18,
    53:23, 54:6,
    85:12, 85:15,
    85:16, 93:5, 93:9
Insurance 14:5,
    15:7, 16:6, 19:18,
    48:19, 91:21
integrated 65:11,
    65:23
intended 15:3,
    18:12, 30:25,
    52:20, 52:22,
    56:5, 84:13, 87:13
intention 93:1
interest 5:7, 16:20,
    16:21, 21:13,
    21:14, 21:16,
    21:23, 51:3, 60:6,
    60:24, 64:24,
    72:23, 73:14,
    95:21
interesting 93:8
interests 21:1,
    58:24, 59:1, 60:5,
    80:7, 80:10, 94:19
interferes 78:23
interlocking 25:2
international 10:4,
    10:7, 90:18
interpret 63:19,
    84:25, 88:19
interpretation
    35:18, 84:25
interpretations 74:3
interpreted 33:9,

34:10, 34:11,
    35:13, 73:7,
    73:16, 74:5, 85:8
interpreting 32:2,
    35:8, 85:4, 85:7
interrupt 6:10,
    6:11, 6:14
interrupted 54:17
Interstate 19:22,
    19:24, 20:1,
    20:18, 95:19
intertwined 59:3
invalid 66:1, 66:19
invalidated 36:4,
    44:17, 57:17, 66:2
inventing 51:5
inventive 29:18,
    84:12
investment 73:3
Investor 17:17
investors 51:3
invitation 70:24
invocation 39:6,
    41:15
invoke 74:17
invoked 38:14, 40:1,
    40:3, 45:12,
    45:13, 69:16
invokes 49:23, 86:7
involved 42:3,
    47:11, 75:6
involving 39:15,
    47:19
irreducible 14:2
irresponsibly 23:6
Islands 22:21,
    22:24, 34:18,
    60:15, 60:20,
    60:23
isolated 18:11,
    36:3, 36:18,
    55:19, 60:10,
    62:12
issuable 21:24
issue 7:20, 8:2,
    9:7, 21:19, 27:22,
    27:23, 33:20,
    34:4, 35:24, 44:6,
    61:21, 63:20,
    66:7, 77:12,

80:18, 80:22,
81:1, 81:14,
85:21, 87:11,
89:19, 92:10
issued 5:18, 19:1,
21:25, 50:25,
82:22
issues 9:16, 9:18,
20:7, 21:15, 22:9,
24:20, 38:9,
47:13, 48:4,
59:10, 66:23,
72:8, 95:9
item 59:7
itself 12:17, 33:20,
39:16, 41:13,
55:23, 64:18,
65:11, 65:18,
66:3, 66:16,
67:22, 70:6,
71:23, 74:9,
74:18, 77:18,
85:3, 85:13,
86:13, 92:23,
92:25, 95:11


< J >
J. 1:32
Jenner 28:17
joined 25:2
Joint 5:23, 6:18
Juan 4:1, 7:16
Judge 1:23, 1:24,
4:5, 4:7, 7:9,
14:13, 20:12, 98:7
judges 14:1, 49:9,
49:11
judgment 22:3, 37:6,
67:14, 87:7
judgments 45:1
judicial 5:17, 16:2,
16:3, 25:5, 26:18,
64:8, 78:9, 80:14,
80:20, 81:15
junk 60:25, 68:3
jure 47:11
jurisdiction 9:23,
10:11, 10:13,
10:18, 10:20,

14:3, 14:7, 15:15,
43:22, 44:24,
49:15, 49:17, 90:1
jurisdiction. 10:19
jurisdictions 16:17,
92:24
jurisprudence 10:1,
91:8
Justice 1:42, 16:4,
19:19, 19:20,
20:15, 31:22,
92:8, 92:14
justified 62:12,
75:15
justifies 46:6


< K >
Kadrmas 26:3, 26:7,
79:19
Katz 10:17
keep 6:20, 97:12
keeping 6:21
key 20:23, 21:15,
43:1, 67:9, 80:14,
91:16
keys 24:10
kind 27:4, 40:9,
42:6, 42:11,
44:12, 44:20,
45:2, 51:15, 53:9,
62:10, 70:3,
76:16, 77:3,
77:19, 78:6, 81:17
kinds 56:5, 61:7,
62:2
knowable 24:15
knowledge 25:1, 25:3
knows 22:16, 74:2


< L >
laches 24:9, 25:5,
27:6, 27:23, 72:8,
75:3, 75:22,
75:23, 76:6,
76:11, 76:16,
76:22, 77:9,
77:14, 77:17,
78:3, 88:24

lack 18:21, 66:12,
74:12
lacks 32:25
language 14:16,
33:7, 42:21,
46:22, 47:16,
53:13, 66:17,
70:18, 91:20,
91:23
lapses 94:14
last 12:14, 21:7,
27:22, 39:14
later 7:23, 26:17,
49:9
latitude 29:14,
32:11, 84:14
Laura 1:23, 4:13,
98:7
lawfully 44:4
laws 8:18, 9:5,
11:1, 11:10, 17:9,
48:8, 51:5, 51:11,
54:2, 56:6, 61:14,
63:7, 74:6, 91:18,
92:11, 93:19
lawsuit 77:1, 82:3
lawsuits 27:16
lead 93:23
least 11:22, 29:6,
32:8
leave 8:1
leaving 21:16
left 61:11
legal 21:25, 59:10,
61:6, 75:23, 89:13
legally 60:11
legislate 12:16,
32:7, 55:3, 59:19,
60:2, 68:11, 72:4
legislated 55:11
legislating 13:25,
14:10, 15:18,
32:24, 50:19,
60:1, 91:21
legislation 11:6,
12:7, 14:19, 17:8,
18:10, 26:21,
29:20, 29:22,
36:2, 36:17,
42:18, 80:24,

86:22
legislative 30:12,
  67:13, 67:16,
  86:20
legislature 9:14,
  30:7, 30:10,
  30:14, 41:24,
  42:5, 42:9, 42:19,
  43:10, 86:18
legislatures 49:4,
  49:5, 89:3
length 33:5, 34:4,
  95:18
less 7:2, 74:24,
  79:14
lesson 22:25
level 67:24, 68:1
levels 60:19
leveraged 22:22
levy 42:8
license 12:2, 12:8,
  12:25, 13:2, 13:8,
  13:15, 90:22
life 49:8, 49:13
life-tenured 49:10
lifetime 14:2
light 33:3, 33:23
lighting 54:20
likewise 60:16
limit 19:1, 29:10,
  84:2, 84:3, 84:6
limitation 14:10,
  15:17, 32:22,
  32:25, 33:9, 43:1,
  68:23, 69:19
limitations 38:15,
  56:24, 57:22, 64:8
limited 5:19, 21:5,
  32:19, 36:14
limiting 87:2
limits 28:24, 72:24,
  72:25
line 5:11, 30:18,
  61:15, 67:20,
  70:24, 78:9, 92:2
lines 12:24, 13:2,
  15:13, 68:10,
  68:14
linked 65:25
liquidating 17:9

