# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| **In re** | PROMESA |
| | Title III |
| **THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,** | No. 17 BK 3283-LTS |
| As a representative of | **(Jointly Administered)** |
| **THE COMMONWEALTH OF PUERTO RICO** *et al.*, | **Telephonic Hearing date:** January 27, 2021 at 9:30 a.m. (AST) |
| **Debtors.**[1] | |

## FEE EXAMINER'S PROMESA SECTIONS 316 AND 317 STATUS REPORT: PROFESSIONAL FEES AND EXPENSES

TO:  HON. LAURA TAYLOR SWAIN,
     UNITED STATES DISTRICT JUDGE

This status report, filed in conjunction with the January 27, 2021 omnibus hearing, does not itself recommend specific professional fee applications for approval. Applications for the Tenth Interim Fee Period (June 1 – September 30, 2020) were filed beginning in mid-November and are now subject to continuing review, written analysis, and discussion that, pursuant to the established interim reporting schedule, will result in a group of interim applications recommended for Court approval in connection with the March 10, 2021 omnibus hearing. This

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the: (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); and, (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

first quarter of this new year is, however, if not a turning point then at least a point of inflection, warranting a brief summary of professional fees and expenses incurred to date in the PROMESA Title III proceedings. There are no motions, new proposals or guidelines offered here. Rather, this report reiterates those standards and reflects the data, experience and observations from the compensation review and recommendation process to date.

The Court has entered an order [Dkt. No. 15468] requiring by February 10, 2021 at least a term sheet for the potential confirmation of a plan of adjustment in the Commonwealth proceeding. The mediation process is in an intensively renewed phase. The Oversight Board now has a full complement of members, the Commonwealth has elected a new Governor, and the new Puerto Rico legislature and the U.S. Congress are in session. This Court has before it several dispositive motions for decision, *e.g.* [Dkt. No. 36; Adv. Pro. No. 20-068, January 12, 2021 argument], and the U.S. Court of Appeals continues to resolve issues brought to it. All of that suggests a brief overview—both appropriate and timely—as the mandated fee review process begins its fourth year.

*Basic Data*

To date, the professionals subject to Title III review have filed and submitted to the Fee Examiner applications for $831,966,663.93 in fees and $26,469,358.56 in expenses. The fees and expenses submitted by each firm with the negotiated reductions—and approved by the Court on an interim basis—are matters of public record. At the very outset, in the first quarter of 2018, a total of 34 professionals (law firms, financial institutions and advisors) began submitting applications for Court-approved compensation. Of those, nine were Commonwealth-based firms. Now, the total number of firms retained by the statutory principals (the Oversight Board, AAFAF for the Commonwealth, the Creditors' Committee, the Special Committee, and the Retirees' Committee) reflects a net increase to 43 firms, not including firms that have completed

2

their work on these cases. Noting that a relatively small percentage of fees is not strictly attributable to Title III services, these are the fees and expenses submitted by category:

**The Oversight Board: $432,286,442.14**
(This includes the Special Claims Committee firms)

>Law firms: $205,945,867.68
>Financial/Investment firms: $109,759,206.01
>Consultants: $116,581,368.45

**The Government: $269,905,184.18**

>Law firms: $132,271,646.52
>Financial/Investment firms: $105,063,041.85
>Consultants: $32,570,495.81

**UCC/Retirees' Committee: $132,814,403.43**

>Law firms: $98,039,959.47
>Financial/Investment firms: $30,047,292.79
>Consultants: $4,694,166.15
>Committee members (expenses only): $32,985.02

**COFINA Agent and professionals: $20,700,188.03**

>COFINA Agent: $1,217,844.00
>Law firms: $19,482,344.03

**Mediation Team: $2,729,804.71**
(Financial advisor)

**Totals**:

>Law firms: $455,739,817.70
>Financial/Investment firms: $247,599,345.36
>Consultants: $153,846,030.41
>Committee members: $32,985.02
>COFINA Agent: $1,217,844.00

**Cumulative Total: $858,436,022.49**

Pursuant to the Court's orders [Dkts. Nos. 1150, 1715, and 3269], the basic application, written report and judicial consideration process has not varied. Most professionals submit

3

compensation requests monthly, receiving 90 percent (or, in some instances, 80 percent) of the amount requested. Those requests are encompassed in formal and publicly-filed applications, typically every four months. The Fee Examiner and counsel review each of the applications and recommend them for approval—frequently with negotiated adjustments—generally without a hearing in the absence of objection.

Every interim compensation application remains subject, at the conclusion of each Title III proceeding, to a final comprehensive application requiring the Court's approval. In the COFINA Title III case, for example, the Court has finally approved $33,279,647.68 in final compensation for all of the COFINA and statutory professionals involved—in a proceeding that the Oversight Board estimates saves the taxing authority $6 billion in debt payments.

