# United States Court of Appeals
## For the First Circuit

No. 19-1181

IN RE: THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, AS REPRESENTATIVE FOR THE COMMONWEALTH OF PUERTO RICO; THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, AS REPRESENTATIVE FOR THE PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY; THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, AS REPRESENTATIVE FOR THE PUERTO RICO ELECTRIC POWER AUTHORITY (PREPA); THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, AS REPRESENTATIVE FOR THE PUERTO RICO SALES TAX FINANCING CORPORATION, a/k/a Cofina; THE FINANCING OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, AS REPRESENTATIVE FOR THE EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO,

Debtors.

---

RENÉ PINTO-LUGO; MOVIMIENTO DE CONCERTACIÓN CIUDADANA INC., (VAMOS); UNIÓN DE EMPLEADOS DE OFICINA Y PROFESIONALES DE LA AUTORIDAD DE EDIFICIOS PÚBLICOS, (UEOGAEP); UNIÓN INSULAR DE TRABAJADORES INDUSTRIALES Y CONSTRUCCIONES ELECTRICAS INC., (UITICE); UNIÓN INDEPENDIENTE DE EMPLEADOS DE LA AUTORIDAD DE ACUEDUCTOS Y ALCANTARILLADOS, (UIA); UNIÓN DE EMPLEADOS DE OFICINA COMERCIO Y RAMAS ANEXAS, PUERTOS, (UEOCRA); UNIÓN DE EMPLEADOS PROFESIONALES INDEPENDIENTES, (UEPI); UNIÓN NACIONAL DE EDUCADORES Y TRABAJADORES DE LA EDUCACIÓN, (UNETE); ASOCIACIÓN DE INSPECTORES DE JUEGOS DE AZAR, (AIJA); MANUEL NATAL ALBELO,

Movants, Appellants,

v.

THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, AS REPRESENTATIVE FOR THE COMMONWEALTH OF PUERTO RICO; THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, AS REPRESENTATIVE FOR THE PUERTO RICO SALES TAX FINANCING CORPORATION, a/k/a Cofina,

Debtors, Appellees,

PUERTO RICO FISCAL AGENCY AND FINANCIAL ADVISORY AUTHORITY,

Movant, Appellee,

ARISTEIA CAPITAL, LLC; CANYON CAPITAL ADVISORS, LLC; GOLDEN TREE
ASSET MANAGEMENT LP; OLD BELLOWS PARTNERS LLP; SCOGGIN
MANAGEMENT LP; TACONIC CAPITAL ADVISORS, L.P.; TILDEN PARK
CAPITAL MANAGEMENT LP; WHITEBOX ADVISORS LLC,

Intervenors.

—————————————

No. 19-1182

IN RE: THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO
RICO, AS REPRESENTATIVE FOR THE COMMONWEALTH OF PUERTO RICO; THE
FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, AS
REPRESENTATIVE FOR THE PUERTO RICO HIGHWAYS AND TRANSPORTATION
AUTHORITY; THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR
PUERTO RICO, AS REPRESENTATIVE FOR THE PUERTO RICO ELECTRIC
POWER AUTHORITY (PREPA); THE FINANCIAL OVERSIGHT AND MANAGEMENT
BOARD FOR PUERTO RICO, AS REPRESENTATIVE FOR THE PUERTO RICO
SALES TAX FINANCING CORPORATION, a/k/a Cofina; THE FINANCIAL
OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, AS
REPRESENTATIVE FOR THE EMPLOYEES RETIREMENT SYSTEM OF THE
GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO,

Debtors.

—————————————

MARK ELLIOTT; LAWRENCE B. DVORES; PETER C. HEIN,

Movants, Appellants,

v.

THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR
PUERTO RICO, AS REPRESENTATIVE FOR THE COMMONWEALTH OF
PUERTO RICO; THE FINANCIAL OVERSIGHT AND MANAGEMENT
BOARD FOR PUERTO RICO, AS REPRESENTATIVE FOR THE PUERTO
RICO SALES TAX FINANCING CORPORATION, a/k/a Cofina,

Debtors, Appellees,

PUERTO RICO FISCAL AGENCY AND FINANCIAL ADVISORY AUTHORITY,

Movant, Appellee,

ARISTEIA CAPITAL, LLC; CANYON CAPITAL ADVISORS, LLC; GOLDEN TREE
ASSET MANAGEMENT LP; OLD BELLOWS PARTNERS LLP; SCOGGIN
MANAGEMENT LP; TACONIC CAPITAL ADVISORS, L.P.; TILDEN PARK
CAPITAL MANAGEMENT LP; WHITEBOX ADVISORS LLC,

Intervenors.

———————————

No. 19-1960

IN RE: THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO
RICO, AS REPRESENTATIVE FOR THE COMMONWEALTH OF PUERTO RICO; THE
FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, AS
REPRESENTATIVE FOR THE PUERTO RICO HIGHWAYS AND TRANSPORTATION
AUTHORITY; THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR
PUERTO RICO, AS REPRESENTATIVE FOR THE PUERTO RICO ELECTRIC
POWER AUTHORITY (PREPA); THE FINANCIAL OVERSIGHT AND MANAGEMENT
BOARD FOR PUERTO RICO, AS REPRESENTATIVE FOR THE PUERTO RICO
SALES TAX FINANCING CORPORATION, a/k/a Cofina; THE FINANCIAL
OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, AS
REPRESENTATIVE FOR THE EMPLOYEES RETIREMENT SYSTEM OF THE
GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO,

Debtors.

———————————

PETER C. HEIN,

Movant, Appellant,

v.

THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR
PUERTO RICO, AS REPRESENTATIVE FOR THE COMMONWEALTH
OF PUERTO RICO; THE FINANCIAL OVERSIGHT AND MANAGEMENT
BOARD FOR PUERTO RICO, AS REPRESENTATIVE FOR THE PUERTO
RICO SALES TAX FINANCING CORPORATION, a/k/a Cofina,

Debtors, Appellees,

PUERTO RICO FISCAL AGENCY AND FINANCIAL ADVISORY AUTHORITY,

Movant, Appellee.

———————————

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Laura Taylor Swain,* U.S. District Judge]

―――――――――――

Before

Howard, Chief Judge.
Torruella** and Kayatta, Circuit Judges.

―――――――――――

Roberto O. Maldonado-Nieves for appellants Pinto Lugo, et. al.

Rafael A. González Valiente for appellant Elliot.

Lawrence B. Dvores on brief for appellant Dvores.

Peter C. Hein for appellant Hein.

Martin J. Bienenstock and Hermann D. Bauer-Alvarez, with whom Timothy W. Mungovan, John E. Roberts, Stephen L. Ratner, Brian S. Rosen, Mark D. Harris, Jeffrey W. Levitan, Lucas Kowalczyk, Shiloh A. Rainwater, Michael A. Firestein, Lary Alan Rappaport, and Proskauer Rose LLP, were on brief for appellee Financial Oversight and Management Board for Puerto Rico as representative for the Commonwealth of Puerto Rico and the Puerto Rico Sales Tax Financing Corporation.

Peter M. Friedman, with whom John J. Rapisardi, Suzanne Uhland, and O'Melveny & Myers LLP, were on brief for appellee Puerto Rico Fiscal Agency and Financial Advisory Authority.

David M. Cooper, with whom Susheel Kirpalani, Quinn Emanuel Urquhart & Sullivan, LLP, Rafael Escalera, Sylvia M. Arizmendi, Carlos R. Rivera-Ortiz, and Reichard & Escalera LLC, were on brief for intervenors.

―――――――――――

February 8, 2021

―――――――――――

―――――――――――

* Of the Southern District of New York, sitting by designation.

** Judge Torruella heard oral argument in this matter and participated in the semble, but he did not participate in the issuance of the panel's decision. The remaining two panelists therefore issued the opinion pursuant to 28 U.S.C. § 46(d).

**KAYATTA**, **Circuit Judge**.   These three consolidated appeals arise out of Title III debt-restructuring proceedings brought by the Financial Oversight and Management Board for Puerto Rico ("the Board") on behalf of the Puerto Rico Sales Tax Financing Corporation (COFINA) under the Puerto Rico Oversight, Management, and Economic Stability Act (PROMESA).   48 U.S.C. §§ 2101-2241. The Title III court approved a plan of adjustment proposed by the Board ("the Plan") resolving disputes between COFINA and the Commonwealth of Puerto Rico and between the junior and senior holders of COFINA's outstanding debt.   Two groups  -- the Elliott and Pinto-Lugo groups -- objected to the Plan, variously contending that it unlawfully abrogated their rights as junior COFINA bondholders, that the plan confirmation procedures were unlawful, and that the plan confirmation should not have been implemented because the Commonwealth violated the Puerto Rico Constitution in enacting implementing legislation.   An individual creditor, Peter Hein, also challenged the dismissal of his proof of claim against COFINA.   The Title III court overruled the objections to the Plan and dismissed Hein's challenges.   No party sought to stay the Title III court's order approving the Plan, which has been fully implemented for nearly two years and given rise to transactions involving billions of dollars and likely tens of thousands of individuals.   For the following reasons, we now dismiss the Elliott

and Pinto-Lugo appeals as equitably moot and we affirm the dismissal of Hein's claim against COFINA.

## I.

The Commonwealth of Puerto Rico consistently spent much more than it received in taxes and other payments. Rather than balance spending and revenues, it repeatedly opted to borrow more by issuing general obligation bonds ("GO bonds"). It did so until limits on sovereign debt contained in the Commonwealth's Constitution substantially constrained the Commonwealth's direct access to the credit markets. To address the situation, the Commonwealth in 2006 passed Act 91, establishing COFINA as a public corporation, separate and independent from the Commonwealth. See P.R. Laws Ann. tit. 13, §§ 11a-16. COFINA had a sole purpose: issuing non-recourse bonds. See id. § 11a. By the time of the Title III petition in this case, aggregate principal and unpaid interest in outstanding COFINA bonds totaled over $17 billion, adding to the already very significant total of accrued public debt in Puerto Rico, a jurisdiction of just over three million people.

To pay the COFINA bondholders, Act 91 looked to the Commonwealth's sales and use tax revenues ("SUT revenues"). Under Puerto Rico's Constitution, all "available revenues" must first be utilized to satisfy general public debt. P.R. Const. art. VI, § 8. Act 91 sought to render a specified percentage of SUT

revenues "unavailable" by pledging that percentage to COFINA and creating a statutory lien on future SUT revenues.  In this manner, Act 91 set in place a potential conflict between the interests of COFINA bondholders (who looked to the pledged SUT revenues for their payments) and the interests of the Commonwealth and GO bondholders (who might view Act 91 as unconstitutional to the extent it sought to put otherwise available Commonwealth revenues beyond the reach of Commonwealth creditors).

