UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

------------------------------------------------------------x

In re:

THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO,

    as representative of

THE COMMONWEALTH OF PUERTO RICO,
et al.,

    Debtors.[1]

------------------------------------------------------------x

PROMESA
Title III

No. 17 BK 3283-LTS

(Jointly Administered)

NOTICE OF CORRESPONDENCE RECEIVED BY THE COURT

The Court has received and reviewed the attached correspondence, described below, from interested persons in the above-captioned cases. Although the Court cannot respond individually to all of those who have expressed their thoughts or concerns, the Court is deeply mindful of the impact of the fiscal crisis on lives, institutions, and expectations, and of the importance of the issues that are raised in these unprecedented cases.

1.     Letter dated December 22, 2020 from Maria Cristy.
2.     Email dated January 30, 2021 from Luis Ordein.
3.     Email dated February 23, 2021 from Jaime Castañer-Cuyar.
4.     Email dated February 23, 2021 from Roberto Castaner.

Dated: February 23, 2021

---

[1] The Debtors in these title III cases, along with each Debtor's respective title III case number listed as a bankruptcy case number due to software limitations and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (the "Commonwealth") (Bankruptcy Case No. 17-BK-3283 (LTS)) (Last Four Digits of Federal Tax ID: 3481), (ii) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566 (LTS)) (Last Four Digits of Federal Tax ID: 9686), (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567 (LTS)) (Last Four Digits of Federal Tax ID: 3808), (iv) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284 (LTS)) (Last Four Digits of Federal Tax ID: 8474); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17-BK-4780) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5233-LTS) (Last Four Digits of Federal Tax ID: 3801).

       



December 22, 2020

***ADVANCE BY EMAIL TO:*** swaindprcorresp@nysd.uscourts.gov

***BY CERTIFIED MAIL TO:*** 7020 0090 0000 6612 6382

Honorable Laura Taylor Swain
United States District Court Judge
Jose V. Toledo Federal Building & US Courthouse
300 Recinto Sur Street
San Juan, P.R. 00901

**CASE:** Adv. Proc. No. 20-00080

**In Re:** Submitted for the Consideration of Judge Taylor Swain the Study prepare by Dr. Juan Lara, economist of Advantage Business Consulting that indicate the Zero or negligible Fiscal Impact and Potential Economic Benefit of Act 82 of 2019

Dear Judge Taylor Swain,

**NO IMPACT ON BUDGET & CERTIFIED FISCAL PLAN**

The Alianza Pro-Acceso a Medicamentos (APAM), is one of the leading entities representing patients in PR and offering direct services to this population.

The study of Dr. Lara (**Exhibit 1**) showed that Act 82 will have a zero or negligible impact on government spending (hence, on the Budget). The Act 82 does not create a new administrative structure, but rather places the Office of the Regulating Commissioner within the existing structure of the Department of Health and requires the Commissioner to be appointed by the Secretary of Health from the ranks of the Department's qualified officials. In addition, the regulatory office will operate with support from SARAFS staff. The costs of audits will be paid by the audited companies, as with all entities regulated by the Department of Health, resulting in no cost to the government. In addition, the law authorizes the Commissioner to request expert advice, when needed, from resources in the Department of Health, the Office of the Commissioner of Insurance, and the Department of Justice.

The Act 82 requires PBMs and PBAs to obtain a license from the Office of the Regulating Commissioner and to pay a licensing fee of $20,000. There are currently nine (9) PMBs and PBAs operating in Puerto Rico. Under Law 82, these entities will generate at least $180,000 in annual fees that will help to defray the operating costs of the Office, thus causing a positive revenue impact. It is

1

CASE: ADV. PROC. NO. 20-00080

important to make it known that the government is no longer accruing money since the passage of the Act, for license items, sanctions, audits, among others, for the past 2 years.

