# UNITED STATES DISTRICT COURT
# DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al*.,<br><br>    Debtors.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br>(Jointly Administered) |
| THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO,<br><br>    Plaintiff,<br><br>    v.<br><br>AMBAC ASSURANCE CORPORATION, *et al.*,<br><br>    Defendants. | Adv. Proc. No. 20-00003-LTS |

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801).

| | |
|---|---|
| THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO,<br><br>    Plaintiff,<br><br>    v.<br><br>AMBAC ASSURANCE CORPORATION, *et al.*,<br><br>    Defendants. | Adv. Proc. No. 20-00004-LTS |
| THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO,<br><br>    Plaintiff,<br><br>    v.<br><br>AMBAC ASSURANCE CORPORATION, *et al.*,<br><br>    Defendants. | Adv. Proc. No. 20-00005-LTS |

**DEFENDANTS' MOTION TO COMPEL DOCUMENT DISCOVERY FROM THE
GOVERNMENT IN THE REVENUE BOND ADVERSARY PROCEEDINGS**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

JURISDICTION AND VENUE ............................................................................................ 4

BACKGROUND ................................................................................................................ 4

    I.      THE COURT'S DECISION TO PERMIT SUMMARY JUDGMENT MOTIONS
           PRIOR TO DISCOVERY............................................................................................ 4

    II.     FOLLOWING EXTENSIVE BRIEFING, THE COURT REJECTED THE
           GOVERNMENT'S ARGUMENTS AGAINST DISCOVERY, AND FOUND THAT
           SPECIFIC RELEVANT MATERIALS AND FACTS MAY EXIST THAT COULD
           BE MATERIAL TO THE SUMMARY JUDGMENT MOTIONS. .......................... 5

    III.    THE PARTIES' MEET-AND-CONFERS ................................................................ 6

ARGUMENT......................................................................................................................7

    I.      THE COURT HAS ALREADY EXPRESSLY FOUND THAT DISCOVERY IS
           NEEDED CONCERNING THE PRIFA INFRASTRUCTURE FUND AND THE
           ACCOUNTING OF RUM TAX REMITTANCES.................................................. 7

         A.     The Court Expressly Authorized Discovery Concerning the Infrastructure
                Fund and the Accounting Treatment of Rum Taxes. ........................................ 8

         B.     Discovery into the "Use and Purpose" of the Commonwealth's Internal
                Accounting of Rum Tax Remittances Entails More Than a Simple Data
                Export.................................................................................................................. 12

    II.     THE COURT SHOULD COMPEL DISCOVERY INTO COMMUNICATIONS
           IDENTIFYING THE ACCOUNTS REFERENCED IN CCDA BOND
           DOCUMENTS.......................................................................................................... 14

    III.    THE COURT SHOULD ORDER DISCOVERY INTO DOCUMENTS GOVERNING
           THE HTA BONDS, AND INTO THE FLOW AND ACCOUNTING OF THE
           EXCISE TAXES...................................................................................................... 17

         A.     Defendants Are Entitled to Documents Governing the HTA Bonds. ............. 17

         B.     Defendants Are Entitled to Discovery into the Commonwealth's Accounting
                Practices Regarding the HTA Revenues. ........................................................ 19

         C.     Defendants Are Entitled to Communications Concerning Treasury's Role in
                Approval of Transfers to HTA. ....................................................................... 27

IV.     RESERVATION OF RIGHTS REGARDING ISSUES SUBJECT TO ONGOING
MEET-AND-CONFER DISCUSSIONS..................................................................... 29

CONCLUSION........................................................................................................................ 29

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Andalusian Global Designated Activity Co. v. Fin. Oversight & Mgmt. Bd. for*
  *Puerto Rico (In re Fin. Oversight & Mgmt. Bd. for Puerto Rico),*
  954 F.3d 1 (1st Cir. 2020)................................................................................22 n.10

*Autoridad de Carreteras y Transportación v. Transcore Atl., Inc.,*
  319 F.R.D. 422 (D.P.R. 2016) ........................................................................6

*Fein v. Numex Corp.,*
  92 F.R.D. 94 (S.D.N.Y. 1981) ........................................................................10

*Gracia-Gracia v. Fin. Oversight & Mgmt. Bd. for P.R.,*
  939 F.3d 340 (1st Cir. 2019).............................................................................22

*In re Fin. Oversight & Mgmt. Bd.  (Assured Guaranty Corp. v. Fin. Oversight &*
  *Mgmt. Bd.*), No. 20-1930 (1st Cir. Mar. 3, 2021) ..................................................2

*United States v. Textron Inc. & Subsidiaries,*
  577 F.3d 21 (1st Cir. 2009) (en banc)............................................................10, 13

**Statutes and Rules**

3 L.P.R.A. § 1914 .............................................................................................8

9 L.P.R.A § 2021 .............................................................................................21

9 L.P.R.A § 5681 .............................................................................................21

13 L.P.R.A. § 31751 .........................................................................................21

48 U.S.C. § 2166(a) .........................................................................................4

48 U.S.C. § 2167(a) .........................................................................................4

Fed. R. Civ. P. 56.................................................................................... *passim*

**Other Authorities**

Financial Accounting Standard Board standards for commercial entities,
  https://www.fasb.org/jsp/FASB/Page/LandingPage&cid=1175805317350 ..........................20

Governmental Accounting Standards Board standards,
  https://www.gasb.org/jsp/GASB/Page/GASBLandingPage&cid=1176160042
  327.....................................................................................................................20

**To the Honorable United States Magistrate Judge Judith Gail Dein:**

Pursuant to Federal Rules of Bankruptcy Procedure 7026, 7034, 7037, and 9014 and Federal Rules of Civil Procedure 26, 34, and 37, Ambac Assurance Corporation ("Ambac"), Financial Guaranty Insurance Company ("FGIC"), Assured Guaranty Corp. and Assured Guaranty Municipal Corp. (collectively, "Assured"), National Public Finance Guarantee Corporation ("National"), The Bank of New York Mellon ("BNY"), and U.S. Bank Trust National Association ("U.S. Bank," and collectively with Ambac, FGIC, Assured, National, and BNY, the "Defendants"), by and through their undersigned counsel, respectfully submit this urgent motion (the "Motion") requesting entry of an order, substantially in the form of **Exhibit A**, compelling the Plaintiff,[2] the Commonwealth, and certain Commonwealth instrumentalities (together, with Plaintiff, the "Government," and the Government together with Defendants, the "Parties"), to produce documents regarding bonds issued by the Puerto Rico Infrastructure Finance Authority ("PRIFA"), the Puerto Rico Convention Center District Authority ("CCDA"), and the Puerto Rico Highways and Transportation Authority ("HTA").

In support of this Motion, Movants respectfully represent as follows:

## PRELIMINARY STATEMENT

1.    When Judge Swain adopted Defendants' position that a more complete record was needed on issues contained within Plaintiff's summary judgment motions, the Rule 56(d) Order set out the topics for which discovery was likely to yield additional material facts.  Rather than detailing specific documents to be produced, Judge Swain authorized Defendants to "propound

---

[2] Unless otherwise indicated, all ECF numbers referenced herein refer to the docket in Case No. 17 BK 3283-LTS.  The Financial Oversight and Management Board for Puerto Rico (the "Board"), as representative of the Commonwealth, is referred to as the "Plaintiff."

discovery requests directed to such topics."[3]  Defendants then did so, propounding specific discovery requests in each of the three Adversary Proceedings that carefully hew to—often restating verbatim—the topics about which Judge Swain authorized discovery.

2.     In authorizing additional discovery now, Judge Swain recognized that the existing record, developed only for a preliminary hearing on the lift stay motion, is inadequate in this procedural posture.  The Parties are now at the merits phase, in a case involving billions of dollars—and raising important, precedent-setting questions about municipal finance.  Judge Swain correctly recognized that these critical issues cannot be decided on the basis of a limited record compiled for a merely procedural motion.  Indeed, in its ruling today affirming Judge Swain's decision on the lift stay motion, the First Circuit observed that "the Title III court will not and cannot treat its earlier, summary determination about whether the Monolines had a colorable claim as conclusive" in these adversary proceedings.  *In re Fin. Oversight & Mgmt. Bd.*  (*Assured Guaranty Corp. v. Fin. Oversight & Mgmt. Bd.*), No. 20-1930, slip op. at 14 (1st Cir. Mar. 3, 2021).  Taking note of the Court's order allowing discovery, the First Circuit observed that this Court "will have a more complete record on which to make its final determination" than it had before.  *Id.* at 25.

