# Ultra Vires Summary Judgment Motions

March 11, 2021 – 9:30 am AST

**Bondholders' UV Demonstrative Slides**

# Enabling Act Authorization of Debt

- With undisputed errors corrected, the Official Translation reads:

"The Board of Trustees may authorize the Administrator **to seek a loan from any financial institution**[, from] the Government of the Commonwealth of Puerto Rico or the Federal Government of the United States of America[,] **or through the direct placement of debts**, securing said debt with the assets of the System."

3 L.P.R.A. § 779(d).

2

# Enabling Act Authorization of Debt

- Dictionaries and the translation of other statutes show there is one further error in the Official Translation:  "seek a loan" should instead be "borrow":

"The Board of Trustees may authorize the Administrator **to [borrow] from any financial institution**[, from] the Government of the Commonwealth of Puerto Rico or the Federal Government of the United States of America[,] **or through the direct placement of debts**, securing said debt with the assets of the System."

3 L.P.R.A. § 779(d).

3

# Enabling Act Authorization of Debt

- "Tomar Prestado," *Cambridge Spanish-English Dictionary*:
  - "**borrow** [verb] to take (something, often money) temporarily with the intention of returning it."

- "Tomar Prestado," *WordReference.com*:
  - "**borrow**.  Juan tomó prestado del auto de sus padres sin su permiso.  Juan borrowed his parents' car without permission."

- The Committees do not cite any contrary dictionary definitions.

# ERS Borrowed and Obtained a Loan When It Accepted Money from the Underwriters and Promised to Repay the Principal Amount with Interest

- It is, therefore unsurprising and undisputed that an issuer of bonds "borrows."

  - The Committees' own brief:  A bond "issuer in a public offering **borrows** . . . ." ECF No. 978 in Case No. 17-bk-3566, at 1920.

  - The Committees' expert:  "Municipal securities issuers . . . **borrow** money in the municipal securities market." Bondholders' UV Ex. 1 (ECF No. 973-1 in Case No. 17-bk-3566, at ECF page 24).

- And it is also unsurprising  and undisputed that an issuer of bonds obtains a "loan."

  - The Committees' expert:  Municipal securities are "**loans** from the investing public," "[t]he borrower is the governmental issuer," and "the evidence of the **loan**" is "the paper bond itself." Bondholders' UV Ex. 3 (ECF No. 973-1 in Case No. 17-bk-3566, at ECF page 30).

5

# ERS Borrowed and Obtained a Loan When It Accepted Money from the Underwriters and Promised to Repay the Principal Amount with Interest

- Purchase and Sale Agreement for each series of ERS Bonds:

  "[T]he Underwriters, jointly and severally, hereby agree to purchase from the System, and the System hereby agrees to sell and deliver to the Underwriters, all (but not less than all) of" the series of ERS Bonds.

  Bondholders' UV Ex. 3 (ECF No. 973-7 in Case No. 17-bk-3566, at ECF Page 3).

- The Bonds themselves for each series of ERS Bonds:

  ERS "acknowledges itself indebted, and for value received, hereby promises to pay . . . the PRINCIPAL AMOUNT specified above, and to pay interest thereon . . ."

  Bondholders' UV Ex. 4 (ECF No. 973-5 in Case No. 17-bk-3566, at ECF Page 72).

# From Whom Did ERS Borrow and Obtain a Loan?



**100% of Bonds**

**ERS**

**Underwriters**

**100% of Borrowed Funds**

- UBS of Puerto Rico
- Popular Securities
- Santander Securities
- BBVA
- Citigroup
- Lehman
- Other banks and broker-dealers

**Sole Exchange at Time of Issuance of Bonds**

Source:  Bondholders' UV Ex. 3 (ECF No. 973-7 in Case No. 17-bk-3566, at ECF Pages 2-16)

# What Happened After ERS Borrowed Money and Obtained a Loan from the Underwriters?



**Exchanges After Issuance of Bonds**

Source:  Bondholders' Rule 56(b) Statement ¶¶ 81-93, ECF No. 972 in Case No. 17-bk-3566.

