# Bondholders' UV
# EXHIBIT 1



These securities are designed primarily for money market funds, corporate money management, and other institutional purchasers. Except when investing exceptionally large amounts for short-term purposes, you are not likely to see these securities.

A somewhat similar form of security, known as auction-rate securities, was issued in the past, but has fallen into disfavor due to remarketing difficulties after bond insurers enhancing the credits were downgraded. Dealers then stopped supporting the auctions. That froze the market for those securities and caused illiquidity and losses to many investors. Those securities are no longer issued, and you should not see them. If you do, you may wish to exercise considerable investigative care before buying them.

## Who Are the Principal Parties in Municipal Securities Offerings?

The principal parties in municipal securities offerings vary from transaction to transaction. The following are the most common parties, and their roles.

### Issuers

Municipal securities issuers are state and local governments and their agencies and instrumentalities that borrow money in the municipal securities market in order to obtain funding for their projects and programs.

In securities issues for governmental purposes, the issuers are considered by the Securities and Exchange Commission (SEC) to have primary disclosure responsibilities regarding important information they control.

### Private Borrowers

Private borrowers are profit-making and nonprofit entities that obtain tax-exempt funding through the issuance of municipal securities. These borrowers effectively borrow monies from municipal issuers in what are known as *conduit* transactions. In those transactions, the governmental issuers serve as conduits through which funds pass between investors and private borrowers. See the section entitled "What Are Conduit Financings?"

Essentially, however, the private borrowers are the substantive parties who make payments for application to the securities. The governmental issuers pay or assign those payments for the benefit of investors.

In conduit securities offerings, the private borrowers are considered by the SEC to be primarily responsible for disclosure of material information they control.

### Underwriters

Underwriters are securities dealers who purchase municipal securities from municipal issuers and resell the securities to investors.

In the municipal market, underwriters are expected to conduct sufficient investigations in order to form a reasonable basis for belief in key representations in official statements. They are also expected to disclose important information they know or should know.

**KEY POINT:**

Principal parties in municipal offerings include the following:

- Issuers/borrowers
- Underwriters
- Financial advisors to issuers/borrowers
- Bond counsel
- Issuer disclosure counsel
- Issuer local counsel
- Underwriter counsel
- Trustees and paying agents
- Auditors and sometimes other experts
- Sometimes developers/other private parties

**KEY POINT:**

In securities issues for governmental purposes, the issuers are considered by the Securities and Exchange Commission (SEC) to have primary disclosure responsibilities regarding important information they control.

**SMART INVESTOR TIP**

In some municipal securities, the prospective obligors will provide ongoing disclosure.

# Bondholders' UV
# EXHIBIT 2

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO
PROMESA TITLE III
CASE NO: 17-BK-03283 (LTS)

IN RE: THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO
        as representative of

THE COMMONWEALTH OF PUERTO RICO, et al.,
        Debtor(s).
------------------------------------------------

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO
PROMESA TITLE III
CASE NO: 17-BK-03566 (LTS)
IN RE: THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO
        as representative of
THE EMPLOYEES RETIREMENT SYSTEM OF THE
GOVERNMENT OF THE COMMONWEALTH OF PUERTO
RICO,
        Debtor(s).
------------------------------------------------


CONFIDENTIAL

REMOTE VIDEOTAPED EXPERT DEPOSITION UNDER
ORAL EXAMINATION OF
ROBERT DOTY
DATE: August 11, 2020


REPORTED BY: MICHAEL FRIEDMAN, CCR

CONFIDENTIAL
Robert Doty - August 11, 2020

|  | Page 10 |
|---|---|

1                    I N D E X
2  WITNESS NAME                                PAGE
3  ROBERT DOTY
4          By Mr. Stewart                        14
5          By Mr. Bassett                       178
6
7                 * * * * * *
8
9                  E X H I B I T S
10
11 EXHIBIT NO.      DESCRIPTION               PAGE
12 1-2            Tab 13, Tab 14              16
13 3              Tab 1                       26
14 4              Tab 2                       45
15 5              Tab 3                       45
16 6              Tab 6                       49
17 7              Tab 5                       58
18 8              Tab 7                       84
19 9              Tab 9                       97
20 10 - 11        Tab 23, Tab 24             103
21 12             Tab 15                     108
22 13             Tab 16                     166
23
24                 * * * * * *
25

|  | Page 11 |
|---|---|

```
1                    - - -
2            Deposition Support Index
3                    - - -
4
5  Direction to Witness Not to Answer
6  Page  Line      Page  Line      Page  Line
7  None
8
9  Request for Production of Documents
10 Page  Line      Page  Line      Page  Line
11 None
12
13 Stipulations
14 Page  Line      Page  Line      Page  Line
15 None
16
17 Questions Marked
18 Page  Line      Page  Line      Page  Line
19 None
20
21
22
23
24
25
```

|  | Page 12 |
|---|---|

```
1          THE COURT REPORTER:  My name is
2  Michael Friedman, a Certified Shorthand
3  Reporter.  This deposition is being held
4  via videoconferencing equipment.
5          The witness and reporter are not in
6  the same room.  The witness will be
7  sworn in remotely, pursuant to agreement
8  of all parties.  The parties stipulate
9  that the testimony is being given as if
10 the witness was sworn in person.
11 ///
12 ///
13 ///
14 ///
15 ///
16 ///
17 ///
18 ///
19 ///
20 ///
21 ///
22 ///
23 ///
24 ///
25 ///
```

|  | Page 13 |
|---|---|

```
1          THE VIDEOGRAPHER:  This is the
2  remote video recorded deposition of
3  Robert Doty.
4          Today is Tuesday, August 11, 2020.
5  The time is now 9:35 a.m. in the Eastern
6  time zone.
7          We are here in the matter of In Re,
8  The Financial Oversight and Management
9  Board for Puerto Rico as Representative
10 of the Commonwealth of Puerto Rico
11 et al., Debtor.
12         All counsel have been noted on
13 record.  My name is Jose Rivera, remote
14 video technician on behalf of Gregory
15 Edwards, LLC.
16         At this time, will the reporter,
17 Michael Friedman, of Gregory Edwards,
18 LLC please swear in the witness.
19 ///
20 ///
21 ///
22 ///
23 ///
24 ///
25 ///
```

Case 1:17-03283-LTS Doc #19431-3 Filed 09/05/21 Entered 09/05/21 18:27:56 Desc:
Exhibit Exhibit 7 Page 2 of 14
CONFIDENTIAL
Robert Doty - August 11, 2020

5 (Pages 14 to 17)

## Page 14

```
1  R O B E R T   D O T Y,
2           called as an expert witness, having been
3  first duly sworn according to law, testifies as
4  follows:
5
6  EXAMINATION BY MR. STEWART:
7       Q    Good morning, Mr. Doty.  I'm Geoff
8  Stewart of the firm of Jones Day.  We
9  represent the bondholders of certain bonds
10 issued by the Employees Retirement System of
11 Puerto Rico.
12           (Whereupon a discussion was held
13 off the record.)
14      Q    Mr. Doty, I will refer to the
15 retirement system as "ERS," if that's okay
16 with you?
17      A    Understood.
18      Q    And I'm going to keep my voice up,
19 so I apologize if it sounds like I'm shouting
20 at you.  I apologize in advance for that.
21           Could you share your full name and
22 your residential address?
23      A    Robert Walter Doty, 988 Placid
24 Court, Arnold, Maryland, 21012.
25      Q    And how long have you lived in
```

## Page 15

```
1  Maryland?
2       A    I've lived in Maryland since 2013.
3       Q    And before that, where did you
4  live?
5       A    California.
6       Q    How long were you in California?
7       A    Twenty-three years.
8       Q    Do you have an office address
9  different from your residential address?
10      A    Would you ask that question again,
11 please?
12      Q    Sure.  Do you have an office
13 address different than your residential
14 address?
15      A    Not since last October.
16      Q    Okay.  You've been deposed any
17 number of times before?
18      A    I've been deposed before, yes.
19      Q    So this will be like those
20 depositions.  I usually take a break on the
21 hour.
22           If you want to take a break earlier
23 than that, just tell me.  We have all day.  I
24 break for five, ten minutes.
25           If you need a break longer than
```

## Page 16

```
1  that, tell me that.  That will be fine, too.
2  If you don't, I will just break on the hour
3  anyway.
4           As with other depositions,
5  Mr. Doty, if you ask for a break, that's
6  fine.  I'd ask that you answer any pending
7  question before we break for obvious reasons.
8       A    Okay.
9       Q    I would like to mark as the first
10 two exhibits, the first report and rebuttal
11 report of Mr. Doty.  Those are respectively
12 Tabs 13 and 14.  I'm not going to use them
13 right away.  I shouldn't say that.
14           Tab 13 is the original report, the
15 first report.  And Tab 14 is the rebuttal
16 report.
17           We'll make that Exhibit 2.
18           (Whereupon the above mentioned was
19 marked for Identification.)
20      Q    Mr. Doty, let's turn, if we could,
21 to your curriculum vitae, which is about
22 halfway through Exhibit 1.
23           Can you turn to that, please?
24      A    That's Tab 13.
25      Q    It is Tab 13, yes.
```

## Page 17

```
1       A    All right.  I'm doing it by these
2  tabs, of course.  What page -- about what
3  page number in there would it be?
4       Q    That's a good question.
5           MR. BASSETT:  Robert, it's page 36
6  of the PDF.
7           THE WITNESS:  Yes, I've got to
8  here.  Yes.
9       Q    Great.  And is that a current
10 summary of your background and credentials,
11 Mr. Doty?
12      A    Yes.
13      Q    And it points out here that you're
14 a lawyer.
15           Correct?
16      A    I am.
17      Q    Do you still practice law?
18      A    I haven't practiced law in a while.
19 So no, I don't practice law.
20      Q    When you say "a while," do you mean
21 a matter of under two years or a longer
22 period?
23      A    Not since 2013.  I was general
24 counsel for a while in the office of a
25 municipal advisor in California.
```

Case 1:17-cv-02896-LTS Doc #1994-13 Filed 08/05/21 Entered 08/05/21 18:32:56 Desc: Exhibit 7 Page 8 of 114
CONFIDENTIAL
Robert Doty – August 11, 2020

28 (Pages 106 to 109)

Page 106

1      MR. BASSETT: Objection. Calls for
2  a legal conclusion.
3      A    It says the underwriters may
4  terminate this purchase contract. It sets
5  forth at great length circumstances where
6  that could occur.
7      Q    Now, is it the case in
8  underwritings -- that underwriters are not
9  necessarily able to sell all the bonds to the
10  investing public?
11      A    No.
12      Q    It's never happened, that they
13  can't sell all the bonds?
14      A    You know, I've been working in the
15  financial markets since the 1960s. I've
16  never seen a situation where underwriters
17  could not sell the bonds to the investing
18  public.
19          I won't exclude the possibility
20  that, theoretically, it might occur in some
21  rare circumstance. But it would -- it's not
22  occurred in my experience.
23      Q    Has it always been the case the
24  underwriters were able to sell all the bonds
25  at the stated IPO price or have they had to

Page 107

1  sell them at a discount?
2      MR. BASSETT: Objection.
3      A    Oh, sometimes they have to sell
4  them at a discount.
5      Q    Why would they have to sell them at
6  a discount?
7      A    Because market conditions have
8  changed.
9      Q    Now, when they sell them at a
10  discount to investors, does the issuer have
11  to pay a different rate of interest than that
12  stated in the official statement?
13      MR. BASSETT: Objection, form.
14      A    No.
15      Q    Does the maturity of the bond
16  change?
17      A    No.
18      MR. BASSETT: Objection.
19      Q    Does the face amount of the bond
20  change?
21      MR. BASSETT: Objection.
22      A    No.
23      Q    If the underwriters have to sell
24  the bonds at a discount to the investors, how
25  much additional money does the issuer owe the

Page 108

1  underwriters?
2      MR. BASSETT: Objection. Lack of
3  foundation, incomplete hypothetical.
4      A    I did not catch all your words at
5  the end.
6      Q    If the underwriters have to sell
7  the bonds at discount to investors, how much
8  additional money does the issuer owe the
9  underwriters?
10      MR. BASSETT: Same objection.
11      A    None.
12      Q    How does the underwriter's discount
13  change?
14      MR. BASSETT: Same objection.
15      A    The underwriter discount is the
16  price data based on the public offering
17  price, the initial public offering price.
18  The underwriter discount doesn't change, but
19  the underwriter's profit changes.
20      Q    Okay. So let me -- let's open
21  another tab. Tab 15 will be the next
22  exhibit.
23      MR. STEWART: Mark this as
24  Exhibit 12.
25          (Whereupon the above mentioned was

Page 109

1  marked for Identification.)
2      A    Tab 15?
3      Q    Yes.
4      A    All right. Oh, good.
5  You have good taste in books.
6      Q    Have you seen this before?
7      A    I have.
8      Q    You wrote this, did you not?
9      A    I did.
10      Q    And for the record, it's Robert
11  Doty's "Visual Guide to Municipal Bonds."
12      A    It's the Bloomberg Visual Guide.
13      Q    Well, I think it's your visual
14  guide. But you're right, it's the Bloomberg
15  Visual Guide.
16          You wrote it, correct?
17      A    Yes. But Bloomberg worked very
18  closely with me on this, and put the visuals
19  in.
20      Q    Okay. And you wrote it around
21  2012?
22      A    I'd have to look, but I think
23  that's about right.
24      Q    Yeah, I'd represent to you that's
25  the copyright date, which may be of some

Case 1:17-cv-02666-LTS Doc #1994-13 Filed 09/05/01 Entered 09/05/01 18:37:56 Desc:
Exhibit Page 9 of 214
CONFIDENTIAL
Robert Doty - August 11, 2020

Page 110

1  help.
2          Was this accurate as of the date it
3  was written?
4      A    Yes.
5      Q    Is it still accurate today, to the
6  best of your knowledge?
7      A    Well, there have been a lot of
8  changes since then.  I would have to go back
9  through.
10         I'm sure I would rewrite portions
11 of it.
12     Q    Okay.  Well, let's start with the
13 "Introduction," which is page 1.
14         Are you open to page 1?
15     A    I'm trying to get there.  Okay.
16     Q    Okay.  Do you see there is a
17 heading, "What Are Municipal Securities?"
18     A    Yes.
19     Q    And --
20         MR. BASSETT:  Geoff, would you mind
21 pausing for one second?  I want to be
22 sure I'm on the right page.  Does
23 somebody have a page of the PDF?
24         MR. FOX:  It's page 13 of the PDF.
25         MR. BASSETT:  Thank you, David.

Page 111

1          Got it.
2      Q    Is everybody there?
3          MR. BASSETT:  Yes, thank you.
4      Q    Okay.  Do you see the heading,
5  "What are Municipal Securities?"
6      A    Yes.
7      Q    Okay.  And there, you write
8  "Municipal" -- and I'm going to just direct
9  your attention to the second sentence where
10 you say, "Municipal securities are debt
11 securities, effectively loans, payable from
12 taxes of governmental or other project
13 revenues."
14         Why do you call them "municipal
15 securities loans"?
16     A    Well, they are loans from the
17 investing public.
18     Q    Who is the borrower?
19     A    The borrower is the governmental
20 issuer.
21     Q    Okay.  Now, what's the evidence of
22 the loan?
23         MR. BASSETT:  Objection.
24     A    There is no paper evidence of it,
25 except in the DTC, the paper bonds.  There's

Page 112

1  a -- I guess there's a paper bond at DTC.
2          Maybe that's what you're referring
3  to as the "jumbo bond," but that would be it.
4      Q    Okay.  But there's a means of
5  determining who's the owner beneficially of
6  the bond?
7      A    On DTC's books, yes.
8      Q    And every bond has a beneficial
9  owner.
10         Correct?
11     A    I suppose so.
12     Q    So -- and the evidence of the
13 beneficial ownership is the chain of book
14 entries running through DTC down to the
15 retail account of the individual investor.
16         Correct?
17     A    Correct.
18     Q    Do you know how an issuer knows who
19 to send payments of interest to?
20     A    It's specified in the bond
21 resolution in this case.
22     Q    Okay.  And do you know how they --
23 how they -- the identity of the individual
24 investor is determined?
25     A    That flows through the DTC, from

Page 113

1  the trustee to DTC, to the individual
2  investors.
3      Q    Okay.  And so --
4      A    To the direct and indirect
5  participants, and from there, down to the
6  individual investors.
7      Q    So going back to this, is it fair
8  to say that the lender is the person who has
9  the beneficial rights to the bond?
10         MR. BASSETT:  Objection.
11     A    Yes.  Once you get to the investor
12 level, yes.
13     Q    Okay.  And that would be whoever it
14 is who happens to own those beneficial
15 rights.
16         Correct?
17         MR. BASSETT:  Objection, misstates
18 testimony.
19     A    Right.  But once the bonds are
20 placed through DTC and the bond issue is
21 completed, it's the individual investor.
22     Q    Okay.
23     A    By "individual," I don't mean
24 people.  I mean specific -- the specific
25 parties.

Robert Doty - August 11, 2020

Page 114

1    **Q**    Fair to say it's the ultimate owner
2 of the beneficial interest?
3    **A**    Correct.
4    **Q**    Would it -- it would make the
5 examination easier if I simply called that
6 person a "bondholder."
7       Would that be acceptable to you or
8 do you think that would be inaccurate or
9 burdensome to you?
10    **A**    I don't object.
11    **Q**    Okay.  So I think you testified
12 that the borrower is the government entity
13 that issued the bonds.
14       And is the lender the bondholder?
15    **A**    Yes.
16    **Q**    And if the bond is sold, the lender
17 changes?
18    **A**    If the -- if the investors trade
19 the bonds, then new -- then, in effect, new
20 investors take their place.
21    **Q**    So if Alice owns the bond, Alice is
22 the lender?
23    **A**    If Alice owns the bond and Alice is
24 a public investor, the answer is yes.
25    **Q**    And if Alice sells the bond to Bob,

Page 115

1 then Bob becomes the lender?
2    **A**    At that point, yes.
3    **Q**    And if Bob sells to Carol, then
4 Carol becomes the lender?
5    **A**    Correct.
6    **Q**    And so on and so forth?
7    **A**    Correct.
8    **Q**    So the identity of the borrower
9 remains the same throughout the life of the
10 bond issue?
11    **A**    As a general rule.
12    **Q**    And the identity of the lender can
13 change over the life of the bond issue?
14    **A**    Correct.
15    **Q**    Also, in your book, you refer to
16 issuers of municipal securities as
17 "borrowers."  I can direct you to those
18 pages, but I was simply going to ask you why
19 you use that term.
20    **A**    I did not catch all your words.
21 I'm sorry.
22    **Q**    Let me start over again.
23       Elsewhere in your book, you refer
24 to municipal issuers as "borrowers."
25       Would you like me to direct you to

Page 116

1 those pages, or is it a usage that you're
2 comfortable talking about without looking at
3 particular parts of your book?
4       MR. BASSETT:  Geoff, if you're
5       going to ask him about particular
6       statements he's made in this book, I
7       think we should look at those
8       statements.  If you want to ask him
9       separate from that, questions about who
10       may or may not be a borrower or whatever
11       you're going to ask, that's fine.
12       But to the extent you're talking
13       about this book, I think he should look
14       at the language.
15       MR. STEWART:  Fine.
16    **Q**    Do you generally refer, Mr. Doty,
17 to issuers of municipal bonds as "borrowers?"
18    **A**    I don't know if I generally do it,
19 but I do do it.
20    **Q**    And is it an accurate description?
21    **A**    Generally, it is.
22    **Q**    So let's now go to your report.  If
23 I find your report.  We marked that, did we
24 not, as Exhibit 1, I think.
25       Do you have Exhibit 1 available to

Page 117

1 you?  It's Tab 13?
2    **A**    Thirteen.  All right.  Thank you.
3    **Q**    Okay.  So I'm going to direct your
4 attention to page 2 of your report.
5       And do you see at the top of page 2
6 where you say that counsel has asked you for
7 your expert opinion on two questions?
8    **A**    Correct.
9    **Q**    Okay.  At any point were you asked
10 to consider any opinions besides these two
11 opinions?
12    **A**    No.
13    **Q**    Let's go to page 5 of the report.
14       And do you see the first heading,
15 entitled the "ERS Enabling Act?"
16    **A**    Yes.
17    **Q**    And you quote two different -- do
18 you see, you have two different indented
19 quotations there.
20       Do you see that?
21    **A**    Yes.
22    **Q**    And those are two different
23 translations of the Spanish language from the
24 1988 amendments that we looked at earlier in
25 your deposition.

Case 1:17-cv-02856-LTS Doc #:199-13 Filed 09/05/01 Entered 09/05/01 18:37:56 Desc:
Exhibit to Page 132 of 2014
CONFIDENTIAL
Robert Doty – August 11, 2020

42 (Pages 162 to 165)

Page 162

1  you -- I was unclear about really what you
2  wanted me to say or talk about on B and C.
3       I thought you wanted -- I'm just --
4  I'm still confused about what you wanted
5  there.
6    Q    Well, what I was asking you about,
7  Mr. Doty, was this.  We were talking about
8  the -- I think it was the opinions and other
9  disclosures and commitments that were made in
10  the Series A transaction.
11       And the question was:  Were those
12  same opinions, commitments, and disclosures
13  made in the Series B and C transactions, to
14  the best of your knowledge?
15       And I asked you that first because
16  I think -- I have a good-faith basis to
17  believe that they're substantially identical
18  transactions.  And second, I wanted to save
19  all of us the time and trouble of going
20  through the enormous closing binders for the
21  other two series if we were all in agreement
22  that substantially they were structured the
23  same.
24    A    If the question is were they
25  structured substantially the same, you know,

Page 163

1  the bond structure, all that kind of thing, I
2  think I can say yes to that.
3       I don't -- you know, I can't answer
4  a lot of specific questions about what were
5  they -- but I've looked at all three of them,
6  and I think I can say that they were -- the
7  patterns were substantially the same.
8    Q    Okay.  And the patterns I was
9  asking about included whether they all had
10  the same kind of legal documentation such as
11  the bond purchase agreement and the official
12  statement and the basic documents that the
13  Series A bonds had?
14    A    For the most part, that's what I
15  saw.  I mean, keep in mind, they were
16  considerably different principal amounts, and
17  the syndicates were larger and smaller, and
18  that sort of thing.
19       But overall, I can -- I think I can
20  say that the bond structure, terms, and so on
21  were -- had similar patterns.
22    Q    Okay.  And that's what I was
23  getting at.  So I think we've covered it.
24    A    All right.
25    Q    Anything else you'd like to add?

Page 164

1    A    No.
2    Q    Okay.  Let me ask you about direct
3  placement versus negotiated underwritings.
4    A    Yes.
5    Q    And the Series A bonds were sold in
6  a negotiated underwriting?
7    A    That's correct.
8    Q    Do issuers sometimes select their
9  underwriters in direct negotiations?
10    A    Well, in direct negotiations they
11  would always select at least the lead
12  underwriter.  They may not select the entire
13  syndicate.
14       The lead underwriter might take
15  that responsibility on, or sometimes the
16  issuer would even select some or all of the
17  members of the syndicate.
18    Q    Okay.  I think I asked my question
19  poorly.  Let me just ask it a different way.
20       Are underwriters sometimes selected
21  in a competitive bidding process?
22    A    Yes.
23    Q    And sometimes by direct
24  negotiation?
25    A    Sometimes, yes.

Page 165

1    Q    And issuers may sell municipal
2  securities to underwriters, either through
3  competitive bidding or through direct
4  negotiation with one or more preselected
5  underwriters?
6    A    Correct.
7    Q    I'm going to ask you about bond
8  counsel.  I think I asked you previously
9  about bond counsel.
10       Is one of the obligations of bond
11  counsel to deliver an opinion stating that
12  the bonds have been validly issued?
13       MR. BASSETT:  Objection to the
14       extent it's outside the scope of the
15       opinions he's been asked to offer in
16       this case.
17    A    Right.  Yeah, again, that's an
18  accurate statement.
19       But the answer's yes.
20    Q    If bond counsel has reason to
21  believe that the issuer does not have the
22  legal authority to issue the bonds, is it
23  your opinion that the bond counsel should not
24  deliver his opinion at the closing?
25       MR. BASSETT:  Same objection.  He's

Case 1:17-02886-LTS Doc #1994-13 Filed 09/05/21 Entered 09/05/21 18:27:56 Desc:
Exhibit Page 238 of 2014
CONFIDENTIAL
Robert Doty - August 11, 2020

44 (Pages 170 to 173)

Page 170

1    Do you see that?
2    **A**    I do see that.
3    **Q**    Is that still your opinion today?
4    **A**    Yes, that -- I think as a general
5  rule, that is correct.
6    **Q**    Yeah.  Are there exceptions to the
7  general rule?
8    **A**    Yes.
9    **Q**    What would examples of those
10 exceptions be?
11   **A**    Where the investors themselves know
12 information or have access to public
13 information, I think they're responsible for
14 that, too.  But in general, I would agree
15 with the statement.
16   **Q**    Okay.  I'd like to go to
17 Paragraph 17.
18   **A**    All right.
19   **Q**    I'm going to read it into the
20 record just so we don't have any objections
21 about my paraphrasing.
22         It says, "As noted above, in
23 accordance with customs, practices, and
24 standards of care prevailing in the municipal
25 securities market in and before 2000, and

Page 171

1  today, municipal securities offering
2  documents were (and are) expected to be,
3  quote, four-corner, unquote, documents that
4  contain (and contain) all information
5  regarding the offered securities that a
6  reasonable investor would consider to be
7  important in making an investment decision."
8         Do you still subscribe to that
9  statement today?
10   **A**    Yes.
11   **Q**    What do you mean by a "four-corner
12 document?"
13   **A**    That the information is supposed to
14 be in the official statement.  That document
15 is supposed to contain that information.
16   **Q**    And so an investor could look at
17 just that one document for all of the
18 information that investor reasonably could
19 need?
20   **A**    As a general rule, I do agree with
21 that.  Again, subject to the same caveat that
22 we made a little while ago.
23   **Q**    That caveat is that if investors
24 happen to have additional knowledge of their
25 own, that also goes into the mix?

Page 172

1    **A**    Yes.  And they're also responsible
2  for other public information, information
3  that's available from the public market
4  sources.
5    **Q**    Okay.  So, let me ask this.  I
6  asked you earlier about ERS's disclosure
7  obligations, and we spoke about EMMA a little
8  bit.
9         Is it the case that if a board
10 member of ERS came to have a belief that
11 these bonds had been illegally issued, that
12 board member or ERS itself would be required
13 to make a disclosure of that fact?
14         MR. BASSETT:  Objection, lack of
15      foundation, outside of his opinions in
16      this case.
17   **A**    I don't know how many board members
18 ERS had.  If an individual trustee concluded
19 that the bonds were not validly issued, I
20 think that trustee had a responsibility to
21 speak up.
22         If -- from an ERS perspective, I
23 think it would depend upon what others
24 associated with ERS believed, that they
25 reached the same conclusion, that they should

Page 173

1  also speak up.
2    **Q**    Okay.  Let me check any notes.  The
3  good news about the lunch break is I was able
4  to get rid of a lot of things.
5         So do you know what obligations, if
6  any, bond counsel have to make disclosures if
7  and when they determine that an earlier
8  opinion is wrong?
9         MR. BASSETT:  Same objections.
10   **A**    I believe that most bond counsel
11 take the point of view, once their opinion is
12 issued, their role is done, and they don't
13 have any further disclosure responsibilities.
14 That's what I have heard them say.
15   **Q**    Okay.  What protections are
16 there -- let me back up.
17         The book you wrote is intended as a
18 guide to investors in municipal securities?
19   **A**    The Bloomberg guide?
20   **Q**    That's the one, yeah.
21   **A**    That was my intention, yes.
22   **Q**    Okay.  And fair to say that you
23 generally believe municipal securities are a
24 sound investment?
25   **A**    I do.

Case 1:17-00286-LSS Doc#:994-13 Filed 08/05/21 Entered 08/05/21 18:37:56 Desc:
Exhibit 13 Page 3 of 14
CONFIDENTIAL
Robert Doty - August 11, 2020

45 (Pages 174 to 177)

Page 174

1    Q    You own them yourself?
2    A    Actually, I refrain from buying
3 individual bonds, as -- because of the
4 pricing.  But I do own bonds through Bond
5 Fund.
6    Q    When we go off the record, I'm a
7 Maryland resident, too, so you're going to
8 have to give me advice on which funds to
9 invest in.  But not on the record.
10    A    Yeah, I have a strong opinion.
11    Q    Okay.  Well, I would ask you,
12 except Nick would object.  All right.
13       What type of disclosures are
14 individual investors entitled to expect when
15 it comes to the legality of the bonds they
16 have purchased?
17       MR. BASSETT:  Same objections as
18 before.
19    A    I believe that traditionally it
20 centers on the bond counsel opinion.
21    Q    Okay.  You're aware, in this case,
22 that certain parties have taken the view that
23 the bonds were never legally issued.  You're
24 aware of that position being taken.
25       Correct?

Page 175

1    A    It's my understanding.
2    Q    And that sometimes it's called in
3 argument that the bonds were issued
4 "ultra vires?"
5    A    I have seen that argument.
6    Q    You are not -- you were not asked
7 to and you have not reached an opinion about
8 whether the bonds were issued ultra vires.
9       Correct?
10    A    Correct.
11    Q    But the bonds were issued about a
12 dozen years ago?
13    A    That seems right.
14    Q    What expectation should investors
15 have of receiving disclosures if and when an
16 issuer determines that it has issued bonds
17 without proper legal authorization?
18       MR. BASSETT:  Objection.  Not
19    within the scope of his opinions in this
20    matter.
21    A    I think that depends on an
22 interpretation in one or two of the material
23 event notices that are in the Master of
24 Continuing Disclosures Agreement.  I think
25 people would argue over one or two of them,

Page 176

1 argue over what one or two of them may mean.
2    Q    But in any event, ERS has remained
3 subject to the Master of Continuing
4 Disclosures Agreement from 2008 until today?
5       MR. BASSETT:  Same objection, and
6    calls for a legal conclusion.
7    A    As far as I know.  I mean, I
8 haven't worked in that area.
9    Q    Okay.  Mr. Doty, bear with me a
10 second.
11       Do you know one way or the other
12 whether the various opinions that were
13 delivered at the closing were delivered with
14 the expectation the investor would rely upon
15 them?
16       MR. BASSETT:  Objection.  Outside
17    of the scope of his opinions, lack of
18    foundation.
19    A    Apart from the bond counsel
20 opinion, I doubt that would be the case, and
21 in the case of the bond counsel opinion, I
22 have not done the analysis.  It is outside
23 the scope of my report.
24       I haven't looked at it in the
25 context of these particular transactions.

Page 177

1    Q    Okay.  So, let us go off the record
2 briefly.  I want to check with others to make
3 sure that they don't have anything that they
4 believe I should have covered.
5       MR. STEWART:  Take about a
6    five-minute break?
7       THE WITNESS:  Sure.
8       THE VIDEOGRAPHER:  Stand by.  The
9    time is 2:09 p.m. and we're going off
10    the record.
11       (Brief recess taken.)
12       THE VIDEOGRAPHER:  Stand by.  The
13    time is 2:20 p.m. and we're back on
14    record.
15    Q    And Mr. Doty, that is all the
16 questions I have of you.  Thank you very much
17 for your patience.
18    A    You're welcome.
19    Q    Others may have questions.  I will
20 ask the witness to -- pass the witness to
21 counsel.
22       MR. BASSETT:  Thank you.  Before
23    I -- I do have a few questions for
24    Mr. Doty.
25       But before I ask those, does anyone

# Bondholders' UV
# EXHIBIT 3

## Employees Retirement System of the
## Government of the Commonwealth of Puerto Rico

### Senior Pension Funding Bonds, Series A

## AMENDED AND RESTATED PURCHASE CONTRACT

San Juan, Puerto Rico
January 30, 2008

Administrator,
Employees Retirement System of the
Government of the Commonwealth of Puerto Rico
San Juan, Puerto Rico

Dear Sir:

UBS Financial Services Incorporated of Puerto Rico ("UBS") and the other underwriters listed in Schedule A hereto (collectively with UBS, the "Underwriters") for whom UBS is acting as representative as described below, offer to enter into this amended and restated Purchase Contract with the Employees Retirement System of the Government of the Commonwealth of Puerto Rico (the "System"), which Contract confirms your agreements with the Underwriters and upon your acceptance of this offer, will be binding upon the System and upon the Underwriters. This offer is made subject to your written acceptance hereof at or before 5:00 p.m., San Juan time, on the date hereof, and, if not so accepted, will be subject to withdrawal by the Underwriters upon notice delivered to you at any time prior to the acceptance hereof. This amended and restated Purchase Contract replaces the purchase contract, dated January 24, 2008, among the parties relating to the above bonds.

The Underwriters have designated UBS as their representative (the "Representative"). The Representative has been duly authorized to act hereunder by and on behalf of the other Underwriters and to execute this Purchase Contract. Any action under this Purchase Contract taken by the Representative will be binding upon all the Underwriters.

1.     Purchase and Sale; Details of Bonds. Upon the terms and conditions and in reliance on the representations, warranties and agreements set forth herein, the Underwriters, jointly and severally, hereby agree to purchase from the System, and the System hereby agrees to sell and deliver to the Underwriters, all (but not less than all) of the $1,588,810,799.60 initial principal amount of Employees Retirement System of the Government of the Commonwealth of Puerto Rico Senior Pension Funding Bonds, Series A (the "Bonds").

The purchase price for the Bonds shall be $1,570,391,795.98 (being the principal amount of such bonds, minus original issue discount of $1,663,850, less $16,755,153.62 of underwriters' discount).

The Bonds shall be dated, shall have the maturities and shall bear interest at the rates per annum set forth or derived from information set forth on the inside cover page of the Official Statement (hereinafter defined).

NYI 6469021v.13

The Bonds shall be issued in accordance with Act No. 447 of the Legislature of Puerto Rico, approved May 15, 1951, as amended ("Act 447"), and shall be as described in and issued under the provisions of a resolution, adopted by the System on January 24, 2008 (the "Master Resolution"), and a resolution supplemental thereto, adopted by the System on January 24, 2008 and amended, restated and readopted on the date hereof, fixing the details of the Bonds (the Master Resolution and said supplemental resolution together, the "Bond Resolution"). The Bonds are being issued for the purpose of providing funds, among other things, for deposit into the System to reduce thereby its unfunded accrued actuarial liability and into a debt service reserve account under the Bond Resolution, and to pay interest on the Bonds for approximately one year and pay certain costs incurred in connection with the issuance of the Bonds. The repayment of the Bonds will be secured by a pledge of Pledged Property (as defined in the Bond Resolution), including Employers' Contributions (as defined in the Bond Resolution).

2.    Delivery of Official Statement, etc.    The System shall deliver to the Representative at the time of or prior to the acceptance of this Purchase Contract by the System (a) a copy of the Official Statement of the System, dated the date hereof, relating to the Bonds (such Official Statement, including all appendices thereto and financial and statistical information contained or referred to or incorporated by reference therein, and with such supplements and amendments as are approved in writing by the Representative, being herein called the "Official Statement"), duly executed on behalf of the System; (b) a certified copy of the Bond Resolution; (c) letters, dated the date hereof, from Parissi P.S.C. and KPMG LLP consenting to the references to their respective names and to the inclusion of their respective reports on the audited financial statements of the System and of the Commonwealth of Puerto Rico (the "Commonwealth") for fiscal year 2007 and 2006, respectively, in the Preliminary Official Statement (hereinafter defined) and in the Official Statement, and in the case of Parissi P.S.C., setting forth the results of certain agreed upon procedures carried out by it in connection with the Official Statement; (d) a letter, dated the date hereof, from Global Insight, Inc. ("Global Insight") consenting to the references to its name and to the inclusion of its report forecasting the total payroll of those government employees that participate in the System over the fifty years covered by the report (the "GI Report") in the Preliminary Official Statement and in the Official Statement; and (e) an executed letter of representations, dated the date hereof (the "Letter of Representations") addressed to the Underwriters and signed by the Commonwealth. The System will provide to the Representative such additional copies of the Bond Resolution as the Representative may reasonably request. As soon as practicable after the date hereof, but, in any event, not later than seven (7) business days after the date hereof and not less than three (3) business days prior to Closing, if earlier, the System shall deliver to the Underwriters such number of printed copies of the final Official Statement as the Representative may reasonably request in writing so as to enable the Underwriters to comply with the requirements of paragraph (b)(4) of Rule 15c2-12 of the Securities Exchange Act of 1934, as amended (the "Rule"). The System shall be under no obligation to determine whether the number of copies of the Official Statement requested by the Representative pursuant to the preceding sentence shall be sufficient to enable the Underwriters to comply with the requirements of said paragraph (b)(4), and the System may conclusively rely upon any such written request of the Representative. For purposes of this Purchase Contract, "business day" means any day other than a Saturday, Sunday or other day on which commercial banks in New York, New York or San Juan, Puerto Rico are authorized or required by law to close.

2

PR-ERS-000003511

The System has previously delivered to the Underwriters a Preliminary Official Statement of the System, dated January 11, 2008, relating to the Bonds (such Preliminary Official Statement, including all appendices thereto, and financial and statistical information included or incorporated by reference therein, being herein called the "Preliminary Official Statement").

3.  <u>Continuing Disclosure</u>.  The System will covenant in a Master Continuing Disclosure Agreement to be executed among the System, the Commonwealth and the fiscal agent under the Bond Resolution (the "MCDA"), (i) to provide within 305 days after the end of each fiscal year, beginning with the fiscal year ended June 30, 2007, core financial information and operating data for the prior fiscal year, including the System's audited financial statements prepared in accordance with generally accepted accounting principles, together with material historical quantitative data on the System and its revenues, expenditures, financial operations and indebtedness, in each case generally found in the Official Statement (the "Annual Information") and (ii) to provide in a timely manner, notices of the occurrence of certain enumerated events described the MCDA.  This covenant has been made in order to assist the Underwriters in complying with paragraph (b)(5) of the Rule.  The Annual Information will be filed by or on behalf of the System with each nationally recognized municipal securities information repository and with any Commonwealth state information depository.  The notices of material events will be filed by the System with each nationally recognized municipal securities information repository or with the Municipal Securities Rulemaking Board and with any Commonwealth state information depository.

4.  <u>Public Offering</u>.  The Underwriters agree to make a bona fide public offering of all the Bonds, solely within Puerto Rico, at prices not in excess of the initial public offering prices (or not less than the yields) set forth on the inside cover page of the Official Statement. The Underwriters reserve the right to change such initial public offering prices or yields as they deem necessary in connection with the marketing to such persons of the Bonds.  The System hereby authorizes the Underwriters to use the Bond Resolution, the MCDA, the Security Agreement (hereinafter mentioned) and the Official Statement and the information contained therein in connection with the public offering and sale of the Bonds to such persons and agrees not to supplement or amend the Official Statement, the MCDA, the Security Agreement or the Bond Resolution or to cause the Official Statement, the MCDA, the Security Agreement or the Bond Resolution to be supplemented or amended at any time prior to the Closing (as defined below) without the prior written consent of the Representative.  The System ratifies and confirms the use by the Underwriters, prior to the date hereof, of the Preliminary Official Statement.



5.  <u>Security Deposit</u>.  The Representative has delivered to the System one or more corporate checks in an aggregate amount equal to 1% of the aggregate principal amount of the Bonds as a security deposit, payable in New York Clearing House Funds to the order of Government Development Bank for Puerto Rico ("Government Development Bank"), as fiscal agent for the System.  In the event the System does not accept this offer, such check shall be immediately returned to the Representative uncashed.  If this offer is accepted, the check will be held uncashed as a security deposit for the performance by the Underwriters of their obligations to purchase, to accept delivery of, and to pay for the Bonds at the Closing.  In the event of the System's failure to deliver the Bonds at the Closing, or if the System shall be unable to satisfy the conditions of the obligations of the Underwriters contained herein, or if the obligations of the

NY1 6469021v.13

PR-ERS-000003512

Underwriters shall be terminated for any reason permitted by this Purchase Contract, the check shall be immediately returned uncashed to the Representative. In the event that the Underwriters fail (other than for a reason permitted hereunder) to purchase, to accept delivery of, and to pay for the Bonds at the Closing, the check may be cashed and the proceeds thereof retained by the System as and for full liquidated damages for such failure and for any defaults hereunder on the part of the Underwriters, and such retention shall constitute a full release and discharge of all claims by the System against the Underwriters arising out of the transactions contemplated hereby.

6.      Representations, Warranties and Agreements of the System.      The System represents and warrants to and agrees with each of the Underwriters that, as of the date hereof and as of the Closing Date (as defined below):

(a)      The System has full legal right, power and authority to adopt the Bond Resolution, to enter into this Purchase Contract, the MCDA and a Security Agreement, dated the Closing Date, between the System and The Bank of New York (the "Security Agreement"), and to issue and deliver the Bonds to the Underwriters as provided herein; by official action of the System taken prior to or concurrently with the acceptance hereof, it has duly adopted the Bond Resolution; the Bond Resolution and Act 447 are in full force and effect and have not been amended, modified or rescinded; the System has duly authorized and approved the execution and delivery of the Bonds, the MCDA, the Security Agreement, the Official Statement and this Purchase Contract; the System has duly authorized and approved the performance of its obligations contained in the Bond Resolution, the MCDA, the Security Agreement, the Official Statement and this Purchase Contract to be performed or consummated at or prior to the Closing; this Purchase Contract has been duly executed and delivered by the System; and the System is and will be in compliance with the provisions of the Bond Resolution and Act 447.

(b)      Except for the approval of Government Development Bank, which has already been or will before the Closing be obtained and is or will at the Closing be in full force and effect, no approval, permit, consent, or authorization of, or registration or filing with, any governmental or public agency or authority not already obtained or made is required by the System in connection with the issuance and sale of the Bonds in the Commonwealth of Puerto Rico, or the execution or adoption and delivery by the System of, or the due performance of its obligations under this Purchase Contract, the Bonds, the Bond Resolution, the MCDA and the Security Agreement.



(c)      Except as set forth in the Official Statement, the System is not in breach of or default under any applicable constitutional provision, law (including, without limitation, any administrative rule-making law) or administrative regulation of the Commonwealth or the United States, or any agency or department of either, or any applicable judgment or decree or any loan agreement, indenture, bond, note, resolution, agreement or other instrument to which the System is a party or to which the System or any of its properties or other assets is otherwise subject, and no event has occurred and is continuing relating to bonds, notes or other evidences of indebtedness of the System or any System guaranty of bonds, notes or other evidences or indebtedness of others which, with the passage of time or the giving of notice, or both, would constitute a default or an event of default under any such instrument; and the execution and delivery of the Bonds, the MCDA, the Security Agreement, the Official Statement and this

4

NY1 6469021v.13

Purchase Contract and the adoption of the Bond Resolution (and any other agreement or instrument to which the System is a party used or contemplated for use in the consummation of the transactions contemplated hereby or by the Bond Resolution, the MCDA, the Security Agreement or the Official Statement), and compliance with the provisions on the System's part contained herein or therein, do not and will not conflict with Act 447 or any constitutional provision, law (including, without limitation, any administrative rule-making law), administrative regulation, judgment or decree, or constitute a breach of or default under any loan agreement, indenture, bond, note, resolution, agreement or other instrument to which the System is a party or to which the System or any of its properties or other assets is otherwise subject.

(d)     The Bonds, when issued, authenticated and delivered in accordance with the provisions of the Bond Resolution, will be valid, binding and legally enforceable obligations of the System secured by a pledge of Employers' Contributions in accordance with the terms of the Bonds, Act 447 and the Bond Resolution.

(e)     Except for the information permitted by the Rule to be excluded therefrom, the information contained in the Preliminary Official Statement was as of the date of said Preliminary Official Statement true and correct in all material respects, and the Preliminary Official Statement did not as of its date contain any untrue statement of a material fact or omit to state a material fact which is necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading. The Preliminary Official Statement was deemed "final" by the System for purposes of paragraph (b)(1) of the Rule, except for the omission therefrom of information permitted to be omitted therefrom by the Rule. Except as disclosed in the Official Statement, the System has not failed to comply with any prior continuing disclosure undertaking of the type described in paragraph 3 hereof.

(f)     Except as disclosed in the Official Statement, since the date of the basic financial statements of the System for fiscal year 2007, which are included in the Official Statement, the System has not incurred, as of the date hereof, and will not have incurred, on the Closing Date, any material liabilities, direct or contingent, or entered into any material transaction, in each case other than in the ordinary course of its business, and as of the date hereof there has not been, and as of the Closing Date there shall not have been, any material adverse change in the condition, financial or otherwise, of the System or its properties or other assets.



(g)     There is no action, suit, proceeding, inquiry or investigation, at law or in equity, before or by any court, government agency or public board or body, pending or, to the knowledge of the System, threatened, which may affect or which seeks to prohibit, restrain or enjoin the sale, issuance or delivery of the Bonds, or the collection or application of any Employers' Contributions or the pledge thereof contained in the Bond Resolution and as described in the Official Statement, or which in any way contests or affects the validity or enforceability of Act 447, the Bonds, the Bond Resolution, the MCDA, the Security Agreement, this Purchase Contract, or any of them, or which may result in any material adverse change in the business, properties, other assets or financial condition of the System as described in the Official Statement, or which contests in any way the completeness or accuracy of the Preliminary Official Statement or the Official Statement, or which contests the powers of the System or any authority or proceedings for the issuance, sale or delivery of the Bonds, the adoption of the Bond

5

NYI 6469021v.13

PR-ERS-000003514

Resolution or the execution and delivery of the MCDA, the Security Agreement or this Purchase Contract, or any of them, nor, to the knowledge of the System, is there any basis therefor, wherein an unfavorable decision, ruling or finding would materially adversely affect the validity or enforceability of Act 447, the Bonds, the Bond Resolution, the MCDA, the Security Agreement, this Purchase Contract, or any of them.

(h)     The System has reviewed the GI Report which report is part of the Official Statement, and believes that the projections made in such report are based on reasonable assumptions.

(i)     The Bonds, the MCDA, the Security Agreement, Act 447 and the Bond Resolution conform to the descriptions thereof contained in the Official Statement and the references to and summaries of the Bonds, the MCDA, the Security Agreement, Act 447 and the Bond Resolution contained in the Official Statement fairly reflect the provisions thereof.

(j)     At the time of the System's acceptance hereof and, subject to the provisions of subparagraph (l) of this paragraph 6, at all times subsequent thereto to and including the Closing Date, the Official Statement does not and will not contain any untrue statement of a material fact or omit to state a material fact which is necessary in order to make the statements contained therein, in the light of the circumstances under which they were made, not misleading. The representations and warranties contained in this paragraph (j) shall not apply to any statements or omissions made in reliance on information furnished in writing by or on behalf of the Underwriters expressly for use in the Official Statement or provided by Government Development Bank for Puerto Rico and DTC.

(k)     If the Official Statement is supplemented or amended pursuant to subparagraph (l) of this paragraph 6 prior to the Closing Date, at the time of each supplement or amendment thereto and (unless subsequently supplemented or amended pursuant to such subsection) at all times subsequent thereto to and including the Closing Date, the Official Statement, as so supplemented or amended, will not contain any untrue statement of a material fact or omit to state a material fact which is necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading.

(l)     If between the date of this Purchase Contract and the date which is twenty-five (25) days after the end of the underwriting period (as such term is defined in paragraph (f)(2) of the Rule) any event shall occur or shall exist which would or might cause the Official Statement, as then supplemented or amended, to contain any untrue statement of a material fact or to omit to state a material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading, the System shall notify the Representative thereof. If in the reasonable opinion of the Representative such event requires the preparation and publication of a supplement or amendment to the Official Statement, the System will at its expense supplement or amend, or cause to be supplemented or amended, the Official Statement in a form and in a manner approved in writing by the Representative, and provide the Underwriters with such copies of such supplement or amendment as the Representative may reasonably request in writing so as to enable the Underwriters to comply with the provisions of paragraph (b)(4) of the Rule. The System shall be under no obligation to determine whether the number of copies requested by the Representative of any amendment of or



6

PR-ERS-000003515

supplement to the Official Statement pursuant to the preceding sentence shall be sufficient to enable the Underwriters to comply with the requirements of said paragraph (b)(4), and the System may conclusively rely upon any such request of the Representative.

(m)    The financial statements of the System included in the Official Statement present fairly the financial condition and results of operations of the System at the dates and for the periods set forth therein.

(n)    The System has delivered to the Underwriters true, complete and correct copies of the documents required to be delivered pursuant to paragraph 2 hereof, and none of said documents has been amended, supplemented or modified since such delivery.

(o)    The System will apply the proceeds from the sale of the Bonds as provided in and subject to all of the terms and provisions of the Bond Resolution and Act 447.

7.    The Closing. At 10:00 a.m., Atlantic Standard time, on January 31, 2008, or at such later time as may be mutually agreed upon by the System and the Representative (the "Closing Date"), the System will, subject to the terms and conditions hereof, deliver the Bonds, duly executed and in definitive form, to or for the account of The Depository Trust Company and deliver to the Representative the other documents hereinafter mentioned; and, subject to the terms and conditions hereof, the Underwriters will pay the purchase price of the Bonds as set forth in paragraph 1 hereof in immediately available funds to or for the account of the System (such delivery of and payment for the Bonds is herein called the "Closing") and the check delivered to Government Development Bank pursuant to paragraph 5 hereof shall thereupon be returned to the Representative uncashed. The Closing shall occur at the offices of Government Development Bank, San Juan, Puerto Rico, or such other place as shall have been mutually agreed upon by the System and the Representative. Time shall be of the essence, and delivery at the time and place specified pursuant to this Purchase Contract is a further condition of the obligations of the Underwriters hereunder.

8.    Closing Conditions. The Underwriters have entered into this Purchase Contract in reliance upon the representations, warranties and agreements of the System contained herein, and upon the representations, warranties and agreements of the Commonwealth contained in the Letter of Representations. Accordingly, the Underwriters' obligations under this Purchase Contract to purchase, to accept delivery of and to pay for the Bonds shall be conditioned upon the performance by the System of its obligations to be performed hereunder at or prior to the Closing, and shall also be subject to the following additional conditions:



(a)    The representations, warranties and agreements of the System contained herein and of the Commonwealth contained in the Letter of Representations shall be true, complete and correct on the date hereof and on and as of the Closing Date, as if made on the Closing Date;

(b)    At the time of the Closing, Act 447 and the Bond Resolution shall be in full force and effect, and shall not have been amended, modified or supplemented since the date hereof, and the Official Statement as delivered to the Representative on the date hereof shall not

PR-ERS-000003516

have been supplemented or amended, except in any such case as may have been approved by the Representative;

(c)     At the time of the Closing, all official action of the System relating to this Purchase Contract, the Bonds, the Bond Resolution, the MCDA, the Security Agreement and Act 447 taken as of the date hereof shall be in full force and effect and shall not have been amended, modified or supplemented;

(d)     At or prior to the Closing, the Representative shall have received copies of each of the following documents:

(1)     The opinion, dated the Closing Date and addressed to you, of Fiddler González & Rodríguez, P.S.C., Bond Counsel for the System, in substantially the form included as Appendix VIII to the Official Statement;

(2)     A supplemental opinion, dated the Closing Date and addressed to the Underwriters, of Fiddler González & Rodriguez, P.S.C., Bond Counsel for the System, in substantially the form attached hereto as Exhibit A;

(3)     Opinions, dated the Closing Date and addressed to the Underwriters, of counsel to the System, and of the Secretary of Justice of the Commonwealth, in substantially the respective forms attached hereto as Exhibits B-1 and B-2;

(4)     Opinions, dated the Closing Date and addressed to the Underwriters, of O'Neill & Borges and of Sidley Austin LLP, counsel to the Underwriters, in substantially the form attached hereto as Exhibit C;

(5)     Certificates, dated the Closing Date, signed by the Administrator of the System and by the Acting Secretary of the Treasury of Puerto Rico, in substantially the respective forms attached hereto as Exhibit D;

(6)     A certificate, dated the Closing Date, signed by the President, any Executive Vice President or any Senior Vice President of Government Development Bank, in substantially the form attached hereto as Exhibit E;

(7)     Executed copies, certified by the Administrator of the System, of the MCDA and the Security Agreement;



(8)     A letter, addressed and in form and substance satisfactory to the Underwriters, dated the Closing Date, from Parissi P.S.C. as to its performance of certain agreed upon procedures respecting the information in the Official Statement relating to the System, among other things;

(9)     Evidence of ratings of the Bonds in full force and effect on the Closing Date of "Baa3" by Moody's Investors Service ("Moody's"), "BBB-" by Standard and Poor's Ratings Services ("S&P") and Fitch Ratings Ltd. ("Fitch");

8

PR-ERS-000003517

(10)    Letters, each dated the Closing Date, from Parissi P.S.C. and KPMG LLP consenting to references to their respective names in the Official Statement and to the inclusion in the Official Statement of their respective reports on the audited financial statements of the System and of the Commonwealth for the fiscal years ended June 30, 2007 and 2006, respectively;

(11)    A final copy of the GI Report in the form attached to the Official Statement as Appendix V, together with the consent of Global Insight to the inclusion of such report in the Official Statement and to the references to them in the Official Statement; and

(12)    Such additional legal opinions, certificates, instruments and other documents as the Representative may reasonably request to evidence the truth and accuracy, as of the date hereof and as of the Closing Date, of the representations and warranties of the System contained herein and of the Commonwealth contained in the Letter of Representations and of the statements and information contained in the Official Statement and the due performance or satisfaction by the System on or prior to the Closing Date of all the respective agreements then to be performed and conditions then to be satisfied by the System.

All of the evidence, opinions, letters, certificates, instruments and other documents mentioned above or elsewhere in this Purchase Contract shall be deemed to be in compliance with the provisions hereof if, but only if, they are in form and substance satisfactory to the Representative with such exceptions and modifications as shall be approved by the Representative and as shall not in the opinion of the Representative materially impair the investment quality of the Bonds. The approving opinion of Fiddler González & Rodriguez, P.S.C., which is referred to in clause (1) of subparagraph 8(d) above shall be deemed satisfactory provided it is substantially in the form included in the Official Statement, and the opinions and certificates referred to in clauses (2), (3), (4), (5) and (6) of such subparagraph shall be deemed satisfactory provided they are substantially in the respective forms attached as exhibits to this Purchase Contract, unless otherwise provided.



If the System shall be unable to satisfy the conditions of the Underwriters to purchase, to accept delivery of and to pay for the Bonds contained in this Purchase Contract, or if the obligations of the Underwriters to purchase, to accept delivery of and to pay for the Bonds shall be terminated for any reason permitted by this Purchase Contract, this Purchase Contract shall terminate and neither the Underwriters nor the System shall be under any further obligation hereunder, except for the return of the security deposit and except that the respective obligations of the System and the Underwriters set forth in paragraph 10 hereof shall continue in full force and effect.

9.    Termination. The Underwriters may terminate this Purchase Contract by notice to the System in the event that on or prior to the Closing Date (a) legislation shall have been introduced in or enacted by the Congress of the United States or the Legislature of the Commonwealth, or legislation pending in the Congress of the United States or the Legislature of the Commonwealth shall have been amended, or legislation shall have been favorably reported for passage to either House of the Congress of the United States by a Committee of such House

9

to which such legislation has been referred for consideration, or a decision by a court of the
United States or the Tax Court of the United States shall be rendered, or a ruling, regulation or
official statement by or on behalf of the Treasury Department of the United States, the Internal
Revenue Service or other governmental agency shall be made, with respect to Federal taxation of
interest received on securities of the general character of the Bonds or which would have the
effect of changing, directly or indirectly, the Commonwealth income tax consequences of receipt
of interest on securities of the general character of the Bonds in the hands of the holders thereof,
which in the reasonable opinion of the Representative would materially adversely affect the
market price of the Bonds; (b) the United States shall become engaged in hostilities that have
resulted in a Congressional declaration of war or there shall be a national emergency or there
shall have occurred any outbreak of hostilities or an act of terrorism or other national or
international calamity or crisis or escalation of any thereof, the effect of which on the financial
markets of the United States is, in the reasonable judgment of the Representative, to materially
adversely affect the market for the Bonds; (c) there shall be in force a general suspension of
trading on the New York Stock Exchange or other national exchanges, or minimum or maximum
prices for trading shall have been fixed and be in force, or maximum ranges for prices for
securities shall have been required and be in force on the New York Stock Exchange whether by
virtue of a determination by that Exchange or by order of the Securities and Exchange
Commission or any other governmental authority having jurisdiction; (d) a general banking
moratorium shall have been established by Federal, New York or Commonwealth authorities or a
major financial crisis or material disruption in commercial banking or securities settlement or
clearances services shall have occurred which, in the reasonable judgment of the Representative,
would make the marketing of securities of the general character of the Bonds generally
impracticable; (e) any event, including any event described in a supplement or amendment to the
Official Statement, shall have occurred or shall exist which, in the reasonable opinion of the
Representative, makes untrue or incorrect, as of such time, in any material respect, any statement
or information contained in the Official Statement as theretofore supplemented and amended or
which is not reflected in the Official Statement as theretofore supplemented and amended, but
which should be reflected therein in order to make the statements and information contained
therein not misleading as of such time; (f) the System fails to deliver the final Official Statement
to the Representative within the time period provided in paragraph 2 hereof and such failure
affects the Underwriters' marketing and sale of the Bonds or subjects the Underwriters to
possible compliance infractions under Securities and Exchange Commission or Municipal
Securities Rulemaking Board delivery requirements; (g) any extraordinary event (not otherwise
covered above in this paragraph) shall have occurred or shall exist affecting current national or
international economic, financial or other conditions or affecting the Commonwealth, which, in
the reasonable opinion of the Representative, materially affects the market for the Bonds or the
sale, at the contemplated offering prices, by the Underwriters of the Bonds; (h) any rating of the
Bonds shall have been downgraded or withdrawn by Moody's or Fitch, and such action, in the
reasonable opinion of the Representative, materially adversely affects the market for the Bonds
or the sale, at the contemplated offering prices, by the Underwriters of the Bonds; (i) any
amendment to the Official Statement is proposed by the System or deemed necessary by Bond
Counsel or counsel to the Underwriters which, in the reasonable opinion of the Representative,
materially adversely affects the market for the Bonds or the sale, at the contemplated offering
prices, by the Underwriters of the Bonds; or (j) the System shall be unable to satisfy the

10

PR-ERS-000003519

conditions to the obligations of the Underwriters to purchase, to accept delivery of and to pay for the Bonds contained in this Purchase Contract.

10.   Expenses.   (a) The Underwriters shall be under no obligation to pay, and the System shall pay, any expenses incident to the performance of the obligations of the System hereunder, including, but not limited to:   (i) the cost of preparation and printing or other reproduction, if any, of the Bond Resolution; (ii) the cost of preparation and printing of the Bonds; (iii) the cost of preparation, printing and distribution of the Preliminary Official Statement and the Official Statement; (iv) the fees and disbursements of Fiddler González & Rodriguez, P.S.C., Bond Counsel for the System, and Sidley Austin LLP and O'Neill & Borges, counsel to the underwriters; (v) the fees and disbursements of the Parissi P.S.C., of KPMG LLP and of Global Insight in connection with the letters described in paragraph 2 and clauses (8), (10) and (11) of paragraph 8(d), and of any other experts, consultants, or advisers retained by the System in connection with the issuance and sale of the Bonds; and (vi) the fees for rating the Bonds.

(b)   The Underwriters shall pay: (i) the cost of preparation and reproduction of this Purchase Contract and related underwriting documents; (ii) all advertising expenses in connection with the public offering of the Bonds; and (iii) all other expenses incurred by them or any of them in connection with the public offering of the Bonds.

(c)   In the event that either the System or the Underwriters shall have paid obligations of the other as set forth in this Section, proper adjustment shall be made.

11.   Indemnification.   (a)   To the extent permitted by law, the System agrees to indemnify and hold harmless each Underwriter and each person, if any, who controls any Underwriter within the meaning of the Securities Act of 1933, as amended, or the Securities Exchange Act of 1934, as amended (collectively, the "Securities Acts"), as follows:

(i)   against any and all loss, liability, claim, damage and expense whatsoever, joint or several, arising out of any untrue statement or alleged untrue statement of a material fact contained in the Official Statement (or any amendment or supplement thereto) or the omission or alleged omission therefrom of a material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading, unless such untrue statement or omission or such alleged untrue statement or omission was made in reliance upon and in conformity with written information furnished to the System by such Underwriter through the Representative expressly for use in the Official Statement.

(ii)   against any and all loss, liability, claim, damage, and expense whatsoever, joint or several, to the extent of the aggregate amount paid in settlement of any litigation commenced or threatened, or of any claim whatsoever, based upon any such untrue statement or omission, or any such alleged untrue statement or omission, if such settlement is effected with the written consent of the System; and



11

PR-ERS-000003520

(iii) against any and all expense whatsoever, joint or several, reasonably incurred in investigating, preparing or defending against it any litigation commended or threatened, or any claim whatsoever, based upon any such untrue statement or omission, or any such alleged untrue statement or omission, to the extent that any such expense is not paid under (i) or (ii) above.

(b) Each Underwriter agrees to indemnify and hold harmless the System and each person, if any, who controls the System within the meaning of the Securities Acts against any and all loss, liability, claim, damage and expense described in the indemnity contained in subsection (a) of this Section (including only such settlements as are effected with the written consent of the Representative), but only with respect to untrue statements or omissions, or alleged untrue statements or omissions, made in the Official Statement in reliance upon and in conformity with written information furnished to the System by such Underwriter through the Representative expressly for use in the Official Statement.

(c) Each indemnified party shall give prompt notice to each indemnifying party of any action commenced against it in respect of which indemnity may be sought hereunder, but failure so to notify an indemnifying party shall not relieve it from any liability hereunder except to the extent the indemnifying party is prejudiced by such failure, and shall not relieve it from any liability which it may have otherwise than on account of this indemnity agreement. An indemnifying party may participate at its own expense in the defense of such action. If it so elects within a reasonable time after receipt of such notice, an indemnifying party, jointly with any other indemnifying parties receiving such notice, may assume the defense of such action with counsel chosen by it and approved by the indemnified parties defendant in such action, unless such indemnified parties reasonably object to such assumption on the ground that there may be legal defenses available to them which are different from or in addition to those available to such indemnifying party. If an indemnifying party is entitled pursuant to the preceding sentence to assume, and in fact assumes the defense of such action, the indemnifying parties shall not be liable for any fees and expenses of counsel for the indemnified parties incurred thereafter in connection with such action. In no event shall the indemnifying parties be liable for the fees and expenses of more than one counsel for all indemnified parties in connection with any one action or separate but similar or related actions in the same jurisdiction arising out of the same general allegations or circumstances.



(d) If the indemnification provided for in subparagraphs (a) or (b) of this Section 11 is unavailable to an indemnified party in respect of any losses, claims, damages or liabilities referred to therein, then each indemnifying party under such paragraph, in lieu of indemnifying such indemnified party thereunder, shall contribute to the amount paid or payable by such indemnified party as a result of such losses, claims, damages or liabilities (i) in such proportion as is appropriate to reflect the relative benefits received by the System and the Underwriters from the offering of the Bonds or (ii) if the allocation provided by clause (i) above is not permitted by applicable law, in such proportion as is appropriate to reflect not only the relative benefits referred to in clause (i) above but also the relative fault of the System and of the Underwriters in connection with the statements or omissions that resulted in such losses, claims, damages or liabilities, as well as any other relevant equitable considerations. The relative benefits received by the System and the Underwriters shall be deemed to be in the same respective proportions as the net proceeds from the offering (before deducting expenses)

12

PR-ERS-000003521

received by the System and the total underwriting discounts and commissions received by the Underwriters, bear to the aggregate public offering prices of the Bonds. The relative fault of the System and the Underwriters shall be determined by reference to, among other things, whether the untrue or alleged untrue statement of a material fact or the omission or alleged omission to state a material fact relates to information supplied by the System or by the Underwriters and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such statement or omission.

The System and the Underwriters agree that it would not be just and equitable if contribution pursuant to this Section were determined by pro rata allocation (even if the Underwriters were treated as one entity for such purpose) or by any other method of allocation that does not take account of the equitable considerations referred to in the immediately preceding paragraph. The amount paid or payable by an indemnified party as a result of the losses, claims, damages and liabilities referred to in the immediately preceding paragraph shall be deemed to include, subject to the limitations set forth above, any legal or other expenses reasonably incurred by such indemnified party in connection with investigating or defending any such action or claim. Notwithstanding the provisions of this Section 11(d), no Underwriter shall be required to contribute any amount in excess of the amount by which the underwriting discounts or commissions received by it on account of the Bonds sold by it to the public exceeds the amount of any damages that such Underwriter has otherwise been required to pay by reason of such untrue or alleged untrue statement or omission or alleged omission. No person guilty of fraudulent misrepresentation shall be entitled to contribution from any person who was not guilty of such fraudulent misrepresentation. The Underwriters' obligations to contribute pursuant to this Section are several in proportion to their respective underwriting percentages (as defined in the Agreement Among Underwriters) and not joint.

12.    Notices. Any notice or other communication to be given to the System under this Purchase Contract may be given by delivering the same in care of Government Development Bank for Puerto Rico, Roberto Sánchez Vilella Government Center, De Diego Avenue, San Juan, Puerto Rico 00940, Attention: Jorge Irizarry Herráns, President, and any such notice or other communication to be given to the Underwriters (other than the acceptance referred to in paragraph 1 hereof) may be given by delivering the same to UBS Financial Services Incorporated of Puerto Rico, American International Plaza, 250 Muñoz Rivera Avenue, Hato Rey, Puerto Rico 00918 Attention: Jose Arias. All notices or communications hereunder by any party shall be given and served upon each other party.



13.    Parties in Interest. This Purchase Contract is made solely for the benefit of the System and the Underwriters (including the successors or assigns of any Underwriter) and no other person shall acquire or have any right hereunder or by virtue hereof. All of the representations, warranties and agreements of the System contained in this Purchase Contract shall remain operative and in full force and effect regardless of: (i) any investigations made by or on behalf of any of the Underwriters; (ii) delivery of and payment for the Bonds pursuant to this Purchase Contract; or (iii) any termination of this Purchase Contract but only to the extent provided by the last paragraph of paragraph 8 hereof.

NY1 6469021v.13

PR-ERS-000003522

14.    Effectiveness.  This Purchase Contract shall become effective upon the execution of the acceptance hereof by the System, shall constitute the entire agreement between us and shall be valid and enforceable at the time of such acceptance.

15.    Counterparts.  This Purchase Contract may be executed in several counterparts, each of which shall be regarded as an original and all of which together shall constitute one and the same instrument.

16.    Puerto Rico Law Governs; Severability.    The  validity,  interpretation  and performance of this Purchase Contract shall be governed by the laws of the Commonwealth of Puerto Rico.  Wherever possible, each provision of this Purchase Contract shall be interpreted in such manner as to be effective under the laws of such State or any other applicable law.  In the event that any provision or any portion of any provision, of this Purchase Contract shall be held to be void or unenforceable, the remaining provisions of this Purchase Contract, and the remaining portion of any provision found void or unenforceable in part only, shall continue in full force and effect.

17.    No Oral Change.  This Purchase Contract may not be changed orally, but only by an agreement in writing and signed by the party against whom enforcement of any waiver, change, modification or discharge is sought.



[SIGNATURE PAGE FOLLOWS]

14

NY1 6469021v.13

PR-ERS-000003523

18. Headings. The headings of the sections of this Purchase Contract are inserted for convenience only and shall not be deemed to be part hereof.

Very truly yours,

UBS FINANCIAL SERVICES INCORPORATED OF PUERTO RICO
as Representative of the Underwriters listed on Schedule A

By: _____
Name:
Title: Managing Director

Accepted on or about 11:00 a.m., Atlantic time, on January 30, 2008

EMPLOYEES RETIREMENT SYSTEM OF THE
GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO

By: _____
Name: Juan Cancel Alegría
Title: Administrator

15

PR-ERS-000003524

**SCHEDULE A**

UBS FINANCIAL SERVICES INCORPORATED OF PUERTO RICO
POPULAR SECURITIES, INC.
SANTANDER SECURITIES CORPORATION
BANCO BILBAO VIZCAYA ARGENTARIA PUERTO RICO
CITIGROUP GLOBAL MARKETS INC.
LEHMAN BROTHERS, INC.
MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED
ORIENTAL FINANCIAL SERVICES, INC.
SAMUEL A. RAMÍREZ & CO., INC.
SCOTIABANK OF PUERTO RICO
TCM CAPITAL, INC.
WACHOVIA CAPITAL MARKETS, LLC



16

PR-ERS-000003525

**EXHIBIT A**

OPINION OF BOND COUNSEL
(Pursuant to subparagraph 8(d)(2) of the Purchase Contract)

January 31, 2008

UBS FINANCIAL SERVICES INCORPORATED OF PUERTO RICO
POPULAR SECURITIES, INC.
SANTANDER SECURITIES CORPORATION
BANCO BILBAO VIZCAYA ARGENTARIA PUERTO RICO
CITIGROUP GLOBAL MARKETS INC.
LEHMAN BROTHERS, INC.
MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED
ORIENTAL FINANCIAL SERVICES, INC.
SAMUEL A. RAMÍREZ & CO., INC.
SCOTIABANK OF PUERTO RICO
TCM CAPITAL, INC.
WACHOVIA CAPITAL MARKETS, LLC

In care of UBS Financial Services Incorporated of Puerto Rico
American International Plaza
250 Muñoz Rivera Avenue
Hato Rey, Puerto Rico 00918
Attention: Jose Arias

Ladies and Gentlemen:

We have acted as Bond Counsel in connection with the authorization, issuance and sale by the Employees Retirement System of the Government of the Commonwealth of Puerto Rico (the "System") of $1,588,810,799.60 initial aggregate principal amount of its Senior Pension Funding Bonds, Series A (the "Bonds") as to which you are acting as underwriters ("Underwriters"), as representatives of yourselves and the other Underwriters named in the amended and restated Purchase Contract, dated January 30, 2008 (the "Purchase Contract"), between the System and the Underwriters.

The Bonds are being issued pursuant to a Pension Funding Bond Resolution, adopted by the System's Board of Trustees on January 24, 2008 (the "Bond Resolution"), and a First Supplemental Pension Funding Bond Resolution, adopted by the System's Board of Trustees on January 24, 2008 and amended, restated and readopted on January 29, 2008 (the "Supplemental Resolution," and together with the Bond Resolution, the "Resolution"), pursuant to which The Bank of New York will act as Fiscal Agent (the "Fiscal Agent"). Any capitalized terms used herein and not otherwise defined shall have the meanings ascribed thereto in the Resolution or the Purchase Contract. The Bonds are being issued for the purpose of (i) increasing the total assets currently available to pay benefits under the System's largest defined benefit plan, (ii)

A-1

PR-ERS-000003526

reducing the unfunded accrued actuarial pension liability of the benefit plan, and (iii) making deposits in various funds and accounts established under the Resolution.

In our capacity as Bond Counsel, we have examined and are familiar with (i) Act No. 447 of the Legislature of Puerto Rico, approved May 15, 1951, as amended ("Act 447"), (ii) certified copies of the Resolution, (iii) certified copies of the resolution authorizing the issuance and fixing the terms of the Bonds (the "Authorizing Resolution"), approving the Preliminary Official Statement, dated January 11, 2008, in connection with the Bonds (the "Preliminary Official Statement") and approving the Official Statement, dated January 29, 2008, in connection with the issuance of the Bonds (the "Official Statement"), (iv) a certified copy of the Master Continuing Disclosure Agreement, dated as of January 24, 2008 (the "MCDA"), (v) a certified copy of the Purchase Contract, (vi) a certified copy of the Security Agreement between the System and The Bank of New York (the "Security Agreement"), and (vii) such other proofs as we have deemed necessary as a basis for the opinions hereinafter expressed.

In rendering this opinion, we have assumed the genuineness of all signatures, the authenticity of all documents provided to us as originals and the conformity to authentic original documents of all documents provided to us as certified, conformed or photostatic copies. As to questions of fact material to this opinion, we have relied upon certificates of officers and representatives of the parties to the transactions contemplated by the Purchase Contract and of public officials.

Based upon the foregoing, and subject to the assumptions, limitations and qualifications set forth herein, we are of the opinion that:

(a)     The MCDA, the Security Agreement and the Purchase Contract have been duly authorized, executed and delivered by the System and, assuming the due authorization, execution and delivery thereof by, and the validity and enforceability against the other parties thereto, constitute the legal, valid and binding agreements of the System, enforceable against the System in accordance with their respective terms, except that such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium and other laws affecting the enforcement of creditors' rights generally and by the application of general principles of equity.



(b)     The Resolution and the Authorizing Resolution have been duly adopted by the System and are in full force and effect and constitute the legal, valid and binding agreements of the System, enforceable against the System in accordance with their respective terms, except that such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium and other laws affecting the enforcement of creditors' rights generally and by the application of general principles of equity.

(c)     It is not necessary in connection with the public offering and sale of the Bonds to register any security under the Securities Act of 1933, as amended, or to qualify the Resolution nor any other document or instrument under the Trust Indenture Act of 1939, as amended.

(d)     The statements contained in the Official Statement as of its date and as of the date hereof under the captions "THE SERIES A BONDS," "SECURITY AND SOURCES OF PAYMENT FOR THE BONDS," "TAX MATTERS," "ERISA CONSIDERATIONS,"

A-2

PR-ERS-000003527

"LEGAL INVESTMENT," and "CONTINUING DISCLOSURE," and corresponding statements in "SUMMARY STATEMENT," insofar as such statements constitute summaries of provisions of the Constitution and statutes of the Commonwealth, the Bonds, the Bond Resolution, the MCDA, the Security Agreement or Act 447, or refer to opinions we have rendered, constitute fair and accurate summaries of the documents and matters of law purported to be summarized therein and do not contain any untrue statement of a material fact or omit any material fact which, in our opinion, should be referred to therein so as to make the information or statements made therein not misleading. References to the Official Statement are to the document examined by us upon delivery of the Bonds, and not to any physical or electronic reproduction other than a true copy.

(e)     The System has full legal right, power and authority to sign the Official Statement and has duly approved and authorized the signing of the Official Statement.

We hereby consent to references to us contained in the Official Statement.

The proposed form of Bond Counsel opinion contained in Appendix VIII to the Official Statement is substantially in the form of the opinion delivered on the date hereof by this firm. You may rely on said delivered opinion as if it were addressed to you.

This opinion is being furnished at your request and is solely for your benefit and may not be relied upon by any other persons without our prior written consent.

                              Respectfully submitted,

A-3

PR-ERS-000003528

Case:17-03283-LTS Doc#:9347-3 Filed:09/10/21 Entered:09/10/21 14:27:35 Desc:
Exhibit 40 to 45 Page 34 of 137

**EXHIBIT B-1**

OPINION OF COUNSEL TO THE SYSTEM
(Pursuant to subparagraph 8(d)(3) of the Purchase Contract)

January 31, 2008

UBS FINANCIAL SERVICES INCORPORATED OF PUERTO RICO
POPULAR SECURITIES, INC.
SANTANDER SECURITIES CORPORATION
BANCO BILBAO VIZCAYA ARGENTARIA PUERTO RICO
CITIGROUP GLOBAL MARKETS INC.
LEHMAN BROTHERS, INC.
MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED
ORIENTAL FINANCIAL SERVICES, INC.
SAMUEL A. RAMÍREZ & CO., INC.
SCOTIABANK OF PUERTO RICO
TCM CAPITAL, INC.
WACHOVIA CAPITAL MARKETS, LLC

In care of UBS Financial Services Incorporated of Puerto Rico
American International Plaza
250 Muñoz Rivera Avenue
Hato Rey, Puerto Rico 00918
Attention: Jose Arias

Ladies and Gentlemen:



      In connection with the issuance and sale by the Employees Retirement System of the Government of the Commonwealth of Puerto Rico (the "System"), a trust created pursuant to Act 447 of May 15, 1951, as amended (the "Act"), to provide pension and other benefits to retired employees of the central government, municipalities and public corporations of the Commonwealth of Puerto Rico (the "Commonwealth"), of its $1,588,810,799.60 Senior Pension Funding Bonds, Series A (the "Bonds"), I have, as General Counsel of the System, examined the Act, certified copies of the Pension Funding Bond Resolution, adopted by the System on January 24, 2008, and a First Supplemental Pension Funding Bond Resolution, adopted by the System on January 24, 2008 and amended, restated and readopted on January 29, 2008 (collectively, the "Resolution"), certified copies of an amended and restated resolution of the System, adopted on January 29, 2008 (the "Authorizing Resolution"), authorizing, among other things, the issuance and sale of the Bonds, approving the Preliminary Official Statement, dated January 11, 2008, in connection with the Bonds (the "Preliminary Official Statement") and approving the Official Statement, dated January 29, 2008, in connection with the Bonds (the "Official Statement"), the amended and restated Purchase Contract, dated January 30, 2008, by and between the Underwriters named therein and the System (the "Purchase Contract"), the Master Continuing Disclosure Agreement, dated as of January 1, 2008 (the "MCDA"), among the System, the Commonwealth of Puerto Rico and the Fiscal Agent (hereinafter mentioned),

B-1-1

PR-ERS-000003529

and the Security Agreement, dated January 31, 2008 (the "Security Agreement," and together with the Resolution, the Authorizing Resolution, the Purchase Contract, and the MCDA, the "Agreements"), between the System and The Bank of New York as fiscal agent under the Resolution (the "Fiscal Agent"), and have conducted such other investigations and examined such other proofs as I deemed necessary as a basis for the opinions herein expressed. This opinion is issued pursuant to Section 8(d)(3) of the Purchase Contract. Capitalized terms used and not otherwise defined herein have the meanings assigned to them in the Resolution.

As to certain matters of act material to the opinions expressed herein, I have relied upon the representations and statements of fact made in the Agreements, and certificates, when appropriate, provided by parties thereto other than the System. I have not independently verified the accuracy of the representations and statements so relied upon.

I have assumed the genuineness of all signatures, the authenticity of all documents submitted to me as originals, the conformity and completeness to original documents of all documents submitted to me as certified, photostatic or conformed copies and the authenticity of the originals of all such latter documents.

I have assumed that (a) each party to the Agreements (other than the System) is duly organized and validly existing, has the power and authority to execute, deliver and perform the Agreements to which it is a party, has taken all action necessary to authorize the execution, delivery and performance of those Agreements, and has duly executed and delivered those Agreements, and (b) the Agreements constitute the valid and binding obligations of the parties thereto (other than the System), enforceable against those parties in accordance with their respective terms.

Based on the foregoing, I am of the opinion that:



(a)     Act 447 has been legally enacted in accordance with the laws of the Commonwealth, is in full force and effect and has not been amended, modified, or rescinded in any way.

(b)     The Purchase Contract, the Security Agreement and the MCDA have been duly authorized, executed and delivered by the System and, assuming the due authorization, execution and delivery thereof by, and the validity and enforceability thereof against, the other parties thereto, constitute the legal, valid and binding agreements of the System, enforceable in accordance with their respective terms, except as may be limited by bankruptcy, reorganization, insolvency, moratorium or similar laws affecting the rights and remedies of creditors and other laws, court decisions, or legal or equitable doctrines affecting the right to specific performance, injunctive relief or other equitable remedies.

(c)     The Resolution and the Authorizing Resolution have been duly adopted by the System and are in full force and effect and constitute the legal, valid, and binding agreements of the System, enforceable in accordance with their respective terms, except as may be limited by bankruptcy, reorganization, insolvency, moratorium or similar laws affecting the rights and remedies of creditors and other laws, court decisions, or legal or equitable doctrines affecting the right to specific performance, injunctive relief or other equitable remedies.

B-1-2

PR-ERS-000003530

(d)     The Bonds have been duly and validly authorized and issued.     When authenticated and delivered by the Fiscal Agent as provided in the Resolution, the Bonds will constitute legally valid and binding obligations of the System.

(e)     The Resolution creates a valid and binding security interest in the Revenues and other Pledged Property assigned and pledged by the System to the Fiscal Agent pursuant to the Resolution.

(f)     All legislation, authorizations, consents and approvals necessary to fulfill in all material respects the terms and conditions of the Bonds and to carry out the transactions contemplated by the Purchase Contract, the Official Statement, the Security Agreement, the MCDA, the Authorizing Resolution and the Resolution are in full force and effect or have been obtained, as applicable, and no further legislation, authorization, consent or approval is required for such purposes.

(g)     The System has full legal right, power and authority to sign the Official Statement, has duly approved and authorized the signing of the Official Statement, has ratified the distribution of the Preliminary Official Statement, and has approved the distribution of the Official Statement.

(h)     No litigation is pending (or, to my knowledge, after reasonable inquiry, threatened) (A) to restrain or enjoin the issuance or delivery of any of the Bonds, (B) in any way contesting or affecting any authority for or the validity of the Act, the application of the proceeds of the Bonds, the Resolution, the Authorizing Resolution, the Bonds, the MCDA, the Security Agreement or the Purchase Contract, (C) in any way contesting the power of the System to issue the Bonds or the power of the System to sell the Bonds and to apply the proceeds thereof as contemplated by the Official Statement and the Purchase Contract, (D) in any way contesting the pledge of the Employers' Contributions and other items of security for the payment of the principal of and interest on the Bonds, or (E) that could have a material adverse effect on the financial condition of the System.

(i)     All conditions precedent to the delivery of the Bonds have been fulfilled.



In addition, I have examined the Preliminary Official Statement and the Official Statement (including the information incorporated therein by reference), and the information as to the System, the Resolution, the MCDA, the Security Agreement and the statutes cited or referred to therein contained or incorporated by reference therein, is correct, and nothing has come to my attention which leads me to believe that such information, as of the respective dates thereof, and as to the Official Statement as of the date hereof, contained or contains any untrue statement of a material fact or omitted or omits to state a material fact necessary in order to make the statements therein relating to such information, in the light of the circumstances under which they were made, not misleading.

The opinions expressed herein are limited to the laws of the Commonwealth and based on an analysis of existing laws, regulations, rulings and court decisions of the Commonwealth. Such opinions may be adversely affected by actions taken or events occurring, including a change in law, regulation or ruling (or in the application or official interpretation of any law,

B-1-3

NY1 6469021v.13

PR-ERS-000003531

regulation or ruling) after the date hereof. I have not undertaken to determine, or to inform any person about, whether such actions are taken or such events occur, and I have no obligation to update this opinion in light of such actions or events.

In addition, I express no opinion as to the enforceability of any indemnification or contribution provisions included in any Agreement that may violate any law, rule, regulation or public policy of the United States of America or of the Commonwealth.

Furthermore, my opinions are subject to bankruptcy, reorganization, insolvency, moratorium, fraudulent conveyance or similar laws, from time to time in effect, affecting the rights and remedies of creditors generally and other laws, court decisions, or legal or equitable remedies or principles which may affect enforceability.

This opinion letter is rendered for the sole benefit of each addressee hereof, and no other person or entity is entitled to rely hereon. No attorney-client relationship has existed between me and any rating agency that shall have rated the Bonds or by virtue of this opinion letter. Copies of this opinion letter may not be furnished to any other person or entity, nor may any portion of this opinion letter be quoted, circulated or referred to in any other document without my prior written consent.

Very truly yours,

_____

_____

NYI 6469021v.13

PR-ERS-000003532

OPINION OF THE SECRETARY OF JUSTICE OF THE COMMONWEALTH
(Pursuant to subparagraph 8(d)(3) of the Purchase Contract)

January 31, 2008

UBS FINANCIAL SERVICES INCORPORATED OF PUERTO RICO
POPULAR SECURITIES, INC.
SANTANDER SECURITIES CORPORATION
BANCO BILBAO VIZCAYA ARGENTARIA PUERTO RICO
CITIGROUP GLOBAL MARKETS INC.
LEHMAN BROTHERS, INC.
MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED
ORIENTAL FINANCIAL SERVICES, INC.
SAMUEL A. RAMÍREZ & CO., INC.
SCOTIABANK OF PUERTO RICO
TCM CAPITAL, INC.
WACHOVIA CAPITAL MARKETS, LLC



In care of UBS Financial Services Incorporated of Puerto Rico
American International Plaza
250 Muñoz Rivera Avenue
Hato Rey, Puerto Rico  00918
Attention:  Jose Arias

Ladies and Gentlemen:

In connection with the issuance and sale by the Employees Retirement System of the Government of the Commonwealth of Puerto Rico (the "System") of $1,588,810,799.60 Employees Retirement System of the Government of the Commonwealth of Puerto Rico Senior Pension Funding Bonds, Series A (the "Bonds"), I have examined the Letter of Representations of the Commonwealth of Puerto Rico, dated January 30, 2008 (the "Letter of Representations"), executed by the Acting Secretary of the Treasury.

I have also examined a certified copy of the Master Continuing Disclosure Agreement, dated as of January 1, 2008 (the "MCDA"), by and among the System, the Commonwealth of Puerto Rico (the "Commonwealth") and The Bank of New York, and such other proofs as I have deemed necessary as a basis for the opinions hereinafter expressed.

Based upon the foregoing, I am of the opinion that:

(a)     The Letter of Representations and the MCDA have been duly authorized, executed and delivered by the Commonwealth and, assuming the due authorization, execution and delivery thereof by, and the validity and enforceability thereof against, the other parties thereto, constitute the legal, valid and binding agreements of the Commonwealth, enforceable in accordance with their terms, it being understood that the enforceability thereof may be subject to

NY1 6469021v.13

PR-ERS-000003533

judicial discretion, the valid exercise of the sovereign immunity of the Commonwealth and valid bankruptcy, insolvency, reorganization, moratorium and other laws affecting creditors' rights.

(b)     All legislation, authorizations, consents and approvals necessary to fulfill in all material respects the terms and conditions and to carry out the transactions contemplated by the Letter of Representations and the MCDA are in full force and effect or have been obtained, as applicable, and no further legislation, authorization, consent or approval is required for such purposes.

(c)     No litigation is pending (or, to my knowledge, threatened) in any way contesting or affecting any authority for or the validity of the Letter of Representations and the MCDA or that could have a material adverse effect on the financial condition of the Commonwealth.

In addition, I have examined the Preliminary Official Statement and the Official Statement (each as defined in the Letter of Representations) (including the information incorporated therein by reference and the Commonwealth Report included as Appendix IV thereto), and the information contained or incorporated by reference therein relating to the Commonwealth, as well as the factual information appearing under "LITIGATION" in Appendix IV, is correct, and nothing has come to my attention which leads me to believe that such information, as of the respective dates thereof, and as to the Official Statement as of the date hereof, contained or contains any untrue statement of a material fact or omitted or omits to state a material fact necessary in order to make the statements therein relating to such information, in the light of the circumstances under which they were made, not misleading.

Very truly yours,

_____
Secretary of Justice

B-2-2

PR-ERS-000003534

**EXHIBIT C**

OPINION OF COUNSEL TO THE UNDERWRITERS
(Pursuant to subparagraph 8(d)(4) of the Purchase Contract)

January 31, 2008

UBS FINANCIAL SERVICES INCORPORATED OF PUERTO RICO
POPULAR SECURITIES, INC.
SANTANDER SECURITIES CORPORATION
BANCO BILBAO VIZCAYA ARGENTARIA PUERTO RICO
CITIGROUP GLOBAL MARKETS INC.
LEHMAN BROTHERS, INC.
MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED
ORIENTAL FINANCIAL SERVICES, INC.
SAMUEL A. RAMÍREZ & CO., INC.
SCOTIABANK OF PUERTO RICO
TCM CAPITAL, INC.
WACHOVIA CAPITAL MARKETS, LLC

In care of UBS Financial Services Incorporated of Puerto Rico
American International Plaza
250 Muñoz Rivera Avenue
Hato Rey, Puerto Rico  00918
Attention:  Jose Arias



> **Re:**    **Employees Retirement System of the Government of the Commonwealth of
> Puerto Rico
> $1,588,810,799.60 Senior Pension Funding Bonds, Series A**

We have acted as counsel for the Underwriters named in the amended and restated
Purchase Contract, dated January 30, 2008 (the "Purchase Contract"), by and between the
Underwriters and the Employees Retirement System of the Government of the Commonwealth
of Puerto Rico (the "System") in connection with the purchase of the Bonds described above (the
"Bonds").  As such counsel, we have examined the Official Statement, dated January 29, 2008,
relating to the Bonds (the "Official Statement"), the Purchase Contract, and such other proofs as
we have deemed necessary for the purpose of expressing the following opinion.  This opinion is
being delivered to you pursuant to subparagraph 8(d)(4) of the Purchase Contract.

Based upon such examination, we are of the opinion that it is not necessary in connection
with the public offering and sale of the Bonds to register any security under the Securities Act of
1933, as amended, or to qualify any indenture, document or instrument under the Trust Indenture
Act of 1939, as amended.

In accordance with our understanding with you, we rendered legal advice and assistance
to you in the course of your investigation pertaining to, and your participation in the preparation
of, the Official Statement and the issuance and sale of the Bonds.  Rendering such assistance

C-1

NY1 6469021v.13

PR-ERS-000003535

involved, among other things, discussions and inquiries concerning various legal and related subjects, and reviews of and reports on certain records, documents and proceedings of the System. We also participated in personal and telephone conferences with representatives of the Commonwealth of Puerto Rico (the "Commonwealth"), with your representatives, with Parissi P.S.C. and KPMG LLP, independent auditors of the System's and of the Commonwealth's financial statements, respectively, with Fiddler González & Rodriguez, P.S.C., Bond Counsel, with Global Insight, Inc. and with representatives of Government Development Bank for Puerto Rico, during which conferences the contents of the Official Statement and related matters were discussed and reviewed, and conducted such other due diligence as we considered necessary in rendering the opinion set forth below.

The limitations inherent in the independent verification of factual matters and the character of determinations involved in the preparation of the Official Statement are such, however, that we are not passing upon or assuming responsibility for the accuracy, completeness and fairness of any of the statements made in the Official Statement and have made no independent check or verification thereof. Also, we do not express any opinion or belief as to the financial, statistical or economic data or forecasts, numbers, charts, tables, graphs, estimates, projections, assumptions or expressions of opinion contained in the Official Statement, including those contained in the report of the Global Insight, Inc. (the "Global Insight Report") included as an appendix to the Official Statement. We have also assumed, but have not independently verified, that the signatures on all documents and certificates that we examined were genuine.

On the basis of the information which was developed in the course of the performance of the services referred to above, considered in the light of our understanding of the Federal securities laws and the experience we have gained through our practice thereunder, and without having undertaken to determine independently the accuracy, completeness and fairness of the statements contained in the Official Statement, we advised you and now confirm that during the course of our representation of you on this matter, no information came to the attention of the attorneys in our firm rendering legal services in connection with such representation which leads us to believe that the Official Statement (excluding the System and Commonwealth financial statements included or incorporated therein by reference and other financial and statistical data contained or incorporated by reference in the Official Statement, including in the Global Insight Report, and the information regarding The Depository Trust Company, as to all of which, with your permission, we express no view) as of its date and as of the date hereof contained or contains any untrue statement of a material fact or omitted or omits to state a material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading.

We are furnishing this opinion to you solely for your benefit in connection with the transactions contemplated by the Purchase Contract. This opinion may not be relied upon by any other person or for any other purpose without our express written consent, and no view is expressed as to any offering by the Underwriters or others of derivative instruments with investment characteristics not identical to those of the Bonds.

The opinions expressed herein are based on an analysis of existing laws, regulations, rulings and court decisions. Such opinions may be adversely affected by actions taken or events occurring, including a change in law, regulation or ruling (or in the application or official

C-2

PR-ERS-000003536

interpretation of any law, regulation or ruling) after the date hereof. We have not undertaken to determine, or to inform any person, whether such actions are taken or such events occur, and we have no obligation to update this opinion in light of such actions or events. Our engagement with respect to this matter has terminated as of the date hereof.

We are not expressing any opinion with respect to the authorization, execution, delivery or validity of the Bonds, or the exclusion from gross income for federal income tax purposes of interest on the Bonds.

This letter and the legal opinions herein are intended for the information solely of the addressees hereof and solely for the purposes of the transactions described in the Official Statement and are not to be relied upon by any other person or entity (including, without limitation, any person or entity that acquires Bonds from the addressees of this letter), or for any other purpose, or quoted as a whole or in part, or otherwise referred to, in any document, or to be filed with any governmental or other administrative agency or other person or entity for any purpose without, in any of these instances, our prior written consent. We do not undertake to advise you of matters that may come to our attention subsequent to the date hereof that may affect the conclusions expressed herein.

We bring to your attention the fact that our conclusions are an expression of professional judgment and are not a guarantee of a result.

Respectfully submitted,



NY1 6469021v.13

PR-ERS-000003537

**EXHIBIT D-1**

CERTIFICATE OF THE ADMINISTRATOR OF THE EMPLOYEES RETIREMENT
SYSTEM OF THE GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO
(Pursuant to subparagraph 8(d)(5) of the Purchase Contract)

I, JUAN CANCEL ALEGRÍA, Administrator of the Employees Retirement System of
the Government of the Commonwealth of Puerto Rico (the "System"), DO HEREBY CERTIFY,
in connection with the issuance and sale by the System of its $1,588,810,799.60 Senior Pension
Funding Bonds, Series A (the "Bonds"), that:

(1) except as set forth in the Official Statement dated January 29, 2008 relating to the
Bonds (the "Official Statement"), no litigation or other proceedings are pending or, to the
knowledge of the System, threatened, in or before any agency, court or tribunal, state,
Commonwealth of Puerto Rico, or federal, (A) restraining or enjoining or seeking to restrain or
enjoin the issuance, sale, execution or delivery of any of the Bonds or the collection of the
Employers' Contributions (as defined in the Bond Resolution hereinafter mentioned) pledged to
the payment of the principal of and premium, if any, and interest on the Bonds, (B) contesting or
affecting, in any way, the payment, collection or application of the Employers' Contributions of
the System or the pledge thereof pursuant to the Bond Resolution (as defined in the Official
Statement), (C) contesting or affecting the validity of any provision of the Bonds, the Bond
Resolution, the MCDA, the Security Agreement (each as defined in the Purchase Contract
hereinafter mentioned) or the amended and restated Purchase Contract, dated January 30, 2008
(the "Purchase Contract"), executed by the System in connection with the issuance of the Bonds,
(D) contesting or affecting the validity of any of the proceedings of the System for the
authorization, sale, execution or delivery of the Bonds, or the authorization, execution and
delivery of the Purchase Contract, the MCDA or the Security Agreement or the adoption of the
Bond Resolution, (E) contesting or affecting the organization or existence of the System or the
title of any of its officers to their respective offices or any powers of the System under the laws
of the Commonwealth of Puerto Rico or (F) contesting or affecting the accuracy or completeness
of the Official Statement or any amendment or supplement thereto; (2) the representations and
warranties of the System in the Purchase Contract are true, accurate and correct as of the date
hereof, and the System has complied with and performed all agreements, covenants and
arrangements and satisfied all conditions on its part to be complied with, performed or satisfied

hereunder at or prior to the date hereof; (3) subsequent to the date of the most recent financial
statements of the System in the Official Statement, there has been no material adverse change in
the financial position or results of operations of the System except as set forth in or contemplated
by the Official Statement; and (4) the Official Statement as of its date and at all subsequent times
up to and including the date hereof, did not and does not contain any untrue statement of a
material fact or omit to state a material fact required to be included therein for the purpose for
which the Official Statement is to be used or which is necessary in order to make the statements
therein, in the light of the circumstances under which they were made, not misleading.

D-1-1

PR-ERS-000003538

WITNESS my hand this 31st day of January, 2008.

_____
JUAN CANCEL ALEGRIA
Administrator

D-1-2

PR-ERS-000003539

**EXHIBIT D-2**

CERTIFICATE OF THE SECRETARY OF THE
TREASURY OF THE COMMONWEALTH OF PUERTO RICO
(Pursuant to subparagraph 8(d)(5) of the Purchase Contract)

     I, JOSE GUILLERMO DAVILA, Acting Secretary of the Treasury of the Commonwealth of Puerto Rico (the "Commonwealth"), DO HEREBY CERTIFY, in connection with the issuance and sale by the Employees Retirement System of the Government of the Commonwealth (the "System") of its $1,588,810,799.60 Senior Pension Funding Bonds, Series A (the "Bonds"), that:

     (a)    Representatives of the Department of the Treasury of the Commonwealth, together with representatives of Government Development Bank for Puerto Rico and of the Office of Management and Budget of the Commonwealth, participated in the preparation of the Commonwealth Report and the general purpose financial statements (for the fiscal year ended June 30, 2006) audited by KPMG LLP, included or incorporated by reference in the Official Statement of the System, dated January 29, 2008, in connection with the issuance and sale of the Bonds (the "Official Statement").

     (b)    I have examined the Official Statement (and the information incorporated by reference in the Official Statement) and to my knowledge and belief, (1) as of the date of the Official Statement and as of the date hereof, such Report and financial statements did not and does not contain any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading; (2) as of the date hereof, except as disclosed in such Report and financial statements, there has been no material adverse change in the condition of the Commonwealth, financial or otherwise, since June 30, 2006; (3) as of the date hereof, the Commonwealth is not in default under the provisions of any agreement or of any instrument evidencing or relating to any outstanding indebtedness or other obligations for borrowed money of the Commonwealth or any Commonwealth guaranty of outstanding indebtedness or other obligations for borrowed money of others; and (4) the representations and warranties of the Commonwealth in the Letter of Representations, dated January 30, 2008, are true, accurate and correct as of the date hereof, with the same effect as if made on and as of the date hereof, and the Commonwealth has complied with and performed all agreements, covenants and arrangements and satisfied all conditions on its part to be complied with, performed or satisfied thereunder at or prior to the date hereof. In making the statements specified in clauses (1) through (4) of this paragraph (b), I have relied, after reasonable investigation, and believe that I am justified in so relying, as to information relating to and provided by governmental agencies or departments other than the Department of the Treasury of the Commonwealth, upon information furnished to me by such agencies or departments.



D-2-1

PR-ERS-000003540

WITNESS my hand this 31st day of January, 2008.

_____
José Guillermo Davila
Acting Secretary of the Treasury of Puerto Rico



NYI 6469021v.13

PR-ERS-000003541

<b>EXHIBIT E</b>

CERTIFICATE OF GOVERNMENT DEVELOPMENT BANK<br>
FOR PUERTO RICO<br>
(Pursuant to subparagraph 8(d)(6) of the Purchase Contract)

  I, Jorge Irizarry Herráns, President of Government Development Bank for Puerto Rico, DO HEREBY CERTIFY that the Certificate of the Acting Secretary of the Treasury of the Commonwealth of Puerto Rico pursuant to Section 8(d)(5) of the Purchase Contract relating to $1,588,810,799.60 Senior Pension Funding Bonds, Series A of the Employees Retirement System of the Government of the Commonwealth of Puerto Rico (the "Bonds") is hereby confirmed as to all statements made under the general heading "Public Corporations" in the Commonwealth Report included as Appendix IV to the Official Statement relating to said Bonds.

  In rendering this Certificate, I have relied, after reasonable investigation, and believe that I am justified in so relying, as to information relating to and provided by public corporations other than Government Development Bank for Puerto Rico and any of its subsidiaries, upon information furnished to me by such public corporations.

  WITNESS my hand this 31st day of January, 2008.

    By:   _____
    Title:  President
       Government Development Bank
        for Puerto Rico

E-1

PR-ERS-000003542

# Bondholders' UV
# EXHIBIT 4

## FORM OF TERM BONDS

**No. AR-__**                                                                                                 $_____

### EMPLOYEE RETIREMENT SYSTEM OF THE
### GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO
### SENIOR PENSION FUNDING BOND
### SERIES A

| DATED DATE | MATURITY DATE | INTEREST RATE | CUSIP NO. |
|---|---|---|---|
| January __, 2008 | _____ 1, ____ | ____% | _____ |

**REGISTERED OWNER:**   Cede & Co.

**PRINCIPAL AMOUNT:** _____ DOLLARS

   **EMPLOYEE RETIREMENT SYSTEM OF THE GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO** (herein sometimes called the "System"), a trust created pursuant to Act 447 of May 15, 1951, as amended (the "Act"), to provide pension and other benefits to retired employees of the central government, municipalities and public corporations of the Commonwealth of Puerto Rico (the "Commonwealth"), acknowledges itself indebted, and for value received, hereby promises to pay to the REGISTERED OWNER named above or registered assigns or legal representative, upon presentation and surrender of this Series A Bond at the Corporate Trust Office (as defined in the General Resolution hereinafter mentioned) of the Fiscal Agent hereinafter mentioned on the MATURITY DATE specified above (unless redeemed prior thereto as hereinafter provided), the PRINCIPAL AMOUNT specified above, and to pay interest thereon from the most recent interest payment date to which interest has been paid, or, if no interest has been paid, from the DATED DATE specified above, until the earlier of the maturity or redemption of this Series A Bond, at the per annum INTEREST RATE specified above, payable on each Interest Payment Date (as defined in the Supplemental Resolution hereinafter mentioned), commencing March 1, 2008. Both the principal of and the interest on this Series A Bond are payable in any coin or currency of the United States of America which, on the respective dates of payment thereof, shall be legal tender for the payment of public and private debts. Payment of the interest on this Series A Bond on any interest payment date will be made to the person appearing on the registration books of the System maintained by the Fiscal Agent as the registered owner hereof as of the fifteenth calendar day (whether or not a business day) next preceding such interest payment date, such interest to be paid by check mailed to the registered owner at such registered owner's address or, at the option of a registered owner of at least $1,000,000 in aggregate principal amount of the Series A Bonds (hereinafter defined) who so requests the Fiscal Agent in writing at least 15 calendar days prior to such interest payment date, by wire transfer.

PR-ERS-000003489

This Series A Bond is payable by the System solely from the Pledged Property held under the Resolution and does not constitute a debt, obligation or pledge of the full faith, credit and taxing power of the Commonwealth or any of its municipalities or political subdivisions or of instrumentalities (other than the System), and neither the Commonwealth nor any of its municipalities or political subdivisions or instrumentalities (other than the System) shall be liable for the payment thereof.

This Series A Bond is one of the bonds of a duly authorized series of bonds in the aggregate principal amount at issuance of $1,588,810,799.60 designated "Senior Pension Funding Bonds, Series A" (herein called the "Series A Bonds") authorized to be issued pursuant to an Employee Retirement System of the Government of Puerto Rico Pension Funding Bond Resolution, adopted by the System on January 24, 2008 (herein called the "General Resolution") and a First Supplemental Pension Funding Bond Resolution, adopted by the System on January 29, 2008 (the "Supplemental Resolution," and together with the General Resolution, the "Resolution"), for the purposes set forth in the Resolution. This Series A Bond and any additional bonds issued under the Resolution are herein referred to collectively as the "Bonds."

The Bonds are special obligations of the System. There is pledged to the payment of the principal or redemption price of, if any, and interest on the Bonds in accordance with the provisions of the Resolution, the Pledged Property as defined and provided in the Resolution, subject only to the provisions of the Resolution permitting the use and application thereof for the purposes and on the conditions set forth in the Resolution. Such pledge and other obligations of the System may be discharged, wholly or in part, at or prior to the maturity of the Bonds upon the making of provision for the payment of the principal or redemption price of, if any, and interest on the Bonds pursuant to the terms and conditions set forth in the General Resolution.

At the option of the System, and upon 40 days' prior notice, the Series A Bonds maturing on or after July 1, 2018 are subject to redemption from any moneys available for that purpose (other than from moneys set aside with respect to Sinking Fund Installments) prior to maturity, in whole or in part, at a redemption price equal to the principal amount of the Series A Bonds, plus accrued interest (in the case of the Capital Appreciation Bonds, the Accreted Amount) to the redemption date, and without premium.

If notice of redemption is given and if sufficient funds are on deposit with the Fiscal Agent to provide for the payment of the principal of and premium, if any, and interest (or Accreted Amount, in the case of the Capital Appreciation Bonds) on the Series A Bonds (or portions thereof) to be redeemed, then the Series A Bonds (or portions thereof) so called for redemption will, on the redemption date, cease to bear interest (in the case of the Capital Appreciation Bonds, the Accreted Amount thereof shall cease to increase), and shall no longer be deemed outstanding under or be entitled to any benefit or security under the Resolution.

Copies of the Resolution are on file at the office of the System, and at the Corporate Trust Office of The Bank of New York, as Fiscal Agent under the Resolution (including its successors, herein called the "Fiscal Agent"), and reference to the Resolution and any and all supplements thereto and amendments thereof and to the Act is made for a description of the pledges and covenants securing the Bonds, the nature, extent and manner of enforcement of such pledges and covenants, the terms and conditions upon which Bonds have been issued and

PR-ERS-000003490

additional Bonds may be issued, the rights and remedies of the registered owners of the Bonds with respect thereto, and to other terms and provisions of the Bonds. To the extent and in the manner permitted by the terms of the General Resolution, the provisions of the Resolution or any resolution amendatory thereof or supplemental thereto may be modified or amended.

The registered owner of this Series A Bond shall have no right to enforce the provisions of the Resolution, to institute action to enforce the provisions of the Resolution or to institute, appear in or defend any suit or other proceeding with respect thereto, *except* as provided in the Resolution.

This Series A Bond is transferable, as provided in the Resolution, only upon the books of the System maintained for that purpose at the Corporate Trust Office of the Fiscal Agent by the registered owner hereof in person or by his attorney duly authorized in writing, upon surrender of this Series A Bond together with a written instrument of transfer duly executed by the registered owner or such registered owner's attorney duly authorized in writing, and thereupon a new fully registered Series A Bond or Bonds in the same aggregate principal amount, and of the same series, maturity and interest rate, shall be issued to the transferee in exchange therefor as provided in the General Resolution and upon the payment of the charges, if any, therein prescribed. The System and the Fiscal Agent may treat and consider the person in whose name this Series A Bond is registered as the absolute owner hereof for the purpose of receiving payment of, or on account of, the principal or redemption price, if any, hereof and interest due hereon and for all other purposes whatsoever.

This Series A Bond shall not be valid or become obligatory for any purpose or be entitled to any security or benefit under the Resolution until the Certificate of Authentication hereon shall have been signed by the Fiscal Agent.

**IT IS HEREBY CERTIFIED, RECITED AND DECLARED** that all acts, conditions and things required by the Constitution and statutes of the Commonwealth and the Resolution to exist, to have happened and to have been performed precedent to and in the issuance of this Series A Bond, exist, have happened and have been performed in due time, form and manner as required by law and that the issue of the Bonds, together with all other indebtedness of the System, is within every debt and other limit prescribed by law.

VII-13

PR-ERS-000003491

**IN WITNESS WHEREOF,** the EMPLOYEE RETIREMENT SYSTEM OF THE GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO has caused this Series A Bond to be executed in its name by the manual or facsimile signature of an authorized representative, as of the DATED DATE specified above.

**EMPLOYEE RETIREMENT SYSTEM OF THE GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO**

By: _____

Executive Director

[SEAL]

Attest:

_____
Secretary or Assistant Secretary

PR-ERS-000003492

## CERTIFICATE OF AUTHENTICATION

This Bond is one of the Series A Bonds described in the within-mentioned Resolution.

**THE BANK OF NEW YORK**, as Fiscal Agent

By: _____

Authorized Signatory

Date of Authentication:

VII-15

## ASSIGNMENT

FOR VALUE RECEIVED, the undersigned hereby sells, assigns, and transfers unto

_____

(please print or typewrite name and address of transferee)

_____

(please insert social security or other identifying number of assignee)
(For computer record only)

the within Bond and all rights thereunder, and hereby irrevocably constitutes and appoints
_____ Attorney to transfer the within
Bond on the books kept for registration thereof, with full power of substitution in the premises.

Dated: _____

Signature Guaranteed

_____          _____


_____          _____

By:

Signatures must be guaranteed by an "eligible
guarantor institution" meeting the
requirements of the Fiscal Agent, which
requirements include membership or
participation in the Security Transfer Agent
Medallion Program ("STAMP") or such other
"signature guarantee program" as may be
determined by the Fiscal Agent in addition to,
or in substitution for, STAMP, all in
accordance with the Securities Exchange Act
of 1934, as amended.

VII-16

PR-ERS-000003494

# Bondholders' UV
# EXHIBIT 5

# REBUTTAL TO EXPERT REPORT OF ROBERT W. DOTY

### By

## WILLIAM BARTLEY HILDRETH, PH.D.

In the case of

In re:

The Financial Oversight and Management Board for Puerto Rico, as representative of

The Employees Retirement System of the

Government of the Commonwealth of Puerto Rico

As a supplement to my original report (dated July 1, 2020), I offer the following additional opinions in response to the Expert Report of Robert W. Doty (dated July 1, 2020) regarding the debt transactions of the Employees Retirement System of the Government of the Commonwealth of Puerto Rico [ERS or System].

**SUMMARY OF OPINIONS**

A. Mr. Doty does not explain what purpose his narrow interpretation of the authorization for ERS to incur debt would serve nor offer any reason why the Legislative Assembly would have limited ERS in that way.

B. Mr. Doty neglects the key distinction between direct financing and indirect or conduit financing in public finance.

C. Mr. Doty overlooks the fact that there were many sophisticated participants in the actual transactions at issue in this case who concluded contemporaneously that the issuances were authorized.

D. Mr. Doty mistakenly focuses on the transactions from the perspective of the syndicate of underwriters instead of ERS as the borrower.

E. Mr. Doty overlooks the fact that the market expects the debt issuer, its legal advisors, and other transaction participants to confirm legal authority to incur debt, and that investors cannot practicably do so.

## A. MR. DOTY'S ASSUMPTIONS OF THE LEGISLATIVE ASSEMBLY'S PURPOSE

1. Mr. Doty does not explain what purpose his narrow interpretation of the authorization for ERS to incur debt would serve nor offer any reason why the Legislative Assembly would have limited ERS in that way.

2. Mr. Doty opines (on page 3) that an "underwritten public municipal bond offering, such as the 2008 ERS Bond issuances, is not a loan by or borrowing from a financial institution, nor is it a direct placement of debt."

3. Mr. Doty neglects to cite that in the 1988 Act[1] authorizing ERS "to Incur Debts," the Legislative Assembly of the Commonwealth of Puerto Rico stated in the "Statement of Motives" that its "obligation" was to "be of assistance in improving the System's financial condition" by dealing with "an actuarial deficit estimated at $2.6 billion dollars as of June 30, 1987."

4. Mr. Doty does not specify how his narrow interpretation would have achieved the legislative goal outlined in the Statement of Motives.

5. Mr. Doty loses sight of the financial flexibility required to implement the Statement of Motives.

6. Mr. Doty overlooks the fundamental fact about public finance: "The issuer's goal in a negotiated bond sale is to obtain the lowest borrowing cost for the bonds."[2]

---

[1] Commonwealth of Puerto Rico, Retirement of Government Employees-Amendment (H.B. 1346), No. 46, approved June 29, 1988 [Dowd, Exhibit No. 7] – hereafter cited as 1988 Act.
[2] Government Finance Officers Association, Best Practices, "Selecting and Managing Underwriters for Negotiated Bond Sales." https://www.gfoa.org/materials/selecting-and-managing-underwriters-for-negotiated

7. Mr. Doty seems to have assumed, without evidence, that the Legislative Assembly wanted to place limits, instead of confer flexibility, on ERS to deal with the Commonwealth's pension system's large actuarial deficit.

8. Mr. Doty fails to show that his narrow interpretation of the grant of debt authority to ERS would have served any purpose compared to the benefits of a broader authorization.

## B. DIRECT VERSUS INDIRECT FINANCING

9. Mr. Doty neglects the key distinction between direct financing and indirect or conduit financing in public finance.

10. Mr. Doty takes the view that the wording of "direct placement" means 'private placement,' when it is well known in public finance that debt obligations can be incurred either directly or indirectly.

11. An indirect method of issuing debt is to have a new or existing conduit entity (e.g., the Government Development Bank for Puerto Rico, the Puerto Rico Sales Tax Financing Corporation, or the Public Buildings Authority[3]) formally issue the debt while the ultimate obligor would be ERS in this case.

12. The direct method of issuing debt is for ERS to issue the debt itself, as occurred here.

13. Mr. Doty overlooks the fact that when ERS and the underwriters actually entered into the three financial transactions – i.e., upon the exchange of cash for an obligation to repay – the consummate act constitutes a direct placement and a borrowing. That is because the only

---

[3] Existing special entities are cited in the Commonwealth of Puerto Rico, Basic Financial Statement and Required Supplementary Information, June 30, 2016 (with Independent Auditor's Report Thereon), dated May 3, 2019.

entity with the immediate securities entitlement is the underwriting syndicate, and ERS issued the debt directly to that underwriting syndicate.

## C. CONTEMPORANEOUS VIEWS OF THE TRANSACTIONS

14. Mr. Doty overlooks the fact that there were many sophisticated participants in the actual transactions at issue in this case who concluded contemporaneously that the issuances were authorized.

15. To accept Mr. Doty's views of "industry guidance" (page 8) and his narrow interpretation of the 1988 Act and its implication for the validity of the Series A, B, and C bonds totaling $2,947,648,342.65 of par value, the following expert opinions, votes, signatures, agreements, and assessments at the time of issuance of each of the three series of bonds would have to be disregarded:

   a. The issuer of the ERS bonds, represented by the:

      i. ERS Executive Director;

      ii. ERS General Counsel;

      iii. ERS Board of Trustees, consisting of the:

         1. President of the Government Development Bank for Puerto Rico;

         2. Commissioner of Municipal Affairs of Puerto Rico;

         3. Executive Assistant to the Secretary for Management and Development of the Housing Development and Improvement Administration of Puerto Rico;

         4. Acting Secretary of the Treasury of Puerto Rico;

     5.   Director, Office of Human Resources of the Commonwealth of Puerto Rico;

     6.   Chairman of the Board, Puerto Rico Retirees Association; and the

     7.   Auxiliary Inspector, Inspector for Cooperatives of Puerto Rico

b.   The Acting Secretary of the Treasury of Puerto Rico;

c.   The Secretary of Justice of the Commonwealth of Puerto Rico;

d.   The President of the Government Development Bank;

e.   Attorneys of the Bond Counsel firm, Fiddler Gonzalez & Rodriquez, P.S.C.;

f.   Agents of UBS Financial Services Incorporated of Puerto Rico;

g.   Agents for each of the members of the underwriting syndicate for the three separate bond series that include 11 additional financial services firms for Series A bonds, 2 firms for Series B bonds, and 11 firms for Series C bonds;

h.   Attorneys of the Underwriter's counsel firm, O'Neill & Borges;

i.   Representatives of the Government Development Bank as 'financial advisor';

j.   Agents of the "Financial Advisor" - Mesirow Financial, Inc;

k.   Credit analysts and the review committee[4] at Moody's Investors Service;

l.   Credit analysts and the review committee[5] at Standard & Poor's;

m.   Credit analysts and the review committee[6] at Fitch Ratings; and,

n.   Others in the municipal bond industry not yet specified.

---

[4] The important role of the rating committee is noted in: Securities and Exchange Commission, *Report on the Role and Function of Credit Rating Agencies in the Operation of the Securities Markets*, January 2003, page 26.
[5] Ibid.
[6] Ibid.

16. According to the cover of the Official Statement upon the issuance of the $1.6 billion Series A bonds, the bonds were "offered exclusively in the Commonwealth of Puerto Rico."[7] To accept Mr. Doty's interpretation, the ERS Board of Trustees and other Puerto Rico public officials involved in the transaction were willing to issue unlawful debt instruments for potential investment by their fellow citizens including the employees and employers paying into the retirement system.

**D. ERS' VERSUS UNDERWRITERS' PERSPECTIVE**

17. Mr. Doty mistakenly focuses on the transactions from the perspective of the syndicate of underwriters instead of ERS as the borrower.

18. The sole focus of the 1988 Act's debt authorizing language was the ERS.

19. In contrast, Mr. Doty focuses on the role of the underwriters as a way to distinguish a 'direct placement' from a 'public offering'.

20. Much of Mr. Doty's report discusses the underwriter and underwriter syndicate, but he does not show why the post-issuance actions of the underwriters are material to whether ERS was authorized to undertake the transaction.

21. Mr. Doty does not present any evidence that the Legislative Assembly was concerned about the role of the lenders or underwriters, credit rating organizations, or even the owners/holders of the debt instruments (other than to exempt the interest on the bonds from Puerto Rico income and property taxes).

---

[7] ERS Series A bonds, Tab 4, Official Statement, dated January 29, 2008, cover.

22. There are well known methods to address the concerns of parties other than ERS, but the 1988 Act did not include any of those protections, such as minimum denominations, specified credit rating, itemized coverage ratio, maximum debt level, or any others.

23. Mr. Doty does not address that the lack of such restrictions bestows on ERS the flexibility to design debt transactions to meet its needs.

24. Despite Mr. Doty's assertions that "underwritten public offerings" (page 3) are different from 'direct placement' or 'private placement,' to the issuer the substance of the transaction is the same – the issuer/borrower receives cash in exchange for transferring to another the ownership interest in a repayment obligation.

25. In other words, the economic relationship of concern is between the ERS as the seeker of cash and the direct provider of cash, which was the underwriting syndicate in this case.

26. Mr. Doty confirms this point in his reliance (at page 9) on language from the Government Finance Officers Association's 'Best Practices' document[8]: "The **only legal relationship** between the issuer and an underwriter is created by a Bond Purchase Agreement signed at the time of the pricing of the bonds, **wherein the issuer agrees to sell the bonds to the underwriter and the underwriter agrees to purchase the bonds from the issuer** at an agreed upon price." [his emphasis]

27. Confirming that same point, Mr. Doty's footnote 31 (page 14) quotes a *Harvard Law Review* article that states "… an underwriter takes title to the securities…."

28. Mr. Doty draws a bright line distinction between loans and bonds in contrast to guidance from the Municipal Securities Rulemaking Board [MSRB] that cautioned market participants

---

[8] Government Finance Officers Association, Best Practices, "Selecting and Managing Underwriters for Negotiated Bond Sales." https://www.gfoa.org/materials/selecting-and-managing-underwriters-for-negotiated

in 2011 that "when banks make 'loans' to state and local governments … whether such 'loans' will be considered securities can be a difficult question."[9]

29. While underwriters may not be "interested in purchasing the issuer's bonds for investment" as Mr. Doty states (page 12), their degree of success, or the lack thereof, in reselling the debt is of no economic concern to ERS.

30. Mr. Doty overlooks the evidence that the underwriting of municipal debt includes a risk premium referred to as the 'underwriting fee' as compensation for the underwriter buying the debt and incurring the risk that it may be unable to resell it, as referenced in these authoritative sources:

   a. "The underwriting fee, also known as the 'risk' component of the spread, is designed to compensate the underwriter for the risk incurred by buying the entire issuance before it has received orders from investors for all the bonds."[10]

   b. "Because the underwriter cannot be certain that all of the issuer's bonds will be readily purchased by investors, the underwriter may charge a fee to cover the possibility that some of the bonds may have to be reoffered at a lower price or taken into the underwriter's inventory."[11]

   c. "The underwriting fee, also called the 'risk' component of the spread … is designed to compensate the underwriter for taking the risk of purchasing the entire bond issue before it has received offsetting orders from investors for all of the bonds. In effect,

---

[9] MSRB Notice 2011-52, September 12, 2011.
[10] California Debt and Investment Advisory Commission, California Debt Issuance Primer Handbook, CDIAC #05-06, p. 22. https://www.treasurer.ca.gov/cdiac/debtpubs/handbook.pdf
[11] California Debt Advisory Commission, "Understanding the Underwriting Spread," in in Gerald J. Miller, editor, *Handbook of Debt Management* (New York: Marcel Dekker, Inc., 1996), 569-574, page 570.

the fee is supposed to offer some protection to the underwriter in case of an abrupt

increase in the rates of interest demanded by investors before the firm has had a

chance to sell all of the bonds."[12]

d.  "One of the biggest concerns for the underwriters is their ability to resell the

underwritten debt …. Generally, when the underwriters face difficulties in reselling

the bonds they must absorb all the risk associated with the illiquidity."[13]

e.  "Underwriters, as the term implies, buy the debt, own or hold it for a time – a very,

very short time if they are successful – and then resell [it] to investors. They have

their own money and capital at stake."[14]

f.  "Firms buying municipal bonds for resale on the secondary market may earn some of

their compensation in exchange for the risk that they assume. There is a risk that they

will not be able to resell the bonds to investors and will end up having to hold them in

inventory or sell then at a loss in order to dispose of all of them. That risk could be

material, particularly in volatile interest rate environments where substantial bond

valuation changes could occur between primary purchase and resell."[15]

---

[12] Tom McLoughlin (of the Government Finance Officers Association), "Choosing an
Underwriter for a Negotiated Bond Sale," in Gerald J. Miller, editor, *Handbook of Debt
Management* (New York: Marcel Dekker, Inc., 1996), 395-399, page 398.

[13] Craig L. Johnson, Martin J. Luby, and Tima T. Moldogaziev, *State and Local Financial
Instruments: Policy Changes and Management* (Northampton, MA: Edward Elgar, 2014), page
120.

[14] A. John Vogt, *Capital Budgeting and Finance: A Guide for Local Governments*. Washington,
DC: International City/County Management Association, 2004, page 309.

[15] Lori Raineri, Mark Robbins, Bill Simonsen, and Keith Weaver, "Underwriting, Brokerage, and
Risk in Municipal Bond Sales," *Municipal Finance Journal*, 33:2 (Sumer 2012), 87-103, page
95.

g. "If a bond is sold on a firm commitment basis, the underwriter is stuck with the unsold securities."[16]

h. Inventory risk can occur when "sales slow down dramatically in a rapidly deteriorating market."[17]

i. The Securities and Exchange Commission Rule 15c2-12 defines underwriters as purchasing municipal securities from an issuer "with a view" [18] to sell them; although having only a "view" to do something is a pretty weak expectation of what action to take.

31. The concept that underwriters seek to 'resell' is telling since that word, by itself, accurately conveys a second (legal) exchange of ownership interest.

32. Mr. Doty confirms that underwriting syndicates and their "sales personnel" focus on the "issuers' credit strengths…." (page 11) which, by necessity, is premised on the debt issuer's legal responsibility to repay the money in full and on time. Besides, "sales personnel" are regulated parties who work under conditions set by that firm's credit, compliance, supervision, and audit procedures in compliance with securities rules.[19]

33. Issuers generally have little concern with who holds their debt obligations since the desired amount of cash has been obtained up-front and the issuer fully expects to pay its pledged debt service when due and payable through its paying agent or trustee.

---

[16] "Underwriting Commitments" (emphasis removed). https://app.achievable.me/study/finra-sie/learn/municipal-debt-underwriting-commitments

[17] William Gottdenker, "What Happens After a 'Deal Breaks' and Role of Dealers," Chapter 14 in Frank J. Fabozzi, Sylvan G. Feldstein, Irving M. Pollack, and Frank G. Zarb, editors, *The Municipal Bond Handbook* (Homewood, IL: Dow Jones-Irwin, 1983), 198-203, page 201.

[18] Securities and Exchange Commission, Rule 15c2-12(f)(2).

[19] As guided, for example, by MSRB Rule G-3 on Professional Qualifications Requirements, Rule G-37 on Supervision, and other rules contained in MSRB Rule Book, October 1, 2019.

34. How the ultimate securities entitlements are distributed are not material to the issuer at the actual exchange of economic interest in the original issuance of the debt obligations.

35. Issuers do not know (and because of the book entry system can never know without undertaking enormous effort) the names of the buyers of bonds from the underwriter(s) in the initial reoffering (or even during secondary market transactions); an issuer's only interaction at the initial economic exchange is with the provider of cash.

## E. MARKET EXPECTATIONS

36. Mr. Doty overlooks the fact that the market expects the debt issuer, its legal advisors, and other transaction participants to confirm legal authority to incur debt, and that investors cannot practicably do so.

37. Debt holders/investors are dependent upon the issuer and bond counsel to respect their information needs, with everything resting on the legality of the security undergirding the borrowing.

38. "Bond counsel renders an opinion on the validity of the bond offering …. The opinion of bond counsel provides assurance both to issuers and investors who purchase the bonds that all legal and tax requirements relevant to the matters covered by the opinion are met."[20]

39. "The work of the bond counsel, more prosaically, is marked by searching, meticulous, and detailed examinations of laws, legal instruments, and proceedings – work occasionally disparaged as "the dotting of the i's and the crossing of the t's" approach. Such deliberate approach and circumspection stem from bond counsel's overriding objective to establish to

---

[20] Government Finance Officers Association, Best Practices, "Selecting Bond Counsel," https://www.gfoa.org/materials/selecting-bond-counsel

his satisfaction the legality of the proceedings and the validity of the bonds and also to minimize the risk of litigation on the bonds following their issuance …. Bond counsel's initial consideration is whether there is legal authority for the issuance of the bonds. This may entail a search for and a study of general statutes, local laws, charter provisions and constitutional provisions."[21]

40. A functioning capital market depends upon the fact that holders of the debt instruments must be able to rely upon the foundational work of others so that the primary information of value for a trade is the price and the expected return on investment for the risk being assumed, and not any expectation that an investor be required to retrace the steps of the original issuance process involving legal review by the issuer (and its authorizing government), bond counsel, underwriter, syndicate members, underwriters' counsel, bond rating analysts, and others.

41. I reserve the right to modify or supplement this or other reports by me in this case.

**All of the foregoing opinions and conclusions have been rendered within a reasonable degree of public finance certainty.**

Signature: *W Mitchell*                    Date: July 20, 2020

---

[21] Joseph Guandolo (partner, bond law firm of Mitchell, Pershing, Shetterly & Mitchell), "Municipal Bond Counsel," Chapter 11, *State and Local Public Facility Needs and Financing*, Study Prepared for the Subcommittee on Economic Progress of the Joint Economic Committee, Congress of the United States, Volume 2, Public Facility Financing, 89th Congress, 2nd Session (Washington, DC: U.S. Government Printing Office, December 1966), 207-219, pages 209- 210.

**Additional References to my Original Expert Report[22]**

California Debt Advisory Commission, "Understanding the Underwriting Spread," in in Gerald J. Miller, editor, *Handbook of Debt Management* (New York: Marcel Dekker, Inc., 1996), 569-574.

California Debt and Investment Advisory Commission, California Debt Issuance Primer Handbook, CDIAC #05-06, p. 22. https://www.treasurer.ca.gov/cdiac/debtpubs/handbook.pdf

Gottdenker, William, "What Happens After a 'Deal Breaks' and Role of Dealers," Chapter 14 in Frank J. Fabozzi, Sylvan G. Feldstein, Irving M. Pollack, and Frank G. Zarb, editors, *The Municipal Bond Handbook* (Homewood, IL: Dow Jones-Irwin, 1983), 198-203.

Government Finance Officers Association, "Selecting Bond Counsel," https://www.gfoa.org/materials/selecting-bond-counsel

Government Finance Officers Association, "Selecting and Managing Underwriters for Negotiated Bond Sales." https://www.gfoa.org/materials/selecting-and-managing-underwriters-for-negotiated

Guandolo, Joseph, "Municipal Bond Counsel," Chapter 11, *State and Local Public Facility Needs and Financing*, Study Prepared for the Subcommittee on Economic Progress of the Joint Economic Committee, Congress of the United States, Volume 2, Public Facility Financing, 89th Congress, 2nd Session (Washington, DC: U.S. Government Printing Office, December 1966), 207-219.

Johnson, Craig L., Martin J. Luby, and Tima T. Moldogaziev, *State and Local Financial Instruments: Policy Changes and Management* (Northampton, MA: Edward Elgar, 2014).

McLoughlin, Tom, "Choosing an Underwriter for a Negotiated Bond Sale," in Gerald J. Miller, editor, *Handbook of Debt Management* (New York: Marcel Dekker, Inc., 1996), 395-399.

Raineri, Lori, Mark Robbins, Bill Simonsen, and Keith Weaver, "Underwriting, Brokerage, and Risk in Municipal Bond Sales," *Municipal Finance Journal*, 33:2 (Sumer 2012), 87-103.

Robbins, Mark and Bill Simonsen, "Why Do Issuers Privately Place Municipal Bonds," *Municipal Finance Journal*, 27:3 (Fall 2006), 1-17.

Securities and Exchange Commission, *Report on the Role and Function of Credit Rating Agencies in the Operation of the Securities Markets*, January 2003.

"Underwriting Commitments": https://app.achievable.me/study/finra-sie/learn/municipal-debt-underwriting-commitments

---

[22] Expert Report of William Bartley Hildreth, July 1, 2020.

Vogt, A. John, *Capital Budgeting and Finance: A Guide for Local Governments*. Washington, DC: International City/County Management Association, 2004.

# Bondholders' UV
# EXHIBIT 6

# FIDDLER GONZALEZ & RODRIGUEZ, P.S.C.

ATTORNEYS AND COUNSELORS AT LAW

PO BOX 363507

SAN JUAN, PR 00936-3507

TELEPHONE (787) 753-3113
FAX (787) 759-3123

254 MUÑOZ RIVERA AVENUE
CORNER CHARDÓN STREET
6TH FLOOR
HATO REY, PR 00918

January 31, 2008

Employees Retirement System of the Government
of the Commonwealth of Puerto Rico
437 Ponce de León Avenue
San Juan, Puerto Rico

> **Re:** **$1,588,810,799.60**
> **Employees Retirement System of the Government of the**
> **Commonwealth of Puerto Rico**
> **Pension Funding Bonds, Series A Bonds**

Ladies and Gentlemen:

We have examined the Constitution and the laws of the Commonwealth of Puerto Rico (the "Commonwealth"), including Act No. 447 of the Legislature of Puerto Rico, approved May 15, 1951, as amended and supplemented (the "Act"), creating the Employees Retirement System of the Government of the Commonwealth of Puerto Rico (the "System") as a trust, to provide pension and other benefits to retired employees of the central government, municipalities and public corporations of the Commonwealth.

We have also examined a certified copy of a Pension Funding Bond Resolution (the "General Resolution), adopted by the Board of Trustees of the System on January 24, 2008, and a First Supplemental Pension Funding Bond Resolution, adopted by the Board of Trustees of the System on January 24, 2008, and readopted, amended and restated on January 29, 2008 (the "Supplemental Resolution," and together with the General Resolution, the "Resolution"), and other proofs submitted relative to the issuance of the System's Senior Pension Funding Bonds, Series A in the aggregate principal amount of $1,588,810,799.60 (the "Bonds").

The Bonds are issuable as fully registered Bonds, without coupons, in denominations of $5,000 principal amount (maturity amount in the case of Capital Appreciation Bonds) each or integral multiples thereof.

The Bonds are issued under and pursuant to the Resolution for the purpose of (i) increasing the total assets currently available to pay benefits under the System's largest defined benefit plan, (ii) reducing the unfunded accrued actuarial pension liability of the

PR-ERS-000003659

Employees Retirement System of the Government
  of the Commonwealth of Puerto Rico
January 31, 2008
Page -2-

benefit plan, and (iii) making deposits in various funds and accounts established under
the Resolution.

The Bonds are limited, non-recourse obligations of the System, payable solely
from and secured by a pledge and assignment of Employer Contributions and all other
Revenues (as defined in the Resolution) derived therefrom, certain funds held under the
Resolution, together with income earned thereon (collectively referred to herein as the
"Pledged Property"), pledged therefor under the Resolution.

The Bonds bear interest and are subject to redemption prior to maturity as set
forth in the Resolution.

The principal of the Bonds is payable at the principal corporate trust office of the
Trustee in New York, New York. The interest on the Bonds is payable by check mailed
to the registered owner at the address appearing on the registration books of the System
on the relevant record date or, in certain circumstances set forth in the Resolution, by
wire transfer to a designated account.

From such examination, and having regard to legal questions we deem relevant,
we are of the opinion that:

(1)     The Act is valid in all respects material to this opinion, and the System is a
duly constituted governmental instrumentality of the Commonwealth, deemed as a trust.

(2)     The Resolution has been duly adopted by, and is legal, valid and binding
upon, the System, enforceable in accordance with its terms.

(3)     The Bonds have been duly authorized by the System and constitute legal,
valid and binding limited obligations of the System payable solely from, and secured by a
valid and binding pledge of, the Pledged Property, subject only to the provisions of the
Resolution permitting use of such Pledged Property and its application for the purposes
and on the terms and conditions provided in the Resolution.

(4)     The Bonds do not constitute a debt, obligation or pledge of the full faith,
credit or taxing power of the Commonwealth or any of its municipalities or political
subdivisions or instrumentalities (other than the System), and neither the Commonwealth
nor any of its municipalities or political subdivisions or instrumentalities (other than the
System), shall be liable for the payment thereof.

(5)     Interest on the Bonds is excluded from gross income and exempt from
Puerto Rico income and withholdings taxes, including the alternative minimum tax
imposed by Section 1017 of the Puerto Rico Internal Revenue Code of 1994, as amended
(the "P.R. Code").

Employees Retirement System of the Government
of the Commonwealth of Puerto Rico
January 31, 2008
Page -3-

(6)     The Bonds are exempt from property taxes imposed by the Municipal Property Tax Act of 1991, as amended, and interest thereon is exempt from the municipal license tax imposed by the Municipal License Tax Act of 1974, as amended.

(7)     The transfer of the Bonds by (i) gift will not be subject to gift tax under the P.R. Code in the case of donors who are residents of the Commonwealth at the time the gift is made, and (ii) death will not be subject to estate tax under the P.R. Code in the case of a decedent who at the time of death was (x) a resident of Puerto Rico, and (y) a United States citizen who acquired such citizenship solely by reason of birth or residence in Puerto Rico.

(8)     Gain recognized from the sale or exchange of a Bond will be subject to income tax under the P.R. Code to taxpayers subject to Puerto Rico income tax on such gains, including individuals residing in Puerto Rico and corporations and partnerships organized under the laws of the Commonwealth.

(9)     The Bonds will be considered an obligation of an instrumentality of Puerto Rico for purposes of (i) the non-recognition of gain rules of Section $1112(f)(2)(A)$ of the P.R. Code applicable to certain involuntary conversions, and (ii) the exemption from the surtax imposed by Section 1102 of the P.R. Code available to corporations and partnerships that have a certain percentage of their net income invested in obligations of instrumentalities of Puerto Rico and certain other investments.

(10)     Interest on the Bonds constitutes "industrial development income" under Section 2(j) of the Puerto Rico Industrial Incentives Act of 1963, the Puerto Rico Industrial Incentives Act of 1978, the Puerto Rico Tax Incentives Act of 1987, and the Puerto Rico Tax Incentives Act of 1998, as amended (collectively, the "Acts"), when received by a holder of a grant of tax exemption issued under any of the Acts that acquired the Bonds with "eligible funds," as such term is defined in the Acts.

Based on the provisions of the United States Internal Revenue of 1986, as amended (the "U.S. Code"), and the regulations thereunder, now in force:

(1)     Interest on the Bonds received by, or "original issue discount" (within the meaning of the U.S. Code) accrued to, an individual who is a *bona fide* resident of Puerto Rico within the meaning of Section 937 of the U.S. Code during the entire taxable year in which such interest is received or "original issue discount" is accrued will constitute gross income from sources within Puerto Rico and, therefore, is excludable from gross income for purposes of the U.S. Code pursuant to section 933(1) thereof.

(2)     Interest received or accrued, or original issue discount, on the Bonds is not subject to United States federal income tax if the holder of the Bonds is a corporation organized under the laws of Puerto Rico ("Puerto Rico Corporation") or any foreign country and such interest is not effectively connected with the conduct of a trade or

Employees Retirement System of the Government
of the Commonwealth of Puerto Rico
January 31, 2008
Page -4-

business in the United States by such corporation, such corporation is not a foreign
personal holding company, a controlled foreign corporation or a passive foreign
investment company under the U.S. Code, and such corporation is not treated as a
domestic corporation for the purposes of the U.S. Code.

(3)     Interest on the Bonds is not excludable from the gross income of the
recipient thereof for federal income tax purposes under Section 103(a) of the U.S. Code.

(4)     Pursuant to the provisions of Section 1.937-2T of the Regulations issued
under the U.S. Code ("Temporary Regulations"), the source of the income from the sale
of personal property by a bona fide resident of Puerto Rico within the meaning of Section
937 of the Code shall be determined under the rules of Section 865 of the U.S. Code.
Accordingly, the gain on the sale or exchange of the Bond recognized by an individual
who is a *bona fide* resident of Puerto Rico, within the meaning of Section 937 of the U.S.
Code, during the entire taxable year will constitute Puerto Rico source income and,
therefore, qualify for the income exclusion under in Section 933(1) of the U.S. Code,
provided (i) that such Bonds do not constitute inventory in the hands of such individual
and (ii) if the Bonds were owned before the individual became a bona fide resident of
Puerto Rico, that for any of the 10 years preceding the taxable year for which the source
of the gain must be determined, the individual was not a resident of the United States
(other than a bona fide resident of Puerto Rico).

A Puerto Rico Corporation that invests in the Bonds will be subject to
U.S. federal income tax on a gain from a disposition of Bonds only if the gain is
effectively connected to a U.S. trade or business carried on by the Puerto Rico
Corporation.

(5)     The transfer of the Bonds by death or gift will not be subject to estate or
gift tax under the U.S. Code in the case of decedents or donors who, at the time of death
or gift, are (a) residents of Puerto Rico and (b) (i) United States citizens that acquired
such citizenship solely by reason of birth or residence in Puerto Rico or (ii) not United
States citizens.

In addition to the opinions above we would like to bring to your attention that: (a)
the P.R. Code does not provide rules with respect to the treatment of the excess, if any, of
the amount due at maturity of a Bond over its initial offering price (the "Accretion
Amount") and that under the current administrative practice followed by the Puerto Rico
Department of the Treasury, the Accretion Amount is treated as interest; (b) prospective
owners of the Bonds, including but not limited to financial institutions, should be aware
that ownership of the Bonds may result in having a portion of their interest and other
expenses attributable to interest on the Bonds disallowed as deductions for purposes of
computing the regular tax and the alternative minimum tax for Puerto Rico income tax
purposes; and (c) the U.S. Code provides special rules for the taxation of shareholders of
foreign corporations that qualify as "controlled foreign corporations," "personal holding

PR-ERS-000003662

Employees Retirement System of the Government
  of the Commonwealth of Puerto Rico
January 31, 2008
Page -5-

companies," "foreign personal holding companies" or "passive foreign investment companies," as such terms are defined by the U.S. Code.

In connection with the foregoing statements about certain United States federal tax consequences arising from the ownership of, receipt or accrual of interest on, or the disposition of the Bonds, be advised that pursuant to the U. S. Internal Revenue Service Circular No. 230:

(a)     These tax statements are not intended or written to be used, and cannot be used by any taxpayer, for purposes of avoiding penalties that may be imposed on the taxpayer by the Internal Revenue Service.

(b)     These statements were written in connection with the promotion or marketing of the Bonds.

(c)     Each prospective purchaser of the Bonds should seek tax advice from an independent tax advisor based on its particular circumstances.

We express no opinion regarding any other federal, Commonwealth or state tax consequences with respect to the Bonds.  We are rendering our opinion under existing statutes and court decisions, and regulations as of the issue date, and assume no obligation to update our opinion after the issue date to reflect any future action, fact or circumstance, or change in law or interpretation, or otherwise.

In rendering this opinion, we are advising you that the enforceability of the Bonds and the Resolution may be limited by bankruptcy, moratorium, insolvency, or other laws affecting creditors' rights or remedies and is subject to general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

We have also examined an executed Bond and in our opinion the form of said Bond and its execution are regular and proper.

Very truly yours,

Fiddler González & Rodríguez, PSC

# Bondholders' UV
# EXHIBIT 7

# FIDDLER GONZALEZ & RODRIGUEZ, P.S.C.

ATTORNEYS AND COUNSELORS AT LAW

PO BOX 363507

SAN JUAN, PR 00936-3507

TELEPHONE (787) 753-3113
FAX (787) 759-3123

254 MUÑOZ RIVERA AVENUE
CORNER CHARDÓN STREET
6TH FLOOR
HATO REY, PR 00918

January 31, 2008

Employees Retirement System of the Government
of the Commonwealth of Puerto Rico
P.O. Box 42003
San Juan, Puerto Rico 00940

The Bank of New York
as Fiscal Agent (the "Fiscal Agent")
under a Bond Resolution (the "Bond Resolution"),
adopted on January 24, 2009, and an
Amended and Restated First Supplemental Bond
Resolution (the "Supplemental Resolution," and
together with the Bond Resolution, the "Resolution"),
adopted on January 29, 2008, by the Employees Retirement
System of the Government of the Commonwealth of Puerto Rico
101 Barclay Street, Floor 21 West
New York, NY 10286

Ladies and Gentlemen:

We are acting as Bond Counsel to the Employees Retirement System of the
Government of the Commonwealth of Puerto Rico (the "System") in connection with its
issuance of $1,588,810,799.60 aggregate principal amount of Senior Pension Funding
Bonds, Series A (the "Bonds").

After having reviewed such documents, statutes, and published decisions as we
have deemed appropriate, we are of the opinion that:

(1) the System has the right and power under Act No. 447 of the
Legislative Assembly of Puerto Rico, approved May 15, 1951, as
amended and supplemented (the "Act"), to adopt the Resolution and the
Resolution has been duly and lawfully adopted by the System, is in full
force and effect and is valid and binding upon the System and enforceable
in accordance with its terms, and no other authorization for the Resolution
is required;

(2) the Resolution creates a valid security interest for the benefit of
the Owners of the Bonds on the Pledged Property, subject only to the

PR-ERS-000003643

Employees Retirement System of the Government
  of the Commonwealth of Puerto Rico
The Bank of New York
January 31, 2008
Page -2-

provisions of the Resolution permitting the application thereof to the purposes and on the terms and conditions set forth in the Resolution; and

(3) the Bonds are valid and binding special limited non-recourse obligations of the System as provided in the Resolution, enforceable in accordance with their terms and the terms of the Resolution (except insofar as the enforceability thereof may be limited by bankruptcy, moratorium, insolvency or other laws affecting creditors' rights or remedies theretofore or thereafter enacted and may be subject to general principles of equity, regardless of whether such enforceability is considered in a proceeding in equity or at law), and entitled to the benefit of the Resolution and of the Act, as amended to the date of this opinion, and such Bonds have been duly and validly authorized, executed and issued in accordance with law, including the Act, and in accordance with the Resolution.

This opinion is given in accordance with Section 202.3 of the Bond Resolution. Capitalized terms used herein and not otherwise defined have the respective meanings ascribed to them in the Resolution.

Yours very truly,

Fiddler González & Rodríguez, PSC

PR-ERS-000003644

# Bondholders' UV EXHIBIT :

PR-ERS-000003666

FIDDLER GONZALEZ & RODRIGUEZ, P.S.C.

ATTORNEYS AND COUNSELORS AT LAW

PO BOX 363507

SAN JUAN, PR 00936-3507

TELEPHONE (787) 753-3113
FAX (787) 759-3123

254 MUÑOZ RIVERA AVENUE
CORNER CHARDÓN STREET
6TH FLOOR
HATO REY, PR 00918

January 31, 2008

The Addressees Listed on
Schedule I Attached Hereto

In care of UBS Financial Services Incorporated of Puerto Rico
American International Plaza
250 Muñoz Rivera Avenue
San Juan, Puerto Rico 00918
Attention: José Arias

Ladies and Gentlemen:

We have acted as Bond Counsel in connection with the authorization, issuance and sale by the Employees Retirement System of the Government of the Commonwealth of Puerto Rico (the "System") of $1,588,810,799.60 initial aggregate principal amount of its Senior Pension Funding Bonds, Series A (the "Bonds") as to which you are acting as underwriters ("Underwriters") pursuant to the amended and restated Purchase Contract, dated January 30, 2008 (the "Purchase Contract"), between the System and the Underwriters.

The Bonds are being issued pursuant to a Pension Funding Bond Resolution, adopted by the System's Board of Trustees on January 24, 2008 (the "Bond Resolution"), and a First Supplemental Pension Funding Bond Resolution, adopted by the System's Board of Trustees on January 24, 2008 and amended, restated and readopted on January 29, 2008 (the "Supplemental Resolution," and together with the Bond Resolution, the "Resolution"), pursuant to which The Bank of New York will act as Fiscal Agent (the "Fiscal Agent"). Any capitalized terms used herein and not otherwise defined shall have the meanings ascribed thereto in the Resolution or the Purchase Contract. The Bonds are being issued for the purpose of (i) increasing the total assets currently available to pay benefits under the System's largest defined benefit plan, (ii) reducing the unfunded accrued actuarial pension liability of the benefit plan, and (iii) making deposits in various funds and accounts established under the Resolution.

In our capacity as Bond Counsel, we have examined and are familiar with (i) Act No. 447 of the Legislature of Puerto Rico, approved May 15, 1951, as amended ("Act 447"), (ii) certified copies of the Resolution, (iii) certified copies of the resolution authorizing the issuance and fixing the terms of the Bonds (the "Authorizing

Resolution"), approving the Preliminary Official Statement, dated January 11, 2008, in connection with the Bonds (the "Preliminary Official Statement") and approving the Official Statement, dated January 29, 2008, in connection with the issuance of the Bonds (the "Official Statement"), (iv) a certified copy of the Master Continuing Disclosure Agreement, dated as of January 31, 2008 (the "MCDA"), (v) a certified copy of the Purchase Contract, (vi) a certified copy of the Security Agreement between the System and The Bank of New York (the "Security Agreement"), and (vii) such other proofs as we have deemed necessary as a basis for the opinions hereinafter expressed.

In rendering this opinion, we have assumed the genuineness of all signatures, the authenticity of all documents provided to us as originals and the conformity to authentic original documents of all documents provided to us as certified, conformed or photostatic copies. As to questions of fact material to this opinion, we have relied upon certificates of officers and representatives of the parties to the transactions contemplated by the Purchase Contract and of public officials.

Based upon the foregoing, and subject to the assumptions, limitations and qualifications set forth herein, we are of the opinion that:

(a)     The MCDA, the Security Agreement and the Purchase Contract have been duly authorized, executed and delivered by the System and, assuming the due authorization, execution and delivery thereof by, and the validity and enforceability against the other parties thereto, constitute the legal, valid and binding agreements of the System, enforceable against the System in accordance with their respective terms, except that such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium and other laws affecting the enforcement of creditors' rights generally and by the application of general principles of equity.

(b)     The Resolution and the Authorizing Resolution have been duly adopted by the System and are in full force and effect and constitute the legal, valid and binding agreements of the System, enforceable against the System in accordance with their respective terms, except that such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium and other laws affecting the enforcement of creditors' rights generally and by the application of general principles of equity.

(c)     It is not necessary in connection with the public offering and sale of the Bonds to register any security under the Securities Act of 1933, as amended, or to qualify the Resolution nor any other document or instrument under the Trust Indenture Act of 1939, as amended.

(d)     The statements contained in the Official Statement as of its date and as of the date hereof under the captions "THE SERIES A BONDS," "SECURITY AND SOURCES OF PAYMENT FOR THE BONDS," "TAX MATTERS," "ERISA CONSIDERATIONS," "LEGAL INVESTMENT," and "CONTINUING DISCLOSURE," and corresponding statements in "SUMMARY STATEMENT," insofar

The Addressees Listed on
 Schedule I Attached Hereto
January 31, 2008
Page -3-

as such statements constitute summaries of provisions of the Constitution and statutes of the Commonwealth, the Bonds, the Bond Resolution, the MCDA, the Security Agreement or Act 447, or refer to opinions we have rendered, constitute fair and accurate summaries of the documents and matters of law purported to be summarized therein and do not contain any untrue statement of a material fact or omit any material fact which, in our opinion, should be referred to therein so as to make the information or statements made therein not misleading. References to the Official Statement are to the document examined by us upon delivery of the Bonds, and not to any physical or electronic reproduction other than a true copy.

(e)     The System has full legal right, power and authority to sign the Official Statement and has duly approved and authorized the signing of the Official Statement.

We hereby consent to references to us contained in the Official Statement.

The proposed form of Bond Counsel opinion contained in Appendix VIII to the Official Statement is substantially in the form of the opinion delivered on the date hereof by this firm. You may rely on said delivered opinion as if it were addressed to you.

This opinion is being furnished at your request and is solely for your benefit and may not be relied upon by any other persons without our prior written consent.

Very truly yours,

Fiddler Gonzalez & Rodriguez, PSC

# Bondholders' UV
# EXHIBIT 9



## OPINION OF GENERAL COUNSEL TO THE SYSTEM

January 31, 2008

UBS FINANCIAL SERVICES INCORPORATED OF PUERTO RICO
POPULAR SECURITIES, INC.
SANTANDER SECURITIES CORPORATION
BANCO BILBAO VIZCAYA ARGENTARIA PUERTO RICO
CITIGROUP GLOBAL MARKETS INC.
LEHMAN BROTHERS, INC.
MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED
ORIENTAL FINANCIAL SERVICES, INC.
SAMUEL A. RAMÍREZ & CO., INC.
SCOTIABANK OF PUERTO RICO
TCM CAPITAL, INC.
WACHOVIA CAPITAL MARKETS, LLC

In care of UBS Financial Services Incorporated of Puerto Rico
American International Plaza
250 Muñoz Rivera Avenue
Hato Rey, Puerto Rico 00918
Attention: Jose Arias
Ladies and Gentlemen:

In connection with the issuance and sale by Employees Retirement System of the Government of the Commonwealth of Puerto Rico (the "System"), a trust created pursuant to Act 447 of May 15, 1951, as amended (the "Act"), to provide pension and other benefits to retired employees of the central government, municipalities and public corporations of the Commonwealth of Puerto Rico (the "Commonwealth"), of its $1,588,810,799.60 Senior Pension Funding Bonds, Series A (the "Bonds"), I have, as General Counsel of the System, examined the Act, certified copies of the Pension Funding Bond Resolution, adopted by the System on January 24, 2008, and the Amended and Restated First Supplemental Pension Funding Bond Resolution, adopted by the System on January 29, 2008 (collectively, the "Resolution), certified copies of the resolutions of the System, adopted on January 24, 2008 and January 29, 2008 (collectively, the "Authorizing Resolutions"), authorizing, among other things, the issuance and sale of the Bonds, approving the Preliminary Official Statement, dated January 11, 2008, in connection with the Bonds (the "Preliminary Official Statement") and approving the Official Statement, dated January 29, 2008, in connection with the Bonds (the "Official Statement"), the Amended and Restated Purchase Contract, dated as of January 30, 2008, by and between the Underwriters named therein and the System (the "Purchase Contract"), the Master Continuing Disclosure Agreement, dated as of January 31, 2008 (the "MCDA"), among the System, the Commonwealth of Puerto Rico and the Fiscal Agent (hereinafter mentioned), and the Security Agreement, dated January 31, 2008 (the "Security Agreement," and together with the

Resolution, the Authorizing Resolutions, the Purchase Contract, and the MCDA, the "Agreements"), between the System and The Bank of New York as fiscal agent under the Resolution (the "Fiscal Agent"), and have conducted such other investigations and examined such other proofs as I deemed necessary as a basis for the opinions herein expressed. This opinion is issued pursuant to Section 8(d)(3) of the Purchase Contract. Capitalized terms used and not otherwise defined herein have the meanings assigned to them in the Resolution.

As to certain matters of act material to the opinions expressed herein, I have relied upon the representations and statements of fact made in the Agreements, and certificates, when appropriate, provided by parties thereto other than the System. I have not independently verified the accuracy of the representations and statements so relied upon.

I have assumed the genuineness of all signatures, the authenticity of all documents submitted to me as originals, the conformity and completeness to original documents of all documents submitted to me as certified, photostatic or conformed copies and the authenticity of the originals of all such latter documents.

I have assumed that (a) each party to the Agreements (other than the System) is duly organized and validly existing, has the power and authority to execute, deliver and perform the Agreements to which it is a party, has taken all action necessary to authorize the execution, delivery and performance of those Agreements, and has duly executed and delivered those Agreements, and (b) the Agreements constitute the valid and binding obligations of the parties thereto (other than the System), enforceable against those parties in accordance with their respective terms.

Based on the foregoing, I am of the opinion that:

(a)     Act 447 has been legally enacted in accordance with the laws of the Commonwealth, is in full force and effect and is enforceable in accordance with its terms.

(b)     The Purchase Contract, the Security Agreement and the MCDA have been duly authorized, executed and delivered by the System and, assuming the due authorization, execution and delivery thereof by, and the validity and enforceability thereof against, the other parties thereto, constitute the legal, valid and binding agreements of the System, enforceable in accordance with their respective terms, except as may be limited by bankruptcy, reorganization, insolvency, moratorium or similar laws affecting the rights and remedies of creditors and other laws, court decisions, or legal or equitable doctrines affecting the right to specific performance, injunctive relief or other equitable remedies.

(c)     The Resolution and the Authorizing Resolutions have been duly adopted by the System and are in full force and effect and constitute the legal, valid, and binding agreements of the System, enforceable in accordance with their respective terms, except as may be limited by bankruptcy, reorganization, insolvency, moratorium or similar laws affecting the rights and remedies of creditors and other laws, court decisions, or legal or equitable doctrines affecting the right to specific performance, injunctive relief or other equitable remedies.

(d)     The Bonds have been duly and validly authorized and issued. When authenticated and delivered by the Fiscal Agent as provided in the Resolution, the Bonds will constitute legally valid and binding obligations of the System.

PR-ERS-000003646

(e)     The Resolution creates a valid and binding security interest in the Revenues and other Pledged Property assigned and pledged by the System to the Fiscal Agent pursuant to the Resolution.

(f)     All legislation, authorizations, consents and approvals necessary to fulfill in all material respects the terms and conditions of the Bonds and to carry out the transactions contemplated by the Purchase Contract, the Official Statement, the Security Agreement, the MCDA, the Authorizing Resolutions and the Resolution are in full force and effect or have been obtained, as applicable, and no further legislation, authorization, consent or approval is required for such purposes.

(g)     The System has full legal right, power and authority to sign the Official Statement, has duly approved and authorized the signing of the Official Statement, has ratified the distribution of the Preliminary Official Statement, and has approved the distribution of the Official Statement.

(h)     No litigation is pending (or, to my knowledge, after reasonable inquiry, threatened) (A) to restrain or enjoin the issuance or delivery of any of the Bonds, (B) in any way contesting or affecting any authority for or the validity of the Act, the application of the proceeds of the Bonds, the Resolution, the Authorizing Resolutions, the Bonds, the MCDA, the Security Agreement or the Purchase Contract, (C) in any way contesting the power of the System to issue the Bonds or the power of the System to sell the Bonds and to apply the proceeds thereof as contemplated by the Official Statement and the Purchase Contract, (D) in any way contesting the pledge of the Employers' Contributions and other items of security for the payment of the principal of and interest on the Bonds, or (E) that could have a material adverse effect on the financial condition of the System.

(i)     All conditions precedent to the delivery of the Bonds have been fulfilled.

In addition, I have examined the Preliminary Official Statement and the Official Statement (including the information incorporated therein by reference), and the information as to the System, the Resolution, the MCDA, the Security Agreement and the statutes cited or referred to therein contained or incorporated by reference therein, is correct, and nothing has come to my attention which leads me to believe that such information, as of the respective dates thereof, and as to the Official Statement as of the date hereof, contained or contains any untrue statement of a material fact or omitted or omits to state a material fact necessary in order to make the statements therein relating to such information, in the light of the circumstances under which they were made, not misleading.

The opinions expressed herein are limited to the laws of the Commonwealth and based on an analysis of existing laws, regulations, rulings and court decisions of the Commonwealth. Such opinions may be adversely affected by actions taken or events occurring, including a change in law, regulation or ruling (or in the application or official interpretation of any law, regulation or ruling) after the date hereof. I have not undertaken to determine, or to inform any person about, whether such actions are taken or such events occur, and I have no obligation to update this opinion in light of such actions or events.

In addition, I express no opinion as to the enforceability of any indemnification or contribution provisions included in any Agreement that may violate any law, rule, regulation or public policy of the United States of America or of the Commonwealth.

Furthermore, my opinions are subject to bankruptcy, reorganization, insolvency, moratorium, fraudulent conveyance or similar laws, from time to time in effect, affecting the rights and remedies of

creditors generally and other laws, court decisions, or legal or equitable remedies or principles which may affect enforceability.

This opinion letter is rendered for the sole benefit of each addressee hereof, and no other person or entity is entitled to rely hereon. No attorney-client relationship has existed between me and any rating agency that shall have rated the Bonds or by virtue of this opinion letter. Copies of this opinion letter may not be furnished to any other person or entity, nor may any portion of this opinion letter be quoted, circulated or referred to in any other document without my prior written consent.

Very truly yours,

Marilyn Cuevas-Silvagnoli, Esq.
General Counsel of the Employees Retirement System
Government of the Commonwealth of Puerto Rico

PR-ERS-000003648

# Bondholders' UV
# EXHIBIT 10



COMMONWEALTH OF PUERTO RICO

*Department of Justice*

**ROBERTO J. SÁNCHEZ RAMOS**
**SECRETARY OF JUSTICE**

January 31, 2008

UBS FINANCIAL SERVICES INCORPORATED OF PUERTO RICO
POPULAR SECURITIES, INC.
SANTANDER SECURITIES CORPORATION
BANCO BILBAO VIZCAYA ARGENTARIA PUERTO RICO
CITIGROUP GLOBAL MARKETS INC.
LEHMAN BROTHERS, INC.
MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED
ORIENTAL FINANCIAL SERVICES, INC.
SAMUEL A. RAMÍREZ & CO., INC.
SCOTIABANK OF PUERTO RICO
TCM CAPITAL, INC.
WACHOVIA CAPITAL MARKETS, LLC

In care of UBS Financial Services Incorporated of Puerto Rico
American International Plaza
250 Muñoz Rivera Avenue
Hato Rey, Puerto Rico 00918
Attention: José Arias

Re:    The issuance and sale of $1,588,810,799.60 by the Employees Retirement System of the
       Government of the Commonwealth of Puerto Rico Senior Pension Funding Bonds, Series
       A

Consulta Núm. 08-182-A

Ladies and Gentlemen:

In connection with the issuance and sale by the Employees Retirement System of the
Government of the Commonwealth of Puerto Rico ("System") of $1,588,810,799.60 Employees

Consulta Núm. 08-182-A
Page 2

Retirement System of the Government of the Commonwealth of Puerto Rico Senior Pension
Funding Bonds, Series A ("Bonds"), I have examined the Letter of Representations of the
Commonwealth of Puerto Rico, dated January 24, 2008 ("Letter of Representations"), executed
by the Acting Secretary of the Treasury.

I have also examined a certified copy of the Master Continuing Disclosure Agreement, dated as
of January 1, 2008 ("MCDA"), by and among the System, the Commonwealth of Puerto Rico
("Commonwealth") and The Bank of New York, and such other proofs as I have deemed
necessary as a basis for the opinions hereinafter expressed.

Based upon the foregoing, I am of the opinion that:

(a)     The Letter of Representations and the MCDA have been duly authorized,
        executed and delivered by the Commonwealth and, assuming the due
        authorization, execution and delivery thereof by, and the validity and
        enforceability thereof against, the other parties thereto, constitute the legal,
        valid and binding agreements of the Commonwealth, enforceable in
        accordance with their terms, it being understood that the enforceability
        thereof may be subject to judicial discretion, the valid exercise of the
        sovereign immunity of the Commonwealth and valid bankruptcy,
        insolvency, reorganization, moratorium and other laws affecting creditors'
        rights.

(b)     All legislation, authorizations, consents and approvals necessary to fulfill
        in all material respects the terms and conditions and to carry out the
        transactions contemplated by the Letter of Representations and the MCDA
        are in full force and effect or have been obtained, as applicable, and no
        further legislation, authorization, consent or approval is required for such
        purposes.

(c)     No litigation is pending (or, to my knowledge, threatened) in any way
        contesting or affecting any authority for or the validity of the Letter of
        Representations and the MCDA or that could have a material adverse
        effect on the financial condition of the Commonwealth.

In addition, I have examined the Preliminary Official Statement and the Official Statement (each
as defined in the Letter of Representations) (including the information incorporated therein by
reference and the Commonwealth Report included as Appendix IV thereto), and the information
contained or incorporated by reference therein relating to the Commonwealth, as well as the
factual information appearing under "LITIGATION" in Appendix IV, is correct, and nothing has
come to my attention which leads me to believe that such information, as of the respective dates
thereof, and as to the Official Statement as of the date hereof, contained or contains any untrue
statement of a material fact or omitted or omits to state a material fact necessary in order to make

Consulta Núm. 08-182-A
Page 3

the statements therein relating to such information, in the light of the circumstances under which they were made, not misleading.

Respectfully submitted,

Roberto J. Sánchez Ramos

PR-ERS-000003672

# Bondholders' UV
# EXHIBIT 11

**Appendix VI**

EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT
OF THE COMMONWEALTH OF PUERTO RICO

PENSION FUNDING BOND RESOLUTION

Adopted on January 24, 2008

# TABLE OF CONTENTS

**Page**

ARTICLE I     STATUTORY AUTHORITY ...................................................................................................... 1

SECTION 101.    Authority for this Resolution.......................................................................................1
SECTION 102.    Resolution to Constitute Contract ..............................................................................1

ARTICLE II     AUTHORIZATION AND ISSUANCE OF BONDS ...................................................... 1

SECTION 201.    Authorization of Bonds..............................................................................................1
SECTION 202.    General Provisions for Issuance of Bonds..................................................................1
SECTION 203.    Special Provisions Concerning Capital Appreciation Bonds and Convertible Capital Appreciation Bonds....................3
SECTION 204.    Special Provisions for Refunding Bonds...................................................................4
SECTION 205.    Delegation of Officers and Committees ....................................................................4
SECTION 206.    Credit and Liquidity Facilities; Rights of Credit Facility Providers...........................4
SECTION 207.    Qualified Hedges.......................................................................................................5
SECTION 208.    Parity Obligations and Subordinate Obligations.......................................................5

ARTICLE III     GENERAL TERMS AND PROVISIONS OF BONDS ..................................................5

SECTION 301.    Medium of Payment; Form and Date .........................................................................5
SECTION 302.    Legends.......................................................................................................................5
SECTION 303.    Execution and Authentication ...................................................................................5
SECTION 304.    Negotiability, Transfer and Registry .........................................................................5
SECTION 305.    Registration of Transfer of Bonds.............................................................................5
SECTION 306.    Regulations with Respect to Exchanges and Registration of Transfers.......................6
SECTION 307.    Bonds Mutilated, Destroyed, Stolen or Lost .............................................................6
SECTION 308.    Preparation of Definitive Bonds; Temporary Bonds..................................................6
SECTION 309.    Tender of Option Bonds or Fixed Tender Bonds.......................................................6
SECTION 310.    Book-Entry-Only System ..........................................................................................6

ARTICLE IV     REDEMPTION OF BONDS ............................................................................................6

SECTION 401.    Privilege of Redemption and Redemption Price.........................................................6
SECTION 402.    Redemption at the Election of the System.................................................................6
SECTION 403.    Redemption in Satisfaction of Sinking Fund Installments ..........................................7
SECTION 404.    Selection of Bonds to be Redeemed in Partial Redemption........................................7
SECTION 405.    Notice of Redemption.................................................................................................7
SECTION 406.    Payment of Redeemed Bonds....................................................................................7
SECTION 407    . Cancellation and Disposition of Bonds ....................................................................8

ARTICLE V     PLEDGE, ASSIGNMENT AND SECURITY INTEREST; ESTABLISHMENT AND MAINTENANCE OF FUNDS
AND ACCOUNTS AND APPLICATION THEREOF .......................................................8

SECTION 501.    Pledge, Assignment and Security Interest .................................................................8
SECTION 502.    Establishment of Fund and Accounts ........................................................................8
SECTION 503.    Capitalized Interest Account .....................................................................................9
SECTION 504.    Revenue Account .......................................................................................................9
SECTION 505.    Debt Service Account ..............................................................................................10
SECTION 506.    Debt Service Reserve Account..................................................................................10
SECTION 507.    Satisfaction of Sinking Fund Installments................................................................11
SECTION 508.    Redemption Account; Amounts to be Deposited Therein..........................................12
SECTION 509.    General Reserve Account ..........................................................................................13

ARTICLE VI     SECURITY FOR DEPOSITS AND INVESTMENT OF FUNDS.................................13

SECTION 601.    Security for Deposits................................................................................................13
SECTION 602.    Investment of Funds, Accounts and Subaccounts Held by the Fiscal Agent ............14
SECTION 603.    Valuation and Sale of Investments............................................................................14

ARTICLE VII     PARTICULAR COVENANTS OF THE SYSTEM .......................................................14

SECTION 701.    Payment of Obligations ...........................................................................................14
SECTION 702.    Extension of Payment of Bonds................................................................................15
SECTION 703.    Offices for Servicing Bonds.....................................................................................15
SECTION 704.    Further Assurance ....................................................................................................15

i

PR-ERS-000003436

# TABLE OF CONTENTS

**Page**

SECTION 705.   Power to Issue Bonds and Assign Funds and Accounts ........................................................15
SECTION 706.   Creation of Liens .................................................................................................................15
SECTION 707.   Accounts and Reports ..........................................................................................................15
SECTION 708.   Issuance of Additional Bonds .............................................................................................15
SECTION 709.   General ................................................................................................................................16

ARTICLE VIII   CONCERNING THE FISCAL AGENT ...............................................................................16

SECTION 801.   Fiscal Agent Appointment and Acceptance of Duties .........................................................16
SECTION 802.   Responsibilities of Fiscal Agent ..........................................................................................16
SECTION 803.   Evidence on Which Fiscal Agent May Act ..........................................................................17
SECTION 804.   Compensation and Indemnification .....................................................................................17
SECTION 805.   Certain Permitted Acts ........................................................................................................17
SECTION 806.   Resignation of Fiscal Agent ................................................................................................17
SECTION 807.   Removal of Fiscal Agent .....................................................................................................17
SECTION 808.   Appointment of Successor Fiscal Agent ..............................................................................18
SECTION 809.   Transfer of Rights and Property to Successor Fiscal Agent .................................................18
SECTION 810.   Merger or Consolidation ......................................................................................................18
SECTION 811.   Adoption of Authentication .................................................................................................18
SECTION 812.   Accounting by Fiscal Agent; Nonpetition Covenant ...........................................................18
SECTION 813.   Appointment of Co-Fiscal Agent19 .

ARTICLE IX   SUPPLEMENTAL RESOLUTIONS ....................................................................................19

SECTION 901.   Supplemental Resolutions Effective upon Filing with the Fiscal Agent ...............................19
SECTION 902.   Supplemental Resolutions Effective with Consent of Bondowners .......................................20
SECTION 903.   Reserved ..............................................................................................................................20
SECTION 904.   General Provisions ...............................................................................................................20

ARTICLE X   AMENDMENTS ...................................................................................................................20

SECTION 1001.   Mailing and Publication .....................................................................................................20
SECTION 1002.   Powers of Amendment. .......................................................................................................20
SECTION 1003.   Consent of Bondowners ......................................................................................................21
SECTION 1004.   Modifications by Unanimous Consent .................................................................................21
SECTION 1005.   Modification Before Bonds Outstanding .............................................................................21
SECTION 1006.   Exclusion of Bonds .............................................................................................................21
SECTION 1007.   Notation on Bonds ..............................................................................................................21

ARTICLE XI   DEFAULTS AND REMEDIES .............................................................................................22

SECTION 1101.   Events of Default .................................................................................................................22
SECTION 1103.   Priority of Payments After Event of Default ........................................................................22
SECTION 1104.   Termination of Proceedings .................................................................................................23
SECTION 1105.   Bondowners' Direction of Proceedings ...............................................................................23
SECTION 1106.   Limitation on Rights of Bondowners ...................................................................................23
SECTION 1107.   Possession of Bonds by Fiscal Agent Not Required .............................................................24
SECTION 1108.   Remedies Not Exclusive ......................................................................................................24
SECTION 1109.   No Waiver of Default ...........................................................................................................24
SECTION 1110.   Notice of Event of Default ...................................................................................................24

ARTICLE XII   SUBORDINATION PROVISIONS .......................................................................................24

SECTION 1201.   Subordination ......................................................................................................................24
SECTION 1202.   Liability of Fiscal Agent and successor Fiscal Agent in respect of Subordination ...............25
SECTION 1203.   When Payment of Subordinated Bonds and Subordinate Obligations Allowed .....................26
SECTION 1204.   Subrogation of Owners of Subordinated Bonds and Subordinate Obligations ........................26
SECTION 1205.   Treatment of Ancillary Bond Facilities ...............................................................................26
SECTION 1206.   Amendments to Senior Bonds and Parity Obligations not Requiring Consent of Owners of Subordinated Bonds and
                 Subordinate Obligations ....................................................................................................26

ARTICLE XIII MISCELLANEOUS .............................................................................................................26

SECTION 1301.   Defeasance ..........................................................................................................................26
SECTION 1302.   Evidence of Signatures of Bondowners and Owners of Bonds .............................................28

PR-ERS-000003437

# TABLE OF CONTENTS

| | | Page |
|---|---|---|
| SECTION 1303. | Moneys Held for Particular Bonds | 28 |
| SECTION 1304. | Preservation and Inspection of Documents | 28 |
| SECTION 1305. | Parties Interested Herein | 28 |
| SECTION 1306. | No Personal Liability | 28 |
| SECTION 1307. | Successors and Assigns | 28 |
| SECTION 1308. | Severability of Invalid Provisions | 28 |
| SECTION 1309. | Headings | 28 |
| SECTION 1310. | Conflict | 28 |
| SECTION 1311. | Governing Law | 28 |
| SECTION 1312. | Notices | 28 |
| SECTION 1313. | Jury Trial Waiver | 29 |
| SECTION 1314. | Effective Date | 29 |

PR-ERS-000003438

BOND RESOLUTION

**WHEREAS,** Employees Retirement System of the Government of the Commonwealth of Puerto Rico (the "System") is a trust created pursuant to Act 447 of May 15, 1951, as amended (the "Act"), to provide pension and other benefits to retired employees of the central government, municipalities and public corporations of the Commonwealth of Puerto Rico;

**WHEREAS,** by virtue of the Act, the System has, among others, the duties and powers

(i) to incur debt secured by the assets of the System;

(ii) to receive and collect Employers' Contributions;

(iii) to make contracts and to execute all instruments necessary or convenient for the exercise of any of its powers; and

(iv) to sue and be sued, complain and defend in all courts of justice and administrative bodies;

**WHEREAS,** as of June 30, 2005, the System had an unfunded liability of approximately $9.9 billion pursuant to the System's actuarial evaluation report;

**WHEREAS,** the System's statutory right to receive Employers' Contributions is an obligation of the Employers and a legal asset of the System;

**WHEREAS,** as a legal asset of the System, the Employers' Contributions may be pledged to secure the debt of the System; and

**WHEREAS,** in order to decrease the unfunded liability of the System, the System wishes to issue limited, non-recourse obligations in the form of Bonds, payable solely from the Pledged Property (as defined below), which includes the Employers' Contributions; now, therefore,

**BE IT RESOLVED** by the Board of Trustees of the System, as follows:

### ARTICLE I
### STATUTORY AUTHORITY

SECTION 101.     Authority for this Resolution. This Resolution is adopted pursuant to the provisions of the Act.

SECTION 102.     Resolution to Constitute Contract. In consideration of the purchase and acceptance of any and all of the Bonds authorized to be issued hereunder by those Persons who shall hold the same from time to time, this Resolution shall be deemed to be and shall constitute a contract among the System, the Owners from time to time of the Bonds and the Ancillary Facility Providers; and the security interest created in this Resolution and the covenants and agreements therein set forth to be performed on behalf of the System shall be for the equal benefit, protection and security of the Owners of any and all of the Bonds and the Ancillary Facility Providers, all of which shall be of equal rank without preference, priority or distinction of any of the Bonds and Ancillary Facility Providers over any other thereof, except as expressly provided in or permitted by this Resolution.

### ARTICLE II
### AUTHORIZATION AND ISSUANCE OF BONDS

SECTION 201.     Authorization of Bonds. The System may issue hereunder one or more series of Bonds of the System to be designated as "Pension Funding Bonds," which Bonds may be issued as hereinafter provided without limitation as to amount except as is or may hereafter be provided in this Resolution or in a Supplemental Resolution or as may be limited by law. There is hereby further created by this Resolution, in the manner and to the extent provided herein, a security interest and lien on the Pledged Property to secure the full and timely payment of the principal of and premium, if any, and interest on, all of the Bonds issued pursuant to this Resolution or any Supplemental Resolution. The Bonds shall be special obligations of the System payable solely from the Pledged Property without recourse against other assets of the System. The Commonwealth shall not be liable for the Bonds or any Ancillary Bond Facility. Neither any Bond nor any Ancillary Bond Facility shall constitute a debt of the Commonwealth within the meaning of any constitutional provision, or a pledge of the good faith and credit of the Commonwealth or of the taxing power of the Commonwealth, and the Commonwealth shall not be liable to make any payments thereon, nor shall any Bond or any Ancillary Bond Facility be payable out of any funds or assets other than the Pledged Property, and the Bonds and each Ancillary Bond Facility shall contain a statement to the foregoing effect.

SECTION 202.     General Provisions for Issuance of Bonds.

1.     The Bonds may, if and when authorized by the System pursuant to one or more Supplemental Resolutions, be issued in one or more Series, as Senior Bonds or Subordinated Bonds, and the designation thereof, in addition to the name "Pension Funding Bonds," shall include such further appropriate particular designations added to or incorporated in such title for the Bonds of any particular Series as the System may determine, including designations of Classes. Each Bond shall bear upon its face the designation so determined for the Series to which it belongs. Except as may be limited by applicable law, Bonds of a Series may be issued in the form of Capital Appreciation Bonds, Convertible Capital Appreciation Bonds, Current Interest Bonds, Adjustable Rate Bonds, Option Bonds, Fixed Tender Bonds, or any combination of the foregoing, or any other type of Bond that may legally be issued by the System, which in each case may include Serial Bonds or Term Bonds, or any combination thereof.

2.     Each Supplemental Resolution authorizing or providing for the issuance of a Series of Bonds shall also specify, except as may be limited by applicable law:

(i)     the authorized principal amount and designation of such Series of Bonds;

(ii)     the purpose or purposes for which such Series of Bonds are being issued, which shall be one or more of the following, to the extent then permitted by applicable law and the provisions of this Resolution: (a) to provide sufficient funds in order to fund the System and decrease the unfunded liability of the System; (b) to refund or otherwise prepay any Bonds or other evidences of indebtedness issued by the System; (c) to pay or provide for the payment of Financing Costs, including

VI-1

PR-ERS-000003439

but not limited to the costs of issuance; (d) to fund debt service reserves and other reserve accounts; and/or (e) for such other purposes as may be authorized by the Act, as the same may be amended and then in effect.

(iii)  the date or dates, maturity date or dates and amounts of each maturity of the Bonds of such Series;

(iv)  the interest rate or rates of the Bonds of such Series (which may include variable, convertible or other rates, and zero interest rate bonds), or the manner of determining such interest rate or rates, and the interest payment dates of the Bonds of such Series, and the date or dates on which and the methods by which any such rates shall be adjusted;

(v)  the type of Bonds to be issued, including, but not limited to, Capital Appreciation Bonds, Convertible Capital Appreciation Bonds, Current Interest Bonds, Adjustable Rate Bonds, Option Bonds, or Fixed Tender Bonds;

(vi)  the designation of Bonds of such Series as Senior Bonds or as Subordinated Bonds;

(vii)  the Record Date, if any, which shall be the 15th day of the month preceding the date of payment, whether or not a Business Day, if no other Record Date is specified;

(viii)  the denomination or denominations of, and the manner of dating, numbering and lettering, the Bonds of such Series;

(ix)  if so determined by the System, any Debt Service Reserve Requirement for the Bonds of such Series, and the method of calculating the same and funding thereof (which may be from Bond proceeds);

(x)  the place or places of payment of the principal of and premium, if any, and interest on the Bonds of such Series, or the method of determining the same;

(xi)  the Redemption Price or Prices, and the Currency in which such Prices are payable, if any, and, subject to the provisions of Article IV, the redemption terms, if any, for the Bonds of such Series (including but not limited to any notice of redemption period other than as provided in Section 406), *provided* that Bonds of any maturity for which Sinking Fund Installments shall be established pursuant to paragraph (xii) of this paragraph shall in any event be redeemable, payable at maturity, by application of the Sinking Fund Installments for such Bonds on the due dates of such Sinking Fund Installments;

(xii)  the amount of each Sinking Fund Installment, or the method for determining such amount, and due date of each Sinking Fund Installment, if any, for Bonds of like maturity of such Series;

(xiii)  the amount, if any, or the method for determining such amount, to be credited to the Capitalized Interest Account, for capitalized interest with respect to such Series of Bonds and provisions for the application thereof to the payment of all or a portion of the interest on such Series of Bonds or any other Series of Bonds;

(xiv)  the amount, if any, or method of determining the costs of issuance to be delivered to GDB at Closing;

(xv)  if so determined by the System, provisions for the application of any moneys available therefor to the purchase or redemption of Bonds of such Series and for the order of purchase or redemption of such Bonds;

(xvi)  if so determined by the System, provisions for the sale of the Bonds of such Series;

(xvii)  provisions for the execution and authentication of the Bonds of such Series;

(xviii)  the respective forms of the Bonds of such Series and of the Fiscal Agent's certificate of authentication;

(xix)  if Bonds of such Series are Adjustable Rate Bonds that are not the subject of a Qualified Hedge, the Maximum Interest Rate for such Bonds;

(xx)  if Bonds of such Series are Option Bonds or Fixed Tender Bonds, provisions regarding tender for purchase or redemption thereof and payment of the purchase or Redemption Price thereof, in the Currency in which the Bonds of such Series are payable;

(xxi)  if Bonds of such Series are Capital Appreciation Bonds or Convertible Capital Appreciation Bonds, provisions for including the principal and interest portions of the Accreted Amount in the calculation of accrued and unpaid and accruing interest or Principal Installments for purposes of the definition of Accrued Payment Obligation;

(xxii)  if Bonds of such Series are Adjustable Rate Bonds, Capital Appreciation Bonds, Convertible Capital Appreciation Bonds or Bonds hedged or to be hedged by a Qualified Hedge, or the Supplemental Resolution authorizes a Qualified Hedge on Bonds previously issued, provisions specifying the method of calculating the Accrued Payment Obligation with respect to such Adjustable Rate Bonds, Capital Appreciation Bonds, Convertible Capital Appreciation Bonds or the Bonds hedged or to be hedged by such Qualified Hedge, as the case may be, for purposes of the Debt Service Reserve Requirement and the additional Bonds tests of Sections 204 and 708;

(xxiii)  if so determined by the System, modifications to the definition of Revenues or Pledged Property applicable to the Bonds of such

VI-2

PR-ERS-000003440

Series for the only purpose of adding resources to Revenues or Pledged Property for the benefit of the Bondowners;

(xxiv)    deposits into Funds, Accounts and Subaccounts as may be required or permitted by this Resolution and not otherwise provided for above;

(xxv)    if such Bonds are not payable in Dollars, the Foreign Currency or Currencies or Currency Unit in which the Bonds of such Series shall be denominated or in which payment of the principal of (and/or premium, if any) and/or interest on the Bonds of such Series may be made;

(xxvi)    if the amount of principal of (and premium, if any) or interest on the Bonds of such Series may be determined with reference to an index, including, but not limited to, an index based on a Currency or Currencies other than that in which the Bonds of such Series are denominated or payable, or any other type of index, the manner in which such amounts shall be determined;

(xxvii)    the book-entry-only systems of registration to be chosen with respect to the Bonds of such Series, and the procedures regarding such registration and, if applicable, the rules and regulations of the book-entry-only system depository; and

(xxvii)    any other provisions deemed advisable by the System, not in conflict with the provisions of this Resolution or the Act as each is then in effect.

3.    Except in the case of the Series A Bonds being issued pursuant to the First Supplemental Resolution, each Series of Bonds issued by the System must satisfy the conditions contained in Section 708 in connection with the issuance of additional Bonds or in Section 204 in connection with the issuance of Refunding Bonds. Each Series of Bonds shall be executed by the System for issuance under this Resolution and delivered to the Fiscal Agent and thereupon shall be authenticated by the Fiscal Agent and delivered to the System and upon the receipt by the Fiscal Agent of:

(i)    a copy of this Resolution, certified by an Authorized Officer of the System;

(ii)    an Opinion of Counsel to the effect that (A) the System has the right and power under the Act, as amended to the date of such opinion, to adopt the Resolution and the Resolution has been duly and lawfully adopted by the System, is in full force and effect and is valid and binding upon the System and enforceable in accordance with its terms, and no other authorization for the Resolution is required; (B) the Resolution creates the valid security interest for the benefit of the Owners of the Bonds on the Pledged Property, subject only to the provisions of the Resolution permitting the application thereof to the purposes and on the terms and conditions set forth in the Resolution; and (C) the Bonds of such Series are valid and binding special, non-recourse obligations of the System as provided in the Resolution,

enforceable in accordance with their terms and the terms of the Resolution (except insofar as the enforceability thereof may be limited by bankruptcy, moratorium, insolvency or other laws affecting creditors' rights or remedies theretofore or thereafter enacted and may be subject to general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law), or other customary exception), and entitled to the benefit of the Resolution and of the Act, as amended to the date of such opinion, and such Bonds have been duly and validly authorized, executed and issued in accordance with law, including the Act, as amended to the date of such opinion, and in accordance with the Resolution;

(iii)    a written order as to the authentication and delivery of the Bonds of such Series, signed by an Authorized Officer of the System;

(iv)    a copy of the Supplemental Resolution authorizing such Series, certified by an Authorized Officer of the System;

(v)    a certificate of an Authorized Officer of the System stating that (A) the System is not in default in any material respect in the performance of any of the terms, provisions or covenants of this Resolution or any Supplemental Resolution to be complied with or performed by the System, and (B) the System has not violated the provisions of Article VII of this Resolution; and

(vi)    such further documents as are required by the provisions of this Section or Article IX or any Supplemental Resolution adopted pursuant to Article IX.

SECTION 203.    Special Provisions Concerning Capital Appreciation Bonds and Convertible Capital Appreciation Bonds.

Except as otherwise may be provided in a Supplemental Resolution:

1.    For purposes of clause (ii) within the definition of "Outstanding" in this Resolution, the principal amount of any Capital Appreciation Bond or Convertible Capital Appreciation Bond, in reference to the payment thereof at maturity, shall be deemed to equal its Maturity Amount.

2.    For purposes of the definition of "Redemption Price" in this Resolution, the principal amount of any Capital Appreciation Bond or Convertible Capital Appreciation Bond shall be deemed to equal its Accreted Amount as of the date of the intended redemption.

3.    For purposes of Sections 305, 307 and 308, the principal amount of any Capital Appreciation Bond or Convertible Capital Appreciation Bond shall be deemed to equal its Accreted Amount as of the date of the intended exchange or substitution.

4.    For purposes of Section 406, the principal amount of any Capital Appreciation Bond or Convertible Capital Appreciation Bond shall be deemed to equal its Accreted Amount.

PR-ERS-000003441

5. For purposes of Sections 501, 502, and 1103, and of all other provisions of this Resolution relating to security for the Bonds or application of assets which secure the Bonds, the principal amount of each Capital Appreciation Bond or Convertible Capital Appreciation Bond shall be deemed to equal its Accreted Amount as of the date of the intended application of the subject assets.

6. For purposes of Sections 1002, 1003, 1101, 1102, 1105 and 1106 and of all other provisions of this Resolution relating to consents or directions given by, or requests of, Owners of the Bonds, the principal amount of each Capital Appreciation Bond or Convertible Capital Appreciation Bond shall be deemed to equal its Accreted Amount as of the most recent Accretion Date.

7. For purposes of Section 1301, the principal amount of any Capital Appreciation Bond or Convertible Capital Appreciation Bond payable upon the maturity thereof shall be deemed to equal its Maturity Amount.

SECTION 204. Special Provisions for Refunding Bonds.

1. Bonds of one or more Series may be authenticated and delivered upon original issuance, subject to the provisions and limitations of Section 202 and this Section, as Refunding Bonds, and only for the purposes of creating economic savings, restructuring debt service, modifying Resolution covenants, and providing for more favorable debt terms, or any of the foregoing or any other valid purpose of the System. Each Supplemental Resolution authorizing a Series of Refunding Bonds shall set forth that the purposes for which such Series is issued include the payment or redemption of all or any part of the Bonds of any one or more Series then Outstanding.

2. The Refunding Bonds of such Series shall be authenticated and delivered by the Fiscal Agent only upon receipt by the Fiscal Agent (in addition to the requirements of Section 202) of:

(i) irrevocable instructions to the Fiscal Agent, in form reasonably satisfactory to it, to give due notice of the payment or redemption of all the Bonds so to be refunded on a payment or redemption date specified in such instructions and the payment or redemption dates, if any, upon which such Bonds are to be paid or redeemed;

(ii) if the Bonds of a Series to be refunded are to be paid or redeemed subsequent to the forty-fifth day next succeeding the date of authentication of the Refunding Bonds, irrevocable instructions to the Fiscal Agent, to provide notice in the manner provided in Section 1301 with respect to the payment of such Bonds pursuant to such Section 1301;

(iii) either (A) moneys or (B) Defeasance Securities as shall be necessary to comply with the provisions of paragraph 3 of Section 1301, which moneys and Defeasance Securities shall be held in trust and used only as provided in paragraph 3 of Section 1301; and

(iv) a certificate of an independent certified public accountant certifying that (A) the amounts described in paragraph (iii) above are sufficient, without any reinvestment, to pay or redeem all of the Bonds to be refunded, and (B) the principal and interest payable with respect to the Refunding Bonds in each year while the Refunding Bonds are Outstanding is less than the principal and interest payable with the respect to the Bonds being refunded, provided that the certificate of the independent certified public accountant shall not be required to cover the matters described in this clause (B) if the Refunding Bonds are issued in compliance with the additional Bonds test set forth in Section 708.

3. Refunding Bonds may be issued upon compliance with Section 708 in lieu of compliance with this Section.

SECTION 205. Delegation of Officers and Committees. A Supplemental Resolution authorizing Bonds may delegate to any Authorized Officer of the System the power to issue Bonds from time to time in compliance with the provisions of this Resolution and to fix the details of any such Bonds by a certificate of such Authorized Officer. Any such action by an Authorized Officer of the System shall be in writing. Each such action by an Authorized Officer of the System with respect to any Bonds shall be deemed to be part of the Supplemental Resolution providing for such Bonds.

SECTION 206. Credit and Liquidity Facilities; Rights of Credit Facility Providers.

1. In connection with any Bonds, the System may obtain or cause to be obtained one or more Credit Facilities or Liquidity Facilities and agree with the Credit Facility Provider or Liquidity Facility Provider to reimburse such provider directly for amounts paid under the terms of such Credit Facility or Liquidity Facility, together with interest thereon; provided, however, that no obligation to reimburse a Credit Facility Provider or Liquidity Facility Provider shall be created, for purposes of this Resolution, until amounts are paid under such Credit Facility or Liquidity Facility.

2. Any Supplemental Resolution may provide that (i) so long as a Credit Facility is in full force and effect, and payment on the Credit Facility is not in default, the Credit Facility Provider shall be deemed to be the sole Owner of the Outstanding Bonds the payment of which such Credit Facility secures when the approval, consent or action of the Owners of such Bonds is required or may be exercised under this Resolution, or, in the alternative, that the approval, consent or action of the Credit Facility Provider shall be required in addition to the approval, consent or action of the applicable percentage of the Owners of Outstanding Bonds required by Section 1002 and following an Event of Default, provided that no such approval, consent or action of a Credit Facility Provider may be made or taken without the approval, consent or action of the Owner of each Bond affected if such approval, consent or action of such Owner otherwise would be required by the second sentence of Section 1002, and (ii) in the event that the principal, Sinking Fund Installments, if any, and Redemption Price, if applicable, and interest due on any Outstanding Bonds shall be paid in the Currency in which the Bonds of such Series are payable under the provisions of a Credit Facility, all covenants, agreements and other obligations of the System to the Owners of such Bonds shall continue to exist and such Bonds shall be deemed to remain Outstanding, and such Credit Facility Provider shall be subrogated to the rights of such

VI-4

PR-ERS-000003442

Owners in accordance with the terms of such Credit Facility.

SECTION 207. Qualified Hedges. The System may enter into one or more Qualified Hedges in connection with any Bonds (i) at the time of issuance of such Bonds, (ii) prior to the issuance of such Bonds, in anticipation of the issuance thereof, *provided* that payments by the System under the Qualified Hedges do not commence until the date any Bonds to which such Qualified Hedge of Qualified Hedges relate are expected to be issued, or (iii) after the issuance of such Bonds.

SECTION 208. Parity Obligations and Subordinate Obligations. For purposes of Articles V and XI, all Parity Obligations and Subordinate Obligations shall specify, to the extent applicable, the interest and principal components of such Parity Obligations and Subordinate Obligations; *provided, however,* that in the case of Qualified Hedges, scheduled payments thereunder shall constitute the interest components thereof and there shall be no principal components.

## ARTICLE III
## GENERAL TERMS AND PROVISIONS OF BONDS

SECTION 301. Medium of Payment; Form and Date.

1. The Bonds shall be payable, with respect to interest, principal and premium, if any, in Dollars or any Currency which at the time of payment is legal tender for the payment of public and private debts, as provided in the Supplemental Resolution authorizing the issuance thereof.

2. The Bonds of each Series shall be issued only in the form of fully registered Bonds without coupons unless otherwise authorized by the Supplemental Resolution authorizing the issuance thereof.

3. Each Bond shall be lettered and numbered as provided in the Supplemental Resolution authorizing the issuance thereof and so as to be distinguished from every other Bond.

4. Bonds of each Series shall be dated as provided in the Supplemental Resolution authorizing the issuance thereof.

5. If so provided by the Supplemental Resolution authorizing the issuance thereof, the Bonds of a Series authorized to be issued by such Supplemental Resolution may be issued in book entry form without definitive Bonds delivered to each beneficial owner thereof.

SECTION 302. Legends. The Bonds of each Series may contain or have endorsed thereon such provisions, specifications and descriptive words not inconsistent with the provisions of this Resolution as may be necessary or desirable to comply with custom or otherwise, as may be determined by the System prior to the authentication and delivery thereof.

SECTION 303. Execution and Authentication.

1. The Bonds shall be executed in the name of the System by the manual or facsimile signature of an Authorized Officer of the System and its seal (or a facsimile thereof) shall be thereunto affixed, imprinted, engraved or otherwise reproduced, and attested by the manual or facsimile signature of its Secretary or an Assistant Secretary. In case any

one or more of the officers who shall have signed or sealed any of the Bonds shall cease to be such officer before the Bonds so signed and sealed shall have been authenticated and delivered by the Fiscal Agent, such Bonds may, nevertheless, be authenticated and delivered as herein provided, and may be issued as if the persons who signed or sealed such Bonds had not ceased to hold such offices. Any Bond of a Series may be signed and sealed on behalf of the System by such persons as at the time of the execution of such Bond shall be duly authorized or hold the proper office in the System, although at the date borne by the Bonds of such Series such persons may not have been so authorized or have held such office.

2. The Bonds of each Series shall bear thereon a certificate of authentication, in the form set forth in the Supplemental Resolution authorizing such Bonds, executed manually by the Fiscal Agent. Only such Bonds as shall bear thereon such certificate of authentication shall be entitled to any right or benefit under this Resolution and no Bond shall be valid or obligatory for any purpose until such certificate of authentication shall have been duly executed by the Fiscal Agent. Such certificate of the Fiscal Agent upon any Bond executed on behalf of the System shall be conclusive evidence that the Bond so authenticated has been duly authenticated and delivered under this Resolution and that the Owner thereof is entitled to the benefits of this Resolution.

SECTION 304. Negotiability, Transfer and Registry. All Bonds issued under this Resolution shall be negotiable, subject to the provisions for registration and registration of transfer contained in this Resolution and in the Bonds. So long as any of the Bonds shall remain outstanding, the Fiscal Agent shall maintain and keep, at the Corporate Trust Office, books for the registration and registration of transfer of Bonds; and, upon presentation thereof for such purpose at said office, the Fiscal Agent shall register or cause to be registered therein, under such reasonable regulations as it or the Fiscal Agent may prescribe, any Bond entitled to registration or registration of transfer. So long as any of the Bonds remain Outstanding, the Fiscal Agent shall also make all necessary provision to permit the exchange of Bonds at the Corporate Trust Office.

SECTION 305. Registration of Transfer of Bonds.

1. The transfer of each Bond shall be registrable only upon the books of the System, which shall be kept for that purpose at the Corporate Trust Office, by the Owner thereof in person or by his attorney duly authorized in writing, upon surrender thereof together with a written instrument of transfer duly executed by the Owner or his duly authorized attorney. Upon the registration of transfer of any such Bond, the System shall issue, and the Fiscal Agent shall authenticate, in the name of the transferee a new Bond or Bonds of the same aggregate principal amount, Series, maturity, and interest rate, as the surrendered Bond.

2. The System and the Fiscal Agent may deem and treat the person in whose name any Bond shall be registered upon the books of the System as the absolute owner of such Bond whether such Bond shall be overdue or not, for the purpose of receiving payment of, or on account of, the principal or Redemption Price, if any, of and interest on such Bond and for all other purposes, and all such payments so made to any such Owner or upon his duly authorized written order shall be valid and effectual to satisfy and discharge the liability upon such Bond to the extent of the sum or sums so paid, and neither the System nor the Fiscal Agent shall be affected by any notice to the contrary.

VI-5

PR-ERS-000003443

The System agrees to indemnify and save the Fiscal Agent harmless from and against any and all loss, cost, charge, expense, judgment or liability incurred by it, acting in good faith and without gross negligence under this Resolution, in so treating such Owner.

SECTION 306.  <u>Regulations with Respect to Exchanges and Registration of Transfers</u>. In all cases in which the privilege of exchanging Bonds or registering transfers of Bonds is exercised, the System shall execute and the Fiscal Agent shall authenticate and deliver Bonds in accordance with the provisions of this Resolution. All Bonds surrendered in any such exchanges or registration of transfers shall forthwith be canceled by the Fiscal Agent. For every such exchange or registration of transfer of Bonds, whether temporary or definitive, the System or the Fiscal Agent may make a charge sufficient to reimburse it for any tax, fee or other governmental charge required to be paid with respect to such exchange or registration of transfer, and, except (i) with respect to the delivery of definitive Bonds in exchange for temporary Bonds, (ii) in the case of a Bond issued upon the first exchange or registration of transfer of a Bond or Bonds surrendered for such purpose within 60 days after the first authentication and delivery of any of the Bonds of the same Series, or (iii) as otherwise provided in this Resolution, may charge a sum sufficient to pay the cost of preparing each new Bond issued upon such exchange or registration of transfer, which sum or sums shall be paid by the person requesting such exchange or registration of transfer as a condition precedent to the exercise of the privilege of making such exchange or registration of transfer. Neither the System nor the Fiscal Agent shall be required to register the transfer of or exchange any Bonds called for redemption.

SECTION 307.  <u>Bonds Mutilated, Destroyed, Stolen or Lost</u>. In case any Bond shall become mutilated or be destroyed, stolen or lost, the System shall execute, and thereupon the Fiscal Agent shall authenticate and deliver, a new Bond of like Series, maturity, and principal amount as the Bond so mutilated, destroyed, stolen or lost or in exchange and substitution for such mutilated Bond, upon surrender and cancellation of such mutilated Bond or in lieu of and substitution for the Bond destroyed, stolen or lost, upon filing with the Fiscal Agent evidence satisfactory to the System and the Fiscal Agent that such Bond has been destroyed, stolen or lost and upon furnishing the System and the Fiscal Agent with indemnity satisfactory to it and complying with such other reasonable regulations as the System and the Fiscal Agent may prescribe and paying such expenses as the System and Fiscal Agent may incur. All Bonds so surrendered to the Fiscal Agent shall be canceled by it. Any such new Bonds issued pursuant to this Section in substitution for Bonds alleged to be destroyed, stolen or lost shall constitute original additional contractual obligations on the part of the System, whether or not the Bonds so alleged to be destroyed, stolen or lost be at any time enforceable by anyone, and shall be equally secured by and entitled to equal and proportionate benefits with all other Bonds issued under this Resolution, in any moneys or securities held by the System or the Fiscal Agent for the benefit of the Bondowners.

SECTION 308.  <u>Preparation of Definitive Bonds; Temporary Bonds</u>.

1.  Until the definitive Bonds of any Series are prepared, the System may execute, in the same manner as is provided in Section 303, and, upon the request of the System, the Fiscal Agent shall authenticate and deliver, in lieu of definitive Bonds, one or more temporary Bonds substantially of the tenor of the definitive Bonds in lieu of which such temporary Bond or Bonds are issued, in denominations or any multiples thereof authorized by the System, and with such omissions, insertions and variations as an Authorized Officer of the System may deem

appropriate to temporary Bonds. The System at its own expense shall prepare and execute and, upon the surrender of such temporary Bonds for exchange and the cancellation of such surrendered temporary Bonds, the Fiscal Agent shall authenticate and, without charge to the Owner thereof, deliver in exchange therefor definitive Bonds, of the same aggregate principal amount, Series and maturity if any, as the temporary Bonds surrendered. Until so exchanged, the temporary Bonds shall in all respects be entitled to the same benefits and security as definitive Bonds authenticated and issued pursuant to this Resolution.

2.  All temporary Bonds surrendered in exchange either for another temporary Bond or Bonds or for a definitive Bond or Bonds shall be forthwith canceled by the Fiscal Agent.

SECTION 309.  <u>Tender of Option Bonds or Fixed Tender Bonds</u>. Option Bonds or Fixed Tender Bonds which are required to be delivered for redemption or purchase pursuant to the provisions hereof or of the Supplemental Resolution authorizing such Bonds shall be deemed surrendered for transfer even though such Bonds have not been actually delivered by the Owners thereof.

SECTION 310.  <u>Book-Entry-Only System</u>. Notwithstanding any other provision of this Resolution, the System may employ one or more book-entry-only systems of registration with respect to any Bonds, and the procedures regarding such registration shall be set forth in a Supplemental Resolution and, if applicable, the rules and regulations of the book-entry-only system depository. Any provisions of this Resolution inconsistent with book-entry-only Bonds, including but not limited to the manner in which Bonds may be paid, shall not be applicable to such book-entry-only Bonds.

## ARTICLE IV
## REDEMPTION OF BONDS

SECTION 401.  <u>Privilege of Redemption and Redemption Price</u>. Series of Bonds subject to redemption prior to maturity pursuant to the Supplemental Resolution authorizing such Series shall be redeemable, upon notice as provided in this Article IV, at such times, at such Redemption Prices, in such Currencies and upon such terms, in addition to and consistent with the terms contained in this Article IV, as may be specified in such Supplemental Resolution.

SECTION 402.  <u>Redemption at the Election of the System</u>. In the case of any redemption of Bonds otherwise than as provided in Section 403, the System shall give written notice to the Fiscal Agent of its election so to redeem, of the redemption date, of the "CUSIP," "ISIN" or other similar numbers (provided, however, that the System and the Fiscal Agent shall not be liable for the correctness of such numbers as contained in such notice), of the Series, and of the aggregate principal amount (or Maturity Amount, if applicable) of the Bonds of each maturity and interest rate of such Series to be redeemed, which principal amount (or Maturity Amount, if applicable) shall be determined by the System in its sole discretion, subject to any limitations with respect thereto contained in any Supplemental Resolution. Such notice shall be given at least forty (40) days prior to the redemption date or such shorter period as shall be acceptable to the Fiscal Agent. In the event notice of redemption shall have been given as provided in Section 406, except to the extent such notice shall state that such redemption is conditioned upon the receipt by the Fiscal Agent of moneys sufficient to pay the Redemption Price, in the Currency in which the Bonds of such Series are payable, or upon the satisfaction of any other condition or the occurrence of any other

VI-6

PR-ERS-000003444

event as shall be stated in such notice, the System shall, prior to the redemption date, pay or cause to be paid to the Fiscal Agent an amount in cash and/or a principal amount of Investment Obligations maturing or redeemable at the option of the holder thereof not later than the date fixed for redemption which, in addition to other moneys, if any, available therefor held by the Fiscal Agent, will be sufficient to redeem on the redemption date at the Redemption Price thereof, plus interest accrued and unpaid to the redemption date, and in the Currency in which the Bonds of such Series are payable, all of the Bonds (or portions thereof) to be redeemed.

SECTION 403.  Redemption in Satisfaction of Sinking Fund Installments.

1.  In addition to the redemption of Bonds pursuant to Sections 401 and 402 above, Term Bonds issued pursuant to this Resolution shall be subject to mandatory redemption by lot out of Sinking Fund Installments at a Redemption Price equal to the principal amount (or Accreted Amount, if applicable) thereof, in the Currency in which the Bonds of such Series are payable, on the dates and in the amounts set forth in the Supplemental Resolution pursuant to which such Bonds were issued.

2.  In the case of any redemption of Bonds out of Sinking Fund Installments, the System shall, in the case of each Sinking Fund Installment, give written notice to the Fiscal Agent of (i) the date of such Sinking Fund Installment, (ii) the unsatisfied balance of such Sinking Fund Installment (determined as provided in Section 507) and (iii) the particular Series and maturity of the Bonds then being redeemed out of such Sinking Fund Installment. Such notice shall be given at least forty (40) days prior to the date of such redemption, or such shorter period as shall be acceptable to the Fiscal Agent.

3.  The System shall, and hereby covenants that it will, on or prior to 11:00 a.m. (New York City time) on the date of such redemption, pay to the Fiscal Agent an amount in cash which, in addition to other moneys, if any, available therefor held by the Fiscal Agent, will be sufficient to redeem at such redemption date, at the Redemption Price thereof, plus interest accrued and unpaid to the redemption date, in the Currency in which the Bonds of such Series are payable, all of the Bonds which are to be redeemed out of such Sinking Fund Installment.

SECTION 404.  Selection of Bonds to be Redeemed in Partial Redemption.

1.  In the event of redemption of less than all the Outstanding Bonds of a particular Series pursuant to Section 401 or 402 hereof, the System shall designate the maturities of the Bonds to be redeemed.

2.  If less than all of the Outstanding Bonds of a particular Series and maturity are to be redeemed, the Fiscal Agent shall select the Bonds or portions of Bonds to be redeemed in the appropriate authorized denominations by lot or by such other manner as it deems appropriate. For purposes of this Section 404, Bonds (or portions thereof) which have theretofore been selected by lot for redemption shall not be deemed to be Outstanding.

SECTION 405.  Notice of Redemption.

1.  When the Fiscal Agent shall receive notice from the System of its election to redeem Bonds pursuant to Section 402, or when Bonds are to be redeemed pursuant to Section 403, the Fiscal Agent shall give notice, in the name of the System, of the redemption of such Bonds, which notice shall specify the Series and maturities and interest rate of the Bonds to be redeemed, the redemption date and the place or places where amounts due upon such redemption will be payable and, if less than all of the Bonds of any like Series and maturity and interest rate are to be redeemed, the letters and numbers or other distinguishing marks of such Bonds so to be redeemed, and, in the case of Bonds to be redeemed in part only such notice shall also specify the respective portions of the principal amount thereof to be redeemed, and, if applicable, that such redemption is conditioned upon the satisfaction of the conditions specified as provided in 2 below. Such notice of redemption shall further state that on such redemption date there shall become due and payable upon each Bond (or portion thereof) to be redeemed the Redemption Price thereof, together with interest accrued to the redemption date in the Currency in which the Bonds of such Series are payable, and that from and after such date, sufficient moneys being held by the Fiscal Agent in trust for the payment of such Redemption Price, interest thereon shall cease to accrue and be payable on the Bonds (or portions thereof) to be redeemed, unless, in the case of any conditional notice, the requisite conditions are not satisfied, and it will further state that the notice will comply with the requirements of the Securities Exchange Act of 1934, as amended, Release No. 34-23856, dated December 3, 1986, as long as such Release shall be in effect. The Fiscal Agent shall mail a copy of such notice, postage prepaid, no less than thirty (30) days before the redemption date, or such other period for any particular Bonds as may be provided by the Supplemental Resolution authorizing such Bonds, to the Owners of Bonds or portions of Bonds which are to be redeemed, at their last address, if any, appearing upon the registry books. Failure so to mail any such notice to any particular Owner shall not affect the validity of the proceedings for the redemption of Bonds not owned by such Owner and failure of any Owner to receive such notice shall not affect the validity of the proposed redemption of Bonds.

2.  Any notice of optional redemption of Bonds given pursuant to this Section may be made conditional upon receipt by the Fiscal Agent of moneys sufficient to pay the Redemption Price of such Bonds in the Currency in which the Bonds of such Series are payable or upon the satisfaction of any other condition or the occurrence of any other event, which notice shall specify any such conditions or events. Any conditional notice so given may be rescinded at any time before payment of such Redemption Price if any such condition is not satisfied or if any such other event does not occur. Notice of such rescission shall be given by the Fiscal Agent to affected Owners of Bonds, in the same manner as the conditional notice of redemption was given, as promptly as practicable after the System shall have notified the Fiscal Agent of the failure of such condition or the occurrence of such other event.

SECTION 406.  Payment of Redeemed Bonds. Notice having been given in the manner provided in Section 405, the Bonds (or portions thereof) so called for redemption shall become due and payable on the redemption date so designated at the Redemption Price, plus interest accrued and unpaid to the redemption date in the Currency in which the Bonds of such Series are payable, and upon presentation and surrender thereof at the office specified in such notice, such Bonds (or portions thereof) shall be paid at the Redemption Price plus interest accrued and unpaid to the redemption date in the Currency in which the Bonds of such Series are payable, except to the extent the same shall not

VI-7

PR-ERS-000003445

occur on account of a failure to comply with a condition or event stated in the notice to the Fiscal Agent pursuant to Section 402 and in the notice of redemption pursuant to Section 405. If there shall be called for redemption less than all of a Bond, the System shall execute and the Fiscal Agent shall authenticate and deliver, upon the surrender of such Bond, without charge to the Owner thereof, for the unredeemed balance of the principal amount of the Bond so surrendered, Bonds of like Series and maturity in any authorized denomination. If, on the redemption date, moneys for the redemption of all the Bonds (or portions thereof) of any like Series and maturity and interest rate to be redeemed, together with interest to the redemption date, shall be held by the Fiscal Agent so as to be available therefor on said date and if notice of redemption shall have been provided as aforesaid, and, with respect to any conditional notice of redemption, the conditions stated in the notice of redemption shall have been met and satisfied, then, from and after the redemption date, interest on the Bonds (or portions thereof) of such Series and maturity and interest rate so called for redemption shall cease to accrue and become payable. If said moneys shall not be so available on the redemption date, such Bonds (or portions thereof) shall continue to bear interest until paid at the same rate as they would have borne had they not been called for redemption.

SECTION 407    Cancellation and Disposition of Bonds. All Bonds paid or redeemed, either at or before maturity, shall be delivered to the Fiscal Agent when such payment or redemption is made, and such Bonds shall thereupon be promptly canceled. Bonds so canceled shall be disposed of by the Fiscal Agent, in accordance with the Fiscal Agent's standard procedures, and, upon request from the System, the Fiscal Agent shall execute a certificate of disposition in duplicate by the signature of one of its Authorized Officers describing the Bonds so disposed of, and one executed certificate shall be delivered to the System and the other executed certificate shall be retained by the Fiscal Agent.

### ARTICLE V
### PLEDGE, ASSIGNMENT AND SECURITY INTEREST; ESTABLISHMENT AND MAINTENANCE OF FUNDS AND ACCOUNTS AND APPLICATION THEREOF

SECTION 501.    Pledge, Assignment and Security Interest.

1.    The pledge and assignment of, and the grant of a security interest in and over, the Pledged Property, subject to Section 804, in favor of the Fiscal Agent for the benefit of the Bondholders and for the payment and as security for the payment of the Principal Installments and Redemption Price of and interest on the Bonds and payments due under Credit Facilities, and payments due under Liquidity Facilities and Qualified Hedges is hereby authorized, created and granted in accordance with the terms and provisions of this Resolution and subject to the provisions of this Resolution permitting the application of the Pledged Property for the purposes and on the terms and conditions set forth in this Resolution, and in each case subject to the provisions regarding priority of payment as between the Senior Bonds and the Subordinated Bonds. Nothing contained herein shall prevent a Credit Facility or Liquidity Facility from being provided with respect to any particular Bonds and not others. To further evidence such pledge, assignment and grant of security interest, the Fiscal Agent and the System shall execute the Security Agreement and the System shall cause the proper filing of the Security Agreement in accordance with the Uniform Commercial Code as in effect in Puerto Rico.

2.    To the fullest extent provided by the Act and other applicable law, the pledge, assignment and grant

of security interest provided by this Section shall be valid and binding, and the Pledged Property shall immediately be subject to the lien of this pledge, assignment and security interest without any physical delivery thereof or further act, and the lien of this pledge, assignment and security interest shall be valid and binding as against all parties having claims of any kind in tort, contract or otherwise against the System, irrespective of whether such parties have notice thereof.

SECTION 502.    Establishment of Fund and Accounts.

1.    The "Project Fund" is hereby created and the following Accounts and Subaccounts are hereby created and established within the Project Fund, each of which shall have as a prefix "Employees Retirement System of the Government of the Commonwealth of Puerto Rico" and shall be held by the Fiscal Agent:

(1)    Capitalized Interest Account,

(2)    Revenue Account,

(3)    Debt Service Account, which, if there shall be any Subordinated Bonds Outstanding, shall be established for each Class of Bonds, and each of which shall contain therein a Principal Subaccount and an Interest Subaccount,

(4)    Debt Service Reserve Account, which, if there shall be any Subordinated Bonds Outstanding, shall be established for each Class of Bonds,

(5)    General Reserve Account, and

(6)    Redemption Account, which, if there shall be any Subordinated Bonds Outstanding, shall be established for each Class of Bonds.

2.    The System may establish and create such other Accounts in the Fund, or such other Subaccounts in any Account, as may be authorized pursuant to any Supplemental Resolution, including a Supplemental Resolution authorizing a Series of Bonds, and deposit therein such amounts as may from time to time be held for the credit of any Account or Subaccount.

3.    Amounts held by the System or by the Fiscal Agent at any time in the Fund or any Accounts and Subaccounts established pursuant to this Section, as the case may be, shall be held in trust in separate Accounts and Subaccounts and shall be applied only in accordance with the provisions of this Resolution and the Act.

SECTION 503.    Capitalized Interest Account.

1.    There shall be deposited in the Capitalized Interest Account amounts, if any, determined as set forth in a Supplemental Resolution and as required by paragraph (xiii) of subsection 2 of Section 202 and authorizing the issuance of a Series of Bonds.

2.    Moneys in the Capitalized Interest Account or any Subaccount thereof shall be transferred to the corresponding Interest Subaccount in the Debt Service Account on or prior to the Business Day preceding each Interest Payment

VI-8

PR-ERS-000003446

Date in accordance with the requirements of the applicable Supplemental Resolution.

3. Any amounts on deposit in the Capitalized Interest Account or any Subaccount thereof and not set aside by the System, or set aside but determined by the System to be no longer required, to pay interest on a Series of Bonds, shall be withdrawn from such Account or Subaccount by the Fiscal Agent and deposited in the Revenue Account, as directed in writing by the System.

4. In the event of the refunding of any Bonds, the System may withdraw from the Capitalized Interest Account related to the Bonds to be refunded all or any portion of amounts accumulated therein with respect to such Bonds and deposit such amounts as provided in a written direction of the System; *provided, however*, that such withdrawal shall not be made unless immediately thereafter the Bonds being refunded shall be deemed to have been paid pursuant to Section 1301.

SECTION 504. Revenue Account.

1. On the last Business Day of the month, the System will transfer the Employers' Contributions to the Fiscal Agent. Immediately thereafter, but in any case no later than the next Business Day following the transfer by the System of the Employers' Contributions, all Revenues shall be deposited into the Revenue Account except as provided by Section 602.3; *provided, however*, that the proceeds of any draw on or payment under any Credit Facility which is intended for the payment of a Bond may be applied directly to such payment or deposited directly to the Debt Service Account for such purpose. In addition, there shall be deposited in the Revenue Account all other amounts required by this Resolution to be so deposited. After payment to the Fiscal Agent of all amounts payable to the Fiscal Agent pursuant to Section 804, amounts on deposit from time to time in the Revenue Account shall be withdrawn and deposited as follows and in the following order of priority:

FIRST: to the Senior Bonds Debt Service Account, allocated between the Principal Subaccount and the Interest Subaccount, pro rata on the basis of the maximum amount required be held in each such Subaccount at the time of deposit, all amounts until the amount on deposit in the Senior Bonds Debt Service Account shall equal the Accrued Payment Obligation related to all Senior Bonds and Parity Obligations;

SECOND: to the Senior Bonds Debt Service Reserve Account, the amount required to cause the amount on deposit therein to be equal to the Debt Service Reserve Requirement related to the Senior Bonds;

THIRD: to the Subordinated Bonds Debt Service Account, allocated between the Principal Subaccount and the Interest Subaccount, pro rata on the basis of the maximum amount required be held in each such Subaccount at the time of deposit, all amounts until the amount on deposit in the Subordinated Bonds Debt Service Account shall equal the Accrued Payment Obligation related to all Subordinated Bonds and Parity Obligations;

FOURTH: to the Subordinated Bonds Debt Service Reserve Account, the amount required to cause the amount on deposit therein to be equal to the Debt Service Reserve Requirement related to the

Subordinated Bonds;

FIFTH: to the payment of Operating Expenses; and

SIXTH: to the General Reserve Account, subject to the requirements established in Section 509 below, the balance of the amount so withdrawn.

2. Investment and interest earnings in each Fund, Account or Subaccount shall be applied to such Fund, Account or Subaccount pursuant to Section 602.

3. In the event that amounts are required to be paid to providers of Qualified Hedges, Credit Facilities or Liquidity Facilities which do not represent scheduled payments or reimbursements in accordance with the terms of the related contracts, but represent costs, indemnities, termination payments or similar non-recurring amounts, or in the event such unscheduled amounts are due to such providers and there are insufficient funds held hereunder and available for the payment thereof, the System shall provide written notice thereof to the Fiscal Agent so that such amounts are paid from the General Reserve Account, subject to the provisions of Section 509 hereof.

4. Operating Expenses shall be paid by the Fiscal Agent to the System pursuant to a requisition form signed by an Authorized Officer of the System and delivered to the Fiscal Agent detailing those expenses to be paid and that such expenses are permitted Operating Expenses payable under the Resolution.

SECTION 505. Debt Service Account.

1. There shall be transferred from the Revenue Account, and deposited into the Interest Subaccount and the Principal Subaccount of each Debt Service Account, the amounts required to be so transferred pursuant to paragraphs FIRST and THIRD of Section 504.1.

2. There also shall be deposited into the Interest Subaccount of a Debt Service Account, if necessary, the following:

(i) Such amount determined by the applicable Supplemental Resolution representing accrued interest received upon the sale of a Series of Bonds.

(ii) Amounts transferred from the General Reserve Account pursuant to Section 509.2 for the payment of interest on the Bonds and the interest component of Parity Obligations.

(iii) Amounts transferred from any Debt Service Reserve Account pursuant to Section 506.2 for the payment of interest on the Bonds and the interest component of Parity Obligations, to the extent other funds (including, but not limited to any amounts in the General Reserve Account) are not available to pay when due the interest on such Bonds and the interest component of Parity Obligations.

3. There also shall be deposited into the Principal Account of a Debt Service Account, if necessary, the following:

VI-9

PR-ERS-000003447

(i) Amounts transferred from the General Reserve Account pursuant to Section 509.2 for the payment of Principal Installments on the Bonds and the principal component of Parity Obligations.

(ii) Amounts transferred from the Debt Service Reserve Account pursuant to Section 506.2 for the payment of Principal Installments of the Bonds and the principal component of Parity Obligations, to the extent other funds (including, but not limited to any amounts in the General Reserve Account and the Redemption Account (see (ii) below)) are not available to pay when due the Principal Installments of such Bonds and the principal component of Parity Obligations.

(iii) Amounts transferred from the Redemption Account pursuant to Section 508 for the payment of Principal Installments of any Bonds.

4. The Fiscal Agent shall pay out of the Interest Account, to the Persons entitled thereto, in the Currency in which the Bonds of such Series are payable, (i) the interest on the Bonds as and when due and payable, and (ii) the interest component of Parity Obligations [at the times, in each case in the manner and on the other terms and conditions as determined by the System and set forth in written directions of an Authorized Officer of the System delivered to the Fiscal Agent]; *provided, however,* that amounts deposited to the Interest Account pursuant to clause (i) of paragraph 2 of this Section shall not be used to pay the interest component of Parity Obligations; and *provided further, however,* that if the amount available shall not be sufficient to pay in full all such interest due on the same date, then out of such available amount the Fiscal Agent shall make such payments under Bonds and Parity Obligations ratably, according to the amounts due on such date, without any discrimination or preference.

5. The Fiscal Agent shall pay out of the Principal Account, to the Persons entitled thereto, in the Currency in which the Bonds of such Series are payable, (i) each Principal Installment for the Bonds (including the Redemption Price payable upon mandatory redemption out of Sinking Fund Installments) as and when due and payable, and (ii) the principal component of Parity Obligations, in each case described in this clause (ii) at the times, in the manner and on the other terms and conditions as determined by the System and set forth in written directions of an Authorized Officer of the System delivered to the Fiscal Agent; *provided, however,* that amounts deposited to the Principal Account pursuant to clause (ii) of paragraph 3 of this Section shall not be used to pay the principal component of Parity Obligations; and *provided further, however,* that if the amount available shall not be sufficient to pay in full all such Principal Installments and principal due on the same date, then out of such available amount the Fiscal Agent shall make such payments under Bonds and Parity Obligations ratably, according to the amounts due on such date, without any discrimination or preference.

6. In the event of the refunding of any Bonds, the Fiscal Agent shall, upon the written direction of an Authorized Officer of the System delivered to the Fiscal Agent, withdraw from the Debt Service Account all or any portion of amounts accumulated therein with respect to the Bonds to be refunded and deposit such amounts as provided in such written direction; *provided, however,* that such withdrawal shall not be made unless immediately thereafter the Bonds being refunded shall be deemed to have been paid pursuant to Section 1301.

7. If there is a deficiency in any Debt Service Account identified in connection with the valuation performed by the Fiscal Agent pursuant to Section 603, the Fiscal Agent shall immediately thereafter, and in any case no later than five Business Days prior to the date any payment obligation is due on the Bonds, notify the System of such deficiency. The System hereby instructs the Fiscal Agent to cover any such deficiency by transferring moneys first, from the General Reserve Account; and if such moneys are not sufficient to cover such deficiency, second, from the Debt Service Reserve Account for such Class of Bonds. In the case of a deficiency in the Debt Service Account for the Senior Bonds, if moneys in the General Reserve Account or the Senior Bonds Debt Service Reserve Account are not sufficient to cover any deficiency, the System hereby instructs the Fiscal Agent to transfer moneys first, from the Subordinated Bonds Debt Service Account and second, from the Subordinated Bonds Debt Service Reserve Account.

SECTION 506. Debt Service Reserve Account.

1. At the time any Series of Bonds is delivered pursuant to this Resolution or any Supplemental Resolution, the System shall pay into the applicable Debt Service Reserve Account from the proceeds of such Bonds or other available funds, the amount, if any, necessary for the amount on deposit in such Debt Service Reserve Account to equal the Debt Service Reserve Requirement applicable to all Outstanding Bonds of such Class plus such additional Bonds being delivered, after giving effect to any Reserve Account Cash Equivalent, calculated immediately after the delivery of such Bonds.

2. Except as otherwise provided by any Supplemental Resolution, amounts on deposit in a Debt Service Reserve Account shall be applied, to the extent other funds (including, but not limited to any amounts in the General Reserve Account) are not available therefor pursuant to this Resolution and the applicable Supplemental Resolution, to pay when due the Principal Installments and Redemption Price of and the interest on the Outstanding Bonds of the related Class and the principal and interest components of Parity Obligations, by transfer, in the Currency in which such Outstanding Bonds are payable, to the Debt Service Account or the Redemption Account, as applicable. To the extent other funds (including, but not limited to any amounts in the General Reserve Account) are not available therefor pursuant to this Resolution and the applicable Supplemental Resolution to pay when due the Principal Installments and Redemption Price of and the interest on the Outstanding Senior Bonds and the principal and interest components of Parity Obligations, the Fiscal Agent shall, and is hereby directed by the System to transfer, amounts on deposit in the Subordinated Bonds Debt Service Reserve Account and the Subordinated Bonds Debt Service Account to the Senior Bonds Debt Service Account, before being applied to the payment of the Principal Installments and Redemption Price of and the interest on the Outstanding Subordinated Bonds and the Subordinate Obligations.

3. Whenever the amount in any Debt Service Reserve Account for a particular Class of Bonds exceeds the related Debt Service Reserve Requirement, after giving effect to any Reserve Account Cash Equivalent, the Fiscal Agent shall, and is hereby directed by the System to, withdraw from such Debt Service Reserve Account the amount of such excess and deposit the moneys so withdrawn into the Revenue Account.

4. To the extent funds are not available in other funds or accounts, moneys may and, upon the

VI-10

PR-ERS-000003448

written direction of an Authorized Officer of the System delivered to the Fiscal Agent, shall be withdrawn from the Debt Service Reserve Account by the Fiscal Agent and deposited in the Redemption Account for the purchase or redemption of Bonds at any time, *provided* that subsequent to such purchase or redemption the amount in the Debt Service Reserve Account, after giving effect to any Reserve Account Cash Equivalent, will not be less than the related Debt Service Reserve Requirement. In the event of the refunding of any Bonds, the Fiscal Agent shall, upon the written direction of an Authorized Officer of the System, withdraw from the related Debt Service Reserve Account all or any portion of amounts accumulated therein with respect to the Bonds being refunded and apply such amounts in accordance with such direction; *provided, however,* that such withdrawal shall not be made unless (i) immediately thereafter the Bonds being refunded shall be deemed to have been paid pursuant to Section 1301, and (ii) the amount remaining in the Debt Service Reserve Account, after giving effect to any Reserve Account Cash Equivalent, after such withdrawal shall not be less than the related Debt Service Reserve Requirement.

     5.    If, as of the last Business Day of each calendar month, a deficiency exists in the Senior Bonds Debt Service Reserve Account, identified in connection with the valuation performed by the Fiscal Agent pursuant to Section 603 hereof, the Fiscal Agent shall transfer from the General Reserve Account to the Senior Bonds Debt Service Reserve Account the amount, if any, required to cause the balance in said Account to equal the Debt Service Reserve Requirement for the Senior Bonds after giving effect to any Reserve Account Cash Equivalent. Thereafter, if, as of the last Business Day of each calendar month, a deficiency exists in the Subordinated Bonds Debt Service Reserve Account, the Fiscal Agent shall transfer from the General Reserve Account to the Subordinated Bonds Debt Service Reserve Account, after all deposits required by paragraphs FIRST, SECOND, THIRD and FOURTH of Section 504.1 have been made, the amount, if any, required to cause the balance in said Account to equal the Debt Service Reserve Requirement for the Subordinated Bonds, after giving effect to any Reserve Account Cash Equivalent.

     6.    Whenever the amount in all Debt Service Reserve Accounts, without giving effect to any Reserve Account Cash Equivalent, together with the amount in all Debt Service Accounts, is sufficient to pay in full all Outstanding Bonds in accordance with their terms (including the maximum amount of Principal Installments and interest which could become payable thereon) and all amounts due and owing to Credit Facility Providers, the funds on deposit in the Debt Service Reserve Accounts shall be transferred to the Debt Service Account established for the same Class, in accordance with the written direction of an Authorized Officer of the System delivered to the Fiscal Agent, and thereupon no further deposits shall be required to be made into the Debt Service Reserve Accounts. Prior to said transfer, all investments held in the Debt Service Reserve Accounts shall be liquidated to the extent necessary in order to provide for the timely payment of the Principal Installments of and interest on Bonds, in accordance with the written direction of an Authorized Officer of the System delivered to the Fiscal Agent.

     7.    Reserve Account Cash Equivalents may be deposited in a Debt Service Reserve Account as provided in this paragraph. In lieu of any required transfers of moneys to the Debt Service Reserve Account, the System may cause to be deposited into the Debt Service Reserve Account a Reserve Account Cash Equivalent in an aggregate amount equal to the difference between the Debt Service Reserve Requirement and the sums of moneys or value of Investment Securities then on deposit in the Debt Service Reserve Account, if any. In lieu of

retaining all or any portion of the moneys theretofore on deposit in the Debt Service Reserve Account, the System may cause to be deposited into the Debt Service Reserve Account a Reserve Account Cash Equivalent in an aggregate amount equal to such moneys, subject to paragraph 3 of this Section. Each Reserve Account Cash Equivalent shall be payable (upon the giving of notice as required thereunder) on any date on which moneys may be required to be withdrawn from the Debt Service Reserve Account. If a disbursement is made pursuant to a Reserve Account Cash Equivalent, the System shall either (i) reinstate the maximum limits of such Reserve Account Cash Equivalent or (ii) deposit into the Debt Service Reserve Account moneys in the amount of the disbursement made under such Reserve Account Cash Equivalent, or a combination of such alternatives, at the times and in the amounts required by paragraph 5 of this Section. In the event that the rating attributable to any provider of any Reserve Account Cash Equivalent shall fall below that required in the definition thereof, such Reserve Account Cash Equivalent shall no longer be deemed to be a Reserve Account Cash Equivalent and the System shall either (i) replace such Reserve Account Cash Equivalent with a Reserve Account Cash Equivalent which shall meet the requirements therefor or (ii) deposit into the Debt Service Reserve Account sufficient moneys, or a combination of such alternatives, at the times and in the amounts required by paragraph 5 of this Section.

     8.    Notwithstanding anything to the contrary contained in this Section, if amounts obtained under a Credit Facility or Reserve Account Cash Equivalent are to be used to pay the Principal Installments and Redemption Price of and interest on Bonds, then the providers of such Credit Facility or Reserve Account Cash Equivalent shall be subrogated to the rights of the relevant Bondholders, and amounts in the Debt Service Reserve Account which would otherwise have been used for such purposes may be applied, to the extent such amounts would have been used for such purpose in accordance with the priorities set forth herein, to reimburse the provider of such Credit Facility or Reserve Account Cash Equivalent for the amounts so obtained.

     SECTION 507.    Satisfaction of Sinking Fund Installments.

     1.    Any amount accumulated in the Debt Service Account up to the unsatisfied balance of each Sinking Fund Installment for Bonds may and, if so directed in writing by an Authorized Officer of the System, shall be applied (together with amounts accumulated in the Debt Service Account with respect to interest on the Bonds for which such Sinking Fund Installment was established) by the Fiscal Agent prior to the forty-fifth day preceding the due date of such Sinking Fund Installment as follows:

     (i)    to the purchase of Bonds of the maturity and interest rate for which such Sinking Fund Installment was established, at prices (including any brokerage and other charges) not exceeding the principal amount (or Maturity Amount, if applicable) of such Bonds plus unpaid interest accrued to the date of purchase, such purchases to be made in such manner as the Fiscal Agent shall determine; or

     (ii)    to the redemption of such Bonds if then redeemable by their terms at the price equal to the principal amount (or Maturity Amount, if applicable) of such Bonds plus unpaid interest accrued to the date of redemption.

PR-ERS-000003449

2. Upon the purchase or redemption of any Bond pursuant to paragraph 1 of this Section, an amount equal to the principal amount (or Maturity Amount, if applicable) of the Bonds so purchased or redeemed shall be credited toward the next Sinking Fund Installment thereafter to become due with respect to the Bonds of such maturity and interest rate and the amount of any excess of the amounts so credited over the amount of such Sinking Fund Installment shall be credited by the Fiscal Agent against future Sinking Fund Installments in direct chronological order, unless otherwise instructed in writing by an Authorized Officer of the System at the time of such purchase or redemption. Concurrently with the delivery of such Bonds, the System shall deliver to the Fiscal Agent a certificate of an Authorized Officer of the System specifying (i) the principal amount (or Maturity Amount, if applicable), Series, maturity, interest rate and numbers of the Bonds so delivered, (ii) the date of the Sinking Fund Installment in satisfaction of which such Bonds are so delivered, (iii) the aggregate principal amount (or Maturity Amount, if applicable) of the Bonds so delivered, and (iv) the unsatisfied balance of such Sinking Fund Installment after giving effect to the delivery of such Bonds.

3. In satisfaction, in whole or in part, of any Sinking Fund Installment, the System may deliver to the Fiscal Agent at least forty-five (45) days prior to the date of such Sinking Fund Installment, for cancellation, Bonds acquired by purchase of the Series and maturity and interest rate entitled to such Sinking Fund Installment. All Bonds so delivered to the Fiscal Agent in satisfaction of a Sinking Fund Installment shall reduce the amount of such Sinking Fund Installment by the aggregate principal amount (or Maturity Amount, if applicable) of such Bonds. Concurrently with such delivery of such Bonds the System shall deliver to the Fiscal Agent a certificate of an Authorized Officer of the System specifying (i) the principal amount (or Maturity Amount, if applicable), Series, maturity, interest rate and numbers of the Bonds so delivered, (ii) the date of the Sinking Fund Installment in satisfaction of which such Bonds are so delivered, (iii) the aggregate principal amount (or Accreted Amount, if applicable) of the Bonds so delivered, and (iv) the unsatisfied balance of each such Sinking Fund Installment after giving effect to the delivery of such Bonds.

4. In the event that Bonds are redeemed prior to maturity pursuant to any Section hereof other than Section 403, the Fiscal Agent shall credit the principal amount (or Accreted Amount, if applicable) of the Bonds so redeemed against Sinking Fund Installments due hereunder; *provided, however,* that the System shall have delivered to the Fiscal Agent, at least forty-five (45) days prior to the date of such Sinking Fund Installment, a certificate of an Authorized Officer of the System specifying (i) the principal amount, Series, maturity, interest rate and number of each Bond so redeemed, (ii) the date of each Sinking Fund Installment in satisfaction of which such redeemed Bonds are credited, (iii) the aggregate principal amount (or Accreted Amount, if applicable) of the Bonds so redeemed, and (iv) the unsatisfied balance of each such Sinking Fund Installment after giving effect to the redemption of such Bonds.

5. The Fiscal Agent shall, upon receipt of the notice specified by Section 403 and in the manner provided in Article IV, call for redemption on the date of each Sinking Fund Installment falling due prior to maturity such principal amount (or Accreted Amount, if applicable) of Bonds of the Series and maturity entitled to such Sinking Fund Installment as is required to exhaust the unsatisfied balance of such Sinking Fund Installment. The Fiscal Agent shall redeem such Bonds pursuant to Section 403.

SECTION 508. Redemption Account; Amounts to be Deposited Therein.

1. The following, upon receipt thereof, shall be deposited into the Redemption Account for the purpose of redeeming Outstanding Bonds at the option of the System:

(i) amounts determined pursuant to paragraph 3 of Section 504; and

(ii) amounts transferred from the Debt Service Reserve Accounts pursuant to Section 506 for the payment of the Redemption Price of Bonds.

2. Subject to the limitations contained in paragraph 4 of this Section, if, on the last Business Day preceding any interest payment date for the Senior Bonds, Principal Installment due date for such Bonds, or due date of interest or principal components of Parity Obligations, the amount on deposit in the Senior Debt Service Account shall be less than the interest on such Bonds due on such interest payment date, the Principal Installment for such Bonds due on such Principal Installment due date, or the interest or principal components of Parity Obligations due on the due date thereof, and after taking into account transfers from the General Reserve Account, the Senior Bonds Debt Service Reserve Account, the Subordinated Bonds Debt Service Account and the Subordinated Bonds Debt Service Reserve Account, then the Fiscal Agent, shall, and is hereby instructed by the System to, transfer from the Senior Bonds Redemption Account to the Senior Bonds Debt Service Account an amount (or all of the moneys in the Senior Bonds Redemption Account if less than the amount required) which will be sufficient to make up such deficiency in the Senior Bonds Debt Service Account.

3. Subject to the limitations contained in paragraph 4 of this Section, if, on the last Business Day preceding any interest payment date for the Subordinated Bonds, Principal Installment due date for such Bonds, or due date of interest or principal components of Subordinate Obligations, the amount on deposit in the Subordinated Debt Service Account shall be less than the interest on such Bonds due on such interest payment date, the Principal Installment for such Bonds due on such Principal Installment due date, or the interest or principal components of Subordinate Obligations due on the due date thereof, then the Fiscal Agent, shall, and is hereby instructed by the System to, transfer from the Subordinated Bonds Redemption Account to the Subordinated Bonds Debt Service Account an amount (or all of the moneys in the Subordinated Bonds Redemption Account if less than the amount required) which will be sufficient to make up such deficiency in the Subordinated Bonds Debt Service Account.

4. To the extent not required to make up a deficiency as required in paragraph 2 of this Section, amounts in the Redemption Account shall be applied by the Fiscal Agent, as promptly as practicable after delivery to it of written instructions from an Authorized Officer of the System, to the purchase or redemption (including the payment of redemption premium, if any) of any particular Class of Bonds. Interest on Bonds so purchased or redeemed shall be paid from the Debt Service Account and all expenses in connection with such purchase or redemption shall be paid by the System from moneys held in the General Reserve Account.

VI-12

5. The transfers required by paragraph 2 of this Section shall be made from amounts in the Redemption Account only to the extent that such amounts are not then required to be applied to the redemption of Bonds for which notice of redemption shall have been given pursuant to Section 405, unless such notice is conditioned upon the availability of moneys on deposit in the Redemption Account.

SECTION 509. General Reserve Account.

1. There shall be transferred from the Revenue Account, after all deposits required by paragraphs FIRST through FIFTH of Section 504.1 have been made, all excess moneys into the General Reserve Account pursuant to paragraph SIXTH of Section 504.1.

2. Except as otherwise provided by any Supplemental Resolution, amounts on deposit in the General Reserve Account shall be applied, to the extent funds are not available therefor in the Debt Service Account of any particular Class of Bonds, to pay when due the Principal Installments and Redemption Price of and the interest on the Outstanding Bonds of the related Class and the principal and interest components of Parity Obligations, by transfer, in the Currency in which such Outstanding Bonds are payable to such Debt Service Account or Redemption Account, as applicable.

3. Any moneys remaining in the General Reserve Account at any time and not deposited, transferred or retained as set forth in Section 504.1, may be (i) transferred to the Revenue Account, (ii) transferred to the Redemption Account, or (iii) used for (I) the payment or reimbursement of Financing Costs, (II) the purchase of Bonds, or (III) any combination of the foregoing, in each case as directed in writing by an Authorized Officer of the System to the Fiscal Agent.

4. Purchases of Bonds shall be made upon the written direction of an Authorized Officer of the System, with or without advertisement and with or without notice to other Owners of Bonds pursuant to the provisions of Section 507. Such purchases shall be made at such price or prices as determined by such written instructions. If Sinking Fund Installments have been established for the maturities of Bonds purchased by the System, then the Fiscal Agent, upon written instructions from an Authorized Officer of the System, shall credit the principal amount purchased against future Sinking Fund Installments in direct chronological order, unless otherwise instructed in writing by an Authorized Officer of the System at the time of such purchase.

5. Whenever the amount in the General Reserve Account, together with the amount in all Debt Service Accounts, is sufficient to pay in full all Outstanding Bonds in accordance with their terms (including the maximum amount of Principal Installments and interest which could become payable thereon) and all amounts due and owing to Credit Facility Providers, the funds on deposit in the General Reserve Account shall be transferred, in the Currency in which such Bonds are payable, in accordance with the written direction of an Authorized Officer of the System delivered to the Fiscal Agent, to the Debt Service Account established for the same Class. Prior to said transfer, all investments held in the General Reserve Accounts shall be liquidated, in accordance with the written direction of an Authorized Officer of the System delivered to the Fiscal Agent, to the extent necessary in order to provide for the timely payment of the Principal Installments of and interest on Bonds.

6. Except as provided in paragraph 509.7 below, as long as any Bonds are Outstanding, moneys held in the General Reserve Account may only be transferred to the System once per year as of the last Business Day of the Bond Year, if (i) during the Bond Year, there has been no withdrawal from a Debt Service Reserve Account to fund the Debt Service Account for any Class of Bonds; (ii) the balance in the Debt Service Account for each Class of Bonds is not less than the amount required to pay in full the next Accrued Payment Obligation due on each Class of Bonds; (iii) the balance in the Debt Service Reserve Account for each Class of Bonds is not less than the corresponding Debt Service Reserve Requirement; (iv) there are no outstanding amounts due to the Fiscal Agent under this Resolution or any Supplemental Resolution; and (v) the balance in the General Reserve Account is not less than ten percent (10%) of the next Bond Year's Accrued Payment Obligation for all Outstanding Bonds on the last Business Day of the Bond Year. If these conditions are met, the Fiscal Agent may withdraw from the General Reserve Account and transfer to the System the amount in excess of ten percent (10%) of such Accrued Payment Obligation.

7. Notwithstanding the preceding paragraph, there may be no transfers from the General Reserve Account to the System during any period in which the Employers' Contribution Rate is below 9.275% of Covered Payroll. The System shall notify the Fiscal Agent of any reduction of the Employers' Contribution Rate.

8. Assuming compliance with paragraph 5 and 6 above, should the balance to the credit of the General Reserve Account exceed (a) twenty-five percent (25%) or (b) if Subordinated Bonds are Outstanding, fifty percent (50%) of the next Bond Year's Accrued Payment Obligation for all Classes of Bonds Outstanding, transfers may be made by the Fiscal Agent to the System at any time during a Bond Year upon written notice from the System to the Fiscal Agent and Government Development Bank for Puerto Rico. No such transfer may, however, reduce the General Reserve Account balance below (1) ten percent (10%) or (2) if Subordinated Bonds are Outstanding, twenty-five percent (25%) of the next Bond Year's Accrued Payment Obligation for all Classes of Bonds Outstanding.

## ARTICLE VI
## SECURITY FOR DEPOSITS AND INVESTMENT OF FUNDS

SECTION 601. Security for Deposits. All moneys held hereunder by the Fiscal Agent shall be continuously and fully secured, for the benefit of the System and the Owners of the Bonds and Parity Obligations in such manner as may then be required by applicable federal, Commonwealth or state laws and regulations regarding security, by Investment Obligations of a market value at least equal at all times to the amount of the deposit so held by the Fiscal Agent; provided, however, that it shall not be necessary, unless required by applicable law, for the Fiscal Agent to give security for the deposit of any moneys with them held in trust and set aside for the payment of the principal or Redemption Price of, or interest on, any Bonds, or for the Fiscal Agent to give security for any moneys which shall be represented by obligations purchased under the provisions of this Resolution as an investment of such moneys. The Fiscal Agent shall have no obligation for the payment of interest on moneys properly held by it uninvested hereunder.

VI-13

PR-ERS-000003451

SECTION 602.    Investment of Funds, Accounts and Subaccounts Held by the Fiscal Agent.

1.        Moneys in any Fund, Account or Subaccount held by the Fiscal Agent shall be continuously invested and reinvested or deposited and redeposited by the Fiscal Agent upon the written direction of an Authorized Officer of the System. The System shall direct the Fiscal Agent to invest and reinvest the moneys in any Fund, Account or Subaccount held by the Fiscal Agent in Investment Obligations so that the maturity date or date of redemption of such Investment Obligations shall coincide as nearly as practicable with the times at which moneys are anticipated to be expended hereunder, except that any Investment Obligation may be credited to more than one Fund, Account or Subaccount based upon the portions thereof purchased by or allocable to each such Fund, Account or Subaccount and need not be sold in order to provide for the transfer of amounts from one Fund, Account or Subaccount to another. The Investment Obligations purchased by the Fiscal Agent shall be held by it, or for its account as Fiscal Agent. The Fiscal Agent, at the written direction of the System as to specific investments, shall sell, or present for redemption, any Investment Obligations purchased by it as an investment hereunder whenever it shall be necessary in order to provide moneys to meet any payment from such Fund, Account or Subaccount. The Fiscal Agent shall have no obligation to invest, reinvest, deposit, redeposit or sell investments contemplated hereby except upon the written direction of an Authorized Officer of the System as to specific investments. The Fiscal Agent shall have no liability for interest on any money received by it hereunder (except as otherwise agreed in writing with the System and except that the Fiscal Agent shall invest such money as required pursuant to written direction of an Authorized Officer of the System) and no responsibility for any loss (after giving effect to any interest or other income thereon except to the extent theretofore paid to the System) incurred on the sale of such investments. The Fiscal Agent shall advise the System in writing on or before the twentieth (20th) day of each calendar month, of all investments held for the credit of each Fund, Account or Subaccount in its custody under the provisions of this Resolution as of the end of the preceding month.

2.        Investment Obligations purchased under the provisions of this Resolution as an investment of moneys in any Fund, Account or Subaccount shall be deemed at all times to be a part of such Fund, Account or Subaccount and, unless otherwise expressly provided in this Resolution or any Supplemental Resolution, the income or interest earned and gains realized in excess of losses suffered by any Fund, Account or Subaccount due to the investment thereof shall be deposited in such Fund, Account or Subaccount. The Fiscal Agent shall keep records of all such amounts deposited in any such Fund, Account or Subaccount to indicate the source of the income or earnings.

3.        The Fiscal Agent shall sell, or present for redemption or exchange, any Investment Obligation purchased by it pursuant to this Resolution or any Supplemental Resolution whenever it shall be requested in writing by an Authorized Officer of the System to do so or whenever it shall be necessary in order to provide moneys to meet any payment or transfer from the Fund, Account or Subaccount for which such investment was made, except that any Investment Obligation may be credited to more than one Fund, Account or Subaccount based upon the portions thereof purchased by or allocable to each such Fund, Account or Subaccount and need not be sold in order to provide for the transfer of amounts from one Fund, Account or Subaccount to another.

4.        Nothing in this Resolution shall prevent any Investment Obligations acquired hereunder from being held in book-entry form on the books of the Treasury of the United States or of any national securities depository.

5.        In the event that the Fiscal Agent has not, prior to 11:00 a.m. (Eastern time) on any Business Day, received investment instructions as provided herein as to any investment proceeds received hereunder, the Fiscal Agent shall invest the same in Investment Obligations having the shortest available maturity, in accordance with standing instructions received from an Authorized Officer of the System.

SECTION 603.    Valuation and Sale of Investments.

1.        In computing the amounts in any Fund, Account or Subaccount, obligations purchased as an investment of moneys therein shall be valued by the Fiscal Agent at Amortized Value on the last Business Day of each month. Accrued interest received upon the sale of any Investment Obligation shall be treated as income from such Investment Obligation for purposes of this Section, except to the extent that such accrued interest represents the repayment of accrued interest paid upon purchase of such Investment Obligations.

2.        Immediately after each such valuation performed pursuant to Section 603.1, any balance in any Debt Service Reserve Account in excess of the applicable Debt Service Reserve Fund Requirement, shall be transferred by the Fiscal Agent to the Revenue Account.

3.        The Fiscal Agent shall immediately notify the System in writing of any deficiency in the Debt Service Account or Debt Service Reserve Account that appears from the valuation performed by the Fiscal Agent pursuant to Section 603.1.

4.        The Fiscal Agent shall not be liable or responsible for the making of any investment authorized by the provisions of this Article, in the manner provided in this Article, or for any loss resulting from any such investment so made or disposed of in the manner provided in this Article.

### ARTICLE VII
### PARTICULAR COVENANTS OF THE SYSTEM

The System covenants and agrees with the Fiscal Agent and the Bondowners as follows:

SECTION 701.    Payment of Obligations.    The System shall duly and punctually pay or cause to be paid the principal of and premium, if any, on every Bond and the interest thereon, and all Parity Obligations and Subordinate Obligations, on the date(s), at the place(s) and in the manner mentioned in the Act, this Resolution, the applicable Supplemental Resolution, the Bonds, and applicable Credit Facilities, Liquidity Facilities, and Qualified Hedges according to the true intent and meaning thereof, and shall duly and punctually satisfy all Sinking Fund Installments which may be established for any Series, subject to the provisions of Section 201. Furthermore, the System covenants to perform all acts and enforce all its powers under the Act in order to promptly collect and remit the Employers' Contributions to the Fiscal Agent. In addition, the System covenants to enter into a Memorandum of Understanding with Government Development Bank for Puerto Rico to establish inter-agency mechanisms in order to make sure that Employers are current in their payments to the System.

PR-ERS-000003452

SECTION 702.   Extension of Payment of Bonds. The System shall not directly or indirectly extend or assent to the extension of the maturity of any of the Bonds or claims for interest by the purchase or funding of such Bonds or by any other arrangement. Nothing herein shall be deemed to limit the right of the System (i) to issue Option Bonds or Refunding Bonds as provided in herein, and such issuance shall not be deemed to constitute an extension of maturity of Bonds, or (ii) to apply any amount in the Debt Service Account or the Redemption Account to the purchase or redemption of Bonds as provided in this Resolution.

SECTION 703.   Offices for Servicing Bonds. The Fiscal Agent shall at all times maintain one or more offices or agencies where notices, demands and other documents may be served upon the System in respect of the Bonds or of this Resolution. The System hereby appoints the Fiscal Agent as its agent to receive such notices, demands and documents.

SECTION 704.   Further Assurance. At any and all times the System shall, so far as it may be authorized by law, pass, make, do, execute, acknowledge and deliver, all and every such further resolutions, acts, deeds, conveyances, assignments, transfers and assurances and record the same in any office or register as may be necessary or desirable for the better assuring, conveying, granting, assigning and confirming all and singular the rights and other moneys, securities and funds hereby pledged or assigned, or intended so to be, or which the System may become bound to pledge or assign and, if required by law, to perfect the security interest created thereby.

SECTION 705.   Power to Issue Bonds and Assign Funds and Accounts. The System is duly authorized under the Act to create and issue the Bonds and to adopt this Resolution and to create a security interest on the Pledged Property in the manner and to the extent provided in this Resolution. The Pledged Property is and will be free and clear of any pledge, lien, charge or encumbrance thereon or with respect thereto except as permitted by this Resolution, and all action on the part of the System to that end has been and will be duly and validly taken. The Bonds are and will be the valid and legally binding special obligations of the System, enforceable in accordance with their terms and the terms of this Resolution. The System shall at all times, to the extent permitted by law, defend, preserve and protect the assignment of the Pledged Property and all the rights of the Fiscal Agent, the Beneficiaries and the Bondowners under this Resolution against all claims and demands of all persons whomsoever.

SECTION 706.   Creation of Liens. Until the security interest created in Section 501 of this Resolution shall be discharged and satisfied as provided in Section 1301, the System shall not (i) issue any bonds or other evidences of indebtedness, other than the Bonds, secured by the Pledged Property, nor create or cause to be created any lien or charge on the Pledged Property, other than as permitted by this Resolution, nor (ii) at any time when the System is in default in making any payment required to be made under this Resolution or maintaining the balance in any Fund, Account or Subaccount required to be maintained in the amount required therefor by this Resolution, set apart or appropriate and pay any amount from any Fund, Account or Subaccount, except as required by this Resolution. The System may not issue Bonds with a payment priority or claim against the Pledged Property that is senior to that of the Senior Bonds. The System, in its discretion, may determine to execute and deliver Subordinated Bonds or Subordinate Obligations, subject to compliance with Section 708 or 204 hereof.

SECTION 707.   Accounts and Reports.

1.   The System shall keep proper books of record and account (separate from all other records and accounts) in which complete and correct entries shall be made of its transactions relating to the Pledged Property and each Fund, Account and Subaccount established under this Resolution, and which, together with all books and papers of the System relating to the issuance of the Bonds, shall at all reasonable times during normal business hours be subject to the inspection of the Fiscal Agent (it being understood that the Fiscal Agent shall have no duty so to inspect).

2.   The System shall file with the Fiscal Agent and the Ancillary Facility Providers forthwith upon becoming aware of any Event of Default, or the occurrence of any event which with notice or lapse of time or both would be an Event of Default, in the performance by the System of any covenant, agreement or condition contained in this Resolution, a certificate signed by an Authorized Officer of the System specifying such Event of Default or other event as described in this paragraph, and if any such Event of Default or other such event shall so exist, specifying the nature and status of such Event of Default or other such event.

SECTION 708.   Issuance of Additional Bonds. The System may issue additional Bonds, from time to time, in one or more Series within any Class, on a parity with each such Series of Bonds within such Class, and secured by the Pledged Property, upon meeting the following requirements:

1.   There shall have been delivered to the Fiscal Agent the following documents:

(i)   a report (the "Consultant's Report") from a nationally recognized, independent, economic consultant, dated no earlier than 12 months before the date of issuance of the additional Bonds, identifying the projected Employers' Contributions for each Bond Year through the final Maturity of all outstanding Bonds proposed to be issued, and the assumptions used in such projections, it being agreed that the report, dated January 11, 2008, of Global Insight, Inc. delivered in connection with the issuance of the Series A Bonds (the "Global Insight Report") shall satisfy the obligations of the System under this paragraph (i) if delivered to the Fiscal Agent in connection with the delivery of any additional Bonds or Parity Obligations hereunder prior to January 1, 2009;

(ii)   a Supplemental Resolution adopted pursuant to requirements of Section 202; and

(iii)   a certificate of an Authorized Officer of the System setting forth for each Bond Year listed in the report in clause (i) above the Accrued Payment Obligation for the additional Bonds proposed to be issued and all Bonds and Parity Obligations to be Outstanding immediately after the issuance of said additional Bonds. The certificate shall state that (a) the System has reviewed the Consultant's Report and believes that the assumptions used are reasonable (provided

VI-15

that this requirement should not apply to the Global Insight Report mentioned in paragraph (i) above prior to January 1, 2009 when used during 2008); and (b) (I) in the case of Senior Bonds, for each Bond Year, the projected Employers' Contributions for such year are equal to or greater than 140% of the corresponding Accrued Payment Obligation for the additional Senior Bonds proposed to be issued and the Senior Bonds and corresponding Parity Obligations outstanding immediately after the issuance of such additional Bonds; or (II) in the case of Subordinated Bonds, for each Bond Year, the projected Employers' Contributions for such year are equal to or greater than 125% of the corresponding Accrued Payment Obligation for the additional Subordinated Bonds proposed to be issued and the Senior Bonds, Subordinated Bonds and corresponding Parity Obligations outstanding immediately after the issuance of such additional Bonds.

2. Refunding Bonds issued pursuant to Section 204 of this Resolution which generate savings in every Bond Year are exempt from complying with the coverage tests required by (iii) above.

SECTION 709. General.

1. The System shall do and perform or cause to be done and performed all acts and things required to be done or performed by or on behalf of the System under the provisions of the Act and this Resolution. Specifically, the System shall do and perform or cause to be done and performed all acts and things required to be done or performed by or on behalf of the System with regards to the collection of the Employers' Contributions as provided in the Act.

2. The System shall oppose any attempt by the Legislature of the Commonwealth to reduce the Employers' Contribution Rate or to make any other change in the Act or any other relevant legislation that would have a material adverse effect on Bondholders. Such opposition shall include delivering written position papers to the Legislature of the Commonwealth, appearing before Legislative committees, and contacting individual legislators and other government officials to make legislators and other government officials aware that such reductions in the Employers' Contribution Rate or other changes may adversely affect the ability of the System to comply with its obligations and may ultimately have an adverse effect on the credit of the Commonwealth.

3. Upon the date of authentication and delivery of any of the Bonds, all conditions, acts and things required by law and this Resolution to exist, to have happened and to have been performed precedent to and in the issuance of such Bonds shall exist, shall have happened and shall have been performed and the issue of such Bonds, together with all other indebtedness of the System, shall be within every debt and other limit prescribed by the laws of the Commonwealth.

## ARTICLE VIII
## CONCERNING THE FISCAL AGENT

SECTION 801. Fiscal Agent Appointment and Acceptance of Duties. The Bank of New York is hereby appointed

as Fiscal Agent under this Resolution. The Fiscal Agent shall signify its acceptance of the duties and obligations imposed upon it by this Resolution by executing the certificate of authentication endorsed upon the Bonds, and by executing such certificate upon any Bond the Fiscal Agent shall be deemed to have accepted such duties and obligations not only with respect to the Bond so authenticated, but with respect to all Bonds thereafter to be issued, but only, however, upon the terms and conditions set forth in this Resolution.

SECTION 802. Responsibilities of Fiscal Agent. The Fiscal Agent undertakes to perform such duties and only such duties as are specifically set forth in this Resolution, and no implied covenants or obligations shall be read into this Resolution against the Fiscal Agent. The recitals of fact herein and in the Bonds contained shall be taken as the statements of the System and the Fiscal Agent assumes no responsibility for the correctness of the same. The Fiscal Agent makes no representations as to the validity or sufficiency of this Resolution or any Supplemental Resolution or of any Bonds issued thereunder or as to the security afforded by this Resolution or any Supplemental Resolution, and the Fiscal Agent shall incur no liability in respect thereof. The Fiscal Agent makes no representations as to the value, condition or sufficiency of any assets pledged or assigned as security for the Bonds, the right, title or interest of the System therein, or the security provided thereby or by this Resolution. The Fiscal Agent shall, however, be responsible for its representation contained in its certificate of authentication on the Bonds. The Fiscal Agent shall be under no responsibility or duty with respect to the authentication and delivery of the Bonds for value or the application of the proceeds thereof or the application of any moneys paid to the System. The Fiscal Agent shall not be responsible for the validity, perfection, priority or enforceability of the pledge and security interest in the Pledged Property created or intended to be created by this Resolution, whether or not impaired by operation of law. No provision of this Resolution shall be deemed to impose any duty or obligation on the Fiscal Agent to perform any act or acts, receive or obtain any interest in property or exercise any interest in property, or exercise any right, power, duty or obligation conferred or imposed on it in any jurisdiction in which it shall be illegal, or in which the Fiscal Agent shall be unqualified or incompetent in accordance with applicable law, to perform any such act or acts, to receive or obtain any such interest in property or to exercise any such right, power, duty or obligation. The Fiscal Agent shall be under no obligation or duty to perform any act which would involve it in expense or liability or to institute or defend any suit in respect hereof, or to advance any of its own moneys, unless provided with security and indemnity satisfactory to it. The Fiscal Agent shall be under no obligation to exercise any of the rights or powers vested in it by this Resolution at the request or direction of any of the Owners pursuant to this Resolution, unless such Owners shall have offered to the Fiscal Agent security or indemnity satisfactory to the Fiscal Agent against the costs, expenses and liabilities which might be incurred by it in compliance with such request or direction. The permissive right of the Fiscal Agent to take actions enumerated in this Resolution shall not be construed as a duty. The Fiscal Agent shall not be liable in connection with the performance of its duties under this Resolution except for its own gross negligence or willful misconduct. The Fiscal Agent shall not be liable for any error of judgment made in good faith by an Authorized Officer of the Fiscal Agent, unless it shall be proved that the Fiscal Agent was grossly negligent in ascertaining the pertinent facts. The Fiscal Agent shall not be liable with respect to any action taken or omitted to be taken by it in good faith in accordance with the direction of the Owners of a majority in principal amount of the Outstanding Bonds relating to the time, method and place of conducting any proceeding for any remedy available to the Fiscal Agent or exercising any trust or power conferred upon the Fiscal Agent under this Resolution. The Fiscal Agent shall not be liable for any action taken, suffered, or

VI-16

omitted to be taken by it in good faith and believed by it to be authorized or within the discretion or rights or powers conferred upon it by this Resolution. Anything in this Resolution notwithstanding, in no event shall the Fiscal Agent be liable for special, indirect, punitive or consequential loss or damage of any kind whatsoever (including but not limited to loss of profit), even if the Fiscal Agent has been advised as to the likelihood of such loss or damage and regardless of the form of action. Whether or not therein expressly so provided, every provision of this Resolution relating to the conduct or affecting the liability of or affording protection to the Fiscal Agent shall be subject to the provisions of this Article VIII.

> SECTION 803.    Evidence on Which Fiscal Agent May Act.

1.    The Fiscal Agent may conclusively rely and shall be fully protected in acting or refraining from acting upon any notice, resolution, request, consent, order, direction, certificate, report, opinion, bond, or other paper or document believed by it to be genuine, and to have been signed or presented by the proper party or parties. The Fiscal Agent may consult with counsel, who may or may not be of counsel to the System, and the opinion or advice of such counsel or any Opinion of Counsel shall be full and complete authorization and protection in respect of any action taken or omitted to be taken or suffered by it under this Resolution in good faith and in reliance thereon; *provided, however*, that such opinion or advice of counsel shall not relieve the Fiscal Agent from obtaining an Opinion of Counsel when and if required under this Resolution.

2.    Whenever the Fiscal Agent shall deem it necessary or desirable that a matter be proved or established prior to taking or omitting to take or suffering any action under this Resolution, such matter (unless other evidence in respect thereof be therein specifically prescribed) may be deemed to be conclusively proved and established by a certificate of an Authorized Officer of the System, and such certificate shall be full warrant and protection for any action taken or omitted to be taken or suffered, in the absence of bad faith, under the provisions of this Resolution in reliance thereon. The Fiscal Agent shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, bond, debenture, note, other evidence of indebtedness or other paper or document.

3.    Except as otherwise expressly provided in this Resolution, any request, order, notice or other direction required or permitted to be furnished pursuant to any provision thereof by the System to the Fiscal Agent shall be sufficiently evidenced if executed in the name of the System by an Authorized Officer of the System.

SECTION 804.    Compensation    and Indemnification. The System shall pay to the Fiscal Agent from time to time reasonable compensation for all services rendered under this Resolution (which compensation shall not be limited by any provision of law in regard to the compensation of a fiscal agent or trustee of an express trust), and also all reasonable expenses, charges, counsel fees and other disbursements, including those of its attorneys, agents, and employees, incurred in and about the performance of their powers and duties under this Resolution. The System further agrees to indemnify and save the Fiscal Agent harmless against any loss, liability or expenses including taxes (other than taxes based upon, measured by or determined by the income of the Fiscal Agent), arising out of or in connection with the acceptance or administration of the trust or trusts hereunder, including the costs and expenses of defending itself against any

claim (whether asserted by the System or any Bondowner or any other Person) or liability in connection with the exercise or performance of any of its powers or duties hereunder, or in connection with enforcing the provisions of this Section 804, except to the extent that such loss, damage, claim, liability or expense is due to its own gross negligence or willful misconduct. In addition to, but without prejudice to its other rights under this Resolution, when the Fiscal Agent incurs expenses or renders services in connection with a bankruptcy or similar event, the expenses (including the reasonable charges and expenses of its counsel) and the compensation for the services are intended to constitute expenses of administration under any applicable federal or state bankruptcy, insolvency or other similar law. "Fiscal Agent" for purposes of this Section 804 shall include any predecessor Fiscal Agent; *provided, however*, that the negligence, willful misconduct or bad faith of any Fiscal Agent hereunder shall not affect the rights of any other Fiscal Agent hereunder. The obligations of the System and the lien provided for under this Section 804 shall survive the satisfaction and discharge of the Bonds, the termination for any reason of this Resolution or the earlier resignation or removal of the Fiscal Agent. The Fiscal Agent shall not be required to expend any of its own funds in the execution of its duties pursuant to the provisions of this Resolution. The Fiscal Agent shall have a lien prior to that of the Bondowners and other Beneficiaries therefor on any and all funds at any time held by it under this Resolution.

SECTION 805.    Certain Permitted Acts. The Fiscal Agent may become the owner of any Bonds, with the same rights it would have if it were not the Fiscal Agent. To the extent permitted by law, the Fiscal Agent may act as depositary for, and permit any of its officers or directors to act as a member of, or in any other capacity with respect to, any committee formed to protect the rights of Bondowners or to effect or aid in any reorganization growing out of the enforcement of the Bonds or this Resolution, whether or not any such committee shall represent the Owners of a majority in principal amount of the Bonds then Outstanding. The Fiscal Agent may execute any of the trusts or powers hereunder or perform any duties hereunder either directly or by or through agents or attorneys and the Fiscal Agent shall not be responsible for any misconduct or negligence on the part of any agent or attorney appointed with due care by it hereunder. The rights, privileges, protections, immunities and benefits given to the Fiscal Agent, including, without limitation, its right to be indemnified, are extended to, and shall be enforceable by, the Fiscal Agent in each of its capacities hereunder, and each agent, custodian and other Person employed to act hereunder.

SECTION 806.    Resignation of Fiscal Agent. The Fiscal Agent may at any time resign and be discharged of the duties and obligations created by this Resolution by giving not less than forty-five (45) days' written notice to the System (which shall give prompt written notice to each Beneficiary) and to the Bondowners (mailed, postage prepaid), specifying the date when such resignation shall take effect, and such resignation shall take effect upon the day specified in such notice unless (i) no successor shall have been appointed by such date in which ease such resignation shall become effective upon the appointment of a successor, or (ii) previously a successor shall have been appointed by the System or the Bondowners as provided in Section 808, in which event such resignation shall take effect immediately on the appointment of such successor. The Fiscal Agent shall also mail a copy of the notice required to be given by this Section, postage prepaid, to the Owners of the Bonds, at their last addresses appearing on the registry books.

SECTION 807.    Removal of Fiscal Agent. The Fiscal Agent may be removed at any time, with or without cause, by an instrument or concurrent instruments in writing, delivered to

VI-17

PR-ERS-000003455

the Fiscal Agent, and signed by the Owners of a majority in principal amount of the Bonds then Outstanding or their attorneys-in-fact duly authorized, excluding any Bonds held by or for the account of the System, or, so long as no Event of Default or event which with the giving of notice or the passage of time would constitute an Event of Default has occurred and is continuing, by an instrument in writing delivered to the Fiscal Agent and signed by an Authorized Officer of the System; *provided, however,* that in each case that a successor Fiscal Agent shall be simultaneously appointed with the filing of such instrument.

SECTION 808.     Appointment of Successor Fiscal Agent.

1.     In case at any time the Fiscal Agent shall resign or shall be removed or shall become incapable of acting, or shall be adjudged bankrupt or insolvent, or if a receiver, liquidator or conservator of the Fiscal Agent, or of its property, shall be appointed, or if any public officer shall take charge or control of the Fiscal Agent, or of its property or affairs, a successor may be appointed by the Owners of a majority in principal amount of the Bonds then Outstanding, excluding any Bonds held by or for the account of the System, by an instrument or concurrent instruments in writing signed and acknowledged by such Bondowners or by their attorneys-in-fact duly authorized and delivered to such successor Fiscal Agent, notification thereof being given to the System and the predecessor Fiscal Agent; *provided, nevertheless,* that unless a successor Fiscal Agent shall have been appointed by the Bondowners as aforesaid, the System by a duly executed written instrument signed by an Authorized Officer of the System shall forthwith appoint a Fiscal Agent to fill such vacancy until a successor Fiscal Agent shall be appointed by the Bondowners as authorized in this Section. The Fiscal Agent shall mail a copy of the notice of any such appointment, postage prepaid, to the Owners of any Bonds, at their last addresses appearing on the registry books. Any successor Fiscal Agent appointed by the System shall, immediately and without further act, be superseded by a Fiscal Agent appointed by the Bondowners.

2.     If in a proper case no *appointment of a successor Fiscal Agent shall be made pursuant to* the foregoing provisions of this Section within thirty (30) days after the Fiscal Agent shall have given to the System written notice as provided in Section 806 or after a vacancy in the office of the Fiscal Agent shall have occurred by reason of its inability to act or its removal under Section 807, the Fiscal Agent or the Owner of any Bond may apply to any court of competent jurisdiction to appoint a successor Fiscal Agent. Said court may thereupon, after such notice, if any, as such court may deem proper, appoint a successor Fiscal Agent.

3.     Any Fiscal Agent appointed under the provisions of this Section in succession to the Fiscal Agent shall be a bank or trust company organized under the laws of a state of the United States of America or of the Commonwealth or a national banking association, and having a capital and surplus aggregating at least $50,000,000 (or whose obligations hereunder are guaranteed by a bank or trust company duly authorized to exercise corporate trust powers and subject to examination by federal or state authority, of good standing, and having at the time of the appointment of such Fiscal Agent, a combined capital and surplus of at least such amount), if there be such a bank or trust company or national banking association willing and able to accept the office on reasonable and customary terms and authorized by law to perform all the duties imposed upon it by this Resolution.

SECTION 809.     Transfer of Rights and Property to Successor Fiscal Agent. Any successor Fiscal Agent appointed under this Resolution shall execute, acknowledge and deliver to its predecessor Fiscal Agent, and also to the System, an instrument accepting such appointment, and thereupon such successor Fiscal Agent, without any further act, deed or conveyance, shall become fully vested with all moneys, estates, properties, rights, powers, duties and obligations of such predecessor Fiscal Agent, with like effect as if originally named as Fiscal Agent; but the Fiscal Agent ceasing to act shall nevertheless, on the written request of the System, or of the successor Fiscal Agent, upon payment of its charges and all other amounts payable to it hereunder, execute, acknowledge and deliver such instruments of conveyance and further assurance and do such other things as may reasonably be required for more fully and certainly vesting and confirming in such successor Fiscal Agent all the right, title and interest of the predecessor Fiscal Agent in and to any property held by it under this Resolution, and shall pay over, assign and deliver to the successor Fiscal Agent any money or other property subject to the trusts and conditions herein set forth but subject to Section 804. Should any deed, conveyance or instrument in writing from the System be required by such successor Fiscal Agent for more fully and certainly vesting in and confirming to such successor Fiscal Agent any such estates, rights, powers and duties, any and all such deeds, conveyances and instruments in writing shall, on request, and so far as may be authorized by law, be executed, acknowledged and delivered by the System.

SECTION 810.     Merger or Consolidation. Any *company into which the Fiscal Agent may be merged or converted* or with which it may be consolidated or any company resulting from any merger, conversion or consolidation to which it shall be a party or any company to which the Fiscal Agent may sell or transfer all or substantially all of its corporate trust business, *provided* such company shall be a bank or trust company organized under the laws of any state of the United States or the Commonwealth or a national banking association, and shall be authorized by law to perform all the duties imposed upon it by this Resolution, shall be the successor to the Fiscal Agent without the execution or filing of any paper or the performance of any further act.

SECTION 811.     Adoption of Authentication. In case any of the Bonds contemplated to be issued under this Resolution shall have been authenticated but not delivered, any successor Fiscal Agent may adopt the certificate of authentication of any predecessor Fiscal Agent so authenticating such Bonds and deliver such Bonds so authenticated, and in case any of the said Bonds shall not have been authenticated, any successor Fiscal Agent may authenticate such Bonds in the name of the successor Fiscal Agent; and in all such cases such certificate shall have the full force which it is anywhere in said Bonds or in this Resolution provided that the certificate of authentication of the Fiscal Agent shall have.

SECTION 812.     Accounting by Fiscal Agent; Nonpetition Covenant. The Fiscal Agent shall, upon receipt of a written request therefor from the System, provide to the System an accounting of the amounts on deposit in all Funds, Accounts and Subaccounts maintained under this Resolution as of the date of such accounting. Notwithstanding any prior termination of this Resolution, the Fiscal Agent shall not, prior to the date which is one year and one day after the termination of this Resolution, acquiesce, petition or otherwise invoke or cause the System to invoke the process of any court or government authority for the purpose of commencing or sustaining a case against the System under any Federal or state bankruptcy, insolvency or similar law or appointing a receiver, liquidator, assignee, trustee, custodian, sequestrator or other similar official of the System or any

VI-18

substantial part of its property, or ordering the winding up or liquidation of the affairs of the System.

SECTION 813.    Appointment of Co-Fiscal Agent.
(a)    Notwithstanding any other provisions of this Resolution, at any time for the purpose of meeting any legal requirement of any jurisdiction (including any jurisdiction in which any part of the Pledged Property may at the time be located), the Fiscal Agent shall have the power and may execute and deliver all instruments necessary to appoint one or more Persons to act as a co-fiscal agent or co-fiscal agents, or separate fiscal agent or separate fiscal agents (including with respect to all or any part of the Pledged Property), and to vest in such Person or Persons, in such capacity and for the benefit of the Bondowners, subject to the other provisions of this Section, such powers, duties, obligations, rights and trusts as the Fiscal Agent may consider necessary or desirable (including title to the Pledged Property or any part thereof). Each co-fiscal agent or separate fiscal agent hereunder shall be required to have a combined capital and surplus (computed in accordance with Section 310(a)(2) of the Trust Resolution Act of 1939, as amended) of at least $50,000,000 and the Fiscal Agent shall, at the expense of the System, provide prompt notice to holders of the appointment of any co-fiscal agent or separate fiscal agent.

(b)    Every separate fiscal agent and co-fiscal agent shall, to the extent permitted by law, be appointed and act subject to the following provisions and conditions:

(i)    all rights, powers, duties and obligations conferred or imposed upon the Fiscal Agent shall be conferred or imposed upon and exercised or performed by the Fiscal Agent and such separate fiscal agent or co-fiscal agent jointly (it being understood that such separate fiscal agent or co-fiscal agent is not authorized to act separately without the Fiscal Agent joining in such act), except to the extent that under any law of any jurisdiction in which any particular act or acts are to be performed the Fiscal Agent shall be incompetent or unqualified to perform such act or acts, in which event such rights, powers, duties and obligations (including the holding of the Pledged Property or any portion thereof in any such jurisdiction ) shall be exercised and performed singly by such separate trustee or co-trustee, but solely at the direction of the Fiscal Agent;

(ii)    no fiscal agent hereunder shall be personally liable by reason of any act or omission of any other fiscal agent hereunder; and

(iii)    the Fiscal Agent may at any time accept the resignation of or remove any separate fiscal agent or co-fiscal agent.

(c)    Any notice, request or other writing given to the Fiscal Agent shall be deemed to have been given to each of the then separate fiscal agent and co-fiscal agent, as effectively as if given to each of them. Every instrument appointing any separate fiscal agent or co-fiscal agent shall refer to this Resolution and the conditions of this Section 813. Each separate fiscal agent and co-fiscal agent, upon its acceptance of the

trusts conferred, shall be vested with the estates or property specified in its instrument of appointment, either jointly with the Fiscal Agent or separately, as may be provided therein, subject to all the provisions of this Resolution, specifically including every provision of this Resolution relating to the conduct of, affecting the liability of, or affording protection or rights (including the right to compensation, reimbursement and indemnification hereunder) to, the Fiscal Agent. Every such instrument shall be filed with the Fiscal Agent.

(d)    Any separate fiscal agent or co-fiscal agent may at any time constitute the Fiscal Agent its agent or attorney-in-fact with full power and authority, to the extent not prohibited by law, to do any lawful act under or in respect of this Resolution on its behalf and in its name. If any separate properties, rights, remedies and trusts shall vest in and be exercised by the Fiscal Agent, to the extent permitted by law, without appointment of a new or successor fiscal agent.

## ARTICLE IX
## SUPPLEMENTAL RESOLUTIONS

SECTION 901.    Supplemental    Resolutions Effective upon Filing with the Fiscal Agent. For any one or more of the following purposes and at any time or from time to time, the System may adopt a Supplemental Resolution, which, upon the filing with the Fiscal Agent of a copy thereof certified by an Authorized Officer of the System, and without the need to obtain the consent of any Bondholder, shall be fully effective in accordance with its terms:

(i)    to close this Resolution against, or provide limitations and restrictions in addition to the limitations and restrictions contained in this Resolution on, the authentication and delivery of the Bonds or the issuance of other evidences of indebtedness;

(ii)    to add to the covenants and agreements of the System in this Resolution, other covenants and agreements to be observed by the System which are not contrary to or inconsistent with this Resolution as theretofore in effect;

(iii)    to add to the limitations and restrictions in this Resolution, other limitations and restrictions to be observed by the System which are not contrary to or inconsistent with this Resolution as theretofore in effect;

(iv)    to surrender any right, power or privilege reserved to or conferred upon the System by this Resolution to the extent such surrender is for the benefit of the Owners of the Bonds;

(v)    to authorize Bonds of a Series and, in connection therewith, specify and determine the matters and things referred to in Section 202, and also any other matters and things relative to such Bonds which are not contrary to or inconsistent with this Resolution as theretofore in effect, or to amend, modify or rescind any such authorization, specification or determination at any time prior to the first authentication and delivery of such Bonds;

(vi)    to confirm, as further assurance, any pledge and assignment under, and the subjection to any lien, assignment or pledge created or to be created by, this Resolution, of the Pledged Property or of any other moneys, securities, funds or accounts;

VI-19

PR-ERS-000003457

(vii)  to modify any of the provisions of this Resolution as may be necessary or desirable to provide for the issuance of Bonds in book entry form pursuant to Section 301(5);

(viii)  to cure any ambiguity, defect or inconsistent provision in this Resolution;

(ix)  if such Supplemental Resolution authorizes Bonds of a Series that are Adjustable Rate Bonds, Capital Appreciation Bonds, Convertible Capital Appreciation Bonds or Bonds hedged or to be hedged by a Qualified Hedge, or authorizes a Qualified Hedge on Bonds previously issued, to add provisions specifying the method of calculating the Accrued Payment Obligation with respect to such Bonds, for purposes of the Debt Service Reserve Requirement and the additional Bonds tests of Sections 204 and 708;

(x)  to provide such provisions with respect to Subordinated Bonds as are necessary and desirable, *provided*, that no such provisions shall adversely affect the payment priorities under this Resolution of any Bonds then Outstanding;

(xi)  to provide for a security interest on the Pledged Property for the payment and as security for Credit Facilities, Liquidity Facilities and Qualified Hedges as permitted by Section 501(1).

(xii)  as permitted by Section 1005;

(xiii)  to insert such provisions clarifying matters or questions arising under this Resolution as are necessary or desirable and are not contrary to or inconsistent with this Resolution as theretofore in effect; or

(xiv)  to modify any of the provisions of this Resolution or any previously adopted Supplemental Resolution in any respect whatsoever, *provided* that (i) such modification shall be, and be expressed to be, effective only after all Bonds of any Series Outstanding at the date of the adoption of such Supplemental Resolution shall cease to be Outstanding and (ii) such Supplemental Resolution shall be specifically referred to in the text of all Bonds of any Series authenticated and delivered after the date of the adoption of such Supplemental Resolution and of Bonds issued in exchange therefor or in place thereof.

SECTION 902.  Supplemental Resolutions Effective with Consent of Bondowners. At any time or from time to time, the System may adopt a Supplemental Resolution subject to consent by Bondowners in accordance with and subject to the provisions of Article X, which Supplemental Resolution, upon the delivery to the Fiscal Agent of a copy thereof certified by an Authorized Officer of the System, and upon compliance with the provisions of Article X, shall become fully effective in accordance with its terms as provided in Article X.

SECTION 903.  Reserved.

SECTION 904.  General Provisions.

1.  This Resolution shall not be modified or amended in any respect except as provided in and in accordance with and subject to the provisions of this Article IX and Article X. Nothing contained in this Article IX or Article X shall affect or limit the right or obligation of the System to adopt, make, execute, acknowledge or deliver any resolution, act or other instrument pursuant to the provisions of Section 704 or the right or obligation of the System to execute and deliver to the Fiscal Agent any instrument which elsewhere in this Resolution it is provided shall be delivered to the Fiscal Agent.

2.  Any Supplemental Resolution referred to and permitted or authorized by Section 901 may be adopted by the System without the consent of any of the Bondowners, but shall become effective only on the conditions, to the extent and at the time provided in said Section. The copy of every Supplemental Resolution when delivered to the Fiscal Agent shall be accompanied by an Opinion of Counsel stating that such Supplemental Resolution has been duly and lawfully adopted in accordance with the provisions of this Resolution, is authorized or permitted by this Resolution, and is valid and binding upon the System and enforceable in accordance with its terms. After any Supplemental Resolution becomes effective under this Article, the System shall mail to the Owners a notice briefly describing such Supplemental Resolution; *provided, however*, the failure to give such notice, or any defect therein, shall not impair or affect the validity of such Supplemental Resolution under this Article.

3.  The Fiscal Agent is hereby authorized to accept the delivery of a certified copy of any Supplemental Resolution referred to and permitted or authorized by Sections 901 or 902 and to make all further agreements and stipulations which may be therein contained, and the Fiscal Agent, in taking such action in good faith, shall be fully protected in relying on an Opinion of Counsel that such Supplemental Resolution is authorized or permitted by the provisions of this Resolution.

4.  No Supplemental Resolution shall change or modify any of the rights or obligations of the Fiscal Agent without its written assent thereto.

**ARTICLE X
AMENDMENTS**

SECTION 1001.  Mailing and Publication.

1.  Any provision in this Article for the mailing of a notice or other paper to Bondowners shall be fully complied with if it is mailed postage prepaid only (i) to each Owner of Bonds then Outstanding at his address, if any, appearing upon the registry books of the System, and (ii) to the Fiscal Agent.

2.  In case by reason of the suspension of regular mail service or by reason of any other cause it shall be impracticable to give such notice by mail as required by this Resolution, then such notification as shall be made with the approval of the Fiscal Agent shall constitute a sufficient notification for every purpose hereunder.

SECTION 1002.  Powers of Amendment. Any modification or amendment of this Resolution and of the rights and obligations of the System and of the Owners of the Bonds may be

PR-ERS-000003458

made by a Supplemental Resolution, with the written consent, given as provided in Section 1003, (i) of the Owners of at least a majority in principal amount of the Bonds Outstanding at the time such consent is given, and (ii) in case less than all of the several Series of Bonds then Outstanding are affected by the modification or amendment (or the Owners of at least a majority in principal amount of the Bonds of each Series so affected as of the time such consent is given, *provided, however,* that if such modification or amendment will, by its terms, not take effect so long as any Bonds of any specified like Series and maturity remain Outstanding, the consent of the Owners of such Bonds shall not be required until such Bonds shall be deemed to be no longer Outstanding). No such modification or amendment shall permit a change in the terms of redemption or maturity of the principal of any Outstanding Bond or of any installment of interest thereon or a reduction in the principal amount (or Accreted Amount, if applicable) or the Redemption Price thereof or in the rate of interest thereon without the consent of each Bondowner affected thereby, or shall reduce the percentage of Accreted Amounts, or the aggregate principal amount of Accreted Amount, if applicable, of Bonds the consent of the Owners of which is required to effect any such modification or amendment without the consent of all Bondowners, or shall change or modify any of the rights or obligations of the Fiscal Agent without its written assent thereto, or shall change or modify any of the rights of the providers of Qualified Hedges, Credit Facilities or Liquidity Facilities regarding source of and security for payments due to such Persons, or amount and timing of payments due, without their prior written consent of such Persons. For the purposes of this Section, a Series shall be deemed to be affected by a modification or amendment of this Resolution if the same adversely affects or diminishes the rights of the Owners of Bonds of such Series. The Fiscal Agent may, but shall not be obligated to, determine whether or not in accordance with the foregoing powers of amendment, Bonds of any particular Series or maturity would be affected by any such modification or amendment of this Resolution, and any such determination if reasonable and in good faith shall be binding and conclusive on the System and all Owners of Bonds.

**SECTION 1003. Consent of Bondowners.** The System may at any time adopt a Supplemental Resolution making a modification or amendment permitted by the provisions of Section 902, to take effect when and as provided in this Section. A copy of such Supplemental Resolution (or brief summary thereof or of reference thereto in form approved by the Fiscal Agent) together with a request to Bondowners for their consent thereto in form satisfactory to the Fiscal Agent, shall be mailed by the System to all affected Bondowners. Such Supplemental Resolution shall not be effective unless and until (i) there shall have been delivered to the Fiscal Agent (a) the written consents of Owners of the percentage of the aggregate principal amount of Outstanding Bonds specified in Section 1002, and (b) an Opinion of Counsel stating that such Supplemental Resolution has been duly and lawfully adopted and filed by the System in accordance with the provisions of this Resolution, is authorized or permitted by this Resolution, and is valid and binding upon the System and enforceable in accordance with its terms, and (ii) notice shall have been given as hereinafter in this Section provided. Ownership of Bonds shall be conclusively presumed by the registration books of the System. Any such consent shall be binding upon the Owner of such Bonds giving such consent and, anything in Section 1102 to the contrary notwithstanding, upon any subsequent Owner of such Bonds and of any Bonds issued upon registration of transfer thereof or in exchange therefor (whether or not such subsequent Owner thereof has notice thereof), unless such consent is revoked in writing by the Owner of such Bonds giving such consent or a subsequent Owner thereof by filing with the Fiscal Agent, prior to the time when the written statement of the Fiscal Agent hereinafter

in this Section provided for it is filed. At any time after the Owners of the required percentages of Bonds shall have filed their consents to the Supplemental Resolution, the Fiscal Agent shall make and file with the System a written statement that the Owners of such required percentage of Bonds have filed such consents. Such written statement shall be conclusive that such consents have been so filed. At any time thereafter, notice, stating in substance that the Supplemental Resolution (which may be referred to as a Supplemental Resolution adopted by the System on a stated date, a copy of which is on file with the Fiscal Agent) has been consented to by the Owners of the required percentage of the aggregate principal amount of Bonds Outstanding, shall be given to Bondowners by the System by mailing such notice to Bondowners. Such notice shall be provided to the Bondowners. The System shall file with the Fiscal Agent proof of the mailing of such notice. A record, consisting of the papers required by this Section 1003 to be delivered to the Fiscal Agent, shall be proof of the matters therein stated.

**SECTION 1004. Modifications by Unanimous Consent.** The terms and provisions of this Resolution and the rights and obligations of the System and of the Owners of the Bonds may be modified or amended in any respect upon the adoption and filing by the System of a Supplemental Resolution and the consent of the Owners of all of the Bonds then Outstanding, such consent to be given as provided in Section 1003 except that no notice to Bondowners shall be required.

**SECTION 1005. Modification Before Bonds Outstanding.** Prior to the issuance and delivery of the first Series of Bonds under this Resolution, the terms and conditions of this Resolution and the rights and obligations of the System and the Owners of the Bonds may be modified or amended in any respect upon the adoption and filing by the System with the Fiscal Agent of a Supplemental Resolution and the consent of any person, upon the adoption of a Supplemental Resolution and the delivery to the Fiscal Agent of a copy thereof certified by an Authorized Officer of the System.

**SECTION 1006. Exclusion of Bonds.** Bonds owned or held by or for the account of the System shall not be deemed Outstanding for the purpose of consent or other action or any calculation of Outstanding Bonds provided for in this Article, and the System shall not be entitled with respect to such Bonds to give any consent or take any other action provided for in this Article. At the time of any consent or other action taken under this Article, the System shall furnish the Fiscal Agent a certificate of an Authorized Officer, upon which the Fiscal Agent may rely, describing all Bonds so to be excluded.

**SECTION 1007. Notation on Bonds.** Bonds authenticated and delivered after the effective date of any action taken as provided in Article IX or this Article may, and if the Fiscal Agent so determines, shall, bear a notation by endorsement or otherwise in form approved by the System and the Fiscal Agent as to any such action. If the System or the Fiscal Agent shall so determine, new Bonds so modified to conform to such action shall be prepared, authenticated and delivered, and, upon demand of the Owner of any Bond then Outstanding, shall be exchanged, without cost to such Bondowners for Bonds of the same Series and maturity and then Outstanding, upon surrender of such Bonds.

PR-ERS-000003459

## ARTICLE XI
### DEFAULTS AND REMEDIES

SECTION 1101.    Events of Default.

Each of the following events shall constitute an Event of Default under this Resolution:

(i)    There shall occur a default in the payment of principal or Redemption Price of or interest on any Bond or payments due to any Parity Obligation or any Subordinate Obligation related thereto in the Currency in which such Bond, Parity Obligation or Subordinate Obligation is payable, after the same shall have become due, whether at maturity or upon call for redemption or otherwise.

(ii)    There shall occur a failure to observe, or a refusal to comply with, the terms of this Resolution or the Bonds, other than a failure or refusal constituting an event specified in paragraph (i) of this paragraph; provided, however, that with respect to any failure to observe or refusal to comply with the covenants and agreements set forth in this Resolution, such failure or refusal shall have continued for a period of thirty (30) days after written notice, specifying such failure and requesting that it be remedied, is given to the System by the Fiscal Agent or any Beneficiary. If prior to the expiration of the abovementioned thirty (30) day period, the System shall request in writing an extension of time and the System shall certify in such request that the failure stated in the notice cannot be remedied within such 30-day period, then such thirty (30) day period shall be extended for an additional thirty (30) days if corrective action has been instituted by the System and is being diligently pursued;

provided, that all references in this Article XI to the Owners of Bonds exercising or directing the exercise of default remedies shall refer solely to those Bonds as to which an Event of Default has been declared hereunder.

SECTION 1102.    Remedies.

1.    The Fiscal Agent may, and upon the written request of the Owners of not less than twenty-five per centum (25%) in principal amount of the Outstanding Bonds, shall, proceed to protect and enforce its rights and the rights of the Bondowners by such of the following remedies, as the Fiscal Agent, being advised by counsel shall deem most effectual to protect and enforce such rights subject to the provisions of Sections 201, 803 and 1206:

(i)    by suit, action or proceeding to enforce all rights of the Bondowners, including the right to collect or require the System to collect Revenues adequate to carry out the covenants, agreements and assignments with respect thereto contained in this Resolution and to require the System to carry out any other covenant or agreement with Bondowners and to perform its duties under the Act;

(ii)    by suit upon the Bonds limited, upon recovery thereunder, to the Pledged Property pledged and assigned under this Resolution;

(iii)    by action or suit in equity, to require the System to account as if it were the trustee of an express trust for the Bondowners, for the Pledged Property pledged and assigned under this Resolution as shall be within its control; and

(iv)    by action or suit in equity, to enjoin any acts or things which may be unlawful or in violation of the rights of the Bondowners or the Beneficiaries.

2.    In the enforcement of any remedy under this Resolution, but subject to Sections 201, 501 and 1206, the Fiscal Agent shall be entitled to sue for, enforce payment on and receive any and all amounts then or during any default becoming, and at any time remaining, due from the System for principal, Redemption Price, interest or otherwise for Bonds under any provision of this Resolution or any Supplemental Resolution or of or on the Bonds, and unpaid, with interest on overdue payments, to the extent permitted by law, at the rate or rates of interest specified in such Bonds, together with any and all costs and expenses of collection and of all proceedings hereunder and under such Bonds, without prejudice to any other right or remedy of the Fiscal Agent or of the Bondowners, and to recover and enforce judgment or decree against the System for any portion of such amounts remaining unpaid, with interest, costs and expenses, in any manner provided by law, the moneys adjudged or decreed to be payable.

SECTION 1103.    Priority of Payments After Event of Default.

1.    Subject to Section 804 and after making provision for the payment of any reasonable expenses of the Fiscal Agent and its agents and attorneys necessary in the opinion of the Fiscal Agent to protect the interests of the Owners of the Bonds and the other Beneficiaries, and for the payment of the reasonable charges and expenses and liabilities incurred and advances made by the Fiscal Agent and its agents and attorneys in the performance of their duties under this Resolution, in the event that the funds held by the Fiscal Agent shall be insufficient for the payment of interest and principal or Accreted Amount or Redemption Price then due on the Bonds in the Currency or Currencies in which such Bonds are payable, respectively, and other amounts payable as described in clauses FIRST through FIFTH of this paragraph 1, such funds (excluding funds held for the payment or redemption of particular Bonds which have theretofore become due at maturity or by call for redemption) and any other moneys received or collected by the Fiscal Agent and any moneys or other property distributable in respect of the System's obligations under this Resolution after the occurrence of an Event of Default, shall be applied as follows:

FIRST: to the payment to the Persons entitled thereto of regularly scheduled fees payable under each Ancillary Bond Facility;

SECOND: to the payment to the Persons entitled thereto of all installments of interest on the Senior Bonds and the interest component of Parity Obligations then due, and thereafter, in the order of such installments, and, if the amount available shall not be sufficient to pay in full any installment due on the same date, then to the payment thereof ratably, according to the amounts due on such date, without any discrimination or preference, except as to any difference in the respective rates of interest specified in such Bonds and Parity Obligations, and then to the

VI-22

PR-ERS-000003460

payment of any interest due and payable after maturity on such Bonds and the interest component of the Parity Obligations, ratably, to the Persons entitled thereto, without any discrimination or preference except as to any difference in the respective rates of interest specified in such Bonds and Parity Obligations;

THIRD: to the payment to the Persons entitled thereto of the unpaid principal or Redemption Price of the Senior Bonds and the unpaid principal component of Parity Obligations, which shall have become due, whether at maturity or by call for redemption, in the order of their due dates and, if the amount available shall not be sufficient to pay in full all such Bonds and the principal component of Parity Obligations due on the same date, then to the payment thereof ratably, according to the amounts of principal or Redemption Price due on such date, without any discrimination or preference;

FOURTH: to the payment to the Persons entitled thereto of all installments of interest on the Subordinated Bonds and the interest component of Parity Obligations then due, and thereafter, in the order of such installments and, if the amount available shall not be sufficient to pay in full any installment due on the same date, then to the payment thereof ratably, according to the amounts due on such date, without any discrimination or preference, except as to any difference in the respective rates of interest specified in such Bonds and Parity Obligations, and then to the payment of any interest due and payable after maturity on such Bonds and the interest component of Parity Obligations, ratably, to the Persons entitled thereto, without any discrimination or preference except as to any difference in the respective rates of interest specified in such Bonds and Parity Obligations;

FIFTH: to the payment to the Persons entitled thereto of the unpaid principal or Redemption Price of the Subordinated Bonds and the unpaid principal component of Parity Obligations, which shall have become due, whether at maturity or by call for redemption, in the order of their due dates and, if the amount available shall not be sufficient to pay in full all such Bonds and the principal component of Parity Obligations due on the same date, then to the payment thereof ratably, according to the amounts of principal or Redemption Price due on such date, without any discrimination or preference;

SIXTH: to the payment to the Persons entitled thereto of amounts reimbursable or payable by the System under each Credit Facility for draws or payments thereunder to pay principal of or interest on Bonds, whether such reimbursements or payments are made to the Credit Facility Provider as a Bondowner, as a subrogee or otherwise; and

SEVENTH: to the payment to the Persons entitled thereto of amounts payable by the System under each Credit Facility, Liquidity Facility and Qualified Hedge not constituting Parity Obligations or payable pursuant to clauses FIRST through SIXTH of this paragraph.

2.  The provisions of this Section are in all respects subject to the provisions of Section 702.

3.  Whenever moneys are to be applied by the Fiscal Agent pursuant to this Section, such moneys shall be applied by the Fiscal Agent at such times, and from time to time, as provided above. The deposit of such moneys with the Fiscal Agent, or otherwise setting aside such moneys in trust for the proper purpose, shall constitute proper application by the Fiscal Agent and the Fiscal Agent shall incur no liability whatsoever to the System, to any Bondowner to any Beneficiary or to any other Person for any delay in applying any such moneys, so long as the Fiscal Agent acts without gross negligence or willful misconduct. Whenever the Fiscal Agent shall exercise such discretion in applying such moneys, it shall fix the date (which shall be an interest payment date unless the Fiscal Agent shall deem another date more suitable) upon which such application is to be made and upon such date interest on the amounts of principal (or Accreted Amount, if any) to be paid on such date shall cease to accrue. The Fiscal Agent shall give such notice as it may deem appropriate for the fixing of any such date. The Fiscal Agent shall not be required to make payment to the Owner of any Bond unless such Bond shall be presented to the Fiscal Agent for appropriate endorsement or for cancellation if fully paid.

SECTION 1104.  Termination of Proceedings.  In case any proceeding taken by the Fiscal Agent on account of any Event of Default has been discontinued or abandoned for any reason, other than payment in full, then in every such case the System, the Fiscal Agent, the Beneficiaries and the Bondowners shall be restored to their former positions and rights hereunder, respectively, and all rights, remedies, powers and duties of the Fiscal Agent shall continue as though no other such proceeding had been taken.

SECTION 1105.  Bondowners' Direction of Proceedings.  Except as otherwise provided in this Resolution, the Owners of a majority in principal amount of the Bonds in order of Class Priority then Outstanding shall have the right, by an instrument or concurrent instruments in writing executed and delivered to the Fiscal Agent, to direct the method of conducting remedial proceedings to be taken by the Fiscal Agent with respect to the Bonds of such Class Priority, *provided* that such direction shall not be otherwise than in accordance with law or the provisions of this Resolution, and that the Fiscal Agent shall have the right to decline to follow any such direction which in the opinion of the Fiscal Agent would be unjustly prejudicial to Bondowners not parties to such direction or would involve the Fiscal Agent in personal liability.

SECTION 1106.  Limitation on Rights of Bondowners.

1.  No Owner of any Bond shall have any right to institute any suit, action, mandamus or other proceeding in equity or at law hereunder, or for the protection or enforcement of any right under this Resolution unless such Owner shall have given to the Fiscal Agent written notice of the Event of Default or breach of duty on account of which such suit, action or proceeding is to be taken, and unless the Owners of not less than 25% in principal amount of the Bonds in the order of Class Priority then Outstanding shall have made written request of the Fiscal Agent after the right to exercise such powers or right of action, as the case may be, shall have occurred, and shall have afforded the Fiscal Agent a reasonable opportunity either to proceed to exercise the powers herein granted or granted under the law or to institute such action, suit or proceeding in its name and unless, also, there shall have been offered to the Fiscal Agent reasonable security and indemnity against the costs, expenses (including legal fees and expenses) and liabilities to be incurred therein or thereby, and the Fiscal Agent shall have refused or neglected to comply with such request within a reasonable time; and such notification, request and

VI-23

PR-ERS-000003461

offer of indemnity are hereby declared in every such case to be conditions precedent to the execution of the powers under this Resolution or for any other remedy provided hereunder or by law. It is understood and intended that no one or more Owners of the Bonds or other Beneficiary hereby secured shall have any right in any manner whatever by his or their action to affect, disturb or prejudice the security of this Resolution, or to enforce any right hereunder or under law with respect to the Bonds, or this Resolution, except in the manner herein provided, and that all proceedings at law or in equity shall be instituted, had and maintained in the manner herein provided and for the benefit of all Owners of the Outstanding Bonds. Nothing contained in this Article shall affect or impair the right of any Bondowner to enforce the payment of the principal (or Accreted Amount, if any) of and interest on such Owner's Bonds or the obligation of the System to pay the principal (or Accreted Amount, if any) of and interest on each Bond issued hereunder to the Owner thereof at the time and place in said Bond expressed.

2. Anything to the contrary contained in this Section notwithstanding, or any other provision of this Resolution, each Owner of any Bond by such Owner's acceptance thereof, shall be deemed to have agreed that any court in its discretion may require, in any suit for the enforcement of any right or remedy under this Resolution, or in any suit against the Fiscal Agent for any action taken or omitted by it as Fiscal Agent, the filing by any party litigant in such suit of an undertaking to pay the reasonable costs of such suit, and that such court may in its discretion assess reasonable costs, including reasonable pre-trial, trial and appellate attorneys' fees, against any party litigant in any such suit, having due regard to the merits and good faith of the claims or defenses made by such party litigant; but the provisions of this paragraph shall not apply to any suit instituted by the Fiscal Agent, to any suit instituted by any Bondowner or group of Bondowners holding at least 25% in principal amount of the Bonds in the order of Class Priority then Outstanding, or to any suit instituted by any Bondowner for the enforcement of the payment of any Bond on or after the respective due date thereof expressed in such Bond.

SECTION 1107. Possession of Bonds by Fiscal Agent Not Required. All rights of action under this Resolution or under any of the Bonds, enforceable by the Fiscal Agent, may be enforced by it without the possession of any of the Bonds or the production thereof on the trial or other proceeding relative thereto, and any such suit, action or proceeding instituted by the Fiscal Agent shall be brought in its name for the benefit of all the Owners of such Bonds, subject to the provisions of this Resolution.

SECTION 1108. Remedies Not Exclusive. No remedy herein conferred upon or reserved to the Fiscal Agent or to the Owners of the Bonds is intended to be exclusive of any other remedy and each and every such remedy shall be cumulative and shall be in addition to any other remedy given hereunder or now or hereafter existing at law or in equity or by statute.

SECTION 1109. No Waiver of Default. No delay or omission of the Fiscal Agent, the Beneficiaries or of any Owner of the Bonds to exercise any right or power accruing upon any default shall impair any such right or power or shall be construed to be a waiver of any such default or an acquiescence therein, and every power and remedy given by this Resolution to the Fiscal Agent and the owners of the Bonds or such Beneficiaries, respectively, may be exercised from time to time and as often as may be deemed expedient.

SECTION 1110. Notice of Event of Default. The Fiscal Agent shall give to the Bondowners and the Beneficiaries

notice of each Event of Default hereunder known to the Fiscal Agent within ninety (90) days after actual knowledge by an Authorized Officer of the Fiscal Agent of the occurrence thereof, unless such Event of Default shall have been remedied or cured before the giving of such notice. However, except in the case of default in the payment of the principal (or Accreted Amount, if any) or Redemption Price, if any, of or interest on any of the Bonds, the Fiscal Agent shall be protected in withholding such notice if and so long as the board of directors, the executive committee, or a trust committee of directors or responsible officers of the Fiscal Agent in good faith determines that the withholding of such notice is in the interest of the Bondowners and other Beneficiaries. Each such notice of Event of Default shall be given by the Fiscal Agent by mailing written notice thereof: (i) to all Owners of Bonds, as the names and addresses of such Owners appear upon the registry books kept by the Fiscal Agent, (ii) to each of the Rating Agencies, and (iii) to such other Persons as may be required by law.

### ARTICLE XII
### SUBORDINATION PROVISIONS

SECTION 1201. Subordination.

(a) Subordinated Bonds and Subordinate Obligations shall to the extent provided in this Article be subordinate and subject in right of payment to the prior payment in full of the Senior Bonds and Parity Obligations, and the owner of any Subordinated Bond and Subordinate Obligation, whether upon original issue or upon transfer or assignment thereof, accepts and agrees to be bound by such provision. The Fiscal Agent shall be entitled to all rights set forth in this Article with respect to any Senior Bonds and Parity Obligations at any time held by it, to the same extent as any other Owner of Senior Bonds and Parity Obligations. Notwithstanding anything to the contrary contained in this Article XII, in no event shall any amounts payable to the Fiscal Agent under Section 804 be subject to the provisions of this Article XII.

(b) Upon any payment or distribution of assets of the System upon any dissolution or winding up or total or partial liquidation of the System whether in bankruptcy, insolvency or receivership proceedings, or otherwise,

(1) all Senior Bonds and Parity Obligations shall first be paid or duly provided for to the extent of such payment or distribution before any payment is made upon the indebtedness evidenced by the Subordinated Bonds or Subordinate Obligations;

(2) any payment or distribution of assets of the System of any kind or character, whether in cash, property or securities, to which the owners of the Subordinated Bonds or Subordinate Obligations or the Fiscal Agent (on behalf of the Owners of the Subordinated Bonds or the Subordinate Obligations) would be entitled except for the provisions of this Article XII, including any such payment or distribution which may be payable or deliverable by reason of the payment of any other indebtedness or other obligations of the System being subordinated to the payment of the Subordinated Bonds and Subordinate Obligations, shall be paid by the liquidating trustee or agent or other person making such payment or distribution, whether a trustee in bankruptcy, a receiver or liquidating trustee or otherwise, directly to the owners of Senior Bonds and Parity Obligations, to the extent necessary to pay or provide for the payment of all Senior Bonds and Parity Obligations in full before any payment is made upon the indebtedness

VI-24

PR-ERS-000003462

evidenced by the Subordinated Bonds and Subordinate Obligations; and

(3) notwithstanding the foregoing, in the event that, upon any such dissolution or winding up or liquidation, any payment or distribution of assets of the System of any kind or character, whether in cash, property or securities, including any such payment or distribution which may be payable or deliverable by reason of the payment of any other indebtedness or other obligations of the System being subordinated to the payment of the Subordinated Bonds and Subordinate Obligations, shall be received by the Fiscal Agent or by the owners of the Subordinated Bonds or Subordinate Obligations (or by the Fiscal Agent on behalf of the Owners of the Subordinated Bonds or the Subordinated Bonds or Subordinate Obligations) before all Senior Bonds and Parity Obligations are paid or duly provided for in full, such payment or distribution shall be paid over to the owners of such Senior Bonds and Parity Obligations for application to the payment thereof until such Senior Bonds and Parity Obligations shall have been paid or provision for such payment shall have been made in full.

Upon any payment or distribution of assets of the System referred to in this Section 1201, the Fiscal Agent and the owners of the Subordinated Bonds and Subordinate Obligations shall be entitled to rely upon (i) any order or decree of a court of competent jurisdiction in which such dissolution, winding up, liquidation or reorganization proceedings are pending or (ii) a certificate of the liquidating trustee or agent or other person making any payment or distribution to the Fiscal Agent or the owners of the Subordinated Bonds and Subordinate Obligations for the purpose of ascertaining the persons entitled to participate in such payment or distribution, the owners of Senior Bonds and Parity Obligations and other indebtedness of the System, the amount thereof or payable thereon, the amount or amounts paid or distributed thereon and all other facts pertinent thereto, or to this Article.

(c) (1) In the event that moneys available to pay Bonds shall not be sufficient to pay in full all amounts due on the Bonds, the owners of all Senior Bonds and Parity Obligations then Outstanding shall be entitled to receive payment in full of all principal of and interest on all such obligations then due and payable before the owner of any Subordinated Bond or Subordinate Obligation is entitled to receive any payment from the Pledged Property of principal (and premium, if any) or interest upon such Subordinated Bond and Subordinate Obligation.

(2) The provisions of subsection (b) and (c) are solely for the purpose of defining the relative rights of the owners of Senior Bonds and Parity Obligations on the one hand, and the owners of Subordinated Bonds and Subordinate Obligations on the other hand, and nothing therein shall impair, as between the System and the owners of the Subordinated Bonds and Subordinate Obligations, the obligation of the System, which is unconditional and absolute, to pay to the owners thereof the principal thereof and premium, if any, and interest thereon in accordance with their terms, nor shall anything therein prevent the owners of the Subordinated Bonds and Subordinate Obligations from exercising all remedies otherwise permitted by applicable law or thereunder upon default thereunder, subject to the rights under subsections (b) and (c) of the owners of Senior Bonds and Parity Obligations to receive cash, property or securities from the funds pledged to Senior Bonds and Parity Obligations under this Resolution otherwise payable or deliverable to the owners of the Subordinated Bonds and Subordinate Obligations; and insofar as a trustee, fiscal agent or paying agent for such Subordinated Bonds and Subordinate Obligations is concerned, the foregoing provisions shall not prevent the

application by such trustee, fiscal agent or paying agent of any moneys deposited with such trustee, fiscal agent or paying agent for the purpose of the payment of or on account of the principal (and premium, if any) and interest on such Subordinated Bonds and Subordinate Obligations if such trustee, fiscal agent or paying agent did not have knowledge at the time of such application that such payment was prohibited by the foregoing provisions.

(d) No owner of Senior Bonds and Parity Obligations shall be prejudiced in this right to enforce subordination of the Subordinated Bonds and Subordinate Obligations by any act or failure to act on the part of the System.

(e) Any issue of Subordinated Bonds and Subordinate Obligations may have such rank or priority with respect to any other issue of Subordinated Bonds and Subordinate Obligations as may be provided herein, in the applicable Supplemental Resolution or other instrument securing such issue of Subordinated Bonds and Subordinate Obligations and may contain such other provisions as are not in conflict with the provisions of this Resolution.

SECTION 1202.    Liability of Fiscal Agent and successor Fiscal Agent in respect of Subordination.

With respect to the Owners of Senior Bonds and Parity Obligations, the Fiscal Agent undertakes to perform or to observe only such of its covenants and objectives as are specifically set forth in this Resolution, and no implied covenants or obligations with respect to the owners of Senior Bonds and Parity Obligations shall be read into this Resolution against the Fiscal Agent. Neither the Fiscal Agent nor any successor Fiscal Agent shall be deemed to owe any fiduciary duty to the owners of Subordinated Bonds and Subordinate Obligations and shall not be liable to such owners if it shall mistakenly pay over or transfer to owners of Senior Bonds and Parity Obligations, the System or any other person, moneys to which any owners of Subordinated Bonds and Subordinate Obligations shall be entitled by virtue of this Section 1202 or otherwise; provided, however, that neither the Fiscal Agent nor any successor Fiscal Agent shall be relieved from liability for its own negligent action, its own negligent failure to act, or its own willful misconduct. Notwithstanding any of the provisions of this Section 1202 or any other provision of this Resolution, neither the Fiscal Agent nor any such successor Fiscal Agent shall at any time be charged with knowledge of the existence of any facts that would prohibit the making of any payment of moneys to or by the Fiscal Agent or any such successor Fiscal Agent in respect of Subordinated Bonds and Subordinate Obligations or of any default in the payment of the principal of or premium, if any, or interest on any Subordinated Bonds and Subordinate Obligations, unless and until the Fiscal Agent or such successor Fiscal Agent shall have received written notice thereof from the System or the owners of a majority in principal amount of any class or category of any Subordinated Bonds and Subordinate Obligations or from any fiscal agent or other fiduciary therefor and any financial institution that provides credit or security for any Subordinated Bonds and Subordinate Obligations; and before the receipt of any such written notice, the Fiscal Agent shall be entitled in all respects to assume that no such facts exist; provided, however, that if the Fiscal Agent shall not have received the notice provided for in this Section 1202 at least two Business Days prior to the date upon which by the terms hereof any money may become payable for any purpose (including, without limitation, the payment of the principal of, any premium or interest on any Bond of such series), then, anything herein contained to the contrary notwithstanding, the Fiscal Agent shall have full power and authority to receive such money and to apply the same to the purposes for which they were received, and shall not be affected by any notice to the contrary that may be received by it within two Business Days prior to such date.

VI-25

PR-ERS-000003463

SECTION 1203.     When     Payment     of
Subordinated Bonds and Subordinate Obligations Allowed.

Nothing contained in this Resolution or in any Senior Bonds and Parity Obligations or Subordinated Bonds and Subordinate Obligations shall (a) affect the obligation of the System to make, or prevent the System from making, at any time, except as provided in Section 1201, payments of principal of or premium, if any, or interest on Senior Bonds and Parity Obligations or the Subordinated Bonds and Subordinate Obligations, or (b) prevent the application by the Fiscal Agent of any moneys deposited with it hereunder for such purpose to the payment of or on account of the principal of or premium, if any, or interest on Senior Bonds and Parity Obligations or the Subordinated Bonds and Subordinate Obligations, if, at the time of such payment or deposit, the Fiscal Agent did not have at least two Business Days' written notice or actual knowledge of any event prohibiting the making of such deposit by the System.

SECTION 1204.     Subrogation of Owners of
Subordinated Bonds and Subordinate Obligations.

Subject to the payment in full of all Senior Bonds and Parity Obligations as provided in Section 1201, the owners of the Subordinated Bonds and Subordinate Obligations shall be subrogated to the rights of the owners of Senior Bonds and Parity Obligations to receive payments or distributions of assets of the System made on Senior Bonds and Parity Obligations until the Subordinated Bonds and Subordinate Obligations shall be paid in full, and no payments or distributions to the owners of Senior Bonds and Parity Obligations by the System or by the owners of the Subordinated Bonds and Subordinate Obligations shall, as between the System and the owners of the Subordinated Bonds and Subordinate Obligations, be deemed to be a payment by the System to or on account of the Subordinated Bonds and Subordinate Obligations, it being understood that the provisions of this Article are and are intended solely for the purpose of defining the relative rights of the owners of the Subordinated Bonds and Subordinate Obligations and of Senior Bonds and Parity Obligations and nothing in this Article shall or is intended to, as between the System and the owners of the Subordinated Bonds and Subordinate Obligations, impair the obligation of the System, which is unconditional and absolute, to pay from the sources herein provided to the owners of the Subordinated Bonds and Subordinate Obligations the principal of and premium, if any, and interest on the Subordinated Bonds and Subordinate Obligations in accordance with their terms, nor shall anything in this Article XII prevent the Fiscal Agent or the owner of any Subordinated Bond and Subordinate Obligation from exercising all remedies otherwise permitted by applicable law upon default hereunder, subject to the rights, if any, under this Article XII of the owners of Senior Bonds and Parity Obligations in respect of cash, property or securities of the System received upon the exercise of any such remedy.

SECTION 1205.     Treatment of Ancillary
Bond Facilities.

Any payment made under any Ancillary Bond Facility, to the owners of the Subordinated Bonds or Subordinate Obligations having the benefit of such Ancillary Bond Facility, by the appropriate obligor thereof shall be retained by such owners for their own account, and no owner of Senior Bonds or Parity Obligations is to have any right with respect to any such payment so made.

As between the obligor whose Ancillary Bond Facility secures any Subordinated Bond and Subordinate Obligation and the owner of such Subordinated Bonds and Subordinate Obligations, any payment made on such Subordinated Bond and

Subordinate Obligation by the System which, under the subordination provisions of this Article, is required to be paid over to the owners of the Senior Bonds or Parity Obligations, shall not constitute a payment on such Subordinated Bond or Subordinate Obligation but, instead, shall be treated for all purposes of such Ancillary Bond Facility, as though such payment had not been made by the System. Until the owner of the Subordinated Bond or Subordinate Obligation so guaranteed has received from the System, or from such obligor, moneys which such owner is entitled to retain for its own account, equal in the aggregate to the principal amount of his Subordinated Bond or Subordinate Obligation and any accrued and unpaid interest thereon, such obligor shall remain liable on its Ancillary Bond Facility, and, unless otherwise provided in such Ancillary Bond Facility, shall not be subrogated to any of the rights of the owner of such Subordinated Bond or Subordinate Obligation.

SECTION 1206.     Amendments to Senior Bonds
and Parity Obligations not Requiring Consent of Owners of
Subordinated Bonds and Subordinate Obligations.

Unless otherwise provided therefor in the Senior Bonds and Parity Obligations, the owners of the Senior Bonds and Parity Obligations may extend, renew, modify or amend the terms of Senior Bonds or Parity Obligations or any security therefor and release, sell or exchange such security and otherwise deal freely with the System, all without notice to or consent of the owners of the Subordinated Bonds and Subordinate Obligations and without affecting the liabilities and obligations of the System or the owners of the Subordinated Bonds and Subordinate Obligations.

### ARTICLE XIII
### MISCELLANEOUS

SECTION 1301.     Defeasance.

1.     Bonds which are denominated and payable only in Dollars may be defeased pursuant to the provisions of this Section, unless otherwise provided in a Supplemental Resolution. Defeasance provisions, if any, for Bonds denominated in a Foreign Currency or Currencies may be defeased pursuant to the provisions of this Section, as affected by the provisions of the related Supplemental Resolution. The System shall pay and indemnify the Fiscal Agent against any tax, fee or other charge imposed on or assessed against the Defeasance Securities deposited pursuant to this Article or the principal and interest received in respect thereof other than any such tax, fee or other charge which by law is for the account of the Bondowners.

2.     If the System shall pay or cause to be paid, or there shall otherwise be paid, to the Owners of all Bonds then Outstanding, the principal and interest and Redemption Price, if any, to become due thereon, at the times and in the manner stipulated therein and in this Resolution, then, at the option of the System, expressed in an instrument in writing signed by an Authorized Officer of the System and delivered to the Fiscal Agent, the covenants, agreements and other obligations of the System to the Bondowners shall be discharged and satisfied. In such event, and provided that all amounts owing to the Fiscal Agent and all Beneficiaries shall have been fully paid, the Fiscal Agent shall, upon the request of the System, execute and deliver to the System such instruments as may be desirable to evidence such discharge and satisfaction and the Fiscal Agent shall pay over or deliver to the System all money, securities and funds held by it pursuant to this Resolution which are not required for the payment or redemption of Bonds not theretofore surrendered for such payment or redemption.

VI-26

PR-ERS-000003464

3. Bonds (or any portion thereof) for the payment or redemption of which moneys shall have been set aside and shall be held in trust by the Fiscal Agent at the maturity or redemption date thereof shall be deemed to have been paid within the meaning and with the effect expressed in paragraph 2 of this Section. Any Outstanding Bond (or portion thereof) shall, prior to the maturity or redemption date thereof, be deemed to have been paid within the meaning and with the effect expressed in paragraph 2 of this Section 1301 if (a) in case said Bond (or portion thereof) is to be redeemed on any date prior to its maturity, the System shall have given to the Fiscal Agent irrevocable instructions to give notice of redemption on said date of such Bond as provided in Article IV of this Resolution, (b) there shall have been deposited with the Fiscal Agent either moneys in an amount which shall be sufficient, or Defeasance Securities the principal of and interest on which when due and without reinvestment, except as provided below, will provide moneys which, together with the moneys, if any deposited with the Fiscal Agent at the same time, shall be sufficient to pay when due the principal or Redemption Price, if applicable, and interest due and to become due on said Bond (or portion thereof) on and prior to the redemption date or maturity date thereof, as the case may be, and (c) in the event said Bond is not by its terms subject to redemption or maturity within the next succeeding sixty (60) days, the System shall have given the Fiscal Agent irrevocable instructions to give, not less than seven (7) days after receipt of such instructions, a notice to the Owner of the Bond (or portion thereof) which is to be deemed to have been paid hereunder that the deposit required by (b) above has been made with the Fiscal Agent and that said Bond (or portion thereof) is deemed to have been paid in accordance with this Section and stating such maturity or redemption date upon which moneys are to be available for the payment of the principal or Redemption Price, if applicable, of and interest on said Bond (or portion thereof). Such notice shall be mailed, postage prepaid, to the Owner of said Bond (or portion thereof) at its last mailing address, if any, appearing on the registry books, but such mailing shall not be a condition precedent to the deemed payment of such Bond and failure so to mail, or failure by any Owner to receive, any such notice shall not affect the validity of the defeasance of such Bond (or portion thereof) as herein provided for.

Neither Defeasance Securities nor moneys deposited with the Fiscal Agent pursuant to this Section, nor principal or interest payments on any such Defeasance Securities, shall be withdrawn or used for any purpose other than, and shall be held in trust for, the payment of the principal or Redemption Price, if applicable, of and interest on said Bond (or portion thereof); *provided* that any cash received from such principal or interest payments on such Defeasance Securities deposited with the Fiscal Agent, if not then needed for such purpose, shall, to the extent practicable, be reinvested by the Fiscal Agent at the written direction of the System in Defeasance Securities maturing at the time or times and in the amount or amounts sufficient to pay when due the principal or Redemption Price, if applicable, of and interest to become due on said Bond (or portion thereof) on and prior to such redemption date or maturity date thereof, as the case may be. Any income or interest earned by, or increment to, the investment of any such moneys so deposited, in excess of the amounts required hereinabove to pay the principal of, Redemption Price, if applicable, of and interest on such Bond (or portion thereof), shall be deposited as realized by the Fiscal Agent in the Revenue Account. To the extent required by the provider of a Credit Facility, Bonds to which such Credit Facility relates shall not be deemed paid hereunder unless there shall have been delivered to the Fiscal Agent and the provider of such Credit Facility (a) a verification report of a firm of independent accountants verifying the sufficiency of the escrow created hereunder to timely make full payment of principal or Redemption Price, if applicable, of and interest on such Bond (or portion thereof) to the dates scheduled

for such payment, and (b) an Opinion of Counsel to the effect that, based upon the assumptions stated in such opinion, such Bonds are deemed to be paid under this Section 1301.

4. For purposes of determining whether an Adjustable Rate Bond (or any portion thereof) shall be deemed to have been paid prior to the maturity or redemption date thereof, as the case may be, by the deposit of moneys, or Defeasance Securities and moneys, if any, in accordance with the second sentence of paragraph 3 of this Section, the interest to come due on such Adjustable Rate Bond (or portion thereof) on or prior to the maturity date or redemption date thereof, as the case may be, shall be calculated at the Maximum Interest Rate permitted by the terms thereof; *provided, however*, that if on any date, as a result of such Adjustable Rate Bond (or portion thereof) having borne interest at less than such Maximum Interest Rate for any period, the total amount of moneys and Defeasance Securities on deposit with the Fiscal Agent for the payment of interest on such Adjustable Rate Bond (or portion thereof) is in excess of the total amount which would have been required to be deposited with the Fiscal Agent on such date in respect of such Adjustable Rate Bond (or portion thereof) in order to satisfy the second sentence of paragraph 3 of this Section, the Fiscal Agent shall, if requested by the System, pay the amount of such excess to the System free and clear of any trust, pledge, lien, encumbrance or security interest created hereby.

5. An Option Bond (or any portion thereof) shall be deemed to have been paid in accordance with the second sentence of paragraph 3 of this Section only if, in addition to satisfying the requirements of clauses (a) and (c) of such sentence, there shall have been deposited with the Fiscal Agent moneys in an amount which shall be sufficient to pay when due the maximum amount of principal of and premium, if any, and interest on such Bond (or portion thereof) which could become payable to the Owner of such Bond (or portion thereof) upon the exercise of any options provided to said Owner; *provided, however*, that if, at the time a deposit is made with the Fiscal Agent pursuant to paragraph 3 of this Section, the options originally exercisable by said Owner are no longer exercisable, such Bond shall not be considered an Option Bond for purposes of this paragraph 5. If any portion of the moneys deposited with the Fiscal Agent for the payment of the principal of and premium, if any, and interest on said Option Bond (or portion thereof) is not required for such purpose, the Fiscal Agent shall, if requested by the System in writing, pay the amount of such excess to the System free and clear of any trust, pledge, lien, encumbrance or security interest created hereby.

6. Anything in this Resolution to the contrary notwithstanding, but subject to any applicable law to the contrary, any moneys held by the Fiscal Agent in trust for the payment of the principal of or premium, if any, or interest on any Bond which remain unclaimed for two (2) years after the date when such principal, premium, if any, or interest, as the case may be, has become due and payable, either at their stated maturity dates or by call for earlier redemption or otherwise, shall, at the written request of the System, be repaid by the Fiscal Agent to the System, as its absolute property and free from trust, and the Fiscal Agent shall thereupon be released and discharged with respect thereto and the Bondowner shall look only to the System for the payment of such principal, premium, if any, or interest, as the case may be; *provided, however*, that before being required to make any such payment to the System, the Fiscal Agent shall, at the expense of the System, cause to be published once in a newspaper or financial journal, customarily published at least once a day for at least five (5) days (other than legal holidays) in each calendar week, printed in the English language and of general circulation in the Borough of Manhattan, City and State of New York, a notice that said moneys remain unclaimed and that, after a date named in

VI-27

PR-ERS-000003465

said notice, which date shall be not less than thirty (30) days after the date of the publication of such notice, the balance of such moneys then unclaimed will be returned to the System.

SECTION 1302. Evidence of Signatures of Bondowners and Owners of Bonds.

1. Any request, consent, revocation of consent or other instrument which this Resolution may require or permit to be signed and executed by the Bondowners may be in one or more instruments of similar tenor, and shall be signed or executed by such Bondowners in person or by their attorneys appointed in writing. The fact and date of the execution by any Bondowner or his attorney duly authorized in writing of such instruments may be proved by a guarantee of the signature thereon by a bank or trust company or by the certificate of any notary public or other officer authorized to take acknowledgments of deeds, that the person signing such request or other instrument acknowledged to him the execution thereof, or by an affidavit of a witness of such execution, duly sworn to before such notary public or other officer. Where such execution is by an officer of a corporation or association or a member of a partnership, or on behalf of such a corporation, association or partnership, such signature guarantee, certificate or affidavit shall constitute proof of his authority.

2. The ownership of Bonds and the amount, numbers and other identification, and date of holding the same shall be proved by the registry books.

3. Any request or consent by the Owner of any Bond shall bind all future Owners of such Bond in respect of anything done or suffered to be done by the System or the Fiscal Agent in accordance therewith.

SECTION 1303. Moneys Held for Particular Bonds. The amounts held by the Fiscal Agent for the payment of the interest, principal or Redemption Price due on any date with respect to particular Bonds shall, on and after such date and pending such payment, be set aside on its books and held in trust by it for the Owners of such Bonds.

SECTION 1304. Preservation and Inspection of Documents. All documents received by the Fiscal Agent under the provisions of this Resolution shall be retained in its possession and shall be subject at all reasonable times to the inspection of the System, and any Bondowner or other Beneficiary and their agents and their representatives any of whom may make copies thereof.

SECTION 1305. Parties Interested Herein. Nothing in this Resolution expressed or implied is intended or shall be construed to confer upon, or to give to, any Person, other than the System, the Fiscal Agent, the Beneficiaries, and the Owners of the Bonds, any right, remedy or claim under or by reason of this Resolution or any covenant, condition or stipulation thereof; and all the covenants, stipulations, promises and agreements in this Resolution contained by and on behalf of the System shall be for the sole and exclusive benefit of the System, the Fiscal Agent, the Beneficiaries, and the Owners of the Bonds.

SECTION 1306. No Personal Liability. Neither the members of the System nor any other Person executing the Bonds or an Ancillary Bond Facility shall be subject to any personal liability or accountability by reason of the issuance or execution and delivery thereof.

SECTION 1307. Successors and Assigns. Whenever in this Resolution the System is named or referred to, it shall be deemed to include its successors and assigns and all the covenants and agreements in this Resolution contained by or on behalf of the System shall bind and inure to the benefit of its successors and assigns whether so expressed or not.

SECTION 1308. Severability of Invalid Provisions. If any one or more of the covenants or agreements provided in this Resolution on the part of the System or the Fiscal Agent to be performed should be contrary to law, then such covenant or covenants, agreement or agreements, shall be deemed severable from the remaining covenants and agreements, and shall in no way affect the validity of the other provisions of this Resolution.

SECTION 1309. Headings. The section headings contained herein are for reference purposes only and will not affect in any way the meaning or interpretation of this Resolution.

SECTION 1310. Conflict. All resolutions or parts of resolutions or other proceedings of the System in conflict herewith be and the same are repealed insofar as such conflict exists.

SECTION 1311. Governing Law. This Resolution shall be governed by, and construed and enforced in accordance with, the laws of the Commonwealth; provided, however, that the formalities leading to the creation of the trusts contained in this Resolution shall be governed by the laws of the State of New York and, provided further, to the maximum extent permitted by applicable law, the rights, duties, privileges and immunities of the Fiscal Agent, any paying agent and Bond Registrar, shall be governed by the law of the jurisdiction in which its Corporate Trust Office is located.

SECTION 1312. Notices. Any notice, demand, direction, request or other instrument authorized or required by this Resolution to be given to or filed with the System or the Fiscal Agent shall be deemed to have been sufficiently given or filed for all purposes of this Resolution if and when delivered:

To the System: Employees Retirement System of the Government of the Commonwealth of Puerto Rico
P.O. Box 42003
San Juan, Puerto Rico 00940

437 Ponce de León Avenue
Stop 32½
Hato Rey, Puerto Rico 00918

Telephone:(787) 754-4545
Fax:        (787) 250-7251
Attn.:     Administrator

To the Fiscal Agent:   The Bank of New York
101 Barclay Street
Floor 7W
New York, New York 10286

Telephone:(212) 815-6955
Fax:        (212) 815-5595 or 5596
Attn.:     Northern Municipals Department

The System or the Fiscal Agent by notice to the other may designate additional or different addresses for subsequent notices or communications. Notwithstanding the foregoing, any notice, demand, request or other instrument to be given or filed

PR-ERS-000003466

with the Fiscal Agent shall be effective only upon receipt by the Fiscal Agent.

The Fiscal Agent shall have the right, but shall not be required, to rely upon and comply with instructions and directions sent by e-mail, facsimile and other similar unsecured electronic methods by persons believed by the Fiscal Agent to be authorized to give instructions and directions on behalf of the System. The Fiscal Agent shall have no duty or obligation to verify or confirm that the person who sent such instructions or directions is, in fact, a person authorized to give instructions or directions on behalf of the System; and the Fiscal Agent shall have no liability for any losses, liabilities, costs or expenses incurred or sustained by the System as a result of such reliance upon or compliance with such instructions or directions. The System agrees to assume all risks arising out of the use of such electronic methods to submit instructions and directions to the Fiscal Agent, including without limitation the risk of the Fiscal Agent acting on unauthorized instructions, and the risk of interception and misuse by third parties.

SECTION 1313. Jury Trial Waiver. EACH PARTY HERETO, AND EACH BONDOWNER AND BENEFICIARY BY ITS ACCEPTANCE OF THE BENEFITS OF THIS RESOLUTION, HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS RESOLUTION.

SECTION 1314. Effective Date. This Resolution shall take effect immediately upon its adoption.

VI-29

PR-ERS-000003467

**EXHIBIT A**

## SECURITY AGREEMENT

This SECURITY AGREEMENT, dated as of _____, 2008, is by and between the Employees Retirement System of the Government of the Commonwealth of Puerto Rico (the "Debtor") and Owners (this and other capitalized terms used herein and not otherwise defined herein shall have the meanings given to them in the Resolution referenced below) from time to time of the Pension Funding Bonds of the Debtor (the "Pension Funding Bonds") issued from time to time pursuant to the provisions of the Debtor's Resolution No. ___, adopted on _____, 2008, as amended and supplemented from time to time (the "Resolution"), and other Beneficiaries, which Owners and Beneficiaries are represented for purposes of this Security Agreement by The Bank of New York, as fiscal agent under the Resolution (the "Secured Party"). Capitalized words not defined herein shall have the meaning ascribed to them in the Resolution.

In order to provide security for the Debtor's payment of principal of, premium (if any) and interest on its Pension Funding Bonds and payment to Beneficiaries and the Fiscal Agent in accordance with their respective terms and the terms of the Resolution, Debtor hereby grants to the Secured Party a security interest in all Revenues; all right, title and interest of the System in and to Revenues, and all rights to receive the same; the Funds, Accounts, and Subaccounts held by the Fiscal Agent, and moneys and securities and, in the case of the Debt Service Reserve Account, Reserve Account Cash Equivalents, from time to time held by the Fiscal Agent under the terms of this Resolution, subject to the application thereof as provided in the Resolution; any and all other rights and real or personal property of every kind and nature from time to time hereafter pledged and assigned by the System to the Fiscal Agent as and for additional security for the Bonds and Parity Obligations; and, any and all cash and non-cash proceeds, products, offspring, rents and profits from any of the Pledged Property mentioned described herein, including, without limitation, those from the sale, exchange, transfer, collection, loss, damage, disposition, substitution or replacement of any of the foregoing.

Remedies for failure of the Debtor to make timely payment of principal of, premium (if any) and interest on the Pension Funding Bonds or failure of the Debtor to fulfill its other covenants contained in the Resolution for the benefit of the Owners of the Pension Funding Bonds are as set forth in the Resolution.

The Debtor shall cause UCC financing statements and continuation statements to be filed, as appropriate, and the Secured Party shall not be responsible for any UCC filings.

**EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO**

By : _____
            Name and Title:

THE BANK OF NEW YORK, as Fiscal Agent under the Resolution

By : _____
            Name and Title:

VI-30

PR-ERS-000003468

**EXHIBIT B**

**DEFINITIONS**

The following terms shall, for all purposes of this Resolution, have the following meanings, unless the context shall clearly indicate some other meaning:

**Administrator** shall mean the Administrator of the System pursuant to the Act.

**Account or Accounts** shall mean any account or accounts, including, without limitation, bank, deposit or securities accounts, as the case may be, established and created pursuant to this Resolution, but does not include any escrow or other fund or account established or created pursuant to Section 1301.

**Accreted Amount** shall mean, on any date and with respect to any particular Capital Appreciation Bond or Convertible Capital Appreciation Bond, the initial principal amount at issuance of such Bond plus accretion of principal, based on compounding on each Accretion Date to the date of maturity thereof (with respect to a Capital Appreciation Bond) or to the Current Interest Commencement Date (with respect to a Convertible Capital Appreciation Bond) at the same interest rate as shall produce a compounded amount on such date of maturity or Current Interest Commencement Date, as applicable, equal to the principal amount thereof on such date; *provided,* that Accreted Amount on any day which is not a Accretion Date shall be determined on the assumption that the Accreted Amount accrues in equal daily amounts between Accretion Dates.

**Accretion Date** shall mean the date on which interest on a Capital Appreciation Bond or Convertible Capital Appreciation Bond is compounded and added to principal in the form of Accreted Amount, as set forth in the related Supplemental Resolution.

**Accrued Payment Obligation** shall mean, with respect to any Class of Bonds and the related Parity Obligations or Subordinate Obligations, and for any Bond Year, as of any date, the aggregate of the Principal Installments of and interest on such Bonds, and the principal and interest components of such related Parity Obligations or Subordinate Obligations, due and unpaid during such Bond Year (or, in the case of Debt Service Account deposits, for Bonds with scheduled payments due more frequently that semi-annually, the current Bond Year and the first three months of the following Bond Year); *provided* that in the case of Adjustable Rate Bonds or Bonds other than fixed rate Bonds denominated in U.S. dollars, the interest shall be based on the Assumed Interest Rate. For purposes of this definition, principal, interest or other obligations for the payment for which the Fiscal Agent shall hold in escrow sufficient funds in a segregated account (including the Capitalized Interest Account and any escrow for the payment of Bonds that are defeased as provided in this Resolution) shall not be taken into consideration.

**Act** shall mean Act No. 447 of the Legislative Assembly of Puerto Rico, approved May 15, 1951, as amended and supplemented.

**Adjustable Rate** shall mean a variable, adjustable, convertible or similar interest rate or rates to be borne by a Series of Bonds or any one or more maturities within a Series of Bonds, for which the method of computing such variable interest rate is specified in the Supplemental Resolution

authorizing such Bonds; *provided,* that the related Supplemental Resolution shall specify (i) whether a Qualified Hedge is to be applicable to such Adjustable Rate Bonds and, if not, or to the extent not so applicable, a Maximum Interest Rate, and (ii) the method or methods for determining the Adjustable Rate and the frequency of change thereof; and *provided further,* that the method or methods for determining the Adjustable Rate may include the selection of such rate by an indexing agent or remarketing agent as provided in an agreement between the System and such agent, the utilization of an Index or Indices as described in the related Supplemental Resolution, the utilization of an auction as described in the related Supplemental Resolution, or such other standard or standards set forth by the System in the related Supplemental Resolution or any combination of the foregoing; and *provided further,* that the Adjustable Rate may never exceed any Maximum Interest Rate related thereto or, if none, the Legal Maximum Interest Rate.

**Adjustable Rate Bond** shall mean any Bond which bears an Adjustable Rate, *provided* that a Bond the interest rate on which shall have been fixed for the remainder of the term thereof shall no longer be deemed to bear interest at an Adjustable Rate.

**Amortized Value,** when used with respect to Investment Obligations purchased at a premium above or a discount below par, shall mean the value at any given date, as calculated by the Fiscal Agent, obtained by dividing the total premium or discount at which such Investment Obligations were purchased by the number of interest payment dates remaining to maturity on such Investment Obligations after such purchase and by multiplying the amount so calculated by the number of interest payment dates having passed since the date of such purchase; and (i) in the case of Investment Obligations purchased at a premium, by deducting the product thus obtained from the purchase price, and (ii) in the case of Investment Obligations purchased at a discount, by adding the product thus obtained to the purchase price.

**Ancillary Bond Facility** shall mean each Credit Facility, each Liquidity Facility, each Qualified Hedge, and each Standby Purchase Agreement.

**Ancillary Facility Providers** shall mean, collectively, each Credit Facility Provider, each Liquidity Facility Provider, each Qualified Hedge Provider, and each Standby Purchase Facility Provider.

**Assumed Interest Rate** shall mean, for Adjustable Rate Bonds, (i) a fixed rate payable by the System under a related Qualified Hedge plus the fixed component of interest on the related Bonds, if any, not included in the payments to be made under the Qualified Hedge by the Qualified Hedge Provider, (ii) for any Qualified Hedge that shall provide for payments from the System that result in a capped rate on the Adjustable Rate Bonds, such capped rate, or (iii) for any Adjustable Rate Bonds that shall not be the subject of a Qualified Hedge, the lesser of the Maximum Interest Rate established therefor and the Legal Maximum Interest Rate. The Supplemental Resolution relating to Bonds other than fixed rate Bonds denominated in U.S. dollars may include other provisions for determining the Assumed Interest Rate.

**Authorized Officer** shall mean (i) in the case of the System, the Administrator, and when used with reference to any act or document, any other person authorized by resolution of the System to perform such act or sign such document (the Fiscal Agent may request that the System deliver an

PR-ERS-000003469

officers' certificate setting forth the names of individuals and/or titles of officers authorized at such time to take specified actions pursuant to this Resolution), and (ii) in the case of the Fiscal Agent, any officer assigned to the Northern Municipals Department (or any successor division or unit) of the Fiscal Agent located at the Corporate Trust Office, or such other address as the Fiscal Agent may designate from time to time by notice to the System, who shall have direct responsibility for the administration of this Resolution, and for the purposes of the thirteenth sentence of Section 802 of this Resolution shall also include any other officer of the Fiscal Agent to whom any matter is referred because of such officer's knowledge of and familiarity with the particular subject.

**Beneficiaries** shall mean (i) the Owners of Bonds Outstanding, (ii) Credit Facility Providers and Liquidity Facility Providers as to which there are Parity Obligations or Subordinate Obligations outstanding, and (iii) Qualified Hedge Providers as to which there are Qualified Hedges outstanding.

**Bond** or **Bonds** shall mean the initial Series of Bonds and any additional Bonds authorized to be issued on a parity therewith pursuant to Section 202 or 708.

**Bondowner** shall mean any person who shall be the registered owner of any Outstanding Bond or Bonds.

**Bond Payment Date** shall mean each date on which Principal Installments of and/or interest on Bonds are due and payable by the System.

**Bond Year** shall mean a twelve-month period commencing on the second day of July in any calendar year and ending on the first day of July in the immediately succeeding calendar year.

**Business Day** shall mean any day other than (i) a Saturday or Sunday, or (ii) a day on which banking institutions in San Juan, Puerto Rico, New York, New York, or any city in which the principal office of the Fiscal Agent, Ancillary Facility Providers (if any), the Remarketing Agent (if any), the Tender Agent (if any), or the Auction Agent (if any) is located are authorized or required by law or executive order to remain closed.

**Capital Appreciation Bonds** shall mean the Bonds of any Series so designated in a Supplemental Resolution; *provided, however,* that the term "Capital Appreciation Bonds" shall only be used with respect to Bonds the interest on which is payable only at maturity or earlier redemption or acceleration of maturity, in amounts determined by reference to the Accreted Amount of each Bond.

**Capitalized Interest Account** shall mean the Capitalized Interest Account established pursuant to Section 502.

**Class** shall mean the designation of Bonds by whether they are Senior Bonds or Subordinated Bonds.

**Class Priority** shall mean, at any time that there shall be Subordinated Bonds Outstanding, and with respect to funding of Debt Service Accounts and Debt Service Reserve Accounts pursuant to Section 504, and payment of Bonds upon an Event of Default under Article XI, funding or payment of the total amount then owing, as applicable, in the order of Senior Bonds and Parity Obligations first until full funding or payment thereof, followed by Subordinated Bonds and Subordinate Obligations of

the highest payment priority next until full funding or payment thereof.

**Code** shall mean the United States Internal Revenue Code of 1986, as amended.

**Commonwealth** shall mean the Commonwealth of Puerto Rico.

**Convertible Capital Appreciation Bonds** shall mean Bonds which, on or prior to the Current Interest Commencement Date, have the characteristics of Capital Appreciation Bonds and, after the Current Interest Commencement Date, have the characteristics of Current Interest Bonds, in each case with such further terms and conditions as may be designated therefor in the Supplemental Resolution authorizing such Bonds.

**Corporate Trust Office** shall mean the office of the Fiscal Agent at which at any particular time its corporate trust business shall be principally administered, which office at the date of the adoption of this Resolution is located at 101 Barclay Street, 7W, New York, New York 10286, Attention: Northern Municipals Department, or such other address as the Fiscal Agent may designate from time to time by notice to the System, or the principal corporate trust office of any successor Fiscal Agent (or such other address as such successor Fiscal Agent may designate from time to time by notice to the System).

**Covered Payroll** shall mean the payroll of all employees of an Employer, other than its irregular and transitory employees, and other than the employees who are covered by one of the Commonwealth's other retirement systems (it being understood that the payroll of employees covered by the System's defined contribution plan constitutes Covered Payroll).

**Credit Facility** shall mean each irrevocable letter of credit, bond insurance policy, surety bond, loan agreement, or other agreement, facility or insurance or guaranty arrangement issued or extended by a bank, a trust company, a national banking association, an organization subject to registration with the Board of Governors of the Federal Reserve System under the Bank Holding Company Act of 1956 or any successor provisions of law, a federal branch pursuant to the International Banking Act of 1978 or any successor provisions of law, a savings bank, a savings and loan association, a Federal Home Loan Bank, a corporation, an insurance company or association chartered or organized under the laws of any state of the United States of America, the Government National Mortgage Association or any successor thereto, Fannie Mae, the Federal Home Loan Mortgage Corporation or any successor thereto, or any other federal or state agency or instrumentality approved by the System, which secures the payment of any Bond, or pursuant to which the System is entitled to obtain moneys to pay, in the Currency in which the Bonds of such Series are payable, the principal or Redemption Price of such Bonds (or any related Qualified Hedges) due in accordance with their respective terms plus accrued interest thereon to the date of payment thereof in accordance herewith and with the Supplemental Resolution authorizing such Bonds, whether or not the System is in default under this Resolution; *provided,* that use of a Credit Facility shall not result, at the time of delivery of the Credit Facility, in a reduction in the Rating of any Bonds Outstanding; and *provided further,* that a substitute Credit Facility may be obtained from time to time (i) which shall contain the same material terms as set forth in the Credit Facility for which substitution is made, and (ii) will not, in and of itself, result in a Rating of the related Bonds lower than those which then prevailed.

**Credit Facility Provider** shall mean the

VI-32

PR-ERS-000003470

Person who has executed a Credit Facility with the System, or otherwise has provided a Credit Facility at the request of the System, for the benefit of any of the Bonds.

**Currency** shall mean Dollars or Foreign Currency or Currency Unit.

**Currency Unit** shall mean a composite currency or currency unit the value of which is determined by reference to the value of the currencies of any group of countries.

**Current Interest Bonds** shall mean Bonds that bear interest which is not compounded but is payable on a current basis on established dates prior to maturity.

**Current Interest Commencement Date** shall mean the date established prior to the issuance of each Series of Convertible Capital Appreciation Bonds, at which time the periodic compounding of interest ceases and on and after which date interest is payable currently on the Accreted Amounts on the next ensuing interest payment dates.

**Debt Service Account** shall mean the Account by that name established by Section 502.

**Debt Service Reserve Account** shall mean the Account by that name established by Section 502.

**Debt Service Reserve Requirement** shall mean, as of any date of calculation, fifty percent (50%) of the average of the Accrued Payment Obligation as of the first Business Day of each Bond Year for each of the following five (5) Bond Years.

**Defeasance Obligations** shall mean any of the following which are not callable or redeemable at the option of the issuer thereof, if and to the extent the same are at the time legal for the investment of the System's funds:

    (i)    Government Obligations;

    (ii)    Defeased Municipal Obligations;

    (iii)    certificates, depositary receipts or other instruments which evidence a direct ownership interest in obligations described in clauses (i) or (ii) above or in any specific interest or principal payments due in respect thereof; *provided, however,* that the custodian of such obligations or specific interest or principal payments shall be a bank or trust company organized under the laws of the United States of America, of the Commonwealth, or of any state or territory of the United States of America or of the District of Columbia, with a combined capital stock, surplus and undivided profits of at least $50,000,000 or the custodian is appointed by or on behalf of the United States of America; and *provided further, however,* that except as may be otherwise required by law, such custodian shall be obligated to pay to the holders of such certificates, depositary receipts or other instruments the full amount received by such custodian in respect of such obligations or specific payments and shall not be permitted to make any deduction therefrom; or

    (iv)    a share or interest in a mutual fund, partnership or other fund wholly comprised of obligations described in clauses (i) through (v) above.

**Defeased Municipal Obligations** shall mean any bonds or other obligations of any state or territory of the United States of America, of the Commonwealth, or of any agency, instrumentality or local governmental unit of any such state or territory or Commonwealth which are not callable at the option of the obligor prior to maturity or as to which irrevocable instructions have been given by the obligor to call on the date specified in the notice; and

    (i)    which are rated, based on an irrevocable escrow account or fund (the "escrow"), in the highest Rating category of any Rating Agency; or

    (ii)    (a) which are fully secured as to principal, interest and redemption premium, if any, by an escrow consisting only of cash or Government Obligations, which escrow may be applied only to the payment of such principal and interest and redemption premium, if any, on such bonds or other obligations on the maturity date or dates thereof or the specified redemption date or dates pursuant to such irrevocable instructions, as appropriate, and (b) which escrow is sufficient, without reinvestment, as verified by a nationally recognized independent certified public accountant, or other nationally recognized verification agent acceptable to the Fiscal Agent, to pay principal of and interest and redemption premium, if any, on the bonds or other obligations described in this paragraph on the maturity date or dates specified in the irrevocable instructions referred to above, as appropriate.

**Dollar** or $ shall mean a dollar or other equivalent unit in such coin or currency of the United States as at the time of payment is legal tender for the payment of public and private debts.

**Employers** shall mean, pursuant to the Act, the government of Puerto Rico, or any Public Enterprise, or municipality, but shall exclude, however, those subsidiary enterprises of government instrumentalities whose employees, in the judgment of the Board of Trustees of the System, may not have a clear relationship of employee and employer with regard to the Commonwealth.

**Employers' Contributions** shall mean the contributions paid from and after the date hereof that are made by the Employers and any assets in lieu thereof or derived thereunder which are payable to the System pursuant to Sections 2-116, 3-105 and 4-113 of the Act.

**Employers' Contribution Rate** shall mean the rate of contribution of each Employer to the System, initially 9.275% of the Covered Payroll.

**Event of Default** shall mean an event described in paragraph 1 of Section 1101.

**Financing Costs** shall mean, with respect to any Bonds, all costs of issuance and any other fees, discounts, expenses and costs related to issuing, securing and marketing the Bonds.

VI-33

PR-ERS-000003471

**First Supplemental Resolution** shall mean the First Supplemental Pension Funding Bond Resolution, adopted by the System on [January 24, 2008], in connection with the issuance of the Series A Bonds.

**Fiscal Agent** shall mean the bank, trust company or national banking association appointed pursuant to Section 801, and its successor or successors and any other bank, trust company or national banking association which may at any time be substituted in its place pursuant to the provisions of this Resolution.

**Fiscal Year** shall mean the fiscal year of the Commonwealth Government beginning July 1 of each calendar year.

**Fitch** shall mean Fitch Ratings, and its successors and assigns.

**Fixed Tender Bond** shall mean any Bond, not constituting an Adjustable Rate Bond, which by its terms must be tendered by the Owner thereof for purchase by or for the account of the System prior to the stated maturity thereof.

**Foreign Currency** shall mean a currency issued by the government of any country other than the United States or a composite currency or currency unit the value of which is determined by reference to the values of the currencies of any group of countries.

**Fund** or **Funds** shall mean any fund or funds established and created pursuant to this Resolution, but does not include any escrow or other fund or account established or created pursuant to Section 1301.

**GDB** shall mean Government Development Bank for Puerto Rico and its successors and permitted assigns.

**General Reserve Account** shall mean the Account by that name established by Section 509.

**Government Obligations** shall mean direct obligations of, or obligations the principal of and the interest on which are unconditionally guaranteed by, the United States of America and entitled to the full faith and credit thereof.

**Interest Subaccount** shall mean the Interest Subaccount established in the Debt Service Account by Section 502.

**Investment Obligations** shall mean and include any of the following securities, if and to the extent the same are at the time legal for investment of the System's funds created by this Resolution for the benefit of the Bondowners:

    (i)    Defeasance Obligations;

    (ii)    Defeased Municipal Obligations;

    (iii)    public housing bonds issued by public agencies or municipalities and fully secured as to the payment of both principal and interest by a pledge of annual contributions under an annual contributions contract or contracts with the United States of America; temporary notes, preliminary loan notes or project notes issued by public agencies or municipalities, in each case fully secured as to the payment of both principal and interest by a requisition or payment agreement with the United States of America; or obligations issued by any state or territory or any public agencies or municipalities which are obligations rated in the highest Rating category by a Rating Agency;

    (iv)    direct and general obligations of any state or territory of the United States to the payment of the principal of and interest on which the full faith and credit of such jurisdiction is pledged which obligations are rated in either of the two highest Rating categories by a Rating Agency;

    (v)    direct obligations of, or obligations guaranteed as to timely payment of principal and interest by, the Federal National Mortgage Association, the Federal Home Loan Mortgage Corporation, or the Federal Farm Credit System;

    (vi)    prime commercial paper of a corporation incorporated under the laws of any state or territory of the United States of America, rated "P-1", "A-1" or "F1" by Moody's, Standard & Poor's or Fitch, respectively;

    (vii)    money market shares of a diversified open-end management investment company as defined in the Investment Company Act of 1940, which company has been rated "A" or better by Moody's, Standard & Poor's or Fitch or money market accounts of the Fiscal Agent or any bank or trust company organized under the laws of the United States or any state thereof, which has a combined capital and surplus of not less than $50,000,000;

    (viii)    deposits evidenced by certificates of deposit issued by banks (which may include the Fiscal Agent) that are members of the Federal Deposit Insurance Corporation, provided that such time deposits are fully secured by obligations described in clause (i) or (ii) above, which such obligations at all times have a market value (exclusive of accrued interest) at least equal to the amount of such bank deposits so secured, including interest;

    (ix)    repurchase agreements relating to securities of the type specified in clauses (i) and (ii) above, *provided* that such securities in an amount at least equal to the face value of such agreements shall be delivered as security for such agreements to (or for) the account of the Fiscal Agent to be held therein during the term of the agreements;

    (x)    investment agreements, secured or unsecured, with any Person whose debt securities are rated at least "AA" (or equivalent rating of short-term obligations if the investment is for a period not exceeding one year) by Standard & Poor's or equivalent Rating by Moody's, Fitch or other Rating Agency; and

    (xi)    any other obligations conforming to System guidelines for investment as provided by the System to the Fiscal Agent from time to time, so long as such obligations are rated at least in the two highest Rating Categories of each of the Rating Agencies and are approved by the applicable Credit Facility Provider.

PR-ERS-000003472

**Legal Maximum Interest Rate** shall mean the highest rate of interest or highest true interest cost that by law may be borne by any Bonds; at present, 12% per annum.

**Liquidity Facility** shall mean an irrevocable letter of credit, surety bond, loan agreement, Standby Purchase Agreement, line of credit or other agreement or arrangement issued or extended by a bank, a trust company, a national banking association, an organization subject to registration with the Board of Governors of the Federal Reserve System under the Bank Holding Company Act of 1956 or any successor provisions of law, a federal branch pursuant to the International Banking Act of 1978 or any successor provisions of law, a savings bank, a savings and loan association, a Federal Home Loan Bank, an insurance company or association chartered or organized under the laws of the Commonwealth or any state of the United States of America, the Government National Mortgage Association or any successor thereto, Federal National Mortgage Association or any successor thereto, the Federal Home Loan Mortgage Corporation or any successor thereto, or any other government sponsored enterprise or federal, state or Commonwealth agency or instrumentality approved by the System, pursuant to which the System is entitled to obtain moneys upon the terms and conditions contained therein for the purchase or redemption of Bonds tendered for purchase or redemption in accordance with the terms hereof and of the Supplemental Resolution authorizing such Bonds; *provided*, that the use of the Liquidity Facility shall not result, at the time it is delivered, in a reduction in the Rating of any Bonds Outstanding; and *provided further* that a substitute Liquidity Facility may be obtained from time to time (i) which shall contain the same material terms as set forth in the Liquidity Facility for which substitution is being made, and (ii) will not, in and of itself, result in a Rating of any Bonds Outstanding lower than those which then prevailed.

**Liquidity Facility Provider** shall mean the Person who has executed a Liquidity Facility with the System, or otherwise has provided a Liquidity Facility at the request of the System, for the benefit of any of the Bonds.

**Maturity Amount** shall mean the Accreted Amount of any Capital Appreciation Bond or Convertible Capital Appreciation Bond due as of the stated maturity thereof.

**Maximum Interest Rate** shall mean, with respect to any particular Adjustable Rate Bond, a numerical rate of interest, which shall be set forth in the Supplemental Resolution authorizing such Bond, that as a matter of contract shall be the maximum rate at which such Bond may bear interest at any time; provided, that the Maximum Interest Rate may not exceed the Legal Maximum Interest Rate.

**'Moody's**' shall mean Moody's Investors Service, and its successors and assigns.

**Operating Expenses** shall mean the reasonable out-of-pocket expenses of the System related to the issuance of the Bonds (including, without limitation, the out-of pocket costs of preparation of accounting and other reports, costs of maintenance of the ratings on Bonds, and insurance premiums, deductibles and retention payments,), legal fees, fees and expenses incurred for professional consultants and fiduciaries, and regularly scheduled fees payable under each Credit Facility and Liquidity Facility. Whenever a requisition for "Operating Expenses" from the Revenue Account shall be made pursuant to Section 505, a certificate of an Authorized Officer of the System, stating that such amount constitutes "Operating Expense" as defined in this Resolution, shall be delivered to the Fiscal Agent. Operating

Expenses shall not include those expenses owed to the Fiscal Agent under Section 804.

**Opinion of Counsel** shall mean an opinion signed by an attorney or firm of attorneys of recognized standing (who may be counsel to the System) of recognized standing in the field of law relating to municipal bonds selected by the System and satisfactory to the Fiscal Agent.

**Option Bond** shall mean any Bond which by its terms may be tendered by and at the option of the Owner thereof for redemption or purchase by (or for the account of) the System prior to the stated maturity thereof, or the maturity of which may be extended by and at the option of the Owner thereof.

**Original Principal Amount** shall mean the original principal amount of any Capital Appreciation Bond or Convertible Capital Appreciation Bond at the date of original issuance, as stated in the Supplemental Resolution relating to such bonds.

**Outstanding**, when used with reference to the Bonds as a whole or the Bonds of a Series, shall mean, as of any date, the Bonds or Bonds of such Series, as the case may be, theretofore or thereupon being delivered and issued under the provisions of this Resolution, except:

(i) any Bonds canceled by or surrendered for cancellation to the Fiscal Agent at or prior to such date;

(ii) Bonds deemed to have been paid as provided in Section 1301;

(iii) Bonds in lieu of or in substitution for which other Bonds shall have been authenticated and delivered pursuant to Article III or Section 1007;

(iv) Option Bonds tendered or deemed tendered in accordance with the provisions of the Supplemental Resolution authorizing such Bonds on the applicable tender date, if the purchase price thereof and interest thereon through such date shall have been paid or amounts are available and set aside for such payment as provided in such Supplemental Resolution, except to the extent such tendered Option Bonds are held by the System or a Credit Facility Provider or a Liquidity Facility Provider and/or thereafter may be resold pursuant to the terms thereof and of such Supplemental Resolution; and

(v) as may be provided with respect to such Bonds by the Supplemental Resolution authorizing such Bonds;

*provided, however,* that in determining whether the Owners of the requisite principal amount of Outstanding Bonds have given any request, demand, authorization, direction, notice, consent or waiver hereunder, (i) Bonds owned by the System shall be disregarded and deemed not to be Outstanding, except that, in determining whether the Fiscal Agent shall be protected in relying upon any such request, demand, authorization,

VI-35

PR-ERS-000003473

direction, notice, consent or waiver, only Bonds which an Authorized Officer of the Fiscal Agent knows to be so owned shall be so disregarded. Bonds so owned which have been pledged in good faith may be regarded as Outstanding if the pledgee establishes to the satisfaction of the Fiscal Agent the pledgee's right to so act with respect to such Bonds and that the pledgee is not the System, and (ii) the principal amount of a Convertible Capital Appreciation Bond or a Capital Appreciation Bond that shall be deemed Outstanding for such purposes shall be the Accreted Amount thereof except as otherwise provided in this Resolution.

**Owner or Owner of Bonds** shall mean each Bondowner.

**Parity Hedge Obligations** shall mean, as allocated to a Series of Bonds pursuant to the terms of the related Supplemental Resolution, fixed and scheduled payments by the System under Qualified Hedges. Parity Hedge Obligations shall not include, among other things, any costs, indemnities, termination payments or similar non-recurring amounts, or any amortization of such non-recurring amounts.

**Parity Obligations** shall mean, collectively, all Parity Reimbursement Obligations and Parity Hedge Obligations.

**Parity Reimbursement Obligations** shall mean, as allocated to a Series of Bonds pursuant to the terms of the related Supplemental Resolution, fixed and scheduled payments due from the System to any Credit Facility Provider or Liquidity Facility Provider, as provided by Section 206, whether such reimbursements or payments are made to the Credit Facility Provider or Liquidity Facility Provider as a Bondowner, as a subrogee or otherwise. Parity Reimbursement Obligations shall include, among other things, reimbursements of direct-pay letters of credit to be drawn on each principal and/or interest payment date.

**Person or Persons** shall mean an individual, partnership, limited liability partnership, corporation, limited liability corporation, trust or unincorporated organization and a government or agency or political subdivision or branch thereof.

**Pledged Property** shall mean the following, collectively (but without duplication), except as otherwise may be provided with respect to a Series of Bonds by the Supplemental Resolution authorizing such Bonds:

    1.     All Revenues.

    2.     All right, title and interest of the System in and to Revenues, and all rights to receive the same.

    3.     The Funds, Accounts, and Subaccounts held by the Fiscal Agent, and moneys and securities and, in the case of the Debt Service Reserve Account, Reserve Account Cash Equivalents, from time to time held by the Fiscal Agent under the terms of this Resolution, subject to the application thereof as provided in this Resolution and to the provisions of Sections 1301 and 1303.

    4.     Any and all other rights and personal property of every kind and nature from time to time hereafter pledged and assigned by the System to the Fiscal Agent as and for additional security for the Bonds and Parity Obligations.

    5.     Any and all cash and non-cash proceeds, products, offspring, rents and profits from any of the Pledged Property mentioned described in paragraphs (1) through (4) above, including, without limitation, those from the sale, exchange, transfer, collection, loss, damage, disposition, substitution or replacement of any of the foregoing.

**Principal Installment** shall mean, as of any date with respect to any Series, so long as any Bonds thereof are Outstanding, the sum of (i) the principal amount and Accreted Amount (to the extent applicable) of Bonds of such Series (including the principal amount of Option Bonds tendered for payment and not purchased) due (or so tendered for payment and not purchased) on such date for which no Sinking Fund Installments have been established, and (ii) the unsatisfied balance (determined as provided in Section 507) of any Sinking Fund Installments due on such date for Bonds of such Series, together with the premiums, if any, payable upon the redemption of such Bonds by application of such Sinking Fund Installments.

**Principal Subaccount** shall mean the Principal Subaccount established in the Debt Service Account by Section 502.

**Public Enterprise** shall mean any government instrumentality or public corporation of the Commonwealth.

**Qualified Hedge** shall mean, with respect to particular Bonds, (i) any financial arrangement (a) which is entered into by the System with an entity that is a Qualified Hedge Provider at the time the arrangement is entered into, (b) which is a cap, floor or collar, forward rate, future rate, swap (such swap may be based on an amount equal either to the principal amount of such Bonds as may be designated or a notional principal amount relating to all or a portion of the principal amount of such Bonds), asset, index, Currency, price or market-linked transaction or agreement, other exchange or rate protection transaction agreement, other similar transaction (however designated), or any combination thereof, or any option with respect to any of the foregoing, executed by the System, and (c) which has been designated as a Qualified Hedge with respect to such Bonds in a written determination signed by an Authorized Officer and delivered to the Fiscal Agent, and (ii) any Credit Facility securing the obligations of the System under any financial arrangement described in clause (i) above. Each Qualified Hedge shall provide that the System and the Qualified Hedge Provider shall provide not less than ten-days' prior written notice of any amendment to the Fiscal Agent.

**Qualified Hedge Provider** shall mean a Person whose long-term obligations, other unsecured, long-term obligations, financial program rating, counterparty rating, or claims paying ability, or whose payment obligations under an agreement that would be a Qualified Hedge are guaranteed by an entity whose long term debt obligations, other unsecured long term obligations, financial program rating, counterparty rating, or claims paying ability, are rated, or whose payment obligations under an interest rate exchange agreement are collateralized in such manner as to cause such agreement to be rated, at the time of the execution of such Qualified Hedge, either (i) at least as high as the third highest Rating Category of each Rating Agency, but in no event lower than any Rating Category designated by any such Rating Agency for the Bonds subject to such Qualified Hedge (without reference to bond

PR-ERS-000003474

insurance, if any), or (ii) any such lower Rating Categories which each such Rating Agency indicates in writing to the System and the Fiscal Agent will not, by itself, result in a reduction or withdrawal of its Rating (without reference to bond insurance, if any) on the Outstanding Bonds, and (iii) a Person whose payment obligations under an interest rate exchange agreement are subject to collateralization requirements that, as evidenced in writing to the System and the Fiscal Agent by each Rating Agency, will not, by itself, result in a reduction or withdrawal of its Rating (without reference to bond insurance, if any) on the Outstanding Bonds.

**Rating** shall mean a rating published by a Rating Agency with respect to any or all Bonds. Any provision of this Resolution that specifies that an action may not be taken if it shall result in a reduction, suspension or withdrawal of the Rating of the Bonds, with respect to any Bonds that are the subject of a Credit Facility, shall mean the Rating of such Bonds without taking into account the credit enhancement provided by such Credit Facility.

**Rating Agency** shall mean each nationally recognized statistical rating organization then maintaining a rating on the Bonds at the request of the System.

**Rating Category** shall mean one of the generic rating categories of any Rating Agency without regard to any refinement or gradation of such rating within any such category by a numerical modifier or otherwise.

**Record Date** shall mean, with respect to each payment of interest on a Bond, each date specified as the "record date" therefor in the Supplemental Resolution authorizing such Bond, or if no such date is specified, the 15th day of the month preceding the date of such payment.

**Redemption Account** shall mean the Account by that name established by Section 502.

**Redemption Price** shall mean, when used with respect to a Bond (other than a Capital Appreciation Bond or a Capital Appreciation Bond) or a portion thereof to be redeemed, the principal amount of such Bond or such portion thereof plus the applicable premium, if any, and, when used with respect to a Convertible Capital Appreciation Bond or a Capital Appreciation Bond, shall mean the Accreted Amount on the date of redemption of such Bond (or portion thereof) plus the applicable premium, if any, payable in either case upon redemption thereof, pursuant to this Resolution and the applicable Supplemental Resolution.

**Refunding Bonds** shall mean all Bonds authenticated and delivered on original issuance pursuant to Section 204 or thereafter authenticated and delivered in lieu of or in substitution for any such Bond pursuant to this Resolution and the applicable Supplemental Resolution.

**Reserve Account Cash Equivalent** shall mean a letter of credit, insurance policy, surety, guaranty or other security arrangement provided to the Fiscal Agent as a substitute for the deposit of cash and/or Investment Securities, or another Reserve Account Cash Equivalent, in the Debt Service Reserve Account pursuant to Section 506. Each such arrangement shall be provided by a Person whose claims paying ability has been assigned a rating from each Rating Agency at least equal to the then existing rating on the Bonds or whose unsecured, long-term debt securities are rated by each Rating Agency at least equal to the then existing Rating on the Bonds (or the highest short-term rating if the Reserve Account Cash Equivalent has a remaining

term measured from the date it is provided not exceeding one year).

**Resolution** shall mean this Bond Resolution, as from time to time amended or supplemented by Supplemental Resolutions.

**Revenue Account** shall mean the Account by that name established by Section 502.

**Revenues** shall mean the following, collectively (but without duplication), except as otherwise may be provided with respect to a Series of Bonds by the Supplemental Resolution authorizing such Bonds:

1.     All Employers' Contributions received by the System or the Fiscal Agent.

2.     With respect to any particular Bonds, the proceeds of any draw on or payment under any Credit Facility which is intended for the payment of such Bonds, but only for purposes of such payment and not for other purposes of this Resolution.

3.     Net amounts received by the System pursuant to a Qualified Hedge.

4.     Income and interest earned and gains realized in excess of losses suffered by any Fund, Account, or Subaccount held by the Fiscal Agent under the terms of this Resolution, subject to the provisions of Sections 1301 and 1303.

5.     Any other revenues, fees, charges, surcharges, rents, proceeds or other income and receipts received by or on behalf of the System or by the Fiscal Agent, lawfully available for the purposes of this Resolution and deposited by or on behalf of the System or by the Fiscal Agent in any Fund, Account, or Subaccount held by the Fiscal Agent under the terms of this Resolution, subject to the provisions of Sections 1301 and 1303.

**Security Agreement** means the Security Agreement dated as of January 31, 2008 between the System and the Fiscal Agent, in the form appended hereto as Appendix A.

**Senior Bonds** shall mean the Series A Bonds and any Bonds of a Class the priority of payment of which under this Resolution is equal with that of the Series A Bonds.

**Serial Bonds** shall mean Bonds which have no Sinking Fund Installment.

**Series** shall mean all of the Bonds authenticated and delivered on original issuance identified pursuant to a Supplemental Resolution as a separate series of Bonds, and any Bonds thereafter authenticated and delivered in lieu of or in substitution therefor pursuant to Article III or Section 1007, regardless of variations in maturities, principal amounts, interest rates or other provisions.

**Series A Bonds** shall mean the System's Senior Pension Funding Bonds, Series A, the initial Series of Bonds to be issued under this Resolution.

VI-37

PR-ERS-000003475

**Sinking Fund Installment** shall mean, when used with respect to any Series of Bonds, the amount of principal or Accreted Amount, as the case may be, due prior to maturity on Bonds of a given maturity on any particular due date as specified in the Supplemental Resolution pursuant to which such Series was issued.

**Standard & Poor's** shall mean Standard & Poor's Ratings Service, a division of The McGraw-Hill Companies, Inc., and its successors and assigns.

**Standby Purchase Agreement** shall mean an agreement by and between the System and another Person pursuant to which such Person is obligated to purchase Option Bonds or Fixed Tender Bonds tendered for purchase.

**Standby Purchase Provider** shall mean the Person who has executed a Standby Purchase Agreement with the System.

**Subaccount** or **Subaccounts** shall mean any subaccount or subaccounts, as the case may be, in each case which may be in the form of a separate account, established or created pursuant to this Resolution, but does not include any escrow or other fund or account established or created pursuant to Section 1301.

**Subordinated Bonds** shall mean Bonds of a Series, the priority of payment of which under this Resolution is subordinate to payment of the Senior Bonds.

**Subordinate Obligations** shall mean, as allocated to each Series of Bonds by Class pursuant to the terms of the related Supplemental Resolution, payment obligations to Persons of the type that otherwise would be classified under this Resolution as Parity Obligations but are subject instead, pursuant to the provisions of the applicable Supplemental Resolutions, to subordination to Parity Obligations under this Resolution on the terms and conditions set forth in such Supplemental Resolutions.

**Supplemental Resolution** shall mean any resolution supplemental to or amendatory of this Resolution or any Supplemental Resolution, adopted by the System in accordance with Articles IX and X.

**Term Bonds** shall mean Bonds having a single stated maturity date, some of which may have Sinking Fund Installments to be specified in a Supplemental Resolution.

The terms "hereby," "hereof," "hereto," "herein," "hereunder," and any similar terms as used in this Resolution, refer to this Resolution. All references to Articles and Sections in this Resolution refer to the Articles and Sections hereof unless otherwise expressly stated.

VI-38

PR-ERS-000003476

# Bondholders' UV
# EXHIBIT 12



**EMPLOYEES' RETIREMENT SYSTEM OF THE GOVERNMENT
OF THE COMMONWEALTH OF PUERTO RICO**

(A Component Unit of the Commonwealth of Puerto Rico)

Basic Financial Statements and Required Supplementary Information

June 30, 2017

(With Independent Auditors' Report Thereon)

**EMPLOYEES' RETIREMENT SYSTEM OF THE GOVERNMENT**
**OF THE COMMONWEALTH OF PUERTO RICO**
(A Component Unit of the Commonwealth of Puerto Rico)

**Table of Contents**

|  | Page(s) |
|---|---|
| Independent Auditors' Report | 1–2 |
| Management's Discussion and Analysis (Unaudited) | 3–14 |
| Basic Financial Statements: | |
| Statement of Fiduciary Net Position | 15–16 |
| Statement of Changes in Fiduciary Net Position | 17 |
| Notes to Basic Financial Statements | 18–74 |
| **Required Supplementary Information (Unaudited)** | |
| Pension Benefits: | |
| Schedule of Changes in the Employers' Net Pension Liability and Related Ratios | 75 |
| Schedule of Investment Returns | 76 |
| Other Postemployment Healthcare Benefits: | |
| Schedule of Employers' Contributions | 77 |
| Schedule of Funding Progress | 78 |
| Notes to Required Supplementary Information | 79–81 |



KPMG LLP
American International Plaza
Suite 1100
250 Muñoz Rivera Avenue
San Juan, PR 00918-1819

**Independent Auditors' Report**

To the Retirement Board of the Government of Puerto Rico
Employees' Retirement System of
   the Government of the Commonwealth of Puerto Rico:

We have audited the accompanying financial statements of the Employees' Retirement System of the Government of the Commonwealth of Puerto Rico (the System), which comprises the statement of fiduciary net position as of June 30, 2017, the related statement of changes in fiduciary net position for the year then ended, and the related notes to the financial statements, which collectively comprise the System's basic financial statements.

*Management's Responsibility for the Financial Statements*

Management is responsible for the preparation and fair presentation of these financial statements in accordance with U.S. generally accepted accounting principles; this includes the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of financial statements that are free from material misstatement, whether due to fraud or error.

*Auditors' Responsibility*

Our responsibility is to express an opinion on these financial statements based on our audit. We conducted our audit in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free from material misstatement.

An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the financial statements. The procedures selected depend on the auditors' judgment, including the assessment of the risks of material misstatement of the financial statements, whether due to fraud or error. In making those risk assessments, the auditor considers internal control relevant to the entity's preparation and fair presentation of the financial statements in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the entity's internal control. Accordingly, we express no such opinion. An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluating the overall presentation of the financial statements.

We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion.

*Opinion*

In our opinion, the financial statements referred to above present fairly, in all material respects, the fiduciary net position of the Employees' Retirement System of the Government of the Commonwealth of Puerto Rico as of June 30, 2017, and the changes in its fiduciary net position for the year then ended, in accordance with U.S. generally accepted accounting principles.

KPMG LLP is a Delaware limited liability partnership and the U.S. member firm of the KPMG network of independent member firms affiliated with KPMG International Cooperative ("KPMG International"), a Swiss entity.



*Emphasis of Matters*

Uncertainty about Ability to Continue as a Going Concern

The accompanying financial statements have been prepared assuming that the System will continue as a going concern. As discussed in notes 3 and 14 to the basic financial statements, the System is severely underfunded, sold its remaining investments in the aggregate amount of approximately $297 million, and started operating on a pay as you go basis in fiscal year 2018. Additionally, on May 3, 2017 and May 22, 2017, the Financial Oversight and Management Board commenced cases for the Commonwealth of Puerto Rico and the System, respectively, by filling petitions for relief under Title III of the Puerto Rico Oversight, Management, and Economic Stability Act with the United States District Court for Puerto Rico. Accordingly, management of the System has stated that substantial doubt exists about the System's ability to continue as a going concern. Management's evaluation of the events and conditions and management's plans regarding these matters are also included in note 3. The financial statements do not include any adjustments that might result from the outcome of this uncertainty. Our opinion is not modified with respect to this matter.

*Other Matters*

Required Supplementary Information

U.S. generally accepted accounting principles require that the management's discussion and analysis on pages 3–14 and the schedules in pages 75-81 be presented to supplement the basic financial statements. Such information, although not a part of the basic financial statements, is required by the Governmental Accounting Standards Board who considers it to be an essential part of financial reporting for placing the basic financial statements in an appropriate operational, economic, or historical context. We have applied certain limited procedures to the required supplementary information in accordance with auditing standards generally accepted in the United States of America, which consisted of inquiries of management about the methods of preparing the information and comparing the information for consistency with management's responses to our inquiries, the basic financial statements, and other knowledge we obtained during our audit of the basic financial statements. We do not express an opinion or provide any assurance on the information because the limited procedures do not provide us with sufficient evidence to express an opinion or provide any assurance.

*KPMG LLP*

San Juan, Puerto Rico
June 29, 2020

Stamp No. E403599 of the Puerto Rico
Society of Certified Public Accountants was
affixed to the record copy of this report.

2

**EMPLOYEES' RETIREMENT SYSTEM OF THE GOVERNMENT
OF THE COMMONWEALTH OF PUERTO RICO**
(A Component Unit of the Commonwealth of Puerto Rico)

Management's Discussion and Analysis (Unaudited)

June 30, 2017

**Introduction**

The following discussion and analysis of the financial performance of the Employees' Retirement System of the Government of the Commonwealth of Puerto Rico (the System) provides an overview of its activities for the fiscal year ended June 30, 2017. Its purpose is to provide explanations and insights into the information presented in the basic financial statements and required supplementary information. This discussion and analysis is intended to be read in conjunction with the System's financial statements.

The System is a trust created by the Legislature of the Commonwealth of Puerto Rico (the Legislature) in 1951 pursuant to Act No. 447 of May 15, 1951, as amended, to provide pension and other benefits to retired employees of the Commonwealth of Puerto Rico (the Commonwealth), its public corporations and municipalities. Prior to August 23, 2017, the System was administered by the Puerto Rico Government Employees and Judiciary Retirement Systems Administration (the ERS and JRS Administration) and governed by a board of trustees (the Board of Trustees).

Prior to August 23, 2017, the System administered a cost-sharing, multi-employer, pension plan consisting of three benefit structures: (i) a cost-sharing, multi-employer, defined benefit program, (ii) a defined contribution program (System 2000 program), and (iii) a contributory hybrid program. The System also administered post-employment healthcare benefits provided by the Commonwealth to retired plan members (Employees' Retirement System of the Government of Puerto Rico and its Instrumentalities Medical Insurance Plan Contribution – ERS MIPC).

The System is considered an integral part of the financial reporting of the Commonwealth and is included in the Commonwealth's basic financial statements as a pension trust fund.

**Overview of the Basic Financial Statements**

The following discussion and analysis is intended to serve as an introduction to the System's basic financial statements. The basic financial statements are prepared in accordance with U.S. generally accepted accounting principles (GAAP) as applicable to governmental organization per Governmental Accounting Standards Board (GASB) pronouncements and include the following:

- The Statement of Fiduciary Net Position presents the financial position of the System at fiscal year-end. It provides information about the nature and amounts of resources with present service capacity that the System presently controls (assets), consumption of net assets by the System that is applicable to a future reporting period (deferred outflow of resources), presents obligations to sacrifice resources that the System has little or no discretion to avoid (liabilities), and acquisition of net assets by the System that is applicable to a future reporting period (deferred inflow of resources) with the difference between assets/deferred outflow of resources and liabilities/deferred inflow of resources being reported as net position. Investments are shown at fair value. All other assets and liabilities are determined on an accrual basis.

- The Statement of Changes in Fiduciary Net Position presents the results of activities during the fiscal year. All changes affecting the assets/deferred outflow of resources and liabilities/deferred inflow of resources of the System are reflected on an accrual basis of when the activity occurred, regardless of the timing of the related cash flows. Changes in the fair values of investments are included in the year's activity as net appreciation (depreciation) in fair value of investments.

3 (Continued)

**EMPLOYEES' RETIREMENT SYSTEM OF THE GOVERNMENT
OF THE COMMONWEALTH OF PUERTO RICO**

(A Component Unit of the Commonwealth of Puerto Rico)

Management's Discussion and Analysis (Unaudited)

June 30, 2017

- The Notes to the Basic Financial Statements – provide additional information that is essential to a full understanding of the data provided in the financial statements. The notes present information about the System's accounting policies, significant account balances and activities, material risks, obligations, contingencies, and subsequent events, if any.

Required Supplementary Information is presented after the notes to the basic financial statements. Such information, although not a part of the basic financial statements, is required by the GASB. It consists of information pertaining to the System's actuarial methods and assumptions and provides data on changes in the employers' net pension liability and related ratios, the pension benefits employers' contributions, and the pension benefits' investment return as well as data on the System's other postemployment benefits.

*Financial Highlights*

Prior to August 23, 2017, the System provided retirement benefits to employees of the Commonwealth, its public corporations and municipalities. The System's total assets as of June 30, 2017 and 2016 amounted to approximately $1,505 million and $2,284 million, respectively.

As of June 30, 2017, the System's total assets consisted of the following:

- $345 million of investments in bonds, stocks and non-exchange commingled trust funds
- $87 million in investments in limited partnerships
- $523 million in member loans and interest receivable
- $539 million in cash and cash equivalents, receivables and collateral from securities lending transactions.
- $11 million in capital and other assets

The System's total assets as of June 30, 2017 are presented in the following chart (in millions):



(Continued)

**EMPLOYEES' RETIREMENT SYSTEM OF THE GOVERNMENT
OF THE COMMONWEALTH OF PUERTO RICO**

(A Component Unit of the Commonwealth of Puerto Rico)

Management's Discussion and Analysis (Unaudited)

June 30, 2017

As of June 30, 2016, the System's total assets consisted of the following:

- $667 million of investments in bonds, stocks and non-exchange commingled trust funds
- $47 million in investments in limited partnerships
- $597 million in member loans and interest receivable
- $963 million in cash and cash equivalents, receivables and collateral from securities lending transactions.
- $10 million in capital and other assets

The System's total assets as of June 30, 2016 are presented in the following chart (in millions):



- The System has been in a deficit position since fiscal year 2015. The System's total liabilities exceeded total assets, representing a fiduciary net deficit position of approximately $2,109 million as of June 30, 2017, compared with fiduciary net position of approximately $1,266 million as of June 30, 2016.
- The plan's fiduciary net deficit position as a percentage of the total pension liability was negative 7.01% at June 30, 2017 and negative 3.47% at June 30, 2016.
- The medical insurance plan contribution, which constitutes the other postemployment healthcare benefits, is financed by the Commonwealth on a pay-as-you-go basis and consequently is unfunded.

5 (Continued)

EMPLOYEES' RETIREMENT SYSTEM OF THE GOVERNMENT
OF THE COMMONWEALTH OF PUERTO RICO

(A Component Unit of the Commonwealth of Puerto Rico)

Management's Discussion and Analysis (Unaudited)

June 30, 2017

The following schedules present comparative summary financial statements of the System's fiduciary net position and changes in fiduciary net position for fiscal years 2017 and 2016:

**Comparative Summary of Fiduciary Net Position – Pension Benefits**

| | 2017 | 2016 | Total dollar change | Total percentage change |
|---|---|---|---|---|
| | | (Dollars in thousands) | | |
| Assets: | | | | |
| Cash and cash equivalents, receivables-net and collateral from securities lending transactions | $ 538,520 | 962,706 | (424,186) | (44.1)% |
| Investments | 431,955 | 714,214 | (282,259) | (39.5) |
| Member loans and interest receivable – net | 523,443 | 596,997 | (73,554) | (12.3) |
| Capital assets and other | 10,718 | 10,487 | 231 | 2.2 |
| Total assets | 1,504,636 | 2,284,404 | (779,768) | (34.1) |
| Liabilities: | | | | |
| Accounts payable and accrued liabilities | 279,366 | 104,315 | 175,051 | 167.8 |
| Bond interest payable | 14,076 | 14,094 | (18) | (0.1) |
| Payable for investment securities purchased | — | 1,609 | (1,609) | (100.0) |
| Securities lending obligations | 7,359 | 19,754 | (12,395) | (62.7) |
| Due to Commonwealth of Puerto Rico | 98,044 | 91,474 | 6,570 | 7.2 |
| Escrow funds of mortgage loans and guarantee insurance reserve for loans to plan members | 11,018 | 10,467 | 551 | 5.3 |
| Accrued Investment Expense | 541 | — | 541 | 100.0 |
| Bonds payable | 3,166,472 | 3,134,902 | 31,570 | 1.0 |
| Other liabilities | 36,613 | 173,674 | (137,061) | (78.9) |
| Total liabilities | 3,613,489 | 3,550,289 | 63,200 | 1.8 |
| Net position (deficit) | $ (2,108,853) | (1,265,885) | (842,968) | 66.6% |

6

(Continued)

**EMPLOYEES' RETIREMENT SYSTEM OF THE GOVERNMENT
OF THE COMMONWEALTH OF PUERTO RICO**

(A Component Unit of the Commonwealth of Puerto Rico)

Management's Discussion and Analysis (Unaudited)

June 30, 2017

**Comparative Summary of Changes in Fiduciary Net Position – Pension Benefits**

|  | | 2017 | 2016 | Total dollar change | Total percentage change |
|---|---|---|---|---|---|
|  | | | (Dollars in thousands) | | |
| Additions: | | | | | |
| Contributions: | | | | | |
| Employer contributions: | | | | | |
| Basic benefits | $ | 726,911 | 582,803 | 144,108 | 24.7% |
| Special benefits | | 194,626 | 196,674 | (2,048) | (1.0) |
| Member contributions | | 320,095 | 333,633 | (13,538) | (4.1) |
| Net investment income | | 28,155 | 37,345 | (9,190) | (24.6) |
| Other income | | 56,626 | 52,791 | 3,835 | 7.3 |
| Total additions | | 1,326,413 | 1,203,246 | 123,167 | 10.2 |
| Deductions: | | | | | |
| Benefits paid to participants | | 1,524,695 | 1,532,640 | (7,945) | (0.5) |
| Refunds of contributions | | 35,229 | 34,937 | 292 | 0.8 |
| Interest on bonds payable | | 198,084 | 196,211 | 1,873 | 1.0 |
| General and administrative | | 24,358 | 27,670 | (3,312) | (12.0) |
| Other expenses | | 387,015 | 9,401 | 377,614 | 4,016.7 |
| Total deductions | | 2,169,381 | 1,800,859 | 368,522 | 20.5 |
| Net decrease in net position | | (842,968) | (597,613) | (245,355) | 41.1 |
| Net position (deficit): | | | | | |
| Beginning of year | | (1,265,885) | (668,272) | (597,613) | 89.4 |
| End of year | $ | (2,108,853) | (1,265,885) | (842,968) | 66.6% |

**Going Concern**

The discussion in note 3 to the financial statements provides information regarding the System's going concern uncertainty.

(Continued)

**EMPLOYEES' RETIREMENT SYSTEM OF THE GOVERNMENT
OF THE COMMONWEALTH OF PUERTO RICO**

(A Component Unit of the Commonwealth of Puerto Rico)

Management's Discussion and Analysis (Unaudited)

June 30, 2017

As of June 30, 2017, the System was a mature retirement system with a significant retiree population. The System's net pension liability and the fiduciary net deficit position as a percentage of the total pension liability (the funded ratio) as of June 30, 2017, are approximately $32,201 million and negative 7.01%, respectively. The System had been in a deficit position since fiscal year 2015. Based on the statutory funding requirements, the annual benefit payments and administrative expenses paid by the System were significantly larger than the member and employers' contributions to the System. Due to the small asset base, investment income was insufficient to cover the negative cash flow. Illiquid assets (total receivables, member loans and related interest receivable, COFINA investment and investments in limited partnership) amounted to approximately $723 million or 48% of the System's total assets as of June 30, 2017.

As described in notes 3 and 14 to the financial statements, in July 2017, the System sold investments amounting to approximately $297 million and transferred approximately $190 million of the net proceeds to the Treasury Department as required under Joint Resolution 188.

On June 30, 2016, the U.S. Congress enacted the Puerto Rico Oversight, Management, and Economic Stability Act (PROMESA), which automatically put into effect a temporary stay of all debt-related litigation against the Commonwealth and its covered instrumentalities, including the System, pursuant to section 405 of PROMESA (the Title IV Stay). On May 1, 2017, the Title IV Stay expired, permitting substantial litigation to resume against the Commonwealth and its covered instrumentalities, including the System. On May 3, 2017, the Financial Oversight and Management Board for Puerto Rico established under PROMESA (the Oversight Board), at the request of the Governor of Puerto Rico (the Governor), commenced a Title III case for the Commonwealth by filing a petition for relief under Title III of PROMESA in the United States District Court for the District of Puerto Rico (the Title III Court). On May 21, 2017, the Oversight Board, at the request of the Governor, commenced a Title III case for the System by filing a similar petition for relief under Title III of PROMESA in the Title III Court.

On August 23, 2017, the Commonwealth enacted the Act to Guarantee the Payment to Our Pensioners and Establish a New Plan for Defined Contributions for Public Servants (Act 106-2017), which completely changed the System by, among other things, (i) replacing the governing boards of the System, the Retirement System for the Judiciary of the Commonwealth of Puerto Rico (JRS), and the Puerto Rico System of Annuities and Pensions for Teachers (TRS, and collectively with the System and JRS, the Retirement Systems) with a single Retirement Board of the Commonwealth of Puerto Rico (the Retirement Board) and (ii) implementing a "pay-as-you-go" (PayGo) method for the payment of pension benefits by the Commonwealth rather than the System. Act 106-2017 created the legal framework for the Commonwealth to guarantee payments to pensioners through the PayGo system.

**Comparative Summary of Fiduciary Net Position Analysis – Pension Benefits**

The basic financial statements of the System for the fiscal year ended June 30, 2017, present a decrease in net position of approximately $843 million, resulting in a net deficit position of approximately $2,109 million as of June 30, 2017, compared with a deficit net position of approximately $1,266 million as of June 30, 2016. The decrease in the net position (increase in deficit) in fiscal year 2017 resulted from the excess of deductions, mainly other expenses and benefits paid to participants, over additions, mainly contributions from participating employers and employees. The decrease in net position is mainly caused by a decrease in employer contributions receivable of approximately $204 million in fiscal year 2017.

(Continued)

**EMPLOYEES' RETIREMENT SYSTEM OF THE GOVERNMENT
OF THE COMMONWEALTH OF PUERTO RICO**

(A Component Unit of the Commonwealth of Puerto Rico)

Management's Discussion and Analysis (Unaudited)

June 30, 2017

Total contributions from participating employers and members increased by approximately $129 million, from $1,113 million during fiscal year 2016 to approximately $1,242 million during fiscal year 2017. Total net investment and securities lending transaction income decreased by approximately $9 million, from approximately $37 million during fiscal year 2016 to approximately $28 million during fiscal year 2017. The System recognized a net depreciation in the fair value of investments of approximately $8 million during fiscal year 2017, compared with a net appreciation in the fair value of investments of approximately $900 thousand recognized in fiscal year 2016. Also, the System recognized an impairment loss on deposits with a governmental bank of approximately $21 million in fiscal year 2016 and $9 million in fiscal year 2017 (refer to note 6 to the financial statements).

Total deductions increased by approximately $369 million in fiscal year 2017, mainly as a result of the increase of approximately $378 million in other expenses and the decrease of approximately $8 million in benefits paid to participants. Benefits paid to participants amounted to approximately $1,525 million for fiscal year 2017 and approximately $1,533 million for fiscal year 2016. General and administrative expenses amounted to approximately $24 million for fiscal year 2017 and approximately $28 million for fiscal year 2016.

During fiscal year 2007, the Board of Trustees approved the issuance of bonds payable to increase the funds available to pay pension benefits to certain beneficiaries and to reduce the unfunded accrued actuarial liability. As of June 30, 2017, bonds payable amounted to approximately $3,166 million.

**Other Post-employment Healthcare Benefits**

Other post-employment healthcare benefits paid during fiscal year 2017 amounted to approximately $91.2 million, a decrease of approximately $2.8 million or 3% as compared to the $93.7 million paid during fiscal year 2016. Effective July 1, 2013, no benefits are provided to new retirees, as required by Act No. 3 of 2013.

**Financial Analysis of the System**

As of June 30, 2017 and 2016, the System held approximately $523 million and $597 million, respectively, in loans and interest receivable from plan members, which represents 55% and 46%, respectively, of the total investment portfolio, including loans. As of June 30, 2017, member loans and interest receivable consisted of $161 million in mortgage loans, $299 million in personal loans, $37 million in cultural trip loans, and $29 million in interest receivable, less $3 million in allowance for adjustments and losses in realization. As of June 30, 2016, member loans and interest receivable consisted of $170 million in mortgage loans, $351 million in personal loans, $45 million in cultural trip loans, and $34 million in interest receivable, less $3 million in allowance for adjustments and losses in realization. As of June 30, 2017, and 2016, the fair value of the System's investment in limited partnerships amounted to approximately $87 million and $47 million, respectively, which represented approximately 9% and 4% of the investment portfolio, as of June 30, 2017 and 2016, respectively.

The System earns additional investment income by lending investment securities to brokers via its custodian's securities lending program. The brokers provide collateral to the System and generally use the borrowed securities to cover short sales and failed trades. The cash collateral received from the brokers is invested in a short-term investment fund in order to earn interest. For the years ended June 30, 2017 and 2016, net income from the securities lending activity amounted to approximately $30,000 and $113,000, respectively.

(Continued)

**EMPLOYEES' RETIREMENT SYSTEM OF THE GOVERNMENT
OF THE COMMONWEALTH OF PUERTO RICO**

(A Component Unit of the Commonwealth of Puerto Rico)

Management's Discussion and Analysis (Unaudited)

June 30, 2017

**Investment Portfolio and Capital Markets Overview**

The System's total investment assets, including member loans, collateral from securities lending transactions and cash equivalents (investment portfolio, including loans), as of June 30, 2017 totaled approximately $979 million. Member loans amounted to $523 million as of June 30, 2017.

As of June 30, 2017, the System's investment portfolio allocation, including member loans, was 70% in fixed-income investments, including loans receivable, 27% in equity securities, 2% in cash and short-term investments, and 1% in other investments as shown in the following chart:



(Continued)

**EMPLOYEES' RETIREMENT SYSTEM OF THE GOVERNMENT
OF THE COMMONWEALTH OF PUERTO RICO**
(A Component Unit of the Commonwealth of Puerto Rico)

Management's Discussion and Analysis (Unaudited)

June 30, 2017

*Economy and Capital Markets Overview*

*United States Equity Overview for the fiscal year 2017*: As of June 30, 2017, the S&P 500 was near a record high, up almost 15% since the U.S. presidential election in November 2016. It was the 26th new high in calendar year 2017. The market growth during this period was led by technology and financial stocks. Most of the economic statistics in the U.S. remained strong and were improving globally. The 2017 fiscal year concluded with a quarter-point rate hike by the Federal Reserve as they remained committed to their plan to normalize monetary policy.

*International Equity Overview for the Fiscal year 2017:* International equity markets were the best performers for fiscal year 2017. The ACWI ex US index was up 20.5% in U.S. dollar terms and emerging markets were up almost 24% for the trailing 12 months. All global regions participated in this growth, led by over 26% growth among developed, small-capitalized companies and with very few countries up less than 10%. Unlike the United States, the developed market growth index lagged the developed market value index for the prior year.

*United States Fixed Income Overview for the Fiscal Year 2017*: U.S. Treasuries, TIPS and municipal positions were all slightly negative for fiscal year 2017. High yield was the strong positive outlier up over 12%. Investment grade managers performed well if they participated more heavily in the credit sectors as spreads tightened across all credit qualities. Many non-dollar debt positions benefited with dollar weakness creating outsized performance in a more globally diverse fixed income portfolio.

**Total Fund Performance**

The total fund (excluding GDB cash) earned 6.5% net of investment manager fees for fiscal year 2017. The results were disappointing as the market had performed strongly since the U.S. presidential election in November 2016, but the System was not able to fully participate. Less than one-third of the remaining assets were liquid. The majority of the assets, approximately $523 million, were in the current employee and retiree loan program. The asset allocation plan adopted in fiscal year 2016 was never fully implemented. With the change in the System administration, a decision was made to use the remaining liquid assets to fund benefit payments.

Over the fiscal year, the investment fund had net cash out flows of approximately $416 million. These outflows were largely used for benefit payments and represent 33% of the beginning year balance.

Though the System was not able to fully take advantage of the strong equity market returns during this fiscal year with the need to raise substantial cash, the fund did earn 6.5% resulting in approximately $69 million in additional gains to the portfolio. As the liquid assets are removed, the focus will be two-fold. One, how to best manage the illiquid investments to maximize the benefit to the plan and two, how the entity must continue to service its members.

*Other Investments and Member Loans Transactions*

As of June 30, 2017, the System held approximately $523 million in member loans which represented 55% of the total investment portfolio, including loans. Member loan balances as of June 30, 2017 were $74 million lower than a year ago.

11 (Continued)

**EMPLOYEES' RETIREMENT SYSTEM OF THE GOVERNMENT
OF THE COMMONWEALTH OF PUERTO RICO**

(A Component Unit of the Commonwealth of Puerto Rico)

Management's Discussion and Analysis (Unaudited)

June 30, 2017

At the end of the 2017 fiscal year, the System had some exposure to limited partnerships of private equity investments valued at approximately $87 million, which represented 9% of the System's total investment portfolio, including member loans.

**Funding Status**

The System was created by Act No. 447 of May 15, 1951 (Act 447) and, since its inception, lacked proper planning and funding. The levels of contributions were relatively low in comparison to the level of benefits. As more people joined the government labor force and then retired under the different benefit structures, the gap between the assets available to pay benefits and the actuarial obligation started its steeping course.

During fiscal year 2007, the Board of Trustees approved the issuance of bonds in an effort to increase the funds available to pay pension benefits and to reduce the unfunded accrued actuarial pension liability. In connection with the Bonds, the System pledge employers contributions, as defined in the ERS Bond Resolution, made after the date of issuance of the first series of Bonds to the payment of the Bonds, invested the proceeds of the Bonds, and used these investments and the earnings thereon to provide pension benefits to beneficiaries. Specifically, on January 31, 2008, the System issued the first series of the Bonds, which consisted of approximately $1,589 million aggregate principal amount of Senior Pension Funding Bonds, Series A. On June 2, 2008, the System issued the second of such series of Bonds, which consisted of approximately $1,059 million aggregate principal amount of Senior Pension Funding Bonds, Series B. Finally, on June 30, 2008, the System issued the third and final of such series of Bonds, which consisted of approximately $300 million aggregate principal amount of Senior Pension Funding Bonds, Series C.

Despite these efforts, the System's actuarial obligation continued its increasing trend as a result of the growth in the size and longevity of the pensioner population and the fact that incoming pensioners were entitled to even higher annuities based on their higher salaries.

Prior to fiscal year 2017, the Commonwealth enacted a series of laws to deal with the funding issues that the System experienced. For example, in 2011, the Commonwealth enacted Law 116 to increase the employers' contribution rate from 9.275% to 10.275% of employee compensation for the 2011-2012 fiscal year, 1% annually for each of the next four years, and 1.25% annually for each of the five years thereafter, capped at an aggregate contribution rate of 20.525% effective July 1, 2020. Other measures taken to improve the System's funding, included: (1) improving the collection of late contributions by receiving such contributions directly from the Municipal Revenue Collection Center (known as CRIM by its Spanish acronym) when a municipality fails to send their contributions within 30 days from the due date or from the Department of Treasury of the Commonwealth in the case of public corporations; (2) implementation of Act No. 70 establishing early retirement incentives; (3) revision of the Employee Personal Loan Policy by reducing personal and cultural loan amounts to $5,000 each, from $15,000 and $10,000, respectively; and (4) the receipt of approximately $162.5 million in bonds issued by the Puerto Rico Sales Tax Financing Corporation (known as COFINA by its Spanish acronym).

In 2013, the Commonwealth enacted Law 3 that reformed the System by, among other measures, reducing benefits, increasing employee contributions, and, in the case of active employees who were entitled to the defined benefits program, replacing most of the defined benefit elements of the system with a defined contribution system. Based on the statutory funding requirements prior to this reform, the annual benefit

12                                                                                           (Continued)

**EMPLOYEES' RETIREMENT SYSTEM OF THE GOVERNMENT
OF THE COMMONWEALTH OF PUERTO RICO**

(A Component Unit of the Commonwealth of Puerto Rico)

Management's Discussion and Analysis (Unaudited)

June 30, 2017

payments and administrative expenses of the System were significantly larger than the member and employer contributions made to the System.

Act No. 3 2013 amended Act No. 447, Act No. 1 of 1990 (Act No. 1) and Act No. 305 to establish, among other things, a defined contribution program similar to the System 2000 Program (the Contributory Hybrid Program) to be administered by the System. All regular employees hired for the first time on or after July 1, 2013, became part of the Contributory Hybrid Program. Also, Act No. 3 froze all retirement benefits accrued through June 30, 2013 under the Defined Benefit Program, and thereafter, all future benefits accrued under the defined contribution formula used for the 2000 System Program participants. Ceasing future defined benefit accruals under Act No. 447 and Act No. 1 and converting to a member-funded hybrid plan resulted in lower benefit payments.

On June 27, 2017, the Treasury Department issued Circular Letter No. 1300-46-17 in order to convey to the Commonwealth central government agencies, public corporations and municipalities the procedures to adopt, effective, July 1, 2017, the new "pay-as-you-go" (PayGo) system. With the start of the fiscal year 2018, employers' contributions, contributions ordered by special laws, and the Additional Uniform Contribution were eliminated. A monthly PayGo charge was implemented to cover the actual cost of pension payments and that is remitted by the aforementioned government entities to pay benefits to their respective retirees. The System helps determine and administer the payment amount per each current retiree that is charged to each Commonwealth central government agency, public corporation and municipality.

On August 23, 2017, the Governor signed into law Act 106-2017, which created the legal framework for the Commonwealth to guarantee payments to pensioners through the PayGo system. Among other things, Act 106-2017 also created a Defined Contribution Plan for current employees under which future benefits will not accumulate.

At June 30, 2017, the System's pension plan consisted of three different benefit structures, which were administrated according to the specifications in each applicable pension benefit law. For all plan members, employee contributions range from 8.275% to 10% of their salary, as specified by the employee. Under all structures, employers' contributions during the fiscal year ended June 30, 2017 were 15.275% of the employee salary. Based on the last actuarial valuation at June 30, 2017, the employers' net pension liability amounted to approximately $32,201 million, with a plan fiduciary net deficit position as a percentage of the total pension liability of negative 7.01%. The liability for postemployment healthcare benefits amounted to approximately $1,138 million as of June 30, 2017 and was fully unfunded.

**Capital Assets**

The total aggregate amount of the System's investment in capital assets (net of accumulated depreciation) was approximately $9.9 million and $9.7 million as of June 30, 2017 and June 30, 2016, respectively. Capital assets include land, building and improvements, construction in progress, and equipment. Building and improvements consist of the facilities in which the System conducts its operations.

(Continued)

**EMPLOYEES' RETIREMENT SYSTEM OF THE GOVERNMENT
OF THE COMMONWEALTH OF PUERTO RICO**

(A Component Unit of the Commonwealth of Puerto Rico)

Management's Discussion and Analysis (Unaudited)

June 30, 2017

**Debt Administration**

Long-term debt obligations include the System's senior funding bonds and amounted to approximately $3,166 million and $3,135 million as of June 30, 2017 and 2016, respectively. The System has issued three series of revenue bonds designated as "Senior Pension Funding Bonds", the proceeds of which were used mainly to increase the funds available to pay pension benefits to certain of its beneficiaries and reduce its unfunded actuarial accrued liability. The Bonds are limited, nonrecourse obligations of the System, payable solely from and secured solely by a pledge of employer contributions, as defined in the ERS Bond Resolution, made after the date of issuance of the first series of Bonds, and from funds held on deposit with the Bank of New York Mellon (the Fiscal Agent). The Bonds are not payable from contributions made to the System by participating employees, or from the assets acquired with the proceeds of the Bonds, or from employer contributions released by the Fiscal Agent to the System after funding of required reserves, or from any other assets of the System. These bonds are currently rated "C" by Moody's Investors Service and "CC" by Standard & Poor's Ratings Services. Refer to note 10 to the basic financial statements for further information regarding the System's long-term obligations. For the suspension of the monthly payments to the trustee of the System's bonds, refer to note 14 of the basic financial statements.

**Requests for Information**

This financial report is designed to provide a general overview of the System's finances, comply with related laws and regulations, and demonstrate commitment to public accountability. Questions concerning any of the information provided in this report or requests for additional information should be addressed to the Commonwealth of Puerto Rico Government Employees and Judiciary Retirement Systems Administration, Avenida Jose de Diego, Parada 22 Centro Gubernamental Minillas, Edificio Torre Norte, Piso 11, San Juan, Puerto Rico, 00940.

EMPLOYEES' RETIREMENT SYSTEM OF THE GOVERNMENT
OF THE COMMONWEALTH OF PUERTO RICO

(A Component Unit of the Commonwealth of Puerto Rico)

Statement of Fiduciary Net Position

June 30, 2017

(In thousands)

|  | Pension | Post employment healthcare benefits | Total |
|---|---|---|---|
| **Assets:** | | | |
| Cash and cash equivalents: | | | |
| Deposits at commercial banks: | | | |
| Unrestricted | $ 257,879 | — | 257,879 |
| Restricted | 202,295 | — | 202,295 |
| Money market funds: | | | |
| Unrestricted | 2,340 | — | 2,340 |
| Restricted | 13,279 | — | 13,279 |
| U.S. Treasury bill – restricted | 909 | — | 909 |
| Total cash and cash equivalents | 476,702 | — | 476,702 |
| Receivables, net: | | | |
| Employers – net of allowance for uncollectible accounts of $1,029,739 | 36,172 | — | 36,172 |
| Due from Retirement System for the Judiciary of the Commonwealth of Puerto Rico | 627 | — | 627 |
| Investments sold | 401 | — | 401 |
| Other | 17,259 | — | 17,259 |
| Total receivables, net | 54,459 | — | 54,459 |
| Collateral from securities lending transactions | 7,359 | — | 7,359 |
| Investments: | | | |
| Bonds and notes | 163,187 | — | 163,187 |
| Nonexchange commingled trust funds | 181,699 | — | 181,699 |
| Investments in limited partnerships | 87,069 | — | 87,069 |
| Total investments | 431,955 | — | 431,955 |
| Member loans and interest receivable – net | 523,443 | — | 523,443 |
| Capital assets – net | 9,902 | — | 9,902 |
| Other assets | 816 | — | 816 |
| Total assets | 1,504,636 | — | 1,504,636 |

(Continued)

**EMPLOYEES' RETIREMENT SYSTEM OF THE GOVERNMENT
OF THE COMMONWEALTH OF PUERTO RICO**

(A Component Unit of the Commonwealth of Puerto Rico)

Statement of Fiduciary Net Position

June 30, 2017

(In thousands)

| | Pension | Post employment healthcare benefits | Total |
|---|---|---|---|
| Liabilities: | | | |
| Accounts payable and accrued liabilities | $ 279,366 | — | 279,366 |
| Bond interest payable | 14,076 | — | 14,076 |
| Securities lending obligations | 7,359 | — | 7,359 |
| Due to Commonwealth of Puerto Rico | 98,044 | — | 98,044 |
| Escrow funds of mortgage loans and guarantee insurance reserve for member loans | 11,018 | — | 11,018 |
| Accrued Investment Expense | 541 | — | 541 |
| Bonds payable | 3,166,472 | — | 3,166,472 |
| Other liabilities | 36,613 | — | 36,613 |
| Total liabilities | 3,613,489 | — | 3,613,489 |
| Contingencies (note 13) | — | — | — |
| Unrestricted net deficit position | $ (2,108,853) | — | (2,108,853) |

See accompanying notes to basic financial statements.

16

**EMPLOYEES' RETIREMENT SYSTEM OF THE GOVERNMENT
OF THE COMMONWEALTH OF PUERTO RICO**

(A Component Unit of the Commonwealth of Puerto Rico)

Statement of Changes in Fiduciary Net Position

Year ended June 30, 2017

(In thousands)

| | Pension | Post employment healthcare benefits | Total |
|---|---|---|---|
| Additions: | | | |
| Contributions: | | | |
| Employer contributions: | | | |
| Basic benefits, net of provision for uncollectible contributions of $405,661 | $ 726,911 | — | 726,911 |
| Special benefits | 194,626 | 91,280 | 285,906 |
| Member contributions | 320,095 | — | 320,095 |
| Total contributions | 1,241,632 | 91,280 | 1,332,912 |
| Investment income: | | | |
| Net depreciation in fair value of investments | (7,856) | — | (7,856) |
| Impairment loss on deposits with governmental bank (note 6) | (9,218) | — | (9,218) |
| Interest | 46,800 | — | 46,800 |
| Dividends | 253 | — | 253 |
| Less investment expense, other than from securities lending | (1,854) | — | (1,854) |
| Net income from investing, other than from securities lending | 28,125 | — | 28,125 |
| Securities lending income | 30 | — | 30 |
| Net investment income | 28,155 | — | 28,155 |
| Other income | 56,626 | — | 56,626 |
| Total additions | 1,326,413 | 91,280 | 1,417,693 |
| Deductions: | | | |
| Benefits paid to participants: | | | |
| Annuities | 1,320,005 | — | 1,320,005 |
| Special benefits | 194,626 | 91,280 | 285,906 |
| Death benefits | 10,064 | — | 10,064 |
| Refunds of contributions | 35,229 | — | 35,229 |
| Interest on bonds payable | 198,084 | — | 198,084 |
| General and administrative | 24,358 | — | 24,358 |
| Other expenses | 387,015 | — | 387,015 |
| Total deductions | 2,169,381 | 91,280 | 2,260,661 |
| Net decrease in net position | (842,968) | — | (842,968) |
| Net position (deficit): | | | |
| Beginning of year | (1,265,885) | — | (1,265,885) |
| End of year | $ (2,108,853) | — | (2,108,853) |

See accompanying notes to basic financial statements.

**EMPLOYEES' RETIREMENT SYSTEM OF THE GOVERNMENT
OF THE COMMONWEALTH OF PUERTO RICO**

(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2017

**(1)  Organization**

The Employees' Retirement System of the Government of the Commonwealth of Puerto Rico (the System) is a trust created by the Legislature of the Commonwealth of Puerto Rico (the Legislature) pursuant to Act No. 447 on May 15, 1951 (Act No. 447), as amended, to provide pension and other benefits to retired employees of the Commonwealth, its public corporations and municipalities. Prior to August 23, 2017, the System administered a cost-sharing, multi-employer, pension plan (the pension plan). The System also administers post-employment healthcare benefits provided by the Commonwealth of Puerto Rico (the Commonwealth) to retired plan members (the Employees' Retirement System of the Government of Puerto Rico and its Instrumentalities Medical Insurance Plan Contribution – ERS MIPC), an unfunded, cost-sharing, multi-employer defined benefit other postemployment benefit plan.

The System is considered an integral part of the Commonwealth's financial reporting entity and is included in the Commonwealth's basic financial statements as a pension trust fund. The System, as a governmental retirement plan, and as such is excluded from the provisions of the Employee Retirement Income Security Act of 1974 (ERISA). Income earned by the System is not subject to Federal and Puerto Rico taxes.

Under Act No. 447, until August 23, 2017, the System was governed by an 11-member board of trustees (the Board of Trustees), composed of (i) four ex-officio members (or their designees): the Secretary of Treasury of the Commonwealth, the President of the Government Development Bank for Puerto Rico (GDB), the Commissioner of Municipal Affairs, and the Director of the Office of Human Resources of the Commonwealth; (ii) three members appointed to three-year terms by the Governor of the Commonwealth (the Governor), two of whom had to be members of the System and one member of the Retirement System for the Judiciary of the Commonwealth of Puerto Rico (JRS), each with at least ten years of credited service; (iii) two members who had to be pensioners of the System and JRS, respectively; (iv) the President of the Federation of Mayors; and (v) the President of the Association of Mayors. As of June 30, 2017, the System was governed by the Board of Trustees.

On August 23, 2017, Act 106-2017 dissolved the Board of Trustees and established a new Retirement Board of the Government of Puerto Rico (the Retirement Board), to govern all of the Commonwealth's Retirement Systems, including the System. The Retirement Board is comprised of 13 members, composed of (i) six ex-officio members (or their designees): the Executive Director of the Puerto Rico Fiscal Agency and Financial Advisory Authority (FAFAA), the Secretary of Treasury of the Commonwealth, the Director of the Office of Management and Budget, the Director of the Office for the Administration and Transformation of Human Resources of the Government of Puerto Rico, the President of the Federation of Mayors, and the President of the Association of Mayors; (ii) three Governor-appointed representatives of the teachers of the Department of Education, the public corporations, and the Judiciary Branch; and (iii) four additional Governor-appointed members as representatives of the public interest. As of the date of these financial statements, there are two vacancies in the Retirement Board. For additional information regarding Act 106-2017, refer to note 14 of the basic financial statements

(Continued)

**EMPLOYEES' RETIREMENT SYSTEM OF THE GOVERNMENT
OF THE COMMONWEALTH OF PUERTO RICO**

(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2017

Prior to August 23, 2017, the System and the Retirement System for the Judiciary of the Commonwealth of Puerto Rico (JRS), also a component unit of the Commonwealth, were both administered by the Puerto Rico Government Employees and Judiciary Retirement Systems Administration (the ERS and JRS Administration). The ERS and JRS Administration allocated 97.93% of its general and administrative expenses to the System during the fiscal year ended June 30, 2017. The methodology used to determine the allocation is based on total employers' and participating employees' contributions to the System, divided by the aggregate total of employers' and participating employees' contributions to the System and JRS, combined.

**(2) Summary of Significant Accounting Policies**

The following are the significant accounting policies followed by the System in the preparation of its financial statements:

**(a) Basis of Presentation**

The accompanying financial statements have been prepared on the accrual basis of accounting in accordance with U.S. generally accepted accounting principles (GAAP) as applicable to governmental organizations per the Governmental Accounting Standards Board (GASB) pronouncements. Plan member contributions are recognized in the period in which the contributions are due. Employer contributions are recognized when due and the employer has legal requirement to provide the contributions. Benefits and refunds are recognized when legally due and payable.

**(b) Use of Estimates**

The preparation of the basic financial statements requires management to make significant estimates and assumptions relating to the reporting of assets and liabilities and in the disclosures of contingencies to prepare these financial statements in conformity with GAAP. The System's most significant estimates relate to the total pension liability, the allowance for uncollectible amounts of member loans and accounts receivable and the valuation of certain investments. Due to the inherent nature of these estimates, actual results could differ from those estimates.

**(c) Cash and Cash Equivalents**

Cash equivalents include all highly liquid debt instruments with original maturities of three months or less from the date of acquisition and consist of money market funds, U.S. Treasury bills, and certificates of deposit in GDB (a component unit of the Commonwealth) and in commercial banks. Restricted cash deposited with GDB consists of payments received from mortgage loan holders in the servicing of loans (escrow accounts), expired checks not claimed by the plan members restricted for repayments, and temporary amounts to be transferred to the Bank of New York Mellon (trustee) restricted for bond debt service requirements. Restricted money market funds consist of funds held by the trustee to maintain the debt service funds and the sinking funds for the repayment of the System's bonds payable.

(Continued)

**EMPLOYEES' RETIREMENT SYSTEM OF THE GOVERNMENT
OF THE COMMONWEALTH OF PUERTO RICO**

(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2017

*(d) Investments*

Investments are reported at fair value. The fair value of investments is based on quoted prices, if available. The System has investments in limited partnerships and non-exchange commingled trust funds valued at approximately $87 million and $182 million, respectively, as of June 30, 2017. Fair values of investments in limited partnerships have been estimated in the absence of readily determinable fair values, based on information provided by the underlying fund managers. Non-exchange commingled trust funds are reported at their net asset value (NAV). The NAV includes the market value of the securities in the fund plus any receivables, payables, and accrued fund expenses.

Securities purchases and sales are recorded on a trade-date basis. Realized gains and losses from the sale of securities and unrealized changes in the fair value of outstanding securities are included in net appreciation (depreciation) in fair value of investments. Realized gains and losses are computed as the difference between the proceeds of the sale and the cost of the investment sold, determined by the average cost method. Interest income is recorded as earned on an accrual basis. Dividend income is recorded on the ex-dividend date.

*(e) Member Loans*

Mortgage, personal, and cultural trip loans to plan members are stated at their outstanding principal balance less an allowance for uncollectible amounts. The maximum amount that was loaned to plan members for mortgage loans is $100,000 and $5,000 for personal, and cultural trip loans.

At June 30, 2017, the System serviced mortgage loans with an aggregate principal balance of approximately $161 million at June 30, 2017, related to certain mortgage loans sold to the Federal National Mortgage Association for a fee of 0.25%. The sale contract stipulates that the System must repurchase any loans with payments in arrears over 90 days.

*(f) Guarantee Insurance Reserve for Member Loans*

Premiums collected and benefits claimed are recorded as additions and deductions, respectively. The guarantee insurance reserve for life insurance on loans to plan members is revised each year and adjusted accordingly based on the annual higher claim amount of a five-year period increased by a management determined percentage.

*(g) Capital Assets*

Capital assets include building, building improvements, and furniture and equipment. The System defines capital assets as assets with an initial individual cost of $500 or more at the date of acquisition and a useful life equal to or in excess of four years. Capital assets are recorded at historical cost, or their estimated historical cost, if actual historical costs are not available. Donated capital assets are recorded at their estimated fair value at time of donation.

(Continued)

**EMPLOYEES' RETIREMENT SYSTEM OF THE GOVERNMENT
OF THE COMMONWEALTH OF PUERTO RICO**

(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2017

Capital assets are depreciated on the straight-line method over the assets estimated useful life. There is no depreciation recorded for construction in progress. The estimated useful lives of capital assets are as follows:

|  | Years |
|---|---|
| Building | 50 |
| Buildings improvements | 10 |
| Equipment, furniture, fixtures, and vehicles | 5–10 |

**(h) Termination Benefits**

The System accounts for termination benefits in accordance with GASB Statement No. 47, *Accounting for Termination Benefits*. Pursuant to the provisions of GASB Statement No. 47, the System, as an employer, should recognize a liability and expense for voluntary termination benefits (for example, early retirement incentives) when the offer is accepted and the amount can be estimated. A liability and expense for involuntary termination benefits (for example, severance benefits) should be recognized when a plan of termination has been approved by those with the authority to commit the government to the plan, the plan has been communicated to the employees, and the amount can be estimated.

**(i) Recently Issued Accounting Pronouncements**

The following new accounting standards have been issued but are not yet effective during the fiscal year ending June 30, 2017:

• GASB Statement No. 75, *Accounting and Financial Reporting for Postemployment Benefits Other Than Pensions (and Certain Issues Related to OPEB Plan Reporting).* This Statement replaces the requirements of Statements No. 45, *Accounting and Financial Reporting by Employers for Postemployment Benefits Other Than Pensions*, as amended, and No. 57, *OPEB Measurements by Agent Employers and Agent Multiple-Employer Plans,* for OPEB. This statement establishes new accounting and financial reporting requirements for OPEB plans. The provisions of this statement are effective for fiscal years beginning after June 15, 2017. The System is evaluating the impact of this new statement.

• GASB Statement No. 82, *Pension Issues – an Amendment of GASB Statements No 67, No. 68 and No. 73.* This Statement addresses certain issues that have been raised with respect to GASB Statements No. 67, No. 68, and No. 73. The Statement is designed to improve consistency in the application of the pension standards by clarifying or amending related areas of existing guidance. Specifically, this Statement addresses issues regarding (1) the presentation of payroll-related measures in required supplementary information, (2) the selection of assumptions and the treatment of deviations from the guidance in an Actuarial Standard of Practice for financial reporting purposes, and (3) the classification of payments made by employers to satisfy employee (plan member) contribution requirements. Prior to the issuance of this Statement, GASB Statements No. 67 and No. 68 required presentation of covered-employee payroll, which is

(Continued)

**EMPLOYEES' RETIREMENT SYSTEM OF THE GOVERNMENT
OF THE COMMONWEALTH OF PUERTO RICO**

(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2017

the payroll of employees that are provided with pensions through the pension plan, and ratios that use that measure, in schedules of required supplementary information. This Statement amends GASB Statements No. 67 and No. 68 to instead require the presentation of covered payroll, defined as the payroll on which contributions to a pension plan are based, and ratios that use that measure. This Statement clarifies that a deviation, as the term is used in Actuarial Standards of Practice issued by the Actuarial Standards Board, from the guidance in an Actuarial Standard of Practice is not considered to be in conformity with the requirements of GASB Statement No. 67, GASB Statement No. 68, or GASB Statement No. 73 for the selection of assumptions used in determining the total pension liability and related measures. This Statement clarifies that payments that are made by an employer to satisfy contribution requirements that are identified by the pension plan terms as plan member contribution requirements should be classified as plan member contributions for purposes of GASB Statement No. 67 and as employee contributions for purposes of GASB Statement No. 68. It also requires that an employer's expense and expenditures for those amounts be recognized in the period for which the contribution is assessed and classified in the same manner as the employer classifies similar compensation other than pensions (for example, as salaries and wages or as fringe benefits). The requirements of this Statement are effective for reporting periods beginning after June 15, 2016, except for the requirements of this Statement for the selection of assumptions in a circumstance in which an employer's pension liability is measured as of a date other than the employer's most recent fiscal year-end. In that circumstance, the requirements for the selection of assumptions are effective for that employer in the first reporting period in which the measurement date of the pension liability is on or after June 15, 2017. The System already adopted the requirements of this statement except for the amendments related to the selection of assumptions mentioned above for which the System is evaluating the impact of this new requirement.

- GASB Statement No. 85, *Omnibus 2017*. The objective of this Statement is to address practice issues that have been identified during implementation and application of certain GASB Statements. This Statement addresses a variety of topics including issues related to blending component units, goodwill, fair value measurement and application, and postemployment benefits (pensions and other postemployment benefits (OPEB). The provisions of this Statement are effective for financial statements for periods beginning after June 15, 2017. The System is evaluating the impact of this new statement.

- GASB Statement No. 87, *Leases*. The objective of this Statement is to better meet the information needs of financial statement users by improving accounting and financial reporting for leases by governments. This Statement increases the usefulness of governments' financial statements by requiring recognition of certain lease assets and liabilities for leases that previously were classified as operating leases and recognized as inflows of resources or outflows of resources based on the payment provisions of the contract. It establishes a single model for lease accounting based on the foundational principle that leases are financings of the right to use an underlying asset. Under this Statement, a lessee is required to recognize a lease liability and an intangible right-to-use lease asset, and a lessor is required to recognize a lease receivable and a deferred inflow of resources, thereby enhancing the relevance and consistency of information about governments' leasing activities. The provisions of this Statement are effective for financial statements for periods beginning after December 15, 2019. The System is evaluating the impact of this new statement.

(Continued)

**EMPLOYEES' RETIREMENT SYSTEM OF THE GOVERNMENT
OF THE COMMONWEALTH OF PUERTO RICO**

(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2017

- GASB Statement No. 88, *Certain disclosures related to debt*, *including direct borrowings and direct placements*. The primary objective of this Statement is to improve the information that is disclosed in notes to government financial statements related to debt, including direct borrowings and direct placements. It also clarifies which liabilities governments should include when disclosing information related to debt. This Statement defines debt for purposes of disclosure in notes to financial statements as a liability that arises from a contractual obligation to pay cash (or other assets that may be used in lieu of cash) in one or more payments to settle an amount that is fixed at the date the contractual obligation is established. This Statement requires that additional essential information related to debt be disclosed in notes to financial statements, including unused lines of credit; assets pledged as collateral for the debt; and terms specified in debt agreements related to significant events of default with finance-related consequences, significant termination events with finance-related consequences, and significant subjective acceleration clauses. For notes to financial statements related to debt, this Statement also requires that existing and additional information be provided for direct borrowings and direct placements of debt separately from other debt. The provisions of this Statement are effective for financial statements for periods beginning after June 15, 2018. The System is evaluating the impact of this new statement.

## (3) Going Concern Uncertainty

As of June 30, 2017, the System was severely underfunded with a net pension liability of approximately $32,201 million and a fiduciary net deficit position of approximately $2,109 million. As a result of fiscal and economic challenges, on May 3, 2017, the Financial Oversight and Management Board for Puerto Rico (the Oversight Board) – at the request of the Governor – commenced a Title III case for the Commonwealth by filing a petition for relief under Title III of the Puerto Rico Oversight Management and Economic Stability Act (PROMESA) in the United States District Court for the District of Puerto Rico (the Title III Court). By commencing a Title III case, the Commonwealth was able to ensure the delivery of essential services to the public and the payment of government payroll and essential suppliers.

On May 21, 2017, the Oversight Board – at the request of the Governor – similarly commenced a Title III case for the System by filing a petition for relief in the Title III Court. On June 15, 2017, the United States Trustee appointed an Official Committee of Retired Employees in the Commonwealth's Title III case.

As further described in note 14 to the basic financial statements, in July 2017, the System sold investments in the total aggregate amount of approximately $297 million and transferred approximately $190 million of the net proceeds to the Treasury Department as required under Joint Resolution 188.

*Management's Conclusion on Going Concern Consideration*

Based on the fiscal and financial difficulties of both the Commonwealth and the System discussed above, management believes there is substantial doubt about the ability of the System to continue as a going concern.

(Continued)

**EMPLOYEES' RETIREMENT SYSTEM OF THE GOVERNMENT
OF THE COMMONWEALTH OF PUERTO RICO**

(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2017

*Management's Remediation Plan*

On June 27, 2017, the Treasury Department issued Circular Letter No. 1300-46-17 in order to convey to the Commonwealth central government agencies, public corporations and municipalities the new implementation procedures to adopt, effective, July 1, 2017, a new PayGo system for the payment of pensions. Subsequently, on August 23, 2017, the Governor signed into law Act 106-2017, which established by law the PayGo system for the payment of accumulated pension benefits by the Commonwealth and reformed the System so that its active participants would deposit their individual contributions in a new Defined Contribution Plan, among other significant changes. For additional information on the PayGo system and Act 106-2017, refer to note 14 to the basic financial statements.

Act 106-2017 also suspended the System's loan program and seeks to reduce general and administrative expenses mostly through employee attrition due to normal retirement and reduction in professional services contracts.

**(4) Plan Description**

*Pension Benefits*

Before August 23, 2017, the System administered different benefit structures pursuant to Act No. 447, as amended, including a cost-sharing, multi-employer, defined benefit program, a defined contribution program (System 2000 program) and a contributory hybrid program. Benefit provisions vary depending on member's date of hire. Substantially all full-time employees of the Commonwealth and its instrumentalities (73 Commonwealth agencies, 78 municipalities, and 55 public corporations, including the System) are covered by the System. Membership is mandatory for all regular, appointed, and temporary employees of the Commonwealth at the date of employment. Membership is optional for the Governor of the Commonwealth, Commonwealth secretaries, head of public agencies and instrumentalities, among others.

At July 1, 2016, membership of the System consisted of the following:

| | |
|---|---:|
| Retirees and beneficiaries currently receiving benefits | 108,035 |
| Current participating employees – defined benefit | 53,832 |
| Current participating employees – System 2000 and Act No. 3 | 64,825 |
| Disabled members, receiving benefits | 14,722 |
| Total membership | 241,414 |

The benefits provided to members of the System are established by Commonwealth law and may be amended only by the Legislature with the Governor's approval. Act No. 3, in conjunction with other recent funding and design changes, provided for a comprehensive reform of the System. This summary details the provisions under Act No. 3.

(Continued)

**EMPLOYEES' RETIREMENT SYSTEM OF THE GOVERNMENT
OF THE COMMONWEALTH OF PUERTO RICO**

(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2017

Certain provisions are different for the three groups of members who entered the System prior to July 1, 2013 as described below:

- Members of Act No. 447 are generally those members hired before April 1, 1990. (contributory, defined benefit program)

- Members of Act No. 1 are generally those members hired on or after April 1, 1990 and on or before December 31, 1999. (contributory, defined benefit program)

- Members of Act No. 305 (or System 2000) are generally those members hired on or after January 1, 2000 and on or before June 30, 2013. (defined contribution program)

All regular employees hired for the first time on or after July 1, 2013, and former employees who participated in the defined benefit program and the System 2000 program, and were rehired on or after July 1, 2013, become members of the Contributory Hybrid Program as a condition to their employment. In addition, employees who at June 30, 2013, were participants of previous programs became part of the Contributory Hybrid Program on July 1, 2013.

Each member has a non-forfeitable right to the value of their account. Members have three options to invest their contributions. Investment income is credited to the member's account semi-annually. The Commonwealth does not guarantee benefits at retirement age.

The assets of the defined benefit program, the defined contribution program and the Contributory Hybrid Program were pooled and invested by the System.

This summary of the System's pension plan provisions is intended to describe the essential features of the plan before the enactment of Act 106-2017. All eligibility requirements and benefit amounts shall be determined in strict accordance with the applicable plan documents.

*(a) Service Retirements*

    (1) *Eligibility for Act No. 447 Members* — Act No. 447 members who were eligible to retire as of June 30, 2013 continue to be eligible to retire at any time. Prior to July 1, 2013, Act No. 447 members could retire upon (1) attainment of age 55 with 25 years of credited service, (2) attainment of age 58 with 10 years of credited service, (3) any age with 30 years of credited service, (4) for Public Officers in High Risk Positions (the Commonwealth Police and Firefighter Corps, the Municipal Police and Firefighter Corps and the Custody Office Corps), attainment of age 50 with 25 years of credited service, and (5), for Mayors of municipalities, attainment of age 50 with 8 years of credited service as a Mayor. In addition, Act No. 447 members who attained 30 years of credited service by December 31, 2013 are eligible to retire at any time.

(Continued)

**EMPLOYEES' RETIREMENT SYSTEM OF THE GOVERNMENT
OF THE COMMONWEALTH OF PUERTO RICO**

(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2017

Act No. 447 members who were not eligible to retire as of June 30, 2013 and did not attain 30 years of credited service by December 31, 2013 are eligible to retire upon attainment of the retirement eligibility age shown in the table below with 10 years of credited service.

| Date of birth | Attained age as of June 30, 2013 | Retirement eligibility age |
|---|---|---|
| July 1, 1957 or later | 55 or less | 61 |
| July 1, 1956 to June 30, 1957 | 56 | 60 |
| Before July 1, 1956 | 57 and up | 59 |

In addition to the requirements in the table above, Act No. 447 provides that Public Officers in High Risk Positions who were not eligible to retire as of June 30, 2013 and did not attain 30 years of credited service by December 31, 2013 are eligible to retire directly from active service upon the attainment of age 55 with 30 years of credited service.

(2) *Eligibility for Act No. 1 Members* – Act No. 1 members who were eligible to retire as of June 30, 2013 continue to be eligible to retire at any time. Prior to July 1, 2013, Act No. 1 members could retire upon (1) attainment of age 55 with 25 years of credited service, (2) attainment of age 65 with 10 years of credited service, (3) for Public Officers in High Risk Positions, any age with 30 years of credited service, and (4) for Mayors, attainment of age 50 with 8 years of credited service as a Mayor.

Act No. 1 members who were not eligible to retire as of June 30, 2013 are eligible to retire upon attainment of age 65 with 10 years of credited service. In addition, Act No. 1 Public Officers in High Risk Positions who were not eligible to retire as of June 30, 2013 are eligible to retire directly from active service upon the attainment of age 55 with 30 years of credited service.

(3) *Eligibility for System 2000 Members* – System 2000 members who were eligible to retire as of June 30, 2013 continue to be eligible to retire at any time. Prior to July 1, 2013, System 2000 members could retire upon attainment of age 55 for Public Officers in High Risk Positions and attainment of age 60 otherwise.

26 (Continued)

**EMPLOYEES' RETIREMENT SYSTEM OF THE GOVERNMENT
OF THE COMMONWEALTH OF PUERTO RICO**

(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2017

System 2000 members who were not eligible to retire as of June 30, 2013 are eligible to retire upon attainment of age 55 for Public Officers in High Risk Positions and upon attainment of the retirement eligibility age shown in the table below otherwise.

| Date of birth | Attained age as of June 30, 2013 | Retirement eligibility age |
|---|---|---|
| July 1, 1957 or later | 55 or less | 65 |
| July 1, 1956 to June 30, 1957 | 56 | 64 |
| July 1, 1955 to June 30, 1956 | 57 | 63 |
| July 1, 1954 to June 30, 1955 | 58 | 62 |
| Before July 1, 1954 | 59 and up | 61 |

(4) *Eligibility for Members Hired after June 30, 2013* – Attainment of age 58 if a Public Officer in a High Risk Position and attainment of age 67 otherwise.

*(b) Service Retirement Annuity Benefits*

An annuity is payable for the lifetime of the member equal to the annuitized value of the balance in the Defined Contribution Hybrid Contribution Account at the time of retirement, plus, for Act No. 447 and Act No. 1 members, the accrued benefit determined as of June 30, 2013. If the balance in the Defined Contribution Hybrid Contribution Account is $10,000 or less, it shall be paid as a lump sum instead of as an annuity. For System 2000 participants this service retirement annuity benefit is not available.

(1) *Accrued Benefit as of June 30, 2013 for Act No. 447 Members* – The accrued benefit as of June 30, 2013 shall be determined based on the average compensation, as defined, for Act No. 447 members, the years of credited service, and the attained age of the member all as of June 30, 2013. For Act No. 447 Mayors, the highest compensation, as defined, as a Mayor is determined as of June 30, 2013.

If the Act No. 447 member had at least 30 years of credited service as of June 30, 2013, the accrued benefit equals 65% of average compensation if the member was under age 55 as of June 30, 2013 or 75% of average compensation if the member was at least age 55 as of June 30, 2013. For participants selecting to coordinate with social security (the Coordination Plan), the benefit is re-calculated at the Social Security Retirement Age (SSRA), as defined, as 1.5% of average compensation up to $6,600 multiplied by years of credited service, up to 30 years, plus 65% (75% if member was at least age 55 as of June 30, 2013) of average compensation in excess of $6,600.

(Continued)

**EMPLOYEES' RETIREMENT SYSTEM OF THE GOVERNMENT
OF THE COMMONWEALTH OF PUERTO RICO**

(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2017

If the Act No. 447 member had less than 30 years of credited service as of June 30, 2013, and attains 30 years of credited service by December 31, 2013, the accrued benefit equals 55% of average compensation if the member was under age 55 as of June 30, 2013 or 60% of average compensation if the member was at least age 55 as of June 30, 2013. For participants selecting the Coordination Plan, the benefit is re-calculated at SSRA as 1.5% of average compensation up to $6,600 multiplied by years of credited service, up to 30 years, plus 55% (60% if member was at least age 55 as of June 30, 2013) of average compensation in excess of $6,600. Member contributions received from Act No. 447 members eligible for this transitory benefit during the period beginning July 1, 2013 and ending upon the attainment of 30 years of credited service are considered pre-July 1, 2013 contributions; the contributions to the Defined Contribution Hybrid Contribution Account begin after the member attains 30 years of credited service.

If the Act No. 447 member had less than 30 years of credited service as of December 31, 2013, the accrued benefit equals 1.5% of average compensation multiplied by years of credited service up to 20 years, plus 2% of average compensation multiplied by years of credited service in excess of 20 years. Maximum benefit is 75% of average compensation. Except for Commonwealth Police and Commonwealth Firefighters, the benefit is actuarially reduced for each year payment commences prior to age 58. For participants selecting the Coordination Plan, the basic benefit is re-calculated at SSRA as 1% of average compensation up to $6,600 multiplied by years of credited service up to 20 years, plus 1.5% of average compensation up to $6,600 multiplied by years of credited service in excess of 20 years, plus 1.5% of average compensation in excess of $6,600 multiplied by years of credited service up to 20 years, plus 2.0% of average compensation in excess of $6,600 multiplied by years of credited service in excess of 20 years. Except for Police and Firefighters, the benefit is actuarially reduced for each year payment commences prior to age 58.

For Act No. 447 Mayors with at least 8 years of credited service as a mayor, the accrued benefit will not be less than 5% of highest compensation, as defined, as a Mayor for each year of credited service as a Mayor up to 10 years, plus 1.5% of highest compensation as Mayor for each year of non-Mayoral credited service up to 20 years, plus 2.0% of highest compensation as Mayor for each year of non-Mayoral credited service in excess of 20 years. Non-Mayoral credited service includes service earned as a Mayor in excess of 10 years. Maximum benefit is 90% of highest compensation as a Mayor.

(2) *Accrued Benefit as of June 30, 2013 for Act No. 1 Members* – The accrued benefit as of June 30, 2013 shall be determined based on the average compensation for Act No. 1 members, the years of credited service, and the attained age of the member all as of June 30, 2013. For Act No. 1 Mayors, the highest compensation as a Mayor is determined as of June 30, 2013.

If the Act No. 1 member is a police officer or firefighter with at least 30 years of credited service as of June 30, 2013, the accrued benefit equals 65% of average compensation if the member was under age 55 as of June 30, 2013 or 75% of average compensation if the member was at least age 55 as of June 30, 2013.

(Continued)

**EMPLOYEES' RETIREMENT SYSTEM OF THE GOVERNMENT
OF THE COMMONWEALTH OF PUERTO RICO**

(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2017

For all other Act No. 1 members, the accrued benefit equals 1.5% of average compensation multiplied by years of credited service. The benefit is actuarially reduced for each year payment commences prior to age 65.

For Act No. 1 Mayors with at least 8 years of credited service as a mayor, the accrued benefit will not be less than 5% of highest compensation as a Mayor for each year of credited service as a Mayor up to 10 years, plus 1.5% of highest compensation as Mayor for each year of non-Mayoral credited service up to 20 years, plus 2.0% of highest compensation as Mayor for each year of non-Mayoral credited service in excess of 20 years. Non-Mayoral credited service includes service earned as a Mayor in excess of 10 years. Maximum benefit is 90% of highest compensation as a Mayor.

### (c) Compulsory Retirement

All Act No. 447 and Act No. 1 Public Officers in High Risk Positions must retire upon attainment of age 58 and 30 years of credited service. A two year extension may be requested by the member from the Superintendent of the Puerto Rico Police, the Chief of the Firefighter Corps, or supervising authority as applicable.

### (d) Termination Benefits

#### (1) Lump Sum Withdrawal

*Eligibility*: A Member is eligible upon termination of service prior to 5 years of service or if the balance in the Defined Contribution Hybrid Contribution Account is $10,000 or less.

*Benefit*: The benefit equals a lump sum payment of the balance in the Defined Contribution Hybrid Contribution Account as of the date of the permanent separation of service.

#### (2) Deferred Retirement

*Eligibility*: A Member is eligible upon termination of service with 5 or more years of service (10 years of credited service for Act No. 447 and Act No. 1 members) prior to the applicable retirement eligibility, provided the member has not taken a lump sum withdrawal of the accumulated contributions and the Defined Contribution Hybrid Contribution Account.

*Benefit*: An annuity payable for the lifetime of the member commencing at the applicable retirement eligibility age is equal to the annuitized value of the balance in the Defined Contribution Hybrid Contribution Account at the time of retirement, plus, for Act No. 447 and Act No. 1 members, the accrued benefit determined as of June 30, 2013.

29                                                                                    (Continued)

**EMPLOYEES' RETIREMENT SYSTEM OF THE GOVERNMENT
OF THE COMMONWEALTH OF PUERTO RICO**

(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2017

**(e) Death Benefits**

**(1) Pre-Retirement Death Benefit**

**Eligibility**: Any current nonretired member is eligible.

**Benefit**: A refund of the Defined Contribution Hybrid Contribution Account, plus the accumulated contributions for Act No. 447 and Act No. 1 members.

**(2) High-Risk Death Benefit under Act No. 127 of 1958, as amended (Act No. 127)**

**Eligibility**: Police, firefighters, and other employees in specified high-risk positions who die in the line of work due to reasons specified in Act No. 127.

**Spouse's Benefit**: 50% of the participant's compensation at date of death, payable as an annuity until death or remarriage.

**Children's Benefit**: 50% of the participant's compensation at date of death, payable as an annuity, and allocated pro-rata among eligible children. The annuity is payable for life for a disabled child, until age 18 for a nondisabled child not pursuing studies, and until age 25 for a nondisabled child who is pursuing studies.

**Benefit if No Spouse or Children**: The parents of the member shall each receive 50% of the participant's compensation at date of death, payable as an annuity for life.

**Post-death Increases**: Effective July 1, 1996 and subsequently every three years, the above death benefits are increased by 3% provided that the beneficiary(ies) had been receiving payments for at least three years.

The cost of these benefits is paid by the Commonwealth's General Fund.

**(3) Post-Retirement Death Benefit for Members who Retired prior to July 1, 2013**

**Eligibility**: Any retiree or disabled member receiving a monthly benefit who has not elected a reversionary annuity and whose benefits commenced prior to July 1, 2013.

**Benefit**: The benefit is as follows (Law No. 105 of 1969, as amended by Law No. 158 of 2003 and Article 2-113 of Act 447 of 1951 as amended by Act 524 of 2004):

(i) For those married or with dependent children at the time of death, the annual income to a widow, or widower or dependent children is equal to 60% (50% if in the Coordination Plan – 30% prior to January 1, 2004) of the retirement benefit payable for life for a surviving spouse and/or disabled children and payable until age 18 (age 25 if pursuing studies) for nondisabled children. If in the Coordination Plan, the benefit to the surviving spouse does not begin until the spouse's attainment of age 60 and the surviving spouse must have been married to the member for at least 10 years to be eligible for this benefit. The increase in the percentage from

30 (Continued)

EMPLOYEES' RETIREMENT SYSTEM OF THE GOVERNMENT
OF THE COMMONWEALTH OF PUERTO RICO

(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2017

30% to 50% if the Coordination Plan is paid by the Commonwealth's General Fund for former government employees or by a public corporation or municipality for their former employees. As stated in Law 105 of 1969 as amended by Act 158 of 2003.

(ii) The benefit, when there is no relation as stated above, is equal to the remaining balance of accumulated contributions at the time of retirement after the deduction of lifetime annual income paid and is payable to a beneficiary or to the member's estate. In no case shall the benefit be less than $1,000. Either the Commonwealth's General Fund for former government employees or the public enterprise or municipality for their former employees pays the difference, up to $250, between (1) the accumulated contributions less the lifetime annual income paid and (2) $1,000. The System pays for the rest. As stated in Article 2-113 of Act 447 of 1951 as amended by Act 524 of 2004.

(4) *Post-Retirement Death Benefit for Members who Retired after June 30, 2013*

*Eligibility*: Any retiree or disabled member who began receiving a monthly benefit after June 30, 2013.

*Benefit*: If the member elected at the time of retirement to transfer a portion of the annuity to a beneficiary by selecting an actuarially equivalent optional form of payment, the benefit is the applicable survivor benefit selected.

For all members, the excess, if any, of the Defined Contribution Hybrid Contribution Account, plus the accumulated contributions for Act No. 447 and Act No. 1 members, at the time of retirement over the total annuity payments paid to the member and any beneficiary per the terms of the optional form of payment shall be payable to a beneficiary or the member's estate.

(5) Beneficiaries receiving occupational death benefits as of June 30, 2013 continue to be eligible to receive such benefits.

(f) *Disability Benefits*

(1) *Disability*

*Eligibility*: All members are eligible upon the occurrence of disability.

*Benefit*: The balance of the Defined Contribution Hybrid Contribution Account payable as lump sum distribution, an immediate annuity or a deferred annuity at the election of the participant. Act No. 447 and Act No. 1 members remain eligible to receive the accrued benefit as of June 30, 2013 commencing at the applicable retirement eligibility age.

(2) *High Risk Disability under Act No. 127*

*Eligibility*: Police, firefighters, and other employees in specified high-risk positions who are disabled in the line of work due to reasons specified in Act No. 127 of 1958 (as amended).

(Continued)

**EMPLOYEES' RETIREMENT SYSTEM OF THE GOVERNMENT
OF THE COMMONWEALTH OF PUERTO RICO**

(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2017

*Benefit*: 80% (100% for Act No. 447 members) of compensation as of date of disability, payable as an annuity. If the member dies while still disabled, this annuity benefit continues to his beneficiaries. Beneficiaries include the surviving spouse and/or disabled children (for life), nondisabled children until age 18 (age 25 if pursuing studies), and the parents if no other beneficiaries. Effective July 1, 1996 and subsequently every three years, the disability benefit is increased by 3% provided that the member (or beneficiary) had been receiving payments for at least three years (Act No. 127 of 1958, as amended). The cost of these benefits is paid by the Commonwealth's General Fund.

(3) Members who qualified for occupational or nonoccupational disability benefits as of June 30, 2013 continue to be eligible to receive such benefits.

**(g) Special Benefits**

(1) *Minimum Benefits*

(i) Past Ad hoc Increases

The Legislature, from time to time, increases pensions for certain retirees as described in Act No. 124 approved on June 8, 1973 and Act No. 23 approved on September 23, 1983. The benefits are paid 50% by the Commonwealth's General Fund and 50% by the System.

(ii) Minimum Benefit for Members who Retired before July 1, 2013 (Act No. 156 of 2003, Act No. 35 of 2007, and Act No. 3 of 2013)

The minimum monthly lifetime income for members who retired or become disabled before July 1, 2013 is $500 per month effective July 1, 2013 ($400 per month effective July 1, 2007 and $300 per month up to June 30, 2007). The increase in the minimum monthly benefit from $200 per month to $300 per month is paid by the Commonwealth's General Fund for former government and certain public corporations without their own treasuries employees or by certain public corporations with their own treasuries or municipalities for their former employees. The increase in the minimum monthly benefit from $300 per month to $400 per month is to be paid by the System for former government and certain public corporations without their own treasuries employees or by certain public corporations with their own treasuries or municipalities for their former employees.

(iii) Coordination Plan Minimum Benefit

A minimum monthly benefit is payable upon attainment of SSRA such that the benefit, when added to the Social Security Benefit, is not less than the benefit payable prior to SSRA.

32

(Continued)

**EMPLOYEES' RETIREMENT SYSTEM OF THE GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO**

(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2017

(2) *Cost-of-Living Adjustments (COLA) to Pension Benefits*

The Legislature, from time to time, increased pensions by 3% for retired and disabled members. Beneficiaries are not entitled to COLAs granted after the retiree's death. The first increase was granted by Act No. 10 of 1992. Subsequent 3% increases have been granted every third year since 1992, with the latest 3% increase established on April 24, 2007 and effective July 1, 2007 (retroactive to January 1, 2007) for retired and disabled members that were receiving a monthly benefit on or before January 1, 2004 (Act 35 of 2007). In addition, effective July 1, 2008, any retired or disabled member that was receiving a monthly annuity on or before January 1, 2004 less than $1,250 per month received an increase of up to 3% without exceeding the limit of $1,250 per month (Act 35 of 2007). The COLAs granted in 1992 to all retirees and in 1998 to retirees who are former government or municipal employees shall be paid by the System. All other COLAs granted in 1995 and later shall be paid by the Commonwealth's General Fund for former government and certain public corporations without their own treasuries employees or by certain public corporations with their own treasuries or municipalities for their former employees.

(3) *Special "Bonus" Benefits*

(i) Christmas Bonus (Act No. 144, as Amended by Act No. 3)

An annual bonus of $200 for each retiree, beneficiary, and disabled member paid in December provided the member retired prior to July 1, 2013. This benefit is paid from the supplemental contributions received from the Commonwealth's General Fund for former government and certain public corporations without their own treasuries employees or by certain public corporations with their own treasuries or municipalities for their former employees.

(ii) Medication Bonus (Act No. 155, as Amended by Act No. 3)

An annual bonus of $100 for each retiree, beneficiary, and disabled member to cover health costs paid in July provided the member retired prior to July 1, 2013. Evidence of coverage is not required. The amount is prorated if there are multiple beneficiaries. This benefit is paid from the supplemental contributions received from the Commonwealth's General Fund for former government and certain public corporations without their own treasuries' employees or by certain public corporations with their own treasuries or municipalities for their former employees.

33 (Continued)

**EMPLOYEES' RETIREMENT SYSTEM OF THE GOVERNMENT
OF THE COMMONWEALTH OF PUERTO RICO**

(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2017

*(h)* **Contributions**

*(1)* *Member Contributions (Article 5-105 of Law 447, as amended by Law No. 3 of 2013, amended by Law No. 106 of 2017 and amended by Law 71 of 2019)*

Effective July 1, 2013 through June 30, 2017, contributions by members consisted of 10% of compensation. However, for Act No. 447 members who selected the Coordination Plan, the member contributions were 7% of compensation up to $6,600 plus 10% of compensation in excess of $6,600 during the 2013-2014 fiscal year and 8.5% of compensation up to $6,600 plus 10% of compensation in excess of $6,600 during the 2014-2015 fiscal year. Effective July 1, 2015 members who selected the Coordination Plan, member contribution increased to 10% of compensation. Members may voluntarily make additional contributions to their Defined Contribution Hybrid Contribution Account.

Prior to July 1, 2013, contributions by Act No. 447 members selecting the Coordination Plan were 5.775% of compensation up to $6,600 plus 8.275% of compensation in excess of $6,600. Contributions by all other members were 8.275% of compensation. System 2000 members may also have made voluntary contributions of up to 1.725% of compensation prior to July 1, 2013.

Effective July 1, 2017, contributions by members consists of 8.5% of compensation. However, in the case of members of the rank system of the Puerto Rico Police Bureau, the mandatory contribution is 2.3% of their compensation. In the case of those members of the rank system of the Puerto Rico Police Bureau which have less than 10 years to qualify for retirement as established by Act No. 447, the reduction in the percentage of contribution will apply voluntarily.

*(2)* *Employer Contributions (Article 2-116 of Law 447, as Amended by Law No. 116 of 2011 and Act No. 3 of 2013, eliminated effective on July 1, 2017 by Act 106 of 2017)*

Prior to July 1, 2011, employer contributions were 9.275% of compensation. Effective July 1, 2011, employer contributions were 10.275% of compensation. For the next four fiscal years effective July 1, employer contributions were scheduled to increase annually by 1% of compensation. For the five fiscal years thereafter, employer contributions will increase annually by 1.25% of compensation. Act 106 of 2017 eliminated the employer contributions to the System as of July 1, 2017.

*(3)* *Supplemental Contributions from the Commonwealth's General Fund, Certain Public Corporations, and Municipalities (Act No. 3 of 2013, eliminated on July 1, 2017 by Act 106 of 2017)*

Effective July 1, 2013, the System will receive a supplemental contribution of $2,000 each fiscal year for each pensioner (including beneficiaries receiving survivor benefits) who was previously benefitting as an Act No. 447 or Act No. 1 member while an active employee. This supplemental contribution will be paid by the Commonwealth's General Fund for former government and certain public corporations without their own treasuries employees or by certain public corporations with their own treasuries or municipalities for their former employees.

(Continued)

**EMPLOYEES' RETIREMENT SYSTEM OF THE GOVERNMENT
OF THE COMMONWEALTH OF PUERTO RICO**

(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2017

The special benefits contribution requirement to the System is established by law and is not actuarially determined. The special benefits contributions of approximately $195 million in 2017 mainly represent contributions from the Commonwealth's General Fund, public corporations and municipalities for the special benefits identified above granted by special laws. The funding of the special benefits is provided to the System through legislative appropriations each July 1 by the Commonwealth's General Fund for former government and certain public corporations without their own treasuries employees, and by certain public corporations with their own treasuries and municipalities for their former employees. The legislative appropriations are considered estimates of the payments to be made by the System for the special benefits. Deficiencies in legislative appropriations are covered by the System's own funds until recovered through future legislative appropriations. Any surplus of legislative appropriations collected over special benefits paid is combined with the assets held in trust for the payment of other pension benefits. During fiscal year June 30, 2017, the System transferred to the Commonwealth's General Fund the amount of $56.7 million on a monthly basis to cover any deficiency in the payment of special benefits and pensions.

*(4) Additional Uniform Contribution (Act No. 32, as Amended)*

The Additional Uniform Contribution will be certified by the external actuary of the System each fiscal year from 2015-2016 as necessary to avoid having the projected gross assets of the System, during any subsequent fiscal year, to fall below $1 billion. The Additional Uniform Contribution is to be paid by the Commonwealth's General Fund, public corporations with their own treasuries, and municipalities. Total Additional Uniform Contribution determined for fiscal year ended June 30, 2017 was $776 million. As further described in note 14(b), the Additional Uniform Contribution was eliminated by Act 106-2017.

*(i) Early Retirement Programs*

The Puerto Rico Environmental Quality Board (EQB) implemented an early retirement program for its employees under the Law 244, dated August 9, 2008. EQB has already made the initial payment and would reimburse the remaining balance on annuities and other benefits paid by the System in four installments on each July 31 starting in 2009 through 2012. The EQB was at default on the retirement plan payment, so they requested a new payment plan. The System's Board of Trustees approved a payment plan for the debt balance due of the retirement program for 24 months starting in March 2014.

35                                                                                    (Continued)

**EMPLOYEES' RETIREMENT SYSTEM OF THE GOVERNMENT
OF THE COMMONWEALTH OF PUERTO RICO**

(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2017

On July 2, 2010, the Commonwealth enacted Act No. 70 establishing a program that provides benefits for early retirement or economic incentives for voluntary employment termination to eligible employees, as defined. Act No. 70 of 2010 (Act No. 70) also established that early retirement benefits will be provided to eligible employees that have completed between 15 to 29 years of creditable services and will consist of monthly benefits ranging from 37.5% to 50% of each employees' monthly salary. Benefits under this program will be paid by the Commonwealth's the General Fund and by the public corporations, covering their respective employees until the plan member reaches the later of age 55 for members under Act No. 447 or age 65 for members under Act No. 1, or the date the plan member would have completed 30 years of service had the member continued employment. In addition, the public corporations will also be required to continue making the required employee and employer contributions to the System. The Commonwealth's General Fund will be required to continue making its required employer contributions. The System will be responsible for benefit payments afterwards. As of June 30, 2017, the System recorded a liability of approximately $15 million for its responsibility as an employer under Act No. 70.

On December 8, 2015, the Commonwealth enacted the Voluntary Early Retirement Law, Act No. 211 of 2015 (Act No. 211), establishing a voluntary program to provide pre-retirement benefits to eligible employees, as defined. Act No. 211 applies to eligible employees of agencies and component units whose budgets are funded in whole or in part by the Commonwealth's General Fund, municipalities, component units that operate with their own resources (except those that have their own retirement system), Judiciary Branch, except judges, and the Commonwealth Employees Association. Act No. 211, among other provisions, established that pre-retirement benefits would be provided to eligible employees who started contributing to the System before April 1, 1990 with at least 20 years of service and would consist of biweekly benefits of 60% of the of each employee's salary as of December 31, 2015, as defined. Pursuant to Act No. 211, the employers will continue making the applicable employee and employer contributions to the Retirement Systems and the employer Social Security and Medicare contributions based on average employee salary, as defined, as of December 31, 2015. Individual Social Security and Medicare contribution would be deducted from the biweekly benefits to be paid to the participant. These payments would be made until the employee reaches the age of 61 years. Other benefits would include the payment of the participant's healthcare plan during the first two years of the program. Once the participant reaches 61 years of age, the participant would be eligible to receive payments from the System and would be entitled to a guaranteed minimum pension of 50% of their average salary (except police officers, which would be paid 60%), and related costs would be paid by the employer.

As described in note 14, Act 106-2017 repealed Act No. 211, while creating an incentives, opportunities and retraining program for public workers.

(Continued)

**EMPLOYEES' RETIREMENT SYSTEM OF THE GOVERNMENT
OF THE COMMONWEALTH OF PUERTO RICO**

(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2017

### (j) Other Postemployment Benefits (OPEB) – Healthcare Benefits

ERS MIPC is an unfunded cost-sharing, multi-employer defined benefit other postemployment benefit plan sponsored by the Commonwealth. ERS MIPC covers a payment of up to $100 per month to the eligible medical insurance plan selected by the member provided the member retired prior to July 1, 2013 (Act No. 483, as amended by Act No. 3). Substantially all full time employees of the Commonwealth's central government, certain municipalities of Puerto Rico and certain component units of the Commonwealth not having their own postemployment benefit plan, were covered by the OPEB.

Commonwealth employees became members upon their date of employment. Plan members were eligible for benefits upon reaching the pension benefits retirement ages.

At July 1, 2016, the membership consisted of the following:

| Membership: | |
|---|---|
| Retired members | 94,071 |
| Disabled members | 14,722 |
| Total membership | 108,793 |

The contribution requirement of ERS MIPC is established by Act No. 95 approved on June 29, 1963. This OPEB plan is financed by the Commonwealth. There is no contribution requirement from the plan member during active employment. Retirees contribute the amount of the healthcare insurance premium not covered by the Commonwealth contribution. As a result, these OPEB are 100% unfunded. During the year ended June 30, 2017, OPEB contributions amounted to $91 million.

The funding of the OPEB benefits is provided to the System through legislative appropriations each July 1 by the Commonwealth's General Fund for former government and certain public corporations without their own treasuries employees, and by certain public corporations with their own treasuries and municipalities for their former employees. The legislative appropriations are considered estimates of the payments to be made by the System for the healthcare benefits throughout the year.

## (5) Net Pension Liability

The components of the net pension liability as of June 30, 2017 were as follows (dollars in thousands):

| | | |
|---|---|---|
| Total pension liability | $ | 30,091,826 |
| Plan's fiduciary net deficit | | (2,108,853) |
| Net pension liability | $ | 32,200,679 |
| Plan's fiduciary net deficit as a percentage of the total pension liability | | (7.01)% |

(Continued)

EMPLOYEES' RETIREMENT SYSTEM OF THE GOVERNMENT
OF THE COMMONWEALTH OF PUERTO RICO

(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2017

### (a) Actuarial Methods and Assumptions

The census data collection date is at the beginning-of-the fiscal year. The liability results as of June 30, 2017 are based on projecting the System obligations determined as of the census data collection date of July 1, 2016 for one year, using roll-forward methods and assuming no liability gains or losses.

The actuarial valuation used the following actuarial assumptions:

| | |
|---|---|
| Inflation | Not applicable |
| Municipal bond index | 3.58%%, as per Bond Buyer General Obligation 20-Bond Municipal Bond Index |
| Projected salary increases | 3.00% per year. No compensation increases are assumed until July 1, 2021 as a result of Act No. 3-2017 and the current general economy. |
| Mortality | Pre-retirement Mortality: |
| | For general employees not covered under Act No. 127, RP-2014 Employee Mortality Rates for males and females adjusted to reflect Mortality Improvement Scale MP-2017 from the 2006 base year, and projected forward using MP-2017 on generational basis. For members covered under Act No. 127, RP-2014 Employee Mortality Rates with blue collar adjustments for males and females adjusted to reflect Mortality Improvement Scale MP-2017 from the 2006 base year, and projected forward using MP-2017 on generational basis. As generational tables, they reflect mortality improvements both before and after the measurement date. |
| | 100% of deaths while in active service are assumed to be occupational for members covered under Act No. 127. |

38

(Continued)

**EMPLOYEES' RETIREMENT SYSTEM OF THE GOVERNMENT
OF THE COMMONWEALTH OF PUERTO RICO**

(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2017

Post-retirement Healthy Mortality:
   Rates which vary by gender are assumed for healthy retirees and
      beneficiaries based on a study of plan's experience from 2007
      to 2012 and updated expectations regarding future mortality
      improvement. The 2010 base rates are equal to 92% of the rates
      from the UP-1994 Mortality Table for Males and 95% of the rates
      from the UP-1994 Mortality Table for Females, both projected
      from 1994 to 2010 using Scale AA. The base rates are projected
      using Mortality Improvement Scale MP-2017 on a generational
      basis. As a generational table, it reflects mortality improvements
      both before and after the measurement date.

Post-retirement Disabled Mortality:
   Rates which vary by gender are assumed for disabled retirees
      based on a study of plan's experience from 2007 to 2012 and
      updated expectations regarding future mortality improvement.
      The 2010 base rates are equal to 105% of the rates from
      the UP-1994 Mortality Table for Males and 115% of the rates from
      the UP-1994 Mortality Table for Females. The base rates are
      projected using Mortality Improvement Scale MP-2017 on a
      generational basis. As a generational table, it reflects mortality
      improvements both before and after the measurement date.

Most other demographic assumptions used in the June 30, 2017 valuation were based on the results of
an actuarial experience 2009 study using data as of June 30, 2003, June 30, 2005 and June 30, 2007.

*(b)* *Long-Term Expected Rate of Return*

The long-term expected rate of return on pension benefits investments was not applicable as of
June 30, 2017. Net assets are negative as of June 30, 2017 and accordingly, it is not possible to
determine a rate of return on net assets during the fiscal year. In addition, after June 30, 2017, due to
the PayGo system by which the Commonwealth guarantees payment of pensions. System assets were
no longer necessary to generate investment returns to pay pension benefits. The approximate actual
rate of return on gross assets was 8.74% as of June 30, 2017.

(Continued)

**EMPLOYEES' RETIREMENT SYSTEM OF THE GOVERNMENT
OF THE COMMONWEALTH OF PUERTO RICO**

(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2017

Before June 30, 2017, the pension plan's policy for allocation of invested assets has been established and may be amended by the System's Board of Trustees. Plan assets are managed on a total return basis with a long-term objective of achieving and maintaining a positive impact on the System's financial condition for the benefits provided through the pension programs. The following asset allocation policy as of June 30, 2017 was adopted by the System's Board of Trustees:

|  | Target allocation | Long-term expected rate of return |
|---|---|---|
| Asset class: |  |  |
| Domestic equity | 56 % | N/A |
| International equity | 15 | N/A |
| Fixed income | 28 | N/A |
| Cash | 1 | N/A |
| Total | 100 % |  |

In prior years, the long-term expected rate of return on pension benefits investments was determined using a building-block method in which best-estimate ranges of expected future real rates of return (expected returns, net of pension plan investment expense and inflation) are developed for each major asset class. These ranges are combined to produce the long-term expected rate of return by weighting the expected future real rates of return by the target asset allocation percentage and by adding expected inflation. This year, the long-term expected rate of return assumption is no longer applicable.

*(c) Discount Rate*

The asset basis for the date of depletion projection is the System's fiduciary net position (the gross assets plus deferred outflows of resources less the gross liabilities, including the senior pension funding bonds payable, plus deferred inflows of resources). On this basis, the System's fiduciary net position was exhausted in the fiscal year 2015.

The System's fiduciary net position was not projected to be available to make all projected future benefit payments of current active and inactive employees. Therefore, the tax free municipal bond index (Bond Buyer General Obligation 20-Bond Municipal Bond Index) was applied to all periods of projected benefits payments to determine the total pension liability. The discount rate was 3.58% as of June 30, 2017.

The June 30, 2017, actuarial valuation reflects a decrease of $5,498 million in the net pension liability, mainly related to changes in assumptions of $4,179 million, as a result of an increase in the discount rate as required by GASB Statement No. 67 from 2.85% in fiscal year 2016 to 3.58% in fiscal year 2017, and the effect of plan changes of approximately $2,017 million.

(Continued)

**EMPLOYEES' RETIREMENT SYSTEM OF THE GOVERNMENT
OF THE COMMONWEALTH OF PUERTO RICO**

(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2017

### (d) Sensitivity of the Net Pension Liability to Changes in the Discount Rate

The following presents the net pension liability calculated using the discount rate of 3.58%, as well as what it would be if it were calculated using a discount rate of 1%-point lower (2.58%) or 1% point higher (4.58%) than the current rate (dollars in thousands):

|  | 1% Decrease (2.58%) | Current discount rate (3.58%) | 1% Increase (4.58%) |
|---|---|---|---|
| Net pension liability | $ 36,599,444 | 32,200,679 | 28,666,953 |

## (6) Cash and Cash Equivalents, Investments and Securities Lending Transactions

*Cash and Cash Equivalents*

Cash and cash equivalents as of June 30, 2017 consisted of the following (in thousands):

|  | Carrying amount | Depository bank balance | Amount uninsured and uncollateralized |
|---|---|---|---|
| Deposits with GDB | $ — | 30,027 | 30,027 |
| Deposits with Puerto Rico commercial banks | 460,174 | 454,587 | — |
| Money market funds | 15,619 | N/A | N/A |
| U.S. Treasury bills | 909 | N/A | N/A |
| Total | $ 476,702 | 484,614 | 30,027 |

Custodial credit risk for deposits is the risk that, in an event of the failure of a depository financial institution, the System may not be able to recover deposits or collateral securities that are in the possession of an outside party. The Commonwealth requires that public funds deposited in Puerto Rico commercial banks be fully collateralized for the amount deposited in excess of federal depository insurance. All securities pledged as collateral are held by banks in the Commonwealth's name. Deposits with GDB and with non-Puerto Rico commercial banks and money market funds are uninsured and uncollateralized, as these entities are exempt from compliance with the collateralization requirement.

Restricted cash and cash equivalent amounted to approximately $216 million as of June 30, 2017 and consisted of the following:

- Approximately $1.9 million of funds are restricted for the debt service of the bonds payable, and 100% of such funds were deposited at trustee in money market funds

(Continued)

**EMPLOYEES' RETIREMENT SYSTEM OF THE GOVERNMENT
OF THE COMMONWEALTH OF PUERTO RICO**

(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2017

- Approximately $214 million of funds are restricted for repayments of mortgage and personal loans administrated by the mortgage servicers and the System, for expired checks not claimed by the plan members, and other purposes, of which approximately $11 million of funds were deposited at trustee in money market accounts, approximately $126,000 of funds were deposited at GDB and approximately $202 million were deposited at Puerto Rico commercial banks.

*Custodial Credit Loss on Deposits with GDB*

Management determined based on the information available prior to the issuance of the System's financial statements for the fiscal year ended June 30, 2017 that a custodial credit loss existed as of June 30, 2017 for the deposits held at GDB.

GDB continues to face a critical economic situation as of June 30, 2017 and currently does not have sufficient liquid financial resources to meet obligations when they come due. The Commonwealth and its public entities have not been able to repay their loans from GDB, which has significantly affected GDB's liquidity and ability to repay its obligations. Because of the nonpayment by the Commonwealth of the appropriation to GDB and GDB's inability to restructure its debt considering the broader fiscal crisis faced by the Commonwealth, GDB is in default of its debt obligations since May 1, 2016.

Pursuant to enacted legislation in April 2016, the Governor of the Commonwealth imposed on GDB emergency operational restrictions and debt moratorium. These restrictions included the suspension of loan disbursements from GDB, imposed restrictions on the withdrawal and transfer of deposits from GDB, and imposed a moratorium on debt obligation of GDB, among other measures.

On April 28, 2017, the Oversight Board approved the liquidation proposal included in the GDB's fiscal plan that calls for an orderly winding down its operations over ten years.

On March 23, 2018, GDB ceased its operations and determined to wind down in an orderly fashion under Title VI of PROMESA.

Based on an evaluation of the availability and recoverability of such funds, a custodial credit loss on these deposits has been recorded on the System's financial statements as follows (expressed in thousands):

| | | Deposits held with GDB at June 30, 2017 | | |
| | | Carrying value before impairment loss | Custodial credit loss | Carrying value |
|---|---|---|---|---|
| Type of deposit: | | | | |
| Interest bearing accounts | $ | 30,027 | 30,027 | — |
| Total | $ | 30,027 | 30,027 | — |

42

(Continued)

**EMPLOYEES' RETIREMENT SYSTEM OF THE GOVERNMENT
OF THE COMMONWEALTH OF PUERTO RICO**

(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2017

The realizable balance of the deposits held with the GDB as of June 30, 2017 was determined based on the corresponding actual collections received from the GDB on such deposits after the June 30, 2017 year end.

*Investments*

For the year ended June 30, 2017, the annual money-weighted rate of return on investments, net of investment expenses, was 8.74%. The money-weighted rate of return expresses investment performance, net of investment expense, adjusted for the changing amounts actually invested.

**Fair Value Measurement**

The System categorizes its fair value measurements within the fair value hierarchy established by GAAP. The hierarchy is based on the inputs used in valuation and gives the highest priority to unadjusted quoted prices in active markets and requires that observable inputs be used in the valuations when available. The disclosure of fair value estimates in the hierarchy is based on whether the significant inputs into the valuations are observable. In determining the level of the hierarchy in which the estimate is disclosed, the highest priority, Level 1, is given to unadjusted quoted prices in active markets and the lowest level, Level 3, to unobservable inputs.

Level 1 – Inputs whose values are based on unadjusted quoted prices for identical instruments in active markets that the System has the ability to access.

Level 2 – Inputs whose values are based on quoted prices for similar instruments in active markets; quoted prices for identical or similar instruments in markets that are not active; and model-derived valuations in which all significant inputs are observable.

Level 3 - Valuations based on inputs that are unobservable and significant to the overall fair value measurement.

In instances where inputs used to measure fair value fall into different levels in the fair value hierarchy, fair value measurements in their entirety are categorized based on the lowest level input that is significant to the valuation. The System's assessment of the significance of particular inputs to these fair value measurements requires judgment and considers factors specific to each investment. Investments measured at Net Asset Value (NAV) as practical expedient are not subject to level classification.

(Continued)

EMPLOYEES' RETIREMENT SYSTEM OF THE GOVERNMENT
OF THE COMMONWEALTH OF PUERTO RICO

(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2017

The table below shows the fair value leveling of the System's investments:

| Investment type | Level 1 | Level 2 | Level 3 | Total |
|---|---|---|---|---|
| Investments measured at fair value: | | | | |
| U.S. government securities | $ 8,884 | — | — | 8,884 |
| U.S. government sponsored agencies obligations | 9,789 | — | — | 9,789 |
| Mortgage and asset-backed securities | 6,540 | — | — | 6,540 |
| U.S. corporate bonds and notes | — | 64,939 | — | 64,939 |
| Non U.S. corporate bonds | — | 14,811 | — | 14,811 |
| COFINA bonds | — | 58,224 | — | 58,224 |
| Investments at fair value level | $ 25,213 | 137,974 | — | 163,187 |
| Investments measured at NAV as a practical expedient: | | | | |
| Non exchange commingled trust funds: | | | | |
| U.S. Equity trust funds | | | | 120,498 |
| Non U.S. Equity trust funds | | | | 61,201 |
| Investments in limited partnerships | | | | 87,069 |
| Total Investments | | | | $ 431,955 |

The System's investments are exposed to custodial credit risk, credit risk, concentration of credit risk, foreign currency risk, and interest rate risk. Following is a description of these risks as of June 30, 2017:

*(a)* *Custodial Credit Risk*

Custodial credit risk for investments is the risk that, in the event of the failure of the counterparty to a transaction, the System may not be able to recover the value of the investment or collateral securities that are in the possession of an outside party. At June 30, 2017, securities investments were registered in the name of the System and were held in the possession of the System's custodian banks, except for securities lent. Securities lent are not exposed to custodial credit risk. Cash collateral received from securities lending transactions invested in short-term investments is exposed to custodial credit risk.

(Continued)

**EMPLOYEES' RETIREMENT SYSTEM OF THE GOVERNMENT**
**OF THE COMMONWEALTH OF PUERTO RICO**

(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2017

### (b) Credit Risk

Credit risk is the risk that an issuer or other counterparty to an investment will not fulfill its obligations. All fixed-income securities at the time of purchase must be of investment grade quality. All issuances shall be rated investment grade by at least two of the nationally recognized rating agencies. The portfolio is expected to maintain a minimum weighted average credit quality of either "A–" or better using either Moody's or Standard & Poor's credit ratings.

The credit quality ratings of bonds and notes and nonexchange commingled fixed income trust fund as of June 30, 2017, are as follows (in thousands):

| Investment type | AAA | AA+ to AA- | A+ to A- | BBB+ to BBB- | BB+ to BB- | B+ to B- | CCC- | Not rated | Total |
|---|---|---|---|---|---|---|---|---|---|
| | | | | Rating (1) | | | | | |
| Bonds and notes: | | | | | | | | | |
| U.S. government sponsored agencies obligations: | | | | | | | | | |
| Federal Home Loan Bank (FHLB) | $ — | 2,937 | — | — | — | — | — | — | 2,937 |
| Federal National Mortgage Association (FNMA) | — | 4,249 | — | — | — | — | — | — | 4,249 |
| Federal Home Loan Mortgage Corporation (FHLMC) | — | 927 | — | — | — | — | — | — | 927 |
| Federal Farm Credit Banks (FFCB) | — | 1,676 | — | — | — | — | — | — | 1,676 |
| Mortgage and asset-backed securities: | | | | | | | | | |
| FNMA | — | 2,581 | — | — | — | — | — | — | 2,581 |
| FHLMC | — | 1,420 | — | — | — | — | — | — | 1,420 |
| U.S. corporate bonds and notes | 2,065 | 10,832 | 13,245 | 34,770 | 473 | — | — | 3,554 | 64,939 |
| Non U.S. corporate bonds | — | 502 | 4,094 | 6,444 | 857 | — | — | 2,914 | 14,811 |
| COFINA bonds | — | — | — | — | — | — | 58,224 | — | 58,224 |
| Total | $ 2,065 | 25,124 | 17,339 | 41,214 | 1,330 | — | 58,224 | 6,468 | 151,764 |

(1) Rating obtained from Standard and Poor's or equivalent rating by Moody's Investor Service or Fitch Ratings.

Approximately $11.4 million of the total System investments consist of U.S. government and Government National Mortgage Association (GNMA) mortgage-backed securities, which carry no risk, therefore, not included within the above table.

### (c) Concentration of Credit Risk

Concentration of credit risk is the risk of loss attributed to the magnitude of the System's investment in a single issuer. As of June 30, 2017, there are no investments in any issuer that represent 5% or more of the System's total investments, except for its investment in COFINA Bonds.

Pursuant to Act No. 96 of June 16th, 2011, during the fiscal year ended June 30, 2011, the System received a special contribution of approximately $163 million from the Puerto Rico Infrastructure Financing Authority, an instrumentality of the Commonwealth. The contribution was invested in bonds issued by the Puerto Rico Sales Tax Financing Corporation (known as COFINA by its Spanish acronym), which provide for a 7% accretion rate and maturity dates between 2043 and 2048. COFINA is a blended component unit of the Commonwealth. As required by Act No. 96 of June 16th, 2011, the System cannot voluntary dispose the COFINA Bonds unless such request has been approved by the GDB. The COFINA Bonds have a fair value of approximately $58.2 million as of June 30, 2017.

(Continued)

EMPLOYEES' RETIREMENT SYSTEM OF THE GOVERNMENT
OF THE COMMONWEALTH OF PUERTO RICO

(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2017

### (d) Interest Rate Risk

Interest rate risk is the risk that changes in interest rates will adversely affect the fair value of an investment. In accordance with its investment policy, the System manages its exposure to declines in fair values by structuring the investment portfolio so that securities mature to meet cash requirements for benefit payments, thereby avoiding the need to sell securities on the open market prior to maturity. Investments in equity securities are not subject to the maximum maturity policy since they do not carry a maturity date. The System is expected to achieve capital preservation and income generation by investing in a diversified portfolio of marketable, investment grade intermediate credit and core fixed-income securities.

The contractual maturity of investments as of June 30, 2017, is summarized below (in thousands). Expected maturities will differ from contractual maturities, because counterparties may have the right to call or prepay obligations with or without call or prepayment penalties.

| Investment type | Within one year | After one to five years | After five to ten years | After ten years | Total |
|---|---|---|---|---|---|
| | | | Maturity (in years) | | |
| Bonds and notes: | | | | | |
| U.S. government securities: | | | | | |
| U.S. Treasury notes | $ 2,105 | 824 | 3,602 | — | 6,531 |
| U.S. Treasury bonds | — | — | — | 2,353 | 2,353 |
| U.S. government sponsored agencies obligations: | | | | | |
| FHLBC | — | 1,053 | 1,884 | — | 2,937 |
| FNMA | — | — | 4,249 | — | 4,249 |
| FHLMC | — | 927 | — | — | 927 |
| FFCBC | — | 1,676 | — | — | 1,676 |
| Mortgage and asset-backed securities: | | | | | |
| GNMA | — | — | — | 2,539 | 2,539 |
| FNMA | — | — | — | 2,581 | 2,581 |
| FHLMC | — | — | — | 1,420 | 1,420 |
| U.S. corporate bonds and notes | 9,854 | 31,014 | 23,993 | 78 | 64,939 |
| Non U.S. corporate bonds | 847 | 6,079 | 6,847 | 1,038 | 14,811 |
| COFINA bonds | — | — | — | 58,224 | 58,224 |
| Total bonds and notes | $ 12,806 | 41,573 | 40,575 | 68,233 | 163,187 |

46

(Continued)

**EMPLOYEES' RETIREMENT SYSTEM OF THE GOVERNMENT
OF THE COMMONWEALTH OF PUERTO RICO**

(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2017

| | Maturity (in years) | | | | |
|---|---|---|---|---|---|
| Investment type | Within one year | After one to five years | After five to ten years | After ten years | Total |
| Nonexchange commingled equity trust funds and investments in limited partnerships: | | | | | |
| Nonexchange commingled equity trust funds: | | | | | |
| U.S. – SSgA Russell 3000 Fund | | | | | 120,498 |
| Non-U.S. – SSgA MSCI ACWI Ex USA Fund | | | | | 61,201 |
| Investments in limited partnerships | | | | | 87,069 |
| Total nonexchange commingled equity trust funds and investments in limited partnerships | | | | | 268,768 |
| Total investments | | | | | $ 431,955 |

(1) Nonexchange commingled fixed income trust fund was classified based on effective duration.

### (e) *Foreign Currency Risk*

Foreign currency risk is the risk that changes in exchange rates will adversely affect the fair value of an investment or a deposit. As of June 30, 2017, the SSgA MSCI ACWI Ex USA Fund is subject to foreign currency risk.

47

(Continued)

EMPLOYEES' RETIREMENT SYSTEM OF THE GOVERNMENT
OF THE COMMONWEALTH OF PUERTO RICO

(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2017

As of June 30, 2017, the composition of the underlying investments in the SSgA MSCI ACWI Ex USA Fund by country was as follows:

| Country | SSgA MSCI ACWI EX USA Fund |
|---|---|
| Japan | 16 % |
| United Kingdom | 11 |
| France | 7 |
| Canada | 7 |
| Germany | 7 |
| Switzerland | 6 |
| Australia | 5 |
| Hong Kong | 5 |
| China | 4 |
| Korea | 4 |
| Taiwan | 3 |
| Netherlands | 3 |
| Spain | 2 |
| India | 2 |
| Others | 18 |
| Total | 100 % |

(i) *Nonexchange Commingled Trust Funds*

As of June 30, 2017, the System owned shares in the SSgA Russell 3000 Index Non-Lending Fund (SSgA Russell 3000 Fund) and the SSgA MSCI ACWI Ex USA Non-Lending Fund (SSgA MSCI ACWI Ex USA Fund) as follows (in thousands):

| Fund name | Shares | Value |
|---|---|---|
| SSgA Russell 3000 Fund | 4,619 | $ 120,498 |
| SSgA MSCI ACWI Ex USA Fund | 3,096 | 61,201 |
| Total nonexchange commingled trust funds | | $ 181,699 |

The investment objective of the Russell 3000 Fund is to approximate as closely as practicable, before expenses, the performance of the Russell 3000 Index over the long term. Shares can be redeemed on a daily basis at NAV and have no redemption restrictions.

48

(Continued)

**EMPLOYEES' RETIREMENT SYSTEM OF THE GOVERNMENT
OF THE COMMONWEALTH OF PUERTO RICO**

(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2017

The investment objective of the SSgA MSCI ACWI Ex USA Fund is to approximate as closely as practicable, before expenses, the performance of the MSCI ACWI ex USA Index over the long term. Shares can be redeemed semi-monthly at NAV and have no redemption restrictions.

As of June 30, 2017, the investments underlying the SSgA Russell 3000 Fund and the SSgA MSCI ACWI Ex USA Fund, had the following sector allocations:

| Sector | SSgA Russell 3000 Fund | SSgA MSCI ACWI Ex USA Fund |
|---|---|---|
| Information technology | 21 % | 12 % |
| Financials | 15 | 22 |
| Healthcare | 14 | 8 |
| Consumer discretionary | 12 | 11 |
| Industrials | 11 | 12 |
| Consumer staples | 8 | 9 |
| Energy | 5 | 8 |
| Real Estate | 4 | 3 |
| Materials | 3 | 8 |
| Utilities | 3 | 3 |
| Telecommunication services | 2 | 4 |
| Unclassified | 2 | — |
| Total | 100 % | 100 % |

*(ii)*  *Investments in Limited Partnerships*

The fair value of investments in limited partnerships at June 30, 2017, amounted to approximately $87.0 million and is presented as private equity investments in the basic Statement of Fiduciary Net Position. The allocations of net gains and losses to limited partners are based on certain percentages, as established in the limited partnership agreements. Investments in limited partnerships are not rated by a nationally recognized statistical rating organization.

In accordance with the partnership agreements, the System's investments can only be redeemed upon distribution from funds managers; usually in the form of a sale of its holdings or dividends distributed. As of June 30, 2017, the System does not intend to sell its investments in limited partnerships for an amount different to that presented in the financial statements.

(Continued)

**EMPLOYEES' RETIREMENT SYSTEM OF THE GOVERNMENT
OF THE COMMONWEALTH OF PUERTO RICO**

(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2017

As of June 30, 2017, the date of commitment, total commitment, 2017 contributions, contributions to date at cost, and estimated fair value of investments in limited partnerships are as follows (in thousands):

| | Date of commitment | Total commitment | 2017 Contributions | Contributions to date at cost | Estimated fair value |
|---|---|---|---|---|---|
| Grupo Guayacán, Inc.- | | | | | |
| Guayacán Fund of Funds II, LP | August 1999 | $ 25,000 | — | 23,681 | 919 |
| Advent-Morro Equity Partner, Inc.: | | | | | |
| Guayacán Private Equity Fund, LP | January 1997 | 5,000 | — | 4,645 | 2,162 |
| Guayacán Private Equity Fund II, LP | April 2007 | 25,000 | — | 24,547 | 22,638 |
| Venture Capital Fund, Inc. | November 1995 | 800 | — | 800 | 654 |
| GF Capital Management and Advisors, LLC – GF Capital Private Equity Fund LP | December 2006 | 25,000 | 97 | 25,890 | 19,225 |
| Chase Capital Partners Private: | | | | | |
| Equity Fund of Funds Corporate | July 2000 | 20,000 | — | 18,994 | — |
| Courage Credit | 2017 | 5,000 | 2,254 | 2,254 | 1,857 |
| Medley Credit Opportunity | 2017 | 15,000 | 12,953 | 12,953 | 12,530 |
| MCOY Investments | 2017 | 10,000 | 10,000 | 10,000 | 9,696 |
| Phoenix | 2017 | 10,000 | 10,000 | 10,000 | 9,641 |
| MCLarty Bluhaus Capital Partner | 2017 | 5,000 | 250 | 250 | 250 |
| Terracap | 2017 | 7,500 | 6,829 | 6,829 | 7,497 |
| Total | | $ 153,300 | 42,383 | 140,843 | 87,069 |

*(iii)* *Securities Lending Transactions*

The System participates in a securities lending program, whereby securities are transferred to an independent broker or dealer in exchange for collateral in the form of cash, government securities, and/or irrevocable bank letters of credit with a simultaneous agreement to return the collateral for the same securities in the future. Collateral is marked to market daily and the agent places a request for additional collateral from brokers, if needed. The custodian bank is the agent for the securities lending program.

At the end of the year, there was no credit risk exposure to borrowers because the amounts the System owes the borrowers (the collateral) exceeded the amounts the borrowers owe the System (the securities lent). At June 30, 2017, the collateral received represented 103% of the fair value of the total securities lent.

(Continued)

EMPLOYEES' RETIREMENT SYSTEM OF THE GOVERNMENT
OF THE COMMONWEALTH OF PUERTO RICO

(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2017

The securities on loan for which collateral was received as of June 30, 2017, consisted of the following (in thousands):

| Description | | Fair value of underlying securities |
|---|---|---|
| U.S. government securities: | | |
| U.S. Treasury bills | $ | 657 |
| U.S. Treasury notes | | 892 |
| U.S. government sponsored agencies notes | | 752 |
| U.S. corporate bonds and notes | | 5,058 |
| Total | $ | 7,359 |

The underlying collateral for these securities had a fair value of approximately $7.4 million as of June 30, 2017. The collateral received was invested in a money market fund sponsored by the custodian bank. As of June 30, 2017, the short-term investment fund consisted of securities purchased under agreements to resell.

Under the terms of the securities lending agreement, the System is fully indemnified against failure of the borrowers to return the securities lent (to the extent the collateral is inadequate to replace the securities lent) or failure to pay the System for income distributions by the securities' issuers while the securities are on loan. In addition, the System is indemnified against loss should the lending agent fail to demand adequate and appropriate collateral on a timely basis.

**(7) Accounts Receivable from Employers**

As of June 30, 2017, accounts receivable from employers consisted of the following (in thousands):

| | | |
|---|---|---|
| Early retirement programs | $ | 1,865 |
| Special laws | | 80,627 |
| Employer and employee contributions | | 887,557 |
| Interest on late payments | | 95,862 |
| Total accounts receivable from employers | | 1,065,911 |
| Less allowance for adjustments and losses in realization | | (1,029,739) |
| Total accounts receivable from employers – net | $ | 36,172 |

51

(Continued)

**EMPLOYEES' RETIREMENT SYSTEM OF THE GOVERNMENT
OF THE COMMONWEALTH OF PUERTO RICO**

(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2017

Under Act No. 447, each employer must pay, on a monthly basis, the amounts corresponding to contributions and loan repayments, on or before the fifteenth day of the following month. After that date, interest is charged as established by the System.

As more fully described in note 3, the Commonwealth and many of its instrumentalities, public corporations and municipalities, which are the employers of the System, have been facing significant fiscal and economic challenges. Further, prior to the commencement of the Title III Cases, the rating downgrade and widening of credit spreads for the Commonwealth's public sector and public corporations' debt put further strain on liquidity and sources of funding of the employers. Consequently, most of the receivables from employers are delinquent past established payment dates and/or installment plan due dates. In other instances, amounts past due have continued to be renegotiated to later dates.

As of June 30, 2017, the System recorded an allowance of approximately $1,030 million for adjustments and losses in realization of the salary-based employer contributions and Additional Uniform Contributions due from the Commonwealth, public corporations and municipalities for the fiscal years 2016 and 2017 because, as explained in note 3, their collectability is uncertain.

**(8) Member Loans and Interest Receivable**

Loans receivable from plan members are guaranteed by the contributions of plan members and by other sources, including mortgage deeds and any unrestricted amount remaining in the escrow funds. In addition, collections on loans receivable are received through payroll withholdings. The latest maximum amount of loans to plan members for mortgage loans was $100,000 and $5,000 for personal and cultural trip loans. The originations of mortgage loans were frozen in December 2013 and those related to personal and cultural loans were frozen in November 2016. During the years ended June 30, 2014 and 2013, personal loans with principal balances amounting to approximately $100 million and $88 million, respectively, were sold to two financial institutions. As per servicing agreements, the System is in charge of the servicing, administration and collection of the loans and outstanding principal balances at and after closing date for a servicing fee of 2%.

The allowance for adjustments and losses in realization is considered a general allowance for all categories of loans and interest receivable, except mortgage loans, and also a specific allowance for the special collection project loans balances.

(Continued)

**EMPLOYEES' RETIREMENT SYSTEM OF THE GOVERNMENT
OF THE COMMONWEALTH OF PUERTO RICO**

(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2017

As of June 30, 2017, the composition of loans and interest receivable from plan members is summarized as follows (in thousands):

| | | |
|---|---|---:|
| Loans receivable: | | |
| Personal | $ | 298,879 |
| Mortgage | | 161,495 |
| Cultural trips | | 36,859 |
| Total loans to plan members | | 497,233 |
| Accrued interest receivable | | 29,085 |
| Less allowance for adjustments and losses in realization | | (2,875) |
| Total loans and interest receivable from plan members – net | $ | 523,443 |

**(9) Other Assets**

As of June 30, 2017, other assets mainly consist of repossessed and foreclosed properties acquired through foreclosure proceedings related to delinquent mortgage loans. Foreclosed properties are valued at the outstanding principal balance of the related mortgage loan upon foreclosure. These properties will be sold under a bidding process intended to recover the outstanding principal balance of the related mortgage loan. A gain or loss will be recognized at the time of sale.

Differences resulting from the recognition of losses at the point of sale rather than upon foreclosure, as required by GAAP, are not material. Management believes that the carrying value of these properties approximates fair value.

**(10) Bonds Payable**

Senior Pension Funding Bonds – On February 27, 2007, the System's administration and GDB, acting as the System's fiscal agent (the Fiscal Agent), presented to the Board of Trustees, a financial transaction for the issuance of pension funding bonds in order to reduce the System's unfunded actuarial accrued liability. The Bonds are limited, nonrecourse obligations of the System, payable solely from and secured solely by a pledge of employer contributions, as defined in the ERS Bond Resolution, made after the date of issuance of the first series of Bonds, and from funds held on deposit with the Bank of New York (the Fiscal Agent). The Bonds are not payable from contributions made to the System by participating employees, or from the assets acquired with the proceeds of the Bonds, or from employer contributions released by the Fiscal Agent to the System after funding of required reserves, or from any other assets of the System. The System invested the proceeds of the Bonds and used these investments and the earnings thereon to provide pension benefits to its beneficiaries.

(Continued)

**EMPLOYEES' RETIREMENT SYSTEM OF THE GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO**

(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2017

On January 31, 2008, the System issued the first series of Bonds, which consisted of approximately $1,589 million aggregate principal amount of Senior Pension Funding Bonds, Series A (the Series A Bonds). On June 2, 2008, the System issued the second of such series of Bonds, which consisted of approximately $1,059 million aggregate principal amount of Senior Pension Funding Bonds, Series B (the Series B Bonds). Finally, on June 30, 2008, the System issued the third and final of such series of Bonds, which consisted of approximately $300 million aggregate principal amount of Senior Pension Funding Bonds, Series C (the Series C Bonds).

The following is a summary of changes in the bonds payable principle balance (in thousands):

| | Maturity | Balance at June 30, 2016 | Accretion | Balance at June 30, 2017 |
|---|---|---|---|---|
| 5.85% to 6.45% Term and Capital Appreciation Bonds Series A | 2021–2058 | $ 1,619,072 | 4,740 | 1,623,812 |
| 6.25% to 6.55% Term and Capital Appreciation Bonds Series B | 2028–2058 | 1,220,285 | 26,371 | 1,246,656 |
| 6.15% to 6.50% Term and Capital Appreciation Bonds Series C | 2028–2043 | 301,678 | 241 | 301,919 |
| Bond discounts | | (6,133) | 218 | (5,915) |
| Total | | $ 3,134,902 | 31,570 | 3,166,472 |

As of June 30, 2017, the outstanding principal balance of the Bonds is as follows (in thousands):

| Description | |
|---|---|
| Series A Bonds: | |
| Capital Appreciation Bonds, maturing in 2028, bearing interest at 6.20% | $ 80,042 |
| Term Bonds, maturing from 2021 through 2023, bearing interest at 5.85% | 200,000 |
| Term Bonds, maturing from 2031 through 2038, bearing interest at 6.15% | 679,000 |
| Term Bonds, maturing from 2039 through 2042, bearing interest at 6.20% | 332,770 |
| Term Bonds, maturing from 2055 through 2058, bearing interest at 6.45% | 332,000 |
| Total Series A Bonds outstanding | 1,623,812 |

54 (Continued)

**EMPLOYEES' RETIREMENT SYSTEM OF THE GOVERNMENT
OF THE COMMONWEALTH OF PUERTO RICO**

(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2017

| Description | | |
|---|---|---|
| Series B Bonds: | | |
| Capital Appreciation Bonds, maturing from 2028 through 2030, bearing interest at 6.40% | $ | 198,959 |
| Capital Appreciation Bonds, maturing from 2031 through 2034, bearing interest at 6.45% | | 231,597 |
| Term Bonds, maturing in 2031, bearing interest at 6.25% | | 117,100 |
| Term Bonds, maturing from 2036 through 2039, bearing interest at 6.30% | | 270,000 |
| Term Bonds, maturing from 2055 through 2058, bearing interest at 6.55% | | 429,000 |
| Total Series B Bonds outstanding | | 1,246,656 |
| Series C Bonds: | | |
| Capital Appreciation Bonds, maturing in 2030, bearing interest at 6.50% | | 3,919 |
| Term Bonds, maturing from 2024 through 2028, bearing interest at 6.15% | | 110,000 |
| Term Bonds, maturing from 2029 through 2038, bearing interest at 6.25% | | 45,000 |
| Term Bonds, maturing from 2039 through 2043, bearing interest at 6.30% | | 143,000 |
| Total Series C Bonds outstanding | | 301,919 |
| Total bonds outstanding | | 3,172,387 |
| Less bonds discount | | (5,915) |
| Bonds payable – net | $ | 3,166,472 |

*Series A Bonds* – The aggregate principal amount of the Series A Bonds issued amounted to approximately $1,589 million of which $1,544 million were issued as term bonds (the Series A Term Bonds) and $45 million were issued as capital appreciation bonds (the Series A Capital Appreciation Bonds). Interest in the Series A Term Bonds are payable monthly on the first day of each month. Interest on the Series A Capital Appreciation Bonds are not payable on a current basis but are added to the principal of the Capital Appreciation Bonds on each January 1 and July 1 (Compounding Dates), and are treated as if accruing in equal daily amounts between Compounding Dates, until paid at maturity or upon redemption. Interest shall be computed on the basis of a 360 day year consisting of twelve 30 day months.

The Series A Bonds are subject to redemption at the option of the System from any source, in whole or in part at any time on or after July 1, 2018, at a redemption price equal to the principal amount (in the case of Series A Capital Appreciation Bonds, the accreted amount) of the Series A Bonds, plus accrued interest to the redemption date, and without premium.

**EMPLOYEES' RETIREMENT SYSTEM OF THE GOVERNMENT
OF THE COMMONWEALTH OF PUERTO RICO**

(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2017

In addition, the following Series A Term Bonds are subject to mandatory redemption in part commencing on July 1, 2021 to the extent of the sinking fund requirement for said bonds set forth below at a redemption price equal to 100% of the principal amount thereof plus accrued interest as follows (in thousands):

| Redemption period | Subject bonds | Amount |
|---|---|---|
| July 1, 2021 | Term bonds (final maturity July 1, 2023) | $ 50,000 |
| July 1, 2022 | Term bonds (final maturity July 1, 2023) | 70,000 |
| July 1, 2023 | Term bonds (final maturity July 1, 2023) | 80,000 |
| | Subtotal | 200,000 |
| July 1, 2031 | Term bonds (final maturity July 1, 2038) | 3,000 |
| July 1, 2032 | Term bonds (final maturity July 1, 2038) | 4,500 |
| July 1, 2033 | Term bonds (final maturity July 1, 2038) | 4,000 |
| July 1, 2034 | Term bonds (final maturity July 1, 2038) | 133,500 |
| July 1, 2035 | Term bonds (final maturity July 1, 2038) | 133,500 |
| July 1, 2036 | Term bonds (final maturity July 1, 2038) | 133,500 |
| July 1, 2037 | Term bonds (final maturity July 1, 2038) | 133,500 |
| July 1, 2038 | Term bonds (final maturity July 1, 2038) | 133,500 |
| | Subtotal | 679,000 |
| Total | | $ 879,000 |

*Series B Bonds* – The aggregate principal amount of the Series B Bonds amounted to approximately $1,059 million of which $816 million were issued as term bonds (the Series B Term Bonds) and $243 million were issued as capital appreciation bonds (the Series B Capital Appreciation Bonds). Interest in the Series B Term Bonds are payable monthly on the first day of each month. Interest on the Series B Capital Appreciation Bonds are not payable on a current basis but are added to the principal of the Series B Capital Appreciation Bonds on each January 1 and July 1 (Compounding Dates), and are treated as if accruing in equal daily amounts between Compounding Dates, until paid at maturity or upon redemption. Interest shall be computed on the basis of a 360 day year consisting of twelve 30 day months.

The Series B Bonds are subject to redemption at the option of the System from any source, in whole or in part at any time on or after July 1, 2018, at a redemption price equal to the principal amount (in the case of Series B Capital Appreciation Bonds, the accreted amount) of the Series B Bonds, plus accrued interest to the redemption date, and without premium.

*Series C Bonds* – The aggregate principal amount of the Series C Bonds amounted to approximately $300 million of which $298 million were issued as term bonds (the Series C Term Bonds) and $2 million were issued as capital appreciation bonds (the Series C Capital Appreciation Bonds). Interest in the Series C Term Bonds are payable monthly on the first day of each month. Interest on the Series C Capital Appreciation Bonds are not payable on a current basis, but are added to the principal of the Series C Capital Appreciation Bonds on each January 1 and July 1 (Compounding Dates), and are treated as if

**EMPLOYEES' RETIREMENT SYSTEM OF THE GOVERNMENT
OF THE COMMONWEALTH OF PUERTO RICO**

(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2017

accruing in equal daily amounts between Compounding Dates, until paid at maturity or upon redemption. Interest shall be computed on the basis of a 360 day year consisting of twelve 30 day months.

The Series C Bonds are subject to redemption at the option of the System from any source, in whole or in part at any time on or after July 1, 2018, at a redemption price equal to the principal amount (in the case of Series C Capital Appreciation Bonds, the accreted amount) of the Series C Bonds, plus accrued interest to the redemption date, and without premium.

In addition, the following Series C Term Bonds are subject to mandatory redemption in part commencing on July 1, 2024 to the extent of the sinking fund requirement for said bonds set forth below at a redemption price equal to 100% of the principal amount thereof plus accrued interest as follows (in thousands):

| Redemption period | Subject bonds | Amount |
|---|---|---|
| July 1, 2024 | Term bonds (final maturity July 1, 2028) | $ 18,700 |
| July 1, 2025 | Term bonds (final maturity July 1, 2028) | 22,000 |
| July 1, 2026 | Term bonds (final maturity July 1, 2028) | 29,150 |
| July 1, 2027 | Term bonds (final maturity July 1, 2028) | 36,300 |
| July 1, 2028 | Term bonds (final maturity July 1, 2028) | 3,850 |
| | Subtotal | 110,000 |
| July 1, 2029 | Term bonds (final maturity July 1, 2038) | 100 |
| July 1, 2030 | Term bonds (final maturity July 1, 2038) | 540 |
| July 1, 2031 | Term bonds (final maturity July 1, 2038) | 100 |
| July 1, 2032 | Term bonds (final maturity July 1, 2038) | 3,420 |
| July 1, 2033 | Term bonds (final maturity July 1, 2038) | 4,320 |
| July 1, 2034 | Term bonds (final maturity July 1, 2038) | 100 |
| July 1, 2035 | Term bonds (final maturity July 1, 2038) | 11,940 |
| July 1, 2036 | Term bonds (final maturity July 1, 2038) | 2,160 |
| July 1, 2037 | Term bonds (final maturity July 1, 2038) | 7,920 |
| July 1, 2038 | Term bonds (final maturity July 1, 2038) | 14,400 |
| | Subtotal | 45,000 |
| July 1, 2039 | Term bonds (final maturity July 1, 2043) | 28,600 |
| July 1, 2040 | Term bonds (final maturity July 1, 2043) | 28,600 |
| July 1, 2041 | Term bonds (final maturity July 1, 2043) | 28,600 |
| July 1, 2042 | Term bonds (final maturity July 1, 2043) | 28,600 |
| July 1, 2043 | Term bonds (final maturity July 1, 2043) | 28,600 |
| | | 143,000 |
| Total | | $ 298,000 |

(Continued)

**EMPLOYEES' RETIREMENT SYSTEM OF THE GOVERNMENT
OF THE COMMONWEALTH OF PUERTO RICO**

(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2017

Debt service requirements in future years on the System's bonds as of June 30, 2017 are as follows (in thousands):

| | Principal | Interest | Total |
|---|---|---|---|
| Year ending June 30: | | | |
| 2018 | $ — | 166,519 | 166,519 |
| 2019 | — | 166,519 | 166,519 |
| 2020 | — | 166,519 | 166,519 |
| 2021 | — | 166,519 | 166,519 |
| 2022 | — | 166,519 | 166,519 |
| 2023–2027 | 200,000 | 751,232 | 951,232 |
| 2028–2032 | 1,036,595 | 702,754 | 1,739,349 |
| 2033–2037 | 452,745 | 695,887 | 1,148,632 |
| 2038–2042 | 1,210,220 | 407,702 | 1,617,922 |
| 2043–2047 | 180,550 | 256,577 | 437,127 |
| 2048–2052 | — | 247,568 | 247,568 |
| 2053–2057 | 362,800 | 212,062 | 574,862 |
| 2058–2062 | 398,200 | 14,401 | 412,601 |
| | 3,841,110 | $ 4,120,778 | 7,961,888 |
| Less: | | | |
| Unaccreted interest | (668,723) | | |
| Unamortized discount | (5,915) | | |
| Total | $ 3,166,472 | | |

*Pledge of Employer Contributions Pursuant to Security Agreement* – The System entered into a Security Agreement with the Fiscal Agent for the benefit of the bondholders, pursuant to which the System pledged to the Fiscal Agent, and granted the Fiscal Agent a security interest in employer contributions, as defined in the ERS Bond Resolution, made after January 31, 2008, which was the date of issuance of the first series of bonds, and the funds on deposit with the Fiscal Agent under the various accounts established under the Pension Funding Bond Resolution (the Resolution).

The Resolution and the Security Agreement constitute a contract between the System and the Fiscal Agent, on behalf of the owners of the bonds. The pledge, covenants and agreements of the System set forth in the Resolution and the Security Agreement shall be for the equal benefit, protection and security of the owners of the bonds, regardless of time or times of their issuance or maturity, and shall be of equal rank, without preference, priority or distinction of any of the bonds over any other bond, except as expressly provided in or permitted by the Resolution. Annual employer contributions that are made after January 31, 2008, which was the date of issuance of the first series of bonds, in accordance with the Act and amounts on deposit in the different accounts created pursuant to the Resolution for the benefits of the owners of the

58 (Continued)

**EMPLOYEES' RETIREMENT SYSTEM OF THE GOVERNMENT
OF THE COMMONWEALTH OF PUERTO RICO**

(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2017

bonds, are pledged for annual debt service requirements as established. The pledge is irrevocable so long as any bonds are outstanding under the terms of the Resolution.

Starting in August 2016, and monthly thereafter, the Fiscal Agent under the Resolution of the System's bonds notified to the System that it failed to transfer the requisite employers' contributions on the last business day of each month. The Fiscal Agent is not seeking to collect or recover any indebtedness from, enforce any judgment against, or obtain possession of, exercise control over, any property of or from, the Commonwealth or any of its instrumentalities, including the System, or exercise any act that is stayed by PROMESA, the Puerto Rico Financial Emergency and Fiscal Responsibility Act of January 29, 2017 (Act No. 5 or the Financial Emergency Act), the Puerto Rico Emergency Moratorium and Financial Rehabilitation Act (Act No. 21 or the Moratorium Act), or any Executive Orders related thereto. The Fiscal Agent, however, has filed a proof of claim against the Commonwealth and the System in their respective Title III cases seeking the total aggregate amount of the outstanding System bonds. As discussed further in note 13, the validity of the System's bonds is currently being challenged in the Title III Court.

*Bonds Credit Rating Downgrades* - On June 24, 2016, Fitch Ratings Inc. downgraded the System's Bonds from "CC" to "C" and placed them on "negative" outlook. Fitch cited "the breakdown of negotiations between the Commonwealth and major bondholders, the recent ruling by the U.S. Supreme Court on the Commonwealth's bankruptcy legislation, and the slow process of federal legislation in support of the Commonwealth as indicators that a debt restructuring, deferral or default has become inevitable. On April 5, 2017, Moody's Investors Service downgraded the System's Bonds to from "C" to "Ca" and placed them on "negative" outlook, citing "persistent pressures on Puerto Rico's economic base that indicate a diminishing perceived capacity to repay." Standard & Poor's Ratings Services currently rates the System's Bonds at "CC."

**(11) Guarantee Insurance Reserve for Member Loans**

The System provides life insurance that guarantees the payment of the outstanding principal balance of mortgage, personal and cultural trip loans in case of death of a plan member. The plan members who obtained these loans from the System pay the coverage in its entirety. The life insurance rates are actuarially determined and do not vary by age, sex, or health status.

**(12) Other Postemployment Healthcare Benefits Funded Status and Funding Progress**

The System's other postemployment healthcare benefits (OPEB) funded status as of June 30, 2017, the most recent actuarial valuation date, is as follows (dollars in thousands):

| Actuarial value of plan assets | | Actuarial Accrued Liability (AAL) | Unfunded Actuarial Accrued Liability (UAAL) | Funded ratio | Annual covered payroll | UAAL as a percentage of annual covered payroll |
|---|---|---|---|---|---|---|
| $ | — | 1,138,309 | 1,138,309 | — % $ | 3,344,197 | 34.0 % |

(Continued)

EMPLOYEES' RETIREMENT SYSTEM OF THE GOVERNMENT
OF THE COMMONWEALTH OF PUERTO RICO

(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2017

The schedule of funding progress, presented as required supplementary information following the notes to the basic financial statements, presents multiyear trend information about whether the actuarial value of plan assets is increasing or decreasing over time relative to the AAL for benefits.

Act No. 3 eliminated the medical insurance plan contribution of $100 per month for future retirees effective July 1, 2013.

The census data collection date is at the beginning-of-fiscal-year. The liability results as of June 30, 2017 are based on projecting the System obligations determined as of the census data collection date of July 1, 2016 for one year, using roll-forward methods and assuming no liability gains or losses. The amortization period for GASB Statement No. 45 has been reduced to the expected future lifetime of current in pay members.

The actuarial valuations used the following actuarial assumptions:

| | |
|---|---|
| Actuarial cost method | Entry age normal |
| Amortization method | 18 years closed (beginning July 1, 2014), level dollar |
| Remaining amortization period | 16 years |
| Asset valuation method | Not applicable |
| Actuarial assumptions: | |
| Investment rate of return | 3.00% |
| Projected salary increases | Not applicable |
| Projected payroll growth | Not applicable |
| Inflation | Not applicable |
| Cost of living adjustment | Not applicable |

Actuarial valuations of an ongoing plan involve estimates of the net value of reported amounts and assumptions about the probability of occurrence of events far into the future. Examples include assumptions about future employment and mortality. Amounts determined are subject to continuous revision as actual results are compared with past expectations and new estimates are made about the future.

Calculations are based on the types of benefits provided under the terms of the substantive plan at the time of each valuation and on the pattern of sharing of costs between the employer and plan members to that point. The projection of OPEB for financial reporting purposes does not explicitly incorporate the potential effects of legal or contractual funding limitations on the pattern of cost sharing between the employer and plan members in the future.

The actuarial calculations reflect a long–term perspective. Consistent with that perspective, actuarial methods and assumptions used include techniques that are designed to reduce short–term volatility in actuarial accrued liabilities and actuarial value of assets.

(Continued)

**EMPLOYEES' RETIREMENT SYSTEM OF THE GOVERNMENT
OF THE COMMONWEALTH OF PUERTO RICO**

(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2017

The OPEB mortality rate assumptions are the same as that for pension benefits. For additional information refer to note 5.

**(13) Contingencies**

**A. Litigation Filed by Creditors Against the System Before Commencement of the Title III Case**

*Administración de los Sistemas de Retiro de los Empleados del Gobierno y la Judicatura de Puerto Rico, et. al v. UBS Fin. Servs. Inc. of Puerto Rico, et al.*, Civ. No. KAC-2011-1067 (803) (P.R. Ct. of First Instance Sept. 29, 2011)

On September 29, 2011, two System beneficiaries commenced a derivative suit in the Commonwealth of Puerto Rico Court of First Instance, San Juan Part (the Commonwealth Court), alleging breach of fiduciary duties and breach of contract against the underwriters in the issuance and underwriting of $3 billion of the System Bonds in 2008 (the UBS Action). On December 7, 2016, the Commonwealth Court allowed the System to intervene and ordered the plaintiffs, which now include the System and seven individual plaintiffs (collectively, the Plaintiffs), to file a third amended complaint against the underwriters, including UBS Financial Services Inc. of Puerto Rico (UBS), and related entities (collectively, the UBS Defendants). UBS had served as the lead underwriter of the 2008 System Bonds.

Among other things, Plaintiffs allege that by participating as the lead underwriter of the 2008 System Bonds, UBS violated its contractual, non-contractual and fiduciary obligations to the System. The Plaintiffs seek a ruling that UBS is liable to the System for over $800 million for underwriting the 2008 System Bonds.

On March 6, 2019, Plaintiffs filed the Fourth Amended Complaint against the UBS Defendants, which was accepted by the Commonwealth Court on April 15, 2019. On April 29, 2019, UBS filed its answer and an informative motion regarding its intent to file a counterclaim if the System's Title III automatic stay were to be lifted. The proposed counterclaim attached to the informative motion alleges breach of contract and indemnification arising out of the System's issuance of the 2008 System Bonds.

On June 25, 2019, the Oversight Board filed a motion to stay certain contested matters pending confirmation of a proposed plan of adjustment for the Commonwealth. On July 24, 2019, the Title III Court entered an order staying until November 30, 2019, various adversary proceedings and claims objections before it with overlapping issues, including those involving the validity of the System Bond issuances. UBS contends that the UBS Action in the Commonwealth Court should be stayed pending the Title III Court's resolution of alleged common legal issues.

On October 8, 2019, UBS filed a motion for relief from the automatic stay in order to assert counterclaims in the Commonwealth Court for breach of contract and indemnification against the System in the UBS Action. UBS asserts that the System represented in the 2008 System Bond Offering Statements that it was issuing the 2008 System Bonds in accordance with the authority provided under the Retirement Act, and that the 2008 System Bonds would be legally binding special obligations of the System. UBS also argues that the System represented in the purchase contracts entered into with UBS that the System had full right, power and legal authority to issue the bonds, and it was not in violation of

**EMPLOYEES' RETIREMENT SYSTEM OF THE GOVERNMENT
OF THE COMMONWEALTH OF PUERTO RICO**

(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2017

any law On December 11, 2019, the Title III Court held a hearing on UBS's stay relief motion. On December 16, 2019, the Title III Court granted UBS limited relief from the stay solely to allow UBS to present its proposed counterclaims in the Commonwealth Court. On February 4, 2020, UBS submitted its counterclaims in the Commonwealth Court. On March 9, 2020, the Oversight Board filed its objections to the counterclaims. On March 30, 2020, UBS renewed its stay relief motion, arguing that the Oversight Board's objection to the counterclaims violated the December limited lift-stay order and the Commonwealth Court should now be free to hear the Oversight Board's objections. On April 22, 2020, the Title III Court denied the motion.

UBS has also filed two proofs of claim against the System related to the UBS Action, as well as two proofs of claim related to *Casasnovas Balado v. UBS Fin. Servs., Inc.*, No. K AC-2014-0072 (905) (P.R. Ct. of First Instance Jan. 29, 2016), an action filed by a group of individual plaintiffs arising from the System Bond issuances.

**B. Litigation Filed by Creditors Against the System After Commencement of the Title III Case**

*Employees Ret. Sys. of the Gov't of the Commonwealth of Puerto Rico, et al. v. Altair Global Credit Opportunities Fund (A), LLC, et al.*, Adv. Pro. No. 17-00213 (D.P.R. July 21, 2017)

On July 21, 2017, the Oversight Board, as representative of the System in its Title III case, commenced an adversary proceeding challenging the System bondholders' security interests in various system assets through a declaratory relief action (the System Declaratory Relief Action). Through the System Declaratory Relief Action, the Oversight Board, as representative of the System in the Title III case, sought declaratory relief challenging the validity, priority, extent, and enforceability of the prepetition and postpetition liens and security interests asserted by defendants with respect to bonds issued by the System. The complaint contends that the System bondholders' alleged liens and security interests are not perfected because the required UCC financing statements and subsequent amendments were defective, and therefore the liens could be avoided in the Title III case. The System Declaratory Relief Action also challenged, among other things, the System bondholders' alleged security interest in postpetition employer contributions.

On August 17, 2018, the Title III Court granted partial summary judgment in favor of the System. The Title III Court held, among other things, that the System bondholders' liens are not perfected and their security interests are avoidable under Bankruptcy Code section 544. On September 5, 2018, the Title III Court entered an order dismissing the remaining counts and counterclaims. This decision was appealed to the United States Court of Appeals for the First Circuit.

(Continued)

**EMPLOYEES' RETIREMENT SYSTEM OF THE GOVERNMENT
OF THE COMMONWEALTH OF PUERTO RICO**

(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2017

On January 30, 2019, the First Circuit (i) affirmed the Title III Court's holding that the 2018 financing statements related to the System's bonds did not perfect the System bondholders' security interest in pledged property, (ii) affirmed the dismissal of the System bondholders' claim regarding a January 2017 stipulation, and (iii) reversed the Title III Court by finding that the System bondholders met the requirement for perfection beginning on December 17, 2015. In addition, the First Circuit remanded certain counterclaims to the Title III Court for further consideration. On April 30, 2019, the Oversight Board, on behalf of the System, filed a petition for a *writ of certiorari* with the United States Supreme Court, seeking to reverse the First Circuit's decision. The petition was denied on October 7, 2019.

On remand, the System requested that the Title III Court (i) determine the undecided issue of whether the System bondholders' security interests attach to revenues received by the System after commencement of its Title III case (the Post-Petition Revenue Issue) and (ii) grant it leave to file an amended adversary complaint to raise issues concerning the nature or extent of the System bondholders' security interests. On May 6, 2019, the Title III Court agreed to determine the Post-Petition Revenue Issue, but denied the System's request for leave to amend its complaint. On June 27, 2019, the Title III Court granted summary judgment in favor of the System on the Post-Petition Revenue Issue, holding that Bankruptcy Code section 552 prevents the System bondholders' security interests from attaching to revenues received by the System post-petition, and finding that employers' contributions are not "special revenues" within the meaning of Bankruptcy Code section 902. On July 18, 2019, the System's bondholders appealed the Title III Court's decision to the United States Court of Appeals for the First Circuit. On January 30, 2020, the First Circuit issued an opinion affirming the Title III Court's decision. On March 3, 2020, the First Circuit denied the System bondholders petition for rehearing *en banc*.

*Andalusian Global Designated Activity Co., et al. v. Commonwealth of Puerto Rico, et al.*, Adv. Pro. Nos. 17-00219-LTS, 17-00220-LTS (D.P.R. July 27, 2017)

On July 27, 2017, a group of System bondholders commenced adversary proceedings against the Commonwealth and the System in the cases initially captioned as *Altair Global Credit Opp. Fund (A), LLC, et al. v. Commonwealth of Puerto Rico, et al.*, Adv. Pro. Nos. 17-00219-LTS, 17-00220-LTS (D.P.R. July 27, 2017) (collectively, the PayGo Litigation), seeking a declaration that Joint Resolution 188 and Act 106-2017 (collectively, the PayGo Statute)are void *ab initio* because they violate the Title III automatic stay and the Contracts Clause and Takings Clause of the United States Constitution.

On November 17, 2017, the Oversight Board, as representative of the System in its Title III case and joined by FAFAA and the Retiree Committee, filed a motion to dismiss the PayGo Litigation. On February 2, 2018, the Title III Court issued an order informing the parties that the motion to dismiss would be taken under submission. On September 9, 2018, the Title III Court stayed the case pending the United States Court of Appeals for the First Circuit's decision on the summary judgment appeal in the System Declaratory Relief Action, which decision was rendered on January 30, 2019 (as discussed above). In light of the stay, on September 27, 2018, the Title III Court terminated the motion to dismiss without prejudice to its restoration on request following termination of the stay. No parties have moved to lift the stay.

(Continued)

**EMPLOYEES' RETIREMENT SYSTEM OF THE GOVERNMENT
OF THE COMMONWEALTH OF PUERTO RICO**

(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2017

On March 1, 2019, the Title III Court dismissed this case without prejudice as to Altair Global Credit Opportunities Fund (A), LLC and Nokota Capital Master Fund, L.P. As a result, the case was re-captioned *Andalusian Global Designated Activity Co. et al v. Commonwealth of Puerto Rico, et al.*, Adv. Pro. Nos. 17-00219-LTS, 17-00220-LTS (D.P.R.). On March 5, 2019, the Title III Court entered an order allowing certain System Bondholders – Crown Managed Accounts (for and on behalf of Crown/PW SP), LMA SPC (for and on behalf of Map 98 Segregated Portfolio), Oceana Master Fund Ltd., Pentwater Merger Arbitrage Master Fund Ltd., and PWCM Master Fund Ltd. – to intervene in the adversary proceeding. On October 25, 2019, these System Bondholders filed a motion to inform filing of a response to certain arguments concerning the validity of bonds issued by the System in the omnibus claims objections of the Creditors' Committee and the Retiree Committee, as well as in the motion to dismiss. As of the date of these financial statements, there has been no further docket activity.

C. **Key Contested Matters in the System's Title III Case**

*Appointments Clause Litigation, Case No. 17-3566-LTS (D.P.R. Aug. 7, 2017)*

On August 7, 2017, a group of GO bondholders led by Aurelius Investment, LLC, Aurelius Opportunities Fund, LLC, and Lex Claims, LLC (collectively, Aurelius) filed a motion to dismiss the Title III petitions. In the motion, Aurelius argued that the appointment of the Oversight Board members violated the "Appointments Clause" of the United States Constitution, which requires that "principal officers" of the United States be appointed by the President and confirmed by the Senate. The Title III Court denied Aurelius' motion to dismiss, and Aurelius appealed to the United States Court of Appeals for the First Circuit. On February 15, 2019, the First Circuit reversed the Title III Court, holding that the Oversight Board members' appointment process violated the Appointments Clause. The First Circuit stayed its ruling for 90 days to allow the President and Senate to appoint the members of the Oversight Board in accordance with the United States Constitution. It also expressly validated all of the Oversight Board's past actions, including any actions taken by the Oversight Board during the 90-day stay period.

On April 23, 2019, the Oversight Board appealed the First Circuit's decision to the United States Supreme Court by filing a petition for a writ of certiorari. On April 24, 2019, the Oversight Board filed a motion in the First Circuit requesting an extension of the 90-day stay of its February 15 decision until the Supreme Court's final disposition of the case. On May 6, 2019, the First Circuit granted in part the Oversight Board's extension motion by extending the stay of its February 15 decision until July 15, 2019, but denied the request to extend the stay indefinitely until the Supreme Court's final disposition of the case.

On May 30, 2019, Aurelius filed a cross petition for a writ of certiorari in the United States Supreme Court to challenge the First Circuit's validation of the Oversight Board's past actions under the de facto officer doctrine. On June 6, 2019, the Solicitor General of the United States and the Creditors' Committee each filed separate petitions for writs of certiorari in the United States Supreme Court to address whether the members of the Oversight Board are "Officers of the United States" within the meaning of the Appointments Clause. On June 14, 2019, Unión de Trabajadores de la Industria Eléctrica y Riefo (UTIER) – the plaintiff in a related adversary proceeding under Case Nos. 17-00228 –

64 (Continued)

**EMPLOYEES' RETIREMENT SYSTEM OF THE GOVERNMENT
OF THE COMMONWEALTH OF PUERTO RICO**

(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2017

LTS – filed its own separate petition for a writ of certiorari in the United States Supreme Court to challenge the First Circuit's application of the de facto officer doctrine.

On June 18, 2019, the President of the United States re-nominated all seven original Oversight Board members to complete the remainder of their terms, and these nominations are currently pending before the United States Senate.

On June 20, 2019, the United States Supreme Court granted the Oversight Board, Aurelius, Solicitor General, Creditors' Committee, and UTIER petitions for writs of certiorari and stayed the First Circuit decision pending its final determination. Oral argument on the appeal was heard before the United States Supreme Court on October 15, 2019. As of the date of these financial statements, the Supreme Court has not yet entered its decision on the appeal.

*Motion of Certain Secured Creditors of the System for Relief from the Automatic Stay*, Case No. 17-3566-LTS (D.P.R. July 3, 2018)

On July 3, 2018, a group of System bondholders (including Altair Global, Andalusian Global, Glendon Opportunities Fund, Mason Capital, Nokota Capital, Oaktree, Ocher Rose, SV Credit and a number of Puerto Rico-based mutual funds) filed a motion (the Stay Relief Motion) in the System's Title III case arguing that the Prepetition Segregated Account would run out of funds in August 2018, depriving bondholders of adequate protection in the form of monthly interest payments and therefore leaving movants' constitutionally-protected property interests unprotected. Movants asserted that relief from the Title III stay was necessary in order to maintain the status quo pending the Title III Court's resolution of the cross-motions for summary judgment in the System Declaratory Relief Action (discussed above). In the alternative, movants requested adequate protection of their liens on property of the System. On August 21, 2018, the Title III Court denied the Stay Relief Motion, and on August 29, 2018, the System bondholders filed an appeal to the United States Court of Appeals for the First Circuit.

On February 21, 2019, movants renewed their Stay Relief Motion following the First Circuit's January 30, 2019 reversal, in part, of the Title III Court's August 17, 2018 order in the System Declaratory Relief Action. In light of the Title III Court's June 27, 2019 decision in the System Declaratory Relief Action, the Title III Court terminated the renewed Stay Relief Motion without prejudice on July 8, 2019.

*Omnibus Objections to System Bondholder Claims*, Case No. 17-3566-LTS

On March 12, 2019, the Creditors' Committee filed an omnibus objection to all claims asserted against the System based on the approximately $3.1 billion of outstanding bonds issued by the System in 2008 (the Creditors' Committee System Bond Claims Objection). The Creditors' Committee System Bond Claims Objection argues that the System was only authorized to issue a "direct placement of debts," which the Creditors' Committee claims means a "private placement, not a public offering." Because the System Bonds were issued in a public offering, the Creditors' Committee asserts that the System Bonds were *ultra vires* and are thus "null and void." As a result, the Creditors' Committee seeks an order disallowing all System bond claims in their entirety. Also on March 12, 2019, the Creditors'

65 (Continued)

**EMPLOYEES' RETIREMENT SYSTEM OF THE GOVERNMENT
OF THE COMMONWEALTH OF PUERTO RICO**

(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2017

Committee filed a procedures motion related to the adjudication of the Creditors' Committee System Bond Claims Objection.

On April 23, 2019, the Retiree Committee filed an omnibus objection (the Retiree Committee System Bond Claims Objection) to all System bondholder claims asserted against both the System and the Commonwealth on the grounds that the System Bonds were issued *ultra vires* and that the System bondholders have no enforceable claim with respect to the System Bonds.

On July 24, 2019, the Title III Court entered an order (the July 24 Stay Order) staying the Creditors' Committee System Bond Claims Objection and Retiree Committee System Bond Claims Objection (together, the "System Bond Claims Objections).

On October 18, 2019, the parties to the System Bond Claims Objections jointly filed a motion and stipulated order seeking to modify the July 24, Stay Oder by allowing for the *ultra vires* issues and lien-scope issues raised in the objections to proceed. On October 24, 2019, the Title III Court has not yet entered the stipulated order granted the motion and established a discovery and briefing schedule related to the ultra vires and lien-scope issues through May 2020. On October 28, 2019, the Title III Court entered an order requiring a mediation report and/or scheduling order as to the remaining stayed matters by November 27, 2019 and extended the stay through December 31, 2019 as to all other matters not related to the ultra vires and lien-scope issues. On November 27, 2019, the court – appointed mediation team filed an interim status report, which provided recommended scheduling and sequencing of certain key litigation issues, including (i) the validity of certain challenged series of GO and PBA bonds; (ii) the secured or unsecured status of claims on GO and PBA bonds; and (iii) the rights, as against the Commonwealth, of holders of revenue bonds and other debt issued by certain Puerto Rico instrumentalities. Under the proposed scheduling order contained in the interim status report, the mediation team has proposed initial briefing on these issues to commence in February 2020 with hearings scheduled on April 30, 2020 and in June 2020. On December 27, 2019, the Title III Court entered an amended order extending the stay through March 11, 2020. On February 10, 2020, the mediation team filed an amended report, which the Title III Court considered at a hearing held on March 4, 2020. On March 10, 2020, the Title III Court entered a final order on the stay period, authorizing certain lift stay motions and revenue bond complaints to proceed but otherwise kept the stay in place for proceedings that do not involve ultra vires and/or lien-scope issues pending the Title III Court's decision on confirmation of the Amended Plan (defined below).

On January 6, 2020, the Oversight Board and Creditors' Committee filed several additional objections to the proofs of claim filed by the System Fiscal Agent and System bondholders. The Oversight Board filed an objection to the System Fiscal Agent's proof of claim, which asserts a claim for approximately $3.8 billion in principal, $9.2 million in accrued but unpaid interest, and other fees and expenses. Referencing the System Bond Claims Objections, the Oversight Board argues that the System Fiscal Agent's claim should be disallowed because the bonds were issued ultra vires, but even if the issuance was not ultra vires the Fiscal Agent is undersecured and is only entitled to assets in which the Fiscal Agent has a security interest and can be traced (if any). The Oversight Board also filed objections to the System bondholders' proofs of claim against the System, similarly arguing that the bondholders' claims should be disallowed as duplicative of the Fiscal Agent's claim. In addition, the Creditors'

66 (Continued)

**EMPLOYEES' RETIREMENT SYSTEM OF THE GOVERNMENT
OF THE COMMONWEALTH OF PUERTO RICO**

(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2017

Committee filed an objection to System bondholder claims, reiterating that it seeks disallowance of the bondholders' claims on ultra vires grounds and, alternatively, the System bondholders' asserted secured claims against the System's property are limited only to employer contributions held by the System on its Title III case petition date that are identifiable from other System assets, which System bondholders will not be able to show.

*System Clawback Litigation*, Adv. Pro. Nos. 19-355, 19-356, 19-357, 19-358, 19-359, 19-360, and 19-361-LTS (D.P.R. May 19, 2019)

On May 19, 2019, the Creditors' Committee and the Oversight Board, acting through its Special Claims Committee, commenced seven adversary proceedings (collectively, the System Clawback Litigation) against approximately 230 defendants that owned or currently own Bonds. The plaintiffs seek declaratory relief relating to the Bonds and recovery of certain payments of principal and interest on the Bonds. On May 21, 2019, the plaintiffs filed a motion requesting that the Title III Court enter an order (i) extending the period for serving domestic defendants in the Avoidance Actions to November 18, 2019, and (ii) otherwise staying the Avoidance Actions pending a joint request by both plaintiffs to resume a particular proceeding or further order of the Title III Court.

On July 24, 2019, the Title III Court entered an order staying the System Clawback Litigation through November 30, 2019 and required mandatory mediation of the issues during the stay period.

On October 18, 2019, the parties to the System Clawback Litigation jointly filed a motion and stipulated order seeking to modify the July 24, 2019 stay order Stay Order by allowing for the ultra vires issues related to the ERS Bonds System bonds to proceed. The On October 24, 2019, the Title III Court has not yet entered the stipulated order.granted the motion to modify the July 24 Stay Order and established a discovery and briefing schedule related to the ultra vires issues through May 2020. On November 1, 2019, defendant bond holders commenced discovery against various parties and non-parties, including the System, related to the ultra vires issues. As of the date hereof, the discovery process is ongoing.

On October 28, 2019, the Title III Court entered an order requiring a mediation report and/or scheduling order as to the remaining stayed matters by November 27, 2019 and extended the stay on non-ultra vires matters through December 31, 2019. On December 27, 2019, the Title III Court entered an amended order extending the stay on non-ultra vires matters through March 11, 2020. On March 10, 2020, the Title III Court entered a final order on the stay period, authorizing certain lift stay motions and revenue bond complaints to proceed but otherwise kept the stay in place for proceedings that do not involve ultra vires and/or lien-scope issues pending the Title III Court's decision on confirmation of the Amended Plan (defined below).

*Lien-Scope Adversary Proceedings*, Adv. Pro. Nos. 19-00366-LTS (D.P.R.) and 19-00367-LTS (D.P.R.).

On May 20, 2019, the System and the Creditors' Committee commenced separate adversary proceedings (collectively, the "Lien-Scope Actions") against the Fiscal Agent and certain beneficial

67                                                                                              (Continued)

**EMPLOYEES' RETIREMENT SYSTEM OF THE GOVERNMENT
OF THE COMMONWEALTH OF PUERTO RICO**

(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2017

owners of the Bonds, alleging that the defendants do not hold valid and enforceable security interests in any of the System's remaining assets or the proceeds thereof (except certain accounts receivable).

On July 24, 2019, the Title III Court entered an order staying Lien-Scope Actions through November 30, 2019 and required mandatory mediation of the issues during the stay period.

On October 18, 2019, the parties to the Lien-Scope Actions jointly filed a motion and stipulated order seeking to modify the July 24, 2019 stay order Stay Order by allowing for issues regarding the scope of the System bondholders' liens the lien-scope issues raised in the complaints to proceed.

On October 24, 2019, the Title III Court has not yet entered the stipulated order.granted the motion and established a discovery and briefing schedule related to the lien-scope issues through May 2020. On November 1, 2019, defendant bondholders commenced discovery against various parties and non-parties, including the System. As of the date hereof, the discovery process is ongoing.

On October 28, 2019, the Title III Court entered an order requiring a mediation report and/or scheduling order as to the remaining stayed matters by November 27, 2019 and extended the stay through December 31, 2019 as to all other matters not related to the lien-scope issues. On November 27, 2019, the court-appointed mediation team filed an interim status report, which provided recommended scheduling and sequencing of certain key litigation issues, including (i) the validity of certain challenged series of GO and PBA bonds; (ii) the secured or unsecured status of claims on GO and PBA bonds; and (iii) the rights, as against the Commonwealth, of holders of revenue bonds and other debt issued by certain Puerto Rico instrumentalities. Under the proposed scheduling order contained in the interim status report, the mediation team has proposed initial briefing on these issues to commence in February 2020 with hearings scheduled on April 30, 2020 and in June 2020. On December 27, 2019, the Title III Court entered an amended order extending the stay through March 11, 2020. On February 10, 2020, the mediation team filed an amended report and recommendation and parties filed their responses to the amended report on February 21, 2020. On March 10, 2020, the Title III Court entered a final order on the stay period, authorizing certain lift stay motions and revenue bond complaints to proceed but otherwise kept the stay in place for proceedings that do not involve ultra vires and/or lien-scope issues pending the Title III Court's decision on confirmation of the Amended Plan (refer to note 14 for details).

*The Fin. Oversight & Mgmt. Bd. for Puerto Rico v. Vásquez*, Adv. Pro. No. 19-00393 (D.P.R.) (Jul. 3, 2019)

On July 3, 2019, the Oversight Board filed a complaint against the Governor and FAFAA seeking injunctive relief to prevent the implementation and enforcement of Act 29-2019, which eliminated the obligation of municipalities to make PayGo payments to the Commonwealth, and various joint resolutions because (i) Act 29 violated PROMESA sections 204(a) and 207; (ii) Act 29-2019 and the joint resolutions violated PROMESA section 204(c); (iii) Act 29-2019 and the joint resolutions violated PROMESA section 108(a) because they impair and/or defeat the purposes of PROMESA, as determined by the Oversight Board; and (iv) the Governor's alleged policy of not providing certifications as required under PROMESA section 204 violated PROMESA section 108(a) because it impairs and/or defeats the purposes of PROMESA, as determined by the Oversight Board.

**EMPLOYEES' RETIREMENT SYSTEM OF THE GOVERNMENT
OF THE COMMONWEALTH OF PUERTO RICO**

(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2017

On July 15, 2019, the Governor and FAFAA moved to dismiss the complaint. On August 22, 2019, the Title III Court denied the motion to dismiss in its entirety. On September 10, 2019, the Governor and FAFAA answered the complaint. On December 13, 2019, the Oversight Board filed a motion for summary judgment. On February 5, 2020, the Governor and FAFAA filed their opposition to the Oversight Board's summary judgment motion. On March 5, 2020, the Title III Court heard oral argument on the summary judgment motion. As of the date hereof, the Title III Court has not yet made a final determination on the merits or issued its decision.

*ERS Bondholders' Motion to Appoint Trustee, Case No. 17-03566-LTS (D.P.R. Nov. 19, 2019)*

On November 19, 2019, a certain a group of System Bondholders (including Andalusian Global, Crown Managed Accounts, Glendon Opportunities, LMA SPC, Mason Capital, Oaktree, Oceana, and Pentwater) filed a motion (the Trustee Motion) in the System's Title III case arguing that the Court should appoint a trustee pursuant to Bankruptcy Code section 926 to pursue avoidance claims against the Commonwealth on behalf of the System. Movants specifically sought to have a trustee appointed to avoid alleged transfers made by the System to the Commonwealth pursuant to pension reform legislation enacted by the Commonwealth government. Movants asserted that the Oversight Board unjustifiably refused to pursue these avoidance claims and that the Oversight Board had a conflict of interest because it represents both the Commonwealth and the System. On January 7, 2020, the Title III Court denied the Trustee Motion, and on January 10, 2020, the System Bondholders filed an appeal to the United States Court of Appeals for the First Circuit. On March 19, 2020, the First Circuit issued an opinion affirming the Title III Court's order denying the Trustee Motion

In addition to the foregoing matters, the System is a defendant or co-defendant in various lawsuits resulting from the ordinary conduct of its operations. Based on the advice of legal counsel and considering insurance coverages, management is of the opinion that the ultimate liability, if any, will not have a material effect on the financial status of the System.

**(14) Subsequent Events**

Subsequent events were evaluated through June 29, 2020, the date the financial statements were available to be issued, to determine if such events should be recognized or disclosed in the 2017 financial statements. The subsequent events disclosed below are principally those related to debt activities, including fiscal events and related legislation, both local and federal, that management believes are of public interest for disclosure.

**A. Sale of System Investments**

On June 23, 2017, the Legislative Assembly approved certain other assignments for fiscal year 2018 under Joint Resolution 188, which among other things, ordered the System, JRS, and TRS to liquidate their assets and pass the net proceeds to the Treasury Department. In July 2017, the System sold investments in the total aggregate amount of approximately $297 million and transferred approximately $190 million of the net proceeds to the Treasury Department as required under Joint Resolution 188.

(Continued)

**EMPLOYEES' RETIREMENT SYSTEM OF THE GOVERNMENT
OF THE COMMONWEALTH OF PUERTO RICO**

(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2017

### B. PayGo Pension Reform

On June 27, 2017, the Treasury Department issued Circular Letter No. 1300-46-17 to convey to the central government agencies, public corporations and municipalities the new implementation procedures to adopt, effective July 1, 2017, a new "pay-as-you-go" (PayGo) system. With the start of fiscal year 2018, employers' contributions, contributions ordered by special laws, and the Additional Uniform Contribution were all eliminated.

The PayGo system was one component of Act 106-2017, which the Governor signed into law on August 23, 2017. Act 106-2017 created the legal framework for the Commonwealth to guarantee benefit payments to pensioners through the PayGo system. Approximately $2 billion was allocated for these purposes in each of the budgets for fiscal year 2018 and fiscal year 2019. Act 106-2017 also created a Defined Contributions Plan, similar to a 401(k) plan, that will be managed by a private entity. Future benefits will not be paid by the Retirement Systems.

Act 106-2017, among other things, amended Act No. 12 with respect to the System's governance, funding and benefits for active members of the actual program and new hired members. Under Act 106-2017, the System's board of trustees was eliminated and a new Retirement Board was created. The Retirement Board is currently responsible for governing both the System, JRS and TRS.

Act 106-2017 terminated the previously existing pension programs for the System participants as of June 30, 2017. The members of the prior programs and new system members hired on and after July 1, 2017 will be enrolled in a new defined contributions program that will be selected by the Retirement Board. The accumulated balance on the accounts of the prior program will be transferred to the member accounts in the new defined contribution program. The System's active members of the defined contributions program will retain their benefits as stated under Act 91 of March 29, 2003.

Act 106-2017 also ordered a suspension of the System's loan programs and ordered a merger of the administrative structures of the retirement systems. At the Retirement Board's discretion, the administration of the System benefits may be externalized. The employees of the System that are not retained under the new administrative structure will be transferred to other public agencies in conformity with Act No. 8 of February 8, 2017.

In addition, Act 106-2017 repealed the Voluntary Early Retirement Law, Act No. 211 of 2015, while creating an incentives, opportunities and retraining program for public workers.

On May 17, 2019, the Legislature passed Act No. 29 of 2019 (Act 29-2019), which addressed the severe financial crisis and liquidity shortage of the Puerto Rico municipalities by relieving them of their obligation to make PayGo payments to the Commonwealth under Act 106-2017. The Oversight Board has challenged the implementation and enforcement of Act 29-2019, as discussed in note 13 to the basic financial statements.

On January 30, 2020, the United States Court of Appeals for the First Circuit entered an opinion in the System Declaratory Relief Action upholding the Title III Court's determination that Bankruptcy Code section 552 prevents System bondholders' security interests from attaching to post-petition revenues

(Continued)

**EMPLOYEES' RETIREMENT SYSTEM OF THE GOVERNMENT
OF THE COMMONWEALTH OF PUERTO RICO**

(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2017

and finding that employers' contributions are not "special revenues" within the meaning of Bankruptcy Code section 902. As a result, the First Circuit has determined that System bondholders do not have a security interest in employer contributions received after the System's petition date.

For additional information regarding litigation related to Act 106-2017 and the PayGo system, refer to note 13 to the basic financial statements.

**C. Debt Investigation Report**

On August 2, 2017, the Oversight Board announced its intention, under its authority under PROMESA, to conduct an investigation to review the financial crisis and its contributors, and examine Puerto Rico's debt and its issuance, including disclosure and selling practices. To that end, the Oversight Board named a special investigation committee (the Special Investigation Committee), and conducted a competitive process to identify and select an independent firm to conduct the investigation. On September 13, 2017, the Oversight Board announced that the Special Investigation Committee retained an independent investigator to carry out a review of the Commonwealth's debt and its connection to the current financial crisis. The Oversight Board published the independent investigator's final report on August 20, 2018 (the Debt Investigation Report). The Debt Investigation Report provides an analysis of the historical and more recent macroeconomic and political factors contributing directly and indirectly to the Commonwealth's fiscal and economic crisis, the Commonwealth's municipal bond issuance process, and legislative efforts to restructure the debt, as well as the Oversight Board's investigative findings, policy recommendations, and identification of potential claims and matters for regulatory attention.

The Debt Investigation Report presented findings and recommendations on the following areas:

- GDB
- Puerto Rico Public Utilities (PREPA and PRASA)
- COFINA
- The System
- Puerto Rico's Budgeting, External Reporting, and Accounting Functions
- Calculation of the Constitutional Debt Limit
- Credit Rating Agencies (CRAs)
- Selling Practices for Puerto Rico-Related Bonds
- Puerto Rico's Government Ethics Framework
- Issuers' Use of Interest Rate Swaps
- Puerto Rico's Lack of a Clear Mechanisms for Validating Puerto Rico-Related Bonds Before They Issue
- Possession Tax Credit

(Continued)

**EMPLOYEES' RETIREMENT SYSTEM OF THE GOVERNMENT
OF THE COMMONWEALTH OF PUERTO RICO**

(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2017

The independent investigator also presented an overview of potential causes of action. The Debt Investigation Report in its entirety can be found on the Oversight Board's website.

On August 28, 2018, the Oversight Board appointed a special claims committee (the Special Claims Committee) and delegated to the Special Claims Committee any and all authority of the Oversight Board to review the findings in the Debt Investigation Report and to take any appropriate steps, including without limitation, recommending and/or initiating the negotiation and/or prosecution of claims based on the findings in the Debt Investigation Report on behalf of the Title III debtors for the benefit of all creditors and parties in interest in the Title III cases. The Special Claims Committee is entitled, in its full discretion, to determine the scope of any further action, including, but not limited to, additional investigation, as well as claims to be pursued, and to retain such advisors, consultants, attorneys or other advisors as it in its sole discretion sees fit. On October 25, 2018, the Special Claims Committee signed the contract with the firm that will provide those services. The System is cooperating with this investigation.

For more information on the adversary proceedings and other motions in the Title III cases commenced by the Special Claims Committee against the System, refer to note 13 to the basic financial statements.

**D. Impact of Natural Disasters**

On September 6, 2017 and September 20, 2017, Hurricane Irma and Maria respectively made landfall in Puerto Rico. The hurricanes causes unprecedented and catastrophic damage to the island, its people and its business. As result of Hurricane Maria, the System's headquarters suffered major damages. To continue operations, the System had to relocate its offices and entered into a lease agreement with the Puerto Rico Public Buildings Authority. As a result of the relocation, the System eliminated certain of its prior contracts related to auxiliary services and negotiated new ones.

On December 28, 2019, the first of many earthquakes shook Puerto Rico. Since then, there have been more than 400 earthquakes of magnitude 2 or greater on the Richter scale, including its most destructive earthquake in a century with a magnitude of 6.4. Based on preliminary estimates, these earthquakes have caused approximately $500 million in damages, and thousands of Puerto Rico residents have been forced into refugee camps, as they are afraid to sleep in homes that could collapse in an aftershock. According to a January 29, 2020 report published by the United States Geological Survey, the aftershocks in Puerto Rico are not expected to stop any time soon, with earthquakes of at least a magnitude of 3 or greater expected to occur daily over the next several months and thereafter weekly for years.

(Continued)

**EMPLOYEES' RETIREMENT SYSTEM OF THE GOVERNMENT
OF THE COMMONWEALTH OF PUERTO RICO**
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2017

**E. Former Governor Rosselló's Resignation and Government Transition under Governor Vázquez**

On July 24, 2019, then-Governor Ricardo Rosselló Nevares announced his resignation as Governor of the Commonwealth effective August 2, 2019 at 5pm Atlantic Standard Time. Before his resignation became effective, then-Governor Rosselló appointed former resident commissioner Pedro Pierluisi as Secretary of State. After being confirmed by the House of Representatives (but not the Senate), Mr. Pierluisi was sworn in as acting Governor. On August 7, 2019, the Puerto Rico Supreme Court unanimously determined that Mr. Pierluisi was illegally sworn into office as Governor. As a result, Justice Secretary Wanda Vázquez was sworn in as Governor on August 7, 2019 to complete former Governor Rosselló's term through 2020 and, as of the date of these financial statements, currently serves as the Governor of the Commonwealth.

**F. Oversight Board Files Joint Plan of Adjustment for the Commonwealth, the System, and PBA**

On September 27, 2019, the Oversight Board – as representative of the Commonwealth, the System, and PBA in their respective Title III cases – filed its initial joint Title III plan of adjustment for the Commonwealth, the System and PBA [ECF No. 8765] (the Initial Plan) along with a disclosure statement related thereto [ECF No. 8765] (the Initial Disclosure Statement). On February 28, 2020, the Oversight Board filed its *Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* [ECF No. 11946] (the Amended Plan) and an amended disclosure statement related thereto [ECF No. 11947] (the Amended Disclosure Statement), which revised the Initial Plan to conform to the PSA.

The Amended Plan and Amended Disclosure Statement do not reflect the potential impact from the ongoing outbreak of a respiratory illness caused by a novel (new) coronavirus known as COVID-19 first identified in Wuhan, Hubei Province, China. As a result, on March 23, 2020, the Oversight Board filed an urgent motion requesting to adjourn consideration of the Amended Disclosure Statement – currently scheduled for June 3 and June 4, 2020 – until further notice.

The Amended Plan and Amended Disclosure Statement remain subject to future amendments, particularly given the potential economic impact of COVID-19, and Title III Court approval, and it is not certain that the Title III Court will ultimately confirm the Amended Plan.

For further information, please refer to the publicly available Amended Plan and Amended Disclosure Statement, available at https://cases.primeclerk.com/puertorico/Home-DocketInfo.

(Continued)

**EMPLOYEES' RETIREMENT SYSTEM OF THE GOVERNMENT
OF THE COMMONWEALTH OF PUERTO RICO**

(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2017

### G. Cybersecurity Attack

During January 2020, the System discovered that an external agent gained access to the System's Office 365 application. Apparently, the attacker impersonated a Finance Department's employee email account and sent electronic communications to multiple public corporations. In the aforementioned electronic communications, the attacker gave instructions to change deposit bank accounts. This event did not involve an intrusion in the System's accounting system, nor bank accounts, and System's participants personal information. This event is under state and federal investigation. As of the date of this financial statements four public corporations transferred funds to the fraudulent banks accounts of approximately $4.4 million. The System is still investigating the matter and contracted the services of GM Security Technologies to investigate in deep this incident and provide recommendations to the System's IT security policies. The System is also evaluating the effects of this cyber-attack and could include loss of revenues, increases in cybersecurity costs and an increase in insurance premiums, among others.

### H. Coronavirus Pandemic

On March 15, 2020, the Governor of Puerto Rico issued the Executive Order #OE-2020-023 to make the necessary closures of the government and private companies to combat the effects of Coronavirus (COVID-19). The closure consists of a 14-days lock down and social distancing from March 16 to March 30, 2020. After this date, various executive orders were issued extending the closures of the government and private companies. The most recent was the Executive Order #OE-2020-048 issued on June 28, 2020 eliminates the lock down previously imposed and reduces the curfew hours imposed on the citizens of Puerto Rico and the control measures implemented to contain the spread of the COVID-19 through the island until July 22, 2020.

As the result of the Executive Order, the System closed its operations effective March 16, 2020 and our operations since such date are very limited. The effect of the closing on our operations cannot be reasonable estimated at this time but we believe this closing will have a limited impact in our financial statements and operations.

**REQUIRED SUPPLEMENTARY INFORMATION**

**EMPLOYEES' RETIREMENT SYSTEM OF THE GOVERNMENT
OF THE COMMONWEALTH OF PUERTO RICO**
(A Component Unit of the Commonwealth of Puerto Rico)

Schedule of Changes in the Employers' Net Pension Liability and Related Ratios –
Pension Benefits (Unaudited)

Years ended June 30, 2017 and 2016

(Dollars in thousands)

|  | 2017 Amount | 2016 Amount |
|---|---:|---:|
| Total pension liability: |  |  |
| Service cost | $ 628,025 | 496,732 |
| Interest | 1,035,844 | 1,230,843 |
| Differences between expected and annual experience | (248,414) | (252,405) |
| Changes in assumptions | (4,179,110) | 3,853,693 |
| Plan changes | (2,017,468) | — |
| Benefit payments, including refunds of contributions | (1,559,924) | (1,565,152) |
| Net change in total pension liability | (6,341,047) | 3,763,711 |
| Total pension liability – beginning | 36,432,873 | 32,669,162 |
| Total pension liability – ending (a) | 30,091,826 | 36,432,873 |
| Plan's fiduciary net position (deficit): |  |  |
| Employer contributions – net of provision | 921,537 | 779,477 |
| Member contributions | 320,095 | 333,633 |
| Net investment income | 28,155 | 870 |
| Other income | 56,626 | 110,201 |
| Benefit payments, including refunds of member contributions | (1,559,924) | (1,565,152) |
| Administrative expenses | (24,358) | (27,670) |
| Interest on bonds payable | (198,084) | (196,211) |
| Other expenses | (387,015) | (32,761) |
| Net change in plan fiduciary net position | (842,968) | (597,613) |
| Total fiduciary net position (deficit) – beginning | (1,265,885) | (668,272) |
| Total fiduciary net position (deficit)– ending (b) | (2,108,853) | (1,265,885) |
| Employers' net pension liability – ending (a)-(b) | $ 32,200,679 | 37,698,758 |
| Plan's fiduciary net position (deficit) as a percentage of the total pension liability | (7.01)% | (3.47)% |
| Covered employee payroll | $ 3,344,197 | 3,344,382 |
| Employers' net pension liability as a percentage of covered employee payroll | 962.88 % | 1127.23% |

Note:   Schedule is intended to show information for ten years. Additional years will be displayed as they become available.

See accompanying notes to required supplementary information and independent auditors' report.

**EMPLOYEES' RETIREMENT SYSTEM OF THE GOVERNMENT
OF THE COMMONWEALTH OF PUERTO RICO**

(A Component Unit of the Commonwealth of Puerto Rico)

Schedule of Investment Returns – Pension Benefits (Unaudited)

| Fiscal year ended (1) | Annual money-weighted rate of return, net of expenses |
|---|---|
| June 30, 2017 | 6.8 % |
| June 30, 2016 | 6.7 |
| June 30, 2015 | 4.2 |

(1)  Schedule is intended to show information for ten years. Additional years will be displayed as they become available.

See accompanying notes to required supplementary information and independent auditors' report.

**EMPLOYEES' RETIREMENT SYSTEM OF THE GOVERNMENT
OF THE COMMONWEALTH OF PUERTO RICO**

(A Component Unit of the Commonwealth of Puerto Rico)

Schedule of Employers' Contributions – OPEB (Unaudited)

(Dollars in thousands)

| Fiscal year ended (1) | Annual required contributions | Actual employers' contributions | Percentage of contribution |
|---|---|---|---|
| June 30, 2017 | $ 105,859 | 91,280 | 86.2 % |
| June 30, 2016 | 107,739 | 93,728 | 87.0 |
| June 30, 2015 | 103,878 | 97,374 | 93.7 |
| June 30, 2014 | 88,508 | 102,085 | 115.3 |
| June 30, 2013 | 154,999 | 91,823 | 59.2 |
| June 30, 2012 | 133,654 | 94,664 | 70.8 |
| June 30, 2011 | 129,395 | 93,851 | 72.5 |
| June 30, 2010 | 128,294 | 88,599 | 69.1 |

(1) The System's annual required contributions for the year ended June 30, 2017 and 2016 were determined by the actuarial valuation at beginning of year that was updated to roll forward the funded status to June 30, 2017 and 2016 and assuming no liability gains or losses. Prior year actuarial valuations were made using end-of-year census data.

See accompanying notes to required supplementary information and independent auditors' report.

**EMPLOYEES' RETIREMENT SYSTEM OF THE GOVERNMENT
OF THE COMMONWEALTH OF PUERTO RICO**

(A Component Unit of the Commonwealth of Puerto Rico)

Schedule of Funding Progress – OPEB (Unaudited)

(Dollars in thousands)

| Actuarial valuation date (1) | Actuarial value of plan assets | Actuarial accrued liability (AAL) | Unfunded Actuarial accrued liability (UAAL) | Funded ratio | Annual covered payroll | UAAL percentage of annual covered payroll |
|---|---|---|---|---|---|---|
| June 30, 2017 | $    — | 1,138,309 | 1,138,309 | — % $ | 3,344,197 | 34.0 % |
| June 30, 2016 | — | 1,349,503 | 1,349,503 | — | 3,344,382 | 40.4 |
| June 30, 2015 | — | 1,428,788 | 1,428,788 | — | 3,319,280 | 43.0 |
| June 30, 2014 | — | 1,438,475 | 1,438,475 | — | 3,489,096 | 41.2 |
| June 30, 2013 | — | 1,482,879 | 1,482,879 | — | 3,489,096 | 42.5 |
| June 30, 2012 | — | 2,120,970 | 2,120,970 | — | 3,570,339 | 59.4 |
| June 30, 2011 | — | 1,758,389 | 1,758,389 | — | 3,666,402 | 48.0 |
| June 30, 2010 | — | 1,699,373 | 1,699,373 | — | 3,818,332 | 44.5 |

(1)  The System's OPEB funded status as of June 30, 2017 and 2016 were determined by the actuarial valuation at beginning of
year that was updated to roll forward the funded status to June 30, 2017 and 2016 and assuming no liability gains or losses.
Prior year actuarial valuations were made using end-of-year census data.

See accompanying notes to required supplementary information and independent auditors' report.

**EMPLOYEES' RETIREMENT SYSTEM OF THE GOVERNMENT
OF THE COMMONWEALTH OF PUERTO RICO**

(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Required Supplementary Information

June 30, 2017

**(1) Changes in Benefits Terms**

There have not been any changes in plan provisions since the prior valuation.

**(2) Changes in Assumptions**

Actuarial assumptions are revised periodically to more closely reflect actual, as well as anticipated future experience.

Based on the depletion of System assets during recent fiscal years and the implementation PayGo under Act 106-2017, the investment return assumption is no longer applicable to the System as of June 30, 2017. As of June 30, 2016, the investment return assumption was 6.55% per annum, net of investment expenses and based on the System's investment policy, including target asset allocation and expectations regarding the loan portfolio and the System's actuary's capital market assumptions as of June 30, 2016.

The projected mortality improvement scale was updated from Scale MP-2016 to Scale MP-2017, which was published by the Society of Actuaries in October 2017. Also, as Scale MP-2015 is a two-dimensional mortality scale, the base mortality rates for the post-retirement mortality assumption were set to the 2010 rates – the central year of the 2007 to 2012 System experience study upon which the rates were based. In addition, the pre-retirement mortality rates were also updated to reflect updated mortality tables published by the Society of Actuaries.

The asset basis for the date of depletion projection is the System's fiduciary net position (the gross assets plus deferred outflows of resources less the gross liabilities, including the senior pension funding bonds payable, plus deferred inflows of resources). On this basis, the System's fiduciary net position was exhausted in the fiscal year 2015.

In addition, the date of depletion projection of the actuarial report does not include any amounts from the Additional Uniform Contribution required by Act No. 32 because of actual fiscal and budgetary financial difficulties with continued budget deficits and liquidity risks of the Commonwealth, public corporations and the municipalities and in the event that their financial condition does not improve in the near term. In addition, Act 106-2017 eliminated the Additional Uniform Contribution.

The System's fiduciary net position was not projected to be available to make all projected future benefit payments of current active and inactive employees. Therefore, the tax free municipal bond index (Bond Buyer General Obligation 20-Bond Municipal Bond Index) was applied to all periods of projected benefits payments to determine the total pension liability.

(Continued)

**EMPLOYEES' RETIREMENT SYSTEM OF THE GOVERNMENT
OF THE COMMONWEALTH OF PUERTO RICO**

(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Required Supplementary Information

June 30, 2017

The discount rate used to determine the total pension liability increased from 2.85% at June 30, 2016 to 3.58% at June 30, 2017, determined under GASB Statement No. 67. Under GASB Statement No. 67, the investment return assumption is an input that is used in the calculation of the single equivalent interest rate that is used to discount these benefits to determine the Total Pension Liability. Under former GASB Statements No. 25 and No. 27, the investment return assumption was used to discount all projected Basic System Pension Benefits and System Administered Pension Benefits to determine the Actuarial Accrued Liability. For fiscal years 2008 to 2010 and for fiscal years 2011, 2012 and 2013, the discount rates determined under GASB Statements No. 25 and No. 27 were 7.50%, 6.40%, 6.00% and 6.40%, respectively.

Also, the valuations for fiscal year 2017 and 2016 reflect a salary freeze until July 1, 2017 due to Act No. 66 and the current economic conditions in Puerto Rico.

**(3) Changes in Actuarial Methods since the prior Valuation**

There have not been any changes in methods since the prior valuation.

In fiscal years 2017 and 2016, the census data collection date is as of beginning-of-fiscal-year. The total pension liability at end of year was determined by actuarial valuation as of the census data collection date at beginning-of-year and was then projected forward to end-of-year, using roll-forward methods and assuming no liability gains or losses.

The June 30, 2017, actuarial valuation reflects a decrease of $5,498 million in the net pension liability, mainly related to changes in assumptions of $4,179 million, as a result of an increase in the discount rate as required by GASB Statement No. 67 from 2.85% in fiscal year 2016 to 3.58% in fiscal year 2017, and the effect of plan changes of approximately $2,017 million.

**(4) Method and Assumptions Used in the System's Actuarial Valuation**

The following actuarial methods and assumptions were used in the System's actuarial valuation of June 30, 2017:

| | |
|---|---|
| Actuarial cost method | Entry age normal |
| Asset valuation method | Market value of assets |
| Inflation | Not applicable |
| Municipal bond index | 3.58%, as per Bond Buyer General Obligation 20-Bond Municipal Bond Index |
| Projected salary increases | 3.00% per year. No compensation increases are assumed until July 1, 2021 as a result of Act No. 3 of 2017, four year extension of the Act 66-2014 and the current general economy. |

(Continued)

**EMPLOYEES' RETIREMENT SYSTEM OF THE GOVERNMENT
OF THE COMMONWEALTH OF PUERTO RICO**
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Required Supplementary Information

June 30, 2017

Mortality

Pre-retirement Mortality:

For general employees not covered under Act No. 127, RP-2014 Employee Mortality Rates for males and females adjusted to reflect Mortality Improvement Scale MP-2017 from the 2006 base year, and projected forward using MP-2017 on generational basis. For members covered under Act No. 127, RP-2014 Employee Mortality Rates with blue collar adjustments for males and females adjusted to reflect Mortality Improvement Scale MP-2017 from the 2006 base year, and projected forward using MP-2017 on generational basis. As generational tables, they reflect mortality improvements both before and after the measurement date.

100% of deaths while in active service are assumed to be occupational for members covered under Act No. 127.

Post-retirement Healthy Mortality:

Rates which vary by gender are assumed for healthy retirees and beneficiaries based on a study of plan's experience from 2007 to 2012 and updated expectations regarding future mortality improvement. The 2010 base rates are equal to 92% of the rates from the UP-1994 Mortality Table for Males and 95% of the rates from the UP-1994 Mortality Table for Females, both projected from 1994 to 2010 using Scale AA. The base rates are projected using Mortality Improvement Scale MP-2017 on a generational basis. As a generational table, it reflects mortality improvements both before and after the measurement date.

Post-retirement Disabled Mortality:

Rates which vary by gender are assumed for disabled retirees based on a study of plan's experience from 2007 to 2012 and updated expectations regarding future mortality improvement. The 2010 base rates are equal to 105% of the rates from the UP-1994 Mortality Table for Males and 115% of the rates from the UP-1994 Mortality Table for Females. The base rates are projected using Mortality Improvement Scale MP-2017 on a generational basis. As a generational table, it reflects mortality improvements both before and after the measurement date.