# Exhibit 1

**Puerto Rico Statutes and Related Materials**

**3 L.P.R.A. § 779 (2008)**

*§ 779 Beneficios de retiro de los empleados del Sistema—Inversiones y reinversión de reservas*

(a) Definiciones.—A los fines de esta sección y de las secs. 779a, 779b y 779c de este título, los siguientes términos tendrán el significado que se expresa a continuación:

> (1) Sistema.—Es el Sistema de Retiro de los Empleados del Gobierno y sus Instrumentalidades.
> (2) Junta.—Es la Junta de Síndicos del Sistema.
> (3) Administrador.—Es el Administrador del Sistema.
> (4) Agencias clasificadoras de crédito.—Son aquellas entidades reconocidas, de uso extenso dentro de los Estados Unidos, al efecto de establecer la calidad de crédito respecto a los valores a ser emitidos en el mercado.
> (5) Capital de riesgo.—Es la inversión de capital en empresas nacientes o en desarrollo, de alto riesgo donde existe un alto potencial de crecimiento.
> (6) Escalas más altas de crédito.—Son las primeras cuatro (4) categorías en la clasificación de valores en cuanto a calidad crediticia.
> (7) Instrumento del mercado de dinero.—Cubre valores de corto plazo (un año o menos), tales como papel comercial, certificados de depósitos, depósitos a términos y aceptaciones bancarias, entre otros.
> (8) Futuros.—Son contratos negociados en mercados establecidos que especifican una fecha futura de entrega o recibo de una cantidad definida de un producto tangible o intangible de carácter específico.
> (9) Opciones.—Son derechos a comprar o vender una cantidad fija de un instrumento financiero específico a un precio definido por un límite de tiempo.
> (10) Valores para futura entrega.—Son contratos negociables en mercados interbancarios o de corretaje que especifican una fecha futura de entrega o recibo de una cantidad definida de un producto tangible o intangible de carácter específico.

(b) Tipos de inversiones autorizadas.—El Sistema mantendrá invertidos todos los recursos disponibles que no se requieran para su operación corriente y podrá invertir en los siguientes valores:

> (1)(A) Valores de rendimiento fijo.—Bonos, pagarés y obligaciones del Gobierno de los Estados Unidos, sus agencias e instrumentalidades.
> (B) Instrumentos del mercado de dinero; éstos deberán ser reconocidos y tener la clasificación más alta para este tipo de instrumento de corto plazo de cualquiera de las agencias clasificadoras de crédito.
> (C) Bonos, pagarés o títulos de deudas, sean éstos valores exentos o tributables, que representen obligaciones directas o que estén garantizadas por la buena fe y el crédito de entidades gubernamentales, instrumentalidades, empresas o corporaciones públicas y cualesquiera otras entidades gubernamentales, creadas al amparo de las leyes del Gobierno

**Add.1**

de los Estados Unidos, cualquiera de sus estados o del Estado Libre Asociado de Puerto Rico.

(D) Bonos, pagarés y obligaciones corporativas.

(E) Bonos, pagarés y obligaciones emitidas y garantizadas por gobiernos centrales de países extranjeros.

(F) Instrumentos financieros constituidos directa o indirectamente sobre obligaciones financieras, tales como préstamos hipotecarios, instrumentos colaterizados [sic] por tales préstamos, así como préstamos de automóvil y contratos de arrendamiento.

Las inversiones autorizadas en los párrafos (C), (D), (E) y (F) deberán estar clasificadas por las agencias clasificadoras de crédito en cualquiera de las cuatro escalas más altas de crédito.

(2)(A) Acciones.—Se autoriza al Sistema a comprar, vender o cambiar acciones comunes o acciones preferidas de cualquier corporación creada bajo las leyes de cualquier estado de los Estados Unidos o del gobierno federal o el Estado Libre Asociado de Puerto Rico o por países extranjeros, sujeto a los siguientes criterios:

(i) Las acciones a ser adquiridas deben ser cotizadas abiertamente en uno o más mercados financieros o sistemas de cotización electrónico de carácter nacional o internacional.

(ii) No se podrán adquirir valores mediante colocaciones privadas.

(iii) El Sistema no podrá invertir más del sesenta por ciento (60%) del total de sus recursos en esta clase de valores.

(iv) No se podrá invertir en empresas cuya valorización de mercado sea menor de cien millones (100,000,000) de dólares (moneda americana).

(v) El sistema no podrá tener más del cinco por ciento (5%) de las acciones autorizadas y en circulación de una empresa.

(vi) El sistema no podrá tener más del veinte por ciento (20%) de sus fondos invertidos en un solo sector económico.

(3) Propiedades inmuebles.—El Sistema podrá invertir hasta un máximo del quince por ciento (15%) de sus recursos totales en inversiones directas o indirectas en propiedades inmuebles que generen ingresos. En dicha inversión tiene que haber una expectativa razonable de rendimiento igual o superior a otros tipos de inversiones y que no se podrá invertir en terrenos que no estén desarrollados.

(4) Capital de riesgo.—El Sistema podrá invertir en capital de riesgo, en empresas nacientes, en desarrollo, de alto crecimiento o de alto riesgo, donde exista un alto potencial de apreciación. En este caso el Sistema podrá controlar más de un cinco por ciento (5%) de las acciones autorizadas, sujeto a que los fondos dedicados a este tipo de inversión no excedan de un cinco por ciento (5%) del total de los recursos del Sistema.

(5) Instrumentos financieros.—La Junta de Síndicos podrá autorizar al Sistema, mediante reglamentación al efecto, a hacer uso de instrumentos financieros, tales como opciones, futuros, valores para entrega futura y transacciones relacionadas al intercambio de moneda extranjera con el único propósito de reducir riesgo.

(c)(1) Restricciones y autorizaciones misceláneas.—Las inversiones en países extranjeros no excederán del treinta por ciento (30%) del total de los recursos del Sistema.

(2) No se invertirá en valores de ningún gobierno o empresa localizado en países comunistas o totalitarios o que discriminen por razón de sexo, raza, religión o afiliación política.

(3) Las inversiones del Sistema, tanto de rendimiento fijo como en acciones, podrán estar denominadas en moneda de los Estados Unidos o en monedas extranjeras.

(4) A los fines de realizar las inversiones autorizadas en las secs. 779 et seq. de este título, la Junta deberá contratar los servicios profesionales especializados que sean necesarios, incluyendo los de consultores y administradores de fondos del Sistema, money managers.

(5) Cualesquiera inversiones efectuadas bajo las disposiciones de esta sección se llevarán a cabo con la previsión, cuidado y bajo los criterios que los hombres prudentes, razonables y de experiencia ejercen en el manejo de sus propios asuntos, con fines de inversión y no especulativos, considerando el balance que debe existir entre expectativas de rendimiento y riesgo.

(6) El Secretario de Hacienda, en función de agente cobrador y pagador del Sistema, remesará a éste trimestralmente y dentro de los treinta (3) días siguientes al cierre de cada trimestre calendario, cualquier sobrante que tenga bajo su custodia, que se produzca como resultado del desempeño de dichas funciones.

(d) Autorización para incurrir en deudas.—La Junta de Síndicos podrá autorizar al Administrador para tomar prestado de cualquier institución financiera, del Gobierno del Estado Libre Asociado de Puerto Rico o del gobierno federal de los Estados Unidos de América, o mediante colocaciones directas de deuda, garantizando dicha deuda por los activos del Sistema. Los intereses devengados por dichas obligaciones estarán exentos de pago de contribuciones sobre ingresos al Estado Libre Asociado de Puerto Rico.


## 3 L.P.R.A. § 779 (2008)

### § 779 Employees Retirement System— Investment and reinvestment of reserves

(a) Definitions.— For the purposes of this section and §§ 779a-779c of this title, the following terms shall have the meaning stated below:

(1) System.— Is the Retirement System of the Employees of the Government and its Instrumentalities.

(2) Board.— Is the Board of Trustees of the System.

(3) Administrator.— Is the Administrator of the System.

(4) Credit rating agencies.— Are those recognized agencies extensively used in the United States to establish credit ratings with regard to securities to be issued in the market.

(5) Risk capital.— Is the investment of capital in new or developing high risk enterprises in which there is a high growth potential.

(6) Higher credit scales.— Are the first four (4) categories in the rating of securities with regard to their credit rating.

**Add.3**

(7) Money market instrument.— Covers, among others, short-term securities (a year or less) such as commercial paper, certificates of deposit, time deposits and bankers acceptances, among others.

(8) Futures.— Are contracts negotiated in established markets that specify a future date of delivery or receipt of a stated amount of a tangible or an intangible product of a specific nature.

(9) Options.— Are rights to purchase or sell a fixed amount of a specific financial instrument at a stated price for a limited time.

(10) Future delivery securities.— Are negotiable contracts in interbank or brokerage markets that specify a future date of delivery or the receipt of a definite amount of a tangible or an intangible product of a specific nature.

(b) Types of investments authorized.— The System shall keep all the available resources which are not needed for its ordinary operation invested and may invest in the following securities:

(1) Fixed yield securities.—
> (A) Bonds, notes and obligations of the Government of the United States, its agencies and instrumentalities.
> (B) Money market instruments; these must be recognized and have the highest rating for this type of short-term instrument of any of the credit-rating agencies.
> (C) Bonds, notes or evidence of indebtedness, whether exempted or taxable securities that represent direct obligations or are secured by the good faith and credit of the government entities, instrumentalities, enterprises or public corporations and any other government entities created under the laws of the Government of the United States, any of its states, or of the Commonwealth of Puerto Rico.
> (D) Bonds, promissory notes and corporate obligations.
> (E) Bonds, promissory notes and obligations issued and secured by the central government of foreign countries.
> (F) Financial instruments constituted directly or indirectly on financial obligations such as mortgage loans, instruments secured by such loans, as well as automobile loans and lease contracts.

The investments authorized by paragraphs (C), (D), (E), and (F) of this clause must be rated by the credit-rating agencies in any one of the four highest credit classifications.

(2) Stock.—
> (A) The System is hereby authorized to purchase, sell or barter common or preferred stock of any corporation created under the laws of any state of the United States or the Federal Government or the Commonwealth of Puerto Rico, or by foreign countries, subject to the following criteria:
>> (i) That the stock to be acquired must be openly quoted in one or more financial markets or electronic quotation system of a national or international nature.
>> (ii) Securities shall not be acquired through private placings.
>> (iii) The System shall not invest more than 60% of its total resources in this type of securities.
>> (iv) No investment shall be made in enterprises whose market value is less than one hundred million (100,000,000) dollars (United States currency).

**Add.4**

(v) The System shall not hold more than 5% of an enterprise's authorized shares outstanding.

(vi) The System shall not have more than 20% of its funds invested in one single economic sector.

(3) Real properties.— The System may invest up to a maximum of 15% of its total resources in direct or indirect investments in income-yielding real estate. In such investments there must be a reasonable expectation of a yield equal to or higher than other types of investments and no investment may be made in undeveloped land.

(4) Risk capital.— The System may invest in risk capital, new or developing high risk or high growth enterprises where there is a high appreciation potential. In this case, the System may control more than 5% of the authorized shares, provided the funds dedicated to this type of investment do not exceed 5% of the total resources of the System.

(5) Financial instruments.— The Board of Trustees may authorize the System, through regulations, to make use of financial instruments such as options, futures, future delivery securities and transactions related to the exchange of foreign currency for the sole purpose of reducing risks.

(c) Restrictions and miscellaneous authorizations.—

(1) Investments in foreign countries shall not exceed 30% of the total resources of the System.

(2) No investment shall be made in securities of any government or firm located in communist or totalitarian countries or that discriminate for reasons of sex, race, religion or political affiliation.

(3) The investments by the System, whether of fixed yield as well as in stock, may be denominated in United States currency or foreign currency.

(4) In order to carry out the investments authorized by §§ 779-779c of this title, the Board shall contract the necessary specialized professional services including consultants and managers of System funds money managers.

(5) Any investments whatsoever made under the provisions of this section shall be carried out with foresight and care and according to, the criteria that prudent, reasonable and experienced men exercise when handling their own affairs, for investment and nonspeculative purposes, taking into account the balance that must exist between yield expectation and risks.

(6) The Secretary of the Treasury, acting as collecting and paying agent of the System, shall remit to it any remainder under his custody that is produced as a result of exercising those duties, quarterly and within thirty (30) days following the close of each calendar quarter.

(d) Authorization to incur debts.— The Board of Trustees may authorize the Administrator to seek a loan from any financial institution of the Government of the Commonwealth of Puerto Rico or the Federal Government of the United States of America or through the direct placement of debts, securing said debt with the assets of the System. The interest accrued by these obligations shall be exempt from the payment of income tax to the Commonwealth of Puerto Rico.

# Exhibit 2

(a) He has actual knowledge of it; or
(b) he has received a notice or notification of it, or
(c) from all the facts and circumstances known to him at the time in question he has reason to know that it exists.

A person 'knows' or has 'knowledge' of a fact when he has actual knowledge of it. 'Discover' or 'learn' or a word or phrase of similar imp ort refers to knowledge rather than to sic reason to know. The time and circumstances under which a notice or notification may cease to be effective are not determined by §§ 401 et seq. of this title.

…

## 19 L.P.R.A. § 1752 (U.C.C. § 8-202)

### *§ 1752 Issuer's responsibility and defenses; notice of defect or defense*

(a) Even against a purchaser for value and without notice, the terms of a certificated security include terms stated on the certificate and terms made part of the security by reference on the certificate to another instrument, indenture, or document or to a constitution, statute, ordinance, rule, regulation, order, or the like, to the extent the terms referred to do not conflict with terms stated on the certificate. A reference under this subsection does not of itself charge a purchaser for value with notice of a defect going to the validity of the security, even if the certificate expressly states that a person accepting it admits notice. The terms of an uncertificated security include those stated in any instrument, indenture, or document or in a constitution, statute, ordinance, rule, regulation, order, or the like, pursuant to which the security is issued.

(b) The following rules apply if an issuer asserts that a security is not valid:
(1) A security other than one issued by a government or governmental subdivision, agency, or instrumentality, even though issued with a defect going to its validity, is valid in the hands of a purchaser for value and without notice of the particular defect unless the defect involves a violation of a constitutional provision. In that case, the security is valid in the hands of a purchaser for value and without notice of the defect, other than one who takes by original issue.
(2) Clause (1) of this subsection applies to an issuer that is a government or governmental subdivision, agency, or instrumentality only if there has been substantial compliance with the legal requirements governing the issue or the issuer has received a substantial consideration for the issue as a whole or for that particular security and a stated purpose of the issue is one for which the issuer has power to borrow money or issue the security.

(c) Except as otherwise provided in § 1755 of this title, lack of genuineness of a certificated security is a complete defense, even against a purchaser for value and without notice.

(d) All other defenses of the issuer of a security, including nondelivery and conditional delivery of a certificated security, are ineffective against a purchaser for value who has taken the certificated security without notice of the particular defense.

(e) This section does not affect the right of a party to cancel a contract for a security 'when, as and if issued' or 'when distributed' in the event of a material change in the character of the security that is the subject of the contract or in the plan or arrangement pursuant to which the security is to be issued or distributed.

(f) If a security is held by a securities intermediary against whom an entitlement holder has a security entitlement with respect to the security, the issuer may not assert any defense that the issuer could not assert if the entitlement holder had the security directly.

## UCC § 8-202 cmt. 3

3. The penultimate sentence of subsection (a) and all of subsection (b) embody the concept that it is the duty of the issuer, not of the purchaser, to make sure that the security complies with the law governing its issue. The penultimate sentence of subsection (a) makes clear that the issuer cannot, by incorporating a reference to a statute or other document, charge the purchaser with notice of the security's invalidity. Subsection (b) gives to a purchaser for value without notice of the defect the right to enforce the security against the issuer despite the presence of a defect that otherwise would render the security invalid. There are three circumstances in which a purchaser does not gain such rights: First, if the defect involves a violation of constitutional provisions, these rights accrue only to a subsequent purchaser, that is, one who takes other than by original issue. This Article leaves to the law of each particular State the rights of a purchaser on original issue of a security with a constitutional defect. No negative implication is intended by the explicit grant of rights to a subsequent purchaser.

Second, governmental issuers are distinguished in subsection (b) from other issuers as a matter of public policy, and additional safeguards are imposed before governmental issues are validated. Governmental issuers are estopped from asserting defenses only if there has been substantial compliance with the legal requirements governing the issue or if substantial consideration has been received and a stated purpose of the issue is one for which the issuer has power to borrow money or issue the security. The purpose of the substantial compliance requirement is to make certain that a mere technicality as, e.g., in the manner of publishing election notices, shall not be a ground for depriving an innocent purchaser of rights in the security. The policy is here adopted of such cases as Tommie v. City of Gadsden, 229 Ala. 521, 158 So. 763 (1935), in which minor discrepancies in the form of the election ballot used were overlooked and the bonds were declared valid since there had been substantial compliance with the statute.

A long and well established line of federal cases recognizes the principle of estoppel in favor of purchasers for value without notices where municipalities issue bonds containing recitals of compliance with governing constitutional and statutory provisions, made by the municipal authorities entrusted with determining such compliance. Chaffee County v. Potter, 142 U.S. 355 (1892); Town of Oregon v. Jennings, 119 U.S. 74 (1886); Gunnison County Commissioners v. Rollins, 173 U.S. 255 (1898). This rule has been qualified, however, by requiring that the municipality have power to issue the security. Anthony v. County of Jasper, 101 U.S. 693 (1879); Town of South Ottawa v. Perkins, 94 U.S. 260 (1876). This section follows the case law trend, simplifying the rule by setting up two conditions for an estoppel against a governmental issuer: (1)

Add.15

Substantial consideration given, and (2) power in the issuer to borrow money or issue the security for the stated purpose. As a practical matter the problem of policing governmental issuers has been alleviated by the present practice of requiring legal opinions as to the validity of the issue. The bulk of the case law on this point is nearly 100 years old and it may be assumed that the question now seldom arises.

Section 8-210, regarding overissue, provides the third exception to the rule that an innocent purchase for value takes a valid security despite the presence of a defect that would otherwise give rise to invalidity. See that section and its Comment for further explanation.

# Exhibit 3

# Exhibit 6

FIDDLER GONZALEZ & RODRIGUEZ, P.S.C.

ATTORNEYS AND COUNSELORS AT LAW

PO BOX 363507

SAN JUAN, PR 00936-3507

TELEPHONE (787) 753-3113
FAX (787) 759-3123

254 MUÑOZ RIVERA AVENUE
CORNER CHARDÓN STREET
6TH FLOOR
HATO REY, PR 00918

March 9, 2007

Mr. Juan A. Cancel Alegría
Administrator
Employees Retirement System of
 the Government of the Commonwealth
 of Puerto Rico
437 Ponce de León Avenue
San Juan, Puerto Rico 00940

Dear Mr. Cancel:

At your request, we have examined Act No. 447 of May 15, 1951, as amended (the "Act 447")[1] to determine whether the Employees Retirement System of the Government of the Commonwealth of Puerto Rico (the "System") may issue bonds secured by a pledge of employer contributions payable to the System pursuant to Act 447. For the reasons stated below, we believe that the System is able to issue such bonds and secure their payment with a pledge of such contributions.

### *Facts and Assumption:*

The System was created pursuant to Act 447. The System is a public retirement system and is not subject to the provisions of the Employee Retirement Income Security Act of 1974, as amended.

The System intends to enter into a transaction whereby it would issue "non-recourse" obligations in the form of bonds or notes payable from and secured by a pledge of future statutory employer contributions to the System (the "Transaction"). These obligations (the "Bonds") will be "non-recourse" to the System, which means that no other assets of the System will be pledged or encumbered for the benefit of the holders of the Bonds. Therefore, if the employer contributions pledged are not sufficient to pay the Bonds, neither the System nor any other entity (including the Commonwealth of Puerto Rico, its instrumentalities and political subdivisions) will be liable or responsible for the payment of such Bonds.

---

[1] 3 L.P.R.A. § 761 et. seq.

Mr. Juan A. Cancel Alegría
Employees Retirement System of the Government of the Commonwealth of Puerto Rico
March 9, 2007
Page -2-

### Questions:

1. Is the System authorized to issue the Bonds?
2. If it may issue the Bonds, is the statutory right of the System to receive future employer contributions a legal asset[2] of the System that may be pledged to secure the payment of the Bonds?

### Discussion:

Section 4-105(d) of Act 447 states:

"(d) Authorization to incur debts.-- *The Board of Trustees may authorize the Administrator to seek a loan* from any financial institution, the Government of the Commonwealth of Puerto Rico or the Federal Government of the United States of America or *through the direct placement of debts, securing said debt with the assets of the System.* The interest accrued by these obligations shall be exempt from the payment of income tax to the Commonwealth of Puerto Rico." 3 L.P.R.A. §779(d) (Emphasis added)

Therefore, Section 4-105(d) of Act 447 provides statutory authority for the System to issue debt that is secured with the assets of the System. The question then is whether the right of the System to receive future employer contributions is a legal asset of the System within the meaning of Section 4-105(d) of Act 447 that can be used to secure those debts issued by the System.

Section 2-116 of Act 447 establishes the obligation of employers[3] to make contributions to the System. The relevant subsections for this analysis are (a), (e) and (g) and read as follows:

"(a) The employer's contributions should cover the difference between the total cost of the benefits provided by the System as well as costs of administration, reduced by the portion contributed by participants.

---

[2] We make reference to "legal asset" because we are opining as to the treatment of certain rights and obligations under the law and we are not opining as to the accounting status of these obligations and rights under Generally Accepted Accounting Principles or any other accounting principles that may apply.

[3] "Employers" is defined under Act 447 to mean the Government of Puerto Rico, or any Public Enterprise, or municipality. In relevant part, Act 447 defines "Public Enterprise" as any government instrumentality of the Commonwealth of Puerto Rico heretofore or hereafter created. It does not, however, include those subsidiary enterprises of government instrumentalities whose employees, in the judgment of the Board of Trustees of the System, may not have a clear relationship of "employee and employer with regard to the Commonwealth of Puerto Rico." Therefore, our use of the term "employers" includes other entities separate from the Commonwealth of Puerto Rico.

Mr. Juan A. Cancel Alegría
Employees Retirement System of the Government of the Commonwealth of Puerto Rico
March 9, 2007
Page -3-

.        .        .        .        .        .        .        .        .

"(e) Any difference between the contribution required by subsection (c)(3)
of this section and the minimum contribution of 9.275% mentioned above
shall constitute a deficiency in the employer contribution. The *obligation
accrued* as a result of this deficiency shall constitute an actuarial deficit
for the System *and an obligation of the employer*.

.        .        .        .        .        .        .        .        .

"(g) The contributions of each employer shall be included in the budget
and shall be appropriated annually together with appropriations for
salaries or compensation of employees." 3 L.P.R.A. §781 (Emphasis
added)

Section 3-105 of Act 447 also provides that in the case of participants of "Sistema
2000", employer contributions are also obligations of the employers. Section 3-105 of
Act 447 states that:

"Every employer *shall compulsorily contribute* to the System a sum equal
to nine point two hundred and seventy-five percent (9.275%) of the salary
of each participant of the Program as long as the participant is an
employee. These contributions shall be deposited in the System to increase
the level of the assets of the System, reduce the actuarial deficit, and
enable the System to meet its future obligations. 3 L.P.R.A. §786-5
(Emphasis added)

Section 4-113 of Act 447 also provides that:

"It is the intent of this Act that the contributions required from the
employer, as well as all annuities, benefits, reimbursements, and
administration expenses, *shall constitute obligations of the employer*." 3
L.P.R.A. §787 (Emphasis added)

Sections 2-116(e), 3-105 and 4-113 of Act 447 clearly establish that the
obligations to make contributions by the employer are obligations of the subject employer
to the System.

Article 1042 of the Puerto Rico Civil Code (the "Civil Code") establishes that:

"Obligations are created *by law*, by contracts, by quasi contracts, and by
illicit acts and omissions or by those in which any kind of fault or
negligence occurs." 31 L.P.R.A. § 2992 (Emphasis added).

ERS 0147441

Mr. Juan A. Cancel Alegría
Employees Retirement System of the Government of the Commonwealth of Puerto Rico
March 9, 2007
Page -4-

In addition, Article 1043 of the Civil Code establishes that:

"Obligations arising from law are not presumed. Those expressly determined in this Code or in special laws are the only demandable ones, and they shall be governed by the provisions of the laws which may have established them and by those of this subtitle in regard to what has not been prescribed by said laws." 31 L.P.R.A. §2993

Therefore, the obligation of employers to the System is demandable since it is an express obligation stated in Sections 2-116(e), 3-105 and 4-113 of Act 447. In addition, said obligation is governed by Act 447 as the special law that established the obligation and by the Civil Code in regard to what has not been prescribed by Act 447.

The obligations of the employers to make contributions to the System are obligations of the employers on one hand and a right of the System to receive those contributions on the other. In other words, a liability for the employers and an asset for the System. The Civil Code does not use the words "liabilities" or "assets" but uses equivalent terms such as "obligations" and "property" or "bienes" in Spanish, which the Supreme Court of Puerto Rico has equated to "assets." See, *Díaz v. Alcalá*, 140 D.P.R. 959 (1996).

Article 252 of the Civil Code states:

"The word *property* is applicable in general to anything of which riches or fortune may consist. This word is likewise relative to the word *things*, which is the second object of jurisprudence, the rules of which refer to persons, things and actions." 31 L.P.R.A. §1021 (Emphasis added)

Article 258 of the Civil Code states:

"Things are furthermore divided into corporeal and incorporeal. Corporeal things are such as are manifest to the senses, which may be touched or tasted, whether animate or inanimate. Of this kind are fruits, corn, gold, silver, clothes, furniture, lands, meadows, woods, houses and others.

*"Incorporeal things are such as are not manifest to the senses, and which are conceived only by the understanding, such as the rights of inheritance, servitudes and obligations."* 31 L.P.R.A. §1027 (Emphasis added)

In *Díaz v. Alcalá*, supra, the Supreme Court recognized the right of a future income flow as an asset. *Id.* at pages 972-973. This case discussed the right of lucrum cessans as "property." In the discussion the Supreme Court cited Civil Code

ERS_0147442

Mr. Juan A. Cancel Alegría
Employees Retirement System of the Government of the Commonwealth of Puerto Rico
March 9, 2007
Page -5-

commentators that offer bases for their analysis. For instance, Eduardo Vázquez Bote
points out:

> "[C]onsidering juridical evolution, there seem to be sufficient grounds to
> state, aside from the Civil Code's lack of rigor, that the word property is
> broader than the word things, as Planiol says. Although originally the
> word property referred fundamentally to corporeal objects, and
> specifically to immovables, the progress of juridical life and modifications
> made in the social conscience have greatly broadened its scope to
> encompass everything that constitutes an element of fortune and wealth
> that may be subject to appropriation. In this sense, property encompasses
> all kinds of things: houses, lands, movables, credits, rents, royalties,
> invention patents, etc. Thus, it includes, together with material things, a
> certain number of incorporeal assets: the rights." 7 Eduardo Vázquez Bote,
> Tratado teórico, práctico y crítico de derecho privado puertorriqueño:
> derechos reales 4-5, Oxford, Equity Pub. Co. (1991).[4]

Based on the above discussion, the obligation of the employers to make
contributions to the System pursuant to Act 447 is an incorporeal *thing* and *property*
owned by the System, and, therefore, a legal asset of the System. Section 4-105(d) of Act
447 does not suggest that assets of the System that may be used as security for its debts
are "accounting assets" and our opinion does not address whether any legal assets are
accounting assets. The context in which Section 4-105(d) of Act 447 uses the term
"asset" addresses the legal nature thereof, in other words, that such assets be legally
available to creditors of the System holding the subject debt secured by such assets and
not an "accounting asset" which is an asset for accounting purposes of the System.

Act 447 per Section 4-105(d) quoted above, expressly permits the System to issue
debt secured by its assets, and the Bonds will be such a debt of the System because each
Bond will be a promise by the System to repay the amount borrowed. The Bonds will be
"non-recourse" obligations, and the only asset of the System that the holders of the Bonds
may look to for payment is the future employer contributions and not the other assets of
the System, including the proceeds from the sale of the Bonds and the invested assets of
the System.

The total amount of debt that the System may incur pursuant to Section 4-105(d)
of Act 447 will depend upon the total legal assets of the System. As per our discussion
above, said legal assets include the right to receive future employer contributions from
employers. Given the fact that the Bonds are not secured by other assets of the System
other than the right to receive future employer contributions from employers, the amount

---

[4] As cited in English in the official translation of *Díaz* v. *Alcalá*, supra, by the Supreme Court on Footnote
4, 1996 WL 940337 (May 28, 1996).

Mr. Juan A. Cancel Alegría
Employees Retirement System of the Government of the Commonwealth of Puerto Rico
March 9, 2007
Page -6-

of the Bonds that the System may issue will depend upon the value of the legal asset being pledged[5] and not the value of the other assets of the System.

### *Conclusions:*

Based on the foregoing, it is our opinion that:

1. The System is authorized pursuant to Section 4-105(d) of Act 447 to incur debt secured by the assets of the System, and the Bonds are such a debt.
2. The statutory right of the System to receive future employer contributions pursuant to Sections 2-116(e), 3-105 and 4-113 of Act 447 is an obligation of the employers and a legal asset of the System.
3. As a legal asset of the System, this right may be pledged to secure the Bonds.

This opinion is furnished to you and is not to be used, circulated, quoted or otherwise referred to for any other purposes without our express written consent; provided, however, that you may provide a copy to your external auditors and actuaries. We hereby consent to their reliance on this opinion related to their audit and financial accounting analyses of the System in connection with the Transaction. In authorizing you to provide such a copy to your auditors and actuaries, we are not undertaking or assuming any duty or obligation to or establishing any lawyer-client relationship with them. Furthermore, we do not undertake or assume any responsibility with respect to your financial statements, and we have no obligation to update this opinion.

Very truly yours,

Fiddler Gonzàlez & Rodriguez, PSC

---

[5] In the case of future employer contributions payable to the System, this value could reasonably be the present value or equivalent value of the expected future revenue flow.

# Exhibit 4

Case:17-03283-LTS Doc#:14504 Filed:09/03/05 Entered:09/03/05 13:20:44 Desc: Main
Case:17-03283-LTS Doc#:14504 Filed:09/03/05 Entered:09/03/05 13:20:44 Desc: Main
Document 20 Page 20 of 380

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re: | PROMESA<br>Title III |
| THE FINANCIAL OVERSIGHT AND<br>MANAGEMENT BOARD FOR PUERTO RICO | Case No. 17-BK-03283 (LTS) |
| as representative of | |
| THE COMMONWEALTH OF PUERTO RICO, *et al.*, | |
| Debtors.[1] | |
| In re: | PROMESA<br>Title III |
| THE FINANCIAL OVERSIGHT AND<br>MANAGEMENT BOARD FOR PUERTO RICO, | Case No. 17-BK-03566 (LTS) |
| as representative of | |
| THE EMPLOYEES RETIREMENT SYSTEM OF THE<br>GOVERNMENT OF THE COMMONWEALTH OF<br>PUERTO RICO, | |
| Debtor. | |
| THE SPECIAL CLAIMS COMMITTEE OF THE<br>FINANCIAL OVERSIGHT AND MANAGEMENT<br>BOARD FOR PUERTO RICO, ACTING BY AND<br>THROUGH ITS MEMBERS, | Adv. Proc. No. 19-00356 (LTS) |

[1] The Debtors in these Title III cases, along with each Debtor's respective Title III case number listed as a bankruptcy case number due to software limitations and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK- 3283 (LTS)) (Last Four Digits of Federal Tax ID: 3481), (ii) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566 (LTS)) (Last Four Digits of Federal Tax ID: 9686), (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567 (LTS)) (Last Four Digits of Federal Tax ID: 3808), (iv) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284 (LTS)) (Last Four Digits of Federal Tax ID: 8474); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17-BK- 4780) (Last Four Digits of Federal Tax ID: 3747).

<table>
<tr><td>and</td><td>)</td></tr>
<tr><td></td><td>)</td></tr>
<tr><td>THE OFFICIAL COMMITTEE OF UNSECURED<br>CREDITORS OF ALL TITLE III DEBTORS<br>(OTHER THAN COFINA),</td><td>)<br>)<br>)</td></tr>
<tr><td></td><td>)</td></tr>
<tr><td>as co-trustees of</td><td>)</td></tr>
<tr><td></td><td>)</td></tr>
<tr><td>THE EMPLOYEES RETIREMENT SYSTEM OF THE<br>GOVERNMENT OF PUERTO RICO,</td><td>)<br>)</td></tr>
<tr><td></td><td>)</td></tr>
<tr><td>Plaintiff,</td><td>)</td></tr>
<tr><td></td><td>)</td></tr>
<tr><td>v.</td><td>)</td></tr>
<tr><td></td><td>)</td></tr>
<tr><td>DEFENDANT 1M, <em>et al.</em>,</td><td>)</td></tr>
<tr><td></td><td>)</td></tr>
<tr><td>Defendants.</td><td>)</td></tr>
<tr><td></td><td>)</td></tr>
</table>

| | |
|---|---|
| THE SPECIAL CLAIMS COMMITTEE OF THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, ACTING BY AND THROUGH ITS MEMBERS, ) ) ) ) ) | Adv. Proc. No. 19-00357 (LTS) |

and                                            )

THE OFFICIAL COMMITTEE OF UNSECURED        )
CREDITORS OF ALL TITLE III DEBTORS         )
(OTHER THAN COFINA),                        )

    as co-trustees of                      )

THE EMPLOYEES RETIREMENT SYSTEM OF THE     )
GOVERNMENT OF PUERTO RICO,                  )

    Plaintiff,                            )

v.                                            )

STOEVER GLASS & CO., *et al.*,               )

Defendant.                                      )
                                                )
                                                )
_____       )
                                                )
THE SPECIAL CLAIMS COMMITTEE OF THE             )
FINANCIAL OVERSIGHT AND MANAGEMENT              )
BOARD FOR PUERTO RICO, ACTING BY AND            )      Adv. Proc. No. 19-00359 (LTS)
THROUGH ITS MEMBERS,                            )
                                                )
        and                                     )
                                                )
THE OFFICIAL COMMITTEE OF UNSECURED             )
CREDITORS OF ALL TITLE III DEBTORS              )
(OTHER THAN COFINA),                            )
                                                )
        as co-trustees of                       )
                                                )
THE EMPLOYEES RETIREMENT SYSTEM OF THE          )
GOVERNMENT OF PUERTO RICO,                      )
                                                )
        Plaintiff,                              )
                                                )
v.                                              )
                                                )
DEFENDANT 1H-78H,                               )
                                                )
        Defendants.                             )
                                                )
_____       )
                                                )
THE SPECIAL CLAIMS COMMITTEE OF THE             )
FINANCIAL OVERSIGHT AND MANAGEMENT              )
BOARD FOR PUERTO RICO, ACTING BY AND            )      Adv. Proc. No. 19-00361 (LTS)
THROUGH ITS MEMBERS,                            )
                                                )
        and                                     )
                                                )
THE OFFICIAL COMMITTEE OF UNSECURED             )
CREDITORS OF ALL TITLE III DEBTORS              )
(OTHER THAN COFINA),                            )
                                                )
        as co-trustees of                       )
                                                )
                                                )

3

THE EMPLOYEES RETIREMENT SYSTEM OF THE )
GOVERNMENT OF PUERTO RICO,                )
                                          )
      Plaintiff,                         )
                                          )
v.                                        )
                                          )
DEFENDANT 1G-50G, *et al.*,               )
                                          )
      Defendants.                        )
                                          )
------------------------------------------------------------------------ X

### DECLARATION OF DR. W. BARTLEY HILDRETH

I, Dr. W. Bartley Hildreth, hereby declare under penalty of perjury:

1.     I am a Professor of Public Management and Policy in the Andrew Young School of Policy Studies at Georgia State University. I was retained as an expert witness by certain of the ERS Bondholders in these proceedings.

2.     Attached as Exhibit 1 is a true and correct copy of my expert report in this case. Exhibit 1 is based on my personal knowledge and expertise and on the materials cited in Exhibit 1.

3.     Attached as Exhibit 2 is a true and correct copy of my rebuttal report in this case. Exhibit 2 is based on my personal knowledge and expertise and on the materials cited in Exhibits 1 and 2.

4.     If called to testify in these proceedings, I would testify to the opinions contained in Exhibits 1 and 2.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America, to the best of my knowledge, that the foregoing is true and correct.

Dated: September 9, 2020
     Atlanta, GA

                          Dr. W. Bartley Hildreth

4

# Exhibit 1

# EXPERT REPORT OF

# WILLIAM BARTLEY HILDRETH

In the case of

In re:

The Financial Oversight and Management Board for Puerto Rico, as representative of

The Employees Retirement System of the

Government of the Commonwealth of Puerto Rico

## I. CREDENTIALS

1. I, William Bartley Hildreth, serve in my personal, professional capacity and all communications, representations, and expert opinions constitute my own views and not necessarily those of any organization or group for which I am affiliated.

2. My academic position is Professor of public management and policy in the Andrew Young School of Policy Studies at Georgia State University, a tenured position I have held since July 2009.

3. My Ph.D. in public administration is from the University of Georgia (1979), my masters of public administration (M.P.A.) is from Auburn University at Montgomery (1974), and my bachelors of arts (B.A.) in political science is from the University of Alabama (1971).

4. Since 1979, I have taught public budgeting, financial management, and municipal securities, among other topics.

5. My scholarly awards include the 2008 Aaron B. Wildavsky Award for lifetime scholarly achievement in the field of public budgeting and financial management; and, in 2017, receipt of my second (the first in 2012) best research article published in that volume of the quarterly journal *Public Budgeting & Finance*, with both of the co-authored articles involving municipal securities.

6. I serve as editor-in-chief (1989 to present) of the *Municipal Finance Journal*, the only professional quarterly journal dedicated to peer-reviewed articles on municipal securities and the financing of state and local governments, where my role is to facilitate communication between peer reviewers and the author of a submitted manuscript, but neither to proof the author's work nor necessarily to agree with the author's work.

7. I served as Director of Finance for the City of Akron, Ohio (January 1984 to July 1985) where I was responsible for budgeting, accounting (as the "chief accounting officer"), financial statement preparation (including issuance of the city's first Comprehensive Annual Financial Report), grant management, debt financing, income tax administration, procurement, internal auditing, and other fiscal policy obligations.

8. In addition to managing the city budget through a severe recession and high inflation, the major fiscal issue faced (and successfully completed) during my service as Akron's Director of Finance was to resolve a technical default of a bond issue for a city enterprise operation that threatened to place the city government and all its finances under a state-defined financial emergency.

9. Other public budgeting and finance experience includes, but is not limited to, relevant service such as: Kansas gubernatorial appointee, and State Senate confirmed, member of the board of directors of the statewide, multipurpose conduit bond issuer for qualifying public and private entities – the Kansas Development Finance Authority (1997 to 2003); and, member of the board of directors of the conduit bond issuing authority for the city of Wichita, Kansas – the Wichita Public Building Commission (1999 to 2003).

10. I served as a member of the Governmental Accounting Standards Advisory Council (2002 to 2003), the group charged by the Financial Accounting Foundation to provide counsel on technical projects, priorities, and accounting issues to the Governmental Accounting Standards Board (GASB).

11. My published work in municipal securities includes the *State and Local Government Debt Issuance and Management Service,* among others contained in my Curriculum Vitae.

12. I was the only academic on the task force on municipal disclosure that produced the
*Disclosure Guidelines for State and Local Government Securities* (1988 and 1991 versions),
a widely followed set of voluntary standards that predated action by the U.S. Securities and
Exchange Commission [S.E.C.] in adopting Rule 15c2-12 in 1989 to enhance the quality
and timeliness of disclosure to investors in municipal securities [as confirmed by the S.E.C.,
*Statement of the Commission Regarding Disclosure Obligations of Municipal Securities
Issuers and Others*, Federal Register, vol. 59, no. 52, March 17, 1994, page 12748].

13. I served as a 'public member' of the Municipal Securities Rulemaking Board [MSRB] for
the term from October 2012 to September 2015. MSRB was created by Congress to promote
a fair and efficient municipal securities market. In addition to its role in regulating
Broker/Dealers (also known as 'underwriters') of municipal securities since 1975, the
MSRB started regulating Municipal Advisors (also known as 'financial advisors' to debt
issuers) during my term. The MSRB also operates the Electronic Municipal Market Access
facility [EMMA] – the official source for municipal securities trading data and disclosure
documents.

14. In 2018, I received the Industry Contribution Award from the National Federation of
Municipal Analysts, which is the professional association of municipal analysts from credit
rating organizations, broker/dealers, institutional investors, and other organizations involved
in the municipal securities market.

15. I am an elected Fellow of the National Academy of Public Administration which was
established by Congress to advise the federal government and to promote good governance
generally.

16. I am an investor in municipal securities, although I have not directly owned any bonds issued by the Commonwealth of Puerto Rico or its agencies.

17. Public administration practitioners and scholars, like me, cite law and legal provisions not in any attempt to imply one's practice of law, but rather in recognition that public organizations are creatures of and operate under rules codified by law and it advances public governance and management to cite those references.

18. Additional details regarding my qualifications including my publications is provided in my Curriculum Vitae in Appendix D.

19. A listing of my recent expert testimony activity is provided in Appendix B to this Report.


## II. BACKGROUND

20. The Employees Retirement System of Puerto Rico [the "System" or just ERS] was created in 1951 and the enabling Act was amended in 1988 to include the "Authorization to Incur Debts." [Laws of Puerto Rico, No. 447, approved May 15, 1951; H.B. 1346, No. 46, approved June 29, 1988]

21. "On February 27, 2007, the System's administration and the Government Development Bank for Puerto Rico, acting as the System's fiscal agent, presented to the Board of Trustees a financial transaction for the issuance of pension funding bonds. The System authorized the issuance of one or more series of bonds …." [ERS "Basic Financial Statements and Required Supplementary Information, June 30, 2014", dated June 1, 2016 by the auditor (KPMG LLP), page 16.]

22. On January 31, 2008, ERS issued $1,588,810,799.60 aggregate principal amount of Senior Pension Funding Bonds, Series A. [ERS Series A, Tab 4, Official Statement, dated January

29, 2008, cover.; ERS "Basic Financial Statements and Required Supplementary

Information, June 30, 2014", dated June 1, 2016 by the auditor (KPMG LLP), page 16.]

23. On June 2, 2008, ERS issued $1,058,634,613.05 aggregate principal amount of Senior

Pension Funding Bonds, Series B. [ERS Series B, Tab 3, Official Statement, dated May 28,

2008, cover; and, ERS "Basic Financial Statements and Required Supplementary

Information, June 30, 2014", dated June 1, 2016 by the auditor (KPMG LLP), page 16.]

24. On June 30, 2008, ERS issued $300,202,930 aggregate principal amount of Senior Pension

Funding Bonds, Series C. [ERS Series C, Official Statement, dated June 26, 2008, cover, at

PDF page 330; and, ERS "Basic Financial Statements and Required Supplementary

Information, June 30, 2014", dated June 1, 2016 by the auditor (KPMG LLP), page 16.]

25. As shown in my Appendix A, the total par amount of the 2018 Series A, B, and C bonds that

the ERS owed after issuing the bonds was $2,947,648,342.65, and after reduction of all up-

front costs (excluding the original issuance discount), the ERS actually received 92.56

percent of par amount, or $2,728,354,896.87. [Appendix A based on Series A bonds, Tab

38-48, Final Closing Memorandum; Series B bonds, Tab 38, Final Closing Memorandum;

and Series C bonds, Final Closing Memorandum, Tab 48, PDF pages 753-756]

26. As shown in my Appendix A, the uses of the total proceeds for the cost of issuance,

underwriter's discount, debt service reserve fund, and the capitalized interest fund totaled

$211,404,095.78, or 7.48 percent of par.

27. Each series of bonds included both term bonds, which pay semi-annual interest at the same

rate over the life of the bond while the principal is repaid at maturity, and Capital

Appreciation Bonds [CAB], with the CABs not paying interest until maturity which thereby

increases the amount due at maturity.

28. Series A, B, and C bonds was "registered under the Depository Trust Corporation's book-entry only system, and will be issued without coupons, in denominations of $5,000 principal amount (maturity amount in the case of the Capital Appreciation Bonds) and integral multiples thereof. Purchasers of the … Bonds will not receive bond certificates." [Cover sheets of the respective Official Statements found at Series A bonds, Tab 4; Series B bonds, Tab 3; and, Series C bonds, Document 4]

29. The Depository Trust Corporation is the only holder of the single global security for each maturity and all other transactions are electronic book entry. DTC via its nominee Cede & Co received legal title ("absolute owner") to the bonds from ERS with all transactions occurring in the beneficial interests in the bonds. [Specimen bonds: Series A bonds, Tab 36; Series B bonds, Tab 33; Series C bonds, starting at PDF page 706. Supplemental Pension Funding Bond Resolution, Series A bonds, Tab 2; Series B bonds, Tab 2; and, Series C bonds, Document 2]

30. The issuance process for the Series A bonds included the following provisions, among others:

- The underwriters (with UBS Financial Services Incorporated of Puerto Rico as representative of itself and others) entered into a contract with ERS on January 30, 2008 to "purchase" from the ERS "$1,588,810,799.60 initial principal amount" of ERS bonds." [Series A bonds, Tab 5]

- The purchase contract required that ERS "represents and warrants…[that] [6a] The [ERS] System has full legal right, power and authority to adopt the Bond Resolution …. [and] …[6d]…The Bonds … will be valid, binding and legally enforceable obligations of the System …." [Series A bonds, Tab 5).

- The underwriting syndicate for Series A bonds included UBS Financial Services Incorporated of Puerto Rico (as Manager), Popular Securities, Santander Securities, BBVAPR MSD, Merrill Lynch & Co., Scotia Capital, Citi, Oriental Financial Services Corporation, TCM Capital, Lehman Brothers, Samuel A. Ramirez & Co., Inc., and Wachovia Capital Markets, LLC., and these firms shared in the Underwriter's Discount based on their share of the purchase and offering of the securities [Series A bonds, Tab 5, Official Statement, cover; Tab 37, Selling Group Agreement; Tab 38-48, Final Closing Memorandum]

- The Official Statement which is required upon the issuance of municipal securities states that the underwriter enters into the purchase of bonds "subject to certain conditions precedent set forth in its purchase contract…." [Series A bonds, Tab 4, Underwriting]

- On January 30, 2008, UBS provided DTC with the questionnaire required for DTC to register the Series A bonds under DTC's book-entry only system. [UBS-ERS Ultra Vires-0043861]

- On January 31, 2008, the Acting Administrator of the ERS and the Secretary of the Board of Trustees of ERS certified that the Official Statement dated January 29, was a "true and correct" copy. [Series A bonds, Tab 10-11]

- On February 26, 2008, the ERS bond counsel sent a copy of the Official Statement to four S.E.C. registered Nationally Recognized Municipal Securities Information Repositories under S.E.C. Rule 15c2-12, thereby providing access to potential investors. [Series A bonds, Tab 38-48]

- The Final Closing Memorandum, dated January 31, 2008, states: "The Series A Bonds will be authenticated by an authorized officer of The Bank of New York, ("Fiscal Agent') …. [and] held at DTC [Depository Trust Corporation] pending verbal notification from UBS and the Fiscal Agent that the transaction has been successfully closed and delivered to the Fiscal Agent at the [Bond Counsel's office]." [Series A bonds, Tab 38-48, "Final Closing Memorandum," page 2]

- The Final Closing Memorandum states that the underwriter made payment of $1,570,391,795.98 via Fed Funds wire to The Bank of New York, fiscal agent for ERS, on January 31, 2008, representing the purchase price of the Series A bonds. The par amount of the Series A bonds of $1,588,810,799.60 minus the Original Issue Discount of $1,663,850.00 and minus the Underwriter's Discount of $16,755,153.62 equals the amount transferred of $1,570,391,795.98. [Series A bonds, Tab 38-48]

- The Final Closing Memorandum states that of the $1,570,391,795.98 transferred from the underwriter, ERS actually received $1,426,002,361.71, the debt service reserve fund received $46,982,352.66, the capitalized interest fund received $93,737,392.13, and $3,669,689.48 was allocated for the cost of issuance. [Series A bonds, Tab 38-48]

- On January 31, 2008, the ERS fiscal agent, as FAST Agent [under the Fast Automated Securities Transfer Program] to DTC, received the "possession, custody and control" of $1,588,810,799.60 aggregate principal amount of Bonds from ERS. [Receipt and Safekeeping Agreement, Tab 27-28, January 31, 2008]

- On January 31, 2008, the underwriters acknowledged receipt from the ERS fiscal agent of the Bonds (and its underwriters' discount) but the physical security remained in the physical possession of the fiscal agent on behalf of DTC. [Underwriters' Receipt for Series A Bonds, Tab 27; Receipt and Safekeeping Agreements, Tab 28]

- The Final Closing Memorandum states that the three bond rating organizations received a total of $783,000 for their reviews (including $175,000 to each of S&P [Standard & Poor's] and Moody's, another $193,000 to Moody's, and $240,000 to Fitch. [Series A bonds, Tab 38-48]

- The Final Closing Memorandum states that the Government Development Bank received $1,986,013.50 for its service while its agent, Mesirow, served as the Financial Advisor and was paid $175,000. [Series A bonds, Tab 38-48]

- The Final Closing Memorandum confirms that each maturity was assigned a unique CUSIP identifier. [Series A bonds, Tab 38-48]

31. The issuance process for the Series B bonds included the following provisions, among others:

- The underwriters (with UBS Financial Services Incorporated of Puerto Rico as representative of itself and others) entered into a contract with ERS on May 28, 2008 to "purchase" from the ERS "$1,058,634,613.05 of initial principal amount" of ERS bonds." [Series B bonds, Tab 4]

- The purchase contract required that ERS "represents and warrants…[that] [6a] The [ERS] System has full legal right, power and authority to adopt the Bond

Resolution …. [and] …[6d]…The Bonds … will be valid, binding and legally enforceable obligations of the System…." [Series B bonds, Tab 4].

- The underwriting syndicate for Series B bonds included UBS Financial Services Incorporated of Puerto Rico (as Manager), Santander Securities, and Popular Securities, and these firms shared in the Underwriter's Discount based on their equal 33.33% share of the purchase and offering of the securities [Series B bonds, Tab 3, Official Statement, cover; Tab 34, Selling Group Agreement; Tab 38, Final Closing Memorandum]

- The Official Statement which is required upon the issuance of municipal securities states that the underwriter enters into the purchase of bonds "subject to certain conditions precedent set forth in its purchase contract…." [Series B bonds, Tab 3, Underwriting]

- On June 2, 2008, the Acting Administrator of the ERS and the Secretary of the Board of Trustees of ERS certified that the Official Statement dated May 28, 2008 was a "true and correct" copy. [Series B bonds, Tab 10-11]

- On May 28, 2008, UBS provided DTC with the questionnaire required for DTC to register the Series A bonds under DTC's book-entry only system. [UBS-ERS Ultra Vires-0076149]

- On May 30, 2008, the ERS bond counsel sent a copy of the Official Statement to four S.E.C. registered Nationally Recognized Municipal Securities Information Repositories under S.E.C. Rule 15c2-12, thereby providing access to potential investors. [Series B bonds, Tab 35-36]

- The Final Closing Memorandum, dated June 2, 2008, states: "The Series B Bonds will be authenticated by an authorized officer of The Bank of New York…. [and] held at DTC pending verbal notification from UBS and the Trustee that the transaction has been successfully closed and delivered to the Trustee at the [Bond Counsel's office]." [Series B bonds, Tab 38, "Final Closing Memorandum," page 2]

- The Final Closing Memorandum states that the underwriter made payment of $1,047,115,939.98 via Fed Funds wire to The Bank of New York, fiscal agent for ERS Series B bonds on June 2, 2008, representing the purchase price of the Series B bonds. The par amount of the Series B bonds of $1,058,634,613.05 minus the Original Issue Discount of $6,225,500.00 and minus the Underwriter's Discount of $5,293,173.07 equals the amount transferred of $1,047,115.939.98. [Series B, Tab 38]

- The Final Closing Memorandum states that of the $1,047,115,939.98 transferred from the underwriter, ERS actually received $1,017,315,428.51, the debt service reserve fund received $25,791,551.54, and $4,008,959.93 was charged for the cost of issuance). [Series B bonds, Tab 38]

- On June 2, 2008, the ERS fiscal agent, as FAST agent to DTC, received the "possession, custody and control" of $1,058,634,613.05 aggregate principal amount of Bonds from ERS. [Series B bonds, Receipt and Safekeeping Agreement, Tab 19-25]

- On June 2, 2008, the underwriters acknowledged receipt from the ERS fiscal agent of the Bonds (and its underwriters' discount) but the physical security

remained in the physical possession of the fiscal agent on behalf of DTC. [Series
B bonds: Underwriters' Receipt for Series B Bonds, Tab 24; Receipt and
Safekeeping Agreement, Tab 25]

- The Final Closing Memorandum states that the Government Development Bank
  received $1,323,293.27 for its service while its agent, Mesirow, served as the
  Financial Advisor and was paid $175,000. [Series B bonds, Tab 38]

- The Final Closing Memorandum confirms that each maturity was assigned a
  unique CUSIP identifier. [Series B bonds, Tab 38]

32. The issuance process for the Series C bonds included the following provisions, among
others:

- The underwriters (with UBS Financial Services Incorporated of Puerto Rico as
  representative of itself and others) entered into a contract with ERS on June 26,
  2008 to "purchase" from the ERS "$300,202,930.00 initial principal amount" of
  ERS bonds." [Series C bonds, PDF page 545]

- The purchase contract required that ERS "represents and warrants…[that] [6a]
  The [ERS] System has full legal right, power and authority to adopt the Bond
  Resolution …. [and] …[6d] …The Bonds … will be valid, binding and legally
  enforceable obligations of the System…." [Series C bonds, PDF pages 548 and
  549].

- The underwriting syndicate for Series C bonds included UBS Financial Services
  Incorporated of Puerto Rico (as Manager), Popular Securities, Santander
  Securities, BBVAPR MSD, Lehman Brothers, Samuel A. Ramirez & Co., Inc.,
  Citi, Merrill Lynch & Co., Scotia Capital, Eurobank MSD, Oriental Financial

Services Corporation, and Wachovia Capital Markets, LLC., and these firms shared in the Underwriter's Discount based on their share of the purchase and offering of the securities [Series C bonds, Official Statement, PDF page 330; Selling Group Agreements, PDF pages 730-740; Final Closing Memorandum, PDF page 755]

- The Official Statement which is required upon the issuance of municipal securities states that the underwriter enters into the purchase of bonds "subject to certain conditions precedent set forth in its purchase contract…." [Series C bonds, Underwriting, PDF page 389]

- On June 16, 2008, UBS provided DTC with the questionnaire required for DTC to register the Series A bonds under DTC's book-entry only system. [UBS-ERS Ultra Vires-0087856]

- On June 30, 2008, the Secretary of the Board of Trustees of ERS certified that the Official Statement dated June 26, 2008 was a "true and correct" copy. [Series C bonds, PDF page 329]

- On July 1, 2008, the ERS bond counsel sent a copy of the Official Statement to four S.E.C. registered Nationally Recognized Municipal Securities Information Repositories under S.E.C. Rule 15c2-12, thereby providing access to potential investors. [Series C bonds, PDF pages 742-746]

- The Final Closing Memorandum, dated June 30, 2008, states: "The Series C Bonds will be authenticated by an authorized officer of The Bank of New York, ("Trustee') …. [and] held at DTC pending verbal notification from UBS and the Trustee that the transaction has been successfully closed and delivered to the

Trustee at the [Bond Counsel's office]." [Series C bonds, "Final Closing Memorandum," PDF page 754]

- The Final Closing Memorandum states that the underwriter made payment of $295,519,764.29 via Fed Funds wire to the ERS fiscal agent on June 30, 2008, representing the purchase price of the Series C bonds. The par amount of the Series C bonds of $300,202,930 minus the Underwriter's Discount of $4,683,165.71 equals the amount transferred of $295,519,764.29. [Series C, PDF page 755]

- The Final Closing Memorandum states that of the $295,519,764.29 transferred from the underwriter, ERS actually received $285,037,106.65, the debt service reserve fund received $9,148,607.98, and $1,334,049.66 was charged for the cost of issuance). [Series C bonds, PDF page 755]

- On June 30, 2008, the ERS fiscal agent, as FAST Agent for DTC, received the "possession, custody and control" of $300,202,930.00 aggregate principal amount of Bonds from ERS. [Series C bonds, Receipt and Safekeeping Agreement, PDF page 676]

- On June 30, 2008, the underwriters acknowledged receipt from the ERS fiscal agent of the Bonds (and its underwriters' discount) but the physical security remained in the physical possession of the fiscal agent on behalf of DTC. [Series C bonds, Underwriters' Receipt for Series B Bonds, Tab 25; Receipt and Safekeeping Agreement, Tab 26]

- The Final Closing Memorandum states that the three bond rating organizations received a total of $348,000 for their reviews (including $150,000 to both Fitch

and Moody's, and $48,000 to Standard and Poor's). [Series C bonds, PDF page
755]

- The Final Closing Memorandum states that the Government Development Bank
  received $375,253.66 out of the cost of issuance to serve as financial advisor.
  [Series C bonds, PDF page 755]

- The Final Closing Memorandum confirms that each maturity was assigned a
  unique CUSIP identifier. [Series B bonds, PDF page 754]

33. ERS Series A, B, and C bonds are parity bonds payable from and secured by the same
Pledged Property including all Employer Contributions made after the date of issuance of
the Series A bonds. [see Series C bonds, Official Statement, PDF page 330 and 380]

34. The Commonwealth of Puerto Rico's audited financial statement for the period ending June
30, 2016 reports $3,134,902,000 of pension bonds payable as liabilities in its fiduciary
funds' balance sheet (actually entitled 'Statement of Fiduciary Net Position – Fiduciary
Funds').[1] ["Commonwealth of Puerto Rico, Basic Financial Statements and Required
Supplementary Information, June 30, 2016 (with Independent Auditor's Report Thereon),"
dated May 3, 2019 by KPMG LLP, page 45].

35. In the Notes to its 2016 basic financial statements, the Commonwealth of Puerto Rico stated
that "ERS issued…limited, nonrecourse obligations of ERS…." ["Commonwealth of Puerto
Rico, Basic Financial Statements and Required Supplementary Information, June 30, 2016
(with Independent Auditor's Report Thereon)," dated May 3, 2019 by KPMG LLP, page
200.]

---

[1] The accreted value of capital appreciation bonds accounts for a higher maturity value than par.

36. The June 30, 2014 ERS annual financial statement, dated June 1, 2016, shows $3,077,587,000 of "bonds payable" as a liability in its balance sheet (actually, the Statement of Fiduciary Net Position). [Employees Retirement System of Government of the Commonwealth of Puerto Rico, Basic Financial Statements and Required Supplementary Information, June 30, 2014, dated June 1, 2016 by KPMG LLP, page 21]

37. The independent audit firm that audited ERS also audited the Commonwealth of Puerto Rico.

38. The ERS considers the Series A, B and C bonds "contractual indebtedness" in its May 1, 2019 official filing to the MSRB Electronic Municipal Market Access [EMMA] facility. ["Annual Financial Information and Operating Data pursuant to Rule 15c2-12" for the fiscal period of 2017-18, https://emma.msrb.org/ER1220073-ER955038-ER1356043.pdf, page 9]

39. The May 1, 2019 document posted to the EMMA facility mentions the assertion by the Creditors' Committee in the Omnibus Objection to System Bondholder Claims.

40. Neither that May 1, 2019 filing nor any other official market disclosure statement (that I am aware of) conveys a position by ERS officials that ERS bond series A, B and/or C are anything other than valid and legal contractual indebtedness of the ERS; thus, secondary market trading continues on the basis of the 2008 primary official disclosure documents and subsequent official market disclosures (or the lack of any material changes) by the debt issuer.


## III. SCOPE OF ANALYSIS

41.  Counsel for the Bondholders requested that I:

- Provide general background on the issuance of municipal securities.

- Examine the issuance of the ERS debt obligations.

- Assess the financial reality of an underwritten bond offering.

- Assess official market disclosures related to the ERS debt obligations.

- Clarify the role of the Depository Trust Corporation and CUSIP identifiers as market utilities in the issuance of municipal securities.

- Examine market expectations of authorized and valid issuances of debt instruments.

- Assess what a reasonable investor would expect in making an investment decision.

42. I have conducted the research and analysis to complete this assignment using standard methods in the field of public administration, public budgeting, municipal financing, and government finance (referred to collectively here as 'public finance').

43. In addition to items in my Curriculum Vitae, to complete this assignment I reviewed documentary evidence as cited in Appendix C.

44. My compensation for time spent on this matter is at the rate of $650 per hour. My compensation is not contingent upon the nature of my findings or the outcome of this litigation.


## IV. SUMMARY OF OPINIONS

45. The functioning of a market depends upon the proposition that investors can rely upon the actions, opinions and representations by responsible officials and parties to the particular transactions at the time of the original issuance.

46. The ERS debt obligations were sold to lenders based upon specific and critical assurances incorporated in the ERS market disclosure documents such as the Preliminary Official Statements and the final Official Statements as well as any other disclosures.

47. Those market-oriented disclosure documents specified that the debt obligations were legal and binding on the ERS.

48. The ERS bonds were issued with written legal opinions by its General Counsel and an independent bond counsel firm, both attesting that Series A, B and C bonds were legal and valid. In each transaction there was an underwriters' counsel with due diligence responsibilities.

49. Each of three different independent credit rating organizations conducted its own due diligence reviews and then signaled to investors through credit ratings that ERS could be expected to pay back the investors on time and in full.

50. The ERS bonds were sold directly to underwriters in one total amount for each series of bonds.

51. ERS borrowed directly from the underwriters instead of retail or institutional investors since it was the underwriters whose money was transferred to ERS.

52. The Fiscal Agent under the Bond Resolution and the market utility, the Depository Trust Corporation [DTC], accepted legal title to the ERS bonds after receiving details (as provided in the Preliminary Official Statements and/or the final Official Statements) about the security and structure undergirding each transaction.

53. DTC is the only holder of the single global security for each maturity and all other transactions are electronic through book entry.

54. Another market utility is CUSIP Global Services [CUSIP] which assigned unique identifiers after receiving similar details. Each maturity in Series A, B and C series bonds was assigned a unique identifier, referred to as a CUSIP number, and the bonds were denominated in $5,000 principal amounts and integral multiples thereof.

55. Investors in Series A, B and/or C bonds did not, and do not, transfer any money to ERS when purchasing ERS debt obligations.

56. The most recently disclosed audited financial statement of the Commonwealth of Puerto Rico includes the ERS pension obligation bonds as a liability, as attested to by its independent auditor which is the same auditor that attested to the ERS audited financial statement.

57. Making either the purchasers of securities entitlements or DTC responsible for reviewing legislation or conducting other diligence in connection with bond issues or secondary market purchases could impede issuer access to financial markets, with a resulting decrease in the efficiency of government operations. Imposing such risks could reduce demand, increase interest rates paid by issuers, limit negotiability of municipal bonds, and impair bond values.

58. A reasonable investor cannot be expected to uncover material facts that vary from what the professionals involved with the transaction state in market-oriented certifications.


## V. ANALYSIS AND BASIS FOR OPINIONS

This section reviews: the debt market; the roles of the debt issuer, underwriter, bond counsel, underwriter counsel, financial advisor, credit rating organizations, Commonwealth of Puerto Rico officials, market utilities (the Depository Trust Corporation and the CUSIP identifiers); and, the reasonable expectations of investors.

**Debt Market**

59. Debt is when money is owed by one party (the borrower or issuer) to a second party (the lender, creditor, or debt holder).

60. A debt instrument is the asset that the debt issuer sells to the lender based upon specific terms of repayment.

61. The purchase contract between the debt issuer and the lender specifies the all-in amount that is exchanged between the parties, with one providing the form of the legal obligation to repay and the other providing the cash transfer.

62. There is no financial difference to the debt issuer in the form of borrowing used because money is received up-front from the lender in exchange for a documented contractual obligation to repay in the future.

63. Classifying an obligation as a loan or security can vary by state and purpose; moreover, "whether an obligation is a security will be of less concern to a governmental issuer than to the financial advisor to, or placement agent for, such governmental issuer." [National Association of Bond Lawyers, *Direct Purchases of State or Local Obligations by Commercial Banks and Other Financial Institutions*, Washington, DC, July 2017, p. 33]

64. A financial intermediary, such as an investment banker or underwriter (or syndicate), transfers its money to the debt issuer in return for the evidence of the issuer's repayment obligation – that is, the debt instrument.

65. The intent of a financial intermediary is to recover all costs by reselling the debt instruments to the ultimate investor(s).

66. The financial intermediary is often expected to help make the market of subsequent trading in the debt instruments (that is, the secondary market).

67. The capital market refers to the handling of multi-year debt obligations while the money market refers to short-term (a year or less) debt obligations.

68. The mission of the U.S. Securities and Exchange Commission [S.E.C.] is: "…to protect investors; maintain fair, orderly, and efficient markets; and facilitate capital formation…." [https://www.sec.gov/about.shtml]

69. In its July 21, 2012 *Report on the Municipal Securities Market*, the S.E.C. says the securities laws have "… two basic objectives: require that investors receive financial and other significant information concerning securities being offered for public sale; and prohibit deceit, misrepresentations, and other fraud in the sale of securities." [hereafter 'S.E.C. Report,' footnote 142, page 27],


**Debt Issuer**

70. Bonds and term loans are similar in that both require a borrower and a lender; thus, both transactions create a corpus of money up-front for the debt issuer in exchange for its contractual obligation to repay the borrowed amount in full and on time.

71. Municipal securities are obligations of the Commonwealth of Puerto Rico (or, elsewhere, a state government) or its agencies or special authorities.

72. Governmental entities may also borrow via conduit financing, rather than directly. In a conduit financing, debt is issued by a third-party entity (the 'conduit issuer'), rather than by the ultimate borrower (the 'conduit borrower') itself. The ERS bonds are not conduit financings, because they are issued by the same entity – ERS – that is the ultimate borrower. [MSRB Glossary, http://www.msrb.org/glossary/definition/conduit-financing.aspx]

73. Under certain conditions, municipal securities can qualify under the United States Internal Revenue Code of 1986, as amended, as tax-exempt for federal tax purposes, meaning that the taxpayer/investor does not pay tax on the interest payment received. In addition, such securities may be exempted from the Commonwealth income tax (and state and local income taxes in the rest of the country).

74. Pension obligation bonds, such as the ERS Series A, B and C bonds, did not qualify for tax-exemption: "Interest on the ...Bonds is not excludable from the gross income of the recipients thereof under Section 103(a) of the United States Internal Revenue Code of 1986, as amended. Interest … is exempt from Puerto Rico income and property taxes." [Cover sheets of the respective Official Statements found at Series A, Tab 4; Series B, Tab 3; and, Series C, Document 4]

75. Municipal securities are issued as general obligation or revenue securities. General obligation bonds carry the full faith and credit backing of the issuer. Revenue bonds are backed by a dedicated revenue source.

76. Most municipal securities are highly varied and differentiated debt structures, especially because most municipal securities are issued as revenue bonds.

77. An issuer of municipal securities describes the transaction in the offering circular, referred to as the Official Statement (and, earlier, the Preliminary Official Statement) for municipal securities.

78. Municipal securities are subject to the antifraud provisions of the securities laws, with numerous enforcement actions brought against issuers, issuer officials, underwriters, financial advisors, and others [S.E.C, "*Report on the Municipal Securities Market*," July 21, 2012; https://www.sec.gov/municipal/oms-enforcement-actions.html; and S.E.C. Staff

Legal Bulletin, "Application of Antifraud Provisions to Public Statements of Issuers and

Obligated Persons of Municipal Securities in the Secondary Market," February 7, 2020]

**Bond Counsel**

79. The contractual agreement between a borrower and a lender is the foundation upon which

the transaction rests so debt holders expect an independent legal review of the borrower's

obligation to repay the money.

80. "The practice of using bond counsel developed out of the widespread irregularities in

municipal bonds during the latter part of the 19th century. Investors found that some of the

instruments they had purchased in good faith were fraudulent. In other cases, the bonds were

declared invalid because of the issuer's failure to comply with the procedures specified in

the law governing the sale of municipal bonds….The situation produced an atmosphere of

suspicion and undermined confidence in municipal bonds….Gradually investment bankers,

and later the issuers, employed attorneys with outstanding reputations for ability and

integrity in the municipal bond field to provide opinions as to the validity of the bonds at the

time of sale." [Lennox L. Moak, *Municipal Bonds: Planning, Sale and Administration*,

1982, Chicago: Municipal Financial Officers Association, page 143]

81. The glossary for the Municipal Securities Rulemaking Board defines bond counsel as: "An

attorney or law firm retained, typically by the issuer, to give the traditional bond counsel

opinion. Such opinion customarily opines that the bonds have been validly issued and, if tax

exemption is intended, that the bonds are tax-exempt bonds. The opinion also may address

related matters, such as state or local tax exemption and the enforceability of certain security

provisions. Typically, bond counsel may prepare, or review and advise the issuer regarding,

authorizing resolutions, bond contracts, official statements, validation proceedings, and litigation." [http://msrb.org/Glossary/Definition/BOND-COUNSEL.aspx]

82. As stated in the 2012 S.E.C. Report: "Bond counsel play a unique role in the municipal marketplace. They are engaged to provide an expert and objective opinion with respect to the validity of the municipal securities being offered and other subjects, including the tax treatment of interest on the municipal securities. **The bond opinion is intended to be relied upon by the purchasers of the municipal securities**…." [S.E.C. Report, pages 47-48, footnotes omitted; highlight added.]

83. "The threshold question addressed by bond counsel's opinion relates to the validity, or legality, of the obligations." [Michael Ettlinger and John Koehane, "Responsibilities of Bond Counsel," chapter 36, pages 700 to 723, at 708, in Robert Lamb, James Leigland and Stephen Rappaport, *The Handbook of Municipal Bonds and Public Finance*, New York: New York Institute of Finance, 1993]

84. The independent Bond Counsel for the Series A bonds provided the following opinions:

- As an integral part of the Official Statement upon the issuance of the Series A bonds, the Opinion of Bond Counsel letter stated: "We have examined the Constitution and the laws of the Commonwealth ... including Act No. 447…[and] we are of the opinion that…[the bond Resolution] "is legal, valid and binding" [Series A bonds, Tab 4, Official Statement, Appendix VIII, Fiddler Gonzalez & Rodriquez, P.S.C., PDF pages 279 and 280, January 31, 2008]

- In its letter to the ERS and the Fiscal Agent, the Bond Counsel for the Series A bonds stated: "…the System has the right and power under Act No. 447 …"; there is a "…valid security interest for the benefit of the Owners of the Bonds ….";

and, "…the Bonds are valid and binding special limited non-recourse obligations of the System." [Series A bonds, Tab 29-35, Fiddler Gonzalez & Rodriquez, P.S.C., PDF pages 1 and 2, January 31, 2008]

85. The independent Bond Counsel for the Series B bonds provided the following opinions:

- As an integral part of the Official Statement upon the issuance of the Series B bonds, the Opinion of Bond Counsel letter stated: "We have examined the Constitution and the laws of the Commonwealth ... including Act No. 447…[and] we are of the opinion that…[the bond Resolution] "is legal, valid and binding" [Series B bonds, Tab 3, Official Statement, Appendix VII, Fiddler Gonzalez & Rodriquez, P.S.C., PDF pages 190 and 192, June 2, 2008]

- In its letter to the ERS and the Fiscal Agent, the Bond Counsel for the Series B bonds stated: "…the System has the right and power under Act No. 447 …"; there is a "…valid security interest for the benefit of the Owners of the Bonds …."; and, "…the Bonds are valid and binding special limited non-recourse obligations of the [ERS] System." [Series B bonds, Tab 26-32, Fiddler Gonzalez & Rodriquez, P.S.C., PDF pages 1 and 2, June 2, 2008]

86. The independent Bond Counsel for the Series C bonds provided the following opinions:

- As an integral part of the Official Statement upon the issuance of the Series C bonds, the Opinion of Bond Counsel letter stated: "We have examined the Constitution and the laws of the Commonwealth ... including Act No. 447…[and] we are of the opinion that…[the bond Resolution] "is legal, valid and binding" [Series C bonds, Official Statement, Appendix VII, Fiddler Gonzalez & Rodriquez, P.S.C., PDF pages 534 and 535, June 30, 2008]

- In its letter to the ERS and the Fiscal Agent, the Bond Counsel for the Series C
  bonds stated: "…the System has the right and power under Act No. 447 …"; there
  is a "…valid security interest for the benefit of the Owners of the Bonds ….";
  and, "…the Bonds are valid and binding special limited non-recourse obligations
  of the [ERS] System." [Series C bonds, Fiddler Gonzalez & Rodriquez, P.S.C.,
  PDF pages 677 and 678, June 30, 2008]

87. "The Bond Counsel … prepared one certificate per maturity, each inscribed with its proper
    CUSIP number for that maturity …. [Series A bonds, Tab 38-48, "Final Closing
    Memorandum," page 2; Series B bonds, Tab 38, "Final Closing Memorandum," page 2;
    Series C bonds, PDF page 754, "Final Closing Memorandum, page 2]

88. For its work as Bond Counsel on Series A, B and C bonds, the firm of Fiddler Gonzalez &
    Rodriquez, P.S.C. [FGR] received a total of $835,000, as listed in my Appendix A.

89. The Official Statement for each of Series A, B, and C bonds, in the Underwriting section of
    each, references the "purchase contract" for that bond Series, that itself requires "Opinions,
    dated the Closing Date and addressed to the Underwriters, of counsel to the System, and of
    the Secretary of Justice of the Commonwealth, in substantially the respected forms attached
    hereto…." [Official Statement: Series A bonds, Tab 4; Series B bonds, Tab 3; Series C
    bonds, PDF page 389. Purchase contracts: Series A bonds, Tab 5; Series B bonds, Tab 4; C
    bonds, PDF page 552]

90. The ERS General Counsel is in the best position to have exact knowledge of the power and
    authority of the ERS and its ability to borrow money and, as such, each transaction is
    predicated on an official legal opinion by that office.

91. The ERS General Counsel provided a formal written opinion relied upon by the underwriters under the respective purchase contract that the bonds were "legal, valid and binding…." and further stated that "The Bonds have been duly and validly authorized and issued." [Opinion of General Counsel to the System: Series A bonds, Tab 29-35, January 31, 2008; Series B bonds, Tab 26-32, June 2, 2008; Series C, June 30, 2008, PDF page 679-682]

**Underwriters**

92. Governmental entities borrowing large sums of money turn to financial intermediaries to facilitate the financial transaction.

93. The financial intermediaries that underwrite the financial transaction are known as Underwriters (also referred to as investment bankers or, more formally, registered broker/dealers or municipal securities dealers).

94. Underwriters enter into a Purchase Contract to buy bonds from the Issuer in one total purchase price, but sell the beneficial interest to investors in the denominations specified in the Official Statement, although the legal title rests in the name of the securities depository (in the case of municipal securities it is the Depository Trust Corporation's nominee Cede & Co.). [Purchase Contract: Series A bonds, tab 5; Series B bonds, tab 4; Series C bonds, document 5 at PDF 545]

95. Underwriters are regulated by the MSRB – the self-regulatory board created by Congress under the auspices of the S.E.C. and the securities laws of the United States.

96. As the S.E.C. stated in its 2012 *Report on the Municipal Securities Market*: "Municipal securities typically are issued through an underwriting process in which one or more broker-dealers or municipal securities dealers (referred to … as "underwriters") <u>purchase the</u>

securities <u>directly</u> from the issuer and reoffer them to investors." [S.E.C. Report, page 15, emphasis added]

97. A public offering can have a sole purchaser (a single investment banking firm) or a syndicate of firms that spread the burden.

98. A fully underwritten public offering is the direct purchase of debt by the underwriters since the transaction is between the borrower (ERS in this case) and the purchaser of the entire transaction (the underwriters); no other party is directly involved in the transfer of assets (money from the underwriters to the borrower in exchange for the contractual obligation to repay the money in full and on time).

99. The underwriting syndicate for the ERS Series A, B, and C bonds (with UBS Financial Services Incorporated of Puerto Rico as representative of itself and others) is listed at the bottom of the first page of the Official Statement upon the issuance of bonds. [Series A bonds: Tab 4; Series B bonds: Tab 3; Series C bonds: Document 4].

100. The underwriters to Series A, B, and C bonds were "obligated to purchase all the … Bonds if any … are purchased."[2] [Series A bonds, Official Statement, Underwriting, Tab 4; Series B bonds, Official Statement, Underwriting, Tab 3; Series C bonds, Official Statement, Underwriting, PDF page 389]

101. In 1988, the S.E.C. issued an Interpretation [the '1988 Interpretation'] "concerning the responsibilities of underwriters participating in offering of municipal securities under the general antifraud provisions of the federal securities laws." [Robert A. Fippinger and Edward L. Pittman, "Disclosure Obligations of Underwriters of Municipal Securities," *The Business Lawyer*, 47:1 (November 1991), 127-156, 128 – hereafter Fippinger-Pittman;

---

[2] Although most municipal bonds are sold on an underwriter's commitment basis some are on a best effort basis.

citing as the '1988 Interpretation' the Exchange Act Release No. 26,100, 53 Federal Register 37,778, September 28, 1988]

102.  "The Interpretation emphasizes that the general standard applied to municipal underwriters requires a reasonable belief in the "accuracy and completeness of the key representations in the final official statement." [Fippinger-Pittman, page 131, quoting the 1988 Interpretation]

103.  The Interpretation "addressed the obligations of syndicate members …. while no hard lines exists …. a syndicate member … at least must review the official statement, determine that the [lead] manager has conducted a professional inquiry and notify the manager of "any factors that suggest inaccuracies in disclosure or signal the need for additional investigation." [Fippinger-Pittman, page 136, quoting the 1988 Interpretation, at 136]

104.  In 1989, the S.E.C. adopted Rule 15c2-12 that "created, for the first time, a formal process for disclosure in municipal offerings." [Fippinger-Pittman, 128]

105.  Rule 15c2-12 requires underwriters to "obtain and review an official statement early in the offering process" [Fippinger-Pittman, 144]

106.   "The Rule itself is silent as to the content of the disclosure document or the underwriter's obligations other than to "obtain and review" a nearly final official statement….The history of the Rule, however, suggests that the SEC intended to impose on the underwriter some due diligence obligation….[since] The SEC took the position in issuing the Rule [at 28803] that "by participating in an offering, an underwriter makes an implied recommendation about the securities. This recommendation implies that the underwriter has a reasonable basis for belief in the truthfulness and completeness of the key representations contained in the official statement."" [Robert S. Amdursky and Clayton P. Gillette, *Municipal Debt*

*Finance Law: Theory and Practice*, Boston: Little, Brown and Company, 1992, page 381;

citing S.E.C. Rule 15c2-12, S.E.C. Release No. 34-26985, 54 Fed. Reg. 28799 (July 10,

1989)]

107.   Under S.E.C. Rule 15c2-12, underwriters must obtain and review the issuer's preliminary

official statement (and the final official statement) and enter into an undertaking with the

issuer that commits the issuer to provide continuing disclosures and certain event notices.

108.   None of the underwriting syndicate involved in the ERS bonds expressed any reservation

in the Official Statement about the legality of the bonds or any differences with the

representations made in that document, or any others, involved in the official transcript of

the transactions (constituting all the tabs for Series A bonds, Series B bonds, or Series C

bonds).

**Underwriters Counsel**

109.   The glossary of the Municipal Securities Rulemaking Board defines the underwriter's

counsel as: "An attorney or law firm retained to represent the interests of an underwriter in

connection with the purchase of a new issue of municipal securities. The duties of

underwriter's counsel may include review of the issuer's bond resolution and documentation

on behalf of the underwriter; review of the accuracy and adequacy of disclosure in the

official statement; preparation of the agreement among underwriters, purchase contract

and/or the official statement; assisting the underwriter in meeting the underwriter's due

diligence obligation; and delivery of a 10b-5 opinion. [

http://msrb.org/glossary/definition/underwriters-counsel.aspx]

110.   The S.E.C. *Report on the Municipal Securities Market*, dated July 31, 2012, addresses the

role of the underwriter's counsel thusly:

- The underwriter's counsel has "many responsibilities in a municipal financing including … (6) providing an opinion addressing the accuracy and completeness of the official statement (known as a "10b-5 opinion")." [S.E.C. Report, footnotes omitted, page 49]

- "A 10b-5 opinion (or due diligence opinion) "addressed to an underwriter by underwriter's counsel customarily states that, based on certain specified inquiries, nothing has come to such counsel's attention indicating that the official statement contains any misstatements of material facts or any material omissions." MSRB Glossary…." [S.E.C. Report, quoting the MSRB Glossary 2nd edition (2004), in footnote 278, page 49]

111.   The procedure "suggested" for the underwriter's counsel when an issue is "unseasoned" is a "particularly thorough investigation." [Ann J. Gellis[3], "Application of Securities Laws and Disclosure Standards," Chapter 8, in M. David Gelfand, *State & Local Government Debt Financing*, Thomson West, dated August 1997, Section 8:59.20, page 240.]

112.   Underwriter's counsel O'Neill & Borges was involved in the "discussions and inquiries concerning various legal and related subjects, and reviews of and reports on certain records, documents and proceedings of the System …. during which conferences the contents of the Official Statement and related matters were discussed and reviewed, and conducted such other due diligence as we considered necessary…. no information came to the attention of the attorneys in our firm…which leads us to believe that the Official Statement…contained

---

[3] As stated on page 1 of Chapter 8: "This revised Chapter 8 combines and updates Chapters 8 and 8A written by Robert Doty, Jeffrey Green, Lewis Horne, Jr. and John M. Gardner. Most of their original work has been left intact, but rearranged."

or contains any untrue statement of a material fact or omitted or omits to state a material

fact….." [Series A bonds, Tab 29-35; Series B bonds, Tab 26-32; Series C bonds, PDF pages

687-689]

113.   For its work on the Series A bonds, underwriter's counsel O'Neill & Borges [O&B]

received $233,333.33 from UBS on January 31, 2008 out of the UBS Underwriter's

Discount [Series A bonds, Final Closing Memorandum, page 4, Tab 38-48]

114.   Unlike the handling of the underwriter's counsel fees in the Series A bonds which were

paid directly by the underwriter out of its underwriter's discount, the underwriter's counsel

fees for the Series B bonds were paid out of the transaction's cost of issuance and to two

legal firms with O'Neill & Borges and Sidley Austin, LLP each receiving $233,333.33.

[Series B bonds, Final Closing Memorandum, June 2, 2008, Tab 38]

115.   O'Neill & Borges received $90,000 for its role as underwriter's counsel on the Series C

bonds and this amount was paid out of the transaction's cost of issuance. [Series C bonds,

Final Closing Memorandum, June 30, 2018, PDF page 755]

116.   For the Series B bonds, a second underwriter's counsel, Sidley Austin, LLP, also

"participated" in the "discussions and inquiries concerning various legal and related

subjects, and reviews of and reports on certain records, documents and proceedings of the

System …during which conferences the contents of the Official Statement and related

matters were discussed and reviewed, and conducted such other due diligence as we

considered necessary….no information came to the attention of the attorneys in our

firm…which leads us to believe that the Official Statement…contains any untrue statement

of a material fact or omitted or omits to state a material fact…." [Series B bonds, Tab 26-32]

117.   None of the four bond counsel and underwriter's counsel involved in the Series A, B and/or C transactions, who received a total of $1,489,666.66 in fees (as specified in my Appendix A), identified any legal problems that would suggest to a reasonable investor or their clients (as show in the documents compiled in the bond transcripts for Series A, B and C bonds) that any of the bonds were legally questionable.

**Financial Advisor**

118.   Financial advisors [FA] assist the Issue in making decisions regarding the borrowing process.

119.   The 2010 Dodd-Frank Act required FAs to register as Municipal Advisors [M-A] and imposed on them a federal fiduciary responsibility to the issuer, so M-As now are regulated by the MSRB but not at the time of the issuance of the 2008 ERS bonds.

120.   The Government Development Bank for Puerto Rico [GDB] "acted as financial advisor to the…." three series of ERS bonds [Series A bonds: Tab 4, page 51 of the Official Statement; Series B bonds: Tab 3, page 49 of the Official Statement; Series C bonds: page 54 of the Official Statement].

121.   GDB "…engaged Mesirow Financial, Inc., Chicago, Illinois, as Financial Advisor (the "Financial Advisor") in connection with the System's issuance and sale of the …Bonds." [Series A bonds: Tab 4, page 55 of the Official Statement; Series B bonds: Tab 3, page 52 of the Official Statement; and Series C bonds: page 57 of the Official Statement].

122.   Neither GDB nor Mesirow expressed any reservation in any of the three Official Statements (for Series A, B, and C bonds) about the legality of the bonds or any differences

with the representations made in those market-oriented disclosure documents or any others

that are available to me.

123.   For their roles on Series A, B and C bonds, GDB received a total fee of $3,684,560.43

and Mesirow received $350,000, as detailed in my Appendix A.


**Credit Rating Organizations**

124.   The function of a credit rating organization is to give potential (and current) investors an

independent and objective opinion (summarized in a credit rating) on the degree of risk

involved in purchasing a debt obligation.

125.   Credit rating organizations (also known as credit rating agencies or bond rating firms) are

required to be registered by the S.E.C. as "Nationally Recognized Statistical Rating

Organizations."

126.   Credit rating organizations assess the credit condition of municipal bond transactions and

issuers by examining several key factors (slightly different per credit rating firm and the

specific type of transaction) that help distinguish credits from one another: financial

condition; debt levels; socio-economic conditions; and, governance (including legal

protections for debt holders).

127.   In its report on the Series A bonds, Moody's Investors Service identified only two factors

that "could move the rating – DOWN" and neither factor alerted a reasonable investor of

any risk to the legality of the bonds. [Series A bonds, Tab 38-48, PDF page 14]

128.   In a Congressional hearing on the topic of "Municipal Bond Turmoil" by the Committee

on Financial Services of the U.S. House of Representatives that was held on March 12,

2008, the point was made (by the State of New York Superintendent of Insurance) that

despite errors by the rating agencies in the period leading up to the Great Recession they still serve a purpose because "…it is impossible for credit providers, loan givers and investors to make all of those individual distinctions…." [page 26].

129.   A senior managing director of Moody's Investors Service [Laura Levenstein] testified at the aforementioned 2008 House hearing that "one of the primary values municipal investors have historically sought from our ratings, [is] namely, the ability to differentiate the relative credit risk among various municipal securities. We have been told by many investors that not providing that differentiation would make the market less transparent, more opaque, and presumably less efficient for both investors and issuers." [page 70].

130.   Moody's Investors Service, on January 7, 2008, assigned a new rating of Baa3 to the ERS Series A Bonds and said it "… is the same as the commonwealth's general obligation rating." Moody's did not raise any questions about the legal validity of the Bonds. [Series A bonds, Tab 38-48]

131.   There was no change in the Baa3 bond rating assigned by Moody's Investors Service to the Series A bonds even after separate credit reviews for ERS Series B bonds and Series C bonds. [Series A bonds Tab 38-45; Series B Bonds, Tab 39; Series C bonds, PDF page 757]

132.   The ratings assigned to the Series A bonds by Standard & Poor's and Fitch (both BBB-) did not change for Series B and C bonds, and Fitch even labeled the "rating outlook" as stable. [Series B Bonds, Tab 39; Series C bonds, PDF page 757 to 764]

133.   For their role as independent credit rating organizations on the Series A, B and C transactions, the three firms received a total of $1,131,000, as identified in my Appendix A.

## Commonwealth of Puerto Rico Officials

134.    The ERS Board of Trustees includes the Puerto Rico Secretary of the Treasury, the

President of the Government Development Bank and others. [Official Statements found at

Series A, Tab 4, Official Statement, page 8; Series B, Tab 3, Official Statement, page 8;

and, Series C, PDF page 343]

135.    To "induce" the Contract of Purchase between the underwriter and ERS for each series of

bonds, the Acting Secretary of the Treasury of the Puerto Rico certified for each of the

Series A, B, and C bonds in separate 'Letter of Representations' to the underwriter and

ERS: "…the terms of which are hereby approved, and to make the offering and sale of the

Bonds therein contemplated, the Commonwealth, intending to be legally bound, hereby

represents, warrants and agrees with each of you the following: (a) The Commonwealth has

full legal right, power and authority to enter into this Letter of Representations …." [Series

A bonds, Tab 38-48, January 30, 2008; Series B bonds, Tab 39-46, June 2, 2008; and, Series

C bonds, June 26, 2008, PDF pages 802-803]

136.    The Secretary of Justice of the Commonwealth of Puerto Rico certified in separate letters

for each of the Series A, B, and C bonds that the representations "executed" by the (Acting)

Secretary of Treasury of Commonwealth of Puerto Rico concerning the bonds "constitute

the legal, valid and binding agreements of the Commonwealth….[and] All legislation,

authorizations, consents and approvals necessary to fulfill in all material respects the terms

and conditions and to carry out the transactions contemplated…are in full force and effect or

have been obtained, as applicable, and no further legislation, authorization, consent or

approval is required for such purposes." [Series A bonds, Tab 29-35, January 31, 2008;

Series B bonds, Tab 26-32, June 2, 2008; and, Series C bonds, June 30, 2008, PDF pages 703-704]

## Market Utilities

137.   Market efficiency means that prices reflect all available, relevant information. [George A. Akerlof, "The Market for 'Lemons': Quality Uncertainty and the Market Mechanism, *The Quarterly Journal of Economics*, 84:3 (August, 1970), 488-500]

138.   Market efficiency rests upon ease in the clearing and settlement of transactions between trading parties. [Maureen O'Hara, *Market Microstructure Theory*, Cambridge, MA: Blackwell Publishers, 1995]

139.   Moving from physical trades to registered electronic trades advances market efficiency. [Securities and Exchange Commission, *Report on the Municipal Securities Market*, July 31, 2012]

140.   Financial institutions created, and U.S. market regulators sanction, a market utility to provide its members with an efficient and transparent post-trade infrastructure – the Depository Trust & Clearing Corporation [DTCC].

141.   A uniform, universally accepted numbering system for financial instruments facilities their expeditious and efficient settlement and transfer.

142.   Financial institutions created and U.S. market regulators require the assignment of CUSIP (Committee on Uniform Securities Identification Procedures of the American Bankers Association) numbers on securities. [e.g., MSRB, Rule Book, Rule G-34]

143.   CUSIP numbers reflect the differences in securities that are relevant to trading and investment decisions.

144.    Since the 1982 Tax Equity and Fiscal Responsibility Act which discontinued the issuance

of bearer bonds, municipal securities are book entry and immobilized as fully-registered

securities registered in the name of Cede & Co, the partnership nominee of the Depository

Trust Company which is the securities depository; DTC is a wholly-owned subsidiary of the

Depository Trust & Clearing Corporation [DTCC].

145.    According to the S.E.C.: "When securities are held in street name, there is a legal

distinction between the nominee who has legal status as the registered securityholder, and

the person with economic or beneficial ownership of the security. Securities held in street

name are legally owned by and registered in the name of the depository's nominee (most

often DTC's nominee, Cede & Co.). The individual investor's broker (or other

intermediary) who is a member or participant of the depository will be identified on the

books of the depository as having a "securities entitlement" [4] to a pro rata share of the

fungible bulk of that security held by the depository. Correspondingly, the individual

investor will be identified on the books of the depository participant (his or her broker or

other intermediary) as having a securities entitlement to a pro rata share of the securities in

which the participant has an interest." [S.E.C. Release 34-76743, File No. S7-27-15,

"Transfer Agent Regulations," December 22, 2015, pages 38 and 39, footnotes omitted]

146.    According to Robert Doty: "From the perspective of issuers and borrowers, municipal

securities are not owned any longer in a literal sense by the actual investors in those

securities or even by the investors' brokers or dealers. Instead, municipal securities are

owed in electronic form by book-entry through the Depository Trust Company (DTC)."

---

[4] Original footnote 115 refers to the Uniform Commercial Code for a definition; the term generally means the
enumerated economic benefits of owning the security.

[Robert Doty, *Bloomberg Visual Guide to Municipal Bonds*. New York: Bloomberg Press/Wiley, 2012, page 166]

147.   The electronic book-entry system enables issuers and investors to avoid the costs and risks associated with physical certificates: book-entry securities are easier to trade (for both the holder and the issuer), with no risk of loss of the physical certificates and reduced recording burden for the issuer, and are easier for the issuer to administer. Under this system, "the principal mechanism through which securities trades are settled is not delivery of certificates or registration of transfers on the issuer's books, but netted settlement arrangements and accounting entries on the books of a multi-tiered pyramid of securities intermediaries." [Uniform Commercial Code, Article 8, Investment Securities, Prefatory Note, Section I.D]

148.   The DTC blanket issuer letter of representations incorporates sample offering document language that describes book-entry-only issuance: "To facilitate subsequent transfers, all securities deposited by Direct Participants [member regulated financial institutions] with DTC are registered in the name of DTC's partnership nominee Cede & Co., or such other name as may be requested by an authorized representative of DTC. The deposit of Securities with DTC and their registration in the name of Cede & Co. or such other DTC nominee do not effect any change in beneficial ownership. DTC has no knowledge of the actual Beneficial Owners of the Securities; DTC's records reflect only the identity of the Direct Participants to whose accounts such Securities are credited, which may or may not be the Beneficial Owners."  [DTC, Blanket Letter of Representations, Schedule A, point 4; as used in Series C bonds, Official Statement, Appendix VIII: Book Entry Systems, PDF page 538, at 539]

149.    Underwriters have to apply to DTC to have a particular municipal security deemed

eligible (that is freely tradable and fungible) for the depository and book-entry services of

DTC. [DTC, "New Issue Eligibility" https://www.dtcc.com/settlement-and-asset-

services/underwriting/new-issue-eligibility]

150.    According to MSRB Rule G-34: "[t]he New Issue Information Dissemination Service

[NIIDS]… [is] an automated, electronic system operated by DTCC as part of its

underwriting eligibility request platform, UW Source, that receive comprehensive new issue

information for municipal securities on a market-wide basis for the purposes of establishing

depository eligibility and immediately re-disseminating such information to information

vendors supplying formatted municipal securities information for use in automated trade

processing systems." [MSRB, Rule Book, October 1, 2019, Rule G-34 (a)(ii)(C)(3)(b), page

290]

151.    According to DTC: "To request eligibility for a new or secondary …municipal debt…, a

user of this service must submit securities offering data and offering documentation (e.g.,

prospectus, official statement, the offering memorandum) via Underwriting's online

platform Securities Origination, Underwriting and Reliable Corporate action Enforcement

(UW SOURCE)." [DTC, New Issue Eligibility, https://www.dtcc.com/settlement-and-asset-

services/underwriting/new-issue-eligibility]

152.    MSRB Rule G-34 requires that an underwriter must submit all necessary information to

the DTCC NIIDS system at the time of formal award, defined as "the later of the time the

contract to purchase the securities from the issuer is executed or the time the issuer notifies

the underwriter of its execution." [MSRB Rule Book, Rule G-34 (a)(ii)(C)(1)(a)(B), page

290]

153. DTC states that it "… does not in any way undertake to, and shall not have any responsibility to, monitor or ascertain the compliance of any transactions in the [DTC eligible] Securities with … any other local, state, federal, or foreign laws or regulations thereunder." [DTC, Operational Arrangements Necessary for an Issue to Become and Remain Eligible for DTC Services, February 2002, Section A.7.b.]

154. ERS Series A, B, and C bonds were registered under the DTC book-entry only system. [Cover sheets of the respective Official Statements found at Series A, Tab 4; Series B, Tab 3; and, Series C, Document 4]

155. At the time of initial issuance, ERS registered the ownership of the bonds in the name of Cede & Co., the nominee of DTC. Cede & Co. remains the registered owner of each ERS bond.

156. Making either DTC or purchases of securities entitlements responsible for reviewing legislation or conducting other diligence in connection with bond issues or secondary market purchases could impede issuer access to financial markets, with a resulting decrease in the efficiency of government operations. Imposing such risks could reduce demand, increase interest rates paid by issuers, limit negotiability of municipal bonds, and impair bond values.

**Reasonable Expectations of the Investing Public**

157. The initial sale of the debt instrument constitutes the primary market while the secondary market refers to subsequent trades.

158. To be effective, market-oriented disclosures by the debt issuer must be accurate, complete and timely.

159. The creation and functioning of a national, if not global, capital market depends upon disclosures where officials and professionals at each step in the debt issuance process exercise due diligence in their roles on behalf of potential investors.

160. The parties involved, and benefiting in one form or another from the debt transactions, include ERS officials, Commonwealth officials, financial advisors, bond counsel, underwriters, underwriter counsel, fiscal agents, fiscal agent counsel, bond rating organizations, the financial industry's utilities (DTC and CUSIP) and, ultimately, the taxpayers and residents of the Commonwealth of Puerto Rico.

161. A reasonable investor cannot be expected to substitute her judgment on the legality of a bond when the legal experts (namely the Bond Counsel and General Counsel) charged with knowing the full basis of authority to borrow formally opine that such bonds are "legal, valid and binding", or, as the General Counsel also stated, the bonds are "duly and validly authorized and issued."

162. A reasonable investor cannot be expected to repeat the due diligence assignments of the officials and parties intimate to the transaction, much less uncover basic information than those parties did not find.

163. A reasonable investor is highly likely to find the omission in disclosure documents and subsequent market-oriented disclosures that ERS bonds were in any way questionable legal and valid instruments as surely altering the total mix of information useful in making an investment decision.

164. Prior to the May 1, 2019 notice about the claim at issue here, there was no disclosure by ERS to the MSRB EMMA facility, as required by S.E.C. Rule 15c2-12, of any question about the rights of security holders being so fundamentally at risk.

165.   It would be a material fact for a reasonable investor to know that the ERS bonds were or could be claimed invalid.

166.   Post-issuance invalidation of bonds is a more severe action for an investor than a bond default or municipal bankruptcy.

167.   Post-issuance invalidation of bonds undermines the confidence of the investing public.


## VI. CONCLUSIONS

Based on my analysis to date, I conclude:

168.   The functioning of a market depends upon the proposition that investors can rely upon the actions, opinions and representations by responsible officials and parties to the particular transactions at the time of the original issuance.

169.   The ERS debt obligations were sold to lenders based upon specific and critical assurances incorporated in the ERS market disclosure documents such as the Preliminary Official Statements and the final Official Statements as well as any other disclosures.

170.   Those market-oriented disclosure documents specified that the debt obligations were legal and binding on the ERS.

171.   The ERS bonds were issued with written legal opinions by its General Counsel and an independent bond counsel firm, both attesting that Series A, B and C bonds were legal and valid. In each transaction there was an underwriters' counsel with due diligence responsibilities.

172.   Each of three different independent credit rating organizations conducted its own due diligence reviews and then signaled to investors through credit ratings that ERS could be expected to pay back the investors on time and in full.

173.   The ERS bonds were sold directly to underwriters in one total amount for each series of bonds.

174.   ERS borrowed directly from the underwriters instead of retail or institutional investors since it was the underwriters whose money was transferred to ERS.

175.   The Fiscal Agent under the Bond Resolution and the market utility, the Depository Trust Corporation [DTC], accepted legal title to the ERS bonds after receiving details (as provided in the Preliminary Official Statements and/or the final Official Statements) about the security and structure undergirding each transaction.

176.   DTC is the only holder of the single global security for each maturity and all other transactions are electronic through book entry.

177.   Another market utility is CUSIP Global Services [CUSIP] which assigned unique identifiers after receiving similar details. Each maturity in Series A, B and C series bonds was assigned a unique identifier, referred to as a CUSIP number, and the bonds were denominated in $5,000 principal amounts and integral multiples thereof.

178.   Investors in Series A, B and/or C bonds did not, and do not, transfer any money to ERS when purchasing ERS debt obligations.

179.   The most recently disclosed audited financial statement of the Commonwealth of Puerto Rico includes the ERS pension obligation bonds as a liability, as attested to by its independent auditor which is the same auditor that attested to the ERS audited financial statement.

180.   Making either the purchasers of securities entitlements or DTC responsible for reviewing legislation or conducting other diligence in connection with bond issues or secondary market purchases could impede issuer access to financial markets, with a resulting decrease

in the efficiency of government operations. Imposing such risks could reduce demand,

increase interest rates paid by issuers, limit negotiability of municipal bonds, and impair

bond values.

181. A reasonable investor cannot be expected to uncover material facts that vary from what

the professionals involved with the transaction state in market-oriented certifications.

**All of the foregoing opinions and conclusions have been rendered within a reasonable
degree of public finance certainty.**

**Signature:** _WMWilson_

**Date:** July 1, 2020

APPENDIX A

**PROCEEDS AND USES OF SERIES A, B AND C BONDS OF EMPLOYEES RETIREMENT SYSTEM OF THE COMMONWEALTH OF PUERTO RICO**

| | Series A | Series B | Series C | Total | Percentage of Par |
|---|---|---|---|---|---|
| **PROCEEDS** | | | | | |
| Par | $1,588,810,799.60 | $1,058,634,613.05 | $300,202,930.00 | $2,947,648,342.65 | |
| Less: Original Issue Discount | ($1,663,850.00) | ($6,225,500.00) | | ($7,889,350.00) | |
| Total Proceeds | $1,587,146,949.60 | $1,052,409,113.05 | $300,202,930.00 | $2,939,758,992.65 | |
| | | | | | |
| **USES** | | | | | |
| Underwriter's Discount | $16,755,153.62 | $5,293,173.07 | $4,683,165.71 | $26,731,492.40 | 0.91% |
| Debt Service Reserve Fund | $46,982,352.66 | $25,791,551.54 | $9,148,607.98 | $81,922,512.18 | 2.78% |
| Capitalized Interest Fund | $93,737,392.13 | | | $93,737,392.13 | 3.18% |
| Cost of Issuance: | | | | | 0.00% |
|     Bond Counsel (FGR) | $350,000.00 | $350,000.00 | $135,000.00 | $835,000.00 | 0.03% |
|     Previous Bond Counsel (NB) | $98,000.00 | | | $98,000.00 | 0.00% |
|     Underwriters Counsel (O&B) | | $233,333.33 | $90,000.00 | $323,333.33 | 0.01% |
|     Underwriters Counsel (Sidley) | | $233,333.33 | | $233,333.33 | 0.01% |
|     Fiscal Agent / Trustee Counsel | $15,000.00 | $15,000.00 | $15,000.00 | $45,000.00 | 0.00% |
|     Fiscal Agent / Trustee Acceptance Fee | $4,000.00 | $4,000.00 | $4,000.00 | $12,000.00 | 0.00% |
|     Financial Advisor (Mesirow) | $175,000.00 | $175,000.00 | | $350,000.00 | 0.01% |
|     Auditor Fees (KPMG/Parissi) | $34,000.00 | $50,000.00 | $34,000.00 | $118,000.00 | 0.00% |
|     Structuring Fee (Merrill Lynch) | | $1,500,000.00 | | $1,500,000.00 | 0.05% |
|     Marketing | $35,675.98 | | $15,000.00 | $50,675.98 | 0.00% |
|     Printing | $47,000.00 | | $25,000.00 | $72,000.00 | 0.00% |
|     CUSIP Fee | | | $296.00 | $296.00 | 0.00% |
|     S&P | $175,000.00 | | $48,000.00 | $223,000.00 | 0.01% |
|     Moody's | $175,000.00 | | $150,000.00 | $325,000.00 | 0.01% |
|     Moody's Maintenance Fee | $193,000.00 | | | $193,000.00 | 0.01% |
|     Fitch | $240,000.00 | | $150,000.00 | $390,000.00 | 0.01% |

| | | | | | |
|---|---|---|---|---|---|
| GDB Fee | $1,986,013.50 | $1,323,293.27 | $375,253.66 | $3,684,560.43 | 0.13% |
| Contingency | $50,000.00 | $100,000.00 | $200,000.00 | $350,000.00 | 0.01% |
| Global Insight | $92,000.00 | $25,000.00 | $92,500.00 | $209,500.00 | 0.01% |
| Total Cost of Issuance | $3,669,689.48 | $4,008,959.93 | $1,334,049.66 | $9,012,699.07 | 0.31% |
| Total Uses: | $161,144,587.89 | $35,093,684.54 | $15,165,823.35 | $211,404,095.78 | 7.48% |
| | | | | | |
| Actual Proceeds to ERS | $1,426,002,361.71 | $1,017,315,428.51 | $285,037,106.65 | $2,728,354,896.87 | |
| as Percentage of Par | 89.75% | 96.10% | 94.95% | 92.56% | |

APPENDIX B

## WILLIAM BARTLEY HILDRETH
Expert Witness Engagements Last Three Years


In re: The Financial Oversight and Management Board for Puerto Rico (debtor)
PROMESA Title III
Peaje Investments LLC, against Puerto Rico Highways & Transportation Authority, et al.
U.S. District Court for the District of Puerto Rico
Adversary Proceeding No. 17-151-LTS, No. 17-152-LTS
Expert Opinion Report filed
Deposition Testimony, August 2017
Trial Testimony, August 2017
Peaje Investments LLC

Robert F. Cherry, Jr., et al. v. Mayor and City Council of Baltimore City
Circuit Court for Baltimore City, Maryland
Case No. 24-C-18-004670 [November 2018]
Rebuttal Expert Report filed
Robert F. Cherry

Town of Apple Valley v. Apple Valley Ranchos Water Company
Superior Court of the State of California, County of San Bernardino
Case No. CIVDS 1600180
Expert Opinion Report filed
Deposition Testimony, August 2019
Trial Testimony, November 2019
Apple Valley Ranchos Water Company

APPENDIX C

References

ERS Ultra Vires Documents (set of documents from attorneys)
UBS-ERS_Ultra_Vires-0043861
UBS-ERS_Ultra_Vires-0076149
UBS-ERS_Ultra_Vires-0087856

Akerlof, George A. "The Market for 'Lemons': Quality Uncertainty and the Market Mechanism, *The Quarterly Journal of Economics*, 84:3 (August, 1970), 488-500.

Amdursky, Robert S. and Clayton P. Gillette, *Municipal Debt Finance Law: Theory and Practice*, Boston: Little, Brown and Company, 1992.

Commonwealth of Puerto Rico, Basic Financial Statement and Required Supplementary Information, June 30, 2016 (with Independent Auditor's Report Thereon), dated May 3, 2019.

Commonwealth of Puerto Rico, Retirement of Government Employees – Amendment (H.B. 1346, No. 46, approved June 29, 1988 [Dowd, Exhibit No. 7]

Depository Trust & Clearing Corporation, https://dtcc.com

Depository Trust & Clearing Corporation, Blanket Letter of Representations.

Depository Trust & Clearing Corporation, "Underwriting," https://www.dtcc.com/settlement-and-asset-services/underwriting/faqs/eligibility

Depository Trust & Clearing Corporation, "New Issue Eligibility" https://www.dtcc.com/settlement-and-asset-services/underwriting/new-issue-eligibility

Depository Trust & Clearing Corporation, Life Cycle of a Security, 2010.

Depository Trust & Clearing Corporation, Operational Arrangements, July 2019. http://www.dtcc.com/~/media/Files/Downloads/Settlement-Asset-Services/Underwriting/operational-arrangements.pdf.

Depository Trust & Clearing Corporation, FAQS: How Issuers Work With DTC https://www.dtcc.com/settlement-and-asset-services/issuer-services/how-issuers-work-with-dtc

Depository Trust & Clearing Corporation, New Issue Information Dissemination Service (NIIDS), https://www.dtcc.com/settlement-and-asset-services/underwriting/new-issue-information-dissemination-service

Depository Trust Company, Operational Arrangements Necessary for an Issue to Become and Remain Eligible for DTC Services, February 20, 2002.

Doty, Robert, "Municipal Securities Law and Disclosure Developments," *Municipal Finance Journal* 27:4 (Winter 2007), 55-88.

Doty, Robert, "Municipal Securities Law and Disclosure Developments – Continued Expansion and a Market in Flux: Part 1," *Municipal Finance Journal* 28:4 (Winter 2008), 63-101.

Doty, Robert, "Municipal Securities Law and Disclosure Developments – Continued Expansion and a Market in Flux: Part 2," *Municipal Finance Journal* 29:1 (Spring, 2008), 31-75.

Doty, Robert, *Bloomberg Visual Guide to Municipal Bonds*. New York: Bloomberg Press/Wiley, 2012.

Employees Retirement System of Government of the Commonwealth of Puerto Rico, Basic
    Financial Statements and Required Supplementary Information, June 30, 2014, dated June
    1, 2016.

Employees Retirement System of Government of the Commonwealth of Puerto Rico, "Annual
    Financial Information and Operating Data pursuant to Rule 15c2-12" for the fiscal period of
    2017-18, May 1, 2019. https://emma.msrb.org/ER1220073-ER955038-ER1356043.pdf

Employees Retirement System of Government of the Commonwealth of Puerto Rico,
    https://www.retiro.pr.gov/

Ettlinger, Michael and John Koehane, "Responsibilities of Bond Counsel," chapter 36, page 708, in
    Robert Lamb, James Leigland and Stephen Rappaport, *The Handbook of Municipal Bonds
    and Public Finance*, New York: New York Institute of Finance, 1993.

Fippinger, Robert A. and Edward L. Pittman, "Disclosure Obligations of Underwriters of
    Municipal Securities," *The Business Lawyer*, 47:1 (November 1991), 127-156.

Gellis, Ann J. "Application of Securities Laws and Disclosure Standards," Chapter 8, in M. David
    Gelfand, *State & Local Government Debt Financing*, Thomson West, August 1997.

Moak, Lennox L. *Municipal Bonds: Planning, Sale and Administration.* Chicago: Municipal
    Financial Officers Association, 1982.

Municipal Securities Rulemaking Board, Rule A-13 Interpretive Guidance, "Underwriting
    assessment: application to private placements," February 22, 1982.

Municipal Securities Rulemaking Board, Glossary, http://msrb.org/glossary/

Municipal Securities Rulemaking Board, Note 2008-23, Notice of Filing of Proposed Rule Change
    to Require Underwriter Registration and Testing with DTCC's NIIDS System, May 9,
    2008.

Municipal Securities Rulemaking Board, "Potential Applicability of MSRB Rules to Certain
    "Direct Purchases" and "Bank Loans," MSRB Notice 2011-52, September 12, 2011.
    http://msrb.org/Rules-and-Interpretations/Regulatory-Notices/2012/2012-18.aspx

Municipal Securities Rulemaking Board, Rule Book, October 1, 2019. [includes Rules G-34]

Municipal Securities Rulemaking Board, Letter to Securities and Exchange Commission, Proposed
    Exemption Order (File No. S7-16-19), December 9, 2019.

Municipal Securities Rulemaking Board, https://msrb.org

Municipal Securities Rulemaking Board, https://emma.msrb.org

National Association of Bond Lawyers, *Direct Purchases of State or Local Obligations by
    Commercial Banks and Other Financial Institutions*, Washington, DC, July 2017.

O'Hara, Maureen, *Market Microstructure Theory*, Cambridge, MA: Blackwell Publishers, 1995.

Securities and Exchange Commission, *Statement of the Commission Regarding Disclosure
    Obligations of Municipal Securities Issuers and Others*, Federal Register, vol. 59, no. 52,
    March 17, 1994.

Securities and Exchange Commission, Rule 15c2-12, S.E.C. Release No. 34-26985, 54 Fed. Reg.
    28799 (July 10, 1989).

Securities and Exchange Commission, *Report on the Municipal Securities Market*, July 21, 2012

Securities and Exchange Commission, Release 34-76743, File No. S7-27-15, "Transfer Agent
    Regulations," December 22, 2015

Securities and Exchange Commission, Staff Legal Bulletin No. 21, "Application of Antifraud
    Provisions to Public Statements of Issuers and Obligated Persons of Municipal Securities in
    the Secondary Market", February 7, 2020.

Securities and Exchange Commission, https://www.sec.gov/about.shtml

Securities and Exchange Commission, https://www.sec.gov/municipal/oms-enforcement-actions.html

U.S. House of Representatives, Committee on Financial Services, Municipal Bond Turmoil: Impact on Cities, Towns, and States, Hearings, March 12, 2008, https://www.govinfo.gov/content/pkg/CHRG-110hhrg41730/pdf/CHRG-110hhrg41730.pdf

Uniform Commercial Code, Article 8, Investment Securities, Prefatory Note, Section I.D.

APPENDIX D:

## W. BARTLEY HILDRETH

Andrew Young School of Policy Studies
Georgia State University
P.O. Box 3992
Atlanta, Georgia 30302-3992
Phone: 404-413-0271, Fax: 404-413-0248
Office: 14 Marietta Street, N.W., Suite 430 (zip 30303)

Email: BartHildreth@gsu.edu
Professional web page:
https://BartHildreth.com
SSRN: http://ssrn.com/author=15385

## EDUCATION

B.A. (Political Science), University of Alabama, 1971
M.P.A. (Public Administration), Auburn University at Montgomery, 1974
Ph.D. (Public Administration), University of Georgia, 1979

## ACADEMIC APPOINTMENTS

Professor (with Tenure), Department of Public Management and Policy, Andrew Young School of Policy Studies, Georgia State University, Atlanta, Georgia, July 2009 – present.

> Faculty Affiliate, Center for State and Local Finance, Andrew Young School of Policy Studies, 2014 to present.

> Faculty Affiliate, Fiscal Research Center, Andrew Young School of Policy Studies, 2010 to present.

> Faculty Affiliate, Philosophy, Politics and Economics (PPE) Program, Georgia State University, 2017 to present.

> Dean, Andrew Young School of Policy Studies, Georgia State University, Atlanta, Georgia, July 2009 to March 2010.

Regents Distinguished Professor of Public Finance (with Tenure and voting rights in two colleges), public administration faculty of the Hugo Wall School of Urban and Public Affairs in the Lindquist College of Liberal Arts and Sciences, and finance faculty of the W. Frank Barton School of Business, Wichita State University, Wichita, Kansas, 1994 to 2009.

> Director, Kansas Public Finance Center, Hugo Wall School of Urban and Public Affairs, Wichita State University, 1994 to 2009.

> Interim Dean, W. Frank Barton School of Business, Wichita State University, Wichita, Kansas, August 2007 to June 2008.

Professor (with Tenure), Public Administration Institute, College of Business Administration, Louisiana State University, Baton Rouge, LA, 1990 to 1994.

Associate Professor (with Tenure), Public Administration Institute, College of Business Administration, Louisiana State University, Baton Rouge, LA, 1985 to 1990.

Associate Professor of Finance and Public Administration (with Tenure), College of Business Administration and Graduate School of Management, Kent State University, Kent, OH, 1984 to 1985 (on unpaid leave of absence).

Assistant Professor of Finance and Public Administration, College of Business Administration and Graduate School of Management, Kent State University, Kent, OH, 1979 to 1984.

**SIGNIFICANT PROFESSIONAL HONORS AND APPOINTMENTS**

Editor-in-Chief, Municipal Finance Journal, 1989 to present.

2012 Elected Fellow, National Academy of Public Administration.

Member, Board of Directors, Municipal Securities Rulemaking Board, 2012 to 2015.

Aaron B. Wildavsky Award for Lifetime Scholarly Achievement in Public Budgeting and Financial Management, awarded in 2008 by the Association for Budgeting and Financial Management of the American Society for Public Administration.

Industry Award for contributions in advancing the municipal bond industry, National Federation of Municipal Analysts, May 2017.

Fulbright scholar and Visiting Research Chair in Public Policy, McGill Institute for the Study of Canada, McGill University (Montreal, Quebec), Fall 2005.

**PUBLICATIONS**

**Articles**

"Does Financial Slack Reduce Municipal Short-Term Borrowing?" Public Budgeting & Finance, 38:1 (Spring 2018), 95-113. With Min Su.

"Impact of Bankruptcy Eligibility Requirements and Statutory Liens on Borrowing Costs," Public Budgeting & Finance, 37:4 (Winter 2017), 47-73. With Temirlan T. Moldogaziev and Sharon N. Kioko. Winner of the Jesse Burkhead Award for Best Article in the journal in 2017.

"The Past and Future of Municipal Securities: Fortieth Anniversary of the Municipal Securities Rulemaking Board," Municipal Finance Journal, 37:1 (Spring 2016), 1-23. Moderator, with Christopher Taylor, Lynnette Kelly, Robert Doty, and Rick A. Fleming.

"A Descriptive Analysis of the Municipal Advisors Market," Municipal Finance Journal, 34:4 (Winter 2014), 69-98. With Martin Luby.

"What are General Obligation Bonds? Reactions to 'Diversity and Default Risks of Municipal Bonds'", <u>Municipal Finance Journal</u>, 34:2 (Summer 2013), 89-98.

"Finance Managers' Propensity to Save," <u>Journal of Public Budgeting, Accounting & Financial Management</u>, 24:2 (Summer 2012), 313-349. With Samuel J. Yeager, Gerald J. Miller, and Jack Rabin.

"Government-Wide Financial Statements and Credit Risk," <u>Public Budgeting & Finance</u>, 32:1 (Spring 2012), 80-104. With Craig L. Johnson and Sharon N. Kioko. Winner of the Jesse Burkhead Award for Best Article in the journal in 2012.

"Frederickson's Social Equity Agenda Applied: Public Support and Willingness to Pay," <u>Public Integrity</u>, 14:1 (Winter 2011-12), 19-37. With Mark Glasser, Brandon J. McGuire and Corinne Bannon.

"State Government Catastrophe Risk Financing and the Capital Markets," <u>National Tax Association: Proceedings of the 104th Annual Conference on Taxation</u>, (2011), 56-61. With Gerald J. Miller and Emefa Sewordor.

"Implications of Successful Career Paths of Top Local Government Finance Managers," <u>Public Budgeting & Finance</u>, 30:4 (Winter 2010), 81-96. With Samuel J. Yeager, Gerald J. Miller, and Jack Rabin.

"Mapping a Field's Development: 20 Years of ABFM Conferences," <u>Public Budgeting & Finance</u>, 29:3 (Fall 2009), 15-27. With Michael Woodrum.

"The Financial Logistics of Disaster: The Case of Hurricane Katrina," <u>Public Performance & Management Review</u>, 32:3 (March 2009), 400-436.

"Estimates of the Uniform and Equal Property Tax Base before Exemptions," <u>National Tax Association: Proceedings 100th Annual Conference on Taxation 2007</u> (placed in 101st proceedings by mistake, 1-13; and printed in <u>State Tax Notes</u> 49:6, August 11, 2008). With John D. Wong and Glenn W. Fisher.

"The Relative Effects of Supervisors Emphasizing Ethical Behavior Versus Political Responsiveness," <u>Public Integrity</u> 9:3 (2007), 265-281. With Samuel J. Yeager, Gerald J. Miller, and Jack Rabin.

"Sizing up Kansas Finances." <u>Kansas Policy Review</u> 29:1 (Spring 2007), 13-21. With Glenn Fisher, H.Edward Flentje and John D. Wong.

"What Difference Does Having an MPA Make?" <u>Journal of Public Administration Education</u> 13:2 (2007), 147-167. With Samuel J. Yeager, Gerald J. Miller, and Jack Rabin

"Canadian and American Federalism in the Capital Markets: Comparative Debt Financing, <u>Canadian Foreign Policy</u> 12:3 (2006), 93-104.

"Leading the Way to Better Budgeting," <u>Government Finance Review</u> (Issue devoted to Centennial Anniversary of GFOA), 22:2 (April 2006), 50-58.

"Federalism and Capital Markets in Canada and the U.S.: Financing Infrastructure in the Wake of Hurricane Katrina," <u>Policy Options/Politiques</u> 27:1 (December 2005-January 2006), 39-45.

"Fiscal Trends in Kansas: Taxing, Spending and Borrowing." <u>Kansas Policy Review,</u> 28:1 (Spring 2006), 21-30. With H. Edward Flentje.

"The Evolution of the State and Local Government Municipal Debt Market Over the Past Quarter Century," <u>Public Budgeting & Finance</u>, Special Issue 2005, 127-153. With Kurt Zorn. Reprinted in: Mikesell, John L. and Daniel R. Mullins, ed., <u>The Evolution of Public Finance and Budgeting: A Quarter Century of Developments</u> (Oxford, UK: Blackwell, 2006), Chapter 6, 125-151.

"Interstate Tax Uniformity and the Multistate Tax Commission," <u>National Tax Journal</u> 58:3 (September, 2005), 575-589. With Matt Murray and David Sjoquist.

"How Financial Managers Deal with Ethical Stress," <u>Public Administration Review</u> 65:3 (May/June 2005), 301-312.  With Gerald J. Miller, Samuel J. Yeager and Jack Rabin.

 "The Theme of Public Finance in the Amusement Park Industry," <u>National Tax Association: Proceedings 95th Annual Conference on Taxation 2002</u>, pp. 409-415.  With John D. Wong

"Debt and the Local Economy: Problems in Benchmarking Local Government Debt Affordability," <u>Public Budgeting & Finance</u> 22:4 (Winter 2002), 99-113. With Gerald J. Miller.

"Service Delivery Satisfaction and Willingness to Pay Taxes: Citizen Recognition of Local Government Performance," <u>Public Productivity & Management Review</u> 23:1 (1999), 48-67. With Mark Glaser.

"State Initiatives in Transportation Investment: The Evolution from Anti-Debt to Debt Financed Programs in Kansas," <u>National Tax Association: Proceedings 92nd Annual Conference on Taxation 1999</u>, pp. 148-154.  With H. Edward Flentje.

"Implications of Retail Competition for Kansas Municipal Electric Utilities and Municipalities," <u>National Tax Association:  Proceedings of 90th Annual Conference on Taxation 1997</u>, pp. 129-134.  With John D. Wong and H. Edward Flentje.

"Should there be an Accreditation Program for Finance and Budget Offices?" <u>Public Budgeting & Finance</u> 18:2 (Summer 1998), pp. 18-27.

"Stranded Costs in Kansas Municipal Electric Utilities," <u>Municipal Finance Journal</u> 19:3 (Fall 1998), pp. 44-55.

"Kansas Municipal Electric Utilities in Perspective," <u>Municipal Finance Journal</u> 19:2 (Summer 1998), pp. 41-57. With Carol McMillan.

"The Context of Change Facing Municipal Electric Utilities," <u>Municipal Finance Journal</u> 19:1 (Spring 1998), pp. 16-30.

"Strategic Issues Confronting a Municipal Electric Utility in a Competitive Environment," <u>Municipal Finance Journal</u> 19:1 (Spring 1998), pp. 43-48. With John D. Wong and H. Edward Flentje.

"Financial Management: A Balancing Act for Local Government Chief Financial Officers," Public Administration Quarterly 20:3 (Fall 1996), pp. 320-342. Reprinted in: Watson, Douglas J. and Wendy L. Hassettt (Editors), Local Government Management: Current Issues and Best Practices (Armonk, NY: M. E. Sharpe, Inc. and the American Society for Public Administration "Classics Series", 2003).

"A Profile of Discontinuity Between Citizen Demand and Willingness to Pay Taxes: Comprehensive Planning for Park and Recreation Investment," Public Budgeting & Finance 16:4 (Winter 1996), pp. 96-113. With Mark Glaser.

"Strategic Public Planning: External Orientations and Strategic Planning Team Members," American Review of Public Administration 23:4 (December 1993), pp. 307-318. With Gary Bruton. Reprinted in: Rabin, Jack, Gerald J. Miller and W. Bartley Hildreth (editors), Handbook of Strategic Management (New York: Marcel Dekker, Inc., 2000).

"Federal Financial Management Control Systems: An Integrative Framework," Public Budgeting & Finance 13:1 (Spring 1993), pp. 77-86. Reprinted in: Savoie, Donald J. (editor). Budgeting and the Management of Public Spending (Brookfield, VT: Edward Elgar Publishing Company, The International Library of Comparative Public Policy Series, volume 4, 1996).

"Budgeting the Work Force: Influences, Elements, Disclosure Strategies, and Roles," International Journal of Public Administration 16:7 (1993), pp. 985-1014.

"State and Local Governments as Borrowers: Strategic Choices and the Capital Market," Public Administration Review 53:1 (January/February, 1993), pp. 41-49. Reprinted in: Marlowe, Justin and David Matkin (editors), Financial Management in the Public Sector, Volume 2 (Sage Publications, 2013); Watson, Douglas J. and Wendy L. Hassett (editors), Local Government Management: Current Issues and Best Practices (Armonk, NY: M. E. Sharpe, Inc. and the American Society for Public Administration "Classics Series", 2003); and, Rabin, Jack, W. Bartley Hildreth and Gerald J. Miller (editors), Budgeting: Formulation and Execution (Athens, GA: Institute of Government, University of Georgia, 1996).

"Research and Trends in Governmental Accounting and Reporting," International Journal of Public Administration 15:5 (1992), pp. 1121-1148. With Nicholas G. Apostolou and Richard C. Brooks.

"The Evolving Regulatory Environment of State and Local Tax-Exempt Securities," Public Budgeting and Financial Management 4:3 (1992), 491-527. With Rosalyn Y. Carter.

"Knowledge of Classical Organizational Principles," The Korea Public Administration Journal 1:2 (August, 1992), 198-226. With Felix Nigro, Jack Rabin, and Gerald J. Miller.

"The National Debt and Government Use of Long-Term Financial Tools: Results from the Longitudinal Study in Public Budgeting and Financial Management," Sri Lanka Journal of Development Administration 7:2 (July-December 1990), pp. 96-114. With Jack Rabin and Gerald J. Miller.

"The Business of Public Management," Public Productivity Review 12:3 (Spring, 1989), pp. 303-321. With Rodger P. Hildreth. Reprinted in: Halachmi, Arie and Marc Holzer (editors), Competent Government: Theory and Practice (Burke, VA: Chatelaine Press, 1994).

"In Search of Capital," Municipal Finance Journal 10:4 (1989), pp. 351-355.

"The Politics of a Windfall: Allocating Special Offshore Oil and Gas Receipts in Four Southern States Facing Fiscal Retrenchment," International Journal of Public Administration 11:5 (1988), pp. 581-600.

"The Changing Roles of Municipal Market Participants," Public Administration Quarterly 11:3 (Fall, 1987), pp. 314-340.

"Strategy, Values and Productivity," Public Productivity Review 43 (Fall, 1987), pp. 81-96. With Gerald J. Miller and Jack Rabin. Reprinted in: Miller, Gerald J., W. Bartley Hildreth and Jack Rabin (editors), Performance Based Budgeting (Boulder, CO: Westview Press and the American Society for Public Administration "Classics Series", 2001).

"Clients, Administrators and the Courts," Public Administration Quarterly 10:4 (Winter, 1987), pp. 387-396.

"Client-Based Administrative Responsibility and Risk Strategy," International Journal of Public Administration 8:3 (May, 1986), pp. 261-287.

"Integrating Planned Change Intervention and Computer Simulation Technology: The Case of Affirmative Action," The Journal of Applied Behavioral Science 20 (May, 1984), pp. 125-140. With James Ledvinka. Reprinted in: Davey, Bruce and Larry S. Jacobson (editors), Computerizing Human Resource Management, (Alexandria, VA: International Personnel Management Association, 1987).

"Applying Professional Disclosure Standards to Productivity Financial Analyses," Public Productivity Review 7:3 (September, 1983), pp. 269-287. Reprinted in: Miller, Gerald J., W. Bartley Hildreth and Jack Rabin (editors), Performance Based Budgeting (Boulder, CO: Westview Press and the American Society for Public Administration "Classics Series", 2001).

"Errors, Liability and Risk Management," The Bureaucrat 10 (Fall, 1981), pp. 11-12.

"Administrative Malpractice Suits: Tort Liability and the Challenge to Professionalism," Public Personnel Management Journal 10:1 (1981), pp. 119-125. With Jack Rabin and Gerald J. Miller.

"The Liability of Public Executives: Implications for Practice in Personnel Administration," Review of Public Personnel Administration 1:1 (Fall, 1981), pp. 45-56. With Gerald J. Miller and Jack Rabin. Reprinted in: Bozeman, Barry and Jeffrey Straussman (editors), New Directions in Public Administration (Monterey, CA: Brooks/Cole Publishing Co. 1984); and, Open Learning Fire Service: Political and Legal Foundations of Fire Protection (Boston: Ginn and Company, 1982).

"Suing Federal Executives for Damages," The Bureaucrat 8 (Spring,1979), pp. 54-56. With Jack Rabin and Gerald J. Miller. Reprinted in: Howard Ball (editor), Federal Administrative Agencies: Essays on Power and Politics (Englewood Cliffs, NJ: Prentice-Hall, Inc., 1984).

"The Challenge of Professional Development: Teaching Public Administrators at the Graduate Level," Southern Review of Public Administration 1:1 (June, 1977), pp. 62-73. With Frank Gibson.

**Journal Symposia Editorships**

"A Symposium on Resource Allocation Decisions: The Individual and the Organization." <u>International Journal of Organization Theory and Behavior</u>, three articles, 4:1 (2001), 105-195.

"Budget Execution:  A Symposium." <u>Journal of Public Budgeting, Accounting, & Financial Management</u>, three articles, 11:2 (1999), 230-310.  Co-editor, Aman Khan.

"Audit Costs for Small Cities, Large Cities and State Governments:  A Symposium." <u>Public Budgeting and Financial Management</u>, three articles, 6:3 (1994), 119 pp. Co-editor, Don Deis.

"Certificates of Participation in Brevard County:  A Local Political Issue and Its Implications for the National Municipal Market," <u>Municipal Finance Journal</u>, six presentations, 15:1 (Spring 1994), 24 pp.

"Review of Public Budgeting and Financial Management," <u>International Journal of Public Administration</u>, five articles, 11:6 (1988), 152 pp.  Co-editors, Jack Rabin and Gerald J. Miller.

"Financial Management in Government," <u>Public Administration Quarterly</u>, six articles, 11:3 (Fall, 1987), 137 pp.

"Review of Public Budgeting and Financial Management," <u>International Journal of Public Administration</u>, six articles, 7:4 (1985), 525 pp. Co-editors, Jack Rabin and Gerald J. Miller.

"Personal Liability of Federal Administrators," <u>The Bureaucrat</u>, seven articles, 9 (1981). Co-editors, Jack Rabin and Gerald J. Miller.

**Books**

<u>Handbook of Public Administration, Fourth Edition</u>.  New York, NY: Routledge, under contract. Co-editor with Gerald J. Miller and Evert Lindquist.

<u>Budgeting: Politics and Power, Second Edition</u>. New York, NY: Oxford University Press, 2013, 346 pp. With Carol Lewis.

<u>Management Policies in Local Government Finance, 6th edition</u>. Washington, DC: International City/County Management Association, 2013, 476 pp. Co-editors John R. Bartle and Justin Marlowe.

<u>Budgeting: Politics and Power</u>. New York, NY: Oxford University Press, 2011, 360 pp. With Carol Lewis.

<u>Handbook of Public Administration, Third Edition</u>.  New York, NY: Marcel Dekker, Inc., 2007, 1243 pp. Co-editor with Jack Rabin and Gerald J. Miller.

<u>Financial Management Theory in the Public Sector</u>. Westport, CT: Greenwood Publishing, 2004, 270 pp. Co-editor with Aman Khan (Translated into Chinese in 2007).

<u>Budget Theory in the Public Sector</u>. Westport, CT: Greenwood Publishing, 2002, 297 pp.  Co-editor with Aman Khan (Translated into Chinese in 2007).

State and Local Government Budgeting Practices Handbook.  Austin, TX:  Sheshunoff Information Services, Inc., 1997, with annual updates through 2008.  With Charles Mecimore.

State and Local Government Debt Issuance and Management Service.  Austin, TX:  Sheshunoff Information Services Inc., 1996, with annual updates through 2008.  Assisted by Robert Doty, John Gunyou and Mike Bell.

Encyclopedia of Public Administration and Public Policy.  New York, NY: Marcel Dekker, Inc., Contributing Editor (for contributions to the Financial Management section), 2002, with yearly updates through 2006.

Case Studies in Public Budgeting and Financial Management, Second Edition. New York, NY: Marcel Dekker, Inc., 2003, 784 pp.  Co-editor with Aman Khan.

Performance Based Budgeting.  Boulder, CO:  Westview Press and the American Society for Public Administration "Classics Series", 2001, 504 pp.  Co-editor with Gerald J. Miller and Jack Rabin.

State and Local Government Public/Private Partnerships. Austin, TX: Sheshunoff Information Service, Inc., 2000, with annual updates through 2003.  With John Wong.

Local Government Benchmarking Service: Cities Within Selected Population Groups (2 volume set for each of the 50 states). Austin, TX: AlexInformation Inc., 2000.  Technical author.

Handbook on Taxation.  New York, NY:  Marcel Dekker, Inc., 1999, 998 pp. Co-editor with James A. Richardson.

Handbook of Strategic Management, Second Edition.  New York, NY: Marcel Dekker, Inc., 2000, 816 pp.. Co-editor with Jack Rabin and Gerald J. Miller.

State & Local Government Capital Improvement Planning and Budgeting Service.  Austin, TX: Sheshunoff Information Services, Inc., 1997, with annual updates through 2003.  With John Wong.

Handbook of Public Administration, Second Edition.  New York, NY:  Marcel Dekker, Inc., 1998, 1246 pp. Co-editor with Jack Rabin and Gerald J. Miller (Translated into Chinese by Mengzhong Zhang, 2006).

Budgeting:  Formulation and Execution.  Athens, GA:  Carl Vinson Institute of Government, University of Georgia, 1996, 531 pp.  Co-editor with Jack Rabin and Gerald J. Miller.

Public Budgeting Laboratory, Second Edition, Athens, GA:  Carl Vinson Institute of Government, University of Georgia, 1996.  With Jack Rabin and Gerald J. Miller.  Package includes:
- Workbook, 110 pp. (1996)
- Data Supplement, 185 pp. (1996)
- Instructor's Manual, 58 pp. (1996)
- Interactive Student Guide Workbook on CD (2000), with additional coauthors Sherry Bartel and Robert Munzinrider
- Interactive Student Guide Workbook Guide (2000), with additional coauthors Sherry Bartel and Robert Munzinrider
- Beta Version 1.0 (2006)

Case Studies in Public Budgeting and Financial Management. Dubuque, IA: Kendall/Hunt Publishing Co., 1994, 580 pp. Co-editor with Aman Khan.

Handbook of Public Personnel Administration. New York, NY: Marcel Dekker, Inc., 1995, 720 pp. Co-editor with Jack Rabin, Thomas Vocino, and Gerald J. Miller.

Handbook of Public Sector Labor Relations. New York, NY: Marcel Dekker, Inc., 1994, 450 pp. Co-editor with Jack Rabin, Thomas Vocino, and Gerald J. Miller.

Handbook of Strategic Management. New York, N.Y.: Marcel Dekker, Inc., 1989, 457 pp. Co-editors, Jack Rabin and Gerald J. Miller.

Handbook of Public Administration. New York, NY: Marcel Dekker, Inc., 1989, 1095 pp. Co-editors, Jack Rabin and Gerald J. Miller.

Public Budgeting Laboratory. Athens, GA: Carl Vinson Institute of Government, University of Georgia, 1983. With Jack Rabin and Gerald J. Miller. Including: Workbook, 83 pp.; Data Supplement, 153 pp. (1983) and Revised Edition (1987); Data Diskette (1987); Instructor's Manual, 56 pp.

Budget Management: Readings in Local Government Budgeting and Financial Management. Athens, GA: Carl Vinson Institute of Government, University of Georgia, 1983, 258 pp. Co-editors, Jack Rabin and Gerald J. Miller.

Handbook on Public Personnel Administration and Labor Relations. New York, NY: Marcel Dekker, Inc., 1983, 671 pp. Co-editors, Jack Rabin, Thomas Vocino and Gerald J. Miller.

**Book Chapters**

"Finance Officers and Public Risk Management," in Piotra Tworek and Jozef Myrczek (Editors), Public Risk Management. Katowice, Poland: Polish Economic Society, 2016, pp. 76-109. With Gerald J. Miller.

"Pullback Management: State Budgeting Under Fiscal Stress," in Robert D. Ebel and John E. Petersen (Editors), The Oxford Handbook of State and Local Government Finance. New York, NY: Oxford University Press, 2012, pp. 816-842. With Carolyn Bourdeaux.

"The Persistent Need for Budget Reform" Fudan Public Administration [China], Volume 4, 2008, pp. 12-19.

"Local Debt Management," in Anwar Shah (Editor), Local Public Financial Management. Washington, DC: The World Bank, 2007, pp. 109-155. With Gerald J. Miller.

"Local Government Own-source Revenues and Debt: Structure and Stress," in Michael A. Pagano and Robert Leonardi (Editors), The Dynamics of Federalism in National and Supranational Political Systems. Basingstoke, Hampshire: Palgrave Macmillan, 2007, pp. 136-165.

"Electric Industry Restructuring," in Joseph R. Marbach (Editor), Federalism in America: An Encyclopedia. Westport, CT: Greenwood Publishing, 2006, pp. 175-176.

"Fundamental Federal Tax Reform and the States," Book of the States 2005. Lexington, KY: Council of State Governments, 2005, pp. 417-423.

"Tax Transparency," in Joseph J. Cordes, Robert Ebel and Jane Gravelle (Editors), Encyclopedia of Taxation and Tax Policy, 2nd Edition. Washington, DC: Urban Institute Press, 2005, pp. 429-430.

"Deregulation of Utilities: A Challenge and an Opportunity for State and Local Governments," in David L. Sjoquist (Editor), State and Local Finances Under Pressure.  New York: Edward Elgar Publishing, Ltd., 2003, pp. 222-275.  With Bruce Seaman.

"Revenue Forecasting in the City of Envy," in Robert P. Watson (Editor), Public Administration: Cases in Managerial Role-Playing.  New York, NY: Addison Wesley Longman, Inc., 2002, pp. 88-97.  With John D. Wong.

"Commentary on Electric Utility Deregulation and the Property Tax in the United States," in Philip Burling (Editor), The Impacts of Electric Utility Deregulation on Property Taxation.  Cambridge, MA: Lincoln Institute of Land Policy, 2000, pp. 64-69.

"The Property Tax in the Context of General Tax Policy and Electric Utility Restructuring," in Proceedings of the 29th Annual Wichita Program on Appraisal for Ad Valorem Taxation of Communications, Energy and Transportation Properties. Wichita, KS: WSU Center for Management Development, 1999, pp. 28-32.

"Economic Principles of Taxation," in W. Bartley Hildreth and James A. Richardson (Editors), Handbook on Taxation.  New York, NY: Marcel Dekker, Inc., 1999, pp. 21-30.  With James A. Richardson.

"Credit Ratings," in Jay M. Shafritz (Editor), International Encyclopedia of Public Policy and Administration. Boulder, CO: Westview Press, 1998, pp. 584-588.

"Defaults, Municipal," in Jay M. Shafritz (Editor), International Encyclopedia of Public Policy and Administration. Boulder, CO: Westview Press, 1998, pp. 644-645.

"Financial Emergency," in Jay M. Shafritz (Editor), International Encyclopedia of Public Policy and Administration. Boulder, CO: Westview Press, 1998, pp. 891-895.

"Financial Management:  The Centrality of the Fiscal in Local Government and Politics," in Jack Gargan (Editor), Handbook of Local Government Administration.  New York, NY:  Marcel Dekker, Inc., 1996, pp. 159-190.

"Assessing Customers' Capital Improvement Preferences:  A Study of Water Utility Net Benefits," in Lucille Brewer (Editor).  Public Works Administration:  Modern Public Policy Perspectives.  Newbury Park, CA:  Sage Publications, Inc., 1996, pp. 79-94.

"Pension Policy, Management, and Analysis," in Jack Rabin, W. Bartley Hildreth and Gerald J. Miller (Editors), Budgeting:  Formulation and Execution, Athens, GA:  University of Georgia, 1996, pp. 431-437. With Gerald J. Miller.

"The Anatomy of a Municipal Bond Default," in Gerald J. Miller (Editor), <u>Handbook of Debt Management</u>. New York, NY:  Marcel Dekker, Inc., 1996, pp. 587-604.

"Budgeting Human Resource Requirements," in Jack Rabin, Thomas Vocino, W. Bartley Hildreth, and Gerald J. Miller (Editors), <u>Handbook of Public Personnel Adm</u>inistration.  New York, NY:  Marcel Dekker, Inc., 1994, pp. 389-429.

"The Gordian Knot of a Project Revenue Bond Default," in Aman Khan and W. Bartley Hildreth (Editors), <u>Case Studies in Public Budgeting and Financial Man</u>agement.  Dubuque, IA:  Kendall/Hunt Publishing Co., 1994, pp. 403-421.

"Financial Analysis of a Public School System," in Aman Khan and W. Bartley Hildreth (Editors), <u>Case Studies in Public Budgeting and Financial Management</u>.  Dubuque, IA:  Kendall/Hunt Publishing Co., 1994, pp. 505-524.  With Lawrence C. Pierce.

"Can the Riverside Community Afford a Massive Debt-Financed Capital Improvements Program," in Aman Khan and W. Bartley Hildreth (Editors), <u>Case Studies in Public Budgeting and Financial Management</u>.  Dubuque, IA:  Kendall/Hunt Publishing Co., 1994, pp. 182-200. With Gerald J. Miller.

"The Politics of Pension Investment Returns," in Aman Khan and W. Bartley Hildreth (Editors), <u>Case Studies in Public Budgeting and Financial Management</u>.  Dubuque, IA:  Kendall/Hunt Publishing Co., 1994, pp. 463-481.  With Laurie White Adams.

"The Design of Taxes," in Jack Rabin (Editor), <u>Handbook of Budgeting</u>.  New York, NY: Marcel Dekker, Inc., 1992, pp. 273-299.  With Rosalyn Y. Carter.

"Federal Financial Management," in Thomas D. Lynch (Editor), <u>Federal Budget and Financial Management Reform</u>.  Westport, CT: Quorum Books, 1991, pp. 151-169.

"Financing Strategy," in Jack Rabin, Gerald J. Miller and W. Bartley Hildreth (Editors), <u>Handbook of Strategic Management</u>.  New York, NY: Marcel Dekker, Inc., 1989, pp. 279-300.  Revised and expanded as: "Financial Strategy" in Robert T. Golembiewski and Jack Rabin (Editors), <u>Public Budgeting and Finance, Fourth Edition</u>, New York:  Marcel Dekker, Inc., 1987, pp. 811-830; and, "Financing Strategy" in <u>Handbook of Strategic Management, 2nd Edition, Revised and Expanded</u>, New York:  Marcel Dekker, Inc., 2000. pp. 249-272.

"State and Local Fiscal Relations in Louisiana," in James A. Richardson (Editor), <u>Louisiana's Fiscal Alternatives: Finding Permanent Solutions to Recurring Budget Crises</u>.  Baton Rouge, LA: Louisiana State University Press, 1988, pp. 74-104.

"Budgeting and Financial Management," in Jack Rabin and Marcia Steinhauer (Editors), <u>Handbook on Human Services Administration</u>.  New York, NY:  Marcel Dekker, Inc., 1988, pp. 79-107.  With Rodger P. Hildreth.

"State and Local Officials and Their Personal Liability," in Jack Rabin and Don Dodd (Editors), <u>State and Local Government Administration</u>.  New York, NY:  Marcel Dekker, Inc., 1985, pp. 245-264.  With Gerald J. Miller.

"Financial Management," in Jack Rabin, Samuel Humes and Brian S. Morgan (Editors), Managing Administration. New York, NY:  Marcel Dekker, Inc., 1984, pp. 181-200.

"Personnel Administration and Labor Relations," in Jack Rabin, Samuel Humes and Brian S. Morgan (Editors), Managing Administration. New York, NY:  Marcel Dekker, Inc., 1984, pp. 151-178.

"Collective Bargaining Impacts on Local Government Management," in Robert T. Golembiewski and Frank Gibson (Editors), Readings in Public Administration:  Institutions, Processes, Behavior and Policy, Fourth Edition.  Boston, MA:  Houghton Mifflin Co., 1983, pp. 271-281.  Reprinted in: Municipal Management, 6 (Fall/Winter 1983-1984), pp. 80-87.

"Risk Management and Pension Systems," in Jack Rabin and Thomas J. Lynch (Editors), Handbook on Public Budgeting and Financial Management.  New York, NY:  Marcel Dekker, Inc., 1983, pp. 457-492.  With Gerald J. Miller.  Revised and reprinted as: "Advantages of a Risk Management Program," and "Pension Policy and Management," in Rabin, Jack, W. Bartley Hildreth and Gerald J. Miller (editors), Budget Management (Athens, GA: University of Georgia, 1983, pp. 175-189).

"Compensation and Reward Systems," in Jack Rabin, Thomas Vocino, W. Bartley Hildreth, and Gerald J. Miller (Editors), Handbook on Public Personnel Administration and Labor Relations.  New York, NY: Marcel Dekker, Inc., 1983, pp. 159-191.  With Gerald Miller.

"Public Bureaucracy," in Jack Rabin and Thomas Vocino (Editors), Contemporary Public Administration. New York, NY:  Harcourt, Brace Jovanovich, Inc., 1981, pp. 41-63.  With Jack Rabin, Gerald J. Miller and Thomas J. Lynch.

"Municipal Liability and Risk Management," in Directory of Risk Management Practices.  Washington, DC:  International City Management Association, 1981, pp. 41-43.  With Jack Rabin and Gerald J. Miller.

"Assessing Electoral Defeat:  New Directions and Values for MARTA," in R. T. Golembiewski, Mass Transit Management: Case Studies of the Metropolitan Atlanta Rapid Transit Authority.  Washington, DC: Urban Mass Transportation Administration, U.S. Department of Transportation, 1980, pp. 1:1-18.  With Robert T. Golembiewski and Timothy A. Almy.

**Publications Online**

"Electric Industry Restructuring," Federalism in American: An Encyclopedia, Second Edition. Easton, PA: Center for the Study of Federalism, 2017.
http://encyclopedia.federalism.org/index.php?title=Electric_Industry_Restructuring

"Kansas," Significant Features of the Property Tax: State-by-State Property Tax. Cambridge, MA: Lincoln Institute of Land Policy, 2016; 2018.  http://datatoolkits.lincolninst.edu/subcenters/significant-features-property-tax/state-by-state-property-tax-at-a-glance

**Book Reviews**

"Osborne, Again: A Local Government Perspective (a review of The Price of Government: Getting the Results We Need in an Age of Permanent Fiscal Crisis, 2004)," State and Local Government Review, 38:1 (2006).

"Foreword," in Beth W. Honadle, James M Costa and Bev A. Cigler, <u>Fiscal Health of Local Governments</u>. San Diego: Elsevier Academic Press, 2004, pp. xi-xvi.

**Technical Reports**

<u>Kansas Local Government Debt Affordability Report</u>. Wichita, KS: Kansas Public Finance Center, Wichita State University, for Kansas Department of Revenue, on behalf of the Kansas Advisory Council on Intergovernmental Relations, 2006. With Anthony Swartzendruber.

"Total Estimated Market Value of Real and Personal Property in Kansas," in Glenn W. Fisher, <u>Erosion of the Kansas Property Tax Base</u>, Wichita, KS: Kansas Public Finance Center, Wichita State University, for Kansas Department of Revenue, on behalf of the Kansas Advisory Council on Intergovernmental Relations, 2006.

<u>Cooperation or Competition: The Multistate Tax Commission and State Corporate Tax Uniformity</u>, Fiscal Research Center (Report No. 110), Andrew Young School of Policy Studies, Georgia State University, August 2005.With Matt Murray and David Sjoquist.

<u>State of Kansas 2005 Debt Affordability Report</u>. Wichita, KS: Kansas Public Finance Center, Wichita State University, 2005. Principal investigator.

<u>Report of the Governor's Tax Review Committee</u>. Topeka, KS: State of Kansas, 1998.

<u>The Impact of Retail Wheeling on Municipal Electric Utilities in Kansas</u>. Wichita, KS: Kansas Public Finance Center, Wichita State University, 1997. Principal investigator.

<u>Report of the Governor's Tax Equity Task Force</u>, Topeka, KS: State of Kansas, 1995. Editor of 14 research papers.

"Canadian and American Federalism in the Capital Markets: Comparative Debt Financing" to the Canadian Embassy, 1992, 55 pp.

<u>State-Local Fiscal Relations in Alabama,</u> Auburn, AL: Center for Governmental Services, 1987.

"State Assistance For Local Public Works: Louisiana Inventory" to the Council of State Governments, 1987, 28 pp.

"State-Local Fiscal Relations in Louisiana: A Technical Report" to the Louisiana Tax Study, 1986, 122 pp.

"Case Studies of Ten Municipal Fiscal Emergencies in Ohio" to the U.S. Advisory Commission on Intergovernmental Relations and the Ohio Urban University Program, 1983, 50 pp.

"The Municipal Liability Market and Rate-Making Revisions" to the CPCU-Loman Insurance Foundation, 1982, 47 pp.

<u>Public Officials' Liability</u>. Washington, DC: International City Management Association, 1979. With Jack Rabin and Gerald J. Miller. Revised/reissued as: "Public Officials Liability" and "Principles of Risk

Management" in <u>Elected Officials Handbook, Volume II, Second Edition</u> (Washington, DC: International City Management Association, 1983, pp. 91-119).

**Instructional and Learning Materials**

MUHAS [Tanzania] Financial Management Workshop for Public Health Laboratories (a turn-key set of 15 audio tapes with slides and scripted audio), Center for State and Local Finance, Andrew Young School of Policy Studies, Georgia State University, 2017. With Ron Shelby.

<u>Learning Manual for the State & Local Government Cash Management Service</u>. Austin, TX: Sheshunoff Information Service, 1998. With Rodger P. Hildreth.

<u>Instructor's Manual</u> for <u>Contemporary Public Administration</u>, edited by Jack Rabin and Thomas Vocino. New York, NY: Harcourt, Brace Jovanovich, 1981. Contributor.

"Teaching Note Number 5-380-734: Assessing Electoral Defeat-New Directions and Values for MARTA (Case 9-380-690)." Edited by James L. McKenney, <u>Cases in Public Policy and Management 1980</u>. Boston, MA: Intercollegiate Case Clearing House, 1980, page 3.

<u>Instructor's Manual</u> for <u>Public Budgeting and Finance, Second Edition</u>, edited by Robert T. Golembiewski and Jack Rabin. Chicago, IL: Peacock Publishing Co., 1975. With Jack Rabin.

**Professional and Other Publications**

"Big Data About Small Towns: Muni Market Regulator Enables Deeper Understanding of Public Finance." Op-ed, <u>The Bond Buyer</u> (June 23, 2020).

"The Local Military Base Prepares for President Truman's Funeral (1972)," First-hand account, accepted for the holdings of the Harry S. Truman Presidential Library in November 2011.

"Chief Financial Officers Feel the Fiscal Stress of Cities (Q&A Interview)", MuniNet.com (December 14, 2010).

"Canadian Elections Matter in Kansas." Op-Ed, <u>The Wichita Eagle</u> (January 27, 2006).

"Holding the CEO Responsible," Letter to the Editor, <u>CFO Magazine</u> (April 2005), p. 12.

"Soccer Giveaway," Letter to the Editor, <u>The Wichita Eagle</u> (June 10, 2004).

"Soccer Groups Should Pay Fair Share," Op-Ed, <u>The Wichita Eagle</u> (March 9, 2004).

"Progress with GASAC," <u>Budget & Finance</u>, Association for Budgeting and Financial Management (July 2002), page 1, 2.

"California Deregulation," Letter to the Editor, <u>Los Angeles Times</u> (May 6, 2001).

"Evaluating Debt Affordability (Parts 1 and 2)," <u>KSGFOA Update</u>, Kansas Government Finance Officers Association, 1:2 (October 2000), page 2, 4; 2:1 (April 2001), pp. 3-4.

"The Purpose of a Budget," KSGFOA Update, Kansas Government Finance Officers Association, volume 1, issue 1 (March 2000), page 2.

"All of Wichita Gains with Better Schools," Op-Ed piece in The Wichita Eagle (March 31, 2000), page 11A. With Stanley Longhoffer.

National Budget Symposium, New Directions in State and Local Government Budgeting:  Report of Proceedings, Chicago, IL:  Government Finance Officers Association, March 1993.  Conference Moderator and Contributor.

"Financing It Right the First Time," American City & County (June 1993), 18.  Reprinted in: North Carolina Bond Reporter, 7 (July 1993), 14-15.

A Capital Improvements Programming Handbook for Small Cities and Other Governmental Units. Chicago, IL:  Municipal Finance Officers Association, 1978.  Contributor.

"Plain English" Version, Analysis and Index:  1978 EEOC "Uniform Guidelines on Employee Selection Procedures."  Montgomery, AL:  Management Information Associates, Inc., 1979.  Contributor.

A Guide to Affirmative Action Development.  Montgomery, AL:  Public Administration Press, 1978. Contributor.

Personal Liability in Government.  Montgomery, AL:  Section on Personnel Administration and Labor Relations, 1978.  With Felix Nigro, Jack Rabin, Gerald J. Miller and Charles Allen.

"The Junior League of Portland, Maine Selects a Project," in B.B. McIntyre, Skills for Impact: Voluntary Action in Criminal Justice.  Athens, GA; Corrections Division, Institute of Government, University of Georgia for the Association of Junior Leagues, Inc. of New York, NY, 1977, pp. 93-94.

"The Junior League of Cincinnati Structures an Autonomous Community Agency," in B. B. McIntyre, Skills for Impact: Voluntary Action in Criminal Justice.  Athens, GA:  Corrections Division, Institute of Government, University of Georgia, for Association of Junior Leagues, Inc., New York, NY, 1977, pp. 162-165.

Evaluation of Alternative Forms of Government for DeKalb County, Georgia.  Athens, GA:  Institute for Community and Area Development, University of Georgia for Goals for DeKalb, Inc., 1977.  With Timothy A. Almy and David Sink.

"Law Enforcement and Detention Services," in Joint Services Study: Clarke County and City of Athens, Georgia.  Athens, GA:  Institute of Government, University of Georgia, 1976.

"Rights of Drug Abuse Patients," in Patient Rights Reporter.  Montgomery, AL:  Center for the Study of Civil Liberties and Civil Rights for the Special Action Office for Drug Abuse Prevention, U.S. Executive Office of the President, 1976.

"Differences in County and Municipal Government," 19 Mr. County Commissioner (July-August, 1975), p. 19.

A Guide for Developing an Annual Operating Budget:  A Programmed Text.  Montgomery, AL:  South Central Alabama Development Commission, 1975.  Principal author.

A Guide for Developing a Capital Improvements Budget.  Montgomery, AL:  South Central Alabama Development Commission, 1975.  Principal author.

E.E.O. ALERT:  A Handbook of Information on Local Government Personnel Administration.  Montgomery, AL:  South Central Alabama Development Commission, 1975.  With Jack Rabin.

Personnel Practices Survey:  The Legal Constraints, Current Local Practices and Sources of Assistance.  Montgomery, AL:  South Central Alabama Development Commission, 1975.

Community Facility Plan, Public Improvements Program and Capital Improvements Budget for Brundidge, Alabama.  Montgomery, AL: South Central Alabama Development Commission, 1975.

Community Facility Plan, Public Improvements Program and Capital Improvements Budget for Fort Deposit, Alabama.  Montgomery, AL: South Central Alabama Development Commission, 1975.

Community Facility Plan, Public Improvements Program and Capital Improvements Budget for Greenville, Alabama.  Montgomery, AL: South Central Alabama Development Commission, 1974.

Community Facility Plan, Public Improvements Program and Capital Improvements Budget for Georgiana, Alabama.  Montgomery, AL: South Central Alabama Development Commission, 1974.

"Results of National Survey of Financial Practices in Selected Local Governments," in Governmental Financial Practices and Procedures in the Central Alabama Region.  Montgomery, AL:  Central Alabama Regional Planning and Development Commission, 1973.

**Simulations**

"Mayor's Directive on Budgetary Decision-Making."  With Jack Rabin and Gerald J. Miller.  In Jack Rabin, W. Bartley Hildreth and Gerald J. Miller, Public Budgeting Laboratory:  Instructor's Manual.  Athens, GA:  University of Georgia, 1983.

"Mayor's Dilemma."  With Jack Rabin and Gerald J. Miller. Unpublished, 1981.

"Governor's Dilemma:  Executive Discretion and Citizen Rights." With Jack Rabin and Gerald J. Miller.  In Felix Nigro, et al., Personal Liability in Government.  Montgomery, AL:  Section on Personnel Administration and Labor Relations, 1978.

**CONFERENCE PAPERS**

"State Oversight of Local Government Debt Issuance," 31st Annual Conference, Association for Budgeting and Financial Management, Washington, DC, September 2019; 61st Annual Conference, Western Social Science Association, San Diego, CA. With Justina Jose, April 2019.

"Fines, Fees and Fiscal Illusion," 30th Annual Conference, Association for Budgeting and Financial Management, Denver, CO, September 2018. With David Copeland.

"Comparing U.S. Department of Treasury Plans to (Delayed) Results: Carter's Taxable Bond Option Analysis and Obama's Build America Bond Experiment," 29th Annual Conference, Association for Budgeting and Financial Management, Washington, DC, September 2017. With Komla D. Dzigbede.

"An Assessment of Municipal Fiscal Health in the Secondary Municipal Bond Market," 28th Annual Conference, Association for Budgeting and Financial Management, Seattle, WA, October 2016 and Applied Research in Public Finance Conference, Indiana University, April 2017. With Peter Bluestone, Konul Amrahova and Sarah Larson.

"Bankruptcy Risk Premium in the Municipal Securities Market," 25th Annual Conference, Association for Budgeting and Financial Management, Washington, DC, October 2013; and (revised versions) at Brandeis 2014 Municipal Finance Conference, Boston, MA, August 2014, and 2016 Government and Nonprofit Section Midyear Meeting of the American Accounting Association Government and Nonprofit Section (winner of "Best Paper Award"), Washington, DC, March 2016. With Tima T. Moldogaziev and Sharon N. Kioko.

"Tax Revenue Volatility and Municipal Financial Slack Accumulation," 108th Annual Conference on Taxation, National Tax Association, Boston, MA, November 2015. With Min Su.

"Development and Operation of the Public Budgeting Laboratory," Annual Conference of NASPAA: Network of Schools of Public Affairs and Administration, Brooklyn, NY, October 2015. With Gerald J. Miller.

"Does Financial Slack Reduce Municipal Short-Term Borrowing?" 27th Annual Conference, Association for Budgeting and Financial Management, Washington, DC, October 2015; and, 37th Annual Fall Research Conference, Association for Public Policy Analysis and Management, Miami, FL, November 2015. With Min Su.

"Who Benefits (and Who Pays): Competing Designs in Doing Federal Expenditure Analysis," 26th Annual Conference, Association for Budgeting and Financial Management, Grand Rapids, MI, October 2014. With Gerald J. Miller.

"State Budget Execution and Interim Boards: Mediating the Tension Between Administrative Flexibility and Political Control," 2014 Annual Conference, Southeastern Conference for Public Administration, Atlanta, GA, September 2014; and, 26th Annual Conference, Association for Budgeting and Financial Management, Grand Rapids, MI, October 2014. With Carolyn Bourdeaux and Sandy Zook.

"What Motivates Choice of Markets in Ontario's Provincial Debt Transactions?" Biennial Conference, Association for Canadian Studies in the United States. Tampa, FL, November 2013. With Komla Dzigbede, and Emmy Sewordor.

"A Descriptive Analysis of the Municipal Advisors Market," 12th Biennial Conference, Public Management Research Association. Madison, WI, June 2013. With Marty Luby.

"State Government Catastrophe Risk Financing and the Capital Markets," 104th Annual Conference on Taxation, National Tax Association, New Orleans, LA, November 2011. With Gerald J. Miller and Emefa Sewordor.

"Pullback Management: State Budgeting Under Fiscal Stress," 104th Annual Conference on Taxation, National Tax Association, New Orleans, LA, November 2011. With Carolyn Bourdeaux.

"Mapping a Field's Development: 20 Years of ABFM Conferences," 51st Annual Conference, Western Social Science Association, Albuquerque, NM, April 2009. With Michael Woodrum.

"Estimates of the Uniform and Equal Property Tax Base before Exemptions," 100th Annual Conference on Taxation, Columbus, Ohio, November 2007. With John D. Wong and Glenn W. Fisher.

"Government-Wide Financial Statements and Credit Risk," 19th Annual Conference, Association for Budgeting and Financial Management, Washington, DC, October 2007. With Craig L. Johnson and Sharon Kioko.

"The Persistent Need for Budget Reform," International Conference on Public Finance and Government Reform, School of International Relations and Public Affairs, Fudan University, Shanghai, China, June 2007.

"The Preferred Habitat Patterns in the Holdings of Canadian and U.S. Subnational Debt," 99th Annual Conference on Taxation, National Tax Association, Boston, November 2006; Western Social Science Association, Calgary, Alberta, April 2007. With Gonul Colak.

"Trends in State Financial Results," 18th Annual Conference, Association for Budgeting and Financial Management, Atlanta, GA, October 2006. With Craig L. Johnson.

"The Financial Logistics of Disaster: The Case of Hurricane Katrina," Southeastern Conference for Public Administration, Athens, GA, September 2006

"Successful Career Paths of Local Government Finance Professionals," Southeastern Conference for Public Administration, Athens, GA, September 2006. With Samuel J. Yeager, Gerald J. Miller and Jack Rabin.

"Federalism and Capital Markets: Responding to Lindblom on Comparative Infrastructure Financing Mechanisms in a Post-Katrina Environment," Invited paper for "Paying for Public Services Symposium" at the Martin School of Public Policy and Administration, University of Kentucky, Lexington, May 2006.

"Interstate Tax Uniformity and the Multistate Tax Commission," National Tax Association Spring Conference, May 2005, Washington, DC. With Matt Murray and David Sjoquist.

"Lusting after Other People's Money While Saving One's Own," 16th Annual Conference, Association for Budgeting and Financial Management, Chicago, October 2004. With Gerald J. Miller, Samuel J. Yeager, and Jack Rabin.

"Local Government Property and Sales Tax Structure Stress," 97th Annual Conference on Taxation, National Tax Association, Minneapolis, November 2004.

"American State Debt Accumulation and Affordability," 97th Annual Conference on Taxation, National Tax Association, Minneapolis, November 2004. With Gerald J. Miller.

"Ethical Supervisors Make a Difference: Does Gender Matter?" 65th National Conference of the American Society for Public Administration, Portland, OR, March 2004. With Samuel J. Yeager, Gerald J. Miller and Jack Rabin.

"Local Government Own-Source Revenue and Debt in Canada and the US," International Conference on Federalism: Which Federalism? Sponsored by Sculola Superiore dell'Economia e delle Finanze, Bari, Italy, November 2003.

"Finance Managers' Propensity to Save," 15th Annual Conference, Association for Budgeting and Financial Management, Washington, DC, September 2003. With Gerald J. Miller, Samuel J. Yeager, and Jack Rabin.

"State Debt Affordability Studies and the Results they Produce," 15th Annual Conference, Association for Budgeting and Financial Management, Washington, DC, September 2003. With Gerald J. Miller.

"Men and Women Near The Top of the Organization: Revisiting Corson and Paul: Ethical Behavior," 64th National Conference of the American Society for Public Administration, Washington, DC, March 2003. With Samuel J. Yeager, Gerald J. Miller and Jack Rabin.

"Canadian and American Federalism in the Capital Markets," US-Canada Business & Trade Conference, Kelley School of Business, Indiana University, April 2003.

"Subnational Borrowing in Canada and the U.S.," Woodrow Wilson International Center for Scholars and the National Committee for U.S.-China Relations, Beijing China, December 2002.

"The Theme of Public Finance in the Amusement Park Industry," 95th Annual Conference on Taxation, National Tax Association, Orlando, November 2002. With John Wong.

"Local Government Finance Officers Deeply Involved in Budgeting: Initial Career Characterizations," 14th Annual Conference, Association for Budgeting and Financial Management, Kansas City, MO, October 2002. With Samuel J. Yeager, Gerald J. Miller and Jack Rabin.

"How Financial Managers Deal with Ethical Stress," 63rd National Conference of the American Society for Public Administration, Phoenix, March 2002. With Gerald J. Miller, Sam Yeager and Jack Rabin.

"State and Local Tax Transitions During Electric Industry Restructuring," 13th Annual Conference, Association for Budgeting and Financial Management, Washington, DC, January 2002.

"Implications of Electric Industry Restructuring Transitions on State and Local Government Finance," 94th Annual Conference on Taxation, National Tax Association, Baltimore, MD, November 2001.

"Citizens' Perceptions of Performance and Willingness to Pay Taxes: The Case of Public Education." 62nd Annual National Conference, American Society for Public Administration, Newark, NJ, March 2001. With Mark A. Glaser and Jennifer Evans.

"Risk Management and the Capital Markets," 12th Annual Conference, Association for Budgeting and Financial Management, Kansas City, MO, October 2000. With Gerald J. Miller.

"Commentary on Electric Utility Deregulation and the Property Tax in the United States," Presented to the invitation-only seminar, Electric Utility Deregulation and the Property Tax, sponsored by the Lincoln Institute of Land Policy, Cambridge, MA, November 1999.

"Property Tax Dynamics and the Implications of Electric Utility Restructuring," 11th Annual Conference, Association for Budgeting and Financial Management, Washington DC, October 1999.

"Debt and the Local Economy: Problems in Benchmarking Local Debt Affordability," 11th Annual Conference, Association for Budgeting and Financial Management, Washington DC, October 1999.  With Gerald J. Miller.

"Federalism, Technology, and the Market: Conflict or Consensus?  A Policy History of Municipal Electric Utilities," The Conference on Policy History, St. Louis, May 1999.  With John Wong and H. Edward Flentje.

"Service Delivery Satisfaction and Willingness to Pay Taxes: A Local Government Performance Dilemma," 60th National Conference, American Society for Public Administration, April 1999.  With Mark Glaser.

"State Initiatives in Transportation Investment: Two Kansas Cases," National Tax Association, 92nd Annual Conference on Taxation, Atlanta, GA, October 1999.  With H. Edward Flentje.

"Property Tax Dynamics and the Implications of Electric Utility Restructuring," Utility Property Taxes Seminar, Public Utilities Reports, Dallas, TX, December 1998.

"Service Delivery Satisfaction and Willingness to Pay Taxes: Citizen Recognition of Local Government Performance," Interactive on Web, National Center for Public Productivity Conference, November 1998. With Mark Glaser.

"Debt Affordability and Economic Development," Midwest Regional Roundtable on Public Budgeting and Finance, University of Kansas, February 1998.

"The Implications of Retail Competition for Municipal Electric Utilities," 90th Annual Conference on Taxation, National Tax Association, Chicago, IL, November 1997.   With John Wong and H. Edward Flentje.

"A Proposal for Accreditation of Finance and Budget Offices," 9th Annual Conference on Public Budgeting and Finance, Washington, DC, November 1997.

"Infrastructure Financing in Canada and the U.S.: Common Civic Challenges, Different Debt Decisions," Urban Affairs Association, 27th Annual Meeting, Toronto, Canada, April 1997.

"Financial Management:  The Centrality of the Fiscal in Local Government and Politics," Southeastern Conference for Public Administration, Miami, FL, October 1996.

"A Profile of Discontinuity between Citizen Demand and Willingness to Pay Taxes," Urban Affairs Association, 26th Annual Meeting, New York, NY, March 1996.  With Mark A. Glaser.

"Provincial Debt Burdens:  Debt Levels and Composition, "Southwest Association for Canadian Studies, Denton, TX, February 1995.

"Debt Affordability and Economic Development," 24th Annual Meeting, Urban Affairs Association, New Orleans, LA, March 1994.

"Provincial Debt Burdens:  A Study of Debt Levels and Composition," 1993 Biennial Conference, The Association for Canadian Studies in the United States, New Orleans, LA, November 1993.

"Project Revenue Financing in Canada:  A Case for Its Use," 1993 Biennial Conference, The Association for Canadian Studies in the United States, New Orleans, LA, November 1993.

"Municipal Securities:  Issues of Theory, Practice and Public Policy," 5th Annual Conference on Public Budgeting and Financial Management, American Society for Public Administration, Arlington, VA, October 1993.

"A Net-Benefits Model of Capital Improvement Preferences," Southeastern Conference for Public Administration, Cocoa Beach, FL, October 1993.

"Federalism, Capital Markets, and the Constitutional Debate," Southwest Association for Canadian Studies, Lafayette, LA, February 1993.

"Canadian and American Federalism in the Capital Markets: Comparative Debt Financing," 4th Annual Conference on Public Budgeting and Finance, American Society for Public Administration, Arlington, VA, October 1992.

"The Local Economy and Debt:  A Call for Debt Coordination," Annual Conference, State Debt Management Conference, National Association of State Treasurers, Lake Buena Vista, FL, September 1992.

"Taxpayer Challenges to State and Municipal Taxing Authority: Constitutional Tests," National Conference, American Society for Public Administration, Washington, D.C., March 1991.  With O'Neal Jones.

"An Empirical Analysis of Tax Preparers As Coproducers of the Federal Income Tax: Early Results," Southeastern Conference for Public Administration, Jackson, MS, October 1989.

"The Anatomy of a Municipal Bond Default," Southeastern Conference for Public Administration, Birmingham, AL, October 1988.

"Financing Strategy," Southeastern Conference for Public Administration, Birmingham, AL, October 1988.

"The Municipal Debt Financing As A Network Political Economy: Network Stability and Market Efficiency," Annual Meeting, American Political Science Association, Washington, D.C., September 1988. With Gerald J. Miller.

"Insurance and Diverse Policy Issues: An Introduction," Annual Meeting, American Political Science Association, Washington, D.C., September 1988.

"The Search for Capital," Annual Conference, Government Finance Officers Association, Atlanta, GA, May 1988.

"The Career Paths of Municipal Chief Financial Officers," Southeastern Conference for Public Administration, New Orleans, LA, October 1987.

"Natural Resource Wealth and the Impact on State-Local Finances," National Conference, American Society for Public Administration, Boston, MA, April 1987.

"State Supervision of Municipal Financial Emergencies," National Conference, Urban Affairs Association, Akron, OH, April 1987.

"The Politics of Windfalls," Southeastern Conference for Public Administration, Pensacola, FL, October 1986.

"Strategies of Municipal Debt Issuers," National Conference, American Society for Public Administration, Anaheim, CA, April 1986.

"The National Debt and Government Use of Long-Term Financing Tools: Preliminary Results from the Longitudinal Study in Public Budgeting and Financial Management," National Conference, American Society for Public Administration, Anaheim, CA, April 1986.  With Jack Rabin and Gerald J. Miller.

"Assessing the Budgeting of Personnel Requirements," Southeastern Conference for Public Administration, Charleston, SC, October 1985.

"Using External Fiscal Consultants to Remedy State-Declared Fiscal Emergencies," National Conference, American Society for Public Administration, Indianapolis, IN, April 1985.

"Tax Challenges:  Theory and Practice," National Conference, American Society for Public Administration, Denver, CO, April 1984.

"State Fiscal Emergency Laws and Municipal Fiscal Administration:  Bane or Remedy?"  Southeastern Conference for Public Administration, Tallahassee, FL, October 1983.

"Financial Emergencies in Perspective," National Conference, American Society for Public Administration, New York, NY, April 1983.

"Paradigm for Exploring Financial Emergency Experiences," Joint Midwestern and Southeastern Regional Conferences, American Society for Public Administration, Louisville, KY, November 1982.

"Municipalities Differ in Liability Characteristics:  Challenging Simple Rate Models," Annual Conference, Public Risk and Insurance Management Association, San Antonio, TX, June 1982.

"Towards a Higher Standard of Professionalism in Public Administration:  Peer Group Evaluation and Other Implications of Clients That are More Active, Expectant and Skillful," National Conference, American Society for Public Administration, Honolulu, HI, March 1982. [Could not attend; presented by others]

"Municipal Liability Risk Profile," Annual Conference, American Risk and Insurance Association, Kansas City, MO, August 1981.

"Business Executives in Government:  The Loaned Business Executive Task Force Approach," National Conference, American Society for Public Administration, Detroit, MI, April 1981.

"Public Officials' Liability Exposure:  An Overview of Risk Management Strategies," Annual Conference, American Risk and Insurance Association, Chicago, IL, August 1980.  With Gerald J. Miller.

"Client-Based Administrative Responsibility and Risk Management Strategies," Annual Conference, Public Risk and Insurance Management Association, Memphis, TN, June 1980.

"Public Sector Fringe Benefits:  A Sampling of Financial and Personnel Management Issues and Challenges," National Conference, American Society for Public Administration, San Francisco, CA, April 1980.

"Implications for Personnel Administration of the Personal Liability of Public Executives," Southeastern Regional Conference, American Society for Public Administration, Montgomery, AL, October 1979.

"Public Budgeting Laboratory," National Conference on Teaching Public Administration, Memphis, TN, May 1979.  With Gerald J. Miller and Jack Rabin.

"Development and Operation of a Budget Simulation Laboratory," National Conference, American Society for Public Administration, Phoenix, AZ, April 1978.  With Gerald J. Miller and Jack Rabin.

"Using Simulation in Classroom Teaching:  The Equal Rights Amendment and the Legislative Process," Annual Convention, Southern Political Science Association, New Orleans, LA, November 1977.  With Gerald J. Miller.

"Civil Liability of Public Officials Under the Civil Rights Act of 1871:  Dimensions Relevant for Public Administration," Southeastern Regional Conference, American Society for Public Administration, Knoxville, TN, October 1977.  With Gerald J. Miller.

"Balancing Conflicting Teaching Goals Through a Mixture of Methods:  A Survey of Teaching Assistants," Annual Convention, Southern Political Science Association, Atlanta, GA, November 1976.  With Gerald J. Miller.

"Arbitration of Discrimination Grievances in the Public Sector," Southeastern Regional Conference, American Society for Public Administration, Miami Beach, FL, October 1976.

"Techniques for Preparing Budgets:  State Constraints and Local Training," Annual Conference, International City Management Association, Seattle, WA, October 1975.

"Application of a Programmed Learning Guide to Local Government Budgeting," Annual Circuit-Riding City Manager's Conference, International City Management Association, Nashville, TN, April 1975.

**PRESENTATIONS AND WORKSHOPS**

"Challenges in Teaching Financial Management for the PhD," 31st Annual Conference, Association for Budgeting and Financial Management, Washington, DC, September 2019.

"Life, Work and Legacy of John Mikesell: Textbook Contributions," 31st Annual Conference, Association for Budgeting and Financial Management, Washington, DC, September 2019.

"Budgeting and Financial Management for the MPA Curriculum," 31st Annual Conference, Association for Budgeting and Financial Management, Washington, DC, September 2019.

"Property Value Variability: Are All Cities Treated Equally?" 31st Annual Conference, Association for Budgeting and Financial Management, Washington, DC, September 2019. With David Copeland.

"Operating Budgeting," Executive Education in Public Finance, Center for State and Local Finance, Andrew Young School of Policy Studies, Atlanta, May 2018, March 2019, and January 2020.

"Debt Management," Executive Education in Public Finance (3 days), Center for State and Local Finance, Andrew Young School of Policy Studies, Atlanta, September 2015, September 2016, February 2018, September 2018, September 2019.

"Public Budgeting and Debt Management," International Center for Public Policy, Andrew Young School of Policy Studies, Atlanta, August 2019.

"Debt Management," World Bank Indonesia Training Program, International Center for Public Policy, Andrew Young School of Policy Studies, Atlanta, August 2018.

"Fiscal Transparency Across the States: A Volcker Alliance Paper," 60th Annual Conference, Western Social Science Association, Austin, Texas, April 2018. With Jesseca Lightbourne, Alex Hathaway, Emily Franklin, and Bethel Habte.

"Financing Infrastructure in a New Era for Muni Bonds," Economic Perspectives on State and Local Taxes, Lincoln Institute of Land Policy and the Federal Reserve Bank of Boston, Cambridge, MA, May 2018.

"State Budgeting and Governmental Accounting" and "State Debt and Pensions Management," Volcker Alliance 50 State Finance Project, national webinars for partner universities, September and October, 2017.

"Public Debt Management" and "Heritage Assets," Training Program for Indonesia Ministry of Finance Staff, International Center for Public Policy, Andrew Young School of Policy Studies, Atlanta, August 2016.

"Subnational Borrowing: Research and Policy Analysis," XI Summer School in Public Economics, International Center for Public Policy, Andrew Young School of Policy Studies, Atlanta, September 2015. Video: https://vimeo.com/142932809

"Performance Budgeting," International Center for Public Policy, Andrew Young School of Policy Studies, Atlanta, August 2015.

"The Remaking of the Municipal Market," 16th Annual Meeting, Securities and Exchange Commission Historical Society, Washington, DC, June 2015. Video: http://sechistorical.org/museum/programs/video-player.php?vid=4317302189001&title=The%20Remaking%20of%20the%20Municipal%20Market%20(Sixteenth%20Annual%20Meeting)

"Analyzing the Financial Health of Governments," Center for State and Local Finance, Andrew Young School of Policy Studies, Atlanta, June 2015.

"Reflections on the Activities of the Kansas Public Finance Center, 1994-2009," Midwest Regional Public Finance Conference, Wichita, KS, April 2015.

"Municipal Securities and Debt Management," and "Assessing Debt Affordability," Center for State and Local Finance, Andrew Young School of Policy Studies, Atlanta, February and March, 2015.

"Municipal Finance Research Manifesto: First Wave," Plenary Session, 26th Annual Conference, Association for Budgeting and Financial Management, Grand Rapids, MI, October 2014.

"Analyzing State and Local Governments: A New Accounting Language," GLC Webinar, December 2013.

"Public Budgeting Best Practices," Summer Budget Workshop, International Center for Public Policy, Andrew Young School of Policy Studies, Andrew Young School of Policy Studies, Georgia State University, Atlanta, GA, May 2013.

"Municipal Market Participants: Reality Test," Financial Markets Boot Camp, College of Public Programs, Arizona State University. March 2013.

"The Future of Municipals," 24th Annual Conference, Association for Budgeting and Financial Management, New York, NY, October 2012.

"State Budgeting and Finance Competencies – Second Phase Results," 2012 Annual Conference, National Association of Schools of Public Affairs and Administration, Austin, TX, October 2012.

"Budget Training for PHPS Fellows," Centers for Disease Control and Prevention, Public Health Prevention Service, 2011 Fellows Program, Atlanta, GA (July 2012 and September 2012). With Jennifer Simmons.

"Public Budget Laboratory," Centers for Disease Control and Prevention, Public Health Prevention Service, Fourth Year Resident Program, Albuquerque, NM (April 2012) and Atlanta, GA (July and August 2012). With Jennifer Simmons.

"Dodd-Frank Act and the Municipal Bond Market," Second Annual Applied Finance Conference of the Financial Management Association, St. John's University, New York, NY, May 2012.

"A Theoretical and Descriptive Analysis of the Municipal Advisors Market," 54th Annual Conference, Western Social Science Association, Houston, TX, April 2012. With Martin Luby.

"Implications of Financial Regulation of the Municipal Debt Market for American Federalism: What Hath Dodd-Frank Wrought?" 54th Annual Conference, Western Social Science Association, Houston, TX, April 2012. With Robert S. Kravchuk and Christine R. Martell.

"Municipal Securities," Invited Class Lecture, Department of Public Administration, School of Public and International Affairs, University of Georgia, Athens, GA, February 2012.

"State Budgeting and Finance Competencies – First Phase Results," 2011 Annual Conference, National Association of Schools of Public Affairs and Administration, Kansas City, MO, October 2011.

"The Future of Public Affairs Programs: Variations in Academic Cultures," National Association of Schools of Public Affairs and Administration, Kansas City, MO, October 2011.

"From TBO to BAB to no Tax-Exemption: Back to the Future," 53rd Annual Conference, Western Social Science Association, Public Finance and Budgeting Section, Salt Lake City, UT, April 2011; 23rd Annual Conference, Association for Budgeting and Financial Management, Washington, DC, October 2011.

"Subnational Borrowers in the U.S. and Canada," International Studies Program for Vietnamese Officials, Andrew Young School of Policy Studies, Georgia State University, Atlanta, GA, April 2011.

"Municipal Securities," Edge Capital Partners, Atlanta, GA, January 2011.

"State Borrowing and State Debt," Federal Reserve Bank of Boston and Lincoln Institute of Land Policy sponsored conference on Economic Perspectives on State and Local Taxes, Cambridge, MA, January 2011.

"Build America Bonds," invited presentation by a Commissioner of the Securities and Exchange Commission at the "S.E.C.'s State of the Municipal Securities Markets" Hearings, Washington, D.C., December 2010. Video: https://www.sec.gov/news/otherwebcasts/2010/munifieldhearing120710.shtml

"Getting the Porridge Just Right: Setting and Administering Tax Rules in an Era of Anti-Tax Sentiment," 22nd Annual Conference, Association for Budgeting and Financial Management, Omaha, NE, October 2010.

"Big Ideas: The CEO-CFO Relationship," Alliance for Innovation National Meeting, Decatur, GA, October 2009.

"A Taxing Day of Life: Estimating the Tax Price for a Citizen in the Largest City in Each State," 21st Annual Conference, Association for Budgeting and Financial Management, Washington, DC, October 2009. With Johanna Winter.

"A Taxing Day of Life: Estimating the Comparative Price of a Set of Events Invoking Taxes, User Charges and Fines," 51st Annual Conference, Western Social Science Association, Public Finance and Budgeting Section, Albuquerque, NM, April 2009. With Johanna Winter.

"Turmoil in the Financial Markets: Implications for State and Local Government Securities," Government & Nonprofit Section, American Accounting Association, Washington, DC, March 2009.

"Transportation Financing: Implications and Options for Local Government," Winter Seminar, Association of Kansas City/County Management, Wichita, Kansas, February 2009. With Michael Woodrum.

"Draft White Paper on Proposition K," Wichita Metro Chamber of Commerce, February 2009.

"The Financial Crisis: Its' Impact on Local Government," Management Retreat, City of Hutchinson, Kansas. January 2009.

"Current Challenges in Issuing State and Local Government Securities," Federal Reserve Bank of Boston and Lincoln Institute of Land Policy sponsored conference on Economic Perspectives on State and Local Taxes, Cambridge, MA, May 2008.

"State Debt Affordability," Testimony to Kansas House Appropriations Committee, Topeka, February 2008.

"Financial Strategy in Accessing Capital Markets: A Study of the Largest Sub-national Government Borrower in North America," 19th Annual Conference, Association for Budgeting and Financial Management, Washington, DC, October 2007.

"Sub-National Access to the Capital Markets: Comparing Canada and the United States with Lessons for China." School of Public Finance, Central University of Finance and Economics, Beijing, China, June 2007.

"Sizing up Kansas Finances," Kansas Association of Counties, Hutchinson, May 2007.

"Comments on State Debt Affordability," Testimony to Kansas Senate Ways and Means Committee, Topeka, March 2007.

"Threats to Kansas Local Finance," Kansas Association of City/County Management, Winter Meeting, Wichita, January 2007.

"Sizing up Kansas Public Finance," 2006 State of the State Economic Policy Conference, University of Kansas, Lawrence, October 2006.

"Estimating the Tax Base: Kansas Property and Sales Taxes," Kansas Advisory Council on Intergovernmental Relations, Wichita, June 2006; and, Legislative Joint Special Committee on Assessment and Taxation, Topeka, September 2006.

"Federalism and Capital Markets in Transportation Financing: Comparing Canada and the United States," International Conference on Funding Transportation Infrastructure, University of Alberta, Banff, Canada, August 2006.

"Kansas Local Government Debt Affordability," Kansas Advisory Council on Intergovernmental Relations, Wichita, June 2006; and, Legislative Joint Special Committee on Assessment and Taxation, Topeka, September 2006. With Anthony Swartzendruber.

"How to Form and Use an Audit Committee: A Step-by-Step Guide for Auditees and Auditors," Thompson Interactive, June 2006. With Robert Lloyd.

"Debt Management," 11th Annual Midwest Regional Public Finance Conference, Wichita, February 2006.

"State of Kansas 2005 Debt Affordability Study," Invited testimony to State Senate Republican Caucus, Kansas House Democratic Caucus, Kansas House Committee on Economic Development, Kansas House Commerce Committee, Kansas Advisory Council on Intergovernmental Relations, January-February, 2006.

"Fulbright Lecture -- Federalism and Capital Markets in Canada and the U.S.: Financing Infrastructure in the Wake of Hurricane Katrina," McGill University, Montreal, Quebec, October 2005.

"Comments on David Osborne's The Price of Government," invited speaker, "The Future of Local Government," by the Mid-America Regional Council and the Greater Kansas City Chapter of the American Society for Public Administration, Kansas City, MO, March 2005.

"Financial Management," Municipal Leadership Seminar: Municipal Governing Body Orientation, Wichita State University, Wichita, May 2005.

"Fundamental Federal Income Tax Reform: Implications for State and Local Government Finance," 10th Annual Midwest Regional Public Finance Conference, Wichita, February 2005.

"Fundamental Federal Income Tax Reform: Implications for State and Local Government Finance," School of Government, University of North Carolina, Chapel Hill, January 2005.

"The Search for Revenues," invited speaker at the Eight Annual Cities on the Cutting-Edge Conference, "Financing Local Government in the 21st Century," by the University of California Hastings College of the Law's Center for State and Local Government Law, San Francisco, October 2004.

"Analyzing Internal Operations," MiniMPA[tm] Wichita State University, each Fall semester, 2004 to 2008.

"Public Finance," MiniMPA [tm] [and earlier, the Executive Development Institute for Wichita/Sedgwick County] (up to 16 contact hours), Wichita State University, each spring semester, 1996 to 2009.

"Perspectives on Financial Risk Management in State and Local Government," Financial Management Association Annual Meeting, Denver, October 2003.

"County Budgeting Laboratory," Kansas Association of Counties, Wichita, April 2003.  With John Wong and Nancy Snyder.

"Sales Tax on Internet Transactions – Where are we?" 53rd Annual Spring Conference, City Clerks and Municipal Finance Officers of Kansas, Wichita, March 2003.

"Financial Management," 8th Annual Midwest Regional Public Finance Conference, Wichita, February 2003.

"Subnational Borrowing by American State and Local Governments," Presentations to State Planning and Development Council (People's Republic of China); Municipal Governments of Beijing, Hangzhou and Shanghai; Shanghai Academy of Environmental Sciences; Commercial Workshop at American Consulate (Shanghai); and others. Delegation organized by the Woodrow Wilson International Center for Scholars and the National Committee for U.S.-China Relations, December 2002.

"Recent and Future Trends in Kansas Finances," 2002 Economic Policy Conference, At the Crossroads: Can Kansas Afford Its Future, University of Kansas, Lawrence, October 2002.

"Performance-Based Budgeting." League of Kansas Municipalities 94th Annual Conference, October 2002.

"Marketing your Budget: Creating Ways to Engage Citizens in the Bottom Line." Area City/County Managers Seminar, Wichita, September 2002.

"Tax Revenue Neutrality in State and Local Tax Transitions During Electric Industry Restructuring," 32nd Annual Wichita Program on Appraisal for Ad Valorem Taxation of Communications, Energy and Transportation Properties, Wichita. July 2002.

"GASB Update and Statement 34." Presented to 52nd Annual Conference of the City Clerks and Municipal Finance Officers Association of Kansas, Wichita, March 2002.

"Kansas Debt" and "Kansas Department of Transportation," State Budget Roundtable, Kansas Public Finance Center, Wichita, February and April 2002.

"How to Diagnose Your Government's Financial Health." Pre-conference Workshop, 6th Annual Midwest Regional Public Finance Conference, Wichita, February 2002.

"How to Diagnose Your County Government's Financial Health." Presented to Kansas Association of Counties, Wichita, November 2001.

"County Revenue Patterns in Kansas and Surrounding States: Evidence from Just Released Census Data," Presented to Kansas Association of Counties, Topeka, November 2000.

"A-Z's of Cash and Debt Management: GFOA Exam Review Sessions," Professional Workshop, Kansas Government Finance Officers Association, Olathe, October 2000. With John Wong.

"Comparative State and Local Taxation," 30th Annual Wichita Program on Appraisal for Ad Valorem Taxation of Communications, Energy and Transportation Properties, Wichita, August 2000.

"Canada to Mexico and Back Again: The North-South Trade Corridor," Area Managers Seminar, Wichita, May 2000.

"Negotiating Tax Policy and Electric Competition," Conference on Managing Taxation, Center for Business Intelligence, Chicago, IL, April 2000.

"Public Budgeting Laboratory," Pre-conference workshop for Fifth Annual Midwest Regional Public Finance Conference, Wichita, February 2000. With Nancy Snyder.

"Municipal Electric Utilities," Briefing for the Wichita Electric Task Force, November 1999.

"Fundamental Finance Concepts and the GFOA Certification Program," Pre-Conference Workshop, Midwest Regional Public Finance Conference, Wichita, February 1999. With John Wong.

"Report of the Governor's Tax Review Committee," Invited testimony before Kansas State Senate Committee on Assessment and Taxation and the House Committee on Taxation, Topeka, February 1999.

"Property Tax Dynamics and the Implications of Electric Deregulation: An Outline," Public Policy Forum on Retail Wheeling and the Property Tax, Kansas Association of Counties, Manhattan, October 1998.

"An Introduction to Organization Design," Sedgwick County Reorganization Task Force, Wichita, April 1998.

"Federal Tax Reform Forum (60 minute live state-wide TV show with U.S. Senator Sam Brownback, Stephen Moore of Cato Institute, and Grover Norquist of Americans for Tax Reform)," Wichita, January 1998.

"The Effect of Electric Industry Restructuring on the Municipal Bond Market," 9th Annual Conference on Public Budgeting and Finance, Washington, DC, November 1997.

"The Implications of Retail Wheeling for a Community Served by a Municipal Electric Utility," Community meeting in Haven, Kansas, September 1997.

"Setting Fiscal Policy," Institute for Municipal Leadership: Municipal Governing Body Orientation, Wichita, September 1997 and September 1999.

"What Local Officials Should Know about Electric Industry Deregulation," Elected officials of Reno County, Hutchinson, August 1997.

"The Impact of Retail Wheeling on Municipal Electric Utilities in Kansas," Invited testimony before Kansas Retail Wheeling Task Force, Topeka, June 1997.

"Implications of a Property Tax Homestead Exemption," Invited testimony before Kansas State Senate Committee on Assessment and Taxation, Topeka, March 14, 1997.

"An Overview of Federal, State and Local Finance," Downtown Rotary Club, Wichita, January 1997 and December 1995.

"Implications of Overlapping Debt," Meeting of the Governments of Sedgwick County, May 1996.

"Investing in a Changing Market," Annual Conference, City Clerks and Municipal Finance Officers
Association of Kansas, Wichita State University, Wichita, KS, March 1996.

"Bond Basics for the Municipal Clerk," Certification Institute, City Clerks and Municipal Finance Officers
Association of Kansas, Wichita State University, Wichita, KS, November 1995.

"Capital Construction Financing," 43rd Annual College Business Management Institute, University of
Kentucky, July 1995.

"The Environment and Strategy of Disclosure," National Institute for Public Finance, National Association
of State Treasurers, Newark, DE, July 1995.

"The A-B-C's of Making Infrastructure Financing Work," Annual Conference, Government Finance
Officers Association of the U.S. and Canada, Baltimore, June 1995.

"New SEC Disclosure Requirements and the Issuance of Municipal Bonds," 1995 Governmental
Accounting and Auditing Conference, Kansas Society of Certified Public Accountants, Wichita, June 1995.

"Budgeting Process," Institute for Municipal Leadership:  Municipal Governing Body Orientation,
Wichita, June 1995, September 1997, and September 1998.

"Financing Government Infrastructure:  The Arguments for Making Users, Not Taxpayers, Pay the Bill,"
Canadian Centre for Management Development, Ottawa, Canada, April 1995.

"Canadian and American Federalism in the Capital Markets:  Comparative Debt Financing," Toronto
Association for Business and Economics; School of Management, University of Quebec-Montreal; and,
School of Public Administration, Carleton University, Ottawa, Canada, April 1995.

"Municipal Securities:  Issues of Theory, Practice and Public Policy," Doctoral Seminar in Municipal
Securities, Martin School of Public Administration, University of Kentucky, March 1995.

"Performance Budgeting:  Ties to Budget/Efficiency Measurement," Kansas Division of the Budget,
Topeka, KS, March 1995.

"Squeezing the Orange:  Investing Cash in a Changing Market," Annual Conference, City Clerks and
Municipal Finance Officers Association of Kansas, Wichita State University, Wichita, KS, March 1995 and
March 1996.

"Bond Basics," Sedgwick County Building Authority, Wichita, KS, January 1995.

"Bond Basics for Small Cities," Municipal Clerks Certification Institute, Wichita State University, Wichita,
KS, September 1994.

"Key Steps in Infrastructure Investment Decisions," Congress of Cities, National League of Cities,
Orlando, December 1993.

"Financing Debt-Paying Now or Later," Institute for Municipal Leadership, Wichita State University,
September 1993.

"Municipal Budgeting: A Balancing Act," Congress of Cities, National League of Cities, New Orleans, November 1992.

"Strategic Planning Session," Committee on Governmental Debt and Fiscal Policy. Government Finance Officers Association of the U.S. and Canada, Winter meeting, Washington, D.C., February 1992.

"Disclosure in the Municipal Bond Market," State Debt Management Conference, National Association of State Treasurers, Austin, TX, December 1991.

"Government Managers and Quality Concepts", Louisiana Quality Symposium, American Society of Quality Control, Baton Rouge, LA, October 1991.

"Strategic Fiscal Planning," Center for Local Government Administration, University of North Florida, Jacksonville, February 1991.

"Bond Disclosure Initiatives," Council of Industrial Development Bond Issuers - Winter Meeting, New Orleans, LA, February 1991.

"Infrastructure Initiatives for Louisiana," Infrastructure Policy Group, Governor's Cabinet, State of Louisiana, November 1989.

"Budgeting for Results: Measuring and Monitoring Goal-Directed Performance," Budget Preparation Workshops for Department Heads, conducted for the Office of Chief Administrative Officer, City of New Orleans, June 1989.

"Financial Investment and Analysis," Transit Management of Southeast Louisiana, New Orleans Regional Transit Authority, May 1989.

"Privatization - The Pros and Cons," The Fifth Annual Accounting, Auditing and Management Seminar, Baton Rouge Chapter of the Association of Government Accountants, March 1989.

"Budget Seminar," Arts and Humanities Council of Greater Baton Rouge, Baton Rouge, LA, June 1988.

"Budgeting and Accounting for State Managers," Certified Public Manager Training Program, State of Louisiana/Louisiana State University, one-day seminars at various state locations, 1986-1987.

"Local Budgeting," Newly Elected Officials' Conference, Louisiana Municipal Association, February 1987 and 1989.

"Financial Analysis," Ohio Public Finance Officers Training Program, Kent State University, June 1986.

"Financial Strategy for Effective Local Government Management," Annual Conference, Public Affairs Research Council of Louisiana, March 1986.

"Budget Analysis," Budget Balancing Conference, Governmental Finance Officers Association of Louisiana, May 1986.

"The Roles of the Finance Officer," Second Annual Governmental Finance Institute, GFOA of Louisiana/Louisiana State University, September 1985.

"Financial Trend Monitoring," Second Annual Governmental Finance Institute, GFOA of Louisiana/Louisiana State University, September 1985.

"Public Officials Liability and Risk Management," Elected Officials Program, Kent State University, March 1984.

"Management Strategy and Control," Management Development Laboratory, Rider College, Lawrenceville, NJ, 1984.

"City Financial Planning," Ohio Public Finance Officers Training Program, Kent State University, June 1983.

"Fiscal Emergency Assessment," Ohio Public Finance Officers Training Program, Kent State University, June 1983.

"Risk Management for Executives," Management Development Program, Rider College, Lawrenceville, NJ, 1982-1984.

"The Federal Budgeting Process," Washington Program in National Issues, Kent State University, January 1983.

"Public Liability Prevention and Risk Management," First Annual Regional Meeting for Cities and Villages, Kent State University Regional Campuses, April and May 1983.

"Annual Operating Budget," Ohio Public Finance Officers Training Program, Kent State University, June 1982.

"Risk Management and Self-Insurance," Ohio Public Finance Officers Training Program, Kent State University, June 1982.

"Public Budgeting Principles and Practices," Ohio Public Finance Officers Training Program, Kent State University, June 1981.

"Principles of Public Finance," Ohio Public Finance Officers Training Program, Kent State University, June 1981.

"The Liability Challenge for Public Officials," Risk Management and Municipal Insurance Program, Kent State University, February 1981.

"The Federal Setting of Municipal Liability: Section 1983," Update for City Attorneys, Minnesota Bar Association, St. Paul, MN, January 1981.

"Budgeting Personnel Management," Personnel and Labor Management Workshop, Kent State University, November-December 1980.

"Public Budgeting Laboratory," Pre-conference Workshop, American Society for Public Administration, Annual Conferences in: San Francisco, CA, April 1980; Detroit, MI, April 1981; and New York, NY, April 1983.

"Local Government Budgeting," Financial Management Capacity Sharing Program, Kent State University, September 1980.

"Personal Liability and Risk Management," Pre-conference Workshop, American Society for Public Administration, Annual Conference, Baltimore, MD, April 1979.

**CONFERENCE RESPONSIBILITIES**

Discussant, "Measuring Fiscal Sustainability of Local Governments," Ready or Not? Post-Fiscal Crisis/Next Fiscal Crisis, Government Finance Research Center at the University of Illinois at Chicago and the Federal Reserve Bank of Chicago, May 2019.

Moderator, "New Research on Fiscal Federalism," 30th Annual Conference, Association for Budgeting and Financial Management, Denver, CO, October 2018.

Facilitator, "Research Presentations: Evaluating Municipal Fiscal Systems," International Conference on Municipal Fiscal Health, Lincoln Institute of Land Policy, Detroit, MI, May 2018.

Senior Scholar on Publishing and Career Advice, 2017 Lincoln Young Scholars in Urban Economics and Public Finance, Lincoln Institute of Land Policy, Cambridge, MA, May 2017.

Respondent, Applied Research in Public Finance Conference, School of Public and Environmental Affairs, Indiana University, Bloomington, IN, April 2017.

Discussant, "The Volcker Project," Annual Conference, American Society for Public Administration, Atlanta, GA, March 2017.

Discussant, "The Changing Municipal Capital Market," Municipal Finance Conference, The Hutchins Center on Fiscal and Monetary Policy, The Brooking Institution, July 2016. Transcript: https://www.brookings.edu/wp-content/uploads/2016/07/071216BROOKINGSMUNICIPAL.pdf

Chair, "Textual Analysis and Financial Economics," Southern Economic Association Conference, New Orleans, November 2015.

Chair, "Roundtable: The Past and Future of Municipal Securities: 40th Anniversary of the Municipal Securities Rulemaking Board," 27th Annual Conference, Association for Budgeting and Financial Management, Washington, DC, October 2015. Video: https://www.youtube.com/watch?v=v-ZOmhCiSxk

Chair and Discussant, "The Discipline of the Markets: Debt and Municipal Finance," 27th Annual Conference, Association for Budgeting and Financial Management, Washington, DC, October 2015.

Discussant, "Federal, State and Local Budgets in Jeopardy: A Conference on America's Fiscal Future," Indiana University, May 2015.

Participant, "Research Roundtable on Financial Reporting Model Reexamination," Governmental Accounting Standards Board, Atlanta, GA, November 2013.

Participant, "Roundtable on Municipal Fiscal Crisis," George Mason University, Arlington, VA, October 2013.

Panel Moderator, Brandeis 2013 Municipal Finance Conference, Boston, MA, August 2013.

Participant, "Roundtable on Municipal Fiscal Sustainability," Arizona State University, Phoenix, AZ, March 2013.

Member, Organizing Committees, "2014 Municipal Finance Conference," Brandeis International Business School, Newton, MA.

Member, Steering Committee, "2013 Financial Markets Boot Camp," College of Public Programs, Arizona State University, Phoenix, AZ, March 2013.

Member, Organizing and Planning Committees, "2013 Municipal Finance Conference," Brandeis International Business School, Newton, MA.

Session Moderator, "2012 Municipal Finance Conference," Brandeis International Business School, Newton, MA, August 2012.

Moderator, "Roundtable Discussion on Municipal Securities: The State of Municipal Securities; Moving Market Research and Practice," Second Annual Applied Finance Conference of the Financial Management Association, St. John's University, New York, NY, May 2012

Moderator, "State and Local Case Studies in Fiscal Policy and Outcomes," 54th Annual Conference, Western Social Science Association, Houston, TX, April 2012.

Chair/Discussant, "Municipal Bonds and Finance," 23rd Annual Conference, Association for Budgeting and Financial Management, Washington, DC, October 2011.

Co-Chair, Working Group 5: Strategic Management in the Public Services: Difficulties and Disappointments in Good Times, Seventh Transatlantic Dialogue (7TAD), Rutgers University, June 2011.

Plenary Moderator/Presenter, "Debt Management Trends & Outlook," 22nd Annual Conference, Association for Budgeting and Financial Management, Omaha, NE, October 2010.

Presenter, "Public Affairs Programs under Attack," Annual Conference, National Association of Schools of Public Affairs and Administration, Las Vegas, NV, October 2010.

Presenter, "Teachable Moments from the Financial Crisis," Annual Conference, National Association of Schools of Public Affairs and Administration, Washington, DC, November 2009.

Chair, "Fiscal Redistribution: United States," Conference on Government Programs, Distribution and Equity, Andrew Young School of Policy Studies, Georgia State University, Atlanta, GA, October 2009.

Moderator, "Debt Management," 51st Annual Conference, Western Social Science Association, Albuquerque, NM, April 2009.

Member, Planning Committee, Annual Wichita Program on Appraisal for Ad Valorem Taxation of Communications, Energy and Transportation Properties, Wichita, KS, August 1998 to 2009.

Moderator, "Responsible Public Sector Investment and Debt Policy," 101st Annual Conference on Taxation, National Tax Association, Philadelphia, November 2008.

Moderator, "Engaging in Scholarship and Education of the 'Black Box' of Military Strategy and Budgets," 20th Annual Conference, Association for Budgeting and Financial Management, October 2008.

Presenter, "Competition and Cooperation among Public Affairs Schools, Business Schools and Law Schools," Annual Conference, National Association of Schools of Public Affairs and Administration, Charleston, SC, October 2008.

Moderator, "Property Tax Trends," 38th Annual Wichita Program on Appraisal for Ad Valorem Taxation, Wichita, July 2008.

Conference Director and Moderator, 13th Annual Midwest Regional Public Finance Conference, Wichita State University, Wichita, February 2008.

Moderator, "Municipal Securities," 19th Annual Conference, Association for Budgeting and Financial Management, Washington, DC, October 2007.

Conference Director and Moderator, 12th Annual Midwest Regional Public Finance Conference, Wichita State University, Wichita, February 2007.

Moderator, "Threats to Kansas Local Finance: The Current Solution," Kansas Association of City/County Management, Winter Seminar, Wichita, January 2007.

Moderator, "Research Workshop: Using Municipal Bond Trading Data," 18th Annual Conference, Association for Budgeting and Financial Management, Atlanta, GA, October 2006.

Moderator, "BATs and CATs: Taxing Business Activity in the Service Economy," 39th Annual Conference, Multistate Tax Commission, Topeka, KS, August 2006.

Conference Director and Moderator, 11th Annual Midwest Regional Public Finance Conference, Wichita State University, Wichita, KS, February 2006.

Moderator, "The Role of Property Taxes," 35th Annual Wichita Program on Appraisal for Ad Valorem Taxation, Wichita, July 2005.

Conference Director and Moderator, 10th Annual Midwest Regional Public Finance Conference, Wichita State University, Wichita, KS, February 2005.

Conference Director and Moderator, 9th Annual Midwest Regional Public Finance Conference, Wichita State University, Wichita, KS, February 2004.

Moderator, "Improving Your Bond Rating," 9th Annual Midwest Regional Public Finance Conference, Wichita State University, Wichita, KS, February 2004.

Presenter, "Exploring the 'Revolving Door' Between Budget Practitioners and Academicians: Does it Exist, Does it Matter and What are the Implications," 16th Annual Conference, Association for Budgeting and Financial Management, October 2004, Chicago. With Gerald J. Miller, Samuel J. Yeager, and Jack Rabin.

Moderator, "Trends in State and Local Taxes: Is the Property Tax Obsolete?" 33rd Annual Wichita Program on Appraisal for Ad Valorem Taxation of Communications, Energy and Transportation Properties, Wichita, July 2003.

Primary Facilitator and Co-Designer, Iowa Compact Retreat (for the Governor, Lt. Governor and the top legislative Leaders), Des Moines, February 2003.

Invited Participant, "Voluntary Disclosures by State and Local Governments," National Association of State Auditors, Comptrollers and Treasurers, Washington, DC, May 2003.

Conference Director and Moderator, 8th Annual Midwest Regional Public Finance Conference, Wichita State University, Wichita, KS, February 12-14, 2003.

Moderator, "The Theme of Public Finance in the Amusement Park Industry," 95th Annual Conference on Taxation, National Tax Association, Orlando, November 2002.

Moderator, "Changing Resource Needs and Sources: Can We Partner with Governments to Raise Funds to Support our Programs?" Annual Conference of the National Association of Schools of Public Affairs and Administration, Los Angeles, October 2002.

Moderator, "Public Budgeting and Finance Careers: Paths, Challenges and Opportunities," 14th Annual Conference, Association for Budgeting and Financial Management, Kansas City, October 2002.

Conference Director and Moderator, 7th Annual Midwest Regional Public Finance Conference, Wichita State University, Wichita, KS, February 14-15, 2002.

Moderator, "The California Electricity Crisis," 94th Annual Conference on Taxation, National Tax Association, Baltimore, MD, November 2001.

Presenter, "The State of Publishing in Public Administration," 62nd Annual National Conference, American Society for Public Administration, Newark, NJ, March 2001.

Moderator, "We Don't Need No Stinking Budgets! (The great annularity debate!)," 12th Annual Conference, Association for Budgeting and Financial Management, Kansas City, MO, October 2000.

Conference Director and Moderator, 6th Annual Midwest Regional Public Finance Conference, Wichita State University, Wichita, KS, February 14-16, 2001.

Discussant, "Property-Tax Exemptions for Charities," Invitation-only seminar by The Urban Institute, Washington, DC, June 2000.

Chair, "Deregulation: Financial Implications," 11th Annual conference, Association for Budgeting and Financial Management, Washington D.C., October 1999.

Presenter, "The Challenges of Establishing a Research Program in Public Finance and Budgeting: A Roundtable Discussion," 11th Annual conference, Association for Budgeting and Financial Management, Washington D.C., October 1999.

Sponsor Liaison and Program Committee Member, 12th Annual Conference on Public Budgeting and Finance, Kansas City, Missouri, October 7-9, 2000.

Co-Program Coordinator, Educational meetings of Kansas government finance officers, Salina (November 1998), Newton (April 1999), El Dorado (September 1999), Lenexa (October 1999), Salina (September 2000), Olathe (November 2000), Emporia (May 2001), Hutchinson (August 2001), Overland Park (October 2001), Hayes (May 2002), Leavenworth (August 2002), Overland Park (October 2002).

Participant, Midwest Regional Roundtable on Public Budgeting and Finance, academic seminars held at various universities in Kansas, Iowa and Nebraska semi-annually most years since 1998.

Conference Director and Moderator, 5th Annual Midwest Regional Public Finance Conference, Wichita State University, Wichita, KS, February 17-18, 2000.

Conference Director and Moderator, 4th Annual Midwest Regional Public Finance Conference, Wichita State University, Wichita, KS, February 18-19, 1999.

Chair, "Should There be an Accreditation Program for Finance and Budget Offices?" 10th Annual Conference on Public Budgeting and Financial Management, Washington, DC, November 1998.

Conference Director and Moderator, 3rd Annual Midwest Regional Public Finance Conference, Wichita State University, Wichita, KS, February 19-20, 1998.

Conference Director and Moderator, Electric Industry Deregulation and Retail Wheeling: The Road to Power, Wichita State University, Wichita, KS, December 2, 1997.

Moderator, "Economic Outlook," 28th Annual Wichita Program on Appraisal for Ad Valorem Taxation of Communications, Energy and Transportation Properties, Wichita, KS, August 1998.

Conference Director and Moderator, 2nd Annual Midwest Regional Public Finance Conference, Wichita State University, Wichita, KS, January 30-31, 1997.

Conference Director and Moderator, 1st Annual Midwest Regional Public Finance Conference, Wichita State University, Wichita, KS, February 29 - March 1, 1996.

Chair, "Paying for Economic Development and Growth Management," Southeastern Conference for Public Administration, Lexington, KY, October 1994.

Conference Coordinator, "Reinventing Budgeting and Financial Management: Will It Take Us Where We Want to Go?" 6th Annual Conference on Public Budgeting and Financial Management, Washington, DC, October 13-15, 1994.

Moderator, "Certificates of Participation in Brevard County:  A Local Political Issue and Its Implications for the National Municipal Bond Market," Southeastern Conference for Public Administration, Cocoa Beach, FL, October 1993.

Conference Facilitator and Co-Designer, "New Directions in State and Local Budgeting: A National Symposium," sponsored by the Government Finance Officers Association of the U.S. and Canada for major public interest groups, Washington, DC, January 1993.

Co-Chair, Public Sector Track, 1993 Annual Conference, The American Management Foundation and the Association on Employment Practices and Principles, San Diego, CA, October 1993.

Coordinator, "Financial Management" Track, 4th Annual Conference on Public Budgeting and Finance, American Society for Public Administration, Arlington, VA, October 1992.

Coordinator, "Current Issues in Public Administration" Track, Southeastern Conference for Public Administration, Montgomery, AL, October 1992.

Chair, "Municipal Finance: Trends and Developments" Southeastern Conference for Public Administration, Charlotte, NC, October 1991.

Chair, "Innovations in Public Debt Financing," 3rd Annual Conference on Public Budgeting and Finance, American Society for Public Administration, Arlington, VA, October 1991.

Chair, "Taxation and the Courts," National Conference, American Society for Public Administration, Washington, D.C., March 1991.

Discussant, "Budget Theory," 2nd Annual Conference on Public Budgeting and Finance, American Society for Public Administration, Washington, D.C., November 1990.

Chair, "State and Local Government Securities and Debt Disclosure," 2nd Annual Conference on Public Budgeting and Finance, American Society for Public Administration, Washington, D.C., November 1990.

Chair, "Improving Debt Disclosure," Southeastern Conference for Public Administration, Clearwater Beach, FL, October 1990.

Chair, "Disclosure Requirements in the Municipal Market," Annual Conference, Government Finance Officers Association of the U.S. and Canada, Cincinnati, Ohio, May 1990.

Presenter, "V. O. Key and Budgetary Slack," at "Budget Theory" panel, 1st Annual Conference of Public Budgeting and Finance, American Society of Public Administration, Washington, D.C., November 1989.

Chair, "Budget Theory, Southeastern Conference for Public Administration, Jackson, MS, October 1989.

Discussant, "Management Science Applications," Southeastern Conference for Public Administration, Jackson, MS, October 1989.

Presenter, "A Roundtable on Management Science Implementation: Problems and Prospects," Southeastern Conference for Public Administration, Jackson, MS, October 1989.

Presenter, "Developing Management Skills for the Future: Assessing Needs, Generating Competencies," National Conference, American Society for Public Administration, Miami, FL, April 1989.

Chair, "Insurance and Diverse Policy Issues," Annual Meeting, American Political Science Association, Washington, D.C., September 1988.

Moderator, "Alternative Debt Issues," Annual Conference, Government Finance Officers Association of the U.S. and Canada, Atlanta, GA, May 1988.

Co-Chair, "Public Budgeting and Finance" Theme Track, Southeastern Conference for Public Administration, New Orleans, LA, October 1987.

Chair, "Issues in Fiscal Administration," Southeastern Conference for Public Administration, New Orleans, LA, October 1987.

Member, Program Committee, 1987 Southeastern Conference of Public Administration.

Co-Chair, "Symposium: The Movement of Strategy From Private to Public Sector: Observations, Empirical Research, and Model Building," Annual Meeting, Academy of Management, New Orleans, LA, August 1987.

Co-Chair, "Recent Changes in the Tax-Exempt Bond Market," National Conference, American Society for Public Administration, Anaheim, CA, April 1986.

Participant, "The Politics of Capital Budgeting," Midwest Regional Conference, American Society for Public Administration, Columbus, OH, October 1984.

Chair, "Revenue Challenges: Legal, Political and Economic," Annual Conference, American Society for Public Administration, Denver, CO, April 1984.

Chair, "Developing Legal Elements of the Administrative Environment," Southeastern Conference for Public Administration, American Society for Public Administration, Tallahassee, FL, October 1983.

Chair, "Recovering from a Financial Emergency," National Conference, American Society for Public Administration, New York, NY, April 1983.

Participant, "Avoiding Obsolescence in Public Administration," National Conference, American Society for Public Administration, New York, NY, April 1983.

Chair, "Financial Oversight Commissions: Can They Solve Fiscal Crises?" Joint Midwestern and Southeastern Regional Conferences, American Society for Public Administration, Louisville, KY, November 1982.

Chair, Conference Theme Track, "Frontiers of Public Administration," National Conference, American Society for Public Administration, Honolulu, HI, March 1982.

Member, Program Committee for 1982 National Conference, American Society for Public Administration, 1980-1982.

Co-Chair, "Affirmative Action Programs: Is There Life After Parity?" National Conference, American Society for Public Administration, Detroit, MI, April 1981.

Chair, "Business Task Force Technology in State and Local Government," National Conference, American Society for Public Administration, Detroit, MI, April 1981.

Chair, "Fringe Benefits: Personnel and Finance Interface," National Conference, American Society for Public Administration, San Francisco, CA, April 1980.

Chair, "Personal Liability of Public Administration," Midwest Regional Conference, American Society for Public Administration, Milwaukee, WI, October 1980.

Participant, "Personnel Administration Information-Transfer," National Conference, American Society for Public Administration, Baltimore, MD, April 1979.

Participant, "Introductory Public Administration, Substance and Method," National Conference, American Society for Public Administration, Baltimore, MD, April 1979.

Evaluator, "Rewards in the Academic Community for Public Service and Applied Research," National Conference, American Society for Public Administration, Atlanta, GA, April 1977.

Chair, "Techniques for Preparing Budgets," Annual Conference, International City Management Association, Seattle, WA, October 1975.

Chair, "Developing Local Government Budgeting and Accounting Systems," Annual Circuit-Riding City Manager's Conference, International City Management Association, Nashville, TN, April 1975.

**ACADEMIC EDITORIAL RESPONSIBILITIES**

Editor-In-Chief, Municipal Finance Journal, the only peer-reviewed quarterly specializing in municipal securities and state and local financing, starting 1989 (volume 10, Number 4) to present.

Editorial Boards: Public Budgeting & Finance, 2003 to present; American Review of Public Administration, 2009 to present; State and Local Government Review, 2014 to present; Journal of Public Budgeting, Accounting & Financial Management (formally Public Budgeting and Financial Management); Public Administration Quarterly; Public Performance & Management Review; International Journal of Public Administration; International Journal of Organization Theory and Behavior; Journal of Health and Human Resources Administration; Public Administration & Management: An Interactive Journal; International Journal of Economic Development 1999-2007; Journal of Management History, 1995 to 2001; Journal of Management In Practice, 1989 to 1990; The Urban Interest, 1982.

Editor, Book Review Section, <u>International Journal of Public Administration</u>, 1979 (Volume 1, Number 1) to 2008.

Editor, Financial Management Research Section, <u>Public Budgeting and Financial Management: An International Journal</u>, 1991 to1994.

Editor, Research Notes Section, <u>New Directions in Public Administration Research</u>, 1986 to 1990.

Managing Editor, <u>Annals of Public Administration</u> (New York, NY:  Marcel Dekker, Inc.) book series, 1981 to 1983, which published the following books: Joseph A. Uveges (editor), <u>Public Administration:  History and Theory in Contemporary Perspectives</u>, 1982; Thomas Vocino and Richard Heimovics (editors), <u>Public Administration in Transition</u>, 1982; David H. Rosenbloom (editor), <u>Centenary Issues of the Pendleton Act of 1883:  The Problematic Legacy of Civil Service Reform</u>, 1982; Richard H. Leach (editor), <u>Intergovernmental Relations in the 1980s</u>, 1983; William Jones (editor), <u>Criminal Justice Administration</u>, 1983.

Manuscript Reviewer (ad hoc): <u>Public Finance Review</u>; <u>National Tax Journal</u>; <u>Public Administration Review</u>; <u>Journal of Public Administration Research and Theory</u>; <u>Administration and Society</u>; <u>Public Administration</u>; <u>Publius</u>; <u>Policy Studies Journal</u>; <u>Journal of Politics</u>; <u>State and Local Government Review</u>; <u>Journal of Public Administration Education</u>; <u>Review of Public Personnel Administration</u>; <u>Public Integrity</u>; <u>International Public Management Journal</u>; <u>Public Management Review</u>; <u>International Public Management Review</u>, <u>International Review of Administrative Sciences</u>; <u>International Journal of Public Administration</u>; <u>Urban Affairs Review</u>; <u>Journal of Urban Affairs</u>; <u>Economic Development Quarterly</u>; <u>Social Science Journal</u>; <u>Nonprofit Policy Forum</u>; <u>Regional Studies</u>; <u>Planning Practice & Research</u>; <u>Policy and Society</u>; <u>Public Money & Management</u>; <u>Educational Researcher</u>; Reason Public Policy Institute; Global Capital Markets Center at Duke Law School; Public Sector Division and Production/Operations Management Division of the Academy of Management; Public Sector and Health Care Administration section of the Southern Management Association; Merrill Publishing Company; West Publishing Services; Brooks/Cole Publishing Company; Marcel Dekker, Inc.; Prentice Hall; M.E. Sharpe, Inc.; Harcourt Brace; Government Finance Officers Association; Elsevier Science; Academic Press; Jones & Bartlett Publishers; ICMA Press; Taylor & Francis; Georgetown University Press; Pew Center on the States of the Pew Charitable Trusts; Palgrave-MacMillan; Smith Richardson Foundation.

**PROFESSIONAL EDITORIAL RESPONSIBILITIES**

Editor, <u>Louisiana Finance Quarterly</u>, Governmental Finance Officers Association of Louisiana, 1985 to 1990.

Editor, Research and Publication Section, and Microcomputer Section, <u>Newsletter</u>, Section on Budgeting and Financial Management, American Society for Public Administration, 1980 to 1985.

Contributing Editor, <u>PRIMALETTER</u>, Public Risk and Insurance Management Association, 1979 to 1983.

Co-Editor, <u>Personal Liability Digest</u>, Center for the Study of Civil Rights and Civil Liberties, 1975 to 1979.

Co-Editor, <u>Patient Rights Digest</u>, Center for the Study of Civil Rights and Civil Liberties, 1975 to 1979.

Co-Editor, <u>Employment Discrimination Digest</u>, Management Information Associates, Inc., 1975 to 1979.

**SUPERVISION OF DOCTORAL DISSERTATIONS: GEORGIA STATE UNIVERSITY**

**Chair**

Konul Amrahova Riegel (2018). Primary and Secondary Subnational Debt Markets. (Joint GSU-Georgia Tech PhD). Accepted tenure-track position at Naval Postgraduate University; now at KPMG.

Komla D. Dzigbede (2016). Essays in State and Local Government Debt Management: Networks, Strategic Refinancing, and Regulatory Disclosure. (GSU PhD). Accepted tenure-track position at University of Binghamton SUNY.

Min Su (2016). American Cities in Turbulent Economic Times: An Exploration of Financial Slack in Municipal Finance. (Joint GSU-Georgia Tech PhD). Accepted tenure-track position at Louisiana State University, Baton Rouge.

**Committee Member**

Seyedmasood Dastan (2019). Essays in Corruption. (GSU PhD, Economics)

Lang (Kate) Yang (2017). Fiscal Federalism and Distressed Localities: An Empirical Analysis. (PhD, Indiana University; winner of NASPAA Best Dissertation Award in 2017)

Rahul Pathak (2017). Essays on Fiscal Institutions, Public Expenditures, and Debt. (GSU PhD)

Krishanu Karmakar (2016). Essays in Fiscal Policy and Budgeting. (GSU PhD)

Rayna L. Stoycheva (2011), "Sustainable Governance and Management of Defined Benefit Plans in the Public Sector: Lessons from the Turbulent Decade of 2000-2009." (GSU PhD)

Sarah B. Arnett (2012). Fiscal Stress in the U.S. States: An Analysis of Measures and Responses. (GSU PhD)

Spencer T. Brien (2012). Three Essays on the Formation and Finance of Local Governments (GSU PhD)

**UNIVERSITY, COLLEGE, AND DEPARTMENT SERVICE**

**Georgia State University**

Faculty Advisor and Organizer, Municipal Securities Laboratory, AYSPS (Student Technology Fee Awards for multiple years for data purchases), 2015 – present.

Affiliated Faculty, Philosophy, Politics and Economics Program, 2017- present.

Member, PhD Committee, Public Management and Policy [PMAP], 2018 – present.

Member, The Admissions and Coordinating Committee for the Joint GSU-Georgia Tech PhD Committee, 2018-present.

Member, Senior Public Finance Faculty Recruitment Committee, AYSPS, Fall 2018.

Thesis Advisor, M.A. in Economics, Department of Economics (Thomas Kavoori).

Chair, PMAP Full Professor Five Year Review Committee, 2013 and 2015.

Member, PMAP Full Professor Five Year Review Committee, 2012, 2013, 2017, 2018, and 2019.

Chair, PMAP Full Professor Promotion Committee, 2017.

Member, PMAP Full Professor Promotion Committee, 2012, 2013, 2014 and 2018.

Member, PMAP Associate Professor Tenure and Promotion Committee, 2013, 2017 and 2019.

Member, PMAP Promotion Committee for Non-Tenure Track Faculty, 2016 and 2018.

Major Advisor, Masters in Public Policy Thesis, PMAP (Yak Higuchi, 2015)

Chair, PMAP Three-Year Review of Chair, 2015.

Member, PMAP Academic Program Review, 2014.

Member, PMAP Full Professor and Assistant Professor Recruitment Committees, 2014 – 2015.

Member, PMAP Diversity Committee, 2014.

Chair, PMAP, MPA/MPP Finance Concentration Review Committee, 2014.

Member, PMAP Core Course 8161 Assessment Committee, 2013 - present.

Member, PMAP, PhD Field, Public Finance and Budgeting, 2013 - present.

Host, Visiting Summer Scholar (Shama Gamkhar), 2013.

Member, PMAP, PhD Field Comp in Public Management, 2013.

Member, PMAP Search Committee for Senior Public Management Position, 2011-2012.

Instructor of Record, Winners of PMAP Best Graduate Student Research Paper Awards in AY12 (William Steiden) and AY11 (Christian King)

Member, PMAP Committee on Third-Year Review of Assistant Professor, 2011

Member, PMAP, MPA Weave Committee, 2011.

Member, PMAP, MPA Committee, 2010 to present.

Member, Council of Deans, Academic Year 2009-2010.

**Wichita State University**

Member, Council of Deans, Academic Year 2007-2008.

Chair, Search Committee for Barton Distinguished Endowed Chair in International Business, W. Frank Barton School of Business, 2006-2007.

Member, Search Committee for Director, Hugo Wall School of Urban and Public Affairs, 2007 to 2009.

Presenter, "Findings of the Spellings' Commission on the Future of Higher Education," Fairmount College of Liberal Arts & Sciences, Assessment Committee, 2006.

Member, Working Group on Research (Criterion 4), North Central Reaccredidation Steering Committee, 2005 to 2006.

Member, Joint Council of Kansas Distinguished Professors (Wichita State University, University of Kansas and Kansas State University), 1998 to 2009.

Chair, Selection Committee for George Van Riper Endowed Scholarships in Public Finance, Kansas Public Finance Center, 1997 to 2009.

Member, College Advisory Committee, Fairmount College of Liberal Arts and Sciences, 2002 to 2005.

Member, Advisory Committee for Ed.D. Candidate, 2004 to 2005.

Chair, Full Professor Promotion Review Committee, Hugo Wall School of Urban and Public Affairs, Fall 2004.

Member, Research Chairs and Awards Committee, W. Frank Barton School of Business, 2004.

Member, University Information Technology Advisory Committee, 2004.

Member, Search Committee for Finance Faculty, W. Frank Barton School of Business, 2003-2004.

Member, Search Committee for Management Information Systems (MIS) Faculty, W. Frank Barton School of Business, 2002-2003, and Chair, 2003-2004.

Member, Full Professor Promotion Committee, Elliot School of Communications, Fall 2003.

Chair, Program Review and Curriculum Review Committees, Management Information Systems (MIS) Program, Barton School of Business, 2002.

Member, Full Professor Incentive Review Committee, Department of Economics, Fall 2001.

Member, Mission Task Force, W. Frank Barton School of Business, 2001.

Principal Drafter, Master of Public Administration Accreditation Self-Study Report submitted to National Association of Schools of Public Affairs and Administration, 2000 to 2001. Successful initial accreditation.

Head, Promotion Committee for Full Professor, Department of Finance, Real Estate and Decision Science, W. Frank Barton School of Business, Fall 2000.

Member, Promotion and Tenure Committee, Department of Finance, Real Estate and Decision Sciences, W. Frank Barton School of Business, Fall 2000, 2001.

Chair, Full Professor Incentive Review Committee, Hugo Wall School of Urban and Public Affairs, Fall 2000.

Chair, Drafting Committee on Statements of Commitment, Joint Council of Kansas Distinguished Professors, Fall 2000.

Advisor, Power Reliability Laboratory, College of Engineering, Wichita State University, 2000 to 2001.

Chair, Search Committee for Dean of the W. Frank Barton School of Business, Fall 1999 to Spring 2000.

Chair M.P.A. Applied Research Paper for Colin B. McKenney, "Tax Limitation Laws: The Question of Enforcement," Winner of Best Paper Award of the Hugo Wall School of Urban and Public Affairs for Academic Year 1998-9.

Chair, Search Committee for Director of the Center for Economic Development and Business Research, W. Frank Barton School of Business, Spring1999.

Sponsor, "Minorities in Government Finance Scholarship by the Government Finance Officers Association of the U.S. and Canada ($3,500)," awarded to Stephanie Payton-Walker, 1998.

Chair, M.P.A. Applied Research Paper for Carol McMillan, "Local Government Debt in Sedgwick County, Kansas: 1985-1995," Hugo Wall School of Urban and Public Affairs.  Winner of 1997 Graduate Student Paper Award, Association for Budgeting and Financial Management, Washington, DC, November 1997.

Chair or Member, M.P.A. Applied Research Paper (various students), Hugo Wall School of Urban and Public Affairs.

Member, M.A. Thesis Committee, Graduate School, 1998.

Chair, Untenured Faculty Evaluation Committee, Hugo Wall School of Urban and Public Affairs, 1995, 1997-1998, 1998-1999.

Chair, Ad Hoc Tenure and Promotion Guidelines Drafting Committee, Hugo Wall School of Urban and Public Affairs, 1997.

Chair, Search Committee for Director of Hugo Wall School of Urban and Public Affairs, 1996.

Member, Distinguished Professor Review Committee, College of Liberal Arts and Sciences, 1996.

Chair, Promotion and Tenure Committee, Hugo Wall School of Urban and Public Affairs, 1995, 1996 and 1999.

Chair, Adjunct Faculty Policy committee, Hugo Wall School of Urban and Public Affairs, 1995.

Member, Promotion and Tenure Committee, Hugo Wall School of Urban and Public Affairs, 1994.

Full member, Graduate Faculty, 1994 to 2009.

**Louisiana State University**

Full Member, Graduate Faculty, Fall 1985 to 1994.

Member, Financial Resources Committee, Southern Association of Colleges and Schools (SACS) Accreditation Self-Study, 1992.

Chair, AACSB Strategic Planning Committee, College of Business Administration, 1992 to 1994.

Member, Promotion/Tenure Committee, College of Business Administration, 1992 to 1994.

Member, M.B.A. Committee, College of Business Administration, 1989-1990, 1990-1991, 1991-1992, 1993-1994.

Member, Research Advisory Committee Group in Social Sciences, 1993 to 1994

Member, Ph.D. Examination Committee (various candidates).

Member, Ph.D. Dissertation Defense (various candidates).

Chair, Certified Public Manager Committee, 1985.

Advisor (Ad Hoc) to M.P.A. students, College of Business Administration, 1985-1994.

Job and Internship Placement Advisor (Ad Hoc) to M.P.A. Students (Public Budgeting and Financial Management Concentration), College of Business Administration, 1985-1994.

Advisor (Ad Hoc) to M.B.A. students with public administration concentration, College of Business Administration, 1985-1994.

**Kent State University**

Full Member, Graduate Faculty, Graduate School of Management, Fall 1979 to August 1985.

Full Member, Graduate Faculty, Department of Political Science, Graduate College, Fall 1979 to August 1985.

Elected to Graduate Studies Council, Graduate School of Management, 1983-1984.

Elected to Graduate Studies Committee, Department of Political Science, 1980-1981 and 1983-1984.

Chair of Internal Review Committee of Department of Administrative Science, College of Business Administration, 1982-1984.

Elected to College Advisory Committee, College of Business Administration and Graduate School of Management, 1982-1983.

Chair of Internal Review Committee of School of Journalism, Graduate College, 1981 to 1982.

Elected to Faculty Advisory Committee, Department of Finance and Public Administration, 1979-1980, 1981-1982, 1982-1983, and 1983-1984.

Moderator and Graduate School of Management Representative of Ph.D. Dissertation Defense (various candidates).

Member of Ph.D. Oral Exams (various candidates), Department of Political Science and Graduate School of Education, 1979 to 1985.

Member of M.P.A. Thesis Committees, Graduate School of Management, 1982 to 1983.

Advisor on Executive M.B.A. Thesis, Graduate School of Management, 1983.

Advisor (Ad Hoc) to Ph.D. majors and minors in Public Administration (various candidates), Department of Political Science and Graduate School of Education, 1979-1983.

Advisor (Ad Hoc) to M.P.A. students, Graduate School of Management, 1979-1985.

Job and Internship Placement Advisor (Ad Hoc) to M.P.A. Students (Public Budgeting and Financial Management Concentration), Graduate School of Management, 1979-1985.

Member of Evaluation Committee on Graduate Faculty Status, Graduate School of Management, 1981.

**PROFESSIONAL ACTIVITIES**

External Reviewer, Graduate Programs, Department of Public Administration, College of Urban Planning and Public Affairs, University of Illinois at Chicago, March 2019.

Member, 3-person Expert Advisory Group of the National Academy of Public Administration, Strategic Plan for the Public Company Accounting Oversight Board (PCAOB), Washington, DC, 2018.

Member, Best Article in Volume 40 Committee, Journal of Health and Human Services Administration, 2018-2019.

Member, Scholarly Forum, Municipal Securities Rulemaking Board, Washington, DC, September 2018.

Member, Conference Host Committee, International Conference on Municipal Fiscal Health, Lincoln Institute of Land Policy, Detroit, MI, 2017 -2018.

Advisor, State Debt Affordability Project (including the 2017 report, "Strategies for Managing State Debt"), Pew Charitable Trusts, 2015 – 2017.

Senior Scholar, Lincoln Scholars Program, Lincoln Institute of Land Policy, 2017

Advisor, Center for Municipal Finance, Harris School of Public Policy, University of Chicago, 2016.

Member, Volcker Alliance Project on State Budgeting Working Group, 2016 to 2018.

Member, Municipal Fiscal Health Working Group, Lincoln Institute of Land Policy, 2015 to 2018.

Co-Chair, Public Budgeting & Finance Track for 2016 Annual Conference, American Society for Public Administration.

Chair, External Review, Martin School of Public Policy & Administration, University of Kentucky, February 2014.

Reviewer, Assessing the Affordability of State Debt, Federal Reserve Bank of Boston and New England Public Policy Center, December 2013.

Reviewer of Revisions, "Glossary of Municipal Securities Terms," Municipal Securities Rulemaking Board, 2013.

Member, Aaron Wildavsky Award Committee, Association for Budgeting and Financial Management, 2012.

Merit Reviewer, National Science Foundation, Economics Program, 2012-2013.

Chair, External Review of Undergraduate and Graduate Curriculum in Public Budgeting and Finance, School of Public and Environmental Affairs, Indiana University, March 2012.

Reviewer and Contributor, State Finance Project: Federal Debt/Deficit; Municipal Securities, Pew Center on the States, 2011.

Co-Chair, Best Dissertation Awards Committee, Public and Nonprofit Management Section, Academy of Management, 2011-2012.

Member, Board of Directors, Section on Public Administration Research, American Society for Public Administration, 2010 to 2012.

Member, Finance Committee (and Auditor Selection Subcommittee), National Association of Schools of Public Affairs and Administration, 2003-2004, 2008-2009.

Member, Appeal Board, Commission on Peer Review and Accreditation, National Association of Schools of Public Affairs and Administration, December 2009.

Member, Advisory Committee to Streamlined Sales Tax Governing Board, 2008 to 2009.

Participant, 54th National Security Seminar Week, Army War College, Carlisle Barracks, Pennsylvania, June 2008 [Invited in 2007 but could not attend due to China trip]

Member, Board of Directors, Southern Public Administration Education Foundation, 2008 to present.

Member, Intergovernmental Financial Dependency Risk Research Forum, Governmental Accounting Standards Board, 2007.

Member, Derivatives Task Force, Governmental Accounting Standards Board, 2006 to 2008

Reviewer, Academy of Management Annual Conference Public and Nonprofit Section Paper Submissions, 2007.

Member, Howard Award Committee, Association for Budgeting and Financial Management, 2006.

Member, Katrina Research Hub, Social Science Research Council in New York (ssrc.org), 2006.

Member, Academic Program Review Team on the M.A. in Urban Affairs and Ph.D. in Urban and Public Administration, School of Urban and Public Affairs, University of Texas at Arlington, March 2006.

Member, Best Dissertation Awards Committee, Public and Nonprofit Management Section, Academy of Management, 2005.

Chair, Drafting Committee on RFP for National Secretariat Services, Association for Budgeting and Financial Management, 2005.

Member, Board of Directors, National Tax Association, 2001 to 2004.

Member, Governmental Accounting Standards Advisory Council, the official advisory body to the Governmental Accounting Standards Board and the Financial Accounting Foundation, as the Founding Representative of the Association for Budgeting and Financial Management, 2002 to 2003.

Member, Municipal Securities Market Interim Disclosure Task Force, National Association of State Auditors, Comptrollers and Treasurers, 2003.

Member, Finance Committee, American Society for Public Administration, 2002 to 2004.

President (2004-2005), Vice-President (2003-2004) and Board Member (2002-2003), Kansas Chapter, American Society for Public Administration.

Member, Program Planning Committee, Annual Conference, Association for Budgeting and Financial Management, 2004, 2005.

Member, Planning Committee, 95th Annual Conference, National Tax Association, Orlando, FL, 2002.

Member, Planning Committee, 94th Annual Conference, National Tax Association, Baltimore, MD, 2001.

Chair, Ad hoc Committee on Drafting Responses to GASB Exposure Drafts, Association for Budgeting and Financial Management, 2000 to 2001.

Founding Member, Council on Certification (for the "Certified Public Finance Officer" program), Government Finance Officers Association of the United States and Canada, 1996 to 1999.

Member, Financial Reporting Model Task Force (Statement No. 34), Governmental Accounting Standards Board, 1998 to 1999.

Chair, Aaron Wildavsky Award Committee, Association for Budgeting and Financial Management, 1997.

Member, National Advisory Council on State and Local Budgeting, 1996 to 1998.

Chair, Donato J. Pugliese Award Committee, Southeastern Conference for Public Administration, Inc., 1996.

Chair, Nominations Committee, Association for Budgeting and Financial Management, 1996.

Member, Selection Committee for Editor of Public Budgeting & Finance, PFP Inc., 1996.

Member, Board of Directors, PFP Inc. (the publisher of the journal, <u>Public Budgeting & Finance</u>), 1995 to 1997.

Member, Site Review Team, National Association of Schools of Public Affairs and Administration, 1996.

Chair (elected), Association for Budgeting and Financial Management, American Society for Public Administration, 1994-1995.

Advisor Member, Committee on Governmental Budgeting and Management, Government Finance Officers Association of the U.S. and Canada, 1994 to 1996.

Member, Executive Committee, Section on Budgeting and Financial Management, American Society for Public Administration, 1991 to 1994.

Treasurer, Southeastern Conference for Public Administration, Inc., 1989 to 1994.

Judge, Exemplary State and Local Awards Program, National Center for Public Productivity, March 1993 to 1995.

Advisor Member, Committee on Governmental Debt and Fiscal Policy, Government Finance Officers Association of the U.S. and Canada, 1987 to 1993.

Member, Board of Directors, National Center for Public Productivity, Rutgers University, Newark, NJ, 1990 to 1991.

Member, Advisory Board, Transportation Studies Program, Georgia State University, Atlanta, GA, 1990 to 1991.

Member, Board of Directors, Louisiana Chapter, American Society for Public Administration, 1988 to 1991.

Member, Review Panel, Awards for Excellence in Financial Management, Government Finance Officers Association of the U.S. and Canada, 1990.

Member, Advisory Task Force of Academics, Government Finance Officers Association of the U.S. and Canada, 1988.

Member, Task Force on Municipal Disclosure, 1987 to 1995. (Significance: Only academician on the sixteen-person industry task force charged with rewriting the S.E.C.-sanctioned municipal bond market's Disclosure Guidelines for State and Local Government Securities, 1988 and 1991 editions).

Reviewer, Distinguished Budget Awards Program, Government Finance Officers Association of the U.S. and Canada, 1985 to 1990.

Research Associate, Public Budgeting and Finance Observatory, 1986 to 1990.

President, Northeast Ohio (Cleveland) Chapter, American Society for Public Administration, 1982-1983.

Member, Public Administration Centennial Agendas Committee, American Society for Public Administration, 1981 to 1984.

Member, Intergovernmental Fiscal Relations Committee, National Tax Association-Tax Institute of America, 1982 to 1988.

Founding Member, Board of Directors, Section on Government and Business, American Society for Public Administration, 1980 to 1982.

Drafter of Charter, Section on Government and Business, American Society for Public Administration, 1980.

Vice-President, Northeast Ohio (Cleveland) Chapter, American Society for Public Administration, 1980-1982.

Regional Coordinator, Section of Budgeting and Financial Management, American Society for Public Administration, 1978 to 1979.

Member, Board of Directors, Section on Personnel Administration and Labor Relations, American Society for Public Administration, 1978 to 1979.

Member, Civil Service Reform Task Force, American Society for Public Administration, 1978.

Co-Chair, Working Group on Simulations, Laboratories and Computer Uses, of the Task Force on Teaching Materials, Southern Political Science Association, 1977 to 1980.

**PUBLIC SERVICE**

Member, Executive Director Search Committee, The Civic League, Atlanta, 2010.

Member, Proposition K Task Force, Wichita Metro Chamber of Commerce, 2009.

Moderator, Transportation Seminar, Kansas Association of City/County Management, Wichita, Kansas, February 2009.

Member (Appointed by Governor Kathleen Sebelius), T-Link Task Force ("Transportation-Leveraging Investment in Kansas"), 2008.

Member, Economic Impact Working Group and Project Selection Process Working Group, Kansas Department of Transportation, 2008 to 2009.

Member, Emergency Management Service System Professional Performance Board, City of Wichita and Sedgwick County, (Chair, Finance Committee, 2006), 2004 to 2009.

Member, Small Business Micro-Loan Committee, City of Wichita, 2004 to 2009.

Chair, Board of Education Audit Committee, Wichita Public Schools (United School District 259), 2004 to 2005.

Member, Incentive Advisory Group, Kansas Department of Revenue, 2005 to 2006.

Member, Interview Panel for Director of Finance, City of Wichita, 2005.

Member, Alternative Revenue Task Force, City of Wichita, 2003.

Advisor to the City Manager, City of North Miami, Florida, 2003.

Member, Board of Directors (appointed twice by Governor Bill Graves and confirmed by State Senate), Kansas Development Finance Authority, 1997 to 2003. (KDFA is the primary non-transportation bond issuer for the State of Kansas, and it meets monthly).

Member, Kansas Sales Tax Simplification Committee, Kansas Department of Revenue, 1999 to 2005.

Member, First Vice President (2001), and Second Vice President (1999 to 2001), Board of Directors, Wichita Public Building Authority, 1999 to 2003.

Independent Expert Observer, Property and Motor Vehicle Property Tax Recoding and Distribution Project, Sedgwick County, 2000 to 2001.

Advisor, (ad hoc) on Strategic Planning, Kansas, Inc., 2001.

Member, City of Wichita, Selection Committee for Municipal Electric Utility Feasibility Consultant, January 2000.

Member, City of Wichita, Electric Wichita Task Force, 1999 to 2000.

Member, Project Advisory Committee on Emergency Social Services in Kansas, Kansas Responds, Inc, 1999 to 2001, 2004.

Member, Debt Coordination Committee of Sedgwick County Governments, 1996 to 1999.

Chair, Governor's Tax Review Committee, 1998.

Member, Board of Directors, Kansas Equity Fund, Inc., 1997 to 2000. (KDFA affiliate and issuer of Affordable Housing, LP).

Advisor on Taxation and Infrastructure Financing, Kansas Governor's Office, 1996, 1998, and 1999.

Member, Finance Committee, Park and Recreation Department, City of Wichita, 1996 to 1997.

Presenter, Bond Rating Agency Meetings, Sedgwick County, June 1996.

Appointed Member and Research Coordinator, Governor's Kansas Tax Equity Task Force, 1995.

Member, Financial Input Group, City of Wichita, 1995 to 2003.

Member, Governor's Interagency Task Force on Louisiana Flood Prevention and Mitigation, Ways and Means Committee, 1991.

Strategic Planning Advisor, State of Louisiana Board of Regents, 1990.

Government Fiscal Affairs Committee, Greater Baton Rouge Chamber of Commerce, 1986 to 1988, 1990 to 1991, 1991 to 1992.

Coordinator, Comprehensive Master Land Use and Development Plan, City of Baton Rouge/Parish of East Baton Rouge, 1989.

Chair, City-Parish Comprehensive Plan Committee, Greater Baton Rouge Chamber of Commerce, 1989.

Financial Advisor, Hospice Foundation of Greater Baton Rouge, 1989 to 1991.

Finance Transition Committee, Mayor-President Tom Ed McHugh, City of Baton Rouge/Parish of East Baton Rouge, 1988.

State Treasurer's Advisory Committee, Bond and Long-Term Debt Subcommittee, Department of Treasury, State of Louisiana, 1988.

Fleet Management Team (Chair), Internal Cost Containment Task Force for Governor-Elect Buddy Roemer, 1988.

Wastewater Funding Source Committee, Greater Baton Rouge Chamber of Commerce, 1988 to 1990.

Long-Range Planning Task Force, State Banking Commissioner and Office of Financial Institutions, State of Louisiana, 1987.

Advisory Committee on the City-Parish Plan of Government Charter Commission, Greater Baton Rouge Chamber of Commerce, 1986 to 1987.

Financial Advisor to the Transition Team, Mayor-elect Tom Sawyer, City of Akron, Ohio, November 1983.

**EXTERNAL GRANT AWARDS**

Co-Principal Investigator, "Sustainable Public Finance and the Challenge of Unfunded Pension Liabilities," Under revision for resubmission. With J.L. Martinez, A. Feltenstein, M.W. Rider, and N.P. Nguimkeu.

Principal Investigator, "The Volcker Alliance Multi-State Budget Project: Phase 2," Awarded by The Volcker Alliance to the Center for State and Local Finance, Andrew Young School of Policy Studies, 2017. With Maggie Reeves.

Principal Investigator, "NTA Executive Support Activities [one day per week]," Awarded by the National Tax Association to the Andrew Young School of Policy Studies, 2015 and 2016.

Principal Investigator, "Public Budgeting Training for CDC's Public Health Prevention Service Fellows Program," Awarded by Centers for Disease Control and Prevention and SciMetrika, 2012.

Principal Investigator, "Public Budgeting and Financial Management Training for CDC's Public Health Prevention Service Residents Program," Awarded by Centers for Disease Control and Prevention and SciMetrika, 2012.

Co-Principal Investigator [as Dean], "Proposal to Establish the Atlanta Census Research Data Center," Awarded by National Science Foundation, 2010-2013.

Principal Investigator, "Ontario Ministry of Finance and the Capital Markets," Awarded by the Public Administration Institute of Canada, 2006.

Principal Investigator, "Kansas Local Government Debt Affordability Report." Awarded by Kansas Department of Revenue, on behalf of the Kansas Advisory Council on Intergovernmental Relations, 2006.

Coordinator, "Erosion of the Kansas Property and Sales Taxes," Awarded by the Kansas Department of Revenue, on behalf of the Kansas Advisory Council on Intergovernmental Relations, 2005.

Principal Investigator, "Capital Market Behavior of Canadian and American Sub-National Governments in Financing Public Infrastructure." Awarded by the Canadian Embassy, 2005.

Principal Investigator, "Sedgwick County Budget Benchmarking Study." Awarded by Sedgwick County and WSU Community Services Fund, 2002.

Coordinator, "Professional Development Service Contract." Awarded by Kansas Government Finance Officers Association, 2000 to 2003, 2004 to 2006, 2007 to 2009.

Principal Investigator, "Kansas Tax Policy Research." Awarded by Division of the Budget, State of Kansas, 1998.

Principal Investigator, "The Impact of Deregulation on Municipal Electric Utilities in Kansas." Awarded by Kansas Municipal Energy Agency, 1996. $89,000.

Principal Investigator, "Kansas Economic and Demographic Project." Awarded by Division of the Budget, State of Kansas, 1996.

Co-Initiator, "Canadian Studies Library Support Program." Awarded to Wichita State University Library by Canadian Department of Foreign Affairs and International Trade and the Canadian Consulate General, 1996.

Principal Investigator, "Evaluating Kansas Tax Policy." Awarded by Division of the Budget, State of Kansas, 1995.

Principal Investigator, "Provincial Debt Liability Strategies in Taxable and Foreign Capital Financing." Awarded by the Canadian Embassy, 1991.

Principal Investigator, "Quebec's Debt Financing in Foreign Markets:  Lessons for American State and Municipal Governments." Awarded by Government of Quebec (Canada), 1990.

Coordinator, "Coordination Services for The City-Parish Comprehensive Plan, 1989."  Awarded by City of Baton Rouge/Parish of East Baton Rouge, August, 1989.

Co-Investigator, "Capital Budget Financing and Municipal Economic Development." Awarded by Ohio Urban University Demonstration Program, 1986.  With John J. Gargan.

Principal Investigator, "Causes and Remedies for Ohio Municipal Fiscal Emergencies."  Awarded by Ohio Urban University Demonstration Program, 1983.

Initiator, "Operational Support Grant for Public Administration Centennial Agendas Committee to the American Society for Public Administration."  Awarded by The Gund Foundation, March, 1982.

**PROFESSIONAL AND ADMINISTRATIVE EXPERIENCE**

Public Member, Board of Directors, Municipal Securities Rulemaking Board, a self-regulatory organization created by Congress under the Securities Acts Amendments of 1975, as amended by the Dodd-Frank Wall Street Reform and Consumer Protection Act in 2010, to protect investors and state and local governments in the estimated $4 trillion municipal securities market, 2012-2015 term.
>    Audit Committee, 2013-2014, 2014-2015
>    Nomination and Governance Committee, 2012-2013
>    Market Structure [Information] Working Group, 2012-2013, 2013-2014, 2014-2015

Executive Director (one-day-per-week under GSU-NTA agreement), National Tax Association, 2015 - 2016.

Director of Finance, City of Akron, Ohio, January 1, 1984 to July, 1985. Chief financial officer and chief accounting officer. [On unpaid leave of absence from Kent State University.]

Visiting Adjunct Assistant Professor, Weekend Management Development Program, Rider College, Lawrenceville NJ, 1982 to 1984.

Vice President and Executive Director, Mana Associates, Inc., Kent, OH, 1982 to 1985.

Teaching and Research Assistant (to Drs. Felix Nigro, Robert T. Golembiewski, and Frank Gibson), Department of Political Science, The University of Georgia, Athens, GA, 1975 to 1979.

Research Assistant, Institute of Government, The University of Georgia, Athens, GA, Summers of 1976, 1978 and 1979.

Researcher, "Administrative Experiences and Innovations in Urban Mass Transportation Systems," Case Study Project on the Metropolitan Atlanta Rapid Transit Authority, funded by the Urban Mass Transportation Administration, U.S. Department of Transportation, 1977 to 1978. Principal Investigator: Dr. Robert T. Golembiewski.

Management Consultant, Health Maintenance Organization Development Corporation, Montgomery, AL, 1977 to 1979.

Principal, Administrative Management, Inc., Athens, GA, 1975 to 1979.

Local Government Management Advisor ("Circuit-Riding City Manager"), South Central Alabama Development Commission, Montgomery, AL, 1973 to 1975.

Government Affairs Liaison, Alabama Hospital Association, Montgomery, AL, 1973.

Squadron Section Commander (Second Lieutenant), Civil Engineering Squadron, U.S. Air Force, Richards-Gebaur Air Force Base, Kansas City, MO, 1972 to 1973. Honorable Discharge.

Commander, Arnold Air Society, and Distinguished Cadet, AFROTC, University of Alabama, 1971.

Research Assistant, Department of Political Science, University of Alabama, Tuscaloosa, AL, Fall 1971.

Political Science Intern, United States Senate, Office of Senator John Sparkman, Washington, DC, 1971.

**EXPERT WITNESS AND OTHER CONSULTING WORK**

**Expert Witness (Details provided as needed)**

U.S. Federal Courts, Admitted Expert Witness (Daubert Standard) on Municipal Securities, Municipal Bond Markets, Municipal Finance, Public Pensions, Toll Roads, Bankruptcy, and Public Finance

State Trial Courts, Admitted Expert Witness on Municipal Securities, Auction-Rate Securities, Public Budgeting and Governmental Accounting, Municipal Finance

Financial Industry Regulatory Authority, Admitted Expert Witness on Municipal Securities, and Auction-Rate Securities

National Association of Securities Dealers, Admitted Expert Witness on Municipal Securities

**Other Consulting Engagements (Selected)**

Center for Municipal Finance, University of Chicago, 2016.
The Pew Charitable Trusts/Pew Center on the States, 2012, 2015.
Site Analytics Co., New York, NY, 2012
Nomura Institute of Capital Markets Research, Tokyo, Japan, 2007.
Government Finance Officers Association of the U.S. and Canada, 1992.
Greater Baton Rouge Chamber of Commerce, 1991 (Local Government Finance)
Council of State Governments, 1987.
Auburn University, Center for Governmental Services, 1987
Akron chapter, American Federation of State, County and Municipal Employees, 1982-1983
U.S. Advisory Commission on Intergovernmental Relations, 1983-1984.
Government Training Service, St. Paul, MN, 1981.
U.S. General Accounting Office, Atlanta Regional Office, 1979.
University of South Carolina, Bureau of Governmental Research and Service, 1978.
University of Georgia, Criminal Justice Division, Institute of Government, 1977.
U.S. Executive Office of the President, Special Action Office for Drug Abuse Prevention, 1975-1976, Subcontractor.
Central Alabama Regional Planning and Development Commission, 1973.

**MEDIA INTERVIEWS/STORIES**

The New York Times, Business Week, Bloomberg Magazine, Bloomberg, Bloomberg Brief-Municipal Market, Wall Street Journal, Associated Press, Dow Jones News Service, CNNMoney.com, Reuters News Service, The Bond Buyer, American Banker, MuniNetGuide.com, Governing, Public Sector Derivatives, MuniNet.com, The New Republic, CQ Weekly, Atlanta Journal-Constitution, Atlanta Business Chronicle, WABE-Radio (Atlanta), WAGA-TV (Atlanta), Georgia Public Policy Foundation Blog, Politifact-Georgia, Douglas County Sentinel, Inside Higher Education, The Hechinger Report, WBEZ-FM (Chicago), KSPC-Radio (California), Wichita Business Journal, Wichita Eagle, Hutchinson News, Salina Journal, Lawrence Journal-World, Manhattan Mercury, Manhattan Free Press, Colby Free Press, KSNW-TV 3 (Wichita), KAKE-TV 10 (Wichita), KWCH-TV12 (Wichita), KFDI-Radio (Wichita), Current TV, Des Moines (Iowa) Register, Los Angeles Times, Sacramento Bee, San Francisco Chronicle, San Francisco Weekly, San Jose Mercury News, Philadelphia Inquirer, New York Newsday, Pittsburgh Post-Dispatch, The Enterprise (Boston), Charlotte Observer, Florida Times Union, Sun Sentinel (Florida), Orlando Business Journal, Chicago Tribune, Crain's Chicago Business, Chicago Current, Baltimore Sun, Baltimore Business Journal, Dallas Morning News, Dallas Business Journal, Houston Chronicle, Times Tribune (Scranton, NJ), Binghamton News, Virginia Pilot, El Paso Inc. Newspaper, The Daily Republic (South Dakota), Paulding Neighbor, Sioux Falls Argus Leader, Atlanta Constitution, St. Louis Post-Dispatch, New Orleans Times Picayune, Baton Rouge Morning Advocate/State Times, Cleveland Plain-Dealer, Akron Beacon Journal.

**EXTERNAL REFEREE EVALUATION LETTERS**

For Promotion and Tenure, early review, re-appointment, professor review, and distinguished appointments in public affairs and public administration, unless otherwise noted:

Brigham Young University
Cleveland State University
Duquesne University, Department of Economics
East Carolina University
Fairfield University, Department of Accounting
Florida Atlantic University
Florida State University
Georgia State University
Indiana University
Indiana University-Purdue University-Indianapolis
Iowa State University
Kent State University
Loyola College (Maryland), Department of Accounting
Miami (Ohio) University
Ohio University
Old Dominion University
New York University
Penn State University-Harrisburg, Department of Finance
Randolph-Macon College, Department of Accounting
Rutgers University-Newark
SUNY-Albany, Department of Finance
SUNY-Albany, Rockefeller College
Syracuse University
Texas A&M University
Texas A&M University System, Regents Professorship

University of Akron
University of Arizona
University of Arkansas-Little Rock
University of Central Florida
University of Colorado-Denver
University of Connecticut
University of Delaware
University of Georgia
University of Illinois-Chicago
University of Illinois-Springfield
University of Kentucky
University of Memphis
University of Minnesota
University of Nebraska-Omaha
University of New Mexico
University of North Carolina-Chapel Hill
University of North Carolina-Charlotte
University of North Florida
University of North Texas
University of Oklahoma
University of Oregon
University of South Florida
University of Texas-Austin
University of Texas-Arlington
University of Washington
University of Western Carolina
Vice-President, Municipal Securities, Merrill Lynch
Virginia Commonwealth University

**RECOGNITIONS**

2017 Municipal Securities Industry Contribution Award, National Federation of Municipal Analysts.

Keynote Alumni Presentation (and Outstanding Graduate Award), Awards Banquet, Department of Political Science and Public Administration, Auburn University at Montgomery, April 2010.

Excellence in Research Award, Wichita State University, 2003.

Woodrow Wilson International Center for Scholars and the National Committee for U.S.-China Relations, only academic member of 5-person invited municipal securities delegation to China on environmental infrastructure financing, 2002.

Keynote Alumni Presentation, Public Administration Graduation Dinner, Department of Political Science, The University of Georgia, Athens, April 2001.

Donato J. Pugliese Award for outstanding contributions to the profession of public service, Southeastern Conference for Public Administration, 1995.

Foreign Speakers Programme, International Council for Canadian Studies, 1995.

C.P.C.U. Loman Insurance Foundation Fellowship, 1981-1982.

Honor Societies: Phi Kappa Phi (academic); Pi Alpha Alpha (public administration); Pi Sigma Alpha (political science), Beta Gamma Sigma (business).

Albert Nelson Marquis Lifetime Achievement Award (2017); Who's Who in America, 70th Edition (2015), 64th Edition (2010); Who's Who in the Midwest, 36th Edition (2008), 25th Edition (1996-1997); Who's Who in South and Southwest, 22nd Edition (1991-1992), 23rd Edition (1993-1994); Who's Who of Emerging Leaders in America, 2nd Edition (1989-1990), 3rd Edition (1991-1992); Who's Who in Finance and Industry, 25th Edition (1987-1988).

**TEACHING EXPERIENCE**

<u>Graduate</u>: Public Budgeting & Finance; State and Local Government Finance; Managing Public Money; PhD Seminar in Public Budgeting Theory and Research; PhD Seminar in Public Financial Management Theory and Research; Public Financial Management; State and Local Government Budgeting; Seminar in Municipal Securities; Seminar in Public Budgeting; Decision Models for Public Administration; Public Budgeting and Financial Management; Governmental Financial Analysis; Public Management Concepts and Practices; Seminar in Governmental Risk Management; Human Resource Management (Executive MBA Program).

<u>Undergraduate</u>: Business Risk Management; Governmental Budgeting; Budgetary Process and Policy Making; Introduction to Public Administration; Introduction to American Government.

**RESEARCH AREAS**

Public Budgeting and Public Financial Management; State and Local Finance; Municipal Securities; Infrastructure Finance; Public Administration

**MEMBERSHIPS**

Association for Budgeting and Financial Management; American Society for Public Administration; Public Management Research Association; National Tax Association; Economic History Association

02133A

# Exhibit 2

# REBUTTAL TO EXPERT REPORT OF ROBERT W. DOTY

## By

## WILLIAM BARTLEY HILDRETH, PH.D.

In the case of

In re:

The Financial Oversight and Management Board for Puerto Rico, as representative of

The Employees Retirement System of the

Government of the Commonwealth of Puerto Rico

As a supplement to my original report (dated July 1, 2020), I offer the following additional

opinions in response to the Expert Report of Robert W. Doty (dated July 1, 2020) regarding the

debt transactions of the Employees Retirement System of the Government of the Commonwealth

of Puerto Rico [ERS or System].


**SUMMARY OF OPINIONS**

A.  Mr. Doty does not explain what purpose his narrow interpretation of the authorization for
    ERS to incur debt would serve nor offer any reason why the Legislative Assembly would
    have limited ERS in that way.

B.  Mr. Doty neglects the key distinction between direct financing and indirect or conduit
    financing in public finance.

C.  Mr. Doty overlooks the fact that there were many sophisticated participants in the actual
    transactions at issue in this case who concluded contemporaneously that the issuances were
    authorized.

D.  Mr. Doty mistakenly focuses on the transactions from the perspective of the syndicate of
    underwriters instead of ERS as the borrower.

E.  Mr. Doty overlooks the fact that the market expects the debt issuer, its legal advisors, and
    other transaction participants to confirm legal authority to incur debt, and that investors
    cannot practicably do so.

## A. MR. DOTY'S ASSUMPTIONS OF THE LEGISLATIVE ASSEMBLY'S PURPOSE

1. Mr. Doty does not explain what purpose his narrow interpretation of the authorization for ERS to incur debt would serve nor offer any reason why the Legislative Assembly would have limited ERS in that way.

2. Mr. Doty opines (on page 3) that an "underwritten public municipal bond offering, such as the 2008 ERS Bond issuances, is not a loan by or borrowing from a financial institution, nor is it a direct placement of debt."

3. Mr. Doty neglects to cite that in the 1988 Act[1] authorizing ERS "to Incur Debts," the Legislative Assembly of the Commonwealth of Puerto Rico stated in the "Statement of Motives" that its "obligation" was to "be of assistance in improving the System's financial condition" by dealing with "an actuarial deficit estimated at $2.6 billion dollars as of June 30, 1987."

4. Mr. Doty does not specify how his narrow interpretation would have achieved the legislative goal outlined in the Statement of Motives.

5. Mr. Doty loses sight of the financial flexibility required to implement the Statement of Motives.

6. Mr. Doty overlooks the fundamental fact about public finance: "The issuer's goal in a negotiated bond sale is to obtain the lowest borrowing cost for the bonds."[2]

---

[1] Commonwealth of Puerto Rico, Retirement of Government Employees-Amendment (H.B. 1346), No. 46, approved June 29, 1988 [Dowd, Exhibit No. 7] – hereafter cited as 1988 Act.
[2] Government Finance Officers Association, Best Practices, "Selecting and Managing Underwriters for Negotiated Bond Sales." https://www.gfoa.org/materials/selecting-and-managing-underwriters-for-negotiated

7. Mr. Doty seems to have assumed, without evidence, that the Legislative Assembly wanted to place limits, instead of confer flexibility, on ERS to deal with the Commonwealth's pension system's large actuarial deficit.

8. Mr. Doty fails to show that his narrow interpretation of the grant of debt authority to ERS would have served any purpose compared to the benefits of a broader authorization.

## B. DIRECT VERSUS INDIRECT FINANCING

9. Mr. Doty neglects the key distinction between direct financing and indirect or conduit financing in public finance.

10. Mr. Doty takes the view that the wording of "direct placement" means 'private placement,' when it is well known in public finance that debt obligations can be incurred either directly or indirectly.

11. An indirect method of issuing debt is to have a new or existing conduit entity (e.g., the Government Development Bank for Puerto Rico, the Puerto Rico Sales Tax Financing Corporation, or the Public Buildings Authority[3]) formally issue the debt while the ultimate obligor would be ERS in this case.

12. The direct method of issuing debt is for ERS to issue the debt itself, as occurred here.

13. Mr. Doty overlooks the fact that when ERS and the underwriters actually entered into the three financial transactions – i.e., upon the exchange of cash for an obligation to repay – the consummate act constitutes a direct placement and a borrowing. That is because the only

---

[3] Existing special entities are cited in the Commonwealth of Puerto Rico, Basic Financial Statement and Required Supplementary Information, June 30, 2016 (with Independent Auditor's Report Thereon), dated May 3, 2019.

entity with the immediate securities entitlement is the underwriting syndicate, and ERS issued the debt directly to that underwriting syndicate.

## C. CONTEMPORANEOUS VIEWS OF THE TRANSACTIONS

14. Mr. Doty overlooks the fact that there were many sophisticated participants in the actual transactions at issue in this case who concluded contemporaneously that the issuances were authorized.

15. To accept Mr. Doty's views of "industry guidance" (page 8) and his narrow interpretation of the 1988 Act and its implication for the validity of the Series A, B, and C bonds totaling $2,947,648,342.65 of par value, the following expert opinions, votes, signatures, agreements, and assessments at the time of issuance of each of the three series of bonds would have to be disregarded:

    a. The issuer of the ERS bonds, represented by the:

        i. ERS Executive Director;

        ii. ERS General Counsel;

        iii. ERS Board of Trustees, consisting of the:

            1. President of the Government Development Bank for Puerto Rico;

            2. Commissioner of Municipal Affairs of Puerto Rico;

            3. Executive Assistant to the Secretary for Management and Development of the Housing Development and Improvement Administration of Puerto Rico;

            4. Acting Secretary of the Treasury of Puerto Rico;

5. Director, Office of Human Resources of the Commonwealth of Puerto Rico;

6. Chairman of the Board, Puerto Rico Retirees Association; and the

7. Auxiliary Inspector, Inspector for Cooperatives of Puerto Rico

b. The Acting Secretary of the Treasury of Puerto Rico;

c. The Secretary of Justice of the Commonwealth of Puerto Rico;

d. The President of the Government Development Bank;

e. Attorneys of the Bond Counsel firm, Fiddler Gonzalez & Rodriquez, P.S.C.;

f. Agents of UBS Financial Services Incorporated of Puerto Rico;

g. Agents for each of the members of the underwriting syndicate for the three separate bond series that include 11 additional financial services firms for Series A bonds, 2 firms for Series B bonds, and 11 firms for Series C bonds;

h. Attorneys of the Underwriter's counsel firm, O'Neill & Borges;

i. Representatives of the Government Development Bank as 'financial advisor';

j. Agents of the "Financial Advisor" - Mesirow Financial, Inc;

k. Credit analysts and the review committee[4] at Moody's Investors Service;

l. Credit analysts and the review committee[5] at Standard & Poor's;

m. Credit analysts and the review committee[6] at Fitch Ratings; and,

n. Others in the municipal bond industry not yet specified.

---

[4] The important role of the rating committee is noted in: Securities and Exchange Commission, *Report on the Role and Function of Credit Rating Agencies in the Operation of the Securities Markets*, January 2003, page 26.
[5] Ibid.
[6] Ibid.

16. According to the cover of the Official Statement upon the issuance of the $1.6 billion Series
A bonds, the bonds were "offered exclusively in the Commonwealth of Puerto Rico."[7] To
accept Mr. Doty's interpretation, the ERS Board of Trustees and other Puerto Rico public
officials involved in the transaction were willing to issue unlawful debt instruments for
potential investment by their fellow citizens including the employees and employers paying
into the retirement system.

## D. ERS' VERSUS UNDERWRITERS' PERSPECTIVE

17. Mr. Doty mistakenly focuses on the transactions from the perspective of the syndicate of
underwriters instead of ERS as the borrower.

18. The sole focus of the 1988 Act's debt authorizing language was the ERS.

19. In contrast, Mr. Doty focuses on the role of the underwriters as a way to distinguish a 'direct
placement' from a 'public offering'.

20. Much of Mr. Doty's report discusses the underwriter and underwriter syndicate, but he does
not show why the post-issuance actions of the underwriters are material to whether ERS was
authorized to undertake the transaction.

21. Mr. Doty does not present any evidence that the Legislative Assembly was concerned about
the role of the lenders or underwriters, credit rating organizations, or even the owners/holders
of the debt instruments (other than to exempt the interest on the bonds from Puerto Rico
income and property taxes).

---

[7] ERS Series A bonds, Tab 4, Official Statement, dated January 29, 2008, cover.

22. There are well known methods to address the concerns of parties other than ERS, but the 1988 Act did not include any of those protections, such as minimum denominations, specified credit rating, itemized coverage ratio, maximum debt level, or any others.

23. Mr. Doty does not address that the lack of such restrictions bestows on ERS the flexibility to design debt transactions to meet its needs.

24. Despite Mr. Doty's assertions that "underwritten public offerings" (page 3) are different from 'direct placement' or 'private placement,' to the issuer the substance of the transaction is the same – the issuer/borrower receives cash in exchange for transferring to another the ownership interest in a repayment obligation.

25. In other words, the economic relationship of concern is between the ERS as the seeker of cash and the direct provider of cash, which was the underwriting syndicate in this case.

26. Mr. Doty confirms this point in his reliance (at page 9) on language from the Government Finance Officers Association's 'Best Practices' document[8]: "The **only legal relationship** between the issuer and an underwriter is created by a Bond Purchase Agreement signed at the time of the pricing of the bonds, **wherein the issuer agrees to sell the bonds to the underwriter and the underwriter agrees to purchase the bonds from the issuer** at an agreed upon price." [his emphasis]

27. Confirming that same point, Mr. Doty's footnote 31 (page 14) quotes a *Harvard Law Review* article that states "… an underwriter takes title to the securities…."

28. Mr. Doty draws a bright line distinction between loans and bonds in contrast to guidance from the Municipal Securities Rulemaking Board [MSRB] that cautioned market participants

---

[8] Government Finance Officers Association, Best Practices, "Selecting and Managing Underwriters for Negotiated Bond Sales." https://www.gfoa.org/materials/selecting-and-managing-underwriters-for-negotiated

in 2011 that "when banks make 'loans' to state and local governments … whether such 'loans' will be considered securities can be a difficult question."[9]

29. While underwriters may not be "interested in purchasing the issuer's bonds for investment" as Mr. Doty states (page 12), their degree of success, or the lack thereof, in reselling the debt is of no economic concern to ERS.

30. Mr. Doty overlooks the evidence that the underwriting of municipal debt includes a risk premium referred to as the 'underwriting fee' as compensation for the underwriter buying the debt and incurring the risk that it may be unable to resell it, as referenced in these authoritative sources:

    a. "The underwriting fee, also known as the 'risk' component of the spread, is designed to compensate the underwriter for the risk incurred by buying the entire issuance before it has received orders from investors for all the bonds."[10]

    b. "Because the underwriter cannot be certain that all of the issuer's bonds will be readily purchased by investors, the underwriter may charge a fee to cover the possibility that some of the bonds may have to be reoffered at a lower price or taken into the underwriter's inventory."[11]

    c. "The underwriting fee, also called the 'risk' component of the spread … is designed to compensate the underwriter for taking the risk of purchasing the entire bond issue before it has received offsetting orders from investors for all of the bonds. In effect,

---

[9] MSRB Notice 2011-52, September 12, 2011.
[10] California Debt and Investment Advisory Commission, California Debt Issuance Primer Handbook, CDIAC #05-06, p. 22. https://www.treasurer.ca.gov/cdiac/debtpubs/handbook.pdf
[11] California Debt Advisory Commission, "Understanding the Underwriting Spread," in in Gerald J. Miller, editor, *Handbook of Debt Management* (New York: Marcel Dekker, Inc., 1996), 569-574, page 570.

the fee is supposed to offer some protection to the underwriter in case of an abrupt

increase in the rates of interest demanded by investors before the firm has had a

chance to sell all of the bonds."[12]

d. "One of the biggest concerns for the underwriters is their ability to resell the

underwritten debt …. Generally, when the underwriters face difficulties in reselling

the bonds they must absorb all the risk associated with the illiquidity."[13]

e. "Underwriters, as the term implies, buy the debt, own or hold it for a time – a very,

very short time if they are successful – and then resell [it] to investors. They have

their own money and capital at stake."[14]

f. "Firms buying municipal bonds for resale on the secondary market may earn some of

their compensation in exchange for the risk that they assume. There is a risk that they

will not be able to resell the bonds to investors and will end up having to hold them in

inventory or sell then at a loss in order to dispose of all of them. That risk could be

material, particularly in volatile interest rate environments where substantial bond

valuation changes could occur between primary purchase and resell."[15]

---

[12] Tom McLoughlin (of the Government Finance Officers Association), "Choosing an Underwriter for a Negotiated Bond Sale," in Gerald J. Miller, editor, *Handbook of Debt Management* (New York: Marcel Dekker, Inc., 1996), 395-399, page 398.

[13] Craig L. Johnson, Martin J. Luby, and Tima T. Moldogaziev, *State and Local Financial Instruments: Policy Changes and Management* (Northampton, MA: Edward Elgar, 2014), page 120.

[14] A. John Vogt, *Capital Budgeting and Finance: A Guide for Local Governments*. Washington, DC: International City/County Management Association, 2004, page 309.

[15] Lori Raineri, Mark Robbins, Bill Simonsen, and Keith Weaver, "Underwriting, Brokerage, and Risk in Municipal Bond Sales," *Municipal Finance Journal*, 33:2 (Sumer 2012), 87-103, page 95.

g. "If a bond is sold on a firm commitment basis, the underwriter is stuck with the unsold securities."[16]

h. Inventory risk can occur when "sales slow down dramatically in a rapidly deteriorating market."[17]

i. The Securities and Exchange Commission Rule 15c2-12 defines underwriters as purchasing municipal securities from an issuer "with a view" [18] to sell them; although having only a "view" to do something is a pretty weak expectation of what action to take.

31. The concept that underwriters seek to 'resell' is telling since that word, by itself, accurately conveys a second (legal) exchange of ownership interest.

32. Mr. Doty confirms that underwriting syndicates and their "sales personnel" focus on the "issuers' credit strengths…." (page 11) which, by necessity, is premised on the debt issuer's legal responsibility to repay the money in full and on time. Besides, "sales personnel" are regulated parties who work under conditions set by that firm's credit, compliance, supervision, and audit procedures in compliance with securities rules.[19]

33. Issuers generally have little concern with who holds their debt obligations since the desired amount of cash has been obtained up-front and the issuer fully expects to pay its pledged debt service when due and payable through its paying agent or trustee.

---

[16] "Underwriting Commitments" (emphasis removed). https://app.achievable.me/study/finra-sie/learn/municipal-debt-underwriting-commitments

[17] William Gottdenker, "What Happens After a 'Deal Breaks' and Role of Dealers," Chapter 14 in Frank J. Fabozzi, Sylvan G. Feldstein, Irving M. Pollack, and Frank G. Zarb, editors, *The Municipal Bond Handbook* (Homewood, IL: Dow Jones-Irwin, 1983), 198-203, page 201.

[18] Securities and Exchange Commission, Rule 15c2-12(f)(2).

[19] As guided, for example, by MSRB Rule G-3 on Professional Qualifications Requirements, Rule G-37 on Supervision, and other rules contained in MSRB Rule Book, October 1, 2019.

34. How the ultimate securities entitlements are distributed are not material to the issuer at the actual exchange of economic interest in the original issuance of the debt obligations.

35. Issuers do not know (and because of the book entry system can never know without undertaking enormous effort) the names of the buyers of bonds from the underwriter(s) in the initial reoffering (or even during secondary market transactions); an issuer's only interaction at the initial economic exchange is with the provider of cash.

## E. MARKET EXPECTATIONS

36. Mr. Doty overlooks the fact that the market expects the debt issuer, its legal advisors, and other transaction participants to confirm legal authority to incur debt, and that investors cannot practicably do so.

37. Debt holders/investors are dependent upon the issuer and bond counsel to respect their information needs, with everything resting on the legality of the security undergirding the borrowing.

38. "Bond counsel renders an opinion on the validity of the bond offering …. The opinion of bond counsel provides assurance both to issuers and investors who purchase the bonds that all legal and tax requirements relevant to the matters covered by the opinion are met."[20]

39. "The work of the bond counsel, more prosaically, is marked by searching, meticulous, and detailed examinations of laws, legal instruments, and proceedings – work occasionally disparaged as "the dotting of the i's and the crossing of the t's" approach. Such deliberate approach and circumspection stem from bond counsel's overriding objective to establish to

---

[20] Government Finance Officers Association, Best Practices, "Selecting Bond Counsel," https://www.gfoa.org/materials/selecting-bond-counsel

his satisfaction the legality of the proceedings and the validity of the bonds and also to
minimize the risk of litigation on the bonds following their issuance …. Bond counsel's
initial consideration is whether there is legal authority for the issuance of the bonds. This
may entail a search for and a study of general statutes, local laws, charter provisions and
constitutional provisions."[21]

40. A functioning capital market depends upon the fact that holders of the debt instruments must
be able to rely upon the foundational work of others so that the primary information of value
for a trade is the price and the expected return on investment for the risk being assumed, and
not any expectation that an investor be required to retrace the steps of the original issuance
process involving legal review by the issuer (and its authorizing government), bond counsel,
underwriter, syndicate members, underwriters' counsel, bond rating analysts, and others.

41. I reserve the right to modify or supplement this or other reports by me in this case.

**All of the foregoing opinions and conclusions have been rendered within a reasonable
degree of public finance certainty.**

Signature:  *W Mitchell*                    Date:  July 20, 2020

---

[21] Joseph Guandolo (partner, bond law firm of Mitchell, Pershing, Shetterly & Mitchell),
"Municipal Bond Counsel," Chapter 11, *State and Local Public Facility Needs and Financing*,
Study Prepared for the Subcommittee on Economic Progress of the Joint Economic Committee,
Congress of the United States, Volume 2, Public Facility Financing, 89th Congress, 2nd Session
(Washington, DC: U.S. Government Printing Office, December 1966), 207-219, pages 209- 210.

## Additional References to my Original Expert Report[22]

California Debt Advisory Commission, "Understanding the Underwriting Spread," in Gerald J. Miller, editor, *Handbook of Debt Management* (New York: Marcel Dekker, Inc., 1996), 569-574.

California Debt and Investment Advisory Commission, California Debt Issuance Primer Handbook, CDIAC #05-06, p. 22. https://www.treasurer.ca.gov/cdiac/debtpubs/handbook.pdf

Gottdenker, William, "What Happens After a 'Deal Breaks' and Role of Dealers," Chapter 14 in Frank J. Fabozzi, Sylvan G. Feldstein, Irving M. Pollack, and Frank G. Zarb, editors, *The Municipal Bond Handbook* (Homewood, IL: Dow Jones-Irwin, 1983), 198-203.

Government Finance Officers Association, "Selecting Bond Counsel," https://www.gfoa.org/materials/selecting-bond-counsel

Government Finance Officers Association, "Selecting and Managing Underwriters for Negotiated Bond Sales." https://www.gfoa.org/materials/selecting-and-managing-underwriters-for-negotiated

Guandolo, Joseph, "Municipal Bond Counsel," Chapter 11, *State and Local Public Facility Needs and Financing*, Study Prepared for the Subcommittee on Economic Progress of the Joint Economic Committee, Congress of the United States, Volume 2, Public Facility Financing, 89th Congress, 2nd Session (Washington, DC: U.S. Government Printing Office, December 1966), 207-219.

Johnson, Craig L., Martin J. Luby, and Tima T. Moldogaziev, *State and Local Financial Instruments: Policy Changes and Management* (Northampton, MA: Edward Elgar, 2014).

McLoughlin, Tom, "Choosing an Underwriter for a Negotiated Bond Sale," in Gerald J. Miller, editor, *Handbook of Debt Management* (New York: Marcel Dekker, Inc., 1996), 395-399.

Raineri, Lori, Mark Robbins, Bill Simonsen, and Keith Weaver, "Underwriting, Brokerage, and Risk in Municipal Bond Sales," *Municipal Finance Journal*, 33:2 (Sumer 2012), 87-103.

Robbins, Mark and Bill Simonsen, "Why Do Issuers Privately Place Municipal Bonds," *Municipal Finance Journal*, 27:3 (Fall 2006), 1-17.

Securities and Exchange Commission, *Report on the Role and Function of Credit Rating Agencies in the Operation of the Securities Markets*, January 2003.

"Underwriting Commitments": https://app.achievable.me/study/finra-sie/learn/municipal-debt-underwriting-commitments

---

[22] Expert Report of William Bartley Hildreth, July 1, 2020.

Vogt, A. John, *Capital Budgeting and Finance: A Guide for Local Governments*.
Washington, DC: International City/County Management Association, 2004.

# Exhibit 5

**Appendix I**

# Puerto Rico Enabling Acts That Specifically Authorize Issuing Bonds

| ENTITY | LAW | ENGLISH | SPANISH |
|---|---|---|---|
| Public Buildings Authority | Act 56-1958 | To borrow money, make and issue bonds of the Authority for any of its corporate purposes, …" – (Article 5. — Powers. 22 L.P.R.A. § 906). | "para tomar dinero a préstamo, hacer y emitir bonos de la Autoridad para cualquiera de sus fines corporativos,…" |
| Water Authority | Act 68-2016 | "(g)  To borrow money and to issue revenue bonds for any of its corporate purposes, including without limitation the purpose of funding, refunding or purchasing with or without premium, paying or discharging any outstanding bonds or other obligations issued or assumed by it, the principal of or the interest upon which is payable in whole or in part from revenues of the Authority. …<br>Section 12 (1) (22 L.P.R.A. § 152) Revenue bonds<br>(1)  The Authority is hereby authorized to provide by resolution, from time to time, for the issuance of revenue bonds of the Authority for any of its corporate purposes including, but not limited to, the following purposes:<br>(a)  To pay all or any part of the cost, as herein defined, of improvements to the Commonwealth Water System, to the Commonwealth Sewer System, or to both such systems.<br>(b)  To pay all or any part of the cost, as herein defined, of improvements to the Commonwealth Water System and the Commonwealth Sewer System combined by the Authority as a single system for operating and financing purposes; and the Authority is hereby authorized and empowered to combine such systems for such purposes.<br>(c)  To provide funds for refunding any bonds (including refunding bonds) heretofore issued and outstanding under the provisions of §§  141—161 of this title, including the payment of any premium and any interest accrued on the bonds to be refunded to the date of such refunding.<br>Such revenue bonds shall be payable solely from the revenues of the Authority as herein provided." | "(g) Tomar dinero a préstamo y emitir bonos de renta para cualesquiera de sus fines corporativos incluyendo, sin limitación, el fin de consolidar, reconsolidar o comprar con o sin premio, pagar o cancelar cualesquiera bonos u otras obligaciones en circulación emitidos o asumidos por ella, cuyo principal e intereses es pagadero en todo o en parte, de las rentas de la Autoridad.<br>Sección 12(1) - La Autoridad queda por la presente facultada a disponer por resolución, de tiempo en tiempo, para la emisión de bonos de renta de la Autoridad para cualquiera de sus fines corporativos incluyendo, pero sin limitación, los siguientes:<br>(a) Para pagar el total o cualquier parte del coste, como en la Sección 1 de esta Ley se define, de mejoras al Sistema Estadual de Acueductos y al Sistema Estadual de Alcantarillados, o a ambos sistemas;<br>(b) para pagar el total o cualquier parte del coste, como en la Sección 1 de esta Ley se define, de mejoras al Sistema Estadual de Acueductos y al Sistema Estadual de Alcantarillados combinados por la Autoridad como un solo sistema para los fines de su explotación y financiamiento; y por la presente la Autoridad queda autorizada y facultada para combinar dichos sistemas para dichos fines;<br>(c) para proveer fondos para consolidar cualesquiera bonos (incluyendo bonos de consolidación) anteriormente emitidos, y en vigor de acuerdo con las disposiciones de esta Ley; incluyendo el pago de cualquier prima y cualquier interés acumulado sobre los bonos a ser consolidados hasta la fecha de tal consolidación.<br>Dichos bonos de renta se pagarán exclusivamente de las rentas de la Autoridad tal como aquí se provee." (22 L.P.R.A. § 152) |

| ENTITY | LAW | ENGLISH | SPANISH |
|--------|-----|---------|---------|
| Infrastructure Financing Authority | Act 44-1988 | "(l) Borrow money and issue bonds of the Authority for any of its corporate purposes, …" – (Article 7 — General Powers. 3 L.P.R.A. § 1906). | "(l) Tomar dinero a préstamo y emitir bonos de la Autoridad para cualquiera de sus propósitos corporativos,…" |
| Convention Center District | Act 351-2000 | "(h) Make loans in order to finance the costs of the Center, the improvement projects and the projects in private parcels or the District, and comply with any of its corporate purposes and powers at the discretion of the Board; make and issue negotiable bonds of the Authority; …" – (Article 2.02 — Specific Powers of the Authority 23 L.P.R.A. § 6412). | "(h) Tomar préstamos con el propósito de financiar los costos del Centro, los proyectos de mejoramiento y proyectos en las parcelas privadas o el Distrito y cumplir con cualquiera de sus propósitos y poderes corporativos, a discreción de la Junta; hacer y emitir bonos negociables de la Autoridad;…" |
| PR Industrial Development Company | Act 188-1942 | "(i)  To borrow money, give security and make and issue bonds …" – (Article 8 — General Powers. 23 L.P.R.A. § 278) | "(i) Tomar dinero a préstamo, dar garantías y hacer y emitir bonos …" |
| Government Development Bank for Puerto Rico | Act 17-1948 | "(I)  To borrow money and contract debts for its corporate purposes upon such terms and conditions as the Bank may from time to time determine, with or without security, to dispose of its obligations evidencing such borrowing, to make, execute and deliver trust indentures and other agreements with respect to any such borrowing, contracting of debt, issuance of bonds, …" -  (Article 2 — Charter. 7 L.P.R.A. § 552) | "(I) Tomar dinero a préstamo y contraer deudas para sus fines corporativos bajo aquellos términos y condiciones que el Banco de tiempo en tiempo determine, con o sin garantías disponer de sus obligaciones evidenciando tales préstamos, hacer, otorgar y entregar instrumentos de fideicomiso y de otros convenios en relación con cualesquiera de dichos préstamos, contracción de deudas, emisión de bonos, …" |
| Puerto Rico Electric Power Authority | Act 83-1941 | "(o) To borrow money, make and issue bonds of the Authority for any of its corporate purposes, and to secure payment of its bonds and of any and all other obligations by pledging or placing a lien on all or any of its contracts, revenues, and income only…" – (Section 5 – Powers. 22 L.P.R.A. § 196) | "(o) Tomar dinero a préstamo, hacer y emitir bonos para cualquiera de sus fines corporativos, y garantizar el pago de sus bonos y de todas y cualesquiera de sus otras obligaciones mediante gravamen o pignoración de todos o cualesquiera de sus contratos, rentas, e ingresos…" |
| Medical Services Administration | Act 66-1978 | "(a) By authority of the Government of Puerto Rico hereby executed, the Puerto Rico Medical Services Administration is by these presents authorized to issue all at once or from time to time, bonds to finance the purposes of this chapter. …" (Article 9 — Bonds. 24 L.P.R.A. § 342h) | "(a) Por autoridad del Gobierno de Puerto Rico, que por la presente se otorga, la Administración de Servicios Médicos de Puerto Rico queda por la presente autorizada a emitir de una vez, o de tiempo en tiempo, bonos para los propósitos de esta ley." |

2

| ENTITY | LAW | ENGLISH | SPANISH |
|--------|-----|---------|---------|
| University of Puerto Rico | Act 1-1966 | "(e)  The University is hereby authorized to borrow money for any of its purposes and activities and to issue, as evidence of such loans, bonds, notes and other obligations, including provisional bonds and refunding bonds (herein collectively called "bonds")." – (Article 12 — Properties and funds. 18 L.P.R.A. § 612). | "Se autoriza a la Universidad para tomar dinero a préstamo para cualesquiera de sus fines y actividades y en evidencia de tales préstamos se le autoriza a emitir bonos, pagarés y otras obligaciones, incluyendo bonos temporáneos y de refinanciamiento (denominados aquí colectivamente "bonos")." |
| Industrial, Medical, Education and Environmental Pollution-Control Facilities Financing Authority | Act 121-1977 | "(l)  To borrow money and issue bonds of the Authority in evidence thereof for the purpose of providing funds to pay for all or any part of the cost of one or more projects and any refinancing bonds, and to grant loans to financial institutions under such terms and conditions that require that the product of said loans be used by said financial institutions to grant loans to users for the partial or total funding of the cost of one or more projects." – (Article 5 — General Powers. 12 L.P.R.A. § 1255) | "(l) Tomar dinero a préstamo y emitir en evidencia bonos de la Autoridad con el propósito de proveer fondos para pagar todo o cualquier parte del costo de uno o más proyectos y de cualesquiera bonos de refinanciamiento y para hacer préstamos a instituciones financieras bajo términos y condiciones que requieran que el producto de dichos préstamos se utilice por dichas instituciones financieras para hacer préstamos a usuarios para proveerle fondos para pagar todo o parte del costo de uno o más proyectos." |
| Puerto Rico Ports Authority | Act 125-1942 | "(o)  To make and issue bonds for the purpose of funding, refunding, purchasing, paying, or discharging any of the outstanding bonds or obligations issued or assumed by it or any bonds or obligations the principal or interest of which is payable in whole or in part from its revenues. ..." – (Article 6. — Powers. 23 L.P.R.A. § 336) | "(o) hacer y emitir bonos con el propósito de consolidar, reembolsar, comprar, pagar o redimir cualesquiera bonos u obligaciones, emitidos o subrogados por ella, que estén en circulación; o cualesquiera bonos u obligaciones cuyo principal o intereses sean pagaderos en total o en parte de sus rentas;" |
| Highway and Transportation Authority | Act 74-1965 | "(l)  To borrow money for any of its corporate purposes, and to issue bonds of the Authority in evidence of such indebtedness and to secure payment of bonds and interest thereon by pledge of, or other lien on, all or any of its properties, revenues or other income, and subject to the provisions of § 8 of Art. VI of the Constitution of the Commonwealth, pledge to the payment of said bonds and interest thereon, the proceeds of any tax or other funds which may be made available to the Authority by the Commonwealth." (Article 2 — Powers. 9 L.P.R.A. § 2004) | "(l) Tomar dinero a préstamo para cualesquiera de sus fines corporativos y emitir bonos de la Autoridad en evidencia de tales obligaciones y garantizar el pago de dichos bonos y sus intereses mediante pignoración u otro gravamen sobre todas sus propiedades, rentas, o ingresos, y, sujeto a las disposiciones de la Sección 8 del Artículo VI de la Constitución de Puerto Rico, pignorar para el pago de dichos bonos y sus intereses, el producto de cualesquiera contribuciones u otros fondos que puedan ser puestos a la disposición de la Autoridad por el Estado Libre Asociado." |
| COFINA | Act 91-2006 | "(b) COFINA is created for the purpose of issuing bonds and utilizing other financing mechanisms for the following ends: ..." (13 LPRA. 11a (b)) | "(b) COFINA se crea con el propósito de emitir bonos y utilizar otros mecanismos de financiamiento para los siguientes propósitos:" |

| ENTITY | LAW | ENGLISH | SPANISH |
|---|---|---|---|
| Government Development Bank / Public Funding Corporation (PFC) | Act 22-1985 / The Public Funding Corporation (PFC) was created by way of Resolution in the Government Development Bank in 1984 | "(e)  To borrow money and contract debts for its corporate ends, under such terms and conditions which its Board of Directors shall determine from time to time, with or without collateral, dispose of its obligations securing such loans, make, grant and hand over trust instruments and other agreements in regard to any of said loans, debts, bond issues, notes, mortgage obligations or other obligations, and by authority of the Commonwealth of Puerto Rico granted herein, issue its own bonds, notes, mortgage obligations or other obligations." (7 L.P.R.A. § 611b) | "(e) Tomar dinero a préstamo y contraer deudas para sus fines corporativos bajo aquellos términos y condiciones que de tiempo en tiempo determine su Junta de Directores, con o sin garantía, disponer de sus obligaciones evidenciando tales préstamos, hacer, otorgar y entregar instrumentos de fideicomiso y de otros convenios en relación con cualesquiera de dichos préstamos, deudas, emisión de bonos, pagarés, obligaciones hipotecarias u otras obligaciones y por autoridad del Estado Libre Asociado de Puerto Rico que aquí se le otorga, emitir sus propios bonos, pagarés, obligaciones hipotecarias u otras obligaciones." |
| Municipal Finance Agency | Act 29-1972 | "(c) To borrow money and to issue bonds of the Agency as authorized by this chapter, and to redeem such bonds." (21 L.P.R.A. § 685) | "(c) Tomar dinero a préstamo y emitir bonos de la Agencia según se autoriza por esta ley y redimir cualesquiera de dichos bonos." |
| Children's Trust | Act 173-1999 | "(h)  Borrow money and issue Trust bonds for any of its purposes, including, but not limited to, the financing of all or part of the costs and expenses of the projects, and loan or otherwise provide funds to a benefited entity, including, but not limited to, the payment of all or part of any debt of said benefited entity or for any other purpose authorized by this chapter." 24 L.P.R.A. § 3128 | "(h) Tomar dinero a préstamo y emitir bonos del Fideicomiso para cualquiera de sus propósitos, incluyendo, pero sin limitarse a, financiar todos o parte de los costos y gastos de los proyectos, y para prestar o de otra forma proveer fondos a una entidad beneficiada, incluyendo, sin que constituya una limitación, para el pago de la totalidad o parte de cualquier deuda de dicha entidad beneficiada o para cualquier otro propósito autorizado por esta Ley." |
| GDB Debt Recovery Authority (DRA) | Act 109-2017 | "(c) issuing the Restructuring Bonds from time to time; ..." (7 L.P.R.A. § 3174) | "(c) emitir los Bonos de Restructuración, de tiempo en tiempo;..." |

4

| ENTITY | LAW | ENGLISH | SPANISH |
|--------|-----|---------|---------|
| Puerto Rico Telephone Authority | Act 25 May 6, 1974 | The last issuance of bonds of the Telephone Authority occurred in 1993 when it clearly had the legal authority to sell bonds.<br><br>"Article 7 – General Powers. The Authority shall enjoy all the powers that are necessary or convenient to carry out and execute the purposes and provisions of this chapter, including, but without limiting the general terms of the preceding, the power to:<br><br>"(o) borrow money for any of its corporate purposes and issue bonds in force of said debt and guarantee the payment of such bonds and interest thereon by pledging or encumbering all or any of its Communication Facilities and the income that they accrue; "<br><br>(p) issue bonds for the purpose of consolidating, repaying, purchasing or redeeming any of its outstanding bonds." | "Artículo 7 – Poderes Generales. La Autoridad gozará de todos los poderes necesarios o convenientes para llevar a cabo y realizar los propósitos y disposiciones de esta ley, incluyendo, pero sin limitar la generalidad de lo que antecede, el poder de:<br><br>(o) tomar dinero a préstamo para cualesquiera de sus fines corporativos y emitir bonos en vigencia de dicha deuda y garantizar el pago de tales bonos e intereses sobre los mismos mediante pignoración o gravamen de todas o cualesquiera de sus Facilidades de Comunicación y las rentas que las mismas devenguen;"<br><br>(p) emitir bonos con el propósito de consolidar, rembolsar, comprar o redimir cualesquiera de sus bonos que estén en circulación ; |
| Puerto Rico Industrial Investment Corporation | Act 17 of September 23, 1948 | Article 2(I) – "(I)  To borrow money and contract debts for its corporate purposes upon such terms and conditions as the Bank may from time to time determine, with or without security, to dispose of its obligations evidencing such borrowing, to make, execute and deliver trust indentures and other agreements with respect to any such borrowing, contracting of debt, issuance of bonds, notes, debentures or other obligations, and by the authority of the Government of Puerto Rico which is hereby granted, to issue its bonds, notes, debentures or other obligations in such form, secured in such manner, and subject to such terms of redemption with or without premium, and to sell the same at public or private sale for such price or prices, all as may be determined by its Board of Directors." | "(I) Tomar dinero a préstamo y contraer deudas para sus fines corporativos bajo aquellos términos y condiciones que el Banco de tiempo en tiempo determine, con o sin garantías disponer de sus obligaciones evidenciando tales préstamos, hacer, otorgar y entregar instrumentos de fideicomiso y de otros convenios en relación con cualesquiera de dichos préstamos, contracción de deudas, emisión de bonos, pagarés, obligaciones hipotecarias u otras obligaciones y por autoridad del Gobierno de Puerto Rico, que aquí se le otorga, emitir sus propios bonos, pagarés, obligaciones hipotecarias u otras obligaciones en la forma, con la garantía y bajo aquellos términos de redención, con o sin prima, y vender los mismos en venta pública o privada por el precio o precios, según se determinare para todo ello, por su Junta de Directores." |

| ENTITY | LAW | ENGLISH | SPANISH |
|---|---|---|---|
| Government Development Bank | Act 22-1985 | "(e)  To borrow money and contract debts for its corporate ends, under such terms and conditions which its Board of Directors shall determine from time to time, with or without collateral, dispose of its obligations securing such loans, make, grant and hand over trust instruments and other agreements in regard to any of said loans, debts, bond issues, notes, mortgage obligations or other obligations, and by authority of the Commonwealth of Puerto Rico granted herein, issue its own bonds, notes, mortgage obligations or other obligations." (7 L.P.R.A. § 611b) | "(e) Tomar dinero a préstamo y contraer deudas para sus fines corporativos bajo aquellos términos y condiciones que de tiempo en tiempo determine su Junta de Directores, con o sin garantía, disponer de sus obligaciones evidenciando tales préstamos, hacer, otorgar y entregar instrumentos de fideicomiso y de otros convenios en relación con cualesquiera de dichos préstamos, deudas, emisión de bonos, pagarés, obligaciones hipotecarias u otras obligaciones y por autoridad del Estado Libre Asociado de Puerto Rico que aquí se le otorga, emitir sus propios bonos, pagarés, obligaciones hipotecarias u otras obligaciones." |
| Port Authority of the Americas | Act 240-2011 | "(p) To borrow money and issue bonds of the Authority in order to provide funds to pay the cost of acquiring or building any property of the Authority or to carry out any of its corporate purposes, or to refinance, pay, or redeem any of its outstanding bonds or obligations, and it may guarantee the payment of its bonds and the bonds of any of its subsidiaries, and of any and all of its obligations or the obligations of any of its subsidiaries by means of assignment, pledge, mortgage or any other lien on any or all of its contracts, revenues, income, or properties." 23 L.P.R.A. § 2905 | "(p) Tomar dinero a préstamo y emitir bonos de la Autoridad con el propósito de proveer fondos para pagar el costo de adquisición o construcción de cualquier propiedad de la Autoridad o para llevar a cabo cualquiera de sus fines corporativos o para el propósito de refinanciar, pagar o redimir cualesquiera de sus bonos u obligaciones en circulación, y podrá garantizar el pago de sus bonos y de los bonos de cualquiera de sus subsidiarias y de todas y cualesquiera de sus obligaciones u obligaciones de cualquiera de sus subsidiarias mediante cesión, pignoración, hipoteca o cualquier otro gravamen sobre todos o cualesquiera de sus contratos, rentas, ingresos o propiedad." |
| Puerto Rico Development Bank | Act 22-1985 | "(e)  To borrow money and contract debts for its corporate ends, under such terms and conditions which its Board of Directors shall determine from time to time, with or without collateral, dispose of its obligations securing such loans, make, grant and hand over trust instruments and other agreements in regard to any of said loans, debts, bond issues, notes, mortgage obligations or other obligations, and by authority of the Commonwealth of Puerto Rico granted herein, issue its own bonds, notes, mortgage obligations or other obligations." (7 L.P.R.A. § 611b) | "(e) Tomar dinero a préstamo y contraer deudas para sus fines corporativos bajo aquellos términos y condiciones que de tiempo en tiempo determine su Junta de Directores, con o sin garantía, disponer de sus obligaciones evidenciando tales préstamos, hacer, otorgar y entregar instrumentos de fideicomiso y de otros convenios en relación con cualesquiera de dichos préstamos, deudas, emisión de bonos, pagarés, obligaciones hipotecarias u otras obligaciones y por autoridad del Estado Libre Asociado de Puerto Rico que aquí se le otorga, emitir sus propios bonos, pagarés, obligaciones hipotecarias u otras obligaciones." |
| Trade and Export Company | Act 323-2003 | "(o) Issue its own bonds, notes, mortgage bonds, and other obligations…." – (Article 5 — Faculties, Powers, and Responsibilities. (7 L.P.R.A. § 1227b) | "(o) Emitir sus propios bonos, pagarés, obligaciones hipotecarias y otras obligaciones." |

| ENTITY | LAW | ENGLISH | SPANISH |
|--------|-----|---------|---------|
| Land Authority | Act 26-1941 | "(k) To borrow money for any of its purposes and to secure the repayment of same by the encumbering, mortgaging, or pledging of all or any of its lands, properties, contracts, revenues, and receipts; to make, issue, and sell bonds of the Authority for any of the said purposes and to secure the payment of its bonds by the encumbering, mortgaging, or pledging of all or any of its lands, properties, contracts, revenues, and receipts." – (Article 5. — General Rights and Powers. 28 L.P.R.A. § 261) | "(k) Tomar dinero o préstamo para cualquiera de sus fines y garantizar el pago del mismo mediante gravamen, hipoteca o pignoración de todos o cualesquiera de sus tierras, bienes, contratos, rentas e ingresos; hacer, emitir y vender bonos de la Autoridad para cualquiera de dichos fines y garantizar el pago de sus bonos mediante gravamen, hipoteca o pignoración de todos o cualesquiera de sus tierras bienes, contratos, rentas e ingresos." |
| National Guard Institutional Trust | Act 23-1991 | "(l) Borrow money evidenced by bonds of the Puerto Rico National Guard Institutional Trust, in order to provide funds to pay all or any part of the cost of any project, ..." – (Article 10 — General Powers. 25 L.P.R.A. § 2918) | "(l) Tomar dinero a préstamo y emitir en evidencia bonos del Fideicomiso Institucional de la Guardia Nacional de Puerto Rico con el propósito de proveer fondos para pagar todo o cualquier parte del costo de cualquier proyecto,..." |
| Cancer Center | Act 230-2004 | "The Center is hereby authorized to issue, from time to time, bonds to achieve the purposes of this chapter. ..." - (Article 14 — Bonds. 24 L.P.R.A. § 3376) | "Se autoriza al Centro a emitir, de tiempo en tiempo, bonos para cumplir con los propósitos de esta ley. ..." |
| Economic Development Bank | Act 22-1985 | "(e) To borrow money and contract debts for its corporate ends, under such terms and conditions which its Board of Directors shall determine from time to time, with or without collateral, dispose of its obligations securing such loans, make, grant and hand over trust instruments and other agreements in regard to any of said loans, debts, bond issues, notes, mortgage obligations or other obligations, and by authority of the Commonwealth of Puerto Rico granted herein, issue its own bonds, notes, mortgage obligations or other obligations., ..." - (Article 3 — Faculties and Powers 7 L.P.R.A. § 611b) | "(e) Tomar dinero a préstamo y contraer deudas para sus fines corporativos bajo aquellos términos y condiciones que de tiempo en tiempo determine su Junta de Directores, con o sin garantía, disponer de sus obligaciones evidenciando tales préstamos, hacer, otorgar y entregar instrumentos de fideicomiso y de otros convenios en relación con cualesquiera de dichos préstamos, deudas, emisión de bonos, pagarés, obligaciones hipotecarias u otras obligaciones y por autoridad del "Ley del Banco de Desarrollo Económico para Puerto Rico" que aquí se le otorga, emitir sus propios bonos, pagarés, obligaciones hipotecarias u otras obligaciones." |
| Science, Technology and Research Trust | Act 214-2004 | " Obtain money on loan and issue notes, bonds and any other evidence of debt of the Trust in order to provide funds to defray the operating costs of the Trust, make investments or provide financial assistance to the projects of the Trust ..." – Council of Trustees—Rights, powers and duties (23 L.P.R.A. §696c) | "Tomar dinero a préstamo y emitir notas, Bonos y cualquier otra evidencia de deuda del Fideicomiso con el propósito de financiar los Costos de Desarrollo del Distrito y los Proyectos del Fideicomiso, ..." |

| ENTITY | LAW | ENGLISH | SPANISH |
|---|---|---|---|
| Martín Peña Canal Special Planning District Integrated Development Act | Act 489-2004 | "(y) To issue and sell participating bonds as a method for raising funds for the Corporation,…" – (Section 6 – Powers. 23 L.P.R.A. §5035) | "(y) Emitir y vender bonos de participación como método para allegar fondos para la Corporación…" |
| Roosevelt Roads Naval Station Facilities and Land Redevelopment Authority | Act 508-2004 | "(a)  The Authority, with the prior [approval] of the Legislature, is hereby authorized to issue bonds from time to time for those amounts which in the opinion of the Authority are necessary to provide sufficient funds for any of its purposes …"- (Article 13 - Design, development, construction, financing, operation and maintenance contract. 25 L.P.R.A. § 3051k) | "(a) La Autoridad, previa autoridad de la Asamblea Legislativa, queda por la presente autorizada a emitir bonos de tiempo en tiempo por aquellas cantidades que en opinión de la Autoridad sean necesarias para proveer suficientes fondos para cualquiera de sus propósitos…" |
| Puerto Rico and Caribbean Cardiovascular Center Corporation | Act 51-1986 | "(a) The Puerto Rico and the Caribbean Cardiovascular Center Corporation is hereby empowered to issue bonds …"- (Article 12 — Bonds. (24 L.P.R.A. § 343k) | "(a) Se autoriza a la Corporación del Centro Cardiovascular de Puerto Rico y del Caribe emitir de una vez, o de tiempo en tiempo, bonos…" |
| Metropolitan Bus Authority | Act 5-1959 | "(n) To borrow money, make and issue bonds …"- (Article 6 — Powers of the Authority. 23 L.P.R.A. § 606) | "(n) tomar dinero a préstamo, hacer y emitir bonos…" |
| Cooperative bank of Puerto Rico | Act 88-1966 | "(s) To take on loans by issuing bonds, promissory notes, commercial paper or other obligations or secured debt instruments, …" – (Article 11 — 7 L.P.R.A. § 761) | "(s) Tomar a préstamo mediante la emisión de bonos, pagarés, papel comercial u otras obligaciones o evidencias de deuda garantizadas o asegurada,…" |
| Urgent Interest Fund Act | Act 91-2006 | "On or after the Effective Date, the Corporation's purpose will be to (a) issue the Plan of Adjustment Bonds…" (Article 2.3 — Purpose of the Corporation.) | "En y después de la Fecha de Efectividad, el propósito de la Corporación será (a) emitir los Bonos del Plan de Ajuste…" |

| ENTITY | LAW | ENGLISH | SPANISH |
|---|---|---|---|
| Municipal Revenues Collection Center | Act 80-1991 | "(j)  Make loans and authorize the issuing of notes through resolutions to such effects in advance of the collection of pending taxes and estimated revenues, with the sole purpose of advancing funds to the municipalities subject to the provisions of § 5814 of this title, as well as to borrow money and incur debts for its operations under those terms and conditions that the Center shall determine from time to time, with or without collateral. If the Center is required to post a collateral, it may borrow money secured by the collection of the basic municipal tax. If necessary, only the surplus, if any, shall be used, of the sum destined to meet the payment of municipal bonds (C.A.E., Spanish acronym), to secure loans. The Center may dispose of its obligations evidenced by said loans, to make, grant and deliver trust instruments and other covenants with regard to any of said loans, contracting of debts, bond issues, notes, mortgage obligations or other obligations, under those redemption terms with or without premiums, and sell the same in public or private sale for the price or prices, as determined therefor by the Board of Directors. ..." – (Article 4 – General Powers and Duties. 21 L.P.R.A. § 5803) | "(j) Tomar dinero a préstamo y autorizar la emisión de pagarés mediante resolución al efecto en anticipación del cobro de contribuciones e ingresos estimados a ser recibidos, con el único propósito de anticipar fondos a los municipios sujeto a lo dispuesto en el Artículo 14 de esta ley (21 L.P.R.A.§ 5813), así como tomar dinero a préstamo y contraer deudas para sus fines operacionales bajo aquellos términos y condiciones que el centro, de tiempo en tiempo determine con o sin garantía. De serle requerida al centro una garantía, éste podrá tomar dinero a préstamo garantizado contra el cobro de la contribución básica municipal. De ser necesario, solamente se utilizará el exceso, si alguno, de la cantidad destinada al cumplimiento de pago de los bonos municipales (C.A.E.) para garantizar préstamos. El Centro podrá disponer de sus obligaciones evidenciando tales préstamos, hacer, otorgar y entregar instrumentos de fideicomiso y de otros convenios en relación con cualquiera de dichos préstamos, contracción de deudas, emisión de bonos, pagarés, obligaciones hipotecarias u otras obligaciones, bajo aquellos términos de redención con o sin prima, y vender los mismos en venta pública o privada por el precio o precios, según se determinare para todo ello por la Junta de Gobierno." |
| Land Administration | Act 13-1962 | "(m) To borrow money, give security and issue bonds for any of its corporate purposes or for the purpose of funding, refunding, paying, or discharging any of its outstanding or assumed bonds or obligations, and to secure payment of its bonds and of any and all other obligations by pledging, mortgaging, or otherwise encumbering all or any of its contracts, revenues, income or property." – (Article 7 — Duties and Powers. 23 L.P.R.A. § 311f) | "(m) tomar dinero a préstamo, dar garantías, emitir bonos para cualquiera de sus fines corporativos o con el propósito de consolidar, restituir, pagar o liquidar cualesquiera bonos u obligaciones en circulación, emitidos o asumidos por ella, y garantizar el pago de sus bonos y de todas y cualesquiera de sus otras obligaciones mediante la pignoración, hipoteca o cualquier otro gravamen sobre todos o cualesquiera de sus contratos, rentas, ingresos o propiedades." |
| Mayaguez Ports Commission Act | Act 10-1959 | "(n) Take money on loan, make and issue Ports Commission bonds ..." (Article 5 – 25 L.P.R.A. §555) | "(n) Tomar dinero a préstamo, hacer y emitir bonos de la Comisión de los Puertos ..." (Artículo 4 — 25 L.P.R.A. § 555) |

| ENTITY | LAW | ENGLISH | SPANISH |
|--------|-----|---------|---------|
| Puerto Rico Integrated Transit Authority | Act 123-2014 | "(11)  To borrow money for any of its corporate purposes, and issue bonds of the Authority as evidence of such obligations and guarantee the payment of such bonds and interest thereon by pledging or encumbering its properties, revenues or income and, subject to the provisions of Section 8 of Article VI of the Constitution of Puerto Rico, pledge for the payment of such bonds and interest thereon, tax revenues or other funds that the Commonwealth of Puerto Rico may make available to the Authority." – (Article 5 — Powers of the Authority. 23 L.P.R.A. § 11164) | "(11) Tomar dinero a préstamo para cualesquiera de sus fines corporativos y emitir bonos de la Autoridad en evidencia de tales obligaciones y garantizar el pago de dichos bonos y sus intereses mediante pignoración u otro gravamen sobre todas sus propiedades, rentas, o ingresos, y, sujeto a las disposiciones de la Sección 8 del Artículo VI de la Constitución de Puerto Rico, pignorar para el pago de dichos bonos y sus intereses, el producto de cualesquiera contribuciones u otros fondos que puedan ser puestos a la disposición de la Autoridad por el Estado Libre Asociado de Puerto Rico." |
| Municipal Financing Act of 1996 | Act 64-1966 | "… Municipalities are hereby authorized to incur obligations evidenced by bonds, notes, or other instruments …" 21 L.P.R.A. § 6003 | "… Los municipios quedan autorizados por este capítulo a incurrir en obligaciones evidenciadas por bonos, pagarés u otros instrumentos …" |
| Municipal Finance Agency | Act 29 of June 30, 1972 | "(c) To borrow money and to issue bonds of the Agency as authorized by this chapter, and to redeem such bonds. 21 L.P.R.A. §685 "Powers".

"… Any municipality may issue bonds or municipal notes on bond anticipation for sale and delivery to the Agency …" - 21 L.P.R.A. § 690 "Issuance of bonds by municipalities". | "(c) Tomar dinero a préstamo y emitir bonos de la Agencia según se autoriza por este capítulo y redimir cualesquiera de dichos bonos."

"… Cualquier municipio puede emitir bonos municipales o pagarés municipales en anticipación de bonos, para ser vendidos y entregados a la Agencia …". |
| Center for Diabetes Research, Education and Medical Services | Act 166-2000 | "(m)  Borrow money from any source of financing, including private institutions as well as the Government of Puerto Rico and the government of the United States. 24 L.P.R.A. § 3352

"(a)  The Center for Diabetes Research, Education and Medical Services is hereby authorized to issue at a given time, or from time to time, bonds for the purposes of this chapter." 24 L.P.R.A. §3359 | "(m) Tomar dinero a préstamo de cualquier fuente de financiamiento, incluyendo las instituciones privadas así como también del Gobierno de Puerto Rico y del Gobierno de los Estados Unidos."

"(a) Se autoriza al Centro de Investigaciones, Educación y Servicios Médicos para la Diabetes emitir de una vez, o de tiempo en tiempo, bonos para los propósitos de este capítulo." |

| ENTITY | LAW | ENGLISH | SPANISH |
|--------|-----|---------|---------|
| Puerto Rico Mineral Resources Development Corporation | Act 154 of July 2, 1975 | "(l)  To borrow money, to make and issue bonds of the Corporation for any of its purposes, and to secure payment of its bonds and of any of its other obligations by pignoration or encumbrance of all or any of its contracts, revenues and income."<br><br>(m)  To issue bonds for the purpose of consolidating, refinancing, purchasing, paying or redeeming any of its outstanding subrogated or issued bonds or debentures." 28 L.P.R.A. § 91f | "(l) Tomar dinero a préstamo, hacer y emitir bonos de la Corporación para cualquiera de sus propósitos, y garantizar el pago de sus bonos y cualesquiera de sus otras obligaciones mediante pignoración o gravamen de todos o cualesquiera de sus contratos, rentas e ingresos.<br><br>(m) Emitir bonos con el propósito de consolidar, refinanciar, comprar, pagar o redimir cualesquiera de sus bonos u obligaciones emitidos o subrogados por ella que estén en circulación." |
| Maritime Shipping Authority | Act 62 of June 10, 1974 | "(n)  to borrow money for any of its corporate purposes and to issue bonds in evidence of said indebtness, and to secure the payment of such bonds and the interest thereon through pledge or lien of all or part of its income;<br><br>(o)  to issue bonds for the purpose of financing, refinancing, purchase or redemption of any of its outstanding bonds; …" 23 L.P.R.A. § 3055 "General Powers". | "(n) tomar dinero a préstamo para cualesquiera de sus fines corporativos y emitir bonos en evidencia de dicha deuda y garantizar el pago de tales bonos e intereses sobre los mismos mediante pignoración o gravamen de todo o parte de sus ingresos;<br><br>(o) emitir bonos con el propósito de consolidar, refinanciar, comprar o redimir cualesquiera de sus bonos que estén en circulación; …" |
| Special Communities Perpetual Trust | Act 271-2002 | "(f) Obtain monies through loans and issue bonds of the trust in order to provide funds to pay the cost of acquiring any property for the trust or to achieve any of its purposes or in order to refinance, pay or redeem any of its outstanding bonds or obligations and may to guarantee the payment of its bonds and all and any of its obligations through assignment, pignoration, or mortgaging or any other lien on all or any of its contracts, revenues, income or properties. 21 L.P.R.A. § 971g - "Powers".<br><br>"(b) The trust is hereby authorized to issue bonds from time to time for those amounts that are needed to provide sufficient funds for any of its purposes." 21 L.P.R.A. § 971i - "Financing powers". | "(f) Tomar dinero a préstamo y emitir bonos del Fideicomiso con el propósito de proveer fondos para pagar el costo de adquisición de cualquier propiedad para el Fideicomiso o para llevar a cabo cualquiera de sus fines o para el propósito de refinanciar, pagar o redimir cualesquiera de sus bonos u obligaciones en circulación; y podrá garantizar el pago de sus bonos y de todas y cualesquiera de sus obligaciones mediante cesión, pignoración, hipoteca o cualquier otro gravamen sobre todos o cualesquiera de sus contratos, rentas, ingresos o propiedades."<br>…<br>"(b) El Fideicomiso queda por la presente autorizado a emitir bonos de tiempo en tiempo por aquellas cantidades que sean necesarias para proveer suficientes fondos para cualquiera de sus propósitos." |

11

| ENTITY | LAW | ENGLISH | SPANISH |
|--------|-----|---------|---------|
| Integral Development of Cantera Península | Act 20-1992 | "(m)  Borrow money for any of its corporate ends, including, without limitation, the purpose of consolidating, reconsolidating or buying, paying, or canceling any bonds, or other outstanding obligations issued or assumed by it, whose principal and interest is payable in whole or in part, from the revenues of the corporate entity. 23 L.P.R.A. § 5007 - "Company—Powers".  "(a) The Company is hereby authorized to issue bonds from time to time for those principal amounts …" 23 L.P.R.A. § 5017 "Bonds". | "(m) Tomar dinero a préstamo para cualesquiera de sus fines corporativos, incluyendo, sin limitación, el fin de consolidar, reconsolidar o comprar, pagar o cancelar cualesquiera bonos u otras obligaciones en circulación emitidos o asumidos por ella, cuyo principal e intereses es pagadero en todo o en parte de las rentas de la entidad corporativa."  "(a) La Compañía queda por esta sección autorizada para emitir bonos de tiempo en tiempo por aquellas cantidades de principal …" |
| New San Juan Center Project | Act 153 of July 23,1974 | "(i)  To borrow money, to give warranties and issue bonds for its corporate purposes, or for the purpose of funding, refunding, paying or discharging any of the outstanding bonds or other obligations of the Corporation, and to secure payment of its bonds and of any and all other obligations by pledge, mortgage of, or other lien on, all or any of its contracts, revenues, income or property, except as otherwise provided in this chapter." 23 L.P.R.A. § 146 - "General Powers".  "(a)  By authority of the Commonwealth of Puerto Rico, hereby granted, the Corporation may issue from time to time, and sell, its own bonds, and keep them outstanding." 23 L.P.R.A. § 150 – "Bonds". | –"(i) Tomar dinero a préstamo, dar garantías y emitir bonos para sus fines corporativos, o con el propósito de consolidar, restituir, pagar, o liquidar cualesquiera bonos u otras obligaciones en circulación emitidos o asumidos por la Corporación y garantizar el pago de sus bonos y de todas y cualesquiera de sus otras obligaciones mediante la pignoración, hipoteca o cualquier otro gravamen sobre todos o cualesquiera de sus contratos, rentas, ingresos o propiedades, salvo lo que se disponga en contrario en este capítulo." "(a) Por autoridad del Estado Libre Asociado de Puerto Rico, que se otorga por la presente, la Corporación podrá emitir, de tiempo en tiempo, y vender sus propios bonos y tenerlos en circulación." |
| Port Commission of Ponce | Act 93 of June 25, 1958 | "(n)  To borrow money, make and issue bonds of the Port Commission for any of its corporate purposes, or for the purpose of financing, refinancing, paying or redeeming any of its bonds or obligations, whether outstanding or assumed, and to secure payment of its bonds and of any and all obligations by pledge, alienation or mortgage of all or any of its contracts, revenues, income, or property." 23 L.P.R.A. § 525 – "Purpose; duties" | "(n) Tomar dinero a préstamo, hacer y emitir bonos de la Comisión del Puerto para cualquiera de sus fines corporativos o para el propósito de financiar, refinanciar, pagar o redimir cualesquiera de sus bonos u obligaciones en circulación o asumidas, y garantizar el pago de sus bonos y de todas y cualesquiera de sus obligaciones mediante pignoración o hipoteca o cualquier otro gravamen sobre todos o cualesquiera de sus contratos, rentas, ingresos o propiedad." |

| ENTITY | LAW | ENGLISH | SPANISH |
|--------|-----|---------|---------|
| Cooperative Development Company | Act 90 of June 21, 1966 | "(j)  To borrow money and issue bonds and any other type of obligation for its corporate purposes or for the purpose of funding, paying, or discharging any of its outstanding or assumed bonds or obligation …" 5 L.P.R.A. § 981f – "Powers". | "(j) Tomar dinero a préstamo, emitir bonos y cualquier otro tipo de obligación para sus fines corporativos o para consolidar, pagar o liquidar cualesquiera bonos u obligaciones en circulación emitidos o asumidos por ella …" |

13

# Exhibit 6

**EXHIBIT 10**

(5)

## CERTIFICATE OF SECRETARY OF THE SYSTEM
## AS TO AMENDED AND RESTATED PURCHASE CONTRACT

I, Rosa Castro Rivera, Secretary of the Board of Trustees of Employees Retirement System of the Government of the Commonwealth of Puerto Rico (the "System"), **DO HEREBY CERTIFY** that attached hereto is a true and correct copy of the Amended and Restated Purchase Contract, dated January 30, 2008, as amended and supplemented, submitted by UBS Financial Services Incorporated of Puerto Rico, acting on behalf of each of the several underwriters referred to therein, which Amended and Restated Purchase Contract was approved by resolution duly adopted by the Board of Trustees of the System on January 29, 2008.

**IN WITNESS WHEREOF**, I have hereunto set my hand and affixed the seal of said System this 31st day of January, 2008.



_Rosa Castro Rivera_

Secretary of the Board of Trustees
Employees Retirement System of the Government
of the Commonwealth of Puerto Rico

FIDDLER-#703510-v1-4th_draft_Closing_Documents

PR-ERS-000003509

**Employees Retirement System of the**
**Government of the Commonwealth of Puerto Rico**

**Senior Pension Funding Bonds, Series A**

**AMENDED AND RESTATED PURCHASE CONTRACT**

San Juan, Puerto Rico
January 30, 2008

Administrator,
Employees Retirement System of the
Government of the Commonwealth of Puerto Rico
San Juan, Puerto Rico

Dear Sir:

UBS Financial Services Incorporated of Puerto Rico ("UBS") and the other underwriters listed in Schedule A hereto (collectively with UBS, the "Underwriters") for whom UBS is acting as representative as described below, offer to enter into this amended and restated Purchase Contract with the Employees Retirement System of the Government of the Commonwealth of Puerto Rico (the "System"), which Contract confirms your agreements with the Underwriters and upon your acceptance of this offer, will be binding upon the System and upon the Underwriters. This offer is made subject to your written acceptance hereof at or before 5:00 p.m., San Juan time, on the date hereof, and, if not so accepted, will be subject to withdrawal by the Underwriters upon notice delivered to you at any time prior to the acceptance hereof. This amended and restated Purchase Contract replaces the purchase contract, dated January 24, 2008, among the parties relating to the above bonds.

The Underwriters have designated UBS as their representative (the "Representative"). The Representative has been duly authorized to act hereunder by and on behalf of the other Underwriters and to execute this Purchase Contract. Any action under this Purchase Contract taken by the Representative will be binding upon all the Underwriters.

1.      Purchase and Sale; Details of Bonds. Upon the terms and conditions and in reliance on the representations, warranties and agreements set forth herein, the Underwriters, jointly and severally, hereby agree to purchase from the System, and the System hereby agrees to sell and deliver to the Underwriters, all (but not less than all) of the $1,588,810,799.60 initial principal amount of Employees Retirement System of the Government of the Commonwealth of Puerto Rico Senior Pension Funding Bonds, Series A (the "Bonds").

The purchase price for the Bonds shall be $1,570,391,795.98 (being the principal amount of such bonds, minus original issue discount of $1,663,850, less $16,755,153.62 of underwriters' discount).

The Bonds shall be dated, shall have the maturities and shall bear interest at the rates per annum set forth or derived from information set forth on the inside cover page of the Official Statement (hereinafter defined).

NY1 6469021v.13

The Bonds shall be issued in accordance with Act No. 447 of the Legislature of Puerto Rico, approved May 15, 1951, as amended ("Act 447"), and shall be as described in and issued under the provisions of a resolution, adopted by the System on January 24, 2008 (the "Master Resolution"), and a resolution supplemental thereto, adopted by the System on January 24, 2008 and amended, restated and readopted on the date hereof, fixing the details of the Bonds (the Master Resolution and said supplemental resolution together, the "Bond Resolution"). The Bonds are being issued for the purpose of providing funds, among other things, for deposit into the System to reduce thereby its unfunded accrued actuarial liability and into a debt service reserve account under the Bond Resolution, and to pay interest on the Bonds for approximately one year and pay certain costs incurred in connection with the issuance of the Bonds. The repayment of the Bonds will be secured by a pledge of Pledged Property (as defined in the Bond Resolution), including Employers' Contributions (as defined in the Bond Resolution).

2.    <u>Delivery of Official Statement, etc</u>.    The System shall deliver to the Representative at the time of or prior to the acceptance of this Purchase Contract by the System (a) a copy of the Official Statement of the System, dated the date hereof, relating to the Bonds (such Official Statement, including all appendices thereto and financial and statistical information contained or referred to or incorporated by reference therein, and with such supplements and amendments as are approved in writing by the Representative, being herein called the "Official Statement"), duly executed on behalf of the System; (b) a certified copy of the Bond Resolution; (c) letters, dated the date hereof, from Parissi P.S.C. and KPMG LLP consenting to the references to their respective names and to the inclusion of their respective reports on the audited financial statements of the System and of the Commonwealth of Puerto Rico (the "Commonwealth") for fiscal year 2007 and 2006, respectively, in the Preliminary Official Statement (hereinafter defined) and in the Official Statement, and in the case of Parissi P.S.C., setting forth the results of certain agreed upon procedures carried out by it in connection with the Official Statement; (d) a letter, dated the date hereof, from Global Insight, Inc. ("Global Insight") consenting to the references to its name and to the inclusion of its report forecasting the total payroll of those government employees that participate in the System over the fifty years covered by the report (the "GI Report") in the Preliminary Official Statement and in the Official Statement; and (e) an executed letter of representations, dated the date hereof (the "Letter of Representations") addressed to the Underwriters and signed by the Commonwealth. The System will provide to the Representative such additional copies of the Bond Resolution as the Representative may reasonably request. As soon as practicable after the date hereof, but, in any event, not later than seven (7) business days after the date hereof and not less than three (3) business days prior to Closing, if earlier, the System shall deliver to the Underwriters such number of printed copies of the final Official Statement as the Representative may reasonably request in writing so as to enable the Underwriters to comply with the requirements of paragraph (b)(4) of Rule 15c2-12 of the Securities Exchange Act of 1934, as amended (the "Rule"). The System shall be under no obligation to determine whether the number of copies of the Official Statement requested by the Representative pursuant to the preceding sentence shall be sufficient to enable the Underwriters to comply with the requirements of said paragraph (b)(4), and the System may conclusively rely upon any such written request of the Representative. For purposes of this Purchase Contract, "business day" means any day other than a Saturday, Sunday or other day on which commercial banks in New York, New York or San Juan, Puerto Rico are authorized or required by law to close.

2

NY1 6469021v.13

PR-ERS-000003511

The System has previously delivered to the Underwriters a Preliminary Official Statement of the System, dated January 11, 2008, relating to the Bonds (such Preliminary Official Statement, including all appendices thereto, and financial and statistical information included or incorporated by reference therein, being herein called the "Preliminary Official Statement").

3.    Continuing Disclosure.    The System will covenant in a Master Continuing Disclosure Agreement to be executed among the System, the Commonwealth and the fiscal agent under the Bond Resolution (the "MCDA"), (i) to provide within 305 days after the end of each fiscal year, beginning with the fiscal year ended June 30, 2007, core financial information and operating data for the prior fiscal year, including the System's audited financial statements prepared in accordance with generally accepted accounting principles, together with material historical quantitative data on the System and its revenues, expenditures, financial operations and indebtedness, in each case generally found in the Official Statement (the "Annual Information") and (ii) to provide in a timely manner, notices of the occurrence of certain enumerated events described the MCDA.    This covenant has been made in order to assist the Underwriters in complying with paragraph (b)(5) of the Rule.    The Annual Information will be filed by or on behalf of the System with each nationally recognized municipal securities information repository and with any Commonwealth state information depository.    The notices of material events will be filed by the System with each nationally recognized municipal securities information repository or with the Municipal Securities Rulemaking Board and with any Commonwealth state information depository.

4.    Public Offering.    The Underwriters agree to make a bona fide public offering of all the Bonds, solely within Puerto Rico, at prices not in excess of the initial public offering prices (or not less than the yields) set forth on the inside cover page of the Official Statement. The Underwriters reserve the right to change such initial public offering prices or yields as they deem necessary in connection with the marketing to such persons of the Bonds.    The System hereby authorizes the Underwriters to use the Bond Resolution, the MCDA, the Security Agreement (hereinafter mentioned) and the Official Statement and the information contained therein in connection with the public offering and sale of the Bonds to such persons and agrees not to supplement or amend the Official Statement, the MCDA, the Security Agreement or the Bond Resolution or to cause the Official Statement, the MCDA, the Security Agreement or the Bond Resolution to be supplemented or amended at any time prior to the Closing (as defined below) without the prior written consent of the Representative.    The System ratifies and confirms the use by the Underwriters, prior to the date hereof, of the Preliminary Official Statement.

5.    Security Deposit.    The Representative has delivered to the System one or more corporate checks in an aggregate amount equal to 1% of the aggregate principal amount of the Bonds as a security deposit, payable in New York Clearing House Funds to the order of Government Development Bank for Puerto Rico ("Government Development Bank"), as fiscal agent for the System.    In the event the System does not accept this offer, such check shall be immediately returned to the Representative uncashed.    If this offer is accepted, the check will be held uncashed as a security deposit for the performance by the Underwriters of their obligations to purchase, to accept delivery of, and to pay for the Bonds at the Closing.    In the event of the System's failure to deliver the Bonds at the Closing, or if the System shall be unable to satisfy the conditions of the obligations of the Underwriters contained herein, or if the obligations of the



3

PR-ERS-000003512

Underwriters shall be terminated for any reason permitted by this Purchase Contract, the check shall be immediately returned uncashed to the Representative. In the event that the Underwriters fail (other than for a reason permitted hereunder) to purchase, to accept delivery of, and to pay for the Bonds at the Closing, the check may be cashed and the proceeds thereof retained by the System as and for full liquidated damages for such failure and for any defaults hereunder on the part of the Underwriters, and such retention shall constitute a full release and discharge of all claims by the System against the Underwriters arising out of the transactions contemplated hereby.

      6.    <u>Representations, Warranties and Agreements of the System</u>. The System represents and warrants to and agrees with each of the Underwriters that, as of the date hereof and as of the Closing Date (as defined below):

      (a)    The System has full legal right, power and authority to adopt the Bond Resolution, to enter into this Purchase Contract, the MCDA and a Security Agreement, dated the Closing Date, between the System and The Bank of New York (the "Security Agreement"), and to issue and deliver the Bonds to the Underwriters as provided herein; by official action of the System taken prior to or concurrently with the acceptance hereof, it has duly adopted the Bond Resolution; the Bond Resolution and Act 447 are in full force and effect and have not been amended, modified or rescinded; the System has duly authorized and approved the execution and delivery of the Bonds, the MCDA, the Security Agreement, the Official Statement and this Purchase Contract; the System has duly authorized and approved the performance of its obligations contained in the Bond Resolution, the MCDA, the Security Agreement, the Official Statement and this Purchase Contract to be performed or consummated at or prior to the Closing; this Purchase Contract has been duly executed and delivered by the System; and the System is and will be in compliance with the provisions of the Bond Resolution and Act 447.

      (b)    Except for the approval of Government Development Bank, which has already been or will before the Closing be obtained and is or will at the Closing be in full force and effect, no approval, permit, consent, or authorization of, or registration or filing with, any governmental or public agency or authority not already obtained or made is required by the System in connection with the issuance and sale of the Bonds in the Commonwealth of Puerto Rico, or the execution or adoption and delivery by the System of, or the due performance of its obligations under this Purchase Contract, the Bonds, the Bond Resolution, the MCDA and the Security Agreement.



      (c)    Except as set forth in the Official Statement, the System is not in breach of or default under any applicable constitutional provision, law (including, without limitation, any administrative rule-making law) or administrative regulation of the Commonwealth or the United States, or any agency or department of either, or any applicable judgment or decree or any loan agreement, indenture, bond, note, resolution, agreement or other instrument to which the System is a party or to which the System or any of its properties or other assets is otherwise subject, and no event has occurred and is continuing relating to bonds, notes or other evidences of indebtedness of the System or any System guaranty of bonds, notes or other evidences or indebtedness of others which, with the passage of time or the giving of notice, or both, would constitute a default or an event of default under any such instrument; and the execution and delivery of the Bonds, the MCDA, the Security Agreement, the Official Statement and this

<div align="center">4</div>

PR-ERS-000003513

Purchase Contract and the adoption of the Bond Resolution (and any other agreement or instrument to which the System is a party used or contemplated for use in the consummation of the transactions contemplated hereby or by the Bond Resolution, the MCDA, the Security Agreement or the Official Statement), and compliance with the provisions on the System's part contained herein or therein, do not and will not conflict with Act 447 or any constitutional provision, law (including, without limitation, any administrative rule-making law), administrative regulation, judgment or decree, or constitute a breach of or default under any loan agreement, indenture, bond, note, resolution, agreement or other instrument to which the System is a party or to which the System or any of its properties or other assets is otherwise subject.

(d)     The Bonds, when issued, authenticated and delivered in accordance with the provisions of the Bond Resolution, will be valid, binding and legally enforceable obligations of the System secured by a pledge of Employers' Contributions in accordance with the terms of the Bonds, Act 447 and the Bond Resolution.

(e)     Except for the information permitted by the Rule to be excluded therefrom, the information contained in the Preliminary Official Statement was as of the date of said Preliminary Official Statement true and correct in all material respects, and the Preliminary Official Statement did not as of its date contain any untrue statement of a material fact or omit to state a material fact which is necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading. The Preliminary Official Statement was deemed "final" by the System for purposes of paragraph (b)(1) of the Rule, except for the omission therefrom of information permitted to be omitted therefrom by the Rule. Except as disclosed in the Official Statement, the System has not failed to comply with any prior continuing disclosure undertaking of the type described in paragraph 3 hereof.

(f)     Except as disclosed in the Official Statement, since the date of the basic financial statements of the System for fiscal year 2007, which are included in the Official Statement, the System has not incurred, as of the date hereof, and will not have incurred, on the Closing Date, any material liabilities, direct or contingent, or entered into any material transaction, in each case other than in the ordinary course of its business, and as of the date hereof there has not been, and as of the Closing Date there shall not have been, any material adverse change in the condition, financial or otherwise, of the System or its properties or other assets.



(g)     There is no action, suit, proceeding, inquiry or investigation, at law or in equity, before or by any court, government agency or public board or body, pending or, to the knowledge of the System, threatened, which may affect or which seeks to prohibit, restrain or enjoin the sale, issuance or delivery of the Bonds, or the collection or application of any Employers' Contributions or the pledge thereof contained in the Bond Resolution and as described in the Official Statement, or which in any way contests or affects the validity or enforceability of Act 447, the Bonds, the Bond Resolution, the MCDA, the Security Agreement, this Purchase Contract, or any of them, or which may result in any material adverse change in the business, properties, other assets or financial condition of the System as described in the Official Statement, or which contests in any way the completeness or accuracy of the Preliminary Official Statement or the Official Statement, or which contests the powers of the System or any authority or proceedings for the issuance, sale or delivery of the Bonds, the adoption of the Bond

NY1 6469021v.13

PR-ERS-000003514

Resolution or the execution and delivery of the MCDA, the Security Agreement or this Purchase Contract, or any of them, nor, to the knowledge of the System, is there any basis therefor, wherein an unfavorable decision, ruling or finding would materially adversely affect the validity or enforceability of Act 447, the Bonds, the Bond Resolution, the MCDA, the Security Agreement, this Purchase Contract, or any of them.

(h)     The System has reviewed the GI Report which report is part of the Official Statement, and believes that the projections made in such report are based on reasonable assumptions.

(i)     The Bonds, the MCDA, the Security Agreement, Act 447 and the Bond Resolution conform to the descriptions thereof contained in the Official Statement and the references to and summaries of the Bonds, the MCDA, the Security Agreement, Act 447 and the Bond Resolution contained in the Official Statement fairly reflect the provisions thereof.

(j)     At the time of the System's acceptance hereof and, subject to the provisions of subparagraph (l) of this paragraph 6, at all times subsequent thereto to and including the Closing Date, the Official Statement does not and will not contain any untrue statement of a material fact or omit to state a material fact which is necessary in order to make the statements contained therein, in the light of the circumstances under which they were made, not misleading. The representations and warranties contained in this paragraph (j) shall not apply to any statements or omissions made in reliance on information furnished in writing by or on behalf of the Underwriters expressly for use in the Official Statement or provided by Government Development Bank for Puerto Rico and DTC.

(k)     If the Official Statement is supplemented or amended pursuant to subparagraph (l) of this paragraph 6 prior to the Closing Date, at the time of each supplement or amendment thereto and (unless subsequently supplemented or amended pursuant to such subsection) at all times subsequent thereto to and including the Closing Date, the Official Statement, as so supplemented or amended, will not contain any untrue statement of a material fact or omit to state a material fact which is necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading.



(l)     If between the date of this Purchase Contract and the date which is twenty-five (25) days after the end of the underwriting period (as such term is defined in paragraph (f)(2) of the Rule) any event shall occur or shall exist which would or might cause the Official Statement, as then supplemented or amended, to contain any untrue statement of a material fact or to omit to state a material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading, the System shall notify the Representative thereof. If in the reasonable opinion of the Representative such event requires the preparation and publication of a supplement or amendment to the Official Statement, the System will at its expense supplement or amend, or cause to be supplemented or amended, the Official Statement in a form and in a manner approved in writing by the Representative, and provide the Underwriters with such copies of such supplement or amendment as the Representative may reasonably request in writing so as to enable the Underwriters to comply with the provisions of paragraph (b)(4) of the Rule. The System shall be under no obligation to determine whether the number of copies requested by the Representative of any amendment of or

6

NY1 6469021v.13

supplement to the Official Statement pursuant to the preceding sentence shall be sufficient to enable the Underwriters to comply with the requirements of said paragraph (b)(4), and the System may conclusively rely upon any such request of the Representative.

(m) The financial statements of the System included in the Official Statement present fairly the financial condition and results of operations of the System at the dates and for the periods set forth therein.

(n) The System has delivered to the Underwriters true, complete and correct copies of the documents required to be delivered pursuant to paragraph 2 hereof, and none of said documents has been amended, supplemented or modified since such delivery.

(o) The System will apply the proceeds from the sale of the Bonds as provided in and subject to all of the terms and provisions of the Bond Resolution and Act 447.

7. The Closing. At 10:00 a.m., Atlantic Standard time, on January 31, 2008, or at such later time as may be mutually agreed upon by the System and the Representative (the "Closing Date"), the System will, subject to the terms and conditions hereof, deliver the Bonds, duly executed and in definitive form, to or for the account of The Depository Trust Company and deliver to the Representative the other documents hereinafter mentioned; and, subject to the terms and conditions hereof, the Underwriters will pay the purchase price of the Bonds as set forth in paragraph 1 hereof in immediately available funds to or for the account of the System (such delivery of and payment for the Bonds is herein called the "Closing") and the check delivered to Government Development Bank pursuant to paragraph 5 hereof shall thereupon be returned to the Representative uncashed. The Closing shall occur at the offices of Government Development Bank, San Juan, Puerto Rico, or such other place as shall have been mutually agreed upon by the System and the Representative. Time shall be of the essence, and delivery at the time and place specified pursuant to this Purchase Contract is a further condition of the obligations of the Underwriters hereunder.

8. Closing Conditions. The Underwriters have entered into this Purchase Contract in reliance upon the representations, warranties and agreements of the System contained herein, and upon the representations, warranties and agreements of the Commonwealth contained in the Letter of Representations. Accordingly, the Underwriters' obligations under this Purchase Contract to purchase, to accept delivery of and to pay for the Bonds shall be conditioned upon the performance by the System of its obligations to be performed hereunder at or prior to the Closing, and shall also be subject to the following additional conditions:



(a) The representations, warranties and agreements of the System contained herein and of the Commonwealth contained in the Letter of Representations shall be true, complete and correct on the date hereof and on and as of the Closing Date, as if made on the Closing Date;

(b) At the time of the Closing, Act 447 and the Bond Resolution shall be in full force and effect, and shall not have been amended, modified or supplemented since the date hereof, and the Official Statement as delivered to the Representative on the date hereof shall not

NY1 6469021v.13

PR-ERS-000003516

have been supplemented or amended, except in any such case as may have been approved by the Representative;

(c)     At the time of the Closing, all official action of the System relating to this Purchase Contract, the Bonds, the Bond Resolution, the MCDA, the Security Agreement and Act 447 taken as of the date hereof shall be in full force and effect and shall not have been amended, modified or supplemented;

(d)     At or prior to the Closing, the Representative shall have received copies of each of the following documents:

(1)     The opinion, dated the Closing Date and addressed to you, of Fiddler González & Rodriguez, P.S.C., Bond Counsel for the System, in substantially the form included as Appendix VIII to the Official Statement;

(2)     A supplemental opinion, dated the Closing Date and addressed to the Underwriters, of Fiddler González & Rodriguez, P.S.C., Bond Counsel for the System, in substantially the form attached hereto as Exhibit A;

(3)     Opinions, dated the Closing Date and addressed to the Underwriters, of counsel to the System, and of the Secretary of Justice of the Commonwealth, in substantially the respective forms attached hereto as Exhibits B-1 and B-2;

(4)     Opinions, dated the Closing Date and addressed to the Underwriters, of O'Neill & Borges and of Sidley Austin LLP, counsel to the Underwriters, in substantially the form attached hereto as Exhibit C;

(5)     Certificates, dated the Closing Date, signed by the Administrator of the System and by the Acting Secretary of the Treasury of Puerto Rico, in substantially the respective forms attached hereto as Exhibit D;

(6)     A certificate, dated the Closing Date, signed by the President, any Executive Vice President or any Senior Vice President of Government Development Bank, in substantially the form attached hereto as Exhibit E;

(7)     Executed copies, certified by the Administrator of the System, of the MCDA and the Security Agreement;

(8)     A letter, addressed and in form and substance satisfactory to the Underwriters, dated the Closing Date, from Parissi P.S.C. as to its performance of certain agreed upon procedures respecting the information in the Official Statement relating to the System, among other things;

(9)     Evidence of ratings of the Bonds in full force and effect on the Closing Date of "Baa3" by Moody's Investors Service ("Moody's"), "BBB-" by Standard and Poor's Ratings Services ("S&P") and Fitch Ratings Ltd. ("Fitch");



8

PR-ERS-000003517

(10) Letters, each dated the Closing Date, from Parissi P.S.C. and KPMG LLP consenting to references to their respective names in the Official Statement and to the inclusion in the Official Statement of their respective reports on the audited financial statements of the System and of the Commonwealth for the fiscal years ended June 30, 2007 and 2006, respectively;

(11) A final copy of the GI Report in the form attached to the Official Statement as Appendix V, together with the consent of Global Insight to the inclusion of such report in the Official Statement and to the references to them in the Official Statement; and

(12) Such additional legal opinions, certificates, instruments and other documents as the Representative may reasonably request to evidence the truth and accuracy, as of the date hereof and as of the Closing Date, of the representations and warranties of the System contained herein and of the Commonwealth contained in the Letter of Representations and of the statements and information contained in the Official Statement and the due performance or satisfaction by the System on or prior to the Closing Date of all the respective agreements then to be performed and conditions then to be satisfied by the System.

All of the evidence, opinions, letters, certificates, instruments and other documents mentioned above or elsewhere in this Purchase Contract shall be deemed to be in compliance with the provisions hereof if, but only if, they are in form and substance satisfactory to the Representative with such exceptions and modifications as shall be approved by the Representative and as shall not in the opinion of the Representative materially impair the investment quality of the Bonds. The approving opinion of Fiddler González & Rodriguez, P.S.C., which is referred to in clause (1) of subparagraph 8(d) above shall be deemed satisfactory provided it is substantially in the form included in the Official Statement, and the opinions and certificates referred to in clauses (2), (3), (4), (5) and (6) of such subparagraph shall be deemed satisfactory provided they are substantially in the respective forms attached as exhibits to this Purchase Contract, unless otherwise provided.

If the System shall be unable to satisfy the conditions of the Underwriters to purchase, to accept delivery of and to pay for the Bonds contained in this Purchase Contract, or if the obligations of the Underwriters to purchase, to accept delivery of and to pay for the Bonds shall be terminated for any reason permitted by this Purchase Contract, this Purchase Contract shall terminate and neither the Underwriters nor the System shall be under any further obligation hereunder, except for the return of the security deposit and except that the respective obligations of the System and the Underwriters set forth in paragraph 10 hereof shall continue in full force and effect.

9. Termination. The Underwriters may terminate this Purchase Contract by notice to the System in the event that on or prior to the Closing Date (a) legislation shall have been introduced in or enacted by the Congress of the United States or the Legislature of the Commonwealth, or legislation pending in the Congress of the United States or the Legislature of the Commonwealth shall have been amended, or legislation shall have been favorably reported for passage to either House of the Congress of the United States by a Committee of such House

9

PR-ERS-000003518

to which such legislation has been referred for consideration, or a decision by a court of the United States or the Tax Court of the United States shall be rendered, or a ruling, regulation or official statement by or on behalf of the Treasury Department of the United States, the Internal Revenue Service or other governmental agency shall be made, with respect to Federal taxation of interest received on securities of the general character of the Bonds or which would have the effect of changing, directly or indirectly, the Commonwealth income tax consequences of receipt of interest on securities of the general character of the Bonds in the hands of the holders thereof, which in the reasonable opinion of the Representative would materially adversely affect the market price of the Bonds; (b) the United States shall become engaged in hostilities that have resulted in a Congressional declaration of war or there shall be a national emergency or there shall have occurred any outbreak of hostilities or an act of terrorism or other national or international calamity or crisis or escalation of any thereof, the effect of which on the financial markets of the United States is, in the reasonable judgment of the Representative, to materially adversely affect the market for the Bonds; (c) there shall be in force a general suspension of trading on the New York Stock Exchange or other national exchanges, or minimum or maximum prices for trading shall have been fixed and be in force, or maximum ranges for prices for securities shall have been required and be in force on the New York Stock Exchange whether by virtue of a determination by that Exchange or by order of the Securities and Exchange Commission or any other governmental authority having jurisdiction; (d) a general banking moratorium shall have been established by Federal, New York or Commonwealth authorities or a major financial crisis or material disruption in commercial banking or securities settlement or clearances services shall have occurred which, in the reasonable judgment of the Representative, would make the marketing of securities of the general character of the Bonds generally impracticable; (e) any event, including any event described in a supplement or amendment to the Official Statement, shall have occurred or shall exist which, in the reasonable opinion of the Representative, makes untrue or incorrect, as of such time, in any material respect, any statement or information contained in the Official Statement as theretofore supplemented and amended or which is not reflected in the Official Statement as theretofore supplemented and amended, but which should be reflected therein in order to make the statements and information contained therein not misleading as of such time; (f) the System fails to deliver the final Official Statement to the Representative within the time period provided in paragraph 2 hereof and such failure affects the Underwriters' marketing and sale of the Bonds or subjects the Underwriters to possible compliance infractions under Securities and Exchange Commission or Municipal Securities Rulemaking Board delivery requirements; (g) any extraordinary event (not otherwise covered above in this paragraph) shall have occurred or shall exist affecting current national or international economic, financial or other conditions or affecting the Commonwealth, which, in the reasonable opinion of the Representative, materially affects the market for the Bonds or the sale, at the contemplated offering prices, by the Underwriters of the Bonds; (h) any rating of the Bonds shall have been downgraded or withdrawn by Moody's or Fitch, and such action, in the reasonable opinion of the Representative, materially adversely affects the market for the Bonds or the sale, at the contemplated offering prices, by the Underwriters of the Bonds; (i) any amendment to the Official Statement is proposed by the System or deemed necessary by Bond Counsel or counsel to the Underwriters which, in the reasonable opinion of the Representative, materially adversely affects the market for the Bonds or the sale, at the contemplated offering prices, by the Underwriters of the Bonds; or (j) the System shall be unable to satisfy the

10

PR-ERS-000003519

conditions to the obligations of the Underwriters to purchase, to accept delivery of and to pay for the Bonds contained in this Purchase Contract.

10. <u>Expenses</u>. (a) The Underwriters shall be under no obligation to pay, and the System shall pay, any expenses incident to the performance of the obligations of the System hereunder, including, but not limited to: (i) the cost of preparation and printing or other reproduction, if any, of the Bond Resolution; (ii) the cost of preparation and printing of the Bonds; (iii) the cost of preparation, printing and distribution of the Preliminary Official Statement and the Official Statement; (iv) the fees and disbursements of Fiddler González & Rodriguez, P.S.C., Bond Counsel for the System, and Sidley Austin LLP and O'Neill & Borges, counsel to the underwriters; (v) the fees and disbursements of the Parissi P.S.C., of KPMG LLP and of Global Insight in connection with the letters described in paragraph 2 and clauses (8), (10) and (11) of paragraph 8(d), and of any other experts, consultants, or advisers retained by the System in connection with the issuance and sale of the Bonds; and (vi) the fees for rating the Bonds.

(b) The Underwriters shall pay: (i) the cost of preparation and reproduction of this Purchase Contract and related underwriting documents; (ii) all advertising expenses in connection with the public offering of the Bonds; and (iii) all other expenses incurred by them or any of them in connection with the public offering of the Bonds.

(c) In the event that either the System or the Underwriters shall have paid obligations of the other as set forth in this Section, proper adjustment shall be made.

11. <u>Indemnification</u>. (a) To the extent permitted by law, the System agrees to indemnify and hold harmless each Underwriter and each person, if any, who controls any Underwriter within the meaning of the Securities Act of 1933, as amended, or the Securities Exchange Act of 1934, as amended (collectively, the "Securities Acts"), as follows:

(i) against any and all loss, liability, claim, damage and expense whatsoever, joint or several, arising out of any untrue statement or alleged untrue statement of a material fact contained in the Official Statement (or any amendment or supplement thereto) or the omission or alleged omission therefrom of a material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading, unless such untrue statement or omission or such alleged untrue statement or omission was made in reliance upon and in conformity with written information furnished to the System by such Underwriter through the Representative expressly for use in the Official Statement.

(ii) against any and all loss, liability, claim, damage, and expense whatsoever, joint or several, to the extent of the aggregate amount paid in settlement of any litigation commenced or threatened, or of any claim whatsoever, based upon any such untrue statement or omission, or any such alleged untrue statement or omission, if such settlement is effected with the written consent of the System; and



NY1 6469021v.13

PR-ERS-000003520

(iii)    against any and all expense whatsoever, joint or several, reasonably incurred in investigating, preparing or defending against it any litigation commended or threatened, or any claim whatsoever, based upon any such untrue statement or omission, or any such alleged untrue statement or omission, to the extent that any such expense is not paid under (i) or (ii) above.

(b)    Each Underwriter agrees to indemnify and hold harmless the System and each person, if any, who controls the System within the meaning of the Securities Acts against any and all loss, liability, claim, damage and expense described in the indemnity contained in subsection (a) of this Section (including only such settlements as are effected with the written consent of the Representative), but only with respect to untrue statements or omissions, or alleged untrue statements or omissions, made in the Official Statement in reliance upon and in conformity with written information furnished to the System by such Underwriter through the Representative expressly for use in the Official Statement.

(c)    Each indemnified party shall give prompt notice to each indemnifying party of any action commenced against it in respect of which indemnity may be sought hereunder, but failure so to notify an indemnifying party shall not relieve it from any liability hereunder except to the extent the indemnifying party is prejudiced by such failure, and shall not relieve it from any liability which it may have otherwise than on account of this indemnity agreement.  An indemnifying party may participate at its own expense in the defense of such action.  If it so elects within a reasonable time after receipt of such notice, an indemnifying party, jointly with any other indemnifying parties receiving such notice, may assume the defense of such action with counsel chosen by it and approved by the indemnified parties defendant in such action, unless such indemnified parties reasonably object to such assumption on the ground that there may be legal defenses available to them which are different from or in addition to those available to such indemnifying party.  If an indemnifying party is entitled pursuant to the preceding sentence to assume, and in fact assumes the defense of such action, the indemnifying parties shall not be liable for any fees and expenses of counsel for the indemnified parties incurred thereafter in connection with such action.  In no event shall the indemnifying parties be liable for the fees and expenses of more than one counsel for all indemnified parties in connection with any one action or separate but similar or related actions in the same jurisdiction arising out of the same general allegations or circumstances.



(d)    If the indemnification provided for in subparagraphs (a) or (b) of this Section 11 is unavailable to an indemnified party in respect of any losses, claims, damages or liabilities referred to therein, then each indemnifying party under such paragraph, in lieu of indemnifying such indemnified party thereunder, shall contribute to the amount paid or payable by such indemnified party as a result of such losses, claims, damages or liabilities (i) in such proportion as is appropriate to reflect the relative benefits received by the System and the Underwriters from the offering of the Bonds or (ii) if the allocation provided by clause (i) above is not permitted by applicable law, in such proportion as is appropriate to reflect not only the relative benefits referred to in clause (i) above but also the relative fault of the System and of the Underwriters in connection with the statements or omissions that resulted in such losses, claims, damages or liabilities, as well as any other relevant equitable considerations.  The relative benefits received by the System and the Underwriters shall be deemed to be in the same respective proportions as the net proceeds from the offering (before deducting expenses)

12

PR-ERS-000003521

received by the System and the total underwriting discounts and commissions received by the Underwriters, bear to the aggregate public offering prices of the Bonds. The relative fault of the System and the Underwriters shall be determined by reference to, among other things, whether the untrue or alleged untrue statement of a material fact or the omission or alleged omission to state a material fact relates to information supplied by the System or by the Underwriters and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such statement or omission.

The System and the Underwriters agree that it would not be just and equitable if contribution pursuant to this Section were determined by pro rata allocation (even if the Underwriters were treated as one entity for such purpose) or by any other method of allocation that does not take account of the equitable considerations referred to in the immediately preceding paragraph. The amount paid or payable by an indemnified party as a result of the losses, claims, damages and liabilities referred to in the immediately preceding paragraph shall be deemed to include, subject to the limitations set forth above, any legal or other expenses reasonably incurred by such indemnified party in connection with investigating or defending any such action or claim. Notwithstanding the provisions of this Section 11(d), no Underwriter shall be required to contribute any amount in excess of the amount by which the underwriting discounts or commissions received by it on account of the Bonds sold by it to the public exceeds the amount of any damages that such Underwriter has otherwise been required to pay by reason of such untrue or alleged untrue statement or omission or alleged omission. No person guilty of fraudulent misrepresentation shall be entitled to contribution from any person who was not guilty of such fraudulent misrepresentation. The Underwriters' obligations to contribute pursuant to this Section are several in proportion to their respective underwriting percentages (as defined in the Agreement Among Underwriters) and not joint.

12.     Notices. Any notice or other communication to be given to the System under this Purchase Contract may be given by delivering the same in care of Government Development Bank for Puerto Rico, Roberto Sánchez Vilella Government Center, De Diego Avenue, San Juan, Puerto Rico 00940, Attention: Jorge Irizarry Herráns, President, and any such notice or other communication to be given to the Underwriters (other than the acceptance referred to in paragraph 1 hereof) may be given by delivering the same to UBS Financial Services Incorporated of Puerto Rico, American International Plaza, 250 Muñoz Rivera Avenue, Hato Rey, Puerto Rico 00918 Attention: Jose Arias. All notices or communications hereunder by any party shall be given and served upon each other party.



13.     Parties in Interest. This Purchase Contract is made solely for the benefit of the System and the Underwriters (including the successors or assigns of any Underwriter) and no other person shall acquire or have any right hereunder or by virtue hereof. All of the representations, warranties and agreements of the System contained in this Purchase Contract shall remain operative and in full force and effect regardless of: (i) any investigations made by or on behalf of any of the Underwriters; (ii) delivery of and payment for the Bonds pursuant to this Purchase Contract; or (iii) any termination of this Purchase Contract but only to the extent provided by the last paragraph of paragraph 8 hereof.

13

PR-ERS-000003522

14.     Effectiveness.  This Purchase Contract shall become effective upon the execution of the acceptance hereof by the System, shall constitute the entire agreement between us and shall be valid and enforceable at the time of such acceptance.

15.     Counterparts.  This Purchase Contract may be executed in several counterparts, each of which shall be regarded as an original and all of which together shall constitute one and the same instrument.

16.     Puerto Rico Law Governs; Severability.   The validity, interpretation and performance of this Purchase Contract shall be governed by the laws of the Commonwealth of Puerto Rico.  Wherever possible, each provision of this Purchase Contract shall be interpreted in such manner as to be effective under the laws of such State or any other applicable law.  In the event that any provision or any portion of any provision, of this Purchase Contract shall be held to be void or unenforceable, the remaining provisions of this Purchase Contract, and the remaining portion of any provision found void or unenforceable in part only, shall continue in full force and effect.



17.     No Oral Change.  This Purchase Contract may not be changed orally, but only by an agreement in writing and signed by the party against whom enforcement of any waiver, change, modification or discharge is sought.

[SIGNATURE PAGE FOLLOWS]

14

PR-ERS-000003523

18. <u>Headings</u>. The headings of the sections of this Purchase Contract are inserted for convenience only and shall not be deemed to be part hereof.

Very truly yours,

UBS FINANCIAL SERVICES INCORPORATED OF PUERTO RICO
as Representative of the Underwriters listed on Schedule A

By: _____
Name:
Title: Managing Director

Accepted on or about 11:00 a.m., Atlantic time, on January 30, 2008

EMPLOYEES RETIREMENT SYSTEM OF THE
GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO

By: _____
Name: Juan Cancel Alegría
Title: Administrator

15

PR-ERS-000003524

**SCHEDULE A**

UBS FINANCIAL SERVICES INCORPORATED OF PUERTO RICO
POPULAR SECURITIES, INC.
SANTANDER SECURITIES CORPORATION
BANCO BILBAO VIZCAYA ARGENTARIA PUERTO RICO
CITIGROUP GLOBAL MARKETS INC.
LEHMAN BROTHERS, INC.
MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED
ORIENTAL FINANCIAL SERVICES, INC.
SAMUEL A. RAMÍREZ & CO., INC.
SCOTIABANK OF PUERTO RICO
TCM CAPITAL, INC.
WACHOVIA CAPITAL MARKETS, LLC



16

PR-ERS-000003525

**EXHIBIT A**

OPINION OF BOND COUNSEL
(Pursuant to subparagraph 8(d)(2) of the Purchase Contract)

January 31, 2008

UBS FINANCIAL SERVICES INCORPORATED OF PUERTO RICO
POPULAR SECURITIES, INC.
SANTANDER SECURITIES CORPORATION
BANCO BILBAO VIZCAYA ARGENTARIA PUERTO RICO
CITIGROUP GLOBAL MARKETS INC.
LEHMAN BROTHERS, INC.
MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED
ORIENTAL FINANCIAL SERVICES, INC.
SAMUEL A. RAMÍREZ & CO., INC.
SCOTIABANK OF PUERTO RICO
TCM CAPITAL, INC.
WACHOVIA CAPITAL MARKETS, LLC

In care of UBS Financial Services Incorporated of Puerto Rico
American International Plaza
250 Muñoz Rivera Avenue
Hato Rey, Puerto Rico 00918
Attention: Jose Arias

Ladies and Gentlemen:



We have acted as Bond Counsel in connection with the authorization, issuance and sale by the Employees Retirement System of the Government of the Commonwealth of Puerto Rico (the "System") of $1,588,810,799.60 initial aggregate principal amount of its Senior Pension Funding Bonds, Series A (the "Bonds") as to which you are acting as underwriters ("Underwriters"), as representatives of yourselves and the other Underwriters named in the amended and restated Purchase Contract, dated January 30, 2008 (the "Purchase Contract"), between the System and the Underwriters.

The Bonds are being issued pursuant to a Pension Funding Bond Resolution, adopted by the System's Board of Trustees on January 24, 2008 (the "Bond Resolution"), and a First Supplemental Pension Funding Bond Resolution, adopted by the System's Board of Trustees on January 24, 2008 and amended, restated and readopted on January 29, 2008 (the "Supplemental Resolution," and together with the Bond Resolution, the "Resolution"), pursuant to which The Bank of New York will act as Fiscal Agent (the "Fiscal Agent"). Any capitalized terms used herein and not otherwise defined shall have the meanings ascribed thereto in the Resolution or the Purchase Contract. The Bonds are being issued for the purpose of (i) increasing the total assets currently available to pay benefits under the System's largest defined benefit plan, (ii)

A-1

PR-ERS-000003526

reducing the unfunded accrued actuarial pension liability of the benefit plan, and (iii) making deposits in various funds and accounts established under the Resolution.

In our capacity as Bond Counsel, we have examined and are familiar with (i) Act No. 447 of the Legislature of Puerto Rico, approved May 15, 1951, as amended ("Act 447"), (ii) certified copies of the Resolution, (iii) certified copies of the resolution authorizing the issuance and fixing the terms of the Bonds (the "Authorizing Resolution"), approving the Preliminary Official Statement, dated January 11, 2008, in connection with the Bonds (the "Preliminary Official Statement") and approving the Official Statement, dated January 29, 2008, in connection with the issuance of the Bonds (the "Official Statement"), (iv) a certified copy of the Master Continuing Disclosure Agreement, dated as of January 24, 2008 (the "MCDA"), (v) a certified copy of the Purchase Contract, (vi) a certified copy of the Security Agreement between the System and The Bank of New York (the "Security Agreement"), and (vii) such other proofs as we have deemed necessary as a basis for the opinions hereinafter expressed.

In rendering this opinion, we have assumed the genuineness of all signatures, the authenticity of all documents provided to us as originals and the conformity to authentic original documents of all documents provided to us as certified, conformed or photostatic copies. As to questions of fact material to this opinion, we have relied upon certificates of officers and representatives of the parties to the transactions contemplated by the Purchase Contract and of public officials.

Based upon the foregoing, and subject to the assumptions, limitations and qualifications set forth herein, we are of the opinion that:

(a)     The MCDA, the Security Agreement and the Purchase Contract have been duly authorized, executed and delivered by the System and, assuming the due authorization, execution and delivery thereof by, and the validity and enforceability against the other parties thereto, constitute the legal, valid and binding agreements of the System, enforceable against the System in accordance with their respective terms, except that such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium and other laws affecting the enforcement of creditors' rights generally and by the application of general principles of equity.



(b)     The Resolution and the Authorizing Resolution have been duly adopted by the System and are in full force and effect and constitute the legal, valid and binding agreements of the System, enforceable against the System in accordance with their respective terms, except that such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium and other laws affecting the enforcement of creditors' rights generally and by the application of general principles of equity.

(c)     It is not necessary in connection with the public offering and sale of the Bonds to register any security under the Securities Act of 1933, as amended, or to qualify the Resolution nor any other document or instrument under the Trust Indenture Act of 1939, as amended.

(d)     The statements contained in the Official Statement as of its date and as of the date hereof under the captions "THE SERIES A BONDS," "SECURITY AND SOURCES OF PAYMENT FOR THE BONDS," "TAX MATTERS," "ERISA CONSIDERATIONS,"

A-2

PR-ERS-000003527

"LEGAL INVESTMENT," and "CONTINUING DISCLOSURE," and corresponding statements in "SUMMARY STATEMENT," insofar as such statements constitute summaries of provisions of the Constitution and statutes of the Commonwealth, the Bonds, the Bond Resolution, the MCDA, the Security Agreement or Act 447, or refer to opinions we have rendered, constitute fair and accurate summaries of the documents and matters of law purported to be summarized therein and do not contain any untrue statement of a material fact or omit any material fact which, in our opinion, should be referred to therein so as to make the information or statements made therein not misleading. References to the Official Statement are to the document examined by us upon delivery of the Bonds, and not to any physical or electronic reproduction other than a true copy.

(e)   The System has full legal right, power and authority to sign the Official Statement and has duly approved and authorized the signing of the Official Statement.

We hereby consent to references to us contained in the Official Statement.



The proposed form of Bond Counsel opinion contained in Appendix VIII to the Official Statement is substantially in the form of the opinion delivered on the date hereof by this firm. You may rely on said delivered opinion as if it were addressed to you.

This opinion is being furnished at your request and is solely for your benefit and may not be relied upon by any other persons without our prior written consent.

Respectfully submitted,

A-3

PR-ERS-000003528

**EXHIBIT B-1**

OPINION OF COUNSEL TO THE SYSTEM
(Pursuant to subparagraph 8(d)(3) of the Purchase Contract)

January 31, 2008

UBS FINANCIAL SERVICES INCORPORATED OF PUERTO RICO
POPULAR SECURITIES, INC.
SANTANDER SECURITIES CORPORATION
BANCO BILBAO VIZCAYA ARGENTARIA PUERTO RICO
CITIGROUP GLOBAL MARKETS INC.
LEHMAN BROTHERS, INC.
MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED
ORIENTAL FINANCIAL SERVICES, INC.
SAMUEL A. RAMÍREZ & CO., INC.
SCOTIABANK OF PUERTO RICO
TCM CAPITAL, INC.
WACHOVIA CAPITAL MARKETS, LLC

In care of UBS Financial Services Incorporated of Puerto Rico
American International Plaza
250 Muñoz Rivera Avenue
Hato Rey, Puerto Rico 00918
Attention: Jose Arias

Ladies and Gentlemen:



      In connection with the issuance and sale by the Employees Retirement System of the Government of the Commonwealth of Puerto Rico (the "System"), a trust created pursuant to Act 447 of May 15, 1951, as amended (the "Act"), to provide pension and other benefits to retired employees of the central government, municipalities and public corporations of the Commonwealth of Puerto Rico (the "Commonwealth"), of its $1,588,810,799.60 Senior Pension Funding Bonds, Series A (the "Bonds"), I have, as General Counsel of the System, examined the Act, certified copies of the Pension Funding Bond Resolution, adopted by the System on January 24, 2008, and a First Supplemental Pension Funding Bond Resolution, adopted by the System on January 24, 2008 and amended, restated and readopted on January 29, 2008 (collectively, the "Resolution"), certified copies of an amended and restated resolution of the System, adopted on January 29, 2008 (the "Authorizing Resolution"), authorizing, among other things, the issuance and sale of the Bonds, approving the Preliminary Official Statement, dated January 11, 2008, in connection with the Bonds (the "Preliminary Official Statement") and approving the Official Statement, dated January 29, 2008, in connection with the Bonds (the "Official Statement"), the amended and restated Purchase Contract, dated January 30, 2008, by and between the Underwriters named therein and the System (the "Purchase Contract"), the Master Continuing Disclosure Agreement, dated as of January 1, 2008 (the "MCDA"), among the System, the Commonwealth of Puerto Rico and the Fiscal Agent (hereinafter mentioned),

B-1-1

NY1 6469021v.13

PR-ERS-000003529

and the Security Agreement, dated January 31, 2008 (the "Security Agreement," and together with the Resolution, the Authorizing Resolution, the Purchase Contract, and the MCDA, the "Agreements"), between the System and The Bank of New York as fiscal agent under the Resolution (the "Fiscal Agent"), and have conducted such other investigations and examined such other proofs as I deemed necessary as a basis for the opinions herein expressed. This opinion is issued pursuant to Section 8(d)(3) of the Purchase Contract. Capitalized terms used and not otherwise defined herein have the meanings assigned to them in the Resolution.

As to certain matters of act material to the opinions expressed herein, I have relied upon the representations and statements of fact made in the Agreements, and certificates, when appropriate, provided by parties thereto other than the System. I have not independently verified the accuracy of the representations and statements so relied upon.

I have assumed the genuineness of all signatures, the authenticity of all documents submitted to me as originals, the conformity and completeness to original documents of all documents submitted to me as certified, photostatic or conformed copies and the authenticity of the originals of all such latter documents.

I have assumed that (a) each party to the Agreements (other than the System) is duly organized and validly existing, has the power and authority to execute, deliver and perform the Agreements to which it is a party, has taken all action necessary to authorize the execution, delivery and performance of those Agreements, and has duly executed and delivered those Agreements, and (b) the Agreements constitute the valid and binding obligations of the parties thereto (other than the System), enforceable against those parties in accordance with their respective terms.

Based on the foregoing, I am of the opinion that:

(a)     Act 447 has been legally enacted in accordance with the laws of the Commonwealth, is in full force and effect and has not been amended, modified, or rescinded in any way.



(b)     The Purchase Contract, the Security Agreement and the MCDA have been duly authorized, executed and delivered by the System and, assuming the due authorization, execution and delivery thereof by, and the validity and enforceability thereof against, the other parties thereto, constitute the legal, valid and binding agreements of the System, enforceable in accordance with their respective terms, except as may be limited by bankruptcy, reorganization, insolvency, moratorium or similar laws affecting the rights and remedies of creditors and other laws, court decisions, or legal or equitable doctrines affecting the right to specific performance, injunctive relief or other equitable remedies.

(c)     The Resolution and the Authorizing Resolution have been duly adopted by the System and are in full force and effect and constitute the legal, valid, and binding agreements of the System, enforceable in accordance with their respective terms, except as may be limited by bankruptcy, reorganization, insolvency, moratorium or similar laws affecting the rights and remedies of creditors and other laws, court decisions, or legal or equitable doctrines affecting the right to specific performance, injunctive relief or other equitable remedies.

B-1-2

PR-ERS-000003530

(d)     The Bonds have been duly and validly authorized and issued.     When authenticated and delivered by the Fiscal Agent as provided in the Resolution, the Bonds will constitute legally valid and binding obligations of the System.

(e)     The Resolution creates a valid and binding security interest in the Revenues and other Pledged Property assigned and pledged by the System to the Fiscal Agent pursuant to the Resolution.

(f)     All legislation, authorizations, consents and approvals necessary to fulfill in all material respects the terms and conditions of the Bonds and to carry out the transactions contemplated by the Purchase Contract, the Official Statement, the Security Agreement, the MCDA, the Authorizing Resolution and the Resolution are in full force and effect or have been obtained, as applicable, and no further legislation, authorization, consent or approval is required for such purposes.

(g)     The System has full legal right, power and authority to sign the Official Statement, has duly approved and authorized the signing of the Official Statement, has ratified the distribution of the Preliminary Official Statement, and has approved the distribution of the Official Statement.

(h)     No litigation is pending (or, to my knowledge, after reasonable inquiry, threatened) (A) to restrain or enjoin the issuance or delivery of any of the Bonds, (B) in any way contesting or affecting any authority for or the validity of the Act, the application of the proceeds of the Bonds, the Resolution, the Authorizing Resolution, the Bonds, the MCDA, the Security Agreement or the Purchase Contract, (C) in any way contesting the power of the System to issue the Bonds or the power of the System to sell the Bonds and to apply the proceeds thereof as contemplated by the Official Statement and the Purchase Contract, (D) in any way contesting the pledge of the Employers' Contributions and other items of security for the payment of the principal of and interest on the Bonds, or (E) that could have a material adverse effect on the financial condition of the System.

(i)     All conditions precedent to the delivery of the Bonds have been fulfilled.



In addition, I have examined the Preliminary Official Statement and the Official Statement (including the information incorporated therein by reference), and the information as to the System, the Resolution, the MCDA, the Security Agreement and the statutes cited or referred to therein contained or incorporated by reference therein, is correct, and nothing has come to my attention which leads me to believe that such information, as of the respective dates thereof, and as to the Official Statement as of the date hereof, contained or contains any untrue statement of a material fact or omitted or omits to state a material fact necessary in order to make the statements therein relating to such information, in the light of the circumstances under which they were made, not misleading.

The opinions expressed herein are limited to the laws of the Commonwealth and based on an analysis of existing laws, regulations, rulings and court decisions of the Commonwealth. Such opinions may be adversely affected by actions taken or events occurring, including a change in law, regulation or ruling (or in the application or official interpretation of any law,

B-1-3

PR-ERS-000003531

regulation or ruling) after the date hereof. I have not undertaken to determine, or to inform any person about, whether such actions are taken or such events occur, and I have no obligation to update this opinion in light of such actions or events.

In addition, I express no opinion as to the enforceability of any indemnification or contribution provisions included in any Agreement that may violate any law, rule, regulation or public policy of the United States of America or of the Commonwealth.

Furthermore, my opinions are subject to bankruptcy, reorganization, insolvency, moratorium, fraudulent conveyance or similar laws, from time to time in effect, affecting the rights and remedies of creditors generally and other laws, court decisions, or legal or equitable remedies or principles which may affect enforceability.



This opinion letter is rendered for the sole benefit of each addressee hereof, and no other person or entity is entitled to rely hereon. No attorney-client relationship has existed between me and any rating agency that shall have rated the Bonds or by virtue of this opinion letter. Copies of this opinion letter may not be furnished to any other person or entity, nor may any portion of this opinion letter be quoted, circulated or referred to in any other document without my prior written consent.

Very truly yours,

_____

_____

B-1-4

PR-ERS-000003532

**EXHIBIT B-2**

OPINION OF THE SECRETARY OF JUSTICE OF THE COMMONWEALTH
(Pursuant to subparagraph 8(d)(3) of the Purchase Contract)

January 31, 2008

UBS FINANCIAL SERVICES INCORPORATED OF PUERTO RICO
POPULAR SECURITIES, INC.
SANTANDER SECURITIES CORPORATION
BANCO BILBAO VIZCAYA ARGENTARIA PUERTO RICO
CITIGROUP GLOBAL MARKETS INC.
LEHMAN BROTHERS, INC.
MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED
ORIENTAL FINANCIAL SERVICES, INC.
SAMUEL A. RAMÍREZ & CO., INC.
SCOTIABANK OF PUERTO RICO
TCM CAPITAL, INC.
WACHOVIA CAPITAL MARKETS, LLC



In care of UBS Financial Services Incorporated of Puerto Rico
American International Plaza
250 Muñoz Rivera Avenue
Hato Rey, Puerto Rico 00918
Attention: Jose Arias

Ladies and Gentlemen:

In connection with the issuance and sale by the Employees Retirement System of the Government of the Commonwealth of Puerto Rico (the "System") of $1,588,810,799.60 Employees Retirement System of the Government of the Commonwealth of Puerto Rico Senior Pension Funding Bonds, Series A (the "Bonds"), I have examined the Letter of Representations of the Commonwealth of Puerto Rico, dated January 30, 2008 (the "Letter of Representations"), executed by the Acting Secretary of the Treasury.

I have also examined a certified copy of the Master Continuing Disclosure Agreement, dated as of January 1, 2008 (the "MCDA"), by and among the System, the Commonwealth of Puerto Rico (the "Commonwealth") and The Bank of New York, and such other proofs as I have deemed necessary as a basis for the opinions hereinafter expressed.

Based upon the foregoing, I am of the opinion that:

(a)     The Letter of Representations and the MCDA have been duly authorized, executed and delivered by the Commonwealth and, assuming the due authorization, execution and delivery thereof by, and the validity and enforceability thereof against, the other parties thereto, constitute the legal, valid and binding agreements of the Commonwealth, enforceable in accordance with their terms, it being understood that the enforceability thereof may be subject to

B-2-1

PR-ERS-000003533

judicial discretion, the valid exercise of the sovereign immunity of the Commonwealth and valid bankruptcy, insolvency, reorganization, moratorium and other laws affecting creditors' rights.

(b)     All legislation, authorizations, consents and approvals necessary to fulfill in all material respects the terms and conditions and to carry out the transactions contemplated by the Letter of Representations and the MCDA are in full force and effect or have been obtained, as applicable, and no further legislation, authorization, consent or approval is required for such purposes.

(c)     No litigation is pending (or, to my knowledge, threatened) in any way contesting or affecting any authority for or the validity of the Letter of Representations and the MCDA or that could have a material adverse effect on the financial condition of the Commonwealth.

In addition, I have examined the Preliminary Official Statement and the Official Statement (each as defined in the Letter of Representations) (including the information incorporated therein by reference and the Commonwealth Report included as Appendix IV thereto), and the information contained or incorporated by reference therein relating to the Commonwealth, as well as the factual information appearing under "LITIGATION" in Appendix IV, is correct, and nothing has come to my attention which leads me to believe that such information, as of the respective dates thereof, and as to the Official Statement as of the date hereof, contained or contains any untrue statement of a material fact or omitted or omits to state a material fact necessary in order to make the statements therein relating to such information, in the light of the circumstances under which they were made, not misleading.



Very truly yours,

_____
Secretary of Justice

NY1 6469021v.13

PR-ERS-000003534

**EXHIBIT C**

OPINION OF COUNSEL TO THE UNDERWRITERS
(Pursuant to subparagraph 8(d)(4) of the Purchase Contract)

January 31, 2008

UBS FINANCIAL SERVICES INCORPORATED OF PUERTO RICO
POPULAR SECURITIES, INC.
SANTANDER SECURITIES CORPORATION
BANCO BILBAO VIZCAYA ARGENTARIA PUERTO RICO
CITIGROUP GLOBAL MARKETS INC.
LEHMAN BROTHERS, INC.
MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED
ORIENTAL FINANCIAL SERVICES, INC.
SAMUEL A. RAMÍREZ & CO., INC.
SCOTIABANK OF PUERTO RICO
TCM CAPITAL, INC.
WACHOVIA CAPITAL MARKETS, LLC

In care of UBS Financial Services Incorporated of Puerto Rico
American International Plaza
250 Muñoz Rivera Avenue
Hato Rey, Puerto Rico 00918
Attention: Jose Arias



> **Re:    Employees Retirement System of the Government of the Commonwealth of
> Puerto Rico
> $1,588,810,799.60 Senior Pension Funding Bonds, Series A**

We have acted as counsel for the Underwriters named in the amended and restated
Purchase Contract, dated January 30, 2008 (the "Purchase Contract"), by and between the
Underwriters and the Employees Retirement System of the Government of the Commonwealth
of Puerto Rico (the "System") in connection with the purchase of the Bonds described above (the
"Bonds"). As such counsel, we have examined the Official Statement, dated January 29, 2008,
relating to the Bonds (the "Official Statement"), the Purchase Contract, and such other proofs as
we have deemed necessary for the purpose of expressing the following opinion. This opinion is
being delivered to you pursuant to subparagraph 8(d)(4) of the Purchase Contract.

Based upon such examination, we are of the opinion that it is not necessary in connection
with the public offering and sale of the Bonds to register any security under the Securities Act of
1933, as amended, or to qualify any indenture, document or instrument under the Trust Indenture
Act of 1939, as amended.

In accordance with our understanding with you, we rendered legal advice and assistance
to you in the course of your investigation pertaining to, and your participation in the preparation
of, the Official Statement and the issuance and sale of the Bonds. Rendering such assistance

C-1

PR-ERS-000003535

involved, among other things, discussions and inquiries concerning various legal and related subjects, and reviews of and reports on certain records, documents and proceedings of the System. We also participated in personal and telephone conferences with representatives of the Commonwealth of Puerto Rico (the "Commonwealth"), with your representatives, with Parissi P.S.C. and KPMG LLP, independent auditors of the System's and of the Commonwealth's financial statements, respectively, with Fiddler González & Rodriguez, P.S.C., Bond Counsel, with Global Insight, Inc. and with representatives of Government Development Bank for Puerto Rico, during which conferences the contents of the Official Statement and related matters were discussed and reviewed, and conducted such other due diligence as we considered necessary in rendering the opinion set forth below.

The limitations inherent in the independent verification of factual matters and the character of determinations involved in the preparation of the Official Statement are such, however, that we are not passing upon or assuming responsibility for the accuracy, completeness and fairness of any of the statements made in the Official Statement and have made no independent check or verification thereof. Also, we do not express any opinion or belief as to the financial, statistical or economic data or forecasts, numbers, charts, tables, graphs, estimates, projections, assumptions or expressions of opinion contained in the Official Statement, including those contained in the report of the Global Insight, Inc. (the "Global Insight Report") included as an appendix to the Official Statement. We have also assumed, but have not independently verified, that the signatures on all documents and certificates that we examined were genuine.

On the basis of the information which was developed in the course of the performance of the services referred to above, considered in the light of our understanding of the Federal securities laws and the experience we have gained through our practice thereunder, and without having undertaken to determine independently the accuracy, completeness and fairness of the statements contained in the Official Statement, we advised you and now confirm that during the course of our representation of you on this matter, no information came to the attention of the attorneys in our firm rendering legal services in connection with such representation which leads us to believe that the Official Statement (excluding the System and Commonwealth financial statements included or incorporated therein by reference and other financial and statistical data contained or incorporated by reference in the Official Statement, including in the Global Insight Report, and the information regarding The Depository Trust Company, as to all of which, with your permission, we express no view) as of its date and as of the date hereof contained or contains any untrue statement of a material fact or omitted or omits to state a material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading.

We are furnishing this opinion to you solely for your benefit in connection with the transactions contemplated by the Purchase Contract. This opinion may not be relied upon by any other person or for any other purpose without our express written consent, and no view is expressed as to any offering by the Underwriters or others of derivative instruments with investment characteristics not identical to those of the Bonds.

The opinions expressed herein are based on an analysis of existing laws, regulations, rulings and court decisions. Such opinions may be adversely affected by actions taken or events occurring, including a change in law, regulation or ruling (or in the application or official

C-2

NY1 6469021v.13

PR-ERS-000003536

interpretation of any law, regulation or ruling) after the date hereof. We have not undertaken to determine, or to inform any person, whether such actions are taken or such events occur, and we have no obligation to update this opinion in light of such actions or events. Our engagement with respect to this matter has terminated as of the date hereof.

We are not expressing any opinion with respect to the authorization, execution, delivery or validity of the Bonds, or the exclusion from gross income for federal income tax purposes of interest on the Bonds.

This letter and the legal opinions herein are intended for the information solely of the addressees hereof and solely for the purposes of the transactions described in the Official Statement and are not to be relied upon by any other person or entity (including, without limitation, any person or entity that acquires Bonds from the addressees of this letter), or for any other purpose, or quoted as a whole or in part, or otherwise referred to, in any document, or to be filed with any governmental or other administrative agency or other person or entity for any purpose without, in any of these instances, our prior written consent. We do not undertake to advise you of matters that may come to our attention subsequent to the date hereof that may affect the conclusions expressed herein.

We bring to your attention the fact that our conclusions are an expression of professional judgment and are not a guarantee of a result.

<div style="text-align:center">Respectfully submitted,</div>



<div style="text-align:center">C-3</div>

PR-ERS-000003537

**EXHIBIT D-1**

CERTIFICATE OF THE ADMINISTRATOR OF THE EMPLOYEES RETIREMENT
SYSTEM OF THE GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO
(Pursuant to subparagraph 8(d)(5) of the Purchase Contract)

I, JUAN CANCEL ALEGRÍA, Administrator of the Employees Retirement System of the Government of the Commonwealth of Puerto Rico (the "System"), DO HEREBY CERTIFY, in connection with the issuance and sale by the System of its $1,588,810,799.60 Senior Pension Funding Bonds, Series A (the "Bonds"), that:

(1)     except as set forth in the Official Statement dated January 29, 2008 relating to the Bonds (the "Official Statement"), no litigation or other proceedings are pending or, to the knowledge of the System, threatened, in or before any agency, court or tribunal, state, Commonwealth of Puerto Rico, or federal, (A) restraining or enjoining or seeking to restrain or enjoin the issuance, sale, execution or delivery of any of the Bonds or the collection of the Employers' Contributions (as defined in the Bond Resolution hereinafter mentioned) pledged to the payment of the principal of and premium, if any, and interest on the Bonds, (B) contesting or affecting, in any way, the payment, collection or application of the Employers' Contributions of the System or the pledge thereof pursuant to the Bond Resolution (as defined in the Official Statement), (C) contesting or affecting the validity of any provision of the Bonds, the Bond Resolution, the MCDA, the Security Agreement (each as defined in the Purchase Contract hereinafter mentioned) or the amended and restated Purchase Contract, dated January 30, 2008 (the "Purchase Contract"), executed by the System in connection with the issuance of the Bonds, (D) contesting or affecting the validity of any of the proceedings of the System for the authorization, sale, execution or delivery of the Bonds, or the authorization, execution and delivery of the Purchase Contract, the MCDA or the Security Agreement or the adoption of the Bond Resolution, (E) contesting or affecting the organization or existence of the System or the title of any of its officers to their respective offices or any powers of the System under the laws of the Commonwealth of Puerto Rico or (F) contesting or affecting the accuracy or completeness of the Official Statement or any amendment or supplement thereto; (2) the representations and warranties of the System in the Purchase Contract are true, accurate and correct as of the date hereof, and the System has complied with and performed all agreements, covenants and arrangements and satisfied all conditions on its part to be complied with, performed or satisfied hereunder at or prior to the date hereof; (3) subsequent to the date of the most recent financial statements of the System in the Official Statement, there has been no material adverse change in the financial position or results of operations of the System except as set forth in or contemplated by the Official Statement; and (4) the Official Statement as of its date and at all subsequent times up to and including the date hereof, did not and does not contain any untrue statement of a material fact or omit to state a material fact required to be included therein for the purpose for which the Official Statement is to be used or which is necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading.



D-1-1

NYI 6469021v.13

PR-ERS-000003538

WITNESS my hand this 31st day of January, 2008.

JUAN CANCEL ALEGRIA
Administrator

D-1-2

PR-ERS-000003539

CERTIFICATE OF THE SECRETARY OF THE
TREASURY OF THE COMMONWEALTH OF PUERTO RICO
(Pursuant to subparagraph 8(d)(5) of the Purchase Contract)

I, JOSE GUILLERMO DAVILA, Acting Secretary of the Treasury of the Commonwealth of Puerto Rico (the "Commonwealth"), DO HEREBY CERTIFY, in connection with the issuance and sale by the Employees Retirement System of the Government of the Commonwealth (the "System") of its $1,588,810,799.60 Senior Pension Funding Bonds, Series A (the "Bonds"), that:

(a)     Representatives of the Department of the Treasury of the Commonwealth, together with representatives of Government Development Bank for Puerto Rico and of the Office of Management and Budget of the Commonwealth, participated in the preparation of the Commonwealth Report and the general purpose financial statements (for the fiscal year ended June 30, 2006) audited by KPMG LLP, included or incorporated by reference in the Official Statement of the System, dated January 29, 2008, in connection with the issuance and sale of the Bonds (the "Official Statement").

(b)     I have examined the Official Statement (and the information incorporated by reference in the Official Statement) and to my knowledge and belief, (1) as of the date of the Official Statement and as of the date hereof, such Report and financial statements did not and does not contain any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading; (2) as of the date hereof, except as disclosed in such Report and financial statements, there has been no material adverse change in the condition of the Commonwealth, financial or otherwise, since June 30, 2006; (3) as of the date hereof, the Commonwealth is not in default under the provisions of any agreement or of any instrument evidencing or relating to any outstanding indebtedness or other obligations for borrowed money of the Commonwealth or any Commonwealth guaranty of outstanding indebtedness or other obligations for borrowed money of others; and (4) the representations and warranties of the Commonwealth in the Letter of Representations, dated January 30, 2008, are true, accurate and correct as of the date hereof, with the same effect as if made on and as of the date hereof, and the Commonwealth has complied with and performed all agreements, covenants and arrangements and satisfied all conditions on its part to be complied with, performed or satisfied thereunder at or prior to the date hereof.  In making the statements specified in clauses (1) through (4) of this paragraph (b), I have relied, after reasonable investigation, and believe that I am justified in so relying, as to information relating to and provided by governmental agencies or departments other than the Department of the Treasury of the Commonwealth, upon information furnished to me by such agencies or departments.



NY1 6469021v.13

PR-ERS-000003540

WITNESS my hand this 31st day of January, 2008.

_____

José Guillermo Davila
Acting Secretary of the Treasury of Puerto Rico



PR-ERS-000003541

<div align="right"><b>EXHIBIT E</b></div>

<div align="center">
CERTIFICATE OF GOVERNMENT DEVELOPMENT BANK<br>
FOR PUERTO RICO<br>
(Pursuant to subparagraph 8(d)(6) of the Purchase Contract)
</div>

     I, Jorge Irizarry Herráns, President of Government Development Bank for Puerto Rico, DO HEREBY CERTIFY that the Certificate of the Acting Secretary of the Treasury of the Commonwealth of Puerto Rico pursuant to Section 8(d)(5) of the Purchase Contract relating to $1,588,810,799.60 Senior Pension Funding Bonds, Series A of the Employees Retirement System of the Government of the Commonwealth of Puerto Rico (the "Bonds") is hereby confirmed as to all statements made under the general heading "Public Corporations" in the Commonwealth Report included as Appendix IV to the Official Statement relating to said Bonds.

     In rendering this Certificate, I have relied, after reasonable investigation, and believe that I am justified in so relying, as to information relating to and provided by public corporations other than Government Development Bank for Puerto Rico and any of its subsidiaries, upon information furnished to me by such public corporations.

     WITNESS my hand this 31st day of January, 2008.

By: _____

Title:  President

       Government Development Bank

        for Puerto Rico

<div align="center">E-1</div>

PR-ERS-000003542

# Exhibit 7

**EXHIBIT 3:**

(H. B. 2855)
(Conference)

### (No. 116-2011)

(Approved July 6, 2011)

# AN ACT

To     amend **Section 1-105** in order to include temporary employees as members
of the System; amend **Section 2-116** to increase employer contributions;
amend **Section 3-105** to increase employer contributions and prevent them
from being assigned or pledged as collateral by the System to take on loans
as well as require the consent of two-thirds of the members of the Board of
Trustees of the System for such purposes; amend **Section 4-101** to increase
the members of the Board to nine, plus one participant and one pensioner of
the Employee Retirement System of the Government; amend **Section 4-104**
to provide that the Legal Division of the System shall represent the System
in any judicial proceeding; amend **Section 4-105** to require the consent of
two-thirds of the members of the Board of Trustees of the System through
their secrete vote, as well as the enactment of legislation by the Legislative
Assembly, in order to pledge the assets of the System as collateral for any
debt directly incurred, provided that, without such consent, no transaction
shall be valid or binding on the System; amend **Section 4-109** to provide that
a certificate of debt shall be issued and sent to the CRIM and the Secretary
of the Treasury in case that any municipality or municipal entity, agency,
public company, or any other body fails to remit to the System any
contribution and loan payment withheld from employees who participate in
the System, within thirty (30) days following such withholding; that such
debt shall not be cancelled by the Administrator or the Board of the System,
and shall have priority over any other debt under Act No. 447 of May 15,
1951, as amended, known as the "Employee Retirement System of the
Government of the Commonwealth of Puerto Rico"; and for other purposes.

### STATEMENT OF MOTIVES

Through this measure, this Legislative Assembly seeks to protect our public
employees by providing stability to a Retirement System that is undergoing a
serious crisis.

CONFIDENTIAL

GLC-ERS-005283

Act No 447 of May 15, 1951, as amended, established the "Employee Retirement System of the Government of the Commonwealth of Puerto Rico," which created a retirement and benefit system of public employees. According to the provisions of the law in effect, this Retirement System is a trust for public employees whose function is investing and keeping custody of the periodic contributions made by employees and their respective employers in order to be able to make the corresponding future employee pension payments for retirement or disability.

There are several Retirement Systems with defined benefit structures, to wit: the Commonwealth of Puerto Rico Teacher's Retirement System, created by Act No. 91 of March 29, 2004; the Retirement System of the University of Puerto Rico, created by Act No. 1 of January 20, 1966; the Retirement System for the Judiciary of the Commonwealth of Puerto Rico, created by Act No. 12; and the Retirement System of the Puerto Rico Electric Power Authority, which was created through a collective bargaining agreement. The structures of these Systems are very similar to the System in question. However, these systems are not undergoing the same economic crisis as the Employee Retirement System of the Government of the Commonwealth of Puerto Rico.

Between June 30, 2007, and June 30, 2009, the System had a total of 160,053 active participants distributed as follows:

| Year* | Act No. 447 - 1951 | Act No. 1-1990 | Act No. 305-1999 | Total Participants |
|---|---|---|---|---|
| 30-6-09 | 38,249 | 56,991 | 64,813 | 160,053 |
| 30-6-07 | 46,062 | 58,337 | 66,704 | 171,103 |

*Data from the June 2007 and June 2009 Actuarial Reports of the Retirement System, Milliman, Wayne, PA

CONFIDENTIAL

On the other hand, as of June 30, 2009, the Retirement System had 104,971 pensioners, that is, 56,000 more participants than pensioners, which was good. It is evident that the gap between pensioners and participants is closing, which could seriously jeopardize the finances of the System.

**Incentivized Retirements** have contributed to a significant increase in the number of Pensioners who have entered the System, and their pensions, unlike those of **Retirement Windows**, are paid with the funds of the System. Until now, Incentivized Retirements for participants who have attained both the age and the time required to avail themselves of a pension based on merit have been a square deal for the Agencies of the Central Government, Public Corporations, and Municipalities, since thousands of employees are thus removed from their payrolls and 75% of their average salary is then paid by the Retirement System through a pension. This situation clearly accelerates and makes evident the Actuarial Deficit of the System, and also increases the Cash Flow deficit thereof. Although these employees are included in the actuarial studies, the truth is that the percentage of participants eligible to retire who actually do so is never 100%.

At this time, we can say that the Retirement System is undergoing the worst and most serious crisis since its creation. This crisis has been slowly draining the System to the extent that, by 2014, its capital assets will have been exhausted and its cash flow deficit will have reach nearly $500 million preventing it from meeting its obligations, namely, the pensions of our retirees. Only employer and individual contributions would be available to pay the System's obligations, which would not be enough. Consequently, an item would have to be included in the General Budget of the Government to defray such annual deficit of approximately $500 million. Therefore, we must find solutions that are proportionate to the problem and not merely superficial.

CONFIDENTIAL

When compared to other Retirement Systems, this one is facing the worst financial crisis. We can conclude that the decisions made in connection with this System have been the least conservative and most devastating. The financial crisis of the System must be regarded as a very serious issue, because this is the Retirement System with the most participants and pensioners.

History has shown that this Retirement System has been managed differently *vis-á-vis* other Systems. Since System membership exceeds 100,000 pensioners, it is believed that providing benefits to such pensioners will translate into votes for the Government Administration that offers them. Hence, benefits are provided even though the System lacks the resources to pay for them. The following Table includes some of the laws that have provided benefits that have had to be paid with the System's funds:

| Act No. 15 of December 10, 1975 | $110 Million Loan To the General Budget | The System received $110 million without interests |
|---|---|---|
| Act No. 221 of August 9, 1998 | 3% Raise to Pensioners | Retirement System |
| Act No. 22 of June 30, 2005 | Mandatory Retirement 58 years-old Police officers | Retirement System |
| Act No. 35 of April 24, 2007 | Pension Raise from $300 to $400 | Retirement System Retirement System |
| Executive Order No. 14 of May 24, 2006 | Incentivized Retirement | Retirement System |

Through **Act No. 110-1973** a $100 million dollar loan was granted to the government general budget. Such amount was repaid many years later, without the interests accrued thereon.

GLC-ERS-005286

Act No. 221 of August 9, 1998 increased pensions granted under Act No. 447 of May 15, 1951, as amended, by three (3) percent, effective on or before January 1, 1995. Furthermore, it provided the necessary funds to cover the impact of such increase and established that, each year, municipalities and public corporations would defray the costs of the increase to the annuities of pensioners who were employees thereof. This Act had an estimated cost of $18 million which the System also had to cover.

Act No. 22 of June 30, 2005, proposed that members of the Puerto Rico Police and the Firefighters Corps may voluntarily retire after attaining the age of fifty-five (55) and thirty (30) years of service. Retirement will be mandatory as of the date on which participants have completed thirty (30) years of service and attained the age of fifty-eight (58). This Act, which also increased the number of pensioners in the System, and impose no cost whatsoever to be paid to such System, benefits the Central Government by eliminating hundreds of Police officers from its payroll and having the Retirement System pay 75% of their average salary.

Act No. 35 of April 24, 2007, set forth that pensioners receiving a monthly pension of less than four hundred dollars ($400) shall, effective on July 1, 2007, receive a one hundred-dollar ($100) raise or the difference between the pension they receive as of June 30, 2007, and four hundred dollars ($400) a month, whichever is less. This raise must have entailed a recurring expense of approximately $20 million which is defrayed by the System. In order to grant this raise, Act No. 35 proposed a **Bond Issue**. The System pledge its assets to make a three billion dollar Bond Issue to pay this raise among other things. This Bond Issue has accelerated the demise of the System, which is set to occur by 2014.

The System has been undergoing serious economic issues, which have not been given the importance they deserve.

CONFIDENTIAL

## Three Billion-Dollar Bond Issue

We must note that the System was involved in a Bond Issue transaction amounting to $3 billion. Such transaction was so badly structured that, rather than yielding profits, it resulted in tremendous losses that have accelerated the demise of Retirement System. The Bond Issue was illegally made by the System's Administration even though such transaction was submitted to the Legislative Assembly for approval and rejected by the House of Representatives for deeming it detrimental to the System. Such Bond Issue was made notwithstanding the fact that other Retirement Systems in the United States were facing difficulties after carrying out similar transactions. The System was led to believe that the return of the sale of such Bonds would make enough profits to pay bondholders and even defray the cash flow deficit. However, the results proved otherwise. Since day one, such investment did not yield any returns, but rather losses, and the payment to bondholders increased the cash flow deficit on the first year to more than one hundred and ten million dollars annually. At the beginning, the Bond Issue was expected to pay 6.6% interest to bondholders, since profits from the investment of the returns of this Bond Issue were estimated at 11%. When the bond issue was finally made, the expectation was down to 4.4%. This shows that, since the beginning, a loss of approximately 2% was expected. This Bond Issue was so terrible that, from $937,000,000 that were invested in February 2008 there were only $837,000,000 by December 2009. Currently, from a $3 billion Bond Issue, only about $1.3 billion remain. According to the documents related thereto, such Issue was secured with the employee contributions to be collected in the next fifty years. For such reason, the Retirement System should not be allowed to issue debt, such as stock market bonds, to be secured with its assets.

GLC-ERS-005288

## Actuarial Deficit and Cash Flow Deficit

As stated above, the Retirement System has been facing not only an actuarial deficit, but also a cash flow deficit so severe that it is slowly draining the System to the extent that, by 2014, its capital assets will have been exhausted. It is necessary to start closing that gap, and there is no doubt that an increase in participant contributions is the solution to raise the funds of the System.

The Actuarial Deficit of this System has been increasing considerably to the point that, from 2001 to 2009, it has doubled, as shown in the Table below:

| Actuarial Deficit of the Retirement System | | | | | |
|---|---|---|---|---|---|
| | **2001** | **2003** | **2005** | **2007** | **2009** |
| **Net Assets** | $2,429,000 | $1,947,000 | $2,328,000 | $2,892,000 | $1,851,000 |
| **Actuarial Obligations** | ($9,882,000) | (11,191,000) | (12,284,000) | (16,770,000) | (18,944,000) |
| **Actuarial Deficit** | ($7,453,000) | ($9,244,000) | ($9,956,000) | ($13,878,000) | ($17,093,000) |

**\* Information supplied by the Employee Retirement System of the Government**

This large deficit should have warned past administrations about the System's situation and encourage them to find solutions to address this issue; however, it was not so.

The cash flow deficit has been increasing precisely due to all the laws that the System has had to finance, along with a $3 billion dollar Bond Issue. The table below shows the timeline of such deficit:

| CASH FLOW DEFICIT* | |
|---|---|
| **1999-2000** | **17 MILLION** |
| **2000-2001** | **93 MILLION** |
| **2001-2002** | **45 MILLION** |
| **2002-2003** | **62 MILLION** |
| **2003-2004** | **58 MILLION** |

GLC-ERS-005289

| 2004-2005 | 138 MILLION |
|-----------|-------------|
| 2005-2006 | 60 MILLION |
| 2006-2007 | 199 MILLION |
| 2007-2008 | 240 MILLION |
| 2008-2009 | 380 MILLION |

**\* Information supplied by the Employee Retirement System of the Government**

This cash flow deficit was defrayed as follows:

**2000-2001 - 93 Million** – This overdraft was subsequently paid to the Bank with the proceeds from the sale of some of the shares of the Puerto Rico Telephone Company which amounted to $172 million.

**2001-2002 - 45 Million** – Paid with the proceeds of the sale of some of the shares of the Puerto Rico Telephone Company.

**2002-2003 - 62 Million** – Assets were sold for the payment thereof.

**2003-2004 - 58 Million -** Assets were sold for the payment thereof.

**2004-2005 - 138 Million** – A loan was taken for the payment thereof.

**2005-2006 - 60 Million -** A loan was taken for the payment thereof.

**2006-2007 - 199 Million** – The Remaining Shares of the Puerto Rico Telephone Company were sold for $529 million for the payment thereof.

**2007-2008 - 240 Million** – Paid with the proceeds from the Sale of the Bond Issue.

**2008-2009 - 380 Million -** Paid with the proceeds from the Sale of the Bond Issue.

**2009-2010 - 520 Million -** Paid with the proceeds from the Sale of the Bond Issue.

According to Act No. 447, *supra*, the Central Government has contributed to the Actuarial Deficit and the Cash Flow Deficit of the System, because its employer contributions have been less than what the law itself requires. The following table shows what the Government should have paid on account of employer contributions versus what it has actually paid:

CONFIDENTIAL

GLC-ERS-005290

| Deficiency in the Required Employer Contribution Versus the Contribution Made | | | | | |
|---|---|---|---|---|---|
| Year | Required Employer Contribution* | Employer Contribution | Contribution Discrepancy | % Employer Contribution Made | % Employer Contribution Not Made |
| 2004 | $   578,387,000 | $330,336,000 | $248,051,000 | 57.11% | 46.89% |
| 2005 | $   578,387,000 | $374,823,000 | $203,504,000 | 64.80% | 37.20% |
| 2006 | $   816,472,000 | $559,198,000 | $257,274,000 | 68.49% | 31.51% |
| 2007 | $   816,472,000 | $566,524,000 | $249,948,000 | 69.39% | 30.61% |
| 2008 | $1,191,275,000 | $581,285,000 | $609,990,000 | 48.80% | 51.20% |
| 2009 | $1,258,695,000 | $594,509,000 | $664,186,000 | 47.23% | 52.77% |
| 2010 | $1,459,774,000 | $590,742,000 | $869,032,000 | 40.47% | 59.53% |

*Data from the June 2009 Actuarial Report of the Retirement System, *Milliman, Wayne, PA*

Looking at the actuarial deficit and the cash flow deficit we can conclude that there is an imbalance between the actual income of the System and what it needs order to pay its short- and long-term obligations. In Section 21 of Act No. 1, *supra*, a new formula was established to solve this situation by decreasing the deficit caused by a deficiency in contributions. This changed the financing formula of the System. The System's income on account of individual and employer contributions, as well as investments, were intended to provide financing to the System. Under this new formula, employers would assume the responsibility of contributing the difference between the total cost of the System and participant contributions, as well as administration costs. However, this formula has never been implemented by any subsequent administrations of the Retirement System. Today, this is one of the reasons why the actuarial deficit has increased to the point that the System already has its days numbered. The new formula was never implemented and the Act failed to fix a term to review the employer contributions thereunder. This formula was once applied to the Aqueduct and Sewers Authority

GLC-ERS-005291

and, according to the Retirement System, the Authority owes it $833,219,000 on account of employer contributions. The State Insurance Fund also owes $984,943,000. Undoubtedly, a payment plan is necessary to collect this accrued debt; however, such payment plan should not extend beyond ten years given the economic crisis that the Retirement System is presently facing. After the approval of said Act, it was recommended that employer contributions be reviewed by the System every two years.

## Change in Employer and Individual Contributions

The contributions schedule has been changing through different legislations. However, we must recognize that, since 1990, the contributions have not been increased. The Table below shows the different legislations that have introduced changes to individual and employer contribution schedules:

| Amendments to Act No. 447 of May 15, 1951 | Individual Contribution | Employer Contribution |
|---|---|---|
| Act No. 447 of May 15, 1951 | 5.5% | 4.5% |
| Act No. 162 of July 20, 1979 | 7% | 7% |
| Act No. July 1st, 1982 | 8% | 8% |
| Act No. 1 of February 16, 1990 | 8.275% | 9.275% |

The actuarial study conducted in 2003, recommended that employers should make a contribution of 16.915% in order for the System to remain balanced. This did not occur, and today we see the results.

## Contribution Remittance Debts

Failure to implement Section 2-116 of Act No. 447, *supra*, now has make it necessary to increase contributions as a short-term solution to the cash flow problem. Thus, said Section is hereby amended to provide that such formula shall be reviewed every two (2) years.

CONFIDENTIAL

GLC-ERS-005292

Carelessness and delay are the order of the day in the Retirement System. Hence, it is necessary to amend the form and manner of sending remittances thereto. Even though previous laws have attempted to implement various remedies, such remedies have been neglected and, therefore, ineffective. The fastest and simplest solution is to enable the System to collect the debt of the municipalities directly from the CRIM, whenever a municipality fails to send their remittances within thirty days, or directly from the Department of the Treasury in the case of agencies that fail to pay within the term provided therefor. Nothing justifies an agency or mayor that withholds contributions and loan payments from the wages of participants and fails to remit such moneys to the Retirement System. We must put an end to this wrongful practice because it not only affects the finances of the System, but also participants themselves when they apply for loans and their applications are rejected because their accounts are past due. This also causes participants to be denied their rights to retire. Thus, we seek to provide that, if municipalities fail to send remittances to the System within 30 days, the System shall issue a Certification to the CRIM so that the latter pays such debt with the funds of the municipality. With regard to Government agencies, we further provide that the System shall issue a certification of debt to the Secretary of the Treasury and the latter shall issue a payment charged to the funds of such agency within 30 days. Debts owed by Government agencies, public corporations, and instrumentalities in connection with the remittance of individual and employer contributions and other payments to the retirement System shall have priority over any other debt. If there is any discrepancy between any Government agency, public corporation, and instrumentality and the System in connection with remittances, such discrepancy shall be notified to the Commission to Solve Controversies of Payments and Debts among Government Agencies. There is no justifiable reason

CONFIDENTIAL

GLC-ERS-005293

for a Government agency to owe excessive sums of money to the Retirement System.

**Retirement Savings Accounts**

This measure introduces changes to the Retirement Savings Account Program. Employer contributions are increased from 9.275% to 11.5% and, 20% of such amount shall be granted to the Participants of the Program. Even though this Act specifically provides that employer contributions shall be deposited in the System to increase its assets, reduce its actuarial deficit, and enable the System to meet its future obligations, it should be clarified that employer contributions shall not be used or pledged as collateral by the System to take on loans. In order to do so, the consent of two-thirds of the members of the Board of Trustees of the System through their secret vote, and the enactment of legislation approved by two-thirds of the members of the Legislative Assembly shall be necessary.

The changes made through the amendments being introduced may seem somewhat drastic, but we should bear in mind that in *Bayrón Toro v. Sierra* (119 DPR 605), our highest Court held, in a discussion about the constitutional bar against the impairment of contractual obligations, that a balance must be established when making reasonable and necessary changes to save the actuarial solvency of the Retirement System to safeguard the interests of the participants.

All contribution increases herein provided are established for the purposes of attaining an actuarial balance between the income of the System and the payment of its obligations and expenditures. For such reason, it is necessary to conduct an actuarial study as part of this measure. The flow of funds from contributions plus the yield of the System's assets must be sufficient to cover administrative costs and the payment of benefits.

CONFIDENTIAL

This Retirement System must achieve financial stability, and the Government should protect it out of deference and respect to our pensioners who worked hard and contributed to build the Puerto Rico that we enjoy today.

With the approval of this measure, this Legislative Assembly seeks to strengthen the Employee Retirement System of the Government of the Commonwealth of Puerto Rico to ensure its financial stability and guarantee that both participants and pensioners can rest assured that their future will be financially stable, and that, at the end of their public service, the Retirement System shall provide them financial security in their retirement.

***BE IT ENACTED BY THE LEGISLATIVE ASSEMBLY OF PUERTO RICO:***

Section 1.- Section 1-105 of Act No. 447 of May 15, 1951, as amended, is hereby amended to read as follows:

"Section 1-105.- Membership.-

(a)    The membership of the system shall be constituted by every person who holds a regular position as a career or trust, or temporary employee or with probationary personnel status in any executive department, agency, administration, board, commission, office or instrumentality of the Executive Branch, by the Justices of the Peace, the regular employees and officials of the Judiciary Branch and the regular officials and employees of the Legislative Assembly of Puerto Rico, and by all regular officials and employees of the municipalities, including the mayors. Municipal temporary employees shall not be participants of the Retirement System.

(b)    Regular and temporary employees of those public enterprises and municipalities who are participating employers of the system shall also be participating members of the system, subject to what is established in Section 1-110 of this Act.

CONFIDENTIAL

GLC-ERS-005295

(i)      …………………………………………………………......

……………………………………………………………………………."

Section 2.- Section 2-101 of Act No. 447 of May 15, 1951, as amended, is hereby amended to read as follows:

"**Section 2-101.- Retirement Annuity**.-

(a)      Upon separation from service, on or after reaching the ages, and after completing the period of service indicated below, all participants who have not been reimbursed their accrued contributions shall be entitled to receive a retirement annuity.  Said annuity shall start on the date on which the participant files his/her application for retirement, but in no case before his/her separation from the service.

……………………………………………………………………

(b)      The preceding provisions of this Section shall not be applicable to officer participants of this System who have served as mayors for at least eight (8) years.

……………………………………………………………………

The maximum retirement annuity to be granted under this subsection shall be ninety percent (90%) of the highest salary that the mayor may have earned.

The payments of the retirement annuity shall begin as of the filing date of the retirement application, but never before the mayor has attained fifty (50) years of age.

……………………………………………………………………

(f)      The deferred retirement annuity provided in this Section shall take effect at the participant's request."

Section 3.- Section 2-116 of Act No. 447 of May 15, 1951, as amended, is hereby amended to read as follows:

GLC-ERS-005296

"**Section 2-116.- Employer Contributions**.-

(a)　　Employer's contributions shall cover the difference between the total cost of the benefits provided by the System and the costs of administration, reduced by the portion contributed by participants.

(b)　　………………………………………………………………..

(c)　　………………………………………………………………..

(d)　　Starting on July 1st, 2011, the employer shall contribute to the appropriate System a minimum percentage equal to ten point two hundred seventy-five (10.275) of the compensation regularly received by the participants, and shall make such contributions concurrently with employee contributions, as provided by this Act. As of July 1st, 2011 and until June 30, 2016, the minimum employer contribution minimum of ten point two hundred seventy-five percent (10.275%) shall be increased annually each July 1st. Such increase shall be equal to one percent (1%) of the compensation that participants regularly receive.　As of July 1st, 2016 and until June 30, 2021, the minimum employer contribution rate in effect as of June 30 of each year shall be increased annually by one point twenty-five percent (1.25%) of the compensation that participants regularly receive.

　　　　　　Provided, that the established increases applicable to Municipalities for Fiscal Years 2011-2012, 2012-2013, and 2013-2014 shall be included in the budget proposal submitted to the Legislative Assembly by the Office of Management and Budget.

(e)　　Any difference between the contribution required by subsection (c)(3) of this Section and the minimum contribution established in subsection (d) of this Section shall constitute a deficiency in the employer contribution. The obligation accrued as a result of this deficiency shall constitute an actuarial deficit for the System and an obligation of the employer.

CONFIDENTIAL

GLC-ERS-005297

(f)    …………………………………………………………….

(g)    …………………………………………………………."

Section 4.- Section 3-105 of Act No. 447 of May 15, 1951, as amended, is hereby amended to read as follows:

"**Section 3-105.- Retirement Savings Account Program – Employer Contributions**.-

Starting on July 1st, 2011, it shall be mandatory for every employer to contribute to the System a sum equal to ten point two hundred seventy-five (10.275%) of the compensation of each participant of the Program while such participant is an employee. These contributions shall be deposited in the System to increase the level of the assets of the System, reduce the actuarial deficit, and enable the System to meet its future obligations. As of July 1st, 2012 and until June 30, 2016, the minimum employer contribution rate of ten point two hundred seventy-five percent (10.275%) shall be increased annually each July 1st. Such increase shall be equal to one percent (1%) of the compensation that participants regularly receive. As of July 1st 2016 and until June 30, 2021, the minimum employer contribution rate in effect on June 30 of each year shall be increased annually by one point twenty-five percent (1.25%) of the compensation regularly received by participants. Provided, that the established increases applicable to Municipalities for Fiscal Years 2011-2012, 2012-2013, and 2013-2014 shall be included in the budget proposal submitted to the Legislative Assembly by the Office of Management and Budget. Said employer contributions may not be assigned or pledged as collateral by the System to take on loans. In order for such employer contributions to be assigned or pledged as collateral by the System to take on loans, the consent of two-thirds of the members of the Board of Trustees of the System through their secret vote and the enactment of legislation which shall be passed by the affirmative vote of two-thirds of the members of the Legislative

CONFIDENTIAL

GLC-ERS-005298

Assembly shall be necessary. In the event that an amendment is introduced in the Legislative Assembly to eliminate the provisions of this Act regarding the consent required to take on loans pledging employer contributions as collateral, the consent of two-thirds of the members of the Legislative Assembly shall be necessary to pass such amendment."

Section 5.- Section 4-101 of Act No. 447 of May 15, 1951, as amended, is hereby amended to read as follows:

"**Section 4-101.- Administration.-**

The system created by this Act shall be considered a trust. Any change in the benefit structure of the trust, which results in an increase in the amount of annuities or other benefits, shall be supported with prior actuarial studies to determine its cost, and the corresponding legislation shall provide for its financing.

A Board of Trustees is hereby created and established, which shall be responsible for the enforcement of the provisions of this Act. Said Board shall consist of eleven (11) members, four (4) of whom shall be ex-officio members, to wit: The Secretary of the Treasury, the Commissioner of Municipal Affairs, the President of the Government Development Bank for Puerto Rico, and the Director of the Director of the Human Resources Office. Three (3) members shall be appointed by the Governor of Puerto Rico for terms of three (3) years each, and shall perform their duties until a successor is appointed and takes office. Two (2) of these members shall be participants of the System created by this Act and the other one shall be a participant of the Retirement System of the Judiciary, both shall have at least ten (10) years of credited service on the date of their appointment. Of the remaining four (4) members, two (2) shall be pensioners of each system, appointed by the Governor for terms of three (3) years and shall perform their duties until a successor is appointed and takes office. The other two

CONFIDENTIAL

GLC-ERS-005299

(2) members shall be the Chairs of the Federation of Mayors and the Association of Mayors of Puerto Rico, respectively.

The ex-officio members may designate delegates to represent them at meetings of the Board and in any other activities within their duties as members of the Board, except when the Chair of the Board requires their attendance.

The System hereby created shall be organized as an agency of the Government of Puerto Rico, independent and separate from others. Neither the Board of Trustees nor the Administration shall be subject to provisions of the 'General Services Administration Act,' or of the Office of Management and Budget Organic Act'; they shall, however, be individual Administrators under the provisions of Act No. 184 of August 3, 2004, as amended, known as the 'Puerto Rico Public Service Personnel Act.'"

Section 6.- Section 4-104 of Act No. 447 of May 15, 1951, as amended, is hereby amended to read as follows:

"**Section 4-104.- Treasurer and Legal Counsel of the System.-**

The Secretary of the Treasury shall be the Treasurer of the System and:

(a) Act as the official custodian of the cash belonging to the System and hold said cash subject to the orders of the Board;

(b) ………………………………………………………………………

(c) ………………………………………………………………………

(d) ………………………………………………………………………

The System's Legal Division shall represent the System in any judicial proceedings including lawsuits, trials, actions, and proceedings related to the investments made by the Administrator as specified in Sections 4-106 and 4-108. The Department of Justice shall continue to handle any pending legal proceeding at the time of approval of this Act until its resolution, along with an attorney of the

CONFIDENTIAL

GLC-ERS-005300

Retirement System Legal Division, and both shall be equally responsible for the defense and processing thereof.

………………………………………………………………………………"

Section 7.- Section 4-105 of Act No. 447 of May 15, 1951, as amended, is hereby amended to read as follows:

(a) …………………………………………………………………………

(b) …………………………………………………………………………

(c) …………………………………………………………………………

(d) Authorization to Incur Debts.- The Board of Trustees may authorize the Administrator to take on a loan from any financial institution of the Government of the Commonwealth of Puerto Rico or the Federal Government of the United States of America. Bond Issues are hereby prohibited as part of the direct placement of debts secured with the assets of the System. For the direct placement of debts secured with the assets of the System, the consent of two-thirds of the members of the Board of Trustees of the System, through their secret vote, as well as the enactment of legislation by the Legislative Assembly to such purposes shall be necessary. This voting shall be detailed in the minutes of the Board by recording therein the number of votes in favor, against, and/or abstained. If the placement is made without such consent, it shall not be valid or binding on the System. In the event that an amendment is introduced in the Legislative Assembly to provide for the placement of direct debt secured with the assets of the System, the consent of two-thirds of the members of the Legislative Assembly shall be necessary to pass such amendment. It is hereby clarified for future generations that the Retirement System made a Bond Issue amounting to three billion dollars, which bears between 6.25% to 6.35% interest to bondholders, thus encumbering employer contributions of the System for up to fifty years. Such Bond Issue was made even though the System had been undergoing a cash flow

CONFIDENTIAL

deficit for several years. Such action has significantly contributed to the financial crisis of the System. The interest accrued on these obligations shall be exempt from the payment of income tax to the Commonwealth of Puerto Rico."

Section 8.- Section 4-109 of Act No. 447 of May 15, 1951, as amended, is hereby amended to read as follows:

**"Section 4-109.- Penalties. -**

(a)    …

…

(e)    If the director fails to meet the certification and notice requirement imposed by this Section, he/she shall be guilty of a misdemeanor and, upon conviction, shall be punished by imprisonment for a term of six (6) months or by a fine of five thousand dollars ($5,000) or both, at the discretion of the Court. Such fine shall be paid from his/her own pocket.

(f)    In the event that the director of an agency, public corporation or municipality knowingly, willfully, and without just cause fails to remit the funds owed to the System after he/she has been notified by the Administrator, he/she shall be guilty of a felony and, upon conviction, shall be punished by imprisonment for a fixed term of six (6) years or a fine of ten thousand dollars ($10,000) or both, at the discretion of the Court. Such fine shall be paid from his/her own pocket.

(g)    Municipal debts on account of individual or employer contributions, which are in arrears for more than thirty (30) days, shall have priority over any other debt of any municipality or municipal entity having participants in the Retirement System. If such municipality or municipal entity fails to remit to the Retirement System employer or individual contributions withheld from employees who participate in the Retirement System, within thirty (30) days following such withholding, the Administrator shall issue a Certificate of debt to the CRIM and

CONFIDENTIAL

GLC-ERS-005302

immediately remit such funds to the System in the amount owed. Such debt shall not be cancelled by the Administrator or the Board of the System.

(h)   Debts on account of individual or employer contributions owed to the Retirement System, which are in arrears for more than thirty (30) days, shall have priority over any other debt of any agency, public company, or any entity having participants in the Retirement System. If any agency, public company, or any entity having participants in the Retirement System fails to remit to the Retirement System the employer or individual contributions withheld from employees who participate in the Retirement System, within thirty (30) days following such withholding, the Administrator shall issue a Certificate of debt to the Secretary of the Treasury and immediately remit such funds to the System in the amount owed. Such debt shall not be cancelled by the Administrator or the Board of the System."

Section 9.- It is hereby provided that, after an actuarial analysis of this bill, if the sum of individual or employer contributions exceed the cash flow necessary to meet the obligation, the remainder thereof may not be used and shall be directly treated as capital to be invested every year.

Section 10.- The operating budget of the System may not exceed 20% of the employer contributions of the Retirement Systems administered by the Retirement System Administration.

Section 11.- Insofar as the System is not at least 75% funded, no Incentivized Retirement may be granted.  However, if such retirements are granted, the cost of any pension that exceeds the normal retirement of such agency shall be paid to the System for a five-year period.

Section 12.- Within one hundred twenty (120) days as of the effective date of this Act, the Administrator may amend any Regulations so as to adjust them to this new Act, and approve the Personnel Regulations, and any other, as directed through this or any other Act providing therefor.  If the Administrator is not able to

GLC-ERS-005303

make such amendments within such term, he/she shall request the Legislative Assembly for additional time.

Section 13.- Severability Clause

If any section or part of this Act were ruled null or unconstitutional by any competent court, such ruling shall not affect, impair, or invalidate the remaining provisions thereof.  Any law or part thereof that is in conflict with any provisions of this Act is hereby repealed.

Section 14.- This Act shall take effect on July 1, 2011.

GLC-ERS-005304

# CERTIFICATION

I hereby certify to the Secretary of State that the following **Act No. 116-2011 (H. B. 2855)**

**(Conference)** of the **5th Session of the 16th Legislature** of Puerto Rico:

**AN ACT**    to amend **Section 1-105** in order to include temporary employees as members of the System; amend **Section 2-116** to increase employer contributions; amend **Section 3-105** to increase employer contributions and prevent them from being assigned or pledged as collateral by the System to take on loans as well as require the consent of two-thirds of the members of the Board of Trustees of the System for such purposes; amend **Section 4-101** to increase the members of the Board to nine, plus one participant and one pensioner of the Employee Retirement System of the Government; amend **Section 4-104** to provide that the Legal Division of the System shall represent the System in any judicial proceeding; amend **Section 4-105** to require the consent of two-thirds of the members of the Board of Trustees of the System through their secrete vote, as well as the enactment of legislation by the Legislative Assembly, in order to pledge the assets of the System as collateral for any debt directly incurred, provided that, without such consent, no transaction shall be valid or binding on the System; etc.

has been translated from Spanish to English and that the English version is correct.

In San Juan, Puerto Rico, on the 18th day of April, 2013.

Juan Luis Martínez Martínez
Acting Director

CONFIDENTIAL                                                    GLC-ERS-005305

# Exhibit 8

**EXHIBIT 6**

# EXPERT REPORT
## OF
# ROBERT W. DOTY

# JULY 1, 2020

# PREPARED AT THE REQUEST OF
# THE GOVERNMENT PARTIES
# AND COMMITTEES

*IN RE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, AS REPRESENTATIVE OF THE EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO, CASE NO. 17-3566 (D.P.R.)*

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................1

SELECT BACKGROUND FACTS.........................................................5

DISCUSSION OF KEY PRINCIPLES ..................................................8

ANALYSIS OF THE ERS BOND ISSUANCES..................................19

APPENDIX I—MATERIALS REVIEWED.........................................I-1

APPENDIX II—DEFINITIONS ...........................................................II-1

APPENDIX III—QUALIFICATIONS AND CURRICULUM VITAE ..........................III-1

# EXPERT REPORT OF
# ROBERT W. DOTY

**Re:** *In re Financial Oversight and Management Board for Puerto Rico, as representative of the Employees Retirement System of the Government of the Commonwealth of Puerto Rico, Case No. 17-3566 (D.P.R.)*

## INTRODUCTION

      I have been retained by Brown Rudnick LLP ("Counsel"), as counsel to the Financial Oversight and Management Board for Puerto Rico (the "Board") acting through its Special Claims Committee ("SCC"), to prepare this Report in connection with certain litigation (the "Litigation") in the above-referenced case of the Employee Retirement System of the Commonwealth of Puerto Rico ("ERS") pending under Title III of the Puerto Rico Oversight, Management, and Economic Stability Act ("PROMESA"). As part of my engagement, I have also agreed to assist certain other parties who are aligned in interest with the SCC in the Litigation, including (i) the Official Committee of Unsecured Creditors of the Title III Debtors and its counsel, Paul Hastings LLP, Genovese Joblove & Battista PA, and Casillas Santiago Torres LLC; (ii) the Official Committee of Retired Employees of the Commonwealth of Puerto Rico and its counsel, Jenner & Block LLP; (iii) the Puerto Rico Fiscal Agency and Financial Advisory Authority and its counsel, O'Melveny & Myers LLP; and (iv) the Board and its counsel, Proskauer Rose LLP. I have been retained as an independent testifying expert witness. I am over the age of 18 years, and am competent to testify at trial. I have personal knowledge of the matters discussed herein. If called upon, unless stated otherwise, I am prepared to testify consistently with the analysis and opinions I express in this Report.

### A. Assignment

      I have been engaged by Counsel in connection with the SCC and other parties' objections and related challenges (collectively, the "Objections") to claims filed in ERS' Title III case by beneficial holders of three series of senior pension funding bonds that ERS issued to the public in 2008 (the "Bonds"[1] or the "ERS Bonds"). My engagement relates to the meaning of certain municipal finance terms used in the ERS Enabling Act relevant to the issuance of the Bonds.

      I understand from Counsel that, at all relevant times, the ERS Enabling Act authorized ERS to incur debt through certain means, including "seeking a loan from any financial institution" (or, depending upon the translation of the Act used, "borrowing" from a financial institution) and "direct placements of debt." I also understand that certain beneficial holders of the ERS Bonds ("the ERS Bondholders") have taken the position that the underwritten public

---

[1] *See* Appendix II for definitions of certain capitalized terms used in this Report.

**Report of Robert W. Doty**
**Page 2**

offerings through which the Bonds were issued in 2008 constituted "borrowing from a financial institution" by ERS or, alternatively, "direct placements of debt" by ERS, and thus were authorized by the ERS Enabling Act.

Counsel has asked for my expert opinion on the following questions:

1.  Whether ERS' issuance of bonds through underwritten public offerings constituted a "borrowing" or "loan" "from a financial institution" according to the meaning of that terminology as used in municipal finance.

2.  Whether ERS' issuance of bonds through underwritten public offerings constituted "direct placements of debt" according to the meaning of that terminology as used in municipal finance.

## B. Qualifications

I have over 45 years of experience in the finance industry in a diversity of capacities relating to several billions of dollars of municipal and corporate finance transactions in approximately two dozen states.  Over the course of my career, I have participated in a substantial number of municipal securities issues on behalf of issuers, underwriters, investors, and other parties to the transactions.

My experience includes work as special consultant to underwriters, issuers and bond counsel and as financial advisor to bond issuers. In the course of those engagements, I have advised, among other entities, municipal bond issuers, issuer officials, underwriters, and investors in municipal securities offerings.  I have served as a municipal bond underwriter with three firms in three states, have worked with and for underwriters as underwriter counsel and worked with underwriters in numerous municipal bond issues.[2]

I am the author or co-author of numerous books, chapters, and articles on municipal bond transactions and roles and responsibilities of various parties in connection with, and customs, practices and standards of care relating to, municipal securities transactions. Those publications include seminal articles as to disclosure practices, due diligence and investigatory procedures, roles and responsibilities of parties, and fiduciary responsibilities in municipal securities transactions.

I have also held numerous directorship and other leadership positions with a variety of industry organizations, including the Government Finance Officers Association ("GFOA"), where I served as the General Counsel and as a key drafter of authoritative guidance on disclosure and bond offering procedures; the National Federation of Municipal Analysts

---

[2]  In addition, I have participated in a substantial number of corporate stock and bond transactions, both public offerings and private placements.

**Report of Robert W. Doty**
**Page 3**

("NFMA"), where I served on the Board of Governors and as a member and officer of NFMA committees; the National Association of Independent Public Finance Advisors ("NAIPFA"), where I served as Vice President and a member of the Board of Directors and as Chair of NAIPFA's Public Affairs Committee; and the Southern Municipal Finance Society, where I served as President and a Director. Other examples of my participation in industry organizations include: (i) serving on the Municipal Securities Rulemaking Board's ("MSRB") Municipal Advisor Professional Qualifications Committee designing qualifications requirements for municipal advisors; (ii) serving on the Muni Council, formed initially through the auspices of the MSRB, including as Chair of the Security Committee of the Muni Council in connection with the development of a central post office for issuer and other obligor continuing disclosure filings; (iii) serving as a Subject Matter Expert for the MSRB's eLearning initiative; and (iv) serving as Vice Chair of Committees and Subcommittees of the National Association of Bond Lawyers and the American Bar Association.

The foregoing is a very brief synopsis of my industry experience. Appendix III of this Report and the accompanying *curriculum vitae* contain a more detailed description of my qualifications and professional background.

## C. Summary of Opinions

An underwritten public municipal bond offering, such as the 2008 ERS Bond issuances, is not a loan by or borrowing from a financial institution, nor is it a direct placement of debt.

When a municipal bond issuer sells bonds to an underwriting syndicate, the issuer is not regarded in the industry as "borrowing" or "taking a loan" from the underwriting syndicate, the members of which serve only as intermediaries for distributing the bonds to the public; rather, the issuer is regarded as borrowing from the public investors who buy the bonds from the underwriters. ERS issued the Bonds through underwriting syndicates led by UBS, which marketed and sold the Bonds to public investors. ERS thus borrowed from these public investors, not from UBS or any of the other member of the underwriting syndicate.

Neither are the ERS Bonds a "direct placement of debt." In municipal finance and the municipal bond market, some commentators use the terms "direct placement" and "private placement" with differing emphases, and other commentators use the terms synonymously. Based on my knowledge and experience in the municipal finance industry, the term "direct placement" is commonly understood in municipal finance to be a type of the larger universe of "private placements." Both a direct placement and a private placement involve the sale of bonds directly to either a single investor or a small number of sophisticated investors. Neither involves the sale of bonds to the general public through an underwritten public offering. Because the ERS Bond issuances were underwritten public offerings, they were not "direct placements of debt."

**Report of Robert W. Doty**
**Page 4**

## D.  Documents and Information Considered

This Report takes into account the documentation and recognized and authoritative industry guidance I have reviewed to date, as well as my active participation in the financial markets for more than 45 years.  Appendix I hereto identifies the materials I considered in reaching my opinions.

I understand that I may be asked in the future to review additional documentation or to conduct additional research and analysis.  I also understand that I may be asked to form additional opinions as to other questions upon appropriate review. I reserve the right to modify or supplement this Report in any respect following my review of additional factual information or documents or additional research and analysis or to respond to additional questions.

This Report and the opinions I express herein are based upon my education, specialized training, skill, personal experience and knowledge of common and prevailing roles and responsibilities of parties involved in municipal bond transactions, and of industry customs, practices and standards of care prevailing in the municipal bond market in 1988 and 2008, and upon my consideration of materials discussed herein.

## E.  Compensation

I am an independent consultant, and have no present or contemplated future interest in this matter or personal bias with respect to the parties to the litigation.  My compensation for my work in this matter is $825 per hour, plus my out-of-pocket expenses. The payment of my fees and expenses is not contingent upon the outcome of this matter.

Report of Robert W. Doty
Page 5

# SELECT BACKGROUND FACTS

### A.  The ERS Enabling Act

I have been informed that the Bonds that are the subject of this Litigation were purportedly issued under the "ERS Enabling Act," which is Act No. 447 of the Legislative Assembly of Puerto Rico, approved May 15, 1951, as amended and supplemented, including as amended by Act 46-1988.

I have been informed by Counsel that the official English translation of the Act states as follows:

> The Board of Trustees may authorize the Administrator to seek a loan from any financial institution of the Government of the Commonwealth of Puerto Rico or the Federal Government of the United States of America or through the direct placement of debts, securing said debt with the assets of the System.

I understand that a dispute exists concerning certain alleged errors in the official translation, and that ERS Bondholders argue the following, alternative English translation applies:[3]

> The Board of Trustees may authorize the Administrator to borrow from any financial institution, from the Government of the Commonwealth of Puerto Rico or from the Federal Government of the United States of America, or through the direct placement of debts, securing said debt with the assets of the System.

### B.  The 2008 ERS Bond Issuances

In 2008, ERS issued Bonds in three "series"—Series A Bonds, Series B Bonds and Series C Bonds—in the aggregate principal amount of approximately $3 billion.  The purpose of the Bond offerings as stated by ERS in its Series A Official Statement (the document used to market the Bonds to public investors) was "to increase the funds currently available to pay benefits under the System's largest benefit plan … and to reduce the unfunded accrued actuarial pension

---

[3] I do not opine in this report on the proper English translation of the ERS Enabling Act.  Instead, for the purposes of this Report, I consider both the official English translation and the ERS Bondholders' translation of the statute.  For the avoidance of doubt, my opinions expressed in this Report are no different whether the statute authorized the Administrator "to seek a loan" or "to borrow."

**Report of Robert W. Doty**
**Page 6**

liability of this benefit plan." [4]  The same statement appears in each of ERS' Series B and Series
C Bond Official Statements. [5]

ERS had warnings that the Bond offerings were particularly complex and risky
transactions. Prior to issuing the Bonds in 2008, the government of Puerto Rico, and
subsequently ERS, investigated multiple sources of raising capital. [6]  In 2007, Merrill Lynch
issued a formal proposal recommending a $7 billion bond issuance. [7]  Credit ratings agencies
expressed multiple concerns about the proposal. [8]  Ultimately, Merrill Lynch was unable to find a
sufficient market for the bonds at the desired terms. [9]  Thereafter, ERS then downsized the
principal amount of the Bond offerings "due to a lackluster demand in the global market." [10]

ERS issued the Bonds in "bona fide public offerings," pursuant to which UBS, and the
other members of the underwriting syndicates, as intermediaries, marketed and sold the Bonds to
public investors. [11]  The Bonds, at the time of issuance, were rated by all three major rating
agencies. [12]

The public offerings were subject to few restrictions on the investor universe to whom the
underwriting syndicates could offer and sell the Bonds.  ERS did not require that investors in the
Bonds be financial institutions or sophisticated investors or that they acquire the Bonds solely for
investment without an intent to distribute in the public municipal bond market.  Finally, there
was no requirement that the Bonds be sold in denominations of $100,000.00 or more, as is
typical in direct placements and other private placements; instead, as is virtually uniform in a
public offering, the Bonds were sold in the typical publicly-offered bond minimum denomination

---

[4]  ERS' Series A Official Statement at 2.

[5]  ERS' Series B Official Statement at 2 and ERS' Series C Official Statement at 2.

[6]  Kobre & Kim Report at 200-207.

[7]  Kobre & Kim Report at 206-208.

[8]  Kobre & Kim Report at 206-208.

[9] Kobre & Kim Report at 206-208.

[10]  Conway MacKenzie Report at 12.

[11] ERS' Series A Bond Official Statement identifies on its cover twelve underwriters as members of the
syndicate offering, the Series B Bond Official Statement identifies three underwriters, and the Series C
Bond Official Statement identifies twelve underwriters.  While there were overlaps in syndicate
memberships, and all were led by UBS, no two ERS Bond syndicates were exactly alike.

[12] ERS' Series A Bond Official Statement at 4, Series B Bond Official Statement at 4, and Series C Bond
Official Statement at 4-5.

**Report of Robert W. Doty**
**Page 7**

of $5,000.00 principal amount (or for capitalized interest Bonds, $5,000.00 maturity amount) and integral multiples thereof. [13]

The terms of the Bonds for the benefit of the public investors are set forth in the ERS Pension Funding Bond Resolution and the Supplemental Bond Resolutions for the respective Bonds. ERS did not engage in any direct negotiations with the public investors in setting these terms or establishing Bond prices. Instead, ERS provided necessary documentation—ERS' Official Statements, Bond Resolutions and other Bond documentation—to UBS and the other underwriters in the respective underwriting syndicates for the underwriters to utilize in their direct discussions and negotiations with public investors for the benefit of ERS.

## C. The Claims and Litigations

As noted above, I understand that the ERS Bondholders have filed claims in ERS' case under Title III of PROMESA for payment on the Bonds. I further understand that (i) the SCC and other parties have challenged the Bonds on the grounds that the ERS Enabling Act did not permit ERS to issue bonds through public offerings in objections to claims and adversary proceedings, among other avenues, and (ii) the ERS Bondholders have argued in response that the Bond issuances constituted a "loan" or "borrowing" by ERS from a financial institution (specifically, UBS, as underwriter) and/or a "direct placement of debt."

---

[13] Each Supplemental Resolution Section 2.3(d).

# DISCUSSION OF KEY PRINCIPLES

To provide context for my analysis, I first provide an overview of certain key principles in municipal finance, including (i) the roles, expectations, and objectives of underwriters in a public municipal bond issuance, and (ii) the meaning and nature of a "direct placement of debt" in municipal finance.

This discussion is based on my decades of experience in the municipal bond industry from the mid-1970s into the 2010s.  I also draw upon recognized industry guidance, including guidance offered by the GFOA and by municipal bond underwriter representatives, notably the Securities Industry and Financial Markets Association ("SIFMA").  In addition, I rely upon key recognized municipal bond market legal and financial authorities, such as, among others cited herein, Robert Fippinger and Christopher Mier.

## A.  Industry Standards for Underwritten Bond Distributions

### 1.  The Role of Underwriters Generally

Underwriters perform an important function by undertaking intensive efforts to identify and negotiate with potential public municipal bond investors who may ultimately purchase and hold municipal bonds.  This role of underwriters is critical because municipal bond issuers generally lack the capability, knowledge, sophistication, and investor contacts to be able to identify and negotiate with a broad range of investors for the issuer's bonds.

To carry out a public offering of a municipal bond issuance, an issuer will engage in well-established practices to facilitate the offering and sale of the bonds by underwriters to public investors.  Such practices include the issuer's preparation of bond offering documents, known as "official statements," through which the issuer provides substantial detailed information regarding itself and the bond offering.  The underwriters will then use this information in their direct discussions and negotiations with public investors regarding the investors' potential purchases of the bonds.

As stated in a "Best Practice" guide published by GFOA, "[t]he primary role of the underwriter in a negotiated sale is to market the issuer's bonds to investors."[14]

GFOA strongly emphasizes the underwriter's ability to obtain the lowest borrowing cost from public investors:

> The issuers (sic) goal in a negotiated bond sale is to obtain the lowest possible borrowing cost for the bonds. To maximize the potential of this occurring, *the*

---

[14] GFOA, "*Selecting and Managing Underwriters for Negotiated Bond Sales*" (2014).

Report of Robert W. Doty
Page 9

> *issuers goal in the underwriter selection process is to select the underwriter(s)
> that has the best potential for obtaining the lowest borrowing cost*. Those
> underwriters are typically the ones that have demonstrated both experience
> underwriting the type of bonds being proposed and the strongest
> marketing/distribution capabilities. [15]

Importantly, in its Best Practice, describing "the only legal relationship" between the
municipal bond issuer and the underwriters, GFOA adds:

> The *only legal relationship* between the issuer and an underwriter is created by a
> Bond Purchase Agreement signed at the time of the pricing of the bonds,
> *wherein the issuer agrees to sell the bonds to the underwriter and the
> underwriter agrees to purchase the bonds from the issuer* at an agreed upon
> price. [16]

In 2012, the MSRB published *Interpretive Guidance Concerning the Application of
MSRB Rule G-17 to Underwriters of Municipal Securities* (Aug. 2, 2012), preceded by MSRB
Notice 2012-38 (July 18, 2012), [17] stating that municipal bond underwriters must disclose to
municipal bond issuers that the underwriters' *"primary role is to purchase securities with a view
to distribution in an arm's-length commercial transaction with the issuer …."* [18]

The Securities and Exchange Commission ("SEC") has described the role of underwriters
in public bond issuances similarly. For example, in the definition of the term "underwriter" in

---

[15] *Id*. Emphasis added.

[16] *Id*. Emphasis added.

[17] These actions by the MSRB give important recognition to industry practices by municipal bond
underwriters. While the MSRB's guidance was issued in 2012, MSRB Notice 2012-38 states that the
principles underlying its guidance have been in place for some time: "Although many of the specific
elements identified in the Notice are fully articulated by the MSRB for the first time, all of them arise
from the same fundamental duty of fairness to the issuer that the MSRB has already required under
Rule G-17 for some time. This is particularly true with regard to those elements of the Notice relating to
representations made by dealers to issuers … ." MSRB Notice 2012-38 (July 18, 2012). Underwriters
are dealers.

[18] MSRB, *Interpretive Guidance Concerning the Application of MSRB Rule G-17 to Underwriters of
Municipal Securities* (Aug. 2, 2012); MSRB Notice 2012-38 (July 18, 2012). Emphasis added.

Similarly, Robert Fippinger, a former Board Member of, and General Counsel to, the MSRB and
Senior Partner in the law firm of Orrick Herrington, states in his recognized and authoritative
treatise, THE SECURITIES LAW OF PUBLIC FINANCE, that "Ordinarily, issuers rely on their
underwriters to make a distribution."

R. . Fippinger, THE SECURITIES LAW OF PUBLIC FINANCE Ch. 10, §10:1.8 at 10-42 (Practising
Law Institute, rel. 9/18).

Report of Robert W. Doty
Page 10

SEC Rule 15c2-12, which governs the disclosure process in municipal bond offerings, the
Commission states:

> The term underwriter means any person who has purchased from an
> issuer of municipal securities *with a view to*, or offers or sells for an
> issuer of municipal securities in connection with, ***the offering of any
> municipal security***, or participates or has a direct or indirect participation
> in any such undertaking, or participates or has a participation in the
> direct or indirect underwriting of any such undertaking … .[19]

The common thread across these authorities is that the role of underwriters is described
solely in terms of purchasing and reselling the issuers' bonds to investors in the public municipal
bond market. None of these respected authorities describe the relationship between municipal
bond issuers and intermediating municipal bond underwriting syndicates as involving
"borrowings" by the issuers from bond underwriting syndicates or a "loan" by the underwriting
syndicates to the issuer. I am not aware of any such authorities describing the relationship
between municipal bond issuers and intermediating municipal bond underwriting syndicates as
involving "borrowings" by the issuers from bond underwriting syndicates or a "loan" by the
underwriting syndicates to the issuer. This understanding and the consistent descriptions of the
roles of underwriters are consistent with my decades of experience.

### 2. Underwriting Syndicates

Underwriting syndicates, as contrasted with an individual underwriter, are formed in
certain public bond issuances both to share transactional risks among underwriters and to provide
enhanced municipal bond distribution capabilities. The underwriting syndicates focus on
conducting effective, successful bona fide public offerings of municipal bonds.

I have extensive experience working with underwriting syndicates for municipal bond
issuances, including working with front line investment bankers, the underwriting desks of
underwriting firms, heads of the sales teams, and individual brokers as they engaged in the
process of identifying potential investors, offering bonds to the investors, providing information
to the investors regarding the issuers and the bonds, receiving feedback from public investors,
and negotiating bond terms with the investors.

As obtaining widespread distribution capabilities for a bond offering is of paramount
concern to an issuer, many municipalities contract with underwriting syndicates, which provide
greater public bond distribution capabilities than using a single underwriter. [20]

---

[19] SEC Rule 15c2-12(f)(2), 17 C.F.R. §240.15c2-12(f)(2). Emphasis added.

[20] Mr. Fippinger states that "The purpose of a syndicate … is to promote the orderly formation of capital
and access to capital over a wide geographic area among a variety of investors."

Report of Robert W. Doty
Page 11

        3.   Underwriting Syndicate Distribution Activities and Objectives

In my experience, before municipal bond underwriting syndicates are willing to execute and deliver bond purchase contracts on behalf of an issuer, they will engage in intensive marketing efforts to receive firm commitments from public investors for the issuers' bonds. Ultimately, an underwriting syndicate will seek to firm up as many commitments from public investors as possible, before entering into a bond purchase contract with the issuer.

This is consistent with industry guidance. In THE FUNDAMENTALS OF MUNICIPAL BONDS, SIFMA describes how underwriting syndicates utilize sales personnel to make sales of the bonds to public investors and contact investors to learn the investors' level of interest in the offered bonds, specifically focusing on the issuers' credit strengths, the terms of the bonds and interest rates offered by the underwriting syndicates.[21] According to SIFMA, in addition to proposing interest rates for offering the bonds, the underwriting desk of the underwriting syndicate members carefully tracks and maintains records of investor levels of interest and investor feedback about the offering. Once the bond purchase contract is executed, "[t]he syndicate desk then processes orders and allocates bonds [to investors]… ."[22] Thereafter, the underwriters send confirmations to the investors requiring payment by the bond closing date.

In "*The Role of the Underwriter*," a chapter in THE HANDBOOK OF MUNICIPAL BONDS, which is a recognized and respected resource in the municipal bond market, a recognized and highly-regarded municipal bond underwriter official, Christopher J. Mier, CFA, Managing Director, of Loop Capital Markets, echoes many of SIFMA's descriptions regarding the process

---

R. Fippinger, THE SECURITIES LAW OF PUBLIC FINANCE Ch. 10A, §10A:3.1 at 10A-39 (Practising Law Institute, rel. 9/18); *see also* Securities Industry and Financial Markets Association, THE FUNDAMENTALS OF MUNICIPAL BONDS at 102 (6th ed. 2012) (describing reasons why a manager might consider particular entities in a syndicate); *see also* Patricia Tigue, A GUIDE FOR SELECTING FINANCIAL ADVISORS AND UNDERWRITERS, WRITING RFPS AND EVALUATING PROPOSALS at 11-12 (Government Finance Officers Association, 1997) (describing the composition of underwriting syndicates as involving firms "chosen on the basis of their marketing strengths," with certain firms "better able to sell to institutional investors while others are known for their strength in the retail market.").

[21] SIFMA, THE FUNDAMENTALS OF MUNICIPAL BONDS at 104 (6th ed. 2012) (recognizing that "[t]he salespeople … work together with the public finance bankers in the early stages of a deal to develop a marketing plan for the bonds.").

[22] Securities Industry and Financial Markets Association, THE FUNDAMENTALS OF MUNICIPAL BONDS at 97, 99, 104-05 (6th ed. 2012). Emphasis in original.

**Report of Robert W. Doty**
**Page 12**

by which underwriting syndicates enable municipal bond issuers to borrow from public investors.[23]

Mr. Mier describes the bond offering process from its initiation as "an idea" and "a gleam" in "a finance director's eye" until it is "transformed" through organization and activities of the finance team, including the underwriters. Mr. Mier concludes that "[t]he end result of this process is a bond issue that has been sold *to the investing public*—both retail and institutional" through which "the governmental issuer receives the financing that it needs."[24]

Mr. Mier describes the bond sale process in which "hundreds of clients will be contacted by the [underwriting] firm's sales force to determine their interest in the issue."[25]

Confirming industry practice, in 2008, SIFMA finalized its **MODEL BOND PURCHASE AGREEMENT** containing a provision stating "[t]he Underwriters intend to make a bona fide initial public offering of all the Securities at prices no higher than, or yields not lower than, those shown in the Official Statement. The Underwriters reserve the right to lower such initial offering prices as they deem necessary in connection with the marketing of the Securities."[26]

After an underwriting syndicate has marketed bonds to public investors, many of those investors may purchase bonds, while others may decline to make purchases. If there is insufficient interest in the bonds by public investors, the public offering may simply be terminated. I understand that this is what happened in 2007 when Merrill Lynch attempted, and failed, to find public investors to purchase $7 billion of ERS pension funding bonds.

Underwriters and underwriting syndicates are not interested in purchasing the issuer's bonds for investment because they are not in the business of investing in those bonds. That would tie up the firms' capital, which they need for underwriting bonds issued by other issuer clients. Their business is underwriting, not investing in municipal bonds or making loans. They make their profit from selling the bonds they purchase to the end investors (see discussion on

---

[23] S. Feldstein and F. Fabozzi, ed. **THE HANDBOOK OF MUNICIPAL BONDS** Ch. 14, *The Role of the Underwriter* at 265-71 (John Wiley & Sons, Inc. 2008). Emphasis in original.

[24] S. Feldstein and F. Fabozzi, ed. **THE HANDBOOK OF MUNICIPAL BONDS** Ch. 14, *The Role of the Underwriter* at 265 (John Wiley & Sons, Inc. 2008). Emphasis added.

[25] S. Feldstein and F. Fabozzi, ed. **THE HANDBOOK OF MUNICIPAL BONDS** Ch. 14, *The Role of the Underwriter* at 268 (John Wiley & Sons, Inc. 2008). Emphasis in original.

[26] Securities Industry and Financial Markets Association, **BOND PURCHASE AGREEMENT, GENERAL PROVISIONS AND CONDITIONS, GOVERNMENTAL TAX- OR REVENUE-SUPPORTED SECURITIES** at 2 (9/17/08).

**Report of Robert W. Doty**
**Page 13**

compensation below), not from earning interest. An issuer does not "borrow" or take a "loan" from an underwriter, but from the public investors who buy the bonds from the underwriters.

    4.   Compensation of Underwriting Syndicates

       In my experience, the compensation that an underwriting syndicate receives for selling municipal bonds to public investors is the difference ("spread" or "discount") between the price the syndicates pay the issuers for the bonds and the public offering prices the syndicates receive from the investors.

       Reflecting this practice, SIFMA describes the fee as "the *gross spread*, [which] is the difference between the price the underwriter pays the issuer for the bonds and the price at which the bonds are reoffered to the investing public."[27] GFOA agrees in its Best Practice entitled "*Selecting and Managing Underwriters for Negotiated Bond Sales*," describing underwriters' compensation as "the sales commission in the transaction."[28]

       In a typical borrowing scenario, by contrast, the lender is entitled to interest payments on the bonds, expects to be repaid the principal amount upon maturity, and is not entitled to any other fee or "spread."

**B. Industry Standards for Direct Placements of Debt**

       I have worked on both public offerings of municipal bonds and direct and private placements of municipal bonds at various times in my career, including in the 1980s and the 2000s. In addition, prior to the 1980s, I worked on corporate public offerings of both stocks and debt securities and numerous direct placements of corporate stocks and debt. Based on my experience, "direct placements" are types of "private placements," which are direct sales to either a single investor or to a small number of sophisticated investors.[29] Private placements and

---

[27] Securities Industry and Financial Markets Association, **THE FUNDAMENTALS OF MUNICIPAL BONDS** at 97 (6th ed. 2012). Emphasis in original.

[28] GFOA Best Practice: "*Selecting and Managing Underwriters for Negotiated Bond Sales*" (2014) at *gfoa.org/selecting-and-managing-underwriters-negotiated-bond-sales*. *See also* Patricia Tigue, **A GUIDE FOR SELECTING FINANCIAL ADVISORS AND UNDERWRITERS, WRITING RFPS AND EVALUATING PROPOSALS** at 26 (Government Finance Officers Association, 1997) (describing underwriters' compensation as "the underwriters' discount" or "gross spread"); R. Fippinger, **THE SECURITIES LAW OF PUBLIC FINANCE** Ch. 10A, §10A:3.2[A] at 10A-53 (Practising Law Institute, rel. 9/18) (describing underwriter compensation as "the gross spread, that is, the difference between the initial offering price and the amount paid to the issuer … .").

[29] R. Pope, **MAKING GOOD DISCLOSURE** at 53 (Government Finance Officers Association, 2001) ("Securities offerings are generally—but imprecisely—divided into two types—public offerings and private placements. … Private placements are sales of bonds or notes to either a single investor or a small number of sophisticated investors."); J.B. Kurish and Patricia Tigue, **AN ELECTED OFFICIALS**

**Report of Robert W. Doty**
**Page 14**

direct placements are vastly different from, and mutually exclusive of, underwritten public offerings.

Although industry publications more commonly discuss the term "private placement," a "direct placement" is a type of private placement and, as noted earlier, the two terms are sometimes referred to synonymously. For example, a 2012 article in Corporate Finance Review states that "[t]he terms 'private placement' and 'direct placement' often refer to direct placements of debt securities, as well as direct bank loans and other alternative financing techniques."[30]  Other publications, including from the 1980s and earlier, are in accord.[31]

In the **Dictionary of Finance and Investment Terms** (5th ed. 1998),[32] published by Barron's, a respected and authoritative source in the financial markets, John Downes and Jordan Elliott Goodman state:

> **DIRECT PLACEMENT direct sale of securities to one or more professional investors**. … They may be bonds … . These investments typically require large minimum purchases, often in the millions of dollars. Direct placements offer higher potential returns **than many publicly offered securities**. … Buyers of direct placements are large, sophisticated financial institutions including insurance companies, banks,

---

**Guide to Debt Issuance** at 49 (Government Finance Officers Association, 2005 ("A private placement is the sale of bonds by an issuer directly to investors without a public offering."). *See also* R. Fippinger, **The Securities Law of Public Finance** Ch. 10A, §10A:3.4[A] at 10A-57 (Practising Law Institute, rel. 9/18) (describing "private placements of municipal securities" as including "direct purchases by a single financial institution.")

[30] Fraser, Devlin and Lawrence, "*Direct Bank Loans to Municipalities by Banks May Be Treated as Securities*" at 6, n. 5 (Corp. Fin. Rev. Sept./Oct. 2012).

[31] See Note, "*Reforming the Initial Sale Requirements of the Private Placement Exemption*," 86 Harv. L. Rev. 403, 426 n. 1 (1972) ("The 'private placement' is alternatively described by courts and commentators as a 'direct placement' or 'private offering.'"); *id*. at n 4 ("Generally, in a public offering, unlike in a private placement, an underwriter takes title to the securities and then resells them to the public."); Comment, "*Institutional Investment Through Private Placement of Corporate Securities*," 53 Colum. L. Rev. 804 (June 1953) ("At different times and in different contexts the phrases "private deal," "private sale," "private placement" and "direct placement" have been used to describe the process by which capital is provided for the use of private or quasi-public corporations by means of direct negotiations either between the suppliers and the recipients, or between the suppliers and agents for the recipients."); Note, "*A Conduct-Oriented Approach to the Glass-Steagall Act*," 91 Yale L J. 102, 110 n. 68 (1981) ("A private placement, also known as a direct placement, is an alternative to an open-market sale of securities.").

[32] J. Downes and J. Goodman, **Dictionary of Finance and Investment Terms** at 151 (Barron's Educational Series, Inc., 5th ed. 1998). Emphasis added.

**Report of Robert W. Doty**
**Page 15**

mutual funds, foundations, and pension funds that are able to evaluate such offerings. **Also called *private placement***

**DIRECT PLACEMENT OF CORPORATE SECURITIES,**[33] by E. Raymond Corey, defines the term "direct placement" as follows:

> *Direct placement refers … to the procedure in which the corporate issuer and the institutional investor deal directly with each other, with or without the aid of an intermediary, in establishing the terms of a security issue, and in which title to the security, or securities, is taken directly by the final holder*. Securities negotiated and sold by this method are *directly* placed in the sense that they are not first sold to intermediate owners (*e.g.*, investment bankers) who have purchased with the intent of reselling.

In its book, **THE FUNDAMENTALS OF MUNICIPAL BONDS**, SIFMA describes private placements as occurring "when the investment banker offers securities to investors, ***without a public offering***."[34] SIFMA further notes that, in a private placement transaction, "the placement agent (the term for the underwriter in this type of transaction) contacts one or more institutional investors" and that such investors have the ability to negotiate directly with the issuer and influence the structure of the deal.[35]

Placement agents, by definition, are "agents." Given that agency role, the contracts between placement agents and municipal bond issuers are fundamentally different from bond purchase contracts with underwriters dealing with issuers at arms-length. Both the SEC and the MSRB have emphasized that placement agents may have fiduciary duties pursuant to state law.

The SEC stated: "a placement agent may have … a fiduciary duty to its client, that arise[s] as a matter of common law or another statutory or regulatory regime."[36]

The MSRB made clear that underwriters have vastly different roles from that of placement agents. In that vein, the MSRB requires underwriters to disclose to municipal issuers that: "The underwriter's primary role is to *purchase securities with a view to distribution* in an arms'-length commercial transaction with the issuer …" and "the underwriter does not have a fiduciary duty to the issuer under the federal securities laws and is, therefore, not required by

---

[33] E. Corey, **DIRECT PLACEMENT OF CORPORATE SECURITIES** at 3 (Harvard Univ., 1951). Emphasis in original.

[34] Securities Industry and Financial Markets Association, **THE FUNDAMENTALS OF MUNICIPAL BONDS** at 71 (6th ed. 2012). Emphasis added.

[35] *Id.*

[36] SEC Rel. No. 34-70462 at 172, n. 628 (Sept. 20, 2013).

federal law to act in the best interests of the issuer without regard to its own financial or other interests."[37]

Due to key distinctions between underwriters, which act in an arms'-length capacity, and placement agents, which do not, the MSRB exempted placement agents from the requirement of disclosing the absence of the fiduciary duty in relationships between placement agents and issuers because placement agents may in fact owe fiduciary duties to issuers.[38]

The market guidance document entitled *Considerations Regarding Voluntary Secondary Market Disclosure About Bank Loans* ("Considerations About Bank Loans"), which was created by nine authoritative national municipal bond market organizations,[39] is also instructive. The document describes the forms in which direct placements of municipal debt occur as: (i) "a direct purchase—by purchasing a bond directly," or (ii) "a direct loan—by entering into a loan agreement or other type of financing agreement with the issuer."[40] Notably, *Considerations About Bank Loans* states that "[t]he term 'bank loan,' . . . ***does not include*** purchases of bonds by banks in a primary public offering or in the secondary market."[41] The document further notes that "direct purchases" and "direct loans" generally occur without an official statement or other public offering document.[42]

In my experience, investors in direct placements typically agree to restrictions on transfers of the bonds into the public municipal bond market, thus protecting against retail purchases of the bonds without adequate information. The restrictions may take the form of "investment letters" in which the placement investors represent their investment intent or may be imposed by limiting the denominations of the bonds to $100,000 or more or as a single bond issue that cannot be broken into small participations. In a direct placement, an issuer provides confidential continuing information directly to the investors, rather than through a continuing

---

[37] MSRB Notice 2012-38 (July 18, 2012).

[38] MSRB Notice 2012-38 (July 18, 2012) ("in a private placement where a dealer acts as a true placement agent, the disclosure relating to fiduciary duty would be inapplicable and may be omitted due to the existence of similar state law obligations.").

[39] The organizations consist of American Bankers Association, Bond Dealers of America, Government Finance Officers Association, Government Finance Officers Association, Investment Company Institute, National Association of Bond Lawyers, National Association of Independent Public Finance Advisors, National Federation of Municipal Analysts, and Securities Industry and Financial Markets Association.

[40] Considerations About Bank Loans at 1.

[41] Considerations About Bank Loans at 1. Emphasis added.

[42] Considerations About Bank Loans at 2, 4.

**Report of Robert W. Doty**
**Page 17**

disclosure agreement providing for disclosures to the general public through the MSRB or national repositories.

The foregoing industry practices regarding direct placements of debt are echoed strongly in the regulatory actions of the SEC that govern disclosure requirements for municipal bond issuances. For example, SEC Rule 15c2-12,[43] which addresses disclosure by municipal bond issuers to the investing public in the municipal bond market, imposes procedural requirements for public offerings of municipal bonds, including that underwriters must obtain, review, and provide to investors official statements prepared by issuers in those public offerings. The Rule includes an explicit exemption from these requirements, however, for limited offerings that incorporate features of private placement transactions meeting all of the following conditions:[44]

1. The bonds must be issued in "denominations of $100,000 or more;"

2. The bonds must be sold to "no more than thirty-five persons each of whom" the underwriter "reasonably believes [h]as such knowledge and experience in financial and business matters that it is capable of evaluating the merits and risks of the prospective investment;" and

3. No investor can be "purchasing for more than one account or with a view to distributing the securities"

Recently, the SEC issued a concept release proposing a potential rule to allow "direct placements of municipal securities" by municipal advisors to municipal bond issuers (as opposed to placements by underwriters). Once again, the SEC's proposal describes common characteristics of direct placements, requiring that the "entire issuance" be placed with a single "Qualified Provider," described as "(i) a bank, savings and loan association, insurance company, or registered investment company; or (ii) an investment adviser registered with the [SEC] or with a state; or (iii) any other institution with total assets of at least $50 million."[45]

In summary, in my substantial experience in the industry and based on industry guidance a "direct placement of debt" in the municipal bond industry is the opposite of a public offering: it does not involve (and has not in the past involved) an intermediating underwriting syndicate selling bonds to public investors using official statements. Instead, a direct placement involves direct contact and negotiations between municipal bond issuers and institutional or other sophisticated purchasers of the municipal bonds in limited distributions, without public official

---

[43] SEC Rule 15c21-2, 17 C.F.R. §240.15c2-12.

[44] SEC Rule 15c21-2(d), 17 C.F.R. §240.15c2-12(d).

[45] SEC Rel. No. 34-87204, Proposed Exemptive Order Granting a Conditional Exemption from the Broker Registration Requirements of Section 15(a) of the Securities Exchange Act of 1934 for Certain Activities of Registered Municipal Advisors at 11, 12 (Oct. 2, 2019).

**Report of Robert W. Doty**
**Page 18**

statements (although an issuer might assemble information in a limited offering memorandum).
Such offering documents are unnecessary because the investors are able to obtain information
directly from the municipal bond issuers and are better able to bear losses on their investments
than are many public investors.[46]

---

[46] For this same reason, directly placed bonds are typically not rated because there is no need for ratings.

# ANALYSIS OF THE ERS BOND ISSUANCES

**A. ERS Did Not "Borrow" or Take a "Loan" from UBS or Other Members of the Underwriting Syndicates As those Terms are Used in Municipal Finance**

As discussed above, based on my decades of experience in the industry and relevant industry guidance, a municipal bond issuer in a public offering conducted through an underwriting syndicate does not "borrow" or take a "loan" from the members of the syndicate. The documents concerning the issuance of the ERS Bonds and the role that UBS, as representative of the underwriting syndicates, played confirm the following:

- The role of the underwriting syndicates with respect to the ERS Bonds was to facilitate the offering and sale of the ERS to public investors – a role typically held by underwriters;

- The transactions were solely purchase-sale transactions;

- The underwriting syndicates, led by UBS, purchased securities with a view to distribution to public investors in arms-length commercial transactions with ERS;

- The underwriting syndicates were compensated as typically expected of an underwriter: through discounts from the public offering price paid by public investors for the Bonds in the transactions;[47] and

- As expected, given the role of an underwriting syndicate, none of the documents governing the issuance of the ERS Bonds reference a borrowing from the underwriting syndicate.

From my review of the bond documents, it is clear the ERS Bond issuance contemplated that UBS and the other members of the underwriting syndicates were fulfilling an intermediating function by buying ERS' Bonds for resale to public investors. For example, in each of the ERS Series A, B and C Bond Letters of Representations to the Underwriters, ERS represented to UBS and the other members of the underwriting syndicates that it was providing the Letters "[i]n order to induce you to enter into the Purchase Contract … and to make the offering and sale of

---

[47] The discounts appear in Section 1 on page 1 of each of the Bond Purchase Contracts.

In addition, the "Underwriting" sections of each of ERS' Official Statements provide the underwriters' discounts "from the initial public offering prices of the … Bonds." Series A Bond Official Statement at 52; Series B Bond Official Statement at 49; and Series C Bond Official Statement at 54.

**Report of Robert W. Doty**
**Page 20**

the Bonds." The Letters say nothing about inducing UBS and the underwriters to allow ERS to "borrow" or take a "loan" from them.

Based on my experience and knowledge of industry customs, practices and standards in the municipal bond market, the relationships between ERS and the intermediating underwriting syndicates would be set forth in a bond purchase contract. [48] Section 4 of the Series A Purchase Contract for the Series A Bond offering specifically describes the responsibilities of UBS and the other underwriters with respect to the ERS Bond issuances as "to make a bona fide public offering of all of the Bonds" and authorizes them to use ERS' Official Statements, Bond Resolutions and other documents in marketing the Bonds to public investors. [49] These provisions show that ERS used the underwriting syndicates not as lenders in a "borrowing" or a "loan," but as intermediaries who would distribute and offer the Bonds for sale to the public.

The Bond closing documentation does not indicate that ERS had a "borrowing" or "loan" relationship with the underwriters. In fact, I could not find any mention of a "borrowing" by ERS from the underwriting syndicates anywhere in any of the Series A, B or C Bond documents I have reviewed. (See Appendix I, Materials Reviewed.) None of the Bond Resolution or Supplemental Bond Resolutions describe the relationship between ERS and the underwriting syndicates as involving a "borrowing" by ERS from the syndicates. And none of ERS' Official Statements, Bond Counsel Opinions, ERS General Counsel Opinions, or Secretary of Justice Opinions describe the relationships between ERS and the underwriting syndicates as involving a "borrowing" by ERS from the syndicates.

The Purchase Contracts between ERS and the underwriters are not borrowing or loan agreements; they are purchase and sale contracts in which the underwriters agree to make "bona fide" public distributions of ERS' Bonds to public investors. The underwriters agree to purchase the Bonds and to re-sell them. They do not agree to participate in a "borrowing" by ERS. The underwriters do not agree to invest in the Bonds because that is not their business model. Indeed, such a practice would inhibit their ability to conduct future underwriting business with other issuer clients by tying up their net capital. [50]

---

[48] In *The Role of Counsel to the Underwriters*," another chapter in **THE HANDBOOK OF MUNICIPAL BONDS**, Mary G. Wilson, a municipal bond underwriter counsel, states that "The bond purchase agreement sets forth the financial and business terms of the underwriting agreements between the issuer and the underwriter … . The bond purchase agreement provides for the sale of the bonds to the underwriter … ." S. Feldstein and F. Fabozzi, ed. **THE HANDBOOK OF MUNICIPAL BONDS** Ch. 6, *The Role of Counsel to the Underwriters* at 86 (John Wiley & Sons, Inc. 2008).

[49] Series A Bond Purchase Contract §4 on page 3. The Series B Bond Purchase Contract §4 on page 3 and Series C Bond Purchase Contract §4 on page 3 contain closely similar provisions.

[50] The SEC set forth net capital requirements in SEC Rule 15c3-1, 17 C.F.R. §240.15c3-1.

**Report of Robert W. Doty**
**Page 21**

A "borrowing" or "loan" agreement would set forth, among other things, the terms of the borrowing, including repayment terms, ERS financial and operational covenants, requirements that ERS provide information directly to the underwriting syndicates, interest rates, default provisions, and enforcement provisions. The Purchase Contracts do none of that. I have seen no such "borrowing" agreement with the underwriting syndicates in connection with the ERS Series A, B or C Bond offerings. The fact that the ERS Bond issuances were not borrowings from or loans by the underwriting syndicates is consistent with my 45 years of experience in the municipal bond market and my earlier experience in the corporate securities market.

As noted above, ERS sold the Bonds to the underwriters at a discount from the initial public offering price. The underwriters would have received their transactional compensation from selling the Bonds to public investors above the discounted price. The underwriters would not have been compensated through the receipt of interest payments, as would be the case if a true borrowing relationship existed between ERS and the underwriters.

In summary, in accordance with market standards, the underwriters were not investors in the ERS Bonds; they were bond underwriters that bought and sold the bonds. The transactions conform to the typical municipal bond market standard of purchase and sale transactions. Thus, ERS did not "borrow" or take a "loan" from the underwriting syndicates.

To view the underwriting relationship as a "borrowing" or "loan" from a "financial institution" would be an aberration and would be inconsistent with municipal bond industry standards and my decades of experience in the market.

## B. ERS Did Not Make a "Direct Placement of Debt" in its Bond Offerings

As discussed above, in municipal finance, a "direct placement of debt" involves the sale of municipal securities by an issuer directly to a single or small group of sophisticated investors. Here, the ERS Bonds were sold to the public at large through underwritten public bond offerings, and bond sales were not restricted to experienced or sophisticated investors or to financial institutions. As such, the ERS Bond issuances were not "direct placements of debt."

In my experience, if the ERS Bond offerings were "direct placements of debt," in addition to a small number of sophisticated investors, I would expect to see direct negotiation of Bond terms between ERS and each of the investors. That did not happen in connection with any of the Bond offerings. ERS did not itself identify the investors, market the Bonds directly to investors, or engage in negotiations with investors. Instead, the underwriting syndicates undertook those investor contacts in the process of offering and selling ERS' Bonds to public investors. ERS prepared its multi-hundred page Official Statements and provided those documents to the underwriting syndicates specifically for the syndicates to distribute public information regarding ERS broadly, not within a controlled confidential group. The investors did not negotiate terms directly with ERS as the issuer.

**Report of Robert W. Doty**
**Page 22**

Other aspects of the Bond issuances are also contrary to what I would expect to see in a direct placement transaction. For example, I would not expect to see:

- Ratings for the Bonds by all three major rating agencies, which ratings typically do not exist for directly placed bonds because the sophisticated investors in such bonds can and do rely primarily upon their own credit research.

- A Master Continuing Disclosure Agreement [51] requiring ongoing public disclosures, as the issuer in a direct placement would typically provide information directly to the end purchasers.

- A complete lack of restrictions on the resale of the Bonds in the public market (including the use of minimum denominations of $5,000, rather than $100,000), which restrictions are a necessary component of a direct placement.

Based on all the foregoing, it is my opinion that ERS would not have been viewed in the industry as making a "direct placement of debt" in connection with the ERS Bond issuances. In fact, because ERS Bonds were part of underwritten public bond offerings, they are in my opinion the direct opposite of a "direct placement of debt."

---

[51] Master Continuing Disclosure Agreement dated January 31, 2008, between ERS and the Commonwealth of Puerto Rico.

I declare under penalty of perjury that the foregoing is true and correct.

**IN WITNESS WHEREOF,** I have executed this Report in Annapolis, Maryland, as of the date set forth below.

**EXECUTED ON:** July 1, 2020

_____

**Robert W. Doty**

# APPENDIX I—

# <u>MATERIALS REVIEWED</u>

# APPENDIX I–
## MATERIALS REVIEWED

In the preparation of this Report, I have considered the following materials (provisions cited in the Report):

**A.** Documents, authorities and other materials, or portions thereof, cited in the Report

**B.** Bond Resolution

**C.** First Supplemental Bond Resolution

**D.** Second Supplemental Bond Resolution

**E.** Third Supplemental Bond Resolution

**F.** Series A Purchase Contract

**G.** Series B Purchase Contract

**H.** Series C Purchase Contract

**I.** Series A Bond Counsel Opinion

**J.** Series B Bond Counsel Opinion

**K.** Series C Bond Counsel Opinion

**L.** Series A Official Statement

**M.** Series B Official Statement

**N.** Series C Official Statement

**O.** Specimen of the Series A Bonds

**P.** Specimen of the Series B Bonds

**Q.** Specimen of the Series C Bonds

**R.** Series A Bond ERS General Counsel Opinion

**S.** Series B Bond ERS General Counsel Opinion

**T.** Series C Bond ERS General Counsel Opinion

**U.** Series A Bond Secretary of Justice Opinion

**V.** Series B Bond Secretary of Justice Opinion

Report of Robert W. Doty
Appendix I-2

**W.** Series C Bond Secretary of Justice Opinion

**X.** ERS Series A Bond Letter of Representations to the Underwriters

**Y.** ERS Series B Bond Letter of Representations to the Underwriters

**Z.** ERS Series C Bond Letter of Representations to the Underwriters

**AA.** ERS Master Continuing Disclosure Agreement

**BB.** Conway MacKenzie Report

**CC.** Kobre & Kim Report

**DD.** R. Fippinger, **THE SECURITIES LAW OF PUBLIC FINANCE** Chs. 5, 10, 10A (Practising Law Institute)

**EE.** R. Pope, **MAKING GOOD DISCLOSURE** (Government Finance Officers Association, 2001)

**FF.** Municipal Securities Rulemaking Board, *Interpretive Guidance Concerning the Application of MSRB Rule G-17 to Underwriters of Municipal Securities* (Aug. 2, 2012)

**GG.** MSRB Notice 2012-38, *Guidance on Implementation of the Interpretive Notice* (July 18, 2012)

**HH.** Securities Industry and Financial Markets Association, **BOND PURCHASE AGREEMENT, GENERAL PROVISIONS AND CONDITIONS, GOVERNMENTAL TAX- OR REVENUE-SUPPORTED SECURITIES** (9/17/08)

**II.** Securities Industry and Financial Markets Association, **THE FUNDAMENTALS OF MUNICIPAL BONDS** (6th ed. 2012)

**JJ.** S. Feldstein and F. Fabozzi, ed. **THE HANDBOOK OF MUNICIPAL BONDS** Ch. 6, *The Role of Counsel to the Underwriters* and Ch. 14, *The Role of the Underwriter* (John Wiley & Sons, Inc. 2008)

**KK.** Government Finance Officers Association, "*Best Practice: Selecting and Managing Underwriters for Negotiated Bond Sales*" (2014)

**LL.** Patricia Tigue, **A GUIDE FOR SELECTING FINANCIAL ADVISORS AND UNDERWRITERS, WRITING RFPS AND EVALUATING PROPOSALS** (Government Finance Officers Association, 1997)

**MM.** J.B. Kurish and Patricia Tigue, **AN ELECTED OFFICIALS GUIDE TO DEBT ISSUANCE** (Government Finance Officers Association, 2005)

**Report of Robert W. Doty**
**Appendix I-3**

**NN.** *Considerations Regarding Voluntary Secondary Market Disclosure About Bank Loans* (May 2013)

**OO.** SEC Rule 15c2-12, 17 C.F.R. §240.15c2-12

**PP.** SEC Rule 144, 17 C.F.R. §230.144

**QQ.** SEC Rel. No. 34-87204, Proposed Exemptive Order Granting a Conditional Exemption from the Broker Registration Requirements of Section 15(a) of the Securities Exchange Act of 1934 for Certain Activities of Registered Municipal Advisors (Oct. 2, 2019)

**RR.** SEC Rel. No. 34-70462 at 172, n. 628 (Sept. 20, 2013)

**SS.** Note, "*Reforming the Initial Sale Requirements of the Private Placement Exemption*," 86 Harv. L. Rev. 403 (1972)

**TT.** Comment, "*Institutional Investment Through Private Placement of Corporate Securities*," 53 Colum. L. Rev. 804 (June 1953)

**UU.** Note, "*A Conduct-Oriented Approach to the Glass-Steagall Act*," 91 Yale L J. 102, 110 (1981)

**VV.** J. Downes and J. Goodman, **DICTIONARY OF FINANCE AND INVESTMENT TERMS** at 151 (Barron's Educational Series, Inc., 5th ed. 1998)

# APPENDIX II—

## <u>DEFINITIONS</u>

# APPENDIX II–
## DEFINITIONS

The following defined terms are used in this Report:

**A.** The term "*Bond Counsel Opinions*" means, collectively, the Series A Bond Counsel Opinion, the Series B Bond Counsel Opinion, and the Series C Bond Counsel Opinion.

    **1.** The term "*Series A Bond Counsel Opinion*" means the Bond Counsel Opinion dated January 31, 2008, of Fiddler Gonzalez & Rodriguez, P.S.C. relating to the Series A Bonds.

    **2.** The term "*Series B Bond Counsel Opinion*" means the Bond Counsel Opinion dated June 2, 2008, of Fiddler Gonzalez & Rodriguez, P.S.C. relating to the Series B Bonds.

    **3.** The term "*Series C Bond Counsel Opinion*" means the Bond Counsel Opinion dated June 30, 2008, of Fiddler Gonzalez & Rodriguez, P.S.C. relating to the Series C Bonds.

**B.** The term "*Bond Resolution*" means the Pension Funding Bond Resolution adopted on January 24, 2008, by ERS' Board of Trustees.

**C.** The term "*Supplemental Bond Resolutions*" means, collectively, the First Supplemental Bond Resolution, the Second Supplemental Bond Resolution, and the Third Supplemental Bond Resolution.

    **1.** The term "*First Supplemental Resolution*" means the First Supplemental Pension Funding Bond Resolution adopted on January 29, 2008, by ERS' Board of Trustees.

    **2.** The term "*Second Supplemental Resolution*" means the Second Supplemental Pension Funding Bond Resolution adopted on May 27, 2008, by ERS' Board of Trustees.

    **3.** The term "*Third Supplemental Resolution*" means the Third Supplemental Pension Funding Bond Resolution adopted on June 26, 2008, by ERS' Board of Trustees.

**D.** The term "*Bonds*" or "*ERS Bonds*" means, collectively, the Series A Bonds, the Series B Bonds, and the Series C Bonds.

    **1.** The term "*Series A Bonds*" means ERS' $1,588,810,799.60 Senior Pension Funding Bonds, Series A dated January 31, 2008.

    **2.** The term "*Series B Bonds*" means ERS' $1,058,634,613.05 Senior Pension Funding Bonds, Series B dated June 2, 2008.

Report of Robert W. Doty
Appendix II-2

    **3.** The term "*Series C Bonds*" means ERS' $303,202,930 Senior Pension Funding Bonds, Series C dated June 30, 2008.

**E.** The term "*Bond Purchase Contracts*" means, collectively, the Series A Bond Purchase Contract, the Series B Bond Purchase Contract, and the Series C Bond Purchase Contract.

    **1.** The term "*Series A Bond Purchase Contract*" means the Amended and Restated Purchase Contract dated January 29, 2008, between ERS and UBS, as representative of the underwriting syndicate, relating to the marketing and sale for ERS of the Series A Bonds by the underwriting syndicate.

    **2.** The term "*Series B Bond Purchase Contract*" means the Purchase Contract dated May 28, 2008, between ERS and UBS, as representative of the underwriting syndicate, relating to the marketing and sale for ERS of the Series B Bonds by the underwriting syndicate.

    **3.** The term "*Series C Bond Purchase Contract*" means the Purchase Contract dated June 26, 2008, between ERS and UBS, as representative of the underwriting syndicate, relating to the marketing and sale for ERS of the Series C Bonds by the underwriting syndicate.

**E.** The term "*Conway MacKenzie Report*" means Review of the Events and Decisions That Have Led to the Current Financial Crisis of the Employees Retirement System of the Government of Puerto Rico Report prepared by Conway MacKenzie, Inc. for the Employees Retirement System of Government of Puerto Rico and Government Development Bank for Puerto Rico, as Fiscal Agent of the Government of Puerto Rico (Oct. 2010).

**D.** The term "*ERS*" means the Employees Retirement System of the Government of the Commonwealth of Puerto Rico.

**E.** The term "*ERS Bondholders*" means certain beneficial holders of the ERS Bonds.

**F.** The term "*ERS Enabling Act*" means Act No. 447 of the Legislative Assembly of Puerto Rico, approved May 15, 1951, as amended and supplemented, including amendment by Act 46-1988.

**G.** The term "*ERS General Counsel Opinions*" means, collectively, the Series A Bond ERS Counsel Opinion, the Series B Bond ERS Counsel Opinion, and the Series C Bond ERS Counsel Opinion.

    **1.** The term "*Series A Bond ERS General Counsel Opinion*" means the Opinion dated January 31, 2008, of Marilyn Cuevas Silvagnoli, Esq. relating to the Series A Bonds.

Report of Robert W. Doty
Appendix II-3

    **2.** The term "*Series B Bond ERS General Counsel Opinion*" means the Opinion dated June 2, 2008, of Marilyn Cuevas Silvagnoli, Esq. relating to the Series B Bonds.

    **3.** The term "*Series C Bond ERS Counsel Opinion*" means the Opinion dated June 30, 2008, of Marilyn Cuevas Silvagnoli, Esq. relating to the Series C Bonds.

**H.** The term "*ERS Letters of Representations to the Underwriters*" means, collectively, the ERS Series A Bond Letter of Representations to the Underwriters, ERS Series B Bond Letter of Representations to the Underwriters, and the ERS Series C Bond Letter of Representations to the Underwriters.

    **1.** The term "*ERS Series A Bond Letter of Representations to the Underwriters*" means the Letter of Representations dated January 30, 2008, of ERS to UBS and the other underwriters of the Series A Bonds.

    **2.** The term "*ERS Series B Bond Letter of Representations to the Underwriters*" means the Letter of Representations dated June 2, 2008, of ERS to UBS and the other underwriters of the Series B Bonds.

    **3.** The term "*ERS Series C Bond Letter of Representations to the Underwriters*" means the Letter of Representations dated June 26, 2008, of ERS to UBS and the other underwriters of the Series C Bonds.

**I.** The term "*GFOA*" means the Government Finance Officers Association of the United States and Canada.

**J.** The term "*Kobre & Kim Report*" means The Independent Investigator's Final Investigative Report prepared by Kobre & Kim LLP for The Financial Oversight & Management Board for Puerto Rico Special Investigation Committee (Aug. 20, 2018).

**K.** The term "*Master Continuing Disclosure Agreement*" means the Master Continuing Disclosure Agreements dated January 31, 2008, between ERS and the Commonwealth of Puerto Rico.

**L.** The term "*MSRB*" means the Municipal Securities Rulemaking Board.

**F.** The term "*Official Statements*" means, collectively, the Series A Bond Official Statement the Series B Bond Official Statement, and the Series C Bond Official Statement.

    **1.** The term "*Series A Bond Official Statement*" means ERS' Official Statement dated January 29, 2008, for the offering and sale of the Series A Bonds to investors.

    **2.** The term "*Series B Bond Official Statement*" means ERS' Official Statement dated May 28, 2008, for the offering and sale of the Series B Bonds to investors.

**Report of Robert W. Doty**
**Appendix II-4**

> **3.** The term "*Series C Bond Official Statement*" means ERS' Official Statement dated June 26, 2008, for the offering and sale of the Series C Bonds to investors.

**M.** The term "*SEC*" means the Securities and Exchange Commission.

**N.** The term "*Secretary of Justice Opinions*" means, collectively, the Series A Bond Secretary of Justice Opinion, the Series B Bond Secretary of Justice Opinion, and the Series C Bond Secretary of Justice Opinion.

> **1.** The term "*Series A Bond Secretary of Justice Opinion*" means the Opinion dated January 31, 2008, of Roberto J. Sanchez Ramos, Esq. relating to the Series A Bonds.

> **2.** The term "*Series B Bond Secretary of Justice Opinion*" means the Opinion dated June 2, 2008, of Roberto J. Sanchez Ramos, Esq. relating to the Series B Bonds.

> **3.** The term "*Series C Bond Secretary of Justice Opinion*" means the Opinion dated June 30, 2008, of Roberto J. Sanchez Ramos, Esq. relating to the Series C Bonds.

**G.** The term "*SIFMA*" means the Securities Industry and Financial Markets Association.

**H.** The term, "*UBS*" means UBS Financial Services Incorporated of Puerto Rico, as representative of the underwriting syndicates distributing the respective ERS' Bonds.

# APPENDIX III—

## QUALIFICATIONS AND CURRICULUM VITAE

# APPENDIX III—
## QUALIFICATIONS AND CURRICULUM VITAE

1. A current true and accurate copy of my *Curriculum Vitae* reflecting my qualifications and experience appears below.

2. As described in my *Curriculum Vitae*, I have over 45 years of experience in the finance industry in a diversity of capacities relating to several billions of dollars of municipal and corporate finance transactions in approximately two dozen states.

3. I have served as a municipal bond underwriter with three firms in three states, have represented underwriters as underwriter counsel, served as a consultant to underwriters, and worked with underwriters in numerous municipal bond issues.

4. I have participated in numerous municipal securities issues as municipal bond counsel, issuer counsel, underwriter counsel, disclosure counsel, trustee counsel, promoter/developer counsel, and investor counsel.

5. My experience includes work as special consultant to underwriters, issuers and bond counsel and as financial advisor to bond issuers. I have worked closely with numerous bond counsel, issuer counsel and underwriter counsel, and have advised municipal bond issuers, issuer officials, underwriters, and investors, among other things, in municipal securities offerings.

6. I was a partner in the bond counsel firm known at the time as Squire, Sanders & Dempsey, now known as Squire Patton Boggs. The firm was, and still is, one of the leading bond and underwriter counsel firms in the United States.

7. In the process of serving in various capacities in the municipal bond market, I have participated in the interview and selection processes for bond counsel and underwriters to work in municipal bond offerings, have negotiated on behalf of issuers with bond counsel, underwriters, and underwriter counsel, and have worked many times closely with, and observed the work of, bond counsel, issuer counsel, underwriters, and underwriter counsel.

8. In the period from 1987 to 1990, I worked with state agencies that had acquired municipal bonds in direct placements of debt, and with their underwriters, in packaging for the secondary market sales of portfolios of such municipal debt. The transactions occurred separately from the acquisition transactions, often years later.

9. Prior to the 1980s, I worked on both public offerings of corporate securities (stocks and bonds) and direct placements of corporate securities (stocks and bonds).

10. I have worked with and advised issuers, underwriters, private promoters/developers, and others in structuring complex financial transactions, and have assisted issuers in connection with financial planning and with workouts of numerous defaulted municipal securities issues.

**Report of Robert W. Doty**
**Appendix III-2**

11. In addition, I have discussed the roles and responsibilities of bond counsel, issuer counsel, issuers and issuer officials, underwriters, and underwriter counsel as a member of panels at numerous national and regional conferences, seminars and workshops sponsored by the National Association of Bond Lawyers, the International Municipal Lawyers Association, the California Debt and Investment Advisory Commission, the Practising Law Institute, and other recognized municipal bond market organizations. In those activities, I observed and learned more about the roles, responsibilities and prevailing practices of underwriter counsel, bond counsel, disclosure counsel, issuer counsel, issuers, issuer officials, underwriters, and other parties.

12. I served, and worked closely with many investors, underwriters and other market participants, as a member of the Board of Governors of the National Federation of Municipal Analysts ("NFMA"), and member and officer of NFMA committees, including as Chair of an NFMA disclosure committee and a member of the NFMA Industry Practices Committee. I have served as a member of NFMA committees preparing Best Practices and White Papers on expert work products (such as feasibility analyses, market and demand studies and appraisals), charter school finance, conflicts of interest, market practices and an advanced distressed debt conference.

13. I am a recipient of NFMA's Municipal Industry Contribution Award.

14. I have taught in law schools, among other things, municipal finance law, professional responsibility, securities law, advanced securities law, corporation law, advanced corporation law, corporate finance law, and agency and partnership law; have taught in-house courses for leading bond counsel law firms on securities law; have taught an in-house course for a leading financial consultant firm on roles and responsibilities of financial consultants; and am a recognized speaker on municipal finance at numerous institutes, conferences, seminars and other programs. One of the courses I structured and taught was an internal course at a major bond counsel firm on underwriter counseling.

15. I have been qualified in and testified as an expert witness on the finance industry in federal courts in Kentucky, Illinois and Iowa, and state courts in Arizona, California, Colorado, Connecticut, Florida, Nevada, New Jersey and Virginia; before Administrative Law Judges of the Securities and Exchange Commission; before arbitration panels of the Financial Industry Regulatory Authority and the American Arbitration Association; and by video before a New Mexico special legislative investigative Subcommittee in an impeachment proceeding. My testimony as an expert witness has included testimony as an expert for the SEC's Division of Enforcement in proceedings brought by the SEC.

16. I am a member of the American Association of Individual Investors ("AAII") and have published in the AAII Journal.

**Report of Robert W. Doty**
**Appendix III-3**

17. I have attended investor conferences sponsored by NFMA, Morningstar and AAII and listened to and discussed concerns and interests of investors.

18. As a member of industry committees, I have participated with others in the preparation of a number of nationally- and regionally-recognized publications providing disclosure, investigatory (due diligence) and related guidance applicable to municipal securities transactions. Those publications include, without limitation, successive editions of the Government Finance Officers Association of the United States and Canada's ("GFOA") **DISCLOSURE GUIDELINES FOR STATE AND LOCAL GOVERNMENT SECURITIES** over a period of almost two decades.

19. I am a former General Counsel to the GFOA.

20. I served as Editor and Coordinator of the 1987 edition of **DISCLOSURE ROLES OF COUNSEL**, sponsored by the National Association of Bond Lawyers and a Section and a Subcommittee of the American Bar Association. In that role, I coordinated, combined and edited the work products produced by national committees of attorneys experienced in municipal securities customs, practices and standards of care.

21. I was a principal drafter, together with a national committee of issuer counsel, of the Exposure Draft of the **FINANCING PROCEDURES CHECKLISTS** (Apr. 2007) of the International Municipal Lawyers Association ("IMLA") for attorneys representing local governmental securities issuers.

22. I served for many years as Chair and Co-Chair of IMLA's Section on Economic Development/Finance & Securities.

23. I received IMLA's award as its Most Outstanding Associate Member.

24. I am the author or co-author of numerous books, chapters, articles on municipal bond transactions and roles and responsibilities of various parties in connection with, and customs, practices and standards of care relating to, those transactions. Those publications include seminal articles as to disclosure practices, due diligence and investigatory procedures, roles and responsibilities of parties, and fiduciary responsibilities in municipal securities transactions.

25. I am the author of the **BLOOMBERG VISUAL GUIDE TO MUNICIPAL BONDS** (John Wiley & Sons and Bloomberg Press, 2012), which discusses in plain English for investors and market participants the diversity and complexity of municipal finance.

26. I am the author of **EXPANDING MUNICIPAL SECURITIES ENFORCEMENT: PROFOUND CHANGES FOR ISSUERS AND OFFICIALS** (International Municipal Lawyers Association, 2016). The book discusses significant expansion from 2013 to 2016 in the enforcement

Report of Robert W. Doty
Appendix III-4

activities of the Securities and Exchange Commission relating to municipal bond issuers, issuer officials, underwriters and financial advisors.

27. I also am the author of MUNICIPAL SECURITIES LAW & PRACTICE: REGULATION, DISCLOSURE AND ENFORCEMENT, 212 Securities Practice Series (Bloomberg BNA 2014, rev. 2015, 2016 and 2017), which discusses the pattern of securities regulation in the municipal bond market and enforcement actions over the past 45 years.

28. My writings have been cited favorably in a number of judicial decisions and by the Financial Industry Regulatory Authority. The Securities and Exchange Commission also has cited my writings favorably in SEC Staff Reports, in connection with the SEC's proposal of SEC Rule 15c2-12 governing disclosure procedures in municipal finance transactions, and in the publication in 1988 and 1989 of the SEC's interpretation on underwriter investigatory responsibilities.

29. I served on the Muni Council, formed initially through the auspices of the Municipal Securities Rulemaking Board, consisting of approximately 20 professional associations representing the major municipal bond market participant sectors for the creation of a "central post office" for filings of issuer and obligor continuing disclosure documents. I served as Chair of the Security Committee of the Muni Council.

30. I served as President and a Director of the Southern Municipal Finance Society; member and officer of committees or subcommittees of the National Association of Bond Lawyers and Sections of Business Law and State and Local Government Law of the American Bar Association; and a member of GFOA's Disclosure Task Force.

31. I served as Vice President and a member of the Board of Directors of the National Association of Independent Public Finance Advisors ("NAIPFA") and as Chair of NAIPFA's Public Affairs Committee.

32. Among the consulting clients I have served are the counsel to the Division of Enforcement of the Securities and Exchange Commission, counsel to the Financial Industry Regulatory Authority, the Office of the California Attorney General, the California Department of Corporations, a United States Attorney, a County District Attorney, counsel to a special investigative subcommittee of the New Mexico House of Representatives in connection with impeachment proceedings relating to a State official, and counsel to investors, underwriters, issuers, issuer officials, bond counsel, financial consultants, developers/promoters, indenture trustees and others involved in finance transactions in a number of states.

33. I was selected as one of a five-member United States delegation formed by the Smithsonian Institution's Woodrow Wilson International Center for Scholars and by the National Committee on United States-China Relations to consult with officials of the Peoples Republic of China in Beijing, Shanghai and Hangzhou.

# ROBERT DOTY
## CURRICULUM VITAE

Robert Doty has been involved for decades in the finance industry as a municipal securities financial and municipal advisor, special consultant, investment banker (underwriter), and bond and securities lawyer and underwriter counsel. In the process, Mr. Doty participated in the successful completion of billions of dollars of municipal finance and corporate finance transactions, including representations benefiting more than 150 governmental entities in approximately two dozen states. He worked with a substantial diversity of credit types in the market for municipal bond and other municipal securities, as well as numerous corporate credits. Mr. Doty is President and proprietor of AGFS, his consulting firm.

Mr. Doty served as Chair and Co-Chair of the Section on Economic Development/Finance & Securities of the International Municipal Lawyers Association. He received IMLA's **MOST OUTSTANDING ASSOCIATE MEMBER AWARD**.



Mr. Doty served as a member of the Board of Governors and Executive Committee, as a member of the Industry Practices Committee, and as Chair of a disclosure committee of the National Federation of Municipal Analysts (NFMA). He is a recipient of NFMA's **MUNICIPAL INDUSTRY CONTRIBUTION AWARD**. He also served as the President and a Director of the Southern Municipal Finance Society.

Mr. Doty served as a member of the Professional Qualifications Advisory Committee of the Municipal Securities Rulemaking Board and as a Subject Matter Expert for the MSRB's eLearning initiative. Mr. Doty also served for two years as Vice President of the National Association of Independent Public Finance Advisors (NAIPFA) (now, the National Association of Municipal Advisors), and served for several years as a member of NAIPFA's Board of Directors and Chair of its Public Affairs Committee. He represented NAIPFA on the Muni Council, a group of approximately 20 national associations from across the major municipal bond market sectors developing improvements in the municipal bond market's continuing disclosure practices.

Mr. Doty is a nationally and regionally recognized authority on public finance, and in particular, aspects of the municipal bond market relating to municipal securities law, municipal disclosure and due diligence, fiduciary duties, and roles and responsibilities of parties. He served for more than three decades in the development of disclosure guidelines and due diligence procedures respecting state and local government securities. Among other things, Mr. Doty served as General Counsel to, and a principal drafter, as a member of national industry committees, of the **DISCLOSURE GUIDELINES FOR STATE AND LOCAL GOVERNMENT SECURITIES** and other disclosure guidelines of, the Government Finance Officers Association. Mr. Doty was active for two decades on the Government Finance Officers Association's Disclosure Task Force, and served actively on committees and subcommittees of the American Bar Association and the National Association of Bond Lawyers. He served as Coordinator and Reporter, as a member of a national industry committee, of **DISCLOSURE ROLES OF COUNSEL IN STATE AND LOCAL GOVERNMENT SECURITIES OFFERINGS** (1st ed. 1987), sponsored by a subcommittee and a section of the American Bar Association and the National Association of Bond Lawyers. Mr. Doty served as a principal drafter, as a member of national industry

committees, of the NFMA's **WHITE PAPER ON EXPERT WORK PRODUCTS** (2011) and NFMA's **WHITE PAPER ON THE DISCLOSURE OF POTENTIAL CONFLICTS OF INTEREST IN MUNICIPAL FINANCE TRANSACTIONS** (2015) and the Exposure Draft of IMLA's **FINANCING PROCEDURES CHECKLISTS** (2007). He also served on the NFMA Task Force on pension disclosure, and served on NFMA's industry committee on charter school disclosure. He served as a member of the NFMA Industry Practices Committee, which prepared NFMA's **WHITE PAPER ON BEST MUNICIPAL BOND ISSUANCE PRACTICES** (2014).

Regionally, Mr. Doty served as a Principal Drafter and Coordinator of the Project Team, working with State agency staff, for the preparation of the California Debt and Investment Advisory Commission's **GUIDELINES FOR LEASES AND CERTIFICATES OF PARTICIPATION**, an important form of California public finance. He serve from 2012 to 2013 as an industry consultant to the Commission. He is also author of a series of papers and draft disclosure guidelines that foreshadowed the Commission's publication of its **DISCLOSURE GUIDELINES FOR LAND-BASED FINANCINGS**, such as for assessment districts and special tax districts.

Mr. Doty participated in a wide variety of activities related to municipal securities transactions, including the issuance of municipal bonds, notes, leases, certificates of participation and other municipal securities for many types of governmental issuers; workouts and forensic analysis of and litigation regarding defaulted municipal bonds and other troubled municipal securities issues; tender offers; and federal and state enforcement investigations. The governmental entities benefited by Mr. Doty include cities, multi-state interlocal agencies, water and wastewater agencies, counties, schools, assessment districts, special taxing districts, authorities, colleges, public utilities, state agencies, joint powers or joint action agencies, power authorities, and recreation and park, community service and other forms of special agencies and districts. He was instrumental in the development of sophisticated pooled and other financing structures.

Mr. Doty is the author and co-author of several books and chapters and over 80 articles on municipal bonds, corporate finance and related subjects. Mr. Doty's most recent book is **EXPANDING MUNICIPAL SECURITIES ENFORCEMENT: PROFOUND CHANGES FOR ISSUERS AND OFFICIALS** (International Municipal Lawyers Association, 2016). The book discusses the significant expansion from 2013 to 2016 in the enforcement activities of the Securities and Exchange Commission relating to municipal bond issuers and officials. Not only did the scope of securities law enforcement actions increased greatly in terms of number and subject matter, but penalties imposed were substantially more exacting for both municipal issuers and officials.

Mr. Doty's other recent books are **THE BLOOMBERG VISUAL GUIDE TO MUNICIPAL BONDS** (John Wiley & Sons 2011) and **MUNICIPAL SECURITIES LAW & PRACTICE: REGULATION, DISCLOSURE AND ENFORCEMENT,** 212 Securities Practice Series (Bloomberg BNA 2014, rev. 2015, 2016, 2017). **THE BLOOMBERG VISUAL GUIDE**, which includes contributions from a number of market participants, is directed to explaining in plain English to retail investors, issuers, students and market professionals seeking to expand their knowledge of municipal finance, the complexity and diversity of municipal securities, a variety of municipal securities structures, and why traditional municipal securities are sound. The book also points out certain market sectors that offer greater rewards and greater risks, and considerations and sources of information for investors. **MUNICIPAL SECURITIES LAW & PRACTICE** discusses the pattern of

securities regulation in the municipal securities market and enforcement actions over the past 45 years. Mr. Doty's other writings include seminal works in the mid-1970s on municipal securities law and municipal securities disclosure and due diligence and later seminal publications on fiduciary duties and roles and responsibilities of parties in municipal bond offerings and other municipal securities transactions. Mr. Doty's writings have been cited favorably by the Securities and Exchange Commission and the Financial Industry Regulatory Authority and in judicial decisions on municipal securities law.

Mr. Doty frequently served as Chair and speaker at national and regional conferences regarding state and local government finance, including among them, from the late 1980s into this century, the **ANNUAL INSTITUTES ON MUNICIPAL FINANCE** sponsored by the Practising Law Institute in New York. Mr. Doty was selected as one of a five-member United States delegation formed by the Smithsonian Institution's Woodrow Wilson International Center for Scholars and by the National Committee on United States-China Relations to consult with officials of the Peoples Republic of China.

Mr. Doty has served as a consultant to lawyers in almost three dozen states on a variety of matters relating to the finance industry, municipal securities law, municipal disclosure, due diligence, roles and responsibilities of parties, and municipal finance, including counsel to municipal securities issuers, underwriters, bond counsel, trustees, investors and governmental agencies, such as counsel to the Division of Enforcement of the Securities and Exchange Commission (as well as in opposition to the Division), the Financial Industry Regulatory Authority, the California Department of Corporations, the Office of the California Attorney General, a United States Attorney, a District Attorney, and a special investigative subcommittee of the New Mexico House of Representatives. In such consultations, Mr. Doty may provide information regarding municipal finance to parties unfamiliar with the municipal market and may engage in forensic analysis of municipal securities transactions.

When appropriate, Mr. Doty has served as a municipal bonds expert witness. He has testified as an expert on the finance industry in federal courts in Kentucky, Illinois and Iowa, and in state courts in Arizona, California, Colorado, Connecticut, Florida, Nevada, New Jersey and Virginia; before Administrative Law Judges of the Securities and Exchange Commission; before arbitration panels of the Financial Industry Regulatory Authority and the American Arbitration Association; and by video before the special investigative Subcommittee of the New Mexico House of Representatives.

Mr. Doty received his law degree from Harvard Law School. He is a member of numerous market associations representing issuers, investors, counsel and others.

**ROBERT W. DOTY**
**988 Placid Court**
**Arnold, MD 21012**
**Telephone: (916) 761-3432**
**Email: Robert.Doty@AGFS.com**

**<u>CURRICULUM VITAE</u>**

**Degrees Earned:**

Harvard Law School, Ll.B, 1967
University of Houston, B.A., *cum laude,* 1964
*Phi Kappa Phi* Honor Society

**Professional Certifications**
**and Registrations:**

Bar examinations in California (retired), Texas (retired) and Maryland
(Out of State Attorneys Exam)

Prior Professional Certifications: National Association of Securities
Dealers, Inc.—Series 24 (Principal—twice), Series 7 (Registered
Representative), Series 63 (State) (No longer in effect)

Certified Independent Public Finance Advisor examination (National
Association of Independent Public Finance Advisors) (No longer in
effect)

Municipal Advisor Registered with Securities and Exchange
Commission and Municipal Securities Rulemaking Board (No longer in
effect)

**Memberships and Offices:**

*Selected activities*—Member, Industry Practices Committee (2013),
Board of Governors and Executive Committee (1990-92), Industry
Practices Committee (1991), Certificate Committee (Chair, 1992-95),
National Federation of Municipal Analysts (now inactive); International
Municipal Lawyers Association (now inactive), Chair and Co-Chair,
Section on Economic Development/Finance & Securities (2012-2019),
Chair, Section on Economic Development, Taxation and Finance (2005-
07), Vice Chair (2004-05) and Recorder (2003-04), Recorder, Associate
Member Department (2002-03); Member, Professional Qualifications
Advisory Committee, Municipal Securities Rulemaking Board (2011-
12); Subject Matter Expert for the MSRB's eLearning initiative
(2017); Muni Council (2002- 2005), Security Committee (Chair, 2004-
2005); Vice President (2006-08), and member, Board of Directors and
Chair, Public Affairs Committee, National Association of Independent
Public Finance Advisors (2004-08); Director and President (1990-92),
Southern Municipal Finance Society; Board of Editorial Advisors,
Municipal Finance Journal (1990-2019); Disclosure Task Force,
Government Finance Officers Association (1975-1991); Subcommittee

**Robert W. Doty**
*Curriculum Vitae*
**Page 2**

on Municipal and Governmental Obligations (Vice Chair 1980s),
American Bar Association (1980s); Special Committee on Securities
Law and Disclosure, National Association of Bond Lawyers (1980s)

*Professional memberships:*

Attorney bar regulatory associations and authorities in California
(inactive); New York (inactive), Maryland, the District of Columbia,
Texas (inactive), and Ohio (inactive). Past memberships through 2019:
the National Federation of Municipal Analysts (now inactive), the
Municipal Analysts Group of New York (now inactive), the Government
Finance Officers Association (Associate Member) (now inactive), the
International Municipal Lawyers Association (Associate Member) (now
inactive), the American Bar Association (now inactive); the National
Association of Bond Lawyers (Associate Member) (now inactive), and
the Securities Experts' Roundtable (now inactive).

**Professional Recognition:**

Chair and Co-Chair, Section on Economic Development/Finance &
Securities (2012-2019), Chair, Economic Development, Taxation and
Finance Section (2005-07), International Municipal Lawyers Association

*Most Outstanding Associate Member Award,* International Municipal
Lawyers Association

Member, Industry Practices Committee (2013), National Federation of
Municipal Analysts (past Member of Board of Governors, Executive
Committee and Chair, Certificate Committee)

*Municipal Industry Contribution Award,* National Federation of
Municipal Analysts

Industry consultant, California Debt & Investment Advisory Commission
(2012-2013)

Member, Professional Qualifications Advisory Committee, Municipal
Securities Rulemaking Board (2011-2012)

Subject Matter Expert for the MSRB's eLearning initiative (2017)

Member, Organizing Committees, Brandeis Municipal Finance
Conferences (2013-2015)

Cited favorably by the Securities and Exchange Commission in its
Release No. 34-26100, 53 F.R. 37778 (Sept. 28, 1988), proposing Rule
15c2-12 effectively to regulate municipal disclosure in the issuance of
municipal securities; the SEC Staff Report on the Municipal Securities
Market at n. 93 (Sept. 1993); and the SEC Staff Report on the Municipal
Securities Market at 7 n. 29, 24 n. 125, 34 n. 185 (July 2012)

Cited favorably by the Financial Industry Regulatory Authority (FINRA) in setting its 2013 "Business Conduct and Sales Practice Priorities (Jan. 11, 2013)

Cited favorably in the following judicial decisions: *In re New York City Municipal Securities Litigation,* 507 F.Supp. 169, 183 nn. 31 and 33, 184 n. 35 (S.D.N.Y. 1980) (co-authored article and congressional testimony); *In re Washington Public Power Supply System Securities Litigation,* 623 F.Supp. 1466, 1479 (W.D. Wash. 1985) (co-authored article); *Brown v. City of Covington,* 805 F.2d 1266, 1270 (6th Cir. 1986) (co-authored article); *Sonnenfeld v. City of Denver,* 100 F.3d 744, 746 (10th Cir. 1996) (co-authored article)

Testified as an expert in the finance industry in federal courts in Kentucky, Illinois and Iowa, and state courts in Arizona, California, Colorado, Connecticut, Florida, Nevada, New Jersey, and Virginia; before Administrative Law Judges of the Securities and Exchange Commission; before arbitration panels of the Financial Industry Regulatory Authority and the American Arbitration Association; and by video before a special investigative Subcommittee of the House Rules and Order of Business Committee of the New Mexico House of Representatives

Selected as one of a five-member United States delegation formed by the Smithsonian Institution's Woodrow Wilson International Center for Scholars and by the National Committee on United States-China Relations to consult with officials of the Peoples Republic of China and of the Cities of Beijing, Shanghai and Hangzhou, together with academicians and interested professionals in the PRC, as to the potential functioning of a municipal securities market in the PRC; role as a member of the delegation was to discuss legal and financial aspects of, and disclosure and due diligence mechanisms for, formation of a municipal securities market for financing environmental infrastructure in the PRC

Co-Chair, with The Honorable Gui Minjie, Vice Chairman of the China Securities Regulatory Commission, of the Securities Law Panel at the 22nd Biennial Congress of the World Jurist Association held in Beijing and Shanghai

**Professional Activities:**

AGFS, Arnold, Maryland (formerly, American Governmental Financial Services Company, Sacramento, California, and Doty Research & Development Company, Houston, Texas), President and proprietor, 1987-present; research, publications and consulting services regarding municipal securities law, municipal disclosure and due diligence, fiduciary duties, and roles and responsibilities of parties in municipal securities transactions (formerly, also a financial advisory firm providing advice to local governments)

**Robert W. Doty**
*Curriculum Vitae*
**Page 4**

Government Financial Strategies, Inc., Sacramento, California, Senior Advisor and Counsel to the Executive Team, 2012 to 2013, financial advisor to state and local governments respecting the conduct of their financings and other financial matters

George K. Baum & Company, Sacramento; Vice President, 1990-1991; origination of state and local government finance transactions; one of two senior bankers in the California office of the firm

University of Houston, School of Law; Visiting Professor and Adjunct Professor, 1987-1989; taught Business Organizations (emphasizing corporate and securities laws) and State and Local Government Finance (a course I developed)

Underwood, Neuhaus & Co. Incorporated, Houston; First Vice President, 1986-1987; public finance securities origination

Boettcher & Co., Inc., Denver; Vice President, 1984-1986; Rocky Mountain region public finance securities origination and financial institution securitization transactions

Squire, Sanders & Dempsey, Washington and Cleveland; Partner, 1979-1984; bond, underwriter, issuer, investor and trustee counsel; legal aspects of state and local government finance, tax-exempt industrial, commercial, real estate and hospital finance, and financial institution securitization transactions; member, Disclosure Committee; prepared firm forms of hospital financing documents; prepared an internal firm course on legal counseling of underwriters

Government Finance Officers Association, Washington; General Counsel and Director of Fiscal Policy, 1977-1979; a principal drafter with national industry committees of nationally-recognized disclosure guidelines for state and local government securities transactions; securities and tax law liaison with the federal government on behalf of state and local governments

Government Finance Officers Association, Washington, 1975, consultant under National Science Foundation grant regarding research and drafting of disclosure considerations for municipal securities offerings

Creighton University, School of Law, Omaha; Assistant Professor of Law and Associate Professor of Law, 1973-1976; taught Advanced Securities Law, Corporations, Advanced Corporations, Agency and Partnership, Professional Responsibility, and a Seminar on the Preparation of Registration Statements (a seminar I developed)

Kutak Rock, Omaha; Special Consultant, 1974-1975; reviewed the firm's securities law practices and taught an internal securities law course for the firm's attorneys

**Robert W. Doty**
*Curriculum Vitae*
**Page 5**

Fulbright & Jaworski, Houston; Associate, 1967-1973; securities and corporate law; preparation of registration statements, proxy statements, and merger and acquisition agreements, and general securities law and corporate advice

**Books and Database:**

EXPANDING MUNICIPAL SECURITIES ENFORCEMENT: PROFOUND CHANGES FOR ISSUERS AND OFFICIALS (International Municipal Lawyers Association, 2016)

MUNICIPAL SECURITIES LAW & PRACTICE: REGULATION, DISCLOSURE, DUE DILIGENCE AND ENFORCEMENT, 212 Securities Practice Series (Bloomberg BNA 2014, rev. 2015, 2016, 2017)

THE BLOOMBERG VISUAL GUIDE TO MUNICIPAL SECURITIES (John Wiley & Sons, Inc., print and electronic editions 2012)

MUNICIPAL ADVISOR RESOURCES (AGFS, 2011)

FROM TURMOIL TO TOMORROW--THE EMERGING NEW WORLD OF MUNICIPAL FINANCE (AGFS, 2010)

INFRASTRUCTURE FINANCE: TRENDS AND TECHNIQUES, Chapter on "*Funding Clean Water Systems in a Prosperous China*" (Euromoney Books, London, 2008)

STATE AND LOCAL GOVERNMENT DEBT ISSUANCE AND MANAGEMENT SERVICE (Sheshunoff Information Services, Inc., 1996 and subsequent revisions) (co-author of portions of book on securities law and disclosure)

SECURITIES LAW FOR MUNICIPAL FINANCE ADVISORS—A COMPILATION [sm] (AGFS, 2001)

SECURITIES LAW FOR THE MUNICIPAL MARKET [sm] (Goodman Publishing, 2002-03)

AGFS MUNICIPAL SECURITIES LAW AND DISCLOSURE DATABASE [sm] (online service through AGFS) (approximately 2001-02)

SIGNIFICANT BRIEFS FROM KEY MUNICIPAL SECURITIES ENFORCEMENT ACTIONS [sm] (AGFS, 2001)

LIFE AFTER WPPSS—ISSUER DISCLOSURE IN THE STATE AND LOCAL GOVERNMENT SECURITIES MARKET (Packard Press, Philadelphia, 1988-89)

THE FEDERAL LAW OF PUBLIC FINANCE, four volumes (Sorg Printing Company, Chicago, 1988) (co-author with John C. Bates, Jr.)

STATE AND LOCAL GOVERNMENT DEBT FINANCING (D. Gelfand, ed., Callaghan & Co., Deerfield, IL, 1986, 1988 revision and cum. supps. 1986, 1987, 1988, 1989, 1990, 1991 and 1992), "Chapter 2—*Traditional Bonds and Notes*" (co-author with Jeffrey S. Green), "Chapter 8— *Application of the Securities Laws & Market Standards to State & Local Government Securities Transactions,*" and "Chapter 8A—*Disclosure Process in State and Local Government Securities Transactions*"

**Market Guidance and Related Publications:**

RECOMMENDED BEST PRACTICES IN CHARTER SCHOOL FINANCINGS (2017, *National Federation of Municipal Analysts*) (member of national industry committee)

WHITE PAPER ON THE DISCLOSURE OF POTENTIAL CONFLICTS OF INTEREST IN MUNICIPAL FINANCE TRANSACTIONS (2015, *National Federation of Municipal Analysts*) (member of national industry committee)

WHITE PAPER ON BEST MUNICIPAL BOND ISSUANCE AND DISCLOSURE PRACTICES (2014, *National Federation of Municipal Analysts*) (member of NFMA's Industry Practices Committee)

WHITE PAPER ON EXPERT WORK PRODUCTS (*National Federation of Municipal Analysts*, 2011) (member of a national industry committee)

FINANCING PROCEDURES CHECKLISTS (*International Municipal Lawyers Association*, Exposure Draft 2007) (member of a national industry committee)

GUIDELINES FOR LEASES AND CERTIFICATES OF PARTICIPATION (California Debt Advisory Commission, 1993) (Coordinator and a principal drafter for the Project Team working with State agency staff)

DISCLOSURE GUIDELINES FOR STATE AND LOCAL GOVERNMENT SECURITIES (Government Finance Officers Association, 1991 edition) (a principal drafter as a member of a national industry committee)

DISCLOSURE GUIDELINES FOR STATE AND LOCAL GOVERNMENT SECURITIES (Government Finance Officers Association, 1988 edition) (a principal drafter as a member of a national industry committee)

DISCLOSURE ROLES OF COUNSEL IN STATE AND LOCAL GOVERNMENT SECURITIES OFFERINGS (Section of Urban, State and Local Government Law of the American Bar Association, 1st ed. 1987), sponsored by Subcommittee on Municipal and Governmental Obligations, Committee on Federal Regulation of Securities, Section of

Corporation, Banking and Business Law, American Bar Association; Section of Urban, State and Local Government Law, American Bar Association; and Committee on Federal Securities Law, National Association of Bond Lawyers (Reporter and Coordinator as a member of a national industry committee)

**OFFICIAL STATEMENTS FOR OFFERINGS OF SECURITIES BY STATE AND LOCAL GOVERNMENTS—EXAMPLES AND GUIDELINES** (Government Finance Officers Association, 1981) (a principal drafter as a member of a national industry committee)

**DISCLOSURE GUIDELINES FOR OFFERINGS OF SECURITIES BY STATE AND LOCAL GOVERNMENTS** (Government Finance Officers Association, 1979 revision) (a principal drafter as a member of a national industry committee)

**DISCLOSURE GUIDELINES FOR OFFERINGS OF SECURITIES BY STATE AND LOCAL GOVERNMENTS** (Government Finance Officers Association, 1976 original version) (a principal drafter as a member of a national industry committee)

**GUIDELINES FOR USE BY STATE AND LOCAL GOVERNMENTS IN THE PREPARATION OF YEARLY INFORMATION STATEMENTS AND OTHER CURRENT INFORMATION** (Government Finance Officers Association, 1979) (a principal drafter as a member of a national industry committee)

**PROCEDURAL STATEMENTS IN CONNECTION WITH DISCLOSURE GUIDELINES** (Government Finance Officers Association, 1978) (a principal drafter as a member of a national industry committee)

**TENTATIVE DISCLOSURE GUIDELINES FOR DEVELOPERS,** a precursor for the California Debt Advisory Commission's 1996 Guidelines

**Selected Publications:**

"*The SEC Raises the Stakes: How the Recent Amendments to Rulen15c2-12 Will Affect Municipal Bond Issuers,*" 59 Mun. Law. No. 6 (Nov.-Dec. 2018) (Co-author with Randall Kulat)

 "*Conflict of Interest Issues Are Pivotal for Municipal Advisors*" (The Bond Buyer Sept. 25, 2018)

"*Municipal Advisors' Fiduciary Duty of Care Is More Than Just 'Professional Standards'*" (The Bond Buyer Sept. 17, 2018)

 "*Setting Standards of Practice for Consultants*" 38 Mun. Fin. J. 15 (Winter 2018) (Panelist)

"*Regulation and Your Consultants: Drawing the Line*" 38 Mun. Fin. J. 25 (Winter 2018) (Panelist)

"*Duty of Care Enforcement for Municipal Advisors*" (The Bond Buyer Online Aug. 30, 2017)

"*What the SEC Has Achieved (So Far) Through Enforcement*" (The Bond Buyer Online, Aug. 30, 2016)

"*Expanding Municipal Securities Enforcement: Profound Changes For Issuers and Officials*" (The Bond Buyer Online, July 12, 2016)

"*The Past and Future of Municipal Securities--Fortieth Anniversary of the Municipal Securities Rulemaking Board,*" Mun. Fin. J. 1 (2016) (Panelist)

"*John Petersen: A Municipal Market Giant*" 33 Mun. Fin. J. 13 (Winter 2013)

"*Telling Myth from Reality in MuniLand,*" Govt. Fin. Rev. 17 (GFOA Feb. 2013)

"*Diversity & Risks of Municipal Bonds*" presented at the 2012 Municipal Finance Conference conducted by the Brandeis International Business School on August 3, 2012, and published in 34(2) Mun. Fin. J. 55 (Summer 2013)

*H.R. 2827—Potential Loss of Important Protections for Municipal Securities Issuers,"* Mun. Lawyers 18 (July/Aug. 2012)

"*The Readily-Identifiable Riskiest Municipal Securities: Due Diligence Does Make a Difference*" 32(2) Mun. Fin. J. 63 (2011)

"*Preliminary Observations on the Dodd-Frank Wall Street Reform and Consumer Protection Act as It Applies to the Municipal Securities Market*" 31(2) Mun. Fin, J. 99 (Summer 2010)

"*Bid-Rigging Investigations in the Municipal Markets: Current and Future*" 23 Journal of Taxation & Regulation of Financial Institutions 41 (July/Aug. 2010)

"*Pennsylvania School Districts v. JP Morgan—A Case Study for Issuers on Reading and Understanding Agreements Before Signing*" 30(4) Mun. Fin. J. 79 (Winter 2010)

"*Kentucky v. Davis—Protection for State Tax Exemptions for Bonds*" Mun. Law. 24 (Nov./Dec. 2008)

"*Securities Law Application to Municipal Finance Transactions— Continued Expansion & A Market in Flux, Part 2*" 29(1) Mun. Fin. J. 31 (Spring 2008)

"*Securities Law Application to Municipal Finance Transactions—Continued Expansion & a Market in Flux, Part I*" 28(4) Mun. Fin. J. 63 (Winter 2008)

**"***Municipal Securities Law and Disclosure Developments—Securities Law Application to Municipal Finance Transactions Is Coming of Age***,"** 27(4) Mun. Fin. J. 55 (Winter 2007)

"*Funding Clean Water Systems in a Prosperous China*," submitted to 2006 China International Conference in Finance, Xi'an, China, and subsequently revised and expanded under the title "*Funding Clean Drinking Water Systems in a Prosperous China*"

"*A Clean Water Funding Plan for a Prosperous China*," 790 Working Papers of the 22nd Congress on the Law of the World (World Jurist Association, Sept. 2005)

"*Lease-Purchase Financings in China—Financial Instruments for Environmental Infrastructure*," 25(4) Municipal Finance Journal 1 (Winter 2005)

"*Municipal Finance Advising, Part I: Fiduciary Relationships of Municipal Finance Advisors with Their Issuer Clients,*" 33 Urb. Law 225 (Spring 2001)

"*Municipal Finance Advising, Part II: Managing Relationships of Municipal Finance Advisors with Issuers*" 33 Urb. Law 259 (Spring 2001)

"*Special Disclosure Considerations for State and Local Government Securities Issuers*," 18 Mun. Fin J. 42 (Summer 1997)

"*Disclosure Responsibilities and Substance in Tax-Exempt Land-Based Financings,*" Mun. Fin J. (Winter 1996) [containing Tentative Disclosure Guidelines for Developers]

"*The Revolution in Municipal Securities Disclosure Practice,*" 2 Insights: Corp. & Sec. L. Advisor No. 11 at 3 (Nov. 1988) (co-author with John M. Gardner)

"*Searching for Standards: Disclosure in the Municipal Securities Market,*" 1976 Duke L.J. 1177 (1977) (co-author with Dr. John E. Petersen, Dr. Ronald W. Forbes and Donald D. Bourque)

"*The Federal Securities Laws and Transactions in Municipal Securities,*" 71 Nw. U.L. Rev. 283 (1976) (co-author with Dr. John E. Petersen)

"*Application of the Antifraud Provisions of the Federal Securities Laws in Exempt Offerings: Duties of Underwriters and Counsel,*" 16 B.C. Ind.

**Robert W. Doty**
*Curriculum Vitae*
**Page 10**

& Com. L. Rev. 393 (1975)

*"Analysis—Regulation of the Municipal Securities Market and Its Relationship to the Governmental Issuer"* (Municipal Finance Officers Association, 1975) (co-author with Dr. John E. Petersen)

**Speaking Since 2005:**

Mr. Doty has served actively as a speaker on municipal bonds, municipal securities law, disclosure, due diligence and roles and responsibilities of parties for more than the past four decades. Among other things, from the late 1980s into the 2000s, Mr. Doty served as Program Chair and Speaker for Practising Law Institute's *Annual Institutes on Municipal Finance Law* in New York.

The following are Mr. Doty's speaking engagements since 2005:

January 2006, Participant in the MSRB's Municipal Market Roundtable, representing National Association of Independent Public Finance Advisors, Washington, DC

April 2006, Moderator: "After *Kelo v. New London*: The Federal and State Response," International Municipal Lawyers Association, Joint Meeting of State League Counsel and Section on Economic Development, Taxation and Finance, *Mid-Year Conference,* Washington, DC

August 2006, Speaker: "Financing Public Water and Wastewater Systems," Smart Metering West Coast Conference, San Francisco, CA

September 2006, Speaker: "Potential Issuer Actions to Mitigate Securities Law Liability;" and Moderator: "Public Finance," International Municipal Lawyers Association, *Annual Conference,* Portland, OR

October 2006, Moderator: "Fiduciary Duties," Moderator: "Transactional Analyses for Clients," Moderator: "Broker-Dealer Requirements Applicable to Advisors," and Moderator: "The Role of Financial Advisors in School Finance: A Study," National Association of Independent Public Finance Advisors, *Annual Conference*, Boston, MA

November 2006, Speaker: "Municipal Bonds Fraud," California District Attorneys Association, San Francisco

January 2007, Participant in the MSRB's Municipal Market Roundtable, representing National Association of Independent Public Finance Advisors, Washington, DC

April 2007, Speaker: "IMLA's **FINANCING PROCEDURES CHECKLISTS**;" International Municipal Lawyers Association, *Mid-Year Conference,* Washington, DC

July 2007, Provided materials: "IMLA's **FINANCING PROCEDURES CHECKLISTS**;" *Annual Seminar*, Florida Municipal Attorneys Association, Amelia Island, FL

September 2007, Moderator and Speaker: "Establishing Issuer Due Diligence and Disclosure Programs;" *6th Annual Pre-Conference Seminar at The Bond Buyer's Annual California Public Finance Conference*, California Debt and Investment Advisory Commission and The Bond Buyer, San Diego, CA

October 2007, Moderator: Panels on "Current SEC, MSRB and IRS Issues," and "Credit Analysis in Municipal Finance," National Association of Independent Public Finance Advisors, *Annual Conference*, Indianapolis, IN

November 2007, Moderator and Speaker: "Hot Topics in Disclosure;" *CDIAC Disclosure Seminar*, California Debt and Investment Advisory Commission, San Mateo, CA

January 2008, Participant in the MSRB's Municipal Market Roundtable, representing National Association of Independent Public Finance Advisors, Washington, DC

September 2008, Speaker: "Emerging Issues in the Municipal Securities Market," International Municipal Lawyers Association, *2008 Annual Conference,* Las Vegas, NV

September 2008, Speaker: "Developments in Continuing Disclosure, " CDIAC Disclosure Seminar on "*Understanding Municipal Securities Regulations*," California Debt and Investment Advisory Commission, San Diego, CA

October 2008, Moderator, "Fundamentals of Financial Advising—What Newer Financial Advisors Need to Know;" Moderator, "Regulatory Activities Affecting Municipal Finance;" Moderator and Speaker: "Project Dynamics—Investigation; Private Parties; Experts;" Moderator, "Financing Public Infrastructure in China;" National Association of Independent Public Finance Advisors, *Annual Conference,* Seattle, WA

October 2008, Speaker: "Emerging Issues in the Municipal Securities Market, " *2008 California Controller's Conference with County Auditors*, Monterrey, CA

March 2009, Speaker, "Bond Financing for Environmental Infrastructure," *China Water Industry Net (CWIN) Seminar*, Beijing

April 2009, Prepared Materials for Presentation, "Recreation and Park District Financings, "California Association of Recreation and Park Districts, *Annual Conference,* Incline Village, NV

May 2009, Interview, DerivActive.com, "Regulation of Financial Advisors," online podcasts

February 2010, Panelist, "The DC Impact on (or Menace to) Municipal Credit," *National Federation of Municipal Analysts Advanced Seminar on Tax-Backed Bonds and Federal Intervention, Reform and Influence over the Municipal Market*, Palm Beach, FL

March 2010, Panelist, "Issuers' Roundtable: Developing and Implementing Financial Strategies for Adjusting to a New Normal," *Information Management Network*, Huntington Beach, CA

March 2010, Speaker, "From Turmoil to Tomorrow: The Emerging New World for Municipal Finance," *Bond Attorneys Spring Workshop*, Palm Beach, FL

May 2010, Panelist, "Expert Work Products White Paper," *National Federation of Municipal Analysts Annual Conference*, Santa Ana Pueblo, NM

October 2010, Panelist: "Rules of Engagement: Inside the SEC's Muni Market Project**,**" *Bond Buyer 20ᵗʰ Annual Public Finance Conference*, San Francisco

October 2010, Speaker: "The Substantial Municipal Market Changes During the Financial Crisis," *National Association of Independent Public Finance Advisors Annual Conference*, Detroit

November 2010, Chair, "Significant Municipal Securities Law & Market Developments for Local Governments," *International Municipal Lawyers Association Teleconference*

January 2011, Speaker, "Exploratory Teleconference on Municipal Advisor Regulation of Municipal Officials," *International Municipal Lawyers Association Teleconferences*

Feb./March/May 2011, Chair, "Municipal Finance Series," *International Municipal Lawyers Association Teleconferences*

Sept. 2011, Speaker, "Issuer Disclosure Procedures," International Municipal Lawyers Association, *2011 Annual Conference,* Chicago, IL

Sept. 2011, Speaker, "Steps for Pro-Active Issuers," *2011 Annual Bond Buyer Pre-Conference,* California Debt and Investment Advisory Commission, San Diego, CA

Feb. 2012, Speaker: "Stepping Forward: The Role of the Finance Officer in Today's Market," *2012 Annual California Society of Municipal*

*Finance Officers Pre-Conference,* California Debt and Investment Advisory Commission, Anaheim, CA

March 2012, Speaker: "Looming Traps for Unsophisticated Issuers," *2012 Bond Attorneys Winter Workshop*, Palm Beach, FL

April 2012, Speaker and Moderator: "Recent Securities Law Developments Affecting Municipal Issuers," *Teleconference Series,* International Municipal Lawyers Association

April 2012, "Recent Securities Law Developments Affecting Municipal Issuers," *2012 Mid-Year Conference*, International Municipal Lawyers Association, Washington, DC

May 2012, Speaker and Moderator: "Municipal Securities Rulemaking Board's Role for the Protection of Issuers," *Teleconference Series,* International Municipal Lawyers Association

Written and oral testimony prepared at the request of the House Committee on Financial Services, Subcommittee on Capital Markets and Government Sponsored Enterprises, at a Hearing on the Impact of the Dodd-Frank Act on Municipal Finance on July 20, 2012

Aug. 2012, "*Diversity & Risks of Municipal Bonds,*" selected for presentation at the 2012 Municipal Finance Conference conducted by the Brandeis International Business School

Sept. 2012, "Major SEC Pronouncements Affecting Municipal Issuer Rights and Responsibilities," *Teleconference Series,* International Municipal Lawyers Association

Oct. 2012, Speaker, "Credit Disclosure in General Obligation and General Fund Securities," *Advanced Distressed Debt Conference,* National Federation of Municipal Analysts

Oct. 2012, Speaker: "Municipal Finance & SEC Regulations," and Speaker and Moderator: "Recent SEC & MSRB Developments on Municipal Securities Law & Disclosure," International Municipal Lawyers Association, *2012 Annual Conference,* Austin, TX

March 2013, Speaker: "What Are General Obligation Bonds & General Fund Securities & What Disclosure Is Appropriate?" *2013 Bond Attorneys Winter Workshop*, Palm Beach, FL

March 2013, Speaker: "Diversity & Risks of Municipal Bonds," Arizona State University School of Public Affairs, *Municipal Finance Challenge 2013*, Phoenix

**Robert W. Doty**
*Curriculum Vitae*
Page 14

April 2013, "Responsibilities of Municipal Advisors" and "Diversity & Risks of Municipal Bonds," U.S. Bank Trust Administrators Teleconferences

April-May 2013, Panelist: "Charter School and Conflicts of Interest Disclosure," National Federation of Municipal Analysts, *30th Annual Conference*, San Diego

July 2013, Speaker: "Charter School and Conflicts of Interest Disclosure," Gates Foundation/LISC Bond Investor Conference, New York

Sept. 2013, Speaker: "Best Practices and Principles for Improving Disclosure to Issuers in California," *2013 Annual Bond Buyer Pre-Conference,* California Debt and Investment Advisory Commission, Los Angeles

Sept. 2013, Speaker: "Recent SEC & MSRB Developments on Municipal Securities Law & Disclosure," International Municipal Lawyers Association, *2013 Annual Conference,* San Francisco

Feb. 2014, Speaker: "General Obligation Bonds?" *2014 Bond Attorneys Winter Workshop*, Palm Beach, FL

April 2013, Panelist, "Municipal Advisor Regulation" Bond Buyer Webinar

June 2014, Moderator, "SEC Self-Reporting Initiative for Issuers and Other Recent Disclosure Actions: Decisions for Municipal Lawyers," International Municipal Lawyers Association Webinar

July/August 2014, Discussant, "Bankruptcy Premium in the Municipal Securities Market," 2014 Municipal Finance Conference conducted by the Brandeis International Business School

Feb. 2015, Speaker: "Regulation of Municipal Advisors" *2015 Bond Attorneys Winter Workshop*, Palm Beach, FL

Apr. 2015, Speaker: "Recent Developments in Municipal Securities Law: How Municipal Officials Can Be Barred for Life!!" *2015 Mid-Year Conference, International Municipal Lawyers Association*, Washington, DC

June 2015, Speaker: "*Navigating Municipal Bond Offerings Amid Increased SEC Scrutiny and Enforcement*," Strafford Webinars

Oct. 2015, Panelist: "*The Past and Future of Municipal Securities: 40th Anniversary of the Municipal Securities Rulemaking Board*," Association for Budgeting and Financial Management,

Washington, DC, remarks published in 37(1) Mun. Fin. J. 1 (Spring 2016)

Apr. 2016, Moderator: "Recent Developments in Municipal Securities Law," *2016 Mid-Year Seminar, International Municipal Lawyers Association*, Washington, DC

July 2016, Discussant: Paper on "*Municipal Borrowing Costs and State Policies for Distressed Municipalities*," 5th Annual Municipal Finance Conference, The Brookings Institution, Brandeis University and Washington University, Washington, DC

Sept. 2016, Panelist and Moderator, "*Expanding Municipal Securities Enforcement: Profound Changes for Issuers & Officials*," International Municipal Lawyers Association, Washington

Sept. 2016, Speaker, "*Expanding Municipal Securities Enforcement: Profound Changes for Issuers & Officials*," California Debt and Investment Advisory Commission, Los Angeles

Oct. 2016, Panelist, "*Hot Topics in Municipal Securities Law*," Bond Attorneys Workshop, Chicago

March 2017, Panelist: "*GFOA Disclosure Guidelines: A Retrospective and Reappraisal*" National Association of Bond Lawyers 2017 Tax and Securities Law Institute, Washington, DC

Apr. 2017, Moderator and Panelist: "*Municipal Securities Disclosure: Selected Key Issues for Issuers & Officials*," International Municipal Lawyers Association 2017 Mid-Year Seminar, Washington, DC

May 2017, Speaker: "*Navigating Municipal Bond Offerings,*" Strafford Webinars

August 2017, Moderator and Panelist: "*Recent Developments in Municipal Securities Law*," International Municipal Lawyers Association Webinar

Sept. 2017, Speaker, "*Setting Standards of Practice for Consultants*," and Facilitator: "*Regulation and Your Consultants: Drawing the Line*," California Debt and Investment Advisory Commission, Carlsbad, CA

Oct. 2017, Panelist: "*Current Municipal Securities Issues for Issuers & Officials*," International Municipal Lawyers Association 2017 Annual Conference, Niagara Falls

Apr. 2018, Panelist: "*Key Focal Points for Issuer Counsel Regarding Bond Issues and Securities Law Compliance*," International Municipal Lawyers Association 2018 Mid-Year Seminar, Washington

**Robert W. Doty**
*Curriculum Vitae*
**Page 16**

Oct. 2018, Panelist: "*SEC's 2018 Amendments to Rule 15c2-12*," International Municipal Lawyers Association 2018 Annual Conference, Houston

Nov. 2019, Moderator: "*Coping with the New Disclosure Mandates of SEC Rule 15c2-12*," International Municipal Lawyers Association

Nov. 2019, Moderator: "*Managing Your Municipal Advisors*," and Speaker: "*Fiduciary Duties of Municipal Advisors (And Counsel)*," International Municipal Lawyers Association

# Exhibit 9

# EXHIBIT 37

# REBUTTAL EXPERT REPORT
## OF
# ROBERT W. DOTY

# JULY 20, 2020

## PREPARED AT THE REQUEST OF
# THE GOVERNMENT PARTIES
## AND COMMITTEES

*IN RE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, AS REPRESENTATIVE OF THE EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO, CASE NO. 17-3566 (D.P.R.)*

# T<span style="font-variant:small-caps">ABLE OF</span> C<span style="font-variant:small-caps">ONTENTS</span>

**INTRODUCTION** ................................................................................................................1

    **A.**    **Assignment** ............................................................................ 1

    **B.**    **Summary of Opinions** ......................................................... 2

    **C.**    **Documents and Information Considered** ........................... 2

**DISCUSSION** ...................................................................................................................3

    **A.**    **ERS' Bond Issuances Were Not "Borrowings" from the Underwriters** ..... 3

    **B.**    **The Phrase "Direct Placement" Does Not Refer to a Public Offering by ERS Itself, as Opposed to Through a Conduit** ........................................................... 4

**APPENDIX I—MATERIALS REVIEWED** ...............................................................I-1

# REBUTTAL EXPERT REPORT OF
# ROBERT W. DOTY

**Re:** ***In re Financial Oversight and Management Board for Puerto Rico, as representative of the Employees Retirement System of the Government of the Commonwealth of Puerto Rico,*** **Case No. 17-3566 (D.P.R.)**

# INTRODUCTION

I have been retained by Brown Rudnick LLP ("Counsel"), as counsel to the Financial Oversight and Management Board for Puerto Rico (the "Board") acting through its Special Claims Committee ("SCC"), to prepare this Rebuttal Report in connection with certain litigation (the "Litigation") in the above-referenced case of the Employee Retirement System of the Commonwealth of Puerto Rico ("ERS") pending under Title III of the Puerto Rico Oversight, Management, and Economic Stability Act ("PROMESA"). As part of my engagement, I have also agreed to assist certain other parties who are aligned in interest with the SCC in the Litigation, including (i) the Official Committee of Unsecured Creditors of the Title III Debtors and its counsel, Paul Hastings LLP, Genovese Joblove & Battista PA, and Casillas Santiago Torres LLC; (ii) the Official Committee of Retired Employees of the Commonwealth of Puerto Rico and its counsel, Jenner & Block LLP; (iii) the Puerto Rico Fiscal Agency and Financial Advisory Authority and its counsel, O'Melveny & Myers LLP; and (iv) the Board and its counsel, Proskauer Rose LLP. I have been retained as an independent testifying expert witness. I am over the age of 18 years, and am competent to testify at trial. I have personal knowledge of the matters discussed herein. If called upon, unless stated otherwise, I am prepared to testify consistently with the analysis and opinions I express in this Report.

I prepared an Initial Expert Report in this matter dated July 1, 2020 (my "Initial Report"), which is incorporated herein by reference.

This Rebuttal Expert Report responds to certain assertions made by Professor William Bartley Hildreth in his Expert Report dated July 1, 2020, in this matter (the "Hildreth Report"). My qualifications and compensation arrangement as described in my Initial Report are the same for this Rebuttal Report and, therefore, are not restated herein.

## A. Assignment

For purposes of this Rebuttal Report, Counsel has asked for my expert opinion on the following questions:

> 1. Whether I agree with Professor Hildreth's conclusion that ERS' issuance of bonds through underwritten public offerings constituted a "borrowing" or "loan" "from a financial institution."

**Rebuttal Report of Robert W. Doty**
**Page 2**

    2.    Whether I agree with Professor Hildreth's suggestion that the term "direct placement of debt" refers to any form of financing (including a public bond issuance) conducted by an issuer itself, as opposed to through a conduit.

## B.  Summary of Opinions

My conclusions are as follows:

I disagree with Professor Hildreth regarding whether, in municipal bond market terms, ERS "borrowed" from the underwriters. ERS did not borrow from the underwriters. Professor Hildreth does not rely on any materials commonly considered by those in the municipal finance industry to reach his conclusion.

I also disagree with Professor Hildreth regarding the meaning, in the municipal bond market, of the term "direct placement," as the opposite of a conduit financing. A "direct placement" in municipal finance is not the opposite of conduit financing, but rather, as described in my Initial Report, the direct sale of debt by a municipal issuer to one or a small group of sophisticated investors.  ERS made no such "direct placement" of its Bonds with the underwriters as that term is properly understood in the municipal bond market.

## C.  Documents and Information Considered

This Rebuttal Report and my Initial Report take into account the documentation and recognized and authoritative industry guidance I have reviewed to date, as well as my active participation in the financial markets for more than 45 years.  Appendix I hereto identifies additional materials I considered in reaching my opinions in this Rebuttal Report.

I understand that I may be asked in the future to review additional documentation or to conduct additional research and analysis.  I also understand that I may be asked to form additional opinions as to other questions upon appropriate review. I reserve the right to modify or supplement this Rebuttal Report and my Initial Report in any respect following my review of additional factual information or documents or additional research and analysis or to respond to additional questions.

This Rebuttal Report and my Initial Report and the opinions I express herein and therein are based upon my education, specialized training, skill, personal experience and knowledge of common and prevailing roles and responsibilities of parties involved in municipal bond transactions, and of industry customs, practices and standards of care prevailing in the municipal bond market in 1988 and 2008, and upon my consideration of materials discussed herein.

Rebuttal Report of Robert W. Doty
Page 3

# DISCUSSION

## A. ERS' Bond Issuances Were Not "Borrowings" from the Underwriters

Professor Hildreth states a few times (without analysis or authority) that the offerings of the ERS Bonds were "borrowings" directly from the underwriters.[1] At the same time, I counted more than 35 instances in which Professor Hildreth, in discussing the underwriters, refers to "purchases," "purchasers," "purchase contracts," or "purchase prices" of the ERS Bonds. He further notes that ERS' relationship with the underwriters is governed by the Bond Purchase Contracts.[2] From all of this, Professor Hildreth appears to conclude that, because the underwriters purchased the ERS Bonds from ERS as the issuer, ERS "borrowed" from the underwriters. I disagree, as this conclusion is not supported by my understanding or experience in the municipal finance industry.

Professor Hildreth's conclusion is incorrect, because, as discussed in my Initial Report, based on my experience and knowledge of industry customs, practices and standards in the municipal bond market, underwriters and underwriting syndicates enter into *purchase* contracts, not loan or borrowing agreements, with issuers of public bonds. These purchase contracts outline the role of the underwriter, which is that of an intermediary tasked with distributing the bonds to public investors, not that of a lender or investor from whom the issuer "borrows" money. Indeed, Professor Hildreth himself, in multiple instances, refers to the role of an underwriter as an "intermediary" between an issuer and a public investor.[3]

The Bond Purchase Contracts here were no different than typical underwriter purchase contracts. They established purchaser-seller relationships, not lender-borrower relationships, between ERS and the underwriters and obligated the underwriters to make "bona fide public offerings of all the bonds." The Bond Purchase Contracts thus confirm that the underwriters were not lenders to ERS, but instead acted in accordance with industry customs, practices, and standards by purchasing the bonds from ERS and agreeing to facilitate the public offering. The Bond Purchase Contracts also make no reference to "borrowing" relationships, which further indicates the underwriters acted in accordance with industry customs, practices, and standards and therefore were not lenders to ERS or investors from whom ERS "borrowed" money. In my opinion and based on my experience, there is no indication in the Bond Purchase Contracts that ERS "borrowed" from the underwriters.

---

[1] See, *e.g.*, Hildreth Report at ¶¶ 51, 174.

[2] Capitalized terms not defined herein have the meanings given to them in my Initial Report.

[3] See, *e.g.*, Hildreth Report at ¶¶ 64-66, 93.

**Rebuttal Report of Robert W. Doty**
**Page 4**

  Moreover, as stated in the "Best Practice" guide published by the Government Finance Officers Association ("GFOA"), the contractual relationship set forth in the Bond Purchase Contracts between ERS and the underwriters is "the only legal relationship" between them.[4] GFOA adds that "[t]he primary role of the underwriter in a negotiated sale is to market the issuer's bonds to investors."[5] Here, there is no indication the underwriters of the ERS Bonds deviated from this practice as Professor Hildreth suggests.

  In support of his conclusion that "ERS borrowed directly from the underwriters instead of retail or institutional investors since it was the underwriters whose money was transferred to ERS[,]"[6] Professor Hildreth does not rely upon or cite to any information or materials normally used or relied upon in the field of municipal finance. As stated in my Initial Report, I am similarly unaware of any such information or materials that support the conclusion that an issuer borrows directly from an underwriter in a public offering context like the one of the ERS Bonds.

**B. The Phrase "Direct Placement" Does Not Refer to a Public Offering by ERS Itself, as Opposed to Through a Conduit**

  Professor Hildreth contrasts the concept of a "conduit" bond issue, in which one entity borrows through another public entity that issues bonds, with a "direct placement" of bonds. Professor Hildreth seems to be opining that the term "direct placement" refers to an issuance of bonds by an entity itself, rather than through a conduit.[7] That is not in accord with the usage in the municipal bond market of the term "direct placement."

  Although "conduit financing" is not an uncommon practice in the municipal bond industry, based on my extensive knowledge and experience, the term "direct placement" does not refer to the opposite of a conduit financing. In fact, I have never heard the term "direct placement" used to refer to a public offering conducted by the municipal bond issuer itself, as opposed to through a conduit; further, Professor Hildreth provides no authority for that conclusion, and I have not discovered any authority to support that conclusion independently.

  As discussed in my Initial Report, with several citations to financial industry literature, the term "direct placement" is a known term having a particular meaning in municipal finance. Specifically, it means a placement of debt in large denominations, generally at least $100,000, directly by an issuer to a single sophisticated investor or small group of

---

[4] GFOA, "*Selecting and Managing Underwriters for Negotiated Bond Sales*" (2014).

[5] *Id*. Emphasis added.

[6] Hildreth Report at ¶ 51.

[7] See, *e.g.*, Hildreth Report at ¶¶ 50, 51, 72, 98, 174.

**Rebuttal Report of Robert W. Doty**
**Page 5**

sophisticated investors, as opposed to an underwritten public offering. In contrast, the ERS Bonds were (1) sold by ERS to the underwriters (2) for resale in "bona fide public offerings of all of the bonds" to (3) public investors in (4) $5,000 denominations.

Indeed, Professor Hildreth's own authority rebuts his opinion. In discussing "securities" (which include municipal bonds) and "loans," Professor Hildreth cites[8] a paper by the National Association of Bond Lawyers ("NABL") discussing "direct purchases" of municipal bonds (which are the same as "direct placements" viewed from the standpoint of the investor). That paper states:

> the phrase "direct purchase" is used to refer to the purchase of tax-exempt or taxable governmental or conduit bonds by a commercial bank, a bank affiliate, or similar financial entity that *does not involve an underwriting or public offering* … .[9]

Consistent with this quote, and for the reasons discussed in my Initial Report, a "direct placement" does not mean the opposite of a conduit financing.

---

[8] See, *e.g*., Hildreth Report at ¶ 63.

[9] National Association of Bond Lawyers, *Direct Purchases of State or Local Obligations by Commercial Banks and Other Financial Institutions* ( July 2017) (emphasis supplied).

**Rebuttal Report of Robert W. Doty**
**Page 6**

I declare under penalty of perjury that the foregoing is true and correct.

**IN WITNESS WHEREOF,** I have executed this Report in Annapolis, Maryland, as of the date set forth below.

**EXECUTED ON:** July 20, 2020

_____

**Robert W. Doty**

# APPENDIX I–
## MATERIALS REVIEWED

In the preparation of this Rebuttal Report, I have considered the following additional materials (provisions cited in this Rebuttal Report):

**A.** Documents, authorities and other materials, or portions thereof, cited in this Rebuttal Report

**B.** Hildreth Report

**C.** National Association of Bond Lawyers, *Direct Purchases of State or Local Obligations by Commercial Banks and Other Financial Institutions* ( July 2017)

# Exhibit 10

# EXHIBIT 30

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re: | ) |
| | ) PROMESA |
| THE FINANCIAL OVERSIGHT AND | ) Title III |
| MANAGEMENT BOARD FOR PUERTO RICO | ) |
| | ) Case No. 17-BK-03283 (LTS) |
|     as representative of | ) |
| | ) |
| THE COMMONWEALTH OF PUERTO RICO, *et al.*, | ) |
| | ) |
|     Debtors.[1] | ) |
| | ) |

| | |
|---|---|
| In re: | ) |
| | ) PROMESA |
| THE FINANCIAL OVERSIGHT AND | ) Title III |
| MANAGEMENT BOARD FOR PUERTO RICO, | ) |
| | ) Case No. 17-BK-03566 (LTS) |
|     as representative of | ) |
| | ) |
| THE EMPLOYEES RETIREMENT SYSTEM OF THE | ) |
| GOVERNMENT OF THE COMMONWEALTH OF | ) |
| PUERTO RICO, | ) |
| | ) |
|     Debtor. | ) |
| | ) |
| | ) |

| | |
|---|---|
| THE SPECIAL CLAIMS COMMITTEE OF THE | ) |
| FINANCIAL OVERSIGHT AND MANAGEMENT | ) Adv. Proc. No. 19-00356 (LTS) |
| BOARD FOR PUERTO RICO, ACTING BY AND | ) |
| THROUGH ITS MEMBERS, | ) |

---

[1] The Debtors in these Title III cases, along with each Debtor's respective Title III case number listed as a bankruptcy case number due to software limitations and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK- 3283 (LTS)) (Last Four Digits of Federal Tax ID: 3481), (ii) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566 (LTS)) (Last Four Digits of Federal Tax ID: 9686), (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK- 3567 (LTS)) (Last Four Digits of Federal Tax ID: 3808), (iv) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284 (LTS)) (Last Four Digits of Federal Tax ID: 8474); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17-BK- 4780) (Last Four Digits of Federal Tax ID: 3747).

|  | ) |
| :--- | :--- |
| and | ) |
|  | ) |
| THE OFFICIAL COMMITTEE OF UNSECURED | ) |
| CREDITORS OF ALL TITLE III DEBTORS | ) |
| (OTHER THAN COFINA), | ) |
|  | ) |
| as co-trustees of | ) |
|  | ) |
| THE EMPLOYEES RETIREMENT SYSTEM OF THE | ) |
| GOVERNMENT OF PUERTO RICO, | ) |
|  | ) |
| Plaintiff, | ) |
|  | ) |
| v. | ) |
|  | ) |
| DEFENDANT 1M, *et al.*, | ) |
|  | ) |
| Defendants. | ) |
|  | ) |

_____

|  | ) |
| :--- | :--- |
| THE SPECIAL CLAIMS COMMITTEE OF THE | ) |
| FINANCIAL OVERSIGHT AND MANAGEMENT | ) |
| BOARD FOR PUERTO RICO, ACTING BY AND | ) |
| THROUGH ITS MEMBERS, | ) |
|  | ) |
|  | ) |
| and | ) |
|  | ) |
| THE OFFICIAL COMMITTEE OF UNSECURED | ) |
| CREDITORS OF ALL TITLE III DEBTORS | ) |
| (OTHER THAN COFINA), | ) |
|  | ) |
| as co-trustees of | ) |
|  | ) |
| THE EMPLOYEES RETIREMENT SYSTEM OF THE | ) |
| GOVERNMENT OF PUERTO RICO, | ) |
|  | ) |
| Plaintiff, | ) |
|  | ) |
| v. | ) |
|  | ) |
| STOEVER GLASS & CO., *et al.*, | ) |
|  | ) |

Adv. Proc. No. 19-00357 (LTS)

Defendant.                                          )
                                                    )
                                                    )
_____               )
                                                    )
THE SPECIAL CLAIMS COMMITTEE OF THE                 )
FINANCIAL OVERSIGHT AND MANAGEMENT                  )
BOARD FOR PUERTO RICO, ACTING BY AND                )    Adv. Proc. No. 19-00359 (LTS)
THROUGH ITS MEMBERS,                                )
                                                    )
     and                                            )
                                                    )
THE OFFICIAL COMMITTEE OF UNSECURED                 )
CREDITORS OF ALL TITLE III DEBTORS                  )
(OTHER THAN COFINA),                                )
                                                    )
     as co-trustees of                              )
                                                    )
THE EMPLOYEES RETIREMENT SYSTEM OF THE              )
GOVERNMENT OF PUERTO RICO,                          )
                                                    )
     Plaintiff,                                     )
                                                    )
v.                                                  )
                                                    )
DEFENDANT 1H-78H,                                   )
                                                    )
     Defendants.                                    )
                                                    )
                                                    )
_____               )
                                                    )
THE SPECIAL CLAIMS COMMITTEE OF THE                 )
FINANCIAL OVERSIGHT AND MANAGEMENT                  )
BOARD FOR PUERTO RICO, ACTING BY AND                )    Adv. Proc. No. 19-00361 (LTS)
THROUGH ITS MEMBERS,                                )
                                                    )
     and                                            )
                                                    )
THE OFFICIAL COMMITTEE OF UNSECURED                 )
CREDITORS OF ALL TITLE III DEBTORS                  )
(OTHER THAN COFINA),                                )
                                                    )
     as co-trustees of                              )
                                                    )
                                                    )

3

THE EMPLOYEES RETIREMENT SYSTEM OF THE )
GOVERNMENT OF PUERTO RICO,                    )
                                              )
      Plaintiff,                          )
                                              )
v.                                            )
                                              )
DEFENDANT 1G-50G, *et al.*,                   )
                                              )
      Defendants.                         )
                                              )
                                              )
_____             )
                                              )
THE FINANCIAL OVERSIGHT AND                   )
MANAGEMENT BOARD FOR PUERTO RICO,             )  Adv. Proc. No. 19-00366 (LTS)
                                              )
      as representative of                )
                                              )
EMPLOYEES RETIREMENT SYSTEM OF THE            )
GOVERNMENT OF THE COMMONWEALTH OF             )
PUERTO RICO,                                  )
                                              )
      and                                 )
                                              )
THE OFFICIAL COMMITTEE OF UNSECURED           )
CREDITORS OF ALL TITLE III DEBTORS (OTHER     )
THAN COFINA),                                 )
                                              )
      as section 926 trustee of           )
                                              )
THE COMMONWEALTH OF PUERTO RICO               )
                                              )
      Plaintiffs,[2]                      )
                                              )
      against                             )
                                              )
ANDALUSIAN GLOBAL DESIGNATED ACTIVITY         )
COMPANY; THE BANK OF NEW YORK MELLON;         )
MASON CAPITAL MASTER FUND LP; OCHER           )
ROSE, L.L.C.; SV CREDIT, L.P.; CROWN MANAGED  )
ACCOUNTS FOR AND ON BEHALF OF CROWN/PW        )
SP; LMA SPC FOR AND ON BEHALF OF MAP 98       )
SEGREGATED PORTFOLIO; OCEANA MASTER           )

---

[2] The Official Committee of Unsecured Creditors serves as section 926 trustee and co-plaintiff in the prosecution of this adversary proceeding pursuant to Docket No. 6990, which is incorporated herein by reference.

FUND LTD.; PENTWATER MERGER ARBITRAGE )
MASTER FUND LTD.; AND PWCM MASTER FUND )
LTD, )
                                        )
        Defendants. )
_____ )
                                        )
THE FINANCIAL OVERSIGHT AND             )
MANAGEMENT BOARD FOR PUERTO RICO,       )        Adv. Proc. No. 19-00367 (LTS)
                                        )
        as representative of            )
                                        )
EMPLOYEES RETIREMENT SYSTEM OF THE      )
GOVERNMENT OF THE COMMONWEALTH OF       )
PUERTO RICO,                            )
                                        )
        and                             )
                                        )
THE OFFICIAL COMMITTEE OF UNSECURED     )
CREDITORS OF ALL TITLE III DEBTORS (OTHER )
THAN COFINA),                           )
                                        )
        as section 926 trustee of       )
                                        )
THE COMMONWEALTH OF PUERTO RICO         )
                                        )
        Plaintiffs,[3]                  )
                                        )
        against                         )
                                        )
GLENDON OPPORTUNITIES FUND, L.P.;       )
OAKTREE-FORREST MULTI-STRATEGY, LLC     )
(SERIES B); OAKTREE OPPORTUNITIES FUND IX, )
L.P.; OAKTREE OPPORTUNITIES FUND IX     )
(PARALLEL 2), L.P.; OAKTREE VALUE       )
OPPORTUNITIES FUND, L.P.; PUERTO RICO AAA )
PORTFOLIO BOND FUND, INC.; PUERTO RICO  )
AAA PORTFOLIO BOND FUND II, INC.; PUERTO )
RICO AAA PORTFOLIO TARGET MATURITY      )
FUND, INC.; PUERTO RICO FIXED INCOME FUND, )
INC.; PUERTO RICO FIXED INCOME FUND II, INC.; )
PUERTO RICO FIXED INCOME FUND III, INC.; )
PUERTO RICO FIXED INCOME FUND IV, INC.; )

_____

[3] The Official Committee of Unsecured Creditors serves as section 926 trustee and co-plaintiff in the
prosecution of this adversary proceeding pursuant to Docket No. 6990, which is incorporated herein by reference.

PUERTO RICO FIXED INCOME FUND V, INC.;    )
PUERTO RICO GNMA & U.S. GOVERNMENT    )
TARGET MATURITY FUND, INC.; PUERTO RICO    )
INVESTORS BOND FUND I; PUERTO RICO    )
INVESTORS TAX-FREE FUND, INC.; PUERTO RICO )
INVESTORS TAX-FREE FUND II, INC.; PUERTO    )
RICO INVESTORS TAX-FREE FUND III, INC.;    )
PUERTO RICO INVESTORS TAX-FREE FUND IV,    )
INC.; PUERTO RICO INVESTORS TAX-FREE FUND )
V, INC.; PUERTO RICO INVESTORS TAX-FREE    )
FUND VI, INC.; PUERTO RICO MORTGAGE-    )
BACKED & U.S. GOVERNMENT SECURITIES    )
FUND, INC.; TAX-FREE PUERTO RICO FUND, INC.; )
TAX-FREE PUERTO RICO FUND II, INC.; TAX-    )
FREE PUERTO RICO TARGET MATURITY FUND,    )
INC.; UBS IRA SELECT GROWTH & INCOME    )
PUERTO RICO FUND,    )
    )
                Defendants.

------------------------------------------------------------------------- X

### DECLARATION OF SHANSHAN CAO

I, Shanshan Cao, hereby declare under penalty of perjury:

1.      I am a Managing Director at Centerbridge Partners, L.P. ("Centerbridge").   I provide this declaration based on my own personal knowledge, based on information that I learned from others at Centerbridge, and based on my counsel's review of pertinent documents collected and reviewed as part of discovery in these proceedings.

2.      I was deposed in these proceedings on March 4, 2020, in both my personal capacity and as a Rule 30(b)(6) representative of SV Credit, L.P. ("SV Credit").   I offer this declaration as a supplement to my deposition.

3.      As I testified at my deposition, I and others at Centerbridge did not have any concerns about ERS's authority to issue bonds at the time that we made the investments.   I understand, however, that a review of SV Credit's files shows that there are brief, unexplained

references to the possibility of challenges to legislative authority to issue the ERS Bonds in documents dating from September 2014. *See* BH-ERS-7-007877 (redacted document and associated log entry); BH-ERS-7-008972 (same); BH-ERS-7-009218 (same); BH-ERS-7-009916 (same); BH-ERS-7-023571 (same). In addition, as noted in paragraph 7 below, a review of SV Credit's files revealed an internal September 7, 2014 email containing notes from discussions with counsel that occurred in February 2014 concerning the legality, illegality, validity, or invalidity of the ERS Bonds. *See* BH-ERS-7-PRIV-00670 (log entry). To my knowledge, and based on the review of files, these are the first references in SV Credit's files to (i) the possibility that the bonds may not have been issued with authority or legally issued or (ii) the possibility of the ultra vires issue, and SV Credit was not aware from any source of those possibilities before 2014.

4.      As I testified at my deposition, SV Credit reviewed portions of the ERS Enabling Act at the time it made investments in the ERS Bonds, as part of its evaluation of whether ERS had the authority to issue them, but I do not recall specifically which parts were reviewed. I understand that a review of SV Credit's files shows that the debt-authorizing language of the ERS Enabling Act as it existed in 2008 was quoted in a February 10, 2015 email. *See* BH-ERS-7-017224. To my knowledge, and based on the review of files, that is the first reference in SV Credit's files to the debt-authorizing language of the ERS Enabling Act as it existed in 2008, and SV Credit was not aware from any source of the debt-authorizing language of the ERS Enabling Act as it existed in 2008 before that date.

5.      As I testified at my deposition, I do not recall when I first reviewed Act 116-2011, which amended the ERS Enabling Act, although I believe I reviewed it as part of the diligence process for the investment in the ERS Bonds. I understand that a review of SV Credit's files shows that the entirety of Act 116-2011, including the "illegally made" language in the Statement of

Motives in Act 116-2011 was attached to an email to me from attorney Lawrence Bauer providing legal advice on the ERS Bonds on October 25, 2013. *See* BH-ERS-7-PRIV-00233 (log entry for email); BH-ERS-7-PRIV-00236 (log entry for Act 116-2011). To my knowledge, and based on the review of files, that is the first reference in SV Credit's files to the "illegally made" language in the Statement of Motives in Act 116-2011, and SV Credit was not aware from any source of the "illegally made" language before that date.

6.     I understand that a review of SV Credit's files shows that the efforts to enact legislation to authorize Commonwealth General Obligation bonds to fund ERS, and the failure of those efforts, were described in the Final Investigative Report issued by Kobre & Kim on August 20, 2018, a copy of which was found in a folder related to the ERS Bond investment. To my knowledge, and based on the review of files, that is the first reference in SV Credit's files to the efforts to authorize Commonwealth General Obligations bonds to fund ERS, and the failure of those efforts, and SV Credit was not aware from any source of those issues before that date.

7.     As I testified at my deposition, SV Credit had discussions with counsel concerning its investment in the ERS Bonds, but I do not recall the specific time frame of those discussions. I understand that a review of SV Credit's files shows that the earliest date that SV Credit sought or received advice from counsel about the validity, invalidity, legality or illegality of the ERS Bonds was in February 2014, as reflected in an internal September 7, 2014 email containing notes from discussions with counsel. *See* BH-ERS-7-PRIV-00670 (log entry). To my knowledge, and based on the review of files, I am unaware of any request for or receipt of legal advice on those subjects before February 2014.

8.     I offer this declaration on my own behalf and on behalf of SV Credit.

Dated:  May 27 2020
         New York, NY                                    Shanshan Cao

8

# Exhibit 11

**EXHIBIT 52**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re: | ) |
| | ) |
| | ) PROMESA |
| THE FINANCIAL OVERSIGHT AND | ) Title III |
| MANAGEMENT BOARD FOR PUERTO RICO | ) |
| | ) Case No. 17-BK-03283 (LTS) |
|     as representative of | ) |
| | ) |
| THE COMMONWEALTH OF PUERTO RICO, *et al.*, | ) |
| | ) |
|     Debtors.[1] | ) |
| | ) |
| | ) |
| In re: | ) |
| | ) PROMESA |
| | ) Title III |
| THE FINANCIAL OVERSIGHT AND | ) |
| MANAGEMENT BOARD FOR PUERTO RICO, | ) Case No. 17-BK-03566 (LTS) |
| | ) |
|     as representative of | ) |
| | ) |
| THE EMPLOYEES RETIREMENT SYSTEM OF THE | ) |
| GOVERNMENT OF THE COMMONWEALTH OF | ) |
| PUERTO RICO, | ) |
| | ) |
|     Debtor. | ) |
| | ) |
| | ) |
| | ) |
| THE SPECIAL CLAIMS COMMITTEE OF THE | ) |
| FINANCIAL OVERSIGHT AND MANAGEMENT | ) Adv. Proc. No. 19-00356 (LTS) |
| BOARD FOR PUERTO RICO, ACTING BY AND | ) |
| THROUGH ITS MEMBERS, | ) |

---

[1] The Debtors in these Title III cases, along with each Debtor's respective Title III case number listed as a bankruptcy case number due to software limitations and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK- 3283 (LTS)) (Last Four Digits of Federal Tax ID: 3481), (ii) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566 (LTS)) (Last Four Digits of Federal Tax ID: 9686), (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567 (LTS)) (Last Four Digits of Federal Tax ID: 3808), (iv) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284 (LTS)) (Last Four Digits of Federal Tax ID: 8474); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17-BK- 4780) (Last Four Digits of Federal Tax ID: 3747).

<table>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>and</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>THE OFFICIAL COMMITTEE OF UNSECURED</td><td>)</td><td></td></tr>
<tr><td>CREDITORS OF ALL TITLE III DEBTORS</td><td>)</td><td></td></tr>
<tr><td>(OTHER THAN COFINA),</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>as co-trustees of</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>THE EMPLOYEES RETIREMENT SYSTEM OF THE</td><td>)</td><td></td></tr>
<tr><td>GOVERNMENT OF PUERTO RICO,</td><td>)</td><td></td></tr>
</table>

|  |  |
|---|---|
| and | ) |
| | ) |
| **THE OFFICIAL COMMITTEE OF UNSECURED** | ) |

THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS OF ALL TITLE III DEBTORS
(OTHER THAN COFINA),                                    )

    as co-trustees of                                    )

THE EMPLOYEES RETIREMENT SYSTEM OF THE )
GOVERNMENT OF PUERTO RICO,                    )

    Plaintiff,                                    )

v.                                    )

DEFENDANT 1M, *et al.*,                                    )

    Defendants.                                    )

_____    )

THE SPECIAL CLAIMS COMMITTEE OF THE            )    Adv. Proc. No. 19-00357 (LTS)
FINANCIAL OVERSIGHT AND MANAGEMENT        )
BOARD FOR PUERTO RICO, ACTING BY AND        )
THROUGH ITS MEMBERS,                                    )

    and                                    )

THE OFFICIAL COMMITTEE OF UNSECURED        )
CREDITORS OF ALL TITLE III DEBTORS                )
(OTHER THAN COFINA),                                    )

    as co-trustees of                                    )

THE EMPLOYEES RETIREMENT SYSTEM OF THE )
GOVERNMENT OF PUERTO RICO,                    )

    Plaintiff,                                    )

v.                                    )

STOEVER GLASS & CO., *et al.*,                                    )

Defendant.                                          )
                                                    )
                                                    )
_____             )
                                                    )
THE SPECIAL CLAIMS COMMITTEE OF THE                 )
FINANCIAL OVERSIGHT AND MANAGEMENT                  )
BOARD FOR PUERTO RICO, ACTING BY AND                )   Adv. Proc. No. 19-00359 (LTS)
THROUGH ITS MEMBERS,                                )
                                                    )
        and                                         )
                                                    )
THE OFFICIAL COMMITTEE OF UNSECURED                 )
CREDITORS OF ALL TITLE III DEBTORS                  )
(OTHER THAN COFINA),                                )
                                                    )
        as co-trustees of                           )
                                                    )
THE EMPLOYEES RETIREMENT SYSTEM OF THE              )
GOVERNMENT OF PUERTO RICO,                          )
                                                    )
        Plaintiff,                                  )
                                                    )
v.                                                  )
                                                    )
DEFENDANT 1H-78H,                                   )
                                                    )
        Defendants.                                 )
                                                    )
_____             )
                                                    )
THE SPECIAL CLAIMS COMMITTEE OF THE                 )
FINANCIAL OVERSIGHT AND MANAGEMENT                  )
BOARD FOR PUERTO RICO, ACTING BY AND                )   Adv. Proc. No. 19-00361 (LTS)
THROUGH ITS MEMBERS,                                )
                                                    )
        and                                         )
                                                    )
THE OFFICIAL COMMITTEE OF UNSECURED                 )
CREDITORS OF ALL TITLE III DEBTORS                  )
(OTHER THAN COFINA),                                )
                                                    )
        as co-trustees of                           )
                                                    )
                                                    )

THE EMPLOYEES RETIREMENT SYSTEM OF THE )
GOVERNMENT OF PUERTO RICO, )

    Plaintiff, )

     )

v. )

     )

DEFENDANT 1G-50G, *et al.*, )

    Defendants. )

     )

_____ )

THE FINANCIAL OVERSIGHT AND )
MANAGEMENT BOARD FOR PUERTO RICO, )    Adv. Proc. No. 19-00366 (LTS)

    as representative of )

EMPLOYEES RETIREMENT SYSTEM OF THE )
GOVERNMENT OF THE COMMONWEALTH OF )
PUERTO RICO, )

    and )

THE OFFICIAL COMMITTEE OF UNSECURED )
CREDITORS OF ALL TITLE III DEBTORS (OTHER )
THAN COFINA), )

    as section 926 trustee of )

THE COMMONWEALTH OF PUERTO RICO )

    Plaintiffs,[2] )

    against )

ANDALUSIAN GLOBAL DESIGNATED ACTIVITY )
COMPANY; THE BANK OF NEW YORK MELLON; )
MASON CAPITAL MASTER FUND LP; OCHER )
ROSE, L.L.C.; SV CREDIT, L.P.; CROWN MANAGED )
ACCOUNTS FOR AND ON BEHALF OF CROWN/PW )
SP; LMA SPC FOR AND ON BEHALF OF MAP 98 )
SEGREGATED PORTFOLIO; OCEANA MASTER )

---

[2] The Official Committee of Unsecured Creditors serves as section 926 trustee and co-plaintiff in the prosecution of this adversary proceeding pursuant to Docket No. 6990, which is incorporated herein by reference.

FUND LTD.; PENTWATER MERGER ARBITRAGE ) 
MASTER FUND LTD.; AND PWCM MASTER FUND ) 
LTD, )
                               )
         Defendants. )
_____ )
                               )
THE FINANCIAL OVERSIGHT AND )
MANAGEMENT BOARD FOR PUERTO RICO, )
                               )   Adv. Proc. No. 19-00367 (LTS)
        as representative of )
EMPLOYEES RETIREMENT SYSTEM OF THE )
GOVERNMENT OF THE COMMONWEALTH OF )
PUERTO RICO, )
                               )
        and )
                               )
THE OFFICIAL COMMITTEE OF UNSECURED )
CREDITORS OF ALL TITLE III DEBTORS (OTHER )
THAN COFINA), )
                               )
        as section 926 trustee of )
THE COMMONWEALTH OF PUERTO RICO )
                               )
        Plaintiffs,[3] )
                               )
        against )
                               )
GLENDON OPPORTUNITIES FUND, L.P.; )
OAKTREE-FORREST MULTI-STRATEGY, LLC )
(SERIES B); OAKTREE OPPORTUNITIES FUND IX, )
L.P.; OAKTREE OPPORTUNITIES FUND IX )
(PARALLEL 2), L.P.; OAKTREE VALUE )
OPPORTUNITIES FUND, L.P.; PUERTO RICO AAA )
PORTFOLIO BOND FUND, INC.; PUERTO RICO )
AAA PORTFOLIO BOND FUND II, INC.; PUERTO )
RICO AAA PORTFOLIO TARGET MATURITY )
FUND, INC.; PUERTO RICO FIXED INCOME FUND, )
INC.; PUERTO RICO FIXED INCOME FUND II, INC.; )
PUERTO RICO FIXED INCOME FUND III, INC.; )
PUERTO RICO FIXED INCOME FUND IV, INC.; )

---

[3] The Official Committee of Unsecured Creditors serves as section 926 trustee and co-plaintiff in the prosecution of this adversary proceeding pursuant to Docket No. 6990, which is incorporated herein by reference.

PUERTO RICO FIXED INCOME FUND V, INC.;    )
PUERTO RICO GNMA & U.S. GOVERNMENT        )
TARGET MATURITY FUND, INC.; PUERTO RICO   )
INVESTORS BOND FUND I; PUERTO RICO        )
INVESTORS TAX-FREE FUND, INC.; PUERTO RICO )
INVESTORS TAX-FREE FUND II, INC.; PUERTO   )
RICO INVESTORS TAX-FREE FUND III, INC.;    )
PUERTO RICO INVESTORS TAX-FREE FUND IV,    )
INC.; PUERTO RICO INVESTORS TAX-FREE FUND  )
V, INC.; PUERTO RICO INVESTORS TAX-FREE    )
FUND VI, INC.; PUERTO RICO MORTGAGE-       )
BACKED & U.S. GOVERNMENT SECURITIES        )
FUND, INC.; TAX-FREE PUERTO RICO FUND, INC.; )
TAX-FREE PUERTO RICO FUND II, INC.; TAX-    )
FREE PUERTO RICO TARGET MATURITY FUND,     )
INC.; UBS IRA SELECT GROWTH & INCOME       )
PUERTO RICO FUND,                           )
                                            )
                    Defendants.

------------------------------------------------------------------- X


### DECLARATION OF JAMES BOLIN

I, James Bolin, hereby declare under penalty of perjury:

1.      I am Vice President and Limited Partner of Appaloosa LP.  I provide this declaration based on my own personal knowledge, based on information that I learned from others at Appaloosa LP, and based on my counsel's review of pertinent documents collected as part of discovery in these proceedings.

2.      I was deposed in these proceedings on March 6, 2020, both in my personal capacity and as a Rule 30(b)(6) representative of Andalusian Global Designated Activity Company ("Andalusian").  I offer this declaration as a supplement to my deposition.

3.      As I testified at my deposition, I recall becoming aware of the ultra vires argument sometime in 2018.  I understand, however, that a review of Andalusian's files shows that on November 4, 2017, I received a copy of ERS's Motion for Summary Judgment in 17-ap-0213,

which referred in a footnote and without explanation to "the defense that the bond issuance was not authorized under ERS's Enabling Act and therefore was ultra vires." *See* BH-ERS-5-006699 (cover email); BH-ERS-5-006705 (filing).  To my knowledge, and based on the review of files, that is the first reference in Andalusian's files to (i) the possibility that the bonds may not have been issued with authority or legally issued or (ii) the possibility of the ultra vires issue, and Andalusian was not aware from any source of those possibilities before that date.

4.      As I testified during my deposition, I do not recall whether I reviewed any portions of the ERS Enabling Act before the Appaloosa Funds made their first purchase of ERS Bonds.  I understand that a review of Andalusian's files shows that the debt-authorizing language of the ERS Enabling Act as it existed in 2008 was quoted in passing in a draft complaint relating to the moratorium on the payment of ERS Bonds that I received on April 21, 2016.  *See* BH-ERS-2-PRIV-00001 (log entry for cover email); BH-ERS-2-PRIV-00002 (log entry for attachment).  To my knowledge, and based on the review of files, that is the first reference in Andalusian's files to the debt-authorizing language of the ERS Enabling Act as it existed in 2008, and Andalusian was not aware from any source of the debt-authorizing language of the ERS Enabling Act as it existed in 2008 before that date.

5.      I understand that a review of Andalusian's files shows that the "illegally made" language in the Statement of Motives in Act 116-2011 was described in AAFAF's motion to dismiss in 17-ap-219, which I received a copy of on November 18, 2017.  *See* BH-ERS-5-007500 (cover email); BH-ERS-5-007501 (filing).  To my knowledge, and based on the review of files, that is the first reference in Andalusian's files to the "illegally made" language in the Statement of Motives in Act 116-2011, and Andalusian was not aware from any source of the "illegally made" language before that date.

7

6.      I understand that a review of Andalusian's files shows that the efforts to enact legislation to authorize Commonwealth General Obligation bonds to fund ERS, and the failure of those efforts, were described in the UCC's objections to Andalusian's proof of claim, which I received a copy of on March 12, 2019.  *See* BH-ERS-2-002854 (cover email); BH-ERS-2-002855 (filing).  To my knowledge, and based on the review of files, that is the first reference in Andalusian's files to the efforts to authorize Commonwealth General Obligations bonds to fund ERS, and the failure of those efforts, and Andalusian was not aware from any source of those issues before that date.

7.      I understand that a review of Andalusian's files shows that the earliest date that Andalusian sought or received advice from counsel about the validity, invalidity, legality or illegality of the ERS Bonds was December 14, 2017, when I received a draft of an opposition to AAFAF's November 2017 motion to dismiss.  *See* BH-ERS-2-PRIV-039 (log entry for cover email); BH-ERS-2-PRIV-040 (log entry for attachment).  To my knowledge, and based on the review of files, that is the first reference in Andalusian's files to any legal advice or request for legal advice about the validity, invalidity, legality or illegality of the ERS Bonds, and I am unaware of any request for or receipt of legal advice on that subject before that date.

8.      I offer this declaration on my own behalf and on behalf of Andalusian Global Designated Activity Company.

Dated:  May 22, 2020
       New York, NY                                         *James Bolin*
                                                            James Bolin

# Exhibit 12

**EXHIBIT 53**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

|  |  |
|---|---|
| In re: | ) |
|  | ) |
|  | ) PROMESA |
| THE FINANCIAL OVERSIGHT AND | ) Title III |
| MANAGEMENT BOARD FOR PUERTO RICO | ) |
|  | ) Case No. 17-BK-03283 (LTS) |
|     as representative of | ) |
|  | ) |
| THE COMMONWEALTH OF PUERTO RICO, *et al.*, | ) |
|  | ) |
|     Debtors.[1] | ) |
|  | ) |

|  |  |
|---|---|
| In re: | ) |
|  | ) PROMESA |
|  | ) Title III |
| THE FINANCIAL OVERSIGHT AND | ) |
| MANAGEMENT BOARD FOR PUERTO RICO, | ) Case No. 17-BK-03566 (LTS) |
|  | ) |
|     as representative of | ) |
|  | ) |
| THE EMPLOYEES RETIREMENT SYSTEM OF THE | ) |
| GOVERNMENT OF THE COMMONWEALTH OF | ) |
| PUERTO RICO, | ) |
|  | ) |
|     Debtor. | ) |
|  | ) |
|  | ) |
|  | ) |
| THE SPECIAL CLAIMS COMMITTEE OF THE | ) |
| FINANCIAL OVERSIGHT AND MANAGEMENT | ) Adv. Proc. No. 19-00356 (LTS) |
| BOARD FOR PUERTO RICO, ACTING BY AND | ) |
| THROUGH ITS MEMBERS, | ) |

---

[1] The Debtors in these Title III cases, along with each Debtor's respective Title III case number listed as a bankruptcy case number due to software limitations and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK- 3283 (LTS)) (Last Four Digits of Federal Tax ID: 3481), (ii) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566 (LTS)) (Last Four Digits of Federal Tax ID: 9686), (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK- 3567 (LTS)) (Last Four Digits of Federal Tax ID: 3808), (iv) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284 (LTS)) (Last Four Digits of Federal Tax ID: 8474); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17-BK- 4780) (Last Four Digits of Federal Tax ID: 3747).

and                                                                )
                                                                   )
THE OFFICIAL COMMITTEE OF UNSECURED             )
CREDITORS OF ALL TITLE III DEBTORS              )
(OTHER THAN COFINA),                            )
                                                                   )
     as co-trustees of                    )
                                                                   )
THE EMPLOYEES RETIREMENT SYSTEM OF THE )
GOVERNMENT OF PUERTO RICO,                      )
                                                                   )
     Plaintiff,                          )
                                                                   )
v.                                                                 )
                                                                   )
DEFENDANT 1M, *et al.*,                         )
                                                                   )
     Defendants.                         )
                                                                   )
_____        )
                                                                   )
THE SPECIAL CLAIMS COMMITTEE OF THE             )
FINANCIAL OVERSIGHT AND MANAGEMENT              )   Adv. Proc. No. 19-00357 (LTS)
BOARD FOR PUERTO RICO, ACTING BY AND            )
THROUGH ITS MEMBERS,                            )
                                                                   )
                                                                   )
     and                                 )
                                                                   )
THE OFFICIAL COMMITTEE OF UNSECURED             )
CREDITORS OF ALL TITLE III DEBTORS              )
(OTHER THAN COFINA),                            )
                                                                   )
     as co-trustees of                    )
                                                                   )
THE EMPLOYEES RETIREMENT SYSTEM OF THE )
GOVERNMENT OF PUERTO RICO,                      )
                                                                   )
     Plaintiff,                          )
                                                                   )
v.                                                                 )
                                                                   )
STOEVER GLASS & CO., *et al.*,                  )
                                                                   )

2

|  | ) |  |
| --- | --- | --- |
| Defendant. | ) | |
|  | ) | |
|  | ) | |
| ——————————————————— | ) | |
|  | ) | |
| THE SPECIAL CLAIMS COMMITTEE OF THE | ) | |
| FINANCIAL OVERSIGHT AND MANAGEMENT | ) | |
| BOARD FOR PUERTO RICO, ACTING BY AND | ) | Adv. Proc. No. 19-00359 (LTS) |
| THROUGH ITS MEMBERS, | ) | |
|  | ) | |
| and | ) | |
|  | ) | |
| THE OFFICIAL COMMITTEE OF UNSECURED | ) | |
| CREDITORS OF ALL TITLE III DEBTORS | ) | |
| (OTHER THAN COFINA), | ) | |
|  | ) | |
| as co-trustees of | ) | |
|  | ) | |
| THE EMPLOYEES RETIREMENT SYSTEM OF THE | ) | |
| GOVERNMENT OF PUERTO RICO, | ) | |
|  | ) | |
| Plaintiff, | ) | |
|  | ) | |
| v. | ) | |
|  | ) | |
| DEFENDANT 1H-78H, | ) | |
|  | ) | |
| Defendants. | ) | |
|  | ) | |
| ——————————————————— | ) | |
|  | ) | |
| THE SPECIAL CLAIMS COMMITTEE OF THE | ) | |
| FINANCIAL OVERSIGHT AND MANAGEMENT | ) | |
| BOARD FOR PUERTO RICO, ACTING BY AND | ) | Adv. Proc. No. 19-00361 (LTS) |
| THROUGH ITS MEMBERS, | ) | |
|  | ) | |
| and | ) | |
|  | ) | |
| THE OFFICIAL COMMITTEE OF UNSECURED | ) | |
| CREDITORS OF ALL TITLE III DEBTORS | ) | |
| (OTHER THAN COFINA), | ) | |
|  | ) | |
| as co-trustees of | ) | |
|  | ) | |
|  | ) | |

3

THE EMPLOYEES RETIREMENT SYSTEM OF THE )
GOVERNMENT OF PUERTO RICO,                )
                                          )
     Plaintiff,  )
                                          )
v.                                        )
                                          )
DEFENDANT 1G-50G, *et al.*,               )
                                          )
     Defendants. )
                                          )
                                          )
_____ )
                                          )
THE FINANCIAL OVERSIGHT AND               )
MANAGEMENT BOARD FOR PUERTO RICO,         )   Adv. Proc. No. 19-00366 (LTS)
                                          )
     as representative of )
                                          )
EMPLOYEES RETIREMENT SYSTEM OF THE        )
GOVERNMENT OF THE COMMONWEALTH OF         )
PUERTO RICO,                              )
                                          )
     and )
                                          )
THE OFFICIAL COMMITTEE OF UNSECURED       )
CREDITORS OF ALL TITLE III DEBTORS (OTHER )
THAN COFINA),                             )
                                          )
     as section 926 trustee of )
                                          )
THE COMMONWEALTH OF PUERTO RICO           )
                                          )
     Plaintiffs,[2] )
                                          )
     against )
                                          )
ANDALUSIAN GLOBAL DESIGNATED ACTIVITY     )
COMPANY; THE BANK OF NEW YORK MELLON;     )
MASON CAPITAL MASTER FUND LP; OCHER       )
ROSE, L.L.C.; SV CREDIT, L.P.; CROWN MANAGED )
ACCOUNTS FOR AND ON BEHALF OF CROWN/PW    )
SP; LMA SPC FOR AND ON BEHALF OF MAP 98   )
SEGREGATED PORTFOLIO; OCEANA MASTER       )

---

[2] The Official Committee of Unsecured Creditors serves as section 926 trustee and co-plaintiff in the prosecution of this adversary proceeding pursuant to Docket No. 6990, which is incorporated herein by reference.

FUND LTD.; PENTWATER MERGER ARBITRAGE )
MASTER FUND LTD.; AND PWCM MASTER FUND )
LTD, )
)
     Defendants. )
)
————————————————————— )
)
THE FINANCIAL OVERSIGHT AND )
MANAGEMENT BOARD FOR PUERTO RICO, )
)    Adv. Proc. No. 19-00367 (LTS)
    as representative of )
)
EMPLOYEES RETIREMENT SYSTEM OF THE )
GOVERNMENT OF THE COMMONWEALTH OF )
PUERTO RICO, )
)
    and )
)
THE OFFICIAL COMMITTEE OF UNSECURED )
CREDITORS OF ALL TITLE III DEBTORS (OTHER )
THAN COFINA), )
)
    as section 926 trustee of )
)
THE COMMONWEALTH OF PUERTO RICO )
)
    Plaintiffs,[3] )
)
    against )
)
GLENDON OPPORTUNITIES FUND, L.P.; )
OAKTREE-FORREST MULTI-STRATEGY, LLC )
(SERIES B); OAKTREE OPPORTUNITIES FUND IX, )
L.P.; OAKTREE OPPORTUNITIES FUND IX )
(PARALLEL 2), L.P.; OAKTREE VALUE )
OPPORTUNITIES FUND, L.P.; PUERTO RICO AAA )
PORTFOLIO BOND FUND, INC.; PUERTO RICO )
AAA PORTFOLIO BOND FUND II, INC.; PUERTO )
RICO AAA PORTFOLIO TARGET MATURITY )
FUND, INC.; PUERTO RICO FIXED INCOME FUND, )
INC.; PUERTO RICO FIXED INCOME FUND II, INC.; )
PUERTO RICO FIXED INCOME FUND III, INC.; )
PUERTO RICO FIXED INCOME FUND IV, INC.; )

---

[3] The Official Committee of Unsecured Creditors serves as section 926 trustee and co-plaintiff in the prosecution of this adversary proceeding pursuant to Docket No. 6990, which is incorporated herein by reference.

PUERTO RICO FIXED INCOME FUND V, INC.;          )
PUERTO RICO GNMA & U.S. GOVERNMENT              )
TARGET MATURITY FUND, INC.; PUERTO RICO         )
INVESTORS BOND FUND I; PUERTO RICO              )
INVESTORS TAX-FREE FUND, INC.; PUERTO RICO )
INVESTORS TAX-FREE FUND II, INC.; PUERTO        )
RICO INVESTORS TAX-FREE FUND III, INC.;         )
PUERTO RICO INVESTORS TAX-FREE FUND IV,         )
INC.; PUERTO RICO INVESTORS TAX-FREE FUND )
V, INC.; PUERTO RICO INVESTORS TAX-FREE         )
FUND VI, INC.; PUERTO RICO MORTGAGE-            )
BACKED & U.S. GOVERNMENT SECURITIES             )
FUND, INC.; TAX-FREE PUERTO RICO FUND, INC.; )
TAX-FREE PUERTO RICO FUND II, INC.; TAX-        )
FREE PUERTO RICO TARGET MATURITY FUND,          )
INC.; UBS IRA SELECT GROWTH & INCOME            )
PUERTO RICO FUND,                               )
                                                )
                    Defendants.

---------------------------------------------------------------------- X


# DECLARATION OF JORDAN MIKES

I, Jordan Mikes, hereby declare under penalty of perjury:

1.       I am a Senior Vice President at Oaktree Capital Management, L.P. ("Oaktree").  I provide this declaration based on my own personal knowledge, based on information that I learned from others at Oaktree, and based on my counsel's review of pertinent documents collected and reviewed as part of discovery in these proceedings.

2.       I was deposed in these proceedings on March 5, 2020, both in my personal capacity and as a Rule 30(b)(6) representative of the Oaktree Funds.[4]  I offer this declaration as a supplement to my deposition.

---

[4] The Oaktree Funds are: Oaktree-Forrest Multi-Strategy, LLC (Series B); Oaktree Opportunities Fund IX, L.P.; Oaktree Opportunities Fund IX (Parallel), L.P.; Oaktree Opportunities Fund IX (Parallel 2), L.P.; Oaktree Huntington Investment Fund II, L.P.; Oaktree Opportunities Fund X, L.P.; Oaktree Opportunities Fund X (Parallel), L.P.; Oaktree Opportunities Fund X (Parallel 2), L.P.; and Oaktree Value Opportunities Fund Holdings, L.P.

3.     As I testified at my deposition, I am not aware of anyone at Oaktree being aware of any issue over whether ERS had authority to issue the ERS Bonds before Oaktree received a notice addressing that issue from the Bank of New York Mellon in 2019.  I understand that a review of the Oaktree Funds' files shows that on November 4, 2017, David Brown and Steven Tesoriere received a copy of ERS's Motion for Summary Judgment in 17-ap-0213, which referred in a footnote and without explanation to "the defense that the bond issuance was not authorized under ERS's Enabling Act and therefore was ultra vires."  *See* BH-ERS-5-006699 (cover email); BH-ERS-5-006705 (filing).  To my knowledge, and based on the review of files, that is the first reference in the Oaktree Funds' files to (i) the possibility that the bonds may not have been issued with authority or legally issued or (ii) the possibility of the ultra vires issue, and the Oaktree Funds were not aware from any source of those possibilities before that date

4.     As I testified at my deposition, prior to making the investment decisions, there was absolutely no discussion of the validity of the bonds, the Enabling Act, or anything like that, and I am not aware of anyone at the Oaktree Funds reviewing the debt-authorizing language of the ERS Enabling (as it existed in 2008) before 2019.  I understand that a review of the Oaktree Funds' files shows that the debt-authorizing language of the ERS Enabling Act as it existed in 2008 was quoted in passing in a memorandum providing legal advice regarding the ERS Bonds that did not address the validity or invalidity of the bonds, or the legality or illegality of the issuance, that was provided to Oaktree on February 29, 2016.  *See* BH-ERS-5-PRIV-00025 (log entry for cover email); BH-ERS-5-PRIV-00026 (log entry for attachment).  To my knowledge, and based on the review of files, that is the first reference in the Oaktree Funds' files to the debt-authorizing language of the ERS Enabling Act as it existed in 2008, and the Oaktree Funds were not aware

from any source of the debt-authorizing language of the ERS Enabling Act as it existed in 2008 before that date.

5.      As I testified at my deposition, I do not know if anyone looked at or saw the "illegally made" language in the Statement of Motives in Act 116-2011 before the Oaktree Funds made an investment in the ERS Bonds, but I do know that illegality was never discussed among the team before investment decisions were made.  I understand that a review of the Oaktree Funds' files shows that the entirety of Act 116-2011, including the Statement of Motives with the "illegally made" language, was attached to a September 18, 2014 email sent to Michael Kreger of Oaktree. *See* BH-ERS-5-002662 (cover email); BH-ERS-5-002664 (attachment).  To my knowledge, and based on the review of files, that is the first reference in the Oaktree Funds' files to the "illegally made" language in the Statement of Motives in Act 116-2011, and the Oaktree Funds were not aware from any source of the "illegally made" language before that date.

6.      I understand that a review of the Oaktree Funds' files shows that the efforts to enact legislation to authorize Commonwealth General Obligation Bonds to fund ERS, and the failure of those efforts, were described in the UCC's objections to the Oaktree Funds' proof of claim, which David Brown, Stephen Tesoriere, Emily Stephens, and Adam Bennett received a copy of on March 12, 2019.  *See* BH-ERS-2-002854 (cover email); BH-ERS-2-002855 (filing).  To my knowledge, and based on the review of files, that is the first reference in the Oaktree Funds' files to the efforts to authorize Commonwealth General Obligations bonds to fund ERS, and the failure of those efforts, and the Oaktree Funds were not aware from any source of those issues before that date.

7.      I understand that a review of the Oaktree Funds' files shows that the earliest date that the Oaktree Funds sought or received advice from counsel about the validity, invalidity, legality or illegality of the ERS Bonds was December 14, 2017, when David Brown and Ken Liang

received a draft of an opposition to AAFAF's November 2017 motion to dismiss.  *See* BH-ERS-2-PRIV-039 (log entry for cover email); BH-ERS-2-PRIV-040 (log entry for attachment).  To my knowledge, and based on the review of files, that is the first reference in the Oaktree Funds' files to any legal advice or request for legal advice about the validity, invalidity, legality or illegality of the ERS Bonds, and I am unaware of any request for or receipt of legal advice on that subject before that date.

8.      I offer this declaration on my own behalf and on behalf of the Oaktree Funds.

Dated:  May 22 2020
     Los Angeles, CA                     Jordan Mikes

# Exhibit 13

**EXHIBIT 54**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

|  |  |
|---|---|
| In re: | PROMESA<br>Title III |
| THE FINANCIAL OVERSIGHT AND<br>MANAGEMENT BOARD FOR PUERTO RICO | Case No. 17-BK-03283 (LTS) |
| as representative of | |
| THE COMMONWEALTH OF PUERTO RICO, *et al.*, | |
| Debtors.[1] | |
| In re: | PROMESA<br>Title III |
| THE FINANCIAL OVERSIGHT AND<br>MANAGEMENT BOARD FOR PUERTO RICO, | Case No. 17-BK-03566 (LTS) |
| as representative of | |
| THE EMPLOYEES RETIREMENT SYSTEM OF THE<br>GOVERNMENT OF THE COMMONWEALTH OF<br>PUERTO RICO, | |
| Debtor. | |
| THE SPECIAL CLAIMS COMMITTEE OF THE<br>FINANCIAL OVERSIGHT AND MANAGEMENT<br>BOARD FOR PUERTO RICO, ACTING BY AND<br>THROUGH ITS MEMBERS, | Adv. Proc. No. 19-00356 (LTS) |

---

[1] The Debtors in these Title III cases, along with each Debtor's respective Title III case number listed as a bankruptcy case number due to software limitations and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK- 3283 (LTS)) (Last Four Digits of Federal Tax ID: 3481), (ii) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566 (LTS)) (Last Four Digits of Federal Tax ID: 9686), (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567 (LTS)) (Last Four Digits of Federal Tax ID: 3808), (iv) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284 (LTS)) (Last Four Digits of Federal Tax ID: 8474); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17-BK- 4780) (Last Four Digits of Federal Tax ID: 3747).

|  |  |
|---|---|
| and | ) |
|  | ) |
| THE OFFICIAL COMMITTEE OF UNSECURED | ) |
| CREDITORS OF ALL TITLE III DEBTORS | ) |
| (OTHER THAN COFINA), | ) |
|  | ) |
|     as co-trustees of | ) |
|  | ) |
| THE EMPLOYEES RETIREMENT SYSTEM OF THE | ) |
| GOVERNMENT OF PUERTO RICO, | ) |
|  | ) |
|     Plaintiff, | ) |
|  | ) |
| v. | ) |
|  | ) |
| DEFENDANT 1M, *et al.*, | ) |
|  | ) |
|     Defendants. | ) |
|  | ) |
| _____ | ) |
|  | ) |
| THE SPECIAL CLAIMS COMMITTEE OF THE | )    Adv. Proc. No. 19-00357 (LTS) |
| FINANCIAL OVERSIGHT AND MANAGEMENT | ) |
| BOARD FOR PUERTO RICO, ACTING BY AND | ) |
| THROUGH ITS MEMBERS, | ) |
|  | ) |
|  | ) |
| and | ) |
|  | ) |
| THE OFFICIAL COMMITTEE OF UNSECURED | ) |
| CREDITORS OF ALL TITLE III DEBTORS | ) |
| (OTHER THAN COFINA), | ) |
|  | ) |
|     as co-trustees of | ) |
|  | ) |
| THE EMPLOYEES RETIREMENT SYSTEM OF THE | ) |
| GOVERNMENT OF PUERTO RICO, | ) |
|  | ) |
|     Plaintiff, | ) |
|  | ) |
| v. | ) |
|  | ) |
| STOEVER GLASS & CO., *et al.*, | ) |
|  | ) |

Defendant.                                     )
                                               )
                                               )
_____               )
                                               )
THE SPECIAL CLAIMS COMMITTEE OF THE            )
FINANCIAL OVERSIGHT AND MANAGEMENT             )
BOARD FOR PUERTO RICO, ACTING BY AND           )     Adv. Proc. No. 19-00359 (LTS)
THROUGH ITS MEMBERS,                           )
                                               )
        and                                    )
                                               )
THE OFFICIAL COMMITTEE OF UNSECURED            )
CREDITORS OF ALL TITLE III DEBTORS             )
(OTHER THAN COFINA),                           )
                                               )
        as co-trustees of                      )
                                               )
THE EMPLOYEES RETIREMENT SYSTEM OF THE         )
GOVERNMENT OF PUERTO RICO,                     )
                                               )
        Plaintiff,                             )
                                               )
v.                                             )
                                               )
DEFENDANT 1H-78H,                              )
                                               )
        Defendants.                            )
                                               )
_____                )
                                               )
THE SPECIAL CLAIMS COMMITTEE OF THE            )
FINANCIAL OVERSIGHT AND MANAGEMENT             )
BOARD FOR PUERTO RICO, ACTING BY AND           )     Adv. Proc. No. 19-00361 (LTS)
THROUGH ITS MEMBERS,                           )
                                               )
        and                                    )
                                               )
THE OFFICIAL COMMITTEE OF UNSECURED            )
CREDITORS OF ALL TITLE III DEBTORS             )
(OTHER THAN COFINA),                           )
                                               )
        as co-trustees of                      )
                                               )
                                               )

3

THE EMPLOYEES RETIREMENT SYSTEM OF THE )
GOVERNMENT OF PUERTO RICO,                 )
                                            )
    Plaintiff,                            )
                                            )
v.                                          )
                                            )
DEFENDANT 1G-50G, *et al.*,                 )
                                            )
    Defendants.                          )
                                            )
_____            )
                                            )
THE FINANCIAL OVERSIGHT AND                 )
MANAGEMENT BOARD FOR PUERTO RICO,           )   Adv. Proc. No. 19-00366 (LTS)
                                            )
    as representative of                 )
                                            )
EMPLOYEES RETIREMENT SYSTEM OF THE          )
GOVERNMENT OF THE COMMONWEALTH OF           )
PUERTO RICO,                                )
                                            )
    and                                  )
                                            )
THE OFFICIAL COMMITTEE OF UNSECURED         )
CREDITORS OF ALL TITLE III DEBTORS (OTHER   )
THAN COFINA),                               )
                                            )
    as section 926 trustee of            )
                                            )
THE COMMONWEALTH OF PUERTO RICO             )
                                            )
    Plaintiffs,[2]                       )
                                            )
    against                              )
                                            )
ANDALUSIAN GLOBAL DESIGNATED ACTIVITY       )
COMPANY; THE BANK OF NEW YORK MELLON;       )
MASON CAPITAL MASTER FUND LP; OCHER         )
ROSE, L.L.C.; SV CREDIT, L.P.; CROWN MANAGED )
ACCOUNTS FOR AND ON BEHALF OF CROWN/PW      )
SP; LMA SPC FOR AND ON BEHALF OF MAP 98     )
SEGREGATED PORTFOLIO; OCEANA MASTER         )

---

[2] The Official Committee of Unsecured Creditors serves as section 926 trustee and co-plaintiff in the prosecution of this adversary proceeding pursuant to Docket No. 6990, which is incorporated herein by reference.

FUND LTD.; PENTWATER MERGER ARBITRAGE )
MASTER FUND LTD.; AND PWCM MASTER FUND )
LTD, )
                                                    )

                 Defendants. )

——————————————————————————— )

THE FINANCIAL OVERSIGHT AND )
MANAGEMENT BOARD FOR PUERTO RICO, )
                                                   )   Adv. Proc. No. 19-00367 (LTS)

       as representative of )

EMPLOYEES RETIREMENT SYSTEM OF THE )
GOVERNMENT OF THE COMMONWEALTH OF )
PUERTO RICO, )

       and )

THE OFFICIAL COMMITTEE OF UNSECURED )
CREDITORS OF ALL TITLE III DEBTORS (OTHER )
THAN COFINA), )

       as section 926 trustee of )

THE COMMONWEALTH OF PUERTO RICO )

       Plaintiffs,[3] )

          against )

GLENDON OPPORTUNITIES FUND, L.P.; )
OAKTREE-FORREST MULTI-STRATEGY, LLC )
(SERIES B); OAKTREE OPPORTUNITIES FUND IX, )
L.P.; OAKTREE OPPORTUNITIES FUND IX )
(PARALLEL 2), L.P.; OAKTREE VALUE )
OPPORTUNITIES FUND, L.P.; PUERTO RICO AAA )
PORTFOLIO BOND FUND, INC.; PUERTO RICO )
AAA PORTFOLIO BOND FUND II, INC.; PUERTO )
RICO AAA PORTFOLIO TARGET MATURITY )
FUND, INC.; PUERTO RICO FIXED INCOME FUND, )
INC.; PUERTO RICO FIXED INCOME FUND II, INC.; )
PUERTO RICO FIXED INCOME FUND III, INC.; )
PUERTO RICO FIXED INCOME FUND IV, INC.; )

---

[3] The Official Committee of Unsecured Creditors serves as section 926 trustee and co-plaintiff in the prosecution of this adversary proceeding pursuant to Docket No. 6990, which is incorporated herein by reference.

PUERTO RICO FIXED INCOME FUND V, INC.;          )
PUERTO RICO GNMA & U.S. GOVERNMENT              )
TARGET MATURITY FUND, INC.; PUERTO RICO        )
INVESTORS BOND FUND I; PUERTO RICO             )
INVESTORS TAX-FREE FUND, INC.; PUERTO RICO     )
INVESTORS TAX-FREE FUND II, INC.; PUERTO       )
RICO INVESTORS TAX-FREE FUND III, INC.;        )
PUERTO RICO INVESTORS TAX-FREE FUND IV,        )
INC.; PUERTO RICO INVESTORS TAX-FREE FUND      )
V, INC.; PUERTO RICO INVESTORS TAX-FREE        )
FUND VI, INC.; PUERTO RICO MORTGAGE-           )
BACKED & U.S. GOVERNMENT SECURITIES            )
FUND, INC.; TAX-FREE PUERTO RICO FUND, INC.;   )
TAX-FREE PUERTO RICO FUND II, INC.; TAX-       )
FREE PUERTO RICO TARGET MATURITY FUND,         )
INC.; UBS IRA SELECT GROWTH & INCOME           )
PUERTO RICO FUND,                              )
                                               )
                        Defendants.

----------------------------------------------------------------------- X


## DECLARATION OF PATRICK DOWD

I, Patrick Dowd, hereby declare under penalty of perjury:

1.      I am a Managing Director at King Street Capital Management ("King Street").  I
provide this declaration based on my own personal knowledge, based on information that I learned
from others at King Street, and based on my counsel's review of pertinent documents collected
and reviewed as part of discovery in these proceedings.

2.      I was deposed in these proceedings on February 28, 2020, both in my personal
capacity and as a Rule 30(b)(6) representative of Ocher Rose, L.L.C. ("Ocher Rose").  I offer this
declaration as a supplement to my deposition.

3.      As I testified at my deposition, Ocher Rose first became aware of an argument that
the ERS Bonds were issued without authority when that issue was first raised against it in litigation.
I did not recall the exact date when that was, but agreed during my deposition that November 2017

was consistent with my recollection. I understand that a review of Ocher Rose's files shows that

on November 4, 2017, I received a copy of ERS's Motion for Summary Judgment in 17-ap-0213,

which referred in a footnote and without explanation to "the defense that the bond issuance was

not authorized under ERS's Enabling Act and therefore was ultra vires." *See* BH-ERS-6-014053

(cover email); BH-ERS-6-014059 (filing). To my knowledge, and based on the review of files,

that is the first reference in Ocher Rose's files to (i) the possibility that the bonds may not have

been issued with authority or legally issued or (ii) the possibility of the ultra vires issue, and Ocher

Rose was not aware from any source of those possibilities before that date.

4. As I testified at my deposition, neither I nor anyone I spoke with at King Street was

sure when we reviewed the ERS Enabling Act, or which parts of that Act, in connection with Ocher

Rose's investment in ERS Bonds, although we believe it was sometime between Ocher Rose's

first purchase of ERS Bonds and its last purchase of ERS Bonds. I understand, however, that a

review of Ocher Rose's files shows that the ERS Enabling Act as a whole (with amendments

through August 2008), including the debt-authorizing language as it existed in 2008, was attached

to an email that Evan Mossop sent to David Fitton and me on November 26, 2013. I understand

that this document was not previously produced in the litigation but is being produced

simultaneously with this declaration. To my knowledge, and based on the review of files, that is

the first reference in Ocher Rose's files to the debt-authorizing language of the ERS Enabling Act

as it existed in 2008, and Ocher Rose was not aware from any source of the debt-authorizing

language of the ERS Enabling Act as it existed in 2008 before that date.

5. I understand that a review of Ocher Rose's files shows that the "illegally made"

language in the Statement of Motives in Act 116-2011 was quoted in passing in a memorandum I

received on August 3, 2015, providing legal advice on the ERS Bonds that did not address the

validity or invalidity of the bonds, or the legality or illegality of the issuance.  *See* BH-ERS-6-
PRIV-00028 (log entry for cover email); BH-ERS-6-PRIV-00029 (log entry for attachment).  To
my knowledge, and based on the review of files, that is the first reference in Ocher Rose's files to
the "illegally made" language in the Statement of Motives in Act 116-2011, and Ocher Rose was
not aware from any source of the "illegally made" language before that date.

6.     I understand that a review of Ocher Rose's files shows that the efforts to enact
legislation to authorize Commonwealth General Obligation bonds to fund ERS, and the failure of
those efforts, were described in the Final Investigative Report issued by Kobre & Kim on August
20, 2018, a copy of which was found in a folder related to the ERS Bond investment.  To my
knowledge, and based on the review of files, that is the first reference in Ocher Rose's files to the
efforts to authorize Commonwealth General Obligations bonds to fund ERS, and the failure of
those efforts, and Ocher Rose was not aware from any source of those issues before that date.

7.     I understand that a review of Ocher Rose's files shows that the earliest date that
Ocher Rose sought or received advice from counsel about the validity, invalidity, legality or
illegality of the ERS Bonds was December 14, 2017, when I received a draft of an opposition to
AAFAF's motion to dismiss.  *See* BH-ERS-2-PRIV-039 (log entry for cover email); BH-ERS-2-
PRIV-040 (log entry for attachment).

8.     I offer this declaration on my own behalf and on behalf of Ocher Rose.

Dated:  May 27 2020                          _____
        New York, NY                          Patrick Dowd

8

# Exhibit 14

**EXHIBIT 55**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | | |
|---|---|---|
| In re: | ) ) | |
| | ) | PROMESA |
| THE FINANCIAL OVERSIGHT AND | ) | Title III |
| MANAGEMENT BOARD FOR PUERTO RICO | ) | |
| | ) | Case No. 17-BK-03283 (LTS) |
| as representative of | ) | |
| | ) | |
| THE COMMONWEALTH OF PUERTO RICO, *et al.*, | ) | |
| | ) | |
| Debtors.[1] | ) | |
| | ) | |
| | ) | |
| In re: | ) | PROMESA |
| | ) | Title III |
| THE FINANCIAL OVERSIGHT AND | ) | |
| MANAGEMENT BOARD FOR PUERTO RICO, | ) | Case No. 17-BK-03566 (LTS) |
| | ) | |
| as representative of | ) | |
| | ) | |
| THE EMPLOYEES RETIREMENT SYSTEM OF THE | ) | |
| GOVERNMENT OF THE COMMONWEALTH OF | ) | |
| PUERTO RICO, | ) | |
| | ) | |
| Debtor. | ) | |
| | ) | |
| | ) | |
| | ) | |
| THE SPECIAL CLAIMS COMMITTEE OF THE | ) | Adv. Proc. No. 19-00356 (LTS) |
| FINANCIAL OVERSIGHT AND MANAGEMENT | ) | |
| BOARD FOR PUERTO RICO, ACTING BY AND | ) | |
| THROUGH ITS MEMBERS, | ) | |

---

[1] The Debtors in these Title III cases, along with each Debtor's respective Title III case number listed as a bankruptcy case number due to software limitations and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK- 3283 (LTS)) (Last Four Digits of Federal Tax ID: 3481), (ii) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566 (LTS)) (Last Four Digits of Federal Tax ID: 9686), (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567 (LTS)) (Last Four Digits of Federal Tax ID: 3808), (iv) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284 (LTS)) (Last Four Digits of Federal Tax ID: 8474); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17-BK- 4780) (Last Four Digits of Federal Tax ID: 3747).

and )
)
THE OFFICIAL COMMITTEE OF UNSECURED )
CREDITORS OF ALL TITLE III DEBTORS )
(OTHER THAN COFINA), )
)
    as co-trustees of )
)
THE EMPLOYEES RETIREMENT SYSTEM OF THE )
GOVERNMENT OF PUERTO RICO, )
)
    Plaintiff, )
)
v. )
)
DEFENDANT 1M, *et al.*, )
)
    Defendants. )
)
_____ )
)
THE SPECIAL CLAIMS COMMITTEE OF THE )
FINANCIAL OVERSIGHT AND MANAGEMENT )    Adv. Proc. No. 19-00357 (LTS)
BOARD FOR PUERTO RICO, ACTING BY AND )
THROUGH ITS MEMBERS, )
)
)
and )
)
THE OFFICIAL COMMITTEE OF UNSECURED )
CREDITORS OF ALL TITLE III DEBTORS )
(OTHER THAN COFINA), )
)
    as co-trustees of )
)
THE EMPLOYEES RETIREMENT SYSTEM OF THE )
GOVERNMENT OF PUERTO RICO, )
)
    Plaintiff, )
)
v. )
)
STOEVER GLASS & CO., *et al.*, )
)

Defendant.                                    )
                                              )
                                              )
_____         )
                                              )
                                              )
THE SPECIAL CLAIMS COMMITTEE OF THE           )
FINANCIAL OVERSIGHT AND MANAGEMENT            )
BOARD FOR PUERTO RICO, ACTING BY AND          )    Adv. Proc. No. 19-00359 (LTS)
THROUGH ITS MEMBERS,                          )
                                              )
       and                                    )
                                              )
THE OFFICIAL COMMITTEE OF UNSECURED           )
CREDITORS OF ALL TITLE III DEBTORS            )
(OTHER THAN COFINA),                          )
                                              )
       as co-trustees of                      )
                                              )
THE EMPLOYEES RETIREMENT SYSTEM OF THE        )
GOVERNMENT OF PUERTO RICO,                     )
                                              )
       Plaintiff,                             )
                                              )
v.                                            )
                                              )
DEFENDANT 1H-78H,                             )
                                              )
       Defendants.                            )
                                              )
                                              )
_____         )
                                              )
THE SPECIAL CLAIMS COMMITTEE OF THE           )
FINANCIAL OVERSIGHT AND MANAGEMENT            )
BOARD FOR PUERTO RICO, ACTING BY AND          )    Adv. Proc. No. 19-00361 (LTS)
THROUGH ITS MEMBERS,                          )
                                              )
       and                                    )
                                              )
THE OFFICIAL COMMITTEE OF UNSECURED           )
CREDITORS OF ALL TITLE III DEBTORS            )
(OTHER THAN COFINA),                          )
                                              )
       as co-trustees of                      )
                                              )
                                              )

3

THE EMPLOYEES RETIREMENT SYSTEM OF THE )
GOVERNMENT OF PUERTO RICO,                )
                                          )
     Plaintiff,                         )
                                          )
v.                                        )
                                          )
DEFENDANT 1G-50G, *et al.*,               )
                                          )
     Defendants.                        )
                                          )
                                          )
_____  )
                                          )
THE FINANCIAL OVERSIGHT AND               )
MANAGEMENT BOARD FOR PUERTO RICO,         )   Adv. Proc. No. 19-00366 (LTS)
                                          )
     as representative of               )
                                          )
EMPLOYEES RETIREMENT SYSTEM OF THE        )
GOVERNMENT OF THE COMMONWEALTH OF         )
PUERTO RICO,                              )
                                          )
     and                                )
                                          )
THE OFFICIAL COMMITTEE OF UNSECURED       )
CREDITORS OF ALL TITLE III DEBTORS (OTHER )
THAN COFINA),                             )
                                          )
     as section 926 trustee of          )
                                          )
THE COMMONWEALTH OF PUERTO RICO           )
                                          )
     Plaintiffs,[2]                      )
                                          )
     against                            )
                                          )
ANDALUSIAN GLOBAL DESIGNATED ACTIVITY     )
COMPANY; THE BANK OF NEW YORK MELLON;     )
MASON CAPITAL MASTER FUND LP; OCHER       )
ROSE, L.L.C.; SV CREDIT, L.P.; CROWN MANAGED )
ACCOUNTS FOR AND ON BEHALF OF CROWN/PW )
SP; LMA SPC FOR AND ON BEHALF OF MAP 98   )
SEGREGATED PORTFOLIO; OCEANA MASTER       )

---

[2] The Official Committee of Unsecured Creditors serves as section 926 trustee and co-plaintiff in the prosecution of this adversary proceeding pursuant to Docket No. 6990, which is incorporated herein by reference.

4

FUND LTD.; PENTWATER MERGER ARBITRAGE )
MASTER FUND LTD.; AND PWCM MASTER FUND )
LTD, )
                                 )
             Defendants. )
_____ )
                                 )
THE FINANCIAL OVERSIGHT AND )
MANAGEMENT BOARD FOR PUERTO RICO, )
                                 )     Adv. Proc. No. 19-00367 (LTS)
       as representative of )
EMPLOYEES RETIREMENT SYSTEM OF THE )
GOVERNMENT OF THE COMMONWEALTH OF )
PUERTO RICO, )
                                 )
       and )
THE OFFICIAL COMMITTEE OF UNSECURED )
CREDITORS OF ALL TITLE III DEBTORS (OTHER )
THAN COFINA), )
                                 )
       as section 926 trustee of )
THE COMMONWEALTH OF PUERTO RICO )
                                 )
       Plaintiffs,[3] )
                                   )
       against )
GLENDON OPPORTUNITIES FUND, L.P.; )
OAKTREE-FORREST MULTI-STRATEGY, LLC )
(SERIES B); OAKTREE OPPORTUNITIES FUND IX, )
L.P.; OAKTREE OPPORTUNITIES FUND IX )
(PARALLEL 2), L.P.; OAKTREE VALUE )
OPPORTUNITIES FUND, L.P.; PUERTO RICO AAA )
PORTFOLIO BOND FUND, INC.; PUERTO RICO )
AAA PORTFOLIO BOND FUND II, INC.; PUERTO )
RICO AAA PORTFOLIO TARGET MATURITY )
FUND, INC.; PUERTO RICO FIXED INCOME FUND, )
INC.; PUERTO RICO FIXED INCOME FUND II, INC.; )
PUERTO RICO FIXED INCOME FUND III, INC.; )
PUERTO RICO FIXED INCOME FUND IV, INC.; )

_____

[3] The Official Committee of Unsecured Creditors serves as section 926 trustee and co-plaintiff in the
prosecution of this adversary proceeding pursuant to Docket No. 6990, which is incorporated herein by reference.

PUERTO RICO FIXED INCOME FUND V, INC.; )
PUERTO RICO GNMA & U.S. GOVERNMENT )
TARGET MATURITY FUND, INC.; PUERTO RICO )
INVESTORS BOND FUND I; PUERTO RICO )
INVESTORS TAX-FREE FUND, INC.; PUERTO RICO )
INVESTORS TAX-FREE FUND II, INC.; PUERTO )
RICO INVESTORS TAX-FREE FUND III, INC.; )
PUERTO RICO INVESTORS TAX-FREE FUND IV, )
INC.; PUERTO RICO INVESTORS TAX-FREE FUND )
V, INC.; PUERTO RICO INVESTORS TAX-FREE )
FUND VI, INC.; PUERTO RICO MORTGAGE- )
BACKED & U.S. GOVERNMENT SECURITIES )
FUND, INC.; TAX-FREE PUERTO RICO FUND, INC.; )
TAX-FREE PUERTO RICO FUND II, INC.; TAX- )
FREE PUERTO RICO TARGET MATURITY FUND, )
INC.; UBS IRA SELECT GROWTH & INCOME )
PUERTO RICO FUND, )
                                                           )

        Defendants.

-------------------------------------------------------------------- X

## DECLARATION OF LUKE CORNING

I, Luke Corning, hereby declare under penalty of perjury:

1.     I am a Portfolio Manager at Pentwater Capital Management ("Pentwater"). I provide this declaration based on my own personal knowledge, based on information that I learned from others at Pentwater, and based on my counsel's review of pertinent documents collected and reviewed as part of discovery in these proceedings.

2.     I was deposed in these proceedings on March 6, 2020, both in my personal capacity and as a Rule 30(b)(6) representative of Crown Managed Accounts, LMA SPC, Oceana Master Fund, Ltd., Pentwater Merger Arbitrage Master Fund, Ltd., and PWCM Master Fund, Ltd. (the "Pentwater Funds"). I offer this declaration as a supplement to my deposition.

3.     As I testified at my deposition, I am not aware of anyone at Pentwater being aware that there had been challenges to the validity of the ERS Bonds until the UCC filed its claim

objection in the spring of 2019. I understand, however, that a review of the Pentwater Funds' files shows that they included a copy of the Bondholders' November 15, 2017 Brief in Opposition to ERS's Motion for Summary Judgment in 17-ap-00213, a portion of which responds to ERS's unexplained assertion that the ERS Bonds were ultra vires. BH-ERS-7-013070. Neither I nor anyone else at Pentwater who is involved in the investment of ERS Bonds recalls reading that portion of the Brief in Opposition (or otherwise becoming aware of these challenges before the spring of 2019), and the Pentwater Funds' files do not reveal that anyone did so. To my knowledge, and based on the review of files, that is the first reference in the Pentwater Funds' files to (i) the possibility that the bonds may not have been issued with authority or legally issued or (ii) the possibility of the ultra vires issue, and the Pentwater Funds were not aware from any source of those possibilities before that date.

4. As I testified at my deposition, Pentwater did not review the ERS Enabling Act before its first purchase of ERS Bonds, and its review of the Enabling Act for the first time in late 2018 was focused on the issues related to the perfection of the Bondholders' liens, not the debt-authorizing language. I understand, however, that a review of the Pentwater Funds' files shows that they included a copy of the Bondholders' November 3, 2017 Motion for Summary Judgment in 17-ap-00213, which quoted in a footnote the debt-authorizing language of the ERS Enabling Act as it existed in 2008. Neither I nor anyone else at Pentwater who is involved in the investment of ERS Bonds recalls reading that portion of the Motion for Summary Judgment, and the Pentwater Funds' files do not reveal that anyone did so. To my knowledge, and based on the review of files, that is the first reference in the Pentwater Funds' files to the debt-authorizing language of the ERS Enabling Act as it existed in 2008, and the Pentwater Funds were not aware from any source of the debt-authorizing language of the ERS Enabling Act as it existed in 2008 before that date.

7

5.      I understand that a review of the Pentwater Funds' files shows that they contain Kobre & Kim's Final Investigative Report dated August 20, 2018, and that this Report refers to the "illegally made" language in the Statement of Motives in Act 116-2011. Neither I nor anyone else at Pentwater who is involved in the investment of ERS Bonds recalls reading that portion of the Kobre & Kim report (or otherwise becoming aware of the "illegally made" language before the spring of 2019), and the Pentwater Funds' files do not reveal that anyone did so. To my knowledge, and based on the review of files, that is the first reference in the Pentwater Funds' files to the "illegally made" language in the Statement of Motives in Act 116-2011, and the Pentwater Funds were not aware from any source of the "illegally made" language before that date.

6.      I understand the Kobre & Kim's Final Investigative Report dated August 20, 2018, also describes efforts to enact legislation to authorize Commonwealth General Obligation bonds to fund ERS, and the failure of those efforts. Neither I nor anyone else at Pentwater who is involved in the investment of ERS Bonds recalls reading that portion of the Kobre & Kim report (or otherwise becoming aware of those unsuccessful efforts to enact legislation in the Commonwealth before May 2020), and the Pentwater Funds' files do not reveal that anyone did so. To my knowledge, and based on the review of files, that is the first reference in the Pentwater Funds' files to the efforts to authorize Commonwealth General Obligations bonds to fund ERS, and the failure of those efforts, and the Pentwater Funds were not aware from any source of those issues before that date.

7.      I understand that a review of the Pentwater Funds' files shows that the earliest date that the Pentwater Funds sought or received advice from counsel about the validity, invalidity, legality or illegality of the ERS Bonds was March 12, 2019. *See* BH-ERS-8-001933 (redacted document and log entry).

8

8. I offer this declaration on my own behalf and on behalf of the Pentwater Funds.

Dated: May 22 2020
       New York, NY

Luke Corning

# Exhibit 15

**EXHIBIT 56**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re: | ) |
| | ) |
| | ) PROMESA |
| THE FINANCIAL OVERSIGHT AND | ) Title III |
| MANAGEMENT BOARD FOR PUERTO RICO | ) |
| | ) Case No. 17-BK-03283 (LTS) |
| as representative of | ) |
| | ) |
| THE COMMONWEALTH OF PUERTO RICO, *et al.*, | ) |
| | ) |
| Debtors.[1] | ) |
| | ) |
| | ) |
| In re: | ) |
| | ) PROMESA |
| | ) Title III |
| THE FINANCIAL OVERSIGHT AND | ) |
| MANAGEMENT BOARD FOR PUERTO RICO, | ) Case No. 17-BK-03566 (LTS) |
| | ) |
| as representative of | ) |
| | ) |
| THE EMPLOYEES RETIREMENT SYSTEM OF THE | ) |
| GOVERNMENT OF THE COMMONWEALTH OF | ) |
| PUERTO RICO, | ) |
| | ) |
| Debtor. | ) |
| | ) |
| | ) |
| | ) |
| THE SPECIAL CLAIMS COMMITTEE OF THE | ) |
| FINANCIAL OVERSIGHT AND MANAGEMENT | ) Adv. Proc. No. 19-00356 (LTS) |
| BOARD FOR PUERTO RICO, ACTING BY AND | ) |
| THROUGH ITS MEMBERS, | ) |

---

[1] The Debtors in these Title III cases, along with each Debtor's respective Title III case number listed as a bankruptcy case number due to software limitations and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK- 3283 (LTS)) (Last Four Digits of Federal Tax ID: 3481), (ii) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566 (LTS)) (Last Four Digits of Federal Tax ID: 9686), (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567 (LTS)) (Last Four Digits of Federal Tax ID: 3808), (iv) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284 (LTS)) (Last Four Digits of Federal Tax ID: 8474); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17-BK- 4780) (Last Four Digits of Federal Tax ID: 3747).

|                                                                                                                                                    |     |                             |
| -------------------------------------------------------------------------------------------------------------------------------------------------- | --- | --------------------------- |
| and                                                                                                                                                | )   |                             |
|                                                                                                                                                    | )   |                             |
| THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF ALL TITLE III DEBTORS (OTHER THAN COFINA),                                                        | )   |                             |
|                                                                                                                                                    | )   |                             |
|     as co-trustees of                                                                                                          | )   |                             |
|                                                                                                                                                    | )   |                             |
| THE EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF PUERTO RICO,                                                                                  | )   |                             |
|                                                                                                                                                    | )   |                             |
|     Plaintiff,                                                                                                                 | )   |                             |
|                                                                                                                                                    | )   |                             |
| v.                                                                                                                                                 | )   |                             |
|                                                                                                                                                    | )   |                             |
| DEFENDANT 1M, *et al.*,                                                                                                                            | )   |                             |
|                                                                                                                                                    | )   |                             |
|     Defendants.                                                                                                                | )   |                             |
|                                                                                                                                                    | )   |                             |
| _____                                                                                                           | )   |                             |
|                                                                                                                                                    | )   |                             |
| THE SPECIAL CLAIMS COMMITTEE OF THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, ACTING BY AND THROUGH ITS MEMBERS,                    | )   | Adv. Proc. No. 19-00357 (LTS) |
|                                                                                                                                                    | )   |                             |
| and                                                                                                                                                | )   |                             |
|                                                                                                                                                    | )   |                             |
| THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF ALL TITLE III DEBTORS (OTHER THAN COFINA),                                                        | )   |                             |
|                                                                                                                                                    | )   |                             |
|     as co-trustees of                                                                                                          | )   |                             |
|                                                                                                                                                    | )   |                             |
| THE EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF PUERTO RICO,                                                                                  | )   |                             |
|                                                                                                                                                    | )   |                             |
|     Plaintiff,                                                                                                                 | )   |                             |
|                                                                                                                                                    | )   |                             |
| v.                                                                                                                                                 | )   |                             |
|                                                                                                                                                    | )   |                             |
| STOEVER GLASS & CO., *et al.*,                                                                                                                     | )   |                             |
|                                                                                                                                                    | )   |                             |

|  | ) |  |
|---|---|---|
| Defendant. | ) | |
|  | ) | |
|  | ) | |
| _____ | ) | |
|  | ) | |
| THE SPECIAL CLAIMS COMMITTEE OF THE | ) | |
| FINANCIAL OVERSIGHT AND MANAGEMENT | ) | |
| BOARD FOR PUERTO RICO, ACTING BY AND | ) | Adv. Proc. No. 19-00359 (LTS) |
| THROUGH ITS MEMBERS, | ) | |
|  | ) | |
| and | ) | |
|  | ) | |
| THE OFFICIAL COMMITTEE OF UNSECURED | ) | |
| CREDITORS OF ALL TITLE III DEBTORS | ) | |
| (OTHER THAN COFINA), | ) | |
|  | ) | |
| as co-trustees of | ) | |
|  | ) | |
| THE EMPLOYEES RETIREMENT SYSTEM OF THE | ) | |
| GOVERNMENT OF PUERTO RICO, | ) | |
|  | ) | |
| Plaintiff, | ) | |
|  | ) | |
| v. | ) | |
|  | ) | |
| DEFENDANT 1H-78H, | ) | |
|  | ) | |
| Defendants. | ) | |
|  | ) | |
| _____ | ) | |
|  | ) | |
| THE SPECIAL CLAIMS COMMITTEE OF THE | ) | |
| FINANCIAL OVERSIGHT AND MANAGEMENT | ) | |
| BOARD FOR PUERTO RICO, ACTING BY AND | ) | Adv. Proc. No. 19-00361 (LTS) |
| THROUGH ITS MEMBERS, | ) | |
|  | ) | |
| and | ) | |
|  | ) | |
| THE OFFICIAL COMMITTEE OF UNSECURED | ) | |
| CREDITORS OF ALL TITLE III DEBTORS | ) | |
| (OTHER THAN COFINA), | ) | |
|  | ) | |
| as co-trustees of | ) | |
|  | ) | |
|  | ) | |

THE EMPLOYEES RETIREMENT SYSTEM OF THE )
GOVERNMENT OF PUERTO RICO,                )
                                          )
    Plaintiff,         )
                                          )
v.                                        )
                                          )
DEFENDANT 1G-50G, *et al.*,               )
                                          )
    Defendants.        )
                                          )
_____  )
                                          )
THE FINANCIAL OVERSIGHT AND               )
MANAGEMENT BOARD FOR PUERTO RICO,         )     Adv. Proc. No. 19-00366 (LTS)
                                          )
    as representative of )
                                          )
EMPLOYEES RETIREMENT SYSTEM OF THE        )
GOVERNMENT OF THE COMMONWEALTH OF         )
PUERTO RICO,                              )
                                          )
    and                )
                                          )
THE OFFICIAL COMMITTEE OF UNSECURED       )
CREDITORS OF ALL TITLE III DEBTORS (OTHER )
THAN COFINA),                             )
                                          )
    as section 926 trustee of )
                                          )
THE COMMONWEALTH OF PUERTO RICO           )
                                          )
    Plaintiffs,[2]     )
                                          )
    against            )
                                          )
ANDALUSIAN GLOBAL DESIGNATED ACTIVITY     )
COMPANY; THE BANK OF NEW YORK MELLON;     )
MASON CAPITAL MASTER FUND LP; OCHER       )
ROSE, L.L.C.; SV CREDIT, L.P.; CROWN MANAGED )
ACCOUNTS FOR AND ON BEHALF OF CROWN/PW    )
SP; LMA SPC FOR AND ON BEHALF OF MAP 98   )
SEGREGATED PORTFOLIO; OCEANA MASTER       )

---

[2] The Official Committee of Unsecured Creditors serves as section 926 trustee and co-plaintiff in the prosecution of this adversary proceeding pursuant to Docket No. 6990, which is incorporated herein by reference.

FUND LTD.; PENTWATER MERGER ARBITRAGE )
MASTER FUND LTD.; AND PWCM MASTER FUND )
LTD, )
)
            Defendants. )
_____ )
)
THE FINANCIAL OVERSIGHT AND )
MANAGEMENT BOARD FOR PUERTO RICO, )
)   Adv. Proc. No. 19-00367 (LTS)
      as representative of )
)
EMPLOYEES RETIREMENT SYSTEM OF THE )
GOVERNMENT OF THE COMMONWEALTH OF )
PUERTO RICO, )
)
      and )
)
THE OFFICIAL COMMITTEE OF UNSECURED )
CREDITORS OF ALL TITLE III DEBTORS (OTHER )
THAN COFINA), )
)
      as section 926 trustee of )
)
THE COMMONWEALTH OF PUERTO RICO )
)
      Plaintiffs,[3] )
)
      against )
)
GLENDON OPPORTUNITIES FUND, L.P.; )
OAKTREE-FORREST MULTI-STRATEGY, LLC )
(SERIES B); OAKTREE OPPORTUNITIES FUND IX, )
L.P.; OAKTREE OPPORTUNITIES FUND IX )
(PARALLEL 2), L.P.; OAKTREE VALUE )
OPPORTUNITIES FUND, L.P.; PUERTO RICO AAA )
PORTFOLIO BOND FUND, INC.; PUERTO RICO )
AAA PORTFOLIO BOND FUND II, INC.; PUERTO )
RICO AAA PORTFOLIO TARGET MATURITY )
FUND, INC.; PUERTO RICO FIXED INCOME FUND, )
INC.; PUERTO RICO FIXED INCOME FUND II, INC.; )
PUERTO RICO FIXED INCOME FUND III, INC.; )
PUERTO RICO FIXED INCOME FUND IV, INC.; )

---

[3] The Official Committee of Unsecured Creditors serves as section 926 trustee and co-plaintiff in the prosecution of this adversary proceeding pursuant to Docket No. 6990, which is incorporated herein by reference.

PUERTO RICO FIXED INCOME FUND V, INC.;            )
PUERTO RICO GNMA & U.S. GOVERNMENT                )
TARGET MATURITY FUND, INC.; PUERTO RICO           )
INVESTORS BOND FUND I; PUERTO RICO                )
INVESTORS TAX-FREE FUND, INC.; PUERTO RICO        )
INVESTORS TAX-FREE FUND II, INC.; PUERTO          )
RICO INVESTORS TAX-FREE FUND III, INC.;           )
PUERTO RICO INVESTORS TAX-FREE FUND IV,           )
INC.; PUERTO RICO INVESTORS TAX-FREE FUND         )
V, INC.; PUERTO RICO INVESTORS TAX-FREE           )
FUND VI, INC.; PUERTO RICO MORTGAGE-              )
BACKED & U.S. GOVERNMENT SECURITIES               )
FUND, INC.; TAX-FREE PUERTO RICO FUND, INC.;      )
TAX-FREE PUERTO RICO FUND II, INC.; TAX-          )
FREE PUERTO RICO TARGET MATURITY FUND,            )
INC.; UBS IRA SELECT GROWTH & INCOME              )
PUERTO RICO FUND,                                 )
                                                  )
                    Defendants.

----------------------------------------------------------------------- X


### DECLARATION OF JUSTIN BOYER

I, Justin Boyer, hereby declare under penalty of perjury:

1.      I am a Principal at Redwood Capital Management LLC ("Redwood").  I provide this declaration based on my own personal knowledge, based on information that I learned from others at Redwood, and based on my counsel's review of pertinent documents collected and reviewed as part of discovery in these proceedings.

2.      I was deposed in these proceedings on March 3, 2020, both in my personal capacity and as a Rule 30(b)(6) representative of Redwood Master Fund Ltd. ("Redwood Master Fund").  I offer this declaration as a supplement to my deposition.

3.      As I testified at my deposition, I was not aware of AAFAF's challenge to the validity of the ERS bonds when Redwood Master Fund invested in ERS Bonds, and I did not become aware of anyone having made the argument that the ERS Bonds are invalid until the spring

6

or summer of 2019, when claim objections were filed.  As I also testified at my deposition, I sent

an email on August 24, 2018 pointing out a different argument related to the possible "voidability"

of the ERS Bonds that no party has made in this litigation, and that Redwood determined was not

a material risk.  *See* BH-ERS-9-001201.  To my knowledge, and based on the review of files, that

August 24, 2018 email, and another of that same date (BH-ERS-9-001037), are the first reference

in Redwood Master Funds' files to (i) the possibility that the bonds may not have been issued with

authority or legally issued or (ii) the possibility of the ultra vires issue, and Redwood Master Fund

was not aware from any source of those possibilities before that date.

4.      As I testified at my deposition, I first reviewed the text of the debt-authorizing

language of the ERS Enabling Act as it existed in 2008 on or around August 22, 2018.  I understand

that a review of Redwood Master Fund's files shows that the text of the debt-authorizing language

of the ERS Enabling Act as it existed in 2008 is contained in an email dated August 24, 2018, and

that the full Act is attached to that email.  *See* BH-ERS-9-001037 (email); BH-ERS-9-001039 (full

Enabling Act).  To my knowledge, and based on the review of files, that is the first reference in

Redwood Master Fund's files to the debt-authorizing language of the ERS Enabling Act as it

existed in 2008, and the Redwood Master Fund was not aware from any source of the debt-

authorizing language of the ERS Enabling Act as it existed in 2008 before on or around August

22, 2018.

5.      As I testified at my deposition, I did not recall ever seeing the "illegally made"

language in the Statement of Motives in Act 116-2011 before it was shown to me at my deposition,

and to my knowledge, no one else at Redwood had seen it before then either.  I understand,

however, that this language may have been referenced in draft pleadings and filings sent to

Redwood by Jones Day after the commencement of the ultra vires proceedings in the fall of 2019.

6.      To my knowledge, and based on the review of files, no one at Redwood Master Fund has ever become aware of efforts to authorize Commonwealth General Obligation bonds to fund ERS, and the failure of those efforts, at any time before now.

7.      Redwood Master Fund did not seek or receive advice from counsel about the validity, invalidity, legality or illegality of the ERS Bonds before the commencement of the ultra vires proceedings in the fall of 2019.

8.      I offer this declaration on my own behalf and on behalf of Redwood Master Fund.

Dated:  May 26, 2020

_Justin Charles Boyer_
_____
Justin Boyer

# Exhibit 16

| Bondholder[1] | Date of Jones Day Representation or Joined Bondholder Group | Dates of Purchases of Currently Held Bonds After Joining Jones Day Bondholder Group |
|---|---|---|
| Andalusian Global Designated Activity Company | Around May 2017 | 8/11/2017; 8/20/2018; 2/19/2019; 3/5/2019 |
| Crown Managed Accounts for and on behalf of Crown/PW SP | Prior to August 2018 | All Purchases Post Representation |
| LMA SPC for and on behalf of Map 98 Segregated Portfolio | Prior to August 2018 | All Purchases Post Representation |
| Mason Capital Master Fund LP | At some point between November 2, 2016 - May 26, 2017 | 12/16/2016; 12/19/2016; 12/20/2016; 1/30/2017; 1/31/2017; 2/13/2017; 2/14/2017; 2/15/2017; 2/17/2017; 2/21/2017; 2/28/2017; 3/3/2017; 3/8/2017; 4/12/2017; 4/17/2017; 4/24/2017; 7/10/2017; 7/12/2017; 8/31/2017; 10/4/2017; 10/13/2017; 10/16/2017; 10/25/2017; 3/12/2018; 9/20/2018; 10/17/2018; 10/23/2018; 10/24/2018; 10/25/2018; 10/30/2018; 1/7/2019; 1/10/2019; 1/14/2019; 1/16/2019; 1/17/2019; 1/29/2019; 1/30/2019; 1/31/2019; 2/12/2019; 6/17/2019 |
| Oaktree Funds[2] | 2014 or 2015 | Using the 2014 date, all purchases post representation. |
| Oceana Master Fund Ltd. | Prior to August 2018 | All Purchases Post Representation |

---

[1] The information contained herein also is contained within Appendix II, which provides the relevant factual citations to the record, and Ex. 32.

[2] The Oaktree Funds are: Oaktree-Forrest Multi-Strategy, LLC (Series B); Oaktree Opportunities Fund IX, L.P.; Oaktree Opportunities Fund IX (Parallel), L.P.; Oaktree Opportunities Fund IX (Parallel 2), L.P.; Oaktree Huntington Investment Fund II, L.P.; Oaktree Opportunities Fund X, L.P.; Oaktree Opportunities Fund X (Parallel), LP.; Oaktree Opportunities Fund X (Parallel 2), L.P.; Oaktree Value Opportunities Fund Holdings, L.P.

| Ocher Rose L.L.C. | Prior to May 26, 2017 | 6/1/2017; 6/8/2017; 6/14/2017; 7/20/2017; 7/21/2017; 7/26/2017 |
|---|---|---|
| Pentwater Merger Arbitrage Master Fund Ltd. | Prior to August 2018 | All Purchases Post Representation |
| PWCM Master Fund Ltd. | Prior to August 2018 | All Purchases Post Representation |
| SV Credit, L.P. | Prior to July 2014 | All Purchases Post Representation |

# Exhibit 17

| Bondholder[1] | Dates of Purchases of Currently Held Bonds After Filing |
|---|---|
| Andalusian Global Designated Activity Company | 8/20/2018; 2/19/2019; 3/5/2019 |
| Crown Managed Accounts for and on behalf of Crown/PW SP | All Purchases Post Filing |
| LMA SPC for and on behalf of Map 98 Segregated Portfolio | All Purchases Post Filing |
| Mason Capital Master Fund LP | 3/12/2018; 9/20/2018; 10/17/2018; 10/23/2018; 10/24/2018; 10/25/2018; 10/30/2018; 1/7/2019; 1/10/2019; 1/14/2019; 1/16/2019; 1/17/2019; 1/29/2019; 1/30/2019; 1/31/2019; 2/12/2019; 6/17/2019 |
| Oceana Master Fund Ltd. | All Purchases Post Filing |
| Pentwater Merger Arbitrage Master Fund Ltd. | All Purchases Post Filing |
| PWCM Master Fund Ltd. | All Purchases Post Filing |
| Redwood Master Fund Ltd. | 8/20/2018; 8/21/2018; 8/22/2018; 9/6/2018; 10/24/2018; 11/28/2018; 12/4/2018; 12/12/2018; 12/13/2018; 1/16/2019; 1/28/2019; 1/29/2019 |

---

[1] The information contained herein also is contained within Appendix II, which provides the relevant factual citations to the record.

# Exhibit 18

| Bondholder[1] | First Became Aware of Ultra Vires Issue or Sought Advice | Purchases Made After Seeking Legal Advice or Being Made Aware of the Ultra Vires Issue |
|---|---|---|
| Andalusian Global Designated Activity Company | November 4, 2017 | 8/20/2018; 2/19/2019; 3/5/2019 |
| Crown Managed Accounts for and on behalf of Crown/PW SP | November 15, 2017 | All purchases after November 15, 2017. |
| LMA SPC for and on behalf of Map 98 Segregated Portfolio | November 15, 2017 | All purchases after November 15, 2017. |
| Mason Capital Master Fund LP | November 2017 | 3/12/2018; 9/20/2018; 10/17/2018; 10/23/2018; 10/24/2018; 10/25/2018; 1/7/2019; 1/10/2019; 1/14/2019; 1/16/2019; 1/17/2019; 1/29/2019; 1/30/2019; 1/31/2019; 2/12/2019; 6/17/2019 |
| Oceana Master Fund Ltd. | November 15, 2017 | All purchases after November 15, 2017. |
| Pentwater Merger Arbitrage Master Fund Ltd. | November 15, 2017 | All purchases after November 15, 2017. |
| PWCM Master Fund Ltd. | November 15, 2017 | All purchases after November 15, 2017. |
| Redwood Master Fund Ltd. | August 24, 2018 | 9/6/2018; 10/24/2018; 11/28/2018; 12/4/2018; 12/12/2018; 12/13/2018; 1/16/2019; 1/28/2019; 1/29/2019 |
| SV Credit, L.P. | February 2014 | All purchases after February 2014. |

---

[1] The information contained herein also is contained within Appendix II, which provides the relevant factual citations to the record, and Ex. 32.

# Exhibit 19

**Bondholders' Testimony Regarding Notice**

| Bondholder | Purchase Dates[1] | Reviewed Enabling Act Generally | Reviewed Debt Authorization Language (§779(d)) | Reviewed Offering Statement | Aware of Act 116 or the "Illegally Made" language | Aware of the November 2017 AAFAF Brief | Retained Jones Day | Joined Bondholder Group | Included on Bondholder Group Signature Block | Earliest Date of Ultra Vires from Any Source | First Sought Advice Related to Ultra Vires Issues |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Altair Global Credit Opportunities Fund (A), LLC; Glendon Opportunities Fund, L.P.<br><br>(Chris Delaney[2]) | Altair: November 18, 2013 – July 10, 2014<br><br>Glendon: September 15, 2014 – April 28, 2015 | Reviewed the Enabling Act prior to their respective first purchases. (87:14-88:11) | February 29, 2016 (143:2-144:4) | Reviewed offering statement prior to respective first purchases. (87:14-88:11) | Aware of Act 116 prior to respective first purchases. (91:23-92:8) | Became aware in November 2017. (141:14-142:7.) | Could not specify when they retained Jones day. (72:11-15) | No later than May 2015. (70:13-71:5) | May 26, 2017 (ERS Dkt.18) | November 2017. (141:14-142:7) | August 3, 2015 (139:16-140:6) |
| Andalusian Global Designated Activity Company<br><br>(James Bolin[3]) | July 14, 2015 - March 5, 2019 | Could not recall whether anyone reviewed the Enabling Act prior to first purchase. (80:12-15) | No later than April 21, 2016.[4] | Reviewed offering statement prior to first purchase in July 2015. (51:10-14) | No later than November 18, 2017.[5] | November 2017. (82:24-84:12) | No testimony given | Around May 2017. (126:17-25) | May 26, 2017- Appaloosa (ERS Dkt.18)<br><br>May 30, 2017- Andalusian (ERS Dkt. 23) | November 4, 2017.[6] | December 14, 2017.[7] |
| Mason Capital Master Fund LP<br><br>(Richard Engman[8]) | December 12, 2016 – June 17, 2019 | Could not recall if Mason reviewed the Enabling Act. (39:3-20) | August 2018. (74:21-75:7) | Reviewed offering statement prior to first purchase | Learned about Act 116 from either the August 2018 Kobre & Kim Report or the March 2018 UCC objection. (75:10-23) | November 2017 (69:1-71:22) | Mason retained Jones Day at the time they joined the Bondholder group. (64:2-10) | At some point between November 2, 2016 - May 26, 2017([ERS Dkt. 65; 62:14-63:10) | May 26, 2017 (ERS Dkt.18) | November 2017. (69:1-71:22) | November 2017. (71:23-72:10) |

---

[1] For all Bondholders, excluding the Puerto Rico Funds, the Purchase Dates can be found at Dec. Ex. 32, Bondholders' Supplemental Response to Interrogatory No. 17.  The Puerto Rico Funds' purchase dates are located on Dec. Ex. 31, Puerto Rico Funds' Supplemental Response to Interrogatory No. 17.
[2] Line cites to Dec. Ex. 26, Tr. of C. Delaney.
[3] Line cites to Dec. Ex. 48, Tr. of J. Bolin.
[4] Dec. Ex. 52, Dec. of J. Bolin at ¶4.
[5] Id. at ¶5.
[6] Id. at ¶3.
[7] Id. at ¶7.
[8] Line cites to Dec. Ex. 23, 5-28-20 Tr. of R. Engman.

| Bondholder | Purchase Dates[1] | Reviewed Enabling Act Generally | Reviewed Debt Authorization Language (§779(d)) | Reviewed Offering Statement | Aware of Act 116 or the "Illegally Made" language | Aware of the November 2017 AAFAF Brief | Retained Jones Day | Joined Bondholder Group | Included on Bondholder Group Signature Block | Earliest Date of Ultra Vires from Any Source | First Sought Advice Related to Ultra Vires Issues |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Oaktree-Forrest Multi-Strategy, LLC (Series B); Oaktree Opportunities Fund IX, L.P.; Oaktree Opportunities Fund IX (Parallel), L.P.; Oaktree Opportunities Fund IX (Parallel 2), L.P.; Oaktree Huntington Investment Fund II, L.P.; Oaktree Opportunities Fund X, L.P.; Oaktree Opportunities Fund X (Parallel), L.P.; Oaktree Opportunities Fund X (Parallel 2), L.P.; Oaktree Value Opportunities Fund Holdings, L.P.  **(Jordan Mikes)[9]** | May 28, 2014 – May 24, 2017 | November 2019 (153:9-154:12; 156:17-21) | February 29, 2016[10] | May 2014. (133:8-19) | September 8, 2014[11] | November 4, 2017[12] | 2014 or 2015. (23:20-24:7) | Did not know. (109:4-9) | May 26, 2017 (ERS Dkt.18) | November 4, 2017[13] | December 14, 2017[14] |
| Ocher Rose L.L.C.  **(Patrick Dowd)[15]** | May 8, 2014 - July 26, 2017 | Reviewed Enabling Act no later than July 17, 2015 (73:20-74:6) | November 26, 2014[16] | Mid to late 2013 (42:10-23) | August 3, 2015[17] | November 2017. (78:14-20) | Unknown. | Prior to May 26, 2017 (ERS Dkt. 18) | May 26, 2017 (ERS Dkt.18) | November 4, 2017[18] | December 14, 2017[19] |

[9] Line cites to Dec. Ex. 24, Tr. of J. Mikes.

[10] Dec. Ex.53, Dec. of Mikes at ¶4.

[11] Id. at ¶5.

[12] Id. at ¶3.

[13] Id.

[14] Id. at ¶7.

[15] Lines cites to Dec. Ex. 28, Tr. of P. Dowd.

[16] Dec. Ex. 54, Dec. of Dowd at ¶4.

[17] Id. at ¶5.

[18] Id. at ¶3.

[19] Id. at ¶7.

| Bondholder | Purchase Dates[1] | Reviewed Enabling Act Generally | Reviewed Debt Authorization Language (§779(d)) | Reviewed Offering Statement | Aware of Act 116 or the "Illegally Made" language | Aware of the November 2017 AAFAF Brief | Retained Jones Day | Joined Bondholder Group | Included on Bondholder Group Signature Block | Earliest Date of Ultra Vires from Any Source | First Sought Advice Related to Ultra Vires Issues |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Crown Managed Accounts for and on behalf of Crown/PW SP; LMA SPC for and on behalf of Map 98 Segregated Portfolio; Oceana Master Fund Ltd.; Pentwater Merger Arbitrage Master Fund Ltd.; PWCM Master Fund Ltd. **(Luke Corning)**[20] | Crown: December 17, 2018 – June 17, 2019; LMA SPC: August 17, 2018 – April 1, 2019; Oceana: August 17, 2018 – June 17, 2019; Pentwater: October 9, 2018 – June 17, 2019; PWCM: August 17, 2018 – June 17, 2019 | Reviewed some portions of the Act in late 2018. (71:3-13) | November 3, 2017[21] | Reviewed the Offering Statement prior to August 17, 2018. (65:19-67:6) | August 20, 2018.[22] | November 15, 2017[23] | Retained Jones Day prior to their first purchases. (26:21-24) | Joined the Bondholder Group in late 2018 or early 2019. (48:15-49:3) | February 19, 2019 (ERS Dkt. 359) | November 15, 2017[24] | March 12, 2019[25] |

---

[20] Lines cites to Dec. Ex. 25, Tr. of L. Corning.
[21] Dec. Ex. 55, Dec. of Corning at ¶4.
[22] Id. at ¶5.
[23] Id. at ¶3.
[24] Id.
[25] Id. at ¶7.

3

| Bondholder | Purchase Dates[1] | Reviewed Enabling Act Generally | Reviewed Debt Authorization Language (§779(d)) | Reviewed Offering Statement | Aware of Act 116 or the "Illegally Made" language | Aware of the November 2017 AAFAF Brief | Retained Jones Day | Joined Bondholder Group | Included on Bondholder Group Signature Block | Earliest Date of Ultra Vires from Any Source | First Sought Advice Related to Ultra Vires Issues |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Puerto Rico AAA Portfolio Bond Fund, Inc.; Puerto Rico AAA Portfolio Bond Fund II, Inc.; Puerto Rico AAA Portfolio Target Maturity Fund, Inc.; Puerto Rico Fixed Income Fund, Inc.; Puerto Rico Fixed Income Fund II, Inc.; Puerto Rico Fixed Income Fund III, Inc.; Puerto Rico Fixed Income Fund IV, Inc.; Puerto Rico Fixed Income Fund V, Inc.; Puerto Rico Fixed Income Fund VI, Inc.; Puerto Rico GMNA & U.S. Government Target Maturity Fund, Inc.; Puerto Rico Mortgage-Backed & U.S. Government Securities Fund, Inc.; Tax-Free Puerto Rico Fund, Inc.; Tax-Free Puerto Rico Fund II, Inc.; Tax-Free Puerto Rico Target Maturity Fund, Inc.; UBS IRA Select Growth & Income Puerto Rico Fund  **(Ricardo Ramos)[26]** | January 25, 2008 – March 10, 2016 | Unaware of Enabling Act review prior to final purchase. (109:8-23) | Unaware of §779 (d) review prior to final purchase. (109:8-23) | Reviewed offering statement prior to first purchase. (49:11-21) | Aware of Act 116 when it was passed in July 2011. (110:11-24) | November 2017. (104:4-105:7) | The Puerto Rico Funds are represented by White & Case. | No later than July 7, 2017 (Adv. Pro. Dkt. 1) | July 7, 2017 (Adv. Pro. Dkt. 1) | November 2017. (108:1-10) | November 2017. (104:4-105:7) |

---

[26] Line cites to Dec. Ex. 50, Tr. of R. Ramos.

| Bondholder | Purchase Dates[1] | Reviewed Enabling Act Generally | Reviewed Debt Authorization Language (§779(d)) | Reviewed Offering Statement | Aware of Act 116 or the "Illegally Made" language | Aware of the November 2017 AAFAF Brief | Retained Jones Day | Joined Bondholder Group | Included on Bondholder Group Signature Block | Earliest Date of Ultra Vires from Any Source | First Sought Advice Related to Ultra Vires Issues |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Redwood Master Fund Ltd.<br><br>**(Justin Boyer)[27]** | October 7, 2013; August 20, 2018 - January 29, 2019 | August 24, 2018 (78:17-23; 113:2-8) | August 24, 2018[28] | Reviewed the Offering Statement in 2018. (78:17-23) | Fall 2019[29] | March 2, 2020 (46:21-47:3) | Unknown. | Redwood joined the Bondholder Group in spring or summer 2019. (72:4-7) | July 15, 2019 (ERS Dkt. 652) | August 24, 2018[30] | Fall 2019[31] |
| SV Credit, L.P.<br><br>**(Shanshan Cao)[32]** | July 10, 2014 - January 25, 2017 | Read Enabling Act in connection with their first purchase in July 2014. (33:4-22) | February 10, 2015[33] | Prior to July 10, 2014 (33:4-16) | October 25, 2013[34] | November 2017 (62:10-18) | SV Credit retained Jones Day prior to their first purchase (77:4-12) | SV Credit was part of original Bondholder Group in May 2015. (93:14-94:3; (Delaney Ex. 5, Fourth Supp. Verified Statement of the ERS Secured Creditors Pursuant to Bankr. R. 2019, ERS Dkt. 652) ("In May 2015, certain of the ERS Secured Creditors . . . retained Jones Day to represent them. . . .") | May 26, 2017 (ERS Dkt.18) | February 2014[35] | February 2014[36] |

---

[27] Line cites to Dec. Ex. 27, Tr. of J. Boyer.
[28] Dec. Ex. 56, Dec. of Boyer at ¶4.
[29] Id. at ¶5.
[30] Id. at ¶3.
[31] Id. at ¶7.
[32] Line cites to Dec. Ex. 51, Tr. of S. Cao.
[33] Dec. Ex. 30, Dec. of Cao at ¶4.
[34] Id. at ¶5.
[35] Id. at ¶3.
[36] Id. at ¶7.

# Exhibit 20

# Exhibit 6

# UNIFORM COMMERCIAL CODE
## REVISED ARTICLE 8.  INVESTMENT SECURITIES

### OCTOBER 5, 1992 DRAFT

This Draft will be discussed at a meeting of the Article 8 Drafting Committee
in Chicago, Illinois on October 23-25, 1992.

### REPORTER'S PREFATORY NOTE

I. History of the Article 8 Revision.................................................i
  A. Drafting   History.........................................................i
  B. Need for Revision of Article 8—Evolution of Securities Holding and
    Trading Systems.........................................................ii
    1. The Traditional Securities Holding System ...........................iii
    2. The Uncertificated Securities System Envisioned by the 1977
      Amendments ......................................................iii
    3. Evolution of the Indirect Holding System............................iv
    4. Need for Different Legal Rules for the Issuer-Direct and Indirect
      Holding Systems ..................................................v
II. Summary of Revised Article 8................................................. vi
  A. Drafting Approach ..................................................... vi
  B. Organization of Revised Article 8 .....................................vii
  C. Direct Holding System ................................................viii
  D. Indirect Holding System .............................................. ix
    1. How Present Law Treats the Indirect Holding System ................. ix
    2. How Revised Article 8 Treats the Indirect Holding System............ ix
  E. Security Interests in Investment Property.............................. x
    1. General Approach of New Security Interest Rules..................... x
    2. New Terminology.................................................xii
    3. Attachment .....................................................xii
    4. Perfection......................................................xii
    5. Priorities.......................................................xiii
    6. Application of Revised Article 9 Rules .............................xiii
    7. Special Provisions on Registered Pledge Unnecessary...............xv

### PART 1.
#### SHORT TITLE AND GENERAL MATTERS

Section 8-101.  Short Title..................................................1
Section 8-102.  Subject Matter..............................................2
Section 8-103.  Security—Definition. ........................................3
Section 8-104.  Securities Account Entitlement—Definition.....................7
Section 8-105.  Other Definitions and Index of Definitions....................8
Section 8-106.  Appropriate Person..........................................14
Section 8-107.  Good Faith. ................................................15
Section 8-108.  Value.......................................................16
Section 8-109.  Adverse Claim..............................................17
Section 8-110.  Notice of Adverse Claim.....................................18
Section 8-111.  Clearing Corporation Rules...................................20
Section 8-112.  Creditors' Rights. ..........................................21
Section 8-113.  Contracts for Purchase and Sale of Securities.................21
Section 8-114.  Choice of Law. .............................................23

## PART 2.
## ISSUE—ISSUER

Section 8-201.  Issuer.................................................................27
Section 8-202.  Issuer's Responsibility and Defenses ...............................27
Section 8-203.  Staleness as Notice of Defects or Defenses.........................29
Section 8-204.  Effect of Issuer's Restrictions on Transfer. ......................30
Section 8-205.  Effect of Unauthorized Signature on Certificated Security or Initial
                Transaction Statement...............................................30
Section 8-206.  Completion or Alteration of Certificated Security or Initial
                Transaction Statement...............................................30
Section 8-207.  Rights and Duties of Issuer With Respect to Registered Owners.......31
Section 8-208.  Effect of Signature of Authenticating Trustee, Registrar, or
                Transfer Agent......................................................31
Section 8-209.  Issuer's Lien......................................................32
Section 8-210.  Effect of Overissue ...............................................32
Section 8-211.  Warranties to Issuers on Presentment for Payment or Exchange.......32

## PART 3.
## TRANSFER OF SECURITIES HELD DIRECTLY

Section 8-301.  Rights of Purchaser and Bona Fide Purchaser.........................34
Section 8-302.  "Bona Fide Purchaser."..............................................35
Section 8-303.  Delivery...........................................................35
Section 8-304.  Security Interest of Persons Delivering Certificated Securities........38
Section 8-305.  Indorsements.......................................................38
Section 8-306.  Instructions.......................................................39
Section 8-307.  Warranties on Transfer.............................................39
Section 8-308.  Signature Guaranty.................................................41
Section 8-309.  Special Signature Guaranty, Indorsement Guaranty, Instruction
                Guaranty...........................................................41
Section 8-310.  Purchaser's Right to Requisites for Registration of Transfer ..........42
Section 8-311.  Actions Against Brokers, financial intermediaries, and other
                Agents and Bailees. ...............................................42

## PART 4.
## REGISTRATION

Section 8-401.  Duty of Issuer to Register Transfer.................................45
Section 8-402.  Assurance that Indorsements and Instructions Are Effective............45
Section 8-403.  Wrongful Registration..............................................46
Section 8-404.  Replacement of Lost, Stolen or Destroyed Certificates ................49
Section 8-405.  Obligation to Notify Issuer of Lost, Stolen or Destroyed
                Certificates.......................................................50
Section 8-406.  Authenticating Trustees, Transfers Agents, Registrars ................50
Section 8-407.  Statements of Uncertificated Securities ............................51
Section 8-408.  Warranties to Issuers on Registration of Transfer. ...................52
Section 8-409.  Registered Owners Not Liable in Conversion.........................53

## PART 5.
## SECURITIES ACCOUNT ENTITLEMENTS

Section 8-501. When Securities Account Entitlement is Acquired..........................54
Section 8-502. Interest of Account Holders in financial assets and Securities
Account Entitlements Held by Financial Intermediary ....................55
Section 8-503. Obligations of Financial Intermediary to Account Holders...............57
Section 8-504. Obligation of Financial Intermediary to Comply with Account
Orders....................................................................................58
Section 8-505. Obligation of Financial Intermediary to Convert Account Holder's
Position to Other Form of Securities Holding.............................59
Section 8-506. Time and Manner of Financial Intermediary's Performance of
Obligations to Account Holder...............................................60
Section 8-507. Warranties to Financial Intermediaries. ...................................60
Section 8-508. Actions Against Account Holders. ........................................61
Section 8-509. Actions Against Financial Intermediaries. ...............................63
Section 8-510 Distribution in Insolvency of Financial Intermediary.....................67

## CONFORMING AMENDMENTS TO ARTICLE 9

Section 9-102. Policy and Subject Matter of Article...........................................68
Section 9-103. Perfection of Security Interest in Multiple State Transactions...........68
Section 9-105. Definitions and Index of Definitions. ......................................69
Section 9-106. Definitions: "Account" ...................................................70
Section 9-110. Sufficiency of Description...................................................70
Section 9-203. Attachment and Enforceability of Security Interest .....................71
Section 9-302. When Filing Is Required to Perfect Security Interest....................73
Section 9-304. Perfection of Security Interest in Instruments, Documents, and
Goods Covered by Documents .............................................73
Section 9-306. "Proceeds"...................................................................78
Section 9-312. Priorities Among Conflicting Security Interests in the Same
Collateral...................................................................79
Section 9-601. Subject Matter of Part 6....................................................79
Section 9-602. Definitions—Repurchase Agreement and Repo Claimant ...............81
Section 9-603. Control.....................................................................81
Section 9-604 Priority Among Conflicting Security Interests in the Same
Investment Property.......................................................85
Section 9-605. Priority Among Conflicting Repo Claimants to the Same
Investment Property.......................................................88
Section 9-606. Priority between Repo Claimants and Secured Parties...................89
Section 9-607. Priority Among Security Interests or Repo Claims and Account
Holders ..................................................................89
Section 9-608. Security Interests in All Securities Account Entitlements in an
Account ..................................................................96

| | |
|---|---|
| 1 | Part 2. |
| 2 | ISSUE—ISSUER |
| 3 | Reporter's Introductory Notes |
| 4 | to Part 2 |

5  Part 2 deals with the obligations and rights of the issuers of securities. Because the
6  current revision project is directed at securities holding systems, it does not seem
7  appropriate to undertake a major revision of the Part 2 rules. There are, however, at least
8  two significant issues that need to be considered.

9  1.  The introduction of the securities account entitlement concept seems to require
10  some adaptation of the Part 2 rules concerning defenses. The basic concept of Part 2 is to
11  apply to investment securities the principle of negotiable instruments law that an obligor is
12  precluded from asserting most defenses against purchasers for value without notice.
13  Present Section 8-202 describes in some detail which defenses issuers can raise against
14  purchasers for value and subsequent purchasers for value. Under present Article 8, these
15  rules can presumably be applied even to the indirect holding system, because current law
16  describes investors who hold through financial intermediaries as "purchasers" of the
17  security. Under Revised Article 8, investors who hold indirectly are not described as
18  purchasers of the security, but as purchasers of securities account entitlements. Thus, if a
19  municipality issues a bond in book entry only form, the only "purchaser" of that bond
20  would be the clearing corporation. The beneficial owners would hold securities account
21  entitlements, but would not the purchasers or subsequent purchasers of the bond itself.
22  The policy of precluding the issuer from asserting defenses is, however, equally
23  applicable. A complete solution to this problem would probably require a rather major
24  redrafting of the Part 2 rules. The Reporter questions whether this is feasible. Instead, the
25  Reporter suggests a "quick fix" solution, a draft of which is included as Revised Section
26  8-202(f).

27  2.  This draft includes the Reporter's suggestions for revision of the Part 4 rules
28  concerning statements of uncertificated securities. A major change suggested is that non-
29  written forms of statements of uncertificated securities be authorized. If that suggestion is
30  adopted, some of the Part 2 rules may also require revision. There are a number of
31  provision in current law that are patterned on negotiable instruments law rules that are not
32  readily adaptable to non-written items, such as the rules concerning the presumption of
33  authenticity of signatures, the effect of unauthorized signatures, and the effect of signing an
34  incomplete writing. Issues analogous to those addressed by these rules can arise in an
35  electronic environment. The Reporter has grave doubts, however, about the wisdom of
36  trying to address these issues by analogy to rules based on writings. For example, present
37  law distinguishes sharply between the effect of a writing on which the signature is forged,
38  and a writing on which the signature was genuine but which has been altered. See
39  §§ 8-205 & 206. There may be an electronic equivalent of the point captured by that
40  distinction, but it is far from clear that it can properly be addressed by tinkering with the
41  definition of "signature." Given how little experience we actually have with uncertificated
42  securities, the Reporter fears that any effort to write rules on these issues will cause more
43  problems than it solves. Accordingly, the Reporter suggests that where Article 8 has
44  provisions that are inherently related to writings, the provisions of present law specifying
45  analogous rules for uncertificated securities should simply be deleted, so that the issues
46  would have to be treated by agreements and common law concepts.

47  To facilitate review, the provisions of Part 2 of present law are set out below, marked
48  with strike-though and underline to show the changes made (other than changes in
49  subsection numbering style).