# UNITED STATES DISTRICT COURT
## DISTRICT OF PUERTO RICO

|  |  |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*,<br><br>Debtors.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br>(Jointly Administered) |
| THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO,<br><br>Plaintiff,<br><br>v.<br><br>AMBAC ASSURANCE CORPORATION, *et al.*,<br><br>Defendants. | Adv. Proc. No. 20-00003-LTS |

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801).

| | |
|---|---|
| THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO,<br><br>    Plaintiff,<br><br>        v.<br><br>AMBAC ASSURANCE CORPORATION, *et al.*,<br><br>    Defendants. | Adv. Proc. No. 20-00004-LTS |
| THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO,<br><br>    Plaintiff,<br><br>        v.<br><br>AMBAC ASSURANCE CORPORATION, *et al.*,<br><br>    Defendants. | Adv. Proc. No. 20-00005-LTS |

**DEFENDANTS' REPLY IN SUPPORT OF THEIR  MOTION TO COMPEL
DOCUMENT DISCOVERY FROM THE GOVERNMENT IN THE
<u>REVENUE BOND ADVERSARY PROCEEDINGS</u>**

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ................................................................................1

ARGUMENT .......................................................................................................2

I.   COLLECTING CUSTODIAL DOCUMENTS, INCLUDING E-MAILS, IS
     ENTIRELY CONSISTENT WITH THE RULE 56(D) ORDER. ....................2

     A.   Targeted Searches of Custodial Documents, Including E-Mails, Are Well
          Within the Scope of What Judge Swain Permitted.................................2

     B.   The Government Failed to Demonstrate That Defendants' Requested E-mail
          Production Poses an Undue Burden.......................................................5

II.  THE GOVERNMENT'S PROPOSED PRIFA-RELATED PRODUCTION WOULD
     NOT ADDRESS KEY ISSUES THAT JUDGE SWAIN IDENTIFIED..........................6

     A.   The Opposition Confirms That the Government Simply Wishes to Relitigate
          the Title III Court's Clear Ruling That a More Developed Record Concerning
          "the Nature and Location of the Infrastructure Fund" Is Needed.........................6

     B.   The Government Proposes to Produce Only Documents Concerning the
          "Use" of Accounting Designations, Not Their "Purpose," Nor Any Discovery
          Into the Accounting Treatment in General of Rum Taxes. ...................9

III. THE GOVERNMENT'S PROPOSED PRODUCTION WOULD NOT IDENTIFY
     THE ACCOUNTS REFERENCED IN CCDA BOND DOCUMENTS.........................11

IV.  THE GOVERNMENT'S PROPOSED HTA-RELATED PRODUCTION WOULD
     NOT ADDRESS KEY ISSUES THAT JUDGE SWAIN IDENTIFIED.......................12

     A.   Defendants Are Entitled to Additional Documents Concerning Treasury's
          Role in Approval of HTA Transfer Vouchers. ....................................12

     B.   The Government's Proposed HTA Accounting Production Is Insufficient to
          Meet Its Discovery Obligations. ........................................................15

     C.   The Government's Refusal to Locate Admittedly Discoverable Documents
          Governing the HTA Bonds Is Unacceptable.......................................18

V.   THE GOVERNMENT'S COMPLAINTS REGARDING THE PROPOSED ORDER
     HAVE EITHER BEEN ADDRESSED OR ARE MERITLESS. ...................19

CONCLUSION..................................................................................................20

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Assured Guar. Corp. v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight & Mgmt. Bd. for P.R.)*,
   2021 WL 805936 (1st Cir. Mar. 3, 2021)..........................................................................3, 13

*Bills v. Kennecott Corp.*,
   108 F.R.D. 459 (D. Utah 1985).............................................................................................14

*Nat'l Day Laborer Org. Network v. U.S. Immigr. & Customs Enf't Agency*,
   877 F. Supp. 2d 87 (S.D.N.Y. 2012)......................................................................................5

*Thomas v. City of New York*,
   336 F.R.D. 1 (E.D.N.Y. 2020)................................................................................................5

**Statutes and Rules**

S.D.N.Y. Local Rule 26.3(c)(2)...................................................................................................3

**Other Authorities**

Manual for Complex Litigation (Fourth) § 11.446.....................................................................14

**To the Honorable United States Magistrate Judge Judith Gail Dein:**

Defendants[2] submit this reply ("Reply") in further support of the Motion and in response to the *Response of the Government Entities and the Oversight Board to Defendants' Motion to Compel in Connection with the PRIFA, CCDA, and HTA Revenue Bond Adversary Proceedings* (ECF No. 16007) (the "Opposition" or "Opp."). Defendants state as follows:

## PRELIMINARY STATEMENT

1.      Rather than offer pragmatic ways to effectuate the discovery required by the Rule 56(d) Order, the Government devotes the bulk of its Opposition to rehashing its argument that the Title III Court should have granted its summary judgment motions *in toto*. The Opposition starts with a table that goes point-by-point through each topic on which Judge Swain found the lift stay record insufficient—and tries to create the impression that, contrary to Judge Swain's express findings, the record on those points was already adequate. Then, in several subsections on specific disputes, the Government argues that there really is no need for any additional discovery—Judge Swain's findings to the contrary notwithstanding.

2.      The merits of Judge Swain's ruling are not before the Court and should not be relitigated. The only question presented here is how to implement the Title III Court's call for additional discovery—in particular, how to balance Judge Swain's determination that a fuller factual record is needed with the directive that discovery should be efficient, targeted, and proportional. The Government offers no answer to that question, but Defendants do.

3.      Defendants have requested targeted searches of custodial documents (including e-mails) that would round out the limited record. Given that the Government has already searched

---

[2] Unless otherwise indicated, all ECF numbers herein refer to the docket in Case No. 17 BK 3283-LTS. Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Motion. Exhibits A-I are appended to the Motion; all other lettered exhibits are exhibits appended hereto.

its central files, simply repeating those same searches (as the Government proposes) would do nothing to resolve the gaps in the record that Judge Swain identified—and would be contrary to the directive that this discovery should not be duplicative of what was previously done. The productive path forward is searching custodial files (including e-mails) on topics where that is necessary, but doing so in a targeted and efficient way so that the process can be completed on time. That is exactly what Defendants seek, and for that reason, the Motion should be granted.

