# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

In re:

THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO,

           as representative of

THE COMMONWEALTH OF PUERTO RICO,

                  Debtor.[1]

PROMESA
Title III

No. 17 BK 3283-LTS
(Jointly Administered)

---

**REPLY OF AMBAC ASSURANCE CORPORATION IN FURTHER SUPPORT OF
MOTION FOR ENTRY OF ORDER AUTHORIZING DISCOVERY UNDER
<u>BANKRUPTCY RULE 2004 CONCERNING COMMONWEALTH ASSETS</u>**

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (the "<u>Commonwealth</u>") (Bankruptcy Case No. 17-BK-3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("<u>COFINA</u>") (Bankruptcy Case No. 17-BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("<u>HTA</u>") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("<u>ERS</u>") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("<u>PREPA</u>") (Bankruptcy Case No. 17-BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("<u>PBA</u>") (Bankruptcy Case No. 19-BK-5233-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT ................................................................................................ 1

ARGUMENT ....................................................................................................................... 5

    I.     THE REQUESTED DISCOVERY IS RELEVANT TO THE
         COMMONWEALTH'S FINANCIAL CONDITION. ........................................... 5

         A.     The Requested Discovery Seeks Information That the
              Commonwealth Itself Regards as Relevant to Its Financial
              Condition.......................................................................................... 5

         B.     The Legal Independence of the Public Corporations Does Not
              Render the Requested Discovery Irrelevant. ............................... 9

         C.     The Requested Discovery Is Relevant to Plan Confirmation Issues
              and Does Not Rely on a Chapter 11 Liquidation Theory. ...................... 12

    II.    THE REQUESTED DISCOVERY IS NOT UNDULY BURDENSOME. ......... 15

    III.   THE GOVERNMENT'S "PROCEDURAL" OBJECTION IS
         MERITLESS.................................................................................................. 19

CONCLUSION..................................................................................................................... 20

CERTIFICATE OF SERVICE ................................................................................................ 22

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Faitoute Iron & Steel Co. v. City of Asbury Park*,
  316 U.S. 502 (1942)...................................................................................14 n.13

*In re Barnwell Cty. Hosp.*,
  471 B.R. 849 (Bankr. D.S.C. 2012) .................................................................13

*In re City of Detroit*,
  524 B.R. 147 (E.D. Mich. 2014) ................................................................13, 15

*In re Fin. Oversight & Mgmt. Bd. for P.R.*,
  361 F. Supp. 3d 203 (D.P.R. 2019)............................................................13, 15

*In re Fin. Oversight & Mgmt. Bd. for P.R.*,
  432 F. Supp. 3d 25 (D.P.R. 2020)....................................................................14

*In re Mount Carbon Metro. Dist.*,
  242 B.R. 18 (Bankr. D. Colo. 1999) .................................................................15

*In re Nat'l Paper & Type Co. of P.R.*,
  120 B.R. 624 (D.P.R. 1990)..............................................................................15

**Statutes**

9 L.P.R.A. §§ 2002 *et seq.* ....................................................................................10

9 L.P.R.A. § 2018 .........................................................................................11 n.11

22 L.P.R.A. §§ 902 *et seq.* ....................................................................................10

22 L.P.R.A. § 906(a)(6)(A)...........................................................................11 n.11

23 L.P.R.A. § 278(o) .....................................................................................11 n.11

23 L.P.R.A. § 311*l*.........................................................................................11 n.11

28 L.P.R.A. § 265 ..........................................................................................11 n.11

32 L.P.R.A. § 2902 ........................................................................................11 n.11

11 U.S.C. § 1129(a)(3)........................................................................................15

Ambac[2] respectfully submits this reply in further support of its *Motion for Entry of Order Authorizing Discovery Under Bankruptcy Rule 2004 Concerning Commonwealth Assets* (ECF No. 15802) (the "Motion" or "Mot.") and in response to: (i) *AAFAF's Response to Ambac Assurance Corporation's Motion for Entry of Order Authorizing Discovery Under Bankruptcy Rule 2004 Concerning Commonwealth Assets* (ECF No. 15965) ("AAFAF Obj."); (ii) the Board's *Objection to Ambac Assurance Corporation's Motion for Order Authorizing Discovery Under Bankruptcy Rule 2004 Concerning Commonwealth Assets* (ECF No. 15967) ("Board Obj."); and (iii) the *Objection of GoldenTree Asset Management LP to Ambac Assurance Corporation's Motion for Entry of Order Authorizing Discovery Under Bankruptcy Rule 2004 Concerning Commonwealth Assets* (ECF No. 15956) ("GoldenTree Obj.").[3]

## **PRELIMINARY STATEMENT**

1. The Objectors do not dispute the central premise of Ambac's Motion: The Commonwealth Entities hold billions of dollars' worth of real property assets, many of which are disused or underutilized, and which, if monetized, could be used to fund the Commonwealth Entities' operations, thereby freeing up cash at the Commonwealth level. On this basis, the Motion sought discovery of six At-Issue Prioritized Commonwealth Entities' real property assets as relevant to the financial condition of the Commonwealth under Rule 2004. In response, the Objectors accuse Ambac of seeking to "cannibaliz[e]"[4] the Commonwealth and trying to force it to sell its beaches (among other things), arguing that five of the At-Issue Prioritized

---

[2] Capitalized terms not defined herein have the meanings ascribed in the Motion. AAFAF, the Board, and GoldenTree Asset Management LP ("GoldenTree") are collectively referred to as the "Objectors."

[3] Following Ambac's filing of the Motion, Assured Guaranty Corp., Assured Guaranty Municipal Corp. (collectively, "Assured"), Financial Guaranty Insurance Company ("FGIC"), National Public Finance Guarantee Corporation ("National"), and the Official Committee of Unsecured Creditors ("UCC") filed joinders to the Motion. (*See* ECF Nos. 15859, 15899).

