```
 1                    UNITED STATES DISTRICT COURT

 2                     DISTRICT OF PUERTO RICO

 3
       In Re:                    )      Docket No. 3:17-BK-3283(LTS)
 4                               )
                                 )      PROMESA Title III
 5     The Financial Oversight and )
       Management Board for      )
 6     Puerto Rico,              )      (Jointly Administered)
                                 )
 7     as representative of      )
                                 )
 8     The Commonwealth of       )
       Puerto Rico, et al.       )      March 17, 2021
 9                               )
                   Debtors,      )
10
       _____
11

12     The Financial Oversight and )
       Management Board for      )
13     Puerto Rico,              ) Docket No. 3:20-AP-00003(LTS)
                                 )
14     as representative of      )
                                 )
15     The Commonwealth of       )
       Puerto Rico, et al.       )      in 3:17-BK-3283(LTS)
16                               )
                   Plaintiff,    )
17                               )
       v.                        )
18                               )
       Ambac Assurance Corporation,)
19     et al.                    )
                                 )
20                 Defendants.   )

21     _____

22

23

24

25
```

```
1  _____

2

3  The Financial Oversight and )
   Management Board for        )
4  Puerto Rico,                ) Docket No. 3:20-AP-00004(LTS)
                               )
5  as representative of        )
                               )
6  The Commonwealth of         )
   Puerto Rico, et al.         )        in 3:17-BK-3283(LTS)
7                              )
                  Plaintiff,  )
8                              )
   v.                          )
9                              )
   Ambac Assurance Corporation,)
10 et al.                      )
                               )
11              Defendants.  )

12 _____

13

14 The Financial Oversight and )
   Management Board for        )
15 Puerto Rico,                ) Docket No. 3:20-AP-00005(LTS)
                               )
16 as representative of        )
                               )
17 The Commonwealth of         )
   Puerto Rico, et al.         )        in 3:17-BK-3283(LTS)
18                             )
                  Plaintiff,  )
19                             )
   v.                          )
20                             )
   Ambac Assurance Corporation,)
21 et al.                      )
                               )
22              Defendants.  )

23 _____

24

25
```

```
 1   _____

 2                       HEARING ON MOTIONS

 3     BEFORE THE HONORABLE U.S. MAGISTRATE JUDGE JUDITH GAIL DEIN

 4                  UNITED STATES DISTRICT COURT JUDGE

 5   _____

 6   APPEARANCES:

 7   ALL PARTIES APPEARING VIA ZOOM

 8   For The Commonwealth
     of Puerto Rico, et al.:  Mr. Michael Firestein, PHV
 9                            Mr. Lary Rappaport, PHV
                              Mr. Colin Kass, PHV
10

11   For Puerto Rico Fiscal
     Agency and Financial
12   Advisory Authority:      Ms. Elizabeth McKeen, PHV
                              Ms. Ashley Pavel, PHV
13

14   For Financial Guaranty
     Insurance Company:       Mr. Adam Langley, PHV
15

     For National Public
16   Finance Guarantee
     Corporation:             Mr. Robert Berezin, PHV
17

     For Assured Guaranty
18   Corporation:             Mr. William Natbony, PHV

19   For Ambac Assurance
     Corporation:             Ms. Atara Miller, PHV
20

21

22

23

24

25   Proceedings recorded by stenography.  Transcript produced by
     CAT.
```

```
 1                              I N D E X
 2   WITNESSES:                                           PAGE
 3         None.
 4
 5   EXHIBITS:
 6         None.
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1           San Juan, Puerto Rico

2           March 17, 2021

3           At or about 2:30 PM

4                   *     *     *

5           THE COURT:  Good afternoon, everyone.  That is to

6   say, good afternoon and greetings in Boston, Puerto Rico and

7   New York.  But I guess I do not know what time it is, so

8   greetings to everybody who is on Zoom and on the phone.

9           Is everybody ready to start?  You're nodding at me.

10  Okay.  Why don't we call the case.

11          COURTROOM DEPUTY:  The United States District Court

12  for the District of Puerto Rico is now in session.  The

13  Honorable Judge Dein presiding.  Today is Wednesday, March

14  17th, 2021.

15          *In re:  The Financial Oversight and Management Board*

16  *for Puerto Rico, as representative of the Commonwealth of*

17  *Puerto Rico, versus Ambac Assurance Corporation, et al.,* case

18  Nos. 17-BK-3283, 20-AP-03, 20-AP-04 and 20-AP-05 will now be

19  heard.

20          This is a general reminder that all persons granted

21  remote access to the hearing are reminded of the general

22  prohibition against photographing, recording and

23  rebroadcasting of court proceedings.  Violation of these

24  prohibitions may result in sanctions, including removal of

25  court-issued media credentials, restricted entry to future

1    hearings, denial of entry to future hearings, or any other

2    sanctions deemed necessary by the Court.

3            Will the parties please identify themselves for the

4    record?

5            THE COURT:  Why don't we start with Ambac.

6            MS. MILLER:  Good afternoon, Your Honor.  Atara

7    Miller from Milbank on behalf of Ambac Assurance

8    Corporation.

9            THE COURT:  Assured.

10           MR. NATBONY:  Good afternoon, Your Honor, and

11   counsel.  William Natbony from Cadwalader, Wickersham & Taft

12   on behalf of the Assured entities.

13           THE COURT:  National.

14           MR. BEREZIN:  Good morning, Your Honor.  Good

15   afternoon I should say.  Robert Berezin, Weil, Gotshal &

16   Manges on behalf of National.

17           THE COURT:  FGIC.

18           MR. LANGLEY:  Good afternoon, Your Honor.  Adam

19   Langley, Butler Snow, on behalf of Financial Guaranty

20   Insurance Company.

21           THE COURT:  AAFAF.

22           MS. MCKEEN:  Good afternoon, Your Honor.  Elizabeth

23   McKeen of O'Melveny & Myers on behalf of AAFAF, and I'm joined

24   by my colleague, Ashley Pavel.

25           THE COURT:  And the Oversight Board?

1        MR. FIRESTEIN:  From Los Angeles, it's morning, so

2   good morning, Your Honor.  Michael Firestein of Proskauer on

3   behalf of the Board, and I'm joined on this call as well by my

4   partners, Lary Rappaport and Colin Kass.

5        THE COURT:  Okay.  I'm going to ask you all before

6   you speak to identify yourselves again for the record to make

7   the transcript easier.

8        As an opening statement, let me just say I have been

9   through all the papers.  There are a lot of papers.  I don't

10  see that there's a general prohibition against any specific

11  type of discovery, so I don't think that there is a blanket

12  prohibition against e-mails or against audit-related papers

13  and work materials.  So I don't really want to hear that

14  argument.  But I do think that the discovery that was

15  authorized is very targeted.  And the words used were used

16  carefully in drafting what the allowable discovery is.

17       So I'm going to ask you to link your argument to the

18  specific request, because I think that's the only way that we

19  can give effect to the very specific order.  And I also think

20  it makes sense for us to do it in the order in the papers.  So

21  we'll start with PRIFA.  We'll finish that, and then we'll

22  move on to the next one.  Okay?

23       All right.  Who's going to start?

24       MS. MILLER:  I will, Your Honor.  Atara Miller from

25  Milbank, LLP, for the record.

1        So I appreciate, you know -- I guess I wanted to

2   start by noting that we're in a really different place now

3   than we were a year ago, not only because I actually had to

4   leave Puerto Rico early, and I missed the last hearing on

5   revenue bonds, because my children were quarantined in the

6   first school that got shut down with COVID.  And so a year has

7   changed a lot, but it also puts us in a very different posture

8   in these cases.

9        You know, as we all know, there has been extensive

10  briefing and argument that -- before Judge Swain on the

11  revenue bond issues.  And after considering it for six months,

12  Judge Swain identified specific topics.  And we would agree

13  with you, they were quite carefully crafted to identify those

14  areas where she thought that material, relevant information

15  was necessary to fill out the record before her.

16       You know, one thing that I just want to say is that

17  Judge Swain could have just issued an order directing

18  production of particular materials, but she didn't.  She

19  identified topics, and then directed defendants to propound

20  discovery directed to such topics.

21       So while I think it is true, and we did in our

22  papers, in our discovery request, hew very closely to the

23  specific language that she used, I don't think that that is

24  necessarily the end point of the discussion.  I think we need

25  to understand what discovery directed to that topic means.

1      And I appreciate Your Honor's comments, and so I was

2  going to do some table setting, and then talk about PRIFA and

3  CCDA, and then pass to Mr. Natbony.  And I appreciate that

4  you've eliminated my first two points that I'll just skip

5  over, and we'll get into the specifics of them in terms of

6  e-mail and audit reports.

7      There's one other blanket -- just blanket refusal to

8  provide any information that I do think is worth putting out,

9  because I think it's going to inform, to some extent, some of

10  the -- whether we're able to craft requests that go to audit

11  materials and, in particular, e-mails.  And that is we are --

12  and, frankly, I'm scratching my head at this, but we are

13  continually faced with a refusal to identify the people with

14  relevant knowledge about these topics.

15      We asked for it.  They said no.  We served an

16  interrogatory.  They said no.  We asked for it in a meet and

17  confer, whether they would consider telling us who the

18  relevant custodians are.  They said no.  They sent us a letter

19  again last night confirming that their answer is an

20  unequivocal no.

21      You know, why -- the reason why I'm scratching my

22  head is because there's so much in their papers that accuses

23  us of dilatory tactics, of just looking for delay, just

24  looking to add burden; and it would seem to me that the most

25  efficient way to identify relevant information is to identify

1    who the key people are, look through their e-mails or look

2    through their documents.

3        And with respect to depositions, it seems like

4    they're going to force us to jump through the hoop of taking a

5    30(b)(6) deposition to find out who the relevant people are,

6    and then notice their depositions.  And I think, you know, the

7    government has said often that there has been turn over, and

8    we acknowledge that.  And so we may be talking about the key

9    people may no longer be with the government.  And, you know,

10   we need time to find them, to serve them with process, and to

11   get the information that we need.

12       And, you know, there's some discussion, and we'll get

13   into this when we talk about CCDA, but I just note that what

14   we're coming up with when we're putting it all -- I suspect

15   that the government's answer is:  Well, they'll get a

16   30(b)(6).  We told them we're going to give them a 30(b)(6),

17   and they'll get a 30(b)(6), and why do they need anybody

18   else's information.

19       And, first of all, without going into too much detail

20   about the information and testimony that we got from the last

21   30(b)(6), I think it's absolutely clear that a 30(b)(6) is not

22   going to cut it here.  And what's happening and what's evident

23   is that to the extent there is a gap in the documents, the

24   30(b)(6) they're putting up is a Title III consultant that

25   they brought in.  So a consultant that was hired during the

1    restructuring process who doesn't actually know anything.

2          And so they are essentially taking legal positions,

3    or suppositions and speculation, and, you know, brushing it

4    with the veneer of a factual assertion.  That doesn't work.

5    And so I just -- I want to put that on the radar, also,

6    because I think that's a critical issue that we need to

7    resolve during this hearing.  And it's obviously going to

8    relate directly to e-mail searches and what a reasonable scope

9    of that might be, also.

10         So with that --

11         THE COURT:  While you're doing that, though, would

12   you just address for me what your understanding is of this

13   file that they are looking at, the central file?  As to that

14   --

15         MS. MILLER:  So I have that in my notes.  I actually

16   have no idea, and they won't tell us what the central

17   repository is.  And they -- you know, with respect to PRIFA,

18   you'll see in some of their responses, there'll be a response

19   from AAFAF that says, with respect to documents about the

20   nature of the Infrastructure Fund, they'll say AAFAF said --

21   AAFAF's response is, we looked through the central repository

22   and we didn't find any information.  And then with PRIFA, they

23   say, well, PRIFA's going to look through its central

24   repository.

25         I don't even have a firm understanding of whether

1   there is a central repository of documents, or whether each

2   entity has its own central repository of documents, and what

3   information is uploaded.  So people I work with laugh at me in

4   part because I refer to our document management system by the

5   name of our two systems ago, and I'm totally incompetent when

6   it comes to it.  And I can tell you if you're looking for a

7   document that I have ever touched, you're not going to find it

8   there, unless I sent it to someone else and they uploaded it.

9        And I suspect that if we're looking to documents that

10  date back to, you know, the early aughts, they're not going to

11  find everything consistently uploaded.  And one thing that I

12  think has become abundantly clear throughout this is that

13  Puerto Rico Government entities do not have the most

14  organized, complete, and comprehensive records.  And so the

15  notion that they're trying to convince us that everything is

16  sort of miraculously going to be in this central repository,

17  and if it's not there, well, we're just not going to look

18  farther, is just not satisfying to me.

19       So that's probably, Your Honor, frankly, a better

20  question for Ms. McKeen, because she probably has an

21  understanding.  So I'm happy to pause if you want that before

22  we move on or --

23       THE COURT:  No, I think move on and then we'll -- I'm

24  assuming that the government entities will address both of

25  your points on what hasn't been produced as a general

1    category.

2         MS. MILLER:  Okay.  So I wanted to turn, I guess,

3    specifically now to PRIFA.  And I think, you know, if you look

4    at the revised proposed order that we submitted, we have tried

5    to really narrow the discovery requests to two main topics:

6    Firstly, the nature and location of the Infrastructure Fund;

7    and then, second, the discovery related to the accounting

8    treatment of the rum tax remittances in general, including the

9    use and purpose of account designations, fund codes, and

10   department IDs.  Those are Judge Swain's two topics, or two of

11   Judge Swain's topics.

12        And I don't think there's any dispute that what the

13   Infrastructure Fund is is a core question in this litigation.

14   And what we keep hearing back in response to the question is

15   citation to statutes and bond documents, but, frankly, if that

16   were enough, we wouldn't have an order directing discovery on

17   it.  So, clearly, Judge Swain is imagining that we would get

18   something else.

19        And I hear, and I'm sympathetic to the government's

20   position that says, well, there just isn't anything else, but

21   I have a hard time accepting that when you won't even search

22   for it.  And if there isn't anything else, it doesn't seem

23   particularly burdensome to go to the e-mail servers, to go to

24   the document servers, and search for "infrastructure fund."

25   And if you get zero hits, you get zero hits.  And then there's

1    nothing to even look through.  And --

2        THE COURT:  Isn't the government saying what's the

3    first 117 million, and this is where it goes, and this is --

4    we are giving you that information?  Is that still disputed?

5        MS. MILLER:  Well, I think it is, because I'm

6    actually not sure that they say that it's the first 117

7    million, period, full stop.  That was definitely the testimony

8    that we got in the 30(b)(6) deposition, but now, in the

9    interrogatory responses, they say it is the first 117 million

10   that was historically allocated to or transferred to PRIFA.

11   And what I think they're saying there is not that "was

12   historically transferred to PRIFA" is sort of an added

13   descriptor, but is actually I think, in the way they're

14   presenting it, defining, definitional of the Infrastructure

15   Fund.

16       So what is the Infrastructure Fund?  It is 117

17   million that goes to PRIFA, as opposed to our position, which

18   is it's the first 117 million, whether it's sitting in the

19   Commonwealth TSA, or whether it's sitting in a PRIFA bank

20   account.  It is being held on behalf of PRIFA by the

21   Commonwealth, because that is the Infrastructure Fund, and the

22   Infrastructure Fund is by statute PRIFA's property.

23       And that is exactly the rub, right?  Like, does it

24   have to -- do they have to do something else?  Did the

25   Infrastructure Fund no longer exist, for example, if they're

1    not transferring the money to PRIFA?

2              THE COURT:  Okay.

3              MS. MILLER:  So, you know, we would agree, and if

4    they're going to concede that it's the first 117 million no

5    matter where that's held, that is the Infrastructure Fund,

6    then we'll take a stipulation to that effect, and we'll bypass

7    all of this discovery.

8              You know, in that regard, I think with respect to

9    this question, this is another example where a blanket refusal

10   to produce any audit-related materials is, frankly,

11   nonsensical.  It is -- it is certainly one of the most

12   targeted and direct potential sources of information that you

13   can get.

14             It is, as the courts have recognized, you know, a

15   very defined and limited set of information.  There's

16   discussion about a PRIFA Special Revenue Fund.  We can debate

17   whether that is the Infrastructure Fund, whether it is not the

18   Infrastructure Fund, but there's clearly discussion in the

19   audited financials about 117 million and restrictions on that

20   money.  And that should be produced.

21             That is directly relevant both to the nature and

22   location of the Infrastructure Fund, and also to the second

23   category of documents or the second topic Judge Swain

24   identified of discovery relating to the accounting treatment

25   of the rum tax remittances.

1    So I just -- you know, again, it seems like we're

2 trying to be conscious and to not force duplicated efforts.

3 We try to think carefully about, you know, where do we think

4 rationally, instead of going through a whole mess -- how can

5 you target it, just look for this information.  It seems like

6 the public disclosures about it, that would be a really good

7 and easy place to look to see what information is there.

8    THE COURT:  Okay.

9    MS. MILLER:  So I think, I mean --

10    THE COURT:  Just address -- I mean, what the

11 government is saying, as I understand it, though, is that they

12 are providing the information which shows the rum tax

13 remittances and where it goes.

14    MS. MILLER:  So what they are showing is -- what they

15 have agreed to produce is the flow, so where the cash goes.

16 And they've agreed to produce the accounting designations.  So

17 how's it getting tagged within the accounting system, and

18 they're going to run a report out of the accounting system.

19    So all of that is really helpful and necessary, but

20 it's not everything.  There's another piece of it, which Judge

21 Swain identified, which is not just the use of the accounting

22 designations, but the purpose of the accounting designations.

23 What does this mean?  Why are they being tagged in that way?

24 Why are they being used like that?

25    And the government hasn't proposed any scope that

1    would address the "why," right.  They are willing, and I

2    acknowledge, right, they are willing to give us more about the

3    "what" or the "how," but nothing about the "why."  And, you

4    know, they say, well, we said we'd give you policies and

5    procedures.  Okay.  My personal view, I haven't seen all the

6    policies and procedures, but based on the ones that I've seen,

7    I don't think it's going to go to the "why."

8             But I also -- to your point at the outset that these

9    were carefully crafted topics, that we should be, you know,

10   really analyzing, because they are meaningful in how they're

11   drafted, Judge Swain has a totally separate topic for policies

12   and procedures.  So if she had intended policies and

13   procedures to be the be-all and end-all of documents that go

14   to the purpose of the accounting designations related to the

15   rum tax remittances, shouldn't have included that in the other

16   topic, right?

17            So, you know, clearly I think there's something more,

18   and there's just a refusal to give it to me.  I'm not exactly

19   sure what to say.

20            You know, the other piece which seems like a small

21   one, but I think is going to be relevant certainly in some

22   spaces, and we're not suggesting that we need, you know, the,

23   you know, A to Z tagging of the flow for every single rum tax

24   dollar ever collected by the Commonwealth, but the government

25   is and continues to arbitrarily narrow and limit their

1    responses only to the first 117 million, and not to the rum

2    tax remittances, which, as Judge Swain used it, refers to the

3    full amount of the rum taxes collected.  So --

4            THE COURT:  But isn't that what we did exemplars on?

5            MS. MILLER:  We did exemplars on the 117, and we did

6    some exemplars on the other piece.  But what they haven't

7    agreed to produce now, for example, are accounting logs and

8    policies related to, let's say, the next five million, which

9    gets deposited into the TSA, but everybody acknowledges is

10   held in trust.

11           And one of the arguments that we made in the 56(d)

12   declaration was that it is useful for the Court, if they're

13   going to argue that these monies are -- one of their arguments

14   is the Commonwealth knows how to make a trust if they want to,

15   and they know how to hold things in trust.  And one of our

16   arguments was, well, these are accounted for.  They're all

17   deposited in the same TSA account.  And the way you

18   distinguish that is through your accounting designation.  That

19   seems relevant.

20           And so the scope is rum tax remittances, and I just

21   want to make sure that we're not limiting it only to the 117

22   million.  If we're going to get extracts and reports from the

23   PRIFAS system, it should address the full rum tax -- the full

24   rum excise taxes, not just the first 117 million.

25           THE COURT:  Okay.

1          MS. MILLER:  So I'm not looking -- to your point,

2     Judge Dein, we're not looking to fill out that full body of

3     exemplars.  I'm not looking for every single transmittal

4     voucher.  I'm not looking for every single entry.  But I would

5     like the report that shows it.  I would like the policies or

6     procedures that address the remainder of the rum excise taxes.

7          THE COURT:  I'm sorry.  That was -- can you hear me

8     now?  There was a bit of a freeze there, no matter how many

9     times we've tested this.

10         All right.  So I got you through there was -- you're

11    not looking to fill out all the exemplars, but you are saying

12    that through the PRIFAS -- to the extent that there are

13    printouts about the flow, you want it beyond the 117 million?

14         MS. MILLER:  Right.  And also to the extent that

15    there are policies or procedures that govern the balance of

16    the rum taxes, we would want those as well.

17         THE COURT:  Okay.  The other -- one other question,

18    and then I'll let the government respond.  But do you have any

19    communications with KPMG?

20         MS. MILLER:  So we subpoenaed KPMG, and not

21    surprisingly their answer was -- oh, have we had communication

22    or have they produced communications?

23         THE COURT:  Have they produced communications?

24         MS. MILLER:  The answer is no.  And KPMG has said

25    they won't produce until after this hearing, understandably.

1              THE COURT:  Okay.  So is it your understanding,

2    though, that KPMG is the accounting firm that the Commonwealth

3    would have been communicating with to account for this fund,

4    for the rum tax fund, the rum tax remittances?

5              MS. MILLER:  That is our understanding.

6              THE COURT:  Okay.  Who's -- I'm assuming you're

7    taking the lead on the defendants on this.  Do any of the

8    other defendants want to add anything?

9              MR. LANGLEY:  Yes, Your Honor.  This is Adam Langley

10   on behalf of FGIC.  I was going to discuss one of the nuance

11   issues on the accounting side of this that I think is

12   important for the Court to understand.

13              So we went through an extensive exemplar process, as

14   you identified, regarding bank accounts and the lift stay

15   discovery, but I think the defendants here are asserting a

16   different basis.  And we are asserting that there is a

17   separate set of accounts called fund accounts that are

18   specific accounting designations that relate to bank accounts,

19   but really is a separate control.

20              And that's really where I think the focus of our

21   discovery is in this later stage, is not trying to recreate

22   the exemplars on bank accounts, but to understand how moneys

23   were collected, what they -- was done in that internal fund

24   accounting management system, and how were they expended,

25   where did they go.  And the bank accounts don't tell us those

1    type of answers.

2           And the way I kind of characterize it is we think of

3    a two-factor authentication system.  So when I order something

4    off of Amazon, a book, I'm going to put in a password for my

5    log-in, and then it's going to send me a link to get the phone

6    and put in a passcode.  There's a dual system in place.  And

7    that's how bank accounts and fund accounts work for

8    governmental entities.

9           The bank account does hold the deposit, but they're

10   tracked, they're segregated, they're controlled, all through

11   fund accounting.  I think that's clearly what Judge Swain was

12   getting at here when she talked about topics two, four, five,

13   six and seven that gets to the accounting treatment in

14   general, that talks about outflows and inflows of the

15   Infrastructure Fund.

16          And I think that's where we're having this principal

17   dispute here is they keep telling us that they're going to

18   produce bank account statements and bank account flow of

19   funds, and we're seeking something completely different.

20   We're seeking special fund flows and how the monies flow

21   through the accounting systems and the physical control

22   systems that the Commonwealth maintains.

23          And we expect these to be fairly sophisticated

24   systems for controlling monies, because the Commonwealth has

25   represented in their financial statements that they maintain

1  these systems and they maintain these controls.  But we've

2  been denied any access to that.  In fact, they footnote at --

3  footnote eight of their response indicated that the lift stay

4  litigation did not include any of the fund accounting.  It did

5  not include any of the production that we are seeking here on

6  this fund accounting documentation.

7       So we do think there's a need for a second set of

8  exemplars, and a full accounting for -- and the controls.  Who

9  received this money?  Who put the designation on the money?

10 Who transferred it?  Was there a management at Treasury that

11 caused that transfer to be initiated?

12      There should be fundamental controls put in place in

13 any accounting system that we should be able to get easy

14 access to, but we've been denied that access to all.  So I

15 think that's very important.

16      And I think, Your Honor -- I don't want to get too

17 far in the audit issue, because you said we're going to be

18 able to do some of that in discovery, but I do think the audit

19 is helpful, because it points us in a clear direction of where

20 those controls are, how are these monies managed, because they

21 have been tested on a regular basis, they've been reported in

22 financial statements and observed.

23      And we do know that auditors obtain audit evidence.

24 They have to maintain that audit evidence for seven years

25 under federal law.  And so that is a readily, easily

1   identifiable body of research and audit evidence that should

2   point us to the clear controls to the special funds that are

3   at stake.

4        And we actually would even assert that the statutes

5   that we're dealing with aren't talking of bank accounts.

6   They're talking the Infrastructure Fund, which is a special

7   revenue fund in the financial statements.  So that's I

8   think --

9        THE COURT:  I think that -- let me hear from the

10  government, because I think the discovery was targeted at

11  identifying the nature and location of the Infrastructure

12  Fund.  And I think what I'm going to hear is the only reason

13  you're getting bank account information is because you're also

14  getting information that indicates where the money came into,

15  and the money came into those bank accounts.  If I'm -- now I

16  should stop talking about accounting and let the government

17  respond.

18        MR. LANGLEY:  I would agree with you.  Real quick, we

19  agree that it goes into bank accounts, but we assert the

20  control mechanism that's talked about in the statute is the

21  fund account that layers onto this, the two -- second layer

22  authentication we have to add.

23        So you have to see where it goes in the bank account,

24  and then how it's controlled from a fund accounting

25  perspective.  Those two layered together is what we assert is

1     how you identify the Infrastructure Fund.

2              THE COURT:  Thank you.

3              MR. NATBONY:  Your Honor, William Natbony from

4     Assured.

5              Not to get ahead of ourselves, but all the arguments

6     that Mr. Langley has made and we've heard may apply equally

7     and should be kept in mind when we get to HTA, because there

8     you have another special revenue fund, meaning Fund 278.  But

9     I'll hold, and we'll deal with that at the appropriate time,

10    with Your Honor's permission.

11             THE COURT:  Thank you.

12             Okay.  Who's responding?

13             MS. MCKEEN:  Your Honor, this is Elizabeth McKeen on

14    behalf of AAFAF.  I will take the lead in responding.

15             I'd like to start, as Ms. Miller did, by making some

16    sort of overarching and general observations.  And then I'd

17    also ask my colleague, Ms. Pavel, to address with granularity

18    the PRIFA specific requests because I think it's helpful not

19    only to address some of the overarching points that have been

20    discussed, but I think, as Your Honor suggested, it will be

21    helpful to focus on the specific requests, because when we do

22    that, I think it will be clearer that the government parties

23    are satisfying their obligations and intend to satisfy their

24    obligations here.

25             You know, I am struck by the extent to which I've

1   heard from both Ms. Miller and Mr. Langley that they need

2   certain things that, in fact, we've agreed to produce.  So I

3   think a lot of what's going on here in the papers and today is

4   based, frankly, on either a mischaracterization or a

5   misunderstanding of what the government parties are actually

6   doing.

7          So with that, you know, as Your Honor referenced,

8   Judge Swain was very clear in her order that the discovery she

9   was permitting should be limited, should be targeted, should

10  be proportional and efficient.  And we actually agree with

11  what you said at the beginning of the hearing.  There's no

12  blanket prohibition on e-mails or on any particular kinds of

13  documents.

14         The approach we're taking is to look at each request

15  and figure out what makes sense with respect to that request.

16  What is the limited, targeted, proportional and efficient way

17  of providing information, providing documents that corresponds

18  to the subject matter?

19         I would say on the flip side of that, we think

20  defendants have completely flouted Judge Swain's directive,

21  and they have propounded shockingly overbroad and burdensome

22  discovery, not only on the government parties, but also on

23  third-party law firms, accountants, banks, and rum producers.

24         And I'm actually glad the subject of the KPMG

25  subpoena came up.  That's obviously not before the Court

1   today, much like the interrogatories that Ms. Miller brought

2   up also are not before the Court, but that's a particularly

3   illustrative example of the overreach that's going on here.

4         They say they tried to think carefully about how to

5   focus their discovery, but they've asked KPMG, who's

6   responsible for auditing the Commonwealth's financial

7   statements, as just one of their requests, to produce all

8   documents and communications concerning Treasury's accounting

9   practices, including the use of fund accounting, GAAP, and

10  GASB principles.

11        That is in no way limited, targeted, proportional or

12  efficient.  And I hope it doesn't actually reflect careful

13  thought, because that's not what it seems like to us.

14  Defendants have not taken it upon themselves to limit what

15  they're asking for, and it has forced the government to go

16  topic by topic and to figure out, okay, what's actually

17  targeted and efficient here.

18        And we've done that.  We have undertaken significant

19  efforts to find new documents and information that were not

20  previously the subject of discovery during the lift stay phase

21  of this proceeding.  We've interviewed at least 20 government

22  personnel.  And since the 56(d) order, we have produced

23  thousands of additional documents.

24        Those documents include documents mapping all

25  Commonwealth revenue sources to the fund numbers that were

1  utilized for expenses.  This includes mapping for Fund 278,

2  which is revenues that were allocated to HTA.  I know we're

3  talking about PRIFA, so it includes revenue account code

4  R4220, which includes the first 117 million dollars in rum tax

5  remittances that were previously allocated to PRIFA.

6       Our export of PRIFA related information, by the way,

7  is not limited to the first 117 million dollars.  So I think

8  that speaks to the issue that Ms. Miller raised.  We're

9  producing bound volumes of documents --

10      THE COURT:  Bear with me for a second, though.  Is

11  there a dispute as to the significance of the first 117

12  million?  I mean, is this an issue -- is this a factual issue

13  that's still in dispute?

14      Ms. Miller seems to think you're distinguishing

15  between 117 million that goes to PRIFA and the first 117

16  million.

17      MS. MCKEEN:  So I think that -- I suppose my response

18  to that is while I understand the point Ms. Miller was trying

19  to make, I'm not sure how she thinks some e-mails are going to

20  shed any light on that.  I think if the parties want to talk

21  about whether the Infrastructure Fund is -- you know,

22  continues to exist in the form of the first 117 million

23  dollars, I think that's a legal argument.  I don't see how an

24  e-mail on that subject is going to inform anything.

25      THE COURT:  So it is still an issue, though, that's

1    in dispute, or subject to discussion?

2            MS. MCKEEN:  So I don't want to speak out of school

3    on that, Your Honor.  And I'd like to defer to counsel for the

4    Board on that to make sure that they are addressing that

5    issue.

6            THE COURT:  Well, unless somebody's comfortable in

7    telling me it's not an issue, we'll just assume it is for

8    today's purposes.

9            MS. MCKEEN:  I think that's fair, Your Honor.  And I

10   think the point I would make there is just that that's not the

11   kind of dispute that's going to be resolved by a one-off

12   e-mail that somebody sent somebody else.

13           In addition to producing that information, we're

14   producing bound volumes for additional PRIFA Rum Bond

15   issuances.  These include resolutions and agreements that were

16   not included in the materials produced in the lift stay.  We

17   are producing additional bank account statements.  We're

18   producing documents from GDB's system.

19           And we're not done.  Those are materials we've

20   already produced.  We have another month to complete our

21   production.  We're preparing a data export from PRIFAS, which

22   is the Commonwealth's accounting system.  It's going to

23   include all transactions from 2014 to the present that involve

24   revenue account code 4220, and that encompasses that first 117

25   million dollars of rum tax remittances.  It also includes

1  expense code E6120, which appeared on some of the vouchers

2  from transfers of rum tax remittances.

3      We're also working really closely with all these

4  entities to locate other categories of documents that we have

5  agreed to produce.  We have agreed to produce GASB 54 fund

6  accounting statements as the defendants have requested.  We

7  said we'll produce bound volumes for earlier rum bonds.  We'll

8  produce resolutions.  We'll produce supplemental agreements.

9  We've agreed to produce vouchers and transfer letters, as well

10  as policy and procedure documents that were not at issue in

11  the Lift Stay.

12      So to the extent the motion, the reply, try to

13  characterize it as though we're refusing to do anything beyond

14  what we already did in the lift stay proceeding or just

15  looking in the same places we looked before, that's just not

16  true.  There are really only two categories of things where

17  we've tried to draw the line, and one of them is this concept

18  of an e-mail search where we'll be asking an IT department to

19  pull someone's entire PST file and run searches against it.

20  We don't think that's the targeted, efficient, proportional

21  way to go here, because what we've actually done is we've

22  spoken to people to ask them where the relevant documents and

23  information are likely to be.

24      And we haven't limited what the answer to that might

25  be.  If somebody tells us, hey, this thing you've asked me

1   for, it's in my e-mail, our response is: Great. Please go

2   get it and give it to us. It's not that we're saying e-mails

3   are sort of categorically out of bounds. What we're saying is

4   we want to search e-mails when we get told by the relevant

5   people that have knowledge that that's where these things are

6   likely to be.

7           We don't want to go off and do the, you know, find a

8   dozen custodians and do a bunch of search terms type of

9   search, because that is not the targeted or efficient thing to

10  do here. But this idea that we sort of have blinders on and

11  we're only looking in one place for documents just isn't the

12  case.

13          When we have spoken to people in an effort to comply

14  with the Court's order, we're going subject by subject and

15  saying, what do you have; where is it; can you get it for us;

16  not only look in some central repository. So to the extent

17  there's confusion on that issue, I'd like to clear it up.

18          THE COURT: Well, I think there is confusion, and I

19  think -- I'm trying to figure out a way to get a comfort level

20  on both sides that the right sources are being reviewed,

21  because that's clearly one of -- that's a theme that runs

22  through all of the papers, you know, where are you looking,

23  and is there this central repository, which is the finite

24  limit of -- the finite limit of your search.

25          So, and then Ms. Miller says, but when we ask you who

1    are the people with knowledge, that's not something you're

2    prepared to answer.

3         MS. MCKEEN:  I think that --

4         THE COURT:  How can we get that information shared

5    among the groups here?  Because I think there are a lot of

6    papers here, and I think the defendants have a right to have

7    at least some understanding as to the scope of searches that

8    are being done.

9         You can do it formally; you can do it informally; but

10   it's an appropriate question.

11        MS. MCKEEN:  I agree, Your Honor, and I think what

12   you're suggesting makes a lot of sense.  If it would be

13   helpful and provide some transparency, we can provide

14   information about, you know, where specifically have we gone,

15   what files have been searched as to each instrumentality.

16   That's absolutely information we can provide, and indeed,

17   would be happy to provide, because we think those searches

18   have been comprehensive and meaningful.  So it's not that

19   we're refusing to provide that information.

20        I think on the subject of the interrogatory that

21   Ms. Miller raised, you know, defendants had suggested that the

22   parties exchange initial disclosures in connection with this

23   proceeding, and we rejected that idea.  We didn't think it

24   made sense or was efficient here.  And they propounded some

25   interrogatories on us, but didn't actually call for the

1    information that Ms. Miller described.

2         They then sought this information in a meet and

3    confer, and we said, look, we don't think it makes sense for

4    you to turn this interrogatory into an initial disclosure

5    process.  We think that's not efficient.  And in particular,

6    some of what they had requested was, you know, anybody that

7    has information or knowledge about, and then would identify a

8    subject matter that's extremely broad.

9         And so the idea that the Commonwealth, you know, in

10   this situation where we're supposed to be targeted and

11   efficient, should be coming up with lists of dozens of people

12   who might at some point in time years past have been

13   associated with the process, that's one way you could do this.

14   It's not the targeted way.  It's not the efficient way.  It's

15   not the proportional way.

16        And so I think what's important to keep in mind here

17   is that for some of the subject matters that the Court said

18   were fair game here, for some of them the answer is we should

19   produce documents; but for others, the answer is if you want

20   to know, for example, the purpose of a particular aspect of

21   fund accounting, the way to find out that isn't to paw through

22   a bunch of e-mails.  It's to ask one of the people who knows,

23   hey, what's the purpose of this.

24        So, yes, for some of these things, deposition

25   testimony may be appropriate.

1          THE COURT:  But how would they know who to ask?

2          MS. MCKEEN:  Well, they'll presumably serve us with

3  an extremely broad 30(b)(6) deposition notice.  At least

4  that's what I anticipate will happen.  So we will need to go,

5  as we did in the lift stay, and identify a witness who will be

6  able to speak competently on that issue in a way that binds

7  the relevant instrumentalities and the Commonwealth.

8          THE COURT:  Well, I think a 30(b)(6) certainly has

9  its role, but it is certainly a step removed from somebody who

10 has the personal knowledge of having done it.

11         MS. MCKEEN:  Well, I guess in this instance I'm not

12 sure if I agree with that, only because while it's true that

13 they are in some cases a step removed, because we are talking

14 about things that happened with respect to different processes

15 over many years, I think the advantage of a 30(b)(6)

16 deposition is that then it is incumbent upon the party being

17 deposed, on the party giving that testimony, to educate its

18 witness so that if that person may not have personal

19 knowledge, they need to go out and find the people that do and

20 educate themselves.  And that is actually a more efficient or

21 can be a more efficient process than taking the depositions of

22 the three, four, five people who may have held the right job

23 at the right time.

24         So I definitely think that the idea that the way to

25 be targeted and efficient here is to be taking testimony of

1    people who have personal knowledge about something, that could

2    get us way off track.  And I would suggest that 30(b)(6)

3    testimony will be much more appropriate, as it was in the lift

4    stay.

5         THE COURT:  Address for me why -- I understand the

6    concern about e-mails, but the blanket objection, I'm not

7    saying I agree with all of it, but I do think that in most

8    cases, e-mails serve different purposes.  But it does seem to

9    me that a number of these categories do call out for some type

10   of accounting documents, and I'm not sure why that was

11   included in your objection, you know, to produce -- you know,

12   I think you wrote there were two types of documents that

13   shouldn't have to be produced, right?  One of which was

14   accounting documents or audit documents.

15        It seems to me that if there is an auditor addressing

16   these accounts or these flows of money, that that would be the

17   file that would include any relevant e-mail instructions or --

18   I mean, the auditors have to document this, right?  So it

19   seems to me that that's an easier way to go.

20        MS. MCKEEN:  Well, so, I think you actually, in sort

21   of grappling with this issue, hit upon an important

22   distinction, which is sort of the distinction between

23   accounting on the one hand and auditing on the other.  So we

24   are producing accounting related materials.  For example, this

25   PRIFAS export that I'm talking about.  That's going to show

1    how this fund accounting was used in practice.

2         So it's not that we are saying, you can't have any

3    accounting related materials.  What we're saying is, you don't

4    need the back and forth between us and our auditor to get at

5    the underlying accounting, how things were treated, because

6    we've agreed to give you things that will reflect how they

7    were treated, how fund accounting was used and practiced.  So,

8    again, it's about trying to be targeted and efficient.

9         As far as the audit materials go, you know, I do

10   think it's noteworthy that that was something that they asked

11   Judge Swain to give them in their Rule 56(d) declarations, and

12   she left it out.  And they've argued, well, she didn't really

13   leave it out, because --

14        THE COURT:  I'm not reading it that way.  I mean, I

15   think I'm reading the order as Judge Swain not doing the

16   discovery.  So, you know --

17        MS. MCKEEN:  Well --

18        THE COURT:  -- I think that's why it's by topics, and

19   if audit material is responsive, I don't think she said,

20   because I didn't allow it as a specific category, that it's

21   precluded.  I think --

22        MS. MCKEEN:  Well --

23        THE COURT:  -- it --

24        MS. MCKEEN:  I'm sorry.  I didn't mean to interrupt

25   you.

1          THE COURT:  No.  I'm repeating myself.

2          MS. MCKEEN:  So here's all I'll say about that.  I

3     think it's important to note that in their 56(d) declaration,

4     in the context in which they ask for the audit papers, it

5     wasn't with respect to any of the topics that are at issue

6     today.  It was in the context of the clawback-related

7     discovery where Judge Swain did not grant their request.

8          With respect to the topics that became part of her

9     order, again, I think the main point is that -- not that there

10    wouldn't conceivably be some way to shoehorn audit-related

11    materials into one of these topics, right?  I'm sure you could

12    do that.  That's what they're doing.

13         I think our point, though, is that's not what's

14    targeted, and that's not what's efficient, because of the

15    accounting related materials that we've already agreed to

16    provide.  And because we are giving them that core set of

17    materials, this other back and forth with auditors just isn't

18    targeted.  It's not necessary.  And we think it's going to be

19    a fishing expedition that's only going to drag things out.

20         So if the question is what is the targeted,

21    proportional thing to do, we're doing that.

22         THE COURT:  But isn't the audit materials a more

23    finite world?

24         MS. MCKEEN:  No, I don't believe it is.  And in

25    particular, I think it's important in that context to

1    appreciate the fact that the Commonwealth is still working

2    very hard with KPMG to complete audited financials for the

3    last several years.

4         And I think the idea, if we start getting into that

5    process, and, in particular, subpoenaing KPMG for all

6    documents and communications about the Commonwealth's use of

7    fund accounting, that the disruption that that will cause to

8    the Commonwealth's ongoing procedures of getting its financial

9    statements audited would be completely disproportionate to any

10   marginal value that kind of material might have when we're

11   already giving them the underlying accounting materials.

12        So I think, yes, those are materials that exist in

13   the universe; but given the disruption it would cause to go

14   off and look for them on the one hand, and all the other

15   things that we are providing on the other hand, I think it

16   would be a mistake to go down that road.  It would be

17   burdensome, expensive and time-consuming.  And we just don't

18   think it's necessary in light of what we're already doing.

19        THE COURT:  Is that your position, though, if they

20   target it to a specific account?  Is it the same burden?

21        MS. MCKEEN:  Well --

22        THE COURT:  If they identify, for example, I know

23   that you -- there's a dispute, but they have identified two

24   accounts that they say may be infrastructure related,

25   Infrastructure Fund related, is it burdensome to produce the

1    audit material relating to those accounts?

2         MS. MCKEEN:  I think it is, because I think it would

3    still require, as a threshold matter, figuring out what it is

4    that they even really think they want.  Because, of course,

5    the motion claims that they're -- they're really being very

6    specific and they only want a few things, but then of course

7    when you go and look at their proposed order, it's incredibly

8    overbroad.  It's not at all targeted in the way that they

9    claim to be targeted in their motion.

10        And I think the difficulty when you start opening the

11   door to communications with auditors becomes a practical one

12   of how to keep things narrow in the way that they should be,

13   because I think we have every reason to believe here that

14   whenever there's any opening, or any chance for more discovery

15   and more documents, defendants will take it.  And that's what

16   we've seen here.

17        Judge Swain's order was very clear that we should be

18   targeted; and what we've seen in response is two dozen

19   third-party subpoenas, and a proposed order here that talks

20   about all documents and communications concerning very broad

21   topics.  And what Judge Swain was talking about was higher

22   level materials, like what are the documents governing

23   something, what is the process.

24        And I think that's the fundamental disconnect here

25   between -- between the sides, is that, you know, they say that

1    they're -- you know, Ms. Miller said they were being targeted,

2    because they hadn't asked for, quote, everything.  That's not

3    our view of what being targeted is.  And I think that's what

4    the Court has to resolve today, so that this doesn't balloon

5    out of control.

6            THE COURT:  Well, I think that the fundamental that

7    I'd like you all to think about and we'll circle around to is

8    how to define and have input into the appropriate places to

9    look for these materials.  I mean, if you're interviewing

10   people who have knowledge about it, it seems to me that Ambac

11   or that the defendants are going to turn around and say, well,

12   we should be able to depose these people.  Somehow they need

13   to be disclosed in this, if these are the people with

14   information.

15           MS. MCKEEN:  Well, I suppose -- I suppose I haven't

16   tussled with that just because the idea that the kinds of

17   folks who know where to send us to look for materials are the

18   same folks that you'd want to depose about the underlying

19   subject matter.  I'm not sure again that that would be

20   efficient here.  I don't think that we need to have discovery

21   about the discovery process.  I think if --

22           THE COURT:  I think that's part of the problem,

23   though.  I'm sorry.  I didn't mean to interrupt you, but that

24   is part of the problem.  It has to do -- when I read these,

25   it's like ships passing in the night.  It's your opening that

1   says, but we are producing these things; and the defendant

2   saying, they're limiting their production to some central

3   file, which I don't know what it is, and I don't understand

4   the investigation that goes into it.

5          That's been a fundamental disconnect, I think, since

6   we started discovery in this many, many years ago; and I think

7   we need to spend a little time on how to make that a better

8   communication, so that if the defendants are feeling that

9   they're not getting -- they always have to bring their motion

10  to compel before they've had a chance to review the documents,

11  because obviously we're in a short time frame here, but the

12  search has to be complete on the topics.  And --

13         MS. MCKEEN:  I think -- I think to the extent the

14  Court thinks it would be helpful for us to provide more

15  detailed information about our searches, that is absolutely

16  something that we're willing to do, because, as I said before,

17  we think those searches have been robust, and, as I said,

18  continue to be robust, because we're not finished yet.

19         So that's information that we can provide.  I think,

20  you know, while we want to be transparent, you know, we still

21  want to be efficient.  And I don't think the fact that we talk

22  to somebody about, like, hey, where might a certain document

23  be necessarily means that person ought to be deposed, but

24  that's of course a discussion we could have at a future date.

25         I don't see any concern with saying that we have to

1   provide defendants with information about where we've looked

2   for things.

3           THE COURT:  All right.  Continue.

4           MS. MCKEEN:  So with that, I would like to turn it

5   over to my colleague, Ms. Pavel, who I think can just, while

6   we're on PRIFA, just quickly go request by request and explain

7   what it is that we either have already provided or will be

8   providing that I think speaks to the topic for each of those

9   requests, because I just want us to be very clear that there

10  isn't a single topic that's at issue in the Rule 56(d) order

11  where the government parties have sort of rested on their

12  laurels and said, we're not doing any more because we already

13  did it in the lift stay.  For every single topic, we are doing

14  more, trying to find more, and I just wanted that to be really

15  clear on a granular level.

16          THE COURT:  Okay.  Thank you.

17          MS. PAVEL:  Good afternoon, Your Honor.  Ashley Pavel

18  on behalf of AAFAF.

19          Ms. Miller mentioned two particular topics, the

20  nature and location of the Infrastructure Fund, and the

21  accounting treatment.  I'll start with the nature and location

22  of the Infrastructure Fund.

23          As we noted in our papers, and I won't repeat it all

24  here, we have provided a lot of information already.  We've

25  spoken to over a dozen people, and we've provided the output

1  of those discussions in a sworn interrogatory response.  We've

2  provided cash flow discovery showing exactly where the 117

3  million that the statute required to be covered into the

4  Infrastructure Fund went.

5       And to Ms. Miller and Mr. Langley's point about the

6  accounting, we are providing an export from the PRIFAS system

7  showing exactly how that 117 million and the rest of the rum

8  tax revenues are being coded.  We have also agreed to search

9  for the GASB 54 statements that they've asked for.  And we are

10 also searching for any policies and procedures, instructions

11 and directives that are given to Treasury personnel as to when

12 to apply these codes or what to use them for.

13      And so I think when Ms. Miller says that we're just

14 not providing anything else, that that's just not accurate.

15 We are providing the accounting discovery that will allow them

16 to test their theory that the Infrastructure Fund is an

17 accounting designation.

18      And the rum tax accounting, I have a similar point.

19 I think it overlaps with the materials that we're providing in

20 connection with the Infrastructure Fund.

21      THE COURT:  So is part of the issue here that you say

22 that you can pull reports from PRIFAS, and the defendant is

23 saying, but we don't know what other kinds of reports can be

24 pulled -- is it helpful to have that conversation?

25      MS. PAVEL:  I think if -- I didn't mean to interrupt

1    you.

2            THE COURT:   No.  Go ahead.

3            MS. PAVEL:   There's a bit of a disconnect.  We're

4    doing a query of the data saying give me all the data points

5    for -- I'll use PRIFA as an example -- revenue code R4220,

6    because that's what has the rum tax revenues.  And then

7    there's actually some manual work that has to be done to make

8    that accessible in an Excel format.

9            We can certainly inquire into what off-the-shelf

10   reports are available, but I don't think it would be

11   appropriate, as the proposed order seems to be asking, for the

12   government to come up with a list of every possible analysis

13   of -- a consultant could sit with PRIFAS for a few days and

14   do.

15           I mean, I think it makes sense to look at the data

16   and meet and confer from there, as opposed to coming up with

17   some comprehensive list of everything that could potentially

18   be done with the data.

19           THE COURT:   Well, I guess I'll circle back to

20   Ms. Miller on this after you're done just on whether the meet

21   and confer to define the scope, or at least to identify the

22   questions that would like to be asked of the system -- I

23   recall reading somewhere that that was an area of dispute as

24   to at least the defendants were feeling that they were unable

25   to identify the reports that could be generated.

1          I have all these brilliant ideas.  We'll see where

2    they go.

3          MS. PAVEL:  Yes, Your Honor.

4          THE COURT:  Yes.  I'm going to like that transcript.

5    Brilliant ideas.  Yes, Your Honor.

6          Okay.  So is there anything else you want to describe

7    about the information that you're providing?

8          MS. PAVEL:  No, Your Honor.  Thank you.

9          THE COURT:  Okay.  Oversight Board, do you want to

10   weigh in on this?

11         MR. FIRESTEIN:  So, Your Honor, it's Michael

12   Firestein on behalf of the Board.

13         And I may yet yield to my partner, Mr. Rappaport, who

14   is more in tune with the PRIFA issues, but I want to just make

15   an overarching statement.  First of all, I agree with what

16   Ms. McKeen and Ms. Pavel have said relative to the searches

17   that have been undertaken and the additional documents that

18   are being produced.  And in some respects, the Court may be

19   correct in terms of ships passing in the night, because the

20   reality is this is not simply an oral communication about what

21   is being produced.  This has been reduced to writing.

22         But the overarching position that I want to just

23   touch on is the fact that the -- you know, everyone is looking

24   to the touchstone of targeted, limited, efficient and

25   proportional.  And no doubt, when the 56(d) order was issued

1    and the follow up status reports were issued, this was fully

2    in the Court's collective mind, both in Your Honor's orders

3    and whatever Judge Swain may have issued, regarding what the

4    calendar is that we're dealing with here.  All right.

5          And it's -- right now the government's document

6    production is to be completed by April the 14th.  Much can

7    happen in a month, but you can't build Rome in a month.  And

8    the discovery is to be completed by May the 7th.  And these

9    were dates that were battled over by the parties with

10   knowledge of what the particularized categories were that were

11   identified by Judge Swain.

12         So there's some balance here that needs to be struck

13   between what the Court's belief was at the time when it was

14   articulating the categories and what is an ever increasing sum

15   of discovery.  And I'll just give a couple of examples.

16         When we talk about providing the names of the people

17   potentially, Ms. McKeen used the term discovery, about

18   discovery, I'm concerned that we'll have 30(b)(6) depositions

19   with three dozen topics for each entity, but we're also going

20   to have 20 individuals who are going to end up being deposed.

21   And that is going to consume so much time between the

22   technology and everything else.

23         Just -- but putting all that aside, just the

24   coordination of that seems like it would have been not

25   contemplated, at least in my submission to the Court, when

1    these categories were particularly identified.  So in my mind,

2    as we go through this, and trying to figure out how to best

3    manage this, I don't want the Court or, frankly, the parties

4    to lose sight of the fact that this is, you know, part of

5    another process.

6         I know what the retort is going to be.  There's

7    billions of dollars that are at stake.  There's been billions

8    of dollars that have been at stake.  And we throw those

9    numbers around loosely as if it's somehow pocket change, but

10   we know it's not, that it's substantial and that the merits

11   are important.

12        However, that was known when we were trying to

13   establish this calendar.  That was known when the Court

14   imposed deadlines on when the Commonwealth needed to file

15   either a term sheet or a plan of adjustment to move these

16   cases along.  So in my mind, I just want to have a notion of

17   perspective that gets factored into the concept of efficiency,

18   targeted nature, and proportional.

19        And if I could, Your Honor, I just want to make one

20   observation about audit work papers.  And I appreciate the

21   Court's comments about, well, it might be subsumed within it.

22   I want to focus, only because Mr. Natbony raised the same

23   issue -- and it pertains to HTA, and if you want me to hold

24   off, I'll hold off.  But it relates to a comment that he made,

25   and it won't take but 30 seconds.  But I'll yield to the

1  Court --

2          THE COURT:  You've got 30 seconds.  Go ahead.  But

3  I'm not listening to HTA right now.

4          MR. FIRESTEIN:  I understand that.  But the only

5  observation I want to make there is with respect to the

6  concept of audit work papers.  In the 56(d) Declaration that

7  was submitted by Mr. Servais relating to HTA, there was a

8  specific category that said documents provided to and

9  communications with Commonwealth and HTA auditors related to

10 pledged revenues, including work papers, engagement letters,

11 tie outs, support for financials, explanations provided

12 auditors.  It goes on.  Nowhere in the 56(d) order is there a

13 discussion about any of that.  It's about materials governing.

14 It's about policies and procedures.  And that's the stuff that

15 Ms. McKeen is speaking to.

16          So I want to be careful that we don't, through

17 slippage, get into things that while there might not have been

18 a blanket prohibition in the Court's view, that nevertheless

19 are things that we have to be very careful about what was and

20 was not intended to be included.

21          And on that, Your Honor, I think I was inside 30

22 seconds.  But I'll just, if I might, Your Honor, it's

23 difficult on Zoom, yield to Mr. Rappaport if he wants to make

24 any observations.  I'm not saying that he should, but if he

25 has any, this would be the time, on PRIFA.

 1            MR. NATBONY:  Judge Dein, did you want me to respond

 2   or did you want to wait for HTA?

 3            THE COURT:  We're going to wait until HTA.

 4            MR. NATBONY:  Thank you, Your Honor.

 5            THE COURT:  We are going to wait.  I think that the

 6   categories are very different for each of the three, and they

 7   are very specific, so we'll deal with them --

 8            MR. NATBONY:  (Nodding head up and down.)

 9            THE COURT:  We'll deal with them in order.

10            Mr. Rappaport.

11            MR. RAPPAPORT:  Lary Rappaport from Proskauer Rose on

12   behalf of the Oversight Board.

13            I think I'm really just going to echo what Your Honor

14   said and what Ms. McKeen said, which is that I think the

15   category or the topic which Judge Swain laid out with respect

16   to the Infrastructure Fund, about the nature and location of

17   the fund and then the restrictions placed on the money, yes,

18   there's a legal interpretation dispute that's been going on.

19   There's disputes as to not what the words of the statute say,

20   but how they're interpreted with respect to the obligation to

21   appropriate the money to PRIFA.

22            The Infrastructure Fund under the statute is to be

23   held by or in the name of -- or I think it's by or on behalf

24   of PRIFA, and our position has been and remains that when the

25   money was being appropriated by the Commonwealth, that first

1   117 million dollars, it went into two funds that were in the

2   name of GDB, which at the time was the fiscal agent for PRIFA.

3   And those funds have been identified.

4   And as the defendants well know, we have different

5   legal positions regarding whether there was a continuing

6   obligation or not, and what the legal effect is of such things

7   as the retention power of the Commonwealth as preemption.  We

8   have a legal dispute over that.  But the fact is that

9   information has been and is being provided by AAFAF, by the

10  government through AAFAF, and they know very well where that

11  money went.  They know when it came from the United States

12  Treasury, where it went.  They know when it left the lockbox

13  account; that it went into the TSA account with the

14  Commonwealth Treasury.  And that's what happened to the 117

15  million dollars.

16  And we could argue all day over the legal

17  significance of it, but that's not the purpose of the

18  discovery.  And I believe that both Ms. McKeen and Ms. Pavel

