# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re: | PROMESA<br>Title III |
| THE FINANCIAL OVERSIGHT AND<br>MANAGEMENT BOARD FOR PUERTO RICO, | |
| as representative of | No. 17 BK 3283-LTS |
| THE COMMONWEALTH OF PUERTO RICO, *et al.* | (Jointly Administered) |
| Debtors.[1] | |
| In re: | PROMESA<br>Title III |
| THE FINANCIAL OVERSIGHT AND<br>MANAGEMENT BOARD FOR PUERTO RICO, | |
| as representative of | |
| THE COMMONWEALTH OF PUERTO RICO | No. 17 BK 3283-LTS |
| -and- | |
| PUERTO RICO HIGHWAYS AND<br>TRANSPORTATION AUTHORITY, | No. 17 BK 3567-LTS |
| Debtors. | THIS PLEADING RELATES<br>ONLY TO THESE TITLE III<br>CASES |

## THE DRA PARTIES' AMENDED MOTION AND MEMORANDUM OF LAW IN SUPPORT OF THEIR REQUEST FOR ADEQUATE PROTECTION OR RELIEF FROM THE AUTOMATIC STAY

[1] The Debtors in these Title III cases, along with each Debtor's respective Title III case number listed as a bankruptcy case number due to software limitations and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (the "Commonwealth") (Bankruptcy Case No. 17-BK-3283 (LTS)) (Last Four Digits of Federal Tax ID: 3481), (ii) Employees Retirement System of the Government of the Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK-3566(LTS)) (Last Four Digits of Federal Tax ID: 9686), (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567 (LTS)) (Last Four Digits of Federal Tax ID: 3808), (iv) Puerto Rico Sales Tax Financing Corporation (Bankruptcy Case No. 17-BK-3284 (LTS)) (Last Four Digits of Federal Tax ID: 8474); (v) Puerto Rico Electric Power Authority  (Bankruptcy Case No. 17-4780 (LTS)) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority (Bankruptcy Case No. 19-BK-5233-LTS) (Last Four Digits of Federal Tax ID: 3801).

## <u>TABLE OF CONTENTS</u>

<u>Page(s)</u>

PRELIMINARY STATEMENT ..................................................................................................1

BACKGROUND ......................................................................................................................4

    I.     The Commonwealth and HTA Seek Protection Under Title III of PROMESA......4

    II.    The DRA Becomes HTA's Largest Secured Creditor. ...........................................5

        A.    Pre-Title VI, GDB Makes Significant Loans to HTA Totaling almost $ 2 billion in principal...............................................................................5

        B.    The GDB Owns $200 Million in HTA Secured Bonds. ............................6

        C.    HTA Assigns, Pledges, and Grants to GDB a Security Interest in the Act 30-31 Revenues to Secure All its Indebtedness. ...................................6

        D.    GDB Restructures its Debt Under Title VI of PROMESA and Transfers all of its interest in, and Payments on, HTA's Debt Obligations to the DRA. ...............................................................................8

    III.   The "Clawback":  The Puerto Rico Constitution and Statutes Protect Revenues Pledged for Service of HTA's Debt Obligations Owed to the DRA.......9

    IV.   The Commonwealth Unlawfully Diminishes the DRA's Collateral. ...................14

    V.    The DRA and Other Parties Seek Relief from the Court Following the Commonwealth's and HTA's Improper Diversion of the Act 30-31 Revenues. ...............................................................................................................18

    VI.   Second Amended Plan ........................................................................................21

RELIEF REQUESTED..............................................................................................................22

ARGUMENT ...........................................................................................................................22

    I.     The DRA Has a Valid, Perfected Security Interest in the Act 30-31 Revenues....22

        A.    The DRA's Prepetition Liens Extend Post-Petition..................................24

        B.    No Valid "Clawback" Has Occurred Pursuant to Article VI, Section 8 of the Puerto Rico Constitution..................................................................26

        C.    PROMESA Does Not Alter Acts 30 and 31 and the FOMB Cannot Modify These Statutes. ............................................................................27

i.     The Act 30-31 Revenues Are Not Appropriations...................27

ii.    The FOMB Cannot Repeal Acts 30 and 31.........................…30

iii.   PROMESA Does Not Alter or Preempt Acts 30 and 31 and Its Text Demonstrates a Contrary Intent to Preserve Territorial Law………………………………………………………….…..…31

II.     The DRA is Entitled to Adequate Protection of Its Interest in the Act 30-31 Revenues ......................................................................................36

III.    If Adequate Protection Cannot be Provided, then the Stay Must be Lifted..........41

A.     The DRA Satisfies the "Colorable Claim" Standard. ...............................41

B.     Lack of Adequate Protection Constitutes Cause for Relief from the Stay under Section 362(d)(1). ......................................................43

i.     The Debtors Bear the Burden of Proof on Adequate Protection to DRA's Collateral, which They Cannot Satisfy .............................43

ii.    In the Absence of Adequate Protection, there is Cause to Lift the Stay …………………….....................................................…43

iii.   Lifting the Automatic Stay Is Also Supported by Other Good Cause………………………………………………….…..…44

C.     Relief from Stay Should Also be Granted with Respect to the Commonwealth Under Section 362(d)(2)................................................48

CONCLUSION.........................................................................................51

NOTICE OF TIME TO RESPOND .................................................................52

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                               **Page(s)**

*Am. Fed'n of Gov't Emps., AFL-CIO, Local 1647 v. Fed. Lab. Rels. Auth.*,
    388 F.3d 405 (3d Cir. 2004)............................................................28

*Antle v. Tuchbreiter*,
    111 N.E.2d 836 (Ill. 1953).............................................................28

*Arizona v. United States*,
    567 U.S. 387 (2012).......................................................................32

*Armstrong v. United States*,
    364 U.S. 40 (1960).........................................................................33

*Assured Guar. Corp. v. Carrion*
    *(In re Fin. Oversight & Mgmt. Bd. for P.R.)*,
    919 F.3d 121 (1st Cir. 2019).........................................................26

*Assured Guar. Corp. v. Fin. Oversight & Mgmt. Bd. for P.R.*
    *(In re Fin. Oversight & Mgmt. Bd. for P.R.)*,
    989 F.3d 170 (1st Cir. 2021)...............................................20, 21, 24, 45

*Brigade Leveraged Cap. Structures Fund Ltd. v. Garcia-Padilla*,
    217 F. Supp. 3d 508 (D.P.R. 2016)............................................37, 38

*In re Builders Grp. & Dev. Corp.*,
    No. 13–04867 (ESL),
    2013 WL 6198203 (Bankr. D.P.R. Nov. 27, 2013) ....................49

*In re Builders Grp. & Dev. Corp.*,
    502 B.R. 95 (Bankr. D.P.R. 2013)...............................................38

*Button's Est. v. Anderson*,
    28 A.2d 404 (Vt. 1942).................................................................28

*C & A, S.E. v. P.R. Solid Waste Mgmt. Auth.*,
    369 B.R. 87 (D.P.R. 2007)............................................................46

*In re City of Detroit*,
    524 B.R. 147 (Bankr. E.D. Mich. 2014) ......................................48

*City of Providence v. Barr*,
    954 F.3d 23 (1st Cir. 2020)...........................................................30

*In re Fin. Oversight & Mgmt. Bd. for P.R.*,
   330 F. Supp. 3d 685 (D.P.R. 2018),
   *aff'd and remanded*,
   945 F.3d 3 (1st Cir. 2019) ............................................................................ 31

*In re Fin. Oversight & Mgmt. Bd. for P.R.,*
   939 F.3d 356 (1st Cir. 2019*)* ...................................................................... 46

*In re Fin. Oversight & Mgmt. Bd. for P.R.*,
   618 B.R. 619 (D.P.R. 2020) ............................................................ 3, 19, 20, 42

*Fin. Oversight & Mgmt. Bd. for P.R. v. Ad Hoc Grp. of PREPA Bondholders
   (In re Fin. Oversight & Mgmt. Bd. for P.R.),*
   899 F.3d 13 (1st Cir. 2018) .......................................................................... 44

*In re Fin. Oversight & Mgmt. Bd. for P.R.*,
   927 F.3d 597 (1st Cir. 2019) ........................................................................ 44

*Franklin Cal. Tax-Free Tr. v. Puerto Rico*,
   805 F.3d 322 (1st Cir. 2015) ........................................................................ 32

*Goya Foods, Inc. v. Unanue-Casal (In re Unanue-Casal),*
   159 B.R. 90 (D.P.R. 1993),
   *aff'd*, 23 F.3d 395 (1st Cir. 1994) ........................................................... 45, 46

*Gracia-Gracia v. Fin. Oversight & Mgmt. Bd. for P.R.*,
   939 F.3d 340 (1st Cir. 2019) ........................................................................ 43

*Graham v. Illinois State Toll Highway Auth.*,
   182 Ill.2d 287 (1998) ................................................................................... 28

*Grant's Dairy-Maine, LLC v. Comm'r of Me. Dep't of Agric., Food & Rural Res.*,
   232 F.3d 8 (1st Cir. 2000) ........................................................................ 32, 33

*Grella v. Salem Five Cent. Sav. Bank*,
   42 F.3d 26 (1st Cir. 1994) ............................................................................ 42

*Haynes v. District Court*,
   78 P.2d 937 (Mont. 1938) ............................................................................ 28

*In re Heffernan Mem'l Hosp. Dist.*,
   202 B.R. 147 (Bankr. S.D. Cal. 1996) .......................................................... 26

*Holt v. Henley*,
   232 U.S. 637 (1914) ..................................................................................... 33

*In re Lally*,
   38 B.R. 622 (Bankr. N.D. Iowa 1984) .......................................................... 49

*LNC Invs., Inc. v. First Fid. Bank,*
  247 B.R. 38 (S.D.N.Y. 2000) ...........................................................................37

*Mazzone v. Attorney General,*
  736 N.E.2d 358 (Mass. 2000) ...........................................................................28

*Mission Prod. Holdings, Inc. v. Schleicher & Stebbins Hotels, L.L.C.*
  *(In re Old Cold, LLC),*
  602 B.R. 798 (1st Cir. BAP 2019) ..............................................................42, 43

*In re MJS Las Croabas Props.,*
  No. 12-05710 (ESL),
  2013 Bankr. LEXIS 2256 (Bankr. D.P.R. May 29, 2013) ..................................50

*In re Moore,*
  267 B.R. 111 (Bankr. E.D. Pa. 2001) ..............................................................49

*In re Nat'l Promoters & Servs., Inc.,*
  499 B.R. 192 (Bankr. D.P.R. 2013) ..................................................................38

*Nowak v. Wereszynski,*
  250 N.Y.S.2d 981 (N.Y. App. Div. 1964) ..........................................................28

*Peaje Invs. LLC v. Garcia-Padilla,*
  Nos. 16-2365 (FAB), 16-2384 (FAB),
  2016 U.S. Dist. LEXIS 153711 (D.P.R. Nov. 2, 2016) ......................................37

*Peaje Invs. LLC v. García-Padilla,*
  845 F.3d 505 (1st Cir. 2017) ...........................................................................40

*People ex rel. Einsfeld v. Murray,*
  44 N.E. 146 (N.Y. 1896) ...................................................................................28

*In re Roberts,*
  367 B.R. 677 (Bankr.D. Colo. 2007) ................................................................49

*In re Smithville Crossing, LLC,*
  No. 11-02573-8-JRL,
  2011 Bankr. LEXIS 4605 (Bankr. E.D.N.C. Sept. 28, 2011) .............................38

*In re Sonnax Indus., Inc.,*
  907 F.2d 1280 (2d Cir. 1990)......................................................................45, 46

*Matter of Spencer,*
  115 B.R. 471 (D. Del. 1990) .............................................................................50

*State Highway Comm'n v. Spainhower,*
  504 S.W.2d 121 (Mo. 1973) .............................................................................28

*Tahoe-Sierra Pres. Couns. v. Tahoe Regency Planning Agency*,
    535 U.S. 302 (2002)............................................................................................33

*In re Townley*,
    256 B.R. 697 (Bankr. D.N.J. 2000) ...................................................................37

*United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*,
    484 U.S. 365 (1988).....................................................................................38, 50

*United States v. Sec. Indus. Bank*,
    459 U.S. 70 (1982)............................................................................................33

*In re Valentin*,
    2014 Bankr. LEXIS 2885 (Bankr. D.P.R. July 3, 2014)....................................50

*Velasquez v. Hanes PR, Inc. (In re Velasquez)*,
    No. 09-03057,
    2010 Bankr. LEXIS 2448 (Bankr. D.P.R. July 2, 2010)....................................41

**United States Constitution**:

U.S. Const. art IV, § 3, cl. 2 ....................................................................................4

U.S. Const. Amend 5, cl. 4 ....................................................................................33

**Puerto Rico Constitution**:

P.R. Const. art. II, § 9 ...................................................................................*passim*

P.R. Const. art. VI, § 6 ...........................................................................................29

P.R. Const. art. VI, § 7 ...................................................................................*passim*

P.R. Const. art. VI, § 8 ...................................................................................*passim*

P.R. Const. art. VI, § 9 ...................................................................................*passim*

**United States Statutes**

11 U.S.C. § 361............................................................................22, 26, 37, 41

11 U.S.C. § 362..................................................................................41, 44

11 U.S.C. § 362(d) ..............................................................................43, 44

11 U.S.C. § 362(d)(1) ....................................................................*passim*

11 U.S.C. § 362(d)(2) .........................................................23, 43, 49, 52

11 U.S.C. § 362(g) ...................................................................................................43, 49

11 U.S.C. § 507 ..................................................................................................................36

11 U.S.C. § 507(a)(2) ........................................................................................................35

11 U.S.C. § 552 ..................................................................................................................25

11 U.S.C. § 552(a) ........................................................................................................24, 26

11 U.S.C. § 902 ............................................................................................................24, 25

11 U.S.C. § 902(2) .......................................................................................................25, 26

11 U.S.C. § 902(2)(E) ........................................................................................................25

11 U.S.C. § 928 ..................................................................................................................25

11 U.S.C. § 928(a) .............................................................................................................26

48 U.S.C. § 2103 (2016) ....................................................................................................32

48 U.S.C. § 2123 (2016) ....................................................................................................36

48 U.S.C. § 2141 (2016) ....................................................................................................34

48 U.S.C. § 2141(b)(1)(N) (2016) ...............................................................................31, 34

48 U.S.C. § 2142 (2016) ....................................................................................................34

48 U.S.C. § 2142(c)(1) (2016) ....................................................................................31, 34

48 U.S.C. § 2144(c)(3)(B) (2016) .....................................................................................35

48 U.S.C. § 2161 (2019) ...............................................................................................5, 35

48 U.S.C. § 2161(a) (2019) ...............................................................................................41

48 U.S.C. § 2174(b)(3) (2016) ..........................................................................................35

48 U.S.C. § 2174(b)(6) (2016) ..........................................................................................35

48 U.S.C. § 2194 (2016) ....................................................................................................40

*Puerto Rico Oversight, Management and Economic Stability Act* ("PROMESA") .............. *passim*

**Puerto Rico Statutes**:

9 L.P.R.A. § 2002 ................................................................................................................5

