**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND<br>MANAGEMENT BOARD FOR PUERTO RICO,<br><br>     as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*<br><br>         Debtors. [1] | PROMESA<br>Title III<br><br><br>Case No. 17 BK 3283-LTS<br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND<br>MANAGEMENT BOARD FOR PUERTO RICO<br><br>     as representative of<br><br>PUERTO RICO ELECTRIC POWER AUTHORITY,<br><br>         Debtor. | PROMESA<br>Title III<br>Case No. 17 BK 4780-LTS |

**UTIER'S OBJECTION TO THE GOVERNMENT PARTIES' MOTION FOR**
**ORDER ALLOWING ADMINISTRATIVE EXPENSE CLAIM FOR AMOUNTS TO BE**
**PAID TO LUMA ENERGY BY PREPA DURING INTERIM PERIOD UNDER**
**SUPPLEMENTAL AGREEMENT AND THE T&D CONTRACT**

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747). (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations.)

# Table of Contents

OPPOSING PARTY ................................................................................................. 5

PRELIMINARY STATEMENT ............................................................................. 5

JURISDICTION AND VENUE .............................................................................. 8

BACKGROUND ...................................................................................................... 9

ARGUMENTS ........................................................................................................ 12

   I.   This Court should dismiss PREPA's Second Administrative Expense Motion
       because the matter is not ripe for adjudication. ..................................................... 12

      A.   The T&D Contract's validity is not final, which makes advisory any decision
          granting priority and administrative expense treatment of fees payable to Luma
          Energy, under the terms and conditions of the T&D Contract and the
          Supplemental Agreement. ............................................................................. 13

      B.   The Preconditions for Luma Energy to assume full control over PREPA's
          operations and management have not been met. ............................................ 16

  III.   In the alternative, the Court should deny PREPA's Second Administrative
       Expense Motion because it is not beneficial for PREPA's restructuring............ 28

      A. Standard of Review............................................................................................ 29

      B.   The Interim Obligations are not necessary costs of preserving the estate,
          because they do not provide any benefits for the debtor or its creditors. ........ 30

      C.   The Interim Obligations do not defeat the presumption in favor of a ratable
          distribution.................................................................................................... 38

  IV.   Granting administrative expense treatment for the Interim Obligations affect and
       harm UTIER ................................................................................................... 39

CONCLUSION........................................................................................................ 40

# TABLE OF AUTHORITIES

**Cases**

*Abbott Laboratories v. Gardner*, 387 U.S. 136 (1967)...................................................... 12

Am. Petroleum Inst. v. E.P.A., 683 F.3d 382 (D.C. Cir. 2012).................................... 13

*City of Fall River, Mass. v. F.E.R.C.*, 507 F.3d 1 (1st Cir. 2007)................................ 12

*City of Fall Rivers v. F.E.R.C.*, 507 F.3d 1 (1st Cir. 2007) ........................................ 22

*Ernst Young v. Depositors Economic Protection*, 45 F.3d 530 (1st Cir. 1995)............................ 12

*In re Craig County. Hosp. Auth.*, 572 B.R. 340 (Bankr. N.D. Okla. 2017)................................ 26

*In re Hemingway Transport, Inc*., 954 F.2d 1 (1st Cir. 1992). ..................................... 38

*In re Jartran, Inc.*, 732 F.2d 584 (7th Cir. 1984)........................................................ 37

*In re La Electronica, Inc.,* 995 F.2d 320 (1st Cir. 1993) ....................................... 29, 38

*In re Malden Mills Industries, Inc.*, 303 B.R. 688  (B.A.P. 1st Cir. 2004)................................. 29

*In re Malden Mills Industries, Inc.,* 303 B.R. 688 (B.A.P. 1st Cir. 2004)...................... 23, 29, 37

*In re Mammoth Mart, Inc.* 536 2.d 950 (1st Cir. 1976) ................................................ 36

*In re New York City Off-Track Betting Corp.,* 434 B.R. 131 (Bankr. S.D.N.Y. 2010) .......... 23, 24

*In re PMC Mktg. Corp*., 09-02048, 2013 WL 3367500, (Bankr. D.P.R. 2013) .......................... 30

*Labor Relations Div. of Constr. Indus. of Mass., Inc. v. Healey*, 844 F.3d 318 (1st Cir. 2016) .. 12

*Lastra v. Esteves (In re Bay Broad.),* 182 B.R. 369 (D.P.R. 1995)............................... 30

*Reddy v. Foster*, 845 F.3d 493 (1st Cir. 2017)............................................................ 12

*Roman Catholic Bishop of SPG v. City of Springfield,* 724 F.3d 78 (1st Cir. 2013).................... 13

**Statutes**

*Puerto Rico Electric Transformation Act*, Act No. 120-2018, 22 LPRA §1112(m) ................... 13

Section 306(a) of PROMESA, 48 U.S.C. §2166(a)......................................................... 8

Section 503(b)(1)(A) of the Bankruptcy Code, 11 USC §503..................................... 7, 10, 23, 29

Section 306(a) of PROMESA. 48 U.S.C. §2166(a)......................................................... 9

Section 307(a) of PROMESA. 48 U.S.C. §2167(a)......................................................... 9

Section 901 of the Bankruptcy Code, 11 U.S.C. § 901 ............................................... 24

**Other Authorities**

5 Norton Bankr. L. & Pract. 3d §90:14........................................................................ 25

6 Collier on Bankruptcy P 901.04 (16th ed. 2020) ..................................................... 25

**TO THE HONORABLE COURT:**

**COME NOW** Unión de Trabajadores de la Industria Eléctrica y Riego, Inc. ("UTIER"), as creditor and party in interest pursuant to 11 U.S.C. §1109(b) and respectfully submit *UTIER's Objection to the Government Parties' Motion For Order Allowing Administrative Expense Claim for Amounts to be Paid to Luma Energy by PREPA During Interim Period under Supplemental Agreement and the T&D Contract* [Dkt. No. 2417].

## OPPOSING PARTY

1. UTIER was founded in the early 1940´s and it is one of four labor unions that represent Puerto Rico Electric Power Authority's ("PREPA") employees. Its members are responsible for the operation and conservation aspect of PREPA, and for the repairs, renovations, and improvements of PREPA's property. UTIER's job is to protect and defend PREPA's workers, as well as negotiate collective bargaining agreements on their behalf. UTIER also represents the branch of its retirees. UTIER is an unsecured creditor in this proceeding.

## PRELIMINARY STATEMENT

2. PREPA by and through the Financial Oversight and Management Board for Puerto Rico ("FOMB"), the Puerto Rico Fiscal Agency and Financial Advisory Authority ("AAFAF" by its Spanish acronym) (collectively as "the Government Parties") come before this court to seek an order granting administrative expense treatment of certain claims to LUMA Energy, LLC and LUMA Energy ServCo, LLC (collectively as "Luma Energy") under the *Puerto Rico Transmission and Distribution System Operation and Maintenance Agreement* ("T&D Contract"). *See Government Parties' Motion for Order Allowing Administrative Expense Claim for Amounts to be Paid to Luma Energy by PREPA During Interim Period Under Supplemental Agreement and the T&D Contract*; [Dkt No. 2417] ("PREPA's Second

5

Administrative Expense Motion"). Specifically, the Government Parties seek administrative expense treatment of PREPA's obligations as to Luma Energy for the latter's operation and management of the electrical grid, while PREPA exits from Title III.

3. However, there are several obstacles that prevent this Court from granting PREPA's Second Administrative Expense Motion. First, PREPA's Second Administrative Expense Motion is unripe for adjudication. The T&D Contract has an essential requirement for its execution which is for the Puerto Rico Energy Bureau ("PREB") to grant an Energy Compliance Certificate. Although the PREB approved it, its decision is not final because it is currently under review before the Supreme Court of Puerto Rico. This means that the PREB's approval of the Energy Certificate Compliance can be reversed, affecting the T&D Contract's validity and thus, enforcement. Second, the Court of Appeals for the First Circuit has before it two issues that affect the Government Parties' request, and thus, this Court's jurisdiction. One of the issues is whether a debtor under Title III of PROMESA has an estate for purposes of Section 503(b) of the Bankruptcy Code, regarding administrative expenses. Thus, if the First Circuit decides that there is no estate in Title III of PROMESA, this Court's decision on the Government Parties' request would be a purely impermissible advisory opinion, barred by Article III of the U.S. Constitution, and will be a burden upon this Court's limited resources. Likewise, the First Circuit has yet to decide whether the Front-End Transition obligations under the T&D Contract are in fact, administrative expenses under Section 503(b) of the Bankruptcy Code. It is worth mentioning that this Court granted administrative expense treatment to such obligations. Also, the administrative expense treatment of the Front-End Transition period is an obligation of PREPA and a condition for Luma Energy to assume control of the T&D System. Thus, if the First Circuit decides that the Front-End Transition

obligations are not administrative expenses, it would affect the T&D Contract and of course, the Government Parties' new request in PREPA's Second Administrative Expense Treatment.

4. Moreover, Puerto Rico's Legislative Assembly is currently thoroughly investigating the legality of the T&D Contract and passed a resolution to postpone the date that Luma Energy will take full control of the T&D System. Also, said resolution requested amendments to the T&D Contract. The claims that the Government Parties request to have administrative expense treatment stem from the T&D Contract and its Supplemental Agreement. This means that if the T&D Contract is amended as the Legislative Assembly of Puerto Rico seeks, this Court's decision on the merits of PREPA's Second Administrative Expense Motion will be an impermissible advisory illegal opinion, that would constitute additional and unnecessary expenses of the parties, and a burden to the limited resources of this Court.

5. Additionally, the T&D Contract and the Supplemental Agreement have certain precedent conditions before Luma Energy can assume full control of the T&D System. These conditions have not been met. Therefore, this Court should dismiss PREPA's Second Administrative Expense Motion for being unripe.

6. Even if this Court considers that PREPA's Second Administrative Expense Motion is ripe, it does not meet the requirements established by Section 503(b)(1)(A) of the Bankruptcy Code regarding administrative expenses. The claims that the Government Parties seek administrative expense treatment are not beneficial for PREPA's restructuring process, nor preserves its property. On the contrary, by these claims and the T&D Contract as a whole, PREPA will be dismantled, lose its decisional power over the electrical grid, and will create

an enormous deficit that will affect its capacity to pay its creditors and stakeholders, and its ability to restructure its outstanding debt.

7.  Likewise, the T&D Contract creates a private monopoly of energy in Puerto Rico, which puts at risk FEMA's funds in the case of a natural disaster. Thus, it is not beneficial for Puerto Rico.

8.  Furthermore, the T&D Contract opens the door for Luma Energy, its affiliates, subsidiaries, and parent companies to work and negotiate in different aspects of the transmission, distribution, reconstruction, or generation of energy in Puerto Rico. Thus, engaging in conflict of interests.

9.  Lastly, Luma Energy's full control of the T&D Contract entails rejecting UTIER's collective bargaining agreements with PREPA, their acquired right and benefits, and their employment positions. This will entail additional burdens to the Commonwealth and Puerto Rico's economy.

10. For the reasons stated in this Opposition, this Court should either deny PREPA's Second Administrative Expense Motion for being unripe and for constituting an enormous prejudice for PREPA's restructuring process. In the alternative, this Court should hold it in abeyance until the T&D Contract's validity is determined.

