# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

--------------------------------------------------------------------- X

In re:

THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO,

       as representative of

THE COMMONWEALTH OF PUERTO RICO *et al.,*

       Debtors.[1]

: PROMESA
: Title III
:
: Case No. 17-BK-3283 (LTS)
:
: (Jointly Administered)
:

--------------------------------------------------------------------- X

In re:

THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO,

       as representative of

PUERTO RICO ELECTRIC POWER AUTHORITY

       Debtor.

: PROMESA
: Title III
:
: Case No. 17-BK-4780 (LTS)
:
: **This filing relates only to**
: **Case No. 17-BK-4780 (LTS)**
:

--------------------------------------------------------------------- X

## RENEWED LIMITED OBJECTION OF OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO GOVERNMENT PARTIES' MOTION FOR ORDER ALLOWING ADMINISTRATIVE EXPENSE CLAIM FOR AMOUNTS TO BE PAID TO LUMA ENERGY BY PREPA DURING INTERIM PERIOD UNDER SUPPLEMENTAL AGREEMENT AND T&D CONTRACT

---

[1] The Debtors in these Title III cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK-3283 (LTS)) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284 (LTS)) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567 (LTS)) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566 (LTS)) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17-BK-4780 (LTS)) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5233) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

## <u>TABLE OF CONTENTS</u>

**Page**

I.   Supplemental Agreement Provides LUMA Energy with Objectionable Veto Right Over PREPA's Plan of Adjustment .................................................................. 3

II.  Termination Fee Does Not Qualify as Administrative Expense ........................................ 7

    A.   Termination Fee Does Not Qualify As an Administrative Expense Under 503(b)(1)(A) .......................................................................................... 7

        *1.   Termination Fee Cannot Be Approved as "Break-Up" Fee* ................... 11

    B.   Termination Fee Cannot Qualify As an Administrative Expense Under 503(b) Generally ................................................................................ 12

III. Alternatively, Court Should Treat Termination Fee As It Did Late Fees Under LUMA Opinion ................................................................................................ 14

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re Am. W. Airlines, Inc.*,
166 B.R. 908 (Bankr. D. Ariz. 1994) ........................................................................9

*In re Concepts Am., Inc.*,
No. 14 B 34232, 2021 WL 811581 (Bankr. N.D. Ill. Mar. 2, 2021) ......................13

*Cramer v. Mammoth Mart, Inc. (In re Mammoth Mart, Inc.)*,
536 F.2d 950 (1st Cir. 1976) .........................................................................7, 8, 13

*In re Drexel Burnham Lambert Grp*,
134 B.R. 482 (Bankr. S.D.N.Y. 1991) ......................................................................7

*In re Elder*,
321 B.R. 820 (Bankr. E.D. Va. 2005) .....................................................................14

*In re Energy Future Holdings Corp.*,
990 F.3d 728 (3d Cir. 2021) ....................................................................................15

*In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*,
621 B.R. 289 (D.P.R. 2020) ...............................................................................2, 15

*Ford Motor Credit Co. v. Dobbins (In re Ford Motor Credit Co.)*,
35 F.3d 860 (4th Cir. 1994) .......................................................................................7

*Fourco Glass Co. v. Transmirra Products Corp.*,
353 U.S. 222, 77 S. Ct. 787, 1 L. Ed. 2d 786 (1957) .............................................14

*In re Fred Swain, Inc.*,
97 B.R. 660 (Bankr. S.D. Fla. 1989) .......................................................................10

*In re Globe Metallurgical, Inc.*,
312 B.R. 34 (Bankr. S.D.N.Y. 2004) .......................................................................14

*In re Hupp Indus., Inc.*,
140 B.R. 191 (Bankr. N.D. Ohio 1992) .....................................................................9

*Matter of Jartran, Inc.*,
732 F.2d 584 (7th Cir. 1984) ...................................................................................13

*In re La Electronica, Inc. v. Capo-Roman (In re La Electronica, Inc.)*,
995 F.2d 320 (1st Cir. 1993) .................................................................................7, 8

*In re Michalek*,
      393 B.R. 642 (Bankr. E.D. Wis. 2008) ...................................................................8

*In re Microfab, Inc.*,
      105 B.R. 161 (Bankr. D. Mass. 1989) .................................................................15

*Nat'l Union Fire Ins. Co. of Pittsburgh v. VP Bldgs., Inc.*,
      No. 1:08 CV 196, 2008 WL 4445075 (N.D. Ohio Sept. 29, 2008), *aff'd sub
      nom. Nat'l Union Fire Ins. Co. v. VP Bldgs., Inc.*, 606 F.3d 835
      (6th Cir. 2010).....................................................................................................14

