# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

In re:

THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO,

as representative of

THE COMMONWEALTH OF PUERTO RICO,

Debtor.[1]

PROMESA
Title III

No. 17 BK 3283-LTS
(Jointly Administered)

## OBJECTION OF AMBAC ASSURANCE CORPORATION TO DEBTORS' JOINT MOTION FOR AN ORDER (I) SCHEDULING A HEARING TO CONSIDER THE ADEQUACY OF INFORMATION CONTAINED IN THE DISCLOSURE STATEMENT, (II) ESTABLISHING THE DEADLINE FOR FILING OBJECTIONS TO THE DISCLOSURE STATEMENT AND REPLIES THERETO, (III) APPROVING FORM OF NOTICE THEREOF, (IV) ESTABLISHING DOCUMENT DEPOSITORY PROCEDURES IN CONNECTION THEREWITH, AND (V) GRANTING RELATED RELIEF

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (the "Commonwealth") (Bankruptcy Case No. 17-BK-3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17-BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5233-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ................................................................................................. 1

ARGUMENT .......................................................................................................................... 6

    I.    IT IS PREMATURE TO CONSIDER THE ADEQUACY OF THE
DISCLOSURE STATEMENT WHILE GATING ISSUES CRITICAL TO
THE PLAN'S CONFIRMABILITY REMAIN UNRESOLVED. ........................ 6

        A.    The Existence and Extent of Revenue Bondholders' Property
Rights Is a Fulcrum Issue in Any Commonwealth Plan of
Adjustment. ..................................................................................................6

        B.    Key Unresolved Legal Issues Impacting the Rights of Nearly All
Creditors Merit Resolution Prior to Solicitation. .........................................8

        C.    Consideration of the Disclosure Statement Now Would Be
Premature for Additional Reasons. .............................................................13

    II.    EVEN IF THE COURT ALLOWS CONSIDERATION OF THE
DISCLOSURE STATEMENT NOW, THE BOARD'S PROPOSED
SCHEDULE SHOULD BE MODIFIED. ............................................................. 15

    III.    THE PROPOSED DOCUMENT DEPOSITORY PROCEDURES
CANNOT SERVE AS A SUBSTITUTE FOR DISCOVERY............................. 21

    IV.    VARIOUS MODIFICATIONS TO THE PROPOSED ORDERS
ATTACHED TO THE MOTION ARE WARRANTED. .................................... 22

CONCLUSION .................................................................................................................... 28

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Granada Wines, Inc. v. New England Teamsters & Trucking Indus. Pension Fund*,
   748 F.2d 42 (1st Cir. 1984)...................................................................... *passim*

*In re 266 Washington Assocs.*,
   141 B.R. 275 (Bankr. E.D.N.Y. 1992), *aff'd*, 147 B.R. 827 (E.D.N.Y. 1992).......................23

*In re 3DFX Interactive, Inc.*,
   2006 WL 2010786 (Bankr. N.D. Cal. June 29, 2006) ...........................................16

*In re Bjolmes Realty Tr.*,
   134 B.R. 1000 (Bankr. D. Mass. 1991) .................................................23

*In re Catholic Bishop of N. Alaska*,
   2009 WL 8412170 (Bankr. D. Alaska July 20, 2009) ...........................................17

*In re Curtis Ctr. Ltd. P'ship*,
   195 B.R. 631 (Bankr. E.D. Pa. 1996) ...................................................13

*In re Kehn Ranch, Inc.*,
   41 B.R. 832 (Bankr. D.S.D. 1984).........................................................12

*In re Mahoney Hawkes, LLP*,
   289 B.R. 285 (Bankr. D. Mass. 2002) ...............................................12, 23

*In re Monroe Well Serv., Inc.*,
   80 B.R. 324 (Bankr. E.D. Pa. 1987) .......................................................13

*In re Phoenix Petroleum Co.*,
   278 B.R. 385 (Bankr. E.D. Pa. 2001) .......................................................23

*In re Ponce de Leon 1403, Inc.*,
   2012 WL 5880443 (Bankr. D.P.R. Nov. 20, 2012) ...............................................16

**Statutes**

PROMESA § 314(b)(3) ...............................................................12

PROMESA § 314(b)(6) .............................................................3, 14

PROMESA § 314(b)(7) ...............................................................13

To the Honorable United States District Court Judge Laura Taylor Swain:

Ambac Assurance Corporation ("Ambac") respectfully submits this objection (the "Objection") to the *Debtors' Joint Motion for an Order (I) Scheduling a Hearing to Consider the Adequacy of Information Contained in the Disclosure Statement, (II) Establishing the Deadline for Filing Objections to the Disclosure Statement and Replies Thereto, (III) Approving Form of Notice Thereof, (IV) Establishing Document Depository Procedures in Connection Therewith, and (V) Granting Related Relief* (ECF No. 16332) (the "DS Scheduling Motion" or "Mot.").[2]

## PRELIMINARY STATEMENT

1.      For the last two years, instead of offering a cohesive, sensible plan that would advance this restructuring toward resolution, the Board's litigation plan has been to move from one premature and inefficient step to the next, focused on one mission:  zeroing out revenue bondholders' rights and, in the process, denying them relevant discovery.  This is reflected in both the DS Scheduling Motion, in which the Board proposes to set a premature hearing on an as-yet-unfiled disclosure statement, and the Board's motion to lift the stay in the Revenue Bond Adversary Proceedings[3] to allow it to file motions for partial summary judgment on some (but not all) of its counts, while preventing the defendants in those proceedings from proceeding with any other litigation.  All of this appears designed with the express purpose of purporting to deny

---

[2] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the DS Scheduling Motion.

[3] The "Revenue Bond Adversary Proceedings" are the adversary proceedings seeking to disallow revenue bondholders' and insurers' claims against the Commonwealth relating to bonds issued by the Puerto Rico Convention Center District Authority ("CCDA"), the Puerto Rico Infrastructure Financing Authority ("PRIFA"), and the Puerto Rico Highways and Transportation Authority ("HTA"), Case Nos. 20-AP-00003-LTS, 20-AP-00004-LTS, and 20-AP-00005-LTS.

revenue bondholders standing to challenge the legal and factual bases for the abysmal treatment they would receive under the forthcoming plan of adjustment.[4]

2.      Now, as the Board hurtles towards confirmation of its not-yet-minted, further amended plan of adjustment (the "Plan"), this Court must be vigilant in protecting the rights of the creditors that are being asked to shoulder the greatest burden in that plan.  Ambac respectfully submits that the Court must ensure that creditors have adequate information, time, and opportunity to evaluate any disclosure statement and that Ambac must be given a fair chance to defend against and prosecute claims in the face of a plan of adjustment that purports to strip Ambac of bargained-for property rights and other claims.  Because the DS Scheduling Motion would severely limit Ambac's and other creditors' ability to do so, it should be denied.

3.      Most fundamentally, the DS Scheduling Motion is premature because it requests a hearing on the forthcoming, further amended disclosure statement (the "Disclosure Statement") when the pivotal gating issues of revenue bondholders' property rights in the Pledged Revenues[5] have not yet been resolved.  The resolution of those issues will dictate whether or not the Plan is viable (as the Court has acknowledged[6]), and it makes no sense to consider approval of a disclosure statement and solicitation of votes for a plan of adjustment that does not have the benefit of those rulings.  The Court will soon be positioned to decide those issues in the Revenue Bond Adversary

---

[4] Ambac insures $101.5 million in outstanding net par amount of general obligation ("GO") bonds and bonds issued by the Puerto Rico Public Buildings Authority ("PBA").  As both the Commonwealth and PBA are debtors to be restructured in the forthcoming plan of adjustment, Ambac will have standing to object to the plan regardless of the outcome of the Revenue Bond Adversary Proceedings.

