## UNITED STATES DISTRICT COURT
## DISTRICT OF PUERTO RICO

------------------------------------------------------------x

In re:

THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO,

      as representative of

THE COMMONWEALTH OF PUERTO RICO, *et al.*,

      Debtors.[1]

------------------------------------------------------------x

PROMESA
Title III

No. 17 BK 3283-LTS

**Re:  ECF No. 16276**

(Jointly Administered)

------------------------------------------------------------x

In re:

THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO,

      as representative of

PUERTO RICO HIGHWAYS AND
TRANSPORTATION AUTHORITY ("HTA")

      Debtor.

------------------------------------------------------------x

PROMESA
Title III

No. 17 BK 3567-LTS

### THE GOVERNMENT PARTIES OBJECTION TO THE DRA PARTIES' STANDING TO SEEK RELIEF FROM THE AUTOMATIC STAY OR IN THE ALTERNATIVE, <u>ORDERING PAYMENT OF ADEQUATE PROTECTION</u>

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID:  3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID:  3808); and (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID:  9686). (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ........................................................................ 1

BACKGROUND ........................................................................................... 6

    A.    The GDB Qualifying Modification........................................... 6

    B.    Restrictions on the DRA Parties' Rights to Enforce Public
        Corporation Loans ................................................................. 6

    C.    The GDB/HTA Loans ........................................................... 7

    D.    Filing of the Lift Stay Motion and Subsequent Proceedings ..................... 8

OBJECTION ................................................................................................. 9

    A.    The Plain and Unambiguous Terms of the Asset Restrictions
        Prohibit the DRA Parties from Bringing the Lift Stay Motion................. 9

    B.    If the Plain Language of the Asset Restrictions Is Unclear, the
        Intentions of the Parties Prevail and the Lift Stay Motion Should
        be Denied .............................................................................. 12

        i.    The Drafting History and Solicitation Documents Supports
            the Government Parties' Interpretation....................... 12

        ii.    The DRA Parties' Interpretation of the Asset Restrictions
            Undermines a Fundamental Component of the Qualifying
            Modification............................................................ 14

    C.    Even if Clause (ii) Applies in Title III, the Lift Stay Motion Does
        Not Constitute an Action to Preserve, Protect or Defend a Security
        Interest.................................................................................. 15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Blackie v. State of Me.*,
   75 F.3d 716 (1st Cir. 1996) ................................................................. 10

*Crowe v. Bolduc*,
   365 F.3d 86 (1st Cir. 2004) ................................................................. 10

*Executive Leasing Corp. v. Banco Popular de P.R.*,
   48 F.3d 66 (1st Cir. 1995) ..................................................................... 9

*Grella v. Salem Five Cent Sav. Bank*,
   42 F.3d 26 (1st Cir. 1994) ................................................................... 16

*In re 604 Columbus Ave. Realty Trust*,
   968 F.2d 1332 (1st Cir. 1992) ............................................................. 11

*In re Fin. Oversight and Mgmt. Bd. for P.R.*,
   989 F.3d 170 (1st Cir. 2021) ............................................................... 16

*Newharbor Partners, Inc. v. F.D. Rich Co., Inc.*,
   961 F.2d 294 (1st Cir. 1992) ............................................................... 11

*Smart v. Gillette Co. Long–Term Disability Plan*,
   70 F.3d 173 (1st Cir.1995) .................................................................. 10

**Statutes**

Act No. 109-2017, § 208(a) (2017) ............................................................ 2

Act No. 109-2017, Art. 103 (2017) ............................................................ 2

Act No. 30-2013 (2013) ............................................................................ 8

Act No. 31-2013 (2013) ............................................................................ 8

P.R. Laws Ann. tit. 31, § 3471 ............................................................... 4, 9

The Financial Oversight and Management Board for Puerto Rico ("FOMB")[2] and the Puerto Rico Fiscal Agency and Financial Advisory Authority ("AAFAF")[3] (collectively, the "Government Parties"), respectfully submit this objection (the "Objection") to the Lift Stay Motion[4] on the grounds that the DRA Parties lack standing.[5]

The Lift Stay Motion should be denied for lack of standing. As described below, the DRA was created as part of the GDB's Title VI Qualifying Modification process and became the holder of certain loans GDB made to HTA. But when GDB created the DRA, it was with the express understanding that the DRA would be a passive actor with respect to other Commonwealth government entities and would only be permitted to act in HTA's Title III case in very narrow circumstances. This understanding was memorialized in a written agreement that binds the DRA Parties, and, as explained below, the Lift Stay Motion falls outside those limited circumstances in which the DRA Parties are permitted to act. Therefore, the DRA Parties cannot pursue their motion against HTA.

## PRELIMINARY STATEMENT

1.      On November 5, 2018, this Court approved the Title VI Qualifying Modification for GDB. Under the Qualifying Modification, the claims of GDB's creditors were exchanged for

---

[2] As sole representative of the Commonwealth of Puerto Rico (the "Commonwealth") and the Puerto Rico Highways and Transportation Authority (the "HTA") pursuant to PROMESA section 315(b).

