**Hearing Date**: April 28, 2021 at 9:30 a.m. (AST).

## UNITED STATES DISTRICT COURT
## DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*,<br><br>Debtors. [1] | PROMESA<br>Title III<br><br>No.  17 BK 3283-LTS<br><br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>PUERTO RICO ELECTRIC POWER AUTHORITY ("PREPA"),<br><br>Debtor. | PROMESA<br>Title III<br><br>No.  17 BK 4780-LTS<br><br>**Re: ECF Nos. 2417, 2418, 2422, 2435, 2436, 2437, 2438, 2439** |

[*Caption continued on next page*]

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico ("Commonwealth") (Bankruptcy Case No. 17-BK-3283- LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17- BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO,

      as representative of

PUERTO RICO ELECTRIC POWER AUTHORITY
("PREPA"),

      Movant,

v.

UNIÓN DE TRABAJADORES DE LA INDUSTRIA
ELÉCTRICA Y RIEGO *et al.*

      Respondents.

**OMNIBUS REPLY IN SUPPORT OF GOVERNMENT PARTIES' MOTION FOR
ORDER ALLOWING ADMINISTRATIVE EXPENSE CLAIM FOR AMOUNTS TO BE
PAID TO LUMA ENERGY BY PREPA DURING INTERIM PERIOD UNDER
<u>SUPPLEMENTAL AGREEMENT AND T&D CONTRACT</u>**

## TABLE OF CONTENTS

**PAGE**

PRELIMINARY STATEMENT ................................................................................................. 2

ARGUMENT .......................................................................................................................... 7

   I.   THE MOTION IS RIPE FOR ADJUDICATION ........................................................... 7

         a.    Ripeness Has No Application to the Administrative Expense Motion .................. 8

         b.    The Issues are Fit for Judicial Decision ................................................................. 9

         c.    Failure to Adjudicate the Motion Would Result in Substantial
               Hardship to PREPA ............................................................................................... 17

   II.   ADMINISTRATIVE EXPENSE PRIORITY TREATMENT FOR THE INTERIM
OBLIGATIONS IS AVAILABLE UNDER PROMESA IN THESE CIRCUMSTANCES ... 18

   III.   THE GOVERNMENT PARTIES HAVE DEMONSTRATED LUMA ENERGY'S
ENTITLEMENT TO AN ADMINISTRATIVE EXPENSE CLAIM FOR THE INTERIM
OBLIGATIONS ......................................................................................................... 21

   IV.   INTERESTS OF PREPA'S OTHER CREDITORS HAVE NO BEARING ON
ALLOWANCE OF INTERIM OBLIGATIONS FOR WORK REQUIRED BY A
CONTRACT .............................................................................................................. 28

   V.   THE TERMINATION FEE AND APPROVAL RIGHTS ARE PART OF THE
OVERALL BARGAIN UNDERLYING THE T&D CONTRACT AND SHOULD NOT BE
ALTERED BY THE COURT ....................................................................................... 31

# <u>TABLE OF AUTHORITIES</u>

**PAGE**

C<small>ASES</small>

*Algonquin Gas Transmission, LLC v. Weymouth*,
    919 F.3d 54 (1st Cir. 2019)..............................................................................9, 11, 12

*Bank of N.Y. Trust Co. NA v. Pac. Lumber Co. (In re Scopac)*,
    624 F.3d 274 (5th Cir. 2010) ..............................................................................15, 16

*Bogosian v. Mercedes-Benz of N. Am., Inc.*,
    104 F.3d 472 (1st Cir. 1997) ....................................................................................26

*Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse Sec. (USA) LLC*,
    752 F.3d 82 (1st Cir. 2014)......................................................................................26

*Christianson v. Colt Indus. Oper'g Corp.*,
    486 U.S. 800 (1988)................................................................................................19

*Devan v. Simon DeBartolo Grp. (In re Merry-Go-Round Enterprises, Inc.)*
    180 F.3d 158 (4th Cir. 1999) ...................................................................................35

*Ernst & Young v. Depositors Econ. Prot. Corp.*,
    45 F.3d 530 (1st Cir. 1995)........................................................................................9

*First Liberty Ins. Corp. v. Budow*,
    No. 05-cv-88, 2007 WL 2071883 (E.D. Pa. July 17, 2007) ....................................33

*In re APP Plus*,
    223 B.R. 870 (Bankr. E.D.N.Y. 1998)....................................................................37

*In re Craig Cty. Hosp. Auth.*,
    572 B.R. 340 (Bankr. N.D. Okla. 2017) ..................................................................28

*In re Fin. Oversight & Mgmt. Bd. For Puerto Rico*,
    432 F. Supp. 3d 25 (D.P.R. 2020)......................................................................27, 28

*In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*,
    621 B.R. 289 (D.P.R. 2020)....................................................7, 10, 18, 19, 20, 21

*In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*
    621 B.R. 349 (D.P.R. 2020)......................................................................................7

*In re Fin. Oversight & Mgmt. Bd. For Puerto Rico*, No. 17 BK 3283-LTS, 2020
    U.S. Dist. LEXIS 7992 (D.P.R. Jan. 7, 2020)..........................................................17

*In re Jartran, Inc.*,
    732 F.2d 584 (7th Cir. 1984) ...........................................................................37

*In re Mammoth Mart, Inc.*,
    536 F.2d 950 (1st Cir. 1976) ....................................................................13, 37

*In re Mount Carbon Metro. Dist.*,
    242 B.R. 18 (Bankr. D. Colo. 1999) ...............................................................27

*In re O'Brien Environmental Energy, Inc.*,
    181 F.3d 527 (3d Cir. 1999) ...........................................................................38

*In re Sullivan Cent. Plaza I, Ltd.*,
    935 F.2d 723 (5th Cir. 1991) ..........................................................................15

*In re Tama Beef Packing, Inc.*,
    290 B.R. 90 (8th Cir. 2003) ............................................................................38

*In re Weinstein*,
    272 F.3d 39(1st Cir. 2001) .............................................................................28

*In re Whispering Pines Estates, Inc.*,
    369 B.R. 752 (1st Cir. B.A.P. 2007) ...............................................................15

*Lawson v. Fleet Bank of Maine*,
    807 F. Supp. 136 (D. Me. 1992), *aff'd*, 3 F.3d 11 (1st Cir. 1993) .................33

*Mission Prod. Holdings v. Schleicher & Stebbins Hotels, L.L.C. (In re Old Cold,
    LLC)*,
    602 B.R. 798 (1st Cir. B.A.P. 2019) ...............................................................15

*Nook v. Long Island R. Co.*,
    190 F.Supp.2d 639 (S.D.N.Y. 2002) ...............................................................26

*Richmond Leasing Co. v. Cap. Bank, N.A.*,
    762 F.2d 1303 (5th Cir. 1985) ...........................................................................8

*Riggs v. Curran*,
    863 F.3d 6 (1st Cir. 2017) ..........................................................................11, 12

*Sindicato Puertorriqueño de Trabajadores v. Fortuño*,
    699 F.3d 1 (1st Cir. 2012) .................................................................................9

*Tokio Marine & Fire Ins. Co. v. Grove Mfg. Co.*,
    958 F.2d 1169 (1st Cir. 1992) .........................................................................26

*Town of Barnstable v. O'Connor*,
    786 F.3d 130 (1st Cir. 2015) ......................................................................11, 14

*U.S. v. Moran*,
  393 F.3d 1 (1st Cir. 2004) ................................................................................................19

*Victory v. Berks Cty.*,
  2019 U.S. Dist. LEXIS 92552 (Bankr. E.D. Pa. Jun. 3, 2019) ...............................................16

*Weaver's Cove Energy, LLC v. R.I. Coastal Res. Mgmt. Council*,
  589 F.3d 458 (1st Cir. 2009)...............................................................................................11

*Woburn Assocs. v. Kahn (In re Hemingway Transp., Inc.)*,
  954 F.2d 1 (1st Cir. 1992)....................................................................................................20

**STATUTES**

11 U.S.C. § 105(a) ...................................................................................................................20

11 U.S.C. § 363 .........................................................................................................................7

11 U.S.C. § 365(a) ...................................................................................................................30

11 U.S.C. § 503(b) ........................................................................................................... passim

11 U.S.C. § 1129(a)(A) ...........................................................................................................29

48 U.S.C. §§ 2101–2241 (Puerto Rico Oversight, Management, and Economic
  Stability Act, or "PROMESA") ..............................................................................................1

48 U.S.C. § 2161 (PROMESA § 301) .............................................................................. passim

48 U.S.C. § 2165 (PROMESA § 305) .......................................................................................5

48 U.S.C. § 2174 (PROMESA § 314) .....................................................................................13

48 U.S.C. § 2175 (PROMESA § 315) .......................................................................................1

**OTHER AUTHORITIES**

4 Collier on Bankruptcy § 503.06..............................................................................................35

Black's Law Dictionary (11th ed. 2019)....................................................................................26

Federal Rule of Evidence 702 ...................................................................................................26

FOMB Contract Review Policy
  *Available at* https://oversightboard.pr.gov/contract-review/ ...................................................24

LUMA Monthly Report to P3A for the Period Ending March 2021
  *Available at* https://energia.pr.gov/en/dockets/?docket=nepr-mi-2020-0008.............25, 26, 30

Petition for Approval of Initial Budgets and Related Terms of Service
*Available at* https://app.reorg.com/v3#/items/intel/1869?item_id=136748 ............................24

Puerto Rico Electric Power Authority Fiscal Year 2021 Certified Budget
*Available at*
https://drive.google.com/file/d/1yIV664F009bi3UeE9WBHi3J6U6r42tFQ/vie
w......................................................................................................................................23

Puerto Rico Energy Public Policy Act, Act No. 29-2009,
S.B. 469, 15th Leg., (P.R. 2009).........................................................................5

Puerto Rico Power System Transformation Act, Act No. 120-2018,
H.B. 1481, 18th Leg., 3rd Reg. Sess. (P.R. 2018) ...............................5, 21, 23, 24, 27

Puerto Rico Energy Public Policy Act, Act No. 17-2019,
S.B. 1121, 18th Leg., 5th Reg. Sess. (P.R. 2019) ....................................................5

Report of the Puerto Rico Public-Private Partnership for the Electric Power
Transmission and Distribution System (the "P3 Report")................................23, 34

To the Honorable United States District Court Judge Laura Taylor Swain:

The Puerto Rico Electric Power Authority ("PREPA"), by and through the Financial Oversight and Management Board for Puerto Rico (the "Oversight Board"), as PREPA's sole Title III representative pursuant to section 315(b) of the Puerto Rico Oversight, Management, and Economic Stability Act ("PROMESA"),[3] and the Puerto Rico Fiscal Agency and Financial Advisory Authority ("AAFAF") as PREPA's representative pursuant to Act 2-2017, respectfully submit this omnibus reply (the "Reply") to (i) *UTIER's Objection to the Government Parties' Motion For Order Allowing Administrative Expense Claim for Amounts to be Paid to LUMA Energy by PREPA During Interim Period under Supplemental Agreement and the T&D Contract* [ECF No. 2435] (the "UTIER Obj."), filed by Unión de Trabajadores de la Industria Eléctrica y Riego ("UTIER"); (ii) *Limited Objection of Whitefish Energy Holdings, LLC to Government Parties' Motion for Order Allowing Administrative Expense Claim for Compensation for Amounts to be Paid to LUMA Energy by PREPA During Interim Period under Supplemental Agreement and the T&D Contract* [ECF No. 2436] (the "Whitefish Obj."), filed by Whitefish Energy Holdings, LLC ("Whitefish"); (iii) *SREAEE's Objection to Government Parties' Motion for Order Allowing Administrative Expense Claim for Compensation for Amounts to be Paid to LUMA Energy by PREPA During Interim Period under Supplemental Agreement and the T&D Contract* [ECF No. 2437] (the "SREAEE Obj."), filed by Sistema de Retiro de los Empleados de la Autoridad de Energía Eléctrica ("SREAEE"); (iv) *Cobra Acquisitions LLC's Objection to Government Parties' Motion for Order Allowing Administrative Expense Claim for Compensation for Amounts to be Paid to LUMA Energy by PREPA During Interim Period under Supplemental Agreement and the T&D Contract* [ECF No. 2438] (the "Cobra Obj."), filed by Cobra Acquisitions

---

[3]   PROMESA is codified at 48 U.S.C. §§ 2101–2241.

LLC ("Cobra"); and (v) *Renewed Limited Objection of Official Committee of Unsecured Creditors to Government Parties' Motion for Order Allowing Administrative Expense Claim for Compensation for Amounts to be Paid to LUMA Energy by PREPA During Interim Period under Supplemental Agreement and the T&D Contract* [ECF No. 2439] (the "UCC Obj.," and collectively with the UTIER Objection, Whitefish Objection, SREAEE Objection, and Cobra Objection, the "Objections"), filed by the Official Committee of Unsecured Creditors for all Title III Debtors, other than PBA and COFINA (the "UCC," and collectively with UTIER, Whitefish, SREAEE, and Cobra, the "Objectors")), and in support of the *Motion for Order Allowing Administrative Expense Claim  for Amounts to Be Paid to LUMA Energy By PREPA During Interim Period Under Supplemental  Agreement and the T&D Contract* [ECF No. 16241 in Case No. 17-3283 and ECF No. 2417 in Case No. 17-4780] (the "Motion").[4]  In support of this Reply, the Government Parties respectfully represent as follows:

## PRELIMINARY STATEMENT

1.     The Motion seeks an order allowing an administrative claim in favor of LUMA Energy for any accrued and unpaid Interim Obligations of PREPA to LUMA Energy under the Supplemental Agreement to the T&D Contract entered into by and among PREPA, the P3 Authority, and LUMA Energy.  To resolve a similar motion, this Court previously determined that the appropriate inquiry under Bankruptcy Code § 503(b)(1)(A) is whether the services to be provided—here, the O&M Services—benefit PREPA.  *See* Front-End Administrative Expense Op. at 19.  As the Government Parties demonstrated in their submissions, LUMA Energy's performance of the O&M Services during the Interim Period, will benefit PREPA in myriad ways, including by revitalizing the T&D System, implementing industry standard practices, improving

---

[4]   Capitalized terms used but not otherwise defined herein shall have the meaning given to them in the Motion.

service and quality, transforming the T&D System to a reliable, efficient, safe system, and assisting in the deployment of federal funding. *See, e.g.* Marrero Decl. ¶¶ 11-13.  Indeed, the Title III Court previously found the Front-End Transition Services were beneficial to PREPA precisely because they laid the groundwork for PREPA to realize the benefits of the O&M Services.  Moreover, if LUMA Energy does what it is contractually required to do, it would be quite incongruous to deny the services benefit PREPA.

2.       All but two Objectors—UTIER and SREAEE (together, the "Union Entities")— generally acknowledge the benefits of the O&M Services and do not oppose the Court granting the Motion subject to certain conditions that promote their own interests.[5]  All Objectors, however, attempt to inject a host of issues designed to distract from the core inquiry (*i.e.* benefit to PREPA) and either attempt to block PREPA's ability to prosecute the Motion or attempt to pick and choose aspects of the T&D Contract while reducing LUMA Energy's bargained-for consideration for those services.  In doing so, the Objections largely repackage arguments this Court has denied, including that (a) the Motion is not ripe, (b) Bankruptcy Code § 503(b)(1)(A) is inapplicable because there is no "estate" in Title III, (c) PREPA's transformation "dismantles" the debtor, and (d) PREPA must demonstrate an administrative expense claim benefits other creditors.  The Court correctly rejected those arguments before, and Objectors provide no reason for the Court to depart from its prior reasoning now.

3.       *First,* the Union Entities argue the Motion is not ripe, airing a laundry list of reasons including that PREB may reconsider its approval, the T&D Contract may be amended, the Puerto

---

[5]  Whitefish Obj. ¶ 24 (stating it "does not oppose the Motion or PREPA's goal of transforming the energy delivery system for Puerto Rico" but asking the Court "craft relief that addresses the equities as they concern [other administrative expense] claimants"); UCC Obj. at 16 (seeking to limit LUMA Energy's consent rights and objecting to the Termination Fee, but otherwise not objecting to the Motion); Cobra Obj. at 4 (asking the Court to "condition approval of the Motion on allowing Cobra to proceed with resolving its administrative expense claims").

