```
 1                    UNITED STATES DISTRICT COURT

 2                     DISTRICT OF PUERTO RICO

 3
     In Re:                    )      Docket No. 3:17-BK-3283(LTS)
 4                             )
                               )      PROMESA Title III
 5   The Financial Oversight and )
     Management Board for       )
 6   Puerto Rico,              )      (Jointly Administered)
                               )
 7   as representative of      )
                               )
 8   The Commonwealth of       )
     Puerto Rico, et al.       )      April 28, 2021
 9                             )
              Debtors,         )
10

11   _____

12   In Re:                    )      Docket No. 3:17-BK-4780(LTS)
                               )
13                             )      PROMESA Title III
     The Financial Oversight and )
14   Management Board for       )
     Puerto Rico,              )      (Jointly Administered)
15                             )
     as representative of      )
16                             )
     The Puerto Rico Electric  )
17   Power Authority,          )
                               )
18            Debtors,         )

19   _____

20

21

22

23

24

25
```

```
 1  _____
 2
 3  Autoridad de Energia      )  Docket No. 3:20-AP-00453(LTS)
    Electrica de Puerto Rico, )
 4                            )      in 3:17-BK-3283(LTS)
                              )
 5              Plaintiff,    )
                              )
 6  v.                        )
                              )
 7  Vitol Inc. and            )
    Vitol S.A., et al.,       )
 8                            )
                              )
 9                            )
                Defendants.   )
10  _____
11
    The Financial Oversight and )  Docket No. 3:20-AP-00003(LTS)
12  Management Board for         )
    Puerto Rico,                 )      in 3:17-BK-3283(LTS)
13                               )
                Plaintiff,       )
14                               )
    v.                           )
15                               )
    Ambac Assurance              )
16  Corporation, et al.,         )
                                 )
17                               )
                                 )
18              Defendants.      )

19  _____
20
21
22
23
24
25
```

```
_____

The Financial Oversight and )  Docket No. 3:20-AP-00004(LTS)
Management Board for         )
Puerto Rico,                 )      in 3:17-BK-3283(LTS)
                             )
              Plaintiff,     )
                             )
v.                           )
                             )
Ambac Assurance              )
Corporation, et al.,         )
                             )
                             )
              Defendants.    )
_____

The Financial Oversight and )  Docket No. 3:20-AP-00005(LTS)
Management Board for         )
Puerto Rico,                 )      in 3:17-BK-3283(LTS)
                             )
              Plaintiff,     )
                             )
v.                           )
                             )
Ambac Assurance              )
Corporation, et al.,         )
                             )
                             )
              Defendants.    )
_____
```

```
 1
     _____
 2
 3   Rafael Hernandez Montanez   )   Docket No. 3:20-AP-00042(LTS)
                                 )
 4                               )       in 3:17-BK-3283(LTS)
                    Plaintiff,   )
 5                               )
     v.                          )
 6                               )
     Pedro Pierluisi Urrutia,    )
 7   et al.,                     )
                                 )
 8                               )
                    Defendants.  )
 9
     _____
10
11                         OMNIBUS HEARING
12     BEFORE THE HONORABLE U.S. DISTRICT JUDGE LAURA TAYLOR SWAIN
13                  UNITED STATES DISTRICT COURT JUDGE
14       AND THE HONORABLE U.S. MAGISTRATE JUDGE JUDITH GAIL DEIN
15                  UNITED STATES DISTRICT COURT JUDGE
16   _____
17
     APPEARANCES:
18
     ALL PARTIES APPEARING TELEPHONICALLY
19
     For The Commonwealth
20   of Puerto Rico, et al.:  Mr. Martin J. Bienenstock, PHV
                              Mr. Brian S. Rosen, PHV
21                            Mr. Paul Possinger, PHV
                              Mr. Michael Firestein, PHV
22                            Ms. Margaret Dale, PHV
                              Mr. Elliot Stevens, PHV
23                            Ms. Laura Stafford, PHV
24
25
```

```
1     APPEARANCES, Continued:
2
3     For Puerto Rico Fiscal
      Agency and Financial
4     Advisory Authority:        Mr. Luis C. Marini Biaggi, Esq.
                                 Mr. Peter Friedman, PHV
5
      For The Official
6     Committee of Unsecured
      Creditors of all
7     Title III Debtors:         Mr. Luc A. Despins, PHV
                                 Mr. Nicholas A. Bassett, PHV
8
      For The Official
9     Committee of Retired
      Employees:                 Ms. Melissa Root, PHV
10                               Mr. Landon Raiford, PHV
11    For Vitol, Inc., and
      Vitol S.A.:                Mr. Alexander L. Kaplan, PHV
12
      For M Solar and
13    YFN Yabucoa:               Mr. Fernando E. Agrait, Esq.
14    For Peter Hein:            Mr. Peter Hein, Pro Se
15    For AmeriNational
      Community Services:        Mr. Nayuan Zouairaban, Esq.
16
      For UTIER and SREAEE:      Ms. Jessica Mendez Colberg, Esq.
17
      For Cantor-Katz
18    Collateral Monitor:        Mr. Peter Amend, PHV
19    For Assured:               Mr. William J. Natbony, PHV
20    For Financial Guaranty
      Insurance Company:         Mr. Martin A. Sosland, PHV
21
      For Ambac Assurance
22    Corporation:               Ms. Atara Miller, PHV
23
24
25
```

```
1
     APPEARANCES, Continued:
2

3    For National Public
     Finance Guarantee
4    Corporation:             Mr. Robert Berezin, PHV

5    For Whitefish Energy
     Holdings:                Ms. Carmen Conde Torres, Esq.
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24   Proceedings recorded by stenography.  Transcript produced by
     CAT.
25
```

```
 1                              I N D E X

 2   WITNESSES:                                          PAGE

 3           None.

 4

 5   EXHIBITS:

 6           None.

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1              San Juan, Puerto Rico

2              April 28, 2021

3              At or about 9:29 AM

4                   *    *    *

5      THE COURT:  Good morning.  This is Judge Swain

6  speaking.

7          MS. NG:  Good morning, Your Honor.  This is Lisa Ng,

8  your courtroom deputy for the Southern District.  Everyone is

9  here.

10         THE COURT:  Thank you very much.

11         Ms. Tacoronte, would you please call the case?

12         COURTROOM DEPUTY:  Good morning, Your Honor.

13         The United States District Court for the District of

14  Puerto Rico is now in session.  The Honorable Laura Taylor

15  Swain presiding.  Also present, the Honorable Magistrate Judge

16  Judith Dein.  God save the United States of America and this

17  Honorable Court.

18         Case No. 2017-BR-3283, *In re:  The Financial*

19  *Oversight and Management Board for Puerto Rico, as*

20  *representative of the Commonwealth of Puerto Rico, et al.*, for

21  Omnibus Hearing.

22         THE COURT:  Thank you, Ms. Tacoronte.

23         And buenos dias.  Good morning.  Welcome, counsel,

24  parties in interest, and members of the public and press.

25  Today's telephonic Omnibus Hearing is occurring in what

1  continue to be challenging times for all stakeholders in these

2  cases, including the people of Puerto Rico.

3      To ensure the orderly operation of today's telephonic

4  hearing, all parties on the line must mute their phones when

5  they are not speaking.  If you are accessing these proceedings

6  on a computer, please be sure to select "mute" on both the

7  Court Solutions dashboard and on your phone.  When you need to

8  speak, you must unmute on both the dashboard and the phone.

9      I remind everyone that consistent with court and

10  judicial conference policies and the orders that have been

11  issued, no recording or retransmission of the hearing is

12  permitted by any person, including but not limited to the

13  parties, members of the public, or the press.  Violations of

14  this rule may be punished with sanctions.

15      I will be calling on each speaker during the

16  proceedings.  When I do, please identify yourself by name for

17  clarity of the record.  After the speakers listed on the

18  Agenda for each of today's matters have spoken, I may provide

19  an opportunity for other parties in interest to address

20  briefly any issues raised during the course of the

21  presentations that require further remarks.

22      If you wish to be heard under these circumstances,

23  please state your name clearly at the appropriate time.  Don't

24  just use the wave feature on the Court Solutions dashboard.  I

25  will call on the speakers if more than one person wishes to be

1  heard.

2          Please don't interrupt each other or me during the

3  hearing.  If we interrupt each other, it is difficult to

4  create an accurate transcript.  But having said that, I

5  apologize in advance for breaking this rule, as I may

6  interrupt if I have questions or if you go beyond your

7  allotted time.  If anyone has difficulty hearing me or another

8  participant, please say something immediately.

9          The Agenda, which was filed as docket entry no. 16615

10 in case no. 17-3283 is available to the public at no cost on

11 Prime Clerk for those who are interested.  I encourage each

12 speaker to keep track of his or her own time.  The Court will

13 also be keeping track of the time and will alert each speaker

14 when there are two minutes remaining with one buzz, and when

15 time is up, with two buzzes.  Here is an example of the buzz

16 sound.

17          (Sound played.)

18          THE COURT:  If your allocation is two minutes or

19 less, you will just hear the final buzzes.

20          If we need to take a break, I will direct everyone to

21 disconnect and dial back in at a specified time.  Our timing

22 today is, for this morning's session, which will end at 11:45

23 AM, and then an afternoon session beginning at 2:15 PM and

24 going until 5:00 PM.  We will then resume as necessary

25 tomorrow morning, beginning at 9:30 AM.  All of these times

1    are in Atlantic Standard Time.

2        As usual, the first Agenda item is status reports

3    from the Oversight Board and AAFAF.  As I requested in the

4    Procedures Order, these reports have been made in writing in

5    advance of this telephonic hearing and are available on the

6    public docket at docket entry nos. 16614 and 16616 in Case No.

7    17-3283.  I thank the Oversight Board and AAFAF for the care

8    and detail reflected in their comprehensive reports.  I do not

9    have further questions for the parties in connection with

10   these reports.

11       I first call on the representative of the Oversight

12   Board to ask whether they wish to make any further remarks.

13       MR. BIENENSTOCK:   Thank you.  Thank you, Your Honor.

14   This is Martin Bienenstock of Proskauer Rose, LLP, for the

15   Oversight Board.

16       No, we don't have any additions to our report.

17       THE COURT:  Thank you, Mr. Bienenstock.

18       And Mr. Marini of AAFAF?

19       MR. MARINI BIAGGI:  Good morning, Your Honor.  This

20   is Luis Marini for AAFAF.

21       We don't have anything else to add as well, Your

22   Honor.

23       THE COURT:  Thank you, Mr. Marini.

24       Do any other counsel who are on the line wish to make

25   any comment or question in response to the reports?  I will

1   wait 30 seconds, and if you wish to make a comment, state your

2   name clearly and then I will call on you.

3          And remember, if you want to be heard, you have to

4   unmute your phone and unmute your dashboard.

5          (No response.)

6          THE COURT:  Very well.  There are no further

7   comments, and so we can turn to Section II of the Agenda, the

8   contested matters.

9          Before I ask counsel to begin presenting on the

10  contested matters in Section II of the Agenda, I have some

11  preliminary remarks concerning certain of the motions so that

12  everyone involved can begin to think about issues that are at

13  the top of my mind and orient their arguments accordingly.

14  And these remarks are not necessarily in the order in which

15  the contested matters will come up, and so I'll just be clear

16  about what I'm referring to.

17         So, first, with respect to the Motion to Schedule the

18  Disclosure Statement Hearing and Implement Related Deadlines

19  and Relief, I am inclined to agree with certain of the parties

20  that the Oversight Board's proposed notice period for

21  objections to the Disclosure Statement is too short.  Instead,

22  the notice period should comply with the 28-day requirement of

23  Rule 2002(b).

24         While certain parties have had prior notice of and

25  taken the opportunity to study some of the content of the

1    proposed Disclosure Statement, there are potentially many

2    interested parties who have not been living and breathing

3    these issues for months or years, and the Disclosure Statement

4    and associated exhibits are lengthy and complex.

5         Accordingly, my intention, after careful review of

6    the pleadings and subject to the arguments presented today is

7    to set the objection deadline such that parties receive 28

8    days notice of the objection deadline after the Disclosure

9    Statement approval motion is filed.

10        The Oversight Board's reply would be due two weeks

11   later, and the hearing would be held on Tuesday, June 29th,

12   2021, if the motion is filed promptly and we can adhere to the

13   timetable that I have outlined.

14        As to the provisions of docket entry no. 16507, which

15   is the proposed order and exhibits, from the provisions

16   concerning the Disclosure Statement depository, I am inclined

17   to strike paragraph number seven, which is titled, No Warranty

18   of Accuracy, as I see no basis to prejudge the intentions of

19   the "Producing Parties."

20        If I am misunderstanding the import of that paragraph

21   and the Oversight Board's goal is to say that the documents in

22   the Disclosure Statement depository are authentic, but that

23   the Producing Parties are not warranting suitability or

24   accuracy of the documents or information for purposes other

25   than objecting to the Disclosure Statement, then the Board may

1   propose alternative language for consideration.  And I also

2   note that the term "Producing Parties" does not appear to be

3   defined anywhere in the motion papers order or exhibits to

4   that order.

5          With respect to the proposed notice, the Court shares

6   some of the concerns raised by certain objecting parties about

7   the burden of serving the long list of parties on Exhibit B-1

8   to the Amended Proposed Order.  Section 2.I and 2.K of the

9   Case Management Order ordinarily allow parties to serve most

10  parties via CM/ECF electronic notification with the exception

11  of the U.S. Trustee.  So to the extent there's a reason to

12  depart from that practice here, the Oversight Board should

13  explain in its remarks what that reason is.  Otherwise, the

14  Court would expect that we would follow the CMO practice for

15  giving notice.

16         Finally, with respect to the Disclosure Statement

17  scheduling motion, in order to enable the Court to plan

18  appropriately for speakers at the telephonic hearing on the

19  Disclosure Statement, and to help to ensure that any oral

20  remarks at that hearing are pertinent, the Court proposes to

21  add a provision to the notice stating that only those

22  objectors who file timely objections will be entitled to make

23  oral remarks at the hearing.

24         So those are my preliminary remarks regarding the

25  Disclosure Statement scheduling motion.  I now turn to the

1   Motion to Lift the Stay applicable to the revenue bond

2   adversary proceedings.

3        I'm inclined to deny both the Oversight Board's

4   motion and the UCC's cross-motion.  The 2020 summary judgment

5   motion practice is still pending, and issues within that

6   motion practice are closely intertwined with additional issues

7   that the Oversight Board and the UCC have now asked to

8   litigate.

9        The rationale for prioritizing resolution of the

10  so-called gateway issues before others is substantially

11  unchanged from the rationale underlying the imposition of the

12  litigation stay in connection with the March 2020 Omnibus

13  Hearing.  And, critically, at least at this point and subject

14  to oral argument, the Court does not believe that the

15  Oversight Board's briefs have provided a compelling

16  explanation as to why granting this motion is material to the

17  Board's ability to propose and confirm a plan of adjustment.

18  And without a clear picture of that rationale, it seems to me

19  that the Oversight Board's request can't overcome the clear,

20  practical issues that weigh against granting the motion.

21       First, the briefing of the issues in the new summary

22  judgment motion practice would have to assume outcomes to

23  issues that are still pending in the 2020 motion practice.

24  Not only will that require parties to inefficiently repeat

25  arguments they've laid out before, but the parties will be

1   arguing from incompatible foundational assumptions that will

2   necessarily be affected once the Court is in a position to

3   resolve the 2020 summary judgment disputes.  And that

4   resolution may moot entire disputes or result in the need for

5   even more briefing in light of shifting legal landscapes.

6        Second, the Court's resources are finite, and the

7   Oversight Board has asked for the Disclosure Statement and

8   plan confirmation process to continue in a swift manner.

9   Additional substantial summary judgment motion practice

10  addressing more than a dozen legal theories across three

11  adversary proceedings, in combination with the many other

12  matters currently pending or soon to be pending, is not

13  compatible with a substantial Disclosure Statement hearing in

14  the early summer and the proposed Plan confirmation hearing in

15  the fall.

16       So when these motions are called for oral argument,

17  the proponents should focus their arguments.  If they wish to

18  continue to press this lifting of the litigation stay motion

19  practice, they should focus on making clear to me why they

20  believe it makes sense to move on with additional summary

21  judgment motions in light of my perception of the

22  circumstances as I've just outlined them.

23       And, finally, with respect to the Vitol and PREPA

24  motions for summary judgment, the Court has read all the

25  briefs, and, at this point, perceives the key issues to be, in

1   this order, first, whether the VIC was ever an alter ego of

2   VSA; second, whether VSA's conviction falls outside the scope

3   of Law 458; third, whether and to what extent Law 458 applies;

4   and fourth, whether any of the fuel contracts are void for

5   deceit.

6           Accordingly, the Court invites the parties to focus

7   their arguments on those issues, particularly on the threshold

8   issue of whether VIC was ever an alter ego of VSA, and any

9   arguments you wish to make to persuade me that the issues I

10  identified are not, in fact, the keys to resolution of the

11  motion practice.

12          I also note with respect to the Vitol and PREPA

13  motions, that the briefing was not entirely clear as to which

14  arguments presented in the motions correspond to which causes

15  of action, counterclaims, and affirmative defenses.  So, to

16  the extent possible in your oral arguments, please make those

17  connections clear by referring to specific pleadings and

18  causes of action.

19          Thank you all for bearing with these lengthy

20  preliminary remarks, but I am hopeful that they will be

21  helpful when we get to oral argument on those motions.

22          So now I turn to Item 1 of the contested matters

23  Agenda, and that is PREPA's Omnibus Motion for an order

24  approving its rejection of certain power purchase and

25  operating agreements, which is docket entry no. 15178 in case

1   no. 17-3283.

2          I have listed first up for speaking Elliot Stevens on

3   behalf of PREPA for eight minutes.  Mr. Stevens.

4          MR. STEVENS:  Good morning, Your Honor.  This is

5   Elliot Stevens of the Oversight Board -- appearing on behalf

6   of the Oversight Board for Puerto Rico as PREPA'S

7   representative in PREPA'S Title III case.

8          As Your Honor identified, this is PREPA's motion to

9   reject at this time two non-operational power purchase and

10  operating agreements, one with YFN Yabucoa -- that's

11  Y-a-b-u-c-o-a, YFN Yabucoa Solar, LLC, and another was M Solar

12  Generating, LLC.  Both of these parties have objected to the

13  motion, but for the reasons I'll discuss, we submit the Court

14  should overrule these objections and enter an order approving

15  PREPA's rejection of these contracts.

16         Your Honor, I'd like to briefly describe the facts

17  which are also set forth in our motion and in the accompanying

18  declaration of Fernando Padilla.  Both of these PPOAs were

19  entered into by PREPA in 2012.  Neither of them are

20  operational.

21         In early 2019, PREPA determined to renegotiate its

22  non-operational PPOAs, which were, among other things, above

23  market pricing of what was contained in them.  As a result, in

24  early 2019 PREPA determined to renegotiate it's PPOAs with YFN

25  and with M Solar and engaged in negotiations with those

1  parties until about the middle of 2020.

2       These negotiations involved the parties delivering

3  proposals and counterproposals back and forth, looking at

4  markups of the PPOAs, and holding meetings to discuss pressing

5  issues and other technical issues.  However, eventually, YFN's

6  final count proposal came back with pricing that was

7  approximately 20 percent higher than other renegotiated PPOAs

8  that PREPA had renegotiated with other parties.  Similarly, M

9  Solar's proposal came back at a level 14 percent higher than

10 those parties.

11      As a result of this pricing difference, as well as

12 the fact that these contracts are not operational and thus

13 could not provide PREPA with power in the near term, PREPA

14 determined to seek their rejection.

15      Your Honor, in a moment I will discuss the objections

16 raised by the objecting parties, but first I'd just like to

17 lay out the legal standard which we submit applies here based

18 on this Court's precedent.

19      THE COURT:  May I interrupt you for a second,

20 Mr. Stevens?  I'd just like you to clarify the status of the

21 request to reject the Windmar PPOAs.  Are you asking for those

22 PPOAs to be adjourned, or are you terminating your motion with

23 respect to those PPOAs?

24      MR. STEVENS:  Certainly.  Yes.  Thank you, Your

25 Honor.

1          At this time, we're asking for this motion to be

2     adjourned with respect to the two outstanding PPOAs with

3     Windmar pending further negotiations with that party.

4          THE COURT:  Thank you.

5          MR. STEVENS:  Thank you, Your Honor.

6          So, yes, the legal standard we submit here as it

7     applies is the business judgment test.  Your Honor, this test

8     requires that the debtor put forth a showing that rejection is

9     an exercise -- was made in the exercise of the debtor's sound

10    business judgment.  It requires under article four some

11    rational justification as to why the debtors believe the

12    rejection will benefit the debtor and the debtor's estate.

13         Your Honor, with the high differential standard and

14    -- it essentially requires the Court to approve the motion

15    unless the Court were to determine PREPA had made its decision

16    out of bad faith, whim, caprice, or some gross abuse of

17    discretion.

18         Your Honor, we submit this test is clearly satisfied

19    here.  As noted, PREPA renegotiated with these parties for

20    over a year.  In the end, however, their pricing came back

21    substantially higher than other PPOA counterparties, and not

22    only that, the contracts are not able to provide PREPA with

23    power in the near term.  None of these basic facts are I

24    understand disputed by the objectors, and, as a result, we

25    submit the business judgment test has been met.

1          I would like to briefly discuss the objectors'

2   arguments.  We have had -- some of the discussions on these

3   parts can be found in our reply.  First, YFN and M Solar argue

4   that the balance of the equities test rather than the business

5   judgment test apply to this motion.  We would submit that this

6   is incorrect.

7          As Your Honor held less than a year ago in connection

8   with the assumption of the Ecoelectrica PPOA, the applicable

9   standard for a motion under Section 365 of the Bankruptcy Code

10  relating to a PPOA is the business judgment test.  As Your

11  Honor held in that opinion, the cases applying the balance of

12  equities test, *Bildisco*, *Mirant*, *FirstEnergy*, the same cases

13  the objectors raised in their objections, involve facts far

14  from the ones here.  They involve situations where a federal

15  regulator under a Federal Statute have either exclusive

16  jurisdiction of the case at court or a significant amount of

17  concurrent jurisdiction to determine certain things related to

18  these contracts, and where that Federal Statute would be in

19  some way undermined or contradicted by an unfettered exercise

20  of the debtors' rejection powers.  As Your Honor determined in

21  the *Ecoelectrica* opinion, there is no similar Federal or even

22  Commonwealth regulatory scheme applicable to PPOAs that would

23  warrant the application of a balance of the equities test.  We

24  submit that Your Honor was correct and that Your Honor should

25  follow that opinion and instruction.

1        Your Honor, YFN and M Solar also argue that even if

2   the business judgment test were to apply, that it is not met

3   here.  That, among other things, YFN and M Solar argue that

4   PREPA didn't correctly weigh YFN and M Solar's profit margin;

5   PREPA did not properly consider its renewable energy targets

6   in Puerto Rico law, or the reasons why the PPOAs have been

7   delayed and non-operational.

8        If Your Honor would like to --

9        (sound played.)

10       We have substantial comments as to each of those

11  points.  However, on a fundamental level, we would submit that

12  they simply misapprehend the business judgment test.  As

13  noted, the test is highly differential.  It's meant to be a

14  summary proceeding where the only real issue is whether the

15  debtor has presented it made its decision as an exercise of

16  sound business judgment.  It does not have to show it's the

17  best decision ever.  It does not have to show it's a great

18  decision, or that everybody else would agree with it, just

19  that it made a rational decision supported by rational

20  reasons.

21       Your Honor, we submit that PREPA has made that case

22  as found in the Padilla declaration, and that it's not

23  controverted, PREPA renegotiated with these parties for over a

24  year.  The pricing came back higher than other renegotiated

25  PPOAs.  And these contracts cannot provide power in the near

1  term.  We submit that that case meets the business judgment

2  test and that the objections should, therefore, be overruled.

3  Finally, Your Honor, YFN and M Solar argue that the

4  rejection of these contracts has to be approved by PREB before

5  being valid.  And, as a result, this motion is unripe until

6  PREB approved.

7  To put it briefly, Your Honor, in our responses that

8  are more fully laid out in the reply, we submit this is wrong

9  for at least three reasons.  First, we submit that Puerto Rico

10  law does not require PREB to approve the rejection of the

11  contract.  Objections don't put forward any statutes stating

12  that PREB must approve the rejection of a contract as distinct

13  from the approval of a new contract.

14  As a result, we submit there is no such requirement

15  here.  Moreover, we would submit even if such a requirement

16  existed, it would be preempted by section 365 of the

17  Bankruptcy Code.

18  Perhaps most fundamentally, however, even if such

19  approval had existed and they were not preempted, we would

20  still submit the motion isn't ripe.  First Circuit

21  jurisprudence such as the *Algonquin Gas Transmission* case we

22  cite in our reply brief, it is clear that a challenge to one

23  regulatory --

24  (Sound played.)

25  MR. STEVENS:  May I finish my sentence, Your Honor?

1          THE COURT:  Yes.

2          MR. STEVENS:  Thank you, Your Honor.

3          First Circuit jurisprudence is clear the Court can

4    adjudicate challenges to one regulatory challenge, even while

5    others are pending, as long as it removes an ultimate barrier

6    to the approval of projects.  We submit that applies here.

7          Unless the Court has further questions, I would turn

8    over the virtual microphone.

9          THE COURT:  Thank you, Mr. Stevens.

10         Now we'll hear from counsel from M Solar and YFN

11   Yabucoa, and that is Mr. Agrait, who I have down for ten

12   minutes.

13         MR. AGRAIT:  Good morning, Your Honor.

14         THE COURT:  Good morning.

15         MR. AGRAIT:  Fernando Agrait for M Solar and YFN

16   Yabucoa Solar.

17         Both cases refer to non-operating PPOAs that have

18   been counter rejected by PREPA.  The real issue before this

19   Court is not whether a debtor in bankruptcy has the right to

20   reject the contract.  The real issue is what does a particular

21   debtor, in this case PREPA, must -- or what step has to take

22   for exercising the right to reject.  In other words, what

23   procedures PREPA must internally follow to decide whether to

24   reject a contract in compliance with its own law and the

25   public policies of the Commonwealth.

1          Until Law 57 of 2014 was approved, the answer to this

2    question could be very simple.  Has PREPA Board of Directors

3    decided the policies, the terms, the prices, and decided

4    whether to reject the contract.   That same provides

5    unilateral power of PREPA ceased to exist in 2014.  Now, under

6    both Law 57 of 2014 and Law 17 of 2019, the internal processes

7    of PREPA are shared by its own Board of Directors and the

8    Puerto Rico Energy Bureau.  Now, PREPA, to decide to reject

9    the contract and to predetermine the terms under which it

10   would assume and not reject has to obtain both its Board of

11   Directors' and PREB's consent.  This is before going to the

12   bankruptcy court and notifying a rejection.

13          THE COURT:  Mr. Agrait, I understand PREPA to agree

14   with you as to PREB's role in authorizing entering into a

15   contract.  However, it has been argued this morning, and in

16   the brief, that nothing in Puerto Rico law gives PREB the

17   authority to play a role in PREPA's decision to reject or

18   terminate a contract.

19          Is there a specific provision of these laws that

20   addresses the termination of a previously approved contract?

21          MR. AGRAIT:  Yes, Your Honor.  What happens is that

22   once a contract is in existence, any alteration to that

23   contract must be equitable in terms of compliance with Law 17

24   -- Law 57 and IRP manuals.  PREPA cannot unilaterally decide

25   that countering or not countering a contract is consistent

1    with the mandates of PREB.

2          First, we claim jurisdiction over all contracts in

3    existence.  The PREB authority is not limited to approving new

4    contracts.  It has authority about -- on all contracts, and

5    complies with all existing contracts.  That's part of the

6    exclusive jurisdiction of the PREB.  So I differ from PREPA'S

7    position that there's nothing in the law that says that PREB

8    has jurisdiction.

9          THE COURT:  Do you have specific section cites for

10   those provisions?

11         MR. AGRAIT:  Yes, Your Honor.  They are subject to --

12   in our oppositions, certainly section -- Article 1.11(b) of

13   Law 17 on the issue of prices on contracts; Act 57, section

14   6.32; and there's also a section that I can't find now that it

15   specifically states that PREB has jurisdiction on all

16   conflicts between parties to any contracts.

17         THE COURT:  Would you say that one more time?  That

18   PREB has -- I just didn't hear the word.

19         MR. AGRAIT:  PREB has exclusive jurisdiction on

20   conflicts between parties to an energy contract.  It's a

21   specific PREB power.

22         THE COURT:  Thank you.

23         MR. AGRAIT:  Okay.  May I continue, Your Honor?

24         THE COURT:  Yes, you may.

25         MR. AGRAIT:  Okay.  Thank you.

1          Prior to Law 57, the rejection of M Solar and YFN

2    Yabucoa could already be found due to being approved by both

3    -- PREPA's Board of Directors.  Not anymore.  Whether the

4    decision to reject complies with the public policy is in

5    PREB's hands.

6          I repeat, the policy of the Commonwealth and the

7    practice of the contracts were in PREPA's Board before Law 57.

8    Not anymore.  As of today, Your Honor, PREB is entertaining at

9    least six open dockets of proceedings to determine whether

10   PREPA's actions comply with Commonwealth public policies that

11   PROMESA Law itself states public policy issues are retained by

12   the Government of Puerto Rico.

13         In one of the proceedings, PREB 2018-0001, the PREB

14   specifically states that the level of the global energy

15   compression -- it's not dependant on prices, other than actual

16   market prices, not -- the phrase I call oxymoron -- of Board

17   determined market prices as PREPA plans to be.  All is not --

18   PREB can decide whether PPOAs, as I mentioned, are in direct

19   compliance or not with PREB's own orders, the IRP and --

20   definitely.  The rejection would make it impossible to apply

21   the proper IRP and -- IRP mandate.  It's only PREB who can

22   determine that.

23         Now, one power that is definitely losing of PREB is

24   price setting of the energy contract, the price of energy in

25   any contract.  PREPA has been frank, open, honest in saying

1  that they -- the Board predetermined the market price of ten

2  cents per kilo.  That Board could determine price, not market

3  -- open market price was determined using that data by PREPA'S

4  Board, and in that manner, it stated the price of the energy

5  contract, a power that the Board used to have before Law 57,

6  but it doesn't have anymore.  The only one who can in Puerto

7  Rico say the price of the contracts is X is the PREB.

8         In that matter --

9         (Sound played.)

10        MR. AGRAIT:  -- if the determination of PREPA would

11  have been based on other issues of contract, then we might not

12  be here at this hearing.  But PREPA opened the table that the

13  issue was price, and PREPA has no power to predetermine price

14  prior to a PREB determination.

15        THE COURT:  Now, would you please speak to

16  Mr. Stevens' point about preemption, that the Bankruptcy Code

17  provision incorporated in PROMESA says that a debtor can

18  reject a contract with court approval?

19        He says that that would preempt any local constraints

20  on the power of this debtor to reject the contract and subject

21  it to the business judgment rule.  What is your response to

22  that?

23        MR. AGRAIT:  Yes.  I can consider, Your Honor, that

24  there's the intervention on the issue of PREB determining the

25  public policy of the Commonwealth.  And it is an issue that is

1  raised before the bankruptcy court, because PREPA cannot take

2  decisions alone, because it's subject under its own law to

3  PREB and certain affiliations.

4          I repeat, if this were before Law 57, you would have

5  the debt rejection and that's it, but before they come

6  through, Your Honor, they have to comply with their own

7  internal procedures.  It would be ridiculous to think that

8  PREPA could go to me with a rejection that has not been

9  approved by its own Board of Directors.  Neither can they go

10  to you because of a rejection that has not passed through

11  PREB, which has, in reality, the power --

12          (Sound played.)

13          MR. AGRAIT:  Can I finish?

14          THE COURT:  You can finish your sentence, yes.

15          MR. AGRAIT:  Powers that were before in the hands of

16  the Board of Directors alone, but now are shared by the Board

17  and PREB.  There's nothing in PROMESA on issues of public

18  policy that would make it possible for PREB to act, and then

19  PREPA go to you to request the rejection.

20          THE COURT:  Thank you, Mr. Agrait.

21          MR. AGRAIT:  Thank you.

22          THE COURT:  Mr. Stevens, you have two minutes for

23  rebuttal.

24          MR. STEVENS:  Thank you, Your Honor.

25          I think I'd just like to briefly state to the extent

1    to which Mr. Agrait suggests that PREB's approval of the

2    matter is essentially corporate authorization akin to a board

3    approving PREPA'S actions, we would totally disagree with

4    that, Your Honor, and we don't think that the brief suggests

5    at all that it's a matter of prior corporate authorization

6    akin to that.

7            Indeed, we would continue to support the point made

8    in our brief and made earlier that PREB simply is not given

9    any power, let alone something that would be akin to prior

10   corporate authorization over the rejection of a contract.

11           Mr. Agrait cites Article 1.11(b) of Act Number 17 of

12   2019, which is cited on page four of their -- of the

13   objector's brief for YFN Yabucoa.  And this provides that any

14   Power Purchase contract or any amendment or extension of a

15   Power Purchase contract shall be executed in accordance with

16   Article 6.32 of Act 57 of 2014, which in turn cited in the

17   brief at page five, says that PREB shall evaluate and approve

18   all contracts -- I'm leaving out a couple of words here, dot,

19   dot, dot -- prior to the execution of said contracts.

20           We submit that neither of these points support the

21   contention that PREB has authority over the rejection of a

22   contract.  They both clearly talk about the approval of new

23   contracts or amendments to contracts.

24           Regardless, Your Honor, we would also continue our

25   point that any state law assessing the standard for rejection

```
1    or constraining that the debtors' ability to reject a contract

2    would be preempted, the Bankruptcy Court of Eastern District

3    of California in In re:  City of Vallejo, 403 B.R. 72,

4    conveyed a situation where California state labor law fought

5    to restrict a municipal debtor's ability to reject a contract.

6    The Court held that that was preempted by Bankruptcy Code

7    Section 365.  We submit that that similarly would apply here.

8              (Sound played.)

9              MR. STEVENS:  Unless the Court has any further

10   questions, I will cede.

11             THE COURT:  Thank you, Mr. Stevens, and thank you,

12   Mr. Agrait, for those arguments.  The Court reserves decision

13   on this motion.

14             We now turn to the second contested matter, which is

15   the government parties' motion for an order allowing an

16   administrative expense claim in connection with LUMA.

17             And so the first speaker is for the Oversight Board.

18   I have Mr. Possinger down for nine minutes.  And the motion is

19   docket entry no. 16241 in case no. 17-3283.

20             MR. POSSINGER:  Good morning, Your Honor.  Paul

21   Possinger of Proskauer Rose on behalf of the Oversight Board

22   as representative of PREPA.

23             Just one clarification, Your Honor.  I believe I have

24   ten and a half minutes.

25             THE COURT:  All right.  My notes said nine, but we'll
```

1   make it ten and a half.

2          MR. POSSINGER:  I think it will all add up to 45

3   minutes at the end of the presentation.  I'd also point out

4   before I begin that Mr. Friedman will be addressing the topic

5   of the termination fee.  So to the extent Your Honor has any

6   questions regarding the termination fee, you may want to defer

7   those to Mr. Friedman's presentation.

8          THE COURT:  Thank you.

9          MR. POSSINGER:  So as you indicate, Your Honor, we

10  are here on the government parties' second motion to approve

11  an administrative expense priority claim for obligations of

12  PREPA accrued under its Operation and Maintenance Agreement

13  with LUMA Energy, which I'll refer to during this presentation

14  as the OMA.

15         At this time, the relief we're seeking is for the fee

16  to be earned and incurred after full service commencement once

17  LUMA commences full operational control over the grid during

18  the period from commencement of full services through the

19  conclusion of PREPA's Title III case.

20         Your Honor, I'll start with an important point from

21  the Court's prior ruling granting our motion allowing an

22  administrative expense claim for front-end transition

23  expenses.  But PROMESA affords government parties substantial

24  discretion and autonomy in establishing government policy.

25  It's the clear policy of the Puerto Rico Government and the

1    mandate of Puerto Rico law that PREPA be transformed and

2    modernized from its current state, and an express requirement

3    of this policy is that PREPA be removed from -- there's a

4    statute called the ebb and flow of politics.  That it be

5    removed from politicized management and that its assets or its

6    operations be transferred to private entities.

7         This policy has been enthusiastically supported by

8    the Oversight Board.  It's been included in certified fiscal

9    plans for PREPA and the Commonwealth for several years now.

10        The OMA is an essential step in performance policy in

11   complying with Puerto Rico Law and the certified fiscal plans.

12   LUMA has announced that it intends for the full service

13   commencement to begin on June 1st, meaning it expects that all

14   the monies allowed to be satisfied or waived by that date.  So

15   LUMA's take over of grid operations is imminent, and while

16   there are many conditions precedent, they would be allowing to

17   -- an administrative expense claim for these interim fees to

18   be incurred and earned.

19        Most of the issues that are relevant to the relief we

20   request here and the objections that have been filed have

21   already been determined and decided by this Court in Your

22   Honor's ruling from last October allowing LUMA an

23   administrative expense claim for the front end transition

24   obligations.

25        In that ruling, among the benefits and the services

1    the Court found is that they were necessary to achieve the

2    primary benefit of the OMA, which is assumption of full

3    operational control over the grid.  LUMA is now close to ready

4    to take over the grid, but PREPA'S still in Title III.

5           So the Oversight Board had negotiated a supplemental

6    agreement with LUMA to ensure that LUMA could take over as

7    soon as it's ready, even if PREPA is still in Title III.  And

8    those are big asks.  LUMA bargained for a 15-year deal in

9    exchange for taking on this challenge, hiring several thousand

10   employees, investing all the resources it's going to need to

11   run the grid.

12          Under the supplemental agreement, they agreed to take

13   all this on with the possibility that it's only going to last

14   18 months.  LUMA was not willing to operate in Title III, back

15   then, so we negotiated an 18-month time frame in compensation

16   for the Title III time to that extent.  This is what it took

17   to get services started on OMA's original time frame, without

18   conclusion of the Title III case.

19          And the benefits of these services, the OMA services

20   to PREPA, its customers and the island economy are clear.  As

21   I noted at the outset, the OMA is necessary for compliance

22   with the policy established by the government parties.  By

23   itself, that's benefit enough.

24          As we explained in our papers, and as is amply

25   supported by the declaration of Mr. Marrero, the services

1    themselves are going to provide substantial and concrete

2    benefits to PREPA.  Now, I won't go into details here, but I

3    refer the Court specifically to paragraphs nine through 16 of

4    Mr. Marrero's declaration.

5         As for the fees, and as with front end transition

6    fees, we're only seeking allowance of fees actually earned

7    through satisfactory performance of LUMA's duties under the

8    terms of the OMA, plus the termination fee, to the extent that

9    fee is earned and incurred.

10        Most of the arguments that have been raised by the

11   objectors to this motion have already been addressed and

12   disposed of in Your Honor's prior order regarding the front

13   end transition services, but I will briefly run through those

14   here.

15        First, the union parties argue again that the

16   administrative claims are not available in Title III, because

17   there is no estate in Title III.  The Court's already ruled

18   that administrative claims under section 503(b)(1)(a) for

19   services that benefit a debtor, a Title III debtor, may be

20   allowed in Title III cases.  The union has appealed this

21   ruling, but for now, it's the law of the case, and the Court

22   can and should continue to apply it as that.

23        Second, Whitefish, Cobra, and Retirement System all

24   argue again that the allowance of an administrative claim for

25   LUMA will prejudice their own recoveries on their own claims.

1  Your Honor's prior ruling, you noted the particular effects of

2  granting the motion on other individual creditors have no

3  bearing on an allowance of this administrative claim.

4      As the Court has noted several times now, the purpose

5  of Title III cases is not only to maximize creditors'

6  recoveries, but to require a more holistic approach, focusing

7  on continuation of the debtors and their ability in aid of the

8  Commonwealth.  Here that is critical.

9      In this case, the OMA, and millions of Puerto Rico

10  residents and businesses that rely on PREPA, it will be a

11  benefit for them, a more reliable and resilient power grid.

12      Third, regarding ripeness, union parties are going to

13  argue as they often do that the motion isn't ripe.  This time

14  based on their own challenges to the PREB approval, their

15  appeal of Your Honor's ruling from last October, pending

16  legislation they hope will delay or terminate the deal, and

17  the OMA's conditions precedent.  At this point, we should be

18  able to dispense with this argument fairly quickly, because

19  several days ago the union filed a lengthy complaint asserting

20  11 counts seeking to terminate the OMA; and two days ago they

21  filed a preliminary injunction motion seeking to enjoin it.

22  That adversary is seeking to block LUMA's takeover of the

23  grid.  Our motion seeks to satisfy a condition precedent to

24  LUMA's takeover.

25      If their lawsuit is ripe for adjudication, as they

1    say it is because they allege that this Court has subject

2    matter jurisdiction, its motion is certainly ripe for

3    adjudication.  But the adversary proceeding aside, this motion

4    is ripe.  The OMA is a live, valid, binding agreement duly

5    approved under Puerto Rico law by the P3 authority, by PREB,

6    by the Governor, and by the Oversight Board.

7         The parties are performing their duties under the

8    agreement, and they have been for ten months.  There's no

9    current legal impediment to any party's performance, no Court

10   order, no PREB resolution, no legislation.  With any valid,

11   enforceable prohibition under applicable law, including

12   PROMESA, then the relief to be granted under this motion might

13   become partially or entirely moot and no administrative claim

14   would be -- it would continue to be earned potentially.  But

15   the law in the First Circuit as we cited in our papers is

16   clear.  Potential future mootness does not negate current

17   ripeness.  The pending future can be described by the union

18   parties as just that, future possibilities that cause no legal

19   impairment of the performance of the OMA.

20        One more note briefly on the unions in the adversary

21   proceeding.  At the end of the day, the unions complain of a

22   challenge to the government's policy of transformation of

23   PREPA.  All the arguments they read about, the merits, and the

24   legality of the OMA go to a policy they opposed, not the

25   benefits LUMA would provide under the OMA.  To the extent they

1  raise those issues in opposition to this motion, they should

2  be litigated in that action.  They're not relevant to this

3  motion.

4        Fourth and finally, Your Honor, the Committee

5  reasserts its position that the Court should compel an

6  amendment to the supplement by limiting LUMA's right of

7  reasonable consent under PREPA's Plan and Confirmation Order.

8  Once again, the Committee seems to misunderstand.  We are not

9  asking for Court approval of the OMA or the supplement.  We're

10 not seeking to assume under Rule -- Section 365 of the

11 Bankruptcy Code.  We're only seeking allowance of an

12 administrative claim the fees LUMA actually and eventually

13 earns.

14       The Committee has raised the possibility that LUMA

15 will use its consent to run out the clock and eventually --

16       (Sound played.)

17       MR. POSSINGER:  -- termination fee.  That's

18 completely unsupported speculation.  There's no basis in fact,

19 no basis on the record, no basis from LUMA's behavior to date.

20 To me, that would be the case but -- there's no credible

21 reason on this record to deny the relief they're requesting in

22 this motion based on a highly hypothetical challenge to a

23 contract term that has nothing to do with fees.

24       If it's hypothetical -- it would have materialized.

25 If LUMA were to make a reasonable demand to PREPA under this

1    provision, they would be in dispute with LUMA, and that

2    dispute may end up before the Court -- before Your Honor.  The

3    government parties don't expect that will happen, but

4    regardless, that potential eventuality isn't relevant to the

5    relief we are requesting here.

6         With that, Your Honor, unless you have any questions

7    of me, I will cede the podium to Mr. Friedman.

8         THE COURT:  Thank you, Mr. Possinger.

9         MR. FRIEDMAN:  Good morning, Your Honor.  It's Peter

10   Friedman from O'Melveny & Myers on behalf of AAFAF.  And I

11   just want to specifically address the termination fee.

12        The termination fee was designed to incentivize LUMA

13   to take on significant risk to start the transformation of

14   PREPA's transmission and distribution system during Title III.

15   And it's a key point, because without that fee, LUMA would not

16   have started the work during the Title III case.  And we think

17   actually that getting that work started is critical to moving

18   PREPA's Title III case forward.  PREPA instead would be

19   languishing.

20        The Committee complains it's wrong to have a

21   termination fee, but giving LUMA rights if there's no plan

22   confirmed in 18 months -- which, by the way, December of 2022,

23   five and a half years from when PREPA began its Title III

24   case -- we actually think it's backwards.  The best chance

25   PREPA has of moving forward and adjusting its debts, and

1  beginning to provide better quality of services across the

2  board at any time in the future is through LUMA starting on

3  June 1st to take over control of the system, and to have

4  incentives to move forward quickly thereafter that every party

5  is cognizant of to avoid having to pay a termination fee.

6  Now, one of the key things in thinking about the

7  termination language that I think the Committee has missed is

8  the critical advantage to the administrative claim, and

9  specifically the approval of a termination fee to the extent

10  it's earned and benefits PREPA.  Imagine if we had not

11  bargained for administrative claim status.  LUMA could have

12  walked away and said we are not going to start this now, or it

13  could have demanded something like an escrow or posting of a

14  bond, neither of which would have been subject to court

15  approval under 305.  PREPA still has the right to enter into

16  contracts outside of -- outside of court approval.

17  It certainly could have entered into that kind of

18  contract.  And that would have been a much worse drain on

19  PREPA's finances.  It would have required an immediate capital

20  commitment and an inefficient use of its resources.  It's

21  actually much better for everybody, including PREPA's estate

22  and its creditors for PREPA to have the flexibility to have

23  this administrative priority commitment rather than an

24  immediate capital commitment.

25  (Sound played.)

1          MR. FRIEDMAN:  So, Your Honor, I think the one other

2     point I wanted to make with respect to this is that I think

3     it's important to think of this in the context of a break-up

4     fee, because of the inducement it provided and certainly the

5     courts can approve break-up fees.  But here I think the

6     termination fee is even more important, because of the fact

7     it's an inducement not just to a bidding process or not at all

8     to a bidding process, like a break-up fee is, but it's

9     actually designed to begin providing the benefits that the

10    Marrero Declaration talked about, which are really fundamental

11    infrastructure investments which are a type of paramount

12    benefits that Title III, in some distinction in Chapter 11,

13    really makes exceedingly important given, as Mr. Possinger

14    mentioned earlier, the benefit -- the purpose of Title III

15    cases and the holistic approach that this Court and the First

16    Circuit has endorsed.

17          We don't think it's proper --

18          THE COURT:  Wouldn't it be --

19          MR. FRIEDMAN:  I'm sorry, Your Honor?

20          THE COURT:  Wouldn't it be fair to look at this

21    termination fee as something that essentially makes the

22    compensation higher if it turns out to be a short-term

23    contract than if it goes forward for the full 15 years?

24          MR. FRIEDMAN:  I don't think so, Your Honor, because

25    I don't think it's additive.  If it goes to the full 15 years,

1     they simply get paid each other --

2          THE COURT:  I mean net amount that they receive if

3     the contract is terminated, because of the 18-month condition,

4     they get the extra year's compensation, so that the amount

5     that's paid for the services before the exit from Title III is

6     higher than the amount that would have been paid for those

7     services had the contract gone all the way through its full

8     projected life.

9          MR. FRIEDMAN:  Yes, I think that's fair to say.

10          (Sound played.)

11          THE COURT:  Thank you.

12          MR. FRIEDMAN:  That's what it's for, Your Honor, to

13     be fair.  That's what it's for.

14          THE COURT:  Thank you.  You can wind up.

15          MR. FRIEDMAN:  That's all, Your Honor.  I think I

16     reserved part of my time in rebuttal, but those are the key

17     points that I wanted to address.

18          THE COURT:  Thank you very much, Mr. Friedman.

19          So now I understand the next speaker up is

20     Mr. Despins or Mr. Bassett for nine minutes for the UCC in

21     opposition?

22          MR. DESPINS:  That is correct, Your Honor.  Good

23     morning, Your Honor.  Luc Despins --

24          THE COURT:  Good morning.

25          MR. DESPINS:  -- with Paul Hastings on behalf of the

1 Committee.

2 Your Honor, we will rest generally on our papers, but

3 I want to take, you know, the nine minutes to focus on the

4 termination fee. And the first point I wanted to make is

5 that, you know, this argument -- it almost implies that LUMA

6 is doing this, you know, now without any compensation. It's

7 very important to understand that currently, and this is based

8 on the March 2021 LUMA monthly operating report, LUMA has

9 already invoiced PREPA over 116 million and it expects to

10 invoice an additional 35 million during these front end

11 services period.

12 So they're getting fully compensated, plus a fixed

13 fee component part of that. And we do recognize that LUMA

14 will make additional investments or involvement here. But

15 they are getting paid for these additional -- additional work,

16 a fixed fee of 115 million or approximately ten million per

17 month during this interim period.

18 And the Board is attempting to justify the

19 termination fee by saying that LUMA will need to incur further

20 costs, if asked to unwind the operation. Yet all of that is

21 covered in section 4.9 of the supplemental agreement, where it

22 provides that up over and above the 115 million termination

23 fee, they will receive payment for any such back-end

24 transition services. And also under the section 16.4 of the

25 O&M Agreement, the back-end transition fee already includes a

1  ten percent premium over actual costs.

2       So the argument that the Board is making is really

3  not valid, because it's tantamount to a break-up fee, but, in

4  fact, they're getting fully compensated for the work they're

5  doing now.  And what it's designed to do is really to

6  compensate it for profits not earned, and that's not a cost,

7  and that's not a benefit -- profits not earned in the future,

8  and that's not a benefit to the estate.

9       We cited, Your Honor, the *America West Airlines* case

10 for the purpose of establishing that the liquidated damage

11 provision is not available under 503.  The Board responded

12 with the Fourth Circuit opinion in *Merry-Go-Round*, but it's a

13 very important one to look at, *Merry-Go-Round,* and also to

14 look at the cases cited by *Merry-Go-Round*, and cases cited

15 since -- that cite *Merry-Go-Round* since then.  But in

16 *Merry-Go-Round*, Your Honor, the leasing question was approved

17 by the Court.  There was a motion to approve the entirety of

18 the lease during the case, and that's the lease that was being

19 defaulted on.  Not the same situation we have here.

20      And the Court actually relied on that and said, well,

21 obviously since the contract of the lease in that case was

22 before the Court and the Court determined that it was in the

23 best interest of the estate to enter into that contract, that

24 issue is behind us.  But here the Board is not seeking

25 approval of the contract.  They're seeking approval of the

1    administrative expense status of certain aspects of the

2    contract.

3         So this argument that they're making relying on

4    *Merry-Go-Round* is really of no moment.  And if you look at the

5    *Lamparter Organization* decision, which *Merry-Go-Round* cited,

6    that was a decision by Judge Gershon, Eastern District --

7    District Court I believe, where the Court basically said that

8    the Court had before it a situation where a lease had been

9    entered into with court approval and the -- basically, the

10   Court said the similarities between an assumed pre-petition

11   contract and a newly executed post-petition contract are more

12   evident because the landlord insisted that the new executed

13   lease be presented to the bankruptcy court for approval.

14   Thus, the Court basically had to make the finding that the

15   contract was in the best interest of the estate.  Here the

16   Board has chosen not to go down that path.  So that is a very

17   key distinction, Your Honor.

18        In addition to that, since then, the *Merry-Go-Round*

19   decision has been cited by many other courts, and, in fact,

20   distinguished.  There's a decision by Judge -- I'm sorry, Your

21   Honor, by Judge Shannon in Delaware.  The case is called,

22   *Juvennelliano*, which is 464 B.R. 60 -- 51, where the Court

23   said, yeah, okay.  I see *Merry-Go-Round,* but I'm dealing with

24   a Chapter 13 case.  And you might say, well, we're not dealing

25   with Chapter 13; why is he raising this to me.  The point

1    there is the Court said in Chapter 13 there is not the same

2    requirement that an assumed lease be made, that a finding be

3    made on notice of creditors that it is in the best interest of

4    the estate to assume it. And, therefore, the presumption that

5    applies in *Merry-Go-Round* does not apply in Chapter 13, which

6    is essentially the situation we have here where there is no

7    Court approval of the contract. The Court -- and the Board is

8    very proud of this. They're saying, we are not seeking Court

9    approval of the contract at all. So that's a very important

10    point.

11         Then, Your Honor, the few other points I wanted to

12    make is that we're not seeking to rewrite the contract. I

13    mean, it's like the late fees. Your Honor determined that

14    those could not be approved on the record you had last year.

15    Same thing could happen here. So this is not requiring a

16    rewrite of the contract.

17         And the supplemental agreement, it's in court, calls

18    the termination fee a liquidated damage provision. We didn't

19    make that up. That's a quote from the supplemental agreement.

20         And in paragraph 56 of their reply, I want the Court

21    to -- I want to draw the attention of the Court to that

22    section. There is a -- there is a sentence in there after

23    *Merry-Go-Round* where they state, the Board says, quote, if the

24    damages include invalid penalties, comma, the invalid

25    penalties will not comply with the legal damages. This is not

1    a quote from the case.  This is the Board saying that --

2           (Sound played.)

3           MR. DESPINS:  -- as if they're implying that there

4    will be a second step to this where in fact the Court could

5    determine later that this could turn out to be a penalty, but

6    they're not doing that.  They're not -- it's contrary to their

7    approach.  So that section or that sentence is kind of a

8    mystery to us.

9           THE COURT:  Which paragraph is that in again?  Which

10   paragraph is that in?

11          MR. DESPINS:  This is paragraph 56, right after the

12   quote from *Merry-Go-Round*.

13          THE COURT:  Thank you.

14          MR. DESPINS:  It says, whatever the legal damages

15   are -- I'm sorry, whatever the legal damages are, they are

16   administrative claims.  If the damages include invalid

17   penalties, the invalid penalties will not comprise the legal

18   damages.

19          That seems to be what the Board is saying.  But we're

20   okay with that.  I mean, we're okay with the second phase

21   where the Court would have to determine what they determine to

22   be a penalty or not.  What we are not okay is giving a blank

23   check and approving the provision today on the record today.

24          And, Your Honor, we believe there's really no

25   evidence.  If this is supposed to compensate for costs, there

1    is no -- given that they're getting compensated a lot right

2    now, and that there's these wind down provisions where they

3    get paid, there's no evidence before the Court today that

4    would allow the Court to find that the 115 is a reasonable

5    liquidated damage provision that.  There's just no -- it's

6    their burden to show that, and there's just no record to that

7    effect.

8         The last point I want to make, Your Honor, is the 18

9    months, of course we want the case to end.  We all want the

10   case to end.  We're not suggesting that we should delay this,

11   the coming out of Chapter 11 -- sorry, of Title III.  The

12   issue, Your Honor, is that the 18 months could be totally

13   without -- outside of our collective control and of your

14   control.

15        I know on the issue of the --

16        (Sound played.)

17        MR. DESPINS:  Two seconds, Your Honor.  You're

18   probably thinking I'm going to determine that, therefore, I've

19   got it, I'm not concerned about that; but the 18 months, Your

20   Honor, that's something that's totally out of our control.  It

21   could be stuck in a regulatory no man's land, as it has

22   before.  And, therefore, this is why the Court should be very

23   concerned about giving a 115 or 116 million dollar blank check

24   for the termination fee.

25        Thank you, Your Honor.

```
1              THE COURT:  Thank you, Mr. Despins.
2              I have next on my list Ms. Mendez Colberg for the
3    unions.  And please confirm to me what your time allocation
4    is.
5              Ms. Mendez?  Please unmute your phone and your
6    dashboard.
7              MS. MENDEZ COLBERG:  Good morning, Your Honor.  This
8    is Jessica Mendez.  Can you hear me?
9              THE COURT:  Yes.  Good morning.
10             MS. MENDEZ COLBERG:  Sorry, Your Honor.  I just saw
11   on my computer saying I have to refresh my Windows.  Okay.  My
12   time allocation, Your Honor, would be nine minutes.
13             THE COURT:  Thank you.  Please proceed.
14             MS. MENDEZ COLBERG:  Okay.  Thank you, Your Honor.
15   This is Jessica Mendez Colberg on behalf of UTIER and the
16   retirement system of the PREPA employees.
17             Now, the government parties focus their request for
18   administrative claim on the basis that it benefits PREPA.  And
19   indeed, this Court already granted the administrative claim of
20   the front end transition services based on such services being
21   beneficial to PREPA.  But I want to focus on has the
22   government party satisfied their burden on demonstrating that
23   the interim obligations and the fees associated are actual and
24   necessary expenses that benefit PREPA, and they have not.
25             The government parties rest on the proposition that
```

1  since this Court already decided and it is a decision under

2  review by the Court of Appeals, but since this Court already

3  decided that the front end transition services were entitled

4  to administrative expense priority, then the services

5  performed during the interim period are equally entitled to

6  such status.

7        With the second motion the government parties make

8  little effort to establish to this Court that those expenses

9  are beneficial to PREPA.  What have they submitted in support

10  of their petition?  They rely on the declaration of Omar

11  Marrero, which is the one that they used for the first motion;

12  a declaration that by the way is self-serving, because with

13  all the direct involvement that Mr. Marrero had in the

14  selection of LUMA Energy, of course he's not going to say

15  anything less than how good of a decision he made.

16        So the government parties provide no additional

17  evidence to meet their burden of establishing that the interim

18  obligations are beneficial to PREPA.  In fact, the only useful

19  paragraph from that declaration which Mr. Possinger made

20  reference to are only speaking of generalities of alleged best

21  practices, without any context as to how LUMA will achieve

22  these responsibilities, or yet do not even begin to explain

23  how it can benefit PREPA financially, or let alone if PREPA

24  can sustain and pay for such services without getting into a

25  worse financial situation than it already is.

1          None of that is explained in the motion, and they

2    certainly do not explain PREPA'S accumulated deficit of more

3    than 400 million dollars according to Mr. Hector Rosario's

4    declaration that we submitted.  The fact that PREPA needs 894

5    million dollars from the Commonwealth to fund LUMA's account

6    is also not explained, on how it benefits PREPA or its

7    restructuring.  And while this Court has stated that PROMESA

8    affords the government parties substantial discretion and

9    autonomy in establishing government policies, and

10   Mr. Possinger made reference to that as well, that substantial

11   discretion cannot be a blank check to come into this court to

12   request the relief on behalf of LUMA and not support it with

13   sufficient evidence and comply with the applicable standard.

14          And to be sure, it is not just a matter of the union

15   entities being dissatisfied with the government parties'

16   policy decisions as they couldn't -- UTIER is raising concerns

17   on the legality of the contract, and in the context of this

18   motion the arguments address how detrimental it is for PREPA.

19   And in doing so, on behalf of more than 5,000 workers, many of

20   them risking their lives every day to perform their jobs, jobs

21   that are not guaranteed by LUMA, and it is the retirement

22   system raising concerns on behalf of more than 10,000 retirees

23   who have dedicated their lives to serve PREPA, and now risk

24   losing their pensions, their only source of income, because

25   the government in the extensive negotiations ended up with a

1   contract that would lead the retirement system to insolvency

2   as soon as 2022.

3          Moreover, the Court cannot be persuaded to grant the

4   administrative expense to LUMA out of the fear that LUMA could

5   terminate the contract.  Yes, the primary purpose of

6   governmental insolvency proceedings is the continuous

7   provision of public services, but the government parties have

8   not established that PREPA will not be able to continue

9   providing services, which in fact it is providing them right

10  now and has been paying LUMA to learn out how to do the job in

11  Puerto Rico.

12         So the fear of LUMA terminating the contract should

13  not govern these proceedings.  And after all, the T&D contract

14  provides far too many instances in which LUMA can terminate

15  the contract.

16         Now, the government parties seem to take offense that

17  the union entities use the word "dismantle" to describe the

18  real effects of the T&D contract, but it was the government

19  parties in the first motion who carelessly and expressly used

20  the term dismantle.  And now they prefer the term transform.

21  But the truth is there is no benefit for the debtor if the

22  goal is to dismantle debtor.

23         The fact that PREPA will continue to own the T&D does

24  not speak at all on how these costs and expenses will benefit

25  PREPA and not just LUMA.  The contract dismantles PREPA,

1   leaving only a shell of a government instrumentality there to

2   receive federal funds that it will not even get to administer

3   because that will be done by LUMA.

4        And the government parties minimize PREPA'S

5   dismantling by stating in their motions that the operations

6   will transition back to PREPA, or a successor, but how

7   exactly, because the fact is that even though PREPA remains

8   the owner of the T&D, it is left without any employees,

9   because the employees will be parsed -- will be dispersed in

10  the government agencies or laid off when LUMA leaves.

11       And to be sure, Act 120 of 2018 provides the

12  framework for a public-private partnership where the benefits

13  as well as the risks are to be shared.  But Act 120 does not

14  provide for a LUMA contract that grants all the benefits to

15  the private operator and shifts all the risks and expenses to

16  the government agency or instrumentality.  For this motion, we

17  are talking about 115 million dollars payable in monthly

18  installments for services yet to be performed.

19  Indemnification of LUMA Energy and its affiliates for claims

20  or damages against them, because LUMA is not even responsible

21  for the damages that it causes; and another 115 million

22  dollars of a termination fee which the government parties can

23  only -- only explanation as to how it benefits PREPA is that

24  these are contractual requirements that are part of the

25  overall economic bargain to unlock the benefits of the T&D

1    contract. And for this there is no support on the record of

2    how it benefits PREPA and when those unproven benefits will

3    materialize apart from mere generalities and a self-serving

4    declaration from Marrero.

5         Furthermore, the only arguments of the government

6    parties to reply to UTIER's point that the T&D contract

7    creates a private monopoly is to cite section eight of Act 120

8    that prohibits that these transactions create a monopoly.

9    However, that does not mean that the contract does not

10   actually create a monopoly. And after all, section 15 of Act

11   120 also states that the rights of the workers shall be

12   assured according to applicable law. And we know that the

13   contract expressly excludes the collective bargaining

14   agreement from the definition of system contracts.

15        So to conclude, Your Honor, if we were to say that

16   the union entities have their own agenda as the government

17   parties put it, then the agenda is certainly to protect the

18   rights and the well being of the workers and the retirees,

19   something that it is also their own government's duty.

20        The government parties have not met their burden for

21   the administrative expenses to be granted. General statements

22   will not cut it.

23        And for the rest of our arguments, obviously we rest

24   on our papers. And with that all being said, we respectfully

25   submit our position that the government parties have not met

55

 1   their burden, and for the consideration -- all these arguments

 2   for the consideration of this Court.  And we request the

 3   administrative expense motion to be denied.

 4          If the Court has no further questions, that will be

 5   our argument for the day.

 6          THE COURT:  Thank you, Ms. Mendez.

 7          I now have for Whitefish, Ms. Conde Torres at four

 8   minutes.

 9          MS. CONDE TORRES:  Yes.  Good morning, Your Honor.

10   This is Carmen Conde on behalf of Whitefish Energy Holding,

11   LLC.

12          It is the position of Whitefish, Your Honor, that

13   LUMA's right to incentives as administrative expense status

14   shall not have any negative impact on PREPA'S ability to

15   propose a feasible plan of adjustment that can be confirmed.

16   That is the real and should be the real benefit to the

17   debtors.

18          Whitefish reaffirms its limited objection at docket

19   2436.  And Whitefish reaffirms its position at docket 2281,

20   which shows that Whitefish is one of the largest

21   administrative expense claimants in this case.

22          The facts are that the first request for 77 million

23   dollars by LUMA was six months ago.  Now, six months after, we

24   have come up to 300 million dollars request.  Six months after

25   the first request we have no plan filed, no disclosure of

1    ability to pay the creditors in this case, mainly the

2    administrative expenses.

3         There is a great feeling of uncertainty of a

4    millionaire increase in administrative expenses in this

5    particular case, and Whitefish is ignorant on the impact of a

6    reasonable plan of adjustment that can be confirmed.  That

7    should be the goal, and that should be the real benefit that

8    shall be viewed in a broader approach by this Honorable Court.

9         It is our prayer, Your Honor, that this Honorable

10   Court considers the effect of this relief by LUMA on debtors'

11   ability to confirm a reasonable and feasible plan of

12   adjustment.  So we reaffirm our position, Your Honor, that

13   LUMA's right to incentive of administrative expense status

14   shall not have a negative impact on PREPA'S ability to propose

15   a feasible and confirmable plan.

16        (Sound played.)

17        MS. CONDE TORRES:  As of today, we are all ignorant

18   as to what this plan will be.

19        Thank you, Your Honor.

20        THE COURT:  Thank you very much, Ms. Conde.

21        And so now we return to movant's counsel for the

22   Oversight Board, Mr. Possinger.  What was your revised time

23   allocation?

24        MR. POSSINGER:  I think it's six minutes.

25        THE COURT:  Okay.  That's what I had before -- you

1    started with ten and a half, and I just don't see anything

2    else that's a half, so that's why I asked.

3         MR. POSSINGER:  I think maybe the objectors may have

4    had a half in there, so we each had 22 and a half for the

5    total, but I don't know that I'll need the full six minutes.

6         THE COURT:  Just go ahead.

7         MR. POSSINGER:  Okay. Thank you, Your Honor.

8         First off, Whitefish, their concern that there is no

9    plan and there is uncertainty, for this exercise, for this

10   work -- we're not talking about the plan of adjustment.  The

11   focus here is on fixing the utility.  Fixing the utility will

12   likely help us get to a successful restructuring, because it

13   will reduce blackouts, blackout grid events, you know,

14   potential future hurricane -- hopefully minimize any

15   disruption from future natural disasters, things like that.

16   That's really the focus here.

17        And, you know, one of the reasons for LUMA taking

18   over June 1st and why it's so important, there's going to be a

19   hurricane season starting in the relative near future after

20   that and they want to be ready for that.  So, again, the

21   recovery to creditors, sure, it's important, but the primary

22   goal of Title III is to make sure that the Title III debtors

23   have the ability to serve the needs of their constituents and

24   here it's the customers of PREPA.  That's really the exercise

25   here.

1          With respect to the union, there's a lot of

2     allegations in the presentation that the contract is -- that

3     it violates law, that it calls for the rejection of CBA, that

4     it leaves the pension insolvent and things like that.  As I

5     said in my opening, these are all matters that are going to be

6     addressed in the adversary proceeding.

7          But a few points, the OMA does not reject the CBA.

8     Only the Oversight Board can reject a CBA, and there's no

9     motion pending to do that.  The pension.  Whatever situation

10    the pension is in, it exists today because of the past, and as

11    noted in our fiscal plan, the pension is over three billion

12    dollars under funded as we sit here today.

13         With regard to the statement that there's no -- that

14    there is no -- presentation has not met the burden on

15    benefits, I start with the policy.  The policy is that PREPA

16    needs to be removed from politicized management.  That's what

17    the law says.  That's what the fiscal plans say.

18         What the Marrero Declaration says, among other

19    things, is that LUMA is qualified.  And it looks in detail at

20    its qualifications and what it's being retained to do.  That's

21    in the Marrero Declaration in detail.

22         I want to point out that the Marrero Declaration is

23    not refuted at all by the declaration that the unions

24    submitted of Mr. Rosario Hernandez.  And just to spend a few

25    minutes with him, the topics of his declaration are the

1   alleged financial impact on PREPA, discussing the deficits

2   that are not in evidence -- I frankly don't know where he got

3   his numbers, especially the 893 million dollar loan from the

4   Commonwealth that will not be a loan from the Commonwealth.

5   There is no financial motion pending before Your Honor.  There

6   is going to be a contribution or appropriation in some dollar

7   amount to help PREPA build up its reserve accounts as we

8   needed, as required by the OMA.

9         The declaration talks about an impact on rates.

10  Without tying in an impact on rates to the OMA other than it

11  be inaccurate since -- regarding the 894 million dollar loan.

12  It talks about hypothetical conflicts of interest.  Talks

13  about concerns about dismantling PREPA, but also creating an

14  illegal monopoly somehow.  And then a lot of focus on the

15  impact on employees and pensions, which we will get to the

16  adversary proceeding, but they're not relevant to the benefits

17  with the OMA and the services LUMA will provide to the

18  residents and customers of PREPA.

19        With respect to dismantling, you know, they -- they

20  the union alleges that PREPA is -- or that the OMA is going to

21  dismantle PREPA.  And they really don't explain how

22  dismantling benefits.  That's sort of a circular argument.

23  They are the ones alleging that there's a dismantling.  Again,

24  we reiterate.  PREPA retains ownership of the assets, possibly

25  through a wholly owned subsidiary under the OMA.  That's yet

1  to be determined.  But PREPA retains ownership.  The policy

2  calls for private operation --

3          (Sound played.)

4          MR. POSSINGER:  The policy calls for private

5  operation, and LUMA will come in and operate the grid.

6  There's a separate process for private operator for

7  generation.  When those terms are concluded of those

8  arrangements, the assets will revert to operation by PREPA in

9  what we expect to be a vastly improved state.  But there's no

10  dismantling.  PREPA'S not being dismantled.  What's being done

11  is pretty -- the law is being complied with.

12          In fact, Puerto Rico Law, section 1.8(b) of Act 17 of

13  2019 requires that there be -- that the vertical monopoly of

14  PREPA be discontinued.  So the OMA again will further PREPA'S

15  compliance with Puerto Rico law and the policies established

16  by the Oversight Board.

17          I'm trying to see if there's anything else I didn't

18  address here, Your Honor.

19          I think the balance of the unions' remarks again are

20  challenges to the contract that are being addressed in the

21  adversary proceeding.  They should be deferred to the

22  adversary proceeding.  They don't go to the benefits of the

23  OMA once LUMA takes over, the target date for June 1st.  Thank

24  you, Your Honor.

25          THE COURT:  Thank you, Mr. Possinger.

1          And, finally, Mr. Friedman for AAFAF.  I have you

2    down for two minutes.

3          MR. FRIEDMAN:  Yes, Your Honor.  Thank you very much.

4    Peter Friedman on behalf of AAFAF.

5          I actually think that Mr. Despins referenced

6    *Merry-Go-Round* to lead to the opposite conclusion.  The fact

7    that the Court doesn't supervise a chapter -- a Title III

8    debtor in the same way as a Chapter 11 debtor does should mean

9    even more deference to the decision to enter into the contract

10   and seek an administrative claim status for the termination

11   fee.

12         And I want to also address what paragraph 56 means,

13   because it really relates to the fact that we have not sought

14   Court blessing for every provision of the contract.  What that

15   means is PREPA has whatever defenses it has to the termination

16   fee.  That's what we're saying.  Whether it's a condition of

17   revoking or, in the unlikely circumstance if PREPA were to

18   argue that some provision of the contract isn't valid, because

19   the contract hasn't been blessed by the Court at this point,

20   PREPA reserves all of its rights.

21         Obviously that's not its intention, but to the extent

22   that there's some provision in there that's non-compliant with

23   the law, that doesn't constitute an administrative damages

24   claim -- an administrative claim, but what is valid should be

25   blessed as an administrative claim.  And LUMA needs that

1    security now to enter into the overall set of benefits that

2    it's providing to PREPA through an assumption of the T&D

3    system on June 1st.

4         I also want to differentiate this from the late fee

5    issue that Mr. Despins raised.  Late fees previously were

6    speculative.  The circumstances under which they could arise

7    and the magnitude of those fees were unknown.  That's clearly

8    not the circumstance here.  There's an amount and there are

9    conditions under which it can be earned.

10        So, Your Honor, that's all I have.  And we ask that

11   the Court approve the administrative expense application and

12   enter and approve the order as requested.  Thank you, Your

13   Honor.

14        THE COURT:  Thank you, Mr. Friedman.  The Court

15   reserves decision on this motion as well.

16        And we will now turn to the Commonwealth's Motion for

17   Stay Relief to Prosecute Further Motions for Partial Summary

18   Judgment.  I anticipate that we should be able to get through

19   at least the opening and objecting arguments before we have to

20   break at 11:45.  And then we will continue as necessary with

21   that and the UCC's cross-motion after the midday break.

22        And so this is docket entry no. 16326 in case no.

23   17-3283.  And I have Mr. Firestein as the first speaker for

24   the Oversight Board at 14 minutes.

25        MR. FIRESTEIN:  Good morning, Your Honor.  Actually,

1    I think it's 13, at least based on the Agenda I have.  But I

2    don't think it's going to be an issue one way or another.

3              Can you hear me?

4              THE COURT:  I can hear you.  Before you start, I

5    apologize to everyone.  I have some notes that were

6    extrapolated from the Agenda, and I think that we may not have

7    used the most recent one.  So I will ask you as you go along

8    to correct me if I don't recite the right amount of time.

9              MR. FIRESTEIN:  No problem, Your Honor.

10             THE COURT:  You may proceed.

11             MR. FIRESTEIN:  Thank you.  Good morning, Your Honor.

12   Michael Firestein of Proskauer on behalf of the Board.

13             I had an argument laid out, but in light of the

14   Court's comments, I want to in the first instance address what

15   I think were three issues that were raised by the Court.

16   There might be subparts to those issues, but as I understood

17   the issues, and they're not necessarily in the order that were

18   presented by the Court, but one is with respect to court

19   resources; another was with respect to why is it necessary to

20   do it for the plan; and the third issue related to the

21   potential overlap of rulings on issues that had yet -- for

22   which rulings have yet to be made in connection with the

23   earlier motions for summary judgment that were filed last year

24   and that are currently the subject of the 56(d) Order and some

25   ongoing discovery.

1          So let me just take them in that order.  As far as

2     the Court resources issues are concerned, obviously we're

3     sensitive to that fact.  I think the purpose of this motion is

4     to tee them up so that they can be addressed in the order that

5     is available for the Court based upon its own resources, and

6     obviously to the extent that a schedule which frankly has yet

7     to be established for these motions, that that can be adjusted

8     as needed.

9          I think the way the motion was teed up was that we

10    would meet and confer after the ruling, assuming that it was

11    granted.  And then we would propose a schedule to the Court.

12    And if the Court had other ideas relative to that, then the

13    Court would adjust accordingly.  So naturally there's only one

14    court and there's only one judge who's deciding these issues.

15    And I think our sensitivity to that is above all else, and our

16    objective was merely to put the issues before the Court to

17    deal with them in a manner that was both consistent with Court

18    availability as well as, importantly, relative to the

19    anticipated plan for the plan.  And the confirmation schedule

20    that is -- has been referenced in some of the other papers.

21         And to that end, I think that the scheduling of the

22    confirmation may be in distress if other issues are not

23    resolved in advance of confirmation.  As I'll get to it in a

24    minute, as to why it's necessary for the plan, the simple

25    truth is we don't want to get to confirmation if we don't have

1   to, not knowing whether the plan that is available or being

2   proposed is one that can be satisfied by the Commonwealth.

3   And we view, in light of the plan that is now being proposed,

4   something that we had forecast some time ago was a

5   possibility.  There are now additional gating issues that need

6   to be -- that need to be addressed relative to that.

7        And frankly, Your Honor, they have to be addressed

8   regardless, and we continue to emphasize that it will

9   streamline the confirmation process, and particularly given

10  the PSA milestones that the Court is aware of, one of which is

11  with some minor modifications, the need for an effective date

12  of December 15th of this year.  And with that as a threshold

13  point, it's important to the Commonwealth's exit from Title

14  III, that whatever is necessary to be able to satisfy that

15  milestone, again subject to the minor modification that exists

16  within the PSA, is something that we are striving to attain.

17       Contrary to the opposition that has been raised by

18  the objectors in this case, we're not particularly trying to

19  jam anyone relative to claims.  What we're dealing with is the

20  issues that are being presented to us as they are being

21  presented to us.  And in light of the PSA, the -- everybody's

22  expressed desire to exit from Title III, and the need to

23  resolve these issues, I think that our position is it's time,

24  it's sufficient, and it was predictable.  Even if it relates

25  to our need to triage these matters in an orderly manner to

1   allow the Court to resolve them in a manner that is within the

2   Court's ability given the scheduling issues that exist.

3          More particularly --

4          THE COURT:  Well --

5          MR. FIRESTEIN:  Go ahead.

6          THE COURT:  -- a milestone that you negotiated that

7   you said it is an admirable goal, and the Court's intention is

8   to do everything in its power to facilitate keeping to an

9   appropriately tight schedule; but, again, the Court's

10  resources are finite.  There are a number of ways, including

11  proceedings that are going on outside of the litigation

12  context, to seek to resolve these issues in good faith, and

13  keep the ultimate resolution on a feasible and appropriate

14  track.

15         So, you know, if what you're saying is that every

16  single thing is going to have to be litigated now or in the

17  G94.

18         context of the confirmation proceedings, that of

19  course will make it more difficult to keep the timetable that

20  you're proposing.  That's just an observation.

21         MR. FIRESTEIN:  Assuredly, Your Honor.  And at the

22  end of the day, there are only 24 hours a day and seven days

23  in a week.  And I'm not aware of a legal argument that can

24  overcome the Court's, you know, practical inability to address

25  these issues.  But a couple of observations about what the

1    Court just noted.

2         You are correct that we did in fact -- you know, it

3    is a deadline that was one that we agreed to, but it wasn't

4    one that was established unilaterally by the Oversight Board

5    in its pursuit of a plan.  It was heavily negotiated.  It's

6    taken a long time to get to these places.  And that was the

7    date that was ultimately agreed upon pursuant to the PSA that

8    was reached.

9         And in furtherance of that, I know the Court is aware

10   of other parties, including some who are defendants in this

11   adversary proceeding, who are for the moment signers on, if

12   there is such a phrase, to the existing PSA.  We're hopeful

13   that that can be brought to fruition.  And so there are --

14   there are -- you correctly note that there are procedures

15   outside of the context of litigation that continue to move

16   forward.

17        However, as much as we might hope that everything

18   could be consensual, we don't know that that's the case.  And

19   while consensus is building relative to the existing agreement

20   we have to be able to address within the permission granted by

21   the Court to the claims that are going to be a potential

22   impediment to confirmation.  And so from our perspective, we

23   need to do whatever we can in order to make these things able

24   to be resolved prior to confirmation, which I think leads me

25   to the question of sort of why is it necessary and the Court's

1   concern that it hadn't been sufficiently laid out within the

2   context of the motion papers.

3        We need to know how much money is available to be

4   able to afford the plan.  We tried to make that point.

5   Perhaps it wasn't as direct or complete as it should have

6   been.  And the issue of the affordability is not its

7   magnitude.  That being the claim that we're seeking to move on

8   at this point.  It's the existence of the claim.

9        It's not a pot plan where all the claims divide up

10  their share of a fixed amount.  The unsecured claims of the

11  retirees, the GO Bonds, the general claims, the revenue bond

12  claims, are each treated differently.  And I would of course

13  yield to my restructuring partners on the particular construct

14  of the plan, but the Court has to know whether the revenue

15  bond clawback claims are valid at any level to know if they're

16  going to be entitled to payment, and whether the payment is

17  sufficient if there's an objection that's going to be made to

18  that.

19       I mean, Ambac alluded to it in its own -- has alluded

20  to its own objections to the amount that's going to be --

21  that's going to be necessary in connection with this.  We need

22  to know the amount -- I mean, in some ways, we need to know

23  the amount of the clawback claims.  But the threshold issue

24  for that is whether -- do the monolines in their case have a

25  claim at all, which will contribute to that in terms of

1    whether it's -- whether it's there.  And on whether they're

2    going to be paid in full.

3              I mean, the Commonwealth just doesn't have any enough

4    resources I don't think to post enough money to pay all of

5    those claims in full.  So as a threshold issue, we want to

6    establish the existence of those claims and we think this as a

7    gating issue is one that is designed to affect that.   And as

8    we forecast some -- you know, some many months ago, we said

9    that we might get to the place where there would be other

10   gating issues.  And now that the plan is taking shape based on

11   its new contours, we're now faced with that situation.

12             So we want to get to a plan that is going to be

13   confirmable, and this is a threshold issue we need to get

14   resolved in advance of confirmation.  Dealing with it at the

15   time of confirmation doesn't seem to be the most efficient use

16   of resources, so that's the reason why we need to get this

17   addressed now.

18             (Sound played.)

19             MR. FIRESTEIN:  Let me just briefly deal, because I

20   hear the beep, with the Court's concern over the overlap of

21   rulings on motions that are already pending, look, you know,

22   certainly.  And we said it in our papers, there might be some

23   guidance that's based on earlier motions, but many of them are

24   not.  And there are several examples to that effect.

25             The contract claims that are proposed to be submitted

1    for summary judgment, and this is not something that, you

2    know, we would air the entirety of the brief here, but there

3    are doctrines that are applicable to those -- to those counts

4    that are not necessarily briefed in the earlier ones.  Whether

5    there's any liability at all in a bond, whether there's an

6    actual breach, it's not dependant on the earlier motion.  Same

7    thing with respect to the tort claims, or the counts for which

8    we seek to move on.  There's no evidence to support a claim

9    for fraud.  Puerto Rico law requires duty for a tort claim to

10   be made.  There isn't any evidence of duty.  On the

11   post-petition interest and costs, it relates to the contract

12   issues that I raised above.

13        Even with respect to preemption, while there is

14   potential overlap there, the Court may not reach that issue if

15   there's no secured interest in the first motion.  And it has a

16   separate and independent basis as applied to the nature of any

17   unsecured claim.  The same would be true with respect to

18   disallowing claims against post petition revenue.  There are

19   separate grounds for these things which we, you know, had

20   obviously hoped to have had resolved the earlier motions at

21   this time, but they're not.  But that doesn't mean that there

22   isn't some basis for the claims to be addressed here.

23        I'm again cognizant of my time.  I wanted to address

24   specifically the Court's issues.  I think the rest of this is

25   addressed in our papers.  And I'll reserve the remainder for

1   my reply.

2          THE COURT:  Thank you, Mr. Firestein.

3          I have one minute for Mr. Despins for the UCC.

4   Mr. Despins?  You have to unmute on both the phone and the

5   computer.

6          MR. DESPINS:  Yes, Your Honor.  I'm sorry that took

7   me a little bit.  And I don't think I'll use the full minute.

8          I don't have much to add to what counsel for the

9   Oversight Board stated.  The Committee obviously believes that

10  the revenue bonds don't have claims against the Commonwealth.

11  We believe that's an important issue before confirmation, but

12  we do understand Your Honor's point about limited judicial

13  resources and we know that you have more than a full plate.

14         So I don't think I have much more to add to the

15  discussion, Your Honor.  Thank you very much.

16         THE COURT:  Thank you, Mr. Despins.

17         Now I turn to Mr. Sosland for FGIC in opposition.  I

18  have you down for 12 and a half minutes, Mr. Sosland.

19         MR. SOSLAND:  Yes.  Thank you, Your Honor.  Good

20  morning.  Martin Sosland of Butler Snow, LLP, for Financial

21  Guaranty Insurance Company, which holds or insures

22  approximately 900 million dollars of revenue bonds that are

23  subject to these adversary proceedings.  And I refer Your

24  Honor to our objection for arguments I will not repeat in this

25  oral presentation.

1           At the outset I want to address two points that were

2    just raised by Mr. Firestein, and also by the Court.  First of

3    all, with respect to proceedings that are going on outside of

4    this litigation, it's -- those proceedings, which appear to be

5    reaching seriatim resolution of issues with certain

6    bondholders, are those in which FGIC is anxious to

7    participate, but we are basically still waiting our place in

8    line.

9           Apparently, it's not only the court which has

10   unlimited resources, but also the Oversight Board.  We are not

11   critical of that.  They've made it clear on the papers and

12   filings in the Court that they intend to negotiate with people

13   in order.  An order that's been set not by us but by them.  We

14   would like to have been there earlier.  We're not.  But we're

15   waiting our place.

16          So when we have that opportunity, we'll see if we can

17   reach a resolution.  We're certainly not -- we're hopeful that

18   we would be able to.  We haven't had that opportunity yet.

19          The other remarks that Mr. Firestein made that are

20   curious is this notion that it's not a pot plan, or there's

21   no -- in terms of considering the amount that's available for

22   clawback claims.  We can't really comment on that, because we

23   haven't seen the plan.  What we know is that in the settlement

24   that the Oversight Board announced on April 12th, there's not

25   a settlement, an agreement in principle with certain other --

1  certain other insurers that there is supposedly a deal to

2  provide a plan for treatment of clawback claims.  But we

3  haven't -- again, we haven't been in the room.  We haven't

4  seen it.

5  In the April 21st status report, the Oversight Board

6  announced that it would file that plan by yesterday.  In

7  yesterday's status report, the Oversight Board said it would

8  file it sometime shortly after this hearing and -- after

9  today's hearings, and we note that the termination date for

10  certain parties has been extended now to April 30th.  We're

11  hopeful of seeing that soon, but whether or not

12  Mr. Firestein's representations are accurate is unknown.  But

13  -- what is accurate is unknown.  We simply haven't seen that

14  deal which hasn't yet been published or otherwise made public.

15  So turning back to the motion, Your Honor, the motion

16  simply makes no sense.  The Court has properly teed up as

17  gating issues those in the adversary proceedings that

18  implicate the property rights of FGIC and other revenue

19  bondholders, but objections to the unsecured -- the

20  quantification of the unsecured portion, if any, of the

21  calculable claims of financial creditors are not gating issues

22  for confirmation.  Not typically, and they should not be here,

23  at least unless there's some serious infirmity in the yet to

24  be filed next amended plan of adjustment.

25  Nor does the Board offer any justification or support

1   for its conclusory assertions that could cause this -- in

2   paragraph 16 of its opening brief, the Oversight Board quotes

3   three decisions.  They use words like prompt or expeditious,

4   but none support the due process proposed by the Board in the

5   instant motion.

6         The *W.R. Grace* decision upheld a confirmation order

7   against an appeal which had an injunction, a channeling

8   injunction and a trust for holders of asbestos tort claimants.

9   The federated decision approves intention of investment banker

10  to assist the Chapter 11 debtor in its reorganization efforts.

11  This Court's own decision denied a motion for lift of stay

12  filed by a creditor of the PREPA case.  None of the cases have

13  anything to do with the relief the Oversight Board seeks in

14  this motion.

15        So we're giving weight to the Oversight Board's

16  proposal to which we object.  The Court should consider what

17  it heard approximately 14 months ago, and what has transpired

18  since.  You recall that Judge Houser, the mediation team

19  leader, recommended at the March 4th, 2020, hearing that

20  certain clawback issues in the amended report are best ruled

21  on if possible prior to the Disclosure Statement hearing.

22  That quote can be found in that transcript on page 76, lines

23  seven to eight.

24        Ultimately, the Court largely adopted the

25  recommendations of the mediation team setting a briefing

1    schedule designed to culminate in a hearing on summary

2    judgment motions scheduled on May 27th, 2020, one week before

3    the Court scheduled a hearing on the Disclosure Statement.

4    The Disclosure Statement that had actually been filed by the

5    way.

6         But before the Court ruled, there was a hearing, and

7    the parties -- before the Court ruled in its order of March

8    10th, we had the March 4th hearing.  The parties objecting to

9    the amended report were heard, as were the parties like the

10   Oversight Board who supported it.

11        A major premise of the amended report and the

12   Oversight Board's position was that the gating issues were

13   clearly legal issues that could be decided as a matter of law.

14   The objecting parties, including the monolines, disagreed,

15   advising the Court that Rule 56(d) defenses would be made to

16   summary judgment motions.  They also addressed the standards

17   to be applied at such an early stage of the adversary

18   proceedings when no answers had been filed, motions to dismiss

19   had been filed but stayed, the adversary proceedings would now

20   be stayed in their entirety, except for defined summary

21   judgment motions.

22        In the colloquy that can be found at page 194 of the

23   transcript, the Court pressed Board counsel when they stood

24   for rebuttal.  Mr. Bienenstock argued the gating issues are

25   crisp and they're legal.  And the Court then asked

1  Mr. Bienenstock, so you believe you can tee them up in a way

2  that would not support a legitimate Rule 56(b) response, and

3  Mr. Bienenstock responded yes.

4       So what has happened in the last 14 months?  Rule

5  56(b) defenses were raised to the Board's summary judgment

6  motions.  After lengthy briefing and a hearing, discovery was

7  ordered.  The current discovery cut off date is May 19th,

8  2021, but there's a pending discovery dispute.  Whatever

9  discovery is complete, the parties are to meet and confer on a

10  briefing schedule.  Oh, and this is a briefing on the initial

11  gating issues that in Judge Houser's words are best ruled on

12  if possible prior to the disclosure hearing.

13       So why would the Court believe the Oversight Board

14  this time?  The claim allowance issues do not involve factual

15  disputes.  As Santayana wrote, those who cannot remember the

16  past are condemned to repeat it.

17       I will briefly respond to the Oversight Board's

18  assertion that we offer no principled objection to their

19  motion.  I don't know that I need to read that -- to state

20  this based on the Court's initial remarks, but if the Court

21  were inclined to change its mind based on Mr. Firestein's

22  argument, I don't want to drop this.

23       So we do have a principled response, and the

24  principled objection is fairness.  At the March 4th, 2020,

25  hearing and consistently since June 2019, FGIC has argued that

1  in any revenue bond litigation over our claims, we should be

2  allowed to pursue counterclaims that we originally filed in

3  stayed adversary proceeding 19-363.

4       In rebutting our argument on March 4th, 2020,

5  Mr. Firestein explained at page 197 of the transcript that the

6  gating issues were met -- were simply a matter of triage.  An

7  interesting word, since he's now using that 14 months later.

8       No one here he said, is suggesting that any one of

9  the issues, the issues that FGIC was seeking to bring, are

10  waived, forfeited, or anything else.  So now it's more than a

11  year later, but the Board still doesn't want us to litigate

12  our claims.

13       One note of interest which I believe Ms. Miller will

14  address more fully is there is a gating issue among those

15  contained in the Board's motion as originally filed.  It would

16  be the preemption issue.

17       At the March 4th, 2020, hearing Mr. Bienenstock

18  explained, we're asking for rulings as part of confirmation

19  that statutes will be put on a list of preempted -- that's at

20  page 185, lines 18 to 20.

21       He followed with, we have to know what's preempted

22  and what's not.  Otherwise, the plan can't work after

23  confirmation.

24       The preemption arguments are interesting, especially

25  the Title II preemption argued in the adversary proceedings,

1    that a claim isn't allowable if based on an obligation not

2    provided for in a budget approved by the Oversight Board.

3           (Sound played.)

4           MR. SOSLAND:  I wonder, in Mr. Firestein's words, if

5    this is really a principled argument with the Board's --

6    complete with contradictory provisions, but for now the Board

7    is not pressing to litigate this issue.  It withdrew it in

8    response to the PSA creditors' objection.

9           One final note.  The Court instructed us at the March

10   4th, 2020, hearing any party in interest may seek relief from

11   the stays imposed by these orders upon a showing of good

12   cause.  The Court reserves the right to deny any such

13   applications summarily, so don't get too excited about this,

14   and make sure if you invoke it, you do it for a truly good

15   reason.  That's at page 209, lines one to six.

16          Your Honor, there's no good reason for this motion,

17   and it should be denied.  Thank you.

18          THE COURT:  Thank you, Mr. Sosland.

19          I now have Ms. Miller for Ambac for 12 and a half

20   minutes.

21          MS. MILLER:  Good morning, Your Honor.  Atara Miller

22   from Milbank on behalf of Ambac Assurance Corporation.

23          THE COURT:  Good morning.

24          MS. MILLER:  Good morning.

25          So I'm going to be brief, because, in all honesty,

1  the majority of the presentation that I was going to make was

2  focused on the -- just inefficiencies of proceeding with a

3  second round of summary judgment before getting guidance from

4  this Court, both on secured claims as well as the overlapping

5  legal issues.  And in light of the Court's comments and

6  Mr. Firestein's response to them, I'm not sure I need to spend

7  much time on them.

8          I found, frankly, that Mr. Firestein's argument

9  proves the point.  You know, in response, he said that there

10  may be some guidance, but many may not be raised previously;

11  that with respect to contracts claims, some applicable

12  doctrines were not necessarily briefed earlier; and that

13  preemption may not be reached by the Court.  Well, doesn't all

14  of that, frankly, favor waiting to see what the Court's

15  decision is so that we can then direct our briefing to what

16  the Court has already told us its views are with respect to

17  the first round of briefing, rather than guess at whether or

18  not the Court will or will not address preemption, and to what

19  extent, as just an example.  Obviously, contracts claim, CCDA

20  liens, and a whole host of other issues which clearly the

21  courts would be guided by -- the parties would be guided by

22  the Court's direction and guidance.

23          You know, the other core point that Mr. Firestein

24  tried to make, which was in response to the Court's question

25  about, you know, why is this necessary for a plan?  I haven't

1   seen a compelling presentation of that.  And Mr. Firestein had

2   a description and discussion of how this is not a pot plan,

3   and he said that what -- the reason why we need to proceed is

4   because we need to, quote, determine whether they are valid at

5   any level.  And then going on to say whether they'll be paid

6   in full or not, which I'm not exactly sure how that relates to

7   the secured claim questions that he's purporting to tee up or

8   proposing to be teed up now.

9        But the idea that this limited set of additional

10  counts would resolve all outstanding revenue bond related

11  issues, such that there would be certainty going into

12  confirmation about whether or not it's a viable plan and

13  whether or not there's sufficient assets to satisfy it, to the

14  extent there was any dispute about that, that was completely

15  gone when they withdrew their priority objection.

16       And it -- there's no question that if they're not

17  going to move forward on the priority preemption component,

18  there will be massive open legal issues that will have to be

19  decided by their own suggestion now at confirmation.  And so

20  not only would it be inefficient to move forward now, because

21  we would need -- we should all have the benefit of the Court's

22  guidance on the existing pending summary judgment motions, but

23  it would also not actually lead to the efficient result that

24  Mr. Firestein is proposing, in no small part because they're

25  proposing to not move forward on one of the core issues.

1          And, you know, I just want to pause there for one

2    second to note that it's particularly troubling that there's a

3    suggestion that the Oversight Board is not going to litigate

4    something, because they agreed with GO Bond -- another set of

5    the creditors that they wouldn't litigate it.  And yet after

6    that agreement and after entering into that PSA, they still

7    included it in a claim in their adversary complaint.  And as

8    best as I can tell, they do still intend to pursue it at

9    confirmation, yet that's something that they're not going to

10   move forward.

11         And much like we agree wholeheartedly with the Court

12   that the Court is not certainly bound by any agreement that

13   the parties reach amongst themselves, no matter how heavily

14   negotiated or how unilaterally imposed by the Oversight Board,

15   Ambac certainly shouldn't be -- you know, its rights shouldn't

16   be effected and its ability to fully litigate issues shouldn't

17   be impacted by any agreement that the Oversight Board may have

18   arrived at with a different set of creditors.

19         So with that, unless Your Honor has any questions or

20   particular issues from Mr. Firestein's presentation that you

21   would like us to address, I rest on the papers.

22         THE COURT:  Thank you, Ms. Miller.  I have no further

23   questions.

24         So I will return to Mr. Firestein.

25         MR. FIRESTEIN:  Thank you, Your Honor.  Can you hear

1  me?

2       THE COURT:  Yes.

3       MR. FIRESTEIN:  I have not been able to see the

4  dashboard well.

5       THE COURT:  I can hear you.

6       MR. FIRESTEIN:  So a handful of points have been

7  made.  I just want to take them in some order here.

8       With respect to Mr. Sosland's remarks about the

9  proceedings going on outside of the litigation and that his

10 client is waiting in line, as the Court's well aware, based on

11 the Court's orders, it's the mediator who sets the schedule

12 for who meets with whom.  And I don't want to disclose the

13 contents of any proceedings that have gone on in the

14 mediation.

15      THE COURT:  Please do not.

16      MR. FIRESTEIN:  I have been -- yeah, that has been

17 the subject of some conflict and controversy in the past, but

18 suffice it to say that it is the mediation team, under the

19 guidance of the mediation team leader that makes those

20 decisions.  But that doesn't mean that the litigation stops in

21 its tracks from being needed to proceed to litigation.  I

22 mean, my goodness, there's obviously lots of activity that's

23 going on relative to the earlier summary judgment motions.

24      Just looking at the motions that are on tap for today

25 relative to the Omnibus, there's other activities proceeding

1  in connection with the revenue bond matter.  And so the fact

2  that there are proceedings going on outside of litigation I

3  don't think dictates what it is that needs to be -- that it

4  doesn't need to be addressed in the context of this.

5       Mr. Sosland also said that, you know, he was

6  concerned over the existence of gating issues, and in fact I

7  believe in whether it was Ambac's papers or FGIC's papers that

8  they agreed that the earlier ones were in fact gating issues,

9  but he's right that the current summary judgment motions also

10 do that.  But with respect to his comment about the prior

11 ones, those were filed because the monolines insisted that

12 final rulings couldn't be issued in the stay litigation.

13      So the whole purpose of that was to try to address

14 that issue that the monolines had suggested could not be

15 resolved finally in the stay litigation.  The new summary

16 judgment motions are equally gating issues for confirmation.

17 Whether they have  viable, unsecured clawback claims against

18 the Commonwealth, as I noted earlier, is key to whether the

19 Plan can be confirmed.  And I won't repeat the issues that I

20 articulated there.

21      One of the things that Mr. Sosland said was that

22 there is an element of unfairness regarding this because of

23 their inability to litigate claims that have been filed in the

24 earlier adversary, in the 19-363 action.  But all of the

25 claims for money that they could think of have been made.

1          It is those that were not previously addressed that

2    have formed the heart of the coming summary judgment motions.

3    They can't file any more.  The bar date has passed.  And the

4    claims that FGIC continues to harp on, the so-called equitable

5    claims or mandamus claims are a rose by any other name.  They

6    are merely other ways to make a demand for claim -- excuse me,

7    for payment.

8          They made claims in the earlier action for

9    declarations to have their claims established.  Claims that

10   the Board acted ultra vires by not recognizing their alleged

11   liens.  Claims that the Board engaged in takings, because of

12   their lien, or violations of the Contracts Clause, because of

13   their lien, or other claims that all relate to their demand

14   for payment.

15         Putting aside the other legal failings that those

16   claims may have, the common thread is evident.  As I noted,

17   they're all demands for payment.  In fact, this Court

18   recognized that in the final lift stay rulings, and denying

19   defendant's motion there.

20         As the Court noted, whether supported by equitable

21   or mandamus rights or otherwise, the claims stem from their

22   bond claims, and, ultimately, are vehicles for asserting

23   rights to payment of amounts outstanding under various bond

24   issues.  And that's exactly what we are trying to accomplish

25   in our intention of litigating those issues, which are brought

1    front and center to the claims that they brought in their

2    proofs of claim, which are called by any other name a demand

3    for payment.

4         Moving on to what Ms. Miller, you know, had to say,

5    there's -- you know, she referenced a number of may haves or

6    could haves.  Look, there is -- you know, there may well be,

7    and I emphasize it again, a guidance that comes out of the

8    earlier motions, but as I also noted, and no one seems to have

9    particularly discounted the fact theories that are going to be

10   espoused here in the new motions that are not ones that are

11   going to be dependant on the earlier motions that are filed,

12   and the fact remains that in order to get us to confirmation,

13   we need to understand the allowability of those contract --

14   excuse me, of those contract claims.

15        If Ambac doesn't contend at confirmation that the

16   allowability of its clawback claims is necessary to know, then

17   we don't have to, you know, necessarily proceed with this.

18   But it's quite clear that that's what their intention is.

19   And, you know, when they're not resolved, I predict that Ambac

20   will be the first to say, confirmation has to be delayed while

21   its claim is determined, which is exactly what we're trying to

22   do here.

23        And so our objective is to use the word that

24   Mr. Sosland emphasized but continues to be applicable, the

25   notion of triage, which the parties can address in its

1   briefing to tee them up at a time that the Court is able to

2   address them without waiting for one set of issues to be

3   completely resolved.  I mean, we may later hear that, well,

4   once this Court has resolved the secured interest issues, we

5   should wait until the First Circuit has resolved whatever

6   appeal relates to that before we go on to confirmation,

7   because it's not -- you know, it's not a final resolution.

8   You know, our goal is to do what we can in order to put this

9   on a track to meet the milestones and to get it -- and to get

10  it resolved.

11       One final observation with respect to the issue

12  concerning priority.  I think we spelled out in response to

13  the PSA creditor limited objection that we don't necessarily

14  agree with them and their interpretation of this; but to be

15  fair, the priority issue, if they don't have a claim at all,

16  may or may not need to be addressed at a later point in time.

17  And our response in that was, look, that's one that we can

18  necessarily deal with at a closer point to confirmation.

19       But if -- whether it be preemption, or a failure of

20  their contract claims, or their tort claims, or any other of

21  the brush related issues that needed to be addressed prior to

22  confirmation are dealt with, it will most assuredly streamline

23  the confirmation process.  This is not to suggest that there

24  isn't going to be a lot of work to be done, because for sure

25  there is going to be a lot of work.  But I think, Your Honor,

1    where this currently stands is that the Commonwealth desiring

2    to be out of Title III, recognizing that there are issues that

3    need to be addressed in advance of that, sensitive to the

4    Court's resources in its ability to decide, you know, as many

5    issues as --

6            (Sound played.)

7            MR. FIRESTEIN:  -- we put before the Court, and the

8    desire to get some certainty with respect to as many things as

9    we can and as quickly as we can, are compelling reasons for

10   the Commonwealth to be able to proceed with this.

11           And I don't think that anything that was done in the

12   context of the earlier permission to grant the limited summary

13   judgment motions that are currently before the Court changes

14   any of that.  We are here today because of the factual

15   scenario that exists now, and the plan that is presented now,

16   and those factual circumstances had been predicted though we

17   didn't necessarily know what the facts were going to be.  And

18   now we do.  And based upon that, I think that the -- I submit,

19   Your Honor, that while trying to alleviate the Court's

20   concerns on its own calendaring issues, we can and should and

21   ought to be able to do whatever we can in order to tee these

22   issues up for adjudication before the Court sufficiently in

23   advance of confirmation, so that the parties know what's up,

24   who has rights to what, and whether the plan is achievable.

25           Unless the Court has further questions, I'll submit.

1          THE COURT:  Thank you, Mr. Firestein.

2          Thank you all for your arguments.  I will consider my

3   ultimate decision on this after hearing the arguments with

4   respect to the UCC's cross-motion.  And my intention is to

5   rule on both of those motions, which are Items 3 and 4 on the

6   Agenda, at the same time following the midday break, for which

7   we have now reached the time.

8          So I would ask that everyone, as soon as I adjourn,

9   disconnect from Court Solutions.  And then dial back in to

10  Court Solutions.  And for the public listeners, dial back in

11  to the AT&T number to be ready to recommence at 2:15.

12         Thank you all very much.  Have a good break.  We are

13  adjourned.

14         (At 11:42 AM, recess taken.)

15         (At 2:18 PM, proceedings reconvened.)

16         THE COURT:  Good afternoon.  Judge Swain here again.

17         MS. NG:  Good afternoon, Judge.  It's Lisa Ng, your

18  courtroom deputy.  Sorry.  Everyone's here.

19         THE COURT:  Thank you, Ms. Ng.

20         So we will now resume with argument on the UCC's

21  Cross-motion for Stay Relief for Leave to File a Limited

22  Objection or in the Alternative, to Intervene.  This is with

23  respect to the revenue bond litigation.  It's docket entry no.

24  16403 in case no. 17-3283.

25         According to my notes, I first up have Mr. Despins

1    for ten minutes for the UCC.

2              MR. DESPINS:  Good afternoon, Your Honor.

3              THE COURT:  Good afternoon.

4              MR. DESPINS:  For the record, Luc Despins with Paul

5    Hastings for the Committee.  I think I'll be very brief,

6    because obviously you've given us some guidance.  And let me

7    just get to the heart of the matter.

8              I think we rise or fall with the Oversight Board in

9    terms of their motion to lift the stay in the sense that, as I

10   would like the world to be different, I don't think there's

11   any world in which we live where you would deny the Board

12   their motion and grant our cross-motion.  And, therefore, I

13   don't want to spend a lot of the Court's time talking about

14   this, but there's the possibility that you would grant --

15   despite what you said at the outset of the meeting, that you

16   would grant their motion and still consider whether to grant

17   our motion, our cross-motion or not.

18             On that, Your Honor, we'll rely on our papers,

19   because, again, I don't -- I think that I understand where the

20   Court is heading, so I don't want to waste the Court's time.

21   And, therefore, I think that leaves one issue open from our

22   perspective, which is a purely procedural issue.  And because

23   we believe the Committee should be allowed to file its

24   objection, but we heard the Court about the sequencing, et

25   cetera, et cetera, that -- just to file the objection, not to

1    prosecute it.

2        So we would ask the Court to authorize us to file our

3    objection, which will be largely, you know, the same thing

4    that the Board is arguing in the complaint that was filed a

5    long time ago.  And we would -- and Your Honor would

6    immediately stay, upon filing of the objection, stay the

7    prosecution of that objection.

8        That would put the Committee on a procedural parity

9    with the Board at no cost to anyone really, because, you know,

10   the objection was drafted a long time ago, so there's no

11   additional cost.  Nobody needs to respond to that, because you

12   would issue an automatic stay of the prosecution of that

13   objection.

14       And, obviously, that would leave open for a future

15   hearing, if there's ever a settlement that's documented with

16   Assured and the others, the issue of -- that you've dealt with

17   in PREPA, in the GO Bonds issue of whether the Oversight Board

18   can settle a matter without our objection being heard.

19       Again, I'm not naive about that.  You've already

20   expressed your views very clearly on that, but I think from

21   the point of view of creating our record, that's all we ask.

22   And we believe that's a -- you know, again, it's not a big

23   ask, and it doesn't disrupt anything, because it would be an

24   immediate stay of the prosecution of objection.

25       And, therefore, unless Your Honor has questions, or

1    unless I really misread the tea leaves, I think that's all I

2    would cover in the opening, and I would reserve, you know, the

3    rest for reply.  But I'm obviously happy to answer any

4    questions the Court may have.

5         THE COURT:  Mr. Despins, I appreciate your brevity

6    and your focus.  My only question for you at this point is why

7    now for filing and staying the limited objection, besides the

8    fact that you're prepared to do that, but is there magic in

9    this particular timing?

10        MR. DESPINS:  Well, obviously, what -- so let me

11   backtrack.  We believe, and you know this, and I'm not going

12   to reargue, but we have an absolute right to file objections

13   to claims, and we did not do that just because there was an

14   order staying all proceedings in the case other than what --

15   the security interest subset of issues.

16        And we refrained from filing the objection, because

17   of that stay.  And obviously the case is moving on, either

18   through a potential settlement that we've heard about, but we

19   haven't really seen the documentation on, and, therefore, we

20   don't want to be prejudiced with the further passage of time.

21   And, obviously, we would like to be able to proceed with the

22   objection.

23        But I know.  I'm not naive, as I said.  There's no

24   way that you would deny the Board with -- the ability to move

25   forward and grant us that right.  That's why I'm suggesting

1   that we just merely have the right to file it, and you

2   automatically stay it so, therefore, there's no issue with

3   the -- you know, taking the Court's time or the parties' time

4   or expenses.

5         There is a reason why now -- why now is because I

6   think procedurally we're going to be prejudiced unless we have

7   an objection on file, because then I would be left with the

8   argument that, oh, I would have filed an objection, but I

9   never did.

10        And there's no timing, there's no laches for filing

11  an objection.  We have -- we believe we have an absolute right

12  to file an objection at any time, but for the fact that you

13  had entered that Stay Order.  And that's why we're saying now,

14  if you're going to deny the Board's motion, then -- and

15  presumably deny our cross-motion, the only thing we're asking

16  is the right to have that objection on file that preserves our

17  argument, that that objection cannot be settled without our

18  consent, which, you know, unless things change drastically, I

19  think you will likely overrule.  But we'll get to that when we

20  get to that.

21        So that's really the purpose of why now.

22        THE COURT:  So you would file the objection with a

23  proposed order staying it?

24        MR. DESPINS:  Correct, so there's no doubt that

25  nobody has to spend any time on it, and -- both on our side,

1  and on the Oversight Board's side, and on the defendant's

2  side.

3        THE COURT:  Thank you for that clarification.

4        MR. DESPINS:  So at this point, Your Honor, I'd like

5  to reserve the rest of my time, I don't know how much time I

6  have left, but for any reply.

7        THE COURT:  Very well.  I think what you have left is

8  about three and a half minutes.

9        MR. DESPINS:  Thank you, Your Honor.

10        THE COURT:  Thank you.

11        Mr. Bienenstock for the Oversight Board.

12        MR. BIENENSTOCK:  Yes, Your Honor.  Good afternoon.

13  Martin Bienenstock of Proskauer Rose, LLP, for the Oversight

14  Board.  I only have four minutes, so I will go quickly, and

15  factoring in, of course, Your Honor's -- Your Honor's comments

16  at the outset.

17        Your Honor, there's a fundamental difference between

18  the Oversight Board's motion and the Committee cross-motion.

19  The Oversight Board's sole goal is to resolve issues that will

20  very likely prevent confirmation if left unresolved.

21  Conversely, the Committees motion is to gain leverage.

22        Plain and simple, the Committee is looking to object

23  to claims settled or being settled.  That would put the

24  Committee in a position to tell the Board that if the Board

25  wants to retain its settlements, it must pay more to certain

1   of the Committee's constituencies.

2          That is exactly the wrong reason for the Committee to

3   get stay relief.  We submit the Court did not merely four

4   years ago assemble a dedicated team of judicial mediators so

5   the Committee can threaten to wreck each of its settlements

6   unless Committee constituencies get what they demand.

7          The Bankruptcy Code already provides the Committee

8   with its means of objecting.  If the Committee's

9   constituencies reject their treatments under a plan, the

10  Committee can object to the settlement and/or object to the

11  plan on the ground of unfair discrimination, that other

12  creditors are treated better without justifiable reason.  The

13  Committee has no valid ground for the extra leverage it is

14  requesting in its motion.

15         The second point is the Committee's threshold

16  assumption that 502(a) grants it standing to file an objection

17  just like the Board can is all wrong.  We cited the First

18  Circuit's decision *In re Thompson* in our response, where the

19  First Circuit said that no creditor can file a claim objection

20  unless the Court says it can, because the Trustee, or in our

21  case, the debtor, is failing to do so.

22         So the request for it to just file, assuming that it

23  could file an objection like the Board can, is just contrary

24  to the existing law.  And tellingly, in the Committee's

25  reply --

1          (Sound played.)

2          MR. BIENENSTOCK:  -- it ignores *In re Thompson*

3     altogether.  Doesn't even address it.

4          Last and most important -- well, next to last point,

5     Bankruptcy Code Section 502(a) does not grant standing to the

6     Committee to object to claims is proven by logic.  If the law

7     were as the Committee contends, that the debtor and any number

8     of parties at interest can object to a claim, what would

9     happen if the debtor wants to settle and the Committee or

10    other objectors do not?

11         It cannot be that Section 502(a) gives a veto power

12    to every party in interest.  The Committee's pleadings and

13    argument today provide no answer, because the only answer is

14    the debtor or trustee is in control, whether the Committee

15    intervenes or not.

16         Finally, while the Board hopes the Court will grant

17    its motion and deny Committee's cross-motion, if the Court

18    denies both motions, we ask the Court advise us when we can

19    ask again.  We urge the Court, instead of denying the Board's

20    motion, to let the parties proceed on new summary judgment

21    pleadings back and forth while the Court schedules hearings,

22    as its time and resources allow, whatever that is.

23         That way, the issues will be ready for resolution

24    whenever the Court finds it is practicable to deal with them.

25    That may well save the ability to confirm a plan in calendar

1    year 2021.

2              Unless the Court has questions, that's all I have,

3    Your Honor.

4              THE COURT:   Thank you, Mr. Bienenstock.   I now have

5    Mr. Natbony for Assured for two minutes.

6              MR. NATBONY:   Yes.   Thank you, Your Honor.   And good

7    afternoon.   For the record, William Natbony from Cadwalader on

8    behalf of Assured.

9              In light of Your Honor's prior comments, there are

10   really two points here:   One dealing with timing and the other

11   dealing with denying the Committee's motion, being consistent

12   with Your Honor's prior orders in *PREPA* and *ERS*, and even one

13   in the *Commonwealth* case.

14             I would echo Your Honor's up front comments and join

15   in the Board's arguments to deny the Committee's cross-motion.

16   As the Court has previously done with respect to similar

17   motions relating to *PREPA* and the *ERS* cases, and the

18   *Commonwealth*, this Court should continue to reject these

19   efforts as improperly timed.

20             The Court has three times before prevented the

21   Committee from litigating claim objections prior to evaluating

22   a Board proposed settlement, and the same circumstances exist

23   here.   I echo Mr. Bienenstock's comment that the Committee

24   will have its opportunity to address its issues as part of the

25   confirmation process.   And increasing the scope and process of

1 litigation here and now, even on counts that are the subject

2 of the settlement in principle, currently being documented by

3 the various parties, would interfere with settlement efforts

4 and undermine the promotion of settlement.

5 Indeed, the Committee's sudden timing here, after

6 knowing for more than a year that these counts could

7 potentially have impact on them is significant.  They filed

8 their motion directly on the heel, in fact, one day after the

9 announcement of the settlement in principle.  And we think

10 that that speaks volumes.

11 As to the intervention request, Your Honor, we also

12 believe that any participation that the Court would order, if

13 at all, should at least be in accordance with the limitations

14 that Your Honor set forth in footnote three of the March 10,

15 2020, case management order --

16 (Sound played.)

17 MR. NATBONY:  -- and prior interventions orders in

18 these cases.

19 Thank you, Your Honor.

20 THE COURT:  Thank you.  We next have Mr. Berezin for

21 National for two minutes.

22 MR. BEREZIN:  Yes, Your Honor.  Actually, I think I

23 have a minute.  But in any event --

24 THE COURT:  Okay.

25 MR. BEREZIN:  -- hopefully one day you'll give me

 1   credit for that minute in another argument.  Robert Berezin,

 2   Weil, Gotshal & Manges on behalf of National Public Finance

 3   Guaranty Corporation.

 4          Your Honor, the only point I'll make, and be brief,

 5   is that there really is no good cause to lift the stay, even

 6   for the limited purpose of filing a claim objection for all

 7   the reasons that Mr. Bienenstock articulated.

 8          We certainly agree with those reasons.  And as one of

 9   the parties that is working very, very hard to reach, and

10   document, I should say, a settlement in principle that we

11   believe would be a true milestone in these cases, not just the

12   Commonwealth, but also potentially HTA, that any action by the

13   Committee in regard to a claim objection for filing any sort

14   of additional pleadings in the adversary could destabilize,

15   undermine really important settlements that otherwise could

16   occur.  And we would urge the Court to follow the Court's

17   earlier rulings in these cases and deny the Committee's

18   motion.

19          Thank you, Your Honor.

20          THE COURT:  Thank you, Mr. Berezin.

21          Now Ms. Miller for Ambac.  I have you down for two

22   minutes, so tell me if that's wrong.

23          Ms. Miller, you need to unmute on the phone and the

24   dashboard.

25          MS. MILLER:  Can you hear me now?

1            THE COURT:  Yes, I can.

2            MS. MILLER:  I think that's right, Your Honor.  For

3    the record, Atara Miller from Milbank on behalf of Ambac

4    Assurance Corporation.

5            I want to make just two quick points, and otherwise,

6    we'll rest on our papers on this.  The first one with respect

7    to Mr. Despins' modified request for a lifting of the stay,

8    solely for purposes of filing the objection, I would note our

9    position that while -- you know, whether or not they have an

10   absolute right to file an objection doesn't mean that whatever

11   rules govern intervention in the obligation of a party to

12   state all of the claims with respect to which it intends to

13   intervene, and all of the allegations that it had to do that.

14   And to the extent that the Committee failed to do that in

15   connection with its initial intervention in these adversaries,

16   that request is untimely now.

17           And you can't cure that by filing an objection,

18   which, as Mr. Despins characterized, would be essentially a

19   mirror of the claims already asserted in the adversary in

20   which the Committee has intervened.

21           And the second point, briefly, I heard

22   Mr. Bienenstock in his -- in his discussion put out a new or

23   modified request with respect to the motion that we previously

24   argued, asking for the Court to identify a time for a briefing

25   or allow briefing now so that everything is ready for the

1   Court's resolution, because that, quote, may well state the

2   ability to confirm a plan in calendar year 2021.

3           I would note that confirming a plan, I think

4   everybody would like a plan to be confirmed as quickly as

5   possible, but calendar year 2021 is arbitrary.

6           And the second point I would say is that that

7   highlights the inefficiency of the proposal.  I mean, I don't

8   think there's any dispute.  And Mr. Firestein, in his reply,

9   reiterated that there certainly would be at least some credit

10  and benefit and efficiency to hearing what the Court would --

11  is going to say on the currently pending summary judgments,

12  and the idea that we're going to brief it so that everything

13  sits in the ether, so that one day when the Court has time,

14  you know, on a Sunday morning pause, it can start looking at

15  these cases --

16          (Sound played.)

17          MS. MILLER:  -- to see if it's the wrong way to

18  proceed.  And with that, I'll rest.

19          THE COURT:  Thank you, Ms. Miller.

20          Mr. Sosland for FGIC, I have you down for two minutes

21  as well.

22          MR. SOSLAND:  Thank you, Your Honor.  Martin Sosland,

23  Butler Snow, for FGIC.

24          Simply put, Your Honor, the motion should be denied.

25  The Court's prior motion granting intervention to the UCC in

1    these adversary proceedings needs to be neither modified nor

2    aggregated.  Other than that, we'll rest on our papers.

3           In response to Mr. Bienenstock's rearguing of their

4    motion after argument had closed, I think that was

5    inappropriate.  I won't respond to it further other than to

6    say that motion should be denied for the reasons previously

7    argued in those papers.  Thank you.

8           THE COURT:  Thank you.

9           Mr. Despins, I return to you for up to five minutes.

10          MR. DESPINS:  Thank you, Your Honor.  And hopefully

11   it will be shorter than that.

12          Let me just address the various points that were made

13   hopefully briefly.  The first one about gaining leverage, when

14   the Board filed this motion to modify the Stay, we told them

15   in writing immediately within a day that we would want to file

16   this cross-motion.  That was before the settlement with

17   Assured was announced.  So that's the first point.

18          And also, when we intervened in the Complaint like, I

19   forget, probably a year or more ago, we said in there that we

20   were not intervening in the objection, quote, unquote, type

21   claims that the Board chose to put in the Complaint, but that

22   we reserve our right to do so.  So we telegraphed a long time

23   ago that this was a live issue.

24          And I want to be clear, we're not talking about

25   litigating these claims.  We're talking about the mere filing

1  of an objection, nothing more.  Mr. Bienenstock seemed to be

2  insulted by the fact that we were going to wreak havoc with a

3  settlement reached.  But, you know, Your Honor, you need --

4  you know that we're being offered 125 million dollars for

5  billions and billions of dollars of claims, while the Board is

6  giving other constituents --

7         THE COURT:  Mr. Despins, I don't want anybody talking

8  about the substance of positions in mediation.

9         MR. DESPINS:  No.  No, Your Honor.  This is in the

10  Disclosure Statement.  There's an offer --

11        THE COURT:  Okay.

12        MR. DESPINS:  There's an --

13        THE COURT:  You're talking about the Disclosure

14  Statement.  Okay.

15        MR. DESPINS:  Yes.  Yes.  Yes.  I'm sorry, Your

16  Honor.  Yes.  No, I would never -- so this is -- the 125

17  million is in the Plan Disclosure Statement.  That's what's

18  being offered to our constituents.  And, therefore, obviously

19  the Committee has no choice but to try to do what it can to

20  improve its position.

21         Now, the argument that Mr. Bienenstock made about 502

22  and *Thompson*, Mr. Bienenstock sees that present -- *Thompson* is

23  a Chapter 7 case, and the First Circuit was pretty clear about

24  the import of that.  And it's very relevant here, because in

25  Chapter 7, the Trustee has the exclusive right to file

1  objections under 704.  And 704 is imported in Chapter 11,

2  Chapter 11 of PREPA, through 1106.

3          But as we've made the argument that there's plenty of

4  time, 1106 is not imported in PREPA -- sorry, in PROMESA, and

5  therefore, that argument, the *Thompson* argument doesn't apply

6  in PREPA because -- sorry, in PROMESA, because 1106 has not

7  been incorporated by reference.

8          But nevertheless, we're not asking the Court to rule

9  that we have a veto or anything like that.  That's for another

10  day.  And by the way, we're not naive about how that line of

11  argument will probably go.  But the point is that we're not

12  asking the Court to rule on that today at all.  And I -- if I

13  remember correctly --

14          (Sound played.)

15          MR. DESPINS:  -- in PREPA, the Board made the same

16  argument, and Your Honor stayed away from it, meaning you did

17  not rule on that basis.  You ruled on the basis that there was

18  a settlement.

19          Here, there's no settlement before the Court today.

20  People talk about a settlement in principle.  We haven't seen

21  the terms of that, and, therefore, we have an absolute right

22  to file, not necessarily to prosecute, the objection.  And --

23          THE COURT:  You've made that -- you're making that

24  point that you're taking that position abundantly clear for

25  the record.  You have your proposal of an objection of record

1    in connection with this motion, at least conceptually.  So to

2    the extent you want a record that you haven't given up and you

3    believe it's something that you can do, that's there under --

4    and there are clearly controversies as to whether you can do

5    it.  You yourself are proposing that those not be litigated

6    now.

7         There would be presumably some arguments about

8    whether the Court permitting you to file it is in some way an

9    acceptance of your position that you have a right to do that.

10   That seems like a little nest that's unnecessary to build

11   right now.

12        MR. DESPINS:  I -- with all due respect, Your Honor,

13   obviously you're the Judge, you're making the decisions, but I

14   don't think that's what we're asking the Court to recognize as

15   an absolute right.  The point is there's a difference between

16   having an objection on file, which the Court chooses to

17   disregard in favor of an eventual settlement, and we

18   understand that, and having --

19        (Sound played.)

20        MR. DESPINS:  -- no objection on file.  I think that

21   that is the unfairness of this, which is that we're not even

22   allowed to have that procedural step.

23        And I'll close on that, Your Honor.  Thank you.

24        THE COURT:  Thank you very much.  So I will make my

25   oral ruling now.

1            Pending before the Court is the Motion of the

2    Commonwealth of Puerto Rico, by and through the Financial

3    Oversight and Management Board, for Stay Relief Granting Leave

4    to Prosecute Further Motions for Partial Summary Judgment,

5    which is docket entry no. 16326 in case no. 17-3283.  I'll

6    refer to that as The Motion.  It's filed by the Financial

7    Oversight and Management Board for Puerto Rico.

8            Also, I have before me the Official Committee of

9    Unsecured Creditors' Urgent Cross-motion for Stay Relief

10   Granting Leave to File Limited Objection, or in Alternative,

11   to Intervene, docket entry no. 16403, which I'll refer to as

12   the Cross-motion, which has been filed by the Official

13   Committee of Unsecured Creditors, which we often refer to as

14   the UCC.

15           The Court has reviewed the relevant pleadings and

16   listened to the arguments carefully.  The Court now makes its

17   oral ruling as to the motion and the cross-motion, and

18   reserves the right to make non-substantive corrections in the

19   transcript of this ruling.

20           For the following reasons, the Motion and the

21   Cross-motion are denied.  The Motion requests partial relief

22   from the litigation stay imposed by the Court in March of 2020

23   in three adversary proceedings, so that brief summary judgment

24   motions concerning certain counts pleaded by the Oversight

25   Board, through which the Oversight Board seeks disallowance of

1    unsecured claims asserted in the defendant's proofs of claim.

2    The Cross-motion supports the relief sought in the Motion, but

3    additionally asks for permission to file claim objections

4    concerning the same matters on which the Oversight Board seeks

5    to commence summary judgment motion practice.  In the

6    alternative, the Cross-motion requests authority to intervene

7    in the summary judgment motion practice.

8         The litigation stay from which the Oversight Board

9    seeks relief excepted only a relatively narrowed set of issues

10   from the stay, and was imposed by the Court with the support

11   of the Oversight Board and over the objection of several

12   parties, to aid in the orderly resolution of crucial issues

13   concerning the defendant's rights with respect to revenue bond

14   holdings.

15        The goal is to allow important issues of law to be

16   resolved in anticipation of the confirmation process in

17   connection with the Commonwealth's Amended Plan of Adjustment

18   in 2020.  Although the plan confirmation process was

19   interrupted by the novel coronavirus pandemic and the summary

20   judgment motion practice has taken a detour for limited

21   discovery, the Court believes that the rationale underlying

22   the litigation structure imposed in 2020 still makes sense.

23        The Oversight Board and the UCC have not provided

24   compelling reasons to lift the litigation stay and expand the

25   scope of litigation at this stage.  As the Court explained

1    towards the beginning of this Omnibus Hearing, its resources

2    and the parties' resources are not unlimited.

3         The Oversight Board has requested an expeditious

4    schedule with respect to confirmation of its further Amended

5    Plan of Adjustment, in part due to deadlines set in plan

6    support and settlement agreements that it negotiated.  It is

7    simply not possible to litigate every outstanding dispute

8    while maintaining anything like the schedule recommended by

9    the Oversight Board.  The Oversight Board and the UCC have not

10   demonstrated the necessity of cueing up briefing on their

11   chosen disputes concerning the liquidation or disallowance of

12   the claims that are the subject of The Motion and Cross-motion

13   at this point.

14        The UCC's request to file and stay claim objections

15   is also denied at this juncture.  Among other things, as the

16   Oversight Board has pointed out, the substantive issues that

17   are key to the described proposed objections can be litigated

18   in a confirmation context.  As we have heard, there are

19   controversies which the Court need not address today

20   concerning whether there is a right to file them in the first

21   place.

22        The Court will expect that after the currently

23   pending summary judgment motions in the revenue bond

24   litigation have been resolved, it will be appropriate to look

25   at what further litigation in what form is necessary in

 1   connection with the revenue bond issues.  Accordingly, the

 2   Court will enter an appropriate order denying the Motion and

 3   the Cross-motion.  Thank you.

 4        So now we turn to the debtors' joint motion to

 5   schedule a hearing concerning the adequacy of information

 6   contained in the Disclosure Statement.  That motion is docket

 7   entry no. 16332 in case no. 17-3283, and this is Item II.5 on

 8   the Agenda.

 9        I first have Mr. Rosen for the Oversight Board for 15

10   minutes.

11        Mr. Rosen, you need to unmute your phone and your

12   dashboard, as I still can't hear you.

13        MR. ROSEN:  Judge, can you hear me?

14        THE COURT:  I can hear you now.

15        MR. ROSEN:  Thank you, Your Honor.  I'm so sorry

16   about that.

17        Your Honor, thank you very much for your indication,

18   your ruling earlier today, because that significantly reduces

19   the amount of time that I'll be speaking.  So I'll be well

20   beneath the 15 minutes.

21        Your Honor, there were a few questions that actually

22   arose as a result of what you said, but let me first address

23   your comments.  The Oversight Board has no issue, Your Honor,

24   whatsoever with a 28-day notice period, and a response two

25   weeks after that, and having the hearing on June 29.

 1            The question that I had, Your Honor, is trying to

 2   reverse engineer this.  That, would it be all right with the

 3   Court if we were to, just based upon what you've heard a lot

 4   about already from people, the documentation associated with

 5   the agreement in principle with Assured and National in there,

 6   the corresponding Plan of Adjustment, and Disclosure Statement

 7   changes as a result of that, would it be possible, Your Honor,

 8   if the latest date that we would file that reply with the

 9   Court would be either June 24th or June 23rd, providing the

10   Court, therefore, with six or five days advance of the

11   replies?  That -- I'm sorry.

12            THE COURT:  Mr. Rosen, I will just tell you, the

13   Court needs two weeks with the papers, because, you know, the

14   Court needs to focus on the motion, and the arguments, and the

15   Plan, and Disclosure Statement in the context of those

16   arguments for efficiency sake.

17            The Court has other things going on all the time,

18   some of which I know about now and some of which I won't know

19   about until that time frame.  So if you need further time to

20   file the plan, we would need to look at a date a little bit

21   further out for the hearing, because I need two weeks.

22            MR. ROSEN:  I'm just working backwards, Your Honor.

23   So that would mean that our last date would be June 15 to

24   provide it to you.  And then that would mean that we would

25   file it no later than May 18.  And I think -- I think if my

1    dates are correct, I think that's eminently doable, Your

2    Honor.  That's fine.

3         THE COURT:  All right.  Are you sure that takes into

4    account everything?  Because it would be you file, there would

5    be 28 days to the opposition deadline, then two weeks after

6    that.  So that's six weeks to your reply, and then I'd still

7    need two weeks to my hearing date.

8         MR. ROSEN:  Right.  So I counted back six weeks from

9    the 29th, Your Honor, 15 -- wait.  Hold on.  Yeah.

10        THE COURT:  It needs to be eight weeks.  It needs to

11   be eight weeks, because you have four weeks to opposition --

12        MR. ROSEN:  Oh, you're right.  You're right.  I

13   apologize, Your Honor.  So that means we would have to file

14   the plan, Your Honor --

15        THE COURT:  By the 4th.

16        MR. ROSEN:  -- by May 4th, which means I look forward

17   to spending a lot of time with a lot of people over the next

18   few days.

19        THE COURT:  Well, you're all getting to know each

20   other so much better, I'm sure, over the past two weeks.  So

21   yes, to hold June 29 as the hearing date, you have to file the

22   plan by May 4th.

23        MR. ROSEN:  All right, Your Honor.  We will do our

24   best.  Thank you for clarifying that.

25        Your Honor, with respect to your own other comments

1    about striking paragraph seven, or a portion of it, we have no

2    problem with that, and we've already set pen to paper to try

3    to make those changes.  We moved the definition or the usage

4    of producing party, and we will modify the notice to reflect

5    that no one who -- unless a party files an objection, they

6    will be unable to speak.  And we will deal with the

7    modification of the service list to be consistent with the

8    case management order.

9         Your Honor, we set forth in our reply, in chart form,

10   and in the back, Your Honor, as well as up front, some of the

11   responses that we had to the six objections that have been

12   filed.  Some of them were just date oriented objections, so

13   they really don't need to be dealt with here, because I think

14   the Court has already given us its perspective with respect to

15   June 29.  There were several, however, that dealt directly

16   with the data root issues themselves and the purported

17   difficulty associated with that.

18        And for someone who is technologically challenged

19   like I am, I must tell you that I was able to get through the

20   process within 30 seconds.  It truly is just a click away to

21   make this thing happen.

22        There is a reference or a request by Mr. Hein that

23   you shouldn't need to be a creditor to be involved in and

24   looking at all this information, and media personnel should be

25   entitled to it as well.

1           Your Honor, we have issues with that.  We think that

2     really only parties in interest, which are the committees in

3     this case, as well as creditors, should have the opportunity

4     to review this information.  We ask merely for the

5     certification that people are creditors.  And if, in fact,

6     people -- and that is just a click here or a click there, and

7     that takes you to another screen.

8           But, Your Honor, to the extent that someone is asking

9     for access to confidential information, we ask that the --

10    that the protective order, which is a very, very short form,

11    and it is very minor in comparison to the prior protective

12    orders that this Court has already entered in this matter,

13    just to get access to the confirmation, and from there, the

14    confidential information.

15          There was a statement, Your Honor, in several of the

16    objections, or at least two of them, and certainly by Ambac,

17    that -- and the Committee that the data room should not be

18    also a replacement to any discovery request that they seek to

19    propound.  And we're not trying to do that, Your Honor.  We've

20    done this in other very large cases, and it's proved to be

21    extremely beneficial.  Actually, cases where some of these

22    firms have been involved and they've supported the idea.

23          But, Your Honor, we're not looking to stop them from

24    serving us with any additional discovery requests.  Likewise,

25    we're not seeking to be bound, and not to say that we won't

1    object to those discovery requests and seek to have the

2    Court's or Magistrate Dein's intervention with respect to

3    those, because we do think they will be inappropriate and

4    unnecessary for Disclosure Statement hearings.

5        So my point was, all parties would be in the position

6    that then, even if the data room had not been in existence --

7    although, of course, we'll be able to point to the fact that

8    most of the information that they'll probably be requesting

9    will already be in the data room, and they should take a look

10   at it ahead of time before they serve a discovery request.

11       Your Honor, with that, honestly, I don't mean to

12   burden the Court with any more argument here.  We think that

13   our papers are extremely responsive to the various requests

14   that have been made.  And, therefore, Your Honor, I'd like to

15   reserve my time for any responses that may be necessary.

16       THE COURT:  Just one -- let's see.  I'm sorry.  I

17   thought that there was another point that I wanted to raise

18   for you.  That is the paragraph seven issue, so forgive me for

19   holding you up there.  I will talk to you again on your reply

20   argument.

21       MR. ROSEN:  Thank you, Your Honor.

22       THE COURT:  Thank you.  So at this point, I will turn

23   to Mr. Despins, who I have down for seven minutes.

24       MR. DESPINS:  Thank you, Your Honor.  And it will be

25   a fraction of that, because I think you've resolved our

1   issues.

2         The only point I wanted to make is that there was a

3   discussion of 28 days from filing.  I think it's 28 days from

4   service.  I don't want to make Mr. Rosen's life harder, but I

5   just -- there's a big difference between filing and service,

6   as he is aware.  So that's the only point I would make.

7         Thank you, Your Honor.

8         THE COURT:  Thank you.

9         Mr. Amend or Mr. Zouairabani for the DRA claims.

10        MR. ZOUAIRABANI:  Yes.  Good afternoon, Your Honor.

11   For the record, Attorney Nayuan Zouairabani of McConnell

12   Valdes, LLC, on behalf of AmeriNational Community Services,

13   LLC.  With me today is my co-counsel, Peter Amend, from

14   Schulte, Roth & Zabel, LLC, in representation of Cantor-Katz

15   Collateral Monitor, LLC.

16        Your Honor, I think most of the issues that we wanted

17   to cover, the Court -- you know, we discussed it as part of

18   the Court's initial remarks this morning.  We agree with the

19   Court's remarks, and it seems that it's been clarified that

20   the 28 days, and just to make sure that I got it right, would

21   run from the filing of the Further Amended Disclosure

22   Statement and the filing of the Disclosure Statement approval

23   motion.

24        And if that were to be the case, that definitely

25   should take care of affording parties sufficient time.  Having

1  said that, Your Honor, I would like to comment briefly on the

2  fact, because it's a running theme on these cases, that at the

3  end of the day, even though this hurdle seems to be resolved,

4  there's a continuing situation that we have with these cases

5  going forward.

6       At the end of the day, the FOMB needs to follow the

7  rules with regard to the Disclosure Statement, and the process

8  needs to be fair to all involved, not just for the PSA

9  parties.  We're concerned with this continuing approach of

10  trying to encroach everyone's rights to accommodate artificial

11  time constraints in the PSA.  And as the Court noted, these

12  deadlines have no real bearing on these proceedings.

13       There are several reasons that support this.  First,

14  while the PSA expects that the plan will be effective by

15  December 15, it also recognizes that this date can be pushed

16  back if needed.  For example, the PSA currently contemplates

17  for the effective date to be extended until January 31, 2022.

18       Second, the PSA's proposed effective date is

19  aspirational, and could be easily undone by factors outside of

20  the control of the PSA party.  For instance, the second

21  amended plan legislation to be approved by the Puerto Rico

22  legislature.  And as prior experience has shown, the FOMB

23  cannot force the PR legislature to legislate on command.

24       These deadlines are neither sacrosanct nor binding in

25  these cases, Your Honor, and the FOMB cannot use them to

1   steamroll parties' due process rights in evaluating the

2   Disclosure Statement of the largest municipal bankruptcy in

3   U.S. history.  And as we've seen, it's in a constant state of

4   flux and affects hundreds of thousands of different

5   stakeholders.

6       And the FOMB has created this problem themselves,

7   Your Honor.  Parties in this case should not bear the cost of

8   FOMB's decision to go forward on arbitrary PSA milestones, an

9   Amended Disclosure Statement Plan that has not even been filed

10  yet, and it seems based looking back, that they'll do that by

11  May 4th.  So we'll look forward to that.  And whenever that

12  happens, the parties will need time to review it to determine

13  how it impacts us.

14      With that, I will yield my remaining time to my

15  co-counsel, Peter Amend.

16      THE COURT:  Thank you.

17      MR. AMEND:  Thank you.  Good afternoon, Your Honor.

18  As Mr. Zouairabani noted, my name is Peter Amend from Schulte,

19  Roth & Zabel on behalf of Cantor-Katz Collateral Monitor.

20      I'll sort of follow up briefly on remarks made by my

21  co-counsel.  We just want to note that whether -- and we

22  support the June 29 Disclosure Statement hearing date, but we

23  just want to be clear that whether this date should continue

24  to hold just depends on whether the Board can comply with the

25  applicable rules.  And, you know, given the circumstances here

1  in this case --

2       (Sound played.)

3       MR. AMEND:  -- we think that any sort of future

4  attempt to reduce a 28-day notice period should not be

5  permitted.  Just generally speaking, under Rule 9006(c),

6  courts have to consider primarily the prejudice that would

7  potentially result to the parties if the notice period is

8  reduced.  And the burden was on the proponent of the plan, not

9  parties reviewing the Disclosure Statement in order to have

10 the notice period shortened.

11      So, for example, in the case out of Bankruptcy Court

12 in the Eastern District of Arkansas, *Tim Wargo & Sons*, 107

13 B.R. 622, the Court did not find cause to shorten the

14 Disclosure Statement notice period when the debtor waited

15 until the 11th hour to file a disclosure statement and plan.

16      And on the flip side, courts generally permit

17 shortening these periods when the debtor or its creditors

18 would otherwise be extremely prejudiced.  And as an example

19 for that, a case out of the Southern District of Florida

20 Bankruptcy Court, *In re:  Florida Coastal Airlines, Inc.,* 361

21 B.R. 286.  The court held that -- the court permitted a

22 shortened disclosure statement notice period, because the

23 debtor could have otherwise lost its airline operating

24 licenses.

25      So I guess just in short and to sum this up, you

1    know, we argue here that the Court should permit the Oversight

2    Board to have the Disclosure Statement hearing on the 29th, if

3    the Board files its Further Amended Plan, Disclosure Statement

4    and Motion to Approve the Disclosure Statement, consistent

5    with the Rules.

6            So thank you, Your Honor, for your time.  And I'm

7    happy to address any questions that the Court may have.

8            THE COURT:  Thank you, Mr. Amend.  I have no

9    questions for you on this.

10           MR. AMEND:  Thank you.

11           THE COURT:  So next on my list is Ms. Miller for four

12   minutes.

13           MS. MILLER:  Good afternoon, Your Honor.  Again,

14   Atara Miller from Milbank on behalf of Ambac Assurance

15   Corporation for the record.

16           THE COURT:  Good afternoon.

17           MS. MILLER:  In light of Your Honor's opening

18   comments at the beginning of today's Omnibus Hearing, and in

19   particular Mr. Rosen's representation, which we appreciated,

20   in the reply as well, that the proposed data room is not

21   intended to displace entirely requests from potential

22   objecting parties, the only thing that we would note is we

23   continue to believe that 28 days in this case for this

24   Disclosure Statement is aggressive.  And that if the parties

25   are going to keep to that, there needs to be discipline and

1   cooperation in terms of getting the -- in terms of getting the

2   relevant materials to parties to review.

3          And so we're not opposed to the data room as a

4   starting point, but given the limited time -- and we would, of

5   course, expect, as Mr. Rosen stated that he does as well, that

6   the document -- that we would have a sense of what's being put

7   in the data room before just propounding discovery.  I mean,

8   nobody wants to duplicate efforts, and nobody wants to ask the

9   government or the Oversight Board for materials that have

10  already been made available.  But we would ask that rather

11  than just do a data dump, that there be some guidance or index

12  provided, or a description of the nature of the documents that

13  are submitted, because I expect that it may be voluminous, and

14  it may take a good amount of time just to get our hands around

15  what has been put into the data room.

16         And, you know, I just don't want that to delay being

17  timely in getting additional requests out.  I mean, it's

18  already clear based on the charts that it's not going to

19  include a number of categories and documents that we've

20  indicated would be relevant.  And we're likely going to have

21  to set up a process hopefully with Judge Dein to get those

22  disputes resolved.  But I do think that we need to set up a

23  protocol that has it move forward as expeditiously and

24  efficiently as possible.

25         THE COURT:  So let me --

1                    (Sound played.)

2              THE COURT:  -- ask you one thing.  I believe I saw in

3    the data room, elements of the proposed order, an indication

4    that there would be some sort of electronic indexing of the

5    material in the data room, the public material and the

6    confidential material, to find what has been proposed

7    insufficient.

8              MS. MILLER:  So I wasn't, frankly, exactly sure what

9    they meant by -- two things troubled me.  First, I wasn't sure

10   what it meant by saying that they were going to be put in

11   folders, and whether that was going to have a description of

12   the nature of documents, or just something more broad that

13   wasn't really going to be able to indicate whether or not --

14   you know, let us really understand what documents are in or

15   what documents are not, like raw data, for example.

16             Clearly, they've said they're going to produce some,

17   but not all.  It's going to take a lot of time for us to

18   download raw data and get experts looking through it to figure

19   out what we have if there isn't a description of what the raw

20   data is.  So, you know, a bucket that says documents

21   underlying the fiscal plan, for example, is not going to be

22   particularly helpful or insightful.  So I am concerned about

23   the degree of description.

24             You know, the other thing that troubles -- that I

25   guess I'm uncertain about is the representation that they'll

1    give that, but that they take no responsibility for it being

2    right or wrong, sort of similar to the disclaiming of any

3    responsibility for the accuracy.  You know, I'm not exactly

4    sure what to do with that.

5         THE COURT:  Well, they -- we're striking paragraph

6    seven.  Paragraph six says that they shall use their

7    reasonable, best efforts to place documents in the depository,

8    to categorize documents by topic.  There'll be disclaimers

9    stating that they're not responsible for miscategorization of

10   anything, and the creditor should not rely upon the

11   categorization, and should review all categories in their

12   entirety.

13        Are you objecting to that disclaimer language and to

14   the generality of the undertaking to categorize documents by

15   topic?

16        MS. MILLER:  If there --

17        THE COURT:  I want Mr. Rosen to be able to -- and

18   we'll go on for a couple minutes.

19        MS. MILLER:  Okay.

20        THE COURT:  I want Mr. Rosen to be able to respond as

21   meaningfully and specifically as he can when he comes back.

22        MS. MILLER:  Right.  So, you know, I've been on the

23   other side of a very large document production, and I

24   understand the undertaking and I'm sensitive to it.

25        So, you know, if that's the only information that

1  we're going to get about the documents, I have an objection

2  both to the broad topic description, as well as the limitation

3  of, you know, best efforts.  But we make no representation.

4       My proposed solution was that rather than imposing a

5  burden on what may be a significant amount of documents and

6  volume of data that's going into this database, for there to

7  potentially be sort of a separate description of the

8  categories and the nature of the documents that are proposed,

9  rather than just a topic to which those documents relate as an

10  alternative.

11       So I'm okay keeping that in the order if it comes

12  with something else if Mr. Rosen isn't willing to provide

13  additional information about the documents, but I have an

14  objection to that paragraph there.

15       THE COURT:  Thank you for clarifying that.

16       All right.  May I move on to Mr. Sosland now,

17  Ms. Miller?

18       MS. MILLER:  Yes.  That's all I had.  Thank you, Your

19  Honor.

20       THE COURT:  Thank you.

21       Mr. Sosland.

22       MR. SOSLAND:  Good afternoon, Your Honor.  Martin

23  Sosland from Butler Snow for FGIC.

24       We had a couple points in our objection.  The one to

25  notice, I believe, based on the colloquy, the Court's already

1    ruled on, so I won't spend any time on that.

2         And the second, which related to the discovery

3    procedures, in our objections that we thought they were not

4    even -- they were more appropriate for confirmation, rather

5    than for the Disclosure Statement, but there's been enough

6    detail on them at the hearing, that to hear that objection is

7    getting any traction and -- although that's what we believe.

8    And, for example, in the *Enron* case, the procedures that were

9    mentioned in the motion were actually approved a month after

10   the Disclosure Statement was approved and did relate to

11   confirmation.

12        It sounds like we're talking about the Plan.

13   Accordingly, the other parties -- what the procedures are for

14   this.  So I won't take up the Court's time with our objection,

15   other than it remains that.  I would note that these

16   procedures, on their face, say that they are -- solely relate

17   to use of the information in this data room --

18        (Sound played.)

19        MR. SOSLAND:  -- for the disclosure hearing and,

20   therefore, if we have a similar motion or proposed procedures

21   in connection with confirmation, we reserve our right to

22   address those at that time.  Thank you.

23        THE COURT:  Thank you.

24        Now, Mr. Hein we have for two and a half minutes.

25        MR. HEIN:  Your Honor, this is Peter Hein.  Three

1   topics.

2           THE COURT:  Yes.

3           MR. HEIN:  On the depository, the debtors are seeking

4   a protective order that would shield even an index to

5   supposedly confidential documents, but there's no

6   justification for shielding an index of confidentiality

7   concerns.  Of full bank account numbers and the like, those

8   could be addressed by redaction.  They do not justify

9   confidentiality for entire records, much less an index.

10          Confidentiality restrictions that preclude me from

11  consulting with others, including analysts or other

12  bondholders, require a compelling justification that has not

13  been shown here.  I would refer Your Honor to the First

14  Circuit decision in *Public Citizen v. Liggett*, 858 F.2d 775,

15  including at pages 789 to 790.

16          Even with respect to non-confidential documents, the

17  debtor would preclude access by public analysts and the media,

18  even to the nonconfidential documents, even to the index.  The

19  debtors' argument is that allowing access by public analysts

20  and the media supposedly could overload the depository, but

21  that claim is conclusory and speculative.  Nothing specific

22  has been shown.

23          Indeed, if there's a hundred thousand plus people

24  entitled to access, and the access is so loosely controlled,

25  as Mr. Rosen has described, it's all the more reason that the

1  public analysts and media should not be precluded from the

2  non-confidential portion of the depository.

3        And this affects me and other bondholders, because

4  public analysts and media could dig in, analyze and highlight

5  what is in the non-confidential documents, providing their

6  analysis, highlighting what is most significant.

7        Second, on the proposed notice, I listened to Your

8  Honor's comments at the outset this morning, but,

9  respectfully, I do not believe Your Honor's changes fully

10  address the problem I raised.  Unless individual bondholders

11  are given the opportunity to participate in the ECF system,

12  they will still be unfairly deterred from objecting by being

13  faced with overly burdensome service requirements.

14        I have proposed several alternative simplified

15  procedures for objection that will result in all parties in

16  the CM/ECF system receiving notice of all objections upon

17  their docketing, and I'd ask Your Honor to take a look at that

18  in my submission.

19        Third, I have standing as a party here to object to a

20  protective order --

21        (Sound played.)

22        MR. HEIN:  -- and to depository access procedures

23  that will affect me -- may I just wrap up, Your Honor?

24        THE COURT:  Yes, you may.

25        MR. HEIN:  Thank you.

1              Debtors are proposing a plan in which the amount I

2    receive will be affected by the votes and decisions of other

3    individual retail investors.  I am, thus, impacted by measures

4    that discourage acts of participation by other individual

5    retail investors.

6              And, respectfully, even apart from my standing, the

7    Court itself obviously, and I'm sure Your Honor recognizes

8    this, has a responsibility to ensure there's a practical means

9    by which individuals can participate and object, and to ensure

10   that information is not concealed behind a curtain, the

11   depository access restrictions, in an overly broad protective

12   order.

13             Thank you very much, Your Honor.

14             THE COURT:  Thank you, Mr. Hein.

15             And now Mr. Mudd for two minutes.

16             MR. ROSEN:  Your Honor, this is Brian Rosen.

17   Mr. Mudd sent me an e-mail early this morning saying he was

18   having some issues and may not be able to log on.  I don't

19   know if he's been able to.

20             THE COURT:  Ms. Ng, has Mr. Mudd logged on?

21             MS. NG:  Judge, hold on one second.  Just let me take

22   a look.

23             THE COURT:  Thank you.

24             MS. NG:  I don't think I had him on before.  Let me

25   look again.

 1            MR. SOSLAND:  Your Honor, Martin Sosland.  Mr. Mudd

 2   e-mailed the other objectors that he would not be able to log

 3   on and any of us could have his time, but I believe we've all

 4   spoken.

 5            THE COURT:  All right.  So we shouldn't expect

 6   Mr. Mudd?

 7            MR. SOSLAND:  That's my understanding.

 8            THE COURT:  Mr. Sosland?

 9            MR. SOSLAND:  Yes.  That's my understanding, Your

10   Honor.

11            THE COURT:  Thank you very much.

12            So we will return then to Mr. Rosen.

13            MR. ROSEN:  Thank you, Your Honor.  And I appreciate

14   Mr. Sosland bringing up *Enron*, because *Enron* was one of the

15   cases that I was referring to.  And Mr. Sosland and I were

16   partners at that time, and we did formulate with others these

17   data room procedures.  And he's correct, they were in the

18   context of the confirmation hearing.

19            And what we thought was we would start the process

20   sooner, because we want people to have as much of an

21   opportunity to review whatever information is available as

22   soon as possible, and not do it subsequent to the approval of

23   the Disclosure Statement, hopefully June 29, or shortly

24   thereafter.

25            So, yes, we are looking to start the process, the

1    data room now, and it would flip over to a so-called

2    confirmation data room.  And some additional information may

3    become available.  Some may be that no additional information

4    is available.

5         But to Mr. Sosland's comment, we will be laying a lot

6    of these things out, Your Honor, in the motion that we filed

7    for approval of the Disclosure Statement, and for procedures

8    associated with discovery and getting us from a disclosure

9    statement hearing to a confirmation hearing.

10        With respect to Ms. Miller's comments, and perhaps I

11   misunderstood the Court's comment earlier about paragraph

12   seven, because in taking my notes, Your Honor, I noted that

13   you would -- you were fine if, in fact, there was some degree

14   or statement with respect to authenticity of the documents.

15   But you were also okay that, to the extent that the Oversight

16   Board did not prepare any of those documents, it would not be

17   repping or warranting as to the accuracy of the information.

18        But so to the extent that they were developed by the

19   Commonwealth, or PBA, or someone else, Your Honor, we would

20   gladly put them in.  But we, as the Oversight Board, cannot

21   rep and warranty as to what their accuracy might be.

22        With respect to the folders, Your Honor, we do have a

23   sense of what the general folders are, but I got the sense

24   from Ms. Miller that she was looking for a separate

25   description of each and every document.  And that's just not

1    going to be possible, because there are so many documents that

2    are going to go into this, and they've noted already the sheer

3    size of this, that to do that, Your Honor, we might as well

4    just not do the data room and just say, come and get them,

5    here they are, pick them up on a street corner.

6         That doesn't make sense, and that would overburden

7    everybody.  And it really is not consistent with what we're

8    trying to do, which is to streamline the process.  And I would

9    also note that Ms. Miller here is taking a quantum leap, as

10   she has often done here, as to what is actually involved for a

11   Disclosure Statement hearing.  And as we indicated in our

12   reply, Your Honor, most of what is referenced in the Ambac

13   response, and perhaps one or two of the others, are not

14   disclosure statement materials.  They are not necessary for a

15   disclosure statement.

16        And Your Honor is well aware of what the standard is

17   for approval of a disclosure statement, and it's not drilling

18   down to the level that Ambac is looking to do.  Everybody's

19   focused, Your Honor, and they've thrown out, and as certainly

20   Mr. Amend did and his colleague did, about the deadlines are

21   not binding.  Deadlines are too short.  They shouldn't be

22   stressed about them, and nor should they be put into a bind

23   about them.  But clearly some of the people involved in this,

24   Your Honor, while they say they're happy to have a Disclosure

25   Statement hearing go forward, their goal is not to have a

1    confirmation hearing go forward in the time frame that we are

2    looking to do it.  Their goal is to delay the process.

3         And their comments about the data room and the

4    exercise that they think should be done, or the documents that

5    they think should be put into these data rooms, are clear

6    examples of their effort to delay the process.

7         We are happy to put in whatever we can put in, Your

8    Honor.  We are pleased to put in folders, to the extent that

9    we can generically describe what are in those documents -- in

10   those folders, Your Honor.  And we're happy to be recipients

11   of --

12        THE COURT:  Mr. Rosen.

13        MR. ROSEN:  -- additional discovery requests --

14        THE COURT:  Mr. Rosen.

15        MR. ROSEN:  -- and deal with what those discovery

16   requests are --

17        THE COURT:  Mr. Rosen, I'm breaking my rule and

18   interrupting you.  So can you give us a concrete example of

19   the level of specificity or generality with which you intend

20   to label folders?

21        So, for instance, are you going to say, one folder is

22   financial information, one folder is bank records?  Or are you

23   going to be more particularized than that?

24        MR. ROSEN:  We're trying to be more particularized,

25   Your Honor.  An example would be factual source material and

1   raw data, underlying Disclosure Statement.  Another would be,

2   approximate creditor recoveries and allocations.  A third

3   might be certain public employee collective bargaining

4   agreements.  A fourth would be dairy producers, so on and so

5   on, Your Honor.  Trying to relate them, to the extent

6   appropriate, to some of the classifications which are set

7   forth in the Plan and will be detailed in the Disclosure

8   Statement, and some underlying source material as well.

9        THE COURT:  Well, I suspect the more general they

10   are, the more quickly you're going to be getting requests for

11   specific types of things, so that three weeks aren't spent

12   trying to figure out whether some things are a terabyte of

13   information or 17 terabytes of information.  So I think that

14   efficiency will be best served by your categorizing things as

15   specifically as possible so that those who are considering

16   discovery requests can make a meaningful look in an efficient

17   way for what's in there.

18        MR. ROSEN:  We certainly will do our best, Your

19   Honor, to be as specific as possible, yes.

20        Your Honor, lastly, with respect to Mr. Hein's

21   comments, I think that we have addressed many of these before,

22   and I don't think there's any need for any further argument

23   with respect to those, as our papers, I believe, set forth our

24   position.

25        THE COURT:  Let me go back to just a couple of

1   things.  So we talked about 28 days from the date of filing,

2   which in ECF is service of what's filed, to the extent people

3   are on ECF.  Mr. Despins points out that the Rule is 28 days

4   from service.

5       I didn't ask him to elaborate there on the -- any

6   material difference that he sees in the effect as to when the

7   period starts running, but will you comment on that?  What's

8   your understanding?

9       MR. ROSEN:  Your Honor, we think, based upon the

10  sheer size of this and getting Prime Clerk to do what's

11  necessary, which would be the preparation of all materials,

12  including the computer sticks that will be used for this

13  process, we would hope that the Court would establish that

14  it's 28 days from the filing on ECF.  And we certainly will

15  endeavor to mail things as quickly as possible from that date.

16      One of the things that the Court should consider also

17  is that there are some people who will be asking for a Spanish

18  translation of this.  And in the past, Your Honor, that has

19  lagged a little bit.  We have tried to remain current with all

20  the changes in the Disclosure Statement, but as we continue to

21  finalize the definitive documentation in the Plan of

22  Adjustment, and, therefore, the corresponding Disclosure

23  Statement, there will be some additional changes necessary to

24  go from English to Spanish.

25      So we're hoping, Your Honor, that we focus -- and the

1    Court does have the ability to limit it to 28 days from the

2    filing, and we hope the Court would do that, because

3    otherwise, Your Honor, there's no way that we could make the

4    time frame that we've already discussed.

5         THE COURT:  How much time is Prime Clerk going to

6    need to get everything out?  I think we have to at least build

7    that period of time in.

8         MR. ROSEN:  Yes, Your Honor.  And I apologize.  I

9    have not had that direct communication.  I don't know if

10   Mr. Ma is on the phone and could answer that question, or

11   Ms. Stafford, or Ms. Alonzo?

12        They may be on listen only lines, Your Honor.  Well,

13   Ms. Stafford is not.

14        THE COURT:  Ms. Stafford was on a live line.

15        MR. ROSEN:  Right.

16        MS. STAFFORD:  Pardon me, Judge.  This is Laura

17   Stafford of Proskauer on behalf of the Financial Oversight and

18   Management Board.  My understanding is about five to six days

19   for Prime Clerk to complete service.

20        THE COURT:  So we need to have the 28-day period run

21   from service.

22        MR. ROSEN:  So, Your Honor, that would mean that we

23   would need to push back to the 29th, most likely.

24        THE COURT:  Yes.  Yes.  I'll have to look at my

25   calendar and consult the District of Puerto Rico as to the

1    precise days on which the facility would be available to do

2    that.

3            MR. ROSEN:  Your Honor, is it -- I apologize for

4    interrupting.  Is it the intention of the Court that the

5    Disclosure Statement hearing would be in San Juan?

6            THE COURT:  Well, even when we're doing this

7    telephonically, we have a base of operations in San Juan that

8    is in a facility that is otherwise used for other court

9    activity.  So I have to make sure of that availability for the

10   court reporter and others who are necessary to this who are in

11   San Juan.  I do not expect it to be live.  So that is -- if

12   you'll excuse me just one second.  Everybody bear with me.  I

13   will be back in just a second.

14           Okay.  I thank everyone for bearing with me.  So I am

15   back.

16           Mr. Rosen, can you hear me?  Hello?

17           MR. ROSEN:  Yes, Your Honor.

18           THE COURT:  Okay.  Great.  For a second, I thought

19   I'd lost everyone.

20           So I don't have the precise date at the moment.  If

21   we're pushing things back for a week, I would hope that we

22   would be able to do it in the following week, which would be

23   the week that follows the July 4th weekend.  I don't have a

24   precise date here.  I will have to put that -- I guess we can

25   file a notice on the docket of what that would be.

1        You are going to be rewriting the proposed order in

2   accordance with the remarks that I made?

3        MR. ROSEN:  Yes, Your Honor.

4        THE COURT:  So you'll put a revised proposed order on

5   the docket as well, and then we'll take it from there.  So we

6   should be able within the next day or so, and then I can

7   probably -- I may be able to announce it orally tomorrow as

8   well, what the date would be, since it seems we can't do June

9   29.

10        MR. ROSEN:  Okay, Your Honor.  We will file that on

11   the docket and send it down to the Court as well.

12        THE COURT:  Very good.  So just to be clear, I'll do

13   a little oral ruling.

14        This is the Court's oral ruling on the Oversight

15   Board's Motion to Set a Hearing for Consideration of the

16   Disclosure Statement for the Third Amended Title III Joint

17   Plan of Adjustment of the Commonwealth of Puerto Rico, as well

18   as related briefing deadlines and other procedures, which is

19   docket entry no. 16332, as modified by the Amended Proposed

20   Order and exhibits that were attached to docket entry no.

21   16507, which is the motion.

22        I've reviewed the pleadings carefully and listened

23   carefully to the arguments today.  As I indicated earlier, I

24   found that the Oversight Board did not show adequate reason

25   for shortening the 2002 notice period.  So the Court's ruling

1   is that the 28 days notice shall be provided, and that will

2   run from date of service, which will be approximately a week

3   after the date of filing.

4        The Court also found that the proposed requirement

5   for service of objections separately from filing by -- and by

6   a mix of mail and e-mail on the entire master service list and

7   others, imposes an undue burden on objectors.  So the Court

8   has ruled and the Oversight Board has agreed that separate

9   service requirement for objections will be in accordance with

10  the Case Management Order.

11       The paragraph seven will be rewritten to narrow

12  disclaimers as to the accuracy of third-party information.

13  There had been concerns expressed about timely access.  The

14  Oversight Board's counsel has explained that there will be

15  very prompt ease of access to the data room, and that is a

16  sufficient response to that objection.

17       So the proposed order will be revised by the debtor

18  to adopt the briefing and hearing schedule that had been

19  described, which is 28 days notice of the objection deadline

20  from the service of the approval motion, two weeks for the

21  reply by the Oversight Board, and a hearing two weeks after

22  that.  The Court will inform the parties of a date that is

23  available and consistent with the time frame after June 29.

24  The provision will be added that persons and entities that

25  have filed timely objections will be entitled to make oral

1   remarks in opposition at the hearing.  The objections are

2   otherwise overruled.

3        MR. ROSEN:  Thank you, Your Honor.  We will submit an

4   order.

5        THE COURT:  Thank you very much.  All right then.

6        The next item on the Agenda is the UCC's Motion to

7   Schedule a Hearing on a Renewed Rule 3013 Motion, and that is

8   docket entry no. 16397 in case no. 17-3283.

9        I have first Mr. Despins for eight minutes.

10       MR. DESPINS:  Yes, Your Honor.  Good afternoon again.

11  Luc Despins -- for the record, Luc Despins with Paul Hastings

12  on behalf of the Committee.

13       Your Honor, this is a scheduling motion.  This is not

14  the 3013 motion.  So at least in the opening remarks, I intend

15  to be fairly brief.

16       The way we recall the hearing in April of last year

17  actually was that the date was not as to whether this would be

18  heard at confirmation or the Disclosure Statement hearing, but

19  rather whether it would be heard prior to the Disclosure

20  Statement, or at the Disclosure Statement hearing.  But the

21  Court did not -- to be clear, the Court did not issue any

22  final rulings on that.  But the comments were of that nature.

23  And that's why we believe today that that's the same issue.

24       We did say at the time, and we're saying again, that

25  we are okay with having this heard at the Disclosure Statement

1    hearing.  But we firmly believe that the best thing for the

2    case, for all sorts of reasons, is to have it heard before,

3    particularly now that there's plenty of time to have that

4    motion be heard on its own -- well, subject to the Court's

5    availability, of course.  But there's plenty of time to have

6    it heard long before the disclosure statement objection

7    deadline.

8           And because you can imagine, you know, that there's

9    going to be millions of dollars spent preparing -- not by us,

10   but just generally across the board, spent preparing

11   objections, et cetera, discovery, and that if for some reason

12   the Committee is found to be correct on this issue, that all

13   of that would be obviated if there's a prior ruling by the

14   Court.  So the Retiree Committee and the Oversight Board

15   really spent a lot of time in their objection addressing the

16   merits.

17          I think also the Oversight Board said, wait a minute,

18   he shouldn't be allowed to go forward until he answers the

19   questions we pose.  And, of course, the questions that they

20   pose but never briefed.  And we don't believe that's the case.

21   But in any event, we've addressed a lot of that in our reply.

22   But, you know, at this point, I would -- I would be inclined

23   to pause and to reserve time for reply, obviously relying on

24   our -- on the reply we filed, and also to address any

25   questions the Court may have, because this is just a

1    scheduling motion at this point.

2            And, of course, I would reserve all my time for the

3    reply.

4            THE COURT:  All right.  We will do that.  I was not

5    unfortunately clocking you on that, and so I will leave it to

6    my time master to note the amount of time, additional time

7    that you have reserved for your reply, and proceed

8    accordingly.

9            So next is Mr. Bienenstock, for the Oversight Board.

10           MR. BIENENSTOCK:   Thank you, Your Honor.  Good

11   afternoon once again.  Martin Bienenstock at Proskauer Rose,

12   LLP, for the Oversight Board.  I think I can be extremely

13   brief on this.  The point of agreement among the parties, and

14   I think the Court as well, is that something that would

15   blatantly make the plan unconfirmable if the matter -- if it's

16   a matter of law, is preferable to be decided before the plan

17   is sent out for voting, et cetera.

18           So we've never had an issue with that type of

19   resolution, and I think Your Honor structured it -- Your Honor

20   actually called it a structural issue, is there no set of

21   facts under which this classification could be legal, and we

22   think that is a perfect way to articulate the issue.

23           And we have no problem dealing with that in advance,

24   whether in advance of the Disclosure Statement hearing or at

25   the hearing.  And I think I'm in agreement with Mr. Despins

1  that subject to the next thing I'm going to say, if that's

2  satisfied, let's tee it up as quickly as possible, consistent

3  with the Court's schedule.

4          Where we differ, and I don't know why the Committee

5  has been playing this cat and mouse game, is before we have a

6  hearing and the Court is asked to rule, that there will be a

7  hearing on the classification issue of the Retiree claims on

8  the one hand and the General Obligation Bondholder claims on

9  the other hand.  There ought to be a showing that it is

10  possible in the real world for us to put Retiree claims in the

11  same class as bond claims.

12          And as I explained when this first came up at I guess

13  with the first 3013 motion, since Retirees -- since there is

14  no fund anymore, the Commonwealth has to pay the pensions

15  basically out of pocket.  The Retiree claims are paid monthly

16  for the life of the retiree, and I suppose sometimes a spouse,

17  but basically they are monthly claims tethered to the lifetime

18  of the retiree.

19          And bond claims are paid untethered to any lifetime.

20  It's an amount that you pay on behalf of a certain amount of

21  the bond claim.  They are different treatments inherently.

22  Section 1123 of the Bankruptcy Code, as incorporated into

23  PROMESA by section 301(a) is not allowing one class -- for you

24  to treat claims differently.  So I asked the first time the

25  Committee raised this, how can that be done?  And I think the

1    Court asked Mr. Despins to be prepared to address that.

2         They didn't address it in their pleading.  I e-mailed

3    Mr. Despins.  He didn't respond.  And now they say we didn't

4    brief it.  Well, I don't know what more they're waiting for

5    than the explanation I gave many months ago at the 3013

6    hearing, and that now I've given a second time and that --

7    well, a third time, because we put it again in our answering

8    pleading for this hearing.

9         So bottom line, we respectfully submit, if and when

10   the Committee shows the Court that there is a way the Court

11   can order that relief, a practicable, doable way such that if

12   he's entitled to that relief, he can get it, then let's

13   schedule the hearing and get it done on or before the

14   Disclosure Statement hearing.  But so far, we had no answer to

15   the question.

16         Thank you, Your Honor.

17         THE COURT:  Thank you.

18         Representative of the Retiree Committee, I have Ms.

19   Root's name down, but that may have changed.

20         MR. RAIFORD:  It has, Your Honor.  Landon Raiford.

21   I'll be playing the role of Ms. Root today.  Jenner & Block

22   for the Retiree Committee, for the record.

23         THE COURT:  Good afternoon, Mr. Raiford.

24         MR. RAIFORD:  Good afternoon.  The Retiree Committee

25   agrees with the Board that as we stand today, the scheduling

1  motion should just be denied.  And we also appreciate the

2  Board presenting kind of an alternative, a compromise solution

3  regarding scheduling.  And, frankly, if the UCC were truly

4  raising a purely structural classification issue, we would

5  perhaps support this proposed alternative schedule.

6          The problem, however, is that twice now the UCC has

7  failed to present such a narrow legal issue for consideration.

8  Instead, they've once again decided to present this Court with

9  an unfair discrimination claim loosely dressed in

10  classifications clothing.  The UCC should not get a third

11  opportunity to correctly tee this issue up prior to plan

12  confirmation.  And so we ask that the Court deny the

13  scheduling motion, and also deny the Rule 3013 motion again

14  without prejudice.

15          The UCC argues that the scheduling motion simply

16  seeks a hearing on a narrow classification issue, but it is

17  whether any plan were separately classified general unsecured

18  and Retiree claims under *Granada Wines*; but for the second

19  time, they fail to analyze the very classification test they

20  claim controls.  Whether the "legal character" -- every

21  separately classified claim is different.  The UCC makes no

22  effort to explain how Retiree pension claims are legally

23  indistinguishable from a trade creditors claim, which is what

24  they must show to present it under a Rule 3013 motion.

25          But it doesn't take much to see that retired pensions

1   are markedly different from general unsecured claims.

2   Pensions are paid pursuant to a myriad of rules related to

3   tenure, job classification and the like.  They are paid over

4   the course of decades and terminated upon the passing of the

5   retiree.

6        These types of claims are on their face,

7   fundamentally different from, for example, a tax refund claim,

8   which is a type of claim held by one of the UCC's members, and

9   the statutory construct for these claims that trade pensions

10  -- the character of the claim legally indistinguishable from

11  those of general unsecured creditors.  And, quite frankly, so

12  is PROMESA, which mandates that the plan provide adequate

13  funding for pension costs.

14       The UCC, in its reply, and again today, trusted the

15  cover of silence on this issue, but they did not need to

16  preemptively address objections to the motion.  But this is

17  not that.  Instead, what the Court is faced with, that -- the

18  party line and purported test that provided no analysis that

19  recalling -- the line is not satisfied here.  The issue is not

20  one of preemptively addressing defenses.  It is a failure to

21  address a prima facie case.

22       What is clear, and, frankly, what the UCC makes

23  explicit in their papers, is that the true concern is not

24  whether unsecured claims must be lumped into one giant class.

25  If they were, they would be arguing for that classification

1    for all unsecured creditor classes.  It is not making that

2    request --

3              (Sound played.)

4              MR. RAIFORD:  -- because the UCC's argument is, to

5    quote them, the general unsecured creditors are entitled to

6    the same treatment as and must receive no less than Retirees.

7    For the reasons stated in our brief, there's a confirmation

8    objection.  They should not be heard now.

9              In sum, the UCC took this Court's guidance a year ago

10   concerning a petition crafting and litigating a true

11   structured classification argument in connection with the

12   Disclosure Statement hearing, and instead filed a routine that

13   they had done before.  They should not be given a third

14   opportunity to try and get it right.

15             Maybe the current theme of this Omnibus Hearing is

16   the enemy of us all, time, and the fact that there is never

17   enough of it.  Your Honor has reminded us that your time is

18   finite, to be practical, to try and address any and everything

19   the parties would like clarity on now.  Of course, maybe there

20   are some one-off litigation issues that may be necessary.

21   This, however, is not one of them.  And the Retiree Committee

22   requests that the Court deny the motion.

23             Thank you.

24             THE COURT:  Thank you, Mr. Raiford.

25             So now we return to Mr. Despins, but before you

1    speak, Mr. Despins, let me put something out there.  It seems

2    to me that this is a problem, that even a year out, no one

3    really knows how you will be dealing with, you know, the

4    question of the differential and satisfaction methodology,

5    basis of confrontation, the ultimate amount to be paid out on

6    the Retiree claims in connection with the classification.

7    Then, as a resource allocation/practical matter, even if I do

8    cue up hurried briefing, and even with the now 28-day plus

9    service or 28 days after service schedule for the objections,

10   there is still likely to be a great deal of work that people

11   are doing in aid of crafting those objections to the

12   Disclosure Statement before the ruling on the motion.

13          It also seems to me that if this is a serious motion

14   on a serious legal issue, not a factual issue, in connection

15   with whether we should go forward on the proposed Disclosure

16   Statement, it can be raised and briefed as part of your

17   objection to the Disclosure Statement, at which point you

18   would clearly have to say why it is that the classification as

19   described in this particular Disclosure Statement could never

20   be legal, not withstanding the characteristics that have been

21   identified.  The Oversight Board may well, you know, front yet

22   again why it is it believes the classification is appropriate

23   in its motion for approval of the Disclosure Statement.

24          So my inclination is to deny the motion for separate

25   briefing, to have this heard as part of the Disclosure

1    Statement evaluation, and briefed as part of the Disclosure

2    Statement briefing rather than separately.  So with that,

3    Mr. Despins --

4            MR. DESPINS:  Okay.  Thank you, Your Honor.

5            Your Honor, I don't know if people refuse to look at

6    the pleadings.  Our Reply in footnote 21 provided one basic

7    answer to the question, which is when Mr. Bienenstock is

8    saying, hey, we are giving them a monthly stipend for life,

9    that's their treatment.  How can you give the same treatment

10   to the others?

11           But that begs the question, if the answer to

12   classification was always, hey, we want to provide them

13   different treatment, therefore, it's okay to classify them

14   separately, well, the classification argument would become a

15   joke.  That's all in footnote 21.  That's just one argument.

16           And the reason why we didn't think we had to brief

17   that is because that's just one argument they'll make.

18   They've never briefed the issue.  But every claim, Your Honor,

19   is accelerated on the petition date.  So this argument that

20   the Retirees have a right to a stream of payment, yes, that

21   was their state law right or state law -- or territory law

22   right.  The same way that trade creditors or tax claimants had

23   a right to receive a tax refund, that was their territory law

24   right.  It may be subject to conditions.  It may be payable

25   over time, but that doesn't changes the character of the

1   claim.

2          The First Circuit has spoken very clearly about what

3   character of the claim means.  It means do you have priority

4   or not.  Do you have different, you know, different rights as

5   a creditor, vis-a-vis the obligor.  And the answer in this

6   case is no.  And that's all we needed to prove in our opening

7   brief.  But nevertheless, we added the argument on footnote 21

8   of the reply that basically explains that, which is it would

9   be so easy just to say, well, I want to pay them over time,

10  and these guys, they're not going to pay over time.

11  Therefore, I win the classification argument.  That would be

12  insane.

13         So, you know, if Your Honor wants all this to be

14  heard at the Disclosure Statement hearing, fine.  But we think

15  that that could turn out to be wasteful from the point of view

16  of if the Court were to agree that separate classification is

17  required, or, sorry, that the common classification is

18  required, then we would have spent an entire -- you know, a

19  lot of time and money on a plan that was dead on arrival.

20         So again, I'm not going to -- I understand, when you

21  usually issue these brilliant rulings, that you generally

22  stick to them, but I wanted to point out to the Court that we

23  did address the issue, even though we didn't have to, because

24  this is an issue that they've never briefed.  By the way, in

25  their original brief, there was not a word about that.

1          I know that if we did that, you know, the Court would

2     probably say, hey, you're barred from raising that.  But

3     Mr. Bienenstock showed up at the April hearing last year and

4     said, hey, we have another argument, which is this one, but

5     that was never briefed by the Board.

6          So for us to brief anticipatory arguments that they

7     have not fully briefed is not required.  But I'm sorry if I

8     sound a little bit indignant, but we did address it, and we do

9     think that it would be preferable for all sorts of reasons to

10    have this heard separately before the Disclosure Statement

11    hearing.  But obviously it's Your Honor's call.

12         Thank you very much, Your Honor.

13         THE COURT:  Thank you.  I guess I'm rather heavy

14    handed with my hints.  To the extent that helps people, that's

15    good, and thank you for bearing with it if you find me heavy

16    handed with my hints.

17         I am persuaded that it is more efficient from the

18    resource allocation point of view to have this classification

19    legality issue briefed as part of the Disclosure Statement

20    briefing.  So the scheduling motion is denied, and the 3013

21    motion is denied without prejudice to litigation of the issue

22    in connection with the Disclosure Statement briefing and

23    hearing.

24         I do appreciate, Mr. Despins, your pointing to your

25    footnote and arguing, in this context, your response to the

1    point that has been argued by the Oversight Board.  I think

2    that that will help to make the briefing of these issues in

3    connection with the Disclosure Statement hearing sharper and

4    clearer for all concerned.

5         So the scheduling motion is denied, and the renewed

6    3013 motion is denied without prejudice to assertion of the

7    arguments in the objection to the proposed Disclosure

8    Statement.  Thank you.

9         Next on the Agenda are a couple of contested

10   objections to claims, one of which I think has been withdrawn,

11   but I will let the Oversight Board's representative explain

12   the current state of play with respect to these objections to

13   claims.  So, Ms. Stafford -- I'm sorry.

14        MR. DESPINS:  Your Honor, I really apologize for

15   interrupting, but it's just -- again, Luc Despins for Paul

16   Hastings for the record.  I clearly understand the ruling.

17   I'm not debating it.  The only question is the effect of that

18   is that the Board will have the last word on this issue,

19   because we're going to file an objection, they'll file a

20   reply, and, of course, we never saw their arguments.

21        So we would ask to have the right to file a sur-reply

22   on this issue, because we will be briefing in the dark because

23   we don't know, other than the statements made by

24   Mr. Bienenstock -- we never saw any briefing on this issue.

25   That's the only soft request we would have on this issue, only

1    of the 3013 classification.

2           Thank you, Your Honor.

3           THE COURT:  You have permission to file a request to

4    file a sur-reply once you've seen the reply, which means

5    you're going to be planning your sur-reply, and you will, in

6    your view, I'm sure, persuade me quite quickly that you have

7    something to say.  If you don't, then there may not be a

8    sur-reply.

9           MR. DESPINS:  Thank you, Your Honor.  I apologize for

10   the interruption.

11          THE COURT:  No worries.  Thank you.

12          All right.  Then number 7 on the Agenda is the 293rd

13   Omnibus Objection to claims, which is docket entry no. 15716

14   in case no. 17-3283.  Ms. Stafford, I believe, is presenting?

15          MS. STAFFORD:  That's correct, Your Honor.  Thank

16   you.  This is Laura Stafford, for the record, of Proskauer

17   Rose, on behalf of the Financial Oversight and Management

18   Board.

19          The 293rd Omnibus Objection, this one, Your Honor,

20   was not withdrawn, just to refer back to your previous

21   statement.  This objection seeks to disallow in their entirety

22   proofs of claim that assert liability associated with

23   government-issued bonds, but which fail to provide information

24   necessary to enable the debtors to reconcile the claims, such

25   as identification of specific bonds asserted by CUSIP number

1   and amount.

2           We received one response with respect to this

3   objection filed by Helvia Caparros Santos at ECF no. 15856

4   with respect to Proof of Claim No. 17107.  In this response,

5   Ms. Caparros Santos makes reference to a UBS account statement

6   as evidence for her alleged ownership of bonds issued by the

7   Commonwealth of Puerto Rico.

8           However, upon review of Ms. Caparros Santos' complete

9   UBS account statement, which debtors' counsel obtained from

10  Ms. Caparros Santos' counsel and attached to our reply, the

11  only Puerto Rico related investments in Ms. Caparros Santos'

12  account are ownership interests in certain mutual funds, which

13  in turn may have invested in bonds issued by the Commonwealth

14  or one of its instrumentalities.

15          For that reason, Ms. Caparros Santos' claim is filed

16  based only on her status as an alleged creditor of a creditor

17  of the Commonwealth, and the debtors respectfully note that,

18  as a result, Ms. Caparros Santos lacks standing to assert that

19  derivative claim against the Commonwealth.  So we would

20  request the Court grant the objection and disallow the claim,

21  not withstanding that response.

22          THE COURT:  Thank you.  I apologize for my misuse of

23  the term "withdrawal", which is not relevant to this

24  particular Omnibus Objection at all.  What I was referring to

25  was an understanding that one response to another Omnibus

1   Objection had been withdrawn.  You'll tell me whether I'm

2   wrong on that, too, in a minute.

3        First, to rule with respect to the 293rd Omnibus

4   Objection.  That is sustained as to claim no. 17107 of

5   Ms. Helvia S. Caparros Santos, and that claim is disallowed in

6   its entirety, because the claimant's response does not dispute

7   that the claimant lacks standing to assert the derivative

8   claim against the Commonwealth and its instrumentalities,

9   since the claim, if any, is derivative of a claim held by a

10  mutual fund, and because she fails to identify the CUSIP

11  number or any other precise identifying information for any

12  bond she may possess.

13       So will the debtor file a comprehensive proposed

14  order disallowing this claim and any others that are resolved

15  by the Omnibus Objection, and if not yet been resolved by an

16  order?

17       MS. STAFFORD:  Of course, Your Honor.  We'd be glad

18  to.  Thank you.

19       THE COURT:  Thank you.

20       The next item on the Agenda is the 298th Omnibus

21  Objection, and that's docket entry no. 16018.

22       MS. STAFFORD:  Thank you, Your Honor.

23       The 298th Omnibus Objection seeks to disallow in

24  their entirety proofs of claim that have been amended and

25  superseded by subsequently filed proofs of claim.  Two

1    responses to this Objection were received, and Your Honor is

2    correct that one of those responses was withdrawn by Baxter

3    Sales last night.  That was filed at ECF number -- or the

4    response was filed at ECF No. 16399.

5        And upon reviewing our reply, and further

6    conversations between myself and counsel for Baxter Sales,

7    we've agreed to the resolution of that response, which was

8    withdrawn yesterday.

9        There is an additional response that was filed by

10   Unique Builders, Inc. with respect to ECF no. 16386 -- sorry,

11   filed at ECF No. 16386, and with respect to Proof of Claim No.

12   23832.  Subsequent to filing that response, Unique Builders

13   filed a notice of withdrawal of his proof of claim.

14       In its withdrawal notice, Unique Builders stated that

15   there is no controversy, that Claim No. 23832 has been amended

16   and superseded, and that Claim No. 29911 should be deemed

17   allowed as filed.  And on that basis, Unique Builders stated

18   that the objection should be denied as moot.

19       And we just wanted to note for the record that the

20   withdrawal notice is not accurate with respect to Claim No.

21   29911.  The debtors expressly reserve their right to object to

22   that remaining claim 29911 on any basis whatsoever, but we're

23   otherwise happy to revise the exhibits associated with our

24   proposed order to reflect the withdrawal of the Unique

25   Builders claim.

1          THE COURT:  So the Claim No. 23832 has been

2    withdrawn, and so I don't need to rule on an objection to

3    that; is that correct?

4          MS. STAFFORD:  That is correct.

5          THE COURT:  Regarding the Baxter Sales Claim No.

6    111825, the response to the objection has been withdrawn, so

7    there is no opposition to the objection to that claim; is that

8    correct?

9          MS. STAFFORD:  That is correct.

10         THE COURT:  Very well then.  The objection is

11   sustained as to Claim No. 111825, which is the Baxter Sales

12   and Distribution claim.

13         The debtor is instructed to remove the withdrawn

14   claim of Unique Sales, Claim No. 29911, from the schedule to

15   the proposed order sustaining the objections set forth in the

16   298th Omnibus Objection, and the debtor is directed to submit

17   a revised comprehensive proposed order.

18         MS. STAFFORD:  Thank you very much, Your Honor.  We

19   will do so.

20         THE COURT:  Thank you very much, Ms. Stafford.

21         So it is now five minutes past 4:00, and the next

22   item on the Omni Agenda is oral argument on the Vitol

23   Cross-motions for Summary Judgment, which are allocated 60

24   minutes.

25         I am prepared to go forward with those, assuming that

1   we can finish those within the 60 minutes, unless counsel

2   would prefer to take those up tomorrow morning instead since

3   it has been a long day.  So I guess I will ask Ms. Dale for

4   PREPA and Mr. Kaplan for Vitol to unmute themselves so that

5   they can talk to each other and me about whether they want to

6   get started this afternoon or tomorrow morning.

7           MR. KAPLAN:  Good afternoon, Your Honor.  It is Alex

8   Kaplan of Susman Godfrey on behalf of Vitol, Inc., and Vitol,

9   S.A.  We are prepared to proceed today, Your Honor.  However,

10  we, of course, are at the Court's pleasure.  If the Court

11  believes that proceeding in the morning instead would allow

12  more time to have any questions the Court may have answered,

13  we're happy to do that.  We are, as I said, at the Court's

14  pleasure.

15          THE COURT:  Thank you.

16          Ms. Dale.

17          MS. DALE:  Good afternoon, Your Honor.  Margaret Dale

18  from Proskauer Rose for the Oversight Board.  We are also

19  prepared to go forward today, but, again, as Mr. Kaplan said,

20  we're really -- whatever the Court's pleasure.

21          THE COURT:  I think it's best to have a little bit

22  more flexibility in terms in responding to my questions, and

23  so we will adjourn the Omni Hearing now and commence tomorrow

24  morning at 9:30 with the argument on the Vitol cross-motions.

25          I appreciate your willingness to go forward this

1  afternoon, but I think it's better, because of my schedule,

2  not to rush this.  Then that will be followed by the argument

3  on the Hernandez Montanez Preliminary Injunction Motion.

4            MR. KAPLAN:  Thank you, Your Honor.

5            MS. DALE:  Thank you, Your Honor.

6            MR. KAPLAN:  It's Alex Kaplan, Your Honor.  May I

7  just raise one question so that we're prepared for the

8  argument in the morning?

9            THE COURT:  Yes.

10           MR. KAPLAN:  Thank you, Your Honor.

11           During your preliminary comments this morning, Your

12  Honor, you identified four issues that you thought would be

13  useful for the parties to focus on.  I believe the third issue

14  you raised was the question, the extent to which Law 458

15  applies?

16           THE COURT:  Yes.

17           MR. KAPLAN:  To the extent the Court would be

18  inclined, perhaps the Court could just indicate what issue the

19  Court is inquiring about there.  It would be appreciated, and

20  we might be able to direct our argument with a bit more

21  clarity in the morning.

22           It's unclear if that's the issue of repeal of some of

23  the remedy provisions that were briefed, or whether the Court

24  is asking about something different.  Thank you.

25           THE COURT:  Thank you.  It is not that issue.  As I

```
1    recall, it is a combination of the question of whether the
2    elements of the crime of conviction map onto the concept of
3    aggravated misappropriation under Puerto Rico law, and I think
4    it's also whether and to what extent, if the alter ego
5    classification is not applicable, Law 458 would apply to the
6    different Vitol entities.
7           I think that's what's underlying this.  I'm sorry.  I
8    did the summary a while ago, and I had lots of other issues in
9    my head this morning.  I am going to ask that my law clerk,
10   Mr. Foster, unmute himself if I have forgotten something
11   fundamental to that particular inquiry right now and tell us,
12   since he knows.
13          MR. FOSTER:  Your Honor, that is precisely right.
14          THE COURT:  Okay.  Thank you.  So --
15          MR. KAPLAN:  Thank you, Your Honor.
16          THE COURT:  -- now you have clarification.
17          MR. KAPLAN:  Thank you very much, Your Honor.  I
18   appreciate it.  Thank you.
19          THE COURT:  Thank you.  Thank you, all.
20          MS. DALE:  Your Honor.
21          THE COURT:  Yes, Ms. Dale.
22          MS. DALE:  I'm sorry to interrupt.  Just before we
23   break, I was looking at the Agenda that was filed yesterday
24   and it seems that it has myself going first.  But I think
25   Mr. Kaplan intended to go first, and I was to go second.  So I
```

1  just wanted to make sure that that was understood and that was

2  all right with the Court.

3       THE COURT:  Thank you.  That wasn't understood.  That

4  is all right with the Court, if that's what you've agreed.

5       Mr. Kaplan, do you know now how much time you would

6  want to reserve for rebuttal?

7       MR. KAPLAN:  Yes, Your Honor.  We had anticipated

8  using 25 minutes in the opening presentation and five minutes

9  for rebuttal.  And then for our presentation, my colleague,

10  Michael Kelso, will be making arguments on the liability

11  issues, and then I would be addressing certain remedy issues.

12  Of course, we will be tailoring our presentation in light of

13  the Court's comments, but if we can reserve five minutes for

14  rebuttal, we would appreciate it.

15       THE COURT:  All right.  Certainly.  Thank you very

16  much for giving us that advance notice.

17       So once again, thank you.  Everyone have a good, safe

18  evening, and I look forward to reconvening tomorrow morning at

19  9:30.  We are adjourned.

20            (At 4:11 PM, proceedings concluded.)

21                       *      *      *

22

23

24

25

1  U.S. DISTRICT COURT    )

2  DISTRICT OF PUERTO RICO)

3

4      I certify that this transcript consisting of 159 pages is

5  a true and accurate transcription to the best of my ability of

6  the proceedings in this case before the Honorable United

7  States District Court Judge Laura Taylor Swain, and the

8  Honorable United States Magistrate Judge Judith Gail Dein on

9  April 28, 2021.

10

11

12

13  S/ Amy Walker

14  Amy Walker, CSR 3799

15  Official Court Reporter

16

17

18

19

20

21

22

23

24

25

< Dates >
April 21st 73:5
April 28, 2021 1:16,
    8:2, 159:9
December 15 115:15
December 15th 65:12
January 31, 2022
    115:17
July 4th 134:23
June 15 109:23
June 1st 33:13,
    40:3, 57:18,
    60:23, 62:3
June 2019 76:25
June 23rd 109:9
June 24th 109:9
June 29 108:25,
    110:21, 111:15,
    116:22, 127:23,
    136:23
June 29. 135:8
June 29th, 2021
    13:11
March 10, 2020 97:14
March 2020 15:12
March 2021 43:8
March 4th 75:8
March 4th, 2020
    74:19, 76:24,
    77:4, 77:17, 78:9
May 18 109:25
May 19th, 2021 76:7
May 27th, 2020, one
    75:2
May 4th 110:16,
    116:11
May 4th. 110:22


< 1 >
1 17:22
1.11(b 26:12, 30:11
1.8(b 60:12
10,000 51:22
107 117:12
10th 75:8
11 36:20, 41:12,
    48:11, 61:8,
    74:10, 103:1,
    103:2

1106 103:4, 103:6
1106. 103:2
111825 154:6, 154:11
1123 140:22
115 43:16, 43:22,
    48:4, 48:23,
    53:17, 53:21
116 43:9, 48:23
11:42 88:14
11:45 10:22
11:45. 62:20
11th 117:15
12 71:18, 78:19
120 53:11, 53:13,
    54:7, 54:11
125 102:4, 102:16
12th 72:24
13 45:24, 45:25,
    46:1, 46:5, 63:1
14 19:9, 62:24,
    74:17, 76:4, 77:7
15 41:23, 41:25,
    54:10, 108:9,
    108:20, 110:9
15-year 34:8
15178 17:25
15716 150:13
15856 151:3
159 159:4
16 35:3, 74:2
16.4 43:24
16018. 152:21
16241 31:19
16326 62:22, 105:5
16332 108:7, 135:19
16386 153:10, 153:11
16397 137:8
16399. 153:4
16403 88:24, 105:11
16507 13:14, 135:21
16614 11:6
16615 10:9
16616 11:6
17 25:6, 25:23,
    26:13, 30:11,
    60:12, 131:13
17-3283 10:10, 108:7
17-3283. 11:7, 18:1,
    31:19, 62:23,
    88:24, 105:5,

137:8, 150:14
17-BK-3283(LTS 1:6,
    2:7, 2:24, 3:7,
    3:24, 4:7
17-BK-4780(LTS 1:23
17107 152:4
17107. 151:4
18 34:14, 39:22,
    48:8, 48:12,
    48:19, 77:20
18-month 34:15, 42:3
185 77:20
19-363 83:24
19-363. 77:3
194 75:22
197 77:5


< 2 >
2.I 14:8
2.K 14:8
20 19:7
20-AP-00003(LTS 2:22
20-AP-00004(LTS 3:5
20-AP-00005(LTS 3:22
20-AP-00042(LTS 4:5
20-AP-00453(LTS 2:5
20. 77:20
2002 135:25
2002(b 12:23
2012. 18:19
2014 25:1, 25:6,
    30:16
2014. 25:5
2017-BR-3283 8:18
2018 53:11
2018-0001 27:13
2019 18:21, 18:24,
    25:6, 30:12, 60:13
2020 15:4, 15:23,
    16:3, 105:22,
    106:22
2020. 19:1, 106:18
2021 100:5
2021. 96:1, 100:2
2022 39:22
2022. 52:2
209 78:15
21 146:6, 147:7
21. 146:15

22 57:4
2281 55:19
23832 153:15, 154:1
23832. 153:12
24 66:22
2436. 55:19
25 158:8
28 13:7, 110:5,
    114:3, 114:20,
    118:23, 132:1,
    132:3, 132:14,
    133:1, 136:1,
    136:19, 145:9
28-day 12:22,
    108:24, 117:4,
    133:20, 145:8
286. 117:21
293rd 150:12,
    150:19, 152:3
298th 152:20,
    152:23, 154:16
29911 153:16,
    153:22, 154:14
29911. 153:21
29th 110:9, 118:2,
    133:23
2:15 10:23
2:15. 88:11
2:18 88:15


< 3 >
3 88:5
30 12:1, 111:20
300 55:24
301(a 140:23
3013 137:7, 137:14,
    140:13, 141:5,
    142:13, 142:24,
    148:20, 149:6,
    150:1
305. 40:15
30th 73:10
35 43:10
361 117:20
365 21:9, 23:16,
    38:10
365. 31:7
3799 159:14
3: 1:6, 1:23, 2:5,

2:7, 2:22, 2:24,
    3:5, 3:7, 3:22,
    3:24, 4:5, 4:7


< 4 >
4 88:5
4.9 43:21
400 51:3
403 31:3
45 32:2
458 17:3, 156:14,
    157:5
464 45:22
4:00 154:21
4:11 158:20
4th 110:15


< 5 >
5,000 51:19
502 102:21
502(a 94:16, 95:5,
    95:11
503(b)(1)(a 35:18
503. 44:11
51 45:22
56 46:20, 47:11,
    61:12
56(b 76:2, 76:5
56(d 63:24, 75:15
57 25:1, 25:6,
    25:24, 26:13,
    27:1, 28:5, 29:4,
    30:16
57. 27:7
5:00 10:24


< 6 >
6.32 26:14, 30:16
60 45:22, 154:23,
    155:1
622 117:13


< 7 >
7 102:23, 102:25,
    150:12
704 103:1

704. 103:1
72 31:3
76 74:22
77 55:22
775 124:14
789 124:15
790. 124:15


< 8 >
858 124:14
893 59:3
894 51:4, 59:11


< 9 >
900 71:22
9006(c 117:5
9:29 8:3
9:30 10:25, 155:24
9:30. 158:19


< A >
A. 5:13, 5:14, 5:40
AAFAF 11:3, 11:7,
    11:18, 11:20,
    39:10, 61:1, 61:4
ability 15:17, 31:1,
    31:5, 36:7, 55:14,
    56:1, 56:11,
    56:14, 57:23,
    66:2, 81:16, 87:4,
    91:24, 95:25,
    100:2, 133:1,
    159:5
able 20:22, 36:18,
    52:8, 62:18,
    65:14, 67:20,
    67:23, 68:4,
    72:18, 82:3, 86:1,
    87:10, 87:21,
    91:21, 111:19,
    113:7, 120:13,
    121:17, 121:20,
    126:18, 126:19,
    127:2, 134:22,
    135:6, 135:7,
    156:20
above 18:22, 43:22,

64:15, 70:12
absolute 91:12,
   92:11, 99:10,
   103:21, 104:15
abundantly 103:24
abuse 20:16
accelerated 146:19
acceptance 104:9
access 112:9,
   112:13, 124:17,
   124:19, 124:24,
   125:22, 126:11,
   136:13, 136:15
accessing 9:5
accommodate 115:10
accompanying 18:17
accomplish 84:24
accordance 30:15,
   97:13, 135:2,
   136:9
According 51:3,
   54:12, 88:25
Accordingly 12:13,
   13:5, 17:6, 64:13,
   108:1, 123:13,
   139:8
account 51:5, 110:4,
   124:7, 151:5,
   151:9, 151:12
accounts 59:7
accrued 32:12
accumulated 51:2
Accuracy 13:18,
   13:24, 121:3,
   128:17, 128:21,
   136:12
accurate 10:4,
   73:12, 73:13,
   153:20, 159:5
achievable 87:24
achieve 34:1, 50:21
across 16:10, 40:1,
   138:10
Act 26:13, 29:18,
   30:11, 30:16,
   53:11, 53:13,
   54:7, 54:10, 60:12
acted 84:10
action 17:15, 17:18,
   38:2, 83:24, 84:8,

98:12
actions 27:10, 30:3
activities 82:25
activity 82:22,
   134:9
acts 126:4
actual 27:15, 44:1,
   49:23, 70:6
Actually 35:6,
   38:12, 39:17,
   39:24, 40:21,
   41:9, 44:20,
   54:10, 61:5,
   62:25, 75:4,
   80:23, 97:22,
   108:21, 112:21,
   123:9, 129:10,
   137:17, 139:20
add 11:21, 14:21,
   32:2, 71:8, 71:14
added 136:24, 147:7
addition 45:18
Additional 15:6,
   16:9, 16:20,
   43:10, 43:14,
   43:15, 50:16,
   65:5, 80:9, 90:11,
   98:14, 112:24,
   119:17, 122:13,
   128:2, 128:3,
   130:13, 132:23,
   139:6, 153:9
additionally 106:3
additions 11:16
additive 41:25
addressed 35:11,
   58:6, 60:20, 64:4,
   65:6, 65:7, 69:17,
   70:22, 70:25,
   75:16, 83:4, 84:1,
   86:16, 86:21,
   87:3, 124:8,
   131:21, 138:21
addresses 25:20
addressing 16:10,
   32:4, 138:15,
   143:20, 158:11
adequacy 108:5
adequate 135:24,
   143:12

adhere 13:12
adjourn 88:8, 155:23
adjourned 19:22,
   20:2, 88:13,
   158:19
adjudicate 24:4
adjudication 36:25,
   37:3, 87:22
adjust 64:13
adjusted 64:7
adjusting 39:25
Adjustment 15:17,
   55:15, 56:6,
   56:12, 57:10,
   73:24, 106:17,
   107:5, 109:6,
   132:22, 135:17
administer 53:2
Administered 1:11,
   1:28
admirable 66:7
adopt 136:18
adopted 74:24
advance 10:5, 11:5,
   64:23, 69:14,
   87:3, 87:23,
   109:10, 139:23,
   139:24, 158:16
advantage 40:8
adversaries 99:15
adversary 15:2,
   16:11, 36:22,
   37:3, 37:20, 58:6,
   59:16, 60:21,
   60:22, 67:11,
   71:23, 73:17,
   75:17, 75:19,
   77:3, 77:25, 81:7,
   83:24, 98:14,
   99:19, 101:1,
   105:23
advise 95:18
advising 75:15
Advisory 5:7
affect 69:7, 125:23
affected 16:2, 126:2
affects 116:4, 125:3
affiliates 53:19
affiliations 29:3
affirmative 17:15

afford 68:4
affordability 68:6
affording 114:25
affords 32:23, 51:8
afternoon 10:23,
  88:16, 88:17,
  89:2, 89:3, 93:12,
  96:7, 114:10,
  116:17, 118:13,
  118:16, 122:22,
  137:10, 139:11,
  141:23, 141:24,
  155:6, 155:7,
  155:17, 156:1
agencies 53:10
Agency 5:6, 53:16
Agenda 9:18, 10:9,
  11:2, 12:7, 12:10,
  17:23, 54:16,
  54:17, 63:1, 63:6,
  88:6, 108:8,
  137:6, 149:9,
  150:12, 152:20,
  154:22, 157:23
aggravated 157:3
aggregated 101:2
aggressive 118:24
ago 21:7, 36:19,
  36:20, 55:23,
  65:4, 69:8, 74:17,
  90:5, 90:10, 94:4,
  101:19, 101:23,
  141:5, 144:9,
  157:8
Agrait 5:25, 24:11,
  24:13, 24:15,
  25:13, 25:21,
  26:11, 26:19,
  26:23, 26:25,
  28:10, 28:23,
  29:13, 29:15,
  29:20, 29:21,
  30:1, 30:11, 31:12
agree 12:19, 22:18,
  25:13, 81:11,
  86:14, 98:8,
  114:18, 147:16
agreed 34:12, 67:3,
  67:7, 81:4, 83:8,
  136:8, 153:7,

158:4
Agreement 32:12,
  34:6, 34:12, 37:4,
  37:8, 43:21,
  43:25, 46:17,
  46:19, 54:14,
  67:19, 72:25,
  81:6, 81:12,
  81:17, 109:5,
  139:13, 139:25
agreements 17:25,
  18:10, 107:6,
  131:4
agrees 141:25
ahead 57:6, 66:5,
  113:10
aid 36:7, 106:12,
  145:11
air 70:2
airline 117:23
Airlines 44:9,
  117:20
akin 30:2, 30:6,
  30:9
al 1:16, 2:14, 2:31,
  3:14, 3:31, 4:13,
  4:33, 8:20
alert 10:13
Alex 155:7, 156:6
Alexander 5:22
Algonquin 23:21
allegations 58:2,
  99:13
allege 37:1
alleged 50:20, 59:1,
  84:10, 151:6,
  151:16
alleges 59:20
alleging 59:23
alleviate 87:19
allocated 154:23
allocation 10:18,
  49:3, 49:12,
  56:23, 148:18
allocation/practical
  145:7
allocations 131:2
allotted 10:7
allow 14:9, 48:4,
  66:1, 95:22,

99:25, 106:15,
  155:11
allowability 85:13,
  85:16
allowable 78:1
allowance 35:6,
  35:24, 36:3,
  38:11, 76:14
allowed 33:14,
  35:20, 77:2,
  89:23, 104:22,
  138:18, 153:17
allowing 31:15,
  32:21, 33:16,
  33:22, 124:19,
  140:23
alluded 68:19
almost 43:5
alone 29:2, 29:16,
  30:9, 50:23
Alonzo 133:11
already 27:2, 33:21,
  35:11, 35:17,
  43:9, 43:25,
  49:19, 50:1, 50:2,
  50:25, 69:21,
  79:16, 90:19,
  94:7, 99:19,
  109:4, 111:2,
  111:14, 112:12,
  113:9, 119:10,
  119:18, 122:25,
  129:2, 133:4
alter 17:1, 17:8,
  157:4
alteration 25:22
Alternative 14:1,
  88:22, 105:10,
  106:6, 122:10,
  125:14, 142:2,
  142:5
Although 106:18,
  113:7, 123:7
altogether 95:3
Ambac 2:30, 3:13,
  3:30, 5:42, 68:19,
  78:19, 78:22,
  81:15, 83:7,
  85:15, 85:19,
  98:21, 99:3,

112:16, 118:14,
129:12, 129:18
Amend 5:35, 114:9,
114:13, 116:15,
116:17, 116:18,
117:3, 118:8,
118:10, 129:20
Amended 14:8, 73:24,
74:20, 75:9,
75:11, 106:17,
107:4, 114:21,
115:21, 116:9,
118:3, 135:16,
135:19, 152:24,
153:15
amendment 30:14,
38:6
amendments 30:23
America 8:16, 44:9
Amerinational 5:29,
114:12
Among 18:22, 22:3,
33:25, 58:18,
77:14, 107:15,
139:13
amongst 81:13
amount 21:16, 42:2,
42:4, 42:6, 59:7,
62:8, 63:8, 68:10,
68:20, 68:22,
68:23, 72:21,
108:19, 119:14,
122:5, 126:1,
139:6, 140:20,
145:5, 151:1
amounts 84:23
amply 34:24
Amy 159:13, 159:14
analysis 125:6,
143:18
analysts 124:11,
124:17, 124:19,
125:1, 125:4
analyze 125:4,
142:19
and/or 94:10
announce 135:7
announced 33:12,
72:24, 73:6,
101:17

announcement 97:9
answer 25:1, 91:3,
95:13, 133:10,
141:14, 146:7,
146:11, 147:5
answered 155:12
answering 141:7
answers 75:18,
138:18
anticipate 62:18
anticipated 64:19,
158:7
anticipation 106:16
anticipatory 148:6
anxious 72:6
anybody 102:7
apart 54:3, 126:6
apologize 10:5,
63:5, 110:13,
133:8, 134:3,
149:14, 150:9,
151:22
Apparently 72:9
appeal 36:15, 74:7,
86:6
appealed 35:20
Appeals 50:2
appear 14:2, 72:4
APPEARANCES 4:28,
5:2, 6:2
APPEARING 4:30, 18:5
applicable 15:1,
21:8, 21:22,
37:11, 51:13,
54:12, 70:3,
79:11, 85:24,
116:25, 157:5
application 21:23,
62:11
applications 78:13
applied 70:16, 75:17
applies 17:3, 19:17,
20:7, 24:6, 46:5,
156:15
apply 21:5, 22:2,
27:20, 31:7,
35:22, 46:5,
103:5, 157:5
applying 21:11
appreciate 91:5,

127:13, 142:1,
148:24, 155:25,
157:18, 158:14
appreciated 118:19,
156:19
approach 36:6,
41:15, 47:7, 56:8,
115:9
appropriate 9:23,
66:13, 107:24,
108:2, 123:4,
131:6, 145:22
appropriately 14:18,
66:9
appropriation 59:6
approval 13:9,
23:13, 23:19,
24:6, 28:18, 30:1,
30:22, 36:14,
38:9, 40:9, 40:15,
40:16, 44:25,
45:9, 45:13, 46:7,
46:9, 114:22,
127:22, 128:7,
129:17, 136:20,
145:23
Approve 20:14,
23:10, 23:12,
30:17, 32:10,
41:5, 44:17,
62:11, 62:12,
118:4
approved 23:4, 23:6,
25:1, 25:20, 27:2,
29:9, 37:5, 44:16,
46:14, 78:2,
115:21, 123:9,
123:10
approves 74:9
approving 17:24,
18:14, 26:3, 30:3,
47:23
approximate 131:2
approximately 19:7,
43:16, 71:22,
74:17, 136:2
April 72:24, 73:10,
137:16, 148:3
arbitrary 100:5,
116:8

argue 21:3, 22:1,
  22:3, 23:3, 35:15,
  35:24, 36:13,
  61:18, 118:1
argued 25:15, 75:24,
  76:25, 77:25,
  99:24, 101:7,
  149:1
argues 142:15
arguing 16:1, 90:4,
  143:25, 148:25
arise 62:6
Arkansas 117:12
arose 108:22
around 119:14
arrangements 60:8
arrival 147:19
arrived 81:18
Article 20:10,
  26:12, 30:11,
  30:16
articulate 139:22
articulated 83:20,
  98:7
artificial 115:10
asbestos 74:8
aside 37:3, 84:15
asks 34:8, 106:3
aspects 45:1
aspirational 115:19
assemble 94:4
assert 150:22,
  151:18, 152:7
asserted 99:19,
  106:1, 150:25
asserting 36:19,
  84:22
assertion 76:18,
  149:6
assertions 74:1
assessing 30:25
assets 33:5, 59:24,
  60:8, 80:13
assist 74:10
associated 13:4,
  49:23, 109:4,
  111:17, 128:8,
  150:22, 153:23
assume 15:22, 25:10,
  38:10, 46:4

assumed 45:10, 46:2
assuming 64:10,
  94:22, 154:25
assumption 21:8,
  34:2, 62:2, 94:16
assumptions 16:1
Assurance 2:30,
  3:13, 3:30, 5:42,
  78:22, 99:4,
  118:14
Assured 5:37, 54:12,
  90:16, 96:5, 96:8,
  101:17, 109:5
Assuredly 66:21,
  86:22
AT&T 88:11
Atara 5:43, 78:21,
  99:3, 118:14
Atlantic 11:1
attached 135:20,
  151:10
attain 65:16
attempt 117:4
attempting 43:18
attention 46:21
Attorney 114:11
authentic 13:22
authenticity 128:14
Authority 1:33, 5:7,
  25:17, 26:3, 26:4,
  30:21, 37:5, 106:6
authorization 30:2,
  30:5, 30:10
authorize 90:2
authorizing 25:14
automatic 90:12
automatically 92:2
autonomy 32:24, 51:9
Autoridad 2:5
availability 64:18,
  134:9, 138:5
available 10:10,
  11:5, 35:16,
  44:11, 64:5, 65:1,
  68:3, 72:21,
  119:10, 127:21,
  128:3, 128:4,
  134:1, 136:23
avoid 40:5
aware 65:10, 66:23,

67:9, 82:10,
  114:6, 129:16
away 40:12, 103:16,
  111:20


< B >
B-1 14:7
back 10:21, 19:3,
  19:6, 19:9, 20:20,
  22:24, 34:14,
  53:6, 73:15, 88:9,
  88:10, 95:21,
  110:8, 111:10,
  115:16, 116:10,
  121:21, 131:25,
  133:23, 134:13,
  134:15, 134:21,
  150:20
back-end 43:23,
  43:25
backtrack 91:11
backwards 39:24,
  109:22
bad 20:16
balance 21:4, 21:11,
  21:23, 60:19
bank 124:7, 130:22
banker 74:9
Bankruptcy 21:9,
  23:17, 24:19,
  25:12, 28:16,
  29:1, 31:2, 31:6,
  38:11, 45:13,
  94:7, 95:5, 116:2,
  117:11, 117:20,
  140:22
bar 84:3
bargain 53:25
bargained 34:8,
  40:11
bargaining 54:13,
  131:3
barred 148:2
barrier 24:5
base 134:7
based 19:17, 28:11,
  36:14, 38:22,
  43:7, 49:20, 63:1,
  64:5, 69:10,

69:23, 76:20,
76:21, 78:1,
82:10, 87:18,
109:3, 116:10,
119:18, 122:25,
132:9, 151:16
basic 20:23, 146:6
basically 45:7,
45:9, 45:14, 72:7,
140:15, 140:17,
147:8
basis 13:18, 38:18,
38:19, 49:18,
70:16, 70:22,
103:17, 145:5,
153:17, 153:22
Bassett 5:14, 42:20
Baxter 153:2, 153:6,
154:5, 154:11
bear 116:7, 134:12
bearing 17:19, 36:3,
115:12, 134:14,
148:15
become 37:13, 128:3,
146:14
beep 69:20
began 39:23
begin 12:9, 12:12,
32:4, 33:13, 41:9,
50:22
beginning 10:23,
10:25, 40:1,
107:1, 118:18
begs 146:11
behalf 18:3, 18:5,
31:21, 39:10,
42:25, 49:15,
51:12, 51:19,
51:22, 55:10,
61:4, 63:12,
78:22, 96:8, 98:2,
99:3, 114:12,
116:19, 118:14,
133:17, 137:12,
140:20, 150:17,
155:8
behavior 38:19
behind 44:24, 126:10
believe 15:14,
16:20, 20:11,

31:23, 45:7,
47:24, 71:11,
76:1, 76:13,
77:13, 83:7,
89:23, 90:22,
91:11, 92:11,
97:12, 98:11,
104:3, 118:23,
120:2, 122:25,
123:7, 125:9,
127:3, 131:23,
137:23, 138:1,
138:20, 150:14,
156:13
believes 71:9,
106:21, 145:22,
155:11
beneath 108:20
beneficial 49:21,
50:9, 50:18,
112:21
benefit 20:12, 34:2,
34:23, 35:19,
36:11, 41:14,
44:7, 44:8, 49:24,
50:23, 52:21,
52:24, 55:16,
56:7, 80:21,
100:10
benefits 33:25,
34:19, 35:2,
37:25, 40:10,
41:9, 41:12,
49:18, 51:6,
53:12, 53:14,
53:23, 53:25,
54:2, 58:15,
59:16, 59:22,
60:22, 62:1
Berezin 6:7, 97:20,
97:22, 97:25,
98:1, 98:20
besides 91:7
best 22:17, 39:24,
44:23, 45:15,
46:3, 50:20,
74:20, 76:11,
81:8, 110:24,
121:7, 122:3,
131:14, 131:18,

138:1, 155:21,
159:5
better 40:1, 40:21,
94:12, 110:20,
156:1
beyond 10:6
BIAGGI 5:7, 11:19
bidding 41:7, 41:8
Bienenstock 4:33,
11:13, 11:14,
11:17, 75:24,
76:1, 76:3, 77:17,
93:11, 93:12,
93:13, 95:2, 96:4,
96:23, 98:7,
99:22, 101:3,
102:1, 102:21,
102:22, 139:9,
139:10, 139:11,
146:7, 148:3,
149:24
big 34:8, 90:22,
114:5
Bildisco 21:12
billion 58:11
billions 102:5
bind 129:22
binding 37:4,
115:24, 129:21
bit 71:7, 109:20,
132:19, 148:8,
155:21, 156:20
blackout 57:13
blackouts 57:13
blank 47:22, 48:23,
51:11
blatantly 139:15
blessed 61:19, 61:25
blessing 61:14
Block 36:22, 141:21
Bond 15:1, 40:14,
68:11, 68:15,
70:5, 77:1, 80:10,
81:4, 83:1, 84:22,
84:23, 88:23,
106:13, 107:23,
108:1, 140:11,
140:19, 140:21,
152:12
Bondholder 140:8

bondholders 72:6,
    73:19, 124:12,
    125:3, 125:10
Bonds 68:11, 71:10,
    71:22, 90:17,
    150:23, 150:25,
    151:6, 151:13
bottom 141:9
bound 81:12, 112:25
breach 70:6
break 10:20, 62:20,
    62:21, 88:6,
    88:12, 157:23
break-up 41:3, 41:5,
    41:8, 44:3
breaking 10:5,
    130:17
breathing 13:2
brevity 91:5
Brian 4:34, 126:16
brief 23:22, 25:16,
    30:4, 30:8, 30:13,
    30:17, 70:2, 74:2,
    78:25, 89:5, 98:4,
    100:12, 105:23,
    137:15, 139:13,
    141:4, 144:7,
    146:16, 147:7,
    147:25, 148:6
briefed 70:4, 79:12,
    138:20, 145:16,
    146:1, 146:18,
    147:24, 148:5,
    148:7, 148:19,
    156:23
briefing 15:21,
    16:5, 17:13,
    74:25, 76:6,
    76:10, 79:15,
    79:17, 86:1,
    99:24, 99:25,
    107:10, 135:18,
    136:18, 145:8,
    145:25, 146:2,
    148:20, 148:22,
    149:2, 149:22,
    149:24
briefly 9:20, 18:16,
    21:1, 23:7, 29:25,
    35:13, 37:20,

    69:19, 76:17,
    99:21, 101:13,
    115:1, 116:20
briefs 15:15, 16:25
brilliant 147:21
bring 77:9
bringing 127:14
broad 120:12, 122:2,
    126:11
broader 56:8
brought 67:13,
    84:25, 85:1
brush 86:21
bucket 120:20
budget 78:2
buenos 8:23
build 59:7, 104:10,
    133:6
Builders 153:10,
    153:12, 153:14,
    153:17, 153:25
building 67:19
burden 14:7, 48:6,
    49:22, 50:17,
    54:20, 55:1,
    58:14, 113:12,
    117:8, 122:5,
    136:7
burdensome 125:13
Bureau 25:8
business 20:7,
    20:10, 20:25,
    21:4, 21:10, 22:2,
    22:12, 22:16,
    23:1, 28:21
businesses 36:10
Butler 71:20,
    100:23, 122:23
buzz 10:14, 10:15
buzzes 10:15, 10:19


< C >
C. 5:7
Cadwalader 96:7
calculable 73:21
calendar 95:25,
    100:2, 100:5,
    133:25
calendaring 87:20

California 31:3,
    31:4
call 8:11, 9:25,
    11:11, 12:2,
    27:16, 148:11
called 16:16, 33:4,
    45:21, 85:2,
    139:20
calling 9:15
calls 46:17, 58:3,
    60:2, 60:4
Cantor-katz 5:34,
    114:14, 116:19
Caparros 151:3,
    151:5, 151:8,
    151:10, 151:11,
    151:15, 151:18,
    152:5
capital 40:19, 40:24
caprice 20:16
care 11:7, 114:25
careful 13:5
carefully 105:16,
    135:22, 135:23
carelessly 52:19
Carmen 6:10, 55:10
cases 9:2, 21:11,
    21:12, 24:17,
    35:20, 36:5,
    41:15, 44:14,
    74:12, 96:17,
    97:18, 98:11,
    98:17, 100:15,
    112:20, 112:21,
    115:2, 115:4,
    115:25, 127:15
CAT 6:48, 140:5
categories 119:19,
    121:11, 122:8
categorization
    121:11
categorize 121:8,
    121:14
categorizing 131:14
cause 37:18, 74:1,
    78:12, 98:5,
    117:13
causes 17:14, 17:18,
    53:21
CBA 58:3, 58:7, 58:8

CCDA 79:19
ceased 25:5
cede 31:10, 39:7
center 85:1
cents 28:2
certain 12:11,
    12:19, 12:24,
    14:6, 17:24,
    21:17, 29:3, 45:1,
    72:5, 72:25, 73:1,
    73:10, 74:20,
    93:25, 105:24,
    131:3, 140:20,
    151:12, 158:11
Certainly 19:24,
    26:12, 37:2,
    40:17, 41:4, 51:2,
    54:17, 69:22,
    72:17, 81:12,
    81:15, 98:8,
    100:9, 112:16,
    129:19, 131:18,
    132:14, 158:15
certainty 80:11,
    87:8
certification 112:5
certified 33:8,
    33:11
certify 159:4
cetera 89:25,
    138:11, 139:17
challenge 23:22,
    24:4, 34:9, 37:22,
    38:22
challenged 111:18
challenges 24:4,
    36:14, 60:20
challenging 9:1
chance 39:24
change 76:21, 92:18
changed 141:19
changes 87:13,
    109:7, 111:3,
    125:9, 132:20,
    132:23, 146:25
channeling 74:7
Chapter 41:12,
    45:24, 45:25,
    46:1, 46:5, 48:11,
    61:7, 61:8, 74:10,

    102:23, 102:25,
    103:1, 103:2
character 142:20,
    143:10, 146:25,
    147:3
characteristics
    145:20
characterized 99:18
chart 111:9
charts 119:18
check 47:23, 48:23,
    51:11
choice 102:19
chooses 104:16
chose 101:21
chosen 45:16, 107:11
Circuit 23:20, 24:3,
    37:15, 41:16,
    44:12, 86:5,
    94:18, 94:19,
    102:23, 124:14,
    147:2
circular 59:22
circumstance 61:17,
    62:8
circumstances 9:22,
    16:22, 62:6,
    87:16, 96:22,
    116:25
cite 23:22, 44:15,
    54:7
cited 30:12, 30:16,
    37:15, 44:9,
    44:14, 45:5,
    45:19, 94:17
cites 26:9, 30:11
Citizen 124:14
City 31:3
claimant 152:6,
    152:7
claimants 55:21,
    74:8, 146:22
clarification 31:23,
    93:3, 157:16
clarified 114:19
clarify 19:20
clarifying 110:24,
    122:15
clarity 9:17,
    144:19, 156:21

class 140:11,
    140:23, 143:24
classes 144:1
classification
    139:21, 140:7,
    142:4, 142:16,
    142:19, 143:3,
    143:25, 144:11,
    145:6, 145:18,
    145:22, 146:12,
    146:14, 147:11,
    147:16, 147:17,
    148:18, 150:1,
    157:5
classifications
    131:6, 142:10
classified 142:17,
    142:21
classify 146:13
Clause 84:12
clawback 68:15,
    68:23, 72:22,
    73:2, 74:20,
    83:17, 85:16
clear 12:15, 15:18,
    15:19, 16:19,
    17:13, 17:17,
    23:22, 24:3,
    32:25, 34:20,
    37:16, 72:11,
    85:18, 101:24,
    102:23, 103:24,
    116:23, 119:18,
    130:5, 135:12,
    137:21, 143:22
clearer 149:4
Clearly 9:23, 12:2,
    20:18, 30:22,
    62:7, 75:13,
    79:20, 90:20,
    104:4, 120:16,
    129:23, 145:18,
    147:2, 149:16
Clerk 10:11, 132:10,
    133:5, 133:19,
    157:9
click 111:20, 112:6
client 82:10
clock 38:15
clocking 139:5

close 34:3, 104:23
closed 101:4
closely 15:6
closer 86:18
clothing 142:10
CM/ECF 14:10, 125:16
CMO 14:14
co-counsel 114:13,
  116:15, 116:21
Coastal 117:20
Cobra 35:23
Code 21:9, 23:17,
  28:16, 31:6,
  38:11, 94:7, 95:5,
  140:22
cognizant 40:5,
  70:23
Colberg 5:32, 49:2,
  49:7, 49:10,
  49:14, 49:15
Collateral 5:35,
  114:15, 116:19
colleague 129:20,
  158:9
collective 48:13,
  54:13, 131:3
colloquy 75:22,
  122:25
combination 16:11,
  157:1
comes 85:7, 121:21,
  122:11
coming 48:11, 84:2
comma 46:24
command 115:23
commence 106:5,
  155:23
commencement 32:16,
  32:18, 33:13
commences 32:17
comment 11:25, 12:1,
  72:22, 83:10,
  96:23, 115:1,
  128:5, 128:11,
  132:7
comments 12:7,
  22:10, 63:14,
  79:5, 93:15, 96:9,
  96:14, 108:23,
  110:25, 118:18,

125:8, 128:10,
  130:3, 131:21,
  137:22, 156:11,
  158:13
commitment 40:20,
  40:23, 40:24
Committees 93:21,
  112:2
common 84:16, 147:17
communication 133:9
Community 5:30,
  114:12
Company 5:40, 71:21
comparison 112:11
compatible 16:13
compel 38:5
compelling 15:15,
  80:1, 87:9,
  106:24, 124:12
compensate 44:6,
  47:25
compensated 43:12,
  44:4, 48:1
compensation 34:15,
  41:22, 42:4, 43:6
complain 37:21
complains 39:20
Complaint 36:19,
  81:7, 90:4,
  101:18, 101:21
complete 68:5, 76:9,
  78:6, 133:19,
  151:8
completely 38:18,
  80:14, 86:3
complex 13:4
compliance 24:24,
  25:23, 27:19,
  34:21, 60:15
complied 60:11
complies 26:5, 27:4
comply 12:22, 27:10,
  29:6, 46:25,
  51:13, 116:24
complying 33:11
component 43:13,
  80:17
comprehensive 11:8,
  152:13, 154:17
compression 27:15

comprise 47:17
compromise 142:2
computer 9:6, 49:11,
  71:5, 132:12
concealed 126:10
concept 157:2
conceptually 104:1
concern 57:8, 68:1,
  69:20, 143:23
concerned 48:19,
  48:23, 64:2, 83:6,
  115:9, 120:22,
  149:4
concerning 12:11,
  13:16, 86:12,
  105:24, 106:4,
  106:13, 107:11,
  107:20, 108:5,
  144:10
concerns 14:6,
  51:16, 51:22,
  59:13, 87:20,
  124:7, 136:13
conclude 54:15
concluded 60:7
concluded. 158:20
conclusion 32:19,
  34:18, 61:6
conclusory 74:1,
  124:21
concrete 35:1,
  130:18
concurrent 21:17
Conde 6:10, 55:7,
  55:9, 55:10,
  56:17, 56:20
condemned 76:16
condition 36:23,
  42:3, 61:16
conditions 33:16,
  36:17, 62:9,
  146:24
confer 64:10, 76:9
conference 9:10
confidential 112:9,
  112:14, 120:6,
  124:5
Confidentiality
  124:6, 124:9,
  124:10

confirm 15:17, 49:3,
    56:11, 95:25,
    100:2
confirmable 56:15,
    69:13
confirmed 39:22,
    55:15, 56:6,
    83:19, 100:4
confirming 100:3
conflict 82:17
conflicts 26:16,
    26:20, 59:12
confrontation 145:5
connection 11:9,
    15:12, 21:7,
    31:16, 63:22,
    68:21, 83:1,
    99:15, 104:1,
    106:17, 108:1,
    123:21, 144:11,
    145:6, 145:14,
    148:22, 149:3
connections 17:17
consensual 67:18
consensus 67:19
consent 25:11, 38:7,
    38:15, 92:18
consider 22:5,
    28:23, 74:16,
    88:2, 89:16,
    117:6, 132:16
Consideration 14:1,
    55:1, 55:2,
    135:15, 142:7
considering 72:21,
    131:15
considers 56:10
consistent 9:9,
    25:25, 64:17,
    96:11, 111:7,
    118:4, 129:7,
    136:23, 140:2
consistently 76:25
consisting 159:4
constant 116:3
constituencies 94:1,
    94:6, 94:9
constituents 57:23,
    102:6, 102:18
constitute 61:23

constraining 31:1
constraints 28:19,
    115:11
construct 68:13,
    143:9
consult 133:25
consulting 124:11
contained 18:23,
    77:15, 108:6
contemplates 115:16
contend 85:15
contends 95:7
content 12:25
contention 30:21
contents 82:13
contested 12:8,
    12:10, 12:15,
    17:22, 31:14,
    149:9
context 41:3, 50:21,
    51:17, 66:12,
    66:18, 67:15,
    68:2, 83:4, 87:12,
    107:18, 109:15,
    127:18, 148:25
continuation 36:7
continue 9:1, 16:8,
    16:18, 26:23,
    30:7, 30:24,
    35:22, 37:14,
    52:8, 52:23,
    62:20, 65:8,
    67:15, 96:18,
    116:23, 118:23,
    132:20
Continued 5:2, 6:2
continues 84:4,
    85:24
continuing 115:4,
    115:9
continuous 52:6
contours 69:11
Contracts 17:4,
    18:15, 19:12,
    20:22, 21:18,
    22:25, 23:4, 26:2,
    26:4, 26:5, 26:13,
    26:16, 27:7, 28:7,
    30:18, 30:19,
    30:23, 40:16,

54:14, 79:11,
    79:19, 84:12
contractual 53:24
contradicted 21:19
contradictory 78:6
Contrary 47:6,
    65:17, 94:23
contribute 68:25
contribution 59:6
control 32:17, 34:3,
    40:3, 48:13,
    48:14, 48:20,
    95:14, 115:20
controlled 124:24
controls 142:20
controversies 104:4,
    107:19
controversy 82:17,
    153:15
controverted 22:23
conversations 153:6
Conversely 93:21
conveyed 31:4
conviction 17:2,
    157:2
cooperation 119:1
core 79:23, 80:25
corner 129:5
coronavirus 106:19
corporate 30:2,
    30:5, 30:10
Corporation 2:31,
    3:14, 3:31, 5:43,
    6:7, 78:22, 98:3,
    99:4, 118:15
Correct 21:24,
    42:22, 63:8, 67:2,
    92:24, 110:1,
    127:17, 138:12,
    150:15, 153:2,
    154:3, 154:4,
    154:8, 154:9
corrections 105:18
correctly 22:4,
    67:14, 103:13,
    142:11
correspond 17:14
corresponding 109:6,
    132:22
cost 10:10, 44:6,

90:9, 90:11, 116:7
costs 43:20, 44:1,
    47:25, 52:24,
    70:11, 143:13
counsel 8:23, 11:24,
    12:9, 24:10,
    56:21, 71:8,
    75:23, 136:14,
    151:9, 151:10,
    153:6, 155:1
count 19:6
counted 110:8
counter 24:18
counterclaims 17:15,
    77:2
countering 25:25
counterparties 20:21
counterproposals
    19:3
counts 36:20, 70:3,
    70:7, 80:10, 97:1,
    97:6, 105:24
couple 30:18, 66:25,
    121:18, 122:24,
    131:25, 149:9
course 9:20, 48:9,
    50:14, 66:19,
    68:12, 93:15,
    113:7, 119:5,
    138:5, 138:19,
    139:2, 143:4,
    144:19, 149:20,
    152:17, 155:10,
    158:12
COURTROOM 8:8, 8:12,
    88:18
courts 41:5, 45:19,
    79:21, 117:6,
    117:16
cover 91:2, 114:17,
    143:15
covered 43:21
crafting 144:10,
    145:11
create 10:4, 54:8,
    54:10
created 116:6
creates 54:7
creating 59:13,
    90:21

credible 38:20
credit 98:1, 100:9
creditor 74:12,
    86:13, 94:19,
    111:23, 121:10,
    131:2, 144:1,
    147:5, 151:16
Creditors 5:12,
    36:2, 36:5, 40:22,
    46:3, 56:1, 57:21,
    73:21, 78:8, 81:5,
    81:18, 94:12,
    105:9, 105:13,
    112:3, 112:5,
    117:17, 142:23,
    143:11, 144:5,
    146:22
crime 157:2
crisp 75:25
critical 36:8,
    39:17, 40:8, 72:11
critically 15:13
Cross-motion 15:4,
    62:21, 88:4,
    88:21, 89:12,
    89:17, 92:15,
    93:18, 95:17,
    96:15, 101:16,
    105:9, 105:12,
    105:17, 105:21,
    106:2, 106:6,
    107:12, 108:3
Cross-motions
    154:23, 155:24
crucial 106:12
CSR 159:14
cue 145:8
cueing 107:10
culminate 75:1
cure 99:17
curious 72:20
current 33:2, 37:9,
    37:16, 76:7, 83:9,
    132:19, 144:15,
    149:12
currently 16:12,
    43:7, 63:24, 87:1,
    87:13, 97:2,
    100:11, 107:22,
    115:16

curtain 126:10
CUSIP 150:25, 152:10
customers 34:20,
    57:24, 59:18
cut 54:22, 76:7


< D >
dairy 131:4
DALE 4:37, 155:3,
    155:16, 155:17,
    156:5, 157:20,
    157:21, 157:22
damage 44:10, 46:18,
    48:5
damages 46:24,
    46:25, 47:14,
    47:15, 47:16,
    47:18, 53:20,
    53:21, 61:23
dark 149:22
dashboard 9:7, 9:8,
    9:24, 12:4, 49:6,
    82:4, 98:24,
    108:12
data 28:3, 111:16,
    112:17, 113:6,
    113:9, 118:20,
    119:3, 119:7,
    119:11, 119:15,
    120:3, 120:5,
    120:15, 120:18,
    120:20, 122:6,
    123:17, 127:17,
    128:1, 128:2,
    129:4, 130:3,
    130:5, 131:1,
    136:15
database 122:6
date 33:14, 38:19,
    60:23, 65:11,
    67:7, 73:9, 76:7,
    84:3, 109:8,
    109:20, 109:23,
    110:7, 110:21,
    111:12, 115:15,
    115:17, 115:18,
    116:22, 116:23,
    132:1, 132:15,
    134:20, 134:24,

135:8, 136:2,
136:3, 136:22,
137:17, 146:19
dates 110:1
day 37:21, 51:20,
  55:5, 66:22, 97:8,
  97:25, 100:13,
  101:15, 103:10,
  115:3, 115:6,
  135:6, 155:3
days 13:8, 36:19,
  36:20, 66:22,
  109:10, 110:5,
  110:18, 114:3,
  114:20, 118:23,
  132:1, 132:3,
  132:14, 133:1,
  133:18, 134:1,
  136:1, 136:19,
  145:9
de 2:5, 2:6
dead 147:19
deadline 13:7, 13:8,
  67:3, 110:5,
  136:19, 138:7
Deadlines 12:18,
  107:5, 115:12,
  115:24, 129:20,
  129:21, 135:18
deal 34:8, 36:16,
  64:17, 69:19,
  73:1, 73:14,
  86:18, 95:24,
  111:6, 130:15,
  145:10
Dealing 45:23,
  45:24, 65:19,
  69:14, 96:10,
  96:11, 139:23,
  145:3
dealt 86:22, 90:16,
  111:13, 111:15
debating 149:17
debt 29:5
debtor 20:8, 20:9,
  20:12, 22:15,
  24:19, 24:21,
  28:17, 28:20,
  31:5, 35:19,
  52:21, 52:22,

61:8, 74:10,
  94:21, 95:7, 95:9,
  95:14, 117:14,
  117:17, 117:23,
  124:17, 136:17,
  152:13, 154:13,
  154:16
Debtors 1:18, 1:35,
  5:13, 20:11,
  21:20, 31:1, 36:7,
  55:17, 56:10,
  57:22, 108:4,
  124:3, 124:19,
  126:1, 150:24,
  151:9, 151:17,
  153:21
debts 39:25
decades 143:4
deceit 17:5
December 39:22
decide 24:23, 25:8,
  25:24, 27:18, 87:4
decided 25:3, 33:21,
  50:1, 50:3, 75:13,
  80:19, 139:16,
  142:8
deciding 64:14
decision 20:15,
  22:15, 22:17,
  22:18, 22:19,
  25:17, 27:4,
  31:12, 45:5, 45:6,
  45:19, 45:20,
  50:1, 50:15, 61:9,
  62:15, 74:6, 74:9,
  74:11, 79:15,
  88:3, 94:18,
  116:8, 124:14
decisions 29:2,
  51:16, 74:3,
  82:20, 104:13,
  126:2
Declaration 18:18,
  22:22, 34:25,
  35:4, 41:10,
  50:10, 50:12,
  50:19, 51:4, 54:4,
  58:18, 58:21,
  58:22, 58:23,
  58:25, 59:9

declarations 84:9
dedicated 51:23,
  94:4
deemed 153:16
defaulted 44:19
defendant 84:19,
  93:1, 106:1,
  106:13
Defendants 2:18,
  2:35, 3:18, 3:35,
  4:16, 67:10
defenses 17:15,
  61:15, 75:15,
  76:5, 143:20
defer 32:6
deference 61:9
deferred 60:21
deficit 51:2
deficits 59:1
defined 14:3, 75:20
definitely 27:20,
  27:23, 114:24
definition 54:14,
  111:3
definitive 132:21
degree 120:23,
  128:13
Dein 4:24, 8:16,
  113:2, 119:21,
  159:8
Delaware 45:21
delay 36:16, 48:10,
  119:16, 130:2,
  130:6
delayed 22:7, 85:20
delivering 19:2
demand 38:25, 84:6,
  84:13, 85:2, 94:6
demanded 40:13
demands 84:17
demonstrated 107:10
demonstrating 49:22
denied 55:3, 74:11,
  78:17, 100:24,
  101:6, 105:21,
  107:15, 142:1,
  148:20, 148:21,
  149:5, 149:6,
  153:18
denies 95:18

deny 15:3, 38:21,
    78:12, 89:11,
    91:24, 92:14,
    92:15, 95:17,
    96:15, 98:17,
    142:12, 142:13,
    144:22, 145:24
denying 84:18,
    95:19, 96:11,
    108:2
depart 14:12
dependant 27:15,
    70:6, 85:11
depends 116:24
depository 13:16,
    13:22, 121:7,
    124:3, 124:20,
    125:2, 125:22,
    126:11
DEPUTY 8:8, 8:12,
    88:18
derivative 151:19,
    152:7, 152:9
describe 18:16,
    52:17, 130:9
described 37:17,
    107:17, 124:25,
    136:19, 145:19
description 80:2,
    119:12, 120:11,
    120:19, 120:23,
    122:2, 122:7,
    128:25
designed 39:12,
    41:9, 44:5, 69:7,
    75:1
desire 65:22, 87:8
desiring 87:1
despite 89:15
destabilize 98:14
detail 11:8, 58:19,
    58:21, 123:6
detailed 131:7
details 35:2
determination 28:10,
    28:14
determine 20:15,
    21:17, 27:9,
    27:22, 28:2, 47:5,
    47:21, 48:18,

80:4, 116:12
determined 18:21,
    18:24, 19:14,
    21:20, 27:17,
    28:3, 33:21,
    44:22, 46:13,
    60:1, 85:21
determining 28:24
deterred 125:12
detour 106:20
detrimental 51:18
developed 128:18
dial 10:21, 88:9,
    88:10
dias 8:23
dictates 83:3
differ 26:6, 140:4
difference 19:11,
    93:17, 104:15,
    114:5, 132:6
different 81:18,
    89:10, 116:4,
    140:21, 142:21,
    143:1, 143:7,
    146:13, 147:4,
    156:24, 157:6
differential 20:13,
    22:13, 145:4
differentiate 62:4
differently 68:12,
    140:24
difficult 10:3,
    66:19
difficulty 10:7,
    111:17
dig 125:4
direct 10:20, 27:18,
    50:13, 68:5,
    79:15, 133:9,
    156:20
directed 154:16
direction 79:22
directly 97:8,
    111:15
Directors 25:2,
    25:7, 25:11, 27:3,
    29:9, 29:16
disagree 30:3
disagreed 75:14
disallow 150:21,

151:20, 152:23
disallowance 105:25,
    107:11
disallowed 152:5
disallowing 70:18,
    152:14
disasters 57:15
discipline 118:25
disclaimer 121:13
disclaimers 121:8,
    136:12
disclaiming 121:2
disclose 82:12
disconnect 10:21,
    88:9
discontinued 60:14
discounted 85:9
discourage 126:4
discovery 63:25,
    76:6, 76:7, 76:8,
    76:9, 106:21,
    112:18, 112:24,
    113:1, 113:10,
    119:7, 123:2,
    128:8, 130:13,
    130:15, 131:16,
    138:11
discretion 20:17,
    32:24, 51:8, 51:11
discrimination
    94:11, 142:9
discuss 18:13, 19:4,
    19:15, 21:1
discussed 114:17,
    133:4
discussing 59:1
discussion 71:15,
    80:2, 99:22, 114:3
discussions 21:2
dismantle 52:17,
    52:20, 52:22,
    59:21
dismantled 60:10
dismantles 52:25
dismantling 53:5,
    59:13, 59:19,
    59:22, 59:23,
    60:10
dismiss 75:18
dispense 36:18

dispersed 53:9
displace 118:21
disposed 35:12
dispute 39:1, 39:2,
    76:8, 80:14,
    100:8, 107:7,
    152:6
disputed 20:24
disputes 16:3, 16:4,
    76:15, 107:11,
    119:22
disregard 104:17
disrupt 90:23
disruption 57:15
dissatisfied 51:15
distinct 23:12
distinction 41:12,
    45:17
distinguished 45:20
distress 64:22
Distribution 39:14,
    154:12
District 1:1, 1:3,
    4:22, 4:23, 4:25,
    8:8, 8:13, 31:2,
    45:6, 45:7,
    117:12, 117:19,
    133:25, 159:1,
    159:2, 159:7
divide 68:9
doable 110:1, 141:11
Docket 1:6, 1:23,
    2:5, 2:22, 3:5,
    3:22, 4:5, 10:9,
    11:6, 13:14,
    17:25, 31:19,
    55:18, 55:19,
    62:22, 88:23,
    105:5, 105:11,
    108:6, 134:25,
    135:5, 135:11,
    135:19, 135:20,
    137:8, 150:13,
    152:21
docketing 125:17
dockets 27:9
doctrines 70:3,
    79:12
document 98:10,
    119:6, 121:23,

128:25
documentation 91:19,
    109:4, 132:21
documented 90:15,
    97:2
documents 13:21,
    13:24, 119:12,
    119:19, 120:12,
    120:14, 120:15,
    120:20, 121:7,
    121:8, 121:14,
    122:1, 122:5,
    122:8, 122:9,
    122:13, 124:5,
    124:16, 124:18,
    125:5, 128:14,
    128:16, 129:1,
    130:4, 130:9
doing 43:6, 44:5,
    47:6, 51:19,
    134:6, 145:11
dollar 48:23, 59:3,
    59:6, 59:11
dollars 51:3, 51:5,
    53:17, 53:22,
    55:23, 55:24,
    58:12, 71:22,
    102:4, 102:5,
    138:9
done 53:3, 60:10,
    86:24, 87:11,
    96:16, 112:20,
    129:10, 130:4,
    140:25, 141:13,
    144:13
dot 30:18, 30:19
doubt 92:24
down 24:11, 31:18,
    45:16, 48:2, 61:2,
    71:18, 98:21,
    100:20, 113:23,
    129:18, 135:11,
    141:19
download 120:18
dozen 16:10
DRA 114:9
drafted 90:10
drain 40:18
drastically 92:18
draw 46:21

dressed 142:9
drilling 129:17
drop 76:22
due 13:10, 27:2,
    74:4, 104:12,
    107:5, 116:1
duly 37:4
dump 119:11
duplicate 119:8
During 9:15, 9:20,
    10:2, 32:13,
    32:17, 39:14,
    39:16, 43:10,
    43:17, 44:18,
    50:5, 156:11
duties 35:7, 37:7
duty 54:19, 70:9,
    70:10


< E >
e-mail 126:17, 136:6
e-mailed 127:2,
    141:2
E. 5:25
earlier 30:8, 41:14,
    63:23, 69:23,
    70:4, 70:6, 70:20,
    72:14, 79:12,
    82:23, 83:8,
    83:18, 83:24,
    84:8, 85:8, 85:11,
    87:12, 98:17,
    108:18, 128:11,
    135:23
early 16:14, 18:21,
    18:24, 75:17,
    126:17
earned 32:16, 33:18,
    35:6, 35:9, 37:14,
    40:10, 44:6, 44:7,
    62:9
earns 38:13
ease 136:15
easily 115:19
Eastern 31:2, 45:6,
    117:12
easy 147:9
ebb 33:4
ECF 125:11, 132:2,

132:3, 132:14,
151:3, 153:3,
153:4, 153:10,
153:11
echo 96:14, 96:23
Ecoelectrica 21:8,
21:21
economic 53:25
economy 34:20
effect 48:7, 56:10,
69:24, 132:6,
149:17
effected 81:16
effective 65:11,
115:14, 115:17,
115:18
effects 36:1, 52:18
efficiency 100:10,
109:16, 131:14
efficient 69:15,
80:23, 131:16,
148:17
efficiently 119:24
effort 50:8, 130:6,
142:22
efforts 74:10,
96:19, 97:3,
119:8, 121:7,
122:3
ego 17:1, 17:8,
157:4
eight 18:3, 54:7,
110:10, 110:11,
137:9
eight. 74:23
either 21:15, 91:17,
109:9
elaborate 132:5
Electric 1:32
Electrica 2:6
electronic 14:10,
120:4
element 83:22
elements 120:3,
157:2
Elliot 4:38, 18:2,
18:5
eminently 110:1
emphasize 65:8, 85:7
emphasized 85:24

employee 131:3
Employees 5:18,
34:10, 49:16,
53:8, 53:9, 59:15
enable 14:17, 150:24
encourage 10:11
encroach 115:10
end 10:22, 20:20,
32:3, 33:23, 35:5,
35:13, 37:21,
39:2, 43:10, 48:9,
48:10, 49:20,
50:3, 64:21,
66:22, 115:3,
115:6
endeavor 132:15
ended 51:25
endorsed 41:16
enemy 144:16
Energia 2:5
Energy 6:9, 22:5,
25:8, 26:20,
27:14, 27:24,
28:4, 32:13,
50:14, 53:19,
55:10
enforceable 37:11
engaged 18:25, 84:11
engineer 109:2
English 132:24
enjoin 36:21
enough 34:23, 69:3,
69:4, 123:5,
144:17
Enron 123:8, 127:14
ensure 9:3, 14:19,
34:6, 126:8, 126:9
enter 18:14, 40:15,
44:23, 61:9, 62:1,
62:12, 108:2
entered 18:19,
40:17, 45:9,
92:13, 112:12
entering 25:14, 81:6
entertaining 27:8
enthusiastically
33:7
entire 16:4, 124:9,
136:6, 147:18
entirely 17:13,

37:13, 118:21
entirety 44:17,
70:2, 75:20,
121:12, 150:21,
152:6, 152:24
entities 33:6,
51:15, 52:17,
54:16, 136:24,
157:6
entitled 14:22,
50:3, 50:5, 68:16,
111:25, 124:24,
136:25, 141:12,
144:5
entry 10:9, 11:6,
13:14, 17:25,
31:19, 62:22,
88:23, 105:5,
105:11, 108:7,
135:19, 135:20,
137:8, 150:13,
152:21
equally 50:5, 83:16
equitable 25:23,
84:4, 84:20
equities 21:4,
21:12, 21:23
ERS 96:12, 96:17
escrow 40:13
especially 59:3,
77:24
espoused 85:10
Esq 5:7, 5:25, 5:30,
5:32, 6:10
essential 33:10
essentially 20:14,
30:2, 41:21, 46:6,
99:18
establish 50:8,
69:6, 132:13
established 34:22,
52:8, 60:15, 64:7,
67:4, 84:9
establishing 32:24,
44:10, 50:17, 51:9
estate 20:12, 35:17,
40:21, 44:8,
44:23, 45:15, 46:4
et 1:16, 2:14, 2:31,
3:14, 3:31, 4:13,

4:33, 8:20, 89:24,
  89:25, 138:11,
  139:17
ether 100:13
evaluate 30:17
evaluating 96:21,
  116:1
evaluation 146:1
evening 158:18
event 97:23, 138:21
events 57:13
eventual 104:17
eventuality 39:4
eventually 19:5,
  38:12, 38:15
Everybody 22:18,
  40:21, 65:21,
  100:4, 129:7,
  129:18, 134:12
Everyone 8:8, 9:9,
  10:20, 12:12,
  63:5, 88:8, 88:18,
  115:10, 134:14,
  134:19, 158:17
everything 66:8,
  67:17, 99:25,
  100:12, 110:4,
  133:6, 144:18
evidence 47:25,
  48:3, 50:17,
  51:13, 59:2, 70:8,
  70:10, 151:6
evident 45:12, 84:16
exactly 53:7, 80:6,
  84:24, 85:21,
  94:2, 120:8, 121:3
example 10:15,
  79:19, 115:16,
  117:11, 117:18,
  120:15, 120:21,
  123:8, 130:18,
  130:25, 143:7
examples 69:24,
  130:6
exceedingly 41:13
except 75:20
excepted 106:9
exception 14:10
exchange 34:9
excited 78:13

excludes 54:13
exclusive 21:15,
  26:6, 26:19,
  102:25
excuse 84:6, 85:14,
  134:12
executed 30:15,
  45:11, 45:12
execution 30:19
exercise 20:9,
  21:19, 22:15,
  57:9, 57:24, 130:4
exercising 24:22
Exhibit 14:7
EXHIBITS 7:9, 13:4,
  13:15, 14:3,
  135:20, 153:23
exist 25:5, 66:2,
  96:22
existed 23:16, 23:19
existence 25:22,
  26:3, 68:8, 69:6,
  83:6, 113:6
existing 26:5,
  67:12, 67:19,
  80:22, 94:24
exists 58:10, 65:15,
  87:15
exit 42:5, 65:13,
  65:22
expand 106:24
expect 14:14, 39:3,
  60:9, 107:22,
  119:5, 119:13,
  127:5, 134:11
expects 33:13, 43:9,
  115:14
expeditious 74:3,
  107:3
expeditiously 119:23
expense 31:16,
  32:11, 32:22,
  33:17, 33:23,
  45:1, 50:4, 52:4,
  55:3, 55:13,
  55:21, 56:13,
  62:11
expenses 32:23,
  49:24, 50:8,
  52:24, 53:15,

54:21, 56:2, 56:4,
  92:4
experience 115:22
experts 120:18
explain 14:13,
  50:22, 51:2,
  59:21, 142:22,
  149:11
explained 34:24,
  51:1, 51:6, 77:5,
  77:18, 106:25,
  136:14, 140:12
explains 147:8
explanation 15:16,
  53:23, 141:5
explicit 143:23
express 33:2
expressed 65:22,
  90:20, 136:13
expressly 52:19,
  54:13, 153:21
extended 73:10,
  115:17
extension 30:14
extensive 51:25
extent 14:11, 17:3,
  17:16, 29:25,
  32:5, 34:16, 35:8,
  37:25, 40:9,
  61:21, 64:6,
  79:19, 80:14,
  99:14, 104:2,
  112:8, 128:15,
  128:18, 130:8,
  131:5, 132:2,
  148:14, 156:14,
  156:17, 157:4
extra 42:4, 94:13
extrapolated 63:6
extremely 112:21,
  113:13, 117:18,
  139:12


< F >
F.2d 124:14
face 123:16, 143:6
faced 69:11, 125:13,
  143:17
facie 143:21

facilitate 66:8
facility 134:1,
  134:8
factoring 93:15
factors 115:19
facts 18:16, 20:23,
  21:13, 55:22,
  87:17, 139:21
factual 76:14,
  87:14, 87:16,
  130:25, 145:14
fail 142:19, 150:23
failed 99:14, 142:7
failing 94:21
failings 84:15
fails 152:10
failure 86:19,
  143:20
fair 41:20, 42:9,
  42:13, 86:15,
  115:8
fairly 36:18, 137:15
fairness 76:24
faith 20:16, 66:12
fall 16:15, 89:8
falls 17:2
far 21:13, 52:14,
  64:1, 141:14
favor 79:14, 104:17
fear 52:4, 52:12
feasible 55:15,
  56:11, 56:15,
  66:13
feature 9:24
Federal 21:14,
  21:15, 21:18,
  21:21, 53:2
federated 74:9
fee 32:5, 32:6,
  32:15, 35:8, 35:9,
  38:17, 39:11,
  39:12, 39:15,
  39:21, 40:5, 40:9,
  41:4, 41:6, 41:8,
  41:21, 43:4,
  43:13, 43:16,
  43:19, 43:23,
  43:25, 44:3,
  46:18, 48:24,
  53:22, 61:11,

61:16, 62:4
feeling 56:3
fees 33:17, 35:5,
  35:6, 38:12,
  38:23, 41:5,
  46:13, 49:23,
  62:5, 62:7
Fernando 5:25,
  18:18, 24:15
few 46:11, 58:7,
  58:24, 108:21,
  110:18
FGIC 71:17, 72:6,
  73:18, 76:25,
  77:9, 83:7, 84:4,
  100:20, 100:23,
  122:23
figure 120:18,
  131:12
files 111:5, 118:3
filing 90:6, 91:7,
  91:16, 92:10,
  98:6, 98:13, 99:8,
  99:17, 101:25,
  114:3, 114:5,
  114:21, 114:22,
  132:1, 132:14,
  133:2, 136:3,
  136:5, 153:12
filings 72:12
final 10:19, 19:6,
  78:9, 83:12,
  84:18, 86:7,
  86:11, 137:22
finalize 132:21
Finally 14:16,
  16:23, 23:3, 38:4,
  61:1, 83:15, 95:16
Finance 6:6, 98:2
finances 40:19
Financial 1:9, 1:26,
  2:22, 3:5, 3:22,
  5:6, 5:39, 8:18,
  50:25, 59:1, 59:5,
  71:20, 73:21,
  105:2, 105:6,
  130:22, 133:17,
  150:17
financially 50:23
find 26:14, 48:4,

117:13, 120:6,
  148:15
finding 45:14, 46:2
finds 95:24
fine 110:2, 128:13,
  147:14
finish 23:25, 29:13,
  29:14, 155:1
finite 16:6, 66:10,
  144:18
Firestein 4:36,
  62:23, 62:25,
  63:9, 63:11,
  63:12, 66:5,
  66:21, 69:19,
  71:2, 72:2, 72:19,
  73:12, 76:21,
  77:5, 78:4, 79:6,
  79:8, 79:23, 80:1,
  80:24, 81:20,
  81:24, 81:25,
  82:3, 82:6, 82:16,
  87:7, 88:1, 100:8
firmly 138:1
firms 112:22
Firstenergy 21:12
Fiscal 5:5, 33:8,
  33:11, 58:11,
  58:17, 120:21
five 30:17, 39:23,
  101:9, 109:10,
  133:18, 154:21,
  158:8, 158:13
fixed 43:12, 43:16,
  68:10
Fixing 57:11
flexibility 40:22,
  155:22
flip 117:16, 128:1
Florida 117:19,
  117:20
flow 33:4
flux 116:4
focus 16:17, 16:19,
  17:6, 43:3, 49:17,
  49:21, 57:11,
  57:16, 59:14,
  91:6, 109:14,
  132:25, 156:13
focused 79:2, 129:19

focusing 36:6
folder 130:21,
   130:22
folders 120:11,
   128:22, 128:23,
   130:8, 130:10,
   130:20
follow 14:14, 21:25,
   24:23, 98:16,
   115:6, 116:20
followed 77:21,
   156:2
following 88:6,
   105:20, 134:22
follows 134:23
FOMB 115:6, 115:22,
   115:25, 116:6,
   116:8
footnote 97:14,
   146:6, 146:15,
   147:7, 148:25
force 115:23
forecast 65:4, 69:8
forfeited 77:10
forget 101:19
forgive 113:18
forgotten 157:10
form 107:25, 111:9,
   112:10
formed 84:2
formulate 127:16
forth 18:17, 19:3,
   20:8, 95:21,
   97:14, 111:9,
   131:7, 131:23,
   154:15
forward 23:11,
   39:18, 39:25,
   40:4, 41:23,
   67:16, 80:17,
   80:20, 80:25,
   81:10, 91:25,
   110:16, 115:5,
   116:8, 116:11,
   119:23, 129:25,
   130:1, 138:18,
   145:15, 154:25,
   155:19, 155:25,
   158:18
FOSTER 157:10,

157:13
fought 31:4
found 21:3, 22:22,
   27:2, 34:1, 74:22,
   75:22, 79:8,
   135:24, 136:4,
   138:12
foundational 16:1
four 20:10, 30:12,
   55:7, 93:14, 94:3,
   110:11, 118:11,
   156:12
Fourth 17:4, 38:4,
   44:12, 131:4
fraction 113:25
frame 34:15, 34:17,
   109:19, 130:1,
   133:4, 136:23
framework 53:12
frank 27:25
frankly 59:2, 64:6,
   65:7, 79:8, 79:14,
   120:8, 142:3,
   143:11, 143:22
fraud 70:9
Friedman 5:8, 32:4,
   32:7, 39:7, 39:9,
   39:10, 41:1,
   41:19, 41:24,
   42:9, 42:12,
   42:15, 42:18,
   61:1, 61:3, 61:4,
   62:14
front 33:23, 35:5,
   35:12, 43:10,
   49:20, 50:3, 85:1,
   96:14, 111:10,
   145:21
front-end 32:22
fruition 67:13
fuel 17:4
full 32:16, 32:17,
   32:18, 33:12,
   34:2, 41:23,
   41:25, 42:7, 57:5,
   69:2, 69:5, 71:7,
   71:13, 80:6, 124:7
fully 23:8, 43:12,
   44:4, 77:14,
   81:16, 125:9,

148:7
fund 51:5, 140:14,
   152:10
fundamental 22:11,
   41:10, 93:17,
   157:11
fundamentally 23:18,
   143:7
funded 58:12
funding 143:13
funds 53:2, 151:12
furtherance 67:9
future 37:16, 37:17,
   37:18, 40:2, 44:7,
   57:14, 57:15,
   57:19, 90:14,
   117:3


< G >
G94 66:17
Gail 4:24, 159:8
gain 93:21
gaining 101:13
game 140:5
Gas 23:21
gateway 15:10
gating 65:5, 69:7,
   69:10, 73:17,
   73:21, 75:12,
   75:24, 76:11,
   77:6, 77:14, 83:6,
   83:8, 83:16
gave 141:5
General 54:21,
   68:11, 128:23,
   131:9, 140:8,
   142:17, 143:1,
   143:11, 144:5
generalities 50:20,
   54:3
generality 121:14,
   130:19
generally 43:2,
   117:5, 117:16,
   138:10, 147:21
Generating 18:12
generation 60:7
generically 130:9
Gershon 45:6

getting 39:17,
   43:12, 43:15,
   44:4, 48:1, 50:24,
   79:3, 110:19,
   119:1, 119:17,
   123:7, 128:8,
   131:10, 132:10
giant 143:24
give 97:25, 121:1,
   130:18, 146:9
given 30:8, 41:13,
   48:1, 65:9, 66:2,
   89:6, 104:2,
   111:14, 116:25,
   119:4, 125:11,
   141:6, 144:13
gives 25:16, 95:11
giving 14:15, 39:21,
   47:22, 48:23,
   74:15, 102:6,
   146:8, 158:16
glad 152:17
gladly 128:20
global 27:14
goal 13:21, 52:22,
   56:7, 57:22, 66:7,
   86:8, 93:19,
   106:15, 129:25,
   130:2
God 8:16
Godfrey 155:8
goodness 82:22
Gotshal 98:2
govern 52:13, 99:11
government-issued
   150:23
governmental 52:6
Governor 37:6
Grace 74:6
Granada 142:18
grant 52:3, 87:12,
   89:12, 89:14,
   89:16, 91:25,
   95:5, 95:16,
   151:20
granted 37:12,
   49:19, 54:21,
   64:11, 67:20
Granting 15:16,
   15:20, 32:21,

36:2, 100:25,
   105:3, 105:10
grants 53:14, 94:16
Great 22:17, 56:3,
   134:18, 145:10
grid 32:17, 33:15,
   34:3, 34:4, 34:11,
   36:11, 36:23,
   57:13, 60:5
gross 20:16
ground 94:11, 94:13
grounds 70:19
Guarantee 6:6
guaranteed 51:21
Guaranty 5:39,
   71:21, 98:3
guess 79:17, 117:25,
   120:25, 134:24,
   140:12, 148:13,
   155:3
guidance 69:23,
   79:3, 79:10,
   79:22, 80:22,
   82:19, 85:7, 89:6,
   119:11, 144:9
guided 79:21
guys 147:10


< H >
half 31:24, 32:1,
   39:23, 57:1, 57:2,
   57:4, 71:18,
   78:19, 93:8,
   123:24
hand 140:8, 140:9
handed 148:14,
   148:16
handful 82:6
hands 27:5, 29:15,
   119:14
happen 39:3, 46:15,
   95:9, 111:21
happened 76:4
happens 25:21,
   116:12
happy 91:3, 118:7,
   129:24, 130:7,
   130:10, 153:23,
   155:13

hard 98:9
harder 114:4
harp 84:4
Hastings 42:25,
   89:5, 137:11,
   149:16
haves 85:5, 85:6
havoc 102:2
head 157:9
heading 89:20
hear 10:19, 24:10,
   26:18, 49:8, 63:3,
   63:4, 69:20,
   81:25, 82:5, 86:3,
   98:25, 108:12,
   108:13, 108:14,
   123:6, 134:16
heard 9:22, 10:1,
   12:3, 74:17, 75:9,
   89:24, 90:18,
   91:18, 99:21,
   107:18, 109:3,
   137:18, 137:19,
   137:25, 138:2,
   138:4, 138:6,
   144:8, 145:25,
   147:14, 148:10
hearings 73:9,
   95:21, 113:4
heart 84:2, 89:7
heavily 67:5, 81:13
heavy 148:13, 148:15
Hector 51:3
heel 97:8
Hein 5:27, 111:22,
   123:24, 123:25,
   124:3, 125:22,
   125:25, 126:14,
   131:20
held 13:11, 21:7,
   21:11, 31:6,
   117:21, 143:8,
   152:9
Hello 134:16
help 14:19, 57:12,
   59:7, 149:2
helpful 17:21,
   120:22
helps 148:14
Helvia 151:3, 152:5

Hernandez 4:5,
  58:24, 156:3
high 20:13
higher 19:7, 19:9,
  20:21, 22:24,
  41:22, 42:6
highlight 125:4
highlighting 125:6
highlights 100:7
highly 22:13, 38:22
hints 148:14, 148:16
hiring 34:9
history 116:3
Hold 110:9, 110:21,
  116:24, 126:21
holders 74:8
Holding 19:4, 55:10,
  113:19
Holdings 6:10,
  106:14
holds 71:21
holistic 36:6, 41:15
honest 27:25
honestly 113:11
honesty 78:25
Honorable 4:22,
  4:24, 8:14, 8:15,
  8:17, 56:8, 56:9,
  159:6, 159:8
hope 36:16, 67:17,
  132:13, 133:2,
  134:21
hoped 70:20
hopeful 17:20,
  67:12, 72:17,
  73:11
hopefully 57:14,
  97:25, 101:10,
  101:13, 119:21,
  127:23
hopes 95:16
hoping 132:25
host 79:20
hour 117:15
hours 66:22
Houser 74:18, 76:11
HTA 98:12
hundred 124:23
hundreds 116:4
hurdle 115:3

hurricane 57:14,
  57:19
hurried 145:8
hypothetical 38:22,
  38:24, 59:12


< I >
idea 80:9, 100:12,
  112:22
ideas 64:12
identification
  150:25
identified 17:10,
  18:8, 145:21,
  156:12
identify 9:16,
  99:24, 152:10
identifying 152:11
ignorant 56:5, 56:17
ignores 95:2
II 12:7, 12:10,
  77:25
II.5 108:7
III 1:8, 1:25, 5:13,
  18:7, 32:19, 34:4,
  34:7, 34:14,
  34:16, 34:18,
  35:16, 35:17,
  35:19, 35:20,
  36:5, 39:14,
  39:16, 39:18,
  39:23, 41:12,
  41:14, 42:5,
  48:11, 57:22,
  61:7, 65:14,
  65:22, 87:2,
  135:16
illegal 59:14
Imagine 40:10, 138:8
immediate 40:19,
  40:24, 90:24
immediately 10:8,
  90:6, 101:15
imminent 33:15
impact 55:14, 56:5,
  56:14, 59:1, 59:9,
  59:10, 59:15, 97:7
impacted 81:17,
  126:3

impacts 116:13
impairment 37:19
impediment 37:9,
  67:22
Implement 12:18
implicate 73:18
implies 43:5
implying 47:3
import 13:20, 102:24
important 32:20,
  41:3, 41:6, 41:13,
  43:7, 44:13, 46:9,
  57:18, 57:21,
  65:13, 71:11,
  95:4, 98:15,
  106:15
importantly 64:18
imported 103:1,
  103:4
imposed 78:11,
  81:14, 105:22,
  106:10, 106:22
imposes 136:7
imposing 122:4
imposition 15:11
impossible 27:20
improperly 96:19
improve 102:20
improved 60:9
in. 128:20, 133:7
inability 66:24,
  83:23
inaccurate 59:11
inappropriate 101:5,
  113:3
Inc. 2:13, 5:21,
  117:20, 153:10,
  155:8
incentive 56:13
incentives 40:4,
  55:13
incentivize 39:12
inclination 145:24
inclined 12:19,
  13:16, 15:3,
  76:21, 138:22,
  156:18
include 46:24,
  47:16, 119:19
included 33:8, 81:7

includes 43:25
including 9:2, 9:12,
  37:11, 40:21,
  66:10, 67:10,
  75:14, 124:11,
  124:15, 132:12
income 51:24
incompatible 16:1
incorporated 28:17,
  103:7, 140:22
incorrect 21:6
increase 56:4
increasing 96:25
incur 43:19
incurred 32:16,
  33:18, 35:9
Indemnification
  53:19
independent 70:16
index 119:11, 124:4,
  124:6, 124:9,
  124:18
indexing 120:4
indicate 32:9,
  120:13, 156:18
indicated 119:20,
  129:11, 135:23
indication 108:17,
  120:3
indignant 148:8
indistinguishable
  142:23, 143:10
individual 36:2,
  125:10, 126:3,
  126:4
individuals 126:9
inducement 41:4,
  41:7
inefficiencies 79:2
inefficiency 100:7
inefficient 40:20,
  80:20
inefficiently 15:24
infirmity 73:23
inform 136:22
information 13:24,
  108:5, 111:24,
  112:4, 112:9,
  112:14, 113:8,
  121:25, 122:13,

123:17, 126:10,
  127:21, 128:2,
  128:3, 128:17,
  130:22, 131:13,
  136:12, 150:23,
  152:11
infrastructure 41:11
inherently 140:21
initial 76:10,
  76:20, 99:15,
  114:18
Injunction 36:21,
  74:7, 74:8, 156:3
inquiring 156:19
inquiry 157:11
insane 147:12
insightful 120:22
insisted 45:12,
  83:11
insolvency 52:1,
  52:6
insolvent 58:4
installments 53:18
instance 63:14,
  115:20, 130:21
instances 52:14
instant 74:5
Instead 12:21,
  39:18, 95:19,
  142:8, 143:17,
  144:12, 155:2,
  155:11
instructed 78:9,
  154:13
instruction 21:25
instrumentalities
  151:14, 152:8
instrumentality
  53:1, 53:16
insufficient 120:7
insulted 102:2
Insurance 5:40,
  71:21
insurers 73:1
insures 71:21
intend 72:12, 81:8,
  130:19, 137:14
intended 118:21,
  157:25
intends 33:12, 99:12

intention 13:5,
  61:21, 66:7, 74:9,
  84:25, 85:18,
  88:4, 134:4
intentions 13:18
interest 8:24, 9:19,
  44:23, 45:15,
  46:3, 59:12,
  70:11, 70:15,
  77:13, 78:10,
  86:4, 91:15, 95:8,
  95:12, 112:2
interested 10:11,
  13:2
interesting 77:7,
  77:24
interests 151:12
interfere 97:3
interim 33:17,
  43:17, 49:23,
  50:5, 50:17
internal 25:6, 29:7
internally 24:23
interpretation 86:14
interrupt 10:2,
  10:3, 10:6, 19:19,
  157:22
interrupted 106:19
interrupting 130:18,
  134:4, 149:15
interruption 150:10
intertwined 15:6
Intervene 88:22,
  99:13, 105:11,
  106:6
intervened 99:20,
  101:18
intervenes 95:15
intervening 101:20
intervention 28:24,
  97:11, 99:11,
  99:15, 100:25,
  113:2
interventions 97:17
invalid 46:24,
  47:16, 47:17
invested 151:13
investing 34:10
investment 74:9
investments 41:11,

43:14, 151:11
investors 126:3,
    126:5
invites 17:6
invoice 43:10
invoiced 43:9
invoke 78:14
involve 21:13,
    21:14, 76:14
involved 12:12,
    19:2, 111:23,
    112:22, 115:8,
    129:10, 129:23
involvement 43:14,
    50:13
IRP 25:24, 27:19,
    27:21
island 34:20
issued 9:11, 83:12,
    151:6, 151:13
Item 11:2, 17:22,
    108:7, 137:6,
    152:20, 154:22
Items 88:5
itself 27:11, 34:23,
    126:7


< J >
J. 4:33, 5:37
jam 65:19
Jenner 141:21
Jessica 5:32, 49:8,
    49:15
job 52:10, 143:3
jobs 51:20
join 96:14
Joint 108:4, 135:16
Jointly 1:11, 1:28
joke 146:15
Juan 8:1, 134:5,
    134:7, 134:11
Judge 4:22, 4:23,
    4:24, 4:25, 8:5,
    8:15, 45:6, 45:20,
    45:21, 64:14,
    74:18, 76:11,
    88:16, 88:17,
    104:13, 108:13,
    119:21, 126:21,

133:16, 159:7,
    159:8
judgments 100:11
judicial 9:10,
    71:12, 94:4
Judith 4:24, 8:16,
    159:8
juncture 107:15
jurisdiction 21:16,
    21:17, 26:2, 26:6,
    26:8, 26:15,
    26:19, 37:2
jurisprudence 23:21,
    24:3
justifiable 94:12
justification 20:11,
    73:25, 124:6,
    124:12
justify 43:18, 124:8
Juvennelliano 45:22


< K >
KAPLAN 5:22, 155:4,
    155:7, 155:8,
    155:19, 156:4,
    156:6, 156:10,
    156:17, 157:15,
    157:17, 157:25,
    158:5, 158:7
keep 10:12, 66:13,
    66:19, 118:25
keeping 10:13, 66:8,
    122:11
Kelso 158:10
key 16:25, 39:15,
    40:6, 42:16,
    45:17, 83:18,
    107:17
keys 17:10
kilo 28:2
kind 40:17, 47:7,
    142:2
knowing 65:1, 97:6
knows 145:3, 157:12


< L >
L. 5:22
label 130:20

labor 31:4
laches 92:10
lacks 151:18, 152:7
lagged 132:19
laid 15:25, 23:8,
    53:10, 63:13, 68:1
Lamparter 45:5
land 48:21
landlord 45:12
Landon 5:19, 141:20
landscapes 16:5
language 14:1, 40:7,
    121:13
languishing 39:19
large 112:20, 121:23
largely 74:24, 90:3
largest 55:20, 116:2
Last 33:22, 34:13,
    36:15, 46:14,
    48:8, 63:23, 76:4,
    95:4, 109:23,
    137:16, 148:3,
    149:18, 153:3
lastly 131:20
Late 46:13, 62:4,
    62:5
later 13:11, 47:5,
    77:7, 77:11, 86:3,
    86:16, 109:25
latest 109:8
Laura 4:22, 4:39,
    8:14, 133:16,
    150:16, 159:7
laws 25:19
lawsuit 36:25
lay 19:17
laying 128:5
lead 52:1, 61:6,
    80:23
leader 74:19, 82:19
leads 67:24
leap 129:9
learn 52:10
lease 44:18, 44:21,
    45:8, 45:13, 46:2
leasing 44:16
least 15:13, 23:9,
    27:9, 62:19, 63:1,
    73:23, 97:13,
    100:9, 104:1,

112:16, 133:6,
137:14
Leave 88:21, 90:14,
105:3, 105:10,
139:5
leaves 53:10, 58:4,
89:21, 91:1
leaving 30:18, 53:1
left 53:8, 92:7,
93:6, 93:7, 93:20
legal 16:5, 16:10,
19:17, 20:6, 37:9,
37:18, 46:25,
47:14, 47:15,
47:17, 66:23,
75:13, 75:25,
79:5, 80:18,
84:15, 139:21,
142:7, 142:20,
145:14, 145:20
legality 37:24,
51:17, 148:19
legally 142:22,
143:10
legislate 115:23
legislation 36:16,
37:10, 115:21
legislature 115:22,
115:23
legitimate 76:2
lengthy 13:4, 17:19,
36:19, 76:6
less 10:19, 21:7,
50:15, 124:9,
144:6
level 19:9, 22:11,
27:14, 68:15,
80:5, 129:18,
130:19
leverage 93:21,
94:13, 101:13
liability 70:5,
150:22, 158:10
licenses 117:24
lien 84:12, 84:13
liens 79:20, 84:11
life 42:8, 114:4,
140:16, 146:8
lifetime 140:17,
140:19

Lift 15:1, 74:11,
84:18, 89:9, 98:5,
106:24
lifting 16:18, 99:7
Liggett 124:14
light 16:5, 16:21,
63:13, 65:3,
65:21, 79:5, 96:9,
118:17, 158:12
likely 57:12, 92:19,
93:20, 119:20,
133:23, 145:10
Likewise 112:24
limit 133:1
limitation 122:2
limitations 97:13
Limited 9:12, 26:3,
55:18, 71:12,
80:9, 86:13,
87:12, 88:21,
91:7, 98:6,
105:10, 106:20,
119:4
limiting 38:6
line 9:4, 11:24,
72:8, 82:10,
103:10, 133:14,
141:9, 143:18,
143:19
lines 74:22, 77:20,
78:15, 133:12
liquidated 44:10,
46:18, 48:5
liquidation 107:11
Lisa 8:7, 88:17
list 14:7, 49:2,
77:19, 111:7,
118:11, 136:6
listed 9:17, 18:2
listen 133:12
listened 105:16,
125:7, 135:22
listeners 88:10
litigate 15:8,
77:11, 78:7, 81:3,
81:5, 81:16,
83:23, 107:7
litigated 38:2,
66:16, 104:5,
107:17

litigating 84:25,
96:21, 101:25,
144:10
litigation 15:12,
16:18, 66:11,
67:15, 72:4, 77:1,
82:9, 82:20,
82:21, 83:2,
83:12, 83:15,
88:23, 97:1,
105:22, 106:8,
106:22, 106:24,
106:25, 107:24,
107:25, 144:20,
148:21
little 50:8, 71:7,
104:10, 109:20,
132:19, 135:13,
148:8, 155:21
live 37:4, 89:11,
101:23, 133:14,
134:11
lives 51:20, 51:23
living 13:2
LLC 18:11, 18:12,
55:11, 114:12,
114:13, 114:14,
114:15
LLP 11:14, 71:20,
93:13, 139:12
loan 59:3, 59:4,
59:11
local 28:19
log 126:18, 127:2
logged 126:20
logic 95:6
long 14:7, 24:5,
67:6, 90:5, 90:10,
101:22, 138:6,
155:3
Look 41:20, 44:13,
44:14, 45:4,
69:21, 85:6,
86:17, 107:24,
109:20, 110:16,
113:9, 116:11,
125:17, 126:22,
126:25, 131:16,
133:24, 146:5,
158:18

looking 19:3, 82:24,
  93:22, 100:14,
  111:24, 112:23,
  116:10, 120:18,
  127:25, 128:24,
  129:18, 130:2,
  157:23
looks 58:19
loosely 124:24,
  142:9
losing 27:23, 51:24
lost 117:23, 134:19
lot 48:1, 58:1,
  59:14, 86:24,
  86:25, 89:13,
  109:3, 110:17,
  120:17, 128:5,
  138:15, 138:21,
  147:19
lots 82:22, 157:8
Luc 5:13, 42:23,
  89:4, 137:11,
  149:15
Luis 5:7, 11:20
lumped 143:24


< M >
Ma 133:10
magic 91:8
Magistrate 4:24,
  8:15, 113:2, 159:8
magnitude 62:7, 68:7
mail 132:15, 136:6
mainly 56:1
maintaining 107:8
Maintenance 32:12
major 75:11
majority 79:1
man 48:21
Management 1:10,
  1:27, 2:23, 3:6,
  3:23, 8:19, 14:9,
  33:5, 58:16,
  97:15, 105:3,
  105:7, 111:8,
  133:18, 136:10,
  150:17
mandamus 84:5, 84:21
mandate 27:21, 33:1

mandates 26:1,
  143:12
Manges 98:2
manner 16:8, 28:4,
  64:17, 65:25, 66:1
manuals 25:24
map 157:2
March 75:7, 105:22
Margaret 4:37,
  155:17
margin 22:4
Marini 5:7, 11:18,
  11:19, 11:20,
  11:23
markedly 143:1
market 18:23, 27:16,
  27:17, 28:1, 28:2,
  28:3
markups 19:4
Marrero 34:25, 35:4,
  41:10, 50:11,
  50:13, 54:4,
  58:18, 58:21,
  58:22
Martin 4:33, 5:40,
  11:14, 71:20,
  93:13, 100:22,
  122:22, 127:1,
  139:11
massive 80:18
master 136:6, 139:6
material 15:16,
  120:5, 120:6,
  130:25, 131:8,
  132:6
materialize 54:3
materialized 38:24
materials 119:2,
  119:9, 129:14,
  132:11
matter 28:8, 30:2,
  30:5, 31:14, 37:2,
  51:14, 75:13,
  77:6, 81:13, 83:1,
  89:7, 90:18,
  112:12, 139:15,
  139:16, 145:7
matters 9:18, 12:8,
  12:10, 12:15,
  16:12, 17:22,

58:5, 65:25, 106:4
maximize 36:5
Mcconnell 114:11
mean 42:2, 46:13,
  47:20, 54:9, 61:8,
  68:19, 68:22,
  69:3, 70:21,
  82:20, 82:22,
  86:3, 99:10,
  100:7, 109:23,
  109:24, 113:11,
  119:7, 119:17,
  133:22
meaning 33:13,
  103:16
meaningful 131:16
meaningfully 121:21
means 61:12, 61:15,
  94:8, 110:13,
  110:16, 126:8,
  147:3, 150:4
meant 22:13, 120:9,
  120:10
measures 126:3
media 111:24,
  124:17, 124:20,
  125:1, 125:4
mediation 74:18,
  74:25, 82:14,
  82:18, 82:19,
  102:8
mediator 82:11
mediators 94:4
meet 50:17, 64:10,
  76:9, 86:9
meeting 89:15
meetings 19:4
meets 23:1, 82:12
Melissa 5:18
members 8:24, 9:13,
  143:8
Mendez 5:32, 49:2,
  49:5, 49:7, 49:8,
  49:10, 49:14,
  49:15, 55:6
mentioned 27:18,
  41:14, 123:9
mere 54:3, 101:25
merely 64:16, 84:6,
  92:1, 94:3, 112:4

merits 37:23, 138:16
Merry-go-round
    44:12, 44:13,
    44:14, 44:15,
    44:16, 45:4, 45:5,
    45:18, 45:23,
    46:5, 46:23,
    47:12, 61:6
met 20:25, 22:2,
    54:20, 54:25,
    58:14, 77:6
methodology 145:4
Michael 4:36, 63:12,
    158:10
microphone 24:8
midday 62:21, 88:6
middle 19:1
Milbank 78:22, 99:3,
    118:14
milestone 65:15,
    66:6, 98:11
milestones 65:10,
    86:9, 116:8
Miller 5:43, 77:13,
    78:19, 78:21,
    78:24, 81:22,
    85:4, 98:21,
    98:23, 98:25,
    99:2, 99:3,
    100:17, 100:19,
    118:11, 118:13,
    118:14, 118:17,
    120:8, 121:16,
    121:19, 121:22,
    122:17, 122:18,
    128:10, 128:24,
    129:9
million 43:9, 43:10,
    43:16, 43:22,
    48:23, 51:3, 51:5,
    53:17, 53:21,
    55:22, 55:24,
    59:3, 59:11,
    71:22, 102:4,
    102:17
millionaire 56:4
millions 36:9, 138:9
mind 12:13, 76:21
minimize 53:4, 57:14
minor 65:11, 65:15,

112:11
minute 64:24, 71:3,
    71:7, 97:23, 98:1,
    138:17, 152:2
Mirant 21:12
mirror 99:19
misapprehend 22:12
misappropriation
    157:3
miscategorization
    121:9
misread 91:1
missed 40:7
misunderstand 38:8
misunderstanding
    13:20
misunderstood 128:11
misuse 151:22
mix 136:6
modernized 33:2
modification 65:15,
    111:7
modifications 65:11
modified 99:7,
    99:23, 101:1,
    135:19
modify 101:14, 111:4
moment 19:15, 45:4,
    67:11, 134:20
money 68:3, 69:4,
    83:25, 147:19
monies 33:14
Monitor 5:35,
    114:15, 116:19
monolines 68:24,
    75:14, 83:11,
    83:14
monopoly 54:7, 54:8,
    54:10, 59:14,
    60:13
Montanez 4:5, 156:3
month 43:17, 123:9
monthly 43:8, 53:17,
    140:15, 140:17,
    146:8
months 13:3, 34:14,
    37:8, 39:22, 48:9,
    48:12, 48:19,
    55:23, 55:24,
    69:8, 74:17, 76:4,

77:7, 141:5
moot 16:4, 37:13,
    153:18
mootness 37:16
mouse 140:5
movant 56:21
move 16:20, 40:4,
    67:15, 68:7, 70:8,
    80:17, 80:20,
    80:25, 81:10,
    91:24, 119:23,
    122:16
moved 111:3
Moving 39:17, 39:25,
    85:4, 91:17
Mudd 126:15, 126:17,
    126:20, 127:1,
    127:6
municipal 31:5,
    116:2
mute 9:4, 9:6
mutual 151:12,
    152:10
Myers 39:10
myriad 143:2
myself 153:6, 157:24
mystery 47:8

< N >
naive 90:19, 91:23,
    103:10
name 9:16, 9:23,
    12:2, 84:5, 85:2,
    116:18, 141:19
narrow 136:11,
    142:7, 142:16
narrowed 106:9
NATBONY 5:37, 96:5,
    96:6, 96:7, 97:17
National 6:5, 97:21,
    98:2, 109:5
natural 57:15
naturally 64:13
nature 70:16,
    119:12, 120:12,
    122:8, 137:22
Nayuan 5:30, 114:11
near 19:13, 20:23,
    22:25, 57:19

necessarily 12:14,
  16:2, 63:17, 70:4,
  79:12, 85:17,
  86:13, 86:18,
  87:17, 103:22
necessary 10:24,
  34:1, 34:21,
  49:24, 62:20,
  63:19, 64:24,
  65:14, 67:25,
  68:21, 79:25,
  85:16, 107:25,
  113:15, 129:14,
  132:11, 132:23,
  134:10, 144:20,
  150:24
necessity 107:10
needed 59:8, 64:8,
  82:21, 86:21,
  115:16, 147:6
needs 51:4, 57:23,
  58:16, 61:25,
  83:3, 90:11,
  101:1, 109:13,
  109:14, 110:10,
  115:6, 115:8,
  118:25
negate 37:16
negative 55:14,
  56:14
negotiate 72:12
negotiated 34:5,
  34:15, 66:6, 67:5,
  81:14, 107:6
negotiations 18:25,
  19:2, 20:3, 51:25
Neither 18:19, 29:9,
  30:20, 40:14,
  101:1, 115:24
nest 104:10
net 42:2
nevertheless 103:8,
  147:7
new 15:21, 23:13,
  26:3, 30:22,
  45:12, 69:11,
  83:15, 85:10,
  95:20, 99:22
newly 45:11
Next 42:19, 49:2,

73:24, 95:4,
  97:20, 110:17,
  118:11, 135:6,
  137:6, 139:9,
  140:1, 149:9,
  152:20, 154:21
NG 8:7, 88:17,
  88:19, 126:20,
  126:21, 126:24
Nicholas 5:14
night 153:3
nine 31:18, 31:25,
  35:3, 42:20, 43:3,
  49:12
Nobody 90:11, 92:25,
  119:8
non-compliant 61:22
non-confidential
  124:16, 125:2,
  125:5
non-operating 24:17
non-operational
  18:9, 18:22, 22:7
non-substantive
  105:18
nonconfidential
  124:18
None 7:5, 7:11,
  20:23, 51:1, 74:4,
  74:12
Nor 73:25, 101:1,
  115:24, 129:22
nos. 11:6
note 14:2, 17:12,
  37:20, 67:14,
  73:9, 77:13, 78:9,
  81:2, 99:8, 100:3,
  116:21, 118:22,
  123:15, 129:9,
  139:6, 151:17,
  153:19
noted 20:19, 22:13,
  34:21, 36:1, 36:4,
  58:11, 67:1,
  83:18, 84:16,
  84:20, 85:8,
  115:11, 116:18,
  128:12, 129:2
notes 31:25, 63:5,
  88:25, 128:12

Nothing 25:16, 26:7,
  29:17, 38:23,
  102:1, 124:21
notice 12:20, 12:22,
  12:24, 13:8, 14:5,
  14:15, 14:21,
  46:3, 108:24,
  111:4, 117:4,
  117:7, 117:10,
  117:14, 117:22,
  122:25, 125:7,
  125:16, 134:25,
  135:25, 136:1,
  136:19, 153:13,
  153:14, 153:20,
  158:16
notification 14:10
notifying 25:12
notion 72:20, 85:25
novel 106:19
Number 13:17, 30:11,
  66:10, 85:5,
  88:11, 95:7,
  119:19, 150:12,
  150:25, 152:11,
  153:3
numbers 59:3, 124:7


< O >
O&M 43:25
O'melveny 39:10
object 74:16, 93:22,
  94:10, 95:6, 95:8,
  113:1, 125:19,
  126:9, 153:21
objected 18:12
objecting 13:25,
  14:6, 19:16,
  62:19, 75:8,
  75:14, 94:8,
  118:22, 121:13,
  125:12
objective 64:16,
  85:23
objector 30:13
objectors 14:22,
  20:24, 21:1,
  21:13, 35:11,
  57:3, 65:18,

95:10, 127:2,
136:7
Obligation 78:1,
99:11, 140:8
obligations 32:11,
33:24, 49:23,
50:18
obligor 147:5
observation 66:20,
86:11
observations 66:25
obtain 25:10
obtained 151:9
obviated 138:13
Obviously 44:21,
54:23, 61:21,
64:2, 64:6, 70:20,
71:9, 79:19,
82:22, 89:6,
90:14, 91:3,
91:10, 91:17,
91:21, 102:18,
104:13, 126:7,
138:23, 148:11
occur 98:16
occurring 8:25
October 33:22, 36:15
offense 52:16
offer 73:25, 76:18,
102:10
offered 102:4,
102:18
Official 5:10, 5:16,
105:8, 105:12,
159:15
often 36:13, 105:13,
129:10
Okay 26:23, 26:25,
45:23, 47:20,
47:22, 49:11,
49:14, 56:25,
57:7, 97:24,
102:11, 102:14,
121:19, 122:11,
128:15, 134:14,
134:18, 135:10,
137:25, 146:4,
146:13, 157:14
OMA 32:14, 33:10,
34:2, 34:17,

34:19, 34:21,
35:8, 36:9, 36:17,
36:20, 37:4,
37:19, 37:24,
37:25, 38:9, 58:7,
59:8, 59:10,
59:17, 59:20,
59:25, 60:14,
60:23
Omar 50:10
Omni 154:22, 155:23
Omnibus 4:21, 8:21,
8:25, 15:12,
17:23, 82:25,
107:1, 118:18,
144:15, 150:13,
150:19, 151:24,
151:25, 152:3,
152:15, 152:20,
152:23, 154:16
Once 16:2, 25:22,
32:16, 38:8,
60:23, 86:4,
139:11, 142:8,
150:4, 158:17
one-off 144:20
one. 63:7
ones 21:14, 59:23,
70:4, 83:8, 83:11,
85:10
ongoing 63:25
open 27:9, 27:25,
28:3, 80:18,
89:21, 90:14
opened 28:12
opening 58:5, 62:19,
74:2, 91:2,
118:17, 137:14,
147:6, 158:8
operate 34:14, 60:5
operating 17:25,
18:10, 43:8,
117:23
Operation 9:3,
32:12, 43:20,
60:2, 60:5, 60:8
operational 18:20,
19:12, 32:17, 34:3
operations 33:6,
33:15, 53:5, 134:7

operator 53:15, 60:6
opinion 21:11,
21:21, 21:25,
44:12
opportunity 9:19,
12:25, 72:16,
72:18, 96:24,
112:3, 125:11,
127:21, 142:11,
144:14
opposed 37:24, 119:3
opposite 61:6
opposition 38:1,
42:21, 65:17,
71:17, 110:5,
110:11, 137:1,
154:7
oppositions 26:12
oral 14:19, 14:23,
15:14, 16:16,
17:16, 17:21,
71:25, 104:25,
105:17, 135:13,
135:14, 136:25,
154:22
orally 135:7
ordered 76:7
orderly 9:3, 65:25,
106:12
orders 9:10, 27:19,
78:11, 82:11,
96:12, 97:17,
112:12
ordinarily 14:9
Organization 45:5
orient 12:13
oriented 111:12
original 34:17,
147:25
originally 77:2,
77:15
others 15:10, 24:5,
90:16, 124:11,
127:16, 129:13,
134:10, 136:7,
146:10, 152:14
Otherwise 14:13,
73:14, 77:22,
84:21, 98:15,
99:5, 117:18,

117:23, 133:3,
134:8, 137:2,
153:23
ought 87:21, 140:9
outcomes 15:22
outlined 13:13,
16:22
outset 34:21, 72:1,
89:15, 93:16,
125:8
outside 17:2, 40:16,
48:13, 66:11,
67:15, 72:3, 82:9,
83:2, 115:19
outstanding 20:2,
80:10, 84:23,
107:7
overall 53:25, 62:1
overburden 129:6
overcome 15:19,
66:24
overlap 63:21,
69:20, 70:14
overlapping 79:4
overload 124:20
overly 125:13,
126:11
overrule 18:14,
92:19
overruled 23:2,
137:2
own 10:12, 24:24,
25:7, 27:19, 29:2,
29:6, 29:9, 35:25,
36:14, 52:23,
54:16, 54:19,
64:5, 68:19,
68:20, 74:11,
80:19, 87:20,
110:25, 138:4
owned 59:25
owner 53:8
ownership 59:24,
60:1, 151:6,
151:12
oxymoron 27:16


< P >
P3 37:5

Padilla 18:18, 22:22
PAGE 7:3, 30:12,
30:17, 74:22,
75:22, 77:5,
77:20, 78:15
pages 124:15, 159:4
paid 42:1, 42:5,
42:6, 43:15, 48:3,
69:2, 80:5,
140:15, 140:19,
143:2, 143:3,
145:5
pandemic 106:19
paper 111:2
papers 14:3, 34:24,
37:15, 43:2,
54:24, 64:20,
68:2, 69:22,
70:25, 72:11,
81:21, 83:7,
89:18, 99:6,
101:2, 101:7,
109:13, 113:13,
131:23, 143:23
Paragraph 13:17,
13:20, 46:20,
47:9, 47:10,
47:11, 50:19,
61:12, 74:2,
111:1, 113:18,
121:5, 121:6,
122:14, 128:11,
136:11
paragraphs 35:3
paramount 41:11
Pardon 133:16
parity 90:8
parsed 53:9
part 26:5, 42:16,
43:13, 53:24,
77:18, 80:24,
96:24, 107:5,
114:17, 145:16,
145:25, 146:1,
148:19
Partial 62:17,
105:4, 105:21
partially 37:13
participant 10:8
participate 72:7,

125:11, 126:9
participation 97:12,
126:4
particular 24:20,
36:1, 56:5, 68:13,
81:20, 91:9,
118:19, 145:19,
151:24, 157:11
particularized
130:23, 130:24
particularly 17:7,
65:9, 65:18, 66:3,
81:2, 85:9,
120:22, 138:3
Parties. 13:19
partners 68:13,
127:16
partnership 53:12
parts 21:3
party 20:3, 37:9,
40:4, 49:22,
78:10, 95:12,
99:11, 111:4,
111:5, 115:20,
125:19, 143:18
passage 91:20
passed 29:10, 84:3
passing 143:4
past 58:10, 76:16,
82:17, 110:20,
132:18, 154:21
path 45:16
Paul 4:35, 31:20,
42:25, 89:4,
137:11, 149:15
pause 81:1, 100:14,
138:23
pay 40:5, 50:24,
56:1, 69:4, 93:25,
140:14, 140:20,
147:9, 147:10
payable 53:17,
146:24
paying 52:10
payment 43:23,
68:16, 84:7,
84:14, 84:17,
84:23, 85:3,
146:20
PBA 128:19

Pedro 4:12
pen 111:2
penalties 46:24,
    46:25, 47:17
penalty 47:5, 47:22
Pending 15:5, 15:23,
    16:12, 20:3, 24:5,
    36:15, 37:17,
    58:9, 59:5, 69:21,
    76:8, 80:22,
    100:11, 105:1,
    107:23
pension 58:4, 58:9,
    58:10, 58:11,
    142:22, 143:13
Pensions 51:24,
    59:15, 140:14,
    142:25, 143:2,
    143:9
People 9:2, 72:12,
    103:20, 109:4,
    110:17, 112:5,
    112:6, 124:23,
    127:20, 129:23,
    132:2, 132:17,
    145:10, 146:5,
    148:14
per 28:2, 43:16
perceives 16:25
percent 19:7, 19:9,
    44:1
perception 16:21
perfect 139:22
perform 51:20
performance 33:10,
    35:7, 37:9, 37:19
performed 50:5,
    53:18
performing 37:7
Perhaps 23:18, 68:5,
    128:10, 129:13,
    142:5, 156:18
period 12:20, 12:22,
    32:18, 43:11,
    43:17, 50:5,
    108:24, 117:4,
    117:7, 117:10,
    117:14, 117:22,
    132:7, 133:7,
    133:20, 135:25

periods 117:17
permission 67:20,
    87:12, 106:3,
    150:3
permit 117:16, 118:1
permitted 9:12,
    117:5, 117:21
permitting 104:8
person 9:12, 9:25
personnel 111:24
persons 136:24
perspective 67:22,
    89:22, 111:14
persuade 17:9, 150:6
persuaded 52:3,
    148:17
pertinent 14:20
Peter 5:8, 5:27,
    5:35, 39:9, 61:4,
    114:13, 116:15,
    116:18, 123:25
petition 50:10,
    70:18, 144:10,
    146:19
phase 47:20
phone 9:7, 9:8,
    12:4, 49:5, 71:4,
    98:23, 108:11,
    133:10
phones 9:4
phrase 27:16, 67:12
PHV 4:33, 4:34,
    4:35, 4:36, 4:37,
    4:38, 4:39, 5:8,
    5:13, 5:14, 5:18,
    5:19, 5:22, 5:35,
    5:37, 5:40, 5:43,
    6:7
pick 129:5
picture 15:18
Pierluisi 4:12
place 69:9, 72:7,
    72:15, 107:21,
    121:7
places 67:6
Plain 93:22
Plaintiff 2:9, 2:26,
    3:9, 3:26, 4:8
planning 150:5
plans 27:17, 33:9,

33:11, 58:17
plate 71:13
play 25:17, 149:12
played. 10:17, 22:9,
    23:24, 28:9,
    29:12, 31:8,
    38:16, 40:25,
    42:10, 47:2,
    48:16, 56:16,
    60:3, 69:18, 78:3,
    87:6, 95:1, 97:16,
    100:16, 103:14,
    104:19, 117:2,
    120:1, 123:18,
    125:21, 144:3
playing 140:5,
    141:21
pleaded 105:24
pleading 141:2,
    141:8
pleadings 13:6,
    17:17, 95:12,
    95:21, 98:14,
    105:15, 135:22,
    146:6
Please 8:11, 9:6,
    9:16, 9:23, 10:2,
    10:8, 17:16,
    28:15, 49:3, 49:5,
    49:13, 82:15
pleased 130:8
pleasure 155:10,
    155:14, 155:20
plenty 103:3, 138:3,
    138:5
plus 35:8, 43:12,
    124:23, 145:8
PM 10:23, 10:24,
    88:15, 158:20
pocket 140:15
podium 39:7
point. 46:10, 68:4,
    68:8, 79:9,
    107:13, 139:1
pointed 107:16
pointing 148:24
points 22:11, 30:20,
    42:17, 46:11,
    58:7, 72:1, 82:6,
    96:10, 99:5,

101:12, 122:24,
132:3
policies 9:10,
24:25, 25:3,
27:10, 51:9, 60:15
policy 27:4, 27:6,
27:11, 28:25,
29:18, 32:24,
32:25, 33:3, 33:7,
33:10, 34:22,
37:22, 37:24,
51:16, 58:15,
60:1, 60:4
politicized 33:5,
58:16
politics 33:4
portion 73:20,
111:1, 125:2
pose 138:19, 138:20
position 16:2, 26:7,
38:5, 54:25,
55:12, 55:19,
56:12, 65:23,
75:12, 93:24,
99:9, 102:20,
103:24, 104:9,
113:5, 131:24
positions 102:8
possess 152:12
possibilities 37:18
possibility 34:13,
38:14, 65:5, 89:14
possible 17:16,
29:18, 74:21,
76:12, 100:5,
107:7, 109:7,
119:24, 127:22,
129:1, 131:15,
131:19, 132:15,
140:2, 140:10
possibly 59:24
Possinger 4:35,
31:18, 31:20,
31:21, 32:2, 32:9,
38:17, 39:8,
41:13, 50:19,
51:10, 56:22,
56:24, 57:3, 57:7,
60:4, 60:25
post 69:4, 70:18

post-petition 45:11,
70:11
posting 40:13
pot 68:9, 72:20,
80:2
Potential 37:16,
39:4, 57:14,
63:21, 67:21,
70:14, 91:18,
118:21
potentially 13:1,
37:14, 97:7,
98:12, 117:7,
122:7
Power 1:33, 17:24,
18:9, 19:13,
20:23, 22:25,
25:5, 26:21,
27:23, 28:5,
28:13, 28:20,
29:11, 30:9,
30:14, 30:15,
36:11, 66:8, 95:11
Powers 21:20, 29:15
PPOA 20:21, 21:8,
21:10
Ppoas 18:18, 18:22,
18:24, 19:4, 19:7,
19:21, 19:22,
19:23, 20:2,
21:22, 22:6,
22:25, 24:17,
27:18
PR 115:23
practicable 95:24,
141:11
practical 15:20,
66:24, 126:8,
144:18
practice 14:12,
14:14, 15:5, 15:6,
15:22, 15:23,
16:9, 16:19,
17:11, 27:7,
106:5, 106:7,
106:20
practices 50:21
prayer 56:9
pre-petition 45:10
precedent 19:18,

33:16, 36:17,
36:23
precise 134:1,
134:20, 134:24,
152:11
precisely 157:13
preclude 124:10,
124:17
precluded 125:1
predetermine 25:9,
28:13
predetermined 28:1
predict 85:19
predictable 65:24
predicted 87:16
preempt 28:19
preempted 23:16,
23:19, 31:2, 31:6,
77:19, 77:21
preemption 28:16,
70:13, 77:16,
77:24, 77:25,
79:13, 79:18,
80:17, 86:19
preemptively 143:16,
143:20
prefer 52:20, 155:2
preferable 139:16,
148:9
prejudge 13:18
prejudice 35:25,
117:6, 142:14,
148:21, 149:6
prejudiced 91:20,
92:6, 117:18
Preliminary 12:11,
14:24, 17:20,
36:21, 156:3,
156:11
premise 75:11
premium 44:1
PREPA'S 18:6, 18:7,
26:6, 28:3, 30:3,
34:4, 51:2, 53:4,
55:14, 56:14,
60:10, 60:14
preparation 132:11
prepare 128:16
prepared 91:8,
141:1, 154:25,

155:9, 155:19,
156:7
preparing 138:9,
138:10
present 8:15,
102:22, 142:7,
142:8, 142:24
presentation 32:3,
32:7, 32:13, 58:2,
58:14, 71:25,
79:1, 80:1, 81:20,
158:8, 158:9,
158:12
presentations 9:21
presented 13:6,
17:14, 22:15,
45:13, 63:18,
65:20, 65:21,
87:15
presenting 12:9,
142:2, 150:14
preserves 92:16
presiding 8:15
press 8:24, 9:13,
16:18
pressed 75:23
pressing 19:4, 78:7
presumably 92:15,
104:7
presumption 46:4
pretty 60:11, 102:23
prevent 93:20
prevented 96:20
previous 150:20
previously 25:20,
62:5, 79:10, 84:1,
96:16, 99:23,
101:6
price 27:24, 28:1,
28:2, 28:3, 28:4,
28:7, 28:13
prices 25:3, 26:13,
27:15, 27:16,
27:17
pricing 18:23, 19:6,
19:11, 20:20,
22:24
prima 143:21
primarily 117:6
primary 34:2, 52:5,

57:21
Prime 10:11, 132:10,
133:5, 133:19
principle 72:25,
97:2, 97:9, 98:10,
103:20, 109:5
principled 76:18,
76:23, 76:24, 78:5
Prior 12:24, 27:1,
28:14, 30:5, 30:9,
30:19, 32:21,
35:12, 36:1,
67:24, 74:21,
76:12, 83:10,
86:21, 96:9,
96:12, 96:21,
97:17, 100:25,
112:11, 115:22,
137:19, 138:13,
142:11
prioritizing 15:9
priority 32:11,
40:23, 50:4,
80:15, 80:17,
86:12, 86:15,
147:3
private 33:6, 53:15,
54:7, 60:2, 60:4,
60:6
Pro 5:27
probably 48:18,
101:19, 103:11,
113:8, 135:7,
148:2
problem 63:9, 111:2,
116:6, 125:10,
139:23, 142:6,
145:2
procedural 89:22,
90:8, 104:22
procedurally 92:6
Procedures 11:4,
24:23, 29:7,
67:14, 123:3,
123:8, 123:13,
123:16, 123:20,
125:15, 125:22,
127:17, 128:7,
135:18
proceed 49:13,

63:10, 80:3,
82:21, 85:17,
87:10, 91:21,
95:20, 100:18,
139:7, 155:9
proceeding 22:14,
37:3, 37:21, 58:6,
59:16, 60:21,
60:22, 67:11,
77:3, 79:2, 82:25,
155:11
Proceedings 6:47,
9:5, 9:16, 15:2,
16:11, 27:9,
27:13, 52:6,
52:13, 66:11,
66:18, 71:23,
72:3, 72:4, 73:17,
75:18, 75:19,
77:25, 82:9,
82:13, 83:2,
88:15, 91:14,
101:1, 105:23,
115:12, 158:20,
159:6
process 16:8, 41:7,
41:8, 60:6, 65:9,
74:4, 86:23,
96:25, 106:16,
106:18, 111:20,
115:7, 116:1,
119:21, 127:19,
127:25, 129:8,
130:2, 130:6,
132:13
processes 25:6
produce 120:16
produced 6:47
producers 131:4
Producing 13:19,
13:23, 14:2, 111:4
production 121:23
profit 22:4
profits 44:6, 44:7
prohibition 37:11
prohibits 54:8
projected 42:8
projects 24:6
PROMESA 1:8, 1:25,
27:11, 28:17,

29:17, 32:23,
37:12, 51:7,
103:4, 103:6,
140:23, 143:12
promotion 97:4
prompt 74:3, 136:15
promptly 13:12
Proof 151:4, 153:11,
153:13
proofs 85:2, 106:1,
150:22, 152:24,
152:25
proper 27:21, 41:17
properly 22:5, 73:16
property 73:18
proponent 117:8
proponents 16:17
proposal 19:6, 19:9,
74:16, 100:7,
103:25
proposals 19:3
propose 14:1, 15:17,
55:15, 56:14,
64:11
proposes 14:20
proposing 66:20,
80:8, 80:24,
80:25, 104:5,
126:1
proposition 49:25
propound 112:19
propounding 119:7
Prosecute 62:17,
90:1, 103:22,
105:4
prosecution 90:7,
90:12, 90:24
Proskauer 11:14,
31:21, 63:12,
93:13, 133:17,
139:11, 150:16,
155:18
protect 54:17
protective 112:10,
112:11, 124:4,
125:20, 126:11
protocol 119:23
proud 46:8
prove 147:6
proved 112:20

proven 95:6
proves 79:9
provide 9:18, 19:13,
20:22, 22:25,
35:1, 37:25, 40:1,
50:16, 53:14,
59:17, 73:2,
95:13, 109:24,
122:12, 143:12,
146:12, 150:23
provided 15:15,
41:4, 78:2,
106:23, 119:12,
136:1, 143:18,
146:6
provides 25:4,
30:13, 43:22,
52:14, 53:11, 94:7
providing 41:9,
52:9, 62:2, 109:9,
125:5
provision 14:21,
25:19, 28:17,
39:1, 44:11,
46:18, 47:23,
48:5, 52:7, 61:14,
61:18, 61:22,
136:24
provisions 13:14,
13:15, 26:10,
48:2, 78:6, 156:23
PSA 65:10, 65:16,
65:21, 67:7,
67:12, 78:8, 81:6,
86:13, 115:8,
115:11, 115:14,
115:16, 115:18,
115:20, 116:8
Public 6:5, 8:24,
9:13, 10:10, 11:6,
24:25, 27:4,
27:10, 27:11,
28:25, 29:17,
52:7, 73:14,
88:10, 98:2,
120:5, 124:14,
124:17, 124:19,
125:1, 125:4,
131:3
public-private 53:12

published 73:14
punished 9:14
Purchase 17:24,
18:9, 30:14, 30:15
purely 89:22, 142:4
purported 111:16,
143:18
purporting 80:7
purpose 36:4, 41:14,
44:10, 52:5, 64:3,
83:13, 92:21, 98:6
purposes 13:24, 99:8
pursuant 67:7, 143:2
pursue 77:2, 81:8
pursuit 67:5
push 133:23
pushed 115:15
pushing 134:21
put 20:8, 23:7,
23:11, 54:17,
64:16, 77:19,
86:8, 87:7, 90:8,
93:23, 99:22,
100:24, 101:21,
119:6, 119:15,
120:10, 128:20,
129:22, 130:5,
130:7, 130:8,
134:24, 135:4,
140:10, 141:7,
145:1
Putting 84:15


< Q >
qualifications 58:20
qualified 58:19
quality 40:1
quantification 73:20
quantum 129:9
question 11:25,
25:2, 44:16,
67:25, 79:24,
80:16, 91:6,
109:1, 133:10,
141:15, 145:4,
146:7, 146:11,
149:17, 156:7,
156:14, 157:1
questions 10:6,

11:9, 24:7, 31:10,
32:6, 39:6, 55:4,
80:7, 81:19,
81:23, 87:25,
90:25, 91:4, 96:2,
108:21, 118:7,
118:9, 138:19,
138:25, 155:12,
155:22
quick 99:5
quickly 36:18, 40:4,
87:9, 93:14,
100:4, 131:10,
132:15, 140:2,
150:6
quite 85:18, 143:11,
150:6
quote 46:19, 46:23,
47:1, 47:12,
74:22, 80:4,
100:1, 101:20,
144:5
quotes 74:2


< R >
Rafael 4:5
Raiford 5:19,
141:20, 141:23,
141:24, 144:4,
144:24
raise 38:1, 113:17,
156:7
raised 9:20, 14:6,
19:16, 21:13,
29:1, 35:10,
38:14, 62:5,
63:15, 65:17,
70:12, 72:2, 76:5,
79:10, 125:10,
140:25, 145:16,
156:14
raising 45:25,
51:16, 51:22,
142:4, 148:2
rates 59:9, 59:10
rather 21:4, 40:23,
79:17, 119:10,
122:4, 122:9,
123:4, 137:19,

146:2, 148:13
rational 20:11,
22:19
rationale 15:9,
15:11, 15:18,
106:21
raw 120:15, 120:18,
120:19, 131:1
Re 1:6, 1:23, 8:18,
31:3, 94:18, 95:2,
117:20
reach 70:14, 72:17,
81:13, 98:9
reached 67:8, 79:13,
88:7, 102:3
reaching 72:5
read 16:24, 37:23,
76:19
ready 34:3, 34:7,
57:20, 88:11,
95:23, 99:25
reaffirm 56:12
reaffirms 55:18,
55:19
real 22:14, 24:18,
24:20, 52:18,
55:16, 56:7,
115:12, 140:10
reality 29:11
really 41:10, 41:13,
44:2, 44:5, 45:4,
47:24, 57:16,
57:24, 59:21,
61:13, 72:22,
78:5, 90:9, 91:1,
91:19, 92:21,
96:10, 98:5,
98:15, 111:13,
112:2, 120:13,
120:14, 129:7,
138:15, 145:3,
149:14, 155:20
reargue 91:12
rearguing 101:3
reason 14:11, 14:13,
38:21, 69:16,
78:15, 78:16,
80:3, 92:5, 94:2,
94:12, 124:25,
135:24, 138:11,

146:16, 151:15
reasonable 38:7,
38:25, 48:4, 56:6,
56:11, 121:7
reasons 18:13, 22:6,
22:20, 23:9,
57:17, 87:9, 98:7,
98:8, 101:6,
105:20, 106:24,
115:13, 138:2,
144:7, 148:9
reasserts 38:5
rebuttal 29:23,
42:16, 75:24,
158:6, 158:9,
158:14
rebutting 77:4
recall 74:18,
137:16, 157:1
recalling 143:19
receive 13:7, 42:2,
43:23, 53:2,
126:2, 144:6,
146:23
received 151:2,
153:1
receiving 125:16
recent 63:7
recess 88:14
recipients 130:10
recite 63:8
recognize 43:13,
104:14
recognized 84:18
recognizes 115:15,
126:7
recognizing 84:10,
87:2
recommence 88:11
recommendations
74:25
recommended 74:19,
107:8
reconcile 150:24
reconvened. 88:15
reconvening 158:18
record 9:17, 38:19,
38:21, 46:14,
47:23, 48:6, 54:1,
89:4, 90:21, 96:7,

99:3, 103:25,
104:2, 114:11,
118:15, 137:11,
141:22, 149:16,
150:16, 153:19
recorded 6:47
recording 9:11
records 124:9,
130:22
recoveries 35:25,
36:6, 131:2
recovery 57:21
redaction 124:8
reduce 57:13, 117:4
reduced 117:8
reduces 108:18
refer 24:17, 32:13,
35:3, 71:23,
105:6, 105:11,
105:13, 124:13,
150:20
reference 50:20,
51:10, 103:7,
111:22, 151:5
referenced 61:5,
64:20, 85:5,
129:12
referring 12:16,
17:17, 127:15,
151:24
reflect 111:4,
153:24
reflected 11:8
refrained 91:16
refresh 49:11
refund 143:7, 146:23
refuse 146:5
refuted 58:23
regard 58:13, 98:13,
115:7
Regarding 14:24,
32:6, 35:12,
36:12, 59:11,
83:22, 142:3,
154:5
Regardless 30:24,
39:4, 65:8
regulator 21:15
regulatory 21:22,
23:23, 24:4, 48:21

reiterate 59:24
reiterated 100:9
reject 18:9, 19:21,
24:20, 24:22,
24:24, 25:4, 25:8,
25:10, 25:17,
27:4, 28:18,
28:20, 31:1, 31:5,
58:7, 58:8, 94:9,
96:18
rejected 24:18
rejection 17:24,
18:15, 19:14,
20:8, 20:12,
21:20, 23:4,
23:10, 23:12,
25:12, 27:1,
27:20, 29:5, 29:8,
29:10, 29:19,
30:10, 30:21,
30:25, 58:3
relate 84:13, 122:9,
123:10, 123:16,
131:5
Related 12:18,
21:17, 63:20,
80:10, 86:21,
123:2, 135:18,
143:2, 151:11
relates 61:13,
65:24, 70:11,
80:6, 86:6
relating 21:10,
96:17
relative 57:19,
64:12, 64:18,
65:6, 65:19,
67:19, 82:23,
82:25
relatively 106:9
relevant 33:19,
38:2, 39:4, 59:16,
102:24, 105:15,
119:2, 119:20,
151:23
reliable 36:11
relied 44:20
Relief 12:19, 32:15,
33:19, 37:12,
38:21, 39:5,

51:12, 56:10,
62:17, 74:13,
78:10, 88:21,
94:3, 105:3,
105:9, 105:21,
106:2, 106:9,
141:11, 141:12
rely 36:10, 50:10,
89:18, 121:10
relying 45:3, 138:23
remain 132:19
remainder 70:25
remaining 10:14,
116:14, 153:22
remains 53:7, 85:12,
123:15
remarks 9:21, 11:12,
12:11, 12:14,
14:13, 14:20,
14:23, 14:24,
17:20, 60:19,
72:19, 76:20,
82:8, 114:18,
114:19, 116:20,
135:2, 137:1,
137:14
remedy 156:23,
158:11
remember 12:3,
76:15, 103:13
remind 9:9
reminded 144:17
remove 154:13
removed 33:3, 33:5,
58:16
removes 24:5
renegotiate 18:21,
18:24
renegotiated 19:7,
19:8, 20:19,
22:23, 22:24
renewable 22:5
Renewed 137:7, 149:5
reorganization 74:10
rep 128:21
repeal 156:22
repeat 15:24, 27:6,
29:4, 71:24,
76:16, 83:19
replacement 112:18

replies 109:11
Reply 13:10, 21:3,
  23:8, 23:22,
  46:20, 54:6, 71:1,
  91:3, 93:6, 94:25,
  100:8, 109:8,
  110:6, 111:9,
  113:19, 118:20,
  129:12, 136:21,
  138:21, 138:23,
  138:24, 139:3,
  139:7, 143:14,
  146:6, 147:8,
  149:20, 150:4,
  151:10, 153:5
report 11:16, 43:8,
  73:5, 73:7, 74:20,
  75:9, 75:11
Reporter 134:10,
  159:15
reports 11:2, 11:4,
  11:8, 11:10, 11:25
repping 128:17
representation
  114:14, 118:19,
  120:25, 122:3
representations
  73:12
Representative 1:13,
  1:30, 8:20, 11:11,
  18:7, 31:22,
  141:18, 149:11
request 15:19,
  19:21, 29:19,
  33:20, 49:17,
  51:12, 55:2,
  55:22, 55:24,
  55:25, 94:22,
  97:11, 99:7,
  99:16, 99:23,
  107:14, 111:22,
  112:18, 113:10,
  144:2, 149:25,
  150:3, 151:20
requested 11:3,
  62:12, 107:3
requesting 38:21,
  39:5, 94:14, 113:8
requests 105:21,
  106:6, 112:24,

113:1, 113:13,
  118:21, 119:17,
  130:13, 130:16,
  131:10, 131:16,
  144:22
require 9:21, 15:24,
  23:10, 36:6,
  124:12
required 40:19,
  59:8, 147:17,
  147:18, 148:7
requirement 12:22,
  23:14, 23:15,
  33:2, 46:2, 136:4,
  136:9
requirements 53:24,
  125:13
requires 20:8,
  20:10, 20:14,
  60:13, 70:9
requiring 46:15
reserve 59:7, 70:25,
  91:2, 93:5,
  101:22, 113:15,
  123:21, 138:23,
  139:2, 153:21,
  158:6, 158:13
reserved 42:16,
  139:7
reserves 31:12,
  61:20, 62:15,
  78:12, 105:18
residents 36:10,
  59:18
resilient 36:11
resolution 15:9,
  16:4, 17:10,
  37:10, 66:13,
  72:5, 72:17, 86:7,
  95:23, 100:1,
  106:12, 139:19,
  153:7
resolve 16:3, 65:23,
  66:1, 66:12,
  80:10, 93:19
resolved 64:23,
  67:24, 69:14,
  70:20, 83:15,
  85:19, 86:3, 86:4,
  86:5, 86:10,

106:16, 107:24,
  113:25, 115:3,
  119:22, 152:14,
  152:15
resource 145:7,
  148:18
resources 16:6,
  34:10, 40:20,
  63:19, 64:2, 64:5,
  66:10, 69:4,
  69:16, 71:13,
  72:10, 87:4,
  95:22, 107:1,
  107:2
respectfully 54:24,
  125:9, 126:6,
  141:9, 151:17
respond 76:17,
  90:11, 101:5,
  121:20, 141:3
responded 44:11,
  76:3
responding 155:22
response 11:25,
  28:21, 76:2,
  76:23, 78:8, 79:6,
  79:9, 79:24,
  86:12, 86:17,
  94:18, 101:3,
  108:24, 129:13,
  136:16, 148:25,
  151:2, 151:4,
  151:21, 151:25,
  152:6, 153:4,
  153:7, 153:9,
  153:12, 154:6
response. 12:5
responses 23:7,
  111:11, 113:15,
  153:1, 153:2
responsibilities
  50:22
responsibility
  121:1, 121:3,
  126:8
responsible 53:20,
  121:9
responsive 113:13
rest 43:2, 49:25,
  54:23, 70:24,

81:21, 91:3, 93:5,
  99:6, 100:18,
  101:2
restrict 31:5
restrictions 124:10,
  126:11
restructuring 51:7,
  57:12, 68:13
result 16:4, 18:23,
  19:11, 20:24,
  23:5, 23:14,
  80:23, 108:22,
  109:7, 117:7,
  125:15, 151:18
resume 10:24, 88:20
retail 126:3, 126:5
retain 93:25
retained 27:11,
  58:20
retains 59:24, 60:1
Retired 5:17, 142:25
Retiree 138:14,
  140:7, 140:10,
  140:15, 140:16,
  140:18, 141:18,
  141:22, 141:24,
  142:18, 142:22,
  143:5, 144:21,
  145:6
Retirees 51:22,
  54:18, 68:11,
  140:13, 144:6,
  146:20
Retirement 35:23,
  49:16, 51:21, 52:1
retransmission 9:11
return 56:21, 81:24,
  101:9, 127:12,
  144:25
revenue 15:1, 68:11,
  68:14, 70:18,
  71:10, 71:22,
  73:18, 77:1,
  80:10, 83:1,
  88:23, 106:13,
  107:23, 108:1
reverse 109:2
revert 60:8
review 13:5, 50:2,
  112:4, 116:12,

119:2, 121:11,
  127:21, 151:8
reviewed 105:15,
  135:22
reviewing 117:9,
  153:5
revise 153:23
revised 56:22,
  135:4, 136:17,
  154:17
revoking 61:17
rewrite 46:12, 46:16
rewriting 135:1
rewritten 136:11
ridiculous 29:7
rights 39:21, 54:11,
  54:18, 61:20,
  73:18, 81:15,
  84:21, 84:23,
  87:24, 106:13,
  115:10, 116:1,
  147:4
ripe 23:20, 36:13,
  36:25, 37:2, 37:4
ripeness 36:12,
  37:17
rise 89:8
risk 39:13, 51:23
risking 51:20
risks 53:13, 53:15
Robert 6:7, 98:1
role 25:14, 25:17,
  141:21
room 73:3, 112:17,
  113:6, 113:9,
  118:20, 119:3,
  119:7, 119:15,
  120:3, 120:5,
  123:17, 127:17,
  128:1, 128:2,
  129:4, 130:3,
  136:15
rooms 130:5
Root 5:18, 111:16,
  141:19, 141:21
Rosario 51:3, 58:24
Rose 11:14, 31:21,
  84:5, 93:13,
  139:11, 150:17,
  155:18

Roth 114:14, 116:19
round 79:3, 79:17
routine 144:12
Rule 9:14, 10:5,
  12:23, 28:21,
  38:10, 75:15,
  76:2, 76:4, 88:5,
  103:8, 103:12,
  103:17, 117:5,
  130:17, 132:3,
  137:7, 140:6,
  142:13, 142:24,
  152:3, 154:2
ruled 35:17, 74:20,
  75:6, 75:7, 76:11,
  103:17, 123:1,
  136:8
Rules 99:11, 115:7,
  116:25, 118:5,
  143:2
ruling 32:21, 33:22,
  33:25, 35:21,
  36:1, 36:15,
  64:10, 104:25,
  105:17, 105:19,
  108:18, 135:13,
  135:14, 135:25,
  138:13, 145:12,
  149:16
rulings 63:21,
  63:22, 69:21,
  77:18, 83:12,
  84:18, 98:17,
  137:22, 147:21
run 34:11, 35:13,
  38:15, 114:21,
  133:20, 136:2
running 115:2, 132:7
rush 156:2


< S >
S. 4:34, 152:5
S/ 159:13
sacrosanct 115:24
safe 158:17
sake 109:16
Sales 153:3, 153:6,
  154:5, 154:11,
  154:14

San 8:1, 134:5,
   134:7, 134:11
sanctions 9:14
Santayana 76:15
Santos 151:3, 151:5,
   151:8, 151:10,
   151:11, 151:15,
   151:18, 152:5
satisfaction 145:4
satisfactory 35:7
satisfied 20:18,
   33:14, 49:22,
   65:2, 140:2,
   143:19
satisfy 36:23,
   65:14, 80:13
save 8:16, 95:25
saw 49:10, 120:2,
   149:20, 149:24
saying 27:25, 43:19,
   46:8, 47:1, 47:19,
   49:11, 61:16,
   66:15, 92:13,
   120:10, 126:17,
   137:24, 146:8
says 26:7, 28:17,
   28:19, 30:17,
   46:23, 47:14,
   58:17, 58:18,
   94:20, 120:20,
   121:6
scenario 87:15
Schedule 12:17,
   64:6, 64:11,
   64:19, 66:9, 75:1,
   76:10, 82:11,
   107:4, 107:8,
   108:5, 136:18,
   137:7, 140:3,
   141:13, 142:5,
   145:9, 154:14,
   156:1
scheduled 75:2, 75:3
schedules 95:21
scheduling 14:17,
   14:25, 64:21,
   66:2, 137:13,
   139:1, 141:25,
   142:3, 142:13,
   142:15, 148:20,

149:5
scheme 21:22
Schulte 114:14,
   116:18
scope 17:2, 96:25,
   106:25
screen 112:7
Se 5:27
season 57:19
Second 16:6, 17:2,
   19:19, 31:14,
   32:10, 35:23,
   47:4, 47:20, 50:7,
   79:3, 81:2, 94:15,
   99:21, 100:6,
   115:18, 115:20,
   123:2, 125:7,
   126:21, 134:12,
   134:13, 134:18,
   141:6, 142:18,
   157:25
seconds 12:1, 48:17,
   111:20
Section 12:7, 12:10,
   14:8, 21:9, 23:16,
   26:9, 26:12,
   26:13, 26:14,
   31:7, 35:18,
   38:10, 43:21,
   43:24, 46:22,
   47:7, 54:7, 54:10,
   60:12, 95:5,
   95:11, 140:22,
   140:23
secured 70:15, 79:4,
   80:7, 86:4
security 62:1, 91:15
seeing 73:11
seek 19:14, 61:10,
   66:12, 70:8,
   78:10, 112:18,
   113:1
seeking 32:15, 35:6,
   36:20, 36:21,
   36:22, 38:10,
   38:11, 44:24,
   44:25, 46:8,
   46:12, 68:7, 77:9,
   112:25, 124:3
seeks 36:23, 74:13,

105:25, 106:4,
   106:9, 142:16,
   150:21, 152:23
seem 52:16, 69:15
seemed 102:1
seems 15:18, 38:8,
   47:19, 85:8,
   104:10, 114:19,
   115:3, 116:10,
   135:8, 145:1,
   145:13, 157:24
seen 72:23, 73:4,
   73:13, 80:1,
   91:19, 103:20,
   116:3, 150:4
sees 102:22, 132:6
select 9:6
selection 50:14
self-serving 50:12,
   54:3
send 135:11
sense 16:20, 73:16,
   89:9, 106:22,
   119:6, 128:23,
   129:6
sensitive 64:3,
   87:3, 121:24
sensitivity 64:15
sent 126:17, 139:17
sentence 23:25,
   29:14, 46:22, 47:7
separate 60:6,
   70:16, 70:19,
   122:7, 128:24,
   136:8, 145:24,
   147:16
separately 136:5,
   142:17, 142:21,
   146:2, 146:14,
   148:10
sequencing 89:24
seriatim 72:5
serious 73:23,
   145:13, 145:14
serve 14:9, 51:23,
   57:23, 113:10
served 131:14
service 32:16,
   33:12, 111:7,
   114:4, 114:5,

125:13, 132:2,
132:4, 133:19,
133:21, 136:2,
136:5, 136:6,
136:9, 136:20,
145:9
Services 5:30,
32:18, 33:25,
34:17, 34:19,
34:25, 35:13,
35:19, 40:1, 42:5,
42:7, 43:11,
43:24, 49:20,
50:3, 50:4, 50:24,
52:7, 52:9, 53:18,
59:17, 114:12
serving 14:7, 112:24
session 8:14, 10:22,
10:23
Set 13:7, 18:17,
62:1, 72:13, 80:9,
81:4, 81:18, 86:2,
97:14, 106:9,
107:5, 111:2,
111:9, 119:21,
119:22, 131:6,
131:23, 135:15,
139:20, 154:15
sets 82:11
setting 27:24, 74:25
settle 90:18, 95:9
settled 92:17, 93:23
settlement 72:23,
72:25, 90:15,
91:18, 94:10,
96:22, 97:2, 97:3,
97:4, 97:9, 98:10,
101:16, 102:3,
103:18, 103:19,
103:20, 104:17,
107:6
settlements 93:25,
94:5, 98:15
seven 13:17, 66:22,
74:23, 111:1,
113:18, 113:23,
128:12, 136:11
seven. 121:6
several 33:9, 34:9,
36:4, 36:19,

69:24, 106:11,
111:15, 112:15,
115:13, 125:14
shall 30:15, 30:17,
54:11, 55:14,
56:8, 56:14,
121:6, 136:1
Shannon 45:21
shape 69:10
share 68:10
shared 25:7, 29:16,
53:13
shares 14:5
sharper 149:3
sheer 129:2, 132:10
shell 53:1
shield 124:4
shielding 124:6
shifting 16:5
shifts 53:15
short 12:21, 112:10,
117:25, 129:21
short-term 41:22
shorten 117:13
shortened 117:10,
117:22
shortening 117:17,
135:25
shorter 101:11
shortly 73:8, 127:23
shouldn't 81:15,
81:16, 111:23,
127:5, 129:21,
138:18
show 22:16, 22:17,
48:6, 135:24,
142:24
showed 148:3
showing 20:8, 78:11,
140:9
shown 115:22,
124:13, 124:22
shows 55:20, 141:10
side 92:25, 93:1,
93:2, 117:16,
121:23
signers 67:11
significant 21:16,
39:13, 97:7,
122:5, 125:6

significantly 108:18
silence 143:15
similar 21:21,
96:16, 121:2,
123:20
similarities 45:10
Similarly 19:8, 31:7
simple 25:2, 64:24,
93:22
simplified 125:14
Simply 22:12, 30:8,
42:1, 73:13,
73:16, 77:6,
100:24, 107:7,
142:15
single 66:16
sit 58:12
sits 100:13
situation 31:4,
44:19, 45:8, 46:6,
50:25, 58:9,
69:11, 115:4
situations 21:14
Six 27:9, 55:23,
55:24, 56:24,
57:5, 109:10,
110:6, 110:8,
111:11, 121:6,
133:18
six. 78:15
size 129:3, 132:10
small 80:24
Snow 71:20, 100:23,
122:23
so-called 15:10,
84:4, 128:1
soft 149:25
Solar 5:24, 18:11,
18:25, 19:9, 21:3,
22:1, 22:3, 22:4,
23:3, 24:10,
24:15, 24:16, 27:1
sole 93:19
solely 99:8, 123:16
solution 122:4,
142:2
Solutions 9:7, 9:24,
88:9, 88:10
somehow 59:14
someone 111:18,

112:8, 128:19
sometime 73:8
sometimes 140:16
Sons 117:12
soon 16:12, 34:7,
  52:2, 73:11, 88:8,
  127:22
sooner 127:20
Sorry 41:19, 45:20,
  47:15, 48:11,
  49:10, 71:6,
  88:18, 102:15,
  103:4, 103:6,
  108:15, 109:11,
  113:16, 147:17,
  148:7, 149:13,
  153:10, 157:7,
  157:22
sort 59:22, 67:25,
  98:13, 116:20,
  117:3, 120:4,
  121:2, 122:7
sorts 138:2, 148:9
Sosland 5:40, 71:17,
  71:18, 71:19,
  71:20, 78:4,
  78:18, 82:8, 83:5,
  83:21, 85:24,
  100:20, 100:22,
  122:16, 122:21,
  122:22, 122:23,
  123:19, 127:1,
  127:7, 127:8,
  127:9, 127:14,
  127:15, 128:5
sought 61:13, 106:2
Sound 10:16, 10:17,
  20:9, 22:9, 22:16,
  23:24, 28:9,
  29:12, 31:8,
  38:16, 40:25,
  42:10, 47:2,
  48:16, 56:16,
  60:3, 69:18, 78:3,
  87:6, 95:1, 97:16,
  100:16, 103:14,
  104:19, 117:2,
  120:1, 123:18,
  125:21, 144:3,
  148:8

sounds 123:12
source 51:24,
  130:25, 131:8
Southern 8:8, 117:19
Spanish 132:17,
  132:24
speaker 9:15, 10:12,
  10:13, 31:17,
  42:19, 62:23
speakers 9:17, 9:25,
  14:18
speaking 8:6, 9:5,
  18:2, 50:20,
  108:19, 117:5
speaks 97:10
specific 17:17,
  25:19, 26:9,
  26:21, 124:21,
  131:11, 131:19,
  150:25
specifically 26:15,
  27:14, 35:3,
  39:11, 40:9,
  70:24, 121:21,
  131:15
specificity 130:19
specified 10:21
speculation 38:18
speculative 62:6,
  124:21
spelled 86:12
spend 58:24, 79:6,
  89:13, 92:25,
  123:1
spending 110:17
spent 131:11, 138:9,
  138:10, 138:15,
  147:18
spoken 9:18, 127:4,
  147:2
spouse 140:16
SREAEE 5:32
Stafford 4:39,
  133:11, 133:13,
  133:14, 133:16,
  133:17, 149:13,
  150:14, 150:15,
  150:16, 152:17,
  152:22, 154:4,
  154:9, 154:18,

154:20
stage 75:17, 106:25
stakeholders 9:1,
  116:5
stand 141:25
Standard 11:1,
  19:17, 20:6,
  20:13, 21:9,
  30:25, 51:13,
  129:16
standards 75:16
standing 94:16,
  95:5, 125:19,
  126:6, 151:18,
  152:7
stands 87:1
start 32:20, 39:13,
  40:12, 58:15,
  63:4, 100:14,
  127:19, 127:25
started 34:17,
  39:16, 39:17,
  57:1, 155:6
starting 40:2,
  57:19, 119:4
starts 132:7
state 9:23, 12:1,
  29:25, 30:25,
  31:4, 33:2, 46:23,
  60:9, 76:19,
  99:12, 100:1,
  116:3, 146:21,
  149:12
stated 28:4, 51:7,
  71:9, 119:5,
  144:7, 153:14,
  153:17
statements 54:21,
  149:23
States 1:1, 4:23,
  4:25, 8:13, 8:16,
  26:15, 27:11,
  27:14, 54:11,
  159:7, 159:8
stating 14:21,
  23:11, 53:5, 121:9
status 11:2, 19:20,
  40:11, 45:1, 50:6,
  55:13, 56:13,
  61:10, 73:5, 73:7,

151:16
Statute 21:15,
  21:18, 33:4
statutes 23:11,
  77:19
statutory 143:9
Stay 15:1, 15:12,
  16:18, 62:17,
  74:11, 83:12,
  83:15, 84:18,
  88:21, 89:9, 90:6,
  90:12, 90:24,
  91:17, 92:2,
  92:13, 94:3, 98:5,
  99:7, 101:14,
  105:3, 105:9,
  105:22, 106:8,
  106:10, 106:24,
  107:14
stayed 75:19, 75:20,
  77:3, 103:16
staying 91:7, 91:14,
  92:23
stays 78:11
steamroll 116:1
stem 84:21
stenography 6:47
step 24:21, 33:10,
  47:4, 104:22
Stevens 4:38, 18:2,
  18:3, 18:4, 18:5,
  19:20, 19:24,
  20:5, 23:25, 24:2,
  24:9, 28:16,
  29:22, 29:24,
  31:9, 31:11
stick 147:22
sticks 132:12
stipend 146:8
stood 75:23
stop 112:23
stops 82:20
stream 146:20
streamline 65:9,
  86:22, 129:8
street 129:5
stressed 129:22
strike 13:17
striking 111:1,
  121:5

striving 65:16
structural 139:20,
  142:4
structure 106:22
structured 139:19,
  144:11
stuck 48:21
study 12:25
subject 13:6, 15:13,
  26:11, 28:20,
  29:2, 37:1, 40:14,
  63:24, 65:15,
  71:23, 82:17,
  97:1, 107:12,
  138:4, 140:1,
  146:24
submission 125:18
submit 18:13, 19:17,
  20:6, 20:18,
  20:25, 21:5,
  21:24, 22:11,
  22:21, 23:1, 23:8,
  23:9, 23:14,
  23:15, 23:20,
  24:6, 30:20, 31:7,
  54:25, 87:18,
  87:25, 94:3,
  137:3, 141:9,
  154:16
submitted 50:9,
  51:4, 58:24,
  69:25, 119:13
subparts 63:16
Subsequent 127:22,
  153:12
subsequently 152:25
subset 91:15
subsidiary 59:25
substance 102:8
substantial 16:9,
  16:13, 22:10,
  32:23, 35:1, 51:8,
  51:10
substantially 15:10,
  20:21
substantive 107:16
successful 57:12
successor 53:6
sudden 97:5
suffice 82:18

sufficient 51:13,
  65:24, 68:17,
  80:13, 114:25,
  136:16
sufficiently 68:1,
  87:22
suggest 86:23
suggested 83:14
suggesting 48:10,
  77:8, 91:25
suggestion 80:19,
  81:3
suggests 30:1, 30:4
suitability 13:23
sum 117:25, 144:9
summarily 78:13
summer 16:14
Sunday 100:14
superseded 152:25,
  153:16
supervise 61:7
supplement 38:6,
  38:9
supplemental 34:5,
  34:12, 43:21,
  46:17, 46:19
support 30:7, 30:20,
  50:9, 51:12, 54:1,
  70:8, 73:25, 74:4,
  76:2, 106:10,
  107:6, 115:13,
  116:22, 142:5
supported 22:19,
  33:7, 34:25,
  75:10, 84:20,
  112:22
supports 106:2
suppose 140:16
supposed 47:25
supposedly 73:1,
  124:5, 124:20
sur-reply 149:21,
  150:4, 150:5,
  150:8
Susman 155:8
suspect 131:9
sustain 50:24
sustained 152:4,
  154:11
sustaining 154:15

Swain 4:22, 8:5,
   8:15, 88:16, 159:7
swift 16:8
System 35:23, 39:14,
   40:3, 49:16,
   51:22, 52:1,
   54:14, 62:3,
   125:11, 125:16


< T >
T&D 52:13, 52:18,
   52:23, 53:8,
   53:25, 54:6, 62:2
table 28:12
Tacoronte 8:11, 8:22
tailoring 158:12
taken. 88:14
takeover 36:22,
   36:24
takings 84:11
talked 41:10, 132:1
Talks 59:9, 59:12
tantamount 44:3
tap 82:24
target 60:23
targets 22:5
tax 143:7, 146:22,
   146:23
Taylor 4:22, 8:14,
   159:7
tea 91:1
team 74:18, 74:25,
   82:18, 82:19, 94:4
technical 19:5
technologically
   111:18
tee 64:4, 76:1,
   80:7, 86:1, 87:21,
   140:2, 142:11
teed 64:9, 73:16,
   80:8
telegraphed 101:22
telephonic 8:25,
   9:3, 11:5, 14:18
TELEPHONICALLY 4:30,
   134:7
tellingly 94:24
ten 24:11, 28:1,
   31:24, 32:1, 37:8,

43:16, 44:1, 57:1,
   89:1
tenure 143:3
terabyte 131:12
terabytes 131:13
term 14:2, 19:13,
   20:23, 23:1,
   38:23, 52:20,
   151:23
terminate 25:18,
   36:16, 36:20,
   52:5, 52:14
terminated 42:3,
   143:4
terminating 19:22,
   52:12
termination 25:20,
   32:5, 32:6, 35:8,
   38:17, 39:11,
   39:12, 39:21,
   40:5, 40:7, 40:9,
   41:6, 41:21, 43:4,
   43:19, 43:22,
   46:18, 48:24,
   53:22, 61:10,
   61:15, 73:9
terms 25:3, 25:9,
   25:23, 35:8, 60:7,
   68:25, 72:21,
   89:9, 103:21,
   119:1, 155:22
territory 146:21,
   146:23
test 20:7, 20:18,
   20:25, 21:4, 21:5,
   21:10, 21:12,
   21:23, 22:2,
   22:12, 22:13,
   23:2, 142:19,
   143:18
tethered 140:17
theme 115:2, 144:15
themselves 35:1,
   81:13, 111:16,
   116:6, 155:4
theories 16:10, 85:9
There'll 121:8
thereafter 40:4,
   127:24
they'll 80:5, 113:8,

116:10, 120:25,
   146:17, 149:19
They've 15:25,
   72:11, 112:22,
   120:16, 129:2,
   129:19, 142:8,
   146:18, 147:24
thinking 40:6, 48:18
Third 17:3, 36:12,
   63:20, 125:19,
   131:2, 135:16,
   141:7, 142:10,
   144:13, 156:13
third-party 136:12
Thompson 94:18,
   95:2, 102:22,
   103:5
though 53:7, 87:16,
   115:3, 147:23
thousand 34:9,
   124:23
thousands 116:4
thread 84:16
threaten 94:5
Three 16:10, 23:9,
   58:11, 63:15,
   74:3, 93:8, 96:20,
   97:14, 105:23,
   123:25, 131:11
threshold 17:7,
   65:12, 68:23,
   69:5, 69:13, 94:15
thrown 129:19
tight 66:9
Tim 117:12
timed 96:19
timely 14:22,
   119:17, 136:13,
   136:25
timetable 13:13,
   66:19
timing 10:21, 91:9,
   92:10, 96:10, 97:5
Title 1:8, 1:25,
   5:13, 18:7, 32:19,
   34:4, 34:7, 34:14,
   34:16, 34:18,
   35:16, 35:17,
   35:19, 35:20,
   36:5, 39:14,

39:16, 39:18,
  39:23, 41:12,
  41:14, 42:5,
  48:11, 57:22,
  61:7, 65:13,
  65:22, 77:25,
  87:2, 135:16
titled 13:17
Today 8:25, 9:3,
  9:18, 10:22, 13:6,
  27:8, 47:23, 48:3,
  56:17, 58:10,
  58:12, 73:9,
  82:24, 87:14,
  95:13, 103:12,
  103:19, 107:19,
  108:18, 114:13,
  118:18, 135:23,
  137:23, 141:21,
  141:25, 143:14,
  155:9, 155:19
tomorrow 10:25,
  135:7, 155:2,
  155:6, 155:23,
  158:18
took 34:16, 71:6,
  144:9
top 12:13
topic 32:4, 121:8,
  121:15, 122:2,
  122:9
topics 58:25, 124:1
TORRES 6:10, 55:7,
  55:9, 56:17
tort 70:7, 70:9,
  74:8, 86:20
total 57:5
totally 30:3, 48:12,
  48:20
towards 107:1
track 10:12, 10:13,
  66:14, 86:9
tracks 82:21
traction 123:7
trade 142:23, 143:9,
  146:22
transactions 54:8
Transcript 6:47,
  10:4, 74:22,
  75:23, 77:5,

105:19, 159:4
transcription 159:5
transferred 33:6
transform 52:20
transformation
  37:17, 39:13
transformed 33:1
transition 32:22,
  33:23, 35:5,
  35:13, 43:24,
  43:25, 49:20,
  50:3, 53:6
translation 132:18
Transmission 23:21,
  39:14
transpired 74:17
treat 140:24
treated 68:12, 94:12
treatment 73:2,
  144:6, 146:9,
  146:13
treatments 94:9,
  140:21
triage 65:25, 77:6,
  85:25
tried 68:4, 79:24,
  132:19
troubled 120:9
troubles 120:24
troubling 81:2
true 70:17, 98:11,
  143:23, 144:10,
  159:5
truly 78:14, 111:20,
  142:3
trust 74:8
trusted 143:14
Trustee 14:11,
  94:20, 95:14,
  102:25
truth 52:21, 64:25
try 83:13, 102:19,
  111:2, 144:14,
  144:18
Trying 60:17, 65:18,
  84:24, 85:21,
  87:19, 109:1,
  112:19, 115:10,
  129:8, 130:24,
  131:5, 131:12

Tuesday 13:11
turn 12:7, 14:25,
  17:22, 24:7,
  30:16, 31:14,
  47:5, 62:16,
  71:17, 108:4,
  113:22, 147:15,
  151:13
turning 73:15
turns 41:22
twice 142:6
tying 59:10
type 41:11, 101:20,
  139:18, 143:8
types 131:11, 143:6
typically 73:22

< U >
UBS 151:5, 151:9
UCC 15:4, 15:7,
  42:20, 62:21,
  71:3, 88:4, 88:20,
  89:1, 100:25,
  105:14, 106:23,
  107:9, 107:14,
  137:6, 142:3,
  142:6, 142:10,
  142:15, 142:21,
  143:8, 143:14,
  143:22, 144:4,
  144:9
ultimate 24:5,
  66:13, 88:3, 145:5
Ultimately 67:7,
  74:24, 84:22
ultra 84:10
unable 111:6
uncertain 120:25
uncertainty 56:3,
  57:9
unchanged 15:11
unclear 156:22
unconfirmable 139:15
underlying 15:11,
  106:21, 120:21,
  131:1, 131:8,
  157:7
undermine 97:4,
  98:15

undermined 21:19
understand 20:24,
    25:13, 42:19,
    43:7, 71:12,
    85:13, 89:19,
    104:18, 120:14,
    121:24, 147:20,
    149:16
understanding 127:7,
    127:9, 132:8,
    133:18, 151:25
understood 63:16,
    158:1, 158:3
undertaking 121:14,
    121:24
undone 115:19
undue 136:7
unfair 94:11, 142:9
unfairly 125:12
unfairness 83:22,
    104:21
unfettered 21:19
unfortunately 139:5
unilateral 25:5
unilaterally 25:24,
    67:4, 81:14
union 35:15, 35:20,
    36:12, 36:19,
    37:17, 51:14,
    52:17, 54:16,
    58:1, 59:20
unions 37:20, 37:21,
    49:3, 58:23, 60:19
Unique 153:10,
    153:12, 153:14,
    153:17, 153:24,
    154:14
United 1:1, 4:23,
    4:25, 8:13, 8:16,
    159:6, 159:8
unknown 62:7, 73:12,
    73:13
Unless 20:15, 24:7,
    31:9, 39:6, 73:23,
    81:19, 87:25,
    90:25, 91:1, 92:6,
    92:18, 94:6,
    94:20, 96:2,
    111:5, 125:10,
    155:1

unlikely 61:17
unlimited 72:10,
    107:2
unlock 53:25
unmute 9:8, 12:4,
    49:5, 71:4, 98:23,
    108:11, 155:4,
    157:10
unnecessary 104:10,
    113:4
unproven 54:2
unquote 101:20
unresolved 93:20
unripe 23:5
Unsecured 5:11,
    68:10, 70:17,
    73:19, 73:20,
    83:17, 105:9,
    105:13, 106:1,
    142:17, 143:1,
    143:11, 143:24,
    144:1, 144:5
unsupported 38:18
untethered 140:19
Until 10:24, 19:1,
    23:5, 25:1, 86:5,
    109:19, 115:17,
    117:15, 138:18
untimely 99:16
unwind 43:20
upheld 74:6
urge 95:19, 98:16
Urgent 105:9
Urrutia 4:12
usage 111:3
useful 50:18, 156:13
using 28:3, 77:7,
    158:8
usual 11:2
UTIER 5:32, 49:15,
    51:16, 54:6
utility 57:11


< V >
v. 2:11, 2:28, 3:11,
    3:28, 4:10, 124:14
Valdes 114:12
valid 23:5, 37:4,
    37:10, 44:3,

61:18, 61:24,
    68:15, 80:4, 94:13
Vallejo 31:3
various 84:23, 97:3,
    101:12, 113:13
vastly 60:9
vehicles 84:22
vertical 60:13
veto 95:11, 103:9
via 14:10
viable 80:12, 83:17
VIC 17:1, 17:8
view 65:3, 90:21,
    147:15, 148:18,
    150:6
viewed 56:8
views 79:16, 90:20
violates 58:3
Violations 9:13,
    84:12
vires 84:10
virtual 24:8
vis-a-vis 147:5
Vitol 2:13, 2:14,
    5:21, 5:22, 16:23,
    17:12, 154:22,
    155:4, 155:8,
    155:24, 157:6
void 17:4
volume 122:6
volumes 97:10
voluminous 119:13
votes 126:2
voting 139:17
VSA 17:2, 17:8


< W >
wait 12:1, 86:5,
    110:9, 138:17
waited 117:14
waiting 72:7, 72:15,
    79:14, 82:10,
    86:2, 141:4
waived 33:14, 77:10
walked 40:12
Walker 159:13,
    159:14
wanted 41:2, 42:17,
    43:4, 46:11,

70:23, 113:17,
114:2, 114:16,
147:22, 153:19,
158:1
wants 93:25, 95:9,
119:8, 147:13
Wargo 117:12
warrant 21:23
warranting 13:23,
128:17
Warranty 13:17,
128:21
waste 89:20
wasteful 147:15
wave 9:24
ways 66:10, 68:22,
84:6
week 66:23, 75:2,
134:21, 134:22,
134:23, 136:2
weekend 134:23
weeks 13:10, 108:25,
109:13, 109:21,
110:5, 110:6,
110:7, 110:8,
110:10, 110:11,
110:20, 131:11,
136:20, 136:21
weigh 15:20, 22:4
weight 74:15
Weil 98:2
Welcome 8:23
West 44:9
Whatever 47:14,
47:15, 58:9,
61:15, 65:14,
67:23, 76:8, 86:5,
87:21, 95:22,
99:10, 127:21,
130:7, 155:20
whatsoever 108:24,
153:22
whenever 95:24,
116:11
whim 20:16
Whitefish 6:9,
35:23, 55:7,
55:10, 55:12,
55:18, 55:19,
55:20, 56:5, 57:8

whole 79:20, 83:13
wholeheartedly 81:11
wholly 59:25
whom 82:12
William 5:37, 96:7
willing 34:14,
122:12
willingness 155:25
win 147:11
wind 42:14, 48:2
Windmar 19:21, 20:3
Windows 49:11
Wines 142:18
wish 9:22, 11:12,
11:24, 12:1,
16:17, 17:9
wishes 9:25
withdrawal 151:23,
153:13, 153:14,
153:20, 153:24
withdrawn 149:10,
150:20, 152:1,
153:2, 153:8,
154:2, 154:6,
154:13
withdrew 78:7, 80:15
within 15:5, 65:16,
66:1, 67:20, 68:1,
101:15, 111:20,
135:6, 155:1
Without 15:18,
34:17, 39:15,
43:6, 48:13,
50:21, 50:24,
53:8, 59:10, 86:2,
90:18, 92:17,
94:12, 142:14,
148:21, 149:6
withstanding 145:20,
151:21
WITNESSES 7:3
wonder 78:4
word 26:18, 52:17,
77:7, 85:23,
147:25, 149:18
words 24:22, 30:18,
74:3, 76:11, 78:4
work 39:16, 39:17,
43:15, 44:4,
57:10, 77:22,

86:24, 86:25,
145:10
workers 51:19,
54:11, 54:18
working 98:9, 109:22
world 89:10, 89:11,
140:10
worries 150:11
worse 40:18, 50:25
wrap 125:23
wreak 102:2
wreck 94:5
writing 11:4, 101:15
wrote 76:15

< Y >
Y-a-b-u-c-o-a 18:11
Yabucoa 5:25, 18:10,
18:11, 24:11,
24:16, 27:2, 30:13
year 20:20, 21:7,
22:24, 42:4,
46:14, 63:23,
65:12, 77:11,
96:1, 97:6, 100:2,
100:5, 101:19,
137:16, 144:9,
145:2, 148:3
years 13:3, 33:9,
39:23, 41:23,
41:25, 94:4
yesterday 73:6,
73:7, 153:8,
157:23
YFN 5:25, 18:10,
18:11, 18:24,
19:5, 21:3, 22:1,
22:3, 22:4, 23:3,
24:10, 24:15,
27:1, 30:13
yield 68:13, 116:14
yourself 9:16, 104:5

< Z >
Zabel 114:14, 116:19
Zouairaban 5:30
Zouairabani 114:9,
114:10, 114:11,

116:18