```
 1              UNITED STATES DISTRICT COURT

 2               DISTRICT OF PUERTO RICO

 3
    In Re:                    )      Docket No. 3:17-BK-3283(LTS)
 4                            )
                              )      PROMESA Title III
 5  The Financial Oversight and )
    Management Board for       )
 6  Puerto Rico,              )      (Jointly Administered)
                              )
 7  as representative of      )
                              )
 8  The Commonwealth of       )
    Puerto Rico, et al.       )      April 29, 2021
 9                            )
                Debtors,      )
10

11  _____

12  In Re:                    )      Docket No. 3:17-BK-4780(LTS)
                              )
13                            )      PROMESA Title III
    The Financial Oversight and )
14  Management Board for       )
    Puerto Rico,              )      (Jointly Administered)
15                            )
    as representative of      )
16                            )
    The Puerto Rico Electric  )
17  Power Authority,          )
                              )
18              Debtors,      )

19  _____

20

21

22

23

24

25
```

```
  1   _____

  2

  3   Autoridad de Energia          )  Docket No. 3:19-AP-00453(LTS)
      Electrica de Puerto Rico,     )
  4                                 )      in 3:17-BK-3283(LTS)
                                    )
  5                 Plaintiff,      )
                                    )
  6   v.                            )
                                    )
  7   Vitol Inc. and                )
      Vitol S.A., et al.,           )
  8                                 )
                                    )
  9                                 )
                  Defendants.       )
 10   _____

 11
      The Financial Oversight and ) Docket No. 3:20-AP-00003(LTS)
 12   Management Board for          )
      Puerto Rico,                  )      in 3:17-BK-3283(LTS)
 13                                 )
                 Plaintiff,         )
 14                                 )
      v.                            )
 15                                 )
      Ambac Assurance               )
 16   Corporation, et al.,          )
                                    )
 17                                 )
                                    )
 18                 Defendants.     )

 19   _____

 20

 21

 22

 23

 24

 25
```

```
The Financial Oversight and )  Docket No. 3:20-AP-00004(LTS)
Management Board for          )
Puerto Rico,                  )       in 3:17-BK-3283(LTS)
                              )
                Plaintiff,    )
                              )
v.                            )
                              )
Ambac Assurance               )
Corporation, et al.,          )
                              )
                              )
                Defendants.   )
```

```
The Financial Oversight and )  Docket No. 3:20-AP-00005(LTS)
Management Board for          )
Puerto Rico,                  )       in 3:17-BK-3283(LTS)
                              )
                Plaintiff,    )
                              )
v.                            )
                              )
Ambac Assurance               )
Corporation, et al.,          )
                              )
                              )
                Defendants.   )
```

```
  1   _____

  2

  3   Rafael Hernandez Montanez   )   Docket No. 3:21-AP-00042(LTS)
                                  )
  4                               )      in 3:17-BK-3283(LTS)
                      Plaintiff,  )
  5                               )
      v.                          )
  6                               )
      Pedro Pierluisi Urrutia,    )
  7   et al.,                     )
                                  )
  8                               )
                      Defendants. )
  9
      _____
 10

 11                      OMNIBUS HEARING

 12    BEFORE THE HONORABLE U.S. DISTRICT JUDGE LAURA TAYLOR SWAIN

 13              UNITED STATES DISTRICT COURT JUDGE

 14     AND THE HONORABLE U.S. MAGISTRATE JUDGE JUDITH GAIL DEIN

 15              UNITED STATES DISTRICT COURT JUDGE

 16   _____

 17
      APPEARANCES:
 18
      ALL PARTIES APPEARING TELEPHONICALLY
 19
      For The Commonwealth
 20   of Puerto Rico, et al.:  Mr. Martin J. Bienenstock, PHV
                               Mr. Brian S. Rosen, PHV
 21                            Mr. Paul Possinger, PHV
                               Mr. Michael Firestein, PHV
 22                            Ms. Margaret Dale, PHV
                               Mr. Timothy Mungovan, PHV
 23
      For Puerto Rico Fiscal
 24   Agency and Financial
      Advisory Authority:      Mr. Peter Friedman, PHV
 25
```

```
 1

 2    APPEARANCES, Continued:

 3
      For Vitol, Inc., and
 4    Vitol S.A.:              Mr. Alexander L. Kaplan, PHV
                               Mr. Michael C. Kelso, PHV
 5
      For the Honorable
 6    Rafael Hernandez Mendez: Mr. Jorge Martinez Luciano, Esq.
                               Mr. Emil Rodriguez Escudero
 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
      Proceedings recorded by stenography.  Transcript produced by
25    CAT.
```

```
 1                          I N D E X

 2   WITNESSES:                                        PAGE

 3         None.

 4

 5   EXHIBITS:

 6         None.

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                              San Juan, Puerto Rico

 2                              April 29, 2021

 3                              At or about 9:44 AM

 4                    *      *      *

 5          THE COURT:  Ms. Tacoronte, would you please call the

 6    case?

 7          COURTROOM DEPUTY:  The United States District Court

 8    for the District of Puerto Rico is now in session.  The

 9    Honorable Judge Laura Taylor Swain presiding.  Also present

10    the Honorable Magistrate Judge Judith Dein.  God save the

11    United States of America and this Honorable Court.

12          Bankruptcy Case No. 2017-3283, In re:  The Financial

13    Oversight and Management Board of Puerto Rico, as a

14    representative of the Commonwealth of Puerto Rico, et al., for

15    Further Omnibus Hearing.

16          THE COURT:  Good morning, and welcome again, counsel,

17    parties in interest, and members of the public and press.

18    This is the second day of the April Omnibus Hearing in these

19    cases, and today I will be hearing oral arguments on motions

20    in Adversary Proceeding No. 19-453 and Adversary Proceeding

21    No. 21-042.

22          To ensure the orderly operation of today's telephonic

23    hearing, all parties on the line must mute their phones when

24    they're not speaking.  If you're accessing these proceedings

25    on a computer, please be sure to select "mute" on both the
```

1    Court Solutions dashboard and your phone.  When you need to

2    speak, you must unmute on both the dashboard and the phone.

3          I remind everyone that consistent with court and

4    judicial conference policies and the orders that have been

5    issued, no recording or retransmission of the hearing is

6    permitted by any person, including but not limited to the

7    parties, members of the public, and members of the press.

8    Violations of this rule may be punished with sanctions.

9          I will be calling on each speaker during the

10   proceedings.  When I do, please identify yourself by name for

11   clarity of the record.  After the speakers listed on the

12   Agenda have spoken, I may provide an opportunity for other

13   parties in interest to make brief comments on issues, but

14   given that this morning's proceedings are specific to certain

15   adversary proceedings, don't count on my doing that.

16         Please don't interrupt each other or me during this

17   hearing.  If we interrupt each other, it is difficult to

18   create an accurate transcript of the proceedings.  But having

19   said that, as usual, I apologize in advance for breaking this

20   rule as I may interrupt if I have questions or if you go

21   beyond your allotted time.  If anyone has difficulty hearing

22   me or another participant, please say something right away.

23         The Agenda, which was filed as docket entry no. 16615

24   in case no. 17-3283, the bankruptcy case, is available to the

25   public at no cost on Prime Clerk for those who are

1   interested.

2         I encourage each speaker to keep track of his or her

3   own time.  The Court will also be keeping track of the time,

4   and will alert each speaker when there are two minutes

5   remaining with one buzz, and when time is up, with two buzzes.

6   Here is an example of the buzz sound.

7         (Sound played.)

8         THE COURT:  If your allocation is two minutes or

9   less, you will just hear the final two buzzes.

10         If we need to take a break, I will direct everyone to

11   disconnect and dial back in at a specified time.  Today we

12   will go until one o'clock if necessary.

13         We will begin with Agenda Item III.1, oral argument

14   on the cross-motions for summary judgment in *PREPA v. Vitol*.

15   I have down that we will begin with 25 minutes of argument on

16   behalf of Vitol by Messrs. Kaplan and Kelso.

17         Mr. Kaplan?

18         MR. KELSO:  Good morning, Your Honor.  This is

19   Michael Kelso.  I'm an associate at Susman Godfrey.  I'm here

20   for Vitol, Inc. and Vitol SA.  I'll address the liability

21   issues on PREPA's affirmative claim.

22         PREPA's liability claims seek to retroactively

23   nullify six fully performed fuel supply contracts after those

24   contracts expired on their own terms, even though PREPA

25   received the full benefit of its economic bargain, admits it

1   suffered no actual damages, and does not have a cause of

2   action for breach of those contracts.

3           PREPA seeks to nullify the contracts based on its Law

4   458 claims, which are Counts I and II in both the first and

5   second complaints.

6           THE COURT:  Mr. Kelso.

7           MR. KELSO:  Yes, Your Honor.

8           THE COURT:  May I ask you to slow down just a bit?

9           MR. KELSO:  Yes, Your Honor.

10          THE COURT:  Thank you.

11          MR. KELSO:  And also seeks to nullify the contract

12  based on its deceit claim, which is Count VIII of the second

13  complaint.

14          I will now address the Court's questions on liability

15  in the order the Court raised them yesterday.  First, the

16  Court asked whether VIC was ever VSA's alter ego, and this

17  question goes to Counts I and II in both the first and second

18  complaint.  The answer to the Court's question is no.  PREPA

19  has not come close to establishing the exceptional

20  circumstances necessary to disregard the corporate form under

21  Delaware law.  The choice of law issue is fully addressed in

22  our briefing, so I'll get right to substance.

23          The uncontroverted evidence set out at pages 18 and

24  19 of our opening brief, and 8 to 14 of our reply, is that VIC

25  was incorporated in late 2006 as part of a long plan of an IRS

1    approved reorganization to take over the Americas trading

2    business of VSA's U.S. branch office.  After that

3    reorganization, VSA and Vitol established separate legal

4    entities operating separate businesses.  And these were not

5    just separate entities on paper, Your Honor.

6         When VIC began operations on January 1st, 2007, it

7    was capitalized with substantial assets, and took over the

8    Americas trading business formerly operated by VSA's branch

9    office.  VSA continued in operation after the reorganization,

10   and continued its own separate and substantial trading

11   business in Europe, Africa, and Asia.

12        Moreover, Your Honor, PREPA does not dispute any of

13   the deciding factors the Delaware courts use to evaluate alter

14   ego.  They don't dispute that VIC was adequately capitalized;

15   that it observes corporate formalities; had its own bank

16   accounts, its own officers, directors, credit facilities; pays

17   its own expenses; files its own tax returns; has never had its

18   funds taken; and when it transacts business with VSA, does so

19   at arm's length, at market prices.  That evidence is

20   uncontroverted and it's conclusive.

21        Now PREPA's main argument in its reply is that,

22   quote, Vitol's corporate restructuring was done in part for

23   limited legal liability for VSA's conviction.  There is

24   absolutely zero evidence in the record to support that

25   assertion.  Not one of the documents discussing VSA's proposed

1  restructuring mentions the IIC inquiries, the New York DA's

2  office investigation, or -- let alone the fuel supply

3  contracts of PREPA for Puerto Rico.

4        Instead, PREPA cites only the general statements in a

5  letter from VSA and VIC to the IRS saying one of the business

6  purposes of the reorganization was to protect against the risk

7  that VSA's, quote, non-U.S. assets may be subjected to

8  potential claims or liabilities in the U.S.  Court after court

9  has held such evidence is insufficient as a matter of law to

10  establish alter ego, and for obvious reasons.

11        The general objective of limiting liability is not

12  just a legitimate reason for incorporation.  It is the

13  principal reason for incorporation.  And we cite that case law

14  at page 12 of our reply.

15        Both Delaware law and Puerto Rico law set a far

16  higher standard.  The plaintiff must prove, quote, specific

17  intent to escape liability for a specific tort or class of

18  torts.  And that's the *Mobile Oil* case cited at page 14 of our

19  reply.  Now, that was the showing in *CASCO Sales*.  The only

20  case PREPA cites on this point.

21        PREPA claims at page 6 of its reply, quote, Vitol

22  argues against alter ego by claiming its behavior was not as

23  egregious as the convicted entity in *CASCO Sales*.  That's not

24  our point at all.  The defendant's conduct in *CASCO Sales* was

25  different in kind from the evidence here, not just in degree.

1    As we explained at page 14 of our reply, the convicted firm in

2    *CASCO Sales* had repeatedly created new entities and

3    transferred its entire business to them for the specific

4    purpose of evading Law 458.

5         Here, there's no evidence in the record, none, that

6    VIC's incorporation had anything to do with Law 458, the fuel

7    supply contracts, or PREPA, or even VSA's New York conviction,

8    or the investigation that preceded it.  And it's not just

9    there's an absence of evidence, Your Honor, although that in

10   itself would require summary judgment under *Salsde* (ph).

11   We've discovered abundant evidence supported by

12   contemporaneous documents and testimony from the percipient

13   witnesses demonstrating that the incorporation of VIC was

14   motivated by legitimate business purposes entirely unrelated

15   to PREPA, or the New York investigation.  A then ongoing IRS

16   audit, it changed the company's understanding of the tax

17   benefits of our branch structure, as well as attempts by

18   creditors of certain of VSA's overseas counterparties to

19   attach liens in the U.S. on VSA's assets by taking advantage

20   of the branch structure.

21        PREPA failed to carry its burden to controvert these

22   facts.  Defendants are entitled to judgment as a matter of law

23   on alter ego.

24        So the Court's second question was whether VSA's

25   conviction falls outside the scope of Law 458.  The answer to

1    that question is yes.  VSA's conviction is outside the scope

2    of Law 458, and that is dispositive of all PREPA's claims as

3    to the contracts at issue.

4         Law 458 sets out a specific list of the Puerto Rico

5    law offenses for which a conviction is disqualifying.  VSA was

6    convicted in New York, not Puerto Rico, so the question is how

7    do we evaluate whether VSA's New York conviction falls within

8    Law 458's listed Puerto Rico law requirement.

9         The text of the statute answers that question.

10   Section 928(b) states, quote, for the purposes of federal

11   jurisdiction, that of the states, and territories of the

12   United States, or of any other country, the prohibitions set

13   forth in this chapter shall apply in cases of conviction for

14   crimes whose constituent elements are equivalent to the above

15   stated crimes.

16        As we explain on page 21 of our opening brief and 15

17   to 16 of our reply, that is exactly the type of language that

18   courts hold it requires, a categorical approach.  PREPA does

19   not dispute that if a categorical approach applies, VSA's New

20   York conviction is outside the scope of Law 458.  Instead,

21   PREPA argues the categorical approach does not apply.  In the

22   reply, PREPA argues for a, quote, case specific approach that,

23   quote, considers a defendant's conduct, rather than the

24   elements of an offense.  But PREPA's proposal, Your Honor, is

25   completely at odds with the language of section 928(b), which

1   looks to the constituent elements of the offense of conviction

2   and asks whether those elements are equivalent to any of the

3   listed Puerto Rico law offenses.

4          So PREPA can't be right, and the Court should apply a

5   categorical approach.  But even if you apply PREPA's case

6   specific approach, Vitol -- VSA's conviction is still outside

7   the scope of Law 458.

8          We explained at pages 21 and 22 of our opening brief

9   three separate, legally independent reasons why VSA's

10  underlying contract, as set out in the New York Plea

11  Agreement, would not constitute illegal appropriation under

12  Puerto Rico law.  PREPA did not respond at all to that

13  analysis, and, therefore, it's uncontested for purposes of

14  summary judgment.  VSA's conviction is outside the scope of

15  Law 458, and that resolves this whole case as a matter of law.

16         The Court's third question was whether Law 458

17  disqualified VIC from contracting with PREPA based on VSA's

18  conviction.  The answer to that question is no.  And this goes

19  to Counts I and II in both the first and second complaints.

20         Law 458 barred the government from contracting with

21  corporations convicted of certain specified crimes.  VIC was

22  PREPA's counterparty on all six contracts at issue, and VIC

23  was not convicted of any crime.  So to show a Law 458

24  violation, PREPA has to establish that VSA's conviction

25  disqualified VIC from contracting with PREPA.

1          To do that, PREPA relies on Law 458's specialized

2    statutory definition of the term juridical person, which is

3    defined to include not just the corporation itself but also

4    its subsidiaries.  For the first four contracts at issue, the

5    contracts executed before VSA was convicted, and which PREPA

6    challenges in Count I of the second complaint, that argument

7    just doesn't work.

8          For the first four contracts, PREPA's claim is based

9    on Law 458's automatic rescission provision and section

10   928(c), but automatic rescission, Your Honor, applies only to

11   contracts, quote, between the person convicted or found guilty

12   and a public corporation.  Section 928(c) does not use Law

13   458's statutorily defined term juridical person.

14         PREPA makes two new arguments in its reply brief that

15   section 928(c) nonetheless applies.  Those are incorrect.

16   First --

17         COURT REPORTER:  Counsel -- I'm sorry, Your Honor.

18   This is the court reporter.  Can counsel please repeat his

19   last statement and slow down some?

20         MR. KELSO:  Yes.  My apologies.

21         THE COURT:  Please do speak much more slowly, and go

22   back and repeat your last statement.

23         MR. KELSO:  Yes, Your Honor.  PREPA makes two new

24   arguments in its reply brief that section 928(c) nonetheless

25   applies.  Those are incorrect.

1          First, PREPA claims that the first contract at issue

2    was actually with VSA.  PREPA is wrong.  Although the first

3    contract was originally executed with VSA's U.S. branch

4    office, VSA assigned that contract to VIC effective January 1,

5    2007.  And PREPA approved that assignment in writing, and

6    fully performed the remainder of the contract post assignment

7    with VIC as a counterparty.

8          THE COURT:  Mr. Kelso --

9          MR. KELSO:  Yes, Your Honor.

10          THE COURT:  -- are you contending that that

11    assignment by VSA was a novation as to VSA?

12          MR. KELSO:  Yes, Your Honor.

13          THE COURT:  So what documentation is there for

14    PREPA's release of VSA from any liability under the

15    contract?

16          MR. KELSO:  Well, Your Honor, this is a matter of

17    Puerto Rico law, and the case we cite is *Goya of Puerto Rico,*

18    *Inc., against Roland Coffee.*  And you'll find that case law at

19    page 12, note three, of our opening brief.

20          And the issue here is that VSA notified PREPA in

21    writing of the assignment.  PREPA confirmed that assignment

22    orally.  They signed off on a subsequent assignment of VIC's

23    right to receive payments under the contract, which further

24    constitutes a ratification of the assignment, and then fully

25    performed the remainder of the contract based on the

1    subsequent assignment of the contract to VIC.

2            In *Goya of Puerto Rico, Inc., against Rowland Coffee*,

3    which is 206 F. Supp. 2d 211, the District of Puerto Rico

4    explained the perfection of the assignment of rights

5    accompanied by the consequent occupation of the assignor's

6    contractual position by the assignee necessarily implies that

7    Tetley was automatically liberated of its obligations towards

8    Goya, the obligor.  And we made this argument, as I said, Your

9    Honor, and cited the relevant Puerto Rico case law at page 12,

10   note three of our opening brief.  PREPA did not respond at

11   all, and so the issue was uncontested for summary judgment.

12           PREPA's second argument and reply is based on *New*

13   *Hampshire Lottery Commission against Rosen.*  Based on that

14   case, PREPA argues "person" in section 928(c) is undefined and

15   should be read as incorporating the statute's definition of

16   natural or juridical person.  PREPA is wrong.

17           *New Hampshire Lottery* dealt with undefined terms, and

18   undefined terms that appeared in the same sentence of the same

19   section of the statute, and where the later terms were a

20   shorthand reference back to earlier unqualified terms in that

21   same sentence.  But here, Your Honor, the legislature

22   specifically defined the term juridical person, and chose not

23   to use that specially defined term anywhere in section 928(c),

24   even when the legislature repeatedly uses the defined term

25   natural or juridical person in multiple other sections of the

1    statute to incorporate the specialized statutory definitions

2    of those terms.

3           And the legislature did not just say "person" in

4    section 928(c).  They included the modifier, the person

5    convicted or found guilty, a further textual indication that

6    the legislature meant the entity that was actually convicted,

7    not other related entities that were not convicted.

8           So that brings us to PREPA's challenge of the last

9    two contracts, and these are the two contracts executed after

10   VSA's conviction challenged in Counts I and II of PREPA's

11   first complaint.  PREPA brings its claims as to the last two

12   contracts under Law 458's prohibition on contracting in

13   section 928.

14          As we explained in pages four to 17 of our opening

15   brief, section 928 only applied to corporations that were

16   subsidiaries of a convicted company at the time the contract

17   was awarded.  VIC was not the SA subsidiary when the final two

18   contracts were awarded, and PREPA appears to agree, because

19   PREPA's only argument about the final two contracts is that

20   they thought it to be VSA's alter ego.  Let me address why

21   that alter ego claim fails as a matter of law at the outset.

22          So the Court's third question was whether any of the

23   fuel supply contracts were void based on deceit.  The answer

24   is no, and this goes to Count VIII in the second complaint,

25   which challenges the last four contracts only -- I'm sorry,

1    the first four contracts only, Your Honor.  I apologize.  My

2    apologies.

3         First, it's worth situating PREPA's deceit claim

4    within the overall case.  This is PREPA's fallback claim if

5    it's not a Law 458 violation.  Obviously, if the contracts are

6    invalid under Law 458, then PREPA's deceit claim adds nothing

7    to the case.  The contracts are already invalid based on the

8    statute.  So PREPA's deceit claim is relevant only if PREPA

9    was legally permitted to contract with VIC under Law 458.

10        PREPA's deceit claim centers on nondisclosure of the

11   investigation of VSA, and that's because Law 458 does not

12   prohibit the government from contracting with a party who is

13   merely under investigation.  So PREPA's deceit claim presents

14   a classic but-for role question at summary judgment.

15        PREPA must establish that even though it is legally

16   permitted to contract with VIC under Law 458, it would not

17   have done so as a factual matter had it known of the

18   investigation of VSA.  Importantly, PREPA'S deceit claim is

19   based on generally applicable Puerto Rico contract law rules,

20   not any special rules that apply to government contracts.

21        PREPA's failed to carry it's summary judgment burden.

22   PREPA included specific provisions in the fuel supply

23   contract, and provided disclosure forms that PREPA drafted

24   setting out the specific information PREPA required to enter

25   into the contracts at issue.  We walked through these

1   contractual disclosures in detail at pages 23 to 25 of our

2   summary judgment motion.

3         None of PREPA's contractual provisions or

4   certification forms require any disclosures as to any legal

5   entity other than the contractual counterparty.  Two of the

6   three forms used for the contracts at issue did not even

7   mention investigations at all, and the one that did was

8   limited to the counterparty, which was VIC.

9         The first time PREPA ever claimed VIC was required to

10  disclose any information about its parent corporation,

11  conviction, investigation, anything, was in this litigation.

12  PREPA cannot establish a Puerto Rico contract law claim for

13  deceit based on the nondisclosure of information that PREPA

14  could have --

15        THE COURT:  Slow down again, please.

16        MR. KELSO:  I'm sorry, Your Honor.

17        PREPA cannot establish a Puerto Rico contract law

18  claim for deceit based on the nondisclosure of information

19  that PREPA could have requested but did not.  And then PREPA's

20  own cases makes this point, Your Honor.  In *Fournier against*

21  *Eastern Airlines, Inc,* which PREPA cites at page 39 of its

22  response, the Court granted summary judgment on a claim for

23  *dolo*, where the contract specified the warrantees it required

24  and included a merger clause, because, quote, the terms of the

25  contract are clear.  There were no warrantees as to the use of

1     the land for a specific purpose.

2            All of the contracts at issue here contain merger

3     clauses just like the contract in *Fournier*, and the Court can

4     find those clauses at Article 27 of the contracts in DX-1,

5     DX-3 and DX-4; Article 29 in DX-2 and DX-5; and Article 30 in

6     DX-6.

7            And that's particularly true here, Your Honor,

8     because under Puerto Rico law, only serious deceit is

9     sufficient to nullify a contract.  And PREPA's burden is

10    heightened still, because PREPA is a commercially

11    sophisticated counterparty.

12           The First Circuit in *Feliciano Nunez,* cited at page

13    17 of our reply, states that *dolo*, quote, may not be presumed.

14    And the Court, in determining whether to promote invalidation

15    of a contract on the basis of *dolo*, Puerto Rico courts place

16    significant weight on the education, social background,

17    economic status, and business experience of the party seeking

18    to avoid the contract.

19           To show serious deceit, PREPA had the summary

20    judgment burden to put forward specific evidence that PREPA

21    would not have entered into the six fuel supply contracts with

22    VIC even if it were legally permitted to do so based on

23    information that was not included in the detailed disclosure

24    forms that PREPA itself drafted and provided to VIC for the

25    purpose of entering into the contracts at issue.

1          PREPA presented no evidence to carry that burden, no

2    deposition, no declaration, no documentary evidence, nothing.

3    A total failure of proof.  Because PREPA failed to put forward

4    any evidence on an essential element of its deceit claim,

5    defendants are entitled to summary judgment.

6          The Court's last question asked if the parties

7    believed that there were other issues that were immaterial to

8    resolving this case, Your Honor, and we do.  Those are the

9    remedy issues.  And I'll let Mr. Kaplan address them now,

10   unless the Court has further questions.

11         THE COURT:  I do have a question for you,

12   Mr. Kelso.

13         MR. KELSO:  Yes, Your Honor.

14         THE COURT:  It appears that VSA, doing business as

15   VIN, misrepresented as early as February 28, 2006, that Vitol

16   has no knowledge of being under judicial, legislative, or

17   administrative investigation in Puerto Rico, the United States

18   of America, or any other country; but the New York County DA

19   had issued subpoenas to VSA dated November 22nd, 2005, and

20   January 26, 2006.

21         So do you concede that while the first contract was

22   underway, VIN falsely denied knowledge of any investigations

23   in violation of section 928(f)?

24         MR. KELSO:  No, Your Honor.  VSA's conviction and the

25   preceding investigation were outside the scope of Law 458.

1    Moreover, PREPA did not identify the particular sworn

2    statement you're referring to in its summary judgment briefing

3    as the basis for its deceit claim, and there's a reason why.

4    That's because that sworn statement was not submitted in

5    connection with any of the six contracts at issue.

6           That sworn statement was received by PREPA in March

7    2006, seven months after the first contract was executed, and

8    nearly a year before the next contract with PREPA was signed.

9    So PREPA could not have relied on that sworn statement in

10   entering into the first contract.

11          PREPA specifically asked for and received another

12   disclosure statement in connection with the first contract at

13   issue.  That disclosure did not ask for investigations, and it

14   asked that -- and, therefore, it was truthful.  So that sworn

15   statement does not constitute a factual basis to set aside the

16   first contract at issue on the basis of deceit or, frankly,

17   any of the other contracts, Your Honor.

18          THE COURT:  Thank you.

19          So we can turn to Mr. Kaplan.

20          Thank you very much, Mr. Kelso.

21          Mr. Kaplan, you need to unmute yourself on your phone

22   and on the computer dashboard.

23          MR. KAPLAN:  Good morning, Your Honor.  Alex Kaplan

24   on behalf of Vitol, Inc., and Vitol SA.  Can you hear me?

25          THE COURT:  Yes, I can.  Good morning, Mr. Kaplan.

1           MR. KAPLAN:   Thank you, Your Honor.

2           Yesterday, in the Court's preliminary remarks, the

3    Court invited the parties to address whether they believed any

4    issues, besides the four the Court identified, are important

5    to the resolution of the motion.  And I respectfully submit,

6    Your Honor, that the remedy issues are additional, and, at a

7    minimum, independent grounds for summary judgment in our

8    favor.

9           That's because PREPA's two complaints in this case

10   seek one, and only one, very specific form of relief.  And the

11   Court can resolve, as a matter of law, that PREPA has no legal

12   entitlement to that particular theory of relief.  And that is

13   what PREPA calls, quote, unilateral repossession.  The return

14   of all money that PREPA paid under the six contracts at issue

15   for fuel that was, of course, consumed to generate electricity

16   and sell to consumers, while obtaining all of the benefits of

17   that fuel oil.  That's Count II of the first complaint,

18   document 31-3, and it's Count III in the second complaint,

19   Doc. 1, at 56.

20          There were, of course, also claims for damages

21   alleged to have been incurred in substituting suppliers, but

22   PREPA, in fact, sustained no damages by its own admission,

23   Your Honor -- and that is paragraph 116 of our statement of

24   facts, which is document 38 -- and has, thus, withdrawn those

25   claims, which were Counts III and IV in the first complaint,

1   and Count V in the second complaint.

2          So with respect to the unilateral repossession

3   theory, Your Honor, there are two purported legal bases for

4   that claim.  The first is the reimbursement penalty under

5   928(c) of Law 458.  And, Your Honor, we have a threshold

6   standing argument on this point.  I'll stand on the papers on

7   that, and I'd like to address the substance.

8          The reimbursement penalty under 928(c) is limited to,

9   quote, the reimbursement of payments made with regard to the

10  contract or contracts directly affected by the commission of

11  the crime.  And we argued in our motion, Your Honor, at page

12  30, that PREPA cannot satisfy this statutory requirement to

13  obtain reimbursement.

14         PREPA did not address this point in any respect in

15  its response, nor did PREPA controvert our evidence that the

16  facts underlying VSA's conviction, which related exclusively

17  to oil allocations in Iraq from years before the contracts

18  here at issue were executed, had no effect, let alone the

19  required direct effect on the contracts with PREPA.  As a

20  matter of law, Your Honor, summary judgment is, therefore,

21  proper.

22         However, for the first time, in its reply brief,

23  PREPA suggests that it can meet the directly affected

24  standard.  That is incorrect, Your Honor.  PREPA's argument in

25  its reply, at pages nine and ten, is that because the

1    conviction is the basis for the purported contract

2    nullification, then the contract law is directly affected by

3    the conviction.

4         That is circular, Your Honor.  If every contract

5    subject to rescission under the first penalty in section

6    928(c) qualifies for the reimbursement penalty in the second

7    sentence of 928(c), then the second sentence would simply say,

8    in addition, the government may seek reimbursement of payments

9    made under all such contracts, or perhaps under any contract

10   so rescinded, or the like.  But that is not what the

11   legislature provided.

