## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re: | |
| THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, | PROMESA Title III |
| as representative of | No. 17 BK 3283-LTS |
| THE COMMONWEALTH OF PUERTO RICO, *et al.* | (Jointly Administered) |
| Debtors.[1] | |
| In re: | |
| THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, | PROMESA Title III |
| as representative of | |
| THE COMMONWEALTH OF PUERTO RICO | No. 17 BK 3283-LTS |
| -and- | |
| PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY, | No. 17 BK 3567-LTS |
| Debtors. | THIS PLEADING RELATES ONLY TO THESE TITLE III CASES |

## THE DRA PARTIES' RESPONSE TO
## THE GOVERNMENT PARTIES OBJECTION TO THE DRA PARTIES' STANDING
## TO SEEK RELIEF FROM THE AUTOMATIC STAY OR IN THE ALTERNATIVE,
## ORDERING PAYMENT OF ADEQUATE PROTECTION

---

[1] The Debtors in these Title III cases, along with each Debtor's respective Title III case number listed as a bankruptcy case number due to software limitations and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (the "Commonwealth") (Bankruptcy Case No. 17-BK-3283 (LTS)) (Last Four Digits of Federal Tax ID: 3481), (ii) Employees Retirement System of the Government of the Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK-3566(LTS)) (Last Four Digits of Federal Tax ID: 9686), (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567 (LTS)) (Last Four Digits of Federal Tax ID: 3808), (iv) Puerto Rico Sales Tax Financing Corporation  (Bankruptcy Case No. 17-BK-3284 (LTS)) (Last Four Digits of Federal Tax ID: 8474); (v) Puerto Rico Electric Power Authority  (Bankruptcy Case No. 17-4780 (LTS)) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority (Bankruptcy Case No. 19-BK-5233-LTS) (Last Four Digits of Federal Tax ID: 3801).

## <u>TABLE OF CONTENTS</u>

<u>Page(s)</u>

PRELIMINARY STATEMENT ........................................................................1

BACKGROUND ...........................................................................................4

    I.    The GDB Restructuring and the Creation of the DRA. ...........................4

    II.    The Ancillary Agreements Follow the Asset Restrictions in the GDB
        Restructuring Act. ....................................................................6

ARGUMENT ...............................................................................................8

    I.    The DRA Parties Have Standing to File the Amended Motion and the
        Government Parties Make no Contrary Arguments to Refute this. ..................8

        A.    The DRA Parties Have Standing to Bring the Amended Motion. ..............8

    II.    The Asset Restrictions Do Not Deprive the DRA of Standing Here or
        Otherwise Prohibit the Filing of the Amended Motion. ........................10

        A.    The Asset Restrictions are Statutory and Do Not Prohibit the
                Amended Motion. ....................................................................10

        B.    The GDB Restructuring Act Is Clear and Unambiguous and Does Not
                Prohibit the Amended Motion. ....................................................11

    III.    The Asset Restrictions in the Transfer Agreement also Support the DRA
        Parties' Position. ....................................................................19

        A.    Applicable Rules on Interpretation of Contracts in Puerto Rico. ..............19

        B.    The Asset Restrictions in the Transfer Agreement are Clear and
                Unambiguous and Do Not Prohibit the Amended Motion. .......................21

        C.    The Government Parties Do Not Rely on the Plain Language of the
                Asset Restrictions And Reach Illogical Conclusions...........................22

        D.    The Court Should Not Consider Extrinsic Evidence ...............................25

        E.    If the Court Considers the Ancillary Agreements as Extrinsic
                Evidence, the Same Favors the DRA Parties............................26

CONCLUSION............................................................................................29

NOTICE OF TIME TO RESPOND .................................................................30

## <u>TABLE OF AUTHORITIES</u>

**United States Cases**                                              **Page(s)**

*Autoridad de Carreteras y Transportacion v. TransCore Atl., Inc.*,
   387 F. Supp. 3d 163, 166 (D.P.R. 2017) ................................20

*Borschow Hosp. & Med. Supplies, Inc. v. Cesar Castillo Inc.*,
   96 F.3d 10, 16 (1st Cir. 1996) ................................25

*Catullo v. Metzner*,
   834 F.2d 1075, 1079 (1st Cir. 1987) ................................20

*Colón v. Blades*,
   717 F.Supp.2d 175, 184, (D.P.R. June 15, 2010) ................................10

*Connecticut Nat. Bank v. Germain*,
   503 U.S. 249, 253–254, (1992) ................................12

*Exec. Leasing Corp. v. Banco Popular de Puerto Rico*,
   48 F.3d 66, 69 (1st Cir. 1995) ................................25

*Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*,
   529 U.S. 120, 133 (2000) ................................12

*FTC v. Mandel Brothers, Inc.*,
   359 U.S. 385, 389 (1959) ................................12

*Grella v. Salem Five Cent. Sav. Bank*,
   42 F.3d 26 (1st Cir. 1994) ................................8,9, 10

*Gustafson v. Alloyd Co.*,
   513 U.S. 561, 569 (1995) ................................12

*Hopgood v. Merrill Lynch, Pierce, Fenner & Smith*,
   839 F.Supp. 98, 106 (D.P.R. 1993). ................................20

*In re Empresas Omajede Inc.*,
   537 B.R. 63, 95 (Bankr. D.P.R. 2015) ................................19

*In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*,
   618 B.R. 362, 371 (D.P.R. 2020) ................................9

*In re FOMB for PR*,
   618 B.R. 619, 630 (D.P.R. 2020) ................................8

*In re Marron,*
    455 B.R. 1, 3 (Bankr. D. Mass. 2011) ..................................................................8

*In re N–500L Cases,*
    517 F.Supp. 816, 818 (D.P.R. 1981) ..................................................................19

*In re Old Cold, LLC,*
    602 B.R. 798, 825 (1st Cir. BAP 2019) .............................................................9

*In re Plaza Resort at Palmas, Inc.,*
    741 F.3d 269, 274–75 (1st Cir. 2014) ...............................................................11

*Luis Santiago v. Santiago,*
    731 F. Supp. 2d 202, 206 (D.P.R. 2010) ...........................................................10

*Marcial v. Tome,*
    144 P.R. Dec. 522, 537 (1997) ..........................................................................20

*Martin v. Vector Co.,*
    498 F.2d 16, 24 (1st Cir. 1974) .........................................................................26

*Mission Prod. Holdings, Inc. v. Schleicher & Stebbins Hotels, L.L.C.*
    *(In re Old Cold, LLC),*
    602 B.R. 798 (1st Cir. BAP 2019) ......................................................................9

*Nike Int'l Ltd. v. Athletic Sales, Inc.,*
    689 F. Supp. 1235, 1245 (D.P.R. 1988) ...........................................................20

*Paterson–Leitch Co. v. Massachusetts Municipal Wholesale Elec. Co.,* 840 F.2d
    985, 990 (1st Cir.1988) .....................................................................................19

*Pritzker v. Yari,*
    42 F.3d 53, 68 (1st Cir. 1994) ...........................................................................12

*Rivera-Gomez v. de Castro,*
    843 F.2d 631, 635 (1st Cir. 1988) .....................................................................19

*S.L.G. Irizarry v. S.L.G. Garcia,*
    155 P.R. Dec. 713, 726 (2001) ..........................................................................21

*Sylva v. Culebra Dive Shop,*
    389 F. Supp. 2d 189, 200 (D.P.R. 2005) ...........................................................25

*Urbain Pottier v. Hotel Plaza Las Delicias, Inc.,*
    379 F. Supp. 3d 130, 134 (D.P.R. 2019) ...........................................................12

*Villamia v. MVP Auto Corp.*,
    433 F. Supp. 3d 261, 270 (D.P.R. 2020) ........................................................12

*Villeneuve v. Avon Prod., Inc.*,
    111 F. Supp. 3d 112, 118–19 (D.P.R. 2015), *aff'd*, 919 F.3d 40 ...........................12

*Vulcan Tools of Puerto Rico v. Makita U.S.A., Inc.*,
    23 F.3d 564, 567 (1st Cir. 1994) ..........................................................20

*Warner Lambert Co. v. Tribunal Superior*,
    1 P.R. Offic. Trans. 527, 559 (1973) ......................................................13

**Puerto Rico Cases:**

*Baez Rodriguez v. E.L.A.*,
    179 D.P.R. 231, 245 (2010) ............................................................13

*Bco. Santander v. Correa Garcia*,
    196 D.P.R. 452, 465 (2016) ............................................................13

*Com. CNP v. CEE*,
    197 D.P.R. 914, 934-35 (2017) .........................................................12

*Engineering Services International, Inc. v. Autoridad de Energía Eléctrica de
    Puerto Rico*,
    2020 WL 5659443 at *11 ...............................................................13

*Gonzalez v. Hurley Int'l LLC*,
    2013 WL 12237670 (D.P.R. Feb. 13, 2013) ...........................................25

*Municipio Mayaguez v. Lebrón*,
    167 D.P.R. 713, 724 (2006) ............................................................20

