**EXECUTION VERSION**

## SERVICING AGREEMENT

**This SERVICING AGREEMENT** (this "**Agreement**") is made and entered into as of the 29th day of November, 2018, by and between the GDB Debt Recovery Authority, a statutory public trust and governmental instrumentality of the Commonwealth of Puerto Rico (the "**Issuer**"), and AmeriNational Community Services, LLC (dba, AmeriNat), a Minnesota limited liability corporation (the "**Servicer**"). The Issuer and the Servicer are referred to herein collectively as the "**Parties**" and each individually as a "**Party**".[1]

## W I T N E S S E T H :

WHEREAS, on August 24, 2017, the Governor of the Commonwealth signed into law the GDB Restructuring Act, which created the Issuer and established the legislative framework for the Restructuring of GDB;

WHEREAS, the Restructuring is being effectuated through the Qualifying Modification under Title VI of PROMESA and the GDB Restructuring Act;

WHEREAS, GDB received approval of the Qualifying Modification from the United States District Court for the District of Puerto Rico on November 6, 2018, and is authorized to carry out the terms of the Qualifying Modification;

WHEREAS, in accordance with the terms of the Qualifying Modification and the GDB Restructuring Act, the Issuer and GDB have entered into the Transfer Agreement, pursuant to which GDB has irrevocably assigned and transferred to the Issuer its entire interest in the Transferred Property in consideration of the cancellation of certain indebtedness of GDB and the release of certain claims against GDB, as more fully described in the Transfer Agreement and the Solicitation Statement, and the Issuer has issued to the holders of such cancelled indebtedness the Bonds under the Bond Indenture;

WHEREAS, in accordance with the terms of the Qualifying Modification and pursuant to the GDB Restructuring Act, upon their issuance, the Bonds are secured by the Statutory Lien;

WHEREAS, in accordance with the terms of the Qualifying Modification, in connection with the issuance of the Bonds, and in consideration for the cancellation of the Participating Bond Claims and the release of certain claims against GDB, (i) the Issuer, GDB and the Indenture Trustee have entered into the Keepwell Agreement and (ii) the Indenture Trustee and the Collateral Monitor have entered into the Collateral Monitor Agreement (including the Collateral Monitor Fee Letter executed by the Issuer attached thereto);

WHEREAS, the Issuer is a newly formed statutory public trust and governmental instrumentality with no existing operations, and will have limited internal administrative support and is required, pursuant to the Bond Indenture, the GDB Restructuring Act and the Qualifying Modification, to delegate management of the Restructuring Property (including all day-to-day operations thereof) to a servicer; and

WHEREAS, in accordance with the terms of the Qualifying Modification and the GDB Restructuring Act, the Issuer has agreed to retain the Servicer to, and the Servicer has agreed to undertake

---

[1] Capitalized terms used in this Agreement but not otherwise defined herein shall have the meanings ascribed to them in Schedule 1. The use of any term defined in Schedule 1 in its non-capitalized form indicates that such term has its normal and general meaning. Capitalized terms used herein but not otherwise defined herein or in Schedule 1 shall have the meanings ascribed to them in that certain bond indenture, dated as of the date hereof (as amended and supplemented, the "**Bond Indenture**"), by and between the Issuer and Wilmington Trust, N.A., as trustee (the "**Indenture Trustee**").

to, perform certain asset management and other services related to the Restructuring Property pursuant to the terms and subject to the conditions of this Agreement.

NOW, THEREFORE, in consideration of the premises and the mutual agreements, representations, covenants and understandings hereinafter set forth, the Parties hereby agree as follows:

# A G R E E M E N T :

## ARTICLE 1
SERVICING, ADMINISTRATION AND MANAGEMENT OF THE RESTRUCTURING PROPERTY

Section 1.01.    *Appointment of the Servicer; Duties of the Servicer*.

(a)    Based upon a request for proposals made by AAFAF with regard to the engagement of the Servicer, the Issuer hereby appoints the Servicer to provide the Services as set forth in Section 1.02, subject to the terms and conditions set forth herein, and the Servicer hereby accepts such appointment and hereby agrees to provide the Services pursuant to the terms of this Agreement in consideration for payment of the Servicing Fee as set forth in Section 1.06.  In each case to the extent consistent with the Accepted Servicing Practices, the Servicer is hereby authorized to:

(i)    act as agent for the Issuer to perform the Services and all other actions required by the Servicer under this Agreement, and to do any and all things in connection therewith that the Servicer may deem necessary or desirable; for the avoidance of doubt, the Servicer is hereby authorized and empowered to act as agent for the Issuer to prepare to be reviewed and approved by the Issuer, the Annual Report and certain other notifications required under the Disclosure Agreement;

(ii)    exercise all available rights of the Issuer and seek all available remedies of the Issuer in respect of the Restructuring Property, including, without limitation, (A) commencing, in its own name or in the name of the Issuer, a legal proceeding to enforce rights and seek remedies under and with respect to the Restructuring Property or any lien or similar interest or claim relating thereto, (B) participating in any legal proceeding (including, without limitation, participation in a proceeding under Title III or Title VI of PROMESA or similar proceeding) relating to or involving the Restructuring Property, including defaults on the Restructuring Property, and (C) executing and delivering, in its own name or in the name of the Issuer, any notices, demands, claims, complaints, responses, affidavits or other documents or instruments in connection with any such proceeding described in the foregoing clause (A) or (B);

(iii)    (A) enter into transactions to waive, modify, vary, or consent to the postponement of strict compliance of any term of, or sell or settle, any Loan Asset or in any manner grant indulgence to any Obligor and (B) execute and deliver, on behalf of itself or the Issuer, any and all instruments of satisfaction, cancellation, partial or full release or discharge and all other comparable instruments with respect to the Restructuring Property and all agreements or other instruments reasonably necessary to effectuate a transaction with respect to the Restructuring Property, including to effectuate a sale thereof; *provided* that the Servicer shall not, except pursuant to an order from a court of competent jurisdiction or as part of a legitimate restructuring transaction in respect of the applicable Loan Asset (which transaction has been approved by the Collateral Monitor as commercially reasonable), release an Obligor from payment of any unpaid amount under any Loan Asset or waive the right to collect the unpaid balance of any Loan Asset from any Obligor, except that the Servicer may forego collection efforts if the amount subject to collection

is *de minimis* or such release or waiver is otherwise consistent with the Accepted Servicing Practices; and

(iv)     engage third-party vendors, legal counsel, brokers, property managers, valuation agents, consultants, accountants and other subcontractors in connection with the servicing, collection, resolution, restructuring, enforcement, litigation, Settlement, sale or other disposition of the Restructuring Property or the other Services, *provided* that (A) the Servicer shall not be relieved of any of its duties pursuant to this Agreement regardless of the performance of any services by third parties, (B) if the Servicer contracts for services of third parties to perform the Services, it shall do so in its own name and (C) the Servicer shall be solely responsible for the fees and expenses payable to any such third party and shall not be entitled to reimbursement therefor except as specifically provided in this Agreement.

(b)     The Servicer shall provide the Services in accordance with the Accepted Servicing Practices. Except as is required with the Accepted Servicing Practices, the Servicer shall not take any action that is inconsistent with, or prejudices, the interests of the Bondholders in respect of the Restructuring Property or the rights and interests of the Bondholders under this Agreement.

(c)     The Servicer shall have the exclusive right to the extent permitted by law, to vote, to give consents, ratifications and waivers and to take any other action with respect to the Restructuring Property with the same force and effect as if the Servicer were the absolute and sole owner thereof, subject in all cases to Accepted Servicing Practices, the Statutory Lien and, upon the occurrence and during the continuance of an Event of Default, the rights of the Indenture Trustee and the Bondholders.

(i)     The Issuer irrevocably constitutes and appoints the Servicer and any officer or agent thereof, with full power of substitution, as its true and lawful attorney in fact with full power and authority in the name of the Issuer or in the Servicer's name, from time to time, in the Servicer's discretion, to take any and all appropriate action with respect to the Restructuring Property that the Issuer might take and to execute any and all documents and instruments which may be necessary or desirable to carry out the terms of this Agreement and to accomplish the purposes hereof.

(ii)     The Issuer shall furnish the Servicer with any additional powers of attorney and other documents that the Servicer deems reasonably necessary or appropriate to enable the Servicer to perform the Services and its other obligations under this Agreement.

(iii)     If the Servicer commences or participates in a legal proceeding in respect of any Loan Asset, REO Asset or Other Asset, as a party or a claimant, pursuant to Section 1.01(a)(ii), in its own name, the Issuer shall be deemed to have automatically assigned the applicable Loan Asset, REO Asset or Other Asset (subject to the lien in favor of the Indenture Trustee for the benefit of the Bondholders) and any other related property of the Issuer with respect to such Loan Asset, REO Asset or Other Asset to the Servicer for purposes of such proceeding, and the Issuer shall execute and deliver any document reasonably requested by the Servicer to evidence such assignment.  If in any such legal proceeding, it should be held that the Servicer may not enforce any such rights and remedies with respect to such Loan Asset, REO Asset or Other Asset, the Issuer shall, at the Servicer's written direction, take such steps as the Servicer may reasonably direct to enforce such Loan Asset, REO Asset or Other Asset, including bringing suit in its name.

(d)     For the avoidance of doubt, the Servicer shall not acquire any right or title to, or any interest in, the Restructuring Property, other than the servicing rights conveyed herein.

Section 1.02.    *Services*.  The Servicer's general obligations under this Agreement shall include performance of the following services, in each case, in accordance with the Accepted Servicing Practices, from and after the date of this Agreement (the "**Services**"):

(a)    using commercially reasonable efforts to maximize the realizable present value of the Restructuring Property, including through the collection of all payments called for under the terms of each Loan Asset as and when the same shall become due and, as appropriate, the sale, Settlement or other disposition of the Restructuring Property and the enforcement of all rights and remedies of the Issuer in respect of the Restructuring Property through the commencement of legal proceedings or other enforcement actions;

(b)    using commercially reasonable efforts to enforce the Issuer's rights under the Transfer Agreement, including by:

(i)    collecting all proceeds that the Issuer is entitled to in respect of the GDB Retained Loans and the Retained Causes of Action and receiving, on behalf of the Issuer, the Additional Recovery Authority Loans, and enforcing the Issuer's rights to each of the foregoing in accordance with the Transfer Agreement, *provided* that the Servicer acknowledges and agrees that none of the Issuer, the Servicer or any other Person (other than GDB) will have the right to commence or direct any litigation or other enforcement action in respect of, or sell, transfer or dispose of, the Retained Causes of Action;

(ii)    enforcing GDB's covenant under the Transfer Agreement to use commercially reasonable best efforts to maximize the return on the GDB Retained Loans, *provided* that the Servicer acknowledges and agrees that, pursuant to the Transfer Agreement, GDB will not be required to bring any action seeking to obtain a judgment against a public entity that is an obligor under any such loan or seeking to foreclose upon any of such public entity's assets except, in each case, insofar as is necessary to preserve the payment or lien priority or rights in respect of any such loan; and

(iii)    reviewing any proposed modification by GDB of any Additional Recovery Authority Loan and providing approval of such modification only if, after consultation with and non-objection by the Collateral Monitor (in accordance with Section 1.07(b)), the Servicer determines in good faith that such modification is commercially reasonable;

(c)    with respect to Obligors on the Loan Assets:

(i)    using commercially reasonable efforts to respond to inquiries of such Obligors;

(ii)    using commercially reasonable efforts to investigate and manage delinquencies, defaults and potential defaults on the Loan Assets, including by using commercially reasonable efforts to contact and interview Obligors to determine the financial condition of such Obligor, the economic viability of the related Loan Asset and such Obligor's intentions with respect to making payments in respect of the Loan Asset; and

(iii)    sending payment coupons or statements and reporting tax information to such Obligors, if applicable;

(d)    establishing and maintaining the Lockbox Account and cooperating with the Issuer and the Indenture Trustee in establishing and maintaining the Collection Account, depositing all Collections therein, managing all deposits therein and preparing Fund Transfer Requisitions for withdrawals therefrom,

4

and maintaining books and records with respect thereto, in each case, in accordance with Section 1.05 and the Bond Indenture;

(e)     maintaining and ensuring the safe custody of, as property of the Issuer, a complete, accurate and separate set of books and records pertaining to the Restructuring Property, including, without limitation, an initial balance sheet or statement of net position for the Issuer as of the date hereof, in accordance with Article 2;

(f)     preparing and delivering the Annual Report, the Payment Date Report, the Quarterly Budget Report, the other information required pursuant to Article 3;

(g)     maintaining for itself an effective system of audits and controls adequate to ensure that the Servicer's agents, representatives, employees and other staff perform their respective obligations and comply with the Accepted Servicing Practices;

(h)     taking all steps necessary, on behalf of the Issuer, to continuously maintain the Issuer's ownership interest in, and the Statutory Lien on, the Restructuring Property and all Collections thereon and the Issuer's perfected security interest in or lien on all Underlying Property and the Vendor Claim Reserve and any proceeds thereof, including by, as necessary, (i) obtaining the execution of all necessary documentation by the applicable Obligor or GDB, (ii) recording, registering, filing, re-recording, re-filing and re-registering all applicable security agreements, financing statements and continuation statements, (iii) amending the title documents of such property, (iv) using all commercially reasonable efforts to defeat any adverse claims to the Restructuring Property (including the sources of repayment of the Restructuring Property), all Underlying Property or the Vendor Claim Reserve Residual, and (v) using all commercially reasonable efforts to preserve the Restructuring Property and the enforceability of the Issuer's rights thereto, including obtaining any necessary insurance for the REO Assets;

(i)     responding to inquiries of federal, state or local government authorities with respect to the Restructuring Property, using commercially reasonable efforts to generate information for U.S. federal tax reporting purposes, as is available to the Servicer, for the Issuer and, in the event that the U.S. Internal Revenue Service asserts that the Bonds are characterized as equity interests of the Issuer for U.S. federal income tax purposes, using commercially reasonable efforts to provide, or cause to be provided, such information as is reasonably requested by Bondholders to enable them to comply with their U.S. federal income tax reporting obligations and to retain possession of records and information relevant to the foregoing;

(j)     performing the other duties, including administrative functions, as specified in this Agreement.

