**EXECUTION VERSION**

---

BOND INDENTURE

between

GDB DEBT RECOVERY AUTHORITY,

as Issuer,

and

Wilmington Trust, N.A.,

as Indenture Trustee

Dated as of November 29, 2018

---

**TABLE OF CONTENTS**

Page

ARTICLE I      DEFINITIONS; INTERPRETATION ..................................................................2

    SECTION 1.01      Definitions ...............................................................................................2

    SECTION 1.02      Usage of Terms ........................................................................................14

ARTICLE II      THE BONDS ...........................................................................................................14

    SECTION 2.01      Authorization of Bonds ...........................................................................14

    SECTION 2.02      Form ..........................................................................................................14

    SECTION 2.03      Execution and Authentication; Additional Bonds .............................15

    SECTION 2.04      Temporary Bonds ....................................................................................16

    SECTION 2.05      Registration; Registration of Transfer and Exchange .......................16

    SECTION 2.06      Mutilated, Destroyed, Lost or Stolen Bonds .....................................17

    SECTION 2.07      Persons Deemed Owners ........................................................................17

    SECTION 2.08      Cancellation..............................................................................................17

    SECTION 2.09      Book-Entry Bonds ...................................................................................17

    SECTION 2.10      Notices to Clearing Agency....................................................................18

    SECTION 2.11      Definitive Bonds......................................................................................18

    SECTION 2.12      Tax Treatment .........................................................................................19

    SECTION 2.13      Additional Bonds .....................................................................................19

ARTICLE III      STATUTORY LIEN ON RESTRUCTURING PROPERTY ..........................19

    SECTION 3.01      Statutory Lien on Restructuring Property............................................19

ARTICLE IV      COVENANTS OF THE ISSUER ..........................................................................20

    SECTION 4.01      Payments to the Bondholders .................................................................20

    SECTION 4.02      Maintenance of Office or Agency ..........................................................20

    SECTION 4.03      Money for Payments on the Bonds to be Held in Trust......................20

    SECTION 4.04      Existence ...................................................................................................21

    SECTION 4.05      Certain Negative Covenants ...................................................................21

    SECTION 4.06      Issuer May Not Consolidate, etc............................................................22

    SECTION 4.07      No Other Activity ....................................................................................22

    SECTION 4.08      No Borrowing............................................................................................22

    SECTION 4.09      Capital Expenditures ...............................................................................22

    SECTION 4.10      Restricted Payments .................................................................................22

    SECTION 4.11      Notice of Events of Default.....................................................................22

    SECTION 4.12      GDB Restructuring Act ...........................................................................23

    SECTION 4.13      Board of Trustees......................................................................................23

    SECTION 4.14      Further Instruments and Actions ...........................................................23

    SECTION 4.15      Tax..............................................................................................................23

**TABLE OF CONTENTS**
(continued)

Page

ARTICLE V      THE SERVICER ....................................................................................................23

    SECTION 5.01        The Servicing Agreement.....................................................................23

    SECTION 5.02        Management of the Restructuring Property.........................................24

    SECTION 5.03        Removal and Replacement of the Servicer..........................................24

ARTICLE VI      THE COLLATERAL MONITOR ..........................................................................25

    SECTION 6.01        The Collateral Monitor Agreement .....................................................25

    SECTION 6.02        Cooperation and Payment by the Issuer ..............................................25

    SECTION 6.03        Replacement of the Collateral Monitor ...............................................25

ARTICLE VII      DEFEASANCE; SATISFACTION AND DISCHARGE OF INDENTURE ...............25

    SECTION 7.01        Defeasance of Bonds and Satisfaction and Discharge of Indenture ...................25

    SECTION 7.02        Application of Trust Money .................................................................26

    SECTION 7.03        Repayment of Monies Held by Paying Agent .....................................26

    SECTION 7.04        Termination of the Trusts Created by Indenture...................................26

    SECTION 7.05        Liquidation of the Restructuring Property; Final Scheduled Payment Date...................27

ARTICLE VIII      EVENTS OF DEFAULT; REMEDIES....................................................................27

    SECTION 8.01        Events of Default..................................................................................27

    SECTION 8.02        Acceleration; Rescission and Annulment.............................................29

    SECTION 8.03        Remedies ..............................................................................................29

    SECTION 8.04        Indenture Trustee May File Proofs of Claim .......................................31

    SECTION 8.05        Enforcement of Bondholder Rights Under Transaction Documents .................31

    SECTION 8.06        Possession of Bonds by Trustee Not Required.....................................32

    SECTION 8.07        Limitation of Suits ...............................................................................32

    SECTION 8.08        Restoration of Rights and Remedies ....................................................32

    SECTION 8.09        Rights and Remedies Cumulative.........................................................32

    SECTION 8.10        Delay or Omission Not a Waiver .........................................................33

    SECTION 8.11        Direction by Bondholders.....................................................................33

    SECTION 8.12        Waiver of Events of Default..................................................................33

    SECTION 8.13        Undertaking for Costs...........................................................................33

    SECTION 8.14        Action on Bonds ...................................................................................33

    SECTION 8.15        Liability of Issuer Limited to Restructuring Property .........................33

ARTICLE IX      THE INDENTURE TRUSTEE..............................................................................34

    SECTION 9.01        Duties of Indenture Trustee ..................................................................34

    SECTION 9.02        Rights of Indenture Trustee ..................................................................35

    SECTION 9.03        Confidentiality......................................................................................36

    SECTION 9.04        Individual Rights of Indenture Trustee.................................................36

**TABLE OF CONTENTS**
(continued)

Page

SECTION 9.05     Indenture Trustee's Disclaimer ...................................................... 36

SECTION 9.06     Notice of Events of Default ............................................................ 37

SECTION 9.07     Reports to Bondholders and Other Notices by Indenture Trustee ..... 37

SECTION 9.08     Compensation and Indemnity .......................................................... 38

SECTION 9.09     Resignation or Replacement of Indenture Trustee ........................... 38

SECTION 9.10     Successor Indenture Trustee by Merger ........................................... 39

SECTION 9.11     Appointment of Co-Indenture Trustee or Separate Indenture Trustee .............. 39

SECTION 9.12     Eligibility; Disqualification ............................................................ 40

SECTION 9.13     Indenture Trustee as Paying Agent and Bond Registrar.................... 40

SECTION 9.14     Representations and Warranties of the Indenture Trustee ................. 40

ARTICLE X     BOND REGISTRAR; BONDHOLDERS' LISTS .................................... 41

SECTION 10.01     Bond Registrar to Furnish Names and Addresses of Bondholders.... 41

SECTION 10.02     Preservation of Information ........................................................... 41

ARTICLE XI     ACCOUNTS AND DISBURSEMENTS; PRIORITY OF PAYMENTS; INVESTMENT
OF TRUST FUNDS ........................................................................ 42

SECTION 11.01     Priority of Payments; Payment of Interest; PIK Amount; Payment of
Principal ......................................................................................... 42

SECTION 11.02     Fund Transfer Requisitions ........................................................... 44

SECTION 11.03     Establishment of Collection Account .............................................. 44

SECTION 11.04     Investments of Trust Funds ........................................................... 44

ARTICLE XII     SUPPLEMENTAL INDENTURES ....................................................... 45

SECTION 12.01     Supplemental Indentures Without Consent of Bondholders............. 45

SECTION 12.02     Supplemental Indentures with Consent of Bondholders................... 45

SECTION 12.03     Limitations on Supplemental Indentures ......................................... 46

SECTION 12.04     Execution of Supplemental Indentures ........................................... 46

SECTION 12.05     Effect of Supplemental Indenture .................................................. 46

SECTION 12.06     Reference in Bonds to Supplemental Indentures ............................. 47

ARTICLE XIII     MISCELLANEOUS ....................................................................... 47

SECTION 13.01     Compliance Certificates and Opinions, etc ..................................... 47

SECTION 13.02     Form of Documents Delivered to Indenture Trustee ........................ 47

SECTION 13.03     Acts of Bondholders ..................................................................... 48

SECTION 13.04     Notices............................................................................................ 48

SECTION 13.05     Notices to Bondholders; Waiver ..................................................... 50

SECTION 13.06     Alternate Payment and Notice Provisions ....................................... 50

SECTION 13.07     Setoff Rights ................................................................................. 50

SECTION 13.08     Effect of Headings and Table of Contents....................................... 50

**TABLE OF CONTENTS**
(continued)

|  |  | **Page** |
|---|---|---|
| SECTION 13.09 | Successors and Assigns | 50 |
| SECTION 13.10 | Severability | 50 |
| SECTION 13.11 | Timing and Business Days | 51 |
| SECTION 13.12 | Benefits of Indenture | 51 |
| SECTION 13.13 | Governing Law; Jurisdiction, Waiver of Jury Trial | 51 |
| SECTION 13.14 | Waiver of Personal Liability | 51 |
| SECTION 13.15 | Counterparts | 51 |
| SECTION 13.16 | No Petition | 51 |
| SECTION 13.17 | "CUSIP" Numbers | 52 |

## TABLE OF CONTENTS
(continued)

**Page**

EXHIBITS

EXHIBIT A        FORM OF BOND..............................................................................................A-1

EXHIBIT B        COLLECTION SCHEDULE..............................................................................B-1

EXHIBIT C        CONTINGENT AND UNLIQUIDATED CLAIMS .........................................C-1

EXHIBIT D        REPORTS TO THE BONDHOLDERS ............................................................D-1

EXHIBIT E        FORM OF FUND TRANSFER REQUISITION ............................................. E-1

EXHIBIT F        FORM OF SOLICITATION OF BONDHOLDER VOTES REGARDING SERVICER
                 REPLACEMENT EVENT ........................................................................... F-1

This BOND INDENTURE, dated as of November 29, 2018 (this "Indenture"), between GDB DEBT RECOVERY AUTHORITY, a statutory public trust and governmental instrumentality of the Commonwealth (the "Issuer"), and WILMINGTON TRUST, N.A., a national banking association, as indenture trustee and not in its individual capacity (the "Indenture Trustee").

## WITNESSETH:

WHEREAS, on August 24, 2017, the Governor of the Commonwealth of Puerto Rico (the "Commonwealth") signed into law Act No. 109-2017, known as the Government Development Bank for Puerto Rico Debt Restructuring Act (as amended on July 18, 2018, and in effect on the Closing Date, the "GDB Restructuring Act"), which created the Issuer and established the legislative framework for the financial restructuring (the "Restructuring") of the Government Development Bank for Puerto Rico, a public corporation and governmental instrumentality of the Commonwealth ("GDB");

WHEREAS, the Restructuring is being effectuated through a qualifying modification (the "Qualifying Modification") under Title VI of the Puerto Rico Oversight, Management, and Economic Stability Act, Pub. L. No. 114-187, 130 Stat. 549 (2016) ("PROMESA") as well pursuant to the GDB Restructuring Act;

WHEREAS, GDB received approval of the Qualifying Modification from the United States District Court for the District of Puerto Rico on November 6, 2018, and is authorized to carry out the terms of the Qualifying Modification;

WHEREAS, in accordance with the terms of the Qualifying Modification and the GDB Restructuring Act, the Issuer and GDB have entered into the Transfer Agreement, pursuant to which GDB has irrevocably assigned and transferred to the Issuer its entire interest in the Transferred Property in consideration of the cancellation of certain indebtedness of GDB and the release of certain claims against GDB, as more fully described in the Transfer Agreement and the solicitation statement, dated as of August 9, 2018, as amended and supplemented;

WHEREAS, in accordance with the terms of the Qualifying Modification and pursuant to the GDB Restructuring Act, upon their issuance, the Bonds are secured by the Statutory Lien on the Restructuring Property, comprised of the Transferred Property and the Collections;

WHEREAS, in accordance with the terms of the Qualifying Modification, in connection with the issuance of the Bonds and in consideration for the cancellation of the Participating Bond Claims and the release of certain claims against GDB, (a) the Issuer and the Servicer have entered into the Servicing Agreement, (b) the Indenture Trustee and the Collateral Monitor have entered into the Collateral Monitor Agreement (and the Issuer and the Collateral Monitor have entered into the Collateral Monitor Fee Letter attached thereto) and (c) the Issuer, GDB and the Indenture Trustee have entered into the Keepwell Agreement;

WHEREAS, the Issuer has duly authorized the issuance of $2,597,754,625 aggregate original principal amount of 7.500% GDB Debt Recovery Authority Bonds (Taxable) due 2040 (the "Initial Bonds") in exchange for the cancellation of certain indebtedness of GDB and the release of certain claims against GDB;

WHEREAS, after the Closing Date, in addition to the Initial Bonds, the Issuer may duly authorize from time to time the issuance of additional 7.500% GDB Debt Recovery Authority Bonds (Taxable) due 2040 in an aggregate original principal amount not to exceed $61,990,562 (the "Additional Bonds" and, together with the Initial Bonds, the "Bonds") pursuant to the terms of the Qualifying Modification, and in accordance with the GDB Restructuring Act and this Indenture;

WHEREAS, the Issuer has duly approved the issuance of the Initial Bonds and authorized the execution and delivery of this Indenture;

WHEREAS, Article 402 of the GDB Restructuring Act provides as follows: "The Restructuring Bonds and the Financing Costs shall automatically, upon the issuance of the Restructuring Bonds, be secured by a statutory lien on the Restructuring Property in favor of the Indenture Trustee for the benefit of the Holders of the Restructuring

Bonds, which shall be senior to any other lien encumbering the Restructuring Property (except for valid liens and encumbrances existing as of the effective date of this Act or that arise in the ordinary course of business after the effective date of this Act and are existing as of the Closing Date, in each case with respect to any real estate assets and any personal property assets related thereto that are part of the Restructuring Property) and may be enforced pursuant to the terms of the Ancillary Agreements. Such statutory lien shall occur automatically and shall automatically be perfected, valid and binding from and after the Closing Date, in any case without any further act or agreement. No instrument needs to be delivered or recorded in any official record or in any government registry or office in order to perfect or continue such statutory lien or to establish or maintain the priority thereof. No commingling of any Restructuring Property with any other property of GDB or any other party shall limit, defeat, impair or interfere with such statutory lien". All capitalized terms used in this paragraph shall have the meanings ascribed thereto in the GDB Restructuring Act;

WHEREAS, the payment of the principal of and interest on the Bonds issued hereunder shall automatically, upon the issuance of the Bonds, be secured by the Statutory Lien pursuant to Article 402 of the GDB Restructuring Act on all of the Restructuring Property;

WHEREAS, the Indenture Trustee is hereby authorized to receive any and all such Restructuring Property as and for security for the payment of the Bonds and the interest thereon, and to hold and apply all such Restructuring Property subject to the terms hereof, to have and to hold the trust estate, whether now owned or held or thereafter acquired, unto the Indenture Trustee and its successors and assigns forever;

WHEREAS, the Issuer has granted to the Indenture Trustee all right, title and interest in the Restructuring Property under the terms of the GDB Restructuring Act, and the Indenture Trustee shall hold such Restructuring Property, upon the terms and trusts herein set forth (a) for the equal and proportionate benefit and security of all present and future Bondholders, without preference, priority or distinction as to lien, or otherwise, of any Bond over any other Bond, (b) for enforcement of the payment of such Bonds, in accordance with their terms and all other sums payable hereunder, and (c) for the enforcement and compliance with the obligations, covenants and conditions of this Indenture except as otherwise expressly provided herein, as if all the Bonds at any time Outstanding had been authenticated, executed and delivered simultaneously with the execution and delivery of this Indenture, all as herein set forth;

WHEREAS, the Indenture Trustee, on behalf and for the benefit of the Bondholders, acknowledges such Statutory Lien and accepts the trusts established under this Indenture in accordance with the provisions of the GDB Restructuring Act and this Indenture and agrees to perform its duties required in this Indenture in accordance with the terms hereof for the equal and proportionate benefit of the Bondholders; and

WHEREAS, all things have been done which are necessary to make the Bonds, when issued, executed and delivered by the Issuer, and authenticated and delivered by the Indenture Trustee hereunder, the valid obligations of the Issuer, and to make this Indenture a valid agreement by the Issuer in accordance with the terms hereof.

NOW, THEREFORE, the Issuer and the Indenture Trustee agree for the benefit of each other and for the benefit of the Bondholders, as follows:

## ARTICLE I

## DEFINITIONS; INTERPRETATION

SECTION 1.01   Definitions.   Except as otherwise provided in this Indenture, whenever used herein the following words and phrases, unless the context or use clearly indicates otherwise, shall have the following meanings:

"AAFAF" means the Puerto Rico Fiscal Agency and Financial Advisory Authority or its successors and assigns.

"Action" has the meaning specified in Section 13.03(a).

"Additional Bonds" has the meaning assigned to such term in the recitals hereto.

"Affiliate" means, with respect to any specified Person, any other Person controlling or controlled by or under common control with such specified Person. For the purposes of this definition, "control," when used with respect to any specified Person, means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of shares, equity in registered capital or other voting securities, by contract or otherwise; and the term "controlling" and "controlled" have meanings correlative to the foregoing. For the avoidance of doubt, the Commonwealth and its municipalities, public corporations and instrumentalities are Affiliates of GDB and of the Issuer.

"Annual Filing Date" means the date no later than 210 days after the end of the Issuer's fiscal year, which fiscal year as of the date hereof ends June 30.

"Applicants" has the meaning specified in Section 10.01.

"Asset Restrictions" has the meaning assigned to such term in the Servicing Agreement.

"Authorized Person" means the Chairperson of the Board of Trustees, any Board Member or any other duly authorized officer of the Issuer.

"Available Cash" means the amount of funds available for payment to Bondholders on the relevant Payment Date, equal to (i) the sum of all amounts in the Collection Account as of the applicable Determination Date (whether arising from the Collections or otherwise), less (ii) the sum of (x) the Fees and Expenses Reserve and (y) the sum of amounts due pursuant to Section 11.01(a)(ii) (without double counting).

"Bankruptcy Laws" means any U.S. federal or Commonwealth insolvency, bankruptcy, reorganization, restructuring, receivership or any other form of debtor relief law, including PROMESA.

"Beneficial Owner" means, with respect to a Book-Entry Bond, any Person who is the beneficial owner of such Book-Entry Bond, as reflected on the books of the Clearing Agency or on the books of a Person maintaining an account with such Clearing Agency (directly as a Clearing Agency Participant or as an indirect participant, in each case, in accordance with the rules of such Clearing Agency).

"Benefit Plan" means (i) any "employee benefit plan" within the meaning specified in Section 3(3) of ERISA, (ii) any plan (as defined in Section 4975(e)(1) of the Code), including an individual retirement account under Section 408 of the Code, to which Section 4975 of the Code applies, and (iii) any plan, including a foreign plan, governmental plan (as defined in Section 3(32) of ERISA) or church plan (as defined in Section 3(33) of ERISA) that is not subject to Title I of ERISA, but that is subject to any federal, state, local, non-U.S. or other laws or regulations that are similar to Title I of ERISA or Section 4975 of the Code.

"Board Member" means a member of the Board of Trustees.

"Board of Trustees" means the board of trustees of the Issuer or any committee of such board duly authorized to act generally or in any particular respect hereunder.

"Bond Register" means the register of Bondholders' information maintained by the Bond Registrar pursuant to Section 2.05.

"Bond Registrar" means the Indenture Trustee, unless and until a successor Bond Registrar shall have been appointed pursuant to Section 2.05.

"Bondholder" means the Person in whose name a Bond is registered on the Bond Register.

"Bonds" has the meaning assigned to such term in the recitals hereto and more particularly means any Bond authenticated and delivered under this Indenture.

"<u>Book-Entry Bonds</u>" means beneficial interests in the Bonds, ownership and transfer of which shall be made through book-entries by a Clearing Agency as described in <u>Section 2.09</u>.

"<u>Business Day</u>" means any day other than a Saturday, a Sunday or a day on which banks in New York, New York, or San Juan, Puerto Rico, are authorized by law, regulation or governmental order to remain closed.

"<u>Clearing Agency</u>" means an organization registered as a "clearing agency" pursuant to Section 17A of the Securities and Exchange Act of 1934, as amended.

"<u>Clearing Agency Participant</u>" means a broker, dealer, bank, other financial institution or other Person for whom from time to time a Clearing Agency effects book-entry transfers and pledges of securities deposited with the Clearing Agency.

"<u>Closing Date</u>" means November 29, 2018.

"<u>Code</u>" means the Internal Revenue Code of 1986, as amended, and the Treasury Regulations promulgated thereunder.

"<u>Collateral Monitor</u>" means Cantor-Katz Collateral Monitor LLC, a Delaware limited liability company, or any successor collateral monitor engaged by the Indenture Trustee or another Independent Person, on behalf of the Bondholders, in accordance with this Indenture.

"<u>Collateral Monitor Agreement</u>" means that certain engagement letter, dated as of the Closing Date, by and between the Indenture Trustee, on behalf of the Bondholders, and the Collateral Monitor, as amended or supplemented from time to time and any other engagement letter or agreement that the Indenture Trustee may enter into with any successor Collateral Monitor in connection with monitoring the activities of the Servicer.

"<u>Collateral Monitor Fee</u>" means any and all fees that the Issuer is required to pay the Collateral Monitor pursuant to the Collateral Monitor Agreement and the Collateral Monitor Fee Letter.

"<u>Collateral Monitor Fee Letter</u>" means the fee letter, dated as of the Closing Date, by and between the Issuer and the Collateral Monitor, as amended or supplemented from time to time and any other collateral monitor fee letter that the Issuer may enter into with any successor Collateral Monitor in connection with monitoring the activities of the Servicer.

"<u>Collection Account</u>" has the meaning specified in <u>Section 11.03</u>.

"<u>Collection Period</u>" means the period commencing on the first day of the calendar month that is six calendar months preceding each Payment Date and ending on the last day of the calendar month immediately preceding each Payment Date (or, in the case of the first Collection Period, from and including the Closing Date and ending on the last day of the calendar month immediately preceding the first Payment Date following the Special First Payment Date).

"<u>Collection Schedule</u>" means the collection schedule set forth in <u>Exhibit B</u> (as adjusted to reflect any modification to the amortization schedule of any of the Municipal Loan Assets pursuant the agreements entered into by the Servicer and Collateral Monitor in connection with the settlement agreement entered into between GDB and the Municipality of San Juan dated as of September 19, 2018).

"<u>Collections</u>" means any and all assets, collections, fees, charges, proceeds, revenues, rents, insurance payments, income or other funds generated by, or received by the Issuer, the Servicer or GDB in respect of the Transferred Property, including in respect of the administration or reinvestment thereof, in each case on or after the Cutoff Date.

"<u>Commission</u>" means the United States Securities and Exchange Commission.

"Commonwealth" has the meaning assigned to such term in the recitals hereto.

"Compliance Test" means the test conducted by the Collateral Monitor as of the applicable Test Date to determine if the cumulative shortfall of the actual cash Collections received in respect of the Municipal Loan Assets as compared to the scheduled interest and amortization payments identified in the Collection Schedule from July 1, 2018 through such Test Date is 10% or more.

"Contingent Claims" means the contingent and unliquidated claims against GDB set forth in Exhibit C.

"Corporate Trust Office" means the offices of the Indenture Trustee, initially located at One Light Street – 14th Floor, MD2-L140, Baltimore, MD 21202, or the principal trust office of any successor trustee qualified and appointed pursuant to this Indenture; or at such other address as the Indenture Trustee may designate from time to time by notice to the Bondholders and the Issuer, or the principal corporate trust office of any successor Indenture Trustee at the address designated by such successor Indenture Trustee by notice to the Bondholders and the Issuer.

"Cutoff Date" means July 1, 2018.

"Default" means any occurrence that is, or with notice or the lapse of time or both would become, an Event of Default.

"Definitive Bonds" means Bonds in definitive form to be issued pursuant to Section 2.11.

"Determination Date" means the Business Day immediately preceding each Payment Date.

"Disclosure Agreement" means the Continuing Disclosure Agreement, dated as of the Closing Date, by and among the Issuer, the Dissemination Agent and the Indenture Trustee, as amended or supplemented from time to time.

"Dissemination Agent" means initially, AAFAF, or any successor thereto, pursuant to the Disclosure Agreement.

"DTC" means The Depository Trust Company.

"Eligible Deposit Account" means a segregated trust account with the corporate trust department of a depositary institution organized under the laws of the United States of America or any one of the states thereof, the District of Columbia or the Commonwealth (or any domestic branch of a foreign bank), having corporate trust powers and acting as trustee for funds deposited in such account, so long as the short term securities of such depositary institution are rated "A-1" by S&P, "P-1" by Moody's and "F1+" by Fitch or the long term securities of such depositary institution are rated at least "BB" by S&P, "Baa" by Moody's and "BB" by Fitch.

"Eligible Institution" means a depositary institution or trust company (including the Indenture Trustee or any of its Affiliates) so long as the short term securities of such depositary institution are rated "A-1" by S&P, "P-1" by Moody's and "F1+" by Fitch or the long term securities of such depositary institution are rated at least "BB" by S&P, "Baa" by Moody's, and "BB" by Fitch and whose deposits are insured by the FDIC.

"Eligible Investments" means, at any time, any or more of the following obligations and securities (which, in all cases, shall have a remaining duration consistent with the payment of Available Cash due on the next Payment Date and, if issued by a U.S. person, shall be payable 183 days or less from the date of its original issue):

(a) obligations of, and obligations fully guaranteed as to timely payment of principal and interest by, the United States or any agency thereof, provided that such obligations are backed by the full faith and credit of the United States;

(b) general obligations of, or obligations guaranteed by, any state of the United States, the District of Columbia or the Commonwealth then rated the highest available credit rating of each Rating Agency;

(c) certificates of deposit issued by any depository institution or trust company (including the Indenture Trustee) incorporated under the laws of the United States or of any state thereof, the District of Columbia or the Commonwealth and subject to supervision and examination by banking authorities of one or more of such jurisdictions, provided that the short-term unsecured debt obligations of such depository institution or trust company are then rated the highest available rating of each Rating Agency;

(d) certificates of deposit, commercial paper, demand or time deposits of, bankers' acceptances issued by, or federal funds sold by, any depository institution or trust company (including the Indenture Trustee or any Affiliate of the Indenture Trustee) incorporated under the laws of the United States or any state thereof and subject to supervision and examination by federal and/or state banking authorities and the deposits of which are fully insured by the FDIC, so long as at the time of such investment or contractual commitment providing for such investment either such depository institution or trust company is an Eligible Institution (or if such investment will mature after more than one month, the long-term, unsecured debt of the issuer has the highest available rating from each Rating Agency);

(e) certificates of deposit issued by any bank, trust company, savings bank or other savings institution that is an Eligible Institution and is fully insured by the FDIC (or if such investment will mature after more than one month, the long-term, unsecured debt of the issuer has the highest available rating from each Rating Agency);

(f) repurchase obligations held by the Indenture Trustee that are acceptable to the Indenture Trustee with respect to any security described in clauses (a) or (b) of this definition of Eligible Investments or any other security issued or guaranteed by any other agency or instrumentality of the United States, in either case entered into with a federal agency or a depository institution or trust company (acting as principal) described in clause (d) of this definition of Eligible Investments (including the Indenture Trustee); provided, however, that repurchase obligations entered into with any particular depository institution or trust company (including the Indenture Trustee) will not be Eligible Investments to the extent that the aggregate principal amount of such repurchase obligations with such depository institution or trust company held by the Indenture Trustee on behalf of the Bondholders or the Issuer, as the case may be, shall exceed 10% of either the pool of assets balance or of the principal balance of all the face amount of all Eligible Investments so held thereby;

(g) money market funds, mutual funds or other pooled investment vehicle so long as such funds or vehicles have the highest available rating from each Rating Agency, including any such fund for which the Indenture Trustee or an Affiliate thereof serves as an investment advisor, administrator, shareholder servicing agent and/or custodian or subcustodian, and notwithstanding that (i) such Person charges and collects fees and expenses from such funds for services rendered, (ii) such Person charges and collects fees and expenses for services rendered pursuant to the Indenture and (iii) services performed for such funds and pursuant to any such agreement may converge at any time. Each of the Issuer and the Servicer hereby specifically authorizes the Indenture Trustee or an Affiliate thereof to charge and collect all fees and expenses from such funds for services rendered to such funds, in addition to any fees and expenses such Person may charge and collect for services rendered pursuant to any such agreement; and

(h) investments in Eligible Investments maintained in "sweep accounts," short-term asset management accounts and the like utilized for the investment, on an overnight basis, of residual balances in investment accounts maintained at the Indenture Trustee or any other depository institution or trust company (including the Indenture Trustee) incorporated under the laws of the United States or any state thereof and subject to supervision and examination by federal and/or state banking authorities and the deposits of which are fully insured by the FDIC, so long as at the time of such investment or contractual commitment providing for such investment either such depository institution or trust company is an Eligible Institution (or if such investment will mature after more than one month, the long-term, unsecured debt of the issuer of such investment has the highest available rating from each Rating Agency);

provided that each of the foregoing investments shall mature or be liquidated (y) on or prior to the Payment Date next succeeding such investment or (z) if the short-term unsecured debt obligations of the Indenture Trustee have the highest available rating from each Rating Agency on the date such investment is made, on the Business Day immediately preceding the Payment Date next succeeding such investment.

