CERTIFIED TRANSLATION

Romero Barcelo v. E.L.A., 169 D.P.R. 460 (2006)

2006 TSPR 163

169 D.P.R. 460, 2006 WL 3290896 (P.R.), 2006 TSPR 163

CARLOS ROMERO BARCELÓ, PETER MULLER, HIPÓLITO ROBLES RIVERA, ANTONIO PINO MARINA AND OTHERS, plaintiffs and petitioners,

v.

THE COMMONWEALTH OF PUERTO RICO, HON. ANÍBAL ACEVEDO VILÁ, in his capacity as GOVERNOR, and HON. JUAN CARLOS MÉNDEZ TORRES, in his capacity as SECRETARY OF FINANCE, defendants and appellees.

In The Supreme Court of Puerto Rico.
*Number:* CT-2006-9
*Resolved:* November 10, 2006
Nov. 10, 2006.

1. CONSTITUTIONAL LAW-DISTRIBUTION OF GOVERNMENTAL POWERS AND FUNCTIONS-JUDICIAL POWERS AND FUNCTIONS-INTRUSIONS ON JUDICIAL POWER-LIMITATION ON THE JURISDICTION OF THE COURTS-CASE OR CONTROVERSY.

The jurisdiction of the Puerto Rican courts is limited to those instances in which the existence of a case or controversy can be ascertained, since the courts exist only to resolve genuine controversies arising between opposing parties who have a real interest in obtaining a remedy that will affect their legal relations. In order to protect this principle, certain justiciability criteria have been developed to demarcate the power of the courts to hear a matter brought before them. Among these are the standing of the party bringing the suit and the maturity of the controversy raised.

2. RULES OF CIVIL PROCEDURE-PARTIES-CAPACITY TO APPEAR AS PLAINTIFF OR DEFENDANT-IN GENERAL-DOCTRINE OF STANDING....

A party has standing if it meets the requirements: (1) that he has suffered a clear and palpable injury; (2) that the injury is real, immediate and precise and not abstract or hypothetical; (3) that there is a connection between the injury suffered and the cause of action asserted; and (4) that the cause of action arises under the canopy of the Constitution or a statute.

3. CONSTITUTIONAL LAW-INTERPRETATION, EFFECT AND APPLICATION OF CONSTITUTIONAL PRECEPTS-WHO CAN RAISE CONSTITUTIONAL ISSUES- TAXPAYER STANDING....

It is indispensable for standing to sue that the alleged damage be concrete and particular, since a generalized damage that the plaintiff shares with the rest of the citizenship prevents the configuration of his standing to sue. In accordance with this requirement, the courts lack jurisdiction to hear those claims in which the plaintiff, merely as a taxpayer, challenges a State expense, since the damage that the plaintiff may suffer as a taxpayer is generalized and shared with the rest of the citizenry. **461

4. PUERTO RICO-COMMONWEALTH-ACTIONS-CLAIMS AGAINST THE COMMONWEALTH -STATUTORY PRECEPTS-LAW OF CLAIMS AND SUITS AGAINST THE COMMONWEALTH -TAXPAYER SUITS.

In Puerto Rico, the prohibition for a taxpayer to have standing, merely as a taxpayer, to challenge a State expenditure is regulated by the Law of Lawsuits against the State, specifically by its Art. 3 (32 L.P.R.A. sec. 3075), which is cited in the opinion.

5. CONSTITUTIONAL LAW-INTERPRETATION, EFFECT AND APPLICATION OF CONSTITUTIONAL PRECEPTS-WHO MAY RAISE CONSTITUTIONAL ISSUES- STANDING OF TAXPAYER ALLEGING VIOLATION OF THE SEPARATION OF CHURCH AND STATE CLAUSE.

The prohibition against taxpayer suit is not absolute. In 1968, the U.S. Supreme Court established an exception to the rule and recognized the standing of the taxpayer who challenges a budgetary appropriation, because it operates in violation of the establishment clause of the First Amendment of the federal Constitution. Said exception was adopted in the jurisdiction of the Commonwealth of Puerto Rico when it was resolved that the prohibition regulated in Art. 3 of the Law of Lawsuits against the State, 32 L.P.R.A. sec. 3075, does not apply to claims in which a taxpayer challenges public expenditures, because they operate in violation of the local constitutional clauses against the establishment of a religion and against the use of public funds for the support of private schools.

6. ID. -ID. -ID. TAXPAYER STANDING.

In the jurisdiction of the Commonwealth of Puerto Rico, the legal standing of a taxpayer to challenge a law that determines his liability in such capacity is supported.

7. ID. -ID. -INTERPRETATION IN GENERAL-MATURITY OF THE CONTROVERSY.

The premature filing of an action also impacts the



I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

Romero Barcelo v. E.L.A., 169 D.P.R. 460 (2006)

2006 TSPR 163

jurisdiction of the courts. Ripeness focuses on the temporal proximity or imminence of the alleged harm and must be examined by a dual analysis: whether the substantive dispute is appropriate for judicial resolution and whether the harm is sufficient to require adjudication. The determining factor is whether the dispute is concretely defined so that the court can evaluate it on its merits. All that is necessary to ensure that a case is ripe is that the contemplated event is in all likelihood going to occur.

8. ID. -ID. -ID. -ID.
The "ripeness" standard does not imply that a party must wait for an approved statute to become effective before challenging it. For such purposes, the Puerto Rican legal system has the declaratory judgment, which is a remedial and prophylactic mechanism that allows anticipating the elucidation of the merits of any claim before the courts, as long as there is a potential danger against the plaintiff.

**\*462**

9. RULES OF CIVIL PROCEDURE-PROCEEDINGS ON SPECIAL MATTERS-DECLARATORY JUDGMENTS IN GENERAL.....
The person filing an application for a declaratory judgment is in turn subject to compliance with the standing criteria, whereby he or she must establish the existence or imminence of a clear and actual injury. The approval of the statute and its eventual effectiveness must be definitive, otherwise the cause of action filed to challenge it will not be ripe, since it does not present a real controversy of a justiciable nature that requires a judicial pronouncement. Once the interpretation of a statute is timely challenged through a declaratory judgment action, and the standing of the plaintiff is established, the court's function is referred to its scope and interpretation.

10. STATUTES, CUSTOMS AND EQUITY-INTERPRETATION AND APPLICATION OF THE LAW-GENERAL RULES OF INTERPRETATION-IN GENERAL-MEANING OF THE LAW, CLEAR.....
Art. 14 of the Civil Code of Puerto Rico, 31 L.P.R.A. sec. 14, provides that when the law is clear and free of ambiguity, the letter of the law must not be disregarded under the pretext of complying with its spirit. By virtue of said mandate, when interpreting a statute, reference must be made to the text of the law, for when the legislature has expressed itself in clear and unambiguous language, the text of the law is the expression par excellence of all legislative intent. Therefore, when a law is clear and unambiguous, there is no need to look beyond the letter in search of the legislative intent. It is necessary to discover and give effect to the intention expressed by the letter of the law.

11. ID. -ID. ID. INTENT OR WILL OF THE LEGISLATOR IN PASSING THE LAW.
In the interpretation of a statute, it is necessary to harmonize, to the extent possible, all the provisions of the law in order to achieve an integrated, logical and reasonable interpretation of the legislative intent. The provisions of a statute should not be interpreted in isolation, but should be analyzed as a whole, taking into consideration its entire context.

12. ID. -ID. -D. POWERS AND DUTIES OF COURTS OF JUSTICE IN GENERAL.
In interpreting the text of a statute, one should not look to the intrinsic reasons why the statute was drafted as it was. The role of the courts is limited to the clear text of the law.

**Synopsis**
PETITION FOR *CERTIORARI* for the Supreme Court to intervene and certify, given the public interest of the controversy, in a declaratory judgment action filed by the petitioners before the Court of First Instance, San Juan Division, against the Commonwealth of Puerto Rico, the Governor and the Secretary of the Treasury, challenging the Executive Branch's interpretation of the Tax Fairness Act of 2006 by implementing a sales and use tax at a rate of 5.5% for the State and 1.5% for the municipalities. The petitioners argue that the Tax Fairness Act, in view of the intent, purpose and legislative history, established a single and total rate of 5.5%, of which 4% would correspond to the State and 1.5% to the municipalities. *The Tax Fairness Act of 2006 establishes a sales and use tax at a maximum total tax rate of 7%: 5.5% corresponding to the state tax and 1.5% corresponding to the municipal tax.*

*Charles A. Rodríguez Colón*, counsel for the petitioner; *Salvador J. Antonetti Stutts*, Solicitor General, *Sara Y. Rosado Morales*, assistant attorney general, counsel for the respondent; *Carlos Romero Barceló*, petitioner appearing in his own right; *Ángel J. Vargas Carcaña* and *Kevin Miguel Rivera-Medina*, counsel for the Senate of Puerto Rico; *Richard W. Markus, Manuel D. Herrero* and *Carlos E. Pérez Acosta*, counsel for the House of Representatives; *Sara L. Vélez Santiago, Jorge E. Pérez Díaz* and *Heidi L. Rodríguez Benítez*, counsel for the Government Development Bank of Puerto Rico, *amicus curiae*.

ASSOCIATE JUDGE REBOLLO LÓPEZ delivered the opinion of the Court.



I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

Romero Barcelo v. E.L.A., 169 D.P.R. 460 (2006)

2006 TSPR 163

On November 15, 2005, the majority delegation of the Puerto Rico House of Representatives introduced House Bill 2193 (Bill) to establish the Tax Fairness Act of 2006. By means thereof, as an initial step towards a tax reform of great social justice, it was intended to establish a sales, use and storage tax at a 7% tax rate. To that effect, the bill *provided as follows*:

*Section 7003* - Limitation to Fix Taxes

No municipality or political or administrative division of the Government of the Commonwealth of Puerto Rico may impose or collect any local sales tax on any article of tangible personal property subject to the payment **\*464** of taxes under the provisions of this Subtitle. Excepted from this loyal [sic] provision is the turnover tax authorized by Act No. 113 of July 10, 1974, as amended, known as the "Municipal License Tax Act," the imposition of which by the municipalities is expressly authorized, and mercantile operations on the articles taxed by this Subtitle shall be included in the turnover, without said turnover being increased by the amount of the general sales, use, and consumption tax. Notwithstanding, when the application of the Municipal License Tax Act, jointly with the application of this Subtitle produces an unsustainable tax situation due to the infringement of any constitutional prohibition, if such imposition is sustainable through the imposition and collection of only one of the taxes, the tax set forth in this Subtitle shall prevail.

........

CHAPTER II - RETAIL SALES TAXES

*Section 7005* - Sales, Use and Storage Taxes

(a) A tax shall be imposed, collected, and paid, at the rates prescribed [in] this Section, on any retail transaction, including mail order, or unitary transaction of tangible personal property or taxable services, admissions, its storage, use or consumption in Puerto Rico, and such tax shall be paid only once, at the time and in the manner specified in Chapter V of this Subtitle. ...

(1) Each unit or article of tangible personal property sold at retail in Puerto Rico *shall be taxed at a rate of 7% of the sales price.*

(2) Each article of tangible personal property, when the same is not sold but is used, consumed or stored for use or consumption in Puerto Rico, *shall be taxed at a rate of 7% of the purchase price.*

(3) Every person, natural or juridical, that makes payments to another person for taxable services rendered in or out of Puerto Rico, as defined in this Subtitle, *shall be taxed at a rate of 7% of the sales price.* (Emphasis supplied.) Appendix, p. 222.

Once the Bill was filed, it was referred to the House Committee on Finance and Financial Affairs (Committee) for its analysis and report. After the corresponding public hearings were held, **\*465** [1] on June 20, 2006, the Committee submitted its report. In this report, it *recommended the approval without amendments of a Substitute to House Bill 2193* (Substitute Bill). Said Substitute Bill, which has now become law 2, *provides* as follows:

SUBTITLE BB - SALES AND USE TAX

CHAPTER 2 - TAXATION, COLLECTION AND RESPONSIBLE PERSON

*Section 2401* - Sales Tax

(a) A tax shall be imposed, collected, and paid, at the rates established in this Section, on every sales transaction of a taxable item in Puerto Rico. The application of the tax shall be subject to the exemptions granted in Chapter 3 of this Subtitle.

(b) *The tax rate shall be five point five (5.5%) percent of the sales price of the taxable item and transactions combined.*

*Section 2402* - Use Tax

(a) A tax shall be imposed, collected, and paid, at the rates established in this Section, on the use, storage, or consumption of a taxable item in Puerto Rico.

(b) *The tax rate shall be five point five (5.5%) of the purchase price of the taxable item.*

........

*Section 2410* - Limitation to Fix Taxes

Except as provided in Section 6189, no municipality, whether autonomous or not, of the Commonwealth of Puerto Rico, may impose or collect any excise or tax on articles, services, taxable items or transactions that are subject to or exempt from the sales and use tax established in this Subtitle, as provided in Section 6188 of Subtitle F.

........

WESTLAW   © 2021 Thomson Reuters. No claim to original U.S. Government Works.                    3

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

SUBCHAPTER B - REGULATION OF PROVISIONS RELATING TO CONTRIBUTORY REPRESENTATIVES BEFORE THE DEPARTMENT

*Section 6188* - Limitation on Assessing Taxes

*Except as provided below or in Section* **\*466** *6189*, no municipality, autonomous or not, of the Commonwealth of Puerto Rico, may impose or collect any contribution or tax established in this Code. Excepted from this provision are the construction and turnover taxes authorized by Act No. 81 of August 30, 1991, as amended, known as the "Autonomous Municipalities Act," and Act No. 113 of July 10, 1974, as amended, known as the Municipal License Tax Act, respectively, the imposition of which by the municipalities is expressly authorized. Notwithstanding, when the application of the Autonomous Municipalities Act and the Municipal Patents Act, together with the application of this Code produces an unsustainable tax situation due to the violation of any constitutional prohibition, if such situation is sustainable through the imposition and collection of only one of the taxes or levies, the tax or levy set forth in this Code shall prevail.

