197 D.P.R. 914, 2017 WL 1656332 (P.R.), 2017 PRSC 57

NORMA E. BURGOS ANDÚJAR, ELECTION COMMISSIONER OF THE NEW PROGRESSIVE PARTY, respondent,
v.
STATE ELECTION COMMISSION, through its PRESIDENT, LIZA GARCÍA VÉLEZ; ACTING ELECTION COMMISSIONER OF THE POPULAR DEMOCRATIC PARTY, MIGUEL RÍOS TORRES; DESIGNATED ELECTION COMMISSIONER OF THE PUERTO RICAN INDEPENDENCE PARTY, MARÍA DE LOURDES SANTIAGO, respondents; COMMONWEALTH OF PUERTO RICO, through the SECRETARY OF JUSTICE, HON. WANDA VÁZQUEZ GARCED, respondent; SENATE OF PUERTO RICO, through its PRESIDENT, HON. THOMAS RIVERA SCHATZ, and its SECRETARY, MANUEL TORRES NIEVES, and HOUSE OF REPRESENTATIVES OF PUERTO RICO, through its SPEAKER, HON. CARLOS MÉNDEZ NUÑEZ, and its SECRETARY, AYLEEN FIGUEROA VÁZQUEZ, petitioners.

In the Supreme Court of Puerto Rico.
*Number:* CT-2017-002
*Resolved on:* April 19, 2017
April 19, 2017.

1.  COURTS—CREATION, ORGANIZATION AND GENERAL PROCEDURE—OPINIONS, JUDGMENTS, RESOLUTIONS, ORDERS AND WRITS—DECISIONS IN PRIOR CASES AS PRECEDENT.
The doctrine of stare decisis establishes that, as a general rule, a court must follow its decisions in subsequent cases in order to achieve legal stability and confidence. Nevertheless, the doctrine does not go as far as declaring that the opinion of a court has the scope of a dogma that must be followed blindly even when the court is subsequently convinced that its prior decision is erroneous. Thus, when the reasoning behind a decision no longer withstands a thorough analysis, the court is not bound to follow it.

2.  ID.—ID.—ID.—ID.
There are three circumstances that, as an exception, justify setting aside a precedent: (1) if the prior decision is clearly erroneous; (2) if its effects on the rest of the system are adverse, and (3) if the number of people who relied on it is

limited.

3.  ID.—ID.—ID.—ID.
*P.P.D. v. Gobernador II*, 136:916, is, without a doubt, a clearly erroneous case. There is a discussion on this matter in this Opinion *per curiam.* **\*915**

4.  STATUTES,    CUSTOMS    AND EQUITY—INTERPRETATION AND APPLICATION OF    THE    LAW—GENERAL    RULES    OF INTERPRETATION—POWERS AND DUTIES OF THE COURTS OF  JUSTICE...
A court must not lose from perspective that its function is to determine what the lawmaker meant to say and not what the court would have liked to be said. In order to fulfill that function, courts must interpret the law as a harmonious whole, giving a logical meaning to its different sections. The interpretation that the court ultimately gives to the legal precept cannot lead to the absurd result of rendering null or incoherent other provisions of the law before its consideration.

5.  ID.—ID.—ID.—IN  GENERAL—MEANING  OF LAW, CLEAR.
The clear and unambiguous text of the law is the expression by excellence of the lawmaker's intent. When the court is before a law that meets this characteristic, it cannot undermine what is expressed by the Legislative Assembly on the pretext of fulfilling the legislative intent.

6.  ID.—ID.—ID.—ID.—ID.
When the language of the law is clear and unambiguous, the court's responsibility is to respect the legislative intent, regardless of the court's personal opinion. When interpreting laws, courts must refrain from replacing the legislative criteria with their own concepts of what is fair, reasonable or desirable. Judges, in fact, must avoid the bad practice of resorting to constitutional precepts as grounds to amend laws. They must always maintain themselves in the judicial sphere, without making wrongful incursions into the legislative sphere.

7.    ELECTIONS    AND REGISTRATIONS—INFRACTIONS OF ELECTION LAWS—PROHIBITIONS AND OFFENSES...
Art. XIII §1(a) of the Immediate Decolonization of Puerto Rico Act provides that prohibitions and offenses related to this consultation process shall be governed by the provisions established in the Puerto Rico Election Act and the Puerto Rico Political Campaign Financing Oversight Act, except where inappropriate or incompatible with the provisions of this law or when this law lays down a specific



I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

offense or penalty.

8. ID.—ID.—ID.
Art. 12.001 of the Puerto Rico Election Act, 16 LPRA § 4231, by which the Legislative Assembly incorporated into our legal system the election ban, provides that during the year when a general election is held and up until the day after the election is held, Government agencies, the Legislative Assembly and the Judicial Branch of Puerto Rico are barred from incurring expenses to buy and distribute advertising or promotional materials in order to put forward their programs, projects, achievements, fulfilments, projections or plans. **916**

9. ID.—ELECTION ACT—DEFINITIONS.
"General elections" is defined as the process by which, every four years, voters choose the officers who will hold elective public offices in the Government of Puerto Rico, including the office of governor, resident commissioner, state legislators, mayors and municipal legislators.

10. ID.—ID.—ID.
Through the Puerto Rico Election Act, the Legislative Assembly provided that it would use the concept of "election" or "elections" on occasions when it is referring to both general elections, and plebiscites, referendums, electorate consultations, special and primary elections.

11. ID.—ID.—ID.
A "plebiscite" is the method by which the electorate of Puerto Rico is submitted to an electoral consultation, the option to choose their preference among several options on the same political issue, including, but not limited to, the political relationship between Puerto Rico and the United States of America.

12. ID.—ID.—ID.
"Referendum" is a process by which the electorate of Puerto Rico is submitted to a direct electoral consultation to approve or reject one or several specific proposals on public policies to be adopted or legislation to be enacted with regard to matters of general interest.

13. ID.—ID.—ID.
In the Puerto Rico Election Act, lawmakers included an express reference to plebiscites and referendums in several provisions. Nevertheless, in Art. 12.001 (16 LPRA § 4231) these are not mentioned. Evidently, the Legislative Assembly only mentioned "general election." The specific reference to this election event excludes other events not included by the Legislative Assembly in the concept of reference.

14. ID.—INFRACTIONS OF ELECTION LAWS—PROHIBITIONS AND OFFENSES.
A thorough reading of Art. 12.001 of the Puerto Rico Election Act, 16 LPRA § 4231, demonstrates that the intent of the Legislative Assembly was to prevent the Government in office during a year when a general election is held from being able to take the opportunity to promote its achievements, projects, programs, fulfilments, projections or plans in order for its officers to achieve victory.

15. ID.—ID.—ID.
As clearly established in the Immediate Decolonization of Puerto Rico Act and the Puerto Rico Election Act, the prohibitions and offenses that apply to the status consultation are those that are compatible and applicable because they were not established **917** for a general election or other electoral event different from a plebiscite or referendum.

16. ID.—ID.—ID.
The Puerto Rico Election Act clearly provides that the election ban only applies during a year when a general election is held and, therefore, as defined, to the electoral event held every four years during which voters elect the officers who will hold the elective public offices of the Government of Puerto Rico.

**Synopsis**
INTRAJURISDICTIONAL CERTIFICATION APPEAL filed by the petitioners for the Court to determine whether the election ban laid down in Art. 12.001 of the Puerto Rico Election Act, 16 LPRA § 4231, can be applied to the plebiscite process to be held on June 11, 2017. *It is inappropriate to activate the election ban contained in Art. 12.001 of the Puerto Rico Election Act*, supra, *for the status consultation authorized under the Immediate Decolonization of Puerto Rico Act. Consequently, Resolution No. CEE-RS-17-07 issued by the State Election Commission is revoked.*

*Eliezer Aldarondo Ortiz, Claudio Aliff Ortiz* and *Rosa Campos Silva*, of *Aldarondo & López Bras, P.S.C.*, attorneys for the Senate of Puerto Rico, petitioner in Certification; *Israel Roldán González*, of *Roldán González & Asociados*, attorney for the House of Representatives, petitioner in Certification; *Hamed G. Santaella Carlo* and *María Elena Vázquez Graziani*, attorneys for Norma E. Burgos Andújar, Election Commissioner of the New Progressive Party, respondent; *Gerardo De Jesús Annoni*

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

Com. CNP v. CEE, 197 D.P.R. 914 (2017).

2017 TSPR 57

and *Nelson J. Rodríguez Vargas*, attorneys for Miguel A. Ríos Torres, commissioner of the Popular Democratic Party, respondent; *Luis Enrique Romero Nieves*, attorney for María de Lourdes Santiago Negrón, Commissioner of the Puerto Rican Independence Party, respondent; *Luis R. Román Negrón*, Attorney General, and *Isaías Báez Sánchez*, Deputy Attorney General, attorneys for the Government of Puerto Rico, respondent.

PER CURIAM:

If in order to arrive at a correct decision in this case it is necessary to modify the opinions previously issued by this Court, let them be modified in any manner or annulled, if necessary. An error should **\*918** never be converted into the truth, no matter how much it is insisted on; if the wrong path has been followed, we must go back on our steps before we get lost in the maze of deception. We must dare to take the correct action. *Giménez et al. v. Brenes*, 10 DPR 128, 170-171 (1906), dissenting opinion of former Associate Justice MacLeary.

The appeal for intrajurisdictional certification before our consideration, in which we are asked to determine whether the election ban laid down in Article 12.001 of the Election Act of 2011, *infra*, applies to election scenarios different from the ones established by the Legislative Assembly, gives us the opportunity to re-examine and correct the erroneous rulings that we made in  *P.P.D. v. Gobernador II*, 136 DPR 916 (1994).

In that case, a majority of this Court violated the most basic principles of statutory interpretation, judicial self-limitation and separation of powers in interpreting Article 8.001 of the Election Act of 1977, *infra*, and expanding the government election ban laid down therein to electoral scenarios not contemplated by the Legislative Assembly.

Therefore, and based on the grounds that we set forth below, we hereby revoke the rule established in *P.P.D. v. Gobernador II*, supra, and hold, pursuant to a thorough statutory analysis, that neither plebiscites, nor referendums, are included within the concept of "general election" established in Article 12.001 of the Election Act of 2011, *infra*.

With that in mind, we will now delineate the facts that gave rise to the dispute in this case. **\*919**

I

On February 3, 2017, the Legislative Assembly passed the Immediate Decolonization of Puerto Rico Act (Decolonization Act), Act No. 7-2017. By virtue of said statute, a plebiscite was authorized to be held on June 11, 2017, to choose one of several political status options. The Act of reference also provides for a referendum to be held on October 8, 2017, in the event that one of the options prevails.[i]

On February 13, 2017, the State Election Commission ("CEE," by its Spanish acronym) held an ordinary meeting. At the meeting, the Election Commissioner of the Popular Democratic Party (PDP Commissioner) presented a motion to activate the Advertisement Examining Board (AEB), until the plebiscite process concluded. The Election Commissioner of the New Progressive Party (NPP Commissioner) opposed the motion based on the understanding that according to Art. 12.001 of the Puerto Rico Election Act (Election Act of 2011), Act No. 78-2011 (16 LPRA § 4231), the election ban and the AEB were only applicable during general elections, not plebiscites or referendums.

Given the lack of unanimity among the election commissioners, the dispute was submitted to the consideration of the president of the CEE who, on March 1, 2017, issued Resolution No. CEE-RS-17-07. Therein, she maintained that Article XIII of the Decolonization Act, *supra*, established that the prohibitions contained in Chapter XII of the Election Act of **\*920** 2011, *supra*, would apply during the plebiscite and acknowledged that, among these, was the ban against public government broadcasting laid down in Article 12.001 of reference, also known as the "election ban." Based on that interpretation, the Constitution of Puerto Rico and what was held by this Court in *P.P.D. v. Gobernador II*, supra, she activated the election ban and ordered the establishment of the AEB. According to the Resolution, the ban would last until June 12, 2017, and, if it was necessary to hold the referendum, then, until October 9, 2017.

After her timely-filed motion to reconsider was denied, the NPP Commissioner filed for judicial review with the Court of First Instance reiterating that the provisions contained in Art. 12.001 of the Election Act of 2011, *supra*, applied only to general elections. Furthermore, she filed a petition for aid in jurisdiction in order for the effects of the challenged Resolution to be stayed until the review appeal was addressed. Lastly, she joined as indispensable parties to the action, the Government of Puerto Rico, and the two legislative bodies.

While the case was pending before the Court of First

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

Com. CNP v. CEE, 197 D.P.R. 914 (2017).

2017 TSPR 57

Instance, the Puerto Rico Senate and the House of Representatives, through their respective presidents and secretaries (jointly, the "petitioners"), filed the appeal for intrajurisdictional certification concerning us. They petitioned us to determine, as a question of law, whether the election ban laid down in Art. 12.001 of the Election Act of 2011, *supra*, can be applied to the plebiscite process to be held on June 11, 2017. On the same date, the NPP Commissioner made an appearance, joining the certification appeal filed.

On March 30, 2017, we issued the writ and ordered the parties to present their respective briefs.

In their brief, the petitioners reiterated that the president of the CEE had exceeded her powers, **\*921** because the election ban only applied to general elections. They based their position on the difference there is between the different election processes, namely, a "general election," a "plebiscite" and a "referendum," as defined in the Election Act of 2011. They argued that both the text of Art. 12.001 of the Election Act of 2011, *supra*, and the text of the Regulations to Control Governmental Public Broadcasting Expenses, only made reference to the term "general election." In view of this, they insisted that both "referendums" and "plebiscites" were outside the scope of application of the article of reference.

On her part, the NPP Commissioner added, among other things, that the Decolonization Act provided that the prohibitions and offenses laid down in the Election Act of 2011 would apply to plebiscites, except when they are incompatible and inapplicable under the law itself. Thus, she concluded that the prohibition against government public broadcasting laid down in Art. 12.001 of the Election Act of 2011, *supra*, could not be applied to the plebiscite, because it was incompatible and inapplicable under the Decolonization Act.

Furthermore, the Attorney General appeared on behalf of the Government of Puerto Rico. First, he claimed that the Government had the duty to inform citizens, especially when dealing with matters of great public interest. He argued that this duty to inform, which the president of the CEE attempted to undermine, was intrinsically tied to the citizens' exercise of their right to freedom of speech. Second, he emphasized that the election ban contained in Art. 12.001 of the Election Act of 2011, *supra*, only applied to general elections. He emphasized that the Election Act of 2011 itself defined "election" as being inclusive of "general elections," "plebiscites" and "referendums," *inter alia*. Consequently, he maintained that when the Legislative Assembly limited the text of the above-cited Art. 12.001 of the Election Act of 2011 to

"general election," it had unequivocally excluded **\*922** from its scope of application both plebiscites and referendums.

The Attorney General further argued that what was decided in *P.P.D. v. Gobernador II*, supra, was inapplicable to the instant case. Otherwise, he argued that this Court had to reevaluate the analysis and scope of the rule established therein, in order to prevent the perpetuation of a doctrinal error. Lastly, he indicated that the fact that the election ban was not applied to the Plebiscite did not mean that the Government could spend the funds unlimitedly. He stressed that under Art. VI § 9 of the Constitution of Puerto Rico, *infra*, any party having the capacity to sue who believed that the Government of Puerto Rico was using public funds for nonpublic purposes could resort to the courts to enforce their rights.

On their part, the parties opposing the appeal, namely, the CEE, the PDP Commissioner and the Election Commissioner of the Puerto Rican Independence Party (PIP Commissioner) defended the accuracy of the CEE's Resolution in all its parts. First, they argued that Art. XIII § 1 of the Decolonization Act, *supra*, incorporated by reference the Section on Offenses and Prohibitions of the Election Act of 2011 in its entirety. Second, they emphasized that what was decided by this Court in *P.P.D. v. Gobernador II*, supra, disposed of the dispute. They concluded that the constitutional principle of financial equality between the parties justified the decreed election ban.

Having examined the positions of all the parties regarding the dispute before us, we will now decide on this dispute.

## II

**[1–2]** The doctrine of stare decisis establishes that, as a general rule, a court must follow its decisions in subsequent cases in order to achieve legal stability and confidence **\*923**. *Pueblo v. Díaz De León*, 176 DPR 913, 921 (2009); *Am. Railroad Co. v. Comisión Indusrial*, 61 DPR 314, 326 (1943). Nevertheless, said doctrine "does not go as far as declaring that the opinion of a court has the scope of a dogma that must be followed blindly even when the court is subsequently convinced that its prior decision is erroneous." *Am. Railroad Co. v. Comisión Industrial*, supra. See, also, *Pueblo v. Sánchez Valle et al.*, 192 DPR 594, 645 (2015). "[T]he purpose of the doctrine of stare decisis is to achieve legal stability and confidence, *but never to perpetuate errors.*" (Emphasis added). *Am.*

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

Com. CNP v. CEE, 197 D.P.R. 914 (2017).

2017 TSPR 57

*Railroad Co. v. Comisión Indusrial*, supra, p. 326. Thus, when the reasoning behind one of our decisions *no longer withstands a thorough analysis*, we are not bound to follow it. *Rivera Ruiz et al. v. Mun. de Ponce et al.*, 196 DPR 412 (2016); *Pueblo v. Díaz De León*, supra, p. 922. In that sense, we have identified three circumstances that, as an exception, justify setting aside a precedent: "(1) if the prior decision was clearly erroneous; (2) if its effects on the rest of the system are adverse, and (3) if the number of people who relied on it is limited." *Rivera Ruiz et al. v. Mun. de Ponce et al.*, supra, p. 431. See, also, *Pueblo v. Sánchez Valle et al.*, supra, p. 645–646.

**[3]** "*The first of these principles disposes of the question brough forward.*" *Pueblo v. Sánchez Valle et al.*, supra, p. 646. There is no doubt that *P.P.D. v. Gobernador II*, supra, is clearly erroneous. We will demonstrate this below.

### III

In August 1994, the Legislative Assembly passed the Enabling Act of the Referendum on Amendments to the Constitution of Puerto Rico of 1994 (Enabling Act of the Referendum), Act No. 49-1994 (16 LPRA § 956) (suppressed). A referendum was thereby authorized **\*924** for registered voters to express their approval or rejection of several proposed amendments to the Constitution of Puerto Rico.

In order to challenge the constitutionality of said law and to request that the Governor of Puerto Rico at the time, Hon. Pedro Rosselló González, be ordered to refrain from advertisement campaigns on the country's public broadcasting media, several complaints were filed against the Government of Puerto Rico and the then governor.

