CERTIFIED TRANSLATION

**Municipality of Mayaguez v. Lebron, 167 D.P.R. 713 (2006)**
2006 TSPR 70

167 D.P.R. 713, 2006 WL 1147762 (P.R.), 2006 TSPR 70

MUNICIPALITY OF MAYAGÜEZ, appellee,

v.

EDGARDO LEBRÓN d.b.a. LEBRÓN & ASSOCIATES, petitioner.

In The Puerto Rico Supreme Court

*Number: AC-2004-37*

**Synopsis**

WRIT OF APPEAL to review a JUDGMENT from *Jocelyn López Vilanova, Roberto Córdova Arone,* and *Yvonne Feliciano Acevedo*, Judges of the Court of Appeals, in which a Judgment of the Court of First Instance that granted a petition for suspension of arbitration filed by the appellee herein, Municipality of Mayagüez, was confirmed. A *judgment is hereby issued in which the appellee is revoked and, consequently, the claim is dismissed.*

*Rebeca Barnés Rosich*, counsel for appellant; *Carlos E. Cardona* and *Alberto O. Jiménez*, counsel for appellee.

ASSOCIATE JUDGE RODRÍGUEZ RODRÍGUEZ issued the opinion of the Court.

We must decide whether a contractual provision about arbitration is enforceable against a municipality when it was not part of the construction contract between the municipality and a private individual, but was included in the specifications document according to which, according to the contract, the work was to be performed.

**I**

The facts of this case arose out of the remodeling of the Palacio de Recreación y Deportes of the Municipality of Mayagüez (Municipality). On January 24, 1995, the Municipality hired the architectural firm Rigau & Penabad to prepare the documents related to the remodeling. The firm prepared, among other things, a *Specifications Document*. This included several American Institute of Architects (AIA) model documents, including one entitled *General Conditions of the Contract for Construction, AIA Document A201-1976* (General Conditions, or A201). Appendix to the Civil Appeal (Appendix), pp. 96-114.

The Municipality twice conducted the bidding process to select the contractor for the remodeling. On both occasions the bidding processes were declared void. Prior to the second bidding process, the Municipality informed interested parties in the *bid notice* that "[a]ll necessary information, as well as all contract documents and bidding forms, may be obtained at the Department of Maintenance, Beautification, and Urban Development". Appendix, p. 906. At the pre-bid meeting held for this project, it was indicated that "the book of specifications prepared for the first bidding of this project *is fully in effect* and is not altered in any way as a consequence of the revisions to which the design was submitted." (Emphasis ours.) This clarification is included in the corresponding Minutes, the content of which "*becomes part of the general conditions of the technical specifications of the project and, consequently, of the bidding and construction documents.*" (Emphasis ours.) Appendix, pp. 910-911.



I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

However, as we indicated, both bidding processes were declared void in 1996, [1] as there was only one bid and it exceeded the available funds. The petitioner, Edgardo Lebrón (Lebrón, or petitioner), was the only bidder on both occasions. Therefore, on November 15, 1996, the Municipality authorized the matter to be taken care of administratively, and then entered into negotiations with the petitioner. Construction Contract, Appendix, pp. 64-75; Letter of March 11, 1996, Appendix, p. 907; Resolution No. 38, Series 1996-1997, Appendix, pp. 930-933.

On May 30, 1997, the parties executed a construction contract. The first article of this contract provided that the Municipality would

... [hire] the services of [petitioner], to perform [sic] the First Phase of the remodeling works of the Palacio de Recreación y Deportes de Mayagüez, *as described in the plans and specifications submitted by the Department of Maintenance, Beautification and Urban Development and accepted by the Contractor* ..... (Emphasis ours.) Appendix, p. 64. [2]

No other reference to the Specifications Document or to arbitration appears in the aforementioned contract. Accordingly, the petitioner filed a *Demand for Arbitration* with the American Arbitration Association on January 2, 2002. It cited as the source for the arbitration Art. 7.9 of the General Conditions included in the Specifications Document. Appendix, p. 107. There is no dispute that said document was the one used during the bidding process and that Lebrón obtained its copy from the Department of Maintenance, Beautification, and Urban Development of the Municipality.

