## Exhibit 2

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PUERTO RICO**

---------------------------------------------------------------- X

In re:

THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO,

      as representative of

THE COMMONWEALTH OF PUERTO RICO *et al.,*

      Debtors.[1]

---------------------------------------------------------------- X

:
:
:
:
:
:
:
:
:
:
:
:
:
:

PROMESA

Title III

Case No. 17-BK-3283 (LTS)

(Jointly Administered)

**OFFICIAL COMMITTEE OF UNSECURED CREDITORS' FIRST SET OF
DOCUMENT REQUESTS TO FINANCIAL OVERSIGHT AND MANAGEMENT
BOARD FOR PUERTO RICO AND ITS ADVISORS IN CONNECTION WITH
DISCLOSURE STATEMENT FOR SECOND AMENDED TITLE III JOINT PLAN
OF ADJUSTMENT OF THE COMMONWEALTH OF PUERTO RICO, ET AL.**

Pursuant to Federal Rules of Civil Procedure 26 and 34 (applicable here under Rule 9014

of the Federal Rules of Bankruptcy Procedure), the Official Committee of Unsecured Creditors[2]

(the "Committee"), by its counsel, hereby propounds to the Financial Oversight and Management

Board for Puerto Rico (the "FOMB"), including to its advisors, including Proskauer Rose LLP

("Proskauer"), O'Neill & Borges LLC ("O&B"), Alvarez & Marsal ("A&M"), Ernst & Young

---

[1] The Debtors in these Title III cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK-3283 (LTS)) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284 (LTS)) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567 (LTS)) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566 (LTS)) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17-BK-4780 (LTS)) (Last Four Digits of Federal Tax ID: 3747) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5233-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

[2] The Committee is the official committee of unsecured creditors for all Title III Debtors, other than PBA and COFINA.

1

LLP ("EY"), McKinsey & Company ("McKinsey"), PJT Partners, Inc. ("PJT Partners"), and Citigroup Global Markets Inc. ("Citigroup"), this First Set of Document Requests (the "Requests"). These Requests are to be responded to fully and in accordance with the definitions and instructions set out below, and the Documents and Communications identified herein are to be produced to the offices of Paul Hastings LLP, Attn: Zachary Zwillinger, 200 Park Avenue, New York, NY on or before May 7, 2021, or as otherwise agreed to by the parties or ordered by the Court. These requests are without waiver of the Committee's rights to serve further discovery requests upon the FOMB or any third party based on the information that may be disclosed in response to these requests or other developments in this litigation, and the Committee expressly reserves all such rights.

## INSTRUCTIONS

1.     Each Request must be responded to separately and specifically. Each Request shall be answered fully unless it is in good faith objected to, in which event the reason for Your objection shall be stated in detail, as set forth below. If an objection pertains only to a portion of a request, or a word, phrase or clause contained within it, You are required to state Your objection to that portion only and to respond to the remainder of the Requests.

2.     Electronically stored information must be produced in accordance with the following instructions:

   a) Images. Black and white images must be 300 DPI Group IV single-page TIFF files. Color images must be produced in JPEG format. File names cannot contain embedded spaces or special characters (including the comma). Folder names cannot contain embedded spaces or special characters (including the comma). All TIFF image files must have a unique file name, i.e., Bates number. Images must be endorsed with sequential Bates numbers in the lower right corner of each image. The number of TIFF files per folder should not exceed 1000 files. Excel spreadsheets should have a placeholder image named by the Bates number of the file.

   b) Image Load File.

2

a. Concordance® Data File. The data file (.DAT) contains all of the fielded information that will be loaded into the Concordance® database. The first line of the .DAT file must be a header row identifying the field names. The .DAT file must use the following Concordance® default delimiters: Comma ASCII character (020) Quote þ ASCII character (254). Date fields should be provided in the format: mm/dd/yyyy. Date and time fields must be two separate fields. If documents includes imaged emails and attachments, the attachment fields must be included to preserve the parent/child relationship between an email and its attachments. An OCRPATH field must be included to provide the file path and name of the extracted text file on the produced storage media. The text file must be named after the FIRST BATES. Do not include the text in the .DAT file. For Documents with native files, a LINK field must be included to provide the file path and name of the native file. The native file must be named after the FIRST BATES.

b. Concordance Image® OR Opticon Cross-Reference File. The image cross-reference file (.LOG or .OPT) links the images to the database records. It should be a comma-delimited file consisting of seven fields per line with a line in the cross-reference file for every image in the database with the following format: ImageID,VolumeLabel,ImageFilePath,DocumentBreak,FolderBreak,BoxBreak,PageCoun.

c) Document Text. Text must be produced as separate text files, not as fields within the .DAT file. The full path to the text file (OCRPATH) should be included in the .DAT file. It is recommended document level ANSI text files, named per the FIRST BATES/Image Key. Extracted text files must be in a separate folder, and the number of text files per folder should not exceed 1,000 files. There should be no special characters (including commas in the folder names). Text files must be provided on a document level.

