## UNITED STATES DISTRICT COURT
## DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>     as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*,<br><br>     Debtors.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |

## URGENT MOTION OF AMBAC ASSURANCE CORPORATION AND FINANCIAL GUARANTY INSURANCE COMPANY TO COMPEL DISCOVERY FROM THE GOVERNMENT PARTIES IN CONNECTION WITH THE DISCLOSURE STATEMENT

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801).

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................. 1

JURISDICTION AND VENUE ................................................................................. 4

BACKGROUND ....................................................................................................... 4

I.      THE FILING OF THE DISCLOSURE STATEMENT AND SCHEDULING OF
        PROCEEDINGS FOR CONSIDERATION OF THE DISCLOSURE
        STATEMENT. ............................................................................................... 4

II.     DISCOVERY RELATING TO THE DISCLOSURE STATEMENT. ............... 8

APPLICABLE LAW ............................................................................................... 11

ARGUMENT .......................................................................................................... 12

I.      THE GOVERNMENT PARTIES SHOULD BE COMPELLED TO PRODUCE
        DOCUMENTS NECESSARY FOR A PROPER EVALUATION OF THE
        DISCLOSURE STATEMENT. ...................................................................... 12

        A.      The Government Parties Should Produce Key Documents Relating to the
                Fiscal Plan. ...................................................................................... 12

        B.      The Board Should Produce Its Best Interests Analysis and Key Documents
                Underlying It. ................................................................................... 16

        C.      The Government Parties Should Produce Documents Reflecting Data,
                Analyses, and Assumptions Underlying the Various Iterations of the
                Disclosure Statement and Plan. ....................................................... 18

        D.      The Government Parties Should Produce Documents Regarding the
                Pension Reserve Trust and the Pension Reserve Fund. .................... 20

        E.      The Government Parties Should Produce Documents Regarding Real
                Property Assets and Illiquid Investments Relevant to the Commonwealth's
                Financial Condition. ......................................................................... 22

        F.      The Government Parties Should Produce Documents Relating to an
                Assessment of the Commonwealth's Essential Services. .................. 23

        G.      The Government Parties Should Produce Documents Providing
                Information Regarding Monies Potentially Available to the
                Commonwealth. ................................................................................ 25

II.     THE GOVERNMENT PARTIES SHOULD BE COMPELLED TO PRODUCE
        WITNESSES IN RESPONSE TO THE DEPOSITION CROSS-NOTICES. ... 29

CONCLUSION ........................................................................................................ 30

CERTIFICATION ................................................................................................... 32

## **TABLE OF AUTHORITIES**

**Cases**                                                                                          **Page(s)**

*Autoridad de Carreteras y Transportación v. Transcore Atl., Inc.*,
    319 F.R.D. 422 (D.P.R. 2016) ...............................................................11

*In re 3DFX Interactive, Inc.*,
    2006 WL 2010786 (Bankr. N.D. Cal. June 29, 2006) ...........................11

*In re Catholic Bishop N. Alaska*,
    2009 WL 8412170 (Bankr. D. Alaska July 20, 2009) ...........................11

*In re Main St. AC, Inc.*,
    234 B.R. 771 (Bankr. N.D. Cal. 1999) ..................................................13

*In re Ponce de Leon 1403, Inc.*,
    2012 WL 5880443 (Bankr. D.P.R. Nov. 20, 2012) ...............................11

*In re Vega*,
    2010 WL 3282656 (Bankr. D.P.R. Aug. 17, 2010) ...............................11

*U.S. Tr. Co. of New York v. New Jersey*,
    431 U.S. 1 (1977)..................................................................................24

**Statutes**

48 U.S.C. § 2141(b) ......................................................................................23

48 U.S.C. § 2166(a) ........................................................................................4

48 U.S.C. § 2167(a) ........................................................................................4

48 U.S.C. § 2174(b) .....................................................................12, 16, 24, 25

**Rules**

Fed. R. Bankr. P. 7037 ...............................................................................1, 11

Fed. R. Bankr. P. 9014 ...............................................................................1, 11

Fed. R. Civ. P. 37 ........................................................................................1, 11

Pursuant to Rule 37 of the Federal Rules of Civil Procedure ("FRCP"), made applicable to this contested matter pursuant to Rules 7037 and 9014 of the Federal Rules of Bankruptcy Procedure ("FRBP"), Ambac Assurance Corporation ("Ambac") and Financial Guaranty Insurance Company ("FGIC" and, together with Ambac, "Movants"), by and through their undersigned counsel, respectfully submit this urgent motion (the "Urgent Motion") requesting entry of an order, substantially in the form attached hereto as **Exhibit A**, compelling the Financial Oversight and Management Board for Puerto Rico (the "Board") and the Puerto Rico Fiscal Agency and Financial Advisory Authority ("AAFAF" and, together with the Board, the "Government Parties") to produce documents responsive to *Ambac Assurance Corporation and Financial Guaranty Insurance Company's First Set of Document Requests to the Government Parties and Their Advisors in Connection with the Disclosure Statement for the Third Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.*, served by Movants on May 12, 2021 (attached hereto as **Exhibit B**) (the "Requests for Production"), and to produce witnesses in response to Movants' deposition cross-notices directed to the Board and Board members David A. Skeel and Justin M. Peterson (attached hereto as **Exhibits C, D, and E**) (the "Deposition Cross-Notices").

## PRELIMINARY STATEMENT

1.   The Third Amended Plan of Adjustment[2] sets forth a plan to restructure the vast majority of the Commonwealth's $120 billion in obligations, including more than $2 billion worth of bonds owned or insured by Movants, while paying them and other creditors pennies on the

---

[2] "Third Amended Plan of Adjustment" or "Plan" refers to the *Third Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (ECF No. 16740).

dollar.  With the filing of the Disclosure Statement Approval Motion[3] on May 13, 2021, the Board has now sought approval of the Disclosure Statement[4] for the Third Amended Plan of Adjustment.

2.    The Disclosure Statement, however, lacks certain critical information, and its underlying foundation is—by the Board's own admission—unverified, inhibiting creditors from casting an informed vote on the Plan.  For example, the Board acknowledges that it has not verified the accuracy of the financial information in the Disclosure Statement, and that it has relied entirely upon the systems and data utilized by the Commonwealth.  (Disclosure Statement at iii.)  Yet at the same time, the Disclosure Statement acknowledges that the Commonwealth has not yet published audited financial statements for its 2018, 2019, and 2020 fiscal years.  (*Id.*)  Furthermore, the Disclosure Statement acknowledges that the economic and financial information in the Disclosure Statement has not been approved by AAFAF as the Commonwealth's fiscal agent.  (*Id.*)  Remarkably, the Disclosure Statement also does not include the Board's analysis of how the Plan is in the best interests of creditors, and the Board has refused to answer repeated inquiries regarding when the analysis will be made available to creditors.  How, then, are creditors supposed to cast an informed vote on the Plan?

3.    In an attempt to gain visibility into the foundations of the Disclosure Statement and the Plan, Ambac and FGIC served the Requests for Production on the Government Parties.  The

---

[3] "Disclosure Statement Approval Motion" refers to the *Amended Joint Motion of the Commonwealth of Puerto Rico, the Employees Retirement System of the Government of the Commonwealth of Puerto Rico, and the Puerto Rico Public Buildings Authority for an Order (i) Approving Disclosure Statement, (ii) Fixing Voting Record Date, (iii) Approving Confirmation Hearing Notice and Confirmation Schedule, (iv) Approving Solicitation Packages and Distribution Procedures, (v) Approving Forms of Ballots, and Voting and Election Procedures, (vi) Approving Notice of Non-Voting Status, (vii) Fixing Voting, Election, and Confirmation Deadlines, and (viii) Approving Vote Tabulation Procedures* (ECF No. 16756).

[4] "Disclosure Statement" refers to the *Disclosure Statement for the Third Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (ECF No. 16741).

