IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| IN re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO<br>   as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, et al.<br><br>Debtors[1] | PROMESA<br>Title III<br><br>Case No. 17-BK-3283 (LTS) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO<br><br>  as representative of<br><br>PUERTO RICO ELECTRIC POWER AUTHORITY ("PREPA"),<br><br>Debtor. | PROMESA<br>Title III<br><br>Case No. 17-BK-4780 (LTS)<br><br>Court Filing Relates Only to PREPA and Shall Only be Filed In Case No. 17-BK-4780 (LTS) |

**<u>VERIFIED MOTION OF FOREMAN ELECTRIC SERVICES INC.
FOR ALLOWANCE OF ADMINISTRATIVE EXPENSE CLAIM</u>**

---

[1] The last four (4) digits of each Debtor's federal tax identification number are (i) Commonwealth of Puerto Rico (Case No. 17 BK 3283-LTS) number 3481; (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Case No. 17 BK 3284-LTS) number 8474; (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Case No. 17 BK 3567-LTS) number 3808; (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") ( Case No. 17 BK 3566-LTS) number 9686; (v) Puerto Rico Electric Power Authority ("PREPA") (Case No. 17-BK-4780-LTS) number 3747; and Puerto Rico Public Buildings Authority ("PBA") (Case No. 19-BK-5523-LTS) number 3801.

Comes now FOREMAN ELECTRIC SERVICES INC. ("Foreman"), by and through the undersigned counsel, hereby files this motion for allowance of its administrative expense claim and respectfully states:

**Introduction**

On September 20, 2017, two (2) months after the filing of the present petition, hurricane Maria passed and caused unprecedented damages throughout Puerto Rico, causing particular havoc to the electric grid of the Island. The devastation is widely known, as it is considered one of the most powerful hurricanes to land on Unites States soil. In response, the Puerto Rico Power Electric Power Authority ("PREPA" or "Debtor") issued a Request for Proposal ("RFP 77844") to procure services of one or more contractors "for the immediate restoration of the PREPA system". After due consideration, PREPA awarded contracts to three companies: Cobra Acquisitions LLC. ("Cobra"), MasTech Renewables Puerto Rico LLC. ("MasTech") and Foreman. Of these, only the two latter received notices to proceed and millions of dollars in payments from PREPA. Of significant importance to this matter, Cobra is currently in the center of a criminal proceeding since its former president and one former FEMA official have been accused of unlawful conduct related to the abovementioned contract[2].

Notwithstanding, Foreman diligently commenced mobilization efforts, as per PREPA's sense of urgency, to promptly provide the Puerto Rican people the necessary assistance to recover and restore power. Contrary to the contractual terms stipulated between the parties, Foreman has not received compensation from PREPA for its actual and necessary expenses in the mobilization, demobilization and other related efforts. Consequently, and pursuant to the applicable law,

---

[2] *See United States of America v. Ahsha Nateef Tribble, Donald Keith Ellison and Jovanda R. Patterson*, case number 19-00541 (FAB) before the United States District Court for the District of Puerto Rico.

Foreman respectfully requests that its post-petition expenses be considered an administrative expense claim of the Debtor and be granted priority treatment accordingly.

## Facts

1. On May 3, 2017, the Financial Oversight and Management Board for Puerto Rico ("Oversight Board") filed a voluntary petition on behalf of the Commonwealth of Puerto Rico pursuant to section 304(a) of the Puerto Rico Oversight, Management and Economic Stability Act ("PROMESA").

2. On July 2, 2017, the Oversight Board filed a voluntary petition on behalf of PREPA pursuant to section 304(a) of PROMESA. The cases are now jointly administered.

3. On September 20, 2017, Puerto Rico was struck by hurricane Maria, causing unprecedented damages to the whole island, particularly, its electric and power grid.

4. Foreman is a corporation organized under the laws of the Commonwealth of Puerto Rico. Mainly, Foreman's prior experiences and work consisted of short-term repair and restoration projects on electric and powerline services following winter and tropical storms.

