# UNITED STATES DISTRICT COURT
## DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND<br>MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*<br><br>Debtors.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br>(Jointly Administered) |

## OBJECTION OF THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO TO URGENT MOTION OF AMBAC ASSURANCE CORPORATION AND FINANCIAL GUARANTY INSURANCE COMPANY TO COMPEL DISCOVERY IN CONNECTION WITH THE DISCLOSURE STATEMENT

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number listed as a bankruptcy case number due to software limitations and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (iv) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780 (LTS)) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................. 1

BACKGROUND ......................................................................................... 5

    A.    Filing of the Plan and Disclosure Statement ........................................... 5

    B.    Motion Practice Regarding Approval of the Disclosure Statement ....................... 6

    C.    Discovery Concerning the May 2021 Disclosure Statement ................................. 8

APPLICABLE LAW ................................................................................... 10

ARGUMENT .............................................................................................. 13

I.      AMBAC/FGIC DO NOT NEED DISCOVERY BECAUSE THEY ALREADY
HAVE DECIDED TO REJECT THE PLAN. .................................................. 13

II.    THE COURT SHOULD DENY AMBAC/FGIC'S MOTION TO COMPEL
DOCUMENT DISCOVERY IN CONNECTION WITH THE MAY 2021
DISCLOSURE STATEMENT. ................................................................. 14

    A.    Request Nos. 2, 3, 4 and 5 Seek Irrelevant Documents and
Communications Relating to the Commonwealth Fiscal Plan. ............................ 15

    B.    The Oversight Board Already Has Provided and Will Continue to Provide
Available, Non-Privileged, Non-Duplicative Documents and
Communications Relating to the Best Interest Analysis in Response to
Request Nos. 6 and 7. ......................................................................... 17

    C.    Request No. 11 Seeks Irrelevant and/or Privileged Documents,
Communications and Analyses Relating to Various Iterations of the
Disclosure Statements and Plans of Adjustment. ......................................... 18

    D.    Request Nos. 12, 13, 14 and 15 Seek Irrelevant Documents and
Communications Regarding the Pension Reserve Trust. .................................. 20

    E.    Request Nos. 16 and 17 Seek Irrelevant Documents and Communications
Concerning Real Property Assets and Illiquid Investments. .............................. 22

    F.    Request No. 18 Seeks Irrelevant Information Regarding the
Commonwealth's Essential Services. ....................................................... 23

    G.    The Oversight Board Has Produced, Will Produce, and/or Has No Non-
Privileged Documents or Communications to Produce in Response to
Request Nos. 19, 20, 21, 22 and 23. ....................................................... 25

III.   THE COURT SHOULD DENY AMBAC/FGIC's MOTION TO COMPEL THE
OVERSIGHT BOARD TO PRODUCE WITNESSES IN RESPONSE TO THE
DEPOSITION CROSS-NOTICES. ............................................................. 27

CONCLUSION ........................................................................................... 28

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

<span style="font-variant:small-caps">Cases</span>

*Bogan v. City of Boston*,
   489 F.3d 417 (1st Cir. 2007) ................................................................................28

*Century Glove, Inc. v. First Am. Bank of New York*,
   860 F.2d 94 (3d Cir. 1988) ..................................................................................10

*In re Am. Cap. Equip., LLC*,
   688 F.3d 145 (3d Cir. 2012) ................................................................................11

*In re Bath Bridgewater S., LLC*,
   No. 11-06817-8-SWH, 2012 WL 4325650 (Bankr. E.D.N.C. Sept. 20, 2012) ......................14

*In re Baumgarten*,
   No. 93 B 40188 (FGC), 1993 Bankr. LEXIS 1933 (Bankr. S.D.N.Y. Dec. 30,
   1993) ...........................................................................................................19

*In re Brandon Mill Farms, Ltd.*,
   37 B.R. 190 (Bankr. N.D. Ga. 1984) ....................................................................19

*In re City of Detroit*
   Case No. 13-53846 (Bankr. E.D. Mich. May 5, 2014) ..............................................20

*In re City of San Bernardino*
   Case No. 12-bk-28006 (Bankr. C.D. Cal. July 29, 2016) ..........................................20

*In re Clamp-All Corp.*,
   233 B.R. 198 (Bankr. D. Mass. 1999) ..............................................................13, 22

*In re Comandante Mgmt. Co.*,
   359 B.R. 410 (Bankr. D.P.R. 2006) ......................................................................12

*In re Copy Crafters Quickprint, Inc.*,
   92 B.R. 973 (Bankr. N.D.N.Y. 1988) ...................................................................16

*In re Fin. Oversight and Mgmt. Bd. for P.R.*,
   432 F. Supp. 3d 25 (D.P.R. 2020) .......................................................................23

*In re FirstEnergy Sols. Corp.*,
   606 B.R. 720 (Bankr. N.D. Ohio 2019) .......................................................12, 13, 14

*In re Fox*,
   No. 98-20105-11, 2000 Bankr. LEXIS 1713 (Bankr. D. Kan. Aug. 4, 2000) .....................19

*In re Georgetown of Kettering*,
17 B.R. 73 (Bankr. S.D. Ohio 1981)......................................................................10, 12

*In re Hutch Holdings, Inc.*,
No. 13-42241-EJC, 2014 WL 7408816 (Bankr. S.D. Ga. Dec. 30, 2014) ...........................10

*In re Monroe Well Serv., Inc.*,
80 B.R. 324 (Bankr. E.D. Pa. 1987) .................................................................................12

*In re Pecht*,
57 B.R. 137 (Bankr. E.D. Va. 1986)..............................................................................12, 14

*In re Ponce de Leon 1403, Inc.*,
No. 11-07920-ESL, 2012 WL 5880443 (Bankr. D.P.R. Nov. 20, 2012)............................10

*In re Price Funeral Home, Inc.*,
No. 08-04816-8-ATS, 2008 Bankr. LEXIS 3462 (Bankr. E.D.N.C. Dec. 12,
2008) ............................................................................................................................10, 11

*In re Sanders*,
No. 14-02271-NPO, 2015 Bankr. LEXIS 3987 (Bankr. S.D. Miss. Nov. 23,
2015) ....................................................................................................................................10

*In re Scioto Valley Mortg. Co.*,
88 B.R. 168 (Bankr. S.D. Oh. 1988)..............................................................................3, 16

*In re Skin Sense, Inc.*,
No. 16-05626-5-JNC, 2017 WL 2773521 (Bankr. E.D.N.C. June 26, 2017)..................11, 13

*In re Waterville Timeshare Grp.*,
67 B.R. 412 413 (Bankr. D.N.H. 1986) ...........................................................................11

*Kirk v. Texaco, Inc.*,
82 B.R. 678 (S.D.N.Y. 1988).............................................................................................19

**STATUTES**

11 U.S.C. § 1125.....................................................................................................................10, 19

48 U.S.C. §§ 2101-2241 ................................................................................................................1

**RULES AND OTHER AUTHORITIES**

7 *Collier on Bankruptcy* (16th ed. 2021) ......................................................................10, 12, 19

Fed. R. Civ. P. 30(b)(6)...........................................................................................................5, 8

**To the Honorable United States Magistrate Judge Judith G. Dein:**

The Financial Oversight and Management Board for Puerto Rico (the "Oversight Board"), as sole Title III representative of the Commonwealth of Puerto Rico (the "Commonwealth"), the Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS"), and the Puerto Rico Public Buildings Authority ("PBA," and together with the Commonwealth and ERS, the "Debtors") pursuant to section 315(b) of the *Puerto Rico Oversight, Management, and Economic Stability Act* ("PROMESA"),[2] respectfully submits this objection to the *Urgent Motion of Ambac Assurance Corporation and Financial Guaranty Insurance Corporation to Compel Discovery from the Government Parties in connection with the Disclosure Statement* [ECF No. 16812] ("Motion to Compel" or "Mot.").

