**Exhibit 3**

PAUL R. GLASSMAN (State Bar No. 76536)
FRED NEUFELD (State Bar No. 150759)
MARIANNE S. MORTIMER (State Bar No. 296193)
KATHLEEN D. DeVANEY (State Bar No. 156444)
STRADLING YOCCA CARLSON & RAUTH
A Professional Corporation
100 Wilshire Blvd., 4th Floor
Santa Monica, CA 90401
Telephone: (424) 214-7000
Facsimile: (424) 214-7010
E-mail: pglassman@sycr.com
    fneufeld@sycr.com
    mmortimer@sycr.com
    kdevaney@sycr.com

GARY D. SAENZ (State Bar No. 79539)
CITY ATTORNEY
300 North "D" STREET, Sixth Floor
San Bernardino, CA 92418
Telephone: (909) 384-5355
Facsimile: (909) 384-5238
E-mail: saenz_ga@sbcity.org

Attorneys for Debtor
City of San Bernardino

# UNITED STATES BANKRUPTCY COURT
## CENTRAL DISTRICT OF CALIFORNIA
### RIVERSIDE DIVISION

| | |
|---|---|
| In re<br><br>CITY OF SAN BERNARDINO, CALIFORNIA,<br><br>　　　　Debtor. | Case No. 6:12-bk-28006-MJ<br><br>Chapter 9<br><br>**THIRD AMENDED DISCLOSURE STATEMENT WITH RESPECT TO THE THIRD AMENDED PLAN FOR THE ADJUSTMENT OF DEBTS OF THE CITY OF SAN BERNARDINO, CALIFORNIA (JULY 29, 2016)**<br><br><u>Plan Confirmation Hearing</u><br>Date:　　October 14, 2016<br>Time:　　10:00 a.m.<br>Place:　　Courtroom 301<br>　　　　　3420 Twelfth Street<br>　　　　　Riverside, CA 92501-3819 |

# TABLE OF CONTENTS

|  |  | Page |
|---|---|---|
| I. | INTRODUCTION | 1 |
| | A. Purpose of the Disclosure Statement | 4 |
| | B. Summary of Treatment of Claims and Other Information | 5 |
| | C. Summary of Entities Entitled to Vote on the Plan and of Certain Requirements Necessary for Confirmation of the Plan | 9 |
| | D. Voting Procedures, Balloting Deadline, Confirmation Hearing, and Other Important Dates, Deadlines, and Procedures | 10 |
| |    1. Voting Procedures and Deadlines | 10 |
| |    2. Plan Confirmation Hearing Date and Deadlines for Objections to Confirmation of the Plan | 11 |
| | E. Important Notices and Cautionary Statements | 12 |
| | F. Persons to Contact for Further Information | 13 |
| II. | THE CITY'S FISCAL CHALLENGES LEADING TO ITS BANKRUPTCY FILING | 13 |
| | A. The City's Financial Problems Prior to the Petition Date | 14 |
| | B. The City's Attempts to Avoid Insolvency | 15 |
| | C. The City Learns It Is Deeply Insolvent | 16 |
| | D. The City's Declaration of Fiscal Emergency and Filing of the Bankruptcy Case | 18 |
| | E. Adoption of City's Fiscal Emergency Plan | 19 |
| III. | ADMINISTRATION OF THE BANKRUPTCY CASE | 20 |
| | A. Implementation of the Pendency Plan | 20 |
| | B. Eligibility Litigation | 21 |
| | C. Mediations Conducted by Judge Gregg Zive | 21 |
| | D. The City's Pension Plan and the CalPERS Settlement | 22 |
| | E. Settlement With Official Retiree Committee on Retiree Health Benefits | 24 |
| | F. Litigation, and then Settlement, with the POB Creditors | 27 |
| | G. Litigation, and then Settlements, with the City's Labor Unions | 28 |
| | H. Motions for Relief from Stay to Pursue or Commence Litigation | 32 |
| | I. Status of the City's Audits | 32 |
| | J. Development of the City's Plan and Implementation of Measures to Increase Operational Efficiencies and Enhance Revenues | 32 |
| | K. Filing of the City's Plan and Disclosure Statement | 34 |
| IV. | THE CITY'S LIABILITIES AND ASSETS | 35 |
| | A. Liabilities and Claims | 35 |
| |    1. Liabilities Listed by the City in Its List of Creditors | 35 |
| |    2. Proofs of Claim | 35 |
| |    3. General Unsecured Claims | 36 |
| |    4. Priority Unsecured Claims | 37 |
| |    5. Secured Claims | 37 |
| |    6. Restricted Revenue Bond and Note Payable Claims | 40 |
| |    7. Other Bond Claims | 41 |
| |    8. Consenting Union Claims | 46 |
| |    9. Litigation Claims | 46 |
| |    10. Employee Wage and Benefit Claims | 54 |
| |    11. Key Contractual Obligations | 55 |
| |    12. Newmark Groundwater Contamination Consent Decree | 56 |
| |    13. Environmental/Remediation Obligations | 56 |
| |    14. Lease Obligations for Real Property | 57 |

