# UNITED STATES DISTRICT COURT
## DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*<br><br>Debtors.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br>(Jointly Administered) |

## OBJECTION OF THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO TO URGENT MOTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO COMPEL DISCOVERY IN CONNECTION WITH THE THIRD AMENDED DISCLOSURE STATEMENT

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number listed as a bankruptcy case number due to software limitations and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (iv) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780 (LTS)) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

# TABLE OF CONTENTS

**Page**

**PRELIMINARY STATEMENT** ................................................................................................ 1

**BACKGROUND** ...................................................................................................................... 5

    A.    Filing of the Plan and Disclosure Statement ................................................... 5

    B.    Motion Practice Regarding Approval of the Disclosure Statement ................. 5

    C.    Discovery Regarding the Third Amended Disclosure Statement .................... 8

**APPLICABLE LAW** ............................................................................................................... 11

**ARGUMENT** .......................................................................................................................... 14

    I.    THE COMMITTEE DOES NOT NEED DISCOVERY BECAUSE IT
    ALREADY DECIDED TO OPPOSE CONFIRMATION OF THE PLAN......... 14

    II.    THE COURT SHOULD DENY THE COMMITTEE'S MOTION TO
    COMPEL DOCUMENT DISCOVERY ....................................................... 15

        A.    The Oversight Board Already Has Provided or Agreed to Provide
        Documents and Information Responsive to Many of the Committee's
        Discovery Requests.......................................................................... 16

            i.    *Number, Amount and Expected Recoveries for Commonwealth and
            ERS General Unsecured Claims (Mot. Ex. 2, Request Nos. 1, 2,
            and 52)* ..................................................................................... 17

            ii.    *Classification of Commonwealth and ERS Unsecured Claims and
            Information Concerning Other Classes (Mot. Ex. 2, Request Nos.
            3, 8 and 34)* ............................................................................... 18

            iii.    *Consideration Provided to Other Creditors, Claim Amounts,
            Terms of Settlements and Other Agreements (Mot. Ex. 2, Request
            Nos. 7, 11, 14, 15, 16, 17, 23, 24, 51, 55, 56; Mot. Ex. 10, Request
            Nos. 2, 4, 6, 8, 9, 10, 11, 16)* ..................................................... 19

            iv.    *Commonwealth's Available Cash and Other Commonwealth Assets
            (Mot. Ex. 2, Request Nos. 10, 35-41)* ........................................ 24

        B.    Certain Requests Seek Documents Relevant Only to Plan
        Confirmation, Not Adequacy of the May 2021 Disclosure Statement. .......... 25

        C.    The Remainder of the Committee's Requests Seek Irrelevant
        Information. .................................................................................... 27

    III.    THE COURT SHOULD DENY THE COMMITTEE'S MOTION TO
    COMPEL THE OVERSIGHT BOARD TO PRODUCE WITNESSES IN
    RESPONSE TO THE DEPOSITION NOTICES. ................................................. 34

**CONCLUSION** ..................................................................................................................... 35

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Bogan v. City of Boston*,
489 F.3d 417 (1st Cir. 2007) ............................................................................4, 35

*Century Glove, Inc. v. First Am. Bank of New York*,
860 F.2d 94 (3d Cir. 1988) ...................................................................................10

*In re Am. Cap. Equip., LLC*,
688 F.3d 145 (3d Cir. 2012) ..................................................................................12

*In re City of Colo. Springs Spring Creek Gen. Improvement Dist.*,
187 B.R. 683 (Bankr. D. Colo. 1995) ....................................................................30

*In re City of Detroit*,
524 B.R. 147 (Bankr. E.D. Mich. 2014) ...........................................................29, 30

*In re Clamp-All Corp.*,
233 B.R. 198 (Bankr. D. Mass. 1999) ...................................................................14

*In re Comandante Mgmt. Co.*,
359 B.R. 410 (Bankr. D.P.R. 2006) .......................................................................12

*In re Fin. Oversight and Mgmt. Bd. for P.R.*,
432 F. Supp. 3d 25 (D.P.R. 2020) .........................................................................29

*In re FirstEnergy Sols. Corp.*,
606 B.R. 720 (Bankr. N.D. Ohio 2019) .............................................................13, 14

*In re Fullmer*,
No. 09-50086-RLJ-11, 2009 WL 2778303 (Bankr. N.D. Tex. Sept. 2, 2009) ........28

*In re Georgetown of Kettering*,
17 B.R. 73 (Bankr. S.D. Ohio 1981) .................................................................11, 12

*In re Hutch Holdings, Inc.*
2014 WL 7408816 (Bankr. S.D. Ga. Dec. 30, 2014) .........................................11, 25

*In re Monroe Well Serv., Inc.*,
80 B.R. 324 (Bankr. E.D. Pa. 1987) ......................................................................12

*In re Mount Carbon Metro. Dist.*,
242 B.R. 18 (Bankr. D. Colo. 1999) ......................................................................29

*In re Pecht*,
  57 B.R. 137 (Bankr. E.D. Va. 1986) .............................................................................13, 14

*In re Ponce de Leon 1403, Inc.*,
  2012 WL 5880443 (Bankr. D.P.R. Nov. 20, 2012) ........................................................11, 25

*In re Price Funeral Home, Inc.*,
  2008 Bankr. LEXIS 3462 (Bankr. E.D.N.C. Dec. 12, 2008) ..................................................11

*In re Sanders*,
  2015 Bankr. LEXIS 3987 (Bankr. S.D. Miss. Nov. 23, 2015) ...............................................11

*In re Scioto Valley Mortg. Co.*,
  88 B.R. 168 (Bankr. S.D. Oh. 1988) ...................................................................................2, 25

*In re Skin Sense, Inc.*,
  2017 WL 2773521 (Bankr. E.D.N.C. June 26, 2017) .....................................................12, 14

*In re Waterville Timeshare Grp.*,
  67 B.R. 412 (Bankr. D.N.H. 1986) ...................................................................................12, 25

*Kirk v. Texaco, Inc.*,
  82 B.R. 678 (S.D.N.Y. 1988) ...................................................................................................26

*Silver Sage Partners, Ltd. v. City of Desert Hot Springs (In re City of Desert Hot
  Springs)*,
  339 F.3d 782 (9th Cir. 2003) ...................................................................................................29

**STATUTES**

11 U.S.C. § 507(a)(2) ....................................................................................................................30

11 U.S.C. § 943(b)(5) ....................................................................................................................30

11 U.S.C. § 1125(a) ..................................................................................................................3, 26

11 U.S.C. § 1125(a)(1) ..................................................................................................................10

48 U.S.C. § 2174(b)(4) ..................................................................................................................30

PROMESA § 101(a) ......................................................................................................................33

PROMESA § 211 ..............................................................................................................................6

**RULES AND OTHER AUTHORITIES**

*7 Collier on Bankruptcy* (16th ed. 2021) ........................................................................11, 13, 21

Fed. R. Civ. P. 30(b)(6) ...........................................................................................................4, 8, 34

**To the Honorable United States Magistrate Judge Judith G. Dein:**

The Financial Oversight and Management Board for Puerto Rico (the "Oversight Board"), as sole Title III representative of the Commonwealth of Puerto Rico (the "Commonwealth"), the Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS"), and the Puerto Rico Public Buildings Authority ("PBA," and together with the Commonwealth and ERS, the "Debtors") respectfully submits this objection to the *Official Committee of Unsecured Creditors' Urgent Motion to Compel Disclosure Statement Discovery from Oversight Board and AAFAF* [ECF No. 16811] ("Mot." or "Motion to Compel"), filed by the Official Committee of Unsecured Creditors (the "Committee").

## PRELIMINARY STATEMENT

1.      The Committee seeks sweeping discovery into a multitude of topics, but the information it seeks is both already in the Committee's possession and is wholly irrelevant to the question at issue—namely, whether the *Disclosure Statement for the Third Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* [ECF No. 16741] (the "May 2021 Disclosure Statement") provides adequate disclosure to claimholders who will be voting on the plan of adjustment the May 2021 Disclosure Statement describes.  The Committee does so even though (i) it has not yet filed an objection to the Oversight Board's motion to approve the May 2021 Disclosure Statement, (ii) its own document requests show the Committee already knows what its objection will say, and (iii) the Committee has argued the *Third Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* [ECF No. 16740] (the "May 2021 Plan") is unconfirmable on its face and it is obvious the Committee will recommend its constituents vote to reject the May 2021 Plan.  *See Renewed Motion of Official Committee of Unsecured Creditors Pursuant to Rule of Federal Bankruptcy Procedure 3013 for Entry of Order Reclassifying Class 48A and Class 55 Claims*, [ECF No. 16396] (the "3013 Motion") ¶ 4 (noting

the Committee believes the plan and disclosure statement are "are deeply flawed and thus may not

be approved by the Court").  The Committee does not even pretend in its Motion to Compel that

any additional information provided in discovery or in the May 2021 Disclosure Statement will

change its (albeit mistaken) position that the May 2021 Plan cannot be confirmed.

