# UNITED STATES DISTRICT COURT
# DISTRICT OF PUERTO RICO

<table>
<tr><td>
In re:<br><br>
THE FINANCIAL OVERSIGHT AND<br>
MANAGEMENT BOARD FOR PUERTO RICO,<br><br>
     as representative of<br><br>
THE COMMONWEALTH OF PUERTO RICO, <i>et al.</i>,<br><br>
     Debtors.[1]
</td>
<td>
PROMESA<br>
Title III<br><br>
No. 17 BK 3283-LTS<br>
(Jointly Administered)
</td></tr>
</table>

## OBJECTION OF AMBAC ASSURANCE CORPORATION, PURSUANT TO BANKRUPTCY CODE SECTION 502 AND BANKRUPTCY RULE 3007, TO CLAIM ASSERTED BY THE OFFICIAL COMMITTEE OF RETIRED EMPLOYEES OF THE COMMONWEALTH OF PUERTO RICO APPOINTED IN THE COMMONWEALTH'S TITLE III CASE

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801).

## **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................ 1

JURISDICTION .................................................................................................... 4

BACKGROUND .................................................................................................... 4

I.      THE RETIREMENT SYSTEMS ............................................................... 4

II.     THE COMMONWEALTH'S PENSION LIABILITY ................................ 5

      A.     Milliman Actuarial Valuations ............................................ 5

      B.     PayGo Expenses.................................................................. 7

      C.     PROMESA Section 211 ...................................................... 8

III.    THE TITLE III PROCEEDINGS ............................................................ 9

      A.     The Retiree Committee Proof of Claim ............................. 9

      B.     Treatment of Pensions Under the Proposed Plan of Adjustment......................... 11

RELIEF REQUESTED........................................................................................... 12

OBJECTION......................................................................................................... 12

I.      THE RETIREE COMMITTEE PROOF OF CLAIM SHOULD BE DISALLOWED
TO THE EXTENT OF ITS OVERSTATEMENT. ......................................... 13

      A.     The Asserted Amount Is Based on Stale Data and Assumptions. ........................ 13

      B.     The Mortality Assumptions in the Milliman Reports Are Outdated and Fail to
Reflect Current Expectations. ........................................... 16

      C.     The Claim Amount Is Overstated Because It Improperly Includes Payments
Due to Deceased Beneficiaries. ........................................ 17

      D.     The Discount Rates Used by Milliman and the Retiree Committee Fail to
Reflect the Value of the Commonwealth's Pension Liabilities. ............................ 18

II.     THE COURT SHOULD HEAR AND DECIDE THE OBJECTION NOW.................. 21

CONCLUSION...................................................................................................... 22

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Hann v. Educ. Credit Mgmt. Corp. (In re Hann)*,
  476 B.R. 344 (B.A.P. 1st Cir. 2012), *aff'd*, 711 F.3d 235 (1st Cir. 2013)...............................12

*In re Colonial Bakery, Inc.*,
  108 B.R. 13 (Bankr. D.R.I. 1989) ........................................................................................13

*In re Cty. of Orange*,
  31 F. Supp. 2d 768 (C.D. Cal. 1998) ...................................................................................20

*In re Johns-Manville Corp.*,
  36 B.R. 743 (Bankr. S.D.N.Y. 1984) .....................................................................................4

*In re Summit Corp.*,
  891 F.2d 1 (1st Cir. 1989) ......................................................................................................4

*United States v. Braunstein (In re Pan)*,
  209 B.R. 152 (D. Mass. 1997) ..............................................................................................13

**Statutes and Rules**

11 U.S.C. § 502 .........................................................................................................................1, 12

11 U.S.C. § 1102 ............................................................................................................................9

11 U.S.C. § 1109 ............................................................................................................................4

2017 P.R. Laws 106 .......................................................................................................................5

PROMESA § 201 ...........................................................................................................................7

PROMESA § 211 ...........................................................................................................................8

PROMESA § 301 .................................................................................................................1, 4, 10

PROMESA § 306 ...........................................................................................................................4

PROMESA § 307 ...........................................................................................................................4

Fed. R. Bankr. P. § 3007 ...............................................................................................................1

In accordance with Section 502 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 3007, each as incorporated into these Title III proceedings by Section 301(a) of the Puerto Rico Oversight Management and Economic Stability Act ("PROMESA"), Ambac Assurance Corporation ("Ambac") hereby objects (the "Objection") to the proof of claim filed by the Official Committee of Retired Employees of the Commonwealth of Puerto Rico Appointed in the Commonwealth's Title III Case (the "Retiree Committee"), designated Proof of Claim No. 21533 in Case No. 17-3283.[2]  (Ex. 1, the "Retiree Committee Proof of Claim").  A copy of the Retiree Committee Proof of Claim is attached hereto as **Exhibit 1**.  In support of its Objection, Ambac respectfully states as follows:

## PRELIMINARY STATEMENT

1.     This Objection challenges the Retiree Committee's claim against the Commonwealth of Puerto Rico (the "Commonwealth") asserting purported pension liabilities of at least $58.5 billion dollars.  By Ambac's calculation, that claim is overstated by at least **$9 billion dollars**; the overstatement alone exceeds all outstanding Commonwealth obligations not yet settled in these Title III proceedings.  This overstatement hurts both pensioners and the citizens of the Commonwealth, distorts the Title III proceedings, and threatens to derail confirmation of any plan of adjustment.  While Ambac does not dispute that valid pension claims exist, the Retiree Committee's claim must be disallowed to the extent of the multi-billion-dollar overstatement.