Lisa 4:7
list 58:9, 82:15
listed 63:8
listening 96:22
lists 79:6, 82:13
litigant 78:14,
  81:8, 81:13
litigants 75:17
litigation 22:20,
  73:3, 75:19, 77:22
littered 27:14
little 43:19, 61:22,
  66:7
LLP 7:10
locality 43:3, 43:8,
  44:21, 53:2
location 9:17
logic 9:25, 17:6,
  85:17
long 21:18, 21:25,
  34:11, 34:19,
  39:7, 39:9, 39:24,
  50:24, 58:9, 77:3
longer 52:16
look 7:16, 24:11,
  24:12, 24:16,
  37:3, 39:10,
  44:14, 45:21,
  48:14, 54:25,
  65:6, 68:14, 94:21
looked 32:15, 47:19,
  48:6, 48:7, 52:10,
  69:3, 85:3, 85:6
looking 47:1, 47:6,
  47:7, 48:21, 50:5,
  50:8, 57:22,
  61:15, 62:3, 63:5,
  69:24
looks 45:2, 66:8,
  77:17
loose 27:4
losers 18:24, 19:6,
  74:19
losing 68:3
loss 23:4
lost 26:14, 36:22,
  54:21, 60:23,
  76:15
lot 17:7, 50:15,
  66:25, 72:11,

87:5, 88:2
lots 22:18
Lydon 81:7


< M >
main 19:17, 38:4,
  84:1
major 95:20
majority 16:6
manage 45:5
Management 1:14, 5:3
manner 42:9, 58:22,
  64:13, 72:25
Mariana 34:18
market 23:21, 50:25,
  51:8, 62:4
markets 22:22,
  36:22, 60:24,
  68:4, 82:23, 91:1
Marshall 16:9
Martin 1:32, 7:10
marvelous 97:6
matching 79:4
matter 29:10, 29:19,
  44:20, 45:14,
  45:23, 49:6,
  51:19, 58:25,
  59:11, 63:5, 94:25
matters 30:2
mean 10:24, 41:10,
  44:11, 61:11,
  73:17, 94:5
meaning 73:20, 94:3
meaningful 26:11,
  27:3
means 12:16, 13:11,
  26:7, 31:2, 31:3,
  35:19, 54:2, 66:6,
  69:8, 71:10, 72:2,
  84:24
measures 23:7
mechanism 44:23,
  69:5, 69:11, 70:6,
  71:15, 78:22
medicine 22:17,
  22:24
members 5:7, 5:20,
  7:25, 40:25, 41:2,
  41:4, 41:7, 43:18,

53:8, 60:1
memories 76:14
mention 19:16, 81:25
mentioned 52:6,
  65:9, 65:13, 77:15
merit 70:20
meritorious 92:18
merits 94:14
metric 68:2
Midwest 20:2
mightily 18:17
million 30:22, 87:1
millions 27:9, 89:12
mind 72:5
mindset 94:15
minimum 8:5, 93:20
minute 39:17
minutes 6:22, 7:1,
  7:8, 24:6, 28:15,
  31:11, 37:12,
  83:14, 87:20,
  90:10
misapprehension
  13:12, 13:13
mischaracterizes
  86:6
misunderstands
  86:18, 88:12
mixed 89:24
moment 42:3, 45:10,
  48:18, 75:9,
  75:18, 76:3, 78:12
money 64:1, 77:15,
  79:3, 79:23
moral 23:2
morning 4:5, 4:7,
  7:9, 7:13, 7:17,
  24:7, 28:19,
  29:21, 31:17,
  31:18, 37:14,
  37:16, 37:17,
  40:23, 41:20,
  47:23, 48:17,
  58:1, 66:25,
  83:19, 91:17,
  93:3, 93:12
Motion 1:22, 5:4,
  5:8, 5:24, 6:19,
  7:8, 7:19, 11:5,
  28:6, 38:1, 83:8,

93:7, 96:17
move 54:10
Moxley 11:10
Ms 2:4, 4:7, 4:10,
  4:16, 37:14,
  37:16, 37:17,
  38:21, 39:2, 47:5,
  47:7, 47:13,
  47:17, 54:19,
  54:23, 71:7, 72:7,
  81:11, 82:25,
  83:3, 83:10,
  83:11, 88:12,
  88:25, 89:8
multiple 7:21,
  45:24, 59:6
municipal 49:10,
  50:25, 58:8, 64:6
municipalities
  17:13, 22:7,
  33:16, 62:7, 62:8,
  92:11, 92:13,
  93:19
municipality 42:24,
  91:12
mute 5:11, 5:13
mutually 81:6
Myers 24:8
myself 54:18


< N >
name 6:1, 6:4, 7:9
namely 10:24
narrow 55:4, 78:8
narrow-minded 16:13
narrowly 50:19,
  55:11, 59:19,
  61:14
nation 13:17, 30:15,
  43:7, 51:2, 51:4
national 8:14, 8:16,
  8:21, 9:7, 9:8,
  9:10, 10:2, 10:7,
  39:22, 43:10,
  43:15, 43:17,
  44:22, 45:7,
  50:12, 50:21,
  50:25, 51:6,
  59:22, 60:7,

90:18, 90:25,
  91:9, 91:11
nationwide 18:13,
  30:5, 31:1, 44:12,
  44:24, 44:25,
  87:15
nationwide. 9:13
Naturalization
  34:12, 34:19,
  35:15, 52:5,
  52:12, 52:14,
  84:6, 84:18, 84:21
nearly 74:3, 74:23,
  82:5
necessarily 45:6
necessary 13:18,
  16:3, 21:8, 39:10,
  40:7, 45:21,
  48:14, 68:9
necessities 26:8
necessity 21:6
need 5:14, 6:4, 7:3,
  16:23, 23:12,
  29:17, 37:2,
  44:14, 51:17,
  61:3, 61:9, 62:1,
  62:9, 87:21, 94:20
needful 8:24, 10:25,
  29:4, 32:5, 39:9
needing 90:22
needs 23:10, 51:20,
  96:1
negotiate 27:12
neighboring 85:1
neither 13:25, 26:10
New 7:15, 24:7,
  26:21, 31:19,
  31:20, 56:3, 77:1,
  77:6, 78:21,
  80:24, 82:22, 97:7
Next 28:15, 88:24,
  96:25
NG 4:7
night 10:8, 90:17
Nine 16:24, 17:22,
  17:23, 17:25,
  33:17, 41:11,
  51:14, 62:5, 62:6,
  63:6, 63:24,
  64:16, 64:21,