*Process/Value*

The Court's initial orders, establishing review standards and the process for professional compensation, have been supplemented by two presumptive standards orders addressing billing issues of general concern. [Dkt. Nos. 3932 and 7678.] These orders are buttressed by the Fee Examiner's guidelines, the U.S. Trustee Guidelines, the Puerto Rico bankruptcy court rules and, not the least, the rules of professional conduct. Most professionals have contractual relationships with their principals that govern compensation, usually including facially permissible rate increases. All are matters of public record.

While the Commonwealth's treasury—Hacienda—pays virtually every compensation request monthly, subject to review, not all professionals file interim applications at the same time or consistent with the established reporting schedule. Generally, that schedule calls for interim fee applications about 45 days after the close of each four-month interim period. However, not every filed application comes with the complete data and documentary support essential for the

4

initial, data-driven phase of the review process. Notably, though, most professionals not initially familiar with the application procedure now have improved compliance.

The analytical and approval process delay for some applications does not adversely affect the Commonwealth because it defers in some instances the Commonwealth's obligation to pay a portion of the fees and expenses held back and eventually approved by the Court. Whether attributable to the pandemic, the many other challenges visited on the island, or administrative convenience, it is important that the public and the Court have timely data as the proceedings continue to a confirmed resolution—consensual and negotiated or otherwise.

In PROMESA, Congress adopted the "reasonable and necessary" standard for professional compensation embodied in the Bankruptcy Code almost 50 years ago. It is a subjective and case-specific standard that does not necessarily require a successful transaction or successfully litigated proceeding for compensation. The sometimes protracted discussions integral to the PROMESA fee process attempt to resolve substantive and legitimate differences over what services are "reasonable and necessary." Typically, the process avoids burdening the Court with objections because the process applies the Bankruptcy Code's (and PROMESA's) foundational principles to compensation applications. The principles themselves, grounded in statute and precedent, are almost never at issue.

The Fee Examiner has tried to apply the principles, in part, to help reinforce for the public and stakeholders the benefit and value indispensably provided by professionals in a unique, constitutionally-significant proceeding attempting to resolve more than $100 billion in obligations assertedly undertaken by Commonwealth entities for its 3.2 million residents.

*Staffing Efficiency*

The single broadest and most costly category of unreasonable and unnecessary services involves inefficient staffing, including within firms and across firms representing the same client

5

or clients allied in interest. Within any single firm, the problem presents itself as daily time recorded and billed by individual professionals—whether partners/shareholders, associates or of counsel, and administrative staff—duplicating efforts, apparently providing the same service or completing the same task, or providing a service that might have been better delegated. The examples are legion—most obvious in the context of hearings and depositions.

The shift to virtual platforms actually may be exacerbating the phenomenon—travel to San Juan or New York is no longer required to participate in most case events, inviting broader participation but also potentially greater cost. A portion of that cost will continue to be offset by reduced travel expenses but only modestly. More significantly, the dramatic changes in travel and meeting, deposition, and hearing patterns necessitated by Covid-19 also should result in permanently reduced expenses, and the prevalence of virtual platform use will be a factor in expense review just as it will be in fee review for deposition, mediation and hearing attendance.

The mediation process is a present example. While the Fee Examiner is not a participant, by definition the number of mediation parties and counsel *not* subject to Title III fee review (primarily bondholders or guarantor groups*)* surely exceeds those that are subject to review. Nevertheless, the prospect of so many individual professionals engaged in or observing mediation sessions presents very concrete billing judgment and fee review challenges.

The sheer number of participants—reflected on filed or ultimately filed applications—does not enhance public perception of value provided. Nor, beyond mediation, does it enhance perception when a single docketed pleading filed in the normal course bears the name of 23 individual professionals and seven firms, *e.g.*, [Dkt. No. 7223], not an isolated occurrence. A pleading just filed in the ERS litigation, [Dkt. No. 15634], submitted five pages of text—

6

followed by a four-page signature block carrying the names of nine firms and more than 25 individual attorneys.

The question of staffing efficiency does not reflect a disagreement over principle. This Court has articulated the need to avoid duplication with repeated admonitions. *E.g.*, Tr. 25:14 and 25.9, March 7, 2018. There is no benefit in making any one firm or deposition or hearing a case study. The Fee Examiner and parties rarely disagree on whether a pleading or brief should have been filed at all; rather, they disagree on the amount and nature of time and resources devoted to a brief or other pleading. In this regard, the Fee Examiner (like the Court) continues to urge parties to rely more heavily on their Commonwealth co-counsel, especially for the tactical execution of strategic decisions and for the drafting of basic procedural motions—to extend time or page limits, for example.

Some inefficiency and duplicative services are inevitable, given the structure of PROMESA and the recurring constitutional and statutory issues subject to litigation, especially in the number initiated by other interested parties. The depth and breadth of the overstaffing question probably do not require another judicial admonition. They do require application of more billing judgment.