This tension turned into outright conflict when the Commonwealth declared a moratorium on payments to GO bondholders. The GO bondholders sued the Commonwealth, claiming a superior right to the SUT revenues that the Commonwealth had pledged to COFINA. COFINA bondholders intervened, joining a zero-sum contest to determine which entity had superior rights under Puerto Rico law to the SUT revenues:  the Commonwealth (to pay its GO creditors), or COFINA (to pay its bondholders).  This court eventually deemed that lawsuit subject to PROMESA's temporary automatic stay.  Lex Claims, LLC v. Fin. Oversight & Mgmt. Bd., 853 F.3d 548 (1st Cir. 2017).  At the same time, we expressed hope that the parties would find "a way to accommodate and balance the respective interests of these bondholders if there is to be a consensual resolution."  Id. at 550.

The parties were initially unable to reach such a resolution.  So, in May 2017, the Board initiated proceedings

placing both the Commonwealth and COFINA under the umbrella of the
Title III court.   Under that umbrella, the Board caused the
Commonwealth and COFINA to pursue the resolution of their contest
over the SUT revenues on two tracks:   (1) a publicly noticed
mediation before Chief Bankruptcy Judge Barbara Houser open to all
interested parties; and (2) an adversary proceeding brought by the
Commonwealth against COFINA that would, if necessary, produce a
binding determination regarding the competing claims to the SUT
revenues.

     The parties to the mediation eventually announced an
agreement in principle resolving their primary disagreements
subject to several conditions, most notably court approval.   In
rough terms, they split the loaf of disputed SUT revenues, with
53.65% allocated to COFINA and the rest to remain with the
Commonwealth.   The Board and the parties to the agreement all
agreed that, given the amount of uncertainty in the ownership of
those revenues, the large stakes, and the substantial risks of a
winner-take-all decision, this split was a fair and reasonable
resolution of the dispute.   In practical terms, it would seem that
COFINA and the Commonwealth each determined that it had a roughly
even chance of getting either 100% of the challenged SUT revenues,
or 0%.

     Mediation also secured a proposed deal among senior and
junior COFINA bondholders, the overwhelming majority of whom

ultimately voted to support the COFINA-Commonwealth resolution and to resolve their own competing claims to the payments that a reorganized COFINA would make going forward. With these tentative agreements in place, the Board (on behalf of the Commonwealth) and COFINA entered into a formal settlement agreement ("the Settlement") memorializing these terms. That Settlement formed the basis of the Plan.

As a condition precedent to implementing the Settlement and the Plan, the Commonwealth was required to pass new bond legislation to reorganize COFINA, to allocate to COFINA the now-more-limited amount of SUT revenues, and to authorize COFINA to issue restructured bonds backed by a statutory lien on the SUT revenues belonging to COFINA. On the penultimate day of the 2018 legislative session, this new bond legislation was brought to the floor of the Puerto Rico House of Representatives for a vote. A representative from the minority party, Manuel Natal Albelo, stood to oppose the bill. According to the Pinto-Lugo appellants, instead of allowing him to speak, the president of the House "ignored" him and "den[ied] [him] the opportunity to participate in the debate." Several other members of the house allegedly "mocked" him. The bill was then passed along party lines in both chambers of the Puerto Rico legislature and signed into law by the governor on November 15, 2018, becoming known as Act 241.

The Pinto-Lugo appellants thereupon filed a complaint in a Commonwealth court, asserting that the treatment of Representative Natal Albelo violated both Puerto Rico legislative rules and his rights under the Puerto Rico Constitution. The complaint asked the court to declare Act 241 null and void due to those alleged deprivations. It also asserted that the act itself (and its predecessor, Act 91) violated the Puerto Rico Constitution, particularly the limitations on Commonwealth borrowing imposed by Article VI, Sections 2 and 7. On January 14, 2019, the Board removed that proceeding to the Title III court. By agreement of the parties, further action in that proceeding was stayed pending the adjudication of this appeal.

After a series of amendments to the Plan and its accompanying disclosure statement, on November 29, 2018, the Title III court entered an order approving both the disclosures and the procedures for approving the Plan. Those procedures required that all objections to the Plan be filed by January 2, 2019, with creditor votes to accept or reject the Plan due by January 8, 2019.

The Elliott and Pinto-Lugo objectors filed timely objections to the Plan. Hein, one of the Elliot objectors, also sought to pursue an individual proof of claim against COFINA.

As grounds for their objection to approval of the Plan, the Pinto-Lugo objectors raised the arguments advanced in their

suit against the Commonwealth, challenging the lawfulness of
Acts 91 and 241 and arguing that Plan approval would be futile
should they prevail on their claims.  The Elliott objectors cast
their net more broadly.  As holders of junior COFINA bonds, they
received about fifty-five cents on the dollar in new COFINA bonds
relative to the par value of their original bonds.  Having
purchased their bonds prior to PROMESA's enactment, they argued
that their asserted liens on the pledged SUT revenues represented
a property interest that could not be retroactively impaired, so
the Settlement, the Plan, and/or the new bond legislation amounted
to a taking for which they have not received just compensation.[1]
See United States v. Sec. Indus. Bank, 459 U.S. 70 (1982).  They
made a similar argument that the asserted impairment of their bonds
violates the Contracts Clause of the United States Constitution.
Separately, they also challenged a feature of the Plan allowing
on-island bondholders to elect to receive taxable bonds in exchange
for different interest rates as violating the Equal Protection,
Privileges and Immunities, and dormant Commerce Clauses of the
United States Constitution.  They also claimed that because this
election was integral to obtaining creditor approval of the Plan
(all who made this election were put into a different class and

---

[1]  Relatedly, they asserted that this retroactive impairment
violates due process and that PROMESA more generally violates the
Bankruptcy Clause.

automatically deemed to have approved the Plan), Plan approval was
unlawful.  Finally, they challenged the confidential settlement
process and the expedited Plan approval procedures as inadequate
to protect their rights, and they asserted a few other statutory
violations, which they have repeated on appeal only in a
perfunctory manner.