When the Act 82 was approved, the Legislative Assembly (Senate and House of Representative) did not give any credibility to the letter and testimony of Mrs. Angie Avila, Ex Director of GHP (ASES) that indicated the Act 82 cost 25 million dollars in a public hearing. The economic impact to which they refer has never been supported by empirical data even though legislative (Senate and House of Representative) in multiple public hearings requested it. In public hearings Mrs. Angela Avila hem acknowledged that this number of economic impacts was provided by a PBM, which has a contract with ASES, and with an economic interest in regulation. ASES also acknowledged that the alleged impact data was not corroborated or purged by the agency.

In the certified fiscal plan for the Commonwealth of Puerto Rico, the Financial Oversight Management Board of PR (FOMB) calls for reductions in Government Health Plan (GHP) payment for medications as part of the effort to "bend the curve" of premium inflation resulting from rising health care costs. This guideline falls under the Board's broader goal of implementing good management measures that help control or reduce the expenditure of public funds. There cannot be reasonable control and measurement of costs to the government without regulation encompassing the entire chain of medication delivery. By leaving a key link in the chain unregulated, prior to Law 82, Puerto Rico's lawmakers risked missing one of the major goals of the FOMB and the fiscal plan.

**BENEFIC OF ACT 82 ON PACIENTS**

The legislative record shows that in the hearings for Law 82 a number of patient rights organizations testified that the practice by PBMs of delaying authorization for prescription medications often results in patients seeking treatment and medication in hospital emergency rooms. The withholding of medication for the sake of profit optimization by a PBM is not only inhumane, but also cost-ineffective for the GHP, because it ends up producing greater use of emergency room and hospitalization services by patients whose health is compromised by lack of timely access to proper therapy. Delaying access to medication may also lead to the emergence of additional health conditions that increase the cost of treatment and cause greater outlays by the GHP. In the legislative record, patient rights organizations denounced cases of leukemia patients that had to interrupt chemotherapy because of authorization delays.

**NO COMPETITION ON CONTRACTING LOCAL PBMS**

The GHP pays about $30 million annually to two local PBMs. In a letter to ASES, the government agency in charge of the GHP, dated June 29, 2018, the FOMB alerted that contracts with the two PBMs had "not been competitively sourced since 2006, which could be indicative of a procurement approach that is inconsistent with principles outlined in the Fiscal Plan." Lack of competition in awarding PBM contracts is a cause for concern and yet another reason to demand regular auditing of PBMs providing services to the GHP.

**LARGE SAVING ON REGULATING THE PBMS**

2

The National Community Pharmacists Association (NCPA) has researched the impact of regulating PBMs in various states and found evidence of large savings. The following table presents a sample of the savings documented by NCPA researchers, some of which are one-time recoups while others are recurring benefits. As show on the below table, West Virginia save 38 million by Abolished Medicaid CMO contracts with PBMs, Arkansas save 13 million by auditing, request transparent RFP, and reduced pharmacy charges, and Tricare (Serving Armed Services personnel and dependents) save 1.687 billion by negotiate prices directly, not through PBM.

| State or Entity | Action | Actual or Anticipated Savings |
|---|---|---|
| South Dakota | Transparency Measures | $820,000 annually |
| Arkansas | Auditing, Transparent RFP, reduced pharmacy charges | $13,000,000 |
| Wisconsin | Moved to a Transparent PBM | $1,500,000 |
| University of Michigan | Cancelled five PBM contracts and enacted regulations | $8,600,000 annually |
| New Jersey | Moved to a Transparent PBM | $540,000,000 |
| Illinois | Direct negotiation of pharmacy benefits | $10,000,000 annually |
| Texas | Enacted Transparent Contract | $265,000,000 |
| Tricare (Serving Armed Services personnel and dependents) | Negotiates prices directly, not through PBM | $1.687 billion |
| West Virginia | Abolished Medicaid CMO contracts with PBMs | $38,000,000 annually |

States such as Ohio have carried out audits of some PBMs and concluded that publicly funded health insurance had been overbilled to the tune of millions of dollars as a result of non-transparent pricing schemes. According to the National Coalition of State Legislatures (NCSL), the Ohio state attorney filed a lawsuit against one PBM to recover $16 million in overpayments following a 2018 audit.