3.     Nevertheless, when it comes to discovery the Government has largely stuck to the same objections, and scope of search, that this Court previously adopted in the context of strictly limited lift stay discovery.  The Parties' specific disagreements for each Adversary Proceeding are set out in the arguments below.  Broadly speaking, there are two main areas of dispute:

---

[3] (*Order Regarding Discovery in Connection with Motions of the Commonwealth of Puerto Rico, By and Through the Financial Oversight and Management Board, Pursuant to Bankruptcy Rule 7056 for Partial Summary Judgment Disallowing Claims* (ECF No. 15656) (the "Rule 56(d) Order") at 7, 9, 11.)

4.      **Scope.**  On the scope of document production, the Government has taken the same position that it took during the lift stay discovery, specifically, that it will search only central files and will not (i) collect documents individual custodians may have (beyond centrally maintained files), or (ii) collect *any* electronically stored information associated with particular individuals, such as e-mail.  For a limited subset of topics, Defendants are asking for custodial documents, and targeted and efficient e-mail searches.  For some topics on which Judge Swain expressly authorized discovery—for example, "the nature and location of the Infrastructure Fund," a critical issue in the PRIFA case—the Government already searched its central files during the lift stay discovery period and found nothing.  To simply stick to the same approach will mean that the factual record on this topic will be no more complete at the end of this process than it was before Judge Swain found a need for more discovery.  Defendants will work with the Government to propose search terms to facilitate a targeted and efficient e-mail search that can be completed within the time the Court has allowed for discovery.  Defendants are not seeking delay; Defendants merely seek targeted searches for key information.

5.      **Accounting Documents.**  The Rule 56(d) Order expressly authorized discovery into the Commonwealth's accounting practices.  For example, as to PRIFA, the Court permitted "[d]iscovery relating to the accounting treatment of Rum Tax Remittances in general, including the ***use and purpose*** of account designations [and] fund codes."  (Rule 56(d) Order at 8 (emphasis added).)  As to HTA, the Court authorized a similar inquiry into the accounting and flow of funds of the HTA revenues, including "[a]ll documents governing the Flow of Excise Taxes and HTA Pledged Revenues," including "into and out of Fund 278 and its subaccounts" (Fund 278 refers to an accounting designation) and discovery into related "policies and procedures."  (*Id.* at 11.)  That critical discovery has the potential to show that the Commonwealth adopted and implemented

- 3 -

fund-accounting standards and practices with respect to Fund 278, recognizing its obligation to segregate and hold the Excise Taxes for their rightful owners: HTA and its bondholders.

6.      The Government has refused to provide *any* evidence of accounting practices, except printouts from PRIFAS (the Commonwealth's accounting system) logging the recording of revenues in the general ledger. But Defendants are seeking—and Judge Swain has authorized—discovery regarding substantive accounting issues governing the various bond revenues that are addressed in the Commonwealth's audited financial disclosures and implemented flows of funds. The limited production the Government is offering will not address key portions of Judge Swain's order.

## JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction over this matter under PROMESA § 306(a), 48 U.S.C. § 2166(a). Venue is proper under PROMESA § 307(a), 48 U.S.C. § 2167(a).

## BACKGROUND

### I.      THE COURT'S DECISION TO PERMIT SUMMARY JUDGMENT MOTIONS PRIOR TO DISCOVERY

8.      On January 16, 2020, the Board initiated three adversary proceedings (the "Adversary Proceedings") on behalf of the Commonwealth objecting to certain of Defendants' claims relating to bonds issued by PRIFA, CCDA, and HTA (collectively, the "Revenue Bonds"). (*See* Adv. Proc. No. 20-00003 ("PRIFA AP"), ECF No. 1; Adv. Proc. No. 20-00004 ("CCDA AP"), ECF No. 1; Adv. Proc. No. 20-00005 ("HTA AP").)

9.      On March 10, 2020, over Defendants' objections, the Court stayed the Adversary Proceedings—including any answer or counterclaims, and all discovery—except that it granted (over Defendants' objection) an opportunity for "limited" summary judgment motions on certain claims. (*See Final Case Management Order for Revenue Bonds* (ECF No. 12186) at 5-7.)

10.     The Court authorized early summary judgment motions based on the Board's representation that the issues to be raised would be purely legal and would not require factual development.  (*Tr. of Mar. 4, 2020 Omnibus Hr'g.* at 220:2-12, ECF No. 12181).  But Judge Swain cautioned at the March 4 Omnibus Hearing that "appropriate discovery opportunities will be provided at appropriate times" if the "Court is [later] persuaded that discovery is necessary."  (*Id.* at 221:6-12.)

## II.  FOLLOWING EXTENSIVE BRIEFING, THE COURT REJECTED THE GOVERNMENT'S ARGUMENTS AGAINST DISCOVERY, AND FOUND THAT SPECIFIC RELEVANT MATERIALS AND FACTS MAY EXIST THAT COULD BE MATERIAL TO THE SUMMARY JUDGMENT MOTIONS.

11.     On April 28, 2020, the Board filed its summary judgment motions.  (*See* PRIFA AP, ECF No. 44, CCDA AP, ECF No. 41; HTA AP, ECF No. 56.)  On July 16, 2020, Defendants opposed the motions on numerous grounds, including through declarations demonstrating that additional discovery was needed before the Court could rule (the "56(d) Declarations").  (*See* PRIFA AP, ECF No. 82; CCDA AP, ECF No. 80; HTA AP, ECF No. 97.)

12.     The Government opposed Defendants' 56(d) Declarations not only with declarations of its own but also extensive and detailed briefing—styled "Objection[s]" to Defendants' Rule 56(d) requests for additional discovery.  (PRIFA AP, ECF No. 90; CCDA AP, ECF No. 85; HTA AP, ECF No. 104.)  In the Objections, the Board argued that:  (i) the discovery Defendants sought was immaterial and irrelevant; (ii) Defendants could not show that any additional documents existed; and (iii) the limited discovery Defendants had already obtained in connection with the Lift Stay Motions was "sufficient information to oppose the Motion."  (PRIFA AP, ECF No. 90, at 5-6, 15, 20; CCDA AP, ECF No. 85, at 5-6, 14-15, 18; HTA AP, ECF No. 104, at 5-6, 13, 20.)

13.     In a carefully written order, Judge Swain rejected the Government's arguments, finding that Defendants had met their burden under Rule 56(d).   (*See* ECF No. 15656 (the "Rule 56(d) Order.")   In the decision, the Court chronicled prior orders regarding lift stay discovery, setting out exactly what discovery had already been authorized that was relevant to each Adversary Proceeding.   The Court found that the "limited opportunity" for discovery in the lift stay proceeding was insufficient to decide the summary-judgment motions, and that "good cause" existed to require further discovery.   (Rule 56(d) Order at 5.)   Judge Swain then delineated a set of topics on which the Court concluded that "specific relevant materials and facts . . . probably exist."   (*Id.*)   Rather than detailing specific documents to be produced, the Court authorized Defendants to "propound discovery requests directed to" those topics.   (*Id.*)

## III.   THE PARTIES' MEET-AND-CONFERS

14.     On February 5, 2021, the Court entered an *Order Setting Discovery Schedule* (ECF No. 15809).   As required by that order, Defendants served their initial document requests on February 8, 2021.   (*See* Exhibit B ("PRIFA Requests"); Exhibit C ("CCDA Requests"); Exhibit D ("HTA Requests").)   On February 23, 2021, the Government served responses and objections. (*See* Exhibit E ("PRIFA R&Os"); Exhibit F ("CCDA R&Os"); Exhibit G ("HTA R&Os").)

15.     The Parties held meet-and-confers on February 23, 2021, and March 1, 2021.   The Government also provided information about its various positions to Defendants on the evening of February 25, 2021, in connection with preparation of the *Joint Status Report Regarding Discovery in the Revenue Bond Adversary Proceedings* (ECF No. 15889) (the "Joint Status Report").

16.     The Parties reached an impasse on certain issues relating to the PRIFA, CCDA, and HTA Requests.   Accordingly, Defendants now move to compel.