# ERS Borrowed and Obtained a Loan From the Underwriters

- ERS transacted only with the underwriters, who were all financial institutions.
  - ERS sold 100% of the Bonds to the underwriters, and received 100% of the borrowed funds from the underwriters.
  - The underwriters subsequently resold the bonds, but those resales had no effect on ERS, which had already received the borrowed funds, and incurred the obligation to repay.
- The current Bondholders who are active litigants are also all financial institutions.
- The Committees have no justification for why ERS should be treated as borrowing and obtaining a loan specifically from the *second* holder of the bonds—not the underwriters, not the current holders or any intermediate holder.

9

# ERS Issued the Bonds in a Direct Debt Placement



**100% of Bonds**

**ERS**

**Underwriters**

**100% of Borrowed Funds**

- UBS of Puerto Rico
- Popular Securities
- Santander Securities
- BBVA
- Citigroup
- Lehman
- Other banks and broker-dealers

**Direct Debt Placement**

Source:  Bondholders' UV Ex. 3 (ECF No. 973-7 in Case No. 17-bk-3566, at ECF Pages 2-16.)

# ERS Did Not Participate In a Conduit Debt Issuance



## Conduit Borrowing
Source:  Bondholders' UV Ex. 5 (Hildreth Rebuttal Report at 4-5, ECF No.  974 in Case No. 17-bk-3566, ECF Pages 122-23.)

# Confirmations of Validity by ERS and Other Parts of the Puerto Rico Government

- Legal opinions from the Secretary of Justice and ERS's General Counsel, and multiple legal opinions from ERS's Bond Counsel, all confirmed validity.  Bondholders' UV Exs. 6-10.

- Judge Gelpi in 2007:  An identical statute authorized TRS to "enter into contracts, make loans, **issue bonds**, and invest funds."  *Rivera Torres v. Junta de Retiro Para Maestros*, 502 F. Supp. 2d 242, 254 (D.P.R. 2007).

- Legislative Assembly in 2007:  The funds needed to cover a pension increase would come from "the resources obtained through **the issue of bonds** of the Employees of the Government and Judicature Retirement Systems Administration."  Act 35-2007, § 5.

- Legislative Assembly in 2011:  The ERS Bonds "bear[] between 6.25% to 6.35% interest to bondholders, thus encumbering employer contributions of the System for up to fifty years."  Act 116-2011, § 7(d).

- Legislative Assembly in 2013:  ERS "is under the obligation to repay" the ERS Bonds.  Act 3-2013, Statement of Motives.

12

# Precedent Confirms the Bonds' Validity

- It was "well known that as early as 1855, **when money was to be raised on loan**, in considerable amounts, either by the commonwealth itself or by cities and towns or by railroad corporations, **a common method of doing it was by means of bonds**." *Commonwealth v. Town of Williamstown*, 30 N.E. 472, 482 (Mass. 1892).

- When bonds are issued, "[i]n substance, **the money is borrowed from the purchasers of the bonds**; it is advanced on the faith of the [issuer's] obligations, for the very purpose for which the [issuer] was authorized to raise it." *Commonwealth ex rel. Hamilton v. Select & Common Councils of City of Pittsburgh*, 34 Pa. 496, 511 (1859).  A court "**cannot be expected to decide that the bonds are illegal**, because the [authorizing legislation] did not specify what securities might be given for the money borrowed." *Id.*

# Precedent Confirms the Bonds' Validity (cont.)

- "Having power to borrow money, the power to issue bonds therefor results as a necessary incident." *Dutton v. City of Aurora*, 28 N.E. 461, 462 (Ill. 1885).

- "[**P]ower to borrow money carries with it the power to issue** the ordinary evidences and security of a **loan**, and among them are county **bonds**." *Doty v. Ellsbree*, 11 Kan. 209, 212 (1873).

- "We can have no doubt . . . that in this commonwealth **the power** given to these towns **to raise these large or unusual sums of money by loan**, no conditions or restrictions being imposed, **carried with it the power to issue bonds**,—a method which certainly enabled the towns to seek the best markets." *Town of Williamstown*, 30 N.E. at 482.

# *Merrill* and *City of Brenham* Are Not to the Contrary

- They were decided in the 19th century under Indiana and Texas law.

- Before they were decided, "the courts, federal and state, almost **uniformly held that the power to borrow money carried with it the power to issue negotiable bonds**." *Russell v. Middletown City Sch. Dist.*, 125 A. 641, 642 (Conn. 1924).