## ARGUMENT

**I.     COLLECTING CUSTODIAL DOCUMENTS, INCLUDING E-MAILS, IS ENTIRELY CONSISTENT WITH THE RULE 56(D) ORDER.**

**A.     Targeted Searches of Custodial Documents, Including E-Mails, Are Well Within the Scope of What Judge Swain Permitted.**

4.     As an initial matter, the Government makes no effort to explain why custodial documents *other than* e-mails should not be collected or produced. The Government has insisted it will not go beyond central files, but it offers no reason why it should not at least speak with the key individuals who are familiar with these matters and ask if they have any files that are not in central filing systems, such as their own hard copy files or electronic documents saved on their own workstation. Such collection efforts are common in litigation and in no way burdensome or expensive.

5.     The Government objects primarily to e-mails because, it maintains, a search through e-mails can never be "limited, targeted, proportional, and efficient." That is wrong. Defendants are seeking targeted e-mail searches, only on critical issues where the Government has already looked through central files and found nothing that resolves the summary judgment issues.

6.     In PRIFA, Defendants seek e-mails on two key topics from the Rule 56(d) Order: the nature and location of the Infrastructure Fund, and the accounting treatment of the Rum Tax Remittances. In CCDA, Defendants seek e-mails on one key issue: the identity of accounts

referenced in the bond documents.  Defendants in HTA seek e-mails on a similar handful of topics.
In each case, the search can be limited to key terms and custodians.

7.     The Government argues that Judge Swain could not have allowed e-mail discovery
because the Rule 56(d) Order "does not use the word 'communications' once."  (Opp. ¶ 10.)  But
Judge Swain repeatedly uses the word "Documents."  E-mails and other electronically stored
information are just one kind of "Document." *See, e.g.*, S.D.N.Y. Local Rule 26.3(c)(2).  The Title
III Court thus did not need to call for "communications" separately.  Nor was there any reason for
the Title III Court to frame the topics to specifically include or exclude "communications."
Rule 56(d) does not require a party to separately state whether e-mail searches will be needed.
Judge Swain addressed the high-level topics that Defendants presented—not specific discovery
requests or discovery disputes.  Rather than dictate the types of available discovery, Judge Swain
invited Defendants to "propound discovery requests directed to such topics."  (Rule 56(d) Order
at 7, 9, 11.)

8.     The Government's proposal—to re-search its central files—flouts Judge Swain's
express guidance that "the discovery authorized herein will not duplicate the discovery conducted
in connection with the" lift stay motions.  (*Id.*)  The Rule 56(d) Order plainly envisioned that the
Parties would focus discovery efforts on those sources that were not previously explored.

9.     The Government's reliance on this Court's comments denying e-mail discovery, in
the lift stay context, are equally misplaced.  (Opp. ¶ 12.)  On the merely procedural lift stay
motions, Judge Swain had explicitly limited the discovery to a handful of factual representations
the Government had put at issue in its lift stay briefs.  Now, the parties are at the merits stage,
where the Court has recognized "a more complete record" is necessary.  *Assured Guar. Corp. v.
Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, 2021 WL

805936, at *8 (1st Cir. Mar. 3, 2021).  Moreover, in the lift stay context, Defendants had requested e-mails to obtain parol evidence—and the Court's decision denying that request plainly was influenced by the "four corners" rule.

10.     The issue presented here is entirely different.  Judge Swain has ordered discovery on issues that the bond documents do not even purport to answer.  To take just one illustrative example, there is no dispute in the CCDA case that unambiguous provisions of the bond documents give CCDA bondholders a lien on the "Transfer Account."  But the Parties dispute, and the bond documents say nothing about, *which* specific bank account is the "Transfer Account."  Lift stay discovery revealed that there is no specific account titled the "Transfer Account."  Judge Swain found that "factual disputes" regarding the identity of the Transfer Account needed to be resolved, necessarily by extrinsic evidence.  E-mails are relevant to this issue, and to the corresponding factual disputes in the HTA and PRIFA cases.

11.     Nor are Defendants seeking merely "subjective state of mind" evidence.  (Opp. ¶ 13.)  E-mails are critical because they will contain the best contemporaneous evidence of the Commonwealth's *institutional* implementation of the bond documents—its course of conduct and on-the-ground implementation of these agreements.  If the Tourism Company's senior financial officers repeatedly referred in contemporaneous e-mails to a particular bank account as the "Transfer Account," and treated it as such in the Commonwealth's fiscal systems, that would be probative of the issue.  E-mails also could surface policies and procedures that are not otherwise located through central searches and help refresh the recollection of any individuals who may need to be deposed.  E-mails referencing the Infrastructure Fund or Excise Taxes in HTA's Fund 278 would be equally probative on the issues Judge Swain has identified.

**B.** **The Government Failed to Demonstrate That Defendants' Requested E-mail Production Poses an Undue Burden.**

12.     The Government fails to meet its "burden of showing [that e-mail discovery would cause] undue burden or expense." *Thomas v. City of New York*, 336 F.R.D. 1, 2 (E.D.N.Y. 2020). The Government makes no showing that e-mails are not readily accessible on active servers. It has submitted no declaration or even factual proffer of any unusual burden. That some effort is involved in providing discovery (Opp. ¶¶ 14-16) is not undue burden.

13.     The Government complains that the proposed order does not expressly limit production "to just a few custodians." (Opp. ¶ 15.) But Defendants asked that the Government provide a list of custodians and to meet-and-confer about them—even serving interrogatories seeking initial disclosures of knowledgeable individuals. The Government refused. The Government thus cannot complain that Defendants are not yet able to identify specific custodians with particularity.[3]

14.     In any event, pulling files for additional custodians merely involves some additional computer time to copy files and process them (a ministerial task routinely delegated to e-discovery vendors). The true determinant of the burden is how many "hits" need to be reviewed. The Parties can use search terms and "computer-assisted review" techniques to surface the key material. *Nat'l Day Laborer Org. Network v. U.S. Immigr. & Customs Enf't Agency*, 877 F. Supp. 2d 87, 109

---

[3] The Government also has stonewalled Defendants' inquiries seeking to determine, among other very basic things, "the time period for which the Government stores e-mail and the systems in which it is maintained" and "any analysis the Government has conducted to date of search term hits." (Ex. L, Ltr. from John J. Hughes, III to Elizabeth L. McKeen, et al., dated Feb. 28, 2021, at 4.) Refusing to engage, the Government instead responded without explanation that "[t]he probative value of email discovery is minimal" and vaguely alluding to the "time and effort involved." (Ltr. from Elizabeth L. McKeen and Michael A. Firestein to John J. Hughes, III et al., dated Mar. 4, 2021, ECF No. 16007-1 at 2-3.) In refusing to participate in meaningful meet-and-confers about a narrow scope, the Government is blocking Defendants from the "targeted, proportional, and efficient" review ordered by the Title III Court. (Rule 56(d) Order at 6.)