[4] Board Obj. ¶ 4.

Commonwealth Entities are public corporations that are legally independent from the Commonwealth and that, moreover, this is not a Chapter 11 case in which assets of the debtor are liquidated.  In so arguing, the Objectors essentially ignore that **the Commonwealth's own statutes** have directed the sale of disused properties of the Commonwealth Entities **for the purpose of increasing the resources available to the Commonwealth**.

2.      Specifically, the Commonwealth enacted Act 26-2017, known as the Fiscal Plan Compliance Act, on April 29, 2017, with the goal of "**maximizing the use of the available state resources, including the resources of the public corporations**."  (Ex. I at 18 (emphasis added).)[5] As one means of achieving this end, the Legislature recognized that "[t]he Executive Branch comprised of its agencies, entities, and public corporations has countless real properties in disuse that can be sold to the private sector for various purposes."  (*Id.* at 19.)  Accordingly, the Act established the Real Property Evaluation and Disposal Committee ("CEDBI") and granted it the authority and responsibility to dispose of disused properties of the Commonwealth Entities. Further, the Act directs the Commonwealth Entities to transfer any annual surpluses to the Commonwealth Treasury, and provides that "**these funds will be considered as resources available to the State**[.]"  (*Id.*, Art. 4.01 (emphasis added).)

3.      Accordingly, far from an attempt by Ambac to "liquidate" the Commonwealth, the Motion simply seeks discovery that the Commonwealth itself clearly regards as relevant to its financial condition and resources, based on its own, ongoing process pursuant to the Fiscal Plan Compliance Act to monetize disused real properties of the Commonwealth Entities and to return resulting surpluses to the Commonwealth.  The discovery sought is therefore directly relevant to the financial condition of the Commonwealth under Rule 2004.

---

[5] Exhibit I is a certified translation of the House bill that was enacted as Act 26-2017.  Exhibits A-H are appended to the Motion; all other lettered exhibits are appended hereto.

4.     The Objectors nevertheless argue that discovery as to five of the six At-Issue Prioritized Commonwealth Entities—HTA, PBA, PRIDCO, the Puerto Rico Land Administration (the "Land Administration"), and the Puerto Rico Land Authority (the "Land Authority") (collectively, the "Public Corporations")—is irrelevant to the financial condition of the Commonwealth itself because those entities are legally independent from the Commonwealth and have the power to own and control their own properties.[6]   That argument fails for a number of reasons.  *First*, the sale of disused properties pursuant to the Act increases the likelihood that the Public Corporations will accrue surpluses which ***must*** be transferred to the Commonwealth's General Fund and treated as resources available to the Commonwealth.   *Second*, even if no surpluses result, an increase in the resources available to the Public Corporations may impact the Commonwealth's future allocation of cash to them.   *Third*, the fact that the enabling acts for PRIDCO, the Land Administration, and the Land Authority (although notably not HTA or PBA) provide that those entities' properties are not property of the Commonwealth does not mean that the Commonwealth did not retain an ownership interest in the properties.   The Government itself has previously recognized that multiple persons can have ownership interests in a single property.

5.     The Government is also wrong that Ambac's Motion is premised on the theory that this is a Chapter 11 case requiring liquidation of the debtor.   Ambac recognizes that this is not a liquidation case.   However, a plan of adjustment that fails to properly consider monetization of assets—particularly disused assets that Commonwealth law directs to be monetized for the purpose of increasing the resources available to the Commonwealth—fails to meet the requirements for confirmability under PROMESA.   While the Government is correct that PROMESA's "best

---

[6] The Government concedes that one of the At-Issue Prioritized Commonwealth Entities—DTOP—is not a public corporation and does not own property independently of the Commonwealth, and that its resources are therefore available to the Commonwealth.   Notably, the only property list produced for DTOP is from 2002, highlighting the need for discovery from DTOP.

interests of creditors" test requires the Court to consider whether available remedies under Commonwealth law would result in a greater recovery for creditors than under the Board's plan, the discovery sought in the Motion may in fact reveal that Ambac and other creditors *could* obtain a better recovery.  For example, if discovery reveals that the Public Corporations are likely to receive significant funds through sales of disused properties, Ambac could introduce evidence showing that those Public Corporations are likely to have surpluses that would need to be returned to the Commonwealth, thereby freeing up money for creditors.  Ambac should not be foreclosed from obtaining that evidence merely because the Board disagrees that Ambac will ultimately be able to make that showing.  Likewise, the Board's refusal to consider the value of the Commonwealth Entities' disused properties, notwithstanding the Commonwealth's ongoing, statutorily-mandated process of monetizing those properties, would raise serious questions as to whether the plan of adjustment was proposed in good faith.  Moreover, precluding Ambac from obtaining this discovery would perversely incentivize the Commonwealth to hold off on monetizing disused assets until after confirmation of a plan, leaving those assets in disuse and of no benefit to its citizens while also failing to fairly compensate the Commonwealth's creditors.

6.     The Government's other arguments fare no better.  AAFAF argues that the requested discovery is unduly burdensome because Ambac's document requests resemble certain requests in Ambac's Original Assets Rule 2004 Motion, which the Court held were overly broad. However, the discovery requested by the Motion is far narrower than that sought in the Original Assets Rule 2004 Motion and is limited to six prioritized entities following compromises during the meet-and-confer process.  The requested discovery is also proportional to the needs of the case, given the likelihood that there is huge untapped value in the Commonwealth Entities' disused properties.  The discovery is also particularly appropriate given that the At-Issue Prioritized

Commonwealth Entities are flagrantly disregarding their obligation to respond to the Assets Memorandum, while the Government is apparently failing to take any actions in response. Ambac and the public deserve to know why the Commonwealth is not carrying out its statutory duty to make the best use of Commonwealth properties.