19  have already explained what is being provided to demonstrate

20  that.  And from our standpoint, we think that it is limited,

21  targeted, proportional and efficient.  And Your Honor will

22  decide what, if anything else, has to be done with it.  But

23  that's not going to resolve the legal dispute from those

24  facts.

25  THE COURT:  Thank you.

1          Ms. Miller.

2          MS. MILLER:  Okay.  So let me start, because I think

3     Mr. Rappaport quite confusingly referred -- totally confused

4     the idea as Mr. Langley was trying to clarify at the outset

5     between funds and accounts.  Yes, we know what bank accounts

6     the rum excise taxes flowed through.  We got a lot of that

7     information.  And to the extent there were gaps, that is being

8     filled.  We all acknowledge that.

9          What we don't know and what they are still, even

10    after Ms. Pavel's summary of everything -- their dissertation

11    of everything they're giving us, they're still not giving us

12    what anybody said contemporaneously about what the

13    Infrastructure Fund was.

14         Did it correspond to an accounting account that is

15    held, a revenue account in the PRIFAS system?  Did it

16    correspond to particular bank accounts?  Was it something

17    else?  They're not doing any analysis.

18         And you look at their interrogatory, and it says,

19    well, the statute says there's an Infrastructure Fund that the

20    first 117 million goes into.  The first 117 million flowed

21    through these two bank accounts after it hit the TSA.  And

22    then it says, based on the foregoing, the Infrastructure Fund

23    was the first 117 million in rum tax remittances historically

24    allocated to PRIFA.

25         Okay.  They do the same thing at CCDA with respect to

1    the transfer account.  I don't know why we have to accept that

2    rather than say, do a search and see.  Did anybody talk about

3    the Infrastructure Fund?  When it was established, in 2006,

4    did anybody say, R4220 is the code that we're going to use for

5    the Infrastructure Fund?

6          Why are we not entitled to know whether there was any

7    internal communication about the nature and location of the

8    Infrastructure Fund and any restrictions that are on it?  I

9    mean, the notion that they're trying -- that they want us to

10   adopt is there is a fund established in the statute.  There is

11   a fund -- that same fund then has a central role in the bond

12   resolution, or the trust agreement in this case, but no one

13   within the Commonwealth ever said anything about it, ever tied

14   it to bank accounts, ever tied it to an accounting account.

15         We don't know.  Maybe it's an accounting account.

16   Maybe it's a bank account.  Maybe in CCDA, we'll just guess

17   and assume it's some combination of three of them.  But I

18   just -- I don't understand how discovery related to the nature

19   and location of the Infrastructure Fund does not include going

20   and looking for what people at the time said was the

21   Infrastructure Fund.  And maybe it's nothing.  And maybe it's

22   a whole lot.

23         And that's where I think the audit materials, which

24   -- I'm going to let Mr. Natbony address HTA, but there's no

25   question that the accounting materials related to all of this

1    is expressly included in PRIFA.  It was not only in the

2    clawback discussion.  It was also in what we had, the category

3    of the nature and location of the Infrastructure Fund, and it

4    is expressly included in the 56(d) order.  And that seems like

5    a targeted place to look.

6         And to Ms. McKeen's point that, well, KPMG is really

7    busy auditing the Commonwealth's current financials, we're not

8    looking to interrupt the current process.  We would like that

9    audit to be completed as timely and as quickly as possible.

10   It's many years delayed already.  But I don't think that

11   asking them specifically for the accounting relating to the

12   PRIFA component unit is going to be particularly burdensome.

13        And I've done a lot of discovery of auditors in my

14   years, and I am always amazed and impressed at how incredibly

15   organized they are.  They have their lists.  Everything is

16   categorized.  It is ticked and checked, and they have the

17   supporting documentation.  And it is neatly held in a very

18   finite doc -- in a file.  And that's all we want.

19        I don't want, because, frankly, I don't have the time

20   or resources to go through every communication that they've

21   ever had with the Commonwealth about anything related to the

22   Commonwealth audit, because I'm confident that that's more

23   volume than I want to look at.  I just want the analysis of

24   the PRIFA Special Revenue Fund.  That's what I want.  You

25   know -- and I'll pause.  I don't know if you've --

1      THE COURT:  I do want to pause.  So are you talking

2 about these two funds that you've identified in the financial

3 statements?

4      MS. MILLER:  Yes.

5      THE COURT:  All right.  Are you talking about -- what

6 are you talking about?  Instructions relating to those funds?

7 If you had to ask the auditors what you needed from them, you

8 want instructions in 2006?

9      MS. MILLER:  So, well, they may -- they probably

10 don't have the 2006 materials, but there's a description of

11 the Puerto Rico Infrastructure Financing Authority Special

12 Revenue Fund.  So there are balance sheets, you know, account

13 balance sheets that got rolled up, because it's a component

14 unit, or becomes a component unit in more recent years.  So we

15 would like documents related to the accounting.

16      So it has, for example, a line item for amounts

17 receivable from other government entities, like to know what's

18 included in that line item.  And then there's a description

19 that includes a description of the nature of the first 117

20 million dollars.  And that description has changed, we would

21 say quite materially, over the last number of years, and in

22 particular, in the audited financials that were released.

23 After the Commonwealth started, you know, came up with this

24 conditionally allocated theory, all of a sudden that comes

25 into the audited financials.

1          And I'd like whatever support there is for that

2     description or the change in what they had previously

3     designated as the nature of those funds, what was the basis

4     for that change.  And maybe it's as simple as, you know, the

5     Title III filing.  Maybe it's something else.  But that seems

6     like it's directly going to the nature and location of the

7     Infrastructure Fund.

8          THE COURT:  So could there be a request to KPMG

9     limited to documents explaining the basis for that

10    description?

11         MS. MILLER:  Yes.  I think we would want the -- the

12    basis for the line items in the balance sheets, and then also

13    for that description.  So it's sort of two pieces, right?

14    There are -- there's the component unit balance sheets, the

15    Special Revenue Fund, what are called like the fund account

16    balance sheets; and then in addition to that -- and I'm

17    looking at Mr. Langley and hoping that he jumps in if I'm

18    saying this totally wrong.  And then in addition to that,

19    there's a general description disclosure.  And those are the

20    two pieces that we would want documents related to.

21         MR. LANGLEY:  Your Honor, and I can provide a little

22    bit of context to that.  At the risk of opening accounting

23    jokes, I am a CPA in addition to being a lawyer, and did

24    perform audit functions for a big four.

25              And we have submitted an expert report here from a

1   CPA that is on the Governmental Accounting Standards Board at

2   Docket No. 83 in the PRIFA adversary proceeding that lays out

3   what he would need to see to be able to make these

4   determinations that he has opined on based on a limited

5   discovery that he got from lift stay discovery.

6        So what we are looking for is like we've identified.

7   They have a debt service fund and a special revenue fund that

8   are specifically attributable to PRIFA, and those identify the

9   117 million.  And to understand what we're seeking, I've

10  actually corresponded with RSM Puerto Rico, who is PRIFA's

11  auditor, and they've already provided an initial disclosure of

12  financial statements from PRIFA that we didn't have.

13       We had the 2015 and 2016, but they've given us 2013

14  and 2014 already.  And there's new information that we didn't

15  have.  We didn't go to auditors.  And we actually see the 2013

16  financial statements showed that the Special Revenue Fund on

17  the Commonwealth's books is actually shown also on PRIFA's

18  books as a restricted asset with 117 million dollars in it.

19       So this discovery that we've already begun has

20  already turned up very probative, relevant information showing

21  this 117 million dollars that's owned by PRIFA.  So that we

22  can target specific -- and we've done that.  There are

23  specific notes that discuss PRIFA.  There are specific notes

24  that discuss special revenue funds and how they constrain

25  resources within the Commonwealth.

1          We can identify those, and go back to the Board and

2     go back to AAFAF and make sure that we're very clear that we

3     are not trying to do a forensic audit of everything that's out

4     there.  I don't want to do that.  I used to do that.  I don't

5     want to do that again.  We can target this and make it very

6     specific to what we're trying to obtain.

7          MS. MCKEEN:  Your Honor --

8          MR. FIRESTEIN:  Your Honor, can I make one

9     observation?  Can I make one observation?  I'm sorry.  I just

10    feel compelled to say this.

11         THE COURT:  You need to first identify yourself and

12    then speak.

13         MR. FIRESTEIN:  Michael Firestein of Proskauer for

14    the Board.

15         We have an understanding with the defendants that if

16    they receive responses or productions, that they would share

17    those productions with us.  This is the first I've heard of

18    something that they have apparently received from a third

19    party, documents responsive to this discovery, and I don't

20    know what he's talking about.

21         And this is not the first instance I've actually had

22    to exchange -- so I want a commitment, if I could implore the

23    Court to have this confirmed, that when they get documents in

24    response to a subpoena, they will send them to us.

25         THE COURT:  I'm assuming that that's the agreement.

1          MR. LANGLEY:  Your Honor, we did provide those.

2   Those are the financial statements for PRIFA.  They were sent

3   over, I believe, from Milbank.

4          So we can confirm with Mr. Firestein and make sure

5   that everything is being done above board, but those were

6   provided.  I think that's a complete --

7          THE COURT:  That's Mr. Langley speaking, by the

8   way.

9          MR. LANGLEY:  I apologize.

10         MR. FIRESTEIN:  This is Michael Firestein.

11         If they have been, that's fine.  I have tried to

12  maintain attention to what we have seen under the

13  circumstances, and I don't recall that.  So if that has

14  occurred, then I'll stand corrected on the point, but I don't

15  recall seeing it.

16         And if -- as long as it's the agreement that's going

17  to be provided, that's good enough for me.  And I'll take

18  Mr. Langley and everybody else at their word on that point,

19  but I don't recall seeing that.

20         MS. MILLER:  Ms. Miller for the record.  Atara Miller

21  from Milbank.

22         I will confirm, or I have confirmed that we have

23  already produced the RSM materials.  And I also -- just so

24  that there is clarity, our intention is to produce documents

25  as we get them on a periodic basis.  So it's not -- you know,

1   we're not going to be uploading things every day, but we're

2   imagining to do it, you know, once a week if it's slow, twice

3   a week if things pick up.

4          So you have our representation, we've committed to it

5   already, and we will continue to produce any materials that we

6   receive.

7          THE COURT:  Okay.  Now, I'm trying to figure out,

8   Ms. McKeen, if there's a very targeted request of audit papers

9   relating to these two accounts, and in particular, the

10  description of these funds.

11         MS. MCKEEN:  So I think what we just heard

12  illustrates the problem that the government parties have had

13  throughout this entire discovery process with what defendants

14  are doing, which is that they say that what they want is very

15  targeted, and they can be very narrow.  And then when the

16  Court comes up with a good idea, which is can this be limited

17  to documents explaining the basis for this description, what

18  you hear in response is, well, it could be that, and then

19  these other things, and communications about these other

20  things, and to be fair, we've also just gotten some materials

21  that shed light on this, but we still need more.

22         I'm going to read what they asked KPMG for.  They

23  asked KPMG for documents and communications concerning

24  Treasury's accounting practices, including the use of fund

25  accounting, GAAP, and GASB principles.  I cannot imagine a

1  more overbroad request.

2       And so I think that what we need to grapple with here

3  is how are we actually going to limit this in a way that makes

4  sense?  Because defendants have shown no ability to reign

5  themselves in.  And so to the extent the Court is inclined to

6  grant some discovery on this issue, it should be exactly as

7  you say, which is it should be limited to documents sufficient

8  to show a certain thing, or a certain fact, not "all documents

9  concerning", not "communications about".  And it should be

10  extremely narrow, not the way that defendants have crafted

11  it.

12       And so I think part of the issue here is that it's a

13  consistently moving and expanding target.  If they had

14  submitted a proposed order with language like you just

15  articulated, we may be in a different place than we are now.

16       So, you know, we continue to think that this is not a

17  path you need to go down, because of all the other materials

18  that are being provided, but I do think if you're inclined to

19  go down this path, there has to be some sort of stringency

20  here, otherwise, to expect the defendants to reign themselves

21  in won't work.

22       THE COURT:  I think there has been a difference in

23  philosophies with the defendants asking for everything, and

24  then saying that you can narrow it in a meet and confer; and

25  the government, on the other hand, saying, we'll figure out

1    what's relevant; and the defendant saying, no, you don't get

2    to vote on all the relevance; we get to figure out what's

3    relevant, too.

4         So I think, you know, you're right, there are

5    different philosophies in this, but I think we do need to work

6    together at this point to finalize this discovery.  I think if

7    there are -- I'm going to ask Ms. Miller to help me on the

8    words, and Mr. Langley, but if there are two specific accounts

9    that you are interested in that you think are relevant, and

10   there is a description of what those accounts are -- so it's

11   not just trace the money and then come up with an idea, but if

12   there is a description of these accounts, and the description

13   has changed over time, that there should be a targeted

14   discovery explaining how these accounts are defined, what

15   they're intended to contain -- reflect, and what is the basis

16   for the descriptions changing over time.

17        MS. MILLER:  So I think what we need -- again, for

18   the record, Atara Miller for Milbank.

19        What we would need are the audit papers related to

20   the Puerto Rico Infrastructure Financing Authority special

21   revenue account -- or Special Revenue Fund, rather, and the

22   Puerto Rico Infrastructure Financing Authority Debt Service

23   Fund, and the related disclosures, or the disclosures related

24   thereto.

25        So the way audited financials work is you have your

 1    financials, and you have the disclosures, and this is the -- I

 2    can't remember what it's called, summary description maybe of

 3    the Commonwealth's special revenue funds, because I think the

 4    section is something like that.  And it specifically is under

 5    the heading Puerto Rico Infrastructure Financing Authority

 6    Special Revenue Fund.  And there is a one paragraph

 7    description.  So we would like audit materials related to

 8    that, those three things.

 9              THE COURT:  So, but --

10              MS. MCKEEN:  I'm sorry.

11              THE COURT:  What does audit materials mean?

12              MS. MILLER:  Well, I think the auditors will have an

13    audit file on the PRIFA Special Revenue Fund.  That's what we

14    want.  And unlike me, where if you want my really important

15    e-mails, you have to go through all of my e-mails, auditors,

16    if an e-mail is important and supporting of a disclosure in

17    the financial statement, will append it to the record, whether

18    it's an electronic record or -- an electronic file or a hard

19    copy file.

20              THE COURT:  So I guess I want to make it clear,

21    though.  We're not talking about the accounting documents,

22    because that's going to be what's being produced by AAFAF, or

23    FOMB, or whatever, through the PRIFAS system.  What we're

24    talking now, and this is in lieu or this is what you're

25    getting instead of the request for communications in general,

1   or e-mails in general, what you're getting is documents that

2   describe what these funds are and why the description has

3   changed over time.

4         MS. MILLER:  So that is an important part, but there

5   is a fundamental difference between the accounting statements

6   in the audited financials and what the -- what the government

7   is proposing to give us out of the PRIFAS system.  Those are

8   two very different things.  One is an account balance sheet

9   for PRIFA.  What are PRIFA's assets and liabilities within

10  this special revenue fund.  There it includes a -- you know,

11  as an asset, a payable from -- you know, a receivable from

12  another government entity, for example.

13        THE COURT:  But that's beyond what was allowed here.

14  I mean, here we're talking an instrument --

15        MS. MILLER:  That's the Infrastructure Fund.  Why

16  wouldn't that describe the nature of the Infrastructure Fund

17  and tell me what's included within it?

18        MR. LANGLEY:  Your Honor, this is Adam Langley again.

19        I think I can find some clarity in this.  So what an

20  auditor would do is they would go to the management of

21  Treasury and the Commonwealth and say, we see that you're

22  reporting this infrastructure fund.  It's a special revenue

23  fund.  That is showing in your financial statements as being a

24  restricted asset for a specific purpose.  What do you have to

25  evidence that this is a restricted asset?

1              And they would provide the law; they would provide

2    whatever they're basing their conclusion on; and then put that

3    in their work papers specific to what they're looking at.

4    Communications, evidence of laws, evidence of whatever

5    documents they're relying on would be there.  So that's a

6    pretty easy, specific, targeted ask.

7              THE COURT:  I think that's --

8              MS. MCKEEN:  Your Honor.

9              THE COURT:  Yes.  Go ahead.

10             MS. MCKEEN:  My only observation would be that --

11             THE COURT:  This is Ms. McKeen.

12             MS. MCKEEN:  Yes.  I apologize.  Ms. McKeen on behalf

13   of AAFAF.

14             I just want to fix this disconnect between the

15   language you keep using, which is documents that describe, and

16   the language Ms. Miller keeps using, which is all documents

17   that relate to.  I think there's a big difference between

18   those two things, and it's the "relating to," "concerning"

19   that gets us into problem territory.

20             So to the extent you're inclined to issue an order

21   around the subject matter that you were just describing, it

22   would be our request that the documents be of a nature that is

23   what I'll call like a "sufficient to show", as opposed to

24   "everything about".

25             THE COURT:  I agree.  I agree with Ms. McKeen, and I

1    recognize that these are not all the documents that Ms. Miller

2    wants; but I think that the discovery is limited to

3    identifying the nature and location of the funds and the

4    restrictions placed thereon.  I think that to the extent there

5    have been these two -- I can't remember if you're saying two

6    or three, I think two specific funds that the defendants have

7    identified, the audit papers which describe and/or explain the

8    nature and content of these funds, and any restrictions placed

9    on the monies therein, need to be produced.

10        And while I assume it will be subsumed therein as

11   special attention to the description of those funds that are

12   included in the audited statements, and I think what's going

13   to happen when this is over is I'm going to ask everybody to

14   submit -- see if you can work out the language together, if

15   you can.  If you submit separately, I'll come up with my

16   own.

17        MS. MILLER:  So, Your Honor, again, Ms. Miller for

18   the record.

19        I just want to make clear that you are contemplating

20   production of materials from the auditors beyond just the

21   disclosure, because, as you described it, I could imagine the

22   government cutting and pasting the disclosure and the audited

23   financials and saying, here you go.  Here is the description

24   of the nature of the restriction.

25        THE COURT:  No, I do -- I am ordering the explanation

1   for the changes, so that would -- it may very well include

2   e-mails.  It may very well include communications.  I don't

3   know.  But I think that those documents would identify the

4   nature and location of -- instead of saying the Infrastructure

5   Fund, I'm saying these two specific funds that have been

6   identified by the defendants as potentially being the

7   Infrastructure Funds.

8            So does that work?

9            MS. MILLER:  I think so.  The devil's in the details,

10  but I am hopeful that we'll be able to work something

11  consensual out in terms of scope.

12           THE COURT:  You see, there's always that fear of

13  letting me write it, which, you know, you never know what you

14  end up with that way.  I think that in addition, when

15  supplemented with the additional discovery that the government

16  has agreed to produce, I'm hearing that that's going to cover

17  the topics that were allowed for PRIFA.

18           MS. MILLER:  So I just want to cover some of the

19  other -- because I don't think we covered all of the pieces.

20           THE COURT:  I do want to talk about, just before we

21  go into anything else specific, and this is to you,

22  Ms. Miller, what about a description of where was searched or

23  input into where should be searched?  How do we get to that

24  point?

25           MS. MILLER:  So I was going to go there next, because

1    I do think that we are entitled to a list of who they're

2    talking about and whether it's names of individuals or it's

3    their position.  You know, if they're just custodial, you

4    know, records people, I don't know that I need their name.  We

5    can go back and ask them for their name if we decide that that

6    information is critical.

7         But, you know, when Ms. McKeen was first describing

8    the 20 people or dozen people that she had spoken to, and made

9    the point, I think quite adamantly, that if they said that it

10   was in e-mails, then they would be searching those e-mails and

11   producing them, but then I heard her say, well, those aren't

12   necessarily the people who have the substantive knowledge,

13   well, if they are not the people who have the substantive

14   knowledge, how are they going to know if someone else has

15   relevant information in their e-mails about it?

16        THE COURT:  No.  I'm saying this is usually covered

17   by the controller and, you know, there are files on that.

18        MS. MILLER:  Of course.  Absolutely.  And that we

19   think that they have done already, and the problem is that

20   that hasn't turned up any information one way or another on

21   what definitive -- about what the Infrastructure Fund is.  And

22   I think the -- sorry.  And I think one of the key points is

23   trying -- we think we are entitled to know whether people

24   contemporaneously within the Commonwealth held certain funds,

25   certain accounts to be the Infrastructure Fund; not a post

1    facto, 20 years later in bankruptcy, when they're taking

2    certain legal positions, what they now say that the

3    Infrastructure Fund was.  Because I can tell you that in 2013,

4    it probably wouldn't have been described as the first 117

5    million that was historically transferred to PRIFA.

6         And I agree that there's going to be legal fighting

7    about the significance of it, but we do need to figure out

8    what the Infrastructure Fund is.  That's what we were charged

9    with.  And the answer that says, well, we'll just never know

10   -- someone has to know it.  I mean, maybe I'm putting too much

11   faith in the Commonwealth, but I am confident that somebody in

12   the Commonwealth knows what the Infrastructure Fund is.

13        MR. NATBONY:  And, Your Honor, William Natbony.

14        MS. MCKEEN:  Your Honor, may I be heard?

15        MR. NATBONY:  Just on the same issue, to add, to the

16   extent that there are relevant custodians, and there are

17   e-mail files of people who are no longer there that could, in

18   fact, have contemporaneous statements or communications

19   relating to what the Infrastructure Fund is, are those going

20   to be searched?  And if they are, you know, I think we should

21   know which ones are being searched, so we can have an

22   understanding as to what the scope of the work is.

23        THE COURT:  Okay.

24        MS. MCKEEN:  Your Honor, a couple of things.  This is

25   Elizabeth McKeen for AAFAF.

1       As I mentioned, I don't have an issue with describing

2   the locations that are being searched, including, if that

3   includes an individual's files.  I think asking us to identify

4   every person we've had a conversation with, that's probably

5   not fair game.  That's work product.  And so I think teed up

6   in that way, that doesn't make sense.  But there is

7   information we can provide about where we've looked for these

8   documents.

9       I think, though, this kind of backsliding into a

10  discussion about being entitled to e-mails about who said what

11  contemporaneously is, frankly, ridiculous.  I mean, that stuff

12  is not going to be probative.

13      As Your Honor observed at one of the hearings on

14  these very issues in connection with the lift stay, no one's

15  arguing ambiguity that's going to be straightened out by some

16  e-mail that somebody sent some place along the line.  It does

17  not make sense.  The defendants are going to have a claim

18  against the Commonwealth at the expense of other creditors

19  based on nonpublic, informal communications that were never

20  subject to the light of day.

21      It does not make sense.  It is not efficient.  It is

22  not targeted.  And it's particularly offensive in light of the

23  fact that defendants said to the First Circuit that they

24  thought this discovery was just gravy, and they didn't need

25  it.

1              And so given what we've already talked about

2       providing in connection with, you know, other things, I think

3       this idea of going back to a conversation about what somebody

4       said in an e-mail five years ago is not targeted or efficient.

5              THE COURT:  All right.  I agree that the discovery --

6       that an e-mail search on the words "infrastructure fund" is

7       not appropriate.  I think that -- I think it would be fine in

8       the world of unlimited discovery, where you could have all

9       your wishes come true, but I don't think that it is the most

10      efficient way; and we are going to run out of time and money,

11      believe it or not, on this discovery.  But I do think what the

12      defendants will have is information as to where all this money

13      went, came in, and the flow of the funds; and to the extent

14      that there are -- I don't know if there need to be account

15      opening documents or the like that would describe these

16      accounts from when the money -- that's what I understand

17      you're producing from PRIFAS, right?

18             MS. MCKEEN:  That is correct.

19             THE COURT:  Like the flow of all of the money?  So at

20      that point --

21             MS. MCKEEN:  Two separate things, so --

22             THE COURT:  Right, but where the money came in and

23      where it was put, it seems to -- is what you're disclosing, or

24      no?

25             MS. MCKEEN:  That information is being provided, yes.

1          THE COURT:  Okay.  So presumably, if it's put into a

2    fund, into an account, assume it's not put into someone's

3    pocket.

4          MS. MCKEEN:  Well, I don't want to conflate the two

5    issues because I think, as defendants have mentioned, there

6    are differences between accounts.

7          THE COURT:  Correct.

8          MS. MCKEEN:  Like bank accounts versus whether funds

9    were designated in some way in a system.  They are going to be

10   getting information about both those things.  They are going

11   to be getting bank account statements.  They are also going to

12   be getting the PRIFAS export that we've described that will

13   reflect how the funds were tagged.

14         THE COURT:  Thank you.  I do understand that, and

15   that was a distinction I was trying to make, that the bank

16   account information has been produced, as I understand it,

17   and/or is still being produced.  The PRIFAS will be the

18   accounting information of how these funds have been accounted

19   for, correct?

20         MS. MCKEEN:  Correct.

21         THE COURT:  All right.  I don't know if those are

22   titled in any way.

23         MR. LANGLEY:  Your Honor, Adam Langley.  If I may

24   speak?

25         Just to clarify just slightly, because I think we're

1   on track, but just need a brief adjustment.  So when we say

2   fund designations, it doesn't do us a lot of good just to see

3   that this was labeled, you know, Fund 111 or Fund 278.  We

4   actually need to know who the custodians would be of that, and

5   who are the persons that are actually authorized to make that

6   entry and make that designation.

7          So there needs to be some understanding as to the

8   control that the Commonwealth and its Treasury have put in

9   place so that we can understand the data that we're going to

10  be given from PRIFAS.  If we don't have that control and

11  custodian level of what is being done, who is authorized to

12  act and what their authority is, we can't understand it.

13         So that would be the only clarification on that

14  discussion that I would add.

15         MR. NATBONY:  Your Honor, William Natbony.

16         Also, there's the question of why.  Why --

17         THE COURT:  I think you should wait until we get to

18  HTA.

19         MR. NATBONY:  But I am on PRIFA as well, Your Honor,

20  so I'm talking about PRIFA, and why the designations were

21  made.

22         THE COURT:  We're not going to go -- all right.

23         MR. NATBONY:  It's not a blank document that says

24  this is designation 42, whatever, for this fund, doesn't tell

25  you why the funds are flowing that way.

 1           THE COURT:  Correct.

 2           MS. MILLER:  Your Honor --

 3           THE COURT:  No.  No.  Wait.  Wait.  Wait.  The second

 4  category of documents are discovery relating to the accounting

 5  treatment, including the use and purpose of account

 6  designations, fund codes and department IDs.  I am assuming,

 7  and I believe I read somewhere, that some documents along

 8  those lines have been produced already.  That is appropriate.

 9  It shouldn't just be a number if there is something that

10  describes it.  And if not, then you'll have to go to the

11  deposition stage for a further description.

12           MS. MCKEEN:  Yes, Your Honor.

13           MS. MILLER:  Your Honor, can I -- Atara Miller from

14  Milbank.

15           Can I just make one point?  Because I think we now

16  quite clearly all have the distinction between bank accounts

17  and funds clearly in mind.  And so I'd like to just take that

18  analogy to sort of make clear where I think the gap remains.

19           What they're giving us are all the monthly

20  statements.  Right.  So not really, but like the aggregation

21  of all of the monthly statement information.  But what they

22  are not giving us is the account opening documents.  They're

23  not telling us what fund is the Infrastructure Fund.

24           When they have a particular fund and account number

25  and money's allocated -- the first 117 million get recorded in

1   that, was that established by saying L.P.R.A. whatever

2   established the Infrastructure Fund, here's how we're going to

3   account for it internally?

4        And so all they're giving us are these monthly

5   statements and saying, well, that should resolve your fight --

6   we'll get to CCDA, but that should resolve your fight about

7   what the transfer account is.  But it doesn't answer the

8   question.  That happens to be a bank account.  This is a fund.

9   We need the account -- the fund establishing documents.  We

10  need whatever materials there are, whether it's an e-mail,

11  whether it's a formal memo, whether it's something else.  But

12  we need that establishing of the Infrastructure Fund within

13  the Commonwealth system.

14        THE COURT:  Ms. McKeen.

15        MS. MCKEEN:  Your Honor, we have told them that we

16  will provide them with the policies, procedures, manuals or

17  instructions that we locate along those lines.  We have also

18  told them that we would provide them with GASB 54 fund

19  accounting statements.  And so to the extent the documents

20  Ms. Miller describes are out there, we have said we will give

21  them to them.

22        So again, here the only dispute goes back to whether

23  we ought to be pulling people's PST's and running search

24  terms.  And I think, for the reasons you've said, that is not

25  targeted or efficient.  We are looking for the kinds of

1  documents Ms. Miller has described, and if we find them, they

2  will be produced.

3        And to the Court's earlier comments, we will provide

4  information about where we have gone to look for those things,

5  so that folks can be satisfied that we're not just, you know,

6  looking in one guy's desk drawer, because that's not what's

7  going on.

8        THE COURT:  I do think that the audit papers, to the

9  extent that there were communications that explain why

10 accounts were set up, they would be included in those.  I

11 think that's a more targeting search than a general e-mail

12 search.  Okay.

13       MS. MCKEEN:  (Nodding head up and down).

14       THE COURT:  All right.  So I'm going to ask you both

15 to work together on that; but if not, just submit something

16 separate, and I will wordsmith it.

17       MS. MCKEEN:  Your Honor, when would you like the

18 parties to submit that?

19       THE COURT:  I guess you better to do it sooner rather

20 than later, right?

21       MS. MCKEEN:  It makes sense.

22       THE COURT:  Okay.

23       MS. MCKEEN:  I don't see any reason we couldn't get

24 it done by the end of the week.  Obviously we want clarity.

25       THE COURT:  I mean, and I am -- I should move on, but

1    I am assuming that the audit materials will come from KPMG as

2    opposed to -- unless PRIFA has audit files of communications

3    with KPMG?

4            MS. MCKEEN:  That's a good question, Your Honor.  I

5    think I'm going to have to look into that.

6            THE COURT:  All right.  I want you to look into

7    that.

8            MS. MCKEEN:  I will.

9            THE COURT:  All right.

10           MR. FIRESTEIN:  Your Honor --

11           THE COURT:  And request that information from KPMG.

12           MR. FIRESTEIN:  I have a -- it's Michael Firestein,

13   Your Honor.

14           I have a question on that.  I gather, so that we can

15   avoid going through the exercise of dealing further on the

16   KPMG subpoena, that that is the limit of the materials, or

17   something -- or something different?

18           THE COURT:  That issue really isn't in front of me,

19   and I don't begin to know what it looks like.

20           MR. FIRESTEIN:  At least as it relates to this issue,

21   though, that --

22           THE COURT:  I don't know what to tell you on that --

23           MR. FIRESTEIN:  All right.

24           THE COURT:  -- so I don't want to go down that rabbit

25   hole.

1        MR. FIRESTEIN:  All right.

2        THE COURT:  Okay.

3        MS. MILLER:  Dare we turn to CCDA?

4        THE COURT:  I don't know.  Is everybody ready or do

5   you need a break?  You're okay?  All right.

6        MS. MILLER:  Hopefully it will be short.

7        THE COURT:  Okay.

8        MS. MILLER:  I do think that CCDA is quite narrow in

9   terms of the area in dispute.

10        THE COURT:  Can I ask a question on CCDA?  Maybe I

11   shouldn't ask this first, but the transfer account and the

12   identity of the transfer account, is that still an issue in

13   the summary judgment pleadings or --

14        MS. MILLER:  (Nodding head up and down.)

15        THE COURT:  -- did the government limit the scope of

16   its request for summary judgment to funds outside of the

17   transfer account?

18        MS. MILLER:  No.

19        MR. KASS:  Your Honor, this is Colin Kass for the

20   Oversight Board.  In our Reply Summary Judgment Brief, we did

21   limit the request for summary judgment to partial summary

22   judgment, recognizing that the transfer account was an issue

23   that the Court had said was a disputed issue of fact.

24        So in our Reply Summary Judgment Brief, we did not

25   seek summary judgment on the identity of the transfer account.

1          THE COURT:  So does that affect the scope of relevant

2    discovery?

3          MR. KASS:  In our view, that should mean that that

4    issue is not on the table, and there should be no discovery.

5          MS. MILLER:  It's Ms. Miller for Milbank.

6          I don't think that the Court saw it that way.  I

7    mean, Judge Swain clearly included it within her 56(d) order.

8          THE COURT:  Well --

9          MS. MILLER:  And it was part of the initial partial

10   motion for summary judgment, and they didn't formally withdraw

11   that.  And it was certainly argued.  So I'm not sure what that

12   means actually.

13         MR. KASS:  Your Honor --

14         THE COURT:  Well, I do think -- the reason I bring it

15   up is I do think that it does take -- there is no topic of

16   identifying the nature and location of the transfer fund.

17   That is not a topic, unlike PRIFA, for the Infrastructure

18   Fund.  There's not a parallel topic in the CCDA, so --

19         MS. MILLER:  Because it's a bank account.  I think

20   because everyone acknowledges that the transfer account is a

21   bank account, and so there are more targeted requests.

22         And so if you look, for example, at topic two, all

23   documents governing the flow of hotel occupancy taxes,

24   including all versions of documents governing the transfer

25   account, well, you have to know what the transfer account is,

1    right?  So I think Judge Swain is saying we want all the

2    account documents for all of the accounts that are implicated

3    here, the transfer account, the surplus account, and any other

4    accounts through which the monies flow through.

5           And then again, if you look at romanette iv, the

6    account opening documents, and in particular, for the GDB 9758

7    account, which is the account that the Oversight Board

8    contends is the transfer account, and the reason why you want

9    those opening -- account opening documents, which they have

10   not found yet, is to determine or to help determine what

11   account is the transfer account or, you know, to the --

12   alternatively, what is the GDB 9758 account, and who owns it.

13          So I think that these requests are clearly going to

14   the question of what is the transfer account.

15          THE COURT:  I'll just point out that it looked to me

16   like the issue had been limited in the reply, and that maybe

17   everybody should focus on that a little in the request.

18          MR. KASS:  Your Honor, this is Colin Kass again for

19   the Oversight Board.

20          We did limit it in that way, and we do think that

21   that should govern the scope of discovery for these

22   proceedings.

23          MS. MCKEEN:  Elizabeth McKeen, Your Honor.

24          I think at a minimum it informs how you ought to

25   think about what is targeted and efficient on these topics in

1    light of what's been said in the papers.  So --

2         MS. MILLER:  Well, I --

3         MS. MCKEEN:  -- for this subject matter, I think

4    we're kind of in the same space as we were with PRIFA, which

5    is that we are providing an awful lot of information that is

6    responsive to all of these topics.  We just don't think, in

7    light of the posture, that searching through e-mails makes

8    sense.

9         And I'm happy to go through each request and explain

10   what we are providing, but again, here the government's

11   position is that in light of where we are, and what we have

12   provided, and what we've agreed to look for and provide, it is

13   not targeted or efficient to search for e-mails about what the

14   transfer account might or might not be.

15        THE COURT:  Ms. Miller.

16        MS. MILLER:  So, Ms. Miller, for the record, from

17   Milbank.

18        But just to be clear, I mean, I hear your point and,

19   frankly, I was surprised when I read the partial summary

20   judgment motion after the lift stay decisions came out,

21   because I would have thought that that would just have been

22   off the table.  But even in the motion to compel brief, they

23   go at whether the discovery is sufficient to demonstrate what

24   the transfer account is.

25        And so they make the point on page 22 that, you know,

1    essentially they are agreeing to produce documents.  They are

2    going to work with the banks and get the additional bank

3    account statements that show the flow of the monies.  And

4    they're going to let us trace the hotel tax revenues from 2006

5    through some pseudo recent date.  And then they say, this

6    discovery will demonstrate which account is the transfer

7    account by showing how the flow of funds changed between the

8    bond issuance and the 2015 start of the lift stay discovery.

9         It's possible.  Maybe it will.  Maybe it won't.

10   Clearly, I think you are aware that the dispute was -- you

11   know, do you look at whether it's coming in in the first

12   account or whether it's going out.  There seems to be an extra

13   account in the flow, and so what do you do with it.  And which

14   one is the transfer account.

15        So I don't know that that's going to resolve the

16   dispute.  I think it's going to cement the dispute that we

17   have, because I think we all acknowledge the flow, and even

18   with the missing information, other than the particularized,

19   you know, transactions which they are giving us.  But at the

20   very minimum, that's like the least efficient way of getting

21   at this issue.

22        Literally piecing together and -- you know, we spent

23   many, many, many -- I was going to say hours, but days trying

24   to piece together the flow of funds to various accounts based

25   on the account -- bank account statements that we got.  It is

1    an arduous effort.  And the idea of going all the way back to

2    2006, and all of a sudden we're going to have this aha moment,

3    and that's more efficient than running a search in e-mails for

4    a transfer account to see if there were any accounts in

5    electronic documents or in e-mails -- I mean, frankly, I'd

6    take the electronic documents, also, that specifically

7    identify or discuss an account called the transfer account and

8    identify the bank account, it just seems totally backwards to

9    me.

10        I mean, we're doing this whole forensic analysis, and

11   then we're going to come to a conclusion based on that simply

12   to avoid doing any search other than account statements.  And

13   I understand, and I really don't want to have to sit through

14   the listing of all the information they're giving us, I

15   acknowledge our dispute is narrow on CCDA.  This is the nature

16   of the dispute.  And with respect to this issue, they won't

17   look for what anyone said, or identified, or maybe even in

18   monthly e-mails identified as a transfer account.

19        We are not looking -- we're -- clearly we're not

20   going to prevail on an argument based on a one-off, you know,

21   e-mail by some clerk.  That's not what we're looking for.

22   We're looking for whether there are core documents that, when

23   the accounts were established, discussed it, spoke about when

24   the documents -- you know, this is a suite of three documents

25   that come together.  Was there a discussion of the accounts,

1  and how they worked together, and which bank account related

2  to which account designation in the documents?  Was there, you

3  know, a monthly e-mail that went out that said the money is

4  moving from the transfer account to the surplus account?

5         That's the kind of thing that we're looking for, and

6  they're just blanket refusing to give it to us.  And I'm not

7  looking for, you know, a search term that we're going to have

8  to negotiate a long list and parameters.  I just want to

9  search for "transfer account."

10        THE COURT:  Tell me why that's still relevant.

11        MS. MILLER:  Well, because I think -- I think that it

12  is relevant because, first of all, I don't think that the

13  Court views the Oversight Board as having withdrawn their

14  summary judgment motion.  But I also think that it's relevant

15  to the extent that they're moving as to all monies that aren't

16  in the transfer account.  They certainly didn't drop it with

17  respect to all monies in the Scotia Bank account.

18        So it's like a little game of, oh, well, we're not

19  moving with respect to monies in the transfer account, but

20  you're also wrong about which account is the transfer account.

21  So you don't really have a lien on this -- on this bank

22  account.  And I just -- you know, we shouldn't -- it was their

23  motion.  They defined it.  They should be held to it.  And we

24  shouldn't be put in a position where we're subject to games

25  like that.  And the consequences are material.

1          THE COURT:  So did you get the account opening

2    statements or you didn't get those yet?

3          MS. MILLER:  I'm not sure.  I think efforts were made

4    to get them.  I don't fault the Oversight Board or AAFAF for

5    this.  I think efforts were made to get them.  We don't -- we

6    didn't get them in the lift stay.  They tried to get them.  We

7    still don't have them.  I'm hoping that they will get them,

8    but it may be that they just don't exist.

9          MS. MCKEEN:  Your Honor, may I be heard on this?

10         THE COURT:  Yes.  Yes.

11         MS. MCKEEN:  So from our perspective, I think

12   everything Ms. Miller just said kind of illustrates our point,

13   which is that as she acknowledges, it's not the one-off

14   e-mails that are going to be important here.  Your Honor

15   acknowledged that the last time we sort of went through this

16   at the last hearing.

17         I will say it's distressing to hear that it's such a

18   pain to go through all these old bank account statements that

19   they specifically demanded that we provide it to them, and

20   they have subpoenaed many third-party banks for it.  If they

21   don't want to go through the trouble, then I wish they

22   wouldn't ask us for all the things, because it's awfully

23   burdensome.

24         But I think the point is the reason we provided them

25   wasn't to avoid doing an e-mail search.  The reason we

1   provided them is because that's what matters.  What matters is

2   how the money flowed, because that's going to allow someone to

3   figure out who's right about what the transfer account is.

4          And I'll give you a good of example of that.  Just in

5   connection with complying with the Rule 56(d) order, we

6   located a former tourism account that we hadn't found in

7   connection with the lift stay proceedings that's called the

8   room tax transfer account.  And it turns out that it's never

9   had a single dollar in it.  And we've now provided them with

10  the statements that relate to that account.

11         But the thesis that what an account is named or what

12  somebody says in an e-mail about it is going to be what

13  matters here is wrong.  What matters is where the funds went

14  when.  And they're going to have, as Ms. Miller pointed out,

15  oodles of documents to go over on that issue.

16         So the suggestion why can't we just go through more

17  e-mails I think is particularly badly taken here in light of

18  the proportionality concerns and the posture of the same.

19         THE COURT:  I think that what -- the thought was that

20  the opening account statements would be a good source of

21  information as to the identity or importance of the account,

22  but you're now saying you can't locate those, so --

23         MS. MCKEEN:  Well, we're still looking, Your Honor.

24  Those aren't efforts we've given up on.  And certainly

25  anything additional we find, we will provide.  We are working

1    with the banks.  We are doing our level best on that front.

2         THE COURT:  Is your investigation with the bank

3    including communications with the bank, banks, relating to the

4    opening of the accounts?

5         MS. MCKEEN:  I believe so, but I'd like Ms. Pavel to

6    make sure I'm not talking out of school here.  I believe we've

7    tried to be as comprehensive as possible in our requests for

8    anything we have that bears on this issue.

9         THE COURT:  Ms. Pavel.

10        MS. PAVEL:  Ashley Pavel on behalf of AAFAF.

11        So when we went to third-party banks, we did ask for

12   any opening materials of any kind, and provided what we

13   received.

14        In connection with the GDB 9758 account, where we

15   were not able to find an account opening statement in GDB or

16   Tourism's records, we had actually taken a screenshot of the

17   account opening information that's in GDB's banking system and

18   provided that.  We are still continuing to look for whatever

19   else there may be.

20        THE COURT:  In your search, do you know who was

21   responsible for opening these accounts?

22        MS. PAVEL:  I do not believe so.  I have to look back

23   over the documents, but I don't think so.

24        THE COURT:  I'm wondering if there is a hard copy,

25   custodian of records, that you can look for.  I mean, I think

1    that the -- unless you can all agree that this issue is not a

2    live issue at all, it seems that the opening documents, the

3    opening statements were important.  And they were important to

4    see how the accounts were organized -- were identified.

5           So I need something to substitute for that, if you

6    can't find it.

7           MS. PAVEL:  We are also working with the Tourism

8    Company, and we are looking through -- GDB is not operational

9    anymore, but we are looking through their issuer archives on

10   the CCDA bond issuances to look for any resolutions,

11   instructions, similar materials like that that would disclose

12   which account was intended to serve which purpose as the bond

13   documents were being implemented.  If we find it, we will

14   produce it.

15          THE COURT:  When you say you're looking through their

16   documents, are you looking through them electronically?  How

17   are you looking through them?

18          MS. PAVEL:  So it's a combination, and it varies

19   depending on entity.  For GDB in particular, they had boxes

20   for each issuer that were digitized and in the possession now

21   of AAFAF.  And so we are looking document by document through

22   that archived box at GDB.

23          At Tourism, we're working with the chief financial

24   officer and in-house counsel to determine where their

25   documents may be and search the relevant files on that point.

1          THE COURT:  So what's the objection -- it sounds like

2     you are doing the search that's needed to show how these --

3     which document -- I'm sorry.  You are doing the search to

4     identify which account was identified as the transfer

5     account?

6          MS. PAVEL:  Yes, Your Honor.

7          THE COURT:  So why are we fighting with each other on

8     this one?  Is this another one where it's a disclosure of the

9     scope of the investigation that's more important?

10          MS. MILLER:  This is Atara Miller from Milbank.

11          This is certainly the first that I've heard sort of a

12     detailed description of what they're doing to try to locate

13     these materials.  You know, I just -- that is more comforting

14     to me.  And, you know, we can reserve on that and come back if

15     those efforts are not fruitful and don't get relevant

16     information to try to figure out a second avenue.  But that's

17     much more comforting to me than just saying, well, we'll give

18     you more of the account flow funds documents that we all -- we

19     both put before Judge Swain, and she said it's not enough.

20          Doing more of that for more years isn't going to

21     elucidate the issue any more.  So I agree with you that we

22     need to come up with another strategy, and account opening

23     documents are helpful.

24          So, you know, on this, I'm happy to reserve.  I'm a

25     little concerned, because of the time constraints, but I am

1   happy to reserve, and see what they come up with, and raise

2   with the Court in a subsequent status report or motion if we

3   can't -- if they are not successful in their search in

4   locating relevant information.

5          I do think we need to get more information, and so

6   just saying we did the search and didn't find anything, we're

7   going to have to come up with another search to do.

8          THE COURT:  Well, Ms. McKeen and Ms. Pavel, is this

9   appropriate for you to confirm, we can do it in writing, a

10  letter to each other, that you're searching for the documents

11  which would describe which account was considered the transfer

12  account, and you can then explain generally where you're

13  searching for it?

14         MS. MCKEEN:  Yes, Your Honor.

15         THE COURT:  Okay.  So let's leave it at that for now.

16         MS. MCKEEN:  (Nodding head up and down.)

17         THE COURT:  Okay.  Oh, no.  I have to go to HTA.

18  Where are you?  I've run out of bonds.

19         MR. NATBONY:  Thank you, Your Honor.

20         MR. FIRESTEIN:  I'm disappointed, Your Honor, that

21  you said that it was an "oh, no" factor relative to moving on

22  to HTA.

23         THE COURT:  There are many of you that want to speak

24  about it.

25         MR. NATBONY:  We do have a little bit to say, Your

1    Honor, so I'm sorry that I do, but it's necessary.

2         MS. MCKEEN:  This is your last chance to give us a

3    break, Your Honor.

4         THE COURT:  Does anybody need a break?

5         MS. MCKEEN:  No.  I'm teasing.

6         MR. NATBONY:  Your Honor, I'm fine if you want to

7    proceed.

8         THE COURT:  We can proceed, but Zoom breaks are

9    allowed.

10        MR. NATBONY:  Thank you.  And, Your Honor, I just

11   want to say to counsel and Your Honor, I hope everyone's doing

12   well and being safe.

13        So I think the discussion of PRIFA kind of raises

14   some similar issues with respect to HTA.  So I think that the

15   questions of what is being searched, the question of, you

16   know, are they looking at individual custodians that are

17   relevant as opposed to some central file, and those are

18   relevant issues, I think, that -- I have a couple of kind of

19   general comments, and then I'll go through the specific three

20   issues, I think, that remain here that I think we need to

21   discuss.

22        But first, before HTA, as with the other credits, I

23   think it's important to emphasize that we are dealing now with

24   a merits decision.  I mean, this is not a lift stay situation.

25   And Judge Swain has basically ruled that there are topics that

1    she needs a more complete record to have in order for her to

2    make a decision.

3          And when I hear Ms. McKeen say, oh, there's no

4    ambiguity here, the fact is there is.  I mean, the bottom line

5    is Judge Swain has ruled that she can't deal with these

6    credits solely on the basis of the statutes, you know, and

7    the -- you know, and the evidence that she has before us, and

8    does need extrinsic evidence.

9          So to the extent that there is some implication that

10   an institutional view of what a statute or what a fund means,

11   or what the flow of funds means, or why certain funds are

12   restricted, for instance, why Fund 278 was created, why those

13   funds are segregated, these are all factual issues that need

14   to be resolved.  And there needs to be extrinsic evidence

15   about it.

16         Now, nobody is saying we should have e-mails from

17   everybody on the lower level, but to the extent that there is

18   an institutional recognition somewhere about the

19   interpretation of what Fund 278 means and why it was created,

20   that's important.  And I also hear, you know, the government

21   saying things like, you know, of course it has to be a

22   targeted search.  And we agree there has to be targeted

23   searches and targeted discovery.  But given the fact that this

24   is a merits decision, targeted doesn't mean preclusive in the

25   sense of preventing us from getting the discovery that we need

1    to challenge the summary judgment motion.

2          And I know there's a deadline, and I know we have to

3    work within that deadline, but the fact of the matter is that

4    the government started off with a position of, look, we're not

5    searching any e-mails.  All we're searching are custodian

6    files.  We're not identifying any custodians.

7          So, you know, in terms of delay and timing, the

8    government has been successful in putting this off for a

9    little while, and I don't think the deadline, you know, should

10   stand in the way of us getting the relevant discovery.  That

11   said, let me move on to I think what the three main issues in

12   my view are that I think Your Honor has to address.

13          So Judge Swain, in her decision, clearly recognized

14   that Fund 278 is extremely relevant to her determination, and

15   it's important.  Now, why?  This is not just about bank

16   accounts, as the government would have you believe at some

17   point.  Every penny of the HTA excise taxes were recorded in

18   this Fund 278 by the Treasury.   And interestingly enough,

19   when HTA wanted to transfer those excise taxes from that fund,

20   from the Commonwealth TSA, they signed a voucher, sent it to

21   the Commonwealth, and bingo, HTA got the money.

22          When HTA prepared their financial statements, the

23   excise taxes that were in Fund 278 were reflected as HTA's own

24   income.  And when the Commonwealth put out financial

25   statements, they excluded the excise taxes from their own

1  statement of revenues.  So the important issue of who owns the

2  excise taxes, are the excise taxes being held in trust or for

3  the benefit of HTA is an issue that is in dispute, is an issue

4  where there's ambiguity.

5         So when you have issues like the accounting

6  documents, conversations with the auditors, why do the

7  financial statements for both HTA and the Commonwealth say

8  what they say?  Why was Fund 278 created?  Why is it, if the

9  Commonwealth believes that the excise taxes are its money and

10 not held in trust for HTA, why does it have to be segregated?

11 What was the purpose of forming Fund 278 and those subaccounts

12 if not for the purpose of holding, for the benefit of HTA, or

13 with the recognition that it was HTA's funds?  And it's on

14 that issue that we basically have nothing.

15        I mean, we have where did the money go?  That's

16 great.  There's a Fund 278.  But even in the flow of funds

17 charts they prepared, all they gave us was a flow of charts to

18 bank accounts.  They don't even mention Fund 278.  So we don't

19 know how Fund 278 works.

20        And what they want to do is they want to go into

21 their PRIFAS system, pull out some numbers and say, okay, here

22 we have these codes and these codes.  That's great.  But it

23 doesn't tell us why was it created, what was the purpose of

24 it.

25        So what don't we have?  We don't have all that stuff

1    related to Fund 278.  And, in fact, we don't have anything

2    from the Commonwealth on Fund 278.  They did give us in the

3    lift stay discovery one Excel spreadsheet that showed from the

4    HTA's perspective what was in Fund 278 and requests for

5    transfers.  But from the Commonwealth, nothing.  And they said

6    they're not going to give us anything more from HTA.

7          We haven't received records of balances and transfers

8    from the Commonwealth, only, about HTA, one Excel spreadsheet.

9    We haven't received any information about why Fund 278 was set

10   up; what do the codes mean; are they restricted.  And that's

11   part of the relevant information.

12         We haven't received the Treasury regulations that

13   govern special funds like Fund 278.  They gave us regulation

14   49, but that doesn't apply, because it applies only to General

15   Fund appropriations.  These funds were never put in the

16   General Fund.  They are in this special Fund 278 designation.

17         Now, the government says that it will give us

18   Commonwealth, not HTA, but Commonwealth regulations, policies,

19   procedures, but the question is where are they going to look

20   for it.  All right.  I mean, if they're going to look on -- in

21   some central file, but not on the desks and in the files of

22   those people who are responsible for dealing with Fund 278, or

23   the top officials that are charged with overseeing Fund 278,

24   what good is it?  It's flat out refused to provide that

25   information from HTA.  Why are the funds being segregated that

1    way?  That's what we need to know.

2        And another example is Fund 278, just like on the

3    PRIFA argument, it's an accounting fund set up under

4    government accounting standards, but again, what standards

5    existed?  What instructions were given to HTA and Treasury

6    officials about why those excise taxes should be recorded in

7    Fund 278; how they should be recorded?

8        Look, the issue here is who the funds belong to.

9    This is all relevant information.  And clearly, all the stuff

10   related to the specific auditor work papers relating to Fund

11   278, in answering questions of why things are said in the

12   Commonwealth and HTA financial statements, why they were set

13   up, they're all relevant to the -- Judge Swain's direction

14   that policies and procedures related to the flow of excise

15   taxes be produced.  That's the topic:  What are the policies

16   and procedures.

17       Now, so in that sense, the purported documents that

18   we're talking about, as I think we've said earlier, is not

19   really that burdensome.  I mean, to the extent that there are

20   discussions amongst the internal and external auditors, they

21   should be in one place.

22       The auditors are the ones responsible, Your Honor,

23   for understanding what the government standards and policies

24   and procedures are.  And those are the words that Judge Swain

25   used, what's governing, and what are the policies and

1    procedures, and whether they're being followed by the

2    Commonwealth and HTA.

3         They rely on conversations, representations in

4    connection with the preparation of the financial statements.

5    What were those communications?  What were those statements?

6    What were the audit documents pertaining to the policies and

7    procedures specifically relating to the flow of funds into

8    Fund 278?  Were they put there because they're restrictive

9    funds?  Were they put there because they're in trust for HTA?

10   Documents like that should be produced.

11        So that, I think, is the first issue that I wanted to

12   say.  And the other thing I just want to point out to Your

13   Honor is we talked about flow of funds.  Just so everyone

14   recognizes, flow of funds is static, right?  I mean, we have a

15   flow of funds chart just on bank accounts, not on Fund 278,

16   and that flow of funds changed four or five times over the

17   course of the HTA history.

18        And we -- when we asked during the lift stay, why did

19   the flow of funds change, why did you first send money to the

20   fiscal agent, you know, so they could get into the Sinking

21   Fund.  And why did you change it, why did you change the flow

22   of funds and take money away from the fiscal agent?

23   Objections were made, and we're told that "why" was not going

24   to be responded to.  Well, now it's time.  It's time to get

25   those answers, and it's time to see if there are documents as

1    to why the flow of funds changed if they are available.

2           The second issue, and just before I move on, to the

3    extent --

4           THE COURT:  It's a lot of subparts on that first

5    issue --

6           MR. NATBONY:  I'm sorry, Your Honor.

7           THE COURT:  -- I have to say.

8           MR. NATBONY:  I understand.  But look, where are they

9    going to search?  Are they going to go to the relevant

10   Treasury management personnel, for example, the finance,

11   and/or accounting, and the controller?  Are they going to look

12   at those files?  Are they going to see -- because they are

13   going to likely have documents relating to the institutional

14   viewpoints relating to Fund 278.

15          And I get it, Your Honor.  It's like Ms. Miller said,

16   we're not looking for e-mails or things like that from

17   countless low level government employees, but there must be

18   somebody that says something about why are we forming this

19   Fund 278; why is it even necessary.  They never even answered

20   that question.

21          Why are all these funds that come in that they claim

22   are the Commonwealth's funds and that HTA has no interest in,

23   why are they not just being put in their general fund?  And

24   they're not.

25          So all this information about why the flow is flowing

1    the way it is, is precisely what Judge Swain needs to look at.

2    And Judge Swain needs to understand, why is it being done that

3    way, and how does it show what the institutional viewpoints

4    were, both in financial statements and otherwise, as to who

5    owns or has an interest in the funds.

6         Second issue:  Judge Swain ordered the production of

7    specific documents relating to the transfer of funds from Fund

8    278 to HTA.  So the question is, we argued that the excise

9    taxes recorded in Fund 278 were received by HTA and did not

10   belong to the Commonwealth, in part because HTA could

11   unilaterally transfer the money out of the Commonwealth's TSA.