9 L.P.R.A. § 2004(l) ...................................................................................................................5

9 L.P.R.A. § 2021 ...............................................................................................13, 27, 48, 51

9 L.P.R.A. § 5681 .........................................................................................11, 13, 27, 48, 51

13 L.P.R.A. § 31625 ...............................................................................................................25

13 L.P.R.A. § 31626(a)(1) .....................................................................................................25

13 L.P.R.A. § 31626(a)(3) .....................................................................................................25

13 L.P.R.A. § 31627(a) ..........................................................................................................25

13 L.P.R.A. § 31627a(a) ........................................................................................................25

13 L.P.R.A. § 31751(a)(1)(A) ...............................................................................................13

13 L.P.R.A. § 31751(a)(1)(C) ...........................................................................13, 27, 28, 48, 51

13 L.P.R.A. § 31751(a)(3)(A) ...............................................................................................13

13 L.P.R.A. § 31751(a)(3)(C) ...........................................................................13, 27, 48, 51

23 L.P.R.A. § 104(c)(1) ...........................................................................................10, 13, 48

23 L.P.R.A. § 104(c)(2) ..........................................................................................................10

23 L.P.R.A. § 104(c)(3) ..........................................................................................................11

23 L.P.R.A. § 104(c)(4)–(5) ...................................................................................................11

P.R. Laws Ann. tit. 5, § 1567 ...........................................................................................29-30

P.R. Laws Ann. tit. 7, § 607b ................................................................................................30

P.R. Laws Ann. tit. 31, § 5 (1930) .........................................................................................31

*Government Development Bank for Puerto Rico Debt Restructuring Act*,
    Act No. 109-2017, *as amended by* Act No. 147-2018 .....................................................1

*HTA Enabling*, Act No. 74-1965 ...........................................................................................5

*Management and Budget Office Organic Act*,
    Act. No. 147 (June 18, 1980) (the "OMB Act") ..............................................................10

*Puerto Rico Emergency Moratorium and Financial Rehabilitation Act*
    ("First Moratorium"), Act No. 21-2016 .......................................................................5, 15

*Puerto Rico Financial Emergency and Fiscal Responsibility Act*
    ("Second Moratorium"), Act No. 5-2017 ................................................................16

## Other Authorities

S. Rep. No. 100-506, 100th Cong., 2d Sess. 21 (1988) ................................................26

3 Collier on Bankruptcy ¶ 361.02 (16th ed. 2019) ....................................................37

3 Collier on Bankruptcy ¶ 362.07[3][a] (15th ed. 2006) ............................................45

3 Collier on Bankruptcy ¶ 362.01 (16th ed. 2019) .........................................41, 38, 43

6 Collier on Bankruptcy ¶ 902.03[2] (16th ed. 2019) ................................................26

6 Collier on Bankruptcy ¶ 902.03[5] (16th ed. 2019) ................................................26

63C Am. Jur. 2d *Public Funds* § 34 (2020)................................................................27

63C Am. Jur. 2d *Public Funds* § 4 (2020)..................................................................28

*Glossary of Terms Used in the Federal Budget Process,*
    GAO-05- 734SP, p. 13 (Washington, D.C.: Sept. 2005) ...................................28

**COME NOW** AmeriNational Community Services, LLC (the "Servicer"), as servicer for the GDB Debt Recovery Authority (the "DRA"), and Cantor-Katz Collateral Monitor LLC, a Delaware limited liability company (the "Collateral Monitor," and together with the Servicer, collectively, the "DRA Parties"), which serves as the collateral monitor for Wilmington Trust, N.A. in connection with the new bonds that the DRA issued pursuant to the *Government Development Bank for Puerto Rico Debt Restructuring Act*, Act No. 109-2017, as amended by Act No. 147-2018, and the approved Qualifying Modification for the Government Development Bank for Puerto Rico (the "GDB")[2] under Title VI of the *Puerto Rico Oversight, Management and Economic Stability Act* ("PROMESA"), by and through the undersigned legal counsel, and respectfully submit the DRA Parties' *Amended Motion and Memorandum of Law in Support of their Request for Adequate Protection or Relief from the Automatic Stay* (the "Motion") against the Commonwealth and HTA.

## PRELIMINARY STATEMENT

The DRA Parties have suffered and continue to suffer as the Commonwealth diverts secured revenue streams that constitute the DRA's collateral away from the DRA.  This diversion contravenes the Puerto Rico Constitution and applicable U.S. and Commonwealth law.

As a result, the DRA has a right to adequate protection.  The Debtors have, to date, failed to adequately protect the DRA's interest in its collateral.  If the Debtors continue to fail to provide such protection and the Court cannot protect this interest, the Court must lift the automatic stay – as there is no other forum for resolution of the DRA's interests and no pending litigation or plan of adjustment addressing these issues.

---

[2] *See* Dkt. No. 270 of Civil Case No. 18- 01561 (LTS) (Nov. 7, 2018).

The DRA succeeded GDB as the holder of more than $1.7 billion in loans to HTA and
the holder of more than $200 million of principal in Series 1998 HTA bonds.  As collateral to
secure the obligations owed to the DRA, HTA pledged excise tax revenues, including an
assortment of revenue streams such as gasoline taxes, gas, oil and diesel oil taxes, motor vehicle
and license fees, toll revenues, petroleum products taxes, and cigarette taxes.  Specifically,
pursuant to an Assignment and Security Agreement dated as of August 28, 2013, between the
GDB and HTA, HTA pledged the Act 30-31 Revenues (as defined below) **“*whether presently
held or hereafter acquired and wherever located.*”**

Under this Security Agreement, the DRA has a valid lien on HTA’s interest in the Act
30-31 Revenues – which interest is subject only to the Commonwealth’s right to use such
pledged revenues under the limited “clawback” exception provided in Article VI, Section 7 and 8
of the Puerto Rico Constitution, to pay interest and amortization with respect to GO bonds.  No
other use is permitted.

The Commonwealth has not demonstrated a valid invocation of the “clawback.” Absent
such a showing, the Commonwealth must, in compliance with Article VI, Section 9 of the Puerto
Rico Constitution, continue to transfer and convey the pledged revenues to HTA for payment to
its secured creditors.

Nevertheless, over the last five years, the Commonwealth has not done so.  Instead it has
continuously depleted the value of the DRA’s collateral and has indicated that it will continue to
do so for the duration of the Commonwealth’s Title III cases.  Because the Commonwealth has
diminished the value of the DRA’s collateral, the DRA Parties have a right to protect the value of
their collateral in the form of adequate protection.  This is the remedy Congress created for the
protection of secured creditors’ property rights in bankruptcy.  If the Commonwealth refuses and

the Court is unable to mandate this protection, the Court should lift the automatic stay and permit

the DRA Parties to pursue their own remedies outside the Title III process – as there is no other

avenue, such as pending litigation in connection with the HTA Title III case, to protect these

rights.

The Commonwealth has attempted to justify the diversion of the Act 30-31 Revenues

through a series of moratoria and executive orders that steered these revenues elsewhere – going

back to before the Title III proceedings were even commenced.  The FOMB has further

condoned this unlawful diminution by approving fiscal plans and certified budgets that it asserts

"preempt" the existing constitutional and statutory obligations of the Commonwealth.[3]  These

actions are illegal, unconstitutional, and constitute an unlawful taking of the DRA's collateral

interest in the Act 30-31 Revenues. Therefore, the FOMB must provide the DRA with adequate

protection of its interest in the Act 30-31 Revenues – or if the FOMB fails to do so, the Court

should lift the automatic stay and permit the DRA to protect its interest in the 30-31 Revenues.

This is not a redux of the Monolines' prior lift stay litigation and the ruling in *In re*

*Financial Oversight & Management Board for Puerto Rico*, 618 B.R. 619 (D.P.R. July 2, 2020)

is not outcome determinative here.  The differences are stark.

*First*, the Monolines and other bondholders do not have liens on the Act 30-31 Revenues

prior to their receipt by HTA and their deposit in the Resolution Funds.[4]  By contrast, the DRA's

---

[3] *See* Opposition of Financial Oversight and Management Board for Puerto Rico to Motion of Assured Guaranty
Corp., Assured Guaranty Municipal Corp., Ambac Assurance Corporation, National Public Finance Guarantee
Corporation, and Financial Guaranty Insurance Company for Relief from Automatic Stay, or, in the Alternative,
Adequate Protection [Dkt. No. 10613]; the Financial Oversight and Management Board's Response to DRA Parties'
Opening Response [Dkt. No. 12496]; and the Sur-Reply of Financial Oversight and Management Board for Puerto
Rico in Opposition to Motion of Assured Guaranty Corp., Assured Guaranty Municipal Corp., Ambac Assurance
Corporation, National Public Finance Guarantee Corporation, and Financial Guaranty Insurance Company for Relief
from the Automatic Stay, or, in the Alternative, Adequate Protection [Dkt. No. 13157].
[4] *See In re Fin. Oversight & Mgmt. Bd. for P.R.*, 618 B.R. at 641. Moreover, for the reasons explained herein, *see
infra* ¶¶ 39-41, and 48-55, this Court's prior ruling does not invalidate the DRA's interest in the Act 30-31
Revenues, even though it also holds bonds issued by HTA under the 1998 Bond Resolution.

liens on the Act 30-31 Revenues attach to HTA's interest in the Act 30-31 Revenues even before those funds are actually received by HTA (*i.e.* "whether presently held or hereafter acquired") and "wherever located," subject only to the limited exception of the Constitutional "clawback." HTA has an interest in the revenues, and the DRA has a lien on that interest, from the time the funds are received by the Commonwealth unless and until the FOMB can demonstrate that the conditions for invoking the "clawback" have been satisfied (which they have not done).

*Second*, unlike the Monolines and other bondholders, the DRA is not a party to any other proceedings that would similarly address this issue.  There is no pending adversary proceeding or other litigation between the Debtors and the DRA that ultimately seeks the same relief as the Monolines sought in their lift stay motion, and, pursuant to the prior orders of this Court, the DRA-specific issues are to be exclusively addressed and resolved as part of the instant Motion. Moreover, the Commonwealth is also not pursuing a plan at HTA that would resolve these issues.

For these reasons, the DRA Parties respectfully request that the Court order the provision of adequate protection for the diminution of the value of the DRA's collateral, or in the alternative, lift the automatic stay to permit the DRA Parties to pursue remedies and protect their interests elsewhere.

## **BACKGROUND**

### I.    **The Commonwealth and HTA Seek Protection Under Title III of PROMESA.**

1.    The Commonwealth of Puerto Rico is an unincorporated territory of the United States of America subject to the Territorial Clause of the United States Constitution.  U.S. Const. art. IV, § 3, cl. 2.

2.      HTA is a public corporation created by Act No. 74-1965 (the "HTA Enabling
Act") to assume responsibility for the construction of highways and other transportation systems
in Puerto Rico.  *See* 9 L.P.R.A. § 2002.  The HTA Enabling Act authorizes HTA to incur
indebtedness and secure its debt obligations through a pledge of certain of its revenues, as more
fully described below.  *See* 9 L.P.R.A. § 2004(*l*).  Congress enacted PROMESA on June 30,
2016. Section 301 of PROMESA established the FOMB. *See* 48 U.S.C. § 2161 (2019).

3.      The FOMB commenced a Title III case under PROMESA for the Commonwealth
on May 3, 2017, and for HTA on May 21, 2017.  *See Title III Petition for the Commonwealth of
Puerto Rico*, Dkt. No. 1[5], and *Title III Petition for Puerto Rico Highways and Transportation
Authority (HTA)*, Dkt. No. 1 of Case No. 17-03567 (LTS).

## II.     The DRA Becomes HTA's Largest Secured Creditor.

### A.      Pre-Title VI, GDB Makes Significant Loans to HTA Totaling Almost $2 billion in Principal.

4.      GDB operated as a banking institution and depository of funds for the
Commonwealth, its instrumentalities, public corporations, and municipalities.  *See Application of
the Government Development Bank for Puerto Rico and the Puerto Rico Fiscal Agency and
Financial Advisory Authority, Pursuant to Section 601(M)(1)(D) of the Puerto Rico Oversight,
Management, and Economic Stability Act, for Approval of the Qualifying Modification for GDB*,
Dkt. No. 1 of Civil Case No. 18-01561 (LTS) ¶ 8 (Aug. 10, 2018).  GDB also acted as a fiscal
agent, paying agent, and financial advisor to the Commonwealth and its instrumentalities, public
corporations, and municipalities until Act No. 21-2016, the *Puerto Rico Emergency Moratorium
and Financial Rehabilitation Act* (the "First Moratorium"), transferred its responsibilities to the

---

[5] Unless otherwise specifically identified in this Motion, the term "Dkt. No." shall refer to Case No. 17-03283
(LTS).

Puerto Rico Fiscal Agency and Financial Advisory Authority.  *See id.* ¶¶ 8, 11; *see also infra* ¶ 31.

5.        Prior to the commencement of the Title III cases, GDB and HTA entered into individual loan agreements and HTA issued 23 separate promissory notes to GDB as evidence of HTA's indebtedness.  Certain of these loan documents are attached hereto as **Exhibit A**.  Upon information and belief, as of the date hereof, those loans have an aggregate outstanding principal balance in excess of $1.7 billion and not less than $844.4 million in accrued interest, plus fees and expenses that have accrued under the terms of the loans.  *See* **Exhibit A**; *see also* Offering Memorandum for GDB Debt Recovery Authority Bonds (Taxable) Due 2040, dated as of November 7, 2018, at 128-29, attached hereto as **Exhibit B**.

### B.        GDB Owns $200 Million in HTA Secured Bonds.

6.        GDB also held $200,000,000 in aggregate original principal amount of Puerto Rico Highway and Transportation Authority Transportation Revenue Bonds (Series A), which HTA issued under Resolution No. 98-06, adopted by HTA on February 26, 1998 (the "1998 Bond Resolution"), attached hereto as **Exhibit C**.  *See also* **Exhibit D** (additional documents in connection with the bonds issued under the 1998 Bond Resolution); 2020 Fiscal Plan for the Puerto Rico Highways & Transportation Authority (HTA) (June 26, 2020) (the "2020 HTA Fiscal Plan") at 84-85, attached hereto as **Exhibit I**.  Upon information and belief, as of the date hereof, HTA owed GDB not less than $92 million in accrued interest plus fees and expenses related to these HTA bonds.  *See id.*

### C.        HTA Assigns, Pledges, and Grants to GDB a Security Interest in the Act 30-31 Revenues to Secure *All* Its Indebtedness.

7.        On August 28, 2013, GDB and HTA executed an Assignment and Security Agreement (the "Security Agreement"), attached hereto as **Exhibit E**, and a related series of loan

agreements.  Pursuant to Section 1.1 of the Security Agreement, HTA "absolutely, irrevocably, and unconditionally assigns, conveys and transfers without recourse, to [GDB all of its] rights, title, obligations and interest in" the following revenues (collectively, the "<u>Act 30-31 Revenues</u>"):

    (a)    The motor vehicle license fees described by Act No. 30-2013 approved by the Legislature of the Commonwealth on June 25, 2013 ("<u>Act 30</u>");

    (b)    Up to $20,000,000 per fiscal year of the excise tax on cigarettes described by Act No. 31-2013 approved by the Legislature of the Commonwealth on June 25, 2013 ("<u>Act 31</u>");

    (c)    The proceeds of the sixteen cents per gallon gasoline tax described by Act 31;

    (d)    The proceeds of the first four cents of the gas and diesel oil excise tax described by Act 31; and

    (e)    The proceeds of the petroleum products excise tax described by Act 31.