## JURISDICTION AND VENUE

11. The United States District Court for the District of Puerto Rico has subject matter jurisdiction over this Motion pursuant to Section 306(a) of PROMESA. 48 U.S.C. §2166(a).

12. Venue is proper pursuant to Section 307(a) of PROMESA. 48 U.S.C. §2167(a).

8

## BACKGROUND

13. On July 7, 2020, the Financial Oversight and Management Board ("FOMB") submitted *PREPA's Motion for Entry of an Order Allowing Administrative Expense Claim for Compensation for Front-End Transition Services under Puerto Rico Transmission and Distribution System Operation and Maintenance Agreement with Luma Energy* ("PREPA's First Administrative Expense Motion") [Dkt. No. 2053]. In such motion, the FOMB on behalf of PREPA requested an administrative expense priority in favor of Luma for any accrued and unpaid Front-End Transition that are due or become due from PREPA under T&D Contract. These obligations correspond to the period that Luma Energy sets up shop, not providing services to PREPA's customers, but only transitioning to become the electric service provider. The FOMB estimated that this claim would amount to $136,351,930.

14. On August 12, 2020, UTIER and *Sistema de Retiro de los Empleados de la Autoridad de Energía Eléctrica* ("SREAEE") opposed PREPA's First Administrative Expense Motion. *See UTIER and SREAEE's Objection to PREPA's Motion for Entry of an Order Allowing Administrative Expense Claim for Compensation for Front-End Transition Services Under Puerto Rico Transmission and Distribution System Operation and Maintenance Agreement with Luma Energy at Docket No. 2053* [Dkt. No. 2128].

15. This Honorable Court granted in part and denied in part PREPA's First Administrative Expense Motion. *See Memorandum Opinion Granting in Part and Denying and Part PPREPA's Motion for Entry of an Order Allowing Administrative Expense Claim for Compensation for Front-End Transition Services under the Puerto Rico Transmission and Distribution System Operation and Maintenance Agreement with Luma Energy* [Dkt. #2258] ("Memorandum Opinion"). In summary, this Court concluded that the Front-End Transition

expenses met the requirements of priority status under Section 503(b)(1)(A) of the Bankruptcy Code. However, it determined that any Late Fees associated therewith would not be granted priority status at this time. *See* Memorandum Opinion at 21-23.

16. As a result, on October 10th, 2020, UTIER and SREAEE appealed this Court's decision granting administrative expense treatment to the Front-End Transition obligations to the Court of Appeals of the United States for the First Circuit. *See Notice of Appeal* [Dkt. #2269]. UTIER and SREAEE challenged, among other issues, whether Section 503(b)(1)(A) of the Bankruptcy Code applies in Title III of PROMESA, 48 U.S.C. §§2161-2177, where there is no estate. Also, UTIER and SREAEE questioned if Front-End Transition Expenses met the requirements for Section 503(b)(1)(A) for "necessary costs and expenses of preserving PREPA."[2] This case is expected to be argued in June 2021.

17. Now, this Honorable Court has before it PREPA's Second Administrative Expense Motion. Through this motion, the Government Parties seek "an order granting to LUMA Energy an allowed administrative expense claim for accrued, unpaid amounts required to be paid by PREPA to LUMA Energy under the Supplemental Agreement and the [Operation and Management] Agreement during the Interim Period to enable LUMA Energy to assume responsibility over operating the [Transmission and Distribution] System." *See* PREPA's Second Administrative Expense Motion at ¶3.

18. The Interim Period comprises the time frame after Luma Energy commences the Operation and Management ("O&M") Services of PREPA under the T&D Contract and the Supplemental Agreement ("Interim Service Commencement"), and before PREPA's exit from Title III or eighteen months after the Interim Service Commencement date. *See id*, at

---

[2] The Court of Appeals for the First Circuit case number is 20-2041.

¶¶31-34. The obligations that stem from the Interim Period ("Interim Obligations") consist of:

> "(a) compensation for the O&M Service during the Interim period […], in an annual fixed amount of $115 million […]; (b) indemnification of LUMA Energy and its affiliates primarily for any claims or damages against them arising from PREPA's operation of the utility […]; (c) a $115 million termination fee, payable upon the occurrence of the Interim Period Termination Date." PREPA's Second Administrative Expense Motion at 16, ¶ 36.

19. Originally, a precondition for Luma Energy's commencement of the O&M Services ("Service Commencement Date") was the existence of a confirmed plan of adjustment for PREPA under Title III. Nonetheless, the FOMB requested an amendment to the T&D Contract to dispense the exit of PREPA from Title III as a condition for Luma Energy to assume full control of the Transmission and Distribution System ("T&D"). These amendments were included in the Supplemental Agreement, as an integral part of the T&D Contract. PREPA's Second Administrative Expense Motion at ¶¶32-33.

20. Moreover, the Supplemental Agreement established that a condition for the Interim Service Commencement is for an unappealable order of this Court granting administrative expense treatment to the Interim Obligations. PREPA's Second Administrative Expense Motion at ¶35.

21. This Court already granted administrative expense treatment and priority to the Front-End Transition period fees, which was the phase for Luma Energy to set-up shop in Puerto Rico. Now, the Government Parties, seek administrative expense treatment for the Interim Obligations, which correspond to the subsequent phase after the Front-End-Transition period. This will mean, that all the expenses incurred by Luma Energy that must be paid by PREPA under the T&D Contract and the Supplemental Agreement would be granted administrative

expense treatment, and Luma Energy will have priority among all other PREPA's creditors, including UTIER and the SREAEE.

22. On April 1st, 2021 UTIER filed a *First Set of Interrogatories to Government Parties* and a *First Request for Production of Documents to Government Parties*, to discover whether the conditions precedent to the Service Commencement Date have been met. Thus, UTIER reserves the right of filing a supplemental brief in support of this Opposition to PREPA's Second Administrative Expense Motion.

## **ARGUMENTS**

**I.    This Court should dismiss PREPA's Second Administrative Expense Motion because the matter is not ripe for adjudication.**

23. The ripeness doctrine is a threshold matter that must be assessed by this Court before considering the merits of PREPA's Second Administrative Expense Motion. It is beyond argument that, "[w]hile [it] has a prudential flavor, a test for ripeness is also mandated by the constitutional requirement that federal jurisdiction extends only to actual cases or controversies[.]" *Ernst Young v. Depositors Economic Protection*, 45 F.3d 530, 535 (1st Cir. 1995) (emphasis added) (citations omitted). Therefore, "[r]ipeness is a justiciability doctrine that is drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction." *City of Fall River, Mass. v. F.E.R.C.*, 507 F.3d 1, 6 (1st Cir. 2007) (quotation marks and citations omitted) (emphasis added). *See, also*, *Reddy v. Foster*, 845 F.3d 493, 499 (1st Cir. 2017) (**"Article III restricts federal court jurisdiction** to 'Cases' and 'Controversies.' **That limitation on the judicial Power** of the United States is fundamental to the federal judiciary's role within our constitutional separation of powers. **Two of the limitation's manifestations are the justiciability doctrines** of standing and

**ripeness, which are interrelated; each is rooted in Article III**." (brackets, quotation marks and citations omitted) (emphasis added).

24. "The basic rationale of the ripeness inquiry is to prevent the courts, **through avoidance of premature adjudication**, from entangling themselves in abstract disagreements in violation of Article III's case or controversy requirement." *Labor Relations Div. of Constr. Indus. of Mass., Inc. v. Healey*, 844 F.3d 318, 326 (1st Cir. 2016) (citations and quotation marks omitted) (emphasis added). *See, also, Abbott Laboratories v. Gardner*, 387 U.S. 136, 148-49 (1967); *Roman Catholic Bishop of SPG v. City of Springfield,* 724 F.3d 78, 89 (1st Cir. 2013). As such, ripeness is a **threshold issue** that the Court cannot ignore.

25. The first prong of any ripeness inquiry is whether the issue is fit for a judicial decision at the time the suit is filed. *See, Labor Relations*, 844 F.3d at 326. "[C]onsidering the fitness prong of the ripeness inquiry, [the First Circuit has] emphasized that **a claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all**." *Id*. (citations and quotation marks omitted). The second prong is the hardship that may be implied by denial of review. However, "[c]onsiderations of hardship that might result from delaying review '**will rarely overcome the finality and fitness problems inherent in attempts to review tentative positions.**'" *Am. Petroleum Inst. v. E.P.A.,* 683 F.3d 382, 389 (D.C. Cir. 2012) (citations omitted).

**A. The T&D Contract's validity is not final, which makes advisory any decision granting priority and administrative expense treatment of fees payable to Luma Energy, under the terms and conditions of the T&D Contract and the Supplemental Agreement.**

26. PREPA's Second Administrative Expense Motion is unripe since the T&D Contract's validity is not final. Although the Puerto Rico Energy Bureau ("PREB") approved the Energy

Certificate Compliance for the T&D Contract, its decision is currently under review by the Supreme Court of Puerto Rico. The *Puerto Rico Electric Transformation Act*, Act No. 120-2018 requires an Energy Compliance Certificate regarding any contract related to a PREPA Transaction. 22 LPRA §1112(m). Consequently, by virtue of law, it is an essential requirement that the T&D Contract receives an Energy Compliance Certificate.

27. Despite that the PREB approved the Energy Compliance Certificate, it is not final since such decision is currently under review in the Supreme Court of Puerto Rico. Thus, the ultimate validity of the T&D Contract has yet to be established and is contingent on future events. This means, that any further order to grant priority to Luma Energy under the T&D Contract or the Supplemental Agreement, will constitute an impermissible advisory opinion.

28. Moreover, this Honorable Court's determination granting administrative expense treatment to the Front-End Transition fees is on appeal at the Court of Appeals for the First Circuit. Specifically, UTIER and SREAEE challenged whether Section 503(b)(1)(A) of the Bankruptcy Code, for "necessary costs and expenses of preserving the estate", applies in Title III of PROMESA, 48 U.S.C. §§ 2161-2177, where there is no estate. In the alternative, the Appellants in that case stated that even if Section 503(b)(1)(A) applies to Title III of PROMESA, the Front-End Transition obligations do not meet the requirements of administrative expenses. Therefore, this Court's determination of granting administrative expense treatment to the Front-End Transition period can be reversed.

29. Likewise, as it will be further discussed, the administrative expense treatment of the Front-End Transition period is an obligation of PREPA under the T&D Contract. Also, it is a condition for Luma Energy to perform its Front-End Transition period obligations under the T&D Contract. Since this Court's determination granting administrative expense treatment to

14

the Front-End Transition period obligations is pending before the Court of Appeals, it is not final. If the First Circuit reverses this Court's determination, PREPA would be failing its obligations under the T&D Contract because the Front-End Transition period obligations will not have administrative expense treatment. This means that considering the merits of PREPA's Second Administrative Expense Motion at this moment would be an advisory opinion and an unnecessary expense of the parties and a burden to the limited resources of this Court.

30. For instance, if the First Circuit determines that Section 503(b)(1)(A) of the Bankruptcy Code, for "necessary costs and expenses of preserving the estate", does not apply in Title III of PROMESA, 48 U.S.C. §§ 2161-2177, because there is no estate, this Court's decision on the merits of PREPA's Second Administrative Expense Motion would be purely advisory.

31. Additionally, the Legislative Assembly of Puerto Rico is thoroughly investigating whether the T&D Contract is legal.[3] Therefore, it is uncertain whether the terms and conditions of the T&D Contract will remain.