*In re Patch Graphics*,
      58 B.R. 743 (Bankr. W.D. Wis. 1986)...................................................................8

*In re Pulaski Highway Exp., Inc.*,
      57 B.R. 502 (Bankr. M.D. Tenn. 1986) ..........................................................13, 16

*In re Stevens*,
      53 B.R. 783 (Bankr. D. Me. 1985*)*..........................................................................8

*In re T.A. Brinkoetter & Sons, Inc.*,
      467 B.R. 668 (Bankr. C.D. Ill. 2012).....................................................................10

**Statutes**

11 U.S.C. § 105(a) ...........................................................................................................12

11 U.S.C. § 503 ..................................................................................................................9

11 U.S.C. § 503(b) ....................................................................................................*passim*

11 U.S.C. § 503(b)(1) .........................................................................................................9

11 U.S.C. § 503(b)(1)(A) ..........................................................................................*passim*

11 U.S.C. § 1129(a)(6) .......................................................................................................6

Bankruptcy Act .................................................................................................................13

**To the Honorable United States District Judge Laura Taylor Swain:**

The Official Committee of Unsecured Creditors (the "Committee")[2] respectfully renews its limited objection (the "Limited Objection") to the *Government Parties' Motion for Order Allowing Administrative Expense Claim for Amounts to be Paid to LUMA Energy by PREPA During Interim Period Under Supplemental Agreement and the T&D Contract* [Docket No. 16241 in Case No. 17-BK-3283] (the "Motion").[3]  In support of this Limited Objection, the Committee states as follows:

## RELEVANT BACKGROUND

1.      On August 12, 2020, the Committee filed a limited and preliminary objection to the Front-End Administrative Motion (the "Preliminary Objection").[4]  The Preliminary Objection explained that the Committee did not oppose PREPA's entry into the T&D Contract generally, but that certain aspects of that agreement and the related Supplemental Agreement raised important concerns.

2.      Specifically, the Committee identified as troubling (i) late fees, in the form of penalty interest for late payments, payable under the T&D Contract, (ii) broad control rights awarded to LUMA Energy with respect to an eventual PREPA plan of adjustment, and (iii) LUMA Energy's right to administrative expense treatment of a $115 million termination fee in the event that the effective date of a plan of adjustment that is "reasonably acceptable" to LUMA

---

[2]      The Committee is the official committee of unsecured creditors for all Title III Debtors, other than PBA and COFINA.

[3]      Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

[4]      *See Limited Preliminary Objection of Official Committee of Unsecured Creditors to PREPA's Motion for Entry of an Order Allowing Administrative Expense Claim for Compensation for Front-End Transition Services Under Puerto Rico Transmission and Distribution System Operation and Maintenance Agreement with LUMA Energy* [Docket No. 14026 in Case No. 17-3283].

Energy has not occurred within 18 months after the commencement of services under the

Supplemental Agreement.

3.       On October 19, 2020, this Court issued its opinion largely granting the Front-End

Administrative Motion (the "LUMA Opinion").[5]  The Court denied without prejudice the

Government Parties' request for administrative expense priority for certain Late Fees (as defined

in the LUMA Opinion) on the basis that "the Government Parties have failed to proffer an

adequate factual basis upon which the Court can conclude at this stage that such fees

categorically constitute actual and necessary costs of preserving PREPA."  *In re Fin. Oversight

& Mgmt. Bd.*, 621 B.R. at 302.  This was primarily because the Late Fees pertained to

hypothetical expenses that "might become due" and had not been "actually incurred."  *Id.*  The

Court also ordered that "any renewed application" by the Government Parties for such fees

"must be accompanied by a record demonstrating that any Late Fees actually incurred were

reasonable and necessary for the preservation of PREPA."  *Id.*

4.       Regarding the Committee's other concerns, the Court declined to address, in the

context of the Front-End Administrative Motion, the specific provisions of the Supplemental

Agreement.  The Court explained that "the Supplemental Agreement contemplates separate

motion practice seeking administrative expense treatment for amounts that become due under the

Supplemental Agreement [] and the [Committee] can raise its concerns if and when that process

is commenced."  *Id.*

---

[5]       *See In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*, 621 B.R. 289, 302 (D.P.R. 2020); *see also Memorandum
Opinion Granting in Part and Denying in Part PREPA's Motion for Entry of an Order Allowing Administrative
Expense Claim for Compensation for Front-End Transition Services Under the Puerto Rico Transmission and
Distribution System Operation and Maintenance Agreement With LUMA Energy* [Docket No. 14607 in Case
No. 17-3283].

5.      Because the Motion currently before the Court expressly raises these issues, the

Committee now renews its limited objection to the Supplemental Agreement including,

specifically, to the Termination Fee (as defined herein) and to LUMA Energy's broad consent

rights to any plan of adjustment for PREPA.