[5] The "Pledged Revenues" are the revenues pledged toward payment of bonds issued by CCDA, PRIFA, and HTA.

[6] *Transcript of March 4, 2020 Omnibus Hearing* at 220:13-16 ("Resolution of those issues that can be decided on legal grounds will resolve key disputes that could affect, for better or worse, the prospect of the Proposed Amended Plan of Adjustment.").

Proceedings, leaving the Board with the opportunity to seek approval of a disclosure statement and confirmation of a plan thereafter.

4.      Other fundamental and unanswered questions regarding the viability of the proposed Plan also should be resolved before the Disclosure Statement Hearing.   One such question is whether the Plan's proposed classification scheme complies with the requirements of *Granada Wines, Inc. v. New England Teamsters & Trucking Indus. Pension Fund*, 748 F.2d 42 (1st Cir. 1984).  Indeed, the Court indicated last year, in connection with the Board's previous plan of adjustment, that this question would be appropriately addressed before a hearing on any disclosure statement, given that it has the potential for rendering the plan of adjustment unconfirmable and unworthy of the solicitation of votes.  Similarly, the Court should address the viability of the Board's sweeping preemption theory, on which the Plan's effectiveness rests. Given that the confirmability of the Plan hinges on these two threshold issues, they should be addressed in briefing and ruled on before the Court sets any hearing on the Disclosure Statement.

5.      While these significant issues alone should dissuade the Court from setting a premature hearing on the Disclosure Statement, there are others.  For one, a new fiscal plan for the Commonwealth has not yet been certified.  The operative fiscal plan was certified on May 27, 2020, during the early days of the COVID-19 pandemic.  Plainly, any consideration of a disclosure statement should be based on a new Commonwealth fiscal plan that takes into account the current situation and allows creditors to determine whether the fiscal plan is consistent with the Plan.  In addition, the current Disclosure Statement, unlike the one put forth last year, does not provide the Board's analysis of how the Plan satisfies the "best interests of creditors" test outlined in PROMESA § 314(b)(6).  Consideration of the Disclosure Statement cannot be complete without this analysis.

6.      Even if the Court decides to allow consideration of the Disclosure Statement now, the Board's proposed schedule is wholly insufficient and requires modification.  The Board's proposed schedule would require any objections to the Disclosure Statement to be due within sixteen days of the hearing on the DS Scheduling Motion, which is when creditors will learn whether a hearing on the Disclosure Statement will even be set.  That is plainly inadequate for preparing objections to a disclosure statement that has yet to be filed (or even the 2,000+ page Disclosure Statement filed by the Board on March 8).  Indeed, last March, in setting a schedule in connection with the previous disclosure statement, the Court granted objectors 45 days to file objections from the date on which it set a disclosure statement schedule.  Moreover, the newly-filed Disclosure Statement will, for the first time, incorporate disclosures concerning settlements reached with ERS last month and with certain HTA and CCDA bondholders yesterday,[7] settlements that may have material impacts on the Plan as a whole and on parties' objections to the Disclosure Statement.  Creditors need sufficient time to review these new disclosures and prepare any objections to the Disclosure Statement relating thereto.

7.      Furthermore, the Board's proposed schedule wrongly assumes that there will be no creditor-propounded discovery relating to the Disclosure Statement.  Consistent with the Board's pattern of seeking to deny creditors relevant discovery, the Board—by seeking approval of certain "Disclosure Statement Depository Procedures"—seeks to appoint itself the sole arbiter of what information could possibly be relevant to creditors in their evaluation of the Disclosure Statement.  Ambac welcomes the sharing of information and has no objection to the creation of a document depository, but emphasizes that these proposed procedures cannot serve as a substitute for creditors' rights to propound relevant discovery in connection with a contested matter—

---

[7] Agreement in Principle Summary: HTA, CCDA, and Clawback Claims (dated April 12, 2021), published on the Electronic Municipal Market Access System (EMMA), attached hereto as Exhibit A.

particularly one as crucial as the approval of a disclosure statement in the largest municipal bankruptcy in United States history.  Discovery on Disclosure Statement-related issues is particularly appropriate in light of the Board's repeated (erroneous) assertion that Rule 2004 discovery is now inappropriate in light of the filing of the Disclosure Statement and Plan.  Herein, Ambac identifies a number of issues that require discovery prior to the Court's hearing on the approval of the Disclosure Statement and the commitment of significant resources to the solicitation process.

8.      Accordingly, to the extent the Court is inclined to schedule a hearing on the Disclosure Statement, Ambac proposes an alternative schedule (set forth herein) that would result in a hearing on the Disclosure Statement only two weeks after the Board's proposed date, while allowing creditors sufficient time for review of the Disclosure Statement, discovery relating thereto, and the preparation of objections.  Ambac also proposes herein certain modifications to the Board's proposed orders governing the Disclosure Statement Depository Procedures.

9.      As eager as the Board may be to reach what it clearly views as the final stages of these cases, creditor protections are more vital now than ever, and cannot be sacrificed based on (yet again) misguided notions of efficiency or—as the Board plainly sees it—the inevitability of the Plan's confirmation.  Creditors, like Ambac, to which the plan purports to offer pennies on the dollar—while certain arguably similarly situated parties stand to receive in excess of 60%, 70%, 80%, even 90% on theirs—are entitled to the opportunity to mount a vigorous defense of their rights and challenge to the supposed adequacy of the Disclosure Statement.  For the reasons submitted herein, the DS Scheduling Motion should be denied; at minimum, it should be modified as proposed below.

## ARGUMENT

I.   **IT IS PREMATURE TO CONSIDER THE ADEQUACY OF THE DISCLOSURE STATEMENT WHILE GATING ISSUES CRITICAL TO THE PLAN'S CONFIRMABILITY REMAIN UNRESOLVED.**

**A.   The Existence and Extent of Revenue Bondholders' Property Rights Is a Fulcrum Issue in Any Commonwealth Plan of Adjustment.**

10.    It is premature to consider the approval of the Disclosure Statement before resolution of the critical gating issues of revenue bondholders' property rights in the billions of dollars in revenues pledged toward payment of bonds issued by CCDA, PRIFA, and HTA.  These pivotal questions must be addressed before votes are solicited on the Plan.  If Ambac and other revenue bondholders are correct—that revenue bondholders have property interests in the Pledged Revenues and are entitled to the value of that property in the Commonwealth's restructuring—the Plan cannot be confirmed.  This is because the Plan hinges upon the assumption that the Commonwealth can use the Pledged Revenues as it wishes.  As the Court has recognized, *see supra* n.6, if the Board is wrong about this—if Ambac and other revenue bondholders are in fact entitled to the value of those Pledged Revenues—the Board must propose a new plan of adjustment.

11.    The Mediation Team and the Court itself recognized that resolution of these critical gating issues is needed when proposing that the Board be permitted to move forward with limited summary judgment motions on certain counts of the Board's complaints in the Revenue Bond Adversary Proceedings.[8]  Indeed, when the Board proposed a schedule for its previous disclosure

---

[8] *Amended Report and Recommendation of the Mediation Team* (ECF 10756) at 12 ("the Mediation Team has identified two other potential 'gating' issues on which merits rulings ***in advance of the approval of the Amended Disclosure Statement*** may facilitate the mediation process and streamline the hearing to consider confirmation of the Amended Plan" (emphasis added)); *Transcript of March 4, 2020 Omnibus Hearing* at 211:14-21 ("the schedules proposed by the mediation team in the Mediation Report allow for contested matters and adversary proceedings that are pending before the Court to progress with respect to important disputed issues raised in connection with revenue bonds in these Title III cases, including critical gating issues relating to the Amended Plan of Adjustment proposed by the Oversight Board").

statement in February 2020, it argued that one of the benefits of its schedule was that it would "allow[] for . . . possible merits rulings on certain revenue bond issues[.]"[9]  It makes no sense for voters to consider the Disclosure Statement when these issues have not been resolved.