[3] Pursuant to the authority granted to it under the Enabling Act of the Fiscal Agency and Financial Advisory Authority, Act 2-2017, Act 2-2017 and as representative to the Government Development Bank of Puerto Rico (the "GDB").

[4] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in *The DRA Parties' Amended Motion and Memorandum of Law in Support of Their Request for Adequate Protection or Relief from the Automatic Stay* [ECF No. 16276] (the "Lift Stay Motion"), which was filed by AmeriNational Community Services, LLC (the "Servicer"), as servicer for the GDB Debt Recovery Authority (the "DRA"), and Cantor-Katz Collateral Monitor LLC, as collateral monitor for the DRA (the "Collateral Monitor," and together with the Servicer, collectively, the "DRA Parties").

[5] The Government Parties are opposing the Lift Stay Motion in relation to standing only at this stage in accordance with the Courts' *Order Approving Joint Stipulation Regarding the DRA Parties' Motion and Memorandum of Law in Support of Their Motion For Relief from the Automatic Stay, or in the Alternative, Ordering Payment of Adequate Protection* (the "Original Order") [ECF No. 7832], and subsequent related orders, which bifurcated the briefing and hearing schedule to first address the standing issue.

new bonds issued by the DRA, a newly-formed government instrumentality created by the Puerto

Rico Legislature for "a public purpose" and "in the best interests of the people of Puerto Rico."

*See* Act No. 109-2017, *Government Development Bank for Puerto Rico Debt Restructuring Act*

(the "GDB Restructuring Act"), at Art. 103.  To protect the interests of Puerto Rico and diminish

the proliferation of intergovernmental litigation, the Qualifying Modification mandated that the

loans supporting the new bonds would continue to be held by a Government entity (*i.e.*, the DRA)

with carefully circumscribed enforcement rights, thus ensuring that the DRA would not force a

public corporation into Title III or frustrate a pending Title III case.[6]

    2.    To that end, the agreement governing the transfer of assets from the GDB to the

DRA includes the following restrictions on affirmative actions the DRA can take with respect to

public corporation loans, which are referred to in the Transfer Agreement as "Non-Municipal

Loans" (collectively, the "Asset Restrictions"):

> [W]ith respect to any Non-Municipal Loan, rights, remedies and powers in respect
> of such Non-Municipal Loan may be exercised solely to the extent necessary:
>
> (i) to assure that the applicable Obligor's funds that are available for debt service
> (consistent with the applicable Fiscal Plan, if any, and applicable PROMESA
> Budget, if any) are applied to such Non-Municipal Loan in accordance with the
> applicable Asset Documents, legal priority, security or other pledge rights
> benefiting such Loan Asset;
>
> (ii) to preserve, protect or defend any security or other pledge rights benefiting such
> Non-Municipal Loan; and
>
> (iii) *in the case of a Non-Municipal Loan where the applicable Obligor is in a
> proceeding under Title III or Title VI of PROMESA and such Obligor has other
> creditors with the same legal priority, security or pledge rights as the Issuer*, to
> ensure that the Issuer receives treatment in such proceedings that is the same as that
> provided to other creditors with the same legal priority, security or pledge rights.

---

[6] *See* Transfer Agreement, dated November 29, 2018, by and among GDB and the DRA (the "Transfer Agreement"),
Schedule 1 (Definition of "Asset Restrictions"); *See also* GDB Restructuring Act at § 208(a) ("It is hereby found and
declared that the activities of the [DRA] are primarily for the benefit of the people of Puerto Rico, for the improvement
of their welfare and prosperity . . . and the [DRA] shall be regarded as performing an essential governmental function
in carrying out the provisions of this Act.")

*See* Transfer Agreement, Schedule 1 (emphasis added).

3.      By the Asset Restriction's plain and unambiguous terms, if an Obligor is a debtor in Title III, the DRA Parties may only exercise "rights, remedies and powers" pursuant to clause (iii) (*i.e.*, the DRA Parties may seek relief to ensure that the DRA is treated equally compared to other creditors of equal priority).  In HTA's case, HTA is the Obligor on 23 different loans made from GDB (and transferred to the DRA), which are outstanding in the total principal amount of approximately $1.7 billion (the "<u>GDB/HTA Loans</u>").  HTA is a Title III debtor and is not giving priority treatment to any creditor with the same legal priority, security, or pledge rights as the DRA with respect to the GDB/HTA Loans.  To the contrary, HTA is not providing any "treatment" to any creditors as HTA has not filed a plan of adjustment.  Moreover, the DRA claims the GDB/HTA Loans are secured by certain revenues levied and collected pursuant to Act 30-2013 and Act 31-2013 (the "<u>Act 30-31 Revenues</u>"), and the DRA has rejected the premise that it either shares this collateral with any other party or that any other party is *pari passu* with it.[7]  As such, the DRA Parties currently have no right to enforce remedies with respect to HTA.

4.      Despite the clear Asset Restrictions, the DRA Parties filed the Lift Stay Motion on the basis that the Commonwealth has, for over 5 years starting prior to the commencement of its and HTA's Title III cases, illegally diverted and retained the Act 30-31 Revenues.