Rico Legislature is reviewing the T&D Contract, the Front-End Administrative Expense Motion is under appeal, and the Government Parties have not provided evidence that various preconditions to the Interim Service Commencement Date have been met.  These arguments ignore that if the contract is somehow undone, administrative expenses will stop accruing under it.  The Union Entities seek to distract the Title III Court from its critical inquiry into the benefit of the O&M Services to PREPA.  If the Title III Court determines, as it did with the Front-End Administrative Expense Motion, that the O&M Services and the related transformation of PREPA are beneficial, the Motion should be granted.  The Title III Court need not entertain hypothetical attempts to impact the T&D Contract nor consider the current status of conditions to Interim Service Commencement.  By its terms, the Motion seeks relief for services to be performed once the parties to the T&D Contract satisfy or waive these conditions, a goal currently targeted for June 1, 2021. Objectors would suffer no harm if the preconditions are not met or not waived, because the Interim Service Commencement Date would not occur and no administrative expense claim for Interim Obligations would accrue in favor of LUMA Energy.  Once the conditions are met (or waived), and not before, LUMA Energy will perform the O&M Services and will be paid for providing such services, but the timing of such services has no bearing on the ultimate benefit to be realized thereby.

4.      The Motion is ripe because the O&M Services are not abstract or hypothetical— they are fully delineated in a valid and binding contract that has received all approvals required under Puerto Rico law and has not been amended.  Once LUMA Energy performs such services, it will be entitled to compensation.  The issue of whether these services benefit PREPA is thus fit for adjudication. In contrast, PREPA would be harmed by undue delay in the commencement of the O&M Services. The sooner LUMA Energy takes over operations, the sooner the transformation

of the utility can begin, and it is critical that the O&M Services begin before the Atlantic hurricane season starts in the early summer.

5.    *Second*, the Union Entities repeat their argument that administrative expenses are not allowable under § 503(b)(1)(A) because there is no "estate" in PROMESA. They offer no reason why Congress would have intended to jeopardize the post-petition viability of Title III debtors by depriving them of the ability to assure payment to third parties contracted to provide goods or services to a Title III debtor—this is especially true since PREPA does not need any Court authorization to make such payment in the first instance. *Cf.* PROMESA § 305. The Court correctly rejected this argument in connection with the Front-End Administrative Expense Motion, finding Congress's incorporation of § 503(b) in its entirety provides strong evidence of its intent to render subsection (b)(1)(A) applicable in PROMESA and that PROMESA § 301(c)(5) can be properly read to apply to incorporate provisions using the term "estate." Front-End Administrative Expense Op. at 18. The Court's decision stands and there exists no compelling justification to diverge from this holding.

6.    *Third*, the Government Parties have demonstrated LUMA Energy's entitlement to an administrative expense claim for the Interim Obligations. LUMA Energy is required to carry out the contractual obligations PREPA bargained for under the T&D Contract, which was the product of an 18-month bidding process coordinated by the P3 Authority in cooperation with the Oversight Board, AAFAF, and PREPA. Marrero Decl. ¶ 6. The O&M Services will provide substantial operational and financial benefits to PREPA necessary to modernize and transform the power grid (*Id.* ¶ 11), as mandated by Act No. 120-2018 and the Puerto Rico Energy Policy Act, Act No. 17-2019. The Union Entities' argument that transformation "dismantles" rather than benefits PREPA has already been rejected by the Court: while LUMA Energy will assume day-to-

5

day responsibility for PREPA's operation, PREPA will at all times remain the owner of both the generation and the T&D System assets, and PREPA will regain operational control at the end of the T&D Contract term.  Rather than "dismantle," the O&M Services will streamline PREPA's operations into a modern, stable, and resilient utility that implements industry best practices for the benefit of the people of Puerto Rico.  The Union Entities' critiques of the T&D Contract are wrong, speculative, and/or fail to negate the myriad benefits of transformation, all while seeking to promote an inadquate status quo at PREPA that the relevant governmental parties have determined must change.

7.      *Fourth*, Objectors argue the administrative expense inquiry should focus on benefit to creditors.  They contend the administrative expense claim would violate the principle of ratable distribution unless PREPA demonstrates that creditors benefit from the O&M Services.  Objectors' argument is a make-believe legal principle.  Payment to postpetition suppliers of goods or services has never depended on the tests Objectors urge this Court to impose.  The Title III Court has already determined the proper inquiry is whether the services benefit the *debtor*, not creditors. Reliance on the ratable distribution principle is also misplaced as LUMA Energy is not "similarly situated" with prepetition creditors, and nothing in the Motion would cause prepetition unsecured claimholders to be treated differently than other unsecured claimholders, or administrative claimholders to be treated differently than other administrative claimholders.

8.      *Finally*, the UCC renews its limited objection to the Termination Fee and LUMA's reasonable approval rights over a Title III plan.  These arguments attempt to isolate these aspects of the Supplemental Agreement from the overall bargain of which they are an indispensable component and fails to account for the fully-negotiated bargain.  These items are a necessary component of the overall deal to entice LUMA Energy to assume operations while PREPA remains

6

in Title III—a hard fought concession the Government Parties bargained for in the negotiations.

Because Bankruptcy Code section 363 is inapplicable to Title III, and approval of the T&D

Contract itself is not before the Court.  LUMA Energy's right of reasonable consent regarding a

plan of adjustment is outside the scope of the inquiry.  With respect to the Termination Fee, the

UCC cannot cherry pick components of the contract it likes and eliminate those it does not.  The

Termination Fee was an essential component of LUMA Energy's agreement to commence

operation of PREPA's T&D System while PREPA's Title III Case remains ongoing given the

possibility that the contract could terminate at the end of the 18-month Interim Period if PREPA

has not exited Title III, rather than the full 15 years of the contract.  The Termination Fee benefits

PREPA by allowing it to realize the benefits of transformation while it completes its restructuring.

## ARGUMENT

## I.  THE MOTION IS RIPE FOR ADJUDICATION

9.      The Union Entities argue the Motion is not ripe for adjudication because (i) PREB's

approval of the Energy Compliance Certificate is under review by the Puerto Rico Supreme Court,

(ii) the Front-End Administrative Expense Motion is on appeal, (iii) the Legislative Assembly is

investigating postponing the Service Commencement Date, (iv) the obligations under the T&D

Contract may change, and (v) the Service Commencement Date Conditions have not been met.

This Court has repeatedly rejected the Union Entities' attempts to block PREPA's ability to seek

relief from the Court by manufacturing ripeness arguments.  *See, e.g.*, *In re Fin. Oversight &*

*Mgmt. Bd. for Puerto Rico* 621 B.R. 349, 360–61 (D.P.R. 2020) (granting PREPA's motion to

assume two PPOAs despite pending motions for reconsideration of PREB approval); *see also In*

*re Fin. Oversight & Mgmt. Bd. for Puerto Rico*, 621 B.R. 289, 297–98 (D.P.R. 2020) (holding

PREPA's motion for allowance of administrative expense claim was ripe despite pending

challenges to PREB decision approving underlying contract).  The Court's reasoning is equally applicable here and determinative of the ripeness issue.

10.    Ironically, the Union Entities filed a complaint just yesterday [ECF No. 1; Adv. Proc. No. 21-00041-LTS], seeking declaratory relief, injunctive relief, and damages on the basis that, among other things, the T&D Contract harms them and violates applicable law. (the "Union Entities' Complaint").  Despite their protestations, the Union Entities somehow had no such qualms with suing on the same contract prior to knowing the answers to all the issues they claim prevent the instant Motion from being ripe.

### A.  Ripeness Has No Application to the Administrative Expense Motion

11.    The Union Entities overlook that ripeness is a component of Article III's case or controversy requirement for the exercise of Article III judicial power, and the designation of a claim as an administrative claim does not require Article III judicial power.  Non-Article III bankruptcy judges do that every day.  But, even if ripeness is implanted into the Motion as a jurisprudential requirement, the matter is clearly ripe because the contract allows LUMA Energy a termination right if it does not receive judicial assurance its claim will be an allowable administrative claim.  All that is required for an administrative expense motion to proceed is that the statutory elements of Bankruptcy Code section 503(b) are met—*i.e.,* the commencement of a Title III case and request for allowance of an administrative expense for the actual, necessary costs and expenses of preserving the debtor.  Those elements are present here, as PREPA is seeking allowance of an administrative expense claim for specific services to be performed under an existing contract that are essential to operating PREPA's T&D system during the pendency of the Title III Case.  The filing of the Motion thus enables "anyone [who] objects to the debtor's [rejection] of the contract" to make such objection.  *See Richmond Leasing Co. v. Cap. Bank, N.A.,*, 762 F.2d 1303, 1310 (5th Cir. 1985).

12.     Even if the ripeness inquiry were to extend beyond § 503(b)'s statutory requirements, the Union Entities' arguments would fail.  Ripeness is determined based on (1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration.  *Algonquin Gas Transmission, LLC v. Weymouth*, 919 F.3d 54, 62 (1st Cir. 2019). Both considerations support adjudication of the Motion now.  Under the "fitness" prong, the Court considers two questions: (i) the constitutional justiciability question of "whether the claim involves uncertain and contingent events that may not occur as anticipated or may not occur at all," that could render the resulting opinion advisory, and (ii) the prudential justiciability question of whether the case turns on "legal issues not likely to be significantly affected by further factual development." *Ernst & Young v. Depositors Econ. Prot. Corp.*, 45 F.3d 530, 536 (1st Cir. 1995) (quotation marks and citation omitted). The "hardship" prong poses the prudential question of "whether the challenged action 'creates a direct and immediate dilemma for the parties.'" *Sindicato Puertorriqueño de Trabajadores v. Fortuño,* 699 F.3d 1, 9 (1st Cir. 2012) (citation omitted).

**B.  The Issues are Fit for Judicial Decision**

13.     The issues are fit for adjudication because the Government Parties are not seeking an advisory opinion about whether abstract services under a hypothetical contract could qualify for an administrative expense.  Here, the Government Parties have presented a lawful and binding contract under which the parties are currently performing, and are bound to continue performing. As the Court correctly recognized in connection with the Front-End Administrative Expense Motion:

> Because the T&D Contract is currently in effect and the Government Parties were contractually obligated to file the Motion promptly after execution of the agreement, the relief sought in the Motion— namely, a determination that certain of LUMA Energy's fees are entitled to administrative expense priority—does not rest on any contingent future event. Indeed, the Motion seeks relief with respect to services that are currently being performed as well as such

9

> services to be performed and for which compensation will properly
> be payable under the remainder of the T&D Contract period.

Front-End Administrative Expense Op. at 14.  The same reasoning remains applicable here.  The

Court need only decide whether LUMA Energy's performance of the O&M Services, as delineated

in the T&D Contract, would benefit PREPA.  That inquiry is neither contingent on future events

nor based on any factual question in need of further development.

14.    The Union Entities' ripeness arguments all suffer from the same flaw as they

confuse future hypothetical mootness for justiciability. That the Motion could become moot in the

future because preconditions are not met or are reversed does not mean that the issue before the

Court is not ripe for adjudication now.  *See In re Fin. Oversight & Mgmt. Bd for P.R.*, 621 B.R.

289, 298 (finding that administrative expense motion is ripe notwithstanding challenges to PREB's

approval of the underlying contract because "[w]hile it is possible that PREB's decision could be

reversed at a later date, that contingency does not render unripe a request for administrative

expense priority treatment for amounts that are currently accruing and payable under an operative

contract.").  Any other rule would mean no motion could ever be ripe because events could always

unfold in a manner that would render an issue moot.  That cannot be the case when bankruptcy

courts routinely and without controversy consider, for instance, (i) approval of the assumption of

contracts that could later unravel, and (ii) the merits of approving plans of adjustment or

reorganization containing countless conditions precedent to effectiveness.

   i.  *PREB Approval*

15.    The Union Entities repeat their incorrect assertion that their motions for

reconsideration of PREB's approval render the Motion unripe.  This theory swallows the rule.[6]  If

---

[6]    The Union Entities previously raised this same argument last fall in their objections to the Front-End Administrative Expense Motion (*see* ECF No. 2128, at 4-8), but PREB has yet to take any action to permit any such hypothetical event to occur.

the theory were correct, then no contractual claim could ever be ripe for adjudication because of the possibility the parties might terminate the contract. The law is clear that the possibility of future mootness does not negate current ripeness. *See Town of Barnstable v. O'Connor*, 786 F.3d 130, 143 (1st Cir. 2015) (where litigant's challenge to regulatory process approving contract was questioned on ripeness grounds because contract may have been invalidated by subsequent developments, dispute was ripe because when it was brought "all that [was] contingent and uncertain [was] the possibility that the dispute . . . may become moot").

16.   Several First Circuit cases examining the ripeness of challenges to a project's regulatory hurdle while other regulatory obstacles remain illustrate this point. From these cases the following rule emerges: where there are separate and independent regulatory approvals and one has not reached completion, challenges to the others are still ripe for adjudication provided such adjudication removes a "barrier[] to ultimate approval of the project." *Algonquin*, 919 F.3d at 63; *Riggs v. Curran*, 863 F.3d 6, 13 (1st Cir. 2017) (citation omitted); *Barnstable*, 786 F.3d at 143; *Weaver's Cove Energy, LLC v. R.I. Coastal Res. Mgmt. Council*, 589 F.3d 458, 468–69 (1st Cir. 2009).

17.   *Riggs* illustrates the point. There, the plaintiffs challenged, on various grounds, the Rhode Island Public Utilities Commission's order approving a power purchase agreement that contemplated construction of a wind farm. *See Riggs*, 863 F.3d at 8–9. To determine when the plaintiffs' claims accrued for statute of limitations purposes, the First Circuit examined whether the pendency of other regulatory approvals at the time the commission issued the order affected the ripeness of the plaintiffs' claims against it. *Id.* at 11. Comprehensively examining First Circuit case law on this point, the *Riggs* court concluded, despite the presence of "numerous hurdles to completing the [w]ind [f]arm when the [] Order issued," challenges to the Order became justiciable

11

upon its issuance because it was "discrete" from the other regulatory approvals. *Id.* at 13.

Rejecting arguments similar to those present here, the First Circuit further reasoned:

> Plaintiffs' argument that their claims were not ripe because the project could be derailed by future regulatory decisions or a lack of financing is foreclosed by Barnstable. The [] Order is unrelated to those other potential barriers, and Plaintiffs' constitutional claims were not affected by the existence of future contingencies. *The fact that the project might be derailed implicates mootness, not ripeness.*

*Id.* (emphasis added); *see also Algonquin*, 919 F.2d at 63 (holding claim was ripe where claimant sought "relief that would finally remove a principal impediment that st[ood] in the way of a final action" notwithstanding other necessary regulatory approvals that were pending).

18.     Here, UTIER's challenge to PREB's approval of the T&D Contract is entirely separate and independent from the Motion and involves a different inquiry (*i.e.*, whether the contracts will remain compliant with Puerto Rico energy policy and PREPA's integrated resource plan).[7] The Motion does not seek judicial review of any PREB determination regarding the T&D Contract, and this Court is not being asked to allow the administrative expense contingent on the conclusion of a legal or political process. PREB's consideration of the T&D Contract would not affect the core factual inquiry regarding whether the O&M Services benefit PREPA.

ii.    *The Service Commencement Date Conditions*

19.     The Union Entities' argument that the Service Commencement Date Conditions must be met before the Court can consider the Motion is both wrong and a mere pretense.  It is wrong because contingencies in a contract do not preclude a court from approving its assumption, and similarly do not prevent a court from determining whether the services are beneficial to the

---

[7]    The Motion and the PREB approval process are carried out by different entities (one federal and one territorial) pursuant to different aims under different statutes and with entirely different standards.  Disapproval from one of them will not be inconsistent with approval from the other because PREB and the Title III court are evaluating different questions on different metrics.

debtor.  It is a pretense because all conditions precedent must either be met or waived by the

parties.  Otherwise, the Interim Period will not commence, no O&M Services will be provided,

and no administrative expense on account of the Interim Obligations will accrue.

20.     Virtually all contracts have conditions for their continuing effectiveness, such as

neither party committing a material breach.  Similarly, plans of adjustment typically have a long

list of conditions precedent for the plan to go effective.  In fact, PROMESA acknowledges this by

stating that certain required approvals could be "expressly conditioned on such approval." *See e.g.*

PROMESA § 314(b)(5).  If the Union Entities were right, such plans could not be confirmed before

all conditions precedent have been complied with.  This is obviously not the case in a bankruptcy

case and is not the case in Title III.

21.     If finality were required, a bankruptcy court could only evaluate administrative

expense motions after all services had been performed.  As the First Circuit has observed, if a

debtor "is to be reorganized, third parties must be willing to provide the necessary goods and

services" to allow it to continue operations throughout the course of the bankruptcy proceedings.