12        (Sound played.)

13        MR. KAPLAN:  Rather, it limited the reimbursement

14   penalty to payments made with regard to contracts directly

15   affected by the commission of the crime.  And, again, Your

16   Honor, PREPA's argument proceeds from a false premise.  The

17   statute does not say, contracts directly affected by the fact

18   of conviction.  It says, contracts directly affected by the

19   commission of the crime.

20        And here the summary judgment evidence is conclusive.

21   The commission of the crime had no effect, let alone the

22   required direct effect, on the contracts at issue.  This is

23   very different than, for example, a conviction for wire fraud,

24   for a false billing to a public entity in Puerto Rico.  There,

25   of course, the contract will be directly affected by the

1    crime.  So, Your Honor, the 928(c) remedy is not available to

2    PREPA.

3          And I would just point out as history, Your Honor,

4    having lived with this case for more than a decade, that PREPA

5    does not actually even have a claim for relief under the

6    reimbursement penalty of 928(c).  There is no cause of action

7    for the 928(c) reimbursement penalty in either complaint, not

8    even a mention of that provision of 928(c).  It's simply not

9    part of the relief PREPA pleaded for.  I would ask my friend

10   on the other side to show otherwise.  And that was not -- no

11   accident.

12         PREPA's outside counsel who filed these cases wrote a

13   memo that was publicly released.  It's Exhibit 88 to our

14   statement of facts, which expressly says the contracts here

15   will not directly effect without a commission of a crime.

16         Instead, Your Honor, PREPA seeks remedies under

17   Articles 1258 and 1257 of the Puerto Rico Civil Code.  We

18   address that point in our brief, Your Honor.  That's the only

19   specific remedy sought in the Complaint, other than the

20   damages claim that has been withdrawn, and that issue is

21   covered by the repeal argument that we set forth in our brief.

22         Those specific civil code provisions are not

23   available to PREPA in this case, Your Honor.  And that is

24   dispositive of, again, the only remedy that PREPA actually

25   seeks.  In their brief in this case, Your Honor, PREPA --

1          (Sound played.)

2          THE COURT:  You can finish your sentence.

3          MR. KAPLAN:  Thank you, Your Honor.

4          In their brief in this case, PREPA says, well, in

5   arguing against appeal, at least we still have our other

6   common law claims.

7          I just point out to the Court, Your Honor, there is

8   no common law claim for restitution or disclosure of any type

9   in either complaint in this case, nor is there a cause of

10  action for the gross profit that is now alluded to as sort of

11  a lesser form of relief in the reply brief, Your Honor.  There

12  is no claim for gross profit, and the undisputed summary

13  judgment evidence is there is no gross profit to disgorge.

14         Thank you.

15         THE COURT:  Thank you, Mr. Kaplan.

16         We will now hear from Ms. Dale for PREPA, and I have

17  her allotted for 30 minutes.

18         MS. DALE:  Good morning, Your Honor.  This is

19  Margaret Dale from Proskauer Rose for the Oversight Board, as

20  a representative of PREPA.

21         THE COURT:  Good morning.

22         MS. DALE:  Your Honor, I would like to reserve five

23  minutes for rebuttal, please.

24         THE COURT:  All right.  So the sequence that you

25  anticipate is that Messrs. Kaplan and Kelso will come back for

1   five minutes, and then you come back for five additional

2   minutes?

3           MS. DALE:  That is accurate, Your Honor.  Yes.  Thank

4   you.

5           THE COURT:  Very well.  So 25 minutes for you now.

6           MS. DALE:  Thank you.

7           Your Honor, thank you for your comments yesterday.

8   That was also very helpful to us in organizing our -- the

9   argument.  I just want to start with an overview of the

10  argument, and then I'll jump in and try to weave in responses

11  to Vitol counsel's oral argument this morning.

12          We believe PREPA has established that VSA and VIC

13  violated Law 458, and sometimes I will refer to VSA and VIC

14  collectively as Vitol.  The first issue concerning the six

15  contracts with PREPA, PREPA has shown an intentional scheme by

16  Vitol to avoid the very liability that PREPA is suing on here

17  today.

18          Second, Law 458 applies even if VIC is not VSA's

19  alter ego, and we contend that it is.  That is so because VIC

20  was a wholly owned subsidiary of VSA at the time of VSA's

21  conviction for grand larceny in the first degree on November

22  20th, 2007.  The first four contracts between the parties were

23  still in existence, and, therefore, were automatically

24  rescinded at the time of the conviction.

25          Third, VSA's conviction squarely falls within the

1    scope of Law 58.  Fourth, I will address how VIC was VSA's

2    alter ego.  Fifth, the contracts are also void for deceit, and

3    PREPA is entitled to full reimbursement under Articles 1257

4    and 1258.

5          So the six contracts between VSA -- between PREPA and

6    Vitol violated Law 458.  Both VIC and VIN -- and VIN is the

7    branch of VSA doing business in the United States and Puerto

8    Rico.  Both VIC and VIN are juridical persons, as reflected in

9    the statute.

10          THE COURT:  Let me just ask you, so VIN, as I

11   understood it was a d/b/a -- "doing business as" -- name of

12   VSA before the creation of VIC, that separated certain

13   elements of the business out to a different corporate entity.

14   So when you say that VIN is a juridical person, are you saying

15   that VSA is a juridical person, or that VIN is some separate

16   juridical entity from both VSA and VIC?

17          MS. DALE:  I mean VIC -- excuse me, Your Honor.  VSA

18   is the juridical person, and VIC is the brand for the doing

19   business of that juridical person.  They're the same.  There's

20   no difference between VIC and VS -- VIN -- I'm sorry.  To the

21   reporter, sorry.  There is no difference between VIN and VSA

22   for that purpose.

23          THE COURT:  Thank you.

24          MS. DALE:  Your Honor, I mentioned this before, but

25   it's important to get the dates straight.  And that's why we

1    created Exhibit A, which we filed on the 27th of April, to try

2    to put before the Court the timeline of both -- well, three

3    aspects:  The corporate structure, the actual contracts with

4    PREPA, and then the investigations and the plea.

5         So it's undisputed that VSA was under investigation

6    by the New York District Attorney for bribery in connection

7    with the Iraqi oil contracts, and that VSA knew of that

8    investigation in -- at least in November of 2005 when it

9    received subpoenas.  It was also aware, obviously, of the

10   UNIIC investigation and the report that was issued earlier.

11   The report was issued in October, October 27, 2005, which

12   began -- which made public the bribery situation involving VSA

13   and Iraq.

14        Your Honor, I want to touch on one of the questions

15   you had about Law 458 and whether it applies, even if VIC is

16   not VSA's alter ego.  And we think it does apply.  And we

17   think we've proved that it applies, particularly in the

18   situation here where VIC undisputedly was the subsidiary of

19   VSA at the time of the conviction, while the first four

20   contracts, excuse me, were still in existence, and, therefore,

21   were automatically rescinded in our view, because VIC -- Vitol

22   argues that Law 458 really only applies if VIC or its

23   subsidiaries had been convicted.  But because VIC's parents

24   were convicted, VIC had no duty to disclose his parents'

25   conviction under the statute.

1              The basis for that argument is the text of section

2    928(a), which defines a juridical person as, "corporations" --

3    and I'm skipping a few words -- "including those that

4    constitute for these purposes the alter ego of the juridical

5    person or subsidiaries thereof."

6              Vitol has also argued that 458, Law 458 only applies

7    to companies that are the same juridical person at the time

8    the contract is awarded, not at the time of conviction, based

9    on an argument about the verb tense that was used.  That's

10   their motion, at pages 15 and 16.

11             We believe that these interpretations are contrary to

12   Puerto Rico law and open an enormous loophole for companies to

13   avoid Law 458 by simply creating new subsidiaries.  And very

14   importantly, I think, Vitol ignores the Circuit Court of

15   Appeals of Puerto Rico's decision in *Rico Tractor, Inc.,*

16   *versus Junta de Subastas del Municipio Autónomo de Carolina.*

17   That is 2004 P.R. App. Lexus 1107, which holds that Law 458

18   applies to the subsidiary of a convicted entity.

19             The Court there clearly held, quote, within the

20   definition of legal persons stipulated in the aforementioned

21   article one, which is referring to section 928 of Law 458,

22   subsidiaries are both convicted of -- excuse me, subsidiaries

23   convicted of fraud are included, end quote.

24             There in that case, the Court found that Rico

25   Tractor, the appellant, was a subsidiary of the company,

1  Clemente Santisteban, during the period that Clemente was

2  convicted in federal court for the crime of fraud against the

3  Government of the United States.

4       Quoting again from the decision, given the

5  circumstances that the appellant, Rico Tractor, was a

6  subsidiary corporation of Clemente Santisteban, Inc., at the

7  moment of the latter's conviction for the crime of fraud, said

8  corporation was definitely included as a legal person

9  prohibited in the Municipality of Carolina from having tenders

10  awarded to them, end quote.  That's at page 13 of the Lexus

11  decision.

12       And that's the exact circumstance here before Your

13  Honor.  VIC was a subsidiary corporation of VSA at the moment

14  of VSA's conviction for the crime of grand larceny.  And,

15  therefore, VIC is included within the legal persons prohibited

16  from contracting with PREPA under Law 458.  And, more

17  importantly, we -- its interpretation goes against the entire

18  public policy purpose of Law 458.  It would create a loophole

19  allowing corporations to circumvent the law, either by, one,

20  creating a subsidiary that can do business in Puerto Rico;

21  and, two, having an already existing subsidiary disaffiliate

22  after the date of conviction and be free to enter into new

23  contracts.  It can't be that you can simply bypass Law 458 by

24  creating a subsidiary following conviction to have that

25  subsidiary operate in Puerto Rico.

1          So we believe that we've shown that Law 458 applies

2    here, even if VIC is not VSA's alter ego, because VIC's a

3    subsidiary of VSA at the time of conviction, invalidating the

4    first four contracts.

5          The second argument I'd like to make for the Court

6    answers the Court's question of whether VSA's conviction,

7    grand larceny in the first degree, falls within the scope of

8    Law 458.  And --

9          THE COURT:  Before you go into that --

10         MS. DALE:  Sure.

11         THE COURT:  -- in that you've been talking about the

12   first four contracts in connection with the juridical person

13   argument, do you concede that the later contracts were made at

14   a time when there wasn't a subsidiary relationship between VSA

15   and VIC, after that further transaction where it went to sort

16   of a sister relationship?

17         MS. DALE:  Yes.  Your Honor, that is the case.  And

18   the fifth and sixth contracts occur after another corporate

19   restructuring, which we think is, again -- and I will get to

20   this, but they occur after the corporate restructuring at the

21   end of 2007, December 28, 2007, where VSA sells all of the

22   shares of VIC to Vitol Holdings, SARL.  That's the parent

23   company.  Thereby, you know, in corporate form, taking VIC out

24   of being a subsidiary of VSA, and making it what we all

25   sometimes call like a sister under the same parent.

1      There are reasons why that in and of itself, I

2  believe, should be disregarded.  And I can get to those, and I

3  can move to those if the Court would prefer me to do it that

4  way now.

5      THE COURT:  Well, do you have a separate alter ego

6  section of your argument?

7      MS. DALE:  Yes.

8      THE COURT:  If so, you can put it in that section of

9  your argument.

10      MS. DALE:  Thank you.  I will.

11      So, excuse me, to return to why VIC -- VSA's

12  conviction falls within the scope of Law 458, the Plea

13  Agreement, as we've looked at -- or perhaps maybe haven't

14  looked at, but it's at Ms. Febus' declaration, Exhibit 32.

15  It's the agreement dated November 20th, 2007.  The crime is

16  grand larceny in the first degree under Penal Law Section

17  155.42 in the New York Supreme Court.

18      The Plea Agreement recites that Vitol SA, which is

19  VSA, is "responsible for approximately 13 million dollars in

20  surcharges that were paid to the Iraqi Government in

21  connection with the crude oil purchased directly or indirectly

22  by Vitol SA."  "Surcharges" here is a nice word for bribes and

23  kickbacks, Your Honor.  The conviction falls within Law 458.

24      The chart that Vitol appends to its opening brief as

25  Appendix 2 is really disingenuous, Your Honor.  It doesn't

1    even state -- it doesn't even include the actual law that VSA

2    pled guilty to, which is Section 155.42.  In any event,

3    Section 155.42 states, quote, a person is guilty of grand

4    larceny in the first degree when he steals property, and then

5    the value of the property exceeds one million dollars.  That

6    is analogous to larceny under Puerto Rico Law 4820, the

7    illegal appropriation statute in the Penal Code of Puerto Rico

8    of 2004, which was operative at the time of VSA's conviction.

9           33 L.P.R.A., section 4820, states, "any person who

10   without violence or intimidation legally takes personal

11   property belonging to another shall commit the crime of

12   larceny and shall incur a misdemeanor."

13          Law 458, section 928(b), lists the crimes covered by

14   Law 458 and includes "aggravated misappropriation in all its

15   modalities."  We believe it's quite clear here that VSA's

16   conviction for grand larceny in the first degree falls within

17   Law 458.

18          THE COURT:  So how is the misdemeanor larceny offense

19   a modality of aggravated misappropriation?

20          MS. DALE:  Aggravated misappropriation here just

21   refers to in all the modalities.  There are numerous sections

22   of the Puerto Rico Penal Law that relate to larceny.  I mean,

23   as the Court is aware, you know, there's larceny in many

24   different degrees.  Aggravated is not necessarily intending to

25   mean felony in the Puerto Rico law.

1          Larceny itself includes the wrongful taking of or

2    withholding of another's property, and that is the same --

3    same as per the grand larceny in the first degree under the

4    New York Penal Law, and section 4820 in the penal law of

5    Puerto Rico.

6          We believe that this categorical approach is

7    improper.  And the way that Vitol argues is that the cases

8    they cite for using a categorical approach, they are used to

9    determine which criminal convictions trigger additional

10   criminal penalties, but there's no authority for applying a

11   categorical approach to a statute that affords a civil remedy,

12   which is what 458 does.  It's ignoring the real world, Your

13   Honor.

14         We argue for a case specific approach which considers

15   the conduct, as well as the elements of the offense.  But here

16   the elements of the offense of grand larceny in the first

17   degree match the elements of aggravated misappropriation under

18   the Penal Law of Puerto Rico.  So we believe that VSA's

19   conviction squarely falls within Law 458.

20         THE COURT:  So do you believe that the reference in

21   Law 458 to constitutive elements is meaningless?

22          MS. DALE:  No, I don't think it's meaningless, Your

23   Honor.  But I think constitutive elements means what are the

24   basic elements of the offense, and in larceny it's the taking

25   of property without -- taking another's property without

1      force.  That's the same thing as misappropriation of property

2      in the Penal Law of Puerto Rico.  Those are the elements of

3      larceny, and those are the elements of misappropriation in all

4      its modalities.

5             THE COURT:  Is there a Puerto Rico statute that

6      specifically defines aggravated misappropriation?  Is there

7      something called aggravated misappropriation?

8             MS. DALE:  That I am not aware of, Your Honor.  I

9      know that we were -- when we were doing the research here, we

10     focused particularly on Section 4820 of 33 L.P.R.A.  It's the

11     illegal appropriation statute in the Penal Code.

12            THE COURT:  Thank you.

13            MS. DALE:  Thank you.

14            So turning to the alter ego issue, which, you know,

15     is very important to this case.  So we contend that in

16     addition to VIC's subsidiary status, it was at all times VSA's

17     alter ego.  And it's really important again to think about the

18     public policy here.

19            I just want to touch on two things first.  Under

20     Puerto Rico law, excuse me, a person is considered an alter

21     ego or a passive economic conduit of another when there is

22     such an identity of interest and ownership between them that

23     their personalities are confused, so that the corporation is

24     not really an independent legal entity.

25            That comes from the Puerto Rico Supreme Court in the

1    case called *CASCO Sales*.  I'm trying to get the cite, Your

2    Honor.  *CASCO Sales Company, Inc., versus Municipal Government*

3    *of Barranquitas*, 172 D.P.R. 825.  And the quote that I read is

4    at page 832.

5         So courts dispense with corporate fictions and lift

6    the corporate veil when recognizing the legal entity is

7    equivalent to, quote, sanctioning of fraud, promoting an

8    injustice, evading a statutory obligation, defeating public

9    policy, justifying inequity, protecting fraud, or defending

10   crime.  That's a quote, again, from *CASCO Sales,* at 832.

11        The legislative history of Law 458 shows that the

12   definition of legal or juridical entity incorporated alter ego

13   to prevent companies from circumventing the law through

14   technicalities.  Reading again from *CASCO Sales,* quoting, for

15   example, they wish to represent that a company that is

16   convicted of one of the crimes listed could use a subsidiary

17   or a company that is actually its alter ego will simply change

18   its name with the sole purpose of circumventing the law, end

19   quote.  We believe that the timing of the various

20   restructures in connection with the contracts involving PREPA

21   make this clear.

22        VIC is incorporated and becomes VSA's wholly owned

23   subsidiary in October of 2006, almost a year after the DA's

24   investigation begins, and more than two years after the UN

25   investigation.  VSA knew it was under investigation, and began

1    to figure out a way to try to avoid the coming consequences.

2            In December of 2006, VSA and VIC sign what they call

3    the transfer agreement.  That's our statement of facts,

4    paragraph 21.  This is months after VSA responded to the

5    subpoenas issued by the New York District Attorney.

6            In that restructuring, VSA transfers all of the

7    operations of the U.S. branch to VIC, its wholly owned

8    subsidiary.  The consequence is all the PREPA related

9    obligations are transferred through VIC.

10           In the letter that it writes to "its valued customer"

11   dated December 19, 2006, this is at the Febus Declaration,

12   Exhibit 7, VIN explains that effective January 1, 2007, the

13   U.S. branch of Vitol SA will reorganize to form Vitol, Inc.,

14   which it then designs as, Inc., and VIC will be a wholly owned

15   subsidiary.  It says, in short, Vitol SA is assigning all of

16   its U.S. based assets and liabilities held under the name

17   Vitol SA, Inc., to a new wholly owned subsidiary.  And in the

18   section called future business, the letter goes on and says,

19   after the effective date, all new trading business will be

20   done in the name of VIC.

21           The staff, contact information, authorized traders,

22   management team, street address, e-mail addresses, and

23   telephone numbers for VIC are the same as they were for the

24   branch.  So the fair inference here is VIC is not an

25   independent legal entity --

1           (Sound played.)

2           MS. DALE:  -- with respect to VSA and VSA's

3   relationship with PREPA.  It was done to circumvent Law 458.

4   VSA is under investigation for bribery and discussing taking a

5   plea, which would automatically result in the rescission of

6   contracts already entered into and the requirement of giving

7   the notice.

8           In addition, Your Honor, in 2007, there's further

9   restructuring done to attempt to limit VSA and VIC's legal

10  liability for the conviction.  Weeks after the conviction on

11  December 28, VSA sells all of its shares to VIC -- sells all

12  of the shares of VIC to the parent, Vitol Holdings.

13          In its letter to the IRS, which was Exhibit 23 to the

14  Vitol exhibits, they very transparently reflect the efforts to

15  avoid liability, particularly on the fifth and sixth

16  contracts, which postdated the conviction, and were entered

17  into by VIC after it had been transferred to the parent.

18          They ask for certain rulings from the IRS to minimize

19  tax liabilities associated with restructuring and the

20  distribution of the shares from VSA to Vitol, including

21  seeking significant corporate law protection against claims,

22  liabilities, and adverse treatment.  And notwithstanding that,

23  that corporate restructuring was done and -- thereby removing

24  VIC as a subsidiary.

25          They continue to be alter egos of one another, and

1   that's best demonstrated by the admission made by VSA and VIC

2   just a few months ago on December 3rd, 2020.

3          Your Honor, there's a Federal Information charging

4   VIC and VSA, with fraud from officials in Brazil, Mexico,

5   Ecuador, between 2004 and 2020.  It was unsealed on December

6   3rd, 2020.  135 million dollars total criminal fine imposed.

7   They admitted that -- both VIC and VSA admitted in the

8   deferred prosecution agreement --

9          (Sound played.)

10          MS. DALE:  Can I finish, Your Honor?

11          THE COURT:  You can finish the thought, yes.

12          MS. DALE:  -- that VSA directly -- quote, directly

13   owned and controlled VIC from approximately 2004 to 2009.

14   This admission made recently to the U.S. Attorney is directly

15   contrary to the contentions that are being made here, that the

16   companies are separate and that VSA no longer controlled VIC

17   as of December 2007 when it distributed the stock to the

18   parent, Vitol Holdings SARL.

19          So we think, based on this and the inferences to be

20   drawn, that the alter ego has been established, and it renders

21   null and void the fifth and sixth contracts as well.  And at a

22   minimum, if you're not convinced, Your Honor, based on this

23   evidence, we believe the Court would require a trial to

24   determine the alter ego issue.

25          And I apologize for going over my time.

1          THE COURT:  So I have a question before we return to

2    Vitol's counsel.  This admission, the unsealed, deferred

3    prosecution agreement, when was that unsealed?

4          MS. DALE:  December -- hold on, Your Honor.  I

5    apologize.  It was unsealed on December 3rd, 2020.

6          THE COURT:  Was that included in your papers on this

7    motion practice?

8          MS. DALE:  Yes, ma'am.  It was included in the

9    appendix to our reply, our reply dated March 12, 2021.  And

10   it's exhibit -- hold on.  I'm just trying to make sure I have

11   the right -- the deferred prosecution agreement, Your Honor,

12   is Exhibit One to our reply brief.

13         The information -- the information that was unsealed

14   is Exhibit Two to our reply brief.  And the admission that I

15   quoted from about directing the ownership and control, VSA

16   directing ownership and control of VIC, is paragraph two of

17   the statement of facts attached to the deferred prosecution

18   agreement.  It's at page 29 of 66 of the PDF.

19         THE COURT:  Thank you.  We will now return to Vitol's

20   counsel for five minutes.

21         MR. KELSO:  Good morning, Your Honor.  Michael Kelso,

22   with Susman Godfrey, for Vitol.

23         I'll start first with counsel's reference to the DPA

24   statement of facts.  The statement in the DPA that Vitol SA

25   directly owns VIC until 2009 was an error.  VSA transferred

1   its ownership and debt to Vitol Holdings, SARL, on December

2   28th, 2007.  And that's at paragraph 30 of our statement of

3   facts.

4        That's a documented, legally operative corporate

5   event, and we put in undisputed evidence of that stock

6   transfer at DX-30.  PREPA admitted those facts at paragraph 30

7   of its response to our statement of facts after a full

8   opportunity for discovery, and those facts are undisputed for

9   summary judgment.

10       Nonetheless, after PREPA cited the statement in the

11  DPA for the first time in their reply brief, VIC reached out

12  to the Department of Justice --

13       THE COURT:  You have to slow down again.  You have to

14  slow down again.

15       MR. KELSO:  My apologies, Your Honor.

16       Nonetheless, after PREPA cited this statement in the

17  DPA for the first time in their reply brief, VIC reached out

18  to the Department of Justice.  And the DOJ has agreed that the

19  statement about VSA's ownership in VIC is factually incorrect,

20  and is the result of a mistaken submission, and should instead

21  state that, quote, Vitol SA ceased direct ownership of Vitol,

22  Inc., as of December 28th, 2007, exactly the date in our

23  statement of facts that PREPA already admitted in this case.

24       We just -- I'm sorry, Your Honor.  Go ahead.

25       THE COURT:  Does that address the reference to

1  control from 2004 to 2009, as I heard Ms. Dale?  Because I

2  don't have the document right in front of me.  She said it's

3  an admission of ownership and control.

4       MR. KELSO:  Yes, Your Honor.  We believe it does

5  address that.  And we just received this confirmation from the

6  DOJ the day before yesterday.  So if the Court believes the

7  statement on the DPA is material, and we don't think it is

8  because of the undisputed summary judgment record, but we just

9  ask for the opportunity to supplement the record with the DOJ

10  statement about the correction.

11       THE COURT:  Thank you.

12       MR. KELSO:  Thank you, Your Honor.

13       But as to control, it's, frankly, more of a legal

14  conclusion, if anything, than a fact.  And as the First

15  Circuit held in *Todd against Conair, Inc.,* (ph) a parent

16  exercising the control incident to ownership of a subsidiary

17  is insufficient as a matter of law to establish alter egos.

18  So it's -- the reference to control, frankly, doesn't

19  accomplish anything for them.

20       So two more points on Ms. Dale's argument.  First,

21  she cited *CASCO Sales* with respect to alter ego.  First,

22  Delaware law applies, not Puerto Rico law, so the point is

23  immaterial.  But even so, *CASCO Sales*, like Delaware law,

24  requires a specific intent to evade Law 458 to find alter ego.

25  And you can find that at page four of the ECF of PREPA's

1    translation of *CASCO Sales*.

2         The Court is talking about the purpose of Law 458's

3    definition of juridical person, and it says, otherwise, a

4    corporation could use a subsidiary or a company as its --

5    actually, its alter ego, or simply change its name, quote,

6    with the sole purpose of circumventing the law.

7         Later, when it talks about the entity at issue, it

8    describes the line of inquiry as whether the entity was,

9    quote, a subterfuge --

10        (Sound played.)

11        MR. KELSO:  --  that's to access of bidding

12   government tenders.  So *CASCO Sales*, even if Puerto Rico law

13   applies, supports the same specific intent requirement.

14        As to the scope of conviction, Your Honor, just very

15   briefly, Ms. Dale described the offense -- defined the offense

16   as stealing someone else's property.  Here that is not the

17   conduct alleged in the plea agreement.

18        The conduct alleged in the plea agreement is that VSA

19   paid its own money to the Iraqi Government in connection with

20   these oil transactions, and that just does not fall within the

21   definition of aggravated misappropriation under Puerto Rico

22   law, which, as we argued in Appendix 2 of our opening brief,

23   requires taking property of another.

24        So with that, Your Honor, I'll hand the baton over to

25   Mr. Kaplan.

1          THE COURT:  Thank you.

2          MR. KAPLAN:  Good morning, Your Honor.  Alex Kaplan.

3          I just want to make one additional point that I was

4   unable to make on the remedy, which is on the repeal issue.  I

5   think that issue, the remedies under the old civil code, 1257,

6   1258, is adequately covered in our brief, other than one

7   additional argument that PREPA made in its reply brief.  And

8   this is the issue of, under the new code, if something is

9   sanctioned by a civil penalty or a deprivation of rights, then

10  the new code is more and benign provisions will prevail over

11  the old code's provisions.

12          There is no dispute that the new code provisions are

13  more benign, but what PREPA says is that where the new code

14  doesn't have a penalty, so, therefore, the old code applies.

15  Two points to that argument.  First, it's a touch bizarre.

16  The fact that we're arguing that if the legislature reduced

17  the severity of a civil penalty, then the new code's more

18  benign provision applies, but if the legislature determined no

19  penalty is warranted, we still apply the harsh penalty of the

20  old code.  I'm surprised -- Article 1807 says you apply the

21  more benign provision of the new code to conduct that both the

22  new code and the old code sanctioned with a civil penalty or

23  the causation -- or deprivation, depending on the translation

24  of rights --

25          (Sound played.)

1            MR. KAPLAN:   And the new code here does indeed

2    provide for a deprivation of rights to contract nullification.

3    That's Article 341 at page 11 of our Appendix 5, which is Doc.

4    3737.

5            As a consequence, Your Honor, the only remedy PREPA

6    has sought in this case, the one way forfeiture of a

7    unilateral repossession, is not available under the old civil

8    code provisions.   They've been repealed.   That resolves the

9    case even before the Court gets to the constitutional

10   defenses.

11           Thank you, Your Honor.

12           THE COURT:   Thank you.

13           And we're back to Ms. Dale for five minutes.

14   Ms. Dale, you have to unmute.

15           MS. DALE:   Yes.   Sorry.

16           Your Honor, first of all, we could only cite the

17   third prosecution agreement and the information in our reply

18   papers, because it was just unsealed in December of 2020.   And

19   so we didn't have knowledge of it beforehand.   That's number

20   one.

21           Number two, this recent decision by the DOJ, or

22   whomever has given them some indication that there was some

23   mistake, it's obviously the first time we've heard of it.   And

24   if the Court deems it appropriate, we should perhaps take a

25   look at what they're saying.

1          I will note that in the deferred prosecution

2     agreement itself, it indicates that the parties will not

3     dispute the statements of fact that are included within the

4     deferred prosecution agreement.  And so I -- you know, we

5     believe that there was still continued control, and here, that

6     implicated the fifth and the sixth contracts as well.

7          The issue of the -- we believe the grand larceny is

8     the same thing as aggravated misappropriation.  I'm just --

9     I'm confused by the, you know, argument here.  There is

10    misappropriation, because VSA bribed Iraqi officials to obtain

11    contracts for oil, thereby taking the money that did not --

12    taking money from the Iraqi people.

13         I mean, the District Attorney, in imposing the

14    restitution here, this is -- apologies.  This is Exhibit 32 of

15    the Plea Agreement.  In section B it says, the incentives to

16    be imposed in the case shall be reattribution of 13 million

17    dollars to the Iraqi people, because the bribes to the Iraqi

18    Government to obtain the oil is an injustice to the public

19    funds of Iraq.

20         So, I mean, if they've misappropriated the contracts

21    and paid money to obtain something they shouldn't have

22    obtained in the first place, that's the larceny.  It's the

23    same thing as aggravated misappropriation.

24         In terms of the -- in terms of the remedy, Your

25    Honor, we believe that Law 458 provides for automatic

1    rescission and provides PREPA the right to seek --

2              (Sound played.)

3              MS. DALE:  -- this return of all of the money that's

4    paid.  And this, again, is to advance the public policy of Law

5    458.  I'm reading from a decision in the Supreme Court of

6    Puerto Rico, *Municipality of Quebradillas versus Corporacion*

7    *de Salud de Lares,* 180 D.P.R. 1003, Your Honor, 2011.  It is

8    not under Law 458, admittedly, but it talks about the

9    importance of the public funds and the public contracting.