*Ríos Martínez, Com. Alt. PNP v. CLE*,
    196 D.P.R. 289, 297-98 (2016) .........................................................13

*Romero Barceló v. E.L.A.*,
    169 D.P.R. 460, 476-77 (2006) .........................................................12

*Torres, Torres v. Torres Serrano*,
    179 D.P.R. 481, 494 (2010) ...........................................................21,22

*Trinidad v. Chade*,
    153 D.P.R. 280, 289 (2001) ............................................................20

**United States Statutes**

*Title VI of the Puerto Rico Oversight, Management and Economic Stability Act*
("PROMESA") .................................................................................... *passim*

**Puerto Rico Statutes**:

7 L.P.R.A. § 3217 ...................................................................................16

P.R. Laws Ann. tit 7, § 3163(d) .............................................................6

P.R. Laws Ann. tit 7, § 3174 ...............................................................18

P.R. Laws Ann. 7, § 3175 .....................................................................18

P.R. Laws Ann. tit. 7, § 3176a(b) ......................................................6, 11

P.R. Laws Ann. 31, § 14 (2015) ..........................................................12

P.R. Laws Ann. tit. 31, § 3372.............................................................10

P.R. Laws Ann. tit. 31, § 3471 ............................................................19

P.R. Laws Ann. tit. 31, § 3472.............................................................20

P.R. Laws Ann. tit. 31, § 3478 ............................................................26

*Government Development Bank for Puerto Rico Debt Restructuring Act*,
Act No. 109-2017, *as amended by* Act No. 147-2018................... *passim*

Art. 1 .......................................................................................................6
Art. 4 .....................................................................................................18
Art. 5 .....................................................................................................18
Art. 204 .................................................................................................17
Art. 205 .................................................................................................18
Art. 207 ......................................................................................5, 17, 18
Art 207(b) .............................................................................................11
Art 404(a) ...............................................................................................7
Art 709 ..................................................................................................16

**Other Authorities**

*Cambridge Dictionary*,
https://dictionary.cambridge.org/dictionary/english/furtherance (last visited on
March 1, 2021) ....................................................................................16

*Cambridge Dictionary*,
https://dictionary.cambridge.org/dictionary/english/foregoing (last visited on
March 1, 2021) ....................................................................................16

DOC ID - 36221177.6

**COME NOW** AmeriNational Community Services, LLC (the "<u>AmeriNat</u>" or "<u>Servicer</u>"), as servicer for the GDB Debt Recovery Authority (the "<u>DRA</u>"), and Cantor-Katz Collateral Monitor LLC, a Delaware limited liability company (the "<u>Collateral Monitor</u>," and together with the Servicer, collectively, the "<u>DRA Parties</u>"), which serves as the collateral monitor for Wilmington Trust, N.A. in connection with the new bonds that the DRA issued pursuant to the *Government Development Bank for Puerto Rico Debt Restructuring Act*, Act No. 109-2017, as amended by Act No. 147-2018 (the "<u>GDB Restructuring Act</u>"), and the approved Qualifying Modification for the Government Development Bank for Puerto Rico (the "<u>GDB</u>")[2] under Title VI of the *Puerto Rico Oversight, Management and Economic Stability Act* ("<u>PROMESA</u>"), by and through the undersigned legal counsel, and respectfully submit their response (the "<u>Response</u>") to *The Government Parties Objection to the DRA Parties' Standing to Seek Relief from the Automatic Stay or in the Alternative, Ordering Payment of Adequate Protection* (the "<u>Standing Objection</u>") [Dkt. No.[3] 16518].

## **PRELIMINARY STATEMENT**

The DRA Parties have standing to bring *The DRA Parties' Amended Motion and Memorandum of Law in Support of their Request for Adequate Protection or Relief from the Automatic Stay* (the "<u>Amended Motion</u>") [Dkt. No. 16276].[4]  That is the only question presently before this Court and the Court should permit the DRA to proceed with the Amended Motion accordingly.

The Standing Objection filed by Financial Oversight and Management Board for Puerto Rico and the Puerto Rico Fiscal Agency and Financial Advisory Authority does not assert any

---

[2] *See* Dkt. No. 270 of Civil Case No. 18- 01561 (LTS) (Nov. 7, 2018).
[3] Unless otherwise specifically identified in this Response, the term "Dkt. No." shall refer to Case No. 17-03283 (LTS).
[4] Capitalized terms not defined in this Response shall have the meaning ascribed to them in the Amended Motion.

basis for dismissal of the Amended Motion for the DRA Parties' lack of standing.  As the Court has previously ruled in other lift stay motions, the only question for the Court to consider in connection with standing here is whether the DRA Parties have a "colorable claim" against the property that is the subject of the Amended Motion (i.e. the Act 30-31 Revenues).  A colorable claim is defined as a "legitimate claim or lien" on the property at issue.

The DRA Parties have established their "colorable claim" in the Amended Motion (see paragraphs 104 to 109 thereof).  The DRA has a valid, perfected lien on the Act 30-31 Revenues, wherever located, which lien is subject only to a limited clawback right, which has not been satisfied here.  The Government Parties do not challenge that assessment in the Standing Objection – or even discuss the "colorable claim" standard at any point in their brief.[5]

Instead of addressing standing, the Government Parties throw up a smokescreen, devoting the entirety of their brief to the narrow (and irrelevant to standing) question of whether certain contractual "asset restrictions" prohibit the DRA Parties from prosecuting the Amended Motion.  The asset restrictions do no such thing.

Although the DRA Parties do not believe the asset restrictions play any role in determining their standing here, even if they did, the asset restrictions are not a limitation on their right to prosecute the Amended Motion.  Instead, the asset restrictions clearly permit the DRA to "preserve, protect or defend" its collateral to "assure that funds are available for debt service from the obligors," which is exactly what the DRA Parties are doing by filing the Amended Motion.

The Government Parties employ a variety of tactics to distract from this fact.  First, the Government Parties fully misstate the nature and history of the asset restrictions. They attempt to

---

[5] The word "standing" appears twice in the Government Parties' brief – both in the first paragraph – and at no point do they explain how the Asset Restrictions pertain to standing.

recast them as ambiguous contractual terms, rather than the clear statutory rights they are.  The Government Parties ignore the statutory basis for the asset restrictions, which is the GDB Restructuring Act, as amended.  This statute provides the overarching framework on which the contractual asset restrictions are based and clearly permits the DRA to file the Amended Motion. Additionally, the proposed reading of the asset restrictions by the Government Parties would produce absurd and unbargained-for results that would prohibit the DRA Parties from speaking during a Title III case in virtually any situation.

The plain language of the contractual asset restrictions on which the Government Parties place their hopes clearly and definitively permits the same actions as the statutory asset restrictions, namely, the right to of the DRA to preserve, protect or defend its collateral.

Finally, the Court should recall the DRA's role in the Commonwealth's restructuring efforts.  The DRA was born from a rare, court-approved consensual restructuring – in which GDB bondholders agreed to a significant 45% haircut on their indebtedness.  The Government Parties have, for the subsequent nearly three years, touted the GDB Title VI restructuring as a prime example of their ability to reach consensual resolution with their creditors.  The parties did agree to limit the DRA's role going forward – but not to the extent that the Government Parties attempt – which would essentially force the DRA Parties out of any effort to protect their constituents interests in the Commonwealth and throughout the Title III cases.

Therefore, while consideration of the asset restrictions is clearly premature at this stage – and likely has no role in a lift stay motion –  the Court should not permit the Government Parties to mischaracterize these contractual provisions and deprive DRA of its property interests.

For these reasons, the DRA Parties respectfully request that the Court deny the Standing Objection and allow the Amended Motion to proceed to a hearing on its merits.

## BACKGROUND

**I.      The GDB Restructuring and the Creation of the DRA.**

1.      On May 15, 2017, certain GDB bondholders and the GDB entered into a *Restructuring Support Agreement* (the "RSA")[6] for the consensual resolution of the GDB's indebtedness, as defined therein, which RSA was also acknowledged and agreed to by AAFAF.

2.      The RSA established the framework for GDB's eventual Title VI restructuring under PROMESA, whereby the Puerto Rico Legislature would create a new separate legal entity (*i.e.*, the DRA) that issued bonds to the GDB bondholders with a face amount equal to 55% of the GDB bondholders' claims in exchange for their GDB bonds.