Section 1.03.    *Sales and Settlements of Assets*.  Consistent with the terms of the Accepted Servicing Practices, and subject to Section 1.07(b) and the Asset Restrictions, the Servicer shall sell, settle or otherwise dispose of any Loan Asset, REO Asset or Other Asset if, in the Servicer's reasonable and prudent determination, such sale, Settlement or other disposition will maximize the value (in present value terms) realized by the Bondholders in respect of such Loan Asset, REO Asset or Other Asset.

(a)     If the Servicer determines that the sale of a Municipal Loan to a purchaser other than one described in clause (a) of the definition of Approved Purchaser will maximize the value (in present value terms) realized on such Municipal Loan, the Servicer shall take all reasonable steps to obtain the approval of such purchaser by AAFAF or other designated Commonwealth agent.

(b)     In any transfer, assignment, sale or disposition of a Municipal Loan or a Non-Municipal Loan, the (i) Servicer shall clearly indicate in the terms of such transfer, assignment, sale or disposition that

such Municipal Loan or Non-Municipal Loan is and will remain subject to the Asset Restrictions applicable to Municipal Loans or Non-Municipal Loans, respectively, and (ii) such transfer, assignment, sale or disposition shall be conditioned upon the acquirer of such Loan Asset delivering to the Issuer a written agreement acknowledging the applicability of such Asset Restrictions to such Loan Asset and agreeing to comply with such Asset Restrictions in all respects.

(c)     Any proposed sale, Settlement or other disposition of any Loan Asset, REO Asset or Other Asset shall be a material transaction for purposes of Section 1.07(b).

(d)     With respect to any Preexisting Contract relating to a REO Asset, the Servicer shall have no duties other than (i) as necessary to authorize the applicable real estate broker to perform its contractual duties under such contract, a copy of which shall be provided to the Servicer, and (ii) to supervise such real estate broker in respect of the execution of its contractual duties, and the Issuer shall direct such real estate broker to keep the Servicer informed, on a timely basis, with respect to any and all actions related to the applicable REO Asset.  If, based on such supervision, the Servicer determines, in its discretion, that it would maximize the realizable present value (after giving effect to any costs and expenses relating to the termination of such Preexisting Contract) of the applicable REO Asset to terminate such Preexisting Contract, the Servicer shall do so.  If the contract option date under any Preexisting Contract expires during the duration of the term of this Agreement, the Servicer shall have no obligation to extend such date and, if not extended, such real estate broker shall no longer be considered engaged.

(e)     Any property manager retained by the Servicer in accordance with Section 1.01(a)(iv) may establish and maintain, in respect of any REO Asset, a property account, which account shall be either a segregated account with an Eligible Institution or an Eligible Deposit Account (or, to the extent there is no Eligible Institution reasonably accessible with respect to such REO Asset, such other account that is in an FDIC-insured institution approved by the Collateral Monitor), and such property manager shall account separately for funds received or expended in respect of such REO Asset.  In connection therewith, the Servicer shall cause the property manager to deposit, as soon as practicable but in no event later than two Business Days after receipt, in the property account all revenues received by it with respect to the relevant REO Asset, and the property manager shall be permitted to withdraw therefrom funds necessary for the proper operation, management and maintenance of such REO Asset, including all operating expenses and permitted lease-up expenses.  No later than fifteen days after the end of each month, the Servicer shall require the property manager to withdraw from the property account and transfer to the Servicer (for deposit into Collection Account in accordance with Section 1.05(a)) all cash Collections generated during the previous calendar month in respect of such REO Asset and all other cash Collections otherwise remaining in such property account at the end of such month.

(f)     As promptly after receipt of any Collections that are not cash as is practicable and to the extent consistent with the Servicer's duty to maximize the realizable present value of the Restructuring Property, the Servicer shall, in accordance with the Accepted Servicing Practices, sell such Collections for cash in an arm's-length transaction to an Independent Person and deposit, or cause to be deposited, the proceeds thereof (which shall constitute Collections) into the Collection Account in accordance with Section 1.05(a).

Section 1.04.     *Custody of Asset Documents*.  On or prior to the Closing Date, pursuant to the Transfer Agreement, the Issuer shall direct GDB to deliver or cause to be delivered to the Servicer original and electronic copies of all of the Closing Asset Documents.  The Servicer shall thereafter deliver such original Closing Asset Documents received from GDB to an appropriate archival repository for cold storage, and shall hold the electronic copies thereof together with all original copies of Asset Documents generated during the term of this Agreement as custodian for the benefit of the Issuer.  For the avoidance of doubt, the Servicer assumes no custodial responsibilities for the Closing Asset Documents received from

GDB other than the transfer of such documents to the cold storage facility.  The Servicer shall promptly, but in no event later than five Business Days following any written request of the Issuer or the Collateral Monitor, deliver a copy of any requested Asset Document to the requester of such document.

Section 1.05.  *Lockbox Account and Collection Account.*

(a)     The Servicer shall establish and maintain the Lockbox Account and cooperate with the Issuer and Indenture Trustee in the establishment and maintenance of the Collection Account, and the Servicer shall deposit, or cause to be deposited, all cash Collections in the Collection Account in accordance with the following:

(i)     The Servicer shall, within five days from the date hereof (or, with respect to any Transferred Property transferred after the Closing Date, from the date of the Issuer's receipt thereof) or as soon thereafter as is reasonably practicable send notice to each Obligor and any relevant intermediary (including, without limitation, the Municipal Revenues Collection Center and any public or private bank holding any redemption or similar fund relating to any of the Loan Assets) to make payments directly to the Lockbox Bank for credit to the Lockbox Account, and shall provide each such Obligor or other relevant intermediary with remittance invoices in order to enable such Obligors or other relevant intermediaries to make such payments directly to the Lockbox Bank for credit to the Lockbox Account.  The Servicer shall cause the Lockbox Bank to deposit all cash Collections on the Restructuring Property into the Collection Account no later than the Business Day after receipt, and shall cause all amounts in the Lockbox Account on account of the Restructuring Property to be transferred to the Collection Account no later than the Business Day after such amounts first become available in the Lockbox Account.

(ii)     The Servicer shall remit all cash Collections in respect of any Loan Asset, REO Asset or Other Asset received by the Servicer to the Collection Account as soon as practicable, but in no event later than the second Business Day after receipt thereof.

(iii)     At the Servicer's option, the Servicer may invest amounts (other than amounts corresponding to the Fees and Expenses Reserve) held in the Collection Account in Eligible Investments from the time deposited in the Collection Account until the next Determination Date, in accordance with the Bond Indenture.  All such Eligible Investments shall be in the name of the Indenture Trustee, for the benefit of the Bondholders.

(b)     The Servicer shall not deposit or cause to be deposited any Collections in any account other than the Collection Account, except to the extent Collections may be deposited in the Lockbox Account in accordance with Section 1.05(a)(i) or a property account in accordance with Section 1.03(e).  The Collection Account, the Lockbox Account and any property account containing Collections shall be established and maintained in accordance with the Accepted Servicing Practices, and shall not, at any time, be pledged as collateral to secure or otherwise serve as security, directly or indirectly, for any obligation of the Servicer.  All funds deposited in the Collection Account and all Collections deposited in the Lockbox Account or any property account shall be held in trust for the benefit of the Bondholders (subject to the terms of the Bond Indenture) until withdrawn in accordance with Section 1.05(d), and shall not be comingled with other funds of the Servicer, and the Servicer shall not have the right to withdraw funds from the Collection Account, except pursuant to a Fund Transfer Requisition submitted to the Indenture Trustee in accordance with this Agreement and the Bond Indenture, and shall not have the right to withdraw Collections from the Lockbox Account or any property account except to transfer such funds to the Collection Account.

(c)     On each Determination Date, the Servicer shall prepare, and deliver to the Issuer, the Collateral Monitor and the Indenture Trustee, the Payment Date Report pursuant to Section 3.02, which shall include, among other things, the amount of Available Cash, and the calculation thereof, to be

distributed to Bondholders on the related Payment Date and the amount of the Fees and Expenses Reserve, and the Semiannual Budget therefor, to be set aside on such Payment Date.

(d)     The Servicer shall, from time to time as may be necessary or appropriate, prepare and submit to the Indenture Trustee Fund Transfer Requisitions in order to make payments from the Collection Account in accordance with the Bond Indenture.  The Servicer shall not submit any Fund Transfer Requisition other than as set forth below.

(i)     On each Determination Date (or such earlier date as may be necessary to ensure the distribution of funds on each Payment Date), the Servicer shall prepare and submit to the Indenture Trustee a Fund Transfer Requisition, in accordance with the Payment Date Report, that provides for:

(A)     the retention of the Fees and Expenses Reserve set forth in the Semiannual Budget prepared by the Servicer and approved by the Issuer and the Collateral Monitor in accordance with Section 3.02(b);

(B)     the payment of the following Issuer Expenses:

(1)     amounts due to the Servicer pursuant to Section 1.06 as set forth on the invoice prepared by the Servicer and provided to the Issuer and the Collateral Monitor in accordance with Section 1.06;

(2)     amounts due to, or on behalf of, each of the Collateral Monitor and the Indenture Trustee pursuant to the Bond Indenture or the Collateral Monitor Agreement, as applicable (including, without limitation, for the payment of fees, expenses and indemnification amounts), as set forth in a written invoice provided to the Servicer by the Collateral Monitor or the Indenture Trustee, as applicable, containing the information required under Section 1.05(d)(iii); and

(3)     subject to Section 1.05(d)(iv), amounts due for the payment of any other Issuer Expense as set forth in a written invoice provided to the Servicer by the Issuer, containing the information required under Section 1.05(d)(iii); and

(C)     the payment of all Available Cash to the Bondholders in accordance with the Bond Indenture.

(ii)     From time to time after each Payment Date and prior to the following Determination Date, the Servicer shall prepare and submit a Fund Transfer Requisition for the payment of the following Issuer Expenses:

(A)     subject to Section 1.06(c), Reimbursable Expenses up to the amount of the Fees and Expenses Reserve corresponding to forecasted Reimbursable Expenses of the Servicer;

(B)     at the request of the Indenture Trustee or the Collateral Monitor, amounts due to, or on behalf of, such Person pursuant to the Bond Indenture or the Collateral Monitor Agreement, as applicable (including, without limitation, for the payment of expenses and indemnification amounts), as set forth in a written invoice provided to the

Servicer by the Collateral Monitor or the Indenture Trustee, as applicable, containing the information required under Section 1.05(d)(iii);

(C)     subject to Section 1.05(d)(iv), at the request of the Issuer, amounts due for the payment of any other Issuer Expense budgeted under the Semiannual Budget or for the payment of any other reasonable Issuer Expense not budgeted under the Semiannual Budget, in each case as set forth in a written invoice provided to the Servicer by the Issuer, containing the information required under Section 1.05(d)(iii);

(iii)     Each Fund Transfer Requisition prepared and submitted by the Servicer shall identify (A) the payee, (B) the purpose, (C) the amount, (D) the payment instructions, and (E) if such payment is for an Issuer Expense, whether such Issuer Expense is an Excluded Expense (including which clause of the definition of Excluded Expenses applies) or an Issuer Operating Expense. The Servicer shall not submit a Fund Transfer Requisition at the request of, or on behalf of, any Person unless a written invoice containing the foregoing information shall have been provided to each of the Servicer and the Collateral Monitor.

(iv)     The Servicer shall not submit any Fund Transfer Requisition for the payment of an Issuer Operating Expense unless (A) such payment would not result in the aggregate Issuer Operating Expenses for the then-current fiscal year exceeding (or being reasonably expected to exceed) the Issuer Operating Expenses Cap for such fiscal year or (B) the Collateral Monitor has consented in writing to such payment. To the extent the payment of such Issuer Operating Expense requires the approval or consent of the Collateral Monitor, the Servicer shall cooperate with the Issuer to request approval or consent of the Collateral Monitor on a prompt basis.