None of the foregoing will be considered an Eligible Investment if:

(1) it constitutes a certificated security, bankers' acceptance, commercial paper, negotiable certificate of deposit or other obligation that constitutes "financial assets" within the meaning of Section 8-102(a)(9)(c) of the UCC unless a security entitlement with respect to such Eligible Investment has been created, in favor of the Indenture Trustee in accordance with Section 8-501(b) of the UCC and the related securities intermediary has agreed not to comply with entitlement orders of any secured party other than the Indenture Trustee; or

(2) it constitutes a book-entry security held through the Federal Reserve System pursuant to federal book-entry regulations, unless, in accordance with applicable law, (A) a book-entry registration thereof is made to an appropriate book-entry account maintained with a Federal Reserve Bank by the Indenture Trustee or by a custodian therefor, (B) a deposit advice or other written confirmation of such book-entry registration is issued to such Person, (C) any such custodian makes entries in its books and records identifying that such book-entry security is held through the Federal Reserve System pursuant to federal book-entry regulations and belongs to such trustee and indicating that such custodian holds such Eligible Investment solely as agent for the Indenture Trustee, (D) the Indenture Trustee makes entries in its books and records establishing that it holds such security solely in such capacity, and (E) any additional or alternative procedures as may hereafter become necessary to effect complete transfer of ownership thereof to such trustee are satisfied, consistent with changes in applicable law or regulations or the interpretation thereof.

Notwithstanding anything to the contrary contained in this definition of Eligible Investments, no Eligible Investment may be purchased at a premium and no Eligible Investment shall be an "interest only" instrument.

For purposes of this definition of Eligible Investments, any reference to the highest available credit rating of an obligation shall mean the highest available credit rating for such obligation (excluding any "+" signs associated with such rating).

"EMMA" means the MSRB's Electronic Municipal Market Access system. Any reference herein to notices provided to the Bondholders through the EMMA website means http://emma.msrb.org or any successor website thereto.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"Event of Default" has the meaning specified in Section 8.01.

"Excluded Expenses" means (a) amounts to be paid for any transaction costs of the Qualifying Modification, including the professional fees and expenses of GDB, AAFAF, the Issuer and the professionals required to be paid pursuant to the Restructuring Support Agreement, (b) amounts owed to, or on behalf of, the Servicer, the Indenture Trustee or the Collateral Monitor (including, in each case, in respect of reimbursable expenses) under the Transaction Documents and (c) expenses arising from (i) Bondholder solicitations required under the terms of this Indenture, (ii) litigation brought against or reasonably brought by the Issuer or the Board of Trustees (including any related legal fees and indemnification costs), (iii) the creation and distribution of information for U.S. tax reporting purposes, (iv) directors and officers insurance or (v) auditing fees.

"Executive Officer" means, with respect to any Person, the Chief Executive Officer, Chief Operating Officer, Chief Financial Officer, President, Executive Vice President, any Vice President, the Secretary, the Executive Director, the Treasurer or any general partner, as applicable, of such Person.

"FDIC" means the Federal Deposit Insurance Corporation.

"Fees and Expenses Reserve" means, with respect to any Payment Date, an amount to be retained in the Collection Account equal to the amount of cash reasonably expected to be required to pay all Issuer Expenses that are capable of estimation (which will not include, for the avoidance of doubt, amounts owed in respect of the Bonds and amounts due to the Servicer and the Collateral Monitor calculated on the basis of cash Collections) through the

next Determination Date based on a good faith estimate prepared by the Servicer and approved by the Collateral Monitor and the Board of Trustees, as set forth in the Semiannual Budget.

"Final Scheduled Payment Date" means August 20, 2040 or thereafter as such date may be delayed by vote of the Bondholders pursuant to Section 7.05.

"Final Scheduled Payment Date Servicing Report" means the report of the Servicer prepared and provided to the Indenture Trustee, the Issuer and the Collateral Monitor, pursuant to the Servicing Agreement, on or prior to the date that is six months prior to the Final Scheduled Payment Date (including as such date may be delayed in accordance with Section 7.05) containing the following information: (a) the Outstanding Amount of the Bonds, (b) a description of and face amount of any remaining Restructuring Property, (c) a good faith projection of the expected Collections to be generated in respect of the remaining Restructuring Property on or prior to the Final Scheduled Payment Date and thereafter and (d) a good faith estimate of the cost to continue to manage the remaining Restructuring Property after the Final Scheduled Payment Date.

"Fitch" means Fitch Ratings, Inc. or its successors and assigns.

"Fund Transfer Requisition" means the written instructions of the Servicer to the Indenture Trustee in substantially the form attached hereto as Exhibit E.

"GDB" has the meaning assigned to such term in the recitals hereto.

"GDB Restructuring Act" has the meaning assigned to such term in the recitals hereto.

"Government" means the government of the Commonwealth.

"Indemnification Trigger Event" has the meaning assigned to such term in the Keepwell Agreement.

"Indenture" has the meaning assigned to such term in the preamble hereto.

"Indenture Trustee" has the meaning assigned to such term in the preamble hereto or any successor thereto appointed in accordance with this Indenture.

"Independent" means, with respect to any Person, a Person that (a) is not an Affiliate of GDB or the Issuer, (b) is not, and is not the Affiliate of, a current or former manager, director, trustee, officer or employee of GDB, the Issuer or their Affiliates (other than with respect to such Person's provision of services to GDB, the Issuer or their Affiliates in the ordinary course of business, subject to the following clause (c)) and (c) collectively with all Affiliates of such Person does not receive more than 10% of its annual revenue from, collectively, GDB, the Issuer and their respective Affiliates.

"Initial Bonds" has the meaning assigned to such term in the recitals hereto.

"Interest Period" means, with respect to any Payment Date, the period from and including the immediately preceding Payment Date on which interest has been paid (in cash or in PIK Amount or any combination thereof) (or, in the case of the Special First Payment Date, from and including the Closing Date) to, but excluding, the Payment Date on which such interest is to be paid (in cash or in PIK Amount or any combination thereof).

"Interest Rate" means 7.500% per annum.

"Issuer" has the meaning assigned to such term in the preamble hereto.

"Issuer Expenses" means Issuer Operating Expenses and Excluded Expenses.

"Issuer Operating Expenses" means all expenses, liabilities or other obligations of the Issuer other than Excluded Expenses and amounts owed in respect of the Bonds.

"Issuer Operating Expenses Cap" means with respect to the Issuer Operating Expenses, in the aggregate, (i) $650,000 per year through February 20, 2020 (prorated for any partial years) and (ii) an amount to be determined by the Board of Trustees for each year thereafter, which amount shall not exceed $650,000 and shall be subject to the consent of the Collateral Monitor, which consent may not be unreasonably withheld, delayed or conditioned; it being understood that such amounts are expected to decrease as of February 20, 2020.

"Issuer Order" means a written order or request signed in the name of the Issuer by, except as specifically set forth herein, any one of its Authorized Persons and delivered to the Indenture Trustee.

"Issuer's Certificate" means a certificate signed by any Authorized Person, under the circumstances described in, and otherwise complying with, the applicable requirements of Section 13.01, and delivered to the Indenture Trustee.

"Keepwell Agreement" means the Keepwell Agreement, dated as of the Closing Date, by and between GDB, the Issuer and Indenture Trustee, as amended or supplemented from time to time.

"Liquidation Payment Date" has the meaning specified in Section 7.05(a).

"Loan Assets" has the meaning assigned to such term in the Servicing Agreement.

"Loans" has the meaning assigned to such term in the Transfer Agreement.

"Material Servicer Default Notice" means the notice of the Collateral Monitor delivered to the Indenture Trustee, the Issuer and the Servicer when (i) the Collateral Monitor believes, in good faith, that a Servicer Default has occurred and is continuing and (ii) the Collateral Monitor believes, in its sole discretion, that such Servicer Default is material to the interests of the Bondholders, which notice shall contain the following information: (A) facts sustaining Collateral Monitor evaluation, (B) possible effect on Bondholder interests and (C) recommendation of Collateral Monitor to Bondholders.

"Moody's" means Moody's Investors Service, Inc., a corporation organized and existing under the laws of the State of Delaware, or its successors and assigns.

"MSRB" means the Municipal Securities Rulemaking Board.

"Municipal Loan Assets" has the meaning assigned to such term in the Transfer Agreement.

"Offering Memorandum" means the Offering Memorandum dated November 7, 2018, related to the Bonds.

"Opinion of Counsel" means one or more written opinions of counsel who may, except as otherwise expressly provided in this Indenture, be counsel to the Issuer, GDB or the Servicer and which counsel shall be reasonably satisfactory to the Indenture Trustee.

"Outstanding" means, as of the date of determination, all Bonds theretofore authenticated and delivered under this Indenture except:

(a)        Bonds theretofore canceled by the Bond Registrar or delivered to the Bond Registrar for cancellation;

(b)        Bonds or portions thereof the payment for which money in the necessary amount has been theretofore deposited with the Indenture Trustee or any Paying Agent in trust for the Bondholders of such Bonds; and

(c)        Bonds in exchange for or in lieu of which other Bonds have been authenticated and delivered pursuant to this Indenture unless proof satisfactory to the Indenture Trustee is presented that any such Bonds are held by a bona fide purchaser;

provided that, in determining whether the Bondholders, or Beneficial Owners providing instructions or directions to the Clearing Agency, of the requisite percentage of the Outstanding Amount have given any request, demand, authorization, direction, notice, consent, or waiver hereunder or under any Transaction Documents, Bonds held or owned, including beneficially owned, by the Issuer or its Affiliates shall be disregarded and deemed not to be Outstanding, except that, in determining whether the Indenture Trustee shall be protected in relying upon any such request, demand, authorization, direction, notice, consent, or waiver, only Bonds that a Trust Officer of the Indenture Trustee actually knows to be so owned shall be so disregarded. Bonds so owned that have been pledged in good faith may be regarded as Outstanding if the pledgee establishes to the satisfaction of the Indenture Trustee the pledgee's right so to act with respect to such Bonds and that the pledgee is Independent and is not acting at the direction of the Issuer, an Affiliate of the Issuer, or any other obligor upon the Bonds.

"Outstanding Amount" means, as of a date of determination, the principal amount of all Bonds that are Outstanding.

"Participating Bond Claims" means all rights to payment and related rights to equitable remedies in respect of (a) the public bonds issued and outstanding pursuant to that certain trust indenture, dated as of February 17, 2006, as amended or supplemented, between GDB and Wilmington Trust, National Association, as successor trustee, (b) the public bonds, issued and outstanding pursuant to that certain trust indenture, dated as of April 29, 2016, as amended or supplemented, between GDB and UMB Bank, National Association, as trustee, (c) certain deposits at GDB after giving effect to the adjustments pursuant to the GDB Restructuring Act on the Closing Date and (d) the contingent and unliquidated claims against, and other outstanding obligations of, GDB set forth in Exhibit C.

"Paying Agent" means the Indenture Trustee or any other Independent Person that meets the eligibility standards for the Indenture Trustee specified in Section 9.12 that has been authorized by the Issuer to make payments to and distributions from the Collection Account, including payment of principal of or interest on the Bonds on behalf of the Issuer.

"Payment Date" means the Special First Payment Date and, thereafter, each February 20 and August 20; provided that, if any such date is not a Business Day, any action to be taken on such date need not be taken on such date, but may be taken on the next succeeding Business Day with the same force and effect as if taken on such date, with no additional interest accruing in respect of the delay.

"Payment Date Report" means the semiannual report to be prepared by the Servicer and provided to the Issuer, the Collateral Monitor and the Indenture Trustee, to be made available to the Bondholders on each Payment Date, containing the information set forth in Exhibit D.

"Permitted Obligations" means (a) the Bonds, (b) Excluded Expenses, (c) Issuer Operating Expenses in an aggregate amount not to exceed the Issuer Operating Expense Cap in any fiscal year and (d) other Issuer Operating Expenses consented to by the Collateral Monitor, in each case in clauses (b) through (d), to the extent such Issuer Expenses are validly incurred and payable from the Collection Account pursuant to the terms of this Indenture.

"Person" means an individual, a corporation, a limited liability company, a company, a partnership, a joint venture, an association, a trust or any other entity or organization, including a government or political subdivision or an agency or instrumentality thereof.

"PIK Amount" has the meaning specified in Section 11.01(d)(iii).

"Predecessor Bond" means, with respect to any particular Bond, every previous Bond evidencing all or a portion of the same debt as that evidenced by such particular Bond; and, for the purpose of this definition, any Bond authenticated and delivered under Section 2.06 in lieu of a mutilated, lost, destroyed or stolen Bond shall be deemed to evidence the same debt as the mutilated, lost, destroyed or stolen Bond.

"Priority of Payments" has the meaning specified in Section 11.01(a).

"Proceeding" means any suit in equity, action at law or other judicial or administrative proceeding.

"<u>PROMESA</u>" has the meaning assigned to such term in the recitals hereto.

"<u>Public Entity Trust</u>" has the meaning specified in the GDB Restructuring Act.

"<u>Puerto Rico Courts</u>" has the meaning specified in <u>Section 13.13</u>.

"<u>Qualification</u>" means those material licenses and material approvals required to qualify as a manager of the Restructuring Property on behalf of the Issuer pursuant to applicable law.

"<u>Qualified Servicer</u>" means any Person that, at the time of determination, (a) is organized and doing business pursuant to the laws of the United States of America or any of its states or territories, (b) is duly authorized to perform the duties of the Servicer on the terms set forth in the Servicing Agreement on behalf of the Issuer, (c) is not restricted or prohibited from contracting with the Issuer, (d) has obtained Qualification, (e) is Independent, (f) is of recognized national standing and (e) is equipped with the requisite expertise and Spanish speaking capability to perform the Services.

"<u>Qualifying Modification</u>" has the meaning assigned to such term in the recitals hereto.

"<u>Quarterly Budget Report</u>" means the quarterly report to be prepared by the Servicer and provided to the Issuer, the Collateral Monitor and the Indenture Trustee, to be made available to the Bondholders on the dates, and containing the information set forth in <u>Exhibit D</u>.

"<u>Rating Agency</u>" means any or each of Fitch, Moody's and S&P, as indicated by the context.

"<u>Record Date</u>" means, with respect to the Bonds (i) in the case of each Payment Date other than the Special First Payment Date, the calendar day immediately preceding such Payment Date or, if Definitive Bonds representing any Bonds have been issued, the last day of the calendar month immediately preceding the month during which such Payment Date occurs or (ii) in the case of the Special First Payment Date, the calendar day immediately succeeding the Closing Date.

"<u>Registered Bondholder</u>" means the Person in whose name a Bond is registered on the Bond Register on the applicable Record Date.

"<u>Remedy Limitations</u>" has the meaning specified in <u>Section 8.03(b)</u>.

"<u>Restructuring</u>" has the meaning assigned to such term in the recitals hereto.

"<u>Restructuring Property</u>" means, collectively, all Collections and any and all Transferred Property.

"<u>Restructuring Support Agreement</u>" means the Restructuring Support Agreement, by and among GDB, AAFAF and certain of GDB's creditors, dated as of May 15, 2017, as amended, modified or supplemented.

"<u>Rule 15c2-12</u>" means Rule 15c2-12 adopted by the Commission under the Securities Exchange Act of 1934, as amended.

"<u>S&P</u>" means S&P Global Ratings, a division of S&P Global Inc., or its successors and assigns.

"<u>Semiannual Bondholder Report</u>" means the semiannual report to be prepared by the Collateral Monitor and provided to the Issuer, the Servicer and the Indenture Trustee, to be made available to the Bondholders on the dates, and containing the information set forth in <u>Exhibit D</u>.

"<u>Semiannual Budget</u>" means, as of each Payment Date, the budget for the following six-month period providing the calculation for the Fees and Expenses Reserve, which budget shall be included in the Payment Date Report and contain the information set forth in <u>Exhibit D</u>.

"Servicer" means AmeriNational Community Services, LLC or any Qualified Servicer duly appointed as a successor servicer in accordance with Section 5.03.

"Servicer Default" wherever used herein, means any one of the following events (whatever the reason for such Servicer Default and whether it shall be voluntary or involuntary or be effected by operation of law or pursuant to any judgment, decree or order of any court or any order, rule or regulation of any administrative or governmental body):

(a) The failure by the Servicer, if within the Servicer's power to do so, to deposit or deliver to the Indenture Trustee for deposit in the Collection Account any cash Collections or to make any required payment or distribution therefrom, which failure continues unremedied for a period of five Business Days after discovery of the failure by an officer of the Servicer or written notice of such failure is provided to the Servicer by the Issuer or the Collateral Monitor;

(b) The Compliance Test carried out by the Collateral Monitor shows a cumulative shortfall of 10% or more as of any applicable Test Date, provided that any Servicer Default occurring as the result of such a cumulative shortfall will be deemed waived and voided if written notice of a possible Servicer Replacement Event is not provided by the Collateral Monitor in respect of such Servicer Default within 30 days of the results of the Compliance Test being published in the Semiannual Bondholder Report;

(c) Information necessary to conduct the Compliance Test as of any Test Date or any of the other information necessary for the Semiannual Bondholder Report is not delivered to the Collateral Monitor on a timely basis;

(d) The Servicer fails to use commercially reasonable efforts to maximize the realizable present value of the Restructuring Property (evaluated in light of the Asset Restrictions), which failure remains unremedied for a period of 30 days after the Servicer's receipt of written notice by the Collateral Monitor reasonably detailing such failure;

(e) The Servicer enters into modifications, extensions or accommodations in respect of the Restructuring Property that are, individually or in the aggregate, not commercially reasonable (evaluated in light of the Asset Restrictions); provided that if the Collateral Monitor fails to object to a modification, extension or accommodation for a period of 10 Business Days after receipt of written notice of such transaction, such modification, extension or accommodation will be presumed to be, individually, commercially reasonable and will not, individually, be the basis for a Servicer Default;

(f) The Servicer fails to maintain its existence in good standing as an entity under the laws of its jurisdiction of organization or to obtain and preserve its Qualification or Independence;

(g) The Servicer merges, consolidates or amalgamates with, or transfers all or substantially all of its assets to, any other Person or a change in control occurs with respect to the Servicer that, in any such case, as reasonably determined by the Collateral Monitor, materially and adversely affects the Servicer's ability to perform its obligations under the Servicing Agreement, with such reasons being detailed and documented in writing to the Servicer;

(h) There occurs a Servicer Insolvency Event;

(i) A violation by the Servicer of any provision of applicable law or any judgment of any court or governmental authority applicable to the Servicer that would materially adversely affect its ability to perform its obligations under the Servicing Agreement in any material respect;

(j) The Servicer engages in fraudulent or criminal activities that would (i) adversely affect its ability to perform its obligations under the Servicing Agreement in any material respect or (ii) present an unacceptable level of risk or damage to (A) the reputation of the Issuer or (B) the ability to make payments to Bondholders;

(k)     Any representation, warranty or statement of the Servicer made in the Servicing Agreement or any certificate, report or other writing delivered pursuant to the Servicing Agreement proves to be incorrect in any material respect as of the time made (and, if such representation, warranty or statement is reasonably capable of cure, continues unremedied for a period of 30 days after the date on which written notice of such failure has been given to the Servicer by the Issuer or the Collateral Monitor);

(l)     There occurs any material adverse change in the Servicer's financial position that has a material adverse effect on the Servicer's ability to perform its obligations under the Servicing Agreement; and

(m)     Failure on the part of the Servicer to observe or perform any covenant or agreement set forth in the Servicing Agreement other than those set forth above that, to the extent capable of remedy, continues unremedied for a period of 30 days after the date on which written notice of such failure has been given to the Servicer by the Issuer or the Collateral Monitor, as set forth in the Servicing Agreement; provided, however, that for a breach capable of being remedied but of the nature that it cannot be reasonably expected to be remedied within such 30-day period, if the Collateral Monitor determines that the Servicer is using its good faith efforts to cure such breach, such 30-day period will be extended for up to an additional 90 days so long as the Servicer continues to use good faith efforts to cure such breach.

"Servicer Insolvency Event" means (a) the filing of a decree or order for relief by a court having jurisdiction in the premises in respect of the Servicer or any substantial part of its property in an involuntary case under any applicable federal, state or foreign bankruptcy, insolvency or other similar law now or hereafter in effect (including, where applicable, PROMESA), or appointing a receiver, liquidator, assignee, custodian, trustee, sequestrator or similar official for the Servicer or for any substantial part of its property, or ordering the winding-up or liquidation of the Servicer's affairs, and such decree or order remains unstayed and in effect for a period of 30 consecutive days; or (b) the commencement by the Servicer of a voluntary case under any applicable federal, state or foreign bankruptcy, insolvency or other similar law now or hereafter in effect, or the consent by the Servicer to the entry of an order for relief in an involuntary case under any such laws, or the consent by the Servicer to the appointment of or taking possession by a receiver, liquidator, assignee, custodian, trustee, sequestrator or similar official for the Servicer or for any substantial part of its property, or the making by the Servicer of any general assignment for the benefit of creditors, or the failure by the Servicer generally to pay its debts as such debts become due, or the taking of action by the Servicer in furtherance of any of the foregoing.

"Servicer Replacement Event" means a Servicer Default that is material to the interests of the Bondholders, as determined by the affirmative vote of Bondholders holding not less than one-third (or, if an Event of Default occurs and is continuing, 25%) of the Outstanding Amount in a solicitation conducted by the Indenture Trustee in accordance with Section 5.03, upon the Servicer's receipt of notice of which, the Servicer's appointment under the Servicing Agreement shall be terminated, subject to the provisions of Section 5.03.

"Servicer Replacement Event Notice" has the meaning specified in Section 5.03(a).

"Servicing Agreement" means the Servicing Agreement, dated as of the Closing Date, by and between the Issuer and the Servicer, as amended or supplemented from time to time, and any other servicing agreement that the Issuer may enter into with any successor Servicer in connection with the management of the Restructuring Property.

"Servicing Fee" means the semi-annual fee that the Issuer is required to pay the Servicer on each Payment Date pursuant to the Servicing Agreement.

"Special First Payment Date" means the Closing Date or as soon thereafter as reasonably practicable.

"Statutory Lien" means the statutory lien on the Restructuring Property in favor of the Indenture Trustee, for the benefit of the Bondholders, imposed by Article 402 of the GDB Restructuring Act, which lien shall be senior to any other lien encumbering the Restructuring Property (except for valid liens and encumbrances existing as of the effective date of the GDB Restructuring Act or that arise in the ordinary course of business after the effective date of the GDB Restructuring Act and are existing as of the Closing Date, in each case with respect to any Real Property

Assets (as defined in the Transfer Agreement) and any personal property assets related thereto that are part of the Restructuring Property), the existence of which is acknowledged and confirmed by Article III.

"Successor Servicer Notice" means a notice prepared by the Issuer, in consultation with the Collateral Monitor, delivered to the Indenture Trustee and the Bondholders in accordance with Section 9.07(b), containing the following information: (i) identity of the successor Servicer, (ii) terms of engagement of the successor Servicer, (iii) notice of opportunity for Bondholder objection to identity and terms of engagement during the first 60 days of such engagement, (iv) other information provided by the Issuer (if applicable) and (v) other information provided by the Collateral Monitor (if applicable).

"Test Date" means, with respect to each Collection Period, the last day thereof.

"Transaction Documents" means, collectively, this Indenture, the Bonds, the Transfer Agreement, the Servicing Agreement, the Keepwell Agreement, the Disclosure Agreement, the Collateral Monitor Agreement and the Collateral Monitor Fee Letter.

"Transfer Agreement" means the Transfer Agreement, dated as of the Closing Date, by and between the Issuer and GDB, as amended or supplemented from time to time.

"Transfer Default" has the meaning assigned to such term in the Transfer Agreement.

"Transfer Trigger Event" has the meaning assigned to such term in the Keepwell Agreement.

"Transferred Property" has the meaning assigned to such term in the Transfer Agreement.

"Trust Officer" means, in the case of the Indenture Trustee, any officer within the Corporate Trust Office of the Indenture Trustee, including any Vice President, Assistant Vice President, Secretary, Assistant Secretary or any other officer of the Indenture Trustee customarily performing functions similar to those performed by any of the above designated officers with direct responsibility for the administration of the Indenture and the Transaction Documents.

"UCC" means the New York Uniform Commercial Code.

SECTION 1.02    Usage of Terms.  With respect to all terms in this Indenture, unless otherwise provided, the singular includes the plural and the plural the singular; words importing any gender include the other genders; references to "writing" include printing, typing, lithography and other means of reproducing words in a visible form; references to agreements and other contractual instruments include all subsequent amendments, amendments and restatements and supplements thereto or changes therein entered into in accordance with their respective terms and not prohibited by this Indenture; references to Persons include their permitted successors and assigns; and the term "including" means "including without limitation." References to the GDB Restructuring Act mean such act as it is in effect on the Closing Date, without giving effect to any subsequent amendments thereto.

## ARTICLE II

## THE BONDS

SECTION 2.01    Authorization of Bonds.  There are hereby authorized to be issued Bonds of the Issuer to be designated as "GDB Debt Recovery Authority Bonds (Taxable)," which, in accordance with, and as provided by, Article 402 of the GDB Restructuring Act are secured by the Statutory Lien on the Restructuring Property to secure the payment of the principal and interest on the Bonds.

SECTION 2.02    Form.  No Bonds may be issued under this Indenture except in accordance with this Article II. The Bonds, together with the Indenture Trustee's certificate of authentication, shall be in substantially the form set forth as Exhibit A, with such appropriate insertions, omissions, substitutions and other variations as are required or permitted by this Indenture, and may have such letters, numbers or other marks of identification and

such legends or endorsements placed thereon as may, consistently herewith, be determined by the Authorized Persons executing such Bonds, as evidenced by their execution thereof. Pursuant to recommendations promulgated by the Committee on Uniform Security Identification Procedures, "CUSIP" numbers may be printed on the Bonds. Any portion of the text of any Bond may be set forth on the reverse thereof, with an appropriate reference thereto on the face of the Bond.

The Definitive Bonds, if any, shall be typewritten, printed, lithographed or engraved or produced by any combination of these methods (with or without steel engraved borders), all as determined by the Authorized Persons executing such Bonds, as evidenced by their execution of such Bonds.

The Bonds shall be issued in U.S. Dollars in minimum denominations of $1.00 and integral multiples of $1.00 in excess thereof, and PIK Amounts, if any, shall be equal to $1.00 and any integral multiples of $1.00 in excess thereof. Each Bond shall be dated the date of its authentication. The terms of the Bonds set forth in Exhibit A are part of the terms of this Indenture. Unless the context requires otherwise, (a) references to "Bonds" for all purposes of this Indenture include any Additional Bonds that are actually issued and (b) references to "principal amount" of Bonds includes any increase in the principal amount of outstanding Bonds as a result of a PIK Amount.

SECTION 2.03   Execution and Authentication; Additional Bonds.

(a)      An Authorized Person shall execute the Bonds for the Issuer by facsimile or manual signature in the name and on behalf of the Issuer. If an Authorized Person whose signature is on a Bond no longer holds that position at the time the Bond is authenticated, the Bond will still be valid.