*Section 6189* - Municipal Retail Sales and Use Taxation

A. The Municipalities are hereby authorized to impose a retail sales and use tax pursuant to the authorization established in Section 2410. *Said tax shall be at the rate of one point five (1.5%) percent, to be imposed in accordance with the same basis, exemptions, and limitations contained in Subtitle BB of the Code*, except that it shall be imposed on all food, to be established and imposed in a uniform manner by all the municipalities of Puerto Rico by means of a Municipal Ordinance to that effect. Likewise, the areas of Federal [sic] stockpiled [sic] fields shall also be taken into account as another authorized exception.

The municipal tax rate of one point five percent (1.5%) shall be distributed proportionally as follows:

    i. a rate of one point two percent (1.2%) for the municipality

    ii. a rate of one point one percent (.1%) for the Municipal Improvements Fund.

    iii. a rate of one point two percent (.2%) as a

Municipal contribution to the General Fund for tax relief to individuals ..... (Emphasis supplied.) Substitute Bill, Appendix, pp. 524-602.

Thus, on June 21, 2006, the Substitute Bill was submitted to the consideration of the full House of Representatives of Puerto Rico (House of Representatives) and was *approved* with 31 votes in favor and 18 votes against**.**[3] On the same date, the House of Representatives sent to the Senate of Puerto Rico (Senate) the final approval text of the Substitute Bill, and on June 25, 2006, it was *approved* by the Senate -without *amendments*- with 23 votes in favor and 2 against.[4]

After the aforementioned vote, differences arose, of public knowledge, with respect to the tax rate that, in effect, was imposed by the aforementioned piece of legislation. While the Governor of Puerto Rico, Hon. Aníbal Acevedo Vilá, and the President of the Senate, Hon. Kenneth McClintock, among others, understood that the Substitute Bill imposes a total tax rate of 7%, a majority of the members of the House of Representatives expressed that, through the approved Substitute Bill, a sales tax was established with a single and total tax rate of 5.5%, distributed in 4% corresponding to the state tax and 1.5% corresponding to the municipal tax.[5]

On July 4, 2006, the Governor signed the Substitute Bill, as approved by the House of Representatives and the Senate on June 21 and 25, 2006, respectively.[6] From that moment on, the Executive Branch **\*468** has taken all the necessary measures for the imposition of the state sales and use tax at a 5.5% for rate, to which, as of *November 15, 2006*, a 1.5% tax rate corresponding to the municipal tax will be added.[7]

Thus, in view of the *imminent imposition* of a sales and use tax at a maximum total tax rate of 7%, Carlos Romero Barceló and Peter Muller Maldonado, as affected taxpayers, and the other plaintiffs, as affected taxpayers and pensioners, filed before the Court of First Instance, San Juan Division, a complaint for declaratory judgment against the Commonwealth of Puerto Rico, the Hon. Aníbal Acevedo Vila, Governor of Puerto Rico, and the Hon. Juan Carlos Méndez Torres, in his capacity as Secretary of the Treasury. In it, they challenged the allegedly erroneous interpretation that the Executive Branch intends to put into effect a tax rate of 5.5% for the State and 1.5% for the municipalities, for a maximum total sales and use tax of 7%.

They requested that the defendants be ordered to interpret and comply with the Tax Fairness Act of 2006, in accordance with its intent, purpose and legislative history, namely: the establishment of a sales and use tax with a single and total rate of 5.5%, of which 4% corresponds to the state and 1.5% corresponds to the municipalities.[8] In turn, they argued that the **\*469** allegedly erroneous and

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

Romero Barcelo v. E.L.A., 169 D.P.R. 460 (2006)

2006 TSPR 163

distorted interpretation of the aforementioned law by the President of the Senate and the Executive Branch, affects Sec. 17 of Art. III of our Constitution, L.P.R.A., Vol. 1, which provides, in summary, that every bill to obtain revenues shall originate in the House of Representatives and that the Senate may propose amendments or agree to them. They understand that it is contrary to the constitutional purpose enshrined therein that the Senate and the Executive Branch may substitute the legislative intent of the House of Representatives in a bill of this nature.

Once the claim outlined above was filed and the corresponding summons were issued and served, on October 31, 2006, the plaintiffs filed a motion for *certification* before this Court, arguing that the intervention of this Court is necessary given the public interest of the controversy involved.

We granted the parties until Tuesday, November 7, 2006 to express their views.[9]  In view of the fact that the controversy raised in this appeal -about the tax rate actually imposed by Act No. 117 of July 4, 2006- is of high public interest, which must be resolved definitively and without any delay, since it must be resolved without any delay whatsoever. 117 of July 4, 2006- is of high public interest, that it must be resolved definitively and without any delay, since its effective date is imminent, that said controversy not only affects, in a direct manner, the budget of the Puerto Rican consumer but may also affect the credit of the Commonwealth of Puerto Rico and, therefore, the future and welfare of all Puerto Ricans, *we endorse the petition for certification filed before this Court by the plaintiffs and petitioners.*

Having the appearances of the parties and the positions of the House of Representatives and the Senate with respect **\*470 to** the requested appeal, we find ourselves in a position to resolve it and we proceed to do so.

**I**

Even though the respondent accepts, in its appearance, the standing of the plaintiffs and petitioners and the justiciability of the controversy before our consideration, it is a reiterated rule that this Court, as zealous guardian of its jurisdiction, is obliged to consider, motu proprio or at the request of a party, all matters relating to its jurisdiction, since it has no discretion to assume it where there is none.

*Morán v. Martí*, 165 D.P.R. 356 (2005); *A.A.A. v. Unión Abo. A.A.A.* 158 D.P.R. 273 (2002). Consequently, and prior to any further analysis, it is necessary to analyze

and determine whether, in fact, the parties and the controversy before us today meet certain requirements of justiciability, indispensable criteria of our jurisdiction.

**[1]** It is well known that the jurisdiction of our courts is limited to those instances in which the existence of a case or controversy can be determined, since "courts exist only to resolve genuine controversies arising between opposing parties who have a real interest in obtaining a remedy that will affect their legal relations. *E.L.A. v. Aguayo*, 80 D.P.R. 552, 558-559 (1958). In order to protect said principle, certain *justiciability criteria* have been developed that demarcate the power of the courts to hear a matter brought before them. Among these, the standing of the party that promotes the lawsuit and the maturity of the controversy raised.

**[2]** A. A party possesses standing if it meets the following requirements: (1) that it has suffered a clear and palpable injury; (2) that the injury is real, immediate and precise, **\*471** and not abstract or hypothetical; (3) that there is a connection between the injury suffered and the cause of action asserted; and (4) that the cause of action arises under the canopy of the Constitution or a statute. *Col. Peritos Elec. v. A.E.E.*150 D.P.R. 327 (2000); *Asoc. Maestros P.R. v. Srio. Educación*, 137 D.P.R. 528 (1994); *Hernández Torres v. Governor*, 129 D.P.R. 824 (1992); *Hernández Agosto v. Romero Barceló*, 112 D.P.R. 407 (1982); *Fund. Arqueológica v. Depto. de la Vivienda*, 109 D.P.R. 387 (1980).

**[3]** It is indispensable that the alleged damage be concrete and particular, since a generalized damage that the plaintiff shares with the rest of the citizenship prevents the configuration of its legal standing to bring the lawsuit. *Fund. Archaeological v. Dept. of Housing*, ante. See, further, *Warth v. Seldin*, 422 U.S. 490 (1975). Consistent with this requirement, courts lack jurisdiction to hear claims in which the plaintiff, merely as a taxpayer, challenges a state *expenditure*, because the harm he may suffer as a taxpayer is generalized and shared with the rest of the citizenry. See *Massachusetts v. Mellon*, 262 U.S. 447 (1923).

**[4]** In Puerto Rico, such prohibition is regulated by specific legislation. In this regard, Section 3 of the Litigation against the State Act, 32 L.P.R.A. sec. 3075, provides:

> 3075. Action by taxpayer, prohibited - Jurisdiction of the courts.

No court of Puerto Rico shall have jurisdiction to hear, or continue to hear if already commenced, either in the first instance or on appeal, any action or proceeding

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

Romero Barcelo v. E.L.A., 169 D.P.R. 460 (2006)

2006 TSPR 163

challenging the validity or constitutionality of any law or resolution of the Legislative Assembly of Puerto Rico or of any act of a public official authorized by law of the Legislative Assembly of Puerto Rico, when the plaintiff alleges no other interest in the action or proceeding, nor other capacity to sue, than that of **\*472** being a taxpayer or representing taxpayers as a class and that, as such, he suffers or may suffer damages by virtue of such law, resolution, or action.

**[5]** *It should be noted, however, that the prohibition against taxpayer suit is not absolute.* In 1968, the U.S. Supreme Court carved out an *exception* to the rule and recognized standing for a taxpayer challenging a budget appropriation as operating in violation of the establishment clause of the First Amendment to the federal Constitution. *Flast v. Cohen*, 392 U.S. 83 (1968). Said exception was adopted in our jurisdiction in *Asoc. Maestros P.R. v. Srio. Educación*, ante, where it was resolved that the prohibition regulated in Art. 3 of the Law of Lawsuits against the State, *supra*, does not apply to claims in which a taxpayer challenges public expenditures, because they operate in violation of the local constitutional clauses against the establishment of a religion and against the use of public funds for the support of private schools.

Similarly, the U.S. Supreme Court has recognized that a taxpayer has standing to challenge a tax law *that determines its own liability as a taxpayer.* See *Bacchus Imports, LTD. v. Dias*, 468 U.S. 263 (1984). To that effect, Laurence H. Tribe states:

> The doctrines limiting taxpayer standing furnish another example of the policy against the assertion of generalized grievances. *A taxpayer of course has standing to challenge the validity or application of a taxing statute in determining his or her own tax obligation.* Less obviously, perhaps, an individual may have a sufficient interest, in his or her capacity as a taxpayer, to challenge spending programs of the taxing government, on the theory -or, more candidly, the fiction- that a successful suit against such a program can result in some decrease in the litigant's taxes. L.H. Tribe, *American Constitutional Law*, 3rd ed., New York, Ed. Foundation Press, 2000, Vol. 1, p. 421. **\*473**

In turn, Prof. Raúl Serrano Geyls illustrates:

> The taxpayer's action - a form of "public action" - has two aspects. First, one in which the citizen challenges his obligation to pay or the amount of his tax contribution in a lawsuit to obtain a refund based on alleged violations of law or the constitution. Second, that in which the person challenges a governmental act as unconstitutional and alleges, as a reason to prove his interest as a litigant, that he contributes, through the payment of taxes, to the economic support of the allegedly unconstitutional act. In this case, the citizen litigates as one of thousands of taxpayers who contribute a sum to the Public Treasury, from which the money used for the expenditure qualified as unconstitutional comes out. In this action, the litigant suffers no direct personal damage, since whether he wins or loses, his contribution will not be reduced or refunded. R.S. Geyls, *Constitutional Law of the United States and Puerto Rico*, San Juan, Ed. C. Abo. P.R., 1986, Vol. 1, p. 132.

In the present case, all the plaintiffs are challenging the piece of legislation in question as affected taxpayers.[10] *The challenged piece of legislation, without any doubt, determines their liability as taxpayers.* This implies that under the doctrine established in *Bacchus Imports, LTD. v. Dias*, ante, and endorsed by the previously cited scholars, *the plaintiffs in question have standing to challenge the Tax Fairness Act of 2006*, as interpreted by the Executive Branch.

**[6]** In the past, we have been flexible in interpreting standing requirements. *Asoc. de Maestros v. Srio. de Educación*, 156 D.P.R. 754 (2002); *Col. Ópticos de P.R. v. Vani Visual Center*, 124 D.P.R. 559 (1989). *Today* **\*474** *we give an example of this and endorse in our jurisdiction the standing of a taxpayer to challenge a tax law that determines its liability in that capacity.* Unlike other cases in which taxpayers have been denied standing, here the

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

Romero Barcelo v. E.L.A., 169 D.P.R. 460 (2006)

2006 TSPR 163

plaintiffs are *not* challenging a State expenditure or a budgetary allocation. *Quite the contrary.* The plaintiffs here are *challenging a piece of tax legislation, and the interpretation finally given to it has a definitive effect on the taxpayers' tax liability. This is precisely the real and concrete damage required.*

If the allegations outlined in the complaint are true, and the jurisdiction of this Court is not recognized due to lack of standing, they will be forced to assume the payment of a sales and use tax at a tax rate allegedly different from the one actually imposed by the legislature. *It is for these particular circumstances that the power of the courts to interpret the statutes approved by the Legislature has been recognized.*

To deny standing to the plaintiffs as taxpayers, in view of the *particular circumstances* of this case, *would be to abdicate our function as the highest interpreter of the statutes without any major justification that would oblige us to decree our lack of jurisdiction. To* rule otherwise would even imply endorsing the unchallengeability of statutes of this nature, since those who are most affected by them, i.e. the taxpayers, would not have standing to challenge them.[11]

Having confirmed the standing of the plaintiffs and petitioners, we proceed to analyze and determine the ripeness of the present controversy. **475**

[7] B. It is well known that the premature filing of an action also affects the jurisdiction of the courts. Ripeness focuses on the temporal proximity or imminence of the harm alleged and must be examined by a dual analysis: whether the substantive controversy is appropriate for judicial resolution and whether the harm is sufficient to require adjudication. "The determinative factor is whether the controversy is concretely defined so that the court can evaluate it on its merits. " *Rexach v. Ramirez*, 162 D.P.R. 130, 142 (2004). "All that is necessary to ensure that a case is ripe is that the event contemplated ... in all likelihood is going to occur. " *Com. de la Mujer v. Srio. de Justicia*, 109 D.P.R. 715, 723 (1980).