After several procedural events, the Court of First Instance held that Art. 8.001 of the Puerto Rico Election Act of 1977 (Election Act of 1977), Act No. 4 of December 20, 1977 (16 LPRA § 3351116 LPRA § 3351) (2009 ed.) —which prohibited Government agencies from incurring expenses for public broadcasting "from January 1ˢᵗ of the year when a general election is to be held through to the day after the date of the election" (emphasis added)—, did apply to the referendum. Thus, it ordered the CEE to appoint the AEB to assess the need to publish any and all government ads until the day of the Referendum. It based its reasoning on the fact that the Enabling Act of the Referendum provided that the Election Act of 1977 would apply, in a complementary manner, to everything that was necessary, relevant and compatible with its purposes. Furthermore, it based itself on the principle of election

financial equality presumably laid down in the Constitution of Puerto Rico.

In disagreement, the Government of Puerto Rico and the Tourism Company turned to this Court and argued, among other matters, that the Court of First Instance erred when it applied the election ban laid down in Art. 8.001 of the Election Act of 1977 of reference to the Referendum, because this distorted the legislative intent.

Thus, the following dispute was submitted to the consideration of this Court: whether it was the *will and* **\*925** *intent of the Legislative Assembly* that the election ban laid down in Article 8.001 of reference for general elections apply to the Referendum. In order to fulfill its objective, the Court had to perform an exhaustive analysis of both the Enabling Act of the Referendum and the Election Act of 1977. That is because it is a well-known principle of statutory interpretation that in order to find out what the lawmaker's intention was, the law must necessarily be analyzed, and "when analyzing [same] *you must first turn* to the text itself, because if the language is clear and unambiguous, it should not be underestimated on the pretext of fulfilling its spirit." (Emphasis added). *Mun. de San Sebastián v. QMC Telecom*, 190 DPR 652, 668 (2014). See, also: *S.L.G. Solá-Maldonado v. Bengoa Becerra*, 182 DPR 675, 691 (2011); *Morell et al. v. Ojeda et al.*, 151 DPR 864, 877 (2000); Art. 14 of the Civil Code of Puerto Rico, 31 LPRA § 14.

However, in *P.P.D. v. Gobernador II*, supra, a majority of this Court failed to perform a thorough analysis of the legal provisions in dispute. Instead of doing so, and without any of the petitioners challenging the constitutionality of the provisions of reference, it confirmed the decision of the lower court, pursuant to an exclusively constitutional analysis. Specifically, and in what is relevant hereto, it expressed the following:

> *Summarizing,* pursuant to the constitutional principle of financial equality permeating any election—which the State has the duty to guarantee and that this Court must protect pursuant to Section 2 of the Constitution of the Commonwealth of Puerto Rico, *supra,*—we must extend the prohibition contained in Art. 8.001 of the Puerto Rico Election Act, *supra, and* apply it to this case to prevent the State from having any influence on the free expression of citizens in the election process, through government ads and the financial power that it has as a result of its access to public funds. (Emphasis in original). *P.P.D. v. Gobernador II*, supra, p. 926–927.

What is transcribed above shows that this Court did not analyze the intent of the Legislative Assembly or look up

WESTLAW    © 2021 Thomson Reuters. No claim to original U.S. Government Works.    5


I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

in the Constitution *926 of Puerto Rico any grounds to issue the decision that it deemed adequate. Such analysis was incorrect.

To begin with, in acting so, the Court infringed the rule of judicial self-limitation that "[w]hen a matter can be resolved by statutory analysis, it becomes unnecessary to consider the constitutional aspect." *P.P.D. v. Admor. Gen. de Elecciones*, 111 DPR 199, 243, note 32 (1981). See also, *Pacheco v. Srio. Instrucción Pública*, 108 DPR 592, 601 (1979) (it was reasoned therein that when the parties do not bring forward the issue of constitutional validity of a statute, there is no justification for the Court to express itself on that issue). The fact that this Court is the supreme interpreter of the Constitution of Puerto Rico does not give it a carte blanche to resort to this without limitation or without a pertinent request to that effect by a party.

Furthermore, such action on the part of the Court infringed the doctrine of separation of powers. In this regard, legal scholars Bernier and Cuevas Segarra have expressed the following:

> Under a system of separation of powers such as the one in effect in Puerto Rico, the Legislative Assembly has the power to pass laws. The Judicial Power exercised by the courts consists in exercising powers to resolve litigations by interpreting the law. In the usual performance of their duties, courts are bound to respect the intent of the lawmakers even if the judges personally disagree with the wisdom behind certain legislative acts. *Interpreting a law in a manner contrary to the lawmaker's intent implies an usurpation on the part of the* [J]udicial [B]ranch of the prerogatives of the [L]egislative [B]ranch. Therefore, the statutory interpreter must refrain from replacing the legislative criteria *with his own concepts of what is fair,* [what is] *reasonable and* [what is] *desirable.* (Emphasis added). R.E. Bernier and J.A. Cuevas Segarra, *Enactment and Interpretation of the Laws of Puerto Rico*, 2nd rev. ed., San Juan, JTS Pub. Co., 1987, Vol. 1, p. 299.[2] *927

Moreover, this Court not only turned to the Constitution of Puerto Rico when it should not have, but it also performed a very erroneous constitutional analysis, which we discuss in two parts below.

A. First, the Court made reference to Section 2 of Art. II of the Constitution of Puerto Rico, which provides that "[t]he laws shall guarantee the expression of the will of the people by means of equal, direct and secret universal suffrage and shall protect citizens from any coercion in the exercise of their electoral prerogative." PR Const., LPRA, Tome 1, 2016 ed., p. 283. Specifically, it reasoned that "to protect the constitutional right of free selection translated into the right to vote," the election ban should apply to the Referendum. *P.P.D. v. Gobernador II*, supra, p. 926. With this reasoning, this Court assumed, *without evidence of any government ad*, that the Government of Puerto Rico would coerce voters during the referendum through public broadcasting. However, the Court could not assume this. Given that we deem them to be completely accurate, we echo the expressions made by former Associate Justice Rebollo López in his dissenting opinion in *P.P.D. v. Gobernador II*:

> We are the first to admit that there is always a *possibility* that the Executive branch of the Government of Puerto Rico —*at a given time of our present or future history as a people, and in relation to an election event*—could *attempt* to violate the axiom of equality and coerce citizens in their electoral prerogative.
> However, *that cannot be assumed by the Judicial Branch.* That is, we are bound to start from the premise that the Executive Branch of any government administration acts correctly and in accordance with the relevant provisions of the Constitution and the laws applicable to the matter before our consideration. In other words, a party that alleges and maintains that the Executive Branch has failed to do so has the burden to prove this during a full hearing before the court. (Emphasis in original). Id., p. 936. *928

That is, the Court could not speculate about any future government action. We certainly do not deny that the rights laid down in Section 2 of Art. II of the Constitution of Puerto Rico, *supra*, exist and must be protected both during general elections and during referendums and plebiscites. However, this does not justify any attempt to protect such rights prematurely and without any evidence showing that they were in fact violated. Such evidence was not presented by the parties in the case, therefore, this Court erred when it vindicated the rights of reference at the wrong time.

B. Moreover, the majority of the Court in *P.P.D. v.*


I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

Com. CNP v. CEE, 197 D.P.R. 914 (2017).

2017 TSPR 57

*Gobernador II*, supra, p. 936, based itself on the "axiom [of financial equality among the parties presumably] laid down in the Constitution [...]%7D." However, *such axiom does not exist in the Constitution.* In this regard, professor Luis M. Villaronga very correctly expressed the following:

> It is well known that an "axiom" means an "[a]ffirmation so evident that it is admitted by everyone without the need to be demonstrated." 1 María Moliner, *Diccionario de uso del español* [Spanish Dictionary] 318 (1986). *Neither the Constitution of Puerto Rico, nor the Constitution of the United States contain such* [*principle of financial equality*] *with respect to people in general and much less with respect to political parties.* (Emphasis added). L.M. Villaronga, *Derecho constitucional* [Constitutional Law], 66 (Numbers 3–4) UPR Law Journal 391, 402 note 48 (1997).

This was acknowledged by this Court in *Marrero v. Mun. de Morovis*, 115 DPR 643, 646 (1984),[3] when it expressed the following:

> At present, in the subject matter of elections, the postulate of equality laid down in our Constitution is not seriously questioned. Historically, this ideal has come to life in the comprehensive financial **\*929** scheme outlined by the Legislative Assembly to achieve financial parity between political parties and candidates. This plan was originally described in the Constitutional Assembly by delegate Padrón Rivera. He advocated for the day on which "if we want fundamentally democratic elections—we must arrive at the conclusion that political parties must be put on the same level of economic potential, so that the candidates have the same opportunity to come into power.... And the State must have the obligation to put all of the candidates in the same financial position, so that the election process purely involves the democratic principle." (Emphasis added.) 2 Record of Sessions of the Constitutional Convention 1401 (1952). *Although that aspiration never reached constitutional lineage*, subsequently, by virtue of Act No. 110 of June 30, 1957—now repealed—*it became law.* (Emphasis in original suppressed and emphasis added).

In that sense, it is pertinent to point out that former Associate Justice Negrón García, who issued the Opinion of the Court in which, for the first time, reference was made to the incorrectly named "axiom,"[4] subsequently admitted the following in his concurring opinion of the Judgment **\*930** *P.S.P. v. Srio. de Hacienda*, 110 DPR 313, 321 (1980), which was joined by former Associate Justices Dávila and Irizarry Yunqué:

Having resolved these preliminary questions and cleared the procedural path, we now direct our attention to the core issue of the appeal: the validity of Art. 3.017.

> Introductorily, this precept forms an integral part of the legislative financial scheme outlined to achieve financial parity between political parties in our country. This plan was originally described in the Constitutional Assembly by delegate Padrón Rivera, who advocated for the day on which "if we want fundamentally democratic elections—we must arrive at the conclusion that political parties must be put on the same level of economic potential, so that the candidates have the same opportunity to come into power.... And the State must have the obligation to put all of the candidates in the same financial position, so that the election process purely involves the democratic principle." *Record of Sessions*, p. 1401. *Although this wish never reached constitutional lineage*, subsequently, by virtue of Act No. 110 of June 30, 1957—now repealed—*it became law.* (Emphasis added and in original).

That is, there is no doubt that the principle of financial equality between parties is not of a constitutional nature. However, we must ask ourselves whether, through Act No. 110 of June 30, 1957 (1957 Laws of Puerto Rico 535–541), which was passed to establish the Electoral Fund, the Legislative Assembly established a universal principle that would apply not only to Act No. 110, *supra*, itself but to any and all laws to be enacted in the future. The answer to that question is negative.

The Legislative Assembly, in the Statement of Purpose of Act No. 110, *supra*, expressed *only its reasons for establishing the Electoral Fund.* Specifically, and in what is relevant hereto, it indicated:

> It is a universally recognized principle that political parties are necessary for democracy to exist, as these serve as vehicles for people to support programs and express **\*931** mandates in relation to their government. All democratic parties, both of the majority and the minority, fulfill these functions: those of the majority, to support the work of the government representing the majority opinion, but that must be carried out to the benefit of all the people, without distinction of political parties; those of the minority, for them to express the points of view of another sector of the population to try to convince the majority of certain ends different in certain ways and ensure that the program backed by the majority is in fact administered with equality for all.

> For these reasons, it is of great public interest that

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

political parties be free of any control by private or government economic forces, which, given the need for these to finance the normal, legitimate activities of political parties [...] can acquire certain control over these or influence them, which is contrary to the concept of democracy, the political freedom of the people in general and the genuine functioning of democracy.

That is why the Legislative Assembly deems it wise to, one the one hand, prohibit large financial contributions to political parties, and on the other hand, provide to these democratic entities an adequate amount of funds for them to fulfil their most essential duties, regardless of the duty that each citizen has to support and make contributions to their political group with small amounts proportional to their income and in accordance with the rules that each party adopts, pursuant to the purposes and objectives of this law. Id., p. 535–536.

What is transcribed above only shows the concern that the Legislative Assembly had about political parties being at the mercy of economic forces, which it addressed by creating the Electoral Fund. Nowhere does this establish the principle that all the parties had to be in an equal financial position. Therefore, it is incorrect to continue applying a *universal and unlimited* principle of financial equality between political parties which was not established in so many words by the Legislative Assembly when it passed Act No. 110, *supra*.

Yet, this Court, in *P.P.D. v. Gobernador II*, supra, applied such principle automatically and elevated it to constitutional rank. That is due to the fact that "[t]hroughout the years, a trend has developed to look at the Constitution, not pursuant to **\*932** its own terms, but rather transforming it into a political document to support a position." R. Martínez Torres, *Originalism as a Method of Constitutional Interpretation and the Principle of Separation of Powers*, 49 UIPR Law Journal 249 (2015). Certainly, "the Judicial Branch's power to be the supreme interpreter of the Constitution has been used to wrongfully extend the meaning of the text of such momentous document, *in order to make up inexistent rights*, without having to pass a law to that effect or amend the Constitution". (Emphasis added). Id., pages, 249–250.

Lastly, besides wrongfully constitutionalizing the presumed "principle," the majority of the Court in *P.P.D. v. Gobernador II*, supra, constitutionalized the election ban and the AEB, although these are created by statute. That is, it created the constitutional right to have the ban applied and the AEB activated in election processes different from the one that the Legislative Assembly had clearly contemplated in Art. 8.001 of the Election Act of 1977,

*supra*. That, to prevent the Government from being able to influence citizen votes during the Referendum, by using public funds for government ads.

But this Court did not have to attribute a constitutional nature to statutory provisions to address the government's misuse of public funds outside the year when general elections are held. The Court certainly ignored the existence of Section 9 of Art. VI of the Constitution of Puerto Rico, which establishes that "[p]ublic funds and properties shall only be disposed of for public purposes and to support and operate the State's institutions and always by authority of the law." PR Const., *supra*, 2016 ed., p. 444. With that provision, our Constitutional Assembly addressed the concern about the government's misuse of public funds throughout the entire four-year term. In that sense **\*933** and by virtue of the fact that Art. 8.001 of the Election Act of 1977, *supra*, only applied to general elections, the parties in *P.P.D. v. Gobernador II*, supra, should have filed, if they had evidence to do so, for an injunction to enforce their rights under the aforementioned Section 9 of Art. VI of the Constitution of Puerto Rico, *supra*.

**IV**

The foregoing analysis demonstrates with complete clarity that the rule established in *P.P.D. v. Gobernador II*, supra, is clearly erroneous and must be revoked. However, the dissenting opinion of this Court intends to evade this outcome due to "the difficult fiscal situation." This is far from what should motivate the revocation of a rule. If the rule is erroneous, we should not "hesitate to rectify and annul it," as we are not "vested with the gift of infallibility."  *Rondón v. Aetna Casualty & Surety Co.*, 56 DPR 439, 456 (1940). "To perpetuate an error in order to highlight the consistency of a previous decision would constitute an abdication of the duty that we have, as an appellate court, to carry out justice and establish law." *Reyes Corano v. Director Ejecutivo*, 110 DPR 40, 42 (1980).

By virtue of this duty, we will proceed to examine whether it was the intent of the *Legislative Assembly* —not ours— that the provisions of Art. 12.001 of the Election Act of 2011, *supra*, apply to the status consultation authorized under the Decolonization Act. In order to fulfill this objective, we will apply what is appropriate under the law, without subjecting this to the wrongful precedent.

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

Com. CNP v. CEE, 197 D.P.R. 914 (2017).

2017 TSPR 57

**V**

[4] A. In accordance with the *doctrine of separation of powers*, we cannot lose from perspective that our function is to determine what the lawmakers intended to say and not **\*934** what we would have liked to be said. *Aquino González v. A.E.E.L.A.*, 182 DPR 1, 39 (2011); Bernier and Cuevas Segarra, *op. cit.*, p. 241. In order to fulfill this duty, "courts must interpret the law as a harmonious whole, giving a logical meaning to its different sections [...]." *Aquino González v. A.E.E.L.A.*, supra, p. 39. Thus, we must interpret the provisions of the law in a comprehensive, not an isolated, manner. Id.; Bernier and Cuevas Segarra, *op. cit.*, p. 315. *The interpretation that we ultimately give to the legal precept cannot lead to the absurd outcome of annulling—or rendering incoherent—other provisions of the law before our consideration.* See *Cabassa v. Bravo*, 21 DPR 185, 186 (1914) ("we must interpret the law in a way that all of its provisions are enforced without omitting any provision"). See, also, *López v. C.E.E.*, 161 DPR 527, 535–536 (2004). This rule is based on the harmony that the provisions of the law—and the law itself—before our consideration must present. After all, we cannot assume that the Legislative Assembly promulgated a law with inconsistent provisions.

[5] Moreover, it is well known that the clear and unambiguous text of the law constitutes the expression by excellence of the lawmaker's intent. *Romero Barceló v. E.L.A.*, 169 DPR 460, 476–477 (2006); *Alejandro Rivera v. E.L.A.*, 140 DPR 538, 544–545 (1996). When we are before a law that meets this characteristic, we cannot undermine the expression of the Legislative Assembly, on the pretext of fulfilling the legislative intent. Art. 14 of the Civil Code of Puerto Rico, *supra* ("When the law is clear and unambiguous, the letter of the law should not be underestimated on the pretext of fulfilling its spirit"); *Romero Barceló v. E.L.A.*, supra, p. 477 ("when a law is clear and unambiguous *there is no need to look beyond its letter to find the legislative intent%*7D"); *Atlantic Pipe Corp. v. F.S.E.*, 132 DPR 1026, 1030 (1993). Given this postulate, we cannot include scenarios in a **\*935** statute that are not within the reason of the precept in question. Bernier and Cuevas Segarra, *op. cit.*, p. 246.[5] Therefore, "[w]e must discover and enforce the intent expressed through the letter of the law." *Romero Barceló v. E.L.A.*, supra, p. 477.

[6] Furthermore, "[w]hen the language of the law is clear and unambiguous, our responsibility is to respect the legislative intent, regardless of our personal opinion." *Delgado, Ex parte*, 165 DPR 170, 192 (2005), making reference to *Alonso García v. S.L.G.*, 155 DPR 91 (2001). See: *Lasalle v. Junta Dir. A.C.A.A.*, 140 DPR 694 (1994);

*Silva v. Adm. Sistemas de Retiro*, 128 DPR 256 (1991). That is, when interpreting laws, courts must refrain from "replacing legislative criteria with their own concepts of what is fair, reasonable or desirable." *Aquino González v. A.E.E.L.A.*, supra, p. 40. "[T]his requires of courts of justice the greatest level of discipline in applying the law [...]." *Sánchez Díaz et al. v. E.L.A.*, 181 DPR 810, 822 (2011). After all, it is the Legislative Assembly's duty "to determine what public policy our laws should embody." *Delgado, Ex parte*, supra, p. 192. Consequently, "[t]he factfinder should not replace the clear letter of the statute with his own sense of justice." *Delgado, Ex parte*, supra, p. 193. See *Berrocal v. Tribl. de Distrito*, 76 DPR 38, 92 (1954). In fact, as judges, we must avoid the bad practice of resorting to constitutional precepts as grounds to amend laws. In the exercise of our function, we must maintain ourselves "always within the judicial sphere, without making wrongful incursions into the legislative sphere." Bernier and Cuevas Segarra, *op. cit.*, p. 299. See *Caguas Bus Line v. Sierra, Comisionado*, 73 DPR 743, 750 (1952).