In response to Lebrón's Demand for Arbitration, the Municipality filed a "Petition for Stay of Arbitration and Request for Immediate Hearing" on March 18, 2002, with the Court of First Instance. It alleged that there was no arbitration agreement between the parties. Appendix, pp. 60-63.[3]

The Court of First Instance granted the Municipality's complaint, concluding that there was no contractual obligation between the parties to submit to arbitration.[4] Dissatisfied, the petitioner appealed to the Court of Appeals, whose judgment affirmed that of the Court of First Instance. [5] Appendix, pp. 53-59. It then resorted to us through a writ of appeal, which we accepted as a petition for *certiorari* and issued the requested writ of *certiorari*. [6] Given the appearance of both parties, and as we are in a position to issue a ruling, we proceed to do so.

**II**

[1] Our law of governmental obligations and contracts starts from a simple premise: governmental entities are subject to the same rules as other persons and entities. See, *e.g.*: *Campos v. Cia. Fom. Ind.*, 153 D.P.R. 137, 149 (2001); *Mun. de Ponce v. Gobernador*, 136 D.P.R. 776, 787 (1994); *Plan Bienestar Salud v. Alcalde Cabo Rojo*, 114 D.P.R. 697, 699 (1983); *Zequeira v. CRUV*, 83 D.P.R. 878, 880-881 (1961); *Rodriguez v. Municipio*, 75 D.P.R. 479, 494 (1953). Obviously, this rule allows for multiple exceptions, among them, that every contract with a municipality must be in writing. See *Lugo v. Municipio Guayama*, 163 D.P.R. 208 (2004). There are no legal provisions in force that impose requirements or other special rules on the arbitration agreement between a municipality and a private party. Therefore, we must examine the general law with respect to arbitration agreements.

**III**

[2] Generally, our legal system allows the parties to a contract to agree to arbitrate potential disputes related to their contract. This power arises principally from the Commercial Arbitration Act (Arbitration Act), which provides that

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

the parties "may include in a written agreement a provision for settlement by arbitration of any controversy which may hereafter arise between them out of or in connection with such agreement." 32 L.P.R.A. sec. 3201. Such agreements, it is provided, shall be valid, enforceable and irrevocable "except upon any grounds that may exist under the law for the revocation of any agreement." Art. 1 of Public Law No. 376 of May 8, 1951 (32 L.P.R.A. sec. 3201). Thus, we are dealing with a figure of a contractual nature. *Rivera v. Samaritano & Co., Inc.*, 108 D.P.R. 604, 606-607 (1979); *U.C.P.R. v. Triangle Engineering Corp.*136 D.P.R. 133, 144 (1994).

[3] Conventional arbitration, naturally, is enforceable only when it has been agreed upon, and the cited provision of the Arbitration Act clarifies that such agreement must be in writing. *Mun. de Ponce v. Gobernador*, supra, p. 783; *Crufon Const. v. Aut. Edif. Públs.*156 D.P.R. 197 (2002). If there is a dispute regarding the obligation to arbitrate, the parties have the right to have it settled in court. Art. 4 of the Arbitration Act, 32 L.P.R.A. sec. 3204. We have pointed out that such controversy admits three modalities. It may refer to whether there is an arbitration agreement, whether such agreement covers a certain controversy, and whether such agreement covers a dispute over the duration or expiration of the contract. *U.C.P.R. v. Triangle Engineering Corp.* supra, p. 144; *World Films, Inc. v. Paramount Pict. Corp.*125 D.P.R. 352, 361 sc. 9 (1990); *National R.R. Passenger Corp. v. Boston & Maine Corp.*850 F.2d 756 (D.C. Cir. 1988).

[4] Now, since there is a strong public policy in favor of arbitration, any doubt as to whether it is appropriate must be resolved in the affirmative. *Paine Webber v. Soc. de Gananciales*, 151 D.P.R. 307, 312-313 (2000); *U.C.P.R. v. Triangle Engineering Corp.* supra, pp. 141-143; *World Films, Inc. v. Paramount Pict. Corp.* supra, pp. 361-362; *McGregor-Doniger v. Superior Court*, 98 D.P.R. 864 (1970). We have even stated that "in the face of an arbitration agreement, judicial abstention is prudent, even though such intervention is not prohibited." *U.C.P.R. v. Triangle Engineering Corp.* supra, p. 142. We have also noted that under the Federal Arbitration Act, 9 U.S.C.A. sec. 1 *et seq.*[7] where there is a valid and enforceable agreement to arbitrate, courts lack discretion with respect to its effectiveness. *Paine Webber v. Soc. de Gananciales*, supra, pp. 311-312.