d) Native Production for Certain File Types. File types that reasonably require viewing in their native format for a full understanding of their content and meaning must be produced in native format. These include, but are not limited to, spreadsheets, spreadsheet-like files (Microsoft Excel, comma separated values, tab separated values, etc.), Microsoft PowerPoint or other special presentation files, database files, and audio/visual files. Provide an image of a Bates numbered slip sheet indicating the presence of a native file, and include the path to the native as a field in the .dat file. Name the produced native file with the Bates number corresponding to the slip sheet for the file. Group native files within incrementally named "NATIVE" directories, separate from images directories.

e) De-duplication. Produce a single copy of each electronic document for which exact duplicates exist. For email messages, consolidate duplicates based on MD5 hash generated from the BCC, Body, CC, From, IntMsgID, To, and

Attach properties.  For email attachments and standalone electronic files, consolidate duplicates based on MD5 hash of the entire file.

f) <u>Metadata</u>.  Produce extracted metadata for each document in the form of a Concordance compliant load file (.dat).  The first line of the .DAT file must be a header row identifying the field names. The .DAT file must use the following Concordance default delimiters: Comma , ASCII character (020) Quote þ ASCII character (254) Date fields should be provided in the format: mm/dd/yyyy.  Date and time fields must be two separate fields. Required metadata listed below:

| Field Name | Sample Data | Description |
|---|---|---|
| FIRSTBATES | EDC0000001 | First Bates number of native file document/email |
| LASTBATES | EDC0000001 | Last Bates number of native file document/email **The LASTBATES field should be populated for single page |
| ATTACHRANGE | EDC0000001 - EDC0000015 | Bates number of the first page of the  parent document to the Bates number of the last page of the last attachment "child" document |
| BEGATTACH | EDC0000001 | First Bates number of attachment range |
| ENDATTACH | EDC0000015 | Last Bates number of attachment range |
| CUSTODIAN | Smith, John | Email: Mailbox where the email  resided Native: Name of the individual or department from whose files  the document  originated |
| FROM | John Smith | Email:  Sender Native: Author(s) of document **semi-colon should be used to separate multiple entries |
| TO | Coffman, Janice; Lee W [mailto:LeeW@MSN.com] | Recipient(s) **semi-colon should be used to separate  multiple entries |
| CC | Frank Thompson [mailto: frank_Thompson@cdt.com] | Carbon copy recipient(s) **semi-colon should be used to separate multiple entries |
| BCC | John Cain | Blind carbon copy recipient(s) **semi-colon should be used to separate multiple entries |
| SUBJECT | Board Meeting Minutes | Email: Subject line of the email Native: Title of document (if available) |
| FILE_NAME | BoardMeetingMinutes.docx | Native: Name of the original native file, including extension |
| DATE_SENT | 10/12/2010 | Email: Date the email was sent Native: (empty) |
| TIME_SENT/TIME_ZONE | 07:05 PM GMT | Email: Time the email was sent/ Time zone in which the emails were standardized |
| TIME_ZONE | GMT | The time zone in which the emails were standardized during conversion. |

| LINK | D:\001\ EDC0000001.msg | Hyperlink to the email or native file document<br>**The linked file must be named per the FIRSTBATES number |
|---|---|---|
| FILE_EXTEN | MSG | The file type extension representing the Email or |
| AUTHOR | John Smith | Email: (empty)<br>Native: Author of the document |
| DATE_CREATED | 10/10/2010 | Email: (empty)<br>Native: Date the document was created |
| TIME_CREATED | 10:25 AM | Email: (empty)<br>Native: Time the document was created<br>**This data must be a separate field and cannot be combined with the DATE_CREATED field |
| DATE_MOD | 10/12/2010 | Email: (empty)<br>Native: Date the document was last modified |
| TIME_MOD | 07:00 PM | Email: (empty)<br>Native: Time the document was last modified<br>**This data must be a separate field and cannot be combined with the DATE_MOD field |
| DATE_ACCESSD | 10/12/2010 | Email: (empty)<br>Native: Date the document was last accessed |
| TIME_ACCESSD | 07:00 PM | Email: (empty)<br>Native: Time the document was last accessed<br>**This data must be a separate field and cannot be combined with the DATE_ACCESSD field |
| FILE_SIZE | 5,952 | Size of native file document/email in KB |
| PGCOUNT | 1 | Number of pages in native file document/email |
| PATH | J:\Shared\SmithJ\October Agenda.doc | Email: (empty)<br>Native: Path where native file document was stored including original file name. |

| INTFILEPATH | Personal Folders\Deleted Items\Board Meeting Minutes.msg | Email: original location of email including original file name. Native: (empty) |
|---|---|---|
| INTMSGID | <000805c2c71b$75977050$cb8306d1@MSN> | Email: Unique Message ID Native: (empty) |
| MD5HASH | d131dd02c5e6eec4693d9a0698aff95c 2fcab58712467eab4004583eb8fb7f89 | MD5 Hash value of the document. |
| OCRPATH | TEXT/001/EDC0000001.txt | Path to extracted text of the native file |

3.      Each Request operates and should be construed independently and, unless otherwise indicated, no Request limits the scope of any other Request.

4.      All Documents are to be produced as kept in the usual course of business or are to be organized and labeled to correspond with the categories in these Requests.