Requests for Production seek documents relating to, *inter alia*, the Fiscal Plan[5] incorporated into the Disclosure Statement, analysis of whether the Plan is in the best interests of creditors, the Commonwealth's $55.6 billion estimated pension liability, assets held by the Commonwealth and/or Commonwealth Entities,[6] necessary operating expenses and the costs of essential services, and the Commonwealth's access to cash. Cognizant of the demands on the Government Parties in these proceedings, Movants have sought to coordinate Disclosure Statement discovery with that sought by the Official Committee of Unsecured Creditors (the "UCC") to the maximum extent possible, including by incorporating by reference document requests issued by the UCC rather than issuing duplicative requests, and (at Movants' request) participating in joint meet-and-confers with the UCC.[7] Movants also served the Deposition Cross-Notices on the Board and two of its members—as cross-notices to deposition notices served by the UCC—to solicit testimony on these issues.

4.     In response, the Government Parties have essentially refused to provide any discovery, thereby confirming what was clear from the Board's DS Scheduling Motion (defined herein) nearly two months ago—the Board will post whatever documents it wants to its electronic depository, and creditors should grin and bear it without asking questions. Indeed, AAFAF has taken the categorical position that it simply will not produce any documents in response to the Requests for Production (or even prepare responses and objections), based on the erroneous presumption that such discovery is appropriate only from "the party seeking approval of the

---

[5] "Fiscal Plan" refers to the fiscal plan certified for the Commonwealth by the Board on April 23, 2021.

[6] "Commonwealth Entities" refers, collectively, to the agencies, instrumentalities, and public corporations of the Commonwealth.

[7] Movants understand that the UCC will be filing, contemporaneously herewith, a motion to compel with respect to the document requests and deposition notices it issued. As discussed herein, Movants join in the UCC's requests for discovery.

disclosure statement."[8]  Not to be outdone, the Board has refused to produce any documents in response to the vast majority of Movants' document requests, and as to the other requests, simply referred to documents that were posted to its document depository, which do not come remotely close to satisfying the requests.  The Government Parties' refusal to provide meaningful discovery leaves creditors and the Court without critical information necessary to evaluate the Disclosure Statement.

5.    The June 15, 2021 deadline for creditors to file any objections to the Disclosure Statement is fast approaching.  To ensure that creditors are provided with adequate information to evaluate the Disclosure Statement in these proceedings—the largest municipal bankruptcy in American history—Movants request that the Court enter an order compelling the Government Parties to produce documents responsive to the Requests for Production by no later than June 10, 2021, and to make the witnesses noticed in the Deposition Cross-Notices available for depositions no later than June 14, 2021.

<u>**JURISDICTION AND VENUE**</u>

6.    The Court has jurisdiction over this matter under 28 U.S.C. § 1331 and PROMESA § 306(a), 48 U.S.C. § 2166(a).  Venue is proper under 28 U.S.C. § 1391(b) and PROMESA § 307(a), 48 U.S.C. § 2167(a).

<u>**BACKGROUND**</u>

I.    **THE FILING OF THE DISCLOSURE STATEMENT AND SCHEDULING OF PROCEEDINGS FOR CONSIDERATION OF THE DISCLOSURE STATEMENT.**

7.    On February 22, 2021, the Board entered into a revised plan support agreement with certain holders of general obligation bonds and bonds issued by the Puerto Rico Public Buildings Authority ("<u>PBA</u>"), including monoline insurers Assured Guaranty Corp. and Assured Guaranty

---

[8] (Letter from AAFAF to Movants, dated May 14, 2021, at 1 (attached hereto as Exhibit F).)

Municipal Corp. (collectively, "Assured"), National Public Finance Guarantee Corp. ("National"), and Syncora Guarantee, Inc. (the "February 2021 PSA"). The February 2021 PSA provided that Assured and National could walk away from the agreement before a date certain, providing those two insurers time to negotiate with the Board on the treatment of other bonds not the subject of the February 2021 PSA (namely, HTA and CCDA bonds).[9]

8. On March 8, 2021, the Board filed the Second Amended Plan of Adjustment[10] and the March 2021 Disclosure Statement,[11] incorporating the agreement reflected in the February 2021 PSA and in previous agreements.

9. On March 9, 2021, the Board announced it had entered into a stipulation with certain holders of bonds issued by the Employees Retirement System of Puerto Rico ("ERS") to file a third amended plan of adjustment reflecting certain agreed terms and that the ERS bondholders would vote to accept such plan.[12] On April 2, 2021, the Board announced that it had executed definitive documentation with the ERS bondholders regarding economic terms, which would be incorporated in the forthcoming third amended plan of adjustment.[13]

10. On April 6, 2021, the Board filed the *Debtors' Joint Motion for an Order (i) Scheduling Hearing to Consider the Adequacy of Information Contained in the Disclosure Statement, (ii)*

---

[9] (*Plan Support Agreement*, dated February 22, 2021, at 7.1(g)-(h) (attached hereto as Exhibit G).)

[10] "Second Amended Plan of Adjustment" refers to the *Second Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (ECF No. 15976).

[11] "March 2021 Disclosure Statement" refers to the *Disclosure Statement for the Second Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al. (Corrected)* (ECF No. 15988).

[12] (*See Stipulation (A) Providing for Due Diligence Period, (B) Allowing Clams of ERS Bondholders, (C) Staying Pending Litigation, and (D) Providing for Treatment of Claims of ERS Bondholders and Dismissal of Pending Litigation Pursuant to a Plan of Adjustment*, dated March 9, 2021, at 12-13 (attached hereto as Exhibit H).)

[13] (*Supplemental Joint Statement Regarding Oral Argument Regarding Pending Motions in Certain Contested Matters and Adversary Proceedings Related to the Bonds Issued by the Employees Retirement System of the Government of the Commonwealth of Puerto Rico* (ECF No. 16286), at 4.)

*Establishing the Deadline for Filing Objections to the Disclosure Statement and Replies Thereto,
(iii) Approving Form of Notice Thereof, (iv) Establishing Document Depository Procedures in
Connection Therewith, and (v) Granting Related Relief* (ECF No. 16332) (the "DS Scheduling
Motion"), asking the Court to establish a schedule for consideration of its then-forthcoming further
amended disclosure statement, proposing that objections to a motion to approve such disclosure
statement be due on May 14, 2021, replies be due on May 28, 2021, and that a hearing to consider
approval of such disclosure statement be held on June 16, 2021.  (DS Scheduling Motion ¶ 6.)  The
Board also proposed creating a centralized document depository to make available for creditors
information that it determines, in its sole discretion, is "necessary or appropriate" to consider the
adequacy of the information contained in the Disclosure Statement, stating that it anticipated that
"information requests" in connection with the Disclosure Statement would "go beyond what is
necessary or appropriate."  (*Id.* ¶¶ 9-10.)

11.  On April 12, 2021, the Board announced it had reached an agreement in principle with
Assured and National regarding the treatment of claims arising from HTA and CCDA bonds.  The
Board stated that it would revise the Second Amended Plan of Adjustment to reflect the terms of
this agreement.  (HTA/CCDA Term Sheet[14] at 2.)

12.  One day thereafter, on April 13, 2021, Ambac filed its objection to the Board's DS
Scheduling Motion, arguing that the Board's proposed schedule was far too compressed and
appeared designed to prevent creditor-propounded discovery despite the clear need for such
discovery on various issues.[15]  FGIC filed its objection to the DS Scheduling Motion on April 14,

---

[14] "HTA/CCDA Term Sheet" refers to the presentation titled *Agreement in Principal Summary HTA,
CCDA, and Clawback Claims* (ECF No. 16395-1).

[15] (*Objection of Ambac Assurance Corporation to Debtors' Joint Motion for an Order (i) Scheduling
Hearing to Consider the Adequacy of Information Contained in the Disclosure Statement, (ii) Establishing
the Deadline for Filing Objections to the Disclosure Statement and Replies Thereto, (iii) Approving Form*

2021, likewise arguing that the Board's proposed schedule was too compressed and raising certain issues with the Board's proposed document depository procedures.[16]

13. On April 21, 2021, the Board filed the *Omnibus Reply of the Financial Oversight and Management Board for Puerto Rico in Support of Debtors' Joint Motion for an Order (i) Scheduling Hearing to Consider the Adequacy of Information Contained in the Disclosure Statement, (ii) Establishing the Deadline for Filing Objections to the Disclosure Statement and Replies Thereto, (iii) Approving Form of Notice Thereof, (iv) Establishing Document Depository Procedures in Connection Therewith, and (v) Granting Related Relief* (ECF No. 16507) ("DS Scheduling Motion Reply"), in which it agreed to push back the proposed objection and reply deadlines for the Disclosure Statement by seven days, to May 21, 2021 and June 4, 2021, respectively, and made certain modifications to its proposed document depository procedures. (DS Scheduling Motion Reply ¶ 10.)