5. In February 2018, PREPA initiated the RFP 77844 process related to the restoration of electric utilities after the damage caused by Hurricane Maria. The RFP 77844 specified that the contractor "shall" certain "required resources," including, but not limited to the following:

    a. 100 Transmission Linemen

    b. 200 Distribution Linemen

    c. 20 Civil workers, Damage assessors, heavy equipment operators, 20 logistics, safety and others (with a minimum of sixty percent of the workforce being sourced from the contractor's own workforce)

3

    d. Transmission Digger Trucks

    e. Distribution Digger Trucks

    f. Auger Trucks

    g. Distribution Bucket Trucks

    h. Transmission Bucket Trucks

    i. Pick ups

    j. Dozer, semi tractors

    k. 60 and 30 Ton Cranes

    l. Semi Tractors and haul *See* RFP, Appendix A – Technical Specifications, at 1.1 "Scope of Phase 2 and Phase 3 Restoration".

6. The RFP 77844 unequivocally stated that "[t]hese resources *shall* be in addition to any available personnel or equipment on grounds," and that "[r]esources *must* be available to start working at the beginning of Phase 2: March 5, 2018." The contractor was then required to include in its proposal a "logistic plan for mobilization" along with an "estimated cost for mobilization." *Id.* The RFP further stated that "PREPA intends to pay Standby Pay as soon as the contractor is notified that their assistance is required for a specific storm." Appendix A at 1. "Scope".

7. Prior to submitting its proposal, Foreman sought clarification on this matter through questions/answers that were appended to RFP in "Addendum I" dated February 24, 2018. Foreman inquired into the start date of March 5, 2018, since it was before the project award date of March 12, 2018. PREPA responded that the "dates were shifted" to "include next storm season," and that the "start date will be two weeks after contract is awarded." Addendum I at p. 3. In a subsequent question on the same topic, PREPA specified that

4

contractor "crews *shall be mobilized* and *ready to start* works [sic] two weeks after contract is awarded." *Id.* at p. 5 (Emphasis added). As for any reimbursable costs, PREPA stated that it will reimburse for "[c]harges, at rates internally used by Contractor, for the use of transportation equipment and *other equipment requested*." *Id.* at pp. 3-4, 6.

8. RFP 77844 further stipulated that any awarded contract "*shall* consist of PREPA's Contract together with the RFP Documents, including, but not limited to, the executed Proposal Documents, which shall be collectively referred to as the Contract Documents." RFP, Exhibit 1 – Scope of Services, at § 2.3.

9. Foreman submitted a 63-page proposal, in which it specified that it would provide over 550 linemen and support personnel and over 350 pieces of necessary equipment. Proposal, Appendix C, at § 1.2. "Project Overview". In Section 5.3, "Account Management," Foreman provided a detailed mobilization and demobilization plan, which included PREPA paying for both. *See* Proposal at §§ 5.3.1.A.-B., H.

10. Foreman was selected for the contract with PREPA on March 29, 2018. Therefore, and consistent with PREPA's conveyed sense of urgency and the fact that the mobilization schedule outlined in the Proposal now constituted part of the "Contract Documents," Foreman commenced mobilization efforts on April 12, 2018.

11. Of the three companies which were awarded the RFP 77844 for the restauration of the electrical grid after the passing of hurricane María, PREPA formalized the contracts with Cobra and MasTech on or before March, 2018.

12. Furthermore, please note that on September 3, 2019, after millions of dollars were paid to Cobra, three persons were indicted for alleged mismanagement and criminal conduct

5

related to the Cobra's contract for repairment of the electrical grid with PREPA: one FEMA official, one former FEMA official and Cobra's employee[3] and Cobra's former president.

13. Specifically, the indictment alleges that one FEMA official "performed official acts through her FEMA employment to advance COBRA's interests and secure favorable treatment for COBRA as needed and as specific opportunities arose in connection with the contracts signed between PREPA and COBRA, the payment of work billed under the contracts, and **work assigned by PREPA to COBRA pursuant to those contracts**." (Emphasis ours). *See* paragraph 43 of the indictment.

14. The indictment further alleges that "[FEMA official], in exchange for receiving things of value from [Cobra's former president], performed official acts as needed and as specific opportunities arose on behalf of COBRA, including but not limited to, influencing, providing advice to, and exerting pressure on PREPA executives , including but not limited to the Chief Executive Office, and Directors of different PREPA divisions, so that PREPA would accelerate payments to COBRA, assigns tasks to COBRA instead of using PREPA employees, **and use COBRA in restoration tasks to the exclusion of other contractors.**" (Emphasis ours). *See* paragraph no. 44 of the indictment.