## PRELIMINARY STATEMENT

1.      Ambac Assurance Corporation and Financial Guaranty Insurance Company (together, "Ambac/FGIC") seek broad discovery into subjects wholly untethered from the narrow question at issue—namely, whether the *Disclosure Statement for the Third Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* [ECF No. 16741] (the "May 2021 Disclosure Statement") contains adequate disclosure to enable a typical "hypothetical investor" to make an informed judgment in connection with voting to accept or reject the plan of adjustment. They demand discovery (i) before filing an objection to the Oversight Board's motion to approve the disclosure statement and (ii) despite the fact, as evidenced by their numerous public statements and pleadings, it is clear Ambac/FGIC intend to vote to reject the *Third Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* [ECF No. 16740] (the "May 2021 Plan"), and no amount of additional information provided in the May 2021 Disclosure Statement

---

[2] PROMESA has been codified at 48 U.S.C. §§ 2101-2241.

will change that result.  Indeed, as creditors who did not sign the latest plan support agreement, Ambac/FGIC already know how they will vote and cannot complain they need more or different information.  Thus, Ambac/FGIC have no basis to object that any disclosures in the May 2021 Disclosure Statement are inadequate, much less to seek discovery to further their already-made decision.  Indeed, it is hardly surprising Ambac/FGIC's (who represent only themselves) Motion to Compel speaks almost entirely about what "creditors" supposedly need to know to evaluate the May 2021 Plan, rather than what Ambac/FGIC supposedly require.  *See, e.g.*, Mot. ¶ 27 ("Movants require discovery on certain categories of documents that are essential in determining whether the Disclosure Statement provides *creditors* sufficient information to cast an informed vote on the Plan, and whether the Disclosure Statement presents a plan that is capable of being confirmed") (emphasis added); ¶ 29 ("*[C]reditors* require a fulsome understanding of the underlying assumptions and methodology behind the Fiscal Plan's financial projections . . . .") (emphasis added); *id.* ("Understanding and evaluating the reasonableness of the Fiscal Plan's financial projections is of utmost importance to *creditors* . . . .") (emphasis added); ¶ 30 ("Movants requested documents sufficient to allow *creditors* to review and reconcile sources and uses of existing cash balances with the inflows and outflows . . . .") (emphasis added); ¶ 32 ("*[C]reditors* need this information for Historical Fiscal Plans, too.") (emphasis added); ¶ 43 ("The production of materials concerning the Pension Reserve Trust is crucial to allowing *creditors* to make an informed determination regarding whether to vote in favor of the Plan.") (emphasis added).

2.      Moreover, the only other cognizable basis for objecting to the May 2021 Disclosure Statement—a contention that the May 2021 Plan is patently unconfirmable—is also not a ground for seeking discovery.  Such an objection, should it be made by Ambac/FGIC, can be decided on

the face of the plan based on the application of legal principles, rather than on an evidentiary record. The confirmation hearing comes after the disclosure statement is approved, not before.

3. In any case, nearly every one of Ambac/FGIC's twenty-four requests relate to issues with no bearing on the adequacy of the information provided in the May 2021 Disclosure Statement. Instead, the requests relate only to confirmation of the May 2021 Plan (if anything). Indeed, the Motion to Compel repeatedly uses language regarding plan feasibility and confirmability, rather than disclosure statement adequacy. *See*, *e.g.*, ¶ 32 ("Movants need discovery . . . before they can determine whether the Fiscal Plan (and the Plan that relies upon it) is feasible and/or a fair reflection of the Commonwealth's future."); ¶ 33 ("This confirmation requirement—known as the 'best interests test' in Chapter 9 municipal bankruptcies—is therefore a central consideration not only for the Court, but also for creditors, in evaluating the Plan"); ¶ 53 ("Creditors and the Court need to understand the scope of essential services under the Plan so that they can evaluate, *inter alia*, the Plan's feasibility and whether it is in the best interests of creditors."). But the legal test for approval of a disclosure statement is not whether the May 2021 Plan meets PROMESA's requirements for confirmation of a plan of adjustment. Rather, issues relating to plan confirmability must be heard at a confirmation hearing, not in connection with a hearing on adequacy of a disclosure statement. *See, e.g.*, *In re Scioto Valley Mortg. Co.*, 88 B.R. 168, 172 (Bankr. S.D. Oh. 1988) ("If the creditors oppose their treatment in the plan, but the Disclosure Statement contains adequate information, issues respecting the plan's confirmability will await the hearing on confirmation."). Ambac/FGIC will be able to seek more confirmation-related discovery in connection with the confirmation hearing. Ambac has been taking confirmation discovery for nearly the last year or more under the umbrella of Rule 2004 discovery. Seeking such discovery in the guise of a disclosure statement dispute is plainly inappropriate and

3

will only serve to create unnecessary expenses and disputes in a process that is not and should not be controversial.

4.      Ambac/FGIC contend the Oversight Board has "essentially refused" to provide any documents or information relating to the May 2021 Disclosure Statement. That is false. The Oversight Board already has made available thousands of documents relevant to a creditor's evaluation of the adequacy of the May 2021 Disclosure Statement. In accordance with the Court's *Order (I) Scheduling a Hearing to Consider the Adequacy of Information Contained in the Disclosure Statement, (II) Establishing the Deadline for Filing Objections to the Disclosure Statement and Replies Thereto, (III) Approving Form of Notice Thereof, (IV) Establishing Document Depository Procedures In Connection Therewith, and (V) Granting Related Relief* [ECF No. 16681] (the "DS Hearing Order"), the Oversight Board established an electronic document depository (the "Disclosure Statement Depository") that contains over 11,000 documents that creditors may use to evaluate the adequacy of the May 2021 Disclosure Statement. Such depository is available to all creditors at the click of a button. These documents are in addition to the tens of thousands of pages of documents provided in connection with Ambac's Rule 2004 requests, which were predicated on Ambac's assertion that it needed information to evaluate a plan of adjustment.[3] The Oversight Board also offered—*despite their unequivocal intention to vote against the May 2021 Plan*—to meet and confer with Ambac/FGIC regarding whether additional language is warranted to address the limited number of Requests (as defined below) actually relevant to the adequacy of the May 2021 Disclosure Statement. Ambac/FGIC refused to

---

[3] Through Rule 2004 discovery, Ambac has sought—and received—thousands of documents relating to the Commonwealth's pension liabilities; the Commonwealth's cash and cash restrictions; the Commonwealth's assets; and factual source materials and raw data underlying the fiscal plans, among other things.

engage in this process, and instead, through their Motion to Compel, attempt to give the false impression the Oversight Board has stonewalled their discovery efforts.

5.      In addition to broad document discovery, Ambac/FGIC also seek to compel the depositions of two Oversight Board members, David Skeel and Justin Peterson, as well as a deposition of the Oversight Board pursuant to Federal Rule of Civil Procedure 30(b)(6).  The only conceivable purpose of these depositions is to harass and distract the Oversight Board and its members.  No amount of testimony will affect their decision whether to vote for or against the May 2021 Plan, but such depositions would impose a burden on the Oversight Board.  Indeed, the only basis Ambac/FGIC provide in support of their demand for depositions of both the Oversight Board and two of its members is the assertion that Messrs. Skeel and Peterson may possess relevant information underlying the May 2021 Disclosure Statement.  This is not enough to meet the "demonstrated need" required by the First Circuit for depositions of high-ranking officials.