TABLE OF CONTENTS

Page

| | | | |
|---|---|---|---|
| | 15. | The PARS Claims | 58 |
| | 16. | Workers Compensation Liabilities | 60 |
| | 17. | Capital Maintenance Obligations | 60 |
| | 18. | Cash Balances of City Funds and Description of Restricted Funds | 62 |
| | 19. | Reservation of Rights on Allowance or Disallowance of Claims | 63 |
| B. | City Assets | | 64 |
| | 1. | City Owned Sports Facilities | 64 |
| | 2. | Other Real and Personal Property Assets | 66 |
| | 3. | The Former RDA and the Successor Agency Assets | 66 |
| V. | SUMMARY OF THE PLAN OF ADJUSTMENT | | 69 |
| A. | Classification and Treatment of Claims | | 69 |
| | 1. | Unclassified Claims | 69 |
| | 2. | Classified Claims | 70 |
| B. | Treatment of Executory Contracts and Unexpired Leases | | 80 |
| | 1. | Executory Contracts Generally | 80 |
| | 2. | Assumption and Assignment of Executory Contracts | 81 |
| | 3. | Rejection of Executory Contracts | 82 |
| | 4. | Deadline for the Assertion of Rejection Damage Claims; Treatment of Rejection Damage Claims | 82 |
| C. | Means for Execution and Implementation of the Plan | | 83 |
| | 1. | Alternative Methods of Delivering Municipal Services | 83 |
| | 2. | Police Resources Plan | 91 |
| | 3. | Necessary Reinvestment in City Infrastructure and Services | 95 |
| | 4. | City Charter Reform | 99 |
| | 5. | Revenue Enhancement Measures | 100 |
| | 6. | City's Continued Operations | 103 |
| | 7. | City's Retention of Rights of Action | 104 |
| D. | Provisions Regarding Distributions Under the Plan | | 104 |
| | 1. | Distribution Agent | 104 |
| | 2. | Delivery of Distributions | 104 |
| | 3. | Distributions of Cash | 105 |
| | 4. | Timeliness of Payments | 105 |
| | 5. | Compliance with Tax, Withholding, and Reporting Requirements | 105 |
| | 6. | Time Bar to Cash Payments | 106 |
| | 7. | No *De Minimis* Distributions | 106 |
| | 8. | Distributions of Unclaimed Property | 106 |
| | 9. | No Distributions on Account of Disputed Claims | 107 |
| | 10. | Certain Claims to be Expunged | 107 |
| | 11. | No Post-petition Accrual | 107 |
| E. | Disputed Claims | | 107 |
| | 1. | Claims Objection; ADR Procedures; Prosecution of Objections | 107 |
| | 2. | Payments and Distributions with Respect to Disputed Claims | 108 |
| F. | Continuing Jurisdiction of the Bankruptcy Court | | 108 |
| VI. | CONFIRMATION AND EFFECTIVENESS OF THE PLAN | | 108 |
| A. | Voting on the Plan | | 109 |
| | 1. | Who May Vote to Accept or Reject the Plan? | 109 |
| | 2. | Who Is Not Entitled to Vote? | 109 |
| | 3. | Vote Necessary to Confirm the Plan | 109 |
| B. | The "Best Interests" Test | | 110 |
| C. | The Plan's Payment of 1% on General Unsecured Claims | | 110 |
| D. | Feasibility: The City's Financial Model and The Bankruptcy Fund | | 114 |
| | 1. | The Baseline Budget | 115 |

TABLE OF CONTENTS

|   |   |   |   | Page |
|---|---|---|---|------|
|   |   | 2. | Adjustments to the Baseline Budget Through New Revenues, Service Delivery Efficiencies and Basic Level Service Recovery | 116 |
|   |   | 3. | The Debt Adjustment Component | 117 |
|   |   | 4. | The Bankruptcy Fund | 117 |
|   | E. | Cramdown | | 118 |
|   | F. | Effective Date | | 119 |
|   |   | 1. | Conditions to the Occurrence of the Effective Date | 119 |
|   |   | 2. | Non-Occurrence of Effective Date | 120 |
|   | G. | Effect of Confirmation | | 120 |
|   |   | 1. | Discharge of the City | 120 |
|   |   | 2. | Release by Holders of Pre-Confirmation Date Claims | 121 |
|   |   | 3. | Injunction | 122 |
|   |   | 4. | Term of Existing Injunctions and Stays | 123 |
|   |   | 5. | Exculpation | 123 |
|   |   | 6. | Comprehensive Settlement of Claims and Controversies | 124 |
|   |   | 7. | Injunction and Release Provisions of the Plan | 124 |
|   |   | 8. | Agreements With the U.S. | 126 |
| VII. | CERTAIN RISK FACTORS TO BE CONSIDERED | | | 127 |
|   | A. | Failure of Voters to Reauthorize Measure Z in 2021 | | 128 |
|   | B. | Failure of Annexation into the County Fire District | | 128 |
|   | C. | Future Increases in CalPERS Rates | | 128 |
|   | D. | Financial Projections | | 131 |
| VIII. | INCOME TAX CONSEQUENCES | | | 131 |
| IX. | RECOMMENDATION | | | 132 |

## I. INTRODUCTION

The City of San Bernardino, California (the "City") filed a petition under Chapter 9 of Bankruptcy Code on August 1, 2012 (the "Petition Date"), Case No. 6:12-28006-MJ (the "Bankruptcy Case"). This "Third Amended Disclosure Statement With Respect to the Third Amended Plan for the Adjustment of Debts of the City of San Bernardino, California" ("Disclosure Statement") provides important information to the holders of claims against the City regarding the City's "Third Amended Plan for the Adjustment of Debts of the City of San Bernardino, California (July 29, 2016)" ("Plan"). A copy of the Plan is attached as Exhibit 1 to the Appendix of Exhibits accompanying this Disclosure Statement ("Appendix").