　　　　2.　　　　The Committee claims its *76 separate document requests* are "narrowly tailored."

Mot. ¶ 2.  On the contrary, the Committee's requests are neither narrow nor in any way tailored to

seek information relating to the adequacy of information in the May 2021 Disclosure Statement.

Instead, the majority of the Committee's requests relate either to plan confirmation or issues with

no bearing on the adequacy of the May 2021 Disclosure Statement.  Indeed, through the Motion

to Compel, the Committee claims it needs information relating to confirmability of the May 2021

Plan before it can decide whether the May 2021 Disclosure Statement is adequate.  *Id*. ¶ 1, 3.  This

claim is totally illogical.  If the plan is not confirmed, the votes on it will not matter.  Therefore,

creditors can vote on the plan assuming it is feasible and confirmable because if it is not, the plan

will not be confirmed and the creditors' votes will have no consequence.  The issue to be decided

at the Disclosure Statement Hearing (defined below) is not whether the May 2021 Plan meets

PROMESA's confirmation requirements.  Those issues are to be considered at a confirmation

hearing.  *In re Scioto Valley Mortg. Co*., 88 B.R. 168, 172 (Bankr. S.D. Oh. 1988) ("If the creditors

oppose their treatment in the plan, but the Disclosure Statement contains adequate information,

issues respecting the plan's confirmability will await the hearing on confirmation.").   The

Committee will be able to seek such discovery in connection with confirmation proceedings.

　　　　3.　　　　The remainder of the Committee's requests seek documents and information the

Oversight Board already has made available to the Committee.  The Committee contends the

Oversight Board believes it "should not have to produce any documents at all" or "need only

produce a bare minimum level of documents" relating to the May 2021 Disclosure Statement, but that is far from the truth.  Mot. ¶ 4.  To the contrary, the Oversight Board already has made thousands of documents available.  Pursuant to the Court's *Order (I) Scheduling a Hearing to Consider the Adequacy of Information Contained in the Disclosure Statement, (II) Establishing the Deadline for Filing Objections to the Disclosure Statement and Replies Thereto, (III) Approving Form of Notice Thereof, (IV) Establishing Document Depository Procedures In Connection Therewith, and (V) Granting Related Relief* [ECF No. 16681] (the "<u>DS Hearing Order</u>"), the Oversight Board has established an electronic document depository (the "<u>Disclosure Statement Depository</u>") that contains over 11,000 documents.  Much of the discovery the Committee seeks can be found in the Disclosure Statement Depository, or in other publically available information.

4.     Many of the Committee's requests ignore Bankruptcy Code section 1125(a).  It expressly provides that adequate information for a disclosure statement does not include information about other possible plans.  Nevertheless, the Committee demands documents concerning potential alternative treatments to many different claims.

5.     The Committee's requests also undermine the effort the Oversight Board will make to provide centralized and efficient confirmation discovery after a disclosure statement is approved.  The Committee is demanding for itself, confirmation discovery that should be done for all plan objectors in an organized fashion.

6.     Critically, the Oversight Board has met with the Committee to answer questions it may have about the May 2021 Disclosure Statement, to discuss additional or different disclosures the Committee thinks should be included in the May 2021 Disclosure Statement, and to address the limited number of requests not already satisfied by what is in the Disclosure Statement

Depository.  Tellingly, the Committee acknowledged that in most instances adding language to the Disclosure Statement would resolve the issues in their requests.  This speaks volumes about the true purpose of its discovery—namely, to cause delay and disrupt a plan process it opposes.[2]

7.       Finally, in addition to the broad document discovery the Committee claims it needs, it also seeks to compel the depositions of two Oversight Board members, David Skeel and Justin Peterson, as well as a deposition of the Oversight Board pursuant to Federal Rule of Civil Procedure 30(b)(6).  The only conceivable purpose of these depositions is to harass and distract members of the Oversight Board.  The sole basis the Committee provides in support of their demand for depositions of both the Oversight Board and two of its members is the assertion these individuals "have relevant knowledge" and may "provide contrasting perspectives" on the May 2021 Disclosure Statement.  The May 2021 Disclosure Statement is not a movie in need of reviews. The Committee's bare allegation is not enough to meet the "demonstrated need" required by the First Circuit for depositions of high-ranking government officials.  *Bogan v. City of Boston*, 489 F.3d 417, 423 (1st Cir. 2007).  Moreover, the Committee's request ignores the fact that no amount of deposition testimony will affect the Committee's decision whether to recommend unsecured creditors support or oppose the Plan (the Committee has obviously already made up its mind about that), and it gives short shrift to the burden such depositions would impose on the Oversight Board.

8.       For these reasons, the Court should deny the Motion to Compel in its entirety.

---

[2] To the extent the Committee plans to object to the May 2021 Disclosure Statement on the ground that the May 2021 Plan is patently unconfirmable, such an objection is to be decided on the face of the plan.  No evidentiary record or discovery is needed or warranted.

## BACKGROUND

### A.    Filing of the Plan and Disclosure Statement

9.    On March 8, 2021, the Oversight Board filed the *Second Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico* [ECF No. 15976] (the "March 2021 Plan") and the *Disclosure Statement for the Second Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico* [ECF No. 15988] (the "March 2021 Disclosure Statement"). The March 2021 Plan implements the Oversight Board's February 22, 2021 plan support agreement with certain holders and insurers of the Commonwealth's general obligation bonds, and provided a framework for the settlement of all outstanding disputes in connection with such bonds, including their validity, priority, and asserted secured status.

10.    On May 11, 2021, the Oversight Board filed the May 2021 Plan, which incorporated additional agreements reached with holders of bonds issued by ERS, as well as insurers and holders of bonds issued by the Puerto Rico Highways and Transportation Authority ("HTA") and the Puerto Rico Convention Center District Authority ("CCDA"), and the accompanying May 2021 Disclosure Statement.

### B.    Motion Practice Regarding Approval of the Disclosure Statement

11.    On April 6, 2021, after the filing of the March 2021 Plan and the March 2021 Disclosure Statement and the announcement of its stipulation with holders of ERS bonds, the Oversight Board filed the *Debtors' Joint Motion for an Order (I) Scheduling Hearing to Consider the Adequacy of Information Contained in the Disclosure Statement, (II) Establishing the Deadline for Filing Objections to the Disclosure Statement and Replies Thereto, (III) Approving Form of Notice Thereof, (IV) Establishing Document Depository Procedures in Connection Therewith, and (V) Granting Related Relief* [ECF No. 16332] (the "DS Scheduling Motion").  Therein, the Oversight Board asked the Court to establish a schedule for consideration of its then-forthcoming

5

further amended proposed disclosure statement and proposed plan of adjustment, and request the Court authorize creation of the Disclosure Statement Depository to make available for creditors "factual source materials underlying the Disclosure Statement (including but not limited to factual source materials underlying the cash restriction analysis, the best interest tests reports, and the Section 211[3] report attached to the Disclosure Statement), as well as documents relating to the nature of claims and classification under the Plan."  DS Scheduling Motion, Ex. 1.  The DS Scheduling Motion further sought authorization to make documents available to creditors using a separate access point, or SFTP.

12.     On May 4, 2021, after argument on the DS Scheduling Motion at the April 28, 2021 omnibus hearing, the Court granted the DS Scheduling Motion, scheduled a hearing to consider the adequacy of the proposed disclosure statement for July 13, 2021, set June 15, 2021 as the deadline for parties to file objections to the disclosure statement, and authorized the Oversight Board to establish the Disclosure Statement Depository and SFTP with materials relevant to creditors' assessment of the adequacy of the disclosure statement.  *See* DS Hearing Order.

13.     On May 7, 2021, the Oversight Board launched the Disclosure Statement Depository and the SFTP.  The Disclosure Statement Depository currently contains the following folders, comprising over 11,000 documents:

- "Factual Source Materials and Raw Data Underlying Disclosure Statement," which includes factual source materials and raw data underlying certain factual statements in the May 2021 Disclosure Statement;

---

[3] "<u>Section 211 Report</u>" refers to the *PROMESA Section 211 Report on the Puerto Rico Retirement Systems* (Sept. 2019).  The report is an analysis of the Government of Puerto Rico's pension systems prepared by Ernst & Young ("<u>EY</u>") at the request of the Oversight Board, as required under PROMESA § 211.  Therein, EY evaluates the fiscal and economic impact of pension cash flows, including the pension liabilities and funding strategy, sources of funding, existing benefits and their sustainability, and the system's legal structure and operational arrangements.