2.     Notwithstanding the jaw-dropping size of the asserted pension liability and the red flags portending that the figure is overstated, neither the Financial Oversight and Management Board for Puerto Rico (the "Board") nor the Puerto Rico Fiscal Agency and Financial Advisory Authority ("AAFAF," and together with the Board, the "Government Parties") has done anything

---

[2] Unless otherwise indicated, all ECF numbers referenced herein refer to the docket in Case No. 17 BK 3283-LTS.

to ensure that the pension liability figure is correct.  The Government Parties have never audited or verified the census data, participant data, or employer information upon which the Commonwealth's pension liability figure is based.  And when the Board has engaged third parties to analyze the pension liability, these third parties have not verified (or even attempted to verify) the pension liability calculation.  Despite the clear directive in PROMESA Section 211 that the Board engage an independent actuary to conduct an analysis of the pension system (once the system was deemed underfunded), the Board and its advisors conducted the most cursory and superficial review possible.  Court filings show minimal engagement on pension analysis—Ernst & Young estimated that its analysis of the entire Commonwealth pension systems would cost only $150,000.[3]

3.      The limited discovery provided by the Government Parties reveals significant concerns regarding both the reliability of the data and the reasonableness of the assumptions used in calculating the amount asserted in the Retiree Committee Proof of Claim.  These errors have resulted in a significant overstatement of the pension claims amount: (i) the Retiree Committee relies on outdated valuation reports by Milliman, Inc. ("Milliman," and the valuation reports, the "Milliman Reports"), the Commonwealth's actuary, which do not take into account the $8.2 billion reduction in total pension liability reflected in the most recent Milliman Reports; (ii) the Milliman Reports fail to use current mortality assumptions, which would reduce the Commonwealth's pension liability, as reflected in the most recent Milliman Reports, by an additional $750 million;

---

[3] In contrast, the Board paid Duff & Phelps approximately $1.9 million to conduct the first iteration of the Commonwealth's cash restriction analysis, almost 10 times the amount spent on the pension analysis.  (*See Amended First Interim Application of Duff & Phelps LLC for Allowance of Compensation for Services Rendered and Reimbursement of Expenses Incurred as Independent Forensic Analysis Team to the Financial Oversight and Management Board for Puerto Rico, as Representative of Debtor, the Commonwealth of Puerto Rico for the Period of November 1, 2018 Through January 31, 2019*, Case No. 17-3283, ECF No. 8450 at 1.)

(iii) the census data upon which Milliman (and thus the Retiree Committee) relies is riddled with errors, including records for deceased beneficiaries; and (iv) the Retiree Committee applies a discount rate that significantly inflates pension liabilities.  As set forth below, the Court should accordingly disallow the overstated portion of the Retiree Committee Proof of Claim.

4. The Commonwealth's inflated pension liability amount hurts all parties in interest in these Title III proceedings by constraining the Commonwealth from being able to negotiate and effectuate its emergence from Title III.  And while all parties would benefit from an ***accurate*** assessment of the Commonwealth's single largest liability, since the start of the Title III proceedings the Government Parties have resisted production of the materials needed for creditors to verify the pension liability figure, opting instead for opposition and obfuscation at every turn.

5. Any assertion by the Government Parties that adjudication of the Retiree Committee Proof of Claim should be delayed should be rejected.  By this Objection, Ambac is not seeking to challenge the amount being proposed to be paid to pensioners under the plan of adjustment or pensioners' relative rights or priorities (although Ambac reserves all rights to do so at a later date).  Rather, Ambac seeks only to determine the overall amount of the Commonwealth's pension liability, the largest in these Title III proceedings.  A right-sizing of the pension liability is both a necessary and prudent step to facilitate a resolution of these Title III proceedings, as overstatement of the pension liability amount has a material impact on all fiscal plans, budgets, and other financial forecasts.  It is thus imperative for the Court to reach an informed and accurate view as to the size of the Retiree Committee Proof of Claim amount before any plan of adjustment can be confirmed.  The Court should resolve the Objection now.

**JURISDICTION**

6.     The Court has jurisdiction over this Objection pursuant to Section 306(a) of PROMESA.  Venue is proper in this district pursuant to Section 307(a) of PROMESA.

7.     As a significant long-term creditor of the Commonwealth and its instrumentalities, Ambac is a "party in interest" pursuant to Section 1109(b) of the Bankruptcy Code, as incorporated by Section 301(a) of PROMESA.  *See e.g.*, *In re Summit Corp.*, 891 F.2d 1, 5 (1st Cir. 1989) ("Courts have generally construed the term 'party in interest' as used in 11 U.S.C. § 1109(b) liberally.") (citation omitted); *see also In re Johns-Manville Corp.*, 36 B.R. 743, 747–48 (Bankr. S.D.N.Y. 1984) (finding that the term "party in interest" is to be construed broadly).

**BACKGROUND**

**I.     THE RETIREMENT SYSTEMS**

8.     Prior to August 2017, the Commonwealth operated three different systems for pension benefits:  the Employees' Retirement System ("ERS"), which  managed pensions for approximately 242,000 active members, retirees, and survivors of government employers, including the Commonwealth's public corporations and municipalities; the Teachers' Retirement System ("TRS"), which managed pensions for approximately 76,000 active members, retirees, and survivors of the Puerto Rico Department of Education; and the Judicial Retirement System ("JRS", and together with ERS and TRS, the "Systems"), which managed pensions for approximately 900 active members, retirees, and survivors of the Judiciary Branch of the Commonwealth.