65:3, 88:15,
   88:19, 91:10,
   92:14, 93:23, 95:9
Nine. 26:22, 41:9,
   62:19, 63:23
Ninth 34:15, 75:5,
   75:7, 75:14,
   76:19, 88:18
No. 1:6, 5:2, 5:9,
   5:24, 44:8, 54:22
non-article 14:25,
   15:22
non-persuasive 87:17
non-puerto 13:21
None 3:5, 3:11,
   49:22, 78:9, 88:10
nonreviewability
   73:22
nonuniform 17:3,
   17:5, 19:5, 19:11,
   20:22, 24:15,
   57:17, 61:14,
   66:17, 66:19,
   72:21, 73:6,
   73:16, 74:4,
   95:11, 95:22
noon 7:6
nor 14:2, 83:5
normal 73:11
North 26:4
Northern 14:15,
   14:17, 14:23,
   15:14, 16:5, 16:7,
   34:18, 91:24
notably 38:20, 39:13
note 34:2, 69:23,
   96:16, 96:22
noted 15:23, 40:14,
   57:16
notes 56:8, 89:22,
   90:2
nothing 26:2, 33:21,
   45:2, 61:11, 79:4,
   87:3, 89:1, 90:5,
   93:23, 95:16
notion 61:25
Notwithstanding 62:8
novel 73:8
nowhere 16:11
null 82:12, 85:24

number 38:2, 38:8,
   47:19, 47:22,
   48:3, 48:5, 49:1,
   63:6, 63:8, 63:9,
   65:3, 90:12
numerous 18:4, 25:8


< O >
O'melveny 8:3, 24:8
objected 59:14
Objections 38:8,
   92:12, 97:1
objectivity 93:23
obligated 27:12
obligation 79:11
obligations 60:17
obscure 56:20
observation 97:4
observed 15:8, 83:22
obstacles 50:9,
   52:13
obtain 12:25, 13:16
obtained 79:5
obviously 86:12
ocean 69:24
odds 39:12
offered 61:25
officers 40:16,
   40:20, 40:21,
   41:1, 41:12
Official 98:14
officials 41:8,
   64:22, 64:23,
   86:12
okay 40:6
old 82:21
Omnibus 97:1
on-off 39:6, 83:21
Once 11:23, 12:2,
   36:5
one-size-fits-all
   52:8
ones 81:16
ongoing 28:1, 75:25,
   76:3, 76:19, 89:1,
   89:5
open 70:24
opening 14:6
operate 40:8, 62:4,

   70:16
operated 15:5,
   56:11, 56:17
operates 10:12,
   64:16, 74:6
operating 49:16,
   56:16, 66:4
operation 5:10
opinion 11:18,
   13:13, 85:14
opinions 93:16
opportunity 71:4
opposed 85:1
opposite 91:13
opposition 22:19
opt 78:15
oral 5:8
Order 5:23, 6:3,
   7:18, 13:11,
   25:16, 38:10,
   42:1, 44:24,
   87:24, 97:4
orderly 5:10
orders 5:17, 46:3
organizing 16:2
original 88:7
originally 71:14
ostensibly 85:8
others 52:17, 52:20
otherwise 6:3, 45:4,
   51:16, 51:17,
   54:4, 64:21, 70:16
out-of-state 50:16
outcome 35:16
outcomes 22:10
outset 52:6, 52:12,
   54:12, 62:19,
   67:4, 78:6
outside 10:1, 10:4,
   47:9
outstanding 60:17
overarching 94:15
overboard 94:16
overlook 26:13
override 85:20
overstatement 38:22
owed 59:12, 79:8
own 6:20, 10:1,
   10:5, 23:7, 24:16,
   42:5, 44:15,

48:15, 61:10,
65:24, 82:6,
92:16, 92:19
owned 90:21

< P >
Pacific 80:12
packs 18:20
PAGE 3:3, 8:12,
8:14, 9:10, 9:13,
11:11, 12:6,
12:11, 12:19,
13:10, 14:6,
19:19, 24:13,
85:14
pages 9:8, 9:18,
10:17, 14:23,
16:9, 20:17, 98:4
paid 12:9, 43:15,
79:9, 79:14
paragraph 21:7,
43:4, 89:20, 92:9
paragraphs 24:16
Pardon 47:5
Parenthetically 20:7
part 49:6, 53:14,
58:15, 68:7,
72:13, 76:9, 77:16
participant 6:16
participate 21:1
participated 25:12,
50:24
participating 7:21
participation 21:4
particular 32:18,
48:4, 48:15,
48:22, 49:20,
49:25, 50:15,
52:10, 55:7, 58:7,
61:15, 61:20,
61:21, 70:22,
71:4, 71:5, 72:9,
72:16, 75:4, 84:3
particularly 33:3,
42:18
PARTIES 1:28, 5:6,
5:11, 5:20, 7:15,
25:16, 38:2,
40:23, 66:24,

71:25, 77:3,
77:16, 93:7
Partnership 81:20
parts 16:20, 18:9,
36:17
party 75:1, 92:2
pass 26:21, 31:3,
36:2, 40:4, 42:1,
42:17, 43:18,
44:7, 44:15, 45:3,
45:7, 45:18,
86:18, 91:18,
92:23
passage 77:4
passed 30:8, 41:22,
42:6, 43:7, 54:1,
55:6, 72:21, 76:4,
81:2, 90:3, 92:19
passing 48:7, 92:16
passively 25:21
past 35:23, 68:17,
76:12, 77:2, 77:10
pause 39:17, 48:18
pay 13:1, 24:21,
26:3, 42:6, 43:17,
43:25, 44:2, 79:22
payment 17:10
payments 89:12
pending 22:8, 77:22,
77:23
pension 60:17, 74:22
people 30:12, 30:22,
32:16, 42:9, 76:9,
86:21, 87:1, 93:16
per 13:3, 60:21,
60:22
perceive 63:21,
64:24
perceived 15:3
percent 11:25, 12:1,
74:22, 74:25,
95:13
perfectly 43:5,
45:15
perhaps 54:5
period 75:14
permissibly 37:19
permission 70:24
permitted 5:19,
59:18

person 5:19, 6:8,
12:22, 13:4, 13:5,
26:20, 46:9,
60:22, 60:23
persons 12:20, 12:22
perspective 67:1
Peter 1:36, 8:2,
24:8
petition 70:17
phases 73:5
phone 5:14, 5:15,
31:13, 87:22
phones 5:11
phrase 11:18, 12:15,
21:17
PHV 1:32, 1:36,
1:39, 1:42, 2:4
pick 18:24, 19:6,
74:18
picked 91:8, 91:24
piece 85:9
Pipeline 14:15,
14:17, 14:23,
15:14, 16:5, 16:8,
91:24
place 38:12, 67:16,
68:8, 78:16,
78:20, 80:11
plainer 26:1
Plaintiff 1:9,
26:14, 75:8,
75:13, 76:13,
76:21, 79:22, 80:9
plaintiffs 75:10,
89:1
plans 20:10, 24:23,
27:21, 88:9
play 87:5
played. 6:25, 22:2,
23:14, 26:23,
28:9, 29:15, 31:6,
36:7, 81:10,
82:24, 85:23,
87:14, 89:15,
95:3, 96:6
pleading 89:20
Please 4:10, 5:13,
6:1, 6:4, 6:10,
6:16, 28:17, 39:1,
83:2, 96:21