### *Rate Increases*

Professional rate increases, usually annually, are not only commonplace but often justifiable with client consent. In the last six weeks, the docket reflects a series of them for 2021. *See*, *e.g.* [Dkt. Nos. 15516, 15515, 15514, 15499 and 15573]. Some of those fall within the range contemplated by the *Fee Examiner's Motion to Impose Additional Presumptive Standards: Rate Increases and the Retention of Expert Witnesses or Other Sub-Retained Professionals* [Dkt. No. 4370]. Others do not. To date, professionals subject to Title III review have imposed rate

increases adding more than $20.6 million in fees that would not have been incurred had rates remained unchanged from retention.

There seems little, if any, evidence that the pandemic has exacted a harsh toll on mainland firms.[2] The rate increases noticed by Puerto Rico firms so far have been reasonable, especially given their much lower hourly rates. Not so for some other firms. The fee review process looks at rate increases by individual professional, not just firm-wide. Some of those individual rate proposals exceed 15 percent, which may well draw objection. *See* 2021 Report; *see also* Andrew Maloney, Rate Pressure and Rising Expenses are Expected to Challenge Firms in 2021, Law.com (Jan. 15, 2021), https://www.law.com/americanlawyer/2021/01/15/rate-pressure-and-rising-expenses-are-expected-to-challenge-firms-in-2021. The Report's author is quoted as "'dubious' that firms could boost rates at the same level as they did last year [2020]—about 5%. The average annual rate increase for firms since 2008 has been about 3%...." It is additionally worth noting that the conceptual justification for greater and cumulating periodic rate increases may lose incentive force as even these complex and unique proceedings enter into a fourth or fifth year.

***Substantial Contribution***

The PREPA and Commonwealth proceedings each has produced a Restructuring Support Agreement (RSA), both the subject of litigation and delayed hearing and resolution. The RSA for PREPA includes a specific provision for the reimbursement or payment of professional fees for all of the parties to the RSA, not merely those subject to PROMESA's fee provisions. The Fee Examiner has filed an objection to those provisions in the RSA. [Dkt. No. 9065.]

---

[2] *See* Georgetown Law Center on Ethics and the Legal Profession & Thomson Reuters Institute, 2021 Report on the State of the Legal Profession (2021) ("2021 Report"); *see also* Roy Strom, Big Law's Windfall Profits May Lead to Prolonged Rate Pressure, Bloomberg Law News (Jan. 14, 2021), https://news.bloomberglaw.com/business-and-practice/big-laws-windfall-profits-may-lead-to-prolonged-rate-pressure.

The prospect that the Commonwealth or PREPA would reimburse dozens of commercial parties for professional compensation or compensate their professionals directly—without limit, without review, and without Court approval—appears inconsistent with PROMESA's commitment to transparency and fiscal responsibility. In addition, in the Chapter 11 context, the relationship between proposed contractual obligations in an RSA (or pre-petition contract) and the substantial contribution provision of 11 U.S.C. § 503(b) is controversial. *See In re Mallinckrodt Plc*, No. 20-12522, Dkt. 1179 (Bankr. D. Del. Jan. 19, 2021) (bench ruling granting (with revisions and limits) motion for debtors to enter into reimbursement agreement for some RSA party professionals). It may become so here.

*Budgeting*

Some firms have fully complied with the Fee Examiner's request for prospective but non-binding and confidential monthly budgets. Compliance by others has been intermittent. Prospective budgets have value—both internally for the firm exercising staffing and billing judgment, externally for those reviewing fees and, ultimately, for the entities asked to pay them. With these proceedings now in their fourth year and mediation and litigation progressing, consistent budgeting becomes progressively more important. The amount of professional fees incurred—and, within reasonable estimates, to be incurred—at these levels is almost unavoidably one of the factors in the resolution of these proceedings and, critically, in the Oversight Board's and Commonwealth's fiscal planning.

## CONCLUSION

Over the last decade, a handful of very large and complex Chapter 11 commercial proceedings and Chapter 9 municipal proceedings have provided some—but quite limited—guidance and points of comparison for the PROMESA proceedings and their cost. For a host of reasons, these proceedings are unique. However uncertain the outcomes, whatever the path,

9

every party in interest will continue to have a direct interest in a transparent compensation process for the professionals and parties trying to not only resolve fiscal challenges but improve the Commonwealth's economy. Most of all, the public has a direct interest.

Dated: January 20, 2021.

**WE HEREBY CERTIFY** that on this date, we electronically filed the foregoing report with the Clerk of the Court using the CM/ECF system that will send notification of such filing to all attorneys of record registered in the use of the CM/ECF system.

                                   EDGE Legal Strategies, PSC

                                   *s/Eyck O. Lugo*
Eyck O. Lugo
252 Ponce de León Avenue
Citibank Tower, 12th Floor
San Juan, PR 00918
Telephone: (787) 522-2000
Facsimile: (787) 522-2010

*Puerto Rico Counsel for Fee Examiner*

GODFREY & KAHN, S.C.
One East Main Street, Suite 500
Madison, WI 53703
Telephone: (608) 257-3911
Facsimile: (608) 257-0609

Brady C. Williamson (*Pro Hac Vice*)
*Fee Examiner*

24705897.2

10