After hearing argument on January 16 and 17, 2019, the
Title III court overruled all objections to the Plan.  The court
rejected all of the Pinto-Lugo objections on their merits but found
that the objection based on the alleged mistreatment of
Representative Natal Albelo presented a nonjusticiable political
question.  The court also determined that the Settlement and Plan
approval process were conducted in good faith and in accordance
with the applicable provisions of PROMESA, satisfying due process
and all requirements of fairness and equal treatment under the
Bankruptcy Code.  And in a later, separate ruling, it dismissed
Hein's proof of claim as duplicative of an omnibus proof of claim
filed on behalf of all subordinate bondholders, including Hein.

The court entered its final approval on February 5,
2019.  None of the objectors asked the Title III court to stay
that approval pending any appeal.  The Plan was implemented on
February 12, 2019.  The first of these appeals followed six days
later.

## II.

### A.

The Board and an intervening coalition of senior COFINA
bondholders ask us to dismiss some or all of these appeals as
"equitably moot" because the plan of reorganization has long ago
been implemented.  In so asking, they point to our decision in
Rochman v. Ne. Utils. Serv. Grp. (In re Pub. Serv. Co. of N.H.),
963 F.2d 469, 471-73 (1st Cir. 1992), which dismissed a challenge
to a plan of reorganization as equitably moot because the requested
relief would have been inequitable or impractical in view of the
plan's consummation.

As we later summarized Rochman's holding, deciding
whether to reject an appeal of an order confirming a plan of
reorganization because the plan has been implemented calls for us
to consider at least three factors:  "(1) whether the appellant
'pursue[d] with diligence all available remedies to obtain a stay
of execution of the objectionable order[]' . . . ; (2) whether the
challenged plan proceeded 'to a point well beyond any practicable
appellate annulment[]' . . . ; and (3) whether providing relief
would harm innocent third parties." PPUC Pa. Pub. Util. Comm'n v.
Gangi, 874 F.3d 33, 37 (1st Cir. 2017) (emphasis in original)
(quoting In re Pub. Serv. Co. of N.H., 963 F.2d at 473-75).  See
also United Sur. & Indem. Co. v. López-Muñoz (In re López-Muñoz),
983 F.3d 69, 72 (1st Cir. 2020).  More generally, we pay heed to

- 13 -

the "equitable and pragmatic" considerations that apply when any court of equity is considering a remedy, albeit through a framework tailored to the specific circumstances that apply to the confirmation of plans. Institut Pasteur v. Cambridge Biotech Corp., 104 F.3d 489, 492 n.5 (1st Cir. 1997), abrogated on other grounds as recognized by Hardemon v. City of Boston, 144 F.3d 24, 26 (1st Cir. 1998). Every circuit has adopted some form of the doctrine. See Bruce A. Markell, The Needs of the Many: Equitable Mootness' Pernicious Effects, 93 Am. Bankr. L.J. 377, 384 (2019). And at least one even recently extended it. See Drivetrain, LLC v. Kozel (In re Abengoa Bioenergy Biomass of Kan., LLC), 958 F.3d 949, 956 (10th Cir. 2020) (extending the doctrine to Chapter 11 plans of liquidation).

**B.**

Before turning to the equitable and pragmatic considerations to be assessed in deciding whether delay has doomed any of these appeals, we take a step back and consider two threshold issues raised by the appellants: whether the Supreme Court in Mission Product Holdings, Inc. v. Tempnology, LLC, 139 S. Ct. 1652, 1660 (2019) rendered the equitable mootness doctrine no longer valid, and whether the doctrine is inapplicable to proceedings under PROMESA.

**1.**

The Elliott objectors argue that the Court's recent holding in Mission Product has undermined the continued viability of the equitable mootness doctrine. See id. Conducting an Article III mootness inquiry as articulated in Chafin v. Chafin, 568 U.S. 165, 172 (2013), Mission Product considered whether the recent disbursement of all remaining cash from the debtor's estate rendered an appeal moot because the disbursement left no remaining assets with which to satisfy any possible judgment. See Mission Prod. Holdings, Inc., 139 S. Ct. at 1660. The Court held that the disbursement did not moot the appeal, explaining that a court must dismiss an appeal as moot under Article III "only" when it is "impossible for a court to grant any effectual relief whatever," id. (quoting Chafin, 568 U.S. at 172), leaving the petitioner with no "continuing stake in [the] dispute's outcome" necessary to create a "live controversy," id. Relief remained possible in Mission Product because, among other things, it was at least possible that the disbursement of the estate's cash might be undone. Id. at 1660-61.

Here, by contrast, there is no contention that the case is moot under Article III. We have a live controversy: Appellants want the Plan confirmation undone, and appellees do not. Equitable mootness bears on how we decide that controversy, not whether we have jurisdiction to decide it. As we recently explained, "this

Circuit has long recognized that mootness is not just a matter of jurisdiction but encompasses 'equitable considerations' as well." In re López-Muñoz, 983 F.3d at 72 (quoting In re Pub. Serv. Co. of N.H., 963 F.2d at 471).   In this regard, the term equitable mootness is perhaps a misnomer.   The doctrine might better be viewed as akin to equitable laches, the notion that the passage of time and inaction by a party can render relief inequitable.   Cf. In re UNR Indus., Inc., 20 F.3d 766, 769 (7th Cir. 1994) (banishing "equitable mootness" from its lexicon and asking instead "whether it is prudent to upset the plan of reorganization at this late date").