**PRE-EMPTION OF ACT 82**

The issue on pre-emption raised by the FOMB, was very recently resolved by the United Supreme Court in <u>Rutledge v. Pharmaceutical Care Management Association (Exhibit 2)</u>, decided on December 10, 2020, wherein the Supreme Court, in an unanimous Opinion issued by Justice Sotomayor, firmly rejected the argument by a trade association for PBMs that the federal Employee Retirement Income Security Act ("ERISA"), pre-empts any aspect of an Arkansas statute that requires: (i) PBMs to "tether" their reimbursement rates to the acquisition costs pharmacies pay, by updating

3

CASE: ADV. PROC. NO. 20-00080

price schedules whenever wholesale drug prices increase; (ii) specifies an appeal process PBMs must provide when a pharmacy contends that the reimbursement level for a drug is below the pharmacy's cost of buying the drug; and (iii) allows a pharmacy to decline to sell a drug if the PBM's reimbursement price is lower than the pharmacy's cost.

We respectfully submit this correspondence and the exhibits attached hereto for your consideration, hoping that these may be of assistance by illustrating the Court about the view of Alianza Pro-Acceso a Medicamentos (Patients Drugs Advocate Organizations) in supporting the implementation of Law No. 82. We call for access to health to be one that harbors a pressing interest on the part of the state, which represents a constitutional responsibility and obligation, which cannot be overlooked or delegated.

We thank you in advance for your due consideration to our correspondence.

Respectfully,

María Cristy
VP de la American Cancer Society (ACS)
Speaker & Representative
Alianza Pro-Acceso a Medicamentos (APAM)
(Patients Drugs Advocate Organizations)

4

To: Dear Sir or Madam  
Subject: Puerto Rico's Debt Restructuring  
Date: January 30, 2021  
　　　　　　　　　　　　Via: Email

# The General Fund: Your Job, Taxes and Benefits

## Solution to Puerto Rico's fiscal crisis

Pedro Luis Ordein, MBA  
pordein@yahoo.com

> According to a study by the V2A company commissioned by the DDEC, for fiscal year 2016 the incentives cost the government of Puerto Rico about $ 7.4 billion, almost the equivalent of the general fund budget.
>
> https://www.abrepr.org/blog/transparencia-incentivos-econmicos
>
> Transparency with economic incentives, their granting and impact AUGUST 20, 2019  
> Arnaldo Cruz - Co-founder of ABREPR

1. **Puerto Rico Financial Statements 2016 shows**:
2. Revenues were $ 9 billion
3. Expenses were $ 8.3 billion
4. Positive of $ 700 million

5. Incentives 2016

6. Incentives in force in 2016 total $ 7.4 billion
7. That means that money did not go into the general fund.
8. Had they entered, revenues would have reached $ 16.4 billion

9. **Incentives thought differently**

10. Incentives are awarded to companies for various reasons
11. The Government maintains a high level of secrecy in granting them
12. This contributes to unfair competition and lends itself to schemes of corruption and influence.
13. We can redirect the concept of incentives as the driving force behind the Economy if we tie it directly to work; to a salary basis. Let's see below:

14. **Strengthening the General Fund**

15. Puerto Rico only needs $ 16 billion annually in its General Fund
16. Enough to maintain a budget of $ 9 billion
17. Enough for Development and Infrastructure for $ 3.5 billion
18. Enough to pay off legitimate debt at a rate of $ 3.5 trillion annually
19. Enough to have a much higher and more competitive salary base
20. Enough so that each family can do better financially
21. Sufficient for municipalities to obtain proportional income
22. Enough to dramatically reduce poverty levels
23. Enough to sustain a new form of pensions for all
24. Enough to be a model of self-sufficiency for the rest of the world

25. **$ 16 billion annual General Fund**

26. **The global budgeting approach is defined in 3 points:**
27. Operate the Government and provide services - Continuity
28. Developing the Economy with its infrastructure - Advance
29. Pay your debts - Fulfillment
30. Strengthening the General Fund is a high priority to stabilize the economy and restore confidence in the investment markets. The efficiency of the services provided by the State is an essential part of this economic vision.