- 6 -

## ARGUMENT

17.     The party resisting a request for production "bears the burden of establishing lack of relevancy or undue burden." *Autoridad de Carreteras y Transportación v. Transcore Atl., Inc.*, 319 F.R.D. 422, 427 (D.P.R. 2016) (citations and internal quotation marks omitted).   "The objecting party must show specifically how each . . . request for production is not relevant or how each question is overly broad, burdensome or oppressive." *Id.*   "[G]eneralized objections to an opponent's discovery requests are insufficient." *Id.*

## I.   THE COURT HAS ALREADY EXPRESSLY FOUND THAT DISCOVERY IS NEEDED CONCERNING THE PRIFA INFRASTRUCTURE FUND AND THE ACCOUNTING OF RUM TAX REMITTANCES

18.     The nature and location of the Puerto Rico Infrastructure Fund, and the Commonwealth's accounting of it, are the central disputes in the PRIFA Adversary Proceeding. Judge Swain recognized the critical importance of these issues—and the inadequacy of the current record to decide them—by expressly authorizing "[d]iscovery identifying the nature and location of the Infrastructure Fund, and restrictions placed upon moneys therein," along with "[d]iscovery relating to the accounting treatment of Rum Tax Remittances *in general*, including the use and purpose of account designations [and] fund codes."  (Rule 56(d) Order at 8 (emphasis added).)

19.     Despite the Court's express order allowing Defendants to propound discovery requests directed to these critical topics, the Government has refused to do anything other than conduct another search through its central files for whatever bits of additional information it might have missed in the first pass, and to provide print-outs of transactions from the Commonwealth's accounting system, PRIFAS.  Even with respect to the limited central files search the Government is undertaking, it is expressly refusing to produce any accounting documents like audit work papers—nor to provide any discovery regarding the Commonwealth's audited financial

statements, which explicitly describe the PRIFA Infrastructure Fund and the accounting treatment thereof.

20.     The Government knows full well that it already undertook a search through its central files for information about the Infrastructure Fund during lift stay discovery and found nothing.  (Ex. E, PRIFA R&Os at 23 ("AAFAF conducted a reasonably diligent search of centralized files for information identifying the nature and location of the Infrastructure Fund in connection with the PRIFA Lift Stay Motion and did not locate any responsive information.").)  In refusing to seek custodial documents or e-mails, the Government is effectively ensuring that the discovery record on these points remains incomplete.  Attempting to sweep away Judge Swain's order—by making a few symbolic concessions but fundamentally refusing to provide discovery into these critical issues—does not serve the cause of efficiency in the long run.  It will only result in more delay, when deficiencies in the factual record preclude the Court from substantively resolving the summary judgment motions.

**A.     The Court Expressly Authorized Discovery Concerning the Infrastructure Fund and the Accounting Treatment of Rum Taxes.**

21.     The Trust Agreement grants PRIFA's bondholders specific legal rights regarding any rum taxes "deposited to the credit of the Puerto Rico Infrastructure Fund pursuant to the [PRIFA Enabling] Act."  (PRIFA AP, ECF No. 47-1, at 18.)  Defendants have consistently claimed that the Infrastructure Fund is a "Special Fund," 3 L.P.R.A. § 1914, meaning an accounting entity used to track the rum tax revenues, and that their rights to the revenues attach once recorded by the Commonwealth.  This reading is supported by the Commonwealth's audited financial

- 8 -

statements, admissions by the Commonwealth's counsel and corporate representative, and analysis

provided by Defendants' expert.[4]

22.    The Government, on the other hand, has never offered a coherent or cohesive

explanation of what it thinks the Infrastructure Fund is.  Initially it suggested the Infrastructure

Fund could not refer to a specific bank account or accounts, but later suggested that the

Infrastructure Fund corresponded to two bank accounts in particular.[5]  An interrogatory response

the Board served just two days ago highlights the confusion on this issue.  Rather than providing

a clear articulation of what the Infrastructure Fund is, the Board cited lengthy statements from a

variety of different sources, none of which provide a clear (let alone consistent) articulation of

what the fund is.  The Board tries to suggest the Infrastructure Fund was some kind of historical

artifact ("the Infrastructure fund was the first $117 million in Rum Tax Remittances *historically*

allocated to PRIFA"), without offering any clear articulation (let alone one supported by

contemporaneous documents) of what buckets of money—historically or today—comprise the

---

[4] (PRIFA AP, ECF No. 84-11, at 323 (2014 Commonwealth Financial Statements describing the
Infrastructure Fund as a "special revenue fund . . . used to account principally for the moneys received by
the Commonwealth, up to $117 million of [Rum Tax Remittances]")); (PRIFA AP, ECF No. 84-22, at 14
(April 7, 2020 letter from AAFAF's counsel stating the "Infrastructure Fund has not been understood to
refer to a specific bank account or accounts")); (PRIFA AP, ECF No. 84-23, at 5 (March 13, 2020 Letter
from AAFAF's counsel stating "[f]unds in Treasury's accounting system are both fiscal and accounting
entities")); (Testimony of Timothy H. Ahlberg, as the Rule 30(b)(6) corporate representative of the
Commonwealth & PRIFA, PRIFA AP, ECF No. 84-1, at 332:3-8 (testifying the Infrastructure Fund
"generally refers to the first 117 million [dollars] of rum revenues")); (PRIFA AP, ECF No. 83-1, at 16
(Defendant's expert stating "special revenue funds are used 'to account for and report the proceeds of
specific revenue sources that are restricted or committed to expenditures for specified purposes other than
debt service or capital projects'").)

[5] (*Compare* PRIFA AP, ECF No. 84-22, at 14 (April 7, 2020 letter from AAFAF's counsel stating the
"Infrastructure Fund has not been understood to refer to a specific bank account or accounts") *with* PRIFA
AP, ECF No. 84-21, at 122:9-13  (PRIFA preliminary lift stay hearing where AAFAF counsel stated, "the
Infrastructure Fund existed across two accounts into which the Commonwealth transferred the first
117 million dollars of rum taxes").)

Infrastructure Fund.  (*See* Ex. H, PRIFA R&Os to First Set of Interrogatories at 12 (emphasis added).)

23.     The Board's cryptic interrogatory response illustrates why Defendants need documents beyond what the Government is offering.  Notably, the Board itself, in articulating its position of what the Infrastructure Fund is, puts accounting documents directly at issue by citing PRIFA's financials for an articulation of what the Infrastructure Fund is.  But in doing so, the Board ignores that there are descriptions of PRIFA's special revenue fund in the *Commonwealth's* financial statements.  The Board does not address those or attempt to explain them, even though the Commonwealth's description of the fund in its audited financial statements is a critical piece of evidence.[6]

24.     There is good reason to expect that targeted inquiries into audit work papers and other accounting documents, including communications, would yield important discoverable information.  Auditors routinely engage with the entities they are auditing by sending written questions and receiving responses on individual line items as they are audited.  There thus should be between Commonwealth accounting and finance personnel and the Commonwealth's auditor (KPMG) e-mails and other documents regarding the PRIFA special revenue fund described in the Commonwealth's financial statements.

25.     Such documents and communications squarely concern the "nature . . . of the Infrastructure Fund, and any restrictions thereon," as well as the "accounting treatment of Rum Tax Remittances in general."  (Rule 56(d) Order at 8.)  And there is no undue burden on the

---

[6] (*Compare* PRIFA AP, ECF No. 84-11, at 323 (2014 Commonwealth Financial Statements describing the Infrastructure Fund as a "special revenue fund . . . used to account principally for the moneys received by the Commonwealth, up to $117 million of [Rum Tax Remittances]") *with* PRIFA AP, ECF No. 84-4, at 357 (2015 Commonwealth Financial Statements stating for the first time that "the Commonwealth 'conditionally allocates' to [the Infrastructure Fund] the first $117 million" of Rum Tax Remittances).)

Government in producing them.  Collecting and producing non-e-mail documents would merely require consulting the relevant parties and custodians, and collecting the relevant audit work papers, which "are specifically defined, readily identifiable and likely to be located in but a few locations," and related accounting materials.  *Fein v. Numex Corp.*, 92 F.R.D. 94, 97 (S.D.N.Y. 1981); *see also United States v. Textron Inc. & Subsidiaries*, 577 F.3d 21, 31 (1st Cir. 2009) (en banc) (acknowledging that the production of auditor work papers alleviates practical discovery problems resulting from otherwise "massive" productions).

26.     Underscoring the need for the Commonwealth to look for these documents in the first instance, KPMG, the Commonwealth's independent auditor, has informed Defendants that it will cooperate with reasonable document requests made by subpoena—but it noted that it would object to the extent it is asked to produce documents that can more easily be produced by a party to this litigation.