- After they were decided, many states did not and do not follow them. *See, e.g.*, *Town of Williamstown*, 30 N.E. at 473; *Russell*, 125 A. at 643.

- *Merrill* and *City of Brenham* were a reaction to fraudulent bond issuances in which officials absconded with funds, which is not a problem in the modern economy.

15

# *Merrill* and *City of Brenham* Are Not to the Contrary (cont.)

- *Merrill* and *City of Brenham* adopt a bond-specific rule of statutory construction. There is no basis for such a rule in Puerto Rico's controlling Civil Code.

- "It is a basic rule of statutory construction [in Puerto Rico] that **when the law grants power to do something, any lesser action included therein** is also authorized implicitly."  31 L.P.R.A. § 16 ann. 1.

- There is no "such thing as a 'canon of donut holes,' in which [a legislature's] failure to speak directly to a specific case that falls within a more general statutory rule creates a tacit exception. Instead, **when [a legislature] chooses not to include any exceptions to a broad rule, courts apply the broad rule**." *Bostock v. Clayton Cnty*., 140 S. Ct. 1731, 1747 (2020).

16

# UCC 8-202(b)

- "A security . . . is valid in the hands of a purchaser for value and without notice of the particular defect . . . ."  UCC § 8-202(b)(1).

- Where securities are held by DTC, as the ERS Bonds are, the "holder of a security entitlement" is protected by 8-202 as if they held the security directly.  UCC § 8-202(f).

- It is undisputed that the Bondholders are purchasers for value.

- The Committees deny that § 8-202 applies, and deny that the Bondholders were "without notice of the particular defect."

17

# UCC 8-202(b) Applies

- It is undisputed that ERS received substantial consideration for the ERS Bonds, and had power to borrow money for the ERS Bonds' stated purpose.  UCC 8-202(b)(2).

- The Committees cannot skirt 8-202(b)'s protections by challenging ERS's debts on ERS's behalf, rather than ERS doing so itself directly. Such a ruling would eviscerate 8-202(b).

  - Section 502 allows the Court to disallow a claim only if unenforceable "against *the debtor*"; whether the Committees are issuers is therefore irrelevant.

- The Committees' argument that the bonds have a defect because they were sold by underwriters to public investors is precisely the scenario that 8-202(b) was intended to cover; there is no exception for *void ab initio* bonds.

18

# The Bondholders Had No Notice of Invalidity

- ERS's Board approved the Bonds when they were issued and stated that the Bonds were valid.  ERS's Board has never rescinded those approvals and statements.  *See* Bondholders' UV Ex. 11.

- ERS's general counsel, the Secretary of Justice, and bond counsel all issued opinion letters confirming validity.  Their opinion letters have never been rescinded.  *See* Bondholders' UV Exs. 6-10.

- There is no official record from ERS of any kind finding that the Bonds are invalid, or that the approval of the Bonds was defective.

- Nor is there any official finding from the Oversight Board that the Bonds are invalid.

# The Bondholders Had No Notice of Invalidity (cont.)

- Outside counsel for AAFAF—not counsel for ERS—discovered the supposed defect sometime in mid-2017.

- Even after that, ERS's Board did not amend or rescind its prior authorization of the Bonds or its statement that the Bonds were authorized, and it has not to this day done so.

- ERS's financial statements issued last year still recognize the Bonds as a liability.  Bondholders' UV Ex. 12.

- Even today, the records of ERS and of the Oversight Board do not find the existence of any specific defect. The only documents asserting that the ERS Bonds are invalid are briefs from the Committees in this litigation.

20

# The Bondholders Had No Notice of Invalidity (cont.)

- The Committees' argument tries to muddle the distinction between investigating whether the bonds were valid and having notice of a particular defect.

- Various people, including ERS and certain Bondholders, have investigated over the years whether the Bonds were validly issued.

- There is no evidence that anyone who looked into the matter, other than AAFAF's and the Committees' counsel, has ever concluded that the Bonds were invalid because they were underwritten.

- To the contrary, everyone else who ever looked into it concluded that the Bonds were valid, including: ERS, GDB, the Secretary of Justice, ERS's outside Bond Counsel, and ERS's outside counsel in 2012.

21