(S.D.N.Y. 2012) ("[P]arties can (and frequently should) rely on . . . machine learning tools[,]" which "can significantly increase the effectiveness and efficiency of searches.").

15.   Once custodians are identified, the Government's counsel could pull their e-mails, process, search, and review them, and produce the responsive data in a matter of 2-3 weeks (or less). An e-mail review can be completed quickly using contract attorneys (as the Government has done in past e-mail reviews) or managed review firms capable of staffing quickly.

16.   Moreover, since the Government submitted its proposed schedule on February 3 (which the Court accepted), the Board has adjourned the time to submit a schedule for a disclosure statement hearing by about two months. Defendants are confident the requested discovery can be provided well within the timeframe the Court has already allowed, but even if there were some slight slippage, the Government would not be prejudiced.

17.   The Government's claims that e-mail review is too expensive are equally baseless. There are three separate adversary proceedings, each seeking to nullify *billions* of dollars in debt, with potential consequences of enormous public significance. The fact that the Government incurred some expense conducting reviews in other cases does not excuse it from its obligations here, especially when the Government is the party seeking a merits judgment.

## II.   THE GOVERNMENT'S PROPOSED PRIFA-RELATED PRODUCTION WOULD NOT ADDRESS KEY ISSUES THAT JUDGE SWAIN IDENTIFIED.

### A.   The Opposition Confirms That the Government Simply Wishes to Relitigate the Title III Court's Clear Ruling That a More Developed Record Concerning "the Nature and Location of the Infrastructure Fund" Is Needed.

18.   The Government's discussion of Defendants' request for discovery into "the nature and location of the Infrastructure Fund" underscores—more clearly than the Government's response on any other PRIFA topic—that the Government is effectively asking this Court to partially overturn the Rule 56(d) Order. The Government does not dispute that its proposal to

- 6 -

search through central files again is entirely duplicative of the search it conducted "in connection

with the PRIFA Lift Stay Motion." (Opp. ¶ 19.) And it does not point to *a single* new document

that it is willing to produce about the Infrastructure Fund. Instead, the Government simply

describes the search it previously did (Opp. ¶¶ 19-21) and reiterates its position (rejected by Judge

Swain) that nothing more is needed.

19.     Judge Swain's decision to authorize discovery on this topic recognized that it is

likely to be *the* critical factual dispute in the PRIFA case. Defendants' Rule 56(d) Declaration in

the PRIFA case contained an entire section on this topic—under the all-caps title "Discovery Is

Needed to Determine the Nature and Location of the Infrastructure Fund and Identify Restrictions

Placed Upon Moneys Therein." (PRIFA AP, ECF No. 82, at 12.) That section listed numerous

sub-topics. Judge Swain copied that section heading nearly verbatim into the Rule 56(d) Order—

endorsing Defendants' contentions regarding the need for discovery addressed therein.

20.     The Government nevertheless claims the record is sufficient and Defendants "just

do not like" what the record shows. (Opp. ¶ 19.) In fact, the opposite is true: The Title III Court

was not persuaded that the Government was entitled to judgment as a matter of law (without getting

into factual issues), nor that the existing factual record was so clear-cut that it could simply decide

the issues. Discovery in this posture, if anything, only helps the Government because *it* (not

Defendants) has the burden of showing that there are no disputed fact issues to be sorted out.

21.     In any event, the Government's merits arguments (reprised in its Opposition) reflect

a basic confusion about the issues Defendants have raised (and on which Judge Swain has allowed

discovery). The Government repeatedly equates the "Infrastructure Fund" with specific bank

accounts. (Opp. ¶ 21.) But Defendants have long argued, based on expert testimony and

documentary evidence, that the Commonwealth uses "fund accounting" to track monies in separate

"special funds"—which are accounting designations tracked on the Commonwealth's general ledger, not separate bank accounts. (Holder Report, HTA AP, ECF No. 96-1, at ¶¶ 2, 4, 46.)

22.     Because of this disconnect—the Government focused on bank accounts, when the issue is actually accounting designations—the Government does not appear to realize that all of the prior discovery it touts actually has nothing to do with the issue on which Defendants were permitted to seek discovery. The Government's lengthy chart lists just three categories of prior discovery regarding the Infrastructure Fund. (Opp. at 6 (item (iv) on chart).) One of those is a set of bank account statements and similar documents. But not one of those bank account statements contains the words "Infrastructure Fund," which is unsurprising because the fund is an accounting designation, not a bank account.

23.     The Government also touts that it provided a single Rule 30(b)(6) deposition and prepared a "flow" of funds chart *of bank accounts* for the deposition. The relevant excerpts from both are attached, so the Court can see for itself how threadbare this discovery is. (Ex. M, Government's 3-21-2020 Letter PRIFA Flow of Funds; Ex. N, excerpts of Deposition of Timothy H. Ahlberg, as corporate designee of the Commonwealth and PRIFA).) Neither the deposition nor the chart meaningfully addresses the accounting issues (as opposed to cash bank accounts); both are inadmissible hearsay (the witness testified to what he had been told, not any personal knowledge (*see* Ex. N at 309:19-311:4)); and both disclose little more than the Government's *post hoc* litigation position.

24.     By contrast, e-mails, and other custodial documents, can provide contemporaneous evidence illuminating which accounting designations the Commonwealth used to track the "Infrastructure Fund." At a minimum, it will provide the best (if not, only) evidence of how the Infrastructure Fund was implemented in practice. The Government concedes there is nothing in

its central files on this point.  That the Commonwealth has failed to maintain adequate central files

on fiscal matters[4] leaves the parties no other option but to look to custodial documents for answers.