7.       Finally, the Court should reject the Board's "procedural" objection that discovery should be adjourned to the plan confirmation process based on the filing of the Second Amended Plan of Adjustment (which, in any event, the Board has indicated will be superseded by a forthcoming Third Amended Plan of Adjustment). Judge Swain already rejected that argument with respect to a prior plan of adjustment, and delaying the discovery until a later point would simply jam the parties when they are in the midst of a plan confirmation crunch based on a hyper-expedited schedule that the Board is pushing. Now is the time to begin this discovery.

## **ARGUMENT**

## I.       **THE REQUESTED DISCOVERY IS RELEVANT TO THE COMMONWEALTH'S FINANCIAL CONDITION.**

### A.       **The Requested Discovery Seeks Information That the Commonwealth Itself Regards as Relevant to Its Financial Condition.**

8.       While the Objectors attempt to portray Ambac as seeking to cannibalize the Commonwealth's assets, the Objectors overlook that the discovery sought by Ambac relates to information that ***the Commonwealth itself*** regards as critical to an understanding of its financial condition, based on the Commonwealth's ongoing efforts, pursuant to the Fiscal Plan Compliance Act, to monetize assets of its instrumentalities ***for the very purpose of increasing the resources available to the Commonwealth***. Placed in its proper context, the requested discovery is therefore directly relevant to the Commonwealth's financial condition and its ability to pay creditors.

9.       The Commonwealth enacted the Fiscal Plan Compliance Act on April 29, 2017 "to take the necessary steps to temper the existing legal and juridical framework to more faithfully

comply with" the Board's certified fiscal plan.  (Ex. I at 1.)  In passing the law, the Legislature

recognized that "[g]iven the [Commonwealth's] fiscal and economic situation, it is clear that the

Government of Puerto Rico must take steps to comply with the Fiscal Plan without affecting the

essential services that the citizens receive."  (*Id.* at 18.)  The Legislature determined that "[t]his

requires ***maximizing the use of the available state resources, including the resources of the***

***public corporations***."  (*Id.* (emphasis added).)  To achieve this end, the Act requires "[t]he public

corporations, agencies, and instrumentalities of the Government of Puerto Rico . . . to transfer to

the Department of the Treasury the surplus from income generated" in each fiscal year.  (*Id.*, Arts.

4.01, 4.02.)  The Act further provides that "these funds will be considered as ***resources available***

***to the State and deposited by the Department of the Treasury in the General Fund***[.]"  (*Id.*, Art.

4.01 (emphasis added).)[7]  The Act suspends any "law, regulation, administrative order, corporate

resolution, or any other similar document that restricts or reduces the funds that can be transferred

by a public corporation, agency, or instrumentality" to the General Fund.  (*Id.*, Art. 4.02.)

10.    In passing the Act, the Legislature also recognized that "[t]he Executive Branch

comprised of its agencies, entities, and public corporations has countless real properties in disuse

that can be sold to the private sector for various purposes[,]" and that the properties "have ample

spaces in strategic places that can very well be maximized by private industry or trade to develop

their activities."  (*Id.* at 18.)  Accordingly, the Act created CEDBI to "establish a legal framework

that facilitates the movement of the state real estate market and provides certainty to the

---

[7] The Act specifies that "[t]he sum of the funds that each of the corporations and instrumentalities will
contribute will be determined by a committee consisting of the Executive Director of [AAFAF],
the Secretary of the Department of the Treasury, and the Executive Director of the Office of Management and
Budget [("OMB")]. . . . This committee will ensure that the transfer of funds as provided in Article 4.01 . . .
will not affect the services offered by the public corporations and instrumentalities and that the surplus will
be available after the operating expenses and obligations of those entities have been covered, according to
the expense budget recommended by the [OMB] for each fiscal year."  (Ex. I, Art. 4.02.)

transactions of these assets." (*Id.* at 19.)  The Legislature recognized that "[t]here would be multiple benefits: on the one hand, the Government will be able to collect more money from the disposal of the inventory of real estate and have more liquidity to mitigate the fiscal crisis it faces." (*Id.*)  On the other hand, sale of disused properties would "promote social wellbeing given the possibility that properties can be acquired by non-profit entities to offer social services" and other public benefits.  (*Id.*)  Consistent with these findings, the Act provides that "[t]he best use of the real estate that is not being used by the State is declared as a public policy of the Government of Puerto Rico ***in order to bring more resources to the public treasury***.  In addition, it is encouraged that such real estate that is currently in total disuse be dedicated to activities for the common wellbeing, whether for nonprofit, commercial, or residential uses that promote the activation of the real estate market and the economy in general." (*Id.*, Art. 5.01 (emphasis added).)

11.     To achieve these purposes, the Act granted CEDBI the authority "to exercise all of the authorities necessary . . . for the disposal of real estate of the Executive Branch of the Government of Puerto Rico." (*Id.*, Art. 5.03.)  This grant of authority includes the ability to "negotiate, execute contracts, process the disposal of real estate of the Executive Branch . . . and all of those other instruments and agreements with any natural or juridical person that are necessary or convenient to exercise the powers and duties conferred in this law." (*Id.*, Art. 5.05(d).)  Thus, CEDBI has the authority to direct the sale of properties of Commonwealth instrumentalities. CEDBI was also tasked with preparing an official inventory of all real estate held by the Commonwealth instrumentalities.  (*Id.*, Art. 5.06(b).)