12   And they did that through vouchers and transfers.  And we've

13   seen some of those transfers and vouchers.  Not all of them,

14   but we've received most of them.

15        Excuse me, Your Honor.  That's better.

16        So we've received some of them, but not all of them.

17   Our position has been that Judge Swain has ordered the

18   production of documents on a topic concerning the Treasury's

19   role in the approval of transfers to HTA, and, two, the extent

20   to which the excise taxes were or have been made available to

21   HTA.

22        Why do we need that discovery?  We need it to permit

23   us to test whether the Commonwealth implemented transfer

24   vouchers, you know, and the Commonwealth's signatures on them

25   were, as a matter of course, ministerial and not substantive.

1    That's the position we've taken.

2          We're not aware that there's ever been a voucher

3    that's been rejected.  So the question is, we need all the

4    vouchers.  We need to see if anyone has ever been denied, you

5    know, or rejected by the Commonwealth for one of these

6    transfers.  When we asked Mr. Ahlberg, their 30(b)(6) witness,

7    that question, he wasn't aware of any, but he wasn't sure.  So

8    we need to see those transfers, all of them.

9          Now, again, Judge Swain specifically recognized that

10   she could not determine what Treasury's role was in the

11   approval process based on the record that she had before her.

12   You know, and interestingly enough, the prior production that

13   the government provided was clearly insufficient.  And I don't

14   know if they're looking at any other places now other than

15   they did before, but for instance, they did provide one

16   Treasury circular in the lift stay motion, which was not

17   relevant.

18         We, on your own, went on the internet and found

19   another Treasury circular that actually said that the approval

20   authority for transfers out of that account had been given to

21   HTA.  They never produced that.  So where were they looking?

22   If they're going to look where they looked before, then that

23   is an insufficient look.

24         What other policies, instructions, and procedures

25   exist with respect to Fund 278, you know, and the transfers,

1   the specific issue -- what role did Treasury have?  Could

2   Treasury say no?  Could Treasury not say no?  And who's going

3   to know that?  Who's going to know that?  Where are they going

4   to look?

5        I would suggest that they need to look, you know, at

6   the people who were dealing with the vouchers.  All right.  And

7   we've tried.  I mean, look, interrogatories or depositions are

8   no replacements for the documents themselves.  You know,

9   self-serving testimony is not a substitute for contemporaneous

10  documentation.

11       We know the transfers existed.  We know who made the

12  transfers.  In our reply, we identified likely custodians, you

13  know.  There are two or three or four people that actually

14  requested the transfers from HTA.  There are one or two people

15  on the Commonwealth side that actually signed off on the

16  vouchers, to the extent that it was required to do so.  Maybe

17  there are vouchers that were never signed that got paid.  All

18  of that is relevant.

19       So we think that at minimum, at minimum, Your Honor,

20  the Commonwealth should be ordered to meet and confer with us

21  about specific custodians, the need to be -- search with

22  respect to this very particularized, very specific issue.

23  What was the role of the Treasury in approval of these

24  transfers?  It's not a broad subject.  And it can't be that

25  difficult.  We know who was involved in them.  We know who the

1    relevant custodians are.

2           THE COURT:  Okay.  I'm going to ask you to breathe

3    for a minute.

4           MR. NATBONY:  Yes.

5           THE COURT:  And I'm going to take a two-minute break,

6    and I'm going to ask the court reporter to send a text or

7    however you are communicating to let us know whether you need

8    a longer break.  But let everybody take two minutes of just

9    breathing here.

10           MR. NATBONY:  I only have one more short issue, so --

11           THE COURT:  You have a lot of subparts on your

12    issues.  So I just want to make sure that the court reporter

13    is okay.

14           MR. NATBONY:  Thank you, Your Honor.  Two minutes?

15           THE COURT:  Two minutes.  Two-minute stretch.  Okay?

16           (At 4:52 PM, recess was taken.)

17           (At 4:54 PM, proceedings reconvened.)

18           THE COURT:  If everybody's ready, you can come back

19    on.

20           MR. NATBONY:  Your Honor, I'm just going to wait

21    until I see everybody's picture.

22           THE COURT:  Yes.  Thank you.

23           Okay.  I think we're good.

24           MR. NATBONY:  May I proceed, Your Honor?

25           THE COURT:  Yes.  Thank you.

1         MR. NATBONY:  So I had one more issue, and that's

2    relating to documents that govern the HTA bonds.  So -- and

3    that is the topic one in Judge Swain's order.

4         So a material issue here is whether the HTA bond --

5    HTA board, I should say, in authorizing the 2002 Bond

6    Resolution intended to be bound by a 2002 security agreement.

7    That agreement was signed by HTA's executive director.

8         And the security agreement is very important, because

9    it goes to the scope of the lien of the excise taxes.  In

10   particular, the 2002 documents are important, because the

11   security agreement provides that the security interest applies

12   to monies required to be deposited in the Sinking Fund, as

13   opposed to just monies that actually do get deposited in the

14   Sinking Fund.

15        The government has basically said, no, the 2002

16   Security Agreement was unauthorized by the Board and,

17   therefore, the signature is not valid by HTA's executive

18   director.  So Judge Swain responded by authorizing discovery

19   with respect to all documents governing the HTA bonds,

20   including all versions of bond resolutions and documents

21   identifying signatories, and here's the key language, and/or

22   those bound by the bond resolutions.

23        So HTA's files in particular need to be searched for

24   documents showing whether, in connection with the 2002

25   Resolution, HTA's board agreed to be bound by the 2002

1   Security Agreement, which was signed by the executive

2   director.  Now, I haven't heard the government say they're

3   going to search HTA files.  I've heard them say they're going

4   to look at some central file, which is undefined, of the

5   Commonwealth or GDB's records; but of course that is likely

6   not where the relevant materials are going to be.

7        I think there needs to be a search of the executive

8   director's files.  And here, I think the e-mails are relevant,

9   because we need to search the secretary -- I mean the

10  executive director of HTA, and the secretary or person

11  responsible for maintaining the records of HTA's board.  This

12  is I think where e-mails are particularly relevant, because

13  they're likely to show the extent of authority and

14  communications with the Board about the security agreement.

15       Now, interestingly enough, the government takes the

16  position that they only have to produce documents relating to

17  older resolutions, like the 1968 and 1998 resolutions, not the

18  2002 Bond Resolution or security agreement.  Judge Swain's

19  order does not limit it in that respect.  And, in fact, Judge

20  Swain's decision on the Lift Stay specifically addresses this

21  2002 Security Agreement, and, therefore, it is, in fact, now a

22  merits issue that needs to be decided.

23       So all in all, Your Honor, those are the three issues

24  I think that cover what I know of that we have a dispute.

25  It's my understanding the government is willing to provide us

1    with, you know, bank account statements and bank opening

2    documents, and I believe even the vouchers, you know.  But the

3    government can correct me if I'm wrong.

4         But, again, these only show the path of the flow of

5    funds, not the why, and not the policies and procedures

6    relating to the flow of funds, which will demonstrate what the

7    institutional views are, and will provide less of an

8    ambiguity, and hopefully resolve for Judge Swain the issue of

9    who has interest in the excise taxes.

10        And for us, we have put in, I think in our proposed

11   order, you know, a limited down and narrowed version of the

12   types of documents that we're talking about.  But I do believe

13   that at minimum, with respect to custodians, there should be

14   some meet and confer process.

15        I'll defer to Mr. Langley, if he has anything else on

16   the accounting issue, or Mr. Berezin on HTA.

17        MR. BEREZIN:  Your Honor, Robert Berezin for

18   National.

19        The only point I would make is my understanding is

20   that the government is refusing categorically to search for

21   any documents within HTA that relate to Fund 278, which relate

22   to the transfer of excise taxes that were in the TSA recorded

23   in Fund 278.  And our view is that that is -- that is

24   completely not compliant with Judge Swain's ruling.

25        So in order to understand fully what HTA -- HTA's

1    policies, HTAs's procedures, what governing accounting and

2    other standards and controls HTA was using, and its

3    understanding institutionally as to whether the funds that

4    were recorded in Fund 278 that were sitting in the TSA

5    actually were HTA's own income, is highly relevant and indeed

6    material to these issues.  And a categorical refusal to obtain

7    that information and produce it is, in our view, simply not

8    compliant with Judge Swain's order.

9         THE COURT:  Before I have a response, I just want to

10   make it clear that there's been a lot of statements about what

11   you assume Judge Swain can and cannot do or what issues she's

12   raising.  My silence on that is not adopting those statements.

13   You know, her order is her order.

14        You filed motions seeking additional discovery where

15   you felt you needed additional discovery.  Now we are working

16   off of that order.  So I just don't want my silence on that to

17   indicate one way or the other whether I'm adopting your view

18   of what Judge Swain felt was sufficient or was not sufficient.

19   Okay.

20        MR. NATBONY:  Your Honor, if I may just say one

21   thing.  The First Circuit, when they looked at Judge Swain's

22   Order, did, in fact, interpret the order as requiring a more

23   complete record on these issues.  So I just wanted to state

24   that.

25        THE COURT:  That will be something that you'll all

1    argue one way or the other.

2              MR. NATBONY:  Thank you, Your Honor.

3              THE COURT:  I'm just working off of the Discovery

4    Order.

5              MR. LANGLEY:  Your Honor, Adam Langley.

6              MR. FIRESTEIN:  Your Honor --

7              THE COURT:  Who's responding?  I'm sorry.  I hear

8    voices, but I can't tell who is talking.

9              MR. LANGLEY:  Your Honor, Adam Langley on behalf of

10   FGIC.

11             I was going to just address a couple clean-up points

12   on HTA.  I think, as Mr. Natbony indicated, a lot of the

13   accounting and auditing issues that were discussed in PRIFA

14   are going to be the same.  So the distinction between bank

15   account and fund account is in HTA like it was in PRIFA.  And

16   the request for audit documentation, which is at issue again

17   in HTA, I believe if we can agree to the same kind of

18   treatment we did for PRIFA, we can accept that on HTA as well.

19             With any specific records to the excise taxes or

20   disputed revenues in the Commonwealth or HTA's revenues, that

21   would be fair game, and not just broad expanse into the audit

22   documentation but these very targeted issues.  And that we

23   would get fund accounts in addition to the bank accounts that

24   they have already provided.

25             If we have that type of agreement on HTA, I don't

1    know that we need to argue a lot, but it's unclear to me

2    whether that is going to be raised distinctly in HTA, apart

3    from how it was presented in PRIFA.

4              THE COURT:  Okay.

5              MR. FIRESTEIN:  So --

6              THE COURT:  Mr. Firestein.

7              MR. FIRESTEIN:  Your Honor, it's Michael Firestein.

8              If I might, I'm going to yield to Ms. McKeen and to

9    Ms. Pavel, but I heard what the Court said.  But let me just

10   state for the record that the manner in which Mr. Natbony

11   characterizes what Judge Swain did or didn't do, or could or

12   couldn't do, and what the status of the record is, in my mind,

13   a rearguing of summary judgments and a rewriting of Rule

14   56(d).

15             So I recognize that the Court has not -- has stated

16   expressly that its silence is not an adoption of what Judge

17   Swain is or isn't doing.  If Your Honor is intending to simply

18   focus on what is or isn't going to be appropriate in discovery

19   and what's tailored and limited, I'll limit my comments and

20   stop there, with one additional observation.  But if I need to

21   go into what 56(d) actually means, and what it's about, and

22   how it might affect this, then I would request the opportunity

23   to be heard more.

24             THE COURT:  I can promise you my decision will be as

25   short as possible.

1          MR. FIRESTEIN:  Perfect.  My only other observation

2     is with respect to the claim that somehow accounting treatment

3     matters, or what the Court has done -- I just want to put two

4     flags in the ground relative to this, because there's a

5     considerable amount of discussion concerning Fund 278 and the

6     like.

7          And I fully understand the Court's 56(d) order with

8     respect to exploring documents that govern the flow or that

9     reflect the flow; but I want to cite one case to the Court,

10    and I want to quote one sentence from Judge Swain's Lift Stay

11    Opinion as it relates to the HTA matter, which I think bears

12    on this.

13         The citation is to the *Market XT Holdings* case, which

14    is cited in our papers at page -- at page four; and the quote

15    from that case is, "the manner in which accountants treat

16    transactions is not determinative of dominion and ownership,"

17    which I think is the connection that Mr. Natbony was trying to

18    draw there.  I'm not debating what's in Judge Swain's Rule

19    56(d) Order, but I think it has to be said in that context.

20         The other quote is the sentence from Judge Swain's

21    Lift Stay Opinion where she writes at page 28, "the Court

22    rejects" -- "thus, the Court rejects the HTA movant's" -- in

23    this case, it's the Monolines' -- "arguments that are founded

24    in accounting terminology and principles, rather than in law.

25    Such arguments are insufficient to demonstrate that the

 1   bondholders have been granted a lien or other property right

 2   in revenues beyond those provided by the plain terms of the

 3   bond resolutions."

 4        It's with this -- in this context and with this

 5   background that what Ms. McKeen and Ms. Pavel are going to

 6   discuss about what the appropriate discovery is, as we

 7   interpret Judge Swain's order, and in the face of Rule 56(d),

 8   ought to be addressed.

 9        And with that, unless the Court has questions or I

10   have further follow-up, I'll yield to Ms. McKeen.

11        THE COURT:  Thank you.

12        Ms. McKeen.

13        MS. MCKEEN:  Your Honor, Elizabeth McKeen on behalf

14   of AAFAF.

15        I want to be really targeted and just focus on the

16   categories Mr. Natbony brought up, because I think this is

17   another instance where there's a big disconnect here, because

18   in listening to Mr. Natbony, I think he's sort of glossing

19   over and focusing on all the things that he wants without

20   focusing on all the things that we've said we'll do.  So let

21   me take them in reverse order.

22        On the 2002 Security Agreement, I'm hopeful we don't

23   have a dispute here.  It's our understanding that the

24   documents that govern the bonds are kept by the office of

25   legal counsel almost exclusively in paper files.  We are

1   working with HTA's office of legal counsel to review those

2   paper boxes and to produce any documents that govern the bond

3   documents, including documents governing the executive

4   director's authority to sign the 2002 Security Agreement.

5           Given how these documents are kept, doing a custodian

6   search term type review to find e-mails doesn't make sense,

7   but to the extent the secretary or the executive director of

8   HTA had any materials bearing on these issues, our

9   understanding is that they would have made their way into that

10  file, so that's why we're searching there.

11          So I think on the 2002 Security Agreement issue,

12  we've said we'll look for, and we'll produce what I think

13  Mr. Natbony is looking for.  And we're doing that at I think

14  the place he just acknowledged is most likely to have

15  materials like that, which is HTA's files.  So that's that

16  issue.

17          With respect to the voucher issue that Mr. Natbony

18  discussed, we have agreed to produce the vouchers.  And in

19  fact, he referenced this idea that, you know, there might have

20  been vouchers that were rejected, and that Mr. Ahlberg didn't

21  happen to know at his deposition one way or another whether or

22  not that had actually happened.

23          We are in the process of identifying and collecting

24  vouchers that were submitted by HTA but were rejected by

25  Treasury.  And it is our understanding that there are such

1   vouchers.  We are locating them, and we will produce them.

2   That is not something that was previously done in the context

3   of the lift stay discovery.  We're doing it now.  So I think

4   that kind of speaks to that issue.

5        With respect to the sort of more broad Fund 278

6   issues, you know, first of all, just an overarching comment.

7   The Commonwealth has a category in its financial statements

8   for fiduciary funds and lists a bunch of them, and HTA's not

9   included.  I think that's just worth noting in light of some

10  of Mr. Natbony's comments.

11       I think the suggestion that communications about Fund

12  278 are going to shed a lot of light here doesn't really make

13  sense, especially when you take a step back and consider the

14  fact that Fund 278 isn't even limited to HTA-related revenues.

15  I think it's helpful to know what we are doing and have agreed

16  to do for HTA.

17       We've already produced accounting documents,

18  including a chart of accounts that map all Commonwealth

19  revenue sources to the fund numbers used for expenses,

20  including mapping for Fund 278.  We've produced bank

21  statements for the relevant bank accounts.  We are, as we

22  talked about at length today, doing this PRIFAS extract for

23  all the Fund 278 transactions since 2014.  And it will include

24  all Fund 278 transactions, not just the HTA ones.

25       We're also updating the flow of funds.  We're looking

1    for GASB accounting statements.  We're looking for the

2    vouchers I've just described.  And we're also looking for

3    policies and procedures or other instructions that govern the

4    accounting treatment and that govern the use of PRIFAS around

5    these issues.  We are looking for policies and procedures

6    regarding HTA's requesting of the transfer of and Treasury

7    transferring excise taxes.  We are looking for those things.

8         Now, Mr. Berezin suggested that we should be getting

9    accounting-related materials from HTA.  That we're not doing,

10   because how HTA did its accounting around these issues, it

11   isn't relevant to what's going on here, which is how did the

12   Commonwealth treat the stuff.  We are looking for stuff at the

13   Commonwealth level.

14        We're still going to HTA for things like policies and

15   procedures and other documents, but what we don't want to do

16   is have to do a dump of HTA's own accounting system, because

17   we don't think that's actually within the scope of what the

18   Court contemplated here.  So I --

19        THE COURT:  I'm sorry.  Who else --

20        MS. MCKEEN:  No.  Please, go ahead.

21        THE COURT:  You are looking at HTA's documents for

22   the policies and procedures?

23        MR. MCKEEN:  Yes.  Yes, Your Honor.

24        THE COURT:  Okay.  And that would include any

25   limitations or purpose of Fund 278?

1          MS. MCKEEN:  Yes, Your Honor.

2          And so, you know, against that backdrop, you know, I

3     want to catch myself before I say I'm agreeing with

4     Mr. Langley, but I do think that, you know, what the Court

5     said about PRIFA earlier is instructive here.  I don't think

6     we need to start going through a bunch of e-mails.  I think,

7     in the context of PRIFA, what the Court said it would allow

8     with respect to audit-related materials bore very specifically

9     on two statements that were in the Commonwealth's financial

10    statements.  Here, I don't think that exists.

11         And what Mr. Langley talked about was, oh, you know,

12    we'll all just be on the same page if we can just get any

13    audit materials that talk about the excise taxes.  I know that

14    now then we're going back to this other sort of broad fishing

15    expedition type concept.  I think what the Court ordered with

16    respect to PRIFA has no analog with respect to HTA, and that

17    what we are doing with respect to HTA is sufficient to satisfy

18    the Court's order.

19         THE COURT:  I will hear from Mr. Langley on this

20    again, just because I don't think that the documents ordered

21    in PRIFA are identical to that that was ordered in HTA.  So to

22    the extent that you're saying that there's a comparable

23    request that should be made to the auditors, how are you

24    linking that?

25         MR. LANGLEY:  Your Honor, Adam Langley.  Was that

1    directed at me to respond?

2         THE COURT:  Yes, please.  Because, I mean, again, in

3    PRIFA, there was discovery identifying the nature and location

4    of the Infrastructure Fund.  That was one of the categories.

5    I'm not seeing a comparable fund, a comparable order for Fund

6    278, which I think was not as disputed as the Infrastructure

7    Fund.

8         MR. LANGLEY:  So the key dispute in HTA is who is

9    controlling the revenues.  That's the dispute.  And they put

10   in their first paragraph bold language in the motion for

11   summary judgment, these are controlled by the Commonwealth and

12   not HTA.  Well, that's inconsistent with the financial

13   statements we have seen.

14        The financial statements we have seen have discretely

15   presented HTA separate from the Commonwealth, and they have

16   shown HTA with its own financial statements showing that the

17   revenues are its own income, and not only that, it's own

18   restricted income for the use -- to bondholders at HTA.  And

19   that's consistent with fund accounting.

20        And I did want to get back to the fundamentals.

21   There's really four functions of fund accounting, and I think

22   they're blended here.  There's bookkeeping, which is journal

23   entries, records, the typical things you think of a

24   bookkeeper.  There's internal controls.  Those are the

25   governing, the controlling functions that say this has to be

1    done this way, this person does it, this person authorizes it.

2    And then there's a reporting function that aggregates the

3    controls and the bookkeeping into usable reports that people

4    can understand, that management, that Treasury, that HTA can

5    use.  And these reports, they're not very helpful to external

6    users.  They're brought into the financial statements.

7           So there's a whole system here that then gets audited

8    by the review process and the auditors.  So this is not

9    something that's just whimsical or trying to search for

10   anything.  There is a very distinct way that these things are

11   set across, and there's a very distinct way that financial

12   statements have presented them.

13          And we think we need to do the tracing of the audits,

14   of the financial statements, the reporting, back through the

15   internal controls to the bookkeeping, which they're saying

16   they're going to give us, which is PRIFAS.  So we can't just

17   get PRIFAS, because we won't understand anything.  We've got

18   to have the internal controls that they are on, and we have to

19   get the reports to try to make sense of all the stuff that

20   we're going to see.

21          And then it's very helpful for us to see both HTA's

22   auditors, KPMG, as the Commonwealth's auditors, and any

23   internal auditors that have been reviewing these type of

24   documents and making statements and representations as to who

25   owned these revenues.  And that's essentially what's at

1    dispute, who owned these revenues.  Was it Commonwealth or

2    HTA?

3            And I think we're entitled to get some understanding

4    as to the controls, to the reporting, and to the audited

5    documentation that gets into these very, very specific issues

6    over who owned the excise taxes.  That's what we're here for.

7            So I don't --

8            MS. MCKEEN:  Your Honor --

9            MR. NATBONY:  Your Honor, just to fill in one blank

10   on your question.  In particular, Judge Swain ordered policies

11   and procedures related to the flow of excise taxes.  And we

12   would assert that such broad language of policies and

13   procedures related to, would encompass policies and procedures

14   relating to the accounting -- accounting treatment that would,

15   therefore, dictate the flow of the funds.

16           So that would be our position on that, to try and tie

17   in --

18           MS. MCKEEN:  Your Honor.

19           THE COURT:  Let me go back one second.  Ms. McKeen,

20   I'll let you speak in a second.

21           MS. MCKEEN:  (Nodding head up and down.)

22           THE COURT:  But is Fund 278 reported in HTA's books?

23           MR. LANGLEY:  So, Your Honor, Adam Langley again.

24           So that's the tricky part with a governmental entity.

25   A governmental entity has a central government that does a lot

1  of functions for the instrumentalities, and that is what we

2  see here with Treasury.  And if you look at the HTA Enabling

3  Act, it actually says the HTA has to consult with the

4  Secretary of Treasury to set up this accounting system and the

5  fund and accounts that are in place.

6       And let me get that cite for you.  That's 9

7  L.P.R.A.,Section 2008.

8       So there is an interrelation between HTA and the

9  Commonwealth.  They are government.  They both perform public

10  purposes.  They just have distinct purposes.  And here we are

11  alleging that revenues were isolated away from the

12  Commonwealth in Fund 278 for the benefit and purpose of HTA to

13  issue bonds to do infrastructure improvements for roads and

14  highways within HTA.  So this is a very common structure.

15       I would again point you to our expert report.  It's

16  at docket 96.  It lays out the specifics of controls and

17  bookkeeping, and why they are all relevant to understanding

18  who owns these revenues.

19       So this is not something that is out of the ordinary.

20  We've got policies and procedures into the excise taxes, and

21  it's very relevant.  The outflow and inflow of excise taxes

22  into Fund 278 is relevant.  Who owns Fund 278 is very

23  important, where they're coming out of, and where they're

24  going into.  So I think this is exactly the question Judge

25  Swain had when she defined these topics.

1          The records regarding Fund 278, that could be HTA.

2   That could be the Commonwealth.  It depends on who is right.

3   Is the Board right that it is Commonwealth owned?  Are we

4   right that it's HTA owned?  We don't know, and we need to be

5   able to explore HTA's records so that we can demonstrate our

6   legal argument is correct.  And I think that's what we're

7   trying to do.

8          And I'm a little concerned about Ms. McKeen's

9   statement that they don't want to search HTA, because that's

10  where we think the documents are.  That's where we think

11  ownership is.  If we don't search HTA, we're not going to get

12  those documents, and we've got the one-sided story that the

13  Board is spinning right now.

14         So I do think it's relevant.  I think it's

15  specifically within Judge Swain's orders, and I think it's

16  highly probable that HTA is going to have documents that show

17  that it's own income included these excise taxes.

18         MR. NATBONY:  Bill Natbony again, Your Honor.

19         And HTA's own financial statements reflect that.

20  They list the excise taxes as their own income.  So in that

21  respect, that would be relevant.

22         THE COURT:  Ms. McKeen.

23         MS. MCKEEN:  Your Honor, the suggestion that Fund 278

24  is anything other than a Commonwealth fund is particularly

25  absurd in light of the fact that Fund 278 includes non-HTA

1 related revenues, including at one point PRIFA-related funds,

2 which defendants know because they attached a voucher

3 reflecting that very thing to some of their papers in this

4 proceeding.

5 So I just want to suggest that the idea that we've

6 really got to figure out whether Fund 278 is a Commonwealth

7 fund or an HTA fund is not right; but I think the bottom line

8 point is that everything Mr. Langley said makes a hundred

9 percent clear that the answer to your question, does this have

10 an analog in what I ordered for PRIFA, is no. There is no

11 analog.

12 What he just described is the same incredibly

13 overbroad kind of fishing expedition into audit-related stuff

14 that you concluded two hours ago wasn't appropriate in PRIFA,

15 and it's not appropriate here for the same reason.

16 MR. NATBONY: Your Honor, Bill Natbony.

17 MR. FIRESTEIN: Can I -- I'm sorry. Do I get a turn?

18 THE COURT: Wait. Mr. Firestein.

19 MR. FIRESTEIN: Thank you, Your Honor. Michael

20 Firestein again.

21 When I started my comments a couple of hours ago, I

22 referenced some things in the HTA 56(d) declaration, and now

23 we're coming full circle back to exactly what's in there, and

24 how they are trying to, for lack of a better way of putting

25 it, run a moose through a mouse hole.

1          In Mr. Servais' HTA 56(d) declaration, he asked

2    specifically, amongst a whole host of other matters, documents

3    and testimony explaining the Commonwealth's accounting

4    practices, including the use of fund accounting, GAAP, and

5    GASB principles.  Apart from the fact of what Ms. McKeen said

6    is being produced, that's nowhere in this.  But more important

7    to this is the bullet point that I raised earlier, which says,

8    documents provided to and communications with the Commonwealth

9    and HTA auditors related to their definition of pledged

10   revenues, including work papers, engagement letters, tie outs,

11   support for financials, and any explanations provided to

12   auditors concerning the Commonwealth's treatment of the

13   pledged revenues.

14          There is nothing remotely like that in the categories

15   that were identified by Judge Swain in connection with HTA.

16   There's no source in existence -- or origination of the

17   Infrastructure Fund.  There's this notion of policies and

18   procedures relating to the flow of excise taxes, not their

19   accounting treatment, which, contrary to Mr. Langley's

20   statement, is an expression that's contrary to law as it

21   relates to dominion and ownership.

22          And what HTA might say in its financial statements,

23   irrespective of the notion that there is one government, all

24   right, which we all understand, nonetheless, HTA is a separate

25   public corporation.  And this is an action brought by the

1    Commonwealth, and these are funds that are raised through the

2    Commonwealth's taxing authority.

3         And the question is what is happening at the

4    Commonwealth, and whether, you know, the bond resolutions or

5    the statutes create an ownership interest or some other

6    security lien in favor of these bondholders, which Judge Swain

7    has already concluded, in connection with the lift stay, it

8    does not.  But to then go fish into HTA as to how they think

9    the Commonwealth may have addressed it is -- frankly, pushes

10   the envelope, to mix my metaphors, a bridge too far.

11        MR. NATBONY:  May I respond briefly?

12        THE COURT:  I have to say I'm not sure that how HTA

13   understood its control over these funds is irrelevant to this

14   case.

15        MR. FIRESTEIN:  Is relevant or irrelevant?

16        THE COURT:  I don't think it is irrelevant is what I

17   said.  But I'm not sure the appropriate way to find it --

18        MR. NATBONY:  Your Honor, may I just say a few brief

19   things in response to what I heard?

20        THE COURT:  Yes.

21        MR. NATBONY:  Thank you, Your Honor.

22        So, first of all, with respect to Mr. Firestein's

23   comments, I should note that it is relevant, because with

24   respect to HTA, Judge Swain basically has determined that the

25   documents and the bond documents do need further

1    interpretation, you know, with respect to what the parties saw

2    as who owns these funds.

3           And while the Commonwealth may have one view, and --

4    if the HTA has a different view, those different views may be

5    based on documents.  They may be based on representations.  So

6    HTA's view, institutional view, I think is highly relevant.

7           And also, with respect to the comment that was made

8    about Fund 278 not being limited to HTA revenues, I think

9    Ms. McKeen is being technical, but let's be clear.  There are

10   particular subaccounts in Fund 278 that specifically deal with

11   and only deal with the excise taxes.  And there's a specific

12   subaccount in Fund 278 for every one of the excise taxes, and

13   they are actually designated with a number that relates to

14   HTA.

15          So, and frankly, you know, I'm not looking for things

16   that are not related to HTA, but to say that Fund 278 has

17   other accounts, there may be other special revenue accounts.

18   We're dealing with HTA.  And there are specific subaccounts in

19   Fund 278 for each of the excise taxes.

20          THE COURT:  Ms. McKeen.

21          MS. MCKEEN:  So, Your Honor, I guess the main point I

22   want to respond to there is that on this idea that HTA's view

23   is relevant, I guess we just disagree with that, because I

24   don't think what HTA's view is or isn't would change rights or

25   obligations vis-a-vis the Commonwealth itself.

1           That having been said --

2           THE COURT:  That may be ultimately the legal

3    conclusion, but I'm not sure for discovery that --

4           MS. MCKEEN:  Well, fair enough, Your Honor.  And

5    that's why we haven't taken the position that we're not going

6    to talk to HTA.  Right.  Like we are looking through HTA's

7    files, for example, for all the kinds of things that I

8    described with respect to the 2002 Security Agreement, with

9    respect to other documents, policies and procedures.  My only

10   point in making that statement was that the accounting related

11   information that we are providing will come from PRIFAS, not

12   from HTA's own internal accounting system.

13          So that's the --

14          THE COURT:  I don't see a problem with that.

15          I guess, Mr. Langley, do you see a problem with that,

16   just to the accounting?

17          MR. LANGLEY:  Well, I guess my answer is I don't know

18   what's there, because we haven't been told anything.  And if

19   we had been told how this PRIFAS worked, or what reports and

20   controls are in place, who operates these controls, we could

21   answer the question; but we haven't been told that.

22          So I think to the extent that we can get an

23   understanding, it's very clear as to who operates these

24   controls, what is the flow through the funds, not the

25   accounting -- excuse me, not the bank accounts, I think we can

1  get a very clear picture as to what we need.  And this is not

2  something that's going to be a fishing expedition.  It is

3  simply we don't have the information up front to be able to

4  answer straight forward questions.

5       MR. BEREZIN:  Your Honor, Robert Berezin for

6  National.  If I could just be heard on this point?

7       THE COURT:  Sure.

8       MR. BEREZIN:  There's a distinction in Judge Swain's

9  topics between documents reflecting the flow of funds,

10  including through Fund 278, which is what the PRIFAS printout

11  will be, and the other topics.  And in particular, your

12  question on the relevance of HTA's view, Judge Swain

13  specifically granted discovery on documents concerning the

14  extent to which excise taxes were or have been made available

15  to HTA.

16       So if you're at HTA, and you've got policies and

17  procedures that basically say you can get Fund 278 money

18  whenever you want, again, Fund 278, the subaccounts that are

19  HTA, as Mr. Natbony noted, that's going to be highly relevant.

20  So it's the policies and procedures, that kind of information

21  should be readily available and accessible, as well as their

22  side of the transfer discussion, because that's going to shed

23  light on what Judge Swain wanted to know, which is were

24  those -- were those excise taxes recorded in Fund 278 made

25  available to HTA.  That's one of the factual disputes that we

1  have.

2          THE COURT:  Well, as I --

3          MS. MCKEEN:  Your Honor.

4          THE COURT:  Yes, Ms. McKeen.

5          MS. MCKEEN:  Your Honor, I just want to -- in

6  response to that, Mr. Berezin sort of paraphrased the order on

7  that issue, but he didn't quote it.  What it says is,

8  "documents concerning the Treasury's role in the approval of

9  transfers to HTA, and the extent to which excise tax revenues

10 were or have been made available to HTA."

11         That is a Commonwealth side inquiry, not an all

12 documents concerning what all the parties thought about these

13 things inquiry.  So the text of the order makes this clear,

14 that this is about Treasury's role and what the Commonwealth

15 did, not what HTA thought about it.

16         THE COURT:  I'm reading it the same way as you are,

17 and I am also hearing that records reflecting the flow of

18 funds in and out are going to be Commonwealth -- the PRIFAS --

19         MS. MCKEEN:  Correct.

20         THE COURT:  -- accounting.  So that makes sense to

21 me, but I do think, and as you've answered already, that the

22 policies and procedures relating to the flow of funds -- you

23 are searching the HTA documents for those?

24         MS. MCKEEN:  (Nodding head up and down.)

25         THE COURT:  And for I am assuming restrictions on the

1    use of funds, and an understanding of what this Fund 278 is or

2    HTA's role in -- sorry.  I do think it is significant for

3    discovery purposes what HTA believed its rights and

4    obligations were with respect to these funds.  Okay.  Whether

5    or not it's ultimately controlling on the issue of summary

6    judgment is a different issue, but I do think for summary

7    judgment that it is significant what HTA did.

8            It sounds to me, though, that a big part of this

9    dispute is, again, where is the search being done, and there's

10   been -- there's a need to have that more fully explained,

11   along with, frankly, the defendant's ability to make

12   suggestions.

13           MS. MCKEEN:  Your Honor, I would certainly intend

14   that we would provide the same kinds of information for HTA,

15   and for CCDA as well, that we mentioned earlier today about

16   providing for PRIFA.  I think it's equally applicable across

17   all three as far as the concept, and we will do that.

18           THE COURT:  All right.  I do think that the defendant

19   should have the opportunity of making suggestions, which you

20   can then fight about later or accept.

21           MS. MCKEEN:  We are all on one another's speed dial,

22   so we can confer.

23           THE COURT:  I would imagine.

24           What I'm not sure of and where I'm a little lost on

25   is whether we need an auditor -- if audit papers add anything

1    to this in any way.  I'm not -- I'm thinking that maybe it's

2    an interrogatory.  I'm thinking maybe it's a deposition.  But

3    I'm not sure where the audit papers would come in.

4           MS. MCKEEN:  I think that's right, and here's why.  I

5    think what you ordered earlier with respect to PRIFA had a

6    very limited scope and a clear relation to a statement that

7    was made in a financial statement and the desire to understand

8    more about the identity of the Infrastructure Fund.  That

9    doesn't exist in the same way in HTA.  And I think a lot of

10   what we've heard today that is desired is an explanation of

11   why something was done in a certain way.  And I think when you

12   look at what is targeted, efficient, limited, and

13   proportional, you are exactly right, that it's to ask that

14   question of a person who knows the answer.  And that's what I

15   would say that we ought to do.

16          And I of course would anticipate that down the road,

17   if after our document production is complete, if after a

18   30(b)(6) witness can't answer a question like that, you would

19   certainly hear from defendants about it; but I don't think

20   that means we need to assume that things won't go the way they

21   are, which is that when defendants ask us those kind of

22   questions, we'll be able to give them answers.  And I think

23   that is the most efficient approach at this point, rather than

24   opening the door to all the kinds of audit materials that have

25   been described today, that you didn't find appropriate to

1   order in PRIFA.

2         MR. BEREZIN:  Your Honor, could I just address that

3   briefly?

4         THE COURT:  Yes.

5         MR. BEREZIN:  Robert Berezin.  This is Robert Berezin

6   for National.

7         There are two specific statements that were made in

8   the financials, audited financials about the Fund 278

9   subaccounts, about the excise taxes in particular.  And so

10  there is an analogy.  At a minimum, we should get the audit

11  papers that relate to those specific statements, which we can

12  identify to the government parties.  The one that was

13  referenced --

14        THE COURT:  Give me a clue.  Give me a hint as to

15  what it says.

16        MR. BEREZIN:  Sure.  One was referenced by

17  Mr. Langley, that the Fund 278 revenues were treated as HTA's

18  own income, quote, unquote.  So we clearly -- there is a basis

19  for that.  We'd like to see what the basis is.

20        And then there are statements in the Treasury, the

21  various Treasury single account statements.  But there's one

22  in particular that appears that we can -- that is

23  representative, that we can also ask them for the support for

24  that.

25        MR. LANGLEY:  Your Honor, this is Adam Langley again.

1    To address the specifics in the financial statements,

2    so, as an example, and as Mr. Berezin says, there are a number

3    of statements specifically about the excise taxes and how

4    they're accounted for in the financial statements.  But this

5    is from the 2010 financial statements.  It says, the

6    Commonwealth pledged -- and I'm going to paraphrase to get rid

7    of some of the wordiness, but the Commonwealth pledged

8    gasoline excise taxes, diesel oil excise taxes, and motor

9    vehicle license fees for the repayment of PR HTA Revenue

10   Bonds.  And that's not HTA.  There's a separate statement HTA

11   pledged it.  That's that the Commonwealth pledged these

12   revenues to the repayment of the HTA bonds.  That's a pretty

13   specific statement in the financial statements that are

14   audited.

15       So that's the type of information that we think is

16   highly probative to the very questions before this Court on

17   whether the Fund 278 is owned by the Commonwealth or HTA.  And

18   I ask for discovery into that.

19       MR. NATBONY:  If I may add to that, in the 2015

20   Commonwealth -- Bill Natbony again, Your Honor.

21       From the 2015 Commonwealth financials, again, the

22   Commonwealth financials say, at pages 30 and 31, certain

23   revenues, such as federal excise taxes -- and then I'm dot,

24   dot, dotting -- which are conditionally allocated to HTA, a

25   discretely presented component are not included as revenues

1    for the purpose of calculating the debt limit, although they

2    may be available for the payment of debt service.

3          So why did that language change?  Just like in

4    PRIFA, when the language changed from 2010 here to 2015.  So

5    there are similar issues.

6          THE COURT:  Ms. McKeen, they're convincing me that

7    there should be a limited inquiry to the auditors under the

8    policies and procedures as to how the Fund 278 revenues with

9    respect to HTA should be treated, if there were instructions

10   there.

11         MS. MCKEEN:  I think this -- what they're asking for

12   is still very different than what was at play in PRIFA,

13   because in PRIFA, you're trying to -- obviously we disagree,

14   you know, but my understanding of what's going on in PRIFA is

15   that we're trying to resolve a factual issue about what is

16   this Infrastructure Fund.

17         Here what I've heard are statements that the parties

18   are going to have a lot of different takes on what the legal

19   effect of those statements is, but I'm less certain about what

20   the factual issue that is sought to be resolved there is.  I

21   think to the extent the Court is inclined to order something

22   on this point, I heard Mr. Berezin say that he had two

23   statements that he wanted us to investigate.  One he shared

24   with us.  One he hasn't.  Then I heard other statements from

25   other people.

1        And so I think it's hard for us to respond about why

2   audit-related work papers are or aren't appropriate to sort of

3   flesh out issues and statements that we still haven't heard

4   what they all are yet.  You know, if the parties would meet

5   and confer about this issue while we're going through the

6   process of figuring out a proposed order on PRIFA, you know, I

7   suppose we could meet and confer about it.  But it's hard for

8   me to respond why audit papers aren't appropriate for a

9   specific statement that Mr. Berezin hasn't told me.

10        I think the more overarching issue, though, is this

11  just isn't the same as what you ordered with respect to the

12  Infrastructure Fund.  And I don't think we need auditor work

13  papers back and forth to get at what the key issues are.

14        I don't know, Mr. Firestein, if you'd like to be

15  heard on this issue, but --

16        THE COURT:  Mr. Firestein, before you speak, what I'm

17  envisioning is more of something in the form of instructions

18  to the auditors, which end up reflected in these notations,

19  but I'm trying to figure out the most efficient way of doing

20  that.   In my mind, and I could be totally wrong, but in my

21  mind, the auditors' papers are easier to search than searching

22  the Commonwealth papers to get to a very specific answer.

23        MS. MCKEEN:  Well, and, Your Honor, I appreciate that

24  the extent to which your focus is on, you know, were there

25  instructions, I think, again, I don't want to beat a dead

1   horse, but I want to make sure that anything that's

2   contemplated on this doesn't become the "all documents

3   relating to" or "concerning" exercise.

4        I think we have to -- if there's going to be

5   discovery on an issue, we have to be really clear about the

6   scope and the limitations, so that it doesn't snowball.

7        MR. LANGLEY:  Your Honor, this is Adam Langley again.

8        I'd like to propose what I think could get us to a

9   very targeted response, and that is to identify the excise

10  taxes.  That is the disputed revenue source.  That should be

11  discretely carried off in either HTA's or the Commonwealth's

12  financials and audit papers.

13       So we're not asking for significant exploration --

14  we'd have to go through and identify each statement in the

15  financials that identifies those excise taxes.  And we could

16  do that, but I think the simpler answer is, we're targeted on

17  the excise taxes.  It's a discrete revenue source for both the

18  Commonwealth and HTA financial statements.  The auditors can

19  tell us very quickly what documents they have on the excise

20  taxes.

21       MR. FIRESTEIN:  I'm sorry, Your Honor.  Michael

22  Firestein again.

23       That actually sounds more like a backslide more than

24  anything else, which sounds frighteningly familiar, to

25  identifying the Infrastructure Fund, which is not a subject

1    that we have here as it relates to the excise taxes.  We know

2    what the excise taxes are.

3         And I want to echo one thing that Ms. McKeen said.

4    The fact of the state -- there is a legal debate about the

5    consequence of the change, but the fact of the change,

6    assuming it to be true, in my mind, I say sort of so what.

7    The fact that, you know, if it ends up being restricted to an

8    instruction by a client, and I would limit it to the

9    Commonwealth, but if the Court is going to say HTA, to its

10   auditors, to say do this with that, and it's part of the

11   compilation of audit work papers that the only gentleman who's

12   an accountant on this call, Mr. Langley, seems to think -- or

13   I guess Ms. Miller said the same thing, that they are sort of

14   neatly put together.

15        And we've all had our dealings with auditors over the

16   years.  That's one thing.  But I want to be careful or make

17   sure that we all are very careful of the timing, and how this

18   can mushroom into communications, and who said what to whom.

19   And then we've got e-mail searches.

20        So, you know, I keep hearing the words out of Your

21   Honor's mouth that strike me as being very structured and

22   rigid with respect to the targeted search, but every time I

23   hear comments coming back from the defendants, I'm concerned

24   that we have a different view, or they're trying to push the

25   envelope a little bit farther.  And after us chatting about it

1    for a few days, we'll come back with differing orders anyway,

2    and I just want to make sure that we get express clarity on

3    this.

4           THE COURT:  -- period that is of critical importance

5    here.

6           MR. FIRESTEIN:  I'm sorry, Your Honor.  Your first

7    couple of words skipped out.  Could you just start again?  I'm

8    sorry.

9           THE COURT:  Would it be appropriate to say

10   instructions from 2014 forward?

11          MR. NATBONY:  Your Honor, if I may be heard just

12   briefly.  Bill Natbony again for Assured.

13          I mean, if there's a communication -- and my fear is

14   that, how do you interpret the word "instruction."  And I

15   don't want it to be so limited so it doesn't include, for

16   instance, a communication that might say something like this:

17   Please don't say that in the audited financial statements.  We

18   don't want to admit that these funds belong to HTA.

19          Would that be an instruction --

20          THE COURT:  If it's not a policy and procedure,

21   you're not going to get it, so I would suggest that --

22          MR. NATBONY:  No, but --

23          THE COURT:  -- you don't keep expanding on what you

24   want --

25          MR. NATBONY:  -- the Order also says all documents

1  governing the flow of funds, so if someone is saying, don't

2  call it that but move it there, put it in Fund 278, don't call

3  it that so it won't be moved there, that would be relevant.

4          THE COURT:  If there are statements that describe

5  the -- no.  Actually, I'm going to take that back, because

6  it's records reflecting the flow of funds.  That's a fact.

7          MR. NATBONY:   That's the first one I was talking

8  about, the first one, Your Honor, all documents governing --

9          THE COURT:  Governing the bonds.  Governing the

10  bonds, including origins of the bond resolutions and documents

11  identifying the signatories to and/or those --

12          MR. NATBONY:   I think -- that says all documents

13  governing the flow of excise taxes -- my apologies for

14  steering you to the first one, Your Honor.  So it's not only

15  reflecting -- that's the whole point.  It's not just where.

16  It's why and how.

17          THE COURT:  Well --

18          MR. FIRESTEIN:  Obviously -- Your Honor, it's Michael

19  Firestein.

20          We have a very different view on what the definition

21  of governing is.  If only I could send an email to my

22  executive committee and tell them what I think should be done.

23  That hardly constitutes something that governs the flow of

24  anything or a determination on anything.  And I think Your

25  Honor expressly described that in the original lift stay

1   discovery proceedings where someone writing and sending an

2   e-mail to someone else doesn't contribute to the meaning of

3   anything.

4           THE COURT:  Correct, but the Board's vote on that

5   would.  So I'm looking for the right file that has that

6   instruction that says these funds are to be treated in such

7   and such a way, and I don't know where the best place is.  My

8   sense is that the best way -- if the Commonwealth came and

9   said, look, here's our legal file, here's our auditor file, we

10  keep copies of every instruction that we give to the auditors,

11  I would tell you that's the place to look; but I'm not hearing

12  from you that that's how the files are kept.

13          So I do think that instructions to the auditors, as

14  to the -- I am assuming that the auditors are recording how

15  the funds are being used to some extent; is that right?

16          MR. LANGLEY:  Your Honor, this is Adam Langley again.

17          So it's close.  So what is happening is actually

18  Treasury and the Commonwealth are making representations to

19  the auditors, and the auditors are going and testing those

20  representations.  So they would actually say what the

21  instructions are, and how these monies are owned; and then the

22  auditors go and test that to make sure there's supporting

23  evidence, and evaluate those controls and those policies and

24  procedures to make sure what the Commonwealth and Treasury is

25  saying are accurate.

1           So that is what we're trying to get at, to get down

2      that road.  And we don't know what that road's going to lead

3      to.  We have to go down that road to get there.

4           THE COURT:  Well, somewhat, because we have to get

5      back to what the original question is, right, which is, who

6      has control over these funds?  And not nine million other

7      possible threads --

8           MS. MCKEEN:  And, Your Honor, I think, just taking a

9      step back, the idea that we need these documents to figure out

10     who has control of these funds we don't agree with, and that's

11     what this whole idea of this voucher discovery process is

12     about.  I think the vouchers and, in fact, the rejected

13     vouchers will reflect that there were times that, you know,

14     HTA submitted a voucher that Treasury rejected.  That's

15     entirely inconsistent with the idea that HTA just had free

16     reign over this stuff.

17          And so I understand the Court's desire to make sure

18     there's discovery on the issue of who controlled these funds.

19     I think that's already being provided.  I think the idea that

20     we have to be looking at communications to auditors, we just

21     don't agree with that.

22          THE COURT:  I --

23          MS. MILLER:  Atara Miller.  If I can, on this --

24     Atara Miller from Milbank.

25          You know, Ms. McKeen makes a good point, but in some

1     ways, it highlights exactly what you would expect to see in

2     the audit materials, because if a venture is rejected by

3     Treasury because one of Treasury's functions is ensuring that

4     HTA is itself complying with the restrictions that are placed

5     on the funds, and the requisition request for a transfer of

6     money was for a purpose that was inconsistent, the voucher

7     would just tell us, hey, you know, request for transfer of

8     money's rejected.  It wouldn't necessarily explain why was it

9     rejected.

10          But the audit materials might actually include or

11    would include the description that includes the controls and

12    the restrictions that are placed on those funds.  And so,

13    actually having both pieces would be the only way to really

14    understand what's going on.

15          THE COURT:  I'm not opening up all of the discovery

16    into all of the audit papers to support HTA --

17          MS. MILLER:  I'm not -- I wasn't suggesting that, but

18    I do think that there are some key components, if you focus in

19    on specific statements and representations that are contained

20    in the audited financials, and you have the audit file backing

21    that up.  It seems pretty narrow and directed, and it might

22    go -- it might answer a lot of other questions and avoid

23    subsequent steps on the vouchers and other things like that.

24          MR. NATBONY:  And, Your Honor, it's Bill Natbony.

25          To the extent that you limit it to instructions or

1    representations based on what was set forth in the financial

2    statements about the excise taxes, you are kind of combining

3    the two and limiting it.

4            THE COURT:  So I think it makes sense to have the

5    defendants identify the statements that you want, similar to

6    PRIFA, identify those statements and see if there are

7    instructions, explanations, instructions in the audit papers

8    to explain the basis of those actions.  All right?

9            I'm assuming it's going to be a reasonable list of

10   questions.

11           MR. BEREZIN:  (Nodding head up and down.)

12           THE COURT:  I've heard two so far.  My guess is when

13   it's done, there will probably be more, but let's leave it

14   under five, unless you have to convince me way otherwise.

15           And, Ms. McKeen, if you find that there are HTA files

16   or Commonwealth files that would have that information, as

17   opposed to doing it via the audit papers, have that

18   conversation.

19           MS. MCKEEN:  Yes, Your Honor.

20           THE COURT:  I'm not wedded to the audit papers.  I'm

21   trying to figure out the best way to get the information, if

22   there were instructions to the auditors on how to handle the

23   reporting.

24           MS. MCKEEN:  Understood.

25           THE COURT:  Okay.  Are we done?

1               MR. BEREZIN:  (Nodding head up and down.)

2               MS. MILLER:  So, Your Honor, this discussion -- I'm

3       sorry.  Atara Miller from Milbank.

4               Just one small issue, and actually our ask hopefully

5       is one that is non-controversial.  I say that, you know, pray

6       -- things may always change, but you had asked Ms. Pavel at

7       some point whether there were -- whether it was possible to

8       run a list of potential reports.  And she explained that

9       they're querying the accounting system, and they would look

10      into, you know, whether there are, you know, off-the-shelf

11      reports.

12              I'm not sure we need a list of off-the-shelf reports

13      that the Commonwealth regularly runs, but we did in our

14      proposed order ask for a meet and confer over potential

15      additional reports.  Once we see the information that they are

16      providing to us, and I think this goes to the point that, you

17      know, we have to trust them, and we are trusting them to some

18      degree, but to the extent there are additional fields or

19      additional materials that we think are necessary, we just want

20      to make clear that we still have that request to at least talk

21      about the possible -- whether there are additional reports

22      that possibly could be run.

23              I haven't seen the reports.  I don't think they've

24      even been produced yet.  And, also, I'm not saying that there

25      will be requests, but it's, again, a little bit of this

1    unknown black box.  And so we're happy to take what they think

2    is the best information; but if there are gaps, we do want to

3    make sure that we can at least have a process for talking

4    about it, and getting some information about the PRIFAS

5    system, and what reports could be run or what information

6    could be extracted from it.

7           THE COURT:  -- into there about --

8           MS. MCKEEN:  I want to make sure -- I just want to

9    make sure we're not talking past each other.  I want to make

10   sure I understand the ask.

11          THE COURT:  I think the ask is you can make custom

12   designed reports, and the defendants want the opportunity to

13   suggest some if they think some are appropriate.  And you have

14   the opportunity to say no.

15          MS. MCKEEN:  I certainly -- so I'm probably the wrong

16   person to ask about the technical capabilities, but it

17   certainly sounds like something that we ought to be able to

18   meet and confer about.

19          THE COURT:  Okay.

20          MS. MILLER:  And I think maybe more specifically,

21   meet and confer about what the technical capabilities are.  So

22   we understand there isn't a list of reports, but if what we

23   have isn't sufficient for certain components, we'd like to

24   know is it even possible.

25          And sort of along the lines of the questions that we

1   asked at the last 30(b)(6) that sort of lead to the

2   Commonwealth running these reports, we'd like to be able to

3   front end it and not save it, ask it at the deposition, and

4   then be out of time to actually get the information that we

5   would want, which is what happened last time.

6        MS. MCKEEN:  So nothing about that strikes me as

7   unreasonable.  My suggestion would be that we provide

8   defendants with the materials that we were working on putting

9   together, and that once you have them, you know, we discuss,

10  hey, is there some other ex -- you know, field or data point

11  or something else you'd expect to see in here.  Let's talk

12  about what that might be and if it's doable, and if it's not,

13  why it's not.  And that kind of stuff.

14       I think that makes sense, and I don't see any reason

15  why we shouldn't be doing that.

16       THE COURT:  I think that that makes sense at this

17  juncture.  You know, I think the luxury of sort of the

18  exploratory, what systems exist, is unfortunately not timely.

19  So I think it makes sense to get -- see what's going on.  If

20  there are certain reports or fields or whatever that the

21  defendants think would be helpful, I think it is appropriate

22  to meet and confer on those.

23       MS. MILLER:  I think we're all in agreement, which

24  may be the only time ever with this group, so I think that

25  this may be a great place to stop.

1              THE COURT:  So that sounds good.  How about by

2    Friday?  Is that still doable?  Or we can wait until Monday if

3    you want to submit a proposed order, Monday close of business?

4    Is that better?

5              Now people are freezing on me?  Now people are

6    freezing on me.

7              MS. MCKEEN:  -- helpful --

8              THE COURT:  You started to move.

9              MS. MILLER:  Ms. McKeen, you cut out.

10             MS. MCKEEN:  Oh, I'm sorry.  Can you hear me now?

11             THE COURT:  Yes.  Sorry.

12             MS. MCKEEN:  Your Honor, to the extent things are a

13   little more broad than they were when I made the Friday

14   comments, I think having some additional days would be helpful

15   to all the parties.

16             THE COURT:  Monday?  Tuesday?  I leave it to you.

17   Work together.  If you can't agree, though, by Tuesday, send

18   me your different proposals, and I'll just rule on it.

19             MS. MCKEEN:  Yes, Your Honor.

20             MR. FIRESTEIN:  Your Honor, Michael Firestein.

21             I think that's fine.  I think the parties here are

22   pretty sophisticated and have a sense as to what in the

23   meantime needs to be done.  And if we end up arguing over the

24   order, so be it, you know.

25             So I think maybe if it's Tuesday by five o'clock

1     Atlantic, if there isn't a joint order to be submitted, then

2     whatever the nature of the dispute is -- the only thing I

3     would like to avoid, and maybe I speak on behalf of everyone,

4     is the less we have to sort of put together, status report --

5     you know, it behooves us all to agree, but it also takes time

6     that might be taken away from other things, right, in terms of

7     complying with discovery and the like.  So --

8          THE COURT:  If you don't agree, I don't need an

9     explanation.  Just submit what you think is appropriate.  I

10    know what I intended to order.

11         MR. FIRESTEIN:  That in and of itself is helpful.

12         THE COURT:  Is that surprising?

13         MR. FIRESTEIN:  No.  No.  No.  No.  Everything the

14    Court -- listen, not to suck up, but everything the Court says

15    is helpful.  But I think, for the benefit of everybody, they

16    sort of collectively wipe their brow relative to that.  There

17    have been some late nights on some of these submissions.

18         THE COURT:  No, and I do know they are difficult.  I

19    mean, the devil is always in the detail, but it would be

20    helpful to me to see what you -- if you can agree on it.

21    Close of business Tuesday is fine.  The beauty of it is that

22    all our times are in the same time zone now, so I don't have

23    to guess if we are doing it at 8:30 in the morning or 9:30 in

24    the morning.  We are all in the same time zone.

25         So do that by close of business on Tuesday, and,

1    again, I don't need an explanation if you don't agree.  Just

2    give me what you have.

3         MR. FIRESTEIN:  Thank you.

4         MS. MILLER:  Thank you, Your Honor.

5         MR. NATBONY:  Thank you, Your Honor.

6         THE COURT:  Then, also, I'm not altering the schedule

7    at all.  We have -- built into the schedule was another status

8    report and another conference if we needed it down the road I

9    believe.

10        MR. FIRESTEIN:  Is that right, Your Honor?  I don't

11   mean to --

12        THE COURT:  I wrote it down.  Here we go.  A joint

13   status report with discovery disputes by April 16th.  Final

14   status conference April 23rd.

15        MR. FIRESTEIN:  So be it.

16        THE COURT:  I have it.  I'm sticking with it unless

17   somebody tells me we have a major crisis between then and now.

18   Okay.

19        MR. BEREZIN:  Now --

20        MR. FIRESTEIN:  Good to go.

21        THE COURT:  I'm not going to ask if there's anything

22   else, because that's a very open question.  I'm just going to

23   say good-bye.

24        MR. FIRESTEIN:  Be safe.  Have a good night.

25        MS. MILLER:  Good-bye.

1        MR. NATBONY:  Thank you, Your Honor.  Be safe.

2        THE COURT:  Thank you, everyone.

3        (At 6:01 PM, proceedings concluded.)

4                         *     *     *

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1   U.S. DISTRICT COURT    )
 2   DISTRICT OF PUERTO RICO)
 3
 4        I certify that this transcript consisting of 146 pages is
 5   a true and accurate transcription to the best of my ability of
 6   the proceedings in this case before the Honorable United
 7   States Magistrate Judge Judith Gail Dein on March 17, 2021.
 8
 9
10
11   S/ Amy Walker
12   Amy Walker, CSR 3799
13   Official Court Reporter
14
15
16
17
18
19
20
21
22
23
24
25
```