**Exhibit E** § 1.1.

8.    Under Section 1.2 of the Security Agreement, HTA also assigned, pledged and granted to GDB as "security for the prompt and complete payment and performance when due of all of its Obligations … a continuing security interest … in all of the right, title and interest of [HTA] in the [Act 30-31 Revenues], whether presently held or hereafter acquired and wherever located."  *See* **Exhibit E** § 1.2.[6]

9.    The Security Agreement defines "Obligations" broadly to include "***all indebtedness***, obligations and liabilities (including, without limitation, guarantees and other contingent liabilities) ***of [HTA] to [GDB]***."  **Exhibit E** § 5.1 (emphasis added).  Thus, the pledge

---

[6] Section 5.1 of the Security Agreement defines Obligations to mean "all indebtedness, obligations and liabilities (including, without limitation, guarantees and other contingent liabilities) of [HTA] to the [GDB], including any amounts owned [sic] on account of outstanding obligations of [HTA] with the [GDB] and those arising under or in connection with the Loan Agreement, the Note or the Loan Documents."

of this Security Agreement secures *any* indebtedness that HTA owes to GDB, notwithstanding

and in addition to any other separate security agreement's pledge of security by HTA to GDB.

10.     The liens granted to GDB by the Security Agreement were duly perfected through

the filing of UCC Financing Statement No. 2013004677 at the Puerto Rico Department of State

on August 29, 2013, as amended on March 31, 2015 (the "30-31 Financing Statement"), attached

hereto as **Exhibit F**.

> **D.     GDB Restructures Its Debt Under Title VI of PROMESA and
> Transfers All Of Its Interest in, and Payments on, HTA's Debt
> Obligations to the DRA.**

11.     On July 12, 2017, the FOMB issued a resolution authorizing GDB to use Title VI

of PROMESA. *See* Dkt. No. 1 of Civil Case No. 18-01561 (LTS) ¶ 18 (Aug. 10, 2018). On

August 10, 2018, GDB and AAFAF initiated a proceeding to restructure GDB's debt obligations

pursuant to Title VI of PROMESA. *See generally id*.

12.     Pursuant to GDB's Title VI restructuring, on November 5, 2018, the FOMB

certified GDB's Qualifying Modification under PROMESA, which Qualifying Modification this

Court subsequently approved by Order dated November 7, 2018. *See* Dkt. No. 270 of Civil Case

No. 18-01561 (LTS).

13.     The GDB Restructuring Act created the DRA. Under that Act, the DRA "is and

shall be recognized for all purposes as a separate legal entity from the Government of Puerto

Rico, GDB and any other Government entity." Act No. 109-2017 at art. 202. Moreover, the

DRA "is independently operated and governed by a board of trustees." **Exhibit B** at 57. Indeed,

no member of the board "may be an officer, employee or director of any government entity of

the Commonwealth." *Id*.; *see also* Act No. 109-2017 at art. 202. The DRA has "corporate

powers," like the power to "[s]ue and be sued," to enter into contracts, to "acquire, lease, hold

and sell property," and to "have complete legal and equitable dominion over its properties."  Act
No. 109-2017 at art. 205.

14.     To secure the DRA's obligations under the bonds issued to the creditors of GDB
in satisfaction of their claims as part of GDB's Title VI restructuring, GDB consensually
transferred a substantial portion of its assets, including the loans to HTA described above and the
1998 HTA bonds, to the DRA.  *See* Act No. 109-2017; *see also* Master Transfer Agreement,
dated November 29, 2018, between GDB and DRA, § 2, attached hereto as **Exhibit G**; *see also*
**Exhibit B** at 100-137.

### III.    The "Clawback":  The Puerto Rico Constitution and Statutes Protect Revenues Pledged for Service of HTA's Debt Obligations Owed to the DRA.

15.     The Puerto Rico Constitution requires that the Commonwealth's annual
appropriations not exceed its annual revenues, and, when the Commonwealth's resources are
insufficient to cover its annual appropriations, it requires the Commonwealth to satisfy fiscal-
year interest and amortization on general obligation ("GO") bonds before it satisfies other
obligations.

16.     Article VI, Section 7 of the Puerto Rico Constitution provides that "[t]he
appropriations made for any fiscal year shall not exceed the total revenues, including available
surplus, estimated for said fiscal year unless the imposition of taxes sufficient to cover said
appropriations is provided by law."  P.R. Const. art. VI, § 7.  Section 7 requires the
Commonwealth to increase tax revenue whenever necessary to provide sufficient funds to cover
appropriations, including fiscal-year operating expenses and general obligation debt service.  *See
id.*  Section 7 also prohibits the Commonwealth from rolling budget shortfalls into successive
fiscal years.  *See id*.

17.     Article VI, Section 8 of the Puerto Rico Constitution creates an ostensible GO priority on an annual basis by providing that "[i]n case the available resources including surplus for any fiscal year are insufficient to meet the appropriations made for that year, interest on the public debt and amortization thereof shall first be paid, and other disbursements shall thereafter be made in accordance with the order of priorities established by law."  P.R. Const. art. VI, § 8.

18.     Further, Article VI, Section 9 of the Puerto Rico Constitution mandates that "[p]ublic property and funds shall only be disposed of for public purposes . . . pursuant to law." P.R. Const. art. VI, § 9.

19.     To properly understand how the use, disposition, and flow of public funds work in Puerto Rico, we look at applicable law.  In the case of the Act 30-31 Revenues, applicable law means (i) the *Management and Budget Office Organic Act*, Act. No. 147 (June 18, 1980) (the "OMB Act") and (ii) the mandates of Acts 30 and 31 themselves, attached hereto as **Exhibits K** and **L**, respectively.

20.     Section 4(c) of the OMB Act creates a waterfall of payment priorities for "when the available funds for a specific fiscal year are not sufficient to cover the appropriations approved for that year."  Under this provision, if there are insufficient funds for the fiscal year, the Commonwealth must apply available funds in the following order:

(a)     First-priority status applies to the "payment of interest and amortizations corresponding to the public debt."  23 L.P.R.A. § 104(c)(1).

(b)     Second-priority status applies to the payment of "commitments entered into by virtue of legal contracts in force, judgments of the courts in cases of condemnation under eminent domain, and binding obligations to safeguard the credit, reputation and good name of the Government of the Commonwealth of Puerto Rico . . . ."  23 L.P.R.A. § 104(c)(2).  ***These obligations include HTA's debt obligations.***

(c)     Third-priority status applies to the payment of "regular expenses" related to government operations, including payments for "[c]onservation of public health," "[p]rotection of persons and property," "[p]ublic education

programs," "[p]ublic welfare programs," pension obligations and any "remaining public services."  23 L.P.R.A. § 104(c)(3).

(d)    Fourth-priority status applies to expenditures for "construction of capital works or improvements" and fifth-priority status applies to "contracts and commitments contracted under special appropriations."  23 L.P.R.A. § 104(c)(4)–(5).

21.    Act 30 requires that the fees assessed by the statute be transferred and conveyed in the following fashion:

> […]
>
> Except as otherwise provided in this chapter the amount of the fees collected in accordance with §§ 5681 . . . of this title ***shall be covered in its entirety into a Special Deposit in the name and for the benefit of the Highways and Transportation Authority***.
>
> The Authority is hereby authorized to pledge or encumber the proceeds of the taxes collected for the payment of the principal of and interest on any bonds or other obligation or for any other lawful purpose of the Authority. Such pledge or encumbrance shall be subject to the provisions of Section 8 of Article VI of the Constitution of Puerto Rico. The proceeds of the taxes collected shall be used solely for the payment of the interest on and amortization of the public debt, as provided in Section 8 of Article VI of the Constitution of Puerto Rico, insofar as the other available resources referred to in said Section does not suffice to attain such purposes. ***Otherwise, the proceeds of said tax, in the necessary amount, shall be used solely for the payment of principal of and interest on the bonds and other obligations of the Authority and to meet any stipulation agreed upon by the Authority to the holders of its bonds and other obligations***.

9 L.P.R.A. § 5681; **Exhibit K** § 1 (emphasis added).

22.    Likewise, Act 31 requires that the tax revenues be transferred as follows:

> (1) The sum of the tax collected on gasoline and four cents (4¢) of the gas oil or diesel oil tax established by Section 3020.06 of this Subtitle, and the total amount per fiscal year of the excise tax collected for crude oil, partially finished and finished oil by-products, and any other hydrocarbon mixtures established in Section 3020.07 of this Subtitle, ***shall be covered into a special deposit in favor of the Highways and Transportation Authority for its corporate purposes***.
>
>> (A) ***The Secretary shall transfer every month, or as agreed on with the Highways and Transportation Authority, the amounts***

*covered into said special deposit*, deducting from these the amounts reimbursed according to the provisions of Section 3030.19 and 3030.20 of this Subtitle.

[…]

(C) The Highways and Transportation Authority is hereby authorized to commit or pledge the proceeds of the collection thus received on gasoline and the tax of four cents (4¢) on gas oil or diesel oil fixed in Section 3020.06 and the amount appropriated by virtue of this Subtitle of the excise tax on crude oil, partially finished and finished oil by-products, and any other mixture of hydrocarbons fixed in Section 3020.07, for the payment of the principal and the interest on bonds or other obligations or for any other legal purpose of the Authority. Said commitment or pledge shall be subject to the provisions of Section 8 of Item VI of the Constitution of the Commonwealth of Puerto Rico. The proceeds of said collection shall be solely used for the payment of interest and amortization of the public debt, as provided in said Section 8 of Item VI of the Constitution, until the other resources available to which reference is made in said section are insufficient for such purposes. *Otherwise, the proceeds of said collection, in the amount that may be necessary, shall be used solely for the payment of the principal and interest on bonds and other obligations of the Authority and to comply with any stipulations agreed to by the latter with the holders of said bonds or other obligations*.

[…]

(3) The revenues collected from the tax on cigarettes established in Section 3020.05 of this Subtitle up to twenty million dollars ($20,000,000) per fiscal year *shall be covered into a special deposit account in favor of the Highways and Transportation Authority for its corporate powers and purposes*.

> (A) *The Secretary shall transfer every month or as agreed on with the Highways and Transportation Authority, the amounts covered into such special deposit account*, deducting therefrom any amounts reimbursed in accordance with the provisions of Section 3030.18 of this Subtitle.

[…]

(C) The Highways and Transportation Authority is hereby authorized to pledge or encumber the proceeds from the excise tax on cigarettes established in Section 3020.05 for the payment of the

principal of and interest on any bonds or other obligation or for any other lawful purpose of the Authority. Such pledge or encumbrance shall be subject to the provisions of Section 8 of Article VI of the Constitution of Puerto Rico. The proceeds from such taxes shall be used solely for the payment of the interest on and amortization of the public debt, as provided in Section 8 of Article VI of the Constitution of the Government of Puerto Rico, insofar as the other available resources referred to in said Section do not suffice to attain such purposes. ***Otherwise, the proceeds from said tax, in the necessary amount, shall be used solely for the payment of principal of and interest on the bonds and other obligations of the Authority and to meet any stipulation agreed on by the Authority to the holders of its bonds and other obligations***.

[…]

13 L.P.R.A. §§ 31751(a)(1)(A), 31751(a)(1)(C), 31751(a)(3)(A), and 31751(a)(3)(C); **Exhibit L** § 3 (emphasis added).  *See also* Dkt. No. 10107-4.

23.      When read together, the Security Agreement, Article VI, Sections 7 through 9 of the Puerto Rico Constitution and the foregoing legislation expressly recognize the potential application of Article VI, Section 8 of the Puerto Rico Constitution to the Act 30-31 Revenues, but make clear that the Commonwealth may *only* use those funds: (i) when the fiscal year begins with a balanced budget, *see* P.R. Const. art. VI, § 7; (ii) to pay *only* interest and amortizations on GO debt ***if all other available resources for the fiscal year are insufficient to cover such GO debt service***, *see* P.R. Const. art. VI, §§ 8-9; 23 L.P.R.A. § 104(c)(1); 9 L.P.R.A. §§ 2021, 5681; 13 L.P.R.A. §§ 31751(a)(1)(C), 31751(a)(3)(C)); and, (iii) once the above is satisfied, to be used otherwise only to pay obligations of HTA.  *See id*.

24.      Under all other circumstances, the Act 30-31 Revenues shall be used solely for the payment of principal of and interest on the bonds and other obligations of HTA.

### IV.    The Commonwealth Unlawfully Diminishes the DRA's Collateral.

25.    Then-Governor Alejandro Garcia-Padilla issued Executive Order 2015-046 on December 1, 2015, which ordered the Treasury Secretary to "retain the revenues assigned to [HTA] for the payment of certain [HTA] obligations . . . ."  *See* Admin. Bulletin OE-2015-046 at 2.  Although this order was purportedly issued pursuant to the auspices of Article VI, Section 8 of the Puerto Rico Constitution, *see id.* at 1, the order unlawfully contradicted this constitutional mandate because it failed to apply the HTA revenues only to repay GO debt, *see id.* at 3 ("The Department of the Treasury shall only retain such revenues that are necessary for the payment of public debt, ***while continuing to provide essential services*** . . . .") (emphasis added).  *See also* Dkt. No. 11947-11 at 36.

26.    On December 8, 2015, then-Governor Garcia-Padilla issued Executive Order 2015-049, which stated that the Governor or the Director of the Office of Management and Budget "may establish budgetary reserves and restrict those resources that are at the disposal of government entities in the manner that they see fit, when deemed necessary in the course of executing and controlling the budget" and that the Director shall "make any budget adjustments necessary in the allocations contained in the Budget in order to match them with available resources."  Admin. Bulletin OE-2015-049 at 2, 3.  As is evident, this executive order unlawfully authorized the Commonwealth to use pledged HTA revenues "in the manner that [it] see[s] fit," to pay virtually any other general expense ahead of GO debt.  See *id*. at 2.

27.    To provide guidelines for the disbursement of HTA and other revenues recovered pursuant to these executive orders, the Department of Treasury issued Circular Letter No. 1300-15-16 on December 17, 2015. This letter directed Commonwealth officials to disburse pledged HTA revenues to pay for:

(a)    essential services;

    (b)      payroll and pensioned persons;

    (c)      any other expense previously provided which at the discretion of the Secretary of the Treasury is necessary to guarantee the operation, continuity, and stability of the central government of the Commonwealth of Puerto Rico, such as those that are necessary to guarantee the welfare of the inhabitants of the country; and

    (d)      expenses arising from an emergency motivated by a catastrophe, acts of nature, fortuitous accidents, or which in any manner impact the security, health education or welfare of the citizens.