32. After an extensive investigation of the T&D Contract the House of Representatives of Puerto Rico approved a Resolution on April 7, 2021, to postpone the Service Commencement Date until January 15, 2021.[4] The Economic Development, Planification, Telecommunications, Public Private Partnership and Energy Committee indicated that after all the findings regarding the T&D Contract's legality and prejudice for PREPA, its employees, and the People of Puerto Rico, the contract must be amended and renegotiated. Consequently, it is

---

[3] Archyde, *Senate approves to investigate contract between PREPA and Luma Energy*, January 29, 2021. (Available at: https://www.archyde.com/senate-approves-to-investigate-contract-between-prepa-and-luma-energy/) (last visit: April 7, 2021).

[4] *See* HR 0309 of the House of Representatives of the Legislative Assembly of Puerto Rico, approved on April 7, 2021.

unlikely  that the terms and conditions of the current T&D Contract and its Supplemental
Agreement, will be upheld.

33. PREPA's Second Administrative Expense Motion requests an order allowing an
administrative expense claim for any accrued and unpaid obligations of PREPA to Luma
Energy during the Interim Period. These obligations stem from the T&D Contract and the
Supplemental Agreement. Since the terms and conditions of the T&D Contract and the
Supplemental Agreement can be amended according to the House of Representative's
Resolution, it is very likely that the obligations of PREPA as to Luma Energy, and the fees
that it has to pay, will change.

34. As a result, PREPA's Second Administrative Expense Motion is not ripe for adjudication,
and a decision into the merits of such motion will constitute an impermissible advisory
opinion, barred by Article III of the U.S. Constitution. Thus, this Court should exercise
prudence and dismiss this matter as unripe. In the alternative, this Court should hold the
matter in abeyance until such a time comes that the Supreme Court reviews the PREB's
approval of the Energy Compliance Certificate, the First Circuit reviews this Court's
determination granting administrative expense treatment to the Front-End Transition
obligations, and until it is clear what will happen with the T&D Contract and the
Supplemental Agreement in the Legislative Assembly of Puerto Rico.

**B. The Preconditions for Luma Energy to assume full control over PREPA's operations and management have not been met.**

35. Another reason that PREPA's Second Administrative Expense Motion is unripe is because
the preconditions for Luma Energy to assume full control over the grid under the T&D
Contract and the Supplemental Agreement have not been met. In PREPA's Second

Administrative Expense Motion, the FOMB stated that the "Supplemental Agreement provides for the commencement of the O&M Services if Service Commencement Date Conditions, other than PREPA's exit from Title III and delivery of certain tax opinion and reliance letter, are satisfied or waived." PREPA's Second Administrative Expense Motion at 15, ¶ 34.

36. Without explaining what are the conditions that must be accomplished before the Service Commencement Date, the FOMB indicated that "Luma Energy has stated that it is on track to complete all Font-End Transition Services and Commencement Date Conditions prior to June 1, 2021." PREPA's Second Administrative Expense Motion at 11, ¶ 25.

37. Section 4.5 of the T&D Contract establishes that the Service Commencement Date shall not occur, nor the parties proceed with their respective obligations corresponding to this period until all the conditions precedent are met, unless the parties mutually agreed otherwise. Under the T&D Contract, there are 23 conditions that must be met before June 1, 2021, for Luma Energy to be able to operate and manage PREPA's grid. Among them is that Luma Energy, PREPA, and the Puerto Rico Public-Private Partnership Authority must have fulfilled all their obligations regarding the Front-End Transition period. There is no allegation in PREPA's Second Administrative Expense Motion that all the preconditions were met.

38. Under the Supplemental Agreement, there are about 15 conditions that must be met before the Interim Service Commencement Date –June 1, 2021— for Luma Energy to enter PREPA's operation and management. Among them is that the T&D Contract shall remain in full force and effect. As already explained, due to Puerto Rico's Legislative Assembly's posture, it is highly likely that the T&D Contract's terms and conditions will not remain.

Therefore, it is probable that this precedent condition will not be met. Also, given that the PREB's approval of the Energy Compliance Certificate is under review before the Supreme Court of Puerto Rico, the T&D Contract's validity is not final. Thus, the Supplemental Agreement's precondition to the Interim Service Commencement Date that that T&D Contract be in full force and in effect, is uncertain and contingent upon future events.

39. On April 1st, 2021, UTIER and SREAEE sent to the movants a *First Set of Interrogatories to Government Parties* and a *First Request for Production of Documents to Government Parties*, to know whether the conditions precedent to the Interim Service Commencement Date have been met.

40. The Government Parties objected, and regarding the information and interrogatories related to the conditions precedent to the Interim Service Commencement Date, indicated that it is irrelevant to PREPA's Second Administrative Expense Motion. *Government Parties' Responses and Objections to Interrogatories,* Response to Interrogatory No. 1. Therefore, it can be assumed that the FOMB is not willing to produce the information required regarding this issue. As a result, it can be understood that the conditions precedent to the Interim Service Commencement Date have not been met.

41. Regarding whether the Supplemental Agreement is in full force as of this date, the Governments Parties stated that it is. *Government Parties' Responses and Objections to Interrogatories,* Response to Interrogatory No 2.  However, it did not establish if all the conditions precedent were met.

42. Another pre-condition established in the Supplemental Agreement is that PREPA's employees must have received and accepted offers of employment with Luma Energy to perform the Interim Period Services. According to Luma Energy's CEO, Wayne Stensby,

3,800 employees are needed for the operation of the T&D System.[5] As of April 2, 2021, the Government Parties answered that Luma Energy has officially extended 488 offers of employment to 437 legacy PREPA employees and 51 external candidates. However, Luma Energy has not been able to answer how many employees it has accepted so far. *Government Parties' Responses and Objections to Interrogatories,* Response to Interrogatory Nos. 3 & 5. From April 2, 2021 through June 1st, 2021, there are only 68 days left. Therefore, in this short period of time, Luma Energy must interview and hire at least 3,800 employees. Luma Energy would have to interview, hire and train 55 employees per day to comply with the T&D Contract and the Supplemental Agreement.

43. Besides not answering how many employees has hired, the FOMB did not specify how it will operate without hiring the number of employees needed. *See Government Parties' Responses and Objections to Interrogatories,* Response to Interrogatory Nos. 3 & 7.

44. Additionally, UTIER inquired about whether all service accounts have been established as required by the Supplemental Agreement. The Government Parties answered that these accounts have not yet been established. *See Government Parties' Responses and Objections to Interrogatories,* Response to Interrogatory Nos 8 & 9. However, to fund these accounts, PREPA would need a loan of $894 million.[6] Funding for these accounts is an essential requirement of the T&D Contract and a precondition for the Interim Service Commencement Date. Yet, the FOMB has not stated that such requirement has been met.

---

[5] Rosario Fajardo, *LUMA CEO Defends PPP Contract with PREPA*, THE WEEKLY JOURNAL, Mar 24, 2021. Available at: https://www.theweeklyjournal.com/business/luma-ceo-defends-ppp-contract-with-prepa/article_2d4730be-8c0a-11eb-853e-1739685887e8.html (Last visit: April 10, 2021).

[6] FOMB's CREDITOR MEDIATION CASH SUPPORT MATERIALS PRESENTATION at 3, 24 (December 17, 2020)(*available at* https://emma.msrb.org/P11450397-P11124337-P11535399.pdf) (last visit: April 10, 2021).

[6] PREPA's Fiscal Plan at 10.

45. Another precondition is that all the documents and instruments identified in Article 4 of the T&D Contract regarding the Front-End-Transition period are in form and substance, reasonable, in effect and enforceable against each party. The Government Parties objected this question as irrelevant. *See Government Parties' Responses and Objections to Interrogatories,* Response to Interrogatory No 15. However, to know whether the conditions have been met addresses the ripeness of PREPA's Second Administrative Expense Motion. The Government Parties have the burden of establishing that the Second Administrative Expense Motion is ripe.

46. A precondition for the Interim Service Commencement Date is the absence of Governmental prohibitions or injunctions that would make the T&D Contract illegal or enjoins a party of performing its obligations accordingly. The Government Parties objected this question as irrelevant. *See Government Parties' Responses and Objections to Interrogatories,* Response to Interrogatory No 16. However, to know whether the conditions have been met addresses the ripeness of PREPA's Second Administrative Expense Motion. The Government Parties have the burden of establishing that the Second Administrative Expense Motion is ripe.

47. A precondition for the Interim Service Commence Date is if there are any pre-existing environmental conditions that present a risk of material liability as established by Section 4.5(f) of the T&D Contract. The Government Parties objected this question as irrelevant. *See Government Parties' Responses and Objections to Interrogatories,* Response to Interrogatory No 17. However, to know whether the conditions have been met addresses the ripeness of PREPA's Second Administrative Expense Motion. The Government Parties have the burden of establishing that the Second Administrative Expense Motion is ripe.

48. A precondition for the Interim Service Commencement Date is that PREPA has adequate funding for Capital Costs as established in Section 4.5(i) of the T&D Contract. The Government Parties objected this question as irrelevant. *See Government Parties' Responses and Objections to Interrogatories,* Response to Interrogatory No 18. However, to know whether the conditions have been met addresses the ripeness of PREPA's Second Administrative Expense Motion. The Government Parties have the burden of establishing that the Second Administrative Expense Motion is ripe.

49. A precondition for the Interim Service Commencement Date is that the Government Parties requested review and approval of the Federal Funding Procurement Manual from FEMA and DHS OIG. The Government Parties objected this question as irrelevant. *See Government Parties' Responses and Objections to Interrogatories,* Response to Interrogatory No 19. However, to know whether the conditions have been met addresses the ripeness of PREPA's Second Administrative Expense Motion. The Government Parties have the burden of establishing that the Second Administrative Expense Motion is ripe.

50. Another precondition for the Interim Service Commencement Date is that PREPA and Luma Energy agree on the manned in which the System of Revenues will be allocated into PREPA accounts managed by Luma Energy. The Government Parties objected this question as irrelevant. *See Government Parties' Responses and Objections to Interrogatories,* Response to Interrogatory No 20. However, to know whether the conditions have been met addresses the ripeness of PREPA's Second Administrative Expense Motion. The Government Parties have the burden of establishing that the Second Administrative Expense Motion is ripe.

51. A precondition for the Interim Service Commencement Date is that there has to be a final plan for the reorganization of PREPA into GenCo and GridCo. The Government Parties

objected to this question as irrelevant. *See Government Parties' Responses and Objections to Interrogatories,* Response to Interrogatory No 21. However, to know whether the conditions have been met goes into the ripeness of PREPA's Second Administrative Expense Motion. The Government Parties have the burden of establishing that the Second Administrative Expense Motion is ripe.

52. In order for PREPA's Second Administrative Expense Motion to be ripe, it is indispensable that PREPA and Luma Energy establish that the conditions precedent to the Interim Service Commencement date have been met. Otherwise, Luma Energy will not be able to assume its role in the Interim Period.

53. If Luma Energy does not enter PREPA's Operation and Management at the Service Commencement Date –June 1st, 2021— PREPA will not have to pay the fees for the Interim Period, which are the fees that the FOMB seeks an order allowing them as administrative expenses. Thus, it will not be until all the conditions precedent to the Interim Service Commencement Date, that PREPA's Second Administrative Expense Motion will be ripe for adjudication. *See City of Fall Rivers v. F.E.R.C.*, 507 F.3d 1, 7-8 (1st Cir. 2007) (The First Circuit held that the review of an agencies' order was unripe since the conditions precedent for the approval of the project –authorization by two other agencies— were not met).