## LIMITED OBJECTION

### I.      **Supplemental Agreement Provides LUMA Energy with Objectionable Veto Right Over PREPA's Plan of Adjustment**

6.      The Supplemental Agreement contains three particularly troubling terms.  First,

section 6.1 of the Supplemental Agreement includes as a condition to the occurrence of the

Service Commencement Date that the Court shall have confirmed, and PREPA shall have

consummated, a Title III Plan that is "reasonably acceptable to" LUMA Energy.  Relatedly,

section 7.1(a) of the Supplemental Agreement provides that both the Supplemental Agreement

and the T&D Agreement itself will terminate if the Service Commencement Date (which

includes the effective date of a plan of adjustment) has not occurred within 18 months of the

June 1, 2021 Supplemental Agreement Effective Date.  Finally, if this automatic termination is

triggered, LUMA Energy will be entitled to $115 million of liquidated damages (the

"Termination Fee").

7.      Taken together, these provisions grant LUMA Energy potential control over

PREPA's Title III case: not only must PREPA confirm and consummate a plan within a date

certain or risk losing the entire T&D Contract and the hundreds of millions of dollars (including

the $115 million Termination Fee) paid to LUMA Energy thereunder, PREPA has agreed to

grant LUMA Energy "reasonable" veto rights over any such plan.

8.      In its Preliminary Objection, the Committee noted that it was not, conceptually,

opposed to a consent right for LUMA Energy, as the Committee recognizes the reasonable

3

concern that LUMA Energy may have regarding the impact of a potential plan of adjustment on its ability to perform under the T&D Contract.  The Committee, however, was concerned that the Supplemental Agreement sets no parameters for determining whether LUMA Energy's dissatisfaction with any proposed plan of adjustment is "reasonable" or not, and that the Supplemental Agreement thus creates a scenario whereby LUMA Energy may be able to throw PREPA's transformation process into turmoil for potentially any reason (even for reasons that do not directly impact the T&D Contract).

9.       As explained in the Preliminary Objection, this concern was highlighted by the parties' unexplained refusal to accept the easy solution to this problem ***already embedded in the Supplemental Agreement***: the Supplemental Agreement already contains such a limiting concept, as it added the defined term "Material Adverse Effect," which is defined to mean "a material adverse effect on (i) the ability of Operator or Owner, as applicable, to perform its obligation under the Supplemental Agreement or (ii) the rights of Operator or Owner, as applicable, under the Supplemental Agreement and/or this [Supplemental] Agreement."[6]

10.      The Government Parties have never offered any explanation for granting LUMA Energy a consent right bounded only by the vague term "reasonably acceptable," as opposed to a provision that would allow LUMA Energy to terminate its obligations under the T&D Contract if the Court confirmed a plan that created a Material Adverse Effect.  Similarly, there is no explanation offered for why the Supplemental Agreement and the T&D Contract terminate simply because, for example, PREPA was able to confirm, but not consummate, an acceptable plan, as opposed to providing that the fact that the plan did not go effective within the 18-month period will be a termination event only if that delay gives rise to Material Adverse Effect.

---

[6]    Suppl. Agreement § 4.2(a).

11.     Indeed, in the current Motion, the Government Parties continue to refuse to do so,
saying only that the "consent rights regarding a Title III plan and confirmation order are subject
to a reasonableness qualifier," and the reasonableness of LUMA Energy's withholding of
consent will be subject to determination by this Court.[7]  The further argument that the Committee
has "plucked" its objection to this "provision[] out of context,"[8] should be understood for the
irrelevant rhetoric it is: granting LUMA Energy (or any creditor) a consent right over a plan has
obvious, and potentially overarching and devastating, impact on PREPA's reorganization, and
the parties should be required to explain how such a provision is both necessary and provides an
actual benefit to PREPA and all parties in interest.  This is particularly true here, where there is
every reason to believe that the vague and unexplained "need" supposedly justifying this
provision can be satisfied through a much narrower provision.  Nor should the Court credit the
Government Parties' vague and conclusory assertion that the consent right was part of the deal
negotiated by the parties and is therefore, and by definition, "necessary."  Under this standard, no
court would ever be able to deny a request for administrative expense (including, for example,
overreaching terms of a proposed DIP facility).

12.     Making matters worse, the Supplemental Agreement also creates a new,
automatic termination of the T&D Contract in the event PREPA has not (i) obtained an order
confirming a plan of adjustment, which plan and confirmation order both must be "reasonably
acceptable" to LUMA Energy **and** (ii) actually consummated that plan and exited title III within
18 months of the commencement of services under the Supplemental Agreement.[9]  Moreover, in
the event of such a termination, LUMA Energy is awarded a generous termination fee of $115

---

[7]     Mot. ¶ 48.