12.     That moment is not far away.  The parties are currently undertaking the limited discovery allowed by the Court in connection with the pending motions for partial summary judgment in the Revenue Bond Adversary Proceedings.[10]  The parties will submit supplemental briefing after the completion of discovery (which is scheduled to conclude just over a month from now on May 19[11]), after which the Court will be positioned to rule on those motions.

13.     Until resolution of the question of revenue bondholders' property rights in the Pledged Revenues, it makes little sense to risk the exorbitantly expensive foot-fault of sending out a disclosure statement that does not have the benefit of the Court's ruling on these key issues.  (*See Amended Report and Recommendation of the Mediation Team* (ECF 10756) at 12 n.14 (suggesting early summary judgment motions on the gating issues because "a material modification to the Amended Plan later in the confirmation process could require a re-solicitation of creditors, with the attendant delay and costs associated with such a re-solicitation").)

---

[9] *Joint Motion of the Commonwealth of Puerto Rico, the Employees Retirement System of the Government of the Commonwealth of Puerto Rico, and the Puerto Rico Public Buildings Authority for an Order (I) Scheduling a Hearing to Consider the Adequacy of Information Contained in the Disclosure Statement, (II) Establishing the Deadline for Filing Spanish Translation of the Disclosure Statement, (III) Establishing the Deadline for Filing Objections to the Disclosure Statement and Replies Thereto, and (V) Granting Related Relief* (ECF No. 10808) ¶ 14.

[10] *Order Regarding Discovery in Connection with Motions of the Commonwealth of Puerto Rico, by and Through the Financial Oversight and Management Board, Pursuant to Bankruptcy Rule 7056 for Partial Summary Judgment Disallowing Claims Dated January 20, 2021* (ECF No. 15656).

[11] *Order Modifying Discovery Schedule Dated April 8, 2021* (ECF No. 16365).

**B.      Key Unresolved Legal Issues Impacting the Rights of Nearly All Creditors Merit Resolution Prior to Solicitation.**

14.      The Court should reject the Board's proposed Disclosure Statement schedule for the additional reason that, prior to consideration of the Disclosure Statement, questions that cut to the core of the Plan's confirmability remain unaddressed.  Those issues include, at a minimum, whether the Board's classification of claims complies with *Granada Wines* and whether the Board's theory of preemption is legally viable.  Those issues can and should be heard and decided now.

15.      *First*, as the Court has already recognized, the applicability of *Granada Wines* is in dispute, and is an issue that can, and should, be resolved before consideration of any disclosure statement.  Just over a year ago, the UCC submitted its motion challenging the 2020 Plan's separate classification of retiree claims from the Commonwealth's other general unsecured creditors on the basis that the classification system violated *Granada Wines*' requirement that substantially similar claims be placed within the same class.[12]  As the UCC noted, courts in the First Circuit have long recognized the binding force of *Granada Wines* and required debtors' compliance with its mandate.  (UCC 3013 Motion ¶¶ 21-23.)  Ambac joined certain arguments advanced in the UCC 3013 Motion, and further observed that:  (1) the 2020 Plan improperly classified and treated revenue bondholders, who are secured creditors, as general unsecured creditors; (2) the same erroneous arguments the Board relies upon to insist that PROMESA has rendered revenue bondholders unsecured, non-priority creditors compel the conclusion—under *Granada Wines*' strict classification rule—that revenue bondholders, GO bondholders, and retirees must be placed in the same class (which the 2020 Plan did not do); and (3) if Commonwealth law priorities have

---

[12] *Motion of Official Committee of Unsecured Creditors Pursuant to Federal Rule of Bankruptcy Procedure 3013 For Entry of an Order Reclassifying Class 39a and Class 41 Claims Under Oversight Board's Plan of Adjustment Dated February 28, 2020* (ECF No. 11989) (the "UCC 3013 Motion").

survived under PROMESA, the 2020 Plan failed to respect those priorities by placing revenue

bondholders behind other unsecured creditors, including pensioners.[13]

16.    In response to the UCC 3013 Motion, the Board took the position that, for nearly

forty years, courts in the First Circuit have ***erroneously*** followed the strict classification mandate

in *Granada Wines*, which the Board dismisses as mere dicta:

> [T]he First Circuit made clear in *Granada Wines* (at 46) it was dealing with a plan
> that did not have separate classification.  As a result, its opinion relating to separate
> classification is not binding on this Court because it is *dicta* going beyond the scope
> of what was essential to the resolution of the case.[14]

17.    At the April 22, 2020 omnibus hearing, the Court "recognize[d] that there [were] a

number of important and hotly disputed legal issues implicated by the [UCC 3013 Motion],

including the extent to which *Granada Wines* is controlling in this case[,]" that "both sides . . .

have raised colorable arguments in support of their respective positions," and that "a resolution on

the merits of even the UCC 3013 Motion itself will likely have meaningful implications for the

rights of many other parties in interest in these Title III cases." (*Transcript of April 22, 2020

Omnibus Hearing* at 10:13-23.)  The Court indicated, however, that it would deny the UCC 3013

Motion without prejudice, in a ruling subsequently memorialized by written order on April 23,

2020, on the basis that it "remain[ed] persuaded that taking these issues up again in conjunction

and in coordination with a schedule that is leading into a determination on the disclosure statement

---

[13] *Partial Joinder of Ambac Assurance Corporation to Motion of Official Committee of Unsecured
Creditors Pursuant to Federal Rule of Bankruptcy Procedure 3013 for Entry of an Order Reclassifying
Class 39a and Class 41 Claims Under Oversight Board's Plan of Adjustment Dated February 28, 2020*
(ECF No. 12691) ("Ambac 3013 Joinder") ¶¶ 5-14.

[14] *Opposition of Financial Oversight and Management Board to Motion of Official Committee of Unsecured
Creditors Pursuant to Federal Rule of Bankruptcy Procedure 3013 for Entry of Order Reclassifying Class
39a and Class 41 Claims Under Oversight Board Plan of Adjustment Dated February 28, 2020 and
Joinders Thereto* (ECF No. 12726) ¶ 53; *see also id.* ¶ 52 (*Granada Wines* is "***completely inapplicable***"
because it derives from the Bankruptcy Act, which preceded the Bankruptcy Code) (emphasis added), ¶ 13
(opining that "the First Circuit would insist it had no intent to impose its *dicta* on all chapter 11 cases, let
alone the instant Title III case").

and that is part of a continuum toward confirmation is appropriate, and more appropriate than taking them up now." (*Transcript of April 22, 2020 Omnibus Hearing* at 39:1-5; *Order Denying [UCC 3013 Motion]* (ECF No. 12952) at 1.)  The Court further indicated that its "***intention [was] to take up, at the disclosure statement stage***, the classification arguments . . . [and] structural arguments that, as a matter of law, [the Board's proposed classifications] can't be done . . . it's the argument that *Granada Wines* would require—would permit only two or three classes here, and it would all be driven by the source of the payment and whether there's security." (*Transcript of April 22, 2020 Omnibus Hearing* at 39:12-21 (emphasis added).)  The Court recognized that, if the UCC was correct that "[y]ou simply cannot do that in the First Circuit," then "there's no point in soliciting votes on a plan that would propose to do that." (*Id.* at 40:3-5.)[15]

18.    The Court's intuition was correct—the issue of the Plan's conformance with *Granada Wines* can and should be decided before the solicitation of votes.  It makes no sense to proceed with solicitation of votes if the classification scheme proposed by the Board is, on its face, impermissible under governing law.