5.      The DRA Parties have represented to the Government Parties that the Lift Stay Motion is authorized under clause (ii) of the Asset Restrictions, as a means to preserve, protect or defend any security or other pledge rights.  Reading the Asset Restrictions as the DRA Parties suggest fails to give effect to clause (iii) because it would be entirely superfluous to clause (ii).  If

---

[7] *See e.g.*, *Fin. Oversight & Mgmt. Bd. for Puerto Rico v. Puerto Rico Highways and Transportation Authority (in re Fin. Oversight & Mgmt. Bd. for Puerto Rico)*, Case No. 17-03567, ECF No. 998 p. 47 ("Only the DRA has a lien in many of the revenues at issue in this Motion - and, in any event, the DRA has the senior most lien in all such collateral.").

in a Title III case the DRA Parties have the unfettered right "to preserve, protect or defend any security or other pledge rights" there would be no reason to further specify that the DRA could only exercise such rights to ensure that they receive treatment consistent with treatment provided to other creditors with the same legal priority or security.  This interpretation fails the basic canons of contract interpretation.  Likewise, the more specific and direct language in clause (iii) regarding precisely what rights can be exercised "*in the case of a Non-Municipal Loan where the applicable Obligor is in a proceeding under Title III or Title VI*" controls over the more general language in clause (ii).

6.      If the Court finds the meaning of the Asset Restrictions are unclear—which they are not—the intention of the parties controls.[8]  Here, the Asset Restrictions are designed to facilitate the global restructuring of the Commonwealth and its instrumentalities and protect public entities from enforcement actions in connection with historic, intergovernmental loans.  Among those public entities that the Asset Restrictions are to protect, the largest (by far) is HTA, which owed GDB approximately $1.7 billion.[9]  Clause (iii) of the Asset Restrictions regarding rights in Title III was therefore designed specifically to circumscribe DRA's rights with respect to this large HTA liability in the pending HTA Title III case.  To hold that the Lift Stay Motion is consistent with the intention of the parties, the Court would have to find that the parties intended to allow the DRA to immediately enforce remedies in connection with more than a billion dollars of HTA loans—each of which was classified in the Qualifying Modification and described in the Solicitation Statement as non-performing and was attributed no recovery value—based on the

---

[8] *See* P.R. Laws Ann. tit. 31, § 3471 ("[i]f the terms of a contract are clear and leave no doubt as to the intention of the contracting parties, the literal sense of its stipulations shall be observed.  If the words should appear contrary to the evident intention of the contracting parties, the intention shall prevail.").

[9] For comparison, the next largest debtor of loans transferred to the DRA is the Puerto Rico Ports Authority, which owed GDB less than $270 million.

historic clawback of the Act 30-31 Revenues.  In other words, the Court would have to conclude

that the extensively negotiated Asset Restrictions that were a cornerstone of the Qualifying

Modification are meaningless with respect to HTA—the single largest debtor of the DRA.  This is

of course not what the Asset Restrictions provide, nor was it the intention of the parties.

7.     But even if the Court rejects the above interpretation, and concludes that the DRA

Parties can avail themselves of clause (ii) of the Asset Restrictions in Title III, the Lift Stay Motion

should still be denied.  The right to "preserve, protect or defend" a security interest does not grant

the DRA Parties the right to "initiate, continue and conclude any foreclosure proceedings over

their collateral," as requested by the Lift Stay Motion.  *See* Lift Stay Motion at ¶ 47.  At most, it

would permit the DRA Parties to act in response to an action that implicates their security interest.

Properly understood, clause (ii) corresponds with the covenant in the bond Indenture obligating

the DRA Parties to "defend, preserve and protect, or cause to be defended, preserved and protected,

the pledge of the Restructuring Property and all the rights of the Indenture Trustee and the

Bondholders under this Indenture against all claims and demands of all Persons whomsoever . . ."

*See* Indenture § 4.05(i).  Acknowledging that the DRA Parties have this obligation (which is

common in credit documents and requires an issuer to protect against actions by third parties), it

was necessary to create this limited exception to the DRA forbearance.  Through the Lift Stay

Motion, the DRA Parties are seeking to turn this limited exception to the Asset Restrictions on its

head and use it as a means to take offensive, aggressive actions against the Commonwealth and

HTA in violation of the forbearance they agreed to in connection with non-performing government

loans—which was a central component of the Qualifying Modification approved by both the

Oversight Board and this Court under section 601 of PROMESA.

## BACKGROUND

**A.    The GDB Qualifying Modification**

8.     To provide the legal framework for the Qualifying Modification, the Puerto Rico Legislature passed the GDB Restructuring Act.  The GDB Restructuring Act created the DRA as a special purpose instrumentality of the Commonwealth.

9.     Under the Qualifying Modification, the claims of GDB's bondholders and municipal and private depositors were cancelled as to GDB and exchanged for new bonds issued by the DRA.  In return, GDB transferred to the DRA its municipal loan portfolio, a portion of its portfolio of loans to Commonwealth governmental entities (including the GDB/HTA Loans), its real estate owned assets, and its unencumbered cash (collectively, the "Restructuring Property"). The Restructuring Property was transferred pursuant to the terms of the Transfer Agreement.