*In re Mammoth Mart, Inc.*, 536 F.2d 950, 954 (1st Cir. 1976).  Third parties, however, "clearly

will not do so unless their claims for payment will be paid ahead of the pre-petition debts and

liabilities of the debtor," out of the understandable concern that the debtor might default on its

obligations once again.  *Id.*  The illogical result of the backward rule the Union Entities advance

is that third parties providing necessary post-petition services to a debtor would have to risk not

being paid if they are ultimately denied an administrative expense claim.  Third parties would

either not contract on such terms—depriving the debtor of necessary services—or would do so on

more onerous terms to the debtor (*e.g.*, depositing moneys into an escrow account to be held in

trust for the benefit of the contracting parties, which would result in a higher cost of capital for the

debtor). Such a rule would be contrary to PROMESA's purpose to ensure a debtor's ability to provide effective services. Front-End Administrative Expense Op. at 22-23.

### iii. Legislative Consideration of T&D Contract

22. The Union Entities also contend the Motion is not ripe because the T&D Contract is currently being evaluated by the Puerto Rico legislature, and "it is uncertain whether the terms and conditions of the T&D Contract will remain."[8] UTIER Obj. ¶ 30. It goes without saying that all contracts are subject to future amendment. If this possibility implicated *ripeness*, no debtor could seek allowance of an administrative expense claim until after the services are performed, nor could a debtor seek assumption of a contract under Bankruptcy Code section 365. As explained above, such a rule would undermine a debtor's ability to contract for necessary post-petition services, as a counterparty would have to perform without assurance of being paid.

23. The Union Entities also point to the current legislative efforts to postpone the Interim Service Commencement Date. UTIER Obj. ¶ 31. But whether that date is June 1, 2021, as targeted, or some other date, does not affect the merits of Motion or the fitness of the issues for adjudication. The Motion only seeks administrative expenses for Interim Obligations that accrue *after* the Interim Service Commencement Date occurs. In either case, the requested relief is warranted. The legislative attempts are the "contingent" or "hypothetical" event which could, at best, give rise to a future challenge. *See Town of Barnstable v. O'Connor*, 786 F.3d 130, 143 (1st Cir. 2015). They do not change the current status of a valid contract approved by all requisite parties required under the T&D Contract, existing Puerto Rico law and PROMESA.

---

[8] The Oversight Board believes the legislative efforts to interfere with the T&D Contract, which have taken place with UTIER's backing, violate, among other things, PROMESA §§ 108 and 204. The Oversight Board sent a letter, attached hereto as **Exhibit A**, notifying the legislature that such actions violate the automatic stay and are enjoined under PROMESA §§ 108 and 204, and reserving the right to seek relief from the Title III Court to the extent such resolutions become effective. AAFAF is aware of this correspondence and intends to work cooperatively with the Oversight Board to advance from the Front-End Transition Period to the commencement of O&M Services.

### iv.   *Finality of Front-End Administrative Expense Motion*

24.     Finally, the Union Entities argue the Motion is not ripe because the Front-End

Administrative Expense Motion is on appeal.  UTIER Obj. ¶ 28.  This argument fails because,

again, UTIER is confusing potential future mootness or potential reversal of a related motion with

ripeness.  The fact that the pending appeal may provide additional guidance on the legal landscape

relevant to the Motion does not render the Motion unripe.[9]

25.     The pendency of an appeal only impacts a court's jurisdiction in that it requires the

court not to do something to moot the appeal.  In all other respects, the court can continue to

exercise all its jurisdiction.  Indeed, courts have warned "against a broad rule that a bankruptcy

court may not consider any request which either directly or indirectly touches upon the issues

involved in a pending appeal and may not do anything which has any impact on the order on

appeal."  *Mission Prod. Holdings v. Schleicher & Stebbins Hotels, L.L.C. (In re Old Cold, LLC)*,

602 B.R. 798, 822 (1st Cir. B.A.P. 2019); *see also Bank of N.Y. Trust Co. NA v. Pac. Lumber Co.

(In re Scopac)*, 624 F.3d 274, 280 (5th Cir. 2010) (it has been "repeatedly recognized that, when a

notice of appeal has been filed in a bankruptcy case, the bankruptcy court retains jurisdiction to

address elements of the bankruptcy proceeding that are not the subject of that appeal," and that

---

[9]   While the Union Entities did not make this argument, the pending appeal does not otherwise render the Court without
jurisdiction: a pending appeal on a separate motion on different subject matter does not deprive the bankruptcy court
of jurisdiction over another motion simply because they proceed under the same Bankruptcy Code section.  *In re
Whispering Pines Estates, Inc.*, 369 B.R. 752, 761 (1st Cir. B.A.P.  2007) (an appeal does not divest bankruptcy court
of jurisdiction over aspects of the case that concern a different subject matter); *see also In re Sullivan Cent. Plaza I,
Ltd.*, 935 F.2d 723, 727 (5th Cir. 1991) (holding that because "the matter on which the bankruptcy court ruled—the
motion to convert—was not the subject of the pending appeal . . . the bankruptcy court retained jurisdiction to consider
the motion").  If such an appeal would have left the Court without jurisdiction, the Court would be rendered unable to
grant any administrative expense claim from the moment the first LUMA Energy administrative expense motion was
granted until it was resolved, something that would dramatically interfere with the administration of the bankruptcy
case.  *Id.* (bankruptcy court should not be considered to have been divested of jurisdiction if it "would severely hamper
the bankruptcy court's ability to administer its cases in a timely manner" otherwise "[p]arties could tie up proceedings
for long periods of time while their various appeals wound their way through three levels of appellate review.").  If
the Union Entities sincerely believed the Court did not have jurisdiction to hear issues pertaining to the T&D Contract
while the appeal is pending, they would not have filed the Union Entities' Complaint, which seeks to invalidate the
entire contract, while asserting the Court has jurisdiction over that matter.

"[i]t may even continue to address matters indirectly implicated in the appeal."). Instead, "the test is a functional one: once an appeal is pending, it is imperative that a lower court not exercise jurisdiction over those issues which, although not themselves expressly on appeal, nevertheless so impact the appeal *so as to interfere with or effectively circumvent the appeal process*." *Id.* (emphasis added).

26.     Nothing here would "interfere with" or "circumvent" the appeal process, or render the pending appeal moot, and thus nothing should prevent this Court from moving this case forward. A determination by the First Circuit of the issue on appeal—whether LUMA Energy has an allowable administrative expense claim for the Front-End Transition Fees—will not determine whether LUMA Energy is entitled to an administrative expense claim for the Interim Obligations—the subject of this Motion. While both motions emanate from the same T&D Contract, the administrative expense claims requested by PREPA are for different services. A determination that LUMA Energy is entitled to an administrative expense claim for the Interim Obligations would not moot the appeal, which relates to different services and different fees. *Victory v. Berks Cty.*, 2019 U.S. Dist. LEXIS 92552, *11–12 (Bankr. E.D. Pa. Jun. 3, 2019) (court was not divested of jurisdiction of summary judgment motion involving similar issues as to whether defendant violated Equal Protection Clause of the U.S. Constitution, which were on appeal in connection with preliminary injunction motion, because the summary judgment motion was based on "a separate record" and would not moot the appeal).

27.     Further, the Union Entities argue that, if the First Circuit reverses, the Court's opinion would be advisory because "PREPA would be failing its obligations under the T&D Contract because the Front-End Transition period obligations will not have administrative expense treatment." UTIER Obj. ¶ 29. This argument fails for the same reasons the Union Entities'

16

challenges to PREB's approval do not implicate ripeness, and is, at best, a misguided observation about potential future mootness.  Even if the First Circuit were to reverse the prior ruling, the Front-End Transition Period would be complete upon the Service Commencement Date, and payment of Front-End Transition obligations is a condition precedent thereto.  The condition of the administrative expense claim treatment of these obligations would no longer be necessary as they would have been paid in full.

28.     Moreover, granting the Motion would not interfere with or moot the pending appeal.  The proceedings are independent, and no ruling from the Court on the Motion would impact the First Circuit's ability to rule on the issues before it.

### C. Failure to Adjudicate the Motion Would Result in Substantial Hardship to PREPA

29.     Failure to permit the Motion to proceed would cause substantial interference with PREPA's ongoing transformation. Absent allowance of this claim or LUMA Energy's waiver of the condition, LUMA Energy would not commence the Interim Services and could eventually terminate the T&D Contract for undue delay in satisfying this condition.  T&D Contract § 4.8.  If PREPA does not obtain administrative expense priority for payment for services it believes are necessary to preserve its property and benefit its operations, Objectors could grind PREPA's restructuring to a halt with every challenge or appeal.  Such a result would give Objectors undue control over PREPA, and would be contrary to bankruptcy policy, which seeks to provide a debtor with a swift means to administer and restructure its operations, and with PROMESA, which charges the Oversight Board with restoring fiscal responsibility and market access.  This is especially true in cases under PROMESA, which are run for the benefit of the distressed instrumentality and public service. *See In re Fin. Oversight & Mgmt. Bd. For P.R.*, Case No. 17 BK 3283-LTS, 2020 U.S. Dist. LEXIS 7992, at *13-14 (D.P.R. Jan. 7, 2020) (This Court and

17

others have recognized that, unlike the commercial focus of bankruptcy cases of private entities, the "primary purpose" of governmental insolvency proceedings "is not future profit, but rather continued provision of public services.").

30.    On the other hand, Objectors suffer no harm from the Motion going forward. If PREB approval or the Front-End Administrative Expense Opinion is reversed, or the Front-End Transition Period is extended or not completed, then the Interim Service Commencement Date Conditions would not be met, in which case the Interim Period would not commence, and no administrative expense claim for the Interim Obligations would accrue unless such conditions were waived.

## II.    ADMINISTRATIVE EXPENSE PRIORITY TREATMENT FOR THE INTERIM OBLIGATIONS IS AVAILABLE UNDER PROMESA IN THESE CIRCUMSTANCES

31.    The Court made clear in its Front-End Administrative Expense Opinion that Bankruptcy Code § 503(b)(1)(A) permits allowance of administrative expense priority claims to parties like LUMA Energy who provide post-petition services that benefit the debtor.  *In re Fin. Oversight & Mgmt. Bd. For P.R.*, 621 B.R. 289, 299 (holding that "the text and structure of PROMESA compel the conclusion that operating expenses of PREPA are eligible for administrative expense priority under section 503(b)(1)(A) of the Bankruptcy Code.").  It held, among other things, that (i) Congress' decision to carve out specific subsections of other incorporated Bankruptcy Code provisions, while incorporating § 503 in its entirety, "provides a strong indication that Congress did not intend to preclude the applicability of section 503(b)(1)(A) in the Title III context," and (ii)  PROMESA § 301(c)(5) is "properly read as applying not only to incorporated provisions of the Bankruptcy Code that use the specific term 'property of the estate,' but also to provisions such as section 503(b)(1)(A) that perform relevant functions and contain the term 'estate.'"  *Id.* at 299–300.  As a result, the Court concluded that Bankruptcy Code

18

§ 503(b)(1)(A), as incorporated into PROMESA, "makes administrative expense priority available for the necessary costs and expenses of preserving PREPA during the course of its Title III case." *Id.* at 300.

32.    Nevertheless, the Union Entities rehash the same, unsuccessful arguments from their objection to the Front-End Administrative Expense Motion without acknowledging the Court's decision on the issue, let alone explaining why the Court should revisit its prior holding. This Court has held in prior proceedings that administrative expense claims have been incorporated into PROMESA. *See e.g. Memorandum Order Denying Motion Requesting Allowance of Post Petition Tort Claim as Priority claim Pursuant to The Fundamental Fairness Doctrine In Reading Co. v. Brown, 391 U.S. 471 (1968)* [ECF No. 14081 in Case No. 17-BK-3282-LTS] at 5 ("The allowance of administrative expense claims is governed by section 503 of title 11 of the United States Code . . . which is made applicable in this case by Section 301 of PROMESA.").  While the Union Entities believe the Court was incorrect, and have appealed the ruling regarding the Front-End Administrative Expense Motion,[10] the Title III Court's decision in that instance stands unless reversed or remanded.  The Union Entities articulate no reason why the Title III Court should issue a ruling on the application of Bankruptcy Code § 503(b)(1)(A) that would effectively reverse its prior decision and thus moot the appeal.  Indeed, the Title III Court's Front-End Administrative Expense Opinion conclusively decided this issue as law of the case and should not be altered.  *U.S. v. Moran*, 393 F.3d 1, 7 (1st Cir. 2004) (the law of the case doctrine provides that "a legal decision made at one stage of a criminal or civil proceeding should remain the law of that case throughout the litigation, unless and until the decision is modified or overruled by a higher court.") (*citing Christianson v. Colt Indus. Oper'g Corp.*, 486 U.S. 800, 816-17 (1988)).

---

[10]  *See Notice of Appeal*, [ECF No. 2269] and [ECF No. 2277] (appeal docketed in the First Circuit as Case No. 20-2041).

33.     In any event, for the reasons articulated in the Front-End Administrative Expense

Motion [ECF No. 2053] and the Government Parties' Omnibus Reply [ECF No. 2169] (both of

which are hereby incorporated by reference), the Title III Court's holding was clearly correct.  It

is also consistent with First Circuit precedent, which provides that "[p]reservation of the estate

[under Bankruptcy Code § 503(b)(1)(A)] includes protection of the assets of the estate, *as well as*

*postpetition operation of the business of the debtor*." *Woburn Assocs. v. Kahn (In re Hemingway*

*Transp., Inc.)*, 954 F.2d 1, 5 (1st Cir. 1992) (emphasis added).   Here, the O&M Services

"protect[]…the postpetition operation of the business of" PREPA as they entail operating,

repairing, and remediating PREPA's T&D System.  Accordingly, under any yardstick, they qualify

for administrative expense priority under Bankruptcy Code § 503(b)(1)(A) through PROMESA

§ 301(a).

34.     Even if Bankruptcy Code § 503(b)(1)(A) itself were deemed inapplicable using the

Union Entities' formalistic reading, the Motion should still be granted pursuant to Bankruptcy

Code §§ 503(b) and 105(a), as incorporated into PROMESA § 301(a).[11]  That is so because the

list of allowable administrative expense categories set forth in Bankruptcy Code § 503(b) is not

exclusive, affording the Title III Court authority to allow types of administrative expenses not

expressly identified in Bankruptcy Code § 503(b), to carry out Title III by enabling PREPA to

improve its ability to carry out its mission to supply energy to the entire Commonwealth of Puerto

Rico.  The Court did not address this issue in connection with the Front-End Administrative

Expense Motion,[12] and need not do so now, as its prior opinion makes administrative expense

---

[11]   Bankruptcy Code section 105(a) empowers the Court to "issue any order, process, or judgment that is necessary or
appropriate to carry out the provisions of" the Bankruptcy Code.

[12]   *See In re Fin. Oversight & Mgmt. Bd. For P.R.*, 621 B.R. 289, 300 n.11 ("Because the Court has determined that
section 503(b)(1)(A) applies in Title III, the Court need not address, and expresses no opinion regarding, the
Government Parties' alternative theories as to why the Front-End Transition Obligations are eligible for administrative
expense priority treatment.").

priority available in Title III cases under § 503(b)(1)(A).  In any event, the Union Entities provide

no explanation for why the Court could not provide an administrative expense claim under

Bankruptcy Code §§ 503(b) and 105(a).  Their arguments that Title III does not permit

administrative expense claims are therefore unavailing.  This independent alternative ground

remains available for the Court to approve an administrative expense claim if, for whatever reason,

the Court decides not to follow its clear rulings in prior instances.

### III. THE GOVERNMENT PARTIES HAVE DEMONSTRATED LUMA ENERGY'S ENTITLEMENT TO AN ADMINISTRATIVE EXPENSE CLAIM FOR THE INTERIM OBLIGATIONS

35.     As the Government Parties demonstrated in the Motion and submissions to the

Court, the O&M Services benefit PREPA because, among other things, they further the

Government of Puerto Rico and the Oversight Board's long-standing goal to bring safe, reliable,

efficient, and modern T&D System services to Puerto Rico.[13]  Marrero Decl. ¶ 10.  Indeed, the

Court previously found the Front-End Transition Expenses benefit PREPA because, among other

things, they are in preparation for and a requirement to reaching the Service Commencement Date

and thus commencing the O&M Services, precisely the services that are the subject of this

Motion.[14]  It follows that the O&M Services to be performed are themselves beneficial to PREPA

and the related fees are entitled to administrative expense treatment.  The Union Entities largely

repeat their attacks on PREPA's transformation and the T&D Contract from their objections to the

Front-End Administrative Motion, which the Court correctly rejected.  Notably, the Title III Court

---

[13]  *See* Act 120-2018, Statement of Motives ("In this Act are created the legal framework and the mechanism for the sale or transfer of PREPA assets related to electric power generation as well as for the establishment of Public-Private Partnerships with respect to any PREPA function, service, or facility.")