10             And here there's a quote.  It says, if the

11   municipality disbursed public funds improperly through a null

12   and void contract, it has the right to recover them.  If we

13   were to conclude otherwise, we would be leaving public funds

14   in private hands where they do not belong.  And that is the

15   point of Law 458, and we disagree.

16             We believe that we have, in the complaints from 2009

17   and 2012, included the remedies in the first cause of action

18   in the Complaint in 2009.  It's for Law 458 violation, and the

19   remedies that are appropriate thereto.  In the second cause of

20   action in the 2009 complaint, it was for illicit consideration

21   or deceit, and the remedies available under section 1257 and

22   1258.

23             In the 2012 complaint, Your Honor, which relates to

24   the first four contracts, the first cause of action -- the

25   first and second causes of action are relating to Law 458.

1  The third cause of action is for restitution because of

2  illegalities.  The fourth cause of action is the remedy for

3  return of the money.  And the eighth cause of action is for

4  nullification of the contracts due to deceit, and the remedies

5  that are available thereto.

6          (Sound played.)

7          THE COURT:  Thank you, Ms. Dale.

8          So I thank you, Counsel, for these arguments.  I will

9  take the motion under submission.

10         Mr. Kelso, file whatever it is you received from the

11 DOJ promptly as a supplement.

12         Counsel, you can meet and confer as to whether any

13 additional brief submissions are appropriate in connection

14 with that point.

15         MR. KELSO:  We will, Your Honor.

16         THE COURT:  All right.  Thank you.  Thank you all.

17         MR. KAPLAN:  Thank you, Your Honor.

18         THE COURT:  The next matter on the calendar is an

19 oral argument on the Hernandez Montanez preliminary injunction

20 motion in Adversary Proceeding No. 2100042.

21         We will take a ten-minute break before beginning that

22 argument, which is scheduled for 70 minutes.  So would

23 everyone kindly disconnect now from Court Solutions and AT&T,

24 and reconnect to be ready to proceed in ten minutes, at 11

25 minutes past 11:00 AM.

1           Thank you very much.

2           (At 10:58 AM, recess taken.)

3           (At 11:18 AM, proceedings reconvened.)

4           THE COURT:  Good morning.  Judge Swain here again.

5           Ms. Ng, is everyone ready?

6           MS. NG:  Good afternoon, Judge.  It's Lisa Ng.  Yes,

7    everybody is here.

8           THE COURT:  Thank you very much.

9           We are now ready for Agenda Item IV, oral argument on

10   the preliminary injunction motion in the *Hernandez Montanez v.*

11   *Pierluisi Urrutia, et al.*, Adversary Proceeding No. 21-00042.

12          We will begin with argument for the movant and

13   plaintiff, for which 25 minutes have been allotted, by

14   Mr. Martinez Luciano and Mr. Rodriguez Escudero.

15          MR. MARTINEZ LUCIANO:  Good morning.  My name is

16   Jorge Martinez Luciano.  I represent the plaintiff, the

17   Honorable Rafael Hernandez Montanez, as Speaker of the Puerto

18   Rico House of Representatives, along with Mr. Rodriguez

19   Escudero.  We would like to set aside five minutes for

20   rebuttal, if it pleases the Court.

21          THE COURT:  The order of speaking that I had was 25

22   minutes for the two of you, then AAFAF, and the Oversight

23   Board, and then returning to you for ten minutes.  So --

24          MR. MARTINEZ LUCIANO:  That's right.  I'm seeing

25   that, Your Honor, so sorry about that.  We have plenty of time

1    for rebuttal.  Sorry about that.

2            THE COURT:  Okay.  Very good.

3            MR. MARTINEZ LUCIANO:  Your Honor, also -- Your

4    Honor, this is a very straight forward case and discrete legal

5    issue that has no underlying factual disputes.  The question

6    is simple:  Is it possible to amend or reprogram funds within

7    a budget of a covered entity that was approved under section

8    202 of PROMESA without following the restrictions in Section

9    204(c) of PROMESA?  The short answer is no.

10           As to why is the plaintiff in this case, well, in

11   attempting to readjust the 2020-2021 budget approved by the

12   Board last summer, the legislature, the legislative branch was

13   deprived of the role that it has under section 204(c).  As a

14   matter of fact, that section is very aptly titled,

15   Restrictions on Budgetary Readjustments.

16           It has no exceptions.  It covers every single

17   budgetary readjustment.  And in subsection one of that

18   statute, it says that the Governor is required to submit or to

19   request the legislature, is what it says there, for the

20   reprogramming of funds, which activates a duty on the Board's

21   part to assess that requested readjustment.

22           And this has been done numerous times since we have

23   been operating under section 202.  I believe we are into the

24   fourth or fifth fiscal year that the budget has been prepared

25   as per section 202 of PROMESA.

1          The Board has to certify that the funds that are

2     being requested to be readjusted are compliant with the fiscal

3     plan, and then the matter is remanded to the legislature.  As

4     a matter of fact, the next subsection, subsection two, clearly

5     states that the legislature shall not adopt a reprogramming

6     unless the Board has certified that the reprogramming is

7     compliant.  Therefore, the role that the legislature has is

8     very clear, to adopt reprogrammings.

9          We have had numerous reprogramming requests, but this

10    one is very particular because this one pertains to a

11    proceeding, a special legislative proceeding that was enacted

12    almost five months after the budget had been approved, on

13    December 30, 2020, just a day or two days before the previous

14    legislative assembly's term ran out.  And it provides for a

15    special election to select -- a congressional delegation is

16    what they call it.

17         It's actually people who have unspecified --

18    specified duties of promoting statehood in Washington, D.C.,

19    that are to be elected on May 16, 2021.  But notwithstanding

20    the fact that it is well-known that elections cost money, no

21    reprogramming request was made at the time.  And it was not

22    until February that the Governor of Puerto Rico -- and this is

23    a May proceeding -- the Governor of Puerto Rico started the

24    process of seeking a reprogramming of the funds, as per

25    Exhibit One of the Complaint, which is the April 13, 2021,

1    resolution adopted by the Board.

2         The Board found that the request was submitted, a

3    compliance request was submitted to the Board on March 26,

4    2021, which is less than two months before the election.  The

5    Board evaluated, assessed, very carefully, very -- pondered, I

6    have no doubt that they were -- that they did their job, and

7    they certified that 1.85 million dollars could be readjusted

8    from the budget to fund the election.  But they, as they state

9    in their resolution, pursuant to PROMESA, submitted that to

10   the legislature, which submitted the matter to the floor of

11   the Puerto Rico House of Representatives as Joint Resolution

12   100.  And it was voted down.  It was not approved.

13        Once the matter goes back, that should have either

14   ended the issue, because section 204(c) is different from 202.

15   Section 202 provides that if the legislature and the Governor

16   are unable to approve a compliant budget, the Board imposes

17   its own budget.  And that has happened several times.

18        There is no similar provision in 204, and the

19   provision in 202 does not mention readjustments.  Whether or

20   not that cedes through 204 and the Board has the authority to

21   resolve an impasse, like the one that we had with the funding

22   for the special election, is unresolved.  It is our position

23   that it does not.  But even if it did, the Board did not

24   resolve the impasse.

25        What the Board did in the April 13, 2021, resolution

1   is that it said, well, the Governor and legislature are at

2   odds over this, so we resolve -- and this is at page two of

3   the resolution, the next to last paragraph.  The Board desires

4   to allow the Commonwealth Government to adopt or not to adopt

5   the proposed revised budget in the same as would occur absent

6   PROMESA.

7          So it seems that -- or it's quite explicit that the

8   Board is saying that this matter is going to be brought

9   outside the scope of PROMESA.  There is no citation to PROMESA

10  or to any legal authority allowing the Board to, in the face

11  of a controversial readjustment, simply remove that

12  readjustment from the rigors of 204(c), to the restrictions

13  that Congress put in there for the restructuring of the

14  budget.

15         As a matter of fact, the Board's position in this

16  case, as per their opposition, seems to be that this is a

17  controversy solely between the executive and legislative

18  branches that it was proper for them to keep out, because it

19  was controversial.  Again, there is no basis in the law for

20  finding this.

21         But looking at Exhibit 22, which was submitted at

22  docket 18 by the Board, it's an April 16, 2021, letter from

23  Omar Marrero Diaz of AAFAF to the executive director of the

24  Board.  It's referencing the April 14th letter, which in turn

25  delivered the April 13th resolution that we were just

1   referring to.

2         And it says here that, in light of your

3   communication, referring to that resolution, we hereby inform

4   you that the Governor of Puerto Rico, according to his

5   ministerial duties and his oath of office to defend and

6   implement the Constitution and the Laws of Puerto Rico, has

7   authorized the disbursement of approximately 1.85 million

8   dollars to fund the special election required by Act 167-2020.

9         To that effect, the Office of Management, it goes on

10  to mention how the process is carried out, but it is very

11  clear that the Governor acted outside of PROMESA, under Puerto

12  Rico law, which is completely preempted as per Section 4 of

13  PROMESA.  There is not a single exception to PROMESA

14  preemption, not one in the law.

15        And the statutory authority that the Governor invoked

16  is preempted by section 204(c).  That is the only way in which

17  a budget of a covered territorial entity may be amended.  So,

18  therefore, the Board's resolution was taken as an

19  authorization by the Governor, and by the members of the

20  executive branch of Puerto Rico, to indeed step outside

21  PROMESA and do a -- it pretty much seems to be similar to them

22  having found an oasis in the desert that is PROMESA.  And for

23  this matter, we are relieved of PROMESA and we're doing it

24  under Puerto Rico law.

25        Again, after extensive briefing from all defendants,

1    they have been utterly unable to point to a single provision

2    in PROMESA, or any of the interpreted decisions that have been

3    handed out by Your Honor, and by the First Circuit, that

4    allows PROMESA to turn off -- to be turned off and on like

5    that.  Therefore, the only nail on which they can try to hang

6    their hat on is section 402 of PROMESA, which is a very

7    straight forward assertion that nothing in the statute shall

8    be construed to affect the people of Puerto Rico's rights to

9    determine their future political status.

10         It does not create an extension to PROMESA.  It is a

11   rule of statutory construction.  It is there clearly to say

12   that, because Puerto Rico has a humongous debt that is part --

13   that is now being reorganized under the largest bankruptcy

14   proceeding probably ever in history, that does not mean that

15   deciding Puerto Rico's future political status is going to be

16   relegated to an unimportant -- or be relegated to a less

17   important matter.

18         It remains an important issue.  And you cannot fail

19   to fund proceedings or to hold proceedings to decide the

20   status, such as a plebiscite.  These are the classical devices

21   that are used for the people to be heard on the matter of

22   status.  We had one on November 3rd.  It was the sixth one

23   that we have had since 1967, when we had the first one.  And

24   no one objected to that, to funds being assigned to that

25   plebiscite.  They weren't even allowed an unopposed

1    readjustment of the budget to assign additional funds for that

2    plebiscite.

3          But this is not what Law 167 is.  Law 167 is not a

4    plebiscite to decide status.  Law 167 is a special election to

5    select six people who are going to be paid a government salary

6    to advocate for one specific status option.

7          The people of Puerto Rico are deciding nothing on

8    November 16th other than the names of the people who are going

9    to represent statehood under a law that provides undefined

10   responsibilities in Congress that these people have to do.

11         So it is clearly not what Congress had in mind.  And

12   in our reply brief, we cite to the report that was rendered by

13   the House Committee on Natural Resources, presided at the time

14   by Representative Bishop of Utah.

15         And speaking of section 402, what the Committee says

16   is that the section maintains the right for Puerto Rico to

17   conduct a plebiscite to determine its future political status.

18   Nothing more is said.  It is specifically addressed as the

19   right to conduct plebiscites, which is not what Law 167 is.

20         Moreover, we cite that same report in which Resident

21   Commissioner General Pedro Pierluisi Urrutia, who happens to

22   be the Governor of Puerto Rico at the present time, but he was

23   our representative in Congress when PROMESA -- when the

24   PROMESA Bill was being considered, declared himself the author

25   of section 402, and gave an extensive speech on his views

1    regarding political status.  But the only thing that he

2    mentions regarding the scope of section 403 is that -- and I'm

3    quoting him, it is my hope and expectation that in 2017 the

4    Puerto Rico Government will use this authority to conduct a

5    federally sponsored yes-or-no plebiscite on whether Puerto

6    Rico should be admitted as a state.  In the admitted term,

7    there is much that Puerto Rico law and the Governor should

8    be -- should do to help manage its economic crisis, including,

9    most urgently, swiftly enacting PROMESA.

10          So even Governor Pedro Pierluisi, when he had a seat

11   at the table when they were considering the bill, the only

12   events that he mentioned in connection with section 402, which

13   he authored -- or it's an amendment that he proposed, was that

14   under that section, we should have a plebiscite that is

15   sponsored by Congress.

16          So to expand the scope of 402 to anything that may be

17   labeled, and this is a very subjective label, as related to

18   political status, simply creates a back door to PROMESA.  All

19   one has to do is say that I need to readjust the budget a

20   hundred million dollars, because I want to pay a lobbying firm

21   to lobby for statehood.  And if the Board says, well, that is

22   not consistent with the fiscal plan, of course the legislature

23   probably will not approve it, the Governor may invoke section

24   403 and say, well, this is not within the purview of PROMESA.

25          He would make a mockery of section 202 if a compliant

1   budget that has gone through the very, very specific and

2   adversarial process to enact the budget that section 202

3   provides, could be amended at will by the Government of Puerto

4   Rico by simply invoking political status.

5          And indeed, the law -- the status -- 402, section 402

6   does not provide, again, for the law not to apply.  It

7   provides for a rule of construction, like, for instance, how

8   employment discrimination statutes are construed in the light

9   more favorable to the employee.

10          Well, PROMESA should be construed in the light more

11  favorable of the people of Puerto Rico -- the people of Puerto

12  Rico's right to decide their future political status.  But

13  that cannot be as subjective as plaintiff put it, that it --

14  we say that a law that was enacted at the very last instance

15  in which that legislature was serving, and a new majority was

16  coming in, that provides for a scheme to -- they say implement

17  the result of a plebiscite.

18          And it is very important to note that, at least

19  publicly, less -- more so than in the pleadings in this case,

20  defendants have tried to cast the Law 167 special election as

21  something that is bootstrapped to the November -- or the

22  results to the November 3rd, 2020, plebiscite, but that is not

23  true.  That plebiscite was held under section -- under Law

24  51-2020, enacted in the summer of 2020.

25          And that law provides its own mechanism to implement

1  a result in favor of statehood, which indeed has not been

2  followed.  Article 4.3 of that law says, what happens if

3  statehood wins, then the Resident Commissioner of Puerto Rico

4  needs to do some things, and the Governor needs to do other

5  things.

6         So this is something that the voters never had on the

7  plate when they cast their ballots in the plebiscite of

8  November 2020.  This is something that came after.  This is

9  something that came after the results of the plebiscite and

10 the general election were known.

11        So it is our position that this is not something that

12 is within the scope and the purview of section 402.  And if it

13 were, section 402 still does not allow for any provision of

14 PROMESA to be cast aside.

15        As a matter of fact, if Congress wanted budgets to be

16 drafted and amended, with exceptions, one would have thought

17 that the exceptions would be either in section 202, which

18 deals with creating the budget, or section 204(c), which deals

19 with amending and reassigning expenses within the budget, not

20 be cryptically hidden in section 402 for someone's subjective

21 interpretation of what interference with Puerto Rico's right

22 to determine its future political status even means.

23        Going back to the arguments again, the Board's main

24 argument in opposition is that it did nothing to readjust,

25 that it merely kept out of this.  Well, on the face of the

1   resolution, and from the -- and of the Exhibit 22 that the

2   Board self-submitted, it is clear that the Government of

3   Puerto Rico took this as an authorization to amend the budget

4   outside PROMESA.

5          And as to the contentions raised by the second branch

6   defendants, pretty much they argue that we don't have a

7   legitimate cause of action, because the Board may ultimately

8   decide what happens with the budget.  And they cite to section

9   202(f), which indeed allows the Board to impose a budget if

10  the legislature and the Governor are unable to approve a

11  complying budget.  But, again, as we previously discussed,

12  that section doesn't roll over into section 204(c).  And if it

13  did, it doesn't matter, because that is not what happened

14  here.

15         What happened here is that the Board decided nothing.

16  So if the Board is the ultimate decision maker, then by

17  defendants' own arguments, it is the Board who should decide

18  whether or not the amendment to the budget is proper or not,

19  which is different from what it already did, which is to

20  certify that it is not contrary to the fiscal plan, that it is

21  compliant with the fiscal plan.

22         The other argument that they raise is that there are

23  public interest considerations involving the possible issuance

24  of -- and great hardship to the people of Puerto Rico, they

25  say, if the injunction that we request is granted, because we

1    would be stopping an election.  Well, that has to be put in

2    context.

3         We are not stopping a general election set forth by

4    the Constitution.  This is not a plebiscite.  This is not a

5    referendum on a constitutional amendment.  This is an election

6    that was called for without any funds on December 30th, and

7    for which funds were not properly requested until late March.

8         So that argument seems to me to be an argument like,

9    take pity on the -- killing not -- one parent, and then asking

10   for pity, because one is an orphan.  It is their own doing

11   that they are funding this -- that this is happening so

12   quickly.

13        And we could have not filed this action before,

14   because it was not until April 16th that the Governor decided

15   to go outside PROMESA.  So this is not -- there are no

16   government vacancies, no public office positions that need to

17   be filled that would be left open if this election is not

18   held.  And in the balance of the hardships, PROMESA provides a

19   specific, categorical role for the legislature.  The

20   legislature adopts amendments once they have been proposed by

21   the Governor and certified by the Board.  And the legislature

22   has been left out of the equation, so it suffers irreparable

23   injury that can only be repaired by an injunction.

24        So if the Court has any questions, I'm happy to

25   answer.

1          THE COURT:  I do have a question as to the language

2     of 204(c).  204(c)(1) begins, if the Governor submits a

3     request to the legislature, the Governor has to make a

4     submission to the Oversight Board for analysis.  Then

5     subparagraph 2 says that, the legislature shall not adopt the

6     reprogramming, and a reprogramming shall not be carried out

7     unless the Oversight Board has provided the certification.

8          I have difficulty seeing on the face of this

9     statutory provision a hard requirement that all such requests

10    go to the legislature, or anything saying that the legislature

11    has exclusive authority and the last word over every

12    reprogramming.  It seems to me that it requires an Oversight

13    Board certification in regard to every proposed reprogramming,

14    and that the legislature and the Oversight Board -- I'm sorry.

15    The legislature and the Governor are not entitled to carry out

16    a reprogramming unless the Oversight Board has provided the

17    certification to the legislature.

18         It doesn't seem to be an affirmative grant of the

19    legislature -- of power to the legislature, or a prescription

20    of the way the legislature has to work in the process.  Would

21    you comment further and show me where you're finding --

22         MR. MARTINEZ LUCIANO:  Yes.  Yes, Your Honor.

23         Subsection (c)(2) provides -- first of all, the

24    Governor does not appear in that subsection.  He has no role.

25    In that subsection, he's not even mentioned.  And it does use

1  the words, the legislature shall not adopt.  Adopting, when

2  referring to a legislative body, obviously refers to taking a

3  vote.

4       There is no other device within section 204, or 202,

5  also, and we have not been able to find in PROMESA any other

6  mechanism for readjustments other than those provided by

7  section 204(c).  And under those, the legislature is mentioned

8  as the entity that receives the Governor's request for

9  amendment.  And in subsection one, the Board submits its

10  analysis not to the Governor, who requested the readjustment,

11  but it submits its analysis to the legislature.

12       If the legislature has no authority to act on the

13  request once it has been certified and analyzed by the Board,

14  Congress would have not required, mandated specifically

15  subsection one, for the Board to submit its analysis to the

16  legislature, if the legislature is merely there to be cc'd on

17  what is going on, to merely have knowledge of what is going

18  on.

19       But if it was possible for either the Governor to

20  amend a budget that is compliant with PROMESA and was approved

21  under section 202 by himself, or even the Board, amend that

22  budget by itself, the projections and --

23            (Sound played.)

24       MR. MARTINEZ LUCIANO:  May we finish that thought,

25  Your Honor?

1          THE COURT:  Yes, please.

2          MR. MARTINEZ LUCIANO:  I wish Congress had been more

3   specific, but Congress, what Congress does mention sets a

4   restriction as to how the budget may be amended.  Amended --

5   it provides that the Governor requests the amendments, the

6   Board analyzes and certifies, and it says that the legislature

7   adopts.  That is all we have to go on.

8          Thank you, Your Honor.

9          THE COURT:  Thank you very much.

10         And now we will hear from Mr. Friedman for AAFAF for

11  20 minutes.

12         Mr. Friedman, you need to unmute on both the computer

13  and the phone.  Mr. Friedman, I'm still not hearing you, so

14  please unmute on both the computer and your phone.

15         Ms. Ng, can you see whether Mr. Friedman is muted on

16  the dashboard?

17         MS. NG:  I unmuted him.

18         THE COURT:  Mr. Friedman?

19         MR. FRIEDMAN:  Yes.

20         THE COURT:  I can hear you now.

21         MR. FRIEDMAN:  Thank you, Ms. Ng.  I appreciate it.

22         Good morning, Your Honor.

23         THE COURT:  Mr. Friedman?  Mr. Friedman, I can't hear

24  you again.

25         MR. FRIEDMAN:  Your Honor?  Can you hear me, Your

1  Honor?

2          THE COURT:  Now I hear you.

3          MR. FRIEDMAN:  Thank you, Ms. Ng, and thank you, Your

4  Honor.  It's Peter Friedman on behalf of the executive branch

5  defendants.

6          Your Honor, there's no likelihood of success on the

7  merits here, and the preliminary injunction should be denied.

8  It turns on the statute, which has to be read comprehensively,

9  which we propose.  We have purported numerous statutory canons

10 of interpretation that plaintiff just simply has not responded

11 to.  And, again, in the second, and third, and fourth prongs,

12 with respect to balance of harms, we believe it tips sharply

13 in our favor.

14         There's a declaration that lays out the harms, and

15 we've pointed out in our brief that there is a real lack of a

16 harm to the legislature.  For plaintiffs to win, they have to

17 show that the Speaker of the legislature has a right under

18 PROMESA to stop the government from spending money.  And I

19 think we've established in our papers that's not how PROMESA

20 works.  That's a Board responsibility.  And they've pointed to

21 nothing in PROMESA that gives the legislature the right to

22 tell the Board what to do.

23         We're getting in a situation where the Board has

24 declined to take an affirmative action, and there's nothing in

25 PROMESA that says the legislature gets to tell the Board that

1    it has to act.  Imagine there was -- and the Board's greater

2    power to approve budget amendments and reprogramming includes

3    the lesser power, particularly when combined with 402, to

4    defer to state law on what to certify and what to permit.

5            So imagine for a moment that the legislature did have

6    an ability to invoke PROMESA and tell the Board what to do.

7    It couldn't here, because of PROMESA section 402.  Section 402

8    modifies every part of PROMESA, including, I think,

9    importantly, section 4 of PROMESA, the preemptive clause.

10   Nothing is excepted from it, and that includes the preemption

11   clause.

12           To understand 402's application here, we have to

13   answer two fundamental questions:  First, does 402 apply to

14   Act 167; and secondly, if so, what effect does 402 have on the

15   rest of PROMESA?  Does 402 cover this dispute?

16           So the first issue we have to dispense with is what

17   does -- are only plebiscites covered?  And I think that is a

18   contention that's obviously no, because the section uses the

19   word "including".  And as we demonstrated, and there's been no

20   rebuttal to, "including" is a word with broad scope.

21   Including, when Congress uses the word "include," the plain

22   meaning of the statute is meant to mean includes, but is not

23   limited to the enumerated item.

24           And "include" is plain on its face.  There's no

25   reason for me to go to legislative history, because of the

1   well-known doctrine about how to interpret the word "include".

2   In other words, the legislative history doesn't help.  It

3   focuses on one example, but it doesn't exclude anything else.

4           So once we know that -- and plaintiff's reading

5   renders the word "includes" superfluous, which -- as it does

6   all of 402 really.  And we've cited cases, and the Court is

7   well familiar with the statutory canons of insuperfluity and

8   meaninglessness.

9           So then the question is does Act 167 relate to Puerto

10  Rico's ability to determine its future political status.  The

11  answer to that is obviously yes.  You can look at the

12  statement of motives.  We know that it filed a plebiscite.  We

13  know that in order to take the next step in determining its

14  status, consistent with the next plebiscite, that Congress has

15  to be addressed, because under the United States Constitution

16  -- only Congress can decide whether to admit Puerto Rico as a

17  state.

18          And Act 167 provides, and it's consistent with what

19  Puerto Rico has done after past plebiscites favoring

20  statehood, so we think that there is no dispute, no meaningful

21  dispute.  It's not that there's not a subjective issue on

22  which the Court can determine, but Act 167 relates to status.

23          And so to them, the question becomes, well, what is

24  402 supposed to mean?  Plaintiff says in its papers that the

25  fact that PROMESA demands fiscal prudence and responsibility

1    is not meant to stall or otherwise dissuade Puerto Rico from

2    seeking a resolution to its status.  And plaintiff said

3    something very similar to that argument before, but we

4    wholeheartedly agree with that.  But plaintiff's reading of

5    PROMESA would allow the Board to entirely prohibit even

6    fiscally responsible for status-related issues, and if that

7    were true, plaintiff's statement would be meaningless, and,

8    even worse, so would section 402.

9         So what does 402 do, and is it really a gigantic

10   loophole for PROMESA?  And the answer to that is no, as we

11   articulate on pages 14 and 15 of our brief.

12        What 402 does is it says the Board can't use its

13   powers to restrict status determination.  That doesn't mean

14   that section 202 doesn't necessarily have any application,

15   right.  And let me give you an example.

16        Suppose Act 167 said, elect a congressional

17   delegation.  That was one part of it.  And the second part

18   was, and fly the delegation to Washington, D.C., every week,

19   each member on their own Gulfstream, and stay at the Hay-Adams

20   in the presidential suite, and you should spend 75 million

21   dollars for that.

22        Well, one part of that statute would relate to

23   status, the first part, and the Court could determine on its

24   face whether Act 167 involves status.  But the second part

25   wouldn't really relate to status, because the Court could

1    reasonably conclude, or the Board could reasonably conclude

2    that going to Washington on a Gulfstream, or spending the

3    night at Hay-Adams, doesn't involve status.  And under 202, or

4    204, or even 108, I suppose, the Board could exercise all of

5    its powers to say, hey, wait a minute; you can't do that;

6    spend an appropriate amount; spend an amount consistent with

7    past practice, and our budget, and our fiscal plan.

8            By the way, Your Honor, it is important to say that

9    when the Board received a certification of Act 167, that Act

10   167 was consistent with -- or not significantly inconsistent

11   with its fiscal plan, the Board didn't object.  And I think

12   the Court knows well, the Board is not shy about objecting at

13   all when it feels that a newly passed statute is inconsistent

14   or significantly inconsistent with the fiscal plan.

15           So I think the interpretation of Act 167 I just

16   proposed -- I'm sorry, PROMESA section 402 that I just

17   proposed does create a harmonious interaction of all sections

18   of PROMESA, which is really the highest obligation of a court,

19   which is to look at statutes and figure how to give each

20   effect meaning.  And that's the canon of harmoniousness.  We

21   started cases on that and -- plaintiff really doesn't have any

22   response to that.  Again, plaintiffs conception of 402, while

23   on the one hand saying PROMESA shouldn't be interpreted for

24   status determinations really would give the Board that

25   absolute right.

1          Your Honor, we talked in our papers about the

2    comparison between section 2 -- 303 of PROMESA and 402 of

3    PROMESA, and I think it's quite powerful in explaining how

4    broad the scope of 402 is.  Argues if actually the Board is

5    obligated to fund under -- because of 402, because there's a

6    valid law under Puerto Rico law, but I don't think we actually

7    need to prove that.  But at a minimum, we think -- and, again,

8    highlighting 303, the difference in 303 which caused our acts

9    -- Titles One and Two, from its restrictions on limitations of

10   the government.  We think at a minimum, it means the Board is

11   appropriately making a decision to stay out of this issue.

12   And once it's determined that the Board can stay out of this

13   issue, and that 202 and 204 don't provide a rule of decisions

14   here, that leaves this matter to be really appropriately

15   determined in the state court.

16          Plaintiff has not argued that the Governor can't take

17   these actions under state law, and that would be a wholly

18   Puerto Rico issue if what I've seen is correct, or the Board's

19   general powers under 202 and 204 permit it to do what it's

20   done.  So I think this Court obviously has had many awesome

21   responsibilities with respect to determining the future of

22   Puerto Rico as a whole.  There's an appropriate mechanism here

23   for this Court not to have to take on this responsibility.  If

24   it denies the PI and a temporary restraining order, plaintiff

25   has every right to go to state court and try to prove its

1   case.

2           This is one issue I think the Court doesn't actually

3   have to decide or take on.

4           THE COURT:  Now, will you circle back to plaintiff's

5   interpretation of 204(c)?  Because, as I understand the

6   plaintiff, the legislature is arguing that 204(c) changes and

7   supersedes, due to the preemption clause, the ordinary

8   reprogramming authority mechanism of Puerto Rico law, and

9   gives the legislature the sole authority to approve, adopt, or

10  refuse a reprogramming as to the certification by the FOMB.

11  So that would imply that there would be no Puerto Rico law

12  mechanism fall back, and that the Court --

13          MR. FRIEDMAN:  Your Honor.

14          THE COURT:  -- could remove PROMESA essentially?

15          MR. FRIEDMAN:  It's a two punch, Your Honor.  The

16  first thing, I think when you read preemption, I think

17  preemption has to be modified by section 402.  So I think

18  that's the first response.  The second response is we don't

19  believe that the legislature essentially has a veto power over

20  reprogramming.  That would be inconsistent with PROMESA as a

21  whole, which is designed and really gives the Board the power

22  to restrain spending, so that the Board is clearly permitted

23  to approve a reprogramming, even if the legislature says no.