3.      The parties renegotiated this initial version of the Asset Restrictions in the *Fourth Amendment to Restructuring and Support Agreement* (the "Amended RSA")[7] to give the DRA Parties' greater rights to protect the security for the DRA bonds.  Section 2(c) of the Amended RSA provides that "the Restructuring Term Sheet attached as Exhibit A to the [RSA] **is hereby amended and replaced in its entirety by the Restructuring Term Sheet attached [as Exhibit A to the Amended RSA]**." *Id.* at p. 4 (Emphasis added). Accordingly, the asset restriction provision from the original RSA's Term Sheet, which is cited by the Government Parties in the Standing Objection, was superseded and replaced by the restriction provision in the Amended RSA.  Specifically, the Amended RSA provides:

> The Issuer (and the Servicer on behalf of the Issuer) shall have the right to exercise remedies in respect of the public entity loans held by the Issuer listed on Schedule 4[[8]], but solely to the extent necessary to assure that funds from those entities that are available for debt service, in accordance with and pursuant to applicable loan documents, Oversight Board-approved fiscal plans (if any) and Oversight Board-approved budgets (if any), are applied to such loans in accordance with the legal priority, security or other

---

[6] A copy of the RSA is attached as **Exhibit A** to this Response.
[7] A copy of the Amended RSA and its press release are attached as **Exhibit B** to this Response.
[8] Schedule 4 includes the GDB loans issued to HTA among many other public entity loans.

pledge rights benefiting such loans. Furthermore, the Issuer (and Servicer on behalf of the Issuer) will be entitled to rights and remedies necessary to preserve, protect or defend any security or other pledge rights benefiting such loans. In furtherance of the foregoing, for any such loan where the obligor on such loan is in Title III or Title VI proceedings and such obligor has other creditors that have the same legal priority, security and pledge rights as the Issuer, the Issuer will be entitled to rights and remedies necessary to ensure that the Issuer receives treatment in such proceedings that is the same as that provided to other creditors that have the same legal priority, security and pledge rights.

*See* **Exhibit B** at pp. 10-11 of Exhibit A.

4.      On July 18, 2018, the Commonwealth amended the original GDB Restructuring Act, Act No. 109-2017 [9] by Act No. 147-2018.[10] The Statement of Motives states that the Amended RSA provided the impetus for the amendment to the GDB Restructuring Act. *See* **Exhibit D** at pp. 20-21.[11]

5.      Among the amendments to the GDB Restructuring Act was the addition of a new Article 207 titled "Management of the Restructuring Property", which adopts a restriction provision almost identical to that contained in the Amended RSA's Term Sheet.  The same reads as follows in its pertinent parts:

The Recovery Authority and the Asset Manager (on behalf of the Recovery Authority) shall have the right to exercise remedies in respect of the Non-Municipal Loans, but solely to the extent necessary to assure that funds that are available for debt service from the obligors under such Non-Municipal Loans, in accordance with and pursuant to the applicable loan documents, Fiscal Plans, if any, and Budgets, if any, are applied to such Non-Municipal Loans in accordance with the legal priority, security or other pledge rights benefitting such Non-Municipal Loans. **Furthermore, the Recovery**

---

[9] A copy of Act No. 109-2017 is attached as **Exhibit C** to this Response.

[10] A copy of Act No. 147-2018 is attached as **Exhibit D** to this Response.

[11] The same states as follows in its pertinent parts:

. . . The changes to the restructuring agreement that were negotiated by GDB and AAFAF will significantly benefit government entities and, in particular, municipalities. However, such changes are not possible under the current legal framework, since they require amendments to Act [No.] 109-2017. As a result, this legislation introduces the necessary technical amendments to allow for the implementation of GDB's new debt restructuring agreement.

> **Authority and the Asset Manager (on behalf of the Recovery Authority)
> shall have all rights and powers to exercise remedies necessary to
> preserve, protect or defend any security or other pledge rights
> benefiting such Non-Municipal Loans. In furtherance of the foregoing,
> for any Non-Municipal Loan where the obligor is in a proceeding under
> Title III or Title VI of PROMESA and such obligor has other creditors
> that have the same legal priority, security, or pledge rights as the
> Recovery Authority, the Recovery Authority and the Asset Manager
> (on behalf of the Recovery Authority) shall have all rights and powers
> to exercise remedies necessary to ensure that the Recovery Authority
> receives treatment in such proceedings that is the same as that provided
> to other creditors that have the same legal priority, security or pledge
> rights**.

7 P.R. Laws Ann. § 3176a(b) (the "Asset Restrictions")[12] (Emphasis added); *see also* Act No. 147-
2018 at Art. 7.

6.      On November 5, 2018, the FOMB certified GDB's Qualifying Modification under

PROMESA, and, on November 7, 2018, this Court entered an Order approving GDB's

Qualifying Modification. *See* Dkt. No. 270 of Civil Case No. 18-01561 (LTS).

## II.      The Ancillary Agreements Follow the Asset Restrictions in the GDB Restructuring Act.

7.      Certain ancillary agreements were required to be executed to give effect and

consummate the GDB restructuring as set forth in the Amended RSA, the Qualifying

Modification, and the GDB Restructuring Act (as amended). These "Ancillary Agreements" are

defined in the GDB Restructuring Act to include ". . . the Bond Indenture, the Transfer

Agreement, the Servicing Agreement, and any other agreement or instrument entered into by the

Recovery Authority, GDB or the Indenture Trustee in connection with, or in furtherance of, the

Restructuring Transaction and in accordance with, or in furtherance of, the Qualifying

Modification." 7 P.R. Laws Ann. § 3163(d); *see also* Act No. 147-2018 at Art. 1.

---

[12] The Standing Objection defines Asset Restrictions with respect to the restrictions set forth in the Transfer
Agreement (as defined below).  For the reasons stated herein, the operative definition of the asset restrictions is as
set forth in the Amended GDB Restructuring Act.

8.      On November 29, 2018, four months after the enactment of the GDB

Restructuring Act, as amended, in accordance with Article 404(a) thereof, the GDB and the DRA

executed the Master Transfer Agreement (the "Transfer Agreement"), through which the GDB

transferred to the DRA all the Transferred Property.[13]  *See* Exhibit G to the Amended Motion.

9.      Schedule 1 of the Transfer Agreement incorporates the "asset restrictions"

definition cited by the Government Parties in the Standing Objection (the "Transfer Agreement

Asset Restrictions"), which read as follows:

> "**Asset Restrictions**" means the following restrictions . . .
>
> > (b) with respect to any Non-Municipal Loan, rights, remedies and
> > powers in respect of such Non-Municipal Loan may be exercised
> > solely to the extent necessary (i) to assure that the applicable
> > Obligor's funds that are available for debt service (consistent with
> > the applicable Fiscal Plan, if any, and applicable PROMESA
> > Budget, if any) are applied to such Non-Municipal Loan in
> > accordance with the applicable Asset Documents, legal priority,
> > security or other pledge rights benefitting such Loan Asset, (ii) **to
> > preserve, protect, or defend any security or other pledge rights
> > benefitting such Non-Municipal Loan and** (iii) **in the case of a
> > Non-Municipal Loan where the applicable Obligor is in a
> > proceeding under Title III or Title VI or PROMESA and such
> > Obligor has other creditors with the same legal priority, security
> > or pledge rights as the Issuer, to ensure that the Issuer receives
> > treatment in such proceedings that is the same as that provided
> > to other creditors with the same legal priority, security or pledge
> > rights**.

*See* Exhibit G to the Amended Motion at Schedule 1-1 (Emphasis added).

---

[13] The "Transferred Property" is defined by Section 1(a) of the Transfer Agreement (defined below) as "all of GDB's legal and equitable right, title and interest in and to, and claims and causes of action to enforce, the following . . .: (i) the Municipal Loan Assets; (ii) the Commonwealth Loan Assets; (iii) the Commonwealth Guaranteed Loan Asset; (iv) the Public Corporation Loan Assets; (v) the Other Loan Assets; (vi) the GDB Retained Loan Rights; (vii) the Beneficial Interests in the Retained Causes of Action; (viii) the Litigation Proceeds (subject to the limitations set forth herein); (ix) upon the date on which GDB is required pursuant to this Agreement, or chooses at its option, to transfer any GDB Retained Loan, such GDB Retained Loan transferred or to be transferred; (x) the Real Property Assets; (xi) the Cash Assets (including the Residual GDB Cash Assets); (xii) the Unknown Assets; and (xiii) all Collections in respect of the foregoing, from and after the Cutoff Date." *See* Exhibit G to the Amended Motion at pp. 2-3.

10.     On November 29, 2018, the DRA and AmeriNat executed the Servicing

Agreement, which incorporates the Transfer Agreement Asset Restrictions. *See* **Exhibit E** at

Schedule 1-1.  The Bond Indenture executed between DRA and Wilmington Trust, N.A. and

dated November 29, 2018 defines "Asset Restrictions" to have that ". . . meaning assigned to

such term in the Servicing Agreement." *See* **Exhibit F**, Section 1.01, at p. 3.

## ARGUMENT

**I.      The DRA Parties Have Standing to File the Amended Motion and the
Government Parties Make no Contrary Arguments to Refute this.**

**A.      The DRA Parties Have Standing to Bring the Amended Motion.**

11.     On August 28, 2020, this Court entered its *Order Approving Joint Stipulation of*

*the Government Parties* and *the DRA Parties Regarding the DRA Parties' Motion and*

*Memorandum of Law in Support of their Motion for Relief from the Automatic Stay, or in the*

*Alternative, Ordering Payment of Adequate Protection* [Dkt. No. 14417] (the "Scheduling

Order").  Pursuant to the Scheduling Order, arguments in connection with the Amended Motion

are to be bifurcated so that this Court can "first determine the DRA Parties' standing to bring the

[Amended Motion] (the "Standing Issue")".  Scheduling Order, Exhibit A at 3.  Accordingly, this

Court ordered that the Government Parties' initial objection be limited to arguments "solely

concerning the Standing Issue."  Scheduling Order at ¶3.