(v)     Following the Indenture Trustee's receipt of a Material Servicer Default Notice, until the removal of the Servicer or waiver of such Servicer Default and possible Servicer Replacement Event in accordance with Section 6.01(c), all decisions by the Servicer in respect of the Collection Account, including all Fund Transfer Requisitions, shall be subject to the consent of the Collateral Monitor, which shall be exercised promptly and in such a manner as to allow for servicing in accordance with Accepted Servicing Practices.

(e)     In accordance with Section 2.01, the Servicer shall monitor the deposits made to the Lockbox Account and maintain adequate records in respect of all deposits into and withdrawals from the Lockbox Account and the Collection Account and shall provide, along with its Payment Date Report, to the Issuer, the Collateral Monitor and the Indenture Trustee, detailed bank reconciliations and statements with respect to all such deposits and withdrawals.

(f)     In the event the Lockbox Bank no longer qualifies as a "well capitalized" (as defined in 12 C.F.R. 324.403(b)(1)) FDIC-insured institution, the Servicer shall use reasonable efforts to cause the Lockbox Account to be moved to another institution qualifying as such within 30 days from the date on which the Lockbox Bank fails to satisfy such qualification. The Servicer shall give notice to the Issuer, the Collateral Monitor and the Indenture Trustee of any proposed change of the location of the Lockbox Account prior to any change thereof.

Section 1.06.     *Servicing Fees and Reimbursement of Certain Expenses*.

(a)     On the Closing Date, the Issuer shall cause GDB to pay or cause to be paid to the Servicer the Initial Portfolio Transfer Fee applicable to each Loan Asset transferred to the Issuer on the Closing Date for servicing under this Agreement.

9

(b)      On each Payment Date (other than the Special First Payment Date), the Servicer shall be entitled to the Servicing Fee for Services performed during the preceding Collection Period. The Servicer shall, on or before five Business Days prior to the Determination Date immediately following each Collection Period (or such other date as shall be mutually agreed by the Issuer, the Servicer and the Collateral Monitor), deliver an invoice to the Issuer, the Collateral Monitor and the Indenture Trustee, setting forth in reasonable detail its calculation of the Servicing Fee for such Collection Period, which Servicing Fee shall be paid to the Servicer from the Collection Account on the immediately following Payment Date in accordance with Section 1.05(d) but subject to the terms and conditions of the Bond Indenture, including the requirement of submission of a Fund Transfer Requisition. If the Servicer has not performed the Services for each day in the Collection Period, then the Servicing Fee shall be prorated by a fraction equal to the actual numbers of days in the Collection Period for which Services have been performed divided by the actual number of days in the Collection Period.

(c)      From time to time after each Payment Date and prior to the following Determination Date, the Servicer shall be entitled to withdraw funds from the Fees and Expenses Reserve to pay Reimbursable Expenses or to reimburse the Servicer for its direct payment of Reimbursable Expenses. To the extent that the Servicer incurs Reimbursable Expenses exceeding the amount set aside in the Fees and Expenses Reserve for such expenses during the relevant semiannual period, such Reimbursable Expenses shall be treated as a Servicer Advance. The Servicer shall have no right to be reimbursed for any costs or expenses other than the Reimbursable Expenses. For the avoidance of doubt, the Servicer is not required nor expected to make advances of interest or principal payments on the Loan Assets. Information regarding each Reimbursable Expense (whether paid from the Fees and Expenses Reserve or as a Servicer Advance) shall be documented in reasonable detail, including information regarding the fees and expenses of Approved Third Parties and the services provided by such Approved Third Parties, and provided by the Servicer to (i) the Issuer, the Collateral Monitor and the Indenture Trustee, no later than the fifteenth day of the month following incurrence of such amounts, (ii) the Bondholders, in the Quarterly Budget Report or Payment Date Report, as applicable, following incurrence of such amounts and (iii) the Indenture Trustee on the Fund Transfer Requisition required to be submitted to the Indenture Trustee as a condition to any withdrawal from the Collection Account. The Servicer shall request the Collateral Monitor to give notice of each Approved Third Party and the engagement thereof to the Bondholders in its next Semiannual Bondholder Report.

(d)      The Servicer shall give prompt written notice to the Issuer, the Collateral Monitor and the Indenture Trustee of any Reimbursable Expense paid as a Servicer Advance, and shall be entitled to repayment thereof on the next Payment Date immediately following the payment of such Servicer Advance in accordance with Section 1.05(d)(i). The Servicer shall be entitled to repayment of such Servicer Advance *plus* interest at the rate of 1.00% per month compounded monthly from the date of the Servicer's payment of such Servicer Advance to but excluding the Payment Date on which such Servicer Advance is repaid.

(e)      The Servicer shall not provide for, assess or collect, with respect to any Loan Asset, REO Asset or Other Asset, fees of any type other than those provided under the terms of the applicable Asset Documents or pursuant to a modification of such Asset Documents in accordance with the terms hereof, which fees shall be collected and deposited into the Collection Account. In addition, the Servicer shall not be entitled to collect and retain as additional servicing compensation any investment earnings or interest earned from the investment of monies on deposit in the Collection Account.

(f)      To the extent that the Servicer has any right of set-off or other similar right with respect to any Loan Asset, REO Asset or Other Asset, the Servicer hereby expressly and irrevocably waives such right.

Section 1.07.     *Oversight by the Collateral Monitor*.  The activities of the Servicer shall be subject to the ongoing oversight and review of the Collateral Monitor, and the Servicer and the Collateral Monitor shall meet and confer regularly and in good faith in fulfillment of their respective duties, each in accordance with the following.

(a)     The Servicer shall cooperate with the Collateral Monitor by, among other things, providing, and responding to reasonable requests of the Collateral Monitor for, (i) access to the Servicer, (ii) access to or copies of Asset Documents or any other reasonably available papers or information regarding the activities of the Issuer and the Servicer, including, without limitation, all information required pursuant to the following paragraph (b) and the reports required pursuant to Article 3, and (iii) temporary on-site access and work space for the Collateral Monitor pursuant to Section 1.09.

(b)     If the Servicer engages in any negotiations relating to, or consideration of, or if the Servicer is approached by any Obligor or other third party in respect of, any potential material transaction in respect of any Loan Asset, REO Asset or Other Asset (or, GDB in respect of a potential transaction in respect of any Additional Recovery Authority Loan), whether in-court or out-of-court, including, in each case, any waiver, modification, amendment, consent or other accommodation in respect of any Loan Asset or Additional Recovery Authority Loan (including any vote in respect of a plan of adjustment or qualifying modification under PROMESA or other similar restructuring or exchange transaction or bankruptcy or insolvency proceeding) or sale, Settlement or other disposition of any Loan Asset, REO Asset or Other Asset or Additional Recovery Authority Loan, the Servicer shall provide the Collateral Monitor with written notification of such transaction and provide, on an ongoing basis throughout the course of such negotiations and consideration, the Collateral Monitor all information necessary, including all material terms of such transaction, for the Collateral Monitor to be able to make a determination as to the commercial reasonableness of such transaction.  The Servicer shall collaborate with the Collateral Monitor in good faith to ensure the completeness and timely delivery of the information provided to the Collateral Monitor, and, in all events, the Servicer shall provide all such information to the Collateral Monitor no less than 10 Business Days prior to the date the Servicer proposes to enter into any such transaction.  Furthermore, the Servicer shall not enter into any agreement or give its consent in respect of a material transaction relating to any Loan Asset, REO Asset or Other Asset or any Additional Recovery Authority Loan if the Collateral Monitor has reasonably objected to such transaction on the grounds that such transaction is not commercially reasonable or that the Collateral Monitor has received inadequate information to make a determination as to the commercial reasonableness of such transaction (including that such information was provided with inadequate time for review thereof).

(c)     Unless waived by the Collateral Monitor in its sole discretion, the Servicer shall meet with the Collateral Monitor (in person or telephonically, as mutually agreed) no less than once each month for the first 24 months after the Closing Date and once each fiscal quarter thereafter, if such reduced schedule is agreed to by the Collateral Monitor, in each case on a date to be mutually agreed (or by default on the day that is fifteen days prior to the end of each month or fiscal quarter, as applicable) to discuss the Servicer's performance, including the past and expected future performance of the Restructuring Property, the forecast of cash Collections, delinquencies on the Loan Assets, REO Asset or Other Asset and strategy and expected timing for returning any Nonperforming Loan Asset to Performing Loan Asset status, the resolution of the Restructuring Property and, in the case of meetings scheduled in the month prior to the month in which the Annual Report, the Payment Date Report or the Quarterly Budget Report are due, such report or budget, as applicable.  The Issuer will have a right to, but will not be required to, attend any such meetings and/or to receive an update from the Servicer as to the results of any such meeting.

(d)     The Servicer acknowledges and understands that the Collateral Monitor will, as part of its duties, conduct the Compliance Test every semiannual period as part of its evaluation of the Servicer's

11

performance. The Servicer shall cooperate with the Collateral Monitor and provide the Collateral Monitor with all information necessary for it to conduct such test, in accordance with Section 3.03.

(e)     The Servicer acknowledges and agrees that it and, the Issuer and the Collateral Monitor share common legal interests arising as of the Closing Date with respect to each of their respective duties in respect of the Restructuring Property and in connection with and in anticipation of any litigation and proceedings that may arise out of or related to the Restructuring Property, including efforts to maximize the realizable present value thereof and to oppose challenges to the Issuer's recovery thereon. In furtherance of this common interest and to formalize and memorialize such common interest, the Servicer shall enter into a common interest agreement with the Issuer and the Collateral Monitor, it being understood that the Collateral Monitor will also be obligated to enter into such an agreement upon request of the Servicer.

Section 1.08.     *Cooperation with the Indenture Trustee*.  The Servicer shall take commercially reasonable steps to cooperate with the Indenture Trustee in respect of its rights and obligations under the Bond Indenture and other Transaction Documents, including upon the occurrence and during the continuance of an Event of Default or a Transfer Trigger Event.

Section 1.09.     *On-Site Personnel*.  The Servicer shall permit any individuals designated by the Collateral Monitor or the Issuer on-site access to the Servicer's facilities from which it primarily performs the Services.  The Servicer shall provide temporary on-site access and work space at the Servicer's facilities for such designated individuals as reasonably necessary to permit the Collateral Monitor and the Issuer to carry out such entities' duties, but in no event more than four Business Days per month.

Section 1.10.     *Reliance on Qualified Advisors*.  The Servicer may rely in good faith upon the advice of a Qualified Advisor in connection with the performance of any of the Servicer's duties or obligations hereunder to the extent such advice is of a type for which such Qualified Advisor has expertise. In connection therewith, the Servicer may rely upon any certificate, statement, instrument, opinion, report, notice, request, consent, order, appraisal, valuation, bond or other document executed by an unaffiliated third party reasonably believed by the Servicer to be genuine and to have been signed or presented by the proper authority.  To the extent the Servicer relies in good faith upon the advice of a Qualified Advisor in accordance with this Section 1.10 (and, with respect to a Qualified Advisor other than the Collateral Monitor, provided that any such advice is consistent with the Accepted Servicing Practices) it shall be deemed not to be in breach of its obligations under this Agreement to the extent of such reliance; *provided however* that the Servicer shall not be relieved of any liability arising therefrom as a result of its own willful misconduct or gross negligence with respect thereto.  A sub-servicer shall not qualify as a Qualified Advisor.  For the avoidance of doubt, this section shall not apply to the Servicer's obligations under Section 1.07.

Section 1.11.     *No Joint Venture or Partnership*.

(a)     This Agreement shall not be deemed to create a joint venture or partnership among the Parties.

(b)     In performing the Services called for under this Agreement, the Servicer is, and shall be considered for all purposes to be, independent of the Issuer, with exclusive control over its employees and agents that are engaged in the performance of such Services.

(c)     The Servicer is solely responsible for determining the terms and conditions of employment between itself and its employees and agents, including for example, hiring, termination, hours of work, rates and payment of compensation, and for the payment, reporting, collection and withholding of all taxes and other payroll deductions.

Section 1.12.    *Liquidation of the Assets on Final Scheduled Payment Date*.

(a)    On or prior to the date that is six months prior to the Final Scheduled Payment Date (including as the same may be delayed pursuant to the terms of the Bond Indenture), the Servicer shall prepare and provide to the Issuer, the Collateral Monitor and the Indenture Trustee the Final Scheduled Payment Date Report in accordance with the Bond Indenture.

(b)    If the Final Scheduled Payment Date is delayed pursuant to the terms of the Bond Indenture, the Issuer shall give or cause to be given notice to the Servicer of the new Final Scheduled Payment Date and additional Payment Dates no later than the date that is three months prior to the then-existing Final Scheduled Payment Date and the term under this Agreement shall likewise be extended.