(b)      A Bond will not be valid until an authorized officer of the Indenture Trustee, upon receipt of an Issuer Order signed by an Authorized Person, manually signs the certificate of authentication on the Bond, with the signature of an authorized officer of the Indenture Trustee conclusive evidence that the Bond has been authenticated under this Indenture.

(c)      In authenticating any Additional Bonds, and accepting the additional responsibilities under this Indenture in relation to such Additional Bonds, the Indenture Trustee shall receive, and, subject to Section 9.01, shall be fully protected in relying upon:

(i)      a copy of the resolution or resolutions of the Board of Trustees in or pursuant to which the terms and form of the Additional Bonds were established, certified by an Authorized Person to have been duly adopted by the Board of Trustees and to be in full force and effect as of the date of such certificate, and if the terms and form of such Bonds are established by an Issuer's Certificate pursuant to general authorization of the Issuer, such Issuer's Certificate;

(ii)      an executed supplemental indenture, if any;

(iii)      Opinion of Counsel; and

(iv)      an Issuer's Certificate delivered in accordance with Section 13.01.

(d)      At any time and from time to time after the execution and delivery of this Indenture, the Issuer may deliver Bonds executed by the Issuer to the Indenture Trustee for authentication. The Indenture Trustee shall authenticate and deliver:

(i)      the Initial Bonds for original issue in the aggregate principal amount specified in an Issuer Order but not to exceed $2,597,754,625 in aggregate original principal amount; and

(ii)      Additional Bonds from time to time for original issue in respect of the Contingent Claims set forth in Exhibit C in the principal amounts specified in one or more Issuer Orders and in accordance with Section 2.12 but not to exceed $61,990,562 aggregate original principal amount.

(e)     The Bonds, any PIK Amounts and any Additional Bonds will constitute and be deemed to be a single series of Bonds for all purposes under this Indenture without preference, priority or distinction, and will vote together as one series of Bonds with respect to all matters. Except as specifically provided for in this Indenture, all Bonds owned by the Issuer, the Servicer, the Collateral Monitor or any of their respective Affiliates will be entitled to equal and proportionate benefits under this Indenture.

SECTION 2.04   Temporary Bonds.  Pending the preparation of Definitive Bonds, the Issuer may execute, and upon receipt of an Issuer Order the Indenture Trustee shall authenticate and deliver, temporary Bonds that are printed, lithographed, typewritten, mimeographed or otherwise produced, of the tenor of the Definitive Bonds in lieu of which they are issued and with such variations not inconsistent with the terms of this Indenture as the Authorized Persons executing such Bonds may determine, as evidenced by their execution of such Bonds. If temporary Bonds are issued, the Issuer shall cause Definitive Bonds to be prepared without unreasonable delay. After the preparation of Definitive Bonds, the temporary Bonds shall be exchangeable for Definitive Bonds upon surrender of the temporary Bonds at the office or agency of the Issuer to be maintained as provided in Section 4.02, without charge to the Bondholder. Upon surrender for cancellation of any one or more temporary Bonds, the Issuer shall execute, and the Indenture Trustee shall authenticate and deliver in exchange therefor, a like principal amount of Definitive Bonds of authorized denominations. Until so exchanged, the temporary Bonds shall in all respects be entitled to the same benefits under this Indenture as Definitive Bonds.

SECTION 2.05   Registration; Registration of Transfer and Exchange.

(a)     The Bond Registrar, acting as agent of the Issuer for this purpose only, shall maintain a Bond Register in which, subject to such reasonable regulations as it may prescribe, the Bond Registrar shall provide for the registration of Bonds and registration of transfers and exchanges of Bonds as provided in this Indenture. The Indenture Trustee is hereby initially appointed Bond Registrar for the purpose of registering Bonds and registering transfers and exchanges of Bonds as provided in this Indenture. In the event that, subsequent to the Closing Date, the Indenture Trustee notifies the Issuer that it is unable to act as Bond Registrar, the Issuer shall appoint another bank or trust company, having an office or agency located in the Borough of Manhattan, the City of New York, agreeing to act in accordance with the provisions of this Indenture applicable to it, and otherwise acceptable to the Indenture Trustee, to act as successor Bond Registrar under this Indenture. The Issuer shall have the right to inspect the Bond Register at all reasonable times and to obtain copies thereof.

If a Person other than the Indenture Trustee is appointed by the Issuer as Bond Registrar, the Issuer shall give the Indenture Trustee prompt written notice of the appointment of such Bond Registrar and of the location, and any change in the location, of the Bond Register, and the Indenture Trustee shall have the right to inspect the Bond Register at all reasonable times and to obtain copies thereof, and the Indenture Trustee shall have the right to rely upon a certificate executed on behalf of the Bond Registrar by an Executive Officer thereof as to the names and addresses of the Bondholders of the Bonds and the principal amounts and number of such Bonds.

(b)     Upon the proper surrender for registration of transfer or exchange of any Bond at the office or agency of the Issuer to be maintained as provided in Section 4.02, the Issuer shall execute, and the Indenture Trustee shall authenticate in the name of the designated transferee or transferees, one or more new Bonds in authorized denominations of a like aggregate principal amount.

(c)     At the option of the Bondholder, Bonds may be exchanged for other Bonds in any authorized denominations, of a like aggregate principal amount, upon surrender of the Bonds to be exchanged at such office or agency. Whenever any Bonds are so surrendered for exchange, the Issuer shall execute, and the Indenture Trustee shall authenticate and the Bondholder shall obtain from the Indenture Trustee, the Bonds which the Bondholder making the exchange is entitled to receive. Every Bond presented or surrendered for registration of transfer or exchange shall be accompanied by a written instrument of transfer or exchange in form satisfactory to the Indenture Trustee and the Bond Registrar duly executed by the Bondholder thereof or his attorney duly authorized in writing.

(d)     No service charge shall be made for any registration of transfer or exchange of Bonds, but the Issuer or the Indenture Trustee may require payment of a sum sufficient to cover any tax or governmental charge that may be imposed in connection with any such transfer or exchange of Bonds.

(e)     All Bonds surrendered for registration of transfer or exchange shall be cancelled and subsequently destroyed pursuant to Section 2.08.

(f)     Each purchaser and transferee of a Bond will be deemed to represent, warrant and covenant either that (i) it is not acquiring such Bond for a Benefit Plan or with the assets of a Benefit Plan or (ii) the acquisition, holding and disposition of such Bond will not give rise to a non-exempt prohibited transaction under Section 406 of ERISA or Section 4975 of the Code or a non-exempt violation under any law that is substantially similar to the fiduciary responsibility or prohibited transaction provisions of ERISA or Section 4975 of the Code.

SECTION 2.06   Mutilated, Destroyed, Lost or Stolen Bonds.  If (a) any mutilated Bond is surrendered to the Indenture Trustee, or the Indenture Trustee receives evidence to its satisfaction of the destruction, loss or theft of any Bond, and (b) there is delivered to the Indenture Trustee such security or indemnity as may be reasonably required by it to hold the Issuer and the Indenture Trustee harmless, then, in the absence of notice to the Issuer, the Bond Registrar or the Indenture Trustee that such Bond has been acquired by a bona fide purchaser, the Issuer shall execute, and upon its request the Indenture Trustee shall authenticate and deliver, in exchange for or in lieu of any such mutilated, destroyed, lost or stolen Bond, a replacement Bond. In connection with the issuance of any new Bond under this Section 2.06, the Issuer or the Indenture Trustee may require payment by the Bondholder of such Bond of a sum sufficient to cover any tax or other governmental charge that may be imposed in relation thereto.

If, after the delivery of such replacement Bond or payment of a destroyed, lost or stolen Bond, a bona fide purchaser of the original Bond in lieu of which such replacement Bond was issued presents for payment such original Bond, the Issuer and the Indenture Trustee shall be entitled to recover such replacement Bond (or such payment) from the Person to whom it was delivered or any Person taking such replacement Bond from such Person to whom such replacement Bond was delivered or any assignee of such Person, except a bona fide purchaser, and shall be entitled to recover upon the security or indemnity provided therefor to the extent of any loss, damage, cost or expense incurred by the Issuer or the Indenture Trustee in connection therewith.

Every replacement Bond issued pursuant to this Section 2.06 in replacement of any mutilated, destroyed, lost or stolen Bond shall constitute an original additional contractual obligation of the Issuer, whether or not the mutilated, destroyed, lost or stolen Bond shall be at any time enforceable by anyone, and shall be entitled to all the benefits of this Indenture equally and proportionately with any and all other Bonds duly issued hereunder.

The provisions of this Section 2.06 are exclusive and shall preclude (to the extent lawful) all other rights and remedies with respect to the replacement or payment of mutilated, destroyed, lost or stolen Bonds.

SECTION 2.07   Persons Deemed Owners.  Prior to due presentment for registration of transfer of any Bond, the Issuer, the Indenture Trustee and any agent of the Issuer or the Indenture Trustee may treat the Person in whose name any Bond is registered (as of the day of determination) as the owner of such Bond for the purpose of receiving payments of principal of and interest, if any, on such Bond and for all other purposes whatsoever, and none of the Issuer, the Indenture Trustee or any agent of the Issuer or the Indenture Trustee shall be affected by any actual or constructive notice to the contrary.

SECTION 2.08   Cancellation.  All Bonds surrendered for payment, registration of transfer or exchange shall, if surrendered to any Person other than the Indenture Trustee, be delivered to the Indenture Trustee and shall be promptly cancelled by the Indenture Trustee. The Issuer may at any time deliver to the Indenture Trustee for cancellation any Bonds previously authenticated and delivered hereunder that the Issuer may have acquired in any manner whatsoever, and all Bonds so delivered shall be promptly cancelled by the Indenture Trustee. No Bonds shall be authenticated in lieu of or in exchange for any Bonds cancelled as provided in this Section 2.08, except as expressly permitted by this Indenture. All cancelled Bonds may be held or disposed of by the Indenture Trustee in accordance with its standard retention or disposal policy as in effect at the time unless the Issuer shall direct by an Issuer Order that they be destroyed or returned to it; provided that such Issuer Order is timely and the Bonds have not been previously disposed of by the Indenture Trustee.

SECTION 2.09   Book-Entry Bonds.  The Bonds, upon original issuance, will be issued in the form of typewritten bonds representing the Book-Entry Bonds, to be delivered to DTC, the initial Clearing Agency, or a custodian therefor, by or on behalf of, the Issuer. The Book-Entry Bonds shall be registered initially on the Bond

Register in the name of Cede & Co., the nominee of the initial Clearing Agency, and no Beneficial Owner thereof will receive a Definitive Bond representing such Beneficial Owner's interest in such Bond, except as provided in Section 2.11. Unless and until the Definitive Bonds have been issued to the Beneficial Owners of Book-Entry Bonds pursuant to Section 2.11:

      (a)      the provisions of this Section 2.09 shall be in full force and effect;

      (b)      the Bond Registrar and the Indenture Trustee shall be entitled to deal with the Clearing Agency for all purposes of this Indenture (including the payment of principal of and interest on the Book-Entry Bonds and the giving of instructions or directions hereunder) as the authorized representative of such Beneficial Owners;

      (c)      to the extent that the provisions of this Section 2.09 conflict with any other provisions of this Indenture, the provisions of this Section 2.09 shall control;

      (d)      the rights of such Beneficial Owners shall be exercised only through the Clearing Agency and shall be limited to those established by law and agreements between such Beneficial Owners and the Clearing Agency and/or the Clearing Agency Participants;

      (e)      the initial Clearing Agency shall make book-entry transfers among the Clearing Agency Participants and receive and transmit payments of principal of and interest on such Bonds to such Clearing Agency Participants;

      (f)      the initial Clearing Agency shall make payments of principal to Clearing Agency Participants as selected by lot, in minimum authorized denominations of $1.00, in accordance with the procedures of the initial Clearing Agency; and

      (g)      whenever this Indenture requires or permits actions to be taken based upon instructions or directions of the Bondholders of a specified percentage of the Outstanding Amount evidencing a specified percentage of the Outstanding Amount, the Clearing Agency shall be deemed to represent such percentage only to the extent that it has received instructions or directions to such effect from Beneficial Owners of Book-Entry Bonds and/or Clearing Agency Participants owning or representing, respectively, such required percentage of the beneficial interest in such Bonds and has delivered such instructions or directions to the Indenture Trustee.

      SECTION 2.10   Notices to Clearing Agency.  Whenever a notice or other communication to the Bondholders is required under this Indenture, unless and until Definitive Bonds shall have been issued to the Beneficial Owners of Book-Entry Bonds pursuant to Section 2.11, the Indenture Trustee shall give all such notices and communications specified herein to be given to the Bondholders of the Book-Entry Bonds to the Clearing Agency and such notices shall be deemed for all purposes of this Indenture to have been given to the Bondholders as of the date of delivery to the Clearing Agency.

      SECTION 2.11   Definitive Bonds.  In the case of the Book-Entry Bonds, if (a) the Issuer advises the Indenture Trustee in writing that the Clearing Agency is no longer willing or able to properly discharge its responsibilities with respect to the Book-Entry Bonds and the Issuer is unable to locate a qualified successor or (b) after the occurrence of an Event of Default, owners of the Book-Entry Bonds holding not less than a majority of the Outstanding Amount of the Book-Entry Bonds advise the Indenture Trustee and the Clearing Agency in writing that the continuation of a book-entry system through the Clearing Agency or a successor thereto is no longer in the best interests of the Bondholders, then the Indenture Trustee through the Clearing Agency and the Clearing Agency Participants shall notify all Beneficial Owners of the occurrence of such event and of the availability of Definitive Bonds to Beneficial Owners requesting the same. Upon surrender to the Indenture Trustee of the typewritten Bonds representing the Book-Entry Bonds by the Clearing Agency, accompanied by re-registration instructions, the Issuer shall execute and the Indenture Trustee shall authenticate the Definitive Bonds in accordance with the instructions of the Clearing Agency. None of the Issuer, the Bond Registrar or the Indenture Trustee shall be liable for any delay in delivery of such instructions and may conclusively rely on, and shall be protected in relying on, such instructions. Upon the issuance of Definitive Bonds, the Indenture Trustee shall recognize the holders of the Definitive Bonds as Bondholders. Neither the Indenture Trustee nor the Issuer shall be liable for any inability to locate a qualified

successor Clearing Agency. From and after the date of issuance of Definitive Bonds, all notices to be given to Bondholders will be mailed thereto at their addresses of record in the Bond Register as of the relevant Record Date. Such notices will be deemed to have been given as of the date of mailing.

SECTION 2.12   Tax Treatment.   The Issuer intends that, for Commonwealth and United States federal, state and local income, single business and franchise tax purposes, the Bonds will be characterized as indebtedness of the Issuer, secured by the Restructuring Property pursuant to the GDB Restructuring Act. The Issuer agrees to treat the Bonds for Commonwealth and United States federal, state and local income, single business and franchise tax purposes as indebtedness of the Issuer unless otherwise required by a final determination of any taxing authority.

SECTION 2.13   Additional Bonds.   The Issuer shall, without the consent of the Bondholders and upon instructions from GDB or AAFAF, and subject to the requirements set forth in Section 2.03, authorize from time to time the issuance of Additional Bonds in respect of the Contingent Claims set forth in Exhibit C in the principal amount(s) specified by GDB or AAFAF, as applicable, in accordance with the instructions from GDB or AAFAF, as applicable; provided that the Additional Bonds (whether issued together or in multiple instances) shall in no event exceed $61,990,562 in aggregate original principal amount. The Additional Bonds shall be in the form as set forth in Exhibit A. If any such Additional Bonds are not fungible with the previously issued Bonds for U.S. federal income tax purposes, such Additional Bonds shall be issued with a different "CUSIP" number from the previously issued Bonds. Such Additional Bonds will rank equally with any other Bonds issued hereunder and will have the pro rata benefit of any Restructuring Property specified in this Indenture as applicable to such corresponding Bonds, from and after the date of issuance of such Additional Bonds. The requirements of Section 2.03 shall be complied with before issuance of any such Additional Bonds. In issuing Additional Bonds, the Issuer shall be entitled to conclusively rely on the instructions from GDB or AAFAF, as applicable, as to the delivery of Additional Bonds, and shall have no duty or responsibility to investigate the accuracy or validity of such instructions; provided that any Additional Bonds issued in excess of the aggregate original principal amount specified above or otherwise in violation of the requirements under this Indenture shall be null and void and of no force or effect.

## ARTICLE III

## STATUTORY LIEN ON RESTRUCTURING PROPERTY

SECTION 3.01   Statutory Lien on Restructuring Property.

(a)   To secure the Bonds and the Financing Costs (as defined in the GDB Restructuring Act), the GDB Restructuring Act grants, automatically, upon the issuance of the Bonds, the Statutory Lien on the Restructuring Property in favor of the Indenture Trustee for the benefit of the Bondholders.  Pursuant to the terms of Article 402 of the GDB Restructuring Act, the Restructuring Property shall automatically upon issuance of the Bonds be subject to the Statutory Lien and no commingling of the Restructuring Property with any property of GDB or any other Person shall limit, defeat, impair or interfere with the Statutory Lien.  The Statutory Lien shall occur automatically and shall automatically be perfected, valid and binding pursuant to Article 402 of the GDB Restructuring Act.

(b)   Issuer and the Indenture Trustee hereby agree and acknowledge that the prompt and complete payment and performance when due of all obligations owing with respect to the Bonds issued hereunder (including principal and interest thereon) shall, automatically, upon the issuance of the Bonds, be secured by the Statutory Lien pursuant to Article 402 of the GDB Restructuring Act on all of the Restructuring Property in favor of the Indenture Trustee for the benefit of the Bondholders in order to secure the amounts owing in respect of the Bonds in compliance with the provisions of the GDB Restructuring Act.

(c)   The Indenture Trustee is hereby authorized to receive any and all of the Restructuring Property as and for security for the payment of the Bonds and the interest thereon, and to hold and apply all such Restructuring Property subject to the terms hereof, to have and to hold the trust estate, whether now owned or held or thereafter acquired, unto the Indenture Trustee and its successors and assigns forever.

(d)   The Indenture Trustee, on behalf and for the benefit of the Bondholders, acknowledges such Statutory Lien and accepts the trusts established under this Indenture in accordance with the provisions of the GDB

Restructuring Act and this Indenture and agrees to perform its duties required in this Indenture in accordance with the terms hereof for the equal and proportionate benefit of the Bondholders.

## ARTICLE IV

## COVENANTS OF THE ISSUER

SECTION 4.01   Payments to the Bondholders.  In accordance with the terms of this Indenture, the Issuer shall direct the Servicer to provide a Fund Transfer Requisition to the Indenture Trustee to duly and punctually release or cause to be released on each Payment Date all Available Cash on deposit in the Collection Account for payment on the Bonds in accordance with and subject to the provisions of Section 11.01. The amount of cash interest and principal required to be paid to the Bondholders on each Payment Date prior to the Final Scheduled Payment Date is limited to the Issuer's Available Cash on the applicable Payment Date and in no event shall the Issuer be deemed to be in default hereunder due to Available Cash being insufficient to pay in cash any or all interest or principal on the Bonds on any Payment Date as provided in Section 11.01(a).

SECTION 4.02   Maintenance of Office or Agency.   The Issuer shall maintain in the Borough of Manhattan in the City of New York, an office or agency where Bonds may be presented or surrendered for payment and where the Bonds may be surrendered for registration of transfer or exchange. The Issuer hereby initially appoints the Indenture Trustee to serve as its agent for the foregoing purposes. Notices and demands to or upon the Issuer in respect of the Bonds and this Indenture may be served in accordance with Section 13.04. The Issuer shall give prompt written notice to the Indenture Trustee of the location, and of any change in the location, of any such office or agency. If at any time the Issuer shall fail to maintain any such office or agency or shall fail to furnish the Indenture Trustee with the address thereof, such surrenders may be made or served at the Corporate Trust Office, and the Issuer hereby appoints the Indenture Trustee as its agent to receive all such surrenders.

SECTION 4.03   Money for Payments on the Bonds to be Held in Trust.   The Issuer shall cause to be deposited all Collections in the Collection Account to be held in trust for the benefit of the Bondholders (subject to the terms of this Indenture). To the extent the Issuer receives any cash Collections, it shall cause to be deposited such cash Collections in the Collection Account to be held in trust for the benefit of the Bondholders (subject to the terms of this Indenture). In accordance with the terms of this Indenture, the Issuer shall direct the Servicer to (a) to the extent practicable, cause all cash Collections collected during each Collection Period to be deposited directly into the Collection Account or, to the extent not practicable to do so, cause all such cash Collections to be subsequently deposited into the Collection Account as promptly as practicable after receipt thereof and (b) instruct the Indenture Trustee to make payments from the Collection Account in accordance with any Fund Transfer Requisition provided by the Servicer and in accordance with Section 11.01, to the extent of funds on deposit in the Collection Account.

All payments of amounts due and payable on the Bonds to the Bondholders that are to be made from amounts withdrawn from the Collection Account pursuant to the terms of this Indenture shall be made on behalf of the Issuer by the Indenture Trustee or by the Paying Agent.

The Issuer hereby initially appoints the Indenture Trustee as the Paying Agent for the purposes of making payments on the Bonds. The Indenture Trustee, as Paying Agent, hereby agrees with the Issuer that it shall (and the Issuer shall direct each Paying Agent other than the Indenture Trustee, as a condition to its acceptance of its appointment as Paying Agent, to execute and deliver to the Indenture Trustee an instrument in which such Paying Agent will agree with the Indenture Trustee, subject to the provisions of this Section 4.03, that such Paying Agent will):

(a)      hold all sums held by it in trust for the payment of amounts due pursuant to this Indenture and the Bonds;

(b)      comply with the Priority of Payments when making distributions from the Collection Account; and

20

(c)      comply with applicable requirements with respect to the withholding from any payments made by it on any Bonds of any applicable withholding taxes imposed thereon and with respect to any applicable reporting requirements in connection therewith.

The Issuer may at any time, for the purpose of obtaining the satisfaction and discharge of this Indenture in accordance with its terms or for any other purpose permitted hereunder, by Issuer Order direct any Paying Agent to pay to the Indenture Trustee all sums held in trust by such Paying Agent, such sums to be held by the Indenture Trustee upon the same trusts as those upon which the sums were held by such Paying Agent; and upon such payment by any Paying Agent to the Indenture Trustee, such Paying Agent shall be released from all further liability with respect to such money.

SECTION 4.04   Existence.  The Issuer shall not take any action, or fail to take any action permitted by law, the result of which would be the Issuer failing to keep in full effect its existence, rights and franchises as a statutory public trust and governmental instrumentality of the Commonwealth under the laws of the Commonwealth.

SECTION 4.05   Certain Negative Covenants.  So long as any Bonds are Outstanding, the Issuer shall not, unless expressly permitted by this Indenture:

(a)      sell, transfer, encumber, exchange, otherwise dispose of, or waive any rights with respect to any of the assets of the Issuer, including any Collections or other Restructuring Property, other than as directed by the Servicer;

(b)      claim any credit on or make any deduction from the principal and interest payable in respect of the Bonds other than amounts that, in accordance with written advice from outside counsel of national standing or a recognized firm of reputable standing within the Commonwealth, are required by law to be withheld from such payments or assert any claim against any present or former holder of the Bonds because of the payment of taxes levied or assessed upon the Issuer;

(c)      dissolve or liquidate in whole or in part;

(d)      at any time insist upon, or plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay or extension law wherever enacted, now or at any time hereafter in force, which may affect the covenants or the performance of this Indenture; and the Issuer (to the extent that it may lawfully do so) will expressly waive all benefit or advantage of any such law, and covenants that it will not hinder, delay or impede the execution of any power herein granted to the Indenture Trustee, but will suffer and permit the execution of every such power as though no such law had been enacted;

(e)      permit the validity or effectiveness of the Transaction Documents to which the Issuer is a party to be impaired, fail to enforce the obligations of counterparties under the Transaction Documents to which the Issuer is a party, or release any Person from any covenants or obligations with respect to the Bonds under the Transaction Documents to which the Issuer is a party;

(f)      fail to observe or perform under any covenant or agreement contained in the Transaction Documents, provided that the sole remedy for a default by the Issuer under the Disclosure Agreement will be an action to compel performance;

(g)      unless otherwise consented to by the Collateral Monitor, which consent may not be unreasonably withheld, delayed or conditioned, incur Issuer Operating Expenses after the Closing Date in any year exceeding the Issuer Operating Expenses Cap;

(h)      permit any lien, charge, excise, claim, security interest, mortgage or other encumbrance to be created on or extended to or otherwise arise upon or burden the assets of the Issuer or any part thereof, or any interest in the assets of the Issuer or the proceeds thereof other than the liens on the Restructuring Property securing this Indenture and the obligations of the Issuer under the Bonds, this Indenture and any related documents or instruments;

21

(i)      fail to all times, to the extent permitted by law, defend, preserve and protect, or cause to be defended, preserved and protected, the pledge of the Restructuring Property and all the rights of the Indenture Trustee and the Bondholders under this Indenture against all claims and demands of all Persons whomsoever;

(j)      fail to execute, acknowledge where appropriate, and deliver, and use its best efforts to cause others to execute, acknowledge where appropriate, and deliver, from time to time promptly at the request of the Indenture Trustee or the Servicer, all such instruments and documents as in the reasonable opinion of the Indenture Trustee or the Servicer, as applicable, are necessary or advisable to carry out the intent and purpose of this Indenture or the Servicing Agreement, as applicable, and to take such other action as may be reasonably necessary to carry out the transactions contemplated hereby and thereby;

(k)      subject to the applicable contractual and legal limitations, take any action that is inconsistent with the maximization of the recoverable value of the Restructuring Property and the Collections thereon or payment of amounts owing on the Bonds; or

(l)      fail to all times, to the extent permitted by law and to the extent not delegated to the Servicer, defend against all claims and demands brought against the Issuer or the Board of Trustees that would adversely affect maximization of the recoverable value of the Restructuring Property and Collections thereon (on a present value basis) or the performance of the Issuer's obligations under the Transaction Documents.

Nothing in this Section 4.05 shall obligate the Issuer to take any action or to incur any fees or expenses unless in the reasonable judgment of the Issuer, the cost of taking such action (i) is included in the Fees and Expenses Reserve, (ii) is an Excluded Expense or (iii) is approved by the Collateral Monitor in advance.

SECTION 4.06   Issuer May Not Consolidate, etc.  The Issuer shall not consolidate or merge with or into any other Person.

SECTION 4.07   No Other Activity.  The Issuer shall not engage in any activity other than as expressly authorized herein and in the GDB Restructuring Act, or required pursuant to the other Transaction Documents.

SECTION 4.08   No Borrowing.  The Issuer shall not (a) issue, incur, assume, guarantee or otherwise become liable, directly or indirectly, for any indebtedness except for the Bonds (including any PIK Amounts), (b) make any loan, advance or credit to, or guarantee (directly or indirectly or by any instrument having the effect of assuring another's payment or performance on any obligation or capability of so doing or otherwise), endorse or otherwise become contingently liable, directly or indirectly, in connection with, the obligations, stocks or dividends of any other Person, (c) own, purchase, repurchase or acquire (or agree contingently to do so) any stock, obligations, assets or securities of, or any other interest in, any other Person other than Eligible Investments made in accordance with Section 11.03, the Restructuring Property or any asset acquired in connection with a transaction in respect of any of the Restructuring Property entered into in accordance with the Servicing Agreement, or (d) make any capital contribution to any other Person.

SECTION 4.09   Capital Expenditures.  Other than Eligible Investments made in accordance with Section 11.04, the Issuer shall not make any expenditure (by long-term or operating lease or otherwise) for the purchase of capital assets (either realty or personalty) other than immaterial expenditures in the ordinary course of business approved by the Collateral Monitor.

SECTION 4.10   Restricted Payments.  The Issuer shall not make any direct payments or distributions from the Collection Account, and the Issuer shall direct the Servicer and any Paying Agent not to, directly or indirectly, make or direct any payments or distributions from the Collection Account except for the payment of Permitted Obligations in accordance with Section 11.01.