8] The "ripeness" criterion *does not* imply that a party must wait for an approved statute to become effective before challenging it. *For such purposes, our system has, as a remedial mechanism, the declaratory judgment.* Rule 59 of Civil Procedure, 32 L.P.R.A. App. III. "The declaratory judgment is a remedial and prophylactic mechanism that allows to anticipate the elucidation of the merits of any claim before the courts, as long as there is a *potential danger* against the plaintiff." (Emphasis supplied.) *Sánchez et al. v. Srio. de Justicia et al.*, 157 D.P.R. 360, 383-384 (2002).

[9] The person who files a petition for a declaratory judgment is in turn subject to compliance with the standing criteria, and therefore, must establish the existence or imminence of a clear and real harm. *Sanchez et al. v. Secretary of Justice et al*, ante. The approval of the statute and its eventual effectiveness must be definitive, otherwise the cause of action filed to challenge it will not be ripe; this is because it does not present an actual controversy of a justiciable nature that requires a judicial pronouncement. See Asoc. *Guardias Penales v. Srio. de Justicia*, 87 D.P.R. 711 (1963). Once the interpretation of a statute is timely challenged by **476** a motion for declaratory judgment and the standing of the plaintiff is established, the court's function is referred to its scope and interpretation. *P.P.D. v. Governor*, 111 D.P.R. 8 (1981).

Having analyzed the criteria outlined above, we are of the opinion that the present controversy is ripe for the corresponding judicial adjudication through the declaratory judgment mechanism. It is *public knowledge* that the Executive Branch has taken the necessary measures for the imposition of a state tax at a 5.5% tax rate, which as of November 15, 2006 will be added to a 1.5% municipal tax rate. The necessary regulations by the Treasury Department have already been approved. Only the effective date of the Tax Fairness Act of 2006, i.e., November 15, 2006, remains for it to become effective, as interpreted by the Executive Branch. Both the approval and the effectiveness of the aforementioned piece of legislation is definitive and its imminent application gives concreteness and maturity to the claim filed by the plaintiffs and petitioners. *This, together with the previously recognized standing, allows us to fully dedicate ourselves to the interpretation of the Tax Fairness Act of 2006.*

## II

[10] Art. 14 of the Civil Code of Puerto Rico, 31 L.P.R.A. sec. 14, provides that "[w]hen the law is clear [and] free from ambiguity, the letter of the law shall not be disregarded under the pretext of complying with its spirit". By virtue of said mandate, when interpreting a statute, we must, from the outset, refer to the text of the law, *because when the legislature has expressed itself in clear and unequivocal language, the text of the law is the expression par excellence of all **477** legislative intent.* See: *Ortiz v. Municipio San Juan*, 167 D.P.R. 609 (2006); *Departamento Hacienda v. Telefónica*, 164 D.P.R. 195 (2005); *Irizarry v. J & J Cons. Prods. Co.* 150 D.P.R.

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

Romero Barcelo v. E.L.A., 169 D.P.R. 460 (2006)

2006 TSPR 163

155 (2000);  *Rodriguez v. Mendez & Co.* 147 D.P.R. 734 (1999); *Rojas v. Méndez & Co., Inc.,* 115 D.P.R. 50 (1984). Because of this, "when a statute is clear and unambiguous *there is no need to look beyond the letter in search of legislative intent.*" (Emphasis supplied.) *Departamento Hacienda v. Telefónica,* ante, p. 215. See, also,  *Rosario v. Dist. Kikuet, Inc.*151 D.P.R. 634 (2000). We must discover and give effect to the intent expressed by the letter of the law.

[11] In fulfilling this function, "[i]t is necessary that the interpretation [harmonize], to the extent possible, *all the* provisions of the law in order to achieve an integrated, logical and reasonable interpretation of the legislative intent. (Emphasis supplied.) *Matos v. Board of Examiners,* 165 D.P.R. 741, 748-749 (2005). The provisions of a statute must *not* be interpreted in isolation, *but must be analyzed as a whole, taking into consideration its entire context.* See *Mun. San Juan v. Banco Gub. Fomento,* 140 D.P.R. 873 (1996). In light of the rules of legal hermeneutics outlined above, we proceed to resolve the controversy in question.

The petitioners argue, in summary, that the text of the Tax Fairness Act of 2006 is ambiguous, which is why they refer us to the legislative history in search of the "legislative intent." To that effect, they argue that through said law the legislature intended to establish a sales tax with a single rate of 5.5%, distributed in 4% corresponding to the state tax and another 1.5% corresponding to the municipal tax. *They are not right.* From a considered analysis of the piece of legislation in question, *it appears that the legislative intent, as expressed in the clear text of the law, is the imposition of a sales and use tax at a maximum total taxable rate of 7%.* Let us see.

The Tax Fairness Act of 2006 *regulates* the state tax and the municipal tax *through separate articles.* Sec. 2410 establishes a sales and use tax at a base tax rate of 5.5%. The funds obtained from the payment of said 5.5% belong to the Commonwealth, by virtue of the provisions of Sec. 2405(c) of the statute.[12] Sec. 6189 *authorizes* municipalities to impose a tax at a 1.5% tax rate, the proceeds of which, by mandate of Sec. 6189(A), belong to the municipalities.[13]

In turn, Sec. 2406, which is part of Subtitle BB -on sales and use tax- exempts the merchant, in cases where it is impractical, from separately stating the sales price and the total tax collected in the receipt, invoice or similar document. For such purposes and in order to eventually calculate the amount corresponding to the total tax collected, subsection (b) of said section provides that: "...

the taxes to be paid on taxable items shall be calculated by subtracting from the total gross sales for the applicable reporting period, the total taxable sales for the same period. *Taxable sales shall be determined by dividing gross sales by one point zero seven (1.07)."* (Emphasis supplied.) As can be inferred from the text, *in the equation to be performed, 1.07 must be used as a variable, which in strict mathematics corresponds to a total tax rate of* **\*479** *7%, a situation or position that, as we will see below, is accepted by the plaintiffs and petitioners.*

Harmonizing the aforementioned provisions, it is *totally incompatible* with the clear text of Act No. 117 to understand, as argued by the plaintiffs and petitioners, that the 1.5% corresponding to the municipal tax is included within the 5.5% established in Sec. 2410. By express mandate of Sec. 2405(c), the collections obtained in payment of the 5.5% belong, *in their entirety,* to the Commonwealth. Therefore, including the 1.5% of Sec. 6189 within the 5.5% of Sec. 2410 would have the effect of denying the municipalities the right to use the funds that Act No. 117 itself recognizes in Sec. 6189(A).

It is well known that the municipalities have their own legal personality, independent from that of the Commonwealth of Puerto Rico, and therefore, *under no applicable rule of legal hermeneutics, can we conclude that the legislature, by allocating the 5.5% revenues to the Commonwealth, included the municipalities within said mandate.* This would be to give a different meaning to the words used by the legislator.

The *only integrated, logical and reasonable interpretation* of Act No. 117 is the imposition of a state tax at a base rate of 5.5%, to which must be added a *separate and independent* tax rate of 1.5% corresponding to the municipal tax, for *a total maximum tax rate of 7%.*

Said interpretation is correct as a matter of law, since it is well known that the provisions of a law should not be interpreted in an isolated manner, but rather analyzed as a whole, taking into consideration its entire context. *The text of the aforementioned Act No. 117 is clear, for which reason we decree the validity of the intent that arises therefrom, without the need to go beyond the letter of the law.* See: **\*480** *Department of the Treasury v. Telefónica,* ante; *Rosario v. Dist. Kikuet, Inc.* ante.

Even the House of Representatives itself *indirectly acknowledged the interpretation decreed herein.* It should be recalled that, after the approval of the Substitute Bill, the House of Representatives, in an *attempt* to reconsider and amend the text approved by both legislative bodies, proposed to add in the body of Act No. 117 that the 5.5%

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

Romero Barcelo v. E.L.A., 169 D.P.R. 460 (2006)

2006 TSPR 163

comprises a single and total tax rate (4% for the State and 1.5% for the Municipalities) and to eliminate from Sec. 2406(b) the 1.07 and replace it with 1.055. *This attempt is nothing more than an affirmative act of recognition that Act No. 117, as approved, imposes through its text a maximum total tax rate of 7%.*

Now, even though the petitioners *accept* that Sec. 2406(b) -referring to the 1.07 equation- refers to the 7% tax rate, they *allege* that it comes from the original bill and that said section was maintained by mistake in the approved Substitute Bill. They argue in support of their claim that in Regulation No. 7230, ante, through the article corresponding to Sec. 2406(b), the Secretary of the Treasury uses 1.055 as variable. They understand that this reflects the error in Sec. 2406(b).

**[12]** *They are not right. In the* first place, it is well known that in interpreting the text of a law we should *not* look to the intrinsic reasons that motivated it to be drafted in the way it was drafted. Our role is limited to the plain text of the law.

On the other hand, from an integrated and harmonious analysis of the aforementioned provisions, we understand that the reference to 7% in the aforementioned section *is not* a mere error or omission. This is in view of the fact that, while in the Tax Fairness Act of 2006 the legislature regulated both the state and municipal taxes, in Regulation No. 7230, ante, the Secretary of the Treasury *limited himself to* regulating the state tax, *for which reason it is* **\*481** *reasonable that in the law the equation was made on the basis of 7%, since it corresponds to the sum of both tax rates regulated in said piece.*

On the contrary, since *the provisions of Regulation No. 7230, ante, are limited to regulating the state tax*, it is reasonable that in said regulation the Secretary of the Treasury limited himself to include the variable corresponding to the state tax rate, i.e., 5.5%. The regulation itself exempts the municipal tax from said equation and imposes on merchants the responsibility of complying with the payment of the taxes pertaining to the municipalities.[14]

Finally, it is clear from the text of the law -which is the maximum expression of the legislative intent- that a total maximum tax rate of 7% was established, 5.5% corresponding to the state tax and 1.5% corresponding to the municipal tax. [15] **\*482**

### III

In merit of the foregoing, *we resolve that the Tax Fairness*

*Act of 2006 establishes a sales and use tax at a maximum total tax rate of 7%: 5.5% corresponding to the state tax and 1.5% corresponding to the municipal tax.*

*Judgment shall be rendered in conformity.*

Associate Judge Fuster Berlingeri issued a concurring opinion. Associate Judge Rivera Pérez issued a dissenting opinion. Associate Judge Rodríguez Rodríguez issued a dissenting opinion.

--O--

Concurring opinion issued by Associate Judge Fuster Berlingeri.

I agree with the opinion issued by the majority of the Court in the instant case. I fully agree with what is set forth therein and with the grounds on which the majority opinion is based. However, I wish to briefly emphasize two aspects of the matter before our **\*483** consideration. The controversy that concerns us here *only this Court can resolve it with finality* and, because of its importance, it is necessary that there be no doubt as to the solid foundations of what we are ruling today.

First, it should be clear that the provisions of Art. 14 of the Civil Code of Puerto Rico, 31 L.P.R.A. sec. 14, is not merely a rule of our own legal system, but is also a *general principle of law.* The rule established by that article, that if the text of a law is clear, the letter of the law cannot be disregarded because of an alleged legislative intent contrary to the letter, has been repeatedly recognized in the federal jurisdiction, even by the United States Supreme Court itself. The highest American judicial forum has so stated:

"We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there. When the words of a statute are unambiguous, then, this first canon is also the last: 'judicial inquiry is complete'. "
*Barhart v. Sigmon Coal Co., Inc.,* 534 U.S. 438, 461-462 (2002). See, also: *Oncale v. Sundowner Offshore Servs.* 523 U.S. 75, 79 (1998); *Ratzlaf v. United States,* 510 U.S. 135, 147-148 (1994); *United States v. Missouri Pacific R. Co.* 278 U.S. 269, 278 (1929); *Recording Industry of America v. Verizon Internet,* 351 F.3d 1229, 1237 (D.C. Cir. 2003); *Stromberg Metal Works, Inc. v. Press Mechanical, Inc.* 77 F.3d 928, 931


I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

Romero Barcelo v. E.L.A., 169 D.P.R. 460 (2006)

2006 TSPR 163

(7th Cir. 1996); *Eagle-Picher Industries v. United States E.P.A.*, 759 F.2d 922, 929 (1985).

A recognized authority in these matters has expressed the aforementioned general principle of law clearly:

> Where the terms of a statute are clear ..., the legislative intent must be derived from it, even if the intent expressed conflicts with the purpose of the statute as set forth in committee reports. N.J. Singer, 2A *Sutherland, Statutes and Statutory Construction* Sec. 48.6, pp. 439 and 442-443 (2000).

There can be no doubt, then, that the text of the law itself, when it is clear, constitutes the definitive expression of **\*484** the legislature's ultimate intent. No other alleged legislative intent can be invoked to undermine what the law itself literally and clearly provides.

### I

The other thing that must be emphasized, as to the specific issue that concerns us in the instant case, is that *the language of the law is clear.* On the one hand, it establishes a *state tax of 5.5%* and on the other hand, it empowers the municipalities to establish a *separate tax of 1.5%.* There is no basis in the text of the statute for a different interpretation on these points. In fact, *the 4% state tax invoked by the petitioners is not mentioned anywhere in the law, not even indirectly. There* is simply no reference to an alleged 4% state tax in the law in question.