In this case, the clear and unambiguous language of the statute postulates a single meaning. Consequently "a complete **\*936** feeling of humbleness and self-discipline requires the application of the legislative intent," as established in the legal precept itself. (Emphasis suppressed). *Alejandro Rivera v. E.L.A.*, supra, p. 545. See, also: *Cotto v. Depto. de Educación*, 138 DPR 658, 662 (1995); *Atlantic Pipe Corp. v. F.S.E.*, supra. Let us see.

[7] B. Art. XIII, § 1(a), of the Decolonization Act, *supra*, provides that

[t]he prohibitions and offenses related to the holding of this consultation shall be governed by the provisions established in Act 78-2011, as amended, known as the "Puerto Rico Election Act" and by Act 222-2011, known as the "Puerto Rico Political Campaign Financing Oversight Act," *except when these are inapplicable or incompatible with the provisions of this Law or when this Law lays down a specific offense or penalty.* (Emphasis added).

Although the provision that establishes the election ban is contained among the prohibitions and offenses laid down in the Election Act of 2011, this does not make it automatically applicable to the plebiscite process or the referendum authorized by the Decolonization Act. As Associate Justice Colón Pérez appears to ignore in his dissenting opinion, *note that the application of the statutory precept that imposes the election ban is subject to this not being incompatible or inapplicable with regard to the plebiscite or, if necessary, the referendum.*[6] Therefore,

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

Com. CNP v. CEE, 197 D.P.R. 914 (2017).

2017 TSPR 57

we must analyze such precept. **\*937**

**[8]** Art. 12.001 of the Election Act of 2011, *supra*, by which the Legislative Assembly incorporated into our legal system the so-called *election ban*, provides as follows:

> *During the year when a general election is held and up until the day after the election is held,* Government agencies, the Legislative Assembly and the Judicial Branch of Puerto Rico are barred from incurring expenses to buy time and space in the media, or to buy and distribute advertising or promotional materials *in order to put forward their programs, projects, achievements, fulfilments, projections or plans.* Excluded from this provision are notices and ads issued in the press by express requirement of the law; campaigns of the Tourism Company to promote internal tourism; promotional campaigns outside of Puerto Rico by the Puerto Rico Tourism Company or the Puerto Rico Convention Center District Authority promoting the island of Puerto Rico as a tourism destination or the Industrial Development Company promoting foreign investment in Puerto Rico, *as long as these do not include accounts of achievements of the administration or the corporation or highlight the figure of any officer.* Furthermore, notices or announcements for legislative or administrative public hearing processes published and circulated without using mass media in exchange for payment are also excluded.

> *Likewise, also excluded from the foregoing provision, are ads that are used to disseminate information that is of public interest, urgent or an emergency, which shall only be permitted with prior authorization to that effect from the Commission.*

> ........

> Any violation of this Article shall entail, for the agency or government office, an administrative fine of up to ten thousand (10,000) dollars for the first infraction and up to twenty-five thousand (25,000) dollars for subsequent infractions. The funds obtained as a result of this shall become part of the special fund to finance expenses associated with the automatization of electoral processes, as provided in [Article 3.001 of this law]. (Emphasis added). 16 LPRA § 4231. **\*938**

Particularly, the first part of Art. 12.001, *supra*, was altered during the legislative process.[7] After it was passed by the House of Representatives, in the Senate, the following expression was added to its text: "During the year when a general election is held and up until the day after the election is held."[8] See Special Committee Report on

Government Reform of the Senate: Documentation of the Report issued on November 10, 2010. With that addition, the Election Act of 2011 was finally enacted.

From reading the article cited above, we can see that express reference is made therein to the "year when a general election is held." Thus, our main function in this case is to determine whether the Legislative Assembly included in the concept of "general elections" the holding of a plebiscite or referendum such as the one provided for in the Decolonization Act, in which case it would be appropriate to apply Art. 12.001 of the Election Act of 2011, *supra*, to such status consultation.

In interpreting what constitutes a "general election," we cannot assume that the lawmakers included useless provisions or words in the law. Bernier and Cuevas Segarra, *op. cit.*, p. 333. That is, we cannot start from the premise that the Legislative Assembly made expressions or clarifications that have no meaning or no function in the statute that they promulgated.

**[9]** In the exercise of our function and the fulfilment of our duty, we cannot ignore that the **\*939** Election Act of 2011 itself contains a provision that defines several concepts that the lawmakers considered important to define. Particularly, the Legislative Assembly took the time to establish the meaning of "general elections." In doing so, it clarified that when they refer to these in the Election Act of 2011 it should be understood that they are referring to the "[p]rocess by which *every four years voters choose the officers who will hold elective public offices* in the Government of Puerto Rico including the office of governor, resident commissioner, state legislators, mayors and municipal legislators." (Emphasis added). Art. 2.003(30) of the Election Act of 2011 (16 LPRA § 4003(30)).[9] The Legislative Assembly thereby avoided us using our own criteria or having to resort to alternative or external sources to find the meaning of what it meant to say. Given its relevance, we are barred from ignoring this provision. See *A.C.A.A. v. Yantín*, 103 DPR 59, 62 (1974). We must note that the Election Act of 2011 expressly establishes that in the general elections "voters choose the officers who will hold elective public offices in the Government of Puerto Rico." Art. 2.003(30) of the Election Act of 2011, *supra*. Furthermore, we must point out in fact that the law specifically limits general elections to the election process that is held "*every four years*," as opposed to its predecessor, the Puerto Rico Election Act of 1977. This definition and the clarification made by the legislature must be given their corresponding meaning and effect when interpreting the law. **\*940**

As we indicated above, we cannot assume that the


I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

Com. CNP v. CEE, 197 D.P.R. 914 (2017).

2017 TSPR 57

Legislative Assembly included in the laws useless statements and clarifications. In fact, if we replace the expression "general election" with the definition provided by the lawmaker himself, the first sentence of Art. 12.001 of the Election Act of 2011, *supra*, would provide as follows:

> During the year when a [*process by which every four years voters choose the officers who will hold elective public offices in the Government of Puerto Rico including the office of governor, resident commissioner, state legislators, mayors and municipal legislators*] and up until the day after the election is held, government agencies, the Legislative Assembly and the Judicial Branch of Puerto Rico are prohibited from incurring expenses to buy time and space in the media, or to buy or distribute advertising or promotional materials in order to put forward their programs, projects, achievements, fulfilments, projections or plans.

[10–12] Moreover, the Legislative Assembly provided for a concept that it would use throughout the Election Act of 2011 on occasions when it made reference to both "general elections," and plebiscites, referendums, voter consultations, special and primary elections. See Art. 2.003(29) of the Election Act of 2011 (16 LPRA § 4003(29)). In that case, it provided that it referred to them only as "election" or "elections". Id. Furthermore, it included a distinct and separate definition of "plebiscite" and of "referendum." It established that a plebiscite is the "[m]ethod by which the electorate of Puerto Rico is submitted to a consultation in which they are given the opportunity to vote for the option that they prefer out of several options regarding a question of political organization, including, but not limited to, the political relationship between Puerto Rico and the United States of America." 16 LPRA § 4003(82). Moreover, it established that the referendum was the process "by which the electorate of Puerto Rico is submitted to a direct consultation in which they are asked to approve or reject **\*941** one or several specific proposals about public policies to be adopted or legislation to be enacted with

regard to matters that are of general interest." 16 LPRA § 4003(86).

Had it been the intent of the Legislative Assembly to include plebiscites within the prohibition contained in Art. 12.001 of the Election Act of 2011, *supra*, it would have been sufficient to refer to the "election" or the "elections." That is because as it was defined in the law, that single concept includes, among other things, referendums and plebiscites. As we can see, the distinction made by the Legislative Assembly was such that, having established the meaning of each concept, the mere addition of one word would alter its meaning.

[13] This is not a scenario where we can say that the Legislative Assembly could not have foreseen the use of a certain word and inadvertently failed to include it in the legal provision. In the Election Act of 2011, the lawmaker included an express reference to plebiscites and referendums in several of its provisions.[10] Nevertheless, in Art. 12.001 of the Election Act of 2011, *supra*, these are not mentioned. Evidently, the Legislative Assembly only mentioned the "general election." The specific reference to this election event excludes other events not included by the Legislative Assembly itself in the concept of reference.

[14] Furthermore, a thorough reading of Art. 12.001 itself of the Election Act of 2011, *supra*, shows that the intent of the Legislative Assembly was to prevent the Government from being able to take advantage during the year in which a general election is held to promote **\*942** its *achievements, projects, programs, fulfilments, projections or plans* in order for its officers to achieve victory. In fact, this conclusion is also supported by the exception contained in the same Art. 12.001 of the law. Specifically, where it is provided that the agencies mentioned in the article are exempted "as long as they do not include accounts of achievements of the administration or the corporation or highlight the figure of any officer." 16 LPRA § 4231.

Furthermore, to conclude that the expression "general election" includes the holding of a plebiscite would be to undermine the effect of several provisions of the Election Act of 2011 itself. Particularly, Art. 9.004 provides that "[t]he purpose of general elections is to elect all officers of the Government of Puerto Rico who, in accordance with the Constitution of Puerto Rico and other special laws, must hold elective public offices by a direct vote of the voters." 16 LPRA § 4144. Likewise, Art. 9.001 establishes that the general election is the one held every four years. 16 LPRA § 4141. Therefore, to include the plebiscite or—if necessary—the referendum within the reference to the "general election" would result in a contradiction in terms.[11]

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

**[15]** What would be most logical and reasonable, pursuant to what is clearly established in the Decolonization Act and the Election Act of 2011—interpreted comprehensively and harmoniously, without undermining the effect of any of their provisions—is that the prohibitions and the offenses that apply to the status consultation are those that are compatible and applicable, because these were not established for a general election or other election event different from a plebiscite or a referendum.[12] *943

**[16]** As we had mentioned, in our interpretative function, we cannot ignore the clear and express language of the law. Nor can we ignore the meaning that the Legislative Assembly gave to each term that we must interpret. The Election Act of 2011 clearly provides that the election ban *only* applies during the year when a general election is held and, therefore, as defined, to the election event held every four years in which voters elect the officers who will hold elective public offices of the Government of Puerto Rico.

# VI

In relation to the dissenting opinion of Associate Justice Colón Pérez, it is necessary to make the following statements.

Unfortunately, the dissenting opinion of Associate Justice Colón Pérez attempts to repeat the error that we made more than two decades ago. Instead of performing a correct analysis of the provision that it was supposed to interpret, the opinion is based on the Constitution—and the incorrect precedent that did the same—to arrive at the outcome deemed convenient.

Although the text of Art. 12.001 of the Election Act of 2011, *supra*, is clear, the dissenting opinion of Associate Justice Colón Pérez decides to ignore it. Specifically, it concludes that "the activation of the election ban against broadcasting government ads contained in Art. 12.001 of Act No. 78-2011, is not only limited to the holding of general elections, *as its text attempts to suggest*." (Emphasis added). Dissenting Opinion of Associate Justice Colón Pérez, p. 989. The Opinion thereby omits using the basic principle of statutory interpretation that establishes that when the law is clear, the letter of the law *should not *944 be underestimated* on the pretext of fulfilling its spirit. Art. 14 of the Civil Code of Puerto Rico, *supra*.

The Opinion not only sets aside the text of Art. 12.001 of the Election Act of 2011, *supra*, but it rules it out in accordance with the incorrectly named *constitutional axiom of financial equality of the parties*. As we have

discussed, said axiom is not of constitutional lineage and we cannot continue to perpetuate it as such. We certainly do recognize that after "constitutions and statutes have been in effect for many years and have been interpreted by courts in several cases, the tendency is inevitably to read the cases and not the constitution or the statute itself when a question on their scope arises." *Pérez v. Tribunal de Distrito*, 69 DPR 4, 12 (1948). Nevertheless, that cannot be a reason for us to immortalize errors.

We are definitively barred from using the Constitution to recognize rights that do not exist. Martínez Torres, *supra*, p. 249. However, in the dissenting opinion of Associate Justice Colón Pérez, committing the same mistake as in *P.P.D. v. Gobernador II*, supra, not only is the principle of financial equality in elections constitutionalized, but as a result the AEB is also constitutionalized, when, as discussed above, the AEB is created by statute. Furthermore, the Opinion goes further and attempts to attribute to the AEB powers that it does not have. Specifically, the dissenting opinion of Associate Justice Colón Pérez expresses the following: "the AEB should be activated as a filter to determine whether the agencies attached to the Executive Power can or not incur expenses of public funds to publish ads, and to corroborate that such ads are not tinged with political party positions." Dissenting opinion of Associate Justice Colón Pérez, p. 993. In that sense, it seeks to incorporate, through case law, *a board to control fiscal expenses for the publication of ads*, in view of Puerto Rico's financial *945 situation. This is inappropriate. The AEB only has the power to evaluate ads, but not the expenses incurred by the Government of Puerto Rico.

Puerto Rico's financial situation certainly is concerning. However, it is incumbent on the Government of Puerto Rico and the Legislative Assembly to address that situation. All we can do is apply the law. If the Legislative Assembly believes that the election ban should apply to the upcoming plebiscite process, then it is incumbent on the Legislative Assembly to amend Art. 12.001 of the Election Act of 2011, *supra*. This Court cannot, by judicial order, extend such application because it deems this fair. The doctrine of separation of powers bars us from doing so.

# VII

Based on the foregoing grounds, *we hereby hold that it is inappropriate to activate the election ban contained in Article 12.001 of the Election Act of 2011*, supra, *for the status consultation authorized by the Decolonization Act. Consequently, we revoke Resolution No. CEE-RS-17-07*



I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

issued by the CEE.

*Judgment shall be entered accordingly.*

Chief Justice Oronoz Rodríguez, Associate Justice Rodríguez Rodríguez, Associate Justice Estrella Martínez and Associate Justice Colón Pérez each issued dissenting opinions.

**--O--**

Dissenting opinion issued by Chief Justice Oronoz Rodríguez.

A Constitution does not establish and must not establish rules for the **\*946** hour that passes, but rather principles for an expanding future[1]

A doctrine established by this Court "should not be altered unless it is so patently wrong that it cannot be upheld without violating reason and justice." *Capestany v. Capestany*, 66 DPR 764, 767 (1946). Apparently, a majority of this Court considers that the constitutional axiom of election equality laid down in our case law violates their warped notions of reason and justice. Pursuant to this distorted impression of what it means to be a truly democratic and egalitarian society, they revoke a rule on an advertising ban that applied to the case before us and warranted the most vigorous protection of this Court. I could not disagree more and, therefore, I dissent.

**I**

A. *The Constitutional Axiom of Election Equality*

The Constitution of Puerto Rico establishes a democratic organization pursuant to which political power emanates from the people's participation in collective decisions. Preamble, PR Const., LPRA, Tome 1. To that effect, the right to vote constitutes one of the most basic and paradigmatic guarantees of our society. That is why our Bill of Rights provides that "[t]he laws shall guarantee the expression of the will of the people by means of equal, direct and secret universal suffrage and shall protect citizens from any coercion in the exercise of their electoral prerogative." Art. II, § 2, Const. PR, LPRA, Tome 1, ed. 2016, p. 283.

The provision cited above imposes on the State a dual

responsibility. **\*947** *P.P.D. v. Gobernador I*, 139 DPR 643, 670 (1995). In the first place, the State must *refrain* from interfering with the citizens' right to exercise their vote freely and, in the second place, it has the *affirmative duty* to protect citizens from any coercion aimed at interfering with the exercise of their electoral prerogative. Id.

In keeping with a democratic system in which the equal right to vote is guaranteed and required to be protected by means of concomitant and affirmative duties on the part of the State, a series of cases provided, up until today, for what was named the *constitutional axiom of election equality*. See: *P.P.D. v. Gobernador I*, supra; *Marrero v. Mun. de Morovis*, 115 DPR 643 (1984); *P.R.P. v. E.L.A.*, 115 DPR 631 (1984); *P.N.P. v. Tribunal Electoral*, 104 DPR 741 (1976). Within the spectrum of that laudable axiom, this Court interpreted that our Constitution demands certain rights and guarantees in addition to the formal act of voting. That is, with the passing of time, we understood that in order for the equal right to vote to be fully exercised, certain circumstances and even specific prohibitions had to be put in place.

Particularly, this Court held that the axiom of election equality requires, among other conditions, that political parties have equal access to government election funds *P.S.P. v. Srio. de Hacienda*, 110 DPR 313 (1980) (Judgment) and equal participation in matters of the State Election Commission and the Permanent Election Board, *P.R.P. v. E.L.A.*, supra; *P.S.P. v. Com. Estatal de Elecciones*, 110 DPR 400 (1980).[2] Furthermore, this Court interpreted that the axiom of election equality prohibits, among other practices, the use of **\*948** public resources to the benefit of political campaigns. See: *Miranda v. C.E.E.*, 141 DPR 775 (1996); *P.P.D. v. Gobernador I*, supra, (prohibition against government advertising with political party connotations). See also, *Marrero v. Mun. de Morovis*, supra (prohibition against the use of public vehicles in political campaigns).[3]

B. *Restrictions on the Government's Power to Inform*

One of the prohibitions or limitations that the axiom of election equality requires has to do with the Government's power to communicate certain information to citizens. *P.P.D. v. Gobernador I*, supra, p. 681–682. To that effect, the case law of this Court recognized, at least, two types of limitations with regard to government advertising or information.

On the one hand there is the prohibition against government advertising with political party content, which arises out of both the axiom of election equality and Art.

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

Com. CNP v. CEE, 197 D.P.R. 914 (2017).