[5] B. In the field of commercial construction contracts, arbitration clauses do not require specific consent, but may be incorporated by reference in the main contract. This has been understood as such in most American jurisdictions, to whose case law we turn since our Arbitration Act was born from American law. See, *e.g.: T.R. Mills Contractors, Inc. v. WRH Enterprises*, 93 S.W.3d 861, 870-871 (2002); *Liberty Mgmt. & Constr. v. Fifth Ave. & Sixty-Sixth St. Corp.*208 A.D.2d 73 (1995); *ADC Construction Co. v. McDaniel Grading, Inc.*338 S.E.2d 733 (1985). Even the casuistry of some jurisdictions suggests that incorporation does not require sacramental words or the signing of the incorporating document, even when arbitration requires a written agreement.[8]

The case of *Liberty Mgmt. & Constr. v. Fifth Ave. & Sixty-Sixth St. Corp.* supra, illustrates the above-mentioned standard. In his bid proposal, a contractor expressed that he had reviewed and understood the plans, specifications, and instructions related to with a remodeling project. He also expressed his willingness *to perform the work in strict accordance with the contract documents.* These included a model contract from AIA that incorporated, in turn, AIA's General Conditions. The owner accepted a revised version of the proposal by letter dated November 18, 1991. Although the contractor did not sign the AIA documents, it was alleged he had accepted them in another letter dated

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

December 20, 1991. The court ruled that the arbitration clause contained in the General Conditions was enforceable against the contractor:

> Thus, under either version of the agreement, plaintiff's - the agreement allegedly completed by appellant's December 16, 1991 letter accepting plaintiff's November 18, 1991 proposal, as subsequently revised - or appellant's - the December 20, 1991 AIA contract, which plaintiff allegedly accepted by its January 2, 1992 letter - plaintiff agreed to arbitrate. *Liberty Mgmt. & Constr. v. Fifth Ave. & Sixty-Sixth St. Corp.* supra, p. 78. [9]

A similar approach has been applied in other industries.[10] Although some courts have been less flexible,[11] the case law cited is of great persuasive value given our public policy that favors arbitration.

### IV

[6] The main objective of contractual interpretation is to determine what was the real and common intention of the parties. *Merle v. West Bend Co.* 97 D.P.R. 403, 409-410 (1969); *Carrillo Norat v. Camejo*, 107 D.P.R. 132, 138 (1978); *Marcial v. Tomé*, 144 D.P.R. 522, 537 (1997); *Unisys v. Ramallo Brothers*, 128 D.P.R. 842, 852-853 (1991); Ramírez, *Segal & Látimer v. Rojo Rigual,* 123 D.P.R. 161, 173-174 (1989). This analysis begins and ends with the terms of the contract, as long as they are clear and leave no doubt as to its intent. Art. 1233 of the Civil Code, 31 L.P.R.A. sec. 3471; *Trinidad v. Chade*, 153 D.P.R. 280, 289 (2001); *Marcial v. Tomé*, supra, p. 536; *Soc. de Gananciales v. Vélez & Asoc.,* 145 D.P.R. 508, 517 (1998); Unysis *v. Ramallo Brothers,* supra, p. 852. Thus, we have indicated that "the tendency of the courts is to limit interpretation to cases in which it becomes truly necessary," recognizing, however, that "[i]nterpreting whether a contract is clear presupposes matching its wording to the intent of the parties." *Marcial v. Tomé*, supra, p. 537. See also, *e.g., Merle v. West Bend Co.* supra, pp. 410-411.

[7] To determine the true and common intention of the parties, we turn to a series of interpretative rules. On the one hand, it is necessary to examine the evidence extrinsic to the contract. This evidence must refer, mainly, to the acts of the parties that are contemporaneous and subsequent to the contract. Art. 1234 of the Civil Code, 31 L.P.R.A. sec. 3472. This does not preclude, however, an examination of all the circumstances indicative of the contractual intent, including the occasion, circumstances, persons, and agreement that was attempted to be carried out, as well as the acts that took place while the contract was being prepared. *Unysis v. Ramallo Brothers*, supra, p. 853; *Ramírez, Segal & Látimer v. Rojo Rigual,* supra, p. 174; Merle *v. West Bend Co.* supra, p. 410; *Coop. La Sagrada Familia v. Castillo*, 107 D.P.R. 405 (1978).