5.      Each Request contained herein extends to all Documents: (a) in Your possession, custody, or control; or (b) in the possession, custody, or control of anyone acting on Your behalf, including Your counsel or other representatives or advisors. A Document is to be deemed in Your possession, custody or control if: (a) it is in Your physical custody; or (b) it is in the physical custody of any other Person and You (i) own such Document in whole or in part, (ii) have a right, by contract, statute or otherwise, to use, inspect, examine or copy such Document on any terms, (iii) have an understanding, express or implied, that You may use, inspect, examine, or copy such Document on any terms, or (iv) have, as a practical matter, been able to use, inspect, examine or copy such Document when You sought to do so. Each Document shall be produced in its entirety.

6.      If You are requested to produce a Document that is no longer in Your possession, custody, or control, then Your response must state: (a) whether such Document (i) is missing or

lost, (ii) has been destroyed, (iii) has been transferred, voluntarily or involuntarily, to others, or (iv) was otherwise disposed of; (b) the reason for, and the facts and circumstances surrounding, such disposition; (c) the Persons who authorized such disposition; (d) the date or approximate date of such disposition; (e) when the Document was most recently in Your possession, custody or control; and (f) the identity of the Person, if any, presently in possession, custody, or control of such Document.

7.      If You are requested to produce a Document that has been destroyed, then Your response must state, in addition to the information required by the preceding Instruction: (a) the reason for the Document's destruction; (b) the identity of the Person who destroyed the Document; and (c) the identity of the Person who directed that the Document be destroyed.

8.      If You claim that a requested Document is privileged or attorney work-product, then Your response must: (a) state (i) a description of the Document adequate to support Your contention that the Document is privileged, (ii) the title of the Document, (iii) the date of the Document, (iv) the author of the Document, (v) the addressee of the Document, (vi) the identity of each Person who received or saw the original or any draft, copy, or reproduction of the Document, (vii) whether the Document itself, or any information contained or referred to in the Document is in the possession, custody, or control of any other Persons, and if so, the identity of such Persons, as well as a statement addressing how the information came into their possession, (viii) the claim of privilege under which the Document is withheld, and (ix) all of the circumstances upon which You will rely to support such claim of privilege; and (b) produce a privilege log containing all of the information requested in Part (a) of this Instruction for each Document withheld on the basis of a claim of privilege. If a portion of an otherwise responsive Document contains information subject to a claim of privilege, only that portion of the Document subject to

the claim of privilege shall be deleted or redacted from the Document following the instructions above, and the rest shall be produced.

9.      If You cannot provide a requested Document (after exercising due diligence to secure it) that was formerly in Your possession, custody, or control, then: (a) Your response must (i) describe in detail the nature of the document and its contents, identify the person(s) who prepared or authored the Document (and, if applicable, the Person(s) to whom the Document was sent), and the date of which the document was prepared or transmitted, (ii) state that You cannot produce the requested Document, (iii) specify the reasons for Your inability to produce the requested Document (e.g., lost, destroyed or otherwise disposed of), (iv) declare that You have exercised due diligence to secure the requested Document, and (v) state all information or knowledge that You have concerning the requested Documents; and (b) You must produce all other requested Documents.

10.      The Requests are continuing in nature. You are hereby instructed to (a) supplement or correct any responses later learned to be incomplete or incorrect immediately upon learning that a prior response was incomplete or incorrect; and (b) produce any additional Documents that are called for under the Requests.

## **RULES OF CONSTRUCTION**

1.      The use of (a) any singular noun shall be construed to include the plural, and vice versa, and (b) a verb in any tense shall be construed as the use of the verb in all other tenses.

2.      The terms (a) "and" and "or" shall be construed either conjunctively or disjunctively as necessary to bring within the scope of any request all responses that might otherwise be construed to be outside of its scope, and (b) "each" and "any" shall be deemed to include and encompass the words "every" and "all."

## DEFINITIONS

1.      "ACR Procedures" shall having the meaning given to it in the Second Amended Disclosure Statement.

2.      "AFT" means and refers to American Federation of Teachers, AFL-CIO, and any of its affiliates, including the Asociación de Maestros Puerto Rico and the Asociación de Maestros de Puerto Rico-Local Sindical, parents, subsidiaries, partners, associates, divisions, agencies, instrumentalities, departments, offices, officers, directors, shareholders, members, agents, attorneys, representatives, employees, predecessors or successors in interest and/or anyone acting on AFT's behalf.

3.      "A&M" means and refers to Alvarez & Marsal and any of its affiliates, parents, subsidiaries, partners, associates, divisions, agencies, instrumentalities, departments, offices, officers, directors, shareholders, members, agents, attorneys, representatives, employees, predecessors or successors in interest and/or anyone acting on A&M's behalf.

4.      "Avoidance Actions Trust" shall have the meaning ascribed to it in the Second Amended Plan.

5.      "Citigroup" means and refers to Citigroup Global Markets Inc. and any of its affiliates, parents, subsidiaries, partners, associates, divisions, agencies, instrumentalities, departments, offices, officers, directors, shareholders, members, agents, attorneys, representatives, employees, predecessors or successors in interest and/or anyone acting on Citigroup's behalf.

6.      "Class" shall have the meaning ascribed to it in the Second Amended Plan.

7.      "Clawback Claim" means a CW/Convention Center Claim, CW/HTA Claim, CW/MBA Claim, CW/MBA Claim, or CW/PRIFA Rume Tax Claim (each as defined in the Second Amended Plan).