14. At the April 28, 2021 omnibus hearing, the Court heard oral argument on the DS Scheduling Motion. In an oral ruling, the Court held that the Board did not provide an adequate basis for shortening the notice period for objections to the Disclosure Statement under FRBP 2002 and that the Board's proposed schedule for the Disclosure Statement hearing was too short.[17] In a subsequent written order filed on May 4, 2021, the Court scheduled a hearing on the Disclosure Statement for July 13, 2021, with objections to the Disclosure Statement due on the twenty-eighth

---

*of Notice Thereof, (iv) Establishing Document Depository Procedures in Connection Therewith, and (v) Granting Related Relief* (ECF No. 16395).)

[16] (*Objection of Financial Guaranty Insurance Company to Debtors' Joint Motion for an Order (i) Scheduling Hearing to Consider the Adequacy of Information Contained in the Disclosure Statement, (ii) Establishing the Deadline for Filing Objections to the Disclosure Statement and Replies Thereto, (iii) Approving Form of Notice Thereof, (iv) Establishing Document Depository Procedures in Connection Therewith, and (v) Granting Related Relief* (ECF No. 16423).)

[17] (*Tr. of April 28, 2021 Omnibus Hr'g* (ECF No. 16662), at 12:17-23; 135:22-136:3.)

day following service of the disclosure statement hearing notice (June 15, 2021, according to the
Board's notice), and replies due fourteen days thereafter.[18] During the hearing, counsel for the
Board responded to arguments by Movants and other creditors that "the data room should not be
. . . a replacement to any discovery request" propounded by creditors, stating that the Board was
"not trying to do that," and that the Board was "not looking to stop [creditors] from serving [the
Board] with any additional discovery requests."[19]

15. On May 5, 2021, the Board announced it had entered into a plan support agreement
with certain holders of HTA and CCDA bonds, including Assured and National, to support
forthcoming plans of adjustment for each of the Commonwealth and HTA that would incorporate
the terms of that agreement (the "HTA/CCDA PSA").[20]

16. On May 11, 2021, the Board filed the Third Amended Plan of Adjustment and the
Disclosure Statement. In the early morning hours of May 12, 2021, the Board filed the *Notice of
Filing of Disclosure Statement for the Third Amended Title III Joint Plan of Adjustment of the
Commonwealth of Puerto Rico, et al. and Hearing Thereon* (ECF No. 16742), noticing June 15,
2021 at 5:00 P.M. AST as the deadline for any objections to the Disclosure Statement. On May 13,
2021, the Board filed the Disclosure Statement Approval Motion.

## II. DISCOVERY RELATING TO THE DISCLOSURE STATEMENT.

17. On May 12, 2021—one day after the Board's filing of the Third Amended Plan of
Adjustment and the Disclosure Statement—Movants served upon the Government Parties the

---

[18] (*Order (i) Scheduling a Hearing to Consider the Adequacy of Information Contained in the Disclosure
Statement, (ii) Establishing the Deadline for Filing Objections to the Disclosure Statement and Replies
Thereto, (iii) Approving Form of Notice Thereof, (iv) Establishing Document Depository Procedures in
Connection Therewith, and (v) Granting Related Relief* (ECF No. 16681).)

[19] (*Tr. of April 28, 2021 Omnibus Hr'g* (ECF No. 16662), at 112:15-24.)

[20] *See Oversight Board Finalizes HTA/CCDA-Related Plan Support Agreement with Assured, National*,
REORG, dated May 5, 2021.

Requests for Production, seeking discovery of materials relevant to consideration of the Disclosure Statement. In a letter accompanying the Requests for Production, Movants explained that they had been in receipt of copies of document requests and deposition notices served on the Board by the UCC on April 23, 2021 relating to the March 2021 Disclosure Statement (prior to the Board's filing of the current Disclosure Statement), as well as correspondence between the UCC and the Board regarding those discovery requests.[21] Movants explained that they believed it would be "most efficient for [disclosure statement] discovery to proceed in a coordinated fashion." (*Id.* at 2.) To that end, Movants noted that rather than issuing document requests duplicative of those issued by the UCC, they had included a request for all documents requested by the UCC, and then included additional requests. (*Id.*) In addition, to further ensure coordination, Movants indicated that they intended to issue cross-notices to the deposition notices issued by the UCC and requested that meet-and-confers on all discovery requests be held jointly. (*Id.*) Movants served the Deposition Cross-Notices on May 14, 2021. (*See* Exhibits C, D, E.)

18. On May 14, 2021, Movants received a letter from the Board claiming that the Requests for Production "are neither necessary nor appropriate" and refusing to produce any deposition witnesses.[22] The Board indicated that it would serve its formal responses and objections to the Requests for Production by May 21, 2021. (*Id.* at 2.)

19. On May 14, 2021, Movants also received a letter from AAFAF categorically refusing to produce any documents or even serve responses and objections to the Requests for Production,

---

[21] (Letter from Movants to the Government Parties, dated May 12, 2021, at 1-2 (attached hereto as Exhibit I).)

[22] (Letter from the Board to Movants, dated May 14, 2021, at 1-2 (attached hereto as Exhibit J).)

claiming that the requests were "neither necessary nor appropriate" and that they were purportedly improper "because AAFAF is not the party seeking approval of the disclosure statement."[23]

20.   On May 19, 2021, Movants, the UCC, and AAFAF held a telephonic meet-and-confer regarding the Requests for Production and the UCC's requests (the "May 19 Meet-and-Confer"). During the May 19 Meet-and-Confer, AAFAF confirmed that it is taking the position that any Disclosure Statement-related discovery directed to it is categorically improper, and that it would not produce any documents in response to the Requests for Production.

21.   On May 21, 2021, the Board served its responses and objections to the Requests for Production.[24]   With respect to most requests, the Board objected to producing any documents (Request Nos. 3-5, 8-18, and 20), and with respect to other requests, merely referred Movants to folders in its document depository purportedly containing responsive documents (Request Nos. 2, 6-7, 19, and 21-24).   (*See* Ex. K at 10-33.)   The Board also confirmed that it would not produce a Rule 30(b)(6) representative on any of the deposition topics noticed by Movants or the UCC.[25]

22.   On May 24, 2021, Movants, the UCC, and the Board held a telephonic meet-and-confer regarding the Requests for Production and the UCC's requests (the "May 24 Meet-and-Confer").   During the May 24 Meet-and-Confer, the Board confirmed that it would not produce any documents beyond those that it unilaterally decided to post to the document depository.

---

[23] (Ex. F at 1.)

[24] (*Responses and Objections of the Financial Oversight and Management Board for Puerto Rico to Ambac Assurance Corporation and Financial Guaranty Insurance Company's First Set of Document Requests to the Government Parties and Their Advisors in Connection with the Disclosure Statement for the Third Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.*, dated May 21, 2021 (attached here to as Exhibit K) (the "Board's R&Os").)

[25] (*See Responses and Objections of the Financial Oversight and Management Board to Cross-Notice of Deposition of the Financial Oversight and Management Board for Puerto Rico Pursuant to Rule 30(b)(6)*, dated May 21, 2021, at 9-23 (attached here to as Exhibit L); *Responses and Objections of the Financial Oversight and Management Board to Notice of Deposition in Connection with Disclosure Statement for Second Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.*, dated May 21, 2021, at 9-34 (attached here to as Exhibit M).)

## APPLICABLE LAW

23. In contested matters like this one, FRCP 37 is made applicable through FRBP 9014 and FRBP 7037. Under FRCP 37(a)(3)(B), a party seeking discovery may move for an order compelling production of documents or testimony.