15. Against this backdrop, and after much follow up on Foreman's part, the terms of the contract itself were formalized on January 29, 2019, when PREPA and Foreman subscribed the Master Service Agreement ("MSA"). The signing of the MSA of course did nothing to

---

[3] Ms. Jovanda R. Patterson, FEMA's former official and Cobra's employee pleaded guilty on Count 13 of the Indictment (18 U.S.C. section 208) regarding Acts affecting personal financial conflicts of interest. Count 13 states as follows: "Jovanda R. Patterson being a FEMA employee assigned to FEMA restoration efforts in Puerto Rico for the major disaster declaration FEMA-4339-DR, participated personally and substantially as a Government employee through decision, approval, recommendation, the rendering of advice, and otherwise in a proceeding in which she knew COBRA and its affiliates Cobra Energy LLC and Cobra Logistics Holding LLC had a financial interest and that at that time she was negotiating and had an arrangement concerning prospective employment with COBRA and its affiliated, to wit, she received through her FEMA email and completed a customer Past Performance Evaluation for Cobra Logistics that was part of a vendor bid process.".

6

alter the fact that Foreman's proposal, as well as the RFP, constituted significant and reliable components of the Contract Documents. Accordingly, from the inception of the contract—*i.e.*, when PREPA selected Foreman on March 29, 2018—Foreman incurred costs related to its mobilized resources, readily available to be utilized by PREPA for benefit of the people of Puerto Rico.

16. The MSA required Foreman to provide "labor, supervision, tools, equipment, and materials necessary to perform the hurricane restoration and reconstruction services at various locations in PREPA's services areas." The value of the contract was not to exceed $250,000,000.00 and, originally, was in effect from January 29, 2019 through June 30, 2019.

17. According to Article 1 of the MSA, Foreman was hired to provide labor, supervision, tools, equipment and materials necessary to perform the hurricane restoration and reconstruction services at various locations in PREPA's service areas. In particular, Foreman agreed to perform overhead distribution power line services, to include but not limited to, engineering and design, tearing down and removing inadequate distribution infrastructure; perform underground distribution power line services; perform overhead transmission power line services; perform underground transmission power line services; perform substation services; perform GIS mapping services to correct and enable the utility to have correct information of location of all powerline, substation, and electrical infrastructure mapping; provide all necessary equipment, tooling, lodging, and logistics, among others. *See* Appendix A of the MSA.

18. Furthermore, PREPA agreed to make payments to Foreman at the rates specified under Appendix B and Appendix C of the MSA. As such, the parties agreed that "*Mobilization /*

7

*Demobilization and other reimbursable items shall be paid on a cost reimbursement basis.*"

See MSA, Appendix B (at bottom of table) (emphasis added).

19. As per Amendment No. 2 to the MSA dated June 20, 2019 ("Amendment No. 2"), the effective date of the contract was extended until December 31, 2019. The Agreement was amended "to extend the term that the Agreement shall be in effect, **in order to ensure that PREPA has an emergency services contractor** in place for the 2019 hurricane season." (Emphasis ours).

20. The MSA and its amendments were duly registered before the Office of the Comptroller of Puerto Rico. The MSA also reiterated the inclusion of Foreman's Proposal as a part of the Contract. *See* MSA at § 2.3 ("Contract – shall mean, *collectively*, the documents listed below [including the Contractor's Proposal] and all supplementary documents thereto that are incorporated by reference." (emphasis added)).

21. PREPA's intent to have Foreman's equipment readily available was communicated to Foreman throughout the duration of the Contract Documents, beginning with the RFP, through execution of the MSA, to various electronic mail communications throughout the duration of each. For example, on Foreman received an email from PREPA asking them to "provide information regarding available crews and equipment." At all times through 2018 and 2019, PREPA made clear to Foreman that ready availability was of the utmost importance.

22. Accordingly, between the years 2018 and 2019, 226 pieces of Foreman's equipment, including 117 bucket trucks and backyard machines and 50 digger derrick trucks, were mobilized to Puerto Rico. In addition, Foreman incurred costs on rented equipment, expenses for rental of a yard for parking and storage equipment, as well as for security

8

services, and other related expenses. This equipment sat ready and "available"—per the terms of the RFP and contract—to be used for more than one (1) year, pending PREPA's orders for further mobilization; yet, none were procured.