6.      For these reasons, the Court should deny Ambac/FGIC's Motion to Compel in its entirety.

## **BACKGROUND**

### **A. Filing of the Plan and Disclosure Statement**

7.      On March 8, 2021, the Oversight Board filed the *Second Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico* [ECF No. 15976] (the "March 2021 Plan") and the *Disclosure Statement for the Second Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico* [ECF No. 15988] (the "March 2021 Disclosure Statement"). The March 2021 Plan implemented the Oversight Board's February 22, 2021 plan support agreement with certain holders and insurers of the Commonwealth's general obligation bonds, and provided a framework for the settlement of all outstanding disputes in connection with such bonds, including their validity, priority, and asserted secured status.

8.      On May 11, 2021, the Oversight Board filed the May 2021 Plan, which incorporated additional agreements reached with holders of bonds issued by ERS, as well as insurers and holders of bonds issued by the Puerto Rico Highways and Transportation Authority ("HTA") and the Puerto Rico Convention Center District Authority ("CCDA"), and the accompanying May 2021 Disclosure Statement.

**B. Motion Practice Regarding Approval of the Disclosure Statement**

9.      On April 6, 2021, after the filing of the March 2021 Plan and the March 2021 Disclosure Statement and the announcement of its stipulation with holders of ERS bonds, the Oversight Board filed the *Debtors' Joint Motion for an Order (I) Scheduling Hearing to Consider the Adequacy of Information Contained in the Disclosure Statement, (II) Establishing the Deadline for Filing Objections to the Disclosure Statement and Replies Thereto, (III) Approving Form of Notice Thereof, (IV) Establishing Document Depository Procedures in Connection Therewith, and (V) Granting Related Relief* [ECF No. 16332] (the "DS Scheduling Motion").  Therein, the Oversight Board asked the Court to establish a schedule for consideration of its then-forthcoming further amended proposed disclosure statement and proposed plan of adjustment, and requested court authorization to create the Disclosure Statement Depository to make available for creditors "factual source materials underlying the Disclosure Statement (including but not limited to factual source materials underlying the cash restriction analysis, the best interest tests reports, and the Section 211 Report[4] attached to the Disclosure Statement), as well as documents relating to the

---

[4] "Section 211 Report" refers to the *PROMESA Section 211 Report on the Puerto Rico Retirement Systems* (Sept. 2019).  The report is an analysis of the Government of Puerto Rico's pension systems prepared by Ernst & Young ("EY") at the request of the Oversight Board, as required under Section 211 of PROMESA.  Therein, EY evaluates the fiscal and economic impact of pension cash flows, including the pension liabilities and funding strategy, sources of funding, existing benefits and their sustainability, and the system's legal structure and operational arrangements.

nature of claims and classification under the Plan." DS Scheduling Motion, Ex. 1 ¶ 1. The DS Scheduling Motion further sought authorization to make documents available to creditors using a separate access point, or SFTP.

10.     On May 4, 2021, after hearing argument on the DS Scheduling Motion at the April 28, 2021 omnibus hearing, the Court granted the DS Scheduling Motion, scheduled a hearing to consider the adequacy of the further amended proposed disclosure statement for July 13, 2021, set June 15, 2021 as the deadline for parties to file objections to the disclosure statement, and authorized the Oversight Board to establish and populate the Disclosure Statement Depository and SFTP with materials relevant to creditors' assessment of the adequacy of the disclosure statement. *See* DS Hearing Order.

11.     On May 7, 2021, the Oversight Board launched the Disclosure Statement Depository and the SFTP. The Disclosure Statement Depository contains the following folders:

- "Factual Source Materials and Raw Data Underlying Disclosure Statement," which includes factual source materials and raw data underlying certain factual statements in the disclosure statement;

- "Approximate Creditor Recoveries and Allocations," which includes a document summarizing certain creditor recoveries and allocations by class;

- "Certain Public Employee Collective Bargaining Agreements," which includes collective bargaining agreements and other documents regarding liabilities owed to certain public employees whose unions support the plan;

- "Dairy Producers," which includes a settlement agreement resolving dairy pricing litigation, and related documents;

- "Federally Qualified Health Centers," which includes injunctions and other orders from federal and Commonwealth court actions relating to federally qualified health centers;

- "Gracia-Gracia Litigation," which includes settlement agreements resolving litigation related to duplicate insurance premiums;

- "Bond Offering Statements," which includes offering statements associated with certain issuances of bonds by the Commonwealth, ERS, and PBA;

- "Working Capital," which includes source materials for the Oversight Board's working capital analysis, which was incorporated into the March 2021 and May 2021 Disclosure Statements;

- "Cash and Cash Restrictions," which includes factual source materials and raw data supporting the Oversight Board's ongoing cash restriction analysis, all of which were previously produced to Ambac, FGIC, and other creditors in connection with Ambac's *Motion for Entry of Order Authorizing Discovery Under Bankruptcy Rule 2004 Concerning Commonwealth Cash Restriction Analysis* [ECF No. 9023] (the "Cash Rule 2004 Motion");

- "Commonwealth Assets," which includes documents relating to certain Commonwealth assets, all of which were previously produced to Ambac, FGIC, and other creditors in connection with Ambac's *Motion for Entry of an Order Authorizing Discovery Under Bankruptcy Rule 2004 Concerning Commonwealth Assets* [ECF No. 9022] (the "Assets Rule 2004 Motion");

- "Pension Liabilities," which includes documents relating to the Commonwealth's pension liabilities, all of which were previously produced to Ambac, FGIC, and other creditors in connection with Ambac's *Motion for Entry of Order Authorizing Discovery Under Bankruptcy Rule 2004 Concerning Pension Liabilities* [ECF No. 7507] (the "Pension Liabilities Rule 2004 Motion");

- "Factual source materials underlying report pursuant to PROMESA Section 211," which includes all factual source materials utilized in developing the PROMESA Section 211 Report, all of which were previously produced to Ambac, FGIC, and other creditors in connection with Ambac's Pension Liabilities Rule 2004 Motion practice; and

- "Best Interest Test," which includes factual source materials relating to the Oversight Board's best interests test analysis.

### C. Discovery Concerning the May 2021 Disclosure Statement[5]

12.      Despite publicly declaring its intent to object to plan confirmation,[6] Ambac,

---

[5] On April 23, 2021, the Official Committee of Unsecured Creditors (the "Committee") served on the Oversight Board its *First Set of Document Requests to Financial Oversight and Management Board for Puerto Rico and its Advisors in Connection with Disclosure Statement for Second Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al*. Contemporaneously, the Committee served a Rule 30(b)(6) deposition notice for the Oversight Board and deposition notices directed to David Skeel and Justin Peterson.

[6] *See, e.g.*, *Objection of Ambac Assurance Corporation and Financial Guaranty Insurance Corporation to Urgent Joint Motion to Stay Certain Contested Matters and Adversary Proceedings Related to Bonds Issued by the Puerto Rico Highways and Transportation Authority*

together with FGIC, served Requests for Production on May 12, 2021.  Mot., Ex. B.

13.     On May 14, 2021, Ambac/FGIC served their Deposition Cross-Notices, seeking to depose the Oversight Board and two of its members, Messrs. Peterson and Skeel.  Mot., Exs. C, D, E.  Also on May 14, 2021, the Oversight Board notified Ambac/FGIC it would serve responses and objections to their requests by May 21, 2021.  Mot., Ex. J.

14.     On May 21, 2021, the Oversight Board served its responses and objections.  Mot., Ex. K.  Therein, the Oversight Board (*i*) directed Ambac/FGIC to the Disclosure Statement Depository for documents relevant to certain of Ambac/FGIC's requests; (*ii*) offered to meet and confer regarding additional disclosures Ambac/FGIC believe are necessary with regard to certain topics; and (*iii*) objected to many of Ambac/FGIC's requests on the basis that they sought information irrelevant to the adequacy of the May 2021 Disclosure Statement.