This Disclosure Statement is being sent to you because the City is asking creditors to vote to accept the Plan. The Bankruptcy Court has approved this Disclosure Statement as containing information of a kind, and in sufficient detail, to enable creditors to make informed judgments about the Plan. The information in this Disclosure Statement is presented as follows: Section II explains the events and circumstances leading to the City's filing of the Bankruptcy Case; Section III summarizes the significant events that have occurred during the administration of the Bankruptcy Case; Section IV describes the City's assets and liabilities, including a description of the proofs of claim filed in the Bankruptcy Case; Section V summarizes the classification and treatment of claims under the Plan and other important information concerning the Plan; Section VI discusses the procedures for voting on the Plan and the legal requirements for confirmation of the Plan; and Section VII presents a discussion of certain risk factors to be considered in connection with the Plan.

As discussed in detail in this Disclosure Statement, the City commenced the Bankruptcy Case when the City realized that it was at risk of running out of funds needed to provide essential municipal services to City residents. The causes of the City's bankruptcy are discussed in Section II. Today, the City has in place settlements with most of its principal creditors, those settlements are all incorporated into the Plan, and the City has made significant progress at restructuring the delivery of municipal services. The City's settlement with the California Public Employees' Retirement System ("CalPERS") regarding the City's continued funding of employee pension benefits is discussed in Section III.D. The City's settlement with the official Retiree Committee regarding the continued funding of retiree

pensions and the restructuring of retiree health benefits is discussed in Section III.E. The City's settlements with the police, firefighters and other employee unions are discussed in Section III.G, IV.A.8 and V.A.2.j. The City's settlements with the bondholders who own City issued bonds are discussed in Section III.F and V.A.2.l. Annexation of the City into the San Bernardino County Fire Protection District ("County Fire"), and having County Fire provide fire suppression and emergency medical response services instead of the current City Fire Department is discussed in Section V.C.1.a. The City's contracting out of solid waste and recycling, sweeping and right-of way clean up services to Burrtec Waste Industries, Inc. ("Burrtec") is discussed in Section V.C.5. The City's insurance coverage for personal injury claims is discussed in Section V.C.1.b. The City's revised Long Term 20-Year Financial Model (the "Financial Model") in support of the financial feasibility of the Plan is attached as Exhibit 3 to the supplemental Appendix and discussed in Section VI.D. Other settlements and restructuring efforts are discussed throughout this Disclosure Statement.

The Plan represents a major step forward for the City in its efforts to exit bankruptcy and breathe new life into the City's economy. **All of the City's principal creditor constituencies that initially opposed the City's restructuring efforts now support the Plan.** That includes the City's police, fire and other unions, the official Retirees Committee and CalPERS and the holder of the City's bonds. The City reached a comprehensive settlement with CalPERS, the unions and the Retiree Committee which provides that, **if the Plan is confirmed, the City will continue to make its payments and comply with its other obligations to CalPERS, thereby preserving, not reducing, employee and retiree pension benefits.** As part of those settlements, employees have agreed to contribute more to their pension plans and to make certain other employee benefit concessions, and the Retiree Committee has agreed to the restructuring of retiree health benefits changes that went into effect on January 1, 2015 – all to help the City dig out from its financial insolvency while preserving pension benefits. The Plan also has the support of all of the holders of the City's bonds, and the holders of the City's pension obligation bonds have recently agreed to take a substantial reduction on their claims as well. Under the Plan, the City's creditors are making substantial sacrifices to help get the City back on its feet.

**Every dollar of savings from the compromises with the City's creditors is going into rebuilding the City's badly depleted infrastructure and modernizing the delivery of municipal services**. Within the last year, the City completed a Strategic Plan with input from City residents and businesses, which formed the basis for the City's recovery plan submitted as an exhibit to the City's original disclosure statement in May 2015. In November 2015, the City developed a Police Services Five Year Resources Plan to rebuild, modernize and properly equip the Police Department to make a significant dent in reducing crime in the City, and has budgeted $17.6 million to implement that five year plan. That money will go to hiring new police officers (the number of officers is 30% less today than in 2009), modernizing the Police Department's technology and replacing the department's aging fleet of vehicles. A copy of the Staff Report for the Five-Year Police Resources Plan is included in the Appendix at Exhibit 11, and parties are encouraged to review it. All the evidence shows that reducing crime will not only positively impact the daily lives of the City's residents, but will also stimulate economic development, and the resulting higher tax revenues will enable the City to renew funding City services that were cut back before and during the Bankruptcy Case. The Financial Model on which the Plan is based also budgets funds for road and street maintenance and repair, building upgrades, parks, libraries, community centers and other essential services which have been neglected for a long time due to the lack of funds.