- "Approximate Creditor Recoveries and Allocations," which includes a document summarizing certain creditor recoveries and allocations by class;

- "Certain Public Employee Collective Bargaining Agreements," which includes collective bargaining agreements and other documents regarding liabilities owed to certain public employees whose unions support the plan;

- "Dairy Producers," which includes a settlement agreement resolving dairy pricing litigation, and related documents;

- "Federally Qualified Health Centers," which includes injunctions and orders from federal and Commonwealth actions relating to federally qualified health centers;

- "Gracia-Gracia Litigation," which includes settlement agreements resolving litigation related to duplicate insurance premiums;

- "Bond Offering Statements," which includes offering statements associated with certain issuances of bonds by the Commonwealth, ERS, and PBA;

- "Working Capital," which includes source materials for the Oversight Board's working capital analysis, which was incorporated into the March 2021 and May 2021 Disclosure Statements;

- "Cash and Cash Restrictions," which includes factual source materials and raw data supporting the Oversight Board's ongoing cash restriction analysis, all of which were previously produced to Ambac, FGIC, and other creditors in connection with Ambac's *Motion for Entry of Order Authorizing Discovery Under Bankruptcy Rule 2004 Concerning Commonwealth Cash Restriction Analysis* [ECF No. 9023] (the "Cash Rule 2004 Motion");

- "Commonwealth Assets," which includes documents relating to certain Commonwealth assets, all of which were previously produced to Ambac, FGIC, and other creditors in connection with Ambac's *Motion for Entry of an Order Authorizing Discovery Under Bankruptcy Rule 2004 Concerning Commonwealth Assets* [ECF No. 9022] (the "Assets Rule 2004 Motion");

- "Pension Liabilities," which includes documents relating to Commonwealth pension liabilities, which were previously produced to Ambac, FGIC, and other creditors in connection with Ambac's *Motion for Entry of Order Authorizing Discovery Under Bankruptcy Rule 2004 Concerning Pension Liabilities* [ECF No. 7507] (the "Pension Liabilities Rule 2004 Motion");

- "Factual source materials underlying report pursuant to PROMESA Section 211," which includes all factual source materials utilized in developing the Section 211 report, all of which were previously produced to Ambac, FGIC, and other creditors in connection with Ambac's Pension Liabilities 2004 motion; and

- "Best Interest Test," which includes factual source materials relating to the Oversight Board's best interests test analysis.

**C.      Discovery Regarding the Third Amended Disclosure Statement**

14.      Despite stating its clear opposition to the March 2021 Plan, *see* 3013 Motion ¶ 4, on April 23, 2021, the Committee served its *First Set of Document Requests to Financial Oversight and Management Board for Puerto and its Advisors in Connection with Disclosure Statement for the Second Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* [ECF No. 16811-3], Mot. Ex. 2 (the "First Set of Document Requests"),[4] which is comprised of 60 requests seeking documents and communications regarding, *inter alia,* the number, amount, and expected recoveries for Commonwealth and ERS general unsecured claims; consideration provided to other creditors, claim amounts and terms of settlement; negotiations that resulted in the May 2021 Plan and plan support agreements ("PSAs") incorporated therein; the Oversight Board's "rationale" or "justification" for certain provisions of the May 2021 Plan and the PSAs; other sources of value the Committee believes could be used to pay unsecured creditors; and potential future obligations of the Commonwealth.  Mot. Ex. 2.

15.      Also on April 23, 2021, the Committee served a Rule 30(b)(6) deposition notice on the Oversight Board and deposition notices on Messrs. Skeel and Peterson, two members of the Oversight Board.  The Rule 30(b)(6) deposition notice spans a broad range of topics, and seeks the Oversight Board's position, calculations, and estimations on everything from classifications of claims to treatment of unsecured creditors under the May 2021 Plan.  Mot. Exs. 3, 4, and 5.

16.      On May 14, 2021 the Committee served its *Second Set of Document Requests to Financial Oversight and Management Board for Puerto Rico and its Advisors in Connection with*

---

[4] Once the superseding May 2021 Plan and May 2021 Disclosure Statement were filed on May 11, 2021, the Committee requested the Oversight Board respond to its document production requests focusing on the May 2021 Plan and May 2021 Disclosure Statement.

*Disclosure Statement for the Third Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* [ECF No. 16811-11], Mot. Ex. 10] (the "Second Set of Document Requests," and together with the First Set of Document Requests, the "Requests," and each individual request a "Request"), seeking an additional 16 separate categories of documents concerning many of the same topics. Mot. Ex. 10.

17.    On May 21, 2021, the Oversight Board served responses and objections (the "First RFP Responses") to the Committee's First Set of Document Requests. Therein, the Oversight Board (*i*) directed the Committee to the Disclosure Statement Depository and/or the May 2021 Plan for information responsive to certain Requests; (*ii*) offered to meet and confer regarding additional disclosures in the May 2021 Disclosure Statement the Committee believes are necessary; and (*iii*) objected to other Requests on the basis they sought information irrelevant to the Committee's evaluation of the adequacy of the May 2021 Disclosure Statement. Mot. Ex. 13.

18.    On May 24, 2021, the parties held a telephonic conference regarding the Requests. During the teleconference, the Committee declined the Oversight Board's suggestion to address each Request individually. The Committee also categorically refused to discuss information it believes should be added to the May 2021 Disclosure Statement to render it "adequate."

19.    On May 26, 2021, counsel for the Oversight Board sent counsel for the Committee a letter (the "May 26 Letter") following up on the parties' May 24 teleconference. Ex. 1.[5] Therein, the Oversight Board (*i*) agreed to provide documents responsive to certain Requests; (*ii*) provided additional information responsive to certain Requests, including directing the Committee to publicly available sources that provide the information sought by such Requests; (*iii*) with respect

---

[5] The May 26 Letter contained certain information that is subject to mediation confidentiality. The Oversight Board has redacted all mediation-related material from the publicly-filed exhibit.

to Requests relating primarily to litigations brought by the Special Claims Committee (the "SCC")
of the Oversight Board, offered to coordinate for the Committee a discussion with counsel for the
SCC; and (*iv*) offered to meet and confer further regarding the Committee's additional questions.

20.     Also on May 26, 2021, the Committee filed the Motion to Compel, which seeks
production of all documents sought by the Committee in the First Set of Document Requests and
the Second Set of Document Requests—two days before the Oversight Board had even served its
responses and objections (the "Second RFP Responses") to the Second Set of Document Requests.

21.     On May 28, 2021, the Oversight Board served its Second RFP Responses to the
Second Set of Document Requests.  *See* Ex. 2.  Therein, the Oversight Board (*i*) agreed to produce
documents responsive to certain Requests; (*ii*) directed the Committee to the May 2021 Plan, the
May 2021 Disclosure Statement, or other publicly available sources for information responsive to
certain Requests; (*iii*) offered to meet and confer regarding additional disclosures to the May 2021
Disclosure Statement the Committee may believe are necessary with respect to certain Requests;
and (*iv*) objected to other Requests on the basis they sought information that was not relevant to
the Committee's evaluation of the adequacy of the May 2021 Disclosure Statement.

22.     On June 1, 2021, the parties held a second telephonic conference regarding the
Committee's Requests.  During the teleconference, the Committee indicated many of the issues
raised in the Discovery Requests—including Mot. Ex. 2, Request Nos. 7, 26, 36, 46, 56, and Mot.
Ex. 10, Request Nos. 8, 10, and 11—could be resolved through additional language in the
Disclosure Statement.   The Oversight Board agreed to consider revisions to the May 2021
Disclosure Statement in response, and agreed to investigate and provide information in response
to certain of the Committee's Requests, including Mot. Ex. 2, Request Nos. 1, 2, 11, 14, 15, 23,

24, and 52, and Mot. Ex. 10, Request Nos. 9 and 13.  On June 2, 2021, the Committee sent a letter

following up on issues raised on the June 1, 2021 teleconference.  *See* Ex. 3.[6]

## APPLICABLE LAW

23.     The purpose of a disclosure statement is to provide "adequate information . . . in

sufficient detail" to enable a typical "hypothetical investor" to make an informed judgment about

a plan of adjustment or reorganization.  11 U.S.C. § 1125(a)(1); *see Century Glove, Inc. v. First

Am. Bank of New York*, 860 F.2d 94, 100 (3d Cir. 1988) (observing "§ 1125 seeks to guarantee a

minimum amount of information to the creditor asked for its vote").  A disclosure statement "need

not be perfect and may be approved if the information is reasonable in the circumstances."  *In re

Price Funeral Home, Inc.*, 2008 Bankr. LEXIS 3462, at *5 (Bankr. E.D.N.C. Dec. 12, 2008);

*accord In re Sanders*, 2015 Bankr. LEXIS 3987, at *15-16 (Bankr. S.D. Miss. Nov. 23, 2015).

Thus, § 1125 qualifies the concept of "adequate information" so as to require only such information

as may reasonably be furnished.  7 *Collier on Bankruptcy* ¶ 1125.02 (16th ed. 2021).

24.     In light of this permissive standard, few cases address the scope and propriety of

discovery in connection with a disclosure statement, and those that do emphasize discovery in

connection with the approval of a disclosure statement is limited in scope and restricted to

achieving the narrow goal set forth in § 1125:  determining whether the disclosure statement

contains adequate information to enable a creditor to determine whether to accept a proposed plan.