9.     Each pension system maintained its own defined benefit plans (for which payments were primarily funded by the Commonwealth and other agencies and municipalities as employers) and hybrid plans (funded primarily by employer contributions).  Prior to 2017, funding for the Systems was driven by each System's statutory requirements, which consisted of a combination

of contributions from members and employers.  The contributions were made on behalf of each employee to attempt to match the growth in the value of the employee's benefit each year.  The contributions would theoretically grow with investment earnings during the employee's career, up to an amount sufficient to fund benefit payments due when the employee retired.

10.     On August 23, 2017, the Commonwealth enacted Act 106, which transformed the Systems into a single pay-as-you-go system (the "PayGo System").  *See* 2017 P.R. Laws 106.  Act 106 requires municipalities, public corporations, and other public employer entities to fund pension obligations for their own retired employees through monthly payments to the Commonwealth.  Contributions under the PayGo System are made only when they come due to retired employees.

11.     In accordance with Act 106, the Systems contribute to a segregated PayGo System account, which also contains proceeds from the liquidations of the Systems' assets.  2017 P.R. Laws 106 §§ 1.3, 1.6.  Per Section 2.1 of Act 106, this account is "segregated from the general assets and accounts of the Government," and  "devoted solely and exclusively to achieve the purposes set forth in [Act 106]."  *Id*. at §§ 2.1, 1.6.

## II.     THE COMMONWEALTH'S PENSION LIABILITY

### A.     Milliman Actuarial Valuations

12.     The Commonwealth's total pension liability is comprised of the amount of pension benefits or post-employment benefits payable to retired or former employees of the Commonwealth, any persons who are or were participants in a pension plan sponsored or administered by the Commonwealth, including the PayGo System, and any beneficiaries of the plan participants.

13.     The Commonwealth's estimate of its total pension liability historically has been calculated by Milliman, the Commonwealth's actuarial consultant.  Milliman conducts annual valuations of the Commonwealth's pension liabilities and publishes those results in the Milliman Reports.  Milliman issues a separate report for each System.

14.     The underlying assumptions and data that form the basis of Milliman's pension liability calculation come from a variety of sources.  The Systems provide Milliman with census data, participant information, and employer contribution information.  (*See* Ex. 2, ERS Actuarial Valuation Report as of June 30, 2017.)  The Milliman Reports expressly state that Milliman does not audit or verify the data provided by the Systems, and note that, to the extent any of the data is inaccurate or incomplete, the results of the valuation "may likewise be inaccurate or incomplete." (*See, e.g.*, *id.*)  In addition, Milliman itself develops actuarial assumptions concerning future estimates of plan experience, including mortality rates and expected retirement age, which can be used to identify emerging trends among plan participants.  (*Id.*)  Milliman also develops assumptions regarding discount rate and other investment return assumptions.  (*See id.* at 59.)

15.     The most recent Milliman Reports estimated a total pension liability of approximately $47.1 billion as of June 30, 2017, with (i) an estimated $30.1 billion attributable to ERS (*see* Ex. 2 at 1); (ii) an estimated $16.4 billion attributable to TRS (*see* Ex. 3, TRS Actuarial Valuation Report as of June 30, 2017 at 1); and (iii) an estimated  $615 million attributable to JRS (*see* Ex. 4, JRS Actuarial Valuation Report as of June 30, 2017 at 1.)  The Government Parties have represented, since at least October 1, 2020, that updated Milliman Reports estimating the Commonwealth's pension liabilities as of June 30, 2018 are forthcoming.  Conversations with Milliman in connection with Rule 2004 discovery have confirmed as much.  Eight months later, however, these updated Milliman Reports still have not been published or produced in discovery;

- 6 -

no explanation has been proffered for the delay, but Milliman has represented that the determination to hold back the Milliman Reports has been made by the Board.  There is no anticipated completion date for the 2019 or 2020 Milliman Reports.

### B.    PayGo Expenses

16.    Under PROMESA, which was signed into law on June 30, 2016, the Board is charged with approving and certifying the Commonwealth's fiscal plans and budgets.  PROMESA § 201.

17.    The current operative fiscal plan and budget reflect the Commonwealth's conversion to the PayGo System and thus describe annual pension expenses rather than total pension liabilities.  The Fiscal Year 2021 Certified Budget for the Commonwealth includes approximately $2.610 billion to cover the PayGo System expenses, of which $2.055 billion is paid out of the General Fund budget and $555 million is paid out of special revenue budgets funded by reimbursements from participating public corporations and municipal employers, pursuant to Act 106.  (*See Disclosure Statement for the Third Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (the "2021 Disclosure Statement"), ECF No. 16741 at 58.)  The Fiscal Plan, dated April 23, 2021, reflects annual costs of approximately $2.3 billion for payment of pension expenses in FY2022-FY2026.  (ECF No. 116741–7 at 303.)

18.    The Milliman Reports do not provide any information regarding how PayGo System expenses are determined in the fiscal plans or budgets.  (*See* Ex. 2 at 9 (noting the difficulty in operating the Systems on a PayGo basis, and flagging that "[a] major issue that needs to be addressed is determining what the process of budgeting for paygo funding will be").)

- 7 -

### C.     PROMESA Section 211

19.     Section 211 of PROMESA requires that if the Board determines that the Systems are materially underfunded, the Board "shall conduct an analysis prepared by an independent actuary of such pension system to assist the Board in evaluating the fiscal and economic impact of the pension cash flows."  PROMESA § 211(a).  In September 2019, the Board published a report based on a purported analysis conducted by Ernst & Young (the "EY Section 211 Report").  (ECF No. 16741-9.)  However, Ernst & Young's assessment of the Commonwealth's pension liabilities are taken directly from the Milliman Reports.  (*Id.* at iv.)