plenary 12:13
plenty 22:20
plurality 16:5
plus 22:7
point. 24:4, 46:9
pointed 25:15,
  26:25, 32:10
points 9:20, 18:25,
  28:18, 28:22,
  45:10, 60:12,
  83:17
police 45:4
policies 5:17,
  22:14, 30:1,
  93:25, 94:1
policy 55:24
Political 23:4,
  40:13, 52:16,
  69:17
politically 64:25
pool 79:2
posed 80:22
position 18:6,
  22:13, 23:8,
  80:15, 81:6,
  81:14, 81:18,
  81:23, 83:19,
  86:8, 90:5, 90:6,
  94:21
positioned 71:8
positions 74:9,
  74:11
possibility 60:6,
  66:12
possible 35:24,
  56:13, 67:20,
  68:16, 75:18,
  75:20
post 48:7
potential 76:5
potentially 28:4,
  28:5, 33:19, 33:21
powers 14:11, 15:6,
  15:19, 15:24,
  18:5, 20:17,
  20:21, 22:18,
  22:19, 23:5, 29:6,
  29:11, 32:23,
  33:1, 38:14, 45:4,
  84:7, 86:22,

91:20, 91:22, 94:5
practical 42:15,
  47:25, 49:6, 49:8,
  49:12, 49:14,
  50:1, 50:8, 51:10,
  51:15, 52:13,
  58:24, 59:11,
  72:20, 73:17,
  76:9, 76:24
practically 82:1,
  86:21
practice 73:17
pragmatic 48:20
pre-existing 78:23
pre-promesa 74:16
precedent 21:17,
  32:1, 38:19,
  39:12, 41:18,
  52:4, 52:6, 53:3,
  53:11, 53:20,
  54:25, 80:8, 81:5
precedents 47:19,
  53:21, 88:16
precise 30:5, 39:1
Precisely 18:3,
  26:21, 27:4
predictability 51:7
preempt 52:22
preemption 44:11,
  74:14, 74:17
preempts 74:16,
  92:10
prejudice 76:14,
  77:15
preliminary 8:10
Prelogar 2:4, 37:14,
  37:15, 37:16,
  37:17, 38:21,
  39:2, 47:5, 47:7,
  47:13, 47:17,
  54:19, 54:23,
  71:7, 72:7, 81:11,
  82:25, 83:3,
  83:10, 83:11,
  88:12, 88:25, 89:8
premised 10:21
PREPA 22:11
preparing 97:8
prescription 15:2
present 31:24, 35:1,

59:15, 61:24,
  62:10
presentations 41:19
presented 80:19,
  81:1, 81:14, 96:14
presidential 79:3
presiding 4:14
press 5:7, 5:20,
  96:19, 96:21
pressing 77:24,
  82:14
Presumably 84:15
pretty 8:23
prevent 34:17,
  50:11, 59:23, 86:4
prevents 23:1
previously 78:13,
  80:18
PRIFA 77:6
primarily 41:5,
  86:12
principal 28:18,
  30:3, 63:10
principally 10:19
principle 13:19,
  76:20
principles 35:18,
  44:10, 78:7, 88:14
prior 47:21, 73:5,
  89:3
priority 55:7, 94:9,
  94:10
prism 30:9
private 8:11, 18:19,
  30:20, 36:8, 55:5,
  56:24, 59:17,
  60:1, 60:2, 79:23,
  86:24, 94:6
problem 33:22, 37:1,
  51:15, 55:23,
  57:14, 58:3,
  60:10, 61:14,
  62:1, 62:13,
  63:21, 68:18,
  69:3, 70:5, 71:6,
  71:22, 80:14,
  87:8, 93:14, 93:20
problematic 55:10
problems 18:11,
  18:16, 21:16,

22:16, 36:3,
36:18, 37:7,
55:12, 55:19,
61:20, 67:9
procedural 38:8,
43:19, 72:7
procedure 73:11
procedures 97:4
Proceeding 5:9,
5:25, 6:12, 6:19,
20:12, 59:6,
64:21, 73:5,
74:20, 80:5, 80:8,
80:21, 81:8
Proceedings 2:47,
5:12, 17:14,
37:22, 41:6, 41:8,
41:12, 51:2, 57:3,
59:3, 65:19,
72:18, 74:1, 74:9,
77:16, 78:2,
97:15, 98:6
proceeds 68:9
process 29:25,
37:21, 57:10
produce 75:11
produced 2:47
producing 75:13
productive 93:1
professional 89:13
profound 73:2
prohibited 92:16
prohibition 48:7
project 28:1, 89:5
projection 63:25
prompted 73:2
promulgated 24:24,
24:25
prong 81:23
pronounced 75:2
proper 53:19
property 8:25, 9:23,
10:14, 11:24,
12:1, 16:14, 21:8,
59:8, 90:15,
90:16, 94:19,
94:25
proponent 89:16,
96:8
Proposed 74:20

proposes 19:4
prosecute 12:23
prosecuting 12:23
Proskauer 7:10
prospect 77:2
prospective 27:24,
28:1, 28:10,
75:25, 76:7
protect 31:4, 50:12,
50:21, 80:9
protecting 60:7
Protection 17:17,
53:10
proves 41:21
provide 36:23, 70:5,
70:8, 71:15
provided 11:14,
20:11, 22:23,
66:1, 81:9, 81:12
provides 8:11, 9:2,
9:4, 14:6, 19:12,
21:7, 44:23,
63:14, 65:18,
69:4, 78:22, 87:1
providing 12:9,
18:25, 30:21
provision-specific
52:7
PSA 25:20, 25:22,
82:19
Ptasynski 35:12,
37:4, 85:5, 87:4
public 5:7, 5:20,
21:13, 21:14,
21:16, 21:23,
25:19, 36:21,
36:25, 65:1,
79:24, 82:23,
95:21
punctuated 22:20
punished 5:21
purists 72:22
purporting 72:21
purpose 16:1, 21:9,
40:11, 40:12,
47:24, 50:6,
50:10, 50:21,
51:18, 52:10,
52:13, 52:18,
53:21

purposefully 57:7
purposes 16:3,
33:14, 42:10,
45:13, 59:15,
63:5, 65:16,
65:25, 66:8,
67:18, 79:12
pursuance 14:9,
15:16
Pursuant 7:19, 9:25,
32:3, 39:19,
40:21, 54:1
pursued 27:15
pursuing 27:19
push 72:13
put 26:1, 89:25
putting 89:23