It should come as no surprise that considerations of equity play a role in reviewing challenges to the confirmation of plans of reorganization in bankruptcy courts.   At their core, "bankruptcy courts . . . are courts of equity and apply the principles and rules of equity jurisprudence."   Young v. United States, 535 U.S. 43, 50 (2002) (internal quotation marks and alteration omitted); see also Pepper v. Litton, 308 U.S. 295, 304 (1939) ("[F]or many purposes, 'courts of bankruptcy are essentially courts of equity, and their proceedings inherently proceedings in equity.'" (quoting Local Loan Co. v. Hunt, 292 U.S. 234, 240 (1934))); Katchen v. Landy, 382 U.S. 323, 327 (1966). One of the Bankruptcy Code's central provisions, 11 U.S.C. § 105(a), which grants bankruptcy courts "broad authority to

'exercise [their] equitable powers -- where necessary or appropriate -- to facilitate the implementation of other Bankruptcy Code provisions,'" makes clear that equity's role in facilitating implementation of the Code survives in its present iteration. Ameriquest Mortg. Co. v. Nosek (In re Nosek), 544 F.3d 34, 43 (1st Cir. 2008) (internal quotation marks omitted) (quoting Bessette v. Avco Fin. Servs., Inc., 230 F.3d 439, 444 (1st Cir. 2000)).

The entry of a plan of adjustment is inherently such an equitable proceeding. See Kuehner v. Irving Tr. Co., 299 U.S. 445, 452 (1937) (discussing how "the equitable adjustment of creditors' claims . . . by way of reorganization, may therefore be regulated by a bankruptcy law which impairs the obligation of the debtor's contracts"); In re Balt. & O.R. Co., 29 F. Supp. 608, 628 (D. Md. 1939) (allowing preferential treatment for senior lienholders under a plan because "equity follows the law" and it would be "inequitable to fail to recognize" the preferential treatment of the lien); Andrew B. Dawson, Beyond the Great Divide: Federalism Concerns in Municipal Insolvency, 11 Harv. L. & Pol'y Rev. 31, 47 (2017) (discussing early practice in bankruptcy of fashioning priority requirements for distribution plans using principles of equity). And nothing about the codification of the factors a court must consider when confirming a reorganization plan disturbs this underlying equitable nature. See 11 U.S.C.

§ 1129(b) (requiring that a plan of adjustment that leaves
objectors' claims impaired be "fair and equitable"); Aurelia
Chaudhury et. al., <u>Junk Cities: Resolving Insolvency Crises in
Overlapping Municipalities</u>, 107 Calif. L. Rev. 459, 517 (2019)
("[C]ourts [in municipal bankruptcies] have engaged in somewhat
free-form equitable balancing, explicitly allowing municipalities
to consider all sorts of policy considerations in devising plans
of adjustment."). One need only look to how a reorganization plan
actually acts as a remedy -- reformation of complex contractual
relationships -- to recognize its equitable character.

We therefore find the teaching of <u>Mission Product</u>
inapplicable here, where the issue at hand turns not on
jurisdiction but on the merits of what is in form and substance a
request for equitable relief.

### 2.

As an alternative threshold objection to applying the
doctrine of equitable mootness, the Elliott objectors contend
that, even if the doctrine fits well within the context of a
commercial bankruptcy case, it does not apply in a municipal
bankruptcy proceeding, and certainly not in a Title III proceeding
under PROMESA.

As to municipal bankruptcy proceedings, every circuit
that has considered the doctrine's applicability to Chapter 9
adjustment plans has uniformly treated it as applicable. <u>See,</u>

e.g., Cobb v. City of Stockton (In re City of Stockton), 909 F.3d
1256, 1263 (9th Cir. 2018); Bennett v. Jefferson Cnty., 899 F.3d
1240, 1250-51 (11th Cir. 2018); Ochadleus v. City of Detroit (In
re City of Detroit), 838 F.3d 792, 802-05 (6th Cir. 2016).  And
they have done so by explaining that the very nature of the relief
in a municipal bankruptcy proceeding can implicate substantial
reliance interests and a particular need for finality once
consummated.  In re City of Stockton, 909 F.3d at 1263.  "If the
interests of finality and reliance are paramount to [application
of equitable mootness for] a Chapter 11 . . . entity . . . , then
these interests surely apply with greater force" to a Chapter 9
plan.  In re City of Detroit, 838 F.3d at 803 (quotation omitted).

So to address whether the doctrine should apply to
adjustment plans under PROMESA, we ask the same question:  whether
the reasons for making the doctrine applicable to Chapter 11
reorganizations apply with equal or even greater force to
adjustments under PROMESA.  We believe they do.  Nothing in PROMESA
undercuts the inherently equitable nature of a proceeding to
approve a plan of adjustment.  To the contrary, PROMESA
incorporates Bankruptcy Code Section 105 (granting the court
powers as appropriate to carry out the Code) and parts of
Section 1129(b)(1), (b)(2)(A), and (b)(2)(B) (allowing a court to
confirm a plan that is fair and equitable).  48 U.S.C. § 2161(a).
PROMESA, like Chapter 9, allows the Board to modify plans only

prior to confirmation. 48 U.S.C. § 2173. That the initial proceedings are in a federal district court under PROMESA, with appeals directly to this court, instead of in a bankruptcy court with appeals in the first instance to a district court or the bankruptcy appellate panel, is either irrelevant or cuts in favor of the doctrine's applicability, as it removes the concern that no Article III court effectively reviewed an Article I court's decision. See In re City of Detroit, 838 F.3d at 806 (Moore, J., dissenting) (noting a concern that application of the doctrine in other types of plans may mean that the merits "will never be heard by an Article III judge"). Finally, the importance of treating plans as final and worthy of reliance is certainly no less in proceedings under PROMESA, including this one, than in Chapter 9 proceedings. For all these reasons, we conclude that requests for after-the-fact judicial rejections or modifications of confirmed plans under PROMESA pose the type of equitable and pragmatic considerations that implicate the doctrine of equitable mootness.