31. **A budget of $ 9 billion**
32. The Puerto Rico budget contains items to address poverty levels

33. In the first 3 years, the budget is maintained to allow flexibility in the use of allocated funds that mitigate the impact of poverty and allow a transitional and responsible adjustment to the new salary and tax system.
34. During that same period of time, the increases in these collections serve to reduce and eliminate other non-punitive taxes.

### 35. $ 3.5 billion is allocated for Development and Infrastructure

36. This item is annual and must be administered in the progressive environment of the Infrastructure Development and improvement projects.
37. In the planning process, the Time factor must be observed as the duration in the final delivery of such projects so as not to exhaust the projections in this budget item in advance.
38. Given that the Puerto Rico budget contemplates debt service (interest) in this model, prudence in considering this annual fund as a matching of funds must be strictly tied to the ability to pay from the debt service item.

### 39. $ 3.5 billion is allocated for the payment of legitimate debt

40. Negotiations for the payment of Puerto Rico's debt must be kept below $ 70 billion
41. Said payment must be made with the issuance of a Super Bond with a decreasing characteristic for a term of 20 years
42. Each year the interest on this bond is calculated and paid and $ 3.5 billion is lowered to the principal of the bond (making it decreasing). The first year would be paying interest on $ 70 billion; over $ 66.5 billion the second year; over $ 63 billion the third year and so on until the debt is extinguished in its 20th year.
43. This does not prevent the debt from being audited and if it arises that a negotiated debt must be eliminated, it is subtracted from the principal at the time of adjudication.

**44. A new salary base**

45. We must not confuse the wage base with a minimum wage
46. Puerto Rico cannot delay wage competitiveness as a pretext for the fiscal crisis
47. The trend in the United States is to move to a minimum wage of $ 15 an hour and in less time, to $ 20 an hour.

48. Puerto Rico is in an advantageous position to be able to articulate a wage base with an average workforce of one million workers.
49. The proposal to create a Salary Base of $ 20 per hour requires the use of tax incentives as support so that disadvantaged businesses can comply with it.
50. Hence the urgency to redefine incentives as a form of work credits.
51. Let's see the process below:

## 52. Salary Base 20/20

53. The salary base in Puerto Rico aspires to a base salary of $ 20 per hour with a single tax of 20%
54. Companies that, beyond any doubt, can prove that they cannot meet that salary base may apply for work incentives as long as they participate in the Business Growth Program (Explained in future writings).
55. Of the 2,080 hours of annual work, only 2,000 are considered as base. The remaining 80 hours (vacation) are exempt from paying taxes.
56. The only tax is contributory at a rate of 20%
57. Tax (%) is relative to salary ($). If you earn $ 13 per hour on the annual average, you pay 13% tax.
58. The employer pays (match) the tax paid by the worker.
59. The employer can reduce every penny of salary tax from his taxable income and maintain a rate of 20% on the taxable remainder.
60. The excess a worker earns over $ 40,000 per year is tax exempt.

## 61. Workforce of one million workers

62. The base workforce is one million workers while the average of all wages combined should reach $ 20 an hour
63. If there is a deficiency in this metric, the tax deficiency is covered, in a proportional way by all employers according to their contribution and without counting the incentives.
64. At all times, the minimum annual collection cannot be less than $ 16 billion.
65. If there is a surplus over $ 16 billion, 50% must be returned, proportionally, to all those who contributed tax in the year that the surplus occurs. 20% is consigned to the Reserve Bank of Puerto Rico. 30% is consigned to the Retirement account.

### 66. Family budget

67. A salary base of $ 40,000 equates Puerto Rico with West Virginia ($ 38,000 average salary)
68. The salary injection into the family budget results in a healthier and more competitive business and better planning in savings and family life projects.
69. More money in the economy, coming from the working class, helps businesses to be able to comply with the 20/20 Salary Base and therefore the Economy.