27.     Likewise, e-mail searches in connection with the Infrastructure Fund and public accounting thereof would necessarily be targeted and minimally burdensome.  Defendants are not asking for every e-mail anyone ever sent regarding the Commonwealth's financials.  The Infrastructure Fund and Rum Tax Remittances are addressed in very specific line items within a broader set of financial statements for the Commonwealth.  Searches for the Infrastructure Fund could be completed easily and quickly (even if the Court does not otherwise order the Government to collect e-mails on other topics).  For example, the Government could ask any personnel in audit or accounting functions who have worked on PRIFA issues to search their e-mail archives for "Infrastructure Fund" and variants thereof to see what comes back.  Given that the Government has said that a search of its central files yielded no documents referring to the Infrastructure Fund, presumably there would not be a large volume of e-mails that "hit" on that search term.  The

- 11 -

Government's position—that *any* discovery beyond central files is unduly burdensome—is simply untenable.

28.     To deny any meaningful discovery on one of the most important issues in the PRIFA Adversary Proceeding, as the Government proposes, would effectively turn the Rule 56(d) Order into a dead letter—and make the time the Court allocated for discovery a waste because, at the conclusion of this process, the Parties would simply be left with the same factual record that Judge Swain found inadequate to resolve the summary judgment motion.  The Government offers no reason that additional searching of central files will yield anything more the second time around. Defendants cannot be stripped of their rights to obtain information simply because the Government refuses to run even a targeted search for key information.

**B.     Discovery into the "Use and Purpose" of the Commonwealth's Internal Accounting of Rum Tax Remittances Entails More Than a Simple Data Export.**

29.     The Court authorized "[d]iscovery relating to the accounting treatment of Rum Tax Remittances in general, including ***the use and purpose*** of account designations, fund codes, and DeptIDs."  (Rule 56(d) Order at 8.[7])  On this topic, PRIFA Defendants requested documents and communications concerning six areas of inquiry regarding the Commonwealth's and PRIFA's accounting treatment of the Rum Tax Remittances:  (i) the purpose of account designations, fund codes, and DeptIDs; (ii) the use of account designations, fund codes, and DeptIDs; (iii) the accounting treatment of the Infrastructure Fund; (iv) the PRIFA special revenue fund and the PRIFA debt service fund, referenced respectively in the Commonwealth's and PRIFA's financial statements; (v) the flow of funds and accounting designations used as Rum Tax Remittances flow into and out of Commonwealth accounts and funds; and (vi) the manner in which the first $117

---

[7] The reference to "fund codes" and "DeptIDs" refers to data fields contained in PRIFAS, the Commonwealth's accounting system.

million of Rum Tax Remittances each fiscal year is transferred and accounted for (the "Accounting Requests"). The requested discovery is squarely within the scope of the Rule 56(d) Order.

30.     The Government has argued that its only obligation is to attempt to export transaction reports from PRIFAS reflecting journal entries on the Commonwealth's accounting ledger associated with the various transfers of Rum Tax Remittances.[8] (Ex. E, PRIFA R&Os at 26-27.) But the production of those reports (of which there will be no more than a handful) are responsive only to a small portion of what Judge Swain ordered. Indeed, examples of the PRIFAS reports were before Judge Swain as part of the summary judgment record. (*See, e.g.*, PRIFA AP, ECF Nos. 84-47, 84-51, 84-52.) Judge Swain could have simply ordered that a more complete set be produced (as ordered in PRIFA topic (vi)), if that was the intended scope. It clearly was not.

31.     As the example attached hereto as Exhibit I shows, exports from PRIFAS contain codes and designations showing that certain revenues were recorded on the general ledger in particular funds and accounts. But such reports do not provide context for how those records map to key accounting concepts discussed in public financial reports. Judge Swain's authorization of discovery into the "accounting treatment of Rum Tax Remittances in general," and into the "use *and* purpose" of its internal accounting designations, reaches more broadly to cover that *context*— how those codes fit into the substantive accounting and financial reporting of the Commonwealth.

32.     What Defendants seek, but the Government refuses to provide, are accounting documents that show what these account codes and designations mean—functionally and in practice—and the "purpose" of those codes. In reality, these documents should be easy to locate

---

[8] Indeed, the Government objected during lift stay discovery to the production of the very PRIFAS transactions it now prefers to provide because PRIFAS "cannot pull vouchers" and "cannot export a report of summary data." (CCDA AP, ECF No. 111-4, at 3-4.) Since the Government's objection then was an exaggeration, its current objection that it cannot provide communications or e-mails in a timely manner should be taken with a grain of salt.

as part of the specific line items from the Commonwealth's public financial statements regarding the special revenue fund for PRIFA.  (PRIFA AP, ECF No. 84-11, at 323.)  Such discovery into audit paper line items is not burdensome.  *Textron Inc.*, 577 F.3d at 31; *Numex Corp.*, 92 F.R.D. at 97.  Without that critical context, all the Government would be producing are essentially meaningless codes—with no evidence about what they mean or correspond to.

33.    Defendants also are requesting communications regarding the accounting concepts. E-mails could be critical to help elucidate the accounting concepts, and indeed, e-mails for accounting of the Rum Tax Remittances would be closely related to Defendants' request above for e-mails regarding the nature and location of the Infrastructure Fund.  These e-mail searches can be narrow and targeted, to surface key information about why certain revenues were accounted for in certain funds and/or accounts, and the relevant accounting principles and funds for the specific line items in the Commonwealth's financial reports that are at issue for the PRIFA bonds.

34.    There are billions of dollars at stake in this litigation.  Targeted electronic discovery, including an e-mail search, is plainly not disproportionate to the case.  The Government has made no showing that the information is not reasonably accessible or that the collective and review would demand too much.  Nor could it, since the set of responsive material is likely to be limited.

## II.    THE COURT SHOULD COMPEL DISCOVERY INTO COMMUNICATIONS IDENTIFYING THE ACCOUNTS REFERENCED IN CCDA BOND DOCUMENTS.

35.    Following extensive briefing on the CCDA lift stay motion, Judge Swain squarely held that there were "many factual disputes" that could not be resolved on the basis of the existing record.  (*Opinion and Order in Connection with Preliminary Hearing Regarding Motion Concerning Application of the Automatic Stay to the Revenues Securing the CCDA Bonds*, ECF

No. 13540, at 32.)  In particular, Judge Swain found that fact disputes existed regarding the identity of accounts referenced in the CCDA bond documents.

36.     The bond documents refer to at least three accounts:  a Transfer Account, a Surplus Account, and a Pledge Account.  CCDA bondholders have specific legal rights with respect to these accounts.  While it was undisputed in the context of the CCDA lift stay motion that the Pledge Account corresponds to a specific account held at the Government Development Bank, the identity of the Transfer Account and the Surplus Account was disputed, and Judge Swain held that the issue of the identity of the Transfer Account would have to be resolved on a more complete record in the CCDA Adversary Proceeding.  (CCDA Final Lift Stay Order, ECF No. 14187, at 6.)  The resolution of that dispute is relevant to whether bondholders have property rights in certain moneys—and also could be relevant to Contracts Clause rights and PROMESA § 407 claims.  (*See Declaration of John J. Hughes, III in Support of the Opposition of Ambac Assurance Corporation, Assured Guaranty Corp., Financial Guaranty Insurance Company, and The Bank of New York Mellon to the Oversight Board's Motion for Partial Summary Judgment Seeking to Disallow Claims Relating to CCDA* Bonds, CCDA AP, ECF No. 80, at 16-17, 24-25.)

37.     Recognizing that there are "many factual disputes" regarding the CCDA bonds, Judge Swain authorized discovery regarding the CCDA bonds in the Rule 56(d) Order—including discovery into "***All*** documents governing the flow of the [Hotel Taxes], including all versions of documents *governing the Transfer Account, Surplus Account and any other accounts* into or through which such funds are or have been transferred."  (Rule 56(d) Order at 9 (emphasis added).)  The Court also authorized discovery regarding "[a]ccount opening documents" for, *inter alia*, the Transfer Account and Surplus Account, as well as "[p]olicies and procedures related to the flow

of Hotel Taxes pursuant to the Bond Documents and Hotel Occupancy Tax Act." (*Id.*)  These topics are directed at, in part, the disputed question of which account is which.