> **B.    The Government Proposes to Produce Only Documents Concerning the
> "Use" of Accounting Designations, Not Their "Purpose," Nor Any Discovery
> Into the Accounting Treatment in General of Rum Taxes.**

25.    The Opposition further confirms that the Government's proposed production will

not address key portions of the authorized "[d]iscovery relating to the accounting treatment of Rum

Tax Remittances in general, including the use and purpose of account designations [and] fund

codes[.]"  (Rule 56(d) Order at 8.)  The Government offers only to (i) "search for any policies and

procedures relating to accounting treatment of the Rum Tax Remittances" and (ii) check "whether

Treasury has . . . fund account statements[.]"  (Opp. ¶ 26.)  But the fund account statements (and

export of data from PRIFAS) will show only the flow of money through different accounting

designations, not the "*purpose*" of those designations or any context around them.

26.    Policies and procedures might contain some indication of the purpose of the

accounting designations—but repeating the previous search through central files will not uncover

anything new.  Such documents can be located, however, through a custodial search.  The U.S.

Treasury paid tens of millions in Rum Tax Remittances to the Commonwealth at a time.  Large

incoming revenues like that, subject to specific legal requirements, receive special handling as

"exceptional items" by accounting personnel.  The Commonwealth's senior fiscal officers almost

certainly provided specific instructions to accountants and bookkeepers as to accounting

---

[4] (*See, e.g.*, Ltr. from Natalie A. Jaresko, Executive Director of the Financial Oversight and Management
Board, to Luis M. Collazo Rodríguez, Executive Director of the Retirement Administration, dated Feb. 3,
2021, at 2 (noting that "the accounting records for PayGo obligations are not entirely complete or accurate,
which [FOMB] discussed many times with the Retirement Administration, AAFAF, the Department of
Treasury, and OMB" and that "much of the information currently available for the evaluation of PayGo
costs is severely outdated") (*available at* https://oversightboard.pr.gov/documents/).)

designations to be used to properly track such revenues. E-mails would reveal such instructions and procedures.

27.     Moreover, KPMG (the Commonwealth's auditor) had to review the accounting of Rum Tax Remittances every year because the revenue stream is described at length in audited financial statements—with the language often changing slightly, reflecting annual reviews and updates. Auditors like KPMG generally submit questions to the senior fiscal officers and receive written responses (usually via e-mail), with supporting documentation validating the accounting treatment. Identifying the key senior fiscal officers who provided direction to accountants and bookkeepers, and who responded to questions from KPMG, would provide real context around how the Commonwealth accounted for and tracked rum taxes—exactly what the Rule 56(d) Order identified as a topic for discovery.

28.     The Government's argument that Defendants "expressly requested" audit work papers, and that Judge Swain did not grant that request (Opp. ¶ 5) is simply wrong. As noted, Judge Swain copied nearly verbatim the heading of an entire section from Defendants' Rule 56(d) declaration—and *also* expressly authorized "[d]iscovery relating to the accounting treatment of Rum Tax Remittances in general." (Rule 56(d) Order at 8.) Audit communications are the best place to obtain discovery into the accounting treatment in general.

29.     Finally, the Government's recycled claim that lift stay discovery was sufficient fares no better here than elsewhere. (Opp. ¶ 25.) The Government points to Treasury Regulation 49, but that gives nothing more than a general overview of fields within PRIFAS—and says nothing of the Rum Tax Remittances. (*See* Ex. O, Treasury Regulation 49, at CW_STAY0009754-9756.) The PRIFAS workbook and PRIFAS data export also merely list "codes," but gives no meaningful context around the "use" or "purpose" of those codes in the broader accounting

framework.  The context is critical, because codes like "R4220" or "fund 111" are meaningless standing alone.  A targeted e-mail search will allow the Title III Court to understand how codes correspond to particular "special funds," or other accounting entities, to which Defendants have legal rights.

### III.    THE GOVERNMENT'S PROPOSED PRODUCTION WOULD NOT IDENTIFY THE ACCOUNTS REFERENCED IN CCDA BOND DOCUMENTS.

30.    The Government ignores Judge Swain's holdings in the CCDA case—arguing that Defendants seek discovery because they "would prefer" for the factual record to be different than it is.  (Opp. ¶ 32.)  But Judge Swain analyzed the record and concluded that *Defendants*, not the Government, had colorable claims.  Judge Swain concluded that there were unresolved "factual disputes" regarding the identity of the Transfer Account and Surplus Account—which necessarily means that, on the record as it stands, the Government's summary judgment motion would fail. Summary judgment cannot be granted when material fact disputes remain.  (*Opinion and Order in Connection with Preliminary Hearing Regarding Motion Concerning Application of the Automatic Stay to the Revenues Securing the CCDA Bonds* (the "CCDA Lift Stay Opinion"), ECF No. 13540, at 32.)

31.    Given this context, the Government's proposal—to merely produce the same "flow of funds" discovery that it previously produced, just for a broader time period (Opp. ¶ 31)—would accomplish little.  Judge Swain found "factual disputes" based in part on "flow" evidence— specifically, that "extraneous distributions appear to have been made from GDB -9758," (CCDA Lift Stay Opinion at 32) undermining the Government's claim that that account was the Transfer Account.  But Judge Swain also heavily emphasized the absence of documents on certain key points, noting that "there are no documents referring to any of the relevant accounts as the

- 11 -

'Transfer Account,'" and "no evidence in the record to corroborate the Oversight Board's assertions regarding" GDB -9758.  (*Id.*)

32.     The Government's proposal ignores this analysis entirely.  The Government's proposal would not surface any additional "documents referring to any of the relevant accounts." Instead, it would merely extend the time period for the "flow" of funds analysis.  Collecting custodial documents, including e-mails, from the key personnel likely would yield a key set of documents referring to the relevant accounts by name.  It is likely that Tourism Company personnel reviewed their obligations under the bond documents from time to time and discussed them.  Even if no policies or procedures are found, contemporaneous e-mail discussions may refer to the accounts—and provide probative evidence of which account was the Transfer Account.