12.     Consistent with these purposes and grants of authority, CEDBI and AAFAF issued the Assets Memorandum on November 25, 2019 to "all the Heads of Agencies, Instrumentalities, and Public Corporations of the Government of Puerto Rico[.]" (Ex. C, Assets Memorandum.)  The

Assets Memorandum noted that CEDBI was created to, "among other things, foster a better use of real property that the State is not using, as well as increas[e] the resources of the Treasury." (*Id.*) The Assets Memorandum further explained that, consistent with CEDBI's responsibility to prepare an official inventory of Commonwealth properties, CEDBI was requesting that, "within a term not to exceed fifteen (15) business days," the Commonwealth Entities provide, among other things, a "certificate including a list of all real property of which the entity you head, including any attached entities and/or offices, is the titleholder." (*Id.*) The Assets Memorandum further directed that the certification issued by each Commonwealth Entity "***must***" include "all the information" contained in the table attached to the letter:  namely, the location of each of its properties; whether such properties are tied to any debt; the terms of any leases on such properties; whether any such properties have a public use, are currently being used by a Commonwealth Entity, or are potentially available for sale; and whether a survey plan is available.  (*See* Ex. J (excerpt from certification provided by P.R. Aqueduct & Sewer Authority ("PRASA") in response to Assets Memorandum).)

13.    The foregoing makes clear that Ambac is simply seeking discovery that the Commonwealth itself regards as relevant to its financial condition and resources.  The requested discovery is therefore "core" to the Commonwealth's financial condition and assessing whether additional Commonwealth cash may be available to creditors.

14.    The need for the discovery is all the more apparent in light of (i) the At-Issue Prioritized Commonwealth Entities' disregard of their obligations to submit a certification in response to the Assets Memorandum (now more than 15 months overdue), and (ii) AAFAF's apparent failure to take any actions in response, notwithstanding its ability to do so.[8]  If AAFAF,

---

[8] *See* Ex. K, Act 2-2017 (granting AAFAF authority to, *inter alia*:  "require any entity of the Government of Puerto Rico to furnish reports, materials, data, and any information" regarding the organization (§ 8(j)); "conduct hearings, examine documents, . . . and conduct investigations, inspections, or verifications" (§ 8(k)); and "conduct administrative or operational audits of any entity of the Government" (§ 8(l))).

CEDBI, and the Commonwealth Entities are refusing to perform their statutory duty to monetize

disused properties for the purposes of increasing the resources available to the Commonwealth,

Ambac and the public have the right to know that information.

**B.    The Legal Independence of the Public Corporations Does Not Render the Requested Discovery Irrelevant.**

15.    The Objectors argue that discovery as to the five Public Corporations is

inappropriate because the Public Corporations are legally independent from the Commonwealth

and have the power to own and control their own properties, rendering discovery as to those entities

irrelevant to the financial condition of the Commonwealth itself.  (AAFAF Obj. ¶¶ 2, 8-10; Board

Obj. ¶¶ 22-23.)[9]  The Objectors are wrong for a multitude of reasons.

16.    *First*, as discussed *supra* in Section I.A, the statutorily-mandated sale of disused

properties of the Public Corporations pursuant to the Fiscal Plan Compliance Act will generate

income that increases the likelihood of surpluses at the Public Corporations.  Pursuant to the Act,

those surpluses **must** be transferred to the Commonwealth's General Fund and are considered

"resources available to the State."  (Ex. I, Art. 4.01.)  Accordingly, discovery into the Public

Corporations' assets is plainly relevant to the Commonwealth's financial condition.

17.    *Second*, even if the sale of properties pursuant to the Act does not yield surpluses

that would be made available to the Commonwealth, increased resources available to the Public

Corporations may impact the Commonwealth's future allocation of cash to them.  The 2021 Fiscal

Year Budget currently allocates over $280 million from the General Fund to the five Public

Corporations, with an additional $147 million allocated from special funds.  (Ex. L at 4, 6, 56-57,

---

[9] Notably, the Objectors do not argue that the Commonwealth lacks the power to sell assets of the Public Corporations.  To the contrary, the Board acknowledges that the Fiscal Plan Compliance Act grants CEDBI that authority, as discussed *supra* Section I.A.  (*See* Board Obj. ¶ 28 n.7.)  Rather, the Objectors argue that the assets of the Public Corporations (including proceeds from any sale) are not available to the Commonwealth.  That is wrong for the reasons discussed herein.

124, 127, 152, 190-91.)  When the Public Corporations monetize their disused real property assets, they will have more cash available for their operations and, just as the Act intends, will require less funding from the Commonwealth.  This would, in turn, leave the Commonwealth with more cash.

18.     It is no argument that the identity or number of properties to be sold, the amounts of any potential surpluses, or the amount of reduction to the Public Corporations' funding are "speculative."  (AAFAF Obj. ¶ 30.)  Discovery is likely to yield relevant information regarding properties that are in disuse, the value of those properties, and their potential benefit to the Commonwealth.  AAFAF's criticism that the discovery sought by Ambac "ignores the entities' statutory missions" and "the purpose of independently owning their real property assets in connection with the services they provide to Puerto Rico's citizens" (*id.*) falls flat.  The whole point of Article V of the Fiscal Plan Compliance Act is that many Commonwealth Entities' properties are **not** providing value to the Commonwealth's citizens, and that they should be put to their "best use. . . to bring more resources to the public treasury."  (Ex. I, Art. 5.01.)