< Dates >
April 16th 144:13
April 23rd 144:14
March 17, 2021 1:16,
  5:2, 146:7
March 17th, 2021
  5:13


< 1 >
111 71:3
117 14:3, 14:6,
  14:9, 14:16,
  14:18, 15:4,
  15:19, 18:1, 18:5,
  18:21, 18:24,
  19:13, 27:4, 27:7,
  27:11, 27:15,
  27:22, 28:24,
  42:2, 42:7, 49:1,
  49:14, 50:20,
  50:23, 53:19,
  55:9, 55:18,
  55:21, 67:4, 72:25
146 146:4
14th 45:6
17-BK-3283 5:18
17-BK-3283(LTS 1:6,
  1:30, 2:12, 2:33
1968 102:17
1998 102:17


< 2 >
20 26:21, 45:20,
  66:8, 67:1
20-AP-00003(LTS 1:25
20-AP-00004(LTS 2:7
20-AP-00005(LTS 2:28
20-AP-03 5:18
20-AP-04 5:18
20-AP-05 5:18
2002 101:5, 101:6,
  101:10, 101:15,
  101:24, 101:25,
  102:18, 102:21,
  108:22, 109:4,
  109:11, 122:8
2006 51:3, 53:8,
  53:10, 80:4, 81:2