28.      On April 6, 2016, the Commonwealth approved the First Moratorium, Act No. 21-2016. Pursuant to the authority granted to him by this Act, then-Governor Garcia-Padilla issued three executive orders that (i) suspended the repayment of HTA's debts (including those owed to GDB and, subsequently, to the DRA), (ii) continued to withhold various government sources of revenue (including the DRA's collateral), and (iii) redirected the withheld funds to satisfy the operating expenses of the Commonwealth:

    (a)      On May 17, 2016, Administrative Bulletin OE-2016-018 declared a state of emergency over HTA until June 30, 2016, stopped the flow of all Toll and non-Toll Revenues to the HTA Revenue Bonds, and stayed all litigation arising from nonpayment of HTA Covered Obligations.

    (b)      On June 30, 2016, Administrative Bulletin EO-2016-030 declared a state of emergency over the Commonwealth, imposed a moratorium on Commonwealth debt payments except GDB loan payments to be applied to "essential services," extended the HTA state of emergency until January 31, 2017, halted all payments on HTA's debt obligations; and stayed all creditor lawsuits against HTA.

    (c)      On June 30, 2016, Administrative Bulletin EO-2016-031 halted transfers of HTA Toll and non-Toll Revenues to HTA's fiscal agent, suspended HTA's obligation to repay debts except GDB loan payments to be applied to "essential services," suspended the Commonwealth's obligation to transfer revenues to HTA unless it was necessary to pay HTA operating expenses or "essential services"; and stayed litigation arising from nonpayment of HTA debts.

(collectively, the "Clawback Executive Orders"). *See also* Dkt. No. 11947-11 at 36-37.

29.     The Commonwealth issued the Clawback Executive Orders without complying
with the requirements for the "clawback"—which is the ***only*** legal and permissible justification
for diversion of the revenues.  The Commonwealth made no effort to show how the diversion of
the revenues complied with the Puerto Rico Constitution's "clawback" provision and applicable
laws.  Each of the Clawback Executive Orders therefore violated the priority of debt payments
set forth in the Puerto Rico Constitution, the OMB Act, and Acts 30 and 31 by elevating the
payment of general expenses over the payment of HTA's senior secured debts, including the
HTA loans and the 1998 HTA bonds.

30.     On January 29, 2017, the Commonwealth approved a second moratorium act, Act
No. 5-2017, known as the *Puerto Rico Financial Emergency and Fiscal Responsibility Act* (the
"Second Moratorium," and jointly with the First Moratorium, the "Moratorium Laws"), which:
(i) repealed or replaced certain portions of the First Moratorium; (ii) maintained the Governor's
ability to seize pledged revenues during an "Emergency Period"; and (iii) authorized the
Governor to "designat[e] the priority for the use of available resources to pay for the essential
services the Governor deems necessary to provide for health, safety, and welfare of the residents
of Puerto Rico . . . ."  Art. 202 of Act No. 5-2017.  Article 208(e) of the Second Moratorium
provides that the Clawback Executive Orders shall remain in place until they are either amended,
rescinded or substituted.  *See id*. at art. 208(e).  *See also* Dkt.11947-11 at 36-37.

31.     Even though the Clawback Executive Orders and the Moratorium Laws were
purportedly issued pursuant to Article VI, Section 8 and/or Article II, Section 19 of the Puerto
Rico Constitution, they violate the Puerto Rico Constitution because the Commonwealth used
those revenues to pay for obligations other than its GO bond obligations or HTA's secured debt
obligations.  This unconstitutional diversion of revenues has continued during the Title III

proceedings for the Commonwealth and HTA, and is still continuing.  For example, in Fiscal

Year 2020, the Commonwealth retained approximately $1,024 million in pledged HTA revenues

that were neither applied to GO or HTA debt service.  *See* Treasury Single Account ("TSA") FY

2020 Cash Flow Report for the month of March FY21, at 10, attached hereto as **Exhibit H**.

Because the conditions of the clawback have not been met, the DRA continues to possess an

interest in the Act 30-31 Revenues and is entitled to adequate protection of that interest due to

the diminution of value caused by the Debtors' diversion of these funds.  To date, no adequate

protection has been provided or offered to the DRA.

32.     In addition, currently the Commonwealth appears to run a budgetary surplus.

Therefore, it cannot satisfy the conditions set forth in the Puerto Rico Constitution for the use of

the pledged Act 30-31 Revenues for any purpose other than payment of the HTA debt

obligations.  *See* 2020 Fiscal Plan for Puerto Rico: Restoring Growth and Prosperity at 53 (May

27, 2020), attached hereto as **Exhibit J**.  As noted above, the Commonwealth may only use

available resources such as the Act 30-31 Revenues to pay GO debts in a fiscal year when the

available resources "are insufficient to meet the appropriations made ***for that year*** . . . ."  P.R.

Const. art. VI, § 8 (emphasis added).  That certainly does not appear to be the case in the current

fiscal year or the preceding years during which the Title III proceedings have been ongoing. *See*

**Exhibit H**.

33.     The diminution of the DRA's collateral under the Clawback Executive Orders and

the Moratorium Laws remains in effect, and the Commonwealth has not modified those

provisions despite the fact that neither the moratoria nor the Executive Orders satisfy Article VI,

Section 8 of the Puerto Rico Constitution, as discussed above.[7]  Consequently, the DRA's

collateral continues to be unlawfully diverted for purported payment of "essential services"

pursuant to the terms of the Clawback Executive Orders and the Moratorium Laws.

34.     Absent a showing that the required conditions for application of the "clawback"

have been satisfied, the Commonwealth's and HTA's actions are directly at odds with the

mandates of Article VI, Section 9 of the Puerto Rico Constitution and expressly violate Acts 30

and 31.  The Commonwealth and HTA have failed to make such a showing.

**V.     The DRA and Other Parties Seek Relief from the Court Following the
Commonwealth's and HTA's Improper Diversion of the Act 30-31 Revenues.**

35.     Given the Commonwealth's illegal diversion and use of the Act 30-31 Revenues,

on June 25, 2019, the DRA Parties filed The DRA Parties' Motion and Memorandum of Law in

Support of Their Motion for Relief from the Automatic Stay, or in the Alternative, Ordering

Payment of Adequate Protection (the "DRA Original Lift Stay Motion") [Dkt. No. 7643].  The

DRA Parties asserted that such actions violated the Puerto Rico Constitution and Puerto Rico

statutes and alleged that the dissipation of their collateral remained ongoing.  *See* DRA Original

Lift Stay Motion ¶¶ 21–24, 34.  The DRA Parties therefore sought relief from the automatic stay

to exercise remedies or, in the alternative, an order requiring the debtors to provide the DRA

with adequate protection of its interest in the Act 30-31 Revenues.  *See generally id.* ¶¶ 43–44.

36.     In August 2019, several monoline insurers (the "Monolines")[8] filed a similar

motion for adequate protection or, in the alternative, for relief from the automatic stay with

respect to bonds issued by HTA.  *See* Dkt. No. 8536 (the "Monolines' Original Lift Stay

---

[7] Although then-Governor Rosselló extended the Emergency Period until June 30, 2019, by virtue of executive orders numbers 2017-031, 2017-076, 2018-023, 2018-053, 2019-030, 2019-066 and 2020-050, none of these orders amended, substituted or rescinded the improper provisions of the Clawback Executive Orders.
[8] The term "Monolines" refers, jointly, to Assured Guaranty Corp., Assured Guaranty Municipal Corp., Ambac Assurance Corporation, National Public Finance Guarantee Corporation, and Financial Guaranty Insurance Company.

Motion"). The Monolines alleged that they had a perfected security interest in certain pledged revenues, including some of the Act 30-31 Revenues, and that stay relief was warranted because the Commonwealth had unlawfully diverted the revenues in violation of Article VI, Section 8 of the Puerto Rico Constitution. *See* Monolines' Original Lift Stay Motion ¶¶ 6, 63, 68.

37.     The Court ordered that both the DRA Original Lift Stay Motion and the Monolines' Original Lift Stay Motion be subject to mandatory mediation. *See, e.g.*, Dkt. Nos. 8481, 8567. In December 2019, the Court entered scheduling orders with respect to the DRA Original Lift Stay Motion and the Monolines' Original Lift Stay Motion. *See* Dkt Nos. 9620, 9622. Consistent with the applicable scheduling order, the Monolines amended their lift stay motion in January 2020. *See* Dkt. No. 10102 (the "Monolines' Amended Lift Stay Motion").

38.     On January 31, 2020, the Court issued an order providing that consideration of the Monolines' Amended Lift Stay Motion would be limited to the preliminary issues of "whether the movants have standing to sue and security or other property interests in the relevant revenues" (the "Gating Issues"). *See* Dkt. No. 10595 at 5. Briefing and discovery on the Gating Issues took place from February through May 2020 and culminated in a hearing on June 4, 2020. Although the DRA Parties were granted limited intervention and briefing rights with respect to the Monolines' Amended Lift Stay Motion, *see* Dkt. Nos. 12005, 12396, 12999, 13226, the Court ordered that briefing on the DRA Original Lift Stay Motion would not commence until it had ruled on the Gating Issues. *See* Dkt. No. 12533.

39.     On July 2, 2020, the Court issued a decision on the Gating Issues. *See In re Fin. Oversight & Mgmt. Bd. for P.R.*, 618 B.R. 619 (the "Gating Issues Decision"). In the Gating Issues Decision, the Court concluded that the Monolines had failed to make the required prima facie showing of a security interest in the excise tax revenues (other than those that had been

deposited in certain special funds). *See id*. at 640.  The Gating Issues Decision notes that the Act

30-31 Revenues "are not able to be used or obtained by HTA nor are they at HTA's disposal"

and are instead "within the possession and control of the Commonwealth."[9] *Id*. at 634-35

(internal quotations omitted).

40.     However, the Court did not reach the question of whether HTA's lack of

possession of the Act 30-31 Revenues means that it lacked any interest in the Act 30-31

Revenues.  The Court also did not address the Commonwealth's justification for diverting the

revenues away from HTA or whether such justification is permissible based on the framework of

the Act 30-31 Revenues under applicable Puerto Rico law and the Puerto Rico Constitution.[10]

41.     In reaching its decision, the Court concluded only that the "specific resolutions

govern[ing] the relationship between HTA *and the Bondholders*" and the excise tax statutes'

"commitments to transfer certain of the Revenues to HTA *for the benefit of the Bondholders*,"

do not purport to grant *bondholders* property rights in the Excise Tax Revenues, and therefore

"[n]either the Bond Resolutions nor the Excise Tax Statutes promise *the Bondholders* that the

Commonwealth will pay them." *Id*. at 634 (emphasis added); *see also id*. at 635 (noting that

section 2015 of title 9 expressly provides that the Commonwealth is not liable for HTA's bond

obligations).

---

[9] In the Gating Issues Decision, this Court also held that Commonwealth excise tax revenue statutes—which require that certain excise tax revenues received by the Commonwealth "shall be covered into a special deposit in the name and for the benefit of [HTA]"to pay debt service on the HTA bonds—did not create statutory liens against those revenues for the benefit of HTA or its bondholders.  *See In re Fin. Oversight and Mgmt. Bd. for P.R.*, 618 B.R. 619, 634-35 (D.P.R. 2020).  Although the First Circuit affirmed the Gating Issues Decision, the First Circuit's ruling was silent on this issue.  *See Assured Guaranty Corporation v. Fin. Oversight & Mgmt. Bd. for Puerto Rico (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, 989 F.3d 170 (1st Cir. 2021).  The DRA Parties respectfully disagree with the Gating Issues Decision in this regard and reserve the right to address this issue in further briefing before this Court or in any appeal.

[10] The Monolines' Appeal Opinion (as defined below) did not address these questions either or the validity and extent of the DRA's security interest in the Act 30-31 Revenues.  *See Assured Guar. Corp.,* 989 F.3d 170.

42.     On September 9, 2020, the Court issued a memorandum opinion and order denying the Monolines' Amended Lift Stay Motion as supplemented.  *See Memorandum Opinion and Order Denying HTA and PRIFA Revenue Bond Stay Relief Motions*, Dkt. No. 14186) (the "Final Lift Stay Decision," and jointly with the Gating Issues Decision, the "Monolines' Lift Stay Denial").  The Monolines appealed these orders to the First Circuit Court of Appeals on September 23, 2020. *See* Dkt. No. 14389.  On March 3, 2021, the First Circuit issued a decision affirming the Monolines' Lift Stay Denial (the "Monolines Appeal Opinion"). *See Assured Guar. Corp.*, 989 F.3d 170.

43.     The Court's decision on the Gating Issues triggered the briefing schedule on the DRA Original Lift Stay Motion.  On July 31, 2020, the Court entered an order approving a stipulation among the DRA Parties, the FOMB and AAFAF which adjourned the deadlines on the DRA Original Lift Stay Motion briefing and permitted the DRA Parties to amend their motion to reflect new developments that have occurred between June 2019 and the filing of this Motion.  *See* Dkt. No. 14417.  This Motion hereby amends the DRA Original Lift Stay Motion.

**VI.     The Second Amended Plan**

44.     On February 22, 2021, the FOMB and certain other Commonwealth economic stakeholders (along with other parties) executed a *Plan Support Agreement* (the "PSA"). *See* Dkt. No. 15977-2.

45.     As a result thereof, on March 8, 2021, the FOMB filed the Second Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, Et Al. [Dkt. No. 15976] (the "Second Amended Plan") and the Disclosure Statement for the Second Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, Et Al. [Dkt. 15977] (the "Second Amended Disclosure Statement").

46.     The Second Amended Disclosure Statement states that the Commonwealth will retain the Act 30-31 Revenues to fund payment of the Commonwealth's creditors in the Second Amended Plan.  *See* Dkt. No. 15977 at 59-60, 264-266, 433, and 436.  Further, the Second Amended Plan confirms that it will not make the Act 30-31 Revenues available to HTA for repayment of the DRA's HTA debt. *See* Dkt. No. 15976 at ¶¶ 83.1(h), 86.3, and **Exhibit K**.

## **RELIEF REQUESTED**

47.     The DRA Parties seek an order of this Court, substantially in the form attached hereto as **Exhibit N**, granting the DRA adequate protection of its interest in the Act 30-31 Revenues in accordance with Section 361 of the Bankruptcy Code or granting the DRA relief from the automatic stay under Section 362(d)(1) and/or Section 362(d)(2) of the Bankruptcy Code so that the DRA Parties may initiate, continue and conclude any foreclosure proceedings over the DRA's collateral and exercise any applicable contractual and legal remedies under applicable law as a result of the Commonwealth and HTA's failure to provide the DRA with adequate protection of its interest in its collateral.

## **ARGUMENT**

48.     The DRA has a valid, perfected lien on HTA's interest in the Act 30-31 Revenues, which lien continues to attach post-petition.  HTA's interest in the Act 30-31 Revenues cannot be eliminated by the Commonwealth's improper and unconstitutional clawback of the revenues.  As such, the Commonwealth's purported clawback of the Act 30-31 Revenues for its own purposes has deprived (and is continuing to deprive) the DRA of the value of its collateral.