54. Moreover, if Luma Energy commences operating and managing PREPA on June 1st, 2021 without all preconditions being fulfilled, it will be breaching and violating the T&D Contract.

55. As explained, it is likely that one of the conditions precedents –that the T&D Contract is in full force and in effect— will not be met, because of the Legislative's Assembly's posture towards it. Likewise, the Supreme Court could reverse the Energy Compliance Certificate – an essential requirement for the T&D Contract by virtue of law. Lastly, the First Circuit can

reverse this Court's determination of granting administrative expense treatment to the Front-End Transition Period, by deciding that there is no estate in Title III of PROMESA and/or that the Front-End Transition obligations are not administrative expenses within Section 503(b)(1)(A).

56. Consequently, a decision on the merits on PREPA's Second Administrative Expense Motion would constitute an impermissible advisory opinion barred by Article III of the U.S. Constitution, an unnecessary expense for the parties, and a burden on the limited resources of this Court. This Court should dismiss PREPA's Second Administrative Expense Motion for being unripe. In the alternative, on behalf of prudence, this Court should hold the matter in abeyance until it is certain that all conditions precedent to the Service Commencement Date are fulfilled.

**II.     This Court should deny PREPA's Second Administrative Expense Motion because there is no administrative expense priority for necessary costs and expense of preserving the bankruptcy estate in Title III of PROMESA.**

57. PREPA is requesting an administrative expense priority for Luma Energy under Section 503(b)(1)(A) of the Bankruptcy Code. However, PREPA's "line of reasoning ignores the crucial fact that **no bankruptcy estate exists in a [Title III] case**." *See, In re New York City Off-Track Betting Corp.,* 434 B.R. 131, 142 (Bankr. S.D.N.Y. 2010) (referring to Chapter 9 cases) (emphasis added).[7] "[T]he plain language of [Title III] does not contemplate the creation of an estate. As **there is no bankruptcy estate** in a [Title III] case, **there can be no 'necessary costs and expenses' of preserving the estate**." *See Id.* (referring to Chapter 9 cases) (emphasis added). Therefore, PREPA does not have the right to an administrative expense priority under this Section.

---

[7] To be clear, these citations are not about Title III of PROMESA. The bracketed modifications are replacing Chapter 9 for Title III because the same considerations apply, as we will argue below.

58. In prior occasions, "[t]he First Circuit Court of Appeals has clearly stated that **granting priority status to creditors is contrary to the fundamental principle of bankruptcy law** that a debtor's limited resources should be distributed equally among similarly situated creditors and thus **statutory priorities should be narrowly construed**." *In re Malden Mills Industries, Inc.,* 303 B.R. 688, 707 (B.A.P. 1st Cir. 2004) (*citing In re FBI Distribution Corp.,* 330 F.3d 36, 42 (1st Cir. 2003)) (emphasis added).

59. That said, the Bankruptcy Code provides that some claims "shall be allowed administrative expenses[,] including (1)(A) the actual, necessary costs and expenses of preserving **the estate**[.]" 11 U.S.C. § 503(b)(1)(A) (emphasis added). However, in Title III, just like in Chapter 9, **there is no estate**, because Section 541 of the Bankruptcy Code is not incorporated into the statutory framework of these proceedings. *Compare* 48 U.S.C. § 2161(a) (excluding Section 541 from Title III), *with* 11 U.S.C. § 901 (excluding Section 541 from Chapter 9).[8]

60. As a result of that express exclusion of Section 541, in the context of Chapter 9 cases, which are few and far between, the **absence of a bankruptcy estate** when a municipality adjusts its debts has led to the inevitable conclusion that **there is no administrative expense priority for operational expenses.** At least one court and two prominent treatises have adopted that reasoning:

> Because a chapter 9 debtor's property remains its own and does not inure into a bankruptcy estate as provided by section 541 of the Bankruptcy Code, **there can be no administrative expenses for "the actual and necessary costs of preserving the estate" as contemplated by section 503(b)(1)(A) of the**

---

[8] It should be noted that this Section does not use the terminology "property of the estate" but "estate." According to Chapter 9 and Title III, statutory interpretation requires replacing "property of the estate" with "property of the debtor." 11 U.S.C. § 902(1); 48 U.S.C. § 2161(c)(5). If Congress had intended to extend that interpretation to the single word "estate" it would have done so in the plain language of the statute. *See Dean v. U.S.,* 556 U.S. 568, 573 (2009) ("Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (citation and brackets omitted)).

24

**Bankruptcy Code**. Both leading bankruptcy treatises concur with this approach. Collier observes that because there is no estate in a chapter 9 case, administrative **expense claims under section 503 must be limited to "expenses incurred in connection with the chapter 9 case itself" and not operating expenses**. Norton agrees, observing in passing that **no operating administrative expenses are permitted in a chapter 9 bankruptcy case**. *In re New York City Off-Track Betting Corp*., 434 B.R. 131, 142 (Bankr. S.D.N.Y. 2010) (citations omitted) (emphasis added).

61. Collier, specifically, has said about this issue:

Section 503(b)(1) **should not be read to include the general operating expenses of a municipality during the period that the chapter 9 case is pending**. Indeed, as there is no estate created in a chapter 9 case, **there can be no necessary costs and expenses of preserving the estate.** Moreover, section 904 precludes the bankruptcy court from exercising control over the property or revenues of a municipality and section 903 counsels against any such interference. Such expenses are not within the control of the court. To permit the court to determine "the actual, necessary costs and expenses of preserving the estate" would give the court undue control over "the political or governmental powers of the debtor … [or] the property or revenues of the debtor." Such claims incurred by the municipality during the case will not be discharged, and will remain liabilities of the municipality after confirmation of a plan or dismissal of the case. 6 Collier on Bankruptcy P 901.04 (16th ed. 2020) (footnotes omitted) (emphasis added).

62. Norton, on the other hand, says:

Section 901 incorporates §§ 503 and 507(a)(2). Section 541 does not apply in Chapter 9. Accordingly, there is no Chapter 9 estate and therefore no administrative expense priority for the costs of preserving the estate. **Administrative claims in Chapter 9 are limited to the costs of the case itself.** The bankruptcy court does not have the power to allow or order payment of administrative claims, but must require payment of administrative claims as a condition of confirmation.

. . . . . . . .

The court noted that § 901 provides that §§ 503 applies to Chapter 9 debtors, but § 901 does not incorporate § 541. Because a Chapter 9 debtor's property remains the debtor's and does not become part of a bankruptcy estate under § 541, there can be no administrative expenses for the actual and necessary costs of administering the estate under § 503(b)(1)(A). **Accordingly, notwithstanding the application of § 503, administrative expense claims in Chapter 9 are limited to the expenses incurred in connection with the case itself and not general operating expenses.** Regardless of the debtor's consent, therefore, the constitutional underpinnings of §§ 903 and 904 preclude the court from intruding

25

on the debtor's operations to the extent of ordering the debtor to make post-petition payments. 5 <u>Norton Bankr. L. & Pract. 3d</u> §90:14 (footnotes omitted) (emphasis added).

63. Thus, in a Chapter 9 case, only the expenses incurred **in the bankruptcy case itself** can be granted administrative expense priority. **Operational expenses cannot be given the same treatment.** This is consistent with the narrowly construed interpretation of priorities in bankruptcy.

64. Now, while these statements are made with reference to Chapter 9 cases, they apply equally to Title III cases because they are based on a textual interpretation of a provision that is present in **both forms of bankruptcy.** Both Chapter 9 and Title III exclude Section 541 because **there is no estate** in these cases. Thus, the reasoning transfers exactly. *Compare* 48 U.S.C. § 2161(a) (excluding Section 541 from Title III) *with* 11 U.S.C. § 901 (excluding Section 541 from Chapter 9). Thus, in keeping with the policy of interpreting priorities **narrowly**, this Court should employ the same interpretation to Title III.

65. In view of the foregoing, in a Title III case there is no right to an administrative expense under Section 503(b)(1)(A) for necessary costs of preserving the estate, **because there is no estate**. The expenses that PREPA seeks priority for are post-petition **operating expenses** and, thus, should not be granted priority in this case.

66. PREPA cites *In re Craig County. Hosp. Auth.*, 572 B.R. 340 (Bankr. N.D. Okla. 2017) to support the contrary position. However, PREPA's reliance on this case is misleading. In *In re Craig,* the Bankruptcy Court only considered the availability of administrative expense priorities for **assumed executory contracts:**

> Having accepted the benefits of an **executory contract**, the debtor-in-possession in *Bildisco* was required to "assume[ ] the contract *cum onere*," meaning that "the **expenses and liabilities incurred may be treated as administrative expenses**, which are afforded the highest priority on the debtor's estate."[63] This Court

believes those principles are **equally relevant to a post-bankruptcy debtor entity in a Chapter 9 case.** Here, the services of Regional were both *supplied to* and *beneficial to* the post-bankruptcy Hospital Trust. Under the terms of the Confirmed Plan and *Bildisco*, the claim of Regional, **based on 1) an assumed contract;** and 2) actual, necessary costs and expenses of preserving the Hospital Trust, is an Allowed Administrative Claim. *In re Craig*, 572 B.R. at 351 (emphasis added) (footnotes omitted).

67. Furthermore, in this case, the Bankruptcy Court was not ruling on a Section 503(b)(1)(A) Motion. It was interpreting a confirmed plan. *Id.* at 347, ("The Court's sole function in this matter is to **interpret the Confirmed Plan and decide** whether the Applicants' claims are entitled to the same priority as professional fees and § 503(b)(9) claims, or whether they will be grouped with general unsecured claims in Class 7."(emphasis added)); at 350 ("Therefore, **the question is not 'what Chapter 9 allows,'"** but whether the parties, under the Confirmed Plan, expressed an intention to give administrative, priority status to post-petition claimants that conferred actual benefit on the Hospital Trust during the course of this case."(emphasis added)). When the Bankruptcy Court referred to "the equitable result[,]" it was responding to the fact that the debtor had agreed to priority in the confirmation plan:

> Were this Court to rule otherwise, it would be countenancing something akin to a "bait and switch" procedure, whereby creditors are enticed to vote for confirmation of a plan with the promise of administrative priority, only to be told "Gotcha! No claims qualify!" when they ultimately seek payment. The Court will not take the rule of law in this jurisdiction down that path. *Id.* at 351.

68. This is not the case before the Court now. The T&D Contract is not an executory contract, nor is it being assumed, and there is not confirmed plan in this proceedings promising Luma Energy an administrative expense priority. There is no need for equitable results in this case, because, unlike in *In re Craig,* the claimant is not relying on a confirmed plan. On the contrary, Luma Energy is aware that receiving an administrative expense priority is not a sure thing, which is why the T&D Contract includes stipulations to that effect.

69. Thus, this Honorable Court should dismiss PREPA's Second Administrative Expense Motion and deny administrative expense priority to the fees payable by PREPA under the T&D Contract and the Supplemental Agreement. It is not this Court's responsibility to validate the actions of PREPA or the FOMB, but to impartially rule on the legal issues surrounding the bankruptcy case. The FOMB may have sole and autocratic discretion over many things under PROMESA, but it cannot change the law and it is not excused from complying with it.

### III.   In the alternative, the Court should deny PREPA's Second Administrative Expense Motion because it is not beneficial for PREPA's restructuring.