[8]     *Id.*

[9]     *See* Suppl. Agreement §§ 6.1 and 7.1(a).

million, to be granted administrative expense status.[10]  Should this occur, LUMA Energy will

also keep all the other compensation that it will have received under the T&D Contract during

that span of time.[11]  In other words, not only can LUMA Energy abandon the transformation

process at a crucial moment in PREPA's Title III case for vague and undefined reasons, but it

can take with it hundreds of millions of dollars in the process.

13.    Most incredibly, LUMA Energy will 'earn' its $115 million Termination Fee even

if PREPA proposes, solicits, and confirms a plan of adjustment that is acceptable to LUMA

Energy within the 18-month period, but that plan does not go effective until, for example, three

weeks after the expiration of the 18-month period.  Nor is there any recourse in such an event,

because while LUMA Energy's consent rights over a plan of adjustment are subject to the

(insufficient) reasonableness qualifier, the automatic termination of the T&D Contract is not

subject even to that limited control or oversight.[12]

14.    Therefore, even if the Court is comfortable that (because of the reasonableness

qualifier) it will be the ultimate arbiter of whether LUMA Energy has acted reasonably in the

determining whether a plan and related confirmation order are "acceptable" to LUMA, the Court

will have no power in a scenario in which the plan and the confirmation order are reasonably

acceptable to LUMA, and the T&D Contract **nonetheless terminates** under the timing prong.

Nor is this an empty concern, as there are any number of reasons that PREPA's exit from Title

III may be delayed.  Indeed, as this Court is well aware, PREPA's restructuring support

---

[10]    *See* Suppl. Agreement § 7.2(c).

[11]    *See id.* § 7.2(a)-(b).  LUMA Energy will also receive a "Back-End Transition Service Fee" in an unspecified
amount if it performs the Back-End Transition Services.  *See id.* § 7.2(b).

[12]    The Supplemental Agreement provides only that the 18-month period may "be extended by the mutual
agreement of the Parties."  *Id.* § 7.1(a).

agreement is, at best, at a standstill; the required[13] regulatory and legislative approval is, at best,

uncertain[14]; notwithstanding LUMA Energy's work so far, PREPA's operations remain in need

of significant restructuring; and PREPA (which has yet to reach agreement with its unions, the

general unsecured creditors, or the fuel line lenders) faces the prospect of a highly contested

confirmation hearing, as well as the prospect of appeals from any ruling.  Moreover, the prospect

of incurring a $115 million administrative expense may pressure the Oversight Board into

pushing ahead with a sub-optimal plan.

## II.   <u>Termination Fee Does Not Qualify as Administrative Expense</u>

15.   Even putting aside the undue control over PREPA's plan of adjustment granted to

LUMA Energy, the Termination Fee cannot be allowed as an administrative expense.  This is

because the Termination Fee fails to qualify as an "actual and necessary" administrative expense

under section 503(b)(1)(A) of the Bankruptcy Code, and furthermore, because there is no valid

alternative basis to allow the Termination Fee as an administrative expense.

### A.   <u>Termination Fee Does Not Qualify As an Administrative Expense Under 503(b)(1)(A)</u>

16.   Bankruptcy Code section 503(b)(1)(A) imposes strict standards on the allowance

of administrative expense claims for the "actual, necessary costs and expenses of preserving the

estate," and the "burden of proving entitlement to priority payment as an administrative expense .

. . rests with the party requesting it."  *In re La Electronica, Inc. v. Capo-Roman (In re La*

*Electronica, Inc.),* 995 F.2d 320, 322 (1st Cir. 1993) (quoting *In re CIS Corp.,* 142 B.R. 640, 642

(S.D.N.Y. 1992)).  As stated by the First Circuit's seminal pre-Code authority on the issue, a

---

[13]   *See* 11 U.S.C. § 1129(a)(6) (regulatory approval in connection with rate changes is a condition to confirmation).