19.    Time has not cured the need for the resolution of this dispute because the classification scheme in the current Plan is substantially similar to that in the 2020 Plan, and presents the same issues as those raised in the UCC 3013 Motion and Ambac 3013 Joinder.  The current Plan, like the 2020 Plan, separately classifies retiree claims and general unsecured

---

[15] At the April 22, 2020 hearing and in its order denying the UCC 3013 Motion, the Court directed that prior to the Board's filing of a new motion to schedule a disclosure statement hearing, the parties to the UCC 3013 Motion should "meet and confer regarding whether it is necessary and appropriate for the classification issues raised in the Motion and related briefing to be addressed separately from, and in advance of, the disclosure statement hearing." (*Id.* at 41:14-20; *see also Order Denying [UCC 3013 Motion]* (ECF No. 12952) at 1-2.)  Ambac was not invited to participate in any meet-and-confer, and it is Ambac's understanding that no substantive meet-and-confer between the UCC and the Board occurred.  That is despite Ambac's understanding that the UCC reached out to the Board to seek a meet-and-confer.  In disregarding the Court's directive, the Board clearly wants to ignore this critical issue.

creditors; and the current Plan, like the 2020 Plan, improperly classifies revenue bondholders (either as being unsecured or, under the Board's legal theories, as having distinct and subordinate rights as compared to GO bondholders). Accordingly, any schedule for a hearing on the Disclosure Statement should account for the need to resolve these critical classification questions.

20.     *Second*, the same considerations that counsel in favor of an early resolution of the Plan's conformance with *Granada Wines* weigh strongly in favor of resolution of the legal viability of the Board's theory of preemption.

21.     Preemption plays a critical role in the Plan, by design. Indeed, the Board has acknowledged that absent preemption, the Plan is not viable.[16] The Board has made abundantly clear it believes preemption has fundamentally altered the rights of creditors, which affects the proper classification of claims.[17] And the Board has also stated that preemption will have an enduring effect, the scope of which is critical to the Plan's likelihood of success. *See Transcript of March 4, 2020 Omnibus Hearing* at 185:17-186:2 (asserting that absent "rulings as part of confirmation" that certain statutes are preempted, "then the day after confirmation . . . HTA and

---

[16] *See Memorandum of the Commonwealth of Puerto Rico, By and Through the Financial Oversight and Management Board, in Support of Motion Pursuant to Bankruptcy Rule 7056 for Partial Summary Judgment Disallowing Claims Dated April 28, 2020*, Case No. 20-AP-00003-LTS (ECF No. 44) ¶¶ 84-85 ("Preemption of the Enabling Act is a logical imperative. If the Enabling Act were not preempted, revenues would have to continue to be paid to PRIFA to satisfy its debt in full and would not be available to pay Commonwealth expenses, or to satisfy Commonwealth debt, including GO debt . . . . ***Absent preemption of statutes appropriating moneys to instrumentalities, any possible Commonwealth restructuring could be blocked***." (emphasis added)); *Reply of the Commonwealth of Puerto Rico, By And Through the Financial Oversight and Management Board, In Support of Motion Pursuant to Bankruptcy Rule 7056 For Partial Summary Judgment Disallowing Claims Dated August 31, 2020*, Case No. 20-AP-00003-LTS (ECF No. 88) ¶ 133 ("Absent preemption of these statutes, the Oversight Board would be unable to control approximately 20.0% of the total certified Commonwealth budget, excluding federal funds.").

[17] According to the Board, as a result of preemption, Commonwealth law priorities do not exist. *See, e.g.*, *Brief for Defendants-Appellees, Aurelius Capital Master, Ltd., et al v. Commonwealth of Puerto Rico Dated July 2, 2018*, Case No. 18-1108 pp. 21-22 (". . . Appellants' contention that any plan of adjustment must treat GO Debt as having a first priority is simply wrong. If Congress had wanted to engraft Commonwealth-law priorities into PROMESA Title III, it could have done so. But it did not. As noted above, PROMESA § 301(a) incorporates only one priority into Title III: Bankruptcy Code § 507(a)(2), which grants priority to administrative claims. No other priorities exist in Title III.")).

PRIFA[] can say, we get all these rum excise taxes starting tomorrow, because the statute says we do.  Well, we have to know what's preempted and what's not, otherwise, the Plan can't work after confirmation.").  The Court will have to decide this issue on the merits, including to evaluate the Plan's compliance with PROMESA § 314(b)(3).

22.     Further, the resolution of challenges to preemption in the context of the Revenue Bond Adversary Proceedings are no substitute for consideration of the lawfulness of the Board's theory of preemption in the Plan.  Simply put, whether certain specific statutes like the revenue bond statutes have been preempted (they have not) is a narrower and distinct question from the one presented by the Plan, which asks the Court to find that a host of statutes (both identified and unidentified) have been preempted.  So, even if the preemption dispute in the Revenue Bond Adversary Proceedings were resolved in favor of the Board (which Ambac would strongly disagree with), it would not offer the complete resolution necessary to determining whether the Plan is confirmable.  Not all statutes are the same, and the Board has advanced numerous alternative theories of preemption, some of which may apply to certain statutes and some of which may not.

23.     The critical questions of the Plan's compliance with *Granada Wines* and preemption of existing Commonwealth laws are questions that should be resolved now.  Courts have long recognized that early resolution of objections decisive to the question of confirmability is appropriate to avoid the potential waste and delay of proceeding on an unconfirmable plan.  *See In re Kehn Ranch, Inc.*, 41 B.R. 832, 832–33 (Bankr. D.S.D. 1984) ("[T]his Court will not proceed with the time-consuming and expensive proposition of hearings on a disclosure statement and plan when the plan may not be confirmable . . . .").  The wisdom of this approach is reflected in those cases where classification challenges are resolved at the disclosure statement phase.  *See In re Mahoney Hawkes, LLP*, 289 B.R. 285, 294 (Bankr. D. Mass. 2002) (evaluating classification

scheme under *Granada Wines* at disclosure statement stage and finding plan patently

unconfirmable); *In re Curtis Ctr. Ltd. P'ship*, 195 B.R. 631, 641 (Bankr. E.D. Pa. 1996) (evaluating

classification of claims at disclosure statement stage and finding plan patently unconfirmable); *In*

*re Monroe Well Serv., Inc.*, 80 B.R. 324, 333 (Bankr. E.D. Pa. 1987) (declining to address at the

disclosure statement stage certain confirmability-related objections, but electing to address

questions concerning voluntary releases of non-debtors because it "goes to the very heart of the

plan" and impacted claim classification).

24.     Ambac urges the Court to resolve these pivotal questions now, before considering

approval of the Disclosure Statement and potentially setting the Commonwealth (and these Title

III proceedings) on a road to nowhere, at great expense to the parties and the Commonwealth itself.

Accordingly, rather than scheduling a hearing on the Disclosure Statement, the Court should

establish a schedule that permits briefing on objections on these two limited issues, and provides

for their resolution, prior to any other disclosure statement proceedings.

**C.     Consideration of the Disclosure Statement Now Would Be Premature for Additional Reasons.**

25.     Beyond the lack of resolution of the key issues described above, there are additional

disclosures that must be made before it is appropriate to even consider whether the Disclosure

Statement contains adequate information.

26.     *First*, the Disclosure Statement cannot be appropriately considered without the

Board's issuance of its certified fiscal plan for the Commonwealth.  The operative fiscal plan was

certified on May 27, 2020, during the early days of the COVID-19 pandemic.  Given the central

role the fiscal plan will play at confirmation, at a bare minimum, creditors must be equipped with

the forthcoming updated fiscal plan that reflects the current state of play when considering the

adequacy of disclosures.  *See* PROMESA § 314(b)(7) (to be confirmed, a plan of adjustment must

be consistent with the certified fiscal plan).  Without the certified fiscal plan, creditors are unable to consider whether the Disclosure Statement provides enough information to determine whether this confirmation requirement is met, and whether the Plan merits their vote.