10.     In accordance with the Qualifying Modification, several third-party service providers were engaged to perform specific functions, including AmeriNational Community Services, LLC as Servicer, Wilmington Trust, N.A. as the Indenture Trustee, and Cantor-Katz Collateral Monitor GP as Collateral Monitor.

**B.    Restrictions on the DRA Parties' Rights to Enforce Public Corporation Loans**

11.     The Transfer Agreement governs the rights of the DRA with respect to the Restructuring Property.  Under the Transfer Agreement, the DRA's rights to take action with respect to loans made by non-municipal public corporations, such as HTA (each, a "Non-Municipal Loan"), are limited solely to the extent necessary:

- "to assure that the applicable Obligor's funds that are available for debt service (consistent with the applicable Fiscal Plan, if any, and applicable PROMESA Budget, if any) are applied to such Non-Municipal Loan in accordance with the applicable Asset Documents, legal priority, security or other pledge rights benefiting such Loan Asset,"

- "to preserve, protect or defend any security or other pledge rights benefiting such Non-Municipal Loan," and

6

- "*in the case of a Non-Municipal Loan where the applicable Obligor is in a proceeding under Title III or Title VI of PROMESA and such Obligor has other creditors with the same legal priority, security or pledge rights as the Issuer*, to ensure that the Issuer receives treatment in such proceedings that is the same as that provided to other creditors with the same legal priority, security or pledge rights."

Transfer Agreement, Schedule 1 (Definition of "Asset Restrictions").

12.     These Asset Restrictions facilitate the global restructuring of the Commonwealth and its instrumentalities, ensuring that no third-party servicer expands or aggressively enforces remedies with respect to the Restructuring Property and interferes with a public corporation or disrupts a pending Title III case.

## C.     The GDB/HTA Loans

13.     The Restructuring Property includes the GDB/HTA Loans (*i.e.*, 23 separate promissory notes made by GDB to HTA, totaling approximately $1.7 billion).  Each of the GDB/HTA Loans was classified in the Qualifying Modification as non-performing and was attributed no value in the GDB Qualifying Modification.[10]  The Qualifying Modification did not contemplate or recognize the transfer of any claim that was or could be asserted against the Commonwealth on account of the GDB/HTA Loans.[11]  In fact, GDB did not file a proof of claim

---

[10] *See* Solicitation Statement, dated August 9, 2018 (the "Solicitation Statement"), at E-126.

[11] Indeed, the Solicitation Statement, pursuant to which the Qualifying Modification was presented to GDB's creditors, acknowledges that a claim was filed against HTA on account of the GDB/HTA Loans:

> On May 25, 2018, GDB filed a proof of claim in HTA's Title III proceeding (Claim No. 29533) in respect of all amounts owed by HTA to GDB under the HTA Debt as of the commencement date of HTA's Title III proceeding under PROMESA (May 21, 2017).  On June 29, 2018, GDB filed an amended and restated proof of claim in HTA's Title III proceeding.  Such proof of claim includes a claim for $1,733,697,499 of principal and $420,390,698 in pre-petition interest in respect of the HTA Loans and for $200,000,000 of principal and $1,886,368 of pre-petition interest in respect of HTA Bonds.

*See* Solicitation Statement at E-128.  The Solicitation Statement further acknowledges that GDB filed a claim against the Commonwealth, but such claim did not including any claim on account of the GDB/HTA Loans:

> On May 25, 2018, GDB filed a proof of claim in the Commonwealth's Title III proceeding (Claim No. 29485) in respect of all indebtedness owed by the Commonwealth to GDB as of the commencement date of the Commonwealth's Title III proceeding under PROMESA (May 3, 2017).  Such proof of claim includes, among other things, a claim for $169,438,036 of principal and $28,849,289 of pre-petition interest in respect of the Commonwealth Loan Assets.

*See* Solicitation Statement at E-124.

7

against the Commonwealth with respect to the GDB/HTA Loans.  The DRA also succeeded GDB

as the holder of approximately $200,000,000 in HTA 1998 bonds.

14.     On August 28, 2013, GDB and HTA executed an Assignment and Security

Agreement (the "Security Agreement").  Pursuant to Section 1.1 of the Security Agreement, HTA

"absolutely, irrevocably, and unconditionally assign[ed], convey[ed] and transfer[red] without

recourse, to [GDB all of its] rights, title, obligations and interest in" the Act 30-31 Revenues as

security for the obligations of HTA to GDB, which grant of security includes whatever rights HTA

has (if any) in:

- The motor vehicle license fees described by Act 30;

- Up to $20,000,000 per fiscal year of the excise tax on cigarettes described by Act 31;

- The proceeds of the sixteen cents per gallon gasoline tax described by Act 31;

- The proceeds of the first four cents of the gas and diesel oil excise tax described by Act 31; and

- The proceeds of the petroleum products excise tax described by Act 31.

*See* Security Agreement § 1.1.; *see also* Act No. 30-2013 (2013); Act No. 31-2013 (2013).