[14]  *In re Fin. Oversight & Mgmt. Bd. For P.R.*, 621 B.R. 289, 301.  The Front-End Transition Services included: (i) mobilization of the LUMA Energy transition team; (ii) development of system remediation plans and initial operating and capital budgets; (iii) preparation to take over customer services and billing and other financial management functions; (iv) preparation for management of federal funding; (v) assessing the chain of supply for fuel and power; and (vi) development of system operation principles and performance metrics, among other things.

is not the forum for the Union Entities to attack the transformation of PREPA, as the Title III

Court's review is limited to the approval of the administrative expense claim, not the T&D

Contract itself.  The Union Entities have been actively lobbying against PREPA's transformation,

but whether PREPA's transformation is a wise decision is a question for the Government Parties,

not for a claimholder, and this Court is not the appropriate forum for those efforts.

36.     The Union Entities have chosen to ignore the host of benefits flowing to PREPA

and the Commonwealth of Puerto Rico from the O&M Services, in favor of their own agenda-

based opposition to the transformation of the utility that the Government Parties have decided to

undertake.  They fundamentally misconstrue the T&D Contract by asserting it serves solely to

"dismantle" PREPA.  UTIER Objection ¶ 87.  Under the T&D Contract, however, PREPA will at

all times remain the owner of the T&D System's assets, with LUMA Energy assuming day-to-day

responsibility for PREPA's operations during the T&D Contract term.  At the end of the T&D

Contract term, after PREPA's T&D System has been modernized and strengthened, the operations

will transition back to PREPA or a successor operator.  Structuring the transformation to divide

PREPA's T&D System and its generation assets, and transition their management to private

operators to support rebuilding and streamlining the operations of PREPA, is the linchpin of

PREPA becoming a modern and efficient utility that implements industry best practices.  This

leaves PREPA the owner of a significantly improved, reliable, stable, and cost-efficient utility to

serve the Puerto Rican people.  The Union Entities profess misplaced concern that PREPA's

transformation and LUMA Energy's provision of operational services will imperil PREPA's

entitlement to federal funds from FEMA.  In fact, LUMA Energy was selected as the operator of

the T&D System in part because of "the consortium's proven collective experience and capacity to manage large federally funded projects . . . ."  Marrero Dec. ¶ 14.[15]

37.     Importantly, while the Union Entities complain about the separation of PREPA's generation and T&D assets for operational purposes, it is not merely a requirement of the T&D Contract – *it is a requirement of Puerto Rico law* under Act 120-2018 and PREPA's certified Fiscal Plan.[16]  The T&D Contract thus simply complies with both Puerto Rico law and the certified Fiscal Plan.

38.     The Union Entities next argue that PREPA's compensation to LUMA Energy for its services somehow renders PREPA's Fiscal Plan unworkable (*see, e.g.*, UTIER Objection ¶ 84). But granting LUMA Energy an administrative expense priority—the relief sought in the Motion— does not change any projected expenses or cash flows in its current fiscal plan or budget.  The Oversight Board, which approved the T&D Contract, accounted for the expenses under the T&D Contract and determined that the Interim Obligations comply with PREPA's Certified Fiscal Plan and maintain a sustainable level of expenditures.  This is demonstrated by the fact that costs under the T&D Contract are included in PREPA's 2021 Certified Budget.[17]  Likewise, the initial budget submitted by LUMA Energy to PREB projects sustainable cash flow for the first three years of the

---

[15]   In addition, as part of the procurement and selection process, LUMA Energy participated in "in-person meetings to discuss federal funding with representatives of FEMA and COR3," and was selected because it "brought to bear experience securing and obtaining federal funds [and] demonstrated that . . . it would be better equipped to navigate and carry out the process for obtaining and implementing federal funding than any other third-party contractor." *Puerto Rico Public-Private Partnership for the Electric Power Transmission and Distribution System* (the "P3 Report"), a copy of which is attached to the Marrero Declaration as Exhibit A, at 62.

[16]   *See* Act 120-2018, Statement of Motives ("In this Act are created the legal framework and the mechanism for the sale or transfer of PREPA assets related to electric power generation as well as for the establishment of Public-Private Partnerships with respect to any PREPA function, service, or facility.").

[17]   Puerto Rico Electric Power Authority Fiscal Year 2021 Certified Budget at 3.  *Available at* https://drive.google.com/file/d/1yIV664F009bi3UeE9WBHi3J6U6r42tFQ/view (last visited: April 21, 2021).

T&D Contract term.[18]  Notably, LUMA Energy has concluded it does not even need to change the current rates to fund the budget it has submitted to PREB in accordance with the T&D Contract and PREB rate review procedures.[19]  *See* T&D Contract section 4.2(e).

39.     The Union Entities' allegations ring hollow because they fail to take into account the projected savings and efficiencies from the T&D Contract.  PREPA's certified Fiscal Plan projects a balanced budget for the next 30 years.  PREPA Fiscal Plan § 1.1.  The T&D Contract, which enables the modernization of the T&D System and reduces costs, is an essential component of those projections.

40.     The Union Entities' various speculations regarding LUMA Energy's control over PREPA leading to conflicts of interest are also irrelevant and without merit.  *See* UTIER Objection ¶¶ 93–95.  LUMA Energy will be subject to independent regulation by PREB and oversight by the P3 Authority throughout the T&D Contract term.  In addition, PREPA will remain a covered territorial instrumentality for a certain period of time even after it emerges from Title III, during which time its contracts will continue to be subject to Oversight Board review.[20]  The Union Entities' allegations about a private monopoly are squarely refuted by section 8(h) of Act 120-2018: "Under no circumstances, may the transactions conducted under this Act be used to constitute or authorize an electric power generation monopoly."   UTIER's arguments misunderstand that LUMA Energy's control and partial autonomy are attractive and beneficial features of the transformation that the Government Parties actively pursued.

---

[18]  *Petition for Approval of Initial Budgets and Related Terms of Service*, LUMA Energy, dated as of Feb. 24, 2021. *Available at* https://app.reorg.com/v3#/items/intel/1869?item_id=136748 (last visited: April 21, 2021).

[19]  The budget excludes payment of legacy liabilities that may be paid pursuant to a Title III plan.

[20]  *See* FOMB Contract Review Policy, *available at* https://oversightboard.pr.gov/contract-review/ (last visited: April 21, 2021).

41.     Moreover, rather than impede PREPA's ability to receive federal funding (UTIER Objection ¶ 96), the Government Parties believe LUMA Energy will help facilitate the procurement and utilization of federal funds.  LUMA Energy will incorporate procurement best practices and develop procurement manuals for nonfederal and federal funds, which will improve transparency and confidence in the efficiency and allocation of those funds.  Marrero Decl. ¶ 18.[21]

42.     The Union Entities' remaining critiques of the T&D Contract all fail to negate the overall benefits of the O&M Services:

---

[21]  In its latest report to PREB and the P3 Authority, LUMA Energy reported that it was 81-90% complete with respect to the federal funding procurement manual.  *Available at* https://energia.pr.gov/en/dockets/?docket=nepr-mi-2020-0008 (last visited: April 21, 2021).

a. Their assertion (at Hernández Decl. ¶ 8.c)[22] that LUMA Energy is paid without any oversight or supporting documents is false as it must submit its bills to the P3 Authority for review, as it has been doing on a monthly basis;[23]

b. While LUMA Energy can terminate the contract upon 120 days' notice in the event of a Force Majeure Event that continues for a period in excess of 18 consecutive months, such a provision is standard, and LUMA Energy would not be entitled to the Termination Fee in such circumstance;

c. Their assertion that PREPA will be required to borrow approximately $894 million and spend approximately $60 million in interest over the 15 year term of the T&D Contract (UTIER Obj. ¶¶ 86-90) is also false, as the Commonwealth has committed to issuing an appropriation of funding sufficient to fund a substantial portion of the required reserve accounts without any repayment obligations;

d. Their accusations regarding the legality of the public bidding process (Hernández Decl. ¶¶ 46-47) are unfounded. LUMA Energy was selected as the T&D Contract

---

[22] In support of their objection, the Union Parties put forth the declaration of Héctor Rosario-Hernández (the "Hernández Decl.") [Exhibit 1 to the UTIER Obj. and SREAEE Obj.]. According to his declaration, Mr. Rosario-Hernández was employed by PREPA in various roles from 1972 to 2005, most recently as PREPA's Chief Executive Officer from 2001 through 2005. Hernández Decl. ¶ 2. Mr. Rosario-Hernández's declaration is deficient for several reasons. At the outset, the Union Parties fail to specify whether Mr. Rosario-Hernández is testifying as a fact or an expert witness. Mr. Rosario-Hernández cannot be treated as a fact witness because, as someone who worked for PREPA over fifteen years ago, he has no foundation to make the conclusions he does, including those relating to the T&D Contract's alleged prejudice to the Com[UTIER Obj. ¶ 92; SREAEE Obj. ¶ 92] and alleged conflict of interests among LUMA Energy affiliates [UTIER Obj. ¶ 93; SREAEE Obj. ¶ 93]. By definition, Mr. Rosario-Hernández cannot bring factual or percipient testimony because he is no longer a PREPA employee and has not actually perceived the majority of his testimony. *See* Black's Law Dictionary (11th ed. 2019) (defining percipient witness as "[a] witness who has perceived the things about which he or she testifies").

Nor have the Union Entities satisfied the burden to treat Mr. Rosario-Hernández as an expert witness. The proponent of expert testimony bears the burden of establishing its admissibility under Federal Rule of Evidence 702 and applicable case law. *Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse Sec. (USA) LLC,* 752 F.3d 82, 96 (1st Cir. 2014). Mr. Rosario-Hernández is not qualified to opine generally on the benefits, or alleged lack thereof, the O&M Services will afford PREPA. *See e.g.* UTIER Obj. ¶ 91 (offering unfounded testimony that PREPA will risk losing FEMA funds). To qualify as an expert under Federal Rule of Evidence 702, a witness must have specialized "knowledge, skill, experience, training, or education" with respect to the "issue at hand." *Bogosian v. Mercedes-Benz of N. Am., Inc.,* 104 F.3d 472, 476-77 (1st Cir. 1997); *see also Tokio Marine & Fire Ins. Co. v. Grove Mfg. Co.,* 958 F.2d 1169, 1173-74 (1st Cir. 1992) (affirming exclusion of civil engineer's proposed expert testimony on mechanical engineering matters); *Nook v. Long Island R. Co.,* 190 F.Supp.2d 639, 643 (S.D.N.Y. 2002) (Swain, J.) (excluding industrial hygienist's proposed testimony on medical diagnosis). Mr. Rosario-Hernández's testimony provides no explanation of any specialized knowledge or experience beyond noting he is a former PREPA employee and currently works "as a consultant and advisor…regarding strategy planning, finance and investing, power generation, and government and public affairs." Hernández Decl. ¶ 7. This vague description does nothing to dispel any potential bias on the part of Mr. Rosario-Hernández, nor does it provide any methodology or basis for the conclusions in his testimony. The only purpose of Mr. Rosario-Hernández's testimony is to give unfounded opinions at odds with LUMA Energy's administrative expense claim and contradict Puerto Rico energy policy embodied in Puerto Rico law and supported by PREPA, LUMA Energy, the P3 Authority, and the Oversight Board. As such, the testimony should not be given any weight.

[23] *See, e.g.,* LUMA Monthly Report to P3A for the Period Ending March 2021. Available at https://energia.pr.gov/en/dockets/?docket=nepr-mi-2020-0008 (last visited: April 21, 2021).

counterparty through a robust, competitive, and transparent process carried out in accordance with Act 120-2018 and its corresponding regulations.  LUMA Energy is a consortium and its members participated in the bidding process, which is specifically permitted under Act 29-2009 and Act 120-2018.  Act 29-2009 § 9 (d) ("The Authority may allow and indicate in the documents pertaining to requests for qualifications or for proposals that the prospective Proponents present their proposals jointly under consortia."); Act 120-2018 § 4 ("All of the provisions of Act No. 29-2009 . . . shall apply to PREPA Transactions, except as otherwise provided in this Act.")  Further, there is no basis for concern that LUMA Energy's fees will be excessive.  *See* Hernández Decl. ¶ 48.  Pursuant to Article 7 of the T&D Contract, LUMA Energy is required to provide the P3 Authority with summaries of the expenses to be paid from the Service Accounts, *see, e.g.*, Marrero Decl. Ex. B at Art. 7 § 7.5(a)(iv) (requiring Operator to provide summary of expenses being paid and, at following month end, a full accounting of such expenses actually incurred and paid), and billing and service fee disputes the parties are not able to resolve must be submitted to an independent expert pursuant to Article 15 of the contract.  Marrero Decl. Ex. B at Art. 7 § 7.1(e), Art. 15; and

e. The allegation that LUMA Energy may have a future conflict of interest because it may seek to obtain generation assets and then contract with itself (Hernández Decl. ¶¶ 25-30)  is purely speculative, and, in any event, misguided, as such contracts could be subject to PREB or Oversight Board approval, among others.

43.    Finally, the Union Entities ignore that "unlike the commercial focus of bankruptcy cases of private entities, the 'primary purpose' of governmental insolvency proceedings 'is not future profit, but rather continued provision of public services.'"  *In re Fin. Oversight & Mgmt. Bd.*, 432 F. Supp. 3d 25, 30 (D.P.R. 2020) (quoting *In re Mount Carbon Metro. Dist.*, 242 B.R. 18, 34 (Bankr. D. Colo. 1999)), *aff'd*, 954 F.3d 1 (1st Cir. 2020).  The Court's inquiry in determining this matter is focused on whether LUMA Energy's services are beneficial to preserving PREPA's operations by enabling it to provide public services and carry out its official mission.  The Union Entities' evident dissatisfaction with the Government Parties' policy decision to enter into the T&D Contract and to pursue the transformation of PREPA offers no basis on which to deny LUMA Energy, as PREPA's operator, an administrative expense claim, and as a result, deny the citizens of Puerto Rico the benefits of a reliable, modernized T&D System.

IV.    **INTERESTS OF PREPA'S OTHER CREDITORS HAVE NO BEARING ON
ALLOWANCE OF INTERIM OBLIGATIONS FOR WORK REQUIRED BY A
CONTRACT**

44.    The Union Entities contend that "for the Interim Obligations to be granted priority

they must be beneficial for PREPA's restructuring, including its creditors and stakeholders."

UTIER Objection ¶ 82.  Additionally, Cobra and Whitefish repeat their previous argument that the

Motion should not be granted because their own alleged administrative expense claims have not

been paid.  *See* Cobra Objection, ¶ 1; Whitefish Objection ¶ 27.

45.    The Title III Court has already rejected the Objectors' attempts to inject their own

interests into a § 503(b) motion, holding in connection with the Front-End Administrative Expense

Motion that "[t]he particular effects that granting the Motion might have on Cobra, Whitefish,

UTIER, or any other individual creditor of PREPA have no bearing on whether the Front-End

Transition Obligations are entitled to administrative expense priority."  *Memorandum Opinion*

*Granting in Part and Denying in Part PREPA's Motion for Entry of an Order Allowing*

*Administrative Expense Claim for Compensation for Front-End Transition Services Under the*

*Puerto Rico Transmission and Distribution System Operation and Maintenance Agreement with*

*LUMA Energy* [ECF No. 2258] (the "Front-End Administrative Expense Opinion") at 22.  This is

because, as discussed above, an administrative expense claim is appropriate in Title III where

(1) the services are necessary to preserve the operations of the debtor (*i.e.*, to provide services to

the public and carry out its mission), and (2) the debtor consents to payment of the claim as an

administrative expense.  *In re Craig Cty. Hosp. Auth.*, 572 B.R. 340 (Bankr. N.D. Okla. 2017).

Consistent with the purposes of PROMESA, this inquiry should remain narrowly focused on

whether the requested administrative expense claim preserves the debtor and its property by

promoting the "continued provision of public services."  *In re Fin. Oversight & Mgmt. Bd. for*

28

*P.R.*, 432 F. Supp. 3d at 30.[24]   There is no basis to consider the impact of the claim on other creditors when determining whether to grant this Motion and allow LUMA Energy's administrative expense claim.  In any event, the clear and substantial benefits of PREPA's long-planned transformation redound to *all* of PREPA's stakeholders.