24          As between the Governor and the legislature, the

25  legislature has an opportunity to be heard.  The legislature

 1    has the chance and the right to make its opinion known.  If

 2    the Board wishes to step outside of the context of approving a

 3    particular reprogramming, the Board can, you know, I guess in

 4    some respects delegate that right to the government and the

 5    legislature.  But I think the Board always retains the right

 6    to make an ultimate determination as to what's appropriate for

 7    a reprogramming, unfettered by either the government or the

 8    legislature in terms of the Board's power to make budgetary

 9    adjustments as it sees fit.

10         I don't particularly like that, but I think that's

11    the right way to understand PROMESA as a whole.  So giving any

12    Puerto Rican entity a unilateral right to force the Board to

13    not spend or to spend might be inconsistent with 204, and 202,

14    and 203, and 108.

15         THE COURT:  Thank you.

16         MR. FRIEDMAN:  So, Your Honor, I think the -- one of

17    the other points I wanted to make is our view of PROMESA and

18    402 is not only harmonious, but it's really content neutral,

19    right?  We think that this would apply to any statute on

20    status.  In fact, we think that's a natural reading for Puerto

21    Rico to take, and, frankly, plaintiff's motivating view of 402

22    is motivated reasoning.

23         We believe 402 hypothetically would cover a future

24    legislature that would decide to repeal Act 167.  The Board

25    couldn't revoke its 108 powers, because of 402.  If they

1 wanted the budget to have a different direction, we don't

2 think the Board could necessarily reject that if it was -- if

3 a new statute was passed to do that.  So we think this is

4 supposed to be content neutral, and that 402 is supposed to be

5 very permissible, financially responsible decisions.

6        I want to make a point about plaintiff's repetitive

7 invocation of the fact that the statute was passed at the very

8 end of the last legislative session.  Maybe they refer to it

9 as a buzzer-beater or -- I don't know if Your Honor is a

10 basketball fan.  I am.  Basketball history would be radically

11 different if buzzer beaters didn't count.

12        Like Houston wouldn't be a 1983 NCAA championship

13 because Lorenzo Charles' shots wouldn't have counted.

14 Christian Layhill wouldn't be --

15        THE COURT:  You're going to lose me on sports here,

16 but I get your point.

17        MR. FRIEDMAN:  Buzzer-beaters count, Your Honor.  So

18 the fact that the plaintiff doesn't like the buzzer beater and

19 couldn't override the buzzer-beater is of no moment at all.

20        There is no public interest at all to overriding a

21 validly enacted statute simply because plaintiff doesn't like

22 the manner in which it was passed.  If counsel had it passed

23 and enacted on the first day of the legislative sessions -- I

24 think that's an argument of no moment.

25        When we talk about harm, there are three other

1  factors that need to be addressed in the context of any

2  preliminary injunction.  They show no irreparable harm at all.

3  Plaintiff says this isn't about an election, but an

4  expenditure of money.  If that's true, of course, A, money is

5  generally not irreparable harm.  And, B, I don't think the

6  plaintiffs can be harmed specifically, because it doesn't

7  decide where the money is spent.

8       It could not tell the Board, don't spend this money

9  somewhere else.  That right had been taken away under PROMESA.

10  So I don't think that can constitute irreparable harm to them.

11       With respect to the second and third, they literally

12  say in their briefs they don't want to dwell on some of the

13  most important factors in dealing with the issuance of a

14  preliminary injunction.  It appeared balance of hardship and

15  the public interest fit together well, and we submitted a

16  declaration, as -- plaintiff for some reason referred to as

17  unsworn, but, in fact, it was properly attested to under the

18  U.S. Code.  So it's completely a sworn declaration and meaning

19  -- under Federal Law.  It was submitted under penalty of

20  perjury.

21       Puerto Rico has publicized an election.  It's done

22  work to get it held, worked for means -- cutting off funding,

23  that would derail the election.  That hurts both defendants

24  and the public.  Frankly, it hurts all politicians to have

25  elections canceled.  You almost don't need facts on that.  I

 1   think the cases we've cited are so powerful, the nature of the

 2   election, the fact that's it's not for a vacant office, I

 3   don't think it matters.  Public participation, civil

 4   participation, elections are important.  They have

 5   consequences.

 6        This has been scheduled, and it's very disruptive of

 7   the public good and civil engagement for an election to be

 8   postponed, date changed, and canceled.  We've cited, as I

 9   said, many cases on that point.

10        Your Honor, that's all I have, unless the Court has

11   any other questions.  Just to, you know, summarize, I think if

12   you evaluate how to best give all sections of PROMESA meaning,

13   I think the interpretation you interposed under 402 is

14   reasonable.  It's modest.

15        The cost here is minimal.  It involved a statute

16   that's -- on its face, it involves political status

17   determination, and the level of harm here is sharply in our

18   favor, particularly at this stage of injunctive relief.

19        Thank you, Your Honor.  That's all I have.

20        THE COURT:  Thank you, Mr. Friedman.

21        And now we will hear from Mr. Mungovan, who has been

22   allotted 15 minutes to speak on behalf of the Oversight

23   Board.

24        MR. MUNGOVAN:  Good afternoon, Your Honor.  May it

25   please the Court, this is Timothy Mungovan appearing on behalf

1   of the Board.  May I proceed?

2            THE COURT:  Yes.  Good afternoon.

3            MR. MUNGOVAN:  Thank you.

4            At the outset, Your Honor, I would like to make three

5   basic points:  First, the motion for TRO and preliminary

6   injunction should be denied as to the Oversight Board; second,

7   the Oversight Board has strived earnestly to take no position

8   on Puerto Rico's future political status, and has endeavored

9   not to restrict Puerto Rico's right to determine its future

10  political status as demonstrated in the record before the

11  Court; and, third, this matter should be resolved under Puerto

12  Rico law.

13            If the government has the authority to reprogram the

14  funds for Act 167 under Puerto Rico law, then the Board will

15  not object to the reprogramming under PROMESA.  If the

16  government did not have the authority to reprogram the funds

17  for Act 167 under Puerto Rico law, then the Board may take

18  action under PROMESA, including pursuant to section 204(c).

19            THE COURT:  So, I'm sure you're going to elaborate on

20  that point --

21            MR. MUNGOVAN:  Yes.

22            THE COURT:  -- but let me just ask you preliminarily,

23  I've been trying to understand what this deference to Puerto

24  Rico law means to the Oversight Board.

25            Mr. Mungovan, so is the Board saying that it will

1   exercise its power to approve or not approve by reference to

2   what would otherwise happen under Puerto Rico law,

3   notwithstanding PROMESA?  Is it saying that the budgetary

4   programming provisions of Puerto Rico law are not otherwise

5   preempted by PROMESA in this regard, or does section 402 allow

6   the Board discretionarily to pull back the PROMESA blanket in

7   a sudden way when it determines that section 402 is

8   implicated?

9        I think that's the best way I can articulate the

10  three scenarios that seem possible to me.

11       MR. MUNGOVAN:  I understand, Your Honor.  Let me try

12  to answer all three questions this way.  So from the Board's

13  perspective, section 402 limits everyone's powers, including

14  the Court's, respectfully, to interpret PROMESA to restrict

15  Puerto Rico's right to determine its future political status.

16       And what that means here is that the Board's

17  determination of whether to approve a budget item for the

18  elections does not necessarily turn on whether it's consistent

19  with the fiscal plan or another provision in PROMESA.

20  Instead, we think that carrying out 402 means allowing or

21  disallowing the expense based on whether it would be

22  authorized outside of PROMESA, whether the Governor's actions,

23  as stated in his April 16 letter to the Board, or AAFAF's

24  letter to the Board, which is an exhibit to a Board submission

25  which I'll turn to later, the Board and -- excuse me, the

1   legislature and the Governor have to determine under Puerto

2   Rico law whether the Governor has the authority to reprogram

3   the funds, as we've done, and explain to the Board on April

4   16th.

5          And the Board ultimately will certify a budget, or

6   accept a reprogramming, whether or not based -- based on

7   whether Puerto Rico law permits the Governor to engage in that

8   reprogramming.

9          THE COURT:  Thank you.

10         MR. MUNGOVAN:  So turning to the motion itself, the

11  Board does believe, as I've just stated, that 402 applies to

12  this dispute.  And I just wanted to provide a little bit of

13  context around that, Your Honor, because the Board believes

14  that 402 applies.  It has endeavored at every step not to take

15  a position under PROMESA that would restrict Puerto Rico's

16  right to determine its future political status, as

17  demonstrated in the record before the Court.

18         And I emphasize the words "Puerto Rico" not only

19  because it's in the statute, but because it highlights the

20  dichotomy between the speaker who is speaking on behalf of the

21  legislature, and the Governor and the executive branch

22  speaking separately from the legislature.

23         The idea here, from the Board's perspective, is what

24  would happen under -- if Puerto Rico law should control,

25  because the speaker and the legislature, on the one hand, and

1    the executive branch and the Governor on the other hand, are

2    at loggerheads.  From the Board's perspective, this has been

3    an extraordinarily complex process with unusual facts.

4         And just to remind the Court, Law 167 does appear to

5    implicate Puerto Rico's right to determine its future

6    political status.  When it was enacted, it lacked internal

7    funding within the four corners of the statute, being no

8    funding was provided in either a fiscal plan or the budget,

9    because the law was enacted in December of 2020, after the

10   fiscal plan and budget were certified.

11        And at each critical juncture along the way, the

12   Board focused on not restricting Puerto Rico's rights to

13   determine its future political status.  And just as a few

14   examples of key facts along the way, on January 27th, the

15   president of the Senate and 11 of the Commonwealth's senators

16   raised concerns about the Governor's proposed funding of Act

17   167.  That's in Exhibit Four to the Board's hearing exhibit

18   binder.

19        On February 3, the Governor submitted a reprogramming

20   request for Act 167 to the Oversight Board.  That is at

21   Exhibit Five to our hearing binder.  And on March 5th, the

22   Speaker of the House asserted that the legislature was seeking

23   to appeal Act 167, and raised concerns about the legislator's

24   authority -- the legislature's authority, excuse me, and role

25   in reviewing reprogramming requests under Puerto Rico law.

1   That's at Exhibit Six.

2        At each step thereafter, as set forth in the Board's

3   hearing binder, the Board walked a tight rope to follow

4   PROMESA, while avoiding taking an action under PROMESA that

5   would restrict the right of Puerto Rico to determine its

6   future political status.  The Board believed that it had

7   struck the right balance, and complied with every aspect of

8   PROMESA, including section 402.

9        I recognize, Your Honor, that this background does

10   not necessarily resolve this dispute, but it is an important

11   predicate to a resolution.

12        Second, there seems to be some confusion,

13   respectfully, on the part of both the speaker and the

14   executive branch concerning the scope of the Board's April

15   13th resolution.  And that resolution is Exhibit A to Board

16   Exhibit 21 in its exhibit binder.

17        The Board's April 14 resolution related only to

18   revising the budget.  It did not relate to any reprogramming

19   request under section 204(c) of PROMESA or otherwise.  The

20   Board never approved any reprogramming request concerning Act

21   167, and the resolution itself does not even mention a

22   reprogramming.

23        Following the Board's April 13 resolution, the

24   executive branch simply reprogrammed the funds, as the

25   executive director of AAFAF informed the Board in his April 16

1   letter to the Board, at Hearing Exhibit 22.  The Governor

2   never submitted -- yes, Your Honor.

3            THE COURT:  Didn't the Board back in March certify

4   that the revised budget, including the reprogramming, would

5   not be significantly disparate from the budget, and submit

6   that to the legislature, or do I have that wrong?

7            MR. MUNGOVAN:  Respectfully, Your Honor, not quite.

8   To be very specific --

9            THE COURT:  I do want to get --

10           MR. MUNGOVAN:  No.  That's okay.  The Board did

11  certify that the Governor's proposed amended budget was

12  compliant with the fiscal plan in March of 2021, pursuant to

13  section 202 of PROMESA, and, specifically, section 202(c) of

14  PROMESA.

15           THE COURT:  Thank you.

16           MR. MUNGOVAN:  That is different, however, Your

17  Honor, than a reprogramming request pursuant to 204(c).

18           And the Governor and the executive branch, following

19  the conclusion of the budget amendment process, which

20  culminated in the Board's resolution of April 13th, the

21  Governor simply reprogrammed the funds, as the director of

22  AAFAF stated in his letter of April 16.

23           THE COURT:  Thank you.

24           MR. MUNGOVAN:  And importantly, as part of that,

25  AAFAF's letter states, "the government did not request prior

1    authorization from the Oversight Board to reprogram these

2    funds.  That's in Exhibit 22.  And importantly, AAFAF stated

3    in its April 16th letter that the OMB reprogrammed the funds,"

4    according to the Laws of Puerto Rico.

5        And I highlight that, because up to that point in

6    time, the executive branch had never identified that Puerto

7    Rico law, or the basis of its asserted authority to conduct

8    any reprogramming.  It had never before invoked specifically

9    that the reprogramming was done under Puerto Rico law.

10       It also bears noting that at the time of issuing its

11   April 13 resolution, the Board believed that the executive

12   branch did not have the authority to unilaterally write

13   reprogramming lines under Puerto Rico law to fund Act 167.

14   Among other things, the Board asked the executive branch for

15   its authority to do so in its March 11 letter, which is

16   Exhibit 12, and the executive branch never identified that

17   authority.  Even through today, through the submissions to the

18   Court, the executive branch has never identified its authority

19   to reprogram funds under Puerto Rico law.

20       But at the same time, Your Honor, the speaker, in his

21   papers, has not asserted anywhere that the executive branch

22   lacks the authority under Puerto Rico law to unilaterally

23   reprogram funds.  And the Board believes that is the core

24   legal issue, and from what I've heard from Mr. Friedman, it

25   seems that the executive branch also believes that it is the

1   core legal issue to be resolved.

2          But at a minimum, there is no factual issue with

3   respect to getting this reprogramming, because the Board never

4   approved the reprogramming that is the subject we believe of

5   this current dispute.

6          So on these facts and circumstances, the Board

7   believes that no injunction should enter against the Board,

8   and the motion should be denied as to the Board.

9          THE COURT:  Thank you.

10         MR. MUNGOVAN:  Now, unless the Court has any further

11  questions for me, I'll waive the remainder of my time.

12         THE COURT:  Thank you, Mr. Mungovan.  I have no

13  further questions for you.

14         So, we return to counsel for the plaintiff for ten

15  minutes.

16         MR. MARTINEZ LUCIANO:  Thank you, Your Honor.

17         Going back to what was just said regarding the April

18  13th Board resolution --

19         THE COURT:  And this is Mr. Luciano?

20         MR. MARTINEZ LUCIANO:  Yes, Your Honor.  I'm sorry

21  about that.

22         THE COURT:  Thank you.

23         MR. MARTINEZ LUCIANO:  Yes.  I had to identify

24  myself.  This is Jorge Martinez Luciano for the plaintiff.

25  Sorry about that.

1           THE COURT:  Thank you.

2           MR. MARTINEZ LUCIANO:  The April 13th resolution,

3   although it does involve section 202, it's about

4   reprogramming, because the only way that Law 167 may be funded

5   is through reprogramming.  Law 167 was enacted with no

6   earmarked funds to cover the special election.

7           As a matter of fact, that is why Law 167 is not a

8   buzzer-beater.  It's an air ball.  It misses the rim, because

9   it had no funds in it, and it could only be funded through a

10  reassignment, whatever you want to call it.

11          And if the Board is indeed acting under section 202,

12  as it purports to do, and it is our contention that only

13  section 204(c) is related to readjustments, which is what

14  we're talking about here, then under that section, under

15  202(f), it had to take a position and to resolve the impasse.

16          It cannot simply turn off PROMESA, because this is a

17  spiny issue and I don't want to decide it.  If it's to be

18  decided under section 202, what section 202 provides is for

19  the Board to decide, which takes me to the reiterated

20  assertions by Mr. Friedman, to the effect that what the

21  legislature is trying to do here is to have veto power over

22  the Board and tell the Board how to spend money.

23          The Board is not trying to spend any money.  The only

24  person who wants to spend money is the Governor and the

25  executive branch of defendants.  As a matter of fact, if one

1   thing is crystal clear from what we just heard from the Board,

2   it is that the Board has authorized no reassignment.

3        Therefore, the Board has not stated, has not held,

4   has not suggested that Law 167 is to be funded.  It merely has

5   stated, without any legal basis -- and the Court asked

6   specifically, and they cited to language in 204(c), but we

7   don't see where it says that the Oversight Board may resort --

8   or leave the matter to be resolved under Puerto Rico law.

9        As a matter of fact, neither section 202 or section

10  204 make reference to state law as being a supplementary

11  authority, to supplement PROMESA with regards to budget.

12  Preemption is complete and absolute.  202 says how we draft

13  the budget, and 204(c) tells us how we may amend or

14  restructure that budget.  That is it.

15       This is not a matter of state law.  As a matter of

16  fact, what good would PROMESA be if a budget was prepared

17  under PROMESA, but amended under Puerto Rico law?  It doesn't

18  make any sense.  And the fallback argument, the only argument

19  that the defendants -- that the government defendants attempt

20  to present is that section 402 allows us to skip 202 and to

21  skip 204(c).

22       And they say that we are not appearing and we have

23  not responded to their argument regarding rules of statutory

24  construction.  Well, we have relied on the most basic and the

25  first rule of statutory construction that is to be applied

1   when reading a statute, and that is the plain language.  That

2   is the rule that says that Congress means what it says. And

3   when Congress chooses words, those words are to be interpreted

4   within the usual and common meaning of those words.

5        And they hinge on the word -- the word "including" as

6   though it was dispositive, or as if because it says including,

7   by conducting the plebiscite as authorized by Public Law

8   113-76, that meant that plebiscites were one of the things,

9   and indeed, they are one of the things that -- they're the

10  major focus of 402.  It is the only thing that is mentioned by

11  the Committee that went over the bill, that heard public

12  hearings on this bill, that received amendments to this bill.

13       And when they render the report and they want to tell

14  us what section 402 is about, the only thing that they say is

15  this section maintains the right for Puerto Rico to conduct a

16  plebiscite to determine its future political status.  402

17  could apply, for instance, if in this budget, and this is the

18  very problem that 167 has, it was approved after the budget

19  was running.  It had no money.

20       If legislation is enacted for some procedure, let's

21  say a plebiscite, an assembly to decide status, and the

22  Governor requests and the legislature makes a request of 20

23  million dollars to fund that event, then 402 -- under 402, the

24  Board could not say, well, that's too much money.  That's too

25  much money, and that's not as important as other things.  I'm

1   not going to give you the money that is necessary to carry out

2   that event.

3          And if defendants want to hang in work sites, we

4   believe that -- as a matter of fact, the "including" there is

5   because Congress wanted to make sure that this includes an

6   allotment that was made in the Omnibus Budget Bill of 2014, in

7   which 2.5 million dollars were set aside for an education

8   campaign on a plebiscite, so long as the Attorney General of

9   the United States approved the formulas in the plebiscite,

10  which has been attempted twice as a matter of fact.  And those

11  funds have not been released.

12         So it's not referring to just any plebiscite, but

13  it's referring to Puerto Rico -- the word including is merely

14  there to link to the possibility of gaining access to those

15  funds.  But we believe that it is more important to see the

16  verb that is used here, shall not "be interpreted to restrict.

17  Restrict Puerto Rico's rights to determine its future

18  political status."

19         I know Mr. Friedman does not live in Puerto Rico,

20  but even then, this is not something that the people of Puerto

21  Rico are going to engage in an exercise of deciding their

22  future political status.  The people in Puerto Rico who

23  support statehood are going to elect, they're going to --

24  they're going not to vote on political status.  They're going

25  to vote on people who are going to go as lobbyists, as paid

1    lobbyists to Congress to lobby for statehood.

2           So if those lobbyists are not elected, is Puerto

3    Rico's right to determine its future political status

4    restricted?  Of course it is not restricted.  That is not a

5    restriction of Puerto Rico's rights.  And if that doesn't

6    happen, the consequence of that not happening would have been

7    that that plebiscite was not funded in the budget, and that

8    the procedure to find the monies within the budget as it

9    exists, as it was enacted and approved by the Board, was not

10   carried out pursuant to PROMESA.

11          So, again, I believe that the most important public

12   interest consideration in this case is that if indeed the

13   injunction is denied, and the precedent is set, that the Board

14   may simply decide to turn off PROMESA.  And as we point out in

15   our reply brief, under PROMESA, the Board has the ministerial

16   duty to make sure that the statute's purposes are carried out.

17   But if it decides that when things get politically

18   complicated, and they may very well get very politically

19   complicated in the next four years, because we have a split --

20          (Sound played.)

21          MR. MARTINEZ LUCIANO: -- a political split in the

22   legislature, and the executive branch then it merely turns off

23   PROMESA, and it becomes a matter of Puerto Rico law.  And you

24   would have two competing systems.  You would have a system

25   that is -- and we should not forget that this is a debtor in a

1   federal bankruptcy proceeding.  Okay.  So deciding the rights

2   of a debtor in a bankruptcy proceeding in state court is not

3   something that I've ever seen, but this is what they're

4   suggesting.

5          If, by merely invoking political status with no

6   support in the legislative record -- as a matter of fact, the

7   legislative record refuses what they're proposing -- then

8   anything can be done.  And where is the line to be drawn?

9          So we believe that the legislature has a role.

10  Congress put the legislature into 204(c), and it has a role, a

11  definite role there.  If a readjustment is carried out without

12  the legislature exercising that role, then PROMESA has not

13  been complied with and defendants -- and plaintiff would have

14  suffered an irreparable injury.

15         It simply would be a matter of the Governor

16  proposing something that is controversial, creating an impact

17  with the legislature, and then having the Board keep their

18  hands out.  And since the Governor controls the budget,

19  although there are some arguments under Puerto Rico law to be

20  made, but they're not relevant, because there is preemption.

21  And, as a matter of fact, that's why complete preemption under

22  PROMESA is so wise, because it avoids having a dual system in

23  which you have to provide -- to have different standards for

24  different -- under federal law and under Puerto Rico law.

25         And you would have a budget that is interpreted

1   under PROMESA, but the Court has a process --

2           (Sound played.)

3           MR. MARTINEZ LUCIANO:  So thanks for hearing our

4   arguments on this.

5           THE COURT:  Thank you very much, Mr. Martinez

6   Luciano.

7           I'm sorry.  Did someone else wish to speak?

8           (No response.)

9           THE COURT:  All right.  I am going to make a ruling,

10  and I ask your patience for a short period while I make sure

11  of my thoughts here.  So we'll just all stay quiet for a

12  moment.

13          Thank you all for your patience.  I am making this

14  ruling orally in light of the time sensitivity here.

15          Before the Court is the Motion to Request the

16  Issuance of a Temporary Restraining Order, and in the

17  Alternative, for Preliminary Injunctive Relief by the

18  Honorable Rafael Hernandez Montanez in his capacity as Speaker

19  of the Puerto Rico House of Representatives (Docket Entry No.

20  3 in Adversary Proceeding No. 21-42, the "Motion").

21          The plaintiff in this action seeks through the Motion

22  an order enjoining the expenditure of funds allocated by the

23  Governor to fund a May 16th, 2021, special election to elect

24  a paid six member delegation to Congress.  He also seeks an

25  order, ["providing a final resolution of the substantive

1    questions before the Court" (Motion at 12),] which he

2    characterizes as whether section 204(c) of PROMESA, which is

3    the Puerto Rico Oversight Management and Economic Stability

4    Act, 48 U.S.C. § 2101 et al., completely preempts Puerto Rico

5    law on the matter of budgetary adjustments, whether the

6    Financial Oversight and Management Board for Puerto Rico (the

7    "Oversight Board") lacks discretion to exempt any budgetary

8    expense from PROMESA, and whether section 402 of PROMESA is

9    simply a rule of statutory construction and does not create

10   privileged expenditures that are exempted from PROMESA.

11          The Court has reviewed the relevant pleadings with

12   care and listened to the arguments today carefully.  The Court

13   now makes its oral ruling as to the Motion, and reserves the

14   right to make non-substantive corrections in the transcript of

15   this ruling.

16          This ruling constitutes the Court's findings of fact

17   and conclusions of law pursuant to Rules 7052 and 7065 of the

18   Federal Rules of Bankruptcy Procedure.  Any finding that is a

19   conclusion of law is deemed a conclusion of law, and anything

20   characterized as a conclusion of law that is a finding of fact

21   is a finding of fact.

22          The Court has jurisdiction pursuant to 28 U.S.C. §

23   1331 and 48 U.S.C. § 2166.

24          The Court makes the following findings of fact.

25   Following a November 3rd, 2020, plebiscite, which I'll refer

1    to as the 2020 Plebiscite, in which a majority of the people

2    of Puerto Rico voted in favor of admission of Puerto Rico as a

3    state of the United States, the Legislature on December 30th,

4    2020, just as the New Progressive Party was transitioning out

5    as the majority party, enacted Law 167-2020, which I'll refer

6    to as Law 167, to provide for a May 16th, 2021, special

7    election of a paid six member delegation to go to Washington,

8    D.C., to lobby for Puerto Rico's statehood.

9            On January 15th, 2021, Governor Pedro

10   Pierluisi-Urrutia (the "Governor") and the Puerto Rico Fiscal

11   Agency and Financial Advisory Authority (AAFAF), submitted a

12   compliance certification for Law 167 under PROMESA section

13   204(a), estimating the law's impact on expenditures,

14   certifying that it was not significantly inconsistent with the

15   Commonwealth's Fiscal Plan, and asserting that Act 167 is an

16   exercise of self-determination of the people of Puerto Rico,

17   as permitted by section 402 of PROMESA.  The Oversight Board

18   did not respond to that certification.

19           On February 3rd, 2021, AAFAF and the Puerto Rico

20   Office of Management and Budget [(the "OMB")], on behalf of

21   the State Elections Commission, submitted a reprogramming

22   request to the Oversight Board for the approval of certain

23   funds to fund the special election.  On February 15th, the

24   chairman of the State Elections Commission notified the public

25   that the special election would occur on May 16th, 2021, as

1  set forth in Law 167.

2        On March 5th, 2021, plaintiff wrote to the Oversight

3  Board urging it to deny the OMB reprogramming request.  The

4  Oversight Board declined in a letter dated March 8th, 2021, to

5  do so, and instead, "encourage[d] the Governor and the

6  Legislature to work together collaboratively, if possible,

7  concerning the funding of Act 167-2020," (Docket Entry No.

8  18-7).

9        After subsequent correspondence, the Oversight Board

10  indicated that its decision to defer action does not restrict

11  Puerto Rico's right to determine its future political status.

12  On March 23rd, 2021, the Oversight Board wrote to the

13  Governor, the President of the Senate, and the Speaker of the

14  House to establish a schedule for potentially amending the

15  certified budget under PROMESA section 202.  On March 26th,

16  2021, the Governor submitted a proposed revised budget to

17  cover the cost of Law 167.

18        On March 31st, 2021, the Oversight Board issued a

19  resolution in which it determined in its sole discretion that

20  the proposed revised budget is a compliant budget as required

21  by PROMESA section 202(c)(1), and approved the proposed

22  revised budget.  It then submitted the proposed revised budget

23  to the Legislature on April 1st, 2021, and that proposed

24  revised budget was defeated in the legislature.

25        On April 13th, 2021, the Oversight Board issued a

1    resolution recognizing an impasse between the Governor and the

2    legislature concerning reprogramming to fund the special

3    election provided under Law 167, and stated that PROMESA

4    section 402 constrained it from interpreting PROMESA in a

5    manner that would allow it to interfere in the dispute; that

6    characterizing a decision one way or another would relate to

7    issues regarding Puerto Rico's future political status; that

8    the original Commonwealth budget would remain in effect

9    without revision; and that the Board desired to allow the

10   Commonwealth Government to adopt or not adopt the proposed

11   revised budget, the same as would occur absent PROMESA.

12        As I said, the House of Representatives voted down

13   the reprogramming request, and notified the Oversight Board of

14   that decision.

15        The Governor thereafter invoked Law 2-2017 and

16   authority granted to AAFAF therein to reallocate budgetary

17   items.  On April 16th, AAFAF informed the Oversight Board that

18   the Governor had authorized the disbursement of certain funds

19   to fund the special election required by Law 167.

20        In its briefing here, (Docket Entry No. 16 at 2), the

21   Oversight Board represents that it interprets PROMESA section

22   402 to bar the use of PROMESA to make the funding decision, at

23   least where neither funding nor not funding materially impacts

24   the Commonwealth Certified Fiscal Plan; that the Oversight

25   Board wished to leave it to the Speaker of the House and the

1    Governor to agree or litigate who was correct; and that if the

2    Governor would have the power to reprogram under Puerto Rico

3    law, the Oversight Board will approve the reprogramming, but

4    if not, the Oversight Board will not approve it.

5         Plaintiff filed the Complaint in this action on April

6    21st, 2021. (Docket Entry No. 1, the "Complaint").  The

7    plaintiff asserts, among other things, that PROMESA section

8    204(c)(2) ensures that only the legislature has the

9    prerogative to adopt the reprogramming that is already

10   approved by the Oversight Board. (Compl. 4.24.)  The plaintiff

11   claims that the Legislature suffers injury insofar as the

12   Oversight Board's determination and the executive branch

13   actions have denied the Legislature a role that PROMESA

14   delegates to the Legislature under section 204(c) of PROMESA.

15        Turning to the applicable legal principles, the First

16   Circuit laid out the applicable standard for injunctive relief

17   in *Corporate Technologies, Inc., v. Harnett*, 731 F.3d 6, 9

18   (1st Cir. 2013), as follows:  "[i]n determining whether to

19   grant a preliminary injunction, the district court must

20   consider: (i) the movant's likelihood of success on the merits

21   of its claims; (ii) whether and to what extent the movant will

22   suffer irreparable harm if the injunction is withheld; (iii)

23   the balance of hardships as between the parties; and (iv) the

24   effect, if any, that an injunction (or the withholding of one)

25   may have on the public interest."