12.     Controlling authority in this Circuit (including from this Court) makes clear that

parties who have a "colorable claim" to property of a debtor have standing to seek stay relief.

*See*, *e.g.*, *In re FOMB for PR,* 618 B.R. 619, 630 (D.P.R. 2020) (holding that in determining

whether a party has standing to sue for relief from the stay "the court must determine 'whether

the party seeking relief has a colorable claim to property of the estate.'") (quoting *Grella v.*

*Salem Five Cent Sav. Bank*, 42 F.3d 26, 33 (1st Cir.1994)); *In re Marron*, 455 B.R. 1, 3 (Bankr.

D. Mass. 2011) (holding that "in determining whether a creditor has standing to seek relief from
the automatic stay, a bankruptcy court need not fully adjudicate the merits of the creditor's
claims but rather determine 'whether a creditor has a colorable claim to property of the estate.')
(citation omitted).

13.      The test for determining standing to seek adequate protection is the same.  *See In
re Fin. Oversight & Mgmt. Bd. for Puerto Rico*, 618 B.R. 362, 371 (D.P.R. 2020) ("The
resolution of . . . standing to seek stay relief under section 362 of the Bankruptcy Code, cause for
such stay relief, and adequate protection is dependent on the determination of whether and to
what extent [movants] have made the requisite demonstration that they have cognizable and
enforceable property interests").

14.      To determine whether a movant has a "colorable claim" "a court may take into
account any matter that bears directly on the debtor's equity, or that clearly refutes a creditor's
claim to the property." *Grella*, 42 F.3d at 34.  The First Circuit has likened this showing to that
required in the context of a hearing for preliminary injunctive relief, where a claim is deemed
colorable if there is "a reasonable likelihood that a creditor has **a legitimate claim or lien as to a
debtor's property**."  *Grella*, 42 F.3d at 33 (emphasis added); *see also In re Old Cold, LLC*, 602
B.R. 798, 825 (1st Cir. BAP 2019) (characterizing a "colorable claim" as one "that is legitimate
and that may reasonably be asserted, given the facts presented and the current law").  As this
Court has previously ruled, proving a colorable claim is "'a low threshold'" and "'not a difficult
standard to meet.'"  *Id*. at 630 (quoting *Mission Prod. Holdings, Inc. v. Schleicher & Stebbins
Hotels, L.L.C. (In re Old Cold, LLC)*, 602 B.R. 798, 825 (1st Cir. BAP 2019)).

15.      For the reasons set forth in the Amended Motion, the DRA has a valid, perfected
lien on the Act 30-31 Revenues, which lien is subject only to conditional clawback rights that

have not been properly invoked, and the Commonwealth's attempts to preempt or otherwise

circumvent the DRA's lien are unconstitutional and ineffective.  *See* Amended Motion at ¶¶ 49-

89.  The Asset Restrictions do not refute or diminish or have any impact whatsoever on the

DRA's claim to the Act 30-31 Revenues.  The Government Parties make no arguments in the

Standing Objection, or in any other filing before this Court, to challenge these points.  Therefore,

the DRA Parties easily satisfy the First Circuit "colorable claim" standard set forth in *Grella*,

which is all that is required to conclude that the DRA Parties have standing to seek adequate

protection or relief form the stay.

> **II.** **The Asset Restrictions Do Not Deprive the DRA of Standing Here or Otherwise Prohibit the Filing of the Amended Motion.**

16.     While the asset restrictions have no bearing on standing and the Court should not

consider them here, the DRA Parties must note that the Government Parties' arguments relating

to the Transfer Agreement Asset Restrictions have no merit because (a) they ignore the statutory

nature of the asset restrictions and (b) they depend on an illogical reading of the provisions that

ignores common sense and rules of contractual interpretation in order to construe them in a way

that would prohibit the Amended Motion, which reading does not hold up under the barest

scrutiny.

> **A.** **The Asset Restrictions are Statutory and Do Not Prohibit the Amended Motion.**

17.     The Transfer Agreement Asset Restrictions are derived from the Asset

Restrictions contained in the GDB Restructuring Act, as amended (Act No. 147-2018).  The

Transfer Agreement Asset Restrictions must, under Puerto Rico law, be read as consistent with

the applicable statutes, as agreements cannot be "**contrary to law**".  *Luis Santiago v. Santiago*,

731 F. Supp. 2d 202, 206 (D.P.R. 2010) (*quoting Colón v. Blades*, 717 F.Supp.2d 175, 184,

(D.P.R. June 15, 2010)) (emphasis added); 31 P.R. Laws Ann. § 3372.

18.     Here, the Ancillary Agreements are meant to complement, not supplant, the GDB

Restructuring Act.[14]  Therefore, to the extent that the Court believes the asset restrictions are

relevant to the question of standing, then it is the Asset Restrictions, as set forth in Article 207(b)

of the GDB Restructuring Act, as amended, that should be considered by the Court, rather than

contractual Transfer Agreement Asset Restrictions, as argued by the Government Parties.

**B.      The GDB Restructuring Act Is Clear and Unambiguous and Does Not
          Prohibit the Amended Motion.**

19.     The statute states as follows:

> The Recovery Authority and the Asset Manager (on behalf of the Recovery
> Authority) shall have the right to exercise remedies in respect of the Non-
> Municipal Loans, but solely to the extent necessary to assure that funds that
> are available for debt service from the obligors under such Non-Municipal
> Loans, in accordance with and pursuant to the applicable loan documents,
> Fiscal Plans, if any, and Budgets, if any, are applied to such Non-Municipal
> Loans in accordance with the legal priority, security or other pledge rights
> benefitting such Non-Municipal Loans.  Furthermore, the Recovery
> Authority and the Asset Manager (on behalf of the Recovery Authority)
> shall have all rights and powers to exercise remedies necessary to preserve,
> protect or defend any security or other pledge rights benefiting such Non-
> Municipal Loans **[(the "Second Clause")]**.  In furtherance of the foregoing,
> for any Non-Municipal Loan where the obligor is in a proceeding under
> Title III or Title VI of PROMESA and such obligor has other creditors that
> have the same legal priority, security, or pledge rights as the Recovery
> Authority, the Recovery Authority and the Asset Manager (on behalf of the
> Recovery Authority) shall have all rights and powers to exercise remedies
> necessary to ensure that the Recovery Authority receives treatment in such
> proceedings that is the same as that provided to other creditors that have the
> same legal priority, security or pledge rights **[(the "Third Clause")]**.

7 P.R. Laws Ann. § 3176a(b); *see also* Act No. 147-2018 at Art. 7.

**i.      The Court Should Look to the Plain Text of Article 207(b).**

20.     "Statutory construction in Puerto Rico begins with the text of the underlying

statute, and ends there as well if the text is unambiguous." *In re Plaza Resort at Palmas, Inc.*,

---

[14] *See* Exhibit G to the Amended Motion, generally; **Exhibit E**, fourth at pp. 1-2; **Exhibit F** at pp. 1-2; Exhibit B to
the Amended Motion, generally.

741 F.3d 269, 274–75 (1st Cir. 2014); *see also Urbain Pottier v. Hotel Plaza Las Delicias, Inc.*, 379 F. Supp. 3d 130, 134 (D.P.R. 2019).  Article 14 of the Puerto Rico Civil Code provides that, "[w]hen a law is clear and free from all ambiguity, the letter of the same shall not be disregarded, under the pretext of fulfilling the spirit thereof." 31 P.R. Laws Ann. § 14 (2015).[15]

21.     When interpreting a Puerto Rico statute, the court "must be faithful not only to conventional rules of construction, but also to the legislature's specific directives." *Pritzker v. Yari*, 42 F.3d 53, 68 (1st Cir. 1994).  Accordingly, when the legislator has employed clear and unequivocal language, the text of the law is the expression par excellence of all legislative intent underlying the same and there is no need to look further in search of the legislative intent. *See Romero Barceló v. E.L.A.*, 169 D.P.R. 460, 476-77 (2006).[16]

22.     A court's analytic/interpretative function is limited to the law's clear text and should not rely on the intrinsic reasons that motivated the legislators to draft or write the law in the way they did. *See Villamia v. MVP Auto Corp.*, 433 F. Supp. 3d 261, 270 (D.P.R. 2020) ("In view of [the law's] clarity and lack of ambiguity, there is no need to look beyond the letter of the law in search of the legislative intent. When the law is clear, it is not subject to interpretations."). Courts should abstain from substituting the legislator's criteria with its own preconceptions of what is just, reasonable or even desirable or include scenarios in a statute which do not fall within the "reasons" underlying or motivating the same. *See Com. CNP v.*

---

[15] The Supreme Court of the United States has also been adamant in how it interprets federal law when its language is clear and free from all ambiguity. *See Villeneuve v. Avon Prod., Inc.*, 111 F. Supp. 3d 112, 118–19 (D.P.R. 2015), *aff'd*, 919 F.3d 40; *see also Connecticut Nat. Bank v. Germain*, 503 U.S. 249, 253–254, (1992) ("We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there."). "A court must therefore interpret the statute 'as a symmetrical and coherent regulatory scheme,' and 'fit, if possible, all parts into an harmonious whole'." *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) (*quoting Gustafson v. Alloyd Co.,* 513 U.S. 561, 569 (1995) and *FTC v. Mandel Brothers, Inc.,* 359 U.S. 385, 389 (1959)).