(c)    Unless the Bond Indenture and this Agreement have been or will have been terminated prior to or on the Final Scheduled Payment Date, the Servicer shall, in accordance with the Bond Indenture and the Accepted Servicing Practices, use commercially reasonable efforts to liquidate all Restructuring Property, if any, remaining as of the Final Scheduled Payment Date as soon as reasonably practicable thereafter and in no event later than the end of the month of the date that is four months after the Final Scheduled Payment Date (or such other date thereafter as reasonably agreed to by the Issuer, the Servicer and the Collateral Monitor).  The Servicer shall deposit, or cause to be deposited, the cash Collections from such liquidation into the Collection Account.

(d)    On the Liquidation Payment Date, the Servicer shall prepare and provide to the Indenture Trustee a Fund Transfer Requisition providing for the distribution of all remaining Collections in accordance with the Priority of Payments.

Section 1.13.    *Servicing Transfer*.  The Servicer shall use its commercially reasonable efforts, in cooperation with the Issuer, to perform all the actions required of it to complete the transfer of the servicing of the Restructuring Property from GDB to the Servicer as promptly as reasonably practicable.

ARTICLE 2
BOOKS AND RECORDS

Section 2.01.    *Books and Records*.

(a)    The Servicer shall maintain customary books and records, as property of the Issuer, with respect to each of the Loan Assets, REO Assets and Other Assets, including, without limitation, (i) a statement of net position or balance sheet, (ii) a statement of revenues, expenses and changes in net position or income statement and (iii) a statement of cash flows and other information as may be required in order to obtain audited financial statements for the Issuer or other unaudited statements or information that the Issuer is obligated to provide under the Disclosure Agreement.

(b)    The books and records shall include, without limitation, information relating to (i) all Collections received by the Servicer or otherwise deposited in the Collection Account in respect of the Restructuring Property, the GDB Retained Loans or the Retained Causes of Action, (ii) all expenses paid or to be paid by the Issuer from the Collection Account (including copies of all Fund Transfer Requisitions submitted to the Indenture Trustee and supporting documentation relating thereto) and (iii) relevant copies of notes, correspondence and documentation of all servicing efforts and activities, including all material meetings and telephone calls with Obligors or made in connection with Obligors or the Restructuring Property.

(c)      The books and records for the Restructuring Property shall be kept, to the extent reasonably practicable, on an asset-by-asset basis and otherwise in form and according to such standards as may be required for the fulfilment of the Servicer's responsibilities under this Agreement and as the Collateral Monitor may reasonably request for the fulfillment of its responsibilities.

(d)      The Servicer shall enter all servicing information on a current basis into the servicing report system utilized by the Servicer in accordance with the Accepted Servicing Practices, including by crediting Collections against the applicable Loan Asset, REO Asset or Other Asset only once actually deposited into the Lockbox Account or, if not deposited into the Lockbox Account, the Collection Account.

(e)      On each Determination Date, in addition to the Payment Date Report, and monthly, the Servicer shall provide to the Issuer and the Collateral Monitor detailed bank reconciliations and statements with respect to all deposits into and withdrawals from the Collection Account (including copies of all Fund Transfer Requisitions submitted to the Indenture Trustee since the last such report).

(f)      The Servicer shall maintain such books and records until its termination as the Servicer pursuant to this Agreement, at which time the Servicer shall transfer such books and records to the Successor Servicer.  If the Servicer is unable to transfer such books and records to a Successor Servicer following the termination of the Servicer pursuant to this Agreement, the Servicer shall maintain such books and records for five years following the date of such termination or such other longer period as required by applicable law, at which time the Servicer shall transfer such books and records to the Issuer.

Section 2.02.    *Right of Inspection*.  The Servicer shall permit any individual designated by the Issuer or the Collateral Monitor to visit, inspect, audit and copy all records relating to the Restructuring Property and the Collections in respect thereof and any of the properties, books and financial reports of the Servicer pertaining to the Restructuring Property and to discuss its affairs, finances and accounts as often as the Issuer and the Collateral Monitor may reasonably request for the purpose of determining compliance with this Agreement; *provided*, *however*, that unless the Collateral Monitor has given notice of a possible Servicer Replacement Event or the Issuer or the Collateral Monitor, in its reasonable determination, suspects fraud or misrepresentation, the Issuer or Collateral Monitor, as applicable, shall provide reasonable advance notice and shall conduct its audit during normal business hours.

Section 2.03.    *Location*.  The performance of the Servicer hereunder shall be conducted, and the books and records relating to the Servicer's activities shall be kept, at the Servicer's locations and such additional locations as determined by the Servicer; *provided* that the Servicer shall give the Issuer, the Collateral Monitor and the Indenture Trustee not less than 30 days prior written notice of any proposed change to the location of the books and records maintained by the Servicer pursuant to this Article 2.

## ARTICLE 3
### REPORTS

Section 3.01.    *Annual Report*.  The Issuer hereby delegates to the Servicer, and the Servicer hereby agrees to assume, the responsibility of the Issuer under the Disclosure Agreement for the preparation of the Annual Report.  The Servicer shall carry out such delegation in accordance with the following.

(a)      The Servicer, promptly following completion of each fiscal year of the Issuer, shall prepare such financial statements and other information, to the extent reasonably available to the Servicer, as may be required to be provided to the auditor of the Issuer (including a management discussion and analysis, if necessary) in order for such auditor to provide the annual audited financial statements of the Issuer for inclusion in the Annual Report.  In addition, the Servicer shall prepare such other information as may be required under the Disclosure Agreement as a part of the Annual Report.  For the avoidance of doubt, the

Servicer's obligations in respect of this Section 3.01 shall be limited to the preparation of information available to and maintained by the Servicer pursuant to its obligations under this Agreement.

(b) The Servicer shall prepare and provide to the Issuer and the AAFAF Disclosure Coordinator, with a copy to the Collateral Monitor and the Indenture Trustee, not less than 20 days prior to the Annual Filing Date a draft of the Annual Report, containing the information required to be included therein and pursuant to the standards set forth under the Disclosure Agreement.

(c) The Servicer has received a copy of the Disclosure Agreement and the Disclosure Policies of the Issuer and shall prepare the Annual Report in accordance with the standards set forth under the Disclosure Agreement and Disclosure Policies, including that the Annual Report shall be accurate and complete. As used in this Section 3.01, "accuracy and completeness" shall mean, in accordance with the Disclosure Policies, that, from the viewpoint of the Person determining accuracy and completeness, based on the circumstances, there shall be no untrue statement of material fact and no omission of a statement necessary to make the statements made, in light of the circumstances under which they were made, not misleading as of the date accuracy and completeness is determined.

(d) The Servicer shall promptly notify the Issuer of the occurrence of a Listed Event under Section 5(a)(1), 5(a)(10) or 5(b)(1) of the Disclosure Agreement or any other Listed Event of which the Servicer has actual knowledge, and assist the Issuer in preparing the information required to be filed by or on behalf of the Issuer with respect to such Listed Event within the period specified in the Disclosure Agreement.

(e) The Issuer shall provide and shall use its best efforts to cause GDB, the Collateral Monitor and the Indenture Trustee to provide to the Servicer any information (including but not limited to documents in the possession of such Person) that the Servicer reasonably determines is necessary for the completion of the Servicer's obligations under this Section 3.01, no later than 10 days after written request by the Servicer or otherwise as soon as reasonably practicable.

Section 3.02. *Payment Date Report and Quarterly Budget Report*. The Servicer shall prepare the Payment Date Report and the Quarterly Budget Report in accordance with the following.

(a) The Servicer shall prepare and provide on each Determination Date to the Issuer, the Collateral Monitor and the Indenture Trustee, to be disseminated to the Bondholders on the Payment Date following such Determination Date, the Payment Date Report, containing the information set forth in Exhibit D to the Bond Indenture. The Payment Date Report, including the Semiannual Budget prepared in accordance with Section 3.02(b), shall be subject to review and approval by the Issuer and the Collateral Monitor, and the Servicer shall deliver to the Issuer and the Collateral Monitor a draft Payment Date Report no later than three Business Days prior to the Determination Date on which the Servicer is required to deliver such report (or such other date as shall be mutually agreed by the Issuer, the Servicer and the Collateral Monitor).

(b) The Servicer shall prepare the Semiannual Budget, including all information as set forth in Exhibit D to the Bond Indenture, for inclusion in the Payment Date Report. The Semiannual Budget shall be prepared based upon the Servicer's good faith estimate of the Issuer's expenditures for the upcoming six-month period. Each of the Parties shall cooperate in good faith, and shall seek the good faith cooperation of the Indenture Trustee and the Collateral Monitor, on a timeline to be mutually agreed to by those Persons, to ensure the completeness and timely preparation of such Semiannual Budget. Consistent with the foregoing, the Servicer shall include in the Semiannual Budget all amounts proposed by each of the Collateral Monitor and the Indenture Trustee in respect of amounts due to, or on behalf of, such Person, pursuant to the Collateral Monitor Agreement or the Bond Indenture, respectively. The Servicer shall include amounts reasonably proposed by the Issuer, *provided* that, without the prior written consent of the

Collateral Monitor, the amount in such Semiannual Budget corresponding to Issuer Operating Expenses may not cause the aggregate Issuer Operating Expenses for the relevant fiscal year to exceed the Issuer Operating Expense Cap for such fiscal year (or cause there to be a reasonable likelihood that the aggregate Issuer Operating Expenses for the relevant fiscal year will exceed the Issuer Operating Expenses Cap for such fiscal year). The Semiannual Budget shall be subject to review and approval by the Issuer and the Collateral Monitor, and the Servicer shall deliver to the Issuer and the Collateral Monitor a draft Semiannual Budget no later than 15 Business Days prior to the Determination Date on which the Servicer is required to deliver the Payment Date Report containing such Semiannual Budget (or such other date as shall be mutually agreed by the Issuer, the Servicer and the Collateral Monitor).

(c)     The Servicer shall prepare and provide on the date that is 45 days following the end of each fiscal quarter that is not the end of a Collection Period to the Issuer, the Collateral Monitor and the Indenture Trustee, to be disseminated to the Bondholders in accordance with the Bond Indenture, the Quarterly Budget Report, containing the information set forth in Exhibit D to the Bond Indenture. The Quarterly Budget Report shall be subject to review and approval by the Issuer and the Collateral Monitor, and the Servicer shall deliver to the Issuer and the Collateral Monitor a draft Quarterly Budget Report no later than 10 Business Days prior to the date required for delivery of such report (or such other date as shall be mutually agreed by the Issuer, the Servicer and the Collateral Monitor).

Section 3.03.     *Semiannual Bondholder Report*.  The Servicer shall cooperate with the Collateral Monitor in the preparation of the Semiannual Bondholder Report in accordance with the following.

(a)     On or before the date that is 30 days after the last day of each Collection Period (or as soon thereafter as reasonably practicable as mutually agreed by the Servicer and the Collateral Monitor), the Servicer shall deliver to the Collateral Monitor (which delivery may be by electronic data transmission) a report containing the following information:

(i)     Cash Collections received for each Loan Asset, REO Asset and Other Asset during the Collection Period;

(ii)     Delinquency and loss information with respect to the Loan Assets in detail and format as reasonably requested by the Collateral Monitor;

(iii)     A brief description of all material actions taken in respect of the Restructuring Property, including material sales, Settlements, modifications, extensions or waivers to any Loan Asset's terms, fees, penalties or payments during the related Collection Period, or that have cumulatively become material over time;

(iv)     A brief description of all material actions taken in respect of Nonperforming Loan Assets, REO Assets and Other Assets.

(v)     All Approved Third Parties retained by the Servicer.

(vi)     All other information reasonably and timely requested by the Collateral Monitor.

(b)     The Servicer and the Collateral Monitor shall cooperate in good faith to ensure the completeness and timely delivery of the information provided by the Servicer to the Collateral Monitor. To the extent it is not practicable for the Servicer to deliver any of the necessary information by the date that is required for delivery thereof, the Servicer shall provide all information that is available by such date and inform the Collateral Monitor of any necessary delays and requests for extensions, which it is understood the Collateral Monitor will not unreasonably deny.

Section 3.04.    *Asset Lists*.  The Servicer shall prepare, at such times as the Issuer or the Collateral Monitor may reasonably request and at the Servicer's expense, such lists of the Restructuring Property in such form as shall be reasonably satisfactory to such requesting Person, describing in such detail as such requesting Person shall reasonably require all accounts comprising or pertaining to the Restructuring Property, specifying the location of such accounts and the Servicer's records pertaining thereto.

ARTICLE 4

THE SERVICER

Section 4.01.    *Representations and Warranties of the Servicer*.  The Servicer hereby makes the following representations and warranties to the Issuer, which shall survive the execution and delivery of this Agreement and the occurrence of a Servicer Replacement Event:

(a)    The Servicer (i) is duly organized, validly existing and in good standing under the laws of the State of Minnesota and (ii) has full power and authority to execute, deliver and perform its obligations under this Agreement.