SECTION 4.11   Notice of Events of Default.  The Issuer shall give the Indenture Trustee prompt written notice of the occurrence of each of the following events of which the Issuer is aware: (i) any Event of Default; (ii) any Default; (iii) any Servicer Default; (iv) any default by the Collateral Monitor under the Collateral Monitor Agreement; (v) any Transfer Trigger Event, Indemnification Trigger Event or default by GDB under the Keepwell

Agreement; (vi) any transfer by GDB of any Transferred Property under the Transfer Agreement; and (vii) any amendment, modification or waiver under any of the Transaction Documents. The Indenture Trustee shall notify each Registered Bondholder of such occurrence within 20 days of the Indenture Trustee's receipt of notice thereof in accordance with Section 9.06. Nothing in this Section 4.11 shall obligate the Issuer to monitor or independently determine whether any of the events in clauses (i) through (vii) has occurred or is continuing.

SECTION 4.12   GDB Restructuring Act.  The Issuer shall comply with the GDB Restructuring Act in all material respects.

SECTION 4.13   Board of Trustees.   The Issuer shall at all times maintain bylaws that require each member of the Board of Trustees to be Independent (provided that a member of the Board of Trustees shall not fail to be Independent solely as a result of such member's position as a member of the Board of Trustees or, solely in the case of the Executive Director (having the responsibilities and compensation contemplated in the Offering Memorandum as of the Closing Date),  as an officer of the Issuer), have executive experience in finance or with respect to assets like the Restructuring Property and be otherwise qualified to serve on the Board of Trustees.

SECTION 4.14   Further Instruments and Actions.  Upon request of the Indenture Trustee, the Issuer will execute and deliver such further instruments, provide such information as the Issuer may have, and do such further acts as may be reasonably necessary or proper to carry out more effectively the purpose of this Indenture. Nothing in this Section 4.14 shall obligate the Issuer to take any action or to incur any fees or expenses unless in the reasonable judgment of the Issuer, the cost of taking such action (i) is included in the Fees and Expenses Reserve, (ii) is an Excluded Expense or (iii) is approved by the Collateral Monitor in advance.

SECTION 4.15   Tax.  The Issuer shall:

(a)      timely file Internal Revenue Service Form 8281 reporting the Bonds as contingent payment debt instruments as defined in U.S. Treasury Regulations Section 1.1275-4 and reflecting a "comparable yield" equal to the applicable federal rate based on the presumption as set forth in subsection (b)(4)(i)(B) thereof;

(b)      timely file a protective election under U.S. Treasury Regulations Section 301.7701-3 on or before the Closing Date with an effective date as of the Closing Date to elect to be classified as a partnership for U.S. tax purposes in the event that Bondholders are treated as holding equity interests in the Issuer and shall make no entity classification election to the contrary; and

(c)      (i) in the event that the U.S. Internal Revenue Service asserts that the Bonds are characterized as equity interests of the Issuer for U.S. federal income tax purposes, use commercially reasonable efforts to provide, or cause to be provided, such information as is reasonably requested by Bondholders to enable them to comply with their U.S. federal income tax reporting obligations, and (ii) use commercially reasonable efforts to retain or cause the Servicer to retain possession of records and information relevant to the Bondholders' U.S. income tax reporting obligations with respect to all periods through and including the period ending five years after the Final Scheduled Payment Date or, if earlier, the date on which the Bonds have been satisfied in full.

**ARTICLE V**

**THE SERVICER**

SECTION 5.01   The Servicing Agreement.   The Issuer shall enter into any necessary subsequent Servicing Agreement with any successor Servicer in accordance with the terms hereof and on terms substantially similar to those in the Servicing Agreement as in effect on the Closing Date, including that the Indenture Trustee and the Bondholders shall be third-party beneficiaries thereof, unless otherwise consented to by the Bondholders in accordance with the amendment, modification and waiver provisions of the Servicing Agreement as in effect on the Closing Date or otherwise in accordance with Section 5.03.

SECTION 5.02    Management of the Restructuring Property.

(a)       The Issuer shall, in accordance with the authority granted to it under Article 204 of the GDB Restructuring Act, delegate to, and confer upon the Servicer the exclusive authority to manage, service, administer, enforce and take any other action with respect to the Restructuring Property in accordance with the terms of this Indenture and the Servicing Agreement. In accordance with the foregoing, the Issuer shall not enter into any transaction in respect of any of the Restructuring Property unless directed by the Servicer.

(b)       The Issuer shall take commercially reasonable efforts to cooperate with the Servicer in the execution of its duties, including by providing information available to the Issuer reasonably requested by the Servicer.

SECTION 5.03    Removal and Replacement of the Servicer.

(a)       Promptly upon the Indenture Trustee's receipt of the Material Servicer Default Notice and the Issuer's recommendation in respect thereof, but in no event later than 30 days after receipt of any Material Servicer Default Notice, the Indenture Trustee shall deliver such Material Servicer Default Notice and recommendation of the Issuer, if any, to the Bondholders in accordance with Section 13.05 and post such Material Servicer Default Notice in accordance with Section 9.07(b), and shall conduct a solicitation of Bondholder votes pursuant to the form attached hereto as Exhibit F, which shall have a voting period of not less than 30 days and not more than 60 days, regarding whether a Servicer Replacement Event has occurred and, as a consequence, the Servicer should be replaced. Upon the conclusion of such solicitation, the Indenture Trustee shall deliver a notice to the Servicer, the Issuer, the Collateral Monitor and the Bondholders of the results of the Bondholder votes in such solicitation in accordance with Sections 13.04 and 13.05 and post such results in accordance with Section 9.07(b).  If Bondholders holding not less than one-third (or, if an Event of Default has occurred and is continuing, 25%) of the Outstanding Amount deliver affirmative votes in respect of the solicitation, a Servicer Replacement Event shall have occurred and, upon the Servicer's receipt of the notice of the results of the Bondholder vote (such notice, a "Servicer Replacement Event Notice"), the Servicer's appointment shall be terminated pending the appointment of, and transition of servicing obligations to, a successor Servicer. If affirmative votes are not received from Bondholders holding not less than one-third (or, if an Event of Default has occurred and is continuing, 25%) of the Outstanding Amount, the Servicer Default and Material Servicer Default Notice related thereto shall be deemed waived.

(b)       Upon receipt of a Servicer Replacement Event Notice or notice of the Servicer's resignation, the Issuer shall initiate a competitive process, reasonably satisfactory to the Collateral Monitor, for the identification of a possible successor Servicer. Any successor Servicer shall be (i) a Qualified Servicer, (ii) reasonably acceptable to the Collateral Monitor, and (iii) engaged on terms consistent with this Article V and reasonably acceptable to the Collateral Monitor. If the Issuer fails to engage a successor Servicer meeting such requirements within 45 days of receipt of a Servicer Replacement Event Notice or notice of the Servicer's resignation, the Issuer shall engage a successor Servicer designated by the Collateral Monitor (which need not be appointed pursuant to a competitive process). Any successor Servicer shall be engaged for a preliminary 60-day period, during which time the Bondholders shall have the opportunity to object to the identity or terms of engagement of such successor Servicer. If Bondholders holding not less than one-third (or, if an Event of Default shall have occurred and be continuing, 25%) of the Outstanding Amount so object, the Issuer (or if applicable, the Collateral Monitor) shall designate a new successor Servicer or renegotiate any objectionable terms of engagement, as applicable, in accordance with the foregoing. In the absence of such objection, within the 60-day period, the successor Servicer's engagement will become final. If a successor Servicer is not appointed within six months following Issuer's receipt of the Servicer Replacement Event Notice and the failure to appoint a successor Servicer is not due to the Issuer's failure to engage a successor Servicer designated by the Collateral Monitor, the Servicer Default and Material Servicer Default Notices related thereto shall be deemed waived and the Servicer will remain in place. Promptly upon the engagement of a successor Servicer, which in any case shall occur no later than six months following the Issuer's receipt of the Servicer Replacement Event Notice, the Issuer shall provide to the Indenture Trustee and the Bondholders, a Successor Servicer Notice in accordance with Sections 13.04 and 13.05 and post such Successor Servicer Notice in accordance with Section 9.07(b).

## ARTICLE VI

## THE COLLATERAL MONITOR

SECTION 6.01   The Collateral Monitor Agreement.  The Indenture Trustee shall comply with and carry out all of its obligations under and enforce, or cause to be enforced, all rights and remedies of the Indenture Trustee and all obligations of the Collateral Monitor under the Collateral Monitor Agreement. The Indenture Trustee shall enter into the Collateral Monitor Agreement on the Closing Date, and shall enter into any necessary subsequent Collateral Monitor Agreement with any successor Collateral Monitor in accordance with the terms hereof and on terms substantially similar to those in the Collateral Monitor Agreement as in effect on the Closing Date, including that the Bondholders shall be third party beneficiaries thereof, unless otherwise consented to by the Bondholders in accordance with the amendment, modification and waiver provisions of the Collateral Monitor Agreement as in effect on the Closing Date or otherwise in accordance with Section 6.03 and shall direct the Issuer to enter into any necessary subsequent Collateral Monitor Fee Letter with any such successor Collateral Monitor.

SECTION 6.02   Cooperation and Payment by the Issuer.

(a)      The Issuer shall comply with and carry out its obligations under the Collateral Monitor Fee Letter, and shall enter into any other necessary subsequent Collateral Monitor Fee Letter with any successor Collateral Monitor at the direction of the Indenture Trustee in connection with any subsequent Collateral Monitor Agreement.

(b)      The Issuer shall make commercially reasonable efforts to cooperate with the Collateral Monitor to facilitate the execution of it duties, including by providing information available to the Issuer reasonably requested by the Collateral Monitor.

(c)      If the Indenture Trustee is unable or unwilling to engage the Collateral Monitor for any reason at any time, the Issuer shall appoint another Independent Person, acting on behalf of the Bondholders, to engage the Collateral Monitor pursuant to the same terms set forth herein and, as a condition to such appointment, require such Independent Person to fulfill the duties of the Indenture Trustee as set forth in this Article VI to the extent that the Indenture Trustee is unable or unwilling to perform such duties.

SECTION 6.03   Replacement of the Collateral Monitor.  Upon the termination of the Collateral Monitor's engagement, the Indenture Trustee shall notify the Issuer and the Bondholders and accept nominations from the Bondholders for successor Collateral Monitor candidates. The Indenture Trustee shall then submit to a vote of the Bondholders each such nominated candidate and the successor Collateral Monitor shall be the candidate receiving the votes of Bondholders holding not less than a plurality of the Outstanding Amount for which votes are submitted. If the Bondholders fail to nominate any successor Collateral Monitor candidates, the Indenture Trustee shall notify the Issuer, and the Issuer shall undertake a competitive process to identify and designate a successor Collateral Monitor. The Indenture Trustee shall engage any successor Collateral Monitor and the Issuer shall agree to pay the successor Collateral Monitor, which shall occur in any case no later than three months after the Issuer's receipt of notice of the termination of the Collateral Monitor's engagement, for a preliminary 60-day period, in each case on terms substantially similar to those in the Collateral Monitor Agreement and the Collateral Monitor Fee Letter (or on terms otherwise negotiated by the Indenture Trustee after consultation with Bondholders, in the Indenture Trustee's discretion). Upon the preliminary engagement of any successor Collateral Monitor, the Bondholders shall have 60 days to object to the identity (in the case of a successor Collateral Monitor designated by the Issuer) or terms of engagement thereof, and if Bondholders holding not less than 25% of the Outstanding Amount so object, the Indenture Trustee shall designate a new successor Collateral Monitor or renegotiate any objectionable terms of engagement, as applicable, in accordance with the foregoing. In the absence of such objection, within the 60-day period, the successor Collateral Monitor's engagement will become final.

## ARTICLE VII

## DEFEASANCE; SATISFACTION AND DISCHARGE OF INDENTURE

SECTION 7.01   Defeasance of Bonds and Satisfaction and Discharge of Indenture.  The Indenture Trustee, on demand of and at the expense of the Issuer, shall execute proper instruments acknowledging satisfaction

25

and discharge of this Indenture with respect to the Bonds and this Indenture shall cease to be of further effect with respect to the Bonds except as to (i) rights of registration of transfer and exchange, (ii) substitution of mutilated, destroyed, lost or stolen Bonds, (iii) rights of Bondholders to receive payments thereon as provided in this <u>Article VII</u>, (iv) the provisions of <u>Section 4.03</u>, (v) the rights, obligations and immunities of the Indenture Trustee hereunder (including the rights of the Indenture Trustee under <u>Section 9.08</u> and the obligations of the Indenture Trustee under <u>Section 7.02</u>), and (v) the rights of Bondholders as beneficiaries hereof with respect to the property so deposited with the Indenture Trustee payable to all or any of them, when:

(a)        either (i) all Bonds theretofore authenticated and delivered (other than Bonds that have been destroyed, lost or stolen and that have been replaced or paid as provided in <u>Section 2.06</u> and Bonds for whose payment money has theretofore been deposited in trust or segregated and held in trust by the Issuer and thereafter repaid to the Issuer or discharged from such trust, as provided in <u>Section 4.03</u>) have been delivered to the Indenture Trustee for cancellation or (ii) the Issuer has irrevocably deposited or caused to be irrevocably deposited with the Indenture Trustee cash or direct obligations of or obligations guaranteed by the United States of America (which will mature no later than the Business Day immediately before the next Payment Date), in trust for such purpose, in an amount sufficient, without reinvestment, to pay and discharge all principal, interest and any other amounts owing on such Bonds not theretofore delivered to the Indenture Trustee for cancellation;

(b)        the Issuer has paid or caused to be paid all other sums payable hereunder by or on behalf of the Issuer; and

(c)        the Issuer has delivered to the Indenture Trustee an Issuer's Certificate and an Opinion of Counsel, each stating that all conditions precedent herein relating to the satisfaction and discharge of this Indenture have been complied with.

SECTION 7.02   <u>Application of Trust Money</u>.  All monies deposited with the Indenture Trustee pursuant to <u>Section 7.01</u> shall be held in trust and applied by it in accordance with <u>Section 11.01</u>.

SECTION 7.03   <u>Repayment of Monies Held by Paying Agent</u>.  In connection with the satisfaction and discharge of this Indenture with respect to the Bonds, all monies then held by any Paying Agent other than the Indenture Trustee under the provisions of this Indenture with respect to such Bonds shall, upon demand of the Issuer, be paid to the Indenture Trustee to be held and applied according to <u>Section 4.03</u> and <u>Section 7.02</u> and thereupon such Paying Agent shall be released from all further liability with respect to such monies.

SECTION 7.04   <u>Termination of the Trusts Created by Indenture</u>.

(a)        The trusts created hereby and the respective obligations and responsibilities of the Issuer and the Indenture Trustee shall terminate upon the cancellation of all Bonds, which will occur upon the earliest of (i) the surrender for payment in full of all principal, interest and all other amounts owing on the Bonds, (ii) the redemption of the Bonds for a pro rata distribution of all remaining Available Cash in accordance with the terms of this Indenture after the disposition or termination of the Restructuring Property (in accordance with the terms of all Loans constituting such Restructuring Property), and (iii) the redemption of the Bonds for a pro rata distribution of all remaining Available Cash in accordance with this Indenture, after liquidation of all remaining Restructuring Property pursuant to <u>Section 7.05</u> or, if no such liquidation occurs pursuant to <u>Section 7.05</u>, a pro rata distribution of all remaining Available Cash, if any, in each case, in accordance with the terms of this Indenture. The Indenture Trustee shall promptly notify the Issuer of any prospective termination pursuant to this <u>Section 7.04(a)</u>.

(b)        Written notice of any termination, specifying the Payment Date upon which the Bondholders must deliver their Bonds to the Indenture Trustee for payment of the final distribution and retirement of the Bonds, shall be given promptly by the Indenture Trustee to Bondholders mailed not later than 10 days prior to the date on which such final distribution is expected to occur specifying (i) the Payment Date upon which final payment of the Bonds shall be made, (ii) the offices of the Indenture Trustee where Bonds may be delivered for presentation and surrender in exchange for such final payment, (iii) the amount of any such final payment and (iv) if applicable, that the Record Date otherwise applicable to such Payment Date is not applicable and the record date that is applicable. The final distribution to each Bondholder will be made only upon cancellation of such Bondholder's Bond after delivery thereof at any office or agency of the Indenture Trustee specified in the notice of termination. A copy of such notice

26

shall also be posted by the Issuer on EMMA. The Indenture Trustee shall give such notice to the Bond Registrar (if other than the Indenture Trustee) at the time such notice is given to Bondholders. Upon presentation and surrender of the Bonds, the Indenture Trustee shall cause to be distributed to Bondholders amounts distributable on such Payment Date pursuant to the Priority of Payments.

(c)      Any Outstanding Bonds will be redeemed concurrently with the termination of this Indenture.

SECTION 7.05      Liquidation of the Restructuring Property; Final Scheduled Payment Date.

(a)      Unless all principal, interest and other amounts owing on the Bonds have been or will have been paid and this Indenture has or will have been terminated prior to or on the Final Scheduled Payment Date, all Restructuring Property remaining after the Final Scheduled Payment Date will thereafter be liquidated by the Servicer in accordance with the Servicing Agreement and the proceeds thereof, which shall constitute Collections, will be deposited in the Collection Account and shall be distributed in accordance with the Priority of Payments on the date that is six months after the Final Scheduled Payment Date (or such other date thereafter as reasonably determined by the Issuer, the Servicer and the Collateral Monitor) (such distribution date, the "Liquidation Payment Date"); provided that the Final Scheduled Payment Date may be delayed in accordance with Section 7.05(b). Upon the liquidation of all remaining Restructuring Property and distribution of all remaining Collections in accordance with the Priority of Payment, the Bondholders shall have no further claims against the Issuer in respect of the Bonds.

(b)      No later than 30 days after the Indenture Trustee's receipt of the Final Scheduled Payment Date Servicing Report provided by the Servicer in accordance with the Servicing Agreement, the Indenture Trustee shall distribute such report to the Bondholders and, unless directed otherwise by the Issuer in accordance with this Section 7.05(b), shall conduct a Bondholder solicitation to determine whether the Final Scheduled Payment Date shall be delayed by one year and the Restructuring Property shall continue to be managed by the Servicer. If Bondholders holding not less than 25% of the Outstanding Amount for which votes are submitted vote against such liquidation and to delay the Final Scheduled Payment Date by one year, then the Issuer shall reschedule the Final Scheduled Payment Date for the date that is one year after the currently scheduled Final Scheduled Payment Date and schedule additional interim Payment Dates, in accordance with the existing schedule of Payment Dates, and the Issuer shall direct the Servicer to continue managing the Restructuring Property and depositing Collections into the Collection Account and distributions shall be made from the Collection Account in accordance with the Priority of Payments on such newly scheduled Payment Dates. The Indenture Trustee shall provide notice of the results of such Bondholder solicitation and, if applicable, the rescheduled Final Scheduled Payment Date and newly scheduled Payment Dates to the Issuer, the Servicer, the Collateral Monitor and the Bondholders. The Issuer shall direct the Indenture Trustee to not conduct such Bondholder solicitation only if, after consultation with the Collateral Monitor and review of the Final Scheduled Payment Date Servicing Report, the Board of Trustees determines in good faith that the projected Collections after the Final Scheduled Payment Date are unreasonably small in comparison to the expected cost to continue to manage the remaining Restructuring Property. If the Board of Trustees makes such a determination, the Issuer shall provide notice of such determination to the Indenture Trustee, to make available to the Bondholders.

## ARTICLE VIII

## EVENTS OF DEFAULT; REMEDIES

SECTION 8.01      Events of Default.   "Event of Default," wherever used herein, means any one of the following events (whatever the reason for such Event of Default and whether it shall be voluntary or involuntary or be effected by operation of law or pursuant to any judgment, decree or order of any court or any order, rule or regulation of any administrative or governmental body):

(a)      a failure by the Issuer to accrue any PIK Amount or to make any required payment in respect of the Bonds from Available Cash on the date on which the same is due, in each case as required pursuant to the terms of this Indenture;

(b)      a failure by the Issuer to observe or perform any covenant or agreement (other than a covenant or agreement referred to in Section 8.01(a)) contained in this Indenture, and such failure continues or is not cured for a

period of 60 days after written notice by the Indenture Trustee or Bondholders holding not less than 25% of the Outstanding Amount;

(c)     the Issuer, pursuant to or within the meaning of any Bankruptcy Laws: (i) commences proceedings to be adjudicated bankrupt or insolvent; (ii) consents to the institution of bankruptcy or insolvency proceedings against it; (iii) files, or consents to the filing of, a petition or answer or consent seeking an arrangement of debt, reorganization, dissolution, winding up or relief under applicable Bankruptcy Laws; (iv) consents to the appointment of a receiver, interim receiver, receiver and manager, liquidator, assignee, trustee, sequestrator or other similar official of it or for all or any substantial part of its property; provided, for the avoidance of doubt, that any such official appointed in respect of an obligor under any Restructuring Property will not constitute an Event of Default under this clause (iv); (v) makes a general assignment for the benefit of its creditors; (vi) is deemed to be a covered territorial instrumentality under PROMESA or is otherwise determined to be subject to oversight under any applicable Bankruptcy Law; or (vii) takes any corporate or similar action in furtherance of any of the foregoing;

(d)     a court of competent jurisdiction enters an order or decree under any Bankruptcy Law that: (i) is for relief against the Issuer in a proceeding in which the Issuer is to be adjudicated bankrupt or insolvent; (ii) approves as properly filed a petition seeking reorganization, arrangement, adjustment or composition of or in respect of the Issuer under any Bankruptcy Law; (iii) appoints a receiver, interim receiver, receiver and manager, liquidator, assignee, trustee, sequestrator or other similar official of the Issuer for all or any substantial part of the property of the Issuer; provided, for the avoidance of doubt, that any such order or decree entered in respect of an obligor under any Restructuring Property will not constitute an Event of Default under this clause (iii); or (iv) orders the liquidation, dissolution or winding up of the Issuer and the order or decree remains unstayed and in effect for 60 consecutive days;

(e)     any legislation is enacted, governmental action is taken (including any action by the Government, the Commonwealth instrumentalities or any Government-controlled or managed entities, including entities with directors or management controlled or appointed by the Government and any failure by the Government or any Commonwealth instrumentality to observe or perform the non-impairment covenant set forth in Article 407 of the GDB Restructuring Act) or any party (other than an obligor on the Restructuring Property) is determined by a final, non-appealable order or admitted in writing by the Issuer to have rights that, in any such case, adversely affect (i) the receipt of current or future Collections on the Restructuring Property to which the Issuer is entitled (other than by reason of (A) a failure, delay or default of the obligor under such Restructuring Property, (B) an obligor being subject to a proceeding under PROMESA or to any provision thereof or (C) changes in taxation or restrictions on the enforcement of rights or remedies, so long as such changes or restrictions are not directed solely at the Issuer, the Restructuring Property, the Bonds or the Bondholders relative to any other entity, asset, security or security holder) in respect of assets having an aggregate value on the Closing Date of $25 million or more (as determined by the face amount of any such asset, in the case of Loans, or the book value of any such asset, in the case of other assets) or (ii) the binding effect or enforcement of, in accordance with their respective terms, the GDB Restructuring Act, the Qualifying Modification, the Public Entity Trust, this Indenture, the Bonds or the liens on the Restructuring Property;

(f)     any entry of a judgment against the Issuer in the amount of $10 million or more;

(g)     the occurrence of a Transfer Default; and

(h)     the Issuer permits the validity or effectiveness of the Transaction Documents to be impaired, and such impairment affects the enforceability of or payments on the Bonds, or any person to be released from any covenants or obligations with respect to the Bonds.

In no event shall the Issuer be deemed to be in default hereunder as a result of there being insufficient Available Cash to pay in cash any or all interest or principal on the Bonds on any Payment Date.

Notwithstanding any other provision of this Indenture, a default under the Disclosure Agreement (including a failure by the Issuer to perform any covenant or agreement contained therein) will not be deemed an Event of Default and the sole remedy in the event of any such failure of the Issuer to comply with the Disclosure Agreement will be an action to compel performance under the Disclosure Agreement. In the event of a failure of the Issuer to

comply with any provision of the Disclosure Agreement, the Indenture Trustee may and, at the request of Bondholders holding not less than 25% of the Outstanding Amount, shall (but only to the extent it has been indemnified to its reasonable satisfaction from any loss, liability, or expense, including without limitation, reasonable fees and out-of-pocket expenses of its attorneys), take such actions as may be necessary and appropriate, including seeking mandamus or specific performance by court order, to cause the Issuer to comply with its obligations under the Disclosure Agreement.

SECTION 8.02   Acceleration; Rescission and Annulment.

(a)       If an Event of Default occurs and is continuing, the Indenture Trustee may, and upon direction of Bondholders holding not less than 25% of the Outstanding Amount shall, declare the principal of such Bonds and accrued but unpaid interest and any other amounts owed thereon to be immediately due and payable by a notice in writing to the Issuer. Interest shall continue to accrue daily on such accelerated amount, with each day's interest immediately due and payable, until all amounts due are paid or acceleration of the Bonds has been rescinded pursuant to Section 8.02(b).

(b)       At any time after such declaration of acceleration has been made, Bondholders holding not less than a majority of the Outstanding Amount, by written notice to the Issuer and the Indenture Trustee, may rescind and annul such declaration and its consequences if:

(i)       the Issuer has paid or deposited, or caused to be paid or deposited, with the Indenture Trustee a sum sufficient to pay:

A.       all payments of principal of and interest on such Bonds and all other amounts that would then be due and payable on such Bonds or in accordance with the terms of such Bonds if the Event of Default giving rise to such acceleration had not occurred; and

B.       all sums paid by the Indenture Trustee hereunder and the reasonable compensation, expenses, and disbursements and advances of the Indenture Trustee and its agents and counsel; or

(ii)       all Events of Default, other than the nonpayment of the principal or interest of the Bonds that has become due solely by such acceleration, have been cured or waived as provided in Section 8.12.

(c)       No such rescission shall affect any subsequent Default or impair any right consequent thereto.

SECTION 8.03   Remedies.

(a)       If an Event of Default occurs and is continuing, the Indenture Trustee shall continue to make payments on each Payment Date from the Collection Account in accordance with the Priority of Payments.

(b)       If an Event of Default occurs and is continuing, the Indenture Trustee (i) upon written request of Bondholders holding not less than 25% of the Outstanding Amount, shall proceed to protect and enforce its rights and the rights of the Bondholders by such of the following remedies as the Indenture Trustee shall deem most effective to protect and enforce such rights or such of the following remedies as Bondholders holding not less than 25% of the Outstanding Amount shall instruct; and (ii) may otherwise exercise the following remedies if (y) Bondholders holding not less than 25% of the Outstanding Amount consent thereto or (z) the proceeds of such exercise would be sufficient to pay in full the principal of and the accrued but unpaid interest and any other amounts owed under the Bonds as of the date of such exercise (collectively, the "Remedy Limitations"):

(i)       initiation of Proceedings to (A) collect all amounts due in respect of the Bonds limited, upon recovery thereunder, to the Restructuring Property; (B) enforce any and all rights of the Bondholders hereunder, (C) enforce any covenant or agreement in this Indenture or in aid of the exercise of any power granted herein or (D) enforce any other proper remedy or legal or equitable right vested in the Indenture Trustee by this Indenture or by law;

(ii)        enforcement of the Statutory Lien by taking possession of the Restructuring Property, selling any of the Restructuring Property or exercising such other rights or remedies in respect of the Restructuring Property to the same extent as the Issuer and the Servicer (except that the Indenture Trustee shall not be bound by the servicing standards set forth in the Servicing Agreement or the restrictions set forth in Section 5.03(b)), but subject to the requirements in Section 8.03(e);

(c)        In determining such sufficiency or insufficiency with respect to Section 8.03(b), the Indenture Trustee may, but need not, obtain and rely upon an opinion of an independent investment banking or accounting firm of national reputation as to the feasibility of such proposed action and as to the sufficiency of the Restructuring Property for such purpose. If the Bondholders do not direct or approve the Indenture Trustee's exercise of remedies in respect of the Restructuring Property pursuant to Section 8.03(b), the Issuer shall maintain possession of the Restructuring Property and the Servicer will continue to manage the Restructuring Property, and the Collections thereon will be distributed in accordance with the Priority of Payments.