It is for all of the above reasons that we must agree here with what has been expressed by a high federal judicial court, in a pertinent manner:

> It is elementary in the law of statutory construction that, absent ambiguity or an absurd or unreasonable result, the literal language of a statute controls and resort to legislative history is not only unnecessary but improper. *Montgomery Charter Serv. Inc. v.*

*Washington Met. A.T. Comm'n*, 325 F.2d 230, 233 (D.C. Cir. 1963).

### --O--

Dissenting opinion issued by Associate Justice Rivera Pérez.

The majority opinion interprets the scope of Act No. to the effect that it empowers the central government **\*485** to collect 5.5% SUT, while allowing municipalities to collect 1.5% SUT. We respectfully dissent.

### I

On November 15, 2005, the majority delegation of the Puerto Rico House of Representatives (majority delegation), composed of legislators elected by the New Progressive Party (NPP), introduced House Bill 2193 of November 15, 2005, 15th Legislative Assembly, 2nd Regular Session (P. S. 2193), to establish the Tax Fairness Act of 2006.[2] The purpose of the legislation was, among others, to authorize the collection of a 7% sales and use tax (SUT) on retail sales. H.B. 2193 was referred to the House Finance and Financial Affairs Committee of the House of Representatives (Finance Committee) to conduct the corresponding studies, analysis and recommendations prior to its approval. As part of its legislative work, the Treasury Committee held, between the months of February and May 2006, approximately thirty-five public hearings to evaluate the merits of H.B. 2193.[3]

After the aforementioned hearings, on June 20, 2006, the majority delegation in the House of Representatives *filed a Substitute Bill to repeal several provisions contained in S.B.. 2193 (Substitute Bill).* [4] *The Substitute Bill provided,* **\*486** as pertinent, for the collection of a total SUT of 5.5%.

The Treasury Committee submitted, together with the Substitute Bill, an extensive Positive Report, whereby it *described in detail the scope, intent, as well as the purpose of the Substitute Bill in establishing a retail sales tax.*[5] For such reason, on pages 40 and 41 of the Positive Report, the Treasury Committee stated the following:

D - Relevant Issues and Conclusions on Tax Reform

As a result of the analysis carried out on the Tax


I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

Romero Barcelo v. E.L.A., 169 D.P.R. 460 (2006)

2006 TSPR 163

Reform Bill, in addition to the technical changes of the change from an excise tax system to a retail sales tax (IVD, Spanish acronym) system, we will present the relevant points of this piece of legislation.

*It replaces the arbitrios system with a general retail sales tax of 5.5% (4% for the State and 1.5% for the municipalities).*

........

*E - On Sales Tax*

After taking into account all the scenarios on the determination of consumption expenditure bases (See Table A and B Economic Appendix), *the Retail Sales Tax is set as follows*:

*The state tax will be 4%.*

........

*The municipal tax shall be 1.5%.* (Emphasis supplied.)

The Positive Report of the Treasury Committee, as well as the Substitute Bill, were submitted to the plenary of the House of Representatives for a vote on June 21, 2006. The Chairman of the Treasury Committee, Hon. Antonio Silva Delgado, through the use of electronic and audiovisual resources, made an extensive presentation of the Substitute Bill on the floor of the House of **\*487** Representatives.[6] During this presentation, a projection called "Estimated Collection-Total/Distribution-State-Municipalities" was presented. This presentation broke down the estimated SUT collection for the State and the municipalities, using 5.5% percent as a base, *which was clearly subdivided into 4% percent for the central government and 1.5% percent for the municipalities.*[7]

During the debate on the floor of the House regarding the approval of the Substitute Bill, several legislators of the majority delegation referred *to a total SUT of 5.5%, while rejecting the 7% figure.*[8]

It is appropriate to review some of the expressions made by the members of the NPP majority delegation during the parliamentary debate, *in order to understand the legislative intent of the parliamentary majority, when approving the SUT percentage contained in the Substitute Bill.* Let's see.

The representative of the majority, Hon. Jorge Navarro Suárez, expressed the following:

And here we have a percent of a 5.5 percent *sales tax*, which you did not believe in the electoral campaign, you campaigned, you played politics to back out of your position ..... (Emphasis supplied.) Journal of Sessions, Substitute to P. S. 2193, June 21, 2006, 15th Legislative Assembly, p. 60.

The Hon. Albita Rivera Ramírez, member of the majority delegation, stated the following:

*Therefore, it is important for you, my taxpayer friend, to know that if you have not been nailed with a seven percent sales tax, it is because here there is a New Progressive Party legislature that has ensured that taxpayers will not continue to be charged* ..... (Emphasis supplied.) Diario de Sesiones, *supra*, p. 87. **\*488**

Later on, during the parliamentary discussion of the Substitute Bill, Hon. Lourdes Ramos Rivera, legislator elected by the NPP, expressed herself in the following terms: "... seeking to tax the pockets of the taxpaying people with a *sales tax of seven percent that is not justified* .... "(Emphasis supplied.) Diario de Sesiones, *supra*, p. 100.

Likewise, the aforementioned legislator expressed the following:

We are talking about ... also the comrades from ... now yes, now Bill 2193, since it had seven percent was the best in the world, but they are blind or they do not want to see reality, a number had to be written there to start, but from the beginning it was said that what we were trying to do was to have the lowest possible percentage, *and how do I explain to the people that I am taking away the 6.6 to put in a 7?* (Emphasis supplied.) Diario de Sesiones, *supra*, p. 101.

The representative of the majority, Hon. Julio Román González, expressed the following words:

What they, like one of the colleagues *who challenged us*


I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

*to approve the 7%, and that is the Governor's request, who gave him the little note to launch this challenge to this delegation.* What for? To have more money and continue abusing the Puerto Rican people with higher taxes, as another one said that seven was less than four. I have not seen in any mathematics that a larger number is less than one ... a smaller number. I don't know where the mathematics is, in what school they taught it, *but a four is a four and a seven is a seven.*

........

A reform that offers around $500 million in tax rebates and benefits to the poor class of this country, *and they want the 7 ... and they want to count who will pay the 7 ... (Emphasis supplied).* (Emphasis supplied.) Journal of Sessions, *supra*, p. 110.

The representative of the majority delegation, Hon. José Concepción Hernández, stated the following:

Those who do not want to give in and continue with the Governor's 7 percent whim are our friends. I personally **\*489** was with comrade Nelson del Valle, Sergio Ortiz and Pedrito, who went and met with the Governor seeking to *lower the 7 percent by telling him the reality of Puerto Rico and what we saw in the streets.* Because on the streets the same church you go to is the same church you go to. The same ball park, the children's and youth ball leagues, basketball leagues, everywhere ... on the radio programs, *people don't want the 7 percent.* (Emphasis supplied.) Journal of Sessions, *supra*, p. 111.

In his turn, the representative of the majority delegation, Hon. Luis Pérez Ortiz, expressed the following:

Here you have the reform, Mr. Governor, and not only, Mr. President, and I would like to make these comments. What is the hurry? Why are they afraid of not giving you six months to approve the *5.5*

*percent tax collection level?* .... (Emphasis supplied.) Journal of Sessions, *supra*, p. 117.

NPP legislator, Hon. Ángel Pérez Otero, made the following remarks:

I invite the delegation of the Popular Party and the people of Puerto Rico to make their calculations. Not only [sic] in tax returns, *but also with this 5.5 excise tax, which* definitely, when they finish those calculations, they will find out and realize that what is being approved by the delegation of the New Progressive Party is favorable, is beneficial for the People of Puerto Rico. (Emphasis supplied.) Journal of Sessions, *supra*, p. 125.

On June 21, 2006, after *an extensive parliamentary debate*, the Substitute Bill was approved by the House of Representatives with thirty-one votes in favor and eighteen against.[9]

It is clear from the legislative record, contained in the House of Representatives' Journal of Sessions of June 21, 2006, that the members of the **\*490** majority NPP delegation cast their vote *under the belief and conviction that they were approving a total SUT of 5.5%; which was to be broken down into 4% for the central government and 1.5% for the municipalities.*

On the contrary, the representatives of the minority delegation of the Popular Democratic Party (PDP) voted against the measure, *since it provided for the imposition of a total SUT of 5.5%, while rejecting the imposition of a SUT of 7%.* Héctor Ferrer Ríos, presented an amendment to the Substitute Bill to raise the SUT from 5.5% to 6.5%.[10] It is evident from the legislative file that *the PDP minority representatives opposed the Substitute Bill, since it completely altered H.B. 2193, originally filed on November 15, 2005 by the NPP delegation. They were opposed, in essence, because the Substitute Bill changed the total SUT rate from 7%, as contemplated in P. S. 2193, to 5.5%.*[11] Perhaps the clearest and most illustrative expressions **\*491** on the reasons why the PDP minority voted against the Substitute Bill, arise from the expressions made by the Hon. Sergio Ortiz Quiñones, legislator of the

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

Romero Barcelo v. E.L.A., 169 D.P.R. 460 (2006)

2006 TSPR 163

PDP minority, who expressed himself as follows:

> And here we must also remember that at one point there were those who were in favor of 7 percent, *and overnight, at 4 or 5.5*, and they kept going down. (Emphasis supplied.) Journal of Sessions, *supra*, p. 73.

It is also evident from the legislative history of the Substitute Bill that at all times the PDP minority understood that the SUT, contained in the Substitute Bill, provided for the collection of a total tax of 5.5%. Likewise, the PDP minority legislators expressed their desire to impose a 7% SUT to allegedly provide tax relief to the people.

The Substitute Project was approved with the following language:

*Section 2401 - Sales Tax*

(a) A tax shall be imposed, collected, and paid, at the rates established in this Section, on every sales transaction of a taxable item in Puerto Rico. The application of the tax shall be subject to the exemptions granted in Chapter 3 of this Subtitle.

(b) The tax rate shall be five point five *(5.5%)* percent of the sales price of the taxable item and transactions combined.

........

*Section 2402 - Use Tax*

(a) A tax on the use, storage, or consumption of a taxable item in Puerto Rico shall be imposed, collected, and paid at the rates established in this Section.

(b) The tax rate shall be five point five *(5.5%)* percent of the purchase price of the taxable item.

........

**\*492**

*Section 2410 - Limitation to Fix Taxes*

Except as provided in Section 6189, no municipality, whether autonomous or not, of the Commonwealth of Puerto Rico, may impose or collect any excise or tax on articles, services, taxable items, or transactions that are subject to or exempt from the sales and use tax established in this Subtitle, as provided in Section 6188 of Subtitle F.

........

*Section 6188 - Limitation on Assessing Taxes*

*Except as provided below or in Section 6189*, no municipality, autonomous or not, of the Commonwealth of Puerto Rico, may impose or collect any contribution or tax established in this Code. ...

*Section 6189 - Municipal Retail Sales and Use Taxation*

A. *Municipalities are hereby authorized to impose a retail sales and use tax pursuant to the authorization established in Section 2410.* Said tax shall be at the rate of *one point five (1.5%) percent*, to be imposed in accordance with the same basis, exemptions, and limitations contained in Subtitle BB of the Code ..... (Emphasis supplied.) Substitute to S.B. 2193 of June 20, 2006, 15th Legislative Assembly, 3rd Regular Session, pp. 139-293.

Thus, on June 21, 2006, the House of Representatives sent the approved Substitute Bill to the Senate of Puerto Rico (Senate). It was referred to the Senate Finance Committee (Senate Committee). The President of the Senate, Hon. Kenneth McClintock Hernández (President of the Senate), relieved the Senate Committee of the legislative proceedings regarding the Substitute Bill. *For such reason, said committee did not produce a report with recommendations, debates or analysis regarding said bill.*

On June 25, 2006, the President of the Senate submitted the Substitute Bill to a vote in said legislative body. On the same day, that is, June 25, 2006, the Senate approved, *without debate, amendments and without a report from the Senate Committee*, the Substitute Bill with twenty-three **\*493** votes in favor and two against.[12] *The members of the Senate voted for the Substitute Bill as approved by the House of Representatives.* Since the Senate Committee did not produce a report nor was a legislative debate held, *the record of legislative intent in approving the Substitute Bill is the debate on the floor of the House of Representatives.*
On June 27, 2006, the Governor of Puerto Rico, Hon. Aníbal Acevedo Vilá (Governor), stated that he interpreted the Substitute Bill as establishing a SUT of 5.5% for the central government, while providing for the collection of a municipal tax of 1.5%. Likewise, the Governor stated that he agreed with the interpretation made by the Senate, to the effect that the approved Substitute Bill provided for the collection of a SUT of 7%, broken down into 5.5% for the central Government and 1.5% at the municipal level. [13]
On June 28, 2006, before the Substitute Bill became law with the Governor's signature, the House of Representatives passed two resolutions *reaffirming its legislative intent in approving the Substitute Bill. They reiterated that the approved SUT provided for the*

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

Romero Barcelo v. E.L.A., 169 D.P.R. 460 (2006)

2006 TSPR 163

collection of a total of 5.5%, broken down into 4% for the central government and 1.5% for the municipalities.[14]

On July 4, 2006, the Governor signed the Substitute Bill, which became Act No. 117.
On October 13, 2006, the Secretary of the Treasury, Hon. Juan Carlos Méndez (Secretary), promulgated Administrative Regulation **494** (Regulation), which authorizes the central government to collect a 5.5% SUT.[15]

In view of such action, on October 30, 2006, the petitioners filed a lawsuit in the Court of First Instance, Superior Court of San Juan, against the Governor and the Secretary. They alleged that the latter made an erroneous and distorted interpretation of the Substitute Bill, which later became Law No. 117, through which they intend to impose a 5.5% SUT charge at the state level. They allege, among other things, that the Substitute Bill, as well as *the legislative record of the debate of that bill, clearly established that a SUT at the state level of 4% and 1.5% at the municipal level was approved.*[16] That same day, they filed before this Court a motion for certification so that we would hear the controversy before the primary forum.