2017 TSPR 57

IV, § 9 of our Constitution, LPRA, Tome 1. See *P.P.D. v. Gobernador I*, supra, p. 701 (it was determined that the use of certain "symbols and insignias of a political partisan nature [was] contrary to the public purpose that our constitution requires in the administration of public funds and the axiom of financial parity between electoral forces that guides it"). (Emphasis added).[4] This prohibition against advertisements with political partisan content applies at any time, even outside election cycles. Id., p. 692. **\*949**

Moreover, we acknowledged an additional limitation against government advertising, even when the contents thereof is not of a political partisan nature, commonly known as the *election ban*. The ban had existed up until today to prevent the influence that, in general terms, government advertising promoted by the party in power can have vis-à-vis an upcoming election event. 🚩 *P.P.D. v. Gobernador II*, 136 DPR 916, 926–927 (1994) (it is explained that the election ban on that occasion sought "to prevent the State from having any influence, through government ads, on the free expression of citizens upon voting").

This last case, *P.P.D. v. Gobernador II*, supra, was the precedent that applied to the dispute before our consideration, which a majority of this Court refused to apply and, therefore, revoked. On that occasion, this Court asked itself whether the axiom of election equality required the application of an election ban to a referendum process, even though the Election Act at the time only applied same to *general elections*. Our answer to that question was affirmative.

According to *P.P.D. v. Gobernador II*, supra, government advertising by the party in power represents a wrongful advantage that allows that party to promote its deeds and positions ahead of an electoral process. Therefore, the election ban operates as a preventive measure to prevent such advantage obtained at the expense of public funds and through different types of government advertising. Id., p. 926–927. In the absence of a statutory measure to that effect in a referendum electoral event, same was imposed in *P.P.D. v. Gobernador II*, supra, "by imperative of the axiom of equality laid down in the Constitution [...]". Id., p. 926.

Given that the then Art. 8.001 of the Election Act provided that the election ban would only apply to general elections, this Court based itself on the aforementioned constitutional **\*950** imperative to extend the applicability of this article to the referendum held at the time. *P.P.D. v. Gobernador II*, supra, p. 926. In doing so, the Court resorted to Art. 5 of the Enabling Act of the Referendum on Amendments to

the Constitution of Puerto Rico of 1994 (Enabling Act of the Referendum) in question, which provides that the articles of the Election Act would complatement this law in anything necessary, relevant and compatible. *P.P.D. v. Gobernador II*, supra, p. 924. This Court thereby concluded that the ban established in the Election Act, given that it constituted a constitutional imperative, was a provision that was compatible and consistent with the Enabling Act of the Referendum. Id., p. 926.

## II

In what is truly a legal *déjà vu*, the case before us today brought forward the same question that we addressed in *P.P.D. v. Gobernador II*, supra. This Court was asked whether an advertisement ban at the government level was appropriate during electoral procedures, particularly a plebiscite and a referendum, for which the law did not contemplate such prohibition expressly. Although in accordance with *P.P.D. v. Gobernador II*, supra, the answer should have been affirmative, the majority answered negatively.

A. *Statutory Provisions in Dispute*

Through Act No. 7-2017, the Immediate Decolonization of Puerto Rico Act, the Legislative Assembly provided for a series of electoral consultations regarding the political status of Puerto Rico to be carried out in 2017. It did not establish an election ban specifically applicable to these events, although it acknowledged that the "prohibitions and offenses related to the holding of [the] consultation, shall be governed by the provisions established in the [...] 'Election **\*951** Act of Puerto Rico' and [in the] 'Puerto Rico Political Campaign Financing Oversight Act % 7D." Art. XIII, § 1(a) of Act No. 7-2017. Thus, it can be interpreted that Art. XIII had the effect of incorporating into Act No. 7-2017 the section on *Election Prohibitions and Offenses* of the Puerto Rico Election Act (Election Act of 2011), 16 LPRA §§ 4231–4255, except for anything that was incompatible or inapplicable.

The section on *Election Prohibitions and Offenses* of the Election Act of 2011 establishes the following in its Art. 12.001:

> During the year when a *general election* is held and up to the day after the election is held, Government agencies, the Legislative Assembly and the Judicial Branch of Puerto Rico are barred from incurring expenses to buy and distribute promotional and advertising materials in order to put forward their programs, projects, achievements, fulfilments,

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

Com. CNP v. CEE, 197 D.P.R. 914 (2017).

2017 TSPR 57

projections or plans. [...]

........

[E]xcluded from the foregoing provisions are ads that are used to broadcast information that is of public interest, urgent or an emergency, which shall only be permitted with prior authorization to that effect from the Commission. (Emphasis added). 16 LPRA § 4231.

Again, the specific dispute brought before our consideration is whether this prohibition also applies to the Plebiscite and Referendum election events established in Act No. 7-2017.

B. *The Sudden Abandonment of a Constitutional Imperative*

As discussed above, the constitutional axiom of election equality limits the Government's powers to disseminate information. Particularly, this Court established in *P.P.D. v. Gobernador II*, supra, that the election ban constituted a constitutional imperative aimed at preventing government advertising from directly or indirectly **\*952** influencing citizens in the free exercise of their right to vote. Evidently, that precedent governed the dispute before our consideration.

We must remember that as long as this Court does not revoke or modify a precedent, the precedent constitutes the established doctrine that the lower courts must follow. *Capestany v. Capestany*, supra, p. 767. Furthermore, a rule of case law "should not be altered unless it is so patently wrong that it cannot be upheld without violating reason and justice%7D". Id. In the subject matter of elections, the consistent application of the precedents of this Court are all the more important, because this has an impact on the credibility of this Court and the democratic organization thereof.

Consequently, with regard to the manner in which this Court should treat the constitutional axiom of election equality, the well-known constitutionalist José Julián Álvarez González suggested that courts should consistently apply such rule or, otherwise, "abandon the undertaking."[5] Grossly distorting the dichotomy suggested by this distinguished professor, a majority of this Court could not opt for consistency and instead opted for abandoning the undertaking. Unfortunately, abandoning the undertaking in this case implies a perversion of our democratic system and setting aside what we had previously called a constitutional imperative.

According to the majority, the rule set in *P.P.D. v. Gobernador II*, supra, is wrong because it had the effect of

constitutionalizing the advertising ban mechanism beyond the electoral processes contemplated by lawmakers in the Election Act. Majority Opinion, p. 932. In that sense, attributing constitutional rank to the so-called election ban consists in a fabrication of rights **\*953** that do not exist which wrongfully extends the meaning of the Constitution. Id. Based on this logic, absent a clear expression on the part of lawmakers imposing the election ban on electoral processes such as the ones laid down in Act No. 7-2017, it is inapplicable.

With what little time the majority of this Court has granted us to express ourselves, we define at least three substantial problems with the majority's position. Let us see.

i. *The Established Axiom of Election Equality*

In clear contempt of prior case law, a majority of this Court is eliminating a component of the axiom of election equality, that is, the election ban, without noticing that in doing so it also jeopardizes the entire axiom. As we mentioned before, this Court's case law had not only held that the axiom of equality prevented an electoral disadvantage caused by government advertising, but also banned other practices incompatible with a democratic system. As professor Álvarez González very well summarizes, this Court relied on the axiom of election equality to determine the following:

> 1) equal participation of parties in the Election Fund, without this being subject to their prior elective force; 2) equal participation of parties by request to principals in the administration of the State Election Commission; 3) prohibition against the use of vehicles in political campaigns; 4) prohibition against the use of public funds for government campaigns ahead of the referendum to amend the Constitution; 5) prohibition against the use of public funds for government campaigns that benefit the party in power; 6) unconstitutionality of a law to vote for the President of the United States. (Citations omitted). Álvarez González, *op. cit.*, p. 965.

Despite the extensive history of this constitutional axiom,


I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

the majority informs us today that the "incorrectly named" axiom of election equality "does not exist in the Constitution." (Emphasis suppressed). Majority Opinion, p. 928. **\*954**

The majority thus informs us that the expressions made by this Court to the effect that "[*E*]*quality is an essential ingredient of the ideal of justice that is constantly mentioned throughout the Constitution* [and g]iven its dynamic nature it can manifest itself in various dimensions" are a dead letter. (Emphasis added). *P.R.P. v. ELA*, supra, p. 633. Furthermore, the expressions by which this Court provided that, "[t]o the extent that a political party campaign is subsidized by public funds, a party (or political candidate) is granted an advantage over others, which violates the *axiom of election equality* and undermines the pillars of the election scheme in place in our Country [...]" are also a dead letter. (Emphasis added). *P.P.D. v. Gobernador I*, supra, p. 671.

It is unacceptable to assume so lightly the weight of these words and of our precedents, especially when such judicial attitude diminishes the protection of constitutional rights instead of broadening same. The precedent doctrine, and its respective exceptions, cannot, and should not, serve, as it is today, as a mere legal label to conceal individual whims.[6] Such use would thwart the doctrine's fundamental purpose to provide legal stability and is detrimental to the already injured credibility of this Court.

ii. *The Role of Courts in Modern Constitutionalism*

It is also important to point out that the majority of this Court bases itself on a minimalist notion of our Constitution, pursuant to which this court is barred from extending the meaning of our constitutional **\*955** order beyond the text of the momentous document. Majority Opinion, p. 931–932 (citing R. Martínez Torres, *Originalism as a Method of Constitutional Interpretation and the Principle of Separation of Powers*, 49 UIPR Law Journal 249 (2015)). That understanding is unsustainable when you take into account the extensive role that this Court has previously assumed in protecting constitutional rights of a political, social, employment and criminal nature.[7] It is also against the development of modern constitutionalism which our democratic system forms a part of.

In a democratic state of law, the Judicial Power acts precisely as a guarantor of constitutional rights and the necessary conditions for same to be enjoyed. See E. Rivera Ramos, *Rights and Democracy: Conflict or Complementarity?*, in *Fundamental Rights*, Buenos Aires, *Editores del Puerto*, s.r.l., 2003. That role does not

constitute a mere theoretical preference or option, but rather a deontological function inserted into the constitutional framework that assigns to the Judicial Power the interpretation of the Constitution itself. Id., p. 35. ("[T]hat function of guarantor of the pre-conditions of democracy can be assigned to the judicial power in the Constitution itself, by a will of the majority, as it occurs in certain [modern] constitutions."); J.J. Álvarez González, *The Protection of Humano Rights in Puerto Rico*, 57 (Numbers 1–2) UPR Law Journal 133, 174 (1988) ("[J]udicial review is the most widely known [...] mechanism present in [the constitutional systems of the United States and Puerto Rico] to **\*956** make the guarantees promised in their Constitutions a reality [...]").

In that sense, such duty was assigned to this Court as the ultimate interpreter of the Constitution, with the correlative power to declare unconstitutional any rules or practices that other branches of government incur in. See Art. V, § 4, PR Const., LPRA, Tome 1. See *Santa Aponte v. Srio. del Senado*, 105 DPR 750, 759 (1977) ("The function of being the ultimate interpreter of the Constitution is exclusively incumbent on one power, the Judicial Power. The Constitution grants certain powers to the Legislative and the Executive Powers, but the definition of its outlines and the determination of the validity of its exercise are matters carefully reserved for the courts").

Judicial review also includes the power that this Court has to cure any constitutional deficiency where the State miscarries or breaches its respective duty to guarantee with legislation the constitutional rights of citizens. See Art. II, §§ 1–2, PR Const., LPRA, Tome 1, 2016 ed., p. 275 and 283 ("Both the laws and the public education system shall embody these principles of essential human equality;" "Laws shall guarantee the expression of the will of the people by means of equal, direct and secret universal suffrage and shall protect citizens from any coercion in the exercise of electoral prerogative"). See also, *García v. Aljoma*, 162 DPR 572, 580–582 (2004).

As I mentioned above, in the subject matter of election equality there is an affirmative duty on the part of the State to guarantee the true exercise of those rights through specific prohibitions and limitations. *P.P.D. v. Gobernador I*, supra, p. 670. See E. Rivera Ramos, *The Rule of Law: Approximation to the Concept*, 81 (No. 4) UPR Law Journal 1113, 1119–1120 (2012) (the importance of regulatory and institutional guarantees to protect fundamental rights is mentioned). To abdicate the constant **\*957** protection of those rights, and their necessary conditions, is to ignore that "mere equality under the law does not guarantee the actual enjoyment of rights to a lot of people." E. Rivera Ramos, *Equality: A Plural*

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

*Vision*, 69 (No. 1) UPR Law Journal 1, 13 (2000). It also reduces our Constitution to a formality, instead of giving it the binding force and social value that it merits.

### iii. *The Importance of the Advertising Ban in Electoral Processes*

The election ban, both a necessary mechanism for the egalitarian exercise of the electoral process and the right to vote, seeks to legitimize the fully democratic nature of our government system. So that it is based on the will of the people, such will must be free from coercion and wrongful influence on the part of the government itself. Otherwise, the democratic essence of the electoral mandate and, therefore, the legitimacy of government power is called into question. See E.H. Ziegler, Jr., *Government Speech and the Constitution: The Limits of Official Partisanship*, 21 B.C.L. Rev. 578, 580 (1980) ("It is a truism that, if a governing structure based upon widespread genuine citizen opinions is to survive as a viable democracy, it must place legal restraints on the government's ability to manipulate the formulation and expression of that opinion"). See, also, *P.P.D. v. Gobernador I*, supra, p. 701, citing S. Shiffrin, *Government Speech*, 27 UCLA L. Rev. 565, 612 (1980) ("'[T]o allow the government, armed with the greatest campaign treasure —public funds—to try to dominate an electoral process, violates the basic integrity of the democratic process%7D"). (Free translation).

Thus, the position assumed by this Court more than twenty years ago was the wisest and in keeping with our Constitution. Unlimited and excessive advertising on the part of the government during any electoral process "constitutes an overt and veiled form of electoral coercion **\*958** in order to benefit the party controlling the Executive Branch [...]". *P.P.D. v. Gobernador II*, supra, p. 929, concurring opinion of Associate Justice Hernández Denton. See *Stern v. Kramarsky*, 375 N.Y.S.2d 235, 239 (1975) ("It would be establishing a dangerous and untenable precedent to permit the government or any agency thereof, to use public funds to disseminate propaganda in favor of or against any issue or candidate. This may be done by totalitarian, dictatorial or autocratic governments but cannot be tolerated, directly or indirectly, in these democratic United States of America"). Today, more than ever, at a time of mass communication through the most diverse, immediate and effective media, it was propitious to limit the influence of government advertising on the will of citizens.

The majority of the Court is setting aside our prior rulings calling them a fabrication; an illegitimate constitutionalization. Surprisingly, the majority expresses no justification whatsoever to abandon the axiom of

election equality of reference, and rather limits its analysis to the absence of constitutional bases in that regard. It thereby ignores potential grounds at the federal level, such as the ones pointed out by professor Nelson Tebbe, who maintains that unrestricted government advertising also contravenes principles of due process, equal protection of the law and freedom of speech. N. Tebbe, *Government Nonendorsement*, 98 (No. 2) Minn. L. Rev. 648, 668–676 (2013) ("[O]fficial speech is limited by a principle of government nonendorsement that cuts across various constitutional provisions and that brings them together to protect full and equal citizenship in a free society"). Id., p. 712. See Shiffrin, *supra*, p. 617–622 ("Government speech relating to ballot questions raises serious first amendment problems, and general rules need to be formulated that **\*959** limit government departures from electoral neutrality"). Id., p. 655.[8]

In short, the majority is wrong in distancing itself from all these considerations, thereby reducing the advertising ban ahead of an electoral process to a mere preference at the mercy of the prerogatives of the legislative body in power. The precedents of this Court and the conscience of the social reality in which our constitutional system operates demanded the contrary.

### III

Just as in *P.D.D. v. Gobernador II*, supra, the article that currently establishes the election ban in the Election Act of 2011 only refers to a "general election." 16 LPRA § 4231. The majority Opinion points out that its language is specific in providing that the election ban will only apply to *general elections*, term which the Election Act of 2011 itself defines as the "[p]rocess by which voters select one or more officers within a geographic district to cover one or more vacancies in an elective public office of the Commonwealth of Puerto Rico." 16 LPRA § 4003(31). In its judgment, whether we turn to Art. 12.001 of the Election Act of 2011 itself, or to the reference made in Act No. 7-2017 to the prohibitions and the offenses of the Election Act,[9] the terminology used by the **\*960** lawmaker is equally limited to *general elections.*

But if we focus our analysis on the text of Art. 12.001 of the Election Act of 2011, the electoral events contemplated in Act No. 7-2017 suffer from a significant constitutional deficiency, in light of what was stated in *P.P.D. v. Gobernador II*, supra. Nevertheless, in our legal system, "laws are assumed to be constitutional until a competent court declares otherwise." *Brau v. ELA*, 190 DPR 315, 337 (2014). From that perspective, "courts must strive to

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

Com. CNP v. CEE, 197 D.P.R. 914 (2017).

2017 TSPR 57

achieve consistent and compatible interpretations that further the constitutionality of the laws." Id. Thus "when the validity of a law is questioned or a doubt arises about its constitutionality, courts must make sure that there is no other possible reasonable interpretation of the law." Id., p. 338.

That is why, although I acknowledge that if the aforementioned provisions are read in an isolated manner these may suggest that the election ban does not apply to the electoral processes before our consideration, the law must be read comprehensively to examine its constitutionality in accordance with *P.P.D. v. Gobernador II*, supra. I consider that Art. 11.001 of the Election Act of 2011 itself furthered this task. 16 LPRA § 4211. Said article establishes that "[e]very referendum, consultation or plebiscite held in Puerto Rico shall be governed by the special law passed to that effect and *by the provisions of this subtitle as to anything necessary or relevant that said special law does not provide for.*" (Emphasis added). Id.

In the effort to interpret the Election Act of 2011 and Act No. 7-2017 in keeping with the constitutional precepts in effect until today, it is my opinion that Art. 11.001 allowed for a more reasonable interpretation of the legal framework of **\*961** these laws, while supporting their constitutionality. That is, it was not sufficient to insist that Art. 12.001 of the Election Act of 2011 only refers to *general elections*. It was necessary to also advise that lawmakers have, and must have, knowledge of applicable constitutional rules, and case law of this Court in that regard. See Statement of Purpose of Act No. 78 of June 1, 2011 (it is acknowledged that the Election Act has been the object of many interpretations by the courts). In that sense, and precisely because we are dealing with a constitutional imperative, the election ban constituted an aspect that is necessary and relevant to the Plebiscite and Referendum processes in dispute here, for which their special law made no provision.[10]

In conclusion, a reasonable interpretation of the dilemma before this Court would have been that, through Art. 11.001 of the Election Act of 2011, lawmakers applied to the electoral events contemplated in Act No. 7-2017 the provisions of the Election Act of 2011 that were necessary and relevant to them. Thus, it was appropriate to apply the advertising ban of the Election Act of 2011 to the plebiscite and the referendum established through Act No. 7-2017 as a necessary and relevant provision, pursuant to the constitutional imperative of *P.P.D. v. Gobernador II*, supra, set aside today.