[8] On the other hand, several principles guide the interpretation of the words used to express the contract. Secs. 1239 and 1240 of the Civil Code, 31 L.P.R.A. secs. 3477 y 3478 are relevant to the instant case. The former establishes that we must employ the use and custom of the place or industry pertinent to the contract to clarify what has been agreed upon and to supply what has not been agreed upon. *G.H. Hammond Co. v. Diego Agüeros & Co.* 30 D.P.R. 610 (1922); *Soc. de Gananciales v. Serrano*, 145 D.P.R. 394, 399 sc. 2 (1998); J. Puig Brutau, *Fundamentos de Derecho Civil*, 3rd ed, Madrid, Ed. Bosch, 1988, T. II, Vol. 1, p. 237. On the other hand, the aforementioned Art. 1240 establishes that the ambiguity of a contract or of its clauses must be resolved against the one who caused it,

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

even when it is not a contract of adhesion. See, *e.g.*: *Coop. La Sagrada Familia v. Castillo*, supra, p. 418; *Zequeira v. CRUV*, supra, p. 880.

**[9]** It should be added that the principle of loyalty affects the interpretation of contracts. That is, when it is necessary to determine what was the common will of the contracting parties, it is understood that they wanted to express themselves as a person of good faith would have done. In *Negrón Rivera and Bonilla, Ex parte*, 120 D.P.R. 61, 75 (1987), we cite Luis Díez-Picazo, in his work *Fundamentos del Derecho Civil Patrimonial*, Madrid, Ed. Tecnos, 1979, Vol. I, Ch. XI, Sec. 45, pp. 251-252, who explains this rule:

> "[Contracts] must be interpreted based on good faith ... [which is] a [*standard*] of conduct in keeping with the ethical imperatives required by the prevailing social conscience ..... Contracts must be interpreted presupposing loyalty and correctness in their drafting, that is, on the understanding that the parties in drawing them up intended to express themselves in the normal manner proper to honest people and not seeking circumlocutions, deliberate confusions or obscurities ..... The contract must be interpreted in such a way that the meaning attributed to it is the most suitable for a fair development of the contractual relations and for reaching the contractual consequences required in accordance with ethical standards. Good faith also imposes the application of the ideas of trust and self-responsibility in the interpretation ..... Declarations of will must be interpreted in the sense most in conformity with the confidence that they may have aroused in accordance with good faith. " (Emphasis deleted and brackets supplied and in the original.)

**[10]** See also: *Ramírez, Segal & Látimer v. Rojo Rigual,* supra, pp. 174-175; L. Díez-Picazo and A. Gullón, *Sistema de Derecho Civil, 6th* ed. It should be added that the principle of loyalty in contractual drafting includes a duty of diligence, since it presumes "a *correctness* in its very drafting" and an expression "according to *the normal way typical* of honest people."

**[11]** Finally, the dispute at hand requires clarification regarding the connection between contractual interpretation and the hermeneutical rules outlined above. We have reiterated that the main objective of such interpretation is the true and common intention of the parties. Yet, the hermeneutical rules established by the Civil Code—Arts. 1233-1241 (31 L.P.R.A. secs. 3471-3479)—"are authentic legal rules, not maxims of experience, and as such they bind the interpreter (judges, arbitrators)." Díez-Picazo and Gullón, *op. cit.* p. 88 (referring to Arts. 1,281-1,289 of the Spanish Civil Code).

**[12]** This means, at the very least, that if the interpretative rules clearly and consistently favor one interpretation over another, the former should prevail. For example, the version that clearly emerges from the relevant acts and circumstances must prevail over the one that arises from the testimony of a contracting party regarding its own intention, and the interpretation derived from the principle of loyalty must overcome one with greater support from the evidence, but clearly contrary to it. While the main objective of contractual hermeneutics is the true and common intention of the parties, the indispensable judicial compass are the interpretative canons.



I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

## V

We have seen that arbitration agreements with a municipality are subject to the general law of obligations and that an arbitration agreement is susceptible to incorporation by reference in a written contract. The instant case does not present any controversy with respect to the validity and effectiveness of the construction contract between the Municipality and Lebrón. Therefore, the only question to be resolved is whether said contract incorporated, by reference, the arbitration article of the General Conditions.

Having thus defined the question, we note that the only pertinent contract provision establishes that the Municipality hires Lebrón to carry out the remodeling "as described in the plans and specifications submitted by the Department." We rule that, given the circumstances of this case, this clause is sufficient to incorporate the A201 document and its Art. 7.9 of the General Conditions, on arbitration, Appendix, p. 107.