8.     "Clawback CVIs" shall have the meaning ascribed to it in the Second Amended Plan.

9.     "Commonwealth" means and refers to the Commonwealth of Puerto Rico.

10.     "Communication" includes every manner of transmitting or receiving facts, information, opinions, or thoughts from one person to another person, whether orally, by documents, writing, e-mail, text message, web messaging, or any other form of instant messaging, or a copy thereof, and to words transmitted by telephone, radio, or any method of voice recording.

11.     "Comprehensive Cap" shall have the meaning ascribed to it in the Second Amended Plan.

12.     "Concerning" and/or "relating to" means, without limitation:   describing, discussing,    constituting,    containing,    considering,    embodying,    evaluating,    mentioning, memorializing, supporting, collaborating, demonstrating, proving, evidencing, showing, refuting, disputing, rebutting, regarding, controverting, contradicting, made in connection with or by reason of, or derived or arising therefrom.

13.     "Consummation Costs" shall have the meaning ascribed to it in the Second Amended Plan.

14.     "Convenience Claim" shall have the meaning ascribed to it in the Second Amended Plan.

15.     "Cooperation Agreement" means and refers to the Common Interest and Cooperation Agreement Relating to Prosecution of Objection to Certain General Obligation Bond Claims, between the FOMB and the Committee, dated January 14, 2019.

16.     "CW Bond Claims" shall have the meaning ascribed to it in the Second Amended Plan.

17.     "CW General Unsecured Claim" shall have the meaning ascribed to it in the Second Amended Plan.

18.     "CW Guarantee Bond Claims" shall have the meaning ascribed to it in the Second Amended Plan.

19.     "Dairy Producer Claim" shall have the meaning ascribed to it in the Second Amended Plan.

20.     "Debtors" means and refers to the Commonwealth, ERS, and PBA.

21.     "Debt Service Reserve Fund" shall have the meaning ascribed to it in the Second Amended Plan.

22.     "Document" is used in the broadest sense contemplated by Federal Rules of Civil Procedure, including all materials, documents, electronically stored information and tangible things within the scope of Rule 34(a).  Document means and refers to any writing, thing, record of any type, or description that is or has been in Your possession, control, or custody, or of which You have knowledge, including but not limited to:  agreements; drafts; communications; correspondence; e-mails; text messages; instant messages; web messages; WhatsApp messages; social media messages; telegrams; cables; facsimiles; memoranda; records; books; financial statements; summaries of records or notes of personal conversations or interview; diaries; calendars; forecasts; statistical statements; accountants work papers; graphs; charts; maps; diagrams; blue prints; tables; indexes; pictures; recordings; tapes; microfilm; charge clips; accounts; analytical records; minutes or records of meetings or conferences; reports and/or summaries of investigations; opinions or reports of consultants; appraisals; reports and/or summaries of negotiations; brochures; pamphlets; circulars; trade letters; press releases; contracts; stenographic, handwritten or any other notes; projections; working papers; federal and state

11

income tax returns; checks, front and back; check stubs or receipts; shipping documents; manifests; invoice vouchers; computer printouts and computer disks and tapes; and tape data sheets or data processing cards or disks or any other written, recorded, transcribed, punched, taped, filmed or graphic matters; however produced or reproduced. Document also means any electronic copy which is not identical to the original, including metadata and other electronically stored information. The term "Document" includes all Communications.

23. "Eminent Domain Claim" shall have the meaning ascribed to it in the Second Amended Plan.

24. "Energy Incentive Claims" shall have the meaning ascribed to it in the Second Amended Plan

25. "ERS" means and refers to the Employees Retirement System of the Government of the Commonwealth of Puerto Rico.

26. "ERS Bonds" shall have the meaning ascribed to it in the Second Amended Plan.

27. "ERS GUC Pool" shall have the meaning ascribed to it in the Second Amended Plan.

28. "ERS Litigation" shall have the meaning ascribed to it in the Second Amended Plan.

29. "ERS Settlement" means the settlement reflected in the *Amended and Restated Stipulation (A) Allowing Claims of ERS Bondholders, (B) Staying Pending Litigation, and (C) Providing for Treatment of Claims of ERS Bondholders and Dismissal of Pending Litigation Pursuant to a Plan of Adjustment* regarding the treatment of the ERS Bonds in a third amended plan of adjustment to be filed by the Oversight Board.

30. "<u>EY</u>" means and refers to Ernst & Young LLP and any of its affiliates, parents, subsidiaries, partners, associates, divisions, agencies, instrumentalities, departments, offices, officers, directors, shareholders, members, agents, attorneys, representatives, employees, predecessors or successors in interest and/or anyone acting on EY's behalf.

31. "<u>Fiscal Plan</u>" means and refers to the most recent Commonwealth Fiscal Plan.

32. "<u>FOMB</u>", "You" or "Your" means and refers to the Financial Oversight and Management Board for Puerto Rico and any of its affiliates, parents, subsidiaries, partners, associates, divisions, agencies, instrumentalities, departments, offices, officers, directors, shareholders, members, agents, attorneys, representatives, employees, predecessors or successors in interest and/or anyone acting on the FOMB's behalf, including Proskauer, O&B, A&M, Citigroup, McKinsey, EY, PJT Partners, and any other counsel or advisors.