24. The party resisting a request for production "bears the burden of establishing lack of relevancy or undue burden." *Autoridad de Carreteras y Transportación v. Transcore Atl., Inc.*, 319 F.R.D. 422, 427 (D.P.R. 2016) (citations and internal quotation marks omitted). "The objecting party must show specifically how each . . . request for production is not relevant or how each question is overly broad, burdensome or oppressive." *Id.* "[G]eneralized objections to an opponent's discovery requests are insufficient." *Id.*

25. It is well-established that bankruptcy courts may grant discovery in connection with consideration of a disclosure statement. *See, e.g.*, *In re 3DFX Interactive, Inc.*, 2006 WL 2010786 at *6 (Bankr. N.D. Cal. June 29, 2006) ("[T]here needs to be additional discovery and disclosure before this court can determine that any disclosure statement accompanying the . . . proposed plan has adequate information."); *In re Ponce de Leon 1403, Inc.*, 2012 WL 5880443, at *2 (Bankr. D.P.R. Nov. 20, 2012) (noting discovery had been granted in connection with hearing on approval of disclosure statement); *In re Catholic Bishop N. Alaska*, 2009 WL 8412170, at *2 (Bankr. D. Alaska July 20, 2009) (addressing motion to compel discovery in connection with disclosure statement).

26. In addition, contrary to the blanket assertions made by AAFAF, disclosure statement discovery is not limited to the plan proponent. *See, e.g.*, *In re Vega*, 2010 WL 3282656, at *3 (Bankr. D.P.R. Aug. 17, 2010) (finding that "discovery requests to third parties [would] be allowed" in dispute regarding disclosure statement); *In re Catholic Bishop N. Alaska*, 2009 WL

8412170, at *1, 2 (addressing creditor committees' document requests propounded upon two third parties for the purpose of assessing the adequacy of the debtor's disclosure statement).

## ARGUMENT

I.   **THE GOVERNMENT PARTIES SHOULD BE COMPELLED TO PRODUCE DOCUMENTS NECESSARY FOR A PROPER EVALUATION OF THE DISCLOSURE STATEMENT.**

27.   Movants require discovery on certain categories of documents that are essential in determining whether the Disclosure Statement provides creditors sufficient information to cast an *informed* vote on the Plan, and whether the Disclosure Statement presents a plan that is capable of being confirmed.

### A.   The Government Parties Should Produce Key Documents Relating to the Fiscal Plan.

28.   The Disclosure Statement incorporates the Fiscal Plan for the Commonwealth certified by the Board on April 23, 2021.   (*See* Disclosure Statement at ii, Ex. G.)   PROMESA section 314(b) provides that, to be confirmed, a plan of adjustment must be "consistent with the applicable Fiscal Plan" certified by the Board.   48 U.S.C. § 2174(b)(7).   PROMESA also requires that the plan of adjustment be "feasible and in the best interests of creditors," which requires analysis of "whether available remedies under the non-bankruptcy laws and constitution of the territory would result in a greater recovery for the creditors than is provided by such plan[.]"   *Id.* § 2174(b)(6).   Evaluation of whether a plan is confirmable therefore requires careful consideration of the certified fiscal plan.

29.   Notwithstanding the critical role played by the Fiscal Plan in the Third Amended Plan of Adjustment and the Disclosure Statement, the Government Parties have refused to provide documents responsive to requests relating to the Fiscal Plan.   While the requests are discussed in greater detail below, it should go without saying that creditors require a fulsome understanding of

the underlying assumptions and methodology behind the Fiscal Plan's financial projections in order evaluate the accuracy, completeness, and sufficiency of the Disclosure Statement. The critical role of the Fiscal Plan cannot be overstated. Not only is the Fiscal Plan a key feature of the Disclosure Statement,[26] but it will be central to the confirmability of the Plan. Understanding and evaluating the reasonableness of the Fiscal Plan's financial projections is of utmost importance to creditors and the Court, especially where (as here) the Government Parties have "never obtained reliable financial statements to support" the projections contained within the Fiscal Plan. *In re Main St. AC, Inc.*, 234 B.R. 771, 775 (Bankr. N.D. Cal. 1999).[27]

- *Request No. 2*: *All Documents and Communications sufficient to allow Creditors to review and reconcile sources and uses of existing cash balances with the inflows and outflows included in the Fiscal Plan, including (without limitation) a three-statement financial model or the equivalent thereof.*

30. Using information currently available, creditors are unable to review and reconcile sources and uses of existing Commonwealth monies with the inflows and outflows included in the Fiscal Plan. In other words, creditors lack the means to understand what revenue streams or entities generated particular monies included in the Fiscal Plan, or any legal restrictions on such monies that govern their permitted uses. Accordingly, Movants requested documents sufficient to allow creditors to review and reconcile sources and uses of existing cash balances with the inflows and outflows included in the Fiscal Plan, including (but not limited to) a three-statement financial

---

[26] (*See* Disclosure Statement at ii (incorporating exhibits, including the Fiscal Plan).)

[27] If the Government Parties' refusal to provide discovery on these points feels like *déjà vu*, that's because it is. In late 2017 and early 2018, the Government Parties fought tooth and nail resisting Rule 2004 discovery into materials underlying the fiscal plan. At the time, AAFAF, **which is now categorically refusing to produce discovery of any kind**, assured the Court that it was "committed to transparency and providing information[,]" that "[t]his is not a black box[,]" and that "[n]o one is resisting sharing information." (*See Tr. of November 15, 2017 Motion Hr'g* (ECF No. 1823), at 116:10-14.)

model or equivalent thereof.[28]  That would allow creditors to, *inter alia*, trace the sources and uses

of Commonwealth monies, validate the assumptions underlying the Fiscal Plan and statements

therein regarding how much Commonwealth monies are currently available or may become

available at some later date, and determine whether existing monies are earmarked for future

expenses but also double counted as expenses that offset future revenue.  The documents are

relevant to consideration of the Disclosure Statement, and Movants expect that they would be of a

relatively limited universe and not unduly burdensome to produce.  The Court should compel their

production.

- Request No. 3:  *The Fiscal Plan Model.*

31. To understand the emptiness of the Board's representations to the Court about its

willingness to entertain disclosure statement-related discovery requests, as well as the extreme

positions it is taking, the Court need look no further than the Board's refusal to provide the Fiscal

Plan Model.[29]  As this Court learned nearly four years ago, "[t]he Fiscal Plan Model is an Excel

file that summarizes the projected financial and operating performance of the Government of

Puerto Rico,"[30] and shows the math behind the Fiscal Plan.  The Fiscal Plan Model provides critical

insight into the Fiscal Plan, and the Board has previously made prior versions of it available to

creditors.  Likewise here, there should be no question that the Board should have provided it

voluntarily in the document depository it established for Disclosure Statement proceedings.  There

---

[28] A "three-statement financial model" refers to a financial model that links an entity's income statement, balance sheet, and cash flow statement into one dynamically connected financial model.

[29] "Fiscal Plan Model" means the financial or economics model(s), including (without limitation) live versions and/or Excel spreadsheets or workbooks of such financial or economic models, containing the financial projections and economic analyses reflected within the Fiscal Plan.

[30] (*See Debtors' Status Report Regarding (A) Financial Disclosures to Creditors and (B) Status of Settlement Discussions* (ECF No. 350-1), Ex. A at 2 (discussing attributes of the fiscal plan model in the context of the 2017 fiscal plan).)

is no conceivable basis for the Board to refuse to produce what Movants expect to be little (if anything) more than a ***single Excel document*** that could provide creditors with substantial insight into the Fiscal Plan and Disclosure Statement.