23. At the end of the contract term on December 31, 2019 as per the Amendment No. 2, Foreman demobilized from Puerto Rico, incurring additional costs to transport equipment back to the continental United States. In sum, Foreman incurred in post-petition costs and expenses a total of $8,362,866.49.

24. Up to the date of the filing of the present motion, Foreman has not been reimbursed by PREPA for any of the costs and expenses it incurred related to the mobilization, demobilization of equipment and other expenses related to the Master Service Agreement. Therefore, Foreman has a right to be compensated for its post-petition efforts to assist in the recovery of Puerto Rico's power grid as an administrative expense of Debtor pursuant to Section 503 of the Bankruptcy Code and be granted priority treatment accordingly.

## Applicable Law and Discussion

25. Section 503 of the Bankruptcy Code, as incorporated by section 301 of PROMESA, allows an entity to timely file a request for payment of an administrative expense. After notice and a hearing, the actual, necessary costs and expenses of preserving the estate[4] shall be allowed as an administrative expense. Section 301(a) of PROMESA, 48 U.S.C. 2161(a), incorporates section 507(a)(2) of the Bankruptcy Code, giving priority to administrative expenses that are allowed under section 503 of the Bankruptcy Code.

---

[4] Section 301(c)(5) of PROMESA provides that the term 'property of the estate', when used in a section of the Bankruptcy Code made applicable in case under subsection (a), means 'property of the debtor', 48 U.S.C.A. 2161(c)(5).

26. The burden of proving entitlement to priority payment as an administrative expense rest upon the party requesting it. *See In re Hemingway Transp. Inc*, 954 F2d. 1 (1st Cir. 1992). The courts have broad discretion in determining whether to grant a request for priority payment. *See In re Jeans.com*, 491 B.R. 16 (Bankr. D.P.R. 2013); *see* also *Memorandum Opinion Granting in Part and Denying in Part PREPA's Motion for Entry of an Orden Allowing Administrative Expense Claim for Compensation for Front-End Transition Services under the Puerto Rico Transmission and Distribution System Operation and Maintenance Agreement with Luma Energy* (Docket Entry No. 2258).

27. This Court's *Order (A) Authorizing Debtor Puerto Rico Electric Power Authority to Obtain Postpetition Financing; (B) Providing Superpriority Administrative Expense Claims; and (C) Granting Related Relief* (Docket Entry No. 744) provides that administrative expense claims will be paid in accordance with PROMESA. Furthermore, no bar date has been established by this Court and the adjudication of the *Joint Motion of Puerto Rico Electric Power Authority and AAFAF Pursuant to Bankruptcy Code Sections 362,502, 922, and 928, and Bankruptcy Rules 3012(a)(1) and 9019 for Order Approving Settlements Embodied in the Restructuring Support Agreement* [Docket Entry No. 1235] is still pending. According to the most recent status report by the Debtor, additional time is necessary in order for the Governmental parties to "preserve the RSA by evaluating different means of implementation in light of the continuing challenges Puerto Rico is facing from COVID-19 pandemic and changing economic and political landscape"[5]. Thus, Foreman's request is timely filed.

---

[5] *See Status Report of the Government Parties Regarding the Covid-19 Pandemic and the 9019 Motion* filed on May 11, 2021, Docket Entry No. 2476.

28. The term "preserving the estate" has been expansively interpreted by the courts on a case-by-case basis and the same should not be interpreted narrowly, *see* COLLIER BANKRUPTCY MANUAL 503-18. As the leading treatise in Bankruptcy Law has discussed:

> Although the trustee has an implicit duty to preserve and safeguard the estate and its assets for the benefit of all creditors, preservation may also include and be a means to other ends in the administration of an estate, such as the continuation of the business or an orderly liquidation.

*Id.*

29. Likewise, the courts have broadly exercised its discretion in determining what "the actual, necessary costs and expenses" are that are allowed by Section 503 of the Bankruptcy Court. For example:

> Preservation of the estate may require, outlays for repairs, upkeep, freight, insuring the value of the property and the hiring of custodians by the trustee (…) The actual and necessary expenditures of the trustee in operating the business of the estate, for storage of property, for rent and for other goods and services incidental to protecting, conserving, maintaining and rehabilitating the estate are certainly contemplated within the phrase 'actual, necessary costs and expenses of preserving the estate.