15.     On May 24, 2021, the parties held a telephonic conference regarding Ambac/FGIC's requests (the "May 24 Meet and Confer").  During the teleconference, counsel for Ambac and FGIC declined to address each request individually.  Ambac and FGIC also categorically refused to discuss what information they believe should be added to the May 2021 Disclosure Statement to render it "adequate" in their view.

---

*("HTA"), the Puerto Rico Convention Center District Authority ("CCDA"), and the Puerto Rico Infrastructure Financing Authority ("PRIFA")*, [ECF No. 16776], ¶ 1 ("Instead, the Board will ask the Court to rule that disfavored creditors (Ambac, FGIC, their insured bondholders, and uninsured bondholders) receive *nothing*, while approving distributions (and generous fees) on account of Assured's and National's claims."); Ex. 1 (Reorg Research, *Ambac Still Not Signed On to Restructuring Deals, Calls for 'Global' Settlement Covering PRIFA* (May 10, 2021)) ("Ambac President and CEO Claude LeBlanc signaled that the monoline would keep pushing at the bargaining table and in court for a 'global' restructuring that further addresses debt at the Puerto Rico Infrastructure Financing Authority, or PRIFA, beyond the previously announced clawback contingent value instrument, or CVI.").

## APPLICABLE LAW

16.    The purpose of a disclosure statement is to provide "adequate information . . . in sufficient detail" to enable a typical "hypothetical investor" to make an informed judgment about the plan of adjustment. 11 U.S.C. § 1125(a)(1); *see Century Glove, Inc. v. First Am. Bank of New York*, 860 F.2d 94, 100 (3d Cir. 1988) (observing "§ 1125 seeks to guarantee a minimum amount of information to the creditor asked for its vote"). A disclosure statement "need not be perfect and may be approved if the information is reasonable in the circumstances." *In re Price Funeral Home, Inc.*, No. 08-04816-8-ATS, 2008 Bankr. LEXIS 3462, at *5 (Bankr. E.D.N.C. Dec. 12, 2008); *accord In re Sanders*, No. 14-02271-NPO, 2015 Bankr. LEXIS 3987, at *15-16 (Bankr. S.D. Miss. Nov. 23, 2015). Thus, section 1125 qualifies the concept of "adequate information" so as to require only such information as may reasonably be furnished. 7 *Collier on Bankruptcy* ¶ 1125.02 (16th ed. 2021).

17.    In light of this permissive standard, few cases address the scope and propriety of discovery in connection with a disclosure statement, and those that do emphasize such discovery should be limited in scope and restricted to achieving the narrow goal set forth in Bankruptcy Code section 1125: determining whether the disclosure statement contains adequate information to enable a typical creditor to determine whether to accept or reject a proposed plan. *In re Ponce de Leon 1403, Inc.*, No. 11-07920-ESL, 2012 WL 5880443, at *2 (Bankr. D.P.R. Nov. 20, 2012) (authorizing only "limited discovery" ahead of the disclosure statement hearing); *In re Hutch Holdings, Inc.*, No. 13-42241-EJC, 2014 WL 7408816, at *2 (Bankr. S.D. Ga. Dec. 30, 2014) (authorizing discovery "on issues relating to the adequacy of the disclosure statement . . . ."). This is particularly true when, as here, a creditor seeking discovery has not filed a formal objection. *See In re Georgetown of Kettering*, 17 B.R. 73, 75 (Bankr. S.D. Ohio 1981) (denying discovery

requests filed absent an objection because "the proper procedure for inquiry by third parties is to object to the disclosure statement . . . ."). Courts have set such limitations because "the requirement of a disclosure statement . . . should not be read to infer a corresponding creditor right of a fishing expedition" and, "[a]though the [d]ebtor is required to disclose his finances in a formal written document, the role of creditors and other parties in interest in the disclosure process is neither supervisory nor participatory." *Id.*

18.     Critically, courts have recognized there are instances, like here, where no amount of disclosure will be "adequate" enough for a creditor who will "never vote for any plan of reorganization." *See In re Skin Sense, Inc.*, No. 16-05626-5-JNC, 2017 WL 2773521, at *4 (Bankr. E.D.N.C. June 26, 2017) (overruling objection that disclosure statement lacked adequate information when "it is clear that no matter how much detailed information the [d]ebtor might provide, [creditor] will never vote for any plan of reorganization[.]"); *see also In re Price Funeral Home, Inc.*, 2008 Bankr. LEXIS 3462, at *5 ("In this case [the objecting creditor] has sufficient information to make an informed decision with respect to the plan, and, in fact, even if more information had been provided, [the objecting creditor] would still have voted against it.").

19.     Courts are especially hesitant to allow objecting parties to transform disclosure statement proceedings into mini-confirmation hearings. *In re Waterville Timeshare Grp.*, 67 B.R. 412 413 (Bankr. D.N.H. 1986) (noting "approval of a disclosure statement is an interlocutory action in the progress of a Chapter 11 reorganization effort leading to a confirmation hearing at which all parties have ample opportunity to object to confirmation of the plan" and is therefore "not intended to be the primary focus of litigation . . . ."). "Ordinarily, confirmation issues are reserved for the confirmation hearing, and not addressed at the disclosure statement stage." *In re Am. Cap. Equip., LLC*, 688 F.3d 145, 153-54 (3d Cir. 2012) (quoting *In re Larsen,* No. 09-02630,

11

2011 WL 1671538, at *2 n.7 (Bankr. D. Idaho May 3, 2011). For example, matters such as whether the plan is in the best interest of creditors, or whether its relative treatment of disparate groups of creditors is appropriate, are not properly addressed in the disclosure statement stage, "other than to hold that these concepts are properly explained in the disclosure statement." *In re Monroe Well Serv., Inc.*, 80 B.R. 324, 333 (Bankr. E.D. Pa. 1987).

20.     When a plan "is so fatally, and obviously flawed that confirmation is impossible," then a court may "consider issues pertaining to the plan, and may rule upon such issues" in connection with approval of a disclosure statement. *In re Comandante Mgmt. Co.*, 359 B.R. 410, 415 (Bankr. D.P.R. 2006) (citing *In re Mahoney Hawkes, LLP*, 289 B.R. 285, 294 (Bankr. D. Mass. 2002)). This inquiry, however, does not require evidentiary development. *See In re FirstEnergy Sols. Corp.*, 606 B.R. 720, 732 (Bankr. N.D. Ohio 2019) ("Patent unconfirmability is treated as a matter of law.") (citation omitted). If a plan is "patently unconfirmable," it must be so "on the face of the plan." *In re Pecht*, 57 B.R. 137, 139 (Bankr. E.D. Va. 1986) ("If, *on the face of the plan*, the plan could not be confirmed, then the Court will not subject the estate to the expense of soliciting votes and seeking confirmation.") (emphasis added); 7 *Collier on Bankruptcy* ¶ 1125.03 (16th ed. 2021) ("[M]ost courts will not approve a disclosure statement if the underlying plan is clearly unconfirmable *on its face*.") (emphasis added).

21.     Thus, discovery requests whose purpose is only to gather confirmation-related information or to support an argument that the plan is patently unconfirmable should be denied at the disclosure statement stage. *See In re Georgetown Kettering*, 17 B.R. at 75 (denying discovery in connection with the disclosure statement as an "unnecessary and expensive burden for resolution of th[e] narrow issue [of] whether the disclosure statement contains 'adequate information' to enable a 'hypothetical reasonable investor . . . to make an informed judgment about the plan[.]'")