The Plan, and the City's settlement with the union representing the City's firefighters, will allow the City to provide better firefighting and emergency medical response ("EMR") services by annexing the City into the County Fire District and utilizing the greater and more modern capacity of the County Fire District to provide City residents with fire and EMR services. The City's firefighters have transitioned over to County employment, and their cooperation in this process, and the concessions they have made, has saved the City substantial sums of money. In addition to replacing the City Fire Department to provide better services at lower cost, the City has contracted for the delivery of solid waste and recycling, sweeping and right-of-way cleanup services to a private contractor, Burrtec Waste Industries ("Burrtec"), which decision had the support of the affected City employees. Every dollar of savings from regionalizing or contracting out City services (including in other areas under consideration) is going to rebuilding the City and improving the delivery of other City services.

1    The City has a long road ahead of it to reach a level of municipal services the residents are
2    entitled to expect.  The Plan and the Financial Model on which it is based dedicate as much as the
3    City's resources as they can to providing municipal services to City residents to reach reasonable levels
4    of services over time.  That leaves very little to pay creditor claims.  Under the Plan, the City will make
5    a distribution of 1% on General Unsecured Claims, because City municipal services were cut to the
6    bone in the years before the Petition Date and in the early days of the Bankruptcy Case, and the City
7    needs to dedicate every dollar available to it to rebuild those municipal services.  A description of how
8    much the City was forced to cut back due to lack of funds is discussed in Section III.J below.

9    All creditors will be better off with the City thriving again, in terms of safer streets, more jobs
10   and greater opportunity.  Confirmation of the Plan and the consequent City exit from bankruptcy is a
11   major step in that direction.  The City asks all creditors, including retirees, who receive Ballots to take
12   the time to check the box for accepting the Plan and return the Ballot to the Ballot Tabulator.

13   **A.    Purpose of the Disclosure Statement**

14   The Bankruptcy Code requires that the proponent of a plan of adjustment prepare and file a
15   disclosure statement that provides information of a kind, and in sufficient detail, that would enable a
16   typical holder of claims in a class impaired under that plan to make an informed judgment with respect
17   to the plan.  This Disclosure Statement provides such information.  ***Creditors and parties in interest***
18   ***should read this Disclosure Statement, the Plan, and all of the exhibits and any supplements***
19   ***accompanying these documents in their entirety in order to ascertain how the Plan will affect***
20   ***creditor claims against the City and how to cast a ballot with respect to the Plan.***

21   This Disclosure Statement cannot and does not provide creditors with legal, tax or other advice
22   or inform such parties of all aspects of their rights.  Claimants are advised to consult with their
23   attorneys and/or financial advisors to obtain more specific advice regarding how the Plan will affect
24   them and regarding their best course of action with respect to the Plan.  In addition, retirees are advised
25   to consult with the Retiree Committee.

26   This Disclosure Statement has been prepared in good faith and in compliance with applicable
27   provisions of the Bankruptcy Code.  Based upon information currently available, the City believes that
28   the information contained in this Disclosure Statement is correct as of the date of its filing.  This

Disclosure Statement, however, does not and will not reflect some events that may occur after Bankruptcy Court approval of the Disclosure Statement, and the City presently does not intend to prepare or distribute any supplements to reflect such events.

As required by the Bankruptcy Code, the Plan classifies the claims of the City's creditors into classes based upon the different legal rights of creditors, and proposes to pay each class of creditors in accordance with the City's financial ability. The City must continue to provide its citizens with basic essential services, maintain its streets and buildings, and create an environment in which its residents can safely live and work. In order to do so, the Plan has no choice but to impair certain of the City's creditor's claims to provide the City with a feasible financial foothold going forward. The City believes that the financial restructuring set forth in the Plan represents the best option for the City to achieve this outcome, and to return the City to solvency.

For the reasons set forth in this Disclosure Statement, the City believes that the Plan provides the greatest and earliest possible recoveries to creditors while preserving necessary City services and operations. Acceptance of the Plan is in the best interests of creditors as well as the best interests of the City's residents and businesses. The alternative to accepting the Plan is only additional delay, uncertainty, expense, litigation, and, ultimately, smaller or no distributions to creditors. Therefore, the City urges that you cast your ballot in favor of the Plan.

**B.     Summary of Treatment of Claims and Other Information**

The following chart summarizes key information about the Plan and this Disclosure Statement, including the proposed treatment of the various classes of claims. **Please do not rely on the chart alone. The Disclosure Statement has important information that is not contained in the chart and that may influence your decision regarding whether to vote to accept the Plan. Please thoroughly read this entire document and the accompanying materials.**