*In re Ponce de Leon 1403, Inc.*, 2012 WL 5880443, at *2 (Bankr. D.P.R. Nov. 20, 2012)

(authorizing "limited discovery" ahead of the disclosure statement hearing); *In re Hutch Holdings,

Inc.* 2014 WL 7408816, at *2 (Bankr. S.D. Ga. Dec. 30, 2014) (authorizing discovery "on issues

---

[6] The Oversight Board disagrees with many of the Committee's characterizations in its June 2
letter.  In any event, the Oversight Board is preparing a responsive letter confirming the agreements
reached at the June 1, 2021 call and outlining steps to address the Committee's remaining issues.

relating to the adequacy of the disclosure statement").  This is particularly true when, as here, a creditor seeking discovery has not filed a formal objection.  *See In re Georgetown of Kettering*, 17 B.R. 73, 75 (Bankr. S.D. Ohio 1981) (denying discovery requests filed absent objection because "the proper procedure for inquiry by third parties is to object to the disclosure statement").  Courts set such limitations because "the requirement of a disclosure statement . . . should not be read to infer a corresponding creditor right of a fishing expedition" and, "[a]though the [d]ebtor is required to disclose his finances in a formal written document, the role of creditors and other parties in interest in the disclosure process is neither supervisory nor participatory."  *Id.*  Courts also recognize there may be instances where no amount of disclosure will be "adequate" for a creditor who will "never vote for any plan of reorganization."  *See In re Skin Sense, Inc.*, 2017 WL 2773521, at *4 (Bankr. E.D.N.C. June 26, 2017) (overruling objection that disclosure statement lacked adequate information when "it is clear that no matter how much detailed information the [d]ebtor might provide, [creditor] will never vote for any plan of reorganization[.]").

25.    Importantly, courts are especially hesitant to allow objecting parties to transform disclosure statement proceedings into mini-confirmation hearings.  "Ordinarily, confirmation issues are reserved for the confirmation hearing, and not addressed at the disclosure statement stage."  *In re Am. Cap. Equip., LLC*, 688 F.3d 145, 153-54 (3d Cir. 2012) (quoting *In re Larsen*, 2011 WL 1671538 at *2 n.7 (Bankr. D. Id. May 3, 2011); *see also In re Waterville Timeshare Grp.*, 67 B.R. 412, 413 (Bankr. D.N.H. 1986) ("[A]pproval of a disclosure statement is an interlocutory action in the progress of a Chapter 11 reorganization effort leading to a confirmation hearing at which all parties have ample opportunity to object to confirmation of the plan.  It is not intended to be the primary focus of litigation in a contested Chapter 11 proceeding." (citations omitted)).  For example, matters such as whether the plan is in the best interest of creditors, or its

relative treatment of disparate groups of creditors, are not properly addressed in the disclosure statement stage, "other than to hold that these concepts are properly explained in the disclosure statement." *In re Monroe Well Serv., Inc.*, 80 B.R. 324, 333 (Bankr. E.D. Pa. 1987).

26.     It is only where a plan "is so fatally, and obviously flawed that confirmation is impossible," that the court may "consider issues pertaining to the plan, and may rule upon such issues." *In re Comandante Mgmt. Co.*, 359 B.R. 410 , 415 (Bankr. D.P.R. 2006) (citing *In re Mahoney Hawkes, LLP*, 289 B.R. 285, 294 (Bankr. D. Mass. 2002)). This inquiry, however, does not involve or require evidentiary development or fact discovery. *See In re FirstEnergy Sols. Corp.*, 606 B.R. 720, 732 (Bankr. N.D. Ohio 2019) ("Patent unconfirmability is treated as a matter of law."). If a plan is "patently unconfirmable," it must be so "on the face of the plan," without any further evidentiary development. *In re Pecht*, 57 B.R. 137, 139 (Bankr. E.D. Va. 1986) ("If, *on the face of the plan*, the plan could not be confirmed, then the Court will not subject the estate to the expense of soliciting votes and seeking confirmation.")(emphasis added); 7 Collier on Bankruptcy ¶ 1125.03 (16th ed. 2021) ("[M]ost courts will not approve a disclosure statement if the underlying plan is clearly unconfirmable *on its face*.")(emphasis added).

27.     Thus, discovery requests whose purpose is only to gather confirmation-related information or create an argument that the plan is patently unconfirmable should be denied at the disclosure statement stage. For example, in *In re FirstEnergy Solutions Corporation*, the court was faced with a patent unconfirmability objection regarding the plan's treatment of certain creditors and a request for discovery related to that objection. 606 B.R. at 732. The court held "[b]ecause this question is a matter of law alone, it does not require the discovery or presentation of evidence," and discovery would be "irrelevant." *Id.* at 732. Rather, what mattered for the

disclosure statement stage was the "language by its terms," which "does not depend on evidence at a confirmation hearing." *Id.* at 740.

## ARGUMENT

### I.    THE COMMITTEE DOES NOT NEED DISCOVERY BECAUSE IT ALREADY DECIDED TO OPPOSE CONFIRMATION OF THE PLAN.

28.    As described above, the sole purpose of a disclosure statement is to enable creditors to make an informed judgment about whether to vote for or against a plan.  The Committee is unequivocally opposed to the May 2021 Plan, and it is clear the Committee will recommend its constituency vote to reject the May 2021 Plan.  *See* 3013 Motion ¶ 4.  The Committee does not provide any rationale as to why it requires documents and information to evaluate whether the May 2021 Disclosure Statement provides its constituency with sufficient information to enable unsecured creditors to make an informed judgment on whether they should accept a plan the Committee already has decided to oppose.  *In re Clamp-All Corp.*, 233 B.R. 198, 204 (Bankr. D. Mass. 1999) ("The purpose of requiring an approved disclosure statement is to ensure that all claim holders are provided with adequate information to enable them to make an informed judgment regarding whether to vote for or against a reorganization plan") (citing *In re Ferretti,* 128 B.R. 16, 18 (Bankr. D.N.H. 1991)).  Discovery regarding the disclosure statement is therefore unnecessary because it will make no difference as to how the Committee will recommend its constituency to vote.  *See, e.g.*, *In re Skin Sense*, 2017 WL 2773521, at *4.

29.    Although the Committee may also intend to object to the May 2021 Disclosure Statement on the basis the May 2021 Plan is patently unconfirmable, that objection does not require discovery.  As explained above, a plan is only patently unconfirmable when it is apparent "on the face" of the plan that it cannot be confirmed.  *In re Pecht*, 57 B.R. at 139.  Discovery in support of a patent unconfirmability objection is therefore inappropriate "[b]ecause [patent

unconfirmability] is a matter of law alone," rendering discovery "irrelevant." *In re FirstEnergy Sols. Corp.*, 606 B.R. at 732.  Patent means patent.  The Committee therefore does not need discovery to support any patent confirmability objection.

30.    Indeed, the Committee's tactics are particularly inappropriate because the Oversight Board has made clear its willingness to answer questions the Committee may have about the May 2021 Disclosure Statement and Plan, and to discuss the inclusion of additional or different disclosures the Committee may reasonably propose.  This is, as the Committee's experienced restructuring counsel well know, customary practice for disclosure statement approval disputes. If, after the parties engage in such discussions, the Committee truly believes there is a need for any discovery, the Oversight Board would consider requests for such discovery in good faith.  But the Committee's current "shoot first and ask questions later" approach puts the cart many miles ahead of the horse.  Accordingly, the Motion to Compel should be denied because it has no legitimate basis to seek discovery regarding the adequacy of the May 2021 Disclosure Statement.

## II.    THE COURT SHOULD DENY THE COMMITTEE'S MOTION TO COMPEL DOCUMENT DISCOVERY.[7]

31.    As previously noted, the Requests seek wide-ranging discovery into numerous broad categories of information, including: (1) expected percentage recovery for Commonwealth general unsecured claims; (2) classification of various types of Commonwealth general unsecured claims; (3) consideration provided to various types of creditors, claim amounts, terms of settlement and other agreements; (4) other sources of value that the Committee apparently believes could be

---

[7] The Committee also seeks to compel discovery from the Oversight Board's advisors.  The Oversight Board responded to the Committee's Requests solely on its own behalf.  However, to the extent any relevant, non-privileged, non-duplicative documents or information that the Oversight Board has agreed to produce are in the possession of its advisors, the Oversight Board will endeavor to obtain such documents, to the extent they are within its control.

used to pay general unsecured creditors; (5) certain terms and provisions in the May 2021 Plan

and the May 2021 Disclosure Statement, as well as the Oversight Board's "justification" or

"rationale" for entering into the settlements incorporated into the May 2021 Plan and/or for

including certain terms in the May 2021 Plan; and (6) future obligations of the Commonwealth.

32.     Putting aside that the Committee has already determined to recommend holders of

general unsecured claims vote to reject the May 2021 Plan, and thus requires no such discovery

(*see supra* Section I), the Requests are improper because they either (i) seek information the

Oversight Board already has provided, or will provide, to the Committee; (ii) seek information

concerning confirmability of the May 2021 Plan, which is not relevant for purposes of disclosure

statement approval; or (iii) are otherwise not relevant to the adequacy of the May 2021 Disclosure

Statement.   Attached hereto as **Appendix A** is a chart summarizing the Oversight Board's

responses to each of the Committee's individual discovery requests, and why none of them

warrants granting the Motion to Compel in any respect.   In many instances, the Oversight Board

is providing the requested documents, even though the discovery is unwarranted.