20.     The EY Section 211 Report provides that the "system actuary for ERS, TRS and JRS" (presumably, Milliman) "performs annual actuarial valuations which estimates the future benefit payments to participants based on their life expectancy and current demographic information." (*Id.* at 23.)  The EY Section 211 Report states that the Board's actuaries utilized the census data, plan provisions, and assumptions described in the Milliman Reports to reproduce Milliman's analysis.  (*Id.*)  In other words, Ernst & Young simply accepted Milliman's data and assumptions and just checked its math.

21.     The EY Section 211 Report includes a section on the projected future plan costs of the Systems, which it states are represented by the "year by year projected payments." (*Id.* at 23.) It provides a calculation of the present value of the projected future plan costs based on the present value of PayGo System costs from FY2020 – FY2058, using a discount rate of 3.5% based on the Bond Buyer 20-bond Municipal Bond Index as of June 30, 2019.  (*Id.* at 25–26.)

22.     The EY Section 211 Report also provides how the Board measured the fair market value of the projected PayGo System costs.  (*Id.* at 26.)  The EY Section 211 Report states that "[b]ased on the discounting assumption selected by the Board, the fair market value as of July 1,

2019 of the PayGo costs from FY 2020 to FY 2058 was calculated by discounting the PayGo costs projected for a given year with the monthly average spot rate of the [US Treasury Nominal-Coupon-Issue (TNC) Yield Curve].  The resulting fair market value of the plans after reflecting the projected freezes and cuts were $25.0B, $15.7B, and $0.6B for ERS, TRS, and JRS respectively." (*Id.*)  The report stated that "the weighted average discount rate for the aggregate fair market value of PayGo costs with freeze and cut was 2.41%." (*Id.*)

23.     The discount rate used to calculate the present value of the Commonwealth's pension liability should reflect the economic value of the promise to employees.  A lower discount rate reflects a lower risk premium and results in a larger pension liability amount and an increase to pension expenses, while a higher discount rate reflects a higher risk premium and results in a smaller pension liability amount and a decrease to pension expenses.[4]  The Board selected its low discount rate based on its position that notwithstanding the significant risks to the PayGo arrangement (as described in the EY Section 211 Report, *see id.* at 26), "promised pension payments represent an obligation that is relatively certain to be paid by the Commonwealth and that the risk premium should appropriately reflect that certainty." (*Id.* at 25-26.)

## III.     THE TITLE III PROCEEDINGS

### A.     The Retiree Committee Proof of Claim

24.     On May 3, 2017, the Board filed a petition for relief under Title III of PROMESA in the United States District Court for the District of Puerto Rico on behalf of the Commonwealth.

25.     On June 15, 2017, the Retiree Committee was appointed by the United States Trustee pursuant to Section 1102(a)(1) of the Bankruptcy Code, made applicable in the Title III

---

[4] The Milliman Reports each show that a 1% increase in the discount rate would result in an 11.55% to an 11.74% reduction in reported liabilities.  (*See* Ex. 2 at 21; Ex. 3 at 15; Ex. 4 at 15.)

proceedings by Section 301(a) of PROMESA.  The constituency of the Retiree Committee is approximately 167,000 retired employees of the Commonwealth and various governmental bodies and their surviving beneficiaries.  (*See* Ex. 2 at 9.)

26.      On May 29, 2018, the Retiree Committee, on behalf of the retired employees of the Commonwealth, filed three identical proofs of claim in the Title III cases of the Commonwealth, ERS, and HTA.  (*See* Ex. 1.)

27.      In its proof of claim against the Commonwealth as the primary obligor, the Retiree Committee asserted a claim for at least $58,502,526,000, "the value of the Pension Claims owed to the Beneficiaries[5] as of May 3, 2017, the date the Commonwealth filed its Title III petition." (*Id*. at 3, 5.)   The Retiree Committee indicated that this figure was based on: "census data, assumptions, methods, and plan provisions used in the June 30, 2016 actuarial valuation reports prepared by Milliman, Inc., except that a 3.82% discount rate was used.  The 3.82% discount rate is the Bond Buyer's 20-Bond GO Index as of April 27, 2017, the most recent rate released prior to the petition date."  (*Id.* at 5–6.)  The census data in the June 30, 2016 actuarial valuation was as of June 30, 2015, and "liabilities were rolled forward from the census date . . . to the petition date . . . using a standard roll-forward method."  (*Id.* at 6.)  The aggregate amount asserted in the Retiree Committee Proof of Claim is not allocated among the different Systems or among the various categories of beneficiaries.

---

[5] The Retiree Committee Proof of Claim defines "Beneficiaries" as "any retiree or former employee of a Debtor, or any person who is or was a participant in a pension plan sponsored or administered by a Debtor, including the Pay-Go system established under Act 106 of 2017, and any beneficiary of any of the foregoing persons."  (*See* Ex. 1 at 5.)

28.     The Retiree Committee Proof of Claim also named ERS as the secondary obligor "for at least $390,480,000, the approximate amount of funds ERS held in trust for the Beneficiaries as of May 21, 2017, the date ERS filed its Title III petition." (*Id.*)

29.     Finally, the Retiree Committee Proof of Claim also asserted an unliquidated claim against HTA as the secondary obligor for any amounts owed to beneficiaries on account of work actually performed on behalf of HTA.[6] (*Id*.)

### B.     Treatment of Pensions Under the Proposed Plan of Adjustment

30.     On May 11, 2021, the Board proposed the Third Amended Title III Joint Plan of Adjustment (the "POA") (ECF No. 16740), which incorporates the terms of the Plan Support Agreement between the Retiree Committee and the Board (the "Retiree Committee PSA").  The proposed POA designates five separate classes of pension claims.  (POA, ECF No. 16740 at 83–85.)  Class 48A is comprised of retiree claims against ERS, TRS, or JRS on account of being or having been a participant in ERS, TRS, or JRS.  (*Id*. at 83.)  Classes 48B, 48C, and 48D are comprised of active ERS, JRS, and TRS participants, respectively.  (*Id*. at 83–85.)  Finally, Class 48E is comprised of claims by holders of accrued benefits under System 2000.[7]  (*Id*. at 85–86.)