< Q >
qualifies 39:20,
40:1, 41:14, 41:22
qualify 38:6, 68:21
quality 21:24
quarter 12:1
question 30:13,
31:23, 31:25,
36:19, 37:18,
38:11, 43:20,
45:25, 46:10,
47:6, 47:7, 51:20,
52:2, 67:14, 68:1,
70:10, 70:19,
71:21, 73:4,
80:24, 94:5
questions 6:14,
24:1, 24:3, 28:12,
31:7, 37:8, 46:17,
46:20, 47:24,
47:25, 60:18,
66:22, 68:4,
96:11, 96:13
quick 81:24, 83:17
quickly 63:10, 67:1,
80:14, 88:21
quintessential 76:16
quintessentially
86:14
quite 24:2, 90:25
quote 12:12, 14:7,

18:7, 21:3, 29:24,
29:25, 30:12,
42:8, 42:13, 67:6,
67:7, 85:19,
86:15, 86:20
quoted 14:16

< R >
race 53:8, 53:15
racist 53:7
Rail 19:24, 19:25,
20:2, 20:22, 95:22
Railroad 20:3,
20:10, 20:18,
30:19, 55:7,
55:12, 80:13, 87:3
railroads 17:12,
20:2, 56:9, 56:16
raise 60:18, 64:4
raised 45:11
raises 37:18, 67:25
ran 40:13
ranting 94:17
rates 60:24
rather 18:16, 30:14,
30:15, 46:12,
55:13, 76:4
ratio 68:2
rationale 74:18
ratios 60:16
re 5:1
reach 66:20
read 13:4, 81:18,
88:6, 89:20
reading 28:23
real 11:24, 57:1,
77:25, 83:5
realize 38:25
really 25:11, 38:4,
44:1, 44:9, 53:25,
61:7, 64:4, 67:9,
69:24, 70:3,
71:22, 75:23,
75:25, 87:5
reason 8:20, 22:25,
45:5, 54:19,
56:17, 66:11,
78:3, 82:2, 84:8,
84:10, 92:8

reasonable 16:1,
77:20
reasoning 15:21,
42:11, 81:22
reasons 25:14, 49:8,
49:12, 49:14,
50:2, 62:11, 83:6,
84:1
rebuttal 24:1,
28:13, 31:8,
83:12, 87:20
recall 47:16
receipt 78:17
receipts 27:14
receive 25:8, 25:11,
26:11, 74:24,
78:14, 78:16,
89:10, 89:11
received 25:3,
25:16, 26:2, 73:18
recently 32:6, 39:13
recipient 89:14
recognition 57:17,
76:9, 94:3
recognize 18:15,
39:5, 52:25,
56:11, 57:20,
72:15, 77:17,
81:4, 90:24
recognized 33:3,
40:3, 43:2, 45:8,
48:9, 49:7, 55:2,
55:16, 57:14,
62:15, 66:16,
67:4, 70:4, 75:3,
75:7, 76:20, 89:24
recognizing 44:4
record 6:2, 71:5,
94:21
recorded 2:47
recording 5:18
Recovery 7:22,
44:17, 74:22
redistricting 75:6,
76:22
reducing 62:13
refer 39:23
reference 56:14,
79:13
referred 52:5,

73:24, 76:20, 78:7
reflect 53:1, 91:2
reflects 69:18
reflexively 53:20
refusal 24:21
refuted 17:5
refutes 13:7, 39:18
regard 45:7, 65:24
Regardless 29:12
regime 17:2, 56:3
regimen 16:14,
17:18, 17:20
regimens 17:15,
17:20
regimes 17:3, 62:2
region 36:14, 55:21,
56:10, 56:20
regional 55:12
regions 18:14, 31:2
regular 17:10
regulated 58:10
regulations 8:24,
10:25, 29:4, 32:5,
39:9, 51:8
rehash 9:19
reiterated 32:6
reject 54:8
rejected 19:16,
20:20, 27:8, 28:2,
30:6, 54:7, 79:24,
94:23
rejecting 89:6
relate 88:14, 88:18
related 30:1, 38:18,
39:8, 41:17, 47:10
relatedness 59:16
relates 51:25
relating 21:23
relation 40:22,
58:12
relations 46:2,
66:10
relationship 52:16,
58:4, 58:16,
59:20, 60:4
relentlessly 27:15
relevant 8:8, 44:6,
45:25, 46:10,
56:15, 63:4, 65:4,
67:25, 68:1, 74:7,

86:12
reliance 77:19,
    85:21
relied 27:3, 41:19,
    47:14
Relief 7:17, 11:13,
    27:24, 28:1, 28:5,
    28:11, 52:21,
    60:1, 61:4, 62:9,
    62:25, 70:8,
    75:25, 76:7, 88:22
relies 30:18, 39:4,
    56:7, 65:12, 93:5,
    93:10
relinquishing 29:1
reluctant 37:6, 87:8
rely 14:24, 41:25,
    85:10, 88:16
relying 52:4, 93:7,
    93:9
rem 10:12, 10:19
remainder 28:13,
    31:8
remaining 6:22,
    74:23
remains 76:25
remark 6:4
remarks 6:1, 24:3,
    37:9, 97:11
remedied 36:24
remedy 18:14, 31:2,
    72:2, 76:13, 81:9,
    81:13, 89:4
Remember 26:19,
    87:21
remind 5:16
remote 76:10
remove 78:17
removed 71:17
removing 69:13
render 10:2, 17:2
rendered 20:22,
    85:22
renders 19:11
Reorganization 17:2,
    19:21, 20:3,
    20:10, 21:2,
    21:15, 33:17, 61:9
reorganizations
    20:19

reorganize 17:11
reorganized 21:21,
    96:3
repeal 92:21
repeat 28:22, 95:23
repeated 49:1, 68:23
repeats 86:17
Reply 9:19, 11:11,
    14:6, 39:21,
    43:14, 46:19, 82:1
report 21:11
Reporter 98:14
reports 96:20
repose 77:9, 77:11
represent 7:11,
    53:23, 73:13
representative 7:12,
    58:19, 64:19,
    73:13
representatives
    96:21
representing 37:15
represents 20:8
Republic 15:3
request 6:5, 6:7,
    6:9, 28:7, 70:13,
    83:8
requests 67:7
require 11:5, 19:24,
    20:1, 32:1, 71:11
required 12:21,
    19:3, 19:21,
    49:25, 81:5
requirements 16:20,
    34:10, 35:4, 35:9,
    63:17, 63:20
requires 30:8, 33:8,
    61:19, 79:13,
    92:13
requiring 11:20,
    65:15, 71:1
resemblance 26:9
reserve 28:12
reserved 14:3
residents 12:8,
    31:5, 34:20, 35:1,
    35:2, 35:3
resides 10:8
residing 13:6
resisted 74:2