### C.

We consider next how the Pinto-Lugo appeal fares under the equitable mootness doctrine. We start with the Pinto-Lugo objectors' lack of diligence in seeking to stay implementation of the plan until their appeals could be heard. Repeatedly, they sat on their hands. Absent a waiver, a plan cannot be implemented until fourteen days after confirmation, during which time the

parties may also seek a longer stay of the Plan pending appeal. See Fed. R. Bankr. P. 3020(e). COFINA's plan contained such a waiver. The Pinto-Lugo objectors nevertheless, in filing objections to other terms in the proposed Plan, offered no complaint at all about the waiver of the automatic stay, thereby signaling that they were prepared to see the Plan go into effect promptly if their objections to its terms were rejected.

When the Title III court did finally approve the Plan, the Pinto-Lugo objectors did not file a motion to stay, either in the Title III court or this court. Nor did they subsequently seek to expedite the appeal. They did not even object to requests to extend the briefing schedule, in fact seeking an extension of the briefing schedule themselves. In short, they have done anything but diligently seek to prevent third parties from building reliance interests in the confirmation of the Plan.

The Pinto-Lugo objectors contend that they need not have sought a stay to vindicate their "fundamental constitutional rights." But while the nature of the right being asserted may be a factor to consider in conducting equitable balancing, the presence of underlying constitutional claims does not act as a per se bar to the applicability of the doctrine. Bennett, 899 F.3d at 1251 (applying the mootness doctrine despite the presence of state constitutional claims). As the Eleventh Circuit stated aptly,

the mere fact that a potential or actual
violation of a constitutional right exists
does not generally excuse a party's failure to
comply with procedural rules for assertion of
the right.  A "constitutional right, or a
right of any other sort, may be forfeited in
criminal as well as civil cases by the failure
to make timely assertion of the right before
a tribunal having jurisdiction to determine
it."  <u>Henderson</u> v. <u>United States</u>, 568 U.S.
266, 271 (2013) (internal quotation marks
omitted).  And we generally allow those with
constitutional rights to waive them.

<u>Id.</u>  This logic applies with equal force here.

The Pinto-Lugo objectors next contend that the Board
caused the eggs to be scrambled by going forward knowing of the
threat posed to the Plan by their adversary proceeding challenging
a necessary precondition to the Plan.  But the Title III court
found the arguments advanced in support of that challenge to be
either without merit or not amenable to judicial relief.  More
importantly, once the plan proponents secured court approval to
proceed forthwith, they had no obligation to not proceed forthwith.
Rather, the burden was on the objectors to seek any stay.

The Pinto-Lugo objectors also argue that any request for
a stay would have been futile.  But they simultaneously claim to
have had good grounds for their objections to plan approval.  And
while the Title III court was undoubtedly of the view that the
objections were without merit, the Pinto-Lugo objectors offer no
evidence that the court would not have entertained some temporary
stay had one been sought.  In any event, even if it would have

been futile to seek a stay from the Title III court, they certainly could have sought a stay from this court.  See id. at 1252 (discussing how the ability to expedite an appeal or seek a stay from a reviewing court weighs against any potential futility of doing so in the bankruptcy court).  All in all, the Pinto-Lugo objectors' complete and repeated lack of diligence in utilizing available mechanisms to stay implementation of the Plan cuts sharply against them.

Nor does the record cut otherwise when we examine whether "the challenged plan [has] proceeded to a point well beyond any practicable appellate annulment." PPUC Pa. Pub. Util. Comm'n, 874 F.3d at 37.  In Rochman, we noted that

> on the effective date of the reorganization plan, all preexisting equity interests in [the debtor] were exchanged for replacement securities, including approximately 32,000,000 shares of [debtor] common stock, notes aggregating $205,000,000, and more than 8,000,000 certificates evidencing contingent rights to acquire, upon [the debtor's] eventual merger with NUSC and Northeast Utility, warrants to purchase common stock in the emergent entity.
> Approximately $1,530,000,000 and 8,000,000 newly-issued contingent warrant certificates were delivered to the distributing agent on May 16, 1991, and distributions commenced the next day. Consequently, in accordance with the terms of the confirmed plan, more than 100,000 individuals and entities received, or became entitled to receive, various forms of securities in full satisfaction of their [debtor] claims and interests.

963 F.2d at 474.  Those "innumerable transfers," we held, "plainly represent[ed] so substantial a consummation of the reorganization plan as to render the requested appellate relief impracticable." Id.

The relief requested in this case is no less impracticable.  Indeed, the Pinto-Lugo objectors describe the result of the relief they seek as "apocalyptic."  Pursuant to the Plan and new bond legislation, upon consummation of the Plan old COFINA bonds worth over $17 billion were exchanged for reorganized COFINA bonds worth over $12 billion.  Those new COFINA bonds have since changed hands tens of thousands of times on the open market for over a year, with many now held by strangers to these proceedings.  In addition, COFINA distributed about $322 million to creditors, Bank of New York Mellon (BNYM), as trustee, transferred more than $1 billion in disputed SUT revenues to the Commonwealth and COFINA, and insurers of the old bonds have paid holders of old bonds under the Plan.  Complicating matters further, claims have been released and all litigation arising from the restructuring has been dismissed with prejudice.  The Pinto-Lugo objectors offer no practical way to undo all of this and return to the pre-confirmation status quo.