### 70. Municipal Income

71. There are constant and growing annoyances among the inhabitants of certain municipalities due to the appearance of new and more aggressive taxes.
72. The 20/20 Salary Base provides a stable source of income to the municipalities
73. For each worker who lives and works in the same municipality, the municipality receives 10% of the tax collection of the salary base
74. If a worker lives and works in different municipalities, the municipality of residence receives 5% of the tax collection and the municipality of work receives the other 5%.
75. The foregoing allows equalizing municipal collections considering the workforce and residential zone. This replaces unpopular and difficult to control taxes.

### 76. Reduction in poverty levels

77. Puerto Rico has a poverty level of 45% (2019)
78. Median household income stands at $ 19,800 (2019)
79. Average net salary is around $ 23,000 (2019)
80. On average, Puerto Rico will experience a reduction in the poverty level
81. Government resources allocated to the poor sectors are adjusted and redirected to ensure the retirement plans of workers.

### 82. Universal Retirement System: Pensions for all workers

83. At the end of their working life, each retiree is entitled to no more than 50% of the salary base or $ 20,000 per year, taxable at 10% or a

    percentage proportional to the average base salary accumulated in their working life.
84. The base working life is 30 years.
85. The retirement taxes collected are consigned to a collective retirement account managed by the Reserve Bank of Puerto Rico.
86. At any time, the worker can contribute to Federal Social Security or another form of retirement exempt from taxation under the Government of Puerto Rico.
87. During the transition period, the contributions of existing employees will be determined and their equivalence to the new Retirement System will be computed. Contributions approved for the transition are transferred to the new Retirement System and only guarantee a maximum of $20,000 in annual withdrawal.
88. The contribution to the retirement systems is 5% by the employee and 5% by the employer.

### 89. Self-Sufficiency Model

90. The People's Tax Reform with a 20/20 Salary Base is a cutting-edge Economic Self-Sufficiency model
91. This model uses the concept of proportionality in contrast to progressive or regressive tax models
92. Motivates workers to exceed the mark of $ 40,000 per year since its excess is exempt from tax
93. Establish a roadmap for poverty eradication
94. Focus government management around a flexible and scheduled budget
95. Allows accurate planning of long-term projects
96. Dispels chances of running into budget deficits and meets debt service
97. Contributes to the proper management of government resources and maximizes them
98. Protects the local economy from the influences and swings of the world economy and minimizes their impact.
99. Strengthens the General Fund, retirement systems, and family and government budgets.
100. Address the systematic problem of the municipalities.

### 101. Conclusion

102. Exiting the fiscal crisis in Puerto Rico requires a redesign of the tax and incentive model.

103. The issue of poverty eradication in Puerto Rico has more than 500 years of history.
104. Education and studies of the various economic models offer a frame of reference from which we can subtract and combine elements adaptable to Puerto Rico.
105. The class struggle contributes nothing to the development of the peoples.
106. The combination of elements of Capitalism (present in the United States) and Socialist elements (such as Social Security in the United States) converge in a new economic philosophy, which we have called Participatory Capitalism or Participative Capitalism.
107. By replacing the regressive and progressive tax models with a proportionality model, we are encouraging the worker to strive for progress and without having to worry about seeing higher taxes once the progress line (Salary Base) is exceeded.
108. The proportional adjustment mechanisms allow the preparation of a flexible budget adapted to the needs of Puerto Rico and the size of its population, while putting a stop to the waste of public funds that occurs under economies that continuously operate in a state of emergency.
109. There are positive collateral impacts that come with the implementation of this model and that we can discuss in later writings.