38.     In light of the Court's express focus on this issue, Defendants are seeking communications concerning the CCDA flow of funds—specifically including any documents governing or identifying the relevant accounts (the Holding Fund, Transfer Account, Surplus Account, and Pledge Account), or any policies and procedures related thereto.  The Government already "conducted a reasonably diligent search of centralized files for bank account opening documents" in connection with lift stay discovery "and did not locate any responsive documents." (Ex. F, CCDA R&Os at 21-22; Testimony of Timothy H. Ahlberg, as the Rule 30(b)(6) corporate representative of the Commonwealth and the Tourism Company ("CCDA Ahlberg Testimony"), CCDA AP, ECF No. 81-2, at 431:19-21.)  As with PRIFA, merely searching central files again is unlikely to resolve the gaps in the evidentiary records as it stands.

39.     By contrast, key custodians will have relevant information on these points.  The Rule 30(b)(6) corporate representative for the Commonwealth and the Tourism Company testified that he "[d]iscussed with Gustavo and Brett [two employees who together managed the cash flow reporting for the Tourism Company] which accounts operated as the transfer, pledge, and surplus account."  (CCDA Ahlberg Testimony, CCDA AP, ECF No. 81-2, at 449:1-10, 481:22- 483:4.) E-mails and documents from these two employees (and any other key employees with relevant knowledge) will shed light on the factually disputed issue of which account is which—and the basis for the Government's assertions on this point.

40.     The universe of documents potentially relevant to this inquiry is also proportional to the needs of the case and would not be unduly burdensome to produce.  Although the Government has refused to discuss custodians with Defendants, the Tourism Company is a

- 16 -

separate public corporation with its own finances and personnel.  It appears that the finance department is relatively small, and a reasonable number of key custodians could be sufficient to allow for narrow and targeted searches into this issue.

41.     For the reasons discussed above, there is no undue burden in narrowed and targeted e-mail searches, and there is no need to delay the schedule.  As long as the Government acts diligently and expeditiously, the court-ordered discovery can be completed on time.

## III.   THE COURT SHOULD ORDER DISCOVERY INTO DOCUMENTS GOVERNING THE HTA BONDS, AND INTO THE FLOW AND ACCOUNTING OF THE EXCISE TAXES.

### A.     Defendants Are Entitled to Documents Governing the HTA Bonds.

42.     The Court authorized discovery into "*[a]ll* documents governing the HTA Bonds, including *all* versions of the Bond Resolutions, and documents identifying the signatories to and/or those bound by the Bond Resolutions."  (Rule 56(d) Order at 11 (emphasis added).)  Consistent with the 56(d) Order, Defendants requested "[a]ll Documents governing the terms of the HTA Bonds, including all versions of the Bond Resolutions, and documents identifying the Signatories to and/or those bound by the Bond Resolutions, from creation to present."  (Ex. D, HTA Requests at 13.)  Yet, the Government construed "governing the terms of the HTA Bonds" to refer to *only* the 1968 and 1998 Resolutions—and not the 2002 Bond Resolution and associated Security Agreement (which Judge Swain analyzed in the preliminary lift stay decision) or other documents governing the HTA Bonds.  (*See* Ex. G, HTA R&Os at 12.)

43.     "All versions" of "[a]ll documents governing the HTA bonds" means more than the 1968 and 1998 Resolutions alone.  It includes all amendments and supplements to the Bond Resolutions, as well as any other resolutions, acts, approvals, or decisions—whatever their form— that were adopted in connection with the HTA Bonds.  Discovery is needed on this topic to test Plaintiffs' assertion that only section 401 of the Bond Resolution grants a security interest.  There

are other documents that independently pledged the Revenues, including, without limitation, two separate supplemental resolutions that pledged the Revenues without qualification or reference to section 401 of either the 1968 Resolution or the 1998 Resolution.  Merely producing the 1968 Resolution or the 1998 Resolution would thus be insufficient.  The governing documents for which Judge Swain authorized discovery also include documents connecting the 2002 Bond Resolution and bond issuance and the 2002 Security Agreement, as well as HTA's authority to enter into such an agreement.

44.     As Judge Swain recognized, the 2002 Security Agreement purported to grant Defendants a security interest in "all amounts required to be on deposit" in the Sinking Fund and Revenue Fund under the terms of the Resolutions.  (*Opinion and Order in Connection with Preliminary Hearing Regarding Motion of Assured Guaranty Corp., Assured Guaranty Municipal Corp., Ambac Assurance Corporation, National Public Finance Guarantee Corporation, and Financial Guaranty Insurance Company for Relief from Automatic Stay, or, in the Alternative, Adequate Protection (Docket Entry No. 10102)* ("HTA Preliminary Lift Stay Order"), ECF No. 13541, at 33.)[9]  But on the limited lift stay record, Judge Swain held that the movants had not yet "demonstrated the connection" between the 2002 Bond Resolution and the 2002 Security Agreement.  (*Id.*, at 35-36.)  The Rule 56(d) Order, however, authorized Defendants to develop that record.  The Government, and particularly HTA, must do a diligent search and produce what they find, including e-mail communications on these limited issues.

---

[9] (*See id.* at 12 (recognizing dispute over Executive Director's authority to execute 2002 Security Agreement).)

**B.**    **Defendants Are Entitled to Discovery into the Commonwealth's Accounting Practices Regarding the HTA Revenues.**

**1.**    **Judge Swain Authorized Discovery into Fund Accounting Practices.**

45.    For the same reasons Defendants are entitled to discovery into the Commonwealth's accounting of the Rum Tax Remittances, *see supra* Argument § I.A, Defendants are entitled to the same relating to the HTA Excise Taxes.  Judge Swain plainly ordered discovery into the Commonwealth's "governing" accounting and fiscal controls (including "policies and procedures") of the disputed revenues and their related funds and flow of funds, including Fund 278—the special revenue fund that the Commonwealth uses to designate the Excise Taxes in its custody.  (Rule 56(d) Order at 11 (subtopics (ii), (iii), (iv), and (v)).)  Indeed, by ordering discovery on those topics, Judge Swain has already *rejected* the Government's contention at the summary-judgment hearing that "discovery into accounting practices or government decisions on the flow of funds . . . does not impact the legal determination presented here."  (HTA AP, ECF No. 125, at 61:13-20.)  Critically, the documents that govern Fund 278 likely demonstrate the Commonwealth and HTA's adoption of accounting standards and practices, or policies and procedures (which may be reflected in instructions), that require the Excise Taxes to be segregated and held for their rightful owners: HTA and its bondholders.

46.    The Government, however, has narrowly redefined "Flow of Funds," "Funds," "Fund 278," and "HTA Accounts" to mean only "bank accounts," and commits to producing mainly "bank account statements," "bank account opening materials," documents regarding transfers into or out of "bank accounts," and "policies and procedures" for "bank accounts." (Ex. G, HTA R&Os at 15-16, 17, 18, 21-22, 28.)  These altered definitions are incomplete because they fail to disclose and produce fund accounting discovery.  This effort to relitigate Judge Swain's Rule 56(d) Order, which expressly permitted discovery into fund accounting, should be rejected.

47.     Governments throughout the United States and at all levels use fund accounting to control and segregate public moneys.   Whereas commercial entities primarily rely on bank accounts to segregate money, government entities primarily rely on accounting funds, which allow cash and other financial resources (together with related liabilities) to be segregated for the purpose of carrying on specific activities or attaining certain objectives in accordance with special regulations, restrictions, or limitations." (Expert Report of William W. Holder ("Holder Report"), HTA AP, ECF No. 96-1, at 1 n.2.)[10]   Unsurprisingly, the Commonwealth's own financial statements (Commonwealth of Puerto Rico Basic Financial Statements and Required Supplemental Information (June 30, 2015) ("2015 Financial Statements"), HTA AP, ECF 98-5, at 78) admit that the Commonwealth segregates restricted revenues by funds:

> The Commonwealth reports its financial position and results of operations in funds, which are considered separate accounting entities . . . . The operations of each fund are accounted for within a set of self balancing accounts.   Fund accounting segregates funds according to their intended purpose and is used to aid management in demonstrating compliance with legal, financial, and contractual provisions.

48.     The Commonwealth's financial statements further admit that the Commonwealth has implemented GASB Statement No. 54 requires governments to implement proper controls over restricted moneys by utilizing fund accounting.   And, the Commonwealth's financial statements themselves admit that the Commonwealth has implemented GASB Statement No. 54 and utilizes funds to impose and track restrictions on public moneys.[11]   "Restrictions" means

---

[10]    (*Compare*   Governmental   Accounting   Standards   Board   ("GASB")   standards, https://www.gasb.org/jsp/GASB/Page/GASBLandingPage&cid=1176160042327,   *with*   Financial Accounting   Standard   Board   ("FASB")   standards   for   commercial   entities, https://www.fasb.org/jsp/FASB/Page/LandingPage&cid=1175805317350; *see also Andalusian Global Designated Activity Co. v. Fin. Oversight & Mgmt. Bd. for Puerto Rico (In re Fin. Oversight & Mgmt. Bd. for Puerto Rico)*, 954 F.3d 1, 7 (1st Cir. 2020) (noting "obvious differences between governmental bankruptcies and commercial private party bankruptcies").)