33.     That the Government has "consulted with" certain individuals to obtain "flow" of funds evidence only confirms the need for discovery from individuals.  Defendants cannot be limited to simply receiving the Government's self-serving litigation positions.  They need a meaningful opportunity to obtain contemporaneous evidence on these disputed points.

## IV.    THE GOVERNMENT'S PROPOSED HTA-RELATED PRODUCTION WOULD NOT ADDRESS KEY ISSUES THAT JUDGE SWAIN IDENTIFIED.

### A.    Defendants Are Entitled to Additional Documents Concerning Treasury's Role in Approval of HTA Transfer Vouchers.

34.     The Government misleadingly suggests it has agreed to provide the discovery Judge Swain authorized concerning the HTA voucher process.  (Opp. ¶ 39.)  But beyond the limited documents produced in the lift stay proceeding, the Government makes only an empty offer to search for policies governing the transfer voucher process, (*id.*), in the *same central files* already searched, without undertaking *any* search for electronic communications.  *See supra* Section I. This flouts Judge Swain's directive to produce "[d]ocuments concerning the Treasury's role in the

approval of transfers to HTA and the extent to which excise tax revenues were or have been made available to HTA."  (Rule 56(d) Order at 11.)[5]

35.     The limited set of documents previously produced does not permit Defendants to test whether the Commonwealth implemented HTA-approved transfer vouchers as a matter of course, rending their countersignature automatic and ministerial.  (Motion ¶ 62.)  The import of and reason for the Commonwealth signature on the SC-735 transfer vouchers and other transfer authorizations is not evident on the face of any previously produced vouchers and transfer documents.   A complete set of relevant policies, procedures, instructions, and memoranda concerning Treasury's role in the transfer approval process, which may well appear in non-central files or electronic communications, are needed for a complete record.   For example, in the lift stay proceeding, the Government produced one Treasury Circular Letter but failed to produce a second one that specifically addressed the Commonwealth's delegation to HTA of authority to approve transfers of Excise Taxes from Fund 278 through the voucher request system.  (*See* Treasury Circular No. 1300-1-99, Natbony Decl. Ex. 45, HTA AP, ECF No. 98-47, at 28-29 (Annex 3).)  Defendants independently located the second Treasury Circular through internet searches.   The failure of the Government's prior search to locate such an important and relevant policy/instruction

---

[5] The Government attempts to sugar-coat their empty promise by arguing that they have no obligation to search for any additional documents, including electronic communications, based on the mistaken notion that Judge Swain already ruled on the issue of whether HTA exercised plenary control over Fund 278. (Opp. ¶ 40.)  That is absolutely untrue.  While Judge Swain held that the limited record in the lift stay proceedings did not at that time establish that HTA had plenary control over Fund 278, it is precisely that issue that Judge Swain has now directed that a more complete record be assembled and presented in the summary judgment proceedings.  (Rule 56(d) Order at 11.)  Both Judge Swain and the First Circuit have unambiguously recognized that the lift stay decision is not a controlling merits decision and a more complete record must now be presented to the Title III Court.  (*Memorandum Opinion and Order Denying HTA and PRIFA Revenue Bond Stay Relief Motions*, ECF No. 14186, at 12 n.13); *Assured Guar. Corp.*, 2021 WL 805936, at *8.  That cannot be done without the necessary discovery requested.

illustrates the limited nature of the Government's lift stay discovery production and prior central
file search efforts.  What other policies, instructions, and procedures exist, and where?

36.    The Government's offer to answer questions about the voucher process in
interrogatories and depositions in lieu of e-mail or document searches is insufficient.  (Opp. ¶ 40.)
They are no replacement for Judge Swain's directive that the documents concerning Treasury's
role in the process be produced. (Rule 56(d) Order at 11); *see also Bills v. Kennecott Corp.*, 108
F.R.D. 459, 462 (D. Utah 1985) ("Computers have become so commonplace that most court battles
now involve discovery of some type of computer-stored information . . . .  [T]he requested party
most often has no reasonable choice other than to produce the documentation . . . ."); Manual for
Complex Litigation (Fourth) § 11.446 (Discovery of electronic data such as e-mails is
"commonplace" and "routine and within the commonly understood scope of Rules 26 and 34").

37.    Moreover, Defendants will agree to targeted word searches of pertinent custodians.
For example, officials César M. Gandiaga Texidor and Luis K. Santiago Reyes appear to have
signed a majority of the SC-735 vouchers produced so far.  (*See, e.g.*, Natbony Decl. Exs. 36-39,
42, 44, HTA AP, ECF Nos. 98-38–98-41, 98-44, 98-46.)  And the transfer instructions to the banks
from the Commonwealth were primarily signed by Treasury official Ana Garcia Noya.[6]  (*See, e.g.*,
Natbony Decl. Ex. 41, HTA AP, ECF No. 98-43, at 7 (trans. at 21).)  Further, Hector R. Gomez
and Lizette Gonzalez Reyes appeared to have entered those electronic transfers into the
Commonwealth's accounting system.[7]  (*See, e.g.*, *id.* at 2 (trans. at 16), 5 (trans. at 19).)  Searches

---

[6] Additional transfer instructions were signed by officials Diana Vazquez Morales, (*e.g.*, Natbony Decl. Ex.
37, HTA AP, ECF No. 98-39), Jayson O Padilla Morales, (*id.*), Brenda Vazquez Rodriguez, (*e.g.*, Natbony
Decl. Ex. 40, HTA AP, ECF No. 98-42), and Yaimé M. Rullán Cabrera.  (*Id.*)  At this time, for efficiency,
Defendants request only a search of these additional individuals' hard-copy files, not e-mails.

[7]  Additional signatories for  HTA appear to have included "MLR" (Natbony Decl. Ex. 43, HTA AP, ECF
No. 98-45, at 9 (trans. at 49)) and Juan M. De Jesus Ayuso (*id.* at 15 (trans. at 55)).  At this time, for
efficiency, Defendants request only a search of these additional individuals' hard-copy files, not e-mails.

targeted to these individuals, who are known to be intimately involved in the transfer process at issue, with appropriate search terms, are likely to yield the types of documents Defendants seek (and Judge Swain ordered). The Government's position, in contrast, is that they will not search beyond its central files, and not for *any* electronic communications, from *any* custodians, on *any* topic. Allowing the Government to unduly limit its search, and exclude searching the files of even the most involved individuals on this issue, is plainly inadequate.