19.     *Third*, while AAFAF argues that the enabling acts of PRIDCO, the Land Administration, and the Land Authority provide that those entities' properties are not property of the Commonwealth (AAFAF Obj. ¶¶ 27-28, 31), notably, AAFAF does not argue the same for HTA or PBA, because those entities' enabling acts do not so provide.  *See* 9 L.P.R.A. §§ 2002 *et seq.*; 22 L.P.R.A. §§ 902 *et seq.*  Thus, while the HTA and PBA enabling acts allow those entities to own property, they do not mean that the Commonwealth cannot also be an owner of the property.  In an analogous context in the CCDA lift stay proceedings, Judge Swain held that "absent a transfer of ownership of the Hotel Taxes by statute or otherwise, such funds remain property of the Commonwealth."  (*Opinion and Order in Connection with Preliminary Hearing Regarding*

*Motion Concerning Application of the Automatic Stay to the Revenues Securing the CCDA Bonds* (ECF No. 13540) at 27.)   Likewise, the Commonwealth may retain an ownership interest in properties used by HTA or PBA, and therefore discovery as to those entities' properties is relevant to the Commonwealth's financial condition.   Even as to PRIDCO, the Land Administration, and the Land Authority, the Government itself has recognized that numerous persons or entities may have an ownership interest in property as part of the bundle of "sticks" (*see* PRIFA SJ Sur-Reply[10] ¶ 27), and Ambac should be permitted discovery to determine whether the Government has retained an ownership interest with respect to properties of the Public Corporations.[11]

20.   GoldenTree's objections relating to PRIDCO are equally unavailing.   While GoldenTree argues that the Trust Indenture for the PRIDCO Bonds (the "Trust Indenture") limits PRIDCO's ability to sell its properties, it concedes that PRIDCO is permitted to sell properties under both its enabling act (GoldenTree Obj. ¶ 8) and the Trust Indenture if certain conditions are met (*id.* ¶ 10).   Similarly, while GoldenTree asserts that some PRIDCO properties are "Trusteed Properties" under the PRIDCO Indenture, it concedes that some are not "Trusteed Properties" and are not subject to any security interest.   (*See id.* ¶ 31.)   Finally, GoldenTree relies on the fact that the PRIDCO enabling act contains a non-impairment provision in which the Commonwealth agreed not to "encumber, limit, or restrict the properties . . . vested in [PRIDCO]" until the

---

[10] "PRIFA SJ Sur-Reply" refers to the *Sur-Reply of Ambac Assurance Corporation, Assured Guaranty Corp., and Financial Guaranty Insurance Company in Further Opposition to the Oversight Board's Motion for Partial Summary Judgment Seeking to Disallow Claims Relating to PRIFA Bonds* (Adv. Proc. No. 20-00003-LTS, ECF No. 96).

[11] In addition, the enabling act for each of the Public Corporations provides that properties held by them are declared public utilities subject to the Commonwealth's eminent domain power under 32 L.P.R.A. § 2902. *See* 23 L.P.R.A. § 278(o) (PRIDCO); 23 L.P.R.A. § 311*l* (Land Administration); 9 L.P.R.A. § 2018 (HTA); 22 L.P.R.A. § 906(a)(6)(A) (PBA); 28 L.P.R.A. § 265 (Land Authority).

PRIDCO bonds have been paid off (*id.* ¶ 33), but nothing in this provision purports to prevent CEDBI from directing a sale of PRIDCO's properties.[12]

21.     *Finally*, the Government concedes that one of the At-Issue Prioritized Commonwealth Entities—DTOP—is not a public corporation and does not own property independently of the Commonwealth, and that its resources are therefore available to the Commonwealth. (*See* Board Obj. ¶¶ 5, 22; AAFAF Obj. ¶ 2.) Discovery regarding DTOP's assets is therefore directly relevant to the financial condition of the Commonwealth. The need for discovery into DTOP's properties is particularly acute in light of the fact that the "property list" produced for DTOP is actually a "Report of Real Property Inventory" ***as of June 30, 2002*** prepared by a third-party consultant. (Ex. M (Spanish language document); Ex. N (English translation of excerpt).) AAFAF's production of this 2002 report, and nothing more, raises serious questions regarding DTOP's knowledge of its own properties. Answers to these questions are critical to an understanding of DTOP's assets and, therefore, the Commonwealth's financial condition.

   **C.     The Requested Discovery Is Relevant to Plan Confirmation Issues and Does Not Rely on a Chapter 11 Liquidation Theory.**

22.     The Board argues that, "[i]ndependent of legal separateness," the Motion should be denied because "it is premised on the incorrect contention government assets must be identified for liquidation to maximize recovery to creditors." (Board Obj. ¶ 24.) Contrary to the Board's characterization, however, the Motion is ***not*** based on the premise that Ambac is seeking to force a liquidation of the Commonwealth as in a Chapter 11 case. Ambac is well aware that neither it nor the Court can force the Commonwealth to liquidate all of its assets to pay creditors. However,

---

[12] GoldenTree's reliance on PRIDCO's non-impairment provision in support of its argument that PRIDCO properties cannot be sold is ironic given that the Commonwealth has indisputably breached the non-impairment provisions applicable to HTA, PRIFA, and CCDA bonds insured by Ambac, but the Objectors are now relying on the Public Corporations' independence from the Commonwealth to seek to foreclose Ambac from obtaining relevant discovery.

a plan of adjustment that fails to properly consider monetization of assets—particularly, disused assets that Commonwealth law directs to be monetized for the purpose of increasing the resources available to the Commonwealth—fails to meet the requirements for confirmability under PROMESA. *Cf. In re City of Detroit*, 524 B.R. 147, 194-97, 218-19 (E.D. Mich. 2014) (confirming Detroit's Chapter 9 plan where the City "made reasonable efforts to monetize its assets to satisfy the best interests of creditors test" by, *inter alia*, entering into development agreements with two monoline insurers, Syncora and FGIC, under which the insurers were granted the option to acquire certain real properties for the purpose of developing them). The requested discovery directly relates to these issues of plan confirmability.