2008. 116:7
2010 128:5, 129:4
2013 55:13, 55:15,
  67:3
2014 28:23, 55:14,
  133:10
2014. 110:23
2015 55:13, 80:8,
  128:19, 128:21
2015. 129:4
2016 55:13
22 79:25
278. 24:8, 71:3,
  92:16, 92:18,
  93:1, 93:2, 93:13,
  96:14, 103:23,
  110:20
28 107:21
2:30 5:3


< 3 >
30 46:25, 47:2,
  47:21, 128:22
30(b)(6 10:5, 10:16,
  10:17, 10:21,
  10:24, 14:8, 33:3,
  33:8, 33:15, 34:2,
  45:18, 98:6,
  126:18, 141:1
31 128:22
3799 146:12
3: 1:6, 1:25, 1:30,
  2:7, 2:12, 2:28,
  2:33


< 4 >
42 71:24
4220 28:24
49 93:14
4:52 100:16
4:54 100:17


< 5 >
54 29:5, 42:9, 73:18
56(d 18:11, 26:22,
  35:11, 36:3,
  41:10, 44:25,

47:6, 47:12, 52:4,
  77:7, 84:5,
  106:14, 106:21,
  107:7, 107:19,
  108:7, 118:22,
  119:1


< 6 >
6:01 145:3


< 7 >
7th 45:8


< 8 >
83 55:2
8:30 143:23


< 9 >
9 116:6
96. 116:16
9758 78:6, 78:12,
  85:14
9:30 143:23


< A >
AAFAF 6:21, 6:23,
  11:19, 11:20,
  11:21, 24:14,
  41:18, 49:9,
  49:10, 56:2,
  61:22, 63:13,
  67:25, 83:4,
  85:10, 86:21,
  108:14
ability 59:4,
  125:11, 146:5
able 9:10, 22:13,
  22:18, 33:6,
  39:12, 55:3,
  65:10, 85:15,
  117:5, 123:3,
  126:22, 140:17,
  141:2
above 57:5
Absolutely 10:21,

31:16, 40:15,
66:18
absurd 117:25
abundantly 12:12
accept 51:1, 105:18,
125:20
accepting 13:21
access 5:21, 22:2,
22:14
accessible 43:8,
123:21
account. 82:9
accountant 132:12
accountants 25:23,
107:15
accounted 18:16,
70:18, 128:4
accounting-related
111:9
accurate 42:14,
135:25, 146:5
accuses 9:22
acknowledge 10:8,
17:2, 50:8, 80:17,
81:15
acknowledged 83:15,
109:14
acknowledges 18:9,
77:20, 83:13
across 114:11,
125:16
Act 71:12, 116:3
action 119:25
actions 138:8
Adam 3:23, 6:18,
20:9, 62:18,
70:23, 105:5,
105:9, 112:25,
115:23, 127:25,
131:7, 135:16
adamantly 66:9
add 9:24, 20:8,
23:22, 67:15,
71:14, 125:25,
128:19
added 14:12
addition 28:13,
54:16, 54:18,
54:23, 65:14,
105:23

additional 26:23,
28:14, 28:17,
44:17, 65:15,
80:2, 84:25,
104:14, 104:15,
106:20, 139:15,
139:18, 139:19,
139:21, 142:14
Address 11:12,
12:24, 16:10,
17:1, 18:23, 19:6,
24:17, 24:19,
34:5, 51:24,
91:12, 105:11,
127:2, 128:1
addressed 108:8,
120:9
addresses 102:20
addressing 28:4,
34:15
adjustment 46:15,
71:1
Administered 1:11
admit 133:18
adopt 51:10
adopting 104:12,
104:17
adoption 106:16
advantage 33:15
adversary 55:2
Advisory 3:19
affect 77:1, 106:22
afternoon 5:5, 5:6,
6:6, 6:10, 6:15,
6:18, 6:22, 41:17
Agency 3:18
agent 49:2, 95:20,
95:22
aggregates 114:2
aggregation 72:20
ago 8:3, 12:5, 40:6,
69:4, 118:14,
118:21
agree 8:12, 15:3,
23:18, 23:19,
25:10, 31:11,
33:12, 34:7,
44:15, 63:25,
67:6, 69:5, 86:1,
87:21, 90:22,

105:17, 136:10,
136:21, 142:17,
143:5, 143:8,
143:20, 144:1
agreed 16:15, 16:16,
18:7, 25:2, 29:5,
29:9, 35:6, 36:15,
42:8, 65:16,
79:12, 101:25,
109:18, 110:15
agreeing 80:1, 112:3
Agreement 51:12,
56:25, 57:16,
101:6, 101:7,
101:8, 101:11,
101:16, 102:1,
102:14, 102:18,
102:21, 105:25,
108:22, 109:4,
109:11, 122:8,
141:23
agreements 28:15,
29:8
aha 81:2
ahead 24:5, 43:2,
47:2, 63:9, 111:20
Ahlberg 98:6, 109:20
al 1:16, 1:30, 1:37,
2:12, 2:19, 2:33,
2:40, 3:12, 5:17
alleging 116:11
allocated 14:10,
27:2, 27:5, 50:24,
53:24, 72:25,
128:24
allow 35:20, 42:15,
84:2, 112:7
allowable 7:16
allowed 62:13,
65:17, 89:9
almost 108:25
already 28:20,
29:14, 36:15,
37:11, 37:18,
41:7, 41:12,
41:24, 49:19,
52:10, 55:11,
55:14, 55:19,
55:20, 57:23,
58:5, 66:19, 69:1,