**I.     The DRA Has a Valid, Perfected Security Interest in the Act 30-31 Revenues.**

49.     Pursuant to the Security Agreement, HTA "absolutely, irrevocably, and unconditionally assigns, conveys and transfers without recourse, to [GDB all of its] rights, title,

obligations and interest in [the Act 30-31 Revenues]." **Exhibit E** § 1.1.  HTA further pledged

these revenues to GDB "security for the prompt and complete payment and performance when

due of all of its Obligations … a continuing security interest … in all of the right, title and

interest of [HTA] in the [Act 30-31 Revenues], whether presently held or hereafter acquired and

wherever located." *See id*. § 1.2 (emphasis added).  This pledge secures ***any*** indebtedness that

HTA owes to GDB.  *See supra* ¶ 9-12.  GDB's lien was perfected through the filing of a UCC

financing statement at the Puerto Rico Department of State.  *See supra* ¶ 10.  As successor to

GDB, the DRA now holds a perfected security interest in HTA's interest in the Act 30-31

Revenues.

50.     It is clear that HTA possesses a property interest in the Act 30-31 Revenues.

Commonwealth law requires that the secured revenues be transferred and conveyed to HTA

***unless*** a valid "clawback" has been properly enforced under Article VI, Section 8 of the Puerto

Rico Constitution.  *See supra* ¶¶ 18-28.  Until the FOMB can demonstrate that the required

conditions for "clawback" have been satisfied – which they have failed to do -- HTA's property

interest in the Act 30-31 Revenues remains, and the DRA's security interest continues to attach

to HTA's interest in such revenues pursuant to Article VI, Section 9 of the Puerto Rico

Constitution.  *See* P.R. Const. art. VI, § 9 ("***[p]ublic property and funds shall only be disposed***

***of . . . pursuant to law***.") (emphasis added).  Accordingly, the Commonwealth's and HTA's

actions in diverting these revenues expressly violate Acts 30 and 31, the Puerto Rico

Constitution, and other Puerto Rico statutes.

51.     Unlike the Monolines – who alleged that their security interests were granted

through the language in HTA's bond resolutions – the DRA is party to a separate Security

Agreement that grants it a valid, perfected security interest in the Act 30-31 Revenues "***whether***

*presently held or hereafter acquired and wherever located*", **Exhibit E** § 1.2 (emphasis added),

and the post-petition stream of future revenues stemming therefrom, s*ee supra* ¶¶ 9-12; *infra* ¶¶

56-62.  The Monolines simply lack this type of security interest in the Act 30-31 Revenues.

52.     During oral argument before the First Circuit on the Monolines' Amended Lift

Stay Motion appeal, Judge Lipez stated that if the bond resolutions contained a pledge of excise

tax revenues without qualification of where such funds were located (akin to the provisions in

the DRA's Security Agreement), the Monolines "would be in a much stronger position to argue

that the pledged revenues were not contingent on what HTA or the Commonwealth happened to

deposit into the sinking fund."[11]  *See* Tr. at 47:2-47:9 (1st Cir. Feb. 4, 2021).

### A.      The DRA's Prepetition Liens Extend Post-Petition.

53.     Section 552(a) of the Bankruptcy Code establishes a general rule that a debtor's

after-acquired property is not subject to a secured creditor's prepetition lien.  However, Section

928(a) of PROMESA carves out an exception to this rule.  Specifically, it states that,

"[n]otwithstanding section 552(a) of this title and subject to subsection (b) of this section, special

revenues acquired by the debtor after the commencement of the case shall remain subject to any

lien resulting from any security agreement entered into by the debtor <u>before</u> the commencement

of the case."

54.     Section 902 of the Bankruptcy Code defines "special revenues" as:

(a)      receipts derived from the ownership, operation, or disposition of projects
         or systems of the debtor that are primarily used or intended to be used
         primarily to provide transportation, utility, or other services, including the
         proceeds of borrowings to finance the projects or systems;

(b)      special excise taxes imposed on particular activities or transactions;

---

[11] Moreover, neither the Gating Issues Decision nor the Monolines' Appeal Opinion alter this fact. As discussed above, *supra* ¶¶ 42-45, the Gating Issues Decision does not have any application to the DRA's liens. Likewise, the Monolines' Appeal Opinion does not modify this outcome. *See Assured Guaranty Corp.*, 989 F.3d 170.

(c) incremental tax receipts from the benefited area in the case of tax-increment financing;

(d) other revenues or receipts derived from particular functions of the debtor, whether or not the debtor has other functions; or

(e) taxes specifically levied to finance one or more projects or systems, excluding receipts from general property, sales, or income taxes (other than tax-increment financing) levied to finance the general purposes of the debtor.

11 U.S.C. § 902(2).[12]

55. The DRA's collateral—which consists of pledged motor vehicle license fees, taxes on gasoline, diesel, crude oil, cigarettes, and other special excise taxes—are special excise taxes imposed on particular activities or transactions and therefore constitute "special revenues" within the meaning of Section 902(2)(B) of the Bankruptcy Code. *See, e.g.*, 13 L.P.R.A. §§ 31626(a)(1) (gasoline tax), 31626(a)(3) (gas oil and diesel oil tax), 31627(a) (petroleum products tax), 31627a(a) (non-diesel petroleum products tax), 31625 (cigarette tax). Additionally, the Act 30-31 Revenues are likewise "special revenues" within the meaning of Section 902(2)(E) because they were specifically created to increase HTA's solvency and capacity to pay certain of its debts. *See* **Exhibit K**, Statement of Motives of Act No. 30-2013, at 2; **Exhibit L**, Statement of Motives of Act No. 31-2013, at 2.

56. The leading bankruptcy treatise, Collier on Bankruptcy, has identified "special revenues" to consist of revenue streams created and pledged for the benefit of particular creditors, as opposed to those generally available to all creditors of a borrower. *See* 6 Collier on Bankruptcy ¶¶ 902.03[2] and 902.03[5] (16th 2019) (citing S. Rep. No. 100-506, 100th Cong., 2d Sess. 21 (1988) (noting, as an example of special revenues, "taxes specifically identified and

---

[12] Section 301 of PROMESA incorporates each of section 902, 928 and 552 of the Bankruptcy Code into PROMESA.

pledged in . . . bond financing documents and [that] are not 'generally' available to all
creditors")).

57.     Here, Sections 1.1 and 1.2 of the Security Agreement exclusively pledged the Act
30-31 Revenues to GDB and later, by assignment, to the DRA.  *See* **Exhibit E** §§ 1.1-1.2. This is
consistent with the Statements of Motives of Acts 30 and 31, which provide that these statutes
were specifically enacted for the purpose of paying down HTA's debt to GDB (now the DRA).
*See* **Exhibit K**, at 2; **Exhibit L**, at 2.

58.     Therefore, pursuant to the plain language of Section 928(a), the DRA's lien
"remain[s] in place after the filing of the petition, despite the fact that Section 552(a) generally
protects property acquired after the petition from being subject to prepetition liens." *Assured
Guar. Corp. v. Carrion (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, 919 F.3d 121, 128 (1st Cir.
2019).[13]

59.     Accordingly, the DRA possesses a valid lien over the post-petition Act 30-31
Revenues.  *See* 11 U.S.C. §§ 361, 362(d)(1).

> **B.**     **No Valid "Clawback" Has Occurred Pursuant to Article VI, Section 8
> of the Puerto Rico Constitution.**

60.     Under the Security Agreement, the DRA's security interest can only contravened
consistent with applicable law, including requiring that the Act 30-31 Revenues may only be
transferred away from HTA *if* the conditions for a valid "clawback" have been met pursuant to
Article VI, Section 8 of the Puerto Rico Constitution, and *only to be used* for the payment of
principal of and interest on the GO bonds and other obligations of HTA.  *See* 9 L.P.R.A.
§§ 2021, 5681; 13 L.P.R.A. §§ 31751(a)(1)(C), 31751(a)(3)(C).  Pursuant to Article VI, Section

---

[13] Additionally, the fact that the Act 30-31 Revenues may have been imposed by the Commonwealth for the benefit
of HTA does not preclude them from qualifying as special revenues under Section 902(2) of the Code. *See In re
Heffernan Mem'l Hosp. Dist.*, 202 B.R. 147 (Bankr. S.D. Cal. 1996).

9 of the Constitution, absent these limited extraordinary circumstances, the Commonwealth

cannot divert the Act 30-31 Revenues for purposes other than those outlined in Acts 30 and 31.

61.     The Clawback Executive Orders and the Moratorium Laws do not activate the

"clawback" provisions of Article VI, Section 8 of the Constitution for the reasons discussed

further below, *infra* ¶¶ 96-108.  To date, the FOMB has not demonstrated before this Court (or

any other forum) that a valid "clawback" occurred.

62.     Simply put, the Commonwealth and the FOMB cannot meet the required statutory

and constitutional predicates necessary to divert the Act 30-31 Revenues.

### C.     PROMESA Does Not Alter Acts 30 and 31 and the FOMB Cannot Modify These Statutes.

63.     The FOMB will likely argue that the DRA's security interest is preempted under

the theory that Act 30-31 Revenues constitute budgetary appropriations and that Acts 30 and 31

are invalidated through the certified fiscal plans and budgets.  *See, e.g.*, Dkt. No. 10613 ¶¶ 4-12,

65; Dkt. No. 12496 ¶¶ 8-15; Dkt. No. 13157 ¶¶ 18-23.  These arguments are legally incorrect and

thus unavailing.  The Act 30-31 Revenues are ***not*** appropriations and Acts 30 and 31 continue to

remain in force, thereby leaving the DRA's security interest in such revenues intact.

### i.     The Act 30-31 Revenues Are Not Appropriations.

64.     Appropriations are legislative authorizations to withdraw funds from the state

treasury and spend those funds for a specified public object or purpose to which such sum is

applied.  *See* 63C Am. Jur. 2d *Public Funds* § 34 (2020).

65.     The concept of "appropriations" has been adopted in several other states.[14]  Funds

or revenues that are not deposited into the General Fund are not subject to the appropriations

---

[14] *See Haynes v. District Court*, 78 P.2d 937 (Mont. 1938) (defining "appropriation" as an authority from the law-making body in legal form to apply sums of money out of that which may be in the treasury ***in a given year*** to specified objects or demands against the state) (emphasis added); *People ex rel. Einsfeld v. Murray*, 44 N.E. 146

process, and a state lacks legal or equitable right to funds that have been designated by the

Legislature for other purposes (as the Puerto Rico Legislature did through Acts 30 and Act

31).  *See Mazzone v. Attorney General*, 736 N.E.2d 358 (Mass. 2000); *Button's Est. v. Anderson*,

28 A.2d 404 (Vt. 1942); 63C Am. Jur. 2d *Public Funds* § 4 (citing *State Highway Comm'n*

*v. Spainhower*, 504 S.W.2d 121 (Mo. 1973)); *Nowak v. Wereszynski*, 250 N.Y.S.2d 981, 982

(N.Y. App. Div. 1964); *Am. Fed'n of Gov't Emps., AFL-CIO, Local 1647 v. Fed. Lab. Rels.*

*Auth.*, 388 F.3d 405, 412 (3d Cir. 2004).  Moreover, statutes allocating specific revenues for

special purposes make those funds legally unavailable for other expenditures and not subject to

the legislature's annual appropriations process.  *See Graham v. Illinois State Toll Highway Auth.*,

182 Ill.2d 287, 302 (1998); *Antle v. Tuchbreiter*, 111 N.E.2d 836, 840 (Ill. 1953).  These

allocations, made by virtue of general legislation, strip subsequent legislatures of their

prerogatives over the allocated funds, unless the legislation is amended.  *See Graham*, 182 Ill. 2d

at 302-03.

66.     Further, the federal budgeting scheme defines appropriations as "a statute, under

the jurisdiction of the House and Senate Committees on Appropriations, that generally provides

legal authority for . . . agencies to incur obligations and to make payments out of the Treasury for

specified purposes."  *Glossary of Terms Used in the Federal Budget Process*, GAO-05-734SP,

page 13 (Washington, D.C. Sept. 2005).

67.     Although the Puerto Rico Constitution does not define "appropriations," it

provides guidance on how they work for budgetary purposes.  Specifically, Article VI, Section 7

requires that "appropriations made for any fiscal year shall not exceed the total calculated

resources . . . estimated for said fiscal year . . . ."  P.R. Const. art. VI, § 7.  Article VI, Section 6

---

(N.Y. 1896) (stating that only the funds available in the state treasury and within the control of the legislature for the
purposes of ***annual budgeting*** may be subject to appropriation) (emphasis added).

provides that, "[i]f at the end of any fiscal year the appropriations necessary for the ordinary operating expenses of the government and for the payment of interest on an amortization of the public debt for the ensuing fiscal year shall not have been made, the several sums appropriated in the last appropriation acts . . . shall continue in effect item by item . . . until corresponding appropriations are made." P.R. Const. art. VI, § 6.

68.     These provisions outline the basic framework for how appropriations work in the Commonwealth budget. *First*, appropriations shall be made on a fiscal year by fiscal year basis to establish a balanced budget. *Second*, if an appropriation is not made for a fiscal year, the appropriations of the prior fiscal year shall be binding until the Governor authorizes the payment of the new corresponding appropriations.

69.     Acts 30 and 31 do not fall within the framework of appropriations because, by the statutes' own terms, (i) the Commonwealth has the obligation to cover the Act 30-31 Revenues into a special deposit for HTA's benefit; (ii) the Commonwealth does not obtain budgetary rights over these revenues because they were transferred pursuant to Act 30 and Act 31 and the Commonwealth does not have the authority to divert them to the General Fund; and (iii) Acts 30 and 31 do not require that their revenues be subject to the fiscal year-by-fiscal year allocation process in the Commonwealth's budget.

70.     When the Puerto Rico Legislature decides to provide funding through budgetary appropriations, it does so clearly and unambiguously in the language of the statute. *See, e.g.*, P.R. Laws Ann. tit. 5, § 1567 ("The sum of five million five hundred two thousand dollars . . . is hereby appropriated from unencumbered funds in the Commonwealth Treasury to the Department of Agriculture for the following purposes . . . ."); P.R. Laws Ann. tit. 7, § 607b ("The Commonwealth of Puerto Rico shall honor, through budget appropriations made by the

Legislature in the operating budgets for each fiscal year for the next thirty (30) years . . . the payments . . . allowed in § 607 . . . .").  By contrast, Acts 30 and 31 do not contain any such budgetary appropriation language.

71.     The Legislature's intent with respect to Acts 30 and 31 is clear: the Act 30-31 Revenues are not discretionary Commonwealth appropriations.  Rather, these funds were assigned by the Puerto Rico Legislature to HTA, and they *must* be transferred and conveyed to HTA as required by statute *unless* a valid "clawback" is enforced under Article VI, Section 8 of the Constitution.  *See supra* ¶¶ 18-28.  Absent a valid "clawback," the Act 30-31 Revenues must continue to be transferred to HTA in compliance with Acts 30 and 31 and with Article VI, Section 9 of the Puerto Rico Constitution.

72.     This limited constitutional exception proves the rule.  It confirms that the Commonwealth does not have free reign over the Act 30-31 Revenues and that, instead, it must remit these funds to HTA.  If these revenues had been discretionary Commonwealth appropriations, the constitutional "clawback" provision would be superfluous because the Commonwealth would already be free to use the revenues as it saw fit—and "[c]ourts generally ought not to interpret statutes in a way that renders … phrases … superfluous." *City of Providence v. Barr*, 954 F.3d 23, 37 (1st Cir. 2020).