70. The Government Parties seeks "an order granting to LUMA Energy an allowed administrative expense claim for accrued, unpaid amounts required to be paid by PREPA to LUMA Energy under the Supplemental Agreement and the O&M Agreement during the Interim Period to enable LUMA Energy to assume responsibility over operating the [Transmission and Distribution] System." *See* PREPA's Second Administrative Expense Motion at 3-4, ¶3.

71. The fees that PREPA must pay to Luma Energy during the Interim Period consist of:

> "(a) compensation for the O&M Service during the Interim period […], in an annual fixed amount of $115 million […]; (b) indemnification of LUMA Energy and its affiliates primarily for any claims or damages against them arising from PREPA's operation of the utility […]; (c) a $115 million termination fee, payable upon the occurrence of the Interim Period Termination Date." PREPA's Second Administrative Expense Motion at 16, ¶ 36.

72. Given PREPA's current financial situation, granting priority and administrative expense treatment to the fees payable to Luma Energy for the Interim Period, will cripple the public corporation even more, affecting its debt restructuring process. This Court already granted administrative expense and priority treatment for the fees payable by PREPA for the Front-End Transition period that will amount to over $136 million.

73. According to the 2020 Fiscal Plan for the Puerto Rico Electric Power Authority ("PREPA's Fiscal Plan"), as certified by the FOMB on June 29, 2020,[9] it is projected that by June 2021, PREPA will have a deficit of $132 million due to the front-end transition fees that PREPA must pay to LUMA Energy. As a matter of fact, PREPA's Budget for FY 2020-2021, as certified by the FOMB, established a $125 million deficit.[10]

74. The O&M Services that Luma Energy is to be performing in the Interim Period are going to be more onerous for PREPA. Therefore, the fees under this period are going to create a more significant deficit in PREPA's financials, affecting its restructuring process.

### A. Standard of Review

75. The Bankruptcy Code provides that some claims "shall be allowed administrative expenses[,] including (1)(A) the actual, necessary costs and expenses of preserving the estate[.]" 11 U.S.C. § 503(b)(1)(A) (emphasis added).

76. The Court of Appeals for the First Circuit has stated that[,] "in general, for a claim to qualify as an administrative expense under subsection 503(b)(1)(A), (1) it must have arisen from a transaction with the trustee or debtor in possession, rather than from a prepetition transaction with the debtor, and (2) the consideration supporting the claim must have benefitted the estate in some demonstrable way." *In re Malden Mills Industries, Inc.*, 303 B.R. 688, 706 (B.A.P. 1st Cir. 2004) (citation omitted) (bracket omitted) (Emphasis added).

77. Moreover, "[t]he burden of proving entitlement to priority payment as an administrative expense rests with the party requesting it as the traditional presumption favoring ratable distribution among all unsecured creditors requires strict construction of provisions

---

[9] 2020 Fiscal Plan for the Puerto Rico Electric Power Authority ("PREPA's Fiscal Plan"), as certified by the Financial Oversight and Management Board for Puerto Rico on June 29, 2020 Available at: https://drive.google.com/file/d/1paRgy0dJBkUH4-5eev7z2SuR0diil8g9/view (last visit: April 9, 2021).

[10] Puerto Rico Electric Power Authority Fiscal Yar 2021 Certfied Budget. Available at https://drive.google.com/file/d/1yIV664F009bi3UeE9WBHi3J6U6r42tFQ/view (Last visit: April 9, 2021).

governing requests for priority payment of administrative expenses." *Id.* at 707 (emphasis added) (citations omitted). *See, also, In re La Electronica, Inc.,* 995 F.2d 320, 322 (1st Cir. 1993) ("As we have long recognized, 'the traditional presumption favoring ratable distribution among all holders of unsecured claims counsels strict construction of the Bankruptcy Code provisions governing requests for priority payment of administrative expenses.'" (citation omitted) (emphasis added)).

78. In view of the foregoing, the standard to prove entitlement to an administrative expense priority under Section 503(b)(1)(A) is high and the burden is on the movant, because there is a presumption against granting this priority. PREPA has not met that burden.

**B. The Interim Obligations are not necessary costs of preserving the estate, because they do not provide any benefits for the debtor or its creditors.**

79. The Government Parties, stated that granting administrative expense priority to the Interim Obligations are beneficial for PREPA, because "LUMA Energy's satisfaction of its contractual obligations manifestly benefits the debtor, as well as the debtor's post-petition operation." PREPA's Second Administrative Expense Motion at ¶40.

80. Additionally, without explaining how, they stated that it will be beneficial for PREPA's stakeholders because by Luma Energy performing the O&M Services, it will make operational improvements to the T&D System. *Id.* at ¶¶30, 41.

81. Moreover, the Government Parties, stated that "the O&M Services are the vehicle driving PREPA's transformation of the T&D System. Thus, the O&M Services themselves, which consist of operating PREPA's T&D System during Title III, crystallize the benefits from the planning phase, and equally are entitled to administrative expense-priority status." *Id.* at ¶42.

82. However, what the Government Parties miss is that for the Interim Obligations to be granted priority they must be beneficial for PREPA's restructuring, including its creditors and stakeholders. The objective of preserving the estate under Section 503(b)(1)(A) is not about benefiting the debtor's business for its own sake, but for the sake of the creditors, who are the intended beneficiaries of a bankruptcy estate. *See, for example, Lastra v. Esteves (In re Bay Broad.),* 182 B.R. 369, 374 (D.P.R. 1995) ("The words 'actual and necessary' have been construed to require the debt to benefit the estate and creditors." (emphasis added) (citation omitted)). *See, also, In re PMC Mktg. Corp.*, 09-02048, 2013 WL 3367500, at *7 (Bankr. D.P.R. 2013) ("A survey of case law reveals that the terms 'actual' and 'necessary' found in the statute are to be narrowly construed. Therefore, to qualify as an administrative expense entitled to priority, the expense must be an actual and necessary cost of preserving the estate for the benefit of its creditors." (emphasis added) (citations omitted)).

83. Without explaining, the Government Parties stated that "LUMA Energy's expenditure of new time and resources will preserve and improve PREPA, and will thus insure to the benefit of all PREPA's stakeholders." PREPA's Second Administrative Expense Motion at ¶43.

84. Notwithstanding, the T&D Contract is causing an enormous deficit for PREPA. For instance, according to PREPA's Fiscal Plan it is projected that by June 2021, PREPA will have deficit of $132 million. This deficit is due to the Front-End transition fee to LUMA Energy, that this Honorable Court granted administrative expense treatment.

85. Mr. Rosario stated that "the accumulated deficit for the first six months of Fiscal Year ("FY") 2020-2021 ascends to $432.8 million. This contrasts the original budgeted loss for FY 2020-2021 of $125,663,000, according to PREPA's Budget for such FY, as certified by the FOMB.  This means that up until January 2021, PREPA's deficit is 3.44 times higher

than the certified budget for FY 2020-2021." (Exhibit 1: Héctor Rosario's Declaration in Support of UTIER's Objection to PREPA's Second Administrative Expense Motion at ¶10). ("Rosario's Declaration").

86. In fact, PREPA will require a loan of more than $894 million to cover the deficiencies generated by the T&D Contract. This means that PREPA will have to get more indebted. (Rosario's Declaration at ¶11). "Additionally, according to PREPA's Fiscal Plan, PREPA diverted $153 million from its budget to guarantee payment to LUMA Energy. These funds were destined to vegetation control and necessary maintenance expenses. Thus, leaving the electrical system more fragile to confront natural disasters." (Rosario's Declaration at ¶12).

87. According to PREPA's First Administrative Expense Motion, the T&D Contract is "the crucial first step in the overall transformation of Puerto Rico's energy sector and will lead to a wholesale change of this sector by **dismantling and reorganizing the current vertically integrated corporation** [. . .]." [Docket No. 2053-1at 16]. Evidently, a set of expenses with the ultimate goal to dismantle the debtor, do not fit the description of an administrative expense. Furthermore, expenses incurred for another entity to take over debtor's business, do not rehabilitate debtor's business.

88. Consequently, besides dismantling PREPA, the T&D Contract has and will keep creating a deficit for PREPA, that will affect its capacity to restructure its debt and pay all its creditors. Moreover, it will make PREPA to get more indebted as it will need a loan from the Central Government of $894 million to comply with the T&D Contract. It is worth mentioning that this will increase the cost of energy in Puerto Rico. According to a calculation made by Mr. Rosario, "the operational deficit of FY 2021 could mean an increase of 3 cents kWh in the cost of energy. Eventually, there will be an increase of up to 4.552 cents kWh that

correspond to the [Restructuring Support Agreement].  If these fees are added to the 18.13 cents per kWh for the current cost of energy, plus 1 cent for PREPA's debt with its Retirement System, it will amount for 26.68 cents per kWh. This calculation does not consider the possible increases in the cost of fuel. This means, that energy costs could increase for 48%. Of course, this increase will be higher since PREPA needs a loan of $894 million to execute the T&D Contract, which will have to be repaid with interests. " (Rosario's Declaration at ¶22).

89. Additionally, Mr. Rosario stated that "[t]he Institute for Energy Economics and Financials Analysis ("IEEFA") has indicated that it is probable that the T&D Contracts pushes the cost of energy up to 30 cents per kWh, due to the additional costs of the service debt, the price of fuel, public sponsorship, and bad negotiation." (Rosario's Declaration at ¶23). "According to IEEFA the repayment of the $894 million will cost around $60 million during the fifteen years of the T&D Contract.  This cost does not include the interests of the $894 million. Therefore, the amount of $60 million is going to be higher." (Rosario's Declaration at ¶22).

90. Further, Mr. Rosario stated that "[t]he increase in energy costs will affect PREPA's rate payers. Thus, it will impact energy consumption, which will decrease its revenues." (Rosario's Declaration at ¶24)

91. Likewise, the T&D Contract gives Luma Energy the responsibility of establishing plans, public policy, rates, assets administration, budget, auctions adjudication, public relations, and other financial matters. All these responsibilities lead to the conclusion that Luma Energy is not an administrator. Rather, it is a for-profit corporation that has placed in PREPA's former positions, through the public corporation's dismantling. This represents a risk for the Government of Puerto Rico of losing FEMA funds. (Rosario's Declaration at ¶34).

Therefore, in the case of a natural disaster, Puerto Rico could be affected since it will not have the federal funding from FEMA to repair the electrical grid.

92. Moreover, the T&D Contract's prejudice goes beyond PREPA. It will affect the Central Government too. The option for the PREPA employees rejected by Luma Energy is relocation with another governmental entity under the concept of sole employer. It is of common knowledge that this concept has not been implemented due to the complications that it entails, specifically for certain positions in PREPA that do not exist in other agencies. This would create a problem for the central government since it would have to absorb in its payroll all the employees not hired by Luma Energy. (Rosario's Declaration at ¶41).

93. Also, the T&D Contract opens the door for potential conflict of interests among Luma Energy's affiliates, subsidiaries, and parent companies. "Luma Energy will analyze and make projections to determine the necessity of projects of capital improvements, including Generated Related Services, the Shared Services Agreement, and the need of PREPA to formalize new generation or energy purchase agreements." (Rosario's Declaration at ¶25). Moreover, these and other projects can be awarded by Luma Energy's affiliates, subsidiaries, or parent companies. "Similarly, one of LUMA Energy's subsidiary or affiliated could develop one of the projects of the new generation plants. This creates a potential conflict of interests in awarding the contract, as well as the moment of selecting the generation that will be dispatched to the Transmission and Distribution System in the Energy Control Center." (Rosario's Declaration at ¶26).