[14]   As the Court is well aware, both the legislature and the regulatory agencies have been particularly focused on PREPA's title III case.

claimant is entitled to an administrative expense priority "**only to the extent** that the consideration supporting the claimant's right to payment **was both supplied to and beneficial to** the debtor-in-possession in the operation of the business." *Cramer v. Mammoth Mart, Inc. (In re Mammoth Mart, Inc.)*, 536 F.2d 950, 954 (1st Cir. 1976) (emphasis added). Hence the requirement that the debtor receive "actual" value or benefit: a potential or speculative benefit is not sufficient. *See, e.g.*, *Ford Motor Credit Co. v. Dobbins (In re Ford Motor Credit Co.)*, 35 F.3d 860, 866–67 (4th Cir. 1994) (section 503(b)(1)(A) contemplates "concrete, actual" benefit); *In re Drexel Burnham Lambert Grp.*, 134 B.R. 482, 488 (Bankr. S.D.N.Y. 1991) ("The estate must have actually benefitted, as opposed to potentially benefitted."); *In re Stevens*, 53 B.R. 783, 788 (Bankr. D. Me. 1985*)* (a "claim can be characterized as an administrative expense only if the expenses incurred 'did in fact confer *actual* value'" (subsequent history omitted) (internal citations omitted); 4 Collier on Bankruptcy P. 503.06[1] (16th 2020) ("'[A]ctual' and 'necessary' must be observed with scrupulous care.").

17.    Notably, and directly contrary to the position taken by the Government Parties,[15] courts—including the First Circuit's seminal ruling in *Mammoth Mart*—have explained that mere negotiation of and performance under a valid post-petition contract with a debtor does not by itself justify administrative expense status. *See In re Mammoth Mart, Inc.,* 536 F.2d 950, 954 (1st Cir. 1976) (even where "there has technically been performance by the contract creditor during the reorganization period," contract creditor not entitled to priority if the bankruptcy estate "was not benefitted in fact therefrom"); *see also In re La Electronica, Inc.,* 995 F.2d 320,

---

[15]    *See* Mot. ¶ 40 ("by performing what is required under a negotiated, lawful contract with the debtor, that was approved by the Government Parties, LUMA Energy's actions satisfy the second prong [that consideration supporting the right to payment was beneficial to the estate of the debtor]"); ¶ 48 ("LUMA Energy's limited consent rights and the Termination Fee are terms that the parties negotiated at arms' length and on which they agreed, and are thus 'necessary' costs of the overall deal through which LUMA Energy provides services that preserve PREPA and improve access to reliable electricity for the island, its residents and its businesses.").

323 (1st Cir. 1993) (even assuming valid consideration provided under contract that was

assumed under plan, claimant failed to carry burden of proof that obligations thereunder were

actual and necessary expenses of estate); *In re Michalek*, 393 B.R. 642, 646 (Bankr. E.D. Wis.

2008) ("I do not believe the code supports *automatic* treatment of the lessors' claim [with respect

to assumed lease] as an administrative expense claim . . . to obligate the estate, there must be

benefit to the estate as required by section 503(b)(1)(A).")[16]

18.     Thus, to support a $115 million administrative expense claim on account of the

Termination Fee, the Government Parties must satisfy an evidentiary burden above and beyond

merely showing that LUMA Energy has a valid contract or that the Termination Fee was a

contractual term that LUMA Energy required as consideration for providing its services—they

must show the Termination Fee is actual and necessary.  In this respect, the Government Parties

fail to meet their burden for multiple reasons.

19.     The Supplemental Agreement expressly characterizes the Termination Fee as a

"payment of liquidated damages."[17]  Because liquidated damages, by definition, are "not

correlated to any transactional cost or expense incurred," they "cannot be paid as an

administrative expense under 11 U.S.C. § 503 because section 503(b) only allows payment of

administrative expense claims which are for 'actual' expenses that were incurred that were also

beneficial to a Debtor's estate."  *In re Am. W. Airlines, Inc.*, 166 B.R. 908, 912–13 (Bankr. D.

Ariz. 1994) (internal references omitted); *see also*, *In re Hupp Indus., Inc.*, 140  B.R. 191, 196

(Bankr. N.D. Ohio 1992) ($100,000 break-up fee characterized as liquidated damages failed to

---

[16]   For the same reason, proving that a postpetition transaction should be approved under the business judgment
standard does not in and of itself result in allowance of an administrative claim.  *In re Patch Graphics*, 58 B.R.
743 (Bankr. W.D. Wis. 1986) ("[I]t is not sufficient merely to show that debtor exercised business judgment in
order to support claim under § 503(b)(1).").

[17]   Suppl. Agreement § 7.2.

meet standard of section 503 where it was "ill-defined, not correlated to an actual transactional cost or expense incurred by the negotiating bidder, and otherwise cannot be addressed under a specific provision of § 503(b).").