27.     On February 19, 2021, the Board indicated its intent to certify a revised Commonwealth fiscal plan by April 23, 2021.[18]  However, after the Commonwealth received a violation letter from the Board regarding its first draft fiscal plan, the Commonwealth submitted a second draft fiscal plan on March 26, 2021, that did not incorporate the Board's instructions in its violation letter.[19]  Thus, the content and timing of a certified fiscal plan for the Commonwealth remains in question.  Creditors need sufficient time to review the certified fiscal plan before any disclosure statement hearing.  The Court should not schedule a disclosure statement hearing— much less a deadline for creditors to file objections to the Disclosure Statement—when creditors will not have the benefit of the certified fiscal plan, any backup information, or time to digest what assumptions have changed from last year's fiscal plan.  Creditors must be able to evaluate the Plan's compliance with the certified fiscal plan; the Board's proposed schedule affords no opportunity to do so.

28.     *Second*, the current Disclosure Statement—unlike the 2020 Disclosure Statement— does not provide the Board's analysis of how the Plan satisfies the "best interests of creditors" test set forth in PROMESA § 314(b)(6).  While Exhibit L to the 2020 Disclosure Statement at least purported to provide analysis of "the recoveries available to creditors of the Commonwealth on the basis of available remedies under non-bankruptcy laws" (2020 Disclosure Statement, Exhibit

---

[18] Letter from Natalie A. Jaresko, Executive Director of the Board, to Hon. Pedro Pierluisi Urrutia, Governor of Puerto Rico, dated Feb. 19, 2021, attached hereto as Exhibit B.

[19] "New Commonwealth Fiscal Plan Draft Skirts Oversight Board Directives on Pensions, Medicaid Funding; Incorporates Additional $19.77B in American Rescue Plan Funding," REORG RESEARCH (March 30, 2021), attached hereto as Exhibit C.

L, at 1), this key analysis has not yet been supplied to creditors in connection with the Disclosure

Statement.  Creditors are informed that this analysis "will be filed at a later date" (Disclosure

Statement, Exhibit L), but there is no guidance as to when creditors may expect this report, or

whether it will be supplied sufficiently advance of the Disclosure Statement hearing to permit

review.  As with the absence of an updated fiscal plan, the absence of this analysis prevents

creditors from determining whether the Disclosure Statement contains sufficient information to

enable a determination on whether the Plan satisfies the best interests tests and ultimately merits

their vote.

## II.   EVEN IF THE COURT ALLOWS CONSIDERATION OF THE DISCLOSURE STATEMENT NOW, THE BOARD'S PROPOSED SCHEDULE SHOULD BE MODIFIED.

29.     Even if the Court allows consideration of the Disclosure Statement at this time, the

Board's proposed schedule is far too compressed and should be modified.  The Board's proposed

schedule—like its proposal to force summary judgment resolution on counts of its choosing in the

Revenue Bond Adversary Proceedings before a proposed plan confirmation hearing prior to year-

end—is simply a continuation of its unyielding efforts to jam creditors with as little time as

possible to defend their positions and to prevent them from obtaining necessary discovery.

30.     The Board's proposed schedule would require creditors to file objections to the

Disclosure Statement by May 14, only sixteen days after the hearing on the DS Scheduling

Motion.  That does not give objectors sufficient time to prepare objections to the 532-page

Disclosure Statement (with its 1,500 additional pages of exhibits), particularly when it is unclear

whether consideration of the Disclosure Statement should happen at this time (and as explained

above, it is Ambac's position that it should not).  By contrast, in its order setting a schedule for

consideration of the Board's Amended Disclosure Statement in March 2020, the Court allowed

objectors 45 days between the issuance of the scheduling order and the date objections were due—

nearly a month more than what the Board is currently proposing.[20]   Contrary to the Board's

suggestion (*see* Mot. ¶ 33), it is of no moment that the current version of the Disclosure Statement

was filed on March 8.   The Board itself acknowledges that a revised version of the Disclosure

Statement will be filed before the hearing on the DS Scheduling Motion.   (*Id.* ¶ 4 n.5.)   While the

Board claims that the forthcoming disclosure statement will not represent a "significant

modification" to the current one (*id.* ¶ 33), that is an improbable assertion given that the new

disclosure statement and revised plan will have to address the substance and impacts of recent

settlements with ERS and HTA claimants.   Creditors do not know the full extent of any

modifications and it should not fall on their shoulders that the Board has chosen to proceed in this

fashion.

31.     Critically, the Board's proposed schedule also contemplates ***no*** time for creditors

to obtain discovery—indeed, it omits entirely any mention of creditor-propounded discovery in

connection with the Disclosure Statement.   (*See id.* ¶¶ 33-34 (stating that the Board's proposed

schedule provides adequate time to "respond" to and "resolve" objections, without mention of

discovery).)

32.     Ambac has identified a number of issues that will require discovery in connection

with its evaluation of the Disclosure Statement.   These categories of information are essential in

determining whether the Disclosure Statement provides creditors sufficient information to cast an

***informed*** vote on the Plan, and whether the Disclosure Statement presents a Plan that is capable

of being confirmed.[21]   These issues include, without limitation:

---

[20] *Order (I) Scheduling a Hearing to Consider the Adequacy of the Information Contained in the Disclosure Statement, (II) Establishing the Deadline for Filing Spanish Translation of the Disclosure Statement, (III) Establishing the Deadline for Filing Objections to the Disclosure Statement and Replies Thereto, and (IV) Granting Related Relief* (ECF 12187) ¶ 2.

[21] *See, e.g.*, *In re Ponce de Leon 1403, Inc.*, 2012 WL 5880443, at *2 (Bankr. D.P.R. Nov. 20, 2012) (noting discovery had been granted in connection with hearing on approval of disclosure statement); *In re 3DFX*

33.     *The financial position of the Commonwealth and its agencies, instrumentalities,*
*and public corporations*.  To determine whether the Plan gives creditors a "fair shake," creditors
are entitled to understand what resources are available to the Commonwealth for potential
distribution or realization.  Ambac has sought discovery regarding a number of these topics
through Rule 2004 discovery, only to be told by the Government Parties that such discovery is no
longer appropriate in light of the filing of the Plan.[22]  The time is now ripe for this discovery, to
ensure that creditors have all of the information necessary to cast an informed vote on the Plan.
Creditors—particularly those like Ambac, who are being asked to shoulder an incredibly
disproportionate share of the burden of the "haircuts" imposed through the Plan—are entitled to
information regarding the resources the Commonwealth can bring to bear in effecting its
restructuring.  Information akin to the following will aid Ambac and other creditors in assessing
the adequacy of the Disclosure Statement and the confirmability of the Plan:

- Analysis underlying key Disclosure Statement and fiscal plan inputs, including (i) the Board's analysis of what constitutes "essential services," and (ii) the Board's cash restriction analysis.

- Basic information regarding the financial position of the Commonwealth, including (i) the Commonwealth's necessary operating expenses, (ii) the costs of essential public services, and (iii) the Commonwealth's liquidity and minimum cash needs.

- Basic information regarding the financial position of public corporations of the Commonwealth, including the cash position of public corporations not reflected in the

---

*Interactive, Inc.*, 2006 WL 2010786 at *6 (Bankr. N.D. Cal. June 29, 2006) ("Additionally, there needs to be additional discovery and disclosure before this court can determine that any disclosure statement accompanying the Creditors' Committee's proposed plan has adequate information."); *In re Catholic Bishop of N. Alaska*, 2009 WL 8412170, at *2 (Bankr. D. Alaska July 20, 2009) ("Because the UCC has objected to the pending disclosure statement, it has become a contested matter. Discovery within a contested matter is governed by Fed. R. Bankr. P. 7026-7037, rather than the more expedited procedure of Rule 2004.").