**D.     Filing of the Lift Stay Motion and Subsequent Proceedings**

15.     Notwithstanding the Asset Restrictions, on June 25, 2019, the DRA Parties filed

the original motion to lift the automatic stay.  The Government Parties and the DRA Parties entered

into several agreements adjourning this Court's consideration of the original lift stay motion.[12]

---

[12] *See Stipulated Order Subjecting the DRA Parties' Lift Stay Mot. to Mediation and 120-Day Stay re Joint Stipulation* ECF No. 632 in Case No. 17-03567 and ECF No. 8481 in Case No. 17-03283; *Interim Order Approving Am. Joint Stipulation Regarding the DRA Parties' Mot. and Mem. of Law in Support of their Mot. for Relief from the Automatic Stay, or in the Alternative, Ordering Payment of Adequate Protection,* ECF No. 662 in Case No. 17-3567, and 6922 in Case No. 17-3283; *Order Granting in Part and Denying in Part DRA Parties' Mot.* ECF No. 721 in Case 17-03567 and ECF No. 12005 in Case 17-03283; *Order Approving Joint Stipulation of the Gov't Parties and the DRA Parties Regarding the DRA Parties' Mot. and the Mem. of Law in Support of their Mot. for Relief From the Automatic Stay, or in the Alternative, Ordering Payment of Adequate Protection* ECF No. 753 in Case No. 17-03567 and 12533 in Case No. 17-3283.

16.     On March 31, 2021, the DRA filed the current Lift Stay Motion.  Through the Lift Stay Motion, the DRA Parties seek relief from the automatic stay to exercise remedies or, in the alternative, to order the Debtors to provide adequate protection for the purported diminution of DRA's asserted interest in the Act 30-31 Revenues.  *See* DRA Lift Stay Motion ¶¶ 47.

## OBJECTION

17.     The Qualifying Modification approved by this Court significantly limited the right of the DRA to pursue collection, foreclosure, or other enforcement actions against Puerto Rico government entities.  In other words, the DRA would facilitate the global restructuring of the Commonwealth and its various instrumentalities and public corporations, not act as an obstacle to it.  The Asset Restrictions reflect this premise, and the Lift Stay Motion violates the Asset Restrictions.

**A.     The Plain and Unambiguous Terms of the Asset Restrictions Prohibit the DRA Parties from Bringing the Lift Stay Motion**

18.     The Transfer Agreement is governed by Puerto Rico law.  *See* Transfer Agreement § 18(a).  Article 1233 of the Puerto Rico's Civil Code provides that "[i]f the terms of a contract are clear and leave no doubt as to the intention of the contracting parties, the literal sense of its stipulations shall be observed.  If the words should appear contrary to the evident intention of the contracting parties, the intention shall prevail."  P.R. Laws Ann. tit. 31, § 3471.  Under Puerto Rico law, "an agreement is 'clear' when it can be understood in one sense alone, without leaving any room for doubt, controversies or difference of interpretation . . ."  *Executive Leasing Corp. v. Banco Popular de P.R.*, 48 F.3d 66, 69 (1st Cir. 1995).

19.     By the Asset Restriction's unequivocal terms, where an Obligor commenced a Title III case—such as HTA—the only action the DRA Parties can take is pursuant to clause (iii) of the Asset Restrictions.  The DRA Parties, however, contend that each clause of the Asset Restrictions

9

applies to an Obligor in Title III.  This interpretation completely ignores the lead-in to clause (iii),

stating that the provision applies "*in the case of a Non-Municipal Loan where the applicable

Obligor is in a proceeding under Title III or Title VI*."  The clear—and only plausible—reason to

include this clause is to specify that in Title III (and Title VI), the rights of the DRA are limited as

set forth therein.

20.     Any other interpretation of the Asset Restrictions would render clause (iii)

meaningless.  Reading the Asset Restrictions as the DRA Parties suggest fails to give effect to

clause (iii) because it would be superfluous to clause (ii).  If in a Title III case the DRA Parties

have the unfettered right "to preserve, protect or defend any security or other pledge rights" there

would be no reason to further specify that the DRA could only exercise such rights to ensure that

they receive treatment consistent with treatment provided to other creditors with the same legal

priority, security or pledge rights.  *See Crowe v. Bolduc*, 365 F.3d 86, 97 (1st Cir. 2004) ("[A]n

inquiring court should, whenever possible, avoid an interpretation that renders a particular word,

clause, or phrase meaningless or relegates it to the category of mere surplusage."); *Blackie v. State

of Me.*, 75 F.3d 716, 722 (1st Cir. 1996) (rejecting interpretation of one section of an agreement

that would render superfluous two other sections and noting "[i]t is hornbook law that an

interpretation which gives effect to all the terms of a contract is preferable to one that harps on

isolated provisions, heedless of context."); *Smart v. Gillette Co. Long–Term Disability Plan*, 70

F.3d 173, 179 (1st Cir.1995); *see also* Restatement (Second) of Contracts § 202 cmt. d (Am. Law

Inst. 1981) (explaining that "[w]here the whole can be read to give significance to each part, that

reading is preferred").