46.     The Union Entities' next argument that an administrative expense in favor of LUMA Energy violates the presumption of ratable distribution among similarly situated creditors (UTIER Obj. at ¶ 106) is similarly unavailing because it has no application here.  Cobra too objects to the Motion on the basis that the relief will result in unequal treatment for similarly situated creditors (Cobra Obj. at ¶ 1).[25]   If Cobra were correct, then debtors could never pay any administrative claim before proving they can pay all administrative claims.  There is no such legal requirement.   And, LUMA Energy is not similarly situated to the Union Entities because it is not a prepetition unsecured creditor, but rather a third party contributing substantial new resources post-petition to preserve and benefit PREPA's operations.  *See In re Weinstein*, 272 F.3d 39, 427(1st Cir. 2001) (observing that a postpetition tax claim is not "similarly situated" to a prepetition unsecured claim and that "the need for equity among creditors is the need to ensure that the trustees pay postpetition tax claims promptly").  An administrative expense claim in favor of LUMA Energy does not cause holders of prepetition claims to be paid differently from one another.  Nor does it cause administrative claim holders to be treated differently than one another—

---

[24]   Section 305 of PROMESA further confirms a narrow inquiry is appropriate here.  Pursuant to section 305, PREPA is entitled to pay all of LUMA Energy's fees, either upfront or on an ongoing basis.  Neither the creditors nor the Court could interfere with PREPA's decision to make such payments to LUMA Energy.  It would defy logic, then, for creditors to be able to preclude the incurrence of an administrative expense claim when a stronger form of obligation—payment in full, either upfront or in the ordinary course—is already available to PREPA.  Had PREPA been compelled to make all such payments upfront, however, its finances would have materially worsened, to the detriment of all its stakeholders.

[25]   Despite the fact that, unlike the Union Entities, Cobra is a party to a postpetition contract, Cobra is not being paid because of allegations of bribery involving Cobra's then-President and certain FEMA officials—and through no fault of PREPA—regarding the contract under which Cobra has alleged it is entitled to an administrative expense claim.

all allowed administrative creditors will have to be paid in full or a plan of adjustment cannot be confirmed because Bankruptcy Code section 1129(a)(A) requires that all allowed administrative claims be paid in full in cash.

47.     UTIER's argument that the T&D Contract will harm its members is equally unavailing for the same reasons that the impact on other creditors is not relevant to the issue at hand.  Moreover, because they have filed a complaint regarding these supposed harms, such issues should be deferred to that adversary proceeding.  In any event, such arguments lack merit because LUMA Energy has actively sought to hire as many PREPA employees (including many of UTIER's members) as possible and continues to make employment offers on a daily basis.[26] UTIER, on the other hand, has interfered with LUMA Energy's recruiting efforts and urged its members not to interview with LUMA Energy.[27]  Accordingly, to the extent that these employees do not pursue or accept employment with LUMA Energy, it would be largely due to UTIER's actions, and not those of PREPA or LUMA Energy, nor the terms of the T&D Contract.  UTIER's attempts to sabotage LUMA Energy's hiring process do not impact the analysis of whether LUMA Energy's services during the Interim Period are beneficial to the debtor, but they do undermine UTIER's assertions of harm to its members from allowing LUMA Energy an administrative expense claim.

48.     Further, UTIER's allegation that the collective bargaining agreements with PREPA will be rejected (UTIER Obj. at ¶ 9) is nothing more than speculation.  There is no provision of the T&D Contract or the Supplemental Agreement that would require or effectuate the rejection

---

[26]  *See* LUMA Monthly Report to P3A for the Period Ending March 2021 at 37 (stating LUMA Energy's objective to interview all PREPA employees and advising that ~2,400 interviews have taken place and offer letters have been sent out), available at https://energia.pr.gov/en/dockets/?docket=nepr-mi-2020-0008 (last visited: April 21, 2021).

[27]  Attached hereto as **Exhibit B** is a certified translated copy of the *Report of the President of the Council of Delegates: United We Will Overcome – LUMA OUT*, Angel R. Figueroa Jaramillo, President of UTIER State Council (Feb. 7, 2021).

of any collective bargaining agreements.  Even if that were the case, any effort to reject the

collective bargaining agreements would be subject to separate motion practice that would require

approval of the Title III Court pursuant to section 365(a) of the Bankruptcy Code (as incorporated

in PROMESA § 301(a)).

49.      Finally, this Motion is simply not an appropriate forum for adjudicating Whitefish's

and Cobra's alleged administrative expense claims.  Each has filed its own motion for allowance

of an administrative expense claim,[28] and the Title III Court will have an opportunity to determine

the rights and interests of the parties in connection therewith.

## V.      THE TERMINATION FEE AND APPROVAL RIGHTS ARE PART OF THE OVERALL BARGAIN UNDERLYING THE T&D CONTRACT AND SHOULD NOT BE ALTERED BY THE COURT

50.      The UCC does not oppose the Motion or the T&D Contract generally (UCC

Objection, ¶ 1), but nevertheless renews its limited objection that the combination of LUMA

Energy's reasonable approval rights over the Title III plan and its Termination Fee "grant [it]

potential control over PREPA's Title III case."  UCC Objection at ¶ 7.  The Title III Court should

overrule the UCC's limited objection because it has no authority to mark up the Supplemental

Agreement to implement the UCC's requests to (i) limit a condition imposed on the Interim Service

Commencement Date that PREPA's Title III confirmation order be "reasonably acceptable to"

LUMA Energy (Supplemental Agreement § 6.1)—which has nothing to do with allowance of an

administrative expense claim—or (ii) eliminate or restructure the $115 million termination fee

---

[28]   *See Motion of Whitefish Energy Holdings, LLC for Allowance of Administrative Expense Claim* [ECF No. 2281] and *Motion for Allowance and Payment of Administrative Expense Claims* [Case No. 17-BK-3283-LTS, ECF No. 8789]. Cobra also uses the Cobra Objection to argue in favor of their Motion to Lift the Stay (as defined in the Cobra Objection).  That issue is before the Title III Court on a different posture and is currently scheduled to be heard on June 16, 2021 [ECF No. 2445].  The Court correctly "decline[d] to entertain [COBRA's] attempts to litigate issues pertaining to [its] claims against PREPA in the context of [the Front-End Admin Motion]" and should decline to do so here.

payable to LUMA Energy if it terminated the T&D Contract in the event that PREPA does not achieve confirmation within eighteen months of the Supplemental Agreement Effective Date (Supplemental Agreement § 7.1(a)).  Each of these provisions is an integral component of the overall contract.  The UCC's arguments also fail for three primary reasons.

51.    *First*, the Motion does not seek overarching approval of the T&D Contract or Supplemental Agreement.  Rather, it seeks approval of an administrative expense claim for fees for the O&M Services rendered during the Interim Period.  LUMA Energy's reasonable consent rights with respect to PREPA's plan of adjustment are not within the narrow scope of the inquiry before the Title III Court: whether the O&M Services benefit the debtor.  In any case, the consent rights apply only to LUMA Energy's interests as they relate to the T&D Contract because they are required to be reasonable, and not a blanket veto right.

52.    *Second*, the UCC inappropriately asks the Title III Court to modify the T&D Contract to qualify LUMA Energy's consent rights by replacing "reasonably acceptable" with a reference to triggering a "Material Adverse Effect" as defined in the Supplemental Agreement. UCC Objection at ¶ 10.  The Title III Court need not address the UCC's argument that it would be "unreasonable" to not consent unless the plan causes a Material Adverse Effect on LUMA Energy at this time.  Should LUMA Energy ever seek to withhold consent to a plan, the Title III Court will have a full opportunity to consider the issue at that time armed with the relevant facts and the informed perspectives of all parties in interest.  There is no reason to theorize about potential scenarios under which LUMA Energy might invoke this provision.  If LUMA Energy does use this provision in a way the Oversight Board believes is unreasonable, the Title III Court can determine what is appropriate in the context of a concrete dispute.

53.     Moreover, standing in the way of confirmation of a Title III plan for any reason unrelated to LUMA Energy's performance of the O&M Services would be unreasonable and LUMA Energy is contractually prohibited from unreasonably withholding consent.  Marrero Decl., Ex. B., Supplemental Agreement § 6.1.  Read in context, the requirement that a plan be "reasonably acceptable to" LUMA Energy does not permit LUMA Energy to reject any plan at its whim; rather, it requires that a proposed plan not materially impair the parties' ability to fulfill their respective obligations under the T&D Contract.  Should LUMA Energy ever attempt to withhold acceptance of a plan for any reason outside the scope of the T&D Contract, the Government Parties have the right to declare such withholding unreasonable and proceed to confirmation.  This hypothetical is highly unlikely ever to occur; LUMA Energy has not invested years of time, manpower, and money to put itself in position to operate and rehabilitate the power grid in Puerto Rico simply to walk away over plan provisions that do not concern its mission.  LUMA Energy is working tirelessly to provide services that are achieving tangible benefits and will effect a much-needed transformation and modernization of PREPA and Puerto Rico's energy system.  It is to both parties' mutual benefit for the T&D Contract to be performed in accordance with its terms.

54.     *Third*, both LUMA Energy's limited consent rights and the Termination Fee are critical economic terms that the parties extensively negotiated at arms' length and on which they agreed.  It is well-settled that courts should not rewrite parties' contracts because doing so would upset the parties' intentions in reaching their agreement.  *See*, *e.g.*, *Lawson v. Fleet Bank of Maine*, 807 F. Supp. 136, 141 (D. Me. 1992) ("The Court should not and will not rewrite the contract to effect a transfer desired by Plaintiffs but quite explicitly not intended by the parties to the contract."), *aff'd*, 3 F.3d 11 (1st Cir. 1993); *First Liberty Ins. Corp. v. Budow*, No. 05-cv-88, 2007

WL 2071883, at *9 (E.D. Pa. July 17, 2007).  That is particularly true where, as here, court approval of the contract itself is neither required nor sought.

55.    LUMA Energy is investing considerable resources, including the hiring of thousands of employees, to assume operational control over the T&D System, and would not undertake such investment if it were not assured payment and a minimum level of compensation. The UCC's assertion that LUMA Energy would take the Termination Fee and run if PREPA does not emerge from Title III after 18-months from the Interim Service Commencement Date (UCC Obj. ¶¶ 13-14) is baseless and mischaracterizes this provision.  The provision is no more than a fail-safe that allows the parties to re-consider proceeding with the contract if PREPA does not emerge from Title III after 18 months of operation by LUMA Energy.  All parties would be much better off if the T&D Contract is performed until its full 15-year term, but all parties will need to consider circumstances at the time if PREPA is unable or unwilling to emerge in 18 months.  Under the original T&D Contract, PREPA's exit from Title III was a condition to Service Commencement, as no bidding operator was initially willing to operate the T&D System while the Title III Case remained ongoing.  The Oversight Board worked diligently to negotiate the Supplemental Agreement with LUMA Energy specifically to secure the benefits of the O&M Services as soon as possible to expedite PREPA's much-needed transformation.[29]  The Termination Fee was an essential consideration to get LUMA Energy to agree to this material change to the original deal and accept the risk that their substantial infrastructure and other up-front investments are not compensated through the anticipated fifteen years of revenue under the T&D Contract.  The Termination Fee is an integral and necessary component of the Supplemental Agreement that provides significant value to the debtor by making it possible for the O&M

---

[29]  *See* P3 Report at 73-74.

Services and PREPA's transformation to commence for the benefit of all stakeholders prior to PREPA's exit from Title III.

56.     Next, the UCC asserts that the Termination Fee cannot qualify as an administrative expense because it is characterized in the Supplemental Agreement as liquidated damages, and therefore is not an actual and necessary expense of the debtor's.  UCC Objections ¶ 19.  In spite of the clear terms of the Supplemental Agreement, the UCC misleadingly characterizes the Termination Fee as a "penalty to disincentivize PREPA from pursuing a plan of adjustment not to LUMA Energy's liking."  *Id.* at ¶ 21; *but see* Supplemental Agreement § 7.2(c)(ii) (stating that the Termination Fee  is "not [a] penalt[y]").  The UCC completely distorts the meaning of administrative claims.  It is hornbook law that a debtor's breach of a postpetition contract gives rise to administrative damage claims.  4 Collier on Bankruptcy § 503.06 ("If the trustee enters into a contract or lease after entry of the order for relief and subsequently breaches the contract or lease…the full amount of the damages arising from the trustee's breach will constitute an administrative expense."); *Devan v. Simon DeBartolo Group (In re Merry-Go-Round Enterprises, Inc.)*, 180 F.3d 158 (4th Cir. 1999) (allowing landlord administrative expense for all future unpaid rent under breached postpetition lease because "if landlords do not receive some assurance that their leases will be paid in full, then they will refuse to enter into leases with Chapter 11 tenants."). Whatever the legal damages are, they are administrative claims.  If the damages include invalid penalties, the invalid penalties will not comprise the legal damages.  That issue is currently a mere hypothetical.  Here, the Termination Fee is not a substitute for contract damages.  It is a bargained-for payment due LUMA Energy if LUMA Energy carries out its contractual obligations, but the T&D Contract is terminated.

57.     Contrary to the UCC's assertions, the Termination Fee is not intended to give LUMA Energy control over PREPA's plan, it is intended to incentivize LUMA Energy to undertake the considerable time and investment to perform under the T&D Contract while PREPA remains in Title III and the corresponding risks associated therewith, including the theoretical possibility that the 15-year term (on which the T&D Contract pricing was determined) does not materialize. LUMA Energy's investment in the T&D System's infrastructure, servicing personnel, customer service operations, and all of the other Front-End Transition Services were premised upon the upside value of a 15-year term outside of the confines of Title III. For this reason, neither LUMA Energy nor any other bidding operator was initially willing to operate the T&D System while PREPA remained in Title III. The Supplemental Agreement, including the Termination Fee that is an integral piece of this agreement, was negotiated between the parties to incentivize LUMA Energy to undertake such risk. PREPA is thus receiving actual value, not a potential or speculative value, in the early commencement of the valuable O&M Services.

58.     The Termination Fee resulted from this heavily-negotiated process between the Government Parties and LUMA Energy, and provides reasonable security to LUMA Energy to induce their commencement of the O&M Services during the Title III Cases. The Termination Fee is equal to just one year of service fees under the T&D Contract, appropriately balancing the risks assumed by LUMA Energy and compensating them for the substantial costs related to terminating the parties' relationship 14 years earlier than anticipated. Should PREPA fail to emerge from Title III within 18 months of the Interim Service Commencement Date, LUMA Energy will have spent almost three years investing in PREPA and the Commonwealth of Puerto Rico, including by establishing best practices for electricity transmission and distribution, hiring thousands of employees, establishing a lineworkers' college, and more. Additionally, LUMA

Energy will need to incur further costs to unwind their operational control and return the T&D System to PREPA.  A Termination Fee of one year of service fees is appropriate and reasonable to induce LUMA Energy to undertake such risks, both financial and reputational, should such circumstances arise.

59.     "The reason that *inducement* of the creditor's performance by the debtor-in-possession is crucial to a claim for administrative priority is rooted in the policies that gave rise to the creation of the priority.  Thus, administrative priority is granted to post-petition expenses so that third parties will be moved to provide the goods and services necessary for a successful reorganization."  *In re Jartran, Inc.*, 732 F.2d 584, 588 (7th Cir. 1984) (*citing Mammoth Mart*, 536 F.2d at 954) (denying an administrative expense where, unlike here, the fees to induce performance by the counterparty were irrevocably incurred prior to the petition date).  The Termination Fee is specifically targeted to induce LUMA Energy's performance during this Title III Case and should receive the appropriate assurance of payment provided by an administrative expense claim.

60.     The UCC attempts to distinguish the Termination Fee from a break-up fee, UCC Obj. ¶ 24, but their argument parses the issue too finely and misses the mark.  Break-up fees are negotiated by deal counterparties because they dedicate significant time and resources to negotiating, formulating, and entering into the deal; agree to take no actions while locked into the deal, resulting in significant opportunity costs to them; support the debtor in seeking approval of the deal; and take risk that all their efforts could be for naught if the deal terminates.  *See In re APP Plus*, 223 B.R. 870, 874 (Bankr. E.D.N.Y. 1998) (break-up fees are intended to reimburse the bidder's out-of-pocket expenses and compensate for time, effort, resources, and the risk of losing other investment opportunities while the bidding process unfolds).  These justifications are even more compelling here than in the typical break-up fee context.  Although the bidding process has

37

been completed, and resulted in the T&D Contract, the Termination Fee is to reward and incentivize LUMA Energy for expending a substantial investment in revitalizing and transforming PREPA's T&D System for the benefit of all stakeholders, at significant opportunity cost to LUMA Energy, while agreeing to operate the T&D System in Title III and taking the risk that all of their time, efforts, and considerable resources will not yield the return it anticipated. Similar to a standard break-up fee which engenders value through higher bids, so too does the Termination Fee drive significant value to PREPA and its stakeholders by incentivizing LUMA Energy to commence PREPA's transformation as early as possible.