1           The threshold question before this Court that is key

2     to the determination of the first two factors, namely, the

3     likelihood of success question and the irreparable harm

4     question, is whether PROMESA imposed on the Legislature or

5     granted to the Legislature the ultimate and final power to

6     determine whether a reprogramming can be implemented.  If

7     PROMESA does not grant the Legislature that power, plaintiff

8     is unlikely to succeed on the Legislature's claim that the

9     Governor's expenditure that is at issue is in violation of

10    section 204(c) of PROMESA.  The plaintiff will also be unable,

11    in his capacity as representative of the Legislature, to

12    demonstrate that the Legislature will suffer irreparable harm

13    by reason of the reprogramming actions here.

14          If the plaintiff cannot establish that the

15    legislature has any such right conferred by section 204(c), he

16    will not be able to show that the Oversight Board's actions

17    constituted a violation of that right, let alone that the

18    Legislature suffered any harm by way of a violation of that

19    right, which, under this hypothesis, would not exist.

20          Indeed, the Court concludes that no such power or

21    right of the Legislature is discernible from the plain

22    language of section 204(c).  Section 204(c)(2) states that,

23    "[t]he Legislature shall not adopt a reprogramming, and no

24    officer or employee of the territorial government may carry

25    out any reprogramming, until the Oversight Board has provided

1   the Legislature with an analysis that certifies such

2   reprogramming will not be inconsistent with the Fiscal Plan

3   and Budget."  48 U.S.C. § 2144(c)(2).

4          By its terms, Section 204(c)(2) serves to prevent

5   both the Legislature and the executive branch from

6   implementing any reprogrammings in the absence of Oversight

7   Board certification that such reprogramming is not

8   inconsistent with the Fiscal Plan or the Budget.  In other

9   words, it is prohibitive of certain legislative actions, but

10  it does not cause a positive grant of exclusive power to the

11  Legislature.

12         Moreover, plaintiff thus fails to show that the

13  Legislature has an interest that is being invaded by the

14  Oversight Board's decision.  To the extent the plaintiff is

15  questioning the Oversight Board's interpretation and

16  application of section 402 of PROMESA, this would appear to be

17  an attempt to control or supervise the Oversight Board's work

18  in interpreting the statute, and would appear to run afoul of

19  section 108(a)(1), which prohibits the Governor and the

20  Legislature from attempting to "exercise any control,

21  supervision, oversight, or review over the Oversight Board or

22  its activities."  48 U.S.C. § 2128.

23         Thus, the Court finds that the plaintiff has failed

24  to show a likelihood of success on the merits of his claim

25  that a right granted to the Legislature by section 204(c) of

1    PROMESA has been invaded.  This also vitiates his ability to

2    show that the Legislature will suffer irreparable harm by

3    means of violation of that alleged right under section 204(c)

4    of PROMESA.

5          Plaintiff has also failed to show that he is likely

6    to prevail on the merits of his contentions regarding the

7    particulars of the propriety of the actions taken or actions

8    refrained from by the Oversight Board.

9          Accordingly, the Court denies the plaintiff's motion

10   in its entirety.  The Court will enter an appropriate order,

11   and the case will be referred for general pretrial management

12   to Magistrate Judge Judith Gail Dein.

13         Thank you all.  That concludes the Court's oral

14   decision.

15         Is there anything further, Counsel, that we need to

16   take up together this morning?

17         (No response.)

18         THE COURT:  Hearing no further comments, this

19   concludes the Hearing Agenda for this Omnibus Hearing.  The

20   next scheduled hearing is the May 18th, 2021, hearing

21   concerning the preliminary injunction motion filed in

22   Adversary Proceeding No. 21-00041.  That hearing, which is

23   telephonic, will begin at 9:30 AM Atlantic Standard Time on

24   May 18th, 2021.

25         As always, I thank the court staff in Puerto Rico,

1    New York, and Boston for their work in preparing for and

2    conducting yesterday's and today's hearing, and their ongoing

3    splendid support of the administration of these very complex

4    cases under very challenging circumstances.

5            Stay safe and keep well, everyone.  We are adjourned.

6            (At 12:56 PM, proceedings concluded.)

7                        *      *      *

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   U.S. DISTRICT COURT    )

2   DISTRICT OF PUERTO RICO)

3

4       I certify that this transcript consisting of 104 pages is

5   a true and accurate transcription to the best of my ability of

6   the proceedings in this case before the Honorable United

7   States District Court Judge Laura Taylor Swain, and the

8   Honorable United States Magistrate Judge Judith Gail Dein on

9   April 29, 2021.

10

11

12

13  S/ Amy Walker

14  Amy Walker, CSR 3799

15  Official Court Reporter

16

17

18

19

20

21

22

23

24

25

< Dates >
167 may 88:4
2007, December 28,
  2007 35:21
April 13 84:23,
  86:11
April 13, 2021
  55:25, 56:25
April 14 84:17
April 14th 57:24
April 16 81:23,
  84:25, 85:22
April 16, 2021 57:22
April 16th 65:14,
  82:3, 86:3, 98:17
April 1st, 2021
  97:23
April 21st, 2021
  99:5
April 29, 2021 1:16,
  7:2, 104:9
December 19, 2006
  41:11
December 2007 43:17
December 28 42:11
December 28th, 2007
  45:1, 45:22
December 30, 2020
  55:13
December 3rd, 2020
  43:2, 43:5, 44:5
February 15th 96:23
February 28, 2006
  23:15
February 3 83:19
February 3rd, 2021
  96:19
January 1, 2007
  17:4, 41:12
January 15th, 2021
  96:9
January 1st, 2007
  11:6
January 26, 2006
  23:20
January 27th 83:14
March 11 86:15
March 12, 2021 44:9
March 2006, seven
  24:6

March 23rd, 2021
  97:12
March 26, 2021 56:3
March 26th, 2021
  97:15
March 31st, 2021
  97:18
March 5th 83:21
March 5th, 2021 97:2
March 8th, 2021 97:4
May 16, 2021 55:19
May 16th, 2021
  94:23, 96:6, 96:25
May 18th, 2021
  102:20, 102:24
November 16th 60:8
November 2020 63:8
November 22nd, 2005
  23:19
November 3rd 59:22
November 3rd, 2020
  62:22, 95:25
October, october 27,
  2005 32:11
one) may 99:24


< 1 >
1 25:19, 99:6
1.85 56:7, 58:7
100. 56:12
1003 51:7
104 104:4
108 73:4, 76:25
108(a)(1 101:19
108. 76:14
10:58 53:2
11 49:3, 52:24,
  83:15
1107 33:17
113-76 90:8
116 25:23
11:00 52:25
11:18 53:3
12 12:14, 17:19,
  18:9, 86:16
12) 95:1
1257 28:17, 31:3,
  48:5, 51:21
1258 28:17, 48:6

1258. 31:4, 51:22
12:56 103:6
13 34:10, 36:19,
  50:16
1331 95:23
135 43:6
13th 57:25, 84:15,
  85:20, 87:18,
  88:2, 97:25
14 10:24, 12:18,
  13:1, 72:11
15 14:16, 33:10,
  72:11, 79:22
155.42 36:17, 37:3
155.42. 37:2
16 14:17, 98:20
16. 33:10
16615 8:23
167 60:3, 60:4,
  60:19, 62:20,
  70:14, 71:9,
  71:18, 71:22,
  72:16, 72:24,
  73:9, 73:10,
  73:15, 80:14,
  80:17, 83:4,
  83:20, 83:23,
  84:21, 88:5, 88:7,
  89:4, 90:18, 96:6,
  96:12, 96:15, 98:3
167-2020 96:5, 97:7
167-2020. 58:8
167. 76:24, 83:17,
  86:13, 97:1,
  97:17, 98:19
17 19:14, 22:13
17-3283 8:24
17-BK-3283(LTS 1:6,
  2:7, 2:24, 3:7,
  3:24, 4:7
17-BK-4780(LTS 1:23
172 40:3
18 10:23, 57:22
18-7). 97:8
180 51:7
1807 48:20
19 10:24
19-453 7:20
19-AP-00453(LTS 2:5
1967 59:23

1983 77:12
1st 99:18


< 2 >
2 36:25, 47:22,
  66:5, 74:2
2) 98:20
2-2017 98:15
2.5 91:7
20 68:11, 90:22
20-AP-00003(LTS 2:22
20-AP-00004(LTS 3:5
20-AP-00005(LTS 3:22
2004 33:17, 37:8,
  43:5, 43:13, 46:1
2005 32:8
2006 10:25, 40:23,
  41:2
2007 35:21, 42:8
2007. 30:22, 36:15
2009 44:25, 46:1,
  51:16, 51:20
2009. 43:13, 51:18
2011. 51:7
2012 51:17, 51:23
2013) 99:18
2014 91:6
2017 61:3
2017-3283 7:12
202 54:8, 54:25,
  56:15, 56:19,
  61:25, 62:2,
  63:17, 67:4,
  67:21, 72:14,
  73:3, 74:13,
  74:19, 76:13,
  85:13, 88:3,
  88:11, 88:18,
  89:9, 89:12, 89:20
202(c 85:13
202(c)(1 97:21
202(f 64:9, 88:15
202. 54:23, 56:14,
  97:15
2020 83:9, 96:1,
  96:4
2020-2021 54:11
2020. 43:5, 49:18,
  62:24

2021 85:12, 97:25
203 76:14
204 56:18, 56:20,
  67:4, 73:4, 74:13,
  74:19, 76:13,
  89:10
204(a 96:13
204(c 54:9, 54:13,
  56:14, 57:12,
  58:16, 63:18,
  64:12, 66:2, 67:7,
  75:5, 75:6, 80:18,
  84:19, 85:17,
  88:13, 89:6,
  89:13, 89:21,
  93:10, 95:2,
  99:14, 100:10,
  100:15, 100:22,
  101:25, 102:3
204(c)(1 66:2
204(c)(2 99:8,
  100:22, 101:4
206 18:3
20th 30:22, 36:15
21 14:16, 15:8,
  84:16
21-00041. 102:22
21-00042. 53:11
21-042. 7:21
21-42 94:20
21-AP-00042(LTS 4:5
21. 41:4
2100042. 52:20
2101 95:4
211 18:3
2128. 101:22
2144(c)(2 101:3
2166. 95:23
22 15:8, 57:21, 64:1
22. 85:1, 86:2
23 21:1, 42:13
25 9:15, 21:1, 30:5,
  53:13, 53:21
27 22:4
27th 32:1
28 95:22
29 22:5, 44:18
2d 18:3

< 3 >
3 94:20
30 22:5, 26:12,
  29:17, 45:2, 45:6
303 74:2, 74:8
30th 65:6, 96:3
31-3 25:18
32 50:14
32. 36:14
33 37:9, 39:10
341 49:3
3737. 49:4
3799 104:14
38 25:24
39 21:21
3: 1:6, 1:23, 2:5,
  2:7, 2:22, 2:24,
  3:5, 3:7, 3:22,
  3:24, 4:5, 4:7


< 4 >
4 58:12, 70:9
4.24. 99:10
4.3 63:2
402. 63:12, 70:7,
  72:8, 75:17,
  76:25, 84:8, 90:10
403 61:2, 61:24
458. 13:4, 13:25,
  14:20, 15:7, 20:9,
  23:25, 26:5, 31:6,
  34:16, 34:18,
  35:8, 36:23,
  37:17, 38:19,
  42:3, 51:5, 51:25
48 95:4, 95:23,
  101:3, 101:22
4820 37:6, 37:9,
  38:4, 39:10


< 5 >
5 49:3
51-2020 62:24
56. 25:19
58. 31:1


< 6 >

6 12:21, 99:17
66 44:18

< 7 >
7 41:12
70 52:22
7052 95:17
7065 95:17
731 99:17
75 72:20

< 8 >
8 10:24
825. 40:3
832. 40:4, 40:10
88 28:13

< 9 >
9 99:17
928 19:15, 33:21
928(a 33:2
928(b 14:10, 14:25,
   37:13
928(c 16:10, 16:12,
   16:15, 16:24,
   18:14, 18:23,
   19:4, 26:5, 26:8,
   27:6, 27:7, 28:1,
   28:6, 28:7, 28:8
928(f 23:23
928. 19:13
9:30 102:23
9:44 7:3
["providing 94:25
[(the 96:20
[i]n 99:18
[t]he 100:23

< A >
AAFAF 53:22, 57:23,
   68:10, 81:23,
   84:25, 85:22,
   85:25, 86:2,
   96:11, 96:19,
   98:16, 98:17
ability 70:6, 71:10,

102:1, 104:5
able 67:5, 100:16
above 14:14
absence 13:9, 101:6
absent 57:5, 98:11
absolute 73:25,
   89:12
absolutely 11:24
abundant 13:11
accept 82:6
access 47:11, 91:14
accessing 7:24
accident 28:11
accompanied 18:5
accomplish 46:19
according 86:4
Accordingly 102:9
accounts 11:16
accurate 8:18, 30:3,
   104:5
Act 58:8, 67:12,
   70:1, 70:14, 71:9,
   71:18, 71:22,
   72:16, 72:24,
   73:9, 73:15,
   76:24, 80:14,
   80:17, 83:16,
   83:20, 83:23,
   84:20, 86:13,
   95:4, 96:15, 97:7
acted 58:11
acting 88:11
action 10:2, 28:6,
   29:10, 51:17,
   51:20, 51:24,
   51:25, 52:1, 52:2,
   52:3, 64:7, 65:13,
   69:24, 80:18,
   84:4, 94:21,
   97:10, 99:5
actions 74:17,
   81:22, 99:13,
   100:13, 100:16,
   101:9, 102:7
activates 54:20
activities. 101:22
acts 74:8
actual 10:1, 32:3,
   37:1
actually 17:2, 19:6,

28:5, 28:24,
   40:17, 47:5,
   55:17, 74:4, 74:6,
   75:2
addition 27:8,
   39:16, 42:8
additional 25:6,
   30:1, 38:9, 48:3,
   48:7, 52:13, 60:1
address 9:20, 10:14,
   19:20, 23:9, 25:3,
   26:7, 26:14,
   28:18, 31:1,
   41:22, 45:25, 46:5
addressed 10:21,
   60:18, 71:15, 78:1
addresses 41:22
adds 20:6
adequately 11:14,
   48:6
adjourned 103:5
adjustments 76:9,
   95:5
Administered 1:11,
   1:28
administration 103:3
administrative 23:17
admission 25:22,
   43:1, 43:14, 44:2,
   44:14, 46:3, 96:2
admit 71:16
admits 9:25
admitted 43:7, 45:6,
   45:23, 61:6
admittedly 51:8
adopt 55:5, 55:8,
   57:4, 66:5, 67:1,
   75:9, 98:10, 99:9,
   100:23
adopted 56:1
Adopting 67:1
adopts 65:20, 68:7
advance 8:19, 51:4
advantage 13:19
adversarial 62:2
Adversary 7:20,
   8:15, 52:20,
   53:11, 94:20,
   102:22
adverse 42:22

Advisory 4:42, 96:11
advocate 60:6
affect 59:8
affected 26:10,
   26:23, 27:2,
   27:15, 27:17,
   27:18, 27:25
affirmative 9:21,
   66:18, 69:24
affords 38:11
aforementioned 33:20
afoul 101:18
Africa 11:11
afternoon 53:6,
   79:24, 80:2
Agency 4:41, 96:11
Agenda 8:12, 8:23,
   9:13, 53:9, 102:19
Aggravated 37:14,
   37:19, 37:20,
   37:24, 38:17,
   39:6, 39:7, 47:21,
   50:8, 50:23
ago 43:2
agree 19:18, 72:4,
   99:1
agreed 45:18
Agreement 15:11,
   36:13, 36:15,
   36:18, 41:3, 43:8,
   44:3, 44:11,
   44:18, 47:17,
   47:18, 49:17,
   50:2, 50:4, 50:15
ahead 45:24
air 88:8
Airlines 21:21
al 1:16, 2:14, 2:31,
   3:14, 3:31, 4:13,
   4:33, 7:14, 53:11,
   95:4
alert 9:4
Alex 24:23, 48:2
Alexander 5:7
alleged 25:21,
   47:17, 47:18,
   102:3
allocated 94:22
allocation 9:8
allocations 26:17

allotment 91:6
allotted 8:21,
   29:17, 53:13,
   79:22
allow 57:4, 63:13,
   72:5, 81:5, 98:5,
   98:9
allowed 59:25
allowing 34:19,
   57:10, 81:20
allows 59:4, 64:9,
   89:20
alluded 29:10
almost 40:23, 55:12,
   78:25
alone 12:2, 26:18,
   27:11, 100:17
already 20:7, 34:21,
   42:6, 45:23,
   64:19, 99:9
alter 10:16, 11:13,
   12:10, 12:22,
   13:23, 19:20,
   19:21, 30:19,
   31:2, 32:16, 33:4,
   35:2, 36:5, 39:14,
   39:17, 39:20,
   40:12, 40:17,
   42:25, 43:20,
   43:24, 46:17,
   46:21, 46:24, 47:5
Alternative 94:17
Although 13:9, 17:2,
   88:3, 93:19
Ambac 2:30, 3:13,
   3:30
amend 54:6, 64:3,
   67:20, 67:21,
   89:13
Amended 58:17, 62:3,
   63:16, 68:4,
   85:11, 89:17
amending 63:19,
   97:14
amendment 61:13,
   64:18, 65:5, 67:9,
   85:19
amendments 65:20,
   68:5, 70:2, 90:12
America 7:11, 23:18

Americas 11:1, 11:8
Among 86:14, 99:7
amount 73:6
Amy 104:13, 104:14
analogous 37:6
analysis 15:13,
   66:4, 67:10,
   67:11, 67:15,
   101:1
analyzed 67:13
analyzes 68:6
answer 10:18, 13:25,
   15:18, 19:23,
   54:9, 65:25,
   70:13, 71:11,
   72:10, 81:12
answers 14:9, 35:6
anticipate 29:25
apologies 16:20,
   20:2, 45:15, 50:14
apologize 8:19,
   20:1, 43:25, 44:5
App 33:17
appeal 29:5, 83:23
Appeals 33:15
appear 66:24, 83:4,
   101:16, 101:18
APPEARANCES 4:28,
   5:3
appeared 18:18,
   78:14
APPEARING 4:30,
   79:25, 89:22
appears 19:18, 23:14
appellant 33:25,
   34:5
Appendix 36:25,
   44:9, 47:22, 49:3
appends 36:24
applicable 20:19,
   99:15, 99:16
application 70:12,
   72:14, 101:16
applied 19:15, 89:25
applies 14:19,
   16:10, 16:15,
   16:25, 30:18,
   32:15, 32:17,
   32:22, 33:6,
   33:18, 35:1,

46:22, 47:13,
48:14, 48:18,
82:11, 82:14
apply 14:13, 14:21,
15:4, 15:5, 20:20,
32:16, 48:19,
48:20, 62:6,
70:13, 76:19,
90:17
applying 38:10
appreciate 68:21
approach 14:18,
14:19, 14:21,
14:22, 15:5, 15:6,
38:6, 38:8, 38:11,
38:14
appropriate 49:24,
51:19, 52:13,
73:6, 74:22, 76:6,
102:10
appropriately 74:11,
74:14
appropriation 15:11,
37:7, 39:11
approval 96:22
approve 56:16,
61:23, 64:10,
70:2, 75:9, 75:23,
81:1, 81:17, 99:3,
99:4
approved 11:1, 17:5,
54:7, 54:11,
55:12, 56:12,
67:20, 84:20,
87:4, 90:18, 91:9,
92:9, 97:21, 99:10
approving 76:2
approximately 36:19,
43:13, 58:7
April 7:18, 32:1,
57:25, 84:14,
85:20, 87:17,
88:2, 97:25
aptly 54:14
argue 38:14, 64:6
argued 26:11, 33:6,
47:22, 74:16
Argues 12:22, 14:21,
14:22, 18:14,
32:22, 38:7, 74:4

arguing 29:5, 48:16,
75:6
arguments 7:19,
16:14, 16:24,
52:8, 63:23,
64:17, 93:19,
94:4, 95:12
arm 11:19
around 82:13
Article 22:4, 22:5,
33:21, 48:20,
49:3, 63:2
Articles 28:17, 31:3
articulate 72:11,
81:9
Asia 11:11
aside 24:15, 53:19,
63:14, 91:7
asks 15:2
aspect 84:7
aspects 32:3
assembly 55:14,
90:21
asserted 83:22,
86:7, 86:21
asserting 96:15
assertion 11:25,
59:7
assertions 88:20
asserts 99:7
assess 54:21
assessed 56:5
assets 11:7, 12:7,
13:19, 41:16
assign 60:1
assigned 17:4, 59:24
assignee 18:6
assigning 41:15
assignment 17:5,
17:6, 17:11,
17:21, 17:22,
17:24, 18:1, 18:4
assignor 18:5
associate 9:19
associated 42:19
Assurance 2:30,
3:13, 3:30
AT&T 52:23
Atlantic 102:23
attach 13:19

attached 44:17
attempt 42:9, 89:19,
101:17
attempted 91:10
attempting 54:11,
101:20
attempts 13:17
attested 78:17
Attorney 32:6, 41:5,
43:14, 50:13, 91:8
audit 13:16
Aut 33:16
author 60:24
authored 61:13
Authority 1:33,
4:42, 38:10,
56:20, 57:10,
58:15, 61:4,
66:11, 67:12,
75:8, 75:9, 80:13,
80:16, 82:2,
83:24, 86:7,
86:12, 86:15,
86:17, 86:18,
86:22, 89:11,
96:11, 98:16
authorization 58:19,
64:3, 86:1
authorized 41:21,
58:7, 81:22, 89:2,
90:7, 98:18
automatic 16:9,
16:10, 50:25
automatically 18:7,
30:23, 32:21, 42:5
Autoridad 2:5
available 8:24,
28:1, 28:23, 49:7,
51:21, 52:5
avoid 22:18, 30:16,
33:13, 41:1, 42:15
avoiding 84:4
avoids 93:22
awarded 19:17,
19:18, 33:8, 34:10
aware 32:9, 37:23,
39:8
away 8:22, 78:9
awesome 74:20

< B >
back 9:11, 16:22,
   18:20, 29:25,
   30:1, 49:13,
   56:13, 61:18,
   63:23, 75:4,
   75:12, 81:6, 85:3,
   87:17
background 22:16,
   84:9
balance 65:18,
   69:12, 78:14,
   84:7, 99:23
ball 88:8
ballots 63:7
bank 11:15
Bankruptcy 7:12,
   8:24, 59:13, 93:1,
   93:2, 95:18
bar 98:22
bargain 9:25
Barranquitas 40:3
barred 15:20
Based 10:3, 10:12,
   15:17, 16:8,
   17:25, 18:12,
   18:13, 19:23,
   20:7, 20:19,
   21:13, 21:18,
   22:22, 33:8,
   41:16, 43:19,
   43:22, 81:21, 82:6
bases 26:3
basic 38:24, 80:5,
   89:24
basis 22:15, 24:3,
   24:15, 24:16,
   27:1, 33:1, 57:19,
   86:7, 89:5
Basketball 77:10
baton 47:24
bears 86:10
beater 77:18
beaters 77:11
becomes 40:22,
   71:23, 92:23
beforehand 49:19
began 11:6, 32:12,
   40:25

begin 9:13, 9:15,
   53:12, 102:23
beginning 52:21
begins 40:24, 66:2
behalf 9:16, 24:24,
   69:4, 79:22,
   79:25, 82:20,
   96:20
behavior 12:22
believe 30:12,
   33:11, 35:1, 36:2,
   37:15, 38:6,
   38:18, 38:20,
   40:19, 43:23,
   46:4, 50:5, 50:7,
   50:25, 51:16,
   54:23, 69:12,
   75:19, 76:23,
   82:11, 87:4, 91:4,
   91:15, 92:11, 93:9
believed 23:7, 25:3,
   84:6, 86:11
believes 46:6,
   82:13, 86:23,
   86:25, 87:7
belong 51:14
belonging 37:11
benefit 9:25
benefits 13:17,
   25:16
benign 48:10, 48:13,
   48:18, 48:21
besides 25:4
best 43:1, 79:12,
   81:9, 104:5
beyond 8:21
bidding 47:11
Bienenstock 4:33
Bill 60:24, 61:11,
   90:11, 90:12, 91:6
billing 27:24
binder 83:18, 83:21,
   84:3, 84:16
Bishop 60:14
bit 10:8, 82:12
bizarre 48:15
blanket 81:6
Board" 95:7
body 67:2
bootstrapped 62:21

Boston 103:1
branch 11:2, 11:8,
   13:17, 13:20,
   17:3, 31:7, 41:7,
   41:13, 41:24,
   54:12, 58:20,
   64:5, 69:4, 82:21,
   83:1, 84:14,
   84:24, 85:18,
   86:6, 86:12,
   86:14, 86:16,
   86:18, 86:21,
   86:25, 88:25,
   92:22, 99:12,
   101:5
branches 57:18
brand 31:18
Brazil 43:4
breach 10:2
break 9:10, 52:21
breaking 8:19
Brian 4:34
bribed 50:10
bribery 32:6, 32:12,
   42:4
bribes 36:22, 50:17
brief 8:13, 10:24,
   14:16, 15:8,
   16:14, 16:24,
   17:19, 18:10,
   19:15, 26:22,
   28:18, 28:21,
   28:25, 29:4,
   29:11, 36:24,
   44:12, 44:14,
   45:11, 45:17,
   47:22, 48:6, 48:7,
   52:13, 60:12,
   69:15, 72:11,
   92:15
briefing 10:22,
   24:2, 58:25, 98:20
briefly 47:15
briefs 78:12
brings 19:8, 19:11
broad 70:20, 74:4
brought 57:8
Budget. 101:3
Budgetary 54:15,
   54:17, 76:8, 81:3,

95:5, 95:7, 98:16
budgets 63:15
burden 13:21, 20:21,
  22:9, 22:20, 23:1
business 11:2, 11:8,
  11:11, 11:18,
  12:5, 13:3, 13:14,
  22:17, 23:14,
  31:7, 31:11,
  31:13, 31:19,
  34:20, 41:18,
  41:19
businesses 11:4
but-for 20:14
buzz 9:5, 9:6
buzzer 77:11, 77:18
buzzer-beater 77:9,
  77:19, 88:8
Buzzer-beaters 77:17
buzzes 9:5, 9:9
bypass 34:23

< C >
c)(2 66:23
C. 5:8
calendar 52:18
call 7:5, 35:25,
  41:2, 55:16, 88:10
called 39:7, 40:1,
  41:18, 65:6
calling 8:9
calls 25:13
campaign 91:8
canceled 78:25, 79:8
canon 73:20
canons 69:9, 71:7
capacity 94:18,
  100:11
capitalized 11:7,
  11:14
care 95:12
carefully 56:5,
  95:12
Carolina 33:16, 34:9
carried 58:10, 66:6,
  92:10, 92:16,
  93:11
carry 13:21, 20:21,
  23:1, 66:15, 91:1,

100:24
carrying 81:20
CASCO 12:19, 12:23,
  12:24, 13:2, 40:1,
  40:2, 40:10,
  40:14, 46:21,
  46:23, 47:1, 47:12
cases 7:19, 14:13,
  21:20, 28:12,
  38:7, 71:6, 73:21,
  79:1, 79:9, 103:4
cast 62:20, 63:7,
  63:14
CAT 5:49
categorical 14:18,
  14:19, 14:21,
  15:5, 38:6, 38:8,
  38:11, 65:19
causation 48:23
cause 10:1, 28:6,
  29:9, 51:17,
  51:19, 51:24,
  52:1, 52:2, 52:3,
  64:7, 101:10
caused 74:8
causes 51:25
cc'd 67:16
ccording 58:4
ceased 45:21
cedes 56:20
centers 20:10
certain 8:14, 13:18,
  15:21, 31:12,
  42:18, 96:22,
  98:18, 101:9
certification 21:4,
  66:7, 66:13,
  66:17, 73:9,
  75:10, 96:12,
  96:18, 101:7
Certified 55:6,
  56:7, 65:21,
  67:13, 83:10,
  97:15, 98:24
certifies 68:6,
  101:1
certify 55:1, 64:20,
  70:4, 82:5, 85:3,
  85:11, 104:4
certifying 96:14

chairman 96:24
challenge 19:8
challenged 19:10
challenges 16:6,
  19:25
challenging 103:4
championship 77:12
chance 76:1
change 40:17, 47:5
changed 13:16, 79:8
changes 75:6
chapter 14:13
characterized 95:20
characterizes 95:2
characterizing 98:6
charging 43:3
Charles 77:13
chart 36:24
choice 10:21
chooses 90:3
chose 18:22
Christian 77:14
Cir 99:18
circle 75:4
Circuit 22:12,
  33:14, 46:15,
  59:3, 99:16
circular 27:4
circumstance 34:12
circumstances 10:20,
  34:5, 87:6, 103:4
circumvent 34:19,
  42:3
circumventing 40:13,
  40:18, 47:6
citation 57:9
cite 12:13, 17:17,
  38:8, 40:1, 49:16,
  60:12, 60:20, 64:8
cited 12:18, 18:9,
  22:12, 45:10,
  45:16, 46:21,
  71:6, 79:1, 79:8,
  89:6
cites 12:4, 12:20,
  21:21
Civil 28:17, 28:22,
  38:11, 48:5, 48:9,
  48:17, 48:22,
  49:7, 79:3, 79:7

claim 9:21, 10:12,
  16:8, 19:21, 20:3,
  20:4, 20:6, 20:8,
  20:10, 20:13,
  20:18, 21:12,
  21:18, 21:22,
  23:4, 24:3, 26:4,
  28:5, 28:20, 29:8,
  29:12, 100:8,
  101:24
claimed 21:9
claiming 12:22
claims 9:22, 10:4,
  12:8, 12:21, 14:2,
  17:1, 19:11,
  25:20, 25:25,
  29:6, 42:21,
  99:11, 99:21
clarity 8:11
class 12:17
classic 20:14
classical 59:20
clause 21:24, 70:9,
  70:11, 75:7
clauses 22:3, 22:4
clear 21:25, 37:15,
  40:21, 55:8,
  58:11, 64:2, 89:1
clearly 33:19, 55:4,
  59:11, 60:11,
  75:22
Clemente 34:1, 34:6
Clerk 8:25
close 10:19
Code 28:17, 28:22,
  37:7, 39:11, 48:5,
  48:8, 48:10,
  48:11, 48:12,
  48:13, 48:14,
  48:17, 48:20,
  48:21, 48:22,
  49:1, 49:8, 78:18
Coffee 17:18, 18:2
collaboratively 97:6
collectively 30:14
combined 70:3
comes 39:25
coming 41:1, 62:16
comment 66:21
comments 8:13, 30:7,