[16] A certified English translation of this decision is attached as **Exhibit G.**

*CEE*, 197 D.P.R. 914, 934-35 (2017);[17] *see also Warner Lambert Co. v. Tribunal Superior,* 1 P.R. Offic. Trans. 527, 559 (1973) (When the law's expression was clear, there was no need for the court to inquire further or enlarge the language as it "would be tantamount to subverting the true sense and purpose of the statute.").

23.     Only when the literal reading of the law's text produces inconsistencies, ambiguities, doubts, contradictions, or gaps, may the Court deviate from the law's literal text. This exception applies only in the rare case where the literal reading of the law is rife with contradictions or inconsistencies, or when an application of the same according to its literal meaning will lead to an absurd result or one that is contrary to the true legislative purpose or intent. *See Bco. Santander v. Correa Garcia*, 196 D.P.R. 452, 465 (2016);[18] *see also Baez Rodriguez v. E.L.A.*, 179 D.P.R. 231, 245 (2010)[19]; *Engineering Services International, Inc. v. Autoridad de Energía Eléctrica de Puerto Rico*, 2020 WL 5659443 at *11 (September 14, 2020).[20]

24.     If the law's provisions are confusing or ambiguous, the courts have an obligation to interpret the statute in question taking into consideration the social purpose that motivated its creation as a means of providing logical meaning to all of the statute's provisions. *Ríos Martínez, Com. Alt. PNP v. CLE*, 196 D.P.R. 289, 297-98 (2016).[21] In those cases, the court must discover and enforce the true intent and desire of the legislative power. *Engineering Services International, supra*, 2020 WL 5659443 at *12.

---

[17] A certified English translation of this decision is attached as **Exhibit H**.
[18] A certified English translation of this decision is attached as **Exhibit I**.
[19] A certified English translation of this decision is attached as **Exhibit J**.
[20] A certified English translation of this decision is attached as **Exhibit K**.
[21] A certified English translation of this decision is attached as **Exhibit L**.

ii.     **The Plain Language of Article 207(b) Clearly Permits the
Amended Motion.**

25.     For ease of discussion, we assess separately each of the applicable clauses and

their clear and unambiguous meaning.

a)   **Second Clause: The Power to Exercise Remedies to
Preserve, Protect or Defend any Security or Pledge Rights
(the "Preserve and Protect Powers")**

26.     The Second Clause is neither confusing nor ambiguous. It clearly and

unequivocally provides that the DRA and Servicer have "**all rights and powers** to do what is

necessary to **preserve, protect or defend any security or pledge rights** benefitting" the DRA's

non-municipal loan portfolio.  The statute contains no limitations on what these Preserve and

Protect Powers encompass, much less confines the DRA and Servicer to a particular set of

remedies to perform under them.  The Amended Motion literally seeks to protect the DRA's

interest in its collateral and is clearly permitted under the statute's plain language.

b)   **Third Clause: Right to Receive Treatment by an Obligor in
Title III or Title VI of PROMESA
(the "Title III Treatment Powers")**

27.     The clear and unequivocal text of the Third Clause provides that, "**in furtherance

of**" the DRA's Preserve and Protect Powers under the Second Clause of the Asset Restrictions,

**where (a) a Non-Municipal Loan obligor is in a Title III or VI proceeding of PROMESA,
and (b) there are creditors that have the same legal priority, security or pledge rights as the
DRA, then (c) DRA/Servicer shall have the rights and powers to make sure that it receives
the same treatment as those creditors that have the same legal priority, security or pledge
rights.**

28.     This Third Clause is triggered only in the specific circumstances set forth therein,

lending itself to the reasonable and unescapable conclusion that the Title III Treatment Powers

become effective when: (i) the obligor is in a Title III or Title VI proceeding; **and** (ii) there are other creditors with the same legal priority and security rights as the DRA. Unless these two conditions are met, the Third Clause does not come into effect.

29.     As the Government Parties correctly note, the DRA Parties argue that the second condition of the Third Clause has not been satisfied here because there are no other HTA creditors "with the same legal priority, security, or pledge rights" as the DRA over the Act 30-31 Revenues.[22]

30.     As this Court ruled in its Gating Issues Decision,[23] the HTA bondholders do not possess liens on the excise tax revenues, including the Act 30-31 Revenues. This means that **the DRA is the only creditor with a perfected secured interest over these funds**. Notwithstanding this, the May 5, 2021 *HTA/CCDA Related Plan Support Agreement* (the "HTA PSA") [Dkt. No. 16741-3], as adopted and incorporated into the *Third Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (the "Third Amended Plan") [Dkt. No. 16740], treats DRA as subordinate to HTA bondholders with respect to the Allowed CW/HTA Claims, including the Act 30-31 Revenues. *See* Dkt. No. 16740 at p. J-12.

31.     One thing is clear under either scenario: **the DRA is not in the same priority, security, or pledge rights with respect to other HTA creditors over the Act 30-31 Revenues**. Because the second condition of the Third Clause has not been met, the Title III Treatment Powers of the Asset Restrictions have not been triggered and is, therefore, not applicable in the instant case.

---

[22] *See* Standing Objection at ¶ 23.

[23] The "Gating Issues Decision" refers to the *Opinion and Order in Connection with Preliminary Hearing Regarding Motion of Assured Guaranty Corp., Assured Guaranty Municipal Corp., Ambac Assurance Corporation, National Public Finance Guarantee Corporation, and Financial Guaranty Insurance Company for Relief from Automatic Stay, or, in the Alternative, Adequate Protection (Docket Entry No. 10102)* [Dkt. No. 13541].

32.    In any event, the clear reading of the Third Clause demonstrates that the same does not bar or abridge the DRA/Servicer from exercising its Preserve and Protect Powers granted in the Second Clause. The Third Clause's use of the phrase "[i]n furtherance of the foregoing" as a means of relating the Title III Treatment Powers to the general "preserve, protect, or defend" powers of the Second Clause undermines the Government Parties' contention that those two provisions are mutually exclusive.

33.    "Furtherance" is defined as "the process of helping something to develop or make progress."[24] "Foregoing" is defined as "involving what has just been mentioned or described."[25] Therefore, "in furtherance of the foregoing" means that the Third Clause's language **constitutes a means to fulfill the end that was described in the sentence immediately preceding thereto**, *i.e.* "to preserve, protect or defend any security or other pledge rights benefitting" the Non-Municipal Loans. This reading is compatible with the Spanish language version of the GDB Restructuring Act, which, in place of "[i]n furtherance of the foregoing" employs "[c]on el fin de lograr lo anterior."[26]

34.    The statutory language in the Third Clause should be read to mean that the DRA/Servicer's right to receive the same treatment in the Commonwealth and HTA's Title III proceedings granted to other creditors with the same legal priority, security or pledge rights constitutes **one** legislatively recognized means of preserving, protecting or defending any security or other pledge rights benefitting the Non-Municipal Loans, **but it is not the only or exclusive means of doing so**.

---

[24] See *Cambridge Dictionary*, https://dictionary.cambridge.org/dictionary/english/furtherance (last visited on March 1, 2021).
[25] *Id.* at https://dictionary.cambridge.org/dictionary/english/foregoing (last visited on March 1, 2021).
[26] Article 709 of the GDB Restructuring Act stipulates that "[i]f in the interpretation or application of this Act any conflict arises as between the English and Spanish texts, the English text shall govern." 7 L.P.R.A. § 3217

35.     The fact that the GDB Restructuring Act, as amended, provides that the DRA and Servicer shall have "**all rights and powers to exercise remedies necessary to**" denotes that these may be various and of different nature, and does not expressly exclude the pursuit of DRA/Servicer's Preserve and Protect Powers. Quite the contrary, the language supports the contention that such rights and powers include others in addition to the one considered by the following sentence, *i.e.* the Third Clause. Had the legislators truly intended to limit the DRA/Servicer's rights and powers in Title III case to only those established in the Third Clause of the Asset Restrictions, they would have employed stronger language in the law such as "the above notwithstanding" instead of "in furtherance of the foregoing."

### c)   The Other Provisions of the GDB Restructuring Act Support the Above Plain Meaning of the Asset Restrictions

36.     Pursuant to the Statement of Motives of Act No. 109-2017, the GDB Restructuring Act was adopted to establish the legal framework for the consensual restructuring of the GDB's obligations that "maximizes the value of the assets [of GDB] to mitigate the impact that its restructuring may have", and "the recovery value for distribution to the corresponding stakeholders." *See* **Exhibit C** at p. 39.