(b)    The execution and delivery of this Agreement by the Servicer and the performance by it of its obligations under this Agreement (i) are within its limited liability company powers, (ii) have been duly authorized by all necessary limited liability company, corporate or similar action, (iii) require no action by or in respect of, or filing with, any governmental body, agency or official, (iv) do not contravene, or constitute a default under, any provision of (A) applicable law, (B) the Servicer's organizational documents, (C) any judgment, injunction, order or decree binding upon the Servicer, (D) any agreement or other instrument binding upon the Servicer and (v) do not result in the creation or imposition of any lien, mortgage, pledge or encumbrance on any of the Servicer's assets.

(c)    (i) This Agreement (A) has been duly and validly authorized, executed and delivered by the Servicer and (B) constitutes a valid and binding agreement of the Servicer, enforceable against it in accordance with its terms, except as limited by (1) applicable bankruptcy, insolvency, fraudulent conveyance or other similar laws affecting creditors' rights generally and (2) general principles of equity; and (ii) no notice to, registration with, consent or approval of or any other action by any relevant governmental authority or other Person is or will be required for the Servicer to execute, deliver and perform its obligations under this Agreement.

(d)    The Servicer is not in violation of, or in default under, any provision of (i) applicable law, (ii) the Servicer's organizational documents, (iii) any judgment, injunction, order or decree binding upon the Servicer or (iv) any agreement or other instrument binding upon the Servicer, which violation or default could have a material adverse effect on the Servicer or its ability to perform its duties under this Agreement.

(e)    There are no actions, suits, proceedings or investigations pending or, to the knowledge of the Servicer, threatened, against or affecting the Servicer or its property or assets, nor is there any outstanding judgment, injunction, order or decree affecting the Servicer before any court or before any federal, state, municipal or other governmental department, commission, board, bureau or agency, which, either separately or in the aggregate, could have a material adverse effect on the Servicer or its ability to perform its duties under this Agreement, except as previously disclosed to the Issuer and the Collateral Monitor.

(f)    The Servicer is not obligated under any agreement or other instrument or under any law, which could materially and adversely affect its ability to perform its obligations under this Agreement.

(g)     The Servicer has obtained Qualification and is in good standing with respect to, all necessary governmental licenses, consents, approvals, authorizations, permits, certificates, inspections and franchises necessary to conduct its business as heretofore proposed to be conducted by it and to own or lease and operate its assets as now owned or leased by it.

(h)     The Servicer is Independent.

(i)     The Servicer has Spanish speaking capability.

Section 4.02.     *Good Standing and Qualification*.  The Servicer shall keep in full force and effect its existence and rights as a company pursuant to local and national laws and shall use commercially reasonable efforts to maintain and preserve in full force and effect, and take no action to jeopardize the continuing validity of, its Qualification.  The Servicer acknowledges that its maintaining and preserving its Qualification is of critical importance to the Issuer and that the Issuer is entering into this Agreement in reliance on the Servicer's agreement to maintain its Qualification.

Section 4.03.     *Merger or Consolidation of the Servicer*.  Any Person into which the Servicer may be merged or consolidated, or any Person resulting from any merger or consolidation to which the Servicer is a party, or any Person otherwise succeeding to all or substantially all of the servicing business of the Servicer shall be the successor of the Servicer under this Agreement, without the execution or filing of any paper or any further act on the part of any of the Parties, unless (a) such merger, consolidation, amalgamation, or transfer is reasonably determined by the Collateral Monitor to materially and adversely affect the Servicer's ability to perform its obligations, which determination is communicated in writing with each cause of such determination being individually listed and documented, in which case, such transaction shall be deemed to be a Servicer Default and may result in the Servicer's removal in accordance with Article 6 or (b) such Person cannot meet the requirements of a Qualified Servicer.   As a condition to the effectiveness of any merger or consolidation of the Servicer, at least 30 calendar days prior to the effective date of such merger or consolidation, the Servicer shall provide written notice to the Issuer, the Collateral Monitor and the Indenture Trustee of any successor pursuant to this Section 4.03 in form and substance reasonably requested by the Issuer in order to comply with the Issuer's reporting obligations under the Disclosure Agreement with respect to a replacement Servicer.   Notwithstanding the foregoing, if, with respect to any merger or consolidation, (y) AmeriNational Community Services, LLC is the surviving Person and (z) no change-in-control is effectuated, then such transaction shall be deemed to not materially and adversely affect the Servicer's ability to perform its obligations.

Section 4.04.     *Removal or Resignation of the Servicer*.

(a)     The Servicer shall not be removed prior to the termination of this Agreement except as provided in Article 6.

(b)     The Servicer shall not resign unless (i) as a result of a change in law, the Servicer's duties under this Agreement are no longer permissible under applicable law or the Servicer receives a written notice from a relevant governmental or regulatory authority to the effect that the Servicer's duties under this Agreement are not permissible under applicable law, (ii) through no fault of the Servicer's, material, non-disputed amounts due to the Servicer in respect of the Servicing Fee or Servicer Advances or otherwise are not paid from monies on deposit in the Collection Account on the applicable Payment Date, which nonpayment is not remedied within 30 days following such Payment Date, (iii) (A) the Servicer has proposed a Qualified Servicer to the Issuer and the Collateral Monitor in writing and such proposed Qualified Servicer is acceptable to the Issuer and the Collateral Monitor and (B) such proposed Qualified Servicer has agreed in writing to assume the obligations of the Servicer under this Agreement or a substantially similar servicing agreement acceptable to the Collateral Monitor or (iv) the Servicer has provided at least three months' advance written notice of its intention to resign to the Issuer, the Collateral

Monitor and the Indenture Trustee.  Subject to applicable law or the direction of an applicable governmental or regulatory authority, resignation pursuant to the foregoing clause (iii) or (iv) shall become effective at the earlier of (y) the date a Successor Servicer is able to provide the Services and enters into a servicing agreement with the Issuer, which Successor Servicer's identity and servicing agreement are acceptable to the Collateral Monitor, and (z) 24 months following the date of the Servicer's resignation.

(c)    If the Servicer resigns or is removed in accordance with the terms of this Agreement, the Servicer agrees to (i) use commercially reasonable efforts to cooperate with the Successor Servicer in effecting the termination of the responsibilities and rights of the Servicer under this Agreement, (ii) allow the Successor Servicer to examine all the books, accounts, records, reports, agreements, Asset Documents and other papers of the Servicer relating to the Restructuring Property and (iii) cooperate with the Issuer, the Collateral Monitor and the Indenture Trustee to effect such transition and to provide the Successor Servicer with such documents and any monies in its possession and held in its capacity as the Servicer under this Agreement.  Upon the appointment of a Successor Servicer pursuant to the terms of the Bond Indenture, all rights, powers, duties and responsibilities of the Servicer under this Agreement, other than the right to receive outstanding amounts due to the Servicer related to the performance of the Services prior to the termination of its appointment hereunder, shall vest in and be assumed by the Successor Servicer. The Issuer is hereby authorized and empowered to execute and deliver, on behalf of the Servicer, as attorney-in-fact or otherwise, all documents and other instruments, and to do or accomplish all other acts or things necessary or appropriate to effect such vesting and assumption.  In addition to (and without duplication of) any rights and remedies of the Issuer under applicable law, all reasonable transition and conversion costs and expenses borne or incurred by the Issuer (including, without limitation, the reasonable fees and expenses of counsel to the Issuer) associated with engaging, and transferring servicing of the Restructuring Property to, the Successor Servicer resulting from the resignation of the Servicer in accordance with Section 4.04(b) or the removal of the Servicer for any action constituting bad faith, willful misconduct or gross negligence or in material breach of any of the obligations, covenants or representations of this Agreement (other than a Servicer Default arising solely from a 10% or greater shortfall under the Compliance Test, which shortfall is not due to any action or inaction of the Servicer) shall be borne by the Servicer; *provided* that such transition or conversion costs and expenses borne by the Servicer shall in no event exceed $25,000.  All transition and conversion costs and expenses borne or incurred by the Issuer that are not borne by the Servicer shall be paid as Issuer Expenses from the Collection Account.

(d)    The duties and obligations of the Servicer under this Agreement shall continue until this Agreement has been terminated in accordance with Section 7.01, and shall survive the exercise by the Issuer of any right or remedy under this Agreement or the enforcement by the Issuer of any provision of this Agreement.

Section 4.05.    *Liability of the Servicer; Indemnification*.

(a)    Neither the Servicer nor any of its directors, officers, employees or agents shall have any liability to the Issuer or the Bondholders for taking any action or for refraining from taking any action in good faith pursuant to this Agreement or for errors in judgment, except that neither the Servicer nor any such Person shall be protected against any breach of representations or warranties made by it herein or any liability that would otherwise be imposed by reason of willful misfeasance, bad faith or gross negligence in the performance of the Servicer's duties under this Agreement or by reason of reckless disregard of its obligations and duties under this Agreement.

(b)    The Issuer agrees to indemnify and hold the Servicer harmless from and against any and all losses, liabilities and expenses (including the reasonable fees and expenses of counsel) in connection with any audit, controversy or judicial proceeding relating to a governmental taxing authority or any legal action relating to this Agreement or the Bonds (each, an "**Action**"), or for any act or omission by the Issuer, the

Collateral Monitor, the Indenture Trustee, or their agents other than any loss, liability or expense related to any specific Loan Asset, REO Asset or Other Asset (except as such loss, liability or expense shall be otherwise reimbursable pursuant to this Agreement) or any loss, liability or expense incurred by reason of willful misfeasance, bad faith or negligence in the performance of the duties hereunder or by reason of reckless disregard of the obligations and duties hereunder or breach of this Agreement.  In addition, the Servicer is under no obligation to appear in, prosecute or defend any legal action that is not incidental to its duties hereunder, including any claims by or against the Issuer unrelated to the Servicer activities, that, in its opinion, may cause it to incur any expense or liability for which it is not indemnified.  The Issuer will not without the prior written consent of the Servicer (not to be unreasonably withheld), settle, compromise, consent to the entry of any judgment in or otherwise seek to terminate (an "**Action Settlement**") any Action or participate in or facilitate an Action Settlement in respect of which indemnification is or may be sought hereunder (whether or not the Servicer is a party thereto) unless such Action Settlement includes a release of the Servicer from any losses arising out of such Action.  The Issuer will not permit any such Action Settlement to include a statement as to, or an admission of, fault or culpability by or on behalf of the Servicer without the Servicer's prior written consent.  If the Servicer is seeking indemnification, reimbursement or contribution under this Agreement, it will not, without the Issuer's prior written consent (not to be unreasonably withheld), agree to the Action Settlement.  The Issuer's obligations set forth herein shall be in addition to any rights that the Servicer may have at law or otherwise.

(c)     The Servicer agrees to indemnify and hold the Issuer and the trustees of the Issuer harmless from and against any and all losses, liabilities and expenses (including the reasonable fees and expenses of counsel) resulting from an act or omission of the Servicer or any subcontractor of the Servicer or any of their respective directors, officers, shareholders, partners, agents, representatives or employees relating to the performance of the Servicer's duties under this Agreement (i) for which the Servicer is responsible under existing applicable law or (ii) that constitutes a breach of any provision of this Agreement.

Section 4.06.     *Servicer Insurance*.  The Issuer does not expect to purchase any insurance with respect to the Restructuring Property, including any liability insurance or insurance against any damage or destruction of the Restructuring Property.  The Servicer shall obtain and maintain, at all times during the term of this Agreement, Required Insurance.  The Servicer shall deliver promptly to the Issuer certificates of insurance made out by the applicable insurer(s) or their authorized agents, for the Required Insurance and for any material policy amendments thereto showing the Issuer as a named insured.  Each policy shall provide for 30 days prior written notice to be given by the insurer to the Issuer in the event of any termination, non-renewal or cancellation, or of any material change in coverage or deductibles.  All Required Insurance shall insure the interests of the Issuer regardless of any breach of violation by the Servicer of warranties, declarations or conditions contained in such policies or any action or inaction of the Servicer or any other person.  All Required Insurance shall be carried with responsible insurance companies of recognized standing which are authorized to do business in the states or territories in which any of the Restructuring Property is located and are rated A-XII or better by A.M. Best.  If the Servicer fails to procure or maintain the Required Insurance, the Issuer shall have the right, but not the obligation, to affect such insurance at the Servicer's expense.

Section 4.07.     *Accepted Servicing Practices*.  The Servicer shall comply in all respects with the Accepted Servicing Practices, including the Asset Restrictions and all laws applicable to the performance of its obligations under this Agreement.

Section 4.08.     *Conflicts*.  If a conflict of interest arises between the Servicer or its agents, representatives, employees or other staff, on the one hand, and the Bondholders (in their capacity as such) or the Issuer, on the other hand:

(a)      Promptly upon discovery, the Servicer shall notify the Issuer, the Collateral Monitor and the Indenture Trustee of such conflict of interest, notice of which shall be included in the following Semiannual Bondholder Report; and

(b)      Such conflict of interest shall be resolved in the best interest of the Bondholders or the Issuer, as applicable.