(d)        If the Indenture Trustee proceeds to enforce the Statutory Lien pursuant to Section 8.03(b)(ii) through the sale of any of the Restructuring Property or any portion thereof or rights or interest therein, it may do so in any manner or method and at any time and place determined by itself or by Bondholders holding not less than 25% of the Outstanding Amount, subject to the Asset Restrictions.   In connection with any such sale of Restructuring Property, which may be conducted through one or more public or private sales, the Indenture Trustee shall afford the Bondholders public notice and information as to the conduct of such sale, and the Indenture Trustee and/or any Bondholder may, by following the procedures outlined in such notice, submit a bid for the purchase of the assets to be sold, and the Indenture Trustee shall consider any and all such bids on the same basis that it considers any other bids submitted by any other party or parties.  Any proceeds of any enforcement of the Statutory Lien shall constitute Collections and shall be deposited into the Collection Account by the Indenture Trustee for distribution in accordance with the Priority of Payments on the next Payment Date. The Indenture Trustee shall have no liability with respect to the amount of any proceeds or the adequacy thereof to make payments in full on the Bonds.

(e)        Notwithstanding anything to the contrary in this Indenture, if the Indenture Trustee obtains possession of the Restructuring Property at any time, the Indenture Trustee will comply with the Asset Restrictions with respect to such Restructuring Property. In any transfer, assignment, sale or disposition of a Loan Asset subject to the Asset Restrictions, the (i) Indenture Trustee shall clearly indicate in the terms of such transfer, assignment, sale or disposition that such Loan Asset is and will remain subject to the Asset Restrictions and (ii) such transfer, assignment, sale or disposition shall be conditioned upon the acquirer of such Loan Asset delivering to the Issuer and AAFAF a written agreement acknowledging the applicability of the Asset Restrictions to such Loan Asset and agreeing to comply with such Asset Restrictions in all respects.

(f)        In any Proceedings brought by the Indenture Trustee (and also any Proceedings involving the interpretation of any provision of this Indenture to which the Indenture Trustee shall be a party), the Indenture Trustee shall be held to represent all the Bondholders, and it shall not be necessary to make any Bondholder a party to any such Proceedings.

(g)        If an Event of Default occurs and is continuing for a period of not less than 30 days, or the Issuer fails to pay all Outstanding Amounts on or prior to the Final Scheduled Payment Date, the Indenture Trustee may, and upon the direction of Bondholders holding not less than 25% of the Outstanding Amount shall, apply to any Puerto Rico Court of competent jurisdiction for the appointment of a receiver for the Issuer. Such receiver so appointed shall have, hold, use, operate, manage, and control the Restructuring Property for the benefit of the Bondholders and shall exercise all the rights and powers of the Issuer with respect to such Restructuring Property as the Issuer itself might do. Such receiver shall act under the direction and supervision of the court that appointed it and will at all times be subject to the orders and decrees of such court and may be removed thereby. The Servicing Agreement will remain in effect notwithstanding the appointment of such a receiver, subject to removal of the Servicer in accordance with the terms of the Servicing Agreement.

(h)        If an Event of Default occurs and is continuing, the Indenture Trustee will provide notice to the Bondholders if required by Section 9.06.

(i)      Subject to Article IX, if an Event of Default occurs and is continuing, the Indenture Trustee shall be under no obligation to exercise any of the rights or powers under this Indenture at the request or direction of any of the Bondholders if the Indenture Trustee reasonably believes it will not be adequately indemnified against the costs, expenses and liabilities which might be incurred by it in complying with such request.

SECTION 8.04   Indenture Trustee May File Proofs of Claim.

(a)      In case there shall be pending, relative to the Issuer, GDB or any Person having or claiming an ownership interest in the Restructuring Property, Proceedings under any applicable Bankruptcy Laws, or in case a receiver, assignee or trustee in bankruptcy or reorganization, liquidator, sequestrator or similar official shall have been appointed for or taken possession of the Issuer, GDB or such other Person or the Restructuring Property, or in case of any other comparable judicial Proceedings relative to the Issuer, GDB or such other Person, or to the creditors or property of the Issuer, GDB or such other Person, then, irrespective of whether the principal of any Bonds shall then be due and payable as therein expressed or by declaration or otherwise and irrespective of whether the Indenture Trustee shall have made any demand pursuant to the provisions of this Section 8.04, the Indenture Trustee shall be entitled and empowered, by intervention in such Proceedings or otherwise:

(i)      to file and prove a claim or claims for the whole amount of principal, interest and any other amounts owing and unpaid in respect of the Bonds or under any of the Transaction Documents and to file such other papers or documents as may be necessary or advisable in order to have the claims of the Indenture Trustee (including any claim for reasonable compensation to the Indenture Trustee and each predecessor Indenture Trustee, and their respective agents, attorneys and counsel, and for reimbursement of all expenses and liabilities incurred, and all advances made, by the Indenture Trustee and each predecessor Indenture Trustee, except as a result of willful misconduct or gross negligence) and of the Bondholders allowed in such Proceedings;

(ii)      unless prohibited by applicable law and regulations, to vote on behalf of the Bondholders in any election of a trustee, a standby trustee or Person performing similar functions in any such Proceedings;

(iii)      to collect and receive any monies or other property payable or deliverable on any such claims and to distribute all amounts received with respect to the claims of the Bondholders and of the Indenture Trustee on their behalf; and

(iv)      to file such proofs of claim and other papers or documents as may be necessary or advisable in order to have the claims of the Indenture Trustee and the Bondholders allowed in any such Proceedings; and any trustee, receiver, liquidator, custodian or other similar official in any such Proceeding is hereby authorized by each of such Bondholders to make payments to the Indenture Trustee and, in the event that the Indenture Trustee shall consent to the making of payments directly to such Bondholders, to pay to the Indenture Trustee such amounts as shall be sufficient to cover reasonable compensation to the Indenture Trustee, each predecessor Indenture Trustee and their respective agents, attorneys and counsel, and all other expenses and liabilities incurred, and all advances made, by the Indenture Trustee and each predecessor Indenture Trustee except as a result of willful misconduct or gross negligence.

(b)      Nothing contained herein shall be deemed to authorize the Indenture Trustee to authorize or consent to or vote for or accept or adopt on behalf of any Bondholder any plan of reorganization, arrangement, adjustment or composition affecting the Bonds or the rights of any Bondholder or to authorize the Indenture Trustee to vote in respect of the claim of any Bondholder in any such Proceeding except, as aforesaid, to vote for the election of a trustee in bankruptcy or similar Person.

SECTION 8.05   Enforcement of Bondholder Rights Under Transaction Documents.

(a)      The Indenture Trustee, upon the written request of Bondholders holding not less than 25% of the Outstanding Amount, shall enforce all third-party beneficiary rights it has under any of the Transaction Documents of which it is a third-party beneficiary, on behalf of the Bondholders, through the exercise of any remedy available thereunder. The Indenture Trustee, upon the written request of Bondholders holding not less than 25% of the

Outstanding Amount, shall protect and enforce all rights and remedies of the Bondholders and all obligations of the applicable counterparty under any of the Transaction Documents to which the Indenture Trustee is a party, through the exercise of any remedy available thereunder.

(b)     Notwithstanding the foregoing, the Indenture Trustee shall be under no obligation to exercise any rights or powers vested in it by any of the Transaction Documents or enforce any rights or claims of the Bondholders or obligations of any of the counterparties under any of the Transaction Documents, at the request, order or direction of any of the Bondholders, unless such Bondholders shall have offered to the Indenture Trustee security or indemnity reasonably satisfactory to it against the costs, expenses and liabilities (including the reasonable fees of counsel) that may be incurred therein or thereby.

SECTION 8.06   Possession of Bonds by Trustee Not Required.   All rights of action and of asserting claims under this Indenture, or under any of the Bonds, may be enforced by the Indenture Trustee without the possession of any of the Bonds or the production thereof in any trial or other Proceedings relative thereto, and any such action or Proceedings instituted by the Indenture Trustee shall be brought in its own name as trustee of an express trust, and any recovery of judgment, subject to the payment of the expenses, disbursements and compensation of the Indenture Trustee, each predecessor Indenture Trustee and their respective agents and attorneys, shall be for the ratable benefit of the Bondholders.

SECTION 8.07   Limitation of Suits.   No Bondholder shall have any right to institute any Proceeding, judicial or otherwise, with respect to this Indenture or for the appointment of a receiver or trustee, or for any other remedy hereunder, unless (a) such Bondholder has previously given written notice to the Indenture Trustee of a continuing Event of Default, (b) Bondholders holding not less than 25% of the Outstanding Amount have made written request to the Indenture Trustee to institute such Proceeding in respect of such Event of Default in its own name, (c) such Bondholder or Bondholders have offered to the Indenture Trustee security or indemnity reasonably satisfactory to it against the costs, expenses and liabilities to be incurred in complying with such request, (d) the Indenture Trustee for at least 30 days after its receipt of such notice, request and offer of indemnity has failed to institute such Proceedings and (e) no direction inconsistent with such Bondholder's written request has been given to the Indenture Trustee during such 30-day period by Bondholders holding not less than a majority of the Outstanding Amount.

Notwithstanding the foregoing, the right of any Bondholder to receive payment or delivery, as the case may be, of cash interest or principal, on or after the respective dates on which the same are due and payable from such Bondholder's ratable share of Available Cash, or to bring suit for the enforcement of any such payment or delivery, as the case may be, on or after such respective dates against the Issuer, may not be impaired or affected without the consent of such Bondholder.

It is understood and intended that no Bondholder shall have any right in any manner by virtue of, or by availing of, any provision of this Indenture to affect, disturb or prejudice the rights of any other Bondholders or to obtain or to seek to obtain priority or preference over any other Bondholders or to enforce any right under this Indenture, except in the manner herein provided, and that all suits, actions and Proceedings at law or in equity shall be instituted, had and maintained in the manner herein provided and for the equal benefit of all Bondholders.

SECTION 8.08   Restoration of Rights and Remedies.   If the Indenture Trustee or any Bondholder has instituted any Proceeding to enforce any right or remedy under this Indenture and such Proceeding has been discontinued or abandoned for any reason or has been determined adversely to the Indenture Trustee or to such Bondholder, then and in every such case the Issuer, the Indenture Trustee and the Bondholders shall, subject to any determination in such Proceeding, be restored severally and respectively to their former positions hereunder, and thereafter all rights and remedies of the Indenture Trustee and the Bondholders shall continue as though no such Proceeding had been instituted.

SECTION 8.09   Rights and Remedies Cumulative.   No right or remedy herein conferred upon or reserved to the Indenture Trustee or to the Bondholders is intended to be exclusive of any other right or remedy, and every right and remedy shall, to the extent permitted by law, be cumulative and in addition to every other right and remedy given hereunder or now or hereafter existing at law or in equity or otherwise. The assertion or employment of any

right or remedy hereunder, or otherwise, shall not prevent the concurrent assertion or employment of any other appropriate right or remedy.

SECTION 8.10    Delay or Omission Not a Waiver.  No delay or omission of the Indenture Trustee or any Bondholder to exercise any right or remedy accruing upon any Default or Event of Default shall impair any such right or remedy or constitute a waiver of any such Default or Event of Default or an acquiescence therein. Every right and remedy given by this Article VIII or by law to the Indenture Trustee or to the Bondholders may be exercised from time to time, and as often as may be deemed expedient, by the Indenture Trustee or by the Bondholders, as the case may be.

SECTION 8.11    Direction by Bondholders.  Subject to Section 9.02, Bondholders holding not less than 25% of the Outstanding Amount  (or such other amount as specifically provided for herein) shall have the right to direct the manner, time, method and place for exercising any remedy available to the Indenture Trustee with respect to the Bonds or any Transaction Document or exercising any trust or power conferred on the Indenture Trustee, including the manner, time, method and place for any sale of the Restructuring Property; provided that such direction shall not be in conflict with any rule of law, this Indenture or, if applicable, such other Transaction Document and subject to Sections 8.05 and 9.01, the Indenture Trustee need not take any action that it determines would be illegal or may not lawfully be taken, might subject it to personal liability or would be unduly prejudicial to the rights of any Bondholders not consenting to such action. The Indenture Trustee may take any other action deemed proper by the Indenture Trustee that is not inconsistent with any such direction.

SECTION 8.12    Waiver of Events of Default.  Prior to the declaration of the acceleration of the Bonds as provided in Section 8.02 or the liquidation or sale of the Restructuring Property pursuant to Section 8.03, Bondholders holding not less than a majority of the Outstanding Amount may, on behalf of all Bondholders waive any Event of Default under this Indenture except an Event of Default under Section 8.01(a), 8.01(c) or 8.01(d) or an Event of Default resulting from, or in respect of, a failure by the Issuer to observe or perform any covenant or provision of this Indenture that cannot be modified without the waiver or consent of each affected Bondholder. No such waiver shall impair such Bondholders' rights with respect to subsequent Defaults.

SECTION 8.13    Undertaking for Costs.  All parties to this Indenture agree, and each Bondholder or Beneficial Owner by such Bondholder's acceptance of such Bond or beneficial interest therein, as the case may be, shall be deemed to have agreed, that any court may in its discretion require, in any suit for the enforcement of any right or remedy under this Indenture, or in any suit against the Indenture Trustee for any action taken, suffered or omitted by it as Indenture Trustee, any party litigant in such suit of an undertaking to pay the costs of such suit, and that such court may in its discretion assess reasonable costs, including reasonable attorneys' fees, against any party litigant in such suit, having due regard to the merits and good faith of the claims or defenses made by such party litigant; but the provisions of this Section 8.13 shall not apply to (a) any suit instituted by the Indenture Trustee, (b) any suit instituted by any Bondholder, or group of Bondholders, in each case, holding not less than 25% of the Outstanding Amount or (c) any suit instituted by any Bondholder for the enforcement of the payment of principal of or interest or any other amount due on any Bond on or after the respective due dates expressed in such Bond and in this Indenture.

SECTION 8.14    Action on Bonds.  The Indenture Trustee's right to seek and recover judgment on the Bonds or under this Indenture shall not be affected by the seeking, obtaining or application of any other relief under or with respect to this Indenture. Neither the Statutory Lien in favor of the Indenture Trustee for the benefit of the Bondholders nor any rights or remedies of the Indenture Trustee or the Bondholders shall be impaired by the recovery of any judgment by the Indenture Trustee against the Issuer or by the levy of any execution under such judgment upon any portion of the Restructuring Property. Any money or property collected by the Indenture Trustee shall be applied in accordance with the Priority of Payments.

SECTION 8.15    Liability of Issuer Limited to Restructuring Property.  Notwithstanding any provision of this Indenture or any of the Bonds to the contrary, all payments or distributions made under this Indenture shall be made only from the Restructuring Property and, with respect to payments or distributions made to Bondholders on each Payment Date, only to the extent of Available Cash in the Collection Account. Except as otherwise provided in this Indenture, each Bondholder, by acceptance of such Bond, agrees that it will look solely to the Restructuring Property to the extent available for payment and distribution to such Bondholder as provided in this Indenture. Each

Bondholder, by acceptance of such Bond, further acknowledges and agrees that the Issuer has no material assets or sources of funds, other than the Restructuring Property. Nothing in this Indenture shall obligate the Issuer to take any action or to incur any fees or expenses unless in the reasonable judgment of the Issuer, the cost of taking such action (i) is included in the Fees and Expenses Reserve, (ii) is an Excluded Expense or (iii) is approved by the Collateral Monitor in advance.

Each Bondholder, by acceptance of such Bond, agrees that (i) the Bonds shall not constitute a debt, general obligation or a pledge of the good faith and credit or taxing power of the Commonwealth, GDB, or any other public instrumentality or political subdivision of the Commonwealth other than the Issuer, and that as to the Issuer, the Bonds constitute special limited obligations of the Issuer payable solely from the Restructuring Property and, in certain limited circumstances, from claims asserted against GDB under the Keepwell Agreement, (ii) the issuance of the Bonds does not obligate the Commonwealth, GDB, or any other public instrumentality or political subdivision of the Commonwealth to levy any tax for the payment of the principal of or interest on the Bonds and (iii) the Issuer has no taxing power.

The Issuer has not independently verified any information relating to the Commonwealth, the Restructuring Property, the obligors on the Restructuring Property or the status of repayments on the Restructuring Property or the Collections, or as to the ownership of, or condition of, any portion of the Restructuring Property, and the Issuer makes no representations with respect to such matters, or as to the adequacy or sufficiency of the Restructuring Property or the Collections to make payments on the Bonds or to pay the other obligations of the Issuer, including the Issuer's obligations under this Indenture.

**ARTICLE IX**

**THE INDENTURE TRUSTEE**

SECTION 9.01   Duties of Indenture Trustee.  The Indenture Trustee undertakes to perform such duties and only such duties as are specifically set forth in this Indenture and any other Transaction Documents to which it is a party.

(a)       The Indenture Trustee, upon receipt of all resolutions, certificates, statements, opinions, reports, documents, orders or other instruments furnished to the Indenture Trustee that shall be specifically required to be furnished pursuant to any provision of this Indenture or another Transaction Document, shall examine them to determine whether they conform on their face to the requirements of this Indenture or such Transaction Document, as applicable.

(b)       No provision of this Indenture shall be construed to relieve the Indenture Trustee from liability for its own gross negligent action, its own gross negligent failure to act, or its own willful misconduct; provided, however, that:

(i)       the duties and obligations of the Indenture Trustee shall be determined solely by the express provisions of this Indenture, the Indenture Trustee shall not be liable except for the performance of such duties and obligations as are specifically set forth in this Indenture, no implied covenants or obligations shall be read into this Indenture against the Indenture Trustee, the permissive right of the Indenture Trustee to do things enumerated in this Indenture shall not be construed as a duty and the Indenture Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon any resolutions, certificates, statements, opinions, reports, documents, orders or other instruments furnished to the Indenture Trustee and conforming on their face to the requirements of this Indenture;

(ii)       the Indenture Trustee shall not be personally liable for an error of judgment made by a Trust Officer, unless it shall be proved that the Indenture Trustee was grossly negligent in performing its duties in accordance with the terms of this Indenture;

(iii)        the Indenture Trustee shall not be personally liable with respect to any action taken, suffered or omitted to be taken in accordance with this Indenture, any other Transaction Documents or the direction of Bondholders holding not less than 25% of the Outstanding Amount relating to the time, method and place of conducting any proceeding for any remedy available to the Indenture Trustee, or exercising or omitting to exercise any trust or power conferred upon the Indenture Trustee under this Indenture; and

(iv)        the Indenture Trustee, or a Trust Officer thereof, shall only be charged with actual knowledge of any default, Servicer Default, an Event of Default or a breach of any representation or warranty by the Servicer, GDB or the Issuer under any Transaction Document if a Trust Officer of the Indenture Trustee actually knows of such default, Servicer Default, Event of Default or breach or receives written notice thereof.

(c)        The Indenture Trustee hereby accepts its contractual duties to the Bondholders to perform its obligations under the Transaction Documents to which it is a party, to enforce its rights and the obligations of the counterparties under such Transaction Documents, and to perform its obligations hereunder in respect of the Transaction Documents to which it is a third-party beneficiary on behalf of the Bondholders.

(d)        The Indenture Trustee shall not be required to expend or risk its own funds or otherwise incur financial liability in the performance of any of its duties under this Indenture, or in the exercise of any of its rights or powers, if there shall be reasonable grounds for believing that the repayment of such funds or adequate indemnity against such risk or liability is not reasonably assured to it.

(e)        Notwithstanding anything to the contrary in this Indenture, the Indenture Trustee shall provide to the Servicer, upon request, copies of any documents in its possession relating to the Restructuring Property. The Indenture Trustee shall make available to the Servicer such copies or originals of documents as are necessary or desirable to permit the Servicer to service, manage, or otherwise enforce contractual rights with respect to the Restructuring Property.

SECTION 9.02    Rights of Indenture Trustee.  Except as otherwise provided in Sections 9.01 and 9.03:

(a)        the Indenture Trustee shall not be liable for any action it takes or omits to take in reliance on an Issuer's Certificate or Opinion of Counsel from the appropriate party;

(b)        the Indenture Trustee may rely and shall be protected in acting or refraining from acting upon any resolution, Issuer's Certificate, Opinion of Counsel, certificate of an authorized signatory, certificate of auditors or any other certificate, statement, instrument, opinion, report, notice, request, consent, order, appraisal, bond or other paper or document believed by it to be genuine and to have been signed or presented by the proper party or parties;

(c)        the Indenture Trustee may consult with counsel and any Opinion of Counsel shall be full and complete authorization and protection in respect of any action taken or suffered or omitted by it under this Indenture and in accordance with such Opinion of Counsel;

(d)        the Indenture Trustee shall be under no obligation to exercise any of the rights or powers vested in it by this Indenture or the other Transaction Documents, or to institute, conduct or defend any litigation under this Indenture, or in relation to this Indenture or the other Transaction Documents, at the request, order or direction of any of the Bondholders pursuant to the provisions of this Indenture or the other Transaction Documents, unless such Bondholders shall have offered to the Indenture Trustee security or indemnity reasonably satisfactory to it against the costs, expenses and liabilities (including the reasonable fees of counsel) that may be incurred therein or thereby;

(e)        neither the Indenture Trustee in its individual capacity nor any of its owners, beneficiaries, agents, officers, directors, employees, Affiliates, successors or assigns shall be personally liable for the payment of any amount on the Bonds or for the agreements of the Issuer contained in this Indenture;

(f)        the Indenture Trustee shall not be bound to recalculate, reverify, or make any investigation into the facts of matters stated in any certificate, resolution, statement, instrument, opinion, report, notice, request, consent,

35

order, approval, bond or other paper or document, unless requested in writing to do so by Bondholders holding not less than 25% of the Outstanding Amount who have agreed to provide indemnity pursuant to Section 9.02(d). However, nothing in this clause shall derogate from the obligation of the Indenture Trustee to observe any applicable law prohibiting disclosure of information regarding the obligors;

(g)      the Indenture Trustee may execute any of the trusts or powers under this Indenture or perform any duties under this Indenture either directly or by or through agents or attorneys or a custodian;

(h)      the right of the Indenture Trustee to perform any discretionary act enumerated in this Indenture shall not be construed as a duty, and the Indenture Trustee shall not be answerable for other than its gross negligence or willful misconduct in the performance of such act; and

(i)      the Indenture Trustee shall not be responsible for delays or failure in performance resulting from acts beyond its control (such acts include but are not limited to acts of God, strikes, lockouts, riots and acts of war). The Indenture Trustee shall use reasonable efforts consistent with accepted practices in the banking industry to resume performance as soon as practicable under the circumstances.

For the avoidance of doubt, the Indenture Trustee shall not have any duty or obligation to monitor or enforce compliance with any applicable risk retention rules or regulations. The Indenture Trustee shall not be charged with knowledge of any such rules or regulations, and it shall not be liable to any Bondholder or any other Person for any violation of any such rules or regulations.

SECTION 9.03    Confidentiality.  All information obtained by the Indenture Trustee regarding the obligors and the Restructuring Property contained in trust, whether upon the exercise of its rights under this Indenture or otherwise, shall be maintained by the Indenture Trustee in confidence and shall not be disclosed to any other Person, unless such disclosure is required by any applicable law or regulation or pursuant to subpoena or to exercise its duty under this Indenture or any other Transaction Documents.

SECTION 9.04    Individual Rights of Indenture Trustee.  The Indenture Trustee in its individual or any other capacity may become the Bondholder, beneficial owner or pledgee of Bonds and may otherwise deal with the Issuer or its Affiliates with the same rights it would have if it were not Indenture Trustee. Any Paying Agent, Bond Registrar, co-registrar or co-paying agent may do the same with like rights. However, in so doing the Indenture Trustee must comply with Sections 9.11 and 9.12.

SECTION 9.05    Indenture Trustee's Disclaimer.  The Indenture Trustee makes no representations as to the validity or sufficiency of this Indenture, the Bonds (other than the execution and authentication thereof) or any Restructuring Property or related documents. The Indenture Trustee shall have no obligation to perform any of the duties of the Servicer unless explicitly set forth in this Indenture or any other Transaction Documents to which it is a party. The Indenture Trustee shall at no time have any responsibility or liability for or with respect to the legality, validity and enforceability of the Bonds or any Restructuring Property or for or with respect to the efficacy of the trust or its ability to generate the payments to be distributed to Bondholders under this Indenture, including without limitation the validity of the assignment of the Restructuring Property to the trust or of any intervening assignment; the existence, condition, location and ownership of the Restructuring Property; the existence and enforceability of any insurance policy; the compliance by the Issuer with any covenant or the breach by the Issuer, GDB or the Servicer of any warranty or representation made under this Indenture or in any Transaction Document or other related document and the accuracy of any such warranty or representation prior to the receipt of written notice by a Trust Officer of the Indenture Trustee of any noncompliance therewith or any breach thereof; the acts or omissions of the Issuer, GDB or the Servicer; or any action by the Indenture Trustee taken at the instruction of the Servicer as long as the Indenture Trustee has the authority, pursuant to the terms of this Indenture, to take such action; provided, however, that the foregoing shall not relieve the Indenture Trustee of its obligation to perform its duties under this Indenture or relieve the prohibitions under this Indenture. Except with respect to a claim based on the Indenture Trustee's willful misconduct or gross negligence, no recourse shall be had for any claim based on any provision of this Indenture or the Bonds or assignment thereof against the institution serving as the Indenture Trustee in its individual capacity. The Indenture Trustee shall not have any personal obligation, liability or duty whatsoever to any Bondholder or any other Person with respect to any such claim, and any such claim shall be asserted solely against the Issuer or any indemnitor who shall furnish indemnity as provided in this Indenture. The Indenture Trustee shall

not be accountable for the use or application by the Issuer of any of the Bonds or of the proceeds of such Bonds, or for the use or application of any funds paid to the Servicer in respect of the Bonds or the Restructuring Property. Anything in this Indenture to the contrary notwithstanding, in no event shall the Indenture Trustee be liable for special, indirect or consequential loss or damage of any kind whatsoever, even if the Indenture Trustee has been advised of the likelihood of such loss or damage and regardless of the form of action.

SECTION 9.06   Notice of Events of Default.   If a Trust Officer of the Indenture Trustee has actual knowledge of the occurrence and continuance of any of the events set forth in Section 4.11, the Indenture Trustee shall notify each Bondholder of such event within 20 days of the Indenture Trustee's discovery thereof; provided, however, that the Indenture Trustee may withhold notice to the Bondholders if and so long as a committee of its officers in good faith determines that withholding such notice is in the best interests of the Bondholders. Such notices shall be provided in accordance with Section 13.05.

SECTION 9.07   Reports to Bondholders and Other Notices by Indenture Trustee.

(a)      The Indenture Trustee shall file each report set forth in Exhibit D, upon receipt thereof, to the MSRB through the EMMA website on or prior to the relevant deadline as set forth in Exhibit D.

(b)      In accordance with Section 5.03, (i) upon the Indenture Trustee's receipt of a Material Servicer Default Notice or a Successor Servicer Notice, the Indenture Trustee shall deliver to the Bondholders pursuant to Section 13.05, and file a posting on the EMMA website or other similar public posting with, such Material Servicer Default Notice or Successor Servicer Notice and (ii) upon the Indenture Trustee's receipt of a result of Bondholder solicitation pursuant to Section 5.03, the Indenture Trustee shall provide notice thereof pursuant to Sections 13.04 and 13.05 to the Servicer, the Issuer, the Collateral Monitor and the Bondholders, and file a posting on the EMMA website or other similar public posting with such notice.

(c)      In accordance with Section 7.05, upon receipt of the Final Scheduled Payment Date Servicing Report from the Servicer, the Indenture Trustee shall promptly deliver to the Bondholders, and file a posting on the EMMA website or other similar public posting with, such Final Scheduled Payment Date Servicing Report. If the Issuer directs the Indenture Trustee to provide notice to the Bondholders of the liquidation of the Restructuring Property, the Indenture Trustee shall promptly make such notice available to the Bondholders. If the Issuer does not direct the Indenture Trustee to not conduct a Bondholder solicitation within 30 days after the Indenture Trustee's receipt of the Final Scheduled Payment Date Servicing Report, the Indenture Trustee shall solicit a Bondholder vote regarding whether the Final Scheduled Payment Date should be delayed by one year and the Restructuring Property should continue to be managed by the Servicer during that time. The Indenture Trustee shall provide notice of the results of such Bondholder solicitation and, if applicable, the rescheduled Final Scheduled Payment Date and newly scheduled Payment Dates to the Issuer, the Servicer, the Collateral Monitor and the Bondholders.