By Resolution of October 31, 2006, we granted the parties a term of seven days to express their views on the merits of the action originally filed before the Court of First Instance. Likewise, we ordered them to express their opinion on the standing of the petitioners to file the above-captioned appeal.

The Attorney General appeared on behalf of the Governor and the Secretary. He argued, among other things, that Act No. 117 is not ambiguous. He indicated that the text of the referred law is clear and that, in this situation, the legislative intent should not be used, in accordance with the rules of hermeneutics, to interpret the scope of the statute. He pointed out that the referred law expressly establishes the collection of a percentage rate of 5.5% for the Central Government, *separate and distinct* from the 1.5%, in **495** concept of the municipal SUT. He pointed out that Act No. 117 should not be interpreted in light of the debate on the floor of the House of Representatives, since the expressions of "some legislators" cannot replace the text of the law, approved without amendments by the House and the Senate, and signed by the Governor.

He further alleged that Sec. 2401 and 2402, contained in Act No. 117, provide for the collection of a SUT of 5.5% to be collected by the Commonwealth. *It indicated that the percentage rate of the referred sections do not include the 1.5% municipal percentage rate*, provided by Sec. 6188 and 6189, *supra*, of the referred law. He indicated that the arguments presented by the petitioners fail to create doubts

as to the letter of the law, since the text of the law constitutes the expression par excellence of the legislative intent.
He further argues that the legislative intent of a single legislative body cannot be attributed to the other, or to the Governor, since the Senate approved Act No. 117 pursuant to the text thereof, while the Governor signed the referred law exclusively based on the text contained in the statute. He indicated that neither the Senators nor the Governor had before them the expressions of the legislative debate, carried out in the House of Representatives, regarding the approval of Act No. 117. On the other hand, he argued that the Substitute Bill did not radically change H.B. 2193, but *merely separated, with greater clarity, the percentage rates of the SUT between the central government and the municipalities.* Finally, he pointed out that interpreting the referred legislation to the effect that it imposes a total SUT of 5.5% would have dire consequences for the economy of the country, since the governmental economic projections have been made based on a total SUT of 7%.[17]

For their part, the petitioners alleged that the regulation approved by the Secretary is null and void, since it **496** provides for the collection of a SUT of 5.5% at the state level, *deviating from the legislative mandate, which provides for the collection of 4%.* They alleged, in summary, that the text of Act No. 117 causes confusion and doubts as to its scope and application. They urged that the interpretation of a law in a manner *contrary to the legislator's intent* constitutes an encroachment of the prerogatives of the legislative branch. They argued that the referred law does not empower the municipalities to charge a SUT *separate and distinct* from the 5.5% percent of the central government. They indicated that during the entire legislative process, that is, during the public hearings held by the Treasury Committee, the Positive Report prepared by the latter, and the debate in the House of Representatives, the approval of a total SUT of 5.5% was discussed. They argued that in this scenario, the *legislative intent must be used to ascertain the will of the legislator when passing a law.* They emphasized that from the debate held in the House of Representatives, it is clear that the majority delegation's intention to approve a total SUT of 5.5% is unquestionable.
On the other hand, they pointed out that, in cases of doubt, the statutes imposing contributions must be interpreted restrictively against the Government and in favor of the taxpayer. They specified that when the purpose of imposing a tax is not clear, the doubt is resolved in favor of not imposing it. They further argued that after an extensive study of H.B. 2193, *supra*, which provided for the levy of a total SUT of 7%, the Treasury Committee specified the need to make innumerable amendments to it.

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

Romero Barcelo v. E.L.A., 169 D.P.R. 460 (2006)

2006 TSPR 163

Consequently, they indicated, the Substitute Bill was filed *changing the authorized SUT rate from 7% to a total of 5.5%.* Finally, they outlined that, since the Senate approved the Substitute Bill without legislative debate, reports or amendments, it was **\*497** approved as approved by the House of Representatives, that is, with a total SUT of 5.5%.[18]

The House of Representatives presented its position regarding the approved SUT percentage contained in Act No. 117.[19] In their argument, they indicated, among other things, that the Substitute Bill *provided for the collection of a total SUT of 5.5%. They* also stated that the text of Act No. 117 is susceptible to different interpretations. However, they argued that *in the absence of clear language in the text of the law, one must resort to the legislative intent and the history of the Substitute Bill to know the true intent of the legislature.* They reiterated that when doubts arise as to the scope of a law that imposes taxes, the interpretation must favor the citizen. They urged that the Governor and the Secretary exceeded their powers by interpreting, in an accommodating manner, the scope of the Substitute Bill. They pointed out that, since the Senate approved the referred bill without debates, reports or amendments, the legislative intent of the House of Representatives remained unaltered. They further alleged that by their actions, the Governor and the Secretary have usurped the prerogatives of the Legislative Branch. They request that the regulations promulgated by the Secretary, by virtue of which the central government is empowered to collect 5.5% SUT, be declared null and void. They contend that the Substitute Bill, which later became Act No. 117, provides, in *accordance with the legislative intent, for the collection of a 4% SUT for the Central Government.*[20] Finally, they stated **\*498** that, pursuant to the Constitution of the Commonwealth of Puerto Rico, the House of Representatives is the legislative body where revenue raising and taxation measures originate.[21] Consequently, they intimated, the legislative intent of that body is *determinative when interpreting statutes that impose taxes.* On the other hand, on November 6, 2006, the Government Development Bank (GDB) filed a Request for Authorization to appear as *amicus curiae.* The GDB presented a variety of arguments in which it understood that Act No. 117 should be interpreted to the effect that it authorizes the collection of a total SUT of 7%. It based its arguments on the fact that the economic projections presented by the Government to different investors, as well as to the credit rating agencies of the Government of Puerto Rico, are based on the entry into force of a total SUT of 7%. It is of the opinion that, if the referred legislation is interpreted as providing for the collection of a total SUT of 5.5%, it would severely harm the economy of the country.

It argues that such determination could have harmful repercussions on the finances of the country, as well as on the issuance of public debt, through bonds, of the Government of Puerto Rico.[22]

*In light of the Substitute Bill, the Positive Report of the House Treasury Committee, the audiovisual presentation made by the Chairman of the Treasury Committee, Hon. Antonio Silva Delgado, to all legislators, their expressions during the debate of the Substitute Bill, as well as the final vote approving the piece of legislation, we conclude that the language approved in the statute, which provides for the collection of a* **\*499** *total SUT of 7%, constitutes a drafting error in the text of the law.*

## II

We agree with the majority's statements regarding the standing of the petitioners, as well as with the expressions regarding the maturity of the appeal before us.

A. *Application of the rules of hermeneutics in the interpretation of statutes*

Within our republican form of government, we have the duty to interpret the laws and clear up any gaps that may exist in them *using legislative intent as a guide.*[23] For this reason, we have stated that it is a firm rule of hermeneutics that the clear letter of a law is the best expression of its spirit.[24]

Art. 14 of Civil Code of Puerto Rico provides as follows: "When the law is clear [and] free from ambiguity, the letter of the law shall not be disregarded under the pretext of complying with its spirit."[25] It is *clear* from the language of this statute *that the law is subject to interpretation,* limiting such interpretation, in some cases, to what emerges from its clear text. However, Art. 19 of the Civil Code of Puerto Rico recognizes that *the spirit of the law, reflected in the legislative intent, is the best tool to find the true meaning of a statute.*[26] The spirit of the law plays a fundamental role in the interpretation of a statute. *Legislative intent in passing a statute is so important that we have established that if* **\*500** *the letter of a statute is at odds with its spirit, clearly established in the legislative history, the spirit of the statute will prevail.*[27]

We have ruled that the function of the courts is to interpret the law and not to judge the wisdom of the legislature in passing it.[28] *In interpreting a statute, the legislative intent must be sought in the language used therein, with the aid of the rules of statutory hermeneutics.* In discharging our function of interpreting a particular provision of a statute *we must always consider what were the purposes pursued by the Legislature in passing it, so that our interpretation will ensure the effectiveness of the intent that animates it*[29]

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

Romero Barcelo v. E.L.A., 169 D.P.R. 460 (2006)

2006 TSPR 163

We have previously stated that *the literalness of a statute may be disregarded by the courts when it is clearly contrary to the true legislative intent or purpose.*[30] The court must reject a literal and strained interpretation of a statutory text *that leads to a result that cannot have been what the legislature intended. The letter of the law cannot be blindly followed in cases that do not fall within its spirit.*[31]

Courts must always consider what were the purposes pursued by the Legislature in passing legislation, so that *their interpretation ensures the effectiveness of the legislative intent.*[32] For this reason, if the courts interpret the law in a manner **\*501** contrary *to the evident intent of the legislature, they would be usurping the prerogatives of the Legislative Branch.*[33]

B. *Prerogatives of the Legislative Branch*

In the administrative sphere, the law is the legal source or means that confers the power to an administrative agency to ensure compliance with its enabling law.[34] The enabling law is the legal mechanism that authorizes and delegates to the administrative agency the powers to act in *accordance with the purpose pursued in that law.*[35] In our review of administrative regulations, we cannot lose sight of the fact that *a regulation promulgated to implement the execution of a statute may supplement, but not conflict with, that statute.*[36] *If the regulation is in conflict with the enabling law that permits and promotes its creation, the regulatory provision must yield to the legislative mandate.*[37] For this reason, we have stated that a regulation is void if it is clearly in conflict or contrary to the law.[38] Under the doctrine of delegation of powers, *the administrative agency enjoys the functions legislatively mandated to it.*[39] In the absence of an express or implied legislative mandate, *administrative action that does not obey the conferred power is* ultra vires *action by the administrative agency.*[40] An administrative agency cannot assume jurisdiction over **\*502** any situation that is not authorized by law; that is, *neither necessity, nor utility, nor convenience*, can substitute for statute as the source of an administrative agency's power. That is why *any doubt as to the existence of such power must be resolved against its exercise.*[41]

*When the text of a law is incompatible and in conflict with the clear and manifest legislative intent, embodied in an extensive legislative history, such intent shall prevail.* The debate on the floor of the House of Representatives, during the approval of the Substitute Bill, *established the clear and manifest legislative intent to approve a total SUT of 5.5%.*

The members of the majority delegation rejected at all times the application of a total SUT of 7%. Likewise, the

Report presented together with the Substitute Bill, as well as the presentation made by the Chairman of the Treasury Committee, Hon. Antonio Silva Delgado, *clearly stated that a total SUT of 5.5% was being considered, broken down into 4% for the central government and 1.5% for the municipalities. On the other hand, it* is evident from the legislative file that the PDP minority tried, unsuccessfully, to raise the total SUT from 5.5% to 6.5%. Likewise, the expressions of the minority legislators clearly established that the Substitute Bill had altered, in its entirety, H.B. 2193, filed in November 2005, which provided for the collection of a total SUT of 7%. Finally, the minority delegation acknowledged that the Substitute Bill lowered the total SUT from 7% to 5.5%.[42]

In view of the foregoing, it must be *concluded that the text of the law, as drafted, insofar as it* **\*503** *provides for a total SUT of 7%, is a drafting error.*[43]

The regulation promulgated by the Secretary of the Treasury provides for the collection of a statewide SUT of 5.5%. Such regulation is contrary to law. *The Legislative Assembly approved the collection of a total SUT of 5.5%, which only empowers the central government to collect 4%.*

To legitimize the Regulations approved by the Secretary would violate the most fundamental principles of our republican system of government. To validate such action not only infringes on the prerogatives of the Legislature, but also violates the separation of powers of our constitutional order.

*We conclude that the Regulations approved by the Secretary are null and void for being contrary to the power delegated to him by the Legislature, by virtue of Act No. 117.*

C. *Interpretation of contributory statutes*

We recently had the opportunity to hear a controversy that dealt, in essence, with the *interpretation of tax statutes.*[44] On that occasion we expressed the following:

In the interpretation of statutes imposing contributions, it is the established practice not to extend their provisions, by implication, beyond the clear scope of the language used, or to broaden their radius so as to embrace matters that have not been specifically stated. *In case of doubt, they are strictly construed against the Government and in favor of the citizen.* (Emphasis supplied.)[45] **\*504**

Likewise, we determined that it is a cardinal principle that *tax legislation is not to be interpreted extensively*, but must be interpreted fairly and in accordance with its own express terms.[46] In *BBC Realty v. Secretary of the Treasury*, supra, we concluded, guided by the rules of



I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

Romero Barcelo v. E.L.A., 169 D.P.R. 460 (2006)

2006 TSPR 163

hermeneutics, that when a law that imposes contributions, taxes or excise taxes does not disclose the legislator's intention, *it must be interpreted restrictively against the State and in favor of the citizen.* We point out that the restrictive interpretation of tax statutes *is limited only to those instances in which the State intends to impose on the citizen the collection of a contribution, tax or excise.*[47] We reaffirm that taxing statutes must be interpreted in a fair manner, so as to comply with their own express terms. To do otherwise would violate basic principles, firmly rooted in our jurisprudence and in our legal system. When the purpose of imposing a contribution *is not clear,* the doubt must be resolved in favor of not imposing it.[48]

*We conclude that the text of Act No. 117 is incompatible and in conflict with the clear and manifest legislative intent to approve a total SUT of 5.5%.* In view of such situation, we cannot support the interpretation of such legislation to the detriment of the citizen and in favor of the Government. The collection of a SUT of 5.5% for the central government, added to the 1.5% at the municipal level, for a total of 7%, *is clearly more detrimental to the citizen than the collection of a total SUT of 5.5%.*

According to the legislative mandate, it is appropriate **\*505** to charge a total SUT of 5.5%, of which 4% corresponds to the central government and 1.5% to the municipalities.