## IV

*P.P.D. v. Gobernador II*, supra, represented a constitutional rule of great democratic value that perfectly applied **\*962** to the case before our consideration. Our constitutional order should repudiate any type of electoral advantage funded with public funds in order to make sure that all ideological preferences are presented to the electorate in the most equal conditions that the State is able to guarantee. I consider that, by constitutional imperative, the advertising ban that is established in the Election Act of 2011 applies to the Plebiscite and Referendum laid down in Act No. 7-2017. For that reason I vehemently dissent with a majority of this Court that holds the contrary today, in a manner such that the doctrine of precedent is weakened in our rule of law and one of the pillars of our democratic system is demolished.

--O--

Dissenting opinion issued by Associate Justice Rodríguez Rodríguez.

The "[b]ad time to vote" continues.

—José Saramago, *Ensayo sobre la lucidez* [Essay on Lucidity].

This upcoming plebiscite and the incidents in this Court could very well be called —apologizing of course to Mr. Gabriel García Márquez—*Crónica de un plebiscito apañado* [Chronicle of a Rigged Plebiscite] (*Chronicle*).[1] It all began **\*963** in 2009, when the waves unleashed by the judicial tide caused a majority of this Court, in *Suárez Cáceres v. Com. Estatal Elecciones*, 176 DPR 31 (2009), a case on how to count votes for purposes of the Minority Act, to decide with no legal explanation whatsoever to revoke an old precedent, namely, *Sánchez y Colón v. E.L.A. I*, 134 DPR 445 (1993).

As you will remember, in *Sánchez y Colón*, this Court abided by its duty to make sure that the legislation enacted to hold the status plebiscite of November 14, 1993, would comply with the constitutional guarantees that ensure the fundamental and preeminent condition of the right to vote. To that effect, the adjudication of blank ballots cast as a vote not favoring any of the status definitions proposed by the political parties for that plebiscite was validated.

It is convenient to refresh our recollection about what we stated in *Suárez Cáceres*, supra, in our dissenting vote, because it helps us understand how this *Chronicle* was written. Therein, we stated and I extensively cite: **\*964**

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

Com. CNP v. CEE, 197 D.P.R. 914 (2017).

2017 TSPR 57

[T]he revocation of *Sánchez y Colón v. E.L.A. I*, supra, proves to be a completely unnecessary determination based on what is argued in this case and *the reality is that it hides other plans.*

In rigorous legality, the dispute before our consideration in *Sánchez y Colón*, supra, is different from the one brought forward in this case. The dispute in *Sánchez y Colón*, supra, questioned the constitutionality of Act No. 22 of July 4, 1993 (1993 Laws of Puerto Rico 101), which authorized holding a status referendum with the following formulas: Commonwealth, Statehood and Independence. The plaintiffs alleged that they were duly registered voters; that they were not affiliated to any of the three political parties; that they did not agree with the definitions of the status formulas set forth on the ballot; that the law did not give them an opportunity to vote for the options of their preference, and that all of this violated their right to vote, to freedom of speech and association, and equal protection of the laws, both under the Constitution of the Commonwealth of Puerto Rico and of the United States of America.

When faced with this dispute, we acknowledged that in the subject matter of constitutional interpretation, when we are dealing with statutes that are unconstitutional due to sub-inclusion, we have the power to extend the statutory benefits to the excluded groups or classes. *Sánchez y Colón*, supra, p. 450. In accordance with this principle and considering the particular facts of this case, and as a mechanism to "overcome the serious constitutional objections raised by the plaintiffs," we ordered the State Election Commission to adjudicate "the blank ballots cast as a vote not favoring any of the status definitions proposed by the parties." *Sánchez y Colón*, supra, p. 450–451.

Thus, the expressions related to the blank ballots are made within the context of finding a remedy to avoid declaring unconstitutional the upcoming electoral event. In other words, in view of the signs of unconstitutionality due to sub-inclusion that Act No. 22 presented, we had to choose one of two options, namely: to annul the electoral process or draw up a remedy that would cure the problem of subinclusion in the law. Naturally, the second path was chosen. [...]

*What we did decide in Sánchez y Colón, supra, and about which the majority says nothing was that in a status referendum, groups or classes that are excluded from the status definitions that are being voted on must be provided* \*965 *space on the ballot where their expression is set forth.* [...] *That is the ratio in Sánchez, Colón, supra. That is the importance of that case which*

*makes the majority so uncomfortable. Evidently, Sánchez y Colón, supra, has little to do—or, we could say, nothing to do—with how votes are counted for purposes of the Minority Act, which, according to the majority, is the dispute in this case.* There is no doubt that in order to arrive at the conclusion that the Court arrives at today, in correct adjudicative methodology, it did not have to revoke *Sánchez y Colón*, supra.

It is very surprising that nowhere in the sixty-four pages of the opinion, does the Court explain what we really determined in *Sánchez y Colón*, supra, and why it is necessary to revoke it now in the context of this case. Such silence is both resonant and deafening. Without any difficulty, it seems reasonable to conclude that the dispute between Jorge Suárez Cáceres and Ángel Rodríguez Otero is secondary; *it is merely the pretext used to erase the constitutional rule that requires that in a referendum, as well as in a plebiscite, space must be provided on the ballot for groups or classes of citizens who do not favor the proposed definitions that will be voted on. Sánchez y Colón*, supra, *p. 451. With that understanding, the course of action of the majority constitutes a flagrant assault on Democracy.*

........

In other words, the raison d'être of today's opinion is not what we are told in the Court's opinion, namely, how to implement the "Minority Act", but [...], to *pave the way for a future status referendum or plebiscite.* (Emphasis ours and in the original, and footnote omitted). *Suárez Cáceres*, ante, pp. 115-117 (Rodríguez Rodríguez, J., dissenting op.).

The passage of time has corroborated what we proposed as an explanation for what at the time seemed inexplicable. *Suárez Cáceres* is the first chapter of this *Chronicle* written by the judicial tide.

Today, the tide returns to our shores writing what seems to be the last chapter of the *Chronicle of a rigged plebiscite*, by revoking  *P.P.D. v. Governor II*, 136 DPR 916 (1994). On that occasion, we extended the electoral ban on the broadcasting of governmental announcements of the general elections contained in the Electoral Law of 1977, Act No. 4 of December 20, 1977, (16 \*966 LPRA sec. 3351 \*966 16 LPRA sec. 3351) (2009 ed.), to the electoral consultation on certain amendments to the Constitution of the Commonwealth of Puerto Rico by means of a referendum. This determination was based on the axiom of economic equality of our Constitution and the right to vote as an element shared by general elections and referendums. Today, without further ado, a majority banishes from our

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

country the principle of electoral economic equality without considering, or caring about, its effects on the legitimization of democracy.

On this occasion, after employing an alleged "textualist analysis", laconic by the way, the majority concluded that the axiom of economic electoral equality does not exist, since the Constitution of the Commonwealth of Puerto Rico does not expressly provide for it. The opinion subscribed by a majority completely ignores that suffrage is an intrinsic right of democracy, whose cornerstone, in turn, is equality for the attainment of justice. This right, like all rights, is nothing more than a conquest of freedom that today, unfortunately, is being violated because, precisely today, it is not convenient.
Historically, the ideal of equality in the electoral context has been built on schemes for the financing of political parties and electoral processes. One of the mechanisms adopted in Puerto Rico, and in much of the world, is the public financing of electoral processes and political parties. This scheme is intended, first, to combat political "inversionism" and, second, to guarantee an equal distribution of direct and indirect goods or subsidies. In the present case, the electoral prohibition (16 LPRA sec. 4231) -as well as other prohibitions contained in the Puerto Rico Electoral Act, Act No. 78-2011- create preventive measures aimed at avoiding the embezzlement of funds, corruption and the aforementioned political "inversionism." **967**

In addition, it should be noted that the majority reverses *P.P.D. v. Governor II*, without the petitioners requesting it. On the contrary, the petitioners, on several occasions, both in their petition for certification and in their pleadings, recognize the validity of the case as case law in force, but they distinguish it to argue that the rule that was established therein does not apply to the situation presented in this case, *but at no time do they state why it should be revoked or why it should be revoked.* In doing so, the majority violates the appellees' right to rebut this argument on its own merits. [2] Moreover, the majority adopts a course of action identical to the one it criticizes the Court that upheld *P.P.D. v. Governor II*, ante. We are, quite frankly, faced with stupid arguments or rationales.

But there is more. It is noted in the majority opinion that in *P.P.D. v. Governor II* this Court affirmed the determination of the primary forum without any of the petitioners challenging the constitutionality of the Enabling Act for the Referendum on Amendments to the Constitution of Puerto Rico of 1994, Act No. 49 of August 2, 1994. Thus, the majority concludes that the Court applied an "improper" analysis, which violated the rule of judicial self-limitation. However, this assertion is false.

For, it is clear from the original record of *P.P.D. v.* **968** *Governor II*, that the lawsuit filed by the Puerto Rican Independence Party, on August 3, 1994, challenged the constitutionality of the referred law.[3] Specifically, in allegation number 27 of the referred lawsuit, in which arguments were raised that were reiterated before this Court, it was indicated:

> Since the 1994 referendum financing scheme violates freedom of expression, freedom of association, the right to vote, due process of law, equal protection of the laws and several provisions of the Election Law, it pursues an illegitimate purpose and therefore violates Article IV, Section 9 of the Constitution of the Commonwealth of Puerto Rico regarding the use of public funds only for legitimate public purposes. See Appendix, CE-1994-588, Annex II, p. 15.

Even more serious, this alleged textual reasoning evidences a troubling lack of knowledge of the constitutional text being interpreted. Thus, Section 19 of Article II of the Constitution of the Commonwealth provides that "[t]he foregoing enumeration of rights *shall not be understood in a restrictive manner or imply the exclusion of other rights belonging to the people in a democracy, and not specifically mentioned*." (Emphasis added). LPRA, Vol. 1, ed. 2016, p. 393. Thus, our constitutional text contains its own interpretive canon on the subject of the Bill of Rights. Specifically, in Section 2 -second in importance after the value of the dignity and equality of the human being-, our constituents placed suffrage and indicated that it shall be "universal, *equal*, direct, and secret [...]". Art. II, Sec. 2, ELA Const. ante, p. 283.

Mr. Jaime Benítez, when presenting the Report on the Bill of Rights **969** to the Constituent Convention, explained that this constitutional article included two canons of interpretation. The first of these, the one that concerns us, had the following objective

> to *protect the rights of the individual against a restrictive interpretation or against an interpretation based on the well-known rule of inclusio unius, exclusio alterius. According to the latter interpretative principle, the act of enumeration entails the act of exclusion, so that whatever is not mentioned is thereby excluded.* We do not believe that a constitution

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

Com. CNP v. CEE, 197 D.P.R. 914 (2017).

2017 TSPR 57

should incorporate a principle of this inflexibility. [...] An interpretation to the effect that whatever is not literally implied in each of the words used is therefore excluded from constitutional protection would be contrary to the basic attitude that has governed the Commission in preferring the brief language of great principles to the minute formulation of inexhaustible detail. (Emphasis added). 4 Journal of Sessions of the Constitutional Convention of Puerto Rico 2576 (1961).

The constituent made it abundantly clear that this section of the Bill of Rights was intended, *precisely,* to avoid interpretations such as the one endorsed by the majority today. In other words, the so-called textualists/"originalists" etc., disregard the clear text of the Constitution or the clear intention of the constituent. In the mouth of the majority, concepts such as "originalism" or "textualism" have no real meaning.

The delegate Mr. Benítez expressed that our Bill of Rights includes the "*most liberal protection of the rights of the individual* [...]". (Emphasis added). Journal of Sessions, ante, p. 2576. As I have said in the past, it is up to us, *Puerto Rican judges*, to make the constitutional mandate of our highest document a reality by giving actuality to individual rights, to comply with our constitutional obligation to provide that more open and *tolerant* protection "of the rights of the individual". Id. The Constitution we interpret is that of the Commonwealth of Puerto Rico, not another, so we must abide by the interpretive canon **\*970** that its framers imposed upon us. We may not like it, but as long as it is in force, we must respect it.

All of which leads me to conclude that invoking the thesis of "textualist analysis" is nothing more than a subterfuge to cover up judicial ideological activism, which leads the majority to disregard our Constitution, to limit the rights of citizens and to abandon established precedents in order to obtain passing advantages in ideological electoral processes. *What a pity!*

On the other hand, it is worth emphasizing that the value of electoral economic equality has been widely studied, which has shown that "an extremely unequal distribution of resources can create the appearance of inequity that

would affect the legitimacy of the electoral result". K. Casas-Zamora and D. Zovatto, *The Cost of Democracy: Notes on the Regulation of Political Financing in Latin America*, Latin America Intiative Foreign Policy (July 2015), available at: https://www.brookings.edu/wp-content/uploads/2016/07/The-Cost-of-Democracy-CasasasZamora-Zovatto-Spanish.pdf (last visited Apr. 17, 2017).

With this in mind, the revocation of the principle of electoral economic equality has the fateful effect of undermining the legitimacy of electoral procedures. This, even more so, when the upcoming plebiscite process has provoked great suspicion in the federal government itself. As we know, just a few days ago, the U.S. Department of Justice refused to endorse this plebiscitary event in view of the serious doubts caused by the ballots designed to be used next June 11, 2017. The Deputy Secretary of the Department of Justice, Mr. Dana J. Boente, in a missive dated April 13, 2017, pointed out that the language contained in the plebiscite ballot contains "several ambiguous and potentially misleading noses statements." (Translation **\*971** ours). *United States Department of Justice review of plebiscite ballot, voter education materials, and expenditure plan*, U.S. Department of Justice, Office of the Deputy Attorney General, April 13, 2017, p. 2.

In consideration of the foregoing and the context of the fiscal crisis that besets us, there is no logic whatsoever to justify the actions of the majority of this Court. On the contrary, the pronouncements issued today by this High Forum only hint that the desire to make possible a particular electoral result is very much present.

For the foregoing reasons, I am forced to dissent from the determination of a majority of this Court that only contributes to the creation of loopholes that threaten our system of government and the fundamental principles of democracy. The opinion that is endorsed today traces a pitiful course for democracy in our country that suffocates and suffocates our conquests of liberties. Today we are not a better country than we were yesterday.


**--O--**

Dissenting opinion issued by Associate Justice Estrella Martínez.

The recognition of the right to equality in all its fundamental and constitutional dimensions requires me to


I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

dissent above all other considerations.

The axiom of electoral equality, [1] in its aspect of economic equality, is clearly recognized, not only **\*972** by our constitutional law, but it is one of the pillars of equality in electoral matters at the level of international law,[2] which as judges we are obliged to recognize by mandate of the federal Constitution itself. Art. IV, U.S. Const., LPRA, Vol. 1. Particularly, in relation to the Universal Declaration of Human Rights and the International Covenant on Civil and Political Rights of December 16, 1966, the following has been established:

> [T]he foundational documents in question, are imbued with influential notions of freedom, equality, accountability, and State obligations. These rights and the notions surrounding them are the primary representations of democratic norms and political values at the international level. Money in politics must first pass through these filters. T.K. Kuhner, *The Democracy to Which We Are Entitled: Human Rights and the Problem of Money in Politics*, 26 Harv. Hum. Rets. J. 39, 58 (2013).

Both international norms are binding and contain inexorable duties applicable to the U.S. government. Thus, it should be noted that electoral equality in its economic aspect imposes obligations directly **\*973** on the State and is not limited to political donors or parity for political parties, as a majority of this Court erroneously resolves.

It should also be noted that, in the context of international law, *real equality* and participation in electoral matters are not limited to general elections, but extend to participation in public affairs. Electoral equality in its economic aspect has been a key element in the struggle for the self-determination of colonized peoples. It would be a contradiction, in light of the Puerto Rican reality, for the economic aspect of electoral equality to be excluded from the process of self-determination of a people and relegated to merely elective posts. Along these lines, scholars of international law have stated the following:

> Consider that the democratic entitlement requires "access, on general terms of equality, to public service in [one's] country," protects "the right and the opportunity without [...] distinctions [as to property, fortune, or economic status] [...] [t]o take part in the conduct of public affairs [...]," and requires all States to provide "[t]ransparent and accountable government institutions." (emphasis omitted). Kuhner, *supra*, p. 40.

Likewise, we cannot ignore that this axiom of equal electoral treatment is the one that puts into practice the

constitutional safeguard of the right to universal, equal, direct and secret suffrage, and to the free expression of the electors in Puerto Rico. Art. II, Sec. 2, ELA Const., LPRA, Vol. 1. Such principle protects citizens from any coercion in any electoral process, whether in general elections, plebiscites or referendums.

The reality of constitutional law and international law on electoral equality cannot be defeated by the intent of the local legislature. However, even using the majority's line of argument, if we examine the Explanatory Memorandum of Law No. 7-2017, we may realize that the Legislative Assembly of Puerto Rico is aware of the parameters **\*974** of neutrality in the message and use of public funds that, in turn, the federal government itself recognized when it passed the *Consolidated Appropriations Act, 2014*, Pub.L. No. 113-76, 128 Stat. 5. Specifically, it expressly recognized the following:

> After more than a century of colonial disadvantages and years after the Plebiscite was held in Puerto Rico, Congress and the President approved an appropriation of $2.5 million in the "Consolidated Appropriations Act (2014)," Public Law 113-76 (2014), to propose a ratification election consultation on the Statehood outcome of the 2012 Plebiscite, now, at the discretion of the Government of Puerto Rico and fund a campaign of "*objective and nonpartisan education of voters in a Plebiscite*" [...] "on the options that would resolve future political status"]. (Emphasis in original).

In view of the Legislative History of Act No. 7-2017, not to mention the express recognition of the legislature in including the prohibitions of the Election Law, it is clear that by virtue of the federal legislation and the local legislation itself, the application of the constitutional axiom of electoral equality in its economic aspect is mandatory, even when the majority does not want to recognize it as having constitutional rank. That is to say, under the same reasoning they would have to conclude that there is a federal mandate and a local legislative recognition of its applicability.

Despite this reality, the precedent of 🚩 *P.P.D. v. GovernorII*, 136 DPR 916 (1994), is unnecessarily overturned today, and the correct recognition of the jurisprudence that this Court has issued is cast aside.[3] In this regard, we have previously stated the following:

> [W]e have recognized that the constitutional axiom of electoral equality "is susceptible of manifesting itself in different dimensions. *P.R.P. v. E.L.A* 115 DPR 631, 633 (1984). See 🚩 *P.P.D. v Governor I*, 139 DPR 643, 667


I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

Com. CNP v. CEE, 197 D.P.R. 914 (2017).