A. The scope of the cited provision allows for more than one interpretation. On the one hand, it could mean that the remodeling work should be carried out in accordance with the plans and specifications, i.e., in accordance with the technical provisions contained therein. This interpretation has the effect of excluding any reference to the non-technical provisions of the Specifications Document, which contains the General Conditions.

On the other hand, the cited provision could mean that the Municipality "contracts the services of the [petitioner] .... as described in the plans and specifications submitted by the Department"; that is, the phrase "as described in the plans and specifications" modifies, not the description of the work, but rather the description of the contract. So interpreted, the clause refers to the entire contents of the Specifications Document, including A201 and Art. 7.9 of the General Conditions, *supra*, on arbitration.

Given these two possible interpretations, we must conclude that we are faced with a legal ambiguity. It will be recalled that the ambiguity of a contract does not respond exclusively to its words, but we are obliged to "match its wording to the intention of the parties," especially when there is a strong public policy in favor of arbitration. To this end, we turn to the contractual text and to the extrinsic evidence, not just evidence related to the acts of the parties who are contemporaneous and subsequent to the contract, but also the evidence that which refers to the acts in preparing the contract and to the occasion, circumstances, persons and agreement that was intended to be carried out.

The facts of this case reveal an ambiguity in the parties' intent regarding the incorporation of the Specifications Document. During the bidding processes, the Municipality indicated that such document would be part of the contract. Lebrón participated in these processes and received the specifications from the Municipality. Although both bidding processes were declared void, the parties executed the construction contract a few months later, but without first discussing the arbitration issue. The contract made reference to the Specifications Document, a reference that was not expressly limited to the technical aspects of the document. These actions reveal an ambiguity as to whether both parties wanted to incorporate the entire contents of the specifications.

On the other hand, the examined U.S. case law suggests that the AIA A201 document is common in the U.S. design-build industry. We will then see that the Court of First Instance made an analogous assessment about the local industry. The parties are no strangers to such industries, and the Municipality was assisted by its legal division.

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

Moreover, the first page of the A201 document conspicuously warns on its first page: "this document has important legal consequences; consultation with an attorney is encouraged with respect to its modification. "Appendix, p. 96. Therefore, the occasion, the circumstances, the people, and the agreement that was attempted to be carried out confirm our conclusion, as we will now discuss.

B. Since the contractual reference to "the plans and specifications submitted by the Department" is ambiguous, we rule that the construction contract refers to all the provisions of the Specifications Document, a document that includes the General Conditions and its Art. 7.9 on arbitration, *supra.*

At least four considerations support this conclusion. First, if there is any doubt as to the obligation to arbitrate, that obligation should be recognized. Second, ambiguity in a contract or its clauses should not favor the party who caused it. The parties stipulated in the *Preliminary Conference between counsel Report* that Lebrón & Associates was not involved in the drafting of the construction contract, and the Municipality admits that it was drafted by one of its officers, namely the legal counsel in charge of the contracts unit. Appendix, p. 764; Pleading of the Municipality of Mayagüez, pp. 4-5 and 12-13; Stipulated Pleading, Appendix, pp. 984-986. Therefore, the ambiguity of the incorporation clause should not favor the Municipality.

Third, usage and custom serve to specify and supplant the ambiguous intention of the contracting parties. In the conclusions of law of its Judgment, the Court of First Instance expressed the following:

> There is no express or oral agreement; on the contrary, what emerges is an inclusion of arbitration in accordance with *a routine procedure* when preparing the Specifications Documents required by the design contract, plans and other documents subscribed with the firm Rigau & Penabad Architects. (Emphasis ours.) Appendix, p. 58.

That is, the sentencing court understands that including the A201 document in the Specifications Document is routine in the local design and construction industry. This does not mean that every construction contract would be understood to be agreed upon with the document used routinely. But when the contract is in writing and make an ambiguous reference to a group of documents, and the contract contains a document that is often used in its entirety in the relevant industry, usage and custom favor full incorporation of the document into the contract.