33. "<u>Gracia Gracia Claim</u>" shall have the meaning ascribed to it in the Second Amended Plan.

34. "<u>HTA</u>" means and refers to the Puerto Rico Highways and Transportation Authority.

35. "<u>Including</u>" means "including, but not limited to" and "including, without limitation."

36. "<u>Initial Disclosure Statement</u>" means and refers to *Disclosure Statement for the Title III Joint Plan of Adjustment for the Commonwealth of Puerto Rico, the Employees Retirement System of the Government of the Commonwealth of Puerto Rico, and the Puerto Rico Public Buildings Authority*, Docket No. 8766, filed on September 27, 2019.

37. "<u>Initial PSA Creditors</u>" shall have the meaning ascribed to it in the Second Amended Plan.

38.     "McKinsey" means and refers to McKinsey & Company, Inc. Washington D.C. and any of its affiliates, parents, subsidiaries, partners, associates, divisions, agencies, instrumentalities, departments, offices, officers, directors, shareholders, members, agents, attorneys, representatives, employees, predecessors or successors in interest and/or anyone acting on McKinsey's behalf.

39.     "Med Center Claims" shall have the meaning ascribed to it in the Second Amended Plan.

40.     "New GO  5.0% CABs" shall have the meaning ascribed to it in the Second Amended Plan.

41.     "New GO  5.375% CABs" shall have the meaning ascribed to it in the Second Amended Plan.

42.     "New GO  Bonds" shall have the meaning ascribed to it in the Second Amended Plan.

43.     "O&B" means and refers to O'Neill & Borges LLC and any of its affiliates, parents, subsidiaries, partners, associates, divisions, agencies, instrumentalities, departments, offices, officers, directors, shareholders, members, agents, attorneys, representatives, employees, predecessors or successors in interest and/or anyone acting on O&B's behalf.

44.     "Pay-Go Legislation" means and refers to Puerto Rico Act 106-2017 and Joint Resolution 188 for Other Allocations for Fiscal Year 2017-2018.

45.     "PBA" means and refers to the Puerto Rico Public Buildings Authority.

46.     "PBA Bond Claims" shall have the meaning ascribed to it in the Second Amended Plan.

47.     "PBA Bonds" shall have the meaning ascribed to it in the Second Amended Plan.

14

48.     "PBA Litigation" shall have the meaning ascribed to it in the Plan Support Agreement.

49.     "PBA Settlement" means and refers to the settlement of the PBA Litigation.

50.     "Person" or "Persons" means any natural or artificial person, business entity or other legal entity, including, but not limited to, individuals, sole proprietorships, associations, companies, firms, partnerships, joint ventures, corporations, employees or former employees, or any other business, governmental, or labor entity, and any divisions, departments, or other units thereof.

51.     "PJT Partners" means and refers to PJT Partners, Inc. and any of its affiliates, parents, subsidiaries, partners, associates, divisions, agencies, instrumentalities, departments, offices, officers, directors, shareholders, members, agents, attorneys, representatives, employees, predecessors or successors in interest and/or anyone acting on PJT 's behalf.

52.     "Plan Support Agreement" means and refers to the agreement, dated as of February 22, 2021, by and among the FOMB and the Initial PSA Creditors (as that term is defined in the Plan Support Agreement), attached as Exhibit B to the Second Amended Disclosure Statement.

53.      "Proskauer" means and refers to Proskauer Rose LLP and any of its affiliates, parents, subsidiaries, partners, associates, divisions, agencies, instrumentalities, departments, offices, officers, directors, shareholders, members, agents, attorneys, representatives, employees, predecessors or successors in interest and/or anyone acting on Proskauer's behalf.

54.     "PSA Restriction Fees" shall have the meaning ascribed to it in the Second Amended Plan.

55.     "Retail Support Fee" shall have the meaning ascribed to it in the Second Amended Plan.

56.     "Retiree Claim" shall have the meaning ascribed to it in the Second Amended Plan.

57.     "Second Amended Disclosure Statement" means and refers to the *Disclosure Statement for the Second Amended Title III Joint Plan Of Adjustment Of The Commonwealth Of Puerto Rico, Et Al.*, Docket No. 15977, filed on March 8, 2021.

58.     "Second Amended Plan" means and refers to the *Second Amended Title III Joint Plan of Adjustment of The Commonwealth of Puerto Rico, et al.*, Docket No. 15976, filed on March 8, 2021.

59.     "Settlements" means and refers to the settlements embodied in the Plan Support Agreement, including the settlements of all issues related to bond priority issues and debt limit violations, including specifically the Debt Related Objections, the Invalidity Actions, the Lien Challenge Actions, the PBA Litigation, or the PRIFA BANs Litigation (as each is defined in the Plan Support Agreement).

60.     "Tax-Supported Debt" shall have the meaning ascribed to it in the Second Amended Plan.

## DOCUMENTS TO BE PRODUCED

1.     All Documents concerning any estimate, by the FOMB or any other party, of the CW General Unsecured Claims in Class 55 of the Second Amended Plan, including all documents concerning the number and amount of such claims, the estimate in the Initial Disclosure Statement of approximately $5.5 billion in general unsecured claims, all spreadsheets, charts, and analyses created by FOMB advisors, including PJT Partners, relating to such estimate, and all drafts of and supporting data and sources for such spreadsheets, charts, and analyses.