- *Request No. 4*: *All Documents, Communications, studies, and analyses, including any scientific, technical, or economic analyses, considered or relied upon in preparing the macroeconomic forecast model(s) and/or the baseline economic outlook model(s) within the Fiscal Plan, see Fiscal Plan at 28 n.14, and/or the Historical Fiscal Plans, including materials considered or relied upon in determining whether and how to revise, adjust, modify, or otherwise alter those models in response to the events described in Chapters 3 and 4 of the Fiscal Plan.*

- *Request No. 5*: *All Documents, Communications, studies, and analyses, including any scientific, technical, or economic analyses, considered or relied upon in preparing analyses contained in Chapter 6 of the Fiscal Plan.*

32. Request Nos. 4 and 5 are directed at understanding the assumptions underlying the Fiscal Plan. As the Court knows, these assumptions have come under fire in the past for being "hopeless," "overly pessimistic," and consistently wrong.[31] Movants need discovery to understand the factual, scientific, and economic grounds that inform these assumptions before they can determine whether the Fiscal Plan (and the Plan that relies upon it) is feasible and/or a fair reflection of the Commonwealth's future. And because the "2021 Fiscal Plan and its underlying financial projections are the result of several years" of iterative work (Disclosure Statement at 492), creditors need this information for Historical Fiscal Plans,[32] too. For example, in the May 2020 Fiscal Plan,[33] the Board stated that the debt sustainability analysis "pertains to traditional debt only, and not to other types such as contingent . . . debt." (*See* May 2020 Fiscal Plan at 54.) But the facially comparable debt-sustainability analysis contained in the current Fiscal Plan omits

---

[31] (*See Joint Motion of PSA Creditors Pursuant to Section 312 of PROMESA and Section 105 of the Bankruptcy Code to Impose Deadlines for Plan of Adjustment* (ECF No. 14478), ¶¶ 31-32.)

[32] "Historical Fiscal Plans" refers to any certified fiscal plan preceding the Fiscal Plan.

[33] "May 2020 Fiscal Plan" refers to the fiscal plan certified for the Commonwealth by the Board on May 27, 2020.

this language—just as contingent value instruments have been used to sweeten the pot for certain creditors.  A creditor reviewing the Fiscal Plan has no way to know why these and other changes were made without access to the underlying materials.

**B.    The Board Should Produce Its Best Interests Analysis and Key Documents Underlying It.**

33.  To confirm a plan of adjustment, PROMESA requires the Court to determine that the plan is "in the best interests of creditors," which "require[s] the [C]ourt to consider whether available remedies under the non-bankruptcy laws and constitution of the territory would result in a greater recovery for the creditors than is provided by such plan[.]"  PROMESA § 314(b)(6), 48 U.S.C. § 2174(b)(6).  This confirmation requirement—known as the "best interests test" in Chapter 9 municipal bankruptcies—is therefore a central consideration not only for the Court, but also for creditors, in evaluating the Plan.

34.  Incredibly, the Disclosure Statement filed with the Court does not include a best interests analysis, and two weeks after its filing, the Board has not yet supplemented the Disclosure Statement with that analysis.  Rather, mere weeks before creditors' deadline to file any objections, the Disclosure Statement simply includes a placeholder slip sheet as Exhibit N, stating that "[t]he Best Interests Test Reports will be filed at a later date."  (Disclosure Statement, Ex. N.)  This is a notable departure from prior disclosure statements filed by the Board, each of which included the Board's best interests analysis applicable to the Board's prior plans of adjustment.  (*See* ECF No. 8766, Ex. L; ECF No. 11947, Ex. L; ECF No. 15987, Ex. L.)  Movants have sent the Board numerous inquiries regarding when the Board would make the best interests analysis available to creditors,[34] only to be ignored and then, during the May 24 Meet-and-Confer, told that the Board

---

[34] (Ex. I at 4; Email from Ambac to the Board, dated May 17, 2021 (attached hereto as Exhibit N); Email from Ambac to the Board, dated May 22, 2021 (attached hereto as Exhibit O).)

does not know when the analysis will be made available to creditors, or even whether it will be

made available before objections to the Disclosure Statement are due.

35. Beyond this fundamental omission, the Disclosure Statement also fails to provide

information underlying the Board's best interests analysis, which creditors need to assess the

Board's analysis. Accordingly, Movants issued the following document requests:

- Request No. 6: *All Documents and Communications analyzing whether the Third Amended Plan of Adjustment is in the best interests of creditors, including whether available remedies under non-bankruptcy laws and the Commonwealth Constitution would result in a greater recovery for creditors than is provided by the Third Amended Plan of Adjustment.*
- Request No. 7: *All Documents and Communications considered or relied upon in preparing the "Best Interests Test Reports" attached as Exhibit L to the February 2020 Disclosure Statement or any forthcoming similar report for the May 2021 Disclosure Statement.*

36. In response to Movants' requests, the Board merely referred to purportedly responsive

documents uploaded to its document depository, and stated that it would produce any additional

responsive, non-privileged, non-duplicative factual source materials and raw data underlying the

Board's not-yet-released best interests test reports to the extent such documents become available.

(Ex. K at 14-15.)

37. The Board's response is wholly insufficient. The Board already knows (at least to

some extent) what assumptions, factual source materials, and raw data will inform the best interests

analysis. As reflected in the best interests analysis appended to the February 2020 Disclosure

Statement,[35] the analysis is prepared by outside advisors using "legal assumptions [and] financial

information [such as] schedules detailing estimates of outstanding bond debt, perspective on cash

balances[,]" as well as "data published by or directly provided by the Government of Puerto

---

[35] "February 2020 Disclosure Statement" refers to the *Disclosure Statement for the Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (ECF No. 11947).

Rico[.]"[36]  Creditors require this background information to, *inter alia*, evaluate the usefulness and accuracy of any forthcoming best interests analysis.  The Board should be compelled to produce these materials.  Likewise, to the extent AAFAF is in possession of any of these materials, it should be compelled to produce them.

### C. The Government Parties Should Produce Documents Reflecting Data, Analyses, and Assumptions Underlying the Various Iterations of the Disclosure Statement and Plan.

38. The Government Parties have refused to produce any documents in response to Request No. 11, which seeks "[d]ocuments, [c]ommunications, studies, and analyses prepared, considered, or relied upon in connection with the development of" the various iterations of the plans of adjustment and disclosure statements.  At a minimum, the Government Parties should be required to produce any documents that reflect data, analyses, or assumptions that underlie the plans of adjustment and disclosure statements.

39. The production of these documents should be non-controversial.  Indeed, the Board has already agreed to produce "certain" factual source materials and raw data underlying the Disclosure Statement, in a purported "effort to enhance the efficiency of the Disclosure Statement hearing."  (DS Scheduling Motion Reply, Ex. C at 6-7.)  While Movants agree that providing any factual source materials and raw data underlying the Disclosure Statement will enhance efficiency and, in theory, enable creditors to better understand the factual predicates underlying the Disclosure Statement, the Board's willingness to produce such materials does not go far enough.

40. *First*, the Board should not have unilateral authority to determine which factual source materials and raw data are relevant in evaluating the adequacy of information in the Disclosure Statement.  Indeed, the fact that the Board itself has acknowledged that it cannot verify the

---

[36] (*See* February 2020 Disclosure Statement, Ex. L at 1.)

accuracy of financial information in the Plan, and that AAFAF, as the Commonwealth's fiscal agent, has not approved of the economic and financial information in the Disclosure Statement, renders a comprehensive production of factual source materials and raw data underlying the Disclosure Statement essential.  If the Board and AAFAF are not willing to confirm the accuracy of key information contained in the Disclosure Statement or the Plan, creditors must be given the tools necessary to test the various assumptions, conclusions, and projections underlying the Plan and the Disclosure Statement—a task that is not possible without access to the factual predicates and raw data underlying such information.

41.  *Second*, the Board's agreement to produce "certain" factual source materials and raw data does not appear to include the production of such materials for (i) the Plan (only for the Disclosure Statement) or (ii) earlier iterations of the Disclosure Statement and the Plan.  Such materials are necessary to evaluate the Plan and to assess the degree to which assumptions, opinions, and conclusions have changed over time due to, *inter alia*, the various plan support agreements the Board has entered into with creditors.  For instance, the Board has previously taken the position that all expenses listed in the Commonwealth's certified budgets are necessary operating expenses, and anything not in the Commonwealth's certified budgets is therefore not essential.[37]  But since the time that representation was made, the Board has since agreed to make significant sums available to facilitate the HTA/CCDA PSA and the ERS PSA and provide for material restriction and consummation fees for the creditors that are parties to those agreements.  These newly found monies raise questions regarding whether assumptions underlying, and

---

[37] (*Responses and Objections of the Financial Oversight and Management Board for Puerto Rico, as Title III Representative of the Commonwealth, to Ambac Assurance Corporation's First Set of Interrogatories Relating to Rule 2004 Discovery on Cash*, served on Sept. 16, 2020, at 9, 11 (attached hereto as Exhibit P).)

opinions and conclusions in, previous iterations of the Disclosure Statement and the Plan were

informed by the Commonwealth's **willingness** to pay certain creditors rather than its **ability** to pay.