*See* COLLIER BANKRUPTCY MANUAL at 503-18.

30. The First Circuit has set forth the criteria that should be considered to determine whether to allow an administrative expense claim. This Court, citing the case of *In re Hemingway Transport Inc.,* 954 F.2d 1 (1st Cir. 1992), stated that a request under Section 503(a) of the Bankruptcy Code may qualify if the right to payment arose from a post-petition transaction with the debtor estate, rather than from a prepetition transaction with the debtor and the consideration supporting the right to payment was beneficial to the estate of the debtor. *See In re Financial Oversight and Management Board for Puerto Rico*, 481 F.Supp. 3d 60 (D.P.R. 2020).

11

31. Debtor has also recognized the existence of administrative claims for post-petition services. For example, PREPA and the Oversight Board have stated that "[t]he Government Parties are sympathetic to and acknowledge the importance of paying allowable administrative claims promptly." *See Opposition to Cobra Acquisitions LLC's Urgent Motion to Modify the Stay Order and Allow Undisputed Tax Claims*, Docket Entry No. 1959.

32. The amounts herein claimed by Foreman were the actual and necessary costs incurred. Furthermore, and particularly considering that the MSA was specifically extended to cover the 2019 hurricane season as per Amendment No. 2, PREPA deemed necessary and beneficial to its operations to secure Foreman's services and equipment for an additional period.

33. Foreman incurred in costs, after being awarded a post-petition restoration contract, in compliance with the terms specified by PREPA and for the benefit of the Puerto Rican people. More than two hundred trucks and other equipment were mobilized to the Island, ready to be used and to assist in the restoration of the electric grid. Likewise, Foreman incurred costs during demobilization; therefore, the corporation is entitled to, and have a valid, enforceable administrative expense claim.

34. In the alternative, and assuming *arguendo* that this Court considers that the requirements of Section 503 are not met, which is hereby denied, this Court can still grant Foreman's request under the doctrine of 'fundamental fairness' sponsored by the Supreme Court in the case of *Reading Co. v. Brown*, 391 U.S. 471, 88 S.Ct. 1759, 20 L.Ed.2d 751 (1968).

35. The facts of *Reading* are as follows: a trustee was appointed to administer the debtor's business consisting solely of an industrial structure and, under the supervision of the trustee, the building was destroyed by a fire. The question then before the Court was

whether the tenants and fire loss claimants should be considered administrative expenses under the bankruptcy proceeding.

36. The trustee argued that the fire loss claimants should not be considered administrative expenses since the main purposes of the bankruptcy proceeding are to facilitate rehabilitation of insolvent business and to preserve a maximum of assets for distribution among the general creditors. The Supreme Court was not persuaded by these arguments and concluded that "[i]n our view the trustee has overlooked one important, and here decisive, statutory objective: **fairness to all persons** having claims against an insolvent." (Emphasis added). *Reading*, 391 U.S. at 477.

37. The *Reading* doctrine has been recently validated by this Court, as well as by the Bankruptcy Appellate Panel for the First Circuit in the case of *In re Healthco International Inc.*, 272 B.R. 510 (BAP 1st Cir. 2002), aff'd., 310 F3d 9 (1st Cir. 2002). The Appellate Panel concluded that costs awarded to litigants for successfully defending trustee's claims were payable on a first priority basis as administrative expenses. Although the requirements of section 503 were not specifically complied with, the Panel determined that:

> [E]ntities 'injured' by the debtor-in-possession's business operations may receive priority payment, even though their claims did not arise from 'transactions' necessary to preserve or rehabilitate the estate (…) In a nutshell, the 'fundamental fairness' exception is recognized when the debtor's postpetition operations occasion tortious injuries to third parties or **when the claim arises from postpetition** actions that deliberately violate applicable law **and damage others**."

(Emphasis added). *In re Healthco Intern., Inc.*, 272 B.R. at 513; *see also In re Financial Oversight Board and Management Board for Puerto Rico* at 65.

38. The costs and expenses incurred post-petition by Foreman were done in accordance with the requirements established by PREPA and the conveyed sense of urgency of restoring power to the population of Puerto Rico considering it was the most devastating natural

13

disaster in recent history. Even though PREPA failed to submit a Notice to Proceed, Foreman's equipment, expertise and personnel were ready and available at the disposal of PREPA—as asserted in the RFP and required under the contract.