(internal citations omitted).  For example, in connection with the disclosure statement in *In re FirstEnergy Solutions Corporation*, the court was faced with a patent unconfirmability objection regarding the plan's treatment of certain creditors and a request for discovery related to that objection.  606 B.R. at 732.  The court held "[b]ecause this question is a matter of law alone, it does not require the discovery or presentation of evidence," and discovery would be "irrelevant." *Id.*  Rather, what mattered for the disclosure statement stage was the "language by its terms," which "does not depend on evidence at a confirmation hearing . . . ." *Id.* at 740.

## ARGUMENT

## I. AMBAC/FGIC DO NOT NEED DISCOVERY BECAUSE THEY ALREADY HAVE DECIDED TO REJECT THE PLAN.

22.     As described above, the sole purpose of a disclosure statement is to enable creditors to make an informed judgment about whether to vote for or against a plan of adjustment. Ambac/FGIC have already plainly announced their intent to reject the May 2021.  *Supra* n. 6. Ambac/FGIC do not provide any rationale as to why they—monoline insurers who represent only themselves, not other creditors who vote independently of Ambac/FGIC—require documents and information related to the Commonwealth Fiscal Plan to evaluate whether the May 2021 Disclosure Statement provides them with sufficient information to enable them to make an informed judgment on whether they should accept a plan they have already decided to reject.  *In re Clamp-All Corp.*, 233 B.R. 198, 204 (Bankr. D. Mass. 1999) ("The purpose of requiring an approved disclosure statement is to ensure that all claim holders are provided with adequate information to enable them to make an informed judgment regarding whether to vote for or against a reorganization plan") (citing *In re Ferretti*, 128 B.R. 16, 18 (Bankr. D.N.H. 1991)).  Discovery regarding the May 2021 Disclosure Statement is therefore unnecessary because it will make no difference as to how Ambac/FGIC will vote.  *See, e.g.*, *In re Skin Sense*, 2017 WL 2773521, at *4;

13

*In re Bath Bridgewater S., LLC*, No. 11-06817-8-SWH, 2012 WL 4325650, at *3 (Bankr. E.D.N.C. Sept. 20, 2012) (overruling objection to disclosure statement where creditor "is a sophisticated voter and has all of the information it presently needs to make an informed decision about its position with respect to the confirmability of the plan, and to challenge any aspect of the plan with which it disagrees").

23. Although Ambac/FGIC may also intend to object to the May 2021 Disclosure Statement on the basis that the May 2021 Plan is patently unconfirmable, that objection does not require discovery. As explained above, a plan is only patently unconfirmable when it is apparent "on the face" of the plan that it cannot be confirmed. *In re Pecht*, 57 B.R. at 139. Discovery in support of a patent unconfirmability objection is therefore inappropriate "[b]ecause [patent unconfirmability] is a matter of law alone," rendering discovery "irrelevant." *In re FirstEnergy Sols. Corp.*, 606 B.R. at 732. Accordingly, Ambac/FGIC's Motion to Compel should be denied because they have no basis to seek discovery regarding the adequacy of the May 2021 Disclosure Statement.

## II. THE COURT SHOULD DENY AMBAC/FGIC'S MOTION TO COMPEL DOCUMENT DISCOVERY IN CONNECTION WITH THE MAY 2021 DISCLOSURE STATEMENT.

24. Setting aside Ambac/FGIC's unequivocal intention to reject the May 2021 Plan, they are not entitled to any of the discovery they seek.

25. The Motion to Compel seeks the following seven categories of information: (1) all documents and communications relating to the Fiscal Plan for the Commonwealth of Puerto Rico, as certified by the Oversight Board on April 23, 2021 (the "Commonwealth Fiscal Plan"), including financial models and assumptions underlying the Commonwealth Fiscal Plan; (2) all documents and communications relating to the Oversight Board's analysis of whether the May 2021 Plan is in the best interests of creditors, including analyses, assumptions, and sources

14

underlying that analysis; (3) all documents and communications relating to the analyses, assumptions and sources underlying various iterations of the disclosure statements and plans of adjustment; (4) all documents and communications relating to the Pension Reserve Trust, including its funding and management; (5) all documents and communications relating to real property assets and illiquid investments of both the Commonwealth and its instrumentalities, including public corporations; (6) all documents and communications relating to assessment of the Commonwealth's essential services; and (7) all documents and communications relating to inaccessible and/or unavailable monies, external financing, surpluses, and emergency reserves. Ambac/FGIC are not entitled to discovery into any of the foregoing categories. Attached hereto as **Appendix A** is a chart summarizing the Oversight Board's responses to each of Ambac/FGIC's individual discovery requests, and why none of them merit granting the Motion to Compel in any respect.

> **A. Request Nos. 2, 3, 4 and 5 Seek Irrelevant Documents and Communications Relating to the Commonwealth Fiscal Plan.**

26.    Request Nos. 2, 3, 4 and 5 seek documents and communications relating to the Commonwealth Fiscal Plan, including, *inter alia*, a "three-statement financial model" reconciling the Commonwealth Fiscal Plan with the Commonwealth's cash balances, the Commonwealth Fiscal Plan Model, and assumptions, analyses, and studies underlying the Commonwealth Fiscal Plan. Mot., Ex. K at 10-13. Ambac/FGIC claim such materials must be produced because "[e]valuation of whether a plan is *confirmable* . . . requires careful consideration of the certified fiscal plan," Mot. ¶ 28 (emphasis added), and "a fulsome understanding of the underlying assumptions and methodology behind the Fiscal Plan's financial projections in order [*sic*] evaluate the accuracy, completeness, and sufficiency of the Disclosure Statement." *Id.* ¶ 29. Neither

explanation justifies Ambac/FGIC's request for broad-based (or indeed any) discovery into the Commonwealth Fiscal Plan.

27.     *First*, Congress wrote in PROMESA section 314(b)(7) that the plan of adjustment must be consistent with the certified fiscal plan—not a creditor's attack on the fiscal plan.  Indeed, if Congress intended the fiscal plan to be litigated at confirmation, it would have made no sense to insulate certified fiscal plans from attack prior to confirmation.  From yet another perspective, it is completely logical that Congress tied plans of adjustment to certified fiscal plans because it goes without saying that no two individuals would make identical assumptions and develop the same fiscal plan, especially when input comes from multiple professionals such as McKinsey & Company, Ernst & Young, Citibank, N.A., etc.

28.     *Second*, in any event, Ambac/FGIC do not contend materials relating to the Commonwealth Fiscal Plan relate to the adequacy of the May 2021 Disclosure Statement.  *Id.* ¶ 28; *see also id.* ¶ 29 (Commonwealth Fiscal Plan "will be *central to the confirmability* of the Plan") (emphasis added); ¶ 32 ("Movants need discovery to understand the factual, scientific, and economic grounds that inform these assumptions before they can determine whether the Fiscal Plan (*and the Plan that relies upon it*) *is feasible and/or a fair reflection of the Commonwealth's future*.") (emphasis added).  But, as explained above, issues relating to plan confirmability are addressed at confirmation, not in connection with a hearing on adequacy of a disclosure statement.  *See, e.g.*, *In re Scioto Valley Mortg. Co.*, 88 B.R. at 172 ("If the creditors oppose their treatment in the plan, but the Disclosure Statement contains adequate information, issues respecting the plan's confirmability will await the hearing on confirmation."); *In re Copy Crafters Quickprint, Inc.*, 92 B.R. 973, 980 (Bankr. N.D.N.Y. 1988) ("[C]are must be taken to ensure that the hearing on the disclosure statement does not turn into a confirmation hearing, due process considerations

are protected and objections are restricted to those defects that could not be cured by voting and where the pertinent material facts are either not at issue or have been fully developed at the disclosure statement hearing.").