| | |
|---|---|
| **Debtor** | City of San Bernardino, California. |
| **Bankruptcy Court** | United States Bankruptcy Court for the Central District of California, Riverside Division, The Honorable Meredith A. Jury presiding. |
| **Plan** | Third Amended Plan For The Adjustment Of Debts Of The City Of San Bernardino, California (July 29, 2016). |
| **Purpose of the Disclosure Statement** | To provide information of a kind, and in sufficient detail, that would enable a typical holder of claims in a Class Impaired under the Plan to make an informed judgment with respect to voting on the Plan. |
| **Balloting Information** | Ballots have been provided with this Disclosure Statement to creditors known to have claims that are Impaired under the Plan. Ballots must be returned to and received by the Ballot Tabulator by no later than 4:00 p.m., Pacific Time, on Friday September 2, 2016. Objections to confirmation also must be filed and served by no later than September 2, 2016. |
| **Ballot Tabulator** | Rust Consulting/Omni Bankruptcy, 5955 De Soto Avenue, Suite 100, Woodland Hills, CA 91367 |
| **Confirmation Hearing and Confirmation Objections** | A hearing regarding confirmation of the Plan will be held by the Bankruptcy Court on October 14, 2016, commencing at 10:00 a.m., Pacific Time, and may be continued from time to time without further notice other than as may be given at the hearing and/or in the docket of the City's chapter 9 bankruptcy case. |
| **Treatment of Claims** | If the Bankruptcy Court confirms the Plan and the Plan becomes effective, claims will be treated as follows: |
| Administrative Claims | Post-petition claims meeting the definition of Administrative Claims will be paid in full, except to the extent that the holder of an Administrative Claim agrees to different treatment. |
| Class 1 Claims: 1996 Refunding Bonds Claims | **Impaired.** This Class is comprised of approximately $6 million of Claims relating to the 1996 Refunding Bonds. These Claims will be paid in accordance with the terms of the 1996 Trust Indenture, as amended by the 1996 Refunding Bonds Amendment, and the 1996 Refunding Bond Agreements (City Hall), which the City will assume on the Effective Date. As part of those amendments, a surety will replace funds held in a "Reserve Fund" (as such term is defined in the 1996 Trust Indenture), with such funds to be released to the City for use for capital expenditure purposes in accordance with federal tax covenants. |
| Class 2 Claims: 1999 Refunding Certificates of Participation Claims | **Impaired.** This Class is comprised of approximately $7.9 million of Claims relating to the 1999 Refunding Certificates of Participation. These Claims will be paid in accordance with the terms of the 1999 Trust Agreement, as amended by the 1999 Refunding Certificates of Participation Amendment, and the 1999 Refunding Certificates of Participation Agreements (Police Station/201 North E Street/South Valle), which the City will |

|  |  |  |
|---|---|---|
| | | assume (as amended by the 1999 Refunding Certificates of Participation Amendment) on the Effective Date. As part of the amendments and assumptions provided for in the 1999 Refunding Certificates of Participation Amendment, the Police Station Lease will be prepaid in full from funds in the Capital Reserve Fund and the debt service Reserve Fund (as such terms are defined in the 1999 Trust Agreement), and the City will redeem an amount of the 1999 Refunding Certificates of Participation equal to the principal components of the Police Station Lease payments to be paid. Upon such prepayment, the Police Station Lease will be terminated, and thereafter, neither the JPFA, National nor the 1999 Refunding Certificates of Participation Trustee will have any interest in the Police Station. In addition, once the Police Station Lease payments have been made, the City will have the right to use any excess funds in the Capital Reserve Fund for capital expenditure purposes in accordance with federal tax covenants. |
| | Class 3<br>Secured Claims:<br>CIEDB Harriman Project Claims | **Unimpaired.** This Class is comprised of Claims held by CIEDB with respect to the Harriman Project. These Claims will be paid in accordance with those CIEDB Documents relating to the CIEDB's financing of Harriman Project. |
| | Class 4<br>Secured Claims:<br>CIEDB Pavement Project Claims | **Unimpaired.** This Class is comprised of Claims held by CIEDB with respect to the Pavement Project. These Claims will be paid in accordance with those CIEDB Documents relating to the CIEDB's financing of the Pavement Project. |
| | Class 5<br>Secured Claims:<br>Police Station AC Financing Claims | **Impaired.** This Class includes the claims of Western Alliance Equipment Finance, Inc. in relation to the Police Station AC Financing Agreement. Under the Plan, the collateral securing the City's payment obligations under the Police Station AC Financing Agreement will be relinquished to Western Alliance, the City will have no further obligations under the Police Station AC Financing Agreement, and Western Alliance will have a General Unsecured Claim for any unpaid amounts due under the Police Station AC Financing Agreement (approximately $475,000). |
| | Class 6<br>Secured Claims:<br>Burgess Claims | **Impaired.** The maturity date with respect to the Burgess Documents is in 2019, at which time a large balloon payment (approximately $1.1 million) is due to Burgess. Under the Plan, the Burgess Documents will be amended to extend the maturity date until 2022, and the balloon payment will be amortized over that 3-year period with interest continuing to accrue through the new maturity date on the unpaid principal balance at the current interest rate set forth in the Note (5%) which will be paid on January 1 and July 1 of each ear of the 3 year extend period. The Burgess Documents will also be amended to provide that Burgess has granted the City the option until April 30, 2017 to pay the principal amount due under the Note at a 10% discount (the "Discounted Payoff"), plus all accrued and unpaid interest at the rate set forth in the Note through the date that the Discounted Payoff payment is made. The City exercised its option to make the Discounted Payoff payment in June 2016, and then conveyed the Fire Maintenance Facility to the County Fire District in connection with annexation of the City into the County Fire |

District.