### A.     The Oversight Board Already Has Provided or Agreed to Provide Documents and Information Responsive to Many of the Committee's Discovery Requests.

33.     Documents and information responsive to numerous requests propounded by the

Committee have already been provided by the Oversight Board via the Disclosure Statement

Depository and the SFTP.   In addition, the Oversight Board has either already provided or agreed

to provide other information responsive to numerous additional Requests.[8]

---

[8] Indeed, the Oversight Board has agreed to provide documents and information responsive to many of the Requests the Committee mentions in its motion.  *See, e.g.*, *Mot. Ex. 2, Request Nos. 1, 2, 7, 8, 11, 14, 15, 16, 17, 23, 24, 26, 34, 35, 36, 37, 38, 39, 40, 41, 51, 52, 55, and 56; Mot. Ex. 10, Request Nos. 2, 3, 4, 5, 6, 8, 9, 10, 11, and 16.*

i.    *Number, Amount and Expected Recoveries for Commonwealth and
ERS General Unsecured Claims (Mot. Ex. 2, Request Nos. 1, 2,
and 52)*

34.    Request Nos. 1, 2, and 52 seek information regarding the number, amount, and

expected recoveries for Commonwealth and ERS general unsecured claims and an estimate of the

total retiree benefit claims in Classes 48A to 48E of the May 2021 Plan.  The Committee claims it

needs this information because the May 2021 Disclosure Statement and Plan do not provide

information regarding fixed recoveries from the Debtors or a "particularized description" of claims

falling into Class 55.  However, the Oversight Board has routinely provided the Committee with

summary reports identifying the number, description, analysis and amount of Commonwealth and

ERS claims, including general unsecured claims.  Accordingly, the Oversight Board objected to

Request Nos. 1, 2, and 52, because they sought information the Committee already possessed.

35.    In addition, the May 2021 Plan includes much of the information the Committee

requests through "discovery".  For example, Section 1.152 of the May 2021 Plan makes clear that

the claims falling into Class 55 are those that do not fit into any other category of claims, and

Section 1.155 of the May 2021 Plan states that CW General Unsecured Claims (as defined in the

May 2021 Plan § 1.152) are expected to receive a fixed recovery of $125 million.  There is no

basis for the Court to compel the production of documents and information to the Committee that

it either already has access to, or that is contained in the May 2021 Plan.

36.    Furthermore, in its May 26 Letter, the Oversight Board agreed to provide a

summary report with the number and amount of Commonwealth general unsecured claims, broken

down according to the subcategories requested by the Committee in Request No. 2.  And on the

June 1, 2021 meet and confer, the Oversight Board confirmed this report would include the same

information regarding ERS general unsecured claims.  Thus, although the May 2021 Plan, the May

2021 Disclosure Statement, and the aforementioned summary reports previously provided to the

Committee provide it with more than sufficient information to know the number, amount, and expected recoveries for Commonwealth and ERS general unsecured claims, additional information provided by the Oversight Board will cure any alleged deficiencies. In addition, the Oversight Board will confer with the Committee regarding what information it can provide with respect to its estimate of the total retiree benefit claims in Classes 48A to 48E of the May 2021 Plan.

37.     Most importantly, the Oversight Board remains open to considering for inclusion in the May 2021 Disclosure Statement any additional or different disclosure language the Committee reasonably proposes.

> ii.   *Classification of Commonwealth and ERS Unsecured Claims and Information Concerning Other Classes (Mot. Ex. 2, Request Nos. 3, 8 and 34)*

38.     The Committee also seeks to compel the production of documents regarding the basis for classifying certain unsecured claims. But the Oversight Board already has provided documents responsive to these requests via the Disclosure Statement Depository and the SFTP, in folders labeled "Certain Public Employee Collective Bargaining Agreements," "Dairy Producers," "Federally Qualified Health Centers," and "Gracia-Gracia Litigation." For example, in the folder labeled "Dairy Producers," the Oversight Board provided the Commonwealth's settlement agreements with creditors holding Dairy Producer Claims (as defined in the May 2021 Plan Section 1.164). Those documents provide information regarding the legal bases on which the Oversight Board separately classified Dairy Producer Claims into Class 50, because they set forth the legal rights of holders of such claims.

39.     The Committee contends these documents are "insufficient" (Mot. at 17), but document discovery is not for creating answers; it is for disclosing existing documents. The Committee has not explained (either in the Motion or in its communications with the Oversight Board) how or why the existing documents fail to provide the Committee with the information

necessary to understand the bases for the Oversight Board's classification determinations, or what additional information the Committee believes it needs.  Discovery is not required to the extent the Committee seeks this information to bolster the classification arguments raised in its 3013 Motion, which the Committee has stated it intends to raise in connection with its forthcoming objection to the May 2021 Disclosure Statement, as this presents purely legal issues (including whether First Circuit authority requires certain claims to be classified together).

40.     In any case, the Oversight Board remains willing to answer any specific questions the Committee may have on these issues and to consider for inclusion in the May 2021 Disclosure Statement any reasonable additional or different language the Committee may propose, but not including language explaining the Committee believes the differing classifications are unjustified, because that is a confirmation objection.

      iii.     *Consideration Provided to Other Creditors, Claim Amounts, Terms of Settlements and Other Agreements (Mot. Ex. 2, Request Nos. 7, 11, 14, 15, 16, 17, 23, 24, 51, 55, 56, 59; Mot. Ex. 10, Request Nos. 2, 4, 6, 8, 9, 10, 11, 16)*

41.     The Committee also seeks to compel discovery regarding the consideration to be provided to "other creditors" (Mot. ¶ 43), by which the Committee presumably means creditors who are not general unsecured claimholders, as well as the terms of the settlements incorporated into the May 2021 Plan.  With respect to information regarding the consideration to be paid to other creditors (Mot. Ex. 2, Request Nos. 7, 11, 14, 15, 23, 24, 26, and 56), the Oversight Board's May 26 Letter already provides the Committee with the information necessary to understand the amount of consideration other creditors will receive.  *See* Ex. 1.  For example, the Committee has requested additional information regarding the amount of consideration to be received by original signatories to the GO/PBA PSA.  Mot. Ex. 2, Request No. 11.  As explained in the May 26 Letter, the amount of the Restriction Fee available to initial GO/PBA PSA creditors is already disclosed

in the May 2021 Disclosure Statement, *see e.g.* Section II.B.1.a, and the Oversight Board has agreed to provide the Committee with the information necessary to calculate the amount of the Consummation Costs the initial GO/PBA PSA creditors will receive.  Ex. 1 at 3.

42.     Other information relating to consideration paid to creditors has similarly been explained in the Disclosure Statement or other documents made available by the Oversight Board, or to be made available in due course.  For example:

- Information regarding likely payments under the GO and Clawback CVIs (Mot. Ex. 2, Request Nos. 26 and 56; Mot. Ex. 10, Request Nos. 10 and 11) is Chapter 5 and 6 of the Fiscal Plan for the Commonwealth of Puerto Rico, dated April 23, 2021 (the "CW 2021 Fiscal Plan"), and Chapter 4 of the Fiscal Plan for COFINA, dated June 19, 2020 (the "COFINA 2020 Fiscal Plan").[9]  *See* Ex. 1 at 5-6.  Payments pursuant to the GO and Clawback CVIs will depend on whether collections of sales and use tax ("SUT") exceed the benchmarks set forth in the CW 2020 Fiscal Plan.  The CW 2021 Fiscal Plan and the COFINA 2020 Fiscal Plan provide the Oversight Board's projections of SUT performance, and the Committee can utilize this information to understand the likely payments to holders of GO and Clawback CVIs.

- The Oversight Board has also agreed to provide information regarding the amount of principal and interest paid to former GO and PBA bondholders (Mot. Ex. 2, Request No. 14) to the extent practicable.

- Puzzlingly, the Committee also requested documents from the Oversight Board regarding the total amount of PBA's administrative "rent" claims held against the

---

[9]  The CW 2021 Fiscal Plan and the COFINA 2020 Fiscal Plan are available at https://oversightboard.pr.gov/fiscal-plans-2/.

Commonwealth (Mot. Ex. 2, Request No. 15).  But the Committee is co-plaintiff in *Commonwealth of Puerto Rico, et al. v. Puerto Rico Public Buildings Authority*, Adv. Proc. No. 18-00149, (the "PBA Litigation"), which seeks to recover PBA "rent" claims for the Commonwealth.  Due to its status as the co-plaintiff in that action, the Committee has access to the information necessary to calculate those claims for itself.  And, to the extent the Committee believes it needs any additional information to assist it in making this calculation, the Oversight Board has agreed to attempt to provide such information.