31.     Pursuant to the terms of the Retiree Committee PSA, the Board and the Retiree Committee agreed that, under the POA, the Total Monthly Retirement Benefit (as defined therein) will not be reduced by more than 8.5%, provided that the Total Monthly Retirement Benefit cannot fall below $1,500 per month (*see* 2021 Disclosure Statement, ECF No. 16741 at 37), which means

---

[6] The Retiree Committee also filed a proof of claim in July 2018 for $58.5 million (Claim No. 73241), which was disallowed for its failure to provide any basis or supporting documentation for asserting its claim. (*See One Hundred and Twenty-Third Omnibus Objection Exhibit C – Schedule of Deficient Claims to be Disallowed via Notice of Presentment*, ECF No. 15612–2 at 71.)

[7] The proposed POA defines "System 2000" as "the pension contribution system implemented in accordance with act No. 205-1999, codified at 3 L.P.R.A. §§ 786-1, et seq, or Act 3-2013."  (POA, ECF No. 16740 at 51.)

that pensioners are to recover no less than, and in many cases more than, 91.5 cents on the dollar. Of course, "the dollar" represents the total pension claim amount, underscoring the multi-billion-dollar ramifications of correctly calculating the total liability amount and the total number of pensioners represented by that amount.

32.     The Retiree Committee PSA also "establish[es] a pension reserve trust . . . for the sole benefit of the Retirees . . . . to help ensure availability of funds to pay pensions in years in which the Commonwealth experiences fiscal deficits.  (*Id.* at 38.)  The recovery of other unsecured creditors is significantly lower than that of the pension claimants.  (*Id.* at 358–419.)

## RELIEF REQUESTED

33.     Ambac seeks entry of an order disallowing the Retiree Committee Proof of Claim (Claim No. 21533) to the extent of its overstatement.

## OBJECTION

34.     Section 502(b) of the Bankruptcy Code provides that the Court may disallow a claim to the extent that "such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured."  11 U.S.C. § 502(b)(1).  Failure to properly document a claim is an appropriate basis for objection and disallowance of a claim under section 502(b).  *Hann v. Educ. Credit Mgmt. Corp. (In re Hann)*, 476 B.R. 344, 347 (B.A.P. 1st Cir. 2012), *aff'd*, 711 F.3d 235 (1st Cir. 2013) (disallowing a claim where debtor objected on the basis that the numbers it used to calculate its claim were wrong).

35.     Courts in the First Circuit have adopted a burden-shifting process for adjudicating objections to a proof of claim.  First, "to be legally sufficient and, therefore, to be prima facie valid under the Bankruptcy Rules," a proof of claim must "be based upon facts which would allow, as a

matter of equity, the document to be accepted as a proof of claim." *United States v. Braunstein (In re Pan)*, 209 B.R. 152, 155 (D. Mass. 1997) (citing *First Nat'l Bank of Fayetteville, Arkansas v. Circle J Dairy (In re Circle J Dairy)*, 112 B.R. 297, 299–300 (W.D. Ark. 1989)). "If the objecting party rebuts the prima facie validity of the proof of claim, the claimant bears the burden of persuasion to prove the validity of the claim by a preponderance of the evidence." *In re Colonial Bakery, Inc.*, 108 B.R. 13, 15 (Bankr. D.R.I. 1989) (citing *Twinton Prop. Partnership v. Nidiffer (In re Twinton Prop. Partnership)*, 44 B.R. 426, 429 (Bankr. M.D. Tenn. 1984)). The ultimate burden of persuasion always is vested in the claimant.

36. For the reasons set forth below, the Retiree Committee Proof of Claim should be disallowed to the extent the amount asserted therein is overstated.

## I. THE RETIREE COMMITTEE PROOF OF CLAIM SHOULD BE DISALLOWED TO THE EXTENT OF ITS OVERSTATEMENT.

### A. The Asserted Amount Is Based on Stale Data and Assumptions.

37. The Retiree Committee Proof of Claim is grounded in stale data and assumptions— data that were superseded only a year later by an analysis showing a more than $8 billion reduction in the Commonwealth's liabilities.

38. The amount asserted in the Retiree Committee Proof of Claim is based entirely on the estimated total pension liabilities calculated by Milliman as of June 30, 2016 (the "2016 Milliman Reports"). The 2016 Milliman Reports estimated the Commonwealth's total pension liabilities at approximately $55.3 billion, with (i) an estimated $36.4 billion attributable to ERS (*see* Ex. 5, ERS Actuarial Valuation Report as of June 30, 2016 at 1); (ii) an estimated $18.2 billion attributable to TRS (*see* Ex. 6, TRS Actuarial Valuation Report as of June 30, 2016 at 1); and (iii) an estimated $652 million attributable to JRS (*see* Ex. 7, JRS Actuarial Valuation Report as of June 30, 2016 at 1.) The Retiree Committee's only modification to Milliman's calculation was to

the discount rate, which it changed to reflect the most recent Bond Buyer's 20-Bond GO Index rate released prior to the petition date. (Ex. 1 at 5–6.)

39.     These estimates provided, at best, a stale foundation on which to base a claim or estimate future pension costs. Not only were the 2016 Milliman Reports nearly a year old as of the petition date, but the reports themselves relied on 2015 data and evaluated 2015 liabilities. (*See, e.g.* Ex. 5 at 2 (analyzing census data as of July 1, 2015).)