resolution 75:21
resolve 18:10, 27:19
resources 59:9
respect 10:23, 25:6,
    25:12, 26:18,
    27:6, 30:2, 33:9,
    37:7, 39:9, 41:4,
    41:23, 43:9, 44:6,
    47:23, 48:13,
    51:17, 51:24,
    55:19, 56:18,
    56:19, 71:5,
    77:14, 83:18,
    87:7, 87:9, 88:24,
    89:21
respectfully 83:8,
    96:7
respecting 8:24,
    32:5
respective 13:2
respects 59:4
respond 6:7, 38:9,
    45:10, 55:18,
    62:17, 72:9
responded 9:18
responding 91:2
response 20:7,
    25:11, 27:10,
    52:3, 60:10,
    62:12, 84:19,
    88:6, 89:6, 91:4
responsibilities
    21:4, 49:5
responsibility 23:8,
    23:20, 30:1, 30:21
responsible 23:23
rest 12:3, 16:16,
    53:6
restore 23:8, 23:20
restrain 54:18
restraint 40:9
restraints 55:1
restricted 13:22,
    14:1
restriction 40:9,
    49:11
restrictions 39:7,
    42:25, 54:4, 89:1
restructure 92:12,
    92:13

restructured 13:20
restructures 44:23
restructuring 37:22,
  44:16, 61:4, 62:1,
  62:23
rests 80:20
Retiree 1:38, 28:15,
  57:5, 83:13
retransmission 5:18
retrospective 76:13
return 29:1
returning 7:16
Revenue 13:17,
  64:13, 74:24,
  84:5, 84:16,
  84:20, 85:11,
  87:10, 87:11
revenues 24:21,
  59:12
review 64:9, 90:1
reviewed 15:22,
  64:14, 95:16
reviewing 74:21
revoke 89:2
RFF 81:20
ride 26:4
rides 18:16
Rights 27:7, 28:2,
  48:9, 77:3, 78:21,
  78:23, 80:7, 89:7,
  94:22, 94:25, 95:1
rise 66:14
risk 30:23, 64:4
Robertson 79:1
role 64:18, 68:12
room 24:24
Rose 7:10
rule 5:21, 6:13,
  11:2, 11:3, 14:13,
  46:13, 75:17,
  80:23
ruled 9:16, 10:16,
  11:22, 21:3
Rules 8:24, 10:25,
  13:11, 14:19,
  14:21, 29:4, 32:5,
  34:14, 34:19,
  39:9, 51:21,
  52:14, 55:13,
  62:4, 62:6, 62:7,

62:21, 63:2
ruling 11:5
run 7:5, 23:2,
  55:23, 96:10

< S >
S/ 98:12
safe 97:12
sales 59:8
salvage 49:18, 49:20
San 4:1, 7:16
Sanchez 32:13
sanctions 5:21
Sand 81:7
satisfied 78:10,
  81:23
satisfies 80:17
satisfy 8:8
save 12:13, 31:8
saying 12:18, 38:22,
  38:24, 54:24,
  74:17, 79:14,
  83:1, 85:14, 86:6,
  92:19, 96:9
says 10:24, 12:12,
  14:23, 15:14,
  25:16, 29:8, 82:8,
  84:19, 85:10,
  85:18, 86:10,
  89:23, 92:9,
  95:11, 95:16,
  95:25
scheduled 7:5,
  96:20, 96:22,
  96:25
scheme 44:12, 44:16,
  50:19, 56:2, 63:7,
  65:11, 65:23,
  66:5, 78:15, 79:17
schemes 50:14, 52:25
school 26:3, 26:5,
  79:20, 79:21
scintilla 22:23
scope 62:13, 67:17,
  69:21, 71:12, 86:3
screen 54:20
Second 9:13, 10:10,
  13:7, 14:21,
  18:24, 23:21,

29:21, 30:6,
  40:24, 55:15,
  64:8, 81:12, 84:4,
  84:8, 85:3, 88:12,
  93:11
Sections 25:20
secured 16:18
Securities 17:17,
  21:19, 21:24,
  21:25, 89:12
seek 73:8, 78:17,
  89:2
seeking 13:16, 75:24
seeks 7:17, 76:13,
  80:9
seems 71:1, 87:9
seen 60:16
segment 6:5, 6:18
select 5:13
selectively 74:17
seminal 14:15
sense 28:23, 44:21,
  63:1, 65:2, 65:22,
  72:20, 90:17
sentence 8:10, 21:7,
  23:15, 34:13, 83:2
series 14:24
serious 36:19, 75:13
serve 53:21
served 22:14
serves 52:12, 52:18,
  58:19
service 24:24,
  60:19, 64:2
services 30:22,
  36:23, 87:1
session 4:13
set 6:18, 34:13,
  34:19, 55:13,
  62:4, 62:6, 62:21,
  63:2, 64:5
settled 77:4, 77:10
settlement 25:24
settles 63:16
seven 93:24
Severability 57:15,
  66:1, 66:6, 66:12,
  66:13, 66:23,
  67:2, 68:19, 69:9,
  69:12, 69:18,

69:25, 72:1
several 16:8, 25:13,
    41:19, 55:17,
    75:12
shall 8:23, 9:4,
    11:21, 12:24,
    20:11, 20:13,
    21:8, 21:9, 67:6
shareholder 21:1
sharp 69:23, 78:24
sharper 74:11
sharply 62:14
shifted 75:16
shifts 8:12
shoehorn 18:17
shoehorning 22:5
shoes 41:24
short 13:24, 17:4
shorthand 56:12
shouldn't 65:6,
    75:3, 85:10
show 9:15, 12:19,
    13:4, 22:21, 49:24
showing 22:23, 80:2,
    82:3
shown 11:3
shows 11:9, 12:18,
    14:18, 16:25,
    19:7, 20:17,
    41:21, 59:15
shut 22:22
side 38:2, 44:9,
    49:16, 49:17,
    50:4, 69:16
signed 25:20, 89:9
significance 10:12
significant 33:12
similar 67:13,
    67:22, 81:21
similarity 62:18,
    68:7
similarly 32:9,
    67:7, 68:17,
    70:12, 70:14,
    70:20, 71:2,
    71:10, 71:24
simple 89:13
simply 25:21, 27:17,
    28:10, 33:23,
    35:14, 49:19,