The Pinto-Lugo objectors fare no better when we look to see whether unwinding the Plan will harm innocent third parties who, due to the Pinto-Lugo objectors' lack of diligence,

justifiably came to rely on the confirmation order.  See In re
Pub. Serv. Co. of N.H., 963 F.2d at 475.  Clearly that is the case
here no less than in Rochman:  "unraveling the substantially
consummated [debtor] reorganization plan would work incalculable
inequity to many thousands of innocent third parties who have
extended credit, settled claims, relinquished collateral and
transferred or acquired property in legitimate reliance on the
unstayed order of confirmation." Id.; see also In re One2One
Commc'ns, LLC, 805 F.3d 428, 436 (3d Cir. 2015) (recognizing as a
general matter that reversal of plan confirmation is more likely
to be inequitable in similar circumstances).  Here, moreover, the
Plan as implemented serves as important forward motion in the
Commonwealth's economic recovery.  Reversal of that momentum at
this late date would inevitably undercut confidence in the ability
of the Plan's supporters to achieve that recovery.  See In re City
of Detroit, 838 F.3d at 799.

        Finally, we recognize the possibility that, in some
cases, it might be possible to modify a stand-alone component of
a plan to satisfy an idiosyncratic claim without upsetting the
interests of third parties, and without setting a precedent that
would trigger a cascade of such claims.  See Samson Energy Res.
Co. v. Semcrude, L.P. (In re Semcrude, L.P.), 728 F.3d 314, 321,
323-26 (3d Cir. 2013).  Here, though, we have a carefully balanced
and highly reticulated plan that offers no relevant stand-alone

component that might be modified to satisfy the Pinto-Lugo objectors.   In turn, their entire argument is predicated on the newly issued bonds being unlawful.   We therefore deny as inequitable and impractical the relief sought by the Pinto-Lugo objectors.

### D.

Like the Pinto-Lugo objectors, the Elliott objectors failed to object to the waiver of the automatic stay of confirmation, did not seek any stay pending appeal, neither sought to expedite the appeal nor objected to requests for extension, and in fact sought to extend the briefing schedule themselves. Similarly, as their objections go to the heart of the Plan (the approval of the COFINA-Commonwealth settlement), posing now a retroactive annulment would entail the exact difficulties that we have already discussed.   Despite these difficulties, the Elliot objectors offer a variety of reasons why equitable mootness is nonetheless inapplicable to their particular appeal.

First, the Elliott objectors contend that seeking a stay would have been futile because simple monetary relief is available. But for reasons we will soon discuss, the simple monetary relief they seek is not a feasible alternative remedy, so seeking a stay would not have been an exercise in futility.

Second, the Elliott objectors contend that seeking to expedite the appeal would have yielded little benefit after

consummation.   Perhaps.   But it is due to their delay that the
appeal trailed well after consummation.

Third, the Elliott objectors claim that the Board has
unclean hands and thus is not in a position to invoke equitable
mootness.   But as evidence of unclean hands the Elliott objectors
point only to the reasons why they object to the Plan.   Were this
cause   for   rendering   the   doctrine   of   equitable   mootness
inapplicable, the doctrine would never have any applicability
except in those cases in which the appeal would have failed on the
merits anyway.

Fourth,  the  Elliott  objectors  contend  that  they  did
object to the waiver of the automatic stay period in the Plan by
objecting to the Plan "in its entirety/in all material respects."
But such a catch-all and perfunctory objection to a multi-part,
reticulated plan raising a slew of issues does not preserve an
objection that is not even mentioned, much less developed.   Cf.
United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).   Had the
objectors had any desire to have confirmation stayed, they should
have said so.

Finally, we come to the Elliott objectors' primary
argument, the idea that we can craft relief short of annulling the
entire Plan while avoiding injury to innocent third parties.   See
Prudential Ins. Co. of Am. v. SW Bos. Hotel Venture, LLC (In re SW
Bos. Hotel Venture, LLC), 748 F.3d 393, 403 (1st Cir. 2014)

(affirming the bankruptcy appellate panel's denial of dismissal where "the bankruptcy court could fashion some form of practicable relief, even if only partial or alternative").  They contend that we can order the Commonwealth to pay what they estimate to be around $316 million to compensate all non-consenting bondholders for the value of their original COFINA bond liens, which they argue was reduced by the COFINA settlement in violation of the Takings Clause and Contracts Clause, among other things.