Receivers:
1. Hon. Pedro Pierluisi, Governor of Puerto Rico
    mensajes@fortaleza. pr.gov
2. Hon. Laura Taylor Swain - United States District Judge
    SwainNYSDCorresp@nysd.uscourts.gov
3. Hon. David Skeel - Chairman of The Financial Oversight and Management Board for Puerto Rico
    Edward.zayas@promesa.gov
    Matthias.rieker@promesa.gov
4. Hon. José Luis Dalmau - President of the Senate of Puerto Rico
    JLDALMAU@SENADO.PR.GOV
5. Hon. Rafael Hernández Montañez - President of the House of Representatives of Puerto Rico
    info@camaraderepresentantes.org

**From:** JL CC
**Sent:** Tuesday, February 23, 2021 1:45 PM
**To:** NYSD Swain Corresp <SwainNYSDcorresp@nysd.uscourts.gov>
**Subject:** PR EMPLOYEES RETIREMENT SYSTEM BONDS

**CAUTION - EXTERNAL:**

Hon. Laura Taylor Swain
District Judge
USA Courthouse
500 Pearl St.
NY, NY 10007-1312

Dear Jugge Taylor Swain:

My name is Jaime Castañer-Cuyar. I am a retired employee of the Government of PR. I am writing for your concerns with the above subject issue .

In 2008, with my savings I bought $50K in ERS bonds, which was to complement my retirement income and Social Security . At the same time my parents sold their house in a small town in PR and with the income received also bought $150K in ERS bonds to complement their only monthly income of $1,300 in SS.

As you are aware, we have not received any interest payment since around 2016. In

addition, is my understanding the FOMB is proposing to pay 12.9 cents per dollar stating this bonds were "illegal".

Regardless of the legal terminology, which I do not understand, since if a transaction is ilegal it should be reversed, including the devolution of the Principal less the Interest earned, **my reality is that with this proposed offer I will be losing 87% of my savings and probably, a reduction in my pension.**

I have written to the FOMB of PR as is extremely difficult to agree with the "proposed offer " and respectfully request if they could revise their proposal.

Respectfully,

Jaime Castañer-Cuyar

**From:** Roberto A. Castaner
**Sent:** Tuesday, February 23, 2021 12:45 PM
**To:** NYSD Swain Corresp <SwainNYSDcorresp@nysd.uscourts.gov>
**Subject:** Puerto Rican government-debt - Employees Retirement System Bonds PR

Honorable Laura Taylor Swain
District Judge
United States Courthouse
500 Pearl St.
New York, NY 10007-1312

My name is Roberto Castaner. I am a retired Engineer from the private sector in Puerto Rico . I am writing for your concerns with the above subject issue .

In 2006 the company I worked for 30 years closed operations in PR and "liquidated" the pensions and savings to all employees . With my "liquidated pension " in 2008 I bought $150K in ERS bonds with a promise of a monthly interest payment ($750 approx),which was to complement my retirement income and eventually complement my wife and myself Social Security . At the same time my parents sold their house in a small southern town in PR and with the income

received also bought $150K in ERS bonds to complement their only monthly income of $1,300 in SS and be able to pay for the ELDERLY HOME CARE they were moving to in San Juan, PR.

As you are aware we have NOT received any interest payment since 2016 (approx). In addition is my understanding the FOMB is proposing to pay 12.9 cents per dollar stating this bonds were "illegal".

Regardless of the legal terminology which I do not understand, my reality is the following - with this proposed offer I will be losing 87% of my pension and 100% of my parents income from the sale of the house and 100% of the NOT paid reinterests in the last three years.
In addition due to the NOT payment of the interest from the ERS bonds my brothers and myself were obliged to take a loan for $52K to be able to complete payments for their care until both of them died a few years ago .

I have written to the FOMB of PR as is extremely difficult to agree with the "proposed offer " and respectfully requested if they could revise their proposal. I understand there are some 60 K retired persons in PR in similar situation, that purchased PR bonds ( most from the private sector ).

**I could very much appreciate if the FOMB offer could be similar to that of pensioners in the public sector.**
Considering when this bonds were offered in 2008 we bought under the premises the bonds were legal and with the warranty of the Government of PR and the Retirement System. And in the moment we bought the bonds we were helping the Government and the ERS to pay pension benefits to its beneficiaries and reduce its unfunded accrued actuarial pension liability.

Your concerns in the handling of this issue will be greatly appreciated.

Respectfully,

Roberto Castaner