[11] (2015 Financial Statements, HTA AP, ECF 98-5, at 80 ("In accordance with GASB Statement No. 54 . . . the classification of fund balance is based on the extent to which the Commonwealth is bound to observe constraints imposed upon the use of resources in the governmental funds.").)

constraints either (1) "externally imposed by creditors (such as through debt covenants), grantors, contributors, or laws or regulations of other governments," or (2) "imposed by law though constitutional provisions or enabling legislation."  (Holder Report, HTA AP, ECF No. 96-1, at 3 (quoting GASB Statement No. 54).)

49.    And specifically, with respect to HTA, the applicable statutes and bond resolutions all use the language of fund accounting—not bank accounts—to restrict and define ownership of the pledged revenues.  The Excise Taxes must be held in a "special deposit in the name and for the benefit of [HTA]," and that special deposit is a fund, not a bank account.  *See* 9 L.P.R.A §§ 2021,[12] 5681; 13 L.P.R.A. § 31751; (HTA AP, ECF No. 98-3); (*see also* HTA AP, ECF No. 94, at 15 n.19 (explaining why "the terms 'special deposit' and 'special fund' are synonymous in this context").)  Similarly, the Resolutions describe even the "Sinking Fund" (in which the Government concedes Defendants have a perfected security interest) as a "special fund," making clear that the Sinking Fund is a "fund" in the accounting sense, not a bank account.[13]

50.    The Government's emphasis on bank accounts is therefore a red herring.  Discovery into fund accounting, rather than just bank accounts, is needed to capture all the documents that govern Fund 278, as ordered by Judge Swain.  The Government's promise to provide a simple export from PRIFAS and a repeat search of centralized files is insufficient.  *See supra* Argument § I.B.  Judge Swain's Rule 56(d) Order plainly allowed discovery beyond documents (such as a PRIFAS printout) that just reflect the actual flow of money into and out of Fund 278 and its subaccounts.  Indeed, only one of Judge Swain's HTA discovery topics calls for documents

---

[12] The English translation of Section 2021 on Westlaw says "in behalf of," but the Spanish text uses the phrase "*a nombre de*," which translates to "in the name of."

[13] (*See* 1968 Resolution, HTA AP, ECF No. 98-50, § 401 ("A special fund is hereby created and designated 'Puerto Rico Highway Authority Highway Revenue Bonds Interest and Sinking Fund'"); 1998 Resolution, HTA AP, ECF No. 98-23, § 401 ("A special fund is hereby created and designated 'Puerto Rico Highways and Transportation Authority Transportation Revenue Bonds Interest and Sinking Fund'").)

"reflecting the actual Flow of Funds in and out of Fund 278 and its subaccounts, and any other

accounts…." (56(d) Order at 11.) If the Court had intended the Government to merely provide a

printout showing where the Excise Taxes and HTA Pledged Revenues went, there would have

been no need for Topic 2 (authorizing discovery of "all Documents governing the Flow of Excise

Taxes and HTA Pledged Revenues" and "governing Fund 278 and its subaccounts, and any other

accounts to designated Funds") or Topic 5 (authorizing discovery of "all policies and procedures

related to the Flow of Funds of Excise Taxes and HTA Pledged Revenues). The Government must

do more than before and produce external and internal audit and accounting documents and

communications regarding the fund accounting that governed the treatment and flow of the

revenues in dispute.

### 2. The Government Parties' Objections to Specific Fund Accounting Requests Are Without Merit.

51.     Given the Government's admitted use of fund accounting to segregate money, it is

a non-sequitur for the Government to argue that bank accounts alone do not allow them to trace

the disputed HTA revenues. (*See* Ex. G, HTA R&Os at 20 (objecting to subparts (a), (c), (d), (f),

(g), and (k) of HTA subtopic (iii) because they seek "documents that do not exist to the extent they

purport to require the Government Entities to attempt to trace the use of Excise Taxes or Toll

Revenues after they have been commingled in cases where no voucher or transfer order specifically

identifies the source of the transferred amounts").) While it may be true, that Excise Taxes were

"commingled" in bank accounts that held other monies, that only highlights the necessity of

discovery into fund accounting, which *can* track the Excise Taxes into and out of Fund 278 and its

subaccounts. *See Gracia-Gracia v. Fin. Oversight & Mgmt. Bd. for P.R.*, 939 F.3d 340, 351 (1st

Cir. 2019) (holding that plaintiffs, by identifying funds held in a separate account in the General

Fund for accounting purposes, "made a prima facie showing of traceability").

52.     The Government also asserts that Request No. 3, subparts (h), (i), (l), and (m) are outside the scope of the Rule 56(d) Order.  (Ex. G, HTA R&Os at 20).  None of these objections are credible.  Subpart (h) plainly requests flow of fund information pertaining to Fund 278, as it requests "records reflecting the balance from January 2014 to present of Fund 278 and its specific subaccounts, and any changes, increases, and decreases of such balances and the reasons therefor[.]"  (Ex. D, HTA Requests at 14.)  All funds have beginning balances, changes in fund balance, and ending balances.  (2015 Financial Statements, HTA AP, ECF 98-5, at 19.)  And the flow of funds is merely the movement from one balance to the next.

53.     Similarly, subpart (i) requests documents governing and describing the policies and procedures for the flow of funds, including fund designations related to Fund 278.  As discussed above, fund designations are procedures implemented to track and account for revenues; they are clearly within the scope of documents governing Fund 278.  And subpart (m) requests "records reflecting the budget and expenditure of any Excise Taxes and HTA Pledged Revenues."  (Ex. D, HTA Requests at 14.)  Records reflecting expenditures, i.e., "the flow of funds . . . out of Fund 278," and documents "governing" expenditures, i.e., budgets, fall squarely within HTA subtopic (iii).

54.     Finally, subpart (l), along with Request No. 5(n), requests communications with auditors and auditor work papers related to the Excise Taxes and HTA Pledged Revenues ("Audit Documentation").  These are especially relevant because the Commonwealth, through its audited financial statements, represented that the Excise Taxes are restricted moneys segregated into special revenue fund for safekeeping apart from the Commonwealth's general fund.  (Holder Report, HTA AP, ECF No. 96-1, at 10-17).  The Commonwealth could not have responsibly made, and the auditors accepted, such representations in financial statements prepared in conformity with

- 23 -

applicable standards without having some reasonable basis for doing so.  (*Id*. at 18.) This audit
evidence will address the factual disputes before Judge Swain by evidencing the Commonwealth's
adoption and implementation of accounting standards that require the Excise Taxes in Fund 278
to be held separately for HTA and its bondholders.

55.     The Government accuses Defendants of prosecuting a forensic audit of the disputed
revenues.  (*Joint Status Report Regarding Discovery in the Revenue Bond Adversary Proceedings*,
HTA AP, ECF No. 134, at 25-27.)  But the Government misses the point.  Defendants do not need
to conduct an audit because its external or internal auditors have already done so.  According to
the Independent Auditors' Report of KPMG, LLP, "[a]n audit involves performing procedures ***to***
***obtain audit evidence*** about the amounts and disclosures in the financial statements" and also
includes evaluating the appropriateness of accounting policies used[.]"  (HTA AP, ECF No. 98-5,
at 9 (emphasis added).)  In other words, the Audit Documentation is already pre-packaged and
readily available to the Government, reducing the burden on the Government to conduct expansive
searches for responsive documents while allowing Defendants to avoid the practical problems of
reviewing a massive discovery production.

56.     As explained above, the Government's promise to provide a simple export from
PRIFAS and a repeat search of centralized files is insufficient.  *See supra* Argument § I.B, II.  The
Government has provided Defendants little to no transparency regarding PRIFAS and its reporting
capabilities.  Nor has the Government indicated whether there are other systems that can and
should be searched.  At a minimum, applicable GASB standards already required the
Commonwealth to have aggregated data for Fund 278 into balance sheets, statements of revenues,
statements of expenditures, and statements of changes in fund balances.  (HTA AP, ECF No. 98-
116, GASB Statement No. 34 at 29, 31-32.)  Those statements and others exist and should be

produced.   And data related to Fund 278 must be controlled, requiring the Government to implement policies and procedures for its input, aggregation, regulation, and reporting.   These documents too should be available and produced.