### B. The Government's Proposed HTA Accounting Production Is Insufficient to Meet Its Discovery Obligations.

38.     Defendants contend that Excise Taxes were and are held in trust by the Commonwealth Treasury for HTA and its bondholders, and were "received" by HTA, based on the facts and circumstances here: a statutory scheme (the Excise Tax Statutes), and a taxing authority (the Commonwealth) that has agreed to collect and hold separate specific revenues streams (the Excise Taxes) for the benefit of a bond issuer (here, HTA) to secure and repay its bonds. In these situations, governments establish a system of fiscal and accounting controls and reporting over the flow of funds passing through and held in government bank accounts. (Holder Report at 3-4.) The Commonwealth used a "special revenue fund" (Fund 278 and its HTA subaccounts) to account for a flow of funds (Excise Taxes) in and through its bank accounts, it designated and treated Fund 278 as "restricted," and the Commonwealth and HTA treated Excise taxes recorded in Fund 278 as if they were held for HTA and its bondholders.

39.     The Government has run out of excuses. Fund 278, as an accounting entity, is governed by the accounting standards adopted by the Commonwealth and HTA and therefore fall within the topic "[a]ll documents governing the flow of Excise Taxes . . . including Fund 278 and its sub-accounts." (Rule 56(d) Order at 11.) They must produce Commonwealth and HTA "policies and procedures related to the flow of Excise Taxes" through Fund 278, and that reflect

"the flow of funds into and account of Fund 278." (*See id.*)  And, the relevant period includes the period prior to the clawback in 2015, not just after.  (*Id.*)  Because the governing accounting standards and policies and procedures for the relevant Fund 278 subaccounts and Excise Taxes are at issue, Defendants seek primarily the following Commonwealth and HTA accounting and financial documents:  (a) accounting policies and procedure manuals (which may be a collection of documents); (b) vouchers or other authorizing documents for the transfer or expenditure of Excise Taxes recorded in Fund 278; (c) accounting or journal entries; (d) chart of accounts for Fund 278 (which is a report of fund accounts and their purpose); (e) instructions governing the flow of funds (*e.g.*, the receipt, transfer, expenditure and reporting of Excise Taxes); and (f) audit documents pertaining to the Commonwealth or HTA's policies and procedures and governing accounting standards for Fund 278 and the Excise Taxes.  Such admissions and supporting evidence will be highly probative.  As discussed in connection with the PRIFA-related points, auditors generally rely upon representations, communications and policies communicated to them in connection with the preparation of financial statements; such documents that speak directly to restrictions on the Excise Taxes are likely to exist and are directly relevant to the Flow of Funds.

40.    Defendants expect that these documents are held by the relevant Treasury management personnel (*e.g.*, finance and accounting/comptroller) charged with flow of fund responsibilities for the Fund 278 subaccounts and the Excise Taxes.

41.    The Government has agreed only to provide from the Commonwealth an export of data from PRIFAS to "investigate whether the government has…fund account statements," (which will simply confirm that Fund 278 subaccounts are "restricted"), and "search for any policies and procedures, including memoranda, instructions, or similar documents, relating to Fund 278," but without searching beyond its central files and without providing the above documents that actually

will contain the information ordered to be produced by Judge Swain, *e.g.*, the governing standards and policies and procedures for Fund 278 and the Excise Taxes.  (Opp. ¶ 37.)

42.     For example, the requested audit documents pertaining to governing standards and policies and procedures for the flow of funds through Fund 278 and the Excise Taxes obviously will disclose responsive documents within the topics authorized by Judge Swain.  Indeed, they are the most likely place to look.  They also will no doubt contain an inquiry concerning legal restrictions on governmental funds, including trusts.  (Motion ¶¶ 47-48.)  For example, the Commonwealth's financial statements represented that "the Commonwealth pledged . . . gasoline excise taxes . . . diesel oil excise taxes . . . and . . . motor vehicle license fees for the repayment of the PRHTA Revenue Bonds."[8]  The Government does not want internal and external audit documents disclosed when they inevitably will contain admissions concerning governance over the flow of Excise Taxes, but they must be produced, along with the other requested documents.

43.     That production is critical given the importance of the documents sought and the paucity of the Commonwealth's production to date.  For example, the Government argues the Commonwealth produced a "[s]ummary reporting for revenues that have the "Fund 278" accounting designation," "[f]low of funds document summarizing flow of excise tax revenues," and "[a]ll available bank account statements," but that production was scope-limited to bank accounts or only came from HTA's files.  (Opp. ¶ 8 (table at 10).)

44.     The situation is even worse for HTA—which refuses to produce any accounting discovery.  (Opp. ¶ 44.)  But Defendants have shown responsive HTA accounting documents exist. They include damning evidence that Excise Taxes recorded in Fund 278 did not belong to the Commonwealth but was HTA's "own" income (*e.g.*, Natbony Decl. Ex. 31 at 394, HTA AP, ECF

---

[8]  Comprehensive Annual Financial Report Year Ended June 30, 2010 at 119, Note 10, http://hacienda.gobierno.pr/downloads/pdf/cafr/FINANCIAL_REPORT_2010.pdf.

No. 98-57), and, as further established in Defendants' 56(d) declaration, "HTA bank accounts are, as a factual matter, [still] receiving hundreds of millions of dollars of Excise Taxes on an annual basis from the Commonwealth."  (*See* HTA AP, ECF No. 97, at ¶ 56; *see also* Natbony Decl. Ex. 55, HTA AP, ECF No. 98-57 (Treasury spreadsheet documenting "Outflows from TSA to PRHTA").)  The same set of documents described above should be produced from HTA's files as required by the Court's 56(d) Order.