23.   *First*, the discovery is relevant to determining whether the Board's plan is in the best interests of creditors. The Board is correct that, unlike a Chapter 11 case in which the court must determine whether a creditor would receive more if the debtor were to liquidate its assets, PROMESA requires the Court to consider "whether available remedies under the non-bankruptcy laws and constitution of the territory would result in a greater recovery of the creditors than is provided by the plan." *In re Fin. Oversight & Mgmt. Bd. for P.R.*, 361 F. Supp. 3d 203, 250 (D.P.R. 2019) ("*COFINA*") (citing PROMESA § 314(b)(6)). However, the requested discovery may in fact reveal that Ambac and other creditors **could** obtain a better recovery. For example, if discovery reveals that the Public Corporations are likely to receive significant funds through sales of disused properties, Ambac could introduce evidence, through an expert or otherwise, showing that those Public Corporations are likely to have surpluses that would need to be returned to the Commonwealth, thereby freeing up money for creditors. *See In re Barnwell Cty. Hosp.*, 471 B.R. 849, 869 (Bankr. D.S.C. 2012) (confirming a Chapter 9 plan that "affords all creditors the potential for the greatest economic return from the Debtor's assets").

- 13 -

24.     The Board's conclusory assertion that its plan of adjustment will meet the best interests of creditors test, and that Ambac should not be permitted discovery to test that assertion, represents nothing more than a prejudgment of the issue.  Moreover, precluding Ambac from obtaining this discovery would create the perverse incentive for the Commonwealth to hold off on monetizing disused assets until after confirmation of a plan, leaving those assets in disuse and of no benefit to the Commonwealth while also failing to recompense the Commonwealth's creditors.

25.     Contrary to the Board's assertion (Board Obj. ¶ 26), there is also nothing inconsistent about allowing the requested discovery and the Court's prior observations that PROMESA requires a "holistic approach that focuses on the continuation and future of a government and its instrumentalities and their ability to meet the needs of the Commonwealth's residents[.]"  *In re Fin. Oversight & Mgmt. Bd. for P.R.*, 432 F. Supp. 3d 25, 30 (D.P.R. 2020).  The Fiscal Plan Compliance Act itself contemplates the sale of disused properties that could be put to better use for the people of Puerto Rico.  Accordingly, the mere fact that creditors may obtain greater recoveries as a result of discovery into the instrumentalities' assets does not mean that the discovery would run afoul of the Court's observations about PROMESA's aims.[13]

26.     *Second*, the Board's refusal to consider these alternative sources of recovery, notwithstanding the Commonwealth's statutory requirement to monetize its instrumentalities'

---

[13] For similar reasons, the Board's reliance on *Faitoute Iron & Steel Co. v. City of Asbury Park*, 316 U.S. 502 (1942), is unavailing.  (*See* Board Obj. ¶¶ 3, 24, 26, 28 n.7.)  *Faitoute* addressed whether a New Jersey municipal bankruptcy law was preempted by federal municipal bankruptcy law and whether the conversion of bondholders' notes into securities under a plan of adjustment constituted an impairment under the Contracts Clause.  *Faitoute*, 316 U.S. at 507-09.  The Board points to the fact that, in discussing general principles applicable to municipal bankruptcy, the *Faitoute* Court observed that "[t]he principal asset of a municipality is its taxing power and that, unlike an asset of a private corporation, cannot be available for distribution. . . .  A city cannot be taken over and operated for the benefit of its creditors, nor can its creditors take over the taxing power."  *Id.* at 509.  That is not remotely the issue here.  The issue here is whether Ambac should be permitted to obtain discovery regarding properties of Commonwealth instrumentalities that the Commonwealth itself regards as relevant to its financial condition, and whether the failure to monetize those properties raises questions as to the confirmability of the plan.

disused properties, would raise serious questions as to whether the plan of adjustment was proposed in good faith, as required to confirm a plan under 11 U.S.C. § 1129(a)(3) (incorporated by PROMESA § 301(a)). Good faith requires that a plan must treat all interested parties fairly. *In re Mount Carbon Metro. Dist.*, 242 B.R. 18, 39 (Bankr. D. Colo. 1999) ("[T]he general rule [is] that a Chapter 9 plan proposed in good faith must treat all interested parties fairly . . . ."); *In re City of Detroit*, 524 B.R. at 247-48 ("Good faith also generally requires that . . . the plan proponent deal with its creditors in a manner that is fundamentally fair."). Thus, in the COFINA restructuring, Judge Swain confirmed a plan that "properly distribute[d] value to Creditors . . . [and] was proposed with the legitimate and honest purpose of maximizing the value of COFINA's property, and to maximize distributions to all creditors." *COFINA*, 361 F. Supp. 3d at 238. If discovery were to reveal that the At-Issue Prioritized Commonwealth Entities have significant real property assets that the Government is failing to consider, notwithstanding the Commonwealth's statutory obligation to monetize those assets, Ambac would be entitled to present that evidence as part of a showing that the plan of adjustment was not proposed with the good-faith desire to treat Ambac and other creditors fairly. *See In re Nat'l Paper & Type Co. of P.R.*, 120 B.R. 624, 626-27 (D.P.R. 1990) (plan is not proposed in good faith where it is proposed for the "purpose of hindering and delaying creditors").

## II. THE REQUESTED DISCOVERY IS NOT UNDULY BURDENSOME.

27.     Contrary to AAFAF's contention (*see* AAFAF Obj. ¶¶ 18-24), Ambac's discovery requests are not unduly burdensome, and critical information regarding the At-Issue Prioritized Commonwealth Entities' assets has not yet been produced.