72:8, 105:24,
110:17, 120:7,
124:21, 136:19
altering 144:6
alternatively 78:12
although 129:1
amazed 52:14
Amazon 21:4
Ambac 1:36, 2:18,
2:39, 3:32, 5:17,
6:5, 6:7, 39:10
ambiguity 68:15,
90:4, 92:4, 103:8
among 31:5
amongst 94:20, 119:2
amount 18:3, 107:5
amounts 53:16
Amy 146:11, 146:12
analog 112:16,
118:10, 118:11
analogy 72:18,
127:10
analysis 43:12,
50:17, 52:23,
81:10
analyzing 17:10
and/or 64:7, 70:17,
96:11, 101:21,
134:11
Angeles 7:1
answer 9:19, 10:15,
19:21, 19:24,
29:24, 31:2,
32:18, 32:19,
67:9, 73:7, 118:9,
122:17, 122:21,
123:4, 126:14,
126:18, 130:22,
131:16, 137:22
answered 96:19,
124:21
answering 94:11
answers 21:1, 95:25,
126:22
anticipate 33:4,
126:16
anybody 10:17, 32:6,
50:12, 51:2, 51:4,
89:4
anyway 133:1

Apart 106:2, 119:5
apologies 134:13
apologize 57:9,
63:12
apparently 56:18
APPEARANCES 3:7
appeared 29:1
APPEARING 3:9
appears 127:22
append 61:17
applicable 125:16
applies 93:14,
101:11
apply 24:6, 42:12,
93:14
appreciate 8:1, 9:1,
9:3, 37:1, 46:20,
130:23
approach 25:14,
126:23
appropriate 24:9,
31:10, 32:25,
34:3, 39:8, 43:11,
48:21, 69:7, 72:8,
88:9, 106:18,
108:6, 118:14,
118:15, 120:17,
126:25, 130:2,
130:8, 133:9,
140:13, 141:21,
143:9
appropriated 48:25
appropriations 93:15
approval 97:19,
98:11, 98:19,
99:23, 124:8
April 45:6
arbitrarily 17:25
archived 86:22
archives 86:9
arduous 81:1
area 43:23, 76:9
areas 8:14
argue 18:13, 49:16,
105:1, 106:1
argued 35:12, 77:11,
97:8
arguing 68:15,
142:23
argument 7:14, 7:17,

8:10, 27:23,
81:20, 94:3, 117:6
arguments 18:11,
18:13, 18:16,
24:5, 107:23,
107:25
around 39:7, 39:11,
46:9, 63:21,
111:4, 111:10
articulated 59:15
articulating 45:14
Ashley 3:20, 6:24,
41:17, 85:10
aspect 32:20
assert 23:4, 23:19,
23:25, 115:12
asserting 20:15,
20:16
assertion 11:4
asset 55:18, 62:11,
62:24, 62:25
assets 62:9
associated 32:13
assume 28:7, 51:17,
64:10, 70:2,
104:11, 126:20
assuming 12:24,
20:6, 56:25, 72:6,
75:1, 124:25,
132:6, 135:14,
138:9
Assurance 1:36,
2:18, 2:39, 3:32,
5:17, 6:7
Assured 3:29, 6:9,
6:12, 24:4, 133:12
Atara 3:33, 6:6,
7:24, 57:20,
60:18, 72:13,
87:10, 136:23,
136:24, 139:3
Atlantic 143:1
attached 118:2
attention 57:12,
64:11
attributable 55:8
audit-related 7:12,
15:10, 36:10,
112:8, 118:13,
130:2

audited 15:19, 37:2,
   37:9, 53:22,
   53:25, 60:25,
   62:6, 64:12,
   64:22, 114:7,
   115:4, 127:8,
   128:14, 133:17,
   137:20
auditing 26:6,
   34:23, 52:7,
   105:13
auditor 34:15, 35:4,
   55:11, 62:20,
   94:10, 125:25,
   130:12, 135:9
audits 114:13
aughts 12:10
authentication 21:3,
   23:22
Authority 3:19,
   53:11, 60:20,
   60:22, 61:5,
   71:12, 98:20,
   102:13, 109:4,
   120:2
authorized 7:15,
   71:5, 71:11
authorizes 114:1
authorizing 101:5,
   101:18
available 43:10,
   96:1, 97:20,
   123:14, 123:21,
   123:25, 124:10,
   129:2
avenue 87:16
avoid 75:15, 81:12,
   137:22, 143:3
aware 80:10, 98:2,
   98:7
away 116:11, 143:6
awful 79:5
awfully 83:22

< B >
back 12:10, 13:14,
   35:4, 36:17,
   43:19, 56:1, 56:2,
   66:5, 69:3, 73:22,

   81:1, 85:22,
   87:14, 100:18,
   110:13, 112:14,
   113:20, 114:14,
   115:19, 118:23,
   130:13, 132:23,
   133:1, 134:5,
   136:5, 136:9
backdrop 112:2
background 108:5
backing 137:20
backslide 131:23
backsliding 68:9
backwards 81:8
badly 84:17
balance 19:15,
   45:12, 53:12,
   53:13, 54:12,
   54:14, 54:16, 62:8
balances 93:7
balloon 39:4
banking 85:17
bankruptcy 67:1
banks 25:23, 80:2,
   83:20, 85:1, 85:3,
   85:11
based 17:6, 25:4,
   50:22, 55:4,
   68:19, 80:24,
   81:11, 81:20,
   98:11, 121:5,
   138:1
basically 89:25,
   92:14, 101:15,
   120:24, 123:17
basing 63:2
basis 20:16, 22:21,
   54:3, 54:9, 54:12,
   57:25, 58:17,
   60:15, 90:6,
   127:18, 127:19,
   138:8
battled 45:9
be-all 17:13
Bear 27:10
bearing 109:8
bears 85:8, 107:11
beat 130:25
beauty 143:21
became 36:8

become 12:12, 131:2
becomes 38:11, 53:14
begin 75:19
beginning 25:11
begun 55:19
behalf 6:7, 6:12,
   6:16, 6:19, 6:23,
   7:3, 14:20, 20:10,
   24:14, 41:18,
   44:12, 48:12,
   48:23, 63:12,
   85:10, 105:9,
   108:13, 143:3
behooves 143:5
belief 45:13
believe 36:24,
   38:13, 49:18,
   57:3, 69:11, 72:7,
   85:5, 85:6, 85:22,
   91:16, 103:2,
   103:12, 105:17,
   144:9
believed 125:3
believes 92:9
belong 94:8, 97:10,
   133:18
benefit 92:3, 92:12,
   116:12, 143:15
BEREZIN 3:27, 6:14,
   6:15, 103:16,
   103:17, 111:8,
   123:5, 123:8,
   124:6, 127:2,
   127:5, 127:16,
   128:2, 129:22,
   130:9, 138:11,
   139:1, 144:19
best 46:2, 85:1,
   135:7, 135:8,
   138:21, 140:2,
   146:5
better 12:19, 40:7,
   74:19, 97:15,
   118:24, 142:4
beyond 19:13, 29:13,
   62:13, 64:20,
   108:2
big 54:24, 63:17,
   108:17, 125:8
Bill 117:18, 118:16,

128:20, 133:12,
137:24
billions 46:7
binds 33:6
bingo 91:21
bit 19:8, 43:3,
54:22, 88:25,
132:25, 139:25
black 140:1
blank 71:23, 115:9
blanket 7:11, 9:7,
15:9, 25:12, 34:6,
47:18, 82:6
blended 113:22
blinders 30:10
Board 1:10, 1:24,
2:6, 2:27, 5:15,
6:25, 7:3, 28:4,
44:9, 44:12,
48:12, 55:1, 56:1,
56:14, 57:5,
76:20, 78:7,
78:19, 82:13,
83:4, 101:5,
101:16, 101:25,
102:11, 102:14,
117:3, 117:13,
135:4
body 19:2, 23:1
bold 113:10
Bond 8:11, 13:15,
28:14, 51:11,
80:8, 86:10,
86:12, 101:4,
101:5, 101:20,
101:22, 102:18,
108:3, 109:2,
120:4, 120:25,
134:10
bondholders 108:1,
113:18, 120:6
Bonds 8:5, 29:7,
88:18, 101:2,
101:19, 108:24,
116:13, 128:10,
128:12, 134:9,
134:10
book 21:4
bookkeeper 113:24
bookkeeping 113:22,

114:3, 114:15,
116:17
books 55:17, 55:18,
115:22
bore 112:8
Boston 5:6
bottom 90:4, 118:7
bound 27:9, 28:14,
29:7, 101:6,
101:22, 101:25
bounds 30:3
box 86:22, 140:1
boxes 86:19, 109:2
break 76:5, 89:3,
89:4, 100:5, 100:8
breaks 89:8
breathe 100:2
breathing 100:9
bridge 120:10
Brief 71:1, 76:20,
76:24, 79:22,
120:18
briefing 8:10
briefly 120:11,
127:3, 133:12
Brilliant 44:1, 44:5
bring 40:9, 77:14
broad 32:8, 33:3,
38:20, 99:24,
105:21, 110:5,
112:14, 115:12,
142:13
brought 10:25, 26:1,
108:16, 114:6,
119:25
brow 143:16
brushing 11:3
build 45:7
built 144:7
bullet 119:7
bunch 30:8, 32:22,
110:8, 112:6
burden 9:24, 37:20
burdensome 13:23,
25:21, 37:17,
37:25, 52:12,
83:23, 94:19
business 142:3,
143:21, 143:25
busy 52:7

Butler 6:19
bypass 15:6

< C >
Cadwalader 6:11
calculating 129:1
calendar 45:4, 46:13
call 5:10, 7:3,
31:25, 34:9,
63:23, 132:12,
134:2
called 20:17, 54:15,
61:2, 81:7, 84:7
capabilities 140:16,
140:21
careful 26:12,
47:16, 47:19,
132:16, 132:17
carefully 7:16,
8:13, 16:3, 17:9,
26:4
carried 131:11
case 5:10, 5:17,
30:12, 51:12,
107:9, 107:13,
107:15, 107:23,
120:14, 146:6
cases 8:8, 33:13,
34:8, 46:16
cash 16:15, 42:2
CAT 3:45
catch 112:3
categorical 104:6
categorically 30:3,
103:20
categories 29:4,
29:16, 34:9,
45:10, 45:14,
46:1, 48:6,
108:16, 113:4,
119:14
categorized 52:16
category 13:1,
15:23, 35:20,
47:8, 48:15, 52:2,
72:4, 110:7
cause 37:7, 37:13
caused 22:11
CCD 86:10

CCDA 9:3, 10:13,
    50:25, 51:16,
    73:6, 76:3, 76:8,
    76:10, 77:18,
    81:15, 125:15
cement 80:16
central 11:13,
    11:16, 11:21,
    11:23, 12:1, 12:2,
    12:16, 30:16,
    30:23, 40:2,
    51:11, 89:17,
    93:21, 102:4,
    115:25
certain 25:2, 40:22,
    59:8, 66:24,
    66:25, 67:2,
    90:11, 126:11,
    128:22, 129:19,
    140:23, 141:20
certainly 15:11,
    17:21, 33:8, 33:9,
    43:9, 77:11,
    82:16, 84:24,
    87:11, 125:13,
    126:19, 140:15,
    140:17
certify 146:4
challenge 91:1
chance 38:14, 40:10,
    89:2
change 46:9, 54:2,
    54:4, 95:19,
    95:21, 121:24,
    129:3, 132:5,
    139:6
changed 8:7, 53:20,
    60:13, 62:3, 80:7,
    95:16, 96:1, 129:4
changes 65:1
changing 60:16
characterize 21:2,
    29:13
characterizes 106:11
charged 67:8, 93:23
chart 95:15, 110:18
charts 92:17
chatting 132:25
checked 52:16
chief 86:23

children 8:5
circle 39:7, 43:19,
    118:23
Circuit 68:23,
    104:21
circular 98:16,
    98:19
circumstances 57:13
citation 13:15,
    107:13
cite 107:9, 116:6
cited 107:14
claim 38:9, 68:17,
    96:21, 107:2
claims 38:5
clarification 71:13
clarify 50:4, 70:25
clarity 57:24,
    62:19, 74:24,
    133:2
clawback 52:2
clawback-related
    36:6
clean-up 105:11
clear 10:21, 12:12,
    22:19, 23:2, 25:8,
    30:17, 38:17,
    41:9, 41:15, 56:2,
    61:20, 64:19,
    72:18, 79:18,
    104:10, 118:9,
    121:9, 122:23,
    123:1, 124:13,
    126:6, 131:5,
    139:20
clearer 24:22
Clearly 13:17,
    15:18, 17:17,
    21:11, 30:21,
    72:16, 72:17,
    77:7, 78:13,
    80:10, 81:19,
    91:13, 94:9,
    98:13, 127:18
clerk 81:21
client 132:8
Close 135:17, 142:3,
    143:21, 143:25
closely 8:22, 29:3
clue 127:14

code 27:3, 28:24,
    29:1, 43:5, 51:4
coded 42:8
codes 13:9, 42:12,
    72:6, 92:22, 93:10
Colin 3:14, 7:4,
    76:19, 78:18
colleague 6:24,
    24:17, 41:5
collected 17:24,
    18:3, 20:23
collecting 109:23
collective 45:2
collectively 143:16
combination 51:17,
    86:18
combining 138:2
comes 12:6, 53:24,
    58:16
comfort 30:19
comfortable 28:6
comforting 87:13,
    87:17
coming 10:14, 32:11,
    43:16, 80:11,
    116:23, 118:23,
    132:23
comment 46:24,
    110:6, 121:7
comments 9:1, 46:21,
    74:3, 89:19,
    106:19, 110:10,
    118:21, 120:23,
    132:23, 142:14
commitment 56:22
committed 58:4
committee 134:22
common 116:14
communicating 20:3,
    100:7
communication 19:21,
    40:8, 44:20, 51:7,
    52:20, 133:13,
    133:16
Communications
    19:19, 19:22,
    19:23, 26:8, 37:6,
    38:11, 38:20,
    47:9, 58:19,
    58:23, 59:9,

61:25, 63:4, 65:2,
  67:18, 68:19,
  74:9, 75:2, 85:3,
  95:5, 102:14,
  110:11, 119:8,
  132:18, 136:20
Company 3:23, 6:20,
  86:8
comparable 112:22,
  113:5
compel 40:10, 79:22
compelled 56:10
competently 33:6
compilation 132:11
complete 12:14,
  28:20, 37:2,
  40:12, 57:6, 90:1,
  104:23, 126:17
completed 45:6,
  45:8, 52:9
completely 21:19,
  25:20, 37:9,
  103:24
compliant 103:24,
  104:8
comply 30:13
complying 84:5,
  137:4, 143:7
component 52:12,
  53:13, 53:14,
  54:14, 128:25
components 137:18,
  140:23
comprehensive 12:14,
  31:18, 43:17, 85:7
concede 15:4
conceivably 36:10
concept 29:17,
  46:17, 47:6,
  112:15, 125:17
concern 34:6, 40:25
concerned 45:18,
  87:25, 117:8,
  132:23
concerning 26:8,
  38:20, 58:23,
  59:9, 63:18,
  97:18, 107:5,
  119:12, 123:13,
  124:8, 124:12,

131:3
concerns 84:18
concluded 118:14,
  120:7
concluded. 145:3
conclusion 63:2,
  81:11, 122:3
conditionally 53:24,
  128:24
confer 9:17, 32:3,
  43:16, 43:21,
  59:24, 99:20,
  103:14, 125:22,
  130:5, 130:7,
  139:14, 140:18,
  140:21, 141:22
conference 144:8,
  144:14
confident 52:22,
  67:11
confirm 57:4, 57:22,
  88:9
confirmed 56:23,
  57:22
confirming 9:19
conflate 70:4
confused 50:3
confusingly 50:3
confusion 30:17,
  30:18
connection 31:22,
  42:20, 68:14,
  69:2, 84:5, 84:7,
  85:14, 95:4,
  101:24, 107:17,
  119:15, 120:7
conscious 16:2
consensual 65:11
consequence 132:5
consequences 82:25
consider 9:17,
  110:13
considerable 107:5
considered 88:11
considering 8:11
consistent 113:19
consistently 12:11,
  59:13
consisting 146:4
constitutes 134:23

constrain 55:24
constraints 87:25
consult 116:3
consultant 10:24,
  10:25, 43:13
consume 45:21
contain 60:15
contained 137:19
contemplated 45:25,
  111:18, 131:2
contemplating 64:19
contemporaneous
  67:18, 99:9
contemporaneously
  50:12, 66:24,
  68:11
contends 78:8
content 64:8
context 36:4, 36:6,
  36:25, 54:22,
  107:19, 108:4,
  110:2, 112:7
continually 9:13
Continue 40:18,
  41:3, 58:5, 59:16
continues 17:25,
  27:22
continuing 49:5,
  85:18
contrary 119:19,
  119:20
contribute 135:2
control 20:19,
  21:21, 23:20,
  39:5, 71:8, 71:10,
  120:13, 136:6,
  136:10
controlled 21:10,
  23:24, 113:11,
  136:18
controller 66:17,
  96:11
controlling 21:24,
  113:9, 113:25,
  125:5
controls 22:1, 22:8,
  22:12, 22:20,
  23:2, 104:2,
  113:24, 114:3,
  114:15, 114:18,

115:4, 116:16,
122:20, 122:24,
135:23, 137:11
conversation 42:24,
68:4, 69:3, 138:18
conversations 92:6,
95:3
convince 12:15,
138:14
convincing 129:6
coordination 45:24
copies 135:10
copy 61:19, 85:24
core 13:13, 36:16,
81:22
Corporation 1:36,
2:18, 2:39, 3:27,
3:30, 3:33, 5:17,
6:8, 119:25
Correct 44:19,
69:18, 70:7,
70:19, 70:20,
72:1, 103:3,
117:6, 124:19,
135:4
corrected 57:14
correspond 50:14,
50:16
corresponded 55:10
corresponds 25:17
counsel 6:11, 28:3,
86:24, 89:11,
108:25, 109:1
countless 96:17
couple 45:15, 67:24,
89:18, 105:11,
118:21, 133:7
course 38:4, 38:6,
40:24, 66:18,
90:21, 95:17,
97:25, 102:5,
126:16
court-issued 5:25
COURTROOM 5:11
courts 15:14
cover 65:16, 65:18,
102:24
covered 42:3, 65:19,
66:16
COVID 8:6

CPA 54:23, 55:1
craft 9:10
crafted 8:13, 17:9,
59:10
create 120:5
created 90:12,
90:19, 92:8, 92:23
credentials 5:25
creditors 68:18
credits 89:22, 90:6
crisis 144:17
critical 11:6, 66:6,
133:4
CSR 146:12
current 52:7, 52:8
custodial 66:3
custodian 71:11,
85:25, 91:5, 109:5
custodians 9:18,
30:8, 67:16, 71:4,
89:16, 91:6,
99:12, 99:21,
100:1, 103:13
custom 140:11
cut 10:22, 142:9
cutting 64:22


< D >
Dare 76:3
data 28:21, 43:4,
43:15, 43:18,
71:9, 141:10
date 12:10, 40:24,
80:5
dates 45:9
day 49:16, 58:1,
68:20
days 43:13, 80:23,
133:1, 142:14
dead 130:25
deadline 91:2, 91:3,
91:9
deadlines 46:14
deal 24:9, 48:7,
48:9, 90:5,
121:10, 121:11
dealing 23:5, 45:4,
75:15, 89:23,
93:22, 99:6,

121:18
dealings 132:15
debate 15:16, 132:4
debating 107:18
Debt 55:7, 60:22,
129:1, 129:2
Debtors 1:18
decide 49:22, 66:5
decided 102:22
decision 89:24,
90:2, 90:24,
91:13, 102:20,
106:24
decisions 79:20
Declaration 18:12,
36:3, 47:6,
118:22, 119:1
declarations 35:11
deemed 6:2
defendant 40:1,
42:22, 60:1,
125:11, 125:18
defer 28:3, 103:15
define 39:8, 43:21
defined 15:15,
60:14, 82:23,
116:25
defining 14:14
definitely 14:7,
33:24
definition 119:9,
134:20
definitional 14:14
definitive 66:21
degree 139:18
Dein 3:4, 5:13,
19:2, 48:1, 146:7
delay 9:23, 91:7
delayed 52:10
demanded 83:19
demonstrate 49:19,
79:23, 80:6,
103:6, 107:25,
117:5
denial 6:1
denied 22:2, 22:14,
98:4
department 13:10,
29:18, 72:6
depending 86:19

depends 117:2
depose 39:12, 39:18
deposed 33:17,
   40:23, 45:20
deposit 21:9
deposited 18:9,
   18:17, 101:12,
   101:13
deposition 10:5,
   14:8, 32:24, 33:3,
   33:16, 72:11,
   109:21, 126:2,
   141:3
depositions 10:3,
   10:6, 33:21,
   45:18, 99:7
DEPUTY 5:11
describe 44:6, 62:2,
   62:16, 63:15,
   64:7, 69:15,
   88:11, 134:4
described 32:1,
   64:21, 67:4,
   70:12, 74:1,
   111:2, 118:12,
   122:8, 126:25,
   134:25
describes 72:10,
   73:20
describing 63:21,
   66:7, 68:1
description 53:10,
   53:18, 53:19,
   53:20, 54:2,
   54:10, 54:13,
   54:19, 58:10,
   58:17, 60:10,
   60:12, 61:2, 61:7,
   62:2, 64:11,
   64:23, 65:22,
   72:11, 87:12,
   137:11
descriptions 60:16
descriptor 14:13
designated 54:3,
   70:9, 121:13
designation 18:18,
   22:9, 42:17, 71:6,
   71:24, 82:2, 93:16
designations 13:9,

16:16, 16:22,
   17:14, 20:18,
   71:2, 71:20, 72:6
designed 140:12
desire 126:7, 136:17
desired 126:10
desk 74:6
desks 93:21
detail 10:19, 143:19
detailed 40:15,
   87:12
details 65:9
determination 91:14,
   134:24
determinations 55:4
determinative 107:16
determine 78:10,
   86:24, 98:10
determined 120:24
devil 65:9, 143:19
dial 125:21
dictate 115:15
diesel 128:8
difference 59:22,
   62:5, 63:17
differences 70:6
different 8:2, 8:7,
   20:16, 21:19,
   33:14, 34:8, 48:6,
   49:4, 59:15, 60:5,
   62:8, 75:17,
   121:4, 125:6,
   129:12, 129:18,
   132:24, 134:20,
   142:18
differing 133:1
difficult 47:23,
   99:25, 143:18
difficulty 38:10
digitized 86:20
dilatory 9:23
direct 15:12
directed 8:19, 8:20,
   8:25, 113:1,
   137:21
directing 8:17,
   13:16
direction 22:19,
   94:13
directive 25:20

directives 42:11
directly 11:8,
   15:21, 54:6
director 101:7,
   101:18, 102:2,
   102:8, 102:10,
   109:4, 109:7
disagree 121:23,
   129:13
disappointed 88:20
disclose 86:11
disclosed 39:13
disclosing 69:23
disclosure 32:4,
   54:19, 55:11,
   61:16, 64:21,
   64:22, 87:8
disclosures 16:6,
   31:22, 60:23, 61:1
disconnect 38:24,
   40:5, 43:3, 63:14,
   108:17
discrete 131:17
discretely 113:14,
   128:25, 131:11
discuss 20:10,
   55:23, 55:24,
   81:7, 89:21,
   108:6, 141:9
discussed 24:20,
   81:23, 105:13,
   109:18
discussion 8:24,
   10:12, 15:16,
   15:18, 28:1,
   40:24, 47:13,
   52:2, 68:10,
   71:14, 81:25,
   89:13, 107:5,
   123:22, 139:2
discussions 42:1,
   94:20
disproportionate
   37:9
dispute 13:12,
   21:17, 27:11,
   27:13, 28:1,
   28:11, 37:23,
   43:23, 48:18,
   49:8, 49:23,

73:22, 76:9,
80:10, 80:16,
81:15, 81:16,
92:3, 102:24,
108:23, 113:8,
113:9, 115:1,
125:9, 143:2
disputed 14:4,
76:23, 105:20,
113:6, 131:10
disputes 48:19,
123:25, 144:13
disruption 37:7,
37:13
dissertation 50:10
distinct 114:10,
114:11, 116:10
distinction 34:22,
70:15, 72:16,
105:14, 123:8
distinctly 106:2
distinguish 18:18
distinguishing 27:14
distressing 83:17
DISTRICT 1:1, 1:3,
3:5, 5:11, 5:12,
146:1, 146:2
doable 141:12, 142:2
doc 52:18
Docket 1:6, 1:25,
2:7, 2:28, 55:2,
116:16
document 12:4, 12:7,
13:24, 34:18,
40:22, 45:5,
71:23, 86:21,
87:3, 126:17
documentation 22:6,
52:17, 99:10,
105:16, 105:22,
115:5
dollar 17:24, 84:9
dollars 27:4, 27:7,
27:23, 28:25,
46:7, 46:8, 49:1,
49:15, 53:20,
55:18, 55:21
dominion 107:16,
119:21
done 20:23, 26:18,

28:19, 29:21,
31:8, 33:10, 43:7,
43:18, 43:20,
49:22, 52:13,
55:22, 57:5,
66:19, 71:11,
74:24, 97:2,
107:3, 110:2,
114:1, 125:9,
126:11, 134:22,
138:13, 138:25,
142:23
door 38:11, 126:24
dot 128:23, 128:24
dotting 128:24
doubt 44:25
down 8:6, 37:16,
59:17, 59:19,
74:13, 75:24,
103:11, 126:16,
136:1, 136:3,
144:8, 144:12
down. 48:8, 76:14,
88:16, 115:21,
124:24, 138:11,
139:1
dozen 30:8, 38:18,
41:25, 45:19, 66:8
dozens 32:11
drafted 17:11
drafting 7:16
drag 36:19
draw 29:17, 107:18
drawer 74:6
drop 82:16
dual 21:6
dump 111:16
duplicated 16:2
during 10:25, 11:7,
26:20, 95:18


< E >
e-mail 9:6, 11:8,
13:23, 27:24,
28:12, 29:18,
30:1, 34:17,
61:16, 67:17,
68:16, 69:4, 69:6,
73:10, 74:11,

81:21, 82:3,
83:25, 84:12,
132:19, 135:2
e-mails 7:12, 9:11,
10:1, 25:12,
27:19, 30:2, 30:4,
32:22, 34:6, 34:8,
61:15, 62:1, 65:2,
66:10, 66:15,
68:10, 79:7,
79:13, 81:3, 81:5,
81:18, 83:14,
84:17, 90:16,
91:5, 96:16,
102:8, 102:12,
109:6, 112:6
E6120 29:1
earlier 29:7, 74:3,
94:18, 112:5,
119:7, 125:15,
126:5
early 8:4, 12:10
easier 7:7, 34:19,
130:21
easily 22:25
easy 16:7, 22:13,
63:6
echo 48:13, 132:3
educate 33:17, 33:20
effect 7:19, 15:6,
49:6, 129:19
efficiency 46:17
effort 30:13, 81:1
efforts 16:2, 26:19,
83:3, 83:5, 84:24,
87:15
eight 22:3
either 25:4, 41:7,
46:15, 131:11
electronic 61:18,
81:5, 81:6
electronically 86:16
eliminated 9:4
Elizabeth 3:19,
6:22, 24:13,
67:25, 78:23,
108:13
elucidate 87:21
email 134:21
emphasize 89:23

employees 96:17
Enabling 116:2
encompass 115:13
encompasses 28:24
end 8:24, 45:20,
    65:14, 74:24,
    130:18, 141:3,
    142:23
end-all 17:13
ends 132:7
engagement 47:10,
    119:10
enough 13:16, 57:17,
    87:19, 91:18,
    98:12, 102:15,
    122:4
ensuring 137:3
entire 29:19, 58:13
entirely 136:15
entities 6:12,
    12:13, 12:24,
    21:8, 29:4, 53:17
entitled 51:6, 66:1,
    66:23, 68:10,
    115:3
entity 12:2, 45:19,
    62:12, 86:19,
    115:24, 115:25
entries 113:23
entry 5:25, 6:1,
    19:4, 71:6
envelope 120:10,
    132:25
envisioning 130:17
equally 24:6, 125:16
especially 110:13
essentially 11:2,
    80:1, 114:25
establish 46:13
established 51:3,
    51:10, 73:1, 73:2,
    81:23
establishing 73:9,
    73:12
et 1:16, 1:30, 1:37,
    2:12, 2:19, 2:33,
    2:40, 3:12, 5:17
evaluate 135:23
everybody 5:8, 5:9,
    18:9, 57:18,

64:13, 76:4,
    78:17, 90:17,
    100:8, 100:18,
    100:21, 143:15
everyone 5:5, 44:23,
    77:20, 89:11,
    95:13, 143:3,
    145:2
Everything 12:11,
    12:15, 16:20,
    39:2, 43:17,
    45:22, 50:10,
    50:11, 52:15,
    56:3, 57:5, 59:23,
    63:24, 83:12,
    118:8, 143:13,
    143:14
evidence 22:23,
    22:24, 23:1,
    62:25, 63:4, 90:7,
    90:8, 90:14,
    135:23
evident 10:22
ex 141:10
exactly 14:23,
    17:18, 42:2, 42:7,
    59:6, 116:24,
    118:23, 126:13,
    137:1
example 14:25, 15:9,
    18:7, 26:3, 32:20,
    34:24, 37:22,
    43:5, 53:16,
    62:12, 77:22,
    84:4, 94:2, 96:10,
    122:7, 128:2
examples 45:15
Excel 43:8, 93:3,
    93:8
exchange 31:22,
    56:22
excluded 91:25
exclusively 108:25
Excuse 97:15, 122:25
executive 101:7,
    101:17, 102:1,
    102:7, 102:10,
    109:3, 109:7,
    134:22
exemplar 20:13

exemplars 18:4,
    18:5, 18:6, 19:3,
    19:11, 20:22, 22:8
exercise 75:15,
    131:3
EXHIBITS 4:9
exist 14:25, 27:22,
    37:12, 83:8,
    98:25, 126:9,
    141:18
existed 94:5, 99:11
existence 119:16
exists 112:10
expanding 59:13,
    133:23
expanse 105:21
expect 21:23, 59:20,
    137:1, 141:11
expedition 36:19,
    112:15, 118:13,
    123:2
expended 20:24
expense 29:1, 68:18
expenses 27:1,
    110:19
expensive 37:17
expert 54:25, 116:15
explain 41:6, 64:7,
    74:9, 79:9, 88:12,
    137:8, 138:8
explained 49:19,
    125:10, 139:8
explaining 54:9,
    58:17, 60:14,
    119:3
explanation 64:25,
    126:10, 143:9,
    144:1
explanations 47:11,
    119:11, 138:7
exploration 131:13
exploratory 141:18
explore 117:5
exploring 107:8
export 27:6, 28:21,
    34:25, 42:6, 70:12
express 133:2
expression 119:20
expressly 52:1,
    52:4, 106:16,

134:25
extensive 8:9, 20:13
external 94:20,
  114:5
extra 80:12
extract 110:22
extracted 140:6
extracts 18:22
extremely 32:8,
  33:3, 59:10, 91:14
extrinsic 90:8,
  90:14


< F >
face 108:7
faced 9:13
fact 22:2, 25:2,
  37:1, 40:21,
  44:23, 46:4, 49:8,
  59:8, 67:18,
  68:23, 76:23,
  90:4, 90:23, 91:3,
  93:1, 102:19,
  102:21, 104:22,
  109:19, 110:14,
  117:25, 119:5,
  132:4, 132:5,
  132:7, 134:6,
  136:12
facto 67:1
factor 88:21
factored 46:17
facts 49:24
factual 11:4, 27:12,
  90:13, 123:25,
  129:15, 129:20
fair 28:9, 32:18,
  58:20, 68:5,
  105:21, 122:4
fairly 21:23
faith 67:11
familiar 131:24
far 22:17, 35:9,
  120:10, 125:17,
  138:12
farther 12:18,
  132:25
fault 83:4
favor 120:6

fear 65:12, 133:13
federal 22:25,
  128:23
feel 56:10
feeling 40:8, 43:24
fees 128:9
felt 104:15, 104:18
few 38:6, 43:13,
  120:18, 133:1
FGIC 6:17, 20:10,
  105:10
fiduciary 110:8
field 141:10
fields 139:18,
  141:20
fight 73:5, 73:6,
  125:20
fighting 67:6, 87:7
figure 25:15, 26:16,
  30:19, 46:2, 58:7,
  59:25, 60:2, 67:7,
  84:3, 87:16,
  118:6, 130:19,
  136:9, 138:21
figuring 38:3, 130:6
file 11:13, 29:19,
  34:17, 40:3,
  46:14, 52:18,
  61:13, 61:18,
  61:19, 89:17,
  93:21, 102:4,
  109:10, 135:5,
  135:9, 137:20
filed 104:14
files 31:15, 66:17,
  67:17, 68:3, 75:2,
  86:25, 91:6,
  93:21, 96:12,
  101:23, 102:3,
  102:8, 108:25,
  109:15, 122:7,
  135:12, 138:15,
  138:16
filing 54:5
fill 8:15, 19:2,
  19:11, 115:9
filled 50:8
Final 144:13
finalize 60:6
Finance 3:26, 96:10

financials 15:19,
  37:2, 47:11, 52:7,
  53:22, 53:25,
  60:25, 61:1, 62:6,
  64:23, 119:11,
  127:8, 128:21,
  128:22, 131:12,
  131:15, 137:20
Financing 53:11,
  60:20, 60:22, 61:5
find 10:5, 10:10,
  11:22, 12:7,
  12:11, 26:19,
  30:7, 32:21,
  33:19, 41:14,
  62:19, 74:1,
  84:25, 85:15,
  86:6, 86:13, 88:6,
  109:6, 120:17,
  126:25, 138:15
fine 57:11, 69:7,
  89:6, 142:21,
  143:21
finish 7:21
finished 40:18
finite 30:23, 30:24,
  36:23, 52:18
firm 11:25, 20:2
firms 25:23
Firstly 13:6
Fiscal 3:17, 49:2,
  95:20, 95:22
fish 120:8
fishing 36:19,
  112:14, 118:13,
  123:2
five 18:8, 21:12,
  33:22, 69:4,
  95:16, 138:14,
  142:25
fix 63:14
flags 107:4
flat 93:24
flesh 130:3
flip 25:19
flouted 25:20
flowed 50:6, 50:20,
  84:2
flowing 71:25, 96:25
flows 21:20, 34:16

focus 20:20, 24:21,
   26:5, 46:22,
   78:17, 106:18,
   108:15, 130:24,
   137:18
focusing 108:19,
   108:20
folks 39:17, 39:18,
   74:5
follow 45:1
follow-up 108:10
followed 95:1
FOMB 61:23
footnote 22:2, 22:3
force 10:4, 16:2
forced 26:15
foregoing 50:22
forensic 56:3, 81:10
form 27:22, 130:17
formal 73:11
formally 31:9, 77:10
format 43:8
former 84:6
forming 92:11, 96:18
forth 35:4, 36:17,
   130:13, 138:1
forward 123:4,
   133:10
found 78:10, 84:6,
   98:18
founded 107:23
four 21:12, 33:22,
   95:16, 99:13,
   107:14, 113:21
four. 54:24
frame 40:11
frankly 9:12, 12:19,
   13:15, 15:10,
   25:4, 46:3, 52:19,
   68:11, 79:19,
   81:5, 120:9,
   121:15, 125:11
free 136:15
freeze 19:8
freezing 142:5,
   142:6
Friday 142:2, 142:13
frighteningly 131:24
front 75:18, 85:1,
   123:3, 141:3

fruitful 87:15
full 14:7, 18:3,
   18:23, 19:2, 22:8,
   118:23
fully 45:1, 103:25,
   107:7, 125:10
function 114:2
functions 54:24,
   113:21, 113:25,
   116:1, 137:3
fund. 13:24
fundamental 22:12,
   38:24, 39:6, 40:5,
   62:5
fundamentals 113:20
future 5:25, 6:1,
   40:24