**ii.     The FOMB Cannot Repeal Acts 30 and 31**.

73.     The FOMB's certified fiscal plans and certified budgets cannot be used to effectively "repeal" Acts 30 and 31.  The Puerto Rico Civil Code provides that "[l]aws shall only be repealed by means of *subsequent laws* . . . ."  P.R. Laws Ann. tit. 31, § 5 (1930) (emphasis added). The power to modify existing legislation belongs to the Puerto Rican legislative assembly only.  Thus, the FOMB cannot repeal Acts 30 and 31 through certified fiscal plans and certified budgets because the FOMB does not possess the authority to enact legislation. *See In re*

*Fin. Oversight & Mgmt. Bd. for P.R.*, 330 F. Supp. 3d 685, 701–02 (D.P.R. 2018), *aff'd and*

*remanded*, 945 F.3d 3 (1st Cir. 2019) ("[T]he Oversight Board has not been given power to

affirmatively legislate. Thus. . . measures that . . . require the adoption of new legislation ***or the***

***repeal or modification of existing Commonwealth law***, the Oversight Board has only budgetary

tools and negotiations to use to elicit any necessary buy-in from the elected officials and

legislators.") (emphasis added and citations omitted). This conclusion is further supported by the

fact that PROMESA requires that the FOMB "respect the relative lawful priorities or lawful

liens, as may be applicable, in the constitution, other laws, or agreements of a covered territory

or covered territorial instrumentality . . . " in preparing and certifying fiscal plans and in the

budget approval process. *See* 48 U.S.C. §§ 2141(b)(1)(N), 2142(c)(1) (2016).

74.     Just as there are no circumstances (at least none that have been explained by the

FOMB) to justify an application of the "clawback," the DRA's security interest in the Act 30-31

Revenues cannot be undermined under an appropriations theory or a challenge to Acts 30 and 31

through certified fiscal plans and certified budgets. Accordingly, these arguments do not in any

way diminish the DRA's colorable claim to the Act 30-31 Revenues.

> ### iii.     PROMESA Does Not Alter or Preempt Acts 30 and 31 and Its Text Demonstrates a Contrary Intent to Preserve Territorial Law.

75.     The FOMB will also argue that the DRA does not have an interest in Act 30-31

Revenues because Acts 30 and 31 have been preempted by PROMESA. *See, e.g.*, Dkt. No.

10613 ¶¶ 4-12, 65, 83-88; Dkt. No. 12496 ¶¶ 8-15; Dkt. No. 13157 ¶¶ 6, 17, 21, 41. This

argument also fails.

76.     In the absence of an express statutory preemption provision, there are two

different ways in which a federal statute can preempt territorial law: field preemption and

conflict preemption.

77.      "Field preemption occurs when a federal regulatory scheme is so pervasive as to warrant an inference that Congress did not intend the states to supplement it." *Grant's Dairy-Maine, LLC v. Comm'r of Me. Dep't of Agric., Food & Rural Res.*, 232 F.3d 8, 15 (1st Cir. 2000).  It only applies where there is a clear "congressional decision to foreclose any state regulation in the area." *Arizona v. United States*, 567 U.S. 387, 401 (2012).

78.      "Conflict preemption takes place either when compliance with both state and federal regulations is impossible or when state law interposes an obstacle to the achievement of Congress['] discernible objectives." *Id*.  This form of preemption applies in the absence of express preemption where state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Franklin Cal. Tax-Free Tr. v. Puerto Rico*, 805 F.3d 322, 343 (1st Cir. 2015) (internal citation omitted).  In other words, there has to be a state or territorial law that specifically conflicts with Congress' intent.

79.      PROMESA does not preempt local law.  Rather, Congress intended PROMESA to supplement—not supplant—territorial law and to displace territorial law *only* when it directly conflicts with PROMESA.  *See* 48 U.S.C. § 2103 (2016) ("The provisions of this Act shall prevail over any general or specific provisions of territory law, State law, or regulation that is *inconsistent* with this Act.") (emphasis added).  Accordingly, the statute does not "reflect[] a congressional decision to foreclose *any* state regulation in the area," *Arizona*, 567 U.S. at 401 (emphasis added), or "warrant an inference that Congress did not intend the states to supplement" the statutory scheme, *Grant's Dairy*, 232 F.3d at 15.

80.      The Fifth Amendment to the U.S. Constitution provides, in relevant part, that "private property [shall not] be taken for public use, without just compensation."  U.S. Const. amend. V, cl. 4.  The Puerto Rico Constitution similarly provides that "[p]rivate property shall

not be taken or damaged for public use except upon payment of just compensation and in the

manner provided by law."  P.R. Const. art. II, § 9.  A taking requiring just compensation occurs

when the government "takes possession of an interest in property for some public purpose . . ."

*Tahoe-Sierra Pres. Couns. v. Tahoe Regency Planning Agency*, 535 U.S. 302, 322

(2002).  Bankruptcy law has always been read to protect secured property interests from being

taken "without compensation."  *United States v. Sec. Indus. Bank*, 459 U.S. 70, 75 (1982).

81.     The DRA's liens and priority designations are property protected by the U.S. and

Puerto Rico Constitutions.  *See Armstrong v. United States*, 364 U.S. 40, 48 (1960) (liens

"constitute compensable property" and cannot be destroyed without just compensation).  If

PROMESA were interpreted to destroy those preexisting liens and erase the DRA's priority

designations, it would effectively "take[] possession" of the liens and confiscate the DRA's

essential secured property rights.  *Tahoe-Sierra Pres. Couns.*, 535 U.S. at 322.  Under the Fifth

Amendment of the U.S. Constitution, this would trigger a "categorical duty to compensate" the

party deprived of its property.  *Id*.

82.     Absent a clear statement to the contrary by Congress (of which there is none), the

Court should not read PROMESA to preempt Acts 30 and 31, destroy preexisting liens and erase

creditor priority designations.  *See United States v. Sec. Indus. Bank*, 459 U.S. at 79-82; *Holt v.
Henley*, 232 U.S. 637, 639 (1914).  As discussed further below, *infra* ¶¶ 87-93, the text of

PROMESA makes clear that it does **not** disturb Commonwealth law relating to priority

designations or destroy Commonwealth law liens, and Congress made explicit its objective of

respecting and preserving these Commonwealth law rights.

83.     *First*, Sections 201 and 202 of PROMESA (which establish the process for

approval of fiscal plans and certified budgets), 48 U.S.C. §§ 2141, 2142 (2016), say nothing

about displacing Commonwealth law regarding debt payment priorities during a Title III case or as part of a plan of adjustment. To the contrary, Section 201(b)(1)(N) of PROMESA expressly requires that any fiscal plan shall "***respect the relative lawful priorities or lawful liens, as may be applicable, in the constitution, other laws, or agreements of a covered territory or covered territorial instrumentality in effect prior to June 30, 2016.***" 48 U.S.C. § 2141(b)(1)(N) (2016) (emphasis added).

84.     Moreover, Section 202 does not provide anything about the substance of the budget or payment of funds, what kind of budget can be proposed, how properly appropriated funds should be distributed, or what law applies to any of those issues. *See* 48 U.S.C. § 2142(c)(1) (2016). Thus, given the clear congressional directive to preserve territorial liens and priorities, neither the fiscal plans nor the certified budgets can preempt Puerto Rico law. To the contrary, fiscal plans and budgets must comply with Puerto Rico law, which is consistent with Congress' intent to complement—not eliminate—Commonwealth law.

85.     *Second*, Section 204(c)(3)(B) of PROMESA authorizes the FOMB to "review, and in its sole discretion, rescind, any law that—(i) was enacted during the period between . . . May 4, 2016 . . . and the date of appointment of all members and the Chair of the Oversight Board; and (ii) alters pre-existing priorities of creditors in a manner outside the ordinary course of business or inconsistent with the territory's constitution or the laws of the territory as of . . . May 4, 2016 . . . ***but such rescission shall only be to the extent that the law alters such priorities***." 48 U.S.C. § 2144(c)(3)(B) (2016) (emphasis added). In other words, Congress provided the FOMB with limited authority to rescind statutes under Section 204(c)(3)(B) of PROMESA. Otherwise, PROMESA was meant to preserve the legal *status quo* so that the FOMB could not alter creditor rights and priorities under its pre-existing laws. This provision

also demonstrates a clear intent to preserve priority designations that existed in territorial law at the time of the statute's enactment, by limiting the FOMB's powers to preempt existing laws regarding priority to a specific and brief period.  Such intent is wholly inconsistent with the theory that Congress intended PROMESA to displace territorial priority designation wholesale.

86.     *Third*, Section 314(b)(6) of PROMESA provides that, for purposes of confirmation of a Title III plan of adjustment, the plan must be "feasible and in the best interests of creditors, which shall require the court to consider whether available remedies under the non-bankruptcy laws and constitution of the territory would result in a greater recovery for the creditors than is provided by such plan . . . ."  48 U.S.C. § 2174(b)(6) (2016).  In addition, Section 314(b)(3) of PROMESA requires that the debtor not be "prohibited by law from taking any action necessary to carry out the plan . . . ."  48 U.S.C. § 2174(b)(3) (2016).  Once again, these provisions denote Congress' intent to preserve creditors' rights, interests, and remedies under Puerto Rico law, and not displace them through PROMESA.

87.     *Fourth*, although Section 301 of PROMESA incorporates numerous provisions of the Bankruptcy Code, *see* 48 U.S.C. § 2161 (2016) (providing that a list of provisions of the Bankruptcy Code apply in any case under PROMESA), it does not incorporate the bulk of the Bankruptcy Code's waterfall priority provision set forth in Section 507.  PROMESA Section 301 only incorporates Section 507(a)(2), which provides priority for administrative expense claims. Congress' decision not to incorporate Section 507 of the Bankruptcy Code provides further indication that it did not intend for PROMESA to occupy the field and displace existing territorial law on creditor priority; rather, Congress intended to cede this to existing Commonwealth law.  The exclusion of Section 507, the creation of a unique best interest test for Title III (differing from the Bankruptcy Code's best interests test), along with the other

provisions of Section 314 of PROMESA, elucidate Congress' intent to incorporate the
Commonwealth's priority scheme into PROMESA.  These sections of PROMESA reflect that
there is no direct conflict between PROMESA and existing creditor priority schemes under
Commonwealth law.

88.     *Finally*, where Congress intended territorial law not to apply in the PROMESA
context, it said so expressly.  For example, Section 103(c) provides that "[t]he Executive
Director and staff of the Oversight Board may be appointed and paid without regard to any
provision of the laws of the covered territory or the Federal Government governing appointments
and salaries.  ***Any provision of the laws of the covered territory governing procurement shall
not apply to the Oversight Board***."  48 U.S.C. § 2123 (2016) (emphasis added).

89.     For all these reasons, PROMESA's text evinces Congress' intent to harmonize the
statute with existing territorial law, and not displace existing creditor priority designations or
security or property interests in the absence of a clear conflict.  Thus, Acts 30 and 31 remain in
effect, and the FOMB cannot rely on the theory of preemption to eviscerate the DRA's property
interests in and colorable claim to the Act 30-31 Revenues.

## II.     The DRA is Entitled to Adequate Protection of Its Interest in the Act 30-31 Revenues

90.     As a secured creditor, the DRA is entitled to adequate protection of its interest in
the Act 30-31 Revenues beginning on June 25, 2019, the date that it first requested adequate
protection by filing the DRA Original Lift Stay Motion.  *See* Dkt. No. 7643.

91.     "An entity is entitled to adequate protection as a matter of right…when [it] is
stayed from enforcing its interest [in its collateral or property]."  3 Collier on Bankruptcy ¶
361.02 (16th ed. 2019).  The Bankruptcy Code provides for adequate protection "as a matter of

policy" and "as a matter of constitutional law."  *Id.*; *In re Townley*, 256 B.R. 697, 700 (Bankr. D.N.J. 2000).

92.     While the Bankruptcy Code does not define adequate protection, Section 361 of the Bankruptcy Code (also incorporated into Title III at Section 301 of PROMESA) provides three non-exclusive examples: (1) periodic cash payments; (2) additional or replacement liens; and (3) the granting of such other relief which will result in the realization of the "indubitable equivalent" of the entity's interest in the property under consideration.  11 U.S.C. § 361.

93.     "The concept of adequate protection is derived from the fifth amendment protection of property interests as enunciated by the Supreme Court."  *LNC Invs., Inc. v. First Fid. Bank*, 247 B.R. 38, 44 (S.D.N.Y. 2000) (citation omitted).  "The focus of the adequate protection requirement is to protect a secured creditor from diminution in the value of its interest in its particular collateral during the period of use by the debtor."  *Brigade Leveraged Cap. Structures Fund Ltd. v. Garcia-Padilla*, 217 F. Supp. 3d 508, 532 (D.P.R. 2016); *Peaje Invs. LLC v. Garcia-Padilla*, No. 16-2365 (FAB), 2016 U.S. Dist. LEXIS 153711, at *20 (D.P.R. Nov. 2, 2016).  The debtor must provide adequate protection "to insure that the creditor receives the value for which [it] bargained prebankruptcy."  *Id.*, at *20.  "[A]dequate protection in the context of relief from the automatic stay is a flexible concept which requires a Court to make decisions on a case-by-case basis, after full consideration of the peculiar characteristics common to each proceeding."  *Brigade*, 217 F. Supp. 3d at 532 (internal quotation marks omitted).

94.     As the Supreme Court has explained, adequate protection safeguards "the right of a secured creditor to have the security applied in payment of the debt."  *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs.*, *Ltd.*, 484 U.S. 365, 370 (1988).  It is well-settled that "adequate protection" is required "to the extent [that a] debtor's use of the property results in a

decrease of value of such entity's interest in such property."[15] *In re Nat'l Promoters & Servs., Inc.*, 499 B.R. 192, 208 (Bankr. D.P.R. 2013).

95.     In *In re Builders Grp. & Dev. Corp.*, 502 B.R. 95, 122 (Bankr. D.P.R. 2013), a bankruptcy court in this district held that a debtor's diversion of the property encumbered by a secured creditor's lien to a party other than the secured creditor is "clearly a diminution of the secured party's interest in [such property], and [a]ny such decrease attributable to the [d]ebtor's usage, therefore, must be protected by cash payments from another source, an additional or replacement lien, or other such indubitable equivalent." *Id.* (emphasis added, citing *In re Smithville Crossing, LLC*, No. 11-02573-8-JRL, 2011 Bankr. LEXIS 4605, at *29 (Bankr. E.D.N.C. Sept. 28, 2011)).

96.     The DRA has established that it has an interest in the Act 30-31 Revenues.  That interest is currently not adequately protected due to the past and continuing unauthorized use of the revenues by the Commonwealth.  The Debtors clearly have not provided the DRA with cash payments or additional or replacement liens.  Moreover, as demonstrated below, the Debtors have failed to offer the indubitable equivalent of the dissipated collateral.