94. This conflict of interest is even higher if it is considered that the Energy Control Center was transferred to Luma Energy under the T&D Contract. (Rosario's Declaration at ¶27). Luma Energy has the duties of programming the generation assets and dispatch. "Also, it has the

duty of coordinating the load and energy requirements with independent producers and GenCo. These functions entail a future conflict of interest, since LUMA would be acting as an Independent System Operator (ISO), as described in laws 57-2014 and 17-2019, without being one." (Rosario's Declaration at ¶28).

95. Therefore, Luma Energy's operation and management of the T&D System during the Interim period could lead to potential conflict of interests. Therefore, it is not beneficial for PREPA.

96. Additionally, Luma Energy's full control over the T&D System creates a risk of Puerto Rico losing federal funding in cases of natural disasters. Mr. Rosario stated that "under the T&D Contract, PREPA remains as the owner of the T&D System, because if otherwise, it will lose access to FEMA funds to reconstruct the grid in case of natural disasters. Therefore, it is expected that PREPA' top management officials will remain but without any decisional power, in violation to Act 83-1941." (Rosario's Declaration ¶32). Moreover, these top management officials, including PREPA's Governing Board, will be receiving high compensations, but will not make any decision regarding the T&D Contract and the administration of the electric system. As a matter of fact, under the T&D Contract LUMA Energy will be entity responsible for implementing the public policy on energy. All of this, to keep receiving funds of FEMA. This raises doubt of whether this is legal under the Stafford Act, FEMA's organic law. (Rosario's Declaration ¶32).

97. Losing federal funding to repair the electrical grid in cases of natural disasters is evidently not beneficial for PREPA nor Puerto Rico as a whole, including its people, businesses, the government, and the economy.

98. In sum, the T&D Contract and of course, the Interim Obligations are significantly onerous for PREPA, since it affects PREPA's ability to comply with its creditors, stakeholders, and

its restructuring process as a whole. Also, it opens the door for conflicts of interests, and represents a risk for Puerto Rico to lose federal funding in case of natural disasters.

99. The payment of the Interim Obligations will negatively affect PREPA, as a debtor, and consequently, its creditors. By granting it an administrative expense priority, PREPA's creditors would be twice cursed: first, the Interim Obligations payments will reduce PREPA's income and, second, Luma Energy will have priority over them in the confirmed plan.

100. Moreover, once Luma Energy takes over PREPA's operations, all of the income PREPA would have received from those operations will no longer be part of PREPA's coffers nor available for debt service. While PREPA maintains the ownership of that revenue in name, it will be deposited in the service accounts for Luma Energy's use and operations. Thus, PREPA would be losing money by handing over these expenses and not receiving any returns. It is questioned then, how can granting priority to these obligations will be beneficial for PREPA and its restructuring.

101. The purpose of administrative expense priorities is preserving the bankruptcy estate and benefit the creditors. Awarding Luma Energy priority in this case defeats that purpose. The Interim Obligations do not yield any monetary benefits to the estate; they do not increase revenue or value of the estate that can be passed on to creditors. On the contrary, they continue to reduce PREPA to a shell of itself, which is detrimental to its ability to pay its creditors. The costs of the Interim Obligations are not outweighed by any financial benefits. The only party that receives a benefit is Luma Energy. PREPA and its creditors have nothing to gain and everything to lose.

102. The FOMB stated in the alternative that this Court can grant the relief requested in PREPA's Second Administrative Expense Motion pursuant to Section 503(b) of the Bankruptcy Code in general terms. PREPA's Second Administrative Expense Motion at ¶46. Moreover, that since "the categories of expenses under Section 509(b) [are] not exhaustive, the Court may allow additional administrative expenses not expressly listed and is not confined to expenses incurred in preserving the estate under subsection (1)(A)." *Id*. at ¶ 47.

103. Nonetheless, the cases cited in support of such erred arguments are inapposite. The Government Parties cited *In re Mammoth Mart, Inc.* 536 2.d 950 (1st Cir. 1976). The complete quote stated by them in such case states that:

> Congress recognized that if a business is to be reorganized, third parties must be willing to provide the necessary goods and services. Since they clearly will not do so unless their claims for payment will be paid ahead of the pre-petition debts and liabilities of the debtor, § 64(a)(1) provides a priority for expenses incurred by the debtor-in-possession in order to maintain, **preserve, or rehabilitate the bankrupt estate.** *Id*. at 954.

Conveniently, the Government Parties left out of the quote the part that states "in order to maintain, preserve, or rehabilitate the bankrupt estate."

104. The Government Parties also cite *In re Jartran, Inc.*, 732 F.2d 584 (7th Cir. 1984). In that case, the Seventh Circuit was clear that for a claim to be afforded administrative expense treatment, it must be beneficial for debtor. *See Id*. at 587. Consequently, the Government Parties are misleading this Court by stating that Section 503(b) is not confined to expenses incurred in preserving the estate.

105. In sum, the T&D Contract as a whole is not beneficial for PREPA, its creditors, its stakeholders, and the People of Puerto Rico. Thus, it is evident that the Interim Obligations will not benefit PREPA's restructuring nor will preserve PREPA's property. On the contrary, PREPA will not have any rights upon its property once Luma Energy takes full control of the

T&D System. Therefore, PREPA's Second Administrative Expense Motion should be denied.

### C. The Interim Obligations do not defeat the presumption in favor of a ratable distribution.

106. Furthermore, the Government Parties have not met their burden to justify the priority because there is a presumption of ratable distribution. As previously mentioned, "[t]he burden of proving entitlement to priority payment as an administrative expense rests with the party requesting it as the traditional presumption favoring ratable distribution among all unsecured creditors requires strict construction of provisions governing requests for priority payment of administrative expenses." *In re Malden Mills Industries*, Inc., 303 B.R. at 707 (emphasis added) (citations omitted). It has been "long recognized, 'the traditional presumption favoring ratable distribution among all holders of unsecured claims counsels strict construction of the Bankruptcy Code provisions governing requests for priority payment of administrative expenses." *In re La Electronica, Inc.,* 995 F.2d at 322 (citation omitted) (emphasis added).

107. Although the "[p]reservation of the estate includes protection of the assets of the estate, as well as postpetition operation of the business of the debtor[,]" *In re Hemingway Transport, Inc.*, 954 F.2d 1, 5 (1st Cir. 1992), this is not to say that any transaction that is related to the post-petition operation of the debtor's business is entitled to priority. The priority encompasses the idea that "existing creditors hope that by partial or complete postponement of their claims they will, through successful rehabilitation, eventually recover from the debtor either in full or in larger proportion than they would in immediate bankruptcy." *Id*. at 6 (emphasis added). Thus, for the Luma Energy expense claim to warrant administrative expense priority it needs to demonstrate that it benefits PREPA's creditors. Otherwise, it

cannot be allowed to deviate from equal treatment and ratable distribution. That is not the case here.

108. In this case, PREPA does not point to any benefit for its creditors and, on the contrary, only demonstrates that PREPA's unsecured creditors will be treated unequally in favor of a claim that produces no return. There is no hope that by prioritizing Luma Energy PREPA's business will be rehabilitated and, thus, pay off for creditors. Therefore, PREPA has not defeated the presumption of ratable distribution.

## IV.    Granting administrative expense treatment for the Interim Obligations affect and harm UTIER

109. UTIER members, as creditors in this Title III case, will be harmed by the T&D contract and the requested administrative priority. Even though the laws enacted to make privatization feasible establish that any privatization process must recognize collective agreements, and therefore the union, the T&D contract specifies that it will not recognize them.

110. The T&D Contract stated that Luma Energy would only be required to interview with a priority, the workers who apply for a job, but it is not obliged to hire it. Besides, Luma Energy is not required to grant the rights or benefits acquired in the collective bargaining agreements.

111. Additionally, PREPA will be dismantled, and any worker which Luma Energy does not hire will be transferred to other governmental entities, further burdening the Commonwealth's budget. With these actions, a union with almost 80 years of existence would disappear, leaving more than 4,000 workers and their families deprived of their rights and benefits.

112. IEEFA recognized that this contract harms the workers and thus, PREPA and Puerto Rico:

> Given the physical state of Puerto Rico's electrical system, PREPA's workforce is literally its most valuable asset. Union jobs with good salaries and benefits also

are scarce in Puerto Rico and represent an important element of the island's shrinking middle class. The elimination of the PREPA unions and their collective bargaining agreements represents another self-inflicted wound to the Puerto Rico economy.[11]

113. Another extremely disastrous element is the effect on the pension system of all PREPA's employees. The T&D Contract would have a devastating economic effect since the employees who today contribute to the pension system will not continue to do so, nor will Luma Energy make the corresponding employer's contribution, which leads it to insolvency, leaving more than 12,000 retirees deprived of their pensions.

114. By harming PREPA's workers and retirees, the T&D contract will increase the Central Government's financial problems, further damaging PREPA, and the general economy of Puerto Rico. Therefore, granting administrative priority to Luma Energy will serve no benefit to the debtor, creditors, and its stakeholders.

## **CONCLUSION**

115. For the reasons stated in this Opposition, this Court should deny PREPA's Second Administrative Expense Motion for being unripe and for constituting an enormous prejudice for PREPA's restructuring process. In the alternative, this Court should hold it in abeyance until the T&D Contract's validity is determined.

Dated: April 12, 2021.

Respectfully submitted,

BUFETE
EMMANUELLI,
C.S.P.

472 Tito Castro Ave.
Marvesa Building, Suite 106
Ponce, Puerto Rico 00716

---

[11] Testimony of Tom Sanzillo: Before the Puerto Rico House of Representatives Commission on Economic Development, Planning, Telecommunications, Public-Private Partnerships and Energy (April 6, 2021). Available at: http://ieefa.org/wp-content/uploads/2021/04/Tom-Sanzillo-testimony-April-6-English.pdf (last visit: April 10, 2021).

Tel: (787) 848-0666
Fax: (787) 841-1435
notificaciones@bufete-emmanuelli.com

*/s/Rolando Emmanuelli Jiménez*
Rolando Emmanuelli-Jiménez
USDC: 214105
1st Cir. #7707
rolando@bufete-emmanuelli.com

*/s/Jessica Méndez-Colberg*
Jessica Méndez-Colberg
USDC: 302108
1st Cir. # 1185272
jessica@bufete-emmanuelli.com

*Counsel for UTIER*

**I HEREBY CERTIFY** that on this same date I electronically filed the foregoing with the

Clerk of the Court using the CM/ECF system, which will send notification of such filing to all

participants and Standard Parties.

/s/Rolando Emmanuelli Jiménez
USDC: 214105

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*<br><br>Debtors. [1] | PROMESA<br>Title III<br><br><br>Case No. 17 BK 3283-LTS<br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO<br><br>as representative of<br><br>PUERTO RICO ELECTRIC POWER AUTHORITY,<br><br>Debtor. | PROMESA<br>Title III<br>Case No. 17 BK 4780-LTS |

## DECLARATION OF MR. HÉCTOR ROSARIO-HERNÁNDEZ IN SUPPORT OF UTIER' OBJECTION TO THE GOVERNMENT PARTIES' MOTION FOR ORDER ALLOWING ADMINISTRATIVE EXPENSE CLAIM FOR AMOUNTS TO BE PAID TO LUMA ENERGY BY PREPA DURING INTERIM PERIOD UNDER SUPPLEMENTAL AGREEMENT AND THE T&D CONTRACT

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747). (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations.)