20.    This makes sense: section 503(b)(1)(A) is meant to ensure that a debtor can receive the goods and services it needs to reorganize during a time creditors would, understandably, be reluctant to provide such goods and services to a bankrupt entity.  This policy does not encompass—and, in fact, by requiring that the goods and services be both actual and necessary, specifically excludes—granting priority status to payments made to parties on account of services they agreed to provide but never actually provided, or to payments meant to compensate such parties for the profits they expected to earn had they provided the agreed, but never-provided, services.[18]

21.    Even if the Court were to accept that liquidated damages could be allowed as administrative expense claims, the Government Parties provide no evidence regarding why $115 million is an appropriate amount for unliquidated damages.  Notwithstanding the Supplemental Agreement's attempt to designate the Termination Fee as "not penalties,"[19] the Supplemental Agreement reveals that the Termination Fee is exactly that—a penalty to disincentivize PREPA from pursuing a plan of adjustment not to LUMA Energy's liking.  The $115 million Termination Fee is equal to the amount of LUMA Energy's annual Interim Period Service Fee, *id.* § 7.2 (which LUMA Energy will be paid as an administrative expense), not a metric

---

[18]    The Committee notes that the Government Parties have conceded this point, explaining, in connection with the Front-End Administrative Motion, that in requesting administrative priority for its fees under the T&D Contract, "It's as if LUMA Energy is saying, I will render certain service in exchange for a right to payment that is an administrative right, to the extent I earn it."  The Government Parties proceeded to explain that LUMA Energy's motivation was that "it understandably did not want to perform and then have to find out later whether it had an administrative claim or not."  *See* **Exhibit A**, Sept. 16, 2020 Hr'g Tr., at 40:4-6.  Left unexplained is how a liquidated damages award can be earned in connection with services never performed.

[19]    Suppl. Agreement § 7.2(c)(ii).

reflecting actual damages.  Liquidated damages that are in fact penalties are not properly allowed

as administrative claims.  *See In re T.A. Brinkoetter & Sons, Inc.,* 467 B.R. 668, 670–71 (Bankr.

C.D. Ill. 2012) (liquidated damages were "true penalty" and "not a form of compensation for a

benefit to the estate, and thus may not be accorded administrative priority status"); *In re Fred*

*Swain, Inc*., 97 B.R. 660, 661–62 (Bankr. S.D. Fla. 1989) (finding liquidated damages to be

penalties excluded from section 503(b)).

### 1.    Termination Fee Cannot Be Approved as "Break-Up" Fee

22.    It is important to recognize that the Termination Fee is not at all analogous to the

break-up fees that bankruptcy courts allow as administrative expenses in the context of

competitive bidding scenarios.  In the prototypical break-up fee arrangement, the fee is paid to a

stalking horse bidder that loses at an auction of the debtor's assets.  In these circumstances, the

break-up fee is designed to encourage the stalking horse bidder to provide a baseline bid in the

auction; assuming the amount of the fee is reasonable, allowance of the break-up fee is

appropriate because the stalking horse bidder adds value to the estate by encouraging other

parties to bid up the price.

23.    The situation here could not be more different.  Obviously, LUMA Energy is not

a stalking horse bidder, nor is it assuming a role analogous to one.  More importantly,

notwithstanding the Government Parties' assertion that the "reasonableness of the Interim

Obligations is evidenced by the competitive bidding process,"[20] the only process in which

LUMA Energy competed with other potential Operators was the RFP, which concluded on

January 11, 2020 when LUMA Energy was selected as "preferred proponent to engage in

---

[20]    Mot. ¶ 45.

11

exclusive discussions and negotiations with the P3 Authority."[21]  It was only *after this*, during

"the period from the end of January through the end of March [2020]"[22] that the parties

negotiated the Supplemental Agreement.  Thus, far from resulting from a competitive process,

the Supplemental Agreement arose from negotiations that occurred with LUMA Energy

exclusively, and there is no evidence that other bidders required similar terms.

24.     Further, in the auction or plan support agreement context the payment of a

termination or break-up fee is not guaranteed, but is paid only when a debtor consummates a

*superior* transaction.  Any detriment the debtor incurs in paying the termination or break-up fee

is balanced by the benefit of obtaining the better deal.  That dynamic is entirely missing here, as

the Termination Fee is payable if PREPA has been unable to confirm a plan of adjustment within

18 months that is acceptable to LUMA Energy, or even if PREPA does confirm such a plan, but

will lose the benefits of the T&D Contract simply because, *even though it confirmed a plan*

*acceptable to LUMA Energy*, the plan does not go effective until after the 18-month automatic

termination deadline.  This is the exact opposite of a termination or break-up fee payable when a

superior transaction closes, and the Government Parties fail to show how PREPA benefits in

such a scenario.

B.     Termination Fee Cannot Qualify As an Administrative Expense Under 503(b)
       Generally

25.     The Government Parties alternatively argue that the Termination Fee qualifies as

an administrative claim under section 503(b) "generally" and that the Court may order such relief

pursuant to section 105(a) "to carry out the purposes of Title III."[23]  This argument rests entirely

---

[21]     Mot. ¶ 19.