[22] To be clear, Ambac still believes that Rule 2004 discovery is proper, and will continue to pursue it.  But the Government Parties should not be permitted to, with one hand, block Ambac from obtaining Rule 2004 discovery on the basis that such discovery is purportedly inappropriate in light of forthcoming motions to approve the Disclosure Statement and, with the other, prevent Ambac from obtaining discovery relevant to consideration of the Disclosure Statement.

- 17 -

Disclosure Statement or fiscal plan (for example, the positions of those public corporations released publicly in the blowout of mediation materials).[23]

- Disclosures regarding non-cash resources of the Commonwealth and its agencies, instrumentalities, and public corporations, including (without limitation) real property, illiquid investments, and the Municipal Revenue Collection Center's anticipated sale of its tax arrears and liens portfolio for at least $400 million.

Indeed, the Board apparently recognizes that much of the foregoing is relevant to consideration of the Disclosure Statement in proposing to make similar information available to creditors in its Disclosure Statement Depository. But, as discussed *infra* Section III, the Board should not be permitted to use the Disclosure Statement Depository as a substitute for discovery propounded by creditors on these issues.

34. *Information regarding key settlements underpinning Plan treatment.* The Disclosure Statement provides for treatment of certain classes of claims achieved through various "settlements." (Disclosure Statement §§ II.B.1.a, II.B.2.a, V.H.7, VI.C.) But key information regarding the settlements themselves, or the claims being settled, is absent from the Disclosure Statement.

35. In March 2020, in connection with the 2020 DS Scheduling Motion, counsel to the Board represented that the settlements reached with various classes of creditors would be "litigated," presumably allowing for discovery (or, at a minimum, argument) in connection with those settlements. (*Transcript of March 4, 2020 Omnibus Hearing* at 187:7-9 ("The settlement with each class, to the extent they are settlements, will be litigated, and we'll have to show they're in the realm of reasonableness.").) But this has not been the case. The settlements underpinning

---

[23] As discussed more fully in connection with Ambac's pending motion to compel Rule 2004 discovery regarding the assets of certain Commonwealth instrumentalities, Commonwealth law requires surpluses of public corporations to be returned to the Commonwealth each fiscal year, making the financial position of public corporations relevant to an understanding of the financial condition of the Commonwealth. (*Reply of Ambac Assurance Corporation in Further Support of Motion for Entry of Order Authorizing Discovery Under Bankruptcy Rule 2004 Concerning Commonwealth Assets* (ECF 16085) ¶¶ 2-3, 9, 16.)

the PSA and the Plan have not been litigated, but merely presented in the Disclosure Statement. There has never been an opportunity to take discovery in connection with these settlements (nor, in fact, to present arguments in connection therewith).

36.     Discovery is therefore warranted to determine what additional disclosures the Board must provide to creditors in connection with these "settlements"—especially as the information provided to date indicates that certain of these settlements are extremely generous. The treatment of pension claims, in particular, raises significant questions about the appropriateness of the classification of pension claims as compared to other purportedly unsecured claims, including (according to the Board) Ambac's revenue bond claims.  And discovery relating to the correctness of the $55 billion pension claim amount is critical given that it is the largest liability of the Commonwealth, and any material errors in that disclosure may render the Plan unconfirmable.[24]

37.     Discovery on the following information is therefore warranted:

- Information regarding key classes treated in the Plan, especially when such treatment is premised on a settlement.  For example, information regarding (i) the Pension Reserve Trust, contributions thereto, and the management thereof, and (ii) the Pension Reserve Fund described in the Retiree Committee PSA, including its establishment, funding, management, and projected investment guidelines and investment returns.

- Information regarding the calculation of the claim amount of pension claims addressed in the Plan.

---

[24] The discovery Ambac has received to date concerning pension claims indicates that the calculation of the pension claim amount is, to put it mildly, unreliable.  What discovery Ambac has received indicates that the Commonwealth's pension data is unverified and unaudited, that there are numerous gaps in the census records for pension plan participants, and that pension data limitations have resulted in several areas where data was missing, inconsistent, or invalid.

The current Disclosure Statement indicates that the Board retained experts to "verify and understand" the pension data.  (Disclosure Statement at iii ("In some cases, as for pension liabilities and determinations of available cash, the Oversight Board retained experts to help verify and understand the data.").)  Creditors are entitled to test this assertion and to understand the contours of the analysis performed, including the conclusions and limitations thereof.  In particular, Ambac queries whether the results of this analysis may warrant significant additional disclosures regarding the pension claim amounts.

- Information regarding the "ERS assets" that are to be sold to the Commonwealth under the Board's proposed settlement with ERS bondholders.  (ERS Stipulation ¶ 5(c)(i).)

38.     *Investigation regarding improper solicitation*.   Discovery is also warranted regarding whether votes of certain creditors may have been improperly solicited.  Discovery on this issue is appropriate now, and should not be delayed until the confirmation phase.  If votes have been improperly solicited or impermissibly "locked-up" before approval of a Disclosure Statement, the best time to remedy this wrong is now, when "locked-up" votes may be freed or improper support agreements nullified before full solicitation commences.   If delayed until confirmation, the only remedy would be re-solicitation (*after* the expenditure of significant resources) or vote disallowance.  Specifically, discovery may be warranted regarding, *inter alia*:

- Communications between the Board and the PSA signatories regarding (i) the termination of the 2020 PSA and (ii) the negotiation of the PSA.

- Communications between the Board and the parties to the ERS Stipulation regarding the negotiation of the ERS Stipulation.

- Communications between the Board and the Retiree Committee regarding the negotiation of the Retiree Committee PSA.

*             *             *

39.     For the foregoing reasons, the Board's proposed schedule is far too compressed. Thus, if the Court is inclined to allow a hearing on the Disclosure Statement to proceed at this time, Ambac proposes the below modified Disclosure Statement schedule (the "Modified DS Scheduling Proposal") to allow Ambac and other creditors sufficient time to fully review the Disclosure Statement, obtain relevant discovery, and prepare objections:

- **Expedited Discovery**:  April 28, 2021 – June 4, 2021.

- **Disclosure Statement Objections**: June 11, 2021.

- **Disclosure Statement Replies**: June 25, 2021.

- 20 -

- **Disclosure Statement Hearing**: 9:30 a.m., Atlantic Standard Time, on July 2, 2021, or another date convenient for the Court.

40.     The Modified DS Scheduling Proposal allows for proper consideration of the Disclosure Statement, with a hearing only two weeks after the date proposed by the Board, while also preserving sufficient time for the solicitation of votes and plan confirmation proceedings such that, if confirmable, the Plan may go effective by the Board's desired date of December 15, 2021 (notwithstanding Ambac's position that such a schedule for plan confirmation proceedings is also impractical).

## III.    THE PROPOSED DOCUMENT DEPOSITORY PROCEDURES CANNOT SERVE AS A SUBSTITUTE FOR DISCOVERY.

41.     The Board proposes the creation of a "centralized electronic document depository" that will contain "pertinent materials relating to the Disclosure Statement" (the "Depository"). (Mot. ¶ 27.)  The purpose of this Depository, the Board states, is to "allow creditors access to information in an orderly, expeditious, and efficient fashion on a consistent timeline, without the need for wasteful motion practice on an individual basis, or for other motions seeking expedited relief before this Court."  (*Id.* ¶ 29.)