21.     By contrast, the Government Parties' interpretation gives full meaning and effect

to the plain language of both clause (ii) and (iii).  Clause (ii) sets forth the right to bring an action

to preserve, protect or defend any security or other pledge rights outside of a Title III case (when there is no automatic stay).  Whereas clause (iii) sets forth the more limited rights that can be pursued once an entity has filed a Title III case, which is only triggered when (i) the applicable debtor has other creditors with the same legal priority, security or pledge rights as the DRA; and (ii) a plan of adjustment proposes a treatment that prefers such *pari passu* creditor to the DRA Parties.

22.     Moreover, under basic canons of interpretation, the more specific and direct language in clause (iii) regarding the rights in Title III controls, rather than the more general language in clause (ii) regarding a general right to preserve, protect or defend.  *See Newharbor Partners, Inc. v. F.D. Rich Co., Inc.*, 961 F.2d 294, 299 (1st Cir. 1992) ("A common principle of contract construction is that a specific term will control over a conflicting general term. . . . Similarly, it is only logical that a[n] unequivocal term will control over a conflicting ambiguous term."); *see also In re 604 Columbus Ave. Realty Trust*, 968 F.2d 1332, 1357 (1st Cir. 1992) ("Specific terms are given greater weight than general language.").

23.     Accordingly, the DRA Parties can only pursue the Lift Stay Motion if permitted to under clause (iii) of the Asset Restrictions.  However, by the DRA Parties' own admission, clause (iii) has not been triggered:  the DRA Parties maintain that there are no other HTA creditors with the same legal priority, security or pledge rights,[13] and no HTA plan of adjustment has been filed.

---

[13] *See DRA Parties' Opening Response to (i) Motion of Assured Guaranty Corp., Assured Guaranty Municipal Corp., Ambac Assurance Corp, Nat'l Public Finance guarantee Corp., and Financial Guaranty Insurance Company for Relief from the Automatic Stay, or, in the Alternative, Adequate Protection* [ECF. No. 10102], and (ii) Opposition of *the Financial Oversight and Management Board for Puerto Rico to Motion of Assured Guaranty Corp., Assured Guaranty Municipal Corp., AMBAC Assurance Corp., Nat'l Public Finance Guarantee Corp., and Financial Guaranty Insurnace Company for Relief from the Automatic Stay, or, in the Alternative, Adequate Protection,* ECF No. 741 ("DRA Response Brief") ¶ 55.  ("[T]he Monolines do not have any property interest in an ongoing revenue stream" and "the Monolines' alleged liens on revenues are invalid and unperfected under the Puerto Rico Uniform Commercial Code").

**B.      If the Plain Language of the Asset Restrictions is Unclear, the Intentions of the Parties Prevail and the Lift Stay Motion Should be Denied**

24.      If the Court determines that the Asset Restrictions are ambiguous, it should interpret the Transfer Agreement in a manner that comports with the intention of the parties.  Here, the parties to the Transfer Agreement plainly intended clause (iii) to operate as a limitation on the DRA Parties rights in HTA's Title III case.

*i.      The Drafting History and Solicitation Documents Supports the Government Parties' Interpretation*

25.      Restrictions on enforcement rights regarding government loans first appeared in the original Restructuring Support Agreement, dated May 15, 2017, which included a term sheet outlining the key terms of the Qualifying Modification.  *See* Restructuring Support Agreement, dated May 15, 2017, by and among GDB, AAFAF, and the bondholders parties thereto.[14]  That term sheet included the following provision regarding the restrictions on Non-Municipal Loans:

> With respect to the public entity loans held at the Issuer listed on Schedule 5 [*i.e.*, the Non-Municipal Loans], if the Issuer is treated *pari passu* with other debt holders of the same legal priority, the Issuer and the Asset Manager shall not be permitted to pursue any collection or enforcement actions related to such loans, and the Asset Manager shall enforce any and all rights and remedies in a proceeding under Title III or Title VI of PROMESA of any such public entities only to the extent necessary and appropriate in order to ensure that the Issuer receives a distribution (if any) in such proceeding consistent with distributions to creditors holding claims with the same legal priority as the claims of the Issuer.

26.      Acknowledging that many of the public entities that were obligors of Non-Municipal Loans had not commenced cases under Title III or Title VI, the Asset Restrictions were expanded to include the concepts that now appear in clauses (i) and (ii).  Clause (i) was included to account for the scenario where the Oversight Board certifies a fiscal plan for an entity that is not a Title III debtor and such fiscal plan provides that such entity has funds available for debt

---

[14] A copy of the Restructuring Support Agreement can be viewed at https://emma.msrb.org/EP997504-EP773376-EP1175143.pdf.

service.  In that case, if the entity fails to pay debt service, the DRA Parties have a right to take affirmative steps to enforce such loans.  This clearly does not apply to HTA.  HTA is not making debt service payments during its Title III case.