61.     Courts have held there is no compelling justification for treating an application for break-up fees under Bankruptcy Code § 503(b) differently than any other application for administrative expenses under that provision.[30] The Government Parties have established the O&M Services will provide a substantial benefit to PREPA. Thus, there is no legitimate question that LUMA Energy's agreement to provide the O&M Services and take over control of the T&D System without waiting for PREPA's eventual emergence from Title III likewise provides a substantial benefit to PREPA and, accordingly, LUMA Energy is entitled to the Termination Fee as an administrative expense claim if the T&D Contract is terminated.

62.     Furthermore, the Termination Fee is an actual and necessary expense of PREPA. If it is not approved, LUMA Energy would have the ability to terminate the T&D Contract prior to Interim Service Commencement to the detriment of PREPA and all of its stakeholders, as well as the island and its residents. At a minimum, LUMA Energy could delay the Service Commencement Date until after Title III exit, or terminate the contract for failure to meet the

---

[30] *In re O'Brien Environmental Energy, Inc.*, 181 F.3d 527, 535 (3d Cir. 1999); *In re Tama Beef Packing, Inc.*, 290 B.R. 90, 97–98 (8th Cir. 2003) (holding that break-up fees should be evaluated under general administrative expense jurisprudence).

38

contractual deadline for the Service Commencement Date (T&D Contract § 4.8), which would leave PREPA without the benefit of a third-party professional operator for the T&D System and the attendant transformative benefits indefinitely.

63.    The UCC argues in the alternative that this Title III Court should treat the Termination Fee in the same way it treated the late fees pursuant to the Front-End Administrative Expense Opinion and defer a determination of whether such fee is actual and necessary until such late fees are incurred and PREPA can present factual evidence "demonstrating that any Late Fees actually incurred were reasonable and necessary for the preservation of PREPA."  Front-End Administrative Expense Op. at 21.

64.    The Termination Fee and the late fees are not comparable and should not receive the same treatment.  While late fees were speculative, and the circumstances under which they could arise and the magnitude of such fees were unknown, the circumstances under which the Termination Fee could be triggered and the amount thereof are readily ascertainable.  Because the basis for the Termination Fee, and the O&M Services under the T&D Contract that it will be inducing, are already assessable, this Title III Court may determine that the Termination Fee is an actual and necessary expense of the debtor's to not only preserve, but enhance, its property.  Accordingly, the Termination Fee should be granted administrative expense priority under the terms of the T&D Contract.

*[Remainder of Page Intentionally Left Blank]*

WHEREFORE the Government Parties respectfully request the Court (i) overrule the

Objections and (ii) enter the Proposed Order (a) granting the Motion and (b) granting PREPA such

other relief as is just and proper.

Dated: April 21, 2020
　　　　San Juan, Puerto Rico

Respectfully submitted,

/s/   Martin J. Bienenstock

Martin J.  Bienenstock (*pro hac vice*)
Paul V.  Possinger (*pro hac vice*)
Ehud Barak (*pro hac vice*)
Daniel S.  Desatnik *(pro hac vice)*
**PROSKAUER ROSE LLP**
Eleven Times Square
New York, NY 10036
Tel:  (212) 969-3000
Fax:  (212) 969-2900

*Attorneys for the Financial Oversight and
Management Board as representative for the
Commonwealth of Puerto Rico and the Puerto
Rico Electric Power Authority*

**O'NEILL & BORGES LLC**

/s/ Hermann D. Bauer

Hermann D. Bauer
USDC No. 215205
250 Muñoz Rivera Ave., Suite 800
San Juan, PR 00918-1813
Tel:  (787) 764-8181
Fax:  (787) 753-8944

*Co-Attorney for the Financial Oversight and
Management Board as representative of the
Debtor*

**MARINI PIETRANTONI MUÑIZ LLC**

*/s/ Luis Marini*
Luis C. Marini-Biaggi
USDC No. 222301
250 Ponce de León Ave., Suite 900
San Juan, Puerto Rico 00918
Tel:  (787) 705-2171
Fax:  (787) 936-7494

*Co-counsel for the Puerto Rico Fiscal Agency
and Financial Advisory Authority*

**DÍAZ & VÁZQUEZ LAW FIRM, P.S.C**

*/s/ Katiuska Bolaños*
Katiuska Bolaños
USDC-PR No. 231812
290 Jesús T. Piñero Ave.
Oriental Tower, Suite 803
San Juan, PR 00918
Tel.:  (787) 395-7133
Fax:  (787) 497-9664

*Counsel for Puerto Rico Electric Power
Authority*

**O'MELVENY & MYERS LLP**

*/s/ Elizabeth L. McKeen*

John J. Rapisardi
Maria J. DiConza
7 Times Square
New York, New York 10036
Tel:  (212) 326-2000
Fax:  (212) 326-2061

-and-

Peter Friedman
1625 Eye Street, NW
Washington, D.C. 20006
Tel:  (202) 383-5300
Fax:  (202) 383-5414

-and-

Elizabeth L. McKeen
Ashley M. Pavel
610 Newport Center Drive, 17th Floor
Newport Beach, CA 92660
Tel:  (949) 823-6900
Fax:  (949) 823-6994

*Attorneys for the Puerto Rico Fiscal Agency
and Financial Advisory Authority and Puerto
Rico Electric Power Authority*

41

## <u>EXHIBIT A</u>

**Letter to Puerto Rico Legislature Dated April 6, 2021**



# FINANCIAL OVERSIGHT & MANAGEMENT BOARD
## FOR PUERTO RICO

Members
Andrew G. Biggs
Arthur J. González
Antonio L. Medina
John E. Nixon
Justin M. Peterson
Betty E. Rosa

Natalie A. Jaresko
Executive Director

David A. Skeel, Jr.
Chair

**BY ELECTRONIC MAIL**

April 6, 2021

The Honorable Pedro Pierluisi Urrutia
Governor of Puerto Rico

The Honorable José Luis Dalmau Santiago
President of the Senate of Puerto Rico

The Honorable Rafael Hernández Montañez
Speaker of the House of Representatives of Puerto Rico

Dear Governor Pierluisi Urrutia, Senate President Dalmau Santiago, and Speaker Hernández
Montañez:

We write with respect to Senate Bill 213 ("SB 213") and House Joint Resolution 88 ("HJR 88,"
and together with SB 213, the "Bills"), and our concerns regarding their financial impact,
inconsistency with the 2020 Fiscal Plans for the Commonwealth and PREPA (together, the "Fiscal
Plans"), and propensity to impair and defeat the purposes of PROMESA.

The Bills, as explained below, would interfere with efforts by the Government of Puerto Rico,
supported by the Oversight Board and required by the Fiscal Plans, to modernize and transform
PREPA's facilities and operations, including the Operation and Maintenance Agreement (the
"OMA") among PREPA, the P3 Authority, and LUMA Energy, LLC ("LUMA"). The Bills are,
therefore, inconsistent with the express terms of the Fiscal Plans and contrary to the purposes of
PROMESA. If enacted, the Bills would violate PROMESA, as well as the Contracts Clause of the
U.S. Constitution. As the Bills are currently pending before the Legislature, we offer our initial
analysis of the Bills and explain why their enactment would violate PROMESA section 108(a)(2).

Governor Pierluisi Urrutia
Senate President Dalmau Santiago
Speaker Hernández Montañez
April 6, 2021
Page 2 of 6

## SB 213

SB 213, among other things, would amend Law 83-1941[1] to impose a Legislative approval requirement for various PREPA actions, including creating subsidiaries, developing industrial projects, and conveying any PREPA property.

By requiring Legislative approval of the sale and disposition of the property of the debtor, among other covered actions,[2] SB 213 impermissibly conditions and interferes with the Oversight Board's authority under Bankruptcy Code section 1123(b) to include transfers of PREPA's property in a plan of adjustment under PROMESA. PROMESA section 315(b) states "[t]he Oversight Board in a case under this title is the representative of the debtor" and section 312(a) adds that *only* the Oversight Board "may file a plan of adjustment of the debts of the debtor." SB 213 would grant the Legislature veto power regarding certain determinations that fall squarely within the purview of the Oversight Board as PREPA's sole representative in its Title III case. Similarly, the Legislature's imposition of its own control over PREPA's property (including implementation of the OMA) violates the automatic stay, which bars acts to exercise control over the debtor's property pursuant to section 362(a) of the Bankruptcy Code, as incorporated by PROMESA section 301.

SB 213, if passed, would also be inconsistent with the Fiscal Plans. The Fiscal Plans for the Commonwealth and PREPA are intended to, among other things, eliminate structural deficits and enable the achievement of fiscal targets for the Commonwealth and PREPA. PROMESA sections

---

[1] Law 83-1941 is also known as the Puerto Rico Electric Power Authority Act.

[2] SB 213 purports to amend Section 5(u) of Law 83 of May 2, 1941, as amended, known as the Puerto Electric Power Authority Act, read as follows:

"With the prior approval of the Bureau *and the ratification of the Legislature, through Concurrent Resolution,* to create, either in Puerto Rico or in any other jurisdiction, or to contract with, companies, partnerships, or subsidiary corporations, for pecuniary or non-pecuniary purposes, affiliates or associates, for the purposes, among others, of:

    i.      splitting off and separating into one or more subsidiaries, the Authority's functions of generation, transmission, and distribution,

    ii.     participating in Public Private Partnerships according to Law 29-2009, as amended and Law 120-2018, as amended,

    iii.    developing, financing, building, and operating industrial and other infrastructure projects directly related to the maximization of the Authority's electrical infrastructure (to have a stable, state-of-the-art, sustainable, reliable and highly efficient electric system),

    iv.    acquiring, having, and disposing of securities and shares, contracts, bonds, or other interests in other companies, entities, or corporations, and exercising each and every one of the powers and rights that such interest grants, provided that, in the opinion of the Board, such endeavor is necessary, appropriate, or convenient to achieve the purposes of the Authority or to exercise its powers, and

    v.     selling, leasing, assigning, or otherwise transferring any property of the Authority or delegating or transferring any of its rights, powers, functions, or duties to any of said companies, entities, or corporations that are subject to its total or partial control, except for the right to initiate expropriation proceedings."

Governor Pierluisi Urrutia
Senate President Dalmau Santiago
Speaker Hernández Montañez
April 6, 2021
Page 3 of 6

201(b)(1)(D) and (G). The changes SB 213 would impose at PREPA would hinder the fulfillment of these requirements not only at PREPA, but also at the Commonwealth given the substantial impact that the cost of power supply has on Puerto Rico's economy.

SB 213 is also inconsistent with the requirements in the Fiscal Plans for a strong independent regulator and the depoliticization of PREPA.[3] Giving the Legislature authority to overturn the decision-making afforded to the professional and politically independent regulator – the Puerto Rico Energy Bureau ("PREB") – erodes and limits PREB's powers and independence, and subjects it to direct political oversight and influence. Such a result is directly contrary to the directives in the Fiscal Plans, including transforming PREPA into an effective, reliable, and affordable electric utility necessary for economic growth – that is free from direct political control.[4] The bill also appears aimed at hindering the break-up of PREPA's vertical monopoly and transition to separate and independent private operation of transmission and distribution ("T&D") and power generation, as well as the use of private-public partnerships ("P3s") to further reform the power sector, all as required by the Fiscal Plans.[5]

Further, if enacted, SB 213 would impair and defeat the purposes of PROMESA, as determined by the Oversight Board, and the Legislature and Governor are enjoined from enacting, implementing, and/or enforcing SB 213 (or any law premised on SB 213) pursuant to PROMESA section 108(a)(2). SB 213 impairs PREPA's and the Commonwealth's ability to transform Puerto Rico's electric system, a key component in achieving fiscal responsibility and access to capital markets. In addition, SB 213 is significantly inconsistent with the Fiscal Plans in that, among other things, it undermines the implementation of an existing contract (*i.e.*, the OMA) that was approved by the Oversight Board, impedes transformation of generation facilities, erodes an independent regulatory scheme for PREPA, and jeopardizes future private sector investment in PREPA and Puerto Rico generally by purporting to insert the Legislature into the already complex approval process of any future or current P3 contract. In so doing, SB 213 violates the Oversight Board's objectives, which are consistent with PROMESA, of making the territorial government a facilitator of, and not a competitor to, private enterprise and avoiding the creation of any additional bureaucratic obstacles to efficient contracting, including the politicization of the P3s process. PROMESA § 204(b)(3).

Finally, SB 213, if passed, would violate PROMESA section 108(a)(1), as it seeks to impose impermissible Legislative oversight, control, review and supervision over the Oversight Board's activities and decisions as they relate to PREPA and its assets.

## HJR 88

HJR 88 seeks to halt all efforts to implement the OMA, until January 15, 2022 to compel unilateral

---

[3] *See* 2020 Commonwealth Fiscal Plan at 138; 2020 PREPA Fiscal Plan at 13, 16, 30, 31, 36, 37.

[4] *See* 2020 Commonwealth Fiscal Plan at 134; 2020 PREPA Fiscal Plan at 37.

[5] *See* 2020 Commonwealth Fiscal Plan at 132-33; 2020 PREPA Fiscal Plan at 11.

Governor Pierluisi Urrutia
Senate President Dalmau Santiago
Speaker Hernández Montañez
April 6, 2021
Page 4 of 6

and fundamental amendments to the OMA that will eliminate key benefits of the OMA and impede
LUMA's performance, which in turn will provide LUMA with termination rights under the OMA.

If enacted, HJR 88 would run afoul of the United States Constitution, the Bankruptcy Code, and
PROMESA.  HJR 88 would interfere with and impair existing and lawful government contractual
obligations.  The Contracts Clause of the United States Constitution dictates a state (or territory)
cannot amend a contract unilaterally as "[n]o State shall … pass any … Law impairing the
Obligation of Contracts."  U.S. Const. art. I, § 10, cl. 1.  No applicable exception exists to justify
this proposed interference with the OMA.

HJR 88 would also violate the automatic stay under section 362(a)(3) of the Bankruptcy Code by
taking control of PREPA's property (*i.e.*, the OMA).  The OMA provides substantial benefits to
PREPA that represent an invaluable opportunity for the transformation of the T&D system and
depoliticization of the utility.  HJR 88 is a clear effort by the Legislature to seize control over
PREPA's rights under the OMA in a manner that would impair and substantially erode, if not
altogether eliminate, the OMA's value to PREPA and the Commonwealth.

HJR 88 would also violate various provisions of PROMESA.  First, HJR 88 would be significantly
inconsistent with the Fiscal Plans.   Similar to SB 213, the changes that HJR 88 would impose at
PREPA would interfere with the Commonwealth and PREPA eliminating their structural deficits
and achieving their respective fiscal targets.  PROMESA section 201(b)(1)(D) and (G).  HJR 88
would interfere with the OMA, which is critical to several PREPA and Commonwealth Fiscal Plan
objectives, such as improving operational efficiencies, improving service quality, and reducing
costs through better management and operational practices.[6]  As HJR 88 would necessarily impose
a delay in implementation which will add unnecessary costs and risk possible termination of the
OMA, it would forestall and likely defeat the Commonwealth's efforts to modernize the Island's
energy system as contemplated by the Fiscal Plans and further impair Puerto Rico's return to fiscal
stability.[7]  Moreover, the amendments called for in HJR 88 would effectively reestablish some
political control over the operation of the T&D system, the elimination of which is a primary policy
goal of the Oversight Board, as stated in the Fiscal Plans.[8]  The amendments would also require
that PREPA remain the employer of all T&D personnel, defeating the Fiscal Plans' goal of
improving PREPA's finances and financial stability going forward.[9]

HJR 88 would also violate PROMESA section 204(b), which authorizes the Oversight Board to
"establish policies to require prior Oversight Board approval of certain contracts … to ensure such
proposed contracts promote market competition and are not inconsistent with the approved Fiscal
Plan."  The FOMB Policy on the Review of Contracts ("Contracts Review Policy") requires prior
Oversight Board review of certain "contracts to determine whether they are consistent with the
applicable fiscal plan."  "All contracts or series of related contracts, inclusive of any amendments,

---

[6] *See* 2020 Commonwealth Fiscal Plan at 133-34; 2020 PREPA Fiscal Plan at 30-31.
[7] *Id.*
[8] *See* 2020 Commonwealth Fiscal Plan at 138; 2020 PREPA Fiscal Plan at 13, 16, 30, 31, 36, 37.
[9] *Id.*

Governor Pierluisi Urrutia
Senate President Dalmau Santiago
Speaker Hernández Montañez
April 6, 2021
Page 5 of 6

modifications, or extensions, with an aggregate expected value of $10 million or more, including any professional advisory or personal services contracts must be submitted to the FOMB for its approval before execution."  By purporting to empower the Legislature to amend an approved, executed contract, HJR 88 would impose a material amendment to a Board-approved contract with a face value of greater than $10 million without prior Oversight Board approval.