102:18
commercially 22:10
Commission 18:13,
  26:10, 27:15,
  27:19, 27:21,
  28:15, 96:21,
  96:24
Commissioner 60:21,
  63:3
commit 37:11
Committee 60:13,
  60:15, 90:11
common 29:6, 29:8,
  90:4
Commonwealth 1:15,
  4:32, 7:14, 57:4,
  83:15, 96:15,
  98:8, 98:10, 98:24
communication 58:3
companies 33:7,
  33:12, 40:13,
  43:16
Company 13:16,
  19:16, 33:25,
  35:23, 40:2,
  40:15, 40:17, 47:4
comparison 74:2
competing 92:24
Compl 99:10
Complaint 10:13,
  10:18, 16:6,
  19:11, 19:24,
  25:17, 25:18,
  25:25, 26:1, 28:7,
  28:19, 29:9,
  51:18, 51:20,
  51:23, 55:25, 99:5
Complaint" 99:6
complaints 10:5,
  15:19, 25:9, 51:16
complete 89:12,
  93:21
completely 14:25,
  58:12, 78:18, 95:4
complex 83:3, 103:3
compliance 56:3,
  96:12
compliant 55:2,
  55:7, 56:16,
  61:25, 64:21,

67:20, 85:12,
  97:20
complicated 92:18,
  92:19
complied 84:7, 93:13
complying 64:11
comprehensively 69:8
computer 7:25,
  24:22, 68:12,
  68:14
Conair 46:15
concede 23:21, 35:13
conception 73:22
concerning 30:14,
  84:14, 84:20,
  97:7, 98:2, 102:21
concerns 83:16,
  83:23
conclude 51:13, 73:1
concluded. 103:6
concludes 100:20,
  102:13, 102:19
conclusion 46:14,
  85:19, 95:19,
  95:20
conclusions 95:17
conclusive 11:20,
  27:20
conduct 12:24,
  14:23, 38:15,
  47:17, 47:18,
  48:21, 60:17,
  60:19, 61:4, 86:7,
  90:15
conducting 90:7,
  103:2
conduit 39:21
confer 52:12
conference 8:4
conferred 100:15
confirmation 46:5
confirmed 17:21
confused 39:23, 50:9
confusion 84:12
Congress 57:13,
  60:10, 60:11,
  60:23, 61:15,
  63:15, 67:14,
  68:2, 68:3, 70:21,
  71:14, 71:16,

90:2, 90:3, 91:5,
  92:1, 93:10, 94:24
congressional 55:15,
  72:16
connection 24:5,
  24:12, 32:6,
  35:12, 36:21,
  40:20, 47:19,
  52:13, 61:12
consequence 41:8,
  49:5, 92:6
consequences 41:1,
  79:5
consequent 18:5
consider 99:20
consideration 51:20,
  92:12
considerations 64:23
considered 39:20,
  60:24
considering 61:11
considers 14:23,
  38:14
consistent 8:3,
  61:22, 71:14,
  71:18, 73:6,
  73:10, 81:18
consisting 104:4
constituent 14:14,
  15:1
constitute 15:11,
  24:15, 33:4, 78:10
constituted 100:17
constitutes 17:24,
  95:16
Constitution 58:6,
  65:4, 71:15
constitutional 49:9,
  65:5
constitutive 38:21,
  38:23
constrained 98:4
construction 59:11,
  62:7, 89:24,
  89:25, 95:9
construed 59:8,
  62:8, 62:10
consumed 25:15
consumers 25:16
contact 41:21

contain 22:2
contemporaneous
  13:12
contend 30:19, 39:15
contending 17:10
content 76:18, 77:4
contention 70:18,
  88:12
contentions 43:15,
  64:5, 102:6
context 65:2, 76:2,
  78:1, 82:13
continue 42:25
Continued 5:3, 11:9,
  11:10, 50:5
contracting 15:17,
  15:20, 15:25,
  19:12, 20:12,
  34:16, 51:9
contractual 18:6,
  21:1, 21:3, 21:5
contrary 33:11,
  43:15, 64:20
control 44:15,
  44:16, 46:1, 46:3,
  46:13, 46:16,
  46:18, 50:5,
  82:24, 101:17,
  101:20
controlled 43:13,
  43:16
controls 93:18
controversial 57:11,
  57:19, 93:16
controversy 57:17
controvert 13:21,
  26:15
convicted 12:23,
  13:1, 14:6, 15:21,
  15:23, 16:5,
  16:11, 19:5, 19:6,
  19:7, 19:16,
  32:23, 32:24,
  33:18, 33:22,
  33:23, 34:2, 40:16
convictions 38:9
convinced 43:22
core 86:23, 87:1
corners 83:7
Corporacion 51:6

Corporate 10:20,
  11:15, 11:22,
  31:13, 32:3,
  35:18, 35:20,
  35:23, 40:5, 40:6,
  42:21, 42:23,
  45:4, 99:17
Corporation 2:31,
  3:14, 3:31, 16:3,
  16:12, 21:10,
  34:6, 34:8, 34:13,
  39:23, 47:4
corporations 15:21,
  19:15, 33:2, 34:19
correct 74:18, 99:1
correction 46:10
corrections 95:14
correspondence 97:9
cost 8:25, 55:20,
  79:15, 97:17
Counsel 7:16, 16:17,
  16:18, 28:12,
  30:11, 44:2,
  44:20, 44:23,
  52:8, 52:12,
  77:22, 87:14,
  102:15
Count 8:15, 10:12,
  16:6, 19:24,
  25:17, 25:18,
  26:1, 77:11, 77:17
counted 77:13
counterparties 13:18
counterparty 15:22,
  17:7, 21:5, 21:8,
  22:11
country 14:12, 23:18
Counts 10:4, 10:17,
  15:19, 19:10,
  25:25
County 23:18
course 25:15, 25:20,
  27:25, 61:22,
  78:4, 92:4
COURTROOM 7:7
courts 11:13, 14:18,
  22:15, 40:5
cover 70:15, 76:23,
  88:6, 97:17
covered 28:21,

37:13, 48:6, 54:7,
  58:17, 70:17
covers 54:16
create 8:18, 34:18,
  59:10, 73:17, 95:9
created 13:2, 32:1
creates 61:18
creating 33:13,
  34:20, 34:24,
  63:18, 93:16
creation 31:12
credit 11:16
creditors 13:18
crime 15:23, 26:11,
  27:15, 27:19,
  27:21, 28:1,
  28:15, 34:2, 34:7,
  34:14, 36:15,
  37:11, 40:10
crimes 14:14, 14:15,
  15:21, 37:13,
  40:16
criminal 38:9,
  38:10, 43:6
crisis 61:8
critical 83:11
cross-motions 9:14
crude 36:21
cryptically 63:20
crystal 89:1
CSR 104:14
culminated 85:20
current 87:5
customer 41:10
cutting 78:22

< D >
d/b/a 31:11
DA 12:1, 23:18,
  40:23
Dale 4:37, 29:16,
  29:18, 29:19,
  29:22, 30:3, 30:6,
  31:17, 31:24,
  35:10, 35:17,
  36:7, 36:10,
  37:20, 38:22,
  39:8, 39:13, 42:2,
  43:10, 43:12,

44:4, 44:8, 46:1,
  46:20, 47:15,
  49:13, 49:14,
  49:15, 51:3, 52:7
damages 10:1, 25:20,
  25:22, 28:20
dashboard 8:1, 8:2,
  24:22, 68:16
date 34:22, 41:19,
  45:22, 79:8
dated 23:19, 36:15,
  41:11, 44:9, 97:4
dates 31:25
day 7:18, 46:6,
  55:13, 77:23
days 55:13
de 2:5, 2:6, 33:16,
  51:7
dealing 78:13
deals 63:18
dealt 18:17
debt 45:1, 59:12
debtor 92:25, 93:2
Debtors 1:18, 1:35
decade 28:4
deceit 10:12, 19:23,
  20:3, 20:6, 20:8,
  20:10, 20:13,
  20:18, 21:13,
  21:18, 22:8,
  22:19, 23:4, 24:3,
  24:16, 31:2,
  51:21, 52:4
December 41:2, 44:4,
  49:18, 65:6, 83:9,
  96:3
decide 59:19, 60:4,
  62:12, 64:8,
  64:17, 71:16,
  75:3, 76:24, 78:7,
  88:17, 88:19,
  90:21, 92:14
decided 64:15,
  65:14, 88:18
decides 92:17
deciding 11:13,
  59:15, 60:7,
  91:21, 93:1
decision 33:15,
  34:4, 34:11,

49:21, 51:5,
  64:16, 74:11,
  97:10, 98:6,
  98:14, 98:22,
  101:14, 102:14
decisions 59:2,
  74:13, 77:5
Declaration 23:2,
  36:14, 41:11,
  69:14, 78:16,
  78:18
declared 60:24
declined 69:24, 97:4
deemed 95:19
deems 49:24
defeated 97:24
defeating 40:8
defend 58:5
defendant 12:24,
  14:23
Defendants 2:18,
  2:35, 3:18, 3:35,
  4:16, 13:22, 23:5,
  58:25, 62:20,
  64:6, 64:17, 69:5,
  78:23, 88:25,
  89:19, 91:3, 93:13
defending 40:9
defenses 49:10
defer 70:4, 97:10
deference 80:23
deferred 43:8, 44:2,
  44:11, 44:17,
  50:1, 50:4
defined 16:3, 16:13,
  18:22, 18:23,
  18:24, 47:15
defines 33:2, 39:6
definite 93:11
definitely 34:8
definition 16:2,
  18:15, 33:20,
  40:12, 47:3, 47:21
definitions 19:1
degree 12:25, 30:21,
  35:7, 36:16, 37:4,
  37:16, 38:3, 38:17
degrees 37:24
Dein 4:24, 7:10,
  102:12, 104:8

del 33:16
Delaware 10:21,
  11:13, 12:15,
  46:22, 46:23
delegate 76:4
delegates 99:14
delegation 55:15,
  72:17, 72:18,
  94:24, 96:7
delivered 57:25
demands 71:25
demonstrate 100:12
demonstrated 43:1,
  70:19, 80:10,
  82:17
demonstrating 13:13
denied 23:22, 69:7,
  80:6, 87:8, 92:13,
  99:13
denies 74:24, 102:9
deny 97:3
Department 45:12,
  45:18
depending 48:23
deposition 23:2
deprivation 48:9,
  48:23, 49:2
deprived 54:13
DEPUTY 7:7
derail 78:23
described 47:15
describes 47:8
desert 58:22
designed 75:21
designs 41:14
desired 98:9
desires 57:3
detail 21:1
detailed 22:23
determination 72:13,
  76:6, 79:17,
  81:17, 99:12,
  100:2
determinations 73:24
determine 38:9,
  43:24, 59:9,
  60:17, 63:22,
  71:10, 71:22,
  72:23, 80:9,
  81:15, 82:1,

82:16, 83:5,
  83:13, 84:5,
  90:16, 91:17,
  92:3, 97:11, 100:6
determined 48:18,
  74:12, 74:15,
  97:19
determines 81:7
determining 22:14,
  71:13, 74:21,
  99:18
device 67:4
devices 59:20
dial 9:11
Diaz 57:23
dichotomy 82:20
difference 31:20,
  31:21, 74:8
different 12:25,
  27:23, 31:13,
  37:24, 56:14,
  64:19, 77:1,
  77:11, 85:16,
  93:23, 93:24
difficult 8:17
difficulty 8:21,
  66:8
direct 9:10, 26:19,
  27:22, 45:21
directing 44:15,
  44:16
direction 77:1
directly 26:10,
  26:23, 27:2,
  27:14, 27:17,
  27:18, 27:25,
  28:15, 36:21,
  43:12, 43:14,
  44:25
director 57:23,
  84:25, 85:21
directors 11:16
disaffiliate 34:21
disagree 51:15
disallowing 81:21
disbursed 51:11
disbursement 58:7,
  98:18
discernible 100:21
disclose 21:10,

32:24
disclosure 20:23,
  22:23, 24:12,
  24:13, 29:8
disclosures 21:1,
  21:4
disconnect 9:11,
  52:23
discovered 13:11
discovery 45:8
discrete 54:4
discretion 95:7,
  97:19
discretionarily 81:6
discrimination 62:8
discussed 64:11
discussing 11:25,
  42:4
disgorge 29:13
disingenuous 36:25
disparate 85:5
dispense 40:5, 70:16
dispositive 14:2,
  28:24, 90:6
dispute 11:12,
  11:14, 14:19,
  48:12, 50:3,
  70:15, 71:20,
  71:21, 82:12,
  84:10, 87:5, 98:5
disputes 54:5
disqualified 15:17,
  15:25
disqualifying 14:5
disregard 10:20
disregarded 36:2
disruptive 79:6
dissuade 72:1
distributed 43:17
distribution 42:20
District 1:1, 1:3,
  4:22, 4:23, 4:25,
  7:7, 7:8, 18:3,
  32:6, 41:5, 50:13,
  99:19, 104:1,
  104:2, 104:7
Doc 25:19, 49:3
Docket 1:6, 1:23,
  2:5, 2:22, 3:5,
  3:22, 4:5, 8:23,

57:22, 94:19,
97:7, 98:20, 99:6
doctrine 71:1
document 25:18,
25:24, 46:2
documentary 23:2
documentation 17:13
documented 45:4
documents 11:25,
13:12
doing 8:15, 23:14,
31:7, 31:11,
31:18, 39:9,
58:23, 65:10
DOJ 45:18, 46:6,
46:9, 49:21, 52:11
dollars 36:19, 37:5,
43:6, 50:17, 56:7,
58:8, 61:20,
72:21, 90:23, 91:7
dolo 21:23, 22:13,
22:15
done 11:22, 20:17,
41:20, 42:3, 42:9,
42:23, 54:22,
71:19, 74:20,
78:21, 82:3, 86:9,
93:8
door 61:18
doubt 56:6
down 9:15, 10:8,
16:19, 21:15,
45:13, 45:14,
56:12, 98:12
DPA 44:23, 44:24,
45:11, 45:17, 46:7
draft 89:12
drafted 20:23,
22:24, 63:16
drawn 43:20, 93:8
dual 93:22
due 52:4, 75:7
during 8:9, 8:16,
34:1
duties 55:18, 58:5
duty 32:24, 54:20,
92:16
dwell 78:12
DX-1 22:4
DX-2 22:5

DX-3 22:5
DX-30 45:6
DX-4 22:5
DX-5 22:5
DX-6 22:6


< E >
e-mail 41:22
earlier 18:20, 32:10
early 23:15
earmarked 88:6
earnestly 80:7
Eastern 21:21
ECF 46:25
Economic 9:25,
22:17, 39:21,
61:8, 95:3
Ecuador 43:5
education 22:16,
91:7
effect 26:18, 26:19,
27:21, 27:22,
28:15, 58:9,
70:14, 73:20,
88:20, 98:8, 99:24
effective 17:4,
41:12, 41:19
efforts 42:14
ego 10:16, 11:14,
12:10, 12:22,
13:23, 19:20,
19:21, 30:19,
31:2, 32:16, 33:4,
35:2, 36:5, 39:14,
39:17, 39:21,
40:12, 40:17,
43:20, 43:24,
46:21, 46:24, 47:5
egos 42:25, 46:17
egregious 12:23
eighth 52:3
either 28:7, 29:9,
34:19, 56:13,
63:17, 67:19,
76:7, 83:8
elaborate 80:19
elect 72:16, 91:23,
94:23
elected 55:19, 92:2

election 55:15,
56:4, 56:8, 56:22,
58:8, 60:4, 62:20,
63:10, 65:1, 65:3,
65:5, 65:17, 78:3,
78:21, 78:23,
79:2, 79:7, 88:6,
94:23, 96:7,
96:23, 96:25,
98:3, 98:19
Elections 55:20,
78:25, 79:4,
81:18, 96:21,
96:24
Electric 1:32
Electrica 2:6
electricity 25:15
element 23:4
elements 14:14,
14:24, 15:1, 15:2,
31:13, 38:15,
38:16, 38:17,
38:21, 38:23,
38:24, 39:2, 39:3
Emil 5:12
emphasize 82:18
employee 62:9,
100:24
employment 62:8
enact 62:2
enacted 55:11,
62:14, 62:24,
77:21, 77:23,
83:6, 83:9, 88:5,
90:20, 92:9, 96:5
enacting 61:9
encourage 9:2
encourage[d] 97:5
end 33:23, 34:10,
35:21, 40:18, 77:8
endeavored 80:8,
82:14
ended 56:14
Energia 2:5
engage 82:7, 91:21
engagement 79:7
enjoining 94:22
enormous 33:12
ensure 7:22
ensures 99:8

enter 20:24, 34:22,
   87:7, 102:10
entered 22:21, 42:6,
   42:16
entering 22:25,
   24:10
entire 13:3, 34:17
entirely 13:14, 72:5
entirety 102:10
entities 11:4, 11:5,
   13:2, 19:7
entitled 13:22,
   23:5, 31:3, 66:15
entitlement 25:12
entity 12:23, 19:6,
   21:5, 27:24,
   31:13, 31:16,
   33:18, 39:24,
   40:6, 40:12,
   41:25, 47:7, 47:8,
   54:7, 58:17, 67:8,
   76:12
Entry 8:23, 94:19,
   97:7, 98:20, 99:6
enumerated 70:23
equation 65:22
equivalent 14:14,
   15:2, 40:7
error 44:25
escape 12:17
Escudero 5:12,
   53:14, 53:19
Esq 5:11
essential 23:4
essentially 75:14,
   75:19
establish 12:10,
   15:24, 20:15,
   21:12, 21:17,
   46:17, 97:14,
   100:14
established 11:3,
   30:12, 43:20,
   69:19
establishing 10:19
estimating 96:13
et 1:16, 2:14, 2:31,
   3:14, 3:31, 4:13,
   4:33, 7:14, 53:11,
   95:4

Europe 11:11
evade 46:24
evading 13:4, 40:8
evaluate 11:13,
   14:7, 79:12
evaluated 56:5
event 37:2, 45:5,
   90:23, 91:2
events 61:12
everybody 53:7
everyone 8:3, 9:10,
   52:23, 53:5,
   81:13, 103:5
evidence 10:23,
   11:19, 11:24,
   12:9, 12:25, 13:5,
   13:9, 13:11,
   22:20, 23:1, 23:2,
   23:4, 26:15,
   27:20, 29:13,
   43:23, 45:5
exact 34:12
exactly 14:17, 45:22
example 9:6, 27:23,
   40:15, 71:3, 72:15
examples 83:14
exceeds 37:5
excepted 70:10
exception 58:13
exceptional 10:19
exceptions 54:16,
   63:16, 63:17
exclude 71:3
exclusive 66:11,
   101:10
exclusively 26:16
excuse 31:17, 32:20,
   33:22, 36:11,
   39:20, 81:25,
   83:24
executed 16:5, 17:3,
   19:9, 24:7, 26:18
executive 57:17,
   57:23, 58:20,
   69:4, 82:21, 83:1,
   84:14, 84:24,
   84:25, 85:18,
   86:6, 86:11,
   86:14, 86:16,
   86:18, 86:21,

86:25, 88:25,
   92:22, 99:12,
   101:5
exempt 95:7
exempted 95:10
exercise 73:4, 81:1,
   91:21, 96:16,
   101:20
exercising 46:16,
   93:12
Exhibit 28:13, 32:1,
   36:14, 41:12,
   42:13, 44:10,
   44:12, 44:14,
   50:14, 55:25,
   57:21, 64:1,
   81:24, 83:17,
   83:21, 84:1,
   84:15, 84:16,
   85:1, 86:2, 86:16
EXHIBITS 6:9, 42:14
exist 100:19
existence 30:23,
   32:20
existing 34:21
exists 92:9
expand 61:16
expectation 61:3
expenditure 78:4,
   94:22, 100:9
expenditures 95:10,
   96:13
expense 81:21, 95:8
expenses 11:17,
   63:19
experience 22:17
expired 9:24
explain 14:16, 82:3
explained 13:1,
   15:8, 18:4, 19:14
explaining 74:3
explains 41:12
explicit 57:7
expressly 28:14
extension 59:10
extensive 58:25,
   60:25
extent 99:21, 101:14
extraordinarily 83:3

< F >
F. 18:3
F.3d 99:17
face 57:10, 63:25,
    66:8, 70:24,
    72:24, 79:16
facilities 11:16
fact 25:22, 27:17,
    46:14, 48:16,
    50:3, 54:14, 55:4,
    55:20, 57:15,
    63:15, 71:25,
    76:20, 77:7,
    77:18, 78:17,
    79:2, 88:7, 88:25,
    89:9, 89:16, 91:4,
    91:10, 93:6,
    93:21, 95:16,
    95:20, 95:21,
    95:24
factors 11:13, 78:1,
    78:13, 100:2
facts 13:22, 25:24,
    26:16, 28:14,
    41:3, 44:17,
    44:24, 45:3, 45:6,
    45:7, 45:8, 45:23,
    78:25, 83:3,
    83:14, 87:6
factual 20:17,
    24:15, 54:5, 87:2
factually 45:19
fail 59:18
failed 13:21, 20:21,
    23:3, 101:23,
    102:5
fails 19:21, 101:12
failure 23:3
fair 41:24
fall 47:20, 75:12
fallback 20:4, 89:18
falls 13:25, 14:7,
    30:25, 35:7,
    36:12, 36:23,
    37:16, 38:19
false 27:16, 27:24
falsely 23:22
familiar 71:7
fan 77:10

far 12:15
favor 25:8, 63:1,
    69:13, 79:18, 96:2
favorable 62:9,
    62:11
favoring 71:19
February 55:22
Febus 36:14, 41:11
Federal 14:10, 34:2,
    43:3, 78:19, 93:1,
    93:24, 95:18
federally 61:5
feels 73:13
Feliciano 22:12
felony 37:25
few 33:3, 43:2,
    83:13
fictions 40:5
Fifth 31:2, 35:18,
    42:15, 43:21,
    50:6, 54:24
figure 41:1, 73:19
file 52:10
filed 8:23, 28:12,
    32:1, 65:13,
    71:12, 99:5,
    102:21
files 11:17
filled 65:17
final 9:9, 19:17,
    19:19, 94:25,
    100:5
Financial 1:9, 1:26,
    2:22, 3:5, 3:22,
    4:41, 7:12, 95:6,
    96:11
financially 77:5
find 17:18, 22:4,
    46:24, 46:25,
    67:5, 92:8
finding 57:20,
    66:21, 95:18,
    95:20, 95:21
findings 95:16,
    95:24
finds 101:23
fine 43:6
finish 29:2, 43:10,
    43:11, 67:24
Firestein 4:36

firm 13:1, 61:20
Fiscal 4:40, 54:24,
    55:2, 61:22,
    64:20, 64:21,
    71:25, 73:7,
    73:11, 73:14,
    81:19, 83:8,
    83:10, 85:12,
    96:10, 96:15,
    98:24, 101:2,
    101:8
fiscally 72:6
fit 76:9, 78:15
Five 29:22, 30:1,
    44:20, 49:13,
    53:19, 55:12,
    83:21
floor 56:10
fly 72:18
focus 90:10
focused 39:10, 83:12
focuses 71:3
follow 84:3
followed 63:2
Following 34:24,
    54:8, 84:23,
    85:18, 95:24,
    95:25
follows 99:18
FOMB 75:10
force 39:1, 76:12
forfeiture 49:6
forget 92:25
form 10:20, 25:10,
    29:11, 35:23,
    41:13
formalities 11:15
formerly 11:8
forms 20:23, 21:4,
    21:6, 22:24
formulas 91:9
forth 14:13, 28:21,
    65:3, 84:2, 97:1
forward 22:20, 23:3,
    54:4, 59:7
found 16:11, 19:5,
    33:24, 56:2, 58:22
Four 16:4, 16:8,
    19:14, 19:25,
    20:1, 25:4, 30:22,

32:19, 35:4,
35:12, 46:25,
51:24, 83:7,
83:17, 92:19
Fournier 21:20, 22:3
Fourth 31:1, 52:2,
54:24, 69:11
Frankly 24:16,
46:13, 46:18,
76:21, 78:24
fraud 27:23, 33:23,
34:2, 34:7, 40:7,
40:9, 43:4
free 34:22
Friedman 4:42,
68:10, 68:12,
68:13, 68:15,
68:18, 68:19,
68:21, 68:23,
68:25, 69:3, 69:4,
75:13, 75:15,
76:16, 77:17,
79:20, 86:24,
88:20, 91:19
friend 28:9
front 46:2
fuel 9:23, 12:2,
13:6, 19:23,
20:22, 22:21,
25:15, 25:17
full 9:25, 31:3,
45:7
fully 9:23, 10:21,
17:6, 17:24
fund 56:8, 58:8,
59:19, 74:5,
86:13, 90:23,
94:23, 96:23,
98:2, 98:19
fundamental 70:13
funded 88:4, 88:9,
89:4, 92:7
funding 56:21,
65:11, 78:22,
83:7, 83:8, 83:16,
97:7, 98:22, 98:23
funds 11:18, 50:19,
51:9, 51:11,
51:13, 54:6,
54:20, 55:1,

55:24, 59:24,
60:1, 65:6, 65:7,
80:14, 80:16,
82:3, 84:24,
85:21, 86:2, 86:3,
86:19, 86:23,
88:6, 88:9, 91:11,
91:15, 94:22,
96:23, 98:18
future 41:18, 59:9,
59:15, 60:17,
62:12, 63:22,
71:10, 74:21,
76:23, 80:8, 80:9,
81:15, 82:16,
83:5, 83:13, 84:6,
90:16, 91:17,
91:22, 92:3,
97:11, 98:7


< G >
Gail 4:24, 102:12,
104:8
gaining 91:14
gave 60:25
General 12:4, 12:11,
60:21, 63:10,
65:3, 74:19, 91:8,
102:11
generally 20:19,
78:5
generate 25:15
gets 49:9, 69:25
getting 69:23, 87:3
gigantic 72:9
give 72:15, 73:19,
73:24, 79:12, 91:1
given 8:14, 34:4,
49:22
gives 69:21, 75:9,
75:21
giving 42:6, 76:11
God 7:10
Godfrey 9:19, 44:22
Government 15:20,
20:12, 20:20,
27:8, 34:3, 36:20,
40:2, 47:12,
47:19, 50:18,

57:4, 60:5, 61:4,
62:3, 64:2, 65:16,
69:18, 74:10,
76:4, 76:7, 80:13,
80:16, 85:25,
89:19, 98:10,
100:24
Governor" 96:10
Goya 17:17, 18:2,
18:8
grand 30:21, 34:14,
35:7, 36:16, 37:3,
37:16, 38:3,
38:16, 50:7
grant 66:18, 99:19,
100:7, 101:10
granted 21:22,
64:25, 98:16,
100:5, 101:25
great 64:24
greater 70:1
gross 29:10, 29:12,
29:13
grounds 25:7
guess 76:3
guilty 16:11, 19:5,
37:2, 37:3
Gulfstream 72:19,
73:2


< H >
Hampshire 18:13,
18:17
hand 47:24, 73:23,
82:25, 83:1
handed 59:3
hands 51:14, 93:18
hang 59:5, 91:3
happen 81:2, 82:24,
92:6
happened 56:17,
64:13, 64:15
happening 65:11,
92:6
happens 60:21, 63:2,
64:8
happy 65:24
hard 66:9
hardship 64:24,

78:14
hardships 65:18,
    99:23
harm 69:16, 77:25,
    78:2, 78:5, 78:10,
    79:17, 99:22,
    100:3, 100:12,
    100:18, 102:2
harmed 78:6
harmonious 73:17,
    76:18
harmoniousness 73:20
harms 69:12, 69:14
Harnett 99:17
harsh 48:19
hat 59:6
Hay-adams 72:19,
    73:3
hear 9:9, 24:24,
    29:16, 68:10,
    68:20, 68:23,
    68:25, 69:2, 79:21
heard 46:1, 49:23,
    59:21, 75:25,
    86:24, 89:1, 90:11
Hearing 4:21, 7:15,
    7:18, 7:19, 7:23,
    8:5, 8:17, 8:21,
    68:13, 83:17,
    83:21, 84:3, 85:1,
    94:3, 102:18,
    102:19, 102:20,
    102:22, 103:2
hearings 90:12
heightened 22:10
held 12:9, 33:19,
    41:16, 46:15,
    62:23, 65:18,
    78:22, 89:3
help 61:8, 71:2
helpful 30:8
hereby 58:3
Hernandez 4:5, 5:11,
    52:19, 53:10,
    53:17, 94:18
hidden 63:20
higher 12:16
highest 73:18
highlight 86:5
highlighting 74:8

highlights 82:19
hinge 90:5
history 28:3, 40:11,
    59:14, 70:25,
    71:2, 77:10
hold 14:18, 44:4,
    44:10, 59:19
Holdings 35:22,
    42:12, 43:18, 45:1
holds 33:17
Honorable 4:22,
    4:24, 5:10, 7:9,
    7:10, 7:11, 53:17,
    94:18, 104:6,
    104:8
hope 61:3
House 53:18, 56:11,
    60:13, 83:22,
    94:19, 97:14,
    98:12, 98:25
Houston 77:12
humongous 59:12
hundred 61:20
hurts 78:23, 78:24
hypothesis 100:19
hypothetically 76:23