37.     The powers and rights granted to the DRA under the GDB Restructuring Act are consistent with the general purpose of the law. Article 204 of the GDB Restructuring Act, as amended, establishes the DRA's "authorized activities" and states, in pertinent part, that:

> The [DRA]'s activities shall be limited to the following Authorized Activities: [. . .]
>
> (f) **subject to Article 207 of this Act**, collecting, receiving, owning, enforcing, monitoring, selling and protecting the Restructuring Property or otherwise authorizing any of the foregoing, in accordance with the Ancillary Agreements and **for the sole purpose of realizing on, or preserving, the value of the Restructuring Property or the proceeds therefrom, including, without limitation, by initiating necessary legal action**.

[. . .]

(h) entering into contracts and **taking any other necessary or convenient actions with respect to realizing the maximum value of the Restructuring Property, subject to Article 207 of this Act**, including related to the collection, enforcement, sale, monitoring, protection, forbearance or settlement thereof consistent with the terms of the Ancillary Agreements; [. . .]

7 P.R. Laws Ann. § 3174; *see also* Act No. 147-2018 at Art. 4 (Emphasis added).

38.     In addition, Article 205 sets forth the ancillary powers of the DRA, which include:

(f) have complete legal and equitable dominion over its properties (including the Restructuring Property), subject to Article 207 of this Act;

[. . . ]

(n) **exercise such other powers, not inconsistent herewith, as may be necessary** to carry out the Authorized Activities;

(o) **take any action or measure necessary or convenient to carry out its purpose and exercise the powers** expressly granted in this Article;

(p) **delegate** to its officers, agents, employees or contractors **(including, without limitation, the Asset Manager and the Collateral Monitor) authority to take actions in furtherance of this Act**; [. . .]

7 P.R. Laws Ann. § 3175; *see also* Act No. 147-2018 at Art. 5 (Emphasis added).

39.     A strict, literal reading of the above, leads to the conclusion that, subject only to the Asset Restrictions, the DRA has the power and right to enforce and protect the Restructuring Property in accordance with the Ancillary Agreements and for the sole purpose of realizing on, or preserving or maximizing, the value of the Restructuring Property. The DRA can also take all

necessary and convenient actions as a means of fulfilling that purpose, including, without

limitation, initiating legal action. This language is clear and unequivocal.[27]

### III.   The Asset Restrictions in the Transfer Agreement also Support the DRA Parties' Position.

40.      Even if we were to assume that the Transfer Agreement, as opposed to the GDB

Restructuring Act, is the appropriate source text for the Asset Restrictions, and that those

provisions have any bearing on standing, a clear reading of the contract still does not prohibit the

Amended Motion.

### A.    Applicable Rules on Interpretation of Contracts in Puerto Rico.

41.      It is black letter law in Puerto Rico that, when "the terms of a contract are

unambiguous, courts are duty-bound to interpret them as reflecting the will of the parties at the

time of the agreement and must refrain from further speculation as to their alleged contractual

intentions." *In re N–500L Cases*, 517 F.Supp. 816, 818 (D.P.R. 1981); *see also In re Empresas*

*Omajede Inc.*, 537 B.R. 63, 95 (Bankr. D.P.R. 2015) ("[W]hen the terms of a contract, its

conditions and exclusions are clear and specific, and leave no room for controversies, doubt or

for different interpretations, the same should be applied as reflecting the will of the parties at the

time of the agreement."); 31 P.R. Laws Ann. § 3471 ("If the terms of a contract are clear and

leave no doubt as to the intentions of the contracting parties, the literal sense of its stipulations

shall be observed. If the words should appear contrary to the evident intention of the contracting

parties, the intention shall prevail").

---

[27] By narrowing their Standing Objection to the Transfer Agreement Asset Restrictions, the Government Parties have waived their right to challenge, contest, or dispute the applicable statutory interpretation of the Asset Restrictions in the GDB Restructuring Act, as amended. As the Court of Appeals for the First Circuit has explained, "Judges are not expected to be mindreaders [and] a litigant has an obligation 'to spell out its arguments squarely and distinctly,' or else forever hold its peace." *Rivera-Gomez v. de Castro*, 843 F.2d 631, 635 (1st Cir. 1988) (*citing Paterson–Leitch Co. v. Massachusetts Municipal Wholesale Elec. Co.*, 840 F.2d 985, 990 (1st Cir.1988)).

42.     Consequently, when the terms of a contract are clear, the courts need not rely on
the rules governing the interpretation of contracts. *Trinidad v. Chade*, 153 D.P.R. 280, 289
(2001). "[A] term is considered clear when it is sufficiently lucid to be understood to have one
particular meaning, without room for doubt. If the meaning of a contract's term is sufficiently
clear, **the court cannot dwell on the alleged intent of the parties at the time they entered into
the contract.**" *Vulcan Tools of Puerto Rico v. Makita U.S.A., Inc.*, 23 F.3d 564, 567 (1st Cir.
1994) (Emphasis added); *see also Catullo v. Metzner*, 834 F.2d 1075, 1079 (1st Cir. 1987).

43.     In Puerto Rico, the tendency has been to limit the interpretation of contracts to
those cases in which it is truly necessary. *Marcial v. Tome*, 144 P.R. Dec. 522, 537 (1997). "That
intent, once again, is to be gleaned first from the literal terms of the contract and then, if
necessary, from the circumstances surrounding its execution." *Nike Int'l Ltd. v. Athletic Sales,
Inc.*, 689 F. Supp. 1235, 1245 (D.P.R. 1988).

44.     "Only if the literal terms of the contract are in doubt will it be necessary . . . to
examine or interpret the contract with the help of extrinsic evidence." *Autoridad de Carreteras y
Transportacion v. TransCore Atl., Inc.*, 387 F. Supp. 3d 163, 166 (D.P.R. 2017) (*quoting
Hopgood v. Merrill Lynch, Pierce, Fenner & Smith*, 839 F.Supp. 98, 106 (D.P.R. 1993)). Said
evidence refers to, principally, those acts of the parties contemporaneous and subsequent to the
contract. *Municipio Mayaguez v. Lebrón*, 167 D.P.R. 713, 724 (2006);[28] *see also* 31 P.R. Laws
Ann. § 3472 ("In order to judge as to the intention of the contracting parties, attention must
principally be paid to their acts, contemporaneous and subsequent to the contract").

45.     When interpreting a contract, the court must assume that the parties operated in
good faith when drafting its terms, and the court cannot distort the terms of the contract to reach

---

[28] A certified English translation of this decision is attached as **Exhibit M**.

absurd or unjust results. *S.L.G. Irizarry v. S.L.G. Garcia*, 155 P.R. Dec. 713, 726 (2001). In

addition, when words may have different meanings, these shall be understood according to the

nature and object of the contract. *Torres, Torres v. Torres Serrano*, 179 D.P.R. 481, 494

(2010).[29]

> **B.    The Asset Restrictions in the Transfer Agreement are Clear and
> Unambiguous and Do Not Prohibit the Amended Motion**.

46.    The Government Parties admit, and the DRA Parties agree, that the terms of the

asset restrictions in the Transfer Agreement are clear, plain, and unambiguous. *See* Standing

Objection at ¶¶ 3 (". . . the Asset Restriction's plan and unambiguous terms . . ."), 4 (". . . the

clear Asset Restrictions . . ."), 6 ("If the Court finds the meaning of the Asset Restrictions are

unclear – which they are not – . . ."), and 19 (". . . the Asset Restriction's unequivocal terms…").

47.    The Transfer Agreement Asset Restrictions read as follows:

> (b) with respect to any Non-Municipal Loan, rights, remedies and powers
> in respect of such Non-Municipal Loan may be exercised solely to the
> extent necessary . . . (ii) to preserve, protect, or defend any security or other
> pledge rights benefitting such Non-Municipal Loan **[(the "TA Preserve
> and Protect Powers")] and** (iii) in the case of a Non-Municipal Loan
> where the applicable Obligor is in a proceeding under Title III or Title VI
> of PROMESA and such Obligor has other creditors with the same legal
> priority, security or pledge rights as the Issuer, to ensure that the Issuer
> receives treatment in such proceedings that is the same as that provided to
> other creditors with the same legal priority, security or pledge rights **[(the
> "TA Title III Treatment Powers")]**.

*See* Exhibit G to the Amended Motion at Schedule 1-1 (Emphasis added).

48.    The plain reading of this provision is easy to glean on its face.  The contractual

interpretation norm in Puerto Rico is that the copulative conjunction "and" is used to join words

or clauses in the affirmative, and its use implies the union of all the words that it links, whereas

the use of the disjunctive conjunction "or" indicates difference, separation or alternative between

---

[29] A certified English translation of this decision is attached as **Exhibit N**.

two or more persons, things, or ideas. *Torres, Torres*, 179 D.P.R. at 494 (Discussing how to
interpret "and/or" in a contract).