Section 4.09.      *Personnel of Servicer*.  The Servicer agrees to give due priority to the performance of its obligations under this Agreement and to assign sufficient personnel to service the Restructuring Property in accordance with this Agreement.  The Servicer agrees that (a) Adrienne Thorson, (b) another individual of comparable skill and experience acceptable to the Issuer or (c) competent individuals selected by an individual identified in the foregoing clause (a) or (b) and working under such individual's direction and guidance, shall devote such portion of his or her time to the performance of the Services set forth in this Agreement as is necessary and appropriate to fulfill the obligations of the Servicer hereunder.  The Servicer shall have a knowledgeable contact person available daily to respond to inquiries from the Issuer. In addition, the Servicer shall ensure that there are adequate controls and segregation of personnel in accordance with the Accepted Servicing Practices.

Section 4.10.      *Continuity of Business*.  The Servicer shall maintain a disaster recovery plan in support of the processing and related functions it performs for the Issuer.  The Servicer's disaster recovery plan shall include, at a minimum, procedures for back-up/restoration of operating and loan administration computer systems; procedures and third-party agreements for replacement equipment (including, without limitation, computer equipment), and procedures and third-party agreements for off-site production facilities.  The Servicer shall provide the Issuer information regarding its disaster recovery plan upon the Issuer's reasonable request.  The Servicer agrees to annually test its disaster recovery plan to ensure compliance with this Section 4.10.  The Servicer shall notify the Issuer and the Collateral Monitor each year of the general results of such test (i.e., pass or fail) and any material change to the Servicer's disaster recovery plan.  If such test results identify a material failure, the Servicer shall advise the Issuer and the Collateral Monitor of the steps the Servicer will take to remedy such failure and shall notify the Issuer and the Collateral Monitor when the Servicer has remedied such failure and retested.  The Servicer shall promptly notify the Issuer and the Collateral Monitor of any actual or suspected data breach or unauthorized access to information concerning the Restructuring Property, the Obligors or the Issuer, and shall cooperate with the Issuer in connection with any such notification that the Issuer is required to make or which the Issuer determines are appropriate to make.

Section 4.11.      *Complete Information*.  The Servicer shall ensure that all information provided to the Issuer and the Collateral Monitor hereunder by the Servicer (including information provided by an Obligor to the Servicer) shall, to the best of the Servicer's knowledge, be true and correct so as not to be misleading to the recipient thereof.

Section 4.12.      *Notices*.  The Servicer shall furnish to the Issuer and the Collateral Monitor and, with respect to the following clauses (c) and (f), to the Indenture Trustee:

(a)      Promptly after the commencement thereof, notice of all actions, suits and proceedings before any court or governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign, affecting the Servicer which, if determined adversely to the Servicer, could have a material adverse effect on the financial condition, properties or operations of the Servicer;

(b)      Promptly after the filing or receipt thereof, copies of all reports and notices pertaining to a reportable event under section 4030(b) of the Employee Retirement Income Security Act of 1974;

(c)      As soon as possible and in no event later than five Business Days after the occurrence of any breach under this Agreement, a written notice setting forth the details of such breach and the actions the Servicer proposes to take to remedy such breach.  To the extent unremedied, such breach shall mature into a Servicer Default in accordance with Article 6;

(d)      Promptly upon request by the Issuer or the Collateral Monitor, quarterly or annual reports of the Servicer's financial condition, including a balance sheet and income statement;

(e)      Notice of any data breach or unauthorized access, as described in Section 4.10;

(f)      Prompt notice of any investigation or inquiry from any federal, state or local governmental agency or entity relating to the Bonds or the Restructuring Property, or the activities or actions of the Servicer under this Agreement; and

(g)      Promptly upon receipt, copies of any notices received by the Servicer from the Indenture Trustee.

## ARTICLE 5
### THE ISSUER

Section 5.01.    *Representations and Warranties of the Issuer*.  In order to induce the Servicer to enter into this Agreement and to provide the Services contemplated hereunder, the Issuer hereby represents and warrants to the Servicer as follows:

(a)      The Issuer (i) is a statutory public trust and governmental instrumentality of the Commonwealth and (ii) has full power and authority to execute, deliver and perform its obligations under this Agreement.

(b)      The execution and delivery of this Agreement by the Issuer and the performance by it of its obligations under this Agreement (i) are within its statutory powers, (ii) have been duly authorized by all necessary action of the Issuer, (iii) require no action by or in respect of, or filing with, any governmental body, agency or official, (iv) do not contravene, or constitute a default under, any provision of (A) applicable law, (B) the Issuer's organizational documents, (C) any judgment, injunction, order or decree binding upon the Servicer or (D) any agreement or other instrument binding upon the Issuer and (v) do not result in the creation or imposition of any lien, mortgage, pledge or encumbrance on any of the Issuer's assets.

(c)      (i) This Agreement (A) has been duly and validly authorized, executed and delivered by the Issuer and (B) constitutes a valid and binding agreement of the Issuer, enforceable against it in accordance with its terms, except as limited by (1) applicable bankruptcy, insolvency, fraudulent conveyance or other similar laws affecting creditors' rights generally and (2) general principles of equity; and (ii) no notice to, registration with, consent or approval of or any other action by any relevant governmental authority or other Person is or will be required for the Issuer to execute, deliver and perform its obligations under this Agreement.

Section 5.02.    *Cooperation by the Issuer*.  Without prejudice to any other provisions herein, the Issuer shall cooperate in good faith and provide the Servicer with such assistance as may reasonably be necessary to enable the Servicer to perform or facilitate the Servicer in performing its duties and obligations under this Agreement, including by ensuring that the Servicer has the right, title and power in order to exercise the Servicer's duties hereunder, and the Issuer shall execute, deliver, confirm and assign any and all such further instruments and conveyances that are reasonably necessary or desirable in order to establish

the right, power and entitlement of the Servicer to collect amounts due under each Asset Document, realize on the Restructuring Property and otherwise undertake and perform its duties described herein. The Issuer shall have no duty to inquire into any action requested of the Issuer by the Servicer, and shall have no obligation to incur any expenses in connection therewith unless such expenses will be paid from the Restructuring Property. The Issuer shall have the right, but not the obligation, to consult with counsel to the Issuer with respect to any action requested of it by the Servicer, and notwithstanding anything in this section or otherwise in this Agreement, shall have no obligation or duty to take any action which would violate the GDB Restructuring Act or which would, in the reasonable judgment of the Issuer, subject the Issuer or any trustee of the Issuer to any liability which could not be reasonably expected by the Issuer to be paid (or reimbursed) from the Restructuring Property. In the event that, after the Closing Date, Collections are not remitted directly to the Lockbox Account or the Servicer for deposit into the Collection Account as contemplated in this Agreement or are received by the Issuer in any manner other than as contemplated hereby, the Issuer shall promptly remit or cause to be remitted such Collections to the Servicer.

Section 5.03.   *Appointment of Collateral Monitor*.  The Issuer hereby irrevocably appoints and authorizes the Collateral Monitor to take such actions and to exercise such powers as are delegated to the Collateral Monitor by the terms of this Agreement together with such actions and powers as are reasonably incidental thereto. The Issuer has entered into the Collateral Monitor Fee Letter to provide for the payment of the fees and expenses of the Collateral Monitor from the Restructuring Property, however the Issuer shall have no duty or responsibility to monitor or oversee the actions of the Collateral Monitor and no responsibility or liability for actions taken or not taken by the Collateral Monitor.

Section 5.04.   *Delegation of Full Control Over Assets*.  The Issuer hereby irrevocably delegates full control over the Restructuring Property to the Servicer, subject to the Accepted Servicing Practices, the Statutory Lien and the rights of the Indenture Trustee and the Bondholders upon the occurrence and during the continuance of an Event of Default and subject to re-delegation to a Successor Servicer appointed in accordance with the terms of the Bond Indenture.

Section 5.05.   *Limitation on Liability of the Issuer; Release of Individual Trustees of the Issuer*. The Servicer acknowledges that the Issuer currently has no officers or employees other than the Executive Director of the Issuer, who is a member of the Board of Trustees of the Issuer. The Issuer is not expected to own any assets or property other than the Restructuring Property, and will have a limited amount of funds to pay any operating expenses. The Issuer is restricted under the GDB Restructuring Act from engaging in activities other than those expressly provided in the GDB Restructuring Act. Notwithstanding any other provision of this Agreement, the obligations of the Issuer to make payment of fees and expenses and indemnification payments to the Servicer, or to pay any other amounts, is limited solely to the Restructuring Property, including the Collections, and is not an obligation of any individual trustee of the Issuer, and the Servicer hereby releases each trustee from any individual liability or obligation hereunder.

Section 5.06.   *No Representations by Issuer with Respect to Restructuring Property and Other Matters*.  The Issuer has not independently verified any information relating to the Commonwealth, the Restructuring Property, the Obligors or the status of repayments on the Restructuring Property or the Collections, or as to the ownership of, or condition of, any Loan Asset, REO Asset or Other Asset, and the Issuer makes no representations with respect to such matters except as expressly provided in Section 5.01, or as to the adequacy or sufficiency of the Restructuring Property or the Collections to pay the obligations of the Issuer under this Agreement.

## ARTICLE 6
### DEFAULT AND TERMINATION

Section 6.01.    *Servicer Defaults and Servicer Replacement Events*.

(a)    The Servicer acknowledges that, if the Collateral Monitor believes, in good faith, that a Servicer Default has occurred and is continuing, and believes, in its sole discretion, that such Servicer Default is material to the interests of Bondholders, the Collateral Monitor will provide a Material Servicer Default Notice to the Servicer, the Issuer and the Indenture Trustee, which notice will include a detailed narrative and description of (i) the facts sustaining the evaluation of the Collateral Monitor regarding the possible Servicer Replacement Event, (ii) the possible effects on the interests of Bondholders and (iii) the recommendation of the Collateral Monitor regarding the possible Servicer Replacement Event.

(b)    Upon receipt of a Material Servicer Default Notice, the Servicer shall have the opportunity to provide a written explanation of such Servicer Default to the Collateral Monitor, the Issuer and the Indenture Trustee.  Notwithstanding any such explanation provided by the Servicer, the Collateral Monitor's decision to give notice of a possible Servicer Replacement Event, and such notice actually given, shall be in the Collateral Monitor's sole discretion and shall not be subject to challenge by the Servicer, the Issuer or any other Person.

(c)    In accordance with the Bond Indenture, this Agreement and the Servicer's appointment hereunder shall be terminated upon the Servicer's receipt of a Servicer Replacement Event Notice, pending the appointment of of, and the transition of servicing obligations to, a Successor Servicer, in accordance with Section 4.04(c); *provided* that the Servicer Default and possible Servicer Replacement Event shall be deemed waived if (i) after the conclusion of a Bondholder solicitation, the Indenture Trustee delivers notice of such waiver in accordance with the Bond Indenture or (ii) no Successor Servicer Notice is delivered to the Servicer within six months after the Servicer's receipt of a Servicer Replacement Event Notice.

Section 6.02.    *Effect of Termination*.  Termination of this Agreement for any reason shall not affect any right, obligation or liability that has accrued under this Agreement on or prior to the date of termination.  Upon termination of this Agreement, (a) the Issuer shall pay all Servicing Fees and Reimbursable Expenses payable to the Servicer that have accrued up to and including the date of termination on the next proceeding Payment Date after the Servicer has given notice to the Issuer, the Collateral Monitor and the Indenture Trustee of the amount thereof, (b) the Servicer shall reimburse the Issuer for any fees and expenses prepaid to the Servicer and applicable to periods arising after the date of termination within 30 days after the Issuer has given notice to the Servicer of the amount thereof and (c) the Servicer shall pay the amounts set forth in Section 4.04(c).

## ARTICLE 7
### MISCELLANEOUS

Section 7.01.    *Effective Date and Termination*.  This Agreement shall be effective as of the date hereof and shall continue in full force and effect until the earlier of (a) the termination of this Agreement pursuant to Article 6, (b) the resignation of the Servicer pursuant to Section 4.04(b) and (c) the termination of the Bond Indenture in accordance with its terms.  For the avoidance of doubt, this Agreement shall remain in effect notwithstanding the appointment of a receiver of the Issuer in accordance with the Bond Indenture, subject to the removal of the Servicer in accordance with Article 6.

Section 7.02.     *Amendments*.

(a)     The provisions of this Agreement may from time to time be amended, modified, supplemented or waived by the Parties, with the consent of the Collateral Monitor and without the consent of the Bondholders, *provided* that the Collateral Monitor determines, in its sole discretion, that such amendment will not materially and adversely affect the interest of any Bondholder.

(b)     The Parties may otherwise amend, modify, supplement or waive any of the provisions of this Agreement with the consent of Bondholders holding not less than a majority of the Outstanding Amount.