(d)      In accordance with the Transaction Documents to which it is a party, the Indenture Trustee shall deliver such other notices and reports to the Bondholders as provided under the terms of such Transaction Documents.

(e)      In accordance with Section 7.04(b), the Indenture Trustee shall notify the Person in whose name a Bond is registered at the close of business on the Record Date preceding the Final Scheduled Payment Date. Such notice shall be mailed no later than 10 days prior to the Final Scheduled Payment Date, shall specify that payments on the Final Scheduled Payment Date will be payable only upon presentation and surrender of such Bond and shall specify the place where such Bond may be presented and surrendered for payment of such installment. Notwithstanding the foregoing, if any payments are made after the Final Scheduled Payment Date in accordance with the Priority of Payments, the Indenture Trustee shall notify the Person in whose name a Bond is registered at the close of business on the Record Date preceding the Final Scheduled Payment Date, provided that such notice shall comply with the procedures of this paragraph.

(f)      In the event that any Bondholder shall not surrender its Bonds for retirement within six months after the date specified in the written notice of the Final Scheduled Payment Date pursuant to Section 9.07(c), the Indenture Trustee shall give a second written notice to the Registered Bondholders that have not surrendered their Bonds for final payment and retirement. If within one year after such second notice any Bonds have not been

surrendered, the Indenture Trustee shall, at the expense and direction of the Issuer, cause to be published once, in a newspaper published in English and Spanish languages, customarily published on each Business Day and of general circulation in the City of New York and San Juan, Puerto Rico, notice that such money remains unclaimed and that, after a date specified therein, which shall not be less than 30 days from the date of such publication, any unclaimed balance of such money then remaining will be paid to the Commonwealth. The Indenture Trustee shall also adopt and employ, at the expense and direction of the Issuer, any other reasonable means of notification of such repayment specified by the Issuer.

(g)     The Indenture Trustee shall deliver or cause to be delivered annually to each Bondholder of record such information as may be required to enable such holder to prepare its federal and state income tax returns.

SECTION 9.08   Compensation and Indemnity.  On each Payment Date, in accordance with Section 11.01, the Issuer shall pay the Indenture Trustee a semi-annual fee of $2,500. In addition, the Indenture Trustee will be entitled to compensation in the amount of $100 per report to Bondholders that it files on EMMA pursuant to this Indenture and per notice of any event pursuant to the Disclosure Agreement should the Indenture Trustee at any time serve as Dissemination Agent with respect to the Disclosure Agreement. Furthermore, the Indenture Trustee reserves the right to charge for additional services not contemplated in this Indenture as well as extraordinary services it may undertake upon the occurrence and during the continuation of an Event of Default. The Indenture Trustee's compensation shall not be limited by any law on compensation of a trustee of an express trust. The Issuer shall reimburse the Indenture Trustee for all reasonable out-of-pocket expenses and indemnification amounts incurred or made by it, including costs of collection, in addition to the compensation for its services. Such expenses shall include the reasonable compensation and expenses, disbursements and advances of the Indenture Trustee's agents, counsel, accountants and experts. The Issuer shall indemnify the Indenture Trustee against any and all loss, liability or expense (including reasonable attorneys' fees and fees and expenses incurred in the enforcement of the Issuer's obligations) incurred by it in connection with the administration of this trust and the performance of its duties hereunder. The fees, expenses and indemnification amounts due to the Indenture Trustee will be paid in accordance with Section 11.01. The Indenture Trustee shall notify the Issuer promptly of any claim for which it may seek indemnity. Failure by the Indenture Trustee to so notify the Issuer shall not relieve the Issuer of its obligations hereunder if no prejudice to the Issuer will have resulted from such failure. In case any such action is brought against the Indenture Trustee under this Section 9.08 and it notifies the Issuer of the commencement thereof, the Issuer will assume the defense thereof, with counsel reasonably satisfactory to the Indenture Trustee, and the Issuer will not be liable to the Indenture Trustee under this Section 9.08 for any legal or other expenses subsequently incurred by the Indenture Trustee in connection with the defense thereof, other than reasonable costs of investigation. The Issuer shall not reimburse any expense or indemnify against any loss, liability or expense incurred by the Indenture Trustee through the Indenture Trustee's own willful misconduct, gross negligence or bad faith.

The Issuer's payment obligations to the Indenture Trustee pursuant to this Section 9.08 shall survive the discharge of this Indenture or the resignation or removal of the Indenture Trustee and shall extend to any co-trustee or separate trustee appointed pursuant to Section 9.11. When the Indenture Trustee incurs expenses after the occurrence of a Default specified in Section 8.01(d) or (e), the expenses are intended to constitute expenses of administration under Title 11 of the United States Code or any other applicable federal or state bankruptcy, insolvency or similar law.

Notwithstanding the foregoing, the Issuer's obligations under this Section 9.08 will be subject to the limitations in Section 8.15 to pay the fees and expenses of the Indenture Trustee shall be payable solely from the Restructuring Property.

SECTION 9.09   Resignation or Replacement of Indenture Trustee.  The Indenture Trustee may resign at any time by providing written notice of its resignation to the Issuer. The Issuer may remove the Indenture Trustee if:

(a)     the Indenture Trustee fails to comply with Section 9.12;

(b)     the Indenture Trustee becomes legally or practically incapable of fulfilling its duties hereunder;

(c)     the Indenture Trustee is adjudged a bankrupt or insolvent; or

38

(d)        a receiver or other public officer takes charge of the Indenture Trustee or its property.

If the Indenture Trustee resigns or is removed or if a vacancy exists in the office of Indenture Trustee for any reason (the Indenture Trustee in such event being referred to herein as the retiring Indenture Trustee), the Issuer, shall promptly appoint a successor Indenture Trustee. No resignation or removal of the Indenture Trustee and no appointment of a successor Indenture Trustee shall become effective until the acceptance of appointment by the successor Indenture Trustee pursuant to this Section 9.09.

A successor Indenture Trustee shall deliver a written acceptance of its appointment to the retiring Indenture Trustee and to the Servicer. Thereupon the resignation or removal of the retiring Indenture Trustee shall become effective, and the successor Indenture Trustee shall have all the rights, powers and duties of the Indenture Trustee under this Indenture. The successor Indenture Trustee shall mail a notice of its succession to Bondholders. The retiring Indenture Trustee shall promptly transfer all property held by it as Indenture Trustee to the successor Indenture Trustee. The retiring Indenture Trustee shall not be liable for the acts or omissions of any successor Indenture Trustee.

If a successor Indenture Trustee does not take office within 30 days after the retiring Indenture Trustee resigns or is removed, the retiring Indenture Trustee, the Issuer or Bondholders holding not less than 25% of the Outstanding Amount may petition any court of competent jurisdiction for the appointment of a successor Indenture Trustee.

If the Indenture Trustee fails to comply with Section 9.12, Bondholders holding not less than 25% of the Outstanding Amount may at any time thereafter petition any court of competent jurisdiction for the removal of the Indenture Trustee and the appointment of a successor Indenture Trustee.

Notwithstanding the replacement of the Indenture Trustee pursuant to this Section 9.09, the Issuer's obligations under Section 9.08 shall continue for the benefit of the retiring Indenture Trustee.

SECTION 9.10   Successor Indenture Trustee by Merger.   If the Indenture Trustee consolidates with, merges or converts into, or transfers all or substantially all its corporate trust business or assets to, another Person, the resulting, surviving or transferee corporation without any further act shall be the successor Indenture Trustee if such surviving Person or transferee corporation or bank shall be otherwise qualified and eligible under Section 9.12.

In case at the time such successor or successors by merger, conversion or consolidation to the Indenture Trustee shall succeed to the trusts created by this Indenture any of the Bonds shall have been authenticated but not delivered, any such successor to the Indenture Trustee may adopt the certificate of authentication of any predecessor trustee, and deliver such Bonds so authenticated; and in case at that time any of the Bonds shall not have been authenticated, any successor to the Indenture Trustee may authenticate such Bonds either in the name of any predecessor hereunder or in the name of the successor to the Indenture Trustee.

SECTION 9.11   Appointment of Co-Indenture Trustee or Separate Indenture Trustee.

(a)        Notwithstanding any other provisions of this Indenture, at any time, for the purpose of meeting any legal requirement of any jurisdiction in which any part of the Restructuring Property may at the time be located, the Indenture Trustee shall have the power and may execute and deliver all instruments to appoint one or more Persons to act as a co-trustee or co-trustees, or separate trustee or separate trustees, of all or any part of the Trust, and to vest in such Person or Persons, in such capacity and for the benefit of the Bondholders, such title to the Restructuring Property, or any part hereof, and, subject to the other provisions of this Section 9.11, such powers, duties, obligations, rights and trusts as the Indenture Trustee may consider necessary or desirable.

(b)        Every separate trustee and co-trustee shall, to the extent permitted by law, be appointed and act subject to the following provisions and conditions:

(i)        all rights, powers, duties and obligations conferred or imposed upon the Indenture Trustee shall be conferred or imposed upon and exercised or performed by the Indenture Trustee and such

separate trustee or co-trustee jointly (it being understood that such separate trustee or co-trustee is not authorized to act separately without the Indenture Trustee joining in and/or directing such act), except to the extent that under any law of any jurisdiction in which any particular act or acts are to be performed the Indenture Trustee shall be incompetent or unqualified to perform such act or acts, in which event such rights, powers, duties and obligations (including the holding of title to the Restructuring Property or any portion thereof in any such jurisdiction) shall be exercised and performed singly by such separate trustee or co-trustee, but solely at the direction of the Indenture Trustee;

(ii)        no trustee hereunder shall be personally liable by reason of any act or omission of any other trustee hereunder; and

(iii)        the Indenture Trustee may at any time accept the resignation of or remove any separate trustee or co-trustee.

(c)        Any notice, request or other writing given to the Indenture Trustee shall be deemed to have been given to each of the then separate trustees and co-trustees as effectively as if given to each of them. Every instrument appointing any separate trustee or co-trustee shall refer to this Indenture and the conditions of this Article IX. Each separate trustee and co-trustee, upon its acceptance of the trusts thereupon conferred, shall be vested with the estates or property specified in its instrument of appointment, either jointly with the Indenture Trustee or separately, as may be provided therein, subject to all the provisions of this Indenture, including every provision of this Indenture relating to the conduct of, affecting the liability of, or affording protection to, the Indenture Trustee. Every such instrument shall be filed with the Indenture Trustee.

(d)        Any separate trustee or co-trustee may at any time constitute the Indenture Trustee, its agent or attorney-in-fact, with full power and authority, to the extent not prohibited by law, to do any lawful act under or in respect of this Indenture on its behalf and in its name. If any separate trustee or co-trustee shall die, become incapable of acting, resign or be removed, all of its estates, properties, rights, remedies and trusts shall vest in and be exercised by the Indenture Trustee, to the extent permitted by law, without the appointment of a new or successor trustee.

SECTION 9.12    Eligibility; Disqualification.

The Indenture Trustee shall have a combined capital and surplus of at least $50,000,000 as set forth in its most recent published annual report of condition and it or its parent shall have a long-term debt rating of at least BBB- (or the equivalent) by Fitch, Baa3 (or the equivalent) by Moody's or BBB- (or the equivalent) by S&P.

SECTION 9.13    Indenture Trustee as Paying Agent and Bond Registrar.    The rights, protections, indemnities and standard of care of the Indenture Trustee set forth in this Article IX shall apply to Wilmington Trust, N.A., in its capacities as Paying Agent and Bond Registrar to the same extent as they apply to the Indenture Trustee.

SECTION 9.14    Representations and Warranties of the Indenture Trustee.    The Indenture Trustee hereby represents and warrants to the Issuer and for the benefit of the Bondholders, that, as of the date hereof:

(a)        *Organization and Qualification*. The Indenture Trustee is a national banking association duly organized, validly existing and in good standing under the laws of the United States. The Indenture Trustee possesses and shall continue to possess all requisite authority, power, licenses, permits, franchise and approvals for the Indenture Trustee to conduct its business and to execute, deliver and comply with its obligations under this Indenture and other Transaction Documents to which it is a party.

(b)        *Power, Authorization and Enforceability*. The Indenture Trustee has the power and authority to execute deliver and perform the terms of this Indenture and other Transaction Documents to which it is a party. The Indenture Trustee has authorized the execution, delivery and performance of the terms of this Indenture and other Transaction Documents to which it is a party. Each of this Indenture and other Transaction Documents to which it is a party is the legal, valid and binding obligation of the Indenture Trustee enforceable against the Indenture Trustee,

except as may be limited by insolvency, bankruptcy, reorganization or other laws relating to or affecting the enforcement of creditors' rights or by general equitable principles.

(c)      *No Conflicts and No Violation*. The execution and delivery by the Indenture Trustee of the Indenture and other Transaction Documents to which it is a party and compliance with the terms thereof will not conflict with, or result in a violation or breach of, or constitute a default under any loan agreement, indenture, certificate, bond, note, resolution or any other agreement or instrument to which the Indenture Trustee is a party or by which it is bound or any law or any rule, regulation, order or decree of any court or governmental agency or body having jurisdiction over the Indenture Trustee or any of its activities or properties (except that no representation, warranty or agreement is made by the Indenture Trustee with respect to any federal or state securities or "blue sky" law or regulations).

(d)      *No Proceedings*. There are no proceedings or investigations pending or, to the Indenture Trustee's knowledge, overtly threatened in writing, before any court, regulatory body, administrative agency, or other governmental instrumentality having jurisdiction over the Indenture Trustee: (i) asserting the invalidity of any of this Indenture or the Transaction Documents to which it is a party, (ii) seeking to prevent the issuance of the Bonds or the consummation of any of the transactions contemplated by any of the Transaction Documents to which it is a party or (iii) seeking any determination or ruling that would reasonably be expected to have a material adverse effect on the Indenture Trustee's ability to perform its obligations under, or the validity or enforceability of, this Indenture or any other Transaction Document to which it is a party.

(e)      *Eligibility*. The Indenture Trustee satisfies the eligibility criteria set forth in this Indenture.

**ARTICLE X**

**BOND REGISTRAR; BONDHOLDERS' LISTS**

SECTION 10.01  Bond Registrar to Furnish Names and Addresses of Bondholders.  The Bond Registrar shall furnish or cause to be furnished to the Issuer, Indenture Trustee or the Servicer, within 15 days after receipt by the Bond Registrar of a written request therefrom, a list of the names and addresses of each Registered Bondholder as of the most recent Record Date. If Bondholders holding not less than 25% of the Outstanding Amount (hereinafter referred to as "Applicants") apply in writing to the Indenture Trustee, and such application states that the Applicants desire to communicate with other Bondholders with respect to their rights under this Indenture, the Bonds or another Transaction Document and such application is accompanied by a copy of the communication that such Applicants propose to transmit, then the Indenture Trustee shall, within five Business Days after the receipt of such application and communication, afford such Applicants access, during normal business hours, to the current list of Bondholders. The Indenture Trustee may elect not to afford the Applicants access to the list of Bondholders if it agrees to mail the desired communication or proxy, on behalf of and at the expense of the Applicants, to all Bondholders. Every Bondholder, by receiving and holding a Bond, agrees with the Indenture Trustee and the Issuer that none of the Indenture Trustee, the Issuer, the Servicer or the Collateral Monitor shall be held accountable by reason of the disclosure of any such information as to the names and addresses of the Bondholders under this Indenture, regardless of the source from which such information was derived.

If the Indenture Trustee shall cease to be the Bond Registrar, then thereafter the successor Bond Registrar shall furnish or cause to be furnished to the Indenture Trustee not more than five days after the most recent Record Date or at such other times as the Indenture Trustee reasonably may request in writing, a list, in such form as the Indenture Trustee reasonably may require, of the names and addresses of the Bondholders as of such Record Date. The Indenture Trustee shall remain the Bond Registrar until such time that a successor Bond Registrar has been appointed.

SECTION 10.02  Preservation of Information.  The Indenture Trustee shall preserve, in as current a form as is reasonably practicable, the names and addresses of the Bondholders contained in the most recent list furnished to the Indenture Trustee as provided in Section 10.01 and the names and addresses of Bondholders received by the Indenture Trustee in its capacity as Bond Registrar. The Indenture Trustee may destroy any list furnished to it as provided in such Section 10.01 upon receipt of a new list so furnished.

## ARTICLE XI

## ACCOUNTS AND DISBURSEMENTS; PRIORITY OF PAYMENTS; INVESTMENT OF TRUST FUNDS

SECTION 11.01   Priority of Payments; Payment of Interest; PIK Amount; Payment of Principal

(a)      *Priority of Payments.* Notwithstanding any other provision in this Indenture, but subject to Sections 11.01(b) and 11.01(c), the Indenture Trustee shall make payments from amounts in the Collection Account and/or will retain amounts in the Collection Account, as applicable, in the following order of priority (the "Priority of Payments"):

(i)      First, on each Payment Date, the Indenture Trustee shall set aside and retain in the Collection Account from Collections an amount equal to the Fees and Expenses Reserve for the Interest Period commencing on such Payment Date;

(ii)      Second, on each Payment Date or otherwise as such amounts become due, the Indenture Trustee shall make payments to each of the Servicer, the Indenture Trustee and the Collateral Monitor, of the respective amount of any fees, expenses and indemnification amounts due to it, and to the Issuer or other applicable third party, the amount of any other due and payable Issuer Expenses, subject, as applicable, to the Issuer Operating Expenses Cap and any other applicable restrictions under this Indenture on such Issuer Expenses; provided, for the avoidance of doubt, that the payment of all Issuer Expenses (including Excluded Expenses) that are Permitted Obligations will be paid prior to the calculation of Available Cash, notwithstanding any shortfall in the Fees and Expenses Reserve for the applicable semi-annual period;

(iii)      Third, on each Payment Date or otherwise as such amounts become due and payable after acceleration of the Bonds, the Indenture Trustee shall pay all accrued and unpaid interest on the Bonds due on such date; provided that, to the extent there is insufficient Available Cash on any Payment Date to pay all accrued and unpaid interest on the Bonds due on such date, such accrued and unpaid interest shall be paid in cash pro rata to the extent of and from Available Cash and principal on the Bonds will accrue a PIK Amount equal to the amount of any Available Cash shortfall; and provided further that, to the extent there is insufficient Available Cash on any Payment Date to pay at least $1.00 of cash interest for every $1,000 of Outstanding Amount, there will be no cash interest payment to Bondholders on such Payment Date, principal on the Bonds shall accrue a PIK Amount equal to the entire amount of such accrued and unpaid interest, and any Available Cash will remain in the Collection Account until the following Payment Date; and

(iv)      Fourth, on each Payment Date or otherwise as such amounts become due and payable after acceleration of the Bonds, the Indenture Trustee shall pay the Outstanding Amount of the Bonds pro rata to the extent of and from Available Cash in the Collection Account.

(b)      *Payment of Issuer Expenses.* From time to time after each Payment Date and prior to the following Determination Date, the Indenture Trustee shall make payments in accordance with any Fund Transfer Requisition provided by the Servicer to (i) pay the Issuer Expenses budgeted under the Fees and Expenses Reserve and (ii) pay reasonable Issuer Expenses not otherwise budgeted under the Fees and Expenses Reserve; provided that if any such withdrawal would result in the Issuer Operating Expenses exceeding the Issuer Operating Expenses Cap (or if such withdrawal would result in the reasonable likelihood of the aggregate Issuer Operating Expenses for the then-current fiscal year exceeding the Issuer Operating Expenses Cap prior to the end of such fiscal year), the Indenture Trustee may not withdraw any such funds without the prior written consent of the Collateral Monitor, which consent will not be unreasonably withheld, delayed or conditioned. The Issuer Operating Expenses Cap shall not apply to Excluded Expenses.

(c)      *Possible Servicer Replacement Event.* Following the Indenture Trustee's receipt of a Material Servicer Default Notice and until (i) the Indenture Trustee's receipt of a Successor Servicer Notice, (ii) the waiver by the Bondholders of such possible Servicer Replacement Event, or (iii) the waiver of such possible Servicer Replacement Event pursuant to Section 5.03(b) because of the failure to appoint a successor Servicer within the

applicable period (unless, for the avoidance of doubt, such failure to appoint a successor Servicer is due to the Issuer's failure to engage a successor Servicer designated by the Collateral Monitor), all Fund Transfer Requisitions from the Servicer shall be subject to the approval of the Collateral Monitor, which will be exercised promptly and in such a manner as to allow for servicing in accordance with the servicing standards set forth in the Servicing Agreement.

(d)　　*Payment of Interest; PIK Amount*. Interest payments on each Bond shall be made to the registered owner thereof and shall be paid in lawful money of the United States of America by check or draft mailed (other than with respect to PIK Amounts) to the Person in whose name such Bond is registered at his, her, or its address as it appears on the Bond Register on the Record Date (irrespective of any transfer or exchange of such Bond subsequent to such Record Date and prior to the applicable Payment Date, by the Person in whose name the Bond is registered); provided, that (i) while DTC is the owner of the Bonds, all cash payments of principal and interest on the Bonds will be paid to DTC or its nominee by wire transfer and (ii) all PIK Amounts will be credited by adding such PIK Amount to the then Outstanding Amounts in the manner provided in <u>Section 11.01(d)(iii)</u>.

(i)　　In the event that any withholding tax is imposed on any payment (or allocations of income) to the Bondholders under this Indenture, such tax shall reduce the amount otherwise payable to the Bondholders in accordance with <u>Section 11.01(a)(iii)</u> and then <u>Section 11.01(a)(iv)</u>. The Issuer shall instruct the Indenture Trustee regarding the imposition of such withholding tax and, upon receiving such instruction, the Indenture Trustee shall be authorized and directed to retain from amounts otherwise payable to the Bondholders sufficient funds for the payment of any such withholding tax that is legally owed by the Issuer (but such authorization shall not prevent the Indenture Trustee from contesting any such tax in appropriate proceedings, and withholding payment of such tax, if permitted by law, pending the outcome of such proceedings) and timely remit the amounts so withheld to the relevant taxing authority. The amount of any withholding tax imposed with respect to the Bondholders in accordance with this <u>Section 11.01(d)</u> shall be treated as cash distributed to the Bondholders at the time it is withheld and remitted to the appropriate taxing authority. If there is a reasonable possibility that withholding tax is payable with respect to any payment in accordance with written advice from outside counsel of national standing or, with respect to Commonwealth tax only, a recognized firm of reputable standing within the Commonwealth, the Indenture Trustee may in its sole discretion withhold such amounts in accordance with this paragraph.

(ii)　　With respect to any Interest Period, the interest will accrue on the Bonds calculated as the product of (A) the Outstanding Amount on such Payment Date (including, for the avoidance of doubt, accrued PIK Amounts), before giving effect to the payment of principal, if any, on such date, (B) the Interest Rate, and (C) the number of days from and including the immediately preceding Payment Date (or, in the case of the Special First Payment Date, from and including the Closing Date) to, but excluding, the Payment Date on which such interest is to be paid divided by 360.

(iii)　　To the extent there is insufficient Available Cash on any Payment Date to pay in full in cash all interest accrued during the Interest Period with respect to such Payment Date on the Bonds, such accrued interest on the Bonds will be paid in cash pro rata to the extent of and from Available Cash (to the extent there is sufficient Available Cash to pay at least $1.00 of cash interest for every $1,000 of Outstanding Amount), and principal of the Bonds will accrue an amount equal to the amount of any Available Cash shortfall (rounded up to the nearest $1.00) (each such amount of shortfall, a "PIK Amount"). Following an increase in the Outstanding Amount as a result of the accrual of a PIK Amount, the Bonds will bear interest on the then-Outstanding Amount, which shall include such accrued PIK Amount. The Indenture Trustee shall make all determinations with respect to the PIK Amounts and, in the absence of manifest error, such determinations shall be conclusive for all purposes and binding upon the Bondholders.

(iii)　　For the avoidance of doubt, no losses on the Restructuring Property shall be allocated to write down the Outstanding Amount of the Bonds.

(e)　　*Payment of Outstanding Amount*. Principal payments on each Bond shall be made to the registered owner thereof and shall be paid in lawful money of the United States of America by check or draft mailed to the Person in whose name such Bond is registered at his, her, or its address as it appears on the Bond Register on the Record Date (irrespective of any transfer or exchange of such Bond subsequent to such Record Date and prior to the

applicable Payment Date, by the Person in whose name the Bond is registered); provided, that while DTC is the owner of the Bonds, all cash payments of principal on the Bonds will be paid to DTC or its nominee by wire transfer. To the extent Available Cash is used to make payments on the Outstanding Amount (including PIK Amount) of the Bonds on any Payment Date pursuant to Section 11.01(a)(iv), the Outstanding Amount of the Bonds will be reduced by an amount equal to the amount of such payment on the Outstanding Amount (rounded up to the nearest $1.00). Following a decrease in the Outstanding Amount as a result of such payment, the Bonds will bear interest on the then-Outstanding Amount.

(f)     *Final Scheduled Payment Date*. On the Final Scheduled Payment Date, all Outstanding Amounts on the Bonds will be due and payable.

SECTION 11.02 Fund Transfer Requisitions.  All payments made by the Indenture Trustee from the Collection Account shall be in accordance with a Fund Transfer Requisition provided by the Servicer, which the Indenture Trustee may conclusively rely upon in making any payments hereunder; provided that if at any time for any reason there is no Servicer, the Indenture Trustee shall make the distributions required hereunder from the Collection Account in accordance with this Indenture.

SECTION 11.03 Establishment of Collection Account.  The Issuer hereby authorizes and directs the Indenture Trustee to establish a segregated trust account, for the benefit of the Bondholders (subject to the terms of this Indenture), which shall be designated the "Collection Account." The Collection Account shall be held, maintained and disbursed by the Indenture Trustee in accordance with Sections 11.01 and as otherwise provided in this Indenture. In the event the Indenture Trustee no longer qualifies as an Eligible Institution, the Indenture Trustee shall use reasonable efforts to cause the Collection Account to be moved to an Eligible Institution within 30 days from the date on which the Indenture Trustee fails to be an Eligible Institution.

SECTION 11.04 Investments of Trust Funds.

(a)     All or a portion of the funds in the Collection Account (other than amounts retained in the Fees and Expenses Reserve) may be invested in Eligible Investments and reinvested by the Indenture Trustee at the written direction of the Servicer from the time deposited into the Collection Account until the Business Day immediately before the next succeeding Payment Date.

(b)     All income or other gain from investments of monies deposited in the Collection Account shall be deposited by the Indenture Trustee in the Collection Account and paid pursuant to the Priority of Payments on each Payment Date, and any loss resulting from such investments in excess of such income or gain (against which such losses will first be applied) shall be charged to such account. The Indenture Trustee shall be under no liability for interest on monies received hereunder.

(c)     Subject to Section 9.01(c), the Indenture Trustee, in its capacity as such, shall not in any way be held liable by reason of any insufficiency in the Collection Account resulting from any loss on any Eligible Investment included therein at the direction of the Servicer.

(d)     If (i) the Servicer shall have failed to give written investment instructions for any funds on deposit in the Collection Account, as the case may be, to the Indenture Trustee by 12:00 p.m. Eastern Time (or such other time as may be agreed by the Issuer and Indenture Trustee) on any Business Day or (ii) a Default or Event of Default occurs and is continuing with respect to the Bonds, but the Bonds shall not have been declared due and payable pursuant to Section 8.02 or (iii) if such Bonds shall have been declared due and payable following an Event of Default, but amounts collected or receivable from the Restructuring Property are being applied in accordance with Section 8.04 as if there had not been such a declaration, then the Indenture Trustee shall, to the fullest extent practicable, invest and reinvest funds in the Collection Account in one or more Eligible Investments as specified in the most recent instruction received from the Servicer or in the absence thereof such funds shall remain uninvested.