### III

The decision of the Majority undermines the clear and manifest legislative intent of the House of Representatives, which, in turn, is the body required by Art. III, Sec. 17 of the Constitution of the Commonwealth of Puerto Rico, L.P.R.A., Vol. 1, to originate revenue measures. It ignores the legislative history of Act No. 117, since the Senate approved said legislation without debates, amendments or committee reports, that is, just as it was approved by the House of Representatives. It gives disproportionate weight to the text of the law that refers to a total SUT of 7% *when it is clear from the legislative record that such percentage is a drafting error.* We cannot endorse such course of action.

The deep respect we have for legislative intent compels us on certain occasions to make up for any inadvertence the legislature may have incurred. To avoid an unreasonable and untenable result, we have not hesitated in the past to clarify the text of a statute in accordance with the legislative intent. It is a golden rule of judicial hermeneutics that the provisions of a statute should be examined and interpreted so as not to lead to unreasonable and untenable results, but to harmonious ones.[49]

### IV

For the reasons stated above, I dissent from the Majority's opinion. **\*506**

### --O--

Dissenting opinion issued by Associate Judge Rodríguez Rodríguez.

*This case is not justiciable.* Today, a majority of the members of this Court holds that the plaintiffs, as taxpayers and citizens, have standing to challenge in court the Executive Branch's interpretation of a tax law of general and uniform application passed by the Legislature, without the plaintiffs having alleged any constitutional violation whatsoever. I dissent because I am of the opinion that the Court's conclusion regarding the plaintiffs' standing is erroneous and does not find support in the doctrine on the taxpayer's lawsuit.

I hold that in view of the generalized nature of the complaint filed by the plaintiffs, coupled with the absence of a claim of violation of a constitutional right by the enactment of the Tax Fairness Act of 2006, they lack standing as taxpayers and pensioners, or citizens, to challenge the interpretation of the law by the Executive Branch. This in turn leads us to conclude that the correct course of action is the dismissal of the lawsuit.

The facts in this case are substantially summarized in the Court's opinion, so we do not find it necessary to reiterate them. Let us turn then to the actual discussion of the controversy before us today.

### I

A. The case before us raises an issue of statutory interpretation of the Tax Fairness Act of 2006, Act No. 117 of July 4, 2006 (Tax Fairness Act); it does not, therefore, challenge the constitutionality **\*507** of the Tax Fairness Act or the actions of Executive Branch officials.

By means of a request for declaratory judgment, plaintiffs Carlos Romero Barceló, Peter Muller Maldonado and a group of eight pensioned citizens come before us in their capacity as taxpayers, the former, and as taxpayers and


I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

Romero Barcelo v. E.L.A., 169 D.P.R. 460 (2006)

2006 TSPR 163

pensioners, the latter. They invoke the jurisdiction of this Court for the purpose of challenging *the interpretation that both the Department of the Treasury and the Governor of the Commonwealth have given to the sales and use tax rate approved by the Legislature in the Tax Fairness Act*, which is to take effect in the country as of November 15, 2006. Specifically, the petitioners argue that "in the *absence of an express wording in the text of the* [*Tax Fairness Act*]" the Governor is prevented from "applying a seven percent (7%) SUT tax rate." (Emphasis in original.) Petitioners' Brief, p. 18.

B. Declaratory judgment is a procedural mechanism of a remedial or prophylactic nature, which allows a citizen to elucidate before the courts the merits of any claim that involves a potential danger against him. *Charana v. Pueblo*, 109 D.P.R. 641, 653 (1980). By seeking a declaratory judgment, a citizen may obtain judicial protection before the danger has matured into a serious calamity and before the other party initiates litigation to enforce its claims.

This mechanism promotes security and certainty in legal relations, both in the public and private spheres. See: *Sánchez et al. v. Secretary of Justice et al.*, 157 D.P.R. 360 (2002); *Moscoso v. Rivera*, 76 D.P.R. 481, 488 (1954). The latter must be used when it allows concluding a state of uncertainty or insecurity as to **\*508 the** rights claimed. *Suarez v. C.E.E. I*, 163 D.P.R. 347 (2004).

The Rules of Civil Procedure provide that "[t]he Court of First Instance shall have authority to declare rights and other legal relations even if another remedy is or may be sought. Rule 59.1 of Civil Procedure, 32 L.P.R.A. App. III. The courts are thus empowered to interpret statutes that affect the rights of a citizen and to declare what are the "rights, statuses, or other legal relationships that derive from them [statutes]". Rule 59.2 of Civil Procedure, 32 L.P.R.A. App. III.[1]

It follows from this doctrinal framework that the declaratory judgment is the appropriate means to exercise our function as the ultimate interpreters of the laws and the Constitution, by declaring the rule of law in force under the protection of the canopy of our statutes. However, the declaratory judgment does not allow a plaintiff to dispense with the requirements of justiciability that our system establishes to file a plenary coercive lawsuit. In this regard, a plaintiff must demonstrate, among other things, that it has standing to file the litigation pending before a court. *Sánchez et al. v. Srio. de Justicia et al.*, supra, p. 384; *Moscoso v. Rivera*, supra.

As a threshold question then, we must determine whether in this case we are faced with a justiciable controversy that

merits our intervention.

C(i). The principle of justiciability is perhaps the **\*509** most important limitation on the exercise of judicial power. It determines which matters may be heard by the courts and which must be dismissed. In *Com. de la Mujer v. Srio. de Justicia*, 109 D.P.R. 715, 720 (1980), we defined this concept as follows:

> It is the term of art employed to express a twofold constraint imposed upon courts, namely: (1) that they can only decide "questions presented in an adversarial context and in a form historically envisioned as capable of resolution through the judicial process" and (2) the restriction arising from the role assigned to the judiciary in a tripartite distribution of powers, designed to ensure that it will not intervene in areas subject to the discretion of other branches of government. *Flast v. Cohen*, 392 U.S. 83 (1968). The doctrine is self-imposed. Under it, courts themselves inquire and evaluate whether or not it is appropriate to hear a given case in light of various factors and circumstances through an analysis that allows them to exercise their discretion as to the limit of their constitutional power.

The concept of justiciability is embodied in the doctrines of standing, mootness, political question, ripeness and the proscription of courts to issue advisory opinions. See: *Sánchez et al. v. Srio. De Justicia et al.*, 157 D.P.R. 360 (2002); *Noriega v. Hernández Colón*, 135 D.P.R. 406, 422 (1994); *Hernández Torres v. Hernández Colón*, 131 D.P.R. 593, 598-599 (1992); *E.L.A. v. Aguayo*, 80 D.P.R. 552, 558-559 (1958).

We are of the opinion that the adjudication on the merits of the plaintiffs' and petitioners' claims, as we will see, constitutes a clear violation of the rules we have set forth regarding standing, mainly in regard to the taxpayer's lawsuit.

C(ii). The doctrine of standing seeks to ensure that the plaintiff in an action possesses an interest in the suit "such that, in all probability, he will pursue his cause of action vigorously and bring the issues in controversy to the attention of the court". *Noriega v. Hernández Colón*, supra, p. **\*510** 427; *Hernández Agosto v. Romero Barceló*, 112 D.P.R. 407, 413 (1982). To ensure that this is so, we have required that the plaintiff be able to demonstrate that: (1) he has suffered a clear and palpable injury; (2) the injury is real, immediate and precise, not abstract or hypothetical; (3) there is a causal relationship between the action being performed and the alleged injury; and (4) the cause of action arises under the protection of the Constitution or some statute. *Hernández Torres v. Hernández Colón*,

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

Romero Barcelo v. E.L.A., 169 D.P.R. 460 (2006)

2006 TSPR 163

supra, p. 599.[2]

Several values or principles underlie the doctrine of legitimate action, and these have colored our decisions in the past. Prominent among these is the recognition that the requirement of legitimate action promotes institutional respect for the separation of powers, tempering the role of the court in a democratic society. In that sense, it seeks to prevent the Judicial Branch from untimely meddling in fundamentally political controversies whose final solution is the responsibility of the political branches of government. See *Raines v. Byrd*, 521 U.S. 811, 819-820 (1997) ("standing inquiry has been especially rigorous [because of separation of powers concerns] when reaching the merits of a dispute would force [it] to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional"). See, further, A. Scalia, *The Doctrine of Standing as an Essential Element of the Separation of Powers*, 17 (No. 4) Suffolk Univ. L. 881 (1983).

Nevertheless, there is no doubt that we will assume our constitutional role when circumstances demand it, in effect preserving that delicate balance between the branches of government by decreeing the illegality or unconstitutionality of a legislative or **\*511** executive action. Ultimately what it comes down to is to determine what is the appropriate role in our society for the courts. Clearly, Professor Chemerinsky points out: "Separation of powers can be undermined either by overexpansion of the role of the federal courts or by undue restriction. Standing thus focuses attention directly on the question of what is the proper place of the judiciary in the American system of government. "E. Chemerinsky, *Constitutional Law: Principles and Policies*, 2nd ed., New York, Aspen Publishers, 2002, p. 61.

While we have expressed that the doctrine of standing to sue government agencies and officials should be broadly and liberally construed- *Solís v. Municipio de Caguas*, 120 D.P.R. 53, 56 (1987) -this does not imply that we have abandoned the requirement that every litigant must show that he has suffered a concrete and palpable injury in order for the courts to consider his claim on the merits.

Precisely, the clear and palpable harm requirement responds to the prohibition against litigants bringing generalized grievances that can be more effectively elucidated in the representative branches of government. See *Warth v. Seldin*, 422 U.S. 490, 499 (1975) ("[W]hen the asserted harm is a 'generalized grievance' shared in substantially equal measure by all or a large class of citizens, that harm alone normally does not warrant

exercise of jurisdiction."). Therefore, the mere fact that a governmental action injures or affects the interests of citizens, without more, does not imply that they have standing to go to court. As an example, the abstract interest of the citizen that the Government act in accordance with the law is insufficient to confer jurisdiction to a court of justice over a certain controversy. See *Allen v.Wright*, 468 U.S. 737, 754 (1984) ("This Court has repeatedly held that an asserted right to have the Government act in accordance with law is not sufficient, **\*512** standing alone, to confer jurisdiction over a federal court."); *Valley Forge College v. Americans United*, 454 U.S. 464, 483 (1982) ("[A]ssertion of a right to a particular kind of Government conduct, which the Government has violated by acting differently, cannot alone satisfy the requirements of Art. III without draining those requirements of meaning."). See, further, *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 575 (1992).

Regarding the prohibition against elucidating controversies in which the plaintiffs only present a generalized complaint, we established in *Fund. Archaeological v. Dept. of Housing*, 109 D.P.R. 387, 392 (1980), that "[t]he capacity to sue cannot depend on an interest ... held in common by all who comprise the public, because of the necessarily abstract nature of the grievance which all citizens share." See *Schlesinger v. Reservists Committee*, 418 U.S. 208, 220-221 (1974) ("Concrete injury, whether actual or threatened, is that indispensable element of a dispute which serves in part to cast it in a form traditionally capable of judicial resolution.").

In this case, as we have seen, the plaintiffs invoke the jurisdiction of this Court as taxpayers. Let us then look at this allegation in detail.

## II

A. "The doctrine limiting taxpayer standing is an example of the policy against the filing of generalized complaints in the courts of law. "L.H. Tribe, *American Constitutional Law*, 3rd ed., New York, Ed. Foundation Press, 2000, Vol. I, Sec. 3-17, p. 421.[3] The Supreme Court of the **\*513** United States articulated its objections to taxpayer-initiated suits in the seminal case *Massachusetts v. Mellon*, 262 U.S. 447 (1923). In this case it was decided that the plaintiff, who was claiming as a taxpayer and requesting the stoppage of disbursements of public funds authorized by federal legislation, did not have standing because his interest in the treasury monies was

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

Romero Barcelo v. E.L.A., 169 D.P.R. 460 (2006)

2006 TSPR 163

miniscule and undetermined. ´Id. at 487 ("interest in the moneys of the treasury ... is comparatively minute and indeterminable"). The Court held that the plaintiff had to show direct and concrete harm. Id. at 488 ("[plaintiff must allege direct injury] not merely that he suffers in some indefinite way in common with people generally").

In *Flast v. Cohen*, 392 U.S. 83 (1968), the Supreme Court was again faced with a taxpayer standing claim. There it ruled that the determination of whether a taxpayer has standing to sue will depend on whether there is a logical nexus between his status as a taxpayer and the claim at issue. The Court designed a dual analysis to determine the existence of such nexus and indicated the following:

> The nexus demanded of federal taxpayers has two aspects to it. First, the taxpayer must establish a logical link between that status and the type of legislative enactment attacked. Thus a taxpayer will be a proper party to allege the unconstitutionality only of exercises of congressional power under the taxing and spending clause of Art. I, s 8, of the Constitution. It will not be sufficient to allege an incidental expenditure of tax funds in the administration of an essentially regulatory sta tute. ... Secondly, the taxpayer must establish a nexus between the status and the precise nature of the alleged constitutional infringement. Under this requirement, the taxpayer must show that the challenged enactment exceeds specific constitutional **\*514** limitations imposed upon the exercise of the congressional taxing and spending power and not simply that the enactment is generally beyond the powers delegated to Congress by Art. I, Sec. 8. *Flash v. Cohen*, supra, pp. 102-103.