2017 TSPR 57

(1995). While in the past this axiom has been invoked in the context of controversies **\*975** involving political parties, it is not exclusive to that context. Electoral alternatives sometimes transcend the margins of political parties. They expand, and with them the scenarios in which the constitutional axiom of equal treatment must be applied. We cannot constrict its scope. Widening it is the right thing to do. In the face of "partidocracy" democracy must prevail. *Guadalupe v. C.E.E.* 165 DPR 106, 116-117 (2005).

Unfortunately, the course of action being pursued today by a majority of this Court has the effect of narrowing the scope of such an important and fundamental principle of constitutional entrenchment.

Paradoxically, in scrutinizing legislation that seeks to address the problem of *inequality*, this Court restricts the scope of the concept of *equality*. *It* is now in the hands of the political party controlling the Political Branches to establish the parameters, if any, regarding the use of public funds related to electoral events. The electoral administrative body -the State Elections Commission- will not be able to include, in the responsible exercise of its *expertise*, additional constitutional safeguards to the right of universal suffrage that are not contemplated textually and written in stone in the Constitution. Worse yet, the citizenry will not have the timely protection of the Judicial Branch. Previously, I have warned that this reading of Constitutional Law turns the citizen guarantees that emanate from the Constitution into a mere graveyard of words. Today, *equality* is closer to the grave of the constitutional cemetery with actions such as these. As an aggravating situation, the possibility of challenging regulatory norms and resolutions of the nature that concerns us is eliminated, and the citizenry will have to wait and prove that particular damages were suffered in the electoral event to have any success in the claim of *equality*.

These are some of the many consequences of overturning a precedent firmly **\*976** established for more than two decades and, surprisingly, weakening these constitutional principles consubstantial to the existence of democracy.

I cannot lose sight of the rule of law that has governed electoral events in modern history, as well as our pronouncements and the protections we have granted when the main ideological movements in Puerto Rico have invoked the constitutional axiom of electoral equality, in its economic equality aspect, in aspects related to "status", and not only to general elections, as it has been restricted today. As an example, the New Progressive Party (NPP) has made claims aimed at questioning the use of public funds to lobby against statehood. To this end, the NPP's

legal representation, as well as its leadership, have consistently invoked the prohibition of misuse for non-public purposes and the constitutional axiom of economic equality. See, by way of example: *PNP v. ELA*, 196 DPR 42 (2016), intrajurisdictional certification appeal; *P.N.P. v. Governor*, 162 DPR 239 (2004) (Judgment).

Since my law studies, as a lawyer and as a judge, I have known, recognized and applied the axiom of electoral equality in its economic aspect as one of the pillars of the concept of *equality* and as a guarantee of international and constitutional law. This, precisely, to guarantee the self-determination of peoples and to avoid inequalities in electoral processes related and not limited to elections for public office. It is the right thing to do in Law yesterday, today and always, so I consequently dissent and, instead, I would have strengthened and not weakened the axiom of electoral equality in its economic aspect, in accordance with the constitutional and international legal basis exposed. **\*977**

--O--

Dissenting opinion issued by Associate Justice Colón Pérez.

> *Could it be that once again the swaying of the waves shrouds the understanding and causes a zigzagging and ductile jurisprudential tract?* Dissenting opinion of Associate Judge Rodríguez Rodríguez, in *Asoc. Fotoperiodistas v. Rivera Schatz*, 180 DPR 920, 974 (2011).

Today, wrapped again by the uncontrolled and excessive growth of what eight years ago some members of this Court proclaimed as the "*normal flow of the judicial tide*", this Court loses the unique opportunity to reiterate its pronouncements, more than two decades ago, in the matter of electoral equality before the celebration of a referendum. This time, extending the referred regulation to the context of a plebiscite.

Specifically, it was for us to determine whether, in view of the holding of a plebiscite to be held on June 11, 2017, and the possible holding of a referendum to be held on October 8 of the same year, the prohibitions set forth in Section 12.001 of the Puerto Rico Elections Act, *infra, were* extended to the agencies of the Commonwealth of Puerto Rico. These prohibitions have the effect of preventing such agencies, unless expressly authorized by the Advertising Review Board, from incurring in expenses for the purchase of time and space in the media of the country, as well as for

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

Com. CNP v. CEE, 197 D.P.R. 914 (2017).

2017 TSPR 57

the purchase or distribution of propaganda or promotional materials for the purpose of presenting their programs, projects, achievements, accomplishments, projections or plans. The foregoing, with the exception, of course, of those advertisements and press announcements expressly required by law, certain campaigns of the Tourism Company, as well as **978** those announcements that are used to disseminate information of public interest, urgency or emergency, which shall only be allowed, prior authorization to that effect, by the State Elections Commission.

Contrary to what has been stated by a majority of this Court -and in accordance with the axiom of electoral equality contained in the Constitution of the Commonwealth of Puerto Rico and the decision of this Court in *P.P.D. v. Governor I*, infra, in the context of the electoral events to be held in the months of June and, possibly, in October 2017, such prohibition was valid and consistent with the constitutional safeguard to the right to universal, equal, direct and secret suffrage, and to the free expression of the voters in our country.

Because this is not the course of action followed by a majority of this Court, *we dissent.*

The position assumed by a majority of this Court, under the protection of a misguided, literal and positivist reading of the applicable legal provisions, and of the safeguards contained in the Constitution of the Commonwealth of Puerto Rico, entails the revocation of one of our best thought out and structured *stare decisis* in matters of electoral law. As if this were not enough, such ruling undoubtedly and unequivocally entails an attack against the fundamental right of every Puerto Rican to vote, free from coercion by the State.

This nefarious action has the effect of allowing State agencies to arrogate public funds in the context of the celebration of electoral events. With its actions, a majority of this Court endorses that the political party in power uses public funds to interfere -intentionally- with the free right of Puerto Ricans to vote, to be deposited in the ballot box of democracy, thus undermining the pillars of the electoral scheme of our country. Our conscience prevents us from endorsing such a course of action. **979**

## I

The controversy before us arises from the approval of Act No. 7 of February 3, 2017, known as the Act for the Immediate Decolonization of Puerto Rico (Act No. 7-2017). Pursuant to the referred statute, the Legislative

Assembly of Puerto Rico authorized the holding of two electoral events, namely: (1) a *plebiscite*, to be held next June 11, 2017, whereby duly registered voters may vote between "Statehood" and "Free Association/Independence" as political status options (Plebiscite), and (2) a *referendum*, in case the "Free Association/Independence" option prevails, to be held on October 8, 2017 to select the type of sovereign relationship, either "Free Association" or "Independence" (Referendum).

As a result of the foregoing, the Puerto Rico State Elections Commission (CEE, the Spanish acronym) held a regular meeting in which the Interim Electoral Commissioner of the Popular Democratic Party, Mr. Miguel Ríos Torres (PDP Electoral Commissioner), filed a request that -in view of the aforementioned electoral events- the Ad Review Board (JEA, the Spanish acronym) be activated. This was pursuant to Section 12.001 of the Puerto Rico Electoral Act, Act No. 78 of June 1, 2011, as amended, 16 LPRA sec. 4231 (Act No. 78-2011).

To said request, the Electoral Commissioner of the New Progressive Party, Mrs. Norma E. Burgos Andújar (NPP Electoral Commissioner) objected. She alleged that Act No. 7-2017 was silent as to the activation of the JEA and that Art. 12.001 of Act No. 78-2011, *supra*, was applicable only to general elections, and therefore, she understood that the activation of such entity should not proceed before the holding of the plebiscite. **980**

Thus, in view of the lack of unanimity among the election commissioners [1] and pursuant to the procedure established in Act No. 78-2011, *supra*, the controversy was submitted for the consideration of the President of the State Elections Commission (CEE President), who, in due course, issued Resolution C.E.E.-RS-17-07 (hereinafter, CEE Resolution) and disposed of the controversies submitted for her consideration. In doing so, by means of the aforementioned document, the President of the CEE activated the electoral ban on the dissemination of governmental advertisements contained in Art. 12.001 of Law No. 78-2011, *supra*, until June 12 of the current year, the day after the plebiscite. On the other hand, it provided that in the event that it is necessary to hold the Referendum, the referred prohibition shall be in effect until October 9, 2017. Finally, and consistent with the foregoing, it ordered the establishment of the JEA, the entity in charge of enforcing the provisions of the aforementioned Section 12.001 of Act No. 78-2011.

Dissatisfied with said proceeding, and after the timely filing of a request for reconsideration before the President of the CEE -which was denied-, the NPP Electoral Commissioner filed a motion for Judicial Review before

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

the Court of First Instance to challenge the CEE's Resolution. In summary, the NPP Electoral Commissioner requested that the aforementioned ruling be set aside on the grounds that the provisions contained in Art. 12.001 of Law No. 78-2011, *supra*, are exclusively applicable to the holding of general elections, not to the Plebiscite or Referendum.

Thus, and while the case was pending before the Court of First Instance, the Senate of Puerto Rico, through its President, Hon. Thomas Rivera Schatz, and its Secretary, Manuel Torres Nieves, together with the **\*981** House of Representatives of Puerto Rico, through its President, Hon. Carlos Méndez Núñez, appeared before this Court through a request for Certification. In this request, they asked us to certify the present case, so that this Court could hear, in the first instance, the issues raised before the primary forum.

On the same day, the NPP Electoral Commissioner appeared before us, joining the aforementioned request and adopting the grounds set forth by the Senate of Puerto Rico, its president and secretary, the House of Representatives of Puerto Rico and its president.

After this Court granted the request for Certification, and after the required formalities, the parties in this lawsuit filed their respective pleadings. In them, the CEE alleges that, as the entity designated by law to resolve electoral matters, it was authorized to regulate everything related to the electoral process in the country; this, as a safeguard of the citizens' right to vote. Likewise, it argued that the provisions of Act No. 7-2017 were compatible with Act No. 78-2011, *supra*, regarding the electoral ban. Particularly, it outlines that this Court had previously resolved a controversy identical to the present one and, there, it determined that the electoral ban on the dissemination of advertisements by the State, and paid for with public funds, was applicable to a referendum event.

The NPP Electoral Commissioner, on the other hand, argues that activating the electoral ban on referendums and plebiscites would have the effect of "paralyzing" the ability of the Commonwealth of Puerto Rico (Commonwealth) to communicate its public policies and inform the citizenry. Consequently, it argues that the prohibition contained in Art. 12.001 of Act No. 78-2011, *supra*, applied exclusively to general elections in the country.

On the other hand, the PDP Electoral Commissioner understands, in summary, that the matter before our consideration **\*982** is not new, but that this Court resolved it years ago. Thus, he expressed that in accordance with what was resolved in 🚩 *P.P.D. v. Governor II*, 136 DPR 916 (1994), and according to the clear text of Act No.

7-2017, the electoral closure applies to the electoral matters to be held on June 11 and October 8, 2017, if the latter is necessary. Therefore, it held that the constitution of the JEA was appropriate.

Likewise, the Electoral Commissioner of the Puerto Rican Independence Party, María de Lourdes Santiago Negrón, appeared before us. In her argument, and in what is pertinent here, she argues that Act No. 7-2017 itself incorporated, literally, the provisions of Act No. 78-2011 regarding crimes and prohibitions. Therefore, she is of the opinion that the electoral prohibition contained in Section 12.001 of our current electoral statute, being a type of prohibition, applies to the electoral events to be held in June and October of the current year. Likewise, she alleges that this Court has resolved situations such as the present one under the protection of the principle of electoral economic equality.

On the other hand, in his appearance, the Attorney General of the Commonwealth of Puerto Rico (Attorney General) presented his opposition to the CEE Resolution. In essence, the Commonwealth argues that in our rule of law there is a delegated power to the State to communicate and inform the citizens of the country about government programs and that, although it recognizes that it does not have a right to freedom of expression, any limitation to this power must be observed with caution. Furthermore, it argues that nothing in this Court's decision supports the activation of the JEA during periods when a general election is not held.

In a separate brief, the Senate of Puerto Rico, its president and secretary, alleged, in summary, that the provisions of Act No. 7-2017 were incompatible with the prohibition contained in Section 12.001 of Act No. **\*983** 78-2011, *supra*, and therefore, the former prevailed, since it is a special law. Likewise, they argue that in *P.P.D. v. Governor II*, supra, this Court determined that the prohibition contained in the electoral statute in effect at that time did not extend to years in which a general election was not held.

Finally, the House of Representatives of Puerto Rico, its Speaker and its Secretary, also filed their corresponding pleadings. In this, among other matters, they argue that in order to determine whether or not the electoral ban contained in Act No. 78-2011, *supra*, was applicable, it was not only necessary to make a distinction between the different electoral events -namely, a general election, a plebiscite and a referendum-, but also to consider the nature of the referendum. Thus, it argued that what this Court had ruled on other occasions, in contexts similar to the present one, did not apply.

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

Com. CNP v. CEE, 197 D.P.R. 914 (2017).

2017 TSPR 57

## II

At the outset, it is necessary to clarify that, contrary to what a majority of this Court intends to suggest, this Court -as the final interpreter of the Constitution of the Commonwealth of Puerto Rico- can and must resort to the text of the Constitution in all those circumstances in which it is meritorious. Precisely, by deploying such revisory power and thus interpreting the contours of our Constitution, "*we must ensure its vigor and relevance in the face of current social, economic and political problems.*" (Emphasis supplied). *Misión Ind. P.R. v. J.P.* 146 DPR 64, 91 (1998). See, furthermore: *Nogueras v. Hernández Colón [I]*, 127 DPR 405, 411 (1990); *P.I.P. v. C.E.E.* 120 DPR 580, 613 (1988); *López Vives v. Policía de P.R.*118 DPR 219, 227 (1987). The contention to the contrary, that we cannot exercise such function "*without the corresponding request of the parties*," results in an anomaly to our **\*984** role as court of last resort. Having clarified the foregoing, we proceed to discuss the law applicable -and obviated by this majority- to the controversy before us. (Emphasis supplied). *Per curiam*, p. 926.

## III

As is well known, and as it pertains to the controversy before us, the Constitution of the Commonwealth of Puerto Rico, like the Constitution of the United States of America, enshrines as a fundamental principle in our life as a people the right to equality and equal protection of the laws In this regard, Art. II, Sec. 1 of our Magna Carta states:

The dignity of the human being is inviolable. All men are equal before the law. No discrimination may be established on the basis of race, color, sex, birth, origin or social condition, or political or religious ideas. Both the laws and the system of public instruction shall embody these principles of essential human equality. LPRA, Vol. 1, ed. 2016, p. 275.

As stated in the Journal of Sessions of the Constitutional Convention, among the principles that inspired the founders and foundress of our Constitution at the time of drafting the aforementioned constitutional clause were:

[...] to clearly establish as the

consubstantial basis of all that follows the principle of the dignity of the human being and, as a consequence of this, the essential equality of all persons within our constitutional system. Equality before the law is above accidents or differences, whether they have their origin in nature or in culture. Any discrimination or **\*985** privilege contrary to this essential equality is repugnant to the Puerto Rican legal system. Insofar as necessary, our legal organization is strengthened by the present constitutional provision, and at the same time obliged to broaden its provisions to give full effect to the provisions herein. Report of the Bill of Rights Commission, 4 Diario de Sesiones de la Convención Constituyente de Puerto Rico 2561 (1962).

Consistent with the foregoing, in order to give meaning and life to the aforementioned constitutional provision, and in the context of the controversies before us, we have established that equality "[b]*ecause of its dynamic nature is susceptible of manifesting itself in various dimensions%7D* ". *P.P.D. v. Gobernador I*, 139 DPR 643, 667 (1995), citing *P.R.P. v. E.L.A.* 115 DPR 631, 633 (1984). *One of these manifestations is electoral equality.*

The principle of electoral equality is jealously guarded in our constitutional order in Art. II, Sec. 2 of the Constitution of the Commonwealth of Puerto Rico, *supra*, p. 283. Said article guarantees the expression of the will of the people through universal, equal, direct and secret suffrage, and protects the citizen against any coercion in the exercise of his or her electoral prerogative. Id.

As can be seen, it can be said that, in its content, Art. II, Sec. 2 of our Constitution, *supra*, enshrines the fundamental principle that political power in our constitutional order emanates from the consent and will of the citizens of the country. This constitutional precept imposes on the Government a dual responsibility: "*to abstain, on the one hand, from interfering with the exercise of universal, equal, direct and secret suffrage, and on the other hand, to protect the citizen against any coercion in the exercise of such electoral prerogative.* (Emphasis supplied and in the original). *P.P.D. v. Governor I*, supra, p. 670. See *Sánchez y Colón v. E.L.A. I*, 134 DPR 445,

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

Com. CNP v. CEE, 197 D.P.R. 914 (2017).

2017 TSPR 57

449-450 (1993). **\*986**

Specifically, this Court, in expressing its opinion on this postulate, has established the following:

> *These constitutional postulates protect and guarantee the right to universal suffrage, both in general elections and in referendums and plebiscites. Although it is not an absolute right and the Legislature has broad power to regulate it, the courts have the responsibility to ensure that enacted legislation complies with constitutional guarantees.* In discharging this responsibility we must strike a delicate balance between the fundamental right to vote and the State's interest in regulating its exercise so that the process is conducted in an orderly manner with the greatest possible participation of electors on equal terms. [...] *Each decision must be made carefully, taking into account the particular circumstances of each case. As a general principle, legislation that is burdensome and substantially affects the right to vote is subject to constitutional challenge.* (Emphasis supplied and in the original). *Sánchez y Colón v. E.L.A. I*, supra, pp. 449-450.

In this regard, it is worth noting that one of the tools with which we have historically sought to guarantee electoral equality in our country is Section 12.001 of Act No. 78-2011, *supra*, formerly Section 8.001 of the Puerto Rico Electoral Act of 1977, Act No. 4 of December 20, 1977 (16 LPRA sec. 335116 *LPRA sec. 3351* (2009 ed.)). (Electoral Act of 1977).[3] As pertinent to the controversy before us, the referred legal provision establishes that: **\*987**

> During the year in which a general election is held and until the day following the date of the holding thereof, the agencies of the Government, the Legislative Assembly and the Judicial Branch of Puerto Rico are prohibited from incurring in expenses for the purchase of time and space in the media, as well as for the purchase and distribution of propaganda or promotional materials for the purpose of exposing their programs, projects, achievements, accomplishments, accomplishments, projections or plans. Excepted from this provision are those press notices and advertisements expressly required by law; the campaigns of the Tourism Company for the promotion of domestic tourism, promotional campaigns outside Puerto Rico by the Puerto Rico Tourism Company or the Puerto Rico Convention Center District Authority promoting the island of Puerto Rico as a tourist destination, or the Industrial Development Company promoting foreign investment in Puerto Rico, provided that they do not include reports of achievements of the administration or the corporation or highlight the figure of any official. In addition, notices or calls for public legislative or

administrative hearings that are published and circulated without the use of paid mass media are excluded.