The principle of good faith leads to the same result. In interpreting the construction contract, we assume " 'a loyalty and correctness in its very drafting' ," which means that the parties " 'intended to express themselves in the normal way typical of honest people, without seeking circumlocutions, deliberate confusions, or obscurities .... ' ." (Emphasis deleted.) *Negrón Rivera and Bonilla, Ex parte*, supra, p. 75. Given that the Municipality had included the General Conditions in the Specifications Document, that the construction contract referred to such document, and that it is a multi-million-dollar legal transaction, only a disloyal person would have intended to limit its scope without expressly stating it.

C. The Municipality's arguments do not change the result we have reached. It holds that it did not intend to bind itself to arbitration.[12] Its conclusion is supported, principally, by two facts: first, that the construction contract was drafted with the purpose of incorporating only the technical aspects of the Specifications Document; second, that the officials authorized to bind the Municipality were unaware of the existence of Art. 7.9 of the General Conditions,

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

*supra*, on arbitration, because the General Conditions were included in the Specifications Document without their authorization and knowledge. In other words, the appellee admits that it executed a multi-million dollar contract without examining the incorporated documents or carefully limiting their incorporation.

The Municipality's position regarding its intent when drafting the contract is supported by the testimony of the official who drafted the contract. He stated that his intention was to incorporate the technical aspects of the specifications and that the Municipality had a public policy that was contrary to arbitration clauses. Stipulated Pleading, Appendix, pp. 984-986; Appellee's Brief, pp. 12-13. It is not clear whether the sentencing court conferred full credence to said witness, but the matter is moot. When the canons of contractual hermeneutics clearly and consistently favor one interpretation over another, the former must prevail. Given the circumstances of this case, the Court of First Instance should have rejected the Municipality's position, even if it found the official's testimony to be entirely credible.

The Municipality adds that the officials authorized to bind it were unaware of the existence of the arbitration provision. Now, the appellee does not deny that the General Conditions were part of the Specifications Document during the two bidding processes and during the negotiation of the construction contract. Our inspection of the record reveals that the A201 document is found without difficulty and that the basic content of its Art. 7.9, *supra*, is evident with just a cursory reading of the document. Thus, the Municipality's position is—and can only be—that the relevant officials did not examine the Specifications Document before executing a multi-million-dollar construction contract.

We could dispatch this argument with Associate Judge Serrano Geyls' famous motto,[13] but it is unnecessary. The negligence of the party granting a contract does not preclude it from being interpreted according to public policy in favor of arbitration, use and custom, good faith, and the rule unfavorable to the party causing an ambiguity. In fact, the principle of loyalty in the drafting of contracts includes a duty of diligence. Thus, the Municipality's admission regarding its lack of knowledge confirms our conclusion.

## VI

Based on the aforementioned grounds, the appealed *judgment* is revoked and, consequently, the claim is dismissed.

*Judgment shall be rendered in conformity.*

Associate Judge Fuster Berlingeri did not intervene. Associate Judge Rivera Pérez did not intervene.

## Footnotes

[1] Specifically, during 1996, the cancellation of the first bidding process was notified and the procedures related to the second bidding process were carried out.

This contract covered only the first of four contemplated phases, with the remaining phases subject to the approval of funds. The parties eventually amended the construction contract on August 3 and December 4, 1998, to include the second, third and fourth phases. Both amendments provided that the other provisions of the original contract would remain in effect. Appendix, pp. 64-75.

The Municipality of Mayagüez (Municipality) supported its allegation by stating, in summary, that the construction contract does not contain or refer to an arbitration clause, that the parties never discussed such clause, and that the *General Conditions* (*General Conditions of the Contract for Construction, AIA Document A201-1976*) were


I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

included in the Specifications Document without the authorization of an official or private individual with the power to bind the Municipality to arbitration. Appendix, pp. 60-63.

As relevant here, the trier of fact's findings of fact, the veracity of which we do not question, were as follows: (1) the
construction contract does not contain an arbitration clause; (2) the plan and everything concerning the specifications were prepared by Rigau & Penabad, an entity that lacked the authority to bind the Municipality to arbitration; (3) architect Ivan Rigau was the one who included the General Conditions in the Specifications Document; (4) according to the testimony of the petitioner, Edgardo Lebrón, arbitration was never discussed with the Municipality and it does not appear from the evidence that the parties negotiated about it; (5) the Specifications Document was not before the parties when the construction contract was signed; (6) architect Rigau did not inform the Municipality about the arbitration clause; (7) the Specifications Document was in the possession of the Department of Maintenance, Beautification and Urban Development of the Municipality; (8) the cost of the four phases would be $1,100,000; $918,265; $37,607; and $454,264. Examining these facts in light of the applicable law, the Court of First Instance concluded that there was no arbitration agreement between the parties. It emphasized that the parties did not discuss or negotiate on the matter. Appendix, pp. 54-55 and 58.