2.     Documents sufficient to show the number and amount of CW General Unsecured Claims in Class 55 that are (i) claims held by suppliers of goods and services, (ii) unliquidated

litigation claims, (iii) claims resulting from judgments and settlements, (iv) claims eligible to be resolved through the proposed ACR Procedures, (v) tax refund claims, (vi) eminent domain claims, (vii) grievance claims, (viii) retiree benefit claims, (ix) claims owed to public employees for salary and benefits, and (x) claims held by governmental units or instrumentalities, including Documents sufficient to show which governmental units or instrumentalities hold such claims.

3.      All Documents concerning the FOMB's decisions as to which types of unsecured claims, including those types of claims set forth in Request No. 2, to include in or exclude from Class 55.

4.      Documents sufficient to show the estimated cost of solicitation of creditors' votes in connection with the Second Amended Disclosure Statement and Second Amended Plan.

5.      Documents sufficient to show all payments made by the Commonwealth since its Title III petition date (*i.e.,* May 3, 2017) to creditors on account of prepetition unsecured claims, to the extent that any such payment or payments to a particular creditor exceeds $1 million[3] (whether a single payment or the aggregate amount of a series of payments to a particular creditor), including (i) the identity of the recipient of each such payment, (ii) the amount of each such payment and the aggregate amount of all such payments, and (iii) the nature of the services or goods provided or other basis for each such payment.

6.      All Documents concerning the basis for the Commonwealth paying certain prepetition unsecured claims but not other prepetition unsecured claims following the Commonwealth's Title III petition date (*i.e.,* May 3, 2017), including Documents relating to (i)

---

[3]      The Committee reserves the right to adjust this amount based on the number of responsive documents provided to the Committee as a result of Request No. 5.

whether or not the FOMB approved of such payments and (ii) the policy considerations underlying the decisions to make such payments.

7.      Documents sufficient to show the specific litigations and claims that will be transferred to the Avoidance Actions Trust, and all Documents concerning the basis for the FOMB's decisions as to which litigations and claims to include in or exclude from the Avoidance Actions Trust, including (i) the "garden variety" avoidance actions that the FOMB and Committee have commenced against third parties, including those actions listed in Appendix I to the *Order Granting Omnibus Motion by the Financial Oversight and Management Board for Puerto Rico, Acting by and Through the Members of the Special Claims Committee, and the Official Committee of Unsecured Creditors to (I) Establish Litigation Case Management Procedures and (II) Establish Procedures for Approval of Settlements* [Docket No. 7941], (ii) the litigation against certain underwriters pending in Adv. Pro. No. 19-280, and (iii) the affirmative recovery actions to be identified on Exhibit B to the Second Amended Plan.

8.      All Documents concerning the basis for classifying (i) Retiree Claims (Class 48A), (ii) Dairy Producer Claims (Class 50), (iii) Eminent Domain Claims (Class 51), (iv) Energy Incentive Claims (Class 52), (v) Med Center Claims (Class 53), and (vi) Gracia Gracia Claims (Class 65) separately from CW General Unsecured Claims (Class 55).

9.      All Documents, if any, showing the Committee's involvement in the negotiation of the Settlements reached with the Initial PSA Creditors, including Documents regarding the FOMB's decision as to whether or not to involve the Committee in such negotiations, including in light of the Cooperation Agreement.

10.     All Documents, if any, showing the Committee's involvement in the negotiation of the treatment of general unsecured creditors under the Second Amended Plan (including (i) Retiree

Claims (Class 48A), (ii) Dairy Producer Claims (Class 50), (iii) Eminent Domain Claims (Class 51), (iv) Energy Incentive Claims (Class 52), (v) Med Center Claims (Class 53), (vi) CW General Unsecured Claims (Class 55), (vii) Gracia Gracia Claims (Class 65), and (viii) Convenience Claims (Class 66)), including Documents regarding the FOMB's decision as to whether or not to involve the Committee in such negotiations.

11.     All Documents concerning the consideration to be received by the Initial PSA Creditors under the Settlements, including the extent to which (i) such Settlements allegedly reduce the Commonwealth's existing liabilities and (ii) different bonds (by year of issuance) receive different treatment under such Settlements.

12.     All Documents concerning the rationale for the Settlements, including the basis for the different treatment of CW Bond Claims and PBA Bond Claims based on different vintages, *i.e.*, the date of issuance.

13.     All Documents concerning the decision to include original issue discount in the GO and PBA bondholders' claim amounts and the extent to which doing so affects such bondholders' recovery rates.  *See* Second Amended Disclosure Statement at 30.

14.     All Documents concerning the basis for releasing "clawback" claims against former GO and PBA bondholders for recovery of principal and interest payments (*see* Second Amended Disclosure Statement at 311-12), including Documents sufficient to show (i) the total amount of principal and interest paid to such bondholders and (ii) the consideration (if any) that such bondholders are providing in exchange for the release of such claims.

15.     Documents sufficient to identify the total amount of PBA administrative "rent" claims that PBA would hold against the Commonwealth from the petition date through February

28, 2021, as well as the monthly amount of such claims that will accrue going forward, if PBA were to prevail in the PBA Litigation.