### D.    The Government Parties Should Produce Documents Regarding the Pension Reserve Trust and the Pension Reserve Fund.

42.    The Board has refused to produce any documents in response to the following requests

seeking documents relating to the proposed treatment of pension obligations in the Plan and the

Disclosure Statement:

- Request No. 12: *All Documents and Communications concerning the Pension Reserve Trust, including its establishment, funding, management, terms for the deposit and withdrawal of monies, projected investment guidelines and investment returns, and its Non-Impairment Covenant.*

- Request No. 13: *All Documents and Communications concerning proposed contributions to the Pension Reserve Trust, including Base Contributions, actual primary surplus contributions, projected Fiscal Plan primary surplus contributions, and any discretionary contributions by the Commonwealth permitted under the Plan of Adjustment, the Amended Plan of Adjustment, the Second Amended Plan of Adjustment, and/or the Third Amended Plan of Adjustment.*

- Request No. 14: *All Documents and Communications concerning the Pension Reserve Fund described in the Retiree Committee Plan Support Agreement, including its establishment, funding, management, terms for the deposit and withdrawal of monies, and projected investment guidelines and investment returns.*

- Request No. 15: *All Agreements concerning management of the Pension Reserve Trust and/or the Pension Reserve Fund, including Agreements between or among pension plans, plan participants, or their managers, trustees, or fiduciaries.*

43. The production of materials concerning the Pension Reserve Trust[38] is crucial to

allowing creditors to make an informed determination regarding whether to vote in favor of the

Plan.  The estimated $55.6 billion in pension liabilities represents the largest class of claims in

---

[38] "Pension Reserve Trust" refers to the reserve trust proposed to be created in Article LXXIX of the Third Amended Plan of Adjustment, which the Board proposes to utilize for payment of the Commonwealth's pension obligations under Act 106-2017.

these Title III proceedings.  With the conversion of the pension obligations to pay-as-you-go liabilities in 2017, pension payments have become the single largest expense of the Fiscal Plan, reducing by billions of dollars the funds available for the Commonwealth's debt service and other governmental functions.

44.  Notwithstanding the sheer magnitude of this asserted liability, the Board has provided creditors with almost no information regarding how it intends to handle the massive pension claim. The Disclosure Statement provides some information regarding how individual pensioners would be treated under the Plan—the Plan would limit any reduction in an individual's monthly retirement benefits to no more than 8.5%, resulting in potential recoveries by pension claimants of at least 91.5%.  However, the Disclosure Statement does not provide information regarding the allowed amount of the retirees' claims.

45.  Instead, the Disclosure Statement describes the creation of a Pension Reserve Trust to be established for the sole benefit of retirees.  (Disclosure Statement at 38-39, 42, 453-54.)  The Disclosure Statement provides no information regarding how the Pension Reserve Trust will be managed or the sources of proposed contributions to the Pension Reserve Trust.  Nor does the Disclosure Statement provide information regarding the "Pension Reserve Fund" described in the Retiree Committee Plan Support Agreement,[39] which is incorporated into the Disclosure Statement.  (*See id.* at ii, Ex. E.)  Is the Pension Reserve Fund the same as the Pension Reserve Trust, or are they two separate entities?  Discovery into the Pension Reserve Trust and/or Pension Reserve Fund is necessary to allow creditors to understand the roles and functions of these entities

---

[39] "Retiree Committee Plan Support Agreement" refers to the plan support agreement, dated as of June 7, 2019, by and between the Debtor, by and through the Board pursuant to Section 315(b) of PROMESA, and the committee of retired former employees of the Commonwealth and the Commonwealth Entities, appointed in the Title III Proceedings.

and how the Board intends to use Commonwealth monies to fund massive pension payments for many years into the future.

>    **E.   The Government Parties Should Produce Documents Regarding Real Property Assets and Illiquid Investments Relevant to the Commonwealth's Financial Condition.**

46.  The Government Parties have refused to produce any documents in response to Request Nos. 16 and 17, which seek documents and communications concerning disused properties and illiquid investments of the Commonwealth and its instrumentalities.  Discovery into disused properties and illiquid investments is needed because the Disclosure Statement discloses little to no information regarding these assets.

47.  This information is relevant to creditors' ability to assess the adequacy of disclosures in the Disclosure Statement regarding the financial condition of the Commonwealth.  The Commonwealth has acknowledged that "[t]he Executive Branch comprised of its agencies, entities, and public corporations has *countless* real properties in disuse that could be sold to the private sector for various purposes."  (Ex. Q at 18 (emphasis added).)[40]  For that reason, the Commonwealth enacted Act 26-2017 with the express goal of "maximizing the use of available state resources, including the resources of public corporations[,]" and created the Real Property Evaluation and Disposal Committee ("CEDBI") to dispose of publicly held real properties in disuse.  (*Id.* at 18, 19.)[41]  Yet the Disclosure Statement provides *no* information regarding the Commonwealth and Commonwealth Entities' real property assets whatsoever, despite their

---

[40] Exhibit Q is a certified translation of the House bill that was enacted as Act 26-2017.  "Act 26-2017" refers to Act 26-2017, known as the Fiscal Plan Compliance Act, enacted by the Commonwealth on April 29, 2017.

[41] In addition to creating CEDBI to dispose of disused properties, Act 26-2017 requires, *inter alia*, that Commonwealth Entities transfer any annual surpluses to the Puerto Rico Department of Treasury and states that such surplus monies shall be considered "resources available to the [Commonwealth.]"  (*See infra* Arg. § I.G.)

enormous aggregate value and potential to increase the pie available to creditors.  Indeed, Ambac's real estate valuation expert has estimated that a mere 81 real properties held by certain Commonwealth Entities have an approximate value of $1.3 billion.  (*See Ambac Assurance Corporation's Motion for Entry of Order Authorizing Discovery Under Bankruptcy Rule 2004 Concerning Commonwealth Assets* (ECF No. 15802), ¶¶ 2, 24.)

48. The Disclosure Statement also provides **no** information regarding the illiquid investments of the Commonwealth and Commonwealth Entities.  Indeed, since such illiquid investments are not addressed in the Disclosure Statement whatsoever, creditors are left to merely guess at the identity and value of such investments.

49. Documents regarding the Commonwealth's disused properties and illiquid investments are therefore necessary for a proper evaluation of the Disclosure Statement, and their production should be compelled.

**F.     The Government Parties Should Produce Documents Relating to an Assessment of the Commonwealth's Essential Services.**

50. The Government Parties have refused to produce any documents in response to Request No. 18, which seeks documents related to the assessment of the Commonwealth's necessary operating expenses or costs of providing essential public services.  But the Disclosure Statement's failure to provide any explanation as to what services are "essential"—and the Board's blanket assertion that every budget item is "essential"—means that discovery is needed to provide creditors with information about whether the Board's assessment of necessary operating expenses has any viable basis.

51. As the Board acknowledges (Disclosure Statement at 163),  a certified fiscal plan must "ensure the funding of essential public services."   PROMESA § 201(b)(1)(B), 48 U.S.C. § 2141(b)(1)(B).  And, of course, any plan of adjustment must be "consistent with the applicable

Fiscal Plan" certified by the Board.  PROMESA § 314(b)(7), 48 U.S.C. § 2174(b)(7).  Yet, the

Disclosure Statement expressly declines to provide a definition of "essential services" or the costs

associated with the provision of such services (*i.e.*, the Commonwealth's necessary operating

expenses).  (Disclosure Statement at 162-63 ("This Disclosure Statement and the Plan do not

define 'essential services' or 'essential expenses.'").)  Instead, the Board has taken the position

that "every item in the Commonwealth's certified budgets are necessary operating expenses[,]"[42]

while stating in the Disclosure Statement that it need not define "essential services" or enumerate

their costs because, *inter alia*, section 106(e) of PROMESA purportedly shields the Fiscal Plan

from judicial scrutiny in any context.  (Disclosure Statement at 163 ("The fiscal plan's certification

is outside the subject matter jurisdiction of the Title III Court pursuant to PROMESA section

106(e).  PROMESA section 314(b)(7) requires that the Plan be consistent with the fiscal plan, but

imposes no testing of the fiscal plan.  Therefore, essential services are not in issue.").)