39. After evaluating multiple requests, PREPA awarded a contract to Foreman, terms and conditions were negotiated and a contract was subscribed, creating expectations and a legal relationship between the parties. However, PREPA failed to comply with the contract, while favoring a contractor which its former president is now part of a criminal proceeding for unlawful conduct, causing damages to Foreman. Foreman's trucks and specialized equipment sat idle in Puerto Rico while no compensation was received. As a result, Foreman was not able to procure other jobs in continental United States since it was contractually obligated to PREPA for almost a year. Because of these losses, Foreman's opportunities to obtain capital for future operations have been seriously severed.

40. Of the three contractors awarded restoration contracts by PREPA, only Foreman was left without a single notification to proceed, and thus, the most damaged. After receiving millions of dollars in payments from Debtor, Cobra's president and a former FEMA employee are currently being processed for their criminal conduct of influencing PREPA officials, of accelerating payments to Cobra, and of favoring Cobra in the restoration process while excluding other contractors, such as Foreman. Meanwhile, MasTech is also pursuing a cause of action against Cobra for tortious interference with its business relationship with PREPA[6]. Therefore, it is reasonably to conclude that Cobra and/or Cobra's former president's unlawful conduct and its relationship with PREPA and/or PREPA's officials had a direct impact upon the losses suffered by Foreman. As such,

---

[6] *See MasTec Renewables Puerto Rico LLC. v. Mammoth Energy Services, Inc. and Cobra Acquisitions LLC.*, Civil Action No. 20-20263-Civ-Scola filed before the United District Court for the Southern District of Florida.

14

Foreman should not be penalized, by way of PREPA's denial of payment. This topic, and others related, will be part of the complaint to be filed shortly against PREPA, which will result in the granting by this Court of additional damages. These damages should also be considered part of Foreman's administrative expense claim.

41. Consequently, considering the equities and the fairness of the case, and even if the Court considers that there was not a direct benefit to the estate, Foreman is still entitled to receive compensation for the expenses incurred. Foreman's claim should be considered as an administrative expense:

> Some cases recognize that benefit to the estate is merely one factor to consider, rather than an indispensable requirement, in allowing administrative expense requests. Those cases involve situations in which administrative expense status should be afforded to certain types of claims because they are actual and necessary to the preservation of the estate even though they may not 'benefit' the estate within the usual meaning of the word.

*See* COLLIER BANKRUPTCY MANUAL 503-20.

### Conclusion

For the reasons stated above, Foreman's claim complies with the requirements of section 503 of the Bankruptcy Code, as incorporated by section 301 of PROMESA. Foreman's contract was awarded after the filing of the present petition and the post-petition costs and expenses incurred were associated with contracted restoration of Puerto Rico's electric grid after the passing of hurricane María, and thus, beneficial to Debtor's property. The expenses herein claimed in the total amount of $8,362,866.49 were the actual expenses incurred by Foreman in order to assist PREPA as contractually agreed. Consequently, Foreman urges this Court, in exercising its discretion, to enter an order granting the present motion.

WHEREFORE it is respectfully requested that this Court enter an order determining that Foreman's claim be considered an administrative expense of Debtor, entitled to administrative

15

priority pursuant to Section 503 and Section 507 of the Code and enter any other relief as is just and proper.

**RESPECTFULLY SUBMITTED**.

In San Juan, Puerto Rico, this 27th day of May, 2021.

I HEREBY CERTIFY that on this date I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System which will send notification of such filing to the participants in said record including the US Trustee, counsel for AAFAF, counsel for the Oversight Board, Counsel for the Creditor's Committee, and Counsel for the Retiree Committee.