29.      *Third*, unsurprisingly given their arguments about confirmability and feasibility, Ambac/FGIC make no attempt to explain how the requested materials have any bearing on the *adequacy* of the May 2021 Disclosure Statement.  For example, although Ambac/FGIC request a three-statement financial model (*see* Req. No. 2), they simply state it is "relevant to consideration of the Disclosure Statement" (*see* Mot. ¶ 30), without any further explanation. The same is true with respect to Ambac/FGIC's requests for the Commonwealth Fiscal Plan model and the materials underlying the Commonwealth Fiscal Plan's assumptions; they provide no explanation why they need that information to evaluate the adequacy of the May 2021 Disclosure Statement.

### B. The Oversight Board Already Has Provided and Will Continue to Provide Available, Non-Privileged, Non-Duplicative Documents and Communications Relating to the Best Interest Analysis in Response to Request Nos. 6 and 7.

30.      In Request Nos. 6 and 7 (Mot., Ex. K at 14-15), Ambac/FGIC seek documents and communications relating to the Oversight Board's best interest analysis.  As Ambac/FGIC are well aware, factual source materials underlying the best interest analysis have already been uploaded to the "Best Interest Test" folder in the Disclosure Statement Depository and SFTP.  The Oversight Board also intends to make the assumptions utilized in connection with its best interests test analysis available to creditors when the report of the analysis is published, consistent with its prior practice.  *See, e.g.*, *Disclosure Statement for the Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* [ECF No. 11947], Ex. L, Best Interest Test Reports. Ambac/FGIC's only explanation for seeking to compel this discovery is that the documents the Oversight Board has already provided via the Disclosure Statement Depository and SFTP are

"wholly insufficient."   Mot. ¶¶ 36-37.   But Ambac/FGIC have not identified *any* specific deficiencies in the disclosures already provided by the Oversight Board.

31.     As to the latest iteration of the report concerning the best interest test analysis, the Oversight Board advised Ambac/FGIC during the May 24 Meet and Confer that it would make the report and underlying assumptions available as soon as practicable.

> **C.  Request No. 11 Seeks Irrelevant and/or Privileged Documents, Communications and Analyses Relating to Various Iterations of the Disclosure Statements and Plans of Adjustment.**

32.     In Request No. 11 (Mot., Ex. K at 19-20), Ambac/FGIC seek documents, communications, and analyses relating to the May 2021 Disclosure Statement, the May 2021 Plan, and all prior iterations of disclosure statements and plans of adjustment filed by the Oversight Board.   Ambac/FGIC contend the Oversight Board has "refused to produce any documents in response to Request No. 11," which seeks factual source materials and raw data underlying various iterations of the disclosure statements and plans of adjustment.   That is just not true.   As the Oversight Board explained in its responses and objections, the Oversight Board already has uploaded non-privileged, non-duplicative factual source materials and raw data underlying the May 2021 Disclosure Statement to the Disclosure Statement Depository, in a folder labeled "Factual Source Materials and Raw Data Underlying Disclosure Statement."   These materials are the only relevant materials responsive to Request No. 11.

33.     Ambac/FGIC do not explain why materials underlying prior iterations of the disclosure statements are relevant to their consideration of *this* disclosure statement.   All Ambac/FGIC allege is that "[s]uch materials are necessary to evaluate the Plan and to assess the degree to which assumptions, opinions, and conclusions have changed over time . . . ."  Mot. ¶ 41. But changes over time are irrelevant.   The Oversight Board is not seeking approval of prior iterations of the disclosure statement, and Ambac/FGIC have provided no basis for their assertion

that "the degree to which assumptions, opinions, and conclusions have changed over time" has any bearing on whether the May 2021 Disclosure Statement provides adequate information to creditors. *Kirk v. Texaco, Inc.*, 82 B.R. 678, 684 (S.D.N.Y. 1988) ("[A]dequate information need not include such information about any other possible or proposed plan.") (quoting 11 U.S.C. § 1125(a)(1)); *In re Brandon Mill Farms, Ltd*., 37 B.R. 190, 192 (Bankr. N.D. Ga. 1984) ("the disclosure statement is intended to assist the creditors in evaluating the plan on its face rather than to promote a comparison among various proposed plans"); 7 *Collier on Bankruptcy*, ¶ 1125.02[2][c] (16th ed. 2021) ("[A] disclosure statement does not have to disclose the existence of other plans or the terms of such plans").

34.     Ambac/FGIC also claim this information is necessary because it needs to "verify the accuracy of financial information" in the May 2021 Plan (Mot. ¶ 40), in part because the May 2021 Disclosure Statement "acknowledges that the Commonwealth has not yet published audited financial statements for its 2018, 2019, and 2020 fiscal years" (*id.* ¶ 2). Ambac/FGIC are again misguided. Financial information in a disclosure statement may be unaudited. *See, e.g.*, *In re Fox*, No. 98-20105-11, 2000 Bankr. LEXIS 1713, at *51 (Bankr. D. Kan. Aug. 4, 2000) ("Congress did not decree that financial information used in a disclosure statement, plan or confirmation hearing must be audited."). The only requirement accompanying the use of unaudited information is that the debtor not warrant or represent that all of the information is accurate. *See In re Baumgarten*, No. 93 B 40188 (FGC), 1993 Bankr. LEXIS 1933, at *5 (Bankr. S.D.N.Y. Dec. 30, 1993) (where efforts had been made to be accurate and the plan's proponents did not warrant the accuracy of the information, a disclosure statement, though not subject to a certified audit, presented adequate information to creditors pursuant to Bankruptcy Code Section 1125.). As Ambac/FGIC acknowledge, the Oversight Board has not warranted the accuracy of the information in the May

2021 Disclosure Statement.  Mot. ¶¶ 2, 40.  Further, disclaimers similar to the one in the May 2021

Disclosure Statement are common and have been included in numerous disclosure statements filed

and approved in other municipal bankruptcies.  *See, e.g.*, Ex. 2 (Excerpt of *In re City of Detroit*

Disclosure Statement, Case No. 13-53846 (Bankr. E.D. Mich. May 5, 2014) [ECF No. 4391]) at 3

("Except where specifically noted, the financial information contained in this Disclosure Statement

and in its Exhibits has not been audited by a certified public accountant and may not have been

prepared in accordance with standards promulgated by the Government Accounting Standards

Board or generally accepted accounting principles in the United States."); Ex. 3 (Excerpt of *In re*

*City of San Bernardino* Disclosure Statement, Case No. 12-bk-28006 (Bankr. C.D. Cal. July 29,

2016) [ECF No. 1881]) at 12 ("The City's professional advisors have not independently verified

the financial information provided in this Disclosure Statement, and, accordingly, they make no

representations or warranties as to its accuracy.").

### D. Request Nos. 12, 13, 14 and 15 Seek Irrelevant Documents and Communications Regarding the Pension Reserve Trust.

35.     Request Nos. 12, 13, 14, and 15 request documents and communications relating

to the Pension Reserve Trust,[7] including, *inter alia*, projected investment guidelines and

investment returns and terms for the deposit and withdrawal of monies.  Mot., Ex. K at 20-23.