| | | |
|---|---|---|
| Class 7 | Claims on Restricted Revenue Bond and Note Payable Obligations | **Unimpaired.** The City will continue to apply restricted revenues to pay the Restricted Revenue Bond and Notes Payable Obligations in the ordinary course of business pursuant to the applicable documents. |
| Class 8 | CalPERS Claims | **Unimpaired.** The Claims of CalPERS will be paid in accordance with the City's settlement agreement with CalPERS and all terms of the settlement agreement are be deemed incorporated into the Plan. The settlement agreement provides for, among other things, (i) payment of certain arrearages to CalPERS; (ii) payment of certain additional administrative costs of CalPERS; and (iii) a covenant not to impair CalPERS under the Plan. Notwithstanding anything in the Plan to the contrary, nothing in the Plan is intended to or does impair or interfere with the rights of the City and CalPERS under the Mediator's Order. |
| Class 9 | PARS Claims | **Impaired.** The City has entered into a settlement with the holders of the PARS Claims. Pursuant to the settlement: (i) the PARS Plans will be rejected, and the City will waive any and all claims to the funds held within the PARS Trust and the 415 Trust as of the date of termination of the PARS Plans, (ii) the amounts remaining in the PARS Trust and the 415 Trust (approximately $1.92 million) will be distributed to the PARS Participants pursuant to agreed-upon allocations, and the City will endeavor to make each such distributions in a manner that will minimize adverse tax consequences for each PARS Participant, (iii) the City will make a distribution of $290,000.00 on the later of the Effective Date or July 5, 2017, and a distribution $290,000.00 on the later of the Effective Date or July 5, 2018, in each case to the PARS Participants pursuant to agreed-upon allocations, and (iv) the City will be discharged from any and all obligations to further fund any PARS Plan or to make any other distributions on account of the PARS Claims. |
| Class 10 | Consenting Union Claims | **Impaired.** The City has entered into settlements with all of the unions representing its seven bargaining units that establish the amount of the claim of each union and its members. The Consenting Union Claims are Class 13 General Unsecured Claims for all purposes, including for voting of, and distributions, on the claims. |
| Class 11 | Retiree Health Benefit Claims | **Impaired.** Under the Plan, the holders of the Retiree Health Benefit Claims will receive the rights and benefits set forth in the Retiree Settlement, including that their pension benefits will not be impaired, but retiree health benefits have been modified. |
| Class 12 | POB Claims | **Impaired.** The POB Claims will be paid in accordance with the settlement between the City and the POB Creditors. Pursuant to the terms of that settlement, the City will make installment payments over a thirty-year term, starting one year after the City's Plan is confirmed. The City will make payments of $1 million to $2.5 million per fiscal year until 2046 instead of the $3.3 million |

THIRD AMENDED DISCLOSURE STATEMENT FOR PLAN FOR THE ADJUSTMENT OF DEBTS (JULY 29, 2016)    8

|  |  |  |
|---|---|---|
|  |  | to $4.7 million per fiscal year owed under the terms of the 2005 pension bond agreement. The payments constitute a 40% recovery on the POB Claims, in full settlement of the litigation commenced by the POB Creditors regarding the payment priority of their claims, and the POB Creditors now support confirmation of the Plan. |
|  | Class 13 <u>General Unsecured Claims</u> | **Impaired.** On the Effective Date of the Plan or as soon as reasonably practicable after the Effective Date, Holders of Allowed Class 13 General Unsecured Claims will receive a 1% distribution on their claims. |
|  | Class 14 <u>Convenience Class Claims</u> | **Impaired.** Within 30 days after the Effective Date, each holder of an Allowed Convenience Class Claim will receive the lesser of the Allowed amount of the Claim or $100 at the election of the holder of the Allowed Convenience Class Claim. |
| **Questions:** |  | Questions can be submitted electronically on the City's Chapter 9 website (www.sanbernardinochapter9.com) or by calling 800-572-9583 and leaving a message. All questions will receive a prompt response. |

Many capitalized terms are used and defined in this Disclosure Statement and in the Plan. Capitalized terms used but not defined in this Disclosure Statement have the meaning ascribed to them in the Plan.

### C. Summary of Entities Entitled to Vote on the Plan and of Certain Requirements Necessary for Confirmation of the Plan

Holders of Allowed Claims in the following Classes are entitled to vote on the Plan because the Claims in each such Class are "Impaired" under the Plan within the meaning of section 1124 of the Bankruptcy Code: Class 1 – 1996 Refunding Bonds Claims; Class 2 – 1999 Refunding Certificates of Participation Claims; Class 5 – Police Station AC Financing Claims; Class 6 – Burgess Claims; Class 9 – PARS Claims; Class 10 - Consenting Union Claims; Class 11 – Retiree Health Benefit Claims; Class 12 – POB Claims; Class 13 – General Unsecured Claims; and Class 14 – Convenience Class Claims. **Class 10 (Consenting Union Claims) and Class 11 (Retiree Health Benefit Claims) are created for claim description purposes only and are Class 13 General Unsecured Claims for all other purposes under this Plan, including for voting on the Plan and for distributions under a confirmed Plan.**

The Bankruptcy Court may confirm the Plan only if at least one Class of Impaired Claims has voted to accept the Plan and if certain other legal requirements are met with respect to Classes of

creditors who do not vote to accept the Plan, and with respect to individual creditors who do not vote to accept the Plan. A Class of Impaired Claims has accepted the Plan only when more than one-half in number and at least two-thirds in dollar amount of the Allowed Claims voting in that Class vote in favor of the Plan.

In the event of a rejection of the Plan by any of the voting Classes, the City will request that the Bankruptcy Court confirm the Plan in accordance with the "cramdown" provisions of section 1129(b) of the Bankruptcy Code applicable to the Bankruptcy Case. These provisions permit confirmation of the Plan notwithstanding rejection of the Plan by any of the voting Classes if the Bankruptcy Court finds, among other things, that the Plan does not discriminate unfairly and is fair and equitable with respect to each rejecting Impaired Class. Other sections of this Disclosure Statement provide a more detailed description of the requirements for acceptance and confirmation of the Plan.