- With respect to the Committee's request for information regarding the value of the tax benefits relating to the New GO Bonds (Mot. Ex. 2, Request No. 51), the May 2021 Disclosure Statement already provides the only information available to the Oversight Board at this time.  Section VIII.U states that "the tax status of the New GO Bonds has not been determined as of the date of [the May 2021] Disclosure Statement."  Because the tax status of the New GO Bonds has not yet been determined, and the precise value of those tax benefits may depend on the particular characteristics of the holder, Section VIII.U further provides that U.S. tax holders are urged to consult their own tax advisors (*see, e.g.*, Section VIII.U).

- The May 2021 Disclosure Statement also addresses the Committee's request for information regarding whether the New GO Bonds will trade at par.  Mot. Ex 10, Request No. 16.  Disclosure statements are not crystal balls.  Section VIII.C of the May 2021 Disclosure Statement explains the New GO Bonds may not trade at par, and "limited liquidity may make the New GO Bonds less attractive to investors."  *Id.* Further, the May 2021 Disclosure Statement describes the possibility that the

Commonwealth's financial circumstances may make "sales at or near par potentially difficult" due to "limited market acceptance." *Id.* Because the Oversight Board cannot predict or control how the market will react in the future, the disclosure is sufficient to adequately inform creditors of risks related to May 2021 Plan, *see* 7 Collier on Bankruptcy ¶ 1125.02[2] (16th ed.) (noting that "adequate information" is the only information that may reasonably be furnished), and the Committee has proffered no explanation as to why other or additional disclosure is needed.

- Sections 1.340 and 2.1 of the May 2021 Plan already provide information regarding the "identify [*sic*] the terms of the PBA settlement" (Mot. Ex. 2, Request No. 16). The Oversight Board directed the Committee to these plan provisions in its First RFP Responses, but the Committee has failed to explain what additional information it believes is missing. Further, in response to the Committee's requests for information regarding properties owned by PBA that will be transferred from PBA to the Commonwealth (Mot. Ex. 2, Request Nos. 17 and 18), the Oversight Board will produce a list of such properties.

- Information regarding which parties are paying fees under the settlement terms (Mot. Ex. 10, Request No. 8) is included in the HTA/CCDA PSA (May 2021 DS, Ex. C (*see* Article VI, section 6.1(a)-(c))), including information on consummation costs, PSA restriction fees, and retail support fees. The May 2021 Plan also provides this information, *see* Section 3.9, including information on the CCDA restriction fee. Again, the Oversight Board directed the Committee to these plan provisions in its Second RFP Responses, but the Committee has failed to explain what additional information it believes is missing.

- With regard to the Best Interests Test (the "<u>BIT</u>") (Mot. Ex. 2, Request No. 55), as the Oversight Board already has explained in its First RFP Responses, the Oversight Board will produce the BIT as soon as practicable, and sufficiently in advance of the deadline to object to the May 2021 Disclosure Statement.

- Mot. Ex. 10, Request No. 2 seeks information regarding whether Retiree Claims—in other words, retirees' claims to their ongoing monthly pension payments—would be paid "on the same payment schedule" or would "receive a lump sum payment." This request makes no sense as the treatment of Retiree Claims is set forth in the May 21 Plan and described in the May 21 Disclosure Statement. In any event, in its Second RFP Responses, the Oversight Board explained that holders of Retiree Claims would continue to receive their regularly scheduled monthly pension payments, according to the reductions in monthly benefits provided by the May 2021 Plan. Ex. 2 at 9-10. It certainly appears the Committee made the foregoing discovery request in a Hail Mary effort to justify its lingering contention that the retiree class must be consolidated with other classes of unsecured claims even though the treatment for retirees is payment for life, which is different than treatment of all other claims.

- The Committee also seeks copies of the GSA Helicopter Loan, the Hacienda loans, Notas de Ahorra, and the GDB HTA loans, all of which are expected to receive distributions pursuant to the May 2021 Plan. (Mot. Ex. 10, Request Nos. 4, 5, 6). The Oversight Board agreed to produce this information. Ex. 2 at 11-12.

- The Committee also requested information concerning how the Oversight Board arrived at the May 2021 Disclosure Statement's $70.75 million valuation of the ERS private equity portfolio (Mot. Ex. 10, Request No. 9). On the June 1 telephonic

conference, the Oversight Board agreed to facilitate a conversation between the parties'

respective financial advisors (notwithstanding its view that this information is not

relevant to the adequacy of the May 2021 Disclosure Statement), which should resolve

this request.

        iv.    *Commonwealth's Available Cash and Other Commonwealth Assets*
*(Mot. Ex. 2, Request Nos. 10, 35-41)*

43.    The Committee seeks to compel the production of documents regarding the

Commonwealth's available cash, including documents underlying the Oversight Board's ongoing

analysis of the Commonwealth's restricted cash. Here again, the Oversight Board already has

made this information available to the Committee.

44.    As the Court is aware, the Oversight Board has been engaged in a continuing

analysis of the amount of the Commonwealth's available cash, as well as any potential restrictions

on the Commonwealth's use of that cash. In connection with this effort, the Oversight Board has

gathered account statements and other documents reflecting the balances in the Commonwealth's

accounts, as well as documents reflecting any potential legal restrictions. Documents relating to

this effort were previously produced to creditors in connection with Ambac's Cash 2004 Motion.

Those same documents were made available to creditors through the Disclosure Statement

Depository and the SFTP, in a folder labeled "Cash and Cash Restrictions."

45.    The Committee nevertheless complains there are no documents explaining why

certain accounts are designated (1) "Asserted to Be Restricted," (2) "inconclusive," or (3)

"pending." Mot. at 21. But the Disclosure Statement already explains what each of these

categories means. It explains that (1) accounts designated "Asserted to Be Restricted" are "[f]unds

that are subject to active litigation regarding the restriction of funds (*e.g.*, accounts at ERS subject

to the determination of the scope of the ERS bondholders' security interest)," May 2021 Disclosure

Statement at 138; (2) accounts designated "Inconclusive" are "[a]ccounts for which the legal team thus far has insufficient information to determine whether the funds are legally restricted," *id.*; and (3) accounts identified as "pending" are "pending supporting balance documentation from [financial institutions] and are currently under review." *Id.* Moreover, the Committee already has access to all the factual source materials and raw data relied upon by the Oversight Board when it made those designations; the Committee is therefore equally positioned to review those documents and come up with its own analysis of how those accounts should be classified. And while the Committee complains that it lacks an "updated" analysis showing the "sources and uses of the Debtors' cash and investments rolled forward from the December 31, 2020 account balances to June 30, 2021 and adjusted for settlements reached in connection with the [May 2021] Plan," Mot. Ex. 2, Request No. 41, the Oversight Board cannot possibly provide such an analysis, given that it seeks information on sources and uses of cash and investments nearly a month into the future. On the June 1, 2021 telephonic conference, the Committee acknowledged the Oversight Board cannot provide a complete response to this Request. Instead, the Committee requested updated information on sources and uses of cash, and the Oversight Board agreed to consider that request.

### B.    Certain Requests Seek Documents Relevant Only to Plan Confirmation, Not Adequacy of the May 2021 Disclosure Statement.

46.    The only issue before the Court on the Oversight Board's motion for approval of the May 2021 Disclosure Statement is whether it provides adequate information to enable a typical creditor to determine whether to accept or reject the May 2021 Plan. *See In re Ponce de Leon 1403, Inc.*, 2012 WL 5880443, at *2; *In re Hutch Holdings, Inc.* 2014 WL 7408816, at *2. Any discovery requests related to the confirmability of the May 2021 Plan are thus irrelevant. *See, e.g.*, *In re Scioto Valley Mortg. Co.*, 88 B.R. at 172 ("If the creditors oppose their treatment in the plan, but the Disclosure Statement contains adequate information, issues respecting the plan's

confirmability will await the hearing on confirmation."); *In re Waterville Timeshare Grp.*, 67 B.R. at 413 ("[A]pproval of a disclosure statement is an interlocutory action in the progress of a . . . re-organization effort leading to a confirmation hearing at which all parties have ample opportunity to object to confirmation of the plan.").

47.     Certain Requests, including the basis for capping the available recovery for ERS general unsecured creditors at $5 million (Mot. Ex. 2, Request No. 53), relate solely to confirmability of the May 2021 Plan. The only issue at confirmation will be whether the May 2021 Plan's proposed treatment of ERS unsecured claimholders satisfies the best interests test and is fair and equitable, not the Oversight Board's rationale. Accordingly, this request is invalid.

48.     As another example, Mot. Ex. 22, Request No. 22 seeks information concerning an assessment of the maximum amount the Debtors are capable of paying unsecured creditors under the May 2021 Plan. To the extent that information is relevant to anything, it can only be to the confirmability of the May 2021 Plan. Whether an alternate plan more favorable to general unsecured creditors could have been formulated is irrelevant to the adequacy of the May 2021 Disclosure Statement. 11 U.S.C. § 1125(a); *Kirk v. Texaco, Inc.*, 82 B.R. 678, 684 (S.D.N.Y. 1988) ("[A]dequate information need not include such information about any other possible or proposed plan.").