40.     The Retiree Committee attempts to address the staleness issue by rolling forward the pension liabilities derived from the 2015 census date to the petition date, using what the Retiree Committee describes as "a standard roll-forward method." (Ex. 1 at 6.) The Retiree Committee provides no additional information regarding the "standard roll-forward method' used. However, the Retiree Committee's statement suggests that it assumed no liability gains or losses from 2015 to 2016. This is flatly inconsistent with the actual experience of the Systems and results in a significant overstatement of the claim amount.

41.     The most recent Milliman Reports, dated June 30, 2017 (the "2017 Milliman Reports"), which rely on census data as of July 1, 2016, showed total pension liabilities of $47.1 billion—a decrease of $8.2 billion from the previous year. (*See* Ex. 2 at 19; Ex. 3 at 13; Ex. 4 at 13.) ERS' total pension liability alone decreased by approximately $6 billion. (*See* Ex. 2 at 19.)

42.     Milliman reported a change in total pension liability resulting from pension plan changes, the effect of economic/demographic gains, and a decrease in benefit payments. (*See id*. at 21.) For example, the Commonwealth's conversion to the PayGo System resulted in a $2 billion reduction in the total amount of liability, largely due to the fact that the Systems were no longer prefunding future pay benefits. (*See id*. (listing a $2,108,880,000 decrease in Plan Fiduciary Net Position from 2016 to 2017).) The 2016 Milliman Report for ERS (upon which the Retiree

Committee relies) determined actuarial costs based on the Systems' accrued liability, which no longer exist after the conversion to PayGo. As explained in the 2017 Milliman Report, "[b]ecause of Act 106-2017, no future benefits (except for the additional benefits due to death or disability for reasons specified in Act 127-1958) will be earned by PRGERS members. As a result, the GASB 67 Total Pension Liability equals the present value of all non-Act 127-1958 projected benefits." (*See id.* at 61.)

43.     Changes caused by the transition to the PayGo System are only part of the equation. The 2017 Milliman Reports also reflect assumption changes from the previous year. For example, the 2017 Milliman Report for ERS describes a $20 million loss from the previous year's valuation on account of roughly 120 "pop-up" retirees (described as retirees who were not in the prior year census data). (*See* Ex. 5 at 7.) Milliman could not determine what portion of the 120 retirees emerged from deferred vested status because the deferred census data was incomplete. Therefore, Milliman developed an assumption regarding deferred vesting liability by placing a loading assumption on certain liabilities to account for deferred vested members. (*Id.*) In 2016, Milliman increased the actuarial accrued liabilities for certain members by 5% in order to approximate the value of the liability on behalf of deferred vested participants. (*Id.* at 62.) In the 2017 Milliman Report for ERS, however, Milliman cut its estimate to 2.5% based on a review of actual plan experience. (*See, e.g.,* Ex. 2 at 58.) This updated figure, which is not considered in the Retiree Committee Proof of Claim, reduced ERS' total pension liability by approximately $750 million.

44.     To ignore these changes in the foundational support for the Retiree Committee Proof of Claim is nonsensical. The Milliman analysis is the sole basis for the Retiree Committee's stated claim amount; therefore, to remain even aspirationally accurate, it must necessarily be

adjusted as the Milliman analysis itself is updated.[8]  At a minimum, the claim amount should be reduced by $8.2 billion to reflect the decrease in total pension liability identified by Milliman in its June 30, 2016 and June 30, 2017 valuations.

> **B.    The Mortality Assumptions in the Milliman Reports Are Outdated and Fail to Reflect Current Expectations.**

45.    While there has been a historical trend of improvements in mortality rates, over the past several years such improvements have fallen short of expectations, resulting in a decrease in mortality improvement rates.  (*See* Society of Actuaries Mortality Improvement Scale MP-2016, MP-2017,    MP-2018,    MP-2019,    and    MP-2020,    *available    at*    https://www.soa.org/ resources/experience-studies/2020/mortality-improvement-scale-mp-2020/.)  The 2016 Milliman Reports, on which the Retiree Committee Proof of Claim relies, use mortality improvement projections from 2016 that do not reflect this downward trend.  (*See, e.g.*, Ex. 5 at 8.)

46.    The Retiree Committee's failure to take into account the recent U.S. population mortality experience results in a further overstatement of the claim amount:  applying the mortality improvement projection factors created by the Society of Actuaries from 2020 to the data relied on in the 2016 Milliman Reports would reduce the pension liability by approximately $1.4 billion.

47.    The 2017 Milliman Reports, which rely on mortality improvement projection factors from 2017, similarly do not reflect the recent mortality experience of the U.S. population. Applying the Society of Actuaries' 2020 mortality improvement projection factors to the data relied on in the 2017 Milliman Reports would reduce the reported pension liability by

---

[8] The 2017 Milliman Reports likewise do not provide a complete picture of the Commonwealth's total pension liability as of the petition date of May 3, 2017.  However, at a minimum, the 2017 Milliman Reports illustrate downward demographic trends and changes to retirement plans that the Board has asserted are likely to carry over in future years.  Ambac has requested production of any forthcoming Milliman Reports as of 2018, which have not yet been publicly released.  Ambac was informed by Milliman's counsel that the report has been completed by Milliman and is awaiting AAFAF's sign-off, a representation that AAFAF has denied.  In any event, no explanation has been proffered for the delay.

approximately $750 million.  Thus, even if the Court were to rely on the pension liability figure

presented in the 2017 Milliman Reports to reduce the pension claim amount by $8.2 billion, the

claim amount should be reduced by an additional $750 million to accurately reflect the decrease

in total pension liability based on the recent mortality experience and updated projections of future

mortality experience of the U.S. population.