60:10, 84:10,
    85:12, 92:1
single 17:12, 24:13,
    30:19, 37:20,
    80:20, 86:25, 87:3
sit 25:21, 26:8
sitting 27:18
situated 67:7,
    68:17, 70:13,
    70:15, 70:20,
    71:2, 71:10, 71:24
situation 26:6,
    26:10, 61:16,
    62:10, 67:22
situations 69:25
six 22:8, 24:5
skipping 15:13
small 17:12
snippet 12:11
so-called 35:9
Soap 42:12
sole 58:19, 64:19,
    79:5, 80:4
solely 21:22
solution 37:1
Solutions 5:14, 6:6
solve 36:3, 36:18
somebody 26:12
somehow 84:20,
    86:24, 88:11
soon 97:13
sorry 4:18, 19:25,
    50:18, 54:11,
    54:15, 54:16,
    54:19, 80:6
sought 88:22, 89:4
Sound 6:24, 6:25,
    22:2, 23:14,
    26:23, 28:9,
    29:15, 31:6, 36:7,
    81:10, 82:24,
    85:23, 87:14,
    89:15, 95:3, 96:6
soundly 17:5
source 39:4, 39:25,
    45:17, 46:6
sources 45:24
sovereign 15:5,
    28:25, 30:20,
    89:25

sovereignty 29:1,
    31:4, 47:6, 47:12
speaker 5:22, 6:8,
    6:17, 6:20, 6:21
speaking 4:6, 5:12,
    37:13, 89:8
special 11:9, 13:15,
    18:11, 18:16,
    24:21, 25:17,
    78:21, 89:11
specific 33:7,
    36:14, 57:22,
    83:23, 89:19
Specifically 20:16,
    32:21, 34:14,
    40:14, 45:18,
    46:24, 47:20,
    47:22, 51:20,
    53:12, 66:18,
    89:21
specified 7:4
spent 27:9
squarely 82:18,
    89:25
stable 62:4
staff 7:14, 97:6,
    97:10
stand 75:3
Standard 7:6, 17:22,
    21:25, 97:2, 97:3
standardize 52:20
stands 57:1, 69:23,
    78:23
started 85:13, 95:24
starting 88:7
statehood 52:17
Statement 8:11,
    25:23, 46:19
statements 25:19
States. 8:25, 9:6,
    11:21
statesmanship 29:18,
    84:12
status 58:8, 60:25,
    67:21, 68:3, 89:25
statutes 27:2, 54:1,
    70:7
statutory 58:19,
    64:19, 78:25,
    80:24

stay 97:12
stays 72:23
stenography 2:47
stepped 27:1, 95:10
stepping 41:23
steps 58:23
Stern 16:9
stockbrokers 17:13
stood 61:1
stopped 40:6, 77:24
straight 46:21
straitjacket 29:20,
  36:11
strands 25:2
strategic 72:12
strike 69:20
striking 18:19,
  69:13, 92:4
stringent 33:25,
  35:5
strong 22:16, 22:19,
  89:16
struck 92:5
structural 84:2
structure 35:8,
  49:2, 70:14
structures 42:17,
  43:1, 44:2
subdivision 13:1
subject 8:18, 9:5,
  13:10, 13:22,
  17:14, 23:25,
  24:1, 38:11,
  43:11, 44:20,
  45:25, 46:13,
  51:13, 57:13,
  66:10, 80:4,
  80:11, 80:16,
  93:25, 96:10
submission 53:19,
  68:4, 96:23
submit 96:7
submits 16:22, 35:17
subsequent 26:16
subsequently 25:9
substance 43:20,
  43:21
substantial 26:2,
  59:12, 64:15, 68:7
substantially 67:13,

82:9
substantive 54:9,
  89:22
sufficiently 70:19
suggested 64:11,
  67:24
suggesting 46:5,
  79:9
suggestion 39:18,
  61:1
suggestions 51:15
suggests 33:22,
  49:22, 65:5, 68:6
suit 26:12, 27:12,
  72:10, 73:2, 75:4,
  75:14, 75:18,
  77:21, 78:2, 78:4,
  82:20
suits 27:20
summarized 46:25
superficial 17:23,
  17:25
supervise 21:19,
  41:8, 41:12
supply 91:6
Support 13:18,
  25:22, 25:24,
  82:4, 82:5, 82:8,
  89:9, 89:20,
  91:20, 93:7
supporting 97:8
supports 11:17
suppose 16:2
supposedly 30:4
survive 82:13
Suspension 47:8
sustainability 19:2
sustained 96:3
Swain 1:23, 4:5,
  4:14, 7:9, 98:7
swift 7:15
switch 39:6, 83:21
system 13:15
systems 49:3

< T >
Tacoronte 4:10, 4:16
tailored 84:2
takings 88:10

tandem 66:4
Tax 11:17, 11:22,
  11:24, 12:2,
  12:21, 13:4, 42:3,
  42:6, 42:9, 43:7,
  43:12, 43:15,
  43:17, 44:2, 44:5,
  52:4, 52:18,
  52:23, 52:24,
  53:3, 53:11,
  53:20, 84:16,
  90:21
Tax-free 33:13,
  44:18
Taxation 33:9,
  34:22, 35:5, 35:15
taxed 35:1
taxes 11:20, 12:8,
  13:8, 13:16,
  34:24, 42:8, 53:1,
  59:8
taxing 52:22
Taylor 1:23, 4:13,
  98:7
teaching 18:6, 22:15
telephone 97:4
telephonic 5:10
TELEPHONICALLY 1:28
ten 11:11, 79:23,
  93:24
tens 89:12
tension 33:12
Tenth 18:5
tenure 14:2, 49:8,
  49:13, 51:13
term 39:14
terminated 82:6
termination 82:11,
  82:13
terms 39:22, 48:16,
  56:10, 58:4, 58:6,
  58:12, 59:20,
  79:6, 82:6, 82:17,
  86:9, 91:10,
  91:16, 94:2
territorial 13:18,
  15:1, 22:18,
  29:17, 29:20,
  32:12, 42:6,
  42:19, 48:24,

49:2, 49:4, 49:5,
49:9, 49:13,
49:15, 49:19,
49:21, 50:1,
51:12, 74:16,
84:14, 91:19
territory. 12:10
test 9:13, 9:17,
35:16, 46:16,
46:20, 47:18,
61:24, 93:2, 93:3,
93:11, 93:15,
93:21, 93:23
tests 9:9
text 29:9, 35:8,
40:13, 84:23, 85:8
textual 28:22,
28:23, 29:10
Thanks 23:18
themselves 33:16,
41:2, 74:11, 91:13
theories 53:7
theory 10:3, 10:5,
23:3, 38:13,
53:15, 74:14,
80:20
thereby 50:12, 50:20
thereof 13:1
They've 39:3, 82:22
thinking 63:1, 73:21
thinks 61:17, 74:10,
94:7, 94:16
Third 10:16, 14:9,
15:16, 84:19,
85:10, 88:20
Thomas 92:8, 92:14
thoroughly 91:3
though 10:8, 12:20,
43:12, 46:12,
67:19, 72:19,
76:21, 85:16
three 7:23, 9:20,
25:1, 25:4, 25:7,
27:7, 28:15,
28:18, 30:22,
63:10, 66:13,
84:23, 85:4, 85:7,
87:1
threshold 7:20, 8:2,
35:24, 38:10,