This argument overlooks the fact that the Plan rested at base on the court's approval of a settlement between the Commonwealth and COFINA pursuant to which the Commonwealth retained 46.35% of SUT revenues.  The Title III court could approve or disapprove the plan; no one explains how the Title III court could have successfully compelled the Commonwealth to settle its adversary proceeding against COFINA for less than the 46.35% provided for in the approved settlement.  See 48 U.S.C. § 2165. So it would seem to follow that we, too, could not "tweak" the plan by ordering the Commonwealth to settle for 46.35% minus $316 million.  In short, we face an up-or-down decision -- affirm or vacate Plan approval.  And because no one sought a stay of the plan approval, vacating approval is precisely what would trigger a hopeless effort to unscramble the eggs.  See In re BGI, Inc., 772 F.3d 102, 108 (2d Cir. 2014) (asking courts to "examine the actual effects of the requested relief" to see, for example, if

such relief would "unravel intricate transactions so as to knock the props out from under the authorization for every transaction that has [since] taken place" (internal quotation marks omitted)); cf. In re City of Detroit, 838 F.3d at 799 (explaining how undoing the compromise central to an adjustment plan is exactly the type of scenario the doctrine of equitable mootness contemplates).  We therefore conclude that the relief sought by the Elliott objectors is neither equitable nor practical, and for that reason deny their appeal.[2]

**E.**

On appeal, Hein joins the various arguments made by the Elliott objectors, all of which we have disposed of.  As a former holder of COFINA subordinate bonds, he also raises three issues of his own that do not call for retroactively undoing the implemented Plan.  First, Hein complains that the Title III court improperly withheld from public access a transcript of a ruling incorporated by reference into one of the court's orders.  Second, he challenges a discovery ruling denying a motion he filed seeking, post-confirmation, to compel documents concerning communication between

---

[2] On the question of whether their appeal should be denied as equitably moot, the Elliott objectors include in their brief literally dozens of other assertions to which they devote only one or two sentences with no development and often without any citation of relevant authority.  To the extent we have not expressly listed and addressed these contentions, we deem them waived for insufficient development.  Zannino, 895 F.2d at 17.

COFINA and the Internal Revenue Service.  Third, he contends that
the Title III court erred in dismissing his individual proof of
claim as duplicative of the trustee's claim on his behalf.

     As to the ruling transcript, Hein's brief offers no
evidence at all that he ever raised with the Title III court his
complaint about the timing of transcript releases.  So we have no
idea how the court would have addressed the issue, what legal and
practical issues might be implicated, or what alternatives might
be available.  We therefore deem Hein's argument on this issue
waived.

     As to Hein's discovery request, we affirm the Title III
court's denial for the reason given by that court:  The discovery
was not relevant to any pending matter Hein had before the court.
Hein's only then-pending matter before the court was COFINA's
objection to his individual proof of claim.  The only issue posed
by that objection was whether Hein's claim as a bondholder was
duplicative of the trustee's claim on his behalf.  And neither
below nor on appeal has Hein developed any cogent connection
between the requested discovery and the resolution of the objection
to his claim as duplicative.[3]

---

[3]  In addition, as Hein has not raised an objection under 11
U.S.C. § 1144 (incorporated into PROMESA through 48 U.S.C.
§ 2161), we find no basis for finding his requested discovery
materials relevant "to ensure the integrity of the proceedings" or
otherwise.

That last point brings us to Hein's main contention not
disposed of by our rejection of the challenges to Plan
confirmation: that his proof of claim against COFINA was not
duplicative of the claim pursued on his behalf by the trustee.
The parties offer no argument concerning the standard of review we
should apply to this contention. We will assume, arguendo, that
de novo review applies.

The BNYM, as bond trustee, filed an amended master proof
of claim on behalf of all COFINA bondholders on May 25, 2018. That
claim was for "amounts due or becoming due on or in connection
with the Subordinate Bonds." That is, BNYM (like Hein) asserted
that Hein was entitled to full payment under the bond instruments.
Hein makes no claim that the master claim was disallowed in any
respect at all. After the Plan's confirmation and pursuant to its
terms, the BNYM received a distribution on the master claim, which
it paid out to Hein pro rata for his share of junior COFINA bonds.
Hein's payment equaled less than the full amount of his claim only
because COFINA did not have assets sufficient to pay its
bondholders in full; hence the pro rata payments. So the question
posed is whether Hein's proof of claim was duplicative of the
master claim filed on his behalf. As relevant here, a claim is a
"right to payment." 11 U.S.C. § 101(5) (incorporated by 48 U.S.C.
§ 2161). Hein's right to payment by COFINA was a right no
different than that of every other junior bondholder's right to be

paid full principal and interest on the COFINA bonds they held.
That is what he seeks on this appeal.  And that is exactly the
payment sought on his behalf by the trustee:  full payment of
principal and interest under the bonds.

Hein's proof of claim asserts no other right to payment
from COFINA.  He implicitly concedes that, had he received the
amount of money due under the bonds, he would have had no claim at
all.  Nor does he claim that he did not receive a full pro rata
payment on his claim just as did other junior bondholders.  Rather,
his contention is that all junior bondholders should have received
more because COFINA would have had more funds available had the
Commonwealth not diverted SUT revenues from COFINA.  In other
words, he is either repeating his objections to the Plan's blessing
of the Commonwealth-COFINA settlement, or he is saying that he
could have had some sort of independent claim against the
Commonwealth for taking money that he feels should have gone to
COFINA.  To the extent Hein's claim is the former, we have already
disposed of those objections as equitably moot.[4]  To the extent it

---

[4]  Hein faults the Title III court for declining under the
divestiture rule to consider those objections in connection with
the adjudication of his proof of claim.  We disagree.  The
Title III court appropriately deferred to our consideration of
Hein's already filed appeal with the Elliott objectors, which
raises the same issues.  United States v. Brooks, 145 F.3d 446,
455-56 (1st Cir. 1998).  On the other hand, the court was free to
decide the wholly separate issue of whether Hein had a right to
payment independent of his right under the bond instrument.

is the latter, it has no relevance to the adjudication of the objection to his proof of claim against COFINA.

### III.

For the foregoing reasons, we <u>dismiss</u> the challenges to the Title III court's confirmation of the Plan, and we <u>affirm</u> the court's orders rejecting Hein's discovery request and dismissing his proof of claim against COFINA.