> **3.**     **Judge Swain's Grant of Discovery Into "Policies and Procedures" Relating to the "Flow of Excise Taxes and HTA Pledged Revenues" Includes Policies and Procedures Applicable to Fund 278.**

57.     The Rule 56(d) Order expressly permits discovery of "[p]olicies and procedures related to the flow of Excise Taxes and HTA Pledged Revenues pursuant to the Bond Documents." (Rule 56(d) Order at 11.)  Defendants requested that the Government produce "[a]ll policies and procedures related to the Flow of Excise Taxes and HTA Pledged Revenues pursuant to the Bond Documents," and specified subcategories of the types of policies and procedures they seek.  (Ex. D, HTA Requests at 14-15.)  The Government objected to *every single* subcategory—asserting that some subcategories were "not authorized by the HTA 56(d) Order" and that others were "overbroad, unduly burdensome and beyond the scope of discovery allowed." (Ex. G, HTA R&Os at 27.)  The only "policies and procedures" that the Government agreed to produce are those relating to particular bank accounts, but not any relating to Fund 278 or its subaccounts. (*Id*. at 28-29.)

58.     As detailed above, nothing in the 56(d) Order allows the Government to limit discovery to bank accounts rather than accounting funds.  *See supra* Argument § III.B.1.  Indeed, Judge Swain's topics on their face recognize the importance of discovery relating to Fund 278, which by the prior briefing the Court understood was an accounting mechanism rather than a bank account.  The most critical policies and procedures for the flow of the HTA revenues pertain to the Commonwealth's accounting of the Excise Taxes in Fund 278—a special revenue fund that Defendants claim to own—and not the particular bank accounts through which moneys are transmitted.  The Parties dispute who owns Fund 278, and how and why moneys were segregated

and restricted within the funds and any of its subaccounts.  Thus, discovery into the Government's fund accounting, including policies and procedures relating to Fund 278 and its subaccounts (and communications reflecting or discussing such policies and procedures), stands to answer critical questions in the summary judgment proceedings.

59.     Judge Swain recognized as much the lift stay decision (*see* HTA Preliminary Lift Stay Order at 27), and the issue was front of mind when granting further discovery regarding documents governing, records reflecting the flow of funds into and out of, and policies and procedures related to, Fund 278 and its subaccounts.  (*See* Rule 56(d) Order at 11.)  Indeed, Judge Swain specifically listed as discoverable "[a]ll documents governing the flow of Excise Taxes and HTA Pledged Revenues following their collection by the Commonwealth, including all documents *governing Fund 278 and its sub-accounts*, and any other accounts into or through which such funds are or have been transferred . . ." and "[r]ecords reflecting the flow of funds *into and out of Fund 278 and its subaccounts*, and any other accounts into which Excise Taxes and HTA Pledged Revenues have been deposited . . . ."  (*Id.*)  Thus, the broad reference to policies and procedures "related to the flow of Excise Taxes and HTA Pledged Revenues" (*id.*), must be read to include policies and procedures related to Fund 278 and its sub-accounts.[14]

---

[14] Discovery into policies and procedures is also needed to establish the purported legal basis—if any—for the Commonwealth's ongoing failure to comply with the statutes requiring use of the Excise Taxes to pay HTA's bonds.  If, as Defendants contend, the Commonwealth lacks any legitimate basis for failing to comply with those statutes, then the Excise Taxes will sooner or later need to follow their statutorily-mandated path to the fiscal agent accounts in which all Parties agree Defendants have a perfected security interest, increasing the amount of Defendants' secured claims.  To target their challenge to the Commonwealth's non-compliance with the statutes, Defendants first need to know the purported basis for that non-compliance—a topic on which the Government has been evasive and inconsistent.  All policies and procedures, instructions, and any documents "governing" the flow of Excise Taxes or HTA Pledged Revenues, in whatever form (electronic or not) are clearly called for by Judge Swain's Order.  As with the Government's objections in PRIFA and CCDA, its obligation cannot be met with a but a repeat review of central files.  The Government must undertake a reasonable search for responsive documents, wherever or however they are stored.

60.     Importantly, evidence of the relevant policies and procedures likely includes instructions or explanations conveyed in emails or other informal communications.  For example, at the September 23, 2020 hearing on the summary judgment motions, the Board's counsel suggested that the reason the Commonwealth Treasury is not complying with the applicable statutes may be because "the Governor pick[ed] up the phone and t[old] the Secretary of Treasury not to make a payment."  (HTA AP, ECF No. 125, at 32:9-11.)  Given this suggestion that relevant "policies and procedures" may have been conveyed through informal communications, discovery into emails and other informal communications is essential.

**C.     Defendants Are Entitled to Communications Concerning Treasury's Role in Approval of Transfers to HTA.**

61.     The Rule 56(d) Order granted discovery of "[a]ll [d]ocuments concerning the Treasury's role in the approval of transfers to HTA and the extent to which excise tax revenues were or have been made available to HTA."  (Rule 56(d) Order at 11.)  HTA Request No. 4 requests this material verbatim, with four subparts elucidating the specific nature of relevant documents.  (Ex. D, HTA Requests at 14.)  The Government's scope objections are therefore without basis.

62.     The first two subparts of HTA Request No. 4 seek evidence of whether the Government entities exercised plenary control over the monies in Fund 278 through the transfer mechanisms governing the Excise Taxes.  Specifically, in connection with the lift stay motion, the Court concluded that Treasury's countersigning of each SC-735 transfer voucher submitted by HTA before transfers out of the TSA took place was inconsistent with Defendants' position that Treasury signatures were merely ministerial and Fund 278 monies were treated as HTA's assets and subject to HTA's control.  (HTA Preliminary Lift Stay Order at 28.)  Defendants have therefore requested instructions, approvals or denials regarding any transfers or requested transfers of Excise Taxes.  (Ex. D, HTA Requests at 14.)  In connection with lift stay discovery, the Government

produced a limited set of sample SC-735 vouchers. This is insufficient for Defendants to accurately assess the transfer mechanisms, and therefore Defendants requested a full paper trail for each transfer or requested transfer. If, for example, the Government's documents show that the Commonwealth never refused to implement an SC-735 transfer voucher approved by HTA, or implemented HTA-approved transfer vouchers as a matter of course, such documents would be highly relevant to support Defendants' assertion that Treasury's countersignature was merely ministerial rather than substantive, undermining an argument that the Commonwealth exercises plenary authority over the monies in Fund 278.

63.     In addition, the last two subparts of HTA Request 4 seek discovery relating to the process for Excise Tax transfers and identification of the entity with purported authority over transfer activity of Excise Taxes. (Ex. D, HTA Requests at 14.) These requests are directly relevant to the Flow of Funds between HTA and Treasury, including whether HTA or Treasury held transfer authority, and under what circumstances. Discovery that includes instructional manuals, training materials, policies and procedures will elucidate the protocol for transferring Excise Taxes, including who held that authority. In particular, e-mail discovery on this topic could reveal communications (either internal within Treasury or between representatives of HTA and Treasury) instructing funds to be transferred to a certain sub-account for HTA's benefit. In connection with the lift stay motion, the Government entities refused to produce any manuals, policies or other internal Treasury documents instructing employees on the treatment of Excise Taxes. Nor was the Government's Rule 30(b)(6) witness permitted to answer any questions on this topic. (*See* Testimony of Timothy H. Ahlberg, as the Rule 30(b)(6) corporate representative of the Commonwealth and the Highways and Transportation Authority, HTA AP, ECF No. 98-27,

at 110:11-112:25.)  Now, however, this material falls squarely within the Rule 56(d) Order and should be produced.[15]

## IV.   RESERVATION OF RIGHTS REGARDING ISSUES SUBJECT TO ONGOING MEET-AND-CONFER DISCUSSIONS.

64.     As the Parties agreed in the Joint Status Report, Defendants are raising in this Motion only those issues on which the Parties have reached an impasse.  The Parties are continuing to discuss other issues.  As indicated in the Joint Status Report, the Parties agreed to exchange written submissions regarding certain objections.  On February 28, 2021, Defendants sent the Government a written summary of various issues (generally speaking, specific issues on instructions, definitions, and general objections in the document requests and responses).  The Government has not yet responded.  Defendants will continue to discuss open issues with the Government and reserve the right to seek relief with regard to any of the issues that the Parties are continuing to discuss.