45.     The Commonwealth and HTA purport to comply with governing accounting standards that require organized systems and processes to ensure compliance with all legal obligations.  It should be relatively simple, and the Government should be required, to timely identify reports, ledgers, statements, schedules, reconciliations, compilations, charts of accounts, policies, procedures, controls or other tabulating, summarizing, or governing documents that may be produced from PRIFAS or other internal control systems "related to the flow of Excise Taxes and HTA Pledged Revenues," "concerning the Treasury's role in the approval of transfers to HTA," and "reflecting the flow of funds into and out of Fund 278."  (Rule 56(d) Order at 11.) Instead, the Government seeks to hide the ball.

**C.     The Government's Refusal to Locate Admittedly Discoverable Documents Governing the HTA Bonds Is Unacceptable.**

46.     The Rule 56(d) Order authorized discovery with respect to "[a]ll documents governing the HTA bonds, including all versions of the Bond Resolutions . . . ."  (Rule 56(d) Order at 11.)  As Defendants previously established in the Motion, the Bonds are governed by documents other than the previously produced bond resolutions, including two supplemental resolutions that pledged two revenue streams.  (*See* Motion ¶ 43.)  Additionally, the Government concedes, as it must, that the HTA Executive Director's authority to enter into the 2002 Security Agreement is discoverable.  (*See* Opp. ¶ 34; Opp. Ex. 1 at 13-14.)  But it has only "agreed" to "search [in its

- 18 -

central files] for any documents delineating the scope of the Executive Director's authority to enter

into a security agreement" and produce them "if it finds any."  (*See id*.)  The Government should

be compelled also to search for documents concerning the Executive Director's discussions with

the Board about, and the Board's decision to enter into, the 2002-04 Resolution and the Security

Agreement.  Further, that search must be reasonable: rather than merely returning to the same

empty well of GDB archives and "central" files, (*see* Joint Status Report ¶ 50), the Government

should be compelled to identify HTA personnel with knowledge and search the *places* where the

documents might actually be found—including the files and e-mail of the Executive Director and

other personnel likely to have them.  *See supra* Section 1.A.  This type of discovery, which was

unavailable to Judge Swain at the lift stay phase, would "demonstrate[] the connection" between

the 2002 Resolution and the 2002 Security Agreement and is now required by the Rule 56(d)

Order.  (ECF No. 13541, at 35.)

## V.   THE GOVERNMENT'S COMPLAINTS REGARDING THE PROPOSED ORDER HAVE EITHER BEEN ADDRESSED OR ARE MERITLESS.

47.     The Government criticizes Defendants' proposed order in several respects that do

not involve material disputes between the parties.  Defendants therefore submit as Exhibit J a

revised proposed order that addresses those quibbles, specifically:  (i) Defendants clarify they do

not seek accounting-related discovery for CCDA; (ii) Defendants clarify they do not seek a list of

"every type of report that could conceivably be generated," but rather an efficient meet-and-confer

process regarding what information is available, and (iii) Defendants increase the Government's

time to identify custodians to five business days (Defendants will still submit their proposed search

terms in two).  (*See* Ex. J (new proposed order), Ex. K (redline).)

48.     The Government's remaining complaints are meritless:

49.   **Ongoing Meet-and-Confers.**  The parties are continuing to meet-and-confer and the order does not address any points on which the parties do not have ripe disputes.  The proposed order, as drafted, does not exhaustively address each of the topics on which discovery was authorized for PRIFA, HTA, and CCDA; rather, it addresses only the ripe and concrete disputes presented to the Court.

50.   The Government asked the Court in the February 3 Status Report[9] to require Defendants to serve all document discovery requests up front, and to raise all disputes shortly thereafter.  (February 3 Status Report ¶ 50.)  The Court did not adopt this proposal, for good reason:  Discovery is ongoing.  Follow-up requests are permitted.  The Parties are continuing to discuss certain issues.  Indeed, the Government agreed in the last status report that Defendants' motion to compel would be limited to "any issues as to which the Parties have reached an impasse."  (Joint Status Report ¶ 10.)  There is thus no basis for suggesting Defendants have no right to present additional disputes if the Parties reach an impasse.

51.   **Subpoenas.**  The Government also complains about certain third-party subpoenas.  (Opp. ¶ 2 n.3.)  They are not before the Court at this time.  Defendants continue to meet-and-confer with all of the subpoena recipients regarding scope and timing.

## CONCLUSION

52.   For the foregoing reasons, the Motion should be granted and the Court should enter the Proposed Order attached as Exhibit J hereto.

---

[9] "February 3 Status Report" refers to the *Joint Status Report of Ambac Assurance Corporation, Financial Guaranty Insurance Company, Assured Guaranty Corp., Assured Guaranty Municipal Corp., National Public Finance Guarantee Corporation, The Bank of New York Mellon, U.S. Bank Trust National Association, and the Financial Oversight and Management Board for Puerto Rico, as Representative of the Commonwealth of Puerto Rico, Pursuant to the Court's January 20, 2021 Order* (ECF No. 15801).

Dated:  March 12, 2021
            San Juan, Puerto Rico

**FERRAIUOLI LLC**

By: /s/ *Roberto Cámara-Fuertes*
    Roberto Cámara-Fuertes (USDC-PR No. 219002)
    Sonia Colón (USDC-PR No. 213809)
    221 Ponce de León Avenue, 5th Floor
    San Juan, PR 00917
    Telephone: (787) 766-7000
    Facsimile:  (787) 766-7001
    Email:  rcamara@ferraiuoli.com
        scolon@ferraiuoli.com

**MILBANK LLP**

By: /s/ *Atara Miller*
    Dennis F. Dunne (admitted *pro hac vice*)
    Atara Miller (admitted *pro hac vice*)
    Grant R. Mainland (admitted *pro hac vice*)
    John J. Hughes, III (admitted *pro hac vice*)
    Jonathan Ohring (admitted *pro hac vice*)
    55 Hudson Yards
    New York, NY 10001
    Telephone: (212) 530-5000
    Facsimile:  (212) 530-5219
    Email: ddunne@milbank.com
        amiller@milbank.com
        gmainland@milbank.com
        jhughes2@milbank.com
        johring@milbank.com

*Attorneys for Ambac Assurance Corporation*

**REXACH & PICÓ, CSP**

By: /s/ *María E. Picó*
    María E. Picó
    (USDC-PR No. 123214)
    802 Ave. Fernández Juncos
    San Juan, PR 00907-4315
    Telephone: (787) 723-8520
    Facsimile: (787) 724-7844
    Email: mpico@rexachpico.com