28.     In arguing that Ambac's discovery requests are unduly burdensome, AAFAF asserts that Ambac's current requests are similar to certain requests in Ambac's Original Assets

Rule 2004 Motion that, along with Ambac's Original Cash Rule 2004 Motion,[14] was the subject of Judge Swain's January 23, 2020 Memorandum Order denying the Government's Motion to Strike. (*See* AAFAF Obj. ¶ 22.) But even a cursory comparison of the discovery sought in the Original Rule 2004 Motions and the discovery requested by this Motion makes clear that these discovery requests are far narrower than those addressed in the Memorandum Order.

29. In the Memorandum Order, Judge Swain ruled on the Government's Motion to Strike the Original Rule 2004 Motions, which encompassed 83 document requests. (Mem. Order at 9.) While Judge Swain concluded that the motions were overly broad, Judge Swain did ***not*** rule that Ambac could not pursue discovery on the issues implicated in the Original Rule 2004 Motions. Rather, Judge Swain ***denied*** the Motion to Strike and directed the parties to meet and confer "to identify parameters for disclosure that are substantially narrower than the requests set forth in the [Original] Rule 2004 Motions and that are designed to provide Ambac with core information sufficient to obtain a basic understanding of major aspects of the Commonwealth's financial condition that will be relevant to a plan of adjustment"—thereby recognizing that some discovery on these issues would be appropriate. (*Id.* at 9-10.)

30. Thereafter, on June 9, 2020, Ambac requested production of all documents submitted by the Commonwealth entities in response to the Assets Memorandum, and all communications or analysis related thereto. (*See* Ex. E at 2.) Following that request, AAFAF produced certifications submitted to CEDBI in response to the Assets Memorandum by approximately 40 Commonwealth entities. It did not produce any communications or analysis related thereto, nor did it produce certifications for at least 85 other Commonwealth entities. (Mot.

---

[14] "Original Cash Rule 2004 Motion" refers to *Ambac Assurance Corporation's Motion for Entry of Order Authorizing Discovery under Bankruptcy Rule 2004 Concerning Commonwealth Cash Restriction Analysis* (ECF No. 9023). "Original Rule 2004 Motions" refers, collectively, to the Original Assets Rule 2004 Motion and the Original Cash Rule 2004 Motion.

¶ 11.)  In an effort to reduce the burden on the Government, Ambac substantially narrowed its request to include only a small subset of *nine* Prioritized Commonwealth Entities.  (Mot. ¶ 12.)  Because AAFAF thereafter produced certifications for three of the nine Prioritized Commonwealth Entities, only six At-Issue Prioritized Commonwealth Entities are the subject of this Motion.  In addition to being limited to six Commonwealth entities, the requested discovery is also limited to documents and deposition testimony relating to the sale, alienation, or encumbrance of those entities' assets, and does not seek evidence regarding most of the topics that were the subject of the Original Rule 2004 Motions.  Thus, the discovery sought by the Motion is substantially narrower than the requests in the Original Rule 2004 Motions, and is narrowly tailored to obtain information most likely to be of importance in assessing the Commonwealth's financial condition.

31.    AAFAF asserts that it has already produced the "core body of information" regarding properties held by the six At-Issue Prioritized Commonwealth Entities, including property lists disclosing "roughly 16,000 properties."  (AAFAF Obj. ¶ 21.)  In reality, however, the six property lists produced by AAFAF lack much of the information that the At-Issue Prioritized Commonwealth Entities were required to provide in response to the Assets Memorandum, such as information regarding whether the properties are tied to any debt, the terms of any leases on the property, and whether the properties have a public use, are currently being used by a Commonwealth Entity, or are available for sale.  (*See, e.g.*, Ex. O (excerpt from HTA property list[15]); Ex. P (same from Land Administration).)[16]  Moreover, the "property list" that AAFAF produced for DTOP is from *2002* (*see* Exs. M, N), and AAFAF acknowledged that none

---

[15] AAFAF has confirmed to Ambac that this document is the property list for HTA, notwithstanding the presence of the logo for DTOP in the upper-left corner.

[16] For example, PRASA's certification in response to the Assets Memorandum (excerpt attached hereto as Exhibit J) makes clear that many of its properties are available and unused, and that it lacks a certificate of ownership for many of them.  This kind of information is critical to understanding whether the assets of a territorial instrumentality can be readily monetized.

of the property lists it produced for the other At-Issue Prioritized Commonwealth Entities have been "certified for current accuracy." (Ex. G at 2.) While AAFAF takes issue with the fact that Ambac seeks discovery dating back to 2015, AAFAF's own productions make clear that discovery going back to 2015 is necessary to explore whether the property lists provided are based on current information or—like the DTOP "property list"—are based on outdated information.

32.     AAFAF's objections to Ambac's request for deposition testimony (*see* AAFAF Obj. ¶ 24) are equally meritless. Deposition testimony is likely to reveal important information on a multitude of issues that are not well-suited for document discovery. For example, Ambac should be permitted to ask deponents why the At-Issue Prioritized Commonwealth Entities have failed to respond to the Assets Memorandum, as they are required to do under Commonwealth law. AAFAF has asserted that some of the entities are unable to provide responses due to lack of resources. (*Id.* ¶ 5.) Ambac should be permitted to seek testimony to test that assertion. In addition, the Land Administration has apparently taken the position that, pursuant to Article 5.03 of the Fiscal Plan Compliance Act, it is not required to respond to the Assets Memorandum. (*See id.* ¶ 16 n.12.) That position, however, is directly contrary to an administrative order issued by CEDBI stating that the Land Administration is ***not*** exempt from the requirements of Article 5 of the Act because the Land Administration's regulations are "incompatible with the public policy of" the Act. (Ex. Q, OA-2017-01, at 1-2; *see also* Ex. R, Reg. No. 9133, Art. 5 (declaring regulations of public corporations regarding the disposition of real property null and void and providing that CEDBI's regulations govern).) Ambac is entitled to probe as to why these entities are unwilling to comply with the Assets Memorandum, and deposition testimony is the appropriate vehicle to do so. Ambac should also be able to seek testimony regarding the status of any ongoing reviews of property, the accuracy and currentness of any property lists, and any anticipated future

dispositions of property. AAFAF's expressed concern about having to prepare a witness to testify "regarding every interest in the thousands of assets" held by the entities (AAFAF Obj. ¶ 24) is overblown. Clearly, Ambac obtains no benefit from testing whether the deponent has an encyclopedic understanding as to thousands of properties, and Ambac has no intention of doing so.