< G >
GAAP 26:9, 58:25,
   119:4
Gail 3:4, 146:7
game 32:18, 68:5,
   82:18, 105:21
games 82:24
gap 10:23, 72:18
gaps 50:7, 140:2
GASB 26:10, 29:5,
   42:9, 58:25,
   73:18, 111:1,
   119:5
gasoline 128:8
gather 75:14
gave 92:17, 93:13
GDB 28:18, 49:2,
   78:6, 78:12,
   85:14, 85:15,
   85:17, 86:8,
   86:19, 86:22,
   102:5
General 5:20, 5:21,
   7:10, 12:25, 13:8,
   21:14, 24:16,
   54:19, 61:25,
   62:1, 74:11,
   89:19, 93:14,
   93:16, 96:23
generally 88:12
generated 43:25

gentleman 132:11
gets 18:9, 21:13,
   46:17, 63:19,
   114:7, 115:5
getting 16:17,
   21:12, 23:13,
   23:14, 37:4, 37:8,
   40:9, 61:25, 62:1,
   70:10, 70:11,
   70:12, 80:20,
   90:25, 91:10,
   111:8, 140:4
Give 7:19, 10:16,
   17:2, 17:4, 17:18,
   30:2, 35:6, 35:11,
   43:4, 45:15, 62:7,
   73:20, 82:6, 84:4,
   87:17, 89:2, 93:2,
   93:6, 93:17,
   114:16, 126:22,
   127:14, 135:10,
   144:2
Given 37:13, 42:11,
   55:13, 69:1,
   71:10, 84:24,
   90:23, 94:5,
   98:20, 109:5
giving 14:4, 33:17,
   36:16, 37:11,
   50:11, 72:19,
   72:22, 73:4,
   80:19, 81:14
glad 25:24
glossing 108:18
Good-bye 144:23,
   144:25
Gotshal 6:15
gotten 58:20
govern 19:15, 78:21,
   93:13, 101:2,
   107:8, 108:24,
   109:2, 111:3,
   111:4
Governing 38:22,
   47:13, 77:23,
   77:24, 94:25,
   101:19, 104:1,
   109:3, 113:25,
   134:1, 134:8,
   134:9, 134:13,

134:21
Governmental 21:8,
  55:1, 115:24,
  115:25
governs 134:23
grant 36:7, 59:6
granted 5:20, 108:1,
  123:13
granular 41:15
granularity 24:17
grapple 59:2
grappling 34:21
gravy 68:24
Great 30:1, 92:16,
  92:22, 141:25
greetings 5:6, 5:8
ground 107:4
group 141:24
groups 31:5
Guarantee 3:26
Guaranty 3:22, 3:29,
  6:19
guess 5:7, 8:1,
  13:2, 33:11,
  43:19, 51:16,
  61:20, 74:19,
  121:21, 121:23,
  122:15, 122:17,
  132:13, 138:12,
  143:23
guy 74:6


< H >
hand 34:23, 37:14,
  37:15, 59:25
handle 138:22
happen 33:4, 45:7,
  64:13, 109:21
happened 33:14,
  49:14, 109:22,
  141:5
happening 10:22,
  120:3, 135:17
happens 73:8
happy 12:21, 31:17,
  79:9, 87:24, 88:1,
  140:1
hard 13:21, 37:2,
  61:18, 85:24,

130:1, 130:7
hardly 134:23
head 9:12, 9:22,
  48:8, 74:13,
  76:14, 88:16,
  115:21, 124:24,
  138:11, 139:1
heading 61:5
hear 7:13, 13:19,
  19:7, 23:9, 23:12,
  58:18, 79:18,
  83:17, 90:3,
  90:20, 105:7,
  112:19, 126:19,
  132:23, 142:10
heard 5:19, 24:6,
  25:1, 56:17,
  58:11, 66:11,
  67:14, 83:9,
  87:11, 102:2,
  102:3, 106:9,
  106:23, 120:19,
  123:6, 126:10,
  129:17, 129:22,
  129:24, 130:3,
  130:15, 133:11,
  138:12
HEARING 3:3, 5:21,
  8:4, 11:7, 13:14,
  19:25, 25:11,
  65:16, 83:16,
  124:17, 132:20,
  135:11
hearings 6:1, 68:13
held 14:20, 15:5,
  18:10, 33:22,
  48:23, 50:15,
  52:17, 66:24,
  82:23, 92:2, 92:10
help 60:7, 78:10
helpful 16:19,
  22:19, 24:18,
  24:21, 31:13,
  40:14, 42:24,
  87:23, 110:15,
  114:5, 114:21,
  141:21, 142:7,
  142:14, 143:11,
  143:15, 143:20
hew 8:22

higher 38:21
highlights 137:1
highly 104:5,
  117:16, 121:6,
  123:19, 128:16
highways 116:14
hint 127:14
hired 10:25
historically 14:10,
  14:12, 50:23, 67:5
history 95:17
hit 34:21, 50:21
hits 13:25
hold 18:15, 21:9,
  24:9, 46:23, 46:24
holding 92:12
Holdings 107:13
hole 75:25, 118:25
Honorable 3:4, 5:13,
  146:6
hoop 10:4
hope 26:12, 89:11
hopeful 65:10,
  108:22
Hopefully 76:6,
  103:8, 139:4
hoping 54:17, 83:7
horse 131:1
host 119:2
hotel 77:23, 80:4
hours 80:23, 118:14,
  118:21
Hta-related 110:14
HTA. 124:10
Htas 104:1
hundred 118:8


< I >
idea 11:16, 30:10,
  31:23, 32:9,
  33:24, 37:4,
  39:16, 50:4,
  58:16, 60:11,
  69:3, 81:1,
  109:19, 118:5,
  121:22, 136:9,
  136:11, 136:15,
  136:19
ideas 44:1, 44:5

identical 112:21
identifiable 23:1
identified 8:12,
  8:19, 15:24,
  16:21, 20:14,
  37:23, 45:11,
  46:1, 49:3, 53:2,
  55:6, 64:7, 65:6,
  81:17, 81:18,
  86:4, 87:4, 99:12,
  119:15
identifies 131:15
identify 6:3, 7:6,
  8:13, 9:13, 9:25,
  24:1, 32:7, 33:5,
  37:22, 43:21,
  43:25, 55:8, 56:1,
  56:11, 65:3, 68:3,
  81:7, 81:8, 87:4,
  127:12, 131:9,
  131:14, 138:5,
  138:6
identifying 23:11,
  64:3, 77:16, 91:6,
  101:21, 109:23,
  113:3, 131:25,
  134:11
identity 76:12,
  76:25, 84:21,
  126:8
Ids 13:10, 72:6
III 1:8, 10:24, 54:5
illustrates 58:12,
  83:12
illustrative 26:3
imagine 58:25,
  64:21, 125:23
imagining 13:17,
  58:2
implemented 86:13,
  97:23
implicated 78:2
implication 90:9
implore 56:22
importance 84:21,
  133:4
important 20:12,
  22:15, 32:16,
  34:21, 36:3,
  36:25, 46:11,

61:14, 61:16,
  62:4, 83:14, 86:3,
  87:9, 89:23,
  90:20, 91:15,
  92:1, 101:8,
  101:10, 116:23,
  119:6
imposed 46:14
impressed 52:14
improvements 116:13
in-house 86:24
in. 10:25, 59:5
inclined 59:5,
  59:18, 63:20,
  129:21
include 22:4, 22:5,
  26:24, 28:15,
  28:23, 34:17,
  51:19, 65:1, 65:2,
  110:23, 111:24,
  133:15, 137:10,
  137:11
included 17:15,
  28:16, 34:11,
  47:20, 52:1, 52:4,
  53:18, 62:17,
  64:12, 74:10,
  77:7, 110:9,
  117:17, 128:25
includes 27:1, 27:3,
  27:4, 28:25,
  53:19, 62:10,
  68:3, 117:25,
  137:11
including 5:24,
  13:8, 26:9, 47:10,
  58:24, 68:2, 72:5,
  77:24, 85:3,
  101:20, 109:3,
  110:18, 110:20,
  118:1, 119:4,
  119:10, 123:10,
  134:10
income 91:24, 104:5,
  113:17, 113:18,
  117:17, 117:20,
  127:18
incompetent 12:5
inconsistent 113:12,
  136:15, 137:6

increasing 45:14
incredibly 38:7,
  52:14, 118:12
incumbent 33:16
indicate 104:17
indicated 22:3,
  105:12
indicates 23:14
individual 68:3,
  89:16
individuals 45:20,
  66:2
inflow 116:21
inflows 21:14
inform 9:9, 27:24
informal 68:19
informally 31:9
informs 78:24
initial 31:22, 32:4,
  55:11, 77:9
initiated 22:11
input 39:8, 65:23
inquire 43:9
inquiry 124:11,
  124:13, 129:7
inside 47:21
instance 33:11,
  56:21, 90:12,
  98:15, 108:17,
  133:16
instead 16:4, 61:25,
  65:4
institutional 90:10,
  90:18, 96:13,
  97:3, 103:7, 121:6
institutionally
  104:3
instruction 132:8,
  133:19, 135:6,
  135:10
instruction. 133:14
Instructions 34:17,
  42:10, 53:6, 53:8,
  73:17, 86:11,
  94:5, 98:24,
  111:3, 129:9,
  130:17, 130:25,
  133:10, 135:13,
  135:21, 137:25,
  138:7, 138:22

instructive 112:5
instrument 62:14
instrumentalities
  33:7, 116:1
instrumentality
  31:15
insufficient 98:13,
  98:23, 107:25
Insurance 3:23, 6:20
intend 24:23, 125:13
intended 17:12,
  47:20, 60:15,
  86:12, 101:6,
  143:10
intending 106:17
intention 57:24
interest 96:22,
  97:5, 101:11,
  103:9, 120:5
interested 60:9
interestingly 91:18,
  98:12, 102:15
internal 20:23,
  51:7, 94:20,
  113:24, 114:15,
  114:18, 114:23,
  122:12
internally 73:3
internet 98:18
interpret 104:22,
  108:7, 133:14
interpretation
  48:18, 90:19,
  121:1
interpreted 48:20
interrelation 116:8
interrogatories
  26:1, 31:25, 99:7
interrogatory 9:16,
  14:9, 31:20, 32:4,
  42:1, 50:18, 126:2
interrupt 35:24,
  39:23, 42:25, 52:8
interviewed 26:21
interviewing 39:9
investigate 129:23
investigation 40:4,
  85:2, 87:9
involve 28:23
involved 99:25

irrelevant 120:13,
  120:15, 120:16
irrespective 119:23
isolated 116:11
issuance 80:8
issuances 28:15,
  86:10
issued 8:17, 44:25,
  45:1, 45:3
issuer 86:9, 86:20
issues 8:11, 20:11,
  44:14, 68:14,
  70:5, 89:14,
  89:18, 89:20,
  90:13, 91:11,
  92:5, 100:12,
  102:23, 104:6,
  104:11, 104:23,
  105:13, 105:22,
  109:8, 110:6,
  111:5, 111:10,
  115:5, 129:5,
  130:3, 130:13
item 53:16, 53:18
items 54:12
itself 121:25,
  137:4, 143:11
iv 78:5

< J >
job 33:22
joined 6:23, 7:3
joint 143:1, 144:12
Jointly 1:11
jokes 54:23
journal 113:22
Juan 5:1
Judgment 76:13,
  76:16, 76:20,
  76:21, 76:22,
  76:24, 76:25,
  77:10, 79:20,
  82:14, 91:1,
  113:11, 125:6,
  125:7
judgments 106:13
Judith 3:4, 146:7
jump 10:4
jumps 54:17

juncture 141:17

< K >
Kass 3:14, 7:4,
  76:19, 77:3,
  77:13, 78:18
keep 13:14, 21:17,
  32:16, 38:12,
  63:15, 132:20,
  133:23, 135:10
keeps 63:16
kept 24:7, 108:24,
  109:5, 135:12
key 10:1, 10:8,
  66:22, 101:21,
  113:8, 130:13,
  137:18
kind 21:2, 28:11,
  37:10, 68:9, 79:4,
  82:5, 83:12,
  85:12, 89:13,
  89:18, 105:17,
  110:4, 118:13,
  123:20, 126:21,
  138:2, 141:13
kinds 25:12, 39:16,
  42:23, 73:25,
  122:7, 125:14,
  126:24
knowledge 9:14,
  30:5, 31:1, 32:7,
  33:10, 33:19,
  34:1, 39:10,
  45:10, 66:12,
  66:14
known 46:12, 46:13
knows 18:14, 32:22,
  67:12, 126:14
KPMG 19:19, 19:20,
  19:24, 20:2,
  25:24, 26:5, 37:2,
  37:5, 52:6, 54:8,
  58:22, 58:23,
  75:1, 75:3, 75:11,
  75:16, 114:22

< L >
labeled 71:3

lack 118:24
laid 48:15
language 8:23,
   59:14, 63:15,
   63:16, 64:14,
   101:21, 113:10,
   115:12, 129:3,
   129:4
Lary 3:13, 7:4,
   48:11
last 8:4, 9:19,
   10:20, 37:3,
   53:21, 83:15,
   83:16, 89:2,
   141:1, 141:5
late 143:17
later 20:21, 67:1,
   74:20, 125:20
laugh 12:3
laurels 41:12
law 22:25, 25:23,
   63:1, 107:24,
   119:20
laws 63:4
lawyer 54:23
layer 23:21
layered 23:25
layers 23:21
lays 55:2, 116:16
lead 20:7, 24:14,
   136:2, 141:1
least 26:21, 31:7,
   33:3, 43:21,
   43:24, 45:25,
   75:20, 80:20,
   139:20, 140:3
leave 8:4, 35:13,
   88:15, 138:13,
   142:16
left 35:12, 49:12
legal 11:2, 27:23,
   48:18, 49:5, 49:6,
   49:8, 49:16,
   49:23, 67:2, 67:6,
   108:25, 109:1,
   117:6, 122:2,
   129:18, 132:4,
   135:9
length 110:22
less 103:7, 129:19,

143:4
letter 9:18, 88:10
letters 29:9, 47:10,
   119:10
letting 65:13
level 30:19, 38:22,
   41:15, 71:11,
   85:1, 90:17,
   96:17, 111:13
liabilities 62:9
license 128:9
lien 82:21, 101:9,
   108:1, 120:6
lieu 61:24
Lift 20:14, 22:3,
   26:20, 28:16,
   29:11, 29:14,
   33:5, 34:3, 41:13,
   55:5, 68:14,
   79:20, 80:8, 83:6,
   84:7, 89:24, 93:3,
   95:18, 98:16,
   102:20, 107:10,
   107:21, 110:3,
   120:7, 134:25
light 27:20, 37:18,
   58:21, 68:20,
   68:22, 79:1, 79:7,
   79:11, 84:17,
   110:9, 110:12,
   117:25, 123:23
likely 29:23, 30:6,
   96:13, 99:12,
   102:5, 102:13,
   109:14
limit 17:25, 26:14,
   30:24, 59:3,
   75:16, 76:15,
   76:21, 78:20,
   102:19, 106:19,
   129:1, 132:8,
   137:25
limitations 111:25,
   131:6
limited 15:15, 25:9,
   25:16, 26:11,
   27:7, 29:24,
   44:24, 49:20,
   54:9, 55:4, 58:16,
   59:7, 64:2, 78:16,

103:11, 106:19,
   110:14, 121:8,
   126:6, 126:12,
   129:7, 133:15
limiting 18:21,
   40:2, 138:3
line 29:17, 53:16,
   53:18, 54:12,
   68:16, 90:4, 118:7
lines 72:8, 73:17,
   140:25
link 7:17, 21:5
linking 112:24
list 43:12, 43:17,
   66:1, 82:8,
   117:20, 138:9,
   139:8, 139:12,
   140:22
listen 143:14
listening 47:3,
   108:18
listing 81:14
lists 32:11, 52:15,
   110:8
Literally 80:22
litigation 13:13,
   22:4
little 40:7, 54:21,
   78:17, 82:18,
   87:25, 88:25,
   91:9, 117:8,
   125:24, 132:25,
   139:25, 142:13
live 86:2
LLP 7:25
locate 29:4, 73:17,
   84:22, 87:12
located 84:6
locating 88:4, 110:1
location 13:6,
   15:22, 23:11,
   41:20, 41:21,
   48:16, 51:7,
   51:19, 52:3, 54:6,
   64:3, 65:4, 77:16,
   113:3
locations 68:2
lockbox 49:12
log-in 21:5
logs 18:7

long 57:16, 82:8
longer 10:9, 14:25,
    67:17, 100:8
looked 11:21, 29:15,
    41:1, 68:7, 78:15,
    98:22, 104:21
looks 75:19
loosely 46:9
Los 7:1
lose 46:4
lost 125:24
lot 7:9, 8:7, 25:3,
    31:5, 31:12,
    41:24, 50:6,
    51:22, 52:13,
    71:2, 79:5, 96:4,
    100:11, 104:10,
    105:12, 106:1,
    110:12, 115:25,
    126:9, 129:18,
    137:22
low 96:17
lower 90:17
luxury 141:17


< M >
Magistrate 3:4,
    146:7
main 13:5, 36:9,
    91:11, 121:21
maintain 21:25,
    22:1, 22:24, 57:12
maintaining 102:11
maintains 21:22
major 144:17
manage 46:3
managed 22:20
Management 1:10,
    1:24, 2:6, 2:27,
    5:15, 12:4, 20:24,
    22:10, 62:20,
    96:10, 114:4
Manges 6:16
manner 106:10,
    107:15
manual 43:7
manuals 73:16
map 110:18
mapping 26:24, 27:1,

110:20
marginal 37:10
Market 107:13
material 8:14,
    35:19, 37:10,
    38:1, 82:25,
    101:4, 104:6
materially 53:21
matter 15:5, 19:8,
    25:18, 32:8, 38:3,
    39:19, 63:21,
    79:3, 91:3, 97:25,
    107:11
matters 32:17, 84:1,
    84:13, 107:3,
    119:2
meaning 24:8, 135:2
meaningful 17:10,
    31:18
means 8:25, 40:23,
    77:12, 90:10,
    90:11, 90:19,
    106:21, 126:20
meantime 142:23
mechanism 23:20
media 5:25
meet 9:16, 32:2,
    43:16, 43:20,
    59:24, 99:20,
    103:14, 130:4,
    130:7, 139:14,
    140:18, 140:21,
    141:22
memo 73:11
mention 92:18
mentioned 41:19,
    68:1, 70:5, 125:15
merits 46:10, 89:24,
    90:24, 102:22
mess 16:4
metaphors 120:10
Michael 3:12, 7:2,
    44:11, 56:13,
    57:10, 75:12,
    106:7, 118:19,
    131:21, 134:18,
    142:20
Milbank 6:7, 7:25,
    57:3, 57:21,
    60:18, 72:14,

77:5, 79:17,
    87:10, 136:24,
    139:3
mind 24:7, 32:16,
    45:2, 46:1, 46:16,
    72:17, 106:12,
    130:20, 130:21,
    132:6
minimum 78:24,
    80:20, 99:19,
    103:13, 127:10
ministerial 97:25
minute 100:3
minutes 100:8,
    100:14, 100:15
miraculously 12:16
mischaracterization
    25:4
missed 8:4
missing 80:18
mistake 37:16
misunderstanding
    25:5
mix 120:10
moment 81:2
Monday 142:2, 142:3,
    142:16
money 15:1, 15:20,
    22:9, 23:14,
    23:15, 34:16,
    48:17, 48:21,
    48:25, 49:11,
    60:11, 69:10,
    69:12, 69:16,
    69:19, 69:22,
    72:25, 82:3, 84:2,
    91:21, 92:9,
    92:15, 95:19,
    95:22, 97:11,
    123:17, 137:6,
    137:8
moneys 20:22
monies 18:13, 21:20,
    21:24, 22:20,
    64:9, 78:4, 80:3,
    82:15, 82:17,
    82:19, 101:12,
    101:13, 135:21
Monolines 107:23
month 28:20, 45:7

monthly 72:19,
  72:21, 73:4,
  81:18, 82:3
months 8:11
moose 118:25
morning 6:14, 7:1,
  7:2, 143:23,
  143:24
motion 29:12, 38:5,
  38:9, 40:9, 77:10,
  79:20, 79:22,
  82:14, 82:23,
  88:2, 91:1, 98:16,
  113:10
MOTIONS 3:3, 104:14
motor 128:8
mouse 118:25
mouth 132:21
movant 107:22
move 7:22, 12:22,
  12:23, 46:15,
  74:25, 91:11,
  96:2, 134:2, 142:8
moved 134:3
moving 59:13, 82:4,
  82:15, 82:19,
  88:21
mushroom 132:18
Myers 6:23
myself 36:1, 112:3


< N >
name 12:5, 48:23,
  49:2, 66:4, 66:5
named 84:11
names 45:16, 66:2
narrow 13:5, 17:25,
  38:12, 58:15,
  59:10, 59:24,
  76:8, 81:15,
  137:21
narrowed 103:11
National 3:25, 6:13,
  6:16, 103:18,
  123:6, 127:6
nature 11:20, 13:6,
  15:21, 23:11,
  41:20, 41:21,
  46:18, 48:16,

51:7, 51:18, 52:3,
  53:19, 54:3, 54:6,
  62:16, 63:22,
  64:3, 64:8, 64:24,
  65:4, 77:16,
  81:15, 113:3,
  143:2
neatly 52:17, 132:14
necessarily 8:24,
  40:23, 66:12,
  137:8
necessary 6:2, 8:15,
  16:19, 36:18,
  37:18, 89:1,
  96:19, 139:19
needed 46:14, 53:7,
  87:2, 104:15,
  144:8
needs 45:12, 71:7,
  90:1, 90:14, 97:1,
  97:2, 102:7,
  102:22, 142:23
negotiate 82:8
nevertheless 47:18
New 5:7, 26:19,
  55:14
next 7:22, 18:8,
  65:25
night 9:19, 39:25,
  44:19, 144:24
nights 143:17
nine 136:6
No. 1:6, 1:25, 2:7,
  2:28, 9:15, 9:16,
  9:18, 9:20, 19:24,
  36:1, 43:2, 55:2,
  66:16, 72:3,
  76:18, 88:17,
  89:5, 111:20,
  118:10, 134:5,
  140:14, 143:13
nobody 90:16
Nodding 5:9, 48:8,
  74:13, 76:14,
  88:16, 115:21,
  124:24, 138:11,
  139:1
non-controversial
  139:5
non-hta 117:25

None 4:5, 4:11
nonetheless 119:24
nonpublic 68:19
nonsensical 15:11
Nos. 5:18
notations 130:18
note 10:13, 36:3,
  120:23
noted 41:23, 123:19
notes 11:15, 55:23
noteworthy 35:10
nothing 14:1, 17:3,
  51:21, 92:14,
  93:5, 119:14,
  141:6
notice 10:6, 33:3
noting 8:2, 110:9
notion 12:15, 46:16,
  51:9, 119:17,
  119:23
Nowhere 47:12, 119:6
nuance 20:10
number 34:9, 53:21,
  72:9, 72:24,
  121:13, 128:2
numbers 26:25, 46:9,
  92:21, 110:19


< O >
o'clock 142:25
O'melveny 6:23
objection 34:6,
  34:11, 87:1
Objections 95:23
obligation 48:20,
  49:6
obligations 24:23,
  24:24, 121:25,
  125:4
observation 46:20,
  47:5, 56:9, 63:10,
  106:20, 107:1
observations 24:16,
  47:24
observed 22:22,
  68:13
obtain 22:23, 56:6,
  104:6
Obviously 11:7,

25:25, 40:11,
 74:24, 129:13,
 134:18
occupancy 77:23
occurred 57:14
off-the-shelf 43:9,
 139:10, 139:12
offensive 68:22
office 108:24, 109:1
officer 86:24
Official 146:13
officials 93:23,
 94:6
often 10:7
oil 128:8
old 83:18
older 102:17
Once 58:2, 139:15,
 141:9
one-off 28:11,
 81:20, 83:13
one-sided 117:12
one. 7:22
ones 17:6, 67:21,
 94:22, 110:24
ongoing 37:8
oodles 84:15
open 144:22
opening 7:8, 38:10,
 38:14, 39:25,
 54:22, 69:15,
 72:22, 78:6, 78:9,
 83:1, 84:20, 85:4,
 85:12, 85:15,
 85:17, 85:21,
 86:2, 86:3, 87:22,
 103:1, 126:24,
 137:15
operates 122:20,
 122:23
operational 86:8
opined 55:4
Opinion 107:11,
 107:21
opportunity 106:22,
 125:19, 140:12,
 140:14
opposed 14:17,
 43:16, 63:23,
 75:2, 89:17,

101:13, 138:17
oral 44:20
ordered 97:6, 97:17,
 99:20, 112:15,
 112:20, 112:21,
 115:10, 118:10,
 126:5, 130:11
ordering 64:25
orders 45:2, 117:15,
 133:1
ordinary 116:19
organized 12:14,
 52:15, 86:4
original 134:25,
 136:5
origination 119:16
origins 134:10
others 32:19
otherwise 59:20,
 97:4, 138:14
ought 40:23, 73:23,
 78:24, 108:8,
 126:15, 140:17
ourselves 24:5
outflow 116:21
outflows 21:14
output 41:23
outs 47:11, 119:10
outset 17:8, 50:4
outside 76:16
overarching 24:16,
 24:19, 44:15,
 44:22, 110:6,
 130:10
overbroad 25:21,
 38:8, 59:1, 118:13
overlaps 42:19
overreach 26:3
overseeing 93:23
Oversight 1:9, 1:23,
 2:5, 2:26, 5:15,
 6:25, 44:9, 48:12,
 76:20, 78:7,
 78:19, 82:13, 83:4
own 12:2, 64:16,
 91:23, 91:25,
 98:18, 104:5,
 111:16, 113:16,
 113:17, 117:17,
 117:19, 117:20,

122:12, 127:18
owned 55:21, 114:25,
 115:1, 115:6,
 117:3, 117:4,
 128:17, 135:21
ownership 107:16,
 117:11, 119:21,
 120:5
owns 78:12, 92:1,
 97:5, 116:18,
 116:22, 121:2


< P >
PAGE 4:3, 79:25,
 107:14, 107:21,
 112:12
pages 128:22, 146:4
paid 99:17
pain 83:18
paper 108:25, 109:2
paragraph 61:6,
 113:10
parallel 77:18
parameters 82:8
paraphrase 128:6
paraphrased 124:6
part 12:4, 36:8,
 39:22, 39:24,
 42:21, 46:4,
 59:12, 62:4, 77:9,
 93:11, 97:10,
 115:24, 125:8,
 132:10
partial 76:21, 77:9,
 79:19
particular 8:18,
 9:11, 25:12, 32:5,
 32:20, 36:25,
 37:5, 41:19,
 50:16, 53:22,
 58:9, 72:24, 78:6,
 86:19, 101:10,
 101:23, 115:10,
 121:10, 123:11,
 127:9, 127:22
particularized
 45:10, 80:18,
 99:22
particularly 13:23,

26:2, 46:1, 52:12,
  68:22, 84:17,
  102:12, 117:24
PARTIES 3:9, 6:3,
  24:22, 25:5,
  25:22, 27:20,
  31:22, 41:11,
  45:9, 46:3, 58:12,
  74:18, 121:1,
  124:12, 127:12,
  129:17, 130:4,
  142:15, 142:21
partner 44:13
partners 7:4
party 33:16, 33:17,
  56:19
pass 9:3
passcode 21:6
passing 39:25, 44:19
password 21:4
past 32:12, 140:9
pasting 64:22
path 59:17, 59:19,
  103:4
pause 12:21, 52:25,
  53:1
Pavel 3:20, 6:24,
  24:17, 41:5,
  41:17, 42:25,
  43:3, 44:3, 44:8,
  44:16, 49:18,
  50:10, 85:5, 85:9,
  85:10, 85:22,
  86:7, 86:18, 87:6,
  88:8, 106:9,
  108:5, 139:6
paw 32:21
payable 62:11
payment 129:2
penny 91:17
percent 118:9
Perfect 107:1
perform 54:24, 116:9
period 14:7, 133:4
periodic 57:25
permission 24:10
permit 97:22
permitting 25:9
person 33:18, 40:23,
  68:4, 102:10,

114:1, 126:14,
  140:16
personal 17:5,
  33:10, 33:18, 34:1
personnel 26:22,
  42:11, 96:10
persons 5:20, 71:5
perspective 23:25,
  46:17, 83:11, 93:4
pertaining 95:6
pertains 46:23
phase 26:20
philosophies 59:23,
  60:5
phone 5:8, 21:5
photographing 5:22
PHV 3:12, 3:13,
  3:14, 3:19, 3:20,
  3:23, 3:27, 3:30,
  3:33
physical 21:21
pick 58:3
picture 100:21,
  123:1
piece 16:20, 17:20,
  18:6, 80:24
pieces 54:13, 54:20,
  65:19, 137:13
piecing 80:22
place 8:2, 16:7,
  21:6, 22:12,
  30:11, 52:5,
  59:15, 68:16,
  71:9, 94:21,
  109:14, 116:5,
  122:20, 135:7,
  135:11, 141:25
placed 48:17, 64:4,
  64:8, 137:4,
  137:12
places 29:15, 39:8,
  98:14
plain 108:2
Plaintiff 1:32,
  2:14, 2:35
plan 46:15
play 129:12
pleadings 76:13
Please 6:3, 30:1,
  111:20, 113:2,

133:17
pledged 47:10,
  119:9, 119:13,
  128:6, 128:7,
  128:11
PM 5:3, 100:16,
  100:17, 145:3
pocket 46:9, 70:3
point. 42:18, 86:25,
  91:17, 134:15
pointed 84:14
points 9:4, 12:25,
  22:19, 24:19,
  43:4, 66:22,
  105:11
policy 29:10, 133:20
position 13:20,
  14:17, 37:19,
  44:22, 48:24,
  66:3, 79:11,
  82:24, 91:4,
  97:17, 98:1,
  102:16, 115:16,
  122:5
positions 11:2,
  49:5, 67:2
possession 86:20
possible 43:12,
  52:9, 80:9, 85:7,
  106:25, 136:7,
  139:7, 139:21,
  140:24
possibly 139:22
post 66:25
posture 8:7, 79:7,
  84:18
potential 15:12,
  139:8, 139:14
potentially 43:17,
  45:17, 65:6
power 49:7
PR 128:9
practical 38:11
practice 35:1
practiced 35:7
practices 26:9,
  58:24, 119:4
pray 139:5
precisely 97:1
precluded 35:21

preclusive 90:24
preemption 49:7
preparation 95:4
prepared 31:2,
    91:22, 92:17
preparing 28:21
present 28:23
presented 106:3,
    113:15, 114:12,
    128:25
presenting 14:14
presiding 5:13
presumably 33:2,
    70:1
pretty 63:6, 128:12,
    137:21, 142:22
prevail 81:20
preventing 90:25
previously 26:20,
    27:5, 54:2, 110:2
Prifa-related 118:1
PRIFAS 18:23, 19:12,
    28:21, 34:25,
    42:6, 42:22,
    43:13, 50:15,
    61:23, 62:7,
    69:17, 70:12,
    70:17, 71:10,
    92:21, 110:22,
    111:4, 114:16,
    114:17, 122:11,
    122:19, 123:10,
    124:18, 140:4
principal 21:16
principles 26:10,
    58:25, 107:24,
    119:5
printout 123:10
printouts 19:13
prior 98:12
probable 117:16
probably 12:19,
    12:20, 53:9, 67:4,
    68:4, 138:13,
    140:15
probative 55:20,
    68:12, 128:16
problem 39:22,
    39:24, 58:12,
    63:19, 66:19,

122:14, 122:15
procedure 29:10,
    133:20
proceed 89:7, 89:8,
    100:24
proceeding 26:21,
    29:14, 31:23,
    55:2, 118:4
Proceedings 3:44,
    5:23, 78:22, 84:7,
    100:17, 135:1,
    145:3, 146:6
process 10:10, 11:1,
    20:13, 32:5,
    32:13, 33:21,
    37:5, 38:23,
    39:21, 46:5, 52:8,
    58:13, 98:11,
    103:14, 109:23,
    114:8, 130:6,
    136:11, 140:3
processes 33:14
produce 15:10,
    16:15, 16:16,
    18:7, 19:25,
    21:18, 25:2, 26:7,
    29:5, 29:7, 29:8,
    29:9, 32:19,
    34:11, 37:25,
    57:24, 58:5,
    65:16, 80:1,
    86:14, 102:16,
    104:7, 109:2,
    109:12, 109:18,
    110:1
produced 3:44,
    12:25, 15:20,
    19:22, 19:23,
    26:22, 28:16,
    28:20, 34:13,
    44:18, 44:21,
    57:23, 61:22,
    64:9, 70:16,
    70:17, 72:8, 74:2,
    94:15, 95:10,
    98:21, 110:17,
    110:20, 119:6,
    139:24
producers 25:23
producing 27:9,

28:13, 28:14,
    28:17, 28:18,
    34:24, 40:1,
    66:11, 69:17
product 68:5
production 8:18,
    22:5, 28:21, 40:2,
    45:6, 64:20, 97:6,
    97:18, 98:12,
    126:17
productions 56:16,
    56:17
prohibition 5:22,
    7:10, 7:12, 25:12,
    47:18
prohibitions 5:24
PROMESA 1:8
promise 106:24
property 14:22,
    108:1
proportional 25:10,
    25:16, 26:11,
    29:20, 32:15,
    36:21, 44:25,
    46:18, 49:21,
    126:13
proportionality
    84:18
proposals 142:18
propose 131:8
proposed 13:4,
    16:25, 38:7,
    38:19, 43:11,
    59:14, 103:10,
    130:6, 139:14,
    142:3
proposing 62:7
propound 8:19
propounded 25:21,
    31:24
Proskauer 7:2,
    48:11, 56:13
provide 9:8, 31:13,
    31:16, 31:17,
    31:19, 36:16,
    40:14, 40:19,
    41:1, 54:21, 57:1,
    63:1, 68:7, 73:16,
    73:18, 74:3,
    79:12, 83:19,