97.     *First*, the 2020 HTA Fiscal Plan specifically provides that the Commonwealth will continue to withhold the Act 30-31 Revenues from HTA as an "appropriation" and attempts to substitute these funds with a $222 million "variable transfer" from the Commonwealth to HTA.  This action leaves Acts 30 and 31 without effect and withholds the Act 30-31 Revenues from HTA and the DRA.  *See* **Exhibit I** at 82.

98.     Even if this Court were to treat the $222 million variable transfer as a form of protection, the variable transfer is insufficient to qualify as adequate protection under Section

---

[15] The DRA Parties will provide detail on the exact amount of diminution of its interest upon completion of discovery and expect to present appropriate evidence to support this argument.

361 because (i) it is not a direct cash payment to DRA to offset the diminution of its collateral; (ii) the amount of the transfer is insufficient to cover even 50% of the total Act 30-31 Revenues generated during fiscal years 2018 to 2020 (whose revenues fluctuated between $558 and $641 million per year), which would leave a shortfall of approximately $336 and $419 million per year (see **Exhibit M**), (iii) the monies used to fund this variable transfer appear to be nothing more than the Act 30-31 Revenues that already constitute the DRA's collateral – but only a portion of those funds.  This variable transfer does not constitute adequate protection of any sort.

99.      *Second*, based on the current practice of clawing back all of the Act 30-31 Revenues, there is no "equity cushion" in future Act 30-31 Revenues that can be used to protect the DRA's interest in its collateral.  As discussed, the 2020 HTA Fiscal Plan specifically contemplates that the Commonwealth will continue to withhold the Act 30-31 Revenues from HTA and, ultimately, from the HTA creditors themselves. *See* **Exhibit I** at 82; Second Amended Disclosure Statement, Dkt. 15977 at 59-60, 264-266, 433, and 436; Second Amended Plan, Dkt. No. 15976 at ¶¶ 83.1(h), 86.3, and **Exhibit K**.  Because the Act 30-31 Revenues will never be available to repay the DRA's HTA credits under the Second Amended Plan, the future Act 30-31 Revenue streams do not provide the DRA with an "equity cushion" for adequate protection purposes.

100.     The facts here are distinguishable from those in *Peaje Invs. LLC v. García-Padilla*, 845 F.3d 505, 512 (1st Cir. 2017).  In *Peaje*, the district court denied certain motions requesting the lifting of the automatic stay created by virtue of Section 405 of PROMESA, 48 U.S.C. § 2194 (2016).  In reviewing the District Court's decision, the First Circuit stated that the District Court "relied on the existence of an equity cushion… [on] future toll revenues and employer contributions, which it concluded would eventually flow to the fiscal agents in

sufficient quantity to repay the bonds, to support its finding of adequate protection." *See Peaje,* 845 F.3d at 512.  In this case, the Commonwealth does not project making any of the excise tax revenues available for payment to HTA or the DRA.  Thus, the future streams of the Act 30-31 Revenues do not constitute an "equity cushion" and cannot be deemed as adequate protection in this case.  *See* **Exhibit I** at 82; Dkt. 15977 at 59-60, 264-266, 433, and 436; and Dkt. No. 15976 at ¶¶ 83.1(h), 86.3, and **Exhibit K**.

101.     *Third*, the Commonwealth's current cash holdings do not constitute adequate protection.  Although the First Circuit pointed to the Commonwealth's retention of significant cash as a reason to affirm this Court's denial of the Monolines' Amended Lift Stay Motion, these funds do not adequately protect the DRA because they have not been segregated or earmarked for its benefit.

102.     As shown above, the Commonwealth and HTA have diverted the value of the DRA's collateral (which, as noted above, extends post-petition), without exercising the only constitutionally permissible means to do so—the "clawback."  *See supra* ¶¶ 59 – 100.  This unauthorized depletion of the DRA's collateral necessitates the provision of appropriate and satisfactory adequate protection in compliance with the requirements of Section 361.[16]

**III.     If Adequate Protection Cannot be Provided, then the Stay Must be Lifted.**

103.     It is clear that the DRA is entitled to adequate protection of its interest in the Act 30-31 Revenues.  To the extent that this Court does not (or cannot) compel the Commonwealth

---

[16] To the extent the FOMB argues that the Commonwealth has not depleted value but rather is holding diverted funds for future distribution, this would only obviate the need for adequate protection today if the FOMB earmarks those funds for HTA or DRA.  This is not the case here. The 2020 HTA Fiscal Plan contemplates the continued diversion of the Act 30-31 Revenues away from HTA and, instead, substitutes it with a "variable transfer" appropriation from the Commonwealth to HTA, which transfer can be altered by the FOMB at its discretion.  *See* **Exhibit I** at 80-83.

to provide the DRA with adequate protection,  the failure to provide such adequate protection

constitutes "cause" for relief from the automatic stay under Section 362 of the Bankruptcy Code.

### A.    The DRA Satisfies the "Colorable Claim" Standard.

104.    Section 301(a) of PROMESA, 48 U.S.C. § 2161(a) (2019), incorporates the

protections afforded by the automatic stay under 11 U.S.C. § 362.  The automatic stay is a form

of injunctive relief which:

> provides for a broad stay of litigation, lien enforcement and other actions,
> judicial or otherwise that are attempts to enforce or collect prepetition
> claims. It also stays a wide range of actions that would affect or interfere
> with property of the estate, property of the debtor or property in the
> custody of the estate.

3 Collier on Bankruptcy ¶ 362.01 (16th ed. 2019); *see also Velasquez v. Hanes PR, Inc. (In re*

*Velasquez)*, No. 09-03057, 2010 Bankr. LEXIS 2448, at *4-5 (Bankr. D.P.R. July 2, 2010).

105.    While the automatic stay may be broad in scope, its protection is not unlimited:

> Section 362 . . . recognizes circumstances in which a party subject to the stay
> may be entitled to relief.  It provides grounds for seeking relief from the stay
> and, in conjunction with Bankruptcy Rule 4001, provides a procedure for
> seeking such relief.

Collier on Bankruptcy at ¶ 362.01.

106.    "Where, as here, a movant seeks relief from the automatic stay to pursue remedies

with respect to assets allegedly securing obligations, or for an award of adequate protection, . . .

the court must [first] determine 'whether the party seeking relief has ***a colorable claim*** to

property of the estate.'"  *In re Fin. Oversight & Mgmt. Bd. for P.R.*, 618 B.R. at 630 (emphasis

added) (quoting *Grella v. Salem Five Cent. Sav. Bank*, 42 F.3d 26, 33 (1st Cir. 1994)).

107.    This Court has previously noted that proving a colorable claim is "'a low

threshold'" and "'not a difficult standard to meet.'"  *In re Fin. Oversight & Mgmt. Bd. for P.R.*,

618 B.R. at 630 (quoting *Mission Prod. Holdings, Inc. v. Schleicher & Stebbins Hotels, L.L.C.*

*(In re Old Cold, LLC)*, 602 B.R. 798, 825 (1st Cir. BAP 2019)).  "In evaluating whether a
movant has demonstrated a colorable claim, however, the court considers not only the movant's
legal and factual contentions, but also defenses raised by the non-moving party, weighing all
relevant arguments in determining whether the movant has shown the requisite reasonable
likelihood of success." *Id.* (citing *Grella*, 42 F.3d at 34 ("[A] court may take into account any
matter that bears directly on the debtor's equity, or that clearly refutes a creditor's claim to the
property.")).[17]

108.   For the reasons set forth above in Argument I.A-C, the DRA Parties satisfy the
"colorable claim" standard.  *See supra*.  Namely, the DRA has a valid, perfected lien on the Act
30-31 Revenues, which lien is subject only to a limited clawback right, which has not been
satisfied here.  Moreover, the Commonwealth's attempts to preempt or otherwise circumvent the
DRA's lien are unconstitutional and ineffective to defeat the DRA's lien.  This easily satisfies
the "colorable claim" standard.

109.   Once the movant satisfies the "colorable claim" threshold standard, the court will
then assess whether the movant has demonstrated "cause" under Section 362(d) of the
Bankruptcy Code.  *See id.*, at *7 (*citing Gracia-Gracia v. Fin. Oversight & Mgmt. Bd. for P.R.*,
939 F.3d 340, 350 (1st Cir. 2019) (to prevail under § 362(d)(1), stay relief movants must show
that the relevant factors weigh in their favor); *In re Old Cold, LLC*, 602 B.R. at 823-24 (noting
that "the issue in the Stay Relief Motion was whether [the movant] had met its burden of

---

[17] The First Circuit has likened this showing to that required in the context of a hearing for preliminary injunctive
relief, where a claim is deemed colorable where there is "a reasonable likelihood that a creditor has a legitimate
claim or lien as to a debtor's property."  *Grella*, 42 F.3d at 33; *see also In re Old Cold, LLC*, 602 B.R. at 825
(characterizing a "colorable claim" as one "that is legitimate and that may reasonably be asserted, given the facts
presented and the current law").

establishing a colorable claim of a lien on property of the Debtor's estate and, if so, whether [the

movant] was entitled to stay relief under § 362(d)(2) . . . .")).

### B. Lack of Adequate Protection Constitutes Cause for Relief from the Stay under Section 362(d)(1).

#### i. The Debtors Bear the Burden of Proof on Adequate Protection to DRA's Collateral, which They Cannot Satisfy.

110.     Because the DRA has been deprived of its collateral due to Debtors' improper

seizure and diversion of the Act 30-31 Revenues, the Debtors now have the burden of proving

that the DRA's lien is adequately protected. *See* 11 U.S.C. § 362(g) ("In any hearing under

subsection (d) . . . concerning relief from the stay . . . (1) the party requesting such relief has the

burden of proof on the issue of the debtor's equity in property; and (2) *the party opposing such*

*relief has the burden of proof on all other issues*.") (emphasis added).

111.     For the reasons explained in paragraphs 89 to 109 above, the DRA submits that

the Debtors cannot satisfy this burden.

#### ii. In the Absence of Adequate Protection, there is Cause to Lift the Stay.

112.     In the event the Debtors cannot provide and/or be compelled to provide adequate

protection to the DRA, the Court should lift the automatic stay for cause under Section 362(d)(1)

of the Bankruptcy Code.

113.     Section 362(d) states, in pertinent part, that:

> On request of a party in interest and after notice and a hearing, the court
> shall grant relief from the stay provided under subsection (a) of this
> section, such as by terminating, annulling, modifying, or conditioning
> such stay—
> (1) for cause, including the lack of adequate protection of an interest in
> property of such party in interest;

11 U.S.C. § 362(d)(1).

114.    "Section 362(d)(1) guards against the possibility that the automatic stay could deprive a creditor of its property interest by precluding the creditor from exercising any rights it possesses to protect that interest from destruction." *Fin. Oversight & Mgmt. Bd. v. Ad Hoc Grp. of PREPA Bondholders (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, 899 F.3d 13, 20 (1st Cir. 2018).  The DRA should not be forced "to stand by helplessly as the debtor [spends] the creditor's collateral, leaving the debt entirely unsecured." *Id.*  Furthermore, this relief is consistent with the First Circuit's decision in *Fin. Oversight & Mgmt. Bd. v. Puerto Rico*, where the court made clear that "nothing in our holding today suggests that [a party] cannot seek traditional stay relief pursuant to 11 U.S.C. § 362" to raise its constitutional and statutory arguments concerning the Commonwealth and HTA's unlawful diversion of the DRA's collateral.  927 F.3d 597, 605 (1st Cir. 2019).

115.    This is precisely the problem here.  The lack of adequate protection constitutes, in and of itself, cause to lift the automatic stay under Section 362(d)(1) of the Bankruptcy Code.  Moreover, any effort to argue the FOMB cannot be compelled to provide such adequate protection only buttresses the DRA's argument to lift the automatic stay.

### iii.    Lifting the Automatic Stay Is Also Supported by Other Good Cause.

116.    In addition to a lack of adequate protection, Section 362(d)(1) requires a court to grant stay relief if other grounds for "cause" exist.  Here, the factors to be considered in determining whether cause exists further support the arguments above in support of relief from the automatic stay.  "Cause" for relief from the automatic stay under Section 362(d)(1) includes "bases  . . . [that are] broader than merely lack of adequate protection." 3 Collier on Bankruptcy ¶ 362.07[3][a] (15th ed. 2006).  Because "cause" is not defined in the Bankruptcy Code, the term has been given meaning in the case law.  As a result, courts consider legislative intent to

determine what constitutes cause within the meaning of Section 362(d)(1). *See Goya Foods, Inc. v. Unanue-Casal (In re Unanue-Casal)*, 159 B.R. 90, 95 (D.P.R. 1993), *aff'd*, 23 F.3d 395 (1st Cir. 1994); *In re Sonnax Indus., Inc.*, 907 F.2d 1280, 1285-86 (2d Cir. 1990).

117.    In the First Circuit, courts assess whether sufficient "cause" for stay relief exists based on the factors first identified by the Second Circuit in *In re Sonnax Indus., Inc.*, 907 F.2d 1280, 1285-86 (2d Cir. 1990). *See In re Fin. Oversight & Mgmt. Bd. for P.R.*, 939 F.3d 356, 362 (1st Cir. 2019); *Assured Guar. Corp.*, 2021 WL 805936 at *8, fn. 10.

These factors are:

(a)    whether the relief will result in a partial or complete resolution of the issues;

(b)    the lack of any connection with or interference with the bankruptcy case;

(c)    whether the foreign proceeding involves the debtor as fiduciary;

(d)    whether a specialized tribunal has been established to hear the particular cause of action and that tribunal has the expertise to hear such cases;

(e)    whether the debtor's insurance carrier has assumed full financial responsibility for defending the litigation;

(f)    whether the action essentially involves third parties;

(g)    whether litigation in another forum would prejudice the interest of other creditors and/or other interested parties;

(h)    whether the judgment claim arising from the foreign action is subject to equitable subordination under section 510(c);

(i)    whether movant's success in the foreign proceeding would result in a judicial lien avoidable by the debtor;

(j)    the interest of judicial economy and the expeditious and economical determination of litigation for the parties;

(k)    whether the foreign proceedings have progressed to the point where the parties are prepared for trial;

(l)    the impact of the stay on the parties and the balance of hurt.

*See Fin. Oversight & Mgmt. Bd. for P.R.,* 939 F.3d at 362.

118.    "The party moving for the automatic stay to be lifted need not prove a plurality of these factors.  The Courts will generally rely '[on] only a few factors . . . to determine that sufficient cause exist[s] to lift the stay.'" *C & A, S.E. v. P.R. Solid Waste Mgmt. Auth.*, 369 B.R. 87, 95 (D.P.R. 2007) (alteration in original)  (citing *Goya*, 159 B.R. at 95-96).  To the extent that they are applicable here, the *Sonnax* factors weigh favorably towards lifting the automatic stay on behalf of the DRA for the following reasons[18]:

(a)    <u>Factors (a) and (j)</u>: **Matters of judicial economy favor stay relief because an appropriate forum (such as the Puerto Rico Court of First Instance) can grant appropriate relief to the DRA on the threshold questions of the legality of the "clawback" and its impact upon the DRA's rights and interests. Moreover, a non-Title III Court can grant the DRA full and final relief and will not require any further adjudication in this Court.**

Unlike the Monolines, the DRA is not a party to a separate legal proceeding to vindicate their rights and resolve their particular disputes aside from the instant Motion.[19]

Because there are no other proceedings addressing the legality of the Debtors' retention and diversion of the DRA's collateral through the "clawback," the scope and extent of the DRA Parties' interest in the Act 30-31 Revenues, the DRA's priority claims to the Act 30-31 Revenues, and the harm the illegal retention and usage of the Act 30-31 Revenues by the Debtors has had on the DRA, those matters are ripe for adjudication at

---

[18] The DRA Parties believe that factors (c) (whether the foreign proceeding involves the debtor as fiduciary), (e) (whether the debtor's insurance carrier has assumed full financial responsibility for defending the litigation), (f) (whether the action essentially involves third parties), (h) (whether the judgment claim arising from the foreign action is subject to equitable subordination under section 510(c)) and (k) (whether the foreign proceedings have progressed to the point where the parties are prepared for trial) are not applicable here.  Therefore, they are not discussed in this Motion.