**I, HÉCTOR ROSARIO-HERNÁNDEZ, PURSUANT TO 28 U.S.C. §1746, DECLARE AND STATE AS FOLLOWS:**

**I.      What is the subject of your testimony?**

1. My testimony is in support of *UTIER's Objection to the Government Parties' Motion for Order Allowing Administrative Expense Claim for Amounts to be Paid to Luma Energy by PREPA During Interim Period Under Supplemental Agreement and the T&D Contract*.

**II.     What is you background?[2]**

2. My name is Héctor Rosario-Hernández, a certified public accountant (CPA), former Executive Director of the Puerto Rico Electric Power Authority ("PREPA"). I was PREPA's Chief Executive Officer ("CEO") from 2001 through 2005. As PREPA's CEO, I administrated the daily operations of the public corporation, an annual operational and capital improvements budget of over $3.5 billion and $400 million, respectively. Also, among many other duties, I was responsible for the decision making in all policy issues regarding capital improvement programs. From 1991 through 2001 I was PREPA's Treasurer. In such position, my responsibilities included directing all work related to investing and disbursement of PREPA funds. Additionally, I supervised the bond issuance process, made recommendations to PREPA's CEO and Governing Board on financing regulations. Likewise, I prepared cashflow projections, and coordinated the financing of $8 billion for the Capital Improvements Program, PREPA's Capacity Expansion Plan, the Transmission and Distribution Budget, and other administrative areas. Moreover, I was part of PREPA's team in charge of negotiating two power purchase agreements. From 1988 through 1991, I worked as PREPA's Auxiliary Treasurer, where I performed all the duties of the Treasurer. From

---

[2] Attached please find my Resume as Exhibit 1.

1972 -1987, I worked as PREPA's Supervisor on the Funds Management and Investing Department, Funds Disbursement Division, Customer Service, Bank Conciliation Unit, and as Cost Accountant III.

3. I worked as the Financial Advisor to the Mayor of the Municipality of Humacao during 1989 to restructure the municipality's debt and prepare the balanced budget for fiscal year 1989-1990.

4. I worked as a Municipal Legislator in the Municipality of Humacao from 1988 through 1994.

5. Additionally, from 2001 through 2005, I was member of the following Boards and Commissions: President of PREPA's Retirement System Board, Board of Directors of the Puerto Rico Aqueduct and Sewer Authority (PRASA), Port of Mayagüez Commission, President of *Comité de Supervisión y Evaluación del Programa de Inspección de Represas y Embalses* (Supervision and Evaluation Committee for the Inspection Program of Dams and Reservoirs)*,* Large Public Power Council, American Public Power Association's Board of Directors, and Palmas del Mar Utilities, Inc.

6. Furthermore, I workers as Treasurer of the Association of Financial Professionals, and member of *Colegio de Contadores Públicos Autorizados de Puerto Rico*.

7. Currently, I work as a consultant and advisor for public and private corporations in Puerto Rico and the Dominican Republic regarding strategic planning, finance and investing, power generation, and government and public affairs. Also, I have worked as a consultant for the negotiation of Power Purchase Agreements and Solar Projects.

**III.        How will the *Puerto Rico Transmission and Distribution System Operation and Maintenance Agreement* ("T&D Contract") impact PREPA's financials?**

8.  The T&D Contract has a duration of 15 years and includes certain services fees that must be paid by PREPA to LUMA Energy, LLC and LUMA Energy ServCo, LLC (together as "LUMA Energy"), plus 1 one more year for the Front-End Transition period. These are:

   a.  Annual fixed fee that fluctuates from $70 to $100 million during the first three years, and $105 million from the fourth year onwards, plus inflation adjustments. (T&D Contract § 7.1)

   b.  Incentive fee for execution that fluctuates from $13 million to $17 million during the first three years, and $20 million from the fourth year onwards, plus inflation adjustments. (T&D Contract §7.1(c)(i)). Nonetheless, the T&D Contract does not provide for the imposition of penalties on LUMA Energy if it the expected metrics do not get accomplish for LUMA Energy's lack of execution.

   c.  Reimbursement for the expenses incurred by LUMA Energy when complying with its contractual duties and obligations, including entertainment expenses. (T&D Contract §7.2). Between June 22, 2020 and January 31, 2021, LUMA Energy has claimed $52,346,102 in reimbursement for its expenses, in addition to the $36.5 millions for the fixed fee. This amounts for a total of $88,846,102 in only seven months. These expenses have been paid by PREPA without knowing the breakdown of them and the appropriate supporting documents. This can have implications upon bad use of public funds.

9.  According to the 2020 Fiscal Plan for the Puerto Rico Electric Power Authority ("PREPA's Fiscal Plan"), as certified by the Financial Oversight and Management Board for Puerto Rico

("FOMB") on June 29, 2020,[3] it is projected that by June 2021, PREPA will have deficit of $132 million. This deficit is due to the Front-End transition fee to LUMA Energy.

10. Moreover, the accumulated deficit for the first six months of Fiscal Year ("FY") 2020-2021 ascends to $432.8 million.[4] This contrasts the original budgeted loss for FY 2020-2021 of $125,663,000, according to PREPA's Budget for such FY, as certified by the FOMB.[5] This means that up until January 2021, PREPA's deficit is 3.44 times higher than the certified budget for FY 2020-2021.

11. In fact, the FOMB filed a report before the Municipal Securities Rulemaking Board, on January 19, 2020[6], and established that PREPA will require a loan of more than $894 million to cover the deficiencies generated by the T&D Contract. This means that PREPA will have to get more indebted.

12. Additionally, according to PREPA's Fiscal Plan, PREPA diverted $153 million from its budget to guarantee payment to LUMA Energy.[7] These funds were destined to vegetation control and necessary maintenance expenses. Thus, leaving the electrical system more fragile to confront natural disasters.

13. The Public Partnership Committee's Report indicated that the present value of the fixed fee and the incentive fee of the T&D Contract in the term of fifteen years is $1,350 million (an absolute value of $1,940 million including the transition year, but without considering

---

[3] 2020 Fiscal Plan for the Puerto Rico Electric Power Authority ("PREPA's Fiscal Plan"), as certified by the Financial Oversight and Management Board for Puerto Rico on June 29, 2020 Available at: https://drive.google.com/file/d/1paRgy0dJBkUH4-5eev7z2SuR0diil8g9/view (last visit: April 9, 2021).

[4] Puerto Rico Electric Power Authority Fiscal Yar 2021 Certfied Budget. Available at https://drive.google.com/file/d/1yIV664F009bi3UeE9WBHi3J6U6r42tFQ/view (Last visit: April 9, 2021).

[5] Puerto Rico Electric Power Authority Fiscal Yar 2021 Certified Budget. Available at https://drive.google.com/file/d/1yIV664F009bi3UeE9WBHi3J6U6r42tFQ/view (Last visit: April 9, 2021).

[6] FOMB's Creditor Mediation Cash Support Materials Presentation at 3, 24 (December 17, 2020)(*available at* https://emma.msrb.org/P11450397-P11124337-P11535399.pdf) (last visit: April 10, 2021).

[7] PREPA's Fiscal Plan at 10.

inflation). Therefore, the saving's value of the T&D Contract has to be higher for the transaction to be beneficial for Puerto Rico. Considering the current deficit of PREPA, these fees could aggravate PREPA's financials and as a natural consequence, the Government of Puerto Rico.

14. According to the Puerto Rico Fiscal Agency and Financial Advisor Authority ("AAFAF") and the FOMB's projections, the T&D Contract's alleged savings will not overcome the additional costs to operate PREPA until the year of 2025. Of course, this is in an ideal scenario.[8]

15. These projections tend to be too optimists and fail by not including a sensitivity analysis to manage the uncertainty of important variables, such as the cost of fuel. In a realistic scenario, the situation could be negative. Anyway, to cover PREPA's deficit, the rates would have to be revised immediately.

16. The T&D Contract also establishes that PREPA will have to pay a series of expenses that are considered Pass-Through Expenditures. These expenses significantly increase the payments that PREPA must make to LUMA Energy.

17. Other costs related to the T&D Contract are those incurred by the Public-Private Alliance Authority ("P3") to administer such contract, since it would have to contract numerous advisors. It is worth mentioning that these advisors will be paid by PREPA, from the revenues obtained by its ratepayers.

18. As previously explained, the T&D Contract provides for the payment to LUMA Energy of an Incentive Fee, that can be up to $20 million annually if the expected performance metrics for a particular year are achieved. However, it does not provide that LUMA Energy has to pay

---

[8] FOMB's Creditor Mediation Cash Support Materials Presentation at 23 (December 17, 2020) (*available at* https://emma.msrb.org/P11450397-P11124337-P11535399.pdf) (last visit: April 10, 2021).

for penalties if the expected metrics are not achieved, unless they meet three Key Metrics for three or more consecutive years, where the T&D Contract could be terminated if the breach is for LUMA Energy's failure. This is a weak penalty to demand better performance of LUMA Energy. Moreover, three years of underperformance is too onerous for Puerto Rico.

19. The selection of the baseline metrics is of utmost importance since, according to the PREPA's Fiscal Plan, it was disclosed that in 2020 the de-pegging and maintenance of the electric system was abandoned to create a false surplus of $153 million that would be used for the payment of the LUMA Contract.

## IV.    What will be the impact of the T&D Contract upon PREPA's rate payers?

20. Considering the Restructuring Support Agreement ("RSA") and the T&D Contract's cost to PREPA, the price of energy will be significantly higher.

21. The RSA contemplates a transition charge that will be added to the electric service rates and will be increasing for 24 years. According to the RSA, the transition charge will star at 2.768 cents per kWh and will increase up to 4.552 cents per kWh.

22. According to a calculation that we have made, the operational deficit of FY 2021 could mean an increase of 3 cents kWh in the cost of energy. Eventually, there will be an increase of up to 4.552 cents kWh that correspond to the RSA. If these fees are added to the 18.13 cents per kWh for the current cost of energy, plus 1 cent for PREPA's debt with its Retirement System, it will amount for 26.68 cents per kWh. This calculation does not consider the possible increases in the cost of fuel. This means, that energy costs could increase for 48%. Of course, this increase will be higher since PREPA needs a loan of $894 million to execute the T&D Contract, which will have to be repaid with interests. According to Institute for Energy Economics and Financials Analysis ("IEEFA"), the repayment of the $894 million will cost

around $60 million during the fifteen years of the T&D Contract.[9] This cost does not include the interests of the $894 million. Therefore, the amount of $60 million is going to be higher.

23. The IEEFA has indicated that it is probable that the T&D Contracts pushes the cost of energy up to 30 cents per kWh, due to the additional costs of the service debt, the price of fuel, public sponsorship, and bad negotiation.[10]

24. The increase in energy costs will affect PREPA's rate payers. Thus, it will impact energy consumption, which will decrease PREPA's revenues.

**V.      What conflicts of interests are present in the T&D Contract?**

25. LUMA Energy is not required to invest money into PREPA. However, LUMA Energy will analyze and make projections to determine the necessity of projects of capital improvements, including Generated Related Services, the Shared Services Agreement, and the need of PREPA to formalize new generation or energy purchase agreements. *See* T&D Contract §§5.3(d), 5.5.