[22]     Marrero Decl. Ex. A, at 73.

[23]     Mot. ¶ 46.

on their assertion that "the Court must have the power to provide assurances of payment to entities doing business with the debtor."[24]

26.     Superficially appealing, this argument actually undermines a fundamental concept of bankruptcy law.  The Bankruptcy Code already includes a provision that provides assurance of payment to parties doing business with a post-petition debtor: section 503(b)(1)(A), which assures payment for parties that do business with the debtor ***only to the extent such parties*** ***_actually_*** *provide* __necessary__ *goods or services*.  Stated simply, "doing business with" or "reaching agreement with" a debtor is not sufficient.  As noted above, no provision of the Bankruptcy Code—whether in section 503(b) generally or section 503(b)(1)(A) specifically—provides "assurances of payment" to parties in connection with payments meant to compensate such parties for the profits they expected to earn in from agreed, but never-provided, services.

27.     The Government Parties cite no authority for their groundbreaking view of the Bankruptcy Code's administrative expense structure.  Indeed, each of the cases cited by the Government Parties in support of their "general" administrative expense argument actually arose in the specific context of the "actual and necessary" requirement of section 503(b)(1)(A) (or its Bankruptcy Act predecessor).[25]

28.     To the contrary, courts have explained that where a specific subsection of section 503(b) governs the allowance (or disallowance) of an administrative expense claim, the claimant may not rely on the "general" authority of section 503(b).  As one bankruptcy court has very

---

[24]   Mot. ¶ 47.

[25]   *See In re Mammoth Mart, Inc.*, 536 F.2d 950, 954 (1st Cir. 1976) ("When the claim is based upon a contract between the debtor and the claimant, the case law teaches that a creditor's right to payment will be afforded first priority only to the extent that the consideration supporting the claimant's right to payment was both supplied to and beneficial to the debtor-in-possession in the operation of the business."); *Matter of Jartran, Inc.*, 732 F.2d 584, 587 (7th Cir. 1984) (applying *Mammoth Mart*'s "two part test"); *In re Pulaski Highway Exp., Inc.*, 57 B.R. 502, 510 (Bankr. M.D. Tenn. 1986) (citing section 503(b)(1)(A) and *Mammoth Mart* in connection with ruling that collective bargaining agreement was fair gauge of "reasonable value of the services [actually] rendered").

recently explained, "[a]llowing creditors recourse to the general language of § 503(b) ignores the

specific solution[s] Congress designed" by implementing the subsections of § 503(b). *In re*

*Concepts Am., Inc.*, No. 14 B 34232, 2021 WL 811581, at *4 (Bankr. N.D. Ill. Mar. 2, 2021).

Even if the reach of section 503(b) is treated as non-exclusive in a general sense, "when a

subsection directly addresses the type of administrative expense sought, the restrictions in it

cannot be avoided by appealing to the non-exclusive nature of § 503(b)." *In re Elder*, 321 B.R.

820, 828-29 (Bankr. E.D. Va. 2005).[26]

### III. Alternatively, Court Should Treat Termination Fee As It Did Late Fees Under LUMA Opinion

29.     For the reasons articulated herein, the Committee believes that treatment of the

Termination Fee as an administrative expense cannot be approved under the statutory scheme

and the applicable case law.

30.     Alternatively, the Committee submits that the Termination Fee should, at the

least, be treated the same as the Late Fees under the LUMA Opinion.

31.     As explained in the Preliminary Objection, the requirement that a debtor receive

"actual" (rather than speculative or potential) value or benefit from an administrative expense

claim indicates that the debtor must receive such a benefit **before** the incurred expense is granted

administrative priority, not after. *See In re Globe Metallurgical, Inc.,* 312 B.R. 34, 40 (Bankr.

S.D.N.Y. 2004) (fact that "there must be a strict construction of the terms 'actual' and

'necessary' . . . require[s] that the estate actually receive[] 'a real benefit from the transaction,

**before** administrative priority will be granted on claims against the estate.'" (quoting *In re*

---

[26]     These rulings are applications of the basic principle articulated by the Supreme Court that "however inclusive may be the general language of a statute, it will not be held to apply to a matter specifically dealt with in another part of the same enactment. Specific terms prevail over the general in the same or another statute which otherwise might be controlling." *Fourco Glass Co. v. Transmirra Products Corp.*, 353 U.S. 222, 228-29, 77 S. Ct. 787, 1 L. Ed. 2d 786 (1957) (internal citations and quotations omitted).