42.     Avoiding waste and needless expense is a laudable goal, but the Court should see the Board's proposal to create the Disclosure Statement Depository for what it is—an attempt to prevent creditors from propounding discovery.   That is apparent from the Board's stated motivation for creating the Depository:  The Board "anticipate[s] that information requests may be duplicative and/or may go beyond what is necessary or appropriate to evaluate the adequacy of the information contained in the Disclosure Statement." (Mot. ¶ 38.)  The Board should not have the unilateral authority to determine what stakeholders may find relevant in evaluating the

Disclosure Statement.[25]  While Ambac has no objection to (and welcomes) the posting of materials

on a centralized platform, the Court should not let the Disclosure Statement Depository serve as a

substitute for creditors' rights to serve and take discovery in connection with a contested matter,

preserved in Federal Rule of Bankruptcy Procedure 9014 and confirmed in case law.  (*See supra*

¶ 32 n.21.)

## IV.  VARIOUS MODIFICATIONS TO THE PROPOSED ORDERS ATTACHED TO THE MOTION ARE WARRANTED.

43.      In addition to the significant issues with the Board's scheduling proposal, there are

numerous deficiencies in the proposed orders attached to the DS Scheduling Motion.  To the extent

the Court were to set a hearing for the Disclosure Statement and enter any of the Board's proposed

orders, Ambac proposes the changes described below, which are reflected in the revised drafts

attached hereto as Exhibits D, E, F, and G .  Redlines showing the changes to the Board's proposed

orders are attached hereto as Exhibits H, I, J, and K.

44.      ***Improper Limitation of the Scope of the Disclosure Statement Hearing.***  The

proposed order attached to the DS Scheduling Motion as Exhibit A (the "Proposed DS Scheduling

Order"), characterizes the proposed "Disclosure Statement Hearing" (through its incorporation of

that defined term in the DS Scheduling Motion) as a hearing "to consider the adequacy of the

information contained in the [Disclosure Statement]."  (Mot. at 2; Proposed DS Scheduling Order

at 1 n.2 & ¶ 3.)  While adequacy of information will no doubt be a central issue at any hearing on

a motion for approval of a disclosure statement, Ambac at this point does not have enough

information about what specific additional forms of relief such an as-yet-unfiled motion might

---

[25] Notably, it has come to Ambac's attention that the creditor data room used for years in these proceedings—to which the Board has posted information for creditors participating in mediation or who otherwise agreed to certain confidentiality provisions—has been emptied of materials entirely.  This appears to be another effort by the Board to exert unilateral control over what information is available to creditors at this crucial time.

seek.  Nor does Ambac know the full extent of additional issues related to the underlying disclosure

statement and plan that might be in dispute—including, for example, issues that would make the

plan of adjustment patently unconfirmable and therefore ripe for rejection before the solicitation

of votes.[26]  Therefore, in the event the Court were to enter a scheduling order notwithstanding this

Objection, the order should at a minimum refrain from characterizing the Disclosure Statement

hearing in a way that could be interpreted as pre-judging the scope of the issues to be considered

at such a hearing.  Any determination of the scope of a such a hearing would be premature at this

time—just like the DS Scheduling Motion itself.

45.     ***The Purported Creditor Acknowledgements in the Proposed DS Scheduling
Order Should Be Removed.***  Paragraph 7 of the Proposed DS Scheduling Order provides:

> Each Eligible Creditor understands that the Producing Parties (as defined in
> Exhibit 2 to this Order) will endeavor to include in the Confidential Information
> materials relevant for the purpose of evaluation of the Disclosure Statement, but
> each Eligible Creditor acknowledges that the Producing Parties do not make any
> representation or warranty as to the accuracy or completeness of any Confidential
> Information so provided, and none of the Producing Parties shall have any liability
> to any Eligible Creditor or its representatives resulting from the use of such
> information by an Eligible Creditor or its representatives.

This paragraph should be stricken.  Creditors should not be forced to acknowledge that the Board

or the Commonwealth (or any other "Producing Parties") are "endeavor[ing] to include in the

Confidential Information materials relevant for the purpose of evaluation of the Disclosure

Statement" when creditors have no idea what materials are going to be made available on the

---

[26] If a disclosure statement proposes a plan that is patently unconfirmable, the court should decline to
approve it.  *See, e.g.*, *In re Phoenix Petroleum Co.*, 278 B.R. 385, 394 (Bankr. E.D. Pa. 2001) ("Where the
plan's inadequacies are patent, they may, and should be addressed at the disclosure statement stage."); *In
re Mahoney Hawkes*, 289 B.R. at 294-96 (evaluating a plan's classification rationales at the disclosure
statement phase to ensure the court was not permitting the advancement of a patently unconfirmable plan);
*In re Bjolmes Realty Tr.*, 134 B.R. 1000, 1002 (Bankr. D. Mass. 1991) (a court may decide on confirmation
issues at the disclosure statement stage when "it is contended that the plan is so fatally and obviously flawed
that confirmation is impossible"); *In re 266 Washington Assocs.*, 141 B.R. 275, 288 (Bankr. E.D.N.Y. 1992)
("A disclosure statement will not be approved where, as here, it describes a plan which is fatally flawed
and thus incapable of confirmation."), *aff'd*, 147 B.R. 827 (E.D.N.Y. 1992).

- 23 -

proposed Disclosure Statement Depository.  Certainly creditors cannot vouch for the Producing Parties' efforts to include relevant materials without knowing what those materials will be, whether they are indeed relevant, or whether additional relevant materials have not been made available. The purported limitation of liability is also entirely unnecessary for present purposes; any disputes are purely hypothetical at this time and should be addressed if and when they arise.

46.     ***The Board and the Debtors Should Be Required to Provide Raw Data Underlying the Disclosure Statement on Their Depository.***  Exhibit 1 to the Proposed DS Scheduling Order sets forth the Board's proposed procedures for the electronic document depository that they intend to make available in connection with the Disclosure Statement.  Under the Disclosure Statement Depository Procedures, the Board would make available, *inter alia*, factual source materials underlying the Disclosure Statement.  (Disclosure Statement Depository Procedures ¶ 1.)  In addition to factual source materials, the Board should be required to make available raw data underlying the Disclosure Statement.  Throughout the course of Rule 2004 discovery on cash-related issues, the Board voluntarily produced factual source materials ***and raw data*** underlying each iteration of its cash restriction analysis.[27]  Such raw data enhances Ambac's and other creditors' ability to evaluate the Commonwealth's cash position.  It is unclear whether the Board's omission of raw data from its proposed disclosures in the Disclosure Statement Depository was intentional, but the Court should direct the inclusion of raw data, which should not be unduly burdensome, given its value in assisting creditors test the Board's conclusions.  Doing so will allow

---

[27] *See, e.g.*, *Joint Status Report of Ambac Assurance Corporation and the Financial Oversight and Management Board for Puerto Rico, as Representative of the Commonwealth of Puerto Rico, and the Puerto Rico Fiscal Agency and Financial Advisory Authority Pursuant to the Court's March 8 and March 10, 2021 Orders* (ECF No. 16244) ¶ 13 (acknowledging the Board's production of factual source materials ***and raw data*** for the December 2020 Presentation (*i.e.*, fifth iteration of the Board's cash restriction analysis)); *id.* ¶ 15 (acknowledging the Board's agreement to produce factual source materials ***and raw data*** for the March 2021 Disclosure Statement (*i.e.*, sixth iteration of the Board's cash restriction analysis)).

the parties to avoid repeated requests for this information, wasting the resources of the parties and the Court.