27.    Clause (ii) was inserted to correspond with the covenant in the bond Indenture obligating the DRA to "defend, preserve and protect, or cause to be defended, preserved and protected, the pledge of the Restructuring Property and all the rights of the Indenture Trustee and the Bondholders under this Indenture against all claims and demands of all Persons whomsoever . . ."  *See* Indenture § 4.05(i).  Because the DRA Parties have this contractual obligation to preserve and protect its security interest, a limited exception to the Asset Restrictions was necessary to allow them to exercise such right.  As discussed below, this provision does not grant them a right to foreclose, pursue affirmative enforcement actions, or seek to obtain payment of adequate protection.

28.    The Solicitation Statement transmitted in connection with the Qualifying Modification similarly acknowledges the limited enforcement rights with respect to loans owed by a Title III debtor:

> The Servicer (on behalf of the Issuer) will have the right to exercise remedies in respect of the Public Corporation Loan Assets, the Commonwealth Loan Assets, and the Commonwealth Guaranteed Loan Asset, but solely to the extent necessary to assure that funds that are available for debt service from the obligors under such Loans, in accordance with and pursuant to the applicable Loan documents, Oversight Board-approved fiscal plans, if any, and Oversight Board-approved budgets, if any, are applied to such Loans in accordance with the legal priority and the security or other pledge rights benefiting the same.  Furthermore, the Servicer (on behalf of the Issuer) will have all rights and powers to exercise remedies necessary to preserve, protect or defend any priority, security or other pledge rights benefiting such Public Corporation Loan Assets, Commonwealth Loan Assets and Commonwealth Guaranteed Loan Asset.  ***For any such Loan where the obligor is in a proceeding under Title III or Title VI of PROMESA and such obligor has other creditors that have the same legal priority, security or pledge rights as the Issuer, the Servicer (on behalf of the Issuer) will have all rights and powers to exercise remedies necessary to ensure that the Issuer receives treatment in such***

13

> *proceedings that is the same as that provided to other creditors that have the same*
> *legal priority, security or pledge rights.*

*See* Solicitation Statement at E-21.  As the above statement confirms, if the DRA is being

prejudiced in a Title III case, then it can take steps to ensure it obtains treatment consistent with

the treatment provided to creditors of the same legal priority (which could include exercising rights

consistent with romanette (ii) and seeking to defend its priority/lien).  But if the DRA is not

receiving worse treatment in Title III compared to creditors of equal priority or security or pledge

rights, romanettes (i) and (ii) do not confer on the DRA independent rights.

> ii.      *The DRA Parties' Interpretation of the Asset Restrictions Undermines a*
>          *Fundamental Component of the Qualifying Modification*

29.      The Asset Restrictions are a cornerstone of the Qualifying Modification and clause

(iii) was negotiated specifically to address the GDB/HTA Loans.  Under the DRA's interpretations

of the Asset Restrictions, *immediately* upon obtaining the GDB/HTA Loans, the DRA was free to

seek to lift the automatic stay and pursue enforcement actions against HTA, notwithstanding the

carefully negotiated Asset Restrictions designed to prevent this very outcome.  Indeed, the factual

basis for the Lift Stay Motion is the Commonwealth's retention of Act 30-31 Revenues, which has

been ongoing since 2015, well before the closing of the Qualifying Modification in 2018.  Under

the DRA Parties' interpretation of the Transfer Agreement, they inherited the GDB/HTA Loans

free of any enforcement restrictions.  This was not the intent of the parties.

30.      The parties true intention is reflected throughout the Solicitation Statement, which

contemplates that the DRA Parties recovery in Title III is highly uncertain and likely minimal:

> Given the foregoing, the Collections, if any, to be received by the Issuer in respect
> of the Public Corporation Loan Assets [which includes the GDB/HTA Loans] are
> uncertain at this time, but are not expected to be significant, and the Collection
> Schedule included herein reflects the assumption that such Loans will not generate
> Collections.

Solicitation Statement at E-126.  The Solicitation Statement also made clear that the GDB/HTA

Loans are subject to the HTA's automatic stay:

> HTA's financial obligations are currently subject to a temporary moratorium pursuant to various executive orders issued under the Moratorium Act and the Fiscal Responsibility Act. Moreover, HTA is currently in the process of restructuring its liabilities pursuant to Title III of PROMESA. As a result, the Issuer's recovery, if any, on the HTA Debt will be determined in such proceeding and cannot be estimated at this time. Moreover, litigation and claims against HTA, including litigation and claims related to the HTA Debt, are subject to the automatic stay that came into effect upon the filing of the Title III petition.

Solicitation Statement at E-127.

31.     The intention of the parties was clearly not to authorize the DRA to bring expensive and protracted litigation in the HTA Title III case in order to pursue remedies based on loans they inherited on a non-performing basis which were attributed a zero value based on facts and circumstances that existed well before the transfer of such loans.