Finally, if enacted, HJR 88 would impair and defeat the purposes of PROMESA, as determined by the Oversight Board, and the Legislature and Governor are enjoined from enacting, implementing, and/or enforcing HJR 88 (or any law premised on HJR 88) pursuant to PROMESA section 108(a)(2).  Even if HJR 88 does not result in the termination of the OMA, it would reestablish political control over the utility and defeat a critical policy goal of PROMESA as determined by the Oversight Board in achieving independent, professional management of the utility.[10]  HJR 88 impairs PREPA's and the Commonwealth's ability to transform Puerto Rico's electric system, a key component in achieving fiscal responsibility and access to capital markets. HJR 88 is also significantly inconsistent with the Fiscal Plans in that, among other things, it would undermine the Fiscal Plans' goal of transforming the power sector in Puerto Rico through professional private management able to adopt industry best practices to provide the people of Puerto Rico an affordable, reliable, safe, and resilient electric power service by transforming Puerto Rico's energy system.[11]  HRJ 88 also seeks to defeat and impair PROMESA's purposes of promoting market competition, making government contracting more effective, increasing the public's confidence in the government contracting process, and making the Commonwealth Government a facilitator and not a competitor to private enterprise.  PROMESA § 204(b)(3).

\*       \*       \*

For the reasons set forth above, enactment and implementation of the Bills, as currently drafted, is barred by the Contracts Clause of the United States Constitution, Bankruptcy Code sections 362(a) and 1123(b), and PROMESA sections 108(a)(2), 204(a), 204(b), 312(a), and 315(b).  If enacted, the Bills would impair and defeat the purposes of PROMESA, as determined by the Oversight Board – for the reasons detailed in this letter – and the Legislature and Governor are enjoined from enacting, implementing, and/or enforcing the Bills.  If the Legislature and Governor nevertheless proceed with enacting the Bills into law, the Oversight Board will be prepared to seek judicial intervention to enforce section 108(a)(2)'s injunction and to seek nullification of the laws by the Title III court.

The Oversight Board urges the Legislature to reconsider SB 213 and HJR 88 in light of the gravely negative impact they would have on both PREPA and the Commonwealth.  The Oversight Board reserves all its rights including its rights under PROMESA sections 104(k), 108, 204, 312(a), and 315(b), its rights to remedies for intentional violations of section 108(a)(2), and its rights to pursue remedies for violations of the United States Constitution.  We hope vindication of those rights will be unnecessary.

---

[10] *Id.*
[11] *See* 2020 Commonwealth Fiscal Plan at 132; 2020 PREPA Fiscal Plan at 10.

Governor Pierluisi Urrutia
Senate President Dalmau Santiago
Speaker Hernández Montañez
April 6, 2021
Page 6 of 6


We look forward to continuing to work together for the benefit of the people of Puerto Rico.

Sincerely,

*Natalie A. Jaresko*

Natalie A. Jaresko

CC:     Mr. Omar Marrero Díaz

# **EXHIBIT B**

**Report of the President of the Council of Delegates:**
**United We Will Overcome – LUMA OUT**

*CERTIFIED TRANSLATION*                                      By: Olga M. Alicea, fcci, njitce-s



**UTIER REAFFIRMS ITS COMMITMENT TO FIGHT**

# UNITED WE WILL
# OVERCOME

# LUMA OUT

## REPORT OF THE PRESIDENT OF THE COUNCIL
## OF DELEGATES
## FEBRUARY 7, 2021
## HATILLO, PUERTO RICO

Good morning to all colleagues, delegates. First of all, at the beginning of a new year and a new decade, it is my greatest wish that we have health to face all of the challenges we have and thus be able to overcome them. Today, this Council will mark the history of our Union, which is about to celebrate 79 years of struggle and resistance. Precisely 79 years ago, men and women, facing all legal and political adversity, decided

*CERTIFIED TRANSLATION*                                    By: Olga M. Alicea, fcci, njitce-s

without fear and with firmness to create this instrument of transformation that is the UTIER. During decades, as a result of the struggles and resistance, we have managed to improve our quality of life by negotiating the different collective bargaining agreements.

Today, the government and the economic system intend to eliminate decades of struggles and conquests, and it is up to our generation, to us, to do everything necessary to defeat those intentions. Today I tell you that we are going to achieve it.

This document is a legal analysis performed by our attorneys at the Emmanuelli Law Firm. It is not intended to substitute legal procedures for union policies. On the contrary, it is our intention to make it perfectly clear to any interpretation the real consequences of the disastrous contract with Luma Energy. In the same way, this analysis already carried out is an informative complement to determine the actions and decisions that we have to make or without distraction from those who intend to confuse as lackeys of the employer and Luma Energy.

For this analysis, taken into consideration was the Constitution of Puerto Rico, Law No. 130 of May 8, 1945, known as the Puerto Rico Labor Relations Act; Law 120-2018, known as the Law to Transform the Puerto Rico Electric System; Law 8-2017, known as the Law for the Administration and Transformation of Human Resources in the Government of Puerto Rico; Law 4-2017, known as the Labor Transformation and Flexibility Act, and Law 29-2009, known as the Public-Private Partnerships Act; and the contract with LUMA Energy.

**1.      Laws and/or Regulations**

Article II, Section 17 of the Constitution of Puerto Rico provides that "workers in private companies, businesses, and employers and in government agencies or instrumentalities that function as private companies or businesses will have the right to organize and to bargain collectively with their employers through representatives of their own free choice to promote their well-being."  Article II, Section 7 also states that **"(no) laws will be enacted that undermine contractual obligations."**  Collective bargaining agreements are contractual obligations of high public interest protected by those constitutional clauses.

*CERTIFIED TRANSLATION* By: Olga M. Alicea, fcci, njitce-s

Law No. 130 of May 8, 1945, known as the Puerto Rico Labor Relations Act, provides in Article I. on Declaration of Public Policy that:

> The public policy of the Government of Puerto Rico, with regard to the relations between employers and employees and the execution of collective bargaining agreements, is as follows:
>
> (...)
>
> (2) **Industrial peace**, adequate wages and insurance for employees, as well as the uninterrupted production of articles and services, through **collective bargaining**, are essential factors for the economic development of Puerto Rico. The achievement of these purposes depends to a high degree on the relations between employers and employees being fair, friendly, and mutually satisfactory and that adequate means are available to peacefully resolve worker-employer disputes.
>
> 3) **Through collective bargaining, the terms and conditions of employment must be established.** For purposes of such negotiation, employers and employees will have the right to join organizations of their own choosing.
>
> (4) ...
>
> (5) **All collective bargaining agreements in force, and those made in the future**, are hereby declared instruments to promote the **public policy of the Government of Puerto Rico** in its effort to promote production to the maximum; and it is declared that as such they are **vested with a public interest**. The exercise of the rights and the fulfillment of the obligations of the parties in said collective bargaining agreements are, therefore, subject to that reasonable regulation that may be necessary to achieve the public norms of this subchapter. (Emphasis ours.)

Law 29-2009, the Public Private Partnerships Act, establishes the following regarding employees who are the subject of a transaction with a private contractor:

> Article 10. - Partnership Agreement. (27 L.P.R.A. § 2609)
>
> (g) Inapplicability of Prohibition of Employee Transfers. - In the case of a Participating Government Entity that during the fiscal year in which it executes a Partnership Agreement or any previous fiscal year has or has had an operational deficit or that is or has been in a fiscal situation that is or has been certified by the AAFAF as a precarious fiscal situation, this Participating Government Entity

*CERTIFIED TRANSLATION*                          By: Olga M. Alicea, fcci, njitce-s

will not be subject to, nor will it be valid or effective, any labor contractual clause that prohibits the transfer to a Contractor of any Function, Service, or Facility of said Participating Government Entity or the transfer of its employees who are assigned to said Functions, Services, or Facilities, and said clause will not prevent such transfers from being made as a result of the establishment of a Public Private Partnership. In the event that such prohibition exists and is set aside, the Authority **will demand of the Contracting Party hat, in the process of selecting the people who will work with the Contracting Party, the latter guarantee that it will gave priority to the employees of the Participating Government Entity who will be affected by the establishment of the Partnership** and that they will not be transferred to other positions in the Participating Government Entity or other Government agencies.   The aforementioned employees will be exempted from the restrictions for the actions of the former public servants included in the Government Ethics Act of Puerto Rico of 2011. The parties will implement a Transition Plan for Employees Displaced to other employment opportunities or retraining, the cost of which will be borne in equal parts among the Contracting Parties.

**Every public employee who is a participant** in the following Retirement Systems of the Government of Puerto Rico, Law No. 447 of May 15, 1951, as amended, Law No. 447 of May 15, 1951, as amended, Law 160-2013, known as the "Law of the Retirement System for Teachers of the Commonwealth of Puerto Rico," Law No. 12 of October 19, 1954, as amended, known as the "Retirement Law of the Judiciary," Law No. 1 of January 20, 1966, as amended, known as the "Law of the University of Puerto Rico," **the Retirement System of the Employees of the Electric Power Authority** approved by the Board of Directors of the Authority through the approval of Resolution 200 of June 25, 1945, **which has ten (10) years or more of accrued service and is part of a Partnership, will keep all rights acquired under said System and may continue making their Individual contribution to the Retirement System, and its new employer will make its employer contribution**. Provided, that it excludes the beneficiaries of Law 305-1999.

In the event that the new employer has its own Retirement System and the employee chooses to take advantage of it, he/she will be allowed to transfer the contributions in their entirety, without the employee having to pay taxes on the contributions transferred.

No system, meaning that of the University of Puerto Rico, the Electric Power Authority, the Teachers Retirement System, or of the Retirement Systems of the Employees of the Government and the Judiciary, may interfere with the faithful compliance of this Article. (Emphasis ours.)

On the other hand, Law 120-2018, which regulates PREPA's privatization process, provides the following in Section 15:

(...) The provisions of this chapter and any partnership or privatization contract carried out at PREPA in accordance with this chapter, **may not be used by the Government of Puerto Rico as grounds for the dismissal** of any employee with a regular position. The personnel that make up PREPA who choose to remain in the Government of Puerto Rico will be assigned in accordance with the statutes, regulations, and administrative norms applicable to them. Similarly, PREPA and the Government of Puerto Rico may design and offer transition plans or incentivized voluntary resignations.

All established regulations will faithfully comply with the provisions of Sec. 1471a of Title 3, known as the "Law for the Administration and Transformation of Human Resources in the Government of Puerto Rico." Likewise, the concept of mobility and the mechanism established by the Office of Administration and Transformation of the Human Resources of the Government of Puerto Rico (OATRH, *by its Spanish acronym*) to implement the movement of public employees, as established in Secs. 1469, *et seq.* of Title 3, will apply in PREPA in accordance with said sections. Regular PREPA employees who do not go to work for the contracting parties will retain their positions, or will be transferred to other positions within PREPA or other government entities.

Employees who as a result of this chapter are transferred under the concept of mobility to another government entity **will retain all of the rights acquired** in accordance with the laws, norms, **collective bargaining agreements,** and regulations that are applicable to

them, as well as the privileges, obligations, and status with respect to any existing system of pension, retirement, or savings and loan fund established by law, to which they were accepted prior to the enactment of this law and that are compatible with the provisions of Secs. 9461, *et seq.* of Title 3, known as "Compliance with the Fiscal Plan Act."  No regular PREPA employee will be unemployed **or lose benefits** as a result of PREPA's transactions. Subsections (f) and (g) of Sec. 2609 of Title 27 will govern the contracting parties in the management of public employees that is agreed will assume as stipulated in the contract. However, **the contracting parties who assume the employees must establish in the contract that the occupational classification, the criteria of seniority, salary, and fringe benefits will be equivalent to what those employees enjoyed before being assumed by the contracting party** as established in subsection (4)(j) of Sec. 1472d of Title 3. (Emphasis ours.)

However, the preceding paragraph was amended pursuant to Law 17-2019; known as the Puerto Rico Energy Public Policy Act.  To those ends, the text of the last paragraph of Section 15 of Law 120-2018, was set out as follows:

Employees who, as a result of this Law, are transferred under the concept of mobility to another government entity or who become employees of the Contracting Party(ies) of the PREPA Transactions, **will retain all vested rights** according to the laws, norms, **collective bargaining agreements,** and regulations that are applicable to them, as well as the privileges, obligations, and status with respect to any existing pension, retirement, or savings and loan fund system established by law, to which they were accepted before to the enactment of this Law and that are compatible with the provisions of Law 26-2017, known as the "Compliance with the Fiscal Plan Act."  No regular employee of PREPA will be left unemployed **or will lost benefits** as a result of PREPA's Transactions. (Emphasis ours.)

We see that after the amendment in 2019 to the aforementioned paragraph of Law 120-2018, **the requirement was eliminated that contractors that assume the employees must establish in the contract that the occupational classification and seniority criteria are equivalent to what those employees enjoyed prior to being assumed by the contractor**.

*CERTIFIED TRANSLATION*                                    By: Olga M. Alicea, fcci, njitce-s

Law 8 of 2017, in its Section 6.4, on Provisions on Promotions, Transfers, Demotions, and Mobility (3 L.P.R.A. § 1472d), provides that:

10. (I)n every Public Private Participatory Partnership (APP+P, *by its Spanish acronym*) contract, those government employees who are **transferred[1]** to the (APP+P) through the mobility mechanism, **will keep their salary and the fringe benefits they had at the time the mobility was produced, the (APP+P) being responsible for assuming the obligations corresponding to said personnel transaction;** this unless the employee and/or **the union that represents him/her** reach other agreements at the time of the mobility. If there is no agreement to the contrary, the public employee will become an employee of the (APP+P) for all legal purposes. **Provided, that Law 4-2017, known as the "Labor Transformation and Flexibility Act," will not be applicable to such employees, if they entered public service prior to the date of effectiveness of Law 4-2017**. (Emphasis ours.)

Law 4-2017, in its Article 1.2, provides that employees hired prior to the date of effectiveness of this Law **will continue to enjoy the same rights and benefits that they previously had**, as expressly provided in the Articles thereof.

Law No. 80 of May 30, 1976, as amended, known as the Compensation for Dismissal without Just Cause Act, provides that:

Article 8. Probationary (Period) (29 L.P.R.A. § 185h) Employees classified as executives, administrators, and professionals under the *Federal Labor Standards Act* and regulations of the Department of Labor and Human Resources will have an automatic probationary period of twelve (12) months. The rest of the workers who are employees will have an automatic probationary period of nine (9) months. However, the employer and employee may agree on a probationary period, if it is less than the automatic period provided in this Law.  In cases in which the employee is represented by a labor union, the applicable probationary period will be the one agreed upon between the employer and the union. The dismissal of a probationary employee will not be subject to the severance requirements established in this Law.

---

[1] Although the word "transferred" is not specifically defined in the law, the term "transfer" is indeed defined, which we understand as its equivalent.  Article 3 of Law 8-2017 defines the term "Transfer" as the "change of an employee from one position to another within the same class, or from one position to another whose functions are the same or similar and with a basic salary equal or similar to the position held at the time of transfer."  3 L.P.R.A. § 1469(b).

On its part, the contract between PREPA and LUMA Energy defines:

"System Contracts" means (i) the contracts, leases, licenses, permits, and other similar agreements of all kinds related to the T&D System that have been entered into by the Owner (or in accordance to which the Owner has rights) and they remain in force as of the Service Start Date and, (ii) any other contract, lease, license, permit, and similar arrangements of all kinds entered into by the Owner, or by the Operator on behalf and as agent of the Owner, related to the T&D System or the O&M Services in accordance with Section 4.3 (d) (Responsibilities of the owner and administrator: Additional System Contracts and Generation Supply Contracts between the effective date and the Service Start Date) and/or Section 5.2(d) (System Contracts: Additional System Contracts or System Contracts expired after the Service Start Date), including any contracts in connection with:

(A) the ownership, operation, and maintenance of the T&D System (including Interconnection and other related agreements);

(...)

To avoid doubts, the System Contracts **will not include** (x) any agreement between GenCo and a third party, Generation Supply Contracts, he PPOA of GridCo-GenCo, or **collective bargaining agreements with unions** or (y) any arrangement that has been considered system Contracts under clauses (i) or (ii) above, but that have been rejected by the owner in the case of Title III prior to withdrawal from Title III.  (Translation ours; Emphasis ours).