< I >
idea 82:23
identified 25:4,
    86:6, 86:16, 86:18
identify 8:10, 24:1,
    87:23
identity 39:22
ignores 33:14
ignoring 38:12
II 10:4, 10:17,
    15:19, 19:10,
    25:17, 99:21
IIC 12:1
III 1:8, 1:25,
    25:18, 25:25,
    99:22
III.1 9:13
illegal 15:11, 37:7,
    39:11
illegalities 52:2
illicit 51:20
Imagine 70:1, 70:5

immaterial 23:7,
    46:23
impact 93:16, 96:13
impacts 98:23
impasse 56:21,
    56:24, 88:15, 98:1
implement 58:6,
    62:16, 62:25
implemented 100:6
implementing 101:6
implicate 83:5
implicated 50:6,
    81:8
implies 18:6
imply 75:11
importance 51:9
important 25:4,
    31:25, 39:15,
    39:17, 59:17,
    59:18, 62:18,
    73:8, 78:13, 79:4,
    84:10, 90:25,
    91:15, 92:11
Importantly 20:18,
    33:14, 34:17,
    70:9, 85:24, 86:2
impose 64:9
imposed 43:6, 50:16,
    100:4
imposes 56:16
imposing 50:13
improper 38:7
improperly 51:11
Inc 21:21
Inc. 2:13, 5:6,
    9:20, 17:18, 18:2,
    24:24, 33:15,
    34:6, 40:2, 41:13,
    41:14, 41:17,
    45:22, 46:15,
    99:17
incentives 50:15
incident 46:16
include 16:3, 37:1,
    70:21, 70:24, 71:1
included 19:4,
    20:22, 21:24,
    22:23, 33:23,
    34:8, 34:15, 44:6,
    44:8, 50:3, 51:17

includes 37:14,
    38:1, 70:2, 70:10,
    70:22, 71:5, 91:5
Including 8:6, 33:3,
    42:20, 61:8, 70:8,
    70:19, 70:20,
    70:21, 80:18,
    81:13, 84:8, 85:4,
    90:5, 90:6, 91:4,
    91:13
inconsistent 73:10,
    73:13, 73:14,
    75:20, 76:13,
    96:14, 101:2,
    101:8
incorporate 19:1
incorporated 10:25,
    40:12, 40:22
incorporating 18:15
incorporation 12:12,
    12:13, 13:6, 13:13
incorrect 16:15,
    16:25, 26:24,
    45:19
incur 37:12
incurred 25:21
independent 15:9,
    25:7, 39:24, 41:25
indicated 97:10
indicates 50:2
indication 19:5,
    49:22
indirectly 36:21
inequity 40:9
inference 41:24
inferences 43:19
inform 58:3
Information 20:24,
    21:10, 21:13,
    21:18, 22:23,
    41:21, 43:3,
    44:13, 49:17
informed 84:25,
    98:17
injunction 52:19,
    53:10, 64:25,
    65:23, 69:7, 78:2,
    78:14, 80:6, 87:7,
    92:13, 99:19,
    99:22, 99:24,

102:21
Injunctive 79:18,
    94:17, 99:16
injury 65:23, 93:14,
    99:11
injustice 40:8,
    50:18
inquiries 12:1
inquiry 47:8
insofar 99:11
instance 62:7,
    62:14, 90:17
Instead 12:4, 14:20,
    28:16, 45:20,
    81:20, 97:5
insufficient 12:9,
    46:17
insuperfluity 71:7
intending 37:24
intent 12:17, 46:24,
    47:13
intentional 30:15
interaction 73:17
interest 7:17, 8:13,
    39:22, 64:23,
    77:20, 78:15,
    92:12, 101:13
interest. 99:25
interested 9:1
interfere 98:5
interference 63:21
internal 83:6
interposed 79:13
interpret 71:1,
    81:14
interpretation
    34:17, 63:21,
    69:10, 73:15,
    75:5, 79:13,
    101:15
interpretations
    33:11
interpreted 59:2,
    73:23, 90:3,
    91:16, 93:25
interpreting 98:4,
    101:18
interprets 98:21
interrupt 8:16,
    8:17, 8:20

intimidation 37:10
invaded 101:13,
    102:1
invalid 20:6, 20:7
invalidating 35:3
invalidation 22:14
investigation 12:2,
    13:8, 13:15,
    20:11, 20:13,
    20:18, 21:11,
    23:17, 23:25,
    32:5, 32:8, 32:10,
    40:24, 40:25, 42:4
investigations 21:7,
    23:22, 24:13, 32:4
invited 25:3
invocation 77:7
invoke 61:23, 70:6
invoked 58:15, 86:8,
    98:15
invoking 62:4, 93:5
involve 73:3, 88:3
involved 79:15
involves 72:24,
    79:16
involving 32:12,
    40:20, 64:23
Iraq 26:17, 32:13,
    50:19
Iraqi 32:7, 36:20,
    47:19, 50:10,
    50:12, 50:17
irreparable 65:22,
    78:2, 78:5, 78:10,
    93:14, 99:22,
    100:3, 100:12,
    102:2
IRS 10:25, 12:5,
    13:15, 42:13,
    42:18
Issuance 64:23,
    78:13, 94:16
issued 8:5, 23:19,
    32:10, 32:11,
    41:5, 97:18, 97:25
issues 8:13, 9:21,
    23:7, 23:9, 25:4,
    25:6, 72:6, 98:7
issuing 86:10
Item 9:13, 53:9,

70:23, 81:17
items 98:17
itself 13:10, 16:3,
    22:24, 36:1, 38:1,
    50:2, 67:22,
    82:10, 84:21
IV 25:25, 53:9,
    99:23


< J >
J. 4:33
job 56:6
Joint 56:11
Jointly 1:11, 1:28
Jorge 5:11, 53:16,
    87:24
Juan 7:1
Judge 4:22, 4:23,
    4:24, 4:25, 7:9,
    7:10, 53:4, 53:6,
    102:12, 104:7,
    104:8
judgment 9:14,
    13:10, 13:22,
    15:14, 18:11,
    20:14, 20:21,
    21:2, 21:22,
    22:20, 23:5, 24:2,
    25:7, 26:20,
    27:20, 29:13,
    45:9, 46:8
judicial 8:4, 23:16
Judith 4:24, 7:10,
    102:12, 104:8
jump 30:10
juncture 83:11
Junta 33:16
juridical 16:2,
    16:13, 18:16,
    18:22, 18:25,
    31:8, 31:14,
    31:15, 31:16,
    31:18, 31:19,
    33:2, 33:4, 33:7,
    35:12, 40:12, 47:3
jurisdiction 14:11,
    95:22
Justice 45:12, 45:18
justifying 40:9

< K >
KAPLAN 5:7, 9:16,
    9:17, 23:9, 24:19,
    24:21, 24:23,
    24:25, 25:1,
    27:13, 29:3,
    29:15, 29:25,
    47:25, 48:2, 49:1,
    52:17
keep 9:2, 57:18,
    93:17, 103:5
keeping 9:3
KELSO 5:8, 9:16,
    9:18, 9:19, 10:6,
    10:7, 10:9, 10:11,
    16:20, 16:23,
    17:8, 17:9, 17:12,
    17:16, 21:16,
    23:12, 23:13,
    23:24, 24:20,
    29:25, 44:21,
    45:15, 46:4,
    46:12, 47:11,
    52:10, 52:15
kept 63:25
key 83:14, 100:1
kickbacks 36:23
killing 65:9
kind 12:25
kindly 52:23
knowledge 23:16,
    23:22, 49:19,
    67:17
known 20:17, 63:10,
    76:1
knows 73:12


< L >
L. 5:7
label 61:17
labeled 61:17
lack 69:15
lacked 83:6
lacks 86:22, 95:7
laid 99:16
land 22:1
language 14:17,

14:25, 66:1, 89:6,
    90:1, 100:22
Larceny 30:21,
    34:14, 35:7,
    36:16, 37:4, 37:6,
    37:12, 37:16,
    37:18, 37:22,
    37:23, 38:1, 38:3,
    38:16, 38:24,
    39:3, 50:7, 50:22
Lares 51:7
largest 59:13
last 16:19, 16:22,
    19:8, 19:11,
    19:25, 23:6,
    54:12, 57:3,
    62:14, 66:11, 77:8
late 10:25, 65:7
Later 18:19, 35:13,
    47:7, 81:25
latter 34:7
Laura 4:22, 7:9,
    104:7
Laws 58:6, 86:4
Layhill 77:14
lays 69:14
least 29:5, 32:8,
    62:18, 98:23
leave 89:8, 98:25
leaves 74:14
leaving 51:13
left 65:17, 65:22
legal 11:3, 11:23,
    21:4, 25:11, 26:3,
    33:20, 34:8,
    34:15, 39:24,
    40:6, 40:12,
    41:25, 42:9,
    46:13, 54:4,
    57:10, 86:24,
    87:1, 89:5, 99:15
legally 15:9, 20:9,
    20:15, 22:22,
    37:10, 45:4
legislation 90:20
legislative 23:16,
    40:11, 54:12,
    55:11, 55:14,
    57:17, 67:2,
    70:25, 71:2, 77:8,

77:23, 93:6, 93:7, 101:9
legislator 83:23
legitimate 12:12, 13:14, 64:7
length 11:19
less 9:9, 56:4, 59:16, 62:19
lesser 29:11, 70:3
letter 12:5, 41:10, 41:18, 42:13, 57:22, 57:24, 81:23, 81:24, 85:1, 85:22, 85:25, 86:3, 86:15, 97:4
level 79:17
Lexus 33:17, 34:10
liabilities 12:8, 41:16, 42:19, 42:22
liability 9:20, 9:22, 10:14, 11:23, 12:11, 12:17, 17:14, 30:16, 42:10, 42:15
liberated 18:7
liens 13:19
lift 40:5
light 58:2, 62:8, 62:10, 94:14
likelihood 69:6, 99:20, 100:3, 101:24
likely 102:5
limit 42:9
limitations 74:9
limited 8:6, 11:23, 21:8, 26:8, 27:13, 70:23
limiting 12:11
limits 81:13
line 7:23, 47:8, 93:8
lines 86:13
link 91:14
Lisa 53:6
list 14:4
listed 8:11, 14:8,

15:3, 40:16
listened 95:12
lists 37:13
literally 78:11
litigate 99:1
litigation 21:11
little 82:12
live 91:19
lived 28:4
lobby 61:21, 92:1, 96:8
lobbying 61:20
lobbyists 91:25, 92:1, 92:2
loggerheads 83:2
long 10:25, 91:8
longer 43:16
look 49:25, 71:11, 73:19
looked 36:13, 36:14
looking 57:21
looks 15:1
loophole 33:12, 34:18, 72:10
Lorenzo 77:13
lose 77:15
Lottery 18:13, 18:17
Luciano 5:11, 53:14, 53:15, 53:16, 53:24, 54:3, 66:22, 67:24, 68:2, 87:16, 87:19, 87:20, 87:23, 87:24, 88:2, 92:21, 94:3, 94:6

< M >
ma'am 44:8
Magistrate 4:24, 7:10, 102:12, 104:8
main 11:21, 63:23
maintains 60:16, 90:15
major 90:10
majority 62:15, 96:1, 96:5
maker 64:16

manage 61:8
Management 1:10, 1:27, 2:23, 3:6, 3:23, 7:13, 41:22, 58:9, 95:3, 95:6, 96:20, 102:11
mandated 67:14
manner 77:22, 98:5
March 65:7, 85:3, 85:12
Margaret 4:37, 29:19
market 11:19
Marrero 57:23
Martin 4:33
Martinez 5:11, 53:14, 53:15, 53:16, 53:24, 54:3, 66:22, 67:24, 68:2, 87:16, 87:20, 87:23, 87:24, 88:2, 92:21, 94:3, 94:5
match 38:17
material 46:7
materially 98:23
matters 79:3
mean 31:17, 37:22, 37:25, 50:13, 50:20, 59:14, 70:22, 71:24, 72:13
meaning 70:22, 73:20, 78:18, 79:12, 90:4
meaningful 71:20
meaningless 38:21, 38:22, 72:7
meaninglessness 71:8
means 38:23, 63:22, 74:10, 78:22, 80:24, 81:16, 81:20, 90:2, 102:3
meant 19:6, 70:22, 72:1, 90:8
mechanism 62:25, 67:6, 74:22, 75:8, 75:12
meet 26:23, 52:12
member 72:19, 94:24,

96:7
members 7:17, 8:7,
  58:19
memo 28:13
Mendez 5:11
mention 21:7, 28:8,
  56:19, 58:10,
  68:3, 84:21
mentioned 31:24,
  61:12, 66:25,
  67:7, 90:10
mentions 12:1, 61:2
merely 20:13, 63:25,
  67:16, 67:17,
  89:4, 91:13,
  92:22, 93:5
merger 21:24, 22:2
merits 69:7, 99:20,
  101:24, 102:6
Messrs 9:16, 29:25
Mexico 43:4
Michael 4:36, 5:8,
  9:19, 44:21
million 36:19, 37:5,
  43:6, 50:16, 56:7,
  58:7, 61:20,
  72:20, 90:23, 91:7
mind 60:11
minimal 79:15
minimize 42:18
minimum 25:7, 43:22,
  74:7, 74:10, 87:2
ministerial 58:5,
  92:15
minute 73:5
minutes 9:4, 9:8,
  9:15, 29:17,
  29:23, 30:1, 30:2,
  30:5, 44:20,
  49:13, 52:22,
  52:24, 52:25,
  53:13, 53:19,
  53:22, 53:23,
  68:11, 79:22,
  87:15
misappropriated
  50:20
misappropriation
  37:14, 37:19,
  37:20, 38:17,

39:1, 39:3, 39:6,
  39:7, 47:21, 50:8,
  50:10, 50:23
misdemeanor 37:18
misdemeanor. 37:12
misrepresented 23:15
misses 88:8
mistake 49:23
mistaken 45:20
Mobile 12:18
mockery 61:25
modalities 37:21,
  39:4
modalities. 37:15
modality 37:19
modest 79:14
modified 75:17
modifier 19:4
modifies 70:8
moment 34:7, 34:13,
  70:5, 77:19,
  77:24, 94:12
money 25:14, 47:19,
  50:11, 50:12,
  50:21, 51:3, 52:3,
  55:20, 69:18,
  78:4, 78:7, 78:8,
  88:22, 88:23,
  88:24, 90:19,
  90:24, 90:25, 91:1
monies 92:8
Montanez 4:5, 52:19,
  53:10, 53:17,
  94:18
months 24:7, 41:4,
  43:2, 55:12, 56:4
morning 7:16, 8:14,
  9:18, 24:23,
  24:25, 29:18,
  29:21, 30:11,
  44:21, 48:2, 53:4,
  53:15, 68:22,
  102:16
Motion 21:2, 25:5,
  26:11, 33:10,
  44:7, 52:9, 52:20,
  53:10, 80:5,
  82:10, 87:8,
  94:15, 94:21,
  95:1, 95:13,

102:9, 102:21
Motion" 94:20
motions 7:19
motivated 13:14,
  76:22
motivating 76:21
motives 71:12
movant 53:12, 99:20,
  99:21
move 36:3
multiple 18:25
Mungovan 4:38,
  79:21, 79:24,
  79:25, 80:3,
  80:21, 80:25,
  81:11, 82:10,
  85:7, 85:10,
  85:16, 85:24,
  87:10, 87:12
Municipal 40:2
Municipality 34:9,
  51:6, 51:11
Municipio 33:16
mute 7:23, 7:25
muted 68:15
myself 87:24


< N >
nail 59:5
name 8:10, 31:11,
  40:18, 41:16,
  41:20, 47:5, 53:15
namely 100:2
names 60:8
Natural 18:16,
  18:25, 60:13,
  76:20
nature 79:1
NCAA 77:12
nearly 24:8
necessarily 18:6,
  37:24, 72:14,
  77:2, 81:18, 84:10
necessary 9:12,
  10:20, 91:1
need 8:1, 9:10,
  24:21, 61:19,
  65:16, 68:12,
  74:7, 78:1, 78:25,

102:15
needs 63:4
neither 89:9, 98:23
neutral 76:18, 77:4
newly 73:13
next 24:8, 52:18,
   55:4, 57:3, 71:13,
   71:14, 92:19,
   102:20
Ng 53:5, 53:6,
   68:15, 68:17,
   68:21, 69:3
nice 36:22
night 73:3
nine 26:25
No. 1:6, 1:23, 2:5,
   2:22, 3:5, 3:22,
   4:5, 7:12, 7:20,
   7:21, 8:23, 8:24,
   10:18, 15:18,
   52:20, 53:11,
   54:9, 75:23,
   85:10, 94:19,
   94:20, 97:7,
   98:20, 99:6,
   102:22
nomo 33:16
non-substantive
   95:14
non-u 12:7
nondisclosure 20:10,
   21:13, 21:18
None 6:5, 6:11,
   13:5, 21:3
Nonetheless 16:15,
   16:24, 45:10,
   45:16
nor 26:15, 29:9,
   98:23
note 17:19, 18:10,
   50:1, 62:18
Nothing 20:6, 23:2,
   59:7, 60:7, 60:18,
   63:24, 64:15,
   69:21, 69:24,
   70:10
notice 42:7
notified 17:20,
   96:24, 98:13
noting 86:10

notwithstanding
   42:22, 55:19, 81:3
novation 17:11
November 30:21,
   32:8, 36:15, 62:21
null 43:21, 51:11
nullification 27:2,
   49:2, 52:4
nullify 9:23, 10:3,
   10:11, 22:9
Number 49:19, 49:21
numbers 41:23
numerous 37:21,
   54:22, 55:9, 69:9
Nunez 22:12


< O >
o'clock 9:12
oasis 58:22
oath 58:5
object 73:11, 80:15
objected 59:24
objecting 73:12
objective 12:11
obligated 74:5
obligation 40:8,
   73:18
obligations 18:7,
   41:9
obligor 18:8
observes 11:15
obtain 26:13, 50:10,
   50:18, 50:21
obtained 50:22
obtaining 25:16
obvious 12:10
Obviously 20:5,
   32:9, 49:23, 67:2,
   70:18, 71:11,
   74:20
occupation 18:5
occur 35:18, 35:20,
   57:5, 96:25, 98:11
October 40:23
odds 14:25, 57:2
offense 14:24, 15:1,
   37:18, 38:15,
   38:16, 38:24,
   47:15

offenses 14:5, 15:3
Office 11:2, 11:9,
   12:2, 17:4, 58:5,
   58:9, 65:16, 79:2,
   96:20
officer 100:24
officers 11:16
Official 104:15
officials 43:4,
   50:10
Oil 12:18, 25:17,
   26:17, 32:7,
   36:21, 47:20,
   50:11, 50:18
Okay 54:2, 85:10,
   93:1
old 48:5, 48:11,
   48:14, 48:20,
   48:22, 49:7
Omar 57:23
OMB 86:3, 97:3
OMB")] 96:20
Omnibus 4:21, 7:15,
   7:18, 91:6, 102:19
Once 56:13, 65:20,
   67:13, 71:4, 74:12
one. 49:20
ongoing 13:15, 103:2
open 33:12, 65:17
opening 10:24,
   14:16, 15:8,
   17:19, 18:10,
   19:14, 36:24,
   47:22
operate 34:25
operated 11:8
operating 11:4,
   54:23
operation 7:22, 11:9
operations 11:6,
   41:7
operative 37:8, 45:4
opinion 76:1
opportunity 8:12,
   45:8, 46:9, 75:25
opposition 57:16,
   63:24
option 60:6
oral 7:19, 9:13,
   30:11, 52:19,

53:9, 95:13,
  102:13
orally 17:22, 94:14
Order 10:15, 53:21,
  71:13, 74:24,
  94:16, 94:22,
  94:25, 102:10
orderly 7:22
orders 8:4
ordinary 75:7
organizing 30:8
original 98:8
originally 17:3
orphan 65:10
otherwise 28:10,
  47:3, 51:13, 72:1,
  81:2, 81:4, 84:19
outset 19:21, 80:4
outside 13:25, 14:1,
  14:20, 15:6,
  15:14, 23:25,
  28:12, 57:9,
  58:11, 58:20,
  64:4, 65:15, 76:2,
  81:22
overall 20:4
override 77:19
overriding 77:20
overseas 13:18
overview 30:9
own 9:3, 9:24,
  11:10, 11:15,
  11:16, 11:17,
  21:20, 25:22,
  47:19, 56:17,
  62:25, 64:17,
  65:10, 72:19
owned 30:20, 40:22,
  41:7, 41:14,
  41:17, 43:13
ownership 39:22,
  44:15, 44:16,
  45:1, 45:19,
  45:21, 46:3, 46:16
owns 44:25


< P >
PAGE 6:3, 12:14,
  12:18, 12:21,

13:1, 14:16,
  17:19, 18:9,
  21:21, 22:12,
  26:11, 34:10,
  40:4, 44:18,
  46:25, 49:3, 57:2
pages 10:23, 15:8,
  19:14, 21:1,
  26:25, 33:10,
  72:11, 104:4
paid 25:14, 36:20,
  47:19, 50:21,
  51:4, 60:5, 91:25,
  94:24, 96:7
paper 11:5
papers 26:6, 44:6,
  49:18, 69:19,
  71:24, 74:1, 86:21
paragraph 25:23,
  41:4, 44:16, 45:2,
  45:6, 57:3
parent 21:10, 35:22,
  35:25, 42:12,
  42:17, 43:18,
  46:15, 65:9
parents 32:23, 32:24
part 10:25, 11:22,
  28:9, 54:21,
  59:12, 70:8,
  72:17, 72:22,
  72:23, 72:24,
  84:13, 85:24
participant 8:22
participation 79:3,
  79:4
particular 24:1,
  25:12, 55:10, 76:3
particularly 22:7,
  32:17, 39:10,
  42:15, 70:3,
  76:10, 79:18
particulars 102:7
PARTIES 4:30, 7:17,
  7:23, 8:7, 8:13,
  23:6, 25:3, 30:22,
  50:2, 99:23
Party 20:12, 22:17,
  96:4, 96:5
passed 73:13, 77:3,
  77:7, 77:22

passive 39:21
past 52:25, 71:19,
  73:7
patience 94:10,
  94:13
Paul 4:35
pay 61:20
payments 17:23,
  26:9, 27:8, 27:14
pays 11:16
PDF 44:18
Pedro 4:12, 60:21,
  61:10, 96:9
Penal 36:16, 37:7,
  37:22, 38:4,
  38:18, 39:2, 39:11
penalties 38:10
penalty 26:4, 26:8,
  27:5, 27:6, 27:14,
  28:6, 28:7, 48:9,
  48:14, 48:17,
  48:19, 48:22,
  78:19
people 50:12, 50:17,
  55:17, 59:8,
  59:21, 60:5, 60:7,
  60:8, 60:10,
  62:11, 64:24,
  91:20, 91:22,
  91:25, 96:1, 96:16
per 38:3, 54:25,
  55:24, 57:16,
  58:12
percipient 13:12
perfection 18:4
performed 9:23,
  17:6, 17:25
perhaps 27:9, 36:13,
  49:24
period 34:1, 94:10
perjury 78:20
permissible 77:5
permit 70:4, 74:19
permits 82:7
permitted 8:6, 20:9,
  20:16, 22:22,
  75:22, 96:17
person 8:6, 16:2,
  16:11, 16:13,
  18:14, 18:16,

18:22, 18:25,
  19:3, 19:4, 31:14,
  31:15, 31:18,
  31:19, 33:2, 33:5,
  33:7, 34:8, 35:12,
  37:3, 37:9, 39:20,
  47:3, 88:24
personal 37:10
personalities 39:23
persons 31:8, 33:20,
  34:15
perspective 81:13,
  82:23, 83:2
pertains 55:10
Peter 4:42, 69:4
ph 13:10, 46:15
phone 8:1, 8:2,
  24:21, 68:13,
  68:14
phones 7:23
PHV 4:33, 4:34,
  4:35, 4:36, 4:37,
  4:38, 4:42, 5:7,
  5:8
PI 74:24
Pierluisi 4:12,
  53:11, 60:21,
  61:10
Pierluisi-urrutia
  96:10
pity 65:9, 65:10
place 22:15, 50:22
plain 70:21, 70:24,
  90:1, 100:21
plaintiffs 69:16,
  73:22, 78:6
Plan 10:25, 55:3,
  61:22, 64:20,
  64:21, 73:7,
  73:11, 73:14,
  81:19, 83:8,
  83:10, 85:12,
  96:15, 98:24,
  101:2, 101:8
plate 63:7
played. 9:7, 27:12,
  29:1, 42:1, 43:9,
  47:10, 48:25,
  51:2, 52:6, 67:23,
  92:20, 94:2

Plea 15:10, 32:4,
  36:12, 36:18,
  42:5, 47:17,
  47:18, 50:15
pleaded 28:9
pleadings 62:19,
  95:11
Please 7:5, 7:25,
  8:10, 8:16, 8:22,
  16:18, 16:21,
  21:15, 29:23,
  68:1, 68:14, 79:25
pleases 53:20
Plebiscite 59:20,
  59:25, 60:2, 60:4,
  60:17, 61:5,
  61:14, 62:17,
  62:22, 62:23,
  63:7, 63:9, 65:4,
  71:12, 71:14,
  90:7, 90:16,
  90:21, 91:8, 91:9,
  91:12, 92:7,
  95:25, 96:1
plebiscites 60:19,
  70:17, 71:19, 90:8
pled 37:2
plenty 53:25
PM 103:6
point 12:24, 21:20,
  26:14, 28:3,
  28:18, 29:7,
  46:22, 48:3,
  51:15, 59:1, 77:6,
  80:20, 86:5, 92:14
point. 12:20, 26:6,
  52:14, 77:16, 79:9
pointed 69:15, 69:20
points 46:20, 48:15,
  76:17, 80:5
policies 8:4
policy 34:18, 39:18,
  40:9, 51:4
political 59:9,
  59:15, 60:17,
  61:1, 61:18, 62:4,
  62:12, 63:22,
  71:10, 79:16,
  80:8, 80:10,
  81:15, 82:16,

83:6, 83:13, 84:6,
  90:16, 91:18,
  91:22, 91:24,
  92:3, 92:21, 93:5,
  97:11, 98:7
politically 92:17,
  92:18
politicians 78:24
pondered 56:5
position 18:6,
  56:22, 57:15,
  63:11, 80:7,
  82:15, 88:15
positions 65:16
positive 101:10
possibility 91:14
possible 54:6,
  64:23, 67:19,
  81:10, 97:6
Possinger 4:35
post 17:6
postdated 42:16
postponed 79:8
potential 12:8
potentially 97:14
Power 1:33, 66:19,
  70:2, 70:3, 75:19,
  75:21, 76:8, 81:1,
  88:21, 99:2,
  100:5, 100:7,
  100:20, 101:10
powerful 74:3, 79:1
powers 72:13, 73:5,
  74:19, 76:25,
  81:13
practice 44:7, 73:7
preceded 13:8
precedent 92:13
preceding 23:25
predicate 84:11
preempted 58:12,
  58:16, 81:5
Preemption 58:14,
  70:10, 75:7,
  75:16, 75:17,
  89:12, 93:20,
  93:21
preemptive 70:9
preempts 95:4
prefer 36:3

preliminarily 80:22
Preliminary 25:2,
    52:19, 53:10,
    69:7, 78:2, 78:14,
    80:5, 94:17,
    99:19, 102:21
premise 27:16
PREPA'S 20:18
prepared 54:24,
    89:16
preparing 103:1
prerogative 99:9
prescription 66:19
present 7:9, 60:22,
    89:20
presented 23:1
presents 20:13
presided 60:13
President 83:15,
    97:13
presidential 72:20
presiding 7:9
press 7:17, 8:7
presumed 22:13
pretrial 102:11
pretty 58:21, 64:6
prevail 48:10, 102:6
prevent 40:13, 101:4
previous 55:13
previously 64:11
prices 11:19
Prime 8:25
principal 12:13
principles 99:15
prior 85:25
private 51:14
privileged 95:10
probably 59:14,
    61:23
problem 90:18
Procedure 90:20,
    92:8, 95:18
proceed 52:24, 80:1
Proceeding 7:20,
    52:20, 53:11,
    55:11, 55:23,
    59:14, 93:1, 93:2,
    94:20, 102:22
Proceedings 5:48,
    7:24, 8:10, 8:14,

8:15, 8:18, 53:3,
    59:19, 103:6,
    104:6
proceeds 27:16
process 55:24,
    58:10, 62:2,
    66:20, 83:3,
    85:19, 94:1
produced 5:48
profit 29:10, 29:12,
    29:13
programming 81:4
Progressive 96:4
prohibit 20:12, 72:5
prohibited 34:9,
    34:15
prohibition 19:12
prohibitions 14:12
prohibitive 101:9
prohibits 101:19
projections 67:22
promote 22:14
promoting 40:7,
    55:18
promptly 52:11
prongs 69:11
proof 23:3
proper 26:21, 57:18,
    64:18
properly 65:7, 78:17
property 37:4, 37:5,
    37:11, 38:2,
    38:25, 39:1,
    47:16, 47:23
proposal 14:24
propose 69:9
proposed 11:25,
    57:5, 61:13,
    65:20, 66:13,
    73:16, 73:17,
    83:16, 85:11,
    97:16, 97:20,
    97:21, 97:22,
    97:23, 98:10
proposing 93:7,
    93:16
propriety 102:7
prosecution 43:8,
    44:3, 44:11,
    44:17, 49:17,