49.     A literal reading of the Asset Restrictions in the Transfer Agreement shows that
(as is the case in the GDB Restructuring Act, as amended) **the TA Preserve and Protect
Powers and the TA Title III Treatment Powers are not mutually exclusive** due to the joinder
of these clauses through the use of the conjunction "and." Accordingly, the Transfer Agreement
Asset Restrictions do not preclude the DRA and/or Servicer from being able to "preserve, protect
or defend any security or other pledge rights benefitting" the DRA's HTA obligations in the
context of HTA and the Commonwealth's Title III proceedings, while at the same time
"ensur[ing] that the [DRA] receives treatment in such proceedings that is the same as that
provided to other creditors with the same legal priority, security or pledge rights."

50.     These provisions do not contain any language that would limit the DRA/Servicer
to solely the Third Clause of the Asset Restrictions or the TA Title III Treatment Powers in the
event of Obligor's filing of Title III case of PROMESA.  The asset restrictions could have
included specific language to solely afford the DRA Parties the remedies set forth in the third
clause in the event of a Title III filing, **but it did not**.

       **C.**    **The Government Parties Do Not Rely on the Plain Language of the
Asset Restrictions And Reach Illogical Conclusions.**

51.     Despite this, the Government Parties argue "[b]y the Asset Restriction's
unequivocal terms, where an Obligor commenced a Title III case – such as HTA – the **only
action** the DRA Parties can take is pursuant to" the TA Title III Treatment Powers of the asset
restrictions. *See* Standing Objection at ¶ 19 (Emphasis added). They posit that the
Commonwealth and HTA's filing of Title III proceedings made the TA Preserve and Protect
Powers unavailable to the DRA because, in their view, "[a]ny other interpretation . . . would

render [the TA Title III Treatment Powers] meaningless." *Id.* at ¶ 20.  The reading of the

provision is obviously flawed.  While the Government Parties argue this is the "plain" reading of

the provision, their reading relies on a word – "only" – that is not present in the plain language of

the statute (or contractual provision). Thus, it clearly is not based on the plain language of the

Transfer Agreement, much less of the GDB Restructuring Act, as amended.

52.     The plain text reading can be obscured a bit by the complicated nature of the

Asset Restrictions paragraph and its syntax.  Those complications can be overcome by using

more simplified analogies to make the same point.  For example, imagine the following

statement on a restaurant menu: "A guest may request a modification to a dish on the menu

solely to the extent necessary (i) to avoid an allergic reaction, (ii) to accommodate a religious

restriction, and (iii) in the case of a party with children, to split meals onto sharing plates."  It

seems fairly clear from this example that a party with children could nonetheless request a

modification to avoid an allergy or accommodate a religious restriction.  And it seems equally

clear that only parties with children may ask for a dish to be split into smaller plates.  Similarly,

the TA Title III Treatment Powers spells out additional rights that may be exercised in a Title III

proceeding but does not disturb the existing authority under the TA Preserve and Protect Powers.

53.     The Government Parties further allege that, even if the TA Preserve and Protect

Powers is available to the DRA, the relief requested in the Amended Motion is prohibited. The

Government Parties argue that the TA Preserve and Protect Powers is akin to a "DRA

forbearance", that "[t]he right to 'preserve, protect or defend' a security interest does not grant

the DRA Parties the right to 'initiate, continue and conclude any foreclosure proceedings over

their collateral'", that the TA Preserve and Protect Powers does not entitle the DRA Parties to

"collect cash or obtain adequate protection", and that these powers were aimed at protecting the

DRA "against action by third parties" and not "as a means to take offensive, aggressive actions against the Commonwealth and HTA".  *See* Standing Objection at ¶¶ 7, 32 - 36. These arguments fail for several reasons.

54.     *First*, as explained above, the TA Preserve and Protect Powers does not identify any specific limits on the DRA and the Servicer's rights with respect to preserving, protecting, or defending the DRA's security or pledge rights. The parties could have expressly constrained the DRA Parties' actions under the TA Preserve and Protect Powers to a particular set of remedies only, but they did not do so. Accordingly, under a plain text reading of the provision (and disregarding the red herring extrinsic evidence offered by the Government Parties), if the remedies are "necessary to preserve, protect or defend" any of the DRA's security and pledge rights, they are fair game to be pursued by the DRA/Servicer.

55.     *Second*, the Government Parties' assertion that the TA Preserve and Protect Powers were aimed at protecting the DRA "against action by third parties" does not stem from anywhere in the language of the second clause of the Asset Restrictions. Rather, the Government Parties rely on a mistaken reading of section 4.05(i) of the Bond Indenture to support their conclusion. As will be discussed at ¶¶ 58-59, *infra*, the Court cannot rely on extrinsic evidence, including the Bond Indenture, as a source to interpret the second clause should it believe the language in statute is either confusing or ambiguous (which it is not).

56.     *Finally*, the Government Parties' argument would lead to an illogical scenario where the DRA Parties could not even object to the most egregious treatment of their debt and their collateral.  The Government Parties assert that "clause (iii) sets forth the more limited rights that can be pursued once an entity has filed a Title III case, which is only triggered when (i) the applicable debtor has other creditors with the same legal priority, security or pledge rights as the

DRA; and (ii) a plan of adjustment proposes a treatment that prefers such *pari passu* creditor to the DRA Parties." Standing Objection at 11. **Here, there are no *pari passu* creditors to the DRA on the Act 30-31 Revenues.**[30]

57.     Under the Government Parties' interpretation, the DRA could never satisfy the requirements of the final clause and, thus, could never seek to protect its claims. In their interpretation, even if the Government Parties overtly took all of the DRA's collateral and gave it to subordinated creditors, the DRA would be prohibited from action by the Asset Restrictions. This cannot be the case.

### D.     The Court Should Not Consider Extrinsic Evidence

58.     Clauses (b)(ii) and (b)(iii) of the Transfer Agreement Asset Restrictions do not leave room for controversies, doubt, or different readings other than the one espoused by the DRA Parties in this Response. Therefore, the provisions in the contract are clear and unambiguous and the Court should stick to the literal meaning. *See Sylva v. Culebra Dive Shop*, 389 F. Supp. 2d 189, 200 (D.P.R. 2005).

59.     Any effort by the Government Parties to introduce "extrinsic evidence of the parties' intent **is inadmissible in the face of a clear and unambiguous contract term under Puerto Rico Law**." *Borschow Hosp. & Med. Supplies, Inc. v. Cesar Castillo Inc.*, 96 F.3d 10, 16 (1st Cir. 1996) (Emphasis added). *See also Exec. Leasing Corp. v. Banco Popular de Puerto Rico*, 48 F.3d 66, 69 (1st Cir. 1995) (Court rejected extrinsic evidence because the terms of the agreement were clear); *Gonzalez v. Hurley Int'l LLC*, 2013 WL 12237670 (D.P.R. Feb. 13, 2013)

---

[30] As discussed in ¶ 30, *supra*, the DRA Parties understand that they are the only creditor with a perfected security interest over the Act 30-31 Revenues whereas the Government Parties believe that the DRA is subordinate to HTA bondholders with respect to these funds. *See* Dkt. No. 13541 and Dkt. No. 16740 at p. J-12.

("[B]ecause the terms of the Agreement are clear, extrinsic evidence is inadmissible to vary the terms of an such an unambiguous contract.").

### E. If the Court Considers the Ancillary Agreements as Extrinsic Evidence, the Same Favors the DRA Parties.

60.     While the DRA Parties reiterate that no ambiguity exists here, if the Court were to find that any confusion or ambiguity exists[31] – **the same should be interpreted against the Government Parties and in favor of the DRA Parties.**  This is because the Transfer Agreement and the other Ancillary Agreements were a component of the GDB restructuring that was orchestrated, negotiated, reviewed, and pursued by (and among) the Government Parties. Thus, any ambiguity that arises from these contracts must necessarily be interpreted against the party who created it, *i.e.* the Government Parties. *See Martin v. Vector Co.*, 498 F.2d 16, 24 (1st Cir. 1974) ("Ambiguities in a contract should be construed against the party who drafted it."); *see also* 31 P.R. Laws Ann. § 3478 ("The interpretation of obscure stipulations of a contract must not favor the party occasioning the obscurity.").

61.     Notwithstanding the above, the documents relied upon by the Government Parties in support of their interpretation (the RSA, the Bond Indenture, and the Solicitation Statement) do not assist them for several reasons.

62.     *First*, as explained in ¶¶ 3 -5, *supra*, the restriction in the original RSA that is cited by the Government Parties to support their interpretation of the Transfer Agreement Asset Restrictions was superseded by the Amended RSA, which, in turn, was elevated to law in the

---

[31] If the Court determines that the Asset Restrictions or the Transfer Agreement Asset Restrictions are ambiguous (which it should not) and that the Asset Restrictions and Ancillary Agreement when read together in anyway supports the Government Parties' arguments (which it should not), the DRA should be afforded the opportunity to take discovery on all relevant extrinsic evidence regarding the meaning of the Asset Restrictions or the Transfer Agreement Asset Restrictions, as appropriate.