(c)     No amendment, modification, supplement or waiver of any of the provisions of this Agreement may reduce the percentage of the Outstanding Amount required to consent to amendments, modifications, supplements and waivers pursuant to Section 7.02(b) without the consent of each Bondholder.

(d)     Any amendment, modification, supplement or waiver of any provision of this Agreement shall be in writing and signed by the Parties.

Section 7.03.     *Third-Party Beneficiaries*.  Each of the Indenture Trustee, the Collateral Monitor, and the Bondholders, as of the date hereof and at any time hereafter, shall be an express third-party beneficiary of this Agreement, and is hereby authorized and empowered to enforce all provisions of this Agreement, as if it were a party hereto; *provided* that (a) the rights of the Bondholders under this Agreement are collective and not individual, (b) no claim under this Agreement may be made in respect of any one or more of the Bonds but rather may only be made collectively in respect of all of the Bonds and (c) enforcement of such claims may only be sought by the Indenture Trustee on behalf of the Bondholders as a whole, subject to the rights of the Bondholders to direct the Indenture Trustee to act as set forth in the Bond Indenture; *provided further* that, if the Indenture Trustee shall fail to enforce the rights of Bondholders under this Agreement, subject to compliance with the requirements of the Bond Indenture governing the institution of proceedings by a Bondholder, any Bondholder may seek remedies for the class of all Bondholders.  No provision of this Agreement is intended to confer any rights, benefits, remedies, obligations, or liabilities hereunder upon any Person other than the Indenture Trustee, the Collateral Monitor and the Bondholders and the Parties and their respective permitted successors and assigns.  This Agreement does not create any fiduciary duties of the Servicer to the Bondholders, and such duties only exist to the extent they exist under applicable law.

Section 7.04.     *Governing Law; Consent to Jurisdiction; Waiver of Jury Trial*.

(a)     This Agreement shall be construed and enforced in accordance with, and the rights of the Parties shall be governed by, the laws of the State of New York and PROMESA, without giving effect to the conflict of laws principles thereof; provided that any issues addressing the fiduciary or statutory duties of the Issuer or its governing board shall be governed by and construed in accordance with the laws of the Commonwealth.

(b)     Except as provided in Section 7.05, each of the Parties hereby irrevocably agrees (i) that any legal action, suit or proceeding arising out of or relating to this Agreement (or the transactions contemplated hereby) brought by such Party or its successors or assigns against the other Party shall be brought in any federal district court sitting in Puerto Rico or, in the event such federal court does not accept jurisdiction, a Commonwealth court and (ii) not to commence any such proceeding against the other Party except in any federal district court sitting in Puerto Rico, other than proceedings in any court of competent jurisdiction to enforce a judgment, decree or award rendered by a Puerto Rico Court.

(c)     The Servicer hereby irrevocably submits to the jurisdiction of the Puerto Rico Courts and the New York Courts for itself and with respect to its property, generally and unconditionally, with regard to any legal action, suit or proceeding arising out of or relating to this Agreement (or the transactions contemplated hereby) brought by any Party or third-party beneficiary or their respective successors or assigns.  In addition, the Servicer hereby irrevocably and unconditionally waives and agrees not to assert, to the fullest extent permitted by law, any objection it may now or hereafter have that, in any such proceeding brought in any federal district court sitting in Puerto Rico or any New York Court, (i) such proceeding is brought in an inconvenient forum, (ii) the venue of such proceeding is improper or (iii) such court or any appellate court therefrom lacks jurisdiction over such proceeding or any party thereto.

(d)     The Issuer hereby irrevocably submits to the exclusive jurisdiction of the Puerto Rico Courts for itself and with respect to its property, generally and unconditionally, with regard to any legal action, suit or proceeding arising out of or relating to this Agreement (or the transactions contemplated hereby) brought by any Party or third-party beneficiary or their respective successors or assigns.  In addition, the Issuer hereby irrevocably and unconditionally waives and agrees not to assert, to the fullest extent permitted by law, any objection it may now or hereafter have that, in any such proceeding brought in any federal district court sitting in Puerto Rico, (i) such proceeding is brought in an inconvenient forum, (ii) the venue of such proceeding is improper or (iii) such court or any appellate court therefrom lacks jurisdiction over such proceeding or any party thereto.  The Issuer further hereby irrevocably and unconditionally waives and agrees not to assert, to the fullest extent permitted by law, any objection it may now or hereafter have that the Issuer is immune from suit in federal court.

(e)     Each of the Parties further agrees that notice as provided in Section 7.07 shall constitute sufficient service of process and the Parties further waive any argument that such service is insufficient.

(f)     EACH PARTY HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY, WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY.

Section 7.05.     *Mandatory Arbitration; Challenge to Collateral Monitor Action*.  Any controversy or claim brought by the Servicer arising out of or relating to any decision or other action by the Collateral Monitor in respect of the Servicer's duties hereunder shall be settled by arbitration administered by the American Arbitration Association in accordance with its Commercial Arbitration Rules, and judgment on the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof.  In addition, any objection by the Collateral Monitor to any transaction under Section 1.07(b) or the Collateral Monitor's refusal of consent in respect of the Servicer's engagement of any third party as an Approved Third Party or any other decision or action of the Collateral Monitor that, in any such case, is based upon the Collateral Monitor receiving inadequate information shall be deemed reasonable.  Notwithstanding the foregoing, the Collateral Monitor's decision to give notice of a possible Servicer Replacement Event pursuant to Section 6.01(a), and such notice actually given, shall be in the Collateral Monitor's sole discretion and shall not be subject to challenge by the Servicer, the Issuer or any other Person.

Section 7.06.     *Specific Performance.*  The Servicer agrees that time is of the essence and that irreparable damage would occur if any of the provisions of this Agreement to be performed by the Servicer are not performed in accordance with the terms hereof and that the Issuer shall be entitled to an injunction or injunctions to prevent breaches or threatened breaches of this Agreement by the Servicer or to enforce specifically the performance by the Servicer of the terms and provisions hereof in accordance with Section 7.04, in addition to any other remedy to which they are entitled at law or in equity.

Section 7.07.   *Notice*.  Any notice required or contemplated by this Agreement shall be delivered by personal delivery or reputable overnight delivery services, in each case as set forth below:

If to the Issuer:

GDB Debt Recovery Authority
PO Box 366052
San Juan, PR 00936-6052

With dual notice to:

King & Spalding LLP
1180 Peachtree Street, NE
Atlanta, GA 30309
Attention:     Floyd Newton and Arthur Steinberg
Email:          fnewton@kslaw.com and
                    asteinberg@kslaw.com

Cancio, Covas & Santiago, LLP
Suite A-267
255 Ponce de Leon Avenue
San Juan, PR 00917
Attention:     Juan Ramon Cancio
Email:          jrcancio@ccsllp.com

If to the Servicer:

Clark Hill LLP
1055 West Seventh Street, 24th Floor
Los Angeles, CA  90017
Attention:     David Brandon
Email:          dbrandon@mpplaw.com

With dual notice to:

AmeriNat, LLC
217 S. Newton Avenue
Albert Lea, MN  56007
Attention:     Adrienne Thorson, CEO
Email:          athorson@amerinatls.com

If to the Collateral Monitor:

Dual notices sent to:

Matthew Cantor
Cantor-Katz Collateral Monitor LLC
235 West 71st Street, Unit 3
New York, NY  10023

Richard Katz
Cantor-Katz Collateral Monitor LLC
1915 Vallejo Street
San Francisco, CA 94123

With copies emailed to each of:

mcantor4@mac.com and
rich.katz@torquepointllc.com

If to the Indenture Trustee:        Wilmington Trust, N.A.
One Light Street, 14th Floor, MD2-L140
Baltimore, MD 21202
Attention:      Jay H. Smith IV
Email:          jhsmith@wilmingtontrust.com

With a copy to:

Drinker Biddle & Reath LLP
1177 Avenue of the Americas, 41st Floor
New York, NY 10036
Attention:      Kristin Going
Email:          kristin.going@dbr.com

Each Person listed above may change its address for notices hereunder by giving notice of such change to the other Persons listed above. Notice by reputable overnight delivery service shall be effective on the date it is officially recorded as delivered to the intended recipient by such service. All notices and other communication sent by personal delivery shall be deemed to have been delivered to and received by the addressee and shall be effective on the date of personal delivery. Notice not given in writing shall be effective only if acknowledged in writing by a duly authorized representative of the Person to whom it was given. For the avoidance of doubt, communications in the ordinary course of business, including communications relating to the Restructuring Property, by and among the Collateral Monitor, the Indenture Trustee, the Servicer and/or the Issuer may be provided by email.

Section 7.08.    *No Waiver; Remedies*. No failure to exercise and no delay in exercising, on the part of any Party or third-party beneficiary, any right, remedy, power or privilege hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. The rights, remedies, powers and privileges herein provided are cumulative and not exhaustive of any rights, remedies, powers and privileges provided by law.

Section 7.09.    *Severability*. If one or more of the provisions of this Agreement is for any reason whatsoever held invalid or unenforceable, such provisions shall be deemed severable from the remaining covenants, agreements and provisions of this Agreement and such invalidity or unenforceability shall in no way affect the validity or enforceability of such remaining provisions, or the rights of any Party. To the extent permitted by law, the Parties hereby waive any provision of law, whether currently in force or subsequently enacted, that renders any provision of this Agreement or any of the other Transaction Documents invalid or unenforceable in any respect.

Section 7.10.    *Counterparts; Effectiveness*. This Agreement may be signed in any number of counterparts, each of which shall be deemed to be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument. This Agreement shall become effective as of the date first written above.

Section 7.11.    *Titles*.  Titles of the Sections of this Agreement are merely for convenience in reading and shall not be construed to alter, modify or interpret the meaning of the provisions under said titles.

Section 7.12.    *Entire Agreement*.  This Agreement, together with all schedules hereto and the other Transaction Documents, shall constitute the full and entire understanding and agreement of the Parties and there are no further or other agreements or undertakings, written or oral, in effect between the Parties relating to the subject matter hereof unless expressly referred to herein.  All prior negotiations, agreements, representations, warranties, statements and undertakings concerning the subject matter hereof between the Parties are superseded by the foregoing.

Section 7.13.    *Survival*.  The provisions of Sections 2.01 and 2.03 shall survive termination of this Agreement for a period of five years and Sections 4.05 and 7.03–7.14 shall survive the termination of this Agreement indefinitely.

Section 7.14.    *No Assignment*.  The Parties may not assign or transfer this Agreement or any of their respective rights, powers, duties or obligations under this Agreement except as expressly permitted by this Agreement and the Bond Indenture or pursuant to the assignment or transfer of the rights, powers, duties and obligations of the Issuer to a receiver appointed by a court of competent jurisdiction in accordance with the Bond Indenture.

*[Signature Pages Follow]*

**IN WITNESS WHEREOF**, the Parties hereto have caused this Agreement to be duly executed as of the day and year first above written.

**GDB DEBT RECOVERY AUTHORITY**

By: _____

Name:   David Pauker

Title:   Chairman

By: _____

Name:   Jorge Padilla

Title:   Executive Director

**AMERINATIONAL COMMUNITY SERVICES, LLC**

By: _____

Name:   Adrienne Thorson

Title:   Chief Executive Officer

*[Signature Page to Servicing Agreement]*

**AMERINATIONAL COMMUNITY
SERVICES, LLC**

By: _____

Name:   Adrienne Thorson
Title:     CEO

*[Signature Page to Servicing Agreement]*

**Schedules**

**Schedule 1**
**Certain Definitions**

"**AAFAF Disclosure Coordinator**" has the meaning ascribed to such term in the Disclosure Policies.

"**Accepted Servicing Practices**" means (a) in accordance with (i) applicable laws and regulations, (ii) the terms and provisions of the Asset Documents, (iii) the express terms of this Agreement and (iv) the Asset Restrictions, (b) with commercially reasonable care, using the same degree of skill and attention that a prudent lender or asset manager would exercise with respect to comparable assets that it services for itself or others, (c) with a view to ensure the timely collection of all periodic payments due on the Loan Assets, (d) with a duty to maximize the realizable present value of the Restructuring Property and (e) without regard to any relationship that the Servicer may have with the relevant Obligor or any other creditor of such Obligor.

"**Additional Recovery Authority Loans**" has the meaning ascribed to such term in the Transfer Agreement.

"**Annual Filing Date**" has the meaning ascribed to such term in the Disclosure Agreement.

"**Annual Report**" has the meaning ascribed to such term in the Disclosure Agreement.

"**Approved Purchaser**" has the meaning ascribed to such term in the Transfer Agreement.