## ARTICLE XII

## SUPPLEMENTAL INDENTURES

SECTION 12.01 <u>Supplemental Indentures Without Consent of Bondholders</u>.  Subject to <u>Section 12.03</u>, without the consent of the Bondholders, the Issuer and the Indenture Trustee, when authorized by an Issuer Order, at any time and from time to time, may enter into one or more indentures supplemental hereto, in form reasonably satisfactory to the Indenture Trustee, for any of the following purposes:

(a) to cure any ambiguity, omission, defect or inconsistency in this Indenture or in the Bonds;

(b) to conform the provisions in this Indenture to the descriptions thereof contained in the Offering Memorandum;

(c) to provide for the issuance of Additional Bonds in accordance with the limitations set forth in <u>Sections 2.03(d)</u> and <u>2.13</u>;

(d) to add additional property to the description of the Restructuring Property;

(e) to add additional covenants of the Issuer, for the benefit of the Bondholders;

(f) to convey, or otherwise transfer or pledge, any property to the Indenture Trustee;

(g) to add or change any of the provisions of this Indenture as necessary and permitted to facilitate the administration by more than one indenture trustee;

(h) to make any change that would provide additional rights or benefits to the Bondholders; or

(i) to evidence and provide for the appointment hereunder of a successor indenture trustee with respect to the Bonds;

<u>provided</u> that any such supplemental indenture will not adversely affect the interests of any Bondholder (other than in the case of the issuance of Additional Bonds made in accordance with <u>Sections 2.03(d)</u> and <u>2.13</u>), as determined by the Collateral Monitor (or, if the Collateral Monitor is unable to make such determination, another Independent financial advisor) and external legal counsel of recognized national standing.

The Indenture Trustee is hereby authorized to execute any such supplemental indenture and to make any further appropriate agreements and stipulations that may be therein contained.

SECTION 12.02 <u>Supplemental Indentures with Consent of Bondholders</u>.  Subject to <u>Sections 12.01</u> and <u>12.03</u>, the Issuer and the Indenture Trustee, when authorized by an Issuer Order, may enter into one or more supplemental indentures, in form reasonably satisfactory to the Indenture Trustee, for the purpose of adding any provisions to, or changing in any manner or eliminating any of the provisions of, this Indenture, or of modifying in any manner the rights of the Bondholders under this Indenture; provided that Bondholders holding not less than a majority of the Outstanding Amount (including without limitation, Additional Bonds, if any) have consented to such amendment.

It shall not be necessary for any Action of Bondholders under this <u>Section 12.02</u> to approve the particular form of any proposed supplemental indenture, but it shall be sufficient if such Action shall approve the substance thereof.

Promptly after the execution by the Issuer and the Indenture Trustee of any supplemental indenture pursuant to this <u>Section 12.02</u>, the Indenture Trustee shall mail to the Bondholders to which such amendment or supplemental indenture relates a notice setting forth in general terms the substance of such supplemental indenture.

45

Any failure of the Indenture Trustee to mail such notice, or any defect therein, shall not, however, in any way impair or affect the validity of any such supplemental indenture.

SECTION 12.03 <u>Limitations on Supplemental Indentures</u>.   The Issuer and the Indenture Trustee, in accordance with <u>Sections 12.01</u> and <u>12.02</u>, may enter into an indenture or indentures supplemental hereto for the purpose of adding any provisions to, or changing in any manner or eliminating any of the provisions of, this Indenture or of modifying in any manner the rights of the Bondholders under this Indenture; <u>provided</u>, <u>however</u>, that no such supplemental indenture shall, without the consent of the Bondholder of each outstanding Bond whose respective interest is affected thereby:

(a)      change the due date of any principal of or interest on any Bond, or reduce the principal amount thereof, the Interest Rate specified thereon, or change any place of payment where, or the coin or currency in which, any Bond or any interest thereon is payable;

(b)      impair the right to bring suit for the enforcement of the provisions of this Indenture, to the extent provided in <u>Article VIII</u>, requiring the application of funds available therefor to the payment of any such amount due on the Bonds on or after the respective due dates thereof;

(c)      reduce the percentage of the Outstanding Amount, the consent of the Bondholders of which is required to amend or supplement this Indenture or other Transaction Documents or the consent of the Bondholders of which is required for any waiver of compliance with certain provisions of this Indenture or of certain defaults hereunder and their consequences as provided for in this Indenture;

(d)      modify or alter the provisions hereof regarding the voting of Bonds held by the Issuer, any other obligor on the Bonds, or any of their Affiliates;

(e)      reduce the percentage of the Outstanding Amount, the consent of the Bondholders of which is required to direct the Indenture Trustee to sell, liquidate or preserve the Restructuring Property after an Event of Default if the proceeds of such sale would be insufficient to pay the principal amount and accrued but unpaid interest on the outstanding Bonds; or

(f)      permit the creation of any lien or security interest ranking senior to or on a parity with the Statutory Lien with respect to any of the Restructuring Property or, except as otherwise permitted or contemplated herein, terminate the Statutory Lien with respect to any such Restructuring Property or deprive the Bondholder of any such Bond of the security afforded by the Statutory Lien.

SECTION 12.04 <u>Execution of Supplemental Indentures</u>.  In executing, or permitting the additional trusts created by, any supplemental indenture permitted by this <u>Article XII</u> or the modification thereby of the trusts created by this Indenture, the Indenture Trustee shall be entitled to receive, and subject to <u>Sections 9.01</u> and <u>9.02</u>, shall be fully protected in relying upon, an Opinion of Counsel and Issuer's Certificate stating that the execution of such supplemental indenture is authorized or permitted by this Indenture. The Indenture Trustee may, but shall not be obligated to, enter into any such supplemental indenture that affects the Indenture Trustee's own rights, duties, liabilities or immunities under this Indenture or otherwise. The Indenture Trustee shall be entitled to recover any costs (including any reasonable attorneys' fees and expenses) incurred in connection with a supplemental indenture.

SECTION 12.05 <u>Effect of Supplemental Indenture</u>.  This Indenture shall not be modified or amended in any respect except as provided in, in accordance with and subject to the provisions of this <u>Article XII</u>. Upon the execution of any supplemental indenture pursuant to the provisions hereof, this Indenture shall be and shall be deemed to be modified and amended in accordance therewith with respect to the Bonds affected thereby, and the respective rights, limitations of rights, obligations, duties, liabilities and immunities under this Indenture of the Indenture Trustee, the Issuer and the Bondholders shall thereafter be determined, exercised and enforced hereunder subject in all respects to such modifications and amendments, and all the terms and conditions of any such supplemental indenture shall be deemed to be part of the terms and conditions of this Indenture for any and all purposes. After any supplemental indenture becomes effective under this <u>Article XII</u>, the Indenture Trustee shall provide notice to the Bondholders through the EMMA website of such supplemental indenture.

SECTION 12.06  <u>Reference in Bonds to Supplemental Indentures</u>.  Bonds authenticated and delivered after the execution of any supplemental indenture pursuant to this <u>Article XII</u> may, and if required by the Indenture Trustee shall, bear a notation in form approved by the Indenture Trustee as to any matter provided for in such supplemental indenture. If the Issuer or the Indenture Trustee shall so determine, new Bonds so modified as to conform, in the opinion of the Indenture Trustee and the Issuer, to any such supplemental indenture may be prepared and executed by the Issuer and authenticated and delivered by the Indenture Trustee in exchange for outstanding Bonds.

**ARTICLE XIII**

**<u>MISCELLANEOUS</u>**

SECTION 13.01  <u>Compliance Certificates and Opinions, etc</u>.

Upon any application or request by the Issuer to the Indenture Trustee to take any action under any provision of this Indenture, the Issuer shall furnish to the Indenture Trustee (i) an Issuer's Certificate stating that all conditions precedent, if any, provided for in this Indenture relating to the proposed action have been complied with and (ii) an Opinion of Counsel stating that in the opinion of such counsel all such conditions precedent, if any, have been complied with.

Every certificate or opinion with respect to compliance with a condition or covenant provided for in this Indenture shall include:

(i)  a statement that each signatory of such certificate or opinion has read or has caused to be read such covenant or condition and the definitions herein relating thereto;

(ii)  a brief statement as to the nature and scope of the examination or investigation upon which the statements or opinions contained in such certificate or opinion are based;

(iii)  a statement that, in the opinion of each such signatory, such signatory has made such examination or investigation as is necessary to enable such signatory to express an informed opinion as to whether or not such covenant or condition has been complied with; and

(iv)  a statement as to whether, in the opinion of each such signatory, such condition or covenant has been complied with.

SECTION 13.02  <u>Form of Documents Delivered to Indenture Trustee</u>.  In any case where several matters are required to be certified by, or covered by an opinion of, any specified Person, it is not necessary that all such matters be certified by, or covered by the opinion of, only one such Person, or that they be so certified or covered by only one document, but one such Person may certify or give an opinion with respect to some matters and one or more other such Persons as to other matters, and any such Person may certify or give an opinion as to such matters in one or several documents.

Any certificate or opinion of an Authorized Person may be based, insofar as it relates to legal matters, upon a certificate or opinion of, or representations by, counsel, unless such officer knows, or in the exercise of reasonable care should know, that the certificate or opinion or representations with respect to the matters upon which such officer's certificate or opinion is based are erroneous. Any such certificate of an Authorized Person or Opinion of Counsel may be based, insofar as it relates to factual matters, upon a certificate or opinion of, or representations by, an officer or officers of the Servicer, GDB or the Issuer stating that the information with respect to such factual matters is in the possession of the Servicer, GDB or the Issuer, unless such counsel knows, or in the exercise of reasonable care should know, that the certificate or opinion or representations with respect to such matters are erroneous.

47

Where any Person is required to make, give or execute two or more applications, requests, consents, certificates, statements, opinions or other instruments under this Indenture, they may, but need not, be consolidated and form one instrument.

Whenever in this Indenture, in connection with any application or certificate or report to the Indenture Trustee, it is provided that the Issuer shall deliver any document as a condition of the granting of such application, or as evidence of the Issuer's compliance with any term hereof, it is intended that the truth and accuracy, at the time of the granting of such application or at the effective date of such certificate or report (as the case may be), of the facts and opinions stated in such document shall in such case be conditions precedent to the right of the Issuer to have such application granted or to the sufficiency of such certificate or report. The foregoing shall not, however, be construed to affect the Indenture Trustee's right to rely upon the truth and accuracy of any statement or opinion contained in any such document as provided in Article IX.

SECTION 13.03  Acts of Bondholders.

(a)  Any request, demand, authorization, direction, notice, consent, waiver or other action provided by this Indenture to be given or taken by Bondholders may be embodied in and evidenced by one or more instruments of substantially similar tenor signed by such Bondholders in person or by agents duly appointed in writing; and except as herein otherwise expressly provided such action shall become effective when such instrument or instruments are delivered to the Indenture Trustee, and, where it is hereby expressly required, to the Issuer. Such instrument or instruments (and the action embodied therein and evidenced thereby) are herein sometimes referred to as the "Action" of the Bondholders signing such instrument or instruments. Proof of execution of any such instrument or of a writing appointing any such agent shall be sufficient for any purpose of this Indenture and (subject to Section 9.01) conclusive in favor of the Indenture Trustee and the Issuer, if made in the manner provided in this Section 13.03 but the Indenture Trustee may, nevertheless, in its reasonable discretion, require further or other proof in cases where it deems the same desirable.

(b)  The fact and date of the execution by any person of any such instrument or writing may be proved in any manner that the Indenture Trustee deems sufficient.

(c)  The ownership of Bonds shall be proved by the Bond Register.

(d)  Any request, demand, authorization, direction, notice, consent, waiver or other action by a Bondholder in respect of a Bond shall bind the Bondholder of every Bond issued upon the registration of such Bond or in exchange therefor or in lieu thereof, in respect of anything done, omitted or suffered to be done by the Indenture Trustee or the Issuer in reliance thereon, whether or not notation of such action is made upon such Bond.

SECTION 13.04  Notices.  Any request, demand, authorization, direction, notice, consent, waiver or Action of Bondholders or other documents required or contemplated by this Indenture (other than notices to Bondholders) shall be delivered by personal delivery or reputable overnight delivery services, in each case as set forth below:

If to the Issuer:                       GDB Debt Recovery Authority
                                        PO Box 366052
                                        San Juan, PR 00936-6052

                                        With dual notice to:

                                        King & Spalding LLP
                                        1180 Peachtree Street, NE
                                        Atlanta, GA 30309
                                        Attention:    Floyd Newton and Arthur Steinberg
                                        Email:        fnewton@kslaw.com and
                                                      asteinberg@kslaw.com

                                        Cancio, Covas & Santiago, LLP
                                        Suite A-267

255 Ponce de Leon Avenue
San Juan, PR 00917
Attention:     Juan Ramon Cancio
Email:        jrcancio@ccsllp.com

If to the Indenture Trustee:        Wilmington Trust, N.A.
One Light Street, 14th Floor, MD2-L140
Baltimore, MD 21202
Attention:     Jay H. Smith IV
Email:        jhsmith@wilmingtontrust.com

With a copy to:

Drinker Biddle & Reath LLP
1177 Avenue of the Americas, 41st Floor
New York, NY 10036
Attention:     Kristin Going
Email:        kristin.going@dbr.com

If to the Servicer:        Clark Hill LLP
1055 West Seventh Street, 24th Floor
Los Angeles, CA  90017
Attention:     David Brandon
Email:        dbrandon@mpplaw.com

With dual notice to:

AmeriNat, LLC
217 S. Newton Avenue
Albert Lea, MN  56007
Attention:     Adrienne Thorson, CEO
Email:        athorson@amerinatls.com

If to the Collateral Monitor:        Dual notices sent to:

Matthew Cantor
Cantor-Katz Collateral Monitor LLC
235 West 71st Street, Unit 3
New York, NY  10023

Richard Katz
Cantor-Katz Collateral Monitor LLC
1915 Vallejo Street
San Francisco, CA 94123

With copies emailed to each of:

mcantor4@mac.com and
rich.katz@torquepointllc.com

Each Person listed above may change its address hereunder by giving notice of such change to the other Persons listed above. All notices and other communications by reputable overnight delivery service shall be effective on the date it is officially recorded as delivered to the intended recipient by such service.  All notices and other communications sent by personal delivery shall be deemed to have been delivered to and received by the addressee and shall be effective on the date of personal delivery.  All notices and other communications not given in writing shall be effective only if acknowledged in writing by a duly authorized representative of the Person to whom

it was given. For the avoidance of doubt, communications in the ordinary course of business, including communications relating to the Restructuring Property, by and among the Issuer, the Indenture Trustee, the Servicer and/or the Collateral Monitor may be provided by email. The Issuer shall promptly transmit any notice received by it from the Bondholders to the Indenture Trustee

SECTION 13.05 <u>Notices to Bondholders; Waiver</u>.   Where this Indenture provides for notice to Bondholders of any event, such notice shall be sufficiently given (unless otherwise herein expressly provided) (a) in the case of Book-Entry Bonds, upon delivery to the Clearing Agency in writing and (b) in the case of Definitive Bonds, when mailed, first-class, postage prepaid to each Bondholder affected by such event, at its address as it appears on the Bond Register, in each case being delivered or mailed, as the case may be, not later than the latest date, and not earlier than the earliest date, prescribed for the giving of such notice. In any case where notice to Bondholders is given by mail, neither the failure to mail such notice nor any defect in any notice so mailed to any particular Bondholder shall affect the sufficiency of such notice with respect to other Bondholders, and any notice that is mailed in the manner herein provided shall conclusively be presumed to have been duly given.

Where this Indenture provides for notice in any manner, such notice may be waived in writing by any Person entitled to receive such notice, either before or after the event, and such waiver shall be the equivalent of such notice. Waivers of notice by Bondholders shall be filed with the Indenture Trustee but such filing shall not be a condition precedent to the validity of any action taken in reliance upon such a waiver.

In case, by reason of the suspension of regular mail service as a result of a strike, work stoppage or similar activity, it shall be impracticable to mail notice of any event to Bondholders when such notice is required to be given pursuant to any provision of this Indenture, then any manner of giving such notice as shall be reasonably satisfactory to the Indenture Trustee shall be deemed to be a sufficient giving of such notice.

SECTION 13.06 <u>Alternate Payment and Notice Provisions</u>.   Notwithstanding any provision of this Indenture or any of the Bonds to the contrary, the Issuer may enter into any agreement with any Bondholder providing for a method of payment, or notice by the Indenture Trustee or any Paying Agent to such Bondholder, that is different from the methods provided for in this Indenture for such payments or notices. The Issuer shall furnish to the Indenture Trustee a copy of each such agreement and the Indenture Trustee shall cause payments to be made and notices to be given in accordance with such agreements.

SECTION 13.07 <u>Setoff Rights</u>.   By accepting delivery of the Bonds, Bondholders shall be deemed to have waived any right to setoff (except for any adjustments to be effected pursuant to the GDB Restructuring Act as of the Closing Date), or receive credit for, amounts that the Bondholders may owe to the Issuer or GDB as obligors on the Restructuring Property, if any, against amounts payable by the Issuer to such Bondholders on the Bonds.

SECTION 13.08 <u>Effect of Headings and Table of Contents</u>.   The Article and Section headings herein and the Table of Contents are for convenience only and shall not affect the construction hereof.

SECTION 13.09 <u>Successors and Assigns</u>.   When in this Indenture either the Issuer or the Indenture Trustee is named or referred to, such reference shall be deemed to include the successors or assigns thereof. All covenants and agreements in this Indenture and the Bonds by the Issuer shall bind its successors and assigns, whether so expressed or not. All agreements of the Indenture Trustee in this Indenture shall bind its successors, co-trustees and agents. If any of the powers or duties of the Issuer shall be transferred by or pursuant to any law of the Commonwealth, and if such transfer shall relate to any matter or thing permitted or required to be done under this Indenture by the Issuer, then the entity or body or official that shall succeed to such powers or duties shall act and be obligated with respect to such matter or thing in the place and stead of the Issuer as in this Indenture provided.

SECTION 13.10 <u>Severability</u>.   If any one or more of the covenants, agreements, provisions or terms of this Indenture shall be for any reason whatsoever held invalid or unenforceable in any jurisdiction, then such covenants, agreements, provisions or terms shall be deemed severable from the remaining covenants, agreements, provisions or terms of this Indenture and shall in no way affect the validity or enforceability of the other provisions of this Indenture or of the Bonds or the rights of the Bondholders thereof.

SECTION 13.11  <u>Timing and Business Days</u>.  Whenever any action is required to be taken hereunder on a day that is not a Business Day, such action shall be taken on the next succeeding Business Day with the same force and effect as if taken on such date, with no additional interest accruing in respect of the delay, unless otherwise specifically provided in a supplemental indenture.

SECTION 13.12  <u>Benefits of Indenture</u>.  Nothing in this Indenture or the Bonds, express or implied, shall give to any Person, other than the parties hereto and their successors hereunder, the Servicer and the Bondholders, and any other party secured hereunder, and any other Person with an ownership interest in any part of the Restructuring Property, any benefit or any legal or equitable right, remedy or claim under this Indenture.

SECTION 13.13  <u>Governing Law; Jurisdiction, Waiver of Jury Trial</u>.

(a)        This Indenture shall be construed and enforced in accordance with, and the rights of the parties shall be governed by, the laws of the State of New York, without giving effect to the conflict of laws principles thereof; provided that any issues addressing the fiduciary or statutory duties of GDB, the Issuer, AAFAF or any of their respective governing board shall be governed by and construed in accordance with the laws of the Commonwealth. Each of the parties irrevocably agrees that any legal action, suit, or proceeding arising out of this Indenture brought by any party or its successors or assigns shall be brought in any federal district court sitting in the Commonwealth and any appellate court from any thereof or, in the event such federal court does not have or accept jurisdiction, a Commonwealth court and any appellate court from any thereto (collectively, the "Puerto Rico Courts"), and each of the parties hereby irrevocably submits to the exclusive jurisdiction of the Puerto Rico Courts for itself and with respect to its property, generally and unconditionally, with regard to any such proceeding arising out of this Indenture. Each of the parties agrees not to commence any proceeding relating hereto or thereto except in any federal district court sitting in the Commonwealth, other than proceedings in any court of competent jurisdiction to enforce any judgment, decree or award rendered by any Puerto Rico Court. Each of the parties further agrees that notice as provided in <u>Section 13.04</u> shall constitute sufficient service of process and the parties further waive any argument that such service is insufficient. Each of the parties hereto hereby irrevocably and unconditionally waives and agrees not to assert, to the fullest extent permitted by law, any objection that it may now or hereafter have that (i) a proceeding in any federal court sitting in the Puerto Rico district is brought in an inconvenient forum, (ii) the venue of such proceeding is improper or (iii) that any federal district court sitting in the Commonwealth and any appellate court from any thereof lacks jurisdiction over such proceeding or any party thereto. For the avoidance of doubt, to the fullest extent permitted by law, the parties submit to the jurisdiction of any federal district court sitting in the Commonwealth and any appellate court from any thereof and irrevocably waive any immunity from suit in federal court that they may have for any action or proceeding arising out of or relating to this Indenture.

(b)        Each party hereby waives, to the fullest extent permitted by applicable law, any right it may have to a trial by jury in any legal proceeding directly or indirectly arising out of or relating to this Indenture or the transactions contemplated hereby (whether based on contract, tort or any other theory).

SECTION 13.14  <u>Waiver of Personal Liability</u>.  No Board Member, officer or agent of the Issuer shall be individually or personally liable for the payment of the principal or interest on the Bonds or be subject to any personal liability or accountability by reason of the issuance thereof or any other action taken pursuant to this Indenture; but nothing herein contained shall relieve any such Board Member, officer or agent from the performance of any official duty provided by law or by this Indenture.

SECTION 13.15  <u>Counterparts</u>.  This Indenture may be executed simultaneously in any number of counterparts, each of which shall be deemed to be an original, and all of which shall constitute but one and the same instrument.

SECTION 13.16  <u>No Petition</u>.  The Indenture Trustee, by entering into this Indenture, and each Bondholder, by accepting a Bond, hereby covenant and agree that they shall not at any time acquiesce, petition or otherwise invoke or cause the Issuer, GDB or AAFAF to invoke the process of any court or government authority for the purpose of commencing or sustaining a case against the Issuer, GDB or AAFAF under any federal or state bankruptcy, insolvency or similar law, or appointing a receiver (except as specifically provided for in <u>Section 8.03(g)</u>), liquidator, assignee, trustee, custodian, sequestrator or other similar official of the Issuer, GDB or AAFAF, as the case may be, or any substantial part of its property, or ordering the winding up or liquidation of the affairs of

51

the Issuer, GDB or AAFAF, in connection with any obligations relating to the Bonds, this Indenture or any of the Transaction Documents prior to the date that is one year and one day after the date on which this Indenture is terminated. This <u>Section 13.16</u> shall survive the termination of this Indenture and the termination of the Indenture Trustee under this Indenture.

SECTION 13.17  <u>"CUSIP" Numbers</u>.  Neither the Indenture Trustee nor the Issuer shall be liable for any defect or inaccuracy in the "CUSIP" number that appears on any Bond.

***

IN WITNESS WHEREOF, the Issuer and the Indenture Trustee have caused this Indenture to be duly executed by their respective officers, thereunto duly authorized and duly attested, all as of the day and year first above written.

**GDB DEBT RECOVERY AUTHORITY**

By: _____

Name:    David Pauker

Title:    Chairman

By: _____

Name:    Jorge Padilla

Title:    Executive Director

**WILMINGTON TRUST, N.A., as Indenture Trustee**

By: _____

Name: Jay H. Smith IV

Title:  Vice President

*[Signature Page to Indenture]*

EXHIBIT A

FORM OF BOND

**Unless this Bond is presented by an authorized representative of The Depository Trust Company ("*DTC*") to the Trustee for registration of transfer, exchange, or payment, and any Bond issued is registered in the name of Cede & Co. or in such other name as is requested by an authorized representative of DTC (and any payment is made to Cede & Co. or to such other entity as is requested by an authorized representative of DTC), any transfer, pledge, or other use hereof for value or otherwise by or to any person is wrongful inasmuch as the registered owner hereof, Cede & Co., has an interest herein.**

**GDB Debt Recovery Authority**
**GDB Debt Recovery Authority Bonds (Taxable)**

Number  ____                                                                                      Principal Amount
                                                                                                                  $_____

| **Interest Rate** | **Final Scheduled Payment Date** | **Dated Date** | **CUSIP Number** |
|---|---|---|---|
| 7.50% | August 20, 2040, as may be extended as described herein | [date of original issuance and delivery] | 36829Q AA3 |

**REGISTERED OWNER:  CEDE & CO.**

     **KNOW ALL PEOPLE BY THESE PRESENTS** that the **GDB Debt Recovery Authority** (the "*Issuer*"), a statutory public trust and governmental instrumentality of the Commonwealth of Puerto Rico (the "*Commonwealth*"), for value received, hereby promises to pay, but only from the sources as hereinafter provided, to the Registered Owner specified above, or registered assigns, on the Final Scheduled Payment Date (as hereinafter defined), upon the presentation and surrender hereof, at the principal corporate trust office of Wilmington Trust, N.A. (together with its successors and assigns, the "*Trustee*") in [_____] (the "*Office of the Trustee*"), or its successor in trust or at the duly designated office of any duly appointed alternate or successor paying agent, the principal sum set forth above (or such greater or lesser principal amount as may then be Outstanding (including any PIK Amounts (as hereinafter defined)) and any accrued interest that has not been paid in cash or in PIK Amount), and in like manner to pay interest on said principal amount (including any PIK Amounts) at the rate of interest stated above per annum, from the date of original issuance and delivery hereof until said principal amount (including any PIK Amounts) is paid in full or until the Indenture (as  hereinafter defined) is otherwise terminated according to its terms, whichever is earlier. Capitalized terms used herein but not defined shall have the meanings given to such terms in the Indenture.

     Payment of interest on this Bond will be made on each Payment Date.  Interest shall accrue during the period from and including the immediately preceding Payment Date (as hereinafter defined) on which interest has been paid (in cash or in PIK Amount or any combination thereof) (or, in the case of the Special First Payment Date (as hereinafter defined), from and including the Closing Date (as hereinafter defined)) to, but excluding, the Payment Date on which such interest is to be paid (in cash or in PIK Amount or any combination thereof)  (each such period, an "*Interest Period*").  Interest shall be paid on the Special First Payment Date and, thereafter, on each February 20 and August 20, provided that if any such date is not a Business Day, any action to be taken on such date need not be taken on such date but may be taken on the next succeeding Business Day with the same force and effect as if taken on such date, with no additional interest accruing in respect of the delay (each such date, a "*Payment Date*").  On November 29, 2018 (the "*Closing Date*") or as soon thereafter as reasonably practicable (the "*Special First Payment Date*"), the Issuer will apply all Cash Assets received from Banco Gubernamental de Fomento Para Puerto Rico (The Government Development Bank for Puerto Rico) ("*GDB*") in accordance with the

A-1

Priority of Payments set forth in the Bond Indenture dated as of November 29, 2018 (the "***Indenture***"), between the Issuer and the Trustee, including to make payments of interest and principal to the extent sufficient funds are available therefor after the payment or retention, as applicable, of the other amounts required pursuant to such payment priority.

Interest on this Bond will be calculated on an actual/360 basis and for each Interest Period shall equal the product of: (i) the principal amount of the Bonds Outstanding on the Payment Date on which such interest is to be paid (including any previously accrued PIK Amounts), before giving effect to the payment of principal, if any, on that date, (ii) the Interest Rate, and (iii) the number of days from and including the immediately preceding Payment Date on which interest has been paid (in cash or in PIK Amount or any combination thereof) (or, in the case of the Special First Payment Date, from and including the Closing Date) to, but excluding, the Payment Date on which such interest is to be paid divided by 360.