Subsequent to *Flash v. Cohen*, supra, the Supreme Court has declined to expand on its holding there. *E.g.*, *Valley Forge College v. Americans United*, supra; *Schlesinger v. Reservists Committee*, supra; *United States v.*

*Richardson*, 418 U.S. 166 (1974). Hence, Professor Chemerinsky, *op. cit.,* p. 93, summarizes the taxpayer standing doctrine as follows: "After *Richardson*, *Schlesinger*, and *Valley Forge* the only situation in which taxpayer standing appears permissible is if the plaintiff challenges a government expenditure as violating the establishment clause. ¨

B. In our system, Act No. 2 of February 25, 1946 (32 L.P.R.A. secs. 3074-3076) (Act No. 2), prohibits lawsuits in which the plaintiffs invoke the jurisdiction of the court in their capacity as taxpayers.

Taxpayer action is a type of action that proliferated in Puerto Rico during the 1940s, when the government began to implement a comprehensive plan of economic development and social reforms. In this regard, Professor Serrano Geyls points out the following: "Certain persons, among them political leaders of the opposition, went to court as taxpayers to request orders to paralyze several of the new government programs[, alleging] the unconstitutionality of the expenditure. "R. Serrano Geyls, *Constitutional Law of the United States and Puerto Rico*, San Juan, Ed. C. Abo. P.R., 1986, Vol. I, p. 135. *E.g. Buscaglia, Tes. v. Corte*, 64 D.P.R. 11 (1944) (affirming a lower court decision granting plaintiff standing as a taxpayer and halting the disbursement of funds from various social programs). See, also, *Suarez v. Tugwell, Governor*, 67 D.P.R. 180 (1947). **\*515**

As a result of these lawsuits, the Legislature passed Act No. 2. It is clear from the Explanatory Memorandum of Law No. 2 that its purpose was to avoid litigation in which "the legality or constitutionality of laws and actions of public officials authorized by law, *by persons who have not suffered any actual damage as a result thereof, and who allege the right to sue merely because they are taxpayers,*" was challenged. (Emphasis added.) Explanatory Memorandum for Act No. 2 (1946 Laws of Puerto Rico 7). It is abundantly clear from the foregoing that the legislature, by prohibiting the taxpayer action, *intended to discourage the proliferation of lawsuits in which the plaintiff does not suffer a real and individualized damage.* To this effect, in *Suarez v. Tugwell, Governor*, supra, p. 186, we determined that Act No. 2 deprived the courts of Puerto Rico of jurisdiction to hear cases in which it is alleged to have a right that belongs to the public and not to any particular individual.

On the other hand, in *Hernández Torres v. Governor*, 129 D.P.R. 824 (1992), we held that a group of legislators, as taxpayers and on behalf of all taxpayers of Puerto Rico, lacked standing to challenge the constitutionality of the Joint Resolution that provided appropriations for the ordinary expenses of the Commonwealth Government. [4] In

WESTLAW    © 2021 Thomson Reuters. No claim to original U.S. Government Works.                    20

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

Romero Barcelo v. E.L.A., 169 D.P.R. 460 (2006)

2006 TSPR 163

*Hernández Torres v. Governor*, supra, the plaintiffs had requested a permanent injunction to prevent the use of funds allocated under the Joint Resolution on the grounds that the approved budget was deficient. On that occasion, we ruled that the legislators did not have standing because they did not demonstrate that they had suffered personal, **\*516** clear and palpable damages, nor that their legislative prerogatives had been impaired. Id. at 849. We also ruled that they did not have standing under the provisions of Act No. 2.

It is not unreasonable to conclude that in a situation where an expenditure authorized by the Legislature is challenged because it is alleged to violate our separation of church and state clause, we conclude that such plaintiff has standing as a taxpayer to bring such suit, regardless of the text of Act No. 2. *Asoc. Maestros P.R. v. Secretary of Education*, 137 D.P.R. 528 (1994).

In light of the foregoing, it seems evident that in our system, in order to validly claim as a taxpayer, it is required that the plaintiff challenges the validity of a law or governmental action through which *public funds are disbursed*[5] for a specific purpose delineated by the legislature, and that such disbursements violate a constitutional provision On the contrary, if what is claimed is exclusively the abstract interest that the Government complies with the law, we are of the opinion that the taxpayer does not have standing. This is so because this is a generalized interest that all taxpayers and citizens share in the same way, making it difficult, if not impossible, to individualize it.

Likewise, a general allegation in the sense that the tax rate to be imposed by the Executive Branch affects the purchasing power of the citizen and taxpayer, since it limits the money available for use, does not confer standing. This is an **\*517** equally generalized allegation, shared by all citizens and is also undifferentiated. The public policy established in Act No. 2 clearly prohibits lawsuits in which the taxpayer fails to prove the existence of a concrete and individualized interest. See *Federal Election Comm'n v. Akins*, 524 U.S. 11, 35 (1998), dissenting opinion of Justice Scalia.

We must now briefly refer to the grounds invoked by the majority opinion to conclude that the plaintiffs have standing to file this lawsuit, which I not only do not agree with, but also consider erroneous.

The Majority seeks support for its thesis in two citations, one from Professor Serrano Geyls and another from Professor Tribe. In addition, it cites in support *Bacchus*

*Imports, Ltd. v. Dias*, 468 U.S 263 (1984), which, it points out, holds that "a taxpayer has standing to challenge a tax law *that determines its own liability as a taxpayer*". (Emphasis in original.) Majority opinion, p. 472.

Certainly, a careful review of the quotation of Professor Serrano Geyls makes it evident that the proposition put forward by the Majority is not supported therein. Serrano Geyls postulates that a taxpayer has standing to "obtain a refund" for what has been paid or for what is intended to be paid in light of a law that is deemed illegal or unconstitutional. This is clearly not the case here. The second situation in which the taxpayer's suit is alleged to proceed is when the taxpayer " 'challenges a governmental act *as unconstitutional* and alleges, as a reason to prove his interest as a litigant, that he contributes, through the payment of taxes, *to the economic support of the allegedly unconstitutional act*' ". (Emphasis supplied.) Majority opinion, p. 473. Again, this is not the situation before us. I wonder, **\*518** what is the allegedly unconstitutional act in this lawsuit?

The reference to Tribe is equally erroneous. Tribe cites in support of the position expressed in the quotation embraced by the Majority, *Bacchus Imports, Ltd. v. Dias*, supra, and *Regan v. Taxation with Representation of Wash.* 461 U.S. 540 (1983). Tribe, *op. cit. Neither of these two cases deals with the standing of the taxpayer*. The issue raised in *Bacchus Imports, Ltd. v. Dias*, supra, was whether Hawaii's excise tax on wholesale liquor sales, which exempted locally produced liquor, violated the commerce clause by its protectionist nature, the equal protection of the laws clause by discriminating against imported products, and the constitutional import/export clause. In *Regan v. Taxation with Representation of Wash.* supra, the Supreme Court held that a provision of the federal Internal Revenue Code relating to tax-exempt corporations, which conditioned such status on their not engaging in lobbying of Congressmen, was constitutionally valid in the face of an allegation that it violated the First Amendment.

Based on the foregoing, I consider that the grounds invoked by the Court's Opinion are misguided and do not support the position adopted by the Majority of the Court.

## III

Plaintiffs Carlos Romero Barceló, Peter Muller Maldonado and a group of eight pensioned citizens claim to have standing in this case as taxpayers, the former, and as taxpayers and pensioners, the latter. In summary, they


I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

Romero Barcelo v. E.L.A., 169 D.P.R. 460 (2006)

2006 TSPR 163

come before us **\*519** to assert the general interest that every citizen has in the Executive Branch complying with the law as they interpret it, and also because they believe that the Executive Branch's interpretation of the Tax Fairness Act limits their purchasing power.

According to the plaintiffs, what is causing them harm is the Governor's interpretation of the interest rate on consumption and the use provided in the Tax Fairness Act, since they will eventually pay more and see their finances affected by the "decrease" in their purchasing power. It is in their interest that the law be interpreted as they understand it was passed. In other words, that the Government applies the law correctly. Clearly, this is a generalized claim and damage shared by all citizens. As we have said, in the absence of a valid allegation of violation of a constitutional right, the general claim that the law is wrongly interpreted is insufficient to give a taxpayer or citizen standing to file a lawsuit such as the one at hand. On the other hand, it goes without saying the obvious: the plaintiffs have not challenged any disbursement of expenses on the part of the Executive Branch.

Recognizing that plaintiffs have standing to challenge the Executive Branch's action in interpreting the text of a law and putting it into effect, without any allegation of a constitutional violation, would open the doors of the court "wide open for the consideration of any case that any citizen may wish to bring in alleged protection of a public policy". *Salas Soler v. Secretary of Agriculture*, 102 D.P.R. 716, 723-734 (1974). Perhaps more seriously, such a proposal would seem to point to a system of government in which the courts are charged with the obligation to "comply with and enforce the laws," a power inherent in the Executive Branch. Art. IV, Sec. 4, E.L.A. Const., L.P.R.A., Vol. 1. See *Federal Election Comm'n v. Akins*, supra, p. 36. **\*520**

Finally, both the plaintiffs and the Court's Opinion express a concern that if they were not recognized as having standing in this case, no one would have standing. We do not share this opinion. What is certain is that there are some issues whose solution does not fall within the jurisdiction of the Judicial Branch, but rather within the political process. Those who are not satisfied with the Governor's interpretation of the Tax Fairness Act have at their disposal the most powerful power in a democracy to make themselves heard: the vote. Faced with an issue identical to the one that now concerns the Majority, I endorse the expressions of Chief Justice Burger in *United Status v. Richardson*, supra, p. 179, from which we quote extensively:

It can be argued that, if respondent is not permitted to litigate this issue, no one can do so. In a very real sense, the absence of any particular individual or class to litigate these claims gives support to the argument that the subject matter is committed to the surveillance of Congress, and ultimately to the political process. *Any other conclusion would mean that the Founding Fathers intended to set up something in the nature of an Athenian democracy or a New England town meeting to oversee the conduct of the National Government by means of lawsuits in federal courts.* The Constitution created a representative Government, with the representatives directly responsible to their constituents ... that the Constitution does not afford a judicial remedy does not, of course, completely disable the citizen who is not satisfied with the "ground rules" established .... Lack of standing within the narrow confines of Art. III jurisdiction does not impair the right to assert his views in the political forum or at the polls. Slow, cumbersome, and unresponsive though the traditional electoral process may be thought at times, our system provides for changing members of the political branches when dissatisfied citizens convince a sufficient number of their fellow electors that elected representatives are delinquent in performing duties committed to them. (Emphasis ours.)

See also *Schlesinger v. Reservists Committee*, supra, at 227 ("Our system of government leaves many crucial decisions to the political process. *The assumption that if respondents have no standing to sue, no* **\*521** *one would have standing, is not a reason to find standing*.") (Emphasis added.)

In the absence of a justiciable controversy, I am of the opinion that the instant lawsuit should have been dismissed. For the reasons expressed, I dissent from the

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

Romero Barcelo v. E.L.A., 169 D.P.R. 460 (2006)

2006 TSPR 163

opinion issued today.

**Footnotes**

[1] According to the complaint filed in the instant case, the House Committee on Finance and Financial Affairs (Committee) held over 47 public and executive hearings between December 3, 2005 and May 24, 2006.

[2] Act No. 117 of July 4, 2006.

[3] Prior to its approval, some portions of the Bill were amended in the House. *These amendments in no way affected the provisions here in question and previously transcribed.*

[4] This approval was issued without a prior report from the Senate Finance Committee and without a debate among the members of said body.

[5] See R. of the C. 5269 of June 27, 2006 and R. Conc. of the C. 81, which were issued with the purpose of "reaffirming the purpose and legislative reality of the Substitute to House Bill 2193, better known as the 'Tax Fairness Act of 2006', to avoid possible misinterpretations thereof; to ratify the establishment of a sales tax with a single rate of five point five percent (5.5%), distributed in four percent (4%) corresponding to the state tax and another one point five percent (1.5%) corresponding to the municipal tax." Appendix, pp. 960 and 962.

[6] *Prior* to the Governor's signature, the House of Representatives approved a document entitled Substitute to House Bill 2193 Tax Reform Bill, with the purpose of reconsidering and amending certain provisions of the Substitute Bill aimed at establishing the amount of the tax rate. A notice to this effect was sent to the Senate, but the Senate refused to consider it and refused to return the bill to the House of Representatives for reconsideration. In view of the differences that occurred between both legislative bodies, including the refusal to send the approved bill to the Governor for his consideration and signature, the Governor and the Hon. José Luis Dalmau Santiago filed a writ of *mandamus* before this Court. *We issued the writ of* mandamus *and ordered the remittal of the Substitute Bill to the Governor, as approved by the House of Representatives and the Senate on June 21 and 25, 2006, respectively. Acevedo Vilá v. Aponte Hernández, 168 D.P.R. 443 (2006).*

[7] See Regulations to Implement the Provisions of Subtitle BB - Sales and Use Tax of Act No. 120 of October 31, 1994, Regulation No. 7230, Department of State, October 13, 2006.

[8] They further requested the issuance, in due course, of any interim or permanent relief, with the objective of ordering the defendants to impose a sales and use tax at a total and single taxable rate of 5.5%.

[9] Subsequently, we granted the same term to the House of Representatives and the Senate of Puerto Rico to express their respective positions.

[10] Some of the plaintiffs are contesting the *contested* legislation *as affected pensioners.* They argue that the tax rate that the Executive Branch intends to impose affects their respective personal finances and the purchasing power of their pensions. Based on the previously outlined doctrine, we understand that they do not have standing as affected pensioners. The alleged damage is a generalized damage, shared with the citizenship in general, since just as pensioners, salaried employees will see their respective finances and the purchasing power of their salaries affected.