> Likewise, those announcements that are used to disseminate information of public interest, urgency or emergency are exempted from the above provision, which shall only be allowed with prior authorization to that effect from the Commission.

> In the case of announcements or notices that are required by law, to the agencies of the Government, the Legislative Assembly and the Judicial Branch of Puerto Rico, as well as to the municipalities, the Commission shall have a term of two (2) working days to express in writing its approval or objection to the notice or announcement for which the authorization was requested. The aforementioned term shall be counted from the time of the request for authorization to the Commission, and in the event that such term expires without the Commission having expressed its approval or objection, the message, notice or advertisement in question shall be deemed authorized; and the issuance of approval documents by the Board shall not be necessary.

> The provisions of this section shall not apply to the office of Resident Commissioner, which shall be governed by the provisions of the Federal Election Act 2 U.S.C. § 441(a)(1)(A) *et seq.*

> The violation of this Section shall entail an administrative fine of up to ten thousand (10,000) dollars for the first violation and up to twenty-five thousand (25,000) dollars for subsequent violations. The funds obtained under this concept shall become part of the special fund for the financing of the expenses for the automation of the electoral processes, as provided in Sec. 4011 of this title. 16 LPRA sec. 4231.

As may be appreciated, the enactment of Section 12.001, formerly Section 8.001 of the Electoral Law of 1977, had the effect of restricting, with few exceptions authorized by the JEA, the disclosure of information by the Commonwealth during the holding of general elections in the country. In other words, the aforementioned statute had the " '*legislative intent to definitively exclude from the political process the underhanded influence that the party in power may have through the use of governmental advertisements*". (Emphasis supplied). *P.P.D. v. Governor I*, supra, pp. 682-683, citing with approval *C.E.E. v. Depto. de Estado*, 134 DPR 927, 939 (1993).[4] Provisions such as this reflect " '*the interest in discontinuing during the election period the practice of government agencies of*

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

Com. CNP v. CEE, 197 D.P.R. 914 (2017).

2017 TSPR 57

*political campaigning by publishing advertisements about their accomplishments and plans* ". *Id.*

We note, then, that just as under the scheme previously established through repealed Sec. 8.001 of the Electoral Law of 1977, *supra*, the new Sec. 12.001 of Act No. 78-2011, *supra* -which, in essence, advances the same spirit as its predecessor- seeks to prevent the Commonwealth and its agencies, through the use of public funds, from influencing in any way the free expression and selection of the citizens who participate in the electoral events of the country. On this matter, see the First Report of the Senate Special Committee on Government Reform rendered with amendments on the House Substitute to H.B. 1863 of November 10, **\*989**, 2010, 4th Regular Session, 16th Legislative Assembly, p. 25 [5]

Thus, in order to ensure faithful compliance with the provisions of Sec. 12.001 of Act No. 78-2011, *supra* -and similar to how it was done when Sec. 8.001 of the Electoral Act of 1977 was in effect-, pursuant to Rule 2.1 of the Regulations for the Control of Government Public Broadcasting Expenditures of the State Elections Commission of October 14, 2015, the JEA was established. Thus, said agency was granted the task of evaluating any request for authorization for the broadcasting of advertisements submitted by the Government of Puerto Rico in general elections. Rule 2.3 of the Regulations, *supra*, p. 6.

Now, it is necessary to point out that the activation of the electoral ban on the dissemination of governmental advertisements contained in Section 12.001 of Act No. 78-2011 is not only limited to the holding of general elections, as its text intends to suggest. In this regard, and in order to understand the scope of this prohibition, it is convenient to review the interpretations -in our opinion, correct and complete- that this Court made of Art. 8.001 of the Electoral Law of 1977 in *P.P.D. v. Governor I*, supra, and *P.P.D. v. Governor II*, supra.

In *P.P.D. v. Governor II*, supra, this Court had before it a factual situation very similar to the one that concerns us today. On that occasion, the validity of Act No. 49-1994, also known as the Enabling Act for the Referendum on Amendments to the Constitution of Puerto Rico of 1994 (Enabling Act), which authorized the holding of a referendum **\*990** for registered voters to express their approval or rejection of proposed amendments to various sections and articles of the Constitution of the Commonwealth of Puerto Rico, was challenged.

In this matter, the plaintiffs requested that the governor of Puerto Rico and the defendant public corporations, together with the corresponding public officials, be ordered to stop the advertising campaigns carried out by them through the public media of the country. This, pursuant to Art. 8.001 of the Electoral Law of 1977, *supra.*

On said occasion, the lower court determined that the referred article of the Electoral Law of 1977 was effective in relation to the referendum scheduled in Puerto Rico, and therefore ordered the CEE to appoint the Board of Announcements that would evaluate the need for publication of all governmental announcements until the day after the referendum. This, under the protection of the principle of economic equality immersed in the Constitution of the Commonwealth of Puerto Rico.

Thus, this Court ruled on the applicability of the prohibition contained in former Art. 8.001 of the Electoral Law of 1977, *supra*, to the referendum to be held in the country, pursuant to the Enabling Act. II, Sec. 2 of Art. II of our Constitution, *supra*, and the intention of the Constituent Convention in drafting it, the constitutional right to suffrage is "*a common element to general elections and referendum*[*s*]". (Emphasis supplied and in original). *P.P.D. v. Governor II, supra*, p. 925. See also, *Sánchez y Colón v. E.L.A. I*, supra, p. 449. We also established that the constitutional right of suffrage "*is consubstantial with the very existence of democracy,*" since it is a right that is present in both general elections and referendums. *P.P.D. v. Governor II*, supra, p. 925. *That* **\*991** *common element* - the *constitutional right to vote - is undoubtedly also present in plebiscites.*

Subsequently, a year later, in *P.P.D. v. Governor I*, supra,[6] the most essential principles of the right to vote were alleged to have been violated by the use of public funds by the State or a municipality to pay for advertisements intended to benefit the political party in power or the candidates of such party, both at the state and municipal level.

As pertinent here, this Court reaffirmed the rule to the effect that the constitutional axiom of electoral equality is protected in our system. Likewise, we emphasized the protection afforded by our Legislative Assembly to said axiom through the electoral scheme established in Puerto Rico. At that time, we established that Sec. 3.023 of the Electoral Act of 1977 ( 16 LPRA sec. 31161616 LPRA sec. 3116) (2009 ed.) had the purpose of safeguarding said principle of electoral equality by granting equal treatment to political parties in the annual allocation of public funds for their operation. See *P.P.D. v. Governor I*, supra, p. 667.

In evaluating the "*close relationship*" between Sec. 9 of Art. VI of our Constitution, *supra*, and the axiom of electoral equality in its economic equality aspect, we



I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

Com. CNP v. CEE, 197 D.P.R. 914 (2017).

2017 TSPR 57

provided the following:

> *To the extent that a political-party campaign is subsidized with public funds, an advantage is allowed to one party (or political candidate) over others, which goes against the axiom of electoral equality and undermines the pillars of the electoral scheme in our Country, which guarantees economic equality* **\*992** *among the parties without limiting it to the election period.* This affects detrimentally [sic], in addition, the right of the electors to exercise their vote free of any coercion, since as essential components of the parties they are placed at the same economic disadvantage as their party against the party that subsidized part of its political campaign with the funds of all the People of Puerto Rico, including those of the electors belonging to any opposition party of the current Government. (Emphasis supplied). *P.P.D. v. Governor I*, supra, p. 671.

This being so, there is no doubt that -as we ruled in *P.P.D. v. Governor II*, supra- the principle of equality imbedded in our Constitution manifests itself, among others, in electoral matters, be it a general election, plebiscite or referendum. Thus,

> [t]he concept of economic equality, in relation to the distribution of public funds in the electoral process, prevents a party that holds the power to govern the people at any given time from using public funds to take undue advantage in order to promote its position. Section 8.001 [of the Electoral Law of 1977], *supra*, is precisely a preventive measure so that such improper practice does not occur. Therefore, the aforementioned article, *by imperative of the equality axiom immersed in the Constitution, as well as in protection of the constitutional right to free selection translated into the right to vote, is compatible and consequently applicable to the Referendum Enabling Act.* In the interest of maintaining a democratic process, *we cannot allow an undue advantage of the party in government to promote its position through the use of public funds.*

(Emphasis supplied). *P.P.D. v. Governor II*, supra, p. 926.

In short, if twenty years ago -in safeguarding the principle of electoral equality and the economic parity of the political parties- we resolved that the prohibition contained in Art. 8.0001 of the Electoral Law of 1977, *supra*, was extensive to a referendum event to be held in the country, the same guarantee we are obliged to extend to the upcoming electoral events; that is, the Plebiscite of June 11 **\*993**, 2017 and the possible Referendum of October 8 of the same year.

It is important to note that general elections, plebiscites and referendums have a common element. They seek, through the exercise of the vote, to ascertain the feelings of the citizenry on various matters of vital importance. In a general election, the representatives of the people are elected; in a plebiscite, fundamental decisions are taken on the structure or form of the State; and in a referendum, the people express their views on any matter submitted to them for consultation, such as matters of a constitutional or legislative nature, or relating to decisions of a political nature. See Art. 2.003(31), (82) and (86) of Act No. 78-2011, *supra*, 16 LPRA sec. 4003(31), (82) and (86).

It is evident, then, that all these events have a common element: to summon the people so that through the exercise of the vote they may express themselves on a transcendental issue. Since they are such similar events and involve the right to vote as a vehicle of expression, there is no distinction to be made between them for purposes of complying, in the Plebiscite, with the constitutional mandate that we identified in *P.P.D. v. Governor II*, supra. The contrary -i.e., not applying the electoral prohibition to the Plebiscite but, months later, applying such prohibition to the Referendum- would be an anomaly, since Act No. 7-2017, *supra*, provides for both events. This would be a very convoluted reading.

*In this case, contrary to what was outlined by the majority of this Court, there is no condition that should move this Court to vary the previously established precedent.* On the contrary. It is our responsibility, as the High Judicial Forum, to grant a certain degree of certainty as to whether, in view of the celebration of the aforementioned electoral events, the JEA must be activated as a filter to determine whether the agencies attached to the Executive Branch may or may not incur in the expenditure of public funds in the publication of advertisements; in addition to making sure that the referred advertisements are not tinged by political-partisan positions. **\*994**

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

Com. CNP v. CEE, 197 D.P.R. 914 (2017).

2017 TSPR 57

Finally, it is necessary to point out that in the case of the law in controversy, Act No. 7-2017, *supra*, this prohibition becomes more evident if we take into account that this law -in addition to establishing the details for the holding of the electoral events of June 11 and October 8, 2017- in its Art. XIII, Sec. 1, expressly establishes that the prohibitions and crimes related to the holding of this consultation shall be governed by the provisions established in Act No. 78-2011; meaning, the current Electoral Law of Puerto Rico. In this regard, the aforementioned Art. XII, Sec. 1, states the following:

(a) The prohibitions and offenses related to the holding of this consultation shall be governed by the provisions set forth in Act 78-2011, as amended, known as the "Puerto Rico Elections Act," and Act 222-2011, known as the "Puerto Rico Political Campaign Finance Oversight Act," except when they are improper or incompatible with the provisions of this Act or when this Act provides for a specific offense or penalty.

Needless to say, among these prohibitions, Act No. 78-2011 includes the prohibition to incur in expenses for the purchase of time and space in the media of the country, as well as for the purchase or distribution of propaganda or promotional materials for the purpose of exposing programs, projects, achievements, accomplishments, projections or plans of the agencies attached to the Executive Branch. The foregoing, as we have already mentioned, with the exception of those advertisements and press announcements expressly required by law and the campaigns of the Tourism Company, as well as those announcements that are used to disseminate information of public interest, urgency or emergency, which shall only be allowed with the prior authorization of the CEE.

In addition, when considering the aforementioned section of law, it is also necessary to take into consideration Section 11.001 of Act No. 78-2011 (16 LPRA sec. 4211), which provides that "[*a*]*ny referendum, consultation or plebiscite held in* **995** *Puerto Rico shall be governed by the special law approved for such purpose and by the provisions of this subtitle in everything necessary or pertinent for which said special law does not provide*." (Emphasis supplied). In other words, it is abundantly clear that the legislative intent was not to render Act No. 78-2011, *supra*, inoperative; on the contrary, the special statute itself recognizes its effectiveness. See, furthermore, Art. 18 of the Civil Code of Puerto Rico, 31 LPRA sec. 18 ("*Laws that refer to the same subject matter or whose object is the same, must be interpreted by referring to each other, inasmuch as what is clear in one of their precepts may be taken to explain what is doubtful in another*" [emphasis supplied]).

It is, therefore, in light of the aforementioned regulations that we proceed to dispose of the controversies before us.

## IV

In the instant case, the main argument of the NPP Electoral Commissioner, the Attorney General, the Senate of Puerto Rico and the House of Representatives of Puerto Rico is that although the State does not have a right to freedom of expression, it does have the duty and power to communicate with its citizens in order to inform them about governmental plans and other related matters. Under this premise, they allege that, contrary to the resolution of the CEE, the provisions contained in Section 12.001 of Act No. 78-2011, *supra*, are applicable exclusively during the year in which a general election is held. Furthermore, they argue that both the referendum and the plebiscite are events not defined as "*general election*" and that, therefore, the statutory prohibition does not apply during the celebration of such events. He is not right. As we have seen, similar arguments were already addressed and dismissed by this Court in **996** *P.P.D. v. Governor II*, supra, and *P.P.D. v. Governor I*, supra, respectively.

The controversy before our consideration was to determine whether outside the year in which the general elections are held in our country -and in view of the celebration of an event other than the aforementioned general elections, by virtue of a special law- the provisions of the electoral prohibition contained in Section 12.001 of Act No. 78-2011, *supra,* were enforceable. This, so that any advertisement that the State intended to disseminate through the media in the country would be evaluated by the entity designated by the CEE, namely, the JEA.

Pursuant to the aforementioned regulation -which is correct and does not merit reversal-, and in view of the fact that this case does not present additional elements to those already evaluated by this Court in the cases previously discussed, we understand that the CEE acted correctly in extending the provisions of Art. 12.001 of Act No. 78-2011, *supra*, to the electoral events to be held in the country on June 11, 2017 and, if necessary, to the one to be held on October 8 of the same year, namely, the plebiscite and referendum, respectively. We cannot endorse that the Commonwealth, through announcements by means of public broadcasting media, and with funds coming from the people, interfere with the prerogative of each one of our individuals. The right to vote corresponds to democracy itself and it is our duty to ensure that it is exercised freely and voluntarily in all electoral events. This being so, it is our judgment that the errors indicated were not committed.

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

## V

Before concluding, and in relation to one of the arguments outlined by the Attorney General, to the effect that applying the electoral ban would have the effect of undermining his power to communicate with the people on governmental **\*997** matters, we quote "*in extenso*" the ruling of this Court in *P.P.D. v. Governor II*, supra, pp. 923-924:

> The rights contained in the Bill of Rights are for individuals vis-à-vis the State. These rights cannot be extended to government speech because the rights are formulated in terms of what the government may not do in relation to the speech of individuals and not the other way around. Hence, the Government does not have a constitutionally protected right to free speech. The problem before us involves the basic axiom that the Puerto Rican decision-making process responds in its reality to the postulate of equality immersed in our Constitution, which seeks to achieve economic parity among political parties for the dissemination of ideas and messages in our country. See: *Marrero v. Mun. de Morovis*, 115 DPR 643, 646 (1984); *P.N.P. v. Tribunal Electoral*, supra, p. 753.

> On the other hand, governmental advertisements are not completely banned, since there is a mechanism provided by the E.E.C., which will pass judgment on the advertisement, to authorize them if appropriate. Such determination is subject to review by the courts. Let us remember that there is a compelling interest in protecting the constitutional right of equality, that there is an interest in the State and its [agencies] remaining neutral, thus safeguarding the principle of free choice of the people contained in Sec. 2 of Art. II of our Constitution, L.P.R.A., Vol. 1.

## VI

Having established the foregoing, and by way of epilogue, today we would have resolved that, *pursuant to the axiom of electoral equality in its economic equality aspect enshrined in the Constitution of the Commonwealth of Puerto Rico*, Section 12.001 of Act No. 78-2011, *supra*, is applicable to its full extent both to the *Plebiscite* to be held on June 11, 2017, as well as, if necessary, to the *Referendum* to be held on October 8 of the same year. General elections, plebiscites and referendums have as common denominator the exercise of the constitutional right **\*998** to suffrage. It is our function, as the ultimate interpreters of the Constitution, to ensure the purity of these processes. Through this dissenting opinion we have done so today.

## VII

For the reasons set forth above, we dissent from the decision of a majority of this Court. That being so, we would have affirmed the CEE's Resolution and, consequently, ordered the constitution of the JEA.

### Footnotes

1    At the time of the certification of this Opinion *per curiam*, the Puerto Rico Immediate Decolonization Act (Decolonization Act) is being amended as to the political status alternatives of Puerto Rico to be included in the plebiscite. However, none of this alters what this Court resolves today regarding the application of the electoral ban to electoral scenarios other than the one established by the Legislative Assembly in Sec. 12.001 of the Electoral Act of 2011, *infra*.

2    See, further, Paper by former Chief Justice of the Supreme Court, Hon. Federico Hernández Denton, *La separación de poderes y la interpretación constitucional en Puerto Rico*, XIII Encuentro de Presidentes y Magistrados de los Tribunales Constitucionales y de las Salas Constitucionales de América Latina, Mexico, 2006,                    pp.                    8-9,                    available                    at: http://www.scribd.com/doc/51523764/La-Separacion-de-Poderes-y-la-Interpretacion-Constitucional-en-Puerto-Rico-2006 (accessed, April 10, 2017).

3    Paradoxically, *Marrero v. Mun. de Morovis*, 115 DPR 643 (1984), *was cited by the majority of the Court in* 

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

Com. CNP v. CEE, 197 D.P.R. 914 (2017).

2017 TSPR 57

*P.P.D. v. Governor II*, 136 DPR 916 (1994), to sustain the existence of the misnamed "constitutional axiom".