The Court of Appeals gave deference to the appellate court's assessment of the evidence. It noted, *inter alia*, that the parties did not discuss the arbitration and that Rigau & Penabad included the General Conditions in the Specification Document without the authorization of the Municipality. Appendix, pp. 8-9.
"FIRST ERROR: The Honorable Court of Appeals erred in requiring, as a condition for the enforceability of a contractual provision, that the provision be approved or authorized.
"THIRD ERROR: The Honorable Court of Appeals erred by endorsing the determination of the CFI to the effect that the construction contract does not have in its text, nor by reference, an arbitration clause.
"FOURTH ERROR: The Honorable Court of Appeals erred in understanding that the Municipality of Mayagüez is not bound by all the provisions contained in the Specifications Document that the same municipality ordered to be prepared and, subsequently delivered to all the bidders in the auction to govern the bidding process, contracting and execution of the auctioned work." Civil Appeal, pp. 5-6.

The Federal Arbitration Act applies to contracts in interstate commerce. *Paine Webber v. Soc. De Gananciales*, 151 D.P.R. 307, 312-313 (2000).

The case law discussed below is usefully summarized in W.J. Dunn, *Contract providing that it is governed by or subject to rules or regulations of a particular trade, business, or association as incorporating agreement to arbitrate*, 41 A.L.R. 2d 87, and in R.J. Sutton, *Enforcement of Arbitration Agreement Contained in Construction Contract by or Against Nonsignatory*, 100 A.L.R.5th 481.

Also, see: *T.R. Mills Contractors, Inc. v WRH Enterprises*, 93 S.W.3d 861, 870-871 (2002); *Landmark Properties v. Architects Intern.* 526 N.E.2d 603 (1988); *Todd Habermann Construction, Inc. v. Epstein, 70 F. Epstein, 70 N.*E.2d 603 (1988). *Epstein*, 70 F.Supp.2d 1170 (D. Colo. 1999); *Frank J. Rodney, Inc. v. Charles W. Ackerman of Fla*, 219 So.2d 110 (1969), *cert.* dismissed, 230 So.2d 13 (1969).

See, for example, *Wilson & Co. v. Fremont Cake & Meal Co.*, 77 F. Supp. 364 (D. Neb. 1948).

In *re General Silk Importing Co.* 189 N.Y.S. 391 (1921); *In Re General Silk Importing Co.*, 194 N.Y.S. 15 (1922), affirmed, 234 N.Y. 513; *Bachmann, Emmerich & Co. U.S.A. Wenger & Co.* 197 N.Y.S. 879 (1923); *Riverdale Fabrics Corp. v. Tillinghast-Stiles Co.* 306 N.Y. 288 (1954). Cf. *Level Export Corp. v. Wolz, Aiken & Co.*, 305 N.Y. 82 (1953);

Note that arbitration is sometimes denied in the context of special circumstances. See, *e.g.*, *Harper v. Ultimo*, 113 Cal. App. 4th 1402 (2003); *Western Vegetable Oils Co. v. Southern Cotton Oil Co.* 141 F.2d 235 (9th Cir. 1944); *Pillsbury v. Blumenthal*, 272 P.2d 326 (N.M. 1954); *Northridge Cooperative Cooperative Section No. 1 v. 32nd

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

*Avenue Construction Corp.* 139 N.Y.S.2d 37 (1955); *American Rail & Steel Co. v. India Supply Mission, 308* N.Y. 577 (1955).

The appellee raises other arguments that do not merit a detailed analysis, given the facts of this case and the applicable law. The Municipality argues, for example, that validating the arbitration provision would be "unconscionable" (i.e., unconscionable). It adds that the arbitration covenant is contrary to public policy because, among other things, the General Conditions were not sent to the Comptroller, the Municipality's legal counsel never approved the arbitration clause, the architects were not authorized to include the A201 document in the specifications, and the American Arbitration Association is a costly and inadequate forum. Argument, Appendix, pp. 15-17 and 22-28.

"We judges should not ... be so innocent as to believe statements that no one else would believe." *People v. Luciano Arroyo*, 83 D.P.R. 573, 582 (1961).

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.