16.     Documents sufficient to identify all terms of the PBA Settlement, including Documents sufficient to explain the FOMB's decision to no longer seek approval of such settlement through a Rule 9019 motion, as contemplated by the prior plan support agreement dated as of May 31, 2019.

17.     Documents sufficient to identify all properties to be transferred by PBA to the Commonwealth or other entities as part of the PBA Settlement or the Second Amended Plan.

18.     All Documents concerning any analysis of (i) whether the properties (if any) identified in response to Request No. 17 are in fact properties owned by PBA and (ii) the value of such properties (if any).

19.     All Documents concerning the decision to allow interest on CW Guarantee Bond Claims arising from the PBA Bonds through the date of PBA's Title III filing. *See* Plan Support Agreement at 6.

20.     All Documents concerning the decision not to have PBA file a Title III case at the same time as (or shortly after) the filing of the Commonwealth's Title III case.

21.     All Documents concerning the decision to establish a Debt Service Reserve Fund for the New GO Bonds to be issued under the Second Amended Plan. *See* Second Amended Plan at 71.1(h).

22.     All Documents concerning the Debtors' assessment, if any, of the maximum amount they are capable of paying unsecured creditors under the Second Amended Plan, including the extent to which additional bonds could be issued to unsecured creditors under the Comprehensive Cap. *See* Second Amended Plan § 71.4.

23.     All Documents concerning the FOMB's calculation of the Comprehensive Cap, including Documents sufficient to show (i) whether excess capacity remains under the Comprehensive Cap and (ii) if so, how such excess capacity will be used.  *See* Second Amended Plan § 1.123.

24.     All Documents concerning the FOMB's calculation of the Tax Supported Debt. *See* Second Amended Plan § 1.310.

25.     All Documents concerning the decision under the Second Amended Plan to have a deemed issuance date for the New GO Bonds of July 1, 2021, including any calculations or estimates of the interest that will accrue on such bonds prior to the effective date of the Second Amended Plan.  *See* Second Amended Plan § 71.1(c).

26.     All Documents concerning the FOMB's calculation of likely payments under the GO CVIs.

27.     All Documents concerning the FOMB's rationale for providing holders of GO Bond Claims and PBA Bond Claims with the GO CVIs,  including the rationale for the 22-year term of GO CVIs and the annual and lifetime caps (as set forth in the Second Amended Plan).

28.     All Documents concerning the FOMB's rationale for providing $7.024 billion in cash to holders of GO Bonds and PBA Bonds.

29.     All Documents concerning the FOMB's rationale for excluding from the Comprehensive Cap the debt service payments on New GO 5.0% CABs and New GO 5.375% CABs issued pursuant to the Second Amended Plan.

30.     All Documents concerning the FOMB's rationale for providing holders of GO Bonds with New GO 5.0% CABs with installment payments on July 1 of 2022, 2023, and 2024 as opposed to making those funds available for other creditors.

31.     All Documents concerning the FOMB's rationale for providing holders of GO Bonds with New GO 5.375% CABs with installment payments on July 1 of 2029, 2030, 2031, 2032, and 2033 as opposed to making those funds available for other creditors.

32.     All Documents concerning the calculation of and justification for the Consummation Costs, the PSA Restriction Fees, the Retail Support Fee, and the $100 million termination fee set forth in sections 3.5 and 3.6 of the Second Amended Plan.

33.     All Documents concerning the ability of the FOMB to terminate the Plan Support Agreement, including whether or not and to what extent the FOMB considered including a provision in the Plan Support Agreement that would have permitted termination by the FOMB without payment of any fee or penalty.

34.     All Documents concerning the FOMB's estimates of the total retiree benefit claims in Classes 48A to 48E of the Second Amended Plan.

35.     Documents sufficient to show the current status and estimated date of completion of the FOMB's bank account analysis (*see* Second Amended Disclosure Statement at 129-38), including Documents sufficient to show (i) which bank accounts the FOMB is reviewing, (ii) whether the accounts are restricted or unrestricted, and (iii) if the accounts are unrestricted, whether the funds in such accounts will be made available for creditor recoveries and, if not, why not.

36.     All Documents concerning the FOMB's decision to label certain accounts set forth in Exhibit J to the Second Amended Disclosure Statement "restricted," including Documents sufficient to explain what the FOMB means in designating such accounts "restricted."

37.     All Documents concerning the FOMB's decision to label certain accounts set forth in Exhibit J to the Second Amended Disclosure Statement "asserted to be restricted," including Documents sufficient to explain (i) what the FOMB means in designating such accounts "asserted

to be restricted," (ii) why a definitive determination as to whether these accounts are restricted or unrestricted has not yet been made, and (iii) whether and to what extent such designations will change in light of the Oversight Board's recently-announced settlements with other constituencies.

38.     All Documents concerning the FOMB's decision to label certain accounts set forth in Exhibit J to the Second Amended Disclosure Statement "inconclusive," including Documents sufficient to explain what the FOMB means in designating such accounts "inconclusive" and Documents sufficient to explain why a definitive determination as to whether these accounts are restricted or unrestricted hasn't yet been made.

39.     Documents providing the December 31, 2020 account balances for those accounts set forth in Exhibit J to the Second Amended Disclosure Statement with a "pending" designation.