52.  At the same time, the Disclosure Statement states that "'essential services' is a phrase

used to refer, at a minimum, to services which, due to the police power, a court of competent

jurisdiction can allow to be paid for from revenues to which a creditor has a priority claim or a

valid, unavoidable secured claim."  (*Id.* at 162.)[43]  Under that strained view, every item in the

Commonwealth's certified budget pertains to a service provided pursuant to the Commonwealth's

police power.

53. The Board's legal position is meritless, and the Disclosure Statement's failure to

disclose the scope of essential services on those grounds leaves creditors without critical

information.  Creditors and the Court need to understand the scope of essential services under the

---

[42] (Ex. P at 9, 11.)

[43] This position rests on dubious legal grounds.  *See U.S. Tr. Co. of New York v. New Jersey*, 431 U.S. 1,
22 (1977) ("[P]rivate contracts are not subject to unlimited modification under the police power.").

Plan so that they can evaluate, *inter alia*, the Plan's feasibility and whether it is in the best interests of creditors.  PROMESA § 314(b)(6), 48 U.S.C. § 2174(b)(6).  The Board's tortured definition of essential services—which presupposes that monies committed to nebulous essential services are totally beyond the reach of creditors—stymies both these inquiries.  If it was Congress's view that a plan of adjustment's adherence to a certified fiscal plan's evaluation of essential services is a perfect litmus test for whether a plan is feasible and whether it is in the best interests of creditors, it would have said as much.

54. Based on the Disclosure Statement, neither creditors nor the Court have any way of understanding the criteria used to assess what services are or are not essential besides vague references to the Commonwealth's police powers.  Without documents supporting the Board's conclusion regarding what should be considered essential services (and the costs associated therewith), Movants and other creditors will not be able to cast an informed vote on the Plan.  Accordingly, the Court should compel the Government Parties to produce documents relating to an assessment of the Commonwealth's essential services and associated costs.

**G.     The Government Parties Should Produce Documents Providing Information Regarding Monies Potentially Available to the Commonwealth.**

55. Movants propounded the following Requests seeking documents relating to monies potentially available to the Commonwealth and the intended use of monies currently available to the Commonwealth:

- <u>Request No. 19</u>:  *All Documents and Communications regarding "potentially inaccessible" monies, as described in the December 2020 Presentation, including (without limitation) documents concerning:  (i) why the Board, AAFAF, and/or their advisors contend that monies held by public corporations are "potentially inaccessible[;]" (ii) any legislation considered, proposed, or enacted for the purpose of enabling the Commonwealth to access monies held by public corporations; and (iii) why Commonwealth monies appropriated or transferred to public corporations have not been clawed back by, or otherwise transferred back to, the Commonwealth.*

- **Request No. 20**:  *All Documents and Communications regarding any transfer of surplus funds from a Commonwealth Entity to the Commonwealth pursuant to Chapter 4 of Act 26-2017, and Documents and Communications relating or responding to any requests by the Act 26-2017 Committee for transfers pursuant to Chapter 4 of Act 26-2017, whether or not such transfers were effected.*

- **Request No. 21**:  *All Documents and Communications regarding "potentially unavailable" monies, as described in the December 2020 Presentation, including (without limitation) documents concerning:  (i) why the Board, AAFAF, and/or their advisors contend that, as of December 17, 2020, $540 million in Commonwealth monies and $151 million in monies held by public corporations are "potentially unavailable[;]" and (ii) the operational or other cash needs of Commonwealth Entities holding "potentially unavailable" monies.*

- **Request No. 22**:  *All Documents and Communications regarding any analysis prepared, considered, or relied upon in connection with the Board's determination that the Commonwealth should maintain an unrestricted liquidity balance of no less than $2.5 billion, including (without limitation) all Documents and Communications regarding any previous, ongoing, completed, or contemplated efforts to obtain external financing:  (i) for the Disaster Aid Revolving Fund, including any analysis comparing the costs associated with funding the Disaster Aid Revolving Fund using external financing and Commonwealth monies; and (ii) to satisfy the LUMA Funding Requirement, including any analysis regarding the costs associated with satisfying the LUMA Funding Requirement using external financing.*

- **Request No. 23**:  *All Documents and Communications regarding any analysis prepared, considered, or relied upon in connection with the Board's determination that the Commonwealth should maintain an emergency reserve in the amount of $1.3 billion.*

The Board has refused to produce any documents in response to Request No. 20 and, with respect to Request Nos. 19, 21, 22, and 23, has merely referred Movants to documents uploaded to its document depository—documents which were previously produced in connection with Ambac's Rule 2004 requests regarding Commonwealth cash.  AAFAF has, of course, refused to produce any documents.  The Government Parties' refusal to produce documents responsive to these requests is unreasonable, and production should be compelled.

56. *First*, the Government Parties' refusal to produce any documents regarding surplus transfers from Commonwealth Entities to the Commonwealth pursuant to Chapter 4 of Act 26-

2017 ignores the critical role that these transfers play in the Commonwealth's attempt to place itself on firmer financial footing.  Act 26-2017 was enacted by the Commonwealth on April 29, 2017 for the purpose of "maximizing the use of [] available state resources," including those of Commonwealth public corporations, and requires Commonwealth Entities to transfer any annual surpluses to the Puerto Rico Department of Treasury.  (Ex. Q at 18, Art. 4.01.)  Such surplus monies are "***considered as resources available to the State*** . . . to comply with the liquidity requirements contemplated in the Fiscal Plan."  (*Id.*, Art. 4.01 (emphasis added).)  Accordingly, the transfers plainly have relevance to the Commonwealth's financial condition and creditors' ability to assess it.  But the Disclosure Statement provides no information whatsoever about any transfers of surplus monies or any requests for such transfers in the more than three years since the legislation was enacted.

57. *Second*, the documents in the document depository to which the Board has referred Movants are blatantly insufficient.  The documents the Board contends are responsive to Request Nos. 19 and 21 (seeking documents regarding "potentially inaccessible" and "potentially unavailable" monies, respectively) were all previously produced in response to different requests propounded by Ambac in connection with Rule 2004 discovery regarding Commonwealth cash.  However, the Board objected to producing documents relating to potentially inaccessible or unavailable monies in connection with Rule 2004 discovery,[44] so the previously produced documents uploaded to the Board's document depository do not address these issues.  Further, the documents the Board contends are responsive to Request Nos. 22 and 23 (concerning the Commonwealth's minimum unrestricted liquidity balance and emergency reserve) address key

---

[44] (*See* Letter from Board to Ambac, dated March 30, 2021, at 1-2 (attached hereto as Exhibit R) (detailing the Board's objections to substantially similar requests propounded by Ambac in the context of cash Rule 2004 discovery).)

issues, such as the consideration of external financing to advance disaster-related expenses, in conclusory terms, revealing no substantive analysis of the benefits or costs associated with such external financing.

58. The discovery Movants seek through these cash-related requests is vital to consideration of the Disclosure Statement because, while the Disclosure Statement purports to provide adequate information regarding the Commonwealth's cash assets (*see* Disclosure Statement at 133-43), it leaves many questions unanswered. Indeed, the Disclosure Statement limits the Board's cash restriction analysis to just those monies classified as "restricted," "unrestricted," "asserted to be restricted," "inconclusive," or "unreviewed." (*See id*.) However, the Board has separately disclosed information regarding other monies held by the Commonwealth and Commonwealth public corporations through the December 2020 Presentation,[45] which classifies approximately $8.1 billion held by public corporations as "potentially inaccessible" and approximately $691 million held by the Commonwealth and its public corporations as "potentially unavailable." (December 2020 Presentation at 7-9, 11, 13, 15, 18.) Of course, the Board's classification of such monies as *potentially* inaccessible or unavailable to the Commonwealth carries with it the implication that such monies are, indeed, *potentially* accessible or available to the Commonwealth, and, therefore, additional discovery regarding such monies should be produced.