**MCCONNELL VALDES LLC**
*Counsel for Foreman*
270 Munoz Rivera Avenue, Suite 900
Hato Rey, Puerto Rico 00918
P.O. Box 364225
San Juan, PR 00936
Tel. 787-759-9292
Fax. 787-759-8282

By: *s/Antonio A. Arias-Larcada*
Antonio A. Arias-Larcada
USDC PR 204906
aaa@mcvpr.com

By: *s/ Rosamar García-Fontán*
Rosamar García-Fontán
USDC PR 221004
rgf@mcvpr.com

## VERIFICATION UNDER PENALTY OF PERJURY
## PURSUANT TO 28 U.S.C. § 1746

I, Bront Bird of legal age, single, resident of San Juan, Puerto Rico hereby state under penalty of perjury that:

    1.    I have read the foregoing Verified Motion of Foreman Electric Services, Inc. for Allowance of Administrative Expense Claim; and

    2.    The factual assertions in the Verified Motion of Foreman Electric Services, Inc. for Allowance of Administrative Expense Claim are true and correct to the best of my knowledge, information and belief and/or pursuant to documents in my possession and my personal involvement in the facts of this case.

Executed in San Juan, Puerto Rico, this 27th day of May, 2021

**Ordinary Income/Expense Summary 2018**

|  | Apr-18 | May-18 | Jun-18 | Jul-18 | Aug-18 | Sep-18 | Oct-18 | Nov-18 | Dec-18 |
|---|---|---|---|---|---|---|---|---|---|
| **Income** | | | | | | | | | |
| 45100 · Job Income | - | - | - | - | - | - | - | - | - |
| **Total Income** | - | - | - | - | - | - | - | - | - |
| **Expense** | | | | | | | | | |
| 50400 · Equipment-Truck Rental | 454,585.42 | 454,585.42 | 454,585.42 | 454,585.42 | 412,972.34 | 371,359.26 | 371,359.26 | 371,359.26 | 371,359.26 |
| 67200 · Security | - | 5,360.00 | 12,280.00 | 10,040.00 | 8,880.00 | 10,960.00 | 11,600.00 | 10,400.00 | 10,160.00 |
| 71400 · Rent Expense | - | 7,000.00 | 7,000.00 | 7,000.00 | 7,000.00 | 7,000.00 | 7,000.00 | 7,000.00 | 7,000.00 |
| 74000 · Insurance | 16,128.82 | 16,128.82 | 16,128.82 | 16,128.82 | 16,128.82 | 16,128.82 | 16,128.82 | 16,128.82 | 16,128.82 |
| **Total Expense** | 470,714.24 | 483,074.24 | 489,994.24 | 487,754.24 | 444,981.16 | 405,448.08 | 406,088.08 | 404,888.08 | 404,648.08 |
| **Total 2018** | 3,997,590.44 | | | | | | | | |

**Ordinary Income/Expense Summary 2019**

|  | Jan-19 | Feb-19 | Mar-19 | Apr-19 | May-19 | Jun-19 | Jul-19 | Aug-19 | Sep-19 | Oct-19 | Nov-19 | Dec-19 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Income** | | | | | | | | | | | | |
| 45100 · Job Income | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Income** | - | - | - | - | - | - | - | - | - | - | - | - |
| **Expense** | | | | | | | | | | | | |
| 50400 · Equipment-Truck Rental | 371,359.26 | 371,359.26 | 371,359.26 | 363,230.26 | 322,714.24 | 322,714.24 | 322,714.24 | 312,904.05 | 303,093.85 | 303,093.85 | 303,093.85 | 303,093.85 |
| 67200 · Security | 9,080.00 | 8,840.00 | 8,720.00 | 8,220.00 | 9,100.00 | 8,760.00 | 8,180.00 | 7,980.00 | 7,720.00 | 12,520.00 | 14,160.00 | 13,720.00 |
| 71400 · Rent Expense | 7,000.00 | 7,000.00 | 7,000.00 | 7,000.00 | 7,000.00 | 7,000.00 | 7,000.00 | 7,000.00 | 7,000.00 | 7,000.00 | 7,000.00 | 7,000.00 |
| 74000 · Insurance | 16,128.82 | 16,128.82 | 16,128.82 | 16,128.82 | 16,128.82 | 16,128.82 | 16,128.82 | 16,128.82 | 16,128.82 | 16,128.82 | 16,128.82 | 16,128.82 |
| **Total Expense** | 403,568.08 | 403,328.08 | 403,208.08 | 394,579.08 | 354,943.06 | 354,603.06 | 354,023.06 | 344,012.87 | 333,942.67 | 338,742.67 | 340,382.67 | 339,942.67 |
| **Total 2019** | 4,365,276.05 | | | | | | | | | | | |
| **Total Ordinary Income/Expense** | 8,362,866.49 | | | | | | | | | | | |

18