Ambac/FGIC argue the Oversight Board "has provided creditors with almost no information

regarding how it intends to handle the massive pension claim," Mot. ¶ 44, and that materials

regarding the Pension Reserve Trust are "crucial to allowing creditors to make an informed

---

[7] Ambac/FGIC complain that it lacks information regarding whether the Pension Reserve Trust
referenced in the May 2021 Plan is the same as the Pension Reserve Fund described in the Retiree
Committee's June 7, 2019 plan support agreement.  Mot. ¶ 45.  As is evident from the description
of the May 2021 Disclosure Statement's description of the Pension Reserve Trust, however, the
Pension Reserve Trust is the same entity otherwise described as the "Pension Reserve Fund."

determination regarding whether to vote in favor of the Plan," *id.* ¶ 43. That could hardly be further from the truth. The Oversight Board uploaded to the Disclosure Statement Depository and SFTP all documents produced by the Puerto Rico Fiscal Agency and Financial Advisory Authority ("AAFAF") and Milliman, Inc. ("Milliman") in connection with Ambac's Pension Liabilities Rule 2004 Motion, as well as the factual source materials and raw data underlying the Oversight Board's Section 211 Report. These documents provide creditors with substantial information regarding the calculation of the Commonwealth's pension liabilities. With respect to the Pension Reserve Trust itself—which is still in its formative stages—the disclosures in the May 2021 Disclosure Statement are more than adequate.

36.     Even if documents responsive to Ambac/FGIC's requests existed, those documents would be irrelevant. Information on "how the Board intends to use Commonwealth monies to fund massive pension payments" and "how the Pension Reserve Trust will be managed" (*id.* ¶ 45) does not bear on the adequacy of the May 2021 Disclosure Statement. This is especially true for Ambac/FGIC, who are not pensioners and do not represent pensioners. Indeed, information regarding management of the Pension Reserve Trust could only be relevant to an argument that the Commonwealth cannot meet its future obligations under the Plan—which is plainly a feasibility issue to be addressed at confirmation. It has nothing to do with the adequacy of the information in the May 2021 Disclosure Statement. In any event, as explained above, the Oversight Board has already uploaded to the Disclosure Statement Depository and the SFTP thousands of documents produced in connection with Ambac's Pension Liabilities Rule 2004 Motion, including actuarial analyses prepared by Milliman and factual source materials underlying the Section 211 Report, which provide Ambac/FGIC with ample information regarding the amount of the Commonwealth's pension liabilities.

**E. Request Nos. 16 and 17 Seek Irrelevant Documents and Communications Concerning Real Property Assets and Illiquid Investments.**

37.     Request Nos. 16 and 17 (Mot., Ex. K at 23-25) seek documents and communications concerning real property assets and illiquid investments of the Commonwealth and its instrumentalities.  Unlike corporate reorganizations, liquidation is not an option in Title III and Chapter 9 cases involving municipalities.  Puerto Rico's beaches and other assets are not subject to attachment by creditors.  Cash on hand and future revenues are what is available to pay debt.  Therefore, requests for data on other Puerto Rico assets serve no purpose.  Ambac/FGIC argue without any explanation discovery into properties and illiquid investments is needed "to assess the adequacy of disclosures in the Disclosure Statement regarding the financial condition of the Commonwealth."  Mot. ¶ 47.  Ambac/FGIC again ignore the substantial discovery already provided via the Disclosure Statement Depository and the SFTP, which include all documents previously provided to Ambac in connection with its Assets Rule 2004 Motion.  Moreover, as this Court already has found, information relating to the real estate assets and illiquid investments beyond the information already provided in connection with the Assets 2004 Motion "is very attenuated from its goal of evaluating the Commonwealth's financial condition . . . ."  *Memorandum of Decision and Order On Ambac Assurance Corporation's Motion For an Order Authorizing Discovery Under Rule 2004 Concerning Commonwealth Assets* [ECF 16759] (the "Rule 2004 Assets Order") at 10.

38.     Indeed, documents and information relating to the monetization of assets are not probative of whether the May 2021 Disclosure Statement provides creditors with "adequate information to enable them to make an informed judgment regarding whether to vote for or against [the] reorganization plan."  *In re Clamp-All Corp.*, 233 B.R. at 204 (citation omitted).  This is because maximizing creditor recoveries through asset monetization is not relevant to an evaluation

22

of the May 2021 Plan. "This Court and others have recognized that, unlike the commercial focus

of bankruptcy cases of private entities, the 'primary purpose' of governmental insolvency

proceedings 'is not future profit, but rather continued provision of public services.'" *In re Fin.*

*Oversight and Mgmt. Bd. for P.R.*, 432 F. Supp. 3d 25, 30 (D.P.R. 2020) (citation omitted)).

"[T]hese restructuring cases require a more holistic approach that focuses on the continuation and

future of a government and its instrumentalities and their ability to meet the needs of the

Commonwealth's residents as well as provide proper recompense of creditors." *Id.* So, logically,

information regarding assets is not relevant to the adequacy of the May 2021 Disclosure Statement

if confirmation does not even require a line-item accounting of the assets of the Puerto Rico

government for creditors' benefit.

### F. Request No. 18 Seeks Irrelevant Information Regarding the Commonwealth's Essential Services.

39.     Request No. 18 seeks documents regarding the assessment of the Commonwealth's

necessary operating expenses or costs of providing essential services.  Ambac/FGIC assert

"[c]reditors and the Court need to understand the scope of essential services under the Plan so that

they can evaluate, inter alia, the Plan's feasibility and whether it is in the best interests of creditors,"

Mot. ¶ 53, and that creditors need discovery regarding essential services to evaluate whether "any

plan of adjustment [is] consistent with the applicable Fiscal Plan," as required by PROMESA. *Id.*

¶ 51.  Ambac/FGIC again attempt to litigate the fiscal plan.  The expenses provided for in the

certified fiscal plans and budgets are clearly the expenses the Oversight Board believes must be

paid for the economic sustainability of the Commonwealth.  Additionally, the Commonwealth

fiscal plan has explained its approach to essential services and expenses.  May 2021 Disclosure

Statement at 162-64.  Ambac/FGIC again concede their requests only relate to confirmation of the

plan: as explained above, feasibility and whether a plan of adjustment meets the best interests test

are confirmation requirements.  That information is irrelevant to the adequacy of the May 2021 Disclosure Statement.  Indeed, Ambac/FGIC offer nothing beyond their own *ipse dixit* averments in support of their belief that such information is relevant.  *E.g.*, *id*. ¶ 54 ("Without documents supporting the Board's conclusion regarding what should be considered essential services (and the costs associated therewith), [Ambac/FGIC] and other creditors will not be able to cast an informed vote on the Plan.").

40.    The result is not changed by Ambac/FGIC's contrived "contradiction" between statements in the May 2021 Disclosure Statement relating to essential services.  The May 2021 Disclosure Statement explains why a definition of "essential services" is not needed.  May 2021 Disclosure Statement at 162-64.  It also states "[t]he Oversight Board takes the view that 'essential services' is a phrase used to refer, at a minimum, to services which, due to the police power, a court of competent jurisdiction can allow to be paid for from revenues to which a creditor has a priority claim or a valid, unavoidable secured claim."  *Id.* at 162.  These positions are not inconsistent.  The May 2021 Disclosure Statement expressly indicates that the latter is the Oversight Board's view, not the definition of "essential services."  And, if that was not clear enough, the May 2021 Disclosure Statement thereafter expounds for several pages on why a definition of "essential services" is not necessary—one such reason being that "the General Obligation claimholders are not claiming under the settlement revenues otherwise needed to pay essential services."  *Id.* at 163.  Given these substantial disclosures, Ambac/FGIC cannot seriously contend that further information on this point is necessary to evaluate the adequacy of the May 2021 Disclosure Statement.

### G. The Oversight Board Has Produced, Will Produce, and/or Has No Non-Privileged Documents or Communications to Produce in Response to Request Nos. 19, 20, 21, 22 and 23.