### D. Voting Procedures, Balloting Deadline, Confirmation Hearing, and Other Important Dates, Deadlines, and Procedures

#### 1. Voting Procedures and Deadlines

The City has provided copies of this Disclosure Statement, the Plan, Appendix and Ballots to all known holders of Impaired Claims in the voting Classes eligible to vote on the Plan. Those holders of an Allowed Claim as of June 16, 2016 in each of the voting Classes who seek to vote to accept or reject the Plan must accurately complete a Ballot and return it to the Court-appointed Ballot tabulator, Rust Consulting/Omni Bankruptcy, 5955 De Soto Avenue, Suite 100, Woodland Hills, CA 91367 (the "Ballot Tabulator"), so that their Ballots actually are received by no later than the Balloting Deadline (as defined in the following paragraph). ***The ballots must be returned directly to the Ballot Tabulator, not to the Bankruptcy Court.*** Note that Ballots do not constitute proofs of claim.

*All Ballots must be completed, signed, returned to, and <u>actually received</u> by the Ballot Tabulator by not later than 4:00 p.m. Pacific Time, Friday, September 2, 2016 (the "Balloting Deadline"). Ballots received after the Balloting Deadline, and Ballots returned directly to the Bankruptcy Court rather than to the Ballot Tabulator, will not be counted in connection with confirmation of the Plan.*

## 2. Plan Confirmation Hearing Date and Deadlines for Objections to Confirmation of the Plan

The hearing to determine whether the Bankruptcy Court will confirm the Plan (the "Confirmation Hearing") will commence on October 14, 2016, at 10:00 a.m. before the Honorable Meredith A. Jury, United States Bankruptcy Judge for the Central District of California, in Courtroom 301 of the United States Courthouse, 3420 Twelfth Street, Riverside, California 92501.  The Confirmation Hearing may be continued from time to time, including by announcement in open court, without further notice.

Any objections to confirmation of the Plan must be filed with the Bankruptcy Court and served on the following entities so as to be **actually received** by each of them no later than September 2, 2016: (i) City Attorney's Office, 300 North "D" Street, Sixth Floor, San Bernardino, CA 92418, Attention: Gary D. Saenz, City Attorney (the City); (ii) Stradling Yocca Carlson & Rauth, P.C., 100 Wilshire Blvd., 4th Floor, Santa Monica, CA 90401, Attention:  Paul R. Glassman, Fred Neufeld and Marianne S. Mortimer (counsel to the City); (iii) Bienert, Miller & Katzman, PLC, 903 Calle Amanecer, Suite 350, San Clemente, CA 92673, Attention:  Steven J. Katzman, Anthony Bisconti and Anne A. Uyeda (counsel to the Retiree Committee), (iv) Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, NY 10153 Attention:  Debra A. Dandeneau (counsel to National Public Guarantee Finance Corporation); (v) Paul Aronzon, Linda Dakin-Grimm, Thomas Kreller, Milbank, Tweed, Hadley & McCloy LLP, 601 South Figueroa Street, 30th Floor, Los Angeles, CA 90017 (counsel to Ambac Assurance Corporation); (vi) Ballard Spahr LLP, 1735 Market Street, 51st Floor, Philadelphia, PA 19103-7599 Attention:  Vincent J. Marriott, III (counsel to COMMERZBANK Finance & Covered Bond S.A f/k/a/ Erste Europäische Pfandbriefund Kommunalkreditbank AG in Luxemburg); (vii) K&L Gates LLP, 10100 Santa Monica Boulevard, Seventh Floor, Los Angeles, California 90067, Attention: Michael B. Lubic (counsel to the California Public Employees' Retirement System); (viii) Felderstein Fitzgerald Willoughby & Pascuzzi LLP, 400 Capitol Mall, Suite 1750, Sacramento, California 95814 Attention:  Steven Felderstein (counsel to the California Public Employees' Retirement System); (ix) Duane Morris LLP, One Market Plaza, Spear Street Tower, Suite 2200, San Francisco, CA 94105-1127 Attention:  Ron M. Oliner (counsel to the San Bernardino Police Officers Association); and

(x) San Bernardino City Professional Firefighters, Local 891, SulmeyerKupetz, APC, 333 S. Hope St., 35th Floor, Los Angeles, CA 90071 Attention: David M. Goodrich (counsel to the San Bernardino City Professional Firefighters, Local 891). Objections that are not timely filed and served may not be considered by the Bankruptcy Court. ***Please refer to the accompanying notice of the Confirmation Hearing for specific requirements regarding the form and nature of objections to confirmation of the Plan.***

### E. <u>Important Notices and Cautionary Statements</u>

The historical financial data relied on in preparing the Plan and this Disclosure Statement is based upon the City's books and records. Although certain professional advisors of the City assisted in the preparation of this Disclosure Statement, in doing so such professionals relied upon factual information and assumptions regarding financial, business, and accounting data provided by the City and third parties. The status of the City's financial audits is discussed below in Section III.I.