49.     Further, Mot. Ex. 2, Request No. 15—which seeks information regarding analyses of whether the Commonwealth will be able to pay its debts under the May 2021 Plan when they come due—plainly seeks information relevant only to whether the May 2021 Plan is feasible, which is solely relevant to the confirmability of the May 2021 Plan. Because the May 2021 Plan will not be confirmed if it is not feasible, this information is irrelevant to voting on the plan.

C. **The Remainder of the Committee's Requests Seek Irrelevant
Information.**

50.     The remainder of the Committee's Requests seek information having no bearing on

the adequacy of the May 2021 Disclosure Statement (or even the May 2021 Plan).  These requests

seek, among other things, information regarding (1) the Oversight Board's "rationale, justification,

basis, or decision to enter into" the settlements incorporated into the Third Amended Plan (Mot. ¶

47; Mot. Ex. 2, Request Nos. 12, 13, 14, 16, 19, 21, 27, 28, 29, 30, 31, 32, 57, and 58; Mot. Ex.

10, Request No. 7), (2) assets held either by the Commonwealth or by other public entities that are

separate from the Commonwealth (Mot. ¶ 48; Mot. Ex. 2, Request Nos. 35, 36, 37, 38, 39, 40, 41,

42, 43, 44, 45, 46, 47, 48, and 54; Mot. Ex. 10, Requests Nos. 12 and 13), (3) the Commonwealth's

payments of certain prepetition unsecured claims (Mot. Ex. 2, Request Nos. 3 and 4), (4) the

Committee's involvement in negotiations surrounding the development of the May 2021 Plan

(Mot. Ex. 2, Request Nos. 9 and 10), (5) post-petition payments of pre-petition unsecured claims,

and the basis for such payment (Mot. Ex. 2, Request Nos. 5 and 6), and (6) other Oversight Board

determinations, including determinations regarding certain terms and provisions in the May 2021

Plan and May 2021 Disclosure Statement (Mot. Ex. 2, Request Nos. 4, 20, 47, 48, 49, 50, and 54).

51.     None of these Requests is relevant to the adequacy of the May 2021 Disclosure

Statement, the sole, narrow issue currently pending.

52.     ***Documents regarding the Oversight Board's decision to enter into settlements.***

The Committee contends the Oversight Board's "rationale, justification, basis, or decision" to enter

into the settlements incorporated into the May 2021 Plan, and to agree to certain terms incorporated

into the various settlements, is relevant because creditors must understand "the rationale behind

the settlements' terms and payments" in order to "evaluate the reasonableness of the

settlement."  Mot. ¶ 47; Mot. Ex. 2, Request Nos. 12, 13, 14, 16, 19, 21, 25, 27, 28, 29, 30, 31, 32,

33, 57, 58, 59 and 60; Mot. Ex. 10, Request Nos. 7 and 14.  The Committee is wrong again.  If the Court determines a settlement is not reasonable, it will not confirm the plan.  Therefore, creditors voting on the plan can assume each settlement is reasonable, because if it is not, their vote will have no impact because the plan will not be confirmed.

53.     Nor is the Committee correct that *In re Fullmer*, No. 09-50086-RLJ-11, 2009 WL 2778303, at *1 (Bankr. N.D. Tex. Sept. 2, 2009), compels otherwise.  *See* Mot. ¶ 44. There, the court did not order discovery about the debtor's rationale or justification for a settlement.  Rather, the court, after noting it was "not concerned about whether FCB . . . has sufficient information with which to make an informed judgment regarding the debtor's plan[,]" ordered the debtor to amend the disclosure statement to include that creditor's "position" regarding a settlement.  *Id.* at *2.  Here, Oversight Board has been clear to the Committee that it is willing to consider including disclosures the Committee may wish to propose.  That is the appropriate process, not broad discovery into irrelevant matters by a statutory committee clearly opposed to the May 2021 Plan.

54.     ***Documents regarding the value of Commonwealth and public corporation assets.*** The Committee seeks information regarding other sources of value it claims could be used to pay general unsecured claimholders, including investments, bonds and real estate, as well as whether the Commonwealth has access to other assets and resources, including assets and resources held by public corporations legally separate from the Commonwealth.  Mot. ¶ 48; Mot. Ex. 2, Request Nos. 42, 43, 44, 45, 46, 47, 48, and 54; Mot. Ex. 10, Requests No. 12 and 13.  Although it lists six categories of assets,[10] all but one are irrelevant because the Committee is mistaken about the relevance of asset valuation to a municipal bankruptcy.

---

[10] These categories are: (i) the sources and uses of the Debtors' cash and investments through June 30, 2021 (and whether they are available for creditors); (ii) Debtors' unencumbered assets that are potentially for sale; (iii) whether there are unrestricted accounts not listed in Exhibit L; (iv) what

55.     Unlike corporate reorganizations, liquidation is not an option in Title III and Chapter 9 cases involving municipalities.  *See In re Mount Carbon Metro. Dist.,* 242 B.R. 18, 34 (Bankr. D. Colo. 1999) ("creditors . . . cannot force sale of municipal assets under state law"); *see also In re City of Detroit*, 524 B.R. 147, 213 (Bankr. E.D. Mich. 2014) (overruling objections asserting the City should be required to sell pieces from the Detroit Institute of Art so claims can be paid in full); *Silver Sage Partners, Ltd. v. City of Desert Hot Springs (In re City of Desert Hot Springs)*, 339 F.3d 782, 789 (9th Cir. 2003) ("Chapter 9 makes no provision for conversion of the case to another chapter or for an involuntary liquidation of any of the debtor's assets.") (quoting *In re Richmond Unified Sch. Dist*., 133 B.R. 221, 225 (Bankr. N. D. Cal.1991)).  "This Court and others have recognized that, unlike the commercial focus of bankruptcy cases of private entities, the 'primary purpose' of governmental insolvency proceedings 'is not future profit, but rather continued provision of public services.'"  *In re Fin. Oversight and Mgmt. Bd. for P.R.*, 432 F. Supp. 3d 25, 30 (D.P.R. 2020) (citation omitted)).  "[T]hese restructuring cases require a more holistic approach that focuses on the continuation and future of a government and its instrumentalities and their ability to meet the needs of the Commonwealth's residents as well as provide proper recompense of creditors."  *Id*.  Cash on hand and future revenues are what is available to pay debt.  Therefore, requests for data on other Puerto Rico assets serve no purpose, and information regarding assets other than available cash is therefore not relevant to the adequacy

---

constitutes "essential services"; (v) what funds or resources would be needed to implement an HTA plan of adjustment; and (vi) what Commonwealth, PBA and ERS unencumbered property is vacant, including the value of such assets. Mot. ¶ 50.  Note that the Oversight Board addresses the "essential services" category below under the heading "The Oversight Board's Determinations Regarding Essential Services."  The Oversight Board has already provided the Committee with information regarding the first category, but objects to providing information regarding the remaining categories as it is unduly burdensome and irrelevant.

of the May 2021 Disclosure Statement, because even confirmation does not require a line-item accounting of the assets of the Puerto Rico government for creditors' benefit.

56.     The cases cited by the Committee to support its discovery requests concerning the Commonwealth's assets miss the mark, as they arise in the context of a Chapter 11 bankruptcy and "the best interests requirement of chapter 9 differs significantly from the best interests requirement in chapter 11, which involves considering a liquidation analysis." *In re City of Detroit*, 524 B.R. at 212-13; *In re City of Colo. Springs Spring Creek Gen. Improvement Dist.*, 187 B.R. 683, 690 (Bankr. D. Colo. 1995) (in chapter 9 case, objecting creditor is not "protected by the best interest test of § 1129(a)(7)"). The Committee's cases, which address the adequacy of disclosure in connection with a Chapter 11 plan of liquidation, have no applicability in a chapter 9 case, and by extension in this Title III case.[11] As such, the Oversight Board should not be required to produce any additional documents concerning the Commonwealth's investments, bonds, and real estate. The beaches are not for sale!

57.     ***The estimated cost of solicitation of creditors' votes in connection with the May 2021 Plan***. The Committee seeks information regarding the cost of soliciting creditors' votes on the May 2021 Plan. Mot. Ex. 2, Request No. 4; *see also* Mot. Ex. 13 at 13-14. That is not relevant to the adequacy of the May 2021 Disclosure Statement, because information regarding the cost of solicitation has no impact on a creditor's decision whether to accept or reject a plan. The Committee cannot credibly contend otherwise. Although the Committee has (incorrectly) argued

---

[11] PROMESA incorporates several key provisions from Chapter 9. For example, both PROMESA and Chapter 9 provide that—unless the creditor agrees otherwise—claims specified in 11 U.S.C. § 507(a)(2) must be paid in full on the effective date of any confirmed plan of adjustment of debts. *See* 11 U.S.C. § 943(b)(5); 48 U.S.C. § 2174(b)(4).

elsewhere that the May 2021 Plan is so flawed the Commonwealth should not incur the cost of solicitation, it obviously does not need discovery about what the costs will be.