> **C.    The Claim Amount Is Overstated Because It Improperly Includes Payments Due to Deceased Beneficiaries.**

48.    There is no evidence that the Commonwealth, the Systems, Milliman, or Ernst &

Young have ever systematically audited (or even sample-tested) the census data, asset information,

or employer information relied on in the Milliman Reports.  Milliman explicitly states that it does

not verify the data relied upon in its reports, and that to the extent that any of the information is

inaccurate or incomplete, "the results of [the] valuation may likewise be inaccurate or incomplete."

(Ex. 2 at Letter from Glenn Bowen to Luis M. Collazo Rodriguez; *see also id.* (Milliman "did not

audit the data used in [its] analysis" and it was possible that "material defects" could be discovered

in the data if a detailed review of the data were undertaken); EY Section 211 Report, ECF No.

16741-9 at i ("EY has not conducted an independent assessment or verification of the

completeness, accuracy or validity of the information obtained" and thus "provides no assurance

of any kind with respect to, or on, the information presented.")) So, while the Board neglected its

common-sense and statutory duty to accurately assess the scope of the Commonwealth's pension

liabilities, Ambac was forced to verify and audit the data itself, at its own expense.[9]

49.    The importance of such audits cannot be overstated.  Milliman itself has represented

in marketing publications that death audits (like the one commissioned by Ambac and described

---

[9] Ambac's audit of the data was necessarily limited as the Government Parties did not produce in discovery the information necessary to conduct a full audit.

herein) are a standard and common tool used to detect fraud, overpayment, and compliance risks within the pension system.  (*See* Ex. 8, Milliman, DB Digest:  Best Practices for Pension Administration, *Fiduciary responsibilities: Wanted dead or alive* (2017) ("[C]areful tracking of the life status of retirees through a continuous death audit is recommended.").)  Yet there is no evidence that any such audit was ever conducted on the Commonwealth's data.

50.     Accordingly, Ambac commissioned an audit itself, which showed that benefits have been and continue to be paid to deceased beneficiaries of the Systems.  Ambac's audit was limited to the census data relied on in the Milliman Reports – the records of approximately 167,000 retired beneficiaries and 152,000 active pension participants as of July 1, 2016.  The audit yielded significant results that indicate the potential of widespread fraud or errors in the data: it identified death records for 674 retired beneficiaries and 137 active pension participants as of July 1, 2016.  Ambac has conservatively estimated that the present value of future benefit payments to deceased retired beneficiaries is approximately $56.5 million.[10]

**D.     The Discount Rates Used by Milliman and the Retiree Committee Fail to Reflect the Value of the Commonwealth's Pension Liabilities.**

51.     In the 2016 and 2017 Milliman Reports, Milliman determined the total pension liability by applying the discount rate based on a tax-free municipal bond index.  The 2016 Milliman Reports applied a 2.85% discount rate; the 2017 Milliman Reports applied a 3.58% discount rate.  (*See, e.g.,* Ex. 5 at 22; Ex. 2 at 18.)  The Retiree Committee Proof of Claim applied a discount rate based on the Bond Buyer's 20-Bond GO Index, the most recent rate released prior to the petition date (3.82%).  (Ex. 1 at 5–6.)

---

[10] While it is difficult to estimate the present value of benefits paid to active pension participants who are deceased, the results indicate the potential of widespread fraud or errors in the data.

52.    Milliman's selection of its discount rate (and the Retiree Committee's update thereto) was based on guidance from the Government Accounting Standards Board ("GASB"). GASB Statement No. 68 provides that the discount rate to be used in accounting and financial reporting should be "a yield or index rate for 20-year tax exempt general obligation municipal bonds with an average rating of AA/Aa or higher (or equivalent quality on another rating scale)." (Governmental Accounting Standards Bd., Statement No. 68: Accounting and Financial Reporting for Pensions (2012) at 29, *available at* https://www.gasb.org/cs/ContentServer?c=Document_C&cid=1176160220621&d=&pagename=GASB%2FDocument_C%2FDocumentPage.)

53.    The same rate is used for all unfunded obligations of entities subject to GASB accounting standards for purposes of their financial reporting, independent of the economic value of the promise.  In other words, the same discount rate is used for an unsecured promise made by a AAA-rated entity as would be used by a C-rated entity on the verge of bankruptcy with little likelihood of the promise ever being paid.  Bonds issued by two such entities would have extremely different yields to maturity, with the AAA-rated promise having a much lower yield to maturity than the C-rated promise.  Nevertheless, the GASB accounting standard requires the use of a rate for AA/Aa bonds for purposes of financial reporting.  This is partially driven by a desire for comparability of obligations between different public entities, as well as a desire to avoid the anomalous result of an entity's reported liabilities decreasing as its credit rating decreases, with the resulting reporting of "phantom income."

54.    Although GASB's rationale for the use of a rate for AA/Aa bonds may be appropriate for purposes of financial accounting, such rate does not reflect true economic value for purposes of valuation in restructuring proceedings, where the claim amount is crucial to the determination of the feasibility of the Commonwealth's proposed POA. *See In re Cty. of Orange*,

31 F. Supp. 2d 768, 780–81 (C.D. Cal. 1998) (holding that GASB provides "financial reporting guidance" and does not create legal rights and obligations unrelated to financial disclosures). Economic reality is not driven by accounting standards established for financial reporting. It is driven by market valuations.