70:19
throughout 9:6,
11:21, 33:8, 51:2,
53:12, 56:21,
68:23
thrown 72:11
Thursday 97:2
ticked 58:9
tie 92:4
Titles 7:23, 8:1,
13:23, 65:6, 66:2,
66:8, 66:13
To-wit 13:3
Today 5:7, 5:10,
10:18, 26:19,
38:3, 52:25,
55:18, 71:2,
81:25, 87:6,
87:12, 87:17,
96:18, 97:11
together 25:2, 25:4,
66:4, 66:14
tomorrow 77:6
took 12:6, 44:16,
46:7, 81:13, 90:6,
91:20
toothless 54:14,
54:25
total 21:24
touch 45:25, 67:1
touted 25:18
traced 46:25
traces 53:4
track 6:20, 6:21
trade 13:2
traded 82:23
trades 10:8
traditional 69:18
transaction 91:5
Transcript 2:47,
6:12, 98:4
transcription 98:5
transfer 13:3
transgresses 56:23
transportation 79:23
trap 95:10
treasurer 12:9
Treasury 43:16,
43:17, 43:24,
43:25

treat 53:14
treated 33:24, 94:20
treating 34:17
treatment 28:25,
89:14
tried 26:14, 44:15,
80:6
tries 18:17
trigger 77:1
true 25:13, 25:15,
64:14, 84:10,
85:4, 85:5, 98:5
truly 41:22, 76:10
Trust 33:13, 44:18
Trustee 18:2, 95:8
try 23:7, 53:21,
56:1, 61:20,
68:11, 69:8, 88:2
trying 27:11, 27:18,
54:17, 61:16
tundras 26:4
turn 7:7, 24:5,
25:9, 54:9, 66:22,
72:7, 74:3, 78:5,
83:12, 86:5
turned 41:4, 71:19,
81:11
Turning 80:14
turns 45:12
twice 11:22
two 6:22, 6:23, 7:1,
7:2, 7:5, 8:7,
9:9, 14:18, 18:16,
18:21, 26:19,
27:2, 30:3, 55:1,
67:9, 82:5, 84:1,
87:20
type 45:17, 50:20
types 48:3, 49:20,
55:1, 58:10
typical 76:11


< U >
ultimately 40:18,
70:4, 71:19, 75:1,
91:6
unconstitutional
7:24, 67:5, 69:14,
69:19, 75:6, 76:2,

76:8, 76:22, 76:25
undermine 59:22
undermines 90:4
undermining 51:7
underscores 58:16,
  59:16
understand 24:10,
  25:3
understanding 71:21
understands 22:11
understood 10:18,
  72:1
undone 82:21
undoubtedly 12:7,
  28:5, 28:7
unfair 19:7, 94:12
unfit 27:16
uniform 9:5, 11:21,
  13:9, 16:24,
  17:19, 17:20,
  17:21, 20:3,
  23:11, 28:25,
  38:6, 50:18,
  51:21, 56:21,
  62:3, 68:12, 70:7,
  84:5
uniformly 56:18
Union 80:12
unique 18:16, 22:16,
  32:15, 37:21,
  41:25, 50:18,
  57:2, 70:3, 78:13,
  89:11
unit 91:12
units 17:24, 60:3,
  97:4
unlawful 35:4,
  59:15, 88:9
Unless 20:13, 28:12,
  66:22
unlike 51:13
unlimited 86:21
unmute 5:15, 31:12,
  87:21
unmuted 31:15
unnecessary 85:15
unquote 85:20
unreviewable 20:23
unsecured 16:19
until 7:6, 70:15,

75:11
untimely 72:10
untrue 88:23
unusual 29:6, 32:9,
  42:22
upheld 14:25, 34:24,
  36:13
urge 97:12
uses 8:22
using 39:22, 44:2,
  57:13, 70:12,
  91:18
usual 97:3
usurps 23:22

< V >
v. 1:11, 10:16,
  11:10, 11:24,
  12:2, 15:7, 16:9,
  19:18, 20:16,
  32:13, 33:13
vaccinations 7:15
vaccine 97:13
validity 80:23, 90:1
validly 81:2
Valle 32:14
Valuation 20:6,
  20:24, 21:5
value 21:2, 21:8,
  21:10, 95:20
variation 50:15,
  52:24
variety 27:20, 47:1,
  50:14, 58:16, 76:8
Various 24:20,
  25:19, 27:16,
  46:16, 48:8, 52:8,
  59:4, 74:5
versus 5:3, 41:20,
  41:24, 48:19,
  53:4, 69:16, 79:1,
  81:7
vested 16:4
viable 92:7
view 40:5, 53:14,
  64:4, 93:22, 94:4
viewed 30:9, 66:3
violate 82:20
violated 11:8

violates 31:23,
  37:25, 54:11,
  55:2, 57:23, 82:4
violating 18:1, 37:2
violation 38:7, 83:6
Violations 5:20
Virgin 22:21, 22:24,
  60:15, 60:20,
  60:23
Virginia 10:16
void 26:24, 27:1,
  82:12, 85:24
voluntarily 78:14,
  79:3
voluntariness 80:2
voluntary 75:20
votes 89:3

< W >
waited 75:10, 76:21
waiting 26:12, 75:20
walk 39:17, 42:2,
  60:12, 63:10
Walker 98:12, 98:13
wanted 63:10, 89:2
wants 51:9, 54:3
warrant 61:17
wave 6:6
ways 14:18, 29:5,
  32:8, 35:2, 42:22,
  58:17, 59:22,
  62:14, 67:23,
  73:2, 74:5, 85:2
weight 60:8
Welcome 5:6
Western 20:16
whatever 54:3
whatsoever 7:25,
  94:8
whereas 60:22, 87:6
whichever 93:21
who've 96:14
whole 27:20, 62:3,
  77:23
wholly 53:6, 53:16
wide 47:1, 50:13,
  50:15, 52:24,
  76:8, 84:12
wider 70:8

will 5:22, 6:7,
  6:20, 6:21, 7:2,
  7:3, 7:7, 8:3,
  8:4, 9:19, 11:16,
  24:5, 37:8, 51:2,
  64:5, 82:25,
  83:12, 93:16, 97:1
winners 18:24, 19:6,
  74:18
wisdom 87:9
wish 6:3, 7:14
wishes 6:8
Within 11:14, 12:24,
  15:10, 18:3,
  36:25, 43:21,
  44:20, 72:23
without 13:9, 21:6,
  37:2, 56:13,
  57:13, 62:13,
  68:19, 79:16
WITNESSES 3:3, 76:14
word 8:22, 20:6,
  30:16, 57:6, 70:11
words 24:17, 36:24,
  46:1, 56:20,
  68:19, 69:9,
  69:13, 69:21,
  70:12, 72:11
work 22:5, 27:11,
  70:7, 97:8
working 66:4
works 62:5, 64:16,
  69:12, 69:18,
  79:18
world 12:21, 13:6,
  16:16, 16:20,
  79:16, 90:17,
  90:21
worried 54:20
worth 73:4
would-be 70:14
written 24:12


< Y >
year 7:15, 24:8,
  31:19, 31:20
years 7:23, 14:13,
  24:19, 25:7,
  26:12, 26:17,

26:19, 27:7,
  76:12, 76:21,
  82:5, 88:19
York 56:4, 97:7
yourself 6:1, 31:12