## CONCLUSION

65.     For these reasons, Defendants respectfully request that this Court (i) enter the Proposed Order attached as Exhibit A hereto granting relief the requested herein, and (ii) grant Defendants such other relief as the Court deems just and proper.

---

[15] Relatedly, the Government's objection to HTA Request No. 4(d), which seeks discovery on "the delegation of any purported authority over transfer activity relating to Excise Taxes" on the basis that it is "unintelligible" is particularly problematic. (Ex. G, HTA R&Os at 24.)  The Government's contention that "there is no basis to believe authority was delegated" is a legal conclusion and underscores Defendants' right to discovery.  (*Id.*)  The Government cannot assert a fact as categorically true without providing Defendants an opportunity to test it, especially where the existence of Treasury documents (such as Treasury Circular Letter 1300-01-99, App'x 3) already admit the delegation of authority away from the Commonwealth in favor of HTA.  (HTA AP, ECF No. 98-47.)

Dated:  March 3, 2021
San Juan, Puerto Rico

**FERRAIUOLI LLC**

By: /s/ *Roberto Cámara-Fuertes*
Roberto Cámara-Fuertes (USDC-PR No. 219002)
Sonia Colón (USDC-PR No. 213809)
221 Ponce de León Avenue, 5th Floor
San Juan, PR 00917
Telephone: (787) 766-7000
Facsimile:  (787) 766-7001
Email:  rcamara@ferraiuoli.com
        scolon@ferraiuoli.com

**MILBANK LLP**

By: /s/ *Atara Miller*
Dennis F. Dunne (admitted *pro hac vice*)
Atara Miller (admitted *pro hac vice*)
Grant R. Mainland (admitted *pro hac vice*)
John J. Hughes, III (admitted *pro hac vice*)
Jonathan Ohring (admitted *pro hac vice*)
55 Hudson Yards
New York, NY 10001
Telephone: (212) 530-5000
Facsimile:  (212) 530-5219
Email: ddunne@milbank.com
        amiller@milbank.com
        gmainland@milbank.com
        jhughes2@milbank.com
        johring@milbank.com

*Attorneys for Ambac Assurance Corporation*

**REXACH & PICÓ, CSP**

By: /s/ *María E. Picó*
María E. Picó
(USDC-PR No. 123214)
802 Ave. Fernández Juncos
San Juan, PR 00907-4315
Telephone: (787) 723-8520
Facsimile: (787) 724-7844
Email: mpico@rexachpico.com

**BUTLER SNOW LLP**

By: /s/ *Martin A. Sosland*
Martin A. Sosland (admitted *pro hac vice*)
2911 Turtle Creek Blvd., Suite 1400
Dallas, TX 75219
Telephone: (469) 680-5502
Facsimile: (469) 680-5501
Email: martin.sosland@butlersnow.com

James E. Bailey III (admitted *pro hac vice*)
Adam M. Langley (admitted *pro hac vice*)
6075 Poplar Ave., Suite 500
Memphis, TN 38119
Telephone: (901) 680-7200
Facsimile: (901) 680-7201
Email: jeb.bailey@butlersnow.com
        adam.langley@butlersnow.cow

*Attorneys for Financial Guaranty Insurance Company*

**ADSUAR MUNIZ GOYCO SEDA & PEREZ-OCHOA PSC**

By: /s/ *Eric Pérez-Ochoa*
    Eric Pérez-Ochoa
    (USDC-PR No. 206314)
    Email: epo@amgprlaw.com

By: /s/ *Luis A. Oliver-Fraticelli*
    Luis A. Oliver-Fraticelli
    (USDC-PR No. 209204)
    Email: loliver@amgprlaw.com

    208 Ponce de Leon Ave., Suite 1600
    San Juan, PR 00936
    Telephone: (787) 756-9000
    Facsimile: (787) 756-9010

**WEIL, GOTSHAL & MANGES LLP**

By: /s/ *Robert S. Berezin*
    Jonathan D. Polkes (admitted *pro hac vice*)
    Gregory Silbert (admitted *pro hac vice*)
    Robert S. Berezin (admitted *pro hac vice*)
    Kelly DiBlasi (admitted *pro hac vice*)
    Gabriel A. Morgan (admitted *pro hac vice*)
    767 Fifth Avenue
    New York, NY 10153
    Telephone: (212) 310-8000
    Facsimile: (212) 310-8007
    Email: jonathan.polkes@weil.com
        gregory.silbert@weil.com
        robert.berezin@weil.com
        kelly.diblasi@weil.com
        gabriel.morgan@weil.com

***Attorneys for National Public Finance Guarantee Corp.***

**CASELLAS ALCOVER & BURGOS P.S.C.**

By: /s/ *Heriberto Burgos Pérez*
    Heriberto Burgos Pérez
    (USDC-PR No. 204809)
    Ricardo F. Casellas-Sánchez
    (USDC-PR No. 203114)
    Diana Pérez-Seda
    (USDC-PR No. 232014)
    P.O. Box 364924
    San Juan, PR 00936-4924
    Telephone: (787) 756-1400
    Facsimile: (787) 756-1401
    Email: hburgos@cabprlaw.com
        rcasellas@cabprlaw.com
        dperez@cabprlaw.com

**CADWALADER, WICKERSHAM & TAFT LLP**

By: /s/ *Howard R. Hawkins, Jr.*
    Howard R. Hawkins, Jr. (admitted *pro hac vice*)
    Mark C. Ellenberg (admitted *pro hac vice*)
    William J. Natbony (admitted *pro hac vice*)
    Thomas J. Curtin (admitted *pro hac vice*)
    Casey J. Servais (admitted *pro hac vice*)
    200 Liberty Street
    New York, NY 10281
    Telephone: (212) 504-6000
    Facsimile: (212) 504-6666
    Email: howard.hawkins@cwt.com
        mark.ellenberg@cwt.com
        bill.natbony@cwt.com
        thomas.curtin@cwt.com
        casey.servais@cwt.com

***Attorneys for Assured Guaranty Corp. and Assured Guaranty Municipal Corp.***

**RIVERA, TULLA AND FERRER, LLC**

By:  /s/ *Eric A. Tulla*
    Eric A. Tulla
    (USDC-DPR No. 118313)
    Email: etulla@ riveratulla.com
    Iris J. Cabrera-Gómez
    (USDC-DPR No. 221101)
    Email: icabrera@ riveratulla.com
    Rivera Tulla & Ferrer Building
    50 Quisqueya Street
    San Juan, PR 00917-1212
    Telephone: (787) 753-0438
    Facsimile: (787) 767-5784

**SEPULVADO, MALDONADO & COURET**

By: /s/ *Albéniz Couret Fuentes*
    Albéniz Couret Fuentes
    (USDC-PR No. 222207)
    304 Ponce de León Ave. Suite 990
    San Juan, PR 00918
    Telephone: (787) 765-5656
    Facsimile: (787) 294-0073
    Email: acouret@smclawpr.com

**HOGAN LOVELLS US LLP**

By:  /s/ *Ronald J. Silverman*
    Ronald J. Silverman, Esq.
    Michael C. Hefter, Esq.
    390 Madison Avenue
    New York, NY 10017
    Telephone: (212) 918-3000
    Facsimile: (212) 918-3100
    ronald.silverman@hoganlovells.com
    michael.hefter@hoganlovells.com

**REED SMITH LLP**

By: /s/ *Jared S. Roach*
    Luke A. Sizemore (admitted *pro hac vice*)
    Jared S. Roach (admitted *pro hac vice*)
    225 Fifth Avenue, Suite 1200
    Pittsburgh, PA 15222
    Telephone: (412) 288-3131
    Facsimile: (412) 288-3063
    Email: lsizemore@reedsmith.com
        jroach@reedsmith.com

***Attorneys for U.S. Bank Trust National
Association, in its Capacity as Trustee
to PRIFA Bondholders***

***Attorneys for The Bank of New York Mellon, in
its Capacity as Trustee to CCDA Bondholders***

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this same date a true and exact copy of this notice was filed with

the Clerk of Court using the CM/ECF system, which will notify a copy to counsel of record.

/s/ *Roberto Cámara-Fuertes*
Roberto Cámara-Fuertes (USDC-PR No. 219002)
221 Ponce de León Avenue, 5th Floor
San Juan, PR 00917
Telephone: (787) 766-7000
Facsimile:  (787) 766-7001
Email: rcamara@ferraiuoli.com