**BUTLER SNOW LLP**

By: /s/ *Martin A. Sosland*
    Martin A. Sosland (admitted *pro hac vice*)
    2911 Turtle Creek Blvd., Suite 1400
    Dallas, TX 75219
    Telephone: (469) 680-5502
    Facsimile: (469) 680-5501
    Email: martin.sosland@butlersnow.com

    James E. Bailey III (admitted *pro hac vice*)
    Adam M. Langley (admitted *pro hac vice*)
    6075 Poplar Ave., Suite 500
    Memphis, TN 38119
    Telephone: (901) 680-7200
    Facsimile: (901) 680-7201
    Email: jeb.bailey@butlersnow.com
        adam.langley@butlersnow.cow

*Attorneys for Financial Guaranty Insurance Company*

**ADSUAR MUNIZ GOYCO SEDA & PEREZ-OCHOA PSC**

By: /s/ *Eric Pérez-Ochoa*
    Eric Pérez-Ochoa
    (USDC-PR No. 206314)
    Email: epo@amgprlaw.com

By: /s/ *Luis A. Oliver-Fraticelli*
    Luis A. Oliver-Fraticelli
    (USDC-PR No. 209204)
    Email: loliver@amgprlaw.com

    208 Ponce de Leon Ave., Suite 1600
    San Juan, PR 00936
    Telephone: (787) 756-9000
    Facsimile: (787) 756-9010

**WEIL, GOTSHAL & MANGES LLP**

By: /s/ *Robert S. Berezin*
    Jonathan D. Polkes (admitted *pro hac vice*)
    Gregory Silbert (admitted *pro hac vice*)
    Robert S. Berezin (admitted *pro hac vice*)
    Kelly DiBlasi (admitted *pro hac vice*)
    Gabriel A. Morgan (admitted *pro hac vice*)
    767 Fifth Avenue
    New York, NY 10153
    Telephone: (212) 310-8000
    Facsimile: (212) 310-8007
    Email: jonathan.polkes@weil.com
        gregory.silbert@weil.com
        robert.berezin@weil.com
        kelly.diblasi@weil.com
        gabriel.morgan@weil.com

*Attorneys for National Public Finance Guarantee Corp.*

**CASELLAS ALCOVER & BURGOS P.S.C.**

By: /s/ *Heriberto Burgos Pérez*
    Heriberto Burgos Pérez
    (USDC-PR No. 204809)
    Ricardo F. Casellas-Sánchez
    (USDC-PR No. 203114)
    Diana Pérez-Seda
    (USDC-PR No. 232014)
    P.O. Box 364924
    San Juan, PR 00936-4924
    Telephone: (787) 756-1400
    Facsimile: (787) 756-1401
    Email: hburgos@cabprlaw.com
        rcasellas@cabprlaw.com
        dperez@cabprlaw.com

**CADWALADER, WICKERSHAM & TAFT LLP**

By: /s/ *Howard R. Hawkins, Jr.*
    Howard R. Hawkins, Jr. (admitted *pro hac vice*)
    Mark C. Ellenberg (admitted *pro hac vice*)
    William J. Natbony (admitted *pro hac vice*)
    Thomas J. Curtin (admitted *pro hac vice*)
    Casey J. Servais (admitted *pro hac vice*)
    200 Liberty Street
    New York, NY 10281
    Telephone: (212) 504-6000
    Facsimile: (212) 504-6666
    Email: howard.hawkins@cwt.com
        mark.ellenberg@cwt.com
        bill.natbony@cwt.com
        thomas.curtin@cwt.com
        casey.servais@cwt.com

*Attorneys for Assured Guaranty Corp. and Assured Guaranty Municipal Corp.*

**RIVERA, TULLA AND FERRER, LLC**

By: _/s/ Eric A. Tulla_
    Eric A. Tulla
    (USDC-DPR No. 118313)
    Email: etulla@ riveratulla.com
    Iris J. Cabrera-Gómez
    (USDC-DPR No. 221101)
    Email: icabrera@ riveratulla.com
    Rivera Tulla & Ferrer Building
    50 Quisqueya Street
    San Juan, PR 00917-1212
    Telephone: (787) 753-0438
    Facsimile: (787) 767-5784

**SEPULVADO, MALDONADO & COURET**

By: _/s/ Albéniz Couret Fuentes_
    Albéniz Couret Fuentes
    (USDC-PR No. 222207)
    304 Ponce de León Ave. Suite 990
    San Juan, PR 00918
    Telephone: (787) 765-5656
    Facsimile: (787) 294-0073
    Email: acouret@smclawpr.com

**HOGAN LOVELLS US LLP**

By: _/s/ Ronald J. Silverman_
    Ronald J. Silverman, Esq.
    Michael C. Hefter, Esq.
    390 Madison Avenue
    New York, NY 10017
    Telephone: (212) 918-3000
    Facsimile: (212) 918-3100
    ronald.silverman@hoganlovells.com
    michael.hefter@hoganlovells.com

***Attorneys for U.S. Bank Trust National Association, in its Capacity as Trustee to PRIFA Bondholders***

**REED SMITH LLP**

By: _/s/ Jared S. Roach_
    Luke A. Sizemore (admitted _pro hac vice_)
    Jared S. Roach (admitted _pro hac vice_)
    225 Fifth Avenue, Suite 1200
    Pittsburgh, PA 15222
    Telephone: (412) 288-3131
    Facsimile: (412) 288-3063
    Email: lsizemore@reedsmith.com
        jroach@reedsmith.com

***Attorneys for The Bank of New York Mellon, in its Capacity as Trustee to CCDA Bondholders***

## CERTIFICATE OF SERVICE

I hereby certify that on this same date a true and exact copy of this notice was filed with

the Clerk of Court using the CM/ECF system, which will notify a copy to counsel of record.

/s/ *Roberto Cámara-Fuertes*
Roberto Cámara-Fuertes (USDC-PR No. 219002)
221 Ponce de León Avenue, 5th Floor
San Juan, PR 00917
Telephone: (787) 766-7000
Facsimile:  (787) 766-7001
Email: rcamara@ferraiuoli.com