33.      Finally, any burden on the Government is outweighed by the substantial importance of the discovery sought. As confirmed by the evaluation undertaken by CCRE in connection with the Motion—which included only a small subset of properties of the At-Issue Prioritized Commonwealth Entities—there are potentially billions of dollars in untapped value in these assets. The requested discovery can hardly be considered disproportionate to the needs of the case given the potential value to creditors.

## III.   THE GOVERNMENT'S "PROCEDURAL" OBJECTION IS MERITLESS.

34.      The Board's "procedural" objection (Board Obj. ¶ 2) is no impediment to resolving the Motion. The Board contends that because it filed a Second Amended Plan of Adjustment on March 8, 2021, the requested Rule 2004 discovery "is neither legal nor appropriate." (*Id.*) The Court already rejected an identical argument with respect to a previous plan of adjustment, and the Board's attempt to relitigate it should likewise be rejected.

35.      In ruling on the Motion to Strike, Judge Swain squarely rejected the Government's argument "that the mere pendency of a plan proposal constitutes initiation of a contested matter precluding the use of Rule 2004." (Mem. Order at 8.) Instead, it is "[t]he filing of an objection to a motion seeking confirmation of a plan [that] initiates a contested matter." (*Id.* (citation omitted).) Accordingly, Judge Swain held that "Rule 2004 discovery is the appropriate mechanism for use by creditors to obtain information concerning the financial health of the debtor" in this procedural context. (*Id.* at 8-9.) Indeed, the parties have been engaged in Rule 2004 discovery under the

Court's supervision during this entire period, notwithstanding the Board's filing of an Amended Plan of Adjustment on February 28, 2020.

36.     For the same reasons as with Judge Swain's Memorandum Order on the Motion to Strike, Rule 2004 discovery is the appropriate mechanism for the discovery sought by Ambac. While the Board filed the Second Amended Plan of Adjustment on March 8, 2021, it has not filed a motion seeking confirmation of the plan (and, of course, there have been no objections to such a motion). In fact, the Board indicated at the March 10 omnibus hearing that the Second Amended Plan of Adjustment will likely be superseded by a Third Amended Plan of Adjustment.[17]

37.     Moreover, the Board's argument that it would be more efficient to adjourn the requested discovery until the plan confirmation process has it backwards. The Motion is ripe for resolution now. Adjourning the discovery would only delay it to a time when the parties will be knee-deep in plan confirmation discovery on a multitude of significant issues, likely under a hyper-expedited schedule proposed by the Board.[18] The discovery should go forward now.

## CONCLUSION

38.     For these reasons, Ambac respectfully requests that the Court grant the Motion.

---

[17] *See* Ex. S, Mar. 11, 2021 Omnibus Hearing Tr., at 9.

[18] The Board argues that there needs to be "one organized discovery process for all creditors[,]" but that ignores that creditors had the opportunity to join or respond to Ambac's Motion—and many did. (*See supra* n.3.) Assured, FGIC, National, and the UCC—the largest remaining contingent of creditors that are not bound to support the Board's plan of adjustment—all filed joinders to the Motion, seeking to be participants in the discovery. (Assured and National entered into a Plan Support Agreement ("PSA") with the Board, but have the right to terminate their participation in the PSA by March 31, 2021.)

Dated:  March 16, 2021
        San Juan, Puerto Rico

**FERRAIUOLI LLC**

By: /s/ *Roberto Cámara-Fuertes*

    Roberto Cámara-Fuertes (USDC-PR No. 219002)

    Sonia Colón (USDC-PR No. 213809)

    221 Ponce de León Avenue, 5th Floor

    San Juan, PR 00917

    Telephone: (787) 766-7000

    Facsimile:  (787) 766-7001

    Email:  rcamara@ferraiuoli.com

        scolon@ferraiuoli.com

**MILBANK LLP**

By: /s/ *Atara Miller*

    Dennis F. Dunne (admitted *pro hac vice*)

    Atara Miller (admitted *pro hac vice*)

    Grant R. Mainland (admitted *pro hac vice*)

    John J. Hughes, III (admitted *pro hac vice*)

    Jonathan Ohring (admitted *pro hac vice*)

    55 Hudson Yards

    New York, NY 10001

    Telephone:  (212) 530-5000

    Facsimile:  (212) 530-5219

    Email:  ddunne@milbank.com

        amiller@milbank.com

        gmainland@milbank.com

        jhughes2@milbank.com

        johring@milbank.com

*Attorneys for Ambac Assurance Corporation*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on this same date, I electronically filed the foregoing with the

Clerk of the Court using the CM/ECF system, which will send notification of such filing to all

CM/ECF participants in this case.

/s/ *Roberto Cámara-Fuertes*
Roberto Cámara-Fuertes (USDC-PR No. 219002)
221 Ponce de León Avenue, 5th Floor
San Juan, PR 00917
Telephone: (787) 766-7000
Facsimile:  (787) 766-7001
Email:  rcamara@ferraiuoli.com