84:25, 93:24,
98:15, 102:25,
103:7, 125:14,
141:7
provided 41:7,
41:24, 41:25,
42:2, 47:8, 47:11,
49:9, 49:19,
55:11, 57:6,
57:17, 59:18,
69:25, 79:12,
83:24, 84:1, 84:9,
85:12, 85:18,
98:13, 105:24,
108:2, 119:8,
119:11, 136:19
provides 101:11
providing 16:12,
25:17, 37:15,
41:8, 42:6, 42:14,
42:15, 42:19,
44:7, 45:16, 69:2,
79:5, 79:10,
122:11, 125:16,
139:16
pseudo 80:5
PST 29:19, 73:23
Public 3:25, 16:6,
116:9, 119:25
PUERTO 1:3, 1:11,
1:16, 1:25, 1:30,
2:7, 2:12, 2:28,
2:33, 3:12, 3:17,
5:1, 5:6, 5:12,
5:16, 5:17, 8:4,
12:13, 53:11,
55:10, 60:20,
60:22, 61:5, 146:2
pull 29:19, 42:22,
92:21
pulled 42:24
pulling 73:23
purported 94:17
purpose 13:9, 16:22,
17:14, 32:20,
32:23, 49:17,
62:24, 72:5,
86:12, 92:11,
92:12, 92:23,
111:25, 116:12,

129:1, 137:6
purposes 28:8, 34:8,
116:10, 125:3
push 132:24
pushes 120:9
put 11:5, 21:4,
21:6, 22:9, 22:12,
63:2, 69:23, 70:1,
70:2, 71:8, 82:24,
87:19, 91:24,
93:15, 95:8, 95:9,
96:23, 103:10,
107:3, 113:9,
132:14, 134:2,
143:4
puts 8:7
putting 9:8, 10:14,
10:24, 45:23,
67:10, 91:8,
118:24, 141:8


< Q >
quarantined 8:5
query 43:4
querying 139:9
question 12:20,
13:13, 13:14,
15:9, 19:17,
31:10, 36:20,
51:25, 71:16,
73:8, 75:4, 75:14,
76:10, 78:14,
89:15, 93:19,
96:20, 97:8, 98:3,
98:7, 115:10,
116:24, 118:9,
120:3, 122:21,
123:12, 126:14,
126:18, 136:5,
144:22
questions 43:22,
89:15, 94:11,
108:9, 123:4,
126:22, 128:16,
137:22, 138:10,
140:25
quick 23:18
quickly 41:6, 52:9,
131:19

quite 8:13, 50:3,
53:21, 66:9,
72:16, 76:8
quote 39:2, 107:10,
107:14, 107:20,
124:7, 127:18


< R >
R4220 27:4, 43:5,
51:4
rabbit 75:24
radar 11:5
raise 88:1
raised 27:8, 31:21,
46:22, 106:2,
119:7, 120:1
raises 89:13
raising 104:12
Rappaport 3:13, 7:4,
44:13, 47:23,
48:10, 48:11, 50:3
rather 51:2, 60:21,
74:19, 107:24,
126:23
rationally 16:4
Re 1:6, 5:15
read 39:24, 58:22,
72:7, 79:19
readily 22:25,
123:21
reading 35:14,
35:15, 43:23,
124:16
ready 5:9, 76:4,
100:18
Real 23:18
reality 44:20
really 7:13, 8:2,
13:5, 16:6, 16:19,
17:10, 20:19,
20:20, 29:3,
29:16, 35:12,
38:4, 38:5, 41:14,
48:13, 52:6,
61:14, 72:20,
75:18, 81:13,
82:21, 94:19,
108:15, 110:12,
113:21, 118:6,

131:5, 137:13
rearguing 106:13
reason 9:21, 23:12,
    38:13, 74:23,
    77:14, 78:8,
    83:24, 83:25,
    118:15, 141:14
reasonable 11:8,
    138:9
reasons 73:24
rebroadcasting 5:23
recall 43:23, 57:13,
    57:15, 57:19
receivable 53:17,
    62:11
receive 56:16, 58:6
received 22:9,
    56:18, 85:13,
    93:7, 93:9, 93:12,
    97:9, 97:14, 97:16
recent 53:14, 80:5
recess 100:16
recognition 90:18,
    92:13
recognize 64:1,
    106:15
recognized 15:14,
    91:13, 98:9
recognizes 95:14
recognizing 76:22
reconvened. 100:17
record 6:4, 7:6,
    7:25, 8:15, 57:20,
    60:18, 61:17,
    61:18, 64:18,
    79:16, 90:1,
    98:11, 104:23,
    106:10, 106:12
recorded 3:44,
    72:25, 91:17,
    94:6, 94:7, 97:9,
    103:22, 104:4,
    123:24
recording 5:22,
    135:14
records 12:14, 66:4,
    85:16, 85:25,
    93:7, 102:5,
    102:11, 105:19,
    113:23, 117:1,

117:5, 124:17,
    134:6
recreate 20:21
reduced 44:21
refer 12:4
referenced 25:7,
    109:19, 118:22,
    127:13, 127:16
referred 50:3
refers 18:2
reflect 26:12, 35:6,
    60:15, 70:13,
    107:9, 117:19,
    136:13
reflected 91:23,
    130:18
reflecting 118:3,
    123:9, 124:17,
    134:6, 134:15
refusal 9:7, 9:13,
    15:9, 17:18, 104:6
refused 93:24
refusing 29:13,
    31:19, 82:6,
    103:20
regard 15:8
regarding 20:14,
    45:3, 49:5, 111:6,
    117:1
regular 22:21
regularly 139:13
regulation 93:13
regulations 93:12,
    93:18
reign 59:4, 59:20,
    136:16
rejected 31:23,
    98:3, 98:5,
    109:20, 109:24,
    136:12, 136:14,
    137:2, 137:8,
    137:9
rejects 107:22
relate 11:8, 20:18,
    63:17, 84:10,
    103:21, 127:11
related 13:7, 17:14,
    18:8, 27:6, 34:24,
    35:3, 36:15,
    37:24, 37:25,

47:9, 51:18,
    51:25, 52:21,
    53:15, 54:20,
    60:19, 60:23,
    61:7, 82:1, 93:1,
    94:10, 94:14,
    115:11, 115:13,
    118:1, 119:9,
    121:16, 122:10
relates 46:24,
    75:20, 107:11,
    119:21, 121:13,
    132:1
relating 15:24,
    38:1, 47:7, 52:11,
    53:6, 58:9, 63:18,
    67:19, 72:4, 85:3,
    94:10, 95:7,
    96:13, 96:14,
    97:7, 101:2,
    102:16, 103:6,
    115:14, 119:18,
    124:22, 131:3
relation 126:6
relative 44:16,
    88:21, 107:4,
    143:16
released 53:22
relevance 60:2,
    123:12
rely 95:3
relying 63:5
remain 89:20
remainder 19:6
remains 48:24, 72:18
remember 61:2, 64:5
reminded 5:21
reminder 5:20
remittances 13:8,
    15:25, 16:13,
    17:15, 18:2,
    18:20, 20:4, 27:5,
    28:25, 29:2, 50:23
remote 5:21
remotely 119:14
removal 5:24
removed 33:9, 33:13
repayment 128:9,
    128:12
repeat 41:23

repeating 36:1
replacements 99:8
Reply 29:12, 76:20,
   76:24, 78:16,
   99:12
report 16:18, 19:5,
   54:25, 88:2,
   116:15, 143:4,
   144:8, 144:13
reported 22:21,
   115:22
Reporter 100:6,
   100:12, 146:13
reporting 62:22,
   114:2, 114:14,
   115:4, 138:23
reports 9:6, 18:22,
   42:22, 42:23,
   43:10, 43:25,
   45:1, 114:3,
   114:5, 114:19,
   122:19, 139:8,
   139:11, 139:12,
   139:15, 139:21,
   139:23, 140:5,
   140:12, 140:22,
   141:2, 141:20
repository 11:17,
   11:21, 11:24,
   12:1, 12:2, 12:16,
   30:16, 30:23
representation 58:4
representations
   95:3, 114:24,
   121:5, 135:18,
   135:20, 137:19,
   138:1
representative 1:13,
   1:27, 2:9, 2:30,
   5:16, 127:23
represented 21:25
request 7:18, 8:22,
   25:14, 25:15,
   36:7, 41:6, 54:8,
   58:8, 59:1, 61:25,
   63:22, 75:11,
   76:16, 76:21,
   78:17, 79:9,
   105:16, 106:22,
   112:23, 137:5,

137:7, 139:20
requested 29:6,
   32:6, 99:14
requesting 111:6
requests 9:10, 13:5,
   24:18, 24:21,
   26:7, 41:9, 77:21,
   78:13, 85:7, 93:4,
   139:25
require 38:3
required 42:3,
   99:16, 101:12
requiring 104:22
requisition 137:5
research 23:1
reserve 87:14,
   87:24, 88:1
Resolution 51:12,
   101:6, 101:25,
   102:18
resolutions 28:15,
   29:8, 86:10,
   101:20, 101:22,
   102:17, 120:4,
   134:10
resolutions. 108:3
resolve 11:7, 39:4,
   49:23, 73:5, 73:6,
   80:15, 103:8,
   129:15
resolved 28:11,
   90:14, 129:20
resources 52:20,
   55:25
respects 44:18
respond 19:18,
   23:17, 48:1,
   113:1, 120:11,
   121:22, 130:1,
   130:8
responded 95:24,
   101:18
responding 24:12,
   24:14, 105:7
response 11:18,
   11:21, 13:14,
   22:3, 27:17, 30:1,
   38:18, 42:1,
   56:24, 58:18,
   104:9, 120:19,

124:6, 131:9
responses 11:18,
   14:9, 18:1, 56:16
responsible 26:6,
   85:21, 93:22,
   94:22, 102:11
responsive 35:19,
   56:19, 79:6
rest 42:7
rested 41:11
restricted 5:25,
   55:18, 62:24,
   62:25, 90:12,
   93:10, 113:18,
   132:7
restriction 64:24
restrictions 15:19,
   48:17, 51:8, 64:4,
   64:8, 124:25,
   137:4, 137:12
restrictive 95:8
restructuring 11:1
result 5:24
retention 49:7
retort 46:6
Revenue 8:5, 8:11,
   15:16, 23:7, 24:8,
   26:25, 27:3,
   28:24, 43:5,
   50:15, 52:24,
   53:12, 54:15,
   55:7, 55:16,
   55:24, 60:21,
   61:3, 61:6, 61:13,
   62:10, 62:22,
   110:19, 121:17,
   128:9, 131:10,
   131:17
revenues 27:2, 42:8,
   43:6, 47:10, 80:4,
   92:1, 105:20,
   108:2, 110:14,
   113:9, 113:17,
   114:25, 115:1,
   116:11, 116:18,
   118:1, 119:10,
   119:13, 121:8,
   124:9, 127:17,
   128:12, 128:23,
   128:25, 129:8

reverse 108:21
review 40:10, 109:1,
    109:6, 114:8
reviewed 30:20
reviewing 114:23
revised 13:4
rewriting 106:13
RICO 1:3, 1:11,
    1:16, 1:25, 1:30,
    2:7, 2:12, 2:28,
    2:33, 3:12, 3:17,
    5:1, 5:6, 5:12,
    5:16, 5:17, 8:4,
    12:13, 53:11,
    55:10, 60:20,
    60:22, 61:5, 146:2
rid 128:6
ridiculous 68:11
rights 121:24, 125:3
rigid 132:22
risk 54:22
road 37:16, 126:16,
    136:2, 136:3,
    144:8
roads 116:13
Robert 3:27, 6:15,
    103:17, 123:5,
    127:5
robust 40:17, 40:18
role 33:9, 51:11,
    97:19, 98:10,
    99:1, 99:23,
    124:8, 124:14,
    125:2
rolled 53:13
romanette 78:5
Rome 45:7
room 84:8
Rose 48:11
RSM 55:10, 57:23
rub 14:23
Rule 35:11, 41:10,
    84:5, 106:13,
    107:18, 108:7,
    142:18
ruled 89:25, 90:5
ruling 103:24
Rum 13:8, 15:25,
    16:12, 17:15,
    17:23, 18:1, 18:3,

18:20, 18:23,
    18:24, 19:6,
    19:16, 20:4,
    25:23, 27:4,
    28:14, 28:25,
    29:2, 29:7, 42:7,
    42:18, 43:6, 50:6,
    50:23
run 16:18, 29:19,
    69:10, 88:18,
    118:25, 139:8,
    139:22, 140:5
running 73:23, 81:3,
    141:2
runs 30:21, 139:13


< S >
S/ 146:11
safe 89:12, 144:24,
    145:1
San 5:1
sanctions 5:24, 6:2
satisfied 74:5
satisfy 24:23,
    112:17
satisfying 12:18,
    24:23
save 141:3
saw 77:6, 121:1
says 11:19, 13:20,
    30:25, 40:1,
    42:13, 50:18,
    50:19, 50:22,
    67:9, 71:23,
    84:12, 93:17,
    96:18, 116:3,
    119:7, 124:7,
    127:15, 128:2,
    128:5, 133:25,
    134:12, 135:6,
    143:14
schedule 144:6,
    144:7
school 8:6, 28:2,
    85:6
scope 11:8, 16:25,
    18:20, 31:7,
    43:21, 65:11,
    67:22, 76:15,

77:1, 78:21, 87:9,
    101:9, 111:17,
    126:6, 131:6
Scotia 82:17
scratching 9:12,
    9:21
screenshot 85:16
searched 31:15,
    65:22, 65:23,
    67:20, 67:21,
    68:2, 89:15,
    101:23
searches 11:8,
    29:19, 31:7,
    31:17, 40:15,
    40:17, 44:16,
    90:23, 132:19
searching 42:10,
    66:10, 79:7,
    88:10, 88:13,
    91:5, 109:10,
    124:23, 130:21
Second 13:7, 15:22,
    15:23, 22:7,
    23:21, 27:10,
    72:3, 87:16, 96:2,
    97:6, 115:19,
    115:20
seconds 46:25, 47:2,
    47:22
Secretary 102:9,
    102:10, 109:7,
    116:4
Section 61:4, 116:7
Security 101:6,
    101:8, 101:11,
    101:16, 102:1,
    102:14, 102:18,
    102:21, 108:22,
    109:4, 109:11,
    120:6, 122:8
seeing 57:15, 57:19,
    113:5
seek 76:25
seeking 21:19,
    21:20, 22:5, 55:9,
    104:14
seem 9:24, 13:22,
    34:8
seems 10:3, 16:1,

16:5, 17:20,
18:19, 26:13,
27:14, 34:15,
34:19, 39:10,
43:11, 45:24,
52:4, 54:5, 69:23,
80:12, 81:8, 86:2,
132:12, 137:21
seen 17:5, 17:6,
38:16, 38:18,
57:12, 97:13,
113:13, 113:14,
139:23
segregated 21:10,
90:13, 92:10,
93:25
self-serving 99:9
send 21:5, 39:17,
56:24, 95:19,
100:6, 134:21,
142:17
sending 135:1
sense 7:20, 25:15,
31:12, 31:24,
32:3, 43:15, 59:4,
68:6, 68:17,
68:21, 74:21,
79:8, 90:25,
94:17, 109:6,
110:13, 114:19,
124:20, 135:8,
138:4, 141:14,
141:16, 141:19,
142:22
sent 9:18, 12:8,
28:12, 57:2,
68:16, 91:20
sentence 107:10,
107:20
separate 17:11,
20:17, 20:19,
69:21, 74:16,
113:15, 119:24,
128:10
separately 64:15
Servais 47:7, 119:1
serve 10:10, 33:2,
34:8, 86:12
served 9:15
servers 13:23, 13:24

Service 55:7, 60:22,
129:2
session 5:12
set 15:15, 20:17,
22:7, 36:16,
74:10, 93:9, 94:3,
94:12, 114:11,
116:4, 138:1
setting 9:2
seven 21:13, 22:24
several 37:3
share 56:16
shared 31:4, 129:23
shed 27:20, 58:21,
110:12, 123:22
sheet 46:15, 62:8
sheets 53:12, 53:13,
54:12, 54:14,
54:16
ships 39:25, 44:19
shockingly 25:21
shoehorn 36:10
short 40:11, 76:6,
100:10, 106:25
shouldn't 17:15,
34:13, 72:9,
76:11, 82:22,
82:24, 141:15
show 34:25, 59:8,
63:23, 80:3, 87:2,
97:3, 102:13,
103:4, 117:16
showed 55:16, 93:3
showing 16:14, 42:2,
42:7, 55:20,
62:23, 80:7,
101:24, 113:16
shown 55:17, 59:4,
113:16
shows 16:12, 19:5
shut 8:6
side 20:11, 25:19,
45:23, 99:15,
123:22, 124:11
sides 30:20, 38:25
sight 46:4
sign 109:4
signatories 101:21,
134:11
signature 101:17

signatures 97:24
signed 91:20, 99:15,
99:17, 101:7,
102:1
significance 27:11,
49:17, 67:7
significant 26:18,
125:2, 125:7,
131:13
silence 104:12,
104:16, 106:16
similar 42:18,
86:11, 89:14,
129:5, 138:5
simple 54:4
simpler 131:16
simply 44:20, 81:11,
104:7, 106:17,
123:3
single 17:23, 19:3,
19:4, 41:10,
41:13, 84:9,
127:21
Sinking 95:20,
101:12, 101:14
sit 43:13, 81:13
sitting 14:18,
14:19, 104:4
situation 32:10,
89:24
six 8:11, 21:13
skip 9:4
skipped 133:7
slightly 70:25
slippage 47:17
slow 58:2
small 17:20, 139:4
Snow 6:19
snowball 131:6
solely 90:6
somebody 28:6,
28:12, 29:25,
33:9, 40:22,
67:11, 68:16,
69:3, 84:12,
96:18, 144:17
Somehow 39:12, 46:9,
107:2
someone 12:8, 29:19,
66:14, 67:10,

70:2, 84:2, 134:1,
  135:1, 135:2
somewhat 136:4
somewhere 43:23,
  72:7, 90:18
sooner 74:19
sophisticated 21:23,
  142:22
Sorry 19:7, 35:24,
  39:23, 56:9,
  61:10, 66:22,
  87:3, 89:1, 96:6,
  105:7, 111:19,
  118:17, 125:2,
  131:21, 133:6,
  133:8, 139:3,
  142:10, 142:11
sort 12:16, 14:12,
  24:16, 30:3,
  30:10, 34:20,
  34:22, 41:11,
  54:13, 59:19,
  72:18, 83:15,
  87:11, 108:18,
  110:5, 112:14,
  124:6, 130:2,
  132:6, 132:13,
  140:25, 141:1,
  141:17, 143:4,
  143:16
sought 32:2, 129:20
sounds 87:1, 125:8,
  131:23, 131:24,
  140:17, 142:1
source 84:20,
  119:16, 131:10,
  131:17
sources 15:12,
  26:25, 30:20,
  110:19
space 79:4
spaces 17:22
speaking 47:15, 57:7
speaks 27:8, 41:8,
  110:4
Special 15:16,
  21:20, 23:2, 23:6,
  24:8, 52:24,
  53:11, 54:15,
  55:7, 55:16,

55:24, 60:20,
  60:21, 61:3, 61:6,
  61:13, 62:10,
  62:22, 64:11,
  93:13, 93:16,
  121:17
specifically 13:3,
  31:14, 52:11,
  55:8, 61:4, 81:6,
  83:19, 95:7, 98:9,
  102:20, 112:8,
  117:15, 119:2,
  121:10, 123:13,
  128:3, 140:20
specifics 9:5,
  116:16, 128:1
speculation 11:3
speed 125:21
spend 40:7
spent 80:22
spinning 117:13
spoke 81:23
spoken 29:22, 30:13,
  41:25, 66:8
spreadsheet 93:3,
  93:8
stage 20:21, 72:11
stake 23:3, 46:7,
  46:8
stand 57:14, 91:10
Standards 55:1,
  94:4, 94:23, 104:2
standpoint 49:20
start 5:9, 6:5,
  7:21, 7:23, 8:2,
  24:15, 37:4,
  38:10, 41:21,
  50:2, 80:8, 112:6,
  133:7
started 40:6, 53:23,
  91:4, 118:21,
  142:8
state 104:23,
  106:10, 132:4
stated 106:15
statement 7:8,
  44:15, 61:17,
  72:21, 85:15,
  92:1, 117:9,
  119:20, 122:10,

126:6, 126:7,
  128:10, 128:13,
  130:9, 131:14
States 1:1, 3:5,
  5:11, 49:11, 146:7
static 95:14
status 45:1, 88:2,
  106:12, 143:4,
  144:7, 144:13,
  144:14
statute 14:22,
  23:20, 42:3,
  48:19, 48:22,
  50:19, 51:10,
  90:10
statutes 13:15,
  23:4, 90:6, 120:5
Stay 20:14, 22:3,
  26:20, 28:16,
  29:11, 29:14,
  33:5, 34:4, 41:13,
  55:5, 68:14,
  79:20, 80:8, 83:6,
  84:7, 89:24, 93:3,
  95:18, 98:16,
  102:20, 107:10,
  107:21, 110:3,
  120:7, 134:25
steering 134:14
stenography 3:44
step 33:9, 33:13,
  110:13, 136:9
steps 137:23
sticking 144:16
stipulation 15:6
stop 14:7, 23:16,
  106:20, 141:25
story 117:12
straight 123:4
straightened 68:15
strategy 87:22
stretch 100:15
strike 132:21
strikes 141:6
stringency 59:19
struck 24:25, 45:12
structure 116:14
structured 132:21
stuff 47:14, 68:11,
  92:25, 94:9,

111:12, 114:19,
118:13, 136:16,
141:13
subaccount 121:12
subaccounts 92:11,
121:10, 121:18,
123:18, 127:9
subject 25:18,
25:24, 26:20,
27:24, 28:1,
30:14, 31:20,
32:8, 32:17,
39:19, 63:21,
68:20, 79:3,
82:24, 99:24,
131:25
submission 45:25
submissions 143:17
submit 64:14, 64:15,
74:15, 74:18,
142:3, 143:9
submitted 13:4,
47:7, 54:25,
59:14, 109:24,
136:14, 143:1
subparts 96:4,
100:11
subpoena 25:25,
56:24, 75:16
subpoenaed 19:20,
83:20
subpoenaing 37:5
subpoenas 38:19
subsequent 88:2,
137:23
substantial 46:10
substantive 66:12,
66:13, 97:25
substitute 86:5,
99:9
subsumed 46:21,
64:10
successful 88:3,
91:8
suck 143:14
sudden 53:24, 81:2
sufficient 59:7,
63:23, 79:23,
104:18, 112:17,
140:23

suggest 34:2, 99:5,
118:5, 133:21,
140:13
suggested 24:20,
31:21, 111:8
suggesting 17:22,
31:12, 137:17
suggestion 84:16,
110:11, 117:23,
141:7
suggestions 125:12,
125:19
suite 81:24
sum 45:14
Summary 50:10, 61:2,
76:13, 76:16,
76:20, 76:21,
76:24, 76:25,
77:10, 79:19,
82:14, 91:1,
106:13, 113:11,
125:5, 125:6
supplemental 29:8
supplemented 65:15
support 47:11, 54:1,
119:11, 127:23,
137:16
supporting 52:17,
61:16, 135:22
suppose 27:17,
39:15, 130:7
supposed 32:10
suppositions 11:3
surplus 78:3, 82:4
surprised 79:19
surprising 143:12
surprisingly 19:21
suspect 10:14, 12:9
sworn 42:1
sympathetic 13:19
system 12:4, 16:17,
16:18, 18:23,
20:24, 21:3, 21:6,
22:13, 28:18,
28:22, 42:6,
43:22, 50:15,
61:23, 62:7, 70:9,
73:13, 85:17,
92:21, 111:16,
114:7, 116:4,

122:12, 139:9,
140:5
systems 12:5, 21:21,
21:22, 21:24,
22:1, 141:18

< T >
table 9:2, 77:4,
79:22
tactics 9:23
Taft 6:11
tagged 16:17, 16:23,
70:13
tagging 17:23
tailored 106:19
taken. 100:16
talked 21:12, 23:20,
69:1, 95:13,
110:22, 112:11
talks 21:14, 38:19
target 16:5, 37:20,
55:22, 56:5, 59:13
targeting 74:11
tax 13:8, 15:25,
16:12, 17:15,
17:23, 18:2,
18:20, 18:23,
20:4, 27:4, 28:25,
29:2, 42:8, 42:18,
43:6, 50:23, 80:4,
84:8, 124:9
taxing 120:2
teasing 89:5
technical 121:9,
140:16, 140:21
technology 45:22
teed 68:5
tells 29:25, 144:17
term 45:17, 46:15,
82:7, 109:6
terminology 107:24
terms 9:5, 30:8,
44:19, 65:11,
73:24, 76:9, 91:7,
108:2, 143:6
territory 63:19
test 42:16, 97:23,
135:22
tested 19:9, 22:21

testimony 10:20,
   14:7, 32:25,
   33:17, 33:25,
   34:3, 99:9, 119:3
testing 135:19
text 100:6, 124:13
theme 30:21
themselves 6:3,
   26:14, 33:20,
   59:5, 59:20, 99:8
theory 42:16, 53:24
there'll 11:18
therein 64:9, 64:10
thereon 64:4
thereto 60:24
thesis 84:11
they'll 10:15,
   10:17, 11:20, 33:2
they've 16:16,
   22:21, 26:5,
   35:12, 40:10,
   42:9, 52:20,
   55:11, 55:13,
   139:23
thinking 126:1,
   126:2
thinks 27:19, 40:14
third 56:18
third-party 25:23,
   38:19, 83:20,
   85:11
though 11:11, 16:11,
   20:2, 27:10,
   27:25, 29:13,
   36:13, 37:19,
   39:23, 61:21,
   68:9, 75:21,
   125:8, 130:10,
   142:17
thousands 26:23
threads 136:7
three 33:22, 45:19,
   48:6, 51:17, 61:8,
   64:6, 81:24,
   89:19, 91:11,
   99:13, 102:23,
   125:17
threshold 38:3
throughout 12:12,
   58:13

throw 46:8
ticked 52:16
tie 47:11, 115:16,
   119:10
tied 51:13, 51:14
time-consuming 37:17
timely 52:9, 141:18
timing 91:7, 132:17
Title 1:8, 10:24,
   54:5
titled 70:22
Today 5:13, 25:3,
   26:1, 28:8, 36:6,
   39:4, 110:22,
   125:15, 126:10,
   126:25
together 23:25,
   60:6, 64:14,
   74:15, 80:22,
   80:24, 81:25,
   82:1, 132:14,
   141:9, 142:17,
   143:4
top 93:23
topic 8:25, 15:23,
   17:11, 17:16,
   26:16, 41:8,
   41:10, 41:13,
   48:15, 77:15,
   77:17, 77:18,
   77:22, 94:15,
   97:18, 101:3
topics 8:12, 8:19,
   8:20, 9:14, 13:5,
   13:10, 13:11,
   17:9, 21:12,
   35:18, 36:5, 36:8,
   36:11, 38:21,
   40:12, 41:19,
   45:19, 65:17,
   78:25, 79:6,
   89:25, 116:25,
   123:9, 123:11
totally 12:5, 17:11,
   50:3, 54:18, 81:8,
   130:20
touch 44:23
touched 12:7
touchstone 44:24
Tourism 84:6, 85:16,

86:7, 86:23
trace 60:11, 80:4
tracing 114:13
track 34:2, 71:1
tracked 21:10
transactions 28:23,
   80:19, 107:16,
   110:23, 110:24
Transcript 3:44,
   7:7, 44:4, 146:4
transcription 146:5
transferred 14:10,
   14:12, 22:10, 67:5
transferring 15:1,
   111:7
transfers 29:2,
   93:5, 93:7, 97:12,
   97:13, 97:19,
   98:6, 98:8, 98:20,
   98:25, 99:11,
   99:12, 99:14,
   99:24, 124:9
transmittal 19:3
transparency 31:13
transparent 40:20
treat 107:15, 111:12
treated 35:5, 35:7,
   127:17, 129:9,
   135:6
treatment 13:8,
   15:24, 21:13,
   41:21, 72:5,
   105:18, 107:2,
   111:4, 115:14,
   119:12, 119:19
tricky 115:24
tried 13:4, 26:4,
   29:17, 57:11,
   83:6, 85:7, 99:7
trouble 83:21
true 8:21, 29:16,
   33:12, 69:9,
   132:6, 146:5
trust 18:10, 18:14,
   18:15, 51:12,
   92:2, 92:10, 95:9,
   139:17
trusting 139:17
try 16:3, 29:12,
   87:12, 87:16,

114:19, 115:16
trying 12:15, 16:2,
  20:21, 27:18,
  30:19, 35:8,
  41:14, 46:2,
  46:12, 50:4, 51:9,
  56:3, 56:6, 58:7,
  66:23, 70:15,
  80:23, 107:17,
  114:9, 117:7,
  118:24, 129:13,
  129:15, 130:19,
  132:24, 136:1,
  138:21
TSA 14:19, 18:9,
  18:17, 49:13,
  50:21, 91:20,
  97:11, 103:22,
  104:4
Tuesday 142:16,
  142:17, 142:25,
  143:21, 143:25
tune 44:14
turn 10:7, 13:2,
  32:4, 39:11, 41:4,
  76:3, 118:17
turned 55:20, 66:20
turns 84:8
tussled 39:16
twice 58:2
two-factor 21:3
Two-minute 100:5,
  100:15
type 7:11, 21:1,
  30:8, 34:9,
  105:25, 109:6,
  112:15, 114:23,
  128:15
types 34:12, 103:12
typical 113:23


< U >
ultimately 122:2,
  125:5
unable 43:24
unauthorized 101:16
unclear 106:1
undefined 102:4
underlying 35:5,

37:11, 39:18
understand 8:25,
  16:11, 20:12,
  20:22, 27:18,
  34:5, 40:3, 47:4,
  51:18, 55:9,
  69:16, 70:14,
  70:16, 71:9,
  71:12, 81:13,
  96:8, 97:2,
  103:25, 107:7,
  114:4, 114:17,
  119:24, 126:7,
  136:17, 137:14,
  140:10, 140:22
understandably 19:25
understanding 11:12,
  11:25, 12:21,
  20:1, 20:5, 31:7,
  56:15, 67:22,
  71:7, 94:23,
  102:25, 103:19,
  104:3, 108:23,
  109:9, 109:25,
  115:3, 116:17,
  122:23, 125:1,
  129:14
Understood 120:13,
  138:24
undertaken 26:18,
  44:17
unequivocal 9:20
unfortunately 141:18
unilaterally 97:11
unit 52:12, 53:14,
  54:14
United 1:1, 3:5,
  5:11, 49:11, 146:6
universe 37:13
unknown 140:1
unless 12:8, 28:6,
  75:2, 86:1, 108:9,
  138:14, 144:16
unlike 61:14, 77:17
unlimited 69:8
unquote 127:18
unreasonable 141:7
until 19:25, 48:3,
  71:17, 100:21,
  142:2

updating 110:25
uploaded 12:3, 12:8,
  12:11
uploading 58:1
usable 114:3
useful 18:12
users 114:6
using 63:15, 63:16,
  104:2
utilized 27:1


< V >
v. 1:34, 2:16, 2:37
valid 101:17
value 37:10
varies 86:18
various 80:24,
  127:21
vehicle 128:9
veneer 11:4
venture 137:2
version 103:11
versions 77:24,
  101:20
versus 5:17, 70:8
VIA 3:9, 138:17
view 17:5, 39:3,
  47:18, 77:3,
  90:10, 91:12,
  103:23, 104:7,
  104:17, 121:3,
  121:4, 121:6,
  121:22, 121:24,
  123:12, 132:24,
  134:20
viewpoints 96:14,
  97:3
views 82:13, 103:7,
  121:4
Violation 5:23
vis-a-vis 121:25
voices 105:8
void 83:25
volume 52:23
volumes 27:9, 28:14,
  29:7
vote 60:2, 135:4
voucher 19:4, 91:20,
  98:2, 109:17,

118:2, 136:11,
  136:14, 137:6
vouchers 29:1, 29:9,
  97:12, 97:13,
  97:24, 98:4, 99:6,
  99:16, 99:17,
  103:2, 109:18,
  109:20, 109:24,
  110:1, 111:2,
  136:12, 136:13,
  137:23


< W >
Wait 48:2, 48:3,
  48:5, 71:17, 72:3,
  100:20, 118:18,
  142:2
Walker 146:11,
  146:12
wanted 8:1, 13:2,
  41:14, 91:19,
  95:11, 104:23,
  123:23, 129:23
wants 47:23, 64:2,
  108:19
ways 137:1
wedded 138:20
Wednesday 5:13
week 58:2, 58:3,
  74:24
weigh 44:10
Weil 6:15
whatever 45:3, 54:1,
  61:23, 63:2, 63:4,
  71:24, 73:1,
  73:10, 85:18,
  141:20, 143:2
whenever 38:14,
  123:18
whimsical 114:9
whole 16:4, 51:22,
  81:10, 114:7,
  119:2, 134:15,
  136:11
whom 132:18
why. 17:3, 17:7
Wickersham 6:11
William 3:30, 6:11,
  24:3, 67:13, 71:15

willing 17:1, 17:2,
  40:16, 102:25
wipe 143:16
wish 83:21
wishes 69:9
withdraw 77:10
withdrawn 82:13
within 16:17, 46:21,
  51:13, 55:25,
  62:9, 62:17,
  66:24, 73:12,
  77:7, 91:3,
  103:21, 111:17,
  116:14, 117:15
without 10:19,
  108:19
witness 33:5, 33:18,
  98:6, 126:18
WITNESSES 4:3
wondering 85:24
word 57:18, 133:14
wordiness 128:7
words 7:15, 48:19,
  60:8, 69:6, 94:24,
  132:20, 133:7
wordsmith 74:16
Work 7:13, 11:4,
  12:3, 21:7, 43:7,
  46:20, 47:6,
  47:10, 59:21,
  60:5, 60:25, 63:3,
  64:14, 65:8,
  65:10, 67:22,
  68:5, 74:15, 80:2,
  91:3, 94:10,
  119:10, 130:2,
  130:12, 132:11,
  142:17
worked 82:1, 122:19
working 29:3, 37:1,
  84:25, 86:7,
  86:23, 104:15,
  105:3, 109:1,
  141:8
works 92:19
world 36:23, 69:8
worth 9:8, 110:9
write 65:13
writes 107:21
writing 44:21, 88:9,

135:1
wrote 34:12, 144:12


< X >
XT 107:13


< Y >
year 8:3, 8:6
years 22:24, 32:12,
  33:15, 37:3, 40:6,
  52:10, 52:14,
  53:14, 53:21,
  67:1, 69:4, 87:20,
  132:16
yield 44:13, 46:25,
  47:23, 106:8,
  108:10
York 5:7
yourself 56:11
yourselves 7:6


< Z >
zero 13:25
zone 143:22, 143:24
Zoom 3:9, 5:8,
  47:23, 89:8