[19] Though the DRA Parties were allowed intervention in HTA Clawback Adversary Proceeding[*see* Dkt. No. 41 of Adv. No. 20-0005 (LTS)], the same was granted *in a limited fashion* solely as to the "Shared Issues" as defined in the Order issued at Dkt. No. 12005, and which specifically mandates that the DRA Parties *shall prosecute particular issues in this Motion only,* including: (i) whether the DRA Parties themselves
have an equitable lien, trust, or other ownership interest arising out of the Excise Tax Statutes (as defined in the Order); (ii) whether the DRA Parties themselves have a priority claim arising out of the Excise Tax Statutes pursuant to PROMESA Title III; and (iii) "the issues unique to the DRA Parties[] . . . including, without limitations . . . the DRA Parties' rights as lenders to HTA pursuant to the 2013 Security Agreement and right to the Act 30-31 Revenues." *Id*. at pp. 4-5, fn. 3 and 4.

this juncture without any risk of conflicting decisions being issued and warrant the granting of relief from stay.

Moreover, there is not even a plan pending at HTA and no evident time frame for the Debtors to address claims at HTA through a Title III plan.

**(b)**     **Factors (b) and (g): Litigation of these controversies in another forum will not interfere with the instant Title III cases and will not prejudice the interest of other creditors or other interested parties.**

Litigating these issues will not prejudice other parties. Only the DRA has a lien in many of the revenues at issue in this Motion – and, in any event, the DRA has the senior most lien in all such collateral. Further, there is no pending plan at HTA or other litigation that would address these issues. Thus, no party is prejudiced by lifting the automatic stay.

Additionally, the PSA entered into between the FOMB and Commonwealth creditors provides that the agreement may be terminated if the Court enters an order granting this Motion or determines that the clawback funds at issue in this Motion are not property of the Commonwealth.[20] *See* Dkt. No. 15977-2 at ¶ 7.1(b).

The PSA's express recognition that the Second Amended Plan will not be feasible if the DRA Parties succeed on any of these issues demonstrates that the parties are well aware of the risk of this litigation and that any relief granted here will not interfere with the Title III cases or affect the interests of other creditors or parties-in-interest. The outcome of this Motion is "baked into" the pending plan process already.

**(c)**     **Factor (d): A non-Title III court may be the only forum for addressing the relevant issues**.

In particular, if the Court is unable to provide adequate protection due to the strictures of PROMESA, the lack of adequate protection can only be enforced and protected in a non-Title III forum.

The FOMB may argue that Sections 303 and/or 305 of PROMESA prevents this Court from mandating the provision of adequate protection. If the FOMB does so argue, a non-Title III court is the only forum that can safeguard the DRA's interests in the Act 30-31 Revenues—which continue to be diminished without the provision of adequate protection.

**(d)**     **Factor (i): The judgment the DRA Parties may obtain in another court may not be voidable by the Debtors**.

To the extent the judgment that may be issued by the non-Title III court in favor of the DRA were to be based on a violation of the Takings Clause of

---

[20] Further, the Second Amended Disclosure Statement states that the PSA contains "a number of termination events"and that, if the PSA is terminated, it "may have a material adverse effect on the Debtor's ability to confirm the [Second Amended Plan]."*See* Dkt. No. 15977 at 458.

the U.S. Constitution, such judgment will not be voidable by the Debtors because it is not subject to discharge. *See In re City of Detroit*, 524 B.R. 147, 270 (Bankr. E.D. Mich. 2014) ("[W]hen the Constitution requires a money damage award—as is the case here—sec. 944 (c)(1) allows the Court to except claims for that award from discharge in the confirmation order [which] eliminates all issues regarding the constitutionality of chapter 9 in this respect.").

(e)  **Factor (l)**: **The impact of the stay on the DRA Parties outweighs any possible harm to the Debtors**.

As discussed in Section II above, (i) the FOMB and the Commonwealth intend to continue diverting the Act 30-31 Revenues during the pendency of these Title III cases and after the Second Amended Plan becomes effective, (ii) the Commonwealth's current cash position offers no comfort to the DRA because the Commonwealth has indicated that these funds will not be used to repay the DRA, and (iii) the future stream of Act 30-31 Revenues is insufficient to satisfy the DRA because the Commonwealth has not made such funds available to HTA or the DRA. Thus, while the Commonwealth continues to divert the Act 30-31 Revenues, without relief from the stay, the DRA is left without recourse—sitting idly as its collateral is being used without recompense. This use of collateral is precisely the issue adequate protection is designed to address. Failing to permit adequate protection imposes great harm on the DRA and the stay is preventing appropriate remedy. By contrast, the Debtors' potential harm is modest because for the last five years the funds have not been used as required by law. *See* P.R. Const. art. VI, §§ 8-9; 23 L.P.R.A. § 104(c)(1); 9 L.P.R.A. §§ 2021, 5681; 13 L.P.R.A. §§ 31751(a)(1)(C), 31751(a)(3)(C)).

118.    Accordingly, for these reasons, the DRA Parties respectfully submit that "cause" (beyond a lack of adequate protection) exists to warrant stay relief pursuant to Section 362(d)(1).

## C.    Relief from Stay Should Also be Granted with Respect to the Commonwealth Under Section 362(d)(2).

119.    The Court should also lift the stay with respect to the Commonwealth under Section 362(d)(2) of the Bankruptcy Code, which permits a party to seek relief from the automatic stay if "(A) the debtor does not have an equity in [the] property; and (B) such property is not necessary to an effective reorganization." 11 U.S.C. § 362(d)(2). The moving party bears the burden of demonstrating that the debtor lacks equity in the property and the debtor has the

burden to prove that the property in question is necessary for its plan.  11 U.S.C. § 362(g); *see In re Builders Grp. & Dev. Corp.*, No. 13-04867 (ESL), 2013 WL 6198203, at * 7 (Bankr. D.P.R. Nov. 27, 2013).

120.   Courts have found that relief from stay is appropriate under Section 362(d)(2) in situations where debtors do not possess any equity over the pledged revenues.  *See In Re Roberts*, 367 B.R. 677, 688 (Bankr.D. Colo. 2007) (debtor's lack of ownership interest in the property was sufficient to demonstrate to the court that the debtor has no equity in the property); *In re Lally*, 38 B.R. 622, 626 (Bankr. N.D. Iowa 1984) ("[C]ause exists to justify termination of the stay" because debtors "armed only with a 'naked legal title'" in the property "clearly do 'not have equity'" in the property); *see also In re Moore*, 267 B.R. 111, 118 (Bankr. E.D. Pa. 2001) (cause to lift stay exists where "naked legal title to property has passed into the estate but the equitable title is held by another party'") (quoting *Matter of Spencer*, 115 B.R. 471, 476 (D. Del. 1990)).

121.   Here, the Commonwealth has no interest in the Act 30-31 Revenues.  As discussed in Background, Section IV of the Motion, Puerto Rico law mandates that the Act 30-31 Revenues be transferred and conveyed to HTA for payment of HTA creditors ***except*** when a "clawback" has been validly activated ***and only*** to pay GO debt.  *See* P.R. Const. art. VI, §§ 8-9; 9 L.P.R.A. §§ 2021, 5681; 13 L.P.R.A. §§ 31751(a)(1)(C), 31751(a)(3)(C).  Because the Commonwealth has a legal obligation to comply with this directive, and given the FOMB's failure to show that a valid "clawback" has occurred, the Act 30-31 Revenues must continue to be covered into a special deposit in favor of HTA, and the Commonwealth, therefore, does not have any equity in these pledged revenues.

122.    Even if the Court were to find that the Commonwealth somehow has equity in the pledged revenues (which it does not), the Commonwealth cannot meet its burden to demonstrate that the Act 30-31 Revenues are necessary for its effective reorganization.  *See Timbers of Inwood Forest Assocs.*, 484 U.S. at 375-76 (holding that, to fend off stay relief under Section 362(d)(2), the debtor must establish a "reasonable possibility of a successful reorganization within a reasonable time," and that the property at issue is necessary to that reorganization). However, when a property's value is pledged entirely to secured creditors, that property is ***not*** necessary to a debtor's effective reorganization.  *See In re MJS Las Croabas Props.*, No. 12-05710 (ESL), 2013 Bankr. LEXIS 2256, at *15 (Bankr. D.P.R. May 29, 2013) (finding that property was not necessary to an effective reorganization when applicable security agreement required the debtor to apply *all* income from operating or selling the pledged property to satisfying the secured claim); *In re Valentin*, 2014 Bankr. LEXIS 2885, at *4 (Bankr. D.P.R. July 3, 2014) (granting a secured creditor relief from stay because "no benefit would accrue to the estate" if the debtor sold the pledged property to a third party, as the applicable security agreement required the debtor to pay all sale proceeds to the secured creditor).  Here, as noted above, Acts 30 and 31 provide that the Act 30-31 Revenues shall be covered into a special deposit in favor of HTA unless the "clawback" has been legally triggered and implemented.  The Act 30-31 Revenues therefore cannot be necessary to the Commonwealth's reorganization.[21]

123.    The Commonwealth is constitutionally and statutorily barred from using the Act 30-31 Revenues for any other purpose pursuant to Article VI, Section 9 of the Constitution, and

---

[21] Even if a valid "clawback" were to have been activated (which has not been determined by any forum), Article VI, Section 8 of the Puerto Rico Constitution and Puerto Rico law require the Commonwealth to apply such revenues only to pay GO debt (to the amount necessary) and to use the remaining funds for satisfaction of HTA's secured creditors.  *See* P.R. Const. art. VI, §§ 8-9; 9 L.P.R.A. §§ 2021, 5681; 13 L.P.R.A. §§ 31751(a)(1)(C), 31751(a)(3)(C).

must turn over the pledged revenues for the benefit of the secured creditors. In view of the

above, the revenues pledged to the DRA are not necessary for the Commonwealth's effective

reorganization, and the stay must be lifted pursuant to Section 362(d)(2) of the Bankruptcy Code.

## CONCLUSION

In light of the foregoing, the DRA Parties hereby respectfully request this Court enter an order

mandating that Debtors provide adequate protection on account of the diminution in value of the

DRA's collateral interest in the Act 30-31 Revenues. In the alternative, the DRA Parties seek an

order lifting the automatic stay under Section 362(d)(1) and/or 362(d)(2) so that the DRA Parties

may initiate, continue and/or conclude any and all legal proceedings and/or exercise any applicable

contractual and legal remedies under the applicable debt documents.

**WHEREFORE**, the DRA Parties respectfully request this Court to enter an order granting

the relief requested herein and further granting such other relief as may be just and proper.

**RESPECTFULLY SUBMITTED**.

In San Juan, Puerto Rico, this 31st day of March, 2021.

## NOTICE OF TIME TO RESPOND

Pursuant to the terms set forth in the *Order Approving Joint Stipulation of the Government Parties and the DRA Parties Regarding the DRA Parties' Motion and Memorandum of Law in Support of their Motion for Relief from the Automatic Stay, or in the Alternative, Ordering Payment of Adequate Protection* [Dkt. No. 14417] (the "Scheduling Order"), the following terms shall apply with regards to the Motion:

    a. The Government Parties[22] will file any objection to the Motion (on an individual or joint basis), solely concerning the Standing Issue, no later than April 12, 2021;[23]

    b. The DRA Parties will file the DRA Response in support of the Motion, solely concerning the Standing Issue, no later than May 5, 2021;

    c. The Government Parties will file a reply (on an individual or joint basis) to the DRA Response by no later than May 12, 2021; and

    d. The Court will hear argument on the Motion, solely concerning the Standing Issue, at a date and location to be determined by the Court.

**WE HEREBY CERTIFY** that on this same date, we electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all CM/ECF participants in this case. We further certify that, on this same date, we served the foregoing upon all the Standard Parties as identified and defined in the Court's CMP Order, as well as upon all of the parties identified in the Master Service List maintained at https://cases.primeclerk.com/puertorico/.

---

[22] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Scheduling Order.

[23] To the extent the Official Committee of Unsecured Creditors (the "UCC") has the right to be heard on the Standing Issue, the Objection Deadline and the terms of Section 9 of the Final Case Management Order for Revenues Bonds [Dkt. No. 12186] shall apply. All parties reserve their respective rights regarding the scope of the UCC's participation in any aspect of the Motion litigation.

**MCCONNELL VALDÉS LLC**

270 Muñoz Rivera Avenue, Suite 7
Hato Rey, Puerto Rico 00918
P.O. Box 364225
San Juan, PR 00936-4225
Tel:   787-250-5632
Fax:   787-759-9225

By:   */s/ Arturo J. García-Solá*
Arturo J. García-Solá
(USDC No. 201903)
E-mail: ajg@mcvpr.com

*/s/ Nayuan Zouairabani*
Nayuan Zouairabani
(USDC No. 226411)
E-mail: nzt@mcvpr.com

***Attorneys for AmeriNational Community
Services, LLC, as Servicer for the GDB Debt
Recovery Authority***

**C. CONDE & ASSOC. LAW OFFICES**

By:   */s/ Carmen D. Conde Torres*
Carmen D. Conde Torres
(USDC No. 207312)

*/s/  Luisa S. Valle Castro*
Luisa S. Valle Castro
(USDC No. 215611)

254 San José Street
Suite 5
San Juan, PR 00901-1523
Tel:   787-729-2900
Fax:   787-729-2203
E-mail: condecarmen@condelaw.com

-and-

**SCHULTE ROTH & ZABEL LLP**

By:   */s/ Douglas S. Mintz*
Douglas S. Mintz (admitted *pro hac vice*)
901 Fifteenth Street, NW, Suite 800
Washington, DC 20005
Tel:   202-729-7470
Fax:   202-730-4520
E-mail: douglas.mintz@srz.com

-and-

Douglas Koff (admitted *pro hac vice*)
Abbey Walsh (admitted *pro hac vice*)
Peter J. Amend (admitted *pro hac vice*)
919 Third Avenue
New York, NY 10022
Tel:   212-756-2000
Fax:   212-593-5955

E-mail:        douglas.koff@srz.com
               abbey.walsh@srz.com
               peter.amend@srz.com

*Attorneys for Cantor-Katz Collateral Monitor*
*LLC, as Collateral Monitor for the GDB Debt*
*Recovery Authority*