26. These projects, as well as the projects that will be funded by federal funds, can be awarded by LUMA Energy's affiliates, subsidiaries, or parent companies. Similarly, one of LUMA Energy's parent companies, subsidiary, or affiliated could develop one of the projects of the new generation plants. This creates a potential conflict of interests in awarding the contract, as well as the moment of selecting the generation that will be dispatched to the Transmission and Distribution System in the Energy Control Center.

---

[9] IEEFA: Savings from Puerto Rico grid privatization off to a bad start, April 8, 2021. (Available at: https://ieefa.org/ieefa-savings-from-puerto-rico-grid-privatization-off-to-a-bad-start/) (Last visit: April 10, 2021).

[10] Tom Sanzillo, Contract Between Puerto Rico, LUMA Energy Sets up Full Privatization, Higher Rates for Island Grid, October 2020 (available at: https://ieefa.org/wp-content/uploads/2020/10/Contract-with-LUMA-Energy-Sets-up-Full-Privatization_Higher-Rates_October-2020.pdf) (last visit: April 9, 2021).

27. The conflict of interest is even higher if it is considered that the T&D Contract transfer to LUMA Energy the administration of the Energy Control Center. According to Law 57-2014, the Energy Control Center must be an independent and autonomous entity.

28. LUMA Energy has the duties of dispatch and programming of the generation assets that are available. Also, it has the duty of coordinating the demand and production of energy with independent producers and GenCo. These functions entail a future conflict of interest, since LUMA would be acting as an Independent System Operator (ISO), as described in laws 57-2014 and 17-2019, without being one.

29. Nonetheless, LUMA Energy cannot be an ISO due to the own generation assets that can be managed, dispatched and programed by LUMA Energy. Any subsidiary or affiliate of LUMA, Quanta Services or Canadian Utilities (ATCO) could eventually become a generator of electricity, interfering with LUMA's objectivity in performing economic dispatch. Objectivity in dispatching and prioritization could be compromised, preventing the most economic and/or secure dispatches from being developed, which may result in high energy costs and situations where reliable operation of the electric system is at risk. Current and future contract negotiations for energy supply could be compromised when an entity that manages assets and competes with independent producers sits down with them to negotiate the purchase of energy.

30. The function of administrating PREPA's generation assets, is subject to an agreement that has not yet been published and that will represent an additional cost to be paid to LUMA, which may also result in a rate increase. This is included in Section 4.5 of the T&D Contract.

**VI.     How does the T&D Contract dismantle PREPA?**

31. The T&D Contract establish that LUMA Energy will be designated as an agent of PREPA. This means that it will manage all the capital improvements, no matter if they are financed with federal funds or other funds. T&D Contract §5.2(b)(c)).

32. It is worth mentioning that under the T&D Contract, PREPA remains as the owner of the T&D System, because if otherwise, it will lose access to FEMA funds to reconstruct the grid in case of natural disasters. Therefore, it is expected that PREPA' top management officials will remain but without any decisional power, in violation to Act 83-1941. Also, these top management officials, including PREPA's Governing Board, will be receiving high compensations, but will not make any decision regarding the T&D Contract and the administration of the electric system. As a matter of fact, under the T&D Contract LUMA Energy will be entity responsible for implementing the public policy on energy. All of this, to keep receiving funds of FEMA. This raises doubt of whether this is legal under the Stafford Act, FEMA's organic law.

33. Section 406 of the Stafford Act establishes that FEMA's funds are destined to governmental entities or non-profit organizations that lend essential services to a public entity.

34. The T&D Contract gives LUMA Energy the responsibility of establishing plans, public policy, rates, assets administration, budget, auctions adjudication, public relations, and other financial matters. All these responsibilities lead to the conclusion that LUMA Energy is not an administrator. Rather, it is a for-profit corporation that has placed in PREPA's former positions, through the public corporation's dismantling. This represents a risk for the Government of Puerto Rico of losing FEMA funds.

**VII.   What could happen in the event of a natural disaster or emergency?**

35. The T&D Contract provides different instances in which LUMA Energy can unilaterally terminate it. T&D Contract §14.5. One of these circumstances establish that LUMA Energy can unilaterally terminate the T&D Contract in the case that a *Force Majeure Event* continues for a period in excess of 18 months and materially interfered with, delays, or increases the cost of the Front-End Transition Services or the Operation and Management Services. In this case, Luma Energy would have to notify PREPA and P3 with no less than 120 days prior to terminating the T&D Contract.

36. A *Force Majeure Event* is defined under the T&D Contract as "[…] any event that causes any federal or Commonwealth Governmental Body to declare any portion of the geographic area of the T&D System part of a 'disaster zone', 'disaster area', 'state of emergency' or any similar pronouncement." T&D Contract § 4.5(c).

37. Additionally, in the case of a *Force Majeure Event*, Luma Energy could increase its rates and costs according to Section 17.2(c) of the T&D Contract.

**VIII.   Does the T&D Contract open the door for the creation of an illegal private monopoly?**

38. The T&D Contract provides for the privatization of all the electric system of Puerto Rico in the hands of LUMA Energy, including the administration of generation, (for an initial period of at least three years), dispatch, transmission, and distribution of electric energy. This leads to a private monopoly, without any guarantee that the interest of the People of Puerto Rico will be protected, before LUMA Energy's own interest.

**IX.    What will be the T&D Contract's impact upon the rights of PREPA's Employees and Retirees?**

39. The T&D Contract affects the acquired rights of PREPA's employees. The T&D Contract does not guarantee that the employees keep their regular positions at PREPA nor rights. This

is due to Section 5.8 of the T&D Contract which leaves to LUMA Energy's discretion the continuity of the employee on its position in PREPA.

40. Additionally, the T&D Contract does not establish specific guidelines or requirements that LUMA Energy must comply when interviewing, electing, and contracting the employees that potentially pass to work for them.

41. The option for the employees rejected by LUMA Energy is relocation with another governmental entity under the concept of sole employer. It is of common knowledge that this concept has not been implemented due to the complications that it entails, specifically for certain positions in PREPA that do not exist in other agencies. This would create a problem for the central government since it would have to absorb in its payroll all the employees not hired by LUMA Energy.

42. The T&D Contract bypasses the doctrines of the successor employer, corporate *alter ego*, single employer, and transfer of business in process. All of these doctrines have the purpose of avoiding that workers remain unprotected when its employer transfers the corporations' assets to other entity.

43. Likewise, PREPA's employees have been informed that they must quit PREPA and pass on to work for LUMA Energy. Nonetheless, Act 120-2018 does not incorporate in its text that PREPA's employees have to quit.

44. Also, the T&D Contract avoid the rights of PREPA's employees. It does not even analyze the contractual relations between PREPA and the unions, such as UTIER. Of course, this violates Section 15 of Act 120-2018.

45. Furthermore, the T&D Contract is silent upon the almost 10,000 retirees of PREPA that as of this date, receive their pensions.

## X.   How transparent was the process in the negotiation of the T&D Contract?

46. The bidding process was made with only two bidders. LUMA Energy was not among these two bidders. As a matter of fact, LUMA Energy got incorporated on June 17, 2020, several days after LUMA Energy was selected as the winning bidder, which was on January 11, 2020.

47. Therefore, questions about the bidding process' legality have been raised.

48. It should be noted that the Governing Board of PREPA has questioned such bidding process. Specifically, the PREPA's Governing Board questioned how they must authorize the payment of excessive reimbursable expenses claimed by LUMA Energy, without reviewing how these funds were spent.

I declare under penalty of perjury under 28 U.S.C. §1746 that the foregoing is true and correct. Executed this 12th day of April 2021 at Ponce, Puerto Rico.

Héctor Rosario-Hernández

# HÉCTOR R. ROSARIO HERNÁNDEZ, CPA, MBA

*285 Palmas Inn Way Num. 8-103*
*Humacao, Puerto Rico 00791-9687*
*Cel.787.508.1111*
[hrosariohernandez@hotmail.com](mailto:hrosariohernandez@hotmail.com)

**Education:**

**1991**   MBA-Accounting
*Magna Cum Laude,* 3.83 GPA
Interamerican University of Puerto Rico

**1987**   Accounting Board: Certified Public Accountant License (CPA)

**1975**   BBA-Accounting
University of Puerto Rico

**Work Experience:**

**2005-present**                **Consultant**

-  Advisor to public and private companies in areas such as: strategic planning, finance and investing, strategic planning, power generation, government and public affairs.
-  Clients include construction companies, municipalities, and other public and private corporations in Puerto Rico and the Dominican Republic.
- Waste to energy private projects including PPOA with PREPA.
- Solar residential project with net-metering technology.
- Solar Projects with PPOA with PREPA

**2001-March 2005**            **Puerto Rico Electric Power Authority (PREPA)**
Executive Director (CEO**)**

As Chief Executive Officer of PREPA, duties include the administration of the daily operations of the public corporation. Represents PREPA in media appearances, legislative hearings and federal agencies. Administrates an annual operational and capital improvements budget of over $3.5 billion and $400 million respectively.

Responsible for the elaboration of proposals for bond issuance in collaboration with the Government Development Bank for Puerto Rico. Evaluates the performance of each division in the Corporation, according to the established goals. Makes recommendations to the Governing Board regarding the operation of the corporation.

Responsible for the decision making in all policy issues regarding capital improvement programs. Establish the general guidelines that govern affairs related to the preparation, approval and modification of operational, conservation and permanent improvements budget to be submitted to

the Governing Board. Oversees the management and utilization of PREPA's  funds, goods and properties.


*1991-2001*                                    ***Puerto Rico Electric Power Authority***
                                               Treasurer


Responsibilities include directing all work related to investing and disbursement of PREPA funds. Supervises all personnel in the Treasury Division and is responsible of planning and coordination of all investing and financing related activities in PREPA.

Supervises the bond issuance process and long and short term Financings documentation. Makes recommendations regarding financing regulations to the Executive Director and the Governing Board. Prepares cash flow projections (long and short term) and coordinates Financing for $8 billion needed for Capital Improvements Program, PREPA's Expansion Plan, Transmission and Distribution Budget, Electric System Budget and other administrative areas.

Member of the PREPA`s team in charge of negotiations of two power purchase agreements; one for a coal fueled power plant of 454MW and  a natural gas fueled power  plant of 507MW.

**May 1988-1991**                             ***Puerto Rico Electric Power Authority***
                                               Auxiliary Treasurer

Performs all duties of the Treasurer.

**1972-1987**                                 ***Puerto Rico Electric Power Authority***
                                               Funds Management and Investing Department Supervisor
                                               Funds Disbursement Division Supervisor
                                               Customer Service Supervisor
                                               Bank Conciliations Unit Supervisor
                                               Cost Accountant III

**Activities:**

-Financial Advisor to the Mayor of the Municipality of Humacao during 1989; duties included restructuration of the municipal debt and preparation of a balanced budget for fiscal year 1989-1990.
-Municipal Legislator – Municipality of Humacao (1988-1994)
-Former Member of the following Boards and Commissions: (2001-2005):
-       President of PREPA's Retirement System Board
-       Board of Directors of the Puerto Rico Aqueduct and Sewer Authority (PRASA)
-       Commissioner, Port of Mayagüez Commission
-       President, *Comité de Supervisión y Evaluación del Programa de Inspección de Represas y Embalses*
-       Member, Large Public Power Council (LPPC)
-       Board of Directors, American Public Power Association (APPA)
-       Palmas Del Mar Utilities, Inc.

Member or former member of the following professional associations:
- Association of Financial Professionals (Treasurer)
- Colegio de Contadores Públicos Autorizados de Puerto Rico