*Drexel Burnham Lambert Group,* 134 B.R. at 488) (emphasis added).[27]  As explained by one

bankruptcy court within the First Circuit:

> Bankruptcy Courts typically, at the end of a case, rule on and allow
> administrative expenses only after those expenses have been
> incurred. To do otherwise would be tantamount to issuing an
> advisory opinion. Section 503(b)(1)(A) of the Bankruptcy Code
> contains the rationale for this practice: administrative expenses must
> both be "actual" and "necessary." If the Court were to rule on
> administrative expenses before they were incurred, the Court could
> not be certain that the claimant would actually incur the expenses
> for which it seeks advance payment, nor could it be certain that the
> expenses eventually incurred would be necessary.

*In re Microfab, Inc.*, 105 B.R. 161, 170 (Bankr. D. Mass. 1989).

32.     As noted above, applying this case to the Late Fees, in the LUMA Opinion the

Court held that "the Government Parties have failed to proffer an adequate factual basis upon

which the Court can conclude at this stage that such fees categorically constitute actual and

necessary costs of preserving PREPA."  *In re Fin. Oversight & Mgmt. Bd.*, 621 B.R. at 302.  The

Court therefore ordered that "any renewed application" by the Government Parties for such fees

"must be accompanied by a record demonstrating that any Late Fees actually incurred were

reasonable and necessary for the preservation of PREPA."  *Id.*

33.     As with the Late Fees, any finding that the Termination Fee is both "actual and

necessary" at this juncture is both premature and inappropriate in the absence of a factual record.

The triggering event for the Termination Fee (the termination of the T&D Contract) is merely

speculative, and thus categorically cannot be deemed "actual," only hypothetical.

---

[27]   *See also Nat'l Union Fire Ins. Co. of Pittsburgh v. VP Bldgs., Inc.*, No. 1:08 CV 196, 2008 WL 4445075, at *3
(N.D. Ohio Sept. 29, 2008), *aff'd sub nom. Nat'l Union Fire Ins. Co. v. VP Bldgs., Inc.*, 606 F.3d 835 (6th Cir.
2010) ("The estate must receive a real benefit from the transaction **before** administrative expense priority will
be assigned.") (emphasis added).

34.     This Court should, therefore, require that any subsequent application by the Government Parties for payment of the Termination Fee be submitted either at or after the time the Termination Fee is actually incurred and be "accompanied by a record demonstrating that any [fee] actually incurred" was both "reasonable and necessary for the preservation of PREPA."[28]

## **CONCLUSION**

35.     For the reasons explained in this Limited Objection (and in the Preliminary Objection before it), the Committee submits that (a) LUMA Energy's consent rights to PREPA's eventual plan of adjustment should be limited and (b) the Court should not grant administrative expense priority status to the $115 million Termination Fee.


*[Remainder of page intentionally left blank.]*

---

[28]   Any such future application should be subject to appropriate testing procedures, including discovery and an evidentiary hearing.  *See, e.g.*, *In re Energy Future Holdings Corp.*, 990 F.3d 728, 747–48 (3d Cir. 2021) ("with the benefit of discovery, NextEra may (or may not) prove that the actual benefit conferred on the estate outweighed the costs it imposed, such that it is entitled to administrative fees; *In re Pulaski Highway Express, Inc.*, 57 B.R. 502, 510-11 (Bankr. M.D. Tenn. 1986) (setting an evidentiary hearing in order to determine methods to calculate and allocate § 503(b) administrative expense claims).

WHEREFORE, the Committee respectfully requests that the relief granted by the Court be modified to reflect the issues raised herein.

Dated:  April 12, 2021           By:  */s/ Luc A. Despins*

**PAUL HASTINGS LLP**
Luc. A. Despins, Esq. *(Pro Hac Vice)*
200 Park Avenue
New York, New York 10166
Tel: (212) 318-6000
lucdespins@paulhastings.com

Nicholas A. Bassett, Esq. (*Pro Hac Vice*)
875 15th Street, N.W.
Washington, D.C. 20005
Tel: (202) 551-1700
nicholasbassett@paulhastings.com

*Counsel to the Official Committee of Unsecured Creditors*

By:  */s/ Juan J. Ayala*

**CASILLAS, SANTIAGO & TORRES LLC**
Juan J. Casillas Ayala, Esq. (USDC - PR 218312)
Israel Fernández Rodríguez, Esq. (USDC - PR 225004)
Juan C. Nieves González, Esq. (USDC - PR 231707)
Cristina B. Fernández Niggemann, Esq. (USDC - PR 306008)
PO Box 195075
San Juan, Puerto Rico 00919-5075
Telephone: (787) 523-3434 Fax: (787) 523-3433
jcasillas@cstlawpr.com
ifernandez@cstlawpr.com
jnieves@cstlawpr.com
cfernandez@cstlawpr.com

*Local Counsel to the Official Committee of Unsecured Creditors*