47.     ***Creditors Should Be Able to Use Information from the Data Room for any Purpose in Connection with the Title III Cases, Not Just for Purposes of the Disclosure Statement Proceedings.***  The proposed protective order attached as Exhibit 2 to the Proposed DS Scheduling Order (the "Proposed Protective Order") provides that information made available in the Disclosure Statement Depository "shall be used only in connection with evaluating the adequacy of the Disclosure Statement and not for any other purpose." (Proposed Protective Order ¶ 2.)  This is unduly limiting and would be wholly inefficient.  As with other protective orders agreed to by the parties and approved by this Court,[28] parties to the Proposed Protective Order should be permitted to use information from the Disclosure Statement Depository for any purpose in connection with the Title III cases, not just in the limited disclosure statement proceedings. Documents relevant to consideration of the Disclosure Statement may very well be relevant to other aspects of the Title III cases, such as plan confirmation and the Revenue Bond Adversary Proceedings.  There is no reason why a party to the Proposed Protective Order should have to seek permission to use such documents every time they are relevant to the Title III proceedings. Allowing such use would not interfere with the purpose of provisions setting forth limitations on

---

[28] *Protective Order* (ECF No. 3216) ¶ 7 ("Rule 2004 Discovery Protective Order") ("All Material, including, but not limited to, Confidential Material produced in this Title III proceeding, shall be used only in connection with this proceeding[.]"); *Confidentiality Agreement and Order in Connection with (A) Ambac Assurance Corporation's Motion for Entry of Order Authorizing Discovery Under Bankruptcy Rule 2004 Concerning Commonwealth Assets [ECF No. 9022] and (B) Ambac Assurance Corporation's Motion for Entry of Order Authorizing Discovery Under Bankruptcy Rule 2004 Concerning Commonwealth Cash Restriction Analysis [ECF No. 9023]* (ECF No. 12920) ¶ 9 ("Cash/Assets Rule 2004 Confidentiality Order") ("All Material, including, but not limited to, Confidential Material and Professional Eyes Only Material produced in connection with the Rule 2004 Motions shall be used only in connection with the Title III Cases[.]").

use, which is to prevent parties from using information from litigation for unrelated business or

other purposes.

48.     ***The List of Persons Who May Receive Confidential Material Is Too Narrow.***
Paragraph 4 of the Proposed Protective Order sets forth the universe of persons to whom creditors

may disclose Confidential Information.  That list is too narrow.  First, it would limit disclosure to

a mediator, court, and witnesses such that Confidential Information could only be disclosed to

those individuals in connection with Disclosure Statement proceedings.  As discussed above in

paragraph 47, disclosure to those individuals should be permitted as long as it is connection with

the Title III cases.  Second, the Board's list leaves off numerous persons to whom creditors should

be permitted to disclose Confidential Material.  For example, other protective orders entered in

these Title III cases permitted the monoline insurers to disclose materials to their regulators when

necessary.[29]  That should apply equally here.

49.     ***The Purported Limitation on Creditors' Ability to Use Confidential Information
in Objecting to the Disclosure Statement Should Be Stricken.***     Paragraph 6 of the Proposed

Protective Order provides that "Confidential Information shall not be copied or reproduced in an

Eligible Creditor's objection to the Disclosure Statement, unless it is reasonably necessary to

include Confidential Information in such an objection."  That provision should be stricken.  There

is no reason for imposing an ambiguous "reasonably necessary" limitation on creditors' ability to

reference Confidential Material in an objection to the Disclosure Statement.  Creditors should be

permitted to reference Confidential Material in their objections to the Disclosure Statement

consistent with the rules generally applicable to court filings.  Any concerns about the public

---

[29] Cash/Assets Rule 2004 Confidentiality Order ¶ 4(k) (allowing disclosure of produced material "in the
case of a monoline insurer, to its insurance regulators, to the extent such disclosure is requested or required
by them or is determined by the monoline insurer to be advisable").

revelation of Confidential Information are eliminated by the need for creditors to file any Confidential Information under seal under the Court's standing order governing such matters.[30]

50.   ***Creditors Should Not Be Required to Destroy Confidential Information Upon Any Approval of the Disclosure Statement.***   Paragraph 9 of the Proposed Protective Order would require creditors to destroy Confidential Information within 60 days of approval of the Disclosure Statement.[31]   That is grossly inefficient for reasons previously discussed in paragraph 47 above. Instead, creditors should be able to retain Confidential Information for use in connection with the Title III cases, and should not be required to destroy Confidential Information until the exhaustion of any appeals relating to the Title III cases.   That is exactly what is provided in other protective orders in this case.[32]

51.   ***A Presumed Typo in the Protective Order Subscription Should Be Corrected.*** Exhibit 3 to the Proposed DS Scheduling Order is the certification that the Board proposes to have eligible creditors sign to obtain access to Confidential Information (the "Protective Order Subscription").   The Protective Order Subscription provides that the subscriber submits to the jurisdiction of the United States **Bankruptcy** Court for the District of Puerto Rico.   Presumably, that is a typo, and should be corrected to the United States **District** Court for the District of Puerto Rico.

---

[30]   *Second Amended Standing Order* (ECF 15895-1) § 5 (governing redactions and filing under seal).

[31]   The heading of paragraph 9 ("Return or Destruction of Confidential Information Upon Plan Confirmation") suggests that creditors would have to destroy Confidential Information upon plan confirmation, but the text of paragraph 9 provides the even harsher requirement that Confidential Information be destroyed far earlier, upon approval of the Disclosure Statement.

[32] Rule 2004 Discovery Protective Order ¶ 22 (only mandating destruction of produced materials "[a]t the conclusion of this Title III Proceeding, by way of final judgment, settlement or otherwise, including all appeals"); Cash/Assets Rule 2004 Confidentiality Order ¶ 28 (only mandating destruction of produced materials "[a]t the conclusion of the Title III Cases, by way of final judgment, settlement or otherwise, including all appeals, and upon request by the Producing Party or non-party").

## <u>CONCLUSION</u>

52.     For the foregoing reasons, Ambac respectfully requests that the DS Scheduling Motion be denied without prejudice, that the Court refrain from scheduling a hearing on the Disclosure Statement at this time, and that it instead schedule briefing on objections regarding the threshold issues of the Plan's compliance with *Granada Wines* and the viability of the Board's theory of preemption.  Alternatively, to the extent that the Court is inclined to schedule a hearing on the Disclosure Statement, Ambac requests that the Court adopt the Modified DS Scheduling Proposal set forth in Section II above, as reflected in Exhibit D hereto, and that Court adopt the modifications to the Proposed Orders set forth in Section IV above, as reflected in Exhibits D, E, F, and G hereto.

Dated:  April 13, 2021
         San Juan, Puerto Rico

**FERRAIUOLI LLC**

By: /s/ *Roberto Cámara-Fuertes*
       Roberto Cámara-Fuertes (USDC-PR No.
       219002)
       Sonia Colón (USDC-PR No. 213809)
       221 Ponce de León Avenue, 5th Floor
       San Juan, PR 00917
       Telephone: (787) 766-7000
       Facsimile:  (787) 766-7001
       Email:  rcamara@ferraiuoli.com
             scolon@ferraiuoli.com

**MILBANK LLP**

By: /s/ *Atara Miller*
       Dennis F. Dunne (admitted *pro hac vice*)
       Atara Miller (admitted *pro hac vice*)
       Grant R. Mainland (admitted *pro hac vice*)
       John J. Hughes, III (admitted *pro hac vice*)
       Jonathan Ohring (admitted *pro hac vice*)
       55 Hudson Yards
       New York, NY 10001
       Telephone:  (212) 530-5000
       Facsimile:  (212) 530-5219
       Email:  ddunne@milbank.com
             amiller@milbank.com
             gmainland@milbank.com
             jhughes2@milbank.com
             johring@milbank.com

*Attorneys for Ambac Assurance Corporation*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on this same date, I electronically filed the foregoing with the

Clerk of the Court using the CM/ECF system, which will send notification of such filing to all

CM/ECF participants in this case.

<u>/s/ *Roberto Cámara-Fuertes*</u>
Roberto Cámara-Fuertes (USDC-PR No. 219002)
221 Ponce de León Avenue, 5th Floor
San Juan, PR 00917
Telephone: (787) 766-7000
Facsimile:  (787) 766-7001
Email:  rcamara@ferraiuoli.com