## C.     Even if Clause (ii) Applies in Title III, the Lift Stay Motion Does Not Constitute an Action to Preserve, Protect or Defend a Security Interest

32.     Even if the Court concludes that the DRA Parties can avail themselves of clause (ii) of the Asset Restrictions in Title III, the Asset Restrictions still preclude the Lift Stay Motion because such motion does not constitute an action to "preserve, protect or defend" a security interest. By the Lift Stay Motion, the DRA Parties are seeking to "initiate, continue and/or conclude any and all foreclosure proceedings over their collateral and/or the exercise of any applicable contractual and legal remedies under the applicable debt documents." *See* Lift Stay Motion at 32. In other words, the DRA Parties are seeking to collect on the purported proceeds of their alleged security interest, not defend it, preserve or protect it.

33.     Under even the broadest reading of clause (ii) of the Asset Restrictions, the relief the DRA Parties are seeking falls outside of the type of defensive and protective action authorized thereunder. Indeed, the only reason for the inclusion of this limited exception to the Asset Restriction was to correspond with the DRA Parties' obligation in the bond Indenture to protect

15

their security interest.  *See* Indenture § 4.05(i) (obligating the DRA Parties to "defend, preserve and protect, or cause to be defended, preserved and protected, the pledge of the Restructuring Property and all the rights of the Indenture Trustee and the Bondholders under this Indenture against all claims and demands of all Persons whomsoever . . .").

34.     Under the DRA Parties' reading of this clause, the Asset Restrictions are completely undermined and essentially rendered meaningless.  If the Lift Stay Motion is authorized under clause (ii)—an affirmative action seeing not to defend a lien, but to foreclose on collateral based on facts that existed prior to the transfer of the GDB/HTA Loans— it is difficult to imagine any action that would in fact be restricted by the very "Asset Restrictions" agreed to by the DRA Parties in executing the Transfer Agreement.

35.     Moreover, even if the DRA Parties could proceed under clause (ii) of the Asset Restrictions, at most this entitles the DRA to a determination that they have a property right or pledge, not to collect cash or obtain adequate protection.  But as the First Circuit recognized, a lift stay proceeding, by definition, cannot be a forum for the final adjudication of a property right.  *See In re Fin. Oversight and Mgmt. Bd. for P.R.*, 989 F.3d 170, 183 (1st Cir. 2021) (*citing Grella v. Salem Five Cent Sav. Bank*, 42 F.3d 26, 32-33 (1st Cir. 1994) ("Adjudication of a stay-relief motion . . . occurs before and apart from proceedings on the merits of creditors' claims . . .").  Thus the limited relief the DRA Parties could arguably pursue under clause (ii), cannot be conclusively determined via the Lift Stay Motion.

36.     Accordingly, because the DRA Parties are not seeking to preserve a security interest by the Lift Stay Motion, but rather enforce one, they have no authorization under any clause of the Asset Restrictions and the Lift Stay Motion should be denied.

Dated:  April 21, 2021
San Juan, Puerto Rico


Respectfully submitted,

**O'MELVENY & MYERS LLP**

*/s/ Peter Friedman*
John J. Rapisardi
Maria DiConza
Matthew P. Kremer
7 Times Square
New York, NY 10036
Telephone:  (212) 326-2000
Facsimile:  (212) 326-2061
Email:  jrapisardi@omm.com
mdiconza@omm.com
mkremer@omm.com

-and-

Peter Friedman
1625 Eye Street, NW
Washington, DC 20006
Telephone:  (202) 383-5300
Facsimile:  (202) 383-5414
Email:  pfriedman@omm.com


*Attorneys for the Puerto Rico Fiscal Agency
and Financial Advisory Authority*

*/s/ Luis C. Marini-Biaggi*
Luis C. Marini-Biaggi
USDC No. 222301
Carolina Velaz-Rivero
USDC No. 300913
**MARINI PIETRANTONI MUÑIZ LLC**
250 Ponce de León Ave., Suite 900
San Juan, PR 00918
Tel:  (787) 705-2171
Fax:  (787) 936-7494


*Attorneys for the Puerto Rico Fiscal Agency
and Financial Advisory Authority*

Dated:  April 21, 2021
        San Juan, Puerto Rico


**PROSKAUER ROSE LLP**

<u>*/s/ Jeffrey W. Levitan*</u>
Jeffrey W. Levitan
Martin J. Bienenstock
Ehud Barak
(Admitted *Pro Hac Vice*)
Eleven Times Square
New York, NY 10036
Tel:  (212) 969-3000
Fax:  (212) 969-2900
Email:  mbienenstock@proskauer.com
ebarak@proskauer.com

-and-

Michael A. Firestein
Lary Alan Rappaport
(Admitted *Pro Hac Vice*)
2029 Century Park East
Suite 2400
Los Angeles, CA 90067-3010
Tel:  (310) 557-2900
Fax:  (310) 557-2193
Email:  mfirestein@proskauer.com
lrappaport@proskauer.com


*Attorneys for the Financial Oversight and
Management Board as representative of the
Debtors*

<u>*/s/ Hermann D. Bauer*</u>
Hermann D. Bauer
USDC No. 215205
**O'NEILL & BORGES LLC**
250 Muñoz Rivera Ave., Suite 800
San Juan, PR 00918-1813
Tel:  (787) 764-8181
Fax:  (787) 753-8944

*Co-Attorneys for the Financial Oversight and
Management Board as representative of the
Debtors*