In addition, Section 4.2 of the contract with LUMA Energy establishes:

(j) Employment evaluations. As soon as reasonably possible after the Effective Date, but not less than ninety (90) days prior to the Service Start Date (the "Interview deadline"), ManagementCo will make commercially reasonable efforts to **interview and evaluate as candidates** for employment at ServCo (LUMA Energy) in effect as of the Service Start Date, **regular employees of the Owner and its Affiliates (other than generation employees of the Owner, including certain plant administrative and operations personnel)** who (i) are currently and continue being employees of the Owner and its Affiliates (other than the Owner or its employees of the Affiliate generating station) as of the

*CERTIFIED TRANSLATION*                                        By: Olga M. Alicea, fcci, njitce-s

Interview Deadline or are hired by the Owner or its Affiliates on or after the Effective Date in the normal course of business in accordance with the prior practices of the Owner and its Affiliates to replace any existing employee of the Owner, and (ii) **if applicable to ServCo in a job category that ServCo wishes to fill** (collectively, the "Proprietary Employees"). **To avoid doubts, neither ManagementCo nor ServCo will be liable for indemnities or other payments or benefits for proprietary Employees who are not hired by ServCo, including those to whom an employment offer is made but who do not accept such offer.** The Owner and its Affiliates will waive any non-compete, confidentiality, or other obligation arising from any employment contract between the Owner or Affiliate and any Proprietary Employee that may otherwise restrict any of the rights of the Proprietary Employee to be employed by ServCo. The Owner will provide to ManagementCo the following information with respect to the Proprietary Employees immediately upon request: (x) job description for the current and former positions held by such Proprietary Employee, (y) date of employment, and (z) current salary. (Translation ours.) (Emphasis ours.)

## II.   Analysis

The Public Private Partnerships Act establishes that the Public Private Partnerships Authority ("PPA") will require the Employer to guarantee that, in the process of selecting the people who will work with it, it will give priority to the workers of the Participating Government Entity who will be affected by the establishment of the Partnership and who will not be transferred to other positions in the Participating Government Entity or other Government agencies. However, according to the contract with Luma Energy, this obligation to hire all of the workers who currently work at PREPA does not exist. The only obligation that Luma Energy recognizes is to "interview them with priority," but without the obligation to hire them. We can see that interviewing with priority is not the same as hiring with priority. If the worker is not hired and for some reason he/she loses his job, Luma Energy will not pay the Compensation that corresponds in accordance with Law 80 or other applicable ones.

**It is clear that the workers who are interested in working with Luma Energy will have to apply for employment according to the conditions that it imposes, including the occupational classification that it provides and without having to respect their seniority.** Let us remember that Law 17-2019 amended Law 120-20l8 to,

*CERTIFIED TRANSLATION*                                    By: Olga M. Alicea, fcci, njitce-s

among other things, eliminate the requirement that the contractor guarantee occupational classification and seniority. In accordance with the provisions of the LUMA Energy contract, workers are not transferred as established by Law 8-2017, since the contract establishes that its obligation is to interview them and there are no guarantees that they will be hired.  Nor does Law 120-2018 establish the process of how the transfer of workers will be done or the LUMA Energy contract. **That is why LUMA Energy has stated that for a worker to be hired by it, they must resign their position at PREPA.  For this reason, a worker hired by LUMA Energy would be under a new contract and can be hired with a probationary period based on Law 80, as amended by Law 4.  Law 80 establishes probationary periods of up to 12 months, in the case of management employees, and 9 months for the other workers, who during said period may be laid off without the right to any compensation.**

According to the monthly report published by LUMA Energy,[2] as at December 24, 2020, its Human Resources Division had carried out the initial evaluation of the applications submitted, the **selection of interviews** with PREPA workers, and the commencement of the interviews with possible administrators. As a "concern" they note that "the desire to provide PREPA employees with a complete picture of employment options and pension information has not materialized."  In the report of January 15, 2021, they note that "(their) focus at this time remains to **process and interview** PREPA applicants first" and, as in their previous reports, they again state that "the desire to provide PREPA employees with a complete picture of employment options and pension information has not materialized."

On its part, Law 120-2018 provides that any partnership or privatization contract that is carried out in at PREPA cannot be used by the Government of Puerto Rico as grounds for the dismissal of any employee with a regular position and that regular PREPA employees who do not go to work for the contracting parties will retain their positions, or will be transferred to other positions within PREPA or other government

---

[2] In Re: LUMA Monthly Status Reports for Front-End Transition Services, https://energia.pr.gov/en/dockets=nepr-mi2020-0008.

entities. However, it establishes that PREPA and the Government of Puerto Rico may design and offer transition plans or incentivized voluntary resignations.

**What happens if there are not enough positions to retain them within PREPA and to guarantee the transfer to other government entities?** The precarious economic situation of the Country and of the Government is well known to all. With certain agency budgets committed to capacity, with a permanent freeze on positions ordered by the Fiscal Oversight Board and that also depend on compliance with the fiscal plan that it authorizes, it would be very difficult for a large percentage of PREPA employees to relocate, especially when LUMA Energy does not guarantee that they will be hired, but will only give them priority in the interview process. This in the long term would leave the PREPA employees at the mercy of "incentivized" retirement plans, which do not at all benefit employees who have dedicated their lives to public service. In fact, the Governor of Puerto Rico, Pedro Pierluisi, expressed in his last meeting with the UTIER leadership that the government cannot support two employee payrolls, referring to the employees who remain at PREPA and those who are hired by LUMA Energy. But in the same way, it was reaffirmed that no workers will be dismissed.

On the other hand, Law 120-2018 establishes that no regular PREPA worker will be unemployed **or lose benefits** as a result of the PREPA Transactions. It also provides that all employees who are transferred under the concept of mobility to another government entity (or become employees of LUMA Energy}, **will retain all vested rights** in accordance with the laws, norms, **collective bargaining agreements**, and regulations that are applicable to them.  An analogous provision is found in Law 8-2017, which establishes that "all employees of the Government who are transferred to the (APP+P) through' the mobility mechanism, will keep the **salary and fringe benefits that they had at the time of the mobility**, the (APP+P) being responsible for **assuming the obligations** corresponding to said personnel transaction.

However, the LUMA Energy contract establishes in its definitions that the system contracts will not include **collective bargaining agreements with unions. This is in clear contravention of the provisions of the Law and of the Public Policy of the Government of Puerto Rico.**  It is clear that all rights, prerogatives, and fringe benefits emanate from the collective bargaining agreement. Therefore, the fact that LUMA

Energy has repudiated the agreements in the contract leaves truncated rights such as seniority, occupational classification, and union representation in the negotiation processes with the employer and those of complaints and grievances. **All of these are fundamental rights that can only be protected with the validity of the collective bargaining agreements. Without this protection, what is established by Law 120 is totally ineffective.**

Finally, regarding the Retirement System, Law 120-2018 provides that all employees must retain the privileges, obligations, and status with respect to any existing pension, retirement, or savings and loan fund system established by law, to which they were parties prior to the enactment of this Law and that are compatible with the provisions of Law 26-2017, known as the "Compliance with the Fiscal Plan Act." On its part, the Public-Private Partnerships Act provides that: any employee who has ten (10) years or more of accrued services and is part of a Partnership (must) retain all rights vested in said System and may continue to make their individual contribution to the Retirement System, just as their new employer will make its employer contribution. Therefore, those who may move their contributions will be those who have more than 10 years of service. In the case in which the new employer has its own Retirement System and the employee **chooses to avail himself of it**, it will allow (the employees with more than 10 years of service) to transfer the contributions in their entirety, without the employee having to pay taxes for the transferred contributions. In any event, LUMA Energy is offering a 401K retirement plan to anyone who starts working with them. **A 401K plan is a defined contribution plan that does not guarantee any level of benefit at the time of retirement**, as is the case with the Electric Power Authority's Employee Retirement System. Therefore, the provisions of the contract on the Retirement System would only protect people who have been working at PREPA for more than 10 years forcing the other employees to avail themselves of the LUMA Energy 40lK plan.

However, there is an element in the contract with Luma Energy that defeats or limits what the employer's contribution to the Retirement System will be and it is that Luma Energy does not recognize any debt with the PREPA Employees Retirement System itself. In order for us to be able to understand the impact as to what the

employer contribution of Luma Energy would actually be, I proceed to explain the following to you. For the employer's contribution, the amount on the actuarial debt and the impact that any current debt has is primarily calculated. At this time the actuarial debt is estimated at about 2,800 million and the current debt at about 544 million. Based on these criteria is how the percentage of the employer's contribution is projected and calculated. At this time that employer contribution is at 103%. Now then, if the contract establishes that no debt is recognized with the Retirement System, that means that the actuarial debt and the current debt will not be part of the calculation of the employer's contribution by Luma Energy. What would be the impact?  That more than 80% of the calculation of 103% of the employer's contribution corresponds to the concept of debt that we have explained and according to the contract, Luma Energy is not obligated to comply which could force the worker to have to contribute that difference plus the individual contribution. That is totally unreal for any worker.

According to the Trust Agreement, the document that PREPA's relations with the bondholders, it is assumed that before paying the bondholders, the operating obligations and contributions to the Retirement System are paid.  At present, PREPA is not complying with this responsibility alleging cash flow problems and it owes more than $544 million. The agreement with LUMA Energy does not recognize these obligations and to the extent that it represents a risk that PREPA's workforce will be substantially reduced, the contributions of the employees participating in the Retirement System will also be reduced, increasing the actuarial deficit of the retirement trust, so it will accelerate its deterioration and total insolvency. This will have the impact of leaving without pensions those employees who choose to remain under the protections of the PREPA Employees Retirement System.

## III.   Conclusion

Our country's legal framework is designed for the protection of the workers' rights.  The Constitution of Puerto Rico guarantees the right to collective bargaining and provides for the non-enacting of laws that undermine contractual obligations, as are collective bargaining agreements.  Furthermore, the protection of collective bargaining agreements is part of the government's public policy to maintain labor peace in accordance with Law 130-1945.    Consonant with these protections, collective

bargaining agreements have been recognized by Law 120-2018 and Law 8-2017, so that the signing of the contract with LUMA Energy is contrary to these legal protections and is, therefore, void, and continues putting at risk the vested rights of PREPA's workers.

On the other hand, the contract allows that instead of a transfer of workers from PREPA to LUMA, carrying with them all of the employee's rights as required by Law 120-2018, the only thing that is granted is a job interview. LUMA Energy has the absolute right to reject candidates it wants without this representing a responsibility on the part of this company.

The risk that the PREPA workers run if they decide to go to work with LUMA Energy, according to the parameters established by the latter, is certainly greater than the benefits that they can offer them. This, since a worker who decides to work with LUMA Energy must go through a competitive interview process; if chosen, they must resign from PREPA and, thus, from the protection of their collective bargaining agreement; this will eliminate their possibility of transfer or opportunity for relocation in another government instrumentality; occupational classification and seniority criteria will not be recognized; and, they will start as a new employee, subject to the labor reform with probationary periods of 9-12 months where they can be fired at any time. The importance of LUMA Energy not recognizing the seniority of an employee affects the possible compensation that an employee can receive in the event of wrongful termination. Since they will start working with LUMA Energy without any seniority. In other words, an employee who has dedicated 5, 10, 15, or 20 years to service at PREPA will not be compensated according to their years of service in the event of an unjustified dismissal. On the other hand, a newly hired employee who passes the probationary period will be subject to the indemnity calculations introduced by Law 4-2017, which, among other things, limits the amount of the indemnity to a maximum of nine (9) months' salary, regardless of the years of service. Another problem with not recognizing the occupational classification is that the employee could be hired for duties other than those they had as an employee of PREPA.

For LUMA Energy to be able to operate depends on the minimum number of workers necessary for the operation of the electric system. The conditions established

by the laws and the contract do not protect the rights of the employees according to the collective bargaining agreements.  Therefore, the fact that the employees resign from PREPA and apply for employment with LUMA Energy is a monumental error that will destroy the rights that have been obtained by UTIER during long years of union struggle.

I end with the situation of our Generating Plants, which are no less important because we have taken it at the end of the report. The contract with Luma Energy is the legal framework of reference for any contract that is intended to be imposed in a PPA at our plants; therefore, the fight belongs to everyone. We cannot fall into the saying that since it is not me I do not join the fight.

**IV. Actions and Work Plan**

From the legal actions a case is submitted before the consideration of the Supreme Court pending the acceptance of the Certiorari. This case is about the certification issued by the Energy Commission on the contract. In addition, we are ready for other legal actions that as part of the strategy we cannot advance.

The legislative bodies have also been able to pass two investigative resolutions regarding the contract with Luma Energy. In the House of Representatives, H.B. 136 and in the Senate, S.B. 01. We are working on the documents and position papers that, if summoned, we will be submitting together with the Alliance of Active and Retired Employees of PREPA.  In addition, we are meeting with the mayors to get them to reject the contract with Luma Energy, which has been very positive.  And we have prepared a resolution to be submitted to their municipal assemblies in that direction.

Also, as many of you have already seen, we are very active in discussions on social media and on communication which has led to a very serious and important discussion with our people.

Now then, we have to reinforce with something that can never be replaced by what we have indicated in the preceding paragraphs, and that is **FIGHT** and **MOBILIZATIONS**.

To meet these objectives, the State Council unanimously approved convening this Council of Delegates in an extraordinary manner for those purposes.

*CERTIFIED TRANSLATION*                                    By: Olga M. Alicea, fcci, njitce-s

l.   That it be reaffirmed by this Council of Delegates to use all of the economic, legal, and other resources for the actions and determinations that the State Council so determines to finally defeat Luma Energy.

2.   That it be reaffirmed that the workers of the UTIER not apply for employment at Luma Energy based on all of the risks and the non-recognition of the previously established agreement. To fulfill this purpose we will start a campaign for each worker to reaffirm their commitment to the UTIER and the defense of the Collective Bargaining Agreement by filling out a form to those ends.

3.   The instructions not to cooperate with or access the processes that Luma Energy attempts to carry out in our work centers are maintained.

4.   The active participation of the delegates in all OF the activities convened by the organizations in solidarity with this fight against Luma Energy and others commencing on February 10 and the caravan on February 28, 2021.

5.   That a General Assembly be convened taking into account the entire pandemic situation and compliance for the discussion and approval of a strike vote to be implemented by the State Council if necessary.


(Signed)
**ANGEL R.FIGUEROA JARAMILLO**
President
UTIER State Council

*CERTIFIED TRANSLATION*                                    By: Olga M. Alicea, fcci, njitce-s

MUNICIPAL LEGISLATURE
GOVERNMENT OF PUERTO RICO
MUNICIPALITY OF _____

**Resolution No. _____**                                    **SERIES: 2021-**

**TO JOINT AS MUNICIPAL LEGISLATURE OF _____ THE EXPRESSIONS VOICED BY THE HONORABLE MAYOR _____ OF OUR CITY OF _____, REGARDING HIS STRENUOUS REPUDIATION OF THE CONRACT GRANED TO LUMA ENERGY LLC AND LUMA ENERGY SERVICIO,LLC, FOR THE PRIVATIZATION OF THE ELECTRIC POWER AUTHORITY AND ADMINISTRATION OF THE PUBLIC CORPORATION FOR A PERIOD OF FIFTEEN (15) YEARS, AND IN SUPPORT OF S.B. 1 THAT [sic] AND H.B. 136 THAT ORDER A COMPREHENSIVE INVESTIGATION OF SAID CONTRACT.**

**WHEREAS:**        The Puerto Rico Municipal Code, Law No.107 of August 14, 2020, establishes that one of the purposes of the creation of municipal governments is to guarantee the essential services to the inhabitants of the municipality.

**WHEREAS:**        The Puerto Rico Electric Power Authority ("PREPA") is a public corporation, property of the People of Puerto Rico, created through Law No. 83 of May 2, 1941.

**WHEREAS:**        Since its creation, call at its inception as the Water Resources Authority, PREPA was and has been an essential factor in the transformation of Puerto Rico from a fundamentally agricultural economy to an industrial one.  Its ownership in the hands of the People of Puerto Rico has allows Puerto Ricans to enjoy the resource of electric energy without distinction of social class, economic capacity, or location of their houses and businesses, thereby allowing universal access to this essential service.

**WHEREFORE:**    The workers who work for this public company, with their efforts and dedication to service of the People of Puerto Rico, in some cases even [sic]

Attachment 1

**CERTIFICATION**

I, Olga M. Alicea, an English-Spanish Interpreter and Translator certified to that effect by the Administrative Office of the U.S. Courts and by the National Association of Judiciary Interpreters & Translators (NAJIT), do hereby certify that I have personally translated the foregoing document from Spanish to English and that the translation is true and accurate to the best of my knowledge and abilities.

**S/  Olga M. Alicea**                                           **April 20, 2021**
Olga M. Alicea, FCCI, NJITCE-S                                           Date
Fed. Cert. No. 98-005                                    Ref.: P1700.021 (RML)