50:1, 50:4
Proskauer 29:19
protect 12:6
protecting 40:9
protection 42:21
prove 12:16, 74:7,
    74:25
proved 32:17
provide 8:12, 49:2,
    62:6, 74:13,
    82:12, 93:23, 96:6
provided 20:23,
    22:24, 27:11,
    66:7, 66:16, 67:6,
    83:8, 98:3, 100:25
provides 50:25,
    51:1, 55:14,
    56:15, 60:9, 62:3,
    62:7, 62:16,
    62:25, 65:18,
    66:23, 68:5,
    71:18, 88:18
provision 16:9,
    28:8, 48:18,
    48:21, 56:18,
    56:19, 59:1,
    63:13, 66:9, 81:19
provisions 20:22,
    21:3, 28:22,
    48:10, 48:11,
    48:12, 49:8, 81:4
prudence 71:25
Public 7:17, 8:7,
    8:25, 16:12,
    27:24, 32:12,
    34:18, 39:18,
    40:8, 50:18, 51:4,
    51:9, 51:11,
    51:13, 64:23,
    65:16, 77:20,
    78:15, 78:24,
    79:3, 79:7, 90:7,
    90:11, 92:11,
    96:24, 99:25
publicized 78:21
publicly 28:13,
    62:19
pull 81:6
punch 75:15
punished 8:8

purchased 36:21
purported 26:3,
  27:1, 69:9
purports 88:12
purpose 13:4, 22:1,
  22:25, 31:22,
  34:18, 40:18,
  47:2, 47:6
purposes 12:6,
  13:14, 14:10,
  15:13, 33:4, 92:16
pursuant 56:9,
  80:18, 85:12,
  85:17, 92:10,
  95:17, 95:22
purview 61:24, 63:12
put 22:20, 23:3,
  32:2, 36:8, 45:5,
  57:13, 62:13,
  65:1, 93:10

< Q >
qualifies 27:6
Quebradillas 51:6
question 10:17,
  10:18, 13:24,
  14:1, 14:6, 14:9,
  15:16, 15:18,
  19:22, 20:14,
  23:6, 23:11, 35:6,
  44:1, 54:5, 66:1,
  71:9, 71:23,
  100:1, 100:3,
  100:4
questioning 101:15
questions 8:20,
  10:14, 23:10,
  32:14, 65:24,
  70:13, 79:11,
  81:12, 87:11,
  87:13, 95:1
quickly 65:12
quiet 94:11
quite 37:15, 57:7,
  74:3, 85:7
quote 11:22, 12:7,
  12:16, 12:21,
  14:10, 14:22,
  14:23, 16:11,

21:24, 22:13,
  25:13, 26:9,
  33:19, 33:23,
  34:10, 37:3, 40:3,
  40:7, 40:10,
  40:19, 43:12,
  45:21, 47:5, 47:9,
  51:10
quoted 44:15
Quoting 34:4, 40:14,
  61:3

< R >
radically 77:10
Rafael 4:5, 5:11,
  53:17, 94:18
raise 64:22
raised 10:15, 64:5,
  83:16, 83:23
ran 55:14
Rather 14:23, 27:13
ratification 17:24
Re 1:6, 1:23, 7:12
reached 45:11, 45:17
read 18:15, 40:3,
  69:8, 75:16
Reading 40:14, 51:5,
  71:4, 72:4, 76:20,
  90:1
readjust 54:11,
  61:19, 63:24
readjusted 55:2,
  56:7
readjustment 54:17,
  54:21, 57:11,
  57:12, 60:1,
  67:10, 93:11
Readjustments 54:15,
  56:19, 67:6, 88:13
ready 52:24, 53:5,
  53:9
real 38:12, 69:15
reallocate 98:16
really 32:22, 36:25,
  39:17, 39:24,
  71:6, 72:9, 72:25,
  73:18, 73:21,
  73:24, 74:14,
  75:21, 76:18

reason 12:12, 12:13,
  24:3, 70:25,
  78:16, 100:13
reasonable 79:14
reasonably 73:1
reasoning 76:22
reasons 12:10, 15:9,
  36:1
reassigning 63:19
reassignment 88:10,
  89:2
reattribution 50:16
rebuttal 29:23,
  53:20, 54:1, 70:20
receive 17:23
received 9:25, 24:6,
  24:11, 32:9, 46:5,
  52:10, 73:9, 90:12
receives 67:8
recent 49:21
recently 43:14
recess 53:2
recites 36:18
recognize 84:9
recognizing 40:6,
  98:1
reconnect 52:24
reconvened. 53:3
record 8:11, 11:24,
  13:5, 46:8, 46:9,
  80:10, 82:17,
  93:6, 93:7
recorded 5:48
recording 8:5
recover 51:12
reduced 48:16
refer 30:13, 77:8,
  95:25, 96:5
reference 18:20,
  38:20, 44:23,
  45:25, 46:18,
  81:1, 89:10
referencing 57:24
referendum 65:5
referred 78:16,
  102:11
referring 24:2,
  33:21, 58:1, 58:3,
  67:2, 91:12, 91:13
refers 37:21, 67:2

reflect 42:14
reflected 31:8
refrained 102:8
refuse 75:10
refuses 93:7
regard 26:9, 27:14,
  66:13, 81:5
regarding 61:1,
  61:2, 87:17,
  89:23, 98:7, 102:6
regards 89:11
reimbursement 26:4,
  26:8, 26:9, 26:13,
  27:6, 27:8, 27:13,
  28:6, 28:7, 31:3
reiterated 88:19
reject 77:2
relate 37:22, 71:9,
  72:22, 72:25,
  84:18, 98:6
related 19:7, 26:16,
  41:8, 61:17,
  84:17, 88:13
relates 51:23, 71:22
relating 51:25
relationship 35:14,
  35:16, 42:3
release 17:14
released 28:13,
  91:11
relegated 59:16
relevant 18:9, 20:8,
  93:20, 95:11
relied 24:9, 89:24
Relief 25:10, 25:12,
  28:5, 28:9, 29:11,
  79:18, 94:17,
  99:16
relies 16:1
relieved 58:23
remain 98:8
remainder 17:6,
  17:25, 87:11
remaining 9:5
remains 59:18
remanded 55:3
remarks 25:2
remedies 28:16,
  48:5, 51:17,
  51:19, 51:21, 52:4

remedy 23:9, 25:6,
  28:1, 28:19,
  28:24, 38:11,
  48:4, 49:5, 50:24,
  52:2
remind 8:3, 83:4
remove 57:11, 75:14
removing 42:23
render 90:13
rendered 60:12
renders 43:20, 71:5
reorganization 11:1,
  11:3, 11:9, 12:6
reorganize 41:13
reorganized 59:13
repaired 65:23
repeal 28:21, 48:4,
  76:24
repealed 49:8
repeat 16:18, 16:22
repeatedly 13:2,
  18:24
repetitive 77:6
reply 10:24, 11:21,
  12:14, 12:19,
  12:21, 13:1,
  14:17, 14:22,
  16:14, 16:24,
  18:12, 22:13,
  26:22, 26:25,
  29:11, 44:9,
  44:12, 44:14,
  45:11, 45:17,
  48:7, 49:17,
  60:12, 92:15
report 32:10, 32:11,
  60:12, 60:20,
  90:13
Reporter 16:17,
  16:18, 31:21,
  104:15
repossession 25:13,
  26:2, 49:7
represent 40:15,
  53:16, 60:9
Representative 1:13,
  1:30, 7:14, 29:20,
  60:14, 60:23,
  100:11
Representatives

53:18, 56:11,
  94:19, 98:12
represents 98:21
reprogram 54:6,
  80:13, 80:16,
  82:2, 86:1, 86:19,
  86:23, 99:2
reprogrammed 84:24,
  85:21, 86:3
reprogrammings 55:8,
  101:6
Request 54:19,
  55:21, 56:2, 56:3,
  64:25, 66:3, 67:8,
  67:13, 83:20,
  84:19, 84:20,
  85:17, 85:25,
  90:22, 94:15,
  96:22, 97:3, 98:13
requested 21:19,
  54:21, 55:2, 65:7,
  67:10
requests 55:9, 66:9,
  68:5, 83:25, 90:22
require 13:10, 21:4,
  43:23
required 20:24,
  21:9, 21:23,
  26:19, 27:22,
  54:18, 58:8,
  67:14, 97:20,
  98:19
requirement 14:8,
  26:12, 42:6,
  47:13, 66:9
requires 14:18,
  46:24, 47:23,
  66:12
rescinded 27:10,
  30:24, 32:21
rescission 16:9,
  16:10, 27:5, 42:5,
  51:1
research 39:9
reserve 29:22
reserves 95:13
Resident 60:20, 63:3
Resolution 25:5,
  56:1, 56:9, 56:11,
  56:25, 57:3,

57:25, 58:3,
58:18, 64:1, 72:2,
84:11, 84:15,
84:17, 84:21,
84:23, 85:20,
86:11, 87:18,
88:2, 94:25,
97:19, 98:1
resolve 25:11,
56:21, 56:24,
57:2, 84:10, 88:15
resolved 80:11,
87:1, 89:8
resolves 15:15, 49:8
resolving 23:8
resort 89:7
Resources 60:13
respect 26:2, 26:14,
42:2, 46:21,
69:12, 74:21,
78:11, 87:3
Respectfully 25:5,
81:14, 84:13, 85:7
respects 76:4
respond 15:12,
18:10, 96:18
responded 41:4,
69:10, 89:23
response 21:22,
26:15, 45:7,
73:22, 75:18
response. 94:8,
102:17
responses 30:10
responsibilities
60:10, 74:21
responsibility
69:20, 71:25,
74:23
responsible 36:19,
72:6, 77:5
rest 70:15
restitution 29:8,
50:14, 52:1
restrain 75:22
Restraining 74:24,
94:16
Restrict 72:13,
80:9, 81:14,
82:15, 84:5,

91:16, 91:17,
97:10
restricted 92:4
restricting 83:12
restriction 68:4,
92:5
Restrictions 54:8,
54:15, 57:12, 74:9
restructure 89:14
restructures 40:20
restructuring 11:22,
12:1, 35:19,
35:20, 41:6, 42:9,
42:19, 42:23,
57:13
result 42:5, 45:20,
62:17, 63:1
results 62:22, 63:9
retains 76:5
retransmission 8:5
retroactively 9:22
return 25:13, 36:11,
44:1, 44:19, 51:3,
52:3, 87:14
returning 53:23
returns 11:17
review 101:21
reviewed 95:11
reviewing 83:25
revised 57:5, 85:4,
97:16, 97:20,
97:22, 97:24,
98:11
revising 84:18
revision 98:9
revoke 76:25
Rican 76:12
rights 18:4, 48:9,
48:24, 49:2, 59:8,
83:12, 91:17,
92:5, 93:1
rigors 57:12
rim 88:8
risk 12:6
Rodriguez 5:12,
53:14, 53:18
Roland 17:18
role 20:14, 54:13,
55:7, 65:19,
66:24, 83:24,

93:9, 93:10,
93:11, 93:12,
99:13
roll 64:12
rope 84:3
Rose 29:19
Rosen 4:34, 18:13
Rowland 18:2
rule 8:8, 8:20,
59:11, 62:7,
74:13, 89:25,
90:2, 95:9
Rules 20:19, 20:20,
89:23, 95:17,
95:18
ruling 94:9, 94:14,
95:13, 95:15,
95:16
rulings 42:18
run 101:18
running 90:19

< S >
S. 4:34
S/ 104:13
SA 9:20, 19:17,
24:24, 36:18,
41:13, 41:15,
41:17, 44:24,
45:21
SA. 36:22
safe 103:5
salary 60:5
Sales 12:19, 12:23,
12:24, 13:2, 40:1,
40:2, 40:10,
40:14, 46:21,
46:23, 47:1, 47:12
Salsde 13:10
Salud 51:7
San 7:1
sanctioned 48:9,
48:22
sanctioning 40:7
sanctions 8:8
Santisteban 34:1,
34:6
SARL 35:22, 43:18,
45:1

satisfy 26:12
save 7:10
saying 12:5, 31:14,
    49:25, 57:8,
    66:10, 73:23,
    80:25, 81:3
says 27:18, 28:14,
    29:4, 41:15,
    41:18, 47:3,
    48:13, 48:20,
    50:15, 51:10,
    54:18, 54:19,
    58:2, 60:15,
    61:21, 63:2, 66:5,
    68:6, 69:25,
    71:24, 72:12,
    75:23, 78:3, 89:7,
    89:12, 90:2, 90:6
scenarios 81:10
schedule 97:14
scheduled 52:22,
    79:6, 102:20
scheme 30:15, 62:16
scope 13:25, 14:1,
    14:20, 15:7,
    15:14, 23:25,
    31:1, 35:7, 36:12,
    47:14, 57:9, 61:2,
    61:16, 63:12,
    70:20, 74:4, 84:14
seat 61:10
Second 7:18, 10:5,
    10:12, 10:17,
    13:24, 15:19,
    16:6, 18:12,
    19:24, 25:18,
    26:1, 27:6, 27:7,
    30:18, 35:5,
    51:19, 51:25,
    64:5, 69:11,
    72:17, 72:24,
    75:18, 78:11,
    80:6, 84:12
secondly 70:14
sections 18:25,
    37:21, 73:17,
    79:12
seeing 53:24, 66:8
seek 9:22, 25:10,
    27:8, 51:1

seeking 22:17,
    42:21, 55:24,
    72:2, 83:22
seeks 10:3, 10:11,
    28:16, 28:25,
    94:21, 94:24
seem 66:18, 81:10
seems 57:7, 57:16,
    58:21, 65:8,
    66:12, 84:12,
    86:25
seen 74:18, 93:3
sees 76:9
select 7:25, 55:15,
    60:5
self-determination
    96:16
self-submitted 64:2
sell 25:16
sells 35:21, 42:11
Senate 83:15, 97:13
senators 83:15
sense 89:18
sensitivity 94:14
sentence 18:18,
    18:21, 27:7, 29:2
separate 11:3, 11:4,
    11:5, 11:10, 15:9,
    31:15, 36:5, 43:16
separated 31:12
separately 82:22
sequence 29:24
serious 22:8, 22:19
serves 101:4
serving 62:15
session 7:8, 77:8
sessions 77:23
set 10:23, 12:15,
    14:12, 15:10,
    24:15, 28:21,
    53:19, 65:3, 84:2,
    91:7, 92:13, 97:1
sets 14:4, 68:3
setting 20:24
several 56:17
severity 48:17
shall 14:13, 37:11,
    37:12, 50:16,
    55:5, 59:7, 66:5,
    66:6, 67:1, 91:16,

100:23
shares 35:22, 42:11,
    42:12, 42:20
sharply 69:12, 79:17
short 41:15, 54:9,
    94:10
shorthand 18:20
shots 77:13
shouldn't 50:21,
    73:23
show 15:23, 22:19,
    28:10, 66:21,
    69:17, 78:2,
    100:16, 101:12,
    101:24, 102:2,
    102:5
showing 12:19
shown 30:15, 35:1
shows 40:11
shy 73:12
side 28:10
sign 41:2
signed 17:22, 24:8
significant 22:16,
    42:21
significantly 73:10,
    73:14, 85:5, 96:14
similar 56:18,
    58:21, 72:3
simple 54:6
simply 27:7, 28:8,
    33:13, 34:23,
    40:17, 47:5,
    57:11, 61:18,
    62:4, 69:10,
    77:21, 84:24,
    85:21, 88:16,
    92:14, 93:15, 95:9
single 54:16, 58:13,
    59:1
sister 35:16, 35:25
sites 91:3
situating 20:3
situation 32:12,
    32:18, 69:23
six 9:23, 15:22,
    22:21, 24:5,
    25:14, 30:14,
    31:5, 60:5, 94:24,
    96:7

Six. 84:1
sixth 35:18, 42:15,
   43:21, 50:6, 59:22
skip 89:20, 89:21
skipping 33:3
Slow 10:8, 16:19,
   21:15, 45:13,
   45:14
slowly 16:21
social 22:16
sole 40:18, 47:6,
   75:9, 97:19
solely 57:17
Solutions 8:1, 52:23
someone 47:16,
   63:20, 94:7
sometimes 30:13,
   35:25
somewhere 78:9
sophisticated 22:11
Sorry 16:17, 19:25,
   21:16, 31:20,
   31:21, 45:24,
   49:15, 53:25,
   54:1, 66:14,
   73:16, 87:20,
   87:25, 94:7
sort 29:10, 35:15
sought 28:19, 49:6
Sound 9:6, 9:7,
   27:12, 29:1, 42:1,
   43:9, 47:10,
   48:25, 51:2, 52:6,
   67:23, 92:20, 94:2
Speaker 8:9, 9:2,
   9:4, 53:17, 69:17,
   82:20, 82:25,
   83:22, 84:13,
   86:20, 94:18,
   97:13, 98:25
speakers 8:11
speaking 7:24,
   53:21, 60:15,
   82:20, 82:22
special 20:20,
   55:11, 55:15,
   56:22, 58:8, 60:4,
   62:20, 88:6,
   94:23, 96:6,
   96:23, 96:25,

98:2, 98:19
specialized 16:1,
   19:1
specially 18:23
specific 8:14,
   12:16, 12:17,
   13:3, 14:4, 14:22,
   15:6, 20:22,
   20:24, 22:1,
   22:20, 25:10,
   28:19, 28:22,
   38:14, 46:24,
   47:13, 60:6, 62:1,
   65:19, 68:3, 85:8
specifically 18:22,
   24:11, 39:6,
   60:18, 67:14,
   78:6, 85:13, 86:8,
   89:6
specified 9:11,
   15:21, 21:23,
   55:18
speech 60:25
spend 72:20, 73:6,
   76:13, 78:8,
   88:22, 88:23,
   88:24
spending 69:18,
   73:2, 75:22
spent 78:7
spiny 88:17
splendid 103:3
split 92:19, 92:21
spoken 8:12
sponsored 61:5,
   61:15
sports 77:15
squarely 30:25,
   38:19
Stability 95:3
staff 41:21, 102:25
stage 79:18
stall 72:1
stand 26:6
Standard 12:16,
   26:24, 99:16,
   102:23
standards 93:23
standing 26:6
start 30:9, 44:23

started 55:23, 73:21
State 37:1, 45:21,
   56:8, 61:6, 70:4,
   71:17, 74:15,
   74:17, 74:25,
   89:10, 89:15,
   93:2, 96:3, 96:21,
   96:24
stated 14:15, 81:23,
   82:11, 85:22,
   86:2, 89:3, 89:5,
   98:3
statehood 55:18,
   60:9, 61:21, 63:1,
   63:3, 71:20,
   91:23, 92:1, 96:8
statement 16:19,
   16:22, 24:2, 24:4,
   24:6, 24:9, 24:12,
   24:15, 25:23,
   28:14, 41:3,
   44:17, 44:24,
   45:2, 45:7, 45:10,
   45:16, 45:19,
   45:23, 46:7,
   46:10, 71:12, 72:7
statements 12:4,
   50:3
States 1:1, 4:23,
   4:25, 7:7, 7:11,
   14:10, 14:11,
   14:12, 22:13,
   23:17, 31:7, 34:3,
   37:3, 37:9, 55:5,
   71:15, 85:25,
   91:9, 96:3,
   100:22, 104:7,
   104:8
status-related 72:6
status. 91:18
statute 14:9, 18:15,
   18:19, 19:1, 20:8,
   27:17, 31:9,
   32:25, 37:7,
   38:11, 39:5,
   39:11, 54:18,
   59:7, 69:8, 70:22,
   72:22, 73:13,
   76:19, 77:3, 77:7,
   77:21, 79:15,

82:19, 83:7, 90:1,
  92:16, 101:18
statutes 62:8, 73:19
statutorily 16:13
statutory 16:2,
  19:1, 26:12, 40:8,
  58:15, 59:11,
  66:9, 69:9, 71:7,
  89:23, 89:25, 95:9
Stay 72:19, 74:11,
  74:12, 94:11,
  103:5
stealing 47:16
steals 37:4
stenography 5:48
step 58:20, 71:13,
  76:2, 82:14, 84:2
stipulated 33:20
stock 43:17, 45:5
stop 69:18
stopping 65:1, 65:3
straight 31:25,
  54:4, 59:7
street 41:22
strived 80:7
struck 84:7
structure 13:17,
  13:20, 32:3
Subastas 33:16
subject 27:5, 87:4
subjected 12:7
subjective 61:17,
  62:13, 63:20,
  71:21
submission 45:20,
  52:9, 66:4, 81:24
submissions 52:13,
  86:17
submit 25:5, 54:18,
  67:15, 85:5
submits 66:2, 67:9,
  67:11
submitted 24:4,
  56:2, 56:3, 56:9,
  56:10, 57:21,
  78:15, 78:19,
  83:19, 85:2,
  96:11, 96:21,
  97:16, 97:22
subparagraph 66:5

subpoenas 23:19,
  32:9, 41:5
Subsection 54:17,
  55:4, 66:23,
  66:24, 66:25,
  67:9, 67:15
subsequent 17:22,
  18:1, 97:9
subsidiaries 16:4,
  19:16, 32:23,
  33:5, 33:13, 33:22
subsidiary 19:17,
  30:20, 32:18,
  33:18, 33:25,
  34:6, 34:13,
  34:20, 34:21,
  34:24, 34:25,
  35:3, 35:14,
  35:24, 39:16,
  40:16, 40:23,
  41:8, 41:15,
  41:17, 42:24,
  46:16, 47:4
substance 10:22,
  26:7
substantial 11:7,
  11:10
substantive 94:25
substituting 25:21
subterfuge 47:9
succeed 100:8
success 69:6, 99:20,
  100:3, 101:24
sudden 81:7
suffer 99:22,
  100:12, 102:2
suffered 10:1,
  93:14, 100:18
suffers 65:22, 99:11
sufficient 22:9
suggested 89:4
suggesting 93:4
suggests 26:23
suing 30:16
suite 72:20
summarize 79:11
summary 9:14, 13:10,
  15:14, 18:11,
  20:14, 20:21,
  21:2, 21:22,

22:19, 23:5, 24:2,
  25:7, 26:20,
  27:20, 29:12,
  45:9, 46:8
summer 54:12, 62:24
superfluous 71:5
supersedes 75:7
supervise 101:17
supervision 101:21
Supp 18:3
supplement 46:9,
  52:11, 89:11
supplementary 89:10
suppliers 25:21
supply 9:23, 12:2,
  13:7, 19:23,
  20:22, 22:21
support 11:24,
  91:23, 93:6, 103:3
supported 13:11
supports 47:13
Suppose 72:16, 73:4
supposed 71:24, 77:4
Supreme 36:17,
  39:25, 51:5
Surcharges 36:20,
  36:22
surprised 48:20
Susman 9:19, 44:22
sustained 25:22
Swain 4:22, 7:9,
  53:4, 104:7
swiftly 61:9
sworn 24:1, 24:4,
  24:6, 24:9, 24:14,
  78:18
system 92:24, 93:22
systems 92:24


< T >
table 61:11
Tacoronte 7:5
taken. 53:2
talked 74:1
talks 47:7, 51:8
tax 11:17, 13:16,
  42:19
Taylor 4:22, 7:9,
  104:7

team 41:22
technicalities 40:14
Technologies 99:17
telephone 41:23
telephonic 7:22,
    102:23
TELEPHONICALLY 4:30
tells 89:13
Temporary 74:24,
    94:16
ten 26:25, 52:24,
    53:23, 87:14
ten-minute 52:21
tenders 34:9, 47:12
tense 33:9
term 16:2, 16:13,
    18:22, 18:23,
    18:24, 55:14, 61:6
terms 9:24, 18:17,
    18:18, 18:19,
    18:20, 19:2,
    21:24, 50:24,
    76:8, 101:4
territorial 58:17,
    100:24
territories 14:11
testimony 13:12
Tetley 18:7
text 14:9, 33:1
textual 19:5
thanks 94:3
theory 25:12, 26:3
thereafter 84:2,
    98:15
Thereby 35:23,
    42:23, 50:11
therein 98:16
thereof. 33:5
thereto 51:19, 52:5
They've 49:8, 50:20,
    69:20
Third 15:16, 19:22,
    30:25, 49:17,
    52:1, 69:11,
    78:11, 80:11
though 9:24, 20:15,
    90:6
thoughts 94:11
three 15:9, 17:19,
    18:10, 21:6, 32:2,

77:25, 80:4,
    81:10, 81:12
threshold 26:5,
    100:1
tight 84:3
timeline 32:2
timing 40:19
Timothy 4:38, 79:25
tips 69:12
Title 1:8, 1:25
titled 54:14
Titles 74:9
Today 7:19, 7:22,
    9:11, 30:17,
    86:17, 95:12,
    103:2
Todd 46:15
together 78:15,
    97:6, 102:16
took 11:7, 64:3
tort 12:17
torts 12:18
total 23:3, 43:6
touch 32:14, 39:19,
    48:15
towards 18:7
track 9:2, 9:3
Tractor 33:15,
    33:25, 34:5
traders 41:21
trading 11:1, 11:8,
    11:10, 41:19
transaction 35:15
transactions 47:20
transacts 11:18
Transcript 5:48,
    8:18, 95:14, 104:4
transcription 104:5
transfer 41:3, 45:6
transferred 13:3,
    41:9, 42:17, 44:25
transfers 41:6
transitioning 96:4
translation 47:1,
    48:23
transparently 42:14
treatment 42:22
trial 43:23
tried 62:20
trigger 38:9

TRO 80:5
true 22:7, 62:23,
    72:7, 78:4, 104:5
truthful 24:14
try 30:10, 32:1,
    41:1, 59:5, 74:25,
    81:11
trying 40:1, 44:10,
    80:23, 88:21,
    88:23
turn 24:19, 57:24,
    59:4, 81:18,
    81:25, 88:16,
    92:14
turned 59:4
Turning 39:14,
    82:10, 99:15
turns 69:8, 92:22
twice 91:10
type 14:17, 29:8

< U >
ultimate 64:16,
    76:6, 100:5
ultimately 64:7,
    82:5
UN 40:24
unable 48:4, 56:16,
    59:1, 64:10,
    100:10
uncontested 15:13,
    18:11
uncontroverted
    10:23, 11:20
undefined 18:14,
    18:17, 18:18, 60:9
underlying 15:10,
    26:16, 54:5
understand 70:12,
    75:5, 76:11,
    80:23, 81:11
understanding 13:16
understood 31:11
underway 23:22
undisputed 29:12,
    32:5, 45:5, 45:8,
    46:8
undisputedly 32:18
unfettered 76:7

UNIIC 32:10
unilateral 25:13,
   26:2, 49:7, 76:12
unilaterally 86:12,
   86:22
unimportant 59:16
United 1:1, 4:23,
   4:25, 7:7, 7:11,
   14:12, 23:17,
   31:7, 34:3, 71:15,
   91:9, 96:3, 104:6,
   104:8
unless 23:10, 55:6,
   66:7, 66:16,
   79:10, 87:10
unlikely 100:8
unmute 8:2, 24:21,
   49:14, 68:12,
   68:14
unmuted 68:17
unopposed 59:25
unqualified 18:20
unrelated 13:14
unresolved 56:22
unsealed 43:5, 44:2,
   44:3, 44:5, 44:13,
   49:18
unspecified 55:17
unsworn 78:17
until 9:12, 44:25,
   55:22, 65:7,
   65:14, 100:25
unusual 83:3
urgently 61:9
urging 97:3
Urrutia 4:12, 53:11,
   60:21
uses 18:24, 70:18,
   70:21
using 38:2
usual 8:19, 90:4
Utah 60:14
utterly 59:1


< V >
v. 2:11, 2:28, 3:11,
   3:28, 4:10, 9:14,
   53:10, 99:17
vacancies 65:16

vacant 79:2
valid 74:6
validly 77:21
value 37:5
valued 41:10
various 40:19
veil 40:6
verb 33:9, 91:16
versus 33:16, 40:2,
   51:6
veto 75:19, 88:21
view 32:21, 76:17,
   76:21
views 60:25
VIII 10:12, 19:24
VIN 23:15, 23:22,
   31:6, 31:8, 31:10,
   31:14, 31:15,
   31:20, 31:21,
   41:12
violated 30:13, 31:6
violation 15:24,
   20:5, 23:23,
   51:18, 100:9,
   100:17, 100:18,
   102:3
Violations 8:8
violence 37:10
vitiates 102:1
void 19:23, 31:2,
   43:21, 51:12
vote 67:3, 91:24,
   91:25
voted 56:12, 96:2,
   98:12
voters 63:6
VS 31:20


< W >
wait 73:5
waive 87:11
walked 20:25, 84:3
Walker 104:13,
   104:14
wanted 63:15, 76:17,
   77:1, 82:12, 91:5
wants 88:24
warranted 48:19
warrantees 21:23,

21:25
Washington 55:18,
   72:18, 73:2, 96:7
weave 30:10
week 72:18
Weeks 42:10
weight 22:16
welcome 7:16
well-known 55:20,
   71:1
whatever 52:10,
   88:10
whole 15:15, 74:22,
   75:21, 76:11
wholeheartedly 72:4
wholly 30:20, 40:22,
   41:7, 41:14,
   41:17, 74:17
whomever 49:22
win 69:16
wins 63:3
wire 27:23
wise 93:22
wish 40:15, 68:2,
   94:7
wished 98:25
wishes 76:2
withdrawn 25:24,
   28:20
withheld 99:22
withholding 38:2,
   99:24
within 14:7, 20:4,
   30:25, 33:19,
   34:15, 35:7,
   36:12, 36:23,
   37:16, 38:19,
   47:20, 50:3, 54:6,
   61:24, 63:12,
   63:19, 67:4, 83:7,
   90:4, 92:8
without 28:15,
   37:10, 38:25,
   54:8, 65:6, 89:5,
   93:11, 98:9
WITNESSES 6:3, 13:13
word 36:22, 66:11,
   70:19, 70:20,
   70:21, 71:1, 71:5,
   90:5, 91:13

words 33:3, 67:1,
  71:2, 82:18, 90:3,
  90:4, 101:9
work 16:7, 66:20,
  78:22, 91:3, 97:6,
  101:17, 103:1
worked 78:22
works 69:20
world 38:12
worse 72:8
worth 20:3
write 86:12
writes 41:10
writing 17:5, 17:21
wrongful 38:1
wrote 28:12, 97:2,
  97:12


< Y >
year 24:8, 40:23,
  54:24
years 26:17, 40:24,
  92:19
yes-or-no 61:5
Yesterday 10:15,
  25:2, 30:7, 46:6,
  103:2
York 12:1, 13:7,
  13:15, 14:6, 14:7,
  14:20, 15:10,
  23:18, 32:6,
  36:17, 38:4, 41:5,
  103:1
yourself 8:10, 24:21


< Z >
zero 11:24