GDB Restructuring Act.  The language in an early draft of the RSA is not indicative of the

parties' ultimate intent with regarding to subsequently negotiated and agreed upon language.

63.    *Second*, the Government Parties rely on a mistaken reading of section 4.05(i) of

the Bond Indenture to support their outrageous conclusion that the Asset Restrictions were meant

to operate similarly to a "DRA forbearance" whose powers were aimed at protecting the DRA

"against action by third parties". *See* Standing Objection at ¶ 7.  Section 4.05(i) of the Bond

Indenture Agreement[32] provides, in its pertinent part, that:

> So long as any Bonds are Outstanding, the Issuer shall not, unless expressly
> permitted by this Indenture . . . fail to at all times, to the extent permitted by
> law, defend, preserve and protect, or cause to be defended, preserved, and
> protected, the pledge of the Restructuring Property and all the rights of the
> Indenture Trustee and the Bondholders under this Indenture **against all
> claims and demands of all Persons whomsoever**.

*See* **Exhibit F**, Section 4.05, at p. 21 (Emphasis added).

64.    For starters, there is no indication in the Bond Indenture that the right to preserve,

protect or defend referenced in section 4.05(i) is only applicable defensively, or that the same

precludes the DRA/Servicer from enforcing said rights against the Government Parties.  The

Bond Indenture defines the term "Person" as "an individual, a corporation, a limited liability

company, a company, a partnership, a joint venture, an association, a trust or any other entity or

organization, **including a government or political subdivision or an agency or

instrumentality thereof**." *See* **Exhibit F** at p. 10 (Emphasis added). The Debtors and the

Government Parties clearly constitute a "Person" within the context of the Bond Indenture. Thus,

---

[32] Even though the general terms of the *Bond Indenture* are to be construed and enforced in accordance with the laws of the State of New York, "any issues addressing the fiduciary **or statutory duties** of GDB, the Issuer, AAFAF or any of their respective governing board shall be governed by and construed in accordance with the laws of the Commonwealth." *See* **Exhibit F**, Section 13.13(a), at p. 51 (Emphasis added). Therefore, the language of the Section 4.05(i) should be construed in accordance with the laws of the Commonwealth and, more specifically, the GDB Restructuring Act, as amended.

pursuant to section 4.05(i) of the Bond Indenture, there is nothing improper in DRA defending itself against the Debtors and the Government Parties due to their continued diversion and diminution of the Act 30-31 Revenues in violation of the Puerto Rico Constitution and Puerto Rico law.

65.     Further, the Bond Indenture does not provide anything regarding the scope and extent of the DRA/Servicer's Preserve and Protect Powers under the Asset Restrictions.  The only provision the Bond Indenture makes with respect to the Asset Restrictions is to state that this term shall have the "meaning assigned to [it] in the Servicing Agreement" (which, in turn, incorporates the definition from the Transfer Agreement). *See* **Exhibit F**, Section 1.01, at p. 3. Therefore, any reliance on the Bond Indenture with regards to Asset Restrictions is circular.

66.     *Third*, the Solicitation Statement[33] does not provide anything regarding the appropriate interpretation or operation of the Transfer Agreement Asset Restrictions. In fact, the term "Asset Restriction" is not even mentioned or referenced in the Solicitation Statement.

67.     *Fourth*, the Asset Restriction language contained in the "Management of the Restructuring Property" section of the Offering Memorandum similarly follows the same framework as the Asset Restrictions in the GDB Restructuring Act, as amended. *See* Exhibit B to the Amended Motion at p. 105.

68.     Based on the above, the Ancillary Agreements do not support the Government Parties' interpretation of the Transfer Agreement Asset Restrictions, thus, the DRA Parties' clear reading of both the Transfer Agreement Asset Restrictions and the Asset Restrictions in the GDB Restructuring Act, as outlined in this Response, continues to be the clear, unequivocal, and

---

[33] A copy of which can be obtained at Dkt. No. 11260-2.

unambiguous interpretation of the same, and support the DRA Parties' position that they are entitled to pursue and seek all of the remedies requested in the Amended Motion.

## **CONCLUSION**

The DRA Parties hereby respectfully request this Court to enter an order denying the Government Parties' Standing Objection [Dkt. No. 16518] and allowing the DRA Parties to proceed to merits in their Amended Motion [Dkt. No. 16276] so that the Court may mandate the Debtors to provide adequate protection to the DRA Parties on account of the diminution in value of the DRA's collateral interest in the Act 30-31 Revenues, or, in the alternative, that the DRA Parties be allowed to lift the automatic stay under Section 362(d)(1) and/or 362(d)(2) so that the DRA Parties may initiate, continue and/or conclude any and all legal proceedings and/or exercise any applicable contractual and legal remedies under the applicable debt documents.

**WHEREFORE**, the DRA Parties respectfully request this Court to enter an order granting the relief requested herein and further granting such other relief as may be just and proper.

**RESPECTFULLY SUBMITTED**.

In San Juan, Puerto Rico, this 19th day of May, 2021.

## NOTICE OF TIME TO RESPOND

Pursuant to the terms set forth in the *Order Approving Joint Stipulation of the Government Parties and the DRA Parties Regarding the DRA Parties' Motion and Memorandum of Law in Support of their Motion for Relief from the Automatic Stay, or in the Alternative, Ordering Payment of Adequate Protection* [Dkt. No. 14417], as supplemented by the *Order Approving Urgent Motion Modifying Order on Joint Stipulation of the Government Parties and the DRA Parties Regarding the DRA Parties' Motion and Memorandum of Law in Support of their Motion for Relief from the Automatic Stay, or in the Alternative, Ordering Payment of Adequate Protection* [Dkt. No. 16698] (the "Scheduling Order"), the following terms shall apply with regards to the Response:

    a.  The DRA Parties will file the DRA Response in support of the Amended DRA Stay Motion, solely concerning the Standing Issue, no later than May 19, 2021;

    c.  The Government Parties will file the Government Parties Reply (on an individual or joint basis) to the DRA Response, solely concerning the Standing Issue, by no later than June 2, 2021;[34] and

    d.  The Court will hear argument on the Amended DRA Stay Motion, solely concerning the Standing Issue, at a date and location to be determined by the Court.

**WE HEREBY CERTIFY** that on this same date, we electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all CM/ECF participants in this case. We further certify that, on this same date, we served the foregoing upon all the Standard Parties as identified and defined in the Court's CMP Order, as well as upon all of the parties identified in the Master Service List maintained at https://cases.primeclerk.com/puertorico/.

---

[34] To the extent the Official Committee of Unsecured Creditors (the "UCC") has the right to be heard on the Standing Issue, the Objection Deadline and the terms of Section 9 of the Final Case Management Order for Revenues Bonds [Dkt. No. 12186] shall apply. All parties reserve their respective rights regarding the scope of the UCC's participation in any aspect of the DRA Stay Motion litigation.

**MCCONNELL VALDÉS LLC**

270 Muñoz Rivera Avenue, Suite 7
Hato Rey, Puerto Rico 00918
P.O. Box 364225
San Juan, PR 00936-4225
Tel:    787-250-5632
Fax:    787-759-9225

By:    */s/ Arturo J. García-Solá*
Arturo J. García-Solá
(USDC No. 201903)
E-mail: ajg@mcvpr.com

*/s/ Nayuan Zouairabani*
Nayuan Zouairabani
(USDC No. 226411)
E-mail: nzt@mcvpr.com

***Attorneys for AmeriNational Community
Services, LLC, as Servicer for the GDB Debt
Recovery Authority***

**C. CONDE & ASSOC. LAW OFFICES**

By:    */s/ Carmen D. Conde Torres*
Carmen D. Conde Torres
(USDC No. 207312)

*/s/ Luisa S. Valle Castro*
Luisa S. Valle Castro
(USDC No. 215611)

254 San José Street
Suite 5
San Juan, PR 00901-1523
Tel:    787-729-2900
Fax:    787-729-2203
E-mail: condecarmen@condelaw.com

-and-

**SCHULTE ROTH & ZABEL LLP**

By:    */s/ Douglas S. Mintz*
Douglas S. Mintz (admitted *pro hac vice*)
901 Fifteenth Street, NW, Suite 800
Washington, DC 20005
Tel:    202-729-7470
Fax:    202-730-4520
E-mail: douglas.mintz@srz.com

-and-

Douglas Koff (admitted *pro hac vice*)
Abbey Walsh (admitted *pro hac vice*)
Peter J. Amend (admitted *pro hac vice*)
919 Third Avenue
New York, NY 10022
Tel:    212-756-2000
Fax:    212-593-5955

E-mail:    douglas.koff@srz.com
           abbey.walsh@srz.com
           peter.amend@srz.com

***Attorneys for Cantor-Katz Collateral Monitor
LLC, as Collateral Monitor for the GDB Debt
Recovery Authority***