"**Approved Third Party**" means any third party engaged by the Servicer, with the prior written consent of the Collateral Monitor (which consent may not be unreasonably withheld if the Collateral Monitor determines that such engagement is commercially reasonable, *provided* that the Collateral Monitor shall have the opportunity to review all invoices of such Approved Third Party and may rescind such consent upon finding that the Servicer's engagement thereof is no longer commercially reasonable), to assist in the performance of the Services.  If the Collateral Monitor has provided such written consent to the Servicer, notice of which shall be provided to the Issuer and the Indenture Trustee, the fees and expenses of such Approved Third Party shall be Reimbursable Expenses.  The Servicer is not expected to engage third parties absent Collateral Monitor consent of such engagement, even if Collections can be enhanced by or if other benefits would likely accrue to the benefit of the Bondholders through such engagement.

"**Asset Documents**" has the meaning ascribed to such term in the Transfer Agreement.

"**Asset Restrictions**" has the meaning ascribed to such term in the Transfer Agreement.

"**CIAC**" means Caribbean Investment and Acquisition Corp.

"**Closing Asset Documents**" means any and all Asset Documents required to be delivered on the Closing Date by GDB to the Servicer, on behalf of the Issuer, pursuant to the Transfer Agreement.

"**Disclosure Policies**" means the continuing disclosure policies and procedures adopted by the Issuer on August 3, 2018.

"**GDB Retained Loans**" has the meaning ascribed to such term in the Transfer Agreement.

"**Independent**" means, with respect to any Person, a Person that (a) is not an Affiliate of GDB, (b) is not a manager, director, officer or employee of GDB or its Affiliates (other than with respect to the Person's provision of services to GDB or its Affiliates in the ordinary course of business, subject to the following clause (c)) and (c) does not receive more than 10% of its annual revenue from, collectively, GDB

and its Affiliates.  For purposes of the definition of Qualified Advisor and Section 1.03(f), "Independent" means the foregoing as it relates to the Servicer in addition to GDB.

"**Initial Portfolio Transfer Fee**" means $225 per Loan Asset transferred to the Servicer on the Closing Date for servicing under this Agreement.

"**Listed Event**" has the meaning ascribed to such term in the Disclosure Agreement.

"**Loan Asset**" has the meaning ascribed to such term in the Transfer Agreement.

"**Lockbox Account**" means the clearing account held at the Lockbox Bank and maintained by the Servicer in accordance with Section 1.05.

"**Lockbox Bank**" means the bank at which the Lockbox Account is held, which bank shall be a "well capitalized" (as defined in 12 C.F.R. 324.403(b)(1)) FDIC-insured institution.

"**Municipal Loan**" has the meaning ascribed to such term in the Transfer Agreement.

"**Net Collections**" means cash Collections net of any documented Reimbursable Expenses related to realizing such Collections.

"**New York Courts**" means the U.S. District Court for the Southern District of New York and any appellate court therefrom or, in the event such federal court does not accept jurisdiction, a New York State court sitting in New York County and any appellate court therefrom.

"**Non-Municipal Loan**" has the meaning ascribed to such term in the Transfer Agreement.

"**Nonperforming Loan Asset**" means a Loan Asset on which any payment of interest or principal or other regularly scheduled payment is more than 90 days past due.  Once a Loan Asset is classified as a Nonperforming Loan Asset, it shall become a Performing Loan Asset only after all interest, principal and other regularly scheduled payments past due thereon have been paid and all interest, principal and other regularly scheduled payments due on the most recent regularly scheduled payment date for such Loan Asset have been paid on such payment date.  For the avoidance of doubt, if a Nonperforming Loan Asset is restructured, all interest, principal and regularly scheduled payments due thereon shall be considered to have been paid for purposes of its classification so long as all such amounts due under such Loan Asset's restructured terms have been paid.

"**Obligor**" has the meaning ascribed to such term in the Transfer Agreement.

"**Other Asset**" means any asset, other than a Loan Asset or an REO Asset, constituting Transferred Property or Collections.

"**Performing Loan Asset**" means a Loan Asset that is not a Nonperforming Loan Asset.

"**Preexisting Contract**" means a valid contract pending as of the Closing Date between a real estate broker and a potential buyer in connection with the potential sale of any REO Asset.

"**Qualification**" means those material licenses and material approvals required to qualify as a manager of the Restructuring Property on behalf of the Issuer pursuant to applicable law.

"**Qualified Advisor**" means (a) the Collateral Monitor, (b) any reputable counsel or other third-party advisor of the Servicer who is Independent and experienced in assets of a similar type to the

Restructuring Property with respect to which the advice is being sought or (c) such other Person as agreed to by the Collateral Monitor.

"**Reimbursable Expenses**" shall include the reasonable and necessary "out of pocket" costs and expenses (a) incurred by the Servicer in the performance of its obligations under this Agreement, (b) reasonably documented in an invoice delivered to the Issuer, the Collateral Monitor and the Indenture Trustee and (c) arising from (i) the establishment or maintenance of the Collection Account, (ii) legal and other fees and expenses in connection with a legal proceeding in accordance with Section 1.01(a)(ii), a transaction in accordance with Section 1.01(a)(iii), or a sale or Settlement in accordance with Section 1.03, (iii) the maintenance of any Loan Asset, REO Asset or Other Asset or any lien in accordance with Section 1.02(h), (iv) insurance, to the extent required, for any Loan Asset, REO Asset or Other Asset, (v) outside accountant fees in connection with the preparation of any of the reports and budgets required to be provided pursuant to this Agreement or (vi) any other item listed in Schedule 2; *provided*, *however*, that, with respect to each of the foregoing, Reimbursable Expenses shall not include the costs of any legal or other third-party fees or expenses unless such third party is an Approved Third Party; and *provided further* that costs associated with the Servicer's contract with CIAC, including for program advisory services, shall not be Reimbursable Expenses except to the extent the expenses incurred by CIAC otherwise qualify as Reimbursable Expenses.

"**REO Asset**" means each of the Real Property Assets (as defined in the Transfer Agreement) and any real property received by the Issuer in respect of Collections, each of which constitutes Restructuring Property.

"**Required Insurance**" means insurance with respect to the Servicer's activities and operations under this Agreement in such amounts and on such terms as are usual and customary in the loan servicing industry to the extent such insurance is available on commercially reasonable terms; *provided* that such insurance shall include, at a minimum, (a) worker's compensation or approved self-insurance and employer's liability insurance, which shall fully comply with the statutory requirements of all applicable law; (b) commercial general liability insurance with a minimum combined single limit of liability of $1,000,000 per occurrence and $2,000,000 aggregate for injury and/or death and/or property damage, including Broad Form Contractual Liability insurance specifically covering this Agreement; (c) business automobile liability insurance covering all owned, hired and non-owned vehicles and equipment used by the Servicer's employees with a minimum combined single limit of liability of $1,000,000 for injury and/or death and/or property damage; (d) with respect to the foregoing clauses (a) through (c), excess coverage with a minimum combined single limit of $5,000,000; (e) an employee anti-theft insurance policy in an amount not less than $4,000,000; (f) errors and omissions insurance covering the actions of the Servicer and its employees and agents under this Agreement with a minimum combined single limit of $4,000,000 and (g) a fidelity bond in an amount not less than $4,000,000.

"**Retained Causes of Action**" has the meaning ascribed to such term in the Transfer Agreement.

"**Servicer Advance**" means any Reimbursable Expense in excess of the amount set aside in the Fees and Expenses Reserve for the payment of Reimbursable Expenses, which Reimbursable Expense is paid for by the Servicer and which shall be reimbursed on the next Payment Date from funds on deposit in the Collection Account.

"**Services**" has the meaning ascribed to such term in Section 1.02.

"**Servicing Fee**" means the fee paid to the Servicer for the Services performed each Collection Period, pursuant to Section 1.06, calculated as the sum of:

(a)    $225 per Loan Asset transferred to the Issuer subsequent to the Closing Date and during such Collection Period,

(b)    0.120% of the aggregate principal amount of the Performing Loan Assets outstanding during such Collection Period, as measured by the unpaid principal balance as of the beginning of the Collection Period, and prorated for any such Loan Asset disposed of during such Collection Period pursuant to a sale, Settlement or otherwise,

(c)    0.025% of the aggregate principal amount of the Nonperforming Loan Assets outstanding during such Collection Period, as measured by the unpaid principal balance as of the beginning of the Collection Period, and prorated for any such Loan Asset disposed of during such Collection Period pursuant to a sale, Settlement or otherwise,

(d)    3.000% of Net Collections generated upon the sale or Settlement of any Loan Asset by the Servicer during such Collection Period, and

(e)    3.000% of Net Collections generated upon the sale of any REO Asset by the Servicer during such Collection Period; *provided* that such fee shall not apply to the sale of any REO Asset pursuant to a Preexisting Contract.

For purposes of calculating the Servicing Fee, Loan Assets with an unpaid principal balance of $0, but for which accrued interest remains unpaid, as of the Closing Date shall be deemed to have an unpaid principal balance as of the Closing Date equal to the amount of the accrued and unpaid interest as of the Closing Date.

"**Settlement**" means, with respect to any Loan Asset, a disposition (other than a sale) or termination (including as a result of a prepayment) of such Loan Asset or any part thereof in advance of the regularly scheduled maturity date of such Loan Asset, resulting in cash Collections, which disposition or termination shall be a transaction subject to approval by the Collateral Monitor pursuant to Section 1.07(b).

"**Solicitation Statement**" has the meaning ascribed to such term in the Transfer Agreement.

"**Successor Servicer**" means any Qualified Servicer who has been chosen by the Issuer or the Collateral Monitor, as applicable, in accordance with the Bond Indenture.

"**Transferred Property**" has the meaning ascribed to such term in the Transfer Agreement.

"**Underlying Property**" means any property or asset securing or collateralizing any obligation in respect of any Loan Asset.

"**Vendor Claim Reserve**" has the meaning ascribed to such term in the Transfer Agreement.

"**Vendor Claim Reserve Residual**" has the meaning ascribed to such term in the Transfer Agreement.

**Schedule 2**
**Reimbursable Expenses**

Reimbursable Expenses include any documented out-of-pocket expenditure of the Servicer necessary for the protection, preservation, collection or realization of any Loan Asset, REO Asset, Other Asset or Underlying Property or for the preparation of the reports required under this Agreement.  Specific examples include:

(a)      Protective advances for:

(i)      real estate taxes or utility fees on Underlying Property;

(ii)      purchase prior liens or other interests in Underlying Property in jeopardy of being sold in a foreclosure proceeding;

(iii)      senior participation interests in a Loan Asset;

(iv)      property maintenance, repair or refurbishment expenses to preserve the value of any Underlying Property or any Other Asset constituting tangible personal property; and

(v)      premiums for hazard insurance coverage (including force-placed insurance and environmental liability insurance) and private mortgage insurance covering any Underlying Property or Other Asset constituting tangible personal property.

(b)      Professional fees and expenses related to:

(i)      external legal services paid in connection with the collection and administration of assets;

(ii)      loan sale advisory services and valuation services for bulk loans and/or REO Asset sales;

(iii)      real estate brokerage commissions to licensed real estate broker at prevailing market rate (as determined by Collateral Monitor), not to exceed, with respect to any REO Asset transferred to the Issuer for servicing by the Servicer on the Closing Date, 1.500% and, with respect to any REO Asset acquired by the Issuer for servicing by the Servicer thereafter, 3.00% if such REO Asset is sold within the three years after the Closing Date;

(iv)      accounting fees to the extent necessary for deliverance of CPA-quality financial reports; and

(v)      Asset Document storage and retrieval pursuant to Section 1.04.

(c)      Foreclosure and transfer expenses for:

(i)      expenses incurred in perfecting, filing or recording documents evidencing the assignment, foreclosure, sale or mortgaging of any Underlying Property;

(ii)      payments for title insurance, escrow, survey, environmental evaluations, real property appraisals or broker price opinions of any Underlying Property;

(iii)     payments to Obligors or tenants in connection with obtaining title to or possession of any Underlying Property pursuant to a deed-in-lieu of foreclosure, unlawful detainer or eviction action; and

(iv)     sheriff's fees, trustee's fees, trustee's sales, guaranties and other out-of-pocket costs and expenses incurred in foreclosure of any Underlying Property.

(d)     Travel expenses with respect to necessary travel in respect of the Services:

(i)     On the main island of the Commonwealth, travel expenses reimbursement limited to reasonable and documented parking and taxi receipts (or IRS rate, currently 54.5 cents per mile for private car use) with respect to asset administration or servicing, foreclosure, sales or other collection activities of or relating to any Loan Asset, REO Asset, Other Asset or any Underlying Property; and

(ii)     Outside of the main island of the Commonwealth, travel expenses reimbursement shall also include reasonable and documented costs of air travel, car rental and gasoline, and a per diem payment for lodging and food of $225 per day per individual.

(e)     For the avoidance of doubt, Reimbursable Expenses specifically exclude:

(i)     Ordinary day-to-day operating expenses of the Servicer;

(ii)     Postage for ordinary Obligor statements;

(iii)     Telephony expenses with Obligors or Parties; and

(iv)     Ordinary office expenses and rent on temporary office space Servicer provides to Parties subject to this Agreement.