Interest and other distributions on this Bond shall be made to the registered owner hereof and shall be paid in lawful money of the United States of America by check or draft (other than with respect to PIK Amounts) mailed to the Person in whose name this bond is registered at his, her, or its address as it appears on the registration books of the Issuer (the "***Bond Register***") maintained by the Trustee, as bond registrar, on behalf of the Issuer,  on the calendar day immediately preceding the Payment Date (each, a "***Record Date***"), irrespective of any transfer or exchange of this Bond subsequent to a Record Date and prior to such Payment Date, by the Person in whose name this Bond is registered; provided, that (i) while DTC is the Owner of the Bonds, all cash payments of principal and interest on the Bonds will be paid to DTC or its nominee by wire transfer and (ii) all PIK Amounts shall be credited by adding such PIK Amount to the then Outstanding principal amount of the Bond in the manner provided in the Indenture.  The Bonds shall be issued in United States Dollars in minimum denominations of $1.00 and integral multiples of $1.00 in excess thereof, and PIK Amounts, if any, shall be equal to $1.00 and any integral multiples of $1.00 in excess thereof.

To the extent there is insufficient Available Cash on any Payment Date to pay in full in cash all interest accrued during the Interest Period preceding such Payment Date, such accrued interest on this Bond will be paid in cash pro rata to the extent of and from Available Cash (to the extent there is sufficient Available Cash to pay at least $1.00 of cash interest for every $1,000 of Outstanding principal amount of the Bonds), and the principal of this Bond will accrue an amount equal to the amount of any Available Cash shortfall (rounded up to the nearest $1.00) (each such amount of shortfall, a "***PIK Amount***").  Following an increase in the principal amount of this Bond as a result of the accrual of a PIK Amount, this Bond will bear interest on the then-Outstanding principal, which will include such accrued PIK Amount and any previously accrued PIK Amounts.  In addition, to the extent there is insufficient Available Cash on any Payment Date to pay at least $1.00 of cash interest for every $1,000 of Outstanding principal amount of the Bonds, there will be no cash distribution to Bondholders on such Payment Date, principal on this Bond shall accrue a PIK Amount equal to the entire amount of such accrued and unpaid interest, and any Available Cash will remain in the Collection Account until the following Payment Date.

Payments of principal (including any PIK Amounts) on the Bonds will be made from Available Cash on each Payment Date to the extent available after all accrued interest with respect to such Payment Date has been paid in full in cash, thereby reducing the Outstanding principal balance of the Bonds by such amount.  The principal amount of this Bond (including any accrued PIK Amounts) shall be due on August 20, 2040, or thereafter as such date may be delayed by vote of the Bondholders pursuant to the Indenture (the "***Final Scheduled Payment Date***").  If the Issuer fails to pay all Outstanding principal (including any accrued PIK Amounts) on the Bonds on or prior to the Final Scheduled Payment Date, the Trustee may, or upon the direction of Bondholders holding not less than 25% of the Outstanding Amount will, apply to any Commonwealth or federal court of competent jurisdiction in the Commonwealth for the appointment of a receiver for the Issuer.  Upon any liquidation of Restructuring Property (as hereafter defined) and distribution of all remaining Collections (as hereinafter defined) in accordance with the requisite payment priority set forth in the Indenture, the Bondholders will have no further claims against the Issuer in respect of the Bonds.

The Bonds are being issued by means of a book-entry system with no physical distribution of bond certificates to be made except as provided in the Indenture.  One or more bond certificates, in the aggregate principal amount of the Bonds and registered in the name of Cede & Co., as nominee of DTC, are being issued and required to be deposited with DTC (or an authorized banking institution acceptable to DTC) and immobilized in its custody.

The book-entry system will evidence ownership of the Bonds in authorized denominations, with transfers of ownership effected on the records of DTC and its participants pursuant to rules and procedures established by DTC and its participants.  Transfer of principal (including any PIK Amounts) and interest payments to beneficial owners of the Bonds by participants of DTC will be the responsibility of such participants and other nominees of such beneficial owners.  The Issuer will not be responsible or liable for such transfers of payments or for maintaining, supervising or reviewing the records maintained by DTC, its participants or persons acting through such participants.  While Cede & Co. is the registered owner of this Bond, notwithstanding the provisions hereinabove contained, payments of principal (including any PIK Amounts) and interest on this Bond will be made in accordance with the existing arrangements between the Trustee and DTC. In particular, payments of principal shall be made to DTC participants as selected by lot, in minimum authorized denominations of $1.00, consistent with DTC procedures.

This bond is one of an authorized issue of bonds designated "GDB Debt Recovery Authority Bonds (Taxable)" (the "***Bonds***") in the original aggregate principal amount of $[PAR], authorized by the GDB Restructuring Act to be issued to facilitate the restructuring of certain portions of GDB's indebtedness pursuant to the creditor collective action procedures set forth in Title VI of PROMESA. Specifically, upon the consummation of the Qualifying Modification, all of the Participating Bond Claims have been mandatorily exchanged for the Bonds, and GDB has (i) irrevocably assigned and transferred to the Issuer its entire interest in the Transferred Property, whether in existence on the Closing Date or to be delivered from time to time thereafter, and (ii) entered into a keepwell agreement with the Issuer and the Trustee, dated as of the Closing Date (the "***Keepwell Agreement***"), in consideration for the Issuer's issuance of the Bonds and the resulting cancellation of the Participating Bond Claims. Upon the exchange of Participating Bond Claims for the Bonds, the transfer of the Transferred Property on the Closing Date and GDB's and the Issuer's execution of the Keepwell Agreement, all Participating Bond Claims were extinguished and cancelled and holders of such Participating Bond Claims immediately and forever ceased to have any rights, interests or claims against GDB or any of its assets, or any successors or assigns thereof in respect of such Participating Bond Claims, other than as set forth in the Keepwell Agreement. The Bonds are secured by the Statutory Lien on the Transferred Property and any and all assets, collections, fees, charges, proceeds, revenues, rents, insurance payments, income or other funds generated by, or received by the Issuer, the Servicer or GDB in respect of the Transferred Property, including in respect of the administration or reinvestment thereof, in each case on or after the Cutoff Date (collectively, the "***Collections***" and, together with the Transferred Property, the "***Restructuring Property***").

**THE BONDS ARE SPECIAL LIMITED OBLIGATIONS OF THE ISSUER AND ARE NOT INDEBTEDNESS OR LIABILITIES OF GDB, AAFAF, THE COMMONWEALTH OR ANY OF THE COMMONWEALTH'S PUBLIC INSTRUMENTALITIES OR POLITICAL SUBDIVISIONS, OTHER THAN THE ISSUER. THE BONDS ARE NOT BACKED BY THE GOOD FAITH, CREDIT AND TAXING POWER OF THE COMMONWEALTH NOR ARE THEY PAYABLE OR SECURED BY GDB, AAFAF OR ANY OF THE COMMONWEALTH'S PUBLIC INSTRUMENTALITIES OR POLITICAL SUBDIVISIONS, OTHER THAN THE ISSUER. THE BONDS WILL REPRESENT INDEBTEDNESS SOLELY OF THE ISSUER AND WILL NOT BE PAYABLE OR GUARANTEED BY GDB, AAFAF, THE COMMONWEALTH, ANY OF THE COMMONWEALTH'S PUBLIC INSTRUMENTALITIES OR POLITICAL SUBDIVISIONS, OTHER THAN THE ISSUER, OR ANY OTHER PERSON OR ENTITY. THE BONDS ARE SPECIAL LIMITED OBLIGATIONS OF THE ISSUER PAYABLE SOLELY FROM, SECURED SOLELY BY, AND HAVING RECOURSE SOLELY TO, THE RESTRUCTURING PROPERTY; PROVIDED, THAT, IN LIMITED CIRCUMSTANCES, THE ISSUER, THE  TRUSTEE AND THE BONDHOLDERS, AS APPLICABLE, MAY HAVE CERTAIN CLAIMS AGAINST GDB PURSUANT TO THE KEEPWELL AGREEMENT. THE ISSUER DOES NOT HAVE ANY TAXING AUTHORITY.**

The Bonds and any additional bonds issued after the Closing Date in accordance with the terms of the Indenture on a parity with the Bonds (collectively, "***Additional Bonds***") are parity obligations that rank equally, without privilege, priority, or distinction as to the lien or otherwise of any of such bonds over any other of such bonds.

The Bonds were and, with respect to any Additional Bonds, shall be automatically, upon the issuance of the Bonds, secured by a Statutory Lien on the Restructuring Property in favor of the Trustee for the benefit of the

Bondholders, which is senior to any other lien encumbering the Restructuring Property (except for valid liens and encumbrances existing as of the effective date of the GDB Restructuring Act or that arose in the ordinary course of business after the effective date of the GDB Restructuring Act and existed as of the Closing Date, in each case with respect to any real estate assets and any personal property assets related thereto that are part of the Restructuring Property) and may be enforced pursuant to the terms of the Indenture and the other Transaction Documents. Such Statutory Lien occurred automatically upon issuance of the Bonds and is automatically perfected, valid and binding from and after the Closing Date, in any case without any further act or agreement. No instrument needs to be delivered or recorded in any official record or in any government registry or office in order to perfect or continue such Statutory Lien or to establish or maintain the priority thereof. No commingling of any Restructuring Property with any other property of GDB or any other party shall limit, defeat, impair or interfere with such Statutory Lien.

Reference is hereby made to the Indenture and to all indentures supplemental thereto for a description of the property subject to the Statutory Lien, the provisions, among others, with respect to the nature and extent of the security for the Bonds, the rights, duties, and obligations of the Issuer, the Trustee, the Servicer, the Collateral Monitor and the owners of the Bonds, the issuance of Additional Bonds, the terms upon which said Additional Bonds may be issued and secured, and the provisions regulating the manner in which the terms of the Indenture, the Keepwell Agreement and the other Transaction Documents may be modified, to all of which provisions the owner of this Bond, on behalf of himself, herself, or itself and his, her, or its successors in interest, assents by acceptance hereof.

Reference is made to the Indenture, the Keepwell Agreement and the other Transaction Documents for a more complete statement of the provisions thereof and of the rights of the Issuer, the Trustee, the Servicer, the Collateral Monitor and the owners of the Bonds.  Copies of the Indenture, the Keepwell Agreement and the other Transaction Documents are on file and may be inspected at the Office of the Trustee.  By the acceptance of this Bond, the owner hereof signifies assent to all of the provisions of the aforementioned documents.  To the extent permitted by applicable law, in the event of any inconsistency between the terms of this Bond and the terms of the Indenture, the terms of the Indenture will control.

This Bond is governed by the laws of the State of New York.

Subject to the conditions in the Indenture, the owner of any Bond or Bonds issued under the Indenture may, if not prohibited by law, surrender the same (together with a written instrument of transfer satisfactory to the Trustee duly executed by the registered owner or his, her, or its attorney duly authorized in writing) in exchange for an equal aggregate principal amount of Bonds of the same interest rate and maturity and of any authorized denomination. This Bond is transferable as provided in the Indenture by the registered owner in person or by the registered owner's attorney duly authorized in writing at the Office of the Trustee, upon surrender of this Bond accompanied by a duly executed instrument of transfer, in form and with guarantee of signature satisfactory to the Trustee, and upon payment of any shipping, insurance, or governmental charges or taxes incident to such transfer.  Upon any such transfer, a Bond or Bonds in the same aggregate principal amount and of the interest rate, and maturity will be issued to the transferee.  The Issuer and the Trustee may deem and treat the person in whose name this Bond is registered as the absolute owner hereof (whether or not this Bond shall be overdue) for the purpose of receiving payment of, or on account of, the principal (including any PIK Amounts) of and interest due on this Bond and for all other purposes, and the Issuer and the Trustee shall not be affected by any notice to the contrary.

The owner of this Bond will have no right to enforce the provisions of the Indenture or to institute action to enforce the covenants therein, or to take any action with respect to any Event of Default under the Indenture, or to institute, appear in or defend any suit or other proceeding with respect thereto, except as provided in the Indenture.

Upon the occurrence of certain events, and on the conditions, in the manner and with the effect set forth in the Indenture, the principal (including any PIK Amounts) of all Bonds then Outstanding under the Indenture may become or may be declared due and payable before the stated maturity thereof, together with the interest accrued thereon.

Modifications or alterations of the Indenture or any indenture supplemental thereto or the Keepwell Agreement or any other Transaction Document, may be made only to the extent and in the circumstances permitted by the Indenture, the Keepwell Agreement or such other Transaction Document.

      **IT IS HEREBY CERTIFIED, RECITED, AND DECLARED** that all acts, conditions, and things required to exist, happen, and be performed precedent to and in the issuance of this bond do exist, have happened, and have been performed in due time, form, and manner as required by law in order to make this Bond a valid and legal obligation of the Issuer.

      This Bond shall not be valid or become obligatory for any purpose or be entitled to any security or benefit under the Indenture until it shall have been authenticated by the Trustee, as provided for in the Indenture.

**IN WITNESS WHEREOF, the GDB DEBT RECOVERY AUTHORITY** has caused this bond to be executed in its name and on its behalf by the manual or facsimile signature of an Authorized Person of the Issuer, all as of the date set forth above.

**GDB DEBT RECOVERY AUTHORITY**

By: _____
      Name:    David Pauker
      Title:     Chairman


By: _____
      Name:    Jorge Padilla
      Title:     Executive Director

A-6

**[Form of Trustee's Certificate of Authentication]**

**Certificate of Authentication**

This Bond is one of the bonds of the series described in the within mentioned Indenture.

**WILMINGTON TRUST, N.A., as Trustee**

By_____
     Authorized Signatory

Date of Authentication:

_____, _____.

A-7

**Assignment**

The following abbreviations, when used in the inscription on this bond or in the Assignment below, shall be construed as though they were written out in full according to applicable laws or regulations:

**Ten Com**     -     as tenants in common
**Ten Ent**     -     as tenants by the entireties
**Jt Ten**     -     as joint tenants with right of survivorship and not as tenants in common and not as community property

**Unif Trans**
 **Min Act**     -     _____ Custodian _____
                     (Custodian)                 (Minor)
                     under Uniform Transfer to Minors Act _____
                                                   (State)

Additional abbreviations may be used although not in the above list.

**For Value Received**, the undersigned, _____, hereby sells, assigns, and transfers unto _____ (Tax Identification or Social Security No. _____) the within bond and all rights thereunder and hereby irrevocably constitutes and appoints _____ attorney to transfer the within bond on the books kept for registration thereof, with full power of substitution in the premises.

Dated:_____                  _____
                                                Signature

                                           **Notice**: The signature to this Assignment must correspond with the name of the registered owner as it appears upon the face of the within bond in every particular without alteration or enlargement or any change whatsoever.

                                           _____
                                           Signature Guaranteed

                                           **Notice**: The signature to this Assignment must be guaranteed by an institution that is a participant in the Securities Transfer Agent Medallion Program ("STAMP") or similar program.

**[End of Form of Bond]**

A-8

EXHIBIT B

COLLECTION SCHEDULE

| Payment Date | Scheduled Total Collections ($ in millions) |
|---|---|
| Jan-19 | 41.9 |
| Jul-19 | 102.3 |
| Jan-20 | 35.8 |
| Jul-20 | 103.2 |
| Jan-21 | 33.5 |
| Jul-21 | 103.1 |
| Jan-22 | 31.4 |
| Jul-22 | 101.9 |
| Jan-23 | 29.2 |
| Jul-23 | 103.7 |
| Jan-24 | 27.1 |
| Jul-24 | 105.5 |
| Jan-25 | 24.6 |
| Jul-25 | 104.3 |
| Jan-26 | 22.4 |
| Jul-26 | 101.8 |
| Jan-27 | 20.1 |
| Jul-27 | 98.7 |
| Jan-28 | 17.9 |
| Jul-28 | 101.3 |
| Jan-29 | 15.1 |
| Jul-29 | 90.9 |
| Jan-30 | 12.8 |
| Jul-30 | 88.0 |
| Jan-31 | 10.5 |
| Jul-31 | 84.1 |
| Jan-32 | 8.2 |
| Jul-32 | 72.6 |
| Jan-33 | 6.0 |
| Jul-33 | 56.9 |
| Jan-34 | 4.2 |
| Jul-34 | 48.0 |
| Jan-35 | 2.7 |
| Jul-35 | 34.4 |
| Jan-36 | 1.6 |
| Jul-36 | 24.0 |
| Jan-37 | 0.8 |
| Jul-37 | 13.2 |
| Jan-38 | 0.3 |
| Jul-38 | 9.6 |
| Jan-39 | 0.0 |
| Jul-39 | 0.4 |
| Jan-40 | 0.0 |
| Jul-40 | 0.1 |
| **Total** | **$1,894.1** |

EXHIBIT C

CONTINGENT AND UNLIQUIDATED CLAIMS

| Contingent and Unliquidated Claims | |
| --- | --- |
| PR Public Finance Corporation Stand-By Letter of Credit | $86,710,112 |
| Lehman Brothers Special Financing, Inc. - Debt Service Deposit Agreement | $26,000,000 |

C-1

EXHIBIT D

REPORTS TO THE BONDHOLDERS

| Report | Preparer | Content | Due Date |
|---|---|---|---|
| Payment Date Report | Servicer | 1. The amount of Available Cash for the related Payment Date, and the calculation thereof<br><br>2. Amounts relating to the Bonds:<br><br>    (a) The aggregate amount paid or distributed in respect of interest on the Bonds on such Payment Date, if any<br><br>    (b) The aggregate amount of any shortfall of funds available to pay interest on the Bonds on such Payment Date after giving effect to all payments of interest on such Payment Date, if any<br><br>    (c) The aggregate amount paid or distributed in respect of principal on the Bonds on such Payment Date, if any<br><br>    (d) The Outstanding Amount (including PIK Amounts) before and after giving effect to payments on such Payment Date<br><br>3. Current Amounts Due:<br><br>    (a) The amount of fees, expenses and indemnification amounts due and payable to each of the Servicer, the Collateral Monitor and the Indenture Trustee before and after giving effect to payments on such Payment Date, and the amount of any remaining unpaid amounts from prior Payment Dates<br><br>    (b) Amounts due in respect of any other Issuer Expenses on such Payment Date, before and after giving effect to payments on such Payment Date<br><br>4. Budget Report:<br><br>    (a) The aggregate amount of all Issuer Expenses that have been paid or reimbursed through withdrawals from the Collection Account or otherwise corresponding to the related Collection Period<br><br>        (i) The aggregate amount of such Issuer Expenses corresponding to each of the Servicer, the Collateral Monitor, the Indenture Trustee and the Issuer<br><br>        (ii) The individual amount of, and brief description for, each such material | Payment Date |

|  |  | Issuer Expense |  |
|---|---|---|---|
|  |  | (b) The aggregate amount of cash Collections received during the related Collection Period<br><br>5. Semiannual Budget:<br><br>  (a) The aggregate amount to be set aside on such Payment Date for the Fees and Expenses Reserve<br><br>  (b) The amounts set aside in the Fees and Expenses Reserve corresponding to (i) the estimated fees, expenses and indemnification amounts expected to be payable to, or in respect of, each of the Servicer, the Collateral Monitor and the Indenture Trustee, (ii) the estimated Issuer Expenses other than those set forth in the foregoing clause (i) expected to be incurred by the Issuer, and (iii) the estimated amount of any expected individual material Issuer Expense<br><br>  (c) Any item included in the Semiannual Budget for which no amount is set aside in the Fees and Expenses Reserve |  |
| Quarterly Budget Report | Servicer | 1. The aggregate amount of all Issuer Expenses that have been paid or reimbursed through withdrawals from the Collection Account or otherwise corresponding to the related fiscal quarter<br><br>  (a) The aggregate amount of such Issuer Expenses corresponding to each of the Servicer, the Collateral Monitor, the Indenture Trustee and the Issuer<br><br>  (b) The individual amount of each such material Issuer Expense<br><br>2. The aggregate amount of cash Collections received during such fiscal quarter | No later than 45 days after the end of fiscal quarter that is not the end of a Collection Period |

| Semiannual Bondholder Report | Collateral Monitor | 1. The results of the Compliance Test for the related Collection Period | No later than 120 days after Collection Period |
|---|---|---|---|
| | | 2. The Collateral Monitor's assessment of the Servicer's performance and compliance with the applicable servicing standards | |
| | | 3. Delinquency and loss information with respect to the Restructuring Property for the related Collection Period | |
| | | 4. A brief description of any material actions taken in respect of the Restructuring Property, including material modifications, extensions or waivers to the Restructuring Property's terms, fees, penalties or payments during the related Collection Period, or that have cumulatively become material over time (including any sale, Settlement or other disposition with respect to the Restructuring Property) | |
| | | 5. A brief description of any actions taken in respect of all Loans constituting Restructuring Property that are more than 90 days past due and all real estate, cash and other non-interest-bearing assets constituting Restructuring Property | |
| | | 6. A brief description of any Servicer conflicts-of-interest | |
| | | 7. Any other information the Collateral Monitor determines, in its sole discretion, is relevant to the interests of Bondholders | |

EXHIBIT E

FORM OF FUND TRANSFER REQUISITION

To:    Wilmington Trust, N.A., as Indenture Trustee

Re:    7.500% GDB Debt Recovery Authority Bonds (Taxable) due 2040

Requisition No. _____ (to be sequentially numbered)

The undersigned, on behalf of GDB Debt Recovery Authority (the "Issuer"), instructs you to pay or retain, as applicable, on [Applicable Date], from the Collection Account, the total amount shown [below] [on the attachment hereto] to the order of the payee or payees named [below] [on the attachment]. The payee(s), the purpose, the amount and payment instructions of the disbursement requested, are as follows:

| Payee[1] | Purpose[2] | Amount | Payment Instructions[3] |
|---|---|---|---|
| [Name and Address] | | $ | |
| Total: | | $ | |

All capitalized terms used herein have the meanings given such terms in the Bond Indenture, dated as of November 29, 2018, between you and GDB Debt Recovery Authority and relating to the above-captioned Bonds. The undersigned hereby certifies as follows:

1.    Each of the items for which payment (or retainment) is requested is (i) described in Section 11.01 of the Indenture and (ii) is a proper charge against the Collection Account in accordance with the Servicing Agreement.

2.    None of the items for which payment (or retainment) is requested has been paid out (or retained) previously from the Collection Account.

[3.    Attached hereto is the consent of the Collateral Monitor as required under Section [11.01(b)][11.01(c)] of the Indenture.]

Dated: _____

AMERINATIONAL COMMUNITY SERVICES, LLC

By: _____
Name:
Title:

---

[1] **If to be retained, please write "Fees and Expenses Reserve" as the payee.**
[2] **State whether the payment (or retainment) is for (i) the Fees and Expenses Reserve, (ii) Issuer Expenses, (iii) cash interest on the Bonds, or (iv) the principal amount of the Bonds. If the payment is for Issuer Expenses, the request must also specify whether it is for Issuer Operating Expenses or for Excluded Expenses.**
[3] **If to be retained, please write "Retained in the Collection Account" in the payment instructions.**

<u>EXHIBIT F</u>

<u>FORM OF SOLICITATION OF BONDHOLDER VOTES REGARDING SERVICER REPLACEMENT EVENT</u>

**ALL DEPOSITORIES, NOMINEES, BROKERS AND OTHERS:**
**PLEASE FACILITATE THE TRANSMISSION OF THIS NOTICE TO ALL BENEFICIAL OWNERS.**
**ADDITIONAL COPIES OF THIS NOTICE ARE AVAILABLE FOR THIS PURPOSE UPON REQUEST**
**AT THE ADDRESS SET FORTH BELOW.**

**NOTICE OF RECEIPT OF MATERIAL SERVICER DEFAULT NOTICE AND SOLICITATION OF**
**BONDHOLDER VOTE REGARDING WHETHER SERVICER REPLACEMENT EVENT HAS**
**OCCURRED AND, AS A CONSEQUENCE, THE SERVICER SHOULD BE REPLACED**

**TO THE HOLDERS OF 7.500% GDB DEBT RECOVERY AUTHORITY BONDS (TAXABLE) DUE 2040**

**Affected CUSIP Nos.: _____\***

Ladies and Gentlemen:

[Indenture Trustee] is the trustee (the "<u>Trustee</u>") under that certain indenture dated as of November 29, 2018 (the "<u>Indenture</u>") by and among the Trustee and GDB Debt Recovery Authority, a statutory public trust and government instrumentality of the Commonwealth of Puerto Rico.  Capitalized terms used but not defined herein and on the attached ballot have the respective meanings ascribed to them in the Indenture.

**<u>Material Servicer Default Notice</u>**

On [•] (the "<u>Voting Record Date</u>") the Collateral Monitor delivered to the Trustee a Material Servicer Default Notice stating that the (i) Collateral Monitor believes, in good faith, that a Servicer Default has occurred and is continuing and (ii) the Collateral Monitor believes that such Servicer Default is material to the interests of the Bondholders.  The Material Servicer Default Notice provides as follows: [•].

**<u>Solicitation of Bondholder Vote</u>**

Pursuant to Section 5.03 of the Indenture, the Trustee is required to solicit a vote of the Bondholders regarding whether a Servicer Replacement Event has occurred and, as a consequence, the Servicer should be replaced.  Based upon the Servicer Default described in the Material Servicer Default Notice, please use the attached ballot to cast your vote regarding whether a Servicer Replacement Event has occurred and, as a consequence, the Servicer should be replaced.  **In order for your vote to be counted, your completed ballot must be actually received by the Trustee on or before [DATE] at [TIME].**

**<u>Communications with the Trustee</u>**

The Trustee will continue to provide information concerning this matter to the Bondholders as it becomes available.  If you have questions concerning this notice or the ballot, inquiries may be directed to [•] or to the Trustee's counsel: [•].  The Trustee may conclude, however, that a specific response to particular inquiries from individual Bondholders is not consistent with equal and full dissemination of information to all Bondholders. Bondholders should not rely upon the Trustee as their sole source of information.  This notice and solicitation are provided solely for the reasons stated herein.  The Trustee gives no legal, financial or tax advice regarding the Bonds or the matters described herein.  Bondholders should consult their own professions regarding the Bonds and the events described above.

[By the Trustee]
Dated:

**\* The Trustee makes no representation as to the accuracy of the CUSIP number(s) provided and used herein.**

**BALLOT REGARDING SERVICER REPLACEMENT EVENT**

**Item 1.   Certification of Holdings.**   The undersigned hereby certifies that as of the Voting Record Date, the undersigned was a holder (or authorized signatory of such holder) of $[•] aggregate principal amount of 7.500% GDB Debt Recovery Authority Bonds (Taxable) Due 2040.

**Item 2. Vote.**   Please vote regarding whether a Servicer Replacement Event has occurred and, as a consequence, the Servicer should be replaced.

The undersigned holder of 7.500% GDB Debt Recovery Authority Bonds (Taxable) Due 2040 votes as follows (check <u>one</u> box):

☐ A Servicer Replacement Event **has** occurred and the Servicer should be replaced.    ☐ A Servicer Replacement Event **has not** occurred.

**Item 3. Certifications and Acknowledgements.**   By signing this ballot, the holder (or authorized signatory of such holder) acknowledges receipt of the Notice of Receipt of Material Servicer Default Notice and Solicitation of Bondholder Vote Regarding Whether Servicer Replacement Event Has Occurred and, as a Consequence, the Servicer Should Be Replaced, and certifies that (a) it has the authority to vote regarding whether a Servicer Replacement Event has occurred and, as a consequence, the Servicer should be replaced, and (b) as of the Voting Record Date, it was the holder (or is entitled to vote on behalf of such holder) of 7.500% GDB Debt Recovery Authority Bonds (Taxable) Due 2040.   The undersigned understand that an otherwise properly completed, executed and timely returned ballot failing to indicate whether a Servicer Replacement Event has or has not occurred or indicating that a Servicer Replacement Event both has and has not occurred will not be counted.

_____
Name of Holder

_____
Signature

_____
If by Authorized Agent, Name and Title

_____
Name of Institution

_____
Street Address / City / State / Zip

_____
Telephone Number

_____
Date Completed

**IN ORDER FOR YOUR VOTE TO BE COUNTED, YOUR COMPLETED BALLOT <u>MUST BE ACTUALLY RECEIVED BY THE TRUSTEE</u> BY THE VOTING DEADLINE.  PLEASE COMPLETE, SIGN, AND DATE THE BALLOT AND RETURN IT PROMPTLY BY REGULAR MAIL, MESSENGER OR OVERNIGHT DELIVERY AS FOLLOWS:**

[Name of Trustee]
[Attn:]
[Street Address]
[City, State, and ZIP]

BALLOTS RECEIVED VIA EMAIL OR FACSIMILE WILL NOT BE COUNTED.