[11] It is pertinent to point out that neither the referred Law No. 117 nor the Regulation No. 7230 of the Department of the Treasury of October 13, 2006, provide a remedy at law for the challenge of the tax imposed or the reimbursement of the payment made in excess of the tax rate established in the statute.

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

Romero Barcelo v. E.L.A., 169 D.P.R. 460 (2006)

2006 TSPR 163

[12] Sec. 2405(c): ".... The taxes imposed by this Subtitle shall advend funds of the Commonwealth at the time of collection. "

[13] Sec. 6189(A): "The municipal tax rate of one point five percent (1.5%) shall be distributed proportionately as follows: i. a rate of one point two percent (1.2%) for the *municipality*; ii. a rate of one point one percent (.1%) for the *Municipal Improvement Fund*; iii. a rate of two point two percent (.2%) as a *Municipal contribution* to the General Fund for contributory relief to individuals.... ". (Emphasis supplied.) Appendix, p. 602.

[14] Sec. 2406-1(b): "Except in the case of tax payments related to sales made in municipalities for which the Department acts as centralized collector and administrator, taxable sales shall be determined by dividing gross sales by 1.055, it being the responsibility of the merchant or operator of the dispensing machine to comply with his obligation, if any, of payment to a municipality. "Appendix, p. 112.

[15] Although what has been previously expressed disposes of the present controversy, it is pertinent to point out that a study of the Explanatory Memorandum of the Tax Fairness Act of 2006 *confirms* the determination we have reached. Through it, the legislator refers us to the tax systems of different jurisdictions in the United States, especially, to the tax system of Florida. To that effect, the legislature stated:
"In analyzing this measure, the tax systems of several states were considered, including Hawaii, New York and Florida. *For the most part, our SUT has followed the Florida sales and use tax model for the following reasons*: (i) it is widely known that for many years Puerto Ricans have visited and vacationed in the State of Florida, therefore they have experienced the SUT set by Florida; (ii) in recent years, a considerable number of Puerto Ricans have settled in said state but maintain close ties with Puerto Rico and frequently travel to the Island and can share their experience with the SUT imposed in Florida; and (iii) Florida's positive experience with its SUT system has allowed individuals not to be taxed on their income, achieving in turn high revenues for the public treasury. "Appendix, p. 794.
The tax law of the State of Florida, very similar to the Tax Fairness Act of 2006, *establishes a sales and use tax through two separate and independent tax rates, one corresponding to the state and the other corresponding to the municipalities or counties*; as in our tax law, both rates are regulated through independent articles. While Sec. 212.05 establishes a sales and use tax at a base tax rate of 6%, in Secs. 212.054 and 212.055 authorizes the municipalities or counties to establish a tax at a base rate of up to 1.5%.
Although regulated by the same piece of legislation, the municipal tax rate is independent and separate from the 6% base tax rate and is not understood to be included within the 6%. "Florida has a base tax rate of 6%. Local taxes are in addition to this base rate. " State of Florida Department of Revenue, *History of Local Sales Tax and Current Rates,* 2006, http://taxlaw.state.fl.us./wordfiles/SUTTRCHISTORY.pdf. The same structure and interpretation is given to the New York State tax statute. See Arts. 28 and 29 of the Tax Law of the State of New York, Secs. 1101–1264.
By using as a model the tax systems described above and, like them, establishing a state and municipal tax through separate articles, *the only logical and reasonable interpretation of the text of Act No. 117 is that our legislature intended to establish a sales and use tax through two separate and distinct tax rates, and that the municipal tax rate is not included in the 5.5% established in Sec. 2401 of said Act.*

[1] Act No. 117 of July 4, 2006.

[2] House Bill 2193, Appendix, pp. 170-246.

[3] H.B. 2193, Appendix, pp. 607-610. The following deposed: Department of the Treasury, Government Development Bank, Department of Economic Development and Commerce, College of Certified Public Accountants, Puerto Rico Bankers Association, Department of Consumer Affairs, Association of Industrialists, Puerto Rico Association of Economists, Office of the Commissioner of Financial Institutions, Puerto Rico Chamber of Commerce, Puerto Rico

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

Bar Association.

4    Substitute to H.B. 2193, Appendix, pp. 454-603.

5    Positive Report on the Substitute for H.B. 2193, Appendix, pp. 245-454.

6    Presentation H.B. 2193, Tax Reform Act 2006, Appendix, pp. 604-643.

7    Id. at p. 614. See p. 11 of the presentation.

8    Journal of Sessions, Substitute to S. 2193, June 21, 2006, 15th Legislative Assembly, pp. 60, 87, 100, 101, 110, 111, 117, 125, Appendix, pp. 644-791.

9    Appendix, p. 718.

10   The Minority Leader of the Popular Democratic Party (PDP), Hon. Héctor Ferrer Ríos, stated the following: "Second amendment, in Chapter 2, Section 2401, in subsection [sic] (b), substitute '5.5 percent' for '6.5'. "Likewise, later in the debate, the PDP Minority Leader suggested raising the SUT rate from 5.5% to 6.5%. For such reason, he expressed the following words:
"Mr. President, what this proposed amendment does is that it practically tempers, and solves the budgetary or structural deficit that the Government of Puerto Rico has, in a basic period of some three years. If before that term sufficient money is collected and paid, it automatically eliminates that one percent sales tax and lowers it to 5.5. *We do the exact opposite of what you want to do. 5.5 to go up to 6.5* .... " (Emphasis supplied.) Id. at 113.

11   The Hon. Ferdinand Pérez Román, member of the PDP minority, stated:
"Today, perhaps the political pressures and the scenarios in the House of Representatives have caused some changes in the positions after so many months of work. *But the reality is that since the bill was filed on November 15, by the NPP Majority, which was based on 7%* ... nobody invented that. It was not invented by the Popular Party, it was the bill that you filed. After the drafting and discussion of this bill, 2193, on January 16, the Executive presented its amendment bill ..... The truth is that after so many months of work analyzing the two Bills, they took the two Bills, threw them away *and came up with a new Bill.* After months and months of presentations, weeks of work and hours of effort, today we are discussing something totally different from what the speakers presented. In fact, we would basically have to make hearings again of the Bill submitted *today because it has nothing of what was submitted on November 15, which was 2193. It is a totally different bill.* "(Emphasis supplied.) Journal of Sessions, *supra*, p. 57.

12   Complaint filed by the petitioners before the Court of First Instance on October 30, 2006, Appendix, p. 9.

13   "Fortaleza concurs with Senate interpretation," *Primera Hora*, June 27, 2006, p. 9, Appendix, p. 959; "Reforma Firmada," *El Vocero de Puerto Rico*, July 5, 2006, p. 6, Appendix, p. 1130.

14   H.R. 5269 and R. House Conc. R.   81, Appendix, pp. 960-963.

15   Regulations of the Department of the Treasury to implement the provisions of Subtitle BB -Sales and Use Tax-, Appendix, pp. 38-170.

16   Complaint filed by the petitioners before the Court of First Instance on October 30, 2006. Appendix, p. 9.

17   Brief for Appellees, pp. 11-45.



I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

Romero Barcelo v. E.L.A., 169 D.P.R. 460 (2006)

2006 TSPR 163

[18]   Brief Setting forth the Petitioners' Position, pp. 18-34, filed with us on November 7, 2006.

[19]   On November 1, 2006, the House of Representatives filed a Request for Intervention and/or Appearance as *Amicus Curiae.* On November 2, 2006, we granted the House of Representatives and the Senate a term of seven days to express their position in writing.

[20]   Id.

[21]   See *Art. III, Sec. 17, Const.* E.L.A., L.P.R.A., Vol. 1.

[22]   Government Development Bank Special Appearance Memorandum for Puerto Rico, pp. 1-25.

[23]   *Alejandro Rivera v. E.L.A.* 140 D.P.R. 538, 545 (1996).

[24]   *Santiago v. Supt. Police of P.R.* 151 D.P.R. 511 (2000); *Alejandro Rivera v. E.L.A.* supra; *Meléndez v. Superior Court,* 90 D.P.R. 656 (1964).

[26]   31 L.P.R.A. sec. 14.

[27]   31 L.P.R.A. sec. 19.

[28]   *Sucn.* *Alvarez v. Srio. de Justicia,* 150 D.P.R. 252 (2000); *Pueblo v. Zayas Rodríguez,* 147 D.P.R. 530 (1999); *Figueroa v. Díaz,* 75 D.P.R. 163 (1953).

[28]   *Alonso García v. S.L.G.* 155 D.P.R. 91 (2001); *Famania v. Corp. Azucarera de P.R.,* 113 D.P.R. 654 (1982).

[29]   *Irizarry v. J & J Cons. Prods. Co.* 150 D.P.R. 155 (2000); *Dorante v. Wrangler of P.R.* 145 D.P.R. 408 (1998); *Vázquez v. A.R.PE.,* 128 D.P.R. 513 (1991).

[30]   *Otero de Ramos v. Srio. de Hacienda,* 156 D.P.R. 876 (2002); *Pueblo v. Zayas Rodríguez,* supra.

[31]   Id.

[32]   *J.P. v. United Front I,* 165 D.P.R. 445 (2005).

[33]   Id.; *Alejandro Rivera v. E.L.A., supra.* supra.

[34]   *J.P. v. United Front I,* supra; *Caribe Comms, Inc. v. P.R.T. Co.* 157 D.P.R. 203 (2002).

[35]   Id.

[36]   Id.; *Pérez v. Com. Rel. Trab. Serv. Pub.* 158 D.P.R. 180 (2002); *Asoc. Fcias. Com. v. Dep. of Health,* 156 D.P.R. 105 (2002); *P.S.P. v. State Comm. of Elections,* 110 D.P.R. 400, 409 (1980).

[37]   *J.P. v. United Front I,* supra.

[38]   Id.; *P.S.P. v. State Elections Commission,* supra.


I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

[39]   *Caribe Comms, Inc. v. P.R.T.Co.* supra.

[40]   *Acevedo v. Mun. de Aguadilla,* 153 D.P.R. 788 (2001); *Misión Ind. P.R. v. J.P.,* 146 D.P.R. 64 (1998).

[41]   *Raimundi v. Productora,* 162 D.P.R. 215 (2004).

[42]   See pp. 487-492 of this opinion.

[43]   In *Pueblo v. Alvarez Rodriguez Rodriguez,* 154 D.P.R. 566 (2001), we stated the following: "We will only make interpretations that diverge from the plain text of the statute, as we did in *Pueblo v. Zayas Rodriguez,* supra, in extraordinary cases in which *it is compelling to conclude from the legislative history that the Legislature has committed an accidental drafting error.* " (Emphasis supplied.)

[44]   *B.B.C. Realty v. Secretary of the Treasury,* 166 D.P.R. 498 (2005).

[45]   The highest federal forum determined that, when in doubt as to whether a tax is due, it must be resolved in favor of the citizen. See *Gould v. Gould,* 245 U.S. 151 (1917).

[46]   *BBC Realty v. Secretary of the Treasury,* supra; *Talcott Inter-Amer. Corp. v. Registrar,* 104 D.P.R. 254 (1975).

[47]   *Central Coloso v. Descartes, Tes.* 74 D.P.R. 481, 486 (1953); *Plácido Longo & Cía. v. Sancho Bonet, Tes.,* 50 D.P.R. 160 (1936).

[48]   *B.B.C. Realty v. Secretary of the Treasury,* supra.

[49]   *Pueblo v. Zayas Rodríguez,* supra.

[1]   Said rule establishes:
"Any person interested in a deed, will, written contract, or other documents constituting a contract, or whose rights, status or other legal relations were affected by a statute, municipal ordinance, contract or franchise, may request a decision on any divergence in the interpretation or validity of such statute, ordinance, contract or franchise, and also that a declaration be issued as to the rights, status or other legal relations deriving therefrom. A contract may be construed before or after it has been breached. "32 L.P.R.A. App. III, R. 59.2 L.P.R.A. App. III, R. 59.2.

[2]   The Legislature, however, may confer standing on certain persons to file a particular legal remedy under a statute. This is not the case before us. In the absence of a statute granting standing, the plaintiff must comply with the requirements we have enumerated.

[3]   On this subject, see, among others: N.C. Staudt, *Taxpayers in Court: A Systematic Study of a (Misunderstood) Standing Doctrine,* 52 (No. 2) Emory L.J. 771 (2003); S.L. Parsons, *Comments: Taxpayer's Suits: Standing Barriers and Pecuniary Restraints,* 59 (No. 3) Temple L.Q. 951 (1986); E.B. Schnurer, *"More than an Intuition, Less than a Theory": Toward a Coherent Doctrine of Standing,* 86 (No. 3) Colum. L. Rev. 564 (1986); D.S. Boagen, *Standing up for Flast: Taxpayer and Citizen Standing to Raise Constitutional Issues,* 67 Ky. L.J. 147 (1978-1979).

[4]   The plaintiffs there also claimed standing on behalf of the public interest and as representatives of their electorate.

[5]   As an example, in *Suarez v. Tugwell, Governor,* 67 D.P.R. 180 (1947), we determined that Act No. 2 of February 25, 1946 (32 L.P.R.A. secs. 3074-3076) precluded the filing of a taxpayer action in which the plaintiff challenged the

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

**Romero Barcelo v. E.L.A., 169 D.P.R. 460 (2006)**

2006 TSPR 163

allocation of public funds to the Puerto Rico Agricultural Company. The plaintiff alleged that the illegal allocation of funds to said company would cause serious and irreparable harm to him as a taxpayer and to all taxpayers of Puerto Rico.

**End of Document**                                     © 2021 Thomson Reuters. No claim to original U.S. Government Works.

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.