[4]  Professor José Julián Álvarez documents the following on the first manifestation of the "axiom": "P.R.P. [v. ELA, 115 DPR 631 (1984)] is one of a long list of cases in which the Court has referred to an **alleged** 'axiom' or 'postulate' of equality among political parties. [...] It is interesting to trace the origin of that 'axiom'. Its first manifestation was an opinion of the Court issued by Judge Negrón García, *P.N.P. v. Tribunal Electoral*, 104 DPR 741 (1976). The NPP challenged an order of the Electoral Tribunal to inspect its books and other documents relating to its finances. The Tribunal concluded that the electoral body wished to inspect the finances of all parties and upheld the order. To justify it, it found support in the Electoral Code and stated:

"The basic axiom that flows in the Electoral Code that the Puerto Rican political decision-making process should respond in its reality to the mandate of equality enshrined in our Fundamental Law is valid; this is achieved by imposing limitations on the amount of political-party contributions. The constancy, preservation and presentation of data and reports on the matter, and the timely intervention and accounting of the same, are a natural and indispensable consequence to guarantee compliance with the legal limits established in matters of political finances'.

"Obviously, the Court ruled that the law *was justified* because it pursued the ideal of equality, not that its precepts were *compelled* by that ideal." (Emphasis in the original). J.J. Álvarez González, *Derecho constitucional de Puerto Rico y relaciones constitucionales con los Estados Unidos*, Bogotá, Ed. Temis, 2009, pp. 965-966, note 1.

[5]  See: *Morales Torres v. Superior Court*, 99 DPR 459 (1970); *Cardona v. Industrial Commission*, 57 DPR 397, 399 (1940).

[6]  It is not merely that the application of the electoral ban is necessary or pertinent as expressed in the dissenting opinion of Associate Justice Colón Pérez when he refers to Article 11.001 of the Electoral Law of 2011 (16 LPRA sec. 4211). Said article provides in the alternative: "Every referendum, consultation or plebiscite held in Puerto Rico shall be governed by the special law approved for such purpose and by the provisions of this subtitle in all that is necessary or pertinent to which said special law *does not provide*. (Emphasis supplied.) Id.

However, as *provided by* the Legislature in the Decolonization Act, the condition for the application of Sec. 12.001 of the Electoral Law of 2011 (16 LPRA sec. 4231) to proceed is that it be *compatible and applicable* before the holding of the plebiscite and, if applicable, the referendum. The provisions of a law cannot be read halfway. Even if the Decolonization Law had not provided anything, Art. 12.001 of the Electoral Law of 2011, *supra*, should not be extended to the plebiscite process because it is not a general election. As we shall explain, the legislature established this process in the State Elections Commission (CEE) only for general elections.

[7]  The original text of the bill, as passed by the House of Representatives and sent to the Senate, provided in its first sentence as follows:
"The agencies of the Government of Puerto Rico, the Legislative Assembly of Puerto Rico, and the Judicial Branch are prohibited from incurring in expenses for the purchase of time and space in the media and for the purchase and distribution of propaganda or promotional materials for the purpose of exposing their programs, projects, achievements, accomplishments, projections, or plans." House Substitute to S. 1863 of March 8, 2010, 3rd Regular Session, 16th Legislative Assembly, p. 188.

[8]  Id.

[9]  See also the Puerto Rico Political Campaign Finance Oversight Act, Act No. 222-2011, as amended, 16 LPRA sec. 621(28). This provision defines "general elections" as
"[t]he process by which on the first Tuesday after the first Monday of the month of November, every four years, the electors select the officials who are to hold elective public office in the Commonwealth of Puerto

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

Rico, including governor, resident commissioner, state legislators, mayors and municipal legislators."´Id.

[10]   For various provisions in this regard, see: Sec. 3.003 (16 LPRA sec. 4013) (distinguishing periods of meetings of the Commission according to the electoral event), Sec. 3.015 (16 LPRA sec. 4025); Sec. 9.003 (16 LPRA sec. 4143) (establishes holidays for a general election and distinguishes what happens in the case of a referendum, plebiscite, consultation, or special election); Sec. 9.013 (16 LPRA sec. 4153); Sec. 10.019 (16 LPRA sec. 4209); Secs. 11.001-11.010 (16 LPRA secs. 4211-4220).

[11]   For other provisions which would be meaningless if the concept of *general elections* were to include a plebiscite or referendum, see also: Arts. 5.008, 6.012, 6.013, 6.016, 7.001, 7.014, 8.001, 8.004, 8.005, 8.007, 8.009, 8.012, 8.023, 9.001, 9.010, 9.011, 9.044, 10.013, 10.015 and 10.019 of the Election Act of 2011 (16 LPRA secs. 4048, 4072, 4073, 4076, 4091, 4104, 4111, 4114, 4115, 4117, 4119, 4122, 4133, 4141, 4150, 4151, 4184, 4203, 4205 and 4209, respectively).

[12]   For example, Secs. 12.003, 12.005, 12.006, 12.009, 12.024 of the Election Law of 2011 (16 LPRA secs. 4233, 4235, 4236, 4239, 4253a, respectively), among others, would be applicable.

[1]   *P.I.P. v. C.E.E.* 120 DPR 580, 613 (1988), citing B.M. Cardozo, *La naturaleza de la función judicial*, Buenos Aires, Eds. Arayú, 1955, p. 64.

[2]   Originally, this Court had expressed that the axiom of electoral equality arose from Art. IX, Sec. 6 of our Constitution, a transitory provision that recognized the enjoyment of the rights recognized in the Electoral Law to those parties that complied with the minimum requirements to be registered. LPRA, Vol. 1. However, we also recognized that this principle of constitutional equality was not only contained in the aforementioned transitory provision, but also arose from our Bill of Rights. *P.R.P. v. E.L.A* 115 DPR 631, 637 (1984). The latter constitutional basis, in particular, Art. II, Sec. 2 of our Constitution, has since prevailed as the main legal source of the electoral equality axiom. LPRA, Vol. 1.

[3]   See J.J. Álvarez González, *Derecho constitucional de Puerto Rico y relaciones constitucionales con los Estados Unidos*, Bogotá, Ed. Temis, 2009, pp. 965-967 (discussing the jurisprudential history of the electoral equality axiom).

[4]   This Court has used the provisions of Art. VI, Sec. 9 of our Constitution as the constitutional basis for prohibiting advertising with political-partisan content:
"Public property and funds shall only be disposed of for public purposes and for the support and operation of the institutions of the State, and in any case by authority of law." LPRA, Vol. 1, ed. 2016, p. 444. See *P.P.D. v. Governor I*, 139 DPR 643, 688 (1995).

[5]   "If our courts are unable to maintain a consistent and justifiable course on this issue, they would do well to abandon the enterprise. The credibility of the judicial process is a much more important value%7D ". Alvarez Gonzalez, *op. cit.* p. 967.

[6]   "[W]e have identified three circumstances that, as an exception, justify setting aside a precedent: '(1) if the prior decision was clearly erroneous; (2) if its effects on the rest of the order are adverse; and (3) if the number of persons who relied on it is limited%7D ". *People v. Sánchez Valle et al.*, 192 DPR 594, 645-646 (2015), quoting *People v. Camacho Delgado*, 175 DPR 1, 20 sc. 4 (2008).

[7]   The jurisprudence of this Court abounds in examples where specific guarantees and protections are recognized within broader constitutional rights, such as due process of law, privacy, human dignity, equal protection of the laws, freedom of expression, the right to vote, freedom of the press, and freedom of worship. See, *e.g.*: *Arroyo v. Rattan Specialties, Inc.* 117 DPR 35 (1986) (the application of the right to privacy

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

Com. CNP v. CEE, 197 D.P.R. 914 (2017).

2017 TSPR 57

between private parties); *Soto v. Srio de Justicia*, 112 DPR 477 (1982) (right of access to information as part of freedom of expression); *Figueroa Ferrer v. E.L.A., 107 DPR 250 (1978).* 107 DPR 250 (1978) (right to divorce as part of the right to privacy); *Pueblo v. Dolce* DPR 422 (1976) (recognition of a broader bill of rights in the protection against searches and seizures).

[8]  See, also: *Machinists v. Street*, 367 US 740, 788 (1961), dissenting opinion of Justice Black ("Probably no one would suggest that Congress could, without violating [the First] Amendment [...] create a fund to be used in helping certain political parties or groups favored by the Government to elect their candidates or promote their controversial causes"); *Lathrop v. Donohue, 367 US 820, 853 (1961), concurring opinion of Justice Harlan ("[A] State could not 'create a fund to be used in helping certain political parties or groups favored' by the Government to* elect their candidates or promote their controversial causes"). *Donohue*, 367 US 820, 853 (1961), concurring opinion of Justice Harlan ("[A] State could not 'create a fund to be used in helping certain political parties or groups favored' by it 'to elect their candidates or promote their controversial causes' ").

[9]  "The prohibitions and offenses related to the holding of [the] consultation, shall be governed by the provisions set forth in Act 78-2011, as amended, known as the 'Puerto Rico Electoral Act' and Act 222-2011, known as the 'Act for the Oversight of Political Campaign Financing in Puerto Rico,' except when they are improper or incompatible with the provisions of this Act or when this Act provides for specific offense or penalty." Art. XIII, Sec. 1(a) of Act No. 7-2017.

[10]  As mentioned before, a similar interpretation was made by this Court in *P.P.D. v. Governor II*, 136 DPR 916 (1994). The special law that established the referendum at that time contained a provision according to which everything necessary, pertinent and compatible with the Electoral Law, and for which the special referendum law had not provided, would be applied in a supplementary manner. Id. at 924. In ruling that the electoral prohibition constituted a constitutional imperative, this Court concluded that Art. 8.001 (which regulated the electoral prohibition at that time) "was compatible and consequently applicable to the Referendum Enabling Law. Id. at p. 926.

[1]  The procedure followed to certify this opinion has been, moreover, rushed despite the fact that we are dealing with a controversy of constitutional importance, where the majority overturns advanced jurisprudence of this Court. This opinion has been certified in just a few hours, without due deliberation and in a frankly imprudent process. Let me explain.

Last April 11, 2017, a draft opinion was circulated in this case and it was indicated that there was interest in certifying the Opinion on Monday, April 17. On that date, the Judge rapporteur in the opinion that we certify today circulated a dissenting opinion, which obtained the endorsement of a majority of the members of the Court. That same afternoon, the file was referred to him, as is customary, so that he could reformulate his opinion and circulate it again.

To that effect, the rewritten brief was circulated yesterday morning and the Judge Rapporteur indicated that it would be certified that same afternoon at 5:00 p.m. It should be noted that on Monday afternoon, April 17, I expressed in writing that I intended to subscribe a dissenting opinion. Therefore, upon receiving the communication indicating that the certification would be in the afternoon hours of the day in which the reformulated paper had been circulated, I requested, again in writing, that the proposed schedule be reconsidered. This request was made at 11:12 am. The reporting Judge remained silent and at 3:42 p.m. circulated a memorandum reiterating that he intended to certify it that same afternoon. This procedure reflects a regrettable lack of the most elementary principles of civility and civility, and is not at the level that would be expected from a member of this Court.

Fortunately, one member of that majority considered it prudent and reasonable to postpone the certification for 24 hours, as had been proposed yesterday. Thus, the 5 votes necessary to certify the report today were obtained.

Frankly, I do not believe that the excessive "rush" to certify is justified. This is even more evident when we know that the law we are evaluating is being amended at this very moment by the Legislature. In fact, even its

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

name has been changed, and after its approval it must be sent to the U.S. Department of Justice for review. What is the urgency? This course of action could very well lead someone to think that there is an interest in reacting to the public backlash caused by the letter sent by the U.S. Department of Justice.

[2]   On the other hand, it was my understanding that the law is rogatory and that motions not argued by the parties, particularly of a constitutional nature, will not be heard by this Court. See, for example: *E.L.A. v. Northwestern Selecta*, 185 DPR 40 (2012); *Abengoa, S.A. v. American Intl. Ins.* 176 DPR 512 (2009) (it is a principle of law rooted in our system of law that, on appeal, we will refrain from adjudicating issues not raised before the trial court); *Echandi Otero v. Stewart Title*, 174 DPR 355 (2008) (it is a standing rule in our jurisdiction that on appeal we will refrain from adjudicating issues not raised before the trial court); *Delgado, Ex parte*, 165 DPR 170 (2005); *Dorante v. Wrangler of P.R., 145 DPR 408, 448, 448 (2005); Echandi Otero v. Stewart Title* 174 DPR 355 (2008) (it is a standing rule in our jurisdiction that on appeal we will refrain from adjudicating issues not raised before the trial court). 145 DPR 408, 443 (1998); *Trabal Morales v. Ruiz Rodriguez*, 125 DPR 340 (1990) (thus adhering to the existing rule that on appeal we will refrain from adjudicating issues not raised in the first instance); *Sanchez v. Eastern Air Lines, Inc.* 114 DPR 691 (1983); *Santiago Cruz v. Hernández Andino*, 91 DPR 709, 712 (1965). At least, that was the rule until today. Unless, in the future, the sway of the tide requires a different result when a new chapter of this *Chronicle* is written.

[3]   Likewise, the lawsuit of August 12, 1994 filed by the Popular Democratic Party also challenged the constitutionality of the law in question. This lawsuit eventually became appeal CE-1994-588 which was consolidated by hearing *P.P.D. v. Governor II*, 136 DPR 916 (1994).

[1]   The principle of electoral equality contains multiple guarantees applicable to various contexts in democracy, which are not limited to citizen equality in access to public office. L. Castillo González, *Los derechos de la militancia partidista y la jurisdicción*, in *Democracia interna y fiscalización de los recursos de los partidos políticos*, IFE, México, D.F., 2006, 53, 59 and 73; R. Dworkin, *Virtud soberana: la teoría y la práctica de la igualdad*, Barcelona, Ediciones Paidós Ibérica, S.A., 2003. Likewise, it can be quantitatively assessed in the equality of the vote. Another dimension where we find the management of equality is in the access to electoral justice. Also, this principle is used for the equality of resources when electoral financing is studied. J. Woldenberg, *Vida interna de los partidos políticos y fiscalización de los recursos, nuevos retos de la autoridad electoral*, in *Democracia interna y fiscalización de los recursos de los partidos políticos, op. cit.* See C.M. Rosales, *Mecanismos de financiamiento político y el control de las campañas electorales*, 44 (No. 3), Rev. UIPR 515, 525 escs. 30 y 31 (2010).

[2]   See Universal Declaration of Human Rights, G.A. Res. 217(III) A, U.N. Doc. Res. 217(III) A, U.N. Doc. A/RES/217(III) (Dec. 10, 1948), art. 21, http://www.un.org/es/comun/docs/?symbol=A/RES/217(III); International Covenant on Civil and Political Rights, U.N. Doc. Res. 2200(XXI) A, U.N. Doc. A/RES/200 (XXI) A (Dec. 16, 1966), art. 25, http:// www.un.org/es/comun/docs/?symbol=A/RES/2200(XXI) & Lang=S & Area=RESOLUTION. See, further: A.R. Dalla Vía, *Los derechos políticos y electorales en la jurisprudencia del Tribunal Europeo y la Corte Interamericana de Derechos Humanos*, Anales de la Academia Nacional de Ciencias Morales Y Políticas (2012), http:// www.ancmyp.org.ar/user/files/13Dallav%C3[a12.pdf; A.R. Dalla Vía, *Derechos políticos, normativa electoral y equidad en los procesos electorales*, in Cuaderno de Capel 57, Construyendo las Condiciones de Equidad en los Procesos Electorales, Inter-American Institute of Human Rights (2012), http://www.corteidh.or.cr/tablas/r29275.pdf. For a discussion of human rights and economic issues in political processes at the international level, see generally T.K. Kuhner, *The Democracy to Which We Are Entitled: Human Rights and the Problem of Money in Politics*, 26 Harv. Hum. Rts. J. 39 (2013).

[3]   See, for example: *Acevedo Vilá v. C.E.E.* 172 DPR 971 (2007); *Miranda v. C.E.E.* 141 DPR 775 (1996).

[1]   At the time the controversy before our consideration arose, only two election commissioners were present, namely, one for the Popular Democratic Party and another for the New Progressive Party. This was as a



I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

Com. CNP v. CEE, 197 D.P.R. 914 (2017).

2017 TSPR 57

    result of the results of the general elections held in November 2016.

[2]    As relevant here, Amendment XIV of the Constitution of the United States of America provides as follows: "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws. Emda. XIV, U.S. Const., LPRA, Vol. 1, ed. 2016, pp. 207-208.

[3]    The aforementioned Sec. 8.001 of the Puerto Rico Electoral Act of 1977, Act No. 4 of December 20, 1977 ( 16 LPRA sec. 335116 LPRA sec. 3351 (ed. 2009)), repealed by Sec. 12.001 of Act No. 78-2011, Electoral Act of the Commonwealth of Puerto Rico, provided as follows:
"The agencies of the Government of Puerto Rico, the Legislative Assembly of Puerto Rico, and the Judicial Branch are hereby prohibited, as of January 1 of the year in which a general election is to be held and until the day following the date on which the election is to be held, from incurring expenses for the purchase of time and space in the public media for the purpose of publicizing their programs, projects, achievements, accomplishments, projections, or plans. Exceptions to this provision are those press announcements and advertisements expressly required by law.
"Likewise, those advertisements that are used to disseminate information of public interest, urgency or emergency are exempted from the above provision, which shall only be allowed with prior authorization to that effect from the State Elections Commission."

[4]    Such expressions, in reference to former Section 8.001 of the Electoral Law of 1977, *supra*, repealed by current Section 12.001 of Act No. 78-2011.

[5]    There, the Senate Special Committee on Government Reform stated that the bill -eventually, after its approval and signature, converted into Act No. 78-2011- had as one of its purposes, among others, "[t]o *guarantee to the voters, the reduction of public spending on political campaigns, as well as to minimize the intervention with the will of the electorate of elements outside the electoral process*". First Report of the Senate Special Committee on Government Reform rendered with amendments on the House Substitute to P. C. 1863 of November 10, 2010, 4th Regular Session, 16th Legislative Assembly, p. 25.

[6]    It is necessary to point out that, contrary to what was stated by the Government of Puerto Rico in its Argument, in *P.P.D. v. Governor I*, 139 DPR 643 (1995), the factual situation was different from the present one. There, although the use of public funds to pay for the publication of advertisements was explicitly challenged, it did *not occur in the context of a general election, referendum, plebiscite or any other electoral event. On the* contrary, it occurred in the context of a year in which the electoral prohibition contained in former Art. 8.001 of the Electoral Law of 1977 was inapplicable, since it was only in effect during the occurrence of an electoral event, whether it was a general election, a plebiscite or a referendum, for example.

---

**End of Document**                                              © 2021 Thomson Reuters. No claim to original U.S. Government Works.

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.