40.     Documents sufficient to explain whether each of the accounts on Exhibit J to the Second Amended Disclosure Statement with a "pending" designation is restricted or unrestricted.

41.     Documents sufficient to show the sources and uses of the Debtors' cash and investments rolled forward from the December 31, 2020 account balances to June 30, 2021 and adjusted for settlements reached in connection with the Second Amended Plan.

42.     Documents sufficient to show whether any excess funds identified in response to Request No. 41 will be made available for creditors and, if not, why not.

43.     All Documents describing the rationale that FOMB policy (as opposed to a legal determination) should determine whether certain funds in accounts held by the Debtors, Commonwealth agencies, or public corporations receiving general fund appropriations should not be made available for creditor recoveries.

44.     Documents sufficient to show all unencumbered assets of the Debtors that are currently being marketed or being evaluated for sale, including the value of such assets, the current

listed sales price for each asset and whether or not such value is being made available for creditor recoveries.

45.      Documents sufficient to identify all unrestricted Commonwealth investments not included in Exhibit J to the Second Amended Disclosure Statement, including their value and whether or not each such investment is being liquidated for creditor recoveries.

46.      Documents sufficient to show (i) the December 31, 2020 balances and/or value of the ERS assets that the Commonwealth will purchase on the effective date of the Second Amended Plan, as described on page 339 of the Second Amended Disclosure Statement, (ii) whether or not such value will be available for ERS and/or Commonwealth general unsecured creditors after payment is made to ERS bondholders, and (iii) if such value is not so available, why not.

47.      All Documents concerning the FOMB's conclusion, as described on pages 157-58 of the Second Amended Disclosure Statement, that "essential services" need not be defined for purposes of the Second Amended Plan.

48.      All Documents concerning any analyses or lists identifying which services constitute "essential services."

49.      All Documents concerning the FOMB's analysis, if any, of whether the Second Amended Plan will allow the Commonwealth to obtain access to capital markets.

50.      All Documents concerning the FOMB's assessment of whether or not the Second Amended Plan unfairly discriminates against holders of CW General Unsecured Claims, including any review or analysis the FOMB performed of the recovery rate differentials between different types of unsecured creditors (such as general unsecured creditors, retiree claimants, and bondholders) in other bankruptcy cases.

51.     Documents sufficient to show the value of the tax benefits resulting from a favorable ruling concerning the tax exempt status of the New GO Bonds to be issued under the Second Amended Plan.

52.     All Documents concerning the FOMB's estimate of general unsecured claims against ERS in Class 64 of the Second Amended Plan, including the number and amount of such claims.

53.     All Documents concerning the basis for capping the amount in the ERS GUC Pool at $5 million. *See* Second Amended Plan §1.160.

54.     All Documents concerning the FOMB's analysis, if any, of what Commonwealth funds or other resources will be needed to implement and/or fund a restructuring of and/or plan of adjustment for HTA, including the amount of such funds or resources and whether they have been set aside for such purpose.

55.     Provide the Best Interests Test Report (Exhibit L to the Second Amended Disclosure Statement).

56.     All Documents concerning the FOMB's calculation of likely payments under the Clawback CVIs.

57.     All Documents concerning the FOMB's rationale for providing holders of Clawback Claims with the Clawback CVIs, notwithstanding the terms of the settlement of alleged GO priority pursuant to the Second Amended Plan, including the rationale for the 30-year term of Clawback CVIs and the annual caps (as set forth in the Second Amended Plan).

58.     Documents sufficient to show the FOMB's rationale for settling the ERS Litigation pursuant to the ERS Settlement.

59. Documents sufficient to show the status of the settlement summarized in the term sheet dated May 14, 2019, between the FOMB and the AFT.

60. Documents sufficient to show the basis and rationale for not assuming or rejecting the Debtors' collective bargaining agreements, as set forth in Section 73.10 of the Second Amended Plan.

*[Remainder of page intentionally left blank.]*

Dated:  April 23, 2021
New York, New York

/s/ Nicholas A. Bassett

PAUL HASTINGS LLP
Nicholas A. Bassett, Esq. (*Pro Hac Vice*)
875 15th Street, N.W.
Washington, D.C. 20005
Tel:  (202) 551-1700
nicholasbassett@paulhastings.com

Luc A. Despins, Esq. *(Pro Hac Vice)*
200 Park Avenue
New York, New York 10166
Tel:  (212) 318-6000
lucdespins@paulhastings.com

*Counsel to the Official Committee of Unsecured
Creditors*

- and –

/s/ Juan J. Casillas Ayala

CASILLAS, SANTIAGO & TORRES LLC
Juan J. Casillas Ayala, Esq. (USDC - PR 218312)
Israel Fernández Rodríguez, Esq. (USDC - PR
225004)
Juan C. Nieves González, Esq. (USDC - PR 231707)
Cristina B. Fernández Niggemann, Esq. (USDC - PR
306008)
PO Box 195075
San Juan, Puerto Rico 00919-5075
Telephone: (787) 523-3434 Fax: (787) 523-3433
jcasillas@cstlawpr.com
ifernandez@cstlawpr.com
jnieves@cstlawpr.com
crernandez@cstlawpr.com

*Local Counsel to the Official Committee of
Unsecured Creditors*