59. Further, while the Disclosure Statement discloses the Board's conclusion that the Commonwealth should maintain an unrestricted liquidity balance of at least $2.5 billion, which includes approximately $750 million in Commonwealth monies purportedly needed to fund its

---

[45] "December 2020 Presentation" refers to the Board's December 19, 2020 presentation, which was disclosed publicly as part of a periodic release of "cleansing materials" related to ongoing mediation efforts. The presentation is available at https://emma.msrb.org/P11450397-P11124337-P11535399.pdf.

Disaster Aid Revolving Fund[46] and approximately $900 million in Commonwealth monies purportedly needed for the LUMA Funding Requirement[47] (*see* Disclosure Statement at 146-47, 224; December 2020 Presentation at 20), it provides little justification for the annual retention of such a large amount of Commonwealth resources. For example, the Disclosure Statement states, in conclusory fashion, that if external financing (rather than Commonwealth monies) were used to meet the LUMA Funding Requirement, electricity rates would be dramatically increased in the short term. (*Id.* at 147.) Yet it discloses no information regarding any analysis performed to support that conclusion. Nor does the Disclosure Statement even address the potential use of external financing for the Disaster Aid Revolving Fund or the separate, $1.3 billion emergency reserve that is also funded using Commonwealth monies. (*See id.* at 146-48.) Clearly, more information is needed to allow creditors to assess the decision to tie up nearly $4 billion in Commonwealth monies on an annual basis.

## II.   THE GOVERNMENT PARTIES SHOULD BE COMPELLED TO PRODUCE WITNESSES IN RESPONSE TO THE DEPOSITION CROSS-NOTICES.

60. In response to the UCC's deposition notices served upon the Board and two of its members, Mr. Skeel and Mr. Peterson, Movants served the Deposition Cross-Notices. As with the UCC's deposition notices, the Board has refused to produce any of these witnesses for deposition. It should be compelled to do so.

61. It is indisputable that the Board and Messrs. Skeel and Peterson have relevant information relating to the foundations of the Plan and the Disclosure Statement. Deposition

---

[46] "Disaster Aid Revolving Fund" refers to the fund established to advance monies in the form of one or more loans, extensions of credit, or advances to Commonwealth Entities and Commonwealth municipalities as a bridge to the receipt of funding under Federal Emergency Management Agency ("FEMA") programs, as described on page 146 of the Disclosure Statement.

[47] "LUMA Funding Requirement" refers to the financial support the Commonwealth intends to provide to fund certain operating and capital reserve accounts that is a precondition to the commencement of LUMA's services, as described on page 146-47 of the Disclosure Statement.

testimony is particularly appropriate in light of the Government Parties' wholesale refusal to produce documents in response to Movants' Requests for Production. While deposition testimony is not a substitute for production of relevant documents, it may shed light on any holes in the Disclosure Statement and the Government Parties' productions.

62. Moreover, any complaints regarding burden would ring hollow when considered against the magnitude of the restructuring contemplated by the Board. Indeed, both Mr. Skeel and Natalie Jaresko, the Board's Executive Director, have previously been made available for depositions pursuant to an order of this Court in the PREPA proceedings, albeit more than 18 months ago. (*Order on Motion to Compel* (ECF No. 1678, 17-BK-4780 (LTS)), at 6 (granting motion to compel Rule 30(b)(6) depositions of the Board, AAFAF, and PREPA).)

## **CONCLUSION**

The Government Parties' refusal to produce relevant discovery in connection with the Disclosure Statement is a continuation of their years-long efforts to suppress creditors from obtaining information critical to evaluating the Commonwealth's financial condition and its proposed restructuring. From one stage of these proceedings to another, the Government Parties have sought to push off meaningful discovery. But this discovery should not be held up any longer. The Board is now asking the Court to approve a disclosure statement that will be submitted to creditors for a vote to accept or reject the Plan. Creditors should have the information necessary to assess the foundations of the Disclosure Statement and the Plan before they vote. And pushing this discovery off until plan confirmation under the Board's proposed expedited schedule—at which point the Government Parties will once again surely refuse to produce meaningful discovery—only delays the process to a point when the parties and the Court will be attempting to stay above water. The discovery sought by Movants is relevant, reasonable in scope, and should be allowed now.

For the foregoing reasons, Movants respectfully request that this Court enter an order, substantially in the form attached hereto as Exhibit A, compelling the Government Parties to produce documents responsive to the Requests for Production by no later than June 10, 2021, and to make the witnesses noticed in the Deposition Cross-Notices available for depositions no later than June 14, 2021, and for such other relief as this Court deems just and proper.

## CERTIFICATION

Pursuant to Paragraph I.H of the *Fourteenth Amended Notice, Case Management and Administrative Procedures* (ECF No. 15894-1), Movants hereby certify that they have carefully examined the matter and concluded that there is a true need for the Urgent Motion; have not created the urgency through any lack of due diligence; and have made reasonable, good-faith efforts to resolve or narrow the issues that are being brought to the Court, including by meeting and conferring with opposing counsel on May 19, 2021 and May 24, 2021.  Movants believe that the parties are at an impasse on the issues presented in this Urgent Motion, and that the Government Parties will oppose this Urgent Motion.

Dated:  May 26, 2021
San Juan, Puerto Rico

**FERRAIUOLI LLC**

By: /s/ *Roberto Cámara-Fuertes*
Roberto Cámara-Fuertes (USDC-PR No. 219002)
Sonia Colón (USDC-PR No. 213809)
221 Ponce de León Avenue, 5th Floor
San Juan, PR 00917
Telephone: (787) 766-7000
Facsimile:  (787) 766-7001
Email:  rcamara@ferraiuoli.com
          scolon@ferraiuoli.com

**MILBANK LLP**

By: /s/ *Atara Miller*
Dennis F. Dunne (admitted *pro hac vice*)
Atara Miller (admitted *pro hac vice*)
Grant R. Mainland (admitted *pro hac vice*)
John J. Hughes, III (admitted *pro hac vice*)
Jonathan Ohring (admitted *pro hac vice*)
55 Hudson Yards
New York, NY 10001
Telephone: (212) 530-5000
Facsimile:  (212) 530-5219
Email: ddunne@milbank.com
          amiller@milbank.com
          gmainland@milbank.com
          jhughes2@milbank.com
          johring@milbank.com

*Attorneys for Ambac Assurance Corporation*

**REXACH & PICÓ, CSP**

By: /s/ *María E. Picó*
María E. Picó
(USDC-PR No. 123214)
802 Ave. Fernández Juncos
San Juan, PR 00907-4315
Telephone: (787) 723-8520
Facsimile: (787) 724-7844
Email: mpico@rexachpico.com

**BUTLER SNOW LLP**

By: /s/ *Martin A. Sosland*
Martin A. Sosland (admitted *pro hac vice*)
2911 Turtle Creek Blvd., Suite 1400
Dallas, TX 75219
Telephone: (469) 680-5502
Facsimile: (469) 680-5501
Email: martin.sosland@butlersnow.com

James E. Bailey III (admitted *pro hac vice*)
Adam M. Langley (admitted *pro hac vice*)
6075 Poplar Ave., Suite 500
Memphis, TN 38119
Telephone: (901) 680-7200
Facsimile: (901) 680-7201
Email: jeb.bailey@butlersnow.com
          adam.langley@butlersnow.com

*Attorneys for Financial Guaranty Insurance Company*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this same date a true and exact copy of this notice was filed with

the Clerk of Court using the CM/ECF system, which will notify a copy to counsel of record.

<u>/s/ *Roberto Cámara-Fuertes*       </u>
Roberto Cámara-Fuertes (USDC-PR No. 219002)
221 Ponce de León Avenue, 5th Floor
San Juan, PR 00917
Telephone: (787) 766-7000
Facsimile:  (787) 766-7001
Email: rcamara@ferraiuoli.com