41.     Request Nos. 19, 20, 21, 22, and 23 (Mot., Ex. K at 27-31) seek documents and communications regarding potentially inaccessible and/or unavailable monies, surpluses transferred pursuant to Act 26-2017, external financing, and the Commonwealth's emergency reserve.  The Oversight Board already has uploaded to the Disclosure Statement Depository and the SFTP all documents made available to Ambac in connection with its Cash Rule 2004 motion practice, which contain non-privileged, non-duplicative documents responsive to these requests. Nevertheless, Ambac/FGIC argue that "[t]he Board has refused to produce any documents in response to Request No. 20 and, with respect to Request Nos. 19, 21, 22, and 23, has merely referred to Ambac/FGIC to documents uploaded to its document depository."  Mot. ¶ 55.  This ignores or misstates the Oversight Board's positions and mischaracterizes the scope of its productions to date:

- **Request No. 19**: The Oversight Board repeatedly has advised Ambac/FGIC there are no non-privileged documents or communications regarding "potentially inaccessible" monies beyond the documents already provided to Ambac in connection with its Cash Rule 2004 Motion and made available in connection with the May 2021 Disclosure Statement.  Mot., Ex. K at 27-28; *see also* Mot., Ex. R at 2-3.  And, even if there were, such materials would be irrelevant to the decision whether to accept or reject the May 2021 Plan.  If a creditor believes that certain monies should be made available to pay creditors, that creditor can vote to reject the plan—no information is needed beyond the knowledge that certain monies would potentially be inaccessible.  In any case, the Oversight Board advised Ambac/FGIC that it would be willing to discuss additional disclosures relating to

the definition of "potentially inaccessible" funds to supplement the May 2021 Disclosure Statement. Mot., Ex. K at 28. Ambac/FGIC have refused to engage in that discussion.

- **Request No. 20**: During the May 24 Meet and Confer, the Oversight Board advised Ambac/FGIC it will investigate materials relating to surplus transfers from Commonwealth Entities to the Commonwealth pursuant to Chapter 4 of Act 26-2017. The Oversight Board subsequently agreed that, to the extent any non-privileged, non-duplicative documents are identified, it will produce those documents via the Disclosure Statement Depository and the SFTP.

- **Request No. 21**: The Oversight Board repeatedly has advised Ambac/FGIC that there are no non-privileged documents or communications regarding "potentially unavailable" monies. Mot., Ex. K at 29-30; *see also* Mot., Ex. R at 3. And like Request No. 19, the Oversight Board offered to confer with Ambac/FGIC to the extent they believed additional disclosures regarding "potentially unavailable" monies are necessary, but Ambac/FGIC refused to confer with the Oversight Board on that topic. Mot., Ex. K at 30.

- **Request Nos. 22 and 23**: Ambac/FGIC ignore the fact that the Oversight Board has uploaded documents regarding the Commonwealth's minimum unrestricted liquidity balance and emergency reserve to the Disclosure Statement Depository into a folder labeled "Working Capital." Ambac/FGIC fail to explain why the documents already provided are insufficient or what additional disclosures they believe are necessary. As to external financing, Ambac/FGIC have not articulated the relevance of this information to the adequacy of the May 2021 Disclosure

26

Statement.   Moreover, the request for this information is directed at communications and pre-decisional materials relating to the Oversight Board's consideration of or decisions regarding external financing, which are overwhelmingly (if not entirely) privileged.

42.     In sum, Ambac/FGIC's arguments totally fail to show why any of what they request would impact a decision on accepting or rejecting the May 2021 Plan, and the Court should refuse to compel discovery related to Request Nos. 19, 20, 21, 22 and 23.

## III.   THE COURT SHOULD DENY AMBAC/FGIC's MOTION TO COMPEL THE OVERSIGHT BOARD TO PRODUCE WITNESSES IN RESPONSE TO THE DEPOSITION CROSS-NOTICES.

43.     Ambac/FGIC contend that "Messrs. Skeel and Peterson have relevant information relating to the foundations of the Plan and the Disclosure Statement," and that testimony from these witnesses "may shed light on any holes in the Disclosure Statement and the Government Parties' Productions." Mot. ¶ 61, Ex. L.

44.     As an initial matter, each of the Oversight Board's arguments above concerning the irrelevance of the disputed discovery requests applies with equal force here. Even assuming these depositions could be relevant, the need for testimony—particularly in view of the documents and information that have been produced and will be produced—is nil. Having already stated on multiple occasions they would not approve the Plan as currently tendered, these depositions are merely attempts to harass and distract the Oversight Board and its members.

45.     Further, contrary to Ambac/FGIC's contention, the depositions would indeed impose an undue burden. Irrelevance aside, preparation time alone would divert extensive time and resources from core reorganization efforts, and increase the costs and expenses of this bankruptcy case. This is because several of the deposition topics seek testimony requiring legal and/or economic analysis from a layperson or because they would require the Oversight Board to

marshal and educate the witnesses about factual proofs underlying the May 2021 Disclosure Statement and the Plan. By way of example, Topic No. 17 seeks:

> The factual and/or legal characteristics of each class of creditors in the Third Amended Plan of Adjustment, including, but not limited to, the bases upon which the Board developed each class [*sic*] The factual and/or legal characteristics of each class of creditors in the Third Amended Plan of Adjustment, including, but not limited to, the bases upon which the Board developed each class.

Mot., Ex. L at 23-24. These requests have no place in the context of a hearing on the adequacy of the May 2021 Disclosure Statement, and the Court should deny Ambac/FGIC's motion to compel depositions. \*\*\*

46. Finally, the need to limit discovery of high-ranking government officials, like Messrs. Skeel and Peterson, is "well established." *Bogan v. City of Boston*, 489 F.3d 417, 423 (1st Cir. 2007). Courts will not permit the deposition of such an official absent a demonstrated need because these "high ranking government officials have greater duties and time constraints than other witnesses and . . . without appropriate limitations, such officials will spend an inordinate amount of time tending to pending litigation." *Id.* (internal quotation marks omitted). Ambac/FGIC's vague reference to "relevant information" falls far short of satisfying this burden. And its invocation of depositions permitted in another action involving different facts and circumstances has no bearing on the appropriateness of the requested depositions here.

## <u>CONCLUSION</u>

47. For the foregoing reasons, Ambac/FGIC's Motion to Compel should be denied.

*[Remainder of Page Intentionally Left Blank]*

Dated: June 3, 2021
San Juan, Puerto Rico

Respectfully submitted,

*/s/ Martin J. Bienenstock*

Martin J. Bienenstock (*pro hac vice*)
Brian S. Rosen (*pro hac vice*)
Jeffrey W. Levitan (*pro hac vice*)
Margaret A. Dale (*pro hac vice*)
Michael T. Mervis (*pro hac vice*)
Julia D. Alonzo (*pro hac vice*)
Laura Stafford (*pro hac vice*)
**PROSKAUER ROSE LLP**
Eleven Times Square
New York, NY 10036
Tel:  (212) 969-3000
Fax:  (212) 969-2900

*Attorneys for the Financial Oversight and
Management Board*

*/s/ Hermann D. Bauer*

Hermann D. Bauer
USDC No. 215205
**O'NEILL & BORGES LLC**
250 Muñoz Rivera Ave., Suite 800
San Juan, PR 00918-1813
Tel:  (787) 764-8181
Fax:  (787) 753-8944

*Co-Attorneys for the Financial
Oversight and Management Board*

## CERTIFICATE OF SERVICE

I hereby certify that, on this same date, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notifications of such filing to all CM/ECF participants in this case.

/s/ *Hermann D. Bauer*
Hermann D. Bauer