***The City's professional advisors have not independently verified the financial information provided in this Disclosure Statement, and, accordingly, they make no representations or warranties as to its accuracy.*** Although reasonable efforts have been made to provide accurate information, the City does not warrant or represent that the information in this Disclosure Statement, including any and all financial information and projections, is without inaccuracy or omissions, or that actual values or distributions will comport with the estimates set forth herein.

***No entity may rely upon the Plan or this Disclosure Statement or any of the accompanying exhibits for any purpose other than to determine whether to vote in favor of or against the Plan.*** Nothing contained in such documents constitutes an admission of any fact or liability by any party, and no such information will be admissible in any proceeding involving the City or any other party, nor will this Disclosure Statement be deemed evidence of the tax or other legal effects of the Plan on holders of claims in the Bankruptcy Case. This Disclosure Statement is not intended to be a disclosure communication to the public capital markets and should not be relied upon by investors as such in determining whether to buy, hold, or sell any securities of the City or related entities.

Certain information included in this Disclosure Statement and its exhibits contains forward-looking statements. The words "believe," "expect," "anticipate," and similar expressions

identify such forward-looking statements. The forward-looking statements are based upon information available when such statements are made and are subject to risks and uncertainties that could cause actual results to differ materially from those expressed in the statements. A number of those risks and uncertainties are described below. Readers are cautioned not to place undue reliance on the forward-looking statements in this Disclosure Statement. The City undertakes no obligation to publicly update or revise any forward-looking statements, whether as a result of new information, future events, or otherwise. This Disclosure Statement is not required to be submitted to the Securities and Exchange Commission ("SEC") or any other regulatory agency or body for approval, and has not been approved, disapproved or determined to be adequate, accurate, truthful, or complete by the SEC or any other regulatory agency or body.

**F.    Persons to Contact for Further Information**

If you have questions about the procedures for voting on the Plan, want another copy of a ballot, or seek further information about the timing and deadlines with respect to confirmation of the Plan, please write to either: (1) City of San Bernardino Plan of Adjustment, c/o Rust Consulting/Omni Bankruptcy, 5955 De Soto Avenue, Suite 100, Woodland Hills, CA 91367; or (2) Stradling Yocca Carlson & Rauth, P.C., 100 Wilshire Blvd., 4th Floor, Santa Monica, CA 90401, Attention: Paul R. Glassman, Fred Neufeld and Marianne S. Mortimer (facsimile: 424-214-7010; Email: pglassman@sycr.com, fneufeld@sycr.com or mmortimer@sycr.com). Please note that counsel for the City cannot and will not provide creditors with any legal advice, including advice regarding how to vote on the Plan or the effect that confirmation of the Plan will have upon claims against the City. For additional information, retirees should contact the Retiree Committee. Counsel to the Retiree Committee is Bienert, Miller & Katzman, PLC, Attn: Steven J. Katzman, Anthony Bisconti and Anne A. Uyeda, 903 Calle Amanecer, Suite 350, San Clemente, CA 92673, phone (949) 369-3700.

**II.    THE CITY'S FISCAL CHALLENGES LEADING TO ITS BANKRUPTCY FILING**

The City is a municipal corporation formed and organized under the City Charter and the California Constitution. It is governed by a seven-member Common Council and a Mayor elected by popular vote. The City has approximately 213,000 residents, serves as the county seat for San Bernardino County, and occupies an area of approximately 59 square miles.

A. **The City's Financial Problems Prior to the Petition Date**

Beginning in the 1980s, the City faced a number of economic challenges such as job losses from the closure of several major employers in the area like Kaiser Steel and the Santa Fe Rail Yard, as well as the loss of business generated by people traveling between Los Angeles and Las Vegas after Interstate 15 was re-routed roughly fifteen miles west of the City. In 1995, another economic blow hit the City when Norton Air Force Base closed as part of the United States' Base Closure and Realignment Act which resulted in the loss of a significant number of jobs.

The housing construction boom of the early to mid-2000s led to speculation in the residential housing market, and San Bernardino experienced an influx of people seeking housing more affordable than that available in Los Angeles, Orange and San Diego Counties. The new home construction and real estate boom provided a boost to the City's economy, but also increased the demand for services. When the real estate boom went bust and the Great Recession hit, San Bernardino was particularly hard hit.

Between 2007 and 2012, San Bernardino residential housing prices plummeted resulting in significantly lower property tax revenues. Speculation in San Bernardino's housing market made it particularly vulnerable when the housing bubble burst, and the Riverside-San Bernardino-Ontario metro area had one of the nation's highest foreclosure rates in 2012. San Bernardino's foreclosure rate was 3.5 times greater than the national average in 2012. The median single family home sales price peaked in 2007, and remained over 40% below that peak in June of 2012. In addition to declines in residential real estate prices, commercial properties dropped in value and continued to search for a bottom as of 2012. Since peaking in the 2008-09 fiscal year, City property tax revenues dropped between $4 million and $7 million each year from that peak. Given continued housing market weakness and the constraints imposed by Proposition 13 on property tax increases, property tax revenues likely will grow only modestly for years to come.

Sales tax revenues also dropped due to increased unemployment and lower per-capita incomes caused by the loss of the major employers and job losses caused by the Great Recession and real estate market crash. Since June 2008, the City suffered from double digit unemployment and the unemployment rate was 16.9% as of June 2012, notably higher than the State of California's and more