58.    ***The Committee's involvement in negotiations surrounding the development of the May 2021 Plan***. The Committee also seeks discovery about its involvement in settlement negotiations and alleged discussions about whether to include the Committee in such negotiations. (Mot. Ex. 2, Request Nos. 9 and 10).  Of course, the Committee is well aware of its involvement or non-involvement in such negotiations; it does not need discovery from the Oversight Board in that respect.  The Committee is perfectly capable of communicating with its constituency about its level of involvement in settlement negotiations, and the Oversight Board would consider adding information into the May 2021 Disclosure Statement on this subject if the Committee requested. But, the level of involvement the mediators requested from the Committee has nothing to do with disclosure or confirmation.

59.    ***Post-petition payments of pre-petition unsecured claims, and the basis for such payment.***  The Committee seeks information concerning payments made by the Commonwealth to creditors on account of pre-petition unsecured claims and the Oversight Board's reasoning for paying certain pre-petition unsecured claims but not others.  *See* Mot. Ex. 2 Request Nos. 5 and 6. The Committee ignores, however, that the Commonwealth has the right to make payments to prepetition unsecured creditors at its discretion.  Indeed, as an operating government with a responsibility to continue providing services for its citizens, the Commonwealth had no choice but to continue paying certain of its prepetition unsecured creditors.  In any event, these Requests are irrelevant to the adequacy of the May 2021 Disclosure Statement, because whether certain creditors have already received payments—and therefore will not have allowed claims pursuant to

the May 2021 Plan—has no bearing on whether *other* prepetition creditors have information

sufficient to consider whether to accept or reject the May 2021 Plan.

      60.    ***Other Irrelevant Requests:***

a.    ***The Oversight Board's determinations regarding "essential services"***.  The Committee

asks for information concerning the definition of "essential services" and what services constitute

"essential services" (Mot. Ex. 2, Request Nos. 47 and 48).   But the Committee provides no

justification why such information is relevant to the adequacy of the May 2021 Disclosure

Statement.   Indeed, the May 2021 Disclosure Statement already explains why a definition of

"essential services" is not needed.  May 2021 Disclosure Statement at 162-64.  It also states "[t]he

Oversight Board takes the view that 'essential services' is a phrase used to refer, at a minimum, to

services which, due to the police power, a court of competent jurisdiction can allow to be paid for

from revenues to which a creditor has a priority claim or a valid, unavoidable secured claim." *Id.*

at 162.  These positions are not inconsistent.  The May 2021 Disclosure Statement expressly

indicates that the latter is the Oversight Board's view, not the definition of "essential services."

And, if that was not clear enough, the May 2021 Disclosure Statement thereafter expounds for

several pages on why a definition of "essential services" is not necessary—one such reason being

that "the General Obligation claimholders are not claiming under the settlement revenues

otherwise needed to pay essential services." *Id.* at 163.  Given these substantial disclosures, the

Committee cannot seriously contend that further information on this point is necessary to evaluate

the adequacy of the May 2021 Disclosure Statement.

b.    ***The Oversight Board's decision to file a Title III case for PBA.*** The Committee seeks

documents and information regarding "the decision not to have PBA file a Title III case at the

same time as (or shortly after) the filing of the Commonwealth's Title III case."   Mot. Ex. 2,

Request No. 20. But again, the Committee cannot articulate why the timing of PBA's Title III case should have any bearing on a creditor's decision whether to accept or reject the May 2021 Plan. In any event, even if this information were somehow relevant—which it is not—any information regarding the Oversight Board's decision to file a Title III case would be overwhelmingly, if not entirely, privileged.

c. ***The Oversight Board's determinations regarding fairness of the May 2021 Plan towards Commonwealth General Unsecured Claims.*** The Committee seeks to compel documents relevant to the Oversight Board's assessment of whether the May 2021 Plan treats holders of Commonwealth General Unsecured Claims fairly (Mot. Ex. 2, Request No. 50). But whether the Oversight Board has assessed the "fairness" of the May 2021 Plan is not relevant to whether a creditor should vote to accept the plan. Creditors will determine whether the 2021 Plan is fair to them ***based on its terms***; the Oversight Board's opinion on that subject is of no consequence. And, even if this information were somehow relevant, it, too, would be overwhelmingly privileged.

d. ***The Commonwealth's access to capital markets.*** Lastly, Mot. Ex. 2, Request No. 49 seeks information regarding whether the May 2021 Plan will allow the Commonwealth to obtain access to capital markets. This Request conflates the Oversight Board's statutory purpose—to "provide a method for [the Commonwealth] to achieve fiscal responsibility and access to the capital markets"—with PROMESA's requirements for the confirmation of a plan of adjustment for the Commonwealth. PROMESA § 101(a). Whether the Commonwealth will obtain access to the capital markets is not a requirement for confirmation of the May 2021 Plan, and is therefore not relevant to any issue in this contested matter. Besides, the Committee already knows the COFINA bonds issued in COFINA's Title III case have been trading at high levels for over a year. And, the Committee knows the bonds to be issued under the May 2021 Plan were negotiated by

33

sophisticated creditors and investors.  The Committee also knows from the May 2021 Disclosure Statement how much debt and debt service will be reduced by the May 2021 Plan.

61.     In sum, the Committee's arguments totally fail to show why any of what they request would impact a decision accepting or rejecting the May 2021 Plan, and the Court should refuse to compel discovery related to Request Nos. 20, 47, 48, 49, and 50.

## III.   THE COURT SHOULD DENY THE COMMITTEE'S MOTION TO COMPEL THE OVERSIGHT BOARD TO PRODUCE WITNESSES IN RESPONSE TO THE DEPOSITION NOTICES.

62.     The Committee seeks to compel deposition testimony from Oversight Board members Skeel and Peterson.  The Committee contends Messrs. Skeel and Peterson will provide testimony "directly relevant to the issue of whether the Disclosure Statement contains adequate information."  Mot. ¶ 57.  The Committee's motion to compel deposition testimony should be denied.

63.     Each of the Oversight Board's arguments above concerning the irrelevance of the Requests applies with equal force to depositions.  Even assuming these depositions could be relevant, however, the Committee's need for testimony—particularly in view of the documents and information that have been produced and will be produced—is nil.  The Committee has already determined that it would not advise its constituents to accept the Plan as currently tendered.  The request for depositions, therefore, is merely an attempt to harass and distract the Oversight Board and its members while taking confirmation discovery unavailable to other creditors.

64.     Further, contrary to the Committee's contention, the depositions would impose an undue burden.  Irrelevance aside, preparation time alone would divert extensive time and resources from reorganization efforts, and increase the costs and expenses of this case.  This is particularly so for the Rule 30(b)(6) deposition because several topics seek testimony requiring legal and/or economic analysis from a layperson, or because they are extremely broad topics that would require

the Oversight Board to marshal and educate one or more witnesses about factual proofs underlying

the May 2021 Disclosure Statement and the Plan.  For example, Topic No. 9 seeks:

> The rationale for and the terms and negotiation of the Settlements, including
> consideration to be received by the settling parties, the potential litigation outcomes
> in the absence of the Settlements, and the terms of the Second Amended Plan
> implementing such Settlements.

Mot. Ex. 14 at 15.

65.     Finally, the need to limit discovery of high-ranking government officials, like

Messrs. Skeel and Peterson, is "well established."  *Bogan*, 489 F.3d at 423.  Courts will not permit

the deposition of such an official absent a demonstrated need because these "high-ranking

government officials have greater duties and time constraints than other witnesses and . . . without

appropriate limitations, such officials will spend an inordinate amount of time tending to pending

litigation."  *Id.* (internal quotation marks omitted).  The Committee's vague reference to "relevant

information" falls far short of satisfying this burden.

## <u>CONCLUSION</u>

66.     For the foregoing reasons, the Committee's Motion to Compel should be denied in

its entirety.

*[Remainder of Page Intentionally Left Blank]*

Dated: June 3, 2021
San Juan, Puerto Rico

Respectfully submitted,

/s/  Martin J. Bienenstock

Martin J. Bienenstock (*pro hac vice*)
Brian S. Rosen (*pro hac vice*)
Jeffrey W. Levitan (*pro hac vice*)
Margaret A. Dale (*pro hac vice*)
Michael T. Mervis (*pro hac vice*)
Julia D. Alonzo (*pro hac vice*)
Laura Stafford (*pro hac vice*)
**PROSKAUER ROSE LLP**
Eleven Times Square
New York, NY 10036
Tel:  (212) 969-3000
Fax:  (212) 969-2900

*Attorneys for the Financial Oversight and
Management Board*

/s/ Hermann D. Bauer

Hermann D. Bauer
USDC No. 215205
**O'NEILL & BORGES LLC**
250 Muñoz Rivera Ave., Suite 800
San Juan, PR 00918-1813
Tel:  (787) 764-8181
Fax:  (787) 753-8944

*Co-Attorneys for the Financial
Oversight and Management Board*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on this same date, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notifications of such filing to all CM/ECF participants in this case.

/s/ *Hermann D. Bauer*
Hermann D. Bauer