55.     Accordingly, the discount rate should reflect the Commonwealth's actual creditworthiness and factor in the risks relating to the current System, many of which Ernst & Young noted in the EY Section 211 Report, including, *inter alia*,

- Significant deviations in cost are potentially unpredictable and calculating the impact of [future] events may not be feasible.
- Entities may dissolve or become insolvent prior to their ability to pay their obligation and those payments become the general responsibility of the Treasury.
- The term of the pension is longer in duration than the typical budgeting processes.

(*See* EY Section 211 Report, ECF No. 16741-9 at 26.)  Put another way, the discount rate should reflect the true market value of the Commonwealth's unfunded promise to pay.

56.     Thus, Ambac respectfully suggests that a discount rate based on the Puerto Rico General Obligation Bonds ("GO Bonds") is appropriate under the circumstances present here.  The Commonwealth's pensions are similar to the GO Bonds:  the GO Bonds, like pension claims, are not secured by any collateral, nor do they carry any priority over other unsecured claims.  The GO Bonds' discount rate is therefore a reasonable rate to apply to similarly-situated pension claims— and the Board, as the proponent of the POA and the party that must demonstrate its confirmability, has the burden of proving otherwise.

57.     As of May 3, 2017, Puerto Rico GO Bonds had yields to maturity ranging from at least 9.575% (for the 5% 2041 GO Bonds) to 12.86% (for the 8% 2035 GO Bonds).  Restating the above-cited 3.58% discount rate to the lower of the two yields to maturity just cited (9.575%)

would lower the reported present values of accrued liabilities by about 50%, from a total claim of $47.1 billion to about $23.5 billion.[11]

## II.   THE COURT SHOULD HEAR AND DECIDE THE OBJECTION NOW.

58.     Any assertion by the Government Parties that adjudication of the Retiree Committee Proof of Claim should be stayed or otherwise delayed should be rejected.  By this Objection, Ambac seeks only to ensure that the Commonwealth's estimated pension liability is accurately represented in these Title III proceedings.  The Objection does not challenge the proposed payments to pensioners or their treatment under the proposed POA – in fact, it does not concern the terms of the Retiree Committee PSA at all.[12]

59.     Thus, ensuring that the pension claim amount is correct is crucial to the confirmability of the Commonwealth's proposed POA.  Indeed, the pension claims against the Commonwealth constitute the largest remaining creditor group in these Title III cases.  And with the conversion to the PayGo System, pension payments are now the single largest annual expense in the Commonwealth's fiscal plans.  Overstatement of the pension amounts results in overstatement of the PayGo amounts, which has the result of increasing the Commonwealth's annual expenses and reducing the amount available for all other expenses, including debt service. Even a minor correction in the liability amount has a material impact on the Commonwealth's bottom line and ability to service other obligations.  Accordingly, the Court should decide the Objection now.

---

[11] Extrapolating from Milliman's conclusion that a 1% increase in the discount rate would result in an 11.55% to an 11.74% reduction in reported liabilities, (see Ex. 2 at 21; Ex. 3 at 15; Ex. 4 at 15), a 6% increase in the discount rate would compound to an approximate 53% decrease in reported liabilities.  The exact amount can be determined by the Systems' actuary.

[12] Ambac reserves all rights to object to treatment and classification of pensions in separate filings at the appropriate time.

## CONCLUSION

60.     WHEREFORE, Ambac respectfully requests that the Court disallow the Retiree Committee Proof of Claim (Claim No. 21533) to the extent it is overstated, and grant it such other and further relief as is just and proper.

## RESERVATION OF RIGHTS

61.     Nothing contained in this Objection or any action taken by Ambac is intended or should be construed as: (a) an admission as to the validity of any proof of claim filed against the Debtor, in whole or in part; (b) a waiver of Ambac's right to dispute any proof of claim filed against the Debtor on any grounds, in whole or in part; (c) a promise or requirement to pay any proof of claim filed against the Debtor; or (d) a waiver or limitation of Ambac's rights, claims or defenses, whether under the Bankruptcy Code or otherwise.

## NOTICE

62.     Notice of this Objection has been provided to the following entities, or their counsel, if known: (i) the U.S. Trustee; (ii) the Office of the United States Attorney for the District of Puerto Rico; (iii) the Board; (iv) the Puerto Rico Fiscal Agency and Financial Advisory Authority; (v) counsel identified in the Retiree Committee Proof of Claim; and (vi) all parties that have filed a notice of appearance in the Title III cases.

## NO PRIOR REQUEST

63.     No prior request for the precise relief sought in this Objection has been made to this Court or any other court.

Dated: June 3, 2021
San Juan, Puerto Rico

**FERRAIUOLI LLC**

By: /s/ *Roberto Cámara-Fuertes*
    Roberto Cámara-Fuertes (USDC-PR No.
    219002)
    Sonia Colón (USDC-PR No. 213809)
    221 Ponce de León Avenue, 5th Floor
    San Juan, PR 00917
    Telephone: (787) 766-7000
    Facsimile:  (787) 766-7001
    Email:  rcamara@ferraiuoli.com
        scolon@ferraiuoli.com

**MILBANK LLP**

By: /s/ *Atara Miller*
    Dennis F. Dunne (admitted *pro hac vice*)
    Atara Miller (admitted *pro hac vice*)
    Grant R. Mainland (admitted *pro hac vice*)
    John J. Hughes, III (admitted *pro hac vice*)
    Jonathan Ohring (admitted *pro hac vice*)
    55 Hudson Yards
    New York, NY 10001
    Telephone: (212) 530-5000
    Facsimile: (212) 530-5219
    Email: ddunne@milbank.com
        amiller@milbank.com
        gmainland@milbank.com
        jhughes2@milbank.com
        johring